The Parties agree that on or as soon as reasonably practical after the IT Payment Date they shall take all necessary steps to direct the release of funds from the Distribution Escrow Account to pay an amount equal to the Canadian IT Amount to NNL (on behalf of the Canadian Main Sellers) and an amount equal to the NNI IT Amount to NNI (on behalf of the U.S. Debtors).

(b)    The Parties further agree that prior to the later of (i) the TSA Termination Date at which time no amounts are due to NNL and NNI in respect of the Canadian IT Amount and the NNI IT Amount and (ii) the date following the IT Payment Trigger Date that amounts owing to NNL and NNI in respect of the Canadian IT Amount and the NNI IT Amount are due, the Parties shall not take any action to cause the Distribution Escrow Account to fall below $12,000,000 or such other lesser amount that may be contained in the Distribution Escrow Account at such time.

(c)    If the Total Proceeds available on the IT Payment Date are less than the IT Total Payment Amount, the available funds shall be distributed from the Distribution Escrow Account between NNL (on behalf of the Canadian Main Sellers) and NNI (on behalf of the U.S. Debtors) *pro rata* to their respective entitlements to the aggregate Canadian IT Amount and NNI IT Amount ; <u>provided</u> that should any portion of the Total Proceeds become available after the IT Payment Date, the available funds shall be distributed from the Distribution Escrow Account between NNL (on behalf of the Canadian Main Sellers) and NNI (on behalf of the U.S. Debtors) *pro rata* to the extent amounts remain owing for the Canadian IT Amount or the NNI IT Amount.

(d)    The parties hereto agree that payments pursuant to this clause 2.2 are the only payments from the Distribution Escrow Account that shall be made in respect of under-recoveries for the Under-Recovery Period in relation to the TSA, and that no Party shall have any liability in respect of such under-recoveries save as set out in this Agreement.

SECTION 2.3. ███████████████████████

(a)



(b)

ARTICLE III

MISCELLANEOUS

SECTION 3.1.  Exclusion of Liability and Acknowledgments re Joint Administrators, NNSA Office Holders and the Joint Israeli Administrators and Directors of EMEA Non-Debtor Sellers.

(a)     The Parties agree that (i) the Joint Administrators and the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators and the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and (ii) the directors of the EMEA Non-Debtor Sellers (as defined in the EMEA Agreement) shall not incur any personal liability whatsoever, in their capacity as such directors, in respect of the authorization, execution, delivery or performance of this Agreement, howsoever arising other than in respect of fraud by any such director.

(b)     The Joint Administrators and the Joint Israeli Administrators are parties to this Agreement: (i) as agents of each of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, or otherwise, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Sections 3.1, 3.6, 3.7, 3.10 and 3.14.

(c)     Notwithstanding anything in Section 3.6, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Debtors and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

(d)     The Parties agree that any breach of this Agreement by the Joint Administrators or the Joint Israeli Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Debtors, and, in such a case, each Party hereto shall have the right to make claims and assert its rights hereunder, against the relevant EMEA Debtors and their respective successors and assigns.

(e)     The Parties agree that the French Liquidator is entering into this Agreement as agent for NNSA to which he is appointed and that none of the NNSA Office Holders, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

8

(f)     Notwithstanding anything in Section 3.6, any claim, action or proceeding against the NNSA Office Holders arising from or related to (i) the personal liability of the NNSA Office Holders, their firms, partners, employees, advisers, representatives or agents or (ii) their appointment as Liquidateur Judiciaire and Mandataire ad'hoc of NNSA shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Courts.

SECTION 3.2.  Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 3.3.  No Third Party Beneficiaries.  Except as provided in Section 3.4, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement; provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors party hereto only, to the fullest extent as if it were a signatory hereto and the directors of the EMEA Non Debtor Sellers shall be deemed third party beneficiaries of Section 3.1(a) hereof and shall be entitled to enforce and take advantage of the benefit thereof to its fullest extent as of a signatory hereto.

SECTION 3.4.  Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Committee, the Bondholder Group (as defined in the U.S. Bidding Procedures Order) and the Monitor, which amendments, if material in the judgment of the Parties, must be approved by the Canadian Court and the U.S. Bankruptcy Court.

SECTION 3.5.  Successors.  Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the parties hereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 3.6.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 3.1 shall be governed exclusively by English law.

(b)     To the fullest extent permitted by applicable Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be brought in the U.S. Bankruptcy Court if such claim, action, or proceeding would solely affect NNI,  the

9

Canadian Court if such claim, action, or proceeding would solely affect the Canadian Main Sellers or Nortel Networks Technology Corporation, or the English Court if such claim, action or proceeding would solely affect the EMEA Sellers or EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that any claim, action or proceeding set forth in Section 3.1 (except Section 3.1(f)) shall be brought exclusively in the English Courts.

      (c)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.6.

      SECTION 3.7.  Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.7.

| **If to NNI and its Respective Affiliates:** | **With a copy to:** |
|---|---|
| c/o Nortel Networks Inc. | Cleary Gottlieb Steen & Hamilton LLP |
| Attention: Lynn Egan | Attention: James L. Bromley and |
| Address: 220 Athens Way, Suite 300 | Lisa M. Schweitzer |
| Nashville, Tennessee 37228 | Address: One Liberty Plaza |
| U.S.A. | New York, New York 10006 |
| Facsimile No.: +1 615 432 4067 | U.S.A. |
| | Facsimile No.: +1 212 225 3999 |

| **If to the Canadian Main Sellers and their Respective Affiliates:** | **With a copy to:** |
|---|---|
| c/o Nortel Networks Limited | Ogilvy Renault LLP |
| Attention: Anna Ventresca | Attention: Michael Lang |
| Address: 195 The West Mall Mailstop: | Address: Suite 3800 |
| T0503006 | Royal Bank Plaza, South Tower |
| Toronto, Ontario M9C 5K1 | 200 Bay Street, P.O. Box 84 |
| Canada | Toronto, Ontario M5J 2Z4 |
| | Canada |

Facsimile No.: +1 905 863 7386

**If to the EMEA Debtors and their
Respective Affiliates:**
c/o Ernst & Young LLP
Attention: Alan Bloom, Christopher Hill,
Stephen Harris
Address: One More London Place
      London SE1 2AF
      United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**If to the EMEA Non-Debtor Sellers:**

Sharon Rolston / Simon Freemantle
Maidenhead Office Park
Westacott Way
Maidenhead
Berkshire SL6 3QH
United Kingdom

Facsimile:    +44(0) 1628 432416

**If to the Joint Administrators:**
c/o Ernst & Young LLP
Attention: Alan Bloom, Christopher Hill,
Stephen Harris
Address: One More London Place
      London SE1 2AF
      United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**If to the Joint Israeli Administrators:**
Avi D. Pelossof
Zellermayer, Pelossof & Co,
The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile:    +972 3 6255500

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy

Facsimile No.: +1 416 216 3930

**With a copy to:**
Herbert Smith LLP
Attention: Alex Kay
Address: Exchange House
      Primrose Street
      London EC2A 2HS
      United Kingdom
Facsimile No.: +44 (0) 20 7098 4447
Telephone No.: +44 (0) 20 7466 2447

**With a copy to:**

Sandy Shandro
3-4 South Square
Gray's Inn
London
WC1R 5HP

Facsimile:    +44 (0)20 7696 9911

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention:  Fred S. Hodara and Stephen B. Kuhn.
One Bryant Park
New York, New York 10036, U.S.A.
Facsimile No.:  +1 212 872-1002

**If to the Monitor:**
Murray A. McDonald

11

Attention:  Roland Hlawaty
One Chase Manhattan Plaza
New York, New York, 10006, U.S.A.
Facsimile No.:  +1 212 822-5170

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, ON M5K 1J7
Canada
Facsimile No.:  +1416 943-3300

**If to NNSA:**
c/o AJ Associés
Attention: Franck Michel
Address: 10, allée Pierre de Coubertin, 78000
Versailles, France
Facsimile No.: + 33 1 39 50 87 52

**With a copy to:**
Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard Fabre
Address: 1bis, avenue Foch, 75116 Paris, France
Facsimile No.: + 33 1 45 00 08 19

**If to the *Mandataire ad hoc*:**
c/o AJ Associés
Attention: Franck Michel
Address: 10, allée Pierre de Coubertin, 78000
Versailles, France
Facsimile No.: + 33 1 39 50 87 52

**With a copy to:**
Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard Fabre
Address: 1bis, avenue Foch, 75116 Paris, France
Facsimile No.: + 33 1 45 00 08 19

**If to the French Liquidator:**
Attention: Cosme Rogeau
Address: 26 avenue Hoche, 78000 Versailles,
France
Facsimile No.: + 33 1 39 49 44 63

**With a copy to:**
Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard Fabre
Address: 1bis, avenue Foch, 75116 Paris, France
Facsimile No.: + 33 1 45 00 08 19

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 3.8.  <u>Counterparts</u>.  The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 3.9.  <u>Severability</u>.  If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as

originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 3.10.  Termination.  This Agreement will automatically terminate upon the final distribution of all remaining Total Proceeds by the Distribution Agent.  Upon termination, the Parties' rights and obligations under this Agreement shall cease immediately but without prejudice to the rights and obligations of the Parties existing prior to the termination of the Agreement.

SECTION 3.11.  Obligations of the Parties.

(a)     The obligations of the Canadian Main Sellers and the other Canadian Debtors under this Agreement shall be joint and several.

(b)     The obligations of NNI and the other U.S. Debtors under this Agreement shall be joint and several.

(c)     The obligations of the EMEA Debtors under this Agreement shall be joint and several.

SECTION 3.12.  Effectiveness.

(a)     No provision of this Agreement (other than as set forth in Section 3.12(d)) shall be effective until each of the U.S. Bankruptcy Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "**Court Approval Condition**").

(b)     All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)     Each Party hereto shall:

(i)     use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)    keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Court Approval Condition as reasonably requested by other Parties; and

(iii)   use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)     Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.1 through 3.12 and Section 3.12(b), (c) and (d).

SECTION 3.13.     Execution by certain Selling Parties.  The Parties hereby acknowledge that certain Selling Parties are not executing this Agreement as of the date hereof.

13

Subject to Section 3.12, this Agreement shall be binding on all Parties that have executed this Agreement from the time of such execution, regardless of whether all Selling Parties have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall use their reasonable best efforts to cause each Other Seller that is not a signatory to this Agreement as of the date hereof to execute a counterpart to this Agreement as soon as practicable, agreeing to be bound as a Party under this Agreement.

     SECTION 3.14.  <u>Reservation of Rights</u>.  The Parties hereby agree that, except as specifically set forth in Article II hereof, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of proceeds from the sale of the Business among the Selling Parties.

   **[Remainder of this page intentionally left blank.  Signature pages follow.]**

14

IN WITNESS WHEREOF, the Parties have duly executed this Passport Side Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By:_____
    Name:
    Title:

_____
    Name:
    Title:

NORTEL NETWORKS INC.

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Parties have duly executed this Passport Side Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**NORTEL NETWORKS LIMITED**

By:_____
    Name:
    Title:

_____
    Name:
    Title:

**NORTEL NETWORKS INC.**

By:_____
    Name:
    Title:

NORTEL NETWORKS
TECHNOLOGY CORPORATION

By:_____
    Name:
    Title:

NORTEL NETWORKS
INTERNATIONAL CORPORATION

By:_____
    Name:
    Title:

NORTEL NETWORKS GLOBAL
CORPORATION

By:_____
    Name:
    Title:

NORTEL NETWORKS (CALA) INC.

By:_____
    Name:
    Title:

Passport Side Agreement Signature Page

**NORTEL NETWORKS
TECHNOLOGY CORPORATION**


By:_____
    Name:
    Title:


**NORTEL NETWORKS
INTERNATIONAL CORPORATION**


By:_____
    Name:
    Title:


**NORTEL NETWORKS GLOBAL
CORPORATION**


By:_____
    Name:
    Title:


**NORTEL NETWORKS (CALA) INC.**


By:_____
    Name:
    Title:

**NORTEL NETWORKS
INTERNATIONAL INC.**

By: _____
Name:
Title:

**NORTEL NETWORKS
ALTSYSTEMS INC. (F/K/A ALTEON
WEBSYSTEMS, INC.)**

By: _____
Name:
Title:

Passport Side Agreement

SIGNED for and on behalf of Nortel Networks )
UK Limited (in administration) by Christopher )
Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

.................................................
Christopher Hill

Witness signature

.................................................
Name:    JAN  CORDELL
Address: Ernst & Young, 1 More London Place,
London, SE1 2AF

SIGNED for and on behalf of Nortel Networks )
(Ireland) Limited (in administration) by David )
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of: )

.................................................
David Hughes

Witness signature

.................................................
Name:
Address:

SIGNED for and on behalf of Nortel GmbH )
(in administration) by Christopher Hill )
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

.................................................
Christopher Hill

Witness signature

.................................................
Name:    JAN  CORDELL
Address: Ernst & Young, 1 More London Place,
London, SE1 2AF

Passport Side Agreement

**SIGNED** for and on behalf of **Nortel Networks** )
**UK Limited** (in administration) by Christopher )
Hill )  ........................................................................
as Joint Administrator (acting as agent and )  Christopher Hill
without personal liability) in the presence of: )

Witness signature

........................................................................ )
Name: )
Address: Ernst & Young, 1 More London Place, )
London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks** )
**(Ireland) Limited** (in administration) by David )
Hughes as Joint Administrator (acting as agent )  ........................................................................
and without personal liability) in the presence )  David Hughes
of: )

Witness signature

Claire Madden ........................................ )
Name: CLAIRE MADDEN )
Address: HARCOURT CENTRE, )
        HARCOURT STREET, Dublin 2

**SIGNED** for and on behalf of **Nortel GmbH** )
(in administration) by Christopher Hill )  ........................................................................
)  Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

........................................................................ )
Name: )
Address: Ernst & Young, 1 More London Place, )
London, SE1 2AF

Passport Side Agreement

**SIGNED** for and on behalf of Nortel Networks )
Polska Sp. z.o.o. (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name: JAN CORDELL )
Address: Ernst & Young, 1 More London Place, )
London, SE1 2AF

**SIGNED** for and on behalf of Nortel Networks )
Portugal S.A. (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name: JAN CORDELL )
Address: Ernst & Young, 1 More London Place, )
London, SE1 2AF

**SIGNED** for and on behalf of Nortel Networks )
Romania s.r.l. (in administration) by )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Christopher Hill

Witness signature

Name: JAN CORDELL )
Address: Ernst & Young, 1 More London Place, )
London, SE1 2AF

Passport Side Agreement

**SIGNED** for and on behalf of Nortel
Slovensko, s.r.o. (in administration) by
Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

....................................................
Christopher Hill

Witness signature

....................................................
Name:    JAN  CORDELL
Address: Ernst & Young, 1 More London Place,
London, SE1 2AF

)
)
)

**SIGNED** for and on behalf of Nortel Networks
AB (in administration) by Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

....................................................
Christopher Hill

Witness signature

....................................................
Name:    JAN  CORDELL
Address: Ernst & Young, 1 More London Place,
London, SE1 2AF

)
)
)

**SIGNED** for and on behalf of Nortel Networks
s.r.o. (in administration) by Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

....................................................
Christopher Hill

Witness signature

....................................................
Name:    JAN  CORDELL
Address: Ernst & Young, 1 More London Place,
London, SE1 2AF

)
)
)

Passport Side Agreement

**SIGNED** for and on behalf of Nortel Networks
France S.A.S. (in administration) by Kerry
Trigg acting as authorised representative for
Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)
)

Kerry Trigg  Christopher Hill

Witness signature

Name:           JAN  C  CORDELL
                Ernst & Young LLP
Address:        1 More London Place
                London
                SE1 2AF

)
)
)

**SIGNED** for and on behalf of Nortel Networks
SpA (in administration) by Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)

)
)

Christopher Hill

Witness signature

Name:  JAN  CORDELL
Address: Ernst & Young, 1 More London Place,
London, SE1 2AF

)
)
)
)

**SIGNED** for and on behalf of Nortel Networks
Hispania S.A. (in administration) by
Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

Christopher Hill

Witness signature

Name:  JAN  CORDELL
Address: Ernst & Young, 1 More London Place,
London, SE1 2AF

)
)
)
)

Passport Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**B.V.** (in administration) by Christopher Hill    )
                                                     )
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:      )

Christopher Hill

Witness signature

Name:    JAN    CORDELL                               )
Address: Ernst & Young, 1 More London Place,          )
London, SE1 2AF                                       )

**SIGNED** for and on behalf of **Nortel Networks**    )
**N.V.** (in administration) by Christopher Hill       )
                                                       )
as Joint Administrator (acting as agent and            )
without personal liability) in the presence of:        )

Christopher Hill

Witness signature

Name:    JAN    CORDELL                               )
Address: Ernst & Young, 1 More London Place,          )
London, SE1 2AF                                       )

**SIGNED** for and on behalf of **Nortel Networks**    )
**(Austria) GmbH** (in administration) by              )
Christopher Hill                                       )
as Joint Administrator (acting as agent and            )
without personal liability) in the presence of:        )

Christopher Hill

Witness signature

Name:    JAN    CORDELL                               )
Address: Ernst & Young, 1 More London Place,          )
London, SE1 2AF                                       )

**SIGNED** by Simon Freemantle                )
duly authorised for and on behalf of **Nortel**   )
**Networks AG** in the presence of:             )   Simon Freemantle

Witness signature

*B. Schowak*
.......................................................................   )
Name: B. SCHERWATH                      )
Address: C/o NORTEL NETWORKS UK LTD   )
        MAIDENHEAD
        BERKS
        SL6 3QH    UK

**SIGNED** by  Galina Svetlysheva in exercise of   )
a power of attorney dated 17 August 2010 of       )   .......................................................................
Richard Banbury                                   )   Galina Svetlysheva
duly authorised for and on behalf of **Nortel**
**Networks o.o.o.** in the presence of:

Witness signature

.......................................................................   )
Name:                                             )
Address:                                          )

Passport Side Agreement

**SIGNED** by Simon Freemantle                )
duly authorised for and on behalf of **Nortel**   )
**Networks AG** in the presence of:            )    ....................................................
                                               )    Simon Freemantle


Witness signature

....................................................    )
Name:                                          )
Address:                                       )


**SIGNED** by Galina Svetlysheva in exercise of   )
a power of attorney dated 17 August 2010 of    )    ....................................................
Richard Banbury                                )    Galina Svetlysheva
duly authorised for and on behalf of **Nortel**
**Networks o.o.o.** in the presence of:

Witness signature

....................................................    )
Name:  SARAH GALBRAITH                          )
Address:                                        )
       10 UTILSA NIKOLSKAYA

       109012 MOSCOW

       RUSSIA

**Passport Side Agreement**

**SIGNED** by Yaron Har-Zvi

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Israeli Administrators in the presence of:

)
)
)

הנאמן בהקפאות הליכים

.........................................................

Yaron Har-Zvi

Witness signature

Name: Itay Lav:
Address: 20 Lincoln St.
Tel-Aviv, Israel

)
)
)

**SIGNED** by Avi D. Pelossof

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Israeli Administrators in the presence of:

)
)
)

הנאמן בהקפאות הליכים

.........................................................

Avi D. Pelossof

Witness signature

Name: Itay tav
Address: 20 Lincoln St.
Tel-Aviv, Israel

)
)
)

Passport Side Agreement

Subject to the Israeli Courts approval

**SIGNED** for and on behalf of Nortel Networks
Israel (Sales and Marketing) Limited by
Yaron Har-Zvi and Avi D. Pelossof as Joint
Israeli Administrators (acting jointly and
without personal liability) in connection with
the Israeli Assets  and Liabilities:

)
)
)
)
)
)
)
)

הנאמן בהקפאת הליכים

.........................................
Yaron Har-Zvi

הנאמן בהקפאת הליכים
.........................................
Avi D. Pelossof

.........................................
Witness signature

Name: Itay Lavi
Address: 20 Lincoln St.
Tel-Aviv, Israel

)
)
)

**Passport Side Agreement**

**SIGNED** by Alan Bloom                     )
                                             )
in his own capacity and on behalf of the Joint          )
Administrators without personal liability and
solely for the purpose of obtaining the benefit of
the provisions of this Agreement expressed to be
conferred on or given to the Joint Administrators
in the presence of:

Alan Bloom

Witness signature

Name:   WILMA GRAHAM
Address: Ernst & Young, 1 More London Place,          )
London, SE1 2AF                                       )

**Schedule A**

**Schedule A – Other Sellers**

Nortel Networks Technology Corporation

Nortel Networks International Corporation

Nortel Networks Global Corporation

Nortel Networks (CALA) Inc.

Nortel Networks International Inc.

Nortel Altsystems Inc. (f/k/a Alteon Websystems, Inc. name change effective 4/30/09)

Nortel Networks India International Inc.

Nortel Networks de Argentina, S.A.

Nortel Networks Chile S.A.

Nortel Networks del Ecuador, S.A.

Nortel Networks de Guatemala, Ltda.

Nortel Networks de Mexico, S.A. de C.V.

Nortel de Mexico, S. de R.L. de C.V.

Nortel Networks del Paraguay S.A.

Nortel Networks Peru S.A.C.

Nortel Networks del Uruguay, S.A.

Nortel Networks de Venezuela, C.A.

Nortel Networks de Colombia, S.A.S.

Nortel Trinidad and Tobago Limited

Nortel Networks Australia Pty Limited

Nortel Networks (India) Private Limited

PT Nortel Networks Indonesia

Nortel Networks Japan (Japanese name is Nortel Networks Kabushiki Kaisha)

Nortel Networks Korea Limited

Nortel Networks Malaysia Sdn. Bhd.

Nortel Networks New Zealand Limited

Nortel Networks (Asia) Limited

Nortel Networks Singapore Pte. Ltd.

Nortel Networks (Thailand) Ltd.

Nortel Vietnam Limited

Nortel Networks (China) Limited

Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd.
Nortel Technology Excellence Centre Private Limited

## Schedule B – EMEA Sellers

Nortel Networks UK Limited
Nortel Networks (Ireland) Limited

Nortel GmbH (in administration)

Nortel Networks France SAS (in administration)

Nortel Networks S.p.A. (in administration)

Nortel Networks Hispania, S.A. (in administration)

Nortel Networks BV (in administration)

Nortel Networks NV (in administration)

Nortel Networks (Austria) GmbH (in administration)

Nortel Networks Polska Sp. Z.o.o. (in administration)

Nortel Networks Portugal, S.A. (in administration)

Nortel Networks s.r.o.(in administration)

Nortel Networks Romania s.r.l. (in administration)

Nortel Networks Slovensko, s.r.o.  (in administration)

Nortel Networks AG

Nortel Networks o.o.o.

Nortel Networks Israel (Sales and Marketing) Limited
Nortel Networks AB (in administration)

**APPENDIX "D"**

**NON-REDACTED MSS SIDE AGREEMENT**

**[CONFIDENTIAL]**

**APPENDIX "E"**

**BIDDING PROCEDURES**

**[ATTACHED]**

BIDDING PROCEDURES

Set forth below are the bidding procedures (the "<u>Bidding Procedures</u>") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Purchase Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) with respect to a Successful Bidder or an Alternate Bidder (each as defined below) (in each event, the "<u>Sale</u>").  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the North American Agreement (as defined below).

On August 26, 2010, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "<u>U.S. Debtors</u>") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "<u>Canadian Debtors</u>"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "<u>North American Sellers</u>") executed that certain Asset Sale Agreement (the "<u>North American Agreement</u>") with PSP Holding LLC (together with any of its designees, the "<u>Purchaser</u>").

On August 26, 2010, certain other affiliates of the North American Sellers (the "<u>EMEA Sellers</u>" and together with the North American Sellers, the "<u>Sellers</u>"), certain of which are under the control of Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of those EMEA Sellers appointed by the English High Court of Justice in connection with the proceedings (the "<u>UK Proceedings</u>") under the Insolvency Act 1986 (such individuals collectively, the "<u>Administrators</u>"), and the Administrators executed that certain Asset Sale Agreement relating to the sale and purchase of the EMEA Assets with the Purchaser (the "<u>EMEA Agreement</u>" and together with the North American Agreement, the "<u>Purchase Agreements</u>").

The Sellers have determined that: (A) the transactions contemplated by the Purchase Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale or purchase agreement(s) and ancillary agreements with respect to a Successful Bidder (collectively, the "<u>Transactions</u>") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "<u>Bankruptcy Code</u>"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the North American Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "<u>Canadian Court</u>"); and (D) the Transactions shall be (i) submitted for approval by such other applicable court(s) as the Sellers, in consultation with the Creditors' Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and (ii) subject to such other closing conditions as are set forth in the Purchase Agreements with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) with respect to a Successful Bidder.

On August 27, 2010, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Stalking Horse Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-up Fee and Expense Reimbursement, (D) Approving the Notice Procedures and the Assumption and Assignment Procedures, (E) Authorizing the Filing of Certain Documents Under Seal and (F) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts (the "Sale Motion").

On [●], 2010, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement  (the "Bidding Procedures Order").

On [●], 2010, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the North American Agreement by the Canadian Debtors, (II) payment of the Bid Protection Amounts in the circumstances provided for in the North American Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2010, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement  (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process").  The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (jointly administered under Case No. 09-10138) involving the U.S. Debtors (the "Creditors' Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process.  In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Canadian Court and the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.[1]

---

[1] For the avoidance of doubt, the Bidding Process shall not govern any disagreements among the Sellers.

<u>Assets To Be Sold</u>

The Sellers are offering for sale, in one or more Transactions, certain of the Sellers' assets pertaining to the business segment described in the Purchase Agreements (to the extent that such assets are not subsequently excluded from the sale in accordance with the terms of the Purchase Agreements) with respect to the Purchaser, or, as set forth in the relevant sale or purchase agreement(s) with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, and to be made available to other potential bidders that have executed a confidentiality agreement with the Sellers (the "<u>Assets</u>").

<u>"As Is, Where Is"</u>

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Purchase Agreements or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale or purchase agreement(s) of such Successful Bidder.  In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be on an "as-is" basis and will be without any representations or warranties, except, with respect to the Purchaser, to the extent set forth in the EMEA Agreement or, with respect to a Successful Bidder, to the extent set forth in the relevant purchase agreement(s) of such Successful Bidder.

<u>Free Of Any And All Claims And Interests</u>

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "<u>Claims and Interests</u>") to the extent permitted by sections 363 and 365 of the Bankruptcy Code and other applicable law, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the North American Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale or purchase agreement(s) of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

<u>Publication Notice</u>

Within five (5) days of entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures or as soon as practicable thereafter, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in <u>The Financial Times</u> (International Edition), <u>The Wall Street Journal</u> (National Edition), and <u>The Globe & Mail</u> (National Edition).

<u>Participation Requirements</u>

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown, or as otherwise determined by the Sellers (in consultation with the Creditors' Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the Purchaser who wishes to participate in the Bidding Process (a "<u>Potential Bidder</u>") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a) an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in substantially the same form as the confidentiality agreement executed by the Purchaser and otherwise in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets. In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement (i) agreeing that such agreement shall be deemed to be amended so as to be in substantially the same form as the confidentiality agreement executed by the Purchaser; (ii) agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets; and (iii) waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transactions it may enter into, to the Notice Parties (as defined below);

(b) current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transactions; and

(c) a statement demonstrating to the Sellers' satisfaction, a bona fide interest in purchasing the Assets from the Sellers including: (i) the purchase price (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transactions, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements.

A Potential Bidder (i) that has delivered the documents described above, (ii) whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, the financial capability of the Potential Bidder to consummate the Transactions, (iii) that has submitted a reasonably competitive and realistic non-binding proposal, as described above, (iv) that has executed a confidentiality agreement, as described above, and (v) that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transactions, will be deemed a "<u>Qualified Bidder</u>".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets as provided in the following paragraph.

<u>Due Diligence</u>

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Creditors' Committee, the Bondholder Group and the Monitor.  Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on-site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree.  The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below).  The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  In any event, the Purchaser shall be provided access to all material due diligence materials, management presentations, on-site inspections and other information provided to any Qualified Bidders that were not previously made available to the Purchaser as soon as commercially practicable and in no event later than five (5) calendar days after the date that the Sellers made such information available to any such Qualified Bidder. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders.  The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Purchase Agreements or in any other definitive agreement(s) with any Successful Bidder executed and delivered by Sellers.

<u>Bid Deadline</u>

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, Esq., 5945 Airport Road, Suite 360, Mississauga, Ontario L4V 1R9, Facsimile: (905) 863-1984; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) U.S. Debtors' counsel: Morris, Nichols, Arsht & Tunnell LLP, Attn: Derek C. Abbott, 1201 North Market Street, Wilmington, Delaware 19801, Facsimile:  (302) 658-3989; (iv) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (v) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (vi) counsel to the Creditors' Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vii) financial advisor to the Creditors' Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (viii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (ix) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; and (x) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (xi) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than **September 21, 2010** at **12:00 p.m. (ET)** by the Sellers (as may be extended as set out below, the "<u>Bid Deadline</u>").  The Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; <u>provided</u> that for any such extension beyond five (5) Business Days, the Sellers shall have obtained the written consent of the Creditors' Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably withheld.  If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

<u>Qualified Bid</u>

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "<u>Qualified Bid</u>"):

(a)      it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions

6

that the Sellers reasonably determine, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements.

(b)       it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), underlined provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the Sale Hearing, subject to further extensions as may be agreed to under the applicable purchase agreements and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)       it includes duly authorized and executed Purchase Agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, [the Intellectual Property License Agreement, the Transition Services Agreement, the Trademark License Agreement, the Loaned Employee Agreement, the Manufacturing Inventory Agreements Term Sheet] and the other ancillary agreements as described in the Purchase Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") (in each case to the extent applicable) and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)       it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)       it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)       it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)       it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value

offered under the Purchase Agreements, <u>plus</u> the Bid Protection Amounts (each as defined below) <u>plus</u> U.S. $1,000,000;

(h)      it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)      it includes an acknowledgement and representation that the bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)      it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)      it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in U.S. Currency in an amount equal to US$1,250,000 to be dealt with as provided for under "Good Faith Deposit" herein;

(l)      it (i) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with their continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (ii) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)      it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or

8

subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

      (n)      it contains other information reasonably requested by the Sellers; and

      (o)      it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(iv), (j) or (o) without the consent of the Creditors' Committee, the Bondholder Group and the Monitor; provided further that such consent shall not be unreasonably withheld in connection with any bid that would (1) otherwise fully satisfy the requirements of a Qualified Bid but for a de minimis failure to comply with those criteria and (2) such non-compliance is cured within twenty-four (24) hours of the Bid Deadline.  Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Purchase Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) on the next Business Day after the day that the determination is made; provided that such notification shall be given no later than three (3) Business Days following the expiration of the Bid Deadline.  The Sellers shall provide the Purchaser and any Qualified Bidder that has previously submitted a Qualified Bid with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid, but in no event later than two (2) Business Days prior to the commencement of the Auction.

<u>Aggregate Bids</u>

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding**.**

<u>Evaluation of Competing Bids</u>

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transactions, the proposed revisions to the relevant Transaction documents, the effect of the Transactions on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transactions (including any regulatory approvals required to close the Transactions), the assets included or excluded from the bid, the estimated number of in-scope

employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transactions, each as determined by the Sellers, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor.

No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Purchase Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Purchase Agreements, the Sellers shall promptly proceed to seek entry of the appropriate orders approving the Transactions with the Purchaser pursuant to the terms and conditions set forth in the Purchase Agreements.  In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking advancement of the date for approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser.  In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transactions.

Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that the Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Purchase Agreements, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that they will, under the circumstances set forth in the Purchase Agreements and as set forth in the Bidding Procedures Order and the Canadian Sales Process Order reimburse the Purchaser for certain expenses up to an  aggregate amount of $1,500,000 (the "Expense Reimbursement") and pay to the Purchaser a break-up fee equal to $2,500,000 minus the Expense Reimbursement (the "Break-Up Fee" and, together with the Expense Reimbursement, the "Bid Protection Amounts").

Auction

If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreements, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:00 a.m. (ET) on September 24, 2010, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned, subject to the terms of the Purchase Agreements.  The Auction shall run in accordance with the following procedures:

(a)     Only the Sellers, the Purchaser, the Creditors' Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), any creditor of the U.S Debtors or the Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Transactions.

(c) At least three (3) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date.  At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the

11

Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).  Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$1,000,000 over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction.  After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Bid Protection Amounts that may be payable to the Purchaser under the Purchase Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

Selection Of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder") and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any.  The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, approval by the Canadian Court and receipt of any required approvals of any other applicable court(s) and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

Sale Hearing

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as September 30, 2010 at 10:00 a.m.

(ET), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing or with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing.  The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing.  If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above.  If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"); provided, however, that selection of the Purchaser as the Alternate Bidder shall be subject to Section 9.1(b)(iii) of the North American Agreement.  The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval the Sellers reasonably determine in good faith is legally required or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval the Sellers reasonably determine in good faith is legally required or appropriate.  Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court.  The Alternate Bid shall remain open until the earlier of (a) the fortieth (40th) calendar day following the conclusion of the Auction, unless, prior to such date, the Main Sellers have delivered written notice to the Alternate Bidder that the transaction contemplated by the Successful Bid will not occur and the Main Sellers intend to consummate the transaction contemplated by the Alternate Bid, in which case the terms of the Alternate Bid shall be enforceable and shall govern or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date").  All the Qualified Bids other than the Successful Bid and the Alternate Bid shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

<u>Good Faith Deposits</u>

Other than with respect to the Purchaser, whose Good Faith Deposit shall be treated in accordance with the terms and conditions of the Purchase Agreements, the Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid.  The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be

13

returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder.  The Good Faith Deposit of the Successful Bidder will be dealt with in accordance with the terms of the Successful Bid.

<u>Reservation Of Rights</u>

The Sellers, after consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Creditors' Committee, the Bondholder Group and the Monitor or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, and (c) except as otherwise specifically set forth herein, with respect to instances in which the consent of the Creditors' Committee, the Bondholder Group and the Monitor is required, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.  Notwithstanding any of the foregoing, or anything else contained herein, the Sellers may not, without the prior written consent of the Creditors' Committee, the Bondholder Group and the Monitor, which consent may not be unreasonably withheld, (i) extend the deadlines set forth in the Auction procedures for more than five (5) Business Days, (ii) adjourn the Auction for more than three (3) Business Days, or (iii) subject to the availability of the Bankruptcy Court and the Canadian Court adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

Each of the foregoing actions shall be made by the Sellers in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, and their respective advisors.  For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability.  Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the Purchase Agreements or the Purchaser's right to credit the Bid Protection Amounts as part of any subsequent bids (except as specifically set forth herein).

14

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al*.

Court File No:  09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### FIFTY-SECOND REPORT OF THE MONITOR
### DATED AUGUST 30, 2010

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5881834