# APPENDIX "A"

## APPENDIX "A"

### Additional Definitions

| Term | Definition |
|---|---|
| CAW | National Automobile, Aerospace, Transportation and General Workers Union of Canada |
| CAW Counsel | Lewis Gottheil, counsel to the CAW |
| Continuing Employees | All Canadian non-unionized employees of the Applicants whose employment with the Applicants is continuing |
| Continuing Employees' Representatives | Kent Felske and Dany Sylvain, as appointed by the court on July 22, 2009 |
| Continuing Employees' Representative Counsel | Nelligan O'Brien Payne and Shibley Righton LLP, as appointed by the court on July 22, 2009 |
| Former Employees | All former employees, including pensioners, of the Applicants or any person claiming an interest under or on behalf of such former employees or pensioners and surviving spouses in receipt of an Applicant pension, or group or class of them |
| Former Employees' Representatives | Donald Sproule, David Archibald and Michael Campbell as representatives of the Former Employees, as appointed by the court on May 27, 2009 |
| Former Employees' Representative Counsel | Koskie Minsky LLP, as appointed by the court on May 27, 2009 |
| LTD Beneficiaries | Employees of the Applicants who are currently not working due to an injury, illness or medical condition in respect of which they are receiving or entitled to receive disability income benefits by or through the Applicants, and who may assert an existing or future claim for payment, reimbursement or coverage arising in connection with their employment with the Applicants or termination thereof, a pension or benefit plan sponsored by the Applicants, including in relation to medical, dental, long-term or short-term disability benefits, life insurance or any other benefit, obligation or payment to which such persons (or others who may be entitled to claim under or through such person) may be entitled from or through the Applicants, save and except those who are currently employed and whose benefit or other payments, as described above, arise directly or inferentially out of a collective agreement between the Applicants, or any of them, and the CAW |
| LTD Beneficiaries' Representative | Sue Kennedy as representative of the LTD Beneficiaries, as appointed by the court on July 30, 2009 |
| LTD Beneficiaries' Representative Counsel | Koskie Minsky LLP, as appointed by the court on July 30, 2009 |
| Pensioners | All of the Applicants' pensioners and their beneficiaries and survivors, whether or not represented by Settlement Representative Counsel |
| Pension Plans | Nortel Networks Negotiated Pension Plan (Registration No. 08587766), together with the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) |
| Representative Counsel | CAW Counsel, together with Settlement Representative Counsel and |

- 2 -

| Term | Definition |
|---|---|
| | Continuing Employees' Representative Counsel |
| Representatives | The CAW, Settlement Representative Counsel, the LTD Representative and the Former Employees' Representatives |
| Settlement Employee Representatives | LTD Beneficiaries' Representative together with the Former Employees' Representatives |
| Settlement Representative Counsel | LTD Beneficiaries' Representative Counsel, together with the Former Employees' Representative Counsel |
| Unionized Employees | All active and retired employees of the Applicants represented by the CAW |

# APPENDIX "B"

# Goodmans LLP

Memorandum

August 27, 2010

## I.    INTRODUCTION

This memorandum is filed in conjunction with the Fifty-First Report of Ernst & Young Inc., the monitor of Nortel Networks Limited ("Nortel") (the "Monitor's Report") and refers to documents appended thereto.  For the purposes of this memorandum we rely upon the facts set out in the Monitor's Report and the documents referred to in such report.  In addition, capitalized terms that are not defined in this memorandum have the meanings set out in the Monitor's Report.

## II.    ISSUES

The issue to be determined in this motion is how the funds remaining in Nortel's Health and Welfare Trust (the "HWT") are to be distributed upon termination of the HWT.  This determination requires consideration of the following questions:

(A)    Does the HWT constitute one trust or several trusts?

(B)    Who is entitled to the assets in the reserve account on the financial statements referred to as Group Life- Part II (related to optional life insurance)?

(C)    Which claims participate on a termination of the HWT?

(D)    How should the Trust Fund be shared among participating beneficiaries?

## III.    DISCUSSION

1.    Before addressing the appropriate distribution of the Trust Fund, it is important to appreciate that Nortel has contractual obligations to its employees and pensioners to provide certain health and welfare benefits.  Employees and pensioners have claims for those benefits against Nortel on the basis of their contracts of employment.  Claims that do not participate on a termination of the HWT can nevertheless be made against the estate of Nortel.

2.    The creation of such contractual relations does not in itself create trust relationships between the parties, nor is a trust required to fund or deliver health and welfare benefits.  Nortel elected to create the HWT as a funding medium through which to fund at least some of the Plans.

3.    The HWT was established as a health and welfare trust for tax purposes.  Health and welfare trusts are subject to classic trust law principles.

# Goodmans<sup>LLP</sup>

4.  Determining the proper distribution of the Trust Fund on termination of the HWT depends on the interpretation of the termination provisions of the Trust Agreement, read in the context of the Trust Agreement as a whole, and with a view to the intention of Nortel as the settlor at the time the Trust Agreement was entered into. Evidence of such intention may be gleaned from various sources, including the factual matrix at the time and other documents relating to the HWT, employee benefits and employee communications.

## A.  Does the HWT constitute one trust or several trusts?

5.  The first issue that must be addressed in order to determine the appropriate distribution of the Trust Fund is whether the HWT constitutes one trust or several trusts. The issue arises because the language of the Trust Agreement indicates a single trust but administrative and accounting practices may suggest an intention to create a number of separate trusts, as explained below.

6.  The HWT was administered historically as having separate accounting and "reserves" for certain of the benefit plans covered under the trust (the "Reserved Plans"). Amounts were notionally reserved on the HWT financial statements for the Reserved Plans, but the benefits were not fully pre-funded. There was no actual segregation of trust assets; rather, all assets were commingled. Benefits under benefit plans other than the Reserved Plans were paid by Nortel through the HWT on a pay-as-you-go basis.

*Trust Law Principles*

7.  As stated above, classic trust law principles apply to health and welfare trusts. Under trust law, a trust is established if the so-called three certainties are present: certainty of objects, certainty of subject matter and certainty of intention.

8.  *Certainty of objects* requires that the beneficiaries be clear and ascertainable. If the HWT is one trust, the objects are all the beneficiaries of all the Plans. If the HWT consists of separate trusts for the Reserved Plans, the beneficiaries for each Reserved Plan (other than optional life, as discussed in Part B below) would be the objects of each respective trust. Therefore, there is certainty of objects (other than with respect to optional life) whether there is one trust or several trusts.

9.  *Certainty of subject matter* requires clarity as to which property forms part of the trust fund. If the HWT is one trust, the subject matter would be the Trust Fund. If the HWT consists of several trusts, the trust fund for each Reserved Plan would be the reserved amount of the fund in respect of such Plan. Therefore, there is certainty of subject matter whether there is one trust or several trusts. However, if there are several trusts, as there is a deficiency in the HWT and the funds have been commingled, there would be a tracing issue to address.

10. *Certainty of intention* requires a consideration of the intention of the settlor. That is, was the intention of Nortel, as the settlor of the HWT, to establish one trust in respect of all the Plans or separate trusts for each of the Reserved Plans?

# Goodmans LLP

11. In considering Nortel's intention, we have reviewed (i) the Trust Agreement; (ii) Nortel's representations to Revenue Canada (as it then was) in respect of the tax ruling; (iii) and, to a lesser extent, the subsequent administrative and accounting practices of the Trustee and of Nortel acting as settlor and administrator of the HWT.

   *(i)    The Trust Agreement*

12. The Trust Agreement refers to the establishment of a single Trust Fund. There is no indication in the Trust Agreement of an intent to create a separate trust in respect of each Plan. No provision in the Trust Agreement authorizes or directs the Trustee to segregate assets generated by contributions made on account of different Plans or different classes of beneficiary, and in fact the Trust Fund assets have always been commingled without allocation to separate Plans.

13. The recitals in the Trust Agreement state that *a* trust fund "to be known as the Health and Welfare Trust" is established to give effect to the Health and Welfare Plan. The purpose of the Trust Fund is "to provide the Health and Welfare Plan benefits for the benefit of the Employees".

14. "Trust Fund" is defined as:

   > The term "Trust Fund" as used herein shall mean all of the assets of the "Health and Welfare Trust" including all funds received by way of *contributions from the Corporation* and those of its designated affiliated or subsidiary corporations in accordance with the provisions of the Health and Welfare Plan and of this Trust Agreement, *and all employees' contributions* together with all profits, increments, and earnings thereon. (Emphasis ours.)

15. The recitals in the Trust Agreement provide that additional plans may be added to the HWT from time to time:

   > The Corporation has established for the benefit of certain of its employees and the employees of such affiliated or subsidiary Corporations as the Corporation may designate, certain Health and Welfare plans, and such other similar plan or plans as the Corporation may from time to time place in effect, as follows:
   >
   > (a) a Health Care Plan;
   > (b) a Management Long Term Disability Plan;
   > (c) a Union Long Term Disability Plan;
   > (d) a Management Survivor Income Benefit Plan;
   > (e) a Management Short Term Disability Plan;
   > (f) a Group Life Insurance Plan;

# Goodman's LLP

> *all of which are hereinafter collectively referred to as the "Health and Welfare Plan."* (Emphasis ours.)

The Trust Agreement does not specify that any additional plans constitute separate trusts.

16. The Trust Agreement does, however, require the Trustee to keep separate records in respect of each of the separate Plans. Article 3, paragraph (2)(p) of the Trust Agreement provides:

> The Trustee shall keep accurate and detailed accounts of all investments and transactions made by it pursuant to this Agreement and shall keep separate records for each of the separate Plans.

*(ii)    Representations to Revenue Canada*

17. Evidence of Nortel's intention may also be gathered from its representations to Revenue Canada for the tax ruling. These representations refer to *a single trust fund* with "sub-accounts" created expressly for the purpose of record-keeping. In the overall description of the arrangement, in its letter to Revenue Canada dated December 16, 1979 (the "Ruling Request Letter"), Nortel states that Nortel (with related companies) proposes "to *establish a Health and Welfare Trust Fund.*"

18. In describing the Long Term Disability Plan, the Ruling Request Letter states:

> Under this plan eligible claims by employees will be submitted to the administrator for settlement. The administrator will then issue a draft to the claimant(s) drawn on the trust's account.

19. In the description of the Group Life Insurance Plan (Part I – Basic & Part II – Optional), the Ruling Request Letter states:

> Contributions (both the active employees' and the Company's) not immediately applied against claims & expenses of the Carrier will be deposited/transferred to a sub-account of the Trust called the "Pensioners Insurance Fund". [With respect to Part I – Basic.]

> \*          \*          \*

> Group Life Insurance (Part II) is paid totally by the employees and is optional. These employees' contributions will form part of the trust fund but will be kept in a separate sub-account.

> Under this plan (both Part I and Part II) the Carrier will receive and settle all claims and receive settlement of its premium at that time from the Trust. As a matter of record keeping claims together with the Carrier's claim expense charges will be charged to the respective sub-accounts.

# Goodmans<sup>llp</sup>

*(iii)    Administrative and Accounting Practices*

20.  The manner in which Nortel administered the HWT and performed financial reporting may also be relevant.

21.  During the administration of the HWT in the normal course, the Trustee accounted for the assets in the HWT in part by distinguishing between pay-as-you-go benefit plans and funded benefit plans with notional reserve accounts.

22.  The reports prepared by actuaries and accountants for the purposes of determining Nortel's funding policy with respect to the Health and Welfare Plan and preparing financial statements of Nortel and the HWT refer to "reserves" or "sub-accounts" in respect of certain of the Plans.

23.  On the other hand, Nortel files only one federal tax return in respect of the HWT. In addition, it appears that Nortel did not instruct the Trustee to establish separate bank accounts and no separate bank accounts were maintained in respect of each Reserved Plan.

*Analysis*

24.  It may be possible to argue that, because separate records were maintained in respect of each of the Plans, Nortel intended to "earmark" the funds for specific purposes. The notes to the financial statements set out the funded status of each Reserved Plan separately (i.e., long-term disability plan, survivor income benefit plan, pensioners' insurance plan and employee-financed group life plan (Part II)). In addition, both the ruling and the Ruling Request Letter refer to sub-accounts of the Trust Fund, which could suggest an intention on the part of Nortel to create separate trusts.

25.  However, as stated above, there is no express term of the Trust Agreement creating separate trusts and thus no clear statement of intent to create separate trusts. Instead, there are clear provisions stating that the sub-accounts were for record-keeping purposes only, and separate bank accounts were not established or maintained.

26.  We have been unable to find any case where a court has held that there was an intention to create separate trusts on the basis of record-keeping alone. The fact that the accounting and actuarial valuations were performed on a "plan-by-plan" basis indicates nothing more than compliance with Article 3, paragraph (2)(p) of the Trust Agreement.

27.  In conclusion, given the provisions of the Trust Agreement, other relevant documents and Nortel's administrative practices, the HWT constitutes one trust providing a number of different benefits for the beneficiaries.

# Goodmans LLP

**B.**   **Who is entitled to the assets in the reserve account on the financial statements referred to as Group Life- Part II (related to optional life insurance)?**

28.   The 2009 financial statements refer to an amount of $17,906,000 in the reserve account in respect of the group life-part II (optional life) benefit (the "Optional Life Account") and there is no corresponding liability.  There are three possibilities for the allocation and distribution of the Optional Life Account:

- Payment to optional life participants;

- Reversion to Nortel; or

- Inclusion of these funds as part of the Trust Fund to be distributed to those beneficiaries eligible to participate in the corpus of the HWT at the time of termination and distribution of the HWT.

*Payment to optional life participants*

29.   All of the contributions to the optional life insurance plan (i.e., the premiums) were made by the participants (except for those persons on long-term disability whose premiums were contributed by Nortel).  Term life insurance was provided by Sun Life, and Nortel was the policyholder.

30.   If the HWT establishes separate trusts, the employees participating in optional life may argue that they are entitled to the Optional Life Account, as they are its only beneficiaries.  However:

(A)   On the plain language of the Trust Agreement, Nortel would be entitled to these funds because Article VI of the Trust Agreement provides that, on termination, any surplus remaining reverts to Nortel.

(B)   The employees received what they bargained for.   Based on the employee communications provided to us, the employees participating in optional life had no expectation that they would receive anything other than term life insurance protection and a conversion privilege in the event of termination.[1]   It is unlikely that these

---

[1]   In *Canadian Dental Association v. Association des Chirurgiens-Dentistes du Quebec*, 1994 CLB 4402, 17 O.R. (3d) 817, the Ontario Court of Appeal considered a similar fact scenario.  The national association of dentists ("CDA") developed an insurance program for dentists.  Coverage was provided on an experience-rated basis.  Surpluses were declared in several consecutive years with respect to the life and disability plans, and such surpluses were paid to CDA.  The trial court determined that surplus funds belonged to the participants who had paid the premiums.  The Court of Appeal allowed the appeal.  It relied on the fact that, when a participant pays a premium in respect of an insurance policy, the expectation is that he or she will have protection against the insured risk under the policy and nothing further.

# Goodmans ᴸᴸᴾ

reserved funds were contemplated by anyone other than Nortel and Sun Life, and there is no evidence of an intention on the part of the participants not to part outright with the premiums when they paid them. Indeed, the participants in the optional life plans changed from year to year, and any participant who elected not to participate in a following year received no refund.

(C)     Even if there are separate trusts for the Reserved Plans, there is an issue with respect to certainty of objects for the Optional Life Account. The Optional Life Account historically was used to pay optional life claims when there was a year of negative experience and used to reduce premiums in the next year if premiums in respect of a year were set too high. In other words, it was used to benefit not past participants but current and future optional life participants, who are unknown. As a result, there does not appear to be certainty of objects. Therefore, it is arguable that there cannot be a separate trust in respect of the Optional Life Account.

31.     Nevertheless, whether there is a single trust or several trusts, optional life participants may argue they should be the beneficiaries of the Optional Life Account on the basis of resulting or constructive trust.

*(i)     Resulting Trust*

32.     The authors of *Oosterhoff on Trusts* divide resulting trusts into two broad categories:

> The first occurs when a settlor transfers assets to trustees and thereby creates or intends to create an express trust. If the express trust fails to arise or fails to dispose of the entire beneficial ownership of the trust assets, the remainder normally results to the settlor or to his or her estate.

> Resulting trusts in the second category arise when one person (A) voluntarily transfers an asset to another person (B) or when A purchases an asset and directs the vendor to transfer the asset to B. In these situations, equity usually presumes that A did not intend that B should take the asset beneficially, and therefore, B will hold the asset on resulting trust for A unless the presumption is rebutted.[2]

33.     Because the employees participating in the optional life insurance plan paid all of the premiums for the life insurance benefits, they could argue that, in effect, they overpaid the original premiums, and should be reimbursed under a resulting trust. However, since the optional life policy is only between Nortel and Sun Life, the participants would have to establish that Nortel acted as their agent in procuring the life insurance from Sun Life and

---

[2]     A.H. Oosterhoff *et al.*, *Oosterhoff on Trusts: Text, Commentary and Materials*, 7ᵗʰ ed. (Toronto: Carswell, 2009) at 590.

# Goodmans ᴸᴸᴾ

wrongfully kept any surpluses, for which there is no evidence. Among other things, there is no evidence of:

- any understanding or intention that Nortel would act as an agent of the employees in purchasing the insurance;

- separate policies, certificates or accounts in the names of specific employees;

- liability on the part of employees for any shortfall (which would be expected if they were the principals);

- an expectation of receiving a refund of premium based on favourable claims experience; or

- any right of employees to require a return or transfer of the funds or the delivery of policies.

To the contrary, the evidence is that Nortel and Sun Life treated Nortel as the principal, including the cross-rating of claims between basic and optional life. Accordingly, we do not think a Court would impose a resulting trust.

*(ii)    Constructive Trust*

34.    A constructive trust is a remedy that a court may impose where necessary to prevent the unjust enrichment of the defendant at the expense of the plaintiff, or to compensate the plaintiff for a wrong.[3]  The participants in the optional life insurance plan may claim that a constructive trust should be imposed on the Optional Life Account.

35.    Each of the following elements must exist to warrant the imposition of a constructive trust:

- enrichment,

- corresponding deprivation, and

- the absence of any juristic reason for the enrichment.[4]

The courts have also recognized that a constructive trust may be appropriate more generally to prevent persons from retaining property which, in "good conscience," they should not be permitted to retain.[5]

---

[3]    Roy Goode, "Property and Unjust Enrichment" in Andrew Burrows, ed., *Essays on the Law of Restitution* (Oxford: Clarendon Press, 1991) 215 at 217; *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217 at para. 43.

[4]    *Pettkus v. Becker*, [1980] 2 S.C.R. 834; *Sorochan v. Sorochan*, [1986] 2 S.C.R. 38 at para. 9.

[5]    *Soulos v. Korkontzilas, Supra* Note 3 at paras. 17, 29-34.

# Goodmans LLP

36. In *I.U.O.E., Local 894 v. Smurfit-Stone Container (Canada) Inc.,*[6] the employer had received demutualization proceeds in respect of life insurance plans. The employer was the policyholder and paid the premiums. The New Brunswick Court of Appeal held that there was no unjust enrichment or fiduciary obligation and therefore it was not appropriate to impose a constructive trust. Although the demutualization benefit had enriched Smurfit-Stone, the Union had not suffered a corresponding deprivation. The employees had not been deprived of any of the defined benefits they bargained for. In addition, since the policy carried with it an ownership interest in Sun Life and Smurfit-Stone was the policyholder, there was a juristic reason for it to retain the demutualization benefit.

37. Similarly, the optional life participants may be unable to establish a deprivation because they obtained exactly what they had bargained for (i.e., term life insurance coverage). As all of the elements required to make out a case for unjust enrichment are not present, a constructive trust should not be imposed.

38. The situation of the optional life participants is distinguishable from the situation of the annuitants in *Re Nortel Networks Corporation,*[7] where a constructive trust was imposed on individual annuity contracts held by Sun Life. In that case:

- separate accounts were kept by Sun Life relating to each individual annuitant;

- upon retirement, the annuitants had a right to the amounts in their accounts through one of four available methods;

- although Nortel was named as owner and beneficiary, each annuity also recorded the name of a particular individual as "annuitant";

- the annuitants did not receive the payments from Nortel to which they were entitled; and

- but for the constructive trust, the assets would have gone to Nortel's general creditors, which the Court considered would be a windfall.

The optional life participants, by contrast, received the coverage they bargained for. Separate accounts were not kept by Sun Life for named individuals; the participants had no right to receive refunds of premium or direct a delivery or transfer of surplus funds; and there is no concern about a windfall, since under the Proposed Allocation Methodology the funds will be used for payments to other beneficiaries who are suffering a shortfall on their claims.

---

[6]   *I.U.O.E., Local 894 v. Smurfit-Stone Container (Canada) Inc.,* 2005 CarswellNB 209 (C.A.).

[7]   *Nortel Networks Corp. (Re),* 2010 ONSC 3061.

# Goodmans LLP

39.   Where all the elements described in paragraph 35 above are not present, a court may nevertheless impose a constructive trust on the basis that it would not be in good conscience to allow the legal owner of specific assets to retain them.   In *N.A.I.T. Academic Staff Association v. N.A.I.T.*,[8] a significant portion of the premiums had been paid by the participants.   N.A.I.T. was the owner of the policy and received the demutualization proceeds.   The union took the position that a fiduciary relationship existed between the employer and the employees because N.A.I.T. acted as the employees' agent in obtaining the policy and remitting the premiums.   The Court found that an agency existed sufficient to be the foundation for the fiduciary duty claimed, and that N.A.I.T. had profited as a result of that relationship.   N.A.I.T.'s breach of its fiduciary duties by keeping the money (even in the absence of misconduct) was remedied by imposing a constructive trust.

40.   While it might not be in good conscience for Nortel to retain the Optional Life Account, the same cannot be said if the Optional Life Account remains in the Trust Fund for distribution to the other HWT beneficiaries who are suffering a shortfall on their claims.   Further, as discussed in paragraph 33 above, there are no indicia of agency in this case.

## Reversion to Nortel

41.   If the Optional Life Account is a separate trust fund and there is no constructive or resulting trust, under the terms of the Trust Agreement, Nortel is entitled to surplus funds on the termination of the HWT.   However, given the tax rules related to health and welfare trusts (i.e., there can be no reversion), this result is not tenable and would potentially throw into question the tax treatment of the HWT since inception.   In addition, the financial statements in respect of the HWT disclose a debt to the HWT due from the sponsoring company (Nortel).   The financial statements do not indicate to which of the reserved funds the debt due from the sponsoring company relates.   Accordingly, it could be allocated a number of different ways, including a set off in respect of any entitlement of Nortel to excess optional life funds. Finally, the Trust Agreement does not provide for any reversion to Nortel unless "all expenses, claims and obligations and future benefits and claims arising under the terms of the Trust Agreement and the Health and Welfare Plan" have been satisfied.   Given the large deficit in the Trust Fund, and with respect to the Plan, there can be no reversion to Nortel regardless of whether there is one trust or several trusts.

## Inclusion in the Trust Fund

42.   Whether the HWT is one trust or several trusts, the result would be the inclusion of the Optional Life Account in the corpus of the HWT to be distributed to those beneficiaries eligible to participate at the time of termination.

---

[8]   *Northern Alberta Institute of Technology Academic Staff Assn. v. Northern Alberta Institute of Technology*, 2002 ABQB 750; the Alberta Court of Appeal affirmed the decision, but sent the matter back to the Court of Queen's Bench to recalculate the amount of money for which NASA should have its constructive trust, 2004 ABCA 42 (leave to appeal to the SCC refused, 2004 SCCA 154)

# Goodmans LLP

**C.    Which claims participate on a termination of the HWT?**

43.    In order to determine which claims participate on termination, we will consider:

> (i)    the beneficiaries of the HWT;
>
> (ii)    the termination provision in Article VI of the Trust Agreement (the "Termination Provision"); and
>
> (iii)    application of the Termination Provision to claims of the beneficiaries.

*(i)    The beneficiaries of the HWT*

44.    "Beneficiaries" is not expressly defined in the Trust Agreement. Instead, Article II of the Trust Agreement states that the Trust Fund is "created for the purpose of providing the Health and Welfare Plan benefits for the benefit of Employees". "Employees" are "those active and retired employees of the Corporation and designated affiliated or subsidiary corporations which have adopted the Health and Welfare Plan, including dependents as defined in Schedule A, on whose behalf contributions are or have been made to the Trust Fund and who are eligible for benefits under the Health and Welfare Plan".

45.    The first recital to the Trust Agreement refers to components of the "Health and Welfare Plan". These include a health care plan, management long-term disability plan, union long term disability plan, management survivor income benefit plan, management short-term disability plan and group life insurance plan. In the Trust Agreement, all of these separate arrangements are defined collectively to be the "Health and Welfare Plan". The definition of Health and Welfare Plan also includes "such other similar plan or plans as the Corporation may from time to time place in effect."

46.    Therefore, under the Trust Agreement, the beneficiaries of the HWT are defined widely as those employees and former employees of Nortel and their dependants who are eligible for benefits under a health or welfare benefit arrangement that is funded by or through the Trust Fund, and, where there is a surplus on wind-up of the HWT, Nortel itself.

*(ii)    The Termination Provision*

47.    The Trust Agreement provides that Nortel may terminate the HWT on sixty days' notice to the Trustee. Upon receipt of notice of termination, the Trustee must take certain steps:

> Upon receipt of the Notice of Termination the Trustee shall within one hundred twenty (120) days determine and *satisfy all expenses, claims and obligations arising under the terms of the Trust Agreement and Health and Welfare Plan up to the date of the Notice of Termination.* The Trustee shall also determine upon a sound actuarial basis, the amount of money necessary to *pay and satisfy all future benefits and claims to be made under the Plan in respect to benefits and claims up*

# Goodmans<sup>LLP</sup>

> *to the date of the Notice of Termination.*  The Corporation and the designated affiliated or subsidiary corporations shall be responsible to pay to the Trustee sufficient funds to satisfy all such expenses, claims and obligations, and such future benefits and claims.  The final accounts of the Trustee shall be examined and the correctness thereof ascertained and certified by the auditors appointed by the Trustee. Any funds remaining in the Trust Fund after the satisfaction of all expenses, claims and obligations and future benefits and claims, arising under the terms of the Trust Agreement and the Health and Welfare Plan shall revert to the Corporation. (Emphasis ours.)

48.    Whether the HWT is one trust or consists of several separate trusts, lack of clarity in the Termination Provision raises an issue of precisely which benefits and claims participate on termination. Specifically:

- It is clear that any claims actually made and obligations actually incurred up to the date of the Notice of Termination should participate. These would include, for example, reimbursement of medical bills actually incurred, life insurance payments to the estates of people who died and income payments due to LTD beneficiaries.

- What is not clear is which *future* benefits and claims should be paid from the HWT. The phrase "future benefits and claims" is not defined in the Trust Agreement and occurs only in the Termination Provision. While some meaning must be given to the word "future", meaning must also be given to the expression "up to the date of the Notice of Termination".

The next section offers an interpretation of the Termination Provision that gives meaning to the language as a whole, and explains how this interpretation would be applied to different types of benefits.

*(iii)    Application of the Termination Provision to claims of the beneficiaries*

49.    It is first necessary to consider generally whether future benefits would be available to ALL beneficiaries of the HWT, which in turn requires a consideration of the concept of vested rights.  Some beneficiaries have vested rights and benefits under the Plans.  Benefits vest when an employee or former employee becomes absolutely entitled to receive what is promised; that is, the promise to provide the benefits is not subject to any contingency. Vested benefits cannot be reduced or eliminated.[9]  The beneficiaries with vested benefits are

---

[9]    In *Dayco (Canada) Ltd. v. CAW-Canada*, [1993] 2 S.C.R. 230 at para. 87, the Supreme Court expressed the view, in *obiter*, that retirement rights that survive expiration of the underlying agreement vest at the time of retirement and cannot be taken away.

# Goodmans LLP

pensioners and people in receipt of LTD benefits, survivors' income benefits and survivor transition benefits.

50. By contrast, the benefits of active employees may be amended or terminated at any time, as may the employment itself. Claims in respect of these types of benefits (health, dental and life (basic and optional, subject to the discussion above) for active employees other than those on LTD) are not vested and therefore should not participate unless they have been incurred by the date of the Notice of Termination. Claims in respect of future benefits for active employees are uncertain and contingent and cannot be said to have arisen before the date of the Notice of Termination.

51. If the Trust Agreement is interpreted to provide that, on termination, all beneficiaries with vested rights under all Plans participate for future benefits, then all such claims would be included. However, this interpretation gives no meaning to the cut-off date stipulated in the Trust Agreement: "up to the date of the Notice of Termination."

52. If, by contrast, the Trust Agreement is interpreted to give meaning to both the expression "future benefits" and to the stipulated cut-off date, the Trustee should pay only "future benefits and claims" that can be considered to have been made or incurred *prior to the notice of termination*. "Future benefits and claims" may further be interpreted to also include claims that have not been made at the date of the Notice of Termination but that, without termination, would certainly have been made in the future. Applying this interpretation to each category of benefit:

   (i)    *Pensioner Medical/Dental:*  Only claims that were actually incurred prior to the Notice of Termination would be included, since future benefits (being contingent and uncertain) cannot be said to have existed prior to the cut-off date.

   (ii)   *Pensioner Life Insurance:*  As pensioner life is permanent (and not term) insurance, it may be argued that the present value of this future benefit for all pensioners should be included, as there is no contingency with respect to the ultimate payment of this benefit. This benefit may therefore be considered to have existed before the cut-off date.

   (iii)  *LTD Income:*  The present value of the future benefit for LTD income already in pay prior to the Notice of Termination should be included on the basis that a claim was made before the Notice of Termination and the ongoing stream of income constitutes future benefits in respect to that claim.

   (iv)   *LTD Medical/Dental:*  Only claims that were actually incurred prior to the Notice of Termination would be included, on the same basis as (i), above.

# Goodmans LLP

(v)  *LTD Life Insurance:* It may be argued that the present value of this future benefit for all LTDs should be included, as those individuals who are on permanent disability will either die while on LTD or after retirement, so that they are covered in any event, and the claims are not contingent.

(vi)  *SIBs:* The present value of the future benefit for SIB income already in pay prior to the Notice of Termination should arguably be included, on the same basis as (iii) above.

(vii)  *STBs:* The present value of the future benefit of STBs in pay prior to the Notice of Termination should arguably be included, on the same basis as (iii) above.

53.  As noted previously, claims that do not participate on a termination of the HWT may nevertheless remain valid claims in the Nortel estate.

54.  Although we do not believe that the existence of the Reserved Plans demonstrates an intention to establish separate trust funds, regard may be had to Nortel's practice to assist in interpreting the Termination Provision. Other than with respect to optional life, our analysis leads to the conclusion that the claims entitled to participate on termination are in fact claims for benefits with respect to the Reserved Plans.[10] This strongly suggests that there was a perceived difference between these types of claims and claims that Nortel paid on a pay-as-you-go basis. In other words, these were treated as claims that were certain to occur and therefore required the keeping of reserves. This supports our conclusions with respect to which claims participate on termination and which do not.

55.  In conclusion, as discussed above, there are difficulties in interpreting the Termination Provision. However, based on the Trust Agreement, other relevant documents and Nortel's administrative practices, the following categories of claims should participate:

(i)  claims of all beneficiaries of the HWT actually incurred before the Notice of Termination; and

(ii)  claims in respect of future benefits where those benefits have vested and meet the test of the cut-off date as described above, being pensioner life insurance, LTD income, SIBs and STBs. In addition, on balance, LTD life insurance should be included.

---

[10]  Other than the special case of STBs in pay.

# Goodmans LLP

**D.      How should the Trust Fund be shared among participating beneficiaries?**

56.    Under any interpretation of the Trust Agreement, an actuary would determine the present value of the participating claims.  Nortel would be required to pay the Trustee sufficient funds to satisfy this obligation.

57.    As set out above, the Termination Provision does not specify how the Trust Fund is to be shared on the dissolution of the HWT.  Since there are insufficient funds to satisfy all claims against the HWT, an issue arises as to how to allocate the Trust Fund among the competing claims.

58.    It is a well-established maxim that "equality is equity".  This means that, in the absence of sufficient reason for dividing property on any other basis, the courts will order equal division.[11]    This principle has been applied by Canadian courts in many different circumstances, including distributions of funds to investors in an insolvency and to beneficiaries of a pension plan being wound up.

59.    If the Reserved Plans were treated as involving separate trusts, the beneficiaries under each Reserved Plan (other than optional life) would share *pro rata* in the funds reserved for that Plan.  Beneficiaries of plans without reserves would not receive anything from the HWT.

60.    If there is a single trust, the Trust Fund should be distributed *pro rata* among the claims entitled to participate on termination.

## IV.      SUMMARY OF CONCLUSIONS

61.    The HWT is a single trust fund.

62.    The optional life participants are not entitled to the Optional Life Account and these assets do not revert to Nortel.  As the HWT is a single trust fund, these assets should be distributed among the HWT beneficiaries who are eligible to participate at the time of termination.

63.    All claims and obligations arising up to the Date of Termination participate on a termination of the HWT.

64.    With regard to future claims, it may be argued that (i) all claims for all future benefits vested under the Plans should be present valued and participate; or that (ii) only claims made prior to the date of the Notice of Termination, including the present value of future income payments for benefits already in pay, should participate.  Given the language of the Trust Agreement as supported by Nortel's funding practices, the better view is that claims that have not been made but would certainly have been made in the future should participate in addition to those in (ii) above.  Therefore, the following would participate for the actuarial

---

[11]    John McGhee Q.C., *Snell's Equity*, 31st ed. (London: Sweet and Maxwell, 2005) at paras. 5-20 to 5-23.

# Goodmans LLP

value of future benefits: pensioner life insurance, LTD income, SIBs and STBs in pay and, on balance, LTD life insurance.

65. The Trust Fund should be distributed *pro rata* among those entitled to benefit (under either interpretation set out above) under the HWT on termination.

**APPENDIX "C"**

27 August 2010

# Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010

Nortel Networks Limited

# MERCER



MARSH   MERCER   KROLL
GUY CARPENTER   OLIVER WYMAN

**Consulting. Outsourcing. Investments.**

# Contents

1. Introduction..................................................................................................1

2. Valuation Results.........................................................................................5

3. Membership Data .........................................................................................7
   - Included Members ...................................................................................9
   - Member Headcount ...............................................................................10
   - Summary of Data...................................................................................11

4. Methods and Assumptions.........................................................................14
   - Post Retirement Medical, Dental and Life Insurance Benefits (PRB – M&D, PRB
     – Life and PRB – ADB) ..........................................................................15
   - Benefits Provided to Disabled Members – LTD Income, Medical, Dental, Life
     Insurance, Optional Life Insurance and STB Benefits (LTD – Income, LTD –
     IBNR, LTD – M&D, LTD – Life, LTD – Optional Life, LTD – STB – Accruals).....20
   - Survivor Benefits (SIB, STB)..................................................................25

5. Calculations for Individual Member Allocation of Trust............................26

6. Non-Pension Benefit Plan Provisions........................................................28
   - Post Retirement Benefits .......................................................................28
   - Benefits Provided to Disabled Members ................................................33
   - Survivor Benefits....................................................................................34

7. Employer Certification................................................................................35

I:\nortel\opeb\year2010\report\non-pension benefit valn\nortel - dec 31 10 non-pension ben valn - aug 27 (final).doc



**1**

# Introduction

To Nortel Networks Limited ("Nortel" or the "Company") and Ernst & Young Inc.
(the "Monitor").

In accordance with your request, we have performed a valuation of the non-pension
benefits provided by Nortel for purposes of termination of their Health and Welfare Trust
("Trust"). This report contains preliminary estimated liabilities for the identified non-
pension plans and plan members based on assumptions and methodologies as reviewed
with Nortel and the Monitor. We understand that the liability figures provided in this
report (along with the corresponding per member Excel file) are expected to be used for
the following purposes:

1. To determine a pro-rata allocation of the accumulated Trust funds to different benefit
   types.

2. To determine an initial estimate of the corresponding per claimant liabilities for a
   certain subset of the specific benefits provided in this report. These liabilities, after
   potential adjustments for updates, will be used to determine the pro-rata allocation of
   the Trust funds for the specified benefit, to the individual claimants on a pro-rata
   basis.

This is all subject to the approval of the court in Nortel's insolvency proceedings.

We understand that Nortel will stop making benefit payments under both the non-
pension post retirement, long-term post employment and survivor benefit plans as at
December 31, 2010. The liabilities in this report have been determined using the
membership status as at the dates outlined below projected to December 31, 2010. The
liabilities represent the present value as at December 31, 2010, of expected benefits to
be received/claimed after December 31, 2010. The membership data used for the
valuations is outlined in Section 3.

Nortel has established a Health & Welfare Trust for the purposes of funding its member benefit plans. Most of Nortel's benefits, including life insurance, disability, medical and dental, and survivor income benefits, are funded through the Trust. These benefits are extended to active, disabled and certain pensioned members and their beneficiaries. Most of the benefits are funded by Nortel on a "pay-as-you-go" basis. Nortel makes contributions to the Trust to pay for the current benefits paid for by the Trust. Nortel has made contributions in excess of current benefit payments, and therefore funds have accumulated in the Trust.

We understand that as part of the insolvency proceedings, the Trust will be terminated and the accumulated funds distributed to the beneficiaries, subject to the approval of the court in the insolvency proceedings. We understand that the liabilities identified in this report, subject to potential subsequent adjustments, will be referenced to determine the allocation to different benefit types and to different individual claimants.

The scope of our work did not include legal or tax review of the Trust or a determination of appropriate contribution levels.

Liabilities for the following benefit plans have been provided in this report:

1. Post retirement medical and dental benefits (PRB – M&D)
2. Post retirement life insurance (PRB – Life)
3. Post retirement additional death benefit (PRB – ADB)
4. Long term disability income benefits (LTD – Income)
5. Medical and Dental benefits for LTD[1] claimants (LTD – M&D)
6. Life insurance benefits for LTD[2] claimants (LTD – Life)
7. Optional life insurance benefits for LTD claimants (LTD – Optional Life)
8. Survivor Transition Benefits for members on LTD (STB – LTD – accrual)
9. Survivor Income Benefit plan (SIB)
10. Survivor Transition Benefit plan (STB)

We have only provided a liability estimate for the benefits outlined above. Note that any references for the dental plan for the LTD members, includes vision care and hearing costs (DVH plan), whereas for the PRB plans these costs are measured separately but included in PRB-M&D. At this time, we had insufficient data to determine a liability for the waiver of premium for the Optional Life Insurance benefit while the member is on LTD, including which employees on LTD participate in the Optional Life Insurance plan and therefore it has yet to be determined.

---

[1]    Members on LTD with full benefit offsets (i.e. WSIB income benefit is greater than the LTD income benefit) that are still eligible for Medical and Dental Benefits have been included in the information provided.

[2]    Members on LTD with full benefit offsets (i.e. WSIB income benefit is greater than the LTD income benefit) that are still eligible for Life Insurance Benefits have been included in the information provided.

A complete description of the valuation including the benefits included, the assumptions used and the results is provided in the body of this report.

Although we have included the above Plans, we understand that no determination has been made of benefits that would participate in a distribution of the Trust on termination. Further, we make no comment on the applicability of the assumptions used herein, including the valuation date, for any purpose other than the valuation of the liabilities with respect to the termination of the Trust.

In our opinion:

- The individual membership data on which the valuation is based are sufficient and reliable for the purposes of preparing a preliminary estimate of the aggregate liabilities. However, for certain members, we were unable to obtain complete membership data, or to reconcile and validate the membership data. Furthermore, changes in status may occur for some members between the effective date of the data and the valuation date. Therefore, at this time, individual liability amounts should be considered as preliminary estimates only, subject to revision and correction when complete and correct data becomes available.

- The assumptions are in accordance with the instructions received from the Company and the Monitor, and in our opinion, are in aggregate, appropriate for the purposes of this report. The assumptions may not be appropriate for other potential purposes.

- The methods employed are in accordance with the instructions received from the Company and the Monitor for the valuation and, in our opinion, are appropriate for the purposes of the valuation.

This report has been prepared and our opinions given, in accordance with accepted actuarial practice in Canada. However, we are not aware of any actuarial standards or practice requirements specifically designed for settlement of non-pension benefits as outlined in this report. With respect to the selection of the discount rate and the assumed mortality we have used the assumptions described in Section 3800 – *Pension Commuted Values* of the Canadian Institute of Actuaries Standards of Practice.

The information contained in this report was prepared exclusively for Nortel and the Monitor, in connection with the court application with respect to the distribution of the Trust. This report is only intended for the purposes outlined above. Mercer assumes no liability for the use, or reliance upon, this report for purposes other than those specifically identified in this report.

Respectfully submitted,

_____
Ellen Whelan
Fellow of the Canadian Institute of Actuaries
Fellow of the Society of Actuaries

_____
Karen Dixon
Fellow of the Society of Actuaries

August 27, 2010
Date

August 27, 2010
Date

Mercer (Canada) Limited; 161 Bay Street, P.O. Box 501; Toronto, Ontario  M5J 2S5

**2**

# Valuation Results

The following table presents a summary of the estimated liabilities from our valuation as at December 31, 2010 (in millions Canadian dollars).

| Plans | Actives | LTD | Pensioners/ Beneficiaries | Total | Percent |
|---|---|---|---|---|---|
| PRB - M&D | $1.0 | $5.2 | $250.3 | $256.5 | 47.2% |
| PRB – Life | 1.0 | 2.0 | 124.9 | 127.9 | 23.6% |
| PRB – ADB | | | 1.0 | 1.0 | 0.2% |
| PRB – Total | $2.0 | $7.2 | $376.2 | $385.4 | 71.0 % |
| | | | | | |
| LTD – Income | | $77.3 | | $77.3 | 14.2% |
| LTD – IBNR | | 2.6 | | 2.6 | 0.5% |
| LTD – M&D | | 24.5 | | 24.5 | 4.5% |
| LTD – Life | | 2.5 | | 2.5 | 0.5% |
| LTD – Optional Life | | TBD | | TBD | TBD |
| LTD – STB - accrual | | 0.3 | | 0.3 | 0.1% |
| LTD – Total | $0.0 | $107.2 | $0.0 | $107.2 | 19.7% |
| | | | | | |
| SIB | | | $16.2 | $16.2 | 3.0% |
| STB – in receipt | | | 4.1 | 4.1 | 0.8% |
| STB – accrual | | | 30.0 | 30.0 | 5.5% |
| SIB/STB – Total | $0.0 | $0.0 | $50.3 | $50.3 | 9.3% |
| | | | | | |
| Grand Total | $2.0 | $114.4 | $426.5 | $542.9 | 100.0% |

Please note the following:

- LTD – IBNR:  As at June 30, 2010 there were 4 members on short term disability (STD) and 2 members with LTD claims under appeal.  The status of their claim for LTD as at December 31, 2010 cannot be known for certain at this time.  Therefore, an estimate of their LTD income and medical, dental, basic and optional life insurance and STB benefits has been determined assuming they are an open LTD claim at December 31, 2010 and included in the table above under LTD – IBNR.  One of these members would meet the eligibility requirements for the post retirement benefits as at December 31, 2010 if they were still employed at that date and the liability for this has been included in the post retirement liabilities (PRB) above for this member.

- LTD – Optional Life:  At this time, we had insufficient data to determine a liability for the waiver of premium for the Optional Life Insurance benefit while the member is on LTD, including which employees on LTD participate in the Optional Life Insurance plan and therefore a liability estimate for this benefit has yet to be determined.

- LTD – STB – accrual:  As at June 30, 2010, there are 101 members on LTD who have beneficiaries which will be eligible for the STB benefit upon the member's death if the member dies while on LTD.  This information was based upon the members' date of disability and that they have elected family coverage for medical benefits.

- STB – in receipt:  As at June 30, 2010 there were 305 surviving spouses currently in receipt of Income benefits with a benefit ending date after December 31, 2010.

- STB – accrual:  As at June 30, 2010 there are 2,873 pensioners who have beneficiaries which will be eligible for the STB benefit upon the member's death if they survive the member.

---

<div style="border:1px solid black; width:150px; height:150px;">

**3**

</div>

# Membership Data

The membership data has been provided to us by the Company collected at different dates, as follows:

- PRB – Pensioner and Active data (including LTD) as at August 31, 2009, updated to reflect known restructuring and divestitures to March 31, 2010 was projected to December 31, 2010 and used for the PRB – M&D, PRB – Life and PRB – ADB Plans
- LTD (and STD) data as at June 30, 2010 was projected to December 31, 2010 and used for the LTD – Income, LTD – IBNR, LTD – M&D, LTD – Life Plans, LTD – STB – accrual Plans  (LTD – Optional Life – data yet to be obtained)
- Survivor data as at June 30, 2010 was projected to December 31, 2010 and used for the SIB and STB income Plans; STB accruals were based on the PRB – Pensioner data outlined above

Due to the differences in the dates of the valuation data, certain members' status may be inconsistent between Plans.  This explains the difference in the LTD headcounts shown on the membership statistics table on the next page (i.e. 355 LTD members were included in the PRB – M&D valuation; however, 360 (351 + 9 with $0 net benefit) were included for LTD – Income).

---

**We have not independently verified the accuracy or completeness of the data except to the extent required by generally accepted professional standards and practices. Mercer will not be held responsible for any liability arising from the use of incomplete, inaccurate or not up-to-date data or documentation. We have applied tests for internal consistency, as well as for consistency with the data used for the previous valuation. These tests were applied to membership reconciliation, basic information (date of birth, date of hire, date of membership, gender, etc.), earnings, and service. The results of these tests were satisfactory for the purpose of determining a reasonable estimate of the aggregate liabilities of the plan.  The data are not sufficiently complete and reliable (and not as of the required valuation date) for the purpose of allocation of assets to individual**

---

> **members without the benefit of subsequent adjustments to reflect true-ups in the membership data.**

Mercer has used and relied on the membership data supplied by Nortel, and summarized in this valuation report. Nortel is responsible for ensuring that such membership data provides an accurate description of all persons who are eligible for benefits as of December 31, 2010 and that it is sufficiently comprehensive and accurate for the purposes of this report.

## Included Members

The following table describes the basis for establishing the estimated liability as of December 31, 2010 for each member group:

| Member Group | Liability Determination Basis |
|---|---|
| PRB - Pensioners/ Beneficiaries | The liability represents the actuarial present value of the benefits payable under the Plans as of December 31, 2010 based on members who were retired as at the dates of the data as outlined above. |
| PRB – Active Members | The liability represents the actuarial present value of the benefits payable under the Plans assuming the member terminated employment on December 31, 2010 and benefits commence immediately if the member met the eligibility requirements for the plan at that date, based on members who were active as at the dates of the data as outlined above.  If the member does not meet the eligibility requirements for the plan at December 31, 2010 no liability has been calculated. |
| PRB – Disabled Members | The liability represents the actuarial present value of the benefits payable under the Plans assuming the members remain on LTD until age 65 and commence these benefits at age 65 if they meet the eligibility requirements at that date.  The actuarial present value is discounted by the cumulative ultimate recovery rates for the period between the projected age at December 31, 2010 and the earliest eligibility age for these benefits. |
| LTD - Disabled Members | The liability represents the actuarial present value of the benefits (i.e. LTD - Income, LTD – M&D, LTD – Life, LTD – Optional Life, LTD – STB – accrual) payable after December 31, 2010 and until the earliest of age 65, recovery, or death according to the recovery and mortality assumptions.<br><br>For members who are on Short Term Disability or have appealed STD or LTD claims as at the date of the data as outlined above, a liability has been included in this report (LTD – IBNR) for them in the same manner as open LTD claims as outlined above for the Income, Medical, Dental, Basic and Optional Life insurance and STB benefits. |
| SIB/STB – Pensioners/ Beneficiaries | The liability represents the actuarial present value of the benefits payable under the Plans as of December 31, 2010 based on members who were retired as at the dates of the data as outlined above for the "accruals", and based on beneficiaries who were in receipt of the benefits as at the date of the data as outlined above for the "in receipt". |

The data used in this valuation includes plan provisions, membership data, and claims data.  This data has been provided by Nortel and Sun Life.

This valuation is based on the plan provisions as provided by Nortel and the provisions of Government Healthcare Programs as they existed at the time of the valuation.  Except as otherwise noted, it has been assumed that the Nortel and Government plan provisions described and valued in this report continue unchanged.

## Member Headcount

| Plans | Remaining Active | LTD | Pensioners/ Beneficiaries | Total |
|---|---|---|---|---|
| PRB – M&D[3] | 165 | 355 | 10,660 | 11,180 |
| PRB – Life | 165 | 355 | 9,941 | 10,461 |
| PRB – ADB | 0 | 0 | 77 | 77 |
| | | | | |
| LTD – Income | 0 | 351 | 0 | 351 |
| LTD – IBNR | 0 | 6 | 0 | 6 |
| LTD – M&D[4] | 0 | 360 | 0 | 360 |
| LTD – Life | 0 | 358 | 0 | 358 |
| LTD – Optional Life | 0 | TBD | 0 | TBD |
| LTD – STB – accrual | 0 | 101 | 0 | 101 |
| | | | | |
| SIB | 0 | 0 | 81 | 81 |
| STB – in receipt | 0 | 0 | 305 | 305 |
| STB – accrual | 0 | 0 | 2,873 | 2,873 |

---

[3] There are also 6,251 spouses of pensioners covered for benefits.

[4] There are also 158 spouses and 160 children covered for benefits (85 members with children).

**Mercer (Canada) Limited**

## Summary of Data

|  | Non-Union | Union | Total |
|---|---|---|---|
| **PRB – Pensioner/Beneficiary Members projected to 31.12.10** | | | |
| *Pensioners* | | | |
| Total Number | 4,580 | 5,495 | 10,075 |
| ▪ Average Age (years) | 73.4 | 74.9 | 74.2 |
| Number with Medical/Dental | 3,956 | 5,490 | 9,446 |
| ▪ Average Age (years) | 73.8 | 74.9 | 74.4 |
| Number with Life Insurance | 4,555 | 5,386 | 9,941 |
| ▪ Average Age (years) | 73.4 | 74.7 | 74.1 |
| ▪ Average Life Insurance | $36,279 | $14,618 | $23,690 |
| Number with ADB | 77 | | 77 |
| ▪ Average Age (years) | 87.5 | | 87.5 |
| ▪ Average ADB Benefit | $23,714 | | $23,714 |
| | | | |
| *Spouses of Pensioners* | | | |
| Number with Medical/Dental | 2,859 | 3,392 | 6,251 |
| ▪ Average Age (years) | 70.3 | 72.6 | 71.5 |
| | | | |
| *Surviving Spouses* | | | |
| Number with Medical/Dental | 577 | 637 | 1,214 |
| ▪ Average Age (years) | 81.3 | 78.6 | 79.9 |
| | | | |
| **PRB - Active Members projected to 31.12.10** | | | |
| Number | 150 | 15 | 165 |
| ▪ Average age (years) | 59.1 | 58.1 | 59.0 |
| ▪ Average service (years) | 31.3 | 33.1 | 31.5 |
| ▪ Average life insurance | $24,000 | $38,446 | $25,234 |
| | | | |
| **PRB - LTD Members projected to 31.12.10** | | | |
| Number | 211 | 144 | 355 |
| ▪ Average age (years) | 54.9 | 58.5 | 56.4 |
| ▪ Average service (years) | 30.7 | 25.6 | 28.6 |
| ▪ Average life insurance | $19,555 | $37,883 | $26,958 |

Valuation of the Obligations of the Non-Pension                    Nortel Networks Limited
Benefits as at December 31, 2010

| | Non-Union | Union | Total |
|---|---|---|---|
| **LTD Members projected to 31.12.10[5]** | | | |
| **Number with Income Benefits[6]** | **225** | **126** | **351** |
| • Average age (years) | 54.5 | 58.3 | 55.8 |
| • Average duration on claim | 12.2 | 17.6 | 14.2 |
| • Average monthly benefit | $3,018 | $1,651 | $2,527 |
| **Number with Medical/Dental** | **232** | **128** | **360** |
| • Average age (years) | 54.4 | 58.2 | 55.8 |
| • Average duration on claim | 12.3 | 17.6 | 14.2 |
| **Number with Basic Life Insurance** | **232** | **126** | **358** |
| • Average age (years) | 54.4 | 59.2 | 56.1 |
| • Average duration on claim | 12.3 | 17.9 | 14.2 |
| • Average life insurance benefit | $65,305 | $33,536 | $54,124 |
| **Number with Optional Life Insurance** | **TBD** | **TBD** | **TBD** |
| Average age (years) | TBD | TBD | TBD |
| Average duration on claim | TBD | TBD | TBD |
| Average optional life insurance benefit | TBD | TBD | TBD |
| **Number with STB accrual** | | **101** | **101** |
| • Average age (years) | | 57.0 | 57.0 |
| • Average monthly STB benefit | | $551 | $551 |
| | | | |
| **LTD – IBNR[7] Members projected to 31.12.10** | | | |
| **Number with Income Benefits** | **6** | | **6** |
| • Average age (years) | 50.2 | | 50.2 |
| • Average duration on claim | 1.7 | | 1.7 |
| • Average monthly benefit | $5,013 | | $5,013 |
| **Number with Medical/Dental** | **6** | | **6** |
| • Average age (years) | 50.2 | | 50.2 |
| • Average duration on claim | 1.7 | | 1.7 |
| **Number with Basic Life Insurance** | **6** | | **6** |
| • Average age (years) | 50.2 | | 50.2 |
| • Average duration on claim | 1.7 | | 1.7 |
| • Average life insurance benefit | $103,453 | | $103,453 |

---

[5]  3 Non-Union and 3 Union members from the data provided were excluded as they will reach age 65 before December 31, 2010.

[6]  6 Non-union and 2 Union members from the data provided have $0 net benefit as the Workers' Compensation benefits or other offsets have reduced the net benefit to $0. One Non-Union member is from previous divestitures and Nortel is only responsible for their medical/dental and life insurance benefits. All 9 of these records have been excluded from the LTD income benefit information.

[7]  There are 4 members on STD and 2 members with STD/LTD claims under appeal as at the date of this report. We have included a liability estimate for these members assuming they are on open LTD claim as at December 31, 2010.

**Mercer (Canada) Limited**                                                                                              12

**Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010**                    Nortel Networks Limited

| | | | |
|---|---|---|---|
| Number with Optional Life Insurance | TBD | TBD | TBD |
| Average age (years) | TBD | TBD | TBD |
| Average duration on claim | TBD | TBD | TBD |
| Average optional life insurance benefit | TBD | TBD | TBD |

**SIB/STB – Beneficiaries in receipt of SIB/STB projected to 31.12.10**

| | | | |
|---|---|---|---|
| Number of STB | | 305 | 305 |
| ▪  Average Age (years) | | 76.7 | 76.7 |
| ▪  Average monthly STB benefit | | $535 | $535 |
| Number of SIB | 81 | | 81 |
| ▪  Average Age (years) | 70.5 | | 70.5 |
| ▪  Average monthly SIB benefit | $1,395 | | $1,395 |

**STB – Accruals for Future Beneficiaries projected to 31.12.10**

| | | | |
|---|---|---|---|
| Number | | 2,873 | 2,873 |
| ▪  Average Age (years) | | 74.5 | 74.5 |
| ▪  Average monthly STB Benefit | | $579 | $579 |

Nortel Networks Limited



**4**

# Methods and Assumptions

## Comments

The actuarial assumptions and methodologies used were reviewed with Nortel and the
Monitor.

The future is uncertain and the actual experience will differ from those assumptions.
These differences may be significant or material because valuation results are very
sensitive to the assumptions made and, in some cases, to the interaction between
assumptions. Different assumptions or scenarios within a range of possibilities may also
be reasonable and results based on those assumptions would be different. No one
projection of the future or set of assumptions for the future covering a long period of time
is uniquely "correct". Due to the limited scope of our assignment, we did not perform, nor
do we present, an analysis of the potential range of future possibilities and scenarios.

The figures provided in this report do not reflect the potential tax consequences, if any,
on the liability estimates.

In connection with the discount rate, there is no applicable standard of practice which
specify how the discount rate should be determined for purposes of the settlement of the
non-pension benefits. The discount rate has been determined based on the
assumptions described in Section 3800 – *Pension Commuted Values* of the Canadian
Institute of Actuaries Standards of Practice. The discount rate(s) selected reflect a
reasonable choice of rate(s), but do not reflect in detail all potential considerations.

# Post Retirement Medical, Dental and Life Insurance Benefits (PRB – M&D, PRB – Life and PRB – ADB)

The liability for the PRBs is determined for each individual. The liability is equal to the present value of expected future benefits after December 31, 2010. Anticipated benefits are discounted for payment eligibility, for increases in medical and dental costs and the time value of money.

The assumptions used are described in the following table:

| Measurement date | December 31, 2010 | |
|---|---|---|
| Discount rate | 3.70% per annum for 10 years, then 5.10% per annum thereafter | |
| Health care cost trend rates | **Grandfathered Traditional Program** | |
| | Semi-Private Hospital | 4.75% per annum |
| | Prescription Drugs | 8.40% per annum in 2011 grading down to 5.00% per annum in and after 2028 |
| | Other Health Care | 4.75% per annum |
| | Vision Care | 0.00% per annum |
| | Dental Care | 4.75% per annum |
| | Provincial Premium (non-BC) | 3.25% per annum |
| | BC Provincial Premium | 6.0% per annum for 1 year, then 4.5% per annum thereafter |

**Valuation of the Obligations of the Non-Pension**  
**Benefits as at December 31, 2010**                              Nortel Networks Limited

| | | |
|---|---|---|
| *Health care cost trend rates (Cont'd)* | **Non-Grandfathered Traditional Program** | |
| | Catastrophic Plan | 7.55% per annum in 2011 grading down to 5.00% per annum in and after 2028 |
| | Healthcare Spending Account Allocation | No increases |
| | Provincial Premium (non-BC) | 3.25% per annum |
| | BC Provincial Premium | 6.0% per annum for 1 year, then 4.5% per annum thereafter |
| | **Balanced Program and SARP** | |
| | Healthcare Spending Account Allocation | No increases |
| | Provincial Premium (non-BC) | 3.25% per annum |
| | BC Provincial Premium | 6.0% per annum for 1 year, then 4.5% per annum thereafter |
| *Mortality* | UP 94 mortality table with generational improvements projected to 2020 | |
| *Retirement rates* | Members currently in receipt of LTD benefits are assumed to retire at age 65. | |
| | Active members who meet the eligibility requirements for benefits are assumed to retire at December 31, 2010. | |
| *Marital status* | For active members, 90% are assumed to be married at retirement with males assumed to be 3 years older than their female spouses. | |
| | For current pensioners, actual spousal information was used | |

*Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010*                                    Nortel Networks Limited

| *2011 per capita claim cost at age 65* | **Grandfathered Traditional Program** | |
|---|---|---|
| | Semi-private Hospital | $25 |
| | Prescription Drugs[8] | 793 |
| | Vision Care | 17 |
| | Other Medical | 120 |
| | Dental Care | 245 |
| | **Total** | **$1,200** |
| | **Non-Grandfathered Traditional Program** | |
| | Catastrophic Medical Program | $1,004 |
| | Healthcare Spending Account | $50[9] per year of service from age 40 to retirement age |
| | **Balanced Program** | |
| | Healthcare Spending Account | $50[9] per year of service from age 40 to retirement age |
| | **SARP Program** | |
| | Healthcare Spending Account | $50[9] per year of service from age 40 to retirement age |

| *Increases in cost by age* | **Cost at Age** | | | | | | |
|---|---|---|---|---|---|---|---|
| | **55** | **60** | **65** | **70** | **75** | **80** | **85** |
| Supplementary Hospital | 45% | 64% | 100% | 161% | 253% | 388% | 562% |
| Prescription Drugs[5] | 75% | 88% | 100% | 109% | 113% | 114% | 113% |
| Other Medical | 106% | 103% | 100% | 102% | 110% | 121% | 135% |
| Vision Care | 106% | 103% | 100% | 97% | 95% | 92% | 89% |
| Dental Care | 107% | 104% | 100% | 95% | 90% | 83% | 74% |
| Catastrophic Medical Plan | 75% | 88% | 100% | 109% | 113% | 114% | 113% |
| Healthcare Spending Account | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

| *Prescription drug offset assumption at age 65 and after* | Alberta: 55% of claims |
|---|---|
| | Ontario: 65% of claims |
| | Quebec: 50% of claims |
| | Others: 0% |

---

[8]   Drug costs are reduced from age 65 due to coverage from the provincial government drug plans. The assumptions shown here are before the assumed offset.

[9]   Amount decreases to 50% upon members' death and continues for surviving spouses.

Nortel Networks Limited

| | |
|---|---|
| *Adjustment factors for the Catastrophic Medical Plan deductible and lifetime maximum* | The liabilities for the catastrophic medical coverage under the Non-Grandfathered Traditional Program were initially calculated based on the above claims cost, aging, trend and drug offset assumptions. The resulting obligations were then reduced by multiplying by the following factors by age at the valuation date to reflect the expected impact of the plan's lifetime deductible ($7,500 per family) and lifetime maximum ($500,000 per family) provisions. It has been assumed that the current flat lifetime deductible and maximum amounts do not increase in the future. |

| Age Group | Adjustment Factors |
|---|---|
| Less than 30 | 0.96 |
| 30 to 34 | 0.95 |
| 35 to 39 | 0.93 |
| 40 to 44 | 0.92 |
| 45 to 49 | 0.89 |
| 50 to 54 | 0.87 |
| 55 to 59 | 0.82 |
| 60+ | 0.89 |

*Provincial government plans*

As of January 1, 2010 the pensioner premium for the government plans are as follows:

| Province | Single | Family |
|---|---|---|
| RAMQ Premium (Nortel reimbursement) | $175 | $350 |
| British Columbia MSP | $57 ($60 projected to 2011) | $102 ($108 projected to 2011) |

## Claims Cost Development

### Grandfathered Traditional Plan

The 2011 per covered person claim costs at age 65 are based on actual claims experience for Nortel's retired members or surviving spouses for the calendar years, 2007 to 2009, applying equal weight to all experience years. Claim costs were trended to the mid-point (July 1, 2011) of the current valuation period. Refer to the schedule for the development of the 2011 claim costs on the following page.

### Catastrophic Plan

To determine the per capita costs at age 65 for the catastrophic plan, we relied on the data used for the Grandfathered Traditional Plan and applied certain relative value adjustments for the differences in plan designs, to develop the costs for the catastrophic plan.

**Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010**

Nortel Networks Limited

## Grandfathered Traditional Plan

| | 2009 Total | 2008 Total | 2007 Total |
|---|---|---|---|
| Actual Nortel pensioners' paid claims (before administration costs and taxes) | | | |
| Hospital | $906,256 | $1,078,173 | $1,100,660 |
| Drug | 6,866,200 | 6,864,493 | 6,538,106 |
| Vision care | 328,025 | 285,046 | 287,077 |
| Other medical | 2,249,351 | 2,506,056 | 1,845,079 |
| Dental | 4,007,245 | 3,499,054 | 3,450,648 |
| Total | $14,357,078 | $14,232,822 | $13,221,571 |
| | | | |
| Number of Nortel pensioners, spouses and surviving spouses | | | |
| •  Eligible for medical benefits | 17,995 | 17,943 | 17,856 |
| •  Eligible for dental benefits | 17,995 | 17,943 | 17,856 |
| | | | |
| Per covered member costs | | | |
| Hospital | $50.36 | $60.09 | $61.64 |
| Drug | 381.56 | 382.57 | 366.16 |
| Vision care | 18.23 | 15.89 | 16.08 |
| Other medical | 125.00 | 139.67 | 103.33 |
| Dental | 222.69 | 195.01 | 193.25 |
| Total | $797.84 | $793.22 | $740.46 |
| | | | |
| Trend to July 01, 2009 | | | |
| Hospital | 1.00 | 1.05 | 1.10 |
| Drug | 1.00 | 1.09 | 1.19 |
| Vision care | 1.00 | 1.00 | 1.00 |
| Other medical | 1.00 | 1.05 | 1.10 |
| Dental | 1.00 | 1.05 | 1.10 |
| | | | |
| 2009 per covered member costs | | | |
| Hospital | $50.36 | $62.94 | $67.64 |
| Drug | 381.56 | 417.00 | 435.03 |
| Vision care | 18.23 | 15.89 | 16.08 |
| Other medical | 125.00 | 146.30 | 113.38 |
| Dental | 222.69 | 204.27 | 212.04 |
| Total | $797.84 | $846.41 | $844.17 |
| | | | |
| Weighting | 33% | 33% | 33% |
| | | | |
| Trend to July 01, 2011 | | | |
| Hospital | 1.097 | | |
| Drug | 1.182 | | |
| Vision care | 1.000 | | |
| Other medical | 1.097 | | |
| Dental | 1.097 | | |
| | | | |
| 2011 per covered member costs | | | |
| Hospital | $66.18 | | |
| Drug | 485.86 | | |
| Vision care | 16.73 | | |
| Other medical | 140.70 | | |
| Dental | 233.72 | | |
| Total | $943.18 | | |
| | | | |
| Adjustment factors to convert 2011 per covered member costs into age 65 per covered member costs | | | |
| Hospital | 0.3778 | | |
| Drug | 1.6322 | | |
| Vision care | 1.0161 | | |
| Other medical | 0.8529 | | |
| Dental | 1.0483 | | |
| | | | |
| Drug offset assumption at age 65 | 0% | | |
| | | | |
| Per covered member age 65 claims costs (2011 per covered member costs x adjustment factors) | | | |
| Hospital | $25.00 | | |
| Drug - incorporating 0% drug offset | 793.00 | | |
| Vision care | 17.00 | | |
| Other medical | 120.00 | | |
| Dental | 245.00 | | |
| Total | $1,200.00 | | |

**Mercer (Canada) Limited**

# Benefits Provided to Disabled Members – LTD Income, Medical, Dental, Life Insurance, Optional Life Insurance and STB Benefits (LTD – Income, LTD – IBNR, LTD – M&D, LTD – Life, LTD – Optional Life, LTD – STB – Accruals)

In general, disabled members are provided the same benefits as active members.[10] Benefits are paid to the earlier of recovery, death or attainment of age 65. The benefits provided are the benefits in effect at the time the member is disabled. The liability associated with this obligation is the present value of income payments, health care claim reimbursements and life insurance benefits provided to disabled members while they are disabled or upon their death during disability. Income and/or benefits are discounted for the likelihood of continuing disability and the time value of money. Anticipated payments are increased to reflect increases in the cost of living for members with indexed LTD income benefits or trend rate increases in the cost of medical and dental benefits.

| | |
|---|---|
| Measurement date | December 31, 2010 |
| Discount rate | 3.70% per annum for 10 years, then 5.10% per annum thereafter |
| COLA increase for members with indexed benefits | 60% of (1.66% per annum for 10 years, then 2.49% per annum thereafter) |
| Medical trend rate | 8.4% per annum in 2011 grading down linearly to 5.0% per annum in and after 2028. |
| Dental (DVH) trend rate | 4.75% per annum |
| CPP offset | If the LTD claimant has an approved CPP/QPP disability pension at the date of the valuation, the valuation assumes that benefit level will continue. |
| | If the LTD claimant does not have an approved CPP/QPP disability pension at the date of the valuation, the valuation assumes no disability pension will be awarded in the future. |
| Termination rate (due to mortality, termination and recovery) assumption | Canadian Group Long Term Disability Termination Experience 1988-1997 as at December 31, 2009 assuming a 6 month elimination period for non-union members and a 12 month elimination period for union members, no modifications applied; 11.99% Quebec assumed |
| Covered dependents | Actual covered dependent information was used to determine the medical and dental liabilities for the non-union members. |
| | Coverage level (EE Only or EE&Family) was used to determine the medical and dental liabilities for the union members and for their STB accrual liabilities, |
| Average STB monthly benefit | Actual STB monthly benefit was known for 2 eligible members and assumed to be $550 per month for other eligible members. |

---

[10]  Where the benefit program has changed since the member became disabled, the member may be provided benefits under the earlier benefit program or may have been changed to the newer benefit plan. As an example, certain disabled union members are provided with STB coverage.

| 2011 per capita claim cost (contributions not subtracted) | NON-UNION[11] | Employee | Employee + Spouse | Employee + Child | Employee + Spouse + Child |
|---|---|---|---|---|---|
| | Medical | | | | |
| | • Comprehensive | $3,883 | $4,549 | $4,382 | $5,048 |
| | ▪ Plus | $4,357 | $5,223 | $4,821 | $5,687 |
| | ▪ Select | $9,085 | $15,439 | $9,445$1 | 5,799 |
| | Dental (DVH)[12] | | | | |
| | ▪ Comprehensive | $462 | $823 | $1,085 | $1,446 |
| | • Plus | $671 | $1,150 | $1,480 | $1,959 |

| | UNION | Employee | Employee + Spouse | Employee + Child | Employee + Spouse + Child |
|---|---|---|---|---|---|
| | Medical | $4,464 | N/A | N/A | $7,090 |
| | Dental[11] | $433 | N/A | N/A | $1,370 |

| 2011 annual employee contributions | NON-UNION[10] | Employee | Employee + Spouse | Employee + Child | Employee + Spouse + Child |
|---|---|---|---|---|---|
| | Medical | | | | |
| | ▪ Comprehensive | $0 | $72 | $56 | $135 |
| | ▪ Plus | $150 | $461 | $356 | $616 |
| | ▪ Select | $277 | $831 | $468[13] | $1,115 |
| | Dental (DVH)[11] | | | | |
| | ▪ Comprehensive | $0 | $41 | $26 | $110 |
| | ▪ Plus | $97 | $345 | $233 | $519 |

## Claims Cost Development

The 2011 per covered person claim costs are based on actual claims experience for Nortel's disabled members and their covered dependents for the calendar years, 2008 to 2009, applying equal weight to all experience years. Claims totalling $292,800 for 2008 and $106,800 for 2009 were provided but not indentified as being from union or non-union members. These claims were allocated to the union and non-union groups on a pro-rata basis. Claim costs were then trended to the mid-point (July 1, 2011) of the

---

[11]   There are 5 union members who are identified as receiving the Non-Union plan and paying appropriate contributions, so we have included them in the Non-Union plan.

[12]   Dental costs for disabled members also include Vision Care and Hearing benefit costs.

[13]   There are 2 members with this level of coverage and paying different contributions rates. The average has been shown here.

current valuation period. Refer to the schedules for the development of the 2011 claim costs on the following pages.

Nortel Networks Limited

**Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010**

## 2008 Data

| Employee | Records | Med | DVH | Total | Per Capita Records | Per Capita Med | Per Capita DVH | Trend to 2011 Med | Trend to 2011 DVH | Trended Claim Costs Med | Trended Claim Costs DVH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Union | 150 | $694,225 | $62,620 | $756,846 | 179.76 | $3,851.98 | $348.36 | 1.287909 | 1.149376 | $4,973.89 | $400.39 |
| Non-Union | 223 | $977,166 | $117,345 | $1,094,511 | 267.24 | $3,656.50 | $439.10 | 1.287909 | 1.149376 | $4,709.23 | $504.69 |
| *Medical* COMP-Comprehensive Medical | 154 | $602,489 | N/A | $602,489 | 184.55 | $3,264.60 | N/A | 1.287909 | 1.149376 | $4,204.51 | |
| PLUS-Plus Medical | 55 | $246,843 | N/A | $246,843 | 65.91 | $3,745.07 | N/A | 1.287909 | 1.149376 | $4,823.31 | |
| SMED-Select Medical | 14 | $127,834 | N/A | $127,834 | 16.78 | $7,619.37 | N/A | 1.287909 | 1.149376 | $9,813.06 | |
| WAIV-Waived Medical | 0 | $0 | N/A | $0 | - | - | N/A | 1.287909 | 1.149376 | | |
| *DVH* COMP-Comprehensive DVH | 164 | N/A | $77,876 | $77,876 | 196.54 | N/A | $396.24 | 1.287909 | 1.149376 | | $455.43 |
| PLUS-Plus DVH | 59 | N/A | $39,469 | $39,469 | 70.71 | N/A | $558.22 | 1.287909 | 1.149376 | | $641.60 |
| WAIV-Waived DVH | 0 | N/A | $0 | $0 | - | N/A | - | 1.287909 | 1.149376 | | |
| **Total** | 447 | $1,671,392 | $179,965 | $1,851,357 | 447.00 | $3,739.13 | $402.61 | 1.287909 | 1.149376 | $4,815.66 | $462.75 |

| Spouse | Records | Med | DVH | Total | Per Capita Records | Per Capita Med | Per Capita DVH | Trend Med | Trend DVH | Trended Med | Trended DVH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Union | 82 | $133,938 | $30,174 | $164,111 | 97.20 | $1,377.98 | $310.43 | 1.287909 | 1.149376 | $1,774.69 | $356.80 |
| Non-Union | 123 | $148,422 | $47,796 | $196,218 | 145.80 | $1,017.98 | $327.82 | 1.287909 | 1.149376 | $1,311.07 | $376.78 |
| *Medical* COMP-Comprehensive Medical | 81 | $47,767 | N/A | $47,767 | 96.01 | $497.50 | N/A | 1.287909 | 1.149376 | $640.73 | |
| PLUS-Plus Medical | 31 | $26,300 | N/A | $26,300 | 36.75 | $715.71 | N/A | 1.287909 | 1.149376 | $921.77 | |
| SMED-Select Medical | 11 | $74,355 | N/A | $74,355 | 13.04 | $5,702.51 | N/A | 1.287909 | 1.149376 | $7,344.32 | |
| WAIV-Waived Medical | 0 | $0 | N/A | $0 | - | - | N/A | 1.287909 | 1.149376 | | |
| *DVH* COMP-Comprehensive DVH | 86 | N/A | $30,729 | $30,729 | 101.94 | N/A | $301.43 | 1.287909 | 1.149376 | | $346.46 |
| PLUS-Plus DVH | 37 | N/A | $17,067 | $17,067 | 43.86 | N/A | $389.14 | 1.287909 | 1.149376 | | $447.27 |
| WAIV-Waived DVH | 0 | N/A | $0 | $0 | - | N/A | - | 1.287909 | 1.149376 | | |
| **Total** | 243 | $282,360 | $77,969 | $360,329 | 243.00 | $1,161.99 | $320.86 | 1.287909 | 1.149376 | $1,496.52 | $368.79 |

| Child | Records | Med | DVH | Total | Per Capita Records | Per Capita Med | Per Capita DVH | Trend Med | Trend DVH | Trended Med | Trended DVH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Union | 33 | $27,667 | $20,608 | $48,275 | 36.76 | $752.58 | $560.57 | 1.287909 | 1.149376 | $969.25 | $644.30 |
| Non-Union | 81 | $32,202 | $50,810 | $83,012 | 90.24 | $356.85 | $563.08 | 1.287909 | 1.149376 | $459.60 | $647.19 |
| *Medical* COMP-Comprehensive Medical | 50 | $20,692 | N/A | $20,692 | 55.70 | $371.30 | N/A | 1.287909 | 1.149376 | $478.20 | |
| PLUS-Plus Medical | 24 | $9,640 | N/A | $9,640 | 26.74 | $360.54 | N/A | 1.287909 | 1.149376 | $464.55 | |
| SMED-Select Medical | 7 | $1,880 | N/A | $1,880 | 7.80 | $241.07 | N/A | 1.287909 | 1.149376 | $310.48 | |
| WAIV-Waived Medical | 0 | $0 | N/A | $0 | - | - | N/A | 1.287909 | 1.149376 | | |
| *DVH* COMP-Comprehensive DVH | 56 | N/A | $31,264 | $31,264 | 64.61 | N/A | $483.85 | 1.287909 | 1.149376 | | $556.13 |
| PLUS-Plus DVH | 23 | N/A | $19,547 | $19,547 | 25.62 | N/A | $762.86 | 1.287909 | 1.149376 | | $876.81 |
| WAIV-Waived DVH | 0 | N/A | $0 | $0 | - | N/A | - | 1.287909 | 1.149376 | | |
| **Total** | 127 | $59,869 | $71,419 | $131,287 | 127.00 | $471.41 | $562.25 | 1.287909 | 1.149376 | $607.13 | $646.35 |

**Mercer (Canada) Limited**

Nortel Networks Limited

# Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010

## 2009 Data

| Employee | Records | Med | DVH | Total | Records | Per Capita Claim Costs Med | DVH | Trend to 2011 Med | DVH | Trended Claim Costs Med | DVH | Averaged Claim Costs Med | DVH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Union** | 150 | $605,536 | $76,673 | $622,429 | 191 | $ 3,345.71 | 424.72 | 1.181560 | 1.097256 | 3,952.31 | 466.63 | $ 4,683.57 | $ 729.27 |
| **Non-Union** | 252 | $1,093,142 | $142,145 | $1,116,468 | 292 | $ 3,436.04 | 466.79 | 1.181560 | 1.097256 | 4,059.62 | 534.13 | 4,394.56 | 519.41 |
| Medical COMP-Comprehensive Medical | 161 | $585,609 N/A | | $165,696 | 194 | $ 3,104.63 N/A | | 1.181560 | 1.097256 | 3,582.31 | | 3,383.41 | |
| PLUS-Flex Medical | 60 | $228,405 N/A | | $228,405 | 72 | $ 3,222.98 N/A | | 1.181560 | 1.097256 | 3,890.88 | | 4,357.10 | |
| SMED-Select Medical | 21 | $178,329 N/A | | $178,329 | 25 | $ 7,073.59 N/A | | 1.181560 | 1.097256 | 8,357.91 | | 9,085.45 | |
| WAV-Waived Medical | 0 | $0 N/A | | $0 | 0 | N/A | | 1.181560 | 1.097256 | | | | |
| DVH COMP-Comprehensive DVH | 173 N/A | | $69,954 | $69,954 | 209 | N/A | 425.13 | 1.181560 | 1.097256 | | 467.57 | | 461.50 |
| PLUS-Flex DVH | 89 N/A | | $53,192 | $53,192 | 83 | N/A | 638.68 | 1.181560 | 1.097256 | | 701.02 | | 671.31 |
| WAV-Waived DVH | 0 N/A | | $0 | $0 | - | N/A | | 1.181560 | 1.097256 | | | | |
| **Total** | 473 | $1,696,899 | $219,019 | $1,827,917 | 473 | $ 3,401.48 | 463.04 | 1.181560 | 1.097256 | 4,016.08 | 508.87 | 4,417.37 | 485.41 |

| Spouse | Records | Med | DVH | Total | Records | Med | DVH | Med | DVH | Med | DVH | Med | DVH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Union** | 83 | $119,508 | $31,222 | $144,030 | 90 | $ 1,259.04 | 246.19 | 1.181560 | 1.097256 | 1,486.46 | 382.25 | $ 1,635.37 | 369.43 |
| **Non-Union** | 141 | $165,745 | $59,285 | $224,031 | 152 | $ 1,058.07 | 382.52 | 1.181560 | 1.097256 | 1,285.62 | 419.94 | 1,296.35 | 389.31 |
| Medical COMP-Comprehensive Medical | 88 | $55,681 N/A | | $55,681 | 55 | $ 580.67 N/A | | 1.181560 | 1.097256 | 682.01 | | 508.12 | |
| PLUS-Flex Medical | 36 | $26,655 N/A | | $26,655 | 39 | $ 686.36 N/A | | 1.181560 | 1.097256 | 812.58 | | 694.31 | |
| SMED-Select Medical | 17 | $83,370 N/A | | $83,370 | 18 | $ 4,536.36 N/A | | 1.181560 | 1.097256 | 5,363.56 | | 6,303.84 | |
| WAV-Waived Medical | 0 | $0 N/A | | $0 | - | N/A | | 1.181560 | 1.097256 | | | | |
| DVH COMP-Comprehensive DVH | 94 N/A | | $34,674 | $34,674 | 102 | N/A | 341.43 | 1.181560 | 1.097256 | | 374.64 | | 369.55 |
| PLUS-Flex DVH | 47 N/A | | $23,612 | $23,612 | 51 | N/A | 463.01 | 1.181560 | 1.097256 | | 510.23 | | 478.75 |
| WAV-Waived DVH | 0 N/A | | $0 | $0 | - | N/A | | 1.181560 | 1.097256 | | | | |
| **Total** | 242 | $278,733 | $85,507 | $366,060 | 242 | $ 1,151.03 | 349.87 | 1.181560 | 1.097256 | 1,360.04 | 403.54 | 1,428.28 | 387.31 |

| Child | Records | Med | DVH | Total | Records | Med | DVH | Med | DVH | Med | DVH | Med | DVH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Union** | 31 | $26,610 | $14,625 | $43,443 | 33 | $ 864.57 | 447.85 | 1.181560 | 1.097256 | 1,021.55 | 491.41 | $ 995.40 | 507.85 |
| **Non-Union** | 62 | $38,451 | $59,967 | $58,365 | 63 | $ 614.23 | 646.65 | 1.181560 | 1.097256 | 489.44 | 707.34 | 474.52 | 677.27 |
| Medical COMP-Comprehensive Medical | 50 | $23,516 N/A | | $23,516 | 53 | $ 440.45 N/A | | 1.181560 | 1.097256 | 520.43 | | 499.31 | |
| PLUS-Flex Medical | 26 | $10,698 N/A | | $10,698 | 28 | $ 392.53 N/A | | 1.181560 | 1.097256 | 463.81 | | 464.09 | |
| WAV-Waived Medical | 11 | $4,087 N/A | | $4,087 | 12 | $ 346.29 N/A | | 1.181560 | 1.097256 | 409.17 | | 359.83 | |
| WAV-Waived Medical | 0 | $0 N/A | | $0 | - | N/A | | 1.181560 | 1.097256 | | | | |
| DVH COMP-Comprehensive DVH | 58 N/A | | $38,946 | $38,946 | 62 | N/A | 628.65 | 1.181560 | 1.097256 | | 690.01 | | 623.07 |
| PLUS-Flex DVH | 29 N/A | | $20,941 | $20,941 | 31 | N/A | 676.24 | 1.181560 | 1.097256 | | 742.01 | | 899.41 |
| WAV-Waived DVH | 0 N/A | | $0 | $0 | - | N/A | | 1.181560 | 1.097256 | | | | |
| **Total** | 126 | $67,100 | $74,171 | $141,811 | 126 | $ 532.34 | 582.35 | 1.181560 | 1.097256 | 629.23 | 850.81 | 616.16 | 646.48 |

Mercer (Canada) Limited

## Survivor Benefits (SIB, STB)

The liability for the survivor benefits is determined for each individual. The liability is equal to the present value of expected future benefits after December 31, 2010 for those currently in receipt of a benefit. For certain pensioners, their beneficiaries are eligible for an STB benefit upon their death. The present value of these expected payments, that would start upon the member's death, has been included in the STB – accrual figures. Anticipated benefits are discounted for payment eligibility and the time value of money.

The assumptions used are described in the following table:

| Measurement date | December 31, 2010 |
|---|---|
| Discount rate | 3.70% per annum for 10 years, then 5.10% per annum thereafter |
| Mortality | UP 94 mortality table with generational improvements projected to 2020 |

<div style="border: 1px solid black; width: 150px; height: 150px;">

**5**

</div>

# Calculations for Individual Member Allocation of Trust

The aggregate estimated liabilities contained in this report are expected to be used to allocate the accumulated Trust assets to different benefit types, subject to court approval.  The estimated liabilities for each covered individual as at the valuation date have also been calculated for LTD – Income, LTD – Life and SIB and STB – in receipt benefits.  Individual member's amounts are expected to be used to allocate a pro-rata share of the accumulated Trust assets to each member, based on the allocation to that benefit level.

The following unique member information was used in determining the individual amounts for the LTD – Income and LTD life insurance amounts:

1. Attained age
2. Duration on disability
3. Gender
4. Net Monthly LTD income benefit after offsets for other income benefits (i.e. CPP, WSIB)
5. LTD index option
6. Basic life insurance volume

The following unique beneficiary information was used in determining the individual amounts for the SIB and STB amounts in receipt of payment:

1. Attained age
2. Remaining payment period for STB
3. Gender
4. Monthly STB or SIB income benefit

The estimated liability for each individual member on LTD or pensioner/beneficiary has not been calculated at this time for the LTD – M&D plan, LTD – IBNR, LTD – Optional

Life, the PRB – M&D, PRB – Life, PRB – ADB, or STB - accruals.  To do so, the following unique member information would be used as required for the appropriate plan:

1.  Attained age
2.  Duration on disability
3.  Gender
4.  Basic life insurance volume or ADB volume or Optional Life volume
5.  Benefit plan (union, non-union grandfathered, etc)
6.  Benefit coverage (pensioner, pensioner and spouse, pensioner and spouse and child, etc)
7.  Monthly STB income benefit

As noted in Section 3, the data are not sufficiently complete and reliable (and not as of the required valuation date) for purposes of the allocation of assets to individual members without the benefit of subsequent adjustments to reflect true ups in the membership data.

<div style="border:1px solid black; display:inline-block;">

**6**

</div>

# Non-Pension Benefit Plan Provisions

## Post Retirement Benefits

### *Non-Union Pensioners (Retired on or after January 1, 2008)*

On June 2, 2006 Nortel announced changes to the post retirement benefits provided to non-union members. Effective January 1, 2008, non-union members who were not at least 50 years of age with 5 years of service on July 1, 2006:

- Would be provided with medical and dental benefits on an "access-only" basis (100% paid by pensioner)
- A flat $10,000 life benefit

### *Non-Union Pensioners (Retired before January 1, 2008)*

May be covered by one of the various plans outlined on the following pages depending on their compensation plan and depending on their retirement date.

### *Union Pensioners*

Union pensioners are covered under the Traditional Grandfathered plan or SARP plan as shown on the following pages. (There are a few plan differences for the union members covered under the Traditional plan than the non-union members covered under this plan.)

Nortel Networks Limited

**Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010**

| | Grandfathered Traditional Program | Non-Grandfathered Traditional Program — Catastrophic Program | Non-Grandfathered Traditional, Balanced Program and SARP — Healthcare Spending Account |
|---|---|---|---|
| Eligibility | • Age 50 or have at least 28 years of service as at April 30, 2000<br>• Part I: Member must retire directly from active status or Long Term Disability<br>• Part II: Member must be at least age 55 with 5 years of service at retirement | • If member does not qualify for the Grandfathered Traditional program<br>• Part I: Member must retire directly from active status or Long Term Disability<br>• Part II: Member must be at least age 55 with 10 years of service at retirement | • Part I: Member must retire directly from active status or Long Term Disability<br>• Part II: Balanced Program & SARP; member must be at least age 55 with 10 years of service at retirement<br>• Investor program for Quebec pensioners under age 65 who retire from active status |
| *Medical and Dental Coverage* | | | |
| *Deductible* | • $25/50 (single/family) per calendar year<br>• Applies to expenses incurred under either or both health and dental plans | • $7,500 lifetime out-of-pocket deductible per family<br>• Applies to certain medical benefits only | • N/A |
| *Overall Plan Maximum* | • Unlimited | • $500,000 lifetime maximum per family | • N/A |
| *Benefit Amount* | • Out-of-pocket maximum of $1,000 per calendar year per family | • Reimburses 100% (from catastrophic plan) of eligible medical expenses after the lifetime deductible is satisfied | • Annual company paid allocation is $50 per year of service from age 40 |
| *Spousal & Dependent Coverage* | • Yes | • Yes | • Annual company paid allocation reduced by half after the death of the pensioner |
| *Cost Sharing* | • 100% Nortel-paid if member at least age 50 with 5 years service at July 1, 2006, otherwise, 100% pensioner-paid | • 100% Nortel-paid if member at least age 50 with 5 years service at July 1, 2006, otherwise, 100% pensioner-paid | • 100% Nortel-paid if member at least age 50 with 5 years service at July 1, 2006, otherwise, 100% pensioner-paid |
| *Medical* | | | |
| *Drug (Non-Quebec)* | • Prescription drugs covered at 80% | • Prescription drugs, generic substitution where possible<br>• $7 dispensing fee maximum | • Not covered |

Nortel Networks Limited

**Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010**

| | Grandfathered Traditional Program | Non-Grandfathered Traditional Program<br>Catastrophic Program | Non-Grandfathered Traditional, Balanced Program and SARP<br>Healthcare Spending Account |
|---|---|---|---|
| *Drug (Quebec) – Pensioners 65 and over: 2 Choices* | Provincial RQ Drug Plan<br>• Covers 68% up to $954 out of pocket/yr<br>• 100% of expenses in excess of $954<br>• Monthly deductible $14.95/month<br>• Nortel pays premiums (taxable benefit) to a maximum of $175/yr<br>NN RAMQ Equivalent Drug Plan<br>• 80% eligible on RAMQ formulary up to $954 out of pocket a year and 100% of expenses in excess of $954; $25/$50 deductible<br>• Pensioner pays premiums | Provincial RQ Drug Plan<br>• Covers 68% up to $954 out of pocket/yr<br>• 100% of expenses in excess of $954<br>• Monthly deductible $14.95/month<br>• Nortel pays premiums (taxable benefit) to a maximum of $175/yr<br>NN RAMQ Equivalent Drug Plan<br>• 80% eligible on RAMQ formulary up to $954 out of pocket a year and 100% of expenses in excess of $954; $25/$50 deductible<br>• Pensioner pays premiums | Provincial RQ Drug Plan<br>• Covers 68% up to $954 out of pocket/yr<br>• 100% of expenses in excess of $954<br>• Monthly deductible $14.95/month<br>• Nortel pays premiums (taxable benefit) to a maximum of $175/yr<br>NN RAMQ Equivalent Drug Plan<br>• 80% eligible on RAMQ formulary up to $954 out of pocket a year and 100% of expenses in excess of $954<br>• Pensioner pays premiums |
| *Hospital* | • 100% of the first $50 per day and 50% of the remaining cost<br>• Difference between ward and private room coverage | • Not covered | • Not covered |
| *Private Duty Nursing* | • 80% to a maximum of $12,500 in period of illness/injury | • 100% subject to deductible and overall plan maximum | • Not covered |
| *Vision Care* | Non-Union<br>• 50% up to a maximum of $100/ 2yrs /per person, and $200/2yrs for severe eye conditions<br>CAW and COEU<br>• Maximum of $100 /2yrs /per person, and $200/2yrs for severe eye conditions | • Not covered | • Not covered |
| *Hearing Aid* | • 50% to a maximum of $200 /2yrs/ per person | • Not covered | • Not covered |
| *Provincial Health Insurance Premium* | • Nortel Networks pays 100% of the provincial health insurance premiums for pensioners in British Columbia. | • Nortel Networks pays100% of the provincial health insurance premiums for pensioners in British Columbia. | • Nortel Networks pays 100% of the provincial health insurance premiums for pensioners in British Columbia. |

**Mercer (Canada) Limited**

30

**Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010**

| | Grandfathered Traditional Program | Non-Grandfathered Traditional Program | Non-Grandfathered Traditional, Balanced Program and SARP |
|---|---|---|---|
| | | Catastrophic Program | Healthcare Spending Account |
| *Other Medical* | • Includes:<br><br>80% co-insurance:<br>  – Out of province medical coverage<br>  – Medical equipment and supplies<br>  – Ambulance services<br>  – X-rays<br>  – Accidental dental<br>  – Paramedical services ($250 maximum per person per calendar year)<br>  – Orthopaedic shoes<br>  – Physiotherapist (no maximum)<br>  – Other parameds ($250 maximum)<br><br>50% co-insurance:<br>  – Hearing aids<br>  – Nursing Homes | • Includes:<br><br>  – Medical equipment and supplies<br>  – Ambulance services<br>  – X-rays<br>  – Selected list of paramedical services (physiotherapist, chiropractor, speech therapist, osteopath) $250 maximum per practitioner per calendar year<br>  – 100% subject to deductible and overall plan maximum | • Not covered |
| *Dental* | Coinsurance of: | Not Covered | Not covered |
| *Basic* | 80% | | |
| *Periodontic / Endodontic* | 50% | | |
| *Major Restorative* | 50% | | |
| *Orthodontic* | None | | |
| *Maximum Benefit* | • Periodontic / Endodontic: $1,000 per person in any 3 years<br>• Major: $1,000 per person per calendar year | | |

**Mercer (Canada) Limited**

**Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010**

Nortel Networks Limited

| | Grandfathered Traditional Program | Non-Grandfathered Traditional Program | Non-Grandfathered Traditional, Balanced Program and SARP |
|---|---|---|---|
| | | Catastrophic Program | Healthcare Spending Account |
| Life Insurance | • Equal to pre-retirement basic life coverage <br><br> • Non-union members receive $10,000 if not at least age 50 with 5 years service on July 1, 2006 <br><br> • Reducing by 5% on each retirement anniversary <br><br> **Non-Union** <br> <u>Non-Union Pre '91 Pensioner</u> <br> – Reduction stops when coverage is 75% of pre-retirement basic life coverage <br><br> <u>Non-Union Post '91 Pensioner</u> <br> – Reduction stops when coverage is 25% of pre-retirement basic life coverage <br> – Minimum coverage of $20,000 <br><br> <u>Exceptions to the Above:</u> <br> • For pensioners on private payroll whose band was 12 and above, and for NEDCO pensioners; the initial amount of insurance remains level after retirement <br> • There is an identified group of members who retired (mostly) pre-1983 receiving an additional death benefit of 1x preretirement earnings, with no reductions <br><br> **Union** <br> <u>Union Pre '91 Pensioner</u> <br> – Reduction stops when coverage is 75% of pre-retirement basic life coverage <br><br> <u>Union Post '91 Pensioner</u> <br> • Reduction stops when coverage is 50% of pre-retirement basic life coverage <br> • Minimum coverage of $10,000 except for CAW who have a minimum coverage of $25,000 | <u>Non Grandfathered Traditional</u> <br> • $35,000 in company paid coverage or $10,000 death benefit if at least age 50 with 5 years service at July 1, 2006, otherwise, $10,000 | <u>Balanced</u> <br> • $35,000 in company paid coverage or $10,000 death benefit if at least age 50 with 5 years service at July 1, 2006, otherwise, $10,000 <br><br> <u>SARP</u> <br> • $30,000 in company paid coverage or $10,000 death benefit for CAW pensioners <br> • $35,000 in company paid coverage or $10,000 death benefit for COEU pensioners |

**Mercer (Canada) Limited**

# Benefits Provided to Disabled Members

## LTD – Income Benefits

For most union members, the income benefit is a flat amount based on their benefit group. There is a 12 month elimination period to be satisfied before LTD starts. Effective January 1, 2004, members of the COEU have the non-union LTD FLEX plan design. Before January 1, 2004, the benefit ranged from $1,850 to $3,050 per month. The current benefit range for members of the CUCW is $1,975 to $2,250. The benefit for members of the CAW before April 1, 2003 ranged from $1,850 to $3,050 and after April 1, 2003 the range is $1,950 to $3,150. There is a 75% all source maximum and no provision for Cost of Living Adjustment (COLA) on the benefit.

For the non-union members, the income benefit is based on their Flexible Benefit plan election, with the option of 50% or 66 2/3% of salary (reduced from 70%, effective January 1, 2006), with or without Cost of Living Adjustment (COLA) benefit. Beginning after two years of receiving LTD benefit payments, each January, the full amount of disability payment will be increased by the lesser of 60% of the Consumer Price Index or 6%. There is a 6 month elimination period to be satisfied before LTD starts. This COLA feature does not apply if the member is covered under the core LTD option only.

For both union and non-union LTD members, continuation of medical and dental benefits and life insurance is provided up to the earlier of recovery, death or age 65. If the non-union member has waived coverage or is in the Basic or Comprehensive plan, they will be put into the Comprehensive plan at no cost to them. If the member is in the Plus or Select plan, they can continue in that plan provided they pay the member contributions. If the union member went on disability before April 1, 2003 and have a covered dependent, they are eligible to receive the STB income benefit, if they die while on LTD.

## Medical and Dental Benefits

In general, disabled members are provided the same benefits as active members.[14] Benefits are paid to the earlier of recovery, death or attainment of age 65. The benefits provided are the benefits in effect at the time the member is disabled.

## Life Insurance for Members on LTD

There is employer-paid basic coverage for life insurance. Premium for the basic life insurance is continued and paid by Nortel.

For union members, the basic coverage is a flat amount for members of the CUCW; a flat amount that varies by benefit group for members of the CAW; and the FLEX non union basic life for members of the COEU. The coverage varies from $32,500 to about $45,000. Effective April 1, 2003 basic life for members of the CAW increased for any member not on LTD to range from $76,000 to $87,000 depending on benefit group.

---

[14]   Where the benefit program has changed since the member became disabled, the member may be provided benefits under the earlier benefit program or may have been changed to the newer benefit plan.  As an example, certain disabled union members are provided with STB coverage.

For non-union members, the basic coverage is one-time salary.

For both groups, the definition of disability is the same as the LTD definition.

## Survivor Benefits

### Survivor Income Benefits (SIB) and Survivor Transition Benefits (STB)

Survivor Income Benefit (SIB) is a monthly income benefit provided upon the death of non-union members. This benefit coverage is no longer provided with the exception of a closed group of surviving spouses. The payment of benefits is provided for the lifetime of the surviving spouse.

Survivor Transition Benefit (STB) is a monthly income benefit provided upon the death of certain union members or certain retired union members. The monthly benefit is provided to the surviving spouse for 60 months following the death of the member.  Monthly benefit amounts range from $250 - $825.

Coverage for two of the union groups is as follows:

- CAW – Effective April 1, 2003, there is no STB for active members or future pensioners. Members on LTD at the time of this benefit change will maintain STB coverage while on LTD, but will no longer have STB coverage if they retire or return to active status.

- COEU – Effective January 1, 2004, active members were covered under the non union Flex plan, and STB benefits for current or future pensioners were eliminated.

Current pensioners retain eligibility for the STB coverage if they retired before the dates outlined above and they have an eligible dependent.

Nortel Julie Graffam          9723627152              p. 1

Valuation of the Obligations of the Non-Pension                    Nortel Networks Limited
Benefits as at December 31, 2010



**7**

## Employer Certification

With respect to the Report on the Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010 for Nortel's Benefit Plans, I hereby certify that, to the
best of my knowledge and belief:

- The membership data supplied to the actuary provides a complete and accurate
  description of all persons who are entitled to benefits under the terms of the Plan for
  service up to the date of the data provided as outlined in Section 3.

- A copy of the plan documents and of all amendments made up to the date of the
  valuation were supplied to the actuary.

- All events subsequent to the valuation that may have an impact on the results of the
  valuation have been communicated to the actuary.

_August 27, 2010_
Date

_Julie Graffam_
Signed

_Julie Graffam_
Name

_Director, HR Operations_
Title

Nortel (Canada) Limited                                                      35

# MERCER



**MARSH   MERCER   KROLL**
**GUY CARPENTER   OLIVER WYMAN**

Mercer (Canada) Limited
161 Bay Street
P.O. Box 501
Toronto, Ontario  M5J 2S5
+1 416 868 2000

**Consulting. Outsourcing. Investments.**

Mercer (Canada) Limited

**APPENDIX "D"**

# Nortel Health and Welfare Trust
## Illustrative Allocation Scenarios
Scenario: Optional Life does not participate
Cdn Millions

**Appendix D-1**
Scenarios 1 to 4

| Type of Benefit | Benefit Liabilities [6] | 1 All Benefits Share Pro Rata [Distribution %: 14.7%] | 2 Proposed Participating Benefits Share Pro Rata [Distribution %: 34.5%] | 3 Benefits in Pay Share Pro Rata [Distribution %: 72.1%] | 4 Reserved Asset Method 3,5 [Distribution %: N/A] |
|---|---|---|---|---|---|
| Pensioner Life (including ADB) [1] | $ 126.9 | $ 10.90 | $ 36.03 | $ - | $ 33.53 |
| Pensioner M&D | 251.3 | 37.03 | - | - | - |
| **Pensioner Benefit Total** | 378.2 | 47.93 | 36.03 | - | 33.53 |
| LTD Income (including IBNR) | 79.9 | 11.77 | 27.60 | 57.57 | 21.47 |
| LTD M&D [2] | 29.7 | 4.38 | - | - | - |
| LTD - STB accrued | 0.3 | 0.04 | - | - | - |
| LTD Life [2] | 4.5 | 0.66 | 1.55 | - | 0.65 |
| LTD Optional Life Benefit | TBD | - | - | - | - |
| **LTD Benefit Total** | 114.4 | 16.86 | 29.15 | 57.57 | 22.12 |
| SIB [4] | 16.2 | 2.39 | 5.60 | 11.67 | 16.55 |
| STB - in pay | 4.1 | 0.60 | 1.42 | 2.95 | - |
| STB - accrued | 30.0 | 4.42 | - | - | - |
| Optional Life | | - | - | - | - |
| **Total Benefits** | $ 542.9 | $ 72.2 | $ 72.2 | $ 72.2 | $ 72.2 |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 | 7.80 |
| **Total** | $ 542.9 | $ 80.0 | $ 80.0 | $ 80.0 | $ 80.0 |

**NOTES**
1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Optional life reserved asset of $18.7 million has been allocated pro rata amongst the other reserved assets based on asset value
4. The pro-rata allocation of the optional life reserved asset amongst the other remaining reserved asset categories results in the SIB reserved asset allocation exceeding the total benefit claim attributable to this category. No adjustments have been made to limit the SIB distribution under the reserved asset method
5. The Reserved Asset Method allocates HWT Assets using the reserved asset mix as at December 31, 2009 (as disclosed in the 2009 Health Welfare Trust Financial Statements)
6. Source: Mercer 2010 HWT Preliminary Valuation

# Nortel Health and Welfare Trust
## Illustrative Allocation Scenarios
**Scenario: Optional Life is a participating benefit**
Cdn Millions

**Appendix D-2**
**Scenarios 5 to 8**

| Type of Benefit | Benefit Liabilities[4] | 5 All Benefits Share Pro Rata [Distribution %: 11.3%] | 6 Proposed Participating Benefits Share Pro Rata [Distribution %: 26.4%] | 7 Benefits in Pay Share Pro Rata [Distribution %: 53.3%] | 8 Reserved Asset Method[3] [Distribution %: N/A] |
|---|---|---|---|---|---|
| Pensioner Life (including ADB)[1] | $ 126.9 | $ 6.52 | $ 25.76 | $ 42.63 | $ 23.85 |
| Pensioner M&D | 251.3 | 28.35 | - | - | - |
| **Pensioner Benefit Total** | **378.2** | **34.87** | **25.76** | **42.63** | **23.85** |
| LTD Income (including IBNR) | 79.9 | 9.02 | 21.13 | 42.63 | 16.44 |
| LTD M&D[2] | 29.7 | 3.35 | - | - | - |
| LTD - STB accrued | 0.3 | 0.03 | - | - | - |
| LTD Life[2] | 4.5 | 0.51 | 1.19 | - | 0.50 |
| LTD Optional Life Benefit | TBD | | | - | |
| **LTD Benefit Total** | **114.4** | **12.91** | **22.32** | **42.63** | **16.94** |
| SIB | 16.2 | 1.83 | 4.28 | 8.64 | 12.67 |
| STB - in pay | 4.1 | 0.46 | 1.08 | 2.19 | - |
| STB - accrued | 30.0 | 3.38 | - | - | - |
| Optional Life | - | 18.74 | 18.74 | 18.74 | 18.74 |
| **Total Benefits** | **$ 542.9** | **$ 72.2** | **$ 72.2** | **$ 72.2** | **$ 72.2** |
| Pensioner Life 2010 Premiums[1] | NA | 7.80 | 7.80 | 7.80 | 7.80 |
| **Total** | **$ 542.9** | **$ 80.0** | **$ 80.0** | **$ 80.0** | **$ 80.0** |

**NOTES**
1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. The Reserved Asset Method allocates HWT Assets using the reserved asset mix as at December 31, 2009 (as disclosed in the 2009 Health Welfare Trust Financial Statements)
4. Source: Mercer 2010 HWT Preliminary Valuation

# Nortel Health and Welfare Trust
## Illustrative Allocation Scenarios

**Appendix D-3**
Scenarios 9 to 11

Scenario: STB Liability is excluded and Optional Life does not participate
Cdn Millions

| Type of Benefit | Benefit Liabilities[3] | 9 All Benefits Share Pro Rata (Distribution %: 15.7%) | 10 Proposed Participating Benefits (Distribution %: 35.2%) | 11 Benefits in Pay Share Pro Rata (Distribution %: 75.1%) |
|---|---|---|---|---|
| Pensioner Life (including ADB)[1] | $ 126.9 | $ 12.16 | $ 36.82 | $ - |
| Pensioner M&D | 251.3 | 39.54 | - | - |
| **Pensioner Benefit Total** | **378.2** | **51.70** | **36.82** | **-** |
| LTD Income (including IBNR) | 79.9 | 12.57 | 28.10 | 60.03 |
| LTD M&D[2] | 29.7 | 4.67 | - | - |
| LTD - STB accrued | EXCLUDED | - | - | - |
| LTD Life[2] | 4.5 | 0.71 | 1.58 | - |
| LTD Optional Life Benefit | TBD | - | - | - |
| **LTD Benefit Total** | **114.1** | **17.95** | **29.68** | **60.03** |
| SIB | 16.2 | 2.55 | 5.70 | 12.17 |
| STB - in pay | EXCLUDED | - | - | - |
| STB - accrued | EXCLUDED | - | - | - |
| Optional Life | - | - | - | - |
| **Total Benefits** | **$ 508.5** | **$ 72.2** | **$ 72.2** | **$ 72.2** |
| Pensioner Life 2010 Premiums[1] | NA | 7.80 | 7.80 | 7.80 |
| **Total** | **$ 508.5** | **$ 80.0** | **$ 80.0** | **$ 80.0** |

**NOTES**
1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Source: Mercer 2010 HWT Preliminary Valuation (excludes STB Liability)

# Nortel Health and Welfare Trust
## Illustrative Allocation Scenarios

**Scenario: STB Liability is excluded and Optional Life is a participating benefit**

Cdn Millions

| Type of Benefit | Benefit Liabilities [3] | 12 All Benefits Share Pro Rata [Distribution %: 12.0%] | 13 Proposed Participating Benefits [Distribution %: 26.9%] | 14 Benefits in Pay Share Pro Rata [Distribution %: 55.6%] |
|---|---|---|---|---|
| Pensioner Life (including ADB) [1] | $ 126.9 | $ 7.49 | $ 26.37 | $ - |
| Pensioner M&D | 251.3 | 30.27 | | - |
| **Pensioner Benefit Total** | **378.2** | **37.76** | **26.37** | **-** |
| LTD Income (including IBNR) | 79.9 | 9.63 | 21.51 | 44.45 |
| LTD M&D [2] | 29.7 | 3.58 | - | - |
| LTD - STB accrued | EXCLUDED | - | - | - |
| LTD Life [4] | 4.5 | 0.54 | 1.21 | - |
| LTD Optional Life Benefit | TBD | - | - | - |
| **LTD Benefit Total** | **114.1** | **13.75** | **22.73** | **44.45** |
| SIB | 16.2 | 1.95 | 4.36 | 9.01 |
| STB - in pay | EXCLUDED | - | - | - |
| STB - accrued | EXCLUDED | | | - |
| Optional Life | - | 18.74 | 18.74 | 18.74 |
| **Total Benefits** | **$ 508.5** | **$ 72.2** | **$ 72.2** | **$ 72.2** |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 |
| **Total** | **$ 508.5** | **$ 80.0** | **$ 80.0** | **$ 80.0** |

**NOTES**

1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Source: Mercer 2010 HWT Preliminary Valuation (excludes STB Liability)

**APPENDIX "E"**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 31ST DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF MARCH, 2010 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY
CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## SETTLEMENT APPROVAL ORDER

**THIS MOTION**, made by the Applicants (collectively, "Nortel") for an order approving the amended and restated settlement agreement made as of the 30th day of March, 2010, attached as Schedule "A" to this Order (the "Amended and Restated Settlement Agreement") and for the other relief set out in the Notice of Motion dated March 30, 2010 was heard this day at 393 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of Elena King sworn March 30, 2010 and the Forty-Second Report of Ernst & Young Inc. dated March 30, 2010 (the "Forty-Second Report") in its capacity as monitor (the "Monitor"), and on hearing submissions of counsel for the Applicants, the Monitor, The Northern Trust Company, Canada, in its capacity as trustee of the HWT and it is capacity as trustee and custodian for the trust funds maintained in respect of the Pension Plans and the master trust for the Pension Plans, the Northern Telecom Limited Pension Trust Fund, the Opposing LTD Employees and the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and on the consent of CAW, the Former

2

Employees Representatives, the LTD Representative and Representative Counsel (as those terms are defined in the Amended and Restated Settlement Agreement); the UCC, the Bondholder Committee (as those terms are defined in the Amended and Restated Settlement Agreement) and the Superintendent of Financial Services of Ontario (the "Superintendent") as the administrator of and on behalf of the Pension Benefits Guarantee Fund (the "PBGF") not opposing, no one else appearing although duly served as appears from the affidavit of service of Katie Legree dated March 30, 2010, filed.

1.     **THIS COURT ORDERS** that service of the Notice of Motion, the Forty-Second Report and the Motion Record is hereby validated so that this Motion is properly returnable today and further service thereof is hereby dispensed with.

2.     **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Affidavit of Elena King dated February 18, 2010 or the Amended and Restated Settlement Agreement.

**Amended and Restated Settlement Agreement**

3.     **THIS COURT ORDERS** that the Amended and Restated Settlement Agreement is hereby approved in its entirety, including all schedules attached thereto, and that the Parties thereto (including by representation) are hereby bound by this Order and the Amended and Restated Settlement Agreement  and authorized and directed to comply with their obligations thereunder, including, without limitation, to make the payments provided for therein.  The Amended and Restated Settlement Agreement supersedes all prior arrangements and understandings among the Parties thereto (including by representation) with respect to such subject matter, including, without limitation, the Settlement Agreement made as of the 8th day of February, 2010.

**Pension Plans**

4.     **THIS COURT ORDERS AND DECLARES** that any Pension Claims made in these proceedings or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans shall, to the extent they are allowed pursuant to any claims

3

adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, such that no part of any Pension Claims shall be entitled to any preferential treatment or enjoy any priority in any manner over the claims of ordinary unsecured creditors made against Nortel, or rank as a priority claim, as a trust (whether deemed or otherwise) or a lien or charge.

5.    **THIS COURT ORDERS AND DECLARES** that no person or entity, including without limitation, (i) the Representatives, (ii) the Superintendent, as administrator of and on behalf of the PBGF, (iii) NNL, as the administrator of the Pension Plans, (iv) all successor administrators of the Pension Plans (whether appointed by the Superintendent or otherwise), and (v) the Pension HWT Claimants, all future members and beneficiaries of the Pension Plans, the trustee and custodian of the Pension Plans, the employees and former employees of Nortel and others who may have or make claims against Nortel or any Nortel Worldwide Entity with respect to employment or post employment or post retirement benefits (collectively, with the Pension HWT Claimants, the "Employee Claimants"), shall directly or indirectly assert, advance, re-assert or re-file any claim or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity (to the extent such claims are provable) or the Pension Plans except as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, and shall not assert or advance any claim, directly or indirectly, that the Pension Claims, or any part thereof, ranks as a priority or preferential claim over the claims of ordinary unsecured creditors or Nortel, including, without limitation, that it is the subject of a trust (whether deemed or otherwise) or a lien or charge, or under other legal or equitable theory, and all such priority, trust, lien or charge claims are hereby forever barred, enjoined, released and extinguished as against Nortel, any Nortel Worldwide Entity, the Pension Plans, the trustee and custodian of the Pension Plans, and their respective officers, directors, employees, agents, members, legal counsel, financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing.

4

6.     **THIS COURT ORDERS** that the portion of proofs of claim already or hereafter filed by the Superintendent as the administrator of and on behalf of the PBGF, by Nortel, by any Employee Claimants or by any other person or entity claiming, asserting or advancing priority or preferential treatment of any kind, including, without limitation, trusts (whether deemed or otherwise) liens or charges in respect of any Pension Claims or payments by the PBGF with respect to the Pension Plans be and they hereby are disallowed, but only to the extent that they claim such priority or preferential treatment, without prejudice to the ordinary unsecured claims included in such proofs of claim. For greater certainty, such disallowance shall not otherwise affect the quantum or validity of such claims, which shall rank as ordinary unsecured creditors on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel, in each case, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings.

7.     THIS COURT ORDERS that with respect to claims by the Superintendent on behalf of the PBGF, and any administrator appointed by the Superintendent, paragraphs 4, 5 and 6 shall only apply if: (i) the Pension Payments are made in accordance with the Amended and Restated Settlement Agreement; and (ii) no bankruptcy order is made with respect to Nortel on or before September 30, 2010.

8.     **THIS COURT ORDERS** that as long as NNL continues to administer the Pension Plans, there shall be no change whatsoever to the plan terms of the Pension Plans without the approval of the Court, and no change to the current asset mix or investment policies with respect to the Pension Plans other than at the request, and with the consent, of the Representative Counsel and the approval of the Court.

9.     **THIS COURT ORDERS** that Nortel shall make all current service payments and special payments to the Pension Plans in respect of defined benefit entitlements thereunder in the same manner as it has been doing over the course of the proceedings under the CCAA, through to March 31, 2010 in accordance with the last actuarial valuation for the Pension Plans filed with the Financial Services Commission of Ontario ("FSCO") in the aggregate amount of $2,216,254.00 per month. Thereafter and through to September 30, 2010, Nortel shall make only current service payments to the Pension Plans (in accordance with the last

5

actuarial valuation for the Pension Plans filed with FSCO) in the aggregate amount of $379,837.00 per month. For greater certainty, Nortel shall not be required to make any special payment contributions to the Pension Plans after March 31, 2010. Nortel shall also make current service contributions in respect of defined contribution entitlements under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) in accordance with the terms thereof, through to September 30, 2010 and shall not be precluded from doing so by the terms of the Amended and Restated Settlement Agreement. Nortel shall not be required to make any payments to the Pension Plans after September 30, 2010, except in respect of any claims in respect of the Pension Plans allowed against Nortel (which claims shall rank on a *pari passu* basis with the unsecured claims of the ordinary unsecured creditors of Nortel) pursuant to any claims adjudication procedure established in these proceedings. Neither Nortel, nor any Nortel Worldwide Entity shall have any liability regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans that occurs after September 30, 2010. For greater certainty, nothing in this paragraph affects any obligation or liability of Nortel regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans that occurs before 11:59 p.m. on September 30, 2010.

**Health and Welfare Trust**

10.    **THIS COURT ORDERS AND DECLARES** that any HWT Claims made in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the HWT shall, to the extent they are allowed against Nortel pursuant to any claims adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, and no part of any such HWT Claims shall rank as a preferential or priority claim or shall be the subject of a constructive trust or trust of any nature or kind.

11.    **THIS COURT ORDERS AND DECLARES** that  no person or entity, including without limitation, the trustee of the HWT, the Employee Claimants and the Representatives, shall, directly or indirectly (i) advance, assert, re-assert, re-file or make any HWT Claim in

6

these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity (to the extent that such claims are provable) or the HWT except as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, or (ii) advance, assert, re-assert, re-file or make any claim that any HWT Claims are entitled to any priority or preferential treatment over ordinary unsecured claims, including without limitation that they rank as preferential or priority claims against Nortel or any Nortel Worldwide Entity, or are the subject of a constructive trust or trust of any nature or kind, and all such claims are hereby forever barred, enjoined, released and extinguished as against Nortel, any Nortel Worldwide Entity, the HWT and the trustee of the HWT, and their respective officers, directors, employees, agents, members, legal counsel, financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing.

12.    **THIS COURT ORDERS AND DECLARES THAT** nothing in this Order, including, without limiting the generality of the foregoing, the provisions of paragraphs 10 and 11, affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT.

Release and Charge

13.    **THIS COURT ORDERS** that the M&D Beneficiaries and former employees entitled to payment from the Termination Fund shall be entitled to the benefit of a charge on Nortel's Property (as defined in the Initial Order) to secure payment of the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments (the "Payments Charge"), which Payments Charge shall:  (i) not exceed an aggregate amount of FIFTY-SEVEN MILLION DOLLARS ($57,000,000.00); (ii) rank subordinate in priority to the Inter-company Charge and the Shortfall Charge (as both terms are defined in the Initial Order); (iii) apply in these proceedings and in any subsequent bankruptcy or receivership; (iv) be reduced in amount as the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments are paid by an amount equal to each such payment made; and (v) automatically terminate and be extinguished on the filing with this Honourable Court

7

by the Monitor of a certificate certifying that the terms of the Amended and Restated Settlement Agreement have been complied with by Nortel.

14.    **THIS COURT ORDERS** that the Payments Charge shall constitute a "Charge" pursuant to the Initial Order, and shall be subject to the provisions relating to Charges including, without limitation, paragraphs 42 through 47 thereof and that the creation of the Payments Charge shall not preclude this Court from creating additional charges under the Initial Order that rank in priority to or *pari passu* with the Payments Charge.

15.    **THIS COURT ORDERS AND DECLARES** that the Releasees, the trustee and custodian of the Pension Plans, the CAW, the Representatives, and if and only if paragraphs 4, 5 and 6 apply as provided in paragraph 7, the Superintendent in his capacity as administrator of and on behalf of the PBGF, and their respective officers, directors, employees, agents, members, legal counsel and financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing, be and they are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement (whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) related to (i) the Pension Plans, including without limitation, the administration of the Pension Plans, any obligation to assert or advance in these proceedings, or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans, any claim ranking in preference or priority to claims of unsecured creditors, as a trust (whether deemed or otherwise) or a lien or charge, the funding of the Pension Plans (including any obligation to contribute to the Pension Plans, except as required by paragraph 9 of this Order) and the investment of the Pension Plan assets, and (ii) the HWT, including without limitation, the administration of the HWT, the funding of the HWT, any obligation to contribute to the HWT and the investment of the HWT assets, provided that nothing herein shall release a director of Nortel from any matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud on the part of any Releasee, with respect to that Releasee only.

8

16.    **THIS COURT ORDERS AND DECLARES** that the Nortel Releasees be and they are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement (whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) that the Pension Claims and the HWT Claims, or any part thereof, rank as a preferential or priority claim over the claims of ordinary unsecured creditors of Nortel, as a trust (whether deemed or otherwise) or a lien or charge, or under any other legal or equitable theory.    For greater certainty, notwithstanding the foregoing, nothing in this Order shall release or discharge the Nortel Releasees from any Pension Claims and HWT Claims to the extent such claims are allowed as ordinary unsecured claims (which claims shall rank as on a *pari passu* basis with the unsecured claims of the ordinary unsecured creditors of Nortel) against the Nortel Releasees pursuant to any claims adjudication procedure established in these proceedings.

17.    **THIS COURT ORDERS** that the Employee Claimants shall not assert, advance or make any claims of any nature whatsoever against any person or entity whatsoever that could reasonably be expected to result in a claim over (including, without limitation, a claim for contribution or indemnity) being made against any of the Releasees or Nortel Releasees with respect to the subject matter of the release provisions hereof.

**CCAA Plan or Subsequent Bankruptcy**

18.    **THIS COURT ORDERS AND DECLARES** that under no circumstances shall any CCAA Plan of Arrangement in the Nortel proceedings (the "Plan") be proposed or approved by the Court if: (i) the Plan provides for separate classification of any Employee Claimants from ordinary unsecured creditors of Nortel, including, without limitation, bondholders and Nortel Networks Inc.; or (ii) the Employee Claimants and the other ordinary unsecured

9

creditors do not receive the same *pari passu* treatment of their allowed claims against Nortel pursuant to the Plan.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

APR 0 1 2010

PER / PAR

# SCHEDULE "A"

\S805980.22

# AMENDED AND RESTATED SETTLEMENT AGREEMENT

**THIS AGREEMENT** made as of the 30th day of March, 2010

AMONG:

NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS GLOBAL CORPORATION

(collectively, "**Nortel**" and individually a "**Nortel Entity**")

– and –

ERNST & YOUNG INC., solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

(the "**Monitor**")

– and –

DONALD SPROULE, DAVID ARCHIBALD and MICHAEL CAMPBELL, court appointed representatives of the Nortel Former Employees (as hereinafter defined)

(the "**Former Employees Representatives**")

– and –

SUE KENNEDY, court appointed representative of the Represented LTD Beneficiaries (as hereinafter defined)

(the "**LTD Representative**")

– and –

KOSKIE MINSKY LLP, court appointed counsel to the Former Employees of Nortel and the Represented LTD Beneficiaries

("**Representative Counsel**")

- 2 -

- and -

NATIONAL AUTOMOBILE, AEROSPACE,
TRANSPORTATION AND GENERAL WORKERS
UNION OF CANADA (CAW-Canada) and its Locals 27,
1525, 1530, 1837, 1839, 1905 and/or 1915 and George
Borosh et al.

("CAW")

A.    RECITALS

WHEREAS Nortel filed for and obtained protection under the *Companies'
Creditors Arrangement Act* ("CCAA") by order of the Ontario Superior Court of Justice
(Commercial List) (the "Court") dated January 14, 2009, as amended and restated (the "Initial
Order");

AND WHEREAS by Order of the Court dated May 27, 2009, the Former
Employees Representatives were appointed representatives of all former employees, including
pensioners, of Nortel or any person claiming an interest under or on behalf of such former
employees or pensioners and surviving spouses in receipt of a Nortel pension, or group or class
of them, other than (a) those represented by counsel to the CAW, and (b) those who elected
pursuant to the requirements of such Order not to be bound by such Order (the individuals in
respect of whom the Former Employees Representatives were appointed pursuant to such Order,
are referred to herein as the "Nortel Former Employees");

AND WHEREAS certain employees and former employees of Nortel are
represented by counsel to the CAW;

AND WHEREAS by Order of the Court dated July 30, 2009, the LTD
Representative was appointed representative of those employees of Nortel who are currently not
working due to an injury, illness or medical condition in respect of which they are receiving or
entitled to receive disability income benefits by or through Nortel, and who may assert an
existing or future claim for payment, reimbursement or coverage arising in connection with their
employment with Nortel or termination thereof, a pension or benefit plan sponsored by Nortel,
including in relation to medical, dental, long-term or short-term disability benefits, life insurance
or any other benefit, obligation or payment to which such person (or others who may be entitled
to claim under or through such person) may be entitled from or through Nortel , other than (a)
those individuals who are currently employed and whose benefit or other payments, as described
above, arise directly or inferentially out of a collective agreement between any Nortel Entity and
the CAW, and (b) those individuals who elected pursuant to the requirements of such Order not
to be bound by such Order (the individuals in respect of whom the LTD Representative was
appointed pursuant to such Order are referred to herein as the "Represented LTD
Beneficiaries");

- 3 -

AND WHEREAS Representative Counsel was appointed as counsel to the Nortel Former Employees and the Represented LTD Beneficiaries by Court orders dated May 27, 2009 and dated July 30, 2009, respectively, for the purpose of, among other things, settling or compromising the claims of the individuals they represent;

AND WHEREAS the parties to this Settlement Agreement (the "**Parties**") have reached an agreement for the benefit of Nortel and all of its stakeholders, as well as the Official Committee of Unsecured Creditors of Nortel Networks Inc. and certain of its affiliates in the chapter 11 proceedings before the U.S. Bankruptcy Court for the District of Delaware (the "**UCC**") and the Informal Nortel Noteholder Group (the "**Bondholder Committee**") regarding certain issues related to, among other things, Nortel's Pension Plans, HWT (both as defined below) and certain employment related issues (collectively, the "**Settlement**"); and

NOW THEREFORE for value received (the receipt and sufficiency of which are hereby acknowledged), the Parties agree as follows:

*B.*   *BENEFITS AND EMPLOYEES*

1.     For the remainder of 2010, Nortel shall continue in accordance with current practice to pay medical and dental benefits and life insurance benefits to Nortel pensioners and their beneficiaries and survivors, whether or not represented by Representative Counsel, and for greater certainty, including without limitation all of the individuals referenced in paragraphs (a) and (b) of the second recital above (collectively, the "**Pensioners**") and the Nortel employees receiving or who become entitled during 2010 to receive long term disability benefits, whether or not represented by Representative Counsel, and for greater certainty, including without limitation all of the individuals referenced in paragraphs (a) and (b) of the fourth recital above (collectively, the "**LTD Beneficiaries**") in accordance with the current benefit plan terms and conditions. The Pensioners and the LTD Beneficiaries shall be referred to collectively as the "**M&D Beneficiaries**". Medical and dental benefits to be paid to the M&D Beneficiaries shall be funded solely from Nortel's funds on a "pay as you go basis" in respect of benefits for the coverage period ending December 31, 2010 (the "**Medical and Dental Payments**"), provided that no Medical and Dental Payments claims submitted after February 28, 2011 shall be accepted, honoured or paid. Life insurance benefits to the M&D Beneficiaries shall continue unchanged until December 31, 2010 and shall be funded in the same manner as for 2009 (the "**Life Insurance Benefits**"). For greater certainty, no Medical and Dental Payments or Life Insurance Benefits shall be paid by Nortel for any benefit coverage period following December 31, 2010.

2.     Nortel shall pay income benefits to the LTD Beneficiaries and to those people receiving or who become entitled during 2010 to receive survivor income benefits and survivor transition benefits under Nortel benefit plans (as such plans exist at the date of this Settlement Agreement) solely from Nortel funds on a "pay as you

- 4 -

go basis" for benefits in respect of the coverage period from January 1, 2010 to December 31, 2010 (the "**Income Payments**"). For greater certainty, no Income Payments shall be paid by Nortel for the benefit coverage period following December 31, 2010.

3.    Upon the satisfaction of all of the conditions in paragraph I.1 of this Settlement Agreement, Nortel shall create a pool of $4.3 million (inclusive of Representative Counsel's costs in respect of the motion for leave to appeal referred to in paragraph B.4 below to a maximum of $100,000.00, based on documented and reasonable fees and disbursements) (the "**Termination Fund**") to be set aside for employees and former employees of Nortel whose employment has been terminated or is terminated prior to or on June 30, 2010 to whom amounts are or may become owing for termination or severance payments, who have not been offered employment with a purchaser of Nortel's assets and who have not received or are not entitled to receive (i) gross cumulative Annual Incentive Plan payments from and after October 1, 2009 of $3,000.00 or more; or (ii) a Key Employee Incentive Plan or Key Employee Retention Plan payment in 2009; or (iii) payment from any Court approved equivalent 2010 plan. Each such individual shall be paid a maximum of $3,000.00 (subject to applicable withholding taxes) from the Termination Fund (the "**Termination Payments**"). Any Termination Payments paid to such individuals shall be credited against allowed claims of such individuals and such claims shall be correspondingly reduced. To the extent that funds are unused in respect of terminations prior to or on June 30, 2010, or payment of Representative Counsel's costs referred to above, the Termination Fund may be used to make payments on account of terminations after June 30, 2010. If such unused funds are to be used for another purpose, such purpose shall be approved by the Court, on such basis as is agreed to between Representative Counsel and the Monitor.

4.    Upon the issuance of an order by the Court approving this Settlement Agreement in its entirety, including all schedules thereto, and upon the expiry of all appeals and rights of appeal in respect thereof (the "**Final Approval Order**"), Representative Counsel shall promptly withdraw their application for leave to appeal the decision of the Court of Appeal, dated November 26, 2009, to the Supreme Court of Canada (the "**Leave Application**") on a with prejudice basis. No claim for costs in respect of the Leave Application shall be made by or against Nortel, or any creditor participants (including the UCC and the Bondholder Committee).

5.    The employment of the LTD Beneficiaries shall terminate on December 31, 2010. However, such termination shall not affect in any manner any rights the LTD Beneficiaries or anyone claiming through them may have, either under a collective agreement, at common law or pursuant to any statute in relation to ordinary unsecured claims against Nortel arising out of their employment or termination thereof, including but not limited to claims for future lost long term

- 5 -

disability or income continuation benefits, pension benefits or pension benefit accruals, and medical, dental and life insurance benefits, nor should affect in any manner their ability to participate in any program of benefits for which they are eligible that is established as a successor to the plans in which they currently participate. For greater certainty, such claims, to the extent they are allowed as claims against Nortel pursuant to any claims adjudication procedure established in these proceedings, shall rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel. Nothing in this paragraph will affect the rights of the LTD Beneficiaries to make claims in respect of the HWT (as defined below).

## C.  HEALTH AND WELFARE TRUST

1.  Resolution:  The Parties will work towards a Court approved distribution of the Health and Welfare Trust ("HWT") corpus in 2010 to its beneficiaries entitled thereto and the resolution of any issues necessarily incident thereto. For greater certainty, nothing in this Settlement Agreement affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT.  Any fees or expenses incurred in connection with any dispute or litigation among the beneficiaries of the HWT concerning entitlement (including without limitation all legal, actuarial and other fees and expenses of the trustee of the HWT and other service providers of the HWT) shall not be paid by Nortel, but shall be paid by the HWT corpus. For greater certainty, such fees or expenses shall not include those of the Monitor and incurred by Nortel in connection with any motion for termination of the HWT or for directions with respect to the HWT, which shall be paid by Nortel.

2.  Ranking:  The CAW, Representative Counsel, the LTD Representative and the Former Employee Representatives (the "Representatives") agree, on behalf of those they represent and on their own behalf, that in respect of any funding deficit in the HWT or any HWT related claims (the "HWT Claims"), in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any of the entities listed in Schedule "A" (collectively the "Nortel Worldwide Entities" and individually, a "Nortel Worldwide Entity") or the HWT, they shall not advance, assert or make any claim that any HWT Claims are entitled to any priority or preferential treatment over ordinary unsecured claims, including without limitation that they  rank as priority claims against Nortel or any Nortel Worldwide Entity, or are the subject of a constructive trust or trust of any nature or kind in respect of the property and assets of Nortel or any Nortel Worldwide Entity, nor shall they take any action or support any party, person or entity, directly or indirectly, who advances, asserts or makes such claims, and such claims, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings, shall rank as ordinary unsecured

- 6 -

claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel.

**D.   REGISTERED PENSION PLANS**

1.   <u>Administration:</u>   Nortel shall continue to administer the Nortel Networks Negotiated Pension Plan (Registration No. 08587766) and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) (collectively, the "**Pension Plans**") until 11:59 p.m. on September 30, 2010. For greater certainty, Nortel Networks Limited shall remain the administrator (as defined in the *Pension Benefits Act*) of the Pension Plans until 11:59 p.m. on September 30, 2010. Neither Nortel nor the Monitor will take any steps to initiate a wind up, in whole or in part, of the Pension Plans with an effective date prior to September 30, 2010 at 11:59 p.m. Nortel shall cease to administer the Pension Plans on September 30, 2010 at 11:59 p.m. and thereafter shall have no further responsibility or liability for administration thereof (including any windup). So long as Nortel continues to administer the Pension Plans, there shall be no change whatsoever to the plan terms of the Pension Plans without the approval of the Court, and no change to the current asset mix or investment policies with respect to the Pension Plans other than at the request, and with the consent, of the Representative Counsel and the approval of the Court.

2.   <u>Payments:</u>   Nortel shall continue to make contributions to the Pension Plans in the same manner as it has been doing over the course of the proceedings, under the CCAA, through to March 31, 2010, and for greater certainty, shall continue to make all current service payments and special payments related to the Pension Plans through that date in accordance with the last actuarial valuation for the Pension Plans filed with the Financial Services Commission of Ontario in the aggregate amount of $2,216,254.00 per month (the "**March Pension Payments**"). Thereafter and through to September 30, 2010, Nortel shall make only current service payments to the Pension Plans in the aggregate amount of $379,837.00 per month (the "**September Pension Payments**"). For greater certainty, Nortel shall not make any special payment contributions to the Pension Plans after March 31, 2010. The March Pension Payments and the September Pension Payments shall be referred to collectively as the "**Pension Payments**". Nortel shall not make any payments or contributions whatsoever to the Pension Plans after September 30, 2010, except in respect of any claims in respect of the Pension Plans allowed against Nortel (which claims shall rank on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel) pursuant to any claims adjudication procedure established in these proceedings. Neither Nortel, nor any Nortel Worldwide Entity shall have any obligation or liability regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans after September 30, 2010. For greater certainty, nothing in this paragraph affects any obligation or liability of Nortel regarding any contributions, fees, indemnities, charges or costs of any kind in

- 7 -

respect of the administration of the Pension Plans before 11:59 p.m. on September 30, 2010.

3.    <u>Transition</u>: With the assistance of the Monitor, Nortel shall use reasonable efforts to cause all books, records, data and other information relating to the Pension Plans or beneficial to the administration or winding-up of the Pension Plans in the possession or control of Nortel to be consolidated in Toronto, Ontario, Canada by no later than March 31, 2010. The Monitor and Nortel shall take all reasonable steps, at the sole cost and expense of Nortel, to complete the orderly transfer of the records of administration of the Pension Plans to a new administrator appointed by the Superintendent of Financial Services (the "**Superintendent**"), on September 30, 2010 (the "**New Administrator**"). Any non-compliance or allegation of non-compliance by Nortel or the Monitor under this paragraph D.3 shall have no effect on the enforceability or effectiveness of any other provision of this Agreement.

E.    *RANKING OF PENSION CLAIMS*

1.    The Representatives agree on behalf of the members of the Pension Plans their and beneficiaries and surviving spouses who are entitled to benefits from the Pension Plans and whom they represent and on their own behalf (collectively, the "**Pension Claimants**") that in respect of any claim for payment of or damages related to any solvency or wind up deficiencies, unfunded liabilities, or unpaid or accrued contributions (including, for greater certainty, any special payments whatsoever), any liability regarding the Pension Benefits Guarantee Fund (the "**PBGF**") or any obligation of or claim arising against any person with respect to the Pension Plans or the administration thereof (the "**Pension Claims**"): (a) no Pension Claims shall enjoy any priority in any manner over the claims of ordinary unsecured creditors made against Nortel; (b) the Pension Claimants hereby waive, and shall not directly or indirectly assert, advance, re-assert or re-file any claims or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel or any Nortel Worldwide Entity or the Pension Plans, that the Pension Claims or any part thereof rank as a priority claim over the claims of ordinary unsecured creditors, as a trust (whether deemed or otherwise) or a lien or charge (hereinafter referred to as a "**lien**"), or under any other legal or equitable theory; and (c) the Pension Claimants shall not support, directly or indirectly, any application, claim or action by Nortel, in its capacity as administrator of the Pension Plans, the New Administrator, any successor administrator howsoever appointed, the Superintendent, as the administrator of and on behalf of the PBGF, or any other person or entity, to directly or indirectly assert, advance, re-assert or re-file any claims or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel or any

- 8 -

Nortel Worldwide Entity or the Pension Plans, that the Pension Claims or any part thereof rank as a priority claim over the claims of ordinary unsecured creditors, as a trust (whether deemed or otherwise) or a lien, or under any other legal or equitable theory, and such claims shall be treated as ordinary unsecured claims, and for greater certainty, any such claims, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings, shall rank on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel.

2. That portion of any proofs of claim already or hereafter filed by the Superintendent as the administrator of and on behalf of the PBGF, by Nortel or by any person claiming that any payments by the PBGF or that the Pension Claims or any part thereof rank as a priority or preferential claim over the claims of ordinary unsecured creditors of Nortel, as a trust (whether deemed or otherwise) or a lien, or under any other legal or equitable theory shall be disallowed, but only to the extent that such claim such priority or preference, and such disallowance shall not be opposed or appealed, directly or indirectly, by such claimants. For greater certainty, such disallowance shall not otherwise affect the quantum or validity of such claims, which shall rank as ordinary unsecured creditors on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel, in each case, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings.

F. **NON-OPPOSITION**

1. The Representatives agree, on their own behalf and on behalf of those they represent, that they shall not oppose, directly or indirectly, any employee incentive program, including any charge therefor, that is determined by the Monitor to be reasonable and necessary for the continued operation of Nortel. They further agree that they shall not oppose, directly or indirectly, the creation of a trust with respect to claims or potential claims against persons who accept directorships of a Nortel Worldwide Entity in order to facilitate the restructuring, provided that: (i) such trust is approved and recommended by the Monitor; (ii) no part of the corpus of the trust may be used to pay bonuses or any other compensation to the directors; and (iii) any corpus of the trust remaining on the termination of the trust reverts to Nortel.

G. **RELEASE AND CHARGE**

1. The CAW, the LTD Representative and the Former Employees Representatives agree on their own behalf and on behalf of the Pension Claimants and the beneficiaries of the HWT who they represent (collectively, the **"Pension HWT Claimants"**) that each of the trustee of the HWT, the Monitor, and all members of Pension Plans' committees, (in their personal capacity), and their respective officers, directors, employees, agents, members, legal counsel, financial advisors,

and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing and the officers, directors, employees, agents, members, legal counsel, financial advisors of Nortel and the Nortel Worldwide Entities and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing (collectively, the "Releasees"), are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement (whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) related to (i) the Pension Plans, including without limitation, the administration of the Pension Plans, any obligation to assert or advance in these proceedings, or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans, any priority claim, as a trust (whether deemed or otherwise) or a lien, the funding of the Pension Plans (including any obligation to contribute to the Pension Plans except as required by this Settlement Agreement) and the investment of the Pension Plan assets; and (ii) the HWT, including without limitation, the administration of the HWT, the funding of the HWT, any obligation to contribute to the HWT and the investment of the HWT assets, provided that nothing herein shall release a director of Nortel from any matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud on the part of any Releasee, with respect to that Releasee only.

2.    The CAW, the LTD Representative and the Former Employees Representatives agree on their own behalf and on behalf of the Pension HWT Claimants that Nortel and the Nortel Worldwide Entities and their respective successors and assigns (collectively, the "Nortel Releasees") are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement (whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) that the Pension Claims and the HWT Claims, or any part thereof, rank as a preferential or priority claim over the claims of ordinary unsecured creditors of Nortel, as a trust (whether deemed or otherwise) or a lien, or under any other legal or equitable theory. For greater certainty, notwithstanding the foregoing, nothing in this Settlement Agreement shall release or discharge the Nortel Releasees from any Pension Claims and HWT Claims to the extent such claims are allowed as ordinary unsecured claims against the Nortel Releasees pursuant to any claims adjudication procedure established in these proceedings.

3.    In furtherance of the foregoing and in order to ensure that this constitutes a true settlement of the subject matter hereof, the Pension HWT Claimants agree that they shall not assert, advance or make any claims of any nature whatsoever

- 10 -

against any person or entity whatsoever that could reasonably be expected to result in a claim over (including, without limitation, a claim for contribution or indemnity) being made against any of the Releases or the Nortel Releasees with respect to the subject matter of the release provisions of this Settlement Agreement.

4.    The M&D Beneficiaries and former employees entitled to payment from the Termination Fund shall be entitled to the benefit of a charge on Nortel's Property (as defined in the Initial Order) to secure payment of the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments (the "**Payments Charge**"), which Payments Charge shall not exceed an aggregate amount of FIFTY-SEVEN MILLION DOLLARS ($57,000,000.00) and which Payments Charge shall rank subordinate in priority to the Inter-company Charge (as defined in the Initial Order). The Payments Charge shall apply in these proceedings and in any subsequent bankruptcy or receivership. The maximum amount secured by the Payments Charge shall be reduced as the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments are paid by an amount equal to each such payment made. Once the last payment is made, the Monitor shall file a certificate (the "**Monitor's Certificate**") with the Court certifying that the terms of the Settlement have been complied with by Nortel, and the Payments Charge shall automatically terminate and be extinguished by the filing of the Monitor's Certificate.

**H.**    *CCAA PLAN OR SUBSEQUENT BANKRUPTCY*

1.    The Representatives agree on their own behalf and on behalf of the Pension HWT Claimants that under no circumstances shall any CCAA Plan of Arrangement in the Nortel proceedings (the "**Plan**") be proposed or approved if: (i) the Plan provides for separate classification of any Pension HWT Claimants from ordinary unsecured creditors of Nortel, including, without limitation, bondholders and Nortel Networks Inc.; or (ii) the Pension HWT Claimants and the other ordinary unsecured creditors of Nortel do not receive the same *pari passu* treatment of their allowed ordinary unsecured claims against Nortel pursuant to the Plan.

**I.**    *CONDITIONS*

1.    This Settlement Agreement is conditional upon (i) Nortel obtaining the Final Approval Order substantially in the form attached as Schedule "B" with such changes as the parties may agree to, acting reasonably; (ii) the Superintendent in his capacity as administrator of the PBGF, Nortel and the Monitor executing the letter attached as Schedule "C"; and (iii) the Leave Application having been withdrawn on a with prejudice basis.

2.    It is the intention of the Parties that these terms be binding upon, and enure to the benefit of the Pension HWT Claimants, the Releasees and the Nortel Releasees, and that: (i) as beneficiaries hereof, the Releasees and the Nortel Releasees shall

- 11 -

be entitled to rely upon and to seek the enforcement of these terms, which cannot be varied without further order of the Court on full and proper notice to them; and (ii) the ordinary unsecured creditors of Nortel shall be entitled to rely upon and benefit from the provisions and agreements herein and to seek their enforcement, which provisions and agreements cannot be varied without further order of the Court on full and proper notice to them.

**J.    GENERAL**

1.    The Monitor shall post the motion record for approval of the Settlement, including the Settlement Agreement and the proposed Final Approval Order on the Monitor's website at www.ey.com/ca/Nortel and on the website of Representative Counsel at www.kmlaw.ca.

2.    The Representatives, the Representative Counsel and the CAW shall co-operate with Nortel and the Monitor on all communications related to this settlement, as required.

3.    This Settlement Agreement will be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. The Parties hereby irrevocably consent and submit to the non-exclusive jurisdiction of the Ontario Superior Court of Justice and waive any objection based on venue or forum non conveniens with respect to any action commenced in connection with this Settlement Agreement.

4.    This Settlement Agreement may be executed in any number of counterparts (including by way of facsimile and PDF) and all of such counterparts taken together will be deemed to constitute one and the same instrument.

*[Signature pages to follow]*

**IN WITNESS WHEREOF** the Parties have duly executed this Agreement as of the date first written above:

NORTEL NETWORKS CORPORATION

Per: _____

Name:  John Doolittle
Title:   Senior Vice-President, Corporate
          Services and Chief Financial
          Officer

Per: _____

Name:  Clarke Glaspell
Title:   Controller

NORTEL NETWORKS LIMITED

Per: _____

Name:  John Doolittle
Title:   Senior Vice-President,
          Corporate Services and Chief
          Financial Officer

Per: _____

Name:  Clarke Glaspell
Title:   Controller

NORTEL NETWORKS TECHNOLOGY
CORPORATION

Per: _____

Name:  Clarke Glaspell
Title:   President and Controller

- 13 -

**NORTEL NETWORKS INTERNATIONAL CORPORATION**

Per:  _____
      Name:  John Doolittle
      Title:  President

Per:  _____
      Name:  Clarke Glaspell
             Treasurer

**NORTEL NETWORKS GLOBAL CORPORATION**

Per:  _____
      Name:  John Doolittle
      Title:  President

Per:  _____
      Name:  Clarke Glaspell
      Title:  Controller

**ERNST & YOUNG INC.**, solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per:  _____
      Name:
      Title:

**DONALD SPROULE**, court appointed representative of the Nortel Former Employees

Per:  _____
      Name:
      Title:

- 13 -

**NORTEL NETWORKS GLOBAL CORPORATION**

Per: _____
           Name:
           Title:

**ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per: _____
           Name: Murray A. McDonald
           Title: President

**DONALD SPROULE,** court appointed representative of the Nortel Former Employees

Per: _____
           Name:
           Title:

**DAVID ARCHIBALD,** court appointed representative of the Nortel Former Employees

Per: _____
           Name:
           Title:

13 -

**NORTEL NETWORKS GLOBAL
CORPORATION**

Per: _____
       Name:
       Title:

**ERNST & YOUNG INC.,** solely in its capacity
as monitor in the CCAA proceedings of Nortel
and not in its personal capacity

Per: _____
       Name:
       Title:

**DONALD SPROULE,** court appointed
representative of the Nortel Former Employees

Per: _DEKSproule_____
       Name:
       Title: NRPC National Chair

**DAVID ARCHIBALD,** court appointed
representative of the Nortel Former Employees

Per: _____
       Name:
       Title:

**MICHAEL CAMPBELL,** court appointed
representative of the Nortel Former Employees

Per: _____
       Name:
       Title:

- 13 -

**NORTEL NETWORKS GLOBAL CORPORATION**

Per: _____
      Name:
      Title:

**ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per: _____
      Name:
      Title:

**DONALD SPROULE,** court appointed representative of the Nortel Former Employees

Per: _____
      Name:
      Title:

**DAVID ARCHIBALD,** court appointed representative of the Nortel Former Employees

Per: _____
      Name: DAVID D. ARCHIBALD
      Title: RETIREE

**MICHAEL CAMPBELL,** court appointed representative of the Nortel Former Employees

Per: _____
      Name:
      Title:

- 13 -

**NORTEL NETWORKS GLOBAL CORPORATION**

Per: _____

       Name:
       Title:

**ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per: _____

       Name:
       Title:

**DONALD SPROULE,** court appointed representative of the Nortel Former Employees

Per: _____

       Name:
       Title:

**DAVID ARCHIBALD,** court appointed representative of the Nortel Former Employees

Per: _____

       Name:
       Title:

**MICHAEL CAMPBELL,** court appointed representative of the Nortel Former Employees

Per: _M. A. Campbell /cat._

       Name: _MICHAEL CAMPBELL._
       Title: _C. A. R._

- 14 -

**SUE KENNEDY,** court appointed representative
of the Represented LTD Beneficiaries

Per: _Sue Kennedy_____
　　　Name:
　　　Title:


**KOSKIE MINSKY LLP,** court appointed
counsel to the Former Employees of Nortel and
the Represented LTD Beneficiaries


Per: _____
　　　Name:
　　　Title:


**NATIONAL AUTOMOBILE, AEROSPACE,
TRANSPORTATION AND GENERAL
WORKERS UNION OF CANADA (CAW-**
Canada) and its Locals 27, 1525, 1530, 1837,
1839, 1905 and/or 1915 and George Borosh et al.


Per: _____
　　　Name:
　　　Title:

\5830538.1

- 14 -

**SUE KENNEDY,** court appointed representative
of the Represented LTD Beneficiaries

Per:

_____

Name:
Title:

**KOSKIE MINSKY LLP,** court appointed
counsel to the Former Employees of Nortel and
the Represented LTD Beneficiaries

Per: _____

Name: Susan Philpott
Title: Representative Counsel

**NATIONAL AUTOMOBILE, AEROSPACE,
TRANSPORTATION AND GENERAL
WORKERS UNION OF CANADA (CAW-**
Canada) and its Locals 27, 1525, 1530, 1837,
1839, 1905 and/or 1915 and George Borosh et al.

Per: _____

Name:
Title:

\5830538.1

- 14 -

**SUE KENNEDY,** court appointed representative
of the Represented LTD Beneficiaries

Per:
　　　　　―――――――――――――――
　　　　　Name:
　　　　　Title:

**KOSKIE MINSKY LLP,** court appointed
counsel to the Former Employees of Nortel and
the Represented LTD Beneficiaries

Per:
　　　　　―――――――――――――――
　　　　　Name:
　　　　　Title:

**NATIONAL AUTOMOBILE, AEROSPACE,
TRANSPORTATION AND GENERAL
WORKERS UNION OF CANADA (CAW-**
Canada) and its Locals 27, 1525, 1530, 1837,
1839, 1905 and/or 1915 and George Borosh et al.

Per:　　―――――――――――――――
　　　　　Name:
　　　　　Title:

# SCHEDULE "A"

## NORTEL NETWORKS CORPORATION

### Direct and Indirect Subsidiaries

| |
|---|
| Sonoma Systems |
| Sonoma Limited |
| Sonoma Systems Europe Limited |
| Nortel Networks Optical Components (Switzerland) GmbH |
| Xros, Inc. |
| Architel Systems Corporation |
| Architel Systems (U.S.) Corporation |
| Architel Systems (UK) Limited |
| NN Applications Management Solutions Inc. |
| CoreTek, Inc. |
| Alteon WebSystems Inc. |
| Alteon WebSystems International Inc. |
| Alteon WebSystems AB |
| Alteon WebSystems International Limited |
| Nortel Networks Limited |
| Capital Telecommunications Funding Corporation |
| PT Nortel Networks Indonesia |
| Nortel Networks Peru S.A.C. |
| Nortel Networks (Thailand) Ltd. |
| Nortel Networks Telecommunicacoes do Brazil Ltda. |
| Nortel Networks Malaysia Sdn Bhd. |
| Nortel Networks New Zealand Limited |
| Nortel Networks Global Corporation |
| Nortel Networks de Colombia S.A. |
| Nortel Networks Chile S.A. |
| Nortel Networks de Argentina S.A. |
| Nortel Networks del Paraguay S.A. |
| Nortel Networks de Venezuela C.A. |

- 2 -

| |
|---|
| Nortel Networks del Ecuador S.A. |
| Nortel Networks de Mexico S.A. de C.V. |
| Nortel de Mexico, S. De R.L. de C.V. |
| Nortel Networks del Uruguay S.A. |
| Nortel Networks Technology Corporation |
| Nortel Vietnam Limited |
| Nortel Networks Korea Limited |
| Nortel Networks Singapore Pte Ltd |
| Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd. |
| Nortel Networks International Corporation |
| Shenyang Nortel Telecommunications Company Limited |
| Nortel Networks (Ireland) Limited |
| Northern Telecom Maroc SA |
| Nortel Networks Electronics Corporation |
| Regional Telecommunications Funding Corporation |
| Nortel Networks de Bolivia S.A. |
| 1328556 Ontario Inc. |
| CTFC Canada Inc. |
| Northern Telecom Canada Limited |
| Nortel Networks de Panama S.A. |
| TSFC Canada Inc. |
| Nortel Networks Mauritius Ltd. |
| Nortel Networks (India) Private Limited |
| Nortel Networks S.A. |
| Northern Telecom France SA |
| Nortel Networks France SAS |
| Matra Communications Business Systeme GmbH |
| Nortel Networks (China) Limited |
| Nortel Networks Communications Engineering Ltd. |
| Nortel Networks (Asia) Limited |
| Guangdong – Nortel Telecommunications Equipment Co. Ltd. |
| LG-Nortel Co, Ltd. |

- 3 -

| |
|---|
| 6141-Sub  Novera Optics Korea Inc. |
| Novera Optics Inc. |
| LN Srithai Comm Co Ltd |
| Nortel Communications Inc. |
| Nortel Networks Financial Services Limited Liability Co. |
| Nortel Networks Inc. |
| Bay Networks do Brasil Ltda. |
| Bay Networks Fedes de Dados para Sistemas Informaticos, da. |
| Clarify Limited |
| Clarify K.K. |
| Nortel Networks Cable Solutions Inc. |
| Nortel Networks Capital Corporation |
| Nortel Networks Technology K.K. |
| Nortel Networks Eastern Mediterranean Ltd. |
| Nortel Networks International Inc. |
| Nortel Ventures LLC |
| Nortel Networks Japan |
| Penril Datacomm Limited |
| Nortel Networks Southeast Asia Pte Ltd. |
| Nortel Networks Technology (Thailand) Ltd. |
| Nortel Technology Excellence Centre Private Limited |
| Diamondware, Ltd. |
| Northern Telecom International Inc. |
| Nortel Networks Optical Components Inc. |
| The Nortel Foundation |
| Nortel Networks India International Inc. |
| Nortel Networks (CALA) Inc. |
| Nortel Networks de Guatemala, Ltda. |
| Nortel Trinidad and Tobago Limited |
| Qtera Corporation |
| Nortel Networks Technology Ltd. |
| Nortel Networks (Shannon) Limited |

- 4 -

| |
|---|
| Nortel Networks Europe Sales Limited |
| Nortel Government Solutions Incorporated |
| AC Technologies, Inc. |
| Integrated Information Technology Corporation |
| Nortel Networks UK Limited |
| Northern Telecom International Limited |
| Nor. Web DLP Limited |
| Nortel Limited |
| Nortel Networks (Northern Ireland) Limited |
| Networks Employee Benefit Trustee Company Limited |
| Nortel-SE d.o.o. Beograd |
| Nortel Networks Properties Limited |
| Promatory Communications  Limited |
| X-CEL Communications Limited |
| Nortel Networks Optical Components Limited |
| Nortel Networks (Photonics) Pty. Ltd. |
| Northern Telecom PCN Limited |
| Telephone Switching International Limited |
| Frisken Investments Pty. Ltd. |
| Betts Investments Pty. Ltd. |
| Periphonics Limited |
| Nortel Networks Australia Pty Limited |
| Nortel Australia Communication Systems Pty. Limited |
| Star 21 Networks GmbH |
| Star 21 Networks (Schweiz) AG |
| Star 21 Networks Deutschland GmbH |
| Star 21 Facility Management Verwaltung GmbH |
| Star 21 Operations GmbH |
| Star 21 Facility Management GmbH & Co. KG |
| Nortel Networks International Finance & Holding BV |
| Uni-Nortel Communication Technologies (Hellas), S.A. |
| Nortel Networks (Austria) GmbH |

- 5 -

| |
|---|
| Nortel Networks AG |
| Nortel Networks AS |
| Nortel Networks S.R.O. |
| Nortel Networks S.p.A. |
| Nortel Networks S.A. |
| Nortel Networks South Africa (Proprietary) Limited |
| Nortel Networks NV |
| Matra Communication Cellular Terminals GmbH |
| Nortel Networks Engineering Service Kft. |
| Nortel Networks (Bulgaria) EOOD |
| Nortel Networks Slovensko, s.r.o. |
| Nortel Networks Romania Srl |
| Nortel Networks O.O.O |
| Nortel Networks Portugal, S.A. |
| Nortel Communications Holdings (1997) Limited |
| Nortel Networks Israel (Sales and Marketing) Limited |
| Nortel Networks Communications (Israel) Limited |
| Nortel Networks Polska Sp. z.o.o. |
| Nortel GmbH |
| Nortel Networks BV |
| Nortel Networks Malta Limited |
| Nortel Ukraine Ltd. |
| Nortel Networks AB |
| Nortel Networks OY |
| Nortel Networks, Hispania S.A. |
| Nortel Networks Netas Telekomunikasyon A.S. |

SCHEDULE "B" TO AMENDED AND RESTATED SETTLEMENT AGREEMENT

[ATTACHED]

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 31ST DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF MARCH, 2010 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY
CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## SETTLEMENT APPROVAL ORDER

**THIS MOTION**, made by the Applicants (collectively, "Nortel") for an order
approving the amended and restated settlement agreement made as of the 30th day of March,
2010, attached as Schedule "A" to this Order (the "Amended and Restated Settlement
Agreement") and for the other relief set out in the Notice of Motion dated March 30, 2010
was heard this day at 393 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of Elena King sworn March 30, 2010 and the Forty-
Second Report of Ernst & Young Inc. dated March 30, 2010 (the "Forty-Second Report") in
its capacity as monitor (the "Monitor"), and on hearing submissions of counsel for the
Applicants, the Monitor, The Northern Trust Company, Canada, in its capacity as trustee of
the HWT and it is capacity as trustee and custodian for the trust funds maintained in respect of
the Pension Plans and the master trust for the Pension Plans, the Northern Telecom Limited
Pension Trust Fund, the Opposing LTD Employees and the Board of Directors of Nortel
Networks Corporation and Nortel Networks Limited and on the consent of CAW, the Former

2

Employees Representatives, the LTD Representative and Representative Counsel (as those terms are defined in the Amended and Restated Settlement Agreement); the UCC, the Bondholder Committee (as those terms are defined in the Amended and Restated Settlement Agreement) and the Superintendent of Financial Services of Ontario (the "Superintendent") as the administrator of and on behalf of the Pension Benefits Guarantee Fund (the "PBGF") not opposing, no one else appearing although duly served as appears from the affidavit of service of Katie Legree dated March 30, 2010, filed.

1.    **THIS COURT ORDERS** that service of the Notice of Motion, the Forty-Second Report and the Motion Record is hereby validated so that this Motion is properly returnable today and further service thereof is hereby dispensed with.

2.    **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Affidavit of Elena King dated February 18, 2010 or the Amended and Restated Settlement Agreement.

**Amended and Restated Settlement Agreement**

3.    **THIS COURT ORDERS** that the Amended and Restated Settlement Agreement is hereby approved in its entirety, including all schedules attached thereto, and that the Parties thereto (including by representation) are hereby bound by this Order and the Amended and Restated Settlement Agreement and authorized and directed to comply with their obligations thereunder, including, without limitation, to make the payments provided for therein. The Amended and Restated Settlement Agreement supersedes all prior arrangements and understandings among the Parties thereto (including by representation) with respect to such subject matter, including, without limitation, the Settlement Agreement made as of the 8th day of February, 2010.

**Pension Plans**

4.    **THIS COURT ORDERS AND DECLARES** that any Pension Claims made in these proceedings or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans shall, to the extent they are allowed pursuant to any claims

3

adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, such that no part of any Pension Claims shall be entitled to any preferential treatment or enjoy any priority in any manner over the claims of ordinary unsecured creditors made against Nortel, or rank as a priority claim, as a trust (whether deemed or otherwise) or a lien or charge.

5.     **THIS COURT ORDERS AND DECLARES** that no person or entity, including without limitation, (i) the Representatives, (ii) the Superintendent, as administrator of and on behalf of the PBGF, (iii) NNL, as the administrator of the Pension Plans, (iv) all successor administrators of the Pension Plans (whether appointed by the Superintendent or otherwise), and (v) the Pension HWT Claimants, all future members and beneficiaries of the Pension Plans, the trustee of the Pension Plans, the employees and former employees of Nortel and others who may have or make claims against Nortel or any Nortel Worldwide Entity with respect to employment or post employment or post retirement benefits (collectively, with the Pension HWT Claimants, the "Employee Claimants"), shall directly or indirectly assert, advance, re-assert or re-file any claim or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity (to the extent such claims are provable) or the Pension Plans except as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, and shall not assert or advance any claim, directly or indirectly, that the Pension Claims, or any part thereof, ranks as a priority or preferential claim over the claims of ordinary unsecured creditors or Nortel, including, without limitation, that it is the subject of a trust (whether deemed or otherwise) or a lien or charge, or under other legal or equitable theory, and all such priority, trust, lien or charge claims are hereby forever barred, enjoined, released and extinguished as against Nortel, any Nortel Worldwide Entity, the Pension Plans, the trustee of the Pension Plans, and their respective officers, directors, employees, agents, members, legal counsel, financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing.

6.     **THIS COURT ORDERS** that the portion of proofs of claim already or hereafter filed by the Superintendent as the administrator of and on behalf of the PBGF, by Nortel, by any

4

Employee Claimants or by any other person or entity claiming, asserting or advancing priority or preferential treatment of any kind, including, without limitation, trusts (whether deemed or otherwise) liens or charges in respect of any Pension Claims or payments by the PBGF with respect to the Pension Plans be and they hereby are disallowed, but only to the extent that they claim such priority or preferential treatment, without prejudice to the ordinary unsecured claims included in such proofs of claim. For greater certainty, such disallowance shall not otherwise affect the quantum or validity of such claims, which shall rank as ordinary unsecured creditors on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel, in each case, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings.

7.    THIS COURT ORDERS that with respect to claims by the Superintendent on behalf of the PBGF, and any administrator appointed by the Superintendent, paragraphs 4, 5 and 6 shall only apply if: (i) the Pension Payments are made in accordance with the Amended and Restated Settlement Agreement; and (ii) no bankruptcy order is made with respect to Nortel on or before September 30, 2010.

8.    THIS COURT ORDERS that as long as NNL continues to administer the Pension Plans, there shall be no change whatsoever to the plan terms of the Pension Plans without the approval of the Court, and no change to the current asset mix or investment policies with respect to the Pension Plans other than at the request, and with the consent, of the Representative Counsel and the approval of the Court.

9.    THIS COURT ORDERS that Nortel shall make all current service payments and special payments to the Pension Plans in respect of defined benefit entitlements thereunder in the same manner as it has been doing over the course of the proceedings under the CCAA, through to March 31, 2010 in accordance with the last actuarial valuation for the Pension Plans filed with the Financial Services Commission of Ontario ("FSCO") in the aggregate amount of $2,216,254.00 per month. Thereafter and through to September 30, 2010, Nortel shall make only current service payments to the Pension Plans (in accordance with the last actuarial valuation for the Pension Plans filed with FSCO) in the aggregate amount of $379,837.00 per month. For greater certainty, Nortel shall not be required to make any

5

special payment contributions to the Pension Plans after March 31, 2010. Nortel shall also make current service contributions in respect of defined contribution entitlements under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) in accordance with the terms thereof, through to September 30, 2010 and shall not be precluded from doing so by the terms of the Amended and Restated Settlement Agreement. Nortel shall not be required to make any payments to the Pension Plans after September 30, 2010, except in respect of any claims in respect of the Pension Plans allowed against Nortel (which claims shall rank on a *pari passu* basis with the unsecured claims of the ordinary unsecured creditors of Nortel) pursuant to any claims adjudication procedure established in these proceedings. Neither Nortel, nor any Nortel Worldwide Entity shall have any liability regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans that occurs after September 30, 2010. For greater certainty, nothing in this paragraph affects any obligation or liability of Nortel regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans that occurs before 11:59 p.m. on September 30, 2010.

**Health and Welfare Trust**

10.   **THIS COURT ORDERS AND DECLARES** that any HWT Claims made in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the HWT shall, to the extent they are allowed against Nortel pursuant to any claims adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, and no part of any such HWT Claims shall rank as a preferential or priority claim or shall be the subject of a constructive trust or trust of any nature or kind.

11.   **THIS COURT ORDERS AND DECLARES** that  no person or entity, including without limitation, the Employee Claimants and the Representatives, shall, directly or indirectly (i) advance, assert, re-assert, re-file or make any HWT Claim in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity (to the extent

6

that such claims are provable) or the HWT except as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, or (ii) advance, assert, re-assert, re-file or make any claim that any HWT Claims are entitled to any priority or preferential treatment over ordinary unsecured claims, including without limitation that they rank as preferential or priority claims against Nortel or any Nortel Worldwide Entity, or are the subject of a constructive trust or trust of any nature or kind, and all such claims are hereby forever barred, enjoined, released and extinguished as against Nortel, any Nortel Worldwide Entity, the HWT and the trustee of the HWT, and their respective officers, directors, employees, agents, members, legal counsel, financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing.

12.    THIS COURT ORDERS AND DECLARES THAT nothing in this Order, including, without limiting the generality of the foregoing, the provisions of paragraphs 10 and 11, affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT.

**Release and Charge**

13.    THIS COURT ORDERS that the M&D Beneficiaries and former employees entitled to payment from the Termination Fund shall be entitled to the benefit of a charge on Nortel's Property (as defined in the Initial Order) to secure payment of the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments (the "Payments Charge"), which Payments Charge shall:  (i) not exceed an aggregate amount of FIFTY-SEVEN MILLION DOLLARS ($57,000,000.00); (ii) rank subordinate in priority to the Inter-company Charge and the Shortfall Charge (as both terms are defined in the Initial Order); (iii) apply in these proceedings and in any subsequent bankruptcy or receivership; (iv) be reduced in amount as the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments are paid by an amount equal to each such payment made; and (v) automatically terminate and be extinguished on the filing with this Honourable Court by the Monitor of a certificate certifying that the terms of the Amended and Restated Settlement Agreement have been complied with by Nortel.

7

14.     **THIS COURT ORDERS** that the Payments Charge shall constitute a "Charge" pursuant to the Initial Order, and shall be subject to the provisions relating to Charges including, without limitation, paragraphs 42 through 47 thereof and that the creation of the Payments Charge shall not preclude this Court from creating additional charges under the Initial Order that rank in priority to or *pari passu* with the Payments Charge.

15.     **THIS COURT ORDERS AND DECLARES** that the Releasees, the CAW, the Representatives, and if and only if paragraphs 4, 5 and 6 apply as provided in paragraph 7, the Superintendent in his capacity as administrator of and on behalf of the PBGF, and their legal counsel and financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing, be and they are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement (whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) related to (i) the Pension Plans, including without limitation, the administration of the Pension Plans, any obligation to assert or advance in these proceedings, or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans, any priority claim, as a trust (whether deemed or otherwise) or a lien or charge, the funding of the Pension Plans (including any obligation to contribute to the Pension Plans, except as required by paragraph 9 of this Order) and the investment of the Pension Plan assets, and (ii) the HWT, including without limitation, the administration of the HWT, the funding of the HWT, any obligation to contribute to the HWT and the investment of the HWT assets, provided that nothing herein shall release a director of Nortel from any matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud on the part of any Releasee, with respect to that Releasee only.

16.     **THIS COURT ORDERS AND DECLARES** that the Nortel Releasees be and they are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement

8

(whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) that the Pension Claims and the HWT Claims, or any part thereof, rank as a preferential or priority claim over the claims of ordinary unsecured creditors of Nortel, as a trust (whether deemed or otherwise) or a lien or charge, or under any other legal or equitable theory.   For greater certainty, notwithstanding the foregoing, nothing in this Order shall release or discharge the Nortel Releasees from any Pension Claims and HWT Claims to the extent such claims are allowed as ordinary unsecured claims (which claims shall rank as on a *pari passu* basis with the unsecured claims of the ordinary unsecured creditors of Nortel) against the Nortel Releasees pursuant to any claims adjudication procedure established in these proceedings.

17.     **THIS COURT ORDERS** that the Employee Claimants shall not assert, advance or make any claims of any nature whatsoever against any person or entity whatsoever that could reasonably be expected to result in a claim over (including, without limitation, a claim for contribution or indemnity) being made against any of the Releasees or Nortel Releasees with respect to the subject matter of the release provisions hereof.

**CCAA Plan or Subsequent Bankruptcy**

18.     **THIS COURT ORDERS AND DECLARES** that under no circumstances shall any CCAA Plan of Arrangement in the Nortel proceedings (the "Plan") be proposed or approved by the Court if: (i) the Plan provides for separate classification of any Employee Claimants from ordinary unsecured creditors of Nortel, including, without limitation, bondholders and Nortel Networks Inc.; or (ii) the Employee Claimants and the other ordinary unsecured creditors do not receive the same *pari passu* treatment of their allowed claims against Nortel pursuant to the Plan.

# SCHEDULE "A"

\580S980.22

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

**SETTLEMENT APPROVAL ORDER**

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

SCHEDULE "C" TO AMENDED AND RESTATED SETTLEMENT AGREEMENT

[ATTACHED]



# N**O**RTEL

March _30_, 2010

Pension Benefits Guarantee Fund (Ontario)
c/o Financial Services Commission of Ontario
4th Floor
5160 Yonge Street
Toronto, ON
M2N 6L9

**Attention: K. David Gordon, Deputy Superintendent, Pensions**

Dear Sirs:

Re:    Court File No. 09-CL-7950
       In the Matter of the Companies' Creditors Arrangement Act and Nortel
       Networks Corporation et al (Nortel")

This letter sets out, among other things, the understanding among Nortel, the Monitor and the Superintendent of Financial Services in his capacity as Administrator of the Pension Benefits Guarantee Fund concerning the administration of Nortel's registered pension plans (the "Pension Plans") and the transition of the Pension Plans to a new administrator, in order to provide for an orderly, cost effective transition that will be in the best interests of the members of the Pension Plans.

Defined terms used herein shall have the meaning given to them in the agreement made as of the _30__th day of March, 2010 a copy of which is attached hereto as Schedule "A" (the "Amended and Restated Settlement Agreement"):

1.    Conditional Understanding: It is acknowledged that the terms of this letter are conditional on (a) the Amended and Restated Settlement Agreement having been fully executed and delivered, and (b) the order of the Court approving the Amended and Restated Settlement Agreement having been issued and entered substantially in the form of the Order attached as Schedule "B".

2.    Pension Plan Administration: Nortel will continue to administer the Pension Plans until September 30, 2010 at 11:59 p.m. Neither Nortel nor the Monitor will take any steps to initiate a wind up, in whole or in part, of the Pension Plans with an effective date prior to October 1, 2010. So long as Nortel is the administrator of the Pension Plans, there will be no change to the current asset mix, investment policies or the plan terms with respect to the Pension Plans without the consent of the Representative Counsel and the approval of the Court.

Page 2

3. <u>Pension Plan Transition:</u> (a) Nortel will ensure that all books, records, data and other information relating to the administration of the Pension Plans or beneficial to the administration or winding-up of the Pension Plans are consolidated in Toronto, Ontario, Canada by no later than March 31, 2010; and (b) the Monitor and Nortel will take all reasonable steps, at the sole cost and expense of Nortel, to complete the orderly transfer of the administration of the Pension Plans to a new administrator appointed by the Superintendent effective October 1, 2010 (the "New Administrator").

4. <u>Amended and Restated Settlement Agreement and Settlement Approval Order:</u> The Superintendent will not oppose the granting of an Order substantially in the form attached hereto as Schedule "B".

5. <u>Employee Incentive and Director Charge Order:</u> The Superintendent will not oppose the granting of a court order approving (a) any employee incentive program, including any charge therefor, that is determined by the Monitor to be reasonable and necessary for the continued operation of Nortel, or (b) the creation of a trust for persons who accept the directorship of Nortel worldwide subsidiaries in order to facilitate the restructuring, provided that: (i) such trust is approved and recommended by the Monitor; (ii) no part of the corpus of the trust may be used to pay bonuses or any other compensation to the directors; and (iii) any corpus of the trust remaining on the termination of the trust reverts to Nortel.

6. <u>Directors:</u> The Superintendent confirms that as of January 15, 2010, he is not aware of any claims against directors, officers or the Monitor, other than such claims as may arise as a result of the transfer of pension information and other records outside of Canada.

Please sign and return the copy of this letter attached.

Yours very truly,

attachments

\5812988

Page 3

**NORTEL NETWORKS CORPORATION**

Per:

Name: John Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial
Officer

Per:

Name: Clarke Glaspell
Title: Controller


**NORTEL NETWORKS LIMITED**

Per:

Name: John Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial
Officer

Per:

Name: Clarke Glaspell
Title: Controller


**NORTEL NETWORKS GLOBAL
CORPORATION**

Per:

Name: John Doolittle
Title: President

Per:

Name: Clarke Glaspell
Title: Controller

Page 4

**NORTEL NETWORKS INTERNATIONAL CORPORATION**

Per:

Name:   John Doolittle
Title:   President

Per:

Name:   Clarke Glaspell
        Treasurer

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

Per:

Name:   Clarke Glaspell

Title:   President and Controller

**ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per:

Name:
Title:

**SUPERINTENDENT OF FINANCIAL SERVICES OF ONTARIO** as administrator of the Pension Benefits Guarantee Fund, without personal liability

Per:

Name:
Title:

Page 4

**NORTEL NETWORKS INTERNATIONAL CORPORATION**

Per: _____
       Name:
       Title:

Per: _____
       Name:
       Title:

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

Per: _____
       Name:
       Title:

**ERNST & YOUNG INC.**, solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per: _Murray A. McDonald (signature)_
       Name: _Murray A. McDonald_
       Title: _President_

**SUPERINTENDENT OF FINANCIAL SERVICES OF ONTARIO** as administrator of the Pension Benefits Guarantee Fund, without personal liability

Per: _____
       Name:
       Title:

Page 4

NORTEL NETWORKS INTERNATIONAL
CORPORATION

Per:

    Name:
    Title:

Per:

    Name:
    Title:


NORTEL NETWORKS TECHNOLOGY
CORPORATION


Per:

    Name:
    Title:


ERNST & YOUNG INC., solely in its capacity
as monitor in the CCAA proceedings of Nortel
and not in its personal capacity

Per:

    Name: Murray A. McDonald
    Title: President


SUPERINTENDENT OF FINANCIAL
SERVICES OF ONTARIO as administrator of
the Pension Benefits Guarantee Fund, without
personal liability

Per:

    Name: K David Gordon
    Title: Deputy Superintendent, Pensions

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)

Proceeding commenced at Toronto

SETTLEMENT APPROVAL ORDER

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte  LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1911631v2

**APPENDIX "F"**

CITATION: Nortel Networks Limited (Re) , 2010 ONCA 402
DATE: 20100603
DOCKET: M38748

# COURT OF APPEAL FOR ONTARIO

Winkler C.J.O., Goudge and MacPherson JJ.A.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Joel Rochon, John Archibald, and Sakie Tambakos, for the Objecting LTD Beneficiaries

Alan B. Merskey, and Suzanne M. Wood, for the Applicants

Mark Zigler, Susan Philpott, and Andrea McKinnon, for the Former Employees and Disabled Employees of Nortel

Barry E. Wadsworth, for the CAW-Canada, and George Borosh et al

Lyndon Barnes and Adam Hirsh, for the Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited

Richard B. Swan, for the Informal Nortel Noteholder Group

Alex MacFarlane, for the Official Committee of Unsecured Creditors

Fred Myers, Gale Rubenstein, and Melaney Wagner for the Monitor, Ernst & Young Inc.

Page: 2

Considered in writing on : May 31, 2010

On leave to appeal from the order of the Honourable Justice Geoffrey P. Morawetz of the Superior Court of Justice, dated March 31, 2010

## ENDORSEMENT

[1]    Leave to appeal is denied.

[2]    The moving parties have not demonstrated that they have been subjected to any procedural unfairness. They have been represented throughout in a case that has been carefully judicially managed from the beginning. Their counsel accepts the settlement. No other LTD beneficiaries assert any unfair process, and the applicants can show none that they have been exposed to.

[3]    Nor have they been able to show any substantive unfairness in the settlement. The motion judge exercised his discretion to carefully balance the various interests at stake in approving the settlement. In our view he made no demonstrable error in doing so. The settlement cannot be said to be unreasonable.

[4]    The motion is dismissed. No costs are sought by the respondent and none are ordered.