# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

..................................................................X

|  |  |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

..................................................................X

## PROPOSED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND ITS AFFILIATED DEBTORS

| | |
|---|---|
| James L. Bromley (admitted *pro hac vice*) | Derek C. Abbott (No. 3376) |
| Lisa M. Schweitzer (admitted *pro hac vice*) | Eric D. Schwartz (No. 3134) |
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
| One Liberty Plaza | 1201 North Market Street, 18th Floor |
| New York, NY 10006-1470 | P.O. Box 1347 |
| | Wilmington, DE 19899-1347 |

*Attorneys for the Debtors and Debtors-in-Possession*

Dated:  September 3, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND ITS AFFILIATED DEBTORS.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS PROPOSED DISCLOSURE STATEMENT (INCLUDING THE APPENDICES HERETO, THIS "DISCLOSURE STATEMENT") RELATES TO THE JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND ITS AFFILIATED DEBTORS (THE "PLAN"), AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANYONE TO GIVE THE CREDITORS (AS DEFINED BELOW) AND INTERESTHOLDERS (AS DEFINED BELOW) AND OTHER PARTIES IN INTEREST ANY INFORMATION OTHER THAN THE INFORMATION CONTAINED HEREIN, AND THE DEBTORS TAKE NO RESPONSIBILITY FOR ANY OTHER INFORMATION THAT OTHERS MAY GIVE.

ALL SOLICITED CREDITORS (AS DEFINED BELOW) ARE ADVISED AND ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS DISCLOSURE STATEMENT, THE PLAN AND THE SUPPLEMENT TO THE PLAN (THE "PLAN SUPPLEMENT") TO BE FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN OR THE PLAN SUPPLEMENT AND APPENDICES TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES"). THIS DISCLOSURE STATEMENT HAS NOT BEEN PREPARED TO COMPLY WITH, AND IS NOT INTENDED TO COMPLY WITH, FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING

i

DISCLOSURE OUTSIDE THE CONTEXT OF THE BANKRUPTCY CODE.  CREDITORS, INTERESTHOLDERS, OTHER PARTIES IN INTEREST AND ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  NEITHER ANY SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN NOR THIS DISCLOSURE STATEMENT HAS BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC APPROVED OR DISAPPROVED OF THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  IN ADDITION, THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION" AS PROVIDED IN SECTION 1125 OF THE BANKRUPTCY CODE, BUT THE BANKRUPTCY COURT HAS NOT ENDORSED AND MAY NOT ENDORSE THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED OR APPROVED BY ANY OTHER COURT IN ANY OTHER JURISDICTION OR BY ANY REGULATORY BODY IN ANY JURISDICTION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS, AND IS PROTECTED TO THE FULLEST EXTENT PERMITTED BY LAW BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER SIMILAR LAW, RULE OR REGULATION OF ANY APPLICABLE JURISDICTION.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN THE CHAPTER 11 CASES (AS DEFINED BELOW), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, ACCOUNTING OR OTHER LEGAL EFFECTS OF THE PLAN AS TO CREDITORS, INTERESTHOLDERS AND OTHER PARTIES IN INTEREST.

EACH CREDITOR, INTERESTHOLDER OR OTHER PARTY IN INTEREST SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, ACCOUNTING AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION OF THE PLAN, THE APPROVAL OF THE PLAN, THE PLAN ITSELF OR THE TRANSACTIONS CONTEMPLATED THEREBY.

ADDITIONAL INFORMATION REGARDING NORTEL IS CONTAINED IN THE PUBLIC FILINGS OF NORTEL NETWORKS CORPORATION ("NNC"), INCLUDING THE ANNUAL REPORT ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2009 (THE "NNC FORM 10-K"), QUARTERLY REPORTS ON FORM 10-Q (EACH, A "NNC FORM 10-Q") FOR THE QUARTERS ENDED MARCH 31, 2010 AND JUNE 30, 2010, THE

CURRENT REPORTS ON FORM 8-K FILED DURING 2010 AND FILINGS WITH THE CANADIAN SECURITIES ADMINISTRATORS (THE "CSA") (SUCH FILINGS, INCLUDING IN RESPECT OF PRIOR PERIODS, COLLECTIVELY, THE "NNC PUBLIC FILINGS"), PREPARED AND FILED BY NNC WITH THE RELEVANT AUTHORITIES, ON A CONSOLIDATED BASIS FOR NNC AND ITS AFFILIATES.  SUCH INFORMATION IS NOT A PART OF AND IS NOT DEEMED TO BE INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT.  CERTAIN OF SUCH INFORMATION RELATES TO NORTEL AFFILIATES OTHER THAN THE DEBTORS AND, IN PROVIDING OR REFERRING TO SUCH INFORMATION, THE DEBTORS HAVE RELIED UPON INFORMATION AND DESCRIPTIONS PROVIDED BY NORTEL AFFILIATES WITHOUT INDEPENDENT VERIFICATION.  THE DESCRIPTIONS AND DISCUSSION OF NORTEL AFFILIATES OTHER THAN THE DEBTORS AND THE CREDITOR PROTECTION PROCEEDINGS OTHER THAN THE CHAPTER 11 CASES CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE RELIED ON ONLY FOR PURPOSES OF EVALUATING THE PLAN, THE DEBTORS AND THE CHAPTER 11 CASES.

ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.  THE FINANCIAL STATEMENTS AND OTHER INFORMATION INCLUDED IN THE NNC PUBLIC FILINGS WERE PREPARED BY NNC ON A CONSOLIDATED BASIS, AND THEREFORE INCLUDE FINANCIAL AND OTHER INFORMATION IN RESPECT OF THE CANADIAN PETITIONERS (AS DEFINED BELOW), THE EMEA DEBTORS (AS DEFINED BELOW) AND CERTAIN ENTITIES NOT SUBJECT TO BANKRUPTCY, INSOLVENCY OR OTHER CREDITOR PROTECTION PROCEEDINGS, AS WELL AS, ON A CONSOLIDATED BASIS, THE DEBTORS.  THE CONTENTS OF SUCH NNC PUBLIC FILINGS, INCLUDING FINANCIAL STATEMENTS INCLUDED THEREIN, DO NOT NECESSARILY REPRESENT THE FINANCIAL CONDITION OF THE DEBTORS COLLECTIVELY OR THE FINANCIAL CONDITION OF ANY OF THE DEBTORS INDIVIDUALLY.  THE DEBTORS CAN MAKE NO REPRESENTATION AS TO THE ACCURACY OF ANY FINANCIAL AND OTHER INFORMATION CONTAINED IN THE NNC PUBLIC FILINGS, AND BY REFERRING TO THE NNC PUBLIC FILINGS HEREIN, THE DEBTORS ARE NOT REPRESENTING OR ADMITTING TO THE COMPLETENESS OR ACCURACY OF THE CONTENT OF ANY SUCH FILINGS.

THE BUDGETS AND COST ANALYSES PROVIDED IN THIS DISCLOSURE STATEMENT AS APPENDIX H (COLLECTIVELY, THE "BUDGETS") HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT.  THE BUDGETS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AT THE TIME THEY WERE MADE, MAY NOT BE ACHIEVED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC,

COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES (INCLUDING, WITHOUT LIMITATION, SIGNIFICANT LITIGATION CONTINGENCIES), MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD LOOKING STATEMENTS THAT ARE BASED ON THE DEBTORS' CURRENT EXPECTATIONS, ESTIMATES AND FORECASTS ABOUT THE OPERATING ENVIRONMENT, ECONOMICS AND MARKETS IN WHICH THEY OPERATE.  THESE STATEMENTS ARE SUBJECT TO IMPORTANT ASSUMPTIONS, RISKS AND UNCERTAINTIES THAT ARE DIFFICULT TO PREDICT, AND THE ACTUAL OUTCOME MAY BE MATERIALLY DIFFERENT THAN IMPLIED BY SUCH FORWARD LOOKING STATEMENTS.  THE DEBTORS CAUTION THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF SUCH FORWARD LOOKING STATEMENTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS DISCLOSURE STATEMENT WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THIS DISCLOSURE STATEMENT, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF ANY FUTURE EVENT DISCUSSED HEREIN.

PLEASE ALSO SEE SECTION VI (*CERTAIN RISK FACTORS TO BE CONSIDERED*) FOR A DISCUSSION OF CERTAIN RISK FACTORS, WHICH SHOULD BE CONSIDERED IN CONNECTION WITH A DECISION BY A SOLICITED CREDITOR TO ACCEPT OR REJECT THE PLAN.

INFORMATION CONTAINED ON ANY WEBSITES REFERRED TO HEREIN OR THAT CAN BE ACCESSED THROUGH ANY SUCH WEBSITE DOES NOT CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

**IRS CIRCULAR 230 NOTICE.**  TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY APPENDICES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

    A.    Scope of this Disclosure Statement....................................................... 3

    B.    Overview of the Plan and Its Treatment of Claims................................ 4

        1.    Classification of Claims.............................................................. 4

        2.    Estimated Recoveries for Each Class of Claim ......................... 5

        3.    Bar Dates.................................................................................... 5

    C.    Bankruptcy Plan Voting Instructions and Procedures ........................... 6

    D.    Confirmation of the Plan by the Bankruptcy Court .............................. 8

        1.    Acceptance by Impaired Classes ............................................... 9

        2.    Unfair Discrimination and Fair and Equitable Test.................. 9

        3.    Best Interests Test .................................................................... 10

        4.    Feasibility................................................................................. 10

II.    BACKGROUND AND CERTAIN PRE-PETITION OPERATIONS OF THE
DEBTORS ........................................................................................................... 11

    A.    Corporate Structure and Management of the Debtors ........................ 11

        1.    History of Nortel ...................................................................... 11

        2.    Overview of Nortel's Historical Business Operations.............. 11

        3.    Corporate Structure of the Debtors .......................................... 12

        4.    Business of Each Debtor........................................................... 13

        5.    Current Management of the Debtors.......................................... 16

    B.    The Debtors' Pre-petition Capital Structure ....................................... 17

        1.    NNCC 2026 Notes ................................................................... 17

        2.    Certain NNI Guarantees............................................................ 17

        3.    Bonding Facilities Guaranteed by the Debtors ........................ 18

        4.    Pre-petition Liquidity................................................................ 18

        5.    Transfer Pricing ....................................................................... 19

v

**TABLE OF CONTENTS**
(continued)

C.      Recent Financial Results...................................................................... 20

III.    THE CHAPTER 11 CASES AND CERTAIN POST-PETITION OPERATIONS
        OF THE DEBTORS ................................................................................ 22

A.      Events Leading up to the Chapter 11 Cases........................................... 22

B.      Commencement of the Chapter 11 Cases and Other Creditor Protection
        Proceedings ......................................................................................... 23

        1.      Chapter 11 Cases....................................................................... 23

        2.      CCAA Proceedings .................................................................... 23

        3.      Other Creditor Protection Proceedings ..................................... 24

C.      Significant Events During the Chapter 11 Cases .................................. 25

        1.      Certain Significant Court Orders .............................................. 25

        2.      Appointment of Creditors' Committee and Organization of Ad Hoc
                Group of Bondholders............................................................... 25

        3.      Retained Professionals .............................................................. 26

        4.      Disposition of Unexpired Leases and Executory Contracts .................... 27

        5.      Claims Resolution Processes .................................................... 28

        6.      Significant Settlements and Settlement Procedures................................ 29

        7.      Summary of Certain Significant Claims................................... 31

        8.      Avoidance Actions.................................................................... 32

        9.      Post-petition Liquidity, Lending and Financing ...................... 33

        10.     Cascade Indemnity.................................................................... 37

D.      Post-petition Sales and Other Dispositions of Assets ........................... 38

        1.      Mobile WiMAX Business and Alvarion Agreement............................... 38

        2.      Layer 4-7 Assets ...................................................................... 38

        3.      CDMA and LTE Access Assets............................................... 38

        4.      Enterprise Solutions Business.................................................. 39

        5.      Packet Core Assets................................................................... 40

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 6. | Optical Networking and Carrier Ethernet Businesses | 41 |
| | 7. | GSM/GSM-R Business | 41 |
| | 8. | CVAS Business | 42 |
| | 9. | LGN Joint Venture | 43 |
| | 10. | Relay Sale | 43 |
| | 11. | MSS Business | 43 |
| | 12. | De Minimis Asset Sales | 44 |
| | 13. | Purchase Price Adjustments | 44 |
| | 14. | Transition Services Agreements | 44 |
| | 15. | Distribution Escrow Accounts | 48 |
| | 16. | Remaining Intellectual Property Assets | 48 |
| E. | | Certain Other Post-petition Operations of the Debtors and Other Nortel Affiliates | 50 |
| | 1. | Creation of Nortel Business Services Group and the Corporate Group | 50 |
| | 2. | Employee Information | 50 |
| | 3. | Non-Creditor Protection Legal Proceedings | 53 |
| | 4. | Insurance | 55 |
| | 5. | Environmental Matters | 56 |
| | 6. | Supply Chain Agreements | 57 |
| F. | | Description of Non-Debtor Subsidiaries of the Debtors | 57 |
| | 1. | Active Non-Debtor Subsidiaries Held by NNI | 57 |
| | 2. | Dormant Non-Debtor Subsidiaries Held by NNI | 58 |
| | 3. | Non-Debtor Subsidiaries Held by Nortel AltSystems Inc | 58 |
| | 4. | Non-Debtor Subsidiaries Held by Sonoma Systems | 59 |
| | 5. | Non-Debtor Subsidiaries Held by NN CALA | 59 |

**TABLE OF CONTENTS**
(continued)

Page

IV.    CHAPTER 11 PLAN ................................................................. 60

    A.    Summary of the Plan .................................................. 60

    B.    Treatment of Unclassified Claims ................................ 61

        1.    Administrative Expense Claims .......................... 61

        2.    Professional Claims ........................................ 62

        3.    Priority Tax Claims ........................................ 62

    C.    Treatment of Classified Claims and Interests ................ 63

        1.    Class 1 — Priority Non-Tax Claims ................. 63

        2.    Class 2 — Secured Claims .............................. 64

        3.    Class 3 — General Unsecured Claims ................ 64

        4.    Class 4 — Subordinated Claims ....................... 64

        5.    Class 5A — Interests ..................................... 64

        6.    Class 5B — Interests Securities Fraud Claims ...... 66

    D.    Implementation of the Plan ........................................ 66

        1.    Plan Administrator ........................................ 66

        2.    Plan Advisory Committee ................................ 67

        3.    Post-Effective Date Management ....................... 67

        4.    Corporate Existence of Debtors ........................ 67

    E.    Provisions Governing Voting and Distributions .............. 68

        1.    Voting of Claims .......................................... 68

        2.    Minimum Distribution .................................... 68

        3.    Distributions of Creditor Proceeds ..................... 68

        4.    Distributions to Indenture Trustees ..................... 69

        5.    Distribution Record Date ................................. 70

        6.    Limitation on Recovery .................................. 70

        7.    Allocation of Plan Distributions Between Principal and Interest ............ 70

# TABLE OF CONTENTS
(continued)

Page

8.  Delivery of Distributions and Undeliverable Distributions ..................... 71

9.  Time Bar to Cash Payment Rights ........................................................... 71

10.  Withholding and Reporting Requirements ............................................. 71

11.  Setoffs and Recoupment ......................................................................... 72

12.  Distributions for Disputed Claims .......................................................... 72

13.  No Payment on Saturday, Sunday or Legal Holiday .............................. 74

14.  Post-petition Interest .............................................................................. 74

F.  Treatment of Executory Contracts and Unexpired Leases ................................. 74

1.  Previous Assumption, Assignment and Rejection ................................... 74

2.  Assumption and Assignment of Remaining Contracts ........................... 75

3.  Cure of Defaults ..................................................................................... 75

4.  Objections to Assumption of Remaining Contracts ............................... 76

5.  Rejection and Approval of Rejection ...................................................... 76

6.  Post-petition Modification of Executory Contracts ................................ 77

7.  Pre-existing Obligations to the Debtors under Executory Contracts ....... 77

G.  Conditions Precedent to Plan's Confirmation and Effective Date ...................... 77

1.  Conditions to Confirmation of the Plan .................................................. 77

2.  Conditions to Effective Date .................................................................. 77

3.  Waiver of Conditions .............................................................................. 78

4.  Notice of Effective Date ......................................................................... 78

H.  Effect of the Plan on Assets, Claims and Interests ............................................ 78

1.  Vesting .................................................................................................... 78

2.  Limited Release of Directors, Officers and Employees .......................... 79

3.  Exculpation ............................................................................................. 79

4.  Injunctions .............................................................................................. 80

5.  Terms of Injunctions or Stays ................................................................ 80

ix

**TABLE OF CONTENTS**
(continued)

Page

|  |  | 6. | Retention of Litigation Claims and Reservation of Rights | 80 |

I. Defenses with Respect to Unimpaired Claims ... 81

J. The Debtors' Post-Emergence Activities ... 81

K. Summary of Other Provisions of the Plan ... 82

    1. Retention of Jurisdiction ... 82

    2. Plan Supplement ... 83

    3. Modification of the Plan ... 83

    4. Revocation or Withdrawal of the Plan ... 84

    5. Exemption from Certain Transfer Taxes ... 84

    6. Exemption from Registration ... 84

    7. Governing Law ... 84

    8. Severability ... 85

    9. Dissolution of the Creditor's Committee ... 85

    10. Notice ... 85

V. CONFIRMATION OF THE PLAN ... 87

A. Confirmation Hearing ... 87

B. Confirmation Standards ... 87

C. Acceptance by Impaired Classes ... 87

D. Unfair Discrimination and Fair and Equitable Test ... 88

    1. Unfair Discrimination Test ... 88

    2. Fair and Equitable Test ... 88

E. Best Interests Test ... 89

F. Feasibility ... 90

VI. CERTAIN RISK FACTORS TO BE CONSIDERED ... 92

A. General Considerations ... 92

B. Certain Bankruptcy Considerations ... 92

x

## TABLE OF CONTENTS
(continued)

Page

C.  Inherent Uncertainty of Projections and Estimations ........................................... 93

D.  Liquidation Analysis ............................................................................................ 94

E.  Claims Estimations .............................................................................................. 94

F.  Distributions under the Plan................................................................................. 95

G.  Conditions to Effectiveness of the Plan ............................................................... 95

H.  Monetization of Remaining Intellectual Property................................................. 96

I.  Greater Than Budgeted Liquidation Costs ........................................................... 96

J.  NBS Operations ................................................................................................... 96

    1.  TSA Costs May Exceed TSA Revenues................................................... 96

    2.  Risks of Performance and Claims Arising under TSAs........................... 97

    3.  Separation and Wind Down of Operations ............................................. 97

K.  Intercompany Claims and Causes of Action......................................................... 98

L.  Other Creditor Protection Proceedings ................................................................ 98

M.  Environmental Regulation ................................................................................... 98

N.  Certain Tax Considerations.................................................................................. 99

VII.  CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ............................. 100

A.  In General........................................................................................................... 100

B.  U.S. Federal Income Tax Consequences to the Debtors...................................... 101

    1.  Cancellation of Debt and Reduction of Tax Attributes ......................... 101

    2.  Taxable Income Resulting From 363 Sales ........................................... 102

    3.  Intellectual Property Assets ................................................................. 103

    4.  Limitation of NOL Carryforwards and Other Tax Attributes................ 103

C.  Disputed Claims Reserve.................................................................................... 104

D.  U.S. Federal Income Tax Consequences to Holders of Claims........................... 104

    1.  Generally.............................................................................................. 104

    2.  Holders of Allowed General Unsecured Claims.................................... 105

**TABLE OF CONTENTS**
(continued)

**Page**

|  |  | 3. | Holders of Disputed Claims | 106 |
|  |  | 4. | Interest Income with Respect to Allowed Claims | 106 |
|  | E. |  | Backup Withholding and Information Reporting | 106 |
| VIII. |  |  | ALTERNATIVES TO THE PLAN | 108 |

**Index of Appendices to the Proposed Disclosure Statement**

| | |
|---|---|
| Appendix A | Glossary of Defined Terms |
| Appendix B | Joint Chapter 11 Plan of the Debtors |
| Appendix C | Estimated Recoveries |
| Appendix D-1 | Current Structure Chart of Selected Nortel Affiliates |
| Appendix D-2 | Post-Effective Date Structure Chart of the Debtors |
| Appendix E | List of Directors and Officers of the Debtors |
| Appendix F | Unaudited Condensed Combined Financial Statements and Index Thereto |
| Appendix G | Liquidation Analysis |
| Appendix H | Budgets and Cost Analyses |

**PROPOSED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND ITS AFFILIATED DEBTORS**

---

**THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.**

---

I.

INTRODUCTION

Nortel Networks Inc., a Delaware corporation ("NNI"); Nortel Networks Capital Corporation, a Delaware corporation ("NNCC"); Nortel Altsystems Inc. (formerly known as Alteon WebSystems, Inc.), a Delaware corporation; Nortel Altsystems International Inc. (formerly known as Alteon WebSystems International, Inc.), a Delaware corporation; Xros, Inc., a Delaware corporation; Sonoma Systems, a California corporation; Qtera Corporation, a Delaware corporation; CoreTek, Inc., a Delaware corporation; Nortel Networks Applications Management Solutions Inc., a Delaware corporation; Nortel Networks Optical Components Inc., a Delaware corporation; Nortel Networks HPOCS Inc., a Delaware corporation; Architel Systems (U.S.) Corporation, a Delaware corporation; Nortel Networks International Inc., a Delaware corporation; Northern Telecom International Inc., a Delaware corporation; Nortel Networks Cable Solutions Inc., a Delaware corporation; and Nortel Networks (CALA) Inc., a Florida corporation ("NN CALA," and collectively the "Debtors"), provide this Disclosure Statement to holders of claims against the Debtors ("Creditors") impaired by the Plan to permit such Creditors to make an informed decision in voting to accept or reject the Plan filed on July 12, 2010 with the Bankruptcy Court. On January 14, 2009 (the "Initial Petition Date"), the Debtors, other than NN CALA, filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code and, on July 14, 2009, NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases," and the filing date with respect to each Debtor, the "Petition Date"), as set forth in Exhibit A to the Plan. The Chapter 11 Cases are jointly administered with one another under Case No. 09-10138 (KG). Please see the copy of the Plan that is included in this Disclosure Statement as Appendix B.

All Solicited Creditors (as defined below) are advised and encouraged to read and consider carefully this Disclosure Statement, the Plan included as Appendix B and the Plan Supplement in their entirety before voting to accept or reject the Plan.

**This Disclosure Statement and the Plan are an integral package, and they must be considered together for the reader to be adequately informed. This introduction is qualified in its entirety by the remaining portions of this Disclosure Statement, and this Disclosure Statement in turn is qualified, in its entirety, by the Plan and the Plan Supplement. In the event of any inconsistency between this Disclosure Statement and the Plan, the Plan controls.**

**Capitalized terms used herein but not otherwise defined have the meanings assigned to such terms in the Plan.** Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without

1

limitation." All dollar amounts in this Disclosure Statement are in United States Dollars unless otherwise stated.

This Disclosure Statement is presented to certain Creditors in accordance with the requirements of section 1125 of the Bankruptcy Code. Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical investor typical of the holders of claims against or interests in the debtors to make an informed judgment whether to accept or reject the plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

This Disclosure Statement solicits acceptances of the Plan from certain Creditors. To the extent that any Class entitled to vote rejects or any Class is deemed to reject the Plan, the Debtors intend to seek confirmation of the Plan, notwithstanding such rejection or deemed rejection, pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

The Debtors believe that the distributions under the Plan will provide Creditors and holders of Interests in the Debtors ("Interestholders"), at least the same recovery on account of Allowed Claims or Interests as would distributions by a chapter 7 trustee. Further, the Debtors believe that distributions under the Plan to Creditors and Interestholders likely would be made more quickly than distributions by a chapter 7 trustee, the Debtors' ability to realize value from the remaining assets could be impaired in a chapter 7 liquidation, and a chapter 7 trustee would charge a substantial fee, reducing the amount available for distribution on account of Allowed Claims or Interests.

**The Debtors believe that confirmation of the Plan is in the best interests of Creditors. Accordingly, Solicited Creditors are encouraged to vote in favor of the Plan.**

The Plan was filed on July 12, 2010, and this Disclosure Statement was filed on September 3, 2010. The Bankruptcy Court approved this Disclosure Statement and procedures for soliciting votes on the Plan by order entered on [●] and scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") beginning at [●] (prevailing Eastern time) on [●], in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the Creditors, and will review a ballot report concerning votes cast for acceptance or rejection of the Plan.

To obtain, at your cost, additional copies of this Disclosure Statement or of the Plan, please contact:

> Nortel Networks Inc. Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, New York 10017
> Telephone:  (646) 282-2400
> Website:  http://dm.epiq11.com/nortel

A.      Scope of this Disclosure Statement

Before the Initial Petition Date, the Debtors, NNC and each of their Affiliates (collectively, "Nortel") were a global group of companies with legal entities conducting business operations across many jurisdictions around the world.  Nortel includes certain entities that are not Debtors in the Chapter 11 Cases but are either subject to the Creditor Protection Proceedings (as defined below) in other jurisdictions or not subject to any bankruptcy, insolvency or other creditor protection proceedings.  The Debtors are each direct or indirect subsidiaries of NNC and their operations represented only parts of Nortel's global operations.

Since the Initial Petition Date, Nortel has initiated creditor protection proceedings under the respective restructuring regimes of certain jurisdictions in which it does business, including Canada, the United States, the United Kingdom, France and Israel (collectively, the "Creditor Protection Proceedings").  Resolution of each Creditor Protection Proceeding will occur in accordance with the procedures of its respective jurisdiction.

This Disclosure Statement was prepared by the Debtors in the Chapter 11 Cases only, and not for other Creditor Protection Proceedings in any other jurisdiction.  The Debtors collectively do not constitute all Nortel Affiliates, and the Chapter 11 Cases do not constitute all Creditor Protection Proceedings to which Affiliates of the Debtors are subject.  Creditors, Interestholders and other parties in interest are hereby advised that, although certain portions of this Disclosure Statement describe the businesses and history of Nortel as a global group, as well as various Creditor Protection Proceedings initiated by Nortel Affiliates in other jurisdictions, such descriptions should be relied upon only for purposes of evaluating the Plan, the Debtors and the Chapter 11 Cases and not for evaluating any other Creditor Protection Proceedings.

This Disclosure Statement is based on information provided by the Debtors' management and information publicly available in certain SEC filings and pleadings filed with the Bankruptcy Court.  While this Disclosure Statement makes reference to the Canadian Petitioners and the CCAA Proceedings (as defined below) and certain other Nortel Affiliates, this Disclosure Statement is solely intended to provide adequate information for purposes of section 1125(a) of the Bankruptcy Code with respect to the Plan.  It is not intended to provide any information regarding any Creditor Protection Proceedings other than the Chapter 11 Cases or any Nortel Affiliate other than the Debtors, and creditors and shareholders of such other Nortel Affiliates are advised not to rely on this Disclosure Statement for any purpose.  Please see the Disclaimer that starts on page (i) above.

3

B.        Overview of the Plan and Its Treatment of Claims

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN, THE PLAN SUPPLEMENT AND, WHERE APPROPRIATE, THE CONFIRMATION ORDER.  CREDITORS, INTERESTHOLDERS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN SECTION IV (*CHAPTER 11 PLAN*) AND THE PLAN ITSELF.  THE PLAN IS INCLUDED IN THIS DISCLOSURE STATEMENT AS APPENDIX B.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.

The Plan applies separately to each of the Debtors.  The Plan recognizes the corporate integrity of each Debtor and, therefore, Allowed Claims against a particular Debtor will be satisfied only from the assets of that Debtor's bankruptcy estate.  A Creditor or Interestholder of any particular Debtor, by virtue of its Claims against or Interests in that Debtor, has no direct claim against or interest in any other Debtor and has no direct claim against or interest in any Affiliate of that Debtor.  As described in more detail below, the effectiveness of the Plan with respect to each Debtor, however, is conditioned on the effectiveness of the Plan with respect to each other Debtor.

1.        Classification of Claims

The Plan divides the Claims against and Interests in each Debtor into Classes.  Certain Claims (in particular, Administrative Expense Claims; bankruptcy fees (including filing fees and quarterly fees) due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing; Professional Claims; and Priority Tax Claims) remain unclassified in accordance with section 1123(a)(1) of the Bankruptcy Code.  Creditors whose Claims are unclassified are unimpaired and will be deemed to accept the Plan.

Each table included in Appendix C summarizes the classification and treatment under the Plan of the Claims and Interests and reflects the amount and form of consideration that will be distributed in exchange for and in full satisfaction, settlement, release and discharge of such Claims and Interests.  The classification and treatment for all Claims and Interests is described in more detail under Articles 2, 3 and 4 of the Plan.

"Class 1" of each Debtor consists of Priority Non-Tax Claims (if any) against that Debtor.  Class 1 is unimpaired and will be deemed to accept the Plan.

"Class 2" of each Debtor consists of Secured Claims (if any) against that Debtor. Class 2 is unimpaired and will be deemed to accept the Plan.

"Class 3" of each Debtor consists of General Unsecured Claims against that Debtor.  Class 3 is impaired and is entitled to vote to accept or reject the Plan.

4

"Class 4" of each Debtor consists of Subordinated Claims (if any) against that Debtor.  Class 4 is impaired and will be deemed to reject the Plan.

"Class 5A" of each Debtor consists of Interests in that Debtor.  Class 5A is impaired and will be deemed to reject the Plan.

"Class 5B" of each Debtor consists of Interests Securities Fraud Claims against that Debtor.  Class 5B is impaired and will be deemed to reject the Plan.

2.    Estimated Recoveries for Each Class of Claim

The recovery percentages for each Class of Creditors and Interestholders for each Debtor are set forth in Appendix C.  These recovery percentages are merely estimates.  The actual amounts distributed to holders of Allowed Claims under the Plan may be higher or lower than estimated.

To estimate Allowed Claims against each Debtor, the Debtors first calculated the total asserted Claims (other than Administrative Expense Claims, which are based on filed, scheduled, accrued and budgeted amounts) based on Filed and Scheduled Claims.  To the extent a Creditor filed a proof of claim that superseded a Scheduled Claim, the amount in the Filed proof of claim was used.

The Debtors and their advisors then reviewed all of the proofs of claim asserting Priority Tax Claims, Professional Claims, Secured Claims and Subordinated Claims, and a large sample size of the proofs of claim asserting General Unsecured Claims.

The Debtors (with the assistance of their advisors) then determined a range of estimated Allowed Claims by reducing asserted claim amounts for duplicate claims, amended claims, misclassified claims, settled claims, satisfied claims and claims that lack merit in whole or in part.

With respect to the Debtors' unexpired leases and executory contracts, the Debtors (with the assistance of their advisors) analyzed their financial accounts and other available information and prepared estimates of cure amounts and rejection claims for the leases or executory contracts.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of the Debtors' estimates.

3.    Bar Dates

By an order dated August 4, 2009 (the "Bar Date Order"), the Bankruptcy Court established 4:00 p.m. (prevailing Eastern time) on September 30, 2009 (the "Original Bar Date") as the deadline for filing proofs of claim against the Debtors, except NN CALA.  The Debtors provided notice of the Original Bar Date to all known Creditors and published notice of the same in THE GLOBE AND MAIL and THE WALL STREET JOURNAL.  In addition to the Original Bar Date, on November 18, 2009, the Debtors established 5:00 p.m. (prevailing Eastern time) on December 15, 2009 as a supplemental deadline for the filing of proofs of claim by certain Creditors (the

"Supplemental Bar Date").  The Debtors provided notice of the Supplemental Bar Date to those Creditors.

On December 3, 2009, the Bankruptcy Court entered an order (the "NN CALA Bar Date Order") fixing the general bar date as 4:00 p.m. (prevailing Eastern time) on January 25, 2010 for filing proofs of claim against NN CALA (the "NN CALA General Bar Date").  The Debtors provided notice of the NN CALA General Bar Date to all known Creditors of NN CALA and published notice of the same in THE GLOBE AND MAIL and THE WALL STREET JOURNAL.

The Original Bar Date, Supplemental Bar Date and NN CALA General Bar Date do not apply to Administrative Expense Claims, intercompany claims or certain indemnification and contribution claims by officers and directors of the Debtors, except to the extent provided by the Bar Date Order and the NN CALA Bar Date Order.  Pursuant to the Plan, all unpaid Administrative Expense Claims, other than Professional Claims, that accrued on or before the Effective Date must be filed on or before the Administrative Expense Claims Bar Date.  The Administrative Expense Claims Bar Date is the first Business Day that is 30 days following the Effective Date unless otherwise ordered by the Bankruptcy Court.  In addition, the Debtors expect to request that the Bankruptcy Court establish a deadline for the filing of intercompany claims.

C.    Bankruptcy Plan Voting Instructions and Procedures

**THE DEBTORS URGE EACH SOLICITED CREDITOR TO VOTE TO ACCEPT THE PLAN.**

The Bankruptcy Code entitles only holders of impaired claims or interests who are to receive some distribution under a proposed plan to vote to accept or reject that plan. Pursuant to section 1126(f) of the Bankruptcy Code, holders of claims or interests that are unimpaired under a proposed plan are conclusively presumed to have accepted that plan and are not entitled to vote on it.  Pursuant to section 1126(g) of the Bankruptcy Code, holders of claims or interests that will receive no distributions under a proposed plan are conclusively presumed to reject that plan and, therefore, are also not entitled to vote on it.

The Creditors in Classes 1 and 2 of each Debtor are not Impaired under the Plan. Thus, pursuant to section 1126(f) of the Bankruptcy Code, the Creditors in Classes 1 and 2 of each Debtor are deemed to have accepted the Plan and are not entitled to vote on the Plan.

The Class 3 Creditors of each Debtor are Impaired and thus may vote to accept or reject the Plan.  The Debtors have enclosed ballots with this Disclosure Statement ("Ballots") to solicit the votes of all Class 3 Creditors of each Debtor.  Each Impaired Creditor entitled to vote to accept or reject the Plan pursuant to the Plan is referred to as a "Solicited Creditor."

The Class 4 Creditors of each Debtor will receive no cash distribution under the Plan unless the Allowed Claims of Creditors in Classes 1, 2 and 3 of such Debtor have been satisfied in full, which is not expected to occur, as reflected in Appendix C.  Thus, for purposes of determining the right to vote on the Plan, the Class 4 Creditors of each Debtor are deemed to

have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

The Class 5A Interestholders of each Debtor will receive no cash distribution under the Plan.  Thus, pursuant to section 1126(g) of the Bankruptcy Code, the Class 5A Interestholders of each Debtor are deemed to have rejected the Plan and are not entitled to vote on the Plan.

The Class 5B Creditors of each Debtor will receive no distribution under the Plan. Thus, pursuant to section 1126(g) of the Bankruptcy Code, the Class 5B Creditors of each Debtor are deemed to have rejected the Plan and are not entitled to vote on the Plan.

**A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO SOLICITED CREDITORS.  SOLICITED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THIS DISCLOSURE STATEMENT, THE PLAN AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The voting deadline is [●] (prevailing Eastern time) on [●] and the Confirmation Hearing is scheduled for [●] (prevailing Eastern Time) on [●].  The Debtors presently intend to consummate the Plan and to cause the Effective Date to occur.  However, the confirmation and effectiveness of the Plan are subject to material conditions precedent, some of which may not be satisfied or waived.  Thus, there can be no assurance that those conditions will be satisfied or waived and there can also be no assurance as to whether or when the Effective Date actually will occur.  Certain matters that are expected to affect the timing of the receipt of distributions by Creditors and Interestholders of certain Classes, and that could affect the amount of distributions ultimately received by such Creditors and Interestholders, are described in <u>Section IV</u> (*Chapter 11 Plan*) and in the Plan.

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.  You may not cast Ballots or votes orally or by facsimile.  **In order for your Ballot to be considered by the Bankruptcy Court, it must be received by** [●] **(prevailing Eastern time) on** [●], at the following address:

> Nortel Networks Inc. Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, New York 10017
> Telephone:  (646) 282-2400
> Website:  http://dm.epiq11.com/nortel

If you are a Solicited Creditor of any Debtor, and you did not receive a Ballot with this Disclosure Statement, please contact the Nortel Networks Inc. Ballot Processing Center at the address above.

Only Solicited Creditors are entitled to vote on the Plan.  Any Ballot executed by a Solicited Creditor, but which does not indicate acceptance or rejection of the Plan, will not be

considered a vote regarding the Plan.  Any Ballot not executed by a Solicited Creditor will not be counted as a vote to accept or reject the Plan.

**An Impaired Class of Claims accepts the Plan if the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that actually vote cast ballots in favor of the Plan.**

**YOU MAY BE BOUND IF YOU DO NOT VOTE.**  Whether or not a Creditor or Interestholder votes on the Plan, such Person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of the Classes of Claims and Interests and is confirmed by the Bankruptcy Court.  Pursuant to the provisions of section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

The Debtors or other parties in interest, including the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee"), may dispute proofs of claim or interest that have been filed or that the Debtors listed as disputed in the Schedules.  Persons whose Claims are disputed may vote on or otherwise participate in distributions under the Plan only to the extent that the Bankruptcy Court allows their Claims.  The Bankruptcy Court may temporarily allow a Claim for voting purposes only.  Allowance of a Claim for voting purposes or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for distribution purposes.  The Debtors' Schedules listing Claims and whether such Claims are disputed can be reviewed upon reasonable request at the Delaware offices of Morris Nichols (as defined below) at 1201 North Market Street, 18th Floor, Wilmington, Delaware 19899-1347 (telephone: (302) 351-9238) or at the website of the Debtors' claims agent, Epiq Bankruptcy Solutions LLC ("Epiq") (http://dm.epiq11.com/nortel).

D.      Confirmation of the Plan by the Bankruptcy Court

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan with respect to each of the Debtors only if all of the requirements of section 1129 of the Bankruptcy Code are met with respect to each such Debtor.

Among the statutory requirements for confirmation of a chapter 11 plan are that the plan is:  (i) accepted by all impaired classes of claims and equity interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) in the "best interests" of creditors and interestholders that are impaired under the plan, and (iii) feasible.

As more fully discussed in Section V (*Confirmation of the Plan*), the Debtors believe that the Plan will satisfy all of the requirements for confirmation with respect to each Debtor.

1.      Acceptance by Impaired Classes

An impaired class of claims accepts a chapter 11 plan if the holders of at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote cast ballots in favor of the plan.

Class 4 Creditors of each Debtor may receive no cash distributions and Class 5A Interestholders and Class 5B Creditors of each Debtor will receive no distributions, in each case, on account of their respective Claims or Interests and are therefore deemed to have rejected the Plan.  With respect to Classes 4, 5A and 5B, therefore, the Debtors will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan if at least one of the Impaired Classes of Claims for each Debtor (not including any acceptances by "insiders" as defined in section 101(31) of the Bankruptcy Code) accepts the Plan and certain additional conditions are met.

2.      Unfair Discrimination and Fair and Equitable Test

Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision.  Pursuant to this section, the Bankruptcy Court may confirm a chapter 11 plan notwithstanding the plan's rejection (or deemed rejection) by one or more impaired classes as long as the plan is accepted by at least one impaired class (by meeting the acceptance requirement described above), "does not discriminate unfairly," is "fair and equitable" as to each impaired class that has not accepted it and meets certain other statutory requirements.

(a)      Unfair Discrimination

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

(b)      Fair and Equitable Test

(i)      *Secured Creditors*

A plan is fair and equitable as to a non-accepting class of secured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Bankruptcy Code.  These requirements are fulfilled if either (i) each impaired secured creditor will retain its liens securing its secured claim and will receive on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor will realize the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim will be sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(ii)      *Unsecured Creditors*

Likewise, a plan is fair and equitable as to a non-accepting class of unsecured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(B) of the

Bankruptcy Code.  These requirements are fulfilled if (i) the non-accepting claimants will receive the full value of their claims or (ii) if the non-accepting claimants receive less than full value, no class of junior priority will receive anything on account of their pre-petition claims or interests.  The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable as to each Impaired Class.

If the Plan does not meet the cramdown requirements as set forth above with respect to any Debtor, in the Debtors' sole discretion, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

3.      Best Interests Test

In order for a chapter 11 plan to be confirmed, the Bankruptcy Code requires that, with respect to each impaired class of creditors or interestholders, that each of such impaired creditors or interestholders either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount such class members would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date.

4.      Feasibility

To confirm a chapter 11 plan, the Bankruptcy Court must find that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless and to the extent liquidation is contemplated by the plan.

THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW.  PLEASE CONSULT WITH YOUR ATTORNEY TO OBTAIN A COMPLETE UNDERSTANDING OF THE LAW AND YOUR RIGHTS UNDER THE LAW.

II.

BACKGROUND AND CERTAIN PRE-PETITION OPERATIONS OF THE DEBTORS

This section provides a general description of Nortel's and the Debtors' organization and businesses prior to the Initial Petition Date.  As a result of the commencement of the Chapter 11 Cases, the commencement of the Creditor Protection Proceedings relating to certain Nortel Affiliates and the sale of significant business units and assets after the Initial Petition Date, the nature and scope of Nortel's current global businesses and the Debtors' individual businesses have changed substantially from the descriptions set forth in this section.

A.    Corporate Structure and Management of the Debtors

1.    History of Nortel

Nortel traces its heritage to 1895 when the Bell Telephone Company of Canada founded the Northern Electric and Manufacturing Company Limited ("Northern Electric") as an equipment provider for Canada's telephone system.  Over the following century, Northern Electric grew into an international communications technology and services company and changed its name to Northern Telecom in 1976.  In 1995, celebrating its 100th anniversary, Northern Telecom changed its name again to Nortel to reflect its corporate evolution from a telephony manufacturing company to designer, builder and integrator of diverse multiservice networks.  In 1998, the name Nortel Networks was first officially adopted in recognition of the continuing transformation of the company's business.  In its recent history, Nortel gained a well-deserved reputation for innovation and creativity through the development of ground-breaking technology, including many industry firsts, in such fundamental technologies as digital, optical, wireless, Internet Protocol ("IP"), voice-over IP ("VoIP"), broadband, multimedia and Ethernet.

From the mid-1980's to 2000, Nortel expanded substantially, helping to lead the telecommunications boom, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age.  From its Canadian base, North American operations were expanded into the United States with the establishment of production and research and development facilities, resulting in an increase in the number of U.S.-based employees and the creation of a large customer base in the United States.  At the same time, Nortel moved significantly into Europe, Asia, Africa and Latin America, becoming a truly global enterprise.

In 2000, BCE Inc. (formerly known as Bell Canada Enterprises), the parent company of Bell Canada, Inc., spun-off substantially all its shareholdings in Nortel through a statutory reorganization transaction, with the result that NNC became the ultimate parent entity of all Nortel Affiliates, and NNL became its principal Canadian operating subsidiary.

2.    Overview of Nortel's Historical Business Operations

Prior to the Initial Petition Date, Nortel supplied end-to-end networking products and solutions that helped organizations enhance and simplify communications.  These organizations ranged from small businesses to multi-national corporations involved in all aspects of commercial and industrial activity, to federal, state and local government agencies and the

11

military.  They included cable operators, wireline and wireless telecommunications service providers and Internet service providers.  Nortel designed, developed, engineered, marketed, sold, supplied, licensed, installed, serviced and supported these networking solutions worldwide. Nortel's technology expertise ranged across carrier and enterprise, wireless and wireline, applications and infrastructure.

> 3.    **Corporate Structure of the Debtors**

Each Debtor is a direct or indirect subsidiary of NNC.

NNC is a corporation organized under the laws of Canada and its principal offices are located in Mississauga, Ontario, Canada.  Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), is NNC's principal Canadian operating subsidiary and also the parent of NNI.  A copy of the current organizational structure of selected Nortel Affiliates, including NNC, NNL and the Debtors, is included in this Disclosure Statement as Appendix D-1.

Nortel's U.S. assets and operations are organized under either NNC or NNI, NNL's principal U.S. subsidiary.  NNI is the corporate parent of most of Nortel's wholly or partially owned U.S. subsidiaries.

As depicted in Appendix D-1, NNL, a direct subsidiary of NNC, owns 100% of the equity of NNI, which, in turn, owns directly or indirectly 100% of the equity of the following Debtors:  NNCC, Nortel Networks Cable Solutions Inc., Nortel Networks International Inc., Northern Telecom International Inc., NN CALA and Qtera Corporation.  NNI also owns 99.93% (and NNL owns 0.07%) of the equity of Nortel Networks Optical Components Inc., which owns 100% of the equity of Nortel Networks HPOCS Inc.

NNC owns 100% of the equity of the following Debtors:  Sonoma Systems, CoreTek, Inc., Xros, Inc., Nortel Altsystems Inc. and Architel Systems Corporation, a non-Debtor entity that owns 100% of the equity of Architel Systems (U.S.) Corporation, a Debtor. Nortel Altsystems Inc. owns 100% of the equity of Nortel Altsystems International Inc., a Debtor.  NNC also owns 88.62% (and NNI owns 11.38%) of the equity of Nortel Networks Applications Management Solutions Inc., a Debtor.  NNC also directly or indirectly owns certain non-Debtor Affiliates of the Debtors.

NNC, as a public reporting company in the United States and Canada, files annual, quarterly and current reports, and other information with the SEC and the CSA, which provide additional information about Nortel, its management and operations.  NNC's SEC filings are available to the public through the SEC's Electronic Data Gathering, Analysis and Retrieval system (EDGAR) on the website maintained by the SEC at www.sec.gov and from commercial document retrieval services.  NNC's CSA filings are available to the public through the CSA's System for Electronic Document Analysis and Retrieval (SEDAR) which is operated by CDS Inc. on behalf of the CSA on the website www.sedar.com and from commercial document retrieval services.

4.     Business of Each Debtor

The remainder of this section II.A.4 provides information regarding each Debtor's business operations prior to the sale of its businesses through the Creditor Protection Proceedings.

(a)     Nortel Networks Inc.

As Nortel's primary U.S. operating subsidiary, Nortel Networks Inc. has served as a supplier of data and telephony network solutions and services and a U.S. purchasing hub for various Nortel Affiliates.  It is the direct or indirect parent of a majority of the Nortel Affiliates in the United States, including many of the Debtors (Nortel Networks Cable Solutions Inc., NNCC, Nortel Networks Applications Management Solutions Inc., Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., NN CALA and Qtera Corporation).  It is also a guarantor of certain debt securities of NNC and NNL.

As of the Initial Petition Date, NNI had 8,843 employees.  Its central headquarters and research and development complex were based in Richardson, Texas and it owned or leased multiple properties throughout the United States.  NNI had a customer base of over 1,000 customers and total revenue of over $4 billion in fiscal year 2008.

(b)     Nortel Networks Capital Corporation

Nortel Networks Capital Corporation, a wholly-owned subsidiary of NNI, is a special purpose finance company that issued $150 million in aggregate principal amount of debt securities, which were guaranteed by NNL.  These securities, the NNCC 2026 Notes (as defined below), are described further below.  In addition, NNCC entered into a pre-petition intercompany loan with NNI pursuant to which NNI borrowed an initial principal amount equal to approximately $146.7 million.  NNCC has no other independent operations.

(c)     Nortel Altsystems Inc.

Nortel Altsystems Inc. (formerly known as Alteon WebSystems, Inc.), a wholly-owned subsidiary of NNC, was a provider of content aware switching technology, a provider of Internet infrastructure equipment and a manufacturer and marketer of web switches.  Nortel Altsystems Inc. has three subsidiaries:  Nortel Altsystems International Inc. (formerly known as Alteon WebSystems International, Inc.), Nortel Altsystems AB (formerly known as Alteon WebSystems AB), a Swedish entity that was responsible for product development of Nortel's IntelligentEdge products, and Nortel Altsystems International Limited (formerly known as Alteon WebSystems International Limited), a Bermuda-based company that provided Internet infrastructure equipment and manufactured and marketed web switches.  Nortel Altsystems Inc. also holds a 14.39% minority interest in Blade Network Technologies, Inc., a Delaware corporation engaged primarily in telecommunications businesses.

13

(d)      Nortel Altsystems International Inc.

Nortel Altsystems International Inc. (formerly known as Alteon WebSystems International, Inc.), a wholly-owned subsidiary of Nortel Altsystems Inc., is incorporated as a holding company for international branch and representative offices.

(e)      Xros, Inc.

Xros, Inc., a wholly-owned subsidiary of NNC, developed and marketed optical networking systems.

(f)      Sonoma Systems

Sonoma Systems, a wholly-owned subsidiary of NNC, developed carrier-class Broadband Integrated Access Devices that allow service providers to deliver integrated services (Internet, voice, data and video) over a single access network.  Sonoma Systems owned 100% of a dormant U.K.-based subsidiary, Sonoma Limited, which was struck off the U.K. register of companies and dissolved pursuant to U.K. law as of August 31, 2010.  Sonoma Systems Europe Limited is owned 100% by Sonoma Limited and is expected to be struck off and dissolved as of September 15, 2010.

(g)      Qtera Corporation

Qtera Corporation, a wholly-owned subsidiary of NNI, developed and marketed ultra-long-reach optical networking systems for telecommunications service providers.

(h)      CoreTek, Inc.

CoreTek, Inc., a wholly-owned subsidiary of NNC, was a leader and pioneer in the use of VCSEL (vertical cavity surface-emitting laser) and MEMs (micro-electromechanical systems) technology for optical networking.

(i)      Nortel Networks Applications Management Solutions Inc.

Nortel Networks Application Management Solutions Inc. is owned 88.62% by NNC and 11.38% by NNI.  Its primary business activities were software development and marketing.

(j)      Nortel Networks Optical Components Inc.

Nortel Networks Optical Components Inc. is a holding company 99.93% owned by NNI, with the remaining 0.07% held by NNL.  Nortel Networks Optical Components Inc. owns 100% of its sole subsidiary, Nortel Networks HPOCS Inc., which is described below.

(k)      Nortel Networks HPOCS Inc.

Nortel Networks HPOCS Inc. is a wholly-owned subsidiary of Nortel Networks Optical Components Inc.  The entity's primary activities were research, development,

14

manufacture, marketing and sale of optical and microelectronic components for use in telecommunications applications.

(l)      Architel Systems (U.S.) Corporation

Architel Systems (U.S.) Corporation, a wholly-owned subsidiary of Architel Systems Corporation (a Canadian corporation), provided sales and professional services in the United States for its parent company.

(m)     Nortel Networks International Inc.

Nortel Networks International Inc., a wholly-owned subsidiary of NNI, holds various international sales and other branch, liaison or representative offices on behalf of its parent corporation, NNI.  Nortel Networks International Inc. holds minority ownership interests in Nortel Networks Technology (Thailand) Ltd.

(n)      Northern Telecom International Inc.

Northern Telecom International Inc., a wholly owned-subsidiary of NNI, is a service company that utilized U.S. employees to provide services to Affiliates.  This entity is a name holding corporation, which preserves the use of the "Northern Telecom" name in the United States.

(o)      Nortel Networks Cable Solutions Inc.

Nortel Networks Cable Solutions Inc., a wholly-owned subsidiary of NNI, represented Nortel interests at cable industry forums with the goal of influencing the definition of cable telephony network interface specifications and standards.

(p)      Nortel Networks (CALA) Inc.

Nortel Networks (CALA) Inc., a wholly-owned subsidiary of NNI, conducted sales and marketing of Nortel products throughout the Caribbean and Latin America and serves as a trading partner for all Nortel local entities throughout the Caribbean and Latin American region.  NN CALA wholly owns Nortel Trinidad and Tobago Limited.  NN CALA also partially owns Nortel Networks de Guatemala, Ltda. (98% owned) and Nortel Networks de Colombia, S.A. (19.94% owned).

15

5.    Current Management of the Debtors

A list of each Debtor's directors and officers is included herein as <u>Appendix E</u>.

The following provides a brief description of the members of the management team of the Debtors as of August 31, 2010:

| <u>Name</u> | <u>Position</u> | <u>Age</u> |
|---|---|---|
| John J. Ray, III | Principal Officer of each Debtor | 51 |
| Christopher S. Ricaurte | Vice President of Nortel Networks Cable Solutions Inc.; President and Treasurer of NN CALA and Sonoma Systems; President of all other Debtors; Director of each Debtor | 51 |
| Clarke E. Glaspell | Vice President, Finance of each Debtor | 43 |
| Jeffrey T. Wood | Vice President, Tax of each Debtor (other than NN CALA) | 54 |
| Anna Ventresca | Chief Legal Officer of NNI | 45 |
| Lynn C. Egan | Secretary of each Debtor | 57 |

*John J. Ray, III* was retained as Principal Officer of each of the Debtors on December 7, 2009, and his appointment was approved by the Bankruptcy Court on January 6, 2010.  In this capacity, Mr. Ray has the principal responsibility for overseeing and directing the reorganization and wind down of the Debtors' estates.  He is the Senior Managing Director of Avidity Partners, LLC.  From 2004 to 2009, he was Chairman of the Board of Enron Corporation and, from 2005 to 2009, President of Enron Corporation.  Prior to that time, from 1998 to 2002, he served as Chief Administrative Officer and General Counsel of Fruit of the Loom.

*Christopher S. Ricaurte* has been the sole director of NNI since March 2, 2010, of NN CALA since March 16, 2010 and of each other Debtor since June 2, 2010.  Mr. Ricaurte has also been the President and Treasurer of NN CALA and Sonoma Systems since March 16, 2010; the President of NNI since March 16, 2010; the Vice President of Nortel Networks Cable Solutions Inc. since June 2, 2010; and the President of each other Debtor since June 2, 2010.  He was appointed President, Nortel Business Services ("<u>NBS</u>") of NNL and NNC effective February 2, 2010.  Prior to this appointment, Mr. Ricaurte served as Senior Vice President, Finance, NBS from August 2009 to February 2010.  He served as Vice President, Financial Planning and Analysis, Global Operations from April 2007 to August 2009.  From 2004 to 2007, he acted as CFO-Commonwealth Handling Equipment Pool, Europe of Brambles Limited, a global provider of support services headquartered in Sydney, Australia.

*Clarke E. Glaspell* has been Vice President, Finance for NN CALA and Nortel Networks Cable Solutions Inc. from October 10, 2009, and for each other Debtor since October 27, 2009.  Mr. Glaspell has also been serving as Controller of NNC and NNL since October 10, 2009.  He is a chartered accountant with over 14 years of finance work experience.  Since joining Nortel in April of 2000, Mr. Glaspell has held various positions and has gained

experience in several areas including corporate consolidations, corporate control and external reporting. Prior to joining Nortel, Mr. Glaspell earned his chartered accountancy designation while employed by Deloitte & Touche LLP.

*Jeffrey T. Wood* has been Vice President, Tax of the Debtors (except NN CALA and Nortel Networks Cable Solutions Inc.) since September 22, 2008 and of Nortel Networks Cable Solutions Inc. since September 24, 2008, and is responsible for strategic tax policy; tax compliance; U.S. federal, state and foreign controversies; financial tax reporting; and functional management. Prior to his appointment, Mr. Wood was the Vice President of Tax for Konica Minolta and previously held senior tax positions with Diageo and the Pillsbury Company.

*Anna Ventresca* was appointed Chief Legal Officer of NNI as of September 11, 2009. Ms. Ventresca has also been serving as General Counsel-Corporate and Corporate Secretary and Chief Compliance Officer of NNC and NNL since August 10, 2009. Since joining Nortel in 2000, Ms. Ventresca has held a variety of roles, including providing legal support for U.S. and Canadian securities law filings, mergers and acquisitions including antitrust, financings, investments, corporate secretarial matters, ethics and compliance matters.

*Lynn C. Egan* has been Secretary of NNI since October 27, 2009. Before that date, Ms. Egan acted as Assistant Secretary of NNI from October 23, 1996 to October 26, 2009. She was appointed Secretary of Xros, Inc., Sonoma Systems, Qtera Corporation and Northern Telecom International Inc. on May 21, 2002; Nortel Networks International Inc. on November 15, 2002; Nortel Networks Optical Components Inc. and Nortel Networks HPOCS Inc. on December 3, 2002; and NN CALA on April 5, 2010. She is also acting as Senior Counsel for the Nortel Affiliates in the United States, including the Debtors. Since joining Nortel in 1995, she has held a variety of roles, including providing legal support for U.S. and Canadian securities law filings, mergers and acquisitions, antitrust, financings, investments, Original Equipment Manufacturing (OEM) agreements, procurement and corporate secretarial matters.

B.    The Debtors' Pre-petition Capital Structure

1.    NNCC 2026 Notes

On June 17, 1996, NNCC issued and sold $150 million in aggregate principal amount of 7.875% notes due June 2026 (the "NNCC 2026 Notes") pursuant to an indenture dated as of February 15, 1996 among NNCC, NNL, as guarantor, and The Bank of New York, as trustee. On February 12, 2009, The Bank of New York was succeeded by Law Debenture Trust Company of New York ("Law Debenture Trust") as trustee under the indenture.

2.    Certain NNI Guarantees

(a)    NNI guaranteed the following debt securities of NNL, issued under an indenture dated as of July 5, 2006 among NNL, as issuer, NNC and NNI, as guarantors, and The Bank of New York Mellon ("BNYM," formerly known as The Bank of New York), as trustee:

(i)    $2 billion in aggregate principal amount of senior notes comprised of $450 million in aggregate principal amount of 10.75% senior notes due 2016 (the "First

Tranche of NNL 2016 Notes"), $550 million in aggregate principal amount of 10.125% senior notes due 2013 (the "NNL 2013 Notes") and $1 billion in aggregate principal amount of floating rate senior notes due 2011 with a stated interest rate per annum, reset quarterly, equal to LIBOR plus 4.250% (the "NNL 2011 Notes"), each of which were issued on July 5, 2006; and

(ii)    $675 million in aggregate principal amount of 10.75% senior notes due July 2016, which were issued on May 28, 2008 (together with the First Tranche of NNL 2016 Notes, the "NNL 2016 Notes").

(b)    NNI guaranteed the following debt securities of NNC, issued under the indenture dated as of March 28, 2007 among NNC, as issuer, NNL and NNI, as guarantors, and BNYM, as trustee:

(i)    $575 million in aggregate principal amount of 1.75% convertible senior notes due 2012, which were issued on May 28, 2007 (the "NNC 2012 Notes"); and

(ii)    $575 million in aggregate principal amount of 2.125% convertible senior notes due 2014, which were issued on May 28, 2007 (the "NNC 2014 Notes").

The NNCC 2026 Notes, the NNL 2011 Notes, the NNL 2013 Notes, the NNL 2016 Notes, the NNC 2012 Notes and the NNC 2014 Notes are hereinafter referred to collectively as the "Senior Notes". The proceeds from one or more issuances of the Senior Notes were used to redeem existing debt, to refinance a credit facility and for general corporate purposes.

3.    Bonding Facilities Guaranteed by the Debtors

Nortel obtained financing support from certain institutions that issued letters of credit and performance bonds on behalf of various Nortel Affiliates (the "L/C and Bonding Facilities"). These letters of credit and performance bonds gave Nortel's customers comfort in continuing to do business with the relevant Nortel Affiliates.

Prior to the Initial Petition Date, Export Development Canada ("EDC"), Canada's federal export credit agency which provides financing support to Canadian exporters, provided a support facility that backstopped certain letters of credit and performance bonds on behalf of various Nortel Affiliates, including certain of the Debtors (the "EDC Facility"). The EDC Facility provided for the issuance of support in the form of guarantee bonds or guarantee type documents issued to financial institutions that issue letters of credit or guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance. Prior to the Initial Petition Date, NNI issued a guaranty in support of the EDC Facility.

4.    Pre-petition Liquidity

Historically, Nortel has deployed its cash through a variety of intercompany borrowing and transfer pricing arrangements to allow it to operate on a global basis and to allocate profits, losses and certain costs among Nortel Affiliates.

From time to time, as part of the management of Nortel's cash needs on a global basis, certain Nortel Affiliates, including NNI and NNCC, funded intercompany loans and capital contributions to other Nortel Affiliates on an as-needed basis to fund working capital and other expenses for these Affiliates. As part of this practice, prior to the Initial Petition Date, NNI and NNL were parties to a $1 billion revolving loan agreement dated March 21, 2008, which permitted NNL to borrow funds on an as-needed basis. As of the day before the Initial Petition Date, the aggregate outstanding principal balance of this revolving loan was approximately $296 million. NNI's right to repayment of this loan was one of the claims comprising the FCFSA Claim (as defined below) in connection with a subsequent settlement described below.

5.    Transfer Pricing

Nortel's transfer pricing arrangements are documented in certain distribution agreements between two or more Nortel Affiliates and a Master R&D Agreement, dated as of December 22, 2004, among NNL, NNI, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited, Nortel Networks S.A. ("NNSA") and other Nortel Affiliates (as amended from time to time, the "Master R&D Agreement," and together with the distribution agreements, the "Transfer Pricing Agreements"). Until the Initial Petition Date, the Canadian Petitioners and the Debtors continued to allocate operating profits, losses and certain costs among the corporate group through Transfer Pricing Agreement payments ("TPA Payments"), although certain of such TPA Payments were suspended as of the Initial Petition Date, as further described below.

NNI, on behalf of itself and the other members of NNI's consolidated group for U.S. federal income tax purposes (the "NNI Consolidated Group"),[2] and NNL had previously entered into three concurrent Advanced Pricing Arrangements ("APAs") with the U.S. and Canadian tax authorities in connection with TPA Payments between Canada and the United States. Two of these arrangements expired in 1999 and one in 2000. In 2002, NNI (on behalf of the NNI Consolidated Group), NNL and NNUK filed APA requests for the adoption of a new transfer pricing arrangement based on the residual profit split methodology with the tax authorities in the United States, Canada and the United Kingdom. That method applied to the taxation years 2001 through 2005 (such arrangement, the "2001-2005 APA"). During 2006, NNI became aware of the fact that the U.S. Internal Revenue Service ("IRS") disagreed with certain aspects of Nortel's implementation of the residual profit split methodology. During 2009, Nortel received details from the U.S. and Canadian tax authorities concerning the settlement of the 2001-2005 APA under competent authority procedures. The settlement mandated a reallocation of taxable income from NNL to the NNI Consolidated Group in the aggregate amount of $2 billion for the tax years ending 2001 to 2005. In December 2009, NNI and NNL agreed to accept the settlement and the resulting reallocation of taxable income to the NNI Consolidated Group.

---

[2]    Only the Debtors that are direct or indirect subsidiaries of NNI are members of the NNI Consolidated Group. Therefore, Sonoma Systems, Xros, Inc., Architel Systems (U.S.) Corporation, CoreTek, Inc., Nortel Altsystems Inc., and each of their respective subsidiaries (if any) are not members of the NNI Consolidated Group. In addition, Nortel Networks Applications Management Solutions Inc. is not a member of the NNI Consolidated Group because only 11.38% of its equity is owned by NNI.

During 2007 and 2008, NNI (on behalf of the NNI Consolidated Group) and NNL requested new bilateral APAs for tax years 2007 through at least 2011 (the "2007-2011 APA"), for the United States and Canada, with a request for rollback to 2006, following methods generally similar to those requested for 2001 through 2005.  NNI and NNL ultimately withdrew the relevant applications for the 2007-2011 APA following a request by the Canadian tax authority.

C.    Recent Financial Results

This Disclosure Statement includes as Appendix F certain unaudited condensed combined financial statements of each of the Debtors for the six-month period ended June 30, 2010, and the period from January 14, 2009 (or, in the case of NN CALA, July 14, 2009) to December 31, 2009, which were prepared by the Debtors for the purpose of this Disclosure Statement.

As a parent company, NNC reports publicly the financial results of NNC and its Affiliates, including the Debtors, on a consolidated basis.  Supplemental condensed consolidated financial information with respect to NNI was historically included in NNC's financial statements filed as part of NNC's respective Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q.  On March 11, 2010, NNC, NNL, NNI and NNCC each filed a Form 15 with the SEC related to their respective Senior Notes and all related guarantees, as applicable, which resulted in automatic suspension of reporting requirements under the U.S. Securities Exchange Act of 1934, as amended.  As a result, NNC is no longer including supplemental condensed consolidated financial information regarding the guarantors and non-guarantors of the Senior Notes in the notes to the financial statements of NNC.  Therefore, condensed consolidated financial information with respect to NNI was not included in the NNC Form 10-K for the fiscal year ended December 31, 2009 and has not been included in the financial statements of NNC since the Quarterly Report on Form 10-Q for the quarter ended September 30, 2009.

Proceeds received from asset sales to date that are being held in escrow (which does not include the proceeds from the sale of NNL's interests in LG-Nortel Co. Ltd. ("LGN")) are currently reported, as set forth in the NNC Form 10-K and each of the NNC Form 10-Qs, in NNL solely for financial reporting purposes.  The ultimate determination of the final allocation of such proceeds among the various Nortel Affiliates has not yet occurred and may be materially different from the NNL classification and related amounts shown in the financial statements included in the NNC Form 10-K and each of the NNC Form 10-Qs, which financial statements have been prepared by NNC.  The IFSA (as defined below) and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel Affiliates provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such agreement, other dispute resolution proceedings.  Adjustments to the NNL classification and any related amounts arising from the ultimate outcome of the allocation agreement or other dispute resolution proceeding noted above will be recognized when finalized.  The NNL classification and related amounts shown in the financial statements included in the NNC Form 10-K and each of the NNC Form 10-Qs are not determinative of, and have not been accepted by any Debtor, any party in interest in the Creditor Protection Proceedings or any court overseeing such Proceedings, for purposes of deciding, the final allocation of divestiture proceeds.

20

On January 14, 2009, NNC received notice from the New York Stock Exchange (the "NYSE") that it decided to suspend the listing of NNC's common shares on the NYSE. The NYSE stated that its decision was based on the commencement of the CCAA Proceedings and the Chapter 11 Cases. Subsequently, on February 2, 2009, NNC common shares were delisted from the NYSE. On June 19, 2009, and several times subsequently, Nortel announced that it did not expect that the holders of NNC common shares and NNL preferred shares will receive any value from the Chapter 11 Cases and the CCAA Proceedings and that such proceedings would ultimately result in the cancellation of those equity interests. As a result, NNC and NNL applied to delist the NNC common shares and the NNL preferred shares, respectively, from trading on the Toronto Stock Exchange, and such delisting occurred on June 26, 2009.

NNC common shares are currently quoted in the over-the-counter market in the Pink Sheets Electronic Quotation Service under the symbol "NRTLQ". NNL no longer files reports with the SEC, although it continues to file required reports with the CSA.

Although the reports filed with the SEC or the CSA by NNC and NNL may contain information regarding the Debtors, they are not considered to be part of this Disclosure Statement, and such reports should be taken into consideration only to the extent necessary to evaluate the Plan, the Debtors and the Chapter 11 Cases. In addition, the financial and other information provided in such reports is prepared on a consolidated basis for NNC and its Affiliates and does not currently provide information separately on the Debtors. Please see the Disclaimer that starts on page (i) above.

III.

THE CHAPTER 11 CASES AND CERTAIN POST-PETITION OPERATIONS OF THE
DEBTORS

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business
reorganization.  The fundamental purpose of a chapter 11 case is to formulate a plan to
restructure a debtor's finances so as to maximize recoveries to its creditors.  Below is a summary
of certain events leading up to the commencement of the Chapter 11 Cases and certain
significant events thereafter.

A.      Events Leading up to the Chapter 11 Cases

Nortel operated in a highly volatile telecommunications industry that was
characterized by vigorous competition for market share and rapid technological development.  In
the years immediately preceding the Initial Petition Date, Nortel's operating costs generally
exceeded its revenues, resulting in negative cash flow.  A number of factors contributed to these
results, including competitive pressures in the telecommunications industry, an inability to
sufficiently reduce operating expenses, costs related to ongoing restructuring efforts described
below, significant customer and competitor consolidation, customers cutting back on capital
expenditures and deferring new investments and the poor state of the global economy.

In the years immediately preceding the Initial Petition Date, Nortel took a wide
range of steps to attempt to address these issues, including a series of restructurings that reduced
the number of worldwide employees from more than 90,000 in 2000 to approximately 30,000
(including employees in joint ventures) as of December 31, 2008.  In particular, in 2005, under
the direction of then-new management, Nortel began to develop a business transformation plan
with the goal of addressing its most significant operational challenges, simplifying the
organizational structure and maintaining a strong focus on revenue generation and improved
operating margins including quality improvements and cost reductions.

These restructuring measures, however, did not provide adequate relief from the
significant financial pressures Nortel was experiencing.  As global economic conditions
dramatically worsened beginning in September 2008, Nortel experienced significant pressure on
its business and faced a deterioration of cash and liquidity, globally as well as on a regional
basis, as customers across all businesses suspended, delayed and reduced their capital
expenditures.  The extreme volatility in the financial, foreign exchange, equity and credit
markets globally and the expanding economic downturn and potentially prolonged recessionary
period compounded the situation.

In addition, over the past several years, Nortel made significant cash payments
related to its restructuring programs, settlements of class action lawsuits in the United States and
Canada, debt servicing costs and pension plans.  Due to the adverse conditions in the global
financial markets, the value of the assets held in its pension plans declined significantly, resulting
in material increases to pension plan liabilities, which could have in turn resulted in a significant
increase in future pension plan contributions.  It became increasingly clear to Nortel that the
struggle to reduce operating costs during a time of decreased customer spending and massive

22

global economic uncertainty was putting substantial pressure on its liquidity position globally, particularly in North America.

Market conditions further restricted Nortel's ability to access the capital markets, which was compounded by actions taken by rating agencies with respect to the downgrading of the credit ratings of NNC and NNL.  With no access to the capital markets, limited prospects of the capital markets opening up in the near term, substantial interest carrying costs on over $4 billion of unsecured public debt and significant pension plan liabilities expected to increase in a very substantial manner principally due to the adverse conditions in the global financial markets, it became imperative for Nortel to protect its cash position.

B.    Commencement of the Chapter 11 Cases and Other Creditor Protection Proceedings

On the Initial Petition Date, after extensive consideration of all other alternatives, with the unanimous authorization of Nortel's board of directors after thorough consultation with its advisors, Nortel initiated certain Chapter 11 Cases and the Canadian Proceedings.  At the same time, as described below, certain Nortel Affiliates initiated other Creditor Protection Proceedings under the restructuring regimes of various jurisdictions.

1.    Chapter 11 Cases

On the Initial Petition Date, the Debtors, other than NN CALA, filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On January 15, 2009, the Bankruptcy Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only.

Subsequently, on July 14, 2009, NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009, the Bankruptcy Court entered orders approving the joint administration and consolidation of NN CALA's Chapter 11 Case with the other Debtors' Chapter 11 Cases for procedural purposes, and applying to NN CALA certain previously entered orders in the other Chapter 11 Cases.

While the Debtors are authorized to operate in the ordinary course of business, transactions out of the ordinary course require approval from the Bankruptcy Court.  In addition, the Bankruptcy Court has supervised the Debtors' retention of attorneys, accountants, financial advisors and other professionals as required by the Bankruptcy Code.

2.    CCAA Proceedings

Also on the Initial Petition Date, the Debtors' ultimate corporate parent NNC, NNL and certain of their Canadian Affiliates, namely Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Canadian Petitioners"), filed an application with the Ontario Superior Court of

Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (the "CCAA"), seeking relief from their creditors (collectively, the "CCAA Proceedings").

On January 14, 2009, the Canadian Court entered an order recognizing the Chapter 11 Cases filed as of that date as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed monitor in the CCAA Proceedings and as foreign representative for the Canadian Petitioners (the "Canadian Monitor"), the Bankruptcy Court entered an order recognizing the CCAA Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

3.      Other Creditor Protection Proceedings

In addition, on the Initial Petition Date, the High Court of England and Wales (the "U.K. Court") placed 19 of Nortel's European Affiliates (collectively, the "EMEA Debtors"), NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V., into administration under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators" and such proceedings, the "EMEA Proceedings") pursuant to the English Insolvency Statute and the European Insolvency Regulation.

On June 26, 2009, the Bankruptcy Court entered an order recognizing the EMEA Proceedings of NNUK as foreign main proceedings under chapter 15 of the Bankruptcy Code.

On January 18, 2009, certain Nortel Affiliates, directly or indirectly owned by NNL, including Nortel Networks Israel (Sales and Marketing) Limited (the "Israeli Debtors"), filed an application for separate creditor protection proceedings (the "Israeli Administration Proceedings") with the Tel-Aviv-Jaffa District Court (the "Israeli Court"), pursuant to the Israeli Companies Law, 1999.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Debtors under the Israeli Companies Law.

On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary liquidation proceedings (the "French Proceedings") in respect of NNSA.  NNSA was authorized to continue to operate as a going concern until completion of the sale of the Global Systems for Mobile Communications ("GSM") and the Global System for Mobile Railway Communications ("GSM-R") business.  While NNSA's operations are now terminated, the French Proceedings are continuing and, in accordance with the European Union's Council Regulation (EC) No. 1346/2000, the EMEA Proceedings remain the main proceedings in respect of NNSA.

C.    Significant Events During the Chapter 11 Cases

1.    Certain Significant Court Orders

(a)    Initial Orders Entered in the Chapter 11 Cases

The Debtors have obtained numerous orders from the Bankruptcy Court that are intended to enable the Debtors to operate in the normal course of business during the Chapter 11 Cases. Among other things, these orders authorize: (i) the use and operation of the Debtors' consolidated cash management system during the Chapter 11 Cases in substantially the same manner as it was operated prior to the commencement of the Chapter 11 Cases; (ii) the continued engagement in intercompany transactions during the Chapter 11 Cases and the Debtors' exercise of setoffs in connection therewith; (iii) the payment of pre-petition employee salaries, wages and other compensation; medical, retirement and other benefits; and other employee obligations; (iv) the payment of certain taxes and fees; (v) the continuance of insurance coverage in the ordinary course of business during the Chapter 11 Cases; (vi) the performance of certain pre-petition obligations to customers; and (vii) the payment of certain pre-petition common carrier charges and warehouse fees.

(b)    Cross-Border Court-to-Court Protocol

Each of the Bankruptcy Court and the Canadian Court approved a cross-border court-to-court protocol (the "Cross-Border Protocol") to establish general administrative procedures to govern and to facilitate the administration of cross-border matters among the Chapter 11 Cases and the CCAA Proceedings, which protocol was last amended and approved by the Bankruptcy Court and the Canadian Court on June 29, 2009.

(c)    Exclusivity

From the Initial Petition Date to the date of this Disclosure Statement, the Bankruptcy Court has on three occasions granted an extension of the period during which the Debtors, other than NN CALA, have the exclusive right to file a plan of reorganization and of the period during which the Debtors have the exclusive right to solicit acceptances thereof. The last such order extended the exclusive period for filing a plan or plans for all Debtors other than NN CALA through July 13, 2010, and the period for soliciting acceptances thereof through September 13, 2010. The Debtors obtained an order extending the period during which NN CALA has the exclusive right to file a plan or plans of reorganization through January 13, 2011, and the period during which NN CALA has the exclusive right to solicit acceptances thereof through March 13, 2011. The Debtors also obtained an order extending the time to file a disclosure statement for the Plan through September 3, 2010.

2.    Appointment of Creditors' Committee and Organization of Ad Hoc Group of Bondholders

On January 26, 2009, the Office of the United States Trustee for the District of Delaware appointed the Creditors' Committee to represent the interests of the Debtors' unsecured creditors. Since its formation, the Debtors consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases. The Debtors have kept the Creditors'

25

Committee informed about their operations and have sought the concurrence of the Creditors' Committee for actions and transactions taken outside of the ordinary course of the Debtors' businesses.

The Creditors' Committee currently consists of the following members:

The Bank of New York Mellon, as indenture trustee
101 Barclay Street - 8 West
New York, New York 10286

Pension Benefit Guaranty Corporation
1200 K Street, Northwest
Washington, D.C.  20005

Law Debenture Trust Company of New York, as indenture trustee
400 Madison Ave., 4th Floor
New York, New York 10017

The Creditors' Committee is represented by Akin Gump Strauss Hauer & Feld LLP and Richards, Layton & Finger, P.A.  Additionally, the Creditors' Committee has retained and employs Fraser Milner Casgrain LLP as Canadian counsel and Ashurst LLP as European counsel.  The Creditors' Committee's financial advisor is Capstone Advisory Group, LLC, and its investment banker is Jefferies & Company, Inc.

An *ad hoc* group of bondholders (the "Ad Hoc Group of Bondholders"), including a steering committee of members of the Ad Hoc Group of Bondholders that have executed or in the future execute confidentiality or nondisclosure agreements with the Debtors and the Canadian Petitioners, has also been organized.  The Ad Hoc Group of Bondholders is represented by Milbank, Tweed, Hadley & McCloy LLP and Pachulski Stang Ziehl & Jones LLP.  Additionally, the Ad Hoc Group of Bondholders has retained and employs Bennett Jones LLP as Canadian counsel.  The Ad Hoc Group of Bondholders' financial advisor is FTI Capital Advisors, LLC.  The professionals retained and employed by the Ad Hoc Group of Bondholders have not sought approval of their retention and employment from the Bankruptcy Court, and the Debtors do not pay for their fees and expenses.

3.      Retained Professionals

The Bankruptcy Court authorized the Debtors to retain certain professionals to represent them and assist them in connection with the Chapter 11 Cases.  The Debtors have retained, and the Bankruptcy Court has approved the retention of, various professionals including:  (a) Cleary Gottlieb Steen & Hamilton LLP and Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), as counsel for the Debtors in the Chapter 11 Cases; (b) Lazard Frères & Co. LLC ("Lazard"), as financial advisor and investment banker to the Debtors and their Affiliates; (c) Epiq, as official claims, noticing and balloting agent for the Debtors; (d) Huron Consulting Services LLC ("Huron"), as restructuring advisor to the Debtors; (e) John J. Ray, III, as the Debtors' Principal Officer; (f) Chilmark Partners, LLC, as consulting expert to the

Debtors; and (g) RLKS Executive Solutions LLC, as document management and data preservation consultants to the Debtors.

Pursuant to their application seeking approval for the retention of Lazard, the Debtors agreed to pay Lazard's fees and expenses for services rendered by Lazard to the Debtors as well as to certain of their Affiliates not subject to the Chapter 11 Cases, but reserved their right to seek contribution or allocation of those fees and expenses from such Affiliates. The Debtors have agreed in principle with each of NNL, NNUK and certain other Nortel Affiliates that the fees and expenses owed to Lazard, including the fees and expenses previously satisfied by the Debtors, shall be allocated among and reimbursed by such Affiliates pursuant to an agreement to be executed by NNI, NNL, NNUK and certain other Nortel Affiliates. NNI, NNL, NNUK and certain other Nortel Affiliates also agreed that the transaction fees owed to Lazard on account of the post-petition asset sales shall be released from the related sale proceeds escrows.

Finally, the Bankruptcy Court authorized the Debtors to retain, compensate and reimburse the expenses of certain attorneys, accountants, consultants and other professionals used in the ordinary course of the Debtors' businesses and retained pursuant to section 327(e) of the Bankruptcy Code.

4.      Disposition of Unexpired Leases and Executory Contracts

Section 365 of the Bankruptcy Code provides a debtor in possession in a chapter 11 proceeding with the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases entered into before the commencement of the case. In the event an executory contract or unexpired lease is rejected, the counterparty may file a claim for damages incurred due to the rejection. In the case of rejection of leases of real property, such claims are subject to certain limitations imposed by the Bankruptcy Code.

Since the Initial Petition Date, the Debtors, with the assistance of their professionals, have devoted substantial time to evaluating and identifying unexpired leases and executory contracts that are no longer necessary to the operation of the Debtors' estates and economically burdensome to the estates, determining the appropriate and beneficial disposition of such leases and contracts pursuant to section 365 of the Bankruptcy Code and obtaining court approval of such disposition.

On March 20, 2009, the Bankruptcy Court entered the Order Approving Procedures for the Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Certain Assets Related Thereto (the "Rejection Procedures Order"), which provides procedures for the rejection of executory contracts and unexpired leases on limited notice. These procedures alleviated additional expense to the Debtors' estates and the attendant delay that would have resulted if the Debtors had been required to proceed by separate motion and hearing for each executory contract and unexpired lease they determined to reject.

From the Initial Petition Date to the date of this Disclosure Statement, the Debtors have rejected approximately 61 unexpired real property leases and subleases pursuant to the Rejection Procedures Order and assumed five leases, one of which was assigned to a third-party in connection with such third-party's acquisition of various assets of the Debtors. In addition,

27

since the Initial Petition Date, the Debtors have permitted three leases to expire by their terms in the ordinary course of the Debtors' business and one lease to be deemed rejected. Following such lease being deemed rejected, the Debtors and the landlord party thereto entered into a new lease.

Under the Rejection Procedures Order, the Debtors have rejected approximately 33 executory contracts as of the date of this Disclosure Statement. A significant number of the Debtors' executory contracts have been assumed and assigned to various purchasers in connection with the 363 Sales described in <u>Section III.D</u> (*The Chapter 11 Cases and Certain Post-petition Operations of the Debtors — Post-petition Sales and Other Dispositions of Assets*). In addition, two executory contracts were assumed outside of the post-petition asset sale process.

5.    Claims Resolution Processes

Over the last several months, the Debtors have undertaken the process of reconciling the amount and classification of outstanding Claims and filing and prosecuting objections to Claims. As of June 30, 2010, approximately 7,316 proofs of claim (including only once those proofs of claim filed against more than one Debtor) had been filed against the Debtors, asserting in the aggregate approximately $27.1 billion, as well as unliquidated amounts. As of June 30, 2010, Claims included in approximately 1,298 proofs of claim have been resolved, reducing the aggregate amount claimed against the Debtors by approximately $10.8 billion. Certain of these Claims have been resolved on a consensual basis as further described below in <u>Section III.C.6</u> (*The Chapter 11 Cases and Certain Post-petition Operations of the Debtors — Significant Events During the Chapter 11 Cases — Significant Settlements and Settlement Procedures*).

As of July 31, 2010, the Debtors had filed 15 objections, including 12 omnibus objections, to proofs of claim in which the Debtors objected to various types of Claims, such as (i) duplicative Claims; (ii) amended and superseded Claims; (iii) Claims for disputed liabilities; (iv) Claims that were previously paid or otherwise satisfied; (v) overstated Claims; (vi) Claims asserted against the wrong Nortel Affiliate; and (vii) Claims asserted against multiple Debtors with respect to the same liability. Through the omnibus objections, as of July 31, 2010, the Debtors had resolved Claims included in approximately 1,126 proofs of claim (including only once those proofs of claim filed against more than one Debtor), reducing the aggregate amount claimed against the Debtors by approximately $160 million. The Debtors expect to continue preparing, filing and resolving objections to certain other Claims throughout the course of the Chapter 11 Cases.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of the Debtors' estimates. While the Debtors are working actively to resolve disputed Claims, a significant number of Claims have not yet been resolved, and additional claims could be filed. Although the Bankruptcy Court has established bar dates as described above, certain further Claims are and may be permitted. Additionally, the Debtors are in the process of reviewing their Schedules and, upon the completion of such review, may decide to amend or supplement the Schedules in accordance with the Bankruptcy Rules or orders of the Bankruptcy Court. The Debtors also continue to investigate differences between claim amounts

28

asserted by Creditors and claim amounts determined in accordance with the Debtors' books and records. Certain Claims may be duplicative of other claims filed against the Debtors or their Affiliates subject to the Creditor Protection Proceedings, may be based on contingencies that have not occurred or may be otherwise overstated, and would therefore be subject to reduction or disallowance. The Debtors plan to continue to review and resolve such matters throughout the Chapter 11 Cases.

As provided in the Cross-Border Protocol and the Final Canadian Funding and Settlement Agreement (the "FCFSA"), the Debtors are in discussions with the Canadian Petitioners, the Canadian Monitor, the Creditors' Committee and the Ad Hoc Group of Bondholders to develop a protocol for the resolution of Claims that raise cross-border issues with the Canadian Petitioners.

Since the Initial Petition Date, the Debtors have resolved some Claims through joint stipulations and orders, and are negotiating additional consensual resolutions. Through the course of the Chapter 11 Cases, the Debtors may continue to resolve certain Claims through joint stipulations, orders and other agreements relating to settlement of certain pre-petition claims amounts. These agreements may also include the release of other disputed amounts as well as certain post-petition claim amounts.

The amount of the Pro Rata Share that will ultimately be received by any particular holder of an Allowed Claim may be affected by the outcome of the claims resolution process.

6.      Significant Settlements and Settlement Procedures

(a)      Flextronics

On January 14, 2009, Nortel announced that NNL had entered into an amendment (the "Flextronics Amending Agreement") to arrangements with a major supplier, Flextronics Telecom Systems Ltd. (together with its affiliates, "Flextronics"). Under the terms of the Flextronics Amending Agreement, NNL agreed to commitments to purchase $120 million of existing inventory by July 1, 2009, and to make quarterly purchases of other inventory and to terms relating to payment and pricing. Flextronics had notified Nortel of its intention to terminate certain other arrangements upon 180 days' notice effective July 2009 pursuant to the exercise by Flextronics of its contractual termination rights, while the other arrangements between the parties would continue in accordance with their terms. Following subsequent negotiations, NNL and Flextronics executed a settlement agreement dated May 22, 2009, which was approved by the Bankruptcy Court and the Canadian Court on June 11, 2009, that, among other things, resolved various ongoing disputes and issues relating to the interpretation of the Flextronics Amending Agreement and confirmed, among other things, NNL's obligation to purchase inventory of $25 million in accordance with existing plans of record. In addition, the parties agreed that one of the supplier agreements with Flextronics would not terminate effective July 12, 2009, as originally referenced in the Flextronics Amending Agreement, but instead was extended to December 2009, with a further extension for certain products to July 2010.

29

The Debtors, the Canadian Petitioners, certain EMEA Debtors and Flextronics subsequently entered into a settlement and release agreement dated November 20, 2009, which was approved by the Bankruptcy Court and the Canadian Court on December 2, 2009, that, among other things, provides a mechanism for the transfer of Nortel's supply relationship to purchasers of Nortel's other businesses or assets.  In addition, in exchange for payment of certain amounts by NNI to Flextronics (which payment is subject to allocation among the Debtors, the Canadian Petitioners and certain EMEA Debtors pursuant to a side agreement), Flextronics and the Debtors released any and all claims that had been or could have been filed or otherwise asserted in any proceedings of Nortel (including the Chapter 11 Cases) with certain exceptions as stated in the agreement.

(b)    APAC Debt Restructuring Agreement

As a consequence of the Chapter 11 Cases and other Creditor Protection Proceedings, a portion of intercompany payables owed by the Debtors to certain Nortel Affiliates (the "APAC Agreement Subsidiaries") in the Asia Pacific region as of the Initial Petition Date were not paid when due.  To enable each APAC Agreement Subsidiary to continue its respective business operations and to facilitate any potential sales of assets, the Debtors and the APAC Agreement Subsidiaries have entered into an Asia Restructuring Agreement (the "APAC Agreement").  Under the APAC Agreement, the APAC Agreement Subsidiaries were required to pay a portion of certain of the APAC Agreement Subsidiaries' net intercompany debt outstanding as of the Initial Petition Date (the "Pre-petition Intercompany Debt") to the Canadian Petitioners, the Debtors and the EMEA Debtors.  A further portion of the Pre-petition Intercompany Debt will be repayable only to the extent of such APAC Agreement Subsidiary's net cash balance, and subject to certain reserves and provisions.  All required court approvals with respect to the APAC Agreement have been obtained in the United States and Canada; however, implementation of the APAC Agreement for certain parties in other jurisdictions remains subject to receipt of outstanding regulatory approvals.

(c)    IRS Settlement

In consideration of a settlement payment of $37.5 million, the IRS agreed to release all of its claims against the NNI Consolidated Group for the years 1998 through 2008.  As a result of this settlement, the IRS stipulated that its Claim against NNI filed in the Chapter 11 Cases in the amount of approximately $3 billion was reduced to the $37.5 million settlement payment.  This settlement was a condition to the effectiveness of the FCFSA and was approved by the Bankruptcy Court on January 21, 2010.  NNI made the settlement payment to the IRS on February 22, 2010.

In addition, the IRS also agreed that the NNI Consolidated Group is entitled to a federal net operating loss carryforward of $814 million and general business credits of $306 million, as of January 1, 2009, inclusive of certain APA adjustments.

For more information on the APAs, please see Section II.B.5 (*Background and Certain Pre-petition Operations of the Debtors — The Debtors' Pre-petition Capital Structure — Transfer Pricing*).

(d)      Litigation Claims Settlement Procedures

By Order dated April 7, 2009, the Bankruptcy Court approved certain omnibus settlement procedures to resolve, mediate, compromise or otherwise settle certain claims and controversies (the "Litigation Claims Settlement Procedures Order").  Pursuant to the Litigation Claims Settlement Procedures Order, the Debtors are authorized to settle certain actions, including various judicial, administrative, arbitral or other actions or proceedings to which one or more of the Debtors are a party (the "Ordinary Course Actions"), in accordance with certain procedures.  Specifically, where the claims under an Ordinary Course Action were originally greater than $200,000, or where the Debtors propose to pay a settling counterparty any amount in consideration of a pre-petition claim against the Debtors, the Debtors must provide notice of the settlement and an opportunity to object to the United States Trustee and counsel to the Creditors' Committee (the "Notice Parties"), but need not seek further approval of the settlement from the Bankruptcy Court.  Where the claims under an Ordinary Course Action were originally less than $200,000, the Debtors may settle such action without providing notice to the Notice Parties and without seeking further approval of the Bankruptcy Court.  The aggregate amount of Ordinary Course Actions settled pursuant to the Litigation Claims Settlement Procedures Order may not exceed $15 million without further approval of the Bankruptcy Court, and no individual Ordinary Court Action that is originally greater than $1 million may be settled without further Bankruptcy Court approval.

(e)      Reclamation Claims Settlement Procedures

By Order dated February 19, 2009, the Bankruptcy Court approved certain procedures for settling or otherwise resolving reclamation demands (the "Reclamation Procedures Order").  The Reclamation Procedures Order (i) established uniform procedures for addressing reclamation demands; (ii) authorized the Debtors to reconcile and resolve certain reclamation demands and to conduct settlement negotiations in furtherance of such resolution; and (iii) enjoined reclamation claimants from pursuing payment of reclamation demands by alternative means.  To date, pursuant to the Reclamation Procedures Order, 27 reclamation demands have been settled or otherwise resolved, totaling about $6 million in Allowed Claims and payments.

7.      Summary of Certain Significant Claims

Listed below are certain significant Claims that were filed after the Initial Petition Date and have not been settled.  With respect to each Claim, unless otherwise indicated, the Debtors are in the process of reviewing the Claim and intend to raise all objections and defenses available to them.

(a)      Intercompany Claims

The Joint Administrators, NNUK and the EMEA Debtors and their Affiliates have asserted protective Claims in respect of potential Claims against the Debtors arising out of transfer pricing, intercompany dealings, trading and other arrangements or agreements between them.  In addition, these potential Claims could include claims against one or more of the pre-petition directors and officers of the Debtors for mismanagement, breach of duty and/or in

31

respect of the conduct of those directors and officers with respect to the operation, management and control of the Debtors. As of the date such Claims were filed by the Joint Administrators, NNUK and the EMEA Debtors and their Affiliates, the Claims have not been described in detail or quantified.

(b)     Public Debt Claims

The indenture trustees filed proofs of claim with respect to the default of the Senior Notes, which had an aggregate face value of $3.975 billion as of the Initial Petition Date. In addition to the Claims under the Senior Notes indentures and the related guarantees for the principal amount of the Senior Notes, these Claims assert liability for accrued and unpaid interest and certain other Claims.

(c)     EDC Claims

On September 28, 2009, EDC filed a proof of claim against NNI asserting General Unsecured Claims in the approximate amounts of $14.6 million, €2.3 million and £100,000, contingent Claims in the approximate amounts of $69.2 million, €11.7 million and £50,000, as well as certain unliquidated Claims. The Claims asserted by EDC are for the issuance of support in the form of guarantee bonds or guarantee type documents issued to financial institutions that issue letters of credit or guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance. The amounts asserted in the proof of claim are subject to change as projects are completed, support expires, support is recovered and support is transferred in connection with asset sales. The Debtors are reviewing these Claims and intend to raise all objections and defenses available with respect to such Claims.

(d)     Employee Claims

In the course of the Chapter 11 Cases, as of June 30, 2010, approximately 4,812 proofs of claim have been filed by the current and former employees of the Debtors, for the aggregate amount of approximately $ 530 million. The Debtors are in the process of reviewing the proofs of claim by comparing them to the Scheduled Claims and other information available to the Debtors, and considering alternatives to resolve these Claims in an efficient and orderly manner.

8.     Avoidance Actions

Pursuant to the Bankruptcy Code, a debtor may seek to recover, through adversary proceedings in bankruptcy court (each such action, an "Avoidance Action"), certain transfers of the debtor's property in respect of antecedent debts to the extent the transferees received more than they would have received on account of such pre-existing debts had the debtor been liquidated under chapter 7 of the Bankruptcy Code. Such transfers include cash payments, pledges of security interests or other transfers of interests in property. Such transfers must have been made while the debtor was insolvent, and the debtor is rebuttably presumed to have been insolvent during the 90-day period immediately prior to the commencement of its bankruptcy case. These provisions of the Bankruptcy Code can be broad in their application because they allow the debtor to recover payments regardless of whether there was any

impropriety in such payments, with certain limited exceptions.  If the debtor recovers a transfer, the transferee receives a general unsecured claim against the debtor to the extent of the recovery.

During the Chapter 11 Cases, the Debtors and their professional advisors have been analyzing transfers made by the Debtors in the 90-day period immediately prior to the Petition Date to determine whether there are viable Avoidance Actions that may be brought against any of the transferees.  To the extent the Debtors determine to file any such Avoidance Actions, they must do so within two years from the Petition Date, which is January 14, 2011 for all Debtors other than NN CALA, for which the two year period runs until July 14, 2011.  Should any Debtor file any such Avoidance Actions and prevail, such Debtor's estate will recover funds from the transferee of the challenged transfers.  However, no Debtor can predict the outcome of such Avoidance Actions or the amounts that may be realized therefrom.

        9.       Post-petition Liquidity, Lending and Financing

        (a)       Post-petition Liquidity and Capital Resources Overview

As a result of the Chapter 11 Cases and the Creditor Protection Proceedings in other jurisdictions, cash of the various Nortel Affiliates subject to such proceedings generally has been available to fund operations in particular jurisdictions, but not available to be freely transferred between jurisdictions, regions or outside joint ventures, other than for normal course intercompany trade and pursuant to specific court-approved agreements.

Since the Initial Petition Date, the Debtors have generally maintained use of their cash management system and consequently have minimized disruption to their operations pursuant to various court approvals and agreements obtained or entered into in connection with the Chapter 11 Cases.  The Debtors continue to conduct ordinary course trade transactions with non-Debtor Nortel Affiliates.

On June 29, 2009, the Court granted the Debtors authority to make loans or equity infusions to their non-Debtor subsidiaries in an aggregate amount not to exceed $2 million.

On the Initial Petition Date, the Debtors entered into an agreement with the EMEA Debtors governing the settlement of certain intercompany accounts, including for the purchase of goods and services, which was periodically extended and amended.  While the agreement expired on May 31, 2010, the Debtors and the EMEA Debtors have continued to trade and settle in accordance with their practices during the Creditor Protection Proceedings since that date.

As of June 30, 2010, NNI had approximately $767.6 million in cash on hand and the other Debtors collectively had approximately $96.1 million.

        (b)       Intercompany Revolving Loan Agreement

NNI, as lender, entered into a post-petition revolving loan agreement with NNL, as borrower, on January 15, 2009 (which was amended and restated on March 27, 2009), to benefit NNI's estate from NNL's continued operation by providing NNL liquidity to continue its

operations.  This revolving loan agreement was approved by the Canadian Court and, subject to certain conditions, approved by the Bankruptcy Court.  The outstanding amount of the loan may not exceed $200 million at any time.  An initial amount of $75 million was approved and drawn, but drawing on the remaining $125 million provided for under the agreement remains subject to Bankruptcy Court approval.  NNI has not sought Bankruptcy Court approval to allow the draw down of the remaining $125 million, and it is not expected that the balance will be drawn.  The loan bears interest at 10% per annum, and is secured by a charge on NNC's Ottawa, Ontario, Canada Carling facility.  Subject to certain conditions, the loan is also secured by an intercompany charge, each as approved by the Canadian Court on January 14, 2009.  NNL's obligations under the loan are unconditionally guaranteed by Nortel Networks Technology Corporation and each of the other Canadian Petitioners.  The agreement currently matures on December 31, 2010, subject to an extension to June 30, 2011, at the request of NNL and with the written consent of NNI, the Canadian Monitor, the Creditors' Committee and the Ad Hoc Group of Bondholders.  The loan agreement contains certain covenants, including mandatory prepayment of loans with the net cash proceeds from certain asset dispositions.

(c)      Interim Funding and Settlement Agreement

Other than one $30 million payment made by NNI to NNL in January 2009 in respect of amounts that were alleged to have been owed in connection with the Transfer Pricing Agreements, TPA Payments among parties to the Master R&D Agreement were suspended after the Initial Petition Date.  Notwithstanding such suspension, goods, services, research and development and corporate support continued to be provided by various Nortel Affiliates after the Initial Petition Date.  Concluding it was in the best interests of their estates and their creditors, the Debtors (other than NN CALA), with the support of the Creditors' Committee and the Ad Hoc Group of Bondholders, entered into an Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA"), with the Canadian Petitioners and the EMEA Debtors (other than NNSA) to address certain liquidity constraints facing NNL.

Under the IFSA, NNI paid $157 million to NNL, which represented an amount that the Debtors, the Canadian Petitioners, the Creditors' Committee, the Ad Hoc Group of Bondholders, the Canadian Monitor and the Joint Administrators agreed to be an appropriate estimate (taking into account the $30 million payment in January 2009) of the value of corporate overhead and research and development activities provided by NNL to NNI and related costs (subject to the terms of the IFSA) from the Initial Petition Date through September 30, 2009, and forecasted by NNL to be due from NNI under the Master R&D Agreement.  Under the terms of the IFSA, this payment was made in full and final settlement of TPA Payments owed for the period from the Initial Petition Date to September 30, 2009.  The parties entered into the IFSA without any definitive and binding determination regarding the interpretation and applicability of the Transfer Pricing Agreements.

The IFSA was approved by the Bankruptcy Court and the Canadian Court on June 29, 2009, and on June 23, 2009 the U.K. Court approved entry into of the IFSA by the Joint Administrators (except for NNSA which was authorized to enter into the IFSA by the French Court on July 7, 2009).  NNSA and Nortel Networks AG acceded to the IFSA on September 11, 2009.

34

(d)     Final Canadian Funding and Settlement Agreement

The arrangements under the IFSA extended through September 30, 2009, in the case of the Debtors, and through December 31, 2009, in the case of the EMEA Debtors.  In connection with the expiration of the IFSA, the Debtors (other than NN CALA), together with the Creditors' Committee and the Ad Hoc Group of Bondholders, commenced additional negotiations with the Canadian Petitioners and the Canadian Monitor to address NNL's ongoing liquidity concerns, which culminated in the FCFSA, which was executed as of December 23, 2009 by the Canadian Petitioners, the Canadian Monitor and the Debtors (other than NN CALA). The FCFSA provides, among other things, for the settlement of certain intercompany claims, including in respect of any claims of the Debtors against the Canadian Petitioners for overpayments to the Canadian Petitioners under the transfer pricing agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005.

As part of the settlement, the parties have agreed to the establishment of a pre-petition intercompany claim in favor of NNI in the CCAA Proceedings in the aggregate amount of $2.0627 billion (the "FCFSA Claim"), not subject to any setoff or reduction, on account of overpayments to NNL under the Transfer Pricing Agreements, and reconciling certain pre-petition obligations of NNI and NNL.  This amount represents a $2 billion unsecured pre-petition claim and a $62.7 million secured pre-petition claim, by NNI against NNL pursuant to the FCFSA, which settles (i) any claims of the Debtors (other than NN CALA) against the Canadian Petitioners for overpayments to the Canadian Petitioners under the transfer pricing agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005, whether or not resulting from any adjustment of taxable income of the Debtors as determined by the IRS, (ii) certain claims of NNI against NNL for amounts due and owing under that certain revolving loan agreement dated March 21, 2008 and (iii) any claims of the Canadian Petitioners (x) for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations pursuant to transfer pricing agreements or otherwise incurred by any Canadian Petitioners for the benefit of the Debtors which any Canadian Petitioner has asserted or could assert and would have been reimbursed to the Canadian Petitioners through payments payable by the Debtors to the Canadian Applicants during, or with respect to, the period prior to the Initial Petition Date or (y) relating to intercompany trading of goods and services during, or with respect to, the period prior to the Initial Petition Date.  Also, as part of the settlement, the Canadian Petitioners and the Canadian Monitor agreed to acknowledge the FCFSA Claim; defend, if necessary, the FCFSA Claim; and obtain a final order of the Canadian Court approving and allowing the FCFSA Claim.  The Canadian Petitioners and the Canadian Monitor also irrevocably waived any and all rights that may exist at law, in equity or otherwise to set off against, assert any counterclaims with respect to the amount or validity of, or otherwise reduce the amount of, the FCFSA Claim in any way.

In addition, under the FCFSA, the Canadian Petitioners and the Canadian Monitor agreed to waive any and all rights that may exist at law, in equity or otherwise to assert any claims against the Debtors (other than NN CALA) relating to the period prior to the Initial Petition Date; however, subject to certain exceptions, this waiver automatically terminates if the Debtors (other than NN CALA) assert certain pre-petition claims (other than the FCFSA Claim) against the Canadian Petitioners in the CCAA Proceedings or subsequent proceedings.  In addition, under the terms of the FCFSA, NNI has paid to NNL $191.8 million, which amount

represents (A) the maximum payment that the Debtors may or could owe in respect of certain settled obligations, (B) the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Canadian Petitioners or EMEA Debtors may have or could assert against one or more Debtors in any proceeding with respect to certain corporate overhead, research and development costs, transition services in respect of the asset sale transactions and certain other reimbursement obligations, whether pursuant to sections 503 and 507 of the Bankruptcy Code or otherwise and (C) constitutes a full and final settlement of any and all claims for corporate overhead, research and development costs, transition services in respect of the asset sale transactions and certain other reimbursement obligations. The FCFSA also provides for the allocation of certain other anticipated costs to be incurred by the parties, including those relating to the divestiture of Nortel's various businesses, among the various estates. The parties entered into the FCFSA without any definitive and binding determination regarding the interpretation and applicability of the Transfer Pricing Agreements.

On January 21, 2010, the Debtors and Canadian Petitioners obtained approvals from the Bankruptcy Court and the Canadian Court, respectively, of the FCFSA and the creation and allowance of the FCFSA Claim. Also in connection with the FCFSA, the Debtors and NNL received the authorization of the Bankruptcy Court and the Canadian Court, respectively, to enter into advance pricing agreements with the U.S. and Canadian tax authorities to resolve certain transfer pricing issues, on a retrospective basis, for the taxable years 2001 through 2005, which was a condition to the effectiveness of the FCFSA.

(e)     Export Development Canada Support Facility

Effective January 14, 2009, NNL entered into an agreement with EDC (the "Short-Term Support Agreement") to permit NNL continued access to the EDC Facility for an interim period that was extended several times, for up to $30 million of support based on its then-estimated requirements over the period. The EDC Facility, which was guaranteed by NNI prior to the Initial Petition Date, provides for the issuance of support in the form of guarantee bonds or guarantee type documents issued to financial institutions that issue letters of credit or guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance. On June 18, 2009, NNL and EDC entered into a cash collateral agreement (the "Cash Collateral Agreement") in connection with the EDC Facility. NNL provided cash collateral of $6.5 million for all outstanding post-petition support in accordance with the terms of the Cash Collateral Agreement, of which an aggregate of $5.6 million had been released by August 31, 2010, and the charge that was previously granted by the Canadian Court over certain of Nortel's assets in favor of EDC is no longer in force or effect. The Short-Term Support Agreement expired without further extension on December 18, 2009. Further access by NNL to the EDC Facility is at the sole discretion of EDC.

(f)     Post-petition L/C and Bonding Facilities

On June 30, 2009, the Bankruptcy Court entered a final order authorizing the Debtors to negotiate and enter into L/C and Bonding Facilities and to grant the issuers under the L/C and Bonding Facilities automatically perfected first priority security interests in and liens upon deposits and cash collateral pledged by the Debtors to support the issuance of surety bonds or letters of credit, primarily in support of certain obligations to their customers.

36

On July 20, 2009, NNI entered into a collateral agreement (the "Collateral Agreement") with Westchester Fire Insurance Company and ACE INA Insurance (collectively, the "Sureties"), and Westchester Fire Insurance Company as agent for the Sureties. On the same date, NNI executed an indemnity agreement (the "Indemnity Agreement," and together with the Collateral Agreement, the "ACE Facility Agreements"), whereby NNI agreed to indemnify the Sureties in connection with the issuance of up to $30 million in bonds. The ACE Facility Agreements allow for the issuance of performance, surety or other bonds to NNI's customers in support of NNI's contract performance (the "ACE Support"). Pursuant to the ACE Facility Agreements, any ACE Support issued under the ACE Facility is secured by up to 110% cash collateral. In July 2010, NNI's rights and obligations under bonds totaling $3,110,490 were transferred to GENBAND (as defined below) in connection with the sale of the Carrier VoIP and Applications Solutions ("CVAS") business and the Sureties released NNI from all liability with respect thereto and returned $3,110,490 of cash collateral to NNI. As of August 31, 2010, ACE Support in the face amount of $367,500 remained outstanding.

On July 22, 2009, NNI entered into an agreement for standby letters of credit (the "Standby L/C Agreement") and a related pledge agreement (together with the Standby L/C Agreement, the "Citibank Facility Agreements"), each with Citibank, N.A. The Citibank Facility Agreements allow for the issuance of letters of credit to NNI's customers in support of NNI's contract performance up to an aggregate stated amount of $6.2 million (the "Citibank Support"). Pursuant to the Citibank Facility Agreements, any Citibank Support would be secured by 110% cash collateral. As of August 31, 2010, no Citibank Support was outstanding.

10.    Cascade Indemnity

Certain Nortel Affiliates have not filed for bankruptcy or other creditor protection to date. Under the laws of various jurisdictions in which these Affiliates operate, the directors, officers and agents of the Affiliates may be subject to personal liability in certain circumstances. In order to enable those individuals designated by NNL or NNI, as applicable, to serve as directors, officers or agents of such Affiliates (the "Cascade Subsidiaries") and to facilitate participation by the Cascade Subsidiaries in Nortel's sales of businesses and assets as well as the orderly wind down of such Cascade Subsidiaries, NNL and NNI have established a trust (the "Cascade Trust"), which indemnifies individuals in their capacities as directors, officers and/or agents of a Cascade Subsidiary and their successors, if any (the "Cascade Beneficiaries"), for any claims resulting from their service as a director, officer or agent of a Cascade Subsidiary, subject to limited exceptions.

Subject to certain limitations, Cascade Beneficiaries of the Cascade Trust may seek payment for any costs relating to any indemnified claim only in the following order: first, the assets of the Cascade Subsidiary to which such indemnified claim is related; second, any insurance policy currently maintained by Nortel with respect to director and officer liabilities, including any insurance policies maintained by the Cascade Subsidiaries available to such Cascade Beneficiary to cover such costs; and third, the remaining Cascade Trust property. Additionally, NNI and NNL entered into a side agreement (the "Cascade Trust Side Agreement") that requires each to share the net amounts contributed by each of them in establishing the Cascade Trust on a pro rata basis based on the weighted average of proceeds allocated to each of them from certain global sales as well as to use commercially reasonable efforts to recover from

37

other Nortel Affiliates that are benefiting from the global sales (with certain exceptions as set forth in the Cascade Trust Side Agreement) a reasonable portion of the net amounts contributed to establish the Cascade Trust. The establishment of the Cascade Trust and the Cascade Trust Side Agreement were approved by the Canadian Court and the Bankruptcy Court on March 31, 2010.

D.      Post-petition Sales and Other Dispositions of Assets

        After Nortel determined in June 2009 that selling its businesses was the best path forward, Nortel commenced a process to evaluate its businesses and provide for the potential disposition of certain assets. It quickly became clear to the Debtors and other Nortel Affiliates subject to the Creditor Protection Proceedings that the best means of maximizing recovery for the creditors of all estates was through the expeditious monetization of Nortel's operations and assets. In furtherance of this, the Debtors and other Nortel Affiliates have participated since the Initial Petition Date in the asset sales and other dispositions of assets that are described in greater detail below.

        1.      Mobile WiMAX Business and Alvarion Agreement

        On January 29, 2009, Nortel announced its decision to discontinue its mobile WiMAX business and end its joint agreement with Alvarion Ltd. Nortel worked closely with Alvarion and Nortel's mobile WiMAX customers to transition and/or settle Nortel's contractual obligations during 2009 to help ensure that ongoing support commitments were met without interruption or alternative settlements are reached that mutually benefit Nortel and its customers. There have been no asset sales relating to the WiMAX business.

        2.      Layer 4-7 Assets

        On February 19, 2009, Nortel announced that certain Nortel Affiliates, including NNI and certain other Debtors, had entered into a "stalking horse" asset purchase agreement to sell certain portions of Nortel's Layer 4-7 data portfolio, including certain Nortel Application Accelerators, Nortel Application Switches and the Virtual Services Switch, to Radware Ltd. ("Radware") for approximately $18 million. The Bankruptcy Court and Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on February 27, 2009. No higher bids were submitted, and the Bankruptcy Court and Canadian Court entered orders approving the transaction with Radware as the successful bidder on March 26, 2009 and on March 30, 2009, respectively. The sale transaction closed on March 31, 2009. The proceeds of approximately $18 million were held in escrow as of August 31, 2010, by the New York branch of JPMorgan Chase Bank, N.A. ("JPMorgan"), pending allocation as provided under the orders approving the sale.

        3.      CDMA and LTE Access Assets

        On June 19, 2009, Nortel announced that certain Nortel Affiliates, including NNI and certain other Debtors, had entered into a "stalking horse" asset purchase agreement with Nokia Siemens Networks B.V. ("Nokia") for substantially all of Nortel's Code Division Multiple Access ("CDMA") business and Long Term Evolution ("LTE") Access assets for $650 million,

subject to certain purchase price adjustments under certain circumstances. The Bankruptcy Court and the Canadian Court entered orders on June 30, 2009 establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers. Competing bids were required to be submitted by July 21, 2009 and an auction with the qualified bidders was completed on July 24, 2009. Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") emerged as the successful bidder for a purchase price of $1.13 billion, subject to certain post-closing purchase price adjustments. The purchase price was finalized for a purchase price adjustment of $1 million. On July 28, 2009, the Bankruptcy Court and Canadian Court entered orders approving this sale and the sale transaction closed on November 13, 2009.

In connection with this sale, NNI, Architel Systems (U.S.) Corporation, CoreTek, Inc., Nortel Altsystems Inc., Nortel Altsystems International Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Cable Solutions Inc., NNCC, Nortel Networks HPOCS Inc., Nortel Networks International Inc., Nortel Networks Optical Components Inc., Northern Telecom International Inc., Sonoma Systems, Qtera Corporation and Xros, Inc. (the "U.S. Debtor Licensees") as well as certain other Nortel Affiliates, executed a license termination agreement.

Approximately 2,500 Nortel employees received offers of employment from Ericsson. Under the terms of the sale, and pursuant to the terms of a transition services agreement, Nortel is providing transitional services to Ericsson for a period of up to 12 to 24 months after closing of the transaction. In connection with this transaction, NNL and NNI paid an aggregate break-up fee of $19.5 million plus $3 million in expense reimbursements to Nokia.

A portion of the proceeds from this divestiture of approximately $50 million was held in escrow by the New York branch of Citibank N.A. as of August 31, 2010 to secure Nortel's obligations with respect to transition services. The remaining portion of the proceeds, after post-closing adjustments, of approximately $1.010 billion was held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.

4.    Enterprise Solutions Business

On July 20, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset and share sale agreement with Avaya Inc. ("Avaya") for Nortel's North American, CALA (as defined below) and Asian Enterprise Solutions ("ES") business, and an asset sale agreement with Avaya for the EMEA portion of the ES business for a purchase price of $475 million. These agreements provided for the sale of substantially all of the assets of the ES business globally as well as the shares of Nortel Government Solutions Incorporated and DiamondWare, Ltd. The Bankruptcy Court and Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on August 4, 2009. Competing bids were required to be submitted by September 4, 2009 and an auction with the qualified bidders commenced on September 11, 2009. On September 14, 2009, Avaya emerged as the successful bidder for a purchase price of $900 million in cash, subject to certain post-closing purchase price adjustments, with an additional pool of $15 million reserved for an employee retention program. The Bankruptcy Court and the Canadian Court entered orders approving the sale to Avaya on September 16, 2009 and the sale

39

transaction closed on December 18, 2009.  The sale of certain ES assets held by Israeli subsidiaries was subsequently approved by an Israeli Court on December 21, 2009.

Under the terms of the sale, approximately 6,000 Nortel employees accepted employment with Avaya.

A portion of the proceeds from this divestiture of approximately $14 million was held in escrow by the New York branch of Wells Fargo Bank, N.A. as of August 31, 2010 to secure Nortel's obligations with respect to purchase price adjustments.  The remaining portion of the proceeds of approximately $915 million was held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.  Nortel and Avaya are currently working to resolve disagreements in the amount of approximately $14 million concerning each party's final calculation of certain purchase price adjustments as contained in Nortel's closing statement delivered on February 16, 2010 (including revisions delivered on April 16, 2010) and Avaya's disagreement notice delivered April 19, 2010.  In the event that Nortel and Avaya are unable to resolve the disagreements, the parties would appoint an accounting arbitrator to resolve the disagreements under the terms of the sale agreement governing the transaction.  A motion regarding the arbitrability of one such disagreement is currently pending before the Bankruptcy Court and the Canadian Court.

5.      Packet Core Assets

On September 21, 2009, Nortel announced its plan to sell, by "open auction," the assets of Nortel's Wireless Networks business associated with the development of its Next Generation Packet Core network components ("Packet Core Assets"). The Packet Core Assets consist of software to support the transfer of data over existing wireless networks and the next generation of wireless communications technology including relevant non-patent intellectual property, equipment and other related tangible assets.  The Packet Core Assets exclude legacy packet core components for Nortel's Universal Mobile Telecommunications System Access and GSM businesses.  The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures that allowed qualified bidders to submit offers to purchase the Packet Core Assets on September 30, 2009 and September 29, 2009, respectively.  On October 25, 2009, in accordance with bidding procedures approved by the Bankruptcy Court and the Canadian Court, certain Nortel Affiliates, including NNI and certain other Debtors, entered into an agreement with Hitachi, Ltd. ("Hitachi") for the sale of the Packet Core Assets for a purchase price of $10 million.  On October 28, 2009, the Bankruptcy Court and Canadian Court entered orders approving the sale to Hitachi and the sale transaction closed on December 8, 2009, following satisfaction of all closing conditions.  The Bankruptcy Court and the Canadian Court entered orders on May 28, 2010 and May 20, 2010, respectively, approving amendments to the intellectual property license agreement and the TSA (as defined below) that had been executed in connection with the transaction, which provided for an expansion of certain sublicensing rights of Hitachi in exchange for additional consideration of $500,000.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

The total proceeds from this divestiture, after subtraction of the applicable withholding taxes, of approximately $10.36 million were held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.

6.    Optical Networking and Carrier Ethernet Businesses

On October 7, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with Ciena Corporation ("Ciena") for Nortel's North American, CALA and Asian Optical Networking and Carrier Ethernet businesses, and an asset sale agreement with Ciena for the European, Middle Eastern and African ("EMEA") portion of Nortel's Optical Networking and Carrier Ethernet businesses for a purchase price of $390 million in cash, and 10 million shares of Ciena common stock. These agreements included the planned sale of substantially all the assets of Nortel's Optical Networking and Carrier Ethernet businesses globally. The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on October 15, 2009. Qualified bidders were ultimately required to submit offers by November 17, 2009. On November 22, 2009, in accordance with court approved procedures, Nortel concluded an auction for the sale of these assets to Ciena, which emerged as the successful bidder, agreeing to pay $530 million in cash, subject to certain post-closing purchase price adjustments, plus $239 million principal amount of Ciena convertible notes due June 2017. The Bankruptcy Court and Canadian Court entered orders approving the sale to Ciena on December 3, 2009 and the sale transaction closed on March 19, 2010.

Ciena elected, as permitted by the terms of the sale agreement, to replace the $239 million principal amount of convertible notes with cash consideration of $244 million, and thus pay an all cash purchase price of approximately $774 million. The purchase price was finalized, but, at and after closing, this amount was reduced pursuant to the working capital adjustment mechanism of the asset sale agreement by approximately $81 million.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

A portion of the proceeds from this divestiture of approximately $78 million was held in escrow by the New York branch of Citibank, N.A. as of August 31, 2010 to secure Nortel's obligations with respect to taxation, real estate, transition services and other matters. Another portion of the proceeds of approximately CAD$2.2 million was held in escrow by the Ottawa branch of the Royal Bank of Canada as of August 31, 2010 to secure Nortel's obligations with respect to real estate located in Canada. The remaining portion of the proceeds of approximately $614 million was held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.

7.    GSM/GSM-R Business

On September 30, 2009, Nortel announced that certain Nortel Affiliates, including NNI, planned to sell by "open auction" substantially all of Nortel's global GSM/GSM-R business. The Bankruptcy Court and the Canadian Court entered orders establishing bidding

41

procedures that allowed other qualified bidders to submit offers to purchase the GSM/GSM-R business on October 15, 2009. Competing bids were required to be submitted by November 16, 2009. An auction with the qualified bidders concluded on November 24, 2009, with Ericsson and Kapsch CarrierCom AG ("Kapsch") emerging as the successful bidders for the sale of the North American and European assets for a purchase price of $103 million in cash, subject to certain purchase price adjustments. On November 18, 2009, Kapsch filed its bid for the GSM/GSM-R assets of NNSA with the relevant French authority. The Bankruptcy Court and the Canadian Court entered orders approving the sale to Ericsson and Kapsch on December 2, 2009. The French Court entered an order approving the sale to Kapsch on March 30, 2010. The sale transaction closed on March 31, 2010. The purchase price with respect to the sale to Ericsson was finalized, subject to a further working capital downward adjustment of $6 million in the second quarter of 2010. The purchase price for the sale to Kapsch is also subject to a further working capital adjustment pending finalization between the parties.

A portion of the proceeds of this divestiture of approximately $24 million is currently held in escrow by the New York branch of Citibank, N.A. to secure Nortel's obligations with respect to transition services. The remaining portion of the proceeds, taking into account certain post-closing purchase price adjustments, of approximately $88 million is held in escrow by the New York branch of JPMorgan pending allocation as provided under the orders approving the sale.

On May 28, 2010 and May 20, 2010, the Bankruptcy Court and the Canadian Court, respectively, entered orders authorizing the sale of assets associated with the CALA region GSM/GSM-R business of Nortel to Ericsson for a purchase price of $2 million in cash. This supplemental sale transaction closed on June 4, 2010. The proceeds of this divestiture are held in escrow by the New York branch of JPMorgan pending allocation as provided under the orders approving the sale.

In connection with each of these sales, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

8.      CVAS Business

On December 23, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with GENBAND Inc. (now known as GENBAND US LLC, following a conversion completed May 27, 2010) ("GENBAND") for Nortel's North American, CALA and Asian CVAS business, and an asset sale agreement with GENBAND for the EMEA portion of Nortel's CVAS business for a purchase price of $282 million, subject to balance sheet and other adjustments then estimated at approximately $100 million, resulting in net proceeds of approximately $182 million. These agreements included the planned sale of substantially all the assets of the CVAS business globally. The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on January 8, 2010 and on January 6, 2010, respectively. Competing bids were required to be submitted by February 23, 2010. On February 24, 2010, Nortel announced that it would not proceed to auction and would work toward closing the asset sale agreements with GENBAND.

42

The Bankruptcy Court and the Canadian Court entered orders approving the sale to GENBAND on March 4, 2010, and the sale transaction closed on May 28, 2010.

A portion of the proceeds from this divestiture of approximately $15 million was held in escrow by JPMorgan as of August 31, 2010 to secure Nortel's obligations with respect to transition services and certain employment issues. An additional $13 million of the proceeds was held in escrow by Wells Fargo Bank, N.A. as of August 31, 2010 to secure Nortel's obligations with respect to certain taxation and purchase price adjustments. The remaining portion of the proceeds of approximately $153.5 million was held in escrow by the New York branch of JPMorgan as of August 31, 2010, pending allocation as provided under the orders approving the sale.

9.      LGN Joint Venture

On April 20, 2010, Nortel announced that NNL had entered into a share purchase agreement with Ericsson for the sale of NNL's 50% plus 1 share interest, including preferred shares, in LGN for a purchase price of $242 million in cash, subject to certain purchase price adjustments. The Canadian Court entered an order approving this sale on May 3, 2010 and the sale transaction closed on June 29, 2010. Pursuant to the Canadian Court order approving the sale, the purchase price proceeds have been deposited in a segregated account held in the name of NNL, and such proceeds may not be distributed except upon further order of the Canadian Court, on notice to the Debtors.

10.     Relay Sale

On June 17, 2010, NNL and Nortel Networks Technology Corporation entered into an asset sale agreement with 7522312 Canada Inc. for the sale of certain assets related to the wireless backhaul and multi-hop digital repeater/relay research and development program for a purchase price of $600,000 plus applicable transfer taxes. The Canadian Court entered an order approving this sale on June 29, 2010 and the sale transaction closed on June 30, 2010.

Pursuant to the Canadian Court order approving the sale, the purchase price proceeds have been deposited in a segregated account held in the name of NNL, and such proceeds may not be allocated or distributed except upon either agreement of the U.S. Debtor Licensees as to the distribution of such proceeds (subject to the prior consent of the Creditors' Committee and the Ad Hoc Group of Bondholders acting in good faith) or upon orders of the Canadian Court and the Bankruptcy Court after notice and a joint hearing.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

11.     MSS Business

On August 27, 2010, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with PSP Holding LLC ("PSP Holding") for Nortel's North American, CALA and Asian Multi-Service Switch ("MSS") business, and an asset sale agreement with PSP Holding for the EMEA portion of Nortel's MSS business, for an aggregate

43

purchase price of $39 million, subject to working capital and other adjustments.  These agreements include the planned sale of substantially all the assets of the MSS business globally. On September 1, 2010, the Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that will allow other qualified bidders to submit higher or otherwise better offers.  Pursuant to such orders, competing bids must be submitted by September 21, 2010 and if qualified bids other than that of PSP Holding are received, an auction will be held on September 24, 2010.

      12.      De Minimis Asset Sales

On February 18, 2009, the Bankruptcy Court entered an order establishing procedures for the sale or abandonment of de minimis assets.  Pursuant to the terms of such order, the Debtors have sold and intend to continue to sell and abandon certain de minimis assets in order to maximize the value of any such assets in connection with the wind down of the Debtors' estates.

      13.      Purchase Price Adjustments

Nortel's sale agreements generally provide for post-closing adjustments to the stated purchase price based on the actual value of certain assets and liabilities as of the closing date relative to an estimate of those amounts at closing.  Adjustments may be made for, among other things:  (i) changes in net working capital; (ii) changes in amounts to be paid in respect of transferred employees, including such items as accrued compensation and vacation days, retirement benefits and severance amounts; and (iii) changes in amounts related to assets being transferred outside the United States, including purchase price reductions for assets held by the EMEA Debtors that are unable to be transferred due to potential further insolvency proceedings. In addition, some asset sale agreements include additional purchase price adjustments that depend on changes in inventory, net debt, standard margin and deferred profits of the business sold.

      14.      Transition Services Agreements

In connection with each of the sales of certain of its global businesses and assets, Nortel has entered into various transition services agreements with the purchasers of such businesses and assets (the "TSAs").  Nortel is contractually obligated under each existing TSA to provide certain information technology, business transition and related services to the relevant purchaser of its various global businesses and assets for a period following the closing of the transaction.

Of the Debtors and their subsidiaries, NNI and NN CALA are providing significant services under the TSAs and are expected to continue to do so through the TSA period; Nortel Networks Japan (also known as Nortel Networks Kabushiki Kaisha), wholly owned by NNI, is involved in a number of TSA services; and Nortel Technology Excellence Centre Private Limited (wholly owned by NNI), Nortel Networks de Guatemala (98% owned by NN CALA and 2% owned by NNL) and Nortel Trinidad and Tobago Limited (wholly owned by NN CALA) have minor roles.   Numerous Nortel Affiliates other than the Debtors also are providing services under the TSAs.

The compensation the Nortel Affiliates receive under each TSA for providing services is either cost-based or, in most cases, a fixed amount agreed upon with each purchaser on the basis of a projection of the costs to be incurred by Nortel in providing such services to the business sold.  Under each TSA, Nortel's compensation may be adjusted periodically based on certain changes in the product volume and headcount estimates for the relevant divested business.  Unless otherwise agreed, each Nortel Affiliate providing services under a TSA bears the initial costs of providing such services.  The revenue received from the relevant purchaser is distributed among the relevant Nortel Affiliates.  Each TSA permits the relevant purchaser to terminate some or all services provided by Nortel under such TSA upon written notice to Nortel. To the extent any Nortel Affiliate is unable to eliminate costs associated with the provision of services that are being terminated, or otherwise cannot fully recover its costs from payments actually received from the relevant purchasers, such entity will generally be responsible for such costs and may incur a loss as a result.

With limited exceptions, the Nortel Affiliates that are parties to each TSA must indemnify the purchaser(s) for certain losses resulting from a breach of such TSA by such Nortel signatories, and in some cases, other losses caused by Nortel and relating to the provision of services under such TSA.  Nortel's liability for damages under the TSAs is generally subject to certain limitations, typically including an overall cap of liability based on the revenues payable to Nortel under the relevant TSA, but there may be circumstances in which a higher limitation or no limitation applies.  In addition, the TSAs generally require that all claims under a TSA be brought within enumerated time periods, ranging from 30 to 60 days, after the end of the term of the TSA. Under each TSA, each purchaser must indemnify Nortel for certain losses relating to the provision of services under such TSA or resulting from a breach of such TSA by each purchaser.

Below is a general description of the terms of the TSAs under which Nortel is currently providing services.  Nortel may enter into one or more additional TSAs in connection with the sale of other remaining businesses or assets and NNI and its Affiliates may enter into one or more additional agreements to provide services to or receive services from other Nortel Affiliates after the Debtors emerge from bankruptcy.  In each case, the terms of any such TSA may differ from other TSAs.

(a)     TSA for the Sale of the CDMA Business and LTE Access Assets

In connection with the sale of substantially all of Nortel's CDMA business and LTE Access assets, NNC, NNL and NNI entered into a TSA with Ericsson pursuant to which NNC, NNL and NNI have agreed to provide or cause their Affiliates to provide information technology ("IT"), order management, supply chain, service and technical support, finance and certain back office services for a period of up to 24 months beginning November 13, 2009.  Any service provided under this TSA may be terminated upon 90 days' notice by Ericsson.  NNC, NNL, and NNI have, subject to certain limitations, each severally agreed to indemnify Ericsson for losses in connection with (i) a breach of such Nortel Affiliate's obligations under the TSA, (ii) claims against Ericsson for benefits or compensation by the employees of service providers, (iii) failure by service providers to comply with laws or regulations or (iv) bodily injury or property damage resulting from negligent or willful acts of a services provider or its supplier or subcontractor.

45

(b)        TSA for the Sale of the ES Business

In connection with the sale of substantially all of the ES business, NNI, NN CALA and certain non-Debtor Affiliates entered into a TSA with Avaya pursuant to which these Nortel Affiliates have agreed to provide or cause their Affiliates to provide IT, order management, supply chain, service and technical support, finance, certain back office and legal services for a period of up to 18 months (up to 12 months in certain jurisdictions in the EMEA region) beginning December 18, 2009.  This TSA provides for the early termination of some of the services being provided under certain conditions.  The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify Avaya for losses in connection with the gross negligence or willful misconduct in the performance of such Nortel Affiliate's obligations under the TSA.

(c)        TSA for the Sale of the Optical Networking and Carrier Ethernet Businesses

In connection with the sale of substantially all of the Optical Networking and Carrier Ethernet businesses, certain Nortel Affiliates[3] entered into a TSA with Ciena pursuant to which these Nortel Affiliates have agreed to provide IT, finance, certain back office, supply chain and order management services for a period of up to 24 months (up to 12 months in certain jurisdictions in the EMEA region) beginning March 19, 2010.  Any service provided under this TSA may be terminated upon 90 days' notice by Ciena.  The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify Ciena for losses in connection with a breach of such Nortel Affiliate's obligations under the TSA and claims of intellectual property infringement by third parties where such Nortel Affiliate failed to obtain a required consent from such third party.

(d)        TSA for the Sale of the GSM/GSM-R Business

In connection with the sale of substantially all of the GSM/GSM-R business, NNI and certain non-Debtor Affiliates entered into a TSA with Ericsson pursuant to which these Nortel Affiliates have agreed to provide or cause their Affiliates to provide IT, order management, supply chain, service and technical support, finance and certain back office services for a period of up to 18 months (up to 12 months in certain jurisdictions in the EMEA region) beginning March 31, 2010.  Any service provided under this TSA may be terminated upon 90 days' notice by Ericsson.  The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify Ericsson for losses in connection with (i) a breach of such Nortel Affiliate's obligations under the TSA, (ii) claims against Ericsson for benefits or compensation by the employees of service providers, (iii) failure by service providers to comply with laws or regulations, or (iv) bodily injury or property damage resulting from negligent or willful acts of services provider or its supplier or subcontractor.

---

[3]    These Nortel Affiliates include certain Debtors (NNI, CoreTek, Inc., Qtera Corporation, Xros, Inc. and NN CALA), as well as certain non-Debtor Affiliates.

Also in connection with the sale of substantially all of the GSM/GSM-R business, NNI and certain non-Debtor Affiliates entered into a TSA with Kapsch pursuant to which these Nortel Affiliates have agreed to provide or cause their Affiliates to provide IT, order management, supply chain, service and technical support, finance and certain back office services for a period of up to 12 months that commenced March 31, 2010.  Any service provided under this TSA may be terminated upon 90 days' notice by Kapsch.  The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify Kapsch for losses in connection with (i) a breach of such Nortel Affiliate's obligations under the TSA, (ii) claims against Kapsch for benefits or compensation by the employees of service providers, (iii) failure by service providers to comply with laws or regulations or (iv) bodily injury or property damage resulting from negligent or willful acts of services providers or its supplier or subcontractor.

(e)    TSA for the Sale of the CVAS Business

In connection with the sale of substantially all of the CVAS business, NNI and certain non-Debtor Affiliates entered into a TSA with GENBAND pursuant to which the Nortel signatories to this TSA have agreed to provide IT, supply chain, finance, certain back office and order management services for a period of up to 18 months (up to 12 months in certain jurisdictions in the EMEA region) that commenced May 28, 2010.  Any service provided under this TSA may be terminated upon 90 days' notice by GENBAND.  The Nortel Affiliates that are parties to this TSA (other than NNUK and Nortel Networks (Ireland) Limited) have, subject to certain limitations, each severally agreed to indemnify GENBAND for losses in connection with a breach of such Nortel Affiliate's obligations under the TSA by such Affiliate, its agents, shareholders, partners, representatives or subcontractors.

(f)    TSA for the Sale of the Layer 4-7 and Packet Core Assets

Nortel was providing transition services to the purchasers of the Layer 4-7 Assets and Packet Core Assets, but the terms of the TSAs under which these services were provided have expired.

(g)    TSA for the Sale of the MSS Business

In connection with the sale of the MSS business, and subject to the necessary court approval and closing of the sale, NNI and certain non-Debtor Affiliates would enter into a TSA with PSP Holding pursuant to which the Nortel signatories to the TSA would agree to provide transition services for a period beginning at the closing of the sale and continuing through June 30, 2011 or a later date based on the dates of the U.S. and Canadian sale hearings to approve the sale.  Any service provided under the TSA would be terminable by PSP Holdings upon an advance notice of from 60 to 90 days, to be negotiated on a service-by-service basis. The Nortel Affiliates that are parties to the TSA (other than NNUK and Nortel Networks (Ireland) Limited) would, subject to certain limitations, each severally agree to indemnify PSP Holdings for losses in connection with (i) the breach of such Affiliate's obligations under the TSA by such Affiliate, its directors, officers and employees, agents, shareholders, partners, representatives or subcontractors; (ii) bodily injury or property damage resulting from the willful or negligent acts or omissions of such Affiliate (and any corresponding provider of services), its

47

suppliers or subcontractors or its and their personnel; and (iii) the violation by a provider of services of any law or regulation.

15.    Distribution Escrow Accounts

In connection with each of the major asset sales, each Nortel Affiliate party to the sales, as depositors, entered into escrow agreements with JPMorgan as escrow agent, to hold the proceeds from the divestitures in escrow pending allocation as contemplated by the relevant orders approving each sale.  The funds held in escrow under these agreements are held in accounts in the United States.

According to these agreements, with the exception of the agreement entered into in connection with Level 4-7 sale described above, JPMorgan will distribute the sale proceeds for the relevant asset sale from the escrow funds only if so instructed by a letter of direction jointly executed by the depositors, the Creditors' Committee and the Canadian Monitor or if the depositors have entered into the protocol for resolving disputes concerning allocation proceeds as contemplated under the IFSA, upon delivery of a duly authenticated copy of the binding decision made by each relevant dispute resolver and a certificate attesting to the finality of the award.  For the Level 4-7 sale, JPMorgan will distribute the sale proceeds from the escrow funds only if so instructed by the Bankruptcy Court and the Canadian Court, if the Chapter 11 Cases and the CCAA Proceedings have not yet been terminated or closed.  If the Chapter 11 Cases or the CCAA Proceedings have been terminated or closed, then the proceeds will be distributed upon receipt of a joint letter from the depositors or a final decision of a court of competent jurisdiction. In all cases, the depositors agreed to reimburse the escrow agent for its reasonable costs and expenses and to indemnify and hold harmless the escrow agent and its affiliates, successors, assigns, directors, agents and employees from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigation and expenses arising out or in connection with its performance under the escrow agreement.

16.    Remaining Intellectual Property Assets

Nortel's intellectual property assets include a substantial global portfolio of patents, trademarks, copyrights in software and related documentation, domain names, trade secrets and other intellectual property rights associated with its various businesses.  NNI holds a perpetual, exclusive license in the United States and Puerto Rico for intellectual property that is subject to the Master R&D Agreement (which excludes trademarks).  In addition to NNI, certain other Debtors previously had or presently hold intellectual property rights, as further described below.

In connection with the 363 Sales, Nortel transferred certain intellectual property rights exclusively or predominantly used in the divested businesses to the respective business purchasers and licensed certain additional intellectual property rights related to the businesses acquired by such purchasers.  While the vast majority of the transferred and licensed intellectual property that is registered or applied for with any governmental entity was (or is, in the case of the licensed intellectual property) registered or applied for in the name of NNL, certain of the patents and trademarks transferred or licensed in connection with the 363 Sales were owned by NNI, Nortel Altsystems Inc., Qtera Corporation, Sonoma Systems and Xros, Inc.

48

In addition, upon the closing of the 363 Sales, NNI agreed to terminate or relinquish its exclusive license under the transferred or licensed intellectual property solely to the extent (i) any grant of rights to the purchasers was restricted by or conflicted with any rights held by NNI or (ii) such termination was necessary to facilitate the sales. The Debtors' entitlement to an additional allocation of a portion of the sale proceeds based on the termination and relinquishment of such intellectual property rights will be addressed in connection with the allocation of the sale proceeds generally.

Nortel retains substantial intellectual property rights and IP addresses that were not transferred pursuant to any of the aforementioned asset sales. The primary retained intellectual property assets include an extensive patent portfolio, certain trademarks and domain names, and copyrights and trade secrets in software and related documentation. The majority of the value of Nortel's retained intellectual property rights lies in its residual patent portfolio, which consists of patents and patent applications registered or applied for in multiple countries and covering many aspects of telecommunications and other markets. As mentioned above, NNI holds a perpetual exclusive license for any such intellectual property that is subject to the Master R&D Agreement. In addition, certain Debtors hold certain patents directly.

Nortel has retained Lazard and Global IP Law Group ("Global IP") to assist in the development of a plan to maximize the return value for Nortel's residual patent portfolio. Lazard and Global IP, working with Nortel and its advisors, are currently exploring various options, including the following: (i) sale of the residual patent portfolio in one or more transactions; (ii) sale of or investment in Nortel's patent licensing and enforcement business; or (iii) creation of a licensing entity, which will seek to derive licensing revenue from the patent portfolio over the long term.

In the event of a sale of the residual patent portfolio, cash obtained from the sale of the residual patents will be allocated among the Nortel Affiliates with an interest in such patents either in connection with such transaction or as otherwise determined by the resolution of allocation issues generally. Other alternatives may result in the Debtors holding a continuing stake in certain intellectual property assets or in a licensing business.

The value the Debtors ultimately may realize from the residual patents through the above options discussed above is uncertain at this time and dependent on various factors, including the strategies ultimately implemented, the timing of any such transactions and the allocation of consideration among various Nortel Affiliates.

As part of the ongoing efforts to monetize remaining intellectual property, Nortel is also entertaining proposals for the acquisition of the trademark "NORTEL" and the Nortel globe logo. NNI is the registered owner of two U.S. word and design marks for "NORTEL" and the related logo; however, other similar marks (for classes of goods and services other than those to which NNI's marks apply) are owned by NNL. Accordingly, monetization efforts for these marks will be coordinated between NNL and NNI, and NNI's share of any value derived from these efforts is yet to be determined.

Nortel's current strategy with respect to its other retained intellectual property assets is to maintain only the intellectual property that has potential value greater than the cost of

maintaining it.  Pursuant to this strategy, some of Nortel's remaining trademarks and software may be allowed to, respectively, expire or become obsolete.

E.    Certain Other Post-petition Operations of the Debtors and Other Nortel Affiliates

1.    Creation of Nortel Business Services Group and the Corporate Group

In addition to monetizing their assets, the Debtors have undertaken other restructuring efforts to maximize value for their creditors.  One of such efforts was to establish two internal groups in 2009:  the Corporate Group (the "Corporate Group") and NBS.  Various Nortel Affiliates, including certain of the Debtors and their non-Debtor subsidiaries, provide services as part of the Corporate Group and NBS.

The Corporate Group is focused on a number of key actions, including the completion of announced sales and the sale of remaining businesses and assets as well as exploring strategic alternatives to maximize the value of Nortel's intellectual property.  The Corporate Group also is responsible for restructuring matters, including the claims resolution process and planning toward conclusion of the Chapter 11 Cases and the CCAA Proceedings.  It also continues to provide administrative and management support to various Nortel Affiliates.

NBS continues to provide global transition services in fulfillment of contractual obligations under the TSAs.

2.    Employee Information

(a)    Restructuring

As of the Petition Date, the Debtors employed approximately 8,911 regular full-time employees (excluding employees on notice of termination).  The Debtors also employed individuals on a regular part-time basis and on a temporary full- or part-time basis, and also engaged the services of contractors as required.

From the Initial Petition Date to June 26, 2010, through cost reduction initiatives under the Chapter 11 Cases, the Debtors reduced their headcount by approximately 71%. Further, approximately 4,654 jobs for employees of the Debtors were preserved through creation of jobs for former employees in connection with sales of businesses during the same period.  As of June 26, 2010, approximately 805 employees of the Debtors were continuing in NBS and 39 employees of the Debtors were continuing in the Corporate Group.  As of June 26, 2010, there were 26 active employees of the Debtors, collectively, who were not affiliated with either NBS or the Corporate Group.

(b)    Employee Benefit Plans

(i)    *Nortel Plans Generally*

The Debtors historically maintained various retirement programs covering substantially all of their employees, consisting of tax-qualified and non tax-qualified defined benefit, defined contribution and investment plans.  Since the Initial Petition Date, the Debtors

have ceased payment under their non-tax qualified plans and, as discussed further below, the tax-qualified defined benefit plan has been terminated by the Pension Benefit Guaranty Corporation (the "PBGC").

The Debtors also have provided other benefits, including post-retirement benefits and post-employment benefits. Employees previously enrolled in the capital accumulation and retirement programs offering post-retirement benefits are eligible for company sponsored post-retirement health care and/or death benefits, depending on age and/or years of service. Substantially all other employees have access to post-retirement benefits by purchasing a retiree health care plan at their own cost. The Debtors bear certain administrative costs in connection with providing retiree benefits under the NNI Flex Benefits Plan. Post-retirement and post-employment benefits are funded as claims are incurred. The Debtors also maintained certain severance plans and arrangements, but they have ceased payment under such plans since the Initial Petition Date.

Generally, the employees of the Debtors participate in plans sponsored or maintained by the Debtors solely for U.S. employees, including the Nortel Networks Long-Term Investment Plan (to which the Debtors' employees and the Debtors themselves make employee and matching contributions, respectively) and its own welfare and post-retirement benefit programs.

### (ii)        Termination of the U.S. Retirement Income Plan

On July 17, 2009, the PBGC provided a notice to NNI that the PBGC had determined under the Employee Retirement Income Securities Act of 1974, as amended ("ERISA"), that:  (i) the Nortel Networks Retirement Income Plan (the "Retirement Income Plan"), a defined benefit pension plan sponsored by NNI, will be unable to pay benefits when due; (ii) under section 4042(c) of ERISA, the Retirement Income Plan must be terminated in order to protect the interests of participants and to avoid any unreasonable increase in the liability of the PBGC insurance fund; and (iii) July 17, 2009 was to be established as the date of termination of the Retirement Income Plan. On the same date, the PBGC filed a complaint in the United States District Court for the Middle District of Tennessee against NNI and the Retirement Plan Committee of the Nortel Networks Retirement Income Plan (the "Retirement Plan Committee") seeking to proceed with termination of the Retirement Income Plan though this complaint was not served against NNI. NNI worked to voluntarily assign trusteeship of the Retirement Income Plan to the PBGC and avoid further court involvement in the termination process. On September 8, 2009, pursuant to an agreement between the PBGC and the Retirement Plan Committee, the Retirement Income Plan was terminated with a termination date of July 17, 2009, and the PBGC was appointed trustee of the plan. The PBGC withdrew the complaint it had filed in the United States District Court for the Middle District of Tennessee.

The PBGC has filed a proof of claim in the amount of $593.1 million against each of the Debtors in the Chapter 11 Cases for the unfunded benefit liabilities of the Retirement Income Plan. The PBGC also has filed unliquidated Claims for contributions necessary to satisfy the minimum funding standards, for insurance premiums, interest and penalties, and for shortfall and amortization charges. Under ERISA, the PBGC may have the ability to impose certain claims and liens on the Debtors and certain of their subsidiaries and Affiliates not subject

to the Chapter 11 Cases.  The Debtors are conducting their review of these Claims and intend to raise all objections and defenses available to them.

### (iii)    U.S. Retiree Welfare and Long-Term Disability Plans

The Debtors historically have provided a number of welfare benefits to their active employees and retirees through benefit plans, including the Nortel Networks Inc. Retiree Medical Plan and the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan (together, the "Retiree Welfare Plans") and the Nortel Networks Inc. Long-Term Disability Plan (the "LTD Plan").  Under the Retiree Welfare Plans, the Debtors provide employer-paid (i) post-employment medical benefits for current retirees, their spouses, surviving spouses, domestic partners and dependents and (ii) term life insurance coverage and long-term care expense coverage for current retirees.  Under the LTD Plan, the Debtors provide employer-paid long-term disability benefits for current participants.  On June 21, 2010, the Debtors filed a motion to terminate, effective August 31, 2010, the Retiree Welfare Plans and the LTD Plan.  The Debtors filed a notice of withdrawal of the motion with the Bankruptcy Court on July 16, 2010.  Accordingly, at this time, the Debtors continue to provide benefits under the Retiree Welfare Plans and the LTD Plan, but no final determination has been made regarding the ultimate resolution of the provision of these benefits.

On July 16, 2010, an *ad hoc* committee of retirees filed a motion requesting an order authorizing the formation of a voluntary employee benefit association (a "VEBA") to offer health, prescription drug, dental and vision care benefits to the Debtors' retirees and their spouses and dependents.  The motion asserts that benefits provided through the VEBA will allow retirees aged 55 to 64 and their spouses and dependents to receive an 80% federal subsidy in the form of the Health Coverage Tax Credit codified in section 35(e)(1) of the Internal Revenue Code of 1986, as amended (the "IRC").  The motion is scheduled to be heard on September 30, 2010.

### (iv)    Annual Incentive Plans

The Nortel Networks Limited Annual Incentive Plan (the "Incentive Plan") is an ordinary course of business compensation program that has been in place for several years.  It is a broad-based plan in which nearly all Nortel employees in non-sales positions are eligible to participate.

As of July 1, 2010, approximately 2,164 employees were eligible to participate in the Incentive Plan of which approximately 817 were employees of the Debtors.  Eight of these employees were eligible to receive quarterly awards in connection with their employment by the MSS business.  In addition, 756 and 53 employees of the Debtors associated with NBS and the Corporate Group, respectively, were eligible to receive awards under the Incentive Plan.

### (v)    Key Executive Incentive Plan and Key Employee Retention Plan

After the Initial Petition Date, the Debtors and certain Nortel Affiliates developed a key employee incentive and retention program for employees in (a) North America, (b) Central America and Latin America ("CALA") and (c) Asia.  The program consists of the Nortel

Networks Corporation Key Executive Incentive Plan (the "<u>KEIP</u>") and Nortel Networks Corporation Key Employee Retention Plan (the "<u>KERP</u>").  The KEIP was developed in order to provide incentives to the executives to streamline Nortel's business and guide Nortel out of the Chapter 11 Cases and the CCAA Proceedings as swiftly as possible, while the KERP was aimed at retaining key employees by providing a degree of job security and preventing attrition of key employees before a confirmed plan of reorganization was obtained.  The final payments to employees of the Debtors under the KEIP and KERP were made on June 18, 2010 and July 16, 2010, respectively; no further amounts will be paid to employees of the Debtors under these plans.

*(vi)    Nortel Special Incentive Plan*

Nortel obtained Bankruptcy Court approval on March 4, 2010 and Canadian Court approval on March 8, 2010 of a special incentive plan developed by Nortel (excluding Nortel Affiliates in the EMEA region) as well as a number of its significant creditors (the "<u>Special Incentive Plan</u>").  The Special Incentive Plan is designed to provide cash incentive payments to certain employees (other than those domiciled in the EMEA region or employed by joint ventures) holding positions with NBS and the Corporate Group to encourage the achievement of certain performance targets and other business goals important to Nortel, including the successful conclusion of the Chapter 11 Cases, the compliance with Nortel's obligations under various transaction agreements and the wind down of various Nortel Affiliates. Approximately 1,475 Nortel employees were initially eligible to participate in the plan, of which approximately 866 were employees of the Debtors.

Approximately 88% of the Special Incentive Plan's costs are being funded by the purchasers of Nortel's businesses, pursuant to and during the terms of the sales agreements, which require that Nortel continue to operate, on a contract basis, substantial elements of the day-to-day business functions relating to the divested businesses until such functions can be transferred to the relevant purchaser.  This means that Nortel must retain certain key employees to ensure that the transition of the acquired businesses is as effective and efficient as possible.

(c)    Certain Employment Agreements

NNI obtained Bankruptcy Court approvals on March 4, 2010 and May 5, 2010 to enter into employment agreements providing for special incentive bonuses for certain officers and key employees of the Debtors including Christopher Ricaurte, Donald McKenna, John Veschi and George Riedel, payable upon achievement of business performance objectives relating generally to the efficient and successful wind down of certain Nortel business units. These individuals are not participants in the Special Incentive Plan described above.

3.    Non-Creditor Protection Legal Proceedings

(a)    ERISA Lawsuit

Beginning in December 2001, NNI, NNC and NNL, together with certain of their then-current and former directors, officers and employees, were named as defendants in several purported class action lawsuits pursuant to ERISA.  These lawsuits have been subsequently

53

consolidated into a single proceeding in the United States District Court for the Middle District of Tennessee. This lawsuit is on behalf of participants and beneficiaries of the Nortel Networks Long-Term Investment Plan who held shares of the Nortel Networks Stock Fund during the class period, which has yet to be determined by the court. The lawsuit alleges, among other things, material misrepresentations and omissions to induce participants and beneficiaries to continue to invest in and maintain investments in NNC common shares through the investment plan. The court has not yet ruled as to whether the plaintiffs' proposed class should be certified. As a result of the Chapter 11 Cases, as well as the Bankruptcy Court's order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code and the resulting enforcement of the Canadian stay of proceedings, on September 25, 2009, the district court ordered that the action be stayed and administratively closed.

       (b)       The Pensions Regulator "Warning Notice"

       On September 30, 2009, the Trustee of NNUK's Pension Plan (the "U.K. Pension Trustee") and the Board of Pension Protection Fund (the "PPF") jointly filed proofs of claim against the Debtors in the amount of $3.1 billion with respect to an alleged shortfall in the NNUK defined benefit pension plan. The Debtors are conducting their review of these Claims and intend to raise all objections and defenses available to them.

       In January 2010, The Pensions Regulator in the United Kingdom ("The Pensions Regulator") issued a purported Warning Notice in which it alleged that the NNUK defined benefit pension plan has a shortfall of approximately £2 billion and identified certain Nortel Affiliates, including NNC, NNL, NNI and NN CALA, as targets of a procedure by The Pensions Regulator for the issuance of a financial support direction ("FSD") that could eventually require them to provide funding to eliminate the alleged shortfall.

       On February 26, 2010, the Debtors obtained an order from the Bankruptcy Court that (i) affirms that, by virtue of their filing proofs of claim in the Bankruptcy Court, the U.K. Pension Trustee and the PPF have submitted to the jurisdiction of the Bankruptcy Court; (ii) enforces the automatic stay imposed by section 362 of the Bankruptcy Code against the U.K. Pension Trustee and the PPF and holds that their participation against the Debtors in U.K. pension proceedings would be deemed a violation of the automatic stay and subject them to sanctions; and (iii) deems those proceedings to be of no force or effect as to the Debtors in the Chapter 11 Cases. On March 5, 2010, the U.K. Pension Trustee and the PPF appealed the Bankruptcy Court's order to the United States District Court for the District of Delaware. On August 5, 2010, a United States Magistrate Judge of that Court issued a Report and Recommendation to the United States District Judge who will determine the appeal that the Bankruptcy Court's order should be affirmed.

       A similar order was issued by the Canadian Court in the CCAA Proceedings. Such order also extended to The Pensions Regulator itself. The Pensions Regulator, the U.K. Pension Trustee and the PPF appealed such order, but their appeal was dismissed by the Court of Appeal for Ontario on June 16, 2010. In April 2010, the U.K. Pension Trustee and the PPF filed in Canada a motion to lift the stay, which motion is adjourned without date on the consent of all interested parties.

On June 25, 2010, following an oral hearing before the Determinations Panel of The Pensions Regulator in which none of the targets of the procedure, including NNI and NN CALA, participated, the panel issued a determination notice, in which it set forth its determination that a FSD will be issued against NNC, NNL, NNI, NN CALA and numerous other Nortel Affiliates, whereby such entities will be given a period of six months to put into place financial support for the NNUK defined benefit pension plan.

<blockquote>(c)    Securities Class Action Claim against Former CEO and CFO</blockquote>

On May 18, 2009, a complaint was filed in the United States District Court for the Southern District of New York alleging violations of federal securities law between the period of May 2, 2008 through September 17, 2008, against Mike Zafirovski (NNC's former President and Chief Executive Officer) and Pavi Binning (NNC's former Executive Vice President, Chief Financial Officer and Chief Restructuring Officer).  Although no Nortel Affiliate (including the Debtors) is a named defendant, this lawsuit has been stayed as a result of the Bankruptcy Court's order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code, and the resulting enforcement of the Canadian stay of proceedings.  Messrs. Zafirovski and Binning have filed Claims in the Bankruptcy Court for indemnification and contribution for potential liability arising out of this matter in amounts to be determined.  The Debtors reserve their right to raise all objections and defenses available to them.

<blockquote>(d)    Others</blockquote>

The Debtors also are defendants in various other suits, claims, proceedings and investigations that have arisen in the normal course of business.

<blockquote>4.    Insurance</blockquote>

Prior to the Initial Petition Date, the Debtors maintained numerous insurance policies from third-party insurance carriers providing coverage for claims relating to workers' compensation and automobile liability.  These policies were and are still subject to various deductibles and per-occurrence and annual aggregate limits and are supported by various letters of credit issued by NNL.

On January 15, 2009, the Bankruptcy Court entered an order authorizing the Debtors to pay pre-petition premiums necessary to maintain insurance coverage and enter into new insurance policies.  Consistent with this order, the Debtors have reviewed their insurance programs and policies since the Initial Petition Date and, where necessary in their business judgment, have renewed or extended current policies or purchased additional policies.  This process is ongoing.

In addition to the insurance policies funded directly by the Debtors, NNC maintains third-party insurance policies on behalf of all its subsidiaries, including the Debtors. These insurance policies include: professional liability; fiduciary liability; auto liability; comprehensive general liability; directors' and officers' liability; property, terrorism, boiler and machinery liability; transit floater liability; crime liability; employment practices liability; and special accident insurance.  Such insurance policies were in NNC's name and the premiums were

paid by NNL.  To the extent that any losses were incurred as a result of actions or omissions by the employees of any covered Nortel entity other than NNL, such entity would reimburse NNL for any associated costs through then-existing transfer pricing arrangements.  In December of 2009, NNL sought partial reimbursement for a $25 million premium for a one-year extension of combined coverage under the fiduciary liability and directors' and officers' liability insurance policies from covered Nortel entities.  As a result, NNL paid $8.1 million for that one-year extension, NNI paid $8.1 million to NNL for that one-year extension and the remaining amounts were paid by the EMEA Debtors and other Nortel Affiliates.

Since the Initial Petition Date, certain insurance policies held by NNC on behalf of itself and all of its subsidiaries, including the Debtors, have expired and certain policies have been renewed.  The NNC-held group policies that currently cover the Debtors are scheduled to expire either in 2010 or 2011.  The Debtors are currently in the process of evaluating each of the NNC-held group insurance policies to determine whether, as of the next expiration date, the Debtors should obtain separate coverage or renew their participation in the existing group coverage for a limited period of time.  The Debtors intend to approach several different insurance underwriters to evaluate available insurance options and ultimately intend to choose the form of coverage that best facilitates the Debtors' performance of transition services under the sale agreements.

5.    Environmental Matters

The Debtors' businesses have been subject to a wide range of continuously evolving environmental laws in various jurisdictions, including the United States.  The Debtors have sought to operate their businesses in compliance with these changing laws.  Existing and new laws may cause the Debtors to incur additional costs.

The Debtors are exposed to liabilities and compliance costs arising from their past generation, management and disposal of hazardous substances and wastes.  Specifically, NNI has remedial activities under way at one site that its predecessor, Northern Telecom Electronics, Inc., previously operated.  At another of its former U.S. sites, an agreement has been reached to settle the Debtors' remedial obligations through the claims resolution process.

Nortel also is listed as a potentially responsible party under the U.S. Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA," or "Superfund") at two Superfund sites in the United States.  At both of the Superfund sites, Nortel is considered a de minimis potentially responsible party.  A de minimis potentially responsible party is generally considered to have contributed less than 1% (depending on the circumstances) of the total hazardous substances at a Superfund site.  At one additional Superfund site, an agreement has been reached to settle the Debtors' obligations through the claims resolution process.  Liability under CERCLA may be imposed on a joint and several basis, without regard to the extent of Nortel's (or any individual Debtor's) involvement.  In addition, the accuracy of Nortel's estimate of environmental remediation costs is affected by several uncertainties, such as additional requirements that may be identified in connection with remedial activities, the complexity and evolution of environmental laws and regulations, the identification of presently unknown contamination, the Debtors' volumetric share of hazardous substances and the financial

viability of other potentially responsible parties. Consequently, the Debtors' liabilities under CERCLA could be greater than their current expectations.

An estimate of Nortel's anticipated remediation costs associated with all such sites, including its former site in the United States with identified remediation issues and the three identified Superfund sites, to the extent probable and reasonably estimable, is estimated at less than $300,000. The Debtors may need to contribute to these remediation costs. Additional sites for which the Debtors have remediation liability may be identified in the future.

6.    Supply Chain Agreements

As previously discussed, the Debtors, the Canadian Petitioners, certain EMEA Debtors and Flextronics entered into the Flextronics Amending Agreement that, among other things, provides a mechanism for the transfer of Nortel's supply relationship to purchasers of Nortel's other businesses or assets.

Since the Initial Petition Date, the Debtors also periodically have entered into agreements with other suppliers to address issues and concerns as they arose in order to ensure ongoing supply of goods and services and minimize any disruption in their global supply chain. In certain circumstances some of these agreements included advance deposit or escrow obligations or purchase commitments in order to mitigate the risk associated with supplying the Debtors during the pendency of the Chapter 11 Cases.

F.    Description of Non-Debtor Subsidiaries of the Debtors

1.    Active Non-Debtor Subsidiaries Held by NNI

(a)    Nortel Networks India International Inc.

Nortel Networks India International Inc., a wholly-owned subsidiary of NNI, acts as a supplier of hardware and software for contracts with certain Nortel customers in India.

(b)    Nortel Ventures LLC

Nortel Ventures LLC is a special purpose investment subsidiary with respect to NNI's investment in certain offshore funds. The sole member of Nortel Ventures LLC is NNI. Nortel Ventures LLC holds minor ownership interests in Infotech Pacific Ventures, L.P., New Enterprise Associates 12, L.P., Pacven Walden Ventures VI, L.P., VantagePoint Venture Partners 2006 (Q), L.P. and WI Harper Inc. Fund VI Ltd.

(c)    Nortel Technology Excellence Centre Private Limited

Tasman Networks Private Limited was acquired in 2006 as part of the acquisition of Tasman Networks, Inc., and subsequently renamed Nortel Technology Excellence Centre Private Limited. The company provided computer software and hardware and services including networking connectivity, systems engineering, product support, remote diagnostics, system integration, remote management and other related computer services for its only customer, NNI.

NNI currently has 99.01% ownership in the entity, while Nortel Networks Mauritius Ltd., which in turn is held by NNL, holds the remaining 0.99%.

(d)    Nortel Networks Japan

Nortel Networks Japan (also known as Nortel Networks Kabushiki Kaisha), a wholly-owned NNI subsidiary, is responsible for sales and marketing of Nortel telecommunications equipment in Japan.

2.    **Dormant Non-Debtor Subsidiaries Held by NNI**

NNI has a number of directly held subsidiaries that are dormant and which in most cases have little or no assets. These entities have been or will likely be liquidated and dissolved according to the applicable procedures in each entity's jurisdiction.

(a)    EMEA Region

In the EMEA region, Clarify Limited and Penril Datacomm Limited were struck off the U.K. company registry and were dissolved as of August 31, 2010. Bay Networks Redes de Dados para Sistemas Informaticos, Lda. registered for liquidation in October 2006 and is in the process of resolving tax issues. Nortel Networks Technology Ltd., a Cayman company, and its two subsidiaries in the EMEA region, Nortel Networks (Shannon) Limited and Nortel Networks Europe Sales Limited, are dormant and are expected to begin liquidation or strike off once issues in the local jurisdictions are resolved.

(b)    Asia Region

In the Asia region, Nortel Networks Southeast Asia Pte Ltd., Nortel Networks Technology K.K. and Nortel Networks Technology (Thailand) Ltd. have been dormant for several years and are proceeding towards dissolution.

Nortel Networks Eastern Mediterranean Ltd. is expected to commence liquidation in Israel at the beginning of 2011.

(c)    CALA Region

Bay Networks do Brasil Ltda. registered its dissolution before the Sao Paulo Board of Trade in September 2009 and is in the process of canceling its registration before local taxing authorities.

3.    **Non-Debtor Subsidiaries Held by Nortel AltSystems Inc.**

(a)    Nortel AltSystems AB

Nortel AltSystems AB, a wholly-owned subsidiary of Nortel AltSystems Inc., is a private corporation responsible for product development of Nortel's IntelligentEdge products. Nortel AltSystems AB has been dormant since the second quarter of 2006.

(b)     Nortel Altsystems International Limited

Nortel AltSystems International Limited, a wholly-owned subsidiary of Nortel AltSystems Inc. provided Internet infrastructure equipment, and manufactured and marketed web switches.  The company is currently dormant.

4.     Non-Debtor Subsidiaries Held by Sonoma Systems

(a)     Sonoma Limited

Sonoma Limited was a wholly-owned subsidiary of Sonoma Systems that was struck off the U.K. company register and dissolved as of August 31, 2010.

(b)     Sonoma Systems Europe Limited

Sonoma Systems Europe Limited is a wholly-owned subsidiary of Sonoma Limited that is expected to be struck off the U.K. company register and dissolved as of September 15, 2010.

5.     Non-Debtor Subsidiaries Held by NN CALA

(a)     Nortel Networks de Guatemala, Ltda.

NN CALA holds a 98% investment and NNL holds a 2% investment in Nortel Networks de Guatemala, Ltda.  Nortel Networks de Guatemala, Ltda. sold telecommunications equipment and services, and will be dissolved as soon as certain local accounting issues are resolved.

(b)     Nortel Trinidad and Tobago Limited

Nortel Trinidad and Tobago Limited is a wholly-owned subsidiary of NN CALA. The company was a supplier of data and telephony networks solutions and services in Trinidad and Tobago.  Nortel Trinidad and Tobago Limited is dormant and is expected to be liquidated in the future according to local procedure.

IV.
CHAPTER 11 PLAN

As noted above, the fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors.  Accordingly, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and interestholders with respect to their claims against and equity interests in the debtor's bankruptcy estate.

THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN.  THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS INCLUDED IN THIS DISCLOSURE STATEMENT AS <u>APPENDIX B</u>, AND THE PLAN SUPPLEMENT.  THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN.  CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN WITHOUT A CONCOMMITANT FULL AND COMPLETE READING OF THE PLAN.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY AND, IF NECESSARY, TO CONSULT WITH COUNSEL.  THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS.

A.      Summary of the Plan

The overriding purpose of the Plan is to enable the expeditious distribution of the asset sale and other proceeds of each Debtor to holders of Allowed Claims of such Debtor, to maximize the ability of each Reorganized Debtor to monetize any residual assets it may hold after the Effective Date and administer its remaining assets and obligations.

The Debtors believe that the Plan represents a fair economic solution for all of the Debtors' Creditors and Interestholders, will expedite the administration of the Chapter 11 Cases and will maximize and accelerate recoveries to holders of Allowed Claims.

The Plan recognizes the corporate integrity of each Debtor and, therefore, Allowed Claims against a particular Debtor will be satisfied only from the assets of that Debtor's bankruptcy estate.  Although the effectiveness of the Plan with respect to each Debtor is conditioned on the effectiveness of the Plan with respect to each other Debtor, the distributions to Creditors and Interestholders of each Debtor, as well as other aspects of the Plan, apply separately to each of the Debtors.  A Creditor or Interestholder of any particular Debtor, by virtue of its Claims against or Interests in that Debtor, has no direct claim against or interest in any other Debtor and has no direct claim against or interest in any other Affiliate of that Debtor.

As described in greater detail below, the Plan contemplates payment of all Allowed Administrative Expense Claims against each Debtor in full in Cash, inclusive of Allowed Claims against each Debtor arising under section 503(b) of the Bankruptcy Code and Allowed Priority Tax Claims against each Debtor (subject to permitted installment payments for certain Allowed Priority Tax Claims).

60

The Plan also provides for the treatment of Allowed Claims against and Interests in each Debtor as follows: (i) with respect to each holder of an Allowed Secured Claim against a Debtor, at the option of such Debtor, (a) payment in full in Cash, (b) the disposition proceeds of the Collateral securing such Claim to the extent of such Claim, (c) surrender of the Collateral securing such Claim to the holder of such Claim or (d) other treatment that leaves the holder of such Claim's legal, equitable and contractual rights unaltered, or such other treatment to which the parties may agree; (ii) with respect to each holder of an Allowed General Unsecured Claim against a Debtor, its pro rata share of the Creditor Proceeds of such Debtor; and (iii) with respect to any Allowed Subordinated Claim against, Interest in or Interest Securities Fraud Claim against any Debtor, no anticipated distribution, except with respect to each Interestholder of NN CALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc, Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc., which shall receive its pro rata share of limited liability interests in the relevant Reorganized Debtor.

In addition, the Plan provides for the appointment of a Plan Administrator, who shall have the authority to carry out and implement the provisions of the Plan with respect to and on behalf of the Debtors, the Reorganized Debtors and the Liquidating Debtors, in accordance with the provisions of the Plan Administration Agreement and subject to the oversight of the Plan Advisory Committee as provided therein.

Under the provisions of the Plan, the Reorganized Debtors are reorganized for the purpose of fulfilling each Reorganized Debtor's obligations under the 363 Sales and the TSAs; monetizing or otherwise disposing of each Reorganized Debtor's assets, including its residual property rights, through sale, liquidation or otherwise; distributing its Creditor Proceeds in accordance with the Plan; and fulfilling its other obligations under the Plan. Upon completion of such obligations, each Reorganized Debtor may be dissolved by the Plan Administrator without further corporate action subject to appropriate governmental filings (including transferring the assets of such Reorganized Debtor to a liquidating trust). The Plan also provides for the liquidation of each Liquidating Debtor on the Effective Date without further corporate action.

Although the Plan does not currently designate any Debtor as a Liquidating Debtor, it provides that the Debtors may subsequently make such designation by filing notice no later than 20 days prior to the Confirmation Hearing.

B.    Treatment of Unclassified Claims

1.    Administrative Expense Claims

Administrative Expense Claims are Claims constituting a cost or expense of administration (including Professional Claims) of the Chapter 11 Cases allowed under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date. Such Claims include (i) all actual and necessary costs and expenses of preserving the estates of the Debtors or operating the business of the debtors in possession arising on or after the Petition Date; (ii) any payments made under the Plan to cure a default under an executory contract or unexpired lease assumed by the Debtors; and (iii) all compensation or reimbursement of expenses of Professionals arising on or after the Petition Date unless the holder of an

Administrative Expense Claim and the relevant Debtor agree to different treatment, in each case to the extent allowed by the Bankruptcy Court under the Bankruptcy Code.  Any fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code also are included in the definition of Administrative Expense Claim.

Allowed Administrative Expense Claims will be paid in full, in Cash, on the later of the Effective Date and the date the Administrative Expense Claim becomes an Allowed Claim, or as soon thereafter as is practicable by the Debtor obligated for the payment of such Administrative Expense Claim.  Administrative Expenses Claims with respect to liabilities arising under a written agreement incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases will be paid in the ordinary course of business.

2.      Professional Claims

Professional Claims are Administrative Expense Claims for the compensation of Professionals and reimbursement of expenses incurred by such professionals pursuant to sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code.

Pursuant to the Plan, other than a Professional retained pursuant to the Ordinary Course Professional Order, each holder of a Professional Claim shall file its final application for the allowance of compensation for services rendered and reimbursement of expenses incurred by no later than the date that is 60 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of such Debtor in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable, or upon such other terms as may be mutually agreed upon by the claimant and such Debtor obligated for the payment for such Allowed Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimburse expenses incurred after the Confirmation Date in the ordinary course and without Bankruptcy Court approval.

Section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees and other entities making a "substantial contribution" to a reorganization case and to attorneys for and other professional advisors to such entities.  The amounts, if any, which may be sought by entities for such compensation are not known by the Debtors at this time.  Requests for compensation must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors and other parties in interest may participate and object to the allowance of any Claims for compensation and reimbursement of expenses.

3.      Priority Tax Claims

Priority Tax Claims are any Claims entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Pursuant to the Plan, at the option of each Debtor, the holder of an Allowed Priority Tax Claim will be entitled to receive:

(a)    cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable;

(b)    equal annual installment payments in cash (commencing on the Effective Date, or as soon thereafter as practicable) (i) of a total value on the Effective Date equal to the Allowed amount of such Claim; (ii) over a period not exceeding five years after the Petition Date; and (iii) in a manner not less favorable than the most favored non-priority Unsecured Claim provided for by the Plan; or

(c)    such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the applicable Debtor.

Because certain taxes carry joint and/or several liability, taxing authorities may file duplicative Priority Tax Claims against multiple Debtors.  However, because the taxing authorities do not collect more than once for a particular joint and/or several tax liability, the amount of any actual payments in respect of duplicative Allowed Priority Tax Claims would be less than the aggregate total of such duplicative claims.

The Debtors are currently engaged in dispute resolution processes with respect to their state and local disputed tax issues, as described in more detail below.  Because the parties have not yet completed the dispute resolution processes, it is difficult at this stage to predict precisely the expected amount of Allowed Priority Tax Claims.

C.    Treatment of Classified Claims and Interests

The Plan places all Claims and Interests with respect to each Debtor, except Administrative Expense Claims and Priority Tax Claims, in the classes listed below for all purposes including voting and Distributions.  A Claim or Interest is placed in a particular Class only to the extent that it falls within the description of that Class, and is classified in any other Class to the extent that any portion thereof falls within the description of such other Class.

Unless otherwise specified below, a holder of Claims against or Interests in a Debtor in each Class will receive its Pro Rata Share of Creditor Proceeds from the Debtor against which it holds an Allowed Claim.  For further detail regarding the classification and treatment of the Claims and Interests, see the Plan included in this Disclosure Statement as Appendix B.

1.    Class 1 — Priority Non-Tax Claims

Class 1 Claims consist of all Allowed Priority Non-Tax Claims against a Debtor, including any Claim against such Debtor, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority of payment under section 507(a) of the Bankruptcy Code.

Each holder of Allowed Priority Non-Tax Claims against a Debtor will be entitled to be paid by the applicable Debtor in Cash in the full amount of the holder's Allowed Claim under the Plan.

2.        Class 2 — Secured Claims

Class 2 Claims consist of all Allowed Secured Claims, if any, against a Debtor, including any Claim (a) reflected as a Secured Claim either in the Schedules or upon a proof of claim as a Secured Claim or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

Unless the holder of a Allowed Secured Claim agrees to different treatment, each Holder of an Allowed Secured Claim against a Debtor will be entitled to receive at the option of such Debtor a Distribution of (i) payment in Cash by that Debtor in an amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) payment of the sale or disposition proceeds of the Collateral securing such Allowed Secured Claim to the extent of the value of the Collateral securing such Allowed Secured Claim; (iii) delivery of the Collateral securing such Allowed Secured Claim to the holder of such Allowed Secured Claim; or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the holder of the Allowed Secured Claim is entitled.

3.        Class 3 — General Unsecured Claims

Class 3 Claims consist of all Allowed General Unsecured Claims against a Debtor, including any Unsecured Claim against such Debtor other than Subordinated Claims and Interests Securities Fraud Claims.

Each holder of an Allowed General Unsecured Claim against a Debtor will receive its Pro Rata Share of Creditor Proceeds from such Debtor.

4.        Class 4 — Subordinated Claims

Class 4 Claims consist of all Allowed Subordinated Claims, including any General Securities Fraud Claims and any other Claims, except for Interests Securities Fraud Claims, that would be subject to subordination under section 510 of the Bankruptcy Code.

Each holder of an Allowed Subordinated Claim against a Debtor is not expected to receive any Distribution on account of such Claim; *provided*, *however*, that in the event that all Allowed Claims in Classes 1 through 3 of such Debtor have been satisfied in full, each holder of an Allowed Subordinated Claim in Class 4 shall receive its Pro Rata Share of any remaining Creditor Proceeds from such Debtor.

5.        Class 5A — Interests

Class 5A Claims consist of all Interests in a Debtor, including any shares of common, preferred stock, other form of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards

64

granted under management ownership plans, stock incentive plans or employee incentive plans that was in existence immediately prior to or on the Petition Date for such Debtor.

(a)     NNI Class 5A

Each holder of an Interest in NNI is not expected to receive any Distributions under the Plan.  On the Effective Date, all Interests in NNI will be cancelled and one new share of NNI's common stock will be issued to the Plan Administrator which will hold such share for the benefit of the holders of such former Interests consistent with their former economic entitlements.  Each holder of an Interest in NNI will neither receive nor retain any property or any interest in property on account of such Interests; *provided*, *however*, that in the event that all Allowed Claims in NNI Classes 1 through 4 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in NNI will receive its Pro Rata Share of any remaining Creditor Proceeds from NNI consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date.  Unless otherwise determined by the Plan Administrator, all such former Interests in NNI will be deemed cancelled and of no force and effect as of the closing of NNI's Chapter 11 Case, in accordance with the Plan, provided that such cancellation does not adversely affect the Debtors' Estates.

(b)     Class 5A of Nortel Altsystems Inc., Xros, Inc., Sonoma Systems, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc. and Architel Systems (U.S) Corporation

All Interests in Nortel Altsystems Inc., Xros, Inc., Sonoma Systems, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc. and Architel Systems (U.S) Corporation will be cancelled and holders of such Interests will neither receive nor retain any property or interest in property on account of such Interests.  In the event that all Allowed Claims in Classes 1 through 4 of any Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in Class 5A of the applicable Debtor will receive its Pro Rata Share of any remaining Creditor Proceeds from the applicable Debtor.

(c)     Class 5A of NN CALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc, Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc.

All Interests in NN CALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc, Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc. will be cancelled and each holder of any such Interest will receive its pro rata Distribution of limited liability company interests in the applicable Reorganized Debtor.  No Interestholder shall receive Distributions on account of its Interests or its limited liability company interests until such time that all Allowed Claims in Classes 1 through 4 of any Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan.  At such time, each holder of an Interest in Class 5A of the applicable Debtor will receive its Pro Rata Share of any remaining Creditor Proceeds from the applicable Debtor.

6.        Class 5B — Interests Securities Fraud Claims

Class 5B Claims consist of all Interests Securities Fraud Claims against a Debtor, including unknown claims, demands, rights, liabilities and Causes of Action of any kind whatsoever, known or unknown, that have been or could be asserted in a direct, derivative or other capacity against that Debtor arising out of, relating to or in connection with (a) the purchase, sale or other decision or action made or taken, or declined, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Interests in such Debtor; (b) the purchase, ownership or sale of such Interests of that Debtor; and (c) any other claims arising out of, relating to or in connection with such Interests that would be subject to subordination under section 510(b) of the Bankruptcy Code.

Each holder of an Allowed Interests Securities Fraud Claim against a Debtor will receive no Distribution under the Plan in respect of such Claim.

D.        Implementation of the Plan

1.        Plan Administrator

(a)        Appointment and Authority of the Plan Administrator

The Plan appoints John J. Ray, III as the Plan Administrator for each of the Debtors, the Reorganized Debtors and the Liquidating Debtors.

The Plan Administrator will have the authority and right on behalf of each of the Debtors, the Reorganized Debtors and the Liquidating Debtors without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement the Plan and the Plan Administration Agreement in accordance with their terms.

(b)        Liability of Plan Administrator

The Plan Administrator will have no liability whatsoever for any acts or omissions to the Debtors, the Reorganized Debtors, the Liquidating Debtors or holders of Claims against or Interests in the Debtors, the Reorganized Debtors or the Liquidating Debtors other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order, provided that the Plan Administrator will have no liability for such acts or omissions if approved by or undertaken at the request or on behalf of the Plan Advisory Committee.  The Plan Administrator will be indemnified and held harmless by each of the Debtors, the Reorganized Debtors and the Liquidating Debtors for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty as determined by a Final Order.

(c)        Establishment of Reserve Accounts for Disputed Claims

On the Effective Date, the Debtors will fund the Disputed Claims Reserve in such amounts as agreed by the Debtors and the Plan Administrator in accordance with the terms of the

Plan Administration Agreement to be necessary to make sufficient future payments with respect to Disputed Claims as provided by the Plan.

2.    Plan Advisory Committee

On the Effective Date, an advisory committee jointly selected by the Creditors' Committee and the Ad Hoc Group of Bondholders (the "Plan Advisory Committee") will be deemed founded. The Plan Advisory Committee will consist of one member selected by the Creditors' Committee and two members selected by the Ad Hoc Group of Bondholders, in each case with the consent of the Debtors (such consent not to be unreasonably withheld). The Plan Advisory Committee will advise and approve the actions of the Plan Administrator and have certain rights and duties as more particularly set forth in the Plan Administration Agreement. The Plan Advisory Committee or its members will have no liability whatsoever for any acts or omissions to the Debtors, Reorganized Debtors, Liquidating Debtors or holders of Claims against or Interests in the Debtors, Reorganized Debtors or Liquidating Debtors other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty as determined by a Final Order. The Plan Advisory Committee and its members will be indemnified and held harmless by each of the Debtors, Reorganized Debtors and Liquidating Debtors for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty as determined by a Final Order.

3.    Post-Effective Date Management

(a)    Reorganized NNI

On the Effective Date, the board of directors of Reorganized NNI will consist of one natural person selected by the Plan Administrator to serve through the closing of its Chapter 11 Case. The current officers of Reorganized NNI will continue to serve in such capacity in accordance with applicable non-bankruptcy law, employment agreements executed after the Petition Date and Reorganized NNI's by-laws through the closing of Reorganized NNI's Chapter 11 Case, unless such officer resigns or is removed prior to such time.

(b)    Other Reorganized Debtors

On the Effective Date, the manager of each Reorganized Debtor other than Reorganized NNI will consist of one natural person selected by the Plan Administrator to serve through the closing of such Reorganized Debtor's Chapter 11 Case. The current officers of such Reorganized Debtor will continue to serve in such capacity in accordance with applicable non-bankruptcy law, employment agreements executed after the Petition Date and each Reorganized Debtor's by-laws, through the closing of such Reorganized Debtor's Chapter 11 Case, unless such officer resigns or is removed prior to such time.

4.    Corporate Existence of Debtors

After the Effective Date, the Plan Administrator may in his sole discretion (a) maintain any Reorganized Debtor as a corporation or limited liability company in good standing until such time as all aspects of the Plan pertaining to such Reorganized Debtor have

67

been completed; (b) dissolve any Reorganized Debtor or complete the winding up of such Reorganized Debtor without the necessity for any further actions to be taken by or on behalf of such dissolving Reorganized Debtor, its shareholders or its members or for any payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, transferring all or part of the Residual Assets of such Reorganized Debtor to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Reorganized Debtor; or (c) dissolve any Controlled Non-Debtor Affiliate or complete the winding up of such Controlled Non-Debtor Affiliate in accordance with applicable law or abandon the interests in such Controlled Non-Debtor Affiliate.

A copy of the expected organizational structure of the Debtors and certain of their Affiliates immediately following the Effective Date is included in this Disclosure Statement as Appendix D-2.

E.     Provisions Governing Voting and Distributions

1.     Voting of Claims

Section 8.1 of the Plan provides that each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 and Article 4 of the Plan will be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court. A holder of Allowed Claims in Impaired Classes of multiple Debtors will be entitled to vote on the Plan separately with respect to each such Debtor.

2.     Minimum Distribution

No payment of Creditor Proceeds of less than $100 will be made by any Debtor to any holder of an Allowed Claim against such Debtor. Such amounts will be deemed reallocated for distribution to holders of Allowed Claims against such Debtor and accordingly will be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

3.     Distributions of Creditor Proceeds

After the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines in accordance with the Plan Administration Agreement that the relevant Debtor will pay such Allowed Secured Claim in Cash) against a Debtor, the Disbursing Agent will make a Distribution of its Creditor Proceeds in accordance with the provisions of the Plan (i) to each holder of an Allowed Claim as of the Effective Date against such Debtor, within 60 days of the Effective Date or as soon thereafter as practicable and (ii) to each holder of an Allowed Claim that is allowed after the Effective Date against such Debtor, in accordance with Section 9.4 of the Plan. After the initial Distribution with respect to any Allowed Claim, the Disbursing Agent will make Distributions of Creditor Proceeds in accordance with the Plan to holders of Allowed Claims against such Debtor quarterly on

March 31, June 30, September 30 and December 31 of each year (each such Distribution, an "Interim Distribution") and on the Final Distribution Date.  Notwithstanding the foregoing, the Plan Administrator may determine in accordance with the terms of the Plan Administration Agreement to direct the Disbursing Agent (a) to make Distributions more frequently than quarterly on dates other than the Interim Distribution dates, (b) not to make an Interim Distribution on the basis that the costs of making such Interim Distribution exceed the Distribution amount or (c) not to make a Distribution to the holder of an Allowed Claim on the basis that it has not yet determined whether to object to such Claim in which case such Claim shall be treated as a Disputed Claim for purposes of Distributions under the Plan until the Plan Administrator (i) determines not to object to such Claim (or the time to object to Claims expires), (ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order.

4.    Distributions to Indenture Trustees

Distributions for the benefit of the holders of the Allowed Claims with respect to the NNCC 2026 Notes will be made to Law Debenture Trust upon the surrender of NNCC 2026 Notes pursuant to Section 8.14 of the Plan or as soon as practicable thereafter.  Distributions for the benefit of holders of Allowed Senior Notes NNI Guarantee Claims will be made to BNYM on the close of business on the Effective Date (the "Distribution Record Date"), pursuant to Section 8.5 of the Plan, or as soon as practicable thereafter.  Law Debenture Trust shall promptly administer the Distributions to the holders of Allowed Claims for the NNCC 2026 Notes and BNYM shall promptly administer the Distributions to the holders of Allowed Senior Notes NNI Guarantee Claims, in accordance with the Plan and the applicable Senior Notes Indenture.

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, (a) the NNCC 2026 Notes, the NNCC Notes Indenture, the Senior Notes NNI Guarantee Obligations and any other notes, bonds (with the exception of any surety bonds outstanding), indentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under the Plan will be deemed cancelled and extinguished as to the Debtors and (b) the obligations of the Debtors (but not any other Affiliate of the Debtors, including NNC and NNL) under any agreements, documents, indentures or certificates of designation governing the Senior Notes, the Senior Notes NNI Guarantee Obligations, the Senior Notes Indentures and any other notes, bonds, indentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under the Plan will be, discharged as to the Debtors (but not discharged as to any other Affiliate of the Debtors, including NNC and NNL), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the Security holders, officers or directors of the Debtors or by any other Person. The Depository Trust Company ("DTC") shall surrender for cancellation to Law Debenture Trust the NNCC 2026 Notes issued in the name of Cede and Co. and that are held by DTC. Notwithstanding the foregoing, the NNCC Notes Indenture will continue in effect solely for the purposes of:  (i) allowing and preserving the rights of Law Debenture Trust to assert its charging Lien against such Distributions for payment of its reasonable fees and expenses (including reasonable fees and expenses of counsel and other professionals), (ii) allowing and preserving the rights of holders of Allowed Claims in respect of the NNCC 2026 Notes to receive

Distributions under the Plan, (iii) allowing and preserving the rights of Law Debenture Trust to make Distributions in satisfaction of Allowed Claims in respect of the NNCC 2026 Notes and (iv) allowing and preserving the rights of holders of claims in respect of the NNCC Notes Guarantee Obligations to pursue such claims in the CCAA Proceedings, but in all cases subject to the terms and conditions of the NNCC Notes Indenture.

5.      Distribution Record Date

As of the Distribution Record Date, the register for each Debtor will be closed and there will be no further changes to the record holder of any of the Claims or Interests, except with respect to the NNCC 2026 Notes, which will be settled for cancellation.  The Debtors and the Plan Administrator will have no obligation to recognize any transfer of any such Claims or Interests occurring after the close of business on the Distribution Record Date.  The Debtors will be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE DISTRIBUTION RECORD DATE, OR WITH RESPECT TO THE NNCC 2026 NOTES, FOLLOWING THE SURRENDER OF SUCH NOTES FOR CANCELLATION, YOU WILL NOT RECEIVE A DISTRIBUTION FROM THE DEBTORS, THE REORGANIZED DEBTORS OR THE LIQUIDATING DEBTORS ON ACCOUNT OF SUCH CLAIM.  IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE DISTRIBUTION RECORD DATE OR, WITH RESPECT TO THE NNCC 2026 NOTES, BEFORE THE SURRENDER OF SUCH NOTES FOR CANCELLATION, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.

6.      Limitation on Recovery

Section 8.6 of the Plan provides that, in the event that the sum of the Distributions of Creditor Proceeds and other Distributions with respect to an Allowed Claim under the Plan or in connection with a Foreign Proceeding are in excess of 100% of a holder's Allowed Claim, then the Creditor Proceeds remaining to be distributed to such holder in excess of such 100% will be deemed reallocated for distribution to other holders of Allowed Claims against such Debtor and, accordingly, will be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

In no event shall any holder of any Allowed Claim receive Distributions under the Plan in excess of the Allowed amount of such Claim.

7.      Allocation of Plan Distributions Between Principal and Interest

Pursuant to Section 8.13 of the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

8.      Delivery of Distributions and Undeliverable Distributions

Distributions to holders of Allowed Claims of each Debtor will be made at the address of each such holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a holder of an Allowed Claim or (b) in another writing notifying the Plan Administrator (at the addresses set forth in Section 13.16 of the Plan) of a change of address.  If any holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such holder on account of such Claim. Such Claim shall be discharged and the holder of such Claim shall be forever barred from asserting such Claim against the applicable Debtor, its Estate and its respective property.  In such cases, any Cash held for Distribution on account of such Claim shall become the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

9.      Time Bar to Cash Payment Rights

Checks issued in respect of Allowed Claims will be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of a voided check shall be made on or before 90 days after the expiration of the 90-day period following the date of issuance of such check. Thereafter, the amount represented by such voided check will irrevocably revert to the relevant Debtor's Estate, to be distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check will be discharged and forever barred from assertion against such Debtor, its Estate and its respective property.

10.     Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors, the Plan Administrator and the Disbursing Agent will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan will be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan has the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution.  The Disbursing Agent will have the right, but not the obligation, to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations.  The Disbursing Agent may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable, to each such holder.  If the Disbursing Agent makes such a request and the holder fails to comply before the date that is 180 days after the request is made, no further Distributions will be made to the holder on account of such Claim.  The amount of such Distribution will irrevocably revert to the applicable Debtor and such Claim will be discharged and the holder of such Claim will be forever barred from asserting such Claim against such Debtor, its Estate or its respective property.  In such cases, any Cash held for Distribution on account of such Claim will become

71

the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

11.     Setoffs and Recoupment

The Debtors may setoff against any Claim the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors may have against the holder of such Claim.

Unless otherwise stipulated in writing by the Debtors, any party against whom a claim or counterclaim is asserted by the Estates (an "Estate Claim") must assert any setoff rights, right of subrogation or recoupment of any kind against such Estate Claim prior to the Confirmation Date, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred.

12.     Distributions for Disputed Claims

(a)     Objections

As of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator, who will consult with the applicable Debtor regarding the same.  Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the later of (a) the date that is 180 days after the Effective Date; *provided*, *however*, that the Plan Administrator may in his sole discretion extend such date for up to an additional 180 days without need for Bankruptcy Court approval and (b) such later date as may be fixed by the Bankruptcy Court for cause shown.

(b)     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no Distribution will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

(c)     Estimation of Claims

The Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain exclusive jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, such Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to

72

be cumulative and not exclusive of one another.  Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

      (d)     Resolution of Disputed Claims

On and after the Effective Date, the Plan Administrator will have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims.  On the date of the first Distribution that is at least 60 days after the date on which the order allowing a Disputed Claim becomes a Final Order, such Debtor will remit, to the holder of such Allowed Claim, Creditor Proceeds equal to the amount such holder would have received as of that date under the Plan if the Allowed portion of the Disputed Claim had been an Allowed Claim as of the Effective Date.  To the extent that a Disputed Claim against a Debtor is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the proof of claim, or as previously estimated by the Bankruptcy Court, the excess of the amount of Creditor Proceeds that would have been distributed to the holder of the Disputed Claim if the Claim had been Allowed in full, over the amount of Creditor Proceeds actually distributed on account of such Disputed Claim, will become Creditor Proceeds for Distribution to other holders of Allowed Claims in the Class corresponding to the Disputed Claim at issue in accordance with the terms of the Plan and the Bankruptcy Code.

      (e)     No Interest

Holders of Disputed Claims will not be entitled to interest if such Disputed Claim becomes an Allowed Claim unless the holder of such Allowed Claim is otherwise entitled to post-petition interest on such Claim under the Bankruptcy Code and the Plan.

      (f)     Reserve Account for Disputed Claims

On or after the Effective Date, the Plan Administrator will hold Cash in the Disputed Claims Reserve in an aggregate amount sufficient to pay to each holder of a Disputed Claim the Pro Rata Share of any Distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim.  Cash withheld and reserved for payments to holders of Disputed Claims will be held and deposited by the Plan Administrator in one or more segregated reserve accounts for each Debtor, to be used to satisfy any Disputed Claim if and when any Disputed Claim becomes an Allowed Claim.

      (g)     Investment of Disputed Claims Reserve

All interest earned on Cash in the Disputed Claims Reserve will be held in the appropriate account in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of the Disputed Claims Reserve, including Taxes payable on such interest income, if any, will be transferred out of the Disputed Claims Reserve and will become Available Cash for Distribution to holders of Allowed Claims in the Class corresponding to the Disputed Claims Reserve account at issue in accordance with the terms of the Plan and the Bankruptcy Code.

(h)     Release of Funds from the Disputed Claims Reserve

If at any time or from time to time after the Effective Date there shall be Cash in a Disputed Claims Reserve account with respect to a Debtor in an amount in excess of the Plan Administrator's maximum remaining payment obligations to the then-existing holders of Disputed Claims with respect to such Debtor, such excess funds and the Pro Rata Share of net interest in respect thereof will become property of the relevant Estate and become available for distribution to the other holders of Allowed Claims in accordance with the terms of the Plan and the Bankruptcy Code.

If at any time after the Effective Date the Bankruptcy Court expunges a Disputed Claim or estimates any contingent, unliquidated or other Disputed Claim at an amount less than the amount of Cash held in a Disputed Claims Reserve account with respect to such Claim, and the order with respect to such expungement or estimation has not been stayed pending appeal, the Cash held in the Disputed Claims Reserve account relating to such expunged Claim or in excess of the estimated amount of such Claim will become property of the relevant Estate and become available for distribution to the other holders of Allowed Claims in accordance with the terms of the Plan and the Bankruptcy Code, and the Plan Administrator shall have no further obligation to reserve funds for such expunged Claim.

13.     No Payment on Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

14.     Post-petition Interest

Except as specifically provided for in the Plan or under the Bankruptcy Code, no Allowed Administrative Expense Claim or Allowed Claim shall be entitled to receive any post-petition interest on such Claim under any circumstances.

F.     Treatment of Executory Contracts and Unexpired Leases

1.     Previous Assumption, Assignment and Rejection

Throughout the Chapter 11 Cases, the Bankruptcy Court has established deadlines and procedures for the assumption and rejection of executory contracts and unexpired leases by the Debtors, including in connection with the 363 Sale Orders and 363 Sales, and allocated responsibility for payment of cure amounts with respect to such contracts and leases.  Any executory contracts and unexpired leases of the Debtors not assumed and assigned or rejected prior to the Confirmation Date or with respect to which the Debtors have not otherwise Filed a notice of assumption and assignment or obtained an order assuming or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts") will be rejected pursuant to Section 7.5 of the Plan unless assumed, or assumed and assigned, pursuant to Section 7.2 of the Plan.  To the extent the Debtors have Filed a notice of assumption and assignment or motion for

74

the assumption or assumption and assignment prior to the Confirmation Date with respect to an executory contract or unexpired lease, but the Bankruptcy Court has not yet entered an order approving such assumption or assumption and assignment and fixing the cure amount therefor or the assumption or assumption and assignment has otherwise not yet become effective, the assumption or assumption and assignment of the contract or lease and any cure amount that may be owing in connection therewith will be governed by the terms of the applicable order or procedure.

2.      Assumption and Assignment of Remaining Contracts

As of the Effective Date, the Debtors will assume or assume and assign, as applicable, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, each of the Remaining Contracts of the Debtors that are identified in Exhibit E to the Plan that have not expired under their own terms prior to the Effective Date.  Under the Plan, the Debtors reserve the right to amend such exhibit not later than ten days prior to the Confirmation Hearing either to:  (a) delete any executory contract or unexpired lease listed therein and provide for its rejection; or (b) add any executory contract or unexpired lease to such exhibit, thus providing for its assumption or assumption and assignment, as applicable.  The Debtors will provide notice of any such amendment of such exhibit to the parties to the executory contract or lease affected thereby and counsel for the Creditors' Committee not later than ten days prior to the Confirmation Hearing.  The Confirmation Order will constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code approving all such assumptions or assumptions and assignments, as applicable, described in the Section 7.2 of the Plan, as of the Effective Date. If any provision of an executory contract to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.

3.      Cure of Defaults

Any monetary defaults under each Remaining Contract to be assumed under the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in either of the following ways:  (a) by payment of the default amount in Cash, in full, on the Effective Date; or (b) by payment of the default amount on such other terms as may be agreed to by the Debtors and the non-Debtor parties to such Remaining Contract.  In the event of a dispute regarding (i) the amount or timing of any cure payments; (ii) the ability of the Debtor or Debtors assuming such Remaining Contract, or an assignee thereof, to provide adequate assurance of future performance under the Remaining Contract to be assumed or assumed and assigned, as applicable; or (iii) any other matter pertaining to assumption or assumption and assignment of the Remaining Contract to be assumed, the Debtor or Debtors assuming such Remaining Contract will pay all required cure amounts promptly following the entry of a Final Order resolving the dispute.  Under the Plan, the Debtors reserve the right (i) to withdraw their request for assumption of any Remaining Contract at any time prior to the entry of such an order and (ii) either to reject or nullify the assumption of any executory contract no later than five Business Days after the entry of a final order of the Bankruptcy Court determining the cure amount or any request for adequate assurance of future performance required to assume such executory contract.

75

4.        Objections to Assumption of Remaining Contracts

To the extent that any party to a Remaining Contract identified for assumption asserts a claim for arrearages or damages pursuant to section 365(b)(1) of the Bankruptcy Code, or has any other objection with respect to any proposed assumption, revestment, cure or assignment on the terms and conditions provided in the Plan (including, without limitation, in Exhibit E thereto), all such Claims for arrearages and damages and objections must be filed and served:  (a) as to any Remaining Contract identified in Exhibit E to the Plan that is mailed to any party to any such Remaining Contract, along with all other solicitation materials accompanying the Plan, within the same deadline and in the same manner established for the filing and service of objections to Confirmation of the Plan; and (b) as to any Remaining Contract identified in any subsequent amendments to Exhibit E to the Plan that is mailed to any party to any such Remaining Contract not later than ten days prior to the Confirmation Hearing, in such a manner as to be Filed and received by the Bankruptcy Court and the Debtors and counsel thereto, as the case may be, if applicable, no later than the earlier of (i) 20 days after such subsequent amendment is served and (ii) three days prior to the Confirmation Hearing.

Under the Plan, a party's failure to assert such claims for arrearages and damages or objections in the manner described above will constitute consent to the proposed assumption, revestment, cure or assignment on the terms and conditions provided in the Plan, including an acknowledgement that the proposed assumption and/or assignment provides adequate assurance of future performance and that the amount identified for "cure" in Exhibit E to the Plan is the amount necessary to cover any and all outstanding defaults under the Remaining Contract to be assumed, as well as an acknowledgement and agreement that no other defaults exist under such Remaining Contract.

If any assumption of a Remaining Contract proposed in the Plan for any reason is not approved by the Bankruptcy Court, then the Debtors will be entitled, in their sole discretion, upon written notice to the applicable non-Debtor party to such Remaining Contract, to deem such Remaining Contract to have been rejected pursuant to the provisions of Section 7.5 of the Plan.

5.        Rejection and Approval of Rejection

Except for those executory contracts and unexpired leases that (a) are assumed pursuant to the Plan, (b) have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court or (c) are the subject of a pending motion before the Bankruptcy Court with respect to the assumption or assumption and assignment of such executory contracts and unexpired leases, as of the Effective Date, all executory contracts and unexpired leases of the Debtors will be rejected pursuant to section 365 of the Bankruptcy Code; *provided*, *however*, that neither the inclusion by the Debtors of a contract or lease on Exhibit E to the Plan nor anything contained in Article 7 of the Plan will constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.

The Confirmation Order will constitute an Order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 7.5 of the Plan

pursuant to section 365 of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be filed within 30 days after the mailing of notice of the entry of the Confirmation Order, or such Claim shall receive no distribution under the Plan or otherwise on account of such Claim.

6.      Post-petition Modification of Executory Contracts

Unless otherwise agreed by the parties and approved by the Bankruptcy Court, modifications, amendments, supplements and restatements to pre-petition executory contracts that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the pre-petition nature of the executory contract, or the validity, priority or amount of any Claims that may arise in connection therewith.

7.      Pre-existing Obligations to the Debtors under Executory Contracts

Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to the Debtors under such contracts.

G.      Conditions Precedent to Plan's Confirmation and Effective Date

1.      Conditions to Confirmation of the Plan

A condition precedent to the confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order containing terms and conditions reasonably satisfactory in form and substance to each Debtor.

2.      Conditions to Effective Date

The following are conditions precedent to the Effective Date:

(a)      The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors and the effectiveness of which shall have not been stayed within 14 days following the entry thereof;

(b)      All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors;

(c)      All authorizations, consents and regulatory approvals, if any required by the Debtors in connection with the consummation of the Plan, are obtained and not revoked;

(d)      The amended organizational document of Reorganized NNI and the organizational documents of the Reorganized Subsidiaries shall have been filed with the applicable authority of each of such reorganized Debtor's respective jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws;

77

(e)      Each of the relevant Debtors has received its full and final distribution of the Allocation Proceeds;

(f)      All statutory fees then due to the United States Trustee shall have been paid in full by the Debtors pursuant to the Plan;

(g)      With respect to each Debtor, each of the conditions in Section 10.2 of the Plan have been satisfied with respect to each other Debtor;

(h)      The Confirmation Order shall have become a Final Order; and

(i)      The Debtors shall have Filed the "Notice of Effective Date" in accordance with Section 10.4 of the Plan.

As noted in clause (g) above, the effectiveness of the Plan with respect to each Debtor is conditioned on the effectiveness of the Plan with respect to each other Debtor.

3.      Waiver of Conditions

Section 10.3 of the Plan provides that each Debtor may waive any or all of the conditions precedent to the Effective Date with respect to itself as set forth in Section 10.2 of the Plan other than Section 10.2(a).  Any such waiver may be effected at any time without notice or leave given by the Bankruptcy Court and without any formal action other than proceeding to consummate the Plan.

4.      Notice of Effective Date

Upon satisfaction of all the other conditions to the Effective Date listed above, or if waivable, waiver pursuant to Section 10.3 of the Plan, or as soon thereafter as is reasonably practicable, the Debtors will File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Debtors in their sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that the Debtors will have no obligation to notify any Person other than counsel to the Creditors' Committee and the Ad Hoc Group of Bondholders of such fact.  The Plan shall be deemed to be effective as of 12:01 a.m. (prevailing Eastern time), on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by U.S. mail, postage prepaid (or at the Debtors' option, by courier or facsimile) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

H.      Effect of the Plan on Assets, Claims and Interests

1.      Vesting

Pursuant to Section 11.10 of the Plan, except as otherwise expressly provided in the Plan, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, the relevant Debtors will transfer, and the Reorganized Debtors will be vested with, all of the Assets of such Debtors' Estates free and clear of all Claims, Interests, Liens, encumbrances, charges and other

78

interests of Creditors and holders of Interests, and may operate their businesses free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by any of the Debtors after the Petition Date.  The Debtors will continue as Debtors-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, the Reorganized Debtors may operate their businesses free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

2.      Limited Release of Directors, Officers and Employees

**Pursuant to Section 11.4 of the Plan, claims of any of the Debtors' Estates against their present or former officers, directors or employees arising from or relating to the period prior to the Petition Date, are not released by the Plan.  As of the Effective Date, each of the Debtors and the Debtors-in-Possession will be deemed to have waived and released its present and former directors, officers, and employees who were directors, officers or employees, respectively, at any time during the Chapter 11 Cases, from any and all claims of each of the Debtors' Estates arising from or relating to the period from and after the Petition Date; *provided, however*, that, except as otherwise provided by prior or subsequent Final Order of the Bankruptcy Court, this provision in Section 11.4 of the Plan shall not operate as a waiver or release of (a) any Person (i) named prior to the Effective Date as a defendant in any action commenced by or on behalf of the Debtors, including any actions prosecuted by the Creditors' Committee and the Ad Hoc Group of Bondholders or (ii) adjudicated prior to the Effective Date by a court of competent jurisdiction to have engaged in acts of dishonesty or willful misconduct detrimental to the interest of the Debtors or (b) any claim (i) with respect to any loan, advance or similar payment by the Debtors to any such person, (ii) with respect to any contractual obligation owed by such Person to the Debtors or (iii) relating to such Person's knowing fraud, gross negligence or willful misconduct, and *provided, further,* that the foregoing is not intended to release any of the Debtors' claims that may exist against the Debtors' directors and officers liability insurance; and *provided, further,* that, notwithstanding the foregoing, all such claims will be preserved by the Debtors for setoff purposes.**

3.      Exculpation

**Pursuant to Section 11.5 of the Plan, none of the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Creditors' Committee, the Ad Hoc Group of Bondholders, Law Debenture Trust, BNYM or any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (acting in such capacity) (individually, each an "Exculpated Party," and collectively, the "Exculpated Parties") will have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, this Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the**

Plan; *provided*, *however*, the foregoing provisions of Section 11.5 of the Plan will not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

4.     Injunctions

Pursuant to Section 11.6 of the Plan, except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all holders of Claims or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Estates, the Reorganized Debtors, the Liquidating Debtors or any properties or interest in properties of the Debtors, the Reorganized Debtors or the Liquidating Debtors; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Estates, the Reorganized Debtors, the Liquidating Debtors or any properties or interest in properties of the Debtors or the Reorganized Debtors and the Liquidating Debtors; (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Estates, the Reorganized Debtors or any properties or interest in properties of the Debtors, the Reorganized Debtors or the Liquidating Debtors; (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Estates, the Reorganized Debtors, the Liquidating Debtors or any properties or interest in properties of the Debtors, the Reorganized Debtors or the Liquidating Debtors; (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan; and (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.

5.     Terms of Injunctions or Stays

Section 11.7 of the Plan provides that unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all of the Chapter 11 Cases.

6.     Retention of Litigation Claims and Reservation of Rights

Section 11.8 of the Plan provides that, except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order will be deemed to be a waiver or

relinquishment of any rights of Litigation Claims that the Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator may have or choose to assert on behalf of the respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors, or representatives; (ii) any and all claims or rights arising under any Tax sharing agreement among the Debtors and their Affiliates; (iii) any and all Claims for reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the disposition of any Affiliate's Assets; and (iv) any and all Avoidance Actions.

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim.  The Debtors, the Reorganized Debtors, the Liquidating Debtors and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

Except as expressly provided in the Plan, the Plan Administrator will, after the Effective Date, retain the rights of each Debtor to prosecute any Litigation Claims that could have been brought by such Debtor at any time.

I.    Defenses with Respect to Unimpaired Claims

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

J.    The Debtors' Post-Emergence Activities

After the Effective Date, each Reorganized Debtor will operate to fulfill its obligations under the 363 Sales and the TSAs, monetize its assets, including residual intellectual property rights, distribute Creditor Proceeds and otherwise effectuate the provisions of the Plan. In accordance with the Plan Administration Agreement, each Reorganized Debtor may be maintained by the Plan Administrator for the purpose of fulfilling these obligations or may be dissolved or wound down without the necessity of further corporate action by the Reorganized Debtor or the Bankruptcy Court.

Each Liquidating Debtor, on the other hand, will be liquidated as of the Effective Date in accordance with the Plan.  Although the Plan identifies each Debtor as a Reorganizing Debtor, it provides that a Debtor may be subsequently designated as a Liquidating Debtor by the filing of notice no later than 20 days prior to the Confirmation Hearing.

81

K.       Summary of Other Provisions of the Plan

1.       Retention of Jurisdiction

Article 12 of the Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases after the Effective Date to the fullest extent legally permissible, including jurisdiction to, among other things:

(a)       Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)       Hear and determine any and all Causes of Action against any Person, and rights of the Debtors, the Reorganized Debtors and the Liquidating Debtors that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and Debtor-in-Possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

(c)       Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(d)       Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any of the Debtors may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)       Enter orders approving the Reorganized Debtors' post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

(f)       Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)       Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in the Chapter 11 Cases on the Effective Date;

(h)       Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code;

(i)       Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order;

(j)    Hear and determine any matters concerning the enforcement of the provisions of Article 11 of the Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

(k)    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(l)    Permit the Debtors to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan or any agreement or document created in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

(m)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)    Enforce any injunctions entered in connection with or relating to the Plan or the Confirmation Order;

(o)    Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(p)    Hear and determine all claims, rights or disputes arising under or in connection with 363 Sale Agreements and the Plan Administration Agreement;

(q)    Determine any other matters that may arise in connection with or relating to the Plan or any agreement or the Confirmation Order;

(r)    Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(s)    Enter final decrees closing the Chapter 11 Cases.

2.    Plan Supplement

Section 13.1 of the Plan provides that the Plan Supplement will be filed at least ten days prior to the last day upon which holders of Claims may vote to accept or reject the Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained on the Debtors' independent website at http://dm.epiq11.com/nortel or by request to the Debtors in accordance with Section 13.16 of the Plan.

3.    Modification of the Plan

Pursuant to Section 13.2 of the Plan, alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, including to substantively consolidate one or more Debtors' Assets and liabilities for

83

voting and Distribution purposes.  Further, the Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of the Bankruptcy Code and the Bankruptcy Court after notice and a hearing, confirms the Plan, as altered, modified or amended, in accordance with the Bankruptcy Code, and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claims of such holder.

4.      Revocation or Withdrawal of the Plan

Pursuant to Section 13.3 of the Plan, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If any Debtor revokes or withdraws the Plan with respect to such Debtor, or if Confirmation does not occur or if the Plan does not become effective, then the Plan will be null and void with respect to such Debtor, and nothing contained in the Plan or this Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Person; (b) constitute an admission of any fact or legal conclusion by such Debtor or any other Entity; or (c) prejudice in any manner the rights of such Debtor in any further proceedings involving such Debtor.

5.      Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, any transfers from any of the Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator pursuant to, in furtherance of, or in connection with the Plan, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.      Exemption from Registration

Pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of any securities or interests on account of, and in exchange for the Claims against, the Debtors will be exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and any other applicable non-bankruptcy law or regulation.

7.      Governing Law

The rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflict of laws thereof, unless a rule of law or procedure is supplied by (a) U.S. federal law (including the Bankruptcy Code and Bankruptcy Rules) or (b) an express

choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan.

8.      Severability

Pursuant to Section 13.9 of the Plan, if, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Debtors the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a final judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

9.      Dissolution of the Creditor's Committee

Pursuant to Section 13.15 of the Plan, effective on the Effective Date, the Creditors' Committee will be dissolved automatically and its members shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code without need for a further order of the Bankruptcy Court; *provided*, *however*, that (a) obligations arising under confidentiality agreements, joint interest agreements and protective orders, if any, entered during the Chapter 11 Cases will remain in full force and effect according to their terms, and (b) the Creditors' Committee may make application for Professional Claims and members of the Creditors' Committee may make requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases.  The Debtors, the Reorganized Debtors, the Liquidating Debtors and the Plan Administrator will not have any obligation to pay or reimburse any fees of any official or unofficial committee of creditors or bondholders, including, without limitation, the Ad Hoc Group of Bondholders, incurred after the Effective Date.

10.     Notice

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

Counsel for the Debtors

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-3999 (facsimile)
Attention:  James L. Bromley, Esq.
              Lisa M. Schweitzer, Esq.

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-3989 (facsimile)
Attention:    Derek C. Abbott, Esq.
                Eric D. Schwartz, Esq.

The Plan Administrator

Avidity Partners, LLC
18 W140 Butterfield Road, 15th Floor
Oakbrook Terrace, Illinois 60181
(630) 613-7001 (facsimile)
Attention:  John J. Ray, III

Counsel for the Plan Administrator

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-3999 (facsimile)
Attention:  James L. Bromley, Esq.
              Lisa M. Schweitzer, Esq.

Counsel for the Creditors' Committee

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
(212) 872-1002 (facsimile)
Attention: Fred S. Hodara, Esq.
              David H. Botter, Esq.

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7701 (facsimile)
Attention:    Christopher M. Samis, Esq.

Counsel for the Ad Hoc Group of Bondholders

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5219 (facsimile)
Attention:  Albert A. Pisa, Esq.

# V.
# CONFIRMATION OF THE PLAN

## A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a chapter 11 plan.  The Bankruptcy Court has scheduled the Confirmation Hearing for [●] at [●] (prevailing Eastern time) before the Honorable Kevin Gross, Judge for the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the Claim or Interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Bankruptcy Court, together with proof of service, and served so that it is received on or before [●] at [●] (prevailing Eastern time) by the Notice Parties.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY FILED AND SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan with respect to each of the Debtors only if all of the requirements of section 1129 of the Bankruptcy Code are met with respect to each such Debtor.

Among the statutory requirements for confirmation of a chapter 11 plan are that the plan is:  (i) accepted by all impaired classes of claims and equity interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) in the "best interests" of creditors and interestholders that are impaired under the plan and (iii) feasible.

The Debtors believe that the Plan will satisfy all of the requirements for confirmation with respect to each Debtor.

## C.    Acceptance by Impaired Classes

An impaired class of claims accepts a chapter 11 plan if the holders of at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote cast ballots in favor of the plan.

Class 4 Creditors of each Debtor may receive no cash distributions and Class 5A Interestholders and Class 5B Creditors of each Debtor will receive no distributions, in each case,

on account of their respective Claims or Interests and are therefore deemed to have rejected the Plan.  With respect to Classes 4, 5A and 5B, therefore, the Debtors will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan if at least one of the Impaired Classes of Claims for each Debtor (not including any acceptances by "insiders" as defined in section 101(31) of the Bankruptcy Code) accepts the Plan and certain additional conditions are met.

D.     Unfair Discrimination and Fair and Equitable Test

        AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES OF CLAIMS AND INTERESTS.  THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A CHAPTER 11 PLAN CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS FOR EACH DEBTOR HAS VOTED TO ACCEPT THE PLAN.

        Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision.  Pursuant to this section, the Bankruptcy Court may confirm a chapter 11 plan notwithstanding the plan's rejection (or deemed rejection) by one or more impaired classes as long as the plan is accepted by at least one impaired class (by meeting the acceptance requirement described above), "does not discriminate unfairly," is "fair and equitable" as to each impaired class that has not accepted it and meets certain other statutory requirements.

        1.     Unfair Discrimination Test

        A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

        2.     Fair and Equitable Test

        (a)     Secured Creditors

        A plan is fair and equitable as to a non-accepting class of secured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Bankruptcy Code.  These requirements are fulfilled if either (i) each impaired secured creditor will retain its liens securing its secured claim and will receive on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor will realize the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim will be sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)     Unsecured Creditors

Likewise, a plan is fair and equitable as to a non-accepting class of unsecured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(B) of the Bankruptcy Code. These requirements are fulfilled if (i) the non-accepting claimants will receive the full value of their claims or (ii) if the non-accepting claimants receive less than full value, no class of junior priority will receive anything on account of their pre-petition claims or interests. The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable as to each Impaired Class.

If the Plan does not meet the cramdown requirements as set forth above with respect to any Debtor, in the Debtors' sole discretion, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation, or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

E.     Best Interests Test

In order for a chapter 11 plan to be confirmed, the Bankruptcy Code requires that, with respect to each impaired class of creditors or interestholders, that each of such impaired creditors or interestholders either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount such class members would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. This test is imposed by section 1129(a)(7) of the Bankruptcy Code and is referred to as the "best interests" test. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find, before confirming the Plan, that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To estimate the recovery members of each Impaired Class of unsecured Creditors and Interestholders would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from each Debtor's assets if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value" of such assets). The Liquidation Value for a Debtor would consist of the net proceeds from the disposition of that Debtor's Assets and would be augmented by any Cash held by that Debtor.

As detailed in the liquidation analysis prepared by Huron from information provided by the Debtors and other sources (the "Liquidation Analysis"), a copy of which is included herein as Appendix G, the Liquidation Value of each Debtor's Assets available to general unsecured Creditors would be reduced by the costs and expenses of the liquidation, as well as other administrative expenses that would have been incurred in the hypothetical chapter 7 cases. Each Debtor's costs of liquidation under chapter 7 would include the compensation of a trustee or trustees, as well as counsel and other professionals retained by the trustee(s),

89

disposition expenses, all unpaid expenses incurred by that Debtor during its chapter 11 proceedings (such as compensation for attorneys and accountants) which are allowed in the chapter 7 proceedings, and litigation costs and claims against that Debtor arising from its business operations during the pendency of the chapter 11 proceedings and chapter 7 liquidation proceedings.  These costs, expenses and claims would be paid in full out of that Debtor's liquidation proceeds before the balance would be made available to pay Unsecured Claims.

Once the percentage recoveries in liquidation of secured claimants, priority claimants, general unsecured Creditors and Interestholders are ascertained, the value of the distribution available out of the Liquidation Value is compared with the value of the property offered to each Class of Claims and Interests under the Plan to determine whether the Plan is in the best interests of each such Class.  The Debtors believe that the Plan satisfies the best interests test because, if the Plan is not confirmed and, instead, the Chapter 11 Cases are converted to chapter 7 liquidation proceedings, the value of each Debtor's estate would diminish because (i) each estate would need to pay fees and other costs to any chapter 7 trustee and (ii) each estate would incur increased professional fee costs associated with supporting the chapter 7 proceedings and associated litigation costs and claims.  In addition, the Debtors' ability to realize value from the remaining assets could be impaired in a chapter 7 liquidation.  Comparing the estimated recoveries set forth in Appendix C with the Liquidation Analysis included herein as Appendix G, the Debtors believe that distributions under the Plan will provide at least the same recovery to holders of Allowed Claims against or Interests in each of the Debtors on account of such Allowed Claims or Interests as would distributions by a chapter 7 trustee. Conversion of the Chapter 11 Cases to chapter 7 liquidation proceedings would also likely delay the ultimate distributions to Creditors and Interestholders.

F.    Feasibility

To confirm a chapter 11 plan, the Bankruptcy Court must find that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless and to the extent liquidation is contemplated by the plan.  This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement.  The Debtors believe that they will be able to timely perform all obligations described in the Plan, and therefore, that the Plan satisfies the feasibility requirement.

To demonstrate the feasibility of the Plan, the Debtors have prepared the Budgets, a copy of which is included herein as Appendix H.  The Budgets indicate that the Debtors should have sufficient cash flow to fund and pay their various obligations existing and arising after the Effective Date of the Plan taking into account all completed and proposed asset sales. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement.  The Debtors caution, however, that no representations can be made as to the accuracy of the Budgets. See Section VI (*Certain Risk Factors To Be Considered*) for a discussion of certain risk factors that may affect financial feasibility of the Plan.

THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF

90

THE LAW.  PLEASE CONSULT WITH YOUR ATTORNEY TO OBTAIN A COMPLETE
UNDERSTANDING OF THE LAW AND YOUR RIGHTS UNDER THE LAW.

VI.

CERTAIN RISK FACTORS TO BE CONSIDERED

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, SOLICITED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS BELOW, AS WELL AS OTHER RISKS AND UNCERTAINTIES IDENTIFIED IN THIS DISCLOSURE STATEMENT, IN THEIR ENTIRETY. SUCH RISKS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. THE ORDER IN WHICH RISK FACTORS ARE HEREIN PRESENTED DOES NOT NECESSARILY REFLECT THEIR ORDER OF IMPORTANCE.

A.      General Considerations

The Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors. Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all. Please see Section IV (*Chapter 11 Plan*) and Article 4 of the Plan.

Creditors, Interestholders and other parties in interest are encouraged to read certain information in the NNC Public Filings under the respective risk factors headings contained in the NNC Form 10-K (*Part I.1.A. Risk Factors*) and each of the NNC Form 10-Qs (*Part II.1.A. Risk Factors*), which may be relevant to Solicited Creditors' consideration whether to accept or reject the Plan. Such information is not deemed to be a part of or incorporated by reference in this Disclosure Statement. Certain of such information relates to Nortel Affiliates other than the Debtors. The descriptions and discussion of Nortel Affiliates other than the Debtors and the Creditor Protection Proceedings other than the Chapter 11 Cases contained therein should be taken into consideration only to the extent necessary to evaluate the Plan, the Debtors and the Chapter 11 Cases. Please also see the Disclaimer that starts on page (i) above.

B.      Certain Bankruptcy Considerations

The Debtors are parties to various contractual arrangements under which the commencement of the Chapter 11 Cases and the other transactions contemplated by the Plan could, subject to the Debtors' rights and powers under the Bankruptcy Code (and in particular, sections 105, 362 and 365 of the Bankruptcy Code) (i) result in a breach, violation, default or conflict; (ii) give other parties thereto rights of termination or cancellation; and/or (iii) have other adverse consequences for the Debtors. The magnitude of any such adverse consequences may depend upon, among other factors, the diligence and vigor with which other parties to such arrangements may seek to assert any such rights and pursue any such remedies in respect of such matters, and the ability of the Debtors to resolve such matters on acceptable terms through negotiations with such other parties or otherwise.

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Even if the requisite acceptances are received and the requirements for

92

"cramdown" are met with respect to relevant Classes of Creditors and Interestholders, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A Creditor or Interestholder might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code and/or Bankruptcy Rules. Although the Bankruptcy Court has determined that this Disclosure Statement and the balloting procedures are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of a plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  While there can be no assurance that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a liquidation except as contemplated by the Plan or a need for further financial reorganization and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received in a liquidation pursuant to chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case.  See Section V.F (*Confirmation of the Plan — Feasibility of the Plan*).

The confirmation and consummation of the Plan are also subject to satisfaction or waiver of certain conditions.  There can be no assurance that all of the various conditions to effectiveness of the Plan will be timely satisfied or waived.  If the Plan were not to become effective for not meeting such conditions, it is unclear what distribution Creditors and Interestholders ultimately would receive with respect to their Claims and Interests.

If the Plan does not meet the cramdown requirements as set forth above with respect to any Debtor, in the Debtors' sole discretion, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

The continuation of the Chapter 11 Cases, particularly if the Plan is not confirmed or consummated in the timeframe currently contemplated, could further adversely affect the Debtors' ability to maximize value.  If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

C.    Inherent Uncertainty of Projections and Estimations

The Budgets included herein as Appendix H relating to operations of the Reorganized Debtors and their non-Debtor subsidiaries (collectively, the "Reorganized Debtor Group") are based on numerous assumptions including the timing, confirmation and consummation of the Plan in accordance with their terms, the anticipated future performance of the Reorganized Debtor Group (in light of the sale of substantially all of its businesses, other than certain intellectual property), an estimate of the Reorganized Debtor Group's allocation of

proceeds from any remaining intellectual property of the Nortel Affiliates and the resolution of litigation and other matters, many of which are beyond the control of the Reorganized Debtor Group and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement was approved by the Bankruptcy Court may affect the Reorganized Debtor Group's operations. These variations may be material. Because the actual results achieved throughout the periods covered by the Budgets may vary from the projected budgets, the Budgets should not be relied upon as a guaranty, representation or other assurance of the actual costs that will be realized.

Except with respect to the Budgets and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material effect on the information contained in this Disclosure Statement. The Reorganized Debtor Group does not intend to update the Budgets; thus, the Budgets will not reflect the effect of any subsequent events not already accounted for in the assumptions underlying the Budgets.

D.    Liquidation Analysis

The Debtors have prepared the Liquidation Analysis included herein as <u>Appendix G</u> based on certain assumptions that they believe are reasonable under the circumstances. Those assumptions that the Debtors consider significant are described in the liquidation analysis. The underlying projections have not been compiled or examined by independent accountants. The Debtors make no representations regarding the accuracy of the projections or a chapter 7 trustee's ability to achieve the forecasted results. Many of the assumptions underlying the projections are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the ultimate financial results. In the event the Chapter 11 Cases are converted to chapter 7 proceedings, actual results may vary materially from the estimates and projections set forth in the liquidation analysis. Therefore, the liquidation analysis is speculative in nature. In evaluating the Plan, Creditors, Interestholders and other parties in interest are urged to examine carefully all of the assumptions underlying the liquidation analysis.

E.    Claims Estimations

The Debtors' estimates of the distributions certain Classes of Creditors or Interestholders will receive under the Plan depend on numerous assumptions, including assumptions concerning the ultimate amount of Allowed Claims in relevant Classes.

There can be no assurance that the estimated amounts of Claims set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from the estimates. Because the estimated amounts are based solely upon (i) a review of the Debtors' books and records, (ii) a review of the proofs of claim filed in the Chapter 11 Cases, (iii) the Debtors' estimates as to additional claims that may be filed in the Chapter 11 Cases and (iv) the Debtors' estimates of Claims that will be Allowed following the objections to Claims by the Debtors, such estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions

prove incorrect, the actual Allowed amounts of Claims may vary materially from those estimated.

Any allowance of Claims in any Class in an amount materially in excess of the Debtors' estimate could have a significant negative effect on the distributions received by certain Classes of Creditors.

F.    Distributions under the Plan

As discussed above, the Claims of Creditors are subject to the risk of dilution if the total amount of Allowed Claims is higher than the Debtors' estimates.  Many Disputed Claims are material.  Accordingly, the amount of the Distribution that will ultimately be received by any particular holder of a Claim may be adversely affected by the aggregate amount of all Allowed Claims.  In order to account for such risk of dilution, Distributions to General Unsecured Creditors (and certain other Creditors, to the extent necessary and appropriate) of each Debtor will be made on an incremental basis until all Disputed Claims have been resolved.

A substantial amount of time may elapse between the Effective Date and the receipt of Distributions, including, but not limited to, the Distributions received on the Final Distribution Date under the Plan for certain holders of Claims because of the time required to achieve recovery of certain assets and final resolution of Disputed Claims.

G.    Conditions to Effectiveness of the Plan

The Plan becomes effective only when and if all of the conditions to its effectiveness are satisfied as provided in Section 10.2 of the Plan or waived pursuant to Section 10.3 of the Plan.  Creditors, Interestholders and other parties in interest are therefore advised to read carefully the conditions listed above in Section IV.G (*Chapter 11 Plan — Conditions Precedent to Plan's Confirmation and Effective Date*) and Sections 10.2 and 10.3 of the Plan.  Two of the conditions will be of particular importance to the Creditors, Interestholders and other parties in interest:

(a)    Pursuant to Section 10.2(e) of the Plan, the effectiveness of the Plan is conditioned on each relevant Debtor receiving its full and final distribution of the Allocation Proceeds.  Therefore, the Plan will not become effective until after the final allocation of all the proceeds received from asset sales is determined.  The Debtors and other relevant parties, including the Canadian Petitioners and the EMEA Debtors, are currently in negotiations with respect to allocation issues and related matters.  However, there can be no assurance that the Debtors and other relevant parties will reach a consensual agreement with respect to the allocation of such proceeds and related matters.

(b)    Pursuant to Section 10.2(g) of the Plan, the effectiveness of the Plan with respect to each Debtor is conditioned on the effectiveness of the Plan with respect to each other Debtor.  Accordingly, the failure of a condition to the effectiveness of the Plan with respect to any Debtor may prevent or delay the effectiveness of the Plan with respect to all other Debtors.

H.      Monetization of Remaining Intellectual Property

        As discussed above, the Debtors and their Affiliates are in the process of
considering how to maximize the return value on their remaining intellectual property assets, and
the value the Debtors ultimately may realize from such assets is uncertain at this time and
dependent on various factors, including, without limitation, the strategies ultimately
implemented, the timing of any such transactions and the allocation of consideration among
various Nortel Affiliates.  In addition, it is possible that the actual value generated from any such
transactions will be lower than expected or the cost to realizing value may be higher than
anticipated.

I.      Greater Than Budgeted Liquidation Costs

        Winding down the Debtors' estates may be more prolonged and result in greater
costs than currently anticipated, as this process will require navigating complex cross-border
legal and regulatory issues, disposing of the Debtors' remaining assets and, with respect to
certain Reorganized Debtors, providing transition services under the TSAs.  The Debtors have
incurred significant costs to date for personnel and professional services.  Due to the uncertainty
of the effort, cost and time necessary to wind down the Debtors' estates, the future expenditures
may be materially different than anticipated and may affect the ultimate value of the estates.

J.      NBS Operations

        1.      TSA Costs May Exceed TSA Revenues

        While the Debtors have attempted to structure the TSAs so that the revenue
received by Nortel for providing services under the TSAs will equal or exceed Nortel's cost of
providing such services, each relevant Reorganized Debtor's actual costs may exceed actual
revenues and such Reorganized Debtor may incur a loss.  The revenues received for providing
services under each TSA will be distributed among the Nortel Affiliates, generally on the basis
of each Affiliate's projected expenses for providing services under such TSA, but there is no
formal mechanism for allocating among the Nortel Affiliates cost overruns or revenue shortfalls
related to providing TSA services.  Each Nortel Affiliate providing services under a TSA bears
the costs of providing such services.  To the extent that a Nortel Affiliate's costs of providing
services under a TSA exceeds the revenue from such TSA distributed to such Affiliate, that
Nortel Affiliate may incur a loss, regardless of whether the total revenue received by Nortel
under such TSA exceeds the aggregate costs of the Nortel Affiliates providing services under
such TSA.  Nortel is generally not able, under the TSAs, to increase the amount it charges to
provide services.

        If a counterparty fails to make one or more payments to a Nortel Affiliate as
required under a TSA, that Nortel Affiliate may incur a loss.  The risk that a counterparty will
fail to make a payment may increase at the end of the term of each TSA as the relevant
counterparty becomes less dependent on Nortel for services.

        As services terminate during the term of each TSA, revenues received under such
TSA are likely to reduce faster than costs, increasing the risk that a Nortel Affiliate's costs

associated with providing services under a TSA will exceed the revenue from that TSA distributed to such Affiliate. Each TSA permits the relevant purchaser to terminate some or all services provided by Nortel under such TSA upon written notice to Nortel and NBS has plans for reducing or eliminating the costs associated with the provision of services that are being terminated. There is no guarantee, however, that NBS will be able to reduce these costs significantly and to the extent each relevant Reorganized Debtor is unable to eliminate costs associated with its provision of services that are being terminated, such entity will be responsible for such costs and may incur a loss as a result.

2.      Risks of Performance and Claims Arising under TSAs

With limited exceptions, the Nortel Affiliates that are parties to each TSA must indemnify the relevant purchaser for certain losses resulting from a breach of such TSA by such Nortel signatories, and in some cases, other losses caused by Nortel and relating to the provision of services under such TSA. Nortel's liability for damages under the TSAs is generally subject to certain limitations, typically including an overall cap of liability based on the revenues payable to Nortel under the relevant TSA, but there may be circumstances in which a higher limitation or no limitation applies. In addition, the TSAs generally require that all claims under a TSA be brought within enumerated time periods, generally ranging from 30 to 60 days, after the end of the term of the TSA. There is a risk under each TSA, even those with caps and claim deadlines, that Nortel will be required to indemnify a purchaser, and there can be no guarantee that the relevant Debtors and their Affiliates will be able to perform all required services under the various TSAs. If a Nortel Affiliate fails or refuses to perform its allocated function under one or more TSAs, such failures may cause certain Debtors to incur losses or be liable for damages under such TSAs. The relevant Debtors may be unable to perform such functions successfully or at a cost that is less than the revenue such defaulting Nortel Affiliate received for such function prior to defaulting.

In addition to any indemnity claim, a purchaser may bring other claims against Nortel Affiliates for a breach of another Nortel Affiliate's obligations to provide services under the relevant TSA. Claims also may arise among Nortel Affiliates who are providing services under TSAs, including with respect to their entitlement to be reimbursed for the costs of such services. Nortel Affiliates against whom claims are brought relating to a TSA also may seek contribution or indemnification from one or more of the Debtors and their subsidiaries, and to the extent the Debtors have such indemnification and/or contribution claims against their Affiliates, there can be no assurance that the Debtors will be able to collect such amounts.

3.      Separation and Wind Down of Operations

The Debtors intend over time to separate their operations from those of other Nortel Affiliates in anticipation of operating independently starting on the Effective Date. While the Debtors believe this separation will be successful, there is no guarantee that it will be and there may be unanticipated costs or losses associated with this separation and those costs or losses may be significant. Upon the termination of the TSAs, the Reorganized Debtors plan to downsize their NBS-related operations to reduce costs as each Reorganized Debtor's estate is wound down. Each Reorganized Debtor's actual costs associated with the termination of the TSAs and following such termination may exceed projected costs, perhaps significantly.

97

K.    Intercompany Claims and Causes of Action

Under the settlements embodied in the FCFSA and the IFSA, the Debtors (other than NN CALA) and the Canadian Petitioners have settled and waived certain intercompany claims.  These waivers do not affect the Debtors' ability to pursue third parties, and non-Debtor Affiliates, on any claims, causes of action or challenges available to any of the Debtors that have not been settled by the FCFSA and the IFSA.  However, if the Debtors (other than NN CALA) file certain pre-petition claims against any Canadian Debtor, the Canadian Debtors' waiver of certain intercompany claims under the FCFSA will automatically terminate; in that event, the Canadian Debtors may be able to file additional claims relating to the pre-petition period against the Debtors.

In addition, to the extent that any Debtor, Reorganized Debtor or Liquidating Debtor elects to pursue any claims, causes of action or challenges available against any other Debtor, Reorganized Debtor or Liquidating Debtor or any of their subsidiaries and prevails, then the applicable Debtor, Reorganized Debtor or Liquidating Debtor may be adversely affected.

L.    Other Creditor Protection Proceedings

Certain Affiliates of the Debtors are subject to Creditor Protection Proceedings in various jurisdictions, including, without limitation, the CCAA Proceedings, the EMEA Proceedings, the Israeli Administration Proceedings and the French Proceedings.  In addition, other Affiliates of the Debtors may become subject to additional bankruptcy, insolvency or other creditor protection proceedings.  There can be no assurance that the courts and other authorities in those Creditor Protection Proceedings will not make any factual finding or legal determination that may have a materially adverse effect on the Debtors' businesses (including their assets and liabilities) or the confirmation and consummation of the Plan.  Similarly, there can be no assurance that the confirmation and consummation of the Plan will be fully recognized in those Creditor Protection Proceedings or that the courts and other authorities in such Proceedings will not make any factual finding or legal determination or otherwise take positions that may be inconsistent with the Plan or have a materially adverse effect on the Debtors or the Plan.

M.    Environmental Regulation

The Debtors' operations have been subject to various federal, state and local environmental laws and regulations, including those addressing air emission, wastewater discharges, hazardous substances and waste materials.  The Debtors believe that they have been in substantial compliance with existing environmental laws and regulations.  However, the Debtors' operations, including their past generation, management and disposal of hazardous substances and wastes, have been occasionally subject to proceedings, orders and notices of violation under environmental laws and regulations that may result in fines, penalties, sanctions or other liabilities and costs.  Future changes in environmental laws and regulations may result in additional liabilities and costs beyond those currently projected.

Nortel has liabilities for remediation of contamination at one of its former sites and has been listed as a potentially responsible party at certain Superfund sites, and the Debtors may need to contribute to such remediation costs.  Additional sites for which the Debtors have

remediation liability may be identified in the future. The Debtors' ultimate liability in connection with such remediation will depend on many factors. For more information, please see Section III.E.5 (*The Chapter 11 Cases and Certain Post-petition Operations of the Debtors — Certain Other Post-petition Operations of the Debtors and Other Nortel Affiliates — Environmental Matters*).

N.      Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan. Creditors and other interested parties should read carefully the discussion set forth in Section VII (*Certain U.S. Federal Income Tax Considerations*) for a discussion of certain federal income tax consequences of the transactions contemplated under the Plan.

VII.

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

A.    In General

   The following discussion summarizes certain anticipated U.S. federal income tax consequences relating to the Plan. This summary is based on the IRC, U.S. Treasury regulations (proposed, temporary and final) issued thereunder and administrative and judicial interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below.

   The following summary is for general information only. The tax treatment of a beneficial owner of Claims (each a "Holder" and collectively, the "Holders") may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan; Holders that are non-U.S. persons or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities; Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction; Holders that have a "functional currency" other than the United States dollar; and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" (as defined in the IRC) and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

   The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY APPENDICES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

B.      U.S. Federal Income Tax Consequences to the Debtors

1.      Cancellation of Debt and Reduction of Tax Attributes

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which must be included in the debtor's income.  Settlement of a guarantee should not give rise to COD.

The Debtors should be able to utilize a special tax provision which excludes from income COD income attributable to debts discharged in a chapter 11 case (the "Bankruptcy Exception").

Under section 108(b) of the IRC and Treasury regulations that apply to members of a consolidated group, each Debtor that does not include COD income in computing taxable income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated attributes, such as net operating losses (and consolidated net operating losses in the case of Debtors that are in the NNI Consolidated Group) and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to such Debtor; attributes that arose in separate return limitation years of such Debtor (if any); and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the Bankruptcy Exception.  In the case of Debtors that are members of the NNI Consolidated Group, a "look-through rule" applies when asset basis

101

reduction reduces the basis of stock of another member of the consolidated group and requires corresponding adjustments to be made to the attributes attributable to the lower-tier member.

As a result of the required attribute reduction resulting from the discharge of indebtedness, the Debtors believe that, to the extent the Debtors have any remaining net operating losses ("NOLs") and tax credit carryforwards after taking into account gains from the 363 Sales that closed in 2009 and 2010, and any income or gain resulting from implementation of the Plan, such remaining NOLs and tax carryforwards (and alternative minimum tax NOLs) of the Debtors should be eliminated as of the end of the taxable year which includes the Effective Date of the Plan.

2.    Taxable Income Resulting From 363 Sales

The 363 Sales are expected to trigger income or gain recognition by the Debtors. However, the Debtors will not be able to determine the amount of such income or gain with certainty, and consequently will not be able to finally determine the U.S. federal income tax, if any, attributable to the 363 Sales, until the final allocation of sale proceeds is determined.  Under the Plan, the Effective Date will not occur until after the final allocation of sale proceeds is determined.  Therefore, the Debtors' existing NOLs and tax credit carryforwards (prior to being reduced as a result of any attribute reduction resulting from COD Income under the Plan) should generally first be available to offset such income or gain.  Based on the amount of the Debtors' NOLs and other tax attributes, and subject to the discussion in Section VII.B.3 (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to the Debtors — Intellectual Property Assets*), the Debtors do not anticipate owing significant regular U.S. federal income tax with respect to the 363 Sales for taxable years ending after the Initial Petition Date, aside from potential alternative minimum tax liability arising as a result of the Debtors' use of its NOL carryforwards from prior years to offset such income or gain, as described below. However, under certain assumptions about the allocation of proceeds from the 363 Sales, the Debtors may incur regular U.S. federal income tax.  Additionally, if the IRS were to prevail in assessing U.S. federal income tax for taxable years ending after the Initial Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

A corporation or a consolidated group of corporations may incur alternative minimum tax ("AMT") liability even where an NOL is generated for regular corporate income tax purposes or where NOL carryovers and certain other tax attributes are sufficient to eliminate taxable income as computed under the regular corporate income tax.  In general, the AMT is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances allowed in computing a corporation's regular U.S. federal income tax are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, a portion of a corporation's taxable income for AMT purposes may not be offset by available NOL carryforwards (as computed for AMT purposes).  At this time the Debtors expect to incur some amount of AMT resulting from its utilization of NOL carryforwards to offset items of income and gain from the 363 Sales that closed during the 2009 and 2010 taxable years.

3.      Intellectual Property Assets

Nortel is still in the process of developing a plan for the maximization of value realizable from its residual patent portfolio, and is considering various options as described in <u>Section III.D.16</u> (*The Chapter 11 Cases and Certain Post-petition Operations of the Debtors — Post-petition Sales and Other Dispositions of Assets — Remaining Intellectual Property Assets*).  The Debtors may incur taxable income in connection with a disposition of intellectual property assets, or the ongoing operation of an intellectual property company, although the amount and timing of such taxable income will vary depending on the nature and timing of the plan of disposition, and the amount realized therefrom.

4.      Limitation of NOL Carryforwards and Other Tax Attributes

Under section 382 of the IRC ("<u>Section 382</u>"), if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (*i.e.*, economically accrued but unrecognized) as of the date of the ownership change) and tax credits that may be utilized to offset future taxable income generally is subject to an annual limitation.

Notwithstanding the general rule, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains) or tax credits.

The Debtors do not expect to have NOL carryovers and other tax attributes available on the Effective Date, as a result of giving effect to income from the 363 Sales and other items of taxable income prior to the Effective Date.  Moreover, to the extent the Debtors have NOL carryovers and other tax attributes available on the Effective Date, the Debtors do not expect to have any such NOL carryovers or other tax attributes remaining after implementation of the Plan, as a result of attribute reduction resulting from the Debtors' COD income excluded under the Bankruptcy Exception.  Therefore, the Debtors could incur a federal income tax liability in connection with any income earned, including through the liquidation of the Debtors' remaining assets, if any, or the operation of a licensing entity after the Effective Date.

However, the amount of such NOL carryovers and other tax attributes that could be available following the Effective Date is based on a number of factors and it is impossible to determine with certainty at this time whether any NOL carryovers and other tax attributes will be available after emergence.  Some of the factors that will affect the amount of available NOL carryovers and tax attributes include:  (i) the amount of taxable income incurred by the Debtors as a result of the 363 Sales and implementation of the Plan, (ii) the consummation of any additional asset sales prior to the Effective Date and (iii) the amount of COD income incurred by the Debtors, if any, in connection with the Plan.

If the Debtors have any NOL carryovers and other tax attributes available as of the Effective Date, the following results should occur.  Based on a historical Section 382 analysis

of the changes in the Debtors' stock ownership, as well as the order entered by the Bankruptcy Court effective January 14, 2009, as amended, imposing certain restrictions on the trading of interests in the Debtors' equity, the Debtors believe that no ownership change under Section 382 has occurred to date, nor will occur prior to the Effective Date, that would limit the availability of such NOL carryovers and other tax attributes to offset taxable income.  Moreover, pursuant to the Plan, the current holders of NNI Interests will maintain their economic interests in any residual assets of NNI after the satisfaction of all Allowed Claims, which economic interests will be nontransferable.  Accordingly, the Debtors do not believe that an ownership change of NNI will occur on the Effective Date of the Plan.  Nevertheless, due to a lack of direct authoritative guidance in the context of a liquidating chapter 11 plan, and to circumstances beyond the control of the Debtors, there is no assurance that an ownership change would not occur, or that the IRS would not take a contrary position.  If, notwithstanding the Debtors' position, an ownership change were considered to occur, the Debtors' expect they would be unable to use any NOL carryovers or other tax attributes remaining as of the Effective Date (to the extent any exist).  In such a case, the Debtors could incur a federal income tax liability in connection with the liquidation of the Debtors' remaining assets or the operation of a patent licensing entity after the Effective Date.

## C.    Disputed Claims Reserve

The Plan Administrator may create one or more reserve accounts for Cash held on account of Disputed Claims.  Under the IRC, interest and other income earned on such accounts are subject to current tax.  However, the U.S. Treasury Department has not issued Treasury regulations to address the U.S. federal income tax treatment of such funds that specifically applies in a bankruptcy context.  Accordingly, the proper tax treatment of such funds is uncertain.  Distributions from the Disputed Claims Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed and to other Holders when Disputed Claims are subsequently disallowed.  The Debtors intend to treat the Disputed Claims Reserve as a disputed ownership fund, taxable as a separate entity for U.S. federal income tax purposes. Under such treatment, the Plan Administrator shall file all income tax returns with respect to any income attributable to the Disputed Claims Reserve and shall pay the federal, state and local income taxes attributable to the Disputed Claims Reserve using Cash available in the Disputed Claims Reserve, based on the items of income, deduction, credit or loss allocable thereto.

Holders should note the tax treatment of the Disputed Claims Reserve is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Disputed Claims Reserve.

## D.    U.S. Federal Income Tax Consequences to Holders of Claims

### 1.    Generally

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the

Allowed Claim exchanged (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, please see <u>Section VII.D.4</u> (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to Holders of Claims — Interest Income with Respect to Allowed Claims*). When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and is held for more than one year. Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

2.      Holders of Allowed General Unsecured Claims

A Holder of Allowed General Unsecured Claims of a Debtor as of the Effective Date should be treated as receiving from that Debtor the Holder's share of the Creditor Proceeds (net of any applicable liabilities) of the relevant Class after distributions to Holders of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims of that Debtor in satisfaction of those Holders' Allowed Claims. Accordingly, a Holder of such a Class 3 Claim should generally recognize gain or loss in an amount equal to the amount of Cash received in the exchange (as described above) less the adjusted tax basis of its Claim. It is possible that any loss, or a portion of the gain, realized by a Holder may be deferred until all of the distributions to such Holder are received. As discussed in <u>Section VII.D.4</u> (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to Holders of Claims — Interest Income with Respect to Allowed Claims*), the amount of Cash received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a Holder under his or her method of accounting.

Because a Holder's ultimate amount realized in exchange for its Allowed Class 3 Claim may be increased after the Effective Date due to the existence of Disputed Claims, such Holder should recognize additional or offsetting gain if, and to the extent that, the aggregate amount of cash ultimately received by such Holder is greater than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. Because, as discussed in <u>Section VII.D.3</u> (*Certain U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Consequences to Holders of Claims — Holders of Disputed Claims*) the treatment of the Disputed Claims Reserve is unclear, it is unclear when a Holder of an Allowed General Unsecured Claim of any Debtor should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim, (ii) the tax status of the Holder of the Claim, (iii) whether the Claim has been held for more than one year, (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a de minimis exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on

105

the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

3.      Holders of Disputed Claims

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the assets of the Debtors are transferred to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to:  (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim.  Holders of Disputed Claims should note the tax treatment of the Disputed Claims Reserve is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Disputed Claims Reserve.

4.      Interest Income with Respect to Allowed Claims

Pursuant to Section 8.3 of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  In general, to the extent any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

E.      Backup Withholding and Information Reporting

Under federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate.  Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  These categories are very broad; however, there are numerous exceptions.  Holders of Allowed Claims are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's

claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.  NONE OF THE DEBTORS, THE CREDITORS' COMMITTEE OR THEIR RESPECTIVE COUNSEL, ADVISORS OR OTHER PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

VIII.
ALTERNATIVES TO THE PLAN

The Debtors believe that the Plan affords holders of Allowed Claims the potential for the greatest realization of the Debtors' assets and, therefore is in the best interests of such holders.  If, however, the requisite acceptances are not received, or the requisite acceptances are received but the Plan is not confirmed and consummated, the theoretical alternatives include: (a) confirmation of another chapter 11 plan; (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (c) dismissal of the Chapter 11 Cases leaving Creditors and Interestholders to pursue available non-bankruptcy remedies.

These alternatives to the Plan are very limited and not likely to benefit creditors. Although the Debtors could theoretically file a new plan, the most likely result if the Plan is not confirmed is that the Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code.  The Debtors believe that conversion of the Chapter 11 Cases to chapter 7 cases would result in (i) significant delay in distributions to all Creditors and Interestholders who would have received a distribution under the Plan and (ii) diminished recoveries for certain Classes of Creditors.  If the Chapter 11 Cases are dismissed, Creditors and Interestholders would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against each respective Debtor.  However, in that event, Creditors and Interestholders would be faced with the costs and difficulties of attempting, each on its own, to collect claims from, depending upon the Debtor, a Debtor with very limited or no operations.

## CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation of the Plan is preferable to all other alternatives.  Consequently, the Debtors recommend all Solicited Creditors of each Debtor to vote to **ACCEPT** the Plan, and to complete and return their Ballots so that they will be **RECEIVED** by the Epiq on or before [●] (prevailing Eastern time) on [●].

**Nortel Networks Inc.**

By: _____

    Name:  John J. Ray, III
    Title: Principal Officer

**Nortel Networks Capital Corporation**

By: _____

    Name:  John J. Ray, III
    Title: Principal Officer

**Nortel Altsystems Inc.**

By: _____

    Name:  John J. Ray, III
    Title: Principal Officer

**Nortel Altsystems International Inc.**

By: _____

    Name:  John J. Ray, III
     Title: Principal Officer

**Xros, Inc.**

By: _____

    Name:  John J. Ray, III
    Title: Principal Officer

**Sonoma Systems**

By: _____

    Name:  John J. Ray, III
    Title: Principal Officer

**Qtera Corporation**

By: _____

    Name:  John J. Ray, III
    Title: Principal Officer

S-1

**CoreTek, Inc.**

By: _____
     Name:  John J. Ray, III
     Title: Principal Officer

**Nortel Networks Applications Management Solutions Inc.**

By: _____
     Name:  John J. Ray, III
     Title: Principal Officer

**Nortel Networks Optical Components Inc.**

By: _____
     Name:  John J. Ray, III
     Title: Principal Officer

**Nortel Networks HPOCS Inc.**

By: _____
     Name:  John J. Ray, III
     Title: Principal Officer

**Architel Systems (U.S.) Corporation**

By: _____
     Name:  John J. Ray, III
     Title: Principal Officer

**Nortel Networks International Inc.**

By: _____
     Name:  John J. Ray, III
     Title: Principal Officer

**Northern Telecom International Inc.**

By: _____
     Name:  John J. Ray, III
     Title: Principal Officer

**Nortel Networks Cable Solutions Inc.**

By: _____
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Networks (CALA) Inc.**

By: _____
      Name:  John J. Ray, III
      Title: Principal Officer