IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> Nortel Networks Inc., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Bankr. Case No. 09-10138 (KG) <br><br> (Jointly Administered) |
| Nortel Networks Inc., <br> a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> Communications Test Design, Inc., <br> a Pennsylvania corporation, <br><br> Defendant. | Adv. Proc. No. 10-_____ (KG) |

**<u>COMPLAINT</u>**

Plaintiff Nortel Networks Inc. ("NNI"), by its undersigned counsel, Benesch, Friedlander, Coplan & Aronoff LLP and Cleary Gottlieb Steen & Hamilton LLP, as and for its Complaint against Defendant Communications Test Design, Inc. ("CTDI") alleges as follows, based on knowledge as to itself and its own acts and on information and belief as to all other matters except as indicated otherwise. (NNI and its affiliates will be referred to generally below as "Nortel.")

**INTRODUCTION**

1. This action seeks redress for CTDI's willful and fraudulent misconduct, through which CTDI willfully and maliciously misappropriated Nortel's trade secrets, fraudulently obtained and misused Nortel's proprietary technical information and components, and brazenly breached its contractual obligations.

2. CTDI entered into contracts with Nortel that permitted CTDI to repair and refurbish ("Repair") Nortel products. Refurbishing a product entails repairing or replacing defective components and/or providing appropriate updates, and then offering that same product for sale as a refurbished unit – that is, not a new unit. Strictly for the purpose of engaging in these limited Repair activities, CTDI was granted access to Nortel's proprietary intellectual property, trade secrets and technical information, and it was allowed to purchase proprietary Nortel components, which embody Nortel's intellectual property, trade secrets and technical information and which are not available to non-authorized parties. The contracts and licenses between CTDI and Nortel made clear that CTDI was granted access to Nortel's proprietary information and permitted to purchase Nortel's proprietary components <u>only</u> for its limited authorized Repair activities. Further, CTDI was obligated to pay Nortel a royalty on the revenues gained from these authorized Repair activities.

3. CTDI unquestionably was <u>not</u> entitled to use its access to Nortel's proprietary information and components to make and sell <u>new</u> Nortel products. But, that is exactly what CTDI did. Under the guise of ordering parts for Repair activity, CTDI obtained proprietary Nortel components and misused proprietary Nortel technical information and intellectual property to assemble these components into "new" telephone sets that it improperly sold into the market. CTDI plainly knew that what it was doing was wrong. Indeed, if CTDI had believed

that the manufacture of these "new" telephone sets from scratch was permitted by the limited license for Repairing Nortel products, it would have paid royalties to Nortel on the revenue gained from the sales of these products. CTDI paid no such royalties at all. Instead, it concealed these improper sales from Nortel. CTDI also sold millions of dollars of Nortel circuit packs into the market, without paying royalties for them, thus causing NNI additional damage.

4. The sale of new Nortel products was a core part of NNI's business, from which it earned substantial revenue. NNI never authorized, and never would have authorized, CTDI to make and sell new products in competition with it.

5. CTDI's improper manufacture and sale of Nortel telephone products caused NNI to lose sales of its products, inflicting direct losses of at least $44 million based on the limited information collected to date. The full amount of losses likely will be much greater. CTDI's misconduct also enabled it to reap ill-gotten revenues in excess of $30 million, based on the limited information collected to date. In addition, CTDI improperly sold millions of dollars of Nortel cards into the market without compensating NNI for those sales.

6. Because CTDI's breaches and violations were willful and malicious, NNI is entitled to an award of exemplary and punitive damages that, together with compensatory damages, will far exceed $130 million. NNI also is entitled to recover its attorneys' fees and costs of suit.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action under 28 U.S.C. §§ 157, 1332 and 1334.

8. On January 14, 2009, NNI filed a voluntary petition in this District for relief under chapter 11 of the Bankruptcy Code.[1] NNI continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. NNI's claims in this action are related to the chapter 11 proceeding.

9. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1409.

### THE PARTIES

10. Plaintiff NNI is a company organized and existing under the laws of Delaware, with its principal place of business located at 4001 East Chapel Hill-Nelson Highway, Research Triangle Park, North Carolina. In 2009, NNI and certain of its U.S. affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. At the same time, certain NNI affiliates initiated creditor protection proceedings under the restructuring regimes of various jurisdictions, including under the Companies' Creditors Arrangement Act in Canada. As part of its bankruptcy proceedings, Nortel has sold most of its businesses.

11. Defendant CTDI is a Pennsylvania corporation located at 1373 Enterprise Drive, West Chester, Pennsylvania.

---

[1] In addition to NNI, the Debtors in the Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc. ("NN CALA"). Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://chapter11.epiqsystems.com/nortel.

**FACTS**

**Nortel's Proprietary Products And Intellectual Property**

12.     During the period at issue in this action, and prior to its significant business divestitures in connection with the bankruptcy proceedings, Nortel was an industry leader and innovator in the field of global telecommunications.  A core part of NNI's business comprised providing solutions for the communications needs of large and small businesses across a wide variety of industries and government agencies.  The manufacture and sale of telephone sets, sometimes called "telsets," were a key part of that business.

13.     As technology evolved toward a digital communications platform, Nortel was a leader in innovation.  Nortel's products included the M3900 Series Meridian Digital Telephones ("M3900") and the T7000 Series Taurus Digital Telephones ("T7000" and together with M3900, the "Telephone Sets").  These models provide the functionality of Nortel's previous analog models while also offering the convenience and advantages of a digital product, including display-based interfaces, call log, self-labeling keys, and simplified administration.  NNI held during the period in question the exclusive rights in the United States to the proprietary technical information and intellectual property embodied in and relating to these products.

14.     Each of the Telephone Sets contains a variety of components, including without limitation electronic chips embodying proprietary source code, circuitry, silk tape and specially designed plastics (the "Nortel Components").  The proprietary technology contained in these Telephone Sets and their component parts reflects and embodies years of Nortel's research and development and engineering work.  The Nortel Components are assembled into final Nortel products according to proprietary specifications, schematics and other technical information developed by and for Nortel.

15. Each of the Telephone Sets includes a master electronic chip set, developed by Nortel for these Telephone Sets, containing proprietary software that permits the Telephone Sets to perform the functions for which they were designed (the "Software"). The Software and related documentation and specifications constitute confidential, proprietary and economically valuable trade secrets.

16. All of the technical information and materials described above (the "Nortel Know-how") were created at substantial cost and were valuable to Nortel and NNI, and were maintained as proprietary and confidential. NNI held the exclusive rights in the United States to the Nortel Know-how during the period at issue in this action.

### Nortel and CTDI's Licenses And Contracts

17. Nortel and CTDI entered into several licenses and contracts that authorized CTDI to gain access to, and use, Nortel's proprietary intellectual property, technical information and components, but <u>only</u> for the purpose of repairing and refurbishing existing Nortel products. CTDI clearly was <u>not</u> authorized to obtain or use these proprietary materials, components and information for any other purpose, including the manufacture of new products from scratch. Certain of the agreements that Nortel and CTDI executed are summarized below.

    **A.**    **Technical Information Agreement**

18. In 1994, NNI (then known as "Northern Telecom Inc.") and CTDI entered into the Technical Information Agreement (the "1994 TIA"). Under the 1994 TIA, NNI granted CTDI a right to use Nortel's Know-how "solely for the Repair and Update of" Nortel products. 1994 TIA, § 3. In Article 5, CTDI acknowledged that NNI's Know-how constituted trade secrets and specifically agreed that it would use this Know-how "solely" for the purposes contemplated by the 1994 TIA – that is, to Repair Nortel's products. <u>Id.</u>, § 5. CTDI further agreed to treat the

Nortel Know-how in a manner that would protect its confidential, trade secret nature. Id. In addition, Article 9 made clear that CTDI had a license to use Nortel's firmware "only in conjunction with" CTDI's Repair of the Nortel products. Id., § 9.

### B. Asset Purchase Agreement

19. In July 1999, Nortel sold a facility in Nashville, Tennessee (the "Nashville Facility") and the current inventory of parts at the facility to CTDI, in an Asset Purchase Agreement (the "APA") between Nortel and CTDI and its subsidiary Communications Repair Logistics Company. As a "Selling Subsidiary" and the owner of the real property transferred pursuant to the APA, NNI was a party to the APA. See APA, §§ 1.1, 4.18. The APA explicitly excluded from the sale "any and all Intellectual Property owned by or licensed to" Nortel or any of its subsidiaries. See APA, § 2.1(d)(7). The APA also required CTDI to reorganize the Nashville Facility to provide Repair services. See APA, § 5.12

### C. Master Contract Repair Services Agreement

20. Nortel's and CTDI's intention that CTDI would use the Nashville Facility for the exclusive purpose of Repairing Nortel products was further memorialized in the Master Contract Repair Services Agreement ("MCRSA") between Nortel and CTDI, which was attached as Exhibit C to the APA and executed on September 1, 1999. By virtue of issuing a purchase order to CTDI pursuant to the MCRSA, NNI itself became party to the MCRSA. See MCRSA, Ex. 1, at 49 ("'Nortel Networks' means NNC or, as applicable, any Nortel Company that has become a Party to this Agreement by issuing an Order under this Agreement.").

21. Pursuant to the MCRSA, CTDI obtained limited rights to Repair Nortel products. At no time was CTDI permitted to manufacture and distribute newly made Nortel products. The MCRSA states the parties' expectations as follows:

7

> 1.1    Expectations
>
> Nortel Networks has decided to contract the repair of certain of its products in the expectation that this shall enable Nortel Networks to improve Repair service time for its products, increase its ability to respond to market fluctuations and obtain greater access to "best-in-class" repair technologies.

MCRSA, § 1.1.

22.    In connection with the opportunity to Repair Nortel products, CTDI was provided with access to Nortel's confidential and proprietary information related to Nortel's intellectual property, including the Nortel Know-how. See MCRSA, § 1.2. CTDI acknowledged that it did "not have a right to use [Nortel's intellectual property, including, without limitation, the Nortel Know-how] for any purpose other than providing" the services contemplated by the MCRSA. See id., § 1.3 (emphasis supplied).

23.    In Section 13 of the MCRSA, CTDI further agreed that, subject to the provisions of the 1994 TIA, it would use Nortel's intellectual property "solely for internal use for the purpose of performing" Repair of Nortel's products. MCRSA, § 13.1 (emphasis supplied).

24.    In addition, the MCRSA expressly defined the activities for which CTDI was permitted to use Nortel's intellectual property, including, without limitation, the Nortel Know-how, as "engineering, technical, programming, Logistics, Repair, overhaul and other functions and services provided to Nortel Networks by Contractor as set forth in the Statement of Work." APA, Ex. 1, at 45. The Statement of Work in turn confirmed that CTDI is authorized only to Repair Nortel's products. Nothing in the MCRSA, or any other agreement, permits CTDI to manufacture Nortel products.

25.    Furthermore, the MCRSA also articulated, among other things, that parts obtained from Nortel were to be used only for services under the agreement, that such materials must be

obtained only from Nortel unless otherwise approved by Nortel, and that repaired and unrepaired inventory may be sold only with Nortel's consent.  See MCRSA, §§ 6.3, 6.9, 8.3.

**D.      Alliance Agreement and Technical Information License Agreement**

26.     In 2006, Nortel (specifically Nortel Networks Limited on behalf of itself and other Nortel entities including NNI) entered into an Alliance Agreement (the "Alliance Agreement") with CTDI, which established and defined business processes in support of the parties' joint marketing and provision of Repair services to certain customers.  Nothing in the Alliance Agreement allowed CTDI to manufacture Nortel products.  See Alliance Agreement, § 1.1.

27.     In connection with the Alliance Agreement, the parties executed a Technical Information License Agreement (the "2006 TIA"), in which Nortel granted CTDI a limited license to use certain Nortel Know-how.  Like the 1994 TIA, the 2006 TIA made clear that CTDI could use Nortel's Know-how "solely for the provision of Licensed Services," 2006 TIA, § 2.1(d), which was, by definition, limited to the "Repair" of Nortel's products.  Id., § 1(l).  Further, Article 2.5 of the 2006 TIA provides, in pertinent part, that Nortel "reserves all rights and licenses not expressly granted in this Agreement, and nothing in this Agreement shall be construed as implying or give rise to any implied grant of license of any right not expressly set forth in" the 2006 TIA.  Id., § 2.5.

28.     In the 2006 TIA, CTDI acknowledged that the Know-how licensed to it for purposes of the Repair of Nortel's products was confidential, proprietary information that CTDI was required to keep confidential and to use only within the limited scope specified in the 2006 TIA.  See 2006 TIA, § 2.3.

**Discovery Of CTDI's Improper Manufacture And Sale Of Nortel Telephone Sets And Cards**

29. In June 2008, Nortel was contacted by a company that purchased telephone sets from Atlanta Telephone Company ("ATC"). The order was for 3700 telephone sets of Nortel's M3900 Series. The telephone sets were advertised as "new" products. But after a partial shipment of the telephones was delivered, the purchaser noticed almost immediately that the telephone sets were not genuine Nortel products. In particular, the boxes were different from new Nortel telephone boxes; the labels were different; the part numbers were different (and discontinued); and the Nortel hologram, which indicates a genuine Nortel product, was missing.

30. The purchaser contacted ATC to complain that the sets were not new Nortel products. ATC responded in an email, insisting the products were new: "First thing the telephones are new; according to the manufacturer, they're not remans [i.e., remanufactured telephones]. I just opened up 2 or 3 myself a few minutes ago, and they're definitely not remans. They're new as new can be." (Emphasis in original).

31. Once contacted, Nortel investigators examined the telephone sets and confirmed several differences between the products sold by ATC and genuine Nortel products:

- The box containing the counterfeit telephones was dated 2007/09/08, and stated that the telephones were manufactured in "Montery" [*sic.*]. Although Nortel previously manufactured telephones in Monterrey prior to 2002, it had not done so in over five years.

- The telephones failed to include the holographic label that identifies authentic Nortel telephones.

- The bar code labels on the back cover of the telephone sets were oversized and accompanied by two additional small labels. This was not standard to Nortel practice.
- Inside the set, the foam covering the speaker was of a different density and had a clear acoustic septum rather than the white one from the comparison product of the same period. Nortel does not use a clear septum on the speaker foam.

32. Nortel presented the above information to the District Court for the Northern District of Georgia, and the District Court granted Nortel's request for a surprise search and seizure for the purpose of seizing all such counterfeit Nortel products from ATC. In addition to seizing a large number of these counterfeit products, Nortel learned from ATC that it had purchased the telephones from a company called SWB of Nashville, Inc. ("SWB").

33. Armed with the evidence from Nortel v. ATC, Nortel initiated litigation against SWB in the District Court for the Eastern District of Tennessee. The District Court granted Nortel's request for a surprise search and seizure to ensure the preservation of evidence about the presence and source of the counterfeit telephones. The information Nortel obtained through these means established that the counterfeit telephones sold to ATC came from CTDI.

34. Based on this discovery, Nortel exercised its audit rights under the MCRSA to obtain additional information from CTDI. The MCRSA grants Nortel the right to review CTDI's records and, accordingly, Nortel requested such an audit on September 28, 2008. CTDI provided delayed and limited compliance. The limited information that CTDI ultimately produced demonstrated that the number of parts CTDI ordered from Nortel suppliers, under the guise of using them for authorized repair and refurbishing activity, was far higher than the number CTDI had used for its authorized activities.

11

35. Thus, the information established that, on an extremely large scale, CTDI was willfully violating Nortel's rights by fraudulently obtaining proprietary Nortel components, under the guise of using them for authorized repair and refurbishing activity, and then improperly using proprietary Nortel technical information to assemble these fraudulently-obtained components into new products.

36. While NNI has to date been able to obtain only a limited snapshot of products that CTDI improperly manufactured and sold over a limited time frame, from 2005 to 2009, the data collected so far establishes that CTDI's revenues from its improper and unlawful sales of new products totaled more than $30 million. On information and belief, these sales were overwhelmingly made in the United States. Beyond CTDI's unjust enrichment, NNI suffered a direct loss of the profits it would have earned from selling the units that CTDI improperly sold, in an amount exceeding $44 million.

37. In addition, the audit of CTDI revealed that CTDI had sold in excess of $30 million of Nortel circuit packs used in other Nortel products. The circuit packs include line cards, voice or data port cards, trunk cards, CPU's, memory packs and I/O cards (together, the "Nortel Cards"). CTDI was permitted to procure Nortel Cards solely for the purpose of using them to Repair Nortel Products. However, on information and belief, CTDI improperly sold Nortel Cards into the market. Further, CTDI failed to pay any royalties to NNI for these Nortel Cards or otherwise compensate Nortel for them.

FIRST CAUSE OF ACTION
(Misappropriation of Trade Secrets )

38. NNI repeats and realleges each and every allegation set forth in paragraphs 1 through 37 above as if fully set forth herein.

39. CTDI's conduct constitutes a willful and malicious misappropriation of Nortel's Know-how and trade secrets to which NNI holds exclusive rights in the United States.

40. The Nortel Know-how and trade secrets have a substantial independent economic value, because they are not generally known to, and not readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

41. Nortel has maintained Nortel's Know-how and trade secrets as secret, confidential information.

42. In selling newly-manufactured, as opposed to Repaired phones, CTDI misappropriated Nortel's Know-how and trade secrets in a manner that was not permitted, and that CTDI plainly knew was not authorized. In addition, CTDI improperly sold Nortel Cards into the market, rather than using them to Repair existing Nortel products.

43. CTDI's misappropriation of Nortel's Know-how and trade secrets was willful.

44. NNI has been damaged as a result of CTDI's conduct, and seeks damages in accordance with proof at trial, but in any event sufficient to: (1) compensate it for its actual losses, including lost profits resulting from CTDI's misappropriation, and (2) recover the amounts that CTDI unjustly received as a result of its misappropriation of Nortel's trade secrets.

45. In addition, because CTDI's misappropriation was willful and malicious, NNI is entitled to recover exemplary damages in an amount equal to twice the damages otherwise recoverable, and to recover its attorneys' fees and costs of suit.

## SECOND CAUSE OF ACTION
(Fraud)

46. NNI repeats and realleges each and every allegation set forth in paragraphs 1 through 45 above as if fully set forth herein.

47. On numerous occasions, CTDI represented to NNI that it would use Nortel's intellectual property, including, without limitation, Nortel's Know-how and trade secrets, <u>solely</u> for the purpose of Repairing Nortel products. NNI was entitled to rely on CTDI's representations, and did reasonably rely on these representations. On information and belief, CTDI's representations were knowingly false.

48. Further, CTDI fraudulently obtained proprietary Nortel components, which embody proprietary Nortel intellectual property, under the guise of using these components for authorized repair and refurbishing activity, when in fact CTDI was using these components for the <u>unauthorized</u> manufacture of "new" telephone systems from scratch. In permitting CTDI to obtain such proprietary Nortel components and to gain access to and use proprietary Nortel Know-how, technical information and intellectual property concerning the implementation of these components, Nortel relied on CTDI's representations that it would use such proprietary components and information only for authorized purposes. CTDI's knowing and willful acquisition and use of these components for unauthorized purposes constitutes fraud.

49. CTDI's fraudulent activities have harmed NNI and caused NNI damages in an amount to be established in accordance with proof at trial.

THIRD CAUSE OF ACTION
(Breach of Contract)

50. NNI repeats and realleges each and every allegation set forth in paragraphs 1 through 49 above as if fully set forth herein.

51. As set forth above, CTDI misappropriated Nortel's intellectual property, including its Know-how and trade secrets, beyond the scope of the authorized uses that CTDI was permitted to carry out in accordance with its licenses and agreements with Nortel. Accordingly, CTDI acted outside the scope and protection of any agreement with Nortel.

52. In the alternative, CTDI's use of Nortel's intellectual property, including, without limitation, the Nortel Know-how and proprietary technical information and components, for purposes not permitted by the agreements discussed above, constitutes a breach of those agreements.

53. Further, CTDI improperly sold Nortel Cards into the market, rather than using them to Repair existing Nortel products.

54. NNI has been damaged as a result of CTDI's breaches, and seeks damages in accordance with proof at trial, but in any event sufficient to: (1) compensate it for its actual losses including lost profits resulting from CTDI's breaches, and (2) recover the amount by which CTDI was unjustly enriched as a result of its breaches.

## FOURTH CAUSE OF ACTION
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

55. NNI repeats and realleges each and every allegation set forth in paragraphs 1 through 54 above as if fully set forth herein.

56. As detailed above, in its dealings with NNI, CTDI breached the implied covenant of good faith and fair dealing by using Nortel's intellectual property, including, without limitation, the Nortel Know-how and proprietary technical information and components, for purposes not permitted by the agreements discussed above.

57. NNI has been damaged as a result of CTDI's breach, and seeks damages in an amount in accordance with proof at trial, but in any event sufficient to: (1) compensate it for its actual losses including lost profits resulting from CTDI's breaches, and (2) recover the amount by which CTDI was unjustly enriched as a result of its breach.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

58. NNI repeats and realleges each and every allegation set forth in paragraphs 1 through 57 above as if fully set forth herein.

59. CTDI has been unjustly enriched at the expense of NNI. CTDI's unauthorized use of Nortel's Know-how and trade secrets has conferred benefits upon CTDI. CTDI has appreciated, accepted and retained these benefits, under circumstances that would make it inequitable for CTDI to retain these benefits without paying NNI for their value.

60. Accordingly, NNI seeks recovery of the amount by which CTDI has been unjustly enriched.

WHEREFORE, NNI requests the following relief:

(a) Entry of judgment holding CTDI liable for willful and malicious misappropriation of Nortel's trade secrets, fraud and, in the alternative, breach of contract, breach of the covenant of good faith and fair dealing and unjust enrichment;

(b) An award of damages according to proof, including without limitation NNI's lost profits and amounts by which CTDI has been unjustly enriched, together with prejudgment and post-judgment interest;

(c) An award of exemplary and punitive damages and attorneys' fees in light of the willful and malicious nature of CTDI's misconduct and misappropriation of the Nortel trade secrets; and

(d) Any and all additional legal and equitable relief that may be available under law and that the court may deem proper.

Dated: September 21, 2010

        **BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By:   */s/ Raymond H. Lemisch*
      Raymond H. Lemisch, Esq. (No. 4204)
      222 Delaware Ave., Suite 801
      Wilmington, DE 19801
      302-442-7010 (telephone)
      302-442-7012 (facsimile)
      rlemisch@beneschlaw.com

*Counsel to Nortel Networks Inc.*

OF COUNSEL:

David H. Herrington, Esq.
David Y. Livshiz, Esq.
Emily A. Bussigel, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000 (telephone)
(212) 225-3999 (facsimile)