**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>NORTEL NETWORKS INC., <u>et</u> <u>al</u>.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos.  3832, 3855** |

**OBJECTION BY OSS NOKALVA, INC., TO DEBTORS' MOTION FOR ORDERS  (I) (A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE ASSET SALE AGREEMENT; (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES AND BID PRACTICES; (C) APPROVING THE NOTICE PROCEDURES; (D) APPROVING A SIDE AGREEMENT; (E) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL; AND (F) SETTING A DATE FOR THE SALE HEARING; AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' MULTI-SERVICE SWITCH (FORMERLY KNOWN AS 'PASSPORT') BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT
<u>OF CERTAIN EXECUTORY CONTRACTS</u>**

OSS Nokalva, Inc., the successor in interest to Open Systems Solutions, Inc. ("**OSS**"), by

and through its undersigned counsel, by way of objection to Debtors' Motion for Orders (I) (A)

Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement; (B) Authorizing and

Approving the Bidding Procedures and Bid Practices; (C) Approving the Notice Procedures; (D)

Approving a Side Agreement; (E) Authorizing the Filing of Certain Documents Under Seal; and

(F) Setting a Date for the Sale Hearing; and (II) Authorizing and Approving (A) the Sale of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems, Inc. (9769), Nortel Altsystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA), Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

.
1889285.1

Certain Assets of Debtors Multi-Service Switch (Formerly Known as 'Passport') Business Free and Clear of All Liens, Claims, and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts [Docket No. 3832] (the "**Motion**"), respectfully states and represents:

## PRELIMINARY STATEMENT

1. OSS is a party with Debtor Nortel Networks Inc. ("**NNI**" or "**Debtor**") to certain "Nortel Networks/OSS Corporate-Wide Software License Agreements" (the "**OSS Agreements**")[2]. Pursuant to the OSS Agreements, OSS non-exclusively licenses to NNI OSS software, including, without limitation, source code generated by NNI through use of certain of the OSS software (collectively, the "**OSS Software**"), and such licenses and the OSS Agreements cannot be assigned without OSS' consent.

2. Whether by design or inadvertence, nothing in the Motion, Bidding Procedures, or Stalking Horse Agreement remotely identifies OSS, the OSS Agreements or the OSS Software as integral parts of the sale of the Assets to the stalking horse or a yet-unknown ultimate purchaser. OSS submits, however, the OSS Software is an integral part of the NNI Assets being proposed for sale, as has been the case in other asset sales by NNI in this bankruptcy.

3. Despite that fact, OSS has received no notice, formal or otherwise, that NNI intends to assume and assign the OSS Agreements to a purchaser of the Assets. To the contrary, NNI's counsel and the Motion suggest any assignment of the OSS Agreements will be through separate Notice, although all objections must be filed prior to the Sale Hearing. Because of the

---

[2] Capitalized terms have the meaning ascribed to them in the Motion or OSS Agreements, unless the meaning is otherwise clear from the context of their usage.

nature of NNI's use of the OSS Software, OSS submits it may not be possible to separate the sale of the Assets from the OSS Agreements. Moreover, OSS submits that, in addition to the de facto and unlawful assignment of the OSS Agreements without OSS' consent, the OSS Software may be embedded in the Assets and cannot be used by a purchaser without infringement of OSS' software licenses.

4. OSS does not consent to the assignment of the OSS Agreements or transfer of the OSS Software to any purchaser. Such consents are required by the OSS Agreements and applicable non-bankruptcy law. OSS expressly reserves all rights to take appropriate legal action against persons or entities infringing, or aiding and abetting the infringement of, the OSS Software.

5. Accordingly, OSS respectfully requests that the Court deny approval of the sale of the Assets, as presently proposed.

**BACKGROUND**

A. **The Sale of Debtors' Multi-Service Switch Business**

6. For the past several months, NNI has slowly been selling off various units or divisions of its business. On several prior occasions, NNI's sale of assets included an express assumption and assignment of intellectual property licenses. The Motion does not purport to include an assumption and assignment of licenses. However, the Motion states that NNI is assembling a list of contracts which it may need to assume and assign pursuant to section 365 of the Bankruptcy Code, and that Notice and an opportunity to object prior to the Sale Hearing will be provided to any party whose contract was identified for assumption and assignment. (Motion, ¶¶ 36-60).

7.  Although OSS has not yet received formal Notice that its licenses are to be assumed and assigned, NNI also refuses to provide a definitive answer to OSS' inquiry as to whether NNI intends to assume and assign OSS' licenses.

8.  Currently, NNI is attempting to sell additional pieces of its business, including the sale of certain assets of its Multi-Service Switch ("**MSS**") business that are the subject of the Motion.

9.  In the prior sales of parts of Debtors' business, OSS' Software has been an integral part of those businesses and assets. OSS Software was used by the CDMA and LTE Business that NNI sold to Telefonaktiebolaget LM Ericsson. The OSS' ASN.1 Tools software was part of the Next Generation Serving Packet Core Network Components business, for which NNI previously sought the permission of this Court to sell. OSS Software was also used by the GSM/GSM-R business that NNI sold to Telefonaktiebolaget LM Ericsson and Kapsch CarrierCom AG.

10. Under the terms of the Motion, NNI has identified a stalking horse purchaser and will conduct an auction to determine the highest bidder for the Assets of the MSS Business it proposes to sell. (See Exhibit A to the Motion, the Stalking Horse Agreement). Both the Motion and the Stalking Horse Agreement suggest strongly, albeit obliquely, that the OSS Software is an integral component of the Assets.

11. As set forth in the Motion, the Assets for sale consist of MSS' business which is described as "provid[ing] data networking infrastructure solutions to telecom service providers and large enterprise customers throughout the world. . . .These solutions allow customers to integrate a variety of data, voice and video applications onto a single network and connect users in multiple locations securely, efficiently, and seamlessly over a wide area network. . . . In

addition, the MSS Business supports former Nortel business units sold in prior Nortel asset sales with hardware, software and services. The MSS Business sells its base platform to former Nortel business units, which add hardware and software to drive product development for both the wireless and wireline markets." (Motion, ¶¶17- 10).

12. The transfer of OSS' Software would appear to be a central component of any proposed sale by NNI, including this one.

13. For example, Section 2.1.1 of the Stalking Horse Agreement listing the assets to be sold includes references to intellectual property. In addition, Section 4.5 of the Stalking Horse Agreement deals specifically with the transfer of NNI's intellectual property to the ultimate purchaser.

14. The Stalking Horse Agreement also references a proposed Intellectual Property License Agreement and a proposed Trademark License Agreement although these were not attached to any of the documents electronically filed with the Court; consequently, their terms remain undisclosed and whether they are intended to apply to the OSS Software remains unknown.

15. However, from these sections, it clearly appears that the sale contemplates and requires a transfer of OSS' Software as an integral part of the transfer of NNI's MSS business.

**B. OSS' Agreements with NNI**

16. NNI and OSS entered into the OSS Agreements as of the 25th day of June, 1999. Pursuant to the OSS Agreements, NNI was granted non-exclusive licenses to use the OSS Software. Copies of the OSS Agreements are annexed as Exhibit A.

17. The OSS Software includes software tools, libraries and code that Nortel uses to develop certain products, which products Nortel sells to end users. Nortel has used many copies of the OSS Software since the inception of the OSS Agreements.

18. The OSS Software is OSS' main asset. Substantially all of OSS' business consists of licensing the OSS Software to entities and receiving fees for such licenses.

19. NNI's proposed transfer of the OSS Software to a third party for valuable consideration to NNI would deprive OSS of its license fees and risk, potentially, such third party having the continued use of the OSS Software without having to pay fees to OSS.

20. In addition, OSS has concerns if the OSS Software were to be provided to a competitor of OSS. Presently, it is impossible to know if the ultimate purchaser of the Assets is a competitor of OSS or, arguably, may hold interests adverse to those of OSS.

21. Furthermore, there is a distinct risk that the OSS Software may be transferred to a third party, with which OSS might not agree to contract for various business reasons. Those reasons include, without limitation, such party's use of the OSS Software in a manner that could adversely affect OSS' ownership and intellectual property rights or to a third party located in a foreign jurisdiction that will not enforce OSS' ownership rights with respect to the software. For example, if the transferee were to distribute certain source code provided as part of the software, which distribution is prohibited by the OSS Agreements, this would seriously affect OSS' business. OSS would have to proceed with costly and time consuming litigation to prevent further damage to its rights.

22. The OSS Agreements also authorize NNI to use OSS' trademarks in connection with marketing and distributing the OSS Software or those NNI products that incorporate any of

the OSS Software. A transfer of that right to a third party purchaser - - not approved by OSS - - greatly impairs the value and usefulness of the OSS trademarks.

23. Pursuant to Section 12.4 of the OSS Agreements, NNI's duties and rights under the OSS Agreements with respect to the OSS Software "may not be sold, assigned, sublicensed or otherwise transferred by NNI, in whole or in part, without the prior written consent of OSS."

24. In addition, pursuant to Sections 10.1 and 10.2 of the OSS Agreements, any source code provided by OSS, and source code produced by the use of the OSS Software, are confidential information of OSS and cannot be disclosed by NNI to third parties. Thus, absent OSS' consent, OSS is greatly concerned that NNI may breach these provisions of the OSS Agreements in its negotiations with any potential purchaser. NNI may already have breached these provisions.

25. Furthermore, pursuant to Section 2.1.1 and 4.5 of the proposed Sale Agreement, NNI seeks to both transfer rights to a proposed buyer <u>and</u> to retain certain license privileges and benefits as though no assignment had been made.

26. That is unacceptable to OSS because two parties would have a license to the software though a license fee would only be paid by one party.

## LEGAL BASIS FOR OBJECTION

27. Pursuant to 11 U.S.C. § 365(a) and (f) of the Bankruptcy Code, the trustee, subject to the court's approval, may assume or assign any executory contract or unexpired lease of the debtor. The licenses for the OSS Software, which NNI may, in fact, assume and assign, are executory contracts excluded from the reach of § 365(a) and (f) by the exception in 11 U.S.C. § 365(c)(1). Under § 365(c)(1),

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-
>
> (1) (a) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (b) such party does not consent to such assumption or assignment . . .

28. The Third Circuit adheres to the definition under Countryman of an executory contact as a contract in which "the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." See In re Access Beyond Tech., Inc., 237 B.R. 32, 43 (Bankr. D. Del. 1999) (quoting Countryman, Executory Contracts in Bankruptcy; Part I, 57 Minn. L. Rev. 439, 460 (1973)) (citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989)).

29. This Court has also held that intellectual property licenses, including copyright licenses, are executory contracts within the meaning of 11 U.S.C. § 365(c) under the Countryman definition. See In re Valley Media, Inc., 279 B.R. 105, 135 (Bankr. D. Del. 2002) (copyright license found to be executory contract); In re Golden Books Family Entm't Inc., 269 B.R. 311, 314 (Bankr. D. Del. 2001) ("courts generally have found intellectual property license to be 'executory' within the meaning of section 365(c) because each party to the license had the material duty of 'refraining from suing the other for infringement of any of the [intellectual property] covered by the license'") (terms in brackets included in original); Access Beyond Tech., 237 B.R. at 43-44 (patent license agreement found to be executory contract). Accordingly,

the OSS Agreements for the licensing of OSS Software are executory contracts because they provide for the licensing of OSS' intellectual property to NNI.

30. In accordance with the exception outlined in § 365(c)(1)(a), there is applicable non-bankruptcy law that prohibits the assumption and assignment of non-exclusive intellectual property licenses, like the OSS Agreements. Under the Copyright Act, 17 U.S.C. § 201(d), the owner of a copyright may transfer, by a license or otherwise, in whole or in part, any of the exclusive rights that inure to the benefit of the copyright holder as defined in 17 U.S.C. § 106. Those rights under § 106 include the right to make copies of the copyrighted work, prepare derivative works based on the copyrighted work, and distribute copies of the copyrighted work to the public for sale. Thus, any exercise of these exclusive rights, or any transfers of these rights pursuant to a non-exclusive license, may only be accomplished with the consent of the copyright holder.

31. The Copyright Act recognizes a distinction between exclusive licenses, which transfer all rights of the copyright owner to the extent of the license to the licensee, and non-exclusive licenses, where all rights remain with the licensor. See In re Patient Educ. Media, Inc., 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997) (holding that photographer had granted debtor a nonexclusive license in his copyrighted work, and thus, debtor could not transfer license to purchaser of substantially all of its assets without photographer's consent. Id. at 243). The owner of an exclusive license receives the rights of exclusive ownership of the copyright and may act without the consent of the copyright owner. See Golden Books, 269 B.R. at 319 (Bankr. D. Del. 2001) (holding that copyright law provides a distinction between treatment of exclusive and non-exclusive licenses to copyright material and that copyright law would not prevent assumption and assignment of work held pursuant to an exclusive license).

32.     However, the holder of a non-exclusive license does not possess all of the rights of exclusive ownership of the copyright, and thus, may not take any action with respect to the copyright, including assignment of its license, without the consent of the copyright owner. See Valley Media, 279 B.R. at 135 ("A non-exclusive license of rights by a copyright owner to another party is not assignable by that party without the permission of the copyright holder under federal copyright law since the license represents only a personal and not a property interest in the copyright); Patient Educ. Media, 210 B.R. at 240 ("non-exclusive license is personal to the transferee . . . and the licensee cannot assign it to a third party without the consent of the copyright owner").

33.     Notably, the OSS Agreements between OSS and NNI expressly provide in § 12.4 that "the OSS Software and OSS Generated Source Code may not be sold, assigned, sublicensed or otherwise transferred by Nortel Networks, in whole or in part, without the prior consent of OSS".

34.     Here, the OSS Agreements with NNI clearly set forth in the "LICENSE" section, specifically paragraphs 4.1-4.2, that "[s]ubject to the payment of fees . . . OSS grants Nortel Networks a non-exclusive, worldwide right" to perform various actions outlined in the OSS Agreements with respect to its use of the OSS Software.  (See OSS Agreements at 7).  Thus, there can be no dispute that all NNI possesses are non-exclusive licenses for the use of the OSS Software.

35.     Accordingly, because applicable non-bankruptcy law, here the Copyright Act, prohibits NNI from transferring its non-exclusive licenses in the OSS Software without the consent of OSS, and such consent is denied, NNI may not assume and assign its non-exclusive licenses with OSS as part of this bankruptcy proceeding. See In re Sunterra Corp., 361 F.3d 257,

260, 271 (4th Cir. 2004) (debtor not permitted to assume non-exclusive software license under § 365(c)); <u>Patient Educ. Media</u>, 210 B.R. at 243 (relying on case law concerning non-assignability under bankruptcy and federal law of non-exclusive patent licenses to hold that non-exclusive copyright license could not be assigned pursuant to § 365(c) without copyright owner's consent); <u>Access Beyond Tech.</u>, 237 B.R. at 47 (non-exclusive patent cross-license agreement cannot be assigned pursuant to § 365(c)); <u>Cf.</u> <u>Golden Books</u>, 269 B.R. at 314 (determination as to whether copyright license is assignable under § 365(c) turns on whether license is exclusive or non-exclusive).

36. In addition, under trademark law, the registration of a trademark provides the registrant with the exclusive right to use the mark, <u>see</u> 15 U.S.C. § 1057(b) and § 1115, and any person who uses a trademark without the consent of the trademark registrant can be subject to civil suit for infringement. <u>See</u> 15 U.S.C. § 1114.

37. Trademark law similarly provides that the registrant of a trademark may assign the mark, but such assignment must be by consent or "by instrument in writing duly executed." <u>See</u> 15 U.S.C. § 1060.

38. In § 4.8 of the OSS Agreements, OSS also agrees to permit NNI to use its trademarks in connection with marketing and distributing NNI products, provided, however, that NNI properly identifies OSS as the owner of such trademarks and complies with the instructions of OSS regarding the use of the marks.

39. The courts that have addressed the assumption and assignment of licenses to use trademarks have relied upon cases in the copyright and patent areas to similarly hold that the exception under § 365(c)(1) applies with equal force to prohibit the assignment of trademark licensing agreements. <u>See</u> <u>In re: Wellington Vision, Inc.</u>, 364 B.R. 129, 136 (S.D. Fla. 2007)

(precluding assignment of franchise agreement that provided for right to use trademarks as a license under the Trademark (Lanham) Act and § 365(c) and noting that "a clause against unreasonable withholding of consent is not equivalent to a clause expressly allowing assignment without consent."); In re N.C.P. Marketing Group, Inc., 337 B.R. 230, 237-238 (D. Nev. 2005) (holding that "Because . . . under applicable trademark law, trademarks are personal and non-assignable without the consent of the licensor, the [owners'] trademark would be unassumable as part of the bankruptcy estate of NCP without the [owners'] consent.")

40. Moreover, for § 365(c)(1) to be applicable, not only must non-bankruptcy law prohibit the transfer of the property, but the non-debtor party must withhold its consent. As previously noted, OSS refuses to consent to the assignment of its non-exclusive licenses with NNI under the present terms of the asset sale. OSS may withhold consent to such assignment, not only under the applicable law discussed above, but pursuant to section 12.4 of the OSS Agreements, which provides that "the OSS Software and OSS Generated Source Code may not be sold, assigned, sublicensed or otherwise transferred by Nortel Networks, in whole or in part, without the prior written consent of OSS."

41. Although NNI has requested that this Court approve the sale of certain assets of the Debtor, including the Debtor's non-exclusive licenses to certain patent intellectual property which encompasses the OSS Software, pursuant to § 365(a) and (f) of the Bankruptcy Code, such assignments or transfers cannot take place where the exceptions to § 365(a) and (f), under § 365(c), are applicable. Thus, under the OSS Agreements, relevant bankruptcy law, and applicable non-bankruptcy law, the Debtor should not be permitted to transfer its non-exclusive licenses with OSS without the consent of OSS.

42. In addition, when NNI filed a motion requesting that this Court authorize the sale of its CDMA and LTE, OSS filed a similar objection to the transfer - - even inadvertently - - of Debtors' non-exclusive licenses to the OSS Software without its consent.

43. In response to that objection, this Court approved the following language in the final sale order:

> 34. Nothing in this Order provides for the assumption and assignment of any contract or license with OSS Noklava [sic], Inc., successor to Open System Solutions, Inc. ("OSS") pursuant to section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with OSS relating to the Assets, in whole or in part, the Debtors and Purchaser will do so in accordance with the terms of such contract or license, which terms include, *inter alia*, the written consent of OSS. [D.I. 1205]

44. Identical language to the above was also included in the final sale order for the sale of NNI's CVAS business.

45. Similarly, when NNI filed a motion requesting that this Court authorize the sale of its Next Generation Packet Core network components ("**Next Generation Assets**"), OSS filed a similar objection to the transfer of Debtors' non-exclusive licenses to the OSS Software without its consent.

46. OSS and the Debtors agreed upon the following language which the Court included in its final sale order for the sale of the Next Generation Assets:

> 25. Nothing in this Order provides for the assumption and assignment of any contract or license with Open System Solutions, Inc. ("OSS") pursuant to section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with OSS relating to the Purchased Assets, in whole or in part, the Debtors and Purchaser will do so in accordance with the terms of such contract or license, which terms include, *inter alia*, the written consent of OSS. In addition, nothing in this Order permits or may be construed to permit Purchaser any right to access or to use or to have the right to use OSS' license and/or software in connection with the Assets purchased. [D.I. 1760]

47. Identical language to the above was also included in the final sale order for the sale of NNI's Metro Ethernet Networks Business.

48. Language protecting OSS' intellectual property licenses was also included in the final sale order for NNI's sale of its GSM/GSM-R business.

49. Unfortunately, with each sale, OSS has been forced to re-negotiate such language with NNI. Despite several telephone calls and e-mails to Debtors' counsel in an attempt to negotiate language for the proposed Final Sale Order, NNI has been unresponsive to OSS' negotiation overtures and proposals. In fact, with only two days before the auction, NNI has still not advised OSS as to whether it will agree to the language OSS' proposed for the final sale order, whether NNI intends to propose alternative language, or even whether OSS' licenses are to be assumed and assigned in the Motion. In the absence of any assurances from NNI that it will agree to include proposed language in the final sale order protecting OSS' licenses, OSS has no choice but to file this objection so that it will not be deemed to have waived its objection rights.

50. For the foregoing reasons, similar language to that included in the prior sale orders issued by this Court, specifically the language included in the sale orders for the Next Generation and Metro Ethernet asset sales, is also appropriate in any sale order with respect to the sale of the MSS business by NNI. Such language would serve to protect OSS' interest in its intellectual property, to uphold the terms of the OSS Agreements, and to put potential purchasers on notice of the infringement of the OSS Software.

**CONCLUSION**

For each of the reasons set forth above, OSS respectfully requests entry of an order denying the sale of the Assets to any purchaser under the present terms of the Stalking Horse Agreement.

Dated: September 22, 2010  **POLSINELLI SHUGHART PC**
Wilmington, Delaware

By: */s/ Shanti M. Katona*

Christopher A. Ward (No. 3877)
Shanti M. Katona (No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com

-and-

Robert E. Nies, Esq.
**WOLFF & SAMSON PC**
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey 07052
Phone: (973) 325-1500
Facsimile: (973) 325-1501

*Counsel for OSS Nokalva, Inc.*