# EXHIBIT A

# Nortel Networks/OSS Corporate-Wide Software License Agreement

THIS Agreement is made as of the 25th day of June 1999 (the "Effective Date")

BETWEEN:

> **Nortel Networks Inc.,** a Delaware corporation with offices at 2221 Lakeside Boulevard, Richardson, Texas, 75082 and the Adopting Nortel Networks Companies (collectively referred to as "Nortel Networks")

AND:

> **Open Systems Solutions, Inc.,** a corporation organized and existing under the laws of New Jersey, with offices at 7 Kuhn Street, Somerset, New Jersey 08873-3324 ("OSS").

## 1.    DEFINITIONS

1.1    The terms set forth below are defined as follows.

(a)    "Addendum" shall mean a separate document attached to and referencing this Agreement, which shall contain the details of the license under which the Nortel Networks Development Site named therein is granted the rights to use the OSS Products and derivatives listed therein.

(b)    "Adopting Nortel Networks Companies" means those Nortel Networks Companies (including Affiliates and Subsidiaries, as defined herein) that have signified to NNI their acceptance of, and agreement to be bound by, the terms and conditions of this Agreement by signing the appropriate Addendum attached hereto.

(c)    "Affiliate" shall mean, individually or collectively:

(i)    a Manufacturing Licensee;

(ii)    a joint venture, which is a cooperative business enterprise formed between Nortel Networks and one (1) or more other autonomous entities to address more effectively certain mutual business interests and opportunities; and/or

(iii)    a corporation or other legal entity wherein Nortel Networks, directly or indirectly, owns or controls twenty percent (20%) or more of the shares or other ownership interest in the corporation or legal entity, but for greater certainty does not include NNC's Subsidiaries;

which have been sublicensed as provided herein.

(d) "Agreement" means this agreement including the following Schedules and Addendda attached hereto:

> Schedule "A"  OSS Product Price List
> Schedule "B"  Support Services
> Schedule "C"  End User License Terms
> Schedule "D"  Escrow Agreement
> Addendum for each Business Group or Unit

(e) "Confidential Information" has the meaning ascribed to it in the Article titled "Confidentiality".

(f) "Contractor" means a third party contracted by a Nortel Networks Company or an Affiliate to assist in the development of a Nortel Networks Product.

(g) "Distributor" means a third party which enters into an agreement with Nortel Networks, a Nortel Networks Company, an Affiliate or another Distributor, to lease, sell, sublicense or otherwise distribute Nortel Networks Products.

(h) "Documentation" means the user manuals and other documentation normally supplied with the OSS product, and includes any documentation relating to any Updates.

(i) "End User" means a person who purchases or otherwise acquires any Nortel Networks Product other than for the purpose of resale.

(j) "End User License" means an agreement made with an End User pursuant to which an End User acquires rights to use a Nortel Networks Product.

(k) "Gold Master" means the software provided by OSS to a Nortel Networks Development Site from which such Nortel Networks Development Site shall be able to reproduce the OSS Software. This may be delivered via CD-ROM, ftp, email, or other means as agreed by OSS and the particular Nortel Networks Company in its Addendum.

(l) "Manufacturing Licensee" means a third-party which enters into an agreement with Nortel Networks to manufacture, in modified or unmodified form, Nortel Networks Products and to lease, sell, sublicense or otherwise distribute, directly or indirectly through Distributors, such Nortel Networks Products under Nortel Networks' or the Manufacturing Licensee's own brand name.

(m) "NNI" means Nortel Networks Inc.

(n) "Nortel Networks Company" means NNC and each entity, other than NNI, that is majority owned or controlled, directly or indirectly, by NNC.

(o)     "Nortel Networks Derivative Products" means those Nortel Networks Products that incorporate OSS Generated Object Code and OSS Software and add significant function to the OSS Software which the End User can use without relinking, rebuilding or modification.

(p)     "Nortel Networks Development Site" means the specific Nortel Networks Company site which has executed an Addendum hereto which allows it to utilize for development the OSS Products and derivatives listed in that Addendum. Each Nortel Networks Development Site shall be designated either a "Major" or "Minor" site, which are defined as follows:

    (i)     "Major Site" means a site that is licensed to use the OSS Software to generate "OSS Generated Source Code" and build "OSS Generated Object Code; and

    (ii)    "Minor Site" means a site that is licensed to bundle the OSS Generated Object Code and OSS Libraries into Nortel Networks Products.

If there is no designation, the site is considered to be a "Major" site.

(q)     "Nortel Networks Products" means those products manufactured or distributed by or on behalf of Nortel Networks or an Affiliate, and including any enhancement, modification or evolution of such products.

(r)     "NNC" means Northern Networks Corporation.

(s)     "Object Code" means the code resulting from the translation or processing of Source Code by a computer into machine-readable language or intermediate code and which is suitable for execution or interpretation by a computer.

(t)     "OSS Generated Source Code" means source code generated by the OSS Software.

(u)     "OSS Generated Object Code" means object code generated from the OSS Generated Source Code.

(v)     "OSS Software" means the specific items of computer code received from OSS and listed in each Addendum hereto as being used by the specified Nortel Networks Development Site.

    (i)     "OSS Compiler" means the current software version of the OSS ANS.1 Compiler.

    (ii)    "OSS Dynamic Link Libraries" means the OSS Runtime Libraries.

    (iii)   "OSS Runtime Libraries" means libraries.

    (iv)    "OSS Static Libraries" means the OSS Runtime Libraries.

(w) "OSS Product Price List" shall mean OSS's published U.S. price list document, attached hereto as Schedule A, as may be modified pursuant to the provisions hereof.

(x) "Residuals" has the meaning ascribed to it in the Article titled "Confidentiality".

(y) "Specifications" means the specifications, functionality, operating characteristics and performance criteria for the specific OSS Software set forth in any requirements document issued by any Nortel Networks Company to OSS prior to the date of this Agreement, or in any user manuals, documentation or brochures published by OSS which relate to the OSS Software, including those set forth in any documentation or materials supplied with the OSS Software and including any of the foregoing which relate to any Update except to the extent they import a lower standard of functionality or performance.

(z) "Source Code" means the OSS Software and associated Documentation and materials in forms where the program logic is readily understandable by a human being.

(aa) "Subsidiary" shall mean any corporation or other legal entity in which NNC or OSS directly or indirectly owns and controls, and continues to own and control, fifty percent (50%) or more of the shares or other ownership interest entitled to elect the Board of Directors or its equivalent. Each NNC Subsidiary shall be deemed to be a party to, and be bound by the terms of this Agreement upon electing to exercise any rights hereunder.

(bb) "Support Services" means the services described in Schedule "B" hereto.

(cc) "Term" as used herein shall be perpetual, beginning on the Effective Date and remaining in force unless terminated in accord with the article titled *"Term and Termination"*.

(dd) "Trial Period" means the period commencing upon delivery of the OSS Software or any Updates thereto to a Nortel Networks Development Site and ending upon acceptance of such OSS Software or Updates by such Nortel Networks Development Site in accord with the provisions of Article 3 hereunder.

(ee) "Update" means any new version, revision, enhancement, bug fixes, correction or replacement of any of the OSS Software for the platform(s) used by Nortel Networks. By way of clarification, a product of OSS which is a replacement for any of the OSS Software shall be included in the scope of the definition of Update, but if OSS markets a new and distinct product along with and in addition to the OSS Software, then for so long as OSS continues to do so, such new and distinct product of OSS shall be treated as being outside the scope of the definition of Update.

(ff) "Warranty Period" means the twelve (12) month period following the end of the Trial Period for the OSS Software.

## 2.    DELIVERY, PRICE AND PAYMENT

2.1    Within ten (10) days following the Effective Date of this Agreement or the applicable Addendum, and thereafter during the Term, upon the general release of any Update, OSS shall provide a Gold Master copy of the OSS Software to each Nortel Networks Development Site.

2.2    The fees payable by each Nortel Networks Development Site to OSS for OSS Software shall be the fees specified in the OSS Price List. Each Nortel Networks Development Site will pay the fees in U.S. dollars as set forth on an invoice received from OSS within 45 days of issuance.

2.3    No additional license fees or royalties shall be payable for OSS Software pursuant to Section 4 of this Agreement. Without limiting the generality of the foregoing, no license fees or royalties shall be payable in the event that:

(a) any Nortel Networks Derivative Product or any update of a Nortel Networks Derivative Product is provided to an End User licensed to use the Nortel Networks Derivative Product; or

(b) the OSS Software and OSS Generated Object Code embedded in Nortel Networks Derivative Products are transferred from one End User to another in conjunction with the transfer of a Nortel Networks Derivative Product; or

(c) copies of the OSS Software are made for backup or archival purposes.

2.4    If additional licenses of the OSS Software are required by any new or existing Nortel Networks Development Site, such Nortel Networks Development Site will be able to order additional licenses, pursuant to this Agreement, at the price quoted in the then published *OSS Product Price List* as attached hereto as Schedule A. OSS shall be entitled to increase the license fee payable hereunder to an amount not to exceed the standard list price for similarly situated customers, upon prior written notice to Nortel Networks. Any such additional license shall be memorialized in an Addendum hereto

2.5    Fees for Support Services for the additional licenses shall be made available to each Nortel Networks Development Site pursuant to Section 2.6 and Section 2.7 of this Agreement.

.2.6    Nortel Networks shall, at the direction of each Nortel Networks Development Site, withhold any applicable withholding tax from payments made to OSS pursuant to this Agreement. To assist OSS in obtaining any tax credits for the amounts withheld, such Nortel Networks Development Site shall promptly provide OSS with such evidence as may be reasonably required by the applicable taxing authorities to establish that such withholding tax has been paid. Subject to the provisions immediately preceding in this paragraph, Nortel Networks, at the direction of each Nortel Networks Development Site shall pay all taxes and duties associated with this Agreement, other than taxes based on OSS's income.

2.7     OSS may issue an invoice to each Nortel Networks Development Site which orders Support Services hereunder commencing upon the expiration of the Warranty Period for the initial OSS Software delivered hereunder, and on each anniversary of such date thereafter. Payment shall be net forty-five (45) days from the later of: (i) the date referred to in the preceding sentence, or (ii) the date of receipt of the invoice therefor by such Nortel Networks Development Site. Any Nortel Networks Development Site shall be entitled to discontinue Support Services for any OSS Software at any time upon written notice to OSS, and shall be entitled to extend the Support Services beyond the number of years indicated in each Addendum, as agreed by the parties. The annual fees for Support Services are set forth in the appropriate Addendum.

2.8     In the event that OSS increases its list price for Support Services charged to its customers generally, then by giving at least sixty (60) days prior written notice, OSS shall be entitled to increase the support fees payable hereunder effective on the next anniversary of the Agreement by an amount not to exceed the standard list price for similarly situated customers.

## 3.     ACCEPTANCE

3.1     Following delivery of any Updates or any parts of them, each Nortel Networks Development Site receiving such Updates shall have a period of sixty (60) days ("Trial Period") to conduct such tests as it considers appropriate to determine whether such Updates conform to the applicable Specifications. Within Trial Period each Nortel Networks Development Site shall:

    (a)     notify OSS that it has accepted the Update; or

    (b)     notify OSS that it has rejected the Update; or

    (c)     request OSS to rectify all deficiencies in the Update, in which case OSS shall use reasonable efforts to rectify the deficiencies in a timely manner, and until such time as the Nortel Networks Development Site receiving such Update in writing, Nortel Networks shall be entitled to: (i) reject the Update; or (ii) to notify OSS that it accepts the Update with such deficiencies.

3.2     In the event that the Nortel Networks Development Site receiving Updates fails to provide a notice as provided in section 3.1 above, OSS shall be entitled to provide such Nortel Networks Development Site with a notice specifying that unless such Nortel Networks Development Site has provided a notice of a deficiency within fifteen (15) days of receipt of the notice, such Nortel Networks Development Site shall be deemed to have accepted the Update.

3.3     In no event shall acceptance of any Update by any Nortel Networks Development Site constitute a waiver of its right to have any non-conformity of the Update to the Specifications for such Update corrected in accord with the terms of any warranty or Support Services hereunder.

## 4.    LICENSE

4.1    Subject to the payment of fees in respect of the creation and distribution of Nortel Networks Derivative Products as outlined in each Addendum, OSS grants to Nortel Networks a non-exclusive, worldwide right:

(a)    to copy the OSS Software for backup and archiving;

(b)    to use, copy and distribute specified portions of the OSS Software, OSS Generated Source Code and OSS Generated Object Code internally within the Nortel Networks Company to which that copy was issued (and not generally within Nortel) for internal productive purposes and in connection with the development, manufacture, distribution, support and internal use of Nortel Networks Derivative Products;

(c)    to copy and incorporate all or portions of OSS Software and OSS Generated Object Code into Nortel Networks Derivative Products;

(d)    to distribute and sublicense portions of the OSS Software as part of Nortel Networks Derivative Products where the use of the Nortel Networks Derivative Products would add significant functions to other portions of the OSS Software and is a final product which the End User would use without relinking, rebuilding or modification;

(e)    to make copies of portions of the OSS Software and OSS Generated Object Code as reasonably necessary for distribution to End Users in connection with the distribution of Nortel Networks Derivative Products; and

(f)    to sublicense to End Users, directly or indirectly, pursuant to the End User License, the right to use those portions of the OSS Software and OSS Generated Object Code, and to copy such portions of the OSS Software and OSS Generated Object Code in connection with the use and installation of Nortel Networks Derivative Products and for backup and archival purposes.

4.2    Subject to the payment of fees in respect of the creation and distribution of Nortel Networks Derivative Products as outlined in each Addendum, OSS grants to Nortel Networks a non-exclusive, worldwide right to perform the actions specified, under the circumstances specified, in that Addendum.

4.3    Provided Nortel Networks has obtained prior written consent from OSS, Nortel Networks shall be permitted to sublicense any of the rights granted to it pursuant to Paragraphs 4.1(d) through 4.1(f) of this Agreement to Affiliates, provided that Nortel Networks shall take reasonable steps to ensure that each Affiliate executes a written agreement containing provisions reasonably necessary to protect OSS's intellectual property rights in OSS Software and OSS Generated Object Code.

4.4    Distributors appointed hereunder shall be entitled to exercise the rights granted to Nortel Networks pursuant to subsections 4.1(d) to 4.1(f) above.

4.5    The End User License shall contain, in substance, the provisions set forth in Schedule C or such other provisions as Nortel Networks deems appropriate provided that Nortel Networks shall be liable for damages incurred by OSS as a result of Nortel Networks' failure to include any of the provisions set forth in Schedule C.

4.6    Nortel Networks shall not de-compile, disassemble or otherwise reverse-engineer the OSS Software or any portion thereof;

4.7    Nortel Networks agrees to compile OSS Generated Source Code into OSS Generated Object Code prior to any external distribution and that Nortel Networks will ensure that in distributing a Nortel Networks Derivative Product, Nortel Networks does not disclose the application program interface (API) to the OSS Software contained therein;

4.8    Nortel Networks shall be permitted, but not obligated, to use OSS's trademarks in connection with marketing and distribution of OSS Generated Object Code, OSS Software or Nortel Networks Derivative Products incorporating any of OSS Generated Object Code or OSS Software, provided Nortel Networks identifies the ownership of such trademarks and complies with OSS's reasonable instructions regarding the use of the same.

4.9    Each Nortel Networks Development Site shall be entitled to provide specified portions of the OSS Software, OSS Generated Source Code and OSS Generated Object Code to Contractors to assist in the development of Nortel Networks Products and Nortel Networks Derivative Products provided that such Nortel Networks Development Site shall first enter into a written agreement with the Contractor which requires that:

(a)    the Contractor use the OSS Software only at the licensed Nortel Networks Development Site;

(b)    the Contractor use the OSS Software, OSS Generated Source Code and OSS Generated Object Code exclusively for the benefit of Nortel Networks; and

(c)    the Contractor shall incur the same obligations with respect to the use of the OSS Software, OSS Generated Source Code and OSS Generated Object Code as those incurred by Nortel Networks under this Agreement;

4.10    Except for the rights granted under this Agreement and subject to Nortel Networks' rights herein, OSS (or its third party suppliers) shall retain all right, title and interest to the OSS Software and OSS Generated Source Code, excluding any portion of OSS Generated Object Code which contains any derivatives created by or for the benefit of Nortel Networks or any Affiliate. Such derivatives shall be owned by Nortel Networks.

4.11    Nortel Networks shall not export or re-export any OSS Software, without the appropriate United States government or any other government licenses and/or permits or without the prior written consent of OSS. OSS shall advise Nortel Networks of any export restrictions applicable to OSS Software.

4.12    Any copy of OSS Software or OSS Generated Source Code made hereunder shall include the copyright notice attributing ownership of the copyright rights in OSS Software or OSS Generated Source Code to OSS, in the same manner as on any copies delivered to Nortel Networks hereunder or be labeled substantially as follows: "© [year] Northern Telecom and its licensors".

## 5.    SUPPORT AND SOURCE CODE ESCROW

5.1    For so long as any Nortel Networks Development Site elects to obtain Support Services from OSS and provided that such Nortel Networks Development Sites have paid the applicable support fee specified in the applicable Addendum, OSS shall provide Support Services to such Nortel Networks Development Sites in accord with the provisions of Schedule B and the applicable Addendum if the Addendum has support provisions in addition to or in replacement of specific provisions of Schedule B. The parties agree that no support fees are payable by any Nortel Networks Development Site during the initial twelve (12) months following delivery of the OSS Software to such Nortel Networks Development Site, or at any time while OSS is in breach of any support obligations.

5.2    At all times while any Nortel Networks Development Site is entitled to receive support hereunder OSS shall, at no charge, provide to such Development Site a copy of any Update as soon as it becomes commercially available.

5.3    OSS agrees that at all times while any Nortel Networks Development Sites have paid the appropriate fees for Support Services, for a period not to exceed five (5) years after the release date, OSS shall provide Support Services as requested by such Nortel Networks Development Sites, including but not limited to bug fixes, for that release.

5.4    OSS agrees that, promptly upon request from Nortel Networks, Nortel Networks and OSS shall enter into a source code escrow agreement with Data Securities International, Inc. ("DSI"), a form of which herein is attached as Schedule D, or another escrow agent reasonably acceptable to the parties, on terms and conditions substantially similar to those contained in DSI's then current "Preferred Escrow Agreement" pursuant to which all Source Code, the "make files" used to develop the OSS Software, and the internal design documents for the OSS Software shall be placed in escrow for the benefit of Nortel Networks.

    5.4.1    Nortel Networks shall pay the fees due to DSI or other escrow agent for the establishment and maintenance of the escrow, and failure to pay these fees shall not be a release condition.

    5.4.2    In the event that Nortel Networks receives the Source Code, Nortel Networks shall be entitled to use, copy and modify the Source Code as reasonably necessary to support OSS Software.

## 6.    REPRESENTATIONS AND WARRANTIES

6.1   <u>Performance Warranties</u>. OSS represents and warrants for so long as any Nortel Networks Development Site is entitled to receive Support Services hereunder, the OSS Software and any Updates thereto shall comply with and shall perform substantially in accord with the Specifications.

6.2   <u>Additional Warranties</u>. OSS represents and warrants for so long as Nortel Networks or any End User has any right to use any of OSS Software:

(a)   that OSS has the right to grant the rights granted under this Agreement and that in its performance of this Agreement and the provision of any services hereunder it shall not infringe any patent, copyright, trademark, trade secret or other proprietary right of any third person;

(b)   that the use, copying and/or distribution of the OSS Generated Source Code, OSS Generated Object Code and those portions of the OSS Software specified in each Addendum, as permitted hereunder, shall not infringe any patent, copyright, trademark, trade secret or other proprietary right of any third person, and that OSS is not aware of any claim or allegation to the contrary;

(c)   that, if OSS provides any media on which the OSS Software or any part of it is supplied, such media shall be free from defects in materials and workmanship for a period of ninety (90) days after delivery;

(d)   that the OSS Software contains no viruses, time limiting codes, "dongles" or authorization strings, except as identified in writing to Nortel Networks prior to the date of this Agreement, and further excepting that the parties acknowledge that the OSS Software will contain a hardware key that is shipped with the OSS Software and which limits the execution of the OSS Software to one (1) PC or one (1) server at any Nortel Networks Development Site at any one time, and that this hardware key has no time limit;

(e)   that the Documentation shall completely and accurately describe the operation and functionality of the OSS Software in a reasonably organized and coherent manner;

(f)   that any services provided by OSS under this Agreement, shall be provided in a timely manner by qualified and competent personnel knowledgeable in OSS Software.

6.3   <u>Year 2000 Compliance</u>. As long as the Nortel Networks supplied "ASN.1 message" file that Nortel Networks passes through the OSS Software is Year 2000 compliant, OSS represents and warrants that by January 1, 1998, and thereafter for so long as Nortel Networks or any End User has any right to use any of the OSS Software and OSS Generated Source Code pursuant to Section 4 of this Agreement, the OSS Software and OSS Generated Source Code provided pursuant to this Agreement, when used in accord with Documentation, shall (a) process date and time related data without causing any processing interruptions, abnormal

terminations, or changes in performance characteristics, and (b) shall process and manipulate all date and time related functions correctly. Without limiting the generality of the foregoing, the OSS Software and OSS Generated Source Code shall:

(a)     correctly handle date and time related data before, during and after January 1, 2000, including but not limited to accepting date input, providing date output, and performing ongoing operations on dates and portions of dates including, but not limited to, calculating, comparing and sequencing of dates (in both forward and backward operations spanning century boundaries);

(b)     correctly handle leap year calculations (including but not limited to identification of leap years, interval calculations, day-in-year calculations, day-of-the-week calculations and week-of-the-year calculations);

(c)     correctly handle all two digit date and time related input in a manner that resolves ambiguity as to century in a disclosed, defined and predetermined manner; and

(d)     correctly store, retrieve and provide output of all date and time data in a manner that is unambiguous as to century.

6.4     OSS shall immediately notify Nortel Networks of any and all date-related bugs, errors or deficiencies in the OSS Software and OSS Generated Source Code. For the purpose of problem resolution, any such date related bugs, errors or deficiencies shall be deemed to be bugs, errors or deficiencies of the highest priority level, and shall be resolved according to the procedures provided for such priority level.

6.5     EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTIES, REPRESENTATIONS OR CONDITIONS, EXPRESS OR IMPLIED, TO THE OTHER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THERE ARE NO WARRANTIES OR CONDITIONS OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

## 7.     LIMITATION OF LIABILITY

7.1     Except for the indemnification provided in the Article titled *"Indemnification"* and claims arising from either party's breach of its confidentiality obligations set out in the Article titled *"Confidentiality"*, either party's liability for damages under this Agreement (whether in contract or tort) shall not exceed the amount paid by Nortel Networks to OSS hereunder.

7.2     IN NO EVENT SHALL OSS, NORTEL NETWORKS, ANY AFFILIATE, DISTRIBUTOR OR END USER, OR ANY EMPLOYEE OR AGENT OF ANY OF THE FOREGOING BE LIABLE FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES (EXCEPT AS STATED IN PARAGRAPH 8.1, BELOW), REGARDLESS OF THE CAUSE AND WHETHER ARISING IN CONTRACT, (INCLUDING FUNDAMENTAL BREACH), TORT (INCLUDING NEGLIGENCE), OR OTHERWISE. NORTEL NETWORKS HOLDS THE BENEFITS OF THIS SECTION IN TRUST

FOR ITS AFFILIATES, DISTRIBUTORS AND END USERS, AND ANY EMPLOYEES OR AGENTS OF ANY OF THE FOREGOING OR NORTEL NETWORKS.

## 8.    INDEMNIFICATION

8.1    OSS shall indemnify, defend and hold Nortel Networks, any Affiliate, and Distributor, End User, and any employee or agent of any of the foregoing harmless against any claims, damages, settlements or expenses (including reasonable legal fees) arising in connection with any claim or allegation that the use, copying or distribution of the OSS Software, OSS Generated Source Code, and OSS Generated Object Code, infringes any patent, copyright, trademark or other intellectual property right of any person.

8.2    In the event that the use, copying or distribution of any OSS Software, OSS Generated Source Code, and/or OSS Generated Object Code is or is reasonably likely to be enjoined, OSS shall, at its option and expense, obtain for Nortel Networks, and any Affiliates, Distributors and End Users the rights to use, copy and distribute as applicable, OSS Software, OSS Generated Source Code and/or OSS Generated Object Code as the case may be; or repair or replace such OSS Software, OSS Generated Source Code and/or OSS Generated Object Code so that they are non-infringing, while maintaining compliance with all of the provisions of this Agreement, whereupon such replacement shall be deemed the OSS Software, OSS Generated Source Code, and/or OSS Generated Object Code for the purposes of this Agreement.

8.3    In the event that the use, copying or distribution of the OSS Software, OSS Generated Source Code and/or OSS Generated Object Code is enjoined and OSS has failed to obtain rights to such OSS Software, OSS Generated Source Code and/or OSS Generated Object Code or repair or replace the OSS Software, OSS Generated Source Code and/or OSS Generated Object Code so that they are non-infringing, as provided in section 8.2, OSS shall promptly refund to Nortel Networks all amounts paid by Nortel Networks to OSS hereunder in respect of the OSS Software to which the injunction applies.

8.4    Nortel agrees to indemnify OSS against any claim by an End User that the Nortel Products have caused any harm, whether financial or otherwise, to the End User. Nortel agrees that it shall bear the sole responsibility for resolving such claims, and OSS agrees that it shall take no part in such settlement or defense against any claim. However, if the problem is traceable to the OSS Software, then OSS shall promptly provide such support to the End User or Nortel as otherwise provided in this Agreement.

## 9.    TERM AND TERMINATION

9.1    This Agreement shall become effective on the Effective Date and has a perpetual term. Termination must be affirmative, in writing and as described below.

9.2    OSS shall be entitled to terminate the Addendum of any Nortel Networks Development Site upon sixty (60) days written notice to Nortel Networks if such Nortel Networks Development Site is in breach of its payment obligations hereunder, (other than any payment obligation

which is the subject of a reasonable dispute) unless Nortel Networks cures the breach within such sixty (60) day period. OSS shall also be entitled to terminate this Agreement upon the filing of any petition under the Bankruptcy Code by or against Nortel Networks, unless such petition is dismissed within sixty (60) days, upon any assignment for the benefit of creditors of Nortel Networks, or upon dissolution of Nortel Networks.

9.3    OSS shall have the right to terminate this Agreement immediately, upon written notice to Nortel Networks, if Nortel Networks breaches the section titled *"Confidentiality,"* and shall have the right to immediately and unilaterally seek any judicial remedy it deems necessary to protect itself from further breach of the section titled *"Confidentiality"*. Should Nortel Networks respond in writing within ten (10) days that the alleged breach did not occur, the Agreement may continue as the parties may at that time agree or while the issue is being addressed by a court or in mediation. If Nortel Networks has breached the section titled *"Confidentiality,"* it shall be liable to OSS for all damages reasonably attributable to such breach, whether direct or indirect, and including attorneys' fees and costs incurred by OSS in the prosecution of such breach.

9.4    Nortel Networks shall be entitled to terminate this Agreement at any time upon written notice to OSS.

9.5    Any Nortel Networks Development Sites may terminate their Addendum (Addenda) at any time upon written notice to OSS, which termination shall not affect this Agreement nor any other Addendum (Addenda) signed by any other Nortel Networks Development Site.

9.6    Upon termination of this Agreement by either party for any reason, the OSS Software shall be destroyed or erased prior to the disposal of a copy or partial copy, and the original media may be returned to OSS at the request of OSS. This shall not apply in the case of termination of any related or underlying agreement, such as for Support Services pursuant to Section 2.6, but shall only apply when the Agreement itself is terminated. If the parties agree otherwise in writing at the time of termination, OSS may waive this paragraph and allow Nortel Networks to retain the original media and its copies of the OSS Software.

9.7    In the case of Nortel Networks Products or Nortel Networks Derivative Products distributed to any End User, all rights to use the OSS Generated Object Code and any portion of the OSS Software, granted to such End User, and the right of Nortel Networks to use and copy the OSS Generated Object Code and OSS Software, shall survive termination of this Agreement, unless the termination is for breach of the section entitled *"Confidentiality"* as detailed in paragraph 9.3, above, in which case OSS may demand that Nortel Networks terminate all licenses with End Users and recall and destroy all Nortel Networks Derivative Products, or make such other compensation to OSS for the breach as OSS deems will minimize the damages it has or will incur due to the breach.

9.8    In addition to this Article, the Articles titled "Representations and Warranties", "Limitation of Liability", "Indemnification", and "Confidentiality" shall survive termination of this Agreement.

## 10. CONFIDENTIALITY

10.1 "Confidential Information" shall mean any Source Code provided under this Agreement by OSS or produced by use of the OSS Software, or mean any information disclosed by any party which, at the time of disclosure or within ten (10) days thereafter, is designated by the disclosing party in writing as "Confidential".

10.2 Confidential Information shall not be used, disclosed or copied except as reasonably necessary in connection with the performance of any obligations or the exercise of any rights hereunder. Each party shall take reasonable care to prevent the unauthorized use, dissemination or publication of the Confidential Information belonging to the other party. Use of the Source Code or other Confidential Information, not including the OSS Software, at an additional Nortel Networks Development Site shall not be considered a breach of this paragraph, but may result in an additional license at the appropriate cost for such use at that Nortel Networks Development Site.

10.3 Confidential Information does not include Residuals, as defined below, or information which:

   (a) was known by the receiving party prior to disclosure, as evidenced by its business records;

   (b) is or becomes in the public domain other than through a breach of this or any similar Agreement;

   (c) was disclosed to the receiving party by a third party provided that such third party, to the knowledge of the receiving party is not in breach of any obligation of confidentiality owed to the disclosing party;

   (d) is independently developed by the receiving party, as evidenced by its business records.

10.4 Neither party shall be liable for disclosure of any Confidential Information when such disclosure is required by law provided that the disclosing party shall provide prompt notice to the disclosing party, where possible prior to the disclosure and shall cooperate with the disclosing party in an effort to minimize the scope of the information to be disclosed.

10.5 For the purposes hereof the term "Residuals" shall mean any concepts or ideas embodied in any Confidential Information which is retained in non-tangible form (i.e., without reference to any material which is written, stored in magnetic, electronic or physical form or otherwise fixed) by any person entitled to have access to such Confidential Information hereunder. Notwithstanding the foregoing, Residuals do not include information protected by copyright, patent or integrated circuit topography legislation.

## 11.   NOTICES

Any and all notices or other information to be provided by one party to another shall be in writing and shall be deemed sufficiently given when forwarded by prepaid registered or certified first-class mail, facsimile transmission or hand delivery to the other party at the following address:

If to Nortel Networks:

> Nortel Networks Corporation
> 2305 Mission College Boulevard
> Santa Clara, California 95052-8173
> Attn: Sr. Manager, Enterprise Licensing

with a copy to:

> Nortel Networks Corporation
> 2221 Lakeside Blvd.
> Richardson, Texas 75082-4399
> Attn: Law Department

If to OSS:

> Open Systems Solutions, Inc.
> 7   Kuhn Street
> Somerset, New Jersey 08873-3324
> Attention: Mr. Conrad Sigona

or such other address as such other party may designate by giving thirty (30) days prior written notice. Such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or delivered by hand.

## 12.   GENERAL

12.1   The Agreement may be executed in one or more counterparts, each of which shall constitute one and the same instrument.

12.2   No party shall use the name of the other in any advertising, brochures, public relations or media release without the prior written consent of the other.

12.3    With the prior written consent of the other party, such consent not to be unreasonably withheld, either party shall have the right to assign or transfer on a limited basis due to merger to acquisition of the Nortel Networks Company, or transfer of the entire project to another Nortel Networks location, and primarily to other Nortel Networks Development Sites, this Agreement provided that the assigning party shall remain responsible for performance of its obligations hereunder.

12.4    With respect to Nortel Networks' duties and rights under this Agreement, except as set forth specifically in this Agreement the OSS Software and OSS Generated Source Code may not be sold, assigned, sublicensed or otherwise transferred by Nortel Networks, in whole or in part, without the prior written consent of OSS.

12.5    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives.

12.6    This Agreement constitutes the entire agreement between the parties and supersedes all other agreements between the parties concerning the subject matter herein. This Agreement may only be modified by an instrument in writing signed by each party's duly authorized signatories.

12.7    This Agreement shall be governed by the laws of the state of New York, except for the choice-of-law and jurisdictional portions thereof.


IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

NORTEL NETWORKS INC.

Authorized Signature

PRESIDENT  EAS  W. Fotheergill
Printed Name and Title

OPEN SYSTEMS SOLUTIONS INC.

Authorized Signature

CONRAD SIGONA
Printed Name and Title
VICE PRESIDENT

NORTEL
NETWORKS
How the world shares ideas.

APPROVED AS TO LEGAL FORM
• 30 JUNE 1999 •

## OPEN SYSTEMS SOLUTIONS, INC.
7 KUHN STREET, SOMERSET, NEW JERSEY 08873-3324  USA
TEL 732-249-5107 TOLL FREE 1-888-OSS-ASN1 FAX 732-249-4636

### SCHEDULE A

## Product Price Sheet

| OSS ASN.1 Tools | | | |
|---|---|---|---|
| Platform | Full Development License | Compiler-Only License | Runtime-Only License |
| MS-DOS | $11,500 | $8,625 | $2,875 |
| Macintosh | --- | --- | 3,375 |
| Windows 95, NT, OS/2 | 13,500 | 10,125 | 3,375 |
| PC UNIXs(e.g., SCO, Solaris x86, BSD, Linux, UnixWare) | 16,000 | 12,000 | 4,000 |
| Embedded Systems | | | |
| common types | --- | --- | 6,250 |
| uncommon or proprietary types | --- | --- | 9,750 |
| Workstations (e.g., Solaris, HP-UX, AIX, DecUNIX, DG-UX) | 25,000 | 18,750 | 6,250 |
| Minicomputers (e.g., OS400) | 35,000 | 26,250 | 8,750 |
| Mainframes (e.g., MVS, Cray) | --- | --- | 11,625 |

Product Evaluations (30 day)                              1% of the applicable single copy price

Annual Maintenance (after the first year)
    most platforms                                 15% of the applicable single copy price
    embedded platforms                             25% of the applicable single copy price

Additional Copies of the Same Platform:   2nd copy   75% of the applicable single copy price
    3rd copy   50% of the applicable single copy price
    4th copy   35% of the applicable single copy price
    5th copy   20% of the applicable single copy price
    6th and up - no charge

Networked Copy                             same as the price for two copies

Courses in ASN.1 (customized 1-4 days, held at customer's site)
    1st day          $2,500.

## SCHEDULE "B"

### Support Services

OSS shall provide all Support Services required to ensure that all OSS Software continue to perform in accord with the applicable Specifications and all warranties set forth in the Agreement, including the services set forth below.

### B1. **Definitions**

B1.1 Except as otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Agreement.

"Critical Problem" shall mean a Problem that renders a Nortel Networks Product unusable or inoperative, whether in whole or part, substantially or minimally. Critical Problems include, without limitation, significant reduction in capacity, any loss of safety or emergency capability, loss of the ability to perform automatic reconfiguration, loss of billing capability, corruption of billing data or their databases that require connective actions which affect service, loss of access to maintenance or recovery operations, or inability to provide Critical Problem or Major Problems notifications.

"Major Problem" shall mean a Problem that affects the service or operation of a Nortel Networks Product. Major Problems include, without limitation, any reduction in capacity, any loss of functional visibility or diagnostic capability, any loss of routine administrative activity, any significant degradation of the system's ability to provide maintenance or recovery operations, any significant degradation of ability to provide Critical Problem or Major Problem notification, any significant increase in related End User trouble reports, and any corruption of the system's billing databases that do not require corrective actions which affect services.

"Minor Problem" shall mean any Problem, that is not a Critical or Major Problem, that affects the service or operation of a Nortel Networks Product.

"Permanent Solution" shall mean a resolution to a Problem that causes the Product to conform substantially with the Specifications, and restores the service and operation of the affected Nortel Networks Product without any loss of functionality.

"Problem Report" shall have the meaning ascribed to it in section B2.1 hereof.

"Problem" shall mean a Critical Problem, Major Problem or Minor Problem which is due to non-conformance of the OSS Software with the Specifications.

"Work Around" shall mean a temporary resolution to a Problem that restores the service and operation of the affected Nortel Networks Product without any loss of functionality. A Work Around may consist of a patch or instructions on how to avoid the problem. A Work Around

shall be capable of being deployed, without interruption of service or operation, in a Nortel Networks Product operating in an End User's network.

## B2.    Technical Support Services

B2.1    For each request by a Nortel Networks Development Site for technical support from OSS, such Nortel Networks Development Site shall provide OSS with a description ("Problem Report") of the Problem encountered and, where possible, will include a description of how to repeat the condition which brought about the Problem and such diagnostic information as is available.  A Problem Report shall include a priority level as determined by Nortel Networks.

B2.2    Upon notification by any Nortel Networks Development Site of a Problem, OSS shall use all commercially reasonable efforts to provide a Work Around or Permanent Solution.  In the case of a Critical Problem or a Major Problem, OSS shall work continuously (including outside regular business hours) until a Work Around or Permanent Solution is successfully implemented.

B2.3    If a Permanent Solution is developed, but such Permanent Solution cannot be deployed in a Nortel Networks Product operating in an End User's network without affecting service or operation, OSS shall provide a Work Around to the applicable Nortel Networks Development Site.  OSS agrees to provide a Work Around or a Permanent Solution (subject to the restrictions described in the preceding sentence) as soon as possible following notification by the Nortel Networks Development Site of the Problem and in any event: (a) within five (5) calendar days in the case of a Critical Problem; (b) within fourteen (14) calendar days in the case of a Major Problem; and (c) within thirty (30) calendar days in the case of a Minor Problem.

B2.4    The parties acknowledge the potentially idiosyncratic nature of any Problem. Failures to meet these targeted times shall not constitute breaches of this Agreement unless these targeted times are met less than 95% of the time in any period of more than thirty (30) days.

B2.5    OSS agrees to provide on-site services in response to a Critical Problem or Major Problem when requested by Nortel Networks provided that Nortel Networks shall reimburse OSS for travel expenses that are preapproved by Nortel Networks and incurred in connection with such on-site services. If the problem is not attributable to the OSS Software, but is due to hardware or other items outside the control of OSS, Nortel Networks shall also pay to OSS the sum of $1,000.00 per day for each day on which on-site support is provided.

B2.6    Where OSS has provided a Work Around hereunder in response to any Problem, OSS agrees to deliver a Permanent Solution to Nortel Networks in OSS's next regularly scheduled Update.

## B3.    Communications

B3.1    OSS shall identify each outstanding issue relating to a Problem Report with a unique "Case Number" for tracking purposes.  Upon request by Nortel Networks, OSS shall provide a "Status Report" listing the following information:

    (a)    all known bugs, errors or deficiencies in the OSS Software;

    (b)    any resolutions or fixes;

    (c)    any available Work Arounds.

B3.2    For Problems which have been resolved, the Status Report shall include the Case Number, a description of the Permanent Solution, or where a Work Around has been implemented, the expected date that a Permanent Solution will be released and a description of the Work Around. For Problems that have not yet been resolved, the Status Report shall include the Case Number, a problem resolution plan, and a description of the Work Around (if determined).

B3.3    If, in any Update, OSS modifies or removes existing software interfaces, relative to the immediately preceding Update, OSS shall provide a written description of such changes to the Nortel Networks Development Site at least ninety (90) days prior to the initial release of the Update in which they are incorporated.  OSS shall make reasonable efforts to provide documented porting tools which will facilitate the conversion of the existing OSS Software to the new or modified software interfaces.

B3.4    OSS shall provide unlimited telephone support through the number (732) 249-5107 to the Nortel Networks Development Site on issues relating to any OSS Software twenty-four hours per day, seven days a week.  OSS's telephone support service shall be properly staffed by qualified technical representatives with a detailed working knowledge of the OSS Software. The parties may augment these communications with the use of facsimile transmission and electronic mail. The email address for support is: support@oss.com

B3.5    The parties shall use reasonable efforts to establish security measures for the electronic exchange of Problem Reports and other information. If Nortel Networks requires that a communication be encrypted, OSS will comply by using an encryption technology agreed upon between Nortel Networks and OSS. If Nortel Networks and OSS cannot agree upon the encryption technology to be used, then neither Nortel Networks nor OSS will transmit such electronic communication.

## B4.    Update

B4.1    OSS shall provide Updates to Nortel Networks Development Sites, at no additional charge, within ten (10) days of the date on which any Update is provided to any third party.

B4.2    OSS shall provide, with every Update, a written description of the changes included in that Update. This description shall also include a description of the purpose or reason for releasing the Update. Every Update shall be accompanied by written installation instructions.

B4.3    OSS shall provide Support Services for each Update for as long as any Nortel Networks Development Site purchases OSS Support Services.

B4.4.   OSS will perform one (1) to two (2) days of integration/regression testing on any Update prior to release to Nortel Networks. OSS will provide at least one test case to confirm correct Update installation. Nortel Networks may elect to have OSS reduce the amount of integration/regression testing for a Critical Problem with a Nortel Networks Derivative Product. OSS will enhance its regression test suite based on Nortel Networks providing OSS with Nortel Networks' use of the OSS Product if Nortel Networks makes a request to do so. Nortel Networks will inform OSS if the information provided for the regression testing is confidential and proprietary to Nortel Networks.

## END USER LICENSE

## SCHEDULE "C"

End User License Terms:

(a)    prohibit use of the OSS Generated Object Code and OSS Software for any purpose outside the scope of Nortel Networks Products;

(b)    prohibit causing or permitting the reverse engineering, disassembly or decompilation of the OSS Generated Object Code and OSS Software;

(c)    provide that title to the OSS Generated Object Code and OSS Software does not pass to the End User;

(d)    provide that Nortel Networks' suppliers shall not be liable for consequential damages; and

(e)    require, at the termination of the sublicense, to discontinue use and destroy or return the OSS Generated Object Code and OSS Software.

### SCHEDULE "D"

## PREFERRED ESCROW AGREEMENT

Account Number _____

This Agreement is effective _____, 1999 among Data Securities International, Inc. ("DSI"), Open Systems Solutions Inc. ("Depositor") and _Northern Telecom Inc. ("Preferred Beneficiary"), who collectively may be referred to in this Agreement as "the parties."

A.    Depositor and Preferred Beneficiary have entered or will enter into a license agreement, development agreement, and/or other agreement regarding certain proprietary technology of Depositor (referred to in this Agreement as "the license agreement").

B.    Depositor desires to avoid disclosure of its proprietary technology except under certain limited circumstances.

C.    The availability of the proprietary technology of Depositor is critical to Preferred Beneficiary in the conduct of its business and, therefore, Preferred Beneficiary needs access to the proprietary technology under certain limited circumstances.

D.    Depositor and Preferred Beneficiary desire to establish an escrow with DSI to provide for the retention, administration and controlled access of the proprietary technology materials of Depositor.

E.    The parties desire this Agreement to be supplementary to the license agreement pursuant to 11 United States [Bankruptcy] Code, Section 365(n).

### ARTICLE 1 -- DEPOSITS

1.1    <u>Obligation to Make Deposit.</u>  Upon the signing of this Agreement by the parties, Depositor shall deliver to DSI the proprietary information and other materials ("deposit materials") required to be deposited by the license agreement or, if the license agreement does not identify the materials to be deposited with DSI, then such materials will be identified on an Exhibit A.  If Exhibit A is applicable, it is to be prepared and signed by Depositor and Preferred Beneficiary.  DSI shall have no obligation with respect to the preparation, signing or delivery of Exhibit A.

1.2    <u>Identification of Tangible Media.</u>  Prior to the delivery of the deposit materials to DSI, Depositor shall conspicuously label for identification each document, magnetic tape, disk, or other tangible media upon which the deposit materials are written or stored.  Additionally, Depositor shall complete Exhibit B to this Agreement by listing each such tangible media by the item label description, the type of media and the quantity.  The Exhibit B must be signed

by Depositor and delivered to DSI with the deposit materials. Unless and until Depositor makes the initial deposit with DSI, DSI shall have no obligation with respect to this Agreement, except the obligation to notify the parties regarding the status of the deposit account as required in Section 2.2 below.

1.3     Deposit Inspection. When DSI receives the deposit materials and the Exhibit B, DSI will conduct a deposit inspection by visually matching the labeling of the tangible media containing the deposit materials to the item descriptions and quantity listed on the Exhibit B. In addition to the deposit inspection, Preferred Beneficiary may elect to cause a verification of the deposit materials in accord with Section 1.6 below.

1.4     Acceptance of Deposit. At completion of the deposit inspection, if DSI determines that the labeling of the tangible media matches the item descriptions and quantity on Exhibit B, DSI will date and sign the Exhibit B and mail a copy thereof to Depositor and Preferred Beneficiary. If DSI determines that the labeling does not match the item descriptions or quantity on the Exhibit B, DSI will (a) note the discrepancies in writing on the Exhibit B; (b) date and sign the Exhibit B with the exceptions noted; and (c) provide a copy of the Exhibit B to Depositor and Preferred Beneficiary. DSI's acceptance of the deposit occurs upon the signing of the Exhibit B by DSI. Delivery of the signed Exhibit B to Preferred Beneficiary is Preferred Beneficiary's notice that the deposit materials have been received and accepted by DSI.

1.5     Depositor's Representations. Depositor represents as follows:

a.      Depositor lawfully possesses all of the deposit materials deposited with DSI;

b.      With respect to all of the deposit materials, Depositor has the right and authority to grant to DSI and Preferred Beneficiary the rights as provided in this Agreement;

c.      The deposit materials are not subject to any lien or other encumbrance;

d.      The deposit materials consist of the proprietary information and other materials identified either in the license agreement or Exhibit A, as the case may be; and

e.      The deposit materials are readable and useable in their current form or, if the deposit materials are encrypted, the decryption tools and decryption keys have also been deposited.

1.6     Verification. Preferred Beneficiary shall have the right, at Preferred Beneficiary's expense, to cause a verification of any deposit materials. A verification determines, in different levels of detail, the accuracy, completeness, sufficiency and quality of the deposit materials. If a verification is elected after the deposit materials have been delivered to DSI, then only DSI, or at DSI's election an independent person or company selected and supervised by DSI, may perform the verification.

1.7     Deposit Updates. Unless otherwise provided by the license agreement, Depositor shall update the deposit materials within 60 days of each release of a new version of the

product which is subject to the license agreement. Such updates will be added to the existing deposit. All deposit updates shall be listed on a new Exhibit B and the new Exhibit B shall be signed by Depositor. Each Exhibit B will be held and maintained separately within the escrow account. An independent record will be created which will document the activity for each Exhibit B. The processing of all deposit updates shall be in accord with Sections 1.2 through 1.6 above. All references in this Agreement to the deposit materials shall include the initial deposit materials and any updates.

1.8     Removal of Deposit Materials.   The deposit materials may be removed and/or exchanged only on written instructions signed by Depositor and Preferred Beneficiary, or as otherwise provided in this Agreement.

## ARTICLE 2 – CONFIDENTIALITY AND RECORD KEEPING

2.1     Confidentiality.  DSI shall maintain the deposit materials in a secure, environmentally safe, locked facility which is accessible only to authorized representatives of DSI. DSI shall have the obligation to protect reasonably the confidentiality of the deposit materials. Except as provided in this Agreement, DSI shall not disclose, transfer, make available, or use the deposit materials. DSI shall not disclose the content of this Agreement to any third party. If DSI receives a subpoena or other order of a court or other judicial tribunal pertaining to the disclosure or release of the deposit materials, DSI will immediately notify the parties to this Agreement. It shall be the responsibility of Depositor and/or Preferred Beneficiary to challenge any such order; provided, however, that DSI does not waive its rights to present its position with respect to any such order. DSI will not be required to disobey any court or other judicial tribunal order. (See Section 7.5 below for notices of requested orders.)

2.2     Status Reports.  DSI will issue to Depositor and Preferred Beneficiary a report profiling the account history at least semi-annually. DSI may provide copies of the account history pertaining to this Agreement upon the request of any party to this Agreement.

2.3     Audit Rights.   During the term of this Agreement, Depositor and Preferred Beneficiary shall each have the right to inspect the written records of DSI pertaining to this Agreement. Any inspection shall be held during normal business hours and following reasonable prior notice.

## ARTICLE 3 – GRANT OF RIGHTS TO DSI

3.1     Title to Media.  Depositor hereby transfers to DSI the title to the media upon which the proprietary information and materials are written or stored. However, this transfer does not include the ownership of the proprietary information and materials contained on the media such as any copyright, trade secret, patent or other intellectual property rights.

3.2     Right to Make Copies.  DSI shall have the right to make copies of the deposit materials as reasonably necessary to perform this Agreement. DSI shall copy all copyright, nondisclosure, and other proprietary notices and titles contained on the deposit materials onto

any copies made by DSI. With all deposit materials submitted to DSI, Depositor shall provide any and all instructions as may be necessary to duplicate the deposit materials including but not limited to the hardware and/or software needed.

3.3    Right to Transfer Upon Release. Depositor hereby grants to DSI the right to transfer the deposit materials to Preferred Beneficiary upon any release of the deposit materials for use by Preferred Beneficiary in accord with Section 4.5. Except upon such a release or as otherwise provided in this Agreement, DSI shall not transfer the deposit materials.

## ARTICLE 4 -- RELEASE OF DEPOSIT

4.1    Release Conditions. As used in this Agreement, "Release Conditions" shall mean the following conditions which include but is not limited to:

a.    Depositor's failure to carry out obligations imposed on it pursuant to the Nortel Networks/OSS Corporate-Wide Software License Agreement;

b.    Depositor's failure to continue to do business in the ordinary course;

c.    Depositor is the subject of a petition or assignment in bankruptcy under applicable bankruptcy laws or other similar laws;

d.    Depositor files a notice of intention to make a proposal under any applicable bankruptcy or other similar laws (including laws related to corporate restructuring or reorganization);

e.    Depositor is subject to the appointment of a trustee, custodian, receiver, or receiver-manager of itself or of any substantial part of its assets;

f.    A consistent and material failure or refusal (which failure or refusal has been the subject of a notice in writing to Depositor that its continued failure or refusal would cause Nortel Networks to invoke its rights under this Agreement seven (7) days after the receipt by Depositor of such notice) to:

  (i)    Depositor Products as required pursuant to the Nortel Networks/OSS Corporate-Wide Software License Agreement;

  (ii)    provide Technical Support in accord with the provisions of the Software License Agreement or any corresponding support agreement; or

    provide any other services that Depositor is obliged to provide under the Nortel Networks/OSS Corporate-Wide Software License Agreement that are likely to result in a substantial and material negative impact on Nortel Networks' business or the services that it provides to its End Users;

g.    Depositor makes an assignment, or enters into an arrangement with or for the general benefit of its creditors; or

h.    Depositor ceases to carry on normal business operations.

4.2    <u>Filing For Release</u>.  If Preferred Beneficiary believes in good faith that a Release Condition has occurred, Preferred Beneficiary may provide to DSI written notice of the occurrence of the Release Condition and a request for the release of the deposit materials. Upon receipt of such notice, DSI shall provide a copy of the notice to Depositor, by certified mail, return receipt requested, or by commercial express mail.

4.3    <u>Contrary Instructions</u>.  From the date DSI mails the notice requesting release of the deposit materials, Depositor shall have ten business days to deliver to DSI Contrary Instructions. "Contrary Instructions" shall mean the written representation by Depositor that a Release Condition has not occurred or has been cured.  Upon receipt of Contrary Instructions, DSI shall send a copy to Preferred Beneficiary by certified mail, return receipt requested, or by commercial express mail.  Additionally, DSI shall notify both Depositor and Preferred Beneficiary that there is a dispute to be resolved pursuant to the Dispute Resolution section (Section 7.3) of this Agreement.  Subject to Section 5.2, DSI will continue to store the deposit materials without release pending (a) joint instructions from Depositor and Preferred Beneficiary; (b) resolution pursuant to the Dispute Resolution provisions; or (c) order of a court.

4.4    <u>Release of Deposit</u>.  If DSI does not receive Contrary Instructions from the Depositor, DSI is authorized to release the deposit materials to the Preferred Beneficiary or, if more than one beneficiary is registered to the deposit, to release a copy of the deposit materials to the Preferred Beneficiary.  However, DSI is entitled to receive any fees due DSI before making the release.  This Agreement will terminate upon the release of the deposit materials held by DSI.

4.5    <u>Right to Use Following Release</u>.  Unless otherwise provided in the license agreement, upon release of the deposit materials in accord with this Article 4, Preferred Beneficiary shall have the right to use the deposit materials for the sole purpose of continuing the benefits afforded to Preferred Beneficiary by the license agreement.  Preferred Beneficiary shall be obligated to maintain the confidentiality of the released deposit materials.


ARTICLE 5 – TERM AND TERMINATION

5.1    <u>Term of Agreement</u>.  The initial term of this Agreement is for a period of one year. Thereafter, this Agreement shall automatically renew from year-to-year unless (a) Depositor and Preferred Beneficiary jointly instruct DSI in writing that the Agreement is terminated; or (b) the Agreement is terminated by DSI for nonpayment in accord with Section 5.2.  If the deposit materials are subject to another escrow agreement with DSI, DSI reserves the right, after the initial one year term, to adjust the anniversary date of this Agreement to match the then prevailing anniversary date of such other escrow arrangements.

5.2     Termination for Nonpayment. In the event of the nonpayment of fees owed to DSI, DSI shall provide written notice of delinquency to all parties to this Agreement. Any party to this Agreement shall have the right to make the payment to DSI to cure the default. If the past due payment is not received in full by DSI within one month of the date of such notice, then DSI shall have the right to terminate this Agreement at any time thereafter by sending written notice of termination to all parties. DSI shall have no obligation to take any action under this Agreement so long as any payment due to DSI remains unpaid.

5.3     Disposition of Deposit Materials Upon Termination.     Upon termination of this Agreement by joint instruction of Depositor and Preferred Beneficiary, DSI shall destroy, return, or otherwise deliver the deposit materials in accord with Depositor's instructions. Upon termination for nonpayment, DSI may, at its sole discretion, destroy the deposit materials or return them to Depositor. DSI shall have no obligation to return or destroy the deposit materials if the deposit materials are subject to another escrow agreement with DSI.

5.4     Survival of Terms Following Termination. Upon termination of this Agreement, the following provisions of this Agreement shall survive:

    a.     Depositor's Representations (Section 1.5);

    b.     The obligations of confidentiality with respect to the deposit materials;

    c.     The rights granted in the sections entitled Right to Transfer Upon Release (Section 3.3) and Right to Use Following Release (Section 4.5), if a release of the deposit materials has occurred prior to termination;

    d.     The obligation to pay DSI any fees and expenses due;

    e.     The provisions of Article 7; and

    f.     Any provisions in this Agreement which specifically state they survive the termination or expiration of this Agreement.

## ARTICLE 6 — DSI'S FEES

6.1     Fee Schedule. DSI is entitled to be paid its standard fees and expenses applicable to the services provided. DSI shall notify the party responsible for payment of DSI's fees at least 90 days prior to any increase in fees. For any service not listed on DSI's standard fee schedule, DSI will provide a quote prior to rendering the service, if requested.

6.2     Payment Terms. DSI shall not be required to perform any service unless the payment for such service and any outstanding balances owed to DSI are paid in full. All other fees are due upon receipt of invoice. If invoiced fees are not paid, DSI may terminate this Agreement in accord with Section 5.2. Late fees on past due amounts shall accrue at the rate of one and one-half percent per month (18% per annum) from the date of the invoice.

## ARTICLE 7 -- LIABILITY AND DISPUTES

7.1     <u>Right to Rely on Instructions</u>.  DSI may act in reliance upon any instruction, instrument, or signature reasonably believed by DSI to be genuine.  DSI may assume that any employee of a party to this Agreement who gives any written notice, request, or instruction has the authority to do so.  DSI shall not be responsible for failure to act as a result of causes beyond the reasonable control of DSI.

7.2     <u>Indemnification</u>.  DSI shall be responsible to perform its obligations under this Agreement and to act in a reasonable and prudent manner with regard to this escrow arrangement.  Provided DSI has acted in the manner stated in the preceding sentence, Depositor and Preferred Beneficiary each agree to indemnify, defend and hold harmless DSI from any and all claims, actions, damages, arbitration fees and expenses, costs, attorney's fees and other liabilities incurred by DSI relating in any way to this escrow arrangement.

7.3     <u>Dispute Resolution</u>.  Any dispute relating to or arising from this Agreement shall be resolved by arbitration under the Commercial Rules of the American Arbitration Association. Unless otherwise agreed by Depositor and Preferred Beneficiary, arbitration will take place in San Diego, California, U.S.A. Any court having jurisdiction over the matter may enter judgment on the award of the arbitrator(s).  Service of a petition to confirm the arbitration award may be made by First Class mail or by commercial express mail, to the attorney for the party or, if unrepresented, to the party at the last known business address.

7.4     <u>Controlling Law</u>.  This Agreement is to be governed and construed in accord with the laws of the State of California, without regard to its conflict of law provisions.

7.5     <u>Notice of Requested Order</u>.  If any party intends to obtain an order from the arbitrator or any court of competent jurisdiction which may direct DSI to take, or refrain from taking any action, that party shall:

a.      Give DSI at least two business days' prior notice of the hearing;

b.      Include in any such order that, as a precondition to DSI's obligation, DSI be paid in full for any past due fees and be paid for the reasonable value of the services to be rendered pursuant to such order; and

c.      Ensure that DSI not be required to deliver the original (as opposed to a copy) of the deposit materials if DSI may need to retain the original in its possession to fulfill any of its other duties.

## ARTICLE 8 -- GENERAL PROVISIONS

8.1     <u>Entire Agreement</u>.  This Agreement, which includes the Exhibits described herein, embodies the entire understanding among the parties with respect to its subject matter and supersedes all previous communications, representations or understandings, either oral or written.  No amendment or modification of this Agreement shall be valid or binding unless

signed by all the parties hereto, except that Exhibit A need not be signed by DSI, Exhibit B need not be signed by Preferred Beneficiary and Exhibit C need not be signed.

8.2    Notices.    All notices, invoices, payments, deposits and other documents and communications shall be given to the parties at the addresses specified in the attached Exhibit C. It shall be the responsibility of the parties to notify each other as provided in this Section in the event of a change of address. The parties shall have the right to rely on the last known address of the other parties. Unless otherwise provided in this Agreement, all documents and communications may be delivered by First Class mail.

8.3    Severability.    In the event any provision of this Agreement is found to be invalid, voidable or unenforceable, the parties agree that unless it materially affects the entire intent and purpose of this Agreement, such invalidity, voidability or unenforceability shall affect neither the validity of this Agreement nor the remaining provisions herein, and the provision in question shall be deemed to be replaced with a valid and enforceable provision most closely reflecting the intent and purpose of the original provision.

8.4    Successors.    This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the parties.  However, DSI shall have no obligation in performing this Agreement to recognize any successor or assign of Depositor or Preferred Beneficiary unless DSI receives clear, authoritative and conclusive written evidence of the change of parties.

Depositor
By:

Name:

Title:

Date:

Preferred Beneficiary
By:

Name:

Title:

Date:

Data Securities International, Inc.

By:

Name:

Title:

Date:

**EXHIBIT A**

**MATERIALS TO BE DEPOSITED**

Account Number _____

Depositor represents to Preferred Beneficiary that deposit materials delivered to DSI shall consist of the following:

| | |
|---|---|
| _____ | _____ |
| Depositor | Preferred Beneficiary |
| By: | By: |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |

## EXHIBIT B

## DESCRIPTION OF DEPOSIT MATERIALS

Depositor Company Name _____
Account Number _____

### PRODUCT DESCRIPTION:
Product Name _____ Version _____
Operating System _____
Hardware Platform _____

### DEPOSIT COPYING INFORMATION:
Hardware required: _____
Software required: _____

### DEPOSIT MATERIAL DESCRIPTION:

Qty
Description of Each Separate Item

Media Type & Size_____ Label

_____ (excluding documentation)

Disk 3.5" or _____

DAT tape _____mm

CD-ROM

Data cartridge tape _____

TK 70 or _____ tape

Magnetic tape _____

Documentation

Other _____

I certify for Depositor that the above described _____ DSI   has
inspected and accepted the above
deposit materials have been transmitted to DSI: _____ materials
(any exceptions are noted above):

Signature _____          Signature _____
Print Name_____          Print Name_____
Date _____               Date Accepted _____
                                       Exhibit B# _____

Send materials to: DSI, 9555 Chesapeake Dr. #200, San Diego, CA 92123

**EXHIBIT C**

**DESIGNATED CONTACT**

Account Number _____

Notices, deposit material returns and communications to Depositor should be addressed to:

Invoices to Depositor should be addressed to:

Company Name:_____
Address:_____

_____

Designated Contact:_____
Telephone:_____
Facsimile:_____

Contact:_____

_____

Notices and communications to Preferred Beneficiary should be addressed to:

Invoices to Preferred Beneficiary should be addressed to:

Company Name:_____
Address:_____

_____

Designated Contact:_____
Telephone:_____
Facsimile:_____

Contact:_____

_____

Requests from Depositor or Preferred Beneficiary to change the designated contact should be given in writing by the designated contact or an authorized employee of Depositor or Preferred Beneficiary.

Contracts, deposit materials and notices to DSI should be addressed to:

Invoice inquiries and fee remittances to DSI should be addressed to:

DSI
Contract Administration
Suite 200
9555 Chesapeake Drive
San Diego, CA 92123

DSI
Accounts Receivable
Suite 1450
425 California Street
San Francisco, CA 94104

Telephone: (619) 694-1900
Facsimile:   (619) 694-1919

(415) 398-7900
(415) 398-7914

Date:_____

©1983, 1996 DSI P96v1