## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
:
In re:                                                : **Chapter 11**
:
**NORTEL NETWORKS, INC.,** *et al.*,                  : **Case No. 09-10138 (KG)**
                                                      : **(Jointly Administered)**
                        **Debtors.**                  : Hearing Date:  September 30, 2010 at 10:00 a.m.
                                                      : Objection Deadline: September 22, 2010 at 4:00 p.m.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x   Related Docket Nos. 3832, 3855

### AT&T'S LIMITED OBJECTION TO DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES AND BID PROTECTIONS, (C) APPROVING THE NOTICE PROCEDURES AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) APPROVING A SIDE AGREEMENT, (E) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (F) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' MULTI-SERVICE SWITCH (FORMERLY KNOWN AS 'PASSPORT') BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS

AT&T Services, Inc. ("AT&T Services"), on its own behalf and as agent on behalf of

AT&T Mobility LLC and its subsidiaries and affiliates (collectively, "AT&T"), hereby files this

limited objection (the "Objection") to the Debtors' Motion for Orders (i)(a) Authorizing Debtors'

Entry into the Stalking Horse Asset Sale Agreement (the "APA"), (b) Authorizing and

Approving the Bidding Procedures and Bid Protections, (c) Approving the Notice Procedures

and the Assumption and Assignment Procedures, (d) Approving a Side Agreement, (e)

Authorizing the Filing of Certain Documents Under Seal and (f) Setting a Date for the Sale

Hearing, and (ii) Authorizing and Approving (a) the Sale of Certain Assets of Debtors' Multi-

Service Switch (formerly known as 'Passport') Business Free and Clear of all Liens, Claims and

Encumbrances and (b) the Assumption and Assignment of Certain Executory Contracts, August

27, 2010 (the "Sale Motion") and in support thereof states as follows:

## BACKGROUND

A.    *The AT&T Contracts*

1.       As of the commencement of these cases, AT&T and the Debtors were party to

several contracts whereby AT&T purchases Nortel equipment and services for use in AT&T's

telecommunications network, among other things.

2.       With respect to the MMS Business, the Debtors and AT&T are parties to the

following agreements: (i) Global Supply and Services Contract No. R11796A, as amended,

and/or supplemented, and including all agreements, work statements or similar documents issued

thereunder or pursuant to, between BellSouth Corporation and Nortel (the "Global Supply

Contract"), (ii) Supplemental Agreement for ATM Equipment, made pursuant to the Global

Supply Contract, as amended, and/or supplemented, and including all agreements, work

statements or similar documents issued thereunder or pursuant to (the "Global Supply

Supplement"), and (iii) Letter Agreement Regarding ESSP Cap Solution, No. 200900107, as

amended, and/or supplemented, and including all agreements, work statements or similar

documents issued thereunder or pursuant to, between AT&T Mobility LLC and Nortel (the

"ESSP Letter Agreement", together with the Global Supply Contract and the Global Supply

Supplement, the "AT&T Contracts").[1]

3.       The ESSP Letter Agreement provides that Nortel will provide AT&T with an

Extended Service and Support Plan (the "ESSP") under the terms of the ESSP Letter Agreement.

The ESSP Letter Agreement and the Global Supply Supplement (collectively, the "Supplemental

Agreements") are both supplements to the Master Sales Agreement, between Nortel and

---

[1] To the extent Nortel and/or AT&T locate any additional contracts that relate to the MSS Business, AT&T's
objection applies to those contracts as well.

Cingular Wireless, LLC[2], dated November 1, 2001 (the "Cingular Master Agreement", together with the Global Supply Contract, the "Master Agreements") and the Global Supply Contract, respectively. The Supplemental Agreements incorporate the corresponding Master Agreements. The Master Agreements and the related Supplemental Agreements are considered one integrated contract pursuant to their terms.

4.     Under the AT&T Contracts, the Debtors indemnify AT&T against, among other things, any damages or losses caused by the products, or as a result of claims for copyright infringement made by third parties against AT&T (collectively, the "Indemnification Provisions"). The Indemnification Provisions are essential to the AT&T Contracts because by using and/or reselling Nortel equipment to AT&T customers, AT&T, among other things, may expose itself to liability should a claim be asserted against AT&T on account of the Nortel equipment. In addition, under the AT&T Contracts, Nortel provides warranties for the Nortel equipment and is required to send technicians to service and upgrade Nortel products in addition to providing services related to the warranties on such products (collectively, the "Warranty Provisions" and, together with the Indemnification Provisions, the "Indemnification/Warranty Provisions"). The Warranty Provisions are also essential to the AT&T Contracts because AT&T needs Nortel to provide these services for the Nortel equipment.[3]

5.     In addition to the Indemnification/Warranty Provisions, there are other relevant provisions that are important to consider in the context of assuming and assigning the AT&T Contracts. For example, the Debtors are required to provide AT&T with training and certain other services. The Purchaser would be required to meet all these past and ongoing obligations to ensure that these services are provided in a seamless manner.

---

[2] Cingular changed its name to AT&T Mobility LLC ("AT&T Mobility").
[3] The Indemnification/Warranty Provisions (as defined above) related to the ESSP Letter Agreement are contained in the Cingular Master Agreement. As discussed herein, the ESSP Letter Agreement incorporates the terms of the Cingular Master Agreement.

*B.*    *The Sale Motion*

6.    On August 27, 2010, the Debtors filed the Sale Motion. Pursuant to the Sale Motion, the Debtors propose to sell certain assets related to the Debtors' Multi-Service Switch business (the "MSS Business") to PSP Holdings LLC (the "Purchaser") for a base purchase price of $39,000,000 million in cash, subject to certain escrows and net working capital adjustments, among other adjustments, subject to higher and better offers (the "Sale"). On September 1, 2010, the Court entered an order approving bidding procedures, setting the sale hearing and establishing the deadlines for parties to object to the Sale.

7.    In the Sale Motion, the Debtors seek to assume and assign certain executory contracts to the Purchaser pursuant to Section 365 of the Bankruptcy Code (the "Assigned Contracts"). However, the Purchaser is not assuming all liabilities under the Assigned Contracts, but rather, is only assuming the "Assumed Liabilities," which includes, among other things, "liabilities arising after the Closing Date to the extent related to the operation of the MSS Business by the Stalking Horse Purchaser following the Closing. . . [and liabilities arising from the performance of Assigned Contracts after the Closing Date...." Sale Motion at p. 12. Thus, the APA provides that the Purchaser shall assume and become responsible for, "all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof) . . . after the Closing Date...." APA at §2.1.3.

8.    Consistent with the Sale Motion and the APA, the proposed order approving the Sale Motion (the "Proposed Order") provides that "[u]pon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities." Proposed Order at p. 17. Although the Purchaser is not assuming all the liabilities arising from the executory contracts, the Proposed Order provides that, "[u]pon Closing... no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or

related to, the period before Closing with respect to the Assumed and Assigned Contracts…" <u>Id.</u> at p. 14.

## OBJECTION

9.      As of the date of this Objection, AT&T has not received a notice of assumption and assignment of the AT&T Contracts. However, since the AT&T Contracts relate to the MSS Business, AT&T anticipates that the Debtors will seek to assume and assign such contracts to the Purchaser. Accordingly, AT&T is filing this limited objection to preserve its rights in the event that the Debtors propose such assignment.

10.      In that scenario, AT&T objects to the extent that the final executed APA provides that AT&T's rights under the Indemnification/Warranty Provisions along with all of the other contractual provisions are not assumed by the Purchaser.[4] In particular, the APA could be read to preclude AT&T from asserting a claim for indemnity against the Purchaser if such claim relates to events that occurred prior to the Closing Date (even if the claim was not asserted against AT&T until after the Closing Date). As discussed below, this is not permissible under Section 365, and the AT&T Contracts would need to be assumed and assigned in their entirety without limiting AT&T's rights under any of the contractual provisions, including the Indemnification/Warranty Provisions. In addition, AT&T must be provided with adequate assurance of future performance that its bargained for rights will be protected.[5]

11.      AT&T also objects to the extent that the Debtors are attempting to pick and choose certain AT&T Contracts without assuming the corresponding agreements entered thereunder with respect to the MSS Business. The Master Agreements and the related

---

[4] This includes any unfulfilled obligations that have arisen under the AT&T Contracts.
[5] AT&T previously filed objections to Nortel's sale of its Enterprise Business to Avaya, Inc., its MEN Business to Ciena, Inc. and its GSM Business to Ericsson, Inc. based on Nortel's attempt to effect a partial assumption and assignment to the respective purchasers (the "<u>AT&T Objections</u>"). <u>See</u> Docket Nos. 1432, 1848 & 2007.

Supplemental Agreements constitute single integrated agreements which must be assumed and assigned in their entirety.

A.    *The Purchaser Must Be Responsible under all Indemnification/Warranty Provisions*

12.    It is black letter law that a debtor assumes a contract under Section 365 of the Bankruptcy Code *cum onere*—with all of its benefits and burdens.   NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984); In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007). As stated by the Third Circuit,

> Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder … 'The [debtor] … may not blow hot and cold.  If he accepts the benefits he must adopt the burdens.  He cannot accept one and reject the other'… The *cum onere* rule 'prevents the [bankruptcy] estate from avoiding obligations that are an integral part of an assumed agreement.'

Fleming, 499 F.3d at 308 (citations omitted).   Similarly, a debtor seeking to assign a contract under Section 365 must also assign the contract in whole with all the benefits and burdens.  Id. at 308 ("'an assignment is intended to change only who performs an obligation, not the obligation to be performed'") (citing Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001); see also In re Morande Enters., Inc., 335 B.R. 188, 192 (Bankr. M.D. Fla. 2005) ("The Debtor cannot assume and assign the contract in part, under either § 365 or the Florida Dealer Law, but must do so in whole, including the Location Provision"); In re Cajun Elec. Power Co-Op., Inc., 230 B.R. 693, 710 (Bankr. M.D. La. 1999) ("The rule that an executory contract must be assumed or assigned in toto has been recognized on several occasions by the Fifth Circuit... an executory contract must be assumed or assigned in its entirety….").

13.    Among the reasons that a contract must be assigned in its entirety under Section 365 is that the debtor will be relieved of its obligations under the contract pursuant to Section 365(k).  Therefore, the assignee must assume all the obligations so that the counterparty's rights are protected.  The Third Circuit addressed the issue of whether a party can make a partial

assignment under Section 365 in <u>American Flint Glass Workers Union v. Anchor Resolution Corp.</u>, 197 F.3d 76 (3d Cir. 1999). In <u>American Flint</u>, the debtor objected to proofs of claim filed under collective bargaining agreements that had been assumed and assigned to the purchaser of the debtor's assets. The bankruptcy court found that the debtor was relieved of liability under Section 365(k), and therefore, the claims could not be asserted against the debtor. The Third Circuit reversed, holding that an assignment under Section 365 did not take place because the contracts at issue were not assigned with all of the benefits and burdens:

> In the bankruptcy context, however, Code § 365(k) changes the common law rule by effecting a novation by operation of law whether or not the obligee consents to the substitution.... But consistent with the basic concept of a contract's assignment, under which every contractual assignee takes the entire bundle of rights and obligations under the contract, such a forced novation is dependent on just such a total undertaking by the assignee. Code § 365(k) (emphasis added) provides: Assignment by the trustee to an entity *of a contract* or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

> Where Congress uses legal terms that have "accumulated settled meaning" under common law, it must be presumed (unless of course the statute dictates otherwise) that Congress meant to employ that established meaning.... Hence we construe the terms in Code § 365(k) to incorporate the general common law of assignments. In particular, we will follow the dominant consensus of common law jurisdictions, rather than the law of any particular jurisdiction....

> That dominant consensus conforms to the clear meaning of the language involved: that an assignment of a contract as such involves a commitment by the assignee to perform all obligations under the contract, as well as to acquire all rights created by the contract.

<u>Id.</u> at 80-81 (finding the debtor was still liable because the contract was not assigned in its entirety); <u>cf.</u> <u>In re Allegheny Health</u>, 383 F.3d 169 (3d Cir. 2004) (union could not assert post-closing indemnification claim against buyer of assets because such assets were not assumed by the buyer and *union failed to object to the sale*). Thus, a debtor cannot assign a contract under Section 365 unless the assignee assumes all the obligations.

14.     In this case, the Debtors are seeking to assume and assign the contracts under

Section 365 and are seeking to be relieved of all liability after such assignment.  However, the

Purchaser is not taking the Assigned Contracts with all benefits and burdens, but rather, is

seeking to limit its liabilities to the "Assumed Liabilities," i.e., liabilities related to post-closing

performance.  As the Third Circuit has made clear, this is not permissible under Section 365 of

the Bankruptcy Code.  In an analogous case, In re 1945 Route 23 Assocs., Inc., 2008 WL

2386296 (Bankr. D. N.J. 2008), the assignee of a lease argued that it was not responsible for pre-

closing costs because, similar to the APA in this case, the assignee was only responsible for post-

closing costs under the asset purchase agreement.  The court rejected the argument, reasoning:

> The court is similarly not persuaded by Autobacs's construction of the pertinent
> provisions of the APA. Autobacs concedes that the Tozzo lease is an Assumed
> Agreement but then contends that the 2007 Corrected Cost Statement is not an
> Assumed Liability because much of the amount due under that cost statement
> accrued prior to the sale closing date (May 2, 2007). It contends that under the
> APA's definition of Assumed Liabilities, the obligation must both arise and relate
> to a period after the closing date.  Further, it concludes that the following sentence
> in the definition clearly expresses Autobacs's intent not to assume liabilities like
> those contained in the 2007 Corrected Cost Statement: "For avoidance of doubt,
> Assumed Liabilities excludes any Liability attributable to any act, occurrence or
> omission which occurred prior to Closing except as expressly assumed
> hereunder." Autobacs concludes from this that because it did not expressly
> assume the obligation to pay the cost statement, the obligation is expressly
> excluded. The flaw in Autobacs's argument is that under the APA Autobacs
> expressly assumed the Tozzo lease, and thereby expressly assumed all of its
> provisions, including the obligation to satisfy the payment of the 2007 Corrected
> Cost Statement. When R & S, and subsequently Autobacs, assumed the Tozzo
> lease, they assumed it in its entirety, accepting the burdens as well as the benefits.
> See In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007). Unquestionably
> then, the assumed obligation to pay the Corrected 2007 Cost Statement arises and
> relates to the period after the closing date because that is when the obligation
> came due.

Id., 2008 WL 2386296 at *7.

15.     Here, under the AT&T Contracts, AT&T has the right to assert claims for

indemnity if claims are asserted against AT&T on account of Nortel products as well as warranty

and service claims related to the Nortel equipment.  Pursuant to Section 365 of the Bankruptcy Code, the Purchaser takes the assignment subject to those rights.  As it currently stands, the APA would appear to bar AT&T from asserting its bargained for rights, including indemnity rights, against the Purchaser if a claim based on pre-closing conduct is asserted against AT&T.  This is not permissible and, accordingly, the sale should not be approved unless the Purchaser also agrees to fully assume the Indemnification/Warranty Provisions contained in the AT&T Contracts.

B.      *There Is no Adequate Assurance of Future Performance*

16.     Absent assumption of the Indemnification/Warranty Provisions in the contracts, the Debtors must also provide adequate assurance of future performance under the AT&T Contracts.

17.     To effectuate an assignment under the Bankruptcy Code, the Debtors must demonstrate adequate assurance of future performance.   Adequate assurance of future performance is an element of the assumption and assignment process which must be met in addition to the curing of any defaults under an executory contract.  11 U.S.C. § 365(f)(2).  Even in the absence of a default under the contract, adequate assurance of future performance must be afforded before the trustee can assign an executory contract.  See In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 52 (Bankr. M.D.N.C. 2003) (refusing to excise a right of first refusal from a lease agreement reasoning that, among other things, absent such provision the non-debtor party "will not receive the full benefit of its bargain and the Trustee cannot give adequate assurance of future performance").  Although not defined in the Bankruptcy Code, the phrase "adequate assurance of future performance," adopted from Section 2-609(1) of the Uniform Commercial Code, is intended to be given a "practical, pragmatic construction based upon the

facts and circumstances of each case." Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. Pa. 2001) (citations omitted).

18.     As discussed, Section 365(k) of the Bankruptcy Code relieves the trustee and the estate from any liability under a contract occurring after assignment. In re Washington Capital Aviation & Leasing, 156 B.R. 167, 175 & n.3 (Bankr. E.D. Va. 1993) (Section 365(k) alters the common law rule that the original obligor remains ultimately liable after assignment until discharged by performance, consent or otherwise.); see also In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) (in the context of shopping center leases, the court held that adequate assurance is "necessary to protect the rights of the non-debtor party to the contract or lease, because assignment relieves the trustee and the estate from liability arising from a post-assignment breach"), cert. denied, 531 U.S. 873 (2000).

19.     Here, AT&T's indemnity claims based on events that occurred prior to the Closing Date could arise months or years after the Closing.  Assuming arguendo, that these claims are considered pre-closing claims, the APA would appear to prevent AT&T from asserting the claims against the Debtors for a variety of reasons.  This would leave AT&T without its bargained for rights, resulting in the failure to provide adequate assurance of future performance.  In short, the Debtors must provide adequate assurance that AT&T's bargained for rights will be protected, which means that the contracts, including the Indemnification/Warranty Provisions, must be assumed in their entirety in a seamless fashion.

C.      *The Master Agreements and the Related Supplemental*
        *Agreements Must Be Assumed in Their Entirety*

20.     The Debtors cannot assume and assign the Supplemental Agreements without assuming and assigning the Master Agreements and the corresponding Supplemental

Agreements related to the MSS Business since the agreements constitute a single integrated transaction.[6]

21.    Where several separate "contracts" are in substance one agreement, Section 365 of the Bankruptcy Code similarly does not allow a debtor to "cherry pick" the "contracts," accepting certain ones, while rejecting others. In re Atl. Computer Sys., Inc., 173 B.R. 844, 849 (S.D.N.Y. 1994); see also In re Kopel, 232 B.R. 57, 65, n.4 (Bankr. E.D.N.Y. 1999) ("Where several documents are construed as one contract, the debtor must assume or reject them together"). The debtor must assume the entire package of contracts that comprise the overall agreement. Bankruptcy Courts frequently have found that several contracts form one indivisible, integrated agreement and have refused to allow the debtor to split up the transaction by assuming the beneficial contracts and rejecting others under Section 365. See, e.g., In re Cole Bros., 137 B.R. 647, 651 (Bankr. W.D. Mich. 1992); Braniff, Inc. v. GPA Group PLC (In re Braniff), 118 B.R. 819, 844 (Bankr. M.D. Fla. 1989); In re T & H Diner, Inc., 108 B.R. 448, 454 (Bankr. D.N.J. 1989); In re Ritchey, 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988); Bistrian v. Easthampton Sand & Gravel Co., Inc. (In re Easthampton Sand & Gravel Co.), 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982).

22.    In determining whether *several* separate contracts in substance form one integrated agreement that must be assumed as a package under Section 365, the Bankruptcy

---

[6] AT&T reserves its rights to further object to the extent that the Debtors and the Purchaser seek to "un-bundle" the AT&T Contracts as detailed in Section 5.14 of the APA. Under that section, the Debtors and the Purchaser will use "reasonable best efforts" to un-bundle certain contracts and enter into arrangements with counter-parties to a contract by continuing under the existing contract or entering into a new contract. APA at §5.14(a). Section 5.14(b) also allows the Debtors to subcontract portions of the Bundled Contracts to the Purchaser under certain conditions and subject to certain requirements. The Master Agreements govern the MSS Business as well as other business lines with Nortel. As discussed above, the Supplemental Agreements incorporate the Master Agreements and must be assumed and assigned in their entirety. Thus, to effectuate assumption and assignment of the AT&T Contracts that relate to other business units, the Debtors and the Purchaser may need to attempt to "un-bundle" these contracts. At this point, AT&T does not know whether any proposed "un-bundling" of the AT&T Contracts will negatively impact its rights under the contracts. Accordingly, AT&T reserves its right to object with regard to the un-bundling of its contracts or with regard to other issues that may arise when the Debtors make their determination regarding the treatment of the AT&T Contracts.

Courts look to the underlying state law, the contract itself, and the intent of the parties.  In re

Philip Servs. (Del.), Inc., 284 B.R. 541, 546 (Bankr. D. Del. 2002) ("Under general contract law,

the parties' intentions determine whether two separately executed documents are in reality one

agreement").  In determining whether the agreements constitute one integrated agreement, state

courts usually consider the following:

> Ultimately, the question is one of the intent of the parties, and the courts, in
> making this determination, consider all of the facts and circumstances
> surrounding the making of the agreements, including:  (1) the nature and purpose
> of the various agreements, including whether they are contained in one instrument
> or multiple instruments and whether, if the latter, they were executed at the same
> time or at different times, and whether the initially executed agreement
> contemplated the later agreements; (2) whether the same consideration was paid
> for each of the promises contained in the agreements or whether the consideration
> for the various agreements was separate and distinct; and (3) whether the parties'
> obligations under the various agreements are interrelated or independent.

WILLISTON ON CONTRACTS, ASSUMPTION OR REJECTION OF CONTRACTS CONSISTING OF MORE

THAN ONE AGREEMENT § 78:29, § 78:29 (2009).  Thus, in analyzing the parties' intentions,

courts will look to the terms of the agreement.  For example in In re Beatriz Ready Mix, Inc.,

2009 WL 255890 (Bankr. D.P.R. 2009) the court stated:

> Each document also states the parties intended that the three documents be
> considered complimentary and interrelated agreements, or components of the one
> single transaction, that is, the sale of the business
>
> *      *      *
>
> We find the words used in the tie-in clauses in all three documents are clear. The
> contractual language expressing the parties' intent is not murky, or obscure. These
> expressions undoubtedly state the parties intended that the three documents
> complement each other, depicting the components of one single business
> transaction.
>
> *      *      *

Hence, we find the preponderance of the credible and admissible evidence here
shows the tie-in clauses in the three documents demonstrate the parties' true and
unequivocal intent once they reached a meeting of the minds. These tie-in clauses
clearly show the three contracts express the true intent of the parties: that is, the

- 12 -

documents are but components of a single, interdependent, unified business transaction, and that the parties never intended us to consider the documents as three individual, separate, self-standing and severable contracts.

Id. at *4.  Thus, where the terms of the contracts unambiguously demonstrate that the parties intend the contracts to be integrated into a single contract, the courts will find that the agreements should be treated as one contract.  For example, where the parties' relationship is governed by a master agreement and subsequent agreements entered into under the master agreement and the parties intend such agreements to be integrated into a single agreement, courts will find the master agreement and subsequent agreements constitute a single integrated contract that must be assumed and assigned in its entirety.  See, e.g., In re Atl. Computer Sys.., 173 B.R. 844, 849 (S.D.N.Y. 1994), (court reversed bankruptcy court decision allowing Debtors to assume a Master Lease Agreement for computer equipment but not the subsequent leases entered into contemporaneously with the equipment schedules); see also In re Aneco Electrical Construction, 2005 WL 3750364 at *4 (M.D. Fla. 2005) ("the Court finds that the Subcontract Agreement entered by the Debtor and Turner on November 25, 2002, constitutes a single, indivisible contract for electrical work at the Dulles International Airport, and that the subsequent Work Orders did not effect a severance of the contract into two separate and independent 'subcontracts'").

23.    In this case, the parties' intentions are readily apparent through reference to the Supplemental Agreements, which provide for the agreement to be integrated into the Master Agreements.  Specifically, the ESSP Letter Agreement provides that "[t]his letter agreement is subject to the non-conflicting terms and conditions of the Master Sales Agreement between Nortel Networks, Inc. and Cingular Wireless, LLC, dated November 1, 2001, as amended ("MSA")".  ESSP Letter Agreement at p 2.  In addition, the Global Supply Supplement provides, "[t]his Supplement, together with the [Global Supply Contract], shall constitute the entire

agreement between the parties with respect to the subject matter contained herein…." Global Supply Supplement at p 4. The intention of the parties is clear – the Supplemental Agreements are integrated into the corresponding Master Agreement, and as a result, the agreements constitute a single integrated contract that must be assumed and assigned *cum onere*.

## CONCLUSION

WHEREFORE, for the reasons stated above, AT&T objects to the relief requested in the

Sale Motion to the extent cited above and respectfully requests that it be denied, and that the

Court grant such other and further relief as deemed just and proper.

Dated: September 22, 2010

**ASHBY & GEDDES, P.A.**

By: _Am Winfree_

William P. Bowden (#2553)
Amanda M. Winfree (#4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone:  (302) 654-1888
Facsimile: (302) 654-2067

--and--

**FULBRIGHT & JAWORSKI L.L.P.**

David A. Rosenzweig
Mark C. Haut
666 Fifth Avenue
New York, New York 10103
Tel:  (212) 318-3000
Fax:  (212) 318-3400

*Co-Counsel for AT&T*