**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------X
                                                          :
*In re*                                                   :     Chapter 11
                                                          :
Nortel Networks Inc., *et al.*,[1]                        :     Case No. 09-10138 (KG)
                                                          :
                                   Debtors.                :     Jointly Administered
                                                          :
                                                          :     **Hearing date: October 14, 2010 10:00am (ET)  (Proposed)**
                                                          :     **Objections due: October 7, 2010 4:00pm (ET) (Proposed)**
                                                          :
---------------------------------------------------------- X


**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING DELIVERY BY
CERTAIN DEBTORS AS MINORITY STOCKHOLDERS OF CONSENTS TO
MERGER TRANSACTION; (II) APPROVING AN INDEMNIFICATION AND
DEFERRED PAYMENT AGREEMENT; (III) AUTHORIZING CERTAIN DEBTORS
TO ENTER  INTO SUCH INDEMNIFICATION AND DEFERRED PAYMENT
AGREEMENT AND TO CONSUMMATE RELATED TRANSACTIONS;
(IV) AUTHORIZING THE DEBTORS TO FILE CERTAIN DOCUMENTS
<u>UNDER SEAL; AND (V) GRANTING RELATED RELIEF</u>**


Nortel Networks Inc. ("<u>NNI</u>") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "<u>Debtors</u>"), hereby move this Court (the "<u>Motion</u>"), for the entry of

an order substantially in the form attached hereto as Exhibit A, (i) approval of delivery by certain

debtors (the "<u>U.S. Debtor Stockholders</u>") as minority stockholders in Blade Technologies, Inc.

(the "<u>Company</u>") of consents, dated September 23, 2010, to the merger between International

Business Machines Corporation (the "<u>Parent</u>") and the Company (the "<u>Merger</u>"); (ii) approval of

an Indemnification and Deferred Payment Agreement dated September 23, 2010 (as may be

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable

amended, supplemented or otherwise modified from time to time, the "Indemnification

Agreement"), among Parent, certain holders, including the U.S. Debtor Stockholders, of capital

stock and/or options to acquire shares of capital stock of the Company, and Garnett & Helfrich

Capital, L.P. as the representative of the securityholders for purposes of the Merger Agreement

(as defined below), Indemnification Agreement and the related transactions (the

"Representative"); (iii) authorization for each U.S. Debtor Stockholder to enter into the

Indemnification Agreement and to take all steps necessary to consummate related transactions,

including a merger of Bigsby Acquisition Corp. ("Sub") with and into the Company after which

the Company will be the surviving corporation, as more fully described in the Agreement and

Plan of Merger (as may be amended, supplemented or otherwise modified from time to time, the

"Merger Agreement") dated September 23, 2010 (the entry into the Indemnification Agreement

together with the consummation of the other transactions contemplated by the Indemnification

Agreement, the Merger Agreement and related documents, the  "Transaction;" the documents,

including the Indemnification Agreement, the Merger Agreement, any written consents or other

documents, instruments or agreements to be executed or delivered in connection therewith, the

"Transaction Documents"); (iv) authorization for the Debtors to file under seal a copy of each of

the Indemnification Agreement and the Merger Agreement and to limit disclosure thereof (and

any information derived therefrom) to (a) the Court, (b) the United States Trustee for the District

of Delaware (the "U.S. Trustee"), (c) counsel and financial advisors to the Official Committee of

Unsecured Creditors appointed in these cases (the "Committee"), (d) counsel and financial

advisors to the ad hoc group of bondholders holding claims against certain of the Debtors and

certain of the Canadian Debtors (the "Bondholder Group"), and (e) any other party as may be (1)

Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

ordered by the Court or (2) agreed to by the U.S. Debtor Stockholders, the Representative and

the Parent, in either case, under appropriate confidentiality agreements reasonably satisfactory to

the U.S. Debtor Stockholders, the Representative and the Parent that preserve the confidentiality

of the Indemnification Agreement and the Merger Agreement (and any information derived

therefrom) (collectively, the "Limited Notice Parties"); and (v) granting them such other and

further relief as the Court deems just and proper.  In support of this Motion, the Debtors

respectfully represent as follows:

## Jurisdiction

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are sections 105, 107(b)(1) and

363 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rule(s)

2002, 6004, 9014, and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Rule(s) 6004-1 and 9018-1 of the of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

## Background

**A.    Procedural History**

3.    On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA

(defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.    The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b), which provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  On

May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles,

France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary

proceedings in respect of Nortel Networks S.A. ("NNSA").  NNSA was authorized to continue

to operate as a going concern until completion of the sale of the GSM/GSM-R business.  While

NNSA's operations have now terminated, the French Proceedings are continuing and, in

accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency

Proceedings, the English law proceedings (the "English Proceedings") remain the main

proceedings in respect of NNSA.  On June 26, 2009, this Court entered an order recognizing the

English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings

under chapter 15 of the Bankruptcy Code.[4]

       9.      On January 26, 2009, U.S. Trustee appointed the Committee pursuant to section

1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  The Bondholder Group was also organized.

No trustee or examiner has been appointed in the Debtors' cases.

      10.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc.

("NN CALA"), an affiliate of NNI and itself one of the Debtors, filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009, this Court entered orders

approving the joint administration and consolidation of NN CALA's chapter 11 case with the

other Debtors' chapter 11 cases for procedural purposes [D.I. 1098], and applying to NN CALA

certain previously entered orders in the other Debtors' chapter 11 cases [D.I. 1099].  From time

---

[4]      Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (the "Israeli Companies"), filed an application with the Tel-Aviv-Jaffa District Court (the "Israeli Court"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Companies under the Israeli Companies Law (the "Joint Israeli Administrators").

to time, other Nortel affiliates have sought and may seek relief through the commencement of

creditor protection or other insolvency or dissolution proceedings around the world.

**B.    Debtors' Corporate Structure and Business**

11.    Prior to its significant business divestitures, Nortel was a global supplier of end-

to-end networking products and solutions serving both service providers and enterprise

customers.  Nortel's technologies spanned access and core networks and supported multimedia

and business-critical applications.  Nortel's networking solutions consisted of hardware, software

and services.  Nortel designed, developed, engineered, marketed, sold, licensed, installed,

serviced and supported these networking solutions worldwide.

12.    Additional information regarding the Debtors' corporate structure and business

and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in

Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[5]

**C.    Case Milestones**

13.    On June 19, 2009, Nortel announced that it was advancing in discussions with

external parties to sell its businesses and that it would assess other restructuring alternatives for

its businesses in the event it were unable to maximize value through sales.  To date, Nortel has

closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539];

(ii) the sale of substantially all of its CDMA business and LTE Access assets to

Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its

Wireless Networks business associated with the development of Next Generation Packet Core

network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of

the Enterprise Solutions business globally, including the shares of Nortel Government Solutions

---

[5]    Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day
Declaration.

Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all

the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro

Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially

all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; and (vii)

the sale of certain assets of its Carrier Voice Over IP and Application Solutions business to

GENBAND US LLC [D.I. 2632].  In addition, Nortel has obtained Court approval for the

auction of certain assets of the Debtors' Multi-Service Switch (formerly known as "Passport")

business [D.I. 3855].  Efforts continue to be made with respect to the realization of value from

Nortel's remaining assets.

14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00

p.m. (Eastern Time) as the general bar date for filing proofs of claim or interests against the

Debtors (other than NN CALA) [D.I. 1280].  On December 3, 2009 this Court entered an order

fixing January 25, 2010 at 4:00 p.m. (Eastern Time) as the bar date for filing proofs of claim or

interests against NN CALA [D.I. 2059].

15.     On July 13, 2010, the Debtors filed the Joint Chapter 11 Plan of Nortel Networks

Inc. and Its Affiliated Debtors [D.I. 3580].  On September 3, 2010, the Debtors filed the

Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and Its

Affiliated Debtors [D.I. 3874].

## Relief Requested

16.     By this Motion, the Debtors seek an order (i) approving delivery by certain

Debtors as minority stockholders of consents to the Merger transaction; (ii) approving an

Indemnification and Deferred Payment Agreement; (iii) authorizing certain Debtors to enter into

such Indemnification and Deferred Payment Agreement and to consummate related transactions;

(iv) authorizing the debtors to file certain documents under seal; and (v) granting related relief.

**<u>Facts Relevant to this Motion</u>**

**A.     The Company**

17.     The Company provides Ethernet switches and virtualization and management solutions for enterprise data centers.  Its switches are state-of-the-art, offering low latency, low power and low cost of operation compared to competitors, and use standards-based architecture that improves scalability, reduces cost, and permits simplification and virtualization of data centers.

18.     The business operated by the Company originated with the launch of the Debtors' Blade Server Switches Business Unit (BSS BU) in 2003.  The BSS BU was subsequently spun out in February 2006, such that the current majority owner of the company, Garnett & Helfrich Capital, contributed $31,000,000 to the Company and Nortel received $3,600,000 and retained a 25% preferred equity stake on a fully diluted basis with a valuation of $11,000,000.  In December 2008, Nortel Networks, Inc. sold 5,000,000 shares in the Company for $10,000,000 and agreed to an expansion of an intellectual property license to the Company.  In July 2009, a Series B funding round closed, with Juniper Networks, Inc., Broadcom Corporation, NEC Corporation and the Representative investing in the Company at $4.75 per share.

**B.     The Shares**

19.     The U.S. Debtor Stockholders currently own Series A-1 Preferred Shares in the Company, with Nortel Altsystems Inc. owning 7,121,454 shares and NNI owning 623,644 shares.  Collectively, the U.S. Debtor Stockholders own 15.6% of all outstanding shares in the Company on a fully diluted basis.  The U.S. Debtor Stockholders have the right to appoint one Company board member as long as their aggregate share ownership does not drop below 12% on a fully diluted basis.  George Riedel, Nortel's Chief Strategy Officer, is the current Nortel-appointed

member on the Company's Board of Directors, replacing John Roese in that capacity in January 2009.[6]

20.     The Transaction is the culmination of both an effort by the Company to pursue an acquisition or initial public offering, and of an effort over the last few months by the U.S. Debtor Stockholders to monetize their investment in the Company.  In late 2008 and early 2009, the Company received offers for the acquisition of the Company as a whole which where negotiated but did not culminate in any definitive agreement.  In May 2010, the Company began preparations for an initial public offering in late 2010, but the Company's Board of Directors determined that it was in the Company's best interests to engage in high-level discussions with several strategic buyers after expressions of interest were received in respect of an acquisition of the Company as a whole.  On June 10, 2010, the Company received an Indication of Interest ("IOI") from the Parent.  The Company then signed the IOI with Parent granting exclusivity to the Parent until September 18, 2010 in exchange for a higher price.

C.      **Efforts to Market the Shares**

21.     The U.S. Debtor Stockholders began their efforts to market the Shares in May 2010, when information on the Shares was sent to 22 prospective buyers.  Upon learning of the IOI, the Debtors informed other bidders of the Parent's bid, and none of those bidders expressed any interest or submitted any bids approaching the price offered by Parent.  Likewise, the efforts made by the Company to solicit additional bids revealed no viable alternative bidders to the Parent.

---

[6]     On June 25, 2010, Mr. Riedel was granted options to purchase 75,000 shares in the Company at an exercise price of $4.18 per share.  Under the terms of the Merger Agreement, Mr. Riedel would have stood to receive approximately $300,000 in consideration for the cancellation of these options.  Mr. Riedel, however, has voluntarily cancelled these options in advance of the Transaction's Effective Date, thereby waiving his right to any consideration.

22.    After extended negotiation, and an increase in consideration offered by the Parent, the Company and Parent agreed to the terms of the Merger Agreement.  As a condition to entry into the Merger Agreement, the Parent and certain securityholders of the Company, including the U.S. Debtor Stockholders, agreed to enter into the Indemnification Agreement.

23.    The Debtors believe that the consideration set forth in the Merger Agreement represents the highest and best offer available for the Shares, that further marketing of the Shares would not yield a better offer and that further marketing of the Shares may result in a reduction in the Purchase Price or the loss of the deal with the Parent altogether.  Accordingly, the Debtors intend to proceed by private sale and consent to the Transaction.  The Debtors believe that Parent is uniquely suited to purchase the Shares as it has a significant strategic interest in owning the Company, which manufactures components for Parent's blade servers and server and storage racks and has been a longstanding technology partner with Parent.  Parent currently represents a significant portion of the Company's revenue.  In addition, because the U.S. Debtor Stockholders hold a minority position in the Company, their ability to influence a potential sale of the Company, which is closely-held, is materially limited.

24.    The Debtors have consulted with counsel for the Committee and the Bondholders Group regarding the Transaction, and understand that both are supportive of the Transaction as described herein.

**D.    Indemnification Agreement[7]**

25.    On September 23, 2010, the Company, Parent, the Representative and the Indemnifying Securityholders (including the U.S. Debtor Stockholders) executed the

---

[7]    To the extent that there are inconsistencies between any summary description of the Indemnification Agreement contained herein and the terms and conditions of the Indemnification Agreement, the terms and conditions of the Indemnification Agreement shall control.

Indemnification Agreement, entry into which is required for the closing of the Transaction.  The

Indemnification Agreement contains the following material terms:[8]

- **Indemnification**.  Each Indemnifying Securityholder agrees, severally and not jointly, to indemnify and hold harmless the Parent and the Sub, its affiliates, successors and assigns against any losses in connection with any breaches of representations, warranties or covenants in the Merger Agreement and Indemnification Agreement.  Such indemnification obligations will terminate following specified periods of time after the Closing Date (which will vary based on the category of representation, warranty or covenant), as set forth in Section 9.05 of the Merger Agreement and Section 2.04 of the Indemnification Agreement.  Notwithstanding any other provisions in the Indemnification Agreement, pursuant to Section 2.04 of the Indemnification Agreement, the U.S. Debtor Stockholders shall have no liability on or after December 31, 2011, other than with respect to the portion of the merger consideration otherwise payable to the Securityholders and retained by the Parent in accordance with Article IX of the Merger Agreement (such amount, the "Aggregate Deferred Payment Amount").

- **Purchase price holdback**.  Pursuant to Section 2.05 of Indemnification Agreement, the Parent's sole and exclusive monetary remedy from the U.S. Debtor Stockholders under the Indemnification Agreement is the retention of amounts from the Pro Rata Portion of the Aggregate Deferred Payment Amount, which is retained by Parent pursuant to the Merger Agreement.  Pursuant to Section 9.08 of the Merger Agreement, on the Distribution Date, the Parent will distribute to the Securityholders an amount equal to the Aggregate Deferred Payment Amount less (a) any amounts that have been permanently retained by Parent or any other Indemnitee for recoverable losses; and (b) the aggregate amount that is determined by Parent in good faith to be necessary to satisfy claims that have been timely asserted but not finally resolved by that date.  Final distribution of the remaining Aggregate Deferred Payment Amount will occur after such time as there are no amounts to be distributed to the Securityholders or following the resolution of all pending claims.

- **Closing conditions**.  In addition to certain other customary closing conditions, the obligations of the parties to the Indemnification Agreement to close the sale are subject to the accuracy of all representations and warranties and performance in all material respects of all obligations, covenants and agreements required to be performed on or before the Closing.  Specifically, Parent and Sub's obligation to close the sale is, among other conditions, subject to the absence or removal of all legal restraints that have the effect of preventing the consummation of the sale and execution of the Indemnification Agreement by the Indemnifying Securityholders and Parent, and to approval of this Motion by the Court.

---

[8]        Any capitalized terms used in this Section D but not otherwise defined herein, shall have the meaning assigned in the Merger Agreement.

E.    **Sale Free and Clear of All Bankruptcy Claims**

26.    Pursuant to this Court's order approving the Transaction (the "Order"), except as otherwise expressly set forth in the Merger Agreement, the Debtors have agreed to relinquish, sell, transfer and assign pursuant to section 363 of the Bankruptcy Code, the Debtors' right, title and interest in the Shares, free and clear of all Bankruptcy Claims (as defined in the Indemnification Agreement), including any claim, interest or liability relating to any debt, claim, obligation, liability, demand, guaranty, option, right, contractual or other commitment, indemnity, indemnity obligation and warranty relating to any act, omission or circumstance arising prior to the Closing Date (as defined in the Merger Agreement) or otherwise arising under any doctrine of successor liability, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of the Debtors' chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise.  Any and all Bankruptcy Claims shall attach to the U.S. Debtor Stockholders' ratable portion of the net proceeds of the Transaction, with the same priority, validity, force and effect as they now have against the Capital Stock and subject to any rights, claims or defenses of the Debtors or their estates with respect thereto.

**Basis for Relief**

A.    **Entry into the Indemnification Agreement and Related Transactions Is a Product of the Debtors' Reasonable Business Judgment**

27.    Section 363(b)(1) of the Bankruptcy Code provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

12

28.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code, outside the ordinary course of business and prior to the confirmation of a plan of reorganization, is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale:  "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa. 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

29.    The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to

13

interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and

reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re

Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R.

at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[9]

30.     The transfer of the Shares in connection with the Transaction meets the "sound

business reason" test.  First, sound business purposes justify the Transaction.  The Debtors

believe that a prompt sale of the Shares presents the best opportunity to realize the maximum

value of the Shares for the Debtors' estates and their creditors.  The Debtors further believe that

this benefit to their creditors will be adversely affected, or perhaps lost, absent an immediate

transfer of the Shares.  See In re Lionel Corp., 722 F.2d at 1071 (finding that of factors for courts

to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is

increasing or decreasing in value").  In light of the potential decrease in the value of the Shares,

the Debtors believe that a prompt transfer is both necessary and justified to maximize the value

of the Shares for the benefit of the Debtors' creditors and estates.

31.     Second, notice of the Motion will be provided to interested parties in accordance

with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and

applicable Court orders as appropriate under the circumstances.

32.     Third, the Debtors believe they have obtained a fair and reasonable price for the

Shares.  The consideration agreed to in the Merger Agreement is the result of a marketing effort

by the Company for more than two years and the culmination of rigorous, arm's-length

negotiations among the Company, the U.S. Debtor Stockholders and the Parent.

---

[9]      Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a
debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when
the assets to be sold were "wasting" or perishable.  In re Lionel, 722 F.2d at 1071.

33.     Finally, the marketing and negotiation process satisfies the good faith requirement of <u>Abbotts Dairies</u>.  788 F.2d at 149-50.  The Debtors submit that the Transaction is the product of good faith solicitation efforts and arm's-length negotiations among the Company, the U.S. Debtor Stockholders and the Parent with respect to the price and other terms of the Transaction. In addition, the consideration to be received by the U.S. Debtor Stockholders is the same as that being received by other Indemnifying Securityholders.

34.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the entry into the Indemnification Agreement.  The Indemnification Agreement was a necessary component to Parent's willingness to pay the consideration provided for in the Transaction.  The Transaction, which necessarily includes the Indemnification Agreement in addition to the cancellation of the Shares in exchange for the consideration, will afford the Debtors' estates an opportunity to maximize the recovery for creditors.  Accordingly, the Debtors request that the Court approve the Indemnification Agreement and authorize the Debtors to take such steps as are necessary to consummate the Transaction.

**B.     The Transfer of the Shares without Auction is Justified**

35.     Under Bankruptcy Rule 6004, a Debtor may sell assets outside of the ordinary course of business by private sale or public auction.  <u>See</u> Fed. R. Bankr. P. 6004 ("All sales not in the ordinary course of business may be by private sale or by public auction.").

36.     The Debtors believe that the transfer of the Shares to the Parent without an auction is the best way to maximize value for their estates.  As described above, for over two years prior to filing this Motion, the Company marketed itself for sale through consideration of an initial public offering and conduct of high-level negotiations with several potential strategic buyers, and the U.S. Debtor Stockholders marketed the Shares to many potential bidders.

37.     The U.S. Debtor Stockholders currently own a minority stake in the Company –
15.6% on a fully diluted basis.  As minority shareholders, their ability to influence the outcome
of the sale of the Company, which is closely-held, is subject to material limitations.  The Parent
and Company stockholders other than the U.S. Debtor Stockholders have indicated that the
conduct of an auction would render the Transaction infeasible.  It would also, in all likelihood,
fail to attract any higher or better offers, given the timeline and certainty required by Company
stockholders other than the U.S. Debtor Stockholders and the need of any prospective purchaser
to secure the shares of all holders of Company securities in a timely fashion with reasonable
certainty.

**C.      Entry into the Indemnification Agreement is Product of the Debtors' Reasonable Business Judgment**

38.     Sound business purposes justify entry into the Indemnification Agreement.  As
mentioned above, the Indemnification Agreement is an integral part of, and was negotiated in
good faith and at arm's-length as part of, the Transaction.  The Debtors would not be able to
transfer the Shares, and thereby maximize the value of the Shares for the Debtors' creditors and
estates, without the ability to honor the assurances required by the Parent.

39.     Accordingly, the Debtors request that the Court approve the Debtors' entry into
the Indemnification Agreement and authorize the Debtors to perform thereunder.

**D.      The Parent Should be Granted the Protection of Bankruptcy Code Section 363(m)**

40.     As described above, the Company, U.S. Debtor Stockholders and the Parent
negotiated the Transaction in good faith and at arm's-length.  Accordingly, the Debtors maintain
that the Parent is entitled to the protections afforded by Bankruptcy Code section 363(m).

41.     Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b)
> or (c) of this section of a sale or lease of property does not affect the validity of a

> sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

42.     While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pa., Inc., has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

43.     The Company and the U.S. Debtor Stockholders have spent a considerable amount of time and resources over the past several months negotiating the Transaction at arm's-length, with give and take on both sides.  All parties have acted in good faith to advance their interests in this arm's-length process.  Under the circumstances, this Court should find that the Parent is entitled to all of the protections of Bankruptcy Code section 363(m).

**E.     The Transaction is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)**

44.     As set forth above, the U.S. Debtor Stockholders and the Company have been negotiating with the Parent at arm's length and in good faith regarding the Transaction. Moreover, the Debtors do not believe that the Transaction will be the result of collusion or other bad faith between bidders or that the price under the Transaction has been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n). The Debtors are not aware of any agreement between Parent and any other entity relating to bidding for the Shares.

45.     As set forth above, the Transaction with the Parent has been negotiated, and proposed, and will be entered into by the Company, the U.S. Debtor Stockholders and the Parent without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor the Parent nor any of its or their affiliates have engaged in any conduct that could cause or permit the Transaction to be avoided under Bankruptcy Code section 363(n).

**F.     Sale of the Shares Should Be Free and Clear of Bankruptcy Claims**

46.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to transfer, convert, cancel or otherwise dispose of the U.S. Debtor Stockholders' right, interest and title in the Shares to the Parent free and clear of all Bankruptcy Claims, except as set forth in the Merger Agreement, with such Bankruptcy Claims to attach to the proceeds of the Transaction as applicable, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto. Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

      (2)      such entity consents;

      (3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      (4)      such interest is in bona fide dispute; or

      (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written in the disjunctive and thus, court may approve sale "free and clear" provided at least one of the requirements is met).

47.     With respect to each creditor that asserts an Bankruptcy Claim, the Debtors submit that one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) will be satisfied.  Those holders of Bankruptcy Claims who do not object or who withdraw their objections to the Motion or the Transaction will be deemed to have consented to the Motion and Transaction pursuant to Bankruptcy Code § 363(f)(2).  The Debtors also submit that, for holders of Bankruptcy Claims who do object, their Bankruptcy Claims will fall within one or more of the other subsections of Bankruptcy Code section 363(f).

48.     A sale free and clear of Bankruptcy Claims is necessary to maximize the value of the Shares.  The Parent would not have entered into the Merger Agreement and will not consummate the Transaction if the Shares were not transferring to the Parent free and clear of all Bankruptcy Claims (except as permitted by the Merger Agreement).  A transfer of the Shares other than one free and clear of all Bankruptcy Claims would yield substantially less value for the Debtors' estates, with less certainty than the proposed Transaction.  Therefore, the Transaction contemplated by the Merger Agreement and the Indemnification Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  A sale

free and clear of Bankruptcy Claims is particularly appropriate under the circumstances because

any lien or claim in, to or against the Debtors' right, interest and title in the Shares that exists

immediately prior to the closing of the Transaction will attach to the proceeds with the same

validity, priority, force and effect as existed with respect to the Shares at such time, subject to the

rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of

Bankruptcy Claims, if any, will be adequately protected by the availability of the proceeds of the

Transaction to satisfy their claims and interests.

**G.      Filing of Agreements Under Seal**

49.      The Debtors respectfully submit that it is appropriate to allow the Merger

Agreement and Indemnification Agreement to be filed under seal.  The Merger Agreement and

Indemnification Agreement contain substantial sensitive commercial information concerning the

Parent and the Company.

50.      The relief requested by the Debtors is squarely authorized under the Bankruptcy

Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to

issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court **shall** . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information. . . .

11 U.S.C. § 107(b).

51.      Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

52.    This Court has defined "commercial information" in the context of section 107(b) as follows:

> Commercial information is information which would result in 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section 107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid 'affording an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr. Del. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982).  Because the purpose of Rule 9018 is to protect business entities, "disclosure of [the] information [must] reasonably be expected to cause the entity commercial injury." In re Northstar Energy, Inc., 315 B.R. 425, 429 (Bankr.E.D.Tex.2004) (citing In re Global Crossing, Ltd., 295 B.R. 720, 725 (Bankr.S.D.N.Y.2003)).  This policy animating the need for protection of commercial information has greater force when the information at issue is property of a non-debtor.  See In re The 1031 Tax Group, LLC, No. 07-1148, 2007 WL 1836525 at * 2 (Bankr. S.D.N.Y June 22, 2007).

53.    The information sought to be kept confidential need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code.  Orion Pictures, 21 F.3d at 25 (holding that a license agreement authorizing a licensee to "reproduce, manufacture, distribute, and sell videocassettes of three films" contained confidential commercial information); In re Barney's, Inc., 201 B.R. 703, 708-09 (Bankr. S.D.N.Y. 1996) (concluding that for a retailer, confidential commercial "information might include, without limitation, pricing formulae, short and long term marketing strategies and the terms of agreements with

suppliers."); <u>Global Crossing</u>, 295 B.R. at 725 (protecting certain confidential commercial information because it could potentially be used to injure the debtor's ability to sell assets for the benefit of unsecured creditors).

54.     Once a court determines that a party in interest is seeking protection of information that falls within one of the categories enumerated in section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting interested party and has no discretion to deny the application." <u>Orion Pictures</u>, 21 F.3d at 27.

55.     Here, the Merger Agreement and Indemnification Agreement constitute "commercial information" subject to the protection of section 107(b), and the Court should enter an order permitting the Debtors to file the Merger Agreement and Indemnification Agreement under seal.  The Parent regularly engages in acquisitions of private companies, and the terms on which it is willing to enter such transactions are kept strictly confidential.  Public disclosure of the terms of these private transactions would have an adverse impact on Parent's private company acquisition activities.  In keeping with the Parent's confidentiality policy, the filing of the Merger Agreement and Indemnification Agreement under seal is a condition to the closing of the Transaction, and the Parent has indicated that it would not enter into the Transaction but for the filing of the Merger Agreement and Indemnification Agreement under seal.

56.     Disclosure of this confidential commercial information would be damaging to the Company and the Parent if it is disclosed to their competitors.  However, Parent is mindful of the importance of appropriate disclosures for the bankruptcy process, and believes that the disclosure of the Merger Agreement and the Indemnification Agreement to the Limited Notice Parties fully accomplishes that policy objective and is appropriate here.  The Debtors, the Parent and the Company are not attempting to hide important information from the other parties-in-interest in

22

these bankruptcy cases; instead, they are attempting to protect information that is important to

the Parent and the Company's ongoing business and is not meaningful to creditors or other

parties-in-interest in these cases.  The Transaction has already been subjected to scrutiny from

both the Committee and the Bondholder Group, and has the support of both.  Additionally, the

Limited Notice Parties will be granted access to the Merger Agreement and Indemnification

Agreement.  For these reasons, the filing of the Merger Agreement and Indemnification

Agreement under seal is in the best interests of the Debtors and their estates, creditors, and

interest holders and all other parties in interest herein.

**H.      Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)**

57.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all

orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rule

6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal

before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P.

6004(h).

58.    Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent

as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period,

commentators agree that the 14-day stay period should be eliminated to allow a sale or other

transaction to close immediately where there has been no objection to the procedure.  See

generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is

filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may

be reduced to the amount of time necessary to file such appeal.  Id.

59.     Pursuant to the Merger Agreement the Debtors must close this sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

## **Notice**

60.     Notice of the Motion has been given via overnight delivery or hand delivery to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) Parent; (v) the Company; (vi) certain other shareholders in the Company; and (vii) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## **No Prior Request**

61.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  September 27, 2010
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*