(h)     all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents other than the EMEA Asset Sale Agreement or the documentation ancillary thereto based upon arrangements made by or on behalf of the Sellers or any of their Affiliates; it being understood, however, that the Purchaser shall not assume any similar fees in connection with the EMEA Asset Sale Agreement or the documentation ancillary thereto;

(i)     all Liabilities for, or related to any obligation for, any Tax that is not expressly assumed by the Purchaser or any of the Designated Purchasers pursuant to Article VI; for the avoidance of doubt, the Parties intend that no Purchaser or Designated Purchaser shall have any transferee or successor liability for any Tax that the Sellers bear under Article VI;

(j)     all obligations to provide continuation coverage pursuant to COBRA or any similar Law to any Person who has been employed in the Acquired Business and who does not become a Transferred Employee;

(k)     all Liabilities or other obligations arising from the Seller Employee Plans;

(l)     any Liability of the Sellers or any ERISA Affiliate under Title IV of ERISA;

(m)     any pension or retirement Liability of the Sellers or any ERISA Affiliate; and

(n)     all Liabilities of the Sellers arising under this Agreement and the Ancillary Agreements; and

(o)     all Liabilities arising from the Amended and Restated Settlement Agreement (the "**Settlement Agreement**") dated March 30, 2010 among NNC, NNL and their various Affiliates, Ernst & Young, Inc., the Former Employees Representative, Sue Kennedy (the "**LTD Representative**"), Koskie Minsky LLP (the "**Representative Counsel**") and the CAW-Canada.

### 2.1.5    Assumption and/or Assignment or Rejection of 365 Contracts.

(a)     Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth a list (as may be updated and/or amended from time to time after the date hereof, the "**365 Customer Contract List**") of those Customer Contracts to which a U.S. Debtor is a party that are Executory Contracts for purposes of the U.S. Bankruptcy Code and were entered into before the Petition Date (the "**365 Customer Contracts**"), which the relevant U.S. Debtor will assume and assign to the Purchaser or a Designated Purchaser pursuant to section 365 of the U.S. Bankruptcy Code to the extent allowed by applicable Law.

(b)     Section 2.1.5(b) of the Sellers Disclosure Schedule sets forth a list (as may be updated and/or amended from time to time after the date hereof, the "**Other 365 Contract List**") of all Other Contracts to which a U.S. Debtor is a party that are Executory Contracts for purposes of the U.S. Bankruptcy Code and were entered into before the Petition Date (Contracts that may be included on the Other 365 Contract List, the "**Other 365 Contracts**") which the

Purchaser has elected to have the relevant U.S. Debtor pursuant to section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser to the extent allowed by applicable Law (such Contracts on the Other 365 Contract List shall be collectively referred to as the "**Designated Other 365 Contracts**"). The Other 365 Contract List may be updated from time to time after the date hereof to reflect any additional Other 365 Contract that the Purchaser may designate as a Designated Other 365 Contract or remove any previously designated Designated Other 365 Contract prior to the applicable Final Contract Designation Date.

(c)    The (i) 365 Customer Contracts and (ii) Designated Other 365 Contracts are collectively referred to as the "**Assumed and Assigned Contracts**".

(d)    The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to the assumption and assignment of the Assumed and Assigned Contracts effective as of Closing as part of the U.S. Sale Order in accordance with Section 5.1.

(e)    Any Other 365 Contracts that are not Designated Other 365 Contracts shall be referred to as an "Excluded 365 Contract" and shall not be an Assigned Contract hereunder.

(f)    The Purchaser shall not have the right to amend the Other 365 Contract List after the applicable Final Contract Designation Date without the prior written consent of NNI.

2.1.6    <u>Assignment of Non-365 Contracts.</u>

(a)    Non-365 Contracts

(i)    Section 2.1.6(a)(i) of the Sellers Disclosure Schedule sets forth a list (as may be updated and/or amended from time to time, the "**Non-365 Customer Contract List**") of all Sellers' Customer Contracts other than 365 Customer Contracts (the "**Non-365 Customer Contracts**"), which the relevant Seller will assign to the Purchaser or a Designated Purchaser at Closing. The Non-365 Customer Contract List shall be updated after the date hereof with all 365 Customer Contracts entered into by the Sellers in the Ordinary Course between the date hereof and the Closing Date.

(ii)    Section 2.1.6(a)(ii) of the Sellers Disclosure Schedule sets forth a list (as may be updated and/or amended from time to time, the "**Other Non-365 Contract List**") of all Other Contracts that are not Other 365 Contracts (Contracts that may be included on the Other Non-365 Contract List, the "**Other Non-365 Contracts**") which the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser to the extent allowed by applicable Law (such Contracts on the Other Non-365 Contract List shall be collectively referred to as the "**Designated Other Non-365 Contracts**"). The Other Non-365 Contract List may be updated from time to time after the date hereof to reflect any additional Other Non-365 Contract that the Purchaser may designate as a Designated Other Non-365 Contract or remove any previously designated

39

Designated Other Non-365 Contract prior to the applicable Final Contract Designation Date.

(iii)      Any (x) Other Non-365 Contracts that are not Designated Other Non-365 Contracts, and (y) Available Real Estate Leases under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.6(b) shall be referred to as "**Excluded Non-365 Contracts**" and shall not be Assigned Contracts hereunder.

(iv)      The Purchaser shall not have the right to amend the Other Non-365 Contract List after the applicable Final Contract Designation Date without the prior written consent of the Main Sellers.

(b)      Real Estate Leases

(i)      Section 2.1.6(b)(i) of the Sellers Disclosure Schedule sets forth a list prepared by the Sellers (the "**Real Estate Lease List**") of all real estate used in the conduct of the Acquired Business, whether located in the United States or in any other jurisdiction, except as otherwise covered under the EMEA Asset Sale Agreement, and subject to leases, subleases, space licenses or other agreements permitting a Seller to occupy real property, including an indication of which of the related properties have been made available to the Purchaser for either a Sublease or, as described in Section 5.16, a post-closing transitional license (the "**Available Real Estate Leases**").

(ii)      Section 2.1.6(b)(ii) of the Sellers Disclosure Schedule sets forth a list of the Available Real Estate Leases with respect to which (x) the Purchaser has elected to have the relevant Seller enter into a Sublease (as defined in Section 5.24) with the Purchaser or a Designated Purchaser at Closing (the "**Subleased Real Estate Leases**"), in accordance with and subject to the terms of the relevant lease, with each such Sublease to have a term to expire as specified in Section 5.24; or (y) the Purchaser has elected to have the relevant Seller enter into a license agreement (as contemplated by Section 5.16) with the Purchaser or a Designated Purchaser at Closing.  Prior to the applicable Final Contract Designation Date, the list of Subleased Real Estate Leases and the list of designated licenses may be updated to reflect the designation or removal of Available Real Estate Leases.

(iii)      After the applicable Final Contract Designation Date, the Purchaser shall have no right to designate additional Available Real Estate Leases for entry into a Sublease with or license to the Purchaser or Designated Purchaser or to remove any Available Real Estate Lease which has or shall have previously been designated by the Purchaser for sublease under this Section 2.1.6(b), without the prior written consent of the Main Sellers;

(iv)      It is further understood and agreed that the Purchaser shall be obligated to enter into Subleases under all Subleased Real Estate Leases.

40

(c)     Subject to Section 2.1.6(d), Section 2.1.10, Section 5.13 and the receipt of any required Consent, all the Non-365 Customer Contracts and the Designated Other Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at Closing pursuant to Section 2.1.1(c) and the Purchaser or a Designated Purchaser shall enter into a Sublease at Closing pursuant to Section 5.24 with the relevant Seller under each of the Subleased Real Estate Leases in effect as of the Closing.

(d)     The Parties shall, and the Purchaser shall cause the Designated Purchasers to, use their reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, to a Designated Purchaser) of the 365 Customer Contracts, the Designated Other 365 Contracts, the Non-365 Customer Contracts and the Designated Other Non-365 Contracts in force as of the Closing Date, and the entry into the Subleases; provided, however, that, except as expressly provided in Section 2.1.7(c) with respect to Cure Costs for Customer Contracts, the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents. For greater certainty, the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.7   Cure Costs; Adequate Assurance.

(a)     On or prior to the date hereof, the Sellers shall have delivered Section 2.1.7(a)(i) of the Sellers Disclosure Schedule to the Purchaser, which Schedule contains with respect to each Other 365 Contract and Other Non-365 Contract, the Sellers' good faith estimate of the amount of Cure Costs.

(b)     To the extent that the assumption and assignment of any 365 Customer Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order. To the extent that assumption and assignment of any Designated Other 365 Contract entails the payment of any Cure Cost (the "**Other 365 Cure**") as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order, the Purchaser shall be responsible for payment of such Cure Cost; provided, that any such payment by the Purchaser shall not entitle the Purchaser to any adjustment to the Purchase Price or any reimbursement or indemnification from the Sellers on account of payments made by the Purchaser pursuant to this section 2.1.7(b).

(c)     To the extent that assignment to the Purchaser or a Designated Purchaser of any Non-365 Customer Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction. To the extent that assignment to the Purchaser or a Designated Purchaser of any Assigned Contract other than a Non-365 Customer Contract or an Assumed and Assigned Contract entails the payment of Cure Costs (the "**Other Non-365 Cure**," and together with the Other 365 Cure, the "**Other Cure**"), the Purchaser shall be responsible for payment of such Cure Cost to such contracting party in a manner agreed between the Purchaser, the Sellers and such contracting party or ordered by a

41

court of competent jurisdiction; provided, that any such payment shall not entitle the Purchaser to any adjustment to the Purchase Price or any reimbursement or indemnification from the Sellers on account of payments made by the Purchaser pursuant to this section 2.1.7(c).

(d)    The Purchaser and the Sellers agree to carry out the actions set forth in Exhibit 2.1.7(d).

(e)    To the extent that entry into a Sublease with the Purchaser or a Designated Purchaser of any Subleased Real Estate Lease or the license of any Available Real Estate Lease pursuant to Section 2.1.6(b) entails the payment of Cure Costs, the Purchaser shall pay its pro-rata share (based on the ratio of the rentable square footage of the premises subject to such sublease or license to the overall rentable square footage of the premises demised under such Subleased Real Estate Lease or Available Real Estate Lease) of such Cure Costs directly to such contracting party in a manner agreed between the Purchaser and such contracting party or ordered by a court of competent jurisdiction. The Main Seller or relevant Seller shall be responsible to pay the remainder of such Cure Costs in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction. In the case of any Cure Costs relating to any Available Real Estate Lease, the Sellers and the Purchaser shall agree as to the amounts required to be paid to the relevant landlord prior to payment by either the Sellers or the Purchaser with respect to the same.

(f)    Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall provide adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

(g)    The Parties shall, and shall cause the Other Sellers and the Designated Purchasers, as applicable, to, use reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts and the entry into Subleases; provided, however, that the Sellers shall be under no obligation to seek any such Consent prior to the completion of the Auction or to compromise any right, asset or benefit or to expend any amount or incur any Liability or provide any other consideration in seeking such Consents other than filing and application fees to Government Entities and payment of Cure Costs for which such Party is responsible pursuant to Section 2.1.7, and, provided, further, that the failure to obtain any or all of such Consents shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.8    Local Sale Agreements. Subject to the terms and conditions hereof, to the extent necessary to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and/or relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in the countries where such Local

42

Sale Agreements are required, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. In the event of a conflict between this Agreement and any Local Sale Agreement, this Agreement shall prevail. The Parties further agree that no allocation of Purchase Price and no amounts by way of valuation of the Assets, whether provisional, estimated or final, shall be included in any instruments of assignment and/or transfer, except as required by applicable Law.

2.1.9    EMEA Asset Sale Agreement. Except as otherwise set forth in Exhibit 5.25 hereto, none of the EMEA Sellers or the Joint Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into the EMEA Asset Sale Agreement) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Sellers or the Joint Administrators in any manner whatsoever. The only assets, rights, properties and Liabilities of the EMEA Sellers or the Joint Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement. Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

2.1.10    Non-Assignable Assets. Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without such Consent (in each case, after taking into account the effect of the U.S. Sale Order, the Canadian Approval and Vesting Order, and any other order of a court of competent jurisdiction), would constitute a breach, default, violation or other contravention of Law or the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset. For greater certainty, except as explicitly set forth in Article VIII, failure to obtain any such Consent shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price, and the Main Sellers and the Purchaser shall each act in accordance with Section 5.13 hereof in relation to any Deferred Transfer Purchased Assets.

SECTION 2.2        Purchase Price.

2.2.1    Purchase Price. Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the purchase, sale, assignment and conveyance of the Sellers' and EMEA Sellers' right, title and interest in, to and under the Assets and the EMEA Assets, respectively, pursuant and subject to the terms hereof and pursuant and subject to the terms of the EMEA Asset Sale Agreement, respectively, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the Designated Purchasers, shall (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and the EMEA Assumed Liabilities and (y) pay to the Distribution Agent, as

43

agent for the Sellers and the EMEA Sellers, an aggregate amount of cash equal to Sixty Five million dollars ($65,000,000) (the "**Base Purchase Price**"), as adjusted pursuant to Sections 2.2.2 and 2.2.3 (as so adjusted, the "**Purchase Price**"); provided, that for the avoidance of doubt, the Parties acknowledge that amounts of or in respect of VAT (as defined in the EMEA Asset Sale Agreement) and/or Transfer Taxes that are the responsibility of the Purchaser pursuant to Section 6.1 shall be paid directly to the Tax Authority or, to the relevant Seller, EMEA Seller or Joint Administrators for remittance to the applicable Tax Authority in the amount required to be paid to such Tax Authority in accordance with applicable Law, pursuant to and in accordance with the relevant provisions of this Agreement and the EMEA Asset Sale Agreement and shall not be paid to the Distribution Agent).

2.2.2    Estimated Purchase Price.

(a)    For purposes of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser (on its own behalf and as agent for the Designated Purchasers) to the Distribution Agent as agent for the Sellers and the EMEA Sellers at the Closing pursuant to Section 2.3.2(a), at least three (3) Business Days prior to the Closing Date, the Main Sellers and the EMEA Sellers shall deliver to the Purchaser a written statement (the "**Estimated Closing Statement**") prepared in good faith in accordance with the Calculation Principles and the terms hereof setting forth (i) the estimated Adjusted Net Working Capital Transferred as of the Closing Date (the "**Estimated Closing Adjusted Net Working Capital Transferred**"), (ii) all estimated EMEA Downward Adjustments as of the Closing Date (the "Estimated EMEA Downward Adjustment"), (iii) the estimated Total Prepaid Revenue Transferred as of the Closing Date (the "**Estimated Total Prepaid Revenue Transferred**"), (iv) the estimated Pre-Close Employment Payments that the EMEA Sellers have failed to pay prior to the Closing in accordance with the EMEA Asset Sale Agreement (the "**Estimated Pre-Close Employment Payments**") and (v) the Estimated Purchase Price.

(b)    As used in this Agreement, "**Estimated Purchase Price**" shall mean an amount equal to:

(i)    the Base Purchase Price; minus

(ii)    the amount, if any, by which the Estimated Closing Adjusted Net Working Capital Transferred is less than the Target Adjusted Net Working Capital Transferred; minus

(iii)    the Estimated EMEA Downward Adjustment; minus

(iv)    the excess (if any) of the Estimated Total Prepaid Revenue Transferred over the Target Total Prepaid Revenue Transferred; minus

(v)    an amount equal to the Estimated Pre-Close Employment Payments.

2.2.3    Post-Closing Purchase Price Adjustment.

2.2.3.1 Closing Statement; Dispute Resolution

44

(a)    As promptly as practicable (and in any event within sixty (60) days after the Closing), the Purchaser shall deliver to the Main Sellers and the EMEA Sellers a written statement (the "**Closing Statement**") that shall contain their final calculation of (i) the Adjusted Net Working Capital Transferred as of the Closing Date (the "**Closing Adjusted Net Working Capital Transferred**"), (ii) all EMEA Downward Adjustments as of the Closing (the "**Closing EMEA Downward Adjustment**"), (iii) the Total Prepaid Revenue Transferred as of the Closing Date (the "**Closing Total Prepaid Revenue Transferred**"), (iv) Pre-Close Employment Payments that the EMEA Sellers have failed to pay prior to the Closing as of the Closing (the "**Closing Pre-Close Employment Payments**"), (v) the final Purchase Price, and (vi) the amount payable by either Party pursuant to Section 2.2.3.2 as an adjustment to the Estimated Purchase Price. The Closing Statement shall be prepared in accordance with the Calculation Principles and the terms hereof. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Main Sellers and the EMEA Sellers shall, promptly upon request, provide the Purchaser and its respective accountants reasonable access to the assets, books, records, documents, schedules and workpapers and personnel of the Acquired Business in connection with the preparation of the Estimated Closing Statement.

(b)    If the Main Sellers and the EMEA Sellers disagree with the determination of the Closing Statement, the Main Sellers and the EMEA Sellers shall notify the Purchaser of such disagreement within sixty (60) days after delivery of the Closing Statement (such notice, the "**Disagreement Notice**"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Main Sellers and the EMEA Sellers fail to deliver the Disagreement Notice by the end of such sixty- (60-) day period, the Main Sellers and the EMEA Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers and the EMEA Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and the EMEA Sellers and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers and the EMEA Sellers and their respective accountants reasonable access to the assets, books, records, documents, schedules, workpapers and personnel of the Purchaser in connection with the Main Sellers' and the EMEA Sellers' and their respective accountants' review of the Closing Statement. The Purchaser, the Main Sellers and the EMEA Sellers shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Purchaser and the Main Sellers and the EMEA Sellers shall be final and binding upon the Parties.

(c)    If the Purchaser and the Main Sellers and the EMEA Sellers are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within fourteen (14) days after delivery of a Disagreement Notice by the Main Sellers and the EMEA Sellers, either the Main Sellers, the EMEA Sellers or the Purchaser may appoint the Accounting Arbitrator, on behalf of all Parties and the EMEA Sellers, to resolve such disagreement. The Accounting Arbitrator's determination shall be based only on the written submissions by the Main Sellers, the EMEA Sellers and the Purchaser and not upon any independent review by the Accounting Arbitrator. The Primary Parties and NNUK shall instruct the Accounting Arbitrator and the Accounting

Arbitrator shall consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers, the EMEA Sellers and the Purchaser have not resolved their disagreement. With respect to each such item, the decision of the Accounting Arbitrator shall be the amount claimed by the Main Sellers and the EMEA Sellers, the amount claimed by the Purchaser, or an amount between the amount claimed by the Main Sellers and the EMEA Sellers and the amount claimed by the Purchaser. The Main Sellers, NNUK and the Purchaser shall instruct, and they shall use their reasonable best efforts to cause, the Accounting Arbitrator to deliver to the Primary Parties and NNUK, as promptly as practicable (and in no event later than thirty (30) days after his or her appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Parties and the EMEA Sellers. Neither the Main Sellers, the EMEA Sellers nor the Purchaser shall have any ex parte communications or meetings with the Accounting Arbitrator regarding the subject matter hereof without the other Primary Parties' prior consent. In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by dollar amount) of the disputed items, then the Sellers and the EMEA Sellers shall pay the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers and the EMEA Sellers were correct as to a majority (by dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

2.2.3.2 Purchase Price Adjustment

(a)    Working Capital Adjustment Payments:

(i)    If the Closing Adjusted Net Working Capital Transferred, as finally determined in accordance with Section 2.2.3.1, is less than the Estimated Adjusted Net Working Capital Transferred, then the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay, or cause the Distribution Agent to pay, to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to such difference by wire transfer of immediately available funds to the bank account(s) designated in writing by the Purchaser within five (5) Business Days of the final determination of the Closing Adjusted Net Working Capital Transferred.

(ii)    If, instead, the Closing Adjusted Net Working Capital Transferred, as finally determined in accordance with Section 2.2.3.1, is greater than the Estimated Adjusted Net Working Capital Transferred but less than the Target Adjusted Net Working Capital Transferred, then the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the difference between the Closing Adjusted Net Working Capital Transferred and the Estimated Adjusted Net Working Capital Transferred by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers, within five (5) Business Days of the final determination of the Closing Adjusted Net Working Capital Transferred.

(iii)    If, instead, the Closing Adjusted Net Working Capital Transferred, as finally determined in accordance with Section 2.2.3.1, is greater than both the Estimated Adjusted Net Working Capital Transferred and the Target Adjusted Net Working Capital Transferred, then the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the difference between the Target Adjusted Net Working Capital Transferred and the Estimated Adjusted Net Working Capital Transferred by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers, within five (5) Business Days of the final determination of the Closing Adjusted Net Working Capital Transferred.

(b)    <u>EMEA Downward Adjustment</u>:

(i)    If the Closing EMEA Downward Adjustment, as finally determined in accordance with Section 2.2.3.1, is greater than the Estimated EMEA Downward Adjustment, then the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay, or cause the Distribution Agent to pay, to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to such difference by wire transfer of immediately available funds to the bank account(s) designated in writing by the Purchaser within five (5) Business Days of the final determination of the Closing EMEA Downward Adjustment.

(ii)    If, instead, the Closing EMEA Downward Adjustment, as finally determined in accordance with Section 2.2.3.1, is less than the Estimated EMEA Downward Adjustment, then the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the difference between the Estimated EMEA Downward Adjustment and the Closing EMEA Downward Adjustment by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers, within five (5) Business Days of the final determination of the Closing EMEA Downward Adjustment.

(c)    <u>Prepaid Revenue Adjustments</u>:

(i)    If the Closing Prepaid Revenue Transferred, as finally determined in accordance with Section 2.2.3.1, is greater than the Estimated Prepaid Revenue Transferred, then the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay, or cause the Distribution Agent to pay, to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to such difference by wire transfer of immediately available funds to the bank account(s) designated in writing by the Purchaser within five (5) Business Days of the final determination of the Closing Prepaid Revenue Transferred.

47

(ii)    If, instead, the Closing Prepaid Revenue Transferred, as finally determined in accordance with Section 2.2.3.1, is less than the Estimated Prepaid Revenue Transferred but greater than the Target Prepaid Revenue Transferred, then the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the difference between the Closing Prepaid Revenue Transferred and the Estimated Prepaid Revenue Transferred by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers, within five (5) Business Days of the final determination of the Prepaid Revenue Transferred.

(iii)    If, instead, the Closing Prepaid Revenue Transferred, as finally determined in accordance with Section 2.2.3.1, is less than both the Estimated Prepaid Revenue Transferred and the Target Prepaid Revenue Transferred, then the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the difference between the Target Prepaid Revenue Transferred and the Estimated Prepaid Revenue Transferred by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers, within five (5) Business Days of the final determination of the Closing Prepaid Revenue Transferred.

(d)    Pre-Close Employment Payments:

(i)    If the Closing Pre-Close Employment Payments, as finally determined in accordance with Section 2.2.3.1, is greater than the Estimated Pre-Close Employment Payments, then the Main Sellers, acting on their own behalf and as agent of the Other Sellers and the EMEA Sellers, shall pay, or cause the Distribution Agent to pay, to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers (if applicable), an amount equal to such difference by wire transfer of immediately available funds to the bank account(s) designated in writing by the Purchaser within five (5) Business Days of the final determination of the Closing Pre-Close Employment Payments.

(ii)    If, instead, the Closing Pre-Close Employment Payments, as finally determined in accordance with Section 2.2.3.1, is less than the Estimated Pre-Close Employment Payments, then the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to such difference by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers within five (5) Business Days of the final determination of the Closing Pre-Close Employment Payments.

(e)    Any payment to be made under this Section 2.2.3.2 shall include interest thereon accrued from the Closing Date to the date of payment at a rate per annum of three percent (3%). Such interest shall accrue from day to day.

48

(f)     The Parties shall deliver appropriate instructions to the Escrow Agent in respect of any payment required to be made by the Sellers and the EMEA Sellers pursuant to this Section 2.2.3.2. Any funds remaining in the Escrow Account after such payment has been made, or all such funds in the Escrow Account in the event no such payment is required to be made, shall be delivered to the Distribution Agent, and the Parties shall promptly deliver appropriate instructions to the Escrow Agent to effect such delivery.

2.2.4     Good Faith Deposit.

(a)     Prior to the date hereof, the Purchaser has delivered to NNI cash in the amount of $1.25 million ($1,250,000) (the "**Good Faith Deposit**") to serve as earnest money under this Agreement and the EMEA Asset Sale Agreement.

(b)     The Good Faith Deposit, together with actual earnings thereon, shall:

(i)     If the Purchaser is the Successful Bidder at the Auction, be applied to the Estimated Purchase Price to be paid by the Purchaser and therefore be paid to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) at Closing pursuant to Section 2.3.2(b); or

(ii)     If the Purchaser is not the Successful Bidder at the Auction, be returned to the Purchaser as soon as practicable following the Auction; or

(iii)     become property of the Sellers and the EMEA Sellers in the event that this Agreement is terminated by any Primary Party pursuant to Section 9.1(c)(ii) or in the event that the EMEA Asset Sale Agreement is terminated by the EMEA Sellers pursuant to Clause 15.4.3(B) of the EMEA Asset Sale Agreement.

(c)     If not previously paid to the Sellers, the Good Faith Deposit together with actual earnings thereon shall be held by NNI until the Closing and delivered to the Distribution Agent at Closing in accordance with Section 2.3.2(b) or, in the event this Agreement or the EMEA Asset Sale Agreement is terminated before the Closing for any reason other than those set forth in Section 2.2.4(b), be returned by NNI to the Purchaser; provided, that such return of the Good Faith Deposit by NNI to the Purchaser shall not relieve the Purchaser from any potential obligation it may have to pay damages to the Sellers or the EMEA Sellers for a breach hereof and/or of the EMEA Asset Sale Agreement, as applicable, as and when such damages become due and payable (including pursuant to any settlement of claims).

2.2.5     Escrow.

(a)     On or prior to the date of the entry of the U.S. Sale Order, each of NNL, NNI, NNUK and the Purchaser shall have entered into the Escrow Agreement with the Escrow Agent, in order to secure payment by the Sellers or the EMEA Sellers, as appropriate, of amounts owed to the Purchaser pursuant to Section 2.2.3 as post-Closing purchase price adjustments and other payment obligations provided hereunder.

(b)     Each of NNL, NNI, NNUK and the Purchaser hereby undertakes to promptly execute and deliver to the Escrow Agent, in accordance with the formalities set forth in the Escrow Agreement, joint instructions to pay to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) or the Purchaser, as applicable, funds from the Escrow Account at any time that any Person becomes entitled to such payment from the Escrow Account pursuant to this Agreement.

2.2.6   Purchase Price Allocation.

(a)     Except as otherwise required by applicable Law, the Parties and the EMEA Sellers shall (i) first allocate to the tangible Assets, the tangible EMEA Assets and the CIP Unbilled Accounts Receivable of the Acquired Business a proportion of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities and the EMEA Assumed Liabilities), equal to the net book value of such Assets and such EMEA Assets as of the Closing Date and (ii) then allocate the balance of the Purchase Price, as adjusted in clause (i) of this Section, to the intangible Assets and the intangible EMEA Assets.

(b)     To the extent necessary to file Transfer Tax Returns, the Parties shall negotiate in good faith to determine an allocation of the Purchase Price, (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities and the EMEA Assumed Liabilities) among the Assets and the EMEA Assets in accordance with the principles of Section 1060 of the Code and the Treasury regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be consistent with the principles of Section 2.2.6(a) (such allocation, a "**Partial Allocation**"). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Accounting Arbitrator, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including for this purpose an allocation required, approved or authorized pursuant to a Bankruptcy Proceeding), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation (but in all cases shall be consistent with the principles of Section 2.2.6(a) to the extent permitted by such Government Entity). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Accounting Arbitrator has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.7(b), then such Transfer Tax Return shall be timely filed in the manner that the Party with primary responsibility for filing such return reasonably determines and, upon receiving the Accounting Arbitrator's later determination and to the extent permitted under applicable Law, the filing Party shall promptly file, or cause to be filed, an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Accounting Arbitrator (as modified to be consistent with the allocation required by a Government Entity, as described above), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes (including the preparation and filing of any Transfer Tax Returns). For purposes of this Section 2.2.6(b), the term "Parties" shall include the EMEA Sellers to the extent any negotiations or agreement required hereunder concern Transfer Tax Returns.

50

SECTION 2.3          Closing.

2.3.1    Closing Date.  The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities shall occur simultaneously with the closing of the transactions contemplated by the EMEA Asset Sale Agreement and shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 8:00 am New York time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under Article VIII (other than conditions to be satisfied at Closing, but subject to the waiver or fulfillment of those conditions at Closing) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), or at such other place, date and time as shall be mutually agreed upon in writing by the Purchaser, the Main Sellers, the Joint Administrators and the EMEA Sellers (the day on which the Closing takes place being the "**Closing Date**").  The transactions contemplated by this Agreement and the other Transaction Documents will be deemed completed (the "**Closing**") at the time the Parties release and exchange signature pages and the Sellers and the Distribution Agent, as applicable, receive the deliverables set forth in Section 2.3.2.

Upon occurrence of the Closing, such legal title, title and interest as has been agreed to be transferred pursuant to Article II and risk of loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at 11:59 p.m. local time on the Closing Date in the jurisdiction in which the Assets are located in accordance with the terms hereof.  For the avoidance of doubt, all Transferred Employees shall transfer at the Employee Transfer Date.

2.3.2    Closing Actions and Deliveries.  At the Closing:

(a)      the Purchaser shall deliver to:

(i)      the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, an amount equal to the Estimated Purchase Price minus the Good Faith Deposit, the Aggregate Escrow Amount, the French Escrow Amount, the TSA Escrow Amount and the TSA EMEA Employment Escrow Amount (together with any actual earnings thereon) by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Distribution Agent in a written notice to the Purchaser;

(ii)     the Escrow Agent, an amount equal to the Aggregate Escrow Amount;

(iii)    the NNFSAS Escrow Agent, an amount equal to the French Escrow Amount;

(iv)     the TSA Escrow Agent, an amount equal to the TSA Escrow Amount;

51

(v)      the TSA Employment Escrow Agent, an amount equal to the TSA Employment Escrow Amount;

(vi)      the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied; and

(vii)      the other parties thereto, executed counterparts of the Transition Services Agreement, the Intellectual Property License Agreement, the Trademark License Agreement and any other Ancillary Agreements that have been executed at such time.

(b)      NNL, NNI, NNUK and the Purchaser shall cause the Escrow Agent to deliver to the Distribution Agent (as agent for the Sellers and the EMEA Sellers), and the Escrow Agent shall deliver to the Distribution Agent (as agent for the Sellers and the EMEA Sellers), the Good Faith Deposit (together with actual earnings thereon) by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Distribution Agent in a written notice to NNL, NNI and NNUK and the Purchaser;

(c)      the Main Sellers shall deliver to the Purchaser:

(i)      a duly executed certificate of an executive officer of one of the Main Sellers certifying that the conditions set forth in Sections 8.3(a) and 8.3(b) have been satisfied;

(ii)      updated Sections 2.1.5(a), 2.1.5(b), 2.1.6(a)(i), 2.1.6(a)(ii), 2.1.6(b)(ii) and 4.11(b) of the Sellers Disclosure Schedule, if applicable.

(iii)      executed counterparts of the Transition Services Agreement, the Intellectual Property License Agreement, the Trademark License Agreement and any other Ancillary Agreements that have been executed at such time; and

(iv)      certified copies of the U.S. Sale Order and the Canadian Approval and Vesting Order; and

(d)      each Party shall deliver, or cause to be delivered, to the other Parties any other documents reasonably requested by such other Parties in order to effect, or evidence the consummation of, the transactions contemplated herein.

(e)      each Seller shall deliver to the Purchaser, (i) in the case of a Seller that is a "United States person" within the meaning of Section 7701(a)(30) of the Code and applicable Treasury Regulations, a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations; and (ii) (x) a duly executed certificate certifying that such Seller is not a non-resident of Canada for purposes of section 116 of the Income Tax Act (Canada) (and the equivalent Quebec tax statute), or (y) in the case of a Seller that is a non-resident of Canada for purposes of section 116 of the Income Tax Act (Canada) (and the equivalent Quebec tax statute), a duly executed certificate certifying that the

52

Assets transferred or assigned to the Purchaser pursuant to this Agreement or any of the other Transaction Documents by such Seller do not include any taxable Canadian property as defined in the Income Tax Act (Canada) (and the equivalent Quebec tax statute).

SECTION 2.4        Designated Purchaser(s).

(a)      The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Affiliates of the Purchaser to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ identified Transferred Employees on and after the Closing Date (any Person that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (y) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and Article VII and demonstrate satisfaction of the requirements of section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance with respect to the Assumed and Assigned Contracts and (z) any such designation not creating any Liability (including any Liability relating to Taxes other than Taxes for which the Purchaser is liable pursuant to Article VI) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the Assets, assumed the Assumed Liabilities and/or employed the Transferred Employees, and which Liability is not fully reimbursed by or on behalf of the Purchaser; provided, further, however, that the Sellers acknowledge and agree that each of Ericsson Inc., Ericsson Canada Inc., or Ericsson AB (each, a "**Confirmed Designated Purchaser**") shall be deemed to satisfy the foregoing conditions and may be a Designated Purchaser. Subject to Section 6.2(c), if the designation of a Confirmed Designated Purchaser creates any Liability relating to Taxes for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, the Purchaser or the Designated Purchasers shall pay such additional amounts to the Sellers such that the total amount received by the applicable Sellers, after reducing such amount by the additional Liability relating to Taxes for the Sellers or their Affiliates created by the designation of such Confirmed Designated Purchaser, will equal the full amount such Seller would have received from the Purchaser had the designation not been made. No such designation shall relieve the Purchaser of any of its obligations hereunder. Any breach hereof by a Designated Purchaser shall be deemed a breach by the Purchaser. The Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations assumed by any of them hereunder.

(b)      As soon as reasonably practicable and in no event later than twenty (20) days prior to the Closing Date, the Purchaser shall make the designation referenced in Section 2.4(a) by way of a written notice to be delivered to the Sellers; provided, however, that the Parties agree that such notice may be amended and/or updated by the Purchaser from time to time to the extent there is a relevant material change in the information provided by the Sellers with respect to the jurisdictions in which the Assets are located. Such notice shall, (x) for any Designated Purchasers other than the Confirmed Designated Purchasers, contain appropriate information about the Designated Purchaser(s), including the legal name of the Designated Purchaser, the jurisdiction of incorporation or formation of the Designated Purchaser, the actual (and if there is any intention to change such residence on or prior to Closing proposed) jurisdiction of Tax residence of the Designated Purchaser and (y) (i) indicate in reasonable detail

53

which Assets, Assumed Liabilities and Transferred Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder, (ii) include a signed counterpart or an accession agreement to this Agreement, in either case in a form reasonably acceptable to the Main Sellers, whereby such Designated Purchaser agrees to be bound by the terms of this Agreement and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder and (iii) for any Designated Purchasers other than the Confirmed Designated Purchasers, contain such reasonable evidence as the relevant Seller may reasonably require to demonstrate that any such designation will not (A) create any liability relating to Taxes for any Seller or any Affiliate thereof or any member of the Sellers' group that would not have existed had the Purchaser purchased the relevant Asset, assumed the relevant Assumed Liability or employed the relevant Transferred Employee and (B) reduce the amount of consideration actually received by any Seller whether as a result of any deduction or withholding for or on account of Tax or otherwise, where such reduction would not have occurred had the purchase, assumption and/or employment (as relevant) been made by the Purchaser, in each of clauses (A) and (B) which cost is not fully reimbursed by the Purchaser or a Designated Purchaser at the Closing.

ARTICLE III.

REPRESENTATIONS AND
WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to, and agrees with, the Sellers and the EMEA Sellers as follows:

SECTION 3.1        Organization and Corporate Power.

(a)    The Purchaser is a corporation duly organized and validly existing and in good standing under the Laws of Sweden. Each Designated Purchaser other than the Purchaser is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Each of the Purchaser and the Designated Purchasers has the requisite power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party.

(b)    Each of the Purchaser and the Designated Purchasers is qualified or licensed to do business as contemplated by this Agreement and the other Transaction Documents, to own or lease and operate its properties and assets, including the Assets, and is in good standing in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement, the other Transaction Documents to which it is or will become a party.

SECTION 3.2        Authorization; Binding Effect; No Breach.

54

(a)      The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is, or at Closing will be, a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable. Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is, or at the Closing Date will be, a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principals of equity regardless of whether considered in a proceeding in equity or at Law.

(b)      The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, or require any Consent (other than the Mandatory Regulatory Approvals) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any Contract or other document to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not individually or in the aggregate materially hinder, delay or impair the performance by the Purchaser or the Designated Purchasers of any of their obligations under any Transaction Document.

SECTION 3.3      Adequate Assurance of Future Performance. To the extent required by any Bankruptcy or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract. The Purchaser acknowledges and agrees that, if it becomes necessary to provide an Assumed and Assigned Contract counterparty or a landlord under any Subleased Real Estate Lease with additional assurances to satisfy the Purchaser's or a Designated Purchaser's obligations under Section 2.1.6(d) or Section 2.1.7, the Purchaser shall, and shall cause the relevant Designated Purchasers to, perform all actions and bear all such costs and expenses as may be necessary or advisable in connection with their obligations under Section 2.1.6(d) and Section 2.1.7 without recourse to any Seller; provided, however, that the Purchaser may, subject to the conditions set forth herein (and other than with respect to a Customer Contract), elect to forego performing such actions and incurring such costs and expenses, in which event the relevant Assumed and Assigned Contract shall be deemed to be a Non-Assigned Contract at Closing, unless otherwise agreed in writing by the Seller that is a party thereto.

SECTION 3.4      Financing.

55

(a)      The Purchaser shall have at the Closing sufficient available funds to permit the Purchaser and the Designated Purchasers to pay (i) the Estimated Purchase Price and all other amounts to be paid or repaid by the Purchaser under the Transaction Documents to the extent payable on the Closing Date and (ii) all of the Purchaser's and its Affiliates' fees and expenses associated with the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement.

SECTION 3.5      The Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

(a)      The Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement and the other Transaction Documents. In consultation with experienced counsel and advisors of its choice, the Purchaser has conducted its own independent review and analysis of the Business, the Assets, the EMEA Assets, the Assumed Liabilities, the EMEA Assumed Liabilities and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents. The Purchaser acknowledges that it and/or its representatives (including its outside counsel) have been permitted such access to the books and records, facilities, equipment, contracts and other properties and assets of the Business as it required to complete its review, and that it and its representatives have had an opportunity to meet with the officers and other employees of the Sellers, the EMEA Sellers and the Business to discuss the Business.

(b)      The Purchaser acknowledges and agrees that:

(i)      except for the representations and warranties expressly set forth in herein or in the other Transaction Documents, which representations and warranties set forth herein shall terminate as of Closing, the Purchaser has not relied on any representation or warranty from the Sellers, the EMEA Sellers, or any Affiliate of any such Person or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or the EMEA Sellers or their respective Affiliates in determining whether to enter into this Agreement;

(ii)      except for the representations and warranties expressly set forth in Article IV, which representations and warranties shall not survive, and shall terminate as of, the Closing, none of the Sellers, the EMEA Sellers, or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, the EMEA Sellers, or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets or the EMEA Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets or the EMEA Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, the EMEA Assumed Liabilities, or as to the accuracy or completeness of any information regarding any of the foregoing that the Sellers, the EMEA

56

Sellers or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)    notwithstanding anything herein to the contrary, all representations and warranties made in Article IV by the Main Sellers with respect to the EMEA Sellers, the Business of the EMEA Sellers, the EMEA Assets (including any portion thereof such as the EMEA Transferred Intellectual Property) or the EMEA Assumed Liabilities are made only to the Knowledge of the Main Sellers. The Sellers, their Affiliates and the representatives of any of the Sellers or any of their Affiliates shall not have or be subject to any Liability or obligation to the Purchaser, any Designated Purchaser or any Affiliate or representative of the Purchaser or any Designated Purchaser with respect to or on account of any such representation or warranty;

(iv)    no Seller, EMEA Seller or any other Person shall have or be subject to any liability to the Purchaser, any Designated Purchaser or any Affiliate or representative of the Purchaser or any Designated Purchaser resulting from the distribution to the Purchaser or any Designated Purchaser, or the Purchaser's or any Designated Purchaser's use, of the information referred to in Section 3.6(b)(ii);

(v)    except for the representations and warranties expressly set forth in Article IV (which representations and warranties shall not survive Closing), subject to the terms of the Bankruptcy Consents, upon the Closing, the Purchaser or any Designated Purchaser takes the Assets on an "as is" and "where is" basis; and

(vi)    notwithstanding anything to the contrary contained herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person or the availability of funds to the Purchaser.

(c)    Without limiting the generality of the foregoing, THE PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT (I) OF ANY ASSETS, INCLUDING WITH RESPECT TO THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR (II) REGARDING THE SCOPE, VALIDITY OR ENFORCEABILITY OF ANY TRANSFERRED INTELLECTUAL PROPERTY, OR LICENSED INTELLECTUAL PROPERTY RIGHTS.

SECTION 3.6    Brokers. Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

57

ARTICLE IV.

REPRESENTATIONS AND
WARRANTIES OF THE SELLERS

Except (a) as set forth in the applicable section of the Sellers Disclosure Schedule (it being agreed that any matter disclosed in any section of the Seller Disclosure Schedule shall be deemed disclosed in any other section of the Seller Disclosure Schedule if such information is reasonably apparent to be so applied to such other section), (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in Section 4.1 through Section 4.14:

SECTION 4.1    Organization and Corporate Power.

(a)    Each Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Subject to entry of the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of such other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents as contemplated hereby (collectively, the "**Bankruptcy Consents**"), each of the Main Sellers has, and each Other Seller that will execute a counterpart to this Agreement or accede to this Agreement will have, the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party.

(b)    Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on its respective portion of the Acquired Business in the Ordinary Course, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Acquired Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed does not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 4.2    Authorization; Binding Effect; No Breach.

(a)    Subject to the receipt of the Bankruptcy Consents, (i) the execution, delivery and performance by each Main Seller of the Transaction Documents to which such Main Seller is, or at the Closing will be, a party has been or at Closing will be duly authorized by such Main Seller and (ii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes a counterpart to this Agreement or accedes to this Agreement. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is or will be a party, will constitute a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to (in the case of the Non-Debtor Sellers) applicable bankruptcy, insolvency,

58

reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)     Subject to receipt of the Bankruptcy Consents and the Mandatory Regulatory Approvals, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts, any Subleases and any other Consents expressly provided for herein) require any Consent (other than the Mandatory Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any Material Contract to which the relevant Seller is a party, (iii) any order of any Government Entity applicable to any Seller or by which any of their respective Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions, declarations and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (disregarding for these purposes the phrase "transactions contemplated hereby" in clause (e) of the definition of Material Adverse Effect).

SECTION 4.3     Title to Tangible Assets; Sufficiency of Assets.

(a)     Except for Permitted Encumbrances, Liens created by or through the Purchaser or the Designated Purchasers or any of their Affiliates and Liens that shall be released prior to the Closing which are set forth in Section 4.3(a) of the Sellers Disclosure Schedule, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and such Sellers have good and marketable title thereto.

(b)     All tangible assets included in the Owned Equipment are in satisfactory operating condition for the uses to which they are being put, subject to ordinary wear and tear and ordinary maintenance requirements, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     As of the date hereof and assuming the assignment or novation of all Seller Contracts, Non-Assignable Contracts and the MSS Portion of the Bundled Contracts to the Purchaser or a Designated Purchaser and the receipt of all Seller Consents, the Assets and the rights of, or to be acquired by, the Purchaser and/or the Designated Purchasers under this Agreement and the EMEA Asset Sale Agreement, together with the rights to be provided to the Purchaser and/or Designated Purchasers under the other Transaction Documents, considered together, include such assets, properties and rights (other than Intellectual Property, Overhead and Shared Services, non-exclusive supply contracts of the Business, the services of those Employees that will not be considered Transferred Employees for purposes of this Agreement and any services currently being provided to the Business as of the Closing Date that are offered to the Purchaser, but that the Purchaser elects not to receive under the Transition Services Agreement and other than any real estate assets of the Business that the Purchaser has agreed or elects not to have transferred or subleased to it hereunder) as are necessary and sufficient to

59

conduct the Acquired Business substantially in the manner conducted by the Sellers as of the date hereof (as such conduct may reasonably be modified as a result of the restructuring plan previously disclosed to the Purchaser), except where the absence of such assets or rights would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 4.4        Material Contracts.

(a)        Section 4.4(a) of the Sellers Disclosure Schedule sets forth, as of the date hereof, a list of every Seller Contract and Bundled Contract (with respect to those portions relating to the Products or Services), but excluding (a) all licenses of Intellectual Property, all of which are addressed in Section 4.5 below, (b) all real property leases, certain of which are addressed by Section 4.9 below, and (c) all purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:

(i)        in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than $2,000,000 per annum in the aggregate or (B) the receipt by the Acquired Business of more than $2,000,000 per annum in the aggregate, except any Contracts referred to in any other subsection of this Section 4.4(a);

(ii)        is a non-competition, exclusivity, or other agreement that materially restricts the Business, or would materially restrict the business of the Purchaser or the Purchaser's Affiliates following the Closing, from directly or indirectly engaging in any business activity anywhere in the world (whether such agreement is exclusive by geography, product type or otherwise);

(iii)        is a material joint venture, partnership or alliance Contract, or other agreement that involves the sharing of profits, losses, costs or liabilities in respect of the Business, Assets or Assumed Liabilities;

(iv)        is a research and development Contract involving consideration or expenditures in excess of $2,000,000 in the most recent fiscal year or which is reasonably expected to involve consideration or expenditures of more than $2,000,000 per annum after the date hereof;

(v)        is a Contract involving the sale or distribution of the Products, for consideration of more than $2,000,000 in the most recent fiscal year or which is reasonably expected to result in the payment of consideration of more than $2,000,000 in the aggregate per annum after the date hereof;

(vi)        is a distribution Contract that contains any express inventory repurchase requirement (whether contingent or otherwise);

(vii)        has "take or pay" or "requirements" provisions committing the Seller party thereto to purchase goods or services in excess of $2,000,000 in 2009 or any calendar year thereafter;

60

(viii)    involves capital expenditures in excess of $2,000,000 after the date hereof;

(ix)    requires the posting of a security deposit, letter of credit, performance bond or surety; or

(x)    contains any material obligation secured by a Lien on any material Asset (other than by a Permitted Encumbrance or by any encumbrance that will be released prior to or on the Closing Date)

(all the above, collectively, the "**Material Contracts**").

(b)    Complete copies (including all waivers, schedules and amendments) of all Material Contracts have been made available to certain of the Purchaser's representatives pursuant to the Clean Team Confidentiality Agreement.

(c)    As of the date hereof, except (i) as disclosed in Section 4.4(c) of the Sellers Disclosure Schedule or reflected in the Material Contracts disclosed to the Purchaser and (ii) for any claims made in connection with the Bankruptcy Proceedings, no Seller has been notified in writing that any of them is in material breach or default under any Seller Contract that in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than $100,000 in the aggregate or (B) the receipt by the Acquired Business of more than $100,000 in the aggregate, nor has any Seller been notified in writing within the past six months of the other party's intention to terminate, amend or modify any such Seller Contract in any material respect.

(d)    As of the date hereof, no Seller has received any written notice within the last twelve (12) months that any of the ten (10) largest customers of the Business (based on the dollar amount of consolidated net sales of the Business attributable to such customer) for the fiscal year ended December 31, 2009, has sought or is seeking to significantly reduce its use of Services or purchase of Products or the price it will pay for a like volume of such Services or Products.

(e)    As of the date hereof, no Seller has received any written notice within the last twelve (12) months that any of the five (5) largest suppliers (based on the dollar amount of consolidated net purchases of the Business attributable to such supplier) of the Business for the fiscal year ended December 31, 2009, has sought or is seeking to significantly reduce the supply of materials, products or services to the Business or significantly increase the price the Business must pay for a like volume of such materials, products or services.

SECTION 4.5        Intellectual Property.

(a)    The Transferred Intellectual Property, the EMEA Transferred Intellectual Property, the Licensed Intellectual Property and the Intellectual Property licensed to the Sellers and/or their Affiliates under the Inbound License Agreements and the Patent Cross-License Agreements include all the material Intellectual Property that, as of the date hereof, covers or is used by the Sellers or the EMEA Sellers to conduct or operate the Acquired Business, including

61

in connection with the Products or Services, except with respect to any Intellectual Property used in connection with any Overhead and Shared Services.

(b)     A list of all the Transferred Intellectual Property applied for or registered in the name of the Sellers is set forth in Section 4.5(b) of the Sellers Disclosure Schedule (the Intellectual Property disclosed in Section 4.5(b) of the Sellers Disclosure Schedule is collectively referred to as the "**Business Registered IP**"). To the Knowledge of the Sellers, the Business Registered IP is subsisting and in full force and effect. The foregoing will not be construed as a warranty that any Patent or Trademark will issue or be registered based on any application. The list identified in Section 4.5(b) of the Sellers Disclosure Schedule includes: (1) for each issued Patent and Patent application, the current owner of record, the Patent number or application serial number for each jurisdiction in which such Patent is filed, and date issued and filed; (2) for each registered or applied-for Trademark, the current owner of record, the application serial number or registration number, by country and state; (3) for any domain names, the registration date and name of registry; and (4) for each copyright registration or application, the owner of record, the number and date of such registration or application by country and state.

(c)     To the Knowledge of the Sellers, neither the Transferred Intellectual Property nor the EMEA Transferred Intellectual Property is subject to any Liens other than Permitted Encumbrances.

(d)     With respect to the Transferred Intellectual Property, the Sellers own all right, title, and interest in and to each such item of Intellectual Property. To the Knowledge of the Sellers, such rights, title and interest are sufficient for the Sellers to independently bring suit against a Third Party to enforce the issued patents, registered trademarks and registered service marks included in the Transferred Intellectual Property. With respect to the Licensed Intellectual Property (other than any Intellectual Property owned by a Third Party), to the Knowledge of the Sellers, the Sellers own right, title, and interest in and to each such item of Intellectual Property, such rights, title and interest being sufficient to permit the Sellers to license such Intellectual Property as set forth in the Intellectual Property License Agreement and the Trademark License Agreement. The Parties acknowledge and agree that the foregoing sentence does not constitute, and shall not be construed as, a representation or warranty with respect to non-infringement or non-misappropriation of Intellectual Property.

(e)     Except as set forth in Section 4.5(e) of the Sellers Disclosure Schedule, none of the Sellers has received any written assertions during the two (2) years preceding the date of this Agreement that (i) any Seller operations of the Acquired Business, including such Seller's use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the Products sold by the Acquired Business or of the Services rendered by the Acquired Business infringes, misappropriates, or violates in any material respect any Intellectual Property right of any Third Party; or (ii) the use or exploitation of any of the Transferred Intellectual Property infringes or violates in any material respect any Intellectual Property right of, or was misappropriated from, a Third Party.

(f)     To the Knowledge of the Sellers, there has been no assertion or claim made in writing to the Sellers during the two (2) years preceding the date of this Agreement

62

asserting invalidity, misuse or unenforceability of the Transferred Intellectual Property or challenging the Sellers' right to use, right to transfer, or ownership of the Transferred Intellectual Property; in each case, excluding any assertions or claims that would not reasonably be expected to result in any invalidity, unenforceability, loss or other material impairment of any rights or interest in the subject Intellectual Property.

(g)

(i)    To the Knowledge of the Sellers, Section 4.5(g)(i) of the Sellers Disclosure Schedule, as may be updated from time to time after the date hereof, sets forth all material Contracts (other than Patent Cross-License Agreements) granting to the Sellers or any of their Affiliates any license under or to any Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated into the Products (and also includes, to the extent practicable, any license under or to any Intellectual Property owned by a Third Party that is, as of the date hereof, used in connection with the design, development, testing or manufacturing of any of the Products), used in the performance of the Services, or otherwise utilized by the Acquired Business in its operations in the ordinary course (collectively, the "**Inbound License Agreements**"), indicating for each Inbound License Agreement, the title and the parties thereto, except to the extent an Inbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to obtain, in which case it has been omitted from Section 4.5(g)(i) of the Sellers Disclosure Schedule (an "**Omitted Inbound License Agreement**"), but the number of such Inbound License Agreements that have been omitted is set forth in Section 4.5(g)(i) of the Sellers Disclosure Schedule, and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Inbound License Agreements, the disclosure of which does not breach such prohibition.

(ii)    To the Knowledge of the Sellers, Section 4.5(g)(ii) of the Sellers Disclosure Schedule sets forth all material Contracts (other than Patent Cross-License Agreements) under which the Sellers grant a license to a Third Party under the Patents set forth in Section 1.1(m)(i) of the Sellers Disclosure Schedule where the predominant purpose of the Contract is the grant of a Patent license (collectively, the "**Outbound License Agreements**"), indicating for each Outbound License Agreement the title and the parties thereto, except to the extent an Outbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to obtain, in which case it has been omitted from Section 4.5(g)(ii) of the Sellers Disclosure Schedule (an "**Omitted Outbound License Agreement**"), but the number of such Outbound License Agreements that have been omitted is set forth in Section 4.5(g)(ii) of the Sellers Disclosure Schedule, and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Inbound License Agreements, the disclosure of which does not breach such prohibition.  To the Knowledge of the Sellers, Section 4.5(g)(ii)(B) of the Sellers Disclosure Schedule, as may be updated from time to

63

time after the date hereof, sets forth a list of all licenses under which Sellers grant a license to any of the Persons set forth in Section 4.5(g)(ii)(A) of the Sellers Disclosure Schedule to any of the Transferred Patents and all licenses granted within the eighteen (18) month period prior to the date hereof to those certain Software applications known as "MSS" and "MDM."

      (iii)     To the Knowledge of the Sellers, Section 4.5(g)(iii) of the Sellers Disclosure Schedule sets forth all Contracts between Sellers or their Affiliates and a Third Party under which the Sellers or their Affiliates both (i) grant a license under Patents owned by (or licensed to) them and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party (but other than inbound and/or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property), to the extent the scope of such Contracts covers Patents that are used in the Acquired Business (collectively the "**Patent Cross-License Agreements**"), indicating for each Patent Cross-License Agreement, the title and the parties thereto, except to the extent a Patent Cross-License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to obtain, in which case it has been omitted from Section 4.5(g)(iii) of the Sellers Disclosure Schedule (an "**Omitted Patent Cross-License Agreement**"), but the number of such Patent Cross-License Agreements that have been omitted is set forth in Section 4.5(g)(iii) of the Sellers Disclosure Schedule, and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Patent Cross-License Agreements, the disclosure of which does not breach such prohibition.

      (iv)     No royalties or other amounts will be due or payable by the Purchaser under any Omitted Inbound License Agreement or Omitted Patent Cross-License Agreement in connection with entering into this Agreement.

      (v)     To the Knowledge of the Sellers, there is no outstanding dispute or disagreement with respect to (1) any Outbound License Agreement, or (2) any Patent Cross-License Agreement, in each case that materially affects any of the Intellectual Property rights granted to the Purchaser herein.

      (h)     To the Knowledge of the Sellers, Section 4.5(h) of the Sellers Disclosure Schedule sets forth a true, accurate and complete list of any Public Software used in each of the Products and identifies (i) the specific Public Software used; (ii) the specific Public Software version; and (iii) the Products or portions thereof into which such Public Software is incorporated. To the Knowledge of the Sellers, the Acquired Business is in compliance with all license obligations associated with the use of such Public Software, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Sellers (with respect to the Acquired Business) have used reasonable efforts to establish measures regarding data security. To the Knowledge of the Sellers, with respect to data security, the Acquired Business is in compliance with all the requirements of Law, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(i)      The Sellers (with respect to the Acquired Business) have used reasonable efforts to establish measures regarding data security.  To the Knowledge of the Sellers, with respect to data security, the Acquired Business is in compliance with all the requirements of Law, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(j)      The Sellers (with respect to the Acquired Business) have used reasonable efforts to establish measures pertaining to the protection of trade secret information in the Sellers' possession, custody or control.  To the Knowledge of the Sellers, in the last two (2) years, none of the Sellers have received any written notice alleging unauthorized access to or disclosure of Third Party trade secret information.

(k)      There have been no assertions or claims made in writing by the Sellers during the two (2) years preceding the date of this Agreement that any Third Party's use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation or any other exploitation of a Third Party product infringes, misappropriates or violates any of the Transferred Intellectual Property.

(l)      To the Knowledge of the Sellers, all Business Registered IP is in good standing and subsisting, and in full force and effect, except for those items of Transferred Intellectual Property that expire at the end of their term prior to the Closing Date.  No such Transferred Intellectual Property has been abandoned, canceled or adjudicated invalid (excepting any expirations in the ordinary course).

(m)      Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

SECTION 4.6      Litigation.  As of the date hereof, except for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of the Sellers, threatened in writing before any Government Entity against any Seller involving the Business, the Assets or Assumed Liabilities (excluding the EMEA Assets and the EMEA Assumed Liabilities), that would be material to the Business taken as a whole.  As of the date hereof, except for the Bankruptcy Proceedings, there is no outstanding order to which any Seller is subject in respect of the Business or the Assets (excluding the EMEA Assets) only, and not any other business segments or assets of the Sellers, nor are any of the Sellers in default with respect to any such order, in each case which materially affects or restricts the ownership of the Assets or Assumed Liabilities.

SECTION 4.7      Financial Statements.

(a)      Section 4.7(a) of the Sellers Disclosure Schedule sets forth (i) the unaudited management statements of certain assets and liabilities of the Business as of December 31, 2008, December 31, 2009 and March 31, 2010 and (ii) the related unaudited management statements of income of the Business for the one- (1-) year periods ended December 31, 2008 and December 31, 2009 and the three- (3-) month period ended on March 31, 2010 (collectively with clause (i), the "**Financial Statements**").  Except as set forth in

65

the Financial Statements, such Financial Statements were prepared based on the financial books and records maintained by the Sellers and the EMEA Sellers for the Business on the basis of the Nortel Accounting Principles and represent the Sellers' good faith estimate of the selected balance sheet accounts and income statements set forth therein for the Business, in each case as of the dates and for the periods presented therein. The Financial Statements (a) have been prepared in accordance with the Nortel Accounting Principles, (b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the Closing), (c) include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) reflect the estimated historical operation of the Business (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

(b)     Except as set forth in Section 4.7(b) of the Sellers Disclosure Schedule, there are no Assumed Liabilities or EMEA Assumed Liabilities of a type that would be required to be included on a balance sheet of the Business prepared in accordance with Nortel Accounting Principles (or reflected in the notes thereto) except Liabilities that (i) in the aggregate are set forth or reflected in the Financial Statements; (ii) have been incurred in the Ordinary Course since the date of the last balance sheet included in the Financial Statements; (iii) have been incurred in connection with this Agreement or the transactions contemplated hereby; (iv) may be satisfied by the payment of Cure Costs; or (v) are not material to the Business as a whole.

(c)     Any CIP Unbilled Accounts Receivable assumed by Purchasers hereunder represent bona fide transactions.

SECTION 4.8          Compliance with Laws; Consents.

(a)     Since January 1, 2008, the Sellers have not received any notice alleging that any of them has been in violation of any applicable Law in connection with the Acquired Business, in each case except for such violations as would not reasonably be expected to be material to the Business as a whole. None of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Acquired Business or the Assets with any applicable Law nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to be material to the Business as a whole.

(b)     To the Knowledge of the Sellers (i) all the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Acquired Business as conducted on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations as would not reasonably be expected to be material to the Acquired Business taken as a whole. None of the Sellers has received any notice or written claims from any Government Entity relating to any material non-compliance of the Business or the Assets with such Consents nor are there, based on the Knowledge of the Sellers, any such notice or claims

66

threatened or pending, except where such claims would not reasonably be expected to be material to the Business as a whole.

            SECTION 4.9        Real Property. Each parcel of real property leased pursuant to any Subleased Real Estate Lease is leased by a Seller free and clear of all Liens on such Seller's leasehold interest, as applicable, except for Permitted Encumbrances and encumbrances underlying the fee estate (provided that this representation is being made only with respect to that portion of the premises subject thereto which, following the completion of the segregation of such premises contemplated by Section 5.24, will be subject to a Sublease). The Sellers have made available to the Purchaser true, correct and complete copies of any Subleased Real Estate Lease, in each case as amended or otherwise modified and in effect. Following the completion of the segregation of the Subleased Real Estate Leases contemplated by Section 5.24, there will be no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right to use or occupancy of the premises subject to Sublease and there will be no Person (other than the Sellers) in possession of such premises. Each Subleased Real Estate Lease is valid and binding and is in full force and effect, in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and similar laws affecting creditors' rights generally (including, without limitation, the Sellers' rights under the Bankruptcy Proceedings) and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). Except for any such event resulting from the Bankruptcy Proceedings, to the Knowledge of Sellers, since the Petition Date no Seller has materially breached any Subleased Real Estate Lease and no event has occurred that would cause a material breach except for those breaches that can be cured under Section 2.1.7. Since the Petition Date, neither any Seller nor any Affiliate of a Seller has given written notice to any landlord claiming a default by such landlord under a Subleased Real Estate Lease. To the Knowledge of the Sellers, no landlord under a Subleased Real Estate Lease has notified a Seller or any of its Affiliates that it intends to terminate such Subleased Real Estate Lease prior to its scheduled expiration.

            SECTION 4.10        Environmental Matters.

            (a)        To the Knowledge of the Sellers, the Acquired Business is in compliance with Environmental Laws and has obtained and is in compliance with all Environmental Permits, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

            (b)        There are no Actions relating to the Acquired Business or the Assets pending or, to the Knowledge of the Sellers, threatened against any of the Sellers pursuant to Environmental Laws, in each case except those Actions that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

            (c)        Sellers have received no written notice alleging any material violation of any Environmental Law relating solely to the Acquired Business within the prior six (6) months, nor have Sellers engaged in any discussions or negotiations with any Governmental Authority with respect to any alleged material violation of any Environmental Law solely relating to the

67

Acquired Business within the prior six (6) months, in each case any other than any such notice, discussion, or negotiation that has been resolved.

(d)    Notwithstanding anything in this Article IV to the contrary, none of the representations and warranties in this Article IV other than this Section 4.10 shall relate to environmental matters.

SECTION 4.11    Labor and Employee Benefits Matters.

(a)    Section 4.11(a) of the Sellers Disclosure Schedule contains an accurate and complete list, by country, of (i) all material Seller Employee Plans and (ii) all employment agreements or other commitments for employment or engagement by the Sellers or their Affiliates with respect to Employees that deviate in any material respect from the standard form of offer letter for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits to the Employees, excluding in each case Seller Employee Plans (collectively, the "**Special Arrangements**").  The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description for each material Seller Employee Plan and Special Arrangement, to the extent applicable, and, if no such plan document or summary plan description exists, an accurate written summary of the material terms of such Seller Employee Plan or Special Arrangement.

(b)    The information contained in Section 4.11(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) job title/position, (iv) annual base salary and annual target incentive including, in each case, currency, (v) work location, (vi) visa type, if any, and expiry date (vii) the applicable Collective Labor Agreement, if any, (viii) vacation accrual rate, (ix) leave status, reason for the leave, the start date of the leave and expected return date, (x) status as full-time or part-time, (xi) home country of residence, (xii) Job Complexity Indicator, (xiii) country of payroll, (xiv) sales indicator, (xv) Exempt/Non-Exempt status (for Employees in the United States only), and (xvi) payment currency.  Such information shall be updated in accordance with the requirements of Section 7.4(h).

(c)    There has not been for a period of twenty-four (24) consecutive months prior to the date hereof, nor is there existent or, to the Knowledge of the Sellers, has been threatened, any strike, material grievance under a Collective Labor Agreement, slowdown, lockout, picketing or work stoppage against any Seller by or on behalf of the Employees.

(d)    Section 4.11(d) of the Sellers Disclosure Schedule lists all the Collective Labor Agreements in effect with respect to the Employees and, for those that have expired, whether notice to bargain has been given and the status of the bargaining process.  For a period of twenty-four (24) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by, or on behalf of, a union, works council, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers or any Affiliates with respect to Employees, and, to any of the Sellers' Knowledge, no

68

such organizational effort is currently being made or has been threatened by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees. The Sellers have provided the Purchaser with a true and complete copy of each of the Collective Labor Agreements listed in Section 4.11(d) of the Sellers Disclosure Schedule. To the Knowledge of the Sellers, the execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any material breach or other violation of any Collective Labor Agreement set forth on Section 4.11(d) of the Sellers Disclosure Schedule.

(e)     To the Knowledge of the Sellers, all of the Employees employed in the United States are either United States citizens or are legally entitled to work in the United States under the Immigration Reform and Control Act of 1986, as amended, other United States immigration Laws and the Laws related to the employment of non-United States citizens applicable in the state in which the Employees are employed.  To the Knowledge of the Sellers, all Employees employed outside the United States are legally entitled to work in the country in which they are employed.

(f)     There are no Seller Employee Plans that are multiemployer plans within the meaning of Section 3(37) or 4001(a)(3) of ERISA or any similar Law, and none of the Sellers or any of their ERISA Affiliates has, within the past six (6) years, ever maintained, contributed to or participated in, or been required to maintain, contribute to or participate in, any such multiemployer plans.

(g)     Except as set forth in Section 4.11(g) of the Sellers Disclosure Schedule, no Seller Employee Plan or Collective Labor Agreement (or any Liabilities or obligations related thereto) shall transfer to, or be assumed by, the Purchaser or a Designated Purchaser in connection with this Agreement, either alone or in combination with another event (whether contingent or otherwise), or by operation of Law.

(h)     To the Knowledge of the Sellers, no Employee who is an executive of any Seller is a party to any confidentiality, noncompetition, proprietary rights or other such agreement with any Person other than such Seller, which has a Material Adverse Effect on such executive's ability to perform his applicable services to the Acquired Business.  To the Knowledge of the Sellers, no Employee is in violation of any term of any Employment Contract, confidentiality, noncompetition or other proprietary rights agreement or any other contract relating (i) to the right of such Employee to be employed by, or provide services to, such Seller with respect to the Acquired Business or (ii) to the knowledge or use of trade secrets or proprietary information with respect to any such Employee's employment with the Sellers, in each case except for such violation as would not have, individually or in the aggregate, a Material Adverse Effect.

(i)     None of the Sellers has, with respect to the Acquired Business, any Liability to provide retiree welfare benefits to any Person for any reason, except as may be required by COBRA, a Seller Employee Plan listed on Section 4.11(a) of the Sellers Disclosure Schedule, a Collective Labor Agreement, or applicable Law.  Without limiting the generality of the foregoing, with respect to its Canadian Employees and former employees, pursuant to the Order of the Canadian Court dated March 31, 2010 approving the Settlement Agreement, NNC

69

and NNL have no ongoing funding or administration obligations under the Nortel Networks Negotiated Pension Plan in respect of the period after September 30, 2010.

(j)     To the Knowledge of Sellers, and in each case except for such violations as would not reasonably be expected to be material to the Business as a whole, with respect to the Employees: (i) the Sellers are in compliance in all material respects with all applicable Laws relating to labor and employment, including the Laws relating to discrimination, disability, labor relations, hours of work, payment of wages and overtime wages, characterization of workers as employees or independent contractors, pay equity, immigration, workers compensation, working conditions, employee scheduling, occupational safety and health, family and medical leave, employment and reemployment of members of the uniformed services, employee terminations and mass layoffs; (ii) as of the date hereof, the Sellers have not incurred any Liability or obligation which remains unsatisfied under the WARN Act regarding the termination or layoff of such Employees; (iii) the Sellers have not incurred, and no circumstances exist under which the Sellers would reasonably be expected to incur, any material Liability arising from the misclassification of employees as exempt from the requirements of the Fair Labor Standards Act or analogous Laws or the misclassification of employees as independent contractors; and (iv) no arbitration, court decision or governmental order to which the Sellers are or would reasonably be expected to become a party, or are subject to in any way, limits or restricts any of the Sellers from relocating or closing any of the operations of such Seller.

(k)     Except as required under the terms of this Agreement, a Seller Employee Plan or Special Arrangement or under applicable Law, the execution or delivery of this Agreement, shareholder approval of this Agreement nor the consummation of the transactions contemplated by this Agreement could reasonably, either alone or in combination with another event (whether contingent or otherwise), (i) entitle any Transferred Employee to severance pay or any other payment (or an increase thereof) or results in the payment or funding (through a grantor trust or otherwise, or (ii) accelerate the time of payment or vesting, or increase the amount of any payment or benefit due to any such Transferred Employee.

(l)     Each Seller Employee Plan listed on Section 4.11(g) of the Sellers Disclosure Schedule has been established and administered in all material respects in accordance with its terms, any applicable Collective Labor Agreement and in compliance with applicable Laws, rules and regulations.

SECTION 4.12     Brokers.  Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

SECTION 4.13     Taxes.

(a)     Subject to Section 4.13(g), the Sellers have timely filed with the appropriate Tax Authorities all material Tax Returns required to be filed with respect to the Assets and the Business (excluding the Business of the EMEA Sellers) and all such Tax Returns are true, correct and complete in all material respects. Subject to Section 4.13(g), all material

70

Taxes due and payable with respect to the Assets and the Business (excluding the Business of the EMEA Sellers) have been timely paid.

(b)     Subject to Section 4.13(g), no deficiency for any material amount of Taxes has been claimed, proposed or assessed by any Tax Authority against any Seller and there is no pending audit, examination or other proceeding or Action in respect of material Taxes, in each case relating to any Asset or the Business.

(c)     Subject to Section 4.13(g), no Seller has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of material Taxes relating to any Asset or the Business.

(d)     There is no Lien for Taxes, other than Permitted Encumbrances, on any Asset.

(e)     None of the Assets located within the United States or which is owned by a U.S. Debtor (i) is property required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code or (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code.

(f)     No Seller other than Sellers which are "United States persons" under section 7701 of the Code or applicable Treasury Regulations will transfer any United States real property interest (within the meaning of Section 897(c)(1) of the Code) to the Purchaser or any Designated Purchaser pursuant to this Agreement or any other Transaction Document.

(g)     Notwithstanding the foregoing, the representations and warranties set forth in Sections 4.13(a) through 4.13(c) shall not be applicable to the extent that no Asset can be made subject to a Tax Lien and neither the Purchaser nor any Designated Purchaser could be held liable for Taxes of that Seller on the assumption that it has breached any of such representations or warranties.

SECTION 4.14     Representations and Warranties by the Other Sellers. Except (a) as set forth in the Sellers Disclosure Schedule, (b) as disclosed in the Financial Statements, (c) as contemplated by this Agreement or (d) to the extent relating to the Excluded Assets or the Excluded Liabilities, each Other Seller severally but not jointly will, as of the date such Other Seller executes a counterpart or accedes to this Agreement pursuant to Section 10.18, represent and warrant to the Purchaser as follows:

4.14.1 Organization and Corporate Power.

(a)     Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Subject to the receipt of the Bankruptcy Consents, at the time it executes a counterpart or accedes to this Agreement such Other Seller will have the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or, at the Closing Date, will become a party.

71

(b)     Such Other Seller is qualified to do business and to own, lease or otherwise hold its properties and assets, including the Assets, and to conduct its business as presently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Acquired Business requires it to so qualify, except to the extent that the failure to be so qualified would not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.14.2  Authorization; Binding Effect; No Breach.

(a)     Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will have been duly authorized by such Other Seller. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which such Other Seller will be a party will constitute a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable principles of equity regarding the availability of remedies (whether in proceeding at law or in equity).

(b)     The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent of any Person (other than the Mandatory Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of such Other Seller, (ii) any Material Contract to which the such Other Seller is a party or to which any of its assets is subject, (iii) any order of any Government Entity applicable to such Other Seller or by which any of its properties or Assets are bound or (iv) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller is subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

ARTICLE V.

COVENANTS AND OTHER
AGREEMENTS

SECTION 5.1     U.S. Bankruptcy Actions. On the timetables and subject to the terms set forth below, the U.S. Debtors shall (i) seek approval of the transactions contemplated by the Transaction Documents (to the extent necessary) and the procedures for the assignment and assumption of the Assumed and Assigned Contracts as set forth below, (ii) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules, and an order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by

orders in respect of notice that may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 9.1, use their commercially reasonable efforts to obtain U.S. Bankruptcy Court approval of such orders.

5.1.1   <u>U.S. Sale Hearing and U.S. Sale Order</u>.

(a)   The U.S. Debtors shall request that the U.S. Bankruptcy Court and the Canadian Debtors shall request that the Canadian Court schedule, subject to the availability of each of the U.S. Bankruptcy Court and the Canadian Court, a hearing to approve the U.S. Sale Order and the transactions contemplated by this Agreement (the "**U.S. Sale Hearing**") and a hearing to approve the Canadian Approval and Vesting Order and the transactions contemplated by this Agreement (the "**Canadian Sale Hearing**") on or prior to the tenth (10th) Business Day following the conclusion of the Auction.   Each of the U.S. Debtors and Canadian Debtors shall use their reasonable best efforts to cause the U.S. Sale Hearing and Canadian Sale Hearing, respectively, to be heard on that date or the earliest date thereafter permitted by the schedules of the U.S. Bankruptcy Court and the Canadian Court.

(b)   At the U.S. Sale Hearing, if the Purchaser is the Successful Bidder, the Sellers shall seek the entry of the U.S. Sale Order, in the form set forth in Exhibit 5.1.1, any modifications to which must be consented to by the Purchaser, such consent not to be unreasonably withheld (as approved, the "**U.S. Sale Order**") (it being understood that certain provisions thereof must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court as part of the U.S. Sale Order).

SECTION 5.2          <u>Canadian Bankruptcy Actions</u>.

5.2.1   <u>Canadian Approval and Vesting Order</u>.   At the Canadian Sale Hearing, if the Purchaser is the Successful Bidder, the Canadian Debtors shall seek the issuance of the Canadian Approval and Vesting Order in the form set forth in <u>Exhibit 5.2.1</u> on notice satisfactory to the Purchaser, any modifications to which must be consented to by the Purchaser, such consent not to be unreasonably withheld (as approved, the "**Canadian Approval and Vesting Order**").

5.2.2   <u>Additional Requests</u>.   In connection with the foregoing, the Canadian Debtors shall seek in good faith in the Canadian Approval and Vesting Order Motion to (i) have the Canadian Approval and Vesting Order include a finding that, to the extent permitted by Law, neither the Purchaser nor any relevant Designated Purchaser is a successor to the Sellers or their bankruptcy estate by reason of any theory of law or equity, and neither the Purchaser nor any Designated Purchaser shall assume or in any way be responsible for any Liability of any of the Sellers and/or their bankruptcy estates, except as otherwise expressly provided in this Agreement or the Transaction Documents; and (ii) have the endorsement of the Canadian Approval and Vesting Order or the order itself, include a finding that the consideration provided by the Purchaser and any Designated Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Assets. For greater certainty, nothing herein shall require the items in the preceding sentence to be included in the Canadian Approval and Vesting

Order or any endorsement thereof, notwithstanding that such provisions may be included in the form of the order set forth in Exhibit 5.2.1.

SECTION 5.3        Consultation; Notification.

(a)        The Purchaser and the U.S. Debtors shall cooperate with prosecuting the U.S. Sale Motion, and obtaining entry of the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein.

(b)        The Purchaser and the Canadian Debtors shall cooperate with prosecuting the Canadian Approval and Vesting Order Motion, and obtaining entry of the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein.

(c)        If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to use their reasonable best efforts to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the benefits of section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)        If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to take all reasonable steps, and use their reasonable best efforts to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.        .

SECTION 5.4        Pre-Closing Cooperation.

74

(a)     Prior to the Closing, upon the terms and subject to the terms and conditions of this Agreement, in addition to any obligations pursuant to Section 5.5, each of the Parties shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including: (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent, <u>provided</u>, that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party in order to obtain any Consent (other than filing and application fees to Government Entities, and payment of Cure Costs if responsible therefor pursuant to Section 2.1.7) and <u>provided</u>, <u>further</u>, that the Purchaser shall be obligated to cooperate with the Sellers in order to obtain any required Consents from landlords under any Subleased Real Estate Leases (to the extent consent is required) and to enter into Subleases, (ii) defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the Closing, (iii) using reasonable efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity that would prohibit, prevent, restrict or materially delay the consummation of the transactions contemplated by this Agreement, and (iv) cooperating in any reorganization of the Sellers that the Sellers consider necessary for the Sellers to facilitate the transactions contemplated hereby, any such reorganization to occur on or prior to the Closing Date. With respect to all supply Contracts related to the Business, after the entry of the U.S. Sale Order, and in respect of the Canadian Debtors, after the entry of the Canadian Approval and Vesting Order, the Sellers shall (i) at the Purchaser's request to the extent permitted by Law (including any applicable Antitrust Laws), send a letter substantially in the form set forth in <u>Exhibit 5.4(a)</u> to each of the counterparties to such Contracts, as identified in writing by the Purchaser to the Main Sellers, (ii) provide to the Purchaser such contact information as is reasonably requested by the Purchaser with respect to the counterparties to such Contracts and (iii) more generally, to facilitate an orderly transition at Closing, work with outside counsel on the prosecution of pending patent applications and maintenance of existing patents. For greater certainty, the obligations in this Section 5.4(a) do not include an obligation to negotiate, agree to or accept any form of remedy, condition, undertaking or divestiture with any Government Entity; <u>provided</u>, <u>however</u>, that nothing in this Section 5.4(a) shall limit the obligations of the Purchaser or any Designated Purchaser set forth in Section 5.5.

(b)     Each Primary Party shall promptly notify the other Primary Parties of the occurrence, to such Party's Knowledge or knowledge, as applicable, of any event or condition, or the existence, to such Party's Knowledge or knowledge, as applicable, of any fact, that would reasonably be expected to result in any of the conditions to any other Primary Party's obligation to effect the Closing set forth in Article VIII not being satisfied.

(c)     NNC and NNL shall execute, at or within a reasonable amount of time after Closing, upon the Purchaser's request, such documents as reasonably requested by the Purchaser and as contemplated or otherwise permitted under the Patent Cross-License Agreements listed on Section 4.5(g)(iii) of the Sellers Disclosure Schedule in order to provide a sublicense to the Business (to the extent permitted thereunder) or trigger any spin-off right

75

thereunder, such that the Business may continue to be licensed or sublicensed thereunder, all in accordance with the relevant Section of each such Patent Cross-License Agreement that permits NNC or NNL to sublicense or spin off the license granted to NNC or NNL thereunder to a divested business unit or product line.  To the extent that any Patent Cross-License Agreement listed on Section 4.5(g)(iii) of the Sellers Disclosure Schedule, including, without limitation, (i) the Patent Cross License Agreement, effective as of June 16, 2006, between Ciena Corporation and NNL; (ii) the Patent Cross License Agreement, effective as of July 17, 2006, among Microsoft Corporation, NNC and NNL; and (iii) the License Agreement, effective as of January 1, 2001, between International Business Machines Corporation and NNC, contains a limitation on the number of times the relevant Seller may exercise any sublicense or spin off rights thereunder and such rights have not been exhausted prior to the date hereof, the Sellers agree that they shall not exhaust any such rights they may have between the date hereof and the Closing in a manner that would render this Section 5.4(c) ineffective. Notwithstanding the foregoing, the Sellers shall be under no obligation to execute any such documents prior to the completion of the Auction or to expend any amount (other than as directly resulting from the execution of relevant documents), incur any Liabilities or provide any other consideration in complying with their obligations under this section 5.4(c).

SECTION 5.5        <u>Antitrust and Other Regulatory Approvals</u>.

(a)    In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties agrees to prepare and file as promptly as practicable following the U.S. Sale Hearing and the Canadian Sale Hearing all necessary documents, registrations, statements, petitions, filings and applications for the Mandatory Regulatory Approvals, the Trade Approvals and any other Consent of any other Government Entities either required or that the Primary Parties mutually and reasonably agree are advisable to satisfy the condition set forth in Section 8.1(a) as expeditiously as possible.

(b)    If a Primary Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), then such Primary Party shall make, or cause to be made, as soon as reasonably practicable and after consultation with the other Primary Parties, an appropriate response in compliance with such request.

(c)    Each Primary Party shall keep the other Primary Parties apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and work cooperatively in connection with obtaining the Mandatory Regulatory Approvals and the Trade Approvals of each applicable Government Entity, including, to the extent permitted by Law or Government Entity:

(i)    cooperating with each other in connection with the filings required under the applicable Antitrust Laws, Trade Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and each Mandatory Regulatory Approval and Trade Approval and liaising with each other in relation to each step of the procedure before the relevant Government Entities

76

and as to the contents of all communications with such Government Entities. In particular, to the extent permitted by Law or Government Entity, no Party will make any notification in relation to the transactions contemplated hereunder without first providing the Primary Parties with a copy of such notification in draft form (subject to reasonable redactions or limiting such draft, or parts thereof, on an outside-counsel only basis where appropriate) and giving such Primary Parties a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account in good faith of all reasonable comments timely made by the Primary Parties in this respect; provided, however, that no Party shall be required to provide the other Party with such portions of notifications or submissions that would jeopardize any attorney-client or other legal privilege (it being understood, however, that the Parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other Parties to occur without so jeopardizing privilege); provided, further, that a Party may provide such portions of notifications or submissions solely to the other Party's outside counsel pursuant to a common interest agreement and non-disclosure agreement, each to be negotiated by the Parties in good faith, if such Party determines, acting reasonably, that the provision to the other Party of such portions of notifications or submissions could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement are not consummated;

(ii)     furnishing to the other Primary Parties all information within its possession that is required for obtaining the Mandatory Regulatory Approvals or Trade Approvals, or required for any application or other filing to be made by the other Party pursuant to the applicable Antitrust Laws, Trade Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement); provided, however, that (a) no such information shall be required to be provided by a Party if it determines, acting reasonably, that, such information is material and competitively sensitive or that the provision of such information could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement were not completed or that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other parties to occur without so jeopardizing privilege), and (b) in any such case the Purchaser and the Main Sellers shall cooperate with a view to establishing a mutually satisfactory procedure for providing such information directly to the Government Entity requiring or requesting such information, and the relevant Main Seller or the Purchaser or the relevant Designated Purchaser required to provide such information shall provide it directly to such Government Entity requiring or requesting such information;

(iii)     promptly notifying each other of any substantive communications from or with any Government Entity with respect to the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement and ensuring that

77

each of the Parties is entitled to attend any meetings with, or other appearances before, any Government Entity with respect to the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement; and

> (iv)    consulting and cooperating with each other in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with proceedings under or relating to the Mandatory Regulatory Approvals, the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(d)    In addition, subject to any limitations set forth in Section 5.5(e), the Purchaser shall, and shall cause each of the Designated Purchasers to, use its reasonable efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1(a) to the extent the same is within its control and to take, or cause to be taken, all other action and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including using its reasonable efforts to make all required filings and obtain all Mandatory Regulatory Approvals, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(e)    Subject to the proviso below, the obligations of the Purchaser pursuant to Section 5.5(d) shall include committing, and causing the Designated Purchasers to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets or the Assets and/or the EMEA Assets or conduct of business arrangements or terminating any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated hereby and/or by the EMEA Asset Sale Agreement, including taking any and all actions necessary in order to ensure the receipt of the necessary Consents and Mandatory Regulatory Approvals; provided, however, that none of the Purchaser , the Designated Purchasers, or the EMEA Designated Purchasers are under any obligation under this Agreement or the applicable provisions of the EMEA Asset Sale Agreement, in respect of obtaining the Mandatory Regulatory Approvals or otherwise, to commit, or cause the Designated Purchasers or the EMEA Designated Purchaser to commit, to any undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets or the Assets and/or the EMEA Assets or conduct of business arrangements or terminate any and all existing relationships and contractual rights and obligations or take any other action where to do so could reasonably be expected to be materially adverse to the business, financial condition, or prospects of the Purchaser, any Designated Purchaser, any EMEA Designated Purchaser, or the Business or Assets being acquired pursuant to this Agreement and the EMEA Asset Sale Agreement.

(f)      For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

SECTION 5.6        <u>Pre-Closing Access to Information</u>.

(a)      The Main Sellers shall, and shall cause the Other Sellers (other than the EMEA Debtors or EMEA Sellers) to, (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to (x) all books, records, personnel, officers and other facilities and properties of the Acquired Business and (y) only after the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, all product documentation and design specifications of the Acquired Business, including access to certain managerial Employees designated by the Sellers, who have knowledge of the skills and competencies of Employees relative to the Business and will provide such information to the Purchaser and Human Resources personnel designated by the Sellers who can provide information relevant to the Purchaser otherwise complying with the Purchaser's obligations pursuant to ARTICLE VII, (ii) permit the Purchaser and its representatives to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request, (iii) cause the officers of the Sellers to furnish the Purchaser with such financial, business and operating data and other information with respect to the Acquired Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request, (iv) without limiting the generality of subsections (i), (ii) and (iii), deliver to the Purchaser no later than ten (10) Business Days following the end of each fiscal quarter a report reflecting any changes to the headcount of the Business since the previous fiscal quarter; <u>provided</u>, <u>however</u>, that (A) any such access shall be conducted at the Purchaser's expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the Business or the other businesses of the Sellers and their Affiliates, (B) except pursuant to Section 7.1.1 and Section 5.6(e), the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records, other than as provided in Section 5.6(e). If any requested documentation and information includes what can reasonably be considered competitively sensitive information relating to sales, marketing or pricing of the Sellers products or services, such information shall be shared with any employees or representatives of the Purchaser who are designated by the Purchaser and reasonably agreed upon by the Sellers, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchaser and who have executed the Clean Team Confidentiality Agreement, <u>provided</u>, <u>however</u>, that where such documentation or information relates to pricing or other material competitive terms offered to any customer of the Business, the employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or other material competitive terms for a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(b)      Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof (other than Section 6.5), the Sellers shall not have any obligation to make available to the Purchaser or

79