**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## MOTION RECORD
### Approval and Vesting Order
### MSS Business
### (returnable September 30, 2010)

September 27, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| 1. | Notice of Motion returnable September 30, 2010 | 001 |
| 2. | Affidavit of Khush Dadyburjor, sworn September 27, 2010 | 044 |
| 3. | Affidavit of Khush Dadyburjor, sworn August 27, 2010 | 054 |
| 4. | Fifty-Second Report of Ernst & Young, dated August 30, 2010 | 069 |
| 5. | Blackline of draft Approval and Vesting Order (MSS Business) to Model Approval and Vesting Order | 108 |
| 6. | Draft Approval and Vesting Order | 122 |

**TAB 1**

Court File No.  09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

### NOTICE OF MOTION
### (returnable September 30, 2010)

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") will make a motion to Justice Morawetz of the Commercial List court on **Thursday, September 30, 2010 at 11:00 a.m. at 393 University Avenue, Toronto, Ontario.**

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐  in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐  in writing as an opposed motion under subrule 37.12.1(4);

☒  orally.

THE MOTION IS FOR AN ORDER:

(a)    Abridging the time for service of the Notice of Motion and Motion Record in respect of this motion and dispensing with further service thereof;

(b)    Approving and authorizing *inter alia*, the transaction contemplated by an asset sale agreement dated as of September 24, 2010 (the "Sale Agreement") by and among NNC,

NNL, Nortel Networks Inc. ("NNI", and together with NNC and NNL, the "Main Sellers"), the affiliates of the Main Sellers listed in Exhibit "A" to the Sale Agreement (together with the Main Sellers, the "Sellers"), and Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), in respect of certain assets relating to Nortel's Multi-Service Switch business (the "MSS Business") in the form attached as an appendix to the fifty-fourth report of the Monitor (the "Fifty-Fourth Report");

(c)     Vesting the Applicants' right, title and interest in the Assets (as defined in the Sale Agreement) in the Purchaser, upon delivery by the Monitor (as defined below) of a Monitor's certificate; and

(d)     Such further and other relief as counsel may request and this Honourable Court deem just.

THE GROUNDS FOR THE MOTION ARE:

**BACKGROUND**

(a)     On January 14, 2009 (the "Filing Date"), this Honourable Court made an Initial Order granting a stay of proceedings against the Applicants pursuant to the Companies' Creditors Arrangement Act, (Canada) R.S.C. 1985, c. C-36, as amended (the "CCAA") and appointing Ernst & Young Inc. as Monitor in the CCAA proceedings;

(b)     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including Nortel Networks Inc. ("NNI"), made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay under the Code in Canada;

(c)     Additionally, on January 15, 2009, NNUK and certain subsidiaries of Nortel incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order (the "Administration Proceedings") for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the *Insolvency Act 1986*;

(d)     On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited (the "Israeli Company"), filed an application with the Tel-Aviv-Jaffa District Court, (the "Israeli Court") pursuant to the *Israeli Companies Law, 1999*, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators (the "Joint Israeli Administrators") of the Israeli Company under the *Israeli Companies Law, 1999*;

(e)     On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code;

(f)     On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009.   In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France;

(g)     The French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months, subsequently extending until the earlier of May 31, 2010 or the filing by Kapsch CarrierCom AG with the French Court of a letter stating that its bid for the GSM/GSM-R assets of NNSA has become unconditional; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA.  On March 25, 2010, the French Court ended the suspension of the liquidation operations.

(h)     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate

to NNUK and the English Proceedings under Chapter 15 of the Code.  On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code;

(i)     On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code;

(j)     On March 10, 2010, Nortel Networks Telecomunicacoes do Brasil Ltda. ("NN Brazil") filed for bankruptcy protection in Brazil, and was placed under the control of a Brazilian bankruptcy trustee.  NN Brazil will no longer be participating in the Nortel global restructuring efforts;

(k)     References to "Nortel" herein shall be to the global enterprise as a whole;

(l)     Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Affidavit of Khush Dadyburjor sworn September 27, 2010 (the "Dadyburjor Affidavit");

**THE MSS BUSINESS**

(m)     Nortel's MSS Business provides data networking infrastructure solutions to telecom service providers and large enterprise customers throughout the world;

(n)     In addition, the MSS Business supports former Nortel business units sold in prior Nortel asset sales with hardware, software and services;

(o)     The MSS Business sells its base platform to former Nortel business units, which add hardware and software to drive product development for both the wireless and wireline markets;

**THE SALE PROCESS**

(p)     On September 1, 2010, this Court granted an order (i) approving certain bidding procedures (the "Bidding Procedures") in connection with a bidding process for the MSS Business and related assets (the "Bidding Procedure Order"), and (ii) authorizing the Applicants to enter into that certain asset sale agreement dated August 26, 2010, among

5

the Sellers and PSP Holding LLC, as purchaser ("PSP"), as a "stalking-horse" sale agreement in respect of assets related to the MSS Business.

(q)    Upon obtaining the Bidding Procedures Order, Nortel, with the assistance of its financial advisor, proceeded to implement the bidding process. In particular,

    (i)    the Bid Deadline (as defined in the Bidding Procedures) was set for 12:00 p.m. (Eastern) on September 21, 2010, and the time for the Auction (as defined in the Bidding Procedures) was scheduled for 9:00 a.m. on September 24, 2010;

    (ii)    two (2) of the seven (7) parties who submitted expressions of interest were deemed Qualified Bidders (as defined in the Bidding Procedures); and

    (iii)    these two (2) Qualified Bidders were provided access to due diligence materials and information relating to the MSS Business and related assets, including access to management personnel and on-site inspections;

(r)    Pursuant to the Bidding Procedures, Nortel received two (2) bids for the MSS Business and related assets, in addition to the bid contemplated by the Stalking Horse Agreement;

(s)    In accordance with the Bidding Procedures, an auction was held at the offices of Cleary Gottlieb Steen & Hamilton LLP on September 24, 2010, commencing at approximately 10:37 a.m.;

(t)    The Dadyburjor Affidavit and Fifty-Fourth Report contain details of the auction and the bids received during same;

(u)    The last bid provided by the Purchaser at the auction was declared to be the "Final Bid" in accordance with the Bidding Procedures, and is reflected in the terms of the Sale Agreement;

(v)    The completion of the transactions contemplated by the Sale Agreement is subject to certain customary closing conditions including approval of the transactions by both this Honourable Court as well as the U.S. Court;

(w)     The motion for approval of the Sale Agreement in the U.S. Court is scheduled as part of a joint hearing with this Honourable Court on the return date of this motion;

*(x)*     The confidential appendices to the Fifty-Fourth Report contain sensitive, competitive and, in some instances, personal information which is appropriate to be sealed in the circumstances;

**MISCELLANEOUS**

(y)     The provisions of the CCAA; and

(z)     Such further and other grounds as counsel may advise and this Honourable Court permit.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)     The Dadyburjor Affidavit;

(b)     The Affidavit of Khush Dadyburjor sworn August 27, 2010;

(c)     The Fifty-Second Report of the Monitor dated August 30, 2010;

(d)     The Fifty-Fourth Report, to be filed;

(e)     Such further and other relief as counsel may request and this Honourable Court deem just.

September 27, 2010                       **OGILVY RENAULT LLP**
                                          Suite 3800
                                          Royal Bank Plaza, South Tower
                                          200 Bay Street
                                          Toronto, Ontario  M5J 2Z4  CANADA

                                          **Derrick Tay LSUC#: 21152A**
                                          Tel:  (416) 216-4832
                                          Email: dtay@ogilvyrenault.com

                                          **Jennifer Stam LSUC #46735J**
                                          Tel: (416) 216-2327
                                          Email: jstam@ogilvyrenault.com

                                          Fax: (416) 216-3930
                                          Lawyers for the Applicants

- 7 -

TO:    Attached Service List

*Updated as of Monday, September 27, 2010*

Court File No.  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

### SERVICE LIST

TO:      **OGILVY RENAULT LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Tony Reyes
         Jennifer Stam

         Email:   dtay@ogilvyrenault.com
                  treyes@ogilvyrenault.com
                  jstam@ogilvyrenault.com

         Tel:     416.216.4000
         Fax:     416.216.3930

         Lawyers for the Applicants

TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:   nortel.monitor@ca.ey.com

Tel:     416.943.3016
Fax:     416.943.3300

AND TO: **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:   jcarfagnini@goodmans.ca
         jpasquariello@goodmans.ca
         grubenstein@goodmans.ca
         fmyers@goodmans.ca
         carmstrong@goodmans.ca

Tel:     416.597.4107
Fax:     416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND TO: **OSLER HOSKIN AND HARCOURT LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:   lbarnes@osler.com
         rchartrand@osler.com
         esellers@osler.com
         ahirsh@osler.com

Tel:     416.362.2111
Fax:     416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND TO: **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:   dmilner@fasken.com
         akauffman@fasken.com
         elamek@fasken.com
         jlevin@fasken.com

Tel:     416.868.3538
Fax:     416.364.7813

Lawyers for Export Development Canada

AND TO:
**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:    jsullivan@edc.ca

Tel:      613.597.8651
Fax:      613.598.3113

AND TO:
**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON  M5K 1K7

Robert I. Thornton
Rachelle Moncur
Leanne M. Williams

Email:    rthornton@tgf.ca
          rmoncur@tgf.ca
          lwilliams@tgf.ca

Tel:      416.304.1616
Fax:      416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO:
**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:    john.stringer@mcinnescooper.com
          stephen.kingston@mcinnescooper.com

Tel:      902.425.6500
Fax:      902.425.6350

Lawyers for Convergys EMEA Limited

AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart

Email:    jcarhart@millerthomson.com

Tel:      416.595.8615/8577
Fax:      416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO:
**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:    barry.wadsworth@caw.ca
          lewis.gottheil@caw.ca

Tel.:     416.495.3776
Fax:      416.495.3786

Lawyers for all active and retired Nortel employees represented by the CAW-Canada

AND TO:
**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:    hharrison@boughton.ca

Tel:      604.687.6789
Fax:      604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd., in its capacity as duly authorized agent for Holdings 1506 Enterprises Ltd.

AND
TO:
**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

| Email: | mmacnaughton@blgcanada.com |
| Tel: | 416. 367.6646 |
| Fax: | 416. 682.2837 |

| Email: | rjaipargas@blgcanada.com |
| Tel: | 416.367.6266 |
| Fax: | 416.361.7067 |

| Email: | srappos@blgcanada.com |
| Tel: | 416.367.6033 |
| Fax: | 416.361.7306 |

Lawyers for Bell Canada

AND
TO:
**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

| Email: | ray.leach@siskinds.com |
| | dimitri.lascaris@siskinds.com |
| | monique.radlein@siskinds.com |

| Tel: | 519.672.2121 |
| Fax: | 519.672.6065 |

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND
TO:
**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

John Contini
Aaron Rousseau

| Email | jcontini@langmichener.ca |
| Tel: | 416.307.4148 |
| Fax: | 416.304.3767 |

| Email | arousseau@langmichener.ca |
| Tel: | 416.307.4081 |
| Fax: | 416.365.1719 |

Lawyers for ABN AMRO Bank N.V.

AND
TO:
**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

| Email: | zychk@bennettjones.com |
| Tel: | 416.777.5738 |
| Fax: | 416.863.1716 |

| Email: | orzyr@bennettjones.com |
| Tel: | 416.777.5737 |
| Fax: | 416.863.1716 |

| Email: | finlaysong@bennettjones.com |
| Tel: | 416.777.5762 |
| Fax: | 416.863.1716 |

Canadian Lawyers for The Informal Nortel
Noteholder Group

12

- 5 -

| | | | | |
|---|---|---|---|---|

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:      416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:      416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:      416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:      416.595.2150
Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:      416.595.2701
Fax:     416.204.2909

Lawyers for the Former Employees of Nortel

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:      416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:      416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:      416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:      416.595.2150
Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:      416.595.2701
Fax:     416.204.2909

Lawyers for the LTD Beneficiaries

13

AND
TO:

**MILLER THOMSON LLP**

Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:    jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email:    msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Email:    jmklotz@millerthomson.com
Tel:      416.595.4373
Fax:      416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**

11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:    joseph.kim@lge.com

Tel:      +82.2.3777.3171
Fax:      +82.2.3777.5345

AND
TO:

**MILLER THOMSON LLP**

Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:    jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email    msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**CHAITONS LLP**

185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:    harvey@chaitons.com

Tel:      416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:   ken.rosenberg@paliareroland.com
Tel:     416.646.4304
Fax:     416.646.4301

Email:   max.starnino@paliareroland.com
Tel:     416.646.7431
Fax:     416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:     416.646.4326
Fax:     416.646.4301

Email:   tina.lie@paliareroland.com
Tel:     416.646.4332
Fax:     416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON M5X 1G5

E. Patrick Shea

Email:   patrick.shea@gowlings.com

Tel:     416.369.7399
Fax:     416.862.7661

Lawyers for Westcon Group

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:   Shayne.kukulowicz@fmc-law.com
         Alex.macfarlane@fmc-law.com
         Michael.wunder@fmc-law.com
         ryan.jacobs@fmc-law.com

Tel:     416.863.4511
Fax:     416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:   rslattery@mindengross.com
         dullmann@mindengross.com
Tel:     416.369.4149
Fax:     416.864.9223

Lawyers for Verizon Communications Inc.

AND
TO:
**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:  hfogul@airdberlis.com
Tel:    416.865.7773
Fax:    416.863.1515

Email:  pczegledy@airdberlis.com
Tel:    416.865.7749
Fax:    416.863.1515

Lawyers for Microsoft Corporation

AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:  renglish@airdberlis.com
        smitra@airdberlis.com

Tel:    416.863.1500
Fax:    416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND
TO:
**ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:  surquhart@ahbl.ca
Tel:    604.484.1757
Fax:    604.484.1957

Lawyers for Algo Communication Products Ltd.

AND
TO:
**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:    416.865.6655
Fax:    416.865.6636

Email:  vdare@foglers.com
Tel:    416.865.6641
Fax:    416.865.6636

Lawyers for Andrew, LLC

AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:  mfleming@millerthomson.com
Tel:    416.595.8686
Fax:    416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

16

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:    bdarlington@davis.ca
Tel:       416.365.3529
Fax:      416.369.5210

Email:    jdavissydor@davis.ca
Tel:       416.941.5397
Fax:      416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:    sgraff@airdberlis.com
Tel:       416.865.7726
Fax:      416.863.1515

Email:    iaversa@airdberlis.com
Tel:       416.865.3082
Fax:      416.863.1515

Lawyers for Perot Systems Corporation

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

Email:    dgrieve@casselsbrock.com
Tel:       416.860.5219
Fax:      416.350.6923

Lawyers for Alvarion Ltd.

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:    andrew.kent@mcmillan.ca
Tel:       416.865.7160
Fax:      416.865.7048

Email:    hilary.clarke@mcmillan.ca
Tel:       416.865.7286
Fax:      416.865.7048

Email:    tushara.weerasooriya@mcmillan.ca
Tel:       416.865.7262
Fax:      416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:    lawrence.crozier@mcmillan.ca
Tel:       416.865.7178
Fax:      416.865.7048

Email:    adam.maerov@mcmillan.ca
Tel:       416.865.7285
Fax:      416.865.7048

Lawyers for Citibank

AND
TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:    dmagisano@blaney.com
Tel:       416.593.2996
Fax:      416.593.5437

Lawyers for Expertech Network Installation Inc.

AND
TO:
**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:      416.865.6636

Email:   vdare@foglers.com
Tel:      416.865.6641
Fax:      416.865.6636

Lawyers for Amphenol Corporation

AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra

Email:   smitra@airdberlis.com

Tel:      416.863.1500
Fax:      416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND
TO:
**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Aaron Rousseau

Email:   arousseau@langmichener.ca
Tel:      416.307.4081
Fax:      416.365.1719

Lawyer for Right Management Inc.

AND
TO:
**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:   bleonard@casselsbrock.com
           hgarman@casselsbrock.com
           mcasey@casselsbrock.com

Tel:      416.860.6455
Fax:      416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND TO:

**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:     613.233.2679
Fax:     613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management,
Inc.

AND TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:     416.601.7627
Fax:     416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:     416.601.7750
Fax:     416.868.0673

Lawyers for Frank Andrew Dunn

AND TO:

**COLBY, MONET DEMERS, DELAGE & CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:   ddropsy@colby-monet.com
Tel:     514.284.3663
Fax:     514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
         steven.levitt@nelligan.ca
         christopher.rootham@nelligan.ca

Tel:     613.231.8245
Fax:     613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:   416.865.2318
Fax:   416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:   416.865.6944
Fax:   416.863.6275

Lawyers for Jabil Circuit Inc.

AND
TO:

**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
         mgaggino@schneidergaggino.com

Tel:   514.631.8787
Fax:   514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND
TO:

**EURODATA**
2574 Sheffield Road
Ottawa, Ontario K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:   613.745.0921
Fax:   613.745.1172

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
         laugesenm@bennettjones.com

Tel:   416.863.1200
Fax:   416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:   416.369.4335
Fax:   416.864.9223

Lawyers for 2748355 Canada Inc.

AND
TO:

**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:   lbrady@baldwinlaw.ca
Tel:   613.771.9991
Fax:   613.771.9998

Lawyers for Sydney Street Properties Corp.

AND TO: **AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND TO: **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND TO: **SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email: arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND TO: **SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email: arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND TO: **LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :  jysimard@lavery.ca
Tel :     514.871.1522
Fax :    514.871.8977

Lawyers for Texas Landlords to Nortel
Networks Inc.

AND TO: **NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351

| AND TO: | **GOWLING LAFLEUR HENDERSON LLP**<br>Suite 1600, First Canadian Place<br>100 King Street West<br>Toronto, ON  M5X 1G5 | AND TO: | **DAVIS LLP**<br>1 First Canadian Place<br>Suite 5600<br>100 King Street West<br>Toronto, ON  M5X 1E2 |

AND TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:    david.cohen@gowlings.com

Tel:      416.369.6667
Fax:      416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

AND TO:

**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:    rschwill@dwpv.com
Tel:      416.863.0900
Fax:      416.863.0871

Email:    mgottlieb@dwpv.com
Tel:      416.863.0900
Fax:      416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:    bdarlington@davis.ca
Tel:      416.365.3529
Fax:      416.369.5210

Email:    jdavissydor@davis.ca
Tel:      416.941.5397
Fax:      416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:   tosullivan@counsel-toronto.com
Tel:      416.598.1744
Fax:      416.598.3730

Email:    slaubman@counsel-toronto.com
Tel:      416.598.1744
Fax:      416.598.3730

Lawyers for William A. Owens

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:   lydia.salvi@bakernet.com

Tel:       416.865.6944
Fax:      416.863.6275

Lawyers for Wipro Limited

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:       416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:       416.865.3082
Fax:      416.863.1515

Lawyers for the Current and Former Employees
of Nortel Networks Inc. who are or were
Participants in the Long-Term Investment Plan
Sponsored by Nortel Networks Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:       416.601.8342
Fax:      416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:

**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:   sbomhof@torys.com
Tel:       416.865.7370
Fax:      416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND
TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:       416.973.3172
Fax:      416.973.0810

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:   sseigel@langmichener.ca
Tel:       416.307.4063
Fax:      416.365.1719

Lawyers for The Bank of New York Mellon

23

- 16 -

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email: susan.grundy@blakes.com
Tel:   416.863.2572
Fax:   416.863.2653

Email: marc.flynn@blakes.com
Tel:   416.863.2685
Fax:   416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email: pamela.huff@blakes.com
Tel:   416.863.2958
Fax:   416.863.2653

Email: milly.chow@blakes.com
Tel:   416.863.2594
Fax:   416.863.2653

Email: hugh.desbrisay@blakes.com
Tel:   416.863.2426
Fax:   416.863.2653

Email: craig.thorburn@blakes.com
Tel:   416.863.2965
Fax:   416.863.2653

Lawyers for MatlinPatterson Global Advisers
LLC, MatlinPatterson Global Opportunities
Partners III L.P. and MatlinPatterson
Opportunities Partners (Cayman) III L.P.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:   kmcelcheran@mccarthy.ca
Tel:     416.601.7730
Fax:     416.868.0673

Email:   rstabile@mccarthy.ca
Tel:     416.601.8335
Fax:     416.868.0673

Lawyers for Avaya Inc.

AND
TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:   jmcdonald@sgmlaw.com
Tel:     416.979.6425
Fax:     416.591.7333

Email:   dbrown@sgmlaw.com
Tel:     416.979.4050
Fax:     416.591.7333

Lawyers for Edmund Fitzgerald

24

- 17 -

AND TO: **FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:   jspiegelman@foglers.com
Tel:      416.864.9700
Fax:     416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO: **STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:   sdunphy@stikeman.co m
Tel:      416.869.5662
Fax:     416.947.0866

Lawyers for GENBAND Inc.

AND TO: **VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

E-mail:  thomas.wallis@vdg.ca
Tel:      613.241.2701
Fax:     613.241.2599

Lawyers for La Regie des Rentes du Quebec

AND TO: **STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:   gncameron@stikeman.com
Tel:      212.845.7464
Fax:     212.371.7087

Email:   rferguson@stikeman.com
Tel:      212.845.7477
Fax:     212.371.7087

Lawyers for GENBAND Inc.

AND TO: **BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:   jmarshall@blgcanada.com
Tel:      416.367.6024
Fax:     416.361.2763

Email:   chill@blgcanada.com
Tel:      416.367.6156
Fax:     416.631.7301

Lawyers for the U.K. Pensions Regulator

AND TO: **ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON  M5H 2K1

Joel P. Rochon

Email:   jrochon@rochongenova.com
Tel:      416.363.1867
Fax:     416.363.0263

Lawyers for the Opposing LTD Employees

AND
TO:

**BLAKE, CASSELS & GRAYDON**
Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, Ontario M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email:   pamela.huff@blakes.com
Tel:      416.863.2958
Fax:     416.863.2653

Email:   jeremy.forgie@blakes.com
Tel:      416.863.3888
Fax:     416.863.2653

Lawyers for The Northern Trust Company,
Canada

AND
TO:

**CLEARY GOTTLIEB STEEN &**
**HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer

Email:   lschweitzer@cgsh.com
             jbromley@cgsh.com
Tel:      212.225.2000
Fax:     212.225.3999

Lawyers for Nortel Networks Inc.

AND
TO:

**LERNERS LLP**
130 Adelaide St. West
Suite 2400
Toronto, ON M5H 3P5

William E. Pepall

Email:   wpepall@lerners.ca
Tel:      416.601.2352
Fax:     416.867.2415

Lawyers for the Former Employees in Respect
of the Distribution of the Corpus of the Health
and Welfare Trust

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email:   kyle.kashuba@macleoddixon.com
Tel:      403.267.8399
Fax:     403.264.5973

Constellation NewEnergy Canada Inc.

AND
TO:

**SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON K1P 5L4

Peter Engelmann
Fiona Campbell

Email:   pengelmann@sgmlaw.com
Tel:      613-482-2452
Fax:     613-235-3041

Email:   fcampbell@sgmlaw.com
Tel:      613-482-2451
Fax:     613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust

AND
TO:

AND
TO:

**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

D. Brent McPherson

Email:   bmcpherson@langmichener.ca
Tel:      416.307.4103
Fax:     416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to
Wachovia Bank, N.A., in its capacity as Servicer
for the Nortel Networks Pass-Through Trust,
Series 1-1

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage

E-mail:   bboake@mccarthy.ca
Tel:       416.601.7557
Fax:      416.868.0673

Email:   jgage@mccarthy.ca
Tel:       416.601.7539
Fax:      416.686.0673

Lawyers for Morneau Sobeco Limited Partnership

## COURTESY COPIES:

AND TO:
**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:   sbrown@lrlaw.com

Tel:     602.262.5321
Fax:     602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND TO:
**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:  sreisman@curtis.com
         jdrew@curtis.com

Tel:     212.696.6000
Fax:     212-697-1559

Lawyers for Flextronics International

AND TO:
**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara

Email:   fhodara@akingump.com

Tel:     212.872.1000
Fax:     212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND TO:
**MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:   DDunne@milbank.com
Tel:     212.530.5770
Fax:     212.530.5219

Email:   ALeblanc@milbank.com
Tel:     212.835.7574
Fax:     212.530.5219

Email:   APisa@milbank.com
Tel:     212.530.5319
Fax:     212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

AND TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email: mschein@vedderprice.com

Tel: 212.407.6920
Fax: 212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email : andrew.robertson@macleoddixon.com
caylee.rieger@macleoddixon.com

Tel : 403.267.8222
Fax : 403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email: eric.prezant@bryancave.com
Tel: 312.602.5033
Fax: 312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel : 212.906.1373
Fax : 212.751.4864

U.S. Lawyers for The Bank of New York
Mellon



Court File No.  09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

### SUPPLEMENTARY SERVICE LIST OF PPSA REGISTRANTS

TO:      **OGILVY RENAULT LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Mario Forte
         Jennifer Stam

         Email:     dtay@ogilvyrenault.com
                    mforte@ogilvyrenault.com
                    jstam@ogilvyrenault.com

         Tel:       416.216.4000
         Fax:       416.216.3930

         Lawyers for the Applicants

**BY EMAIL:**

AND
TO:
**ARI FINANCIAL SERVICES INC.**
600-1270 Central Parkway West
Mississauga, ON L5C 4P4

Tel:      905-803-8000
Fax:     905-803-8644

Email:   ldearborn@arifleet.ca
         jmcmullin@arifleet.ca

AND
TO:
**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:   jsullivan@edc.ca

Tel:      613.597.8651
Fax:     613.598.3113

AND
TO:
**GENERAL ELECTRIC CAPITAL
EQUIPMENT FINANCE INC.**
5420 North Service Road
Burlington, ON L7L 6C7

Christopher Rankin

Tel:      514.394.2919
Fax:     514.397.5300

Email : christopher.rankin@ge.com

AND
TO:
**GE CAPITAL CANADA LEASING
SERVICES INC.**
5420 North Service Road
4th Floor
Burlington, ON L7L 6C7

Christopher Rankin

Tel:      514.394.2919
Fax:     514.397.5300

Email : christopher.rankin@ge.com

AND
TO:
**GE CAPITAL CANADA LEASING
SERVICES INC.**
1 Place Ville Marie
Suite 1401
Montreal, QC H3B 2B2

Christopher Rankin

Tel:      514.394.2919
Fax:     514.397.5300

Email : christopher.rankin@ge.com

AND
TO:
**GENERAL ELECTRIC CANADA
EQUIPMENT FINANCE G.P.**
500 North Service Road
8th Floor
Burlington, ON L7L 6W6

Christopher Rankin

Tel:      514.394.2919
Fax:     514.397.5300

Email : christopher.rankin@ge.com

32

AND
TO:

**NEXCAP FINANCE
CORPORATION**
3027 Harvester Road
Suite 212
Burlington, ON L7N 3G7


Scott Lowes


Tel:    905.637.4467 ext. 117
Fax:    905-637-1882


Email: slowes@nexcap.com


AND
TO:

**STEELCASE FINANCIAL SERVICES
LTD.**
1 Steelcase Rd. W.
Markham, ON L3R 0T3


Janeen Treur


Tel:    616.246.4389


Email:  jtreur@steelcase.com


AND
TO:

**THE BANK OF NOVA SCOTIA**
44 King Street West,
Toronto, ON M5H 1H1


Attn:    CSRS Queue


Tel:    1.888.855.1234


Email:  bsc@scotiabank.com

33

## BY FAX:

AND
TO: **ABN AMRO BANK N.V.**
Canada Branch
79 Wellington Street West
Suite 1500
Toronto, ON M5K 1G8

Tel:    416-367-0850
Fax:    416-367-1485

AND
TO: **ABN AMRO BANK N.V.**
600 De Maissonneuve Blvd. W.
Suite 1500
Montreal, QC H3A 3J2

Tel:    514.284.1133
Fax:    514.284.2357

AND
TO: **DELL FINANCIAL SERVICES
CANADA LIMITED**
155 Gordon Baker Road
Suite 501
North York, ON M2H 3N5

Tel:    1.877.814.4142
Fax:    1.888.438..1117

AND
TO: **GENERAL ELECTRIC CAPITAL
CANADA INC.**
2300 Meadowvale Boulevard
Suite 200
Mississauga, ON L5N 5P9

Bethany St. Pierre

Tel:    1.866.329.4323
Fax:    1.866.993.1902

AND
TO: **ST MICROELECTRONICS
(CANADA), INC.**
1310 Electronics Drive
Carrollton, Texas 75006

Tel:    905.273.4300
Fax:    905.273.7578

AND
TO: **HEWLETT-PACKARD FINANCIAL
SERVICES CANADA COMPANY**
5150 Spectrum Way
Mississauga, ON L4W 5G1

Attn:    Legal Department

Tel:    905.206.4725
Fax:    905.206.4191

AND
TO: **PRODAIR CANADA LTEE**
291 Rue Quinlan
Ville Lasalle, QC H8R 3W4

Alain Cote

Tel:    1.800.363.3572
Fax:    418.878.3235



**BY COURIER:**

AND **CIT TECHNOLOGIES INC.**
TO:  181 Bay Street
     Suite 3500
     Toronto, ON M5J 2T3

AND **HOLMAN CANADA LIMITED**
TO:  **PARTNERSHIP**

     9000 Midlantice Drive
     Mt. Laurel, New Jersey
     USA  08054

35



Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### SUPPLEMENTARY SERVICE LIST OF
### PROVINCIAL TAX AUTHORITIES

TO:      **OGILVY RENAULT LLP**
Royal Bank Plaza, South Tower
200 Bay Street, Suite 3800
Toronto, Ontario M5J 2Z4

Derrick Tay
Mario Forte
Jennifer Stam

Email:     dtay@ogilvyrenault.com
mforte@ogilvyrenault.com
jstam@ogilvyrenault.com

Tel:      416.216.4000
Fax:     416.216.3930

Lawyers for the Applicants

3手

**BY EMAIL:**

**ALBERTA**

AND
TO:
**ALBERTA MINISTRY OF FINANCE**
The Tax and Revenue Administration
9811-109 Street
Edmonton, Alberta  T5K 2L5

Sue Jamieson, Assistant Deputy Minister

Email: sue.jamieson@gov.ab.ca
Tel:    780.427.9403
Fax:    780.427.0348

**MANITOBA**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF MANITOBA AS
REPRESENTED BY THE MINISTER OF
FINANCE**

450 Broadway
Winnipeg, Manitoba  R3C 0V8

Barry Draward

E-mail: barry.draward@gov.mb.ca
Tel:    204.945.3758
Fax:    204.948.2360

38

**NEW BRUNSWICK**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NEW BRUNSWICK AS
REPRESENTED BY THE MINISTER OF
FINANCE**

Centennial Building
Room: 371, Floor: 3
P. O. Box 6000
Fredericton, New Brunswick
E3B 5H1

Lynn Noel

Email:  lynn.noel@gnb.ca
Tel:      506.457.3550
Fax:     506.444.4920


**NEWFOUNDLAND**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NEWFOUNDLAND AS
REPRESENTED BY THE MINISTER OF
FINANCE**

Department of Finance
3rd Floor, East Block, Confederation Complex
P.O. Box 8700, St. John's, Newfoundland
A1B 4J6

Keith Rees

Email:  krees@gov.nl.ca
Tel:      709.729.6297
Fax:     709.729.2856

39

**NOVA SCOTIA**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NOVA SCOTIA AS
REPRESENTED BY THE MINISTER OF
FINANCE**

P.O. Box 187
1723 Hollis St.
Halifax, Nova Scotia  B3J 2N3

Doug Moodie

Email:   moodiedj@gov.ns.ca
Tel:     902.424.5720
Fax:     902.424.6635

**ONTARIO**

AND
TO:

**ONTARIO MINISTRY OF FINANCE**
Legal Services Branch
6th Floor
33 King Street West
Oshawa, Ontario
L1H 8H5

Kevin O'Hara

Email:   kevin.ohara@ontario.ca
Tel:     905.433.6934
Fax:     905.436.4510



**PRINCE EDWARD ISLAND**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF PRINCE EDWARD
ISLAND AS REPRESENTED BY THE
PROVINCIAL TREASURY**

Shaw Building, 1st Floor
95 Rochford Street
PO Box 2000
Charlottetown, PE  C1A 7N8

Mary Hennessey

Email:  mihennessey@gov.pe.ca
Tel:     902.368.4070
Fax:     902.368.6164


**SASKATCHEWAN**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF SASKATCHEWAN AS
REPRESENTED BY THE MINISTER OF
FINANCE**

2350 Albert Street
Regina, Saskatchewan  S4P 4A6

Margaret Johannsson, Assistant Deputy Minister

Email:  Margaret.johannsson@gov.sk.ca
Tel:     306.787.6685
Fax:     306.787.0241

41

**FEDERAL**

AND
TO:

**CANADA REVENUE AGENCY**
c/o Department of Justice
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email: diane.winters@justice.gc.ca
Tel:    416.973.3172
Fax:    416.973.0810

42

**BY FAX:**

**BRITISH COLUMBIA**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF BRITISH COLUMBIA,
AS REPRESENTED BY THE MINISTER OF
FINANCE, REVENUE DIVISION**

3rd Floor, 1802 Douglas Street
Victoria, British Columbia  V8T 4K6

Michael Ford

Fax:    250.356.0065

**QUEBEC**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF QUEBEC AS
REPRESENTED BY THE MINISTER OF
FINANCE**

**Ministère des Finances**
12, rue Saint-Louis
Québec (Québec) G1R 5L3

Tel:    418.528.9323
Fax:    418.646.1631

43

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Applicants

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**(returnable September 30, 2010)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

**TAB 2**

DOCSTOR: 1680120\1

44

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF KHUSH DADYBURJOR**
**(sworn September 27, 2010)**

I, **Khush Dadyburjor**, of the City of Mississauga in the Province of Ontario, **MAKE
OATH AND SAY:**

1.      I am the Vice President Global M&A of Nortel Networks Limited ("NNL") and as such, I
have personal knowledge of the matters to which I hereinafter depose in this Affidavit.  Where I
do not possess personal knowledge, I have stated the source of my information and, in all such
cases, believe it to be true.

2.      I swear this Affidavit in support of the Applicants' motion for an order, *inter alia*,
authorizing and approving the transaction contemplated by an asset sale agreement dated as of
September 24, 2010 (the "Sale Agreement[1]") by and among Nortel Networks Corporation
("NNC"), NNL, Nortel Networks Inc. ("NNI", and together with NNC and NNL, the "Main
Sellers"), the Affiliates of the Main Sellers listed in Exhibit "A" to the Sale Agreement (together

---

[1] The Sale Agreement is one of two sale agreements in connection with the sale of Nortel's assets related to the
MSS business.  The other sale agreement (the "EMEA Sale Agreement") was entered into amongst the EMEA
Sellers, the Joint Administrators and the Purchaser. The consummation of the transaction contemplated by the Sale
Agreement is conditional on the completion of the transaction contemplated by the EMEA Sale Agreement and *vice
versa*.

- 2 -

with the Main Sellers, the "Sellers"), and Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), in respect of certain assets relating to Nortel's Multi-Service Switch business (the "MSS Business"). Defined terms used herein that are not otherwise defined shall have the meanings ascribed to such terms in the Sale Agreement. Underlined terms between quotes shall have the meaning ascribed to them in the Bidding Procedures (as defined below). A copy of the Sale Agreement will be attached as an appendix to the report that will be filed by Ernst & Young Inc. (the "Monitor") in connection with this motion.

3.    On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed the Monitor in the CCAA proceedings.

4.    Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

5.    Additionally, on January 15, 2009, NNUK and certain subsidiaries (the "EMEA Debtors") of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986.

6.    On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

7.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally

46

- 3 -

authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.

8.      The French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months, subsequently extending until the earlier of May 31, 2010 or the filing by Kapsch CarrierCom AG with the French Court of a letter stating that its bid for the GSM/GSM-R assets of NNSA has become unconditional; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA. On March 25, 2010, the French Court ended the suspension of the liquidation operations.

9.      On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law.

10.     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

11.     On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

12.     On March 10, 2010, Nortel Networks Telecomunicacoes do Brasil Ltda filed for voluntary bankruptcy proceedings. The Brazilian court issued an order and appointed a

- 4 -

47

bankruptcy trustee on March 30, 2010. On April 15, 2010, Nortel Networks de Colombia S.A. ("NN Colombia") was placed into liquidation.

13.     Further details regarding the background to these CCAA proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 previously filed in these proceedings, and further details regarding the bidding procedures relating to the MSS Business are contained in my affidavit sworn on August 27, 2010, and, in each case, are not repeated herein.

14.     All dollar references are US$ unless otherwise indicated. All references to "Nortel" herein are references to the enterprise as a whole.

## BACKGROUND

15.     Nortel's MSS Business provides data networking infrastructure solutions to telecom service providers and large enterprise customers throughout the world.

16.     These solutions allow customers to integrate a variety of data, voice and video applications onto a single network and connect users in multiple locations securely, efficiently, and seamlessly over a wide area network.

17.     In addition, the MSS Business supports former Nortel business units sold in prior Nortel asset sales with hardware, software and services. The MSS Business sells its base platform to former Nortel business units, which add hardware and software to drive product development for both the wireless and wireline markets.

18.     Nortel's MSS Business has a global footprint, with switches located on every continent and in over 100 countries. There are currently 250 employees employed by the MSS Business. They are located in many countries, with the principal locations being Australia, Canada, China, Spain and the United Kingdom. Competitors of the MSS Business include Cisco, Alcatel-Lucent, Ericsson, Ciena and a variety of smaller vendors around the world.

19.     As with Nortel's other assets and businesses, a review was undertaken with respect to the MSS Business, which led to the conclusion that a sale of the assets relating to the MSS Business was the best opportunity to maximize the value of those assets and reduce the continuing cost relating to their support and development.



- 5 -

20.    On September 1, 2010, this Honourable Court made an order (i) approving certain bidding procedures (the "Bidding Procedures") in connection with a bidding process for the MSS Business and related assets (the "Bidding Procedure Order"), and (ii) authorizing the Applicants to enter into that certain asset sale agreement (the "Stalking Horse Agreement") dated August 26, 2010, among the Sellers and PSP Holding LLC, as purchaser ("PSP"), as a "stalking-horse" sale agreement in respect of assets related to the MSS Business.

21.    On the same date, the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") also made an order approving the Bidding Procedures and the Stalking Horse Agreement.

### THE BIDDING PROCESS

22.    Following the granting of the Bidding Procedure Order by this Honourable Court and the corresponding Order by the U.S. Court, Nortel and its financial advisors proceeded to implement the bidding process contemplated by the Canadian Sales Process Order and the Bidding Procedures.  A brief summary of the events that took place during the bidding process is provided below.  I am aware that the report of the Monitor filed in connection with this motion will also contain details on such events.

23.    Pursuant to the Bidding Procedures, the "Bid Deadline" was set for 12:00 pm (Eastern) on September 21, 2010, and the time for the "Auction" was scheduled for 9:00 am on September 24, 2010.

24.    Two (2) of the seven (7) "Potential Bidders" who expressed an interest in the MSS Business satisfied the requirements of the Bidding Procedures in order to become "Qualified Bidders" and advance to the next stage of the bidding process.

25.    "Qualified Bidders" were afforded access to due diligence materials and information relating to the MSS Business and related assets, including access to management personnel and on-site inspections.

26.    In connection with the Bidding Procedures, Nortel received two (2) bids for the MSS Business and related assets, in addition to the bid contemplated by the Stalking Horse

- 6 -

Agreement. The two additional bids received were from the Purchaser and MSS Acquisition LLC, an entity controlled by One Equity Partners IV, L.P. ("OEP").

27.    On September 22, 2010, all "Qualified Bidders" who submitted a bid were advised that their respective bids were deemed to be "Qualified Bids".

28.    On September 23, 2010, all "Qualified Bidders" were notified that the "Qualified Bid" submitted by OEP (the "OEP Bid"), with an aggregate purchase price of US$42.5 million, would be the "Starting Bid" at the "Auction", and that the "Auction" would start at 9:00 am on September 24, 2010.  Copies of all "Qualified Bids" were provided to all "Qualified Bidders".

29.    The OEP Bid was selected as the "Starting Bid" as it represented the best value for the Assets having regards to its terms, which were substantially the same as those contained in the Stalking Horse Agreement, except with an increased purchase price.

30.    The Monitor was involved at all material times throughout the bidding process and Nortel has kept the official committee of unsecured creditors of NNI and the *ad hoc* bondholders committee apprised of all significant development in the process.

## THE AUCTION

31.    As contemplated by the Bidding Procedures, the "Auction" was held at the offices of Cleary Gottlieb Steen & Hamilton LLP.  A brief summary of the auction is as follows:

(a)    the auction commenced at approximately 10:37 am on September 24, 2010 at which time it was reiterated that the OEP Bid was the "Starting Bid";

(b)    the auction was then adjourned to allow bidders to work on the terms of revised bids;

(c)    during round one of bidding, PSP submitted a revised bid with an increased purchase price of $47.5 million (including break fee considerations) and the Purchaser submitted a revised bid with improved deal terms;

- 7 -



(d)     after review of the revised bids received during round one, the auction resumed at 12:00 (noon) at which point Nortel declared PSP's revised bid as the new "Leading Bid";

(e)     at that point, the auction was adjourned again in order for all bidders to work on revised bids;

(f)     during round two of bidding, Nortel received revised bids from each of the Purchaser and OEP. The Purchaser's revised bid included several contract changes favourable to Nortel as well as an increased purchase price of $55 million in cash (which Nortel was valuing at $53 million given certain bid terms that differed from the Stalking Horse Agreement). OEP's revised bid included certain contract changes as well as an increased purchase price of $47 million;

(g)     after review of the revised bids received during round two, the auction resumed at 4:00 pm at which point Nortel described the salient points of the revised bids received and declared the Purchaser's revised bid as the new "Leading Bid";

(h)     during round three of bidding, Nortel received a revised bid from PSP. PSP's revised bid was for a purchase price of $54 million ($51.5 million in cash and a credit of $2.5 million for the bid protections contained in its Stalking Horse Agreement). During that round, OEP withdrew;

(i)     after review of the revised bid from PSP, the auction process was resumed and Nortel declared PSP's revised bid as the "Leading Bid". The auction then moved to a live auction process, the outcome of which resulted in the Purchaser's final revised bid of $65 million being the final bid. Nortel valued this bid at $63 million for the same reasons stated above;

(j)     the auction was then adjourned pending signing of final documents, including the Sale Agreement.

- 8 -

51

## THE SALE AGREEMENT

32.     I am aware that the report of the Monitor that will be filed in connection with this motion will also contain a summary of the terms of the Sale Agreement. Some of the more significant amendments from the Stalking Horse Agreement that are reflected in the Sale Agreement are as follows:

> (a)     the Purchase Price is $65 million, subject to certain escrows and net working capital adjustments, among other adjustments. The Purchase Price pursuant to the Stalking Horse Agreement was $39 million, subject to the same adjustments as the Sale Agreement;

> (b)     the closing of the transaction contemplated by the Sale Agreement is subject to the Purchaser obtaining European Union anti-trust clearance;

> (c)     the Sale Agreement provides the Purchaser with the right to exclude certain assets, liabilities and employees in Brazil, Chile, Egypt, India, Malta and the Philippines from the transactions contemplated by the Sale Agreement and the EMEA Sale Agreement. This does not however entitle the Purchaser to make any adjustment to the Purchase Price;

> (d)     the Transition Services Agreement differs in that the term of the various services provided thereunder will be co-terminous with the term of similar services provided pursuant to the transition services agreement entered into in connection with the sale of the CDMA business and may extend as far as November 2011;

## SEALING

33.     I am aware that the report of the Monitor that will be filed in connection with this motion will include one or more confidential appendices including, among other things, the disclosure schedules and exhibits to the Sale Agreement. These disclosure schedules and exhibits contain sensitive, competitive and, in some instances, personal information. I believe sealing these confidential appendices is appropriate in the circumstances.

- 9 -

## CONCLUSION

34.    I believe that the process undertaken by the Applicants, the U.S. Debtors and their advisors, including with input from the official committee of unsecured creditors of NNI and the *ad hoc* bondholders committee, was in compliance with the Bidding Procedures and that maximum value for the Assets has been achieved.

35.    The bidding process was conducted by Nortel in consultation with its financial and legal advisors, the Monitor and several of its significant stakeholders and in accordance with the Bidding Procedures.  The auction resulted in a significantly increased purchase price.  I believe that the proposed transaction as set out in the Sale Agreement is the best offer available for the Assets.

**SWORN BEFORE ME** at the City of Mississauga, in the Province of Ontario on this 27th day of September, 2010.

_____
Commissioner for Taking Affidavits or
Notary Public

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel, limited to the attestation of instruments and the taking of affidavits, for Nortel Networks Corporation and its subsidiaries. Expires January 29, 2011.

_____
Khush Dadyburjor

53

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

|  |  |
|---|---|
|  | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)** |
|  | Proceeding commenced at Toronto |
|  | **AFFIDAVIT OF KHUSH DADYBURJOR**<br>**(sworn September 27, 2010)** |
|  | **OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario  M5J 2Z4, Canada<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel: (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Mario Forte  LSUC#: 27293F**<br>Tel: (416) 216-4870<br>Email: mforte@ogilvyrenault.com<br><br>**Jennifer Stam LSUC #46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br>Fax: (416) 216-3930<br>Lawyers for the Applicants |

**TAB 3**

DOCSTOR: 1680120\1

36   54

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF KHUSH DADYBURJOR**
**(sworn August 27, 2010)**

I, Khush Dadyburjor, of the City of Toronto, in the Province of Ontario, MAKE OATH
AND SAY:

1.      I am the Vice President Global M&A of Nortel Networks Limited ("NNL") and as such, I
have personal knowledge of the matters to which I hereinafter depose in this Affidavit.  Where I
do not possess personal knowledge, I have stated the source of my information and, in all such
cases, believe it to be true.

2.      I swear this Affidavit in support of the motion for orders, *inter alia*, (i) authorizing and
approving the bidding procedures described in detail in the report of the Monitor (as defined
below) filed with this Honourable Court in connection with this present motion (the "Bidding
Procedures") in respect of the sale of certain assets of Nortel's Multi-Service Switch business
(the "MSS Business"), (ii) authorizing the Applicants (as defined below) to enter into that certain
asset sale agreement (the "Stalking Horse Agreement") dated August 26, 2010, among Nortel
Networks Corporation ("NNC"), NNL and Nortel Networks Inc. and certain other entities
identified therein as sellers (together, the "Sellers") and PSP Holding LLC, as purchaser (the
"Purchaser"), as a "stalking-horse" sale agreement in respect of certain assets related to the MSS

- 2 -

Business (the "Assets"), a copy of which is attached as Appendix "A" to the report of the Monitor to be filed in connection with this motion and (iii) approving that certain MSS side agreement dated August 26, 2010 (the "Side Agreement"), a redacted copy of which is appended as Appendix "B" to the report of the Monitor filed in connection with this motion, and an unredacted copy of which is included in the confidential appendices to that same Monitor's report, and authorizing the Applicants to enter into such Side Agreement.

## BACKGROUND

3.     On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

4.     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

5.     Additionally, on January 15, 2009, NNUK and certain subsidiaries (the "EMEA Debtors") of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986.

6.     On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

7.     On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks

56

38

- 3 -

S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.

8.      The French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months, subsequently extending until the earlier of May 31, 2010 or the filing by Kapsch CarrierCom AG with the French Court of a letter stating that its bid for the GSM/GSM-R assets of NNSA has become unconditional; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA. On March 25, 2010, the French Court ended the suspension of the liquidation operations.

9.      On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law.

10.     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

11.     On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

12.     On March 10, 2010, Nortel Networks Telecomunicacoes do Brasil Ltda filed for voluntary bankruptcy proceedings. The Brazilian court issued an order and appointed a

39   57

- 4 -

bankruptcy trustee on March 30, 2010.  On April 15, 2010, Nortel Networks de Colombia S.A. ("NN Colombia") was placed into liquidation.

13.    Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 previously filed in these proceedings and are therefore not repeated herein.

14.    All dollar references are US$ unless otherwise indicated.  All references to "Nortel" herein are references to the enterprise as a whole.

**The MSS Business**

15.    Nortel's MSS Business provides data networking infrastructure solutions to telecom service providers and large enterprise customers throughout the world.

16.    These solutions allow customers to integrate a variety of data, voice and video applications onto a single network and connect users in multiple locations securely, efficiently, and seamlessly over a wide area network.

17.    In addition, the MSS Business supports former Nortel business units sold in prior Nortel asset sales with hardware, software and services.  The MSS Business sells its base platform to former Nortel business units, which add hardware and software to drive product development for both the wireless and wireline markets.

18.    Nortel's MSS Business has a global footprint, with switches located on every continent and in over 100 countries.  There are currently 250 employees employed by the MSS Business. They are located in many countries, with the principal locations being Australia, Canada, China, Spain and the United Kingdom. Competitors of the MSS Business include Cisco, Alcatel-Lucent, Ericsson, Ciena and a variety of smaller vendors around the world.

**Marketing Efforts in Respect of the MSS Business**

19.    The environment in which Nortel operates is highly competitive, the competition for market share is fierce, and the cost of rapid technological development is steep.  Furthermore, the scale requirements to compete in this industry are substantial.  Due to the global economic downturn, Nortel has been experiencing significant pressure on its businesses and facing

- 5 -

competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses suspend, delay and reduce capital expenditures. The extreme volatility in the financial, foreign exchange and credit markets globally and the uncertainty created by the ongoing creditor protection proceedings has compounded the situation. On June 19, 2009, Nortel announced that it had determined that the sale of its businesses is the best path to maximize value. Since that time, Nortel has been engaged in a process for the orderly disposition of its businesses.

20.    Nortel first began to explore a divestiture of the MSS Business in the first week of February 2010. In connection with this initial effort, Nortel, in consultation with its financial advisors, approached approximately fifty-one (51) parties likely to be interested and able to acquire the MSS Business, including a mix of financial investors and strategic buyers. An information memorandum was provided to the twenty-seven (27) parties who had executed confidentiality agreements. Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations with the eighteen (18) entities it deemed able to consummate a transaction for the MSS Business, and ultimately gave five (5) companies access to an electronic data room containing confidential diligence materials regarding the MSS Business.

**The Stalking Horse Agreement**

21.    After extensive arm's-length, good faith negotiations among the Sellers and the Stalking Horse Purchaser and their respective advisors, the Sellers have entered into the Stalking Horse Agreement, subject to approval of the sale contemplated therein by this Honourable Court and the U.S. Court. Concurrently, the EMEA Sellers (as defined in the Stalking Horse Agreement) and the Stalking Horse Purchaser have entered into an asset sale agreement (the "EMEA Agreement") relating to the sale and purchase of the EMEA Assets (as defined in the Stalking Horse Agreement).

22.    I believe that the Stalking Horse Agreement and the EMEA Agreement represent the best opportunity for the Sellers to maximize the value of their assets relating to the MSS Business by serving as a basis for conducting an auction to seek higher and/or better offers.

- 6 -

23.    The Stalking Horse Agreement includes the following material terms[1]:

    (a)    <u>Purchase Price</u>.  At the Closing, the Stalking Horse Purchaser will pay to the Sellers and the EMEA Sellers, through their Distribution Agent, a base purchase price of $39,000,000 million in cash, subject to certain escrows and net working capital adjustments, among other adjustments.

    (b)    <u>Certain Fees</u>.  In certain circumstances, the Sellers and the EMEA Sellers may be required to pay to the Stalking Horse Purchaser a Break-Up Fee and/or an Expense Reimbursement, which are discussed in further detail below.

    (c)    <u>Good Faith Deposit</u>.  On the next Business Day following the entry of the Bidding Procedures Order, the Stalking Horse Purchaser will deliver to the Escrow Agent for the Sellers a good faith deposit in the amount of $1,250,000 in cash. The good faith deposit will be applied to the balance of the Purchase Price to be paid by the Stalking Horse Purchaser at Closing.

    (d)    <u>Assets</u>.  The Assets to be acquired by the Stalking Horse Purchaser include, among other things, certain (i) inventory and supplies, (ii) unbilled accounts receivable, (iii) equipment, (iv) contracts and certain bids made by the Sellers for a contract which could result in a contract after the Closing Date, (v) prepaid expenses, (vi) tangible embodiment of business information, (vii) intellectual property, (viii) rights under warranties, representations and guarantees by suppliers, manufacturers and contractors and third parties related to the Assets, (ix) net insurance proceeds received or to be received in respect of equipment, (x) tax records required by law to be transferred, (xi) any defenses of the Sellers relating to the Assumed Liabilities and (xii) goodwill associated with the MSS Business.  The assets to be acquired by the Stalking Horse Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (excluding receivables that are unbilled as of the Closing Date), bank account balances and petty cash, and certain assets

---

[1] In this paragraph, all defined terms not otherwise defined herein shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

60

42

- 7 -

and rights (for example, the right to tax refunds, credits, or similar benefits, rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period, and certain rights to Intellectual Property.

(e)    Assigned Contracts.  The Sellers agree to assign certain Seller Contracts, including customer contracts, to the Stalking Horse Purchaser, and to cooperate with the Stalking Horse Purchaser to assist in the transition of Bundled Contracts to the Stalking Horse Purchaser as they relate to the MSS Business.  The Sellers have agreed to pay the Cure Costs associated with the assignment of customer contracts.

(f)    Assumed Liabilities.  The liabilities to be assumed by the Stalking Horse Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the MSS Business by the Stalking Horse Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities, (vi) certain liabilities related to employees and employee benefit plans and under employment laws and (vii) certain liabilities related to supply purchase orders and inventory repurchase obligations.

(g)    Sale Free and Clear.  The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Stalking Horse Purchaser or otherwise expressly permitted under the Stalking Horse Agreement.

(h)    Ancillary Agreements.  Pursuant to the Stalking Horse Agreement, at or prior to the Closing, certain Sellers, certain EMEA Sellers and the Stalking Horse Purchaser will enter into, among others, the following ancillary agreements:

(i).    Transition Services Agreement.  At the Closing, NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited, certain of their affiliates and the Stalking Horse Purchaser will enter into one or more agreements under

- 8 -

which NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited and their affiliates will agree to provide to the Stalking Horse Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing through June 30, 2011, subject to possible extensions in the event the Sale Hearing and the Canadian Sale Hearing do not take place by September 30, 2010.

(ii)    Intellectual Property License Agreement. At the Closing, NNL, NNI, the EMEA Sellers (the "Nortel Parties") and the Stalking Horse Purchaser will enter into an intellectual property license agreement (the "IPLA") pursuant to which (i) the Nortel Parties will grant to the Stalking Horse Purchaser a non-exclusive license to certain intellectual property, and (ii) the Nortel Parties will receive a license back to all intellectual property included in the Assets as necessary for use in their other businesses or to comply with terms of other divestitures. The IPLA licenses will be perpetual.

(iii)    Trademark License Agreement. At the Closing, NNL and the Stalking Horse Purchaser will enter into a license agreement allowing the Stalking Horse Purchaser to use certain Nortel trademarks in connection with its sales of the Products for a limited period after the Closing.

(iv)    Loaned Employee Agreement. At the Closing, Nortel and the Stalking Horse Purchaser will enter into an agreement under which certain employees of Nortel and its affiliates will be seconded to the Stalking Horse Purchaser to perform services for the Stalking Horse Purchaser for a period of up to two months beginning on the Closing Date and certain visa employees of Nortel and its affiliates will be seconded to the Stalking Horse Purchaser for a period of up to twelve months beginning on the Closing Date (collectively, the "Loaned Employees"). Nortel will continue to pay all employment and overhead costs in respect of the Loaned Employees that relate to the period of the Loaned Employee Agreement, and the Stalking Horse Purchaser will provide for the payment

- 9 -

of, pursuant to the pre-funding mechanism in the Loaned Employee Agreement, all such employment and overhead costs.

(v)   <u>Real Estate Terms and Conditions</u>.   At the Closing, the Sellers and the Stalking Horse Purchaser will finalize the general terms to which the parties agree, which will govern the applicable subleases or license agreements in respect of certain real property which the Sellers will sublease or license to the Stalking Horse Purchaser (or an affiliate) from and after Closing.

(i)   <u>Restrictions on Solicitation of Competing Bids</u>.   As set forth in Section 5.27 of the Stalking Horse Agreement and subject to the terms and limitations therein, the Stalking Horse Agreement prohibits the Sellers and its affiliates from engaging in negotiations with respect to any proposal or offer for a competing transaction (other than with respect to the provision of information regarding the Business and the Assets), executing any letter of intent or agreement providing for a competing transaction, or seeking relief inconsistent with the Stalking Horse Agreement, from the date of execution of the Stalking Horse Agreement until the entry of the Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of the Stalking Horse Agreement. Notwithstanding the foregoing, subject to the terms and limitations in the Stalking Horse Agreement, the Sellers are permitted to provide access to due diligence and other information regarding the Bidding Procedures, the Business or the Assets in written or oral form (excluding the Transaction Documents).

(j)   <u>Closing Conditions</u>:   In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals, the obligation of the Stalking Horse Purchaser to close the sale is subject to the satisfaction of the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

(k)   Ongoing Covenants and Restrictions: In addition to certain other customary post-closing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to cooperate with the Stalking Horse Purchaser for an agreed period after Closing in relation to arrangements regarding (i) Bundled Contracts, (ii) certain Assets which were not transferred at Closing and (iii) Contracts for which required consents were not obtained prior to Closing.

(l)   Post-Closing Access to Books and Records.   For five (5) years after the Closing, and subject to its right to destroy such document upon sixty (60) days notice to the Sellers, the Stalking Horse Purchaser must preserve pre-closing records to the extent related to the MSS Business. The Stalking Horse Purchaser and the Seller must preserve tax records through the end of the applicable statute of limitations period. Through such periods the Sellers and the Stalking Horse Purchaser, as applicable, shall, and/or shall cause the person holding such records to provide to the party requesting the records or its representative reasonable access to such records during normal business hours.

24.   As part of the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to make offers to at least 95% [2] of the Nortel employees associated with the MSS Business. The Stalking Horse Agreement provides that the Stalking Horse Purchaser shall be entitled to make offers of employment to such employees after the granting of the U.S. Sale Order and Canadian Approval and Vesting Order.

**Break Fee and Expense Reimbursement**

25.   The Stalking Horse Purchaser and its advisors have expended, and likely will continue to expend, considerable time, energy and resources pursuing the purchase of the Assets, and have engaged in extended, good faith negotiations. The Stalking Horse Agreement is the culmination of those efforts.

---

[2] This number does not include those employees whose employment will transfer automatically by operation of law, all of whom will be hired by the Purchaser.

64

46

- 11 -

26.     In recognition of this expenditure of time, energy, and resources, the Sellers and the EMEA Sellers, in accordance with section 9.2 of the Stalking Horse Agreement and section 15.5 of the EMEA Agreement and upon the termination events described therein, have agreed to pay the Stalking Horse Purchaser an aggregate fee of two million and five hundred thousand dollars ($2,500,000) less the amount the Sellers are required to pay as the Expense Reimbursement (as defined below), which break-up fee (prior to deduction of the Expense Reimbursement) is equal to approximately six and four tenths percent (6.4%) of the estimated aggregate Purchase Price (the "Break-Up Fee").   In accordance with section 9.2 of the Stalking Horse Agreement and section 15.5 of the EMEA Agreement and upon the termination events described therein, the Sellers and the EMEA Sellers also have agreed to pay the Stalking Horse Purchaser's reasonable and documented out-of-pocket costs and expenses (including fees and expenses of the Stalking Horse Purchaser's advisors and notification and filing fees) in connection with the preparation, execution and performance of the Stalking Horse Agreement and the EMEA Agreement and the transactions contemplated thereby to the date of termination of the Stalking Horse Agreement and the EMEA Agreement, which shall not exceed one million and five hundred thousand dollars ($1,500,000), which is equal to approximately three and eight-tenths percent (3.8%) of the estimated aggregate Purchase Price (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections").   Under the Stalking Horse Agreement and the EMEA Agreement, two-thirds of the aggregate Bid Protections will be payable by the Sellers, including the Applicants that are Sellers, and the remaining one-third will be payable by the EMEA Sellers.

27.     I believe, based on my discussions with the Monitor, that its report to be filed will be providing more detail as to the circumstances in which the Bid Protections are payable.

28.     The Sellers have agreed that their obligation to pay their portion of the Break-Up Fee and Expense Reimbursement shall survive termination of the Stalking Horse Agreement.

**The Bidding Procedures**

29.     In order to ensure that the Sellers receive the maximum value for the Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement, if approved by this Honourable Court, will serve as the "stalking-horse" bid for the Assets.

65

47

- 12 -

30.    The Bidding Procedures provide a process through which an interested party may become a "Qualified Bidder".  Bids from Qualified Bidders must be submitted by no later than **12:00 p.m. (ET) on September 21, 2010**.  The auction is scheduled to take place at the offices of Cleary Gottlieb Stein & Hamilton LLP in New York City at **9:00 a.m. (ET) on September 24, 2010**.  Pursuant to the Bidding Procedures, the Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

31.    I am aware that the report of the Monitor to be filed in connection with this motion will outline the proposed bidding process and Bidding Procedures in detail.  I have reviewed the Bidding Procedures and believe them to be fair in the circumstances.

32.    The Sellers subject to the Chapter 11 cases are seeking approval from the U.S. Court of the Stalking Horse Agreement and the bidding process and Bidding Procedures, which request shall be considered at a joint hearing with this Honourable Court.  It is also anticipated that the final sale of the Assets will be submitted for approval to this Honourable Court and the U.S. Court as a joint hearing.

**The Side Agreement**

33.    In connection with the entry into of the Stalking Horse Agreement and the EMEA Agreement, the Applicants, the U.S. Debtors, the EMEA Debtors and certain other Nortel entities have negotiated and executed the Side Agreement to address certain issues among such parties relating to the mitigation of potential costs borne by certain of the estates associated with the Stalking Horse Agreement and the provisions of transition services to the Stalking Horse Purchaser.

34.    I believe that the approval by this Honourable Court of the Side Agreement is appropriate in the circumstances because cooperation amongst the Applicants, the U.S. Debtors and the EMEA Debtors is essential to facilitating the sale pursuant to the Stalking Horse Agreement and maximizing value in connection with the sale of Nortel's MSS Business, particularly given the ongoing creditor protection proceedings in various jurisdictions.  By mitigating certain risks by providing for the allocation of certain cost exposures among the Sellers and the EMEA Sellers, the Side Agreement furthers the Applicants' ability to execute the Stalking Horse Agreement and engage in the transaction.

- 13 -

### Sealing

35.    I am aware that the report of the Monitor that will be filed in connection with this motion will include one or more confidential appendices, including, the sellers disclosure schedules and exhibits to the Stalking Horse Agreement and the unredacted version of the Side Agreement. Those disclosure schedules, exhibits and Side Agreement contain sensitive, competitive and, in some circumstances, personal information. I believe sealing these confidential appendices (including the unredacted copy of the Side Agreement) is appropriate in the circumstances.

### Conclusion

36.    I believe, based on canvassing the marketplace since the commencement of these proceedings, that that the proposed transaction with the Stalking Horse Purchaser represents the best proposal available for the MSS Business, subject to the receipt of a higher or better bid through the auction process contemplated by the Bidding Procedures, and the purchase price represents fair and reasonable value for the Assets.

37.    The potential purchase price that could be realized through a sale of the Assets is likely to decline over time if the Assets remain unsold. While it is clear that the Assets have significant value, the full value of the Assets may not be realized if a sale is not consummated quickly.

38.    The Stalking Horse Agreement requires an expeditious sale process and provides the Stalking Horse Purchaser the right to terminate the Stalking Horse Agreement if certain milestones in the sale process are not timely met. For example, if this Honourable Court does not approve the Bidding Procedures by thirty (30) days from the execution of the Stalking Horse Agreement, the Stalking Horse Purchaser may terminate the Stalking Horse Agreement. For

49

- 14 -

these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Applicants' assets and, in turn, to a recovery for the Applicants' estates.

SWORN BEFORE ME at the City of
Mississauga, in the Province of Ontario
on this 27th day of August, 2010.


_____
Commissioner for Taking Affidavits or
Notary Public

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

_____
Khush Dadyburjor

68

50

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

AFFIDAVIT OF KHUSH DADYBURJOR
(sworn August 27, 2010)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario
M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

**TAB 4**

69

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FIFTY-SECOND REPORT OF THE MONITOR**
**DATED AUGUST 30, 2010**

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to July 22, 2010 by this Honourable Court in its Order dated April 14, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

- 2 -

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries and affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for recognition of the administration proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.  Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.  Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdiction in which they are located.

- 3 -

**PURPOSE**

8.    The purpose of this Fifty-Second Report of the Monitor (the "Fifty-Second Report") is to provide this Honourable Court with information regarding the Applicants' motion seeking:

- approval of an asset sale agreement dated August 26, 2010 (the "PSP Agreement"), amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers" and, with the Main Sellers, the "Sellers"), and PSP Holding LLC ("PSP" or the "Purchaser") in respect of the sale of substantially all of the assets of Nortel's Multi-Service Switch business (the "MSS Business") as a "stalking horse" agreement;

- approval of the terms and conditions of the Seller Break-up Fee and Seller Expense Reimbursement (each as defined below);

- approval of the Side Agreement (as defined below);

- approval of the Bidding Procedures (as defined below);

- a sealing order in respect of the exhibits and the Sellers Disclosure Schedule to the PSP Agreement and the non-redacted Side Agreement for the reasons set out below;

and to provide the Monitor's support in respect thereof.

**TERMS OF REFERENCE**

9.    In preparing this Fifty-Second Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.  EYI has not audited, reviewed nor otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Fifty-Second Report.

- 4 -

10. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11. Capitalized terms not defined in this Fifty-Second Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the PSP Agreement or the Bidding Procedures.

12. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**THE MULTI-SERVICE SWITCH BUSINESS**

*Background*

13. The MSS Business is not operated through a dedicated legal entity or stand-alone division. Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products and services in that country are made through that single legal entity. A more detailed description of this structure is set out in the Pre-Filing Report.

14. The MSS product is a high capacity, high reliability multi-service switch that can aggregate and route different kinds of traffic such as data, video, voice and various other protocols for transmission in a combined fashion.

15. The MSS Business delivers products and services principally to telecommunications services providers and multi-system operators, and is also used by other former Nortel business units within various network products that they sell.

16. The MSS Business had global revenues of approximately $350 million in fiscal 2009, including Canadian revenue of approximately $4 million representing approximately 1% of global MSS revenue. The MSS Business previously operated as a division of Nortel's MEN

73

- 5 -

business, which was sold in March, 2010, and therefore it is difficult to produce and compare historical financial results and other detailed financial information.

17. In addition, the Applicants have an interest in the intellectual property upon which the products of the MSS Business are based. Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the MSS Business to customers in their respective geographic regions.

18. The MSS Business utilizes the services of approximately 330 full time equivalent employees. This includes approximately 250 individuals directly involved in the MSS Business (the "Employees") as well as additional individuals in other Nortel functional areas and corporate departments that support the MSS Business. Of the 250 individuals dedicated to the MSS Business, approximately 66 are located in Canada.

*Sale Process*

19. In February 2010, Nortel commenced efforts to market the MSS Business. With the assistance of Lazard Frères & Co., the Company approached or was contacted by 51 buyers or buyer groups. As a result of those efforts, 27 parties indicated an interest in purchasing the MSS Business, executed confidentiality agreements, and were provided with a confidential information memorandum. Eighteen parties participated in management presentations and ultimately five parties were given access to a confidential electronic data room containing due diligence materials for the MSS Business.

20. On June 7, 2010, Nortel entered into an agreement to negotiate exclusively with one of these bidders. This agreement (and any extensions thereof) expired on June 25, 2010. Despite extensive good faith negotiations during the exclusivity period and continuing for a further period subsequent to the expiration of the exclusivity agreement, Nortel and this bidder were unable to agree on the terms of a transaction that were mutually acceptable to both parties.

74

- 6 -

21. As a result, following the expiration of the exclusivity agreement described above, Nortel resumed negotiations with two other bidders that had previously conducted extensive due diligence. Following weeks of these resumed negotiations, Nortel ultimately entered into the PSP Agreement as described below.

22. The Monitor has had extensive involvement in the sale process including attending and participating in management presentations and negotiations with prospective buyers as described above, performing its own review of materials submitted by prospective purchasers (including the PSP Agreement) and providing input to the Company with respect to these matters.

**THE PSP AGREEMENT**

23. On August 26, 2010, the Sellers entered into the PSP Agreement with the Purchaser. Concurrently, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators entered into a separate Asset Sale Agreement (the "EMEA ASA") with PSP dated August 26, 2010. Collectively, the PSP Agreement and the EMEA ASA set forth the terms of the Sellers' and the EMEA Sellers' sale of the assets and certain associated liabilities of the MSS Business to PSP. The PSP Agreement (excluding exhibits and the Sellers Disclosure Schedule) is attached as Appendix "A" hereto. A copy of the exhibits and the Sellers Disclosure Schedule to the PSP Agreement is attached as confidential Appendix "B" hereto. As these exhibits and schedules contain sensitive competitive information and information with respect to employees, the Monitor requests that confidential Appendix "B" to this Fifty-Second Report be sealed by this Honourable Court.

24. PSP is a special purpose entity to be funded at closing of the transaction contemplated by the PSP Agreement by Marlin Equity Partners ("Marlin") and Samnite Technologies Inc., a communications technology company based in Ottawa. Marlin is a private investment firm based in California with over $1 billion of capital under management. Since 2005, Marlin, through its group of funds and related companies, has acquired over 30 businesses across a variety of industries.

- 7 -

25. A summary of the key provisions of the PSP Agreement is provided in the paragraphs that follow. Reference should be made directly to the PSP Agreement, a copy of which is attached as Appendix "A" hereto, for a complete understanding of the terms governing the proposed transactions.

*Assets*

26. The assets of the Sellers relating to the MSS Business being sold are as follows (collectively, the "Assets"):

- the Owned Inventory as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts;

- all rights of the Sellers as of the Closing Date under non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts or that relate exclusively to the MSS Business;

- the tangible embodiments of the Business Information existing as of the Closing Date;

- the Transferred Intellectual Property as of the Closing Date, subject to license rights granted to NNL, NNI and each of the EMEA Sellers pursuant to the Intellectual Property License Agreement and other licenses granted prior to the Closing Date, together with, amongst other things, all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property and all claims against Third Parties for infringement, misappropriation or other violation of law with respect to the Transferred Intellectual Property;

- all consents of Government Entities that are exclusive to the Acquired Business to the extent assignable under applicable Law;

- 8 -

- all supplies owned by the Sellers and used exclusively in connection with the Acquired Business;

- all rights as of the Closing Date arising from any bid made prior to the Closing Date by any Seller, which is capable of acceptance after the Closing Date and, if accepted, would result in a Customer Contract (any such bid a "Seller Bid");

- all rights as of the Closing Date under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets;

- all assets of the Sellers described in the definition of Adjusted Net Working Capital Transferred as of the Closing Date and not otherwise assigned pursuant to the PSP Agreement;

- any net insurance proceeds in respect of Owned Equipment to the extent payable to the Purchaser pursuant to the terms of the PSP Agreement;

- any Tax records required by law to be transferred;

- any defences of the Sellers, to the extent relating to the Assumed Liabilities; and

- goodwill associated with the Business.

27. The Assets to be acquired by the Purchaser exclude, among other things, cash and cash equivalents, accounts receivable (including intercompany receivables but excluding CIP Unbilled Accounts Receivable), certain rights and refunds (including Tax refunds) relating to the pre-Closing period, security deposits (including cash collateral), any rights under any contracts (other than the Assigned Contracts), any right to any Intellectual Property other than the Transferred Intellectual Property, shares of any person, and any assets owned by certain subsidiaries and joint ventures of the Sellers including those assets owned by Nortel Networks Netas Telekomunikasyon A.S. ("NN Turkey") or Guangdong-Nortel Telecommunications Equipment Co. Ltd.

- 9 -

*Assumed Liabilities*

28.   The Purchaser will assume the following liabilities:

- all liabilities of the Acquired Business arising after the Closing Date to the extent related to the operation of the Acquired Business by the Purchaser following the Closing Date including all liabilities: (i) with respect to the ownership and operation of the Assets; (ii) related to actions or claims brought against the Acquired Business; (iii) under Environmental Laws; (iv) under any product liability laws or similar laws concerning defective products manufactured or sold by the Acquired Business; and (v) under applicable laws in relation to telecommunications providers;

- all liabilities arising from or in connection with the performance (or breach) of the Assigned Contracts after the Closing Date and liabilities with respect to Cure Costs payable pursuant to the PSP Agreement, obligations to buy back from relevant resellers the products sold to resellers under Assigned Contracts, obligations under any warranty liabilities relating to MSS products and services which have been supplied under any Assigned Contract and all Contractual Liabilities under Customer Contracts that are Assigned Contracts;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted to third parties, solely to the extent that the terms of such licensing assurances, declarations, agreements or undertakings require assignees of the Transferred Intellectual Property to assume such liability and all liabilities resulting from the assurances, declarations and undertakings made to standard-setting bodies that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any Tax that the Purchaser bears pursuant to the PSP Agreement;

- 10 -

- except to the extent otherwise set forth in the PSP Agreement, all liabilities related to the Purchaser's: (i) employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees after the Effective Hire Date; (ii) offers of employment or notice of continued employment to any Employees; (iii) decision to make or not make offers of employment to any Employee that violates applicable law; and (iv) failure to satisfy its obligations with respect to the Employees as set out in the PSP Agreement;

- all liabilities that relate to or arise under any Purchaser Employee Plan;

- all liabilities with respect to accrued and unpaid vacation days except to the extent provided in the PSP Agreement;

- all liabilities arising on or after the Closing Date that relate to the Seller Employee Plans and Collective Labour Agreements set forth in the Sellers' Disclosure Schedule;

- any obligation to provide continuation coverage pursuant to COBRA or any similar law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the United States Internal Revenue Code of 1986, as amended) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' Employee Transfer Date;

- certain other liabilities related to the Transferred Employees as set forth in the Sellers Disclosure Schedule or expressly assumed by the Purchaser as set out in the PSP Agreement;

- all liabilities relating to executory supply purchase orders for products or services (other than materials to be delivered to a contract manufacturer) entered into by the Sellers in connection with the MSS Business in the ordinary course before Closing with a person (other than a contract manufacturer) who is a supplier of

- 11 -

the MSS Business as of the date hereof and under which products and/or services have not been delivered as of the Closing Date;

- all liabilities related to the Seller Bids;

- certain other liabilities listed in the Sellers Disclosure Schedule;

- all liabilities of the Sellers described in the definition of Adjusted Net Working Capital Transferred as of the Closing Date and not otherwise transferred or assigned pursuant to the PSP Agreement; and

- all liabilities related to the obligation to repurchase Acquired Business related Inventory as specified in the Contract Manufacturing Inventory Agreements.

*Purchase Price*

29. The Purchase Price is $39 million (the "Base Purchase Price"), as adjusted in the manner described below, plus the Purchaser's obligation to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities.

30. At the Closing, the Purchaser shall deliver the Estimated Purchase Price (less the Good Faith Deposit and the various escrow amounts described below) to the Distribution Agent, as agent for the Sellers and the EMEA Sellers, being an amount equal to:

- the Base Purchase Price; minus

- the amount, if any, by which the Estimated Closing Adjusted Net Working Capital Transferred is less than the Target Adjusted Net Working Capital Transferred; minus

- the Estimated EMEA Downward Adjustment; minus

- the excess (if any) of the Estimated Total Prepaid Revenue Transferred over the Target Total Prepaid Revenue Transferred; minus

- an amount equal to the Estimated Pre-Closing Employment Payments.

- 12 -

31. The Monitor understands that the Purchase Price adjustments described above are currently estimated to result in a downward adjustment to the Purchase Price of approximately $6.9 million.

32. A Good Faith Deposit, being an amount equal to $1.25 million, shall be delivered by the Purchaser to the Escrow Agent on the Business Day following the entry of the U.S. Bidding Procedures Order. The Good Faith Deposit will be deducted from the Estimated Purchase Price to be delivered to the Sellers at Closing.

*Post-Closing Purchase Price Adjustment*

33. The PSP Agreement provides for adjustments to the Purchase Price based on the Closing Adjusted Net Working Capital Transferred, the Closing EMEA Downward Adjustment, the Closing Prepaid Revenue Transferred and the Closing Pre-Close Employment Payment relative to, as applicable, the estimated and target values for each such amount.

34. Within 60 days of Closing, the Purchaser shall deliver the Closing Statement to the Main Sellers and the EMEA Sellers, which shall contain the Purchaser's final calculation of the Adjusted Net Working Capital Transferred (including the underlying amounts used to calculate same) and the other purchase price adjustment amounts specified above in paragraph 33.

35. The Main Sellers shall have 60 days from the date of receipt of the Closing Statement to notify the Purchaser of a disagreement with same. The Purchaser and the Main Sellers shall use commercially reasonable efforts to resolve any disagreements within 14 days thereafter, after which the Accounting Arbitrator may be appointed to resolve any remaining disagreements.

*Employees*

36. The Purchaser has committed to offer employment to at least 95% of the Employees of the MSS Business (the "Transferred Employees"). Except to the extent otherwise required by Law, offers to the Applicants' Employees shall be for employment with: (i) an annual base salary and annual target incentive that is at least equal to the current annual base salary and

- 13 -

annual target incentive for such Employee (excluding the KEIP, KERP and the Nortel Special Incentive Plan); (ii) employment in a reasonably comparable position; and (iii) employment at a location reasonably contiguous to the Employee's current location. The Purchaser shall provide Transferred Employees with benefits substantially comparable in the aggregate to their current benefits under Seller Employee Plans and shall recognize the service date of each Transferred Employee for all purposes including membership and entitlement to benefits under all relevant Purchaser Employee Plans, but not for purposes of benefit accrual, vesting or otherwise for determination of the amount or duration of benefits under any defined benefit pension plan or under any equity incentive plan.

37. The Purchaser or a Designated Purchaser shall establish or otherwise provide a registered pension plan for Transferred Employees employed in Canada and maintain such plan for a period of at least five years following the Closing Date, or such period as may be required by applicable Law.

38. The Sellers shall be solely responsible for any required notice under the WARN Act or similar state or local laws with respect to terminations of employment of Employees other than Transferred Employees and Transitional Employees.

39. With respect to Union Employees, as of the Closing Date the Purchaser will be bound by the terms and obligations of the relevant Collective Labour Agreements with respect to the employment of Union Employees as a successor, assignee or purchaser of the relevant Seller.

40. The Sellers shall retain, and the Purchaser shall not assume, various employee liabilities, including: (i) liabilities related to the Seller Employee Plans; (ii) any obligation to provide continued coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" to Employees with a qualifying event that occurs prior to such Employees' Effective Hire Date; (iii) liabilities relating to any Employee's or a former employee's employment or termination of employment with any of the Sellers; (iv) any other liabilities for Employees and independent contractors related to the Acquired Business that are not Transferred Employees; and (v) all Liabilities arising from the Amended and Restated Settlement Agreement dated March 30, 2010, among NNC, NNL and their various

*82*

- 14 -

Affiliates, the Monitor, the Former Employees Representative, Sue Kennedy, Koskie
Minsky LLP and the CAW-Canada.

### Assignment of Contracts

41.  The Sellers will assign certain Customer Contracts pursuant to Section 365 of the Code or
     otherwise, as applicable, and will sublease or license premises leased under certain Real
     Estate Leases to the Purchaser upon Closing as specified in the Sellers Disclosure Schedule.
     The Parties shall use commercially reasonable efforts to obtain all consents required to
     permit the assignment to the Purchaser of the Assigned Contracts in force as of the Closing
     Date.

### Cure Costs

42.  To the extent that the assignment of any Customer Contract to the Purchaser entails the
     payment of any Cure Cost, the relevant Seller shall pay such amounts directly to such
     counterparty. The Purchaser will be responsible for the payment of Cure Costs relating to
     Designated Other 365 Contracts and Designated Other Non-365 Contracts. The Sellers
     Disclosure Schedule sets out the agreement between the Sellers and the Purchaser with
     respect to certain other potential Cure Costs.

### Sale Free and Clear

43.  The Assets to be transferred by the Sellers will be transferred free and clear of all liens,
     claims and interests, other than those expressly assumed by the Purchaser or otherwise
     expressly permitted under the PSP Agreement.

### Representations and Warranties/Other Covenants

44.  The PSP Agreement contains a number of representations, warranties and covenants by the
     Main Sellers or the Sellers, as applicable, with respect to various matters including title to
     assets, sufficiency of assets, material contracts, intellectual property, preparation of
     financial statements, compliance with laws, status of real property, environmental matters,
     labour and employee matters and taxes. In addition, the PSP Agreement includes a number
     of covenants with respect to matters including pre-Closing cooperation and access to

- 15 -

information, preparation and filings regarding antitrust and other Regulatory Approvals as necessary, the Purchaser's ability to request that the Sellers' independent accountants prepare, at the Purchaser's expense, Audited Financial Statements for the MSS Business, pre-Closing conduct of the Business, post-Closing assistance and maintenance of books and records, post-Closing arrangements with respect to certain non-assignable and/or Bundled Contracts, post-Closing assistance for litigation, negotiation and completion of the Transition Services Agreement, and insurance and sub-leasing matters.

### *Survival of Representations and Warranties or Covenants*

45. No representations, warranties, covenants, or agreements contained in the PSP Agreement shall survive beyond the Closing Date, except for certain specified representations and covenants, and covenants that by their terms are to be satisfied after the Closing Date, which covenants will survive until satisfied in accordance with their terms.

### *Termination Rights*

46. The PSP Agreement may be terminated prior to Closing:

- by mutual written consent of the Purchaser and the Main Sellers;

- by either the Purchaser or the Main Sellers:

    o    if the Closing does not take place on or prior to the date that is six months from the Auction or the date on which the Sellers determine that there shall not be an Auction;

    o    if the Purchaser is not selected as the Successful Bidder or the U.S. Bankruptcy Court and this Honourable Court otherwise approve an Alternative Transaction, subject to certain restrictions if the Purchaser is selected as the Alternate Bidder;

    o    if the EMEA ASA is terminated in accordance with its terms;

84

- 16 -

- o    if the Chapter 11 Proceedings are converted to a liquidation proceeding under Chapter 7 of the Code, and such conversion materially affects the Sellers' ability to consummate the transactions contemplated by this Agreement; or

- o    if the other party is in material breach of its obligation to close the transactions contemplated by the PSP Agreement at the Closing, which breach is not cured within five days from the receipt of a written notice regarding such breach.

- •  by the Purchaser:

- o    in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in the PSP Agreement, which breach would result in a failure of certain conditions to Closing;

- o    if the U.S. Debtors shall fail to file the U.S. Bidding Procedures and Sale Motion within five Business Days of the date of the PSP Agreement and/or the Canadian Debtors shall have failed to file the Canadian Sales Process Motion within seven Business Days of the date of the PSP Agreement;

- o    if the U.S. Bankruptcy Court or this Honourable Court have not entered the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively, on or prior to the date that is 30 days from the date of the PSP Agreement;

- o    if the Purchaser is the Successful Bidder and the U.S. Sale Hearing and the Canadian Sale Hearing have not been commenced before the respective courts on or prior to the later of the tenth Business Day after the Auction or the first available date thereafter that the U.S. Bankruptcy Court and the Canadian Court are available to hold a joint hearing;

- 17 -

o   if the U.S. Bankruptcy Court has not entered the U.S. Sale Order on or
    prior to the date that is 60 days from the date of the PSP Agreement; or

o   if this Honourable Court has not entered the Canadian Approval and
    Vesting Order on or prior to the date that is 60 days from the date of the
    PSP Agreement.

*Break-Up Fee and Expense Reimbursement*

47.  Collectively, the PSP Agreement and the EMEA ASA provide for an aggregate expense
     reimbursement payable by the Sellers and the EMEA Sellers to the Purchaser in certain
     circumstances in respect of its reasonable and documented fees, out-of-pocket costs and
     expenses, to a maximum of $1,500,000 (the "Expense Reimbursement"). The PSP
     Agreement and the EMEA ASA also provide for an aggregate break-up fee, in certain
     circumstances, of $2,500,000 minus any Expense Reimbursement to be paid by the Sellers
     and the EMEA Sellers to the Purchaser (the "Break-Up Fee"). The Sellers shall be
     responsible for two-thirds of the Expense Reimbursement and Break-Up Fee (the "Seller
     Expense Reimbursement" and "Seller Break-Up Fee", respectively).   Pursuant to the
     EMEA ASA, the EMEA Sellers shall be responsible for the remaining one-third of the
     Expense Reimbursement and Break-Up Fee.

48.  The Sellers shall pay the Seller Expense Reimbursement if the PSP Agreement is
     terminated in accordance with its terms, except where such termination is: by mutual
     written consent of the Main Sellers and the Purchaser; by the Purchaser upon written notice
     if the U.S. Debtors and/or the Canadian Debtors shall have failed to file their respective
     bidding procedures motions, or as a result of the U.S. Bankruptcy and/or this Honourable
     Court having not entered the U.S. Bidding Procedures Order and the Canadian Sales
     Process Order, respectively; or by either Primary Party as a result of the other party being in
     material breach of its obligation to close the transactions contemplated by the PSP
     Agreement at the Closing, subject, in each case, to certain restrictions.

- 18 -

49. The Sellers shall pay the Seller Break-Up Fee to the Purchaser if the PSP Agreement is terminated under the following circumstances and the Sellers enter into an agreement with respect to an Alternative Transaction within the nine months following such termination:

  • if the Closing does not take place on or prior to the date that is six months from the Auction or the date on which the Sellers determine that there shall not be an Auction;

  • if the Purchaser is not selected as the Successful Bidder or the U.S. Bankruptcy Court and this Honourable Court otherwise approve an Alternative Transaction;

  • if the EMEA ASA is terminated in accordance with certain specified terms thereof;

  • if the Chapter 11 Proceedings are converted to a liquidation proceeding under Chapter 7 of the Code, and such conversion materially affects the Sellers' ability to consummate the transactions contemplated by this Agreement;

  • if the U.S. Bankruptcy Court has not entered the U.S. Sale Order on or prior to the date that is 60 days from the date of the PSP Agreement; or

  • if this Honourable Court has not entered the Canadian Approval and Vesting Order on or prior to the date that is 60 days from the date of the PSP Agreement.

50. The Sellers shall also pay the Seller Break-Up Fee to the Purchaser if the Purchaser is the Successful Bidder and the PSP Agreement is terminated:

  • due to a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants and such breach results in a failure to meet certain conditions to close the transactions; or

  • if the U.S. Sale Hearing and the Canadian Sale Hearing have not been commenced before the respective Bankruptcy Courts on or prior to the later of the tenth Business Day after the Auction or the first available date thereafter that the

- 19 -

U.S. Bankruptcy Court and this Honourable Court are available to hold a joint hearing,

when the Purchaser is not in breach of the PSP Agreement or the EMEA ASA, which breach would result in a failure to satisfy the Closing conditions set forth in the PSP Agreement.

51. Payment of the Seller Break-Up Fee and/or Seller Expense Reimbursement, if payable in accordance with the terms of the PSP Agreement, will be the sole and exclusive remedy of the Purchaser, whether at Law or in equity, for any and all breaches prior to Closing by the Sellers of the terms and conditions of this Agreement.

*Standstill Period*

52. From the date of the PSP Agreement to the entry of the U.S. Bidding Procedures Order and from the conclusion of the Auction to Closing or termination of the PSP Agreement, the Sellers and their affiliates are prohibited from: (i) engaging in any negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its Affiliates) relating to a Competing Transaction other than with respect to the provision of information regarding the Business and the Assets; (ii) executing any letter of intent or agreement providing for a Competing Transaction other than with respect to the provision of information regarding the MSS Business and the Assets; and (iii) seeking or supporting U.S. Bankruptcy Court or this Honourable Court's approval of a motion or Order inconsistent with the transactions contemplated in the PSP Agreement, provided, however, that the Sellers shall not be prohibited from providing any person with the Bidding Procedures and related documents, answering questions about the Bidding Procedures or announcing the execution of the PSP Agreement or the Auction. Notwithstanding the foregoing, the Sellers may provide continued access to written due diligence materials and other information regarding the MSS Business or the Assets in an electronic data room, or in written or oral form.



- 20 -

*Ancillary Agreements*

53. On or before Closing, the Purchaser and the relevant Sellers and EMEA Sellers will enter into the following ancillary agreements:

- <u>Intellectual Property License Agreement</u> - an intellectual property license agreement (the "IPLA") amongst NNL, NNI, the EMEA Sellers and the Purchaser pursuant to which NNL, NNI and the EMEA Sellers will grant to the Purchaser a non-exclusive, fully paid-up, perpetual and irrevocable license with respect to intellectual property which has not been assigned, to, among other things: (i) use, distribute and otherwise commercially exploit intellectual property, other than patents, used in connection with the MSS Business; and (ii) under the patents associated with the MSS Business, make, develop, use, support and otherwise dispose of products and services in connection therewith, in each case solely within a defined field of use. The licenses granted to the Purchaser under the IPLA include certain limited sublicensing rights and are not assignable except in certain limited circumstances and the IPLA provides for a license back to the Nortel parties off all Intellectual Property transferred to the Purchaser.

- <u>Transition Services Agreement</u> – an agreement between NNL, NNC, NNI, NNUK, NN Ireland, certain Other Sellers, the U.K. Administrators and the Purchaser pursuant to which the Sellers and their affiliates will agree to provide certain information technology, business transition and related services to the Purchaser until June 30, 2011, subject to possible extensions in the event the Sale Hearing and the Canadian Sale Hearing do not take place by September 30, 2010. The final form of the Transition Services Agreement will set forth the fees to be paid by the Purchaser to the Sellers for these services as well as certain other terms that will regulate the provision of services thereunder.  The agreed form of Transition Services Agreement sets out the scope of transition services to be provided and the parties have agreed to finalize the schedules to the Transition Services Agreement as provided for in Exhibit 5.25 to the PSP Agreement.  The parties have agreed to an arbitration procedure to resolve any disputes regarding,

89

- 21 -

among other things, the services to be provided or the amount to be billed for transition services.

- Trademark License Agreement – an agreement between NNL and the Purchaser granting a non-exclusive and royalty-free license to use certain Nortel trademarks in connection with the MSS products for a transitional period of 18 months, solely within the field of the MSS Business. The licenses granted to the Purchaser under the Trademark License Agreement include certain limited sublicensing rights and are not assignable except in certain limited circumstances.

- Loaned Employee Agreement – an agreement between the relevant Sellers and the Purchaser pursuant to which certain employees of the Sellers that cannot be transferred to the Purchaser at Closing will be seconded to the Purchaser for a period of up to two months. The Loaned Employees will remain on the payroll of the applicable Seller and the Purchaser shall reimburse the Sellers for the cost of retaining the Loaned Employees, subject to certain exceptions.

54. On or prior to the Closing, the Purchaser and the Sellers will use their reasonable best efforts to negotiate in good faith:

- Local Sales Arrangements – To the extent necessary to effect the Closing, the Sellers and the Purchaser shall enter into agreements or instruments providing for the sale, transfer, assignment or other conveyance of the Assets in accordance with local law and the assumption of Assumed Liabilities.

- Subleases – Subleases for each Subleased Real Estate Lease with a term to expire on the one-year anniversary of the Closing Date.

- Subcontract Agreement – one or more agreements between the relevant Sellers and the Purchaser to be executed on or before Closing so as to pass through the benefits and burdens of Non-Assignable Contracts.

- 22 -

- **NN Turkey Distribution and Services Agreement** – an agreement between the Purchaser and NN Turkey· governing the sale and servicing of certain MSS products by NN Turkey for release.

*Closing*

55. Closing shall occur five Business Days after the date upon which all Closing conditions have been satisfied or waived.

*Closing Conditions*

56. The Parties' obligation to effect the Closing is subject to the satisfaction of the following conditions:

- all Mandatory Regulatory Approvals shall have been obtained and remain in force (the Monitor understands that there are no Mandatory Regulatory Approvals required to complete the transactions contemplated by the PSP Agreement);

- there shall be in effect no law or order of any Court or other Governmental Entity in Canada, the U.S. or the United Kingdom, or any European Union Entity, prohibiting the consummation of any of the transactions contemplated by the PSP Agreement or the EMEA ASA and no proceedings pending by any Government Entity seeking same;

- the satisfaction of certain conditions to closing under the EMEA ASA;

- the contemporaneous consummation of the transactions contemplated by the EMEA ASA; and

- the U.S. Sale Order and the Canadian Approval and Vesting Order shall have been entered and shall be Final Orders.

57. The obligation of the Sellers to effect the Closing is subject to satisfaction of the following conditions:

9|

- 23 -

- each of the Purchaser's representations and warranties being true and correct, except for any failure to be true and correct that has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

- the Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing;

- The Sellers shall be furnished with a certificate of one of the executive officers of the Purchaser certifying that the above two conditions have been satisfied; and

- Certain specified conditions to Closing of the EMEA ASA shall have been satisfied or waived in accordance with the terms of the EMEA ASA.

58. The obligation of the Purchaser to effect the Closing is subject to satisfaction of the following conditions:

- each of the Sellers' representations and warranties being true and correct, except for any failure to be true and correct that has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

- the Sellers shall have complied in all materials respects with all material covenants, obligations and agreements contained in the PSP Agreement required to be performed by the Sellers on or before Closing;

- the Purchaser shall be furnished with a certificate of an executive officer of one of the Main Sellers certifying that the above two conditions have been satisfied; and

- Certain specified conditions to Closing of the EMEA ASA shall have been satisfied or waived in accordance with the terms of the EMEA ASA

92

- 24 -

*MSS Side Agreement*

59.  In connection with the PSP Agreement and the EMEA ASA, the Sellers and the EMEA
     Sellers have negotiated and executed an MSS Side Agreement dated as of August 26, 2010
     (the "Side Agreement"), to address, among other matters, issues relating to the costs borne
     by NNC, NNL and NNI (the "IT Providers") in providing transition services to the
     Purchaser of the MSS Business in a scenario where transition services are no longer being
     provided to any other purchaser of the various other Nortel business units. The parties to
     the Side Agreement have agreed that a per diem amount will be payable out of the proceeds
     of the sale of the MSS Business to, on the one hand, NNC and NNL, and, on the other
     hand, the U.S. Debtors, for each day during the period from when the IT Providers cease to
     provide IT transition services to any other purchaser of the other Nortel business units until
     the IT Providers cease to provide IT transition services to the purchaser of the MSS
     Business, up to a maximum of $12 million. The Monitor's present expectation is that the
     term of any transition services agreement entered into with a purchaser of the MSS
     Business will expire prior to the above clause being triggered.

60.  A redacted copy of the Side Agreement is attached as Appendix "C" hereto and a non-
     redacted copy is attached as confidential Appendix "D".

**BIDDING PROCEDURES AND AUCTION PROCESS**

61.  Given that certain of the U.S. Debtors are parties to the PSP Agreement and given the
     desire to maximize value for the benefit of stakeholders in relation to the assets which are
     the subject of the PSP Agreement, Nortel has determined and has agreed with PSP that the
     PSP Agreement is subject to higher or better offers being obtained pursuant to a sale
     process under section 363 of the Code and that the PSP Agreement shall serve as a
     "stalking horse" bid pursuant to that process.

62.  A copy of the proposed bidding procedures is attached as Appendix "E" hereto (the
     "Bidding Procedures"). The Monitor notes that the Bidding Procedures are substantially

- 25 -

similar to the bidding procedures used in the sale of Nortel's other significant business units.

63. The PSP Agreement provides that the Sellers that are U.S. Debtors shall file the U.S. Bidding Procedures and Sale Motion with the U.S. Court within five Business Days of the date of the PSP Agreement. This motion was filed with the U.S. Court on August 27, 2010. The PSP Agreement also provides that the Applicants shall file the Canadian Sales Process Order Motion with this Honourable Court within seven days of the date of the PSP Agreement. This motion was served on August 27, 2010, and will be filed on August 30, 2010.

64. The Monitor understands that the Applicants and the U.S. Debtors will seek approval of the Bidding Procedures at a videoconference joint hearing between this Honourable Court and the U.S. Court scheduled for September 1, 2010, at 11:30 am conducted pursuant to the Cross-Border Insolvency Protocol previously approved by both Courts.

65. The Bidding Procedures provide that all bids must be received by the Sellers not later than 12:00 p.m. (ET) on September 21, 2010, and that the Sellers will conduct an auction of the Assets on September 24, 2010, beginning at 9:00 a.m. (ET) (the "Auction").

66. Pursuant to the PSP Agreement, the U.S. Debtors shall request that the U.S. Court, and the Applicants shall request that this Honourable Court, schedule a sale hearing on or prior to the tenth Business Day following the conclusion of the Auction and the Sellers shall use their commercially reasonable efforts to cause the sale hearings to be heard on that date or the earliest dated thereafter permitted by the schedules of the U.S. Court and this Honourable Court.

67. The Monitor recognizes the expeditious nature of the proposed sale process. However, given the extensive process conducted to date and that there are likely to be a limited number of parties interested in acquiring the MSS Business, the Monitor is supportive of the proposed sale process. In addition, Nortel has consulted with the Committee and the Bondholder Group regarding the Bidding Procedures and believes that these parties are supportive of the timing of this sale process.