ASSET SALE AGREEMENT

BY AND AMONG

NORTEL NETWORKS CORPORATION

NORTEL NETWORKS LIMITED

NORTEL NETWORKS INC.

AND

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)

DATED AS OF SEPTEMBER 24, 2010

Doof: US1 6563305v13

## TABLE OF CONTENTS

**Page**

ARTICLE I.    INTERPRETATION ..................................................................... 3

    SECTION 1.1    Definitions ..................................................................... 3
    SECTION 1.2    Interpretation ................................................................ 30

ARTICLE II.    PURCHASE AND SALE OF ASSETS ......................................... 30

    SECTION 2.1    Purchase and Sale ........................................................ 30
    SECTION 2.2    Purchase Price .............................................................. 43
    SECTION 2.3    Closing .......................................................................... 51
    SECTION 2.4    Designated Purchaser(s ................................................ 53

ARTICLE III.    REPRESENTATIONS AND WARRANTIES OF THE
                  PURCHASER ................................................................... 54

    SECTION 3.1    Organization and Corporate Power ............................... 54
    SECTION 3.2    Authorization; Binding Effect; No Breach ...................... 54
    SECTION 3.3    Adequate Assurance of Future Performance ................ 55
    SECTION 3.4    Financing ....................................................................... 55
    SECTION 3.5    The Purchaser's Acknowledgments; Exclusivity of
                  Representations and Warranties .................................... 56
    SECTION 3.6    Brokers .......................................................................... 57

ARTICLE IV.    REPRESENTATIONS AND WARRANTIES OF THE
                  SELLERS ........................................................................ 58

    SECTION 4.1    Organization and Corporate Power ............................... 58
    SECTION 4.2    Authorization; Binding Effect; No Breach ...................... 58
    SECTION 4.3    Title to Tangible Assets; Sufficiency of Assets .............. 59
    SECTION 4.4    Material Contracts ......................................................... 60
    SECTION 4.5    Intellectual Property ...................................................... 61
    SECTION 4.6    Litigation ....................................................................... 65
    SECTION 4.7    Financial Statements ..................................................... 65
    SECTION 4.8    Compliance with Laws; Consents ................................. 66
    SECTION 4.9    Real Property ................................................................. 67
    SECTION 4.10    Environmental Matters ................................................. 67
    SECTION 4.11    Labor and Employee Benefits Matters ........................ 68
    SECTION 4.12    Brokers ........................................................................ 70
    SECTION 4.13    Taxes ........................................................................... 70
    SECTION 4.14    Representations and Warranties by the Other Sellers .... 71

ARTICLE V.    COVENANTS AND OTHER AGREEMENTS ............................. 72

    SECTION 5.1    U.S. Bankruptcy Actions .............................................. 72
    SECTION 5.2    Canadian Bankruptcy Actions ...................................... 73

i

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| SECTION 5.3 | Consultation; Notification | 74 |
| SECTION 5.4 | Pre-Closing Cooperation | 74 |
| SECTION 5.5 | Antitrust and Other Regulatory Approvals | 76 |
| SECTION 5.6 | Pre-Closing Access to Information | 79 |
| SECTION 5.7 | Public Announcements | 81 |
| SECTION 5.8 | Further Actions | 81 |
| SECTION 5.9 | Conduct of Acquired Business | 82 |
| SECTION 5.10 | Transaction Expenses | 85 |
| SECTION 5.11 | Confidentiality | 85 |
| SECTION 5.12 | Certain Payments or Instruments Received from Third Parties | 86 |
| SECTION 5.13 | Non-Assignable Contracts and Other Assets | 87 |
| SECTION 5.14 | Bundled Contracts | 89 |
| SECTION 5.15 | Post-Closing Assistance for Litigation | 91 |
| SECTION 5.16 | Tangible Asset Removal | 92 |
| SECTION 5.17 | Termination of Overhead and Shared Services | 94 |
| SECTION 5.18 | Insurance Matters | 94 |
| SECTION 5.19 | Sellers Deposits, Guarantees and Other Credit Support of the Business | 95 |
| SECTION 5.20 | Receivables | 95 |
| SECTION 5.21 | Use of the Sellers' Trademarks | 96 |
| SECTION 5.22 | Maintenance of Books and Records | 96 |
| SECTION 5.23 | Certain Ancillary Agreements | 97 |
| SECTION 5.24 | Subleases | 98 |
| SECTION 5.25 | Finalization of Transition Services Agreement | 99 |
| SECTION 5.26 | Intentionally Omitted | 99 |
| SECTION 5.27 | Competing Transactions | 99 |
| SECTION 5.28 | Exclusion of Sellers and EMEA Sellers | 99 |
| ARTICLE VI. | TAX MATTERS | 99 |
| SECTION 6.1 | Transfer Taxes | 99 |
| SECTION 6.2 | Withholding Taxes | 101 |
| SECTION 6.3 | Tax Characterization of Payments Under This Agreement | 102 |
| SECTION 6.4 | Apportionment of Taxes | 102 |
| SECTION 6.5 | Records | 103 |
| SECTION 6.6 | Tax Disclosure | 105 |
| SECTION 6.7 | Tax Returns | 105 |
| SECTION 6.8 | Canadian Tax Election | 107 |
| SECTION 6.9 | Other Tax Matters | 107 |
| SECTION 6.10 | Cooperation | 109 |
| ARTICLE VII. | EMPLOYMENT MATTERS | 109 |
| SECTION 7.1 | Employment Obligations with Respect to Employees | 109 |

ii

**TABLE OF CONTENTS**
(continued)

Page

SECTION 7.2    Employment Obligations with Respect to Union Employees.......... 113
SECTION 7.3    Excluded Employee Liabilities................................................ 114
SECTION 7.4    Other Employee Covenants ................................................. 114
SECTION 7.5    Sole Benefit of the Sellers and the Purchaser or Designated
                Purchaser................................................................... 116

ARTICLE VIII.    CONDITIONS TO THE CLOSING............................................... 117

SECTION 8.1    Conditions to Each Party's Obligation ................................... 117
SECTION 8.2    Conditions to the Sellers' Obligation.................................... 118
SECTION 8.3    Conditions to the Purchaser's Obligation .............................. 118

ARTICLE IX.     TERMINATION....................................................................... 119

SECTION 9.1    Termination................................................................... 119
SECTION 9.3    Effects of Termination ..................................................... 120

ARTICLE X.      MISCELLANEOUS .................................................................. 121

SECTION 10.1   No Survival of Representations and Warranties or Covenants........ 121
SECTION 10.2   Remedies...................................................................... 121
SECTION 10.3   No Third-Party Beneficiaries.............................................. 121
SECTION 10.4   Consent to Amendments; Waivers........................................ 121
SECTION 10.5   Successors and Assigns..................................................... 121
SECTION 10.6   Governing Law; Submission to Jurisdiction; Waiver of Jury
                Trial........................................................................... 122
SECTION 10.7   Notices ........................................................................ 123
SECTION 10.8   Exhibits; Sellers Disclosure Schedule ................................... 126
SECTION 10.9   Counterparts.................................................................. 126
SECTION 10.10  No Presumption .............................................................. 126
SECTION 10.11  Severability .................................................................. 126
SECTION 10.12  Headings ...................................................................... 127
SECTION 10.13  Entire Agreement............................................................ 127
SECTION 10.14  Availability of Equitable Relief; Specific Performance ............... 127
SECTION 10.15  Bulk Sales Laws.............................................................. 128
SECTION 10.16  Main Sellers as Representatives of Other Sellers ...................... 128
SECTION 10.17  Obligations of the Sellers.................................................. 128
SECTION 10.18  Execution by Other Sellers ................................................ 129

iii

## EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit F – Escrow Agreement

Exhibit G – Intellectual Property License Agreement

Exhibit H – Intentionally Omitted

Exhibit I – Intentionally Omitted

Exhibit J – Mandatory Regulatory Approvals - Relevant Antitrust Jurisdictions / Authorities

Exhibit K – Form of Sublease

Exhibit L – Transitional Trademark License Agreement

Exhibit M – Transition Services Agreement

Exhibit 2.1.7(d) – Cure Costs and Related Agreements

Exhibit 5.1.1(b) – Form of U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Approval and Vesting Order

Exhibit 5.4(a) – Form of Letter to Suppliers

Exhibit 5.7 – Certain Communications

Exhibit 5.16 – Form of Real Estate License

Exhibit 5.25 – Transition Services

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of September 24, 2010, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("NNC"), Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("NNI" and, together with NNC and NNL, the "Main Sellers"), the affiliates of the Main Sellers listed in Exhibit A hereto (the "Other Sellers" and, together with the Main Sellers, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "Purchaser").

### WITNESSETH:

WHEREAS, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "EMEA Sellers") beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "Petition Date"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "Canadian Debtors") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "CCAA") (the proceedings commenced by such application, the "CCAA Cases") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on April 14, 2010, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases");

WHEREAS, the EMEA Sellers other than Nortel Networks (Northern Ireland) Limited on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "Insolvency Act") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "EMEA Cases") and the English Court issued orders appointing Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of each of the EMEA Sellers (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "Joint Administrators") under the Insolvency Act, which orders were extended for a 24-month period by further order of the English Court on January 10, 2010;

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "Israeli Companies") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "Israeli Court"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "Israeli Companies Law") for a stay of

proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, on May 28, 2009, the Commercial Court of Versailles, France ordered the commencement of secondary proceedings and the appointment of an administrator and a liquidator in respect of Nortel Networks S.A.;

WHEREAS, on July 14, 2009, Nortel Networks (CALA) Inc. (collectively with the Other Sellers listed in part 2 of Exhibit C hereto, the "**U.S. Debtors**") commenced a case under Chapter 11 of the U.S. Bankruptcy Code by filing a voluntary petition for relief in the U.S. Bankruptcy Court of the District of Delaware;

WHEREAS, the Other Sellers listed in part 3 of Exhibit C hereto (the "**Non-Debtor Sellers**") and Nortel Networks (Northern Ireland) Limited are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by the EMEA Sellers;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers and the EMEA Designated Purchasers, if any) of the Assets and the EMEA Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers, as the case may be, of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers, their Affiliates or the EMEA Sellers and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below) and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

2

WHEREAS, in addition, on or before the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**"): (i) the Intellectual Property License Agreement, (ii) the Transition Services Agreement, and (iii) the Trademark License Agreement (each as defined below) and will use their reasonable best efforts to negotiate in good faith (v) the Local Sale Agreements, (vi) the Sublease (subject to Section 2.1.6(b)(iv)), (vii) the Contract Manufacturing Inventory Agreements, and (viii) the Subcontract Agreement (each as defined below). On or before the Closing, the Purchaser will also use its commercially reasonable efforts to negotiate in good faith and enter into the NN Turkey Distribution and Services Agreement (each as defined below).

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I.

### INTERPRETATION

SECTION 1.1        Definitions.  Capitalized Terms Used But Not Otherwise Defined Herein Shall Have The Meanings Set Forth Below:

"**Accounting Arbitrator**" means the auditing firm of international reputation that is (i) jointly selected by the Primary Parties and NNUK, or (ii) in case they cannot agree on any such firm, such other auditing firm of international reputation (or, if the Primary Parties and NNUK agree on other criteria, such Person as satisfies such other criteria) that is selected by the American Arbitration Association at the request of the first of the Primary Parties and NNUK to move.

"**Acquired Actions**" means any avoidance or recovery actions as used under Section 542, 543, 544, 545, 546, 547, 548 or 550 of the Bankruptcy Code or the equivalent provisions or recovery under other applicable Laws that the Sellers have against any counterparty to an Assumed and Assigned Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser or a Designated Purchaser hereunder.

"**Acquired Business**" means the Business of the Sellers to the extent to be acquired or assumed hereunder.

"**Action**" means any litigation, action, hearing, investigation, complaint, suit (whether civil, criminal, administrative or otherwise at law or in equity), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding, including Intellectual Property litigation (including infringement, indemnification, and declaratory judgment actions).

"**Adjusted Net Working Capital Transferred**" means, as of any given date, an amount equal to the Inventory Value plus the CIP Unbilled Accounts Receivable plus Prepaid Expenses minus the Warranty Provision minus Transferred Employee Liabilities.

3

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, however, that (i) no EMEA Seller or Subsidiary of an EMEA Seller shall be deemed an Affiliate of any Seller, and (ii) no joint venture listed in Section 1.1(a) of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.

"**Aggregate Escrow Amount**" means the aggregate of the Succession Tax Escrow Amount, the EMEA Tax Escrow Amount, and the Post-Closing Purchase Price Escrow Amount.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Laws**" means the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means all Seller Contracts except (i) the Excluded 365 Contracts, (ii) the Excluded Non-365 Contracts, (iii) the Non-Assigned Contracts, (iv) the Qualcomm Cross License, and (v) Addendum No. 9 to the OEM iPlanet Software Products (Binary) Exhibit to the Global Account Agreement Master Terms between Sun Microsystems, Inc. and NNI, Binary License and Redistribution Agreement for Java 2 Standard Edition dated October 5, 2006.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(c).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning attributed to such term in the U.S. Bidding Procedures Order.

"**Available Real Estate Leases**" has the meaning set forth in Section 2.1.6(b)(i).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court or any other court before which Bankruptcy Proceedings are held.

4

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

"**Base Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Bid**" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

"**Bidding Procedures**" means the procedures approved pursuant to the U.S. Bidding Procedures Order.

"**Bundled Contract**" has the meaning set forth in Section 5.14(a).

"**Business**" means, collectively, the following business segments of the Sellers and EMEA Sellers as described below:

(i)     the Multi-Service Switch (formerly known as "Passport", including the element management platform portion thereof, Shasta and DPN (and related element management products) business segments of the Sellers and the EMEA Sellers including Employees, customer and supplier relationships and the goodwill associated therewith, through which such entities, individually, jointly or in collaboration with or pursuant to contracts with their respective Affiliates or Third Parties, and using any variety of technologies, research, design, develop, process, manufacture (through contract manufacturers), assemble, test, support, market and sell globally to end users and resellers the Products; and

(ii)     the global services business segment of the Sellers and the EMEA Sellers, which provides, individually or with their respective Affiliates or Third Parties, the following services with respect to the Products (collectively, the "**Services**"):

(a)     implementation and enhancement services, including network planning, consultation, network management, engineering, hardware and software design, installation, integration, convergence, optimization and security services;

(b)     support services, including the support of multi-vendor voice-data-video-converged networks, including providing software, technical support, hardware and software maintenance, corrective content management, equipment spares logistics, and on-site engineers;

(c)     managed and outsourced services, ranging from support of individual solutions to entire multi-vendor networks;

5

(d)     hosted services, including single and multi-tenant hosted services, hosted multimedia services and applications performance engineering;

(e)     application services, including application development, integration and communications-enabled application solutions; and

(f)     communications integration services provided in connection with third party equipment,

(g)     software loadbuild and software distribution services,

but, in each case, only to the extent that the services relate to, are ancillary to, implement, support and manage, the Products and Third Party equipment supplied in connection with the Products or equipment supplied by Third Parties if, as of the Closing Date, the Sellers and the EMEA Sellers generally provide such services with respect to such Products and equipment,

but excluding, in each of clauses (i) and (ii) above: (A) the LGN Joint Venture or NN Turkey, (B) any Excluded Asset or EMEA Excluded Asset, and (C) Overhead and Shared Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, (iii) London, England, United Kingdom, and (iv) Stockholm, Sweden.

"**Business Information**" means, whether in paper, digital or other tangible form, (i) if used exclusively in connection with the Business, all books, records, files, ledgers, sales literature or similar documents in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information on past, present and prospective customers and suppliers, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset or Assumed Liability, documents containing information relating to the research and development of the Products or the Services (whether relating to activities by the Sellers and the EMEA Sellers associated with the Products and Services as of the Closing or any time prior thereto), documents containing technical information, operating and production records, quality control records, blueprints, research and development notebooks and files, customer credit data, manuals, documents containing engineering and scientific data, sales and promotional literature, drawings, technical plans, business plans, budgets and price lists, and (ii) copies of the materials listed on Section 1.1(b) of the Sellers Disclosure Schedule; provided, that "Business Information" shall not include the Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, to the extent applicable to the determination of the Adjusted Net Working Capital Transferred, and the other accounting principles, methodologies and policies for the determination of the Adjusted Net Working Capital Transferred set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

6

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Approval and Vesting Order Motion**" means the motion to be filed by the Main Sellers with the Canadian Court seeking the Canadian Approval and Vesting Order.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sale Hearing**" has the meaning set forth in Section 5.1.1(a).

"**Cash Collateral**" means the cash collateralizing performance bonds or other credit support posted or procured by a Seller set forth on Section 1.1(d) of the Sellers Disclosure Schedule.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Unbilled Accounts Receivable**" means, as of any given date, all amounts classified by the Sellers and the EMEA Sellers in Contracts in progress accounts and other uninvoiced accounts receivable relating to the Business with respect to Contracts in progress, as recognized by the Business pursuant to the Calculation Principles.

"**Claim**" has the meaning set forth in section 101(5) of the U.S. Bankruptcy Code.

"**Clean Team Confidentiality Agreement**" means the clean team confidentiality agreement by and between NNL and its Subsidiaries and the Purchaser and its Subsidiaries, dated as of April 16, 2010, as amended from time to time.

"**Clean Team Members**" has the meaning attributed to that term in the Clean Team Confidentiality Agreement.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Adjusted Net Working Capital Transferred**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Pre-Close Employment Payments**" has the meaning set forth in Section 2.2.3.1(a).

7

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Total Prepaid Revenue Transferred**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement, or addendum appendix or side letter thereto, that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

"**Competing Transaction**" has the meaning set forth in Section 5.27.

"**Computer Hardware**" means any computer hardware, equipment and peripherals of any kind and of any platform, including desktop and laptop personal computers, handheld computerized devices, servers, mid-range and mainframe computers, process control and distributed control systems, and all network and other communications and telecommunications equipment.

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement by and among the Purchaser and NNI, among other parties, dated February 18, 2010.

"**Confirmed Designated Purchaser**" has the meaning set forth in Section 2.4(a).

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, instrument, lease, ground lease or commitment.

"**Contractual Liabilities**" means all Liabilities of the Sellers that arise in the Ordinary Course under Customer Contracts or under the MSS Portion of any Bundled Contracts, including marketing, allowance funds, technical training, demonstration equipment, events, trade shows, advertising, other direct marketing activities and rebate programs, any obligations to buy back from resellers the Products sold by the Business to its resellers under the Seller Contracts or under the MSS Portion of any Bundled Contracts.

"**Contract Manufacturing Inventory Agreements**" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract

8

manufacturers of the Business listed in Section 1.1(e) of the Sellers Disclosure Schedule that the relevant Parties will use their commercially reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.23 and the term sheet attached hereto as Exhibit E.

"**Contract Rejection Date**" has the meaning set forth in Section 5.13(a).

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Covered Assets and Persons**" has the meaning set forth in Section 5.18(a).

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court's Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-to-Court Protocol, dated January 15, 2009, and the Canadian Court in an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, (ii) with respect to any Non-365 Seller Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts necessary to cure any monetary defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Petition Date, and (iii) any amounts required to cure any monetary defaults under a Subleased Real Estate Lease and to pay any actual pecuniary losses under such Subleased Real Estate Lease in respect of the period prior to the Petition Date.

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to an end-user or a reseller, distributor, system integrator or service provider (including the Seller Contracts for Products or Services to be utilized by such reseller or distributor itself).

"**Deferred Transfer Assumed Liability**" has the meaning set forth in Section 5.13(d).

"**Deferred Transfer Purchased Asset**" has the meaning set forth in Section 5.13(c).

"**Designated Courts**" has the meaning set forth in Section 10.6(b).

"**Designated Other Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Other 365 Contracts**" has the meaning set forth in Section 2.1.5(b).

9

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser by and not later than five (5) Business Days before the Closing.

"**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to such term in Schedule 8 of the EMEA Asset Sale Agreement.

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Tax Escrow Amount**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Transferred Intellectual Property**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Employee**" means any employee as of the date hereof, of the Sellers who (i) for the twelve months prior to the date hereof (or such shorter time as such employee was employed by the Sellers) performed services which were all or substantially all related to the Acquired Business or (ii) was hired into, transferred into, or assigned to the Acquired Business prior to the Closing in the Ordinary Course and whose services are all or substantially all related to the

Acquired Business, or (iii) whose services are necessary to the operation of the Acquired Business, as listed in Section 4.11(b) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means SAP electronic data files with respect to Transferred Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date.

"**Employment Contract**" means any Seller Employee Plan or other plan, program, agreement or arrangement pursuant to which any Person provides employment or consulting services to the Acquired Business.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Liabilities and Claims**" means any Liability (including, without limitation, remedial actions, punitive damages, consequential damages, treble damages, legal and expert fees, fines, penalties, sanctions, natural resource damages, or costs of feasibility studies, remedial investigation, and remedial actions to the extent required by Environmental Law), Action or other claim to the extent relating to (i) violations of Environmental Law prior to the Closing, (ii) any Releases or threatened Releases at, onto, from, beneath or migrating to or otherwise relating to (A) any assets or properties currently or formerly owned or operated by the Business or any predecessor in interest prior to the Closing, or (B) any facilities that received Hazardous Materials generated by the Business prior to the Closing, or (iii) natural resources damages related to conditions occurring prior to the Closing.

"**Environmental Law**" means any applicable Law relating to or regulating: (i) the management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable laws or any analogous foreign, state, provincial or local laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Acquired Business as currently conducted.

"**Equipment**" means tangible personal property, excluding any Inventory, Intellectual Property and, to the extent required by Law, any items of tangible property personally assigned to the Transferring Employees, but including all equipment, apparatus, appliances, test equipment, test labs, trial equipment, tooling, business supplies, hardware (including Computer Hardware) and other articles of tangible personal property.

11

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any corporation which is a member of a controlled group or any trade or business (whether or not incorporated) which is under common control with the Sellers or any Subsidiary within the meaning of Sections 414(b) and 414(c) of the Code.

"**Escrow Account**" means the following four (4) escrow accounts to be set up by the Escrow Agent pursuant to the Escrow Agreement: (i) an escrow account for the Succession Tax Amount (the "**Succession Tax Escrow Account**"), (ii) an escrow account for the EMEA Tax Escrow Amount, (iii) an escrow account holding the Post-Closing Purchase Price Escrow Amount (the "**Post-Closing Purchase Price Escrow Account**"), and (iv) an escrow account holding the Good Faith Deposit.

"**Escrow Agent**" means Wells Fargo Bank, National Association.

"**Escrow Agreement**" means the escrow agreement among NNI, NNL, NNUK, the Purchaser and the Escrow Agent to be entered into in the form of Exhibit F hereto in accordance with Section 2.2.5(a).

"**Estimated EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Adjusted Net Working Capital Transferred**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Statement**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Pre-Close Employment Payments**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Total Prepaid Revenue Transferred**" has the meaning set forth in Section 2.2.2(a).

"**European Union Entity**" means a Government Entity of the European Union. For the avoidance of doubt, "European Union Entity" means a supranational Government Entity and not a Government Entity of any member State of the European Union.

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(a)(iii).

12

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller or EMEA Seller other than the Products and Services.

"**Excluded Taxes**" has the meaning set forth in Section 6.9(a).

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(e).

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Final Contract Designation Date**" means (a) for an Other 365 Contract, the later of (i) the twentieth (20th) day prior to the Closing Date and (ii) five (5) Business Days after such Other 365 Contract is listed on Section 2.1.5(b) of the Sellers Disclosure Schedule and a true, accurate and complete list thereof is delivered to the Purchaser, (b) for an Other Non-365 Contract, the later of (i) the third (3rd) Business Day prior to the Closing Date and (ii) five (5) Business Days after such Other Non-365 Contract is listed on Section 2.1.6(a)(ii) of the Sellers Disclosure Schedule and (c) for an Available Real Estate Lease, the later of (i) the date that is twenty (20) days after the date hereof and (ii) five (5) Business Days after such Available Real Estate Lease is listed on Section 2.1.6(b)(ii) of the Sellers Disclosure Schedule; provided, that, in each case, if any U.S. Debtor confirms to the Purchaser a plan under Chapter 11 of the U.S. Bankruptcy Code pursuant to an order of the U.S. Bankruptcy Court prior to either of such dates, the "Final Contract Designation Date" for either an Other 365 Contract or an Other Non-365 Contract shall be the effective date of such plan.

"**Final Order**" means an order of any Bankruptcy Court, any court of competent jurisdiction or other Government Entity (i) as to which no appeal, notice of appeal, motion for leave to appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for leave to appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

"**Financial Statements**" has the meaning set forth in Section 4.7.

"**French Escrow Amount**" has the meaning attributed to the term in the EMEA Asset Sale Agreement.

"**GAAP**" means the United States generally accepted accounting principles, consistently applied.

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.4(a).

13

"**Government Entity**" means any U.S., Canadian, UK, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, minister, governor in council, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST/HST**" means goods and services tax or harmonized sales tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means any chemical, material, waste or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**Headcount Forecast**" has the meaning set forth in the Transition Services Agreement.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) who (i) have accepted the Purchaser's or a Designated Purchaser's Offer as provided in Section 7.1, and (ii) are on a Seller-approved leave of absence for military service, short- or long-term disability, medical leave, pregnancy or parental leave, Family and Medical Leave Act, jury duty or any other leave of absence provided under applicable Law as of the Employee Transfer Date and, in each case, are expected to return and actually work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work within six (6) months from the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(g)(i).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest, penalties or fees), (ii) for indebtedness evidenced by promissory notes, bonds, debentures, notes or similar instruments, (iii) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) any "earn-out" obligations or other obligation for the deferred purchase price of property or services (excluding trade payables) and (vi) research and development funds received or invoices under any alliance agreement that may be required to be earned by future performance or repaid thereunder,(vii) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (vi) above, (vii) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

14

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means all intellectual and industrial property and any and all forms of protection having equivalent or similar effect anywhere in the world and all rights therein as recognized under the laws of the United States of America, Canada and/or other countries or jurisdictions, whether registered or unregistered and including applications for the registration or grant of any such rights, including rights in and to: (a) Trademarks; (b) Patents; (c) copyrights and works of authorship (including any registrations therefor or applications for registration thereof); (d) mask works and integrated circuit topographies (including any registrations therefor or applications for registration thereof); (e) trade secrets, know-how, and proprietary and confidential technical or business information; (f) any Software; (g) any technology; (h) industrial designs, (i) databases and (j) *sui generis* design and database rights.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as <u>Exhibit G</u>.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

"**Inventory Value**" means, as of any given date, the book value, net of all applicable reserves and provisions, of the Owned Inventory and the EMEA Owned Inventory calculated in accordance with the Calculation Principles.

"**IP Escrow Agreements**" has the meaning set forth in Section 5.9(c).

"**IRS**" means the United States Internal Revenue Service.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in part on March 5, 2009, and in part on March 20, 2009, and substantially approved by the Canadian Court in part on March 6, 2009, and in part on March 20, 2009, as the same has been and may further be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same has been and may further be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(f) of the Sellers Disclosure Schedule.

15

"**KPD Provision**" means, as of any given date, the provisions for "Known Product Defects" (as defined in Nortel Accounting Principles) to be recognized and measured by the Business pursuant to the Calculation Principles with respect to defects (other than defects covered by the Non-KPD Warranty Provision) of Products and/or Services that have been sold by the Sellers and the EMEA Sellers.

"**Law**" means any U.S., Canadian, UK, supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, notice, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions. As of June 29, 2010 Nortel Networks Limited completed the sale of its 50% plus 1 share interest in LG-Nortel Co. Ltd with LG Electronics Inc., to Telefonaktiebolaget LM Ericsson (Publ).

"**Liabilities**" means debts, liabilities, commitments and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law, Action or Claim and those arising under any Contract or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchaser(s) under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement. For the avoidance of doubt, "Lien" does not include any Intellectual Property license.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"**LTD Representative**" has the meaning set forth in Section 2.1.4(o).

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Regulatory Approvals**" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Antitrust Laws of any of the jurisdictions listed in <u>Exhibit J</u> (the "**Relevant Antitrust Jurisdiction / Authorities**") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions

16

listed in Exhibit J, in each case authorizing or not objecting to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and including, in each case, as applicable, any decision or consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions or obligations have been or, pursuant to Section 5.5(d), Section 5.5(e) hereof or Clause 10.8 or 10.9 of the EMEA Asset Sale Agreement are required to be, accepted by the Purchaser.

   **"Material Adverse Effect"** means any event, change, circumstance, development, condition, fact, occurrence or effect that, individually or together with any other events, changes, circumstances, developments, conditions, facts, occurrences or effects has had, or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, results of operation or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes, circumstances, developments, conditions, facts, occurrences, or effects to the extent resulting from (a) changes, events and occurrences in the industries and markets in which the Business operates, but only to the extent that such changes, events or occurrences do not have a disproportionate effect on to the Business relative to other businesses in such industries and markets, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, but only to the extent that such factors or conditions, acts of God, war, terrorism or hostilities, in each case, do not have a disproportionate effect on the Business, relative to other businesses in the industries or markets in which the Business operates, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) the pendency of the Bankruptcy Proceedings, (g) the attrition of customers or employees prior to the Closing Date (provided, that the reason for customer attrition, if not otherwise excluded pursuant to the other clauses of this definition in determining whether there has been a Material Adverse Effect, shall be included in determining whether there has been a Material Adverse Effect), (h) actions taken by the Sellers at the specific written request of the Purchaser or (i) the failure of the Business to achieve internal or external financial forecasts or projections, provided, however, that the effect of any underlying event, change, circumstance, development, condition, fact, occurrence or effect giving rise to any such failure to meet forecasts or projections, if not otherwise excluded pursuant to the other clauses of this definition in determining whether there has been a Material Adverse Effect, shall be included in determining whether a Material Adverse Effect has occurred.

   **"Material Contracts"** has the meaning set forth in Section 4.4(a).

   **"Monetary Cost"** has the meaning set forth in the Transition Services Agreement.

   **"Monetary Cost Schedule"** has the meaning set forth in the Transition Services Agreement.

   **"Monitor"** means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**MSS Portion**" has the meaning set forth in Section 5.14(b).

"**New York Courts**" has the meaning set forth in Section 10.6(b).

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNFSAS Escrow Agent**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.1(d).

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"**NN Turkey Distribution and Services Agreement**" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and NN Turkey, on the other hand, governing the sale and servicing of certain Products by the Business to NN Turkey for resale.

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contracts**" means the Non-Assignable Contracts, to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted prior to the Closing Date.

"**Non-Exclusive Supply Contract**" means any supply Contract to which any Seller is a party that relates to the Business and also relates to one or more other businesses of any of the Sellers.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-KPD Warranty Provision**" means, as of any given date, the provision to be recognized and measured by the Business pursuant to the Calculation Principles for potential claims by customers under the Warranty Obligations (other than claims covered by the KPD Provision).

"**Non-Solicitation Period**" means the twelve (12) month period immediately following the Closing Date.

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

18

"**Non-365 Customer Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Customer Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Seller Contracts**" means Seller Contracts other than 365 Contracts.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(g) of the Sellers Disclosure Schedule.

"**Nortel Retained Business**" has the meaning set forth in the Intellectual Property License Agreement.

"**Nortel Special Incentive Plan**" means the Nortel Special Incentive Plan approved by the U.S. Bankruptcy Court on March 4, 2010, and approved by the Canadian Court on March 3, 2010, as amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"**Offer**" has the meaning set forth in Section 7.1.1.

"**Offer Consideration Period**" has the meaning set out in Section 7.1.1.

"**Omitted Inbound License Agreement**" has the meaning set forth in Section 4.5(g)(i).

"**Omitted Outbound License Agreement**" has the meaning set forth in Section 4.5(g)(ii).

"**Omitted Patent Cross-License Agreement**" has the meaning set forth in Section 4.5(g)(iii).

"**Ordinary Course**" means the ordinary course of the Business consistent with past practice since January 14, 2009, and as such practice may be modified from time to time (i) to the extent necessary to reflect the Bankruptcy Proceedings or (ii) as may be required in the reasonable judgment of the Sellers to further effectuate the separation of the Business from the other businesses of the Sellers in a manner consistent with the Transaction Documents.

"**Other Contract**" means any Seller Contract that is not a Customer Contract or an Employment Contract.

"**Other Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Other Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(ii).]

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Other 365 Contract List**" has the meaning set forth in Section 2.1.5(b).

19

"**Other 365 Contracts**" has the meaning set forth in Section 2.1.5(b).

"**Outbound License Agreement**" has the meaning set forth in Section 4.5(g)(iii).

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services (or were provided prior to any recent divestiture by any Seller since the filing of the Bankruptcy Proceedings) and which are provided to both (a) the Business and (b) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, Computer Hardware and Software used by Employees, fleet services, energy/utilities services, procurement and supply arrangements, corporate or shared research and development services, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and Software (in object code form) or other Intellectual Property necessary for or used in connection therewith.

"**Owned Equipment**" means (i) those items of Equipment (including, but not limited to, Computer Hardware) owned by any of the Sellers that are held or used exclusively in connection with the Business (excluding, subject to the proviso set forth at the end of this paragraph, all trade fixtures and fixtures, furniture, furnishings and fittings at any office or other facility where the Acquired Business is or has been conducted), including items of Equipment owned by any of the Sellers that are held or used exclusively in connection with the Business that are (A) located at the shared labs identified in Section 1.1(h) of the Sellers Disclosure Schedule or (B) on loan the Sellers' contract manufacturers or R&D Service providers as listed in Section 1.1(h) of the Sellers Disclosure Schedule , and (ii) the other Equipment listed in Section 1.1(h) of the Sellers Disclosure Schedule, provided, however, that "Owned Equipment" shall not include any (A) Owned Inventory, (B) any items of tangible property personally assigned to Employees who are not Transferred Employees as of the Employee Transfer Date, or (C) any Intellectual Property; provided, further, that if the Purchaser elects to have the relevant Seller enter into a Sublease with such Purchaser or a Designated Purchaser at the Sellers' Beijing, China facility, "Owned Equipment" shall include all trade fixtures, furniture, furnishings and fittings at such facility.

"**Owned Inventory**" means any Inventory owned by the Sellers and held or used exclusively in connection with the Business, including any Inventory which is owned by the Sellers but remains in the possession or control of an Affiliate of any Seller, a contract manufacturer or another Third Party (but excluding any inventory that is purchased by any of the Sellers from any contract manufacturer after the Closing Date under any agreement between such Sellers and contract manufacturers or under any Contract Manufacturing Inventory Agreement), as reflected on Sellers' general ledger as of the Closing Date an estimate of which will be provided to the Purchaser at least three days prior to Closing. For the avoidance of doubt,

20

Owned Inventory shall include assets on loan and would not include products shipped to customers or related costs of services delivered for which a corresponding deferred cost of goods sold has been recorded.

"**Partial Allocation**" has the meaning set forth in Section 2.2.6(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Cross-License Agreements**" has the meaning set forth in Section 4.5(g)(iii).

"**Patents**" means all national (of any country of origin) and multinational statutory invention registrations, invention disclosures, patents, utility models, patent applications, provisional patent applications, industrial models, and all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and which are set forth on Section 1.1(i) of the Sellers Disclosure Schedule, in each case, for which adequate reserves have been established to the extent required by GAAP; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings; (iii) Liens arising hereunder or under any Assigned Contracts (after giving effect to the assignment hereunder); (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(j) of the Sellers Disclosure Schedule; and (vi) zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Plan of Record Products**" means the products related to the Business under development by the Sellers as of the date hereof, as set forth in Section 1.1(k) of the Sellers Disclosure Schedule.

"**Pre-Close Employment Payments**" has the meaning attributed to such term in Schedule 6 of the EMEA Asset Sale Agreement.

21

"**Post-Closing Purchase Price Escrow Amount**" means $10,000,000, minus the amount, if any, by which the Estimated Closing Adjusted Net Working Capital Transferred is less than the Target Adjusted Net Working Capital Transferred, as calculated pursuant to Section 2.2.2(b)(ii); provided, however, that the Post-Closing Purchase Price Escrow Amount shall not be less than $1,000,000.

"**Post-Closing Taxable Period**" means any taxable period or portion thereof beginning after the Closing Date.

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Prepaid Expenses**" means prepaid expenses specifically identified as relating to the Business which have a future economic value.

"**Prepaid Revenue**" means the revenue collected by the Sellers on account of the Prepaid Services as of the Closing Date.

"**Prepaid Revenue Transferred**" means, for any Services Contract, the product of (x) Prepaid Revenue divided by the Prepaid Services Period and (y) the number of days remaining in the Prepaid Services Period as of the Closing Date. Notwithstanding the foregoing, the Sellers shall retain all Seller Receivables.

"**Prepaid Services**" means those services to be performed on a regular basis in a given period under any Services Contract for which the Sellers have collected payments in advance of performing such services prior to the Closing Date. For the avoidance of doubt, such services shall not include the satisfaction of any Warranty Obligations.

"**Prepaid Services Period**" means, for any Services Contract, the total number of days for which the Sellers (i) have issued or will issue an invoice to the customer or (ii) have received payment from the customer, in each case on account of the Prepaid Services.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Product Volume Forecast**" has the meaning set forth in the Transition Services Agreement.

"**Products**" means those products that are manufactured by or on behalf of and/or marketed by the Business, as set forth in Section 1.1(l) of the Sellers Disclosure Schedule and all prior versions thereof that are supported by or on behalf of the Business as of the date hereof.

"**Provider's Cost**" has the meaning set forth in the Transition Services Agreement.

"**Public Software**" means open source Software and any other Software that is subject to a license that requires as a condition of use, modification and/or distribution of the Software that such Software or other Software that is incorporated into, derived from or

22

distributed or integrated with such Software be (1) disclosed or distributed in source code form, (2) licensed for the purpose of making derivative works, or (3) redistributable at no charge whether as, shareware, "copyleft" Software, or similar Software. Public Software includes Software subject to the GNU Lesser General Public License, and the Mozilla Public License.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan," whether or not in writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Parties**" means the Purchaser, any Designated Purchasers and any EMEA Designated Purchasers, any of their respective Subsidiaries and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, Affiliates, stockholders, assignees and representatives of any of the foregoing in their capacity as such.

"**Qualcomm Cross-License**" means that certain Patent Cross-License Agreement, dated December 27, 2006, by and between Qualcomm Incorporated and NNL.

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Lease List**" has the meaning set forth in Section 2.1.6(b)(i).

"**Records Custodian**" means a Person of international reputation that is acceptable to the Purchaser and the Main Sellers, acting reasonably.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Respective Affiliates**" has the meaning set forth in Section 10.16(c).

23

"**Representative Counsel**" has the meaning set forth in Section 2.1.4(o).

"**Representatives**" has the meaning set forth in Section 5.27.

"**Restricted Technical Records**" means the Livelink database or any other similar database containing all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Sale Hearing**" has the meaning set forth in the Bidding Procedures.

"**Selected Suppliers**" means those suppliers of the Acquired Business that are party to Other Contracts that the Purchaser wishes to have assigned to the Purchaser or a Designated Purchaser at Closing in accordance with Section 2.1.5 or Section 2.1.6, as applicable.

"**Seller Authorized Agents**" has the meaning set forth in Section 10.6(c).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(c).

"**Seller Bid**" has the meaning set forth in Section 2.1.1(i).

"**Seller Consents**" has the meaning set forth in Section 2.1.1(g).

"**Seller Contracts**" means (i) those Contracts of a Seller that relate exclusively to the Acquired Business or to the Assets (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Acquired Business or any Asset, but excluding any other licenses of Intellectual Property) and (ii) the Contracts of a Seller that are listed on Section 1.1(m) of the Sellers Disclosure Schedule.

"**Seller Employee Plan**" means any "employee benefit plan," whether or not reduced to writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, agreement, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than any EMEA Sellers, if any) with respect to Employees.

"**Seller Insurance Policies**" has the meaning set forth in 5.18(a).

24

"**Seller Receivables**" means all accounts receivable of the Sellers (excluding any CIP Unbilled Accounts Receivable) and other debts owing to the Sellers, in each case under any Seller Contract, which remain unpaid as of Closing, together with any interest accrued thereon.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.21.

"**Service Provider**" has the meaning set forth in Section 5.24(c).

"**Services**" means those services described in clause (ii) of the definition of "Business" hereunder.

"**Services Contract**" means a Customer Contract (or the MSS Portion of any Bundled Contract) for Services that is an Assigned Contract.

"**Settlement Agreement**" has the meaning set forth in Section 2.1.4(o).

"**Software**" means any and all computer programs, computerized databases and compilations, including operating system and application software, implementation of algorithms, development tools and program interfaces, whether in source code or object code form (including all of the foregoing that is installed on Computer Hardware), and all related documentation, compilation tools, development tools and support tools (including data entry and data processing procedures, report generation, quality control procedures and user manuals related to the foregoing).

"**Special Arrangements**" has the meaning set forth in Section 4.11(a).

"**State Government**" means any state, territory or possession of the United States or any department or agency of any of such state, territory or possession with jurisdiction and responsibility throughout such state, territory or possession.

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more subcontracting agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand.

"**Sublease**" has the meaning set forth in Section 5.24(a).

"**Subleased Real Estate Lease**" has the meaning set forth in Section 2.1.6(b)(ii).

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

Doc# US1-6563305v13

"**Succession Tax Escrow Amount**" means $500,000, which amount shall secure the Sellers' obligations under Section 6.9.

"**Target Adjusted Net Working Capital Transferred**" means $26.9 million.

"**Target Total Prepaid Revenue Transferred**" means $11.1 million.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, harmonized sales, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax and additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay any amounts set forth in clause (a) with respect to another Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group or otherwise for any period.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K. or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world, with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Claim**" has the meaning set forth in Section 6.9(b).

"**Tax Claim Notice**" has the meaning set forth in Section 6.9(b).

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Returns**" means all returns, reports (including any amendments, elections, declarations, disclosures, claims for refunds, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party, including with respect to the Sellers, the EMEA Sellers.

"**Total Prepaid Revenue Transferred**" means the total Prepaid Revenue Transferred for all Services Contracts.

"**Trade Approvals**" means the timely submission by the Sellers of any and all necessary requests to the appropriate Governmental Authority for the assignment or issuance, which may be conditional on Closing, to Purchaser of all material Consents held by the Sellers which would be required under any Trade Law for Purchaser to continue to carry on, after

26

Closing, the Acquired Business as currently conducted and the receipt and acceptance of such requests by the Governmental Authority without any objection.

"**Trade Laws**" means any applicable Law relating to, regulating, prohibiting or imposing requirements with respect to the import, export or transfer of goods, materials, technology or information, including the *Export Act*, *Export and Import Permits Act*, *Special Import Measures Act*, *Special Economic Measures Act*, *International Emergency Economic Powers Act* and the *Arms Export Control Act*, all as amended, and any requirements of a Government Entity promulgated pursuant to such Laws or any analogous supranational foreign, state, provincial, territorial, municipal or local Law.

"**Trade Permit**" means any Consent required under any Trade Law for the Business as currently conducted.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in respect of certain Trademarks used in respect of the Products and/or Services to be entered into on or before the Closing in the form attached hereto as Exhibit L.

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement, the EMEA Asset Sale Agreement or any Local Sale Agreement.

"**Transfer Tax Return**" has the meaning set forth in Section 6.7(a).

"**Transfer Taxes**" means all goods and services, sales, excise, harmonized sales, use, transfer, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transferred Employee**" means Employees who accept an Offer by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 or Section 7.2 and those Employees whose employment transfers by operation of Law.

"**Transferred Employee Liabilities**" means those Assumed Liabilities set forth in Section 7.1.2(c)(ii) and Section 7.1.2(c)(iv) of the Sellers Disclosure Schedule.

"**Transferred Intellectual Property**" means (i) the Patents set forth in Section 1.1(n)(i) of the Sellers Disclosure Schedule (the "**Transferred Patents**"), (ii) the Trademarks set forth in Section 1.1(n)(ii) of the Sellers Disclosure Schedule, (iii) the Intellectual Property (other than Patents and Trademarks) in the Software used exclusively in the Products or in the Plan of Record Products as of the Closing Date or that was used exclusively in the Acquired Business (including in the research and development of products or Plan of Record Products) as of July 20, 2009 (and, with respect to any Software developed or created after July 20, 2009, that is used exclusively in the Acquired Business as of the Closing Date and is not licensed to any of the entities set forth on Section 1.1(n)(iii)(A) of the Sellers Disclosure Schedule in connection with their acquisition of a former Nortel business), including without limitation the Software set forth in Section 1.1(n)(iii)(B) of the Sellers Disclosure Schedule (for the avoidance of doubt, to the extent any Software is owned by any of the Sellers but not used exclusively in the Business, it shall not constitute Transferred Intellectual Property), and (iv) any Intellectual Property (other than Patents, Trademarks or Software) owned by any of the Sellers that is used exclusively in connection with  the Acquired Business as of the Closing Date.

"**Transition Services Agreement**" means an agreement between the TSA Sellers and the TSA EMEA Sellers, on the one hand, and the Purchaser and the relevant Designated Purchasers and/or EMEA Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as <u>Exhibit M</u>, except that the Schedules to such  . agreement shall be agreed to by the Parties in accordance with Section 5.25.

"**TSA Consents**" has the meaning ascribed to the term "Third Party Consents" in the Transition Services Agreement.

"**TSA EMEA Employment Escrow Agent**" has the meaning attributed to that term in the Transition Services Agreement.

"**TSA EMEA Employment Escrow Amount**" has the meaning attributed to that term in the Transition Services Agreement.

"**TSA EMEA Sellers**" means NNUK and Nortel Networks (Ireland) Limited.

"**TSA Escrow Agent**" has the meaning set forth the Transition Services Agreement.

"**TSA Escrow Agreement**" has the meaning set forth the Transition Services Agreement.

"**TSA Escrow Amount**" means $1,000,000.

"**TSA Sellers**" means the Main Sellers and those entities listed in Exhibit A attached to the form Transition Services Agreement contained in <u>Exhibit M</u> hereto.

"**Union Employee**" means an Employee whose terms and conditions of employment are covered by a Collective Labor Agreement as specified in Section 4.11(b) of the Sellers Disclosure Schedule.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures Order**" means the Order dated September 1, 2010 authorizing and approving, among other things, bidding procedures with respect to the sale of the MSS Business (as defined therein).

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Government**" means the United States Government or any department, agency or instrumentality thereof.

"**U.S. Sale Hearing**" has the meaning set forth in Section 5.1.1(a).

"**U.S. Sale Motion**" means the Motion of the Debtors dated August 27, 2010 seeking, among other things, entry of the U.S. Bidding Procedures Order and an order approving the sale of the MSS Business (as defined therein) to the Successful Bidder or the Alternative Bidder (each as defined therein), as the case may be.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1.1(b).

"**WARN Act**" means, collectively, the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state or local law.

"**Warranty Obligations**" means the warranty obligations relating to Products and Services assumed by the Purchaser and/or a Designated Purchaser and/or a Designated EMEA Designated Purchaser pursuant to Section 2.1.3(o) hereof and clause 2.3.8 of the EMEA Asset Sale Agreement.

"**Warranty Provision**" means, as of any given date, the sum of (i) the KPD Provision, (ii) the Non-KPD Warranty Provision and (iii) the Contractual Liabilities.

"**365 Contracts**" means Contracts to which a U.S. Debtor is a party that are Executory Contracts and were entered into before the Petition Date that the Purchaser may elect to have a U.S. Debtor assume and assign pursuant to section 365 of the U.S. Bankruptcy Code.

"**365 Customer Contract List**" has the meaning set forth in Section 2.1.5(a).

"**365 Customer Contracts**" has the meaning set forth in Section 2.1.5(a).

29

SECTION 1.2    Interpretation.

1.2.1   Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2   Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from but excluding" and the words "to" and "until" each mean "to and including", (iv) the use of the words "or" and "any" shall not be exclusive, and (v) in determining whether an asset is "exclusively" used in connection with the Acquired Business, incidental, de minimis or casual uses outside the Acquired Business shall not be considered. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3   Headings, etc. The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4   Currency and Calculations. All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal (Eastern Edition) newspaper for the day in question.

1.2.5   Statutory References. Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

ARTICLE II.

PURCHASE AND SALE OF ASSETS

SECTION 2.1    Purchase and Sale.

2.1.1   Assets.  Subject to the terms and conditions of this Agreement, at Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or assume from the relevant Sellers, and each Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers, all of its right, title and interest in the following assets (such assets, excluding the Excluded Assets, the "Assets") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear of all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

(a)     the Owned Inventory as of the Closing Date;

(b)     the Owned Equipment as of the Closing Date;

(c)     the Assigned Contracts, including the prepaid expenses of the Sellers thereunder and all options to renew, purchase, expand, or lease (including rights of first refusal, first negotiation and first offer);

(d)     all rights of the Sellers as of the Closing Date under (i) non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts, (ii) to the extent they relate exclusively to the Business or the Assets, with Transferred Employees (to the extent assignable without the applicable Transferred Employee's consent), contractors and agents of the Sellers or with other Third Parties or (iii) confidentiality and similar agreements entered into by any Seller or their respective representatives in connection with the sale of the Business, to the extent relating solely to the Assets or the Business;

(e)     the tangible embodiments of the Business Information existing as of the Closing Date, subject to Section 2.1.2(e);

(f)     the Transferred Intellectual Property as of the Closing Date, subject to the licenses granted to NNL, NNI and each of the EMEA Sellers pursuant to the Intellectual Property License Agreement and subject to any and all licenses granted under or to such Intellectual Property prior to the Closing Date not in violation of Section 5.9, together with (A) all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property (except for (x) any income, royalties, damages and payments from claims asserted prior to the Closing Date or payment obligations accrued for periods prior to the Closing Date, whether or not due or payable after the Closing Date, and (y) any income or royalties payable under any contract, arrangement or agreement other than the Assigned Contracts), (B) the right, if any, to register, prosecute, maintain and defend the Transferred Intellectual Property before any public or private agency or registrar, and (C) the right to sue and recover damages or other compensation for past, present or future infringements,

31

dilutions, misappropriations, or other violations thereof, the right to sue and obtain equitable relief in respect of such infringements, dilutions, misappropriations and other violations, and the right to fully and entirely stand in the place of the Sellers in all matters related thereto;

(g)     all Consents of Government Entities that are exclusive to the Acquired Business and listed in Section 2.1.1(g) of the Sellers Disclosure Schedules to the extent assignable under applicable Law (the "**Seller Consents**");

(h)     to the extent not already included in the definition of Owned Inventory or Owned Equipment, all supplies owned by the Sellers and used exclusively in connection with the Acquired Business;

(i)     all rights as of the Closing Date arising from or in connection with any Bid made prior to the Closing Date by any Seller or by a contractor team or joint venture in which any Seller is participating, in each case exclusively related to the Acquired Business, which is capable of acceptance after the Closing and, if accepted, would result in the award of a Customer Contract that (if entered into after the date hereof and prior to the Closing Date) would be an Assigned Contract hereunder or to which the Purchaser has provided its prior written consent (to the extent required pursuant to Section 5.9) (any such Bid, a "**Seller Bid**");

(j)     all rights as of the Closing under (i) all warranties, representations and guarantees made by suppliers, manufacturers, contractors, and Third Parties to the extent related to the Acquired Business or Assets and (ii) with respect to Acquired Actions;

(k)     all assets of the Sellers described in the definition of Adjusted Net Working Capital Transferred as of the Closing Date not otherwise transferred or assigned pursuant to this Section 2.1.1;

(l)     any net insurance proceeds received or to be received in respect of the Assets, to the extent payable to the Purchaser pursuant to Section 5.18(c);

(m)     any Tax records required by Law to be transferred to the Purchaser or a Designated Purchaser;

(n)     any defenses of the Sellers, to the extent relating to the Assumed Liabilities; and

(o)     goodwill associated with the Business.

2.1.2    Excluded Assets.  Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the other Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require the Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to, any of the following assets (collectively, the "**Excluded Assets**"):

(a)    cash equivalents, accounts receivable (including intercompany receivables but excluding the CIP Unbilled Accounts Receivable of the Acquired Business as of the Closing Date), bank account balances and all petty cash of the Sellers;

(b)    all rights to Tax refunds, Tax credits or similar Tax benefits relating to the Assets or the Acquired Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date, except to the extent expressly transferred by this Agreement to the Purchaser or a Designated Purchaser and, for the avoidance of doubt, excluding any such item with respect to Transfer Taxes that are the responsibility of the Purchaser pursuant to Section 6.1, which shall be for the benefit of the Purchaser;

(c)    other than the Assigned Contracts and any other contract rights transferred in connection with the Assets, pursuant to Section 2.1.1, Section 5.13 or Section 5.14(b), any rights of the Sellers under any Contract (including, for the avoidance of doubt, and without limiting any rights under, the Subcontract Agreement, the Non-Assigned Contracts, the Bundled Contracts, the Excluded 365 Customer Contracts, the Excluded Non-365 Customer Contracts and the Seller Insurance Policies (except pursuant to Section 2.1.1(l)));

(d)    any security deposits (including, for the avoidance of doubt, any Cash Collateral) made by or on behalf of the Sellers (including those relating to Other Contracts that are Assigned Contracts);

(e)    the minute books, stock ledgers and Tax records of the Sellers other than the Tax records described in Section 2.1.1(m);

(f)    (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clause (iii) of this subsection (f)), (ii) any Employee Records other than those required to be delivered to the Purchaser pursuant to Section 5.6(e) and Article VII and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privacy but subject to any exemption from those Laws included in the Canadian Approval and Vesting Order or the U.S. Sale Order), in connection with any Action or Claim or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law, under the applicable Action or such agreement, but in any event, copies of the Business Information with such sensitive information redacted shall be provided to the Purchaser);

(g)    any right to any Intellectual Property (i) of any Seller (including the Sellers' names) or any Affiliates of any Seller, with the exception of (A) the Transferred Intellectual Property, and (B) Intellectual Property to the extent rights are granted thereto pursuant to the Intellectual Property License Agreement or the Trademark License Agreement, and (ii) of any Third Party, except to the extent licensed under an Assigned Contract or otherwise granted pursuant to Section 5.4(c);

(h)    all rights of the Sellers under this Agreement and the other Transaction Documents;

33

(i)     all claims, causes of action and rights of the Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which the Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party but excluding any Acquired Actions);

(j)     all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing but excluding any Acquired Actions;

(k)     all records containing personal communications or notes related to the negotiations prepared in connection with the sale of the Assets;

(l)     all stock or other equity interests in any Person;

(m)     any asset owned by NN Turkey, the LGN Joint Venture or Guangdong - Nortel Telecommunications Equipment Co. Ltd.;

(n)     any assets, properties and rights to the extent relating to the Excluded Products and Services (except in all cases as otherwise provided in the Intellectual Property License Agreement);

(o)     any refunds due from, or payments due on, claims with the insurers of any Sellers in respect of losses arising prior to the Closing Date, other than as specified in Section 2.1.1(l);

(p)     any Equipment other than the Owned Equipment; and

(q)     any Inventory other than the Owned Inventory.

In addition to the above, the Sellers, at the Sellers' sole costs, shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information to which the Sellers in good faith determine they are reasonably likely to need access for bona fide business or legal purposes, including in connection with the Bankruptcy Proceedings.

2.1.3     Assumed Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due, only the following Liabilities of the Sellers (the "**Assumed Liabilities**"):

(a)     Except as otherwise expressly provided herein, all Liabilities of the Acquired Business arising after the Closing to the extent related to the ownership, conduct or operation of the Acquired Business after the Closing, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets after the Closing, (ii) all such Liabilities related to Actions or claims brought against the Acquired Business arising from events occurring after the Closing, (iii) all such Liabilities under any Environmental Laws arising

34

from events occurring after the Closing, (iv) all such Liabilities under any products liability Laws or similar Laws concerning defective products delivered after the Closing, and (v) all such Liabilities under any applicable Laws in relation to telecommunications providers arising after the Closing;

(b)     all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof) or any arrangements entered into pursuant to Section 5.13 or 5.14 (or breach thereof), in each case after the Closing (but subject to Section 2.1.3(o) and Section 2.1.3(q)), including (i) any Cure Costs payable by the Purchaser pursuant to Section 2.1.7, (ii) any obligation arising after the Closing under any Assigned Contract and under any arrangements entered into pursuant to Section 5.13 or 5.14 to buy back from resellers the Products sold by the Acquired Business after the Closing to such resellers under such Assigned Contract, (iii) any indemnification obligations arising after the Closing under any Assigned Contract, and (iv) all Contractual Liabilities arising after the Closing under Customer Contracts that are Assigned Contracts (other than Cure Costs payable by the Sellers pursuant to Section 2.1.7);

(c)     (i) all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to Third Parties, solely to the extent that the terms of such licensing assurances, declarations, agreements, or undertakings require assignees of the Transferred Intellectual Property to assume such Liability, and (ii) Liabilities resulting from the assurances, declarations and undertakings made to standard-setting bodies as listed in Section 2.1.3(c) of the Sellers Disclosure Schedule (including, with respect to such Liabilities, the name of each relevant standard-setting body and, to the extent available, any Patents included in the Transferred Intellectual Property that are subject to such Liability), it being understood that the Sellers or their Affiliates may have made other licensing assurances, declarations or undertakings to various standard-setting bodies concerning the Transferred Intellectual Property, the Liabilities for such other assurances, declarations or undertakings are not assumed hereunder but are being referenced merely to provide notice thereof;

(d)     all Liabilities for, or related to, any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under Article VI (including, for the avoidance of doubt, Transfer Taxes to the extent set forth in Article VI);

(e)     except to the extent otherwise expressly set forth in Article VII, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated Purchasers' (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees, to the extent arising on or after the time of transfer of such Transferred Employees on the Effective Hire Date; (ii) except where such Liability is attributable to an act or omission of the Sellers, the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') Offer or notice of continued employment (including any Liability, other than a Liability attributable to an act or omission by the Sellers, arising as a result of any breach of applicable employment Law by the Purchaser or relevant Designated Purchaser in connection with any pre-employment screening process), as applicable, to any Employee pursuant to the terms of Section 7.1, (iii) except where such Liability is attributable to an act or omission of the Sellers, the Purchaser's or relevant

35

Designated Purchasers' (or any of their Affiliates') decision to make or not make Offers to Employees, to the extent such Offer violates applicable Law with respect to discrimination among employees or potential employees, and (iv) the failure of the Purchaser or any Designated Purchasers or their Affiliates to satisfy their obligations with respect to the Employees, including the Transferred Employees, as set out in Article VII;

      (f)     all Liabilities that relate to or arise from or in connection with any Purchaser Employee Plan;

      (g)     all Liabilities related to any payments with respect to accrued and unpaid vacation days to the extent provided in and in accordance with Sections 7.1.2(c)(ii), (iii) and (iv);

      (h)     all Liabilities arising on or after the Closing Date that relate to or arise from or in connection with the Seller Employee Plan and Collective Labor Agreements set forth on Section 4.11(g) of the Sellers Disclosure Schedule with respect to any Transferred Employees who are applicable Union Employees. For greater certainty, there shall be no transfer of assets or liabilities from the Nortel Networks Negotiated Pension Plan or any other Seller Employer Plan to the Purchaser, Designated Purchasers or any Purchaser Employee Plan;

      (i)     any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the Code) to Transferred Employees and/or his or her qualified beneficiaries who have a qualifying event that occurs on or after such Transferred Employee's Employee Transfer Date;

      (j)     all Liabilities payable or to be provided on or after the Closing Date related to the Transferred Employees set forth on Section 2.1.3(j) of the Sellers Disclosure Schedule, as updated prior to Closing in accordance with Section 7.1.2(c), as applicable;

      (k)     all Liabilities related to Transferred Employees expressly assumed by the Purchaser or a Designated Purchaser as set out in Article VII;

      (l)     all Liabilities relating to executory supply purchase orders for products or services (other than raw materials, manufactured or purchased parts, work in process, packaging, stores, tooling, finished goods or supplies, in each case to be delivered to contract manufacturers), entered into by the Sellers in connection with the Acquired Business in the Ordinary Course before the Closing with any Person (other than a contract manufacturer) who is a supplier of the Acquired Business and under which such products and/or services have not been delivered or supplied as of the Closing Date;

      (m)    all Liabilities related to the Seller Bids;

      (n)     all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule;

      (o)     all Liabilities of the Sellers described in the definition of Adjusted Net Working Capital Transferred as of the Closing Date not otherwise transferred or assigned pursuant to Section 2.1.3;

Doc# US1 6565305v13

(p)      Liabilities related to the obligation to repurchase Acquired Business related Inventory under contract manufacturing agreements, as and to the extent specified in the Contract Manufacturing Inventory Agreements; and

(q)      Any obligations under any warranty Liabilities and Known Product Defects (as defined in the Nortel Accounting Principles) relating to Products and Services which have been supplied under the Assigned Contracts, but excluding any Cure Costs payable by Sellers pursuant to Section 2.1.7.

2.1.4    Excluded Liabilities.  Except as expressly provided in Section 2.1.3, neither the Purchaser nor any of the Designated Purchasers shall assume (or be deemed to have assumed) at the Closing any of the Liabilities of any Seller or its Affiliates, including the Excluded Employee Liabilities (collectively, the "**Excluded Liabilities**"), and for the avoidance of doubt, any Liability identified as an Excluded Liability shall not be an Assumed Liability. Without limiting the foregoing, Excluded Liabilities include:

(a)      all Indebtedness of the Sellers and their Affiliates;

(b)      all Liabilities arising out of the Contracts that are not Assigned Contracts;

(c)      other than as specifically set forth herein, all Liabilities to the extent arising out of or relating to the Excluded Assets or the operation by the Sellers of any business other than the Business, whether before, on or after the Closing Date;

(d)      other than as specifically set forth herein, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business of the Sellers prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of the Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business of the Sellers) including any liability with respect to Cure Costs payable by the Sellers pursuant to Section 2.1.7;

(e)      other than as specifically set forth herein, litigation, including without limitation the matters set forth in Section 4.6 of the Sellers Disclosure Schedule, and related claims and Liabilities (including Environmental Liabilities and Claims) or any other claims against any Seller of any kind or nature whatsoever involving or relating to facts, events or circumstances arising or occurring prior to the Closing, no matter when raised (including Liability for breach, misfeasance or under any other theory relating to any Seller's conduct, performance or non-performance);

(f)      other than as specifically set forth in Section 5.19, all guarantees of Third Party obligations by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit;

(g)      all accounts payable and trade payables of the Sellers or their Affiliates, including, in each case, intercompany payables;

(h)    all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents other than the EMEA Asset Sale Agreement or the documentation ancillary thereto based upon arrangements made by or on behalf of the Sellers or any of their Affiliates; it being understood, however, that the Purchaser shall not assume any similar fees in connection with the EMEA Asset Sale Agreement or the documentation ancillary thereto;

(i)    all Liabilities for, or related to any obligation for, any Tax that is not expressly assumed by the Purchaser or any of the Designated Purchasers pursuant to Article VI; for the avoidance of doubt, the Parties intend that no Purchaser or Designated Purchaser shall have any transferee or successor liability for any Tax that the Sellers bear under Article VI;

(j)    all obligations to provide continuation coverage pursuant to COBRA or any similar Law to any Person who has been employed in the Acquired Business and who does not become a Transferred Employee;

(k)    all Liabilities or other obligations arising from the Seller Employee Plans;

(l)    any Liability of the Sellers or any ERISA Affiliate under Title IV of ERISA;

(m)    any pension or retirement Liability of the Sellers or any ERISA Affiliate; and

(n)    all Liabilities of the Sellers arising under this Agreement and the Ancillary Agreements; and

(o)    all Liabilities arising from the Amended and Restated Settlement Agreement (the "**Settlement Agreement**") dated March 30, 2010 among NNC, NNL and their various Affiliates, Ernst & Young, Inc., the Former Employees Representative, Sue Kennedy (the "**LTD Representative**"), Koskie Minsky LLP (the "**Representative Counsel**") and the CAW-Canada.

2.1.5    Assumption and/or Assignment or Rejection of 365 Contracts.

(a)    Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth a list (as may be updated and/or amended from time to time after the date hereof, the "**365 Customer Contract List**") of those Customer Contracts to which a U.S. Debtor is a party that are Executory Contracts for purposes of the U.S. Bankruptcy Code and were entered into before the Petition Date (the "**365 Customer Contracts**"), which the relevant U.S. Debtor will assume and assign to the Purchaser or a Designated Purchaser pursuant to section 365 of the U.S. Bankruptcy Code to the extent allowed by applicable Law.

(b)    Section 2.1.5(b) of the Sellers Disclosure Schedule sets forth a list (as may be updated and/or amended from time to time after the date hereof, the "**Other 365 Contract List**") of all Other Contracts to which a U.S. Debtor is a party that are Executory Contracts for purposes of the U.S. Bankruptcy Code and were entered into before the Petition Date (Contracts that may be included on the Other 365 Contract List, the "**Other 365 Contracts**") which the

Purchaser has elected to have the relevant U.S. Debtor pursuant to section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser to the extent allowed by applicable Law (such Contracts on the Other 365 Contract List shall be collectively referred to as the "**Designated Other 365 Contracts**"). The Other 365 Contract List may be updated from time to time after the date hereof to reflect any additional Other 365 Contract that the Purchaser may designate as a Designated Other 365 Contract or remove any previously designated Designated Other 365 Contract prior to the applicable Final Contract Designation Date.

(c)     The (i) 365 Customer Contracts and (ii) Designated Other 365 Contracts are collectively referred to as the "**Assumed and Assigned Contracts**".

(d)     The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to the assumption and assignment of the Assumed and Assigned Contracts effective as of Closing as part of the U.S. Sale Order in accordance with Section 5.1.

(e)     Any Other 365 Contracts that are not Designated Other 365 Contracts shall be referred to as an "Excluded 365 Contract" and shall not be an Assigned Contract hereunder.

(f)     The Purchaser shall not have the right to amend the Other 365 Contract List after the applicable Final Contract Designation Date without the prior written consent of NNI.

2.1.6     Assignment of Non-365 Contracts.

(a)     Non-365 Contracts

(i)     Section 2.1.6(a)(i) of the Sellers Disclosure Schedule sets forth a list (as may be updated and/or amended from time to time, the "**Non-365 Customer Contract List**") of all Sellers' Customer Contracts other than 365 Customer Contracts (the "**Non-365 Customer Contracts**"), which the relevant Seller will assign to the Purchaser or a Designated Purchaser at Closing. The Non-365 Customer Contract List shall be updated after the date hereof with all 365 Customer Contracts entered into by the Sellers in the Ordinary Course between the date hereof and the Closing Date.

(ii)     Section 2.1.6(a)(ii) of the Sellers Disclosure Schedule sets forth a list (as may be updated and/or amended from time to time, the "**Other Non-365 Contract List**") of all Other Contracts that are not Other 365 Contracts (Contracts that may be included on the Other Non-365 Contract List, the "**Other Non-365 Contracts**") which the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser to the extent allowed by applicable Law (such Contracts on the Other Non-365 Contract List shall be collectively referred to as the "**Designated Other Non-365 Contracts**"). The Other Non-365 Contract List may be updated from time to time after the date hereof to reflect any additional Other Non-365 Contract that the Purchaser may designate as a Designated Other Non-365 Contract or remove any previously designated

39

Designated Other Non-365 Contract prior to the applicable Final Contract Designation Date.

(iii)    Any (x) Other Non-365 Contracts that are not Designated Other Non-365 Contracts, and (y) Available Real Estate Leases under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.6(b) shall be referred to as "**Excluded Non-365 Contracts**" and shall not be Assigned Contracts hereunder.

(iv)    The Purchaser shall not have the right to amend the Other Non-365 Contract List after the applicable Final Contract Designation Date without the prior written consent of the Main Sellers.

(b)    Real Estate Leases

(i)    Section 2.1.6(b)(i) of the Sellers Disclosure Schedule sets forth a list prepared by the Sellers (the "**Real Estate Lease List**") of all real estate used in the conduct of the Acquired Business, whether located in the United States or in any other jurisdiction, except as otherwise covered under the EMEA Asset Sale Agreement, and subject to leases, subleases, space licenses or other agreements permitting a Seller to occupy real property, including an indication of which of the related properties have been made available to the Purchaser for either a Sublease or, as described in Section 5.16, a post-closing transitional license (the "**Available Real Estate Leases**").

(ii)    Section 2.1.6(b)(ii) of the Sellers Disclosure Schedule sets forth a list of the Available Real Estate Leases with respect to which (x) the Purchaser has elected to have the relevant Seller enter into a Sublease (as defined in Section 5.24) with the Purchaser or a Designated Purchaser at Closing (the "**Subleased Real Estate Leases**"), in accordance with and subject to the terms of the relevant lease, with each such Sublease to have a term to expire as specified in Section 5.24; or (y) the Purchaser has elected to have the relevant Seller enter into a license agreement (as contemplated by Section 5.16) with the Purchaser or a Designated Purchaser at Closing.  Prior to the applicable Final Contract Designation Date, the list of Subleased Real Estate Leases and the list of designated licenses may be updated to reflect the designation or removal of Available Real Estate Leases.

(iii)    After the applicable Final Contract Designation Date, the Purchaser shall have no right to designate additional Available Real Estate Leases for entry into a Sublease with or license to the Purchaser or Designated Purchaser or to remove any Available Real Estate Lease which has or shall have previously been designated by the Purchaser for sublease under this Section 2.1.6(b), without the prior written consent of the Main Sellers;

(iv)    It is further understood and agreed that the Purchaser shall be obligated to enter into Subleases under all Subleased Real Estate Leases.

40

(c)      Subject to Section 2.1.6(d), Section 2.1.10, Section 5.13 and the receipt of any required Consent, all the Non-365 Customer Contracts and the Designated Other Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at Closing pursuant to Section 2.1.1(c) and the Purchaser or a Designated Purchaser shall enter into a Sublease at Closing pursuant to Section 5.24 with the relevant Seller under each of the Subleased Real Estate Leases in effect as of the Closing.

(d)      The Parties shall, and the Purchaser shall cause the Designated Purchasers to, use their reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, to a Designated Purchaser) of the 365 Customer Contracts, the Designated Other 365 Contracts, the Non-365 Customer Contracts and the Designated Other Non-365 Contracts in force as of the Closing Date, and the entry into the Subleases; provided, however, that, except as expressly provided in Section 2.1.7(c) with respect to Cure Costs for Customer Contracts, the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents. For greater certainty, the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.7   Cure Costs: Adequate Assurance.

(a)      On or prior to the date hereof, the Sellers shall have delivered Section 2.1.7(a)(i) of the Sellers Disclosure Schedule to the Purchaser, which Schedule contains with respect to each Other 365 Contract and Other Non-365 Contract, the Sellers' good faith estimate of the amount of Cure Costs.

(b)      To the extent that the assumption and assignment of any 365 Customer Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order. To the extent that assumption and assignment of any Designated Other 365 Contract entails the payment of any Cure Cost (the "**Other 365 Cure**") as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order, the Purchaser shall be responsible for payment of such Cure Cost; provided, that any such payment by the Purchaser shall not entitle the Purchaser to any adjustment to the Purchase Price or any reimbursement or indemnification from the Sellers on account of payments made by the Purchaser pursuant to this section 2.1.7(b).

(c)      To the extent that assignment to the Purchaser or a Designated Purchaser of any Non-365 Customer Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction. To the extent that assignment to the Purchaser or a Designated Purchaser of any Assigned Contract other than a Non-365 Customer Contract or an Assumed and Assigned Contract entails the payment of Cure Costs (the "**Other Non-365 Cure**," and together with the Other 365 Cure, the "**Other Cure**"), the Purchaser shall be responsible for payment of such Cure Cost to such contracting party in a manner agreed between the Purchaser, the Sellers and such contracting party or ordered by a

41

court of competent jurisdiction; provided, that any such payment shall not entitle the Purchaser to any adjustment to the Purchase Price or any reimbursement or indemnification from the Sellers on account of payments made by the Purchaser pursuant to this section 2.1.7(c).

(d)    The Purchaser and the Sellers agree to carry out the actions set forth in Exhibit 2.1.7(d).

(e)    To the extent that entry into a Sublease with the Purchaser or a Designated Purchaser of any Subleased Real Estate Lease or the license of any Available Real Estate Lease pursuant to Section 2.1.6(b) entails the payment of Cure Costs, the Purchaser shall pay its pro-rata share (based on the ratio of the rentable square footage of the premises subject to such sublease or license to the overall rentable square footage of the premises demised under such Subleased Real Estate Lease or Available Real Estate Lease) of such Cure Costs directly to such contracting party in a manner agreed between the Purchaser and such contracting party or ordered by a court of competent jurisdiction. The Main Seller or relevant Seller shall be responsible to pay the remainder of such Cure Costs in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction. In the case of any Cure Costs relating to any Available Real Estate Lease, the Sellers and the Purchaser shall agree as to the amounts required to be paid to the relevant landlord prior to payment by either the Sellers or the Purchaser with respect to the same.

(f)    Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall provide adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

(g)    The Parties shall, and shall cause the Other Sellers and the Designated Purchasers, as applicable, to, use reasonable best efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts and the entry into Subleases; provided, however, that the Sellers shall be under no obligation to seek any such Consent prior to the completion of the Auction or to compromise any right, asset or benefit or to expend any amount or incur any Liability or provide any other consideration in seeking such Consents other than filing and application fees to Government Entities and payment of Cure Costs for which such Party is responsible pursuant to Section 2.1.7, and, provided, further, that the failure to obtain any or all of such Consents shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.8    Local Sale Agreements. Subject to the terms and conditions hereof, to the extent necessary to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and/or relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in the countries where such Local

42

Sale Agreements are required, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. In the event of a conflict between this Agreement and any Local Sale Agreement, this Agreement shall prevail. The Parties further agree that no allocation of Purchase Price and no amounts by way of valuation of the Assets, whether provisional, estimated or final, shall be included in any instruments of assignment and/or transfer, except as required by applicable Law.

2.1.9   EMEA Asset Sale Agreement. Except as otherwise set forth in Exhibit 5.25 hereto, none of the EMEA Sellers or the Joint Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into the EMEA Asset Sale Agreement) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Sellers or the Joint Administrators in any manner whatsoever. The only assets, rights, properties and Liabilities of the EMEA Sellers or the Joint Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement. Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

2.1.10   Non-Assignable Assets. Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without such Consent (in each case, after taking into account the effect of the U.S. Sale Order, the Canadian Approval and Vesting Order, and any other order of a court of competent jurisdiction), would constitute a breach, default, violation or other contravention of Law or the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset. For greater certainty, except as explicitly set forth in Article VIII, failure to obtain any such Consent shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price, and the Main Sellers and the Purchaser shall each act in accordance with Section 5.13 hereof in relation to any Deferred Transfer Purchased Assets.

SECTION 2.2    Purchase Price.

2.2.1   Purchase Price. Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the purchase, sale, assignment and conveyance of the Sellers' and EMEA Sellers' right, title and interest in, to and under the Assets and the EMEA Assets, respectively, pursuant and subject to the terms hereof and pursuant and subject to the terms of the EMEA Asset Sale Agreement, respectively, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the Designated Purchasers, shall (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and the EMEA Assumed Liabilities and (y) pay to the Distribution Agent, as

43