IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

-------------------------------------------------- x
In re:                                            :    Chapter 11
                                                  :
                                                  :    Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]                :
                                                  :    Jointly Administered
                             Debtors.             :
                                                  :    **Hearing Date: October 21, 2010 at 10:00 a.m.**
                                                  :    **Objection Deadline: October 7, 2010 at 4:00 p.m.**
-------------------------------------------------- x

**OBJECTION OF THE TRUSTEE OF NORTEL NETWORKS UK PENSION
PLAN AND THE BOARD OF THE PENSION PROTECTION FUND TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING
PROCEDURES FOR THE ABANDONMENT, DISPOSAL, OR DESTRUCTION
OF DATA; (II) WAIVING COMPLIANCE WITH CERTAIN RETENTION
LAWS AND ORDINANCES; AND (III) GRANTING RELATED RELIEF**

The Trustee (the "Trustee") of Nortel Networks UK Pension Plan (the "Plan") and the

Board of the Pension Protection Fund (the "PPF," and together with the Trustee, the "UK

Pension Claimants") hereby respectfully object to the *Debtors' Motion for Entry of an Order (I)*

*Approving Procedures for the Abandonment, Disposal, or Destruction of Data; (II) Waiving*

*Compliance with Certain Retention Laws and Ordinances; and (III) Granting Related Relief*

[D.I. 3965] (the "Motion").  In support of this objection, the UK Pension Claimants, by and

through their undersigned counsel, respectfully state as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems
Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera
Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc.
(2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel
Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom
International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc.
(4226).

## PRELIMINARY STATEMENT

1.      The Debtors' claims resolution process is still in its nascent stages with over 5,000 of the 7,316 claims filed against the estates still unresolved.  Many of these unresolved claims -- including those of the UK Pension Claimants -- have not been the subject of a formal objection as yet, and, consequently, discovery has not commenced.  Despite that fact, the Debtors have an affirmative duty to preserve evidence that may be relevant to issues in any anticipated litigation, including evidence that may be relevant to the UK Pension Claimants' Claims (as defined below).

2.      The Debtors' request that this Court approve procedures that would allow them to abandon or dispose of their hard copy documents and electronic data (the "Document Disposal Procedures") has far-reaching consequences for the UK Pension Claimants and other holders of unresolved claims.  Far from a simple housekeeping measure, the Document Disposal Procedures apply to an extremely broad range of documents and data and present the very real risk that information relevant to the UK Pension Claimants' Claims may be irretrievably lost prior to the commencement of discovery with respect to the Claims.

3.      The Debtors' request, at this stage of the claims resolution process, is premature. Any purported cost-saving benefits that would inure to the Debtors' benefit from implementing the Document Disposal Procedures (estimated to be $75,000 per month) are far outweighed by the amount in controversy -- namely, the $16 billion of unresolved claims, which include the UK Pension Claimants' Claims in excess of $3 billion -- and the substantial prejudice that would result if evidence relevant to these claims was destroyed.

4.      Moreover, by allowing the Debtors to dispose of documents and data on limited, negative notice and requiring claimants to expend their own resources to review these documents

and data, the Document Disposal Procedures attempt to shift improperly the Debtors'
preservation duty and the costs of discovery to claimants like the UK Pension Claimants.  Had
the Debtors formally objected to those claims, such burden-shifting would not be permitted
under the applicable discovery rules and the Debtors should not be allowed to achieve that result
through the back-door.

5.      For the reasons set forth in this objection, the Motion should be denied.
Alternatively, the Court should limit or condition the relief granted pursuant to the Motion in
order to minimize the risk that the UK Pension Claimants' rights are prejudiced by the
destruction of documentary evidence by requiring the Debtors to (i) place a litigation hold on
documents that may be relevant to the UK Pension Claimants' Claims including, but not limited
to, the documents identified on Exhibit A hereto, (ii) acknowledge their obligation to preserve
documents, and (iii) amend the document disposal notices to provide sufficient descriptions of
the documents and data that the Debtors propose to destroy in order to allow claimants to
determine whether such documents are likely to be relevant to their claims.

## BACKGROUND

### The Chapter 11 Cases

6.      On January 14, 2009 (the "Petition Date"), the Debtors (other than Nortel
Networks (CALA) Inc. ("NN CALA")) filed voluntary petitions for relief under chapter 11 of
the Bankruptcy Code.  NN CALA filed its chapter 11 petition on July 14, 2009 and its chapter 11
case was subsequently consolidated with the other Debtors' cases. [D.I. 1098, 1099]

7.      The filing of the Debtors' chapter 11 petitions is part of a coordinated global
restructuring process undertaken by numerous Nortel entities in various jurisdictions.  On
January 14, 2009, nineteen of the Debtors' European affiliates, including Nortel Networks UK

Limited ("NNUK"), were each placed into administration by the High Court of Justice of England and Wales.

**The Trustee and The PPF**

8.　　The Plan is a defined benefit pension scheme established under and governed by U.K. law, pursuant to which employees of NNUK become entitled to pension benefits based on their final salary, with the employer agreeing to meet the balance of the cost of providing such pension benefits after taking into account the employees' own contributions.  (Davies Decl. ¶ 8.)[2] The Plan currently has over 40,000 members, comprised of pensioners receiving payments and deferred members (i.e., members not yet in retirement).  (Id. ¶ 9)

9.　　The Trustee is the trustee of the Plan.  (Id. ¶ 2)  In that capacity, the Trustee owes a fiduciary duty to the members of the Plan, which duty requires, among other things, that the Trustee act in the best interests of the members and take steps to ensure that the assets of the Plan are sufficient to meet the members' pension entitlements.  (Ham Decl. ¶ 44.)[3]

10.　　As part of the overall regulatory framework introduced in the U.K. Pensions Act 2004 (the "2004 Act"), a statutory fund, the PPF, was established to provide compensation to members of eligible schemes where the employer has suffered a qualifying insolvency event and where the scheme's assets are insufficient to cover a specified level of compensation.  (Favier Decl. ¶¶ 4-6.)[4]

**The UK Pension Claims**

11.　　As of the Petition Date, the Plan had a substantial funding deficit.  (Davies Decl. ¶ 10; Davies Decl. Exs. D and E ¶ 2.4)  The Plan actuary has estimated the "section 75 debt" of

---

[2]　　Declaration of David Wyndham Davies executed February 24, 2010. [D.I. 2506]

[3]　　Declaration of Robert Wallace Ham, QC executed February 24, 2010. [D.I. 2509]

[4]　　Declaration of Richard Favier executed February 24, 2010. [D.I. 2508]

NNUK (as of January 13, 2009) to be £2.1 billion (<u>see</u> Davies Decl. Exs. A, D and E), and the

joint administrators of NNUK have stated publicly that an informal estimate of NNUK's "section

75 debt" is in the region of $3.1 billion (<u>see</u> Davies Decl. Exs. B, D and E).

      12.     In compliance with the Court's bar date orders, the Trustee and the PPF jointly

filed timely proofs of claim (the "<u>Claims</u>") against each of the Debtors, asserting unliquidated,

contingent claims arising under U.K. law in respect of the Plan's funding deficit.  (<u>See</u> Davies

Decl. Exs. D and E.)  The Claims describe in detail the U.K. pension regulatory regime, the

funding deficit in the Plan, the commencement of an investigation of the Plan by the Pensions

Regulator ("<u>TPR</u>"), the British governmental agency charged with regulating occupational

pension schemes in the U.K. (Davies Decl. ¶ 12; Ham Decl. ¶ 16), and the prospect that TPR

would seek to obtain issuance of a "Financial Support Direction" ("<u>FSD</u>") against one or more of

the Debtors.  (<u>See</u> Davies Decl. Exs. D and E.)

**<u>The UK Pensions Regulatory Framework</u>**

      13.     Under the UK pensions regulatory framework, the TPR's "moral hazard" powers

include the ability to issue an FSD to an entity that is associated or connected with an employer

in an underfunded pension scheme (a "<u>Related Entity</u>").  (Ham Decl. ¶¶ 7, 30.)  An FSD requires

the Related Entity to submit a proposal to TPR for its approval explaining how it intends to

provide financial support to eliminate the scheme's funding deficit and ensure prospectively that

such support remains in place while the scheme is in existence.  (<u>Id.</u> ¶ 31; Op. at 7.[5])  An FSD

may be issued if certain statutory and other requirements are met, including (i) the plan employer

---

[5]     Memorandum Opinion, dated March 9, 2010. [D.I. 2664]

is "insufficiently resourced";[6] (ii) the Related Entity is an associate of, or is connected with, the employer; and (iii) issuance of an FSD against the Related Entity is reasonable in the circumstances. (See section 43 of the 2004 Act, Ham Decl. Ex. A; Op. at 6-7)

14.    The decision to issue an FSD is made by the Determinations Panel (the "DP"), which is an independent committee established by TPR consisting of persons with legal, business and/or pensions knowledge and expertise who are appointed under terms that are approved by the U.K. Secretary of State.  (Ham Decl. ¶¶ 18, 38, 40.)  The 2004 Act enumerates various factors that the DP may, in its discretion, consider when deciding whether it is reasonable to issue an FSD, including the relationship between the employer and the person against whom the FSD may be issued, the value of benefits received by that person from the employer (in the case of a Related Entity), and the financial circumstances of the person.  (See section 43(7) of the 2004 Act, Ham Decl. Ex. A; Op. at 7.)

15.    A decision of the DP may be referred to an appellate tribunal for a *de novo* review by any party affected by the decision.  (Ham Decl. ¶¶ 46, 47.)  Thereafter, an appeal may be taken on points of law from a decision of the tribunal, with leave, to the Court of Appeal of England and Wales.  (Ham Decl. ¶¶ 49, 53.)  If an FSD is issued and the recipient fails to put, or keep, in place financial support in a form approved by TPR, the DP may issue a non-compliance contribution notice ("Contribution Notice"), which imposes a statutory liability on the non-complying party to pay the sum specified in the Contribution Notice, which may be in an amount

---

[6]    Under the 2004 Act, an employer may be deemed "insufficiently resourced" if, among other things, the value of its assets is less than 50% of its estimated "section 75 debt" as at a "relevant time" specified by TPR.  (Section 44(3) of the 2004 Act, Ham Decl. Ex. A; Ham Decl. ¶ 34)  An employer's section 75 debt is broadly equal to the deficiency in the funding of the pension scheme as estimated by the scheme's actuary on a "buy-out" basis, which represents the difference between the value of the scheme's assets and the cost – estimated by the scheme's actuary – of securing the members' benefits through the purchase of annuities from an authorized insurance company.  (Davies Decl. Exs. D and E ¶ 2.7; Ham Decl. ¶ 26.)

equal to the employer's section 75 debt.  (Ham Decl. ¶ 50; Op. at 7-8; Davies Decl. Exs. D and E

¶ 2.10)  A decision by the DP to issue a Contribution Notice may be referred to the appellate

tribunal for *de novo* review in the first instance and, thereafter, an appeal may be taken on points

of law, with leave, to the Court of Appeal.  (See section 103 of the 2004 Act, Ham Decl. Ex. A.)

**The U.K. Regulatory Procedure Against the Nortel Related Entities**

16.     In the exercise of its statutory oversight authority, TPR commenced an

investigation into the financial position of the Plan.  On the basis of that investigation, TPR

issued a warning notice dated January 11, 2010 (the "Warning Notice") commencing the formal

statutory proceeding (the "U.K. Regulatory Procedure") and particularizing the case for the

issuance of FSDs against 29 Nortel entities, including two of the Debtors -- Nortel Networks Inc.

("NNI") and NN CALA (collectively, the "Nortel Related Entities").  (Davies Decl. ¶ 25.)

Copies of the Warning Notice and supporting documentation were sent to each Nortel Related

Entity, including NNI and NN CALA, on January 13, 2010.

17.     On June 25, 2010 (after entry of the Automatic Stay Order, as described below),

an oral hearing was conducted before the DP, following which, the DP issued a determination

notice and reasons (the "Determination"), setting forth its determination that an FSD will be

issued against certain of the Nortel Related Entities, including NNI and NN CALA.  A copy of

the Determination is annexed hereto as Exhibit B.

18.     An appeal from the Determination has been filed on behalf of certain companies

referred to in the Determination pursuant to section 96 of the 2004 Act.

**The Debtors' Motion to Enforce the Automatic Stay**

19.     On February 18, 2010, the Debtors filed a motion (the "Automatic Stay Motion"),

seeking an order from the Bankruptcy Court enjoining the UK Pension Claimants from

participating in the U.K. Regulatory Procedure, on the grounds that the proceedings and their

participation therein violate the automatic stay contained in section 362(a) of the Bankruptcy

Code. [D.I. 2441] The UK Pension Claimants objected to the relief sought by the Debtors.

[D.I. 2503]

20.     Following a hearing on February 26, 2010, the Court granted the Automatic Stay

Motion and entered the *Order Enforcing The Automatic Stay Against Certain Claimants With

Respect To The U.K. Pension Proceedings* ("Automatic Stay Order"). [D.I. 2576] The

Automatic Stay Order, *inter alia*, enforced the automatic stay as to the U.K. Regulatory

Procedure, provided that the UK Pension Claimants would be subject to sanctions if they

participated in that process as to the Debtors and deemed the U.K. Regulatory Proceedings to be

of no force and effect as to the Debtors in their chapter 11 cases. The Court issued a

memorandum opinion on March 9, 2010. [D.I. 2664]

21.     An appeal from the Automatic Stay Order is currently pending before the United

States District Court for the District of Delaware.[7]

22.     This Court has stated, as the Debtors have contended, that it is the appropriate

forum for fixing and determining the Debtors' liability with respect to the Claims. (Op. at 14, 15

("Here, the Claimants can obtain complete monetary relief in this Court at the appropriate

time."))

23.     Although the Debtors have indicated, on several occasions, that they intend to

object to the Claims (see, e.g., Proposed Disclosure Statement (as defined below), at 54 ("The

---

[7]      On March 5, 2010, the UK Pension Claimants timely appealed from the Automatic Stay Order to the
United States District Court for the District of Delaware. [D.I. 2643] On August 5, 2010, the United States
Magistrate Judge issued a Report and Recommendation to the United States District Judge that the
Automatic Stay Order should be affirmed. The UK Pension Claimants have objected to the Magistrate
Judge's report, and the Debtors and the Official Committee of Unsecured Creditors have filed responses to
the UK Pension Claimants' objection.

Debtors are conducting their review of these Claims and intend to raise all objections and defenses available to them.")), the Debtors have not yet filed formal objections to the Claims. Nonetheless, the Debtors' proposed Plan (as defined below) treats any proof of claim filed as contingent -- like the Claims -- as a "Disputed Claim" not entitled to any distribution under the Plan.  (Plan § 1.43.)

**The Proposed Disclosure Statement and Plan**

24.    The Debtors filed the *Joint Chapter 11 Plan of Nortel Networks Inc. and Its Affiliated Debtors* [D.I. 3580] (the "Plan") on July 12, 2010, and the *Proposed Disclosure Statement* for the Plan [D.I. 3874] (the "Proposed Disclosure Statement") on September 3, 2010. No hearings have yet been proposed or scheduled to approve the Proposed Disclosure Statement, to approve procedures for soliciting votes on the Plan, or to consider confirmation of the Plan.

25.    The Debtors' claims resolution process is currently underway.  According to the Proposed Disclosure Statement, as of June 30, 2010, approximately 7,316 proofs of claim had been filed against the Debtors, asserting in the aggregate approximately $27.1 billion (as well as unliquidated amounts).  (Proposed Disclosure Statement, at 28)  As of June 30, 2010, approximately 1,298 of these proofs of claim had been resolved, reducing the aggregate amount claimed against the Debtors by approximately $10.8 billion.  (Id.)

26.    The proposed Plan provides that objections to the claims may be filed as late as 360 days after the effective date of the Plan, or later with Court approval.  (Plan § 9.1)

**The Document Disposal Procedures Motion**

27.    On September 17, 2010, the Debtors filed the Motion, seeking (i) approval of the Document Disposal Procedures, which would allow the Debtors to abandon or dispose of specified hard copy documents and specified electronic data on notice to certain parties specified

in the procedures; (ii) waiving compliance with certain federal, state or local records retention

laws, rules and/or ordinances; and (iii) granting the Debtors such other and further relief as the

Court deems just and proper.  (Motion ¶ 22.)

## ARGUMENT

### The Document Disposal Procedures Threaten to Destroy Evidence Relevant to the Claims.

28.     The Motion proposes to subject an extremely broad range of hard copy documents

and electronic data to the Document Disposal Procedures.  Specifically, the Motion requests that

the proposed Document Disposal Procedures apply to "all of the hard copy documents physically

located in the Debtors' storage facilities in the U.S." "as well as electronic data preserved in the

form of imaged hard drives, disks and certain specified preserved backup tapes that are

physically located in the U.S." (Motion ¶¶ 18, 19)  No limitations of any kind have been imposed

on the universe of documents that would be subject to destruction, whether by date, document-

type, subject matter or other limitation.

29.     In the event the Automatic Stay Order is not reversed on appeal, and the Claims

are fixed and determined by the Court in these chapter 11 cases, the UK Pension Claimants may

be required to demonstrate that the relevant U.K. statutory and other requirements have been met

for issuance of an FSD, including, *inter alia*, that NNI and NN CALA are associates of, or are

connected with, NNUK, and that issuance of an FSD against NNI and NN CALA would be

reasonable in the circumstances.  In deciding whether it is reasonable to issue an FSD, the Court,

acting in the place of the DP in the DP's exercise of its discretion, will take into consideration,

among other things, the relationship between NNUK and NNI / NN CALA and the value of

benefits received by NNI / NN CALA from NNUK.

30.     The UK Pension Claimants believe that the Debtors are likely to have in their

possession a substantial volume of documents and data that would be relevant to these statutory requirements and considerations, and they intend to seek discovery of such documents as soon as the Debtors file a formal objection to the Claims, thereby creating a contested matter.

31.     Although the Motion does not provide any specific information about the content of the documents and data that may be destroyed, given the potentially limitless range of documents that are subject to the proposed Document Disposal Procedures, many of those documents may be relevant to the UK Pension Claimants' Claims.  For example, adjudication of the UK Pension Claimants' Claims will involve, among other things, issues concerning the relationship between NNUK and NNI and NN CALA dating back to the early 1990s.  Yet, among the categories of documents that the Debtors explicitly identify as candidates for destruction are business records "that are more than fifteen (15) years old and have not been used for a significant period of time."  (Motion ¶ 30.)  Notwithstanding the Debtors' purported lack of use, such older corporate records, which may be difficult – if not impossible – to obtain from another source, are exactly the types of documents that the UK Pension Claimants would seek to obtain in discovery.  However, there is a real risk that, if the Document Disposal Procedures are approved by the Court, such documents and others relevant to the UK Pension Claimants' Claims may be destroyed before discovery even commences with respect to the Claims.

**The Debtors Have a Duty to Preserve Documents That May Be Relevant to the Claims.**

32.     The Motion is improper and should be denied.  The broad relief sought by the Debtors is antithetical to their duty to preserve potentially relevant documents.  In implementing the Document Disposal Procedures, the Debtors are under an affirmative obligation to, at a minimum, preserve any documents and data that may be relevant to the Claims.  It is well established that "[a] party who has reason to anticipate litigation has an affirmative duty to

preserve evidence which might be relevant to the issues in the lawsuit." <u>In re Weschler</u>, 121 F. Supp. 2d 404, 415 (D. Del. 2000); <u>Micron Tech., Inc. v. Rambus Inc.</u>, 255 F.R.D. 135, 148 (D. Del. 2009) ("As soon as a potential claim is thus identified, a party is under a duty to preserve evidence which it knows, or reasonably should know, is relevant to the future litigation."); <u>Mosel Vitelic Corp. v. Micron Tech., Inc.</u>, 162 F. Supp. 2d 307, 310-11 (D. Del. 2000); <u>Quintus Corp. v. Avaya, Inc. (In re Quintus Corp.)</u>, 353 B.R. 77, 84 (Bankr. D. Del. 2006).

33.    "[T]his duty arises at the point in time when litigation is reasonably anticipated whether the organization is the initiator or the target of litigation." <u>Victor Stanley, Inc. v. Creative Pipe, Inc.</u>, Civil No. MJG-06-2662, 2010 WL 3703696, at *23 (D. Md. Sept. 9, 2010) (internal quotation and citation omitted); <u>see also</u> <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.") (quoting <u>Fujitsu Ltd. v. Fed. Express Corp.</u>, 247 F.3d 423, 436 (2d Cir. 2001)).  "A formal discovery request is not necessary to trigger the duty to preserve evidence." <u>Krumwiede v. Brighton Assocs. LLC</u>, No. 05-C-3003, 2006 WL 1308629, at *8 (N.D. Ill. May 8, 2006).

34.    For example, in <u>In re Kmart Corp.</u>, 371 B.R. 823 (Bankr. N.D. Ill. 2007), the court concluded that the debtor's duty to preserve certain documents that were relevant to a creditor's administrative claims arose at the time such claims were filed or a short period thereafter, even though an objection to the claim had not been filed (and thus, a contested matter had not yet been initiated). <u>Id.</u> at 844.  In reaching this conclusion, the court relied on the fact that the particular administrative claim "contained sufficient information to put [the debtor] on notice that litigation was likely." <u>Id.</u> at 844-45 ("Given the rather detailed allegations in this

particular proof of claim, together with the multimillion dollar exposure claimed. . . it should not have taken long to identify this claim as one 'likely' to be litigated.").

35.     Likewise, in <u>Quintus Corp. v. Avaya, Inc. (In re Quintus Corp.),</u> 353 B.R. 77 (Bankr. D. Del. 2006), the defendant-purchaser, who had assumed certain of the debtor's liabilities in connection with its purchase of the debtor's assets, destroyed certain books and records prior to the date on which it paid the liabilities it had assumed in full.  <u>Id.</u> at 83-84.  The trustee commenced an adversary proceeding against the purchaser for failing to pay the assumed liabilities and sought production of documents in order to support its claims.  <u>Id.</u> at 82-83.  The court concluded that the destroyed books and records were relevant to the claims and that the purchaser should have anticipated litigation over its failure to comply with the asset purchase agreement.  <u>Id.</u> at 84, 93.  Moreover, even though there was no evidence that the purchaser had destroyed the books and records in order to suppress the truth from discovery, the court determined that "the most severe sanction" was warranted and entered judgment in favor of the trustee for the full amount of the claims listed on the debtor's schedules and claims register.  <u>Id.</u> at 93-94.

36.     In this case, the Debtors have been on notice for, at a minimum, over a year -- since September 30, 2009, the date when the Trustee and PPF filed its first Claims against the Debtors -- that litigation would be likely, thus triggering the Debtors' preservation duty.  As in <u>Kmart</u>, the UK Pension Claimants filed extremely detailed proofs of claims for a debt estimated to be in excess of $3 billion.  Based on the specificity of the filed Claims and the substantial sum of money at issue, it has been plainly obvious to the Debtors that the Claims would be litigated. The Debtors' obligation to preserve documents therefore attached, at the latest, shortly after the filing of the UK Pension Claimants' proofs of claim.

37.     Even if the Debtors' document preservation obligations had not been triggered by the UK Pension Claimants' filing of the Claims, the service of the Warning Notice on NNI and NN CALA, and the litigation of the Automatic Stay Motion and the ensuing appeal have all provided clear and unequivocal notice that the Claims will be litigated.

38.     Had the Debtors filed a formal objection to the Claims, the UK Pension Claimants would have the ability to take discovery now.  The fact that the Debtors have not yet done so does not relieve them of their duty to preserve evidence that may be relevant to the Claims. Their duty to preserve potentially relevant documents cannot depend on the date they choose to file a formal objection to the Claims -- a date entirely within their control.  See, e.g., In re Kmart Corp., 371 B.R. at 845 ("[S]etting the 'trigger' in this matter as the objection filing date…, as urged by [the debtor], seems equally unreasonable, not only because the objection deadline may be months or even years after the claim was filed, but also because the onset of the duty would then be largely in [the debtor's] control."); Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) ("A plaintiff's duty is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation.").

39.     The preservation duty is broad, as it extends to all evidence which "might be relevant" to the issues in anticipated litigation.  In re Weschler, 121 F. Supp. 2d at 415; Victor Stanley, 2010 WL 3703696, at *23 ; Pension Comm., 685 F. Supp. 2d at 466; Zubulake, 220 F.R.D. at 217, 218 (stating that "anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary.").  "Relevant" documents include:

> [A]ny documents or tangible things (as defined by [Fed. R. Civ. P. 34(a)]) made
> by individuals likely to have discoverable information that the disclosing party

> may use to support its claims or defenses.  The duty also includes documents
> prepared *for* those individuals, to the extent those documents can be readily
> identified (e.g., from the "to" field in e-mails).  The duty also extends to
> information that is relevant to the claims or defenses of any party, or which is
> relevant to the subject matter involved in the action.  Thus, the duty to preserve
> extends to those employees likely to have relevant information -- the "key
> players" in the case.

Zubulake, 220 F.R.D. at 217-18 (quotations and footnotes omitted) (emphasis in original).

40.     Thus, the Debtors are required to place -- if they have not done so already -- a litigation hold on all documents that might be relevant to the Claims.  Rambus Inc., 255 F.R.D. at 148 ("[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.") (citing Zubulake, 220 F.R.D. at 218).  The UK Pension Claimants have not had access to the Debtors' documents, but they submit that at least the categories of documents identified on Exhibit A should be subject to a litigation hold.[8]  Sampson v. City of Cambridge, Md., 251 F.R.D. 172, 181 (D. Md. 2008) (holding that even though the plaintiff had not yet filed a complaint, the defendant's duty to preserve evidence arose when the plaintiff's counsel requested by letter that the defendant preserve relevant evidence, if not earlier).[9]

**The Document Disposal Procedures Are Inadequate to Satisfy the Debtors' Document Preservation Duty.**

41.     The proposed order provides that the Debtors shall retain any document/data that "in the Debtors' reasonable business judgment, has the potential to assist in the claims analysis or relates to certain post-petition asset sale transactions or litigations brought against the

---

[8]     The Debtors have an independent duty to preserve relevant documents, and the UK Pension Claimants' efforts to identify categories of relevant documents are not intended to circumscribe the scope of that duty in any manner.

[9]     Of course here, the UK Pension Claimants have filed the functional equivalent of a complaint in the form of their proofs of claim.

Debtors' estates." (Motion Ex. A (Proposed Form of Order) ¶ 2.) Although the business judgment standard may be applicable to the Court's review of the Debtors' decision to abandon and destroy documents pursuant to Sections 554 and 363 of the Bankruptcy Code, it is not the standard by which the Debtors are obligated to exercise their duty to preserve potentially relevant documents.[10] Rather, the Debtors are required to exercise "reasonable and good faith efforts to retain information that may be relevant to pending or threatened litigation" considering factors such as "the nature of the issues raised in the matter, experience in similar circumstances, and the amount in controversy" and "the costs and burdens of preservation." Victor Stanley, 2010 WL 3703696, at *24, 26 (internal quotations and citations omitted) (stating further, "A party breaches its duty to preserve relevant evidence if it fails to act reasonably by taking positive action to preserve material evidence.").

42.    Just as a seemingly innocuous document retention policy cannot shield a party from liability for destroying documents that it knew or should have known would become material at some point in the future, Rambus, 255 F.R.D. at 148, the Debtors cannot hide behind their business judgment if evidence that will be material to unresolved claims will be lost.

43.    Creditors should not be required at this early stage of the claims resolution process to accept the Debtors' parochial conclusions about what "has the potential to assist in the claims analysis." Instead, the Debtors should be required to maintain their records, at least for

---

[10]    Even a debtor's exercise of its business judgment is not without bounds and does not immunize the debtor from scrutiny. Rather, the business judgment test requires the finding that a "*good business reason* exists for abandonment… after consideration of *all salient factors*" in order for the court to approve the abandonment. In re Beker Indus. Corp., 64 B.R. 900, 908 (Bankr. S.D.N.Y. 1986) (emphasis added), rev'd on other grounds, 89 B.R. 336 (S.D.N.Y. 1988); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153-54 (D. Del. 1999) (in considering whether a sound business purpose exists, a court should "consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.") (quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).

now, for several reasons.

44.     First, the Debtors' request to abandon and dispose of their documents and data is premature.  Although there may come a time, after the claims resolution process has been substantially completed, when it would be justified to reduce the Debtors' record keeping responsibilities, that time has not arrived.  Relief similar to that sought in the Debtors' Motion has been granted in other bankruptcy cases in this district, but typically only during the post-confirmation stage.  See, e.g., In re RCC Liquidating Corp., No. 09-10617-MFW (May 26, 2010) (post-confirmation, substantially all assets sold); In re BWI Liquidating Corp., No. 09-12526-MFW (March 16, 2010) (post-effective date); In re Fedders N. Am., Inc., No. 07-11176-BLS (May 25, 2010) (post-effective date); In re Teleglobe Commc'ns Corp., No. 02-11518-MFW (Aug. 24, 2010) (post-effective date, claims resolution process completed); cf. In re Goody's LLC, No. 09-10124-CSS (Apr. 24, 2009) (debtors had previously filed and emerged from bankruptcy, then re-filed in order to liquidate business); compare with In re Powermate Holding Corp., No. 08-10498-KG (motion filed May 15, 2008) (following objection by U.S. Trustee that no plan or disclosure statement had been filed and that potential chapter 7 trustee may require records if case is converted, motion adjourned indefinitely).

45.     Second, reviewing the documents and data, at this juncture, while the claims resolution process is still in its nascent stages, would require the Debtors to determine whether each document might be relevant to any of the issues underlying any of the 5,000 outstanding claims that have not been resolved (as of June 30).  The substantial number of claims and underlying theories would present a difficult, time-consuming and resource-intensive undertaking for the Debtors -- one that would likely consume much of the cost-savings the Debtors hope to achieve by implementing the Document Disposal Procedures.

46.     Third, the amount in controversy -- namely, $16 billion of unresolved claims (as of June 30) including the UK Pension Claimants' $3.1 billion claim -- far outweighs the $75,000 per month cost of retaining the documents/data.  Victor Stanley, 2010 WL 3703696, at *24 ("[T]he scope of preservation should somehow be proportional to the amount in controversy and the costs and burdens of preservation.") (internal citation omitted).  The incremental costs of retaining the documents over the potential savings that would inure to the estate's benefit are hardly burdensome for an estate of this size, and given the substantial value and benefit that preserving the documents/data would have on the claims resolution process, abandonment is not justified under Section 554.

47.     Lastly, the consequences of inadvertently destroying relevant evidence are substantial, not only for claimants like the UK Pension Claimants, whose ability to establish their claims against the Debtors could be irreparably compromised, but for the Debtors as well, who could face sanctions for breaching their preservation duty by destroying relevant evidence or allowing relevant evidence to be destroyed.  See, e.g., In re Wechsler, 121 F. Supp. 2d at 415 (court held that disposal of the evidence substantially prejudiced the claimants by preventing them from establishing their claims, warranting sanctions); Quintus Corp., 353 B.R. at 93 (destroyed evidence went "to the heart of the Trustee's suit" and warranted "the most severe sanction of judgment" against the defendant); Howell v. Maytag, 168 F.R.D. 502, 505-06 (M.D. Pa. 1996) (destruction of evidence prejudiced defendant, denying it the opportunity to search for alternative causes of damage that were crucial to its defense, requiring sanctions in the form of jury instruction on spoliation of evidence).

**The Debtors' Procedures Impermissibly Shift the Burden and Costs of Discovery to Claimants.**

48.     Once the preservation duty is triggered, the party in possession of documents and

data has an affirmative "obligation to identify, locate, and maintain, information that is relevant to specific, predictable, and identifiable litigation." <u>Victor Stanley</u>, 2010 WL 3703696, at *23.

49.     Under the Document Disposal Procedures, the Debtors propose to file and serve notices ("<u>Document Disposal Notices</u>") containing a general description of the files they intend to abandon or destroy.[11]  Parties wishing to object must do so in writing and must serve their objections on five separate recipients (located in three separate countries) such that the notices are received no later than 20 days after the filing of the Debtors' Document Disposal Notices. Upon receipt of such an objection, the Debtors, in their sole discretion, can determine whether or not to allow the objecting parties to inspect the documents slated for destruction.  The expenses associated with any such inspection, if permitted by the Debtors, must be borne by the objecting party.

50.     The Debtors have not demonstrated any justification for imposing such one-sided and onerous procedures on creditors.  In particular, the Debtors cite no authority for the proposition that the costs entailed in satisfying their duty to preserve potentially relevant documents can be unilaterally shifted to claimants.  In fact, the law is to the contrary. <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 358 (1978) (stating presumption that "the responding party must bear the expense of complying with discovery requests…."); <u>Gembitsky v. DeSteph (In re DeSteph)</u>, 425 B.R. 39, 50 (Bankr. D.N.H. 2010) (concluding that limited circumstances that would justify shifting costs of production to requesting party, such as when responding party shows production would cause an undue burden or cost, were not present);

---

[11]     Although Bankruptcy Rule 6007 requires the Debtors to provide notice to "all creditors", the Document Disposal Procedures propose only to provide notice to certain specific parties as well as Bankruptcy Rule 2002 notice parties, which include "creditors who have appeared and specifically sought such notice in these cases."  (Motion ¶ 46).  Thus, under the Debtors' proposal, even the basic safeguard of providing the Document Disposal Notices will not be afforded to a substantial body of creditors.

<u>Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.</u>, 222 F.R.D. 594, 603 (E.D. Wis. 2004)
(stating, in the context of production of electronic discovery, that courts should only issue an
order shifting the costs of production when a request "truly threatens to subject the responding
party to undue burden or expense," and finding no such threat present).

      51.     Moreover, the form of Document Disposal Notice that the Debtors have proposed
is inadequate to provide claimants with sufficient information to determine whether documents
that may be relevant to their claims are slated for destruction.  It is inadequate for at least the
following reasons:

      a.     First, the proposed Document Disposal Notice contains only very
general descriptions of the types of documents or data to be disposed of -- *e.g.*,
"Banking records," "Invoices," "Agreements; employment" and "Hard Drives" --
along with a "date range" for these documents.  These general descriptions are
inadequate and do not provide anything close to the kind of meaningful
description that would allow claimants to determine the relevance of these
documents to their claims, let alone whether the Debtors are truly exercising their
reasonable judgment in destroying these documents.

      b.     Second, it is clear from the notices that the Debtors do not intend
to itemize each folder or box, let alone each document that they propose to
destroy, but merely propose to rely on these general document type descriptions,
which could pertain to as little as one document or as many as hundreds or even
thousands of boxes of documents.

      c.     Third, as for the other categories of information that the proposed
Document Disposal Notice would contain, it is entirely unclear how any of these

categories would help a claimant decide whether the listed documents may be relevant to its claim: "Storage Location," "Date Submitted to Storage," and "Number of Boxes."  The inclusion of a catch-all "General Comments" column does nothing to assuage these concerns.

Each of these deficiencies materially increases the risk that records that may be relevant to the Claims of the UK Pension Claimants and other creditors will be destroyed.

52.    If the Court is otherwise disposed to grant the Motion, the relief granted should require the Debtors to, at a minimum, itemize each box and subfolder, if not document, that it proposes to destroy (or in the case of electronic data, each hard drive, disk or tape and subfolder), and provide descriptions of, at a minimum, (1) the types of documents/data contained therein, (2) the subject matter of the documents/data, (3) the date or date ranges of the documents/data, (4) the estimated volume of the documents/data, (5) the name of the person to whom the documents/data belonged, (6) such person's department and (7) the name of the Nortel entity who owns the documents/data.

## CONCLUSION

WHEREFORE, the Trustee and the PPF respectfully request that the Court deny the Motion in its entirety.  In the alternative, the Trustee and the PPF request that any relief granted by the Court requires that the Debtors (i) acknowledge their obligation to preserve documents that may be relevant to unresolved claims, (ii) place a litigation hold on all documents that may be relevant to the Claims including, but not limited to, the documents identified on Exhibit A ,and (iii) amend the form of Document Disposal Notices to provide sufficient descriptions of the documents/data that the Debtors propose to destroy in order to allow claimants to determine whether such documents are likely to be relevant to their claims.

Dated:  Wilmington, Delaware
        October 7, 2010

                               BAYARD, P.A.

                               */s/ Justin R. Alberto*
                               Charlene D. Davis (No. 2336)
                               Justin R. Alberto (No. 5126)
                               222 Delaware Avenue, Suite 900
                               Wilmington, Delaware 19899
                               Tel: (302) 655-5000
                               Fax: (302) 658-6395

                               -and-

                               WILLKIE FARR & GALLAGHER LLP
                               Marc Abrams
                               Brian E. O'Connor
                               Sameer Advani
                               787 Seventh Avenue
                               New York, New York 10019
                               Tel: (212) 728-8000
                               Fax: (212) 728-8111

                               *Counsel for the Trustee of Nortel Networks UK*
                               *Pension Plan and the Board of the Pension*
                               *Protection Fund*