# EXHIBIT B

| DETERMINATION NOTICE<br>Issued pursuant to section 96 of<br>the Pensions Act 2004 ("the Act")<br>in respect of<br>Nortel Networks UK Pension Plan<br>("the Scheme") | Internal case reference:<br><br>TM 6409 |
|---|---|

1.   Following an oral hearing before the Determinations Panel (the "Panel") on 2 June 2010 the Panel in exercise of its powers pursuant to Sections 10, 43 and 96 of the Act hereby gives notice of its Determination.

2.   The reasons of the Panel have been issued separately.

**DEFINITIONS**

3.   "The Targets" means the list of companies set out in Appendix A to this Determination Notice.

**DETERMINATION**

4.   In respect of those of the Targets as are listed in Section 1 of Appendix A, The Pensions Regulator has not pursued its case for a Financial Support Direction and no Determination is therefore made.

5.   In respect of those of the Targets as are listed in Section 2 of Appendix A, a Financial Support Direction will be issued pursuant to Section 43 of the Act against those Targets. Such issue is not to take place during the period within which this Determination may be referred to the Upper Tribunal (Tax and Chancery) (the "Upper Tribunal") or, if this Determination is so referred, until the final disposal of the reference and of any appeal against the Upper Tribunal's decision.

6.   The period of time in which the Targets as listed in Section 2 of Appendix A should put financial support in place for the Scheme, pursuant to Section 43 (8) of the Act, will be specified in the Financial Support Direction as 6 months.

7.   Any person who receives this Determination Notice as a directly affected person (pursuant to Section 96(2) (d) of the Act), or any person who appears to the Upper Tribunal to be directly affected by this Determination, may refer this Determination to the Upper Tribunal.

| | |
|---|---|
| Name | Geoffrey Fitchew |
| Position | Chair |
| Signature | .................................. |
| Date | 25 June 2010 |

DM: 1694856                                             1

**Appendix A**

The Target Companies are as set out below.

Section 1:

| | |
|---|---|
| Nortel Communication Holdings (1997) Limited (in Israeli Administration) | Nortel Telecom International Limited |
| Nortel Networks Israel (Sales and Marketing) Limited (in Israeli Administration) | Nortel Networks Ukraine Limited |

Section 2:

| | |
|---|---|
| Nortel Networks Corporation (in CCAA proceedings) | Nortel Networks Limited (in CCAA proceedings) |
| Nortel Networks Incorporated (in Chapter 11 proceedings) | Nortel Networks CALA Incorporated (in Chapter 11 proceedings) |
| Nortel GmbH (in UK Administration) | Nortel Networks NV (in UK Administration) |
| Nortel Networks SpA (in UK Administration) | Nortel Networks BV (in UK Administration) |
| Nortel Networks Hispania SA (in UK Administration) | Nortel Networks Polska Sp z.o.o. (in UK Administration) |
| Nortel Networks International Finance & Holdings BV (in UK Administration) | Nortel Networks France SAS (in UK Administration) |
| Nortel Networks (Ireland) Ltd (in UK Administration) | Nortel Networks SA (in UK Administration) |
| Nortel Networks AG | Nortel Networks O.O.O. |
| Nortel Networks (Austria) GmbH (in UK Administration) | Nortel Networks South Africa (Proprietary) Limited |
| Nortel Networks Slovensko s.r.o (in UK Administration) | Nortel Networks (~~Scandinavia~~) AS    *Amended together 30/09/2010* |
| Nortel Networks Engineering Service Kft (in UK Administration) | Nortel Networks AB (in UK Administration) |
| Northern Telecom France SA | Nortel Networks s.r.o. (in UK Administration) |
| Nortel Networks Portugal S.A. (in UK Administration) | |

REASONS of the

DETERMINATIONS PANEL of

THE PENSIONS REGULATOR

in relation to the Determination

Notice issued on

25 June 2010

NORTEL NETWORKS UK PENSION

PLAN

(the "Scheme")

*All references to section numbers below are to those of the Pensions Act 2004 save for references to "Section 75" which are references to Section 75 of the Pensions Act 1995 and save as otherwise indicated.*

The Pensions
Regulator
case ref:

TM6409

## Introduction

1.  The Nortel Group (the "Group") was once a leading presence in the telecommunications and networks industry.  The Group operated across many different countries including (a) North America, (b) Europe, the Middle East and Africa ("EMEA") and (c) the Caribbean and Latin America ("CALA").

2.  However, many of the members of the Group have entered into formal insolvency processes in the UK, North America and elsewhere.  One of those companies, Nortel Networks UK Limited ("NNUK"), was the principal employer of the Scheme.  At the time NNUK entered administration, on 14 January 2009, the Scheme's deficit was approximately £2.1 billion if valued in accordance with Section 75.

3.    Based on the current funding level of the Scheme, the present trustee of the Scheme (the "Trustee") is not able to pay the Scheme members their full benefits.  In such circumstances, the cost of those benefits would have to be borne, in part, by The Pension Protection Fund ("PPF").  One of the statutory objectives of The Pensions Regulator ("TPR") is to protect the benefits of members of occupational pension schemes.  Another is to reduce the risk of situations arising whereby compensation would become payable by the PPF.  TPR has sought to further its objectives by requesting that we, the Determinations Panel (the "Panel"), issue a Financial Support Direction ("FSD") pursuant to Section 43 against a number of companies within the Group ("the Target Companies").

4.    On 2 June 2010 we convened an oral hearing to hear evidence and submissions as to whether we should issue an FSD against any of the Target Companies.

5.    At the oral hearing TPR was represented by Ms Raquel Agnello QC, Mr Jonathan Hilliard and Mr Thomas Robinson.  The Trustee was represented by Mr Michael Tennet QC and Mr Edward Sawyer.  None of the Target Companies participated in the oral hearing although representatives from Herbert Smith LLP (solicitors acting for some of the Target Companies in the EMEA region) and Ernst & Young LLP (administrator of some of the EMEA Target Companies) were present as observers.

6.    We have been presented with extensive written representations and evidence in the form of witness statements, expert reports and documentary evidence by both TPR and the Trustee.  We heard oral evidence from Ms Wendy Nicholls, an expert in transfer pricing, who had given written evidence on behalf of the Trustee.  We also heard oral submissions from both TPR and the Trustee.  Although we do not refer exhaustively in the following discussion to the evidence and submissions presented to us by the parties, we have taken all of that evidence and those submissions into account when reaching our conclusions in this case.

7.    Before we discuss the evidence and submissions and our findings, we first set out our understanding of the identity and status of the directly affected parties and their level of participation in the process before us.

**The Parties**

8. It is convenient to consider the Target Companies as falling into three broad categories defined by their geographical location, namely:

8.1. Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") (together "the Canadian Entities"); these companies were incorporated in Canada and are the two ultimate parent companies of the Group;

8.2. Nortel Networks Inc ("NNI") and Nortel Networks (CALA) Inc ("NN CALA") (together "the American Entities"); these companies were both incorporated in the USA – NNI was the Group's operating company in the US and NN CALA operated in the Caribbean and Latin American area. As explained below, NN CALA sold products which were based on European rather than American technical standards;

8.3. The following companies (with their country of incorporation in parenthesis) which operated in the EMEA region (together "the EMEA Entities"):

- Nortel Networks International Finance & Holding BV – (Netherlands);
- Nortel GmbH – (Germany);
- Nortel Networks SpA – (Italy);
- Nortel Networks Hispania SA – (Spain);
- Nortel Networks AG – (Switzerland);
- Nortel Networks (Austria) GmbH – (Austria);
- Nortel Networks Slovensko sro – (Slovakia);
- Nortel Networks Engineering Service Kft – (Hungary);
- Nortel Networks NV – (Belgium);
- Nortel Networks BV – (Netherlands);
- Nortel Networks Polska SP zoo – (Poland);
- Nortel Networks OOO – (Russia);
- Nortel Networks South Africa (Proprietary) Limited – (South Africa);
- Nortel Networks AS – (Scandinavia);
- Nortel Networks AB – (Sweden);
- Nortel Networks sro – (Czech Republic);
- Nortel Networks Portugal SA – (Portugal);
- Nortel Networks SA – (France);
- Nortel Networks France SAS – (France);

- Northern Telecom France SA – (France);
- Nortel Networks (Ireland) Limited – (Republic of Ireland).

9.  By the time of the oral hearing TPR had decided not to pursue the following four companies in the EMEA region (with their country of incorporation in parenthesis); accordingly, references below to the EMEA Entities exclude these companies unless the context requires otherwise:

- Nortel Communications Holdings (1997) Limited – (Israel);
- Nortel Networks Israel (Sales and Marketing) Limited – (Israel);
- Nortel Networks Ukraine Limited – (Ukraine);
- Nortel Telecom International Limited – (Nigeria).

10.  In light of TPR's indication that it no longer seeks an FSD against the four companies named in the previous paragraph, we have made no determination in respect of those companies.

11.  In addition to the Target Companies, the other directly affected parties are the PPF and the Trustee. The PPF did not make any representations to the Panel.

12.  We note here that we have been provided by TPR with a helpful chart showing the structure of the Group as at 11 February 2009 (Appendix 3 to the Warning Notice) which sets out the position of each of the Target Companies in relation both to each other and to the other companies in the Group. Appendix 3 also contains a useful table, which sets out the financial circumstances of all the Target Companies after they had entered insolvency proceedings.

**The participation of the Target Companies and the Trustee**

13.  The Canadian and American Entities are currently in insolvency proceedings in their respective jurisdictions. As a result of those proceedings, as we understand it, there is a stay or moratorium on certain types of proceedings against them. The Canadian and American Entities have obtained orders in their respective jurisdictions to the effect that any FSD we are minded to issue will be void in those jurisdictions. They have chosen not to participate before the Panel either by way of written representation or at the oral hearing.

14.    We have been informed that TPR and/or the Trustee are currently appealing the various orders made in Canada and the USA. However, the Trustee's express position, pending the outcome of those appeals, is that it does not put forward any case in relation to the Canadian or American Entities. The Trustee has only advanced a case in relation to the EMEA Entities; it supports TPR's request for an FSD only in respect of these entities. TPR has advanced a case for an FSD against all of the Target Companies.

15.    Finally, we deal with the position of the EMEA Entities. Initially, Herbert Smith LLP indicated, on behalf of most (but, as far as we are aware from the correspondence, not all) of the Target Companies in the EMEA region that they had strong grounds to oppose the imposition of an FSD against them. However, on 10 May 2010 Herbert Smith LLP wrote to the Panel's support team in the following terms:

   *"We are writing to inform the Panel that, whilst they* [i.e. the EMEA Target Companies represented by Herbert Smith LLP] *do not consider that there is any basis for an FSD to be imposed against them, the EMEA Entities have decided, for practical and commercial reasons, that they do not propose to make representations to the Panel in the DP Proceedings."*

16.    Accordingly, with one exception, none of the EMEA Entities put forward any substantive representations to the Panel and nor did any of them (save for the observers from Herbert Smith LLP and Ernst & Young LLP) participate in the oral hearing. The one exception was Nortel Telecom International Limited (a Nigerian company) which submitted brief written representations resisting the issue of an FSD against it; in any event, as noted above, TPR no longer pursues that company.

17.    Even though they have, to somewhat varying degrees, not actively participated in these proceedings, each of the Target Companies was sent the Warning Notice, has been kept informed of the progress of the proceedings and has either been sent, or invited to request, all of the material that has been submitted to the Panel. The Target Companies were also invited to attend the oral hearing but declined to do so save for the attendance of observers as set out above.

18.    We have decided, having considered the submissions of TPR and the Trustee, to deal with the non-participation of the Target Companies in the following way. First,

despite the absence of any active challenge from any of the Target Companies, it is still for TPR (and the Trustee in so far as it supports TPR's case) to persuade us that it is appropriate to issue an FSD in this case in relation to each of the Target Companies. Secondly, we agree with the Trustee's submission that the correct approach to uncontested evidence is for us to accept it save where we consider parts of the evidence to be either inconsistent or manifestly incredible.

19. We should also stress that much of the evidence and representations which have been submitted to us are based on the Group's own documentation in submissions to the regulatory or tax authorities or on documentation submitted by representatives for the individual companies to the UK or North American courts in insolvency proceedings. Where necessary, we refer specifically to that documentation but, as already noted above, we will not attempt exhaustively to repeat the underlying documentation in these Reasons.

## Factual background

20. We now turn to consider, relatively briefly, the relevant factual background, and in particular:

   20.1.  the Group and its origins;

   20.2.  the international expansion of the Group;

   20.3.  the structure of the Group;

   20.4.  NNUK's responsibilities for the EMEA Entities;

   20.5.  examples of NNUK's role in supporting the EMEA Entities' sales and marketing and allocation of contracts;

   20.6.  other services provided by NNUK to the EMEA Entities;

   20.7.  provision of sales and marketing services and other benefits to NN CALA and NNI;

   20.8.  NNUK's cost structure;

   20.9.  transfer pricing systems;

   20.10. NNUK's intercompany loan to NNL and "Project Swift";

   20.11. the insolvency of the Group;

   20.12. the Scheme.

**The Group and its origins**

21.     As set out above, the Group is involved in the global supply of networking solutions including telecommunications, computer networks and software. The ultimate parent of NNUK is NNC which is a Canadian registered company, which was listed on both the Toronto and New York stock exchanges. NNUK is wholly owned by NNL which, in turn, is wholly owned by NNC. The Group is comprised of NNC and over 140 subsidiaries.

22.     Although we discuss this in more detail below, the Group was run along business lines rather than corporate lines. Essentially, the Group was run as an integrated global organisation with each member of the Group being treated as part of a common endeavour rather than a distinct corporate entity with its own interests. This integrated approach was adopted from about 1996 onwards and from 2000 the Group was integrated to such an extent that the legal status of the individual corporate entities was largely ignored. We note, for example, that Mr Timothy Watkins, who was an employee of NNUK, states in his witness statement that:

        *"NNUK was not itself a significant decision making entity. So far as I am aware, the Board of Directors did not exercise executive decision-making power and, like the Boards of other EMEA entities, was responsible solely for the statutory functions of the specific legal entity, such as signing off the accounts. So far as I could tell as I became more senior within the organisation they certainly had no obvious role to play in the governance or operational strategy of the Nortel Group."* [1]

23.     The Group was founded in Canada as the Bell Telephone Company in 1895 and became Northern Telecom Limited in 1976 having expanded into the US, China and Japan. Business began in the US in 1971 with the incorporation of a subsidiary called Northern Telecom Inc but rapidly expanded with the decision of AT&T to undertake a corporate restructuring which opened the US market to NNC. This sort of deregulation dramatically improved NNC's customer base. Similar deregulation was occurring in the UK where, prior to 1991, NNC had only a minor presence in the form of a research and development facility ("R&D") in Maidenhead. This made the UK an attractive market as the Group's filing for the US Securities and Exchange Commission explains:

---

[1]    Bundle B, Tab 6, Paragraph 32.

> *"....in many countries, of which the United Kingdom, Germany, France, Japan and Australia are examples, an increasing trend towards privatization and deregulation of telecommunications operations and the emergence of agreed-upon international standards are expected to facilitate access by non-traditional suppliers. Northern Telecom selects countries for major international marketing efforts based upon careful evaluation of such factors as product suitability, market opportunities, competition and the business and political environment."[2]*

24.   In keeping with this policy, the Group decided to take advantage of the deregulation of the UK and to pursue its expansion into the EMEA region.

### The international expansion of the Group

25.   In 1987 the Group owned a 27.1% stake in STC plc ("STC") which was a major UK public telecommunications company. However, in 1991 the Group acquired the remaining shares of STC for $2,609 million. This represented the Group's first major step into the UK market and gave the Group ownership of a number of additional significant R&D facilities throughout the UK and also ownership of STC's existing and future patents and other technology. TPR, in the Warning Notice (at paragraph 36), summarises the effect of STC's acquisition on the Group as a whole:

> *"The acquisition of STC, coupled with Nortel's pre-existing operations in the UK as at 1991, resulted in successful expansion into the UK telecoms and networking market, followed by further success in the EMEA region. This brought with it customer connections with large European carrier companies such as BT, Cable & Wireless and Telefonica, together with ownership of products that met ETSI[3] standards rather (sic) those set by ANSI[4]. These connections and products in turn allowed Nortel to grow in the North American and CALA regions."*

26.   In particular, the acquisition of STC gave the Group, as set out in the Warning Notice (at paragraph 41), access to significant R&D assets:

---

[2]   Trustee Bundle 1, Tab 2, Page 9, Paragraph 24 quoting from NNL's Form 10-K US SEC filing for 1990.
[3]   European Telecommunications Standards Institute – which sets the standards in EMEA and CALA (and everywhere else apart from North America and Japan).
[4]   American National Standards Institute – which sets the standards in North America (and Japan).

*"... STC's research and development capabilities were world class. One of the three winners of the Noble Prize for Physics in 2009 is a British former director of research at the Standard Telecommunications Laboratories in Harlow, part of STC. This prize was awarded to Charles Kao for work on fibre-optic transmission, which was an area in which STC brought experience, products and patents to Nortel as a result of the acquisition."*

27.   The effect of the purchase of STC was reflected in the Group's sales figures. European revenues (which included Africa, the Commonwealth of Independent States and the Middle East) in the year to 31 December 1991 were US$1.35 billion, an increase of 514% from the previous year. These revenues accounted for 17% of the Group's total revenue. By way of example, during the 1990s the Group also benefited substantially from its acquisition of STC in the following ways:

27.1.   the fibre optic technology which it had acquired from STC;

27.2.   from the introduction into the US market of the GMS mobile phone technology developed by NNUK in collaboration with Matra and from NNUK's work in converting Nortel's switching products to comply with ETSI standards;

27.3.   from the work of NNUK's R&D teams, whose output per head and relative to their R&D expenditure, as measured by new patents, was superior to that of the Group's other R&D centres.[5]

28.   The fortunes of the Group were summarised by Mr John Doolittle (Treasurer of the Canadian Entities), in his affidavit sworn on 14 January 2009, as follows:

*"From the mid-1980s to 2000, the Nortel Companies expanded substantially, helping to lead the telecommunications boom, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age. Expanding from its Canadian base, North American operations were expanded into the Unites States. At the same time, the Nortel Companies moved aggressively into Europe, Asia, Africa and Latin America, becoming a truly global enterprise and generated significant revenue in areas such as Asia where other North American companies had been unable to penetrate markets."*[6]

---

[5]   See bar chart and table in Warning Notice, Pages 56-57, Paragraph 139.
[6]   Bundle 1, Tab 1, Paragraph 8.

29.     In short, the Group had gone from being a significant presence in the North American market to a significant international company and a world leader in many of its market fields.

**The structure of the Group**

30.     As set out above, the Group operates on business lines rather than by reference to legal entities.  Mr Alan Bloom, joint administrator of NNUK and some of the EMEA Entities, explained in a witness statement in support of the administration of NNUK and other Target Companies, that:

> "… the Nortel Group operated along global business lines and not generally by legal entity, the Nortel Group has complex inter-dependent trading relationships between the various global entities."[7]

31.     The Group was also horizontally and vertically integrated. It described itself, in an advanced pricing agreement application dated 31 October 2008, in the following terms:

> "Nortel is a Matrix Organisation – Nortel is vertically and horizontally integrated meaning, organizations within Nortel share information and perform common tasks across geographical boundaries. Fully integrated entities performing R&D, manufacturing support and distribution functions interact together to fulfil customer demand for product and services."[8]

32.     The matrix structure manifested itself within the Group by establishing four distinct Lines of Business ("LOBs"), namely:

32.1    Enterprise Solutions;

32.2    Carrier Networks;

32.3    Metro Ethernet Networks;

32.4    Global Services.

---

[7]    Bundle 4, Tab 3, Paragraph 30.
[8]    Bundle 2, Tab 5, Page 607.

33.    The LOBs (the names of which changed from year to year) were the main profit centres in the Group and their leaders in North America effectively managed the Group's business strategy and controlled the budgets and R&D programmes of the regional subsidiaries. The vertically organised LOBs meshed with regionally organised sales organisations, including NNUK.    However, the LOBs were the dominant voice.

34.    The Warning Notice (at paragraph 50) summarises the Group's rationale for adopting this structure in the following way:

> "... the Nortel Group adopted the above matrix structure for its functions because it perceived that considerable benefits would be secured, including: collaboration as to technology, better integration of the Group's functions under product or process teams, more efficient use of corporate resources, economies of scale within functions, better strategic deployment across the whole Group, avoidance of duplication of functions by product or geographical area, and fostering of a collaborative environment."

35.    From 1995-96 onwards[9] NNUK was put in charge (subject to direction from NNL and the LOB hierarchy) of the day to day management of the EMEA region and was regarded as a key operating company within the Group's integrated structure. As such, it was designated as an Integrated Enterprise ("IE") (subsequently renamed as a Residual Profit Entity ("RPE")).    NNL, NNI, Nortel Networks SA ("NN France SA") and Nortel Networks (Ireland) Limited ("NN Ireland") were the other IEs/RPEs. The other categories of company within the Group were classified as Limited Risk Entities, Cost Plus Entities, At Risk Entities and holding companies[10]. Apart from NN France SA and NN Ireland, all the other EMEA Entities managed by NNUK fell into these four categories.

36.    The key feature of an RPE was that it performed R&D for the Group as a whole as well as other key activities such as sales, marketing, administrative and operations functions. The Group, in its advanced pricing agreement application dated 31 October 2008, described the RPEs' activities as follows:

---

[9]  Mr Gareth Pugh: Bundle A, Tab 2, Page 4 Paragraph 13.
[10]  Bundle 1, Tab 2, Page 63, Paragraph 40; their roles are summarised in paragraphs 41-58 of the same document.

> *"in addition to performing ongoing R&D functions, the IEs....perform all functions relating to the customer fulfilment process including manufacturing support and distribution functions both inside and outside of their geographic markets."*[11]

37.     In return for taking these responsibilities the IEs/RPEs were, at least from 2001 if not earlier, given an exclusive license to use the full range of the Group's patents and other technology in their own territories (i.e. for NNUK in the UK) and non-exclusive licenses outside their own territories. The Limited Risk Entities enjoyed non-exclusive licenses in their own territories.[12]

38.     The IEs/RPEs also provided these fulfilment activities across the Group as a whole. The advanced pricing agreement states:

> *"Nortel is organized in a manner that a significant portion of the global support activities such as executive leadership, operations and corporate services are located within NNL and NNI. However, each of the IEs* [i.e. the RPEs] *perform some degree of similar support activities that benefit local revenues and revenues outside their jurisdiction."*[13]

39.     In addition to its status as an RPE, NNUK was also one of four "purchasing hubs" through which sales orders were routed and products ordered and delivered to the local Nortel sales subsidiary.[14]

**NNUK's Responsibilities for the EMEA Entities**

40.     The management and other responsibilities of NNUK for the operations of the EMEA companies were very broad, covering all key primary functions, including sales, finance, treasury, leasehold property, legal and human resources.[15] It is on the basis of their management by NNUK that 18 of the EMEA Entities were able to satisfy the

---

[11] Bundle 2, Tab 5, Page 605.
[12] Bundle 4, Tab 4, Master Research and R&D Agreement.
[13] Bundle 2, Tab 5, Page 650.
[14] Bundle 1. Tab 3, Paragraphs 36-37.
[15] Bundle 1, Tab 2, Pages 59-60, Paragraph 15.

courts in this jurisdiction that England and Wales is their Centre of Main Interests ("COMI") for the purposes of entry into administration here.[16]

**Examples of NNUK's role in supporting EMEA Entities' sales and marketing and allocation of contracts**

41.    Ms Sharon Rolston, in her witness statement, notes that "significant decisions in relation to sales and dealing with customers are largely made in England", i.e. by NNUK.[17] This is supported by evidence from senior NNUK staff.  For example, Mr Timothy Watkins, who was Vice President for EMEA Sales from 1999-2005, notes that circa 1998 he was responsible for trying to win business with Vodafone and that "thanks to the work done by the NNUK sales team Nortel won the contract [with Vodafone] for their Spanish operations which Nortel's Spanish operating company signed."[18]  Mr Timothy Watkins further notes that "the optical R&D teams based in Harlow ... regularly assisted customers such as Swisscom and Telekom Austria and others across Europe."[19]  Mr Gareth Pugh records that EMEA sales and senior marketing executives were nearly all situated in the UK and they provided support to the other EMEA Entities. He mentions an episode circa 1998/1999 when a large bid was prepared to O2 in Germany that crossed product lines. This led to telephone calls involving 40 or 50 people "representing each of the business divisions and EMEA sales.[20]

42.    The contributions made by NNUK staff to winning contracts in the EMEA region did not necessarily lead to NNUK being awarded the contract. Mr Gareth Pugh notes that "the "default" position would be a "local to local" contract (i.e. whereby the local Nortel entity for the customer's jurisdiction would enter into the contract with the customer in that jurisdiction). Most contracts fell into this category."[21]  Mr Gareth Pugh confirms that this was the case even where NNUK had led the sales negotiation as in contracts negotiated with Vodafone in Spain and Portugal.  Mr Gareth Pugh adds that decisions on contract allocation were "always tax driven".

---

[16]  Bundle 1, Tab 2, page 55, Paragraph 2; similar statements confirming NNUK's management role were also made to the English courts by representatives for each of the EMEA companies seeking administration: see Trustee's Representations, Volume 1, Tab 3, page 9, footnote 26.
[17]  Bundle 1, Tab 2, Page 59, Paragraph 15.d.
[18]  Bundle B, Tab 6, Page 19, Paragraph 80.
[19]  Bundle B, Tab 6, Page 9, Paragraph 39.
[20]  Bundle A, Tab 2, Page 11, Paragraph 37.
[21]  Bundle A, Tab 2, Page 14, Paragraphs 47.

**Other Services provided by NNUK to the EMEA Entities**

43.     Mr Gareth Pugh, Mr Mark Cooper and Mr Darryl Edwards provide other examples of
        services provided by NNUK to the other EMEA Entities in relation to preparation of
        annual accounts, taxation questions, legal advice on employment issues and senior
        management's involvement in sales strategy.  These three witnesses and Mr Timothy
        Watkins, all of whom were senior executives, state that they kept no record of the
        hours they worked for other companies in the Group and believe that their full salary
        was met by NNUK. Mr Darryl Edwards, who was President of the EMEA region in
        2006-2008, notes that during the insolvency process "it has proved difficult to allocate
        employees back to the actual cost entity whose work they benefited which needs to
        be done as part of the break up of the business. We have needed to find out for
        example what costs NNUK is funding, in circumstances where employees of NNUK
        were carrying out work that was not necessarily to the benefit of NNUK rather than to
        the benefit of the global Nortel Group. That was of course never an issue while the
        Group was a going concern."[22]

**Provision of sales and marketing services and other benefits to NN CALA and NNI**

44.     As noted in paragraph 36 above, the IEs/RPEs were expected to apply their
        expertise generally within the Group.  The evidence before us includes several
        instances of NNUK providing its sales and marketing expertise and other advice to
        both NN CALA and NNI. For example, Mr David Ball, who was both a director of
        NNUK between October 1994 and the President of the EMEA region from late 1995
        to the end of 1997 states that an NNUK manager, Mr Peter Lyne, was responsible for
        running the Group's global account with Cable and Wireless ("C&W") during this
        period, covering C&W's operations worldwide including Hong Kong and the
        Caribbean. He notes that "Peter's work resulted in significant sales for the Nortel
        Group in the CALA region"[23]. Mr Timothy Watkins notes that NNUK also managed
        the global account for the Spanish company Telefonica, which had a large presence
        in Latin America in the CALA region and that he and other NNUK staff were active in
        "facilitating interaction between the customer's head office and the local [CALA] team

---

[22]  Bundle B, Tab 5, Page 6, Paragraphs 24-25, and 27; see also Bundle A, Tab 2, Paragraph 34 (Mr Gareth
      Pugh), Bundle B, Tab 6, Page 4, Paragraph 18 (Mr Timothy Watkins) and Bundle B, Tab 9, Page 4,
      Paragraph 18.
[23]  Bundle A, Tab 4, Page 11, Paragraph 45.

in the region."[24] NNUK was involved in the CALA region because, as noted in paragraph 8.2 above, countries in this region operated on the basis of the ETSI standards for equipment, on which NNUK supplied the Group's expertise.

45.     NNUK was also active in providing input on both sales and marketing of EMEA products and R&D advice to NNI for the US market.  Mr Timothy Watkins who had collaborated with Matra on GSM mobile phone networks made many trips to the US between 1995 and 1997, advising NNI how they should set up and structure their GSM business and helping to train their sales force.[25] Similarly, Mr Simon Brueckheimer, one of NNUK's leading researchers, was the technical leader who ran the successful responses to bids from AT&T for a VoATM network in 1997 and its upgrading to a VoIP in 1998. His "Next Generation Networks Group" in Harlow also helped with similar requests from Sprint in the US in 1998 and 2000.[26]

46.     In 1998 NNUK carried out R&D work for NNI at a loss of US$17million for the conversion of Nortel switch products to ETSI standards to enable Worldcom, a major client of NNI, to expand into 25 European countries. The Group's CEO approved the contract being carried out a loss, because of the benefits it would bring to the Group in North America through further contracts with Worldcom.[27]   NNUK was not reimbursed for the loss.

**NNUK's cost structure**

47.     Largely as a result of its management responsibilities towards the other EMEA entities and other extraterritorial work, NNUK's cost base was much higher relative to the revenues it received from its own sales to third parties than was the average for the Group as a whole. This is illustrated in the three bar charts, cited in the Trustee's representations, which are taken from the joint application from NNL and NNI of 31 October 2000 to the North American Tax Authorities requesting an "Advanced Pricing Arrangement" for a revised "Transfer Price system."[28]

---

[24]  Bundle B, Tab 6, Paragraph 36.
[25]  Bundle B, Tab 6, Pages 16-17, Paragraphs 66-72.
[26]  Bundle A, Tab 10, Page 15, Paragraph 57.1 and 57.3.
[27]  Warning Notice, Page 45, Paragraph 104 and Bundle A, Tab 1, Pages 6-7, Paragraphs 25-29, Bundle B, Tab 8, Pages 4-5, Paragraphs 20-21.
[28]  Trustee's Representations, Volume 1, Tab 3, Pages 5-6 and Bundle 2, Tab 5, Pages 654, 656 and 659.

48.    These diagrams indicate that in 2007 NNUK had the highest ratios of sales and
       marketing expenses and of operational expenses to third-party revenues of any of
       the RPEs and was second only to NNL as regards the ratio of its general and
       administrative expenses to third party revenues.

**Transfer Pricing Systems**

49.    It is necessary to describe the Group's Transfer Price arrangements in order to
       explain how the Group sought to ensure that the IEs/RPEs, such as NNUK, were
       paid for the goods and services that they supplied within the Group and how, in
       return, they paid for the goods and services that they received from other members
       of the Group.    The mechanisms for providing such compensation were the
       successive Transfer Pricing Arrangements ("TPAs"), which NNL and NNI initially
       negotiated with the Canadian and American tax authorities.

50.    Transfer pricing is used to set the price of goods and services traded between group
       companies. A group's transfer pricing policies may be determined by a number of
       factors, including facilitating company trading.  Transfer pricing is also of major
       interest to tax authorities whose main aim is to satisfy themselves that transactions
       between companies in an international group are conducted and priced in ways
       which do not lead to profits being understated in their jurisdictions.  It is therefore
       important that the relevant tax authorities are satisfied with the transfer pricing
       arrangements of international groups. The guiding principle, recommended by the
       Organisation for Economic Cooperation and Development and followed by most tax
       authorities, is that transactions between companies within a group should, so far as
       possible, be priced as if they were arms' length transactions between independent
       companies.   This is straightforward for routine transactions such as the sale of
       manufactured goods, but much more difficult for "intangibles", such as R&D, where
       the value-added and contribution to profits are difficult to measure, particularly in an
       integrated group such as Nortel. In such situations, proxy variables have to be used
       as a substitute for the price or value-added of the intangible.

51.    The Group's first set of TPAs was centred on a cost-sharing arrangement between
       the Group's main R&D centres, to which NNUK was admitted in 1995 (though the
       Inland Revenue was not apparently formally approached about it until 2002). We rely

for our understanding of this first TPA on a report produced for the Inland Revenue in 2003 by KPMG and on the description and assessment of it by Ms Wendy Nicholls.[29]

52.     There are two main elements in the first TPA which are relevant to our decision:

52.1.    A Cost-Sharing Agreement between the main R&D centres, initially NNL, NNI and (after 1995) NNUK, under which the participants agreed to share their respective R&D costs according to three allocation keys, of which the relative operating earnings of the respective companies was by far the most important (see Appendix 2 to the KPMG report);

52.2.    The European Market Support Group / Product Line Management Cost Sharing Arrangements.  These covered many of the services provided by NNUK to its EMEA partners, such as "bid support", i.e. sales and marketing, new product introduction and technical support. The sales organisations (Limited Risk Distribution companies) were allocated the costs incurred by NNUK at cost without any mark-up or share of contract revenues.  The allocation key was third party customer sales made by the Limited Risk companies.

53.     We received no evidence on the impact of these cost-sharing arrangements on NNUK's profitability, or whether it was a net beneficiary of the TPA, although Table 5 on page 1068 of the KPMG Report showed that NNUK was a net beneficiary from the EMEA cost sharing arrangements in 1998.  Ms Wendy Nicholls, however, comments that these EMEA arrangements were unusually extensive and differed from the normal arms' length arrangements between independent companies, because they provided no element of profit or "mark-up".[30]  We return to this issue later.

54.     The second sets of TPAs were based on the Residual Profit Split Method ("RPSM"), recommended by the Canadian tax authorities, which appear to have been applied since 2001. Our understanding of this approach is based on the description given by Ms Wendy Nicholls in her report and on a request for the renewal of the arrangement

---

[29]  KPMG's Report is at Bundle 3, Tab 3, Pages 1030–1075; Ms Wendy Nicholl's Report is in the Trustee's Representations, Volume 2, Tab 7.
[30]  Trustee's Representations, Volume 2, Tab 7, Page 12, Paragraph 4.10.

made by NNL and NNI to the Canadian and American tax authorities in October 2008.[31]

55.    There are three main features of the RPSM which we consider relevant to our decision. First, the RPSM divides the participants' available pooled profits into two main elements: the routine profits obtained by the participants as measured by market returns, i.e. from their own direct earnings from sales to third parties, and, second, the "residual" or remaining profits (or losses). The latter were shared among the participants on the basis of their relative shares in spending on R&D over a period of past years (or R&D assets in relation to earlier periods). Second, those RPEs, such as NNUK and NNL, which spent more than the Group average on providing extra-territorial services to other companies in the Group, e.g. on sales and marketing, received a mark-up on their "excess" costs (from 2006 to 2008) or a return on their "net assets" (2002- 2005).[32]   The mark-up on excess costs appears to have been 15% (Warning Notice, page 36, paragraph 83). Third, the Group registered losses or at best broke even during the entire period in which the RPSM was in force.

56.    Ms Wendy Nicholls makes a number of criticisms of the RPSM regime to which we return later. However, there is evidence that under the RPSM NNUK was or should have been a net recipient. Mr Alan Bloom, the Administrator of NNUK, states that "of the EMEA Companies in Administration ... NNUK, like NNL, has historically been a net recipient under the Nortel Pricing Regime".[33] This is confirmed for the years 2006-2008 by Ms Wendy Nicholls, who notes that in those years the RPSM "did result in some large credits to NNUK for the "excess" costs it incurred ... Furthermore NNUK's share of the residual loss was small and its "routine" returns for excess costs were larger than its residual loss share."[34]

57.    Payments made by the "debtor" companies under the RPSM were not sent automatically to the recipient companies, but were routed through NNL which acted as a clearing house.[35]   The credits will, however, have been entered in NNUK's annual accounts as explained by Mr Gareth Pugh and have resulted in a change to the company's recorded profits.[36]

---

[31]  Bundle 2, Tab 5, Pages 595-803.
[32]  Ms Wendy Nicholl's Report, Volume 2 of Trustee's Representations, Tab 7, Page 13, Paragraphs 4.17-4.18.
[33]  Bundle 4, Tab 3, Page 1529, Paragraph 57.
[34]  Trustee's Representations, Volume 2, Tab 7, Appendix F, Page 46, Paragraph 29.
[35]  Statement by Mr John Doolittle at Bundle 1, Tab 6, Page 280, Paragraph (i).
[36]  Bundle A, Tab 2, Paragraph 43.

> "The application of the Transfer Pricing methodology resulted in a partial restatement of NNUK's profit and loss account to reflect the allocation of profits and losses around the Group. The Transfer Pricing adjustments were processed through inter-company balances and tax adjustment lines. Huge balances could be built up this way."

58.    The question of how the debts owed to NNUK by NNL arising from the RPSM calculations were settled is discussed below.

**NNUK's Inter-company Loan to NNL and "Project Swift"**

59.    In around 2003, NNUK was obliged by NNL to enter into a large interest free loan to NNL. This was because a large balance had become outstanding from NNL to NNUK, which, according to Mr Gareth Pugh, "NNL either could not or would not pay in cash".[37] This loan was renewed at regular intervals.[38] A similar, but interest-bearing, loan was also made to NNL by NNI. The amount owed by NNL to NNUK arising from the loan facility rose rapidly and reached a peak of £467 million (US$950million) by late 2007. In late 2006 it was decided for tax reasons that part of the loan should be repaid by NNL. In an operation named "Project Swift" this repayment was effected through a purchase by NNUK from NNL of all the shares of its Dutch holding company, NNIFH BV. This meant that NNUK thereby also became the owner of all NNIFH BV's shares in all of the EMEA Entities, except NN France SA and NN Ireland. NNUK agreed a price of US$628.9 million for its purchase of NNIFH BV, which was paid by NNUK discharging NNL from repaying the same amount of the debt owing to NNUK under the revolving loan agreement. The transaction was agreed at a meeting of the NNUK Board on 20 December 2007. A summary of Project Swift prepared for the Board states explicitly that "the receivable [i.e. the £467 million owing to NNUK] has built up over several years as a result of unpaid transfer pricing adjustments".[39]

60.    TPR argues in paragraph 159 of the Warning Notice that "this resulted in NNUK taking ownership of illiquid assets in the form of subsidiary companies, whose value

---

[37] Bundle A, Tab 2, Pages 13-14, Paragraphs 44-47.
[38] A copy of the Revolving Loan Agreement for 2008 is at Bundle 4, Tab 5.
[39] Trustee's Representations, Volume 1, Tab 3, Page 44, Paragraph 143 and footnote 163.

depended on the continued trading of the Group and the continued use of each company for distribution purposes."

61.    We shall return to the question of transfer pricing when we consider the specific issues arising under Section 43 below.    We continue our discussion of the background to this case with the insolvency of the Group which was when the alleged inadequacies of the transfer pricing system manifested themselves.

**The insolvency of the Group**

62.    The Group peaked in 2000 when annual revenue reached a high of £30 billion and the Group employed approximately 93,000 people. However, 2001 saw the Group facing serious problems associated with the rapid decline of the high tech market also known as the bursting of the "dot com" bubble.

63.    In broad terms, the demand for the Group's products dropped significantly and competition increased. In an attempt to revive its fortunes the Group undertook a major restructuring exercise in 2001 and reduced its workforce to 52,600 employees, which represented a reduction of some 44%. This pattern of restructuring continued until 2008, by which time the Group had reduced to about one third of its peak size in terms of employee numbers and manufacturing had been out-sourced or sold off. NNUK suffered a reduction of around 78% in the number of its employees compared with an average of 63% for the group as a whole.[40]

64.    Despite these changes, the Group's operating costs still exceeded its revenues. Ultimately this led to the Group deciding to implement restructuring within various insolvency processes.  This began with NNC and NNL making applications in the Ontario Superior Court of Justice, on 14 January 2009, for relief from their creditors under the Companies Creditors' Arrangement Act.  At the same time NNI and NN CALA filed for protection under Chapter 11 of the United States Bankruptcy Code and NNUK was placed into administration along with 18 other EMEA Entities.

**The Scheme**

---

[40]  See Trustee's Representations, Volume 1, Tab 2, Page 23, Paragraph 68.

65.  The Scheme is a defined benefit occupational pension scheme. It closed to new members in 2000.

66.  NNUK inherited the Scheme from STC and from 1989 until 2002 all the participating employers, including NNUK, enjoyed a contributions holiday. By the time the contributions holiday came to an end the Scheme had a deficit on an ongoing basis of £177 million. An actuarial report, produced by Watson Wyatt, estimated that:

66.1.  the value of the contribution holiday to the various employers was £300 million; and

66.2.  had the contribution holiday not been taken then the Scheme's funding position would have been improved by some £500 million.

67.  In 2002 a contribution of £33 million was made to the Scheme although, on the basis of actuarial advice at the time, that contribution was nowhere near enough to repair the Scheme's deficit. However, in his actuarial report of April 2002, the Scheme actuary emphasised that significant further deficit reductions would be needed to restore funding to 100% on an ongoing basis. Despite this, NNC/NNL refused to put in place any ongoing schedule of contributions which would allow NNUK to restore the Scheme to a 100% funding level on an ongoing basis. The same story was repeated at the valuation in 2003 when the deficit had risen to £346 million. The actuary recommended annual contributions of £47 million, but NNC/NNL made only ad hoc contributions of £60 million in 2003 and £12 million in 2004 with no commitment to a regular schedule of contributions.

68.  The evidence provided by Mr Clive Gilchrist, a company nominated member of the former trustee, and Mr William Hern, an employee nominated member of the trustee, makes it clear that all the major decisions on funding and investment policy were taken by senior NNC/NNL officers, including the Group's CEO. In his witness statement, dated 16 December 2009, Mr Gilchrist states that:

*"It was often made clear to the Trustee (albeit more so in recent years) that if a significant decision needed to be taken in relation to the Plan [ie the Scheme], it would require approval from NNC/NNL. This was normally explained in terms of the fact that NNC/NNL took a global approach to the management of its pension schemes with the declared aim of treating its employees in different countries equally. This was particularly apparent in the context of the funding of the Plan*

*where, as I describe below, the Trustee met resistance to its funding proposals from the senior officers of NNC/NNL on the basis that those proposals were inconsistent with the Nortel Group's global approach or, as it used to be called, the "Common Platform" approach."[41]*

69.    By 2004 the members of the Trustee collectively decided that they must negotiate directly with the NNC/NNL senior executives, with whom they met in Ottawa in December 2004[42], following which further limited contributions were made to the Scheme in 2005.

70.    By the April 2005 valuation the ongoing deficit had risen to £356 million. Following long negotiations with NNC/NNL, the Trustee did manage to secure a funding agreement dated 21 November 2006 with NNUK (although in reality this was only possible because NNC/NNL sanctioned it) whereby contributions of not less than £150 million would be made by April 2008. After 2008 NNL guaranteed contributions up to 2012 based on an assessment of the deficit and guaranteed NNUK's Section 75 debt up to US$150 million. These figures still fell well below the actuary's assessment that a recovery plan of 3 years would require annual contributions of £134 million.[43]  TPR draws the conclusion that "the guarantees given by NNC/NNL on 21 December 2006 are not close to sufficient to meet the section 75 debt".

71.    As at 13 January 2009, the day before NNUK entered administration, the size of the fund was £1.4 billion but the Section 75 debt was of the order of £2.1 billion. It has been estimated[44] that the likely distribution to NNUK's unsecured creditors (including the Scheme) will be of the order of 15%.

## Section 43

72.    Section 43 sets a number of tests which we are required to apply to the facts to determine whether there is a case for issuing an FSD. The following paragraphs explain the conclusions we have reached in relation to each of these tests and our reasoning for them. In doing so we cross-refer as necessary to our findings on the relevant facts, as set out above, on which we rely. The provisions of Sections 43 to

---

[41]  Bundle D, Tab 1, Paragraph 17.
[42]  Bundle C, Tab 3, Page 21, Paragraph 94.
[43]  See Warning Notice and references, Pages 70-72, Paragraphs 174-179.
[44]  Trustee Bundle 2, Tab 6, Page 21.

45 are set out in Appendix 1 to the Warning Notice and we do not propose to repeat them here. We note, however, that the versions appended to the Warning Notice do not appear to incorporate relevant amendments effected by the Pensions Act 2008; we have considered the amended versions where applicable.

73. It appears to us that Section 43 requires us to be satisfied of 4 matters before an FSD can be imposed on any of the Target Companies. Those matters may be summarised as follows:

73.1.  the **Scheme Test** as set out in Section 43(1);

73.2.  the **Target Test** as set out Section 43(5)(a) and (6);

73.3.  the **Insufficiently Resourced Test** as set out in Section 43(2)(b);

73.4.  the **Reasonableness Test** as set out in Sections 43(5)(b) and (7).

74. We discuss below our findings in relation to each of these tests.

**The Scheme Test**

75. Pursuant to Section 43(1) an FSD can only be imposed in relation to an occupational pension scheme, which is defined by reference to Section 1 of the Pension Schemes Act 1993. We have no difficulty in finding that the Scheme is an occupational pension scheme within that definition; Section 43(1) is therefore satisfied.

**The Target Test**

76. In order to issue an FSD against any of the Target Companies we must be satisfied, in the circumstances of this case, that the relevant company was, at the "relevant time", connected with or an associate of NNUK; see Section 43(6)(c). The "relevant time" for these purposes is a period of two years ending with our determination, should we be so minded, to issue an FSD.[45]

77. The meaning of associated or connected is derived from Sections 249 and 435 of the Insolvency Act 1986.[46]

---

[45]  See Section 43(5)(a) and (9) and Regulation 5 of the Pensions Regulator (Financial Support Directions etc) Regulations 2005.
[46]  See Section 51(3).

78.     The position in relation to the Target Companies appears to us to be as follows:

   78.1.   The Canadian Entities: NNUK is a wholly owned subsidiary of NNL which in turn is a wholly owned subsidiary of NNC; both NNL and NNC are associates of NNUK;

   78.2.   The American Entities: NNI is wholly owned by NNL and NN CALA is wholly owned by NNI and therefore ultimately NNL; both are controlled by the same person or persons as NNUK and are therefore associates of NNUK;

   78.3.   The EMEA Entities:

        78.3.1. Nortel Networks SA (the main operating French company) and its subsidiaries Northern Telecom France SA and Nortel Networks France SAS are subsidiaries of and controlled by NNL;

        78.3.2. Nortel Networks (Ireland Limited) is also a subsidiary of and controlled by NNL;

        78.3.3. The other EMEA Entities are subsidiaries of NNUK and are under the same control as NNUK, i.e. they are all controlled by NNL and ultimately NNC;

        78.3.4. All of the EMEA entities are associates of NNUK.

79.     We are therefore satisfied that at the relevant time the Target Test has been satisfied in this case in respect of each of the Target Companies.

**The Insufficiently Resourced Test**

80.     Section 43(2) provides that we may only issue an FSD in relation to any of the Target Companies if we are satisfied that NNUK is "insufficiently resourced" at a time determined by TPR which falls within the period of two years ending with our determination, should we be so minded, to issue an FSD.

81.     The time determined by TPR for these purposes is 30 June 2008. That date is the last quarterly date in respect of which TPR has been able to obtain reliable financial information for the Group.

82.     "Insufficiently resourced" is defined by Section 44 and the provisions of the Pensions Regulator (Financial Support Directions etc) Regulations 2005 (the "FSD Regulations"). In the circumstances of this case, the relevant statutory test would be satisfied if:

82.1. as at 30 June 2008, the value of NNUK's resources was less than 50% of the Scheme's estimated Section 75 debt; and

82.2. as at the same date, the value of the resources of an associate of NNUK was not less than the difference between the value of NNUK's resources and 50% of the Scheme's estimated Section 75 debt.

83. The associate that TPR has selected, against which NNUK's resources are to be compared, is NNC. We agree that it is appropriate to select NNC, the ultimate parent of the Group, for these purposes.

84. However, we must still be satisfied about the value of the resources of both NNUK and NNC. On this question TPR, in both the Warning Notice and in its skeleton argument, in effect offered two possible approaches for the Panel to follow in considering whether the "insufficiently resourced" test was met. First, TPR argued that the Panel should rely solely on the deemed valuations which TPR has made under Regulation 12 of the FSD Regulations in response to NNUK and NNC declining to offer their own valuations of their respective resources. Secondly, and in the alternative, if, contrary to TPR's primary case, the Panel were to decide that it should make its own assessment of the value of NNUK's and NNC's respective resources, TPR argued that the detailed evidence it had presented (which included a report from PwC commissioned by the Trustee (the "PwC Report"[47]) is sufficient for the Panel to make a finding that the employer was insufficiently resourced within the meaning of Sections 43 and 44 and the FSD Regulations.

85. We considered these points with care. We are conscious that, in the absence of any substantive representations from any of the Target Companies or from NNUK, it has not been presented with any arguments against TPR's assertion as to the conclusive nature of its valuations under Regulation 12 of the FSD Regulations or against the detailed evidence presented in Appendix 4 to the Warning Notice and in the PwC Report. However, having considered all of the evidence presented to it by both TPR and the Trustee in this case, we have reached the clear conclusion that the insufficiently resourced test would be satisfied in this case whichever of TPR's alternative routes is taken.

---

[47] Bundle 4a, Tab 15.

86.     The estimated Section 75 Debt at the relevant time is US$1.773 billion. TPR asserts that its deemed valuation of NNUK's resources at the relevant time is US$453 million and that its deemed valuation of NNC's resources at that time is US$5.308 billion. These are identical to the valuations reached in the PwC Report, which sets out the assumptions and methods of calculation used in detail. We have considered the evidence presented to us and have concluded that it supports findings as to the value of NNUK's and NNC's respective resources in the figures put forward by TPR.

87.     In the circumstances, we have concluded that the "insufficiently resourced" test is met in this case and that it is not necessary for us to resolve the question of how Regulation 12 of the FSD Regulations should be construed. We now turn to consider the question of reasonableness.

**Reasonableness**

88.     Pursuant to Section 43(5), we may only issue an FSD in relation to any of the Target Companies if of the opinion that it is reasonable to impose the requirements of the FSD on those Target Companies. Section 43(7) requires us, when deciding whether the imposition of an FSD is reasonable, to have regard to such matters as we consider relevant. Section 43(7) sets out a number of matters to which we must have regard where they are relevant.

89.     We have concluded that the factors set out in Section 43(7) are not intended to be an exhaustive list of factors that may be relevant in any particular case. Each case must turn on its own circumstances and we are entitled to consider such of these and other factors as are relevant to the exercise of our discretion.

90.     We discuss below the matters that we have considered as being of particular relevance in this case. First, we discuss a matter that we consider to be of general applicability to the Target Companies. We then consider matters that apply more to particular categories of Target Company than others, although we acknowledge that there is some degree of overlap in the applicability of those matters between the different categories of company.

91.     We have already discussed above the way in which the Group operated along business lines rather than by reference to legal entities. From about 1991 onwards (which coincides with the purchase of STC) the Group operated increasingly as a

single global entity. The distinction between corporate legal entities was to a large extent ignored; the companies within the Group operated in accordance with the four business lines outlined above in a common endeavour and for the overall good of the Group rather than for the specific good of each individual company. We discuss specific aspects of the operation of the Group further below, but we consider that the general manner in which the Group operated is relevant to the question of reasonableness with which we are here dealing. Whilst not conclusive in respect of any of the Target Companies, this is a point that is common to all.

92.  We now turn to the matters that we consider to be of particular significance in respect of the various categories of Target Company; we discuss these in relation to the Canadian Entities, the American Entities and then finally the EMEA Entities.

**The Canadian Entities**

93.  The Canadian Entities are NNC and NNL. For the purpose of this discussion we do not differentiate between the two companies. We understand that NNL was both the parent company and the operating company until 2000, when NNC was formed. We propose to treat them as being more or less the same entity since the evidence shows that they operated in that way. We note, for example, that the Boards of NNC and NNL appear to have been more or less identical, including the same non-executive Chairman, and that, with limited exceptions, NNC and NNL held joint Board meetings.[48]

94.  As already discussed above, the Group operated according to a global model and along business lines rather than by legal entity. Furthermore control of the Group's operations was highly centralised. All major strategic decisions were taken by the Canadian Entities. Similarly, all major decisions relating, for example, to financial and budgetary controls, cash flow management, taxation, R&D programs and R&D budgets and on contributions to the pension schemes of the subsidiary companies were taken by the Canadian Entities.

95.  An example of the control exerted by NNC/NNL over other companies in the Group, including NNUK (and again we stress that this is just one of the many examples set out in the evidence presented to us), is seen in the insistence by NNC/NNL that

---

[48]  See, for example, Bundle 1, Tab 1, Page 14, Paragraph 44.

substantial inter-company loans be made. Both NNUK and NNI (one of the American Entities) made substantial loans to NNC/NNL (although as discussed above and further below NNI was repaid in cash with interest whereas NNUK was paid without interest and by way of illiquid assets[49]). These loans were made at the behest of NNC/NNL and without NNUK having any effective choice in the matter either as to the making of the loans or as to the terms of repayment.

96.     Another example of NNC/NNL's control over NNUK is in the appointment of directors to the NNUK Board.[50]

97.     The control exerted by the Canadian Entities over NNUK extended to control over the Scheme.[51]  NNC/NNL had effective control over NNUK's financial position, including whether, and if so in what sum, it should make contributions to the Scheme.  As already noted above, participating employers (again under the control of NNC/NNL) enjoyed a contribution holiday from 1989 until 2002.  By 2002 the Scheme was considerably in deficit but neither NNC nor NNL was prepared to commit to any sort of continuing funding arrangement and NNUK, being under their control, was unable to act independently in this regard.  Such agreements as were eventually sanctioned by NNC/NNL were woefully inadequate in light of the deficit that had built up in the Scheme; for example, NNL's guarantee of the Section 75 debt up to US$150 million is relatively insignificant when compared with the estimated Section 75 debt of £2.1 billion.

98.     As a result of the control exerted by NNC/NNL over NNUK, the Canadian Entities derived considerable benefit from NNUK's activities (and, indeed, the activities of the various other companies in the Group).  In general terms NNC/NNL had the benefit of being able effectively to control the activities and finances of a global enterprise.

99.     More specific benefits to NNC/NNL are also shown by the evidence presented to us. We take, again, the example of the inter-company loan from NNUK to NNL (see the account and evidence summarised above).  At its peak in 2007 the amount of the loan reached around £467 million.  The loan was interest-free.  The loan was not repaid in cash or liquid assets. It was eventually repaid, but only around two-thirds of it, by transferring to NNUK the ownership of a number of subsidiary companies.  We

---

[49]  See Warning Notice, Page 90, Paragraph 206.
[50]  See, for example, Paragraph 74 of the Warning Notice.
[51]  See the witness evidence referred to at Paragraphs 182-185 of the Warning Notice.

accept the argument of TPR that NNUK could not realise the value of these assets, first, because they would have required the consent of NNL to do so and, second, because the value of the assets wholly depended on the companies continuing as a part of the integrated Group. They were therefore illiquid assets.

100.   We also consider that NNC/NNL and the Group as a whole benefited financially from NNC/NNL's failure adequately to remedy the deficit in NNUK's pensions scheme from 2002 onwards (see further detail already given above). This eased the financial situation of both NNL and the Group as a whole in a period when the Group was making losses. One of the factors responsible for a significant portion of the deficit was the pensions contribution holiday, from which NNUK and the Group as a whole had benefited between 1989 and 2002.

101.   We have also considered the available evidence as to the financial circumstances of the Canadian Entities. As already noted above, it has been estimated that NNUK's unsecured creditors are likely to receive a return of only 15%. The value of NNC's resources as at 30 June 2008 has already been discussed above in relation to the issue of whether NNUK was insufficiently resourced at that time; the value at that time has been assessed at over US$5 billion. Further evidence as to the financial circumstances of the Canadian Entities is somewhat limited although we note the contents of the PwC Report[52] and also the information summarised at Appendix 3 to the Warning Notice. The latter shows that although, like most of the Target Companies, NNC's and NNL's liabilities exceed their assets, their assets are still sufficient to provide a significant pay-out to creditors.

**The American Entities**

102.   The American Entities are NNI and NN CALA. NN CALA is a subsidiary of NNI which in turn is a subsidiary of NNL and ultimately NNC.

103.   NNI and NN CALA were part of the same global enterprise operating along business rather than corporate lines and were under the control of the Canadian Entities as was NNUK.

---

[52]   Bundle 4a, Tab 15.

104.    As noted above, an inter-company loan was made by NNI, as well as NNUK, to NNL.
        However, in contrast to the position taken by NNC/NNL in relation to NNUK, interest
        accrued on the loan by NNI to NNL and part of the loan, some US$275 million, was
        subsequently paid to NNI in cash.    NNI therefore benefited indirectly from the non-
        repayment of the debt owing to NNUK, since it may otherwise have had to provide
        more financial support to NNL.

105.    Other specific benefits to NNI and NN CALA have also been identified in the
        evidence.  A major example is the work carried out at a loss by NNUK for Worldcom,
        one of the Group's major customers in the US, where NNI was the Group's main
        operating company.  We rely on the facts and evidence set out above.  NNI similarly
        benefited from NNUK's work adapting equipment from ANSI to ETSI for a number of
        other US customers.[53]

106.    The ETSI standard applied in the CALA region.  Following the work carried out by
        NNUK's R&D team to convert the Group's North American products to ETSI
        standards the Group was able to expand rapidly into the CALA markets which
        operated through NN CALA.  NNI was similarly able to obtain a considerable
        competitive advantage in the US market as a result of the optical cabling technology
        acquired with STC.[54]

107.    Both NNI and NN CALA also relied extensively on NNUK for sales and marketing
        assistance, as described above, which was of clear benefit to both NNI and NN
        CALA but for which we conclude NNUK did not receive any or any adequate
        compensation for the reasons given in our assessment of the TPAs below.

108.    NNI and NN CALA had no direct connection or involvement with the Scheme.
        However, we consider that they benefited indirectly along with the rest of the Group
        as a result of NNC/NNL's failure adequately to repair the Scheme's deficit after 2002.

109.    As with the Canadian Entities, there is relatively limited evidence as to the financial
        circumstances of the American Entities. However, the figures in Appendix 3 to the
        Warning Notice suggest that in the third quarter of 2009, NN CALA's assets were

---

[53]  See the examples given at Paragraph 232 of the Warning Notice.
[54]  See statement of Mr Darryl Edwards at Bundle B, Tab 5, Page 8, Paragraphs 37-38..

only US$5 million less than their liabilities and that NNI's assets covered about 33% of their liabilities.

**The EMEA Entities**

110.    The EMEA Entities are those of the Target Companies as are listed in paragraph 8.3 above.  Since Project Swift, they are mostly, but not entirely, subsidiaries of NNUK. They were all, however, under the effective control of the Canadian Entities and were all part of the same global business approach as NNUK and the American Entities.

111.    We consider that there is clear evidence that benefits flowed from NNUK to the Group as a whole, and therefore to the EMEA Entities, in respect of its R&D activities.  We are not satisfied that NNUK was adequately rewarded through the TPAs for the contribution it made to the Group's profits from the new technology, products and components, of which we were given many examples in the evidence. In the absence of any evidence from the Target Companies we share the views put forward by TPR and the Trustee on this matter.  However, our conclusions do not turn on this particular point so we need say no more about it.

112.    There is also clear evidence, in our view, of other benefits flowing from NNUK to the EMEA Entities in the form of services for which NNUK was inadequately compensated, as explained in our assessment of the TPAs.

113.    First, the EMEA Entities benefited from the wide range of management services provided by NNUK from around 1995-1996 onwards. The range of these services is described by Ms Sharon Rolston's witness statement to the High Court of 14 January 2009 (which is summarised above). We do not believe the provision of these services is a matter of dispute, since, as mentioned above, representatives for the eighteen EMEA Entities in administration here stated as much in supporting their claim that England was their COMI before the High Court.  There are in any case numerous examples in the evidence of assistance being provided by NNUK employees, both senior and more junior, to the EMEA Entities in respect of which there was no adequate recompense.  Mr Gareth Pugh tells of financial and tax support being provided by himself and his team of NNUK employees to EMEA Entities such as Nortel GmbH. Other examples are described above of significant sales and

marketing assistance being provided by NNUK senior executives to EMEA Entities. We regard it as particularly significant that even in cases where NNUK successfully negotiated contracts within the EMEA region, the contracts were generally signed by the relevant local EMEA Entity. This meant that the revenues from the contracts were divided between the local EMEA Entity, which received a small margin, and NNL as the parent company.

114.    We accept the evidence provided by Mr Darryl Edwards and others that the time-costs spent by senior executives of NNUK on work done for other EMEA entities were not booked and were charged to NNUK. Similarly, NNUK employees provided considerable after-sales support but, it seems, only travel costs were repaid to NNUK. There are a great many other examples of such matters set out in the witness evidence presented by TPR; a useful summary of these is to be found in the Trustee's written representations.[55]

115.    The EMEA companies had no direct connection or involvement with the Scheme. However, along with other Group companies, they benefited from the financial easement to the Group arising as a result of NNC/NNL's failure adequately to repair the Scheme's deficit after 2002.

116.    As with the other categories of the Target Companies, we have also considered such information as is available as to the financial circumstances of the EMEA Entities. As well as the evidence presented by TPR, we have been provided by the Trustee with an expert report from Mr Gary Squires in relation to the EMEA Entities.[56] We note Mr Squires' estimate of the likely dividend rates from various companies in the EMEA region; the estimated rate of return for unsecured creditors is significantly greater for all of the EMEA Entities than it is for NNUK and in the majority of cases it is 100%. The same pattern emerges from the table shown in Appendix 3 to the Warning Notice, showing the cash balances and asset liability position of all the Target Companies in the third quarter of 2009. We also note the evidence of Ms Sharon Rolston in support of an application for an administration order in respect of NNUK; she states that in January 2009 some of the EMEA Entities had considerable cash resources and were still technically solvent.[57] The fact that most of the EMEA Entities were in this relatively favourable position when the Group entered insolvency

---

[55]    Trustee Representations, Volume 1, Tab 3.
[56]    Trustee's Representations, Volume 2, Tab 6.
[57]    Bundle 1, Tab 2, Paragraph 100(d).

is, in our view, to a considerable extent the result of the RPSM transfer price system. As Ms Wendy Nicholls points out, under the TPAs the Limited Risk Distribution companies were "in effect, guaranteed a positive operating margin (before excluded costs and local GAAP adjustments) irrespective of the profitability or otherwise of the group and thus [their] inefficiencies would effectively be borne by the RPEs".[58] In other words, the RPEs, including NNUK, shielded the Limited Risk Companies against all the losses. It is clear from the evidence quoted above, along with the figures in Appendix 3 to the Warning Notice, that the EMEA Entities, including those in administration, have sufficient assets to make a significant distribution to creditors.

### The Transfer Pricing System

117.    We must also now consider to what extent the TPAs implemented by the Group, which we have already described above, recompensed NNUK for the benefits it conferred on the other members of the Group and in particular the extent to which those arrangements compensated NNUK for the excessive cost levels it incurred in relation to its revenues from third parties.

118.    The TPAs implemented by the Group, under the control of the Canadian Entities, fall into two distinct time periods:

118.1. From about 1992 until 2000 the Group's TPAs operated through a suite of cost-sharing arrangements ("CSAs"), of which the most important for NNUK were the R&D cost-sharing agreement, the Tangible Inventory Property CSA and the EMEA Market Support Group and Product Line Management CSA;

118.2. From January 2001 onwards the Group's TPAs operated on the basis of a residual profit split model. Under this model, NNUK, as an RPE, would bear a share of the Group's residual profits or (as turned out to be the case in all relevant years) losses.

119.    We have no information on whether overall NNUK was a net payer or recipient under the 1995 CSAs. Our view is, however, that these arrangements were deficient in two respects. First, the arrangements in relation to R&D, being based solely on cost-sharing, did not adequately reflect the value-added contributed by Nortel's different R&D centres.    While the value of intangibles, like R&D, is difficult to measure,

---

[58]   Ms Wendy Nicholls' report: Trustee's Representations, Volume 2, Tab 7, page 15, Paragraph 4.33.

particularly in an integrated group such as Nortel, we accept TPR's contention that an arrangement based purely on cost did not reflect the exceptional performance of NNUK, as reflected in the number of patents per head which it produced (see pages 56-57, paragraph 139 of the Warning Notice).

120.    Second, we share the view, expressed in paragraph 4.10 of Ms Wendy Nicholls' report[59] that the CSAs in relation to sales and marketing support in particular departed significantly from what arms' length independent parties would be prepared to contemplate, because (unlike the Tangible Inventory Property CSA) they contained no profit element in the form of a mark-up on costs. NNUK therefore received no reward for the value added by their substantial sales and marketing efforts, including the negotiation of contracts, on behalf of the EMEA sales distributors and of NNI and NN CALA. The existence of this added value was explicitly recognised by NNL and NNI in their 2008 application for an Advance Pricing Arrangement[60] and by their introduction of a mark-up for "excess" sales and marketing costs in the RPSM system covering the years 2006-2008.

121.    For both these reasons we conclude that the initial Cost Sharing Arrangements did not adequately compensate NNUK for the benefits it provided to the Group.

122.    The RPSM arrangements beginning in 2001 attempted to remedy the defects of the earlier model by the sharing of profits between the RPEs to recognise the value added produced by their R&D activities. Unfortunately, throughout this period the Group was operating at a loss or at best breaking even. As Ms Wendy Nicholls remarks in her report, "independent businesses rarely agree to bear other companies' losses, and to the extent they might agree to do so ... would not allow the situation to continue for a sustained period of time."[61]

123.    We accept, however, the evidence of both Mr Alan Bloom and Ms Wendy Nicholls that in fact the RPSM calculations put NNUK in the position of a net recipient because of the returns it received from the new mark-up on sales and marketing (see paragraph 56 above). However, and this is the key issue, it is clear that between 2003 and 2007 at least large amounts of money due to NNUK under the RPSM were in practice withheld. There was no doubt a book entry of the credit due into NNUK's

---

[59]    Trustee's Representations, Volume 2, Tab 7, Page 12, Paragraph 4.10.
[60]    Bundle 2, Tab 5, Page 606, second unnumbered paragraph.
[61]    Trustee's Representations, Volume 2, Tab 7, Page 14, Paragraph 4.20.

annual accounts, but no cash or other liquid assets were transferred to NNUK. Instead, the amounts due were converted into an interest-free loan to NNL and only partially redeemed in 2007 in the form of illiquid shares in the EMEA companies (see paragraphs 59 to 61 above.).

124.    This fact alone is sufficient evidence in our judgement that NNUK was not adequately recompensed to the tune of at least £467 million for the services it provided to the EMEA Entities during this period.

125.    There are a number of additional reasons why the RPSM arrangement would not have adequately rewarded NNUK even if the monies had been paid. First, the loss-sharing formula applied under the RPSM system at least from 2006 onwards was based on the average relative levels of R&D expenditure over the previous five years with a one year time lag. However, NNUK's relative share of R&D expenditure had been drastically reduced during the previous five years, because of the disproportionate cuts made in NNUK's R&D staff. As a result NNUK's share of the losses by 2007-2008 would have been unfairly high. In their proposals for a renewal of the RPSM system in 2008 NNC/NNL and NNI expressly state that a profit-sharing model based on R&D expense levels is only appropriate where the cost levels of the participants remain relatively constant over time.[62] Second, the model did not reflect NNUK's high restructuring costs during the period because restructuring costs were ignored in the calculation of the RPEs' profits.[63] Since NNUK's reductions in staffing were relatively higher than those made by other RPEs this would have worked to NNUK's disadvantage under the system. Finally, the transfer pricing mechanisms were not consistent with freely negotiated, arms' length, open market arrangements; no company with any significant freedom of decision would have agreed to participate in a system which was as disadvantageous to them as the Nortel arrangements were to NNUK.

126.    For all these reasons we conclude that NNUK was inadequately compensated for the benefits that it provided to the EMEA companies, NNI and NN CALA and the Group as a whole during the period in which the RPSM operated.

**Conclusion on reasonableness**

---

[62]  Bundle 2, Tab 5, page 643, third unnumbered paragraph.
[63]  Trustee's Representations, Volume 2, Tab 7, Page14, Paragraph 4.24.

127.    We have considered all of the evidence and representations presented to us and we are of the opinion that it is reasonable to impose the requirements of the FSD sought by TPR on each of the Target Companies, i.e. the Canadian, American and EMEA Entities as defined above.

**Conclusion**

128.    In all the circumstances of this case, and for the reasons given above, we have concluded that an FSD should be issued in this case as set out in the Determination Notice issued on 25 June 2010.