# EXHIBIT A

Nortel Networks Agreement No. 05-064

This MASTER SERVICES AGREEMENT NO. 06-823, is dated October 1, 2006 (Effective Date). The parties are Nortel Networks Limited, a Canadian corporation, with offices at 8200 Dixie Road, Suite 100, Brampton, Ontario L6T 5P6 (Nortel Networks) and MTS Allstream Inc., a corporation existing under the laws of Canada with principle office at 200 Wellington Street West, Toronto, Ontario M5V 3G2 (Contractor).

*Acceptance* means that Nortel Networks agrees that Services have been completed in accordance with the requirements of the related TSO.

*Agreement* means this Master Services Agreement, all exhibits (including all Schedules and the Service Level Agreement), and all Telco Service Orders placed by Nortel Networks and accepted by Contractor.

*Affiliate* means one or more of the following: (a) a Manufacturing Licensee; (b) a Joint Venture; or (c) an entity of which Nortel Networks Corporation owns 20% to 50% of the voting securities or other control mechanism, or (d) an entity that is under common control with Nortel Networks Inc. or Nortel Networks Limited by between 20% and 50% of the voting stock, shares or voting power of the entity and Nortel Networks Inc. or Nortel Networks Limited.

*Authorized Worker* shall mean Contractor's employees or agents with a bona fide need to have access to the Permitted Systems in connection with the Purpose ("Authorized Workers"). *Change Order* will have the meaning set out in Section 2 of this Agreement.

*Confidential Information* means information disclosed by Nortel Networks or Contractor to the other party that is designated at the time of disclosure as confidential (or like designation), is disclosed in circumstances of confidence or would be understood by Nortel Networks and Contractor, exercising reasonable business judgment, to be confidential.

*Joint Venture* means a business enterprise with a limited scope and duration between Nortel Networks and a third party.

*Manufacturing Licensee* means a third party that has entered into an agreement with Nortel Networks to (a) manufacture or integrate Nortel Networks products and/or (b) lease, sell, sublicense or distribute Nortel Networks products.

*New Services* will have the meaning set out in Section 13.3 of this Agreement.

*Nortel Networks Coordinator* will have the meaning set out in Section 13 of this Agreement.

*Payment Period* will have the meaning set out in Section 14 of this Agreement.

*Service Schedule (s)* means the statement (s) of work attached to and made a part of this Agreement, as a form of Exhibit A, that describe the Service implementation process applicable to any given Service purchased under this Agreement.

*Services or Service* means any of the telecommunications services provided by Contractor to Nortel Networks under this Agreement through a network based on the Service Level Agreement and the Service descriptions as described in the applicable Service Schedules.

*Service Level Agreement (SLA)* means that document attached to and incorporated in this Agreement as Exhibit D.

*Site* means the Nortel Networks location(s) or facilities identified in a Telco Service Order at which Services will be provided.

*Subsidiary* means an entity that directly or indirectly (a) controls or is controlled by Nortel Networks Corporation by more than fifty percent (50%) of the voting stock, shares or voting power, or (b) is under common control with Nortel Networks Inc. or Nortel Networks Limited by more than fifty percent (50%) of the voting stock, shares or voting power of the entity and Nortel Networks Inc. or Nortel Networks Limited.

*Telco Service Order (TSO)* means an order issued by Nortel Networks under this Agreement for the purchase of Services that contains all of the basic information (e.g., statement of work, dates, locations, quantity, i.e., Service Schedule) required by Contractor to deliver the Services ordered.

*Term* means the Effective Date through the earlier of a) 60 days after the expiration of all Service Schedules as listed in Appendix A and written notice by a party of its intention to terminate this Agreement in accordance with this Agreement; or b) termination under Section 16 of this Agreement.

*Transfer Taxes* means all goods and services, sales, land transfer, gross receipt, documentary, value-added, stamp duties and all other similar taxes, surcharges, duties, registration charges or other like charges.

*Worker* means Contractor's employees, agents and subcontractors and the agents and employees of subcontractors that perform Services

1.    Telco Service Orders - To make a purchase under the Agreement Nortel Networks must issue a TSO. A Telco Service Order may include the information set out in the applicable section of the Service Level Agreement.    For avoidance of doubt Nortel Networks may allow its Subsidiaries and Affiliates to use the

Nortel Networks Agreement No. 05-064

Services it purchases under this Agreement, provided, Nortel Networks will be responsible for such use. TSO terms and conditions will be for administrative purposes only, and invalid to the extent they conflict with this Agreement. Contractor will supply Services specified in any TSO in a timely manner and to the satisfaction of Nortel Networks. Contractor, upon receipt of a Telco Service Order, may reject the Telco Service Order if Contractor determines that it is unable to provide the requested Services. Contractor's acceptance of a Telco Service Order will not be unreasonably withheld.

1.1     *Implementation of Telco Service Orders* - Following acceptance of a Telco Service Order by Contractor, Contractor will (a) deliver the Services at the Site(s) identified in the Telco Service Order and in accordance with the service dates agreed in writing by the parties, and (b) provide the Services to the satisfaction of the purchasing Nortel Networks entity in accordance with the specifications set out in the applicable Service Schedule and the Service Level Agreement.

1.2.1   *Delivery Delay* - Contractor will notify Nortel Networks immediately if any event occurs that will or is likely to result in missing a service date set out in a TSO or delay the implementation of Services. Such notification shall include details of Contractor's recovery plan to remedy the delay. However, Contractor's submission of notification will not release Contractor from the performance of its obligations under the Telco Service Order or excuse its failure to meet implementation dates specified in the Telco Service Order or SLA. Upon receipt of notice Nortel Networks will contact and meet with Contractor (either in person or by telephone) to discuss the proposed new date or implementation plan. If the parties agree on a new date and/or the implementation plan and Contractor fails to (a) meet the new date or, as applicable, perform in accordance with the implementation plan, or (b) the parties are unable to reach an agreement on a new date or implementation plan, Nortel Networks in its sole discretion may terminate the Telco Service Order at no cost or charge and no further obligation.

1.2.2   *Testing* -

   a)   Pre-implementation: For all Services provided by Contractor, Nortel Networks and Contractor will jointly test the Services on delivery or prior to installation, the timing and parameters for testing being agreed upon in the applicable Service Schedule.

   b)   Post-Implementation Testing: The parties may agree in writing on the test procedures the parties will use for joint testing relating to Service issues that may arise after commencement of the Services, and, if the parties agree on joint testing, they will include such procedures in the Service Schedule for the applicable Service, either in the original Service Schedule or by amendment, if agreed after the effective date of the Service Schedule.

1.3     *Representatives of the Parties* - In the TSO Nortel Networks may identify its authorized representative and Contractor's point of contact concerning the Telco Service Order (Nortel Networks Coordinator). Within 5 days of the Effective Date Contractor will nominate a dedicated program manager who will be responsible for managing the overall implementation of the Agreement. Within 30 days of the Effective Date Contractor will nominate a dedicated customer service manager who shall be responsible for order management, delivery status, monthly meeting schedules and reports and problem resolution with respect to all Services provided by Contractor under this Agreement. Upon making each appointment Contractor will notify the Nortel Networks Coordinator of the respective names and contact information for its appointed program manager and customer service manager.

2.      *Changes* - The parties may make changes in the Services by mutual written agreement (Change Order). In the event Contractor makes changes without a Change Order, Nortel Networks will have no obligation to pay Contractor for the changed Services.

2.1     *Technology Evolution* - As Contractor makes them commercially available, Contractor will offer Nortel Networks enhanced applications Contractor develops during the Term of this Agreement, including New Services as described in Section 13.3. The parties will agree to a Change Order to provide for any enhanced application that Nortel Networks chooses to purchase from Contractor. During the Term of this Agreement, if Nortel Networks is able to demonstrate to Contractor's satisfaction that superior technology applicable to the Services (the "New Technology") are available from a Competitive Service Provider in the same geographic region at comparable prices, Nortel Networks may request in writing that Contractor provide a written quote to Nortel Networks for the use of the New Technology as part of the Services. Contractor will respond to Nortel Networks in good faith in writing within 90 days of receipt of the request. If Contractor is unable to provide the Services incorporating the New Technology on substantially the same terms and prices offered by the Competitive Service Providers, in its sole discretion Nortel Networks may terminate this Agreement or an applicable Telco Service Order upon 60 days' advance notice to Contractor and migrate the Service(s) to a Competitive Service Provider. However, upon termination Nortel Networks will pay Contractor for all charges for the applicable Services provided up to the date of termination and a single payment as set out in the Service Schedule that would be owing for the same Services for the shorter of the remainder of the Term of the Agreement or term of the applicable Telco Service Order. The described payment represents liquidated damages and not a penalty. Nortel Networks

Nortel Networks Agreement No. 05-064

acknowledges that the precise amount of Contractor's damages would be extremely difficult to calculate and that such payment represents a reasonable estimate of Contractor's actual damages with respect to the remainder of the Term.

3. **Reports and Inspections** - On an agreed date and in an agreed format, Contractor will provide Nortel Networks with the written reports described in the SLA. Nortel Networks or the applicable purchasing entity at its discretion and expense may audit and/or verify the reports. Contractor will reasonably cooperate with Nortel Networks or the applicable purchasing entity during any such verification and/or audit.

4. **Parties' Equipment** - The parties agree that all title and ownership of Contractor-provided equipment will at all times remain with Contractor or its subcontractors, as the case may be. At all times Contractor will retain risk of loss for such equipment and be liable for any loss or damage to such equipment except for any loss or damage as a result of Nortel Networks negligence or willful misconduct. All Nortel Networks-owned equipment associated with the Services shall remain the property of the Nortel Networks. At all times Nortel will retain risk of loss for such equipment and be liable for any loss or damage to such equipment except for any loss or damage as a result of Contractor's negligence or willful misconduct. If Nortel Networks provides materials and/or equipment, Nortel Networks will provide the materials and/or equipment on an "as is" basis only. Contractor will return any Nortel Networks-owned materials and/or equipment upon the earlier of the completion of related Services or Nortel Networks' request for the materials and/or equipment. Contractor will return the materials and/or equipment in the same condition in which they were furnished to Contractor, reasonable wear and tear excepted.

5. **Warranties on Services** - Contractor warrants that it will deliver Services using standards generally accepted in the industry and that the Services will conform to the specifications set out in the applicable SLA without material, service affecting interruptions or defects. In the event of service interruptions lasting twenty-four (24) hours or longer from Contractor's receipt of notification from Nortel Networks, Contractor, upon Nortel Networks' written request, will provide to Nortel Networks a credit or refund of Charges proportionate to the length of the interruption commencing from Contractor's receipt of the Nortel Networks' notification.

5.1   *Business Continuity Planning*

5.1.1   Contractor represents and warrants that it has developed and implemented an effective business continuity plan that will ensure that Contractor is able to continue to provide Services when the Services are interrupted for any reason outside of Contractor's reasonable control ("BCP").

5.1.2   The BCP will contain, at a minimum, provisions for (a) a risk assessment and business impact analysis,(b) a prevention/mitigation plan, and (c) a resumption of Services plan, including a recovery/restoration plan.

5.1.3   Contractor's implementation of the BCP to provide Services will be at no additional cost to Nortel Networks.

5.1.4   At Nortel Networks' request, at no additional charge to Nortel Networks, At Nortel Networks' request and at Nortel Networks' cost, Contractor will participate in, at a maximum, 1 test annually implemented by Nortel Networks or discussions initiated by Nortel Networks for purposes of evaluating and coordinating and integrating the BCP's of its suppliers with Nortel Networks' overall business continuity plan. As reasonably requested by Nortel Networks during the Term, Contractor will adjust the BCP to better conform to and integrate with Nortel Networks's BCP.

5.2   *Except as set out in this Agreement, Contractor makes no warranties, representations or conditions whatsoever, express or implied, including, without limitation, any warranty, representation or condition of fitness for a particular purpose or merchantability with respect to the Services.*

6. **Confidential Information** - Each party will use reasonable care in holding the other's Confidential Information in confidence and not disclose it to anyone except the party's employees. However, a party may also disclose the Confidential information to third parties (e.g., Subsidiaries, Affiliates and subcontractors) who have a need to know for purposes of carrying out this Agreement and have agreed in writing in advance to be bound by confidentiality terms substantially the same as those of this Agreement.

6.1   *Exceptions* - Information is not protected if (a) a recipient can demonstrate through written documentation that it was already known, (b) it becomes known or generally available to the public (other than by act of the recipient) after its disclosure, (c) it is disclosed or made available in writing to the recipient by a third party having a bona fide right to do so and without similar confidentiality obligations, (d) it is independently developed by recipient as demonstrated by its business records, or (e) it is required to be disclosed by subpoena or other process of law. The recipient will notify the disclosing party promptly of a subpoena or other process of law requiring disclosure.

6.2   *Release of Information* - Without the other party's written consent neither party will (a) advertise or publish information concerning this Agreement, or a FSO, or the relationship between Nortel Networks and Contractor, or (b) use the name or trademark of the other party with respect to any advertising, promotion, publicity, or representation that it may make in connection with the other party's business, services, or product lines.

7. **Security** - Contractor will safeguard the security of Nortel Networks' computer systems, as set out in Exhibit B as may be negotiated between the parties and subsequently attached to and incorporated in this Agreement.

8. **Independent Contractor** - Under this Agreement Contractor and Workers are independent service providers. This Agreement does not create a joint venture, partnership, principal-agent or employment relationship between (a) Nortel Networks and (b) Contractor and/or Workers. Even if a government or court of law decides that Contractor and/or Workers are employees of Nortel Networks, neither Contractor nor Workers will be entitled to receive employment benefits from Nortel Networks. Contractor indemnifies Nortel Networks and will hold Nortel Networks harmless from any claim or liability and related costs (including legal fees) resulting from (a) Contractor's and/or Worker's claiming the status of a Nortel Networks employee including related employment benefits, and (b) for Contractor's and/or Worker's failing to pay employment taxes.

Contractor's obligations are expressly conditional upon the following:
(i)  Nortel Networks notifying Contractor promptly in writing of any action that has been brought or is threatened, about which Contractor does not otherwise have actual notice;
(ii)  Nortel Networks permitting Contractor sole control to defend, compromise or settle any claim or action; and
(iii) if requested by Contractor, Nortel Networks providing all reasonably requested information, assistance and authority at Contractor' reasonable expense.

9. **Insurance**- Contractor and its subcontractors will maintain the insurance coverage set out in Exhibit C, attached to and incorporated in this Agreement.

10. **Removal of a Worker**

10.1 *Nortel Networks' Request for Removal* - In the event that Nortel Networks determines in good faith that the continued assignment of an Worker to the performance of the Services will prejudice the interests of Nortel Networks, then Nortel Networks may give Contractor written notice to that effect requesting that the Worker be replaced. Promptly after its receipt of such a request by Nortel Networks, Contractor shall investigate the matters stated in the request and discuss its findings with Nortel Networks. If Nortel Networks, in good faith and acting reasonably, still requests replacement of the Worker, Contractor shall replace the Worker with a person of suitable ability and qualifications.   Contractor shall not treat Nortel Networks' request for removal or a denial of reinstatement after removal as a request for the termination of this Worker's employment with Contractor. Nortel Networks must give its written consent to Contractor in order for (a) former employees and suppliers of Nortel Networks to become Workers, and (b) for removed Workers to perform Services again. For avoidance of doubt Nortel will not be obligated to pay for any Services that are not performed by any Worker in accordance with the terms of this Agreement.

10.2 *Removal by Contractor* - Contractor has the right to replace any Worker with one that has equivalent experience and skills at any time.

11. **Indemnities**

11.1 *Indemnification*
   (a)   Nortel Networks will indemnify, defend and hold Contractor and its affiliates (and each of their employees, officers and directors) harmless against any and all third party fines, penalties, losses, costs, damages, injuries, claims, expenses or liabilities relating to (a) Nortel Networks' unlawful or improper use of the Services, Contractor's facilities, (including equipment, hardware, software, systems and cabling) ("Facilities") or Nortel Networks' Facilities; (b) property damage, personal injury or death caused by Nortel Networks' , negligent or willful acts or omissions arising from Nortel Networks' operation of its Facilities or Nortel Networks' use of the Services; or (c) any information made available, displayed or transmitted in connection with a Service including, among other things, all trade-marks and domain names as well as the contents of any bulletin boards or chat forums, and all updates, upgrades, modifications and other versions of any of the foregoing, including information made available by means of an HTML "hot link", a third party posting or similar means of Nortel Networks or its end-users; or, (d) Nortel's breach of law or regulation.

Nortel Networks shall only be liable for providing indemnification under this Agreement if Contractor:
   (i) notifies Nortel Networks promptly in writing of any action that has been brought or is threatened, about which Nortel Networks does not otherwise have actual notice;
   (ii)  permits Nortel Networks  sole  control to defend, compromise or settle any claim or action; and
   (iii) if requested by Nortel Networks, provides all reasonably requested information, assistance and

Nortel Networks Agreement No. 05-064

authority at Nortel Networks' reasonable expense.

(b) Contractor will indemnify and hold harmless Nortel Networks and its Subsidiaries and Affiliates (including its employees, officers and directors) from third party fines, penalties, losses, costs, damages, injuries, claims, expenses or liabilities resulting from: (x) injury or death of a person or damage or loss of property during Contractor's performance under this Agreement caused by Contractor's negligence or willful acts or omissions., (y) Contractor's breach of law or regulation, (z) in connection with intellectual property owned solely and exclusively by Contractor, the Service infringing any patent, copyright or other intellectual property right in Canada or the U.S.; or, (xx) in connection with intellectual property not owned solely and exclusively by Contractor, any Service infringing any patent, copyright or other intellectual property right. Contractor's obligations are expressly conditional upon the following:

(i) Nortel Networks shall promptly notify Contractor in writing of any such action or proceeding that has been brought or threatened, about which Contractor does not otherwise have actual notice;

(ii) Contractor shall have sole control of the defence or settlement;

(iii) At Contractor's reasonable request and expense Nortel Networks shall cooperate with Contractor in a reasonable way to facilitate the settlement or defence; and

(iv) Contractor will not be obligated to indemnify to the extent the action or proceeding arises from Nortel Networks' modification of the Service or the use of the Service in combination with any equipment, device, software or services, including but limited to telecommunications services, not supplied by Contractor or for which modification or use the Service is not designed or approved in advance in writing by Contractor.

(c) In the event that a final injunction shall be obtained against Nortel Networks' use of the Service by reason of such infringement or if in Contractor's reasonable opinion such Service is likely to become the subject of a claim for infringement, Contractor shall at its option and expense.

(i) procure for Nortel Networks the right to continue using the Service;

(ii) modify the Service, or parts thereof, so that it becomes non-infringing;

(iii) replace the Service with a non-infringing service substantially complying to the replaced Service's specifications; or (if none of the foregoing alternatives is available on terms that are reasonable in Contractor's judgment (acting reasonably))

(iv) terminate the affected Service without liability upon written notice to Nortel Networks and remove all applicable Contractor equipment located on Nortel Networks premises without further liability, except that related to or resulting from the removal.

(d) Contractor will indemnify and hold harmless Nortel Networks and its Subsidiaries and Affiliates (including its employees, officers and directors) from any liens being placed against the Sites as a direct result of Contractor's actions or omissions and will make its best efforts to extinguish any lien filed within 10 days of Contractor's receipt of notice from Nortel Networks of its receipt of a lien notice or the filing of a lien against a Site. The latter indemnification includes Contractor's indemnifying and holding harmless Nortel Networks from any fines, penalties, losses, costs, damages, injuries, claims, expenses or liabilities resulting from the filing of any such lien.

11.2 The obligations under this Section 11 will survive the termination of this Agreement.

12. **Third Party Dealings** - Contractor will not subcontract any of its material obligations relating to the Services set out in a TSO without Nortel Networks' prior written approval. Even though a subcontract is approved, Contractor will continue to be responsible for Services provided under the TSO

12.1 Contractor recognizes that Nortel Networks may decide to use another vendor for certain service requirements. Subject to appropriate non-disclosure agreements, Contractor agrees to work with and cooperate with the other vendor for purposes of meeting the Services performance objectives agreed upon by the purchasing Nortel Networks entity and Contractor. In that regard Contractor will cooperate in negotiating and agreeing with Nortel Networks and the third party vendor on service inter-working procedures necessary to achieve the Services performance objectives. However, Contractor will not be responsible for meeting the Services performance objectives to the extent that the third party vendor does not meet Contractor's service technical specifications.

13. **Prices** - Contractor will charge for each Service ordered by a Nortel Networks purchasing entity in accordance with the prices set forth in (a) the response to the applicable request for proposal/request for quotation (RFP/RFQ), or (b) the applicable individual services quotation, or (c), if (a) and (b) are not applicable, the price stated on the applicable invoice, which shall be in accordance with comparative industry pricing (the "Prices"). The Prices are exclusive of all taxes and, where appropriate, inclusive of all delivery and insurance charges to the Sites mentioned in the relevant Telco Service Order. The

Nortel Networks Agreement No. 05-064

Prices will be subject to the applicable discount rates set forth in the RFP/RFQ and Contractor will not raise the Prices during the Term of the Agreement.

13.1 *Competitive Prices* - It is the parties' intent that, throughout the Term of this Agreement, the Prices shall remain competitive with the prices available in the marketplace for comparable telecommunications services provided by comparable service providers.

13.3 *New Services* - The parties agree to meet once each calendar quarter during the Term to discuss Contractor's new products, services and features developed or offered by Contractor that may be applicable to or be of a benefit to Nortel Networks, its operations or the Services provided under this Agreement (the "New Services"). Contractor will offer the New Services to Nortel Networks (a) at the same prices, terms and conditions offered to other similarly situated customers; (b) if the New Services are not yet offered to other customers, the month-to-month prices stated in Contractor's published pricing or at the volume/term discounts available in Contractor's published data; or (c) if such prices are not published, at prices to be agreed to in writing by the parties.

14.  *Invoices and Taxes* - After Nortel Networks notifies Contractor of Acceptance, Contractor will invoice Nortel Networks for the Services in arrears (a) on the month following Acceptance of a connection for the one-time connection of Services, or (b) once a month for ongoing Services, commencing the month immediately following the month of the initial provision of the Services. Contractor will not invoice for any gift given to any person or entity. Nortel Networks will pay an undisputed invoice within 30 days after its date (Payment Period). If Nortel Networks' bank returns any payment, Nortel Networks will reimburse Allstream for any reasonable bank charges. Contractor incursNortel Networks will pay interest on any late payments at the lower of 18% per annum or the maximum rate allowed by applicable law. Nortel Networks will review Nortel Networks' invoices and inform Contractor promptly in writing of any errors, omissions or irregularities.. If Nortel Networks disputes a portion of an invoice, Nortel Networks will give Contractor written notice within six (6) months of the invoice date, otherwise Nortel Networks will be considered to have accepted the accuracy and validity of the invoice. If Contractor fails to issue an invoice for Services charges within a period of six (6) months from the date the charges were incurred or Nortel Networks validly disputes an invoice, dispute is resolved in Nortel's favour and Contractor fails to correct and re-issue the invoice within a period of six (6) months from the date of the disputed invoice, Nortel Networks will not be obligated to pay the applicable charges.

14.1 Contractor will not invoice Nortel Networks for Transfer Taxes, if Nortel Networks provides Contractor with a tax exemption certificate or proof of payment. Any tax credits obtained by Contractor with Nortel Networks' exemption certificate or proof of payment will be credited back to Nortel Networks on the next invoice issued. Contractor will reimburse Nortel Networks to the extent Transfer Taxes paid by Nortel Networks are recovered by Contractor from the taxing or governmental authority. To the extent that Transfer Taxes may only be refunded to Nortel Networks, Contractor agrees to cooperate reasonably with Nortel Networks' obtaining a refund or reimbursement of the Transfer Taxes. Unless Contractor provides Nortel Networks with an appropriate exemption certificate, Nortel Networks will withhold taxes from payments to Contractor, if required by a governmental taxing authority, and pay the withheld amounts to the taxing authority. On Contractor's request Nortel Networks will provide Contractor with evidence of Nortel Networks' payment of the withholding tax. Nortel Networks will not be responsible for any taxes imposed upon Contractor's net income, net worth, gross receipts, corporate existence or franchise.

14.2 If any governmental authority imposes a Transfer Tax for which Contractor is responsible under this Agreement, Nortel Networks will pay the Transfer Tax, provided, Contractor includes the Transfer Tax as a separate line item on the invoice for the purchase that generated the Transfer Tax. If the Transfer Tax is not included as a separate line item, the amount of the Transfer Tax will be deemed (a) to have been included in the Price for the Services purchased, and (b) paid in full when Nortel Networks pays the applicable invoice.

15.  Damages - With the exception of the parties' indemnification obligations under this Agreement and breach of Section 6 (Confidential Information), (a) neither party will be liable for any unforeseeable, incidental or consequential damages or for any loss of revenues, loss of profits, loss of goodwill or other forms of economic loss, even if the party or its authorized representative has been advised of the possibility of the type of damages and notwithstanding any failure of the essential purpose of any limited remedy; and (b) neither party will be liable to the other for more than the greater of (i) the damages actually proven as directly attributable to the party responsible for the damages or (ii) the total payments for the specific Service that caused the damage after the date the damages were incurred, but in no event more than the previous 12 months.

16.  Termination

16.1 *For Convenience* — For its convenience and without penalty, Nortel Networks or the applicable purchasing entity may terminate all or part of a Telco Service Order, or a Service Schedule, by 60 days'

Nortel Networks Agreement No. 05-064

prior written notice to Contractor; provided, Nortel Networks pays any cancellation fee that may be set out herein or in the appropriate Service Schedule. Nortel Networks will pay for related Services and deliverables provided before and in connection with termination.    To the extent Contractor does not have the right to terminate the work of its subcontractors for its convenience Contractor will indemnify Nortel Networks against any claims by Contractor's subcontractors (including liens that may be filed) for subcontractor charges that accrue after the effective date of termination of this Agreement.

16.2    *Material Default* - Either party may terminate this Agreement, including some or all of the Teleo Service Orders, at the terminating party's sole discretion, if the other party initiates or experiences one of the events of material default listed in sub-parts (a) through (d) below; provided that (a) the non-defaulting party gives the defaulting party at least 30 days prior written notice of the notifying party's intention to terminate based on a material default, and (b) the party notified of its alleged material default is unable to cure the default with the 30 day period. The following events shall constitute events of material default for the purposes of this Section 16.2:

(a) the other party becomes insolvent or bankrupt or makes an assignment of its property for the benefit of creditors or otherwise;

(b) the other party's receivables under this Agreement are levied upon under execution or seized by virtue of any writ of any court;

(c) an involuntary petition is filed in any court to declare the other party bankrupt and is not dismissed within sixty (60) days; or,

(d) a trustee in bankruptcy, receiver or receiver-manager or similar officer is appointed for the other party or for any of its assets.

16.3    *Finish Services* - If requested in writing by Nortel Networks, Contractor will finish incomplete Services after termination.   The terms of the Agreement will apply during the completion of Services after termination.

17.    **Laws, Rules and Regulations** - Contractor represents and warrants that it is familiar with the laws, codes, rules and regulations and standards governing its performance of the Services and will ensure that all Workers will comply with the same.

17.1 *Quality, Health and Safety* - As part of the general compliance obligation described above, Contractor will comply with, meet or exceed all Occupational Health and Safety requirements as identified within Part II of the Canada Labour Code.

18.    **Notices** - Notices will be given in writing by (a) fax, (b) courier service or (c) electronic mail (e-mail). Courier service notice is effective on the earlier of 5 days from being deposited for delivery or the date on the mail or courier receipt. Fax and electronic mail notice are effective when the sender receives confirmation that the fax was sent or electronic mail received. Each party will provide the other with the contact information required for each type of notice. The information will be first provided on the Effective Date and promptly updated, as it changes during the term of this Agreement.

19.    **General**

19.1    *Currency* - Unless otherwise agreed in writing by the parties, all monetary references in this Agreement and all pricing and payments will be in the US or Canadian currency as identified in the applicable schedule.

19.2    *Severability* - If any provision of this Agreement is determined to be legally unenforceable or invalid, the remaining provisions will continue in effect. The parties will substitute a provision that most closely approximates the economic effect and intent of the invalid provision.

19.3    *Waiver* - Unless waived and agreed in writing by the parties, no action or inaction by a party under this Agreement will constitute a waiver of a party's (a) rights or obligations under this Agreement, or (b) breach of this Agreement.

19.4    *Governing Laws* - This Agreement shall be subject to the laws of the Province of Ontario and the federal laws of Canada applicable therein, except for conflict of laws rules.

19.5    *Assignment* - Neither Nortel Networks nor Contractor will assign or transfer this Agreement, or its rights or obligations, without the prior written consent of the other. Consent will not be unreasonably withheld or delayed. However, either party may assign this Agreement to an entity that directly or indirectly owns at least 50% of the voting securities or may exercise 50% of the voting power of such party or to a person or entity to which such party has succeeded all or substantially all of its business and assets to which this Agreement relates.

19.6    *English* - All written communication concerning this Agreement or amendments or restatements of this Agreement will be in the English language.

19.7    *Multiple Counterparts* - This Agreement may be executed by the parties in multiple counterparts, each of which will be deemed an original and all of which will be one and the same document.

19.8    **Entire Agreement** - This Agreement is the entire agreement between Nortel Networks and Contractor with

Nortel Networks Agreement No. 05-464

respect to the subject matter herein. The Agreement supersedes all prior written or oral agreements on the subject matter.

NORTEL NETWORKS LIMITED

By _____

Print name: _____

Title _____

Date: _____

MTS Allstream Inc.

By _____

Print name: PAUL O'HERON

Title: SALES DIRECTOR, ENTERPRISE

Date: MAY 13, 2009

## EXHIBIT A

### (RESERVED FOR SERVICE SCHEDULES)

Each written Service Schedule, referring to this Agreement, and agreed upon by the parties, is attached to and incorporated in this Exhibit A and the Agreement.

Nortel Networks Agreement No. 05-06-4

**EXHIBIT B**
INFORMATION SYSTEMS SECURITY
(This exhibit is reserved)

Nortel Networks Agreement No. 05-064

### EXHIBIT C

### INSURANCE REQUIREMENTS

1.　**Coverage and Limits -** During the Term Contractor will carry the following types of insurance coverage and liability limits:

    (a)　*Comprehensive automobile insurance* for all non-owned vehicles, covering at minimum, bodily injury and property damage, with a minimum liability limit of $1,000,000.00 for each occurrence;

    (b)　*Comprehensive general liability insurance* covering at minimum, bodily injury, broad form property damage, and blanket contractual liability, with a minimum liability limit of $5,000,000.00 for each occurrence;

    (c)　*Employer's liability insurance* with a minimum liability limit of $1,000,000.00; and,

    (d)　*Workers' compensation*, with the statutory requirement for coverage. (In the United States, Contractor must carry statutory workers' compensation coverage whether or not state law allows Contractor to elect not to carry coverage)

1.1　*Additional Insured* - Contractor will name Nortel Networks as an additional insured on its commercial general liability policy.

1.2　*Certification* - On Nortel Networks' request Contractor will provide Nortel Networks with certificates confirming all **insurance coverage.**

1.3　*Termination of Coverage* - Nortel Networks may terminate Contractor's performance of Services, if any of the required insurance coverage terminates.

2.　Notice of Changes in Coverage - Contractor will give Nortel Networks 30 days notice of the cancellation or modification of the insurance coverage and limits in Section 1 above.

3.　Changes Required by Nortel Networks - Nortel Networks may request Contractor to increase its coverage, if Nortel Networks reasonably believes that the preceding coverage is inadequate. Contractor will comply with the request.

Nortel Networks Agreement No. 05-064

**EXHIBT D**

**SERVICE LEVEL AGREEMENT**


14BE_1007

# INTERNET SERVICE SCHEDULE

| Legal Name of Company ("Customer")<br>NORTEL NETWORKS LIMITED | Business Party Identification<br>(BPID) | MSA/Reference Number<br>06-823 |
| Address<br>195 The West Mall, 11b5-04-005, Toronto, Ontario, Canada M9C 5K1 | Annual Contract Value<br>(ACV) $ 54000 | Customer Number<br>43833 |
| Initial Term 2 (yrs) OR Co-terminus with existing Internet Service Schedule<br>dated 2008/02/01 (yyyy/mm/dd) with an Initial Term of 2 year(s) | | Original Agreement (Name) |

This is a Schedule to the Master Services Agreement ("MSA") referred to above between MTS Allstream Inc. and/or it's affiliates ("Allstream") and the Customer for the provision of the services described herein ("the Services"). The Services are subject to the terms and conditions set out in this Service Schedule, the MSA and Allstream's usage policy (as it may be revised by Allstream from time to time, a current copy of which is available at www.allstream.com or upon request to Allstream).

The Initial Term of this Service Schedule shall commence on the "Acceptance Date" indicated below. At the end of the Initial Term this Service Schedule shall continue on a month-to-month basis at Allstream's then prevailing thirty day rate until terminated by either party by giving 30 days notice in writing to the other party.

Unless otherwise defined in this Service Schedule, capitalised terms shall have the meaning ascribed thereto in the Agreement. Notwithstanding anything in this Service Schedule, nothing shall be deemed to limit in any way the limitations of liability provisions contained in the MSA.

## Product/Service Description and Pricing

### Gigabit Ethernet

| Fixed Bandwidth | Mark <X><br>for all that<br>apply | Quantity | Set-up Fee<br>per Unit | Total Set-up<br>Fees | Monthly Fee<br>per Unit | Total Monthly<br>Fees |
|---|---|---|---|---|---|---|
| 70 Mbps | | | | | | |
| 80 Mbps | | | | | | |
| 90 Mbps | | | | | | |
| 100 Mbps | | 1 | n/a | n/a | 4500 | 4500 |
| 150 Mbps | | | | | | |
| 200 Mbps | | | | | | |
| 250 Mbps | | | | | | |
| 300 Mbps | | | | | | |
| 350 Mbps | | | | | | |
| 400 Mbps | | | | | | |
| 500 Mbps | | | | | | |
| 600 Mbps | | | | | | |
| 700 Mbps | | | | | | |
| 800 Mbps | | | | | | |
| 900 Mbps | | | | | | |
| 1000 Mbps | | | | | | |

| Burstable<br>Committed and Sustained Usage - Per Mbps<br>95th Percentile: | Mark <X><br>for all that<br>apply | Quantity | Set-up Fee<br>per Unit | Total Set-up<br>Fees | Monthly Fee<br>per Unit | Total Monthly<br>Fees |
|---|---|---|---|---|---|---|
| Committed Bandwidth | | | | | | |
| 70 - 99.99 Mbps | ☒ | 1 | n/a | n/a | 33.75 per<br>Meg | |
| 100 - 199.99 Mbps | | 1 | n/a | n/a | 33.75 per<br>Meg | |
| 200 - 299.99 Mbps | | | | | | |
| 300 - 399.99 Mbps | | | | | | |

| | Mark <X> for all that apply | Quantity | Set-up Fee per Unit | Total Set-up Fees | Monthly Fee per Unit | Total Monthly Fees |
|---|---|---|---|---|---|---|
| 100 – 499.99 Mbps | ☐ | | | | | |
| 500 – 599.99 Mbps | ☐ | | | | | |
| 600 – 699.99 Mbps | ☐ | | | | | |
| 700 – 799.99 Mbps | ☐ | | | | | |
| 800 – 899.99 Mbps | ☐ | | | | | |
| 900 – 1000 Mbps | ☐ | | | | | |

| Options[1] | Mark <X> for all that apply | Quantity | Set-up Fee per Unit | Total Set-up Fees | Monthly Fee per Unit | Total Monthly Fees |
|---|---|---|---|---|---|---|
| DNS | | | | | | |
| Additional Emailboxes | | | | | | |
| Web 10 (10 MB Storage, 750MB Transfer, 1 Email, 1 DNS) | | | | | | |
| Web 25 (25 MB Storage, 1 GB Transfer, 1 Email, 1 DNS) | ☐ | | | | | |
| Web 50 (50 MB Storage, 1.5 GB Transfer, 1 Email, 1 DNS) | ☐ | | | | | |
| Customer Premise Equipment/Router | ☐ | | | | | |
| Border Gateway Protocol (BGP) | ☐ | | | | | |
| PVC Change | ☐ | | | | | |

## Additional Pricing Information and Restrictions or Stipulations

Quote/Pricing Attached ☐

Price Plan Reference Number [                    ]

Customer Exception Pricing (CEP) Number [ 672468R ]

CUSTOMER'S USE OF ALLSTREAM SERVICES CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS SET OUT IN THIS SERVICE SCHEDULE, THE ORIGINAL AGREEMENT, ALLSTREAM'S TERMS OF SERVICE AND ANY APPLICABLE USAGE POLICY(INCLUDING THE LIMITATION OF LIABILITY AND TERMINATION PROVISIONS CONTAINED THEREIN)

**CUSTOMER: NORTEL NETWORKS LIMITED**

| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | APPLICATION DATE |
|---|---|---|---|
| WENDY MCINTIRE | 919 985 403: | Wendy McIntire | 2008/03/12 (yyyy/mm/dd) |
| APPROVED, MARKETING<br>Customer Contracts<br>March 3, 20080:35:18 AM:March 3,<br>20088:34:28 AM:March 3,<br>20089:34:28 AM:March 3,<br>20089 33:38 AM:March 3,<br>20089:33:31 AM:March 3,<br>20089:33:31 AM:March 3,<br>20089:33:03 AM:March 3,<br>20089:32:56 AM:March 3,<br>20089:32:56 AM:March 3,<br>20089:32:04 AM:February 28,<br>200812:04:13 PM:February 28,<br>200812:04:00 PM:February 28,<br>200812:03:59 PM:February 28,<br>200812:03:59 PM | | | |

**MTS ALLSTREAM INC.**

| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | ACCEPTANCE DATE |
|---|---|---|---|
| Paul Choron | 416 345 253 | | 2008/03/01 (yyyy/mm/dd) |

### For Office Use only

| Reviewing Manager | Title | Project Manager (Print Name) | | Telephone | |
|---|---|---|---|---|---|
| | | | | | |

| SSA Name (Print Name) | Telephone Number | Booking ID | ICMS ID | Revenue ID | Agent ID | Agent Branch ID |
|---|---|---|---|---|---|---|
| | | | | | | |

™ MTS Allstream Inc.

146E_1007

MSA 11-22-01

This MASTER SERVICES AGREEMENT ("Agreement") NO. xxxxxx, including the content of the web pages at the uniform resource locators referenced herein  and SERVICE LEVEL AGREEMENT, and all other exhibits attached, is dated January 1, 2001 ("Effective Date").  The parties are Nortel Networks Limited, a Canadian corporation, with offices at 8200 Dixie Road, Suite 100, Brampton, Ontario L6T 5P6 ("NNL")  and Supplier, a(n) (Country) corporation with offices at (address) (Service Provider).

In this Agreement, the following words and expressions have the following meanings:

*Affiliates* means one or all of the following:  (a) a Manufacturing Licensee; (b) a Joint Venture; or (c) an entity of which Nortel Networks owns between 20% to 50% of the voting securities or other control mechanism.
*Confidential Information--(Information)* means information including, without limitation, specifications, drawings and documentation which may be disclosed by either party to the other party in connection with this Agreement.
*Documentation* means systems descriptions, hardware descriptions, software descriptions, operation and maintenance manuals, installation and configuration manuals together with any other written materials relating to the Services made available by the Service Provider to Nortel.
*Facilities* means Supplier facilities defined as Supplier' s Network including equipment and structures.
*Joint Venture* means a business enterprise with a limited scope and duration between Nortel Networks and a third party.
*Manufacturing Licensee* means a third party that has entered into an agreement with Nortel Networks to (a) manufacture or integrate Nortel Networks products (b) lease, sell, sublicense or distribute Nortel Networks products.
*Nortel Networks* means Nortel Networks Corporation and any entity that places an Order under this Agreement of which Nortel Networks Corporation either directly or indirectly owns at least fifty percent (50%) of the voting securities or  may exercise at least 50% of the voting power of the entity, and a "Nortel Network Entity" means any such entity.
*Nortel Networks Coordinator* means the Nortel Networks point of contact.
*Intellectual Property Rights* means without limitation, all copyrights and rights to create derivative works and all rights in patents, trademarks, trade secrets, mask works and any other intellectual property rights.
*Order(s)* means purchase order(s) issued by Nortel Networks for Services.
*Services* means any of the telecommunications services provided by Service Provider  to Nortel Networks under this Agreement through a network based on the Service Level Agreement and the Service Description as described in the applicable Schedule.
*Service Level Agreement (SLA)* means that document, attached to this MSA.
*Site* means the location(s) or facilities identified in an Order at which the Services will be provided.
*Term* means the Effective Date through the earlier of  a) 60 days after the expiration of all Service Schedules as listed in Appendix A and written notice of the intention to terminate this Agreement; or b) mutual acceptance of both parties to terminate this Agreement under the provisions as described in Section 18 of this Agreement.
*Transfer Taxes* means all goods and services, sales, land transfer, gross receipt, documentary, value-added, stamp duties and all other similar taxes, duties, registration charges or other like charges.
*Worker* means Service Provider's employees, agents and sub-contractors that perform Services.

1. **Orders**—To acquire Services under this Agreement Nortel Networks must issue an Order.  An Order may include the information set out in section 4.1 of the Service Level Agreement. Service Provider will supply Services specified in any Order in a timely manner and to the satisfaction of the issuing Nortel Networks entity in accordance with the specifications set out in the Service Description and the Service Level Agreement. Each Order accepted by Service Provider will be governed by the terms and conditions of this Agreement and will create contractual rights and obligations solely between the ordering Nortel Networks entity and Service Provider .  Service Provider, upon receipt of an Order issued by Nortel Networks, may reject the Order if it is determined that Service Provider is unable to deliver the requested Services.  The Service Provider acceptance of the Nortel Networks Order will not be unreasonably withheld.

2. **Nortel Networks Coordinator** - Each Order will name the Nortel Networks Coordinator. Service Provider will communicate with the Nortel Networks Coordinator about an Order.

3. **Program Manager and Customer Service Manager–** Service Provider shall nominate within 5 days of the Effective Date a dedicated Program Manager who shall be responsible for managing the overall implementation of the Agreement. Service Provider shall nominate within 30 days of the Effective Date a dedicated Customer Service Manager who shall be responsible for order management, delivery status, monthly meeting schedules and reports and problem resolution.

4. **Delivery -** The Services are to be delivered to the Site(s) stated on the Order and in accordance with the time scales stated on such Order. Where Service Provider fails to meet these dates and fails to rectify the problem within 30 days, Nortel Networks shall be entitled to terminate the Order at no cost or charge. Service Provider shall notify Nortel Networks immediately where any event occurs that will or is likely to delay the implementation of Services. Such notification shall include details of Service Provider's recovery plan to remedy the delay. The submission of such notification shall not release Service Provider from the performance of its obligations under the Order.

5. **Testing -** For all the Services provided by Service Provider, Nortel Networks and Service Provider shall test on delivery. Nortel Networks shall test these Services on a regular basis to determine whether or not they meet the Service(s) Description, applying Acceptance Testing as established in the SLA. In order to test the Services, Nortel Networks shall apply the test procedures to be mutually agreed by Nortel Networks and Service Provider within 2 (two) months of the Effective Date of this Agreement (the "Tests"). For each one-time connection of Services, Nortel and Service Provider agree that such Tests will be mutually agreed within 2 (two) months of the Effective Date of this Agreement.

6. **Reports and Inspections**
   On an agreed date and in an agreed format, Service Provider will provide Nortel Networks with the written reports described in sections 3.2, 5.1, 5.4.2 of the SLA. The reports may be verified and/or audited by Nortel Networks at its discretion and at its cost. Service Provider will reasonably cooperate with Nortel Networks during verification and/or audit.

7. **Warranties on Services and Deliverables -** Service Provider will deliver Services using standards generally accepted in the industry and will make best efforts to conform to the Order and to the specifications set out in the SLA. Service Provider makes no other representations, warranties, conditions or guarantees as to merchantability, fitness for a particular purpose or any other representations, warranties, conditions or guarantees regarding any service, product or facilities provided by Service Provider to Nortel Networks (including without limitation, those relating to: (I) Network transmission capacity (ii) whether data will be transmitted in an uncorrupted form; (iii) the security of any transaction; (iv) the fault tolerance of the service or the suitability of same for high risk activities; or (v) the reliability or compatibility of the facilities (including equipment) or software of third parties which may be utilized by Service Provider in providing, or by Nortel Networks in using, the service), whether express or implied in law or in fact, or in writing, except as expressly stated in the Agreement. Nortel Networks acknowledges that it has not relied upon any representation, warranty condition or guarantee made by Service Provider.

8. **Confidential Information–** Each party will use reasonable care in holding the other's Information in confidence and not disclosing the Information to anyone except its employees, sub Service Providers, agents, and in Nortel Networks' case, to an Affiliate, on a need-to-know basis and for the purposes of this Agreement only. Neither Service Provider nor its subcontractors shall, without the prior written consent of Nortel Networks, advertise or publicly announce that Service Provider ( including its subcontractors) is undertaking work for Nortel Networks in relation to this Agreement. Neither Nortel Networks nor its subcontractors shall, without the prior written consent of Supplier Corp, advertise or publicly announce that Supplier Corp (including its subcontractors) is undertaking work for Nortel Networks in relation to this Agreement.
   8.1 *Exceptions -* Information is not protected if (a) a recipient can demonstrate through written documentation that it was already known; (b) it becomes known or generally available to the public (other than by act of the recipient) after its disclosure; (c) it is disclosed or made available in writing to the recipient by a third party having a bona fide right to do so and without similar confidentiality obligations; (d) it is independently developed by recipient as demonstrated by its business records; or (e) it is required to be disclosed by subpoena or other process of law. The recipient will notify the disclosing party promptly of a subpoena or other process of law requiring disclosure.

9. **Security -** Service Provider will safeguard the security of Nortel Networks' computer systems, as set out in http://www.nortelnetworks.com/prd/suppliers/collateral/ics16-000701.pdf

10. **Independent Service Provider -** Under this Agreement Service Provider and Workers are independent



### Exhibit A – Schedule 1

## VOICE SERVICE SCHEDULE

| Customer (Legal Name of Company) | Customer Master Number (CCV) | MSA/Reference Number |
|---|---|---|
| **Nortel Networks Limited** | | 06-823 |
| Address | Annual Contract Value (ACV) | Customer Number (billing) |
| **195 The West Mall, Etobicoke, M9C 5K1** | **$15,000.00** | |
| Original Agreement (Name) | Initial Term | ☐ Co-terminus with the MSA term |
| **Nortel Networks Limited** | **3 (Years)** | |

This is a Schedule to the Original Agreement referred to above (the "Original Agreement") between MTS Allstream and / and/or its affiliates ("Allstream") and the Customer for the provision of the services described herein ("the Services"). The Services are subject to the terms and conditions set out in this Service Schedule, the Original Agreement, and Allstream's Terms of Services and any applicable Allstream usage policy (as they may be revised by Allstream from time to time, a current copy of which is available at www.allstream.org) upon request to Allstream (collectively, the "Agreement").

The Initial Term of this Service Schedule shall commence on the date this Service Schedule is signed by Allstream. Unless otherwise defined in the Service Schedule, capitalized terms shall have the meaning ascribed thereto in the Agreement. Notwithstanding anything in this Service Schedule, nothing shall be deemed to limit in any way the limitations of liability provisions contained in Allstream's Terms of Service.

Product/Service Description and Pricing

☐ *Outbound Long Distance*

| | Mark <X> for all that apply | Flat Rate/ Minute/Month | Billing Minimum/ Increment (in seconds) (30/6 is the default) |
|---|---|---|---|
| Canada-Canada - switched | | | |
| Canada-Canada - dedicated | | | |
| Canada-US - switched | | | |
| Canada-US - dedicated | | | |
| Canada-International | ☐ | Standard Business Long Distance Rates apply | |

| Features and Options | Mark <X> for all that apply | Set-up | Monthly Fee |
|---|---|---|---|
| DS1 Access | | | |
| Other | | | |

☐ *Toll Free/ Inbound Long Distance*

| | Mark <X> for all that apply | Flat Rate/ Minute/Month | Billing Minimum/ Increment (in seconds) (30/6 is the default) |
|---|---|---|---|
| Canada-Canada - switched | | | |
| Canada-Canada - dedicated | | | |
| US - Canada - switched | | | |
| US - Canada - dedicated | | | |
| International - Canada | | Standard Business Long Distance Rates apply | |

| Features and Options | Mark <X> for all that apply | Set-up | Monthly Fee |
|---|---|---|---|

DS1 Access (please use up to Data surface .......)
Other

☐ Calling Cards

| | Mark <X> for all that apply | Flat Rate/ Minute/Month | Billing Minimum/ Increment (in seconds) (30/6 is the default) |
|---|---|---|---|
| Canada-Canada | X | | |
| Canada-US | X | | |
| Canada-International and US-International | | Standard Business Long Distance Rates apply | |
| US-Canada | | | |
| US-US | | As per attached Schedule | |
| International - Canada/US/International | | Standard Business Long Distance Rates apply | |

| | Mark <X> for all that apply | Surcharge per Call |
|---|---|---|
| Surcharge per Call | | |
| Canada-Canada/US | | |
| US-Canada | | |
| US-US | | |
| Canada - Overseas - Customer Dialled | | |
| Canada - Overseas - Operator Assisted | | |
| US - Overseas - Customer Dialled | | |
| US - Overseas - Operator Assisted | | |
| International-Canada/US/International - Customer Dialled | | |
| International-Canada/US/International - Operator Assisted | | |

☐ Local Service - Business Line and Business Trunk

| | Mark <X> for all that apply | Set-up | Monthly Fee |
|---|---|---|---|
| Business Line with Hunting | | | |
| Business Line without Hunting | | | |
| Business Line Resale with Hunting | | | |
| Business Line Resale without Hunting | | | |
| Business Trunk | | | |
| Voice Messaging - Standard Mailbox | | | |
| Voice Messaging - Power Mailbox | | | |
| Voice Messaging - Transfer Mailbox | | | |
| Voice Messaging - Call Processing Mailbox | | | |
| Voice Messaging - Resale | | | |
| Other | | | |

☐ Local Service - Voice Messaging

| | Mark <X> for all that apply | Set-up | Monthly Fee |
|---|---|---|---|
| Voice Messaging - Standard Mailbox | | | |
| Voice Messaging - Power Mailbox | | | |
| Voice Messaging - Transfer Mailbox | | | |
| Voice Messaging - Call Processing Mailbox | | | |
| Voice Messaging - Resale | | | |

133E_0608

Other

☐ Local Service - ISP  PRI

| | Mark <X><br>for all that<br>apply | Set-up | Monthly Fee<br>(Flat Rate) |
|---|---|---|---|
| ISP PRI | ☐ | | |
| Translation Fee (one-time) | ☐ | | |
| UACD (one-time) | ☐ | | |
| Back-up D channel (Optional) | ☐ | | |
| Other | ☐ | | |

☐ Local Service - ISDN PRI

| | Mark <X><br>for all that<br>apply | Set-up | Monthly Fee |
|---|---|---|---|
| ISDN PRI (1-4 Access) | X | | 130.00 |
| ISDN PRI (5-10 Access) | X | | 130.00 |
| PSTN Connections | X | | 15.00 |
| Over D Channel charges | X | | 15.00 |
| | X | | .50 |
| Received DID charges | | | |
| 911 Charges | X | | 21 |
| Miscellaneous Services | X | | 13 |

☐ Local Service – IP Trunking

| | Mark <X><br>for all that<br>apply | Set-up | Monthly Fee |
|---|---|---|---|
| PSTN Connections [1,2] | ☐ | | 15.00 |
| DID Numbers (recurring fee is per DID) | X | | 1.00 |
| Reserved DID Numbers (recurring fee is per DID) | X | | .50 |
| Overflow  Telephone Number (recurring fee is per Telephone Number) | ☐ | | |
| Overflow  Trunk (recurring fee is per Trunk Group) | | | |
| Temporary Local Redirect  TLR (per activation/deactivation) | | | |
| 4 Digit DID Numbers (recurring fee is per DID) | | | |
| Alternate Trunk Group (per DS0 Trunk in a group) | | | |
| Back-up Bearer Line | | | |
| Back-up  D Channel PRI | | | |
| Other | | | |

    1   An accompanying  new or existing 911 service module # 147E  is mandatory for the provisioning of  IP Trunking
    2   An accompanying  911 service termination # 142E  is mandatory for the provisioning  IP Trunking

☐ Local Service - Digital Trunk

| | Mark <X><br>for all that<br>apply | Set-up | Monthly Fee |
|---|---|---|---|
| Digital Trunk   Access | ☐ | | |
| Digital Trunk   PSTN Connections | | | |
| Other | | | |

☐ Local Service - ISDN BRI

| | Mark <X><br>for all that<br>apply | Set-up | Monthly Fee |
|---|---|---|---|

ISDN BRI

BRI Resale

| | Local Service – Centrex

| | Mark «X» | | |
| | if valid | Set-up | Monthly Fee |
| Centrex (1-5 lines) | | | |
| Centrex (6-24 lines) | | | |
| Centrex (25-99 lines) | | | |
| Centrex (99-99 lines) | | | |
| Centrex (100-150 lines) | | | |
| Centrex (151-500 lines) | | | |
| Other | | | |
| Centrex Resale (1-5 lines) | | | |
| Centrex Resale (6-24 lines) | | | |
| Centrex Resale (25-99 lines) | | | |
| Centrex Resale (50-99 lines) | | | |
| Other | | | |

## Additional Pricing Information and Restrictions or Stipulations

1. All currently-sold Allstream long distance calling plans ("LD Plans") charge separate rates for landline and non-landline terminating international long distance calls. However, the rates and charges for some older existing Allstream LD Plans, that do not offer separate international landline/non-landline rates, were calculated based upon an average Allstream Customer usage terminating minutes distribution of approximately 95% landline and 5% non-landline (including without limitation cellular, pagers, and PDAs) (the "Threshold"). With respect to these older LD Plans that do not separate between landline and non-landline termination, the Customer shall comply with and remain within the stated Threshold. In the event Customer's monthly international outbound traffic terminating on non-landline networks exceeds the 5% Threshold stated above, Allstream reserves the right for (a) retroactively apply country specific non-landline per-minute rates to the overage amount; and/or (b) failing to reach an accord with the Customer, immediately terminate the Agreement and any Service Schedule.

2. Outbound usage rates are formulated using an assumed distribution of minutes terminating in Canadian Independent Telco regions. This distribution is based upon an Allstream Customer usage average, comprised of approximately 4% of the total minutes terminating in an Independent Telco region. In the event that this distribution is exceeded, Allstream reserves the right to: (a) retroactively apply Independent Telco-specific per minute rates to the overage amount, and/or (b) failing to reach an accord with the Customer, immediately terminate the Agreement and any Service Schedule.

Unless otherwise noted, calls are rated at 30 second minimums and 6 second increments.

| Pricing Attached | YES | Mark «X» |
| Price Plan Reference Number | | |

Customer Telephone Pricing (CTP) Number                 09029SR, 0637378

## CUSTOMER'S USE OF ALLSTREAM SERVICES CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS SET OUT IN THIS SERVICE

## SCHEDULE, THE ORIGINAL AGREEMENT, ALLSTREAM'S TERMS OF SERVICE AND ANY APPLICABLE ALLSTREAM USAGE POLICY (INCLUDING THE LIMITATION OF LIABILITY AND TERMINATION PROVISIONS CONTAINED THEREIN)

| CUSTOMER: Nortel Networks | | | |
|---|---|---|---|
| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | Date |
| | | | |
| MTS ALLSTREAM INC. | | | |
| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | Date |
| PAUL O'HEARN | 416-315-2525 | | 07/01/15 |
| Account Manager | Talk: | Branch Manager (Print Name) | Cel Phone: |
| SSA Name (Print Name) | Telephone Number | Housing ID | BCMS ID | Agent Code | Agent ID | Agent Branch ID |

™ MTS Allstream Inc.

147E_0306

# Schedule 2
# DATA SERVICE SCHEDULE

| Customer (Legal Name of Company)<br>**Nortel Networks Limited** | Customer Master Number (CCV) | MSA/Reference Number<br>06-823 |
|---|---|---|
| Address<br>195 The West Mall<br>Etobicoke, Ontario<br>M9C 5K1 | Annual Contract Value (ACV)<br>☒ Elected (CDN$) currency<br>☐ Elected (US$) currency<br>$ 278,400.00 | Customer Number (billing)<br>43833 |
| Original Agreement (Name)<br>Master Services Agreement No. 06-823 | | ☐ |

This is a Schedule to the Original Agreement referred to above (the "Original Agreement") between MTS Allstream Inc. and/or its affiliates ("Allstream") and the Customer for the provision of the services herein ("the Services"), and becomes a part of Exhibit A of the Original Agreement. The Services are subject to the terms and conditions set out in this Service Schedule, the Original Agreement, and any applicable Allstream acceptable usage policy (as they may be revised by mutual agreement , a current copy of which is available at www.allstream.com or upon request to Allstream) (collectively, the "Agreement). For avoidance of doubt, the terms of this Schedule will govern to the extent they supplement the terms of the Original Agreement or are in conflict with the terms and conditions of the Original Agreement.

Unless otherwise defined in this Service Schedule, capitalised terms shall have the meaning ascribed thereto in the Agreement. Notwithstanding anything in this Service Schedule, nothing shall be deemed to limit in any way the limitations of liability provisions contained in the Original Agreement.

## Circuits covered by this Schedule:

| Circuit Id | Loc Code | Dest Loc Code | Technology | Digital Level | Monthly | Service Charge |
|---|---|---|---|---|---|---|
| | | | | | | 4400.00 |
| 02/MHXX/000022UCN/00A | West Mall | TCF | PL | OC-12 | 10,000 | |
| 03/MHXX/000013/UCN/001 | CAR | TCF | PL | OC-12 | 13,200 | 0.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## Additional terms:

### TERM
The Initial Term for each circuit set out (the "Circuit(s)") above shall commence on January 1st 2008 unless a particular Circuit was provisioned after January 1st 2008, in which case the Initial Term for that Circuit shall commence on the Nortel acceptance date. The Initial Term for the Circuits shall be for a period of 12 months or until December 31st 2008, whichever is sooner, after which time it shall revert to month to month at the end of the Initial Term on the same terms and conditions except for the pricing which shall be at Allstream's then current thirty day rate, unless either party shall have given notice of termination at least 30 days prior to completion of the Initial Term.

### TERMINATION
If the Customer elects to terminate any or all of the Circuits during the Initial Term, the Customer will pay in a single payment to Allstream an access termination charge ("Access Termination Charge") equal to the Monthly Fees for the terminated Circuit(s) multiplied by the number of months remaining in the Initial Term of each terminated Circuit together with all remaining provisioning charges applicable to the circuit, including all remaining provisioning charges that were amortised and to be paid over the Initial Term. After the expiry of the Initial Term the Customer may terminate Circuits on 30 days notice, and shall pay the applicable Monthly Fee for the terminated circuit(s) for the period of those 30 days notice. The Customer acknowledges that the Access Termination Charge is a realistic pre-

estimate of the damages Allstream will suffer for such Access termination. For greater certainty, the Customer will not be responsible for payment of the Installation Charge, Termination Charge or Service Termination Charge pursuant to the Original Agreement in the event of such Access termination.

**CUSTOMER'S USE OF ALLSTREAM SERVICES CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS SET OUT IN THIS SERVICE SCHEDULE AND THE ORIGINAL AGREEMENT (INCLUDING THE LIMITATION OF LIABILITY AND TERMINATION PROVISIONS CONTAINED THEREIN), AND ANY APPLICABLE ALLSTREAM ACCEPTABLE USAGE POLICY**

**CUSTOMER: Nortel Networks Limited**

| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | Date |
|---|---|---|---|
| Rose Casanave | 919.919.8387 | | Apr 9 2008 |

**MTS ALLSTREAM INC.**

| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | Date |
|---|---|---|---|
| | | | 03/01/2008 |

For Office Use only

| Reviewing Manager | Title | Project Manager (Print Name) | | Telephone | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| SSA Name (Print Name) | Telephone Number | Booking ID | ICMS ID | Revenue ID | Agent ID | Agent Branch ID |
| | | | | | | |

™MTS Allstream Inc.



**ISDN-PRI SERVICE SCHEDULE (RETAIL)**

238E 0210

| Legal Name of Company ("Customer")<br>**Nortel Networks Limited** | Business Party Identification<br>(BPID)  38941 | MSA/Reference Number<br>**06-823** |
|---|---|---|
| Address<br>**5945 Airport Road** | Annual Contract Value<br>(ACV)  $ NA | Customer Number |
| Initial Term  **30 calendar days** | | Original Agreement (Name)<br>**MSA** |

This is a Schedule to the Original Master Services Agreement referred to above (the "Original Agreement") between MTS Allstream Inc. and/or its affiliates ("Allstream") and the Customer for the provision of the services described herein ("the Services"). The Services are subject to the terms and conditions set out in this Service Schedule, the Original Agreement, Allstream's Terms of Services and any applicable Allstream usage policy (as they may be revised by Allstream from time to time, a current copy of which is available at www.allstream.com or upon request to Allstream) (collectively, the "Agreement").

Unless otherwise defined in this Service Schedule, capitalised terms shall have the meaning ascribed thereto in the Agreement. Notwithstanding anything in this Service Schedule, nothing shall be deemed to limit in any way the limitations of liability provisions contained in Allstream's Terms of Service.


**TERMS AND CONDITIONS:**

1. **Regulatory Matters**

    1.1  The Customer acknowledges that Allstream is a regulated CLEC subject to the mandates of the Canadian Radio-television and Telecommunications Commission ("CRTC").  The Customer further acknowledges that the CRTC regulates all telecommunications services in Canada including without limitation, all local telephony services under telecom decision CRTC 97-8 (Local Competition), and Voice over Internet Protocol ("VoIP") services under telecom decision CRTC 2005-28 (Regulatory framework for voice communication services using Internet Protocol) wherein the CRTC addresses the requirement for telecommunication resellers to register with the CRTC.

    1.2  The Customer declares that it will not operate as a reseller of the Services described herein, and will operate exclusively as the End-Customer of this Service throughout the Initial Term or any subsequent renewal term of this Service Schedule.  The Customer agrees and acknowledges that the reselling of telecommunications services in Canada is a regulated business practice, and that any change in the Customer's business practices to contemplate the resale of the telecommunication services outlined in this Service Schedule entails additional requirements, including without limitation prior written approval of MTS Allstream, and registration with the CRTC as a telecommunications reseller.

2. **Definitions**

    2.1  Unless otherwise indicated herein, capitalised terms will have the meanings ascribed to them in the Agreement.

    2.2  For the purposes of this Service Schedule, the terms below shall be defined as follows:

    **"2-1-1 Service"** provides three-digit access to Public Information and Referral Services related to community, social, health and government services, and is applicable and available only in certain municipal jurisdictions that have implemented such a service.

    **"3-1-1 Service"** provides three-digit access to Non-Emergency Municipal Government Services, and is applicable and available only in certain municipal jurisdictions that have implemented such a service.

    **"4-1-1 Service"** provides three-digit access to local Directory Assistance Operator.

    **"7-1-1 Service"** provides three-digit access to Message Relay Service (MRS), a TTY interface used to assist communications for the hearing impaired.

    **"9-1-1 Service"** provides three-digit access to Emergency Services Call-Answer Operator.



"BTN" or "Billing Telephone Number" is the primary telephone number assigned to the ISDN-PRI to which all billing is applied. The location address registered for the BTN must match the physical location where the service is installed.

"CPN" or "Calling Party Number" is a full two-way working telephone number enabled on an ISDN-PRI that has its own unique End User name and location address for registration into the 9-1-1 database. CPNs may be used to facilitate emergency routing location assignments in office buildings or for IP telephone sets installed at branch offices within the same telephone exchange.

"DID" or "Direct Inward Dial Number" is a telephone number enabled on an ISDN-PRI to provide a customer PBX the ability to route incoming calls to a particular telephone set. DID numbers do not have their own location address record; rather they share the same physical location address as the BTN.

"End-Customer" or "End User" means the person using the Customer's in-service CPN.

"Public Service Answering Point (PSAP)" is a specialized emergency call-answer centre for all 9-1-1 calls originating within a specific geographic area. A PSAP agent connects a 9-1-1 caller to the required emergency services agency (police, fire and/or ambulance).

"Universal Call Trace" means the ability of the called customer to initiate an automatic trace of the last incoming call received. The telephone number, date and time are logged and can be forwarded to a law enforcement agency at the request of the called customer.

3. <u>Term</u>

The Initial Term shall begin on the "Acceptance Date" set out below. The Initial Term shall automatically renew for successive one (1) month periods unless either party gives the other party thirty (30) days prior written notice of termination.

4. <u>Provision of Service</u>

4.1 The Customer requests Allstream to supply, and Allstream hereby agrees to provide to the Customer (subject to regulation by the CRTC) the following for use by the Customer (the "Service(s)"): **ISDN-PRI Local Telephone Service**

4.2 The Customer agrees that the Services may not be resold for value to any third parties and/or End-Customers. Any attempt by the Customer to resell the Services to any third party or End-Customer will result in termination of this Service Schedule and immediate suspension of all Services without notice. In the event of termination, the Customer will be responsible for all outstanding invoices for Services rendered to the date of termination, including any and all collection costs and reasonable legal fees.

4.3 The local line service capabilities of the Service shall be in accordance with industry standards, and is made up of the following parts:
   (i) Public Switched Telephone Network (PSTN) connectivity using ISDN PRI's;
   (ii) Calling Party Numbers ("CPN") for each of the ISDN PRI's;
   (iii) Individual local line voice service capabilities including access to 2-1-1 Service (where available), 4-1-1 Service, 7-1-1 Service, and 9-1-1 Service;
   (iv) Local Number Portability (LNP), through the use of the CPN feature in association with each ISDN PRI; and
   (v) Population of subscriber CPN listings in the white pages directory.

4.4 The local line service capabilities of the Service shall be in accordance with industry standards. As new local line service capabilities become generally available (including, without limitation, 3-1-1 Service), they shall automatically be made available to the Customer, where technically feasible.

4.5 The Customer is responsible for ensuring that order information submitted to Allstream is accurate. Allstream accepts no liability for any order or directory listing inaccuracies, including 9-1-1 information.

4.6 Allstream will ensure directory listing information provided by the Customer is made available to the white pages directory listings publisher in each local service area. Allstream is not responsible for providing directory listing information for updates to directory listing websites.

4.7 The Services will be provided in accordance with the terms and conditions of this Service Schedule and the Agreement.



5. **Pricing and Payment**

Allstream shall invoice the Customer for Services in accordance with the charges set out in the ISDN-PRI Service Pricing section of this Service Schedule (the "Charges"). Third party charges incurred by Allstream in connection with the Services are subject to change and Allstream reserves the right to pass on such third party charges to the Customer.

ISDN PRI circuits are designed for normal 2-way transit of local and long distance traffic between the Customer equipment and the Public Switched Telephone Network (PSTN). Customer agrees that the PRI circuits shall not be used for the wholesale termination of long distance traffic that terminates to the Canadian PSTN. Allstream reserves the right to limit or discontinue service with 30 days prior written notice if, in its sole discretion, Allstream determines that the ISDN PRI circuits are used for wholesale termination of long distance traffic to the Canadian PSTN.

6. **Industry Process for Customer Migration Involving Resale**

The Parties agree to follow the "Customer Migration Process Maps" developed and revised from time to time by the CISC Business Process Working Group, or its successor. Deviation from these maps is permitted only to the extent set out in the Customer Migration Process Maps document which is obtainable from the CRTC.

7. **Provision of 9-1-1 Service**

   7.1 **By signing this Service Schedule, the Customer confirms its intent to use the ISDN-PRI Service to provide fixed line local telephone service to its End-Customers, provisioned in a manner that is associated with a fixed service point address, and may not be moved by the End-Customer without notice to and pre-arrangement with MTS Allstream. Pursuant to telecom decision CRTC 2005-21, this type of telephone service is classified as a *Fixed Native* local telephone service, which requires support of Enhanced 9-1-1 Emergency Service ("E9-1-1") in service areas where E9-1-1 is offered by the ILEC. Allstream shall therefore provide the Customer and its End-Customers with access to E9-1-1 where available in accordance with this regulation.**

   7.2 Allstream shall route 9-1-1 dialled calls directly to the appropriate ILEC operated 9-1-1 network trunk for immediate delivery to the local PSAP, along with the caller's telephone number ("Automatic Number Identifier" or "ANI"). Upon receipt of this information, the call answer system at the PSAP will pull the caller's service point location address from its database (" Automatic Location Identifier" or "ALI") such that the End User's address information will be displayed on the Emergency Services Operator's computer screen coincident with the call ringing their station set. The Emergency Services Operator at the local PSAP will then speak to the 9-1-1 caller to determine the nature of the emergency, and gather the pertinent details necessary to appropriately dispatch the required (police, fire, ambulance) services to respond to the call. It is essential that the ALI information displayed at the PSAP match the caller's actual location, so that emergency services may be dispatched to lend assistance even if the 9-1-1 caller is unable to communicate effectively with the PSAP operator.

   7.3 The Customer shall be responsible for maintaining up to date name address and telephone information for each of their End-Customers in 9-1-1 Service areas ("End-Customer 9-1-1 Information").

   7.4 Pursuant to Telecom Order 2000-1048 (follow-up to Order CRTC 2000-500 - Provision of end-customer information), the Customer is required to provide Allstream, as its Local Exchange Carrier, with End-Customer 9-1-1 Information for each in-service CPN so that Allstream can submit this information into the ILEC PSAP database in Allstream 9-1-1 Service areas. The Customer agrees that it shall provide any changes to such End-Customer information within 24 hours of the change.

   7.5 The Customer's private switch shall send the Allstream local switch ("Switch") the correct calling party number in 10-digit format.

   7.6 The Customer shall designate the BTN (pilot telephone number) as the default number with the service point address of the circuit as the central location for each trunk group. This default number is sent by the Allstream Switch to the public service answering point ("PSAP") in the event that the Switch does not receive a Calling Party Number (CPN) from the Customer or if the CPN is invalid and does not pass screening.

   7.7 The Parties agree and acknowledge that 9-1-1 Service is not available in all areas where ISDN-PRI Service is available.

   7.8 **Allstream makes no warranties, representations or guarantees to the Customer with respect to 9-1-1 Service availability.** The Customer and Allstream shall restore service as quickly as possible and on a priority basis should there be any interruption, delay, mistake or defect in transmission of the Service in either Allstream or the Customer's network or facilities.



## ATTACHMENTS:

☒ Additional Quote/Pricing information attached

☐ Standard Voice Service Level Agreement attached forms part of this agreement.

## ISDN-PRI SERVICE PRICING:

| Description | Quantity | Set Up Fee | Monthly Price |
|---|---|---|---|
| ISDN PRI's | 4 | $2,800.00 | $2,824.00 |
| DID Active | | 250.00 | |
| Reserved | | | |
| D Channel Back up | | 100.00 | $25.00 |
| | | | |
| Total | | $3,150.00 | $2849.00 |

---

**CUSTOMER'S USE OF ALLSTREAM SERVICES CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS SET OUT IN THIS SERVICE SCHEDULE AND THE MASTER SERVICES AGREEMENT (INCLUDING THE LIMITATION OF LIABILITY AND TERMINATION PROVISIONS CONTAINED THEREIN)**

**CUSTOMER: Nortel Networks Limited**

| Name of Authorized Representative (Print) | Telephone No. | Signature of Authorized Representative | APPLICATION DATE |
|---|---|---|---|
| Mark Taylor | 613 763 5332 | | Oct 5. 2010 (yyyy/mm/dd) |

**MTS ALLSTREAM INC.**

| Name of Authorized Representative (Print) | Telephone No. | Signature of Authorized Representative | ACCEPTANCE DATE |
|---|---|---|---|
| Brian Donlan, VP Sales | 416-345-2179 | | (yyyy/mm/dd) |

*For Office Use only*

| Reviewing Manager | Title | Project Manager (Print Name) | | Telephone | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| SSA Name (Print Name) | Telephone Number | Booking ID | ICMS ID | Revenue ID | Agent ID | Agent Branch ID | |
| | | | | | | | |

®Manitoba Telecom Services Inc. Used under licence.

> Approved
> CUSTOMER CONTRACTS
> Date:   October 4, 2010



147E_0306

# Schedule 4
# ETHERNET SERVICE SCHEDULE

| Customer (Legal Name of Company)<br>**Nortel Networks Limited** | Customer Master Number (CCV)<br>1053911 | MSA/Reference Number<br>06-823 |
|---|---|---|
| Address<br>195 The West Mall<br>Etobicoke, Ontario<br>M9C 5K1 | Annual Contract Value (ACV)<br>☒ Elected (CDNS) currency<br>☐ Elected (USS) currency<br>$ 53,400.00 | Customer Number (billing)<br>43833 |
| Original Agreement (Name)<br>Master Services Agreement No. 06-823 | | ☐ |

This is a Schedule to the Original Agreement referred to above (the "Original Agreement") between MTS Allstream Inc. and/or its affiliates ("Allstream") and the Customer for the provision of the services herein ("the Services"), and becomes a part of Exhibit A of the Original Agreement. The Services are subject to the terms and conditions set out in this Service Schedule, the Original Agreement, and any applicable Allstream acceptable usage policy (as they may be revised by mutual agreement , a current copy of which is available at www.allstream.com or upon request to Allstream) (collectively, the "Agreement". For avoidance of doubt, the terms of this Schedule will govern to the extent they supplement the terms of the Original Agreement or are in conflict with the terms and conditions of the Original Agreement.

Unless otherwise defined in this Service Schedule, capitalised terms shall have the meaning ascribed thereto in the Agreement. Notwithstanding anything in this Service Schedule, nothing shall be deemed to limit in any way the limitations of liability provisions contained in the Original Agreement. Allstream and Customer agree that this schedule does not constitute a formal modification or amendment of any other provision of the Agreement other than as stated herein and shall not constitute or give rise to the assumption, rejection, novation or repudiation of the Agreement or otherwise affect the parties' rights in the chapter 11 bankruptcy proceedings or the CCAA proceedings of Customer or any affiliate of Customer.

## Circuits covered by this Schedule:

| Circuit Id | CEP # | Loc Code | Dest Loc Code | Technology | Digital Level | Monthly | Service Charge |
|---|---|---|---|---|---|---|---|
| Access | 0925545 | Ottawa | Montreal | E-100 | | 700 | 625 |
| Access | 0925545 | Montreal | Ottawa | E-100 | | 1500 | 2500 |
| Transit | 0925545 | | | 70 Meg PVC | | 2250 | N/A |
| | | | | | | **$4,450** | |

## Additional terms:

<u>TERM</u>

The Initial Term for each Ethernet service set out (the "Circuit(s)") above shall commence on the acceptance date of the Circuits (the "Acceptance Date"). The Initial Term for the Circuit shall be for a period of twelve (12) months or 365 days following the Circuit Acceptance Date, whichever is sooner, after which time it shall revert to month to month at the end of the Initial Term on the same terms and conditions except for the pricing which shall be ten (10) percent higher than Customer's existing rate, unless either party shall have given notice of termination at least 30 days prior to completion of the Initial Term.

The Initial Term, rates and any further conditions, for any additional Circuit(s) shall be negotiated on a case-by-case basis under a separate Service Schedule.

SERVICE SCALABILITY

Ethernet services allow capacity flexibility, and as such this Service Schedule 3 allows the option to upsize or downsize the individual Circuit listed under this Schedule, within the capacity ranges listed in **Appendix A to Schedule 4.** Each Circuit listed in Appendix A to Schedule 3 will list all eligible size options, including monthly costs as quoted for each bandwidth size, as applicable to each service.

TERMINATION

If the Customer elects to terminate any or all of the Circuits during the Initial Term, the Customer will pay in a single payment to Allstream an access termination charge ("Access Termination Charge") equal to the Monthly Fees for the terminated Circuit(s) multiplied by the number of months remaining in the Initial Term of each terminated Circuit together with all remaining provisioning charges applicable to the circuit, including all remaining provisioning charges that were amortised and to be paid over the Initial Term. After the expiry of the Initial Term the Customer may terminate Circuits on 30 days notice, and shall pay the applicable Monthly Fee for the terminated circuit(s) for the period of those 30 days notice. The Customer acknowledges that the Access Termination Charge is a realistic pre-estimate of the damages Allstream will suffer for such Access termination. For greater certainty, the Customer will not be responsible for payment of the Installation Charge, Termination Charge or Service Termination Charge pursuant to the Original Agreement in the event of such Access termination.

CUSTOMER'S USE OF ALLSTREAM SERVICES CONSTITUTES ACCEPTANCE OF THE TERMS AND CONDITIONS SET OUT IN THIS SERVICE SCHEDULE AND THE ORIGINAL AGREEMENT (INCLUDING THE LIMITATION OF LIABILITY AND TERMINATION PROVISIONS CONTAINED THEREIN), AND ANY APPLICABLE ALLSTREAM ACCEPTABLE USAGE POLICY

**CUSTOMER: Nortel Networks Limited**

| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | Date |
|---|---|---|---|
| Mark Taylor | 613-763-5332 | M Taylor | August 20, 2009 |

**MTS ALLSTREAM INC.**

| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | Date |
|---|---|---|---|
| BRIAN DYNAN | | | Aug 31/09 |

For Office Use only

| Reviewing Manager | Title | Project Manager (Print Name) | | Telephone | | |
|---|---|---|---|---|---|---|
| SSA Name (Print Name) | Telephone Number | Booking ID | ICMS ID | Revenue ID | Agent ID | Agent Branch ID |
| | | | | | | |

® Manitoba Telecom Services Inc. Used under licence.



## Appendix A to Schedule 4

This Appendix A documents all Ethernet services as identified under Schedule 4, and lists all available bandwidth size options which are eligible, and further documents quoted monthly recurring costs.  Note, a change to bandwidth size will have the following limitations.

- Changes to the access arrangement, which would require provisioning of a new, larger or smaller, access circuit, will incur additional one time charges, and may involve longer lead-time to deliver that change
- Any change which can be completed using existing access arrangement, will incur a One-Time-Charge of $CDN200.00.
- Minimum billing period, following a change to bandwidth, would be 30 days
  - If bandwidth is increased to support some scheduled event, that capacity upgrade must be retained for 30, or more, days before bandwidth is returned to the original capacity
  - Each activity to add, and then remove, capacity, would incur the $200 One-Time-Charge per occurrence (increase or decrease in capacity).

Ethernet Service (a)  Montreal (BAN) to Ottawa (CAR)

| Ethernet 80 Mb | 0924445 | Ottawa | Montreal | Ethernet IXC | 80 Mb | 2550.00 | $0.00 |
| Ethernet 100 Mb | 092445 | Ottawa | Montreal | Ethernet IXC | 100 Mb | 3150.00 | $0.00 |

Additional Ethernet service x-sections to be added, as required, by Addendum to this Schedule 4.

| CUSTOMER: Nortel Networks Limited | | | | |
|---|---|---|---|---|
| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | | Date |
| Mark Taylor | 613-763-5332 | | | August 20, 2009 |
| MTS ALLSTREAM INC. | | | | |
| Name of Authorized Representative (Print) | Telephone Number | Signature of Authorized Representative | | Date |
| BRIAN DONILAN | 416 345 2119 | | | Aug 21/09 |
| For Office Use only | | | | |
| Reviewing Manager | Title | Project Manager (Print Name) | | Telephone |
| | | | | |
| SSA Name (Print Name) | Telephone Number | Booking ID | ICMS ID | Revenue ID | Agent ID | Agent Branch ID |
| | | | | | | |

® Manitoba Telecom Services Inc. Used under licence.