**EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FIFTY-FIFTH REPORT OF THE MONITOR**
**DATED OCTOBER 21, 2010**

**INTRODUCTION**

1.   On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to October 29, 2010 by this Honourable Court in its Order dated July 16, 2010.

2.   Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings").

1

As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.   An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group").   In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.   Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.   Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors").   The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.   Subsequent to the filing date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.  The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.  Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9.  The purpose of this fifty-fifth report of the Monitor (the "Fifty-Fifth Report") is to report to this Honourable Court on the following matters:

    a)  consolidated cash position and liquidity as at October 2, 2010;

    b)  actual receipts and disbursements from June 27, 2010 until October 2, 2010;

    c)  cash flow forecast for the period from October 3, 2010 until February 28, 2011;

    d)  consolidated Canadian entities' net inter-company position by region;

    e)  status of claims process and cross border claims protocol;

    f)  current status of the Group Supplier Protocol Agreement ("GSPA");

    g)  status of Health and Welfare Trust ("HWT");

    h)  status of Termination Fund (defined below);

    i)  status of the Employee Hardship Application Process and Fund (defined below);

3

j)  status of the transfer of the defined benefit pension plans to Morneau Sobeco Limited Partnership ("Morneau Sobeco"), the replacement pension Administrator;

k)  progress on restructuring and allocation matters;

l)  status of foreign proceedings; and

m) the Applicants' request for orders approving:

  i.   an extension of the stay of proceedings until February 28, 2011;

  ii.  an extension of the Employee Hardship Process (defined below); and

  iii. reimbursement to NNL of the Goldman Fee (defined below) from the LGN Sale Proceeds (defined below).

## TERMS OF REFERENCE

10.  In preparing this Fifty-Fifth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Fifty-Fifth Report.

11.  Unless otherwise stated, all monetary amounts contained herein are expressed in US dollars.

12.  Capitalized terms not defined in this Fifty-Fifth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor.

4

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT OCTOBER 2, 2010**

14. At October 2, 2010, Nortel's consolidated cash balance was approximately $5.9 billion including $2.9 billion of total treasury cash.  Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at October 2, 2010:

| Region | Gross Cash | Restricted | Unavaliable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 439 | (19) | (243) | 177 |
| Other Canada | 37 | (25) | - | 12 |
| | | | | |
| NNI | 807 | (15) | - | 792 |
| Other US (excluding NN CALA) | 2 | - | - | 2 |
| **North America** | **1,285** | **(59)** | **(243)** | **983** |
| | | | | |
| NN UK Limited | 365 | (20) | - | 345 |
| Other EMEA Filed Entities | 405 | (2) | - | 403 |
| JV - Netas | 64 | - | (64) | - |
| EMEA non-filed entities | 21 | - | - | 21 |
| **UK/Europe** | **856** | **(22)** | **(64)** | **769** |
| | | | | |
| Greater China | 174 | (6) | - | 168 |
| Other ASIA PAC (excl JVs) | 294 | (1) | - | 293 |
| Other JVs | 107 | - | (107) | - |
| **ASIA** | **575** | **(7)** | **(107)** | **461** |
| | | | | |
| NN CALA | 92 | - | - | 92 |
| Other CALA filed entities | - | - | - | - |
| CALA non-filed entities | 53 | - | - | 53 |
| **Cala** | **145** | **-** | **-** | **145** |
| | | | | |
| **Total Treasury Cash** | **2,861** | **(88)** | **(415)** | **2,358** |
| | | | | |
| **Divestiture Proceeds** | 3,008 | (3,008) | - | - |
| | | | | |
| **Other Funds held in Escrow** | 35 | (35) | - | - |
| | | | | |
| **Total Cash** | **5,904** | **(3,131)** | **(415)** | **2,358** |

5

15. As at October 2, 2010, North America had cash available for operations and post-filing inter-company settlements of approximately $983 million compared to a gross cash position of approximately $1.3 billion. Of this amount, approximately $189 million is held by Canadian entities and approximately $794 million is held by U.S. entities.

16. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $12 million of cash collateral posted by NNL in support of non-EDC performance bonds and letter of credit facilities primarily on behalf of other Nortel entities; (ii) $12 million held in the D&O Trust as detailed in the Pre-Filing Report; (iii) $10 million held in escrow related to the settlement of the Global Class Action; (iv) $4 million in support of the EDC performance bonds issued in exotic foreign currencies; (v) $4 million held in relation to benefits paid through the HWT; (vi) $2 million held in escrow as cash collateral to support the Jabil supply agreement; and (vii) $1 million of cash collateral posted with EDC in support of post filing performance bonding. Unavailable Cash relates primarily to: (i) $8 million of net proceeds from the sale of the Strandherd Lands; (ii) $234 million received from the sale of NNL's interest in the LGN joint venture and held in a single purpose bank account; and (iii) $1 million received from the sale of NNL's interest in the Relay business and held in a single purpose bank account.

17. NNI's Restricted Cash relates primarily to: (i) $1 million held in escrow for the benefit of utility providers in accordance with a First Day Order and (ii) $14 million held in escrow as cash collateral to support the Jabil supply agreement.

18. The Joint Administrators on behalf of NNUK and the other EMEA Debtors had available cash for operations and post–filing inter-company settlements of approximately $748 million. The EMEA non-filed entities had available cash of approximately $21 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

19.   NETAS, a joint venture in which Nortel Networks International Finance and Holdings BV ("NNIF"), a subsidiary of NNUK, owns a 53% interest, had approximately $64 million of cash of which approximately $34 million represents Nortel's proportionate share. Nortel believes these funds will continue to be used to fund NETAS's operations. Repatriation of these funds requires approval of the respective joint venture partners. The Joint Administrators have indicated that NNIF has entered into a share sale agreement for the sale of NNIF's interest in NETAS. The sale is subject to certain conditions precedent and is currently anticipated to close during the fourth quarter of 2010.

20.   Nortel entities in the APAC region have approximately $461 million of available cash for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $168 million are generally only available to fund operations within Greater China and inter-company settlements which will occur as the liquidation proceeds in APAC.

21.   As at October 2, 2010, NN CALA and the CALA non-filed entities had gross and available cash of $92 million and $53 million, respectively. This cash is expected to be used to fund their domestic operations and inter-company settlements.

22.   On March 10, 2010, Nortel Networks Telecomunicacoes Do Brazil Ltda. ("NN Brazil") filed for bankruptcy protection, on April 15, 2010, Nortel Networks de Colombia S.A. ("NN Colombia") was placed into liquidation and on July 30, 2010, Nortel Networks de Venezuela C.A. ("NN Venezuela") ceased operations as its financial obligations exceeded its available funds. The cash balances held by these entities have been removed as the entities are no longer participating in the Nortel global restructuring and are under the control of local officials in their respective jurisdictions.

23. Divestiture proceeds of approximately $3.0 billion are being held in escrow by various escrow agents. The funds held in escrow include:

  a) Approximately $2.8 billion with JPMorgan Chase Bank, N.A. until an agreement is reached regarding allocation of these proceeds to various Nortel legal entities, including NNL. Divestiture proceeds held in escrow relate to: (i) $1,010 million in proceeds from the sale of CDMA / LTE Access assets; (ii) $18 million in proceeds from the sale of the Layer 4-7 Business; (iii) $10 million in proceeds from the sale of the Next Generation Packet Core business; (iv) $915 million in proceeds from the sale of Enterprise assets; (v) $629 million in proceeds from the sale of the MEN assets, (vi) $90 million in proceeds from the sale of GSM assets; and (vii) $153 million in proceeds from the sale of CVAS assets;

  b) $50 million with CitiBank representing divestiture proceeds relating to the sale of CDMA / LTE Access assets. These divestiture proceeds are being held in support of the related Transition Service Agreement (the "TSA");

  c) $14 million with Wells Fargo Bank representing divestiture proceeds relating to the sale of Enterprise assets. These divestiture proceeds include $14 million being held in support of the finalization of purchase price adjustments;

  d) $65 million comprised of: (i) $2 million of proceeds of sale of the MEN assets in escrow with Ogilvy Renault LLP in support of certain real estate obligations and (ii) $63 million with CitiBank representing divestiture proceeds relating to the sale of MEN assets. These divestiture proceeds include $15 million being held in support of the related TSA, $34 million being held in support of the lease agreement with Ciena in respect of the Carling Campus and $14 million being held subject to certain succession tax, working capital and other adjustments;

e) $24 million with CitiBank representing divestiture proceeds relating to the sale of GSM assets. These divestiture proceeds are being held in support of the related TSA; and

f) $13 million of divestiture proceeds relating to the sale of CVAS assets are being held in escrow by Wells Fargo. These divestiture proceeds include $8 million being held in support of the finalization of purchase price adjustments, and $5 million being held subject to resolution of certain tax liabilities in North America and EMEA. In addition, $15 million is being held by JP Morgan Chase Bank, N.A. consisting of $10 million in support of the CVAS Transition Services Agreement ("TSA") and $5 million in support of potential severance liabilities for a specified employee group in EMEA relating to the sale of CVAS assets.

24. Other funds held in escrow include $35 million transferred from the CDMA / LTE Access asset divestiture proceeds escrow to a separate trust account pursuant to the Cascade Trust Indenture as more fully described in the Forty-First Report.

25. The consolidated cash position balances presented above do not reflect deposits of $1.3 million and $1.2 million received from Ericsson and PSP Holdings LLP, respectively, related to the sale of the MSS assets.

## ACTUAL RECEIPTS AND DISBURSEMENTS FROM JUNE 27, 2010 TO OCTOBER 2, 2010

26. The Applicants' actual consolidated net cash outflow for the period June 27 to October 2, 2010, was $28.7 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Fiftieth Report (the "Fiftieth Report Forecast") is attached at Appendix "A".

27. Actual net cash flow exceeded forecast by $17.7 million. Significant items contributing to this favourable variance were as follows:

a) a favourable permanent variance of $3.8 million with respect to the collection of accounts receivable primarily as a result of $3.1 million related to higher than forecast contract manufacturing receipts;

b) a favourable permanent variance of $11.3 million with respect to Other Receipts primarily as a result of releases of cash collateral as follows:

   i. release of $4.0 million from cash collateral held in support of EDC performance bonds issued in exotic foreign currencies;

   ii. release of $2.6 million from cash collateral posted with EDC in support of post filing performance bonding;

   iii. release of $1.4 million from cash collateral posted by NNL in support of non-EDC post filing performance bonds and letter of credit facilities; and

   iv. release of $1.9 million that was held in escrow in respect of a certain real estate lease;

c) an unfavourable net variance of approximately $2.4 million with respect to inter-company receipts and disbursements primarily as a result of the following:

   i. $4.1 million unfavourable timing variance as trade payables with NNI were settled earlier than originally forecast;

   ii. $8.9 million unfavourable timing variance with the APAC region that is composed of: (i) a $4.6 payment to NN China to settle an invoice backlog; and (ii) $4.3 of intercompany receipts from the remainder of the APAC region being retimed from Q3 2010 into Q4 2010;

10

    iii. $9.1 million favourable permanent variance as a result of a dividend received from GDNT that was declared subsequent to the issuance of the Fiftieth Report Forecast; and

    iv. $1.5 million favourable permanent variance as a result of a distribution from NN Switzerland that was declared subsequent to the issuance of the Fiftieth Report Forecast;

d) a favourable variance of $8.0 million with respect to benefits primarily as a result of the following:

    i. favourable timing variance of $4.0 million as payments with respect to the Termination Fund pursuant to the terms of the Amended and Restated Employee Settlement Agreement were retimed to early November 2010;

    ii. favourable timing variance of $3.5 million related to lower than forecast claims experience for the HWT during this period; and

    iii. favourable timing variance of $0.5 million as the Sun Life annuity payment has been retimed pending resolution of the payment process;

e) an unfavourable variance of $7.9 million with respect to non-inventory purchases primarily on account of: (i) $5.0 million in respect of transaction fees that were paid related to the LGN transaction, which the Applicants are seeking to be reimbursed from the LGN sale proceeds held in the single purpose bank account; and (ii) timing variances of approximately $2.9 million as amounts that were forecast to be paid in Q4 were settled in Q3; and

f) favourable permanent variance of $3.4 million with respect to restructuring costs as professional fees were lower than originally forecast.

11

28. Available Cash was higher than forecast by approximately $2.2 million as a result of a favourable foreign exchange translation on Canadian dollar denominated cash balances due to an appreciation of the Canadian dollar relative to the U.S. dollar.

29. Unavailable Cash increased by $20.0 million primarily as a result of a favourable purchase price adjustment in respect of the sale of NNL's interest in the LGN joint venture. All of the LGN proceeds are held in a single purpose bank account.

30. Restricted Cash decreased by $7.1 million as releases of various cash collateral totalling $9.9 million (as discussed in Other Receipts above) were partially offset by the following:

   a) $1.9 million increase in the balance of the HWT;

   b) $0.5 million increase in the Jabil escrow; and

   c) $0.2 million increase in the D&O Trust on account of the appreciation of the Canadian dollar relative to the U.S. dollar.

## CASH FLOW FORECAST FOR THE PERIOD OCTOBER 3, 2010 TO FEBRUARY 28, 2011

31. The Applicants, with the assistance of the Monitor, have prepared an updated 21-week cash flow forecast for the period October 3, 2010 to February 28, 2011 (the "October 3 Forecast" and the "Forecast Period", respectively). A copy of the October 3 Forecast is attached as Appendix "B".

32. As at October 3, 2010, the Applicants have Available Cash balances of approximately $189.6 million, excluding Restricted Cash and Unavailable Cash of approximately $287.1 million.

12

33. Based on the October 3 Forecast, it is anticipated the Applicants will have total receipts of $288.3 million and total disbursements of $211.8 million resulting in a net cash inflow of $76.5 million during the Forecast Period.

34. The $75 million post filing NNI Loan matures December 31, 2010. The U.S. Debtors have indicated they are not willing to provide a further extension.

35. The October 3 Forecast assumes the sale of the Carling Campus (as discussed later in this Report) will be completed in December 2010 and a portion of the resulting proceeds will be used to repay the $75.0 million NNI Loan and any accrued interest.

36. Other significant assumptions used in preparing the October 3 Forecast include the following:

    a) other receipts include $198.9 million of net sale proceeds from the sale of the Carling Campus and $5.0 million reimbursement from LGN sales proceeds in respect of transaction fees paid by NNL;

    b) the sale of the MSS business closes in December 2010;

    c) monthly billings for transition services provided by the Applicants to buyers of the various Nortel assets and businesses, pursuant to the respective TSAs, are invoiced on an average 45 day billing cycle and subject to 30 day payment terms;

    d) accounts payable disbursements relating to the CDMA / LTE Access assets continue to be administered by Nortel during the Forecast Period. During this transition period and in accordance with the relevant asset purchase agreement, Ericsson will pre-fund these expenses to Nortel resulting in no material working capital impact. The administration of accounts payable disbursements is assumed to continue throughout the Forecast Period;

13

e)  sale proceeds from the CDMA / LTE Access assets, Enterprise business, MEN business, MSS business, GSM/GSM-R, CVAS and certain other asset sale transactions are to be held in escrow pending resolution of allocation discussions and are not reflected in the October 3 Forecast;

f)  accounts receivable collections, consisting of the collection of residual accounts receivable not acquired by the purchasers as part of the divestiture of the business units, have been estimated by the Applicants' collection group based on historic customer collection experience;

g)  all pre-filing amounts owed to suppliers are assumed stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

h)  inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities. Inter-company pre-filing trade accounts and loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

i)  payroll does not include AIP for the second half of 2010 or 2010 retention payments. Pursuant to the terms of Nortel's AIP and Nortel's Special Incentive Plan, these amounts are anticipated to be paid in March 2011 which is outside the Forecast Period;

j)  pursuant to the terms of the Amended and Restated Employee Settlement Agreement, there are no further current funding contributions to the Applicants' defined benefit pension plans made during the Forecast Period. Funding related to current employees' retirement savings plans are reflected in Benefits disbursements. Funding for non-registered pension or other retirement plans is stayed;

14

k)  funding for benefits for pensioners and people on long term disability will be in accordance with the provisions of the Amended and Restated Employee Settlement Agreement;

l)  all interest payments relating to the Company's pre-filing indebtedness are stayed. Interest with respect to the post-filing NNI Loan continues to accrue and is forecast to be paid in December 2010 when the NNI loan is forecast to be paid out in connection with the sale of the Carling Campus;

m)  disbursements include a payment of CAD $4.2 million to the Termination Fund pursuant to the terms of the Amended and Restated Employee Settlement Agreement; and

n)  inter-company disbursements include a partial payment of $4.7 million with respect to the Shortfall Payment owing to NNUK pursuant to the Interim Funding and Settlement Agreement more fully described in the Fifteenth Report of the Monitor.

37.  Based on an analysis prepared by the Monitor, the Applicants have sufficient cash resources to fund operations through February 28, 2011.

15

**CONSOLIDATED CANADIAN ENTITIES' NET INTER-COMPANY POSITION BY REGION**

38.    Summarized below are the preliminary net inter-company book balances (including only trade and loan balances) as at August 31, 2010.   For purposes of the summary, all Canadian entities (the Applicants and their Canadian non-filed subsidiaries) have been consolidated. These inter-company balances have been prepared by the Company based on US GAAP and they are subject to further adjustments. The Company, under US GAAP, has fully reserved against the net inter-company balances owing from filed entities.  For presentation purposes the full amount of the inter-company balance, before the reserve, has been reflected.

39.    For purposes of calculating the net inter-company balances between trading pairs, balances between the same legal entities have been set-off provided the balances were either both pre-filing or both post-filing.  No pre-filing balances have been set-off against post-filing balances.

40.    The net inter-company balances arising prior to January 14, 2009 ("Pre-filing Balances") have been converted using January 14, 2009 foreign exchange rates. Inter-company balances arising after January 14, 2009 ("Post-filing Balances") are converted using August 31, 2010 foreign exchange rates.

41.    The pre-filing net inter-company payable position of $2.062 billion with the U.S. Debtors includes $62.7 million of the Revolver Claim which remains outstanding and is secured by a court-ordered charge in the CCAA proceedings.  The balance of the pre-filing inter-company payable position is unsecured.

42.    The post-filing net inter-company payable position of $86 million includes the $75 million NNI Loan from the U.S. Debtors which is secured by court-ordered charges in the CCAA proceedings. Other post-filing payables owing by the Applicants to the U.S. Debtors are secured by the Inter-Company Charge.  Post-filing payables and receivables between the Applicants and the EMEA Debtors were governed by the

16

GSPA until May 31, 2010 at which time the GSPA expired and has not been further extended.

| | Region | Pre-filing (Jan. 14, 2009 FX rates) | Post-filing (August 31, 2010 FX rates) | |
|---|---|---|---|---|
| **Net Receivable Position** | | (in millions) | | |
| **Filed Entities** | | | | |
| | CALA | 1 | 2 | |
| | EMEA | 93 | 2 | |
| | US * | 54 | 6 | ** |
| **Filed Total** | | 148 | 10 | |
| **Non Filed** | | | | |
| | APAC | 77 | 21 | |
| | CALA | 42 | 2 | |
| | EMEA | 9 | 0 | |
| | US | 14 | 2 | |
| **Non Filed Total** | | 142 | 25 | |
| **Net Receivable Total** | | 289 | 35 | |
| **Net Payable Position** | | | | |
| **Filed Entities** | | | | |
| | CALA | (24) | - | |
| | EMEA | (203) | (1) | |
| | US | (2,062) | (86) | *** |
| **Filed Total** | | (2,289) | (87) | |
| **Non Filed** | APAC | (208) | (2) | |
| | CALA | - | (1) | |
| | EMEA | - | - | |
| **Non Filed Total** | | (208) | (3) | |
| **Net Payable Total** | | (2,497) | (90) | |
| **Grand Total** | | (2,208) | (55) | |

* includes NN CALA Inc., a US entity that filed for Chapter 11 protection on July 14, 2009.

** $4.6M of the post filing balance relates to amounts owing from NN CALA Inc. for the period January 14, 2009 to July 14, 2009. Per NN CALA Inc's US GAAP records, these are considered pre-filing balances and are stayed.

*** includes $75M post-filing loan from US Debtors

## STATUS OF CLAIMS PROCESS AND CROSS BORDER CLAIMS PROTOCOL

43. On July 30, 2009, this Honourable Court issued an Order (the "Claims Procedure Order") setting out the procedures for the filing of certain claims against the Applicants.

17

44. Pursuant to the provisions of the Claims Procedure Order, a claims bar date of September 30, 2009 was established (the "Claims Bar Date") whereby all claims were to be filed with the Monitor with the exception of the following Excluded Claims:

   a) Inter-company Claims;

   b) Compensation Claims of the current and former employees and directors of the Applicants;

   c) claims secured by any of the Charges in the Initial Order;

   d) claims for grievances under any collective agreements to which any of the Applicants are a party; and

   e) claims of any director or officer of the Applicants for indemnification and/or contribution arising from such director's and officer's service to any Applicant.

45. By order dated August 4, 2009, the U.S. Court also established September 30, 2010 as its bar date for filing of claims in the Chapter 11 Proceedings.

46. On September 16, 2010, this Honourable Court issued an Order approving the methodology applicable for the review and determination of claims filed against the Applicants (the "Claims Resolution Order"). In a joint hearing on the same date, a Cross-Border Claims Protocol was approved which specifically addressed the level of cooperation and consultation on issues between the Applicants and U.S. Debtors with respect to Overlapping and Same-Creditor claims (the "Cross-Border Claims Protocol").

47. In its Forty-Eighth Report, the Monitor provided a summary of all proofs of claim filed against the Applicants as of that date.

18

48. The table below (the "Claims Report") provides an update as of October 19, 2010 as to the status of claims that have been filed against the Applicants to date. All claim amounts are in Canadian dollars using January 14, 2009 exchange rates.

**Nortel Networks - CCAA Applicants Overall Claims Status**
October 19, 2010
All amounts in CAD $ millions

| Debtor / Claim Category | Filed Proof of Claim # | $ | Under Review # | $ | Accepted or Reviewed and unadjusted # | $ | Value per Notice of Disallowance # | $ | Value per Notice of Dispute # | $ | Valued by Claims Officer # | $ | Valued by Court # | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Current claim value - most recent stage (1)(2) | | | | | |
| **Nortel Networks Corporation** | | | | | | | | | | | | | | |
| Trade | 91 | 1,672 | 87 | 189 | 2 | 1 | 2 | - | - | - | - | - | - | - | - |
| Bonds | 2 | 4,809 | 2 | 4,809 | - | - | 2 | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,514 | 7 | 2,514 | - | - | - | - | - | - | - | - | - | - | - |
| Other | 161 | 728 | 74 | 724 | - | - | 87 | - | - | - | - | - | - | - | - |
| Total | 261 | 9,722 | 170 | 8,236 | 2 | 1 | 89 | - | - | - | - | - | - | - | - |
| **Nortel Networks Global Corporation** | | | | | | | | | | | | | | |
| Trade | 9 | 1,484 | 7 | 1 | - | - | 2 | - | - | - | - | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510 | 6 | 2,510 | - | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 214 | 35 | 214 | - | - | - | - | - | - | - | - | - | - | - |
| Total | 50 | 4,208 | 48 | 2,725 | - | - | 2 | - | - | - | - | - | - | - | - |
| **Nortel Networks International Corporation** | | | | | | | | | | | | | | |
| Trade | 7 | 1,483 | 5 | 0 | - | - | 2 | - | - | - | - | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510 | 6 | 2,510 | - | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 214 | 35 | 214 | - | - | - | - | - | - | - | - | - | - | - |
| Total | 48 | 4,207 | 46 | 2,724 | - | - | 2 | - | - | - | - | - | - | - | - |
| **Nortel Networks Limited** | | | | | | | | | | | | | | |
| Trade | 271 | 1,302 | 196 | 465 | 67 | 7 | 8 | - | - | - | - | - | - | - | - |
| Bonds | 4 | 5,243 | 4 | 5,243 | - | - | - | - | - | - | - | - | - | - | - |
| Inter-company (NNI claim) | 1 | 2,517 | - | - | 1 | 2,517 | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,511 | 7 | 2,511 | - | - | - | - | - | - | - | - | - | - | - |
| Other | 187 | 1,438 | 186 | 1,431 | - | - | 40 | - | - | - | - | - | - | - | - |
| Total | 470 | 13,011 | 393 | 9,650 | 68 | 2,524 | 48 | - | - | - | - | - | - | - | - |
| **Nortel Networks Technology Corporation** | | | | | | | | | | | | | | |
| Trade | 100 | 1,532 | 39 | 37 | 54 | 3 | 7 | - | - | - | - | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510 | 6 | 2,510 | - | - | - | - | - | - | - | - | - | - | - |
| Other | 37 | 214 | 37 | 214 | - | - | - | - | - | - | - | - | - | - | - |
| Total | 143 | 4,256 | 82 | 2,762 | 54 | 3 | 7 | - | - | - | - | - | - | - | - |

Notes:
Note 1: The estimated value of individual claim by category is aggregated and shown in one claim stage only.
Note 2: All amounts (other than Accepted) are subject to potential material change (ie. negotiation, appeal, etc.) as the process for the determination of claims proceeds.

19

49. Pursuant to the provisions of the Canadian Funding and Settlement Agreement, the Claims Report includes a $2.0627 billion claim by NNI. The claim consists of two portions:

    a) $2 billion representing a pre-filing unsecured claim against NNL ranking pari passu with all other unsecured pre-filing claims; and

    b) $62.7 million representing a pre-filing secured claim which is secured pursuant to the provisions of the Initial Order relating to the Revolving Loan Agreement.

50. To date, 972 claims with a claim value of CAD $35.4 billion have been filed against the Applicants. This includes potential duplicate claims filed against multiple Applicants and claims filed subsequent to the Claims Bar Date. The Monitor, in conjunction with the Applicants, has reviewed 272 claims with a value of $2.5 billion. Of the claims reviewed, Notices of Disallowances have been issued with respect to 148 claims.

51. Pursuant to the provisions of the Claims Resolution Order, the Monitor has provided the U.S. Debtors with updated detail supporting the Claims Report as of October 19, 2010. A copy of the Claims Report will be posted on the Monitor's website.

52. The claims resolution process has progressed since the Claims Resolution Order was issued on September 16, 2010. The Monitor continues to review, revise and disallow claims, as applicable, and will report to this Honourable Court further on this process in subsequent reports.

**CURRENT STATUS OF GSPA**

53. Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the CCAA proceedings (e.g. the Initial Order) and the Chapter 11 Proceedings and/or in accordance with the Code

(together, the "Trading Orders").  Trade between the EMEA Debtors and the Applicants is pursuant to the GSPA.

54.  The purpose of the Trading Orders and GSPA is to ensure goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed as between the Nortel parties prior to the Filing Date.  In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amounts for post-filing purchases owing to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

55.  The GSPA had continued to be extended by the parties substantially in the same form as the initial GSPA.  Subsequent to the expiry of the sixteenth extension of the GSPA on May 31, 2010, the parties have continued to negotiate with respect to terms of an amended GSPA to reflect the significantly reduced volume of intercompany transactions resulting from the sale of Nortel's major lines of business; however, a final agreement has not yet been reached.  In the meantime, ongoing day to day trade of goods and services and settlement of post filing inter-company accounts continues in normal course.

**STATUS OF HEALTH AND WELFARE TRUST**

56.  On August 27, 2010, the Fifty-First Report was filed in support of the Monitor's motion for approval of a proposed allocation methodology (the "Proposed Allocation Methodology") with respect to funds held in the HWT and such ancillary relief as was just and convenient to terminate the HWT and implement the Proposed Allocation Methodology to distribute the funds held in the HWT to the beneficiaries who are entitled thereto.  As part of the Fifty-First Report, the Monitor provided illustrative scenarios showing the distribution percentages under each scenario.  Also, at the request of the LTD Representative, the Monitor, with the assistance of Mercer, sent beneficiary estimated allocation statements ("BEAs") to individuals in

21

receipt of income benefits, namely, LTD Beneficiaries, STB Beneficiaries and SIB Beneficiaries.

57. On September 17, 2010, the Monitor filed the Supplemental Fifty-First Report in order to provide, among other things, an update to the Monitor's Fifty-First report relating to the valuation of the LTD Optional Life benefit. Revised illustrative scenarios were provided showing the adjusted distribution percentages under each scenario. Revised BEAs reflecting this new information were then mailed to every LTD Optional Life Participant on September 20, 2010 by Mercer.

58. Prior to the motion, the Monitor received a number of inquiries from various stakeholders relating to the Proposed Allocation Methodology, related financial information and the BEAs. The Monitor worked diligently to respond to all inquiries on a timely basis.

59. The motion was heard by this Court on September 29 and 30, 2010 and October 1, 2010. At the conclusion of the motion, the Court reserved its decision. As of the date of this Report, the Court's decision is still pending.

**STATUS OF TERMINATION FUND**

60. In accordance with the Amended and Restated Employee Settlement Agreement approved by this Honourable Court on March 31, 2010, the Applicants established a CAD $4.3 million Termination Fund for former employees of the Applicants whose employment was terminated prior to or on June 30, 2010 to whom amounts are owing for termination or severance payments and who did not receive certain other payments.

61. On September 17, 2010, 1,158 former employees were notified by mail they were eligible for a maximum payment of CAD $3,000 from the Termination Fund. These eligible former employees were requested to confirm their contact information and in certain cases, where service was given prior to 1996, elect whether or not to

direct part or all of their payment into an RRSP as an eligible retiring allowance. This had to be completed by October 15, 2010 in order to receive their payment by early November 2010. If this deadline was not met, the payment will be processed as soon as possible after the confirmation is received by Nortel.

62. On September 23, 2010, 279 former employees who were not eligible for a payment from the Termination Fund were notified of being ineligible by mail.

63. As of October 15, 2010, 78% of former employees who were eligible for a payment from the Termination Fund have returned their confirmation to the Company. It is anticipated these payments will be processed by early November. The Monitor understands that once these payments are processed, the Company will attempt to contact those who have not responded in order to reach as many of the eligible former employees as possible.

**STATUS OF EMPLOYEE HARDSHIP APPLICATION PROCESS AND FUND**

64. On July 30, 2009, an order was issued by this Honourable Court approving an employee hardship application process (the "Employee Hardship Order") as more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

65. On July 16, 2010, this Honourable Court approved the Applicants' request to extend the Application Period until October 29, 2010 and to amend the eligibility requirements in respect of the Employee Hardship Process to reflect the extended date.

66. The Monitor is continuing to administer the hardship payment application process and report thereon to the relevant representative counsel. There currently remains available approximately CAD $626,000 of the original CAD $750,000 provided pursuant to the Employee Hardship Order. Applications continue to be received from former employees of the Applicants asserting financial hardship resulting from

23

illness, healthcare costs or ineligibility for pension or employment insurance benefits.

67. While those individuals awarded hardship payments may also have claims against the Applicants in the CCAA proceedings, it is not anticipated that any distributions under a plan of compromise or arrangement will occur in the near term. Accordingly, the Monitor supports the Applicants' request that the Application Period be extended until and including February 28, 2011 and that Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended accordingly. A copy of the amended Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications is attached as Appendix "C" to this Fifty-Fifth Report.

## PENSION PLAN TRANSITION TO REPLACEMENT ADMINISTRATOR

68. Pursuant to the Court approved Amended and Restated Settlement Agreement, Nortel ceased to be administrator of the Nortel pension plans after September 30, 2010. The Financial Services Commission of Ontario and the Ontario pension regulator appointed Morneau Sobeco to be the replacement administrator effective October 1, 2010.

69. The Monitor has posted Morneau Sobeco's website address and other contact details on its website at www.ey.com/nortel. The Monitor has been informed that until the replacement administrator advises of changes to the current monthly pension payments, they will continue unchanged, at least through 2010.

70. The Applicants and the Monitor continue to meet with representatives of Morneau Sobeco periodically to provide information and answer inquiries.

71. Arrangements have been made by the Applicants to compensate those who were grandfathered, for the loss of benefits that would have accrued from September 30, 2010 to December 31, 2010 in the transferred pension plans. This is in accordance

with the Amended and Restated Settlement Agreement where the Applicants committed to the continuation of benefits for all active employees and pensioners until December 31, 2010.

## PROGRESS ON RESTRUCTURING AND ALLOCATION MATTERS

72.   While Nortel has now completed the sale of most of its operating units, Nortel continues to assess the sale of its remaining assets, in consultation with its legal and financial advisors, while at the same time exploring other options in the event it cannot maximize value through sale transactions.

### Divestiture Activities

### *MSS Business Sale*

73.   As discussed in the Fifty-Fourth Report, NNC, NNL and certain of NNL's subsidiaries, including NNI, entered into an asset sale agreement dated September 24, 2010 with Ericsson for the sale of substantially all of the MSS Business for $65 million plus certain assumed liabilities.

74.   The sale transaction was approved by this Honourable Court and the U.S. Court on September 30, 2010.

75.   The sale transaction is targeted to close before the end of 2010; however, due to the timing of the application process for EU anti-trust approval the closing may be delayed until the first quarter of 2011.

### *Carling Campus*

76.   As discussed in the Fiftieth Report of the Monitor, NNL and NNTC retained DTZ Barnicke ("DTZ") to conduct a marketing campaign with respect to the sale of 3500 Carling Avenue, Ottawa, Ontario (the "Carling Campus"). As a result of this marketing campaign NNL and NNTC have entered into an asset sale agreement

dated October 15, 2010 with Public Works and Government Services Canada for the sale of the Carling Campus for CAD $208 million.

77. The Monitor understands that the Applicants will be filing a motion seeking this Honourable Court's approval of the asset sale agreement and a vesting order in the near term. The Monitor will file a report supporting such a motion in due course.

*Realization of Remaining Assets*

78. Nortel continues to make progress towards maximizing proceeds of realization on its residual assets. The Corporate Group remains focused on facilitating the sale of Nortel's residual businesses and assets, including the sale of GDNT, one of NNL's remaining joint ventures. In addition, the Corporate Group continues to explore the strategic alternatives available to best optimize the value of Nortel's remaining intellectual property.

*Settlement of Matters with Avaya Inc.*

79. On July 9, 2010, the Applicants filed a motion regarding the Avaya Disagreement Notice with this Honourable Court. Among other things, this motion sought an Order declaring that certain of the items specified in a disagreement notice delivered by Avaya Inc. ("Avaya") in relation to the closing statement for the Enterprise sale transaction did not constitute a valid dispute in relation to the closing statement having regard to the terms of the amended and restated asset sale agreement between Avaya and Nortel dated September 14, 2009 (the "Sale Agreement"). The U.S. Debtors also sought similar relief from the U.S. Court. Prior to this motion being heard by way of a joint hearing on July 16, 2009, Avaya and Nortel agreed to adjourn the motion to allow for further negotiations. At this time, Avaya and Nortel also agreed to direct Wells Fargo Bank, National Association (the "Escrow Agent"), the escrow agent appointed by Nortel and Avaya to hold, among other amounts, $30 million in relation to potential post-closing purchase price adjustments under the Sale Agreement, to disburse $10,583,300 to JPMorgan Chase Bank, N.A. (the

"Distribution Agent"), as distribution escrow agent for Nortel in connection with the Enterprise transaction, and $4,986,828 to Avaya, as these amounts were no longer in dispute between Nortel and Avaya. On September 30, 2010, Avaya and certain Nortel entities (including NNC, NNL, NNI and NNUK) entered into a Stipulation by and among the Sellers and Avaya Inc. (the "Stipulation") that resolved all outstanding matters between Avaya and Nortel. The principal terms of the Stipulation are as follows:

a) Avaya and Nortel agree to deliver joint written instructions to the Escrow Agent to release out of the purchase price adjustment escrow fund: (i) $6,000,000 plus accrued interest thereon pursuant to the Sale Agreement, minus any Retained Inventory Value (as defined below) to Avaya; and (ii) the balance of the purchase price adjustment escrow fund to the Distribution Agent. Assuming the Retained Inventory Value is $0, the approximate amount to be distributed to the Distribution Agent is $8.3 million;

b) Avaya shall return certain specified inventory to Nortel. To the extent any inventory is retained by Avaya and not transferred to Nortel, the value of such retained inventory (the "Retained Inventory Value") shall be deducted from the amount to be released to Avaya as noted above; and

c) The Stipulation is subject to approval by both this Honourable Court and the U.S. Court and such approvals becoming final and not subject to appeal. The Stipulation was approved by this Honourable Court on September 30, 2010, and by the U.S. Court on October 1, 2010.

*LGN Sale Transaction Advisory Fee Reimbursement*

80.  As discussed in the Fiftieth Report, the sale of NNL's interest in LGN to Ericsson closed on June 29, 2010. Net proceeds from the sale of approximately $234 million (net of withholding taxes) (the "LGN Sale Proceeds") have been deposited to a single purpose bank account pursuant to the Approval and Vesting Order granted by

27

this Honourable Court dated May 3, 2010 (the "LGN Sale Order").  A copy of the LGN Sale Order is attached as Appendix "D" hereto.

81.    Pursuant to the Order of this court made on June 1, 2009 approving the retention of Goldman Sachs as advisor with respect to the LGN transaction, Goldman Sachs was granted a first priority charge over the proceeds of sale for the payment of its fee (the "Goldman Fee").  It was intended the Goldman Fee would be calculated at the conclusion of the sale and paid out of LGN Sale Proceeds; however, the Goldman Fee of approximately $5 million was paid by NNL out of its general operating bank account.  Given the terms of the LGN Sale Order, NNL is seeking approval from this Honourable Court, for the reimbursement of the Goldman Fee from the single purpose bank account holding the LGN Sale Proceeds to the general operating account.

*Allocation Matters and Mediation*

82.    In accordance with the Interim Funding and Settlement Agreement entered into between the Applicants, the U.S. Debtors (excluding NN CALA) and certain of the EMEA entities dated June 9, 2009 (the "IFSA") and pursuant to various Orders of this Honourable Court and the U.S. Court, the sale proceeds of the global sale transactions have been placed into escrow pending agreement of all of the relevant Selling Debtors (as defined in the IFSA) as to an appropriate allocation of such proceeds.

83.    As reported in the Fiftieth Report, at various times through the second half of 2009 and the first quarter of 2010, the Monitor and Applicants, the U.S. Debtors and the Joint Administrators engaged in negotiations regarding the scope and terms of a protocol for resolving disputes concerning the allocation of sale proceeds.  During the course of these negotiations, it became apparent the parties had differing views as to the proper scope of the allocation protocol.

84.  The Monitor and Applicants, the U.S. Debtors and the Joint Administrators agreed to suspend negotiations on the allocation protocol and instead focus on a process to facilitate comprehensive settlement discussions with a view to resolving all material inter-estate matters; in short, the negotiation of a "global" resolution of all inter-estate matters.  To this end, the parties have met on several occasions in an attempt to agree on such a global settlement.

85.  As a result of these meetings, the Monitor and Applicants, the U.S. Debtors, the Joint Administrators, the UCC, the Bondholder Group and certain other Canadian stakeholders have agreed that these inter-estate negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues. The parties have selected Layn R. Phillips of the Alternative Dispute Resolution Center at Irell & Manella LLP ("Irell & Manella") to serve as mediator. Mr. Phillips is a former U.S. federal district court judge and preeminent commercial arbitrator and mediator with significant experience in the resolution of complex multi-party matters.

86.  Specific procedures to be utilized for the mediation have been agreed upon.  The mediation will be non-binding and Mr. Phillips will keep all information received in connection with the mediation confidential. The mediation is scheduled to begin on November 11, 2010.  The parties to the mediation will share the costs of the mediation and will advise Irell & Manella of the proportion to be borne by each of them. The Monitor is of the view that the appointment of Mr. Phillips as a neutral mediator will assist the parties in moving towards the resolution of inter-estate matters.

**Other Restructuring Activities**

*Estate Separation Activities*

87.  As discussed in previous reports, many of Nortel's corporate functions span multiple legal entities. For example, the accounts payable function for Nortel's North American operations are conducted out of Nashville, Tennessee, while the

North American Treasury function operates primarily out of the Mississauga, Ontario corporate office.   As the divestiture of the various operating lines of business has largely been completed and with the expectation that transitional services provided to the various buyers will be completed during 2011, the interdependency of the Nortel entities is expected to continue to diminish.   The various Nortel estates have started to prepare for the separation of various functions to allow each estate to become a "standalone" entity and to independently administer and complete their respective insolvency plans.

88.    Nortel has commenced an extensive analysis of the various corporate functions that will be required by the Applicants, the U.S. Debtors and other global Nortel entities and is preparing a plan, in consultation with the Monitor and the U.S. Principal Officer, to segregate most or all of these functions such that each of the Canadian and U.S. estates can operate independent of one another commencing in 2011.

89.    Nortel has reviewed the preliminary estate separation plans with the Monitor. Further analysis is required to finalize these plans and identify the resources required by the Applicants in order to ensure all necessary functions continue to operate such that administration of the Canadian estates can continue to completion on an effective, efficient and independent basis.

90.    Based on the preliminary analysis prepared by Nortel, the Monitor does not expect the incremental cost to the Applicants on a go forward basis to be material. Furthermore, the Monitor believes that it is in the best interest of the Applicants to operate on an independent basis in the near term.

*French Employee Claims*

91.    Approximately 128 former employees of have commenced actions against, *inter alia*, NNC, NNL and the Monitor, before the Versailles employment tribunal in France. Although the specific relief claimed varies on a case by case basis, the central claim is that NNC and NNL are liable for various employment related claims

30

on the grounds that they were "co-employers" with NNSA. The aggregate amount claimed is approximately €18 million. The Applicants, in consultation with the Monitor, are reviewing the claims and considering their options with respect to same.

## STATUS OF FOREIGN PROCEEDINGS

### *Chapter 11*

92. The following is a summary of the court orders issued and the financial information filed in the Chapter 11 Proceedings since the last update provided in the Monitor's Fiftieth Report:

  a) on July 13, 2010, the U.S. Debtors filed the Joint Chapter 11 Plan of Nortel Networks Inc. and Its Affiliated Debtors;

  b) on September 1, 2010, the U.S. Debtors obtained an order approving the "stalking horse" asset sale agreement with PSP Holding LLC for the sale of certain assets of the MSS Business. The court order also established bidding procedures for an auction that allowed qualified bidders to submit higher or otherwise better offers for the MSS Business;

  c) on September 3, 2010, the U.S. Debtors filed the Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and Its Affiliated Debtors;

  d) on September 16, 2010, the U.S. Debtors obtained an order approving a cross-border claims protocol establishing procedures for the resolution of overlapping and same-creditor claims in the Chapter 11 Proceedings and the CCAA proceedings;

  e) on September 30, 2010, the U.S. Debtors obtained an order authorizing and approving the sale of the MSS Business by the U.S. Debtors to

Telefonaktiebolaget LM Ericsson (publ) as the successful bidder at the auction held on September 24, 2010;

f) on October 1, 2010, the U.S. Debtors obtained an order approving a stipulation among NNC, NNL, NNI, EMEA Sellers, Other Sellers, and Avaya Inc. resolving a purchase price dispute in connection with the sale of the Enterprise Solutions business to Avaya Inc.;

g) on October 14, 2010, the U.S. Debtors obtained an order approving the U.S. Debtors' consent to a merger transaction and related transactions as minority stockholders of Blade Network Technologies, Inc. In connection with the approval of this transaction, the U.S. Debtors have agreed that the proceeds of the transaction payable to Nortel Altsystems Inc., a wholly owned subsidiary of NNC, shall be deposited into a bank account in the name of Nortel Altsystems Inc., which bank account shall hold only such sale proceeds and interest earned thereon. The funds in such account shall not be used for any purpose other than for ordinary course expenses incurred by Nortel Altsystems Inc. (including, without limitation, fees payable to the U.S. Trustee) without further notice and approval by the U.S. Court;

h) the U.S. Debtors filed Debtor-in-Possession Monthly Operating Reports for the months of June, July and August on August 27, 2010, September 3, 2010 and September 30, 2010, respectively; and

i) the U.S. Debtors obtained a final order waiving certain investment guidelines in the Code, and orders granting several omnibus objections to claims, authorizing the retention of professionals by the U.S. Debtors, resolving certain claims and motions, and approving omnibus procedures to settle prepetition claims.

32

*Chapter 15*

93.  The following is a summary of the filings in the Chapter 15 proceedings of the Applicants since the last update provided in the Monitor's Fiftieth Report:

a)  The Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Honourable Court.  The Monitor also filed notice of the Stay Extension Order and Endorsement of the Ontario Court dated July 16, 2010; and

b)  On September 21, 2010, NNL commenced an adversary proceeding in the Chapter 15 proceedings against Communications Test Design, Inc. ("CTDI"), styled Nortel Networks Limited v. Communications Test Design, Inc., No. 10-53066 (KG). CTDI and NNL are parties to several licenses and agreements authorizing CTDI to access and use Nortel's proprietary intellectual property, technical information and components solely for the purpose of repairing and refurbishing existing Nortel products. NNL alleges in its complaint that CTDI obtained or used its proprietary materials, components and information for unauthorized purposes, including but not limited to the manufacture of new products. NNL is asserting claims against CTDI for misappropriation of trade secrets, trademark infringement, dilution of a famous mark, false designation of origin, breach of contract, breach of covenant of good faith and fair dealing, fraud and unjust enrichment. NNI commenced a related adversary proceeding against CTDI in the Chapter 11 Proceedings.

**REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS**

94.  The Stay Period presently expires on October 29, 2010.  The Applicants are seeking a 122 day extension of the Stay Period up to and including February 28, 2011.  As stated above, based on the cash flow analysis including the assumptions contained therein, the Applicants have sufficient cash resources to fund operations through the requested stay extension.

33

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

95.  The Monitor has assisted and continues to assist the Applicants in their efforts to efficiently complete the realization and maximization of value from their assets, conduct the claims process and prepare a plan of arrangement.   The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a Plan.

96.  For the reasons outlined in this Fifty-Fifth Report, the Monitor supports the Applicants' request for the following:

   a)  Reimbursement of the Goldman Fee from the single purpose account holding the LGN Sale Proceeds to NNL's operating account;

   b)  extension of the Application Period for the Hardship Payment Application process up to and including February 28, 2011 and that the Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended accordingly; and

   c)  an extension of the stay up to and including February 28, 2011.

All of which is respectfully submitted this 21st day of October, 2010.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:
Murray A. McDonald
President

**Nortel Networks - October 2, 2010**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 27-Jun-10 | 27-Jun-10 | 27-Jun-10 |
| End of period | 02-Oct-10 | 02-Oct-10 | 02-Oct-10 |

### 1. Receipts & Disbursements

**Receipts**

| | | | |
|---|---|---|---|
| Collection of Accounts Receivable | 9.7 | 13.5 | 3.8 |
| Other Receipts | 214.8 | 226.1 | 11.3 |
| TSA Recoveries from Buyer | 42.3 | 43.8 | 1.5 |
| Payroll & AP reimbursement from Buyers | 8.1 | 7.1 | (1.0) |
| Intercompany Receipts | 13.4 | 14.6 | 1.2 |
| **Total Receipts** | 288.2 | 305.0 | 16.8 |

**Disbursements**

| | | | |
|---|---|---|---|
| Payroll (Gross) | 20.1 | 20.6 | (0.5) |
| Benefits | 24.0 | 16.0 | 8.0 |
| Pension | 1.1 | 1.1 | (0.0) |
| Inventory Purchases | 1.3 | 0.9 | 0.4 |
| Non-Inventory Purchases | 249.7 | 257.5 | (7.9) |
| Payroll & AP payments on behalf of Buyers | 8.1 | 7.1 | 1.0 |
| Intercompany Disbursements | 8.6 | 12.2 | (3.6) |
| Restructuring Costs | 21.8 | 18.4 | 3.4 |
| **Total Disbursements** | 334.7 | 333.7 | 1.0 |
| **Net Cash Flow** | (46.4) | (28.7) | 17.7 |
| FX Impact | - | 2.2 | 2.2 |
| **Opening Available Cash Balance** | 216.1 | 216.1 | - |
| **Closing Available Cash Balance** | 169.7 | 189.6 | 20.0 |
| Unavailable Cash | 222.7 | 242.7 | 20.0 |
| **Total Cash** | 392.4 | 432.3 | 40.0 |
| Restricted Cash | 51.5 | 44.4 | (7.1) |
| **Total Cash + Restricted Cash** | 443.9 | 476.7 | 32.8 |

APPENDIX B

**Nortel Networks - October 3, 2010**
**CCAA Applicants**
**Forecast Cash Flow**
USD (millions)

### Receipts & Disbursements

**Receipts**
- Collection of Accounts Receivable
- Other Receipts
- TSA Recoveries from Buyers
- Payroll & AP reimbursement from Buyers
- Intercompany Receipts

Total Receipts

**Disbursements**
- Payroll (Gross)
- Benefits
- Pension
- Inventory Purchases
- Non-Inventory Purchases
- Payroll & AP payments on behalf of Buyers
- Intercompany Disbursements
- Restructuring Costs

Total Disbursements

Net Cash Flow

Opening Available Cash Balance

Closing Available Cash Balance

Unavailable Cash

Total Cash

Restricted Cash

Total Cash + Restricted Cash

Appendix "C"

**Eligibility Requirements and Procedure with Respect to Hardship Payment Applications**

1. **Eligibility** – A former employee would be eligible for hardship payments if he or she is resident in Canada and has no available source of income, being all monies receivable by the former employee including, without limitation, employment income such as wages, salary or bonuses, consulting income, or pension or disability payments or income replacement payments ("Income"), or Income of a spouse, as of the date of the application and has no reasonable expectation of being in receipt of Income during the Application Period (referred to below) and:

   a. The former employee is unable to work due to illness or is incurring costs in excess of 25% of his or her EI payments as a result of treatment for illness or healthcare costs, or as a result of the illness of a family member who is dependent on the former employee for support; or

   b. During the Application Period the former employee is not receiving a Nortel pension or employment insurance (EI) as a result of ineligibility for EI or exhaustion of EI benefits, and demonstrates some other significant hardship in dealing with financial obligations.

2. **Application Process** – Notice of the application process will be posted on the Monitor's website and the website of the Nortel Retiree Protection Committee (NRPC) in a form approved by the Court. An applicant would be required to complete an application form (to be approved by the Court) to be submitted to a person designated by the Monitor. The person so designated would be expected to deal with completed applications within 14 to 21 days and to make an initial determination to approve or reject the application. The first payment will proceed within seven business days subject to the payment parameters set out below. If not approved, the application is to be reviewed by an informal committee and the applicant will be given the right to be heard by the committee. The committee will be composed of one company appointee, one appointee of the Monitor and one appointee chosen by the NRPC, who will be compensated for his time on an hourly basis. A further appeal may be brought to the Court or an officer of the Court designated by the presiding judge, costs to be determined by the Court on the application.

3. **Payment Parameters** – Any successful applicant may be approved for a maximum payment of up to 8 weeks salary based on a maximum weekly salary of up to $1,200 per week payable in monthly instalments. The hardship committee will also have discretion to approve additional amounts in cases of medical and other emergencies in an amount up to $2,500.

4. **Application Period** – From the date of court approval to February 28, 2011.

5. **Miscellaneous**

   a. Hardship Payments are advances against distributions on claims, and will be deducted from any payments on claims that may be allowed in the ultimate claims process in these proceedings.

   b. The Monitor shall report to the Court on or before February 28, 2011 with respect to the processing and administration of hardship payment applications.

   c. The aggregate maximum amount available for hardship payments on applications approved during the Application Period is $750,000.

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

|                            |     |                       |
| -------------------------- | --- | --------------------- |
| THE HONOURABLE MR.         | )   | MONDAY, THE 3RD       |
|                            | )   |                       |
| JUSTICE MORAWETZ           | )   | DAY OF MAY, 2010      |

THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER**
(Nortel-LGE Joint Venture)

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notice of Motion dated April 29, 2010 including, the approval of a transaction (the "Transaction") to sell certain shares owned by NNL of LG-Nortel Co. Ltd. pursuant to a share purchase agreement dated as of April 21, 2010 (the "Purchase Agreement") between NNL, as seller (the "Seller") and Telefonaktiebolaget LM Ericsson (publ), as purchaser (the "Purchaser") was heard this day at 330 University Avenue, Toronto, Ontario.

- 2 -

ON READING the affidavit of George Riedel sworn April 28, 2010 (the "Riedel Affidavit") and the forty-fourth report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated April 29, 2010 (the "Forty-Fourth Report") and on hearing the submissions of counsel for the Applicant, the Monitor, LG Electronics Inc. of Korea and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn April 29, 2010, filed:

1.     THIS COURT ORDERS that the time for the service of the Notice of Motion, the Forty-Fourth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.     THIS COURT ORDERS AND DECLARES that capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Purchase Agreement.

3.     THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution, delivery and performance of the Termination Agreement, the Purchase Agreement and the other agreements contemplated therein (collectively the "Transaction Documents") by NNL is hereby authorized and approved, and NNL is hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Purchased Shares to the Purchaser or to an Affiliate or Affiliates of the Purchaser in accordance with Section 8.3(a) of the Purchase Agreement.

4.     THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of NNL's right, title and interest in and to the Purchased Shares shall vest absolutely in the Purchaser, or in an Affiliate or Affiliates of the Purchaser in accordance with Section 8.3(a) of the Purchase Agreement, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Orders made in these proceedings, including the Order of the Honourable Justice Morawetz dated

- 3 -

January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which are collectively referred to as the "Encumbrances"). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Shares are hereby expunged and discharged as against the Purchased Shares.

5.    THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the Purchase Price shall stand in the place and stead of the Purchased Shares, and that from and after the delivery of the Monitor's Certificate all Claims and Encumbrances shall attach to the Purchase Price with the same priority as they had with respect to the Purchased Shares immediately prior to the sale, as if the Purchased Shares had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

6.    THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

7.    THIS COURT ORDERS that confidential appendix "C" to the Forty-Fourth Report be and is hereby sealed pending further Order of this Court.

8.    THIS COURT ORDERS that, notwithstanding:

  (a)    the pendency of these proceedings;

  (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

  (c)    any assignment in bankruptcy made in respect of any of the Applicants;

the provisions of the Transaction Documents and the vesting of the NNL's right, title and interest in and to the Purchased Shares in the Purchaser, or in an Affiliate or Affiliates of the Purchaser in accordance with Section 8.3(a) of the Purchase Agreement, pursuant to this Order shall be

- 4 -

binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

9.      THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

10.     THIS COURT ORDERS that NNL shall deposit the Sale Proceeds (as defined in the Forty-Fourth Report) into a single purpose bank account in the name of NNL to be established prior to the closing of the Transaction, which bank account shall hold only such sale proceeds and interest earned thereon, and that the funds in such account shall not be used to fund ongoing operations, or for any purpose other than for distributions to creditors generally, which distributions shall not be made without the prior approval of this Honourable Court on notice to the Service List.

11.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom, the Republic of Korea or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

12.     THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative

- 5 -

body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO..

MAY 0 3 2010

PER / PAR:

**Schedule A – Form of Monitor's Certificate**

Court File No.:  09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

MONITOR'S CERTIFICATE
(Nortel-LGE Joint Venture)

**RECITALS**

A.     Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.     Pursuant to an Order of the Court dated ●, 2010, the Court approved a share purchase transaction (the "Transaction") contemplated by a share purchase agreement dated as of April 21, 2010 (the "Purchase Agreement") between NNL, as seller (the "Seller") and Telefonaktiebolaget LM Ericsson (publ), as purchaser (the "Purchaser") and provided for the vesting in the Purchaser, or in an Affiliate or Affiliates of the Purchaser in accordance with Section 8.3(a) of the Purchase Agreement, of NNL's right, title and interest in and to the Purchased Shares, which vesting is to be effective with

respect to the Purchased Shares upon the delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from NNL that: (i) the Purchaser has paid the Preliminary Purchase Price for the Purchased Shares as set out in the Purchase Agreement; (ii) the conditions to Closing as set out in Article 5 of the Purchase Agreement have been satisfied or waived by the Seller and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of NNL.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Purchase Agreement.

THE MONITOR CERTIFIES the following:

1.      NNL has advised the Monitor that the Purchaser has paid and NNL has received the Preliminary Purchase Price payable for the Purchased Shares on the Closing Date pursuant to the terms of the Purchase Agreement;

2.      NNL has advised the Monitor that the conditions to Closing as set out in Article 5 of the Purchase Agreement have been satisfied or waived by the Applicants; and

3.      NNL has advised the Monitor that the Transaction has been completed to the satisfaction of NNL.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ 2010.

> **ERNST & YOUNG INC. in its capacity as monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**
>
> Per:    _____
>              Name:
>              Title:

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

APPROVAL AND VESTING ORDER
(Nortel-LGE Joint Venture)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel:      (416) 216-4832
Email:    dtay@ogilvyrenault.com

**Jennifer Stam LSUC#: 46735J**
Tel:      (416) 216-2327
Email:    jstam@ogilvyrenault.com
Fax:      (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1842785\5

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

## FIFTY-FIFTH REPORT OF THE MONITOR
## DATED OCTOBER 21, 2010

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.