# **EXHIBIT A**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**FIFTY-SIXTH REPORT OF THE MONITOR**
**DATED OCTOBER 25, 2010**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited
    ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
    International Corporation and Nortel Networks Global Corporation (collectively the
    "Applicants") filed for and obtained protection under the *Companies' Creditors*
    *Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January
    14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was
    appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The
    stay of proceedings was extended to October 29, 2010, by this Honourable Court in its
    Order dated July 16, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently
    filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the

- 2 -

United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.   An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, and each of these groups is participating in the CCAA proceedings.

4.   Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.   Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries and affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for recognition of the administration proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.   Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

- 3 -

7.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdiction in which they are located.


**PURPOSE**

8.    The purpose of this Fifty-Sixth Report of the Monitor ("Fifty-Sixth Report") is to provide information regarding the Applicants' motion seeking approval of a sale of NNL and NNTC's interest in 3500 Carling Avenue in Ottawa, Ontario (the "Carling Facility") pursuant to an Agreement of Purchase and Sale dated October 15, 2010 (the "Carling APS"), amongst NNL, NNTC (collectively, the "Vendor") and Her Majesty the Queen in Right of Canada as Represented by the Minister of Public Works and Government Services ("PWGSC" or the "Purchaser") and to provide the Monitor's support thereof.


**TERMS OF REFERENCE**

9.    In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, discussions with management of Nortel, and various property and marketing reports produced by DTZ Barnicke ("DTZ") and Altus Group Limited.  EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Fifty-Sixth Report.

10.    Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

11.    Capitalized terms not defined in this Fifty-Sixth Report are as defined in the Affidavit of John Doolittle (the "Doolittle Affidavit") sworn on January 14, 2009, the Carling APS, or previous reports of the Monitor.

- 4 -

## THE CARLING FACILITY

### *Background*

12. Nortel's research and development ("R&D") function in Canada is conducted through NNTC. NNTC's purpose is to carry on R&D for Nortel's various business units. NNTC does not produce any third party revenue and relies on NNL for all of its funding, including for payroll and R&D.

13. NNTC's executive office and R&D facility is located at the Carling Facility. Located in the west end of the City of Ottawa, the Carling Facility comprises 367.663 acres and a series of 11 interconnected buildings (referred to as "Labs") totalling approximately 2.3 million square feet of rentable area.

14. Of the 367.663 acres, 67.663 acres are owned by NNTC and the remaining 300 acres are leased by NNL from the National Capital Commission ("NCC") under an amended and restated ground lease agreement dated January 2, 1998 (the "Ground Lease"), the term of which expires on December 31, 2088.

15. The Carling Facility was the global headquarters for Nortel's R&D and at one time the Carling Facility housed approximately 6,500 employees.

16. With the downturn in the telecommunications industry, the utilization of the Carling Facility has been in decline since the early 2000's. As at the Filing Date, approximately 3,000 people were employed at the Carling Facility.

17. Subsequent to the Filing Date, the amount of R&D work conducted by NNTC has declined significantly as Nortel has sold its various operating businesses and accordingly, the number of Nortel employees at the Carling Facility has continued to decline.

18. At present, there are approximately 200 Nortel employees located at the Carling Facility. In addition, in connection with the divestitures of the former Nortel business units, Nortel entered into leases for portions of the Carling Facility with certain of the purchasers covering approximately 1 million square feet of rentable area.

- 5 -

*Sale Process*

19. In 2007, Nortel management determined that, given the reduced utilization of the Carling Facility, the Company would investigate a potential sale of the Carling Facility.

20. DTZ was engaged in December, 2007, to market the Carling Facility and commence a process to sell the property or lease surplus space in the Carling Facility in order to reduce costs.

21. During 2007 and 2008 DTZ continued its marketing efforts to promote the Carling Facility, focusing primarily on the large blocks of vacant space for lease. Approximately six prospects, including PWGSC, toured the site and a number of leasing proposals were entertained, but nothing was concluded.

22. In December, 2008, PWGSC issued a public request for information ("RFI") relating to the availability of a significant amount of office space in the Ottawa area. The deadline for submitting a response to the RFI was January 30, 2009. Nortel determined that the Carling Facility appeared to meet the requirements set out in the RFI and accordingly, with the assistance of DTZ, submitted a response to this RFI including a description of the Carling Facility.

23. In February, 2010, following the commencement of these proceedings and the sale or pending sale of the majority of Nortel's operating businesses, the Applicants, in consultation with the Monitor, determined that it would be in the best interest of the Applicants to conduct a more formal sales process for the Carling Facility.

24. Prior to commencing a formal sales process:

   a) The Monitor understands that, in March 2010, DTZ engaged BMO Capital Markets Real Estate Group ("BMO") as a sub-advisor given BMO's relationships with both public and private sector investors and end users;

   b) An updated appraisal of the Carling Facility was completed by Altus Group dated April, 2010;

- 6 -

c) DTZ, with the assistance of BMO, produced a Confidential Information Memorandum ("CIM"); and

d) DTZ and BMO, in conjunction with the Applicants and the Monitor, developed a marketing plan for the Carling Facility designed to provide maximum exposure to any potential interested parties.

25. The formal marketing process began in April 2010 as follows:

a) DTZ and BMO identified a targeted list of potential domestic users and investors, including the top 67 potential domestic investor purchasers, the top 97 employers in Canada and the top 20 employers in the Ottawa region and circulated preliminary information to these parties. DTZ and BMO subsequently contacted these parties to canvas their level of interest;

b) In addition to the top domestic investors and users noted above, DTZ and BMO sent marketing materials to a large number of other potential buyers, including a selected group of 73 international investors and a selected list of large U.S. based corporate users; and

c) The Carling Facility was advertised in the Globe and Mail on April 13, 2010, April 15, 2010, May 11, 2010 and May 13, 2010, on DTZ's web page, and across DTZ's broker network.

26. In total, DTZ communicated with approximately 109 potential purchasers. Twenty-four potential purchasers signed confidentiality agreements, entitling them to receive the CIM and access an electronic data room, which included due diligence materials in relation to the Carling Facility and a form of agreement of purchase and sale which was to be used as the basis for any offer presented. Fifteen of these potential purchasers toured the Carling Facility.

27. The Applicants invited all 24 potential purchasers to submit initial non-binding expressions of interest. On August 9, 2010, six first-round offers were received.

28.   After reviewing the first-round offers received and following discussions and consultation among the Applicants, the Monitor, DTZ and BMO, it was decided that a second round of bidding should be conducted with five of the parties who submitted first-round offers.

29.   On August 23, 2010, DTZ and BMO sent a letter to these five parties inviting them to refine and clarify their offer in a second round bid process. The bid deadline for the second round bid process was 4:00 p.m. EST on September 1, 2010.   Four potential purchasers submitted revised offers.

30.   Following a review of the second round offers, the Applicants, together with the Monitor, DTZ and BMO, decided that the two leading bids should be pursued, given the strength of these bids relative to the other two bids.

31.   The two leading bidders were notified that their offers were being considered further. Meetings were held with both of these bidders, which were attended by the Applicants, the Monitor, DTZ and BMO. During these meetings, bidders were asked a) to provide clarification on certain elements of their second round offers; b) to make certain revisions to their offers; and c) to make a further offer by September 16, 2010.

32.   Both bidders submitted revised offers on September 16, 2010. After careful review of these offers, the Applicants and the Monitor concluded that efforts should be made to negotiate the terms of a definitive agreement of purchase and sale with PWGSC, as PWGSC's offer represented the best value to the Applicant's for the Carling Facility and is supported by the likely market value range indicated in the Altus Group appraisal.

33.   The Applicants, the Monitor, DTZ and BMO met with representatives of PWGSC on September 24, 2010 to negotiate the terms of a definitive agreement.   As a result of this meeting and further meetings and discussions over the following weeks, an agreement was reached and the Carling APS was executed.

34.   PWSGC is a department of the Government of Canada responsible for, among other things, procuring and managing real estate for the Government.

35.   The Altus Group appraisal and a summary of the other offers received by the Applicants in respect of the Carling Facility are included in confidential Appendix "A" to this Fifty-Sixth

- 8 -

Report. Given the commercially sensitive nature of such information and the impact the disclosure of such information could have on any future sales process for the Carling Facility in the event the transaction described below is not consummated, the Monitor requests that confidential Appendix "A" to this Fifty-Sixth Report be sealed by this Honourable Court.

## THE CARLING APS

36. On October 15, 2010, NNL and NNTC (collectively, the "Vendor") and PWGSC entered into the Carling APS. The key terms of the Carling APS are outlined in the paragraphs that follow. Reference should be made directly to the Carling APS, a copy of which, excluding certain of the schedules, is attached as Appendix "B" hereto, for a complete understanding of the terms governing the proposed transaction.

37. A complete copy of the schedules to the Carling APS are attached as confidential Appendix "C" hereto. As certain of these schedules contain sensitive commercial and other information, the Monitor requests that confidential Appendix "C" to this Fifty-Sixth Report be sealed by this Honourable Court.

### Purchase Price

38. The gross purchase price under the Carling APS is $208 million in cash, exclusive of HST or other applicable transfer taxes and subject to certain adjustments that are typical of a commercial real estate transaction of this type.

### Purchased Assets

39. The Purchased Assets under the Carling APS are the Freehold Lands, the Freehold Premises, the Leaseholds Lands, the Leasehold Premises, the Ground Lease, the Furniture and Equipment, and the Leases. The Purchased Assets are being sold on an "as-is, where-is" basis.

- 9 -

*Closing*

40.  The closing date is the later of December 31, 2010 and 10 Business Days following the satisfaction or waiver of the last of the Conditions Precedent to Closing as set out in the Carling APS (the "Closing Date").

41.  The Purchaser and Vendor are targeting a closing date of December 31, 2010.

42.  In no event shall the Closing Date be later than March 31, 2011 without further written agreement of both the Purchaser and Vendor.

*Deposit*

43.  An initial deposit of $2 million is to be paid by no later than October 21, 2010 to the Vendor's Solicitors in trust. Counsel to the Applicants has confirmed to the Monitor that the initial deposit has been received.

44.  Provided all of the Purchaser's Conditions Precedent (except receipt of the Treasury Board of Canada's approval to complete the Transaction) have been satisfied or waived by the Purchaser, an additional deposit of $7 million is to be paid to the Vendor's Solicitors in trust within three (3) Business Days following November 30, 2010 (the "Environmental and Physical Plant Due Diligence Date").

45.  If the Purchaser fails to complete the Transaction or repudiates the Carling ASA after all of the Purchaser's Conditions Precedent have been satisfied or waived, the Deposit together with interest thereon shall be held by the Vendor's Solicitors, in trust, as security for any claims for damages which may be made by the Vendor.

46.  If the Vendor fails to complete the Transaction or repudiates this Agreement after all Vendor's Conditions Precedent have been satisfied or waived, the Deposit together with accrued interest thereon shall forthwith be refunded to Purchaser, without prejudice to any other claims, damages or remedies which the Purchaser may have or be entitled at law or in equity, against the Vendor.

- 10 -

***Closing Conditions***

47. The Parties' obligation to effect the Closing is subject to several conditions precedent, including:

   a) The Vendor has obtained the Approval and Vesting Order and all appeal periods with regard to the Approval and Vesting Order have expired; and

   b) The Vendor has provided written notice to the Purchaser that Vendor has obtained the NCC's consent to the Ground Lease Amendment Agreement, to the assignment of the Ground Lease to the Purchaser, to certain leases contemplated by the Carling APS, and to the assignment and assumption of existing leases (the "NCC Consent").

48. The Vendor's obligation to effect the Closing is subject to the following conditions precedent:

   a) Within 10 days after execution of the Carling APS, the Vendor shall have obtained all necessary senior management and Monitor approvals to the Transaction;

   b) By November 1, 2010 (the "Documents and Title Due Diligence Date"), the Vendor is satisfied with the terms of the Ground Lease Amendment Agreement, the anticipated terms and conditions of the NCC Consent and the final form of the Nortel Lease (as described below);

   c) By the Environmental and Physical Plant Due Diligence Date, the Vendor is satisfied with the terms and conditions of the Closing Agreement; and

   d) On Closing, the representations and warranties of the Purchaser are true in all material respects and all terms, covenants and conditions of the Carling APS to be complied with or performed by the Purchaser on or before the Closing have been complied with or performed in all material respects.

49. The obligation of the Purchaser to effect the Closing is subject to the following conditions precedent:

- 11 -

a)  On or before the Documents and Title Due Diligence Date, the Purchaser is satisfied with the results of its search of the Vendor's title to the Purchased Assets, its review of the planning, zoning and land use restrictions imposed on the Lands, with the terms of the Ground Lease Amendment Agreement, the anticipated NCC Consent to the assignment of the Ground Lease and the Nortel Lease, and its review of all Leases;

b)  On or before the Environmental and Physical Plant Due Diligence Date, the Purchaser is satisfied that the physical and environmental condition of the Purchased Assets is not materially different from that represented in the due diligence materials or third party reports previously made available to the Purchaser, and the Purchaser is satisfied with the terms and conditions of the Closing Agreement and the Interim Transition Services Agreement;

c)  On or before December 17, 2010, the Purchaser receives Treasury Board of Canada approval to complete the Transaction, with any conditions as may be imposed by the Treasury Board to be satisfied or waived by the Purchaser prior to the Closing Date; and

d)  On Closing, the representations and warranties of the Vendor are true in all material respects and all terms, covenants and conditions of the Carling APS to be complied with or performed by the Vendor on or before the Closing have been complied with or performed in all material respects.

### Assumption of Leases

50.  All Leases are to be assumed by the Purchaser at Closing.

51.  With respect to the Ciena Leases entered into between NNTC and Ciena Canada, Inc. ("Ciena") in connection with the Metro Ethernet Networks ("MEN") transaction, the Vendor is directed by the Purchaser to exercise the Vendor's Early Termination Right pursuant to the terms of the Ciena Leases and accordingly NNTC will provide the Early Termination Notice to Ciena at the time of Closing and cause the escrow agent, appointed by Nortel and Ciena Corporation to hold certain escrow amounts in connection with the MEN transaction, to pay Ciena the Early Termination Fee of USD $33.5 million from the

- 12 -

Carling Property Escrow Amounts as described in the Twenty-Fourth Report of the Monitor.

*Nortel Lease and Nortel Premises*

52.    In order to satisfy its obligations under the Transition Service Agreements with the buyers of Nortel's operating businesses, obligations to Ericsson in connection with the pending sale of the MSS business, and requirements for purposes of monetizing remaining assets, including Nortel's remaining intellectual property, Nortel requires continued use of certain space within the Carling Facility for a period of time after the Closing.

53.    As a result, NNL and the Purchaser will enter into the Nortel Lease on the Closing Date pursuant to which NNL will lease back a portion of the Carling Facility, being parts of the administration building and Labs 2, 3 and 6 (the "Nortel Premises") at a reasonable market rate which is to be agreed upon on or before Closing and for a term of three years, subject to earlier termination rights in favour of NNL.

54.    In addition, pursuant to the Nortel Lease, there are certain areas within Lab 5 and Lab 6 the Vendor will continue to occupy on a rent-free basis for a period of, as applicable,  ninety (90) days or twelve (12) months following the Closing Date while the Vendor vacates and removes whatever lab and specialty equipment that it wishes to remove from such space and consolidates into the Nortel Premises.

55.    Pursuant to the Nortel Lease, the Vendor will have certain rights of transfer, assignment or sublease, including the ability to sublease a portion of the Nortel Premises to the purchaser of the MSS business unit and any potential purchaser of the "IP Law" business unit.

*Closing Agreement*

56.    On or before Closing the Purchaser and the Vendor will enter in a closing agreement (the "Closing Agreement"), which among other things will outline certain agreements pertaining to the Closing of the Transaction, including the transition of the operational control of the Carling Facility from the Vendor to the Purchaser, access to and maintenance and control of certain telecom systems located within the Carling Facility, and the treatment of certain

- 13 -

realty taxes, post-closing adjustments and assignment of security from Tenants under the Leases (being certain parent guarantees or tenant letters of credit).

## SALES COMMISSION

57.   The DTZ engagement letter provides for a sales commission to be paid to DTZ upon closing of a sale of the Carling Facility. DTZ has not been paid, and is not entitled to be paid, any fees other than this sales commission with the exception of out of pocket disbursements in connection with this transaction. The fees payable to DTZ upon closing of the transactions contemplated by the Carling APS are estimated to be approximately $3.2 million. Any fees payable to BMO are to be paid by DTZ.

## APPLICATION OF SALES PROCEEDS

58.   To ensure that the Applicants continued to have sufficient cash resources available to them at the commencement of these proceedings, NNI agreed to provide an inter-company loan of up to USD $200 million support to the Applicants (the "NNI Loan"). An Amended and Restated Revolving Loan Agreement (the "NNI Loan Agreement"), dated March 27, 2009, amongst NNL as borrower, NNI as lender, and NNTC, NNC, NNGC and NNIC as guarantors (collectively, the "Guarantors") governs the terms of the NNI Loan.

59.   The NNI Loan bears interest at 10% per annum and there is currently an outstanding amount of USD $75 million plus accrued and outstanding interest, which amount represents the single draw made by NNL under the NNI Loan in January 2009.

60.   Pursuant to the Initial Order, as security for NNL and NNTC's obligations under the NNI Loan Agreement, NNI has been granted various court-ordered charges, including a charge over NNTC's ownership interest and NNL's leasehold interest in the Carling Facility (the "Carling Facility Charge"), which charge ranks second, behind the Administration Charge, as a charge on the Carling Facility.

- 14 -

61. The term of the NNI Loan Agreement has been extended from time to time, most recently until December 31, 2010. All amounts outstanding under the Loan Agreement are due on December 31, 2010.

62. NNL intends to repay the NNI Loan with the proceeds from the sale of the Carling Facility.

63. As the Carling Facility is solely owned by NNL and NNTC, the proceeds of sale, net of closing costs and an amount sufficient to satisfy the NNI Loan, will be available to NNL and NNTC and have been incorporated into the cash flow forecast attached to the Fifty-Fifth Report of the Monitor. As reported in the Fifty-Fifth Report, the Monitor expects this amount to be approximately USD $124 million. The Monitor is of the view that these funds should remain available to the Applicants to continue the efforts underway to maximize the value of the Applicants' estates for the benefit of all creditors.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

64. The Monitor has reviewed the Applicants' efforts to divest the Carling Facility and is of the view that they have acted in good faith to maximize value. The Monitor is satisfied that the Purchase Price constitutes fair consideration for the Purchased Assets. As a result, the Monitor is of the view that the Carling APS represents the best transaction for the sale of the Carling Facility.

65. The Monitor therefore recommends that this Honourable Court approve the Applicants' motion authorizing the Applicants to complete the transaction contemplated by the Carling APS and vesting all of the Applicants' right, title and interest in the Purchased Assets in PWGSC.

66. As noted above, the Monitor is of the view that the proceeds of sale, net of closing costs and an amount sufficient to satisfy the NNI Loan, should remain available to the Applicants to continue the efforts underway to maximize the value of the Applicants' estates for the benefit of all creditors.

- 15 -

67. For the reasons described in Paragraphs 35 and 37, the Monitor recommends that confidential Appendix "A" and confidential Appendix "C" to this Fifty-Sixth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 25th day of October, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

**APPENDIX "A"**

**BID SUMMARY**

**[CONFIDENTIAL]**

# APPENDIX "B"

# AGREEMENT OF PURCHASE AND SALE

Revised Final Form-Oct 15

# AGREEMENT OF PURCHASE AND SALE

### DATED  October 15, 2010

### BETWEEN

## HER MAJESTY THE QUEEN IN RIGHT OF CANADA, AS

## REPRESENTED BY THE MINISTER OF PUBLIC WORKS AND GOVERNMENT SERVICES,

### as Purchaser

### AND

## NORTEL NETWORKS TECHNOLOGY CORPORATION and

## NORTEL NETWORKS LIMITED

### collectively, as Vendor

### NORTEL CARLING CAMPUS

### OTTAWA, CANADA

DOCSOTT: 829408\8

Revised Final Form-Oct 15

# TABLE OF CONTENTS

**ARTICLE I – INTERPRETATION** ..................................................................2
    1.1    Definitions.............................................................................2
    1.2    Extended Meanings..............................................................8
    1.3    Headings................................................................................8
    1.4    Currency................................................................................8
    1.5    Construction..........................................................................8
    1.6    Obligations as Covenants.....................................................9
    1.7    Applicable Law......................................................................9
    1.8    Time.......................................................................................9
    1.9    Table of Contents, Headings.................................................9
    1.11   Schedules..............................................................................9

**ARTICLE II – AGREEMENT OF PURCHASE AND SALE**.............................9
    2.1    Purchase and Sale of Purchased Assets; Lease of Nortel Premises.......................9
    2.2    Authorizations.....................................................................10
    2.3    Deliveries.............................................................................10
    2.4    Acknowledgment of Purchaser as to Condition of Purchased Assets, Leases and Nortel Lease ....11
    2.5    Confidentiality, Public Announcement................................15
    2.6    Searches and Examination...................................................17
    2.7    Representations and Warranties..........................................18

**ARTICLE III – PURCHASE PRICE** ...............................................................19
    3.1    Deposit................................................................................19
    3.2    Payment of Purchase Price.................................................20
    3.3    General Adjustments...........................................................20
    3.4    Specific Adjustments..........................................................22
    3.5    Letters of Credit and Security Deposits .............................23
    3.6    Price Allocation..................................................................23
    3.7    Taxes...................................................................................23

**ARTICLE IV – CONDITIONS PRECEDENT TO THE OBLIGATION TO CLOSE** ......24
    4.2    Conditions Precedent for Vendor.......................................24
    4.3    Conditions Precedent for Purchaser ..................................25
    4.4    Non Satisfaction of Conditions Precedent.........................28
    4.5    Title Requisitions...............................................................28

**ARTICLE V – CLOSING DOCUMENTS AND CLOSING ARRANGEMENTS** .................28
    5.1    Vendor's Closing Documents.............................................28
    5.2    Purchaser's Closing Documents.........................................30
    5.3    Registration and Other Costs.............................................31
    5.4    Closing Arrangements........................................................31

**ARTICLE VI – OPERATION UNTIL CLOSING AND AFTER CLOSING** ...............32
    6.1    Operation Before Closing/Leasing....................................32
    6.2    Damage Before Closing......................................................32
    6.3    Operation Transition Matters.............................................33
    6.4    Post Closing Obligations....................................................33

**ARTICLE VII – GENERAL** .............................................................................34
    7.1    Invalidity.............................................................................34
    7.2    Amendment of Agreement .................................................34
    7.3    Further Assurance...............................................................34
    7.4    Entire Agreement................................................................34
    7.5    Waiver.................................................................................34

- 2 -

| | | |
|---|---|---|
| 7.6 | Solicitors as Agents and Tender | 34 |
| 7.7 | Merger | 35 |
| 7.8 | Successors and Assigns | 35 |
| 7.9 | Assignment | 35 |
| 7.10 | Notice | 35 |
| 7.11 | Planning Act | 37 |
| 7.12 | Effect of Termination of Agreement | 37 |
| 7.13 | No Registration of Agreement | 37 |
| 7.14 | Commissions | 37 |
| 7.15 | Facsimile and Counterparts | 37 |

**SCHEDULE A - LEGAL DESCRIPTION OF THE LANDS** ........................................................40

**SCHEDULE B - LIST OF LEASES** ........................................................41

**SCHEDULE C – TITLE RESERVATIONS** ........................................................45

**SCHEDULE D – PERMITTED ENCUMBRANCES** ........................................................46

**SCHEDULE E – DESCRIPTION OF FURNITURE AND EQUIPMENT** ........................................................54

**SCHEDULE F - NORTEL RETAINED ASSETS** ........................................................56

**SCHEDULE G - FORM OF NORTEL LEASE** ........................................................57

**SCHEDULE H – PURCHASER APPROVED GROUND LEASE AMENDMENTS** ........................................................58

**SCHEDULE I - CLOSING AGREEMENT** ........................................................59

**SCHEDULE J - FORM OF APPROVAL AND VESTING ORDER** ........................................................73

**SCHEDULE K - FORM OF TENANT ESTOPPEL CERTIFICATE** ........................................................86

Revised Final Form-Oct 15

# AGREEMENT OF PURCHASE AND SALE

Agreement of Purchase and Sale dated as of October 15, 2010 by and between:

### NORTEL NETWORKS TECHNOLOGY CORPORATION ("NNTC"),
a corporation incorporated under the laws of the Province of Nova Scotia, and

### NORTEL NETWORKS LIMITED ("NNL"),
a corporation incorporated under the laws of Canada
(collectively, the "**Vendor**")

and

### HER MAJESTY THE QUEEN IN RIGHT OF CANADA, AS REPRESENTED BY THE MINISTER OF PUBLIC WORKS AND GOVERNMENT SERVICES,

(the "**Purchaser**"),

**WHEREAS** NNL as tenant under the Ground Lease has caused the Leasehold Premises to be developed upon the Leasehold Lands, and NNTC, a corporation affiliated with NNL, owns the Freehold Lands adjoining the Leasehold Lands upon which has been developed the Freehold Premises;

**AND WHEREAS** Vendor wishes to convey the Purchased Assets to Purchaser and, in the case of NNL, to lease back the Nortel Premises in accordance with the provisions of the Nortel Lease;

**AND WHEREAS** Purchaser wishes to purchase the Purchased Assets and to lease the Nortel Premises to NNL in accordance with the provisions of the Nortel Lease;

**AND WHEREAS** the parties have agreed to enter into this Agreement to set forth the terms and conditions under which the purchase and sale of the Purchased Assets, and the entering into of the Nortel Lease, shall be completed;

**AND WHEREAS** by order of the Court on January 14, 2009, NNTC and NNL, inter alia, were granted protection under the Act (the "**CCAA Proceedings**") and Ernst & Young Inc. was appointed as monitor (the "**Monitor**");

**NOW THEREFORE,** for good and valuable consideration and the sum of five dollars ($5) now paid by each party to the other the receipt and sufficiency of which is hereby acknowledged, the parties hereby covenant, agree and declare as follows:

- 2 -

## ARTICLE I – INTERPRETATION

### 1.1 Definitions

The terms defined herein shall have the following meanings for all purposes of this Agreement, unless the context expressly or by necessary implication otherwise requires:

"**Act**" means the *Companies' Creditors Arrangement Act* (Canada);

"**Adjustments**" has the meaning ascribed thereto in Section 3.3(a);

"**Agreement**" means this Agreement of Purchase and Sale and the schedules attached hereto, as amended from time to time; "Article", "Section" and "Subsection" mean and refer to the specified article, section and subsection of this Agreement;

"**Agents**" has the meaning ascribed to it in subsection 2.4(a);

"**Approval and Vesting Order**" means the Order of the Court generally in the form attached hereto as Schedule J by which Order of the Court, and the delivery of the Monitor's Certificate thereunder, the right, title and interest of the Vendor in and to the Purchased Assets is to be vested in the Purchaser;

"**Assignment and Assumption of Leases**" means an assignment and assumption of the Leases, in a form prepared by the Vendor and approved by the Purchaser acting reasonably, pursuant to which the Purchaser shall, from and after Closing, assume the obligations of the landlord under the Leases and indemnify and save Vendor harmless in respect of all claims, demands, actions, costs, damages and liabilities made against or suffered by Vendor in respect thereof;

"**Balance**" has the meaning ascribed thereto in Section 3.2(b);

"**Building Systems**" has the meaning ascribed thereto in Section 2.4(f);

"**Business Day**" means any day other than a Saturday, Sunday or legal holiday in Ottawa, Canada;

"**Business Hours**" means between the hours of 9:00 a.m. o'clock and 5:00 p.m. o'clock Ottawa time;

"**CCAA Proceedings**" has the meaning ascribed to it in the 5th Recital to this Agreement;

"**Ciena Leases**" has the meaning ascribed thereto in Section 2.4(d);

"**CIM**" means the "Confidential Information Memorandum" for the Complex dated June 2010 prepared on behalf of Vendor by DTZ Barnicke and BMO Capital Markets Real Estate Group;

"**Closing**" means the completion and consummation on the Closing Date of the purchase and sale of the Purchased Assets, including without limitation the payment of the Balance of the Purchase Price and the delivery of the Closing Documents, at the offices of Vendor's Solicitors in Ottawa;

- 3 -

"**Closing Agreement**" has the meaning ascribed thereto in Section 5.4(b);

"**Closing Date**" has the meaning set out in Section 5.4(a);

"**Closing Documents**" means the Approval and Vesting Order and Monitor's Certificate and the other agreements, instruments and documents to be delivered by Vendor to Purchaser pursuant to Section 5.1 and the agreements, instruments and other documents to be delivered by Purchaser to Vendor pursuant to Section 5.2;

"**Closing Escrow Arrangements**" has the meaning ascribed to it in subsection 5.4(c);

"**Complex**" means collectively, the Freehold Lands, the Freehold Premises, the Leasehold Lands and the Leasehold Premises;

"**Condition of the Purchased Assets**" has the meaning ascribed thereto in Section 2.4(f);

"**Conditions Precedent**" means any or all of the Conditions Precedent for Purchaser, the Conditions Precedent for Vendor or the Mutual Conditions Precedent, as the case may be;

"**Conditions Precedent for Purchaser**" has the meaning ascribed thereto in Section 4.3(a);

"**Conditions Precedent for Vendor**" has the meaning ascribed thereto in Section 4.2(a);

"**Confidential Information**" has the meaning ascribed thereto in Section 2.5(a);

"**Court**" means the Ontario Superior Court of Justice (Commercial List);

"**Data Room**" means the actual and/or virtual data room in which Vendor has placed the Deliveries;

"**Deliveries**" has the meaning set out in Section 2.3;

"**Deposit**" has the meaning ascribed thereto in Section 3.1(b);

"**Documents and Title Due Diligence Date**" means November 1, 2010;

"**Documents and Title Due Diligence Period**" means the period of time from the date of this Agreement to and including November 1, 2010;

"**Due Diligence Date**" means, as the case may be, either the Documents and Title Due Diligence Date or the Environmental and Physical Plant Due Diligence Date, and "**Due Diligence Period**" means, as the case may be, either the Documents and Title Due Diligence Period or the Environmental and Physical Plant Due Diligence Period;

"**Due Diligence Materials**" means the materials made available to Purchaser in the Data Room by or on behalf of Vendor or otherwise made available to Purchaser by or on behalf of Vendor;

"**Environmental and Physical Plant Due Diligence Date**" means November 30, 2010;

- 4 -

**"Environmental and Physical Plant Due Diligence Period"** means the period of time from the date of this Agreement to and including November 30, 2010;

**"Environmental Laws"** means all applicable environmental laws, regulations, decrees, ordinances, or judgments relating to the Purchased Assets as they exist on the Closing Date;

**"Excise Tax Act"** has the meaning ascribed to it in subsection 3.7;

**"Final Adjustment Date"** has the meaning ascribed thereto in Section 3.3(c);

**"Freehold Lands"** means the lands owned by NNTC more particularly described in Part 1 of Schedule A attached hereto;

**"Freehold Premises"** means the buildings, improvements and structures situate on the Freehold Lands and commonly known as the Lab 1, Lab 2, Lab 3, Lab 4, Lab 5 and Lab 10 buildings and the "Administration" building, together with all underground levels, including parking structures, and all underground tunnel works, if any, and all of the fixtures and systems appurtenant to the buildings, improvements and structures, including the heating, ventilation and air conditioning system, fire protection system, security systems and alarms servicing the buildings, improvement, structures, lighting fixtures, plumbing and electrical systems, elevators, sprinklers, boilers, compressors, transformers, drainage and other mechanical and building systems and equipment comprising part thereof, but specifically excluding Tenant FF&E and the Nortel Retained Assets;

**"Furniture and Equipment"** means all fixtures, chattels and other tangible personal property of every nature and kind owned by Vendor and incorporated in, situate upon and used in connection with the operation of the Complex on the date of execution of this Agreement (or, if Schedule E is amended, as of the date of such amendment), all as described in Schedule E hereto, but specifically excluding Tenant FF&E and the Nortel Retained Assets;

**"Governmental Authorities"** means all applicable federal, provincial and municipal agencies, ministries, department, (save and except for the Purchaser) inspectors and other officials, as well as the City of Ottawa Fire Department and any public or private utility provider with legislated or regulated authority to issue an order in relation to the Complex;

**"Ground Lease"** means that certain Amended and Restated Ground Lease dated as of January 2, 1998 by and between NNL, as tenant, and the NCC, as landlord, for the Leasehold Lands upon which has been developed the Leasehold Premises, as amended by the Ground Lease Amendment Agreement;

**"Ground Lease Amendment Agreement"** means the agreement to amend the Ground Lease between Vendor and the NCC, to be approved by the parties and the NCC in principle on or before the Documents and Title Due Diligence Date pursuant to the provisions of Sections 4.2(a)(ii) and 4.3(a)(i)(B), and once so approved shall be initialled by the parties and appended as Schedule H hereto;

**"Ground Lease Assumption Agreement"** means the agreement to be signed by the NCC, Vendor and/or Purchaser, as the case may be, to assume the Ground Lease upon all of NNL's

- 5 -

right, title and interest therein vesting in the Purchaser pursuant to the Approval and Vesting Order;

"**HST**" means the harmonized sales tax payable under Part IX of the Excise Tax Act;

"**HST Undertaking and Indemnity**" means the HST undertaking and indemnity to be delivered by Purchaser on Closing in a form acceptable to Vendor, acting reasonably;

"**Hazardous Substances**" means any substance, mould, waste, liquid, gaseous or solid matter, fuel, micro-organism, sound, vibration, ray, heat, odour, radiation, energy vector, plasma, organic or inorganic matter which is or is deemed to be alone or in any combination, hazardous, hazardous waste, solid or liquid waste, toxic, a pollutant, a deleterious substance, a contaminant or a source of pollution or contamination under any Environmental Laws;

"**Lab Ten Lease**" has the meaning ascribed to it in subsection 2.4(d);

"**Lands**" means the Freehold Lands and Leasehold Lands collectively described in Schedule A attached hereto;

"**Leases**" means the leases, licenses and agreements to occupy space in the Complex as at the Closing Date, a list of which Leases, as at the date of this Agreement, is attached as Schedule B hereto and in each case, all amendments, restatements, and replacements thereof that do not represent a material increase of the size of the demised or licensed premises or location thereof, a material change of the expiry date of the respective lease, license or agreement to occupy space (including without limitation, a change of the renewal and extension rights), a change of any landlord/licensor option to terminate, a material change of the landlord's/licensor's obligations under the respective lease, license or agreement to occupy space or a change of the financial terms of the respective lease, license or agreement to occupy space, in each case from that applicable as at the date of this Agreement;

"**Leasehold Lands**" means the lands leased by NNL under the Ground Lease, more particularly described in Part 2 of Schedule A attached hereto;

"**Leasehold Premises**" means the buildings, improvements and structures situate on the Leasehold Lands and commonly known as the Lab 6, Lab 7, Lab 8 and Lab 9 buildings, together with all underground levels, including parking structures, and all underground tunnel works, if any,  and all of the fixtures and systems appurtenant to the buildings, improvements and structures, including the heating, ventilation and air conditioning system, fire protection system, security systems and alarms servicing the buildings, improvements and structures, lighting fixtures, plumbing and electrical systems, elevators, sprinklers, boilers, compressors, transformers, drainage and other mechanical and building systems and equipment comprising part thereof, but specifically excluding Tenant FF&E and the Nortel Retained Assets;

"**Monitor**" has the meaning ascribed to it in the 5th recital to this Agreement;

"**Monitor's Certificate**" has the meaning ascribed thereto in Schedule J attached hereto;

"**Mutual Conditions Precedent**" has the meaning ascribed thereto in Section 4.1(a);

- 6 -

"**NCC**" means the National Capital Commission;

"**NCC Consent**" means the consent of the NCC to the Ground Lease Amendment Agreement, to the assignment of the Ground Lease to the Purchaser, to the Nortel Lease, to the Permitted Leases and to the Assignment and Assumption of Leases;

"**NNL**" has the meaning ascribed to it in the Recital to this Agreement;

"**NNTC**" has the meaning ascribed to it in the Recital to this Agreement;

"**Nortel Lease**" means the lease agreement between Purchaser, as landlord, and NNL, as tenant, to be entered into by the parties on or before the Closing Date, the substantive financial and business terms of which are generally set out in the form attached hereto as Schedule G hereto, and the final form of which is to be approved by the parties on or before the Documents and Title Due Diligence Date pursuant to the provisions of Sections 4.2(a)(ii) and 4.3(a)(i)(D), and once so approved shall be initialled by the parties and appended as a replacement to Schedule G hereto;

"**Nortel Premises**" has the meaning ascribed thereto in the Nortel Lease;

"**Nortel Retained Assets**" means the furniture, fixtures and equipment to be retained by Vendor, as described in the Nortel Lease, all as described in Schedule F hereto;

"**Notice**" has the meaning ascribed thereto in Section 7.10;

"**Permitted Encumbrances**" means the encumbrances and other instruments affecting title to the Complex as set out in Schedule D attached hereto;

"**Permitted Lease**" means a lease (which by its terms automatically converts to a sublease under the Nortel Lease upon Closing), a sublease or license (which by its terms automatically converts to a license or sublease under the Nortel Lease upon Closing), as the case may be, between Vendor and the purchaser of the "Passport" business unit, the purchaser of the "IP Law" business unit or the purchaser of any other "business unit" of Vendor relating to premises within the areas to form part of the Nortel Premises necessary for or incidental to the carrying on of such purchased business, the material terms of which do not vary materially from the terms contained in the Leases, and in each case, all amendments, restatements, and replacements thereof that do not represent a material increase in the size of the demised premises or a material adverse change in the expiry date, the landlord obligations or the material financial terms of such Permitted Lease: if the Permitted Lease is entered into before Closing, it shall be entered into by Vendor as landlord or licensor, and if entered into subsequent to Closing, shall be a permitted sublease, license or other occupancy agreement under the Nortel Lease, and in either case, a copy of such executed Permitted Lease shall be delivered to Purchaser once completed;

"**Person**" includes any individual, partnership, limited partnership, joint venture, syndicate, sole proprietorship, company or corporation (with or without share capital), unincorporated association, trust, trustee, executor, administrator or other legal personal representative, regulatory body or agency, government or governmental agency, authority or entity however designated or constituted;

- 7 -

"**Purchased Assets**" means the Complex, the Furniture and Equipment, the Ground Lease, and the Leases;

"**Purchase Price**" means Two Hundred and Eight Million Dollars ($208,000,000), exclusive of HST or any other applicable transfer taxes;

"**Purchaser**" has the meaning ascribed to it in the Recital to this Agreement;

"**Purchaser's Solicitor**" means Department of Justice, Legal Services – Public Works And Government Services, 1C1, Place du Portage, Phase III ,11 Laurier Street, Gatineau  QC   K1A 0S5 Attn:  Michael Siddons, Telephone:   (819) 934-0515, Facsimile:   (819) 956-0014, michael.siddons@pwgsc.gc.ca;

"**PWGSC News Release**" has the meaning ascribed to it in subsection 2.5(a);

"**Realty Tax Refunds**" has the meaning ascribed thereto in Section 3.4(b);

"**Rechargeable Sum Estimates**" has the meaning ascribed thereto in Section 3.3(d);

"**Rechargeable Sums**" has the meaning ascribed thereto in Section 3.3(d);

"**Rent Receivables**" has the meaning ascribed thereto in Section 3.4(a);

"**Statement of Adjustments**" has the meaning ascribed to it in subsection 3.3(e);

"**Tenants**" means the tenants and occupants of the Complex pursuant to the Leases, and "**Tenant**" means any one of them;

"**Tenant Estoppel Certificate**" means a certificate substantially in the form attached hereto as Schedule K;

"**Tenant FF&E**" means all furniture, fixtures and equipment and all appliances and appurtenances thereto owned by the Tenants of the Complex and the subtenant or licensee pursuant to a Permitted Lease, save and except for the Nortel Retained Assets;

"**Tenant LC Documents**" and "**Tenant Guarantees**" have the respective meanings ascribed thereto in Section 3.5(b);

"**Third Party Prepared Reports**" means the building condition report of the Complex prepared by Altus Group and the Phase I Environmental Site Assessment report prepared by Golder Associates originally addressed to the Vendor, copies of which have been made available in the Data Room;

"**Title Reservations**" means the reservations and other matters affecting title to the Complex as set out in Schedule "C" to attached hereto;

"**Transfer Taxes**" has the meaning ascribed thereto in Section 3.7;

- 8 -

"**Transaction**" means the purchase and sale of the Purchased Assets and the lease of premises contemplated in the Nortel Lease provided for in this Agreement;

"**Treasury Board Condition**" and "**Treasury Board Approval Date**" have the respective meanings ascribed thereto in Section 4.3 (a)(iv);

"**Updated Tenant End States**" has the meaning ascribed to it in subsection 2.4(d);

"**Vendor**" has the meaning ascribed to it in the Recital to this Agreement;

"**Vendor's Agents**" means DTZ Barnicke Limited;

"**Vendor's Solicitors**" means Ogilvy Renault, LLP, 1500 45 O'Connor Street, Ottawa, Ontario K1P 1A4 Attention: D. John Naccarato, Tel. (613) 780-8608 Fax (613) 230-5459, jnaccarato@ogilvyrenault.com, or such other firm or firms of solicitors or agents as are retained by Vendor from time to time and notice of which is provided to Purchaser.

"**90 Day Space**" has the meaning ascribed to it in subsection 2.4(d); and

"**12 Month Transition Space**" has the meaning ascribed to it in subsection 2.4(d).

## 1.2    Extended Meanings

The grammatical variations of any terms defined herein have similar meanings to such defined terms, words imparting number include the singular and plural, words imparting gender include the feminine, neuter and masculine genders. The words "hereof", "herein", "hereunder" and similar expressions used in any section or subsection of this Agreement relate to the whole of this Agreement and not to that section or subsection only, unless the context indicates otherwise.

## 1.3    Headings

The division of this Agreement into separate Sections and Schedules and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

## 1.4    Currency

All references to currency herein are references to lawful money of Canada.

## 1.5    Construction

The preparation of this Agreement and the Closing Documents has been a joint effort of the parties and the resulting documents shall not, as a matter of judicial consideration, be construed more severely against one party than the other.

-9-

**1.6     Obligations as Covenants**

Each agreement and obligation of any of the parties hereto, even though not expressed as a covenant, is considered for all purposes to be a covenant.

**1.7     Applicable Law**

This Agreement and the Closing Documents shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. References to statutes shall be deemed to include reference to the regulations passed thereunder and to any amendments and or replacements to such statutes and regulations from time to time.

**1.8     Time**

Time shall be of the essence of this Agreement. References herein to dates, and the providing of notices, performance of obligations, or a period of time expiring by or on a certain date, shall in all cases refer to Business Hours during such date.

**1.9     Table of Contents, Headings**

The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

**1.10    Recitals**

The recitals to this Agreement form an integral part of this Agreement for all purposes.

**1.11    Schedules**

Schedules "A", "B", "C", "D", "E", "F", "G" , "H", "I", "J" and "K" attached hereto form an integral part of this Agreement.

<strong>ARTICLE II – AGREEMENT OF PURCHASE AND SALE</strong>

**2.1     Purchase and Sale of Purchased Assets; Lease of Nortel Premises**

(a)     Upon and subject to the terms and conditions of this Agreement, and in consideration of the payment of the Purchase Price, Vendor will sell, assign, transfer and convey to Purchaser all of the Vendor's right, title and interest in the Purchased Assets, and Purchaser agrees to acquire and assume, the Purchased Assets. The covenants and agreements of Vendor and Purchaser set forth herein create and constitute a binding agreement of purchase and sale for the Purchased Assets in accordance with the provisions of this Agreement.

(b)     Upon and subject to the terms and conditions of, and for the term contemplated in, the Nortel Lease, and in consideration of the Closing of the transactions

- 10 -

contemplated in this Agreement, Purchaser, as landlord, agrees to lease to NNL, and NNL, as tenant, agrees to lease from Purchaser, the Nortel Premises.

## 2.2    Authorizations

Vendor shall deliver to Purchaser, within three (3) Business Days following receipt of written request, authorizations prepared by Purchaser's Solicitors to Governmental Authorities necessary to permit Purchaser to obtain information from the files of such Governmental Authorities, provided said authorizations explicitly do not authorize or result in any physical inspections with respect to the Complex by such Governmental Authorities. Purchaser covenants and agrees with Vendor that it will not request, directly or indirectly, any physical inspections by such Governmental Authorities.

## 2.3    Deliveries

Purchaser acknowledges that it has had and continues to have access to the Data Room. Notwithstanding the foregoing, Vendor will make available to Purchaser for its review in the Data Room, within five (5) Business Days of the date of the final acceptance of this Agreement (except where otherwise indicated), the following documents and files relating to the Purchased Assets to the extent the same exist and are in Vendor's possession or control ("**Deliveries**"):

    (a)    all plans, specifications and drawings for the Complex;

    (b)    a copy of the Ground Lease (excluding the Ground Lease Amendment Agreement), the Leases and all amendments thereto, any NCC consent to the Leases, Lease abstracts containing Tenant account information in Vendor's usual form and status statements in respect of the demising, segregation and consolidation works being performed under the provisions of the applicable Leases;

    (c)    copies of the Third Party Prepared Reports, together with a form of reliance letter the authors of such reports are prepared to issue to the Purchaser permitting reliance upon the information and conclusions contained in such reports in accordance with the provisions of the reliance letters;

    (d)    a copy of any building location survey;

    (e)    copies of any work orders, notices, directives or letters of non-compliance which remain outstanding as of the date hereof received by Vendor from any Governmental Authority;

    (f)    operating budget for the Complex for the current fiscal year and statements of operating income and expenses for the 2009 fiscal year;

    (g)    copies of any current realty tax assessments notices and tax bills and details of any outstanding realty tax appeals;

    (h)    a list of all major or extraordinary repairs made during the past two (2) years;

- 11 -

(i)     a list of all outstanding material accounts payable by Vendor with respect to any of the Leases, including unpaid leasing commissions, tenant inducements and allowances;

(j)     copies of any letters of credit or security deposits issued by Vendor to any Governmental Authority in respect of any site plan control or development agreement relating to the Complex or any utility company in respect of which Vendor requires Purchaser to issue replacement security under Subsection 3.5(a);

(k)     copies of any security held and a list of any prepaid rents made under the Leases;

(l)     a list of service providers used by Vendor in connection with the maintenance, repair, management, security and operation of the Complex and for photocopy services and, as soon as these are in a form that relate exclusively to the Complex, copies of all such service contracts relating to such maintenance, repair, management, security and operation of the Complex and photocopy services; and

(m)     a list of any subsisting warranties relating to the Purchased Assets,

provided however that Vendor shall not be required to provide or provide access to any reports or other information related to Vendor's valuations of the Complex or any information deemed by Vendor in its reasonable discretion to be confidential to its business operations.

**2.4     Acknowledgment of Purchaser as to Condition of Purchased Assets, Leases and Nortel Lease**

Purchaser acknowledges and agrees that, subject to the provisions of this Agreement:

(a)     on Closing, title to the Purchased Assets shall be subject only to the Title Reservations and Permitted Encumbrances;

(b)     in entering into this Agreement, Purchaser has relied and will continue to rely entirely and solely upon its own judgment, inspections and investigations with respect to the Purchased Assets, agreeing to purchase the Purchased Assets "as-is, where-is" as of the date of the execution of this Agreement (together with any changes expressly permitted under this Agreement, normal wear and tear and any damage caused by Purchaser, or as otherwise contemplated in Section 6.2 of this Agreement, to the date of Closing) without legal warranty as to quality, including without limitation, title to the Purchased Assets, the physical and environmental condition of the Purchased Assets and the documentation comprising the Ground Lease and the Leases, and Purchaser acknowledges it is not relying on any information, representation or documentation furnished by Vendor or any other Person or entities on behalf of or at the direction of Vendor in connection therewith, including without limitation the information contained in the CIM, except as may otherwise be expressly set out in this Agreement;

(c)     Purchaser acknowledges and confirms that (i) it has prior to the date of this Agreement inspected and examined the Purchased Assets and the Due Diligence

- 12 -

Materials, and satisfied itself as to the condition of the Purchased Assets and the contents of the Due Diligence Materials (to the extent permitted by the inspections and examinations so conducted and the completeness of the Due Diligence Materials that have been made available in the Data Room prior to the date of this Agreement), and (ii) all of the information forming part of the Due Diligence Materials and derived from such inspections and examinations have been taken into account in establishing the Purchase Price. The Purchaser may continue to conduct its inspections and examinations of the Purchased Assets and the Due Diligence Materials up until the Documents and Title Due Diligence Date, in respect of the matters to be confirmed during the Documents and Title Due Diligence Period, and up until the Environmental and Physical Plant Due Diligence Date, in respect of the matters to be confirmed during the Environmental and Physical Plant Due Diligence Period, in each case to the extent it deems necessary to enter into and complete the Transaction, and that it is relying solely upon the examinations and investigations which it has conducted or may conduct up until such respective Due Diligence Date;

(d)    Purchaser confirms that all Leases are to be assumed by Purchaser at Closing (for clarity, the Purchaser shall not require as part of such assumption that there be a requirement for further space modifications nor vacating of any portions of the Complex or that the Leases be other than as reflected in the Tenant profiles and "Tenant Plan Updates", reflecting the proposed end state locations dated July 13, 2010 and delivered to Purchaser on or about August 31, 2010 (the "**Updated Tenant End States**")), and acknowledges that the Updated Tenant End States have been taken into account in determining the Purchase Price. With respect to the Nortel Lease and the Nortel Premises, Purchaser acknowledges (i) that there are certain areas within the Lab 5 and Lab 6 buildings in the Complex to be identified in the Nortel Lease that Vendor will continue to occupy on a rent-free basis for a period of 12 months following the Closing Date (the "**12 Month Transition Space**") while Vendor vacates and removes whatever lab and speciality equipment it wishes to remove from such 12 month Transition Space, and (ii) that there are certain areas within the Lab 5 building in the Complex to be identified in the Nortel Lease that Vendor will continue to occupy on a rent-free basis for a period of ninety (90) days following the Closing Date (the "**90 Day Space**") while it migrates Vendor employees and service providers from the 90 Day Space into the Nortel Premises, in each case on the terms and conditions to be set out in the Nortel Lease. In addition, Purchaser agrees that Vendor shall have the right, without the requirement to obtain Purchaser's consent, to enter into a Permitted Lease for a term not exceeding the term of the Nortel Lease, that Vendor shall be responsible for and pay all costs and commissions and perform all works required to be performed and paid for in respect of such areas, shall pay the rents and perform all obligations in respect of such areas in accordance with the Nortel Lease, and shall be entitled to receive all rents and operating costs in respect of such areas from the subtenants, licensees or other occupants thereof. Purchaser further acknowledges that with respect to the other Leases, Vendor shall have the right, without the requirement to obtain Purchaser's consent, to make such amendments, restatements or replacements thereof that do not

- 13 -

represent a material increase of the size of the demised or licensed premises or location thereof, a material change of the expiry date of the respective lease, license or agreement to occupy space (including without limitation, a change of the renewal and extension rights), a change of any landlord/licensor option to terminate, a material change of the landlord's/licensor's obligations under the respective lease, license or agreement to occupy space or a change of the financial terms of the respective lease, license or agreement to occupy space, in each case from that applicable as at the date of this Agreement, that Vendor shall be responsible for and shall pay all costs and commissions and perform all works required to be performed and paid for in respect of the Leases prior to the Closing Date in accordance with the provisions of the Closing Agreement. With respect to the Leases to Ciena Canada, Inc. (the "**Ciena Leases**"), Purchaser hereby directs Vendor, and Vendor hereby acknowledges such direction to exercise the Vendor's Early Termination Right (as defined in the subsection 27.1 of the lease (the "**Lab Ten Lease**") dated March 19, 2010 between Nortel Networks Technology Corporation and Ciena Canada, Inc.) in accordance with the escrow release provisions to be set out in the Closing Agreement. Pursuant to this direction and on the terms and conditions required by the Lab Ten Lease, Nortel Networks Technology Corporation shall in accordance with the escrow release provisions to be set out in the Closing Agreement, provide the Early Termination Notice (as defined in the section 27.1 of the Lab Ten Lease) and direct the escrow agent to pay Ciena Canada, Inc. the Early Termination Fee (as defined in the section 27.3 of the Lab Ten Lease);

(e)     with respect to the Leases which contain renewal or extension rights which contain a condition that no such renewal or extension right, as the case may be, shall be effective if the landlord provides the specified notice required under such Lease, the Purchaser hereby directs Vendor and Vendor hereby acknowledges such direction to give, and shall give the specified notice to the respective Tenants as required pursuant to the terms of the respective Leases. Such notices shall be provided by Vendor to the respective Tenants, with copies to Purchaser in accordance with the escrow release mechanisms to be set out in the Closing Agreement;

(f)     except as expressly provided in Section 2.7, Vendor makes no representations or warranties with respect to the Purchased Assets including, without limitation, with respect to (i) the structural integrity or any other aspect of the physical condition of any building, (ii) the sufficiency and condition of any buildings' systems, including, without limitation, the HVAC, electrical, mechanical, lighting, life safety, plumbing and computing systems (the "**Building Systems**"), (iii) the conformity of any building to any plans or specifications for the Complex (including, but not limited to, any plans and specifications that may have been or which may be provided to Purchaser), (iv) the compliance of the Complex with any municipal by-laws, (v) the conformity of the Complex to past, current or future applicable zoning or building code requirements, (vi) the existence of soil instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, (vii) the sufficiency of any under-shoring, (viii) any

- 14 -

other matter affecting the stability or integrity of the Lands, or any building situated on or as part of the Complex, (ix) the sufficiency of any drainage, (x) whether the Complex is located wholly or partially in an agricultural area, flood plain or flood hazard boundary or similar area, (xi) the existence or non-existence of underground storage tanks, (xii) the availability of public utilities and services for the Complex, (xiii) the fitness or suitability of the Complex for occupancy or any intended use (including matters relating to health and safety), (xiv) the potential for further development of the Complex, (xv) the existence of acquired rights, zoning or building entitlements affecting the Complex, (xvi) the status of any Leases, Permitted Encumbrances or the financial condition of any present or prospective Tenant of the Complex or any contractor, (xvii) the condition, fitness for purpose or suitability of any of the Furniture and Equipment, or (xviii) the presence of any Hazardous Substances in, on or about the Complex whether past or present or past or present compliance by the Purchased Assets with any Environmental Laws (collectively, the **"Condition of the Purchased Assets"**); and

(g)     as part of Purchaser's agreement to purchase and accept the Purchased Assets "as-is, where-is" as of the date of the execution of this Agreement (together with any changes expressly permitted under this Agreement, normal wear and tear and any damage caused by Purchaser, or as otherwise contemplated in Section 6.2 of this Agreement, to the date of Closing), without legal warranty as to quality, and not as a limitation on such agreement, Purchaser hereby unconditionally and irrevocably waives any and all actual or potential rights Purchaser might have against Vendor regarding (i) any form of warranty, express or implied, of any kind or type, other than those expressly set forth in this Agreement relating to the Purchased Assets, (ii) the Condition of the Purchased Assets, or (iii) any other aspect of the Condition of the Purchased Assets. Such waiver is absolute, complete, total and unlimited in every way, and includes, but is not limited to, a waiver of express warranties, implied warranties, warranties of fitness for a particular use, warranties of merchantability, warranties of occupancy, strict liability rights, and claims of every kind and type, including, but not limited to, claims regarding defects which might have been discoverable, claims regarding defects which were not or are not discoverable, product liability claims, product liability type claims, and all other extent or later created or conceived of strict liability or strict liability type claims and rights.

Vendor shall not be responsible for any negligent misrepresentation (other than in respect of negligent misrepresentations of Vendor set out in this Agreement) or failure to investigate the Purchased Assets, on the part of Vendor, any real estate broker or sales agent, or any other purported or acknowledged agent, representative, contractor, consultant or employee of Vendor or any third party.

The Vendor acknowledges and agrees that notwithstanding that subsections 2.4 (d) and (e) are acknowledgements and agreements of the Purchaser, the Vendor covenants and agrees to fulfill all covenants of the Vendor contained therein.

- 15 -

**2.5    Confidentiality, Public Announcement**

(a)     The parties confirm that Purchaser has previously delivered a confidentiality agreement in connection with the Transaction, the terms of which remain in full force and effect subject to this Agreement. In addition thereto, until Closing (and in the event this Agreement is terminated for any reason other than its completion, from and after such termination), save and except as hereinafter set out, Purchaser and Vendor and their respective employees, consultants, agents, advisors and solicitors shall keep confidential all negotiations of this Agreement, all of the terms and conditions of this Agreement, all information, documentation and records obtained from the other and or their respective employees, consultants, agents, advisors or solicitors (the "**Agents**") with respect to the Purchased Assets, all information arising out of Purchaser's access to Vendor's records and the Purchased Assets and its due diligence with respect thereto and all matters related to the foregoing (collectively, the "**Confidential Information**"). The parties, save and except as hereinafter set out, shall not (and shall ensure that their respective Agents do not) use any Confidential Information for any purposes not related to the Transaction, or in any way detrimental to the interests of the other party. The parties further acknowledge and agree that:

(i)     nothing herein contained shall restrict or prohibit either party from disclosing the Confidential Information to its employees, consultants, agents, advisors and solicitors that are assisting it in connection with the Transaction provided such Persons agree to keep such information confidential. Each of the parties shall inform these Persons of the confidential nature of the Confidential Information and shall direct them to treat such information confidentially;

(ii)    either or both the Vendor or Purchaser may individually, following the execution of this Agreement, make public announcements or press releases as to the existence and material terms of this Agreement, provided that in respect of the initial announcements to be made by the parties, Vendor shall not issue a press release in respect of the Transaction before 6:00 AM on Tuesday, October 19, 2010, and Purchaser shall not issue a media advisory, press release or announcement before 4:00 PM on Monday, October 18, 2010. For greater clarity, and without limiting the foregoing, the parties acknowledge and agree that:

(1)     Purchaser may issue an initial media advisory after 4:00 PM on Monday, October 18, 2010, and/or a second media advisory on the morning of Tuesday, October 19, 2010, each of which advising of a press conference, release and/or an announcement;

(2)     Vendor may issue a press release in respect of the Transaction after 6:00 AM on Tuesday, October 19, 2010; and

- 16 -

      (3)    Purchaser may conduct a press conference, announcement and/or issue a press release about this Agreement and the Transaction (collectively the "**PWGSC News Release**") on Tuesday, October 19, 2010, or Wednesday, October 20, 2010;

(ii.1)    each party shall provide the proposed wording of all such announcements and press releases (save and except for the Purchaser's initial and second media advisory, the PWGSC News Release and Vendor's October 19, 2010 initial announcement and press release) to the other party at least five (5) days prior to the date of such disclosure; it being agreed by the parties that:

      (A)    Purchaser shall not be required to provide the proposed wording of the initial and/or second media advisories or the PWGSC News Release to Vendor; and

      (B)    Vendor shall provide to Purchaser by 5:00 PM, October 15, 2010, the wording for its initial announcement and press release to be issued on October 19, 2010;

(ii)    after Purchaser or Vendor makes announcements or press releases, Purchaser without notice to Vendor may respond to queries with respect to such announcements or press releases, this Agreement or the Transaction; and

(iii)    either party may disclose Confidential Information where required by law, provided such disclosing party will provide the other with prompt notice of such requirement so that the other party may seek an appropriate protective order or waive compliance with the provisions of the requirement or both.

(b)    If this Agreement is terminated for any reason, Purchaser shall promptly return to Vendor all Confidential Information (other than Purchaser's notes and due diligence materials) and similar material including all copies, and shall destroy all of Purchaser's notes and due diligence materials containing Confidential Information related to the Transaction. Purchaser shall certify to Vendor as to the return and destruction, respectively of all Confidential Information and notes and materials but only in the event that the Closing does not take place.

(c)    Notwithstanding the obligations of confidentiality as set out herein, the parties specifically acknowledge that (i) this Agreement and any other related information and documents may be subject to release pursuant to the provisions of the <u>Freedom of Information and Protection of Privacy Act</u>, R.S.O. 1990, c. F.31, as amended and the <u>Access to Information Act</u>, R.S.C., C.A.-1, and that any release of information or documents in relation to this Agreement or the release of the Agreement itself pursuant to the provisions of the <u>Freedom of Information and Protection of Privacy Act</u> shall not constitute breach of the Purchaser

- 17 -

confidentiality obligation hereunder; and (ii) Vendor is required by law and the CCAA Proceedings to make disclosure of this Agreement and shall be filing this Agreement as part of the motion to obtain the Approval and Vesting Order and that any release of information or documents in relation thereto shall not constitute breach of the Vendor confidentiality obligation hereunder.

**2.6     Searches and Examination**

Vendor will permit Purchaser, its agents and representatives, access to the Purchased Assets from the date of execution of this Agreement by both parties until the Environmental and Physical Plant Due Diligence Date at reasonable times and upon reasonable prior written notice to carry out, at Purchaser's sole expense and risk, such tests and investigations (including structural/physical tests and investigations, soil tests and environmental audits) and inspections as Purchaser may deem necessary. Without limiting the generality of the foregoing, Purchaser shall, during the Environmental and Physical Plant Due Diligence Period, be entitled (i) to undertake an environmental assessment of the Complex, (ii) to examine the Third Party Prepared Reports and discuss any findings therein with the authors of such reports, and (iii) to satisfy itself as to the physical condition of the Purchased Assets. The investigations and enquiries of Purchaser shall be subject to the following provisos, namely that:

(a)     Purchaser shall give Vendor at least two (2) Business Days prior written notice of its intention to conduct or cause to be conducted any physical inspection of any part of the Complex;

(b)     neither Purchaser nor its agents shall enter the Complex except under the supervision of Vendor's representatives;

(c)     save and except as herein after set out in Section 4.3, neither Purchaser nor its agents shall communicate with the NCC nor any Tenant or prospective tenant of the Complex concerning any matter relating to the Ground Lease, a Tenant's tenancy, the Transaction or other matters pertaining or relating to the Purchased Assets except in the company of Vendor or its representatives;

(d)     while it is acknowledged that Purchaser intends to perform certain environmental investigations on the Lands and within the walls of the Complex, no invasive or destructive testing procedures shall be undertaken except with Vendor's prior written consent as to scheduling and methodology, which may be given subject to such conditions as Vendor, acting reasonably, may impose and in order to insure the repair of any damage which may be caused by Purchaser or its representatives in conducting such procedures, and Purchaser shall provide Vendor with evidence of liability insurance prior to each such entry;

(e)     Purchaser may not enter any premises occupied by a Tenant without the consent of such Tenant or in accordance with the provisions of the applicable Lease, and Purchaser shall comply with any reasonable conditions imposed by a Tenant in connection with its entry to such Tenant's premises; and

- 18 -

(f)     Purchaser shall repair any damage to the Complex, to the property of or to any Tenant or to Vendor caused by or attributable to any acts or omissions of Purchaser or its representatives in connection with its investigations.    All examinations and inspections of the Purchased Assets shall be conducted in such manner as to not interfere with the Tenants' peaceable enjoyment of their premises, and so as to not interfere with the conduct by Vendor or any other Tenant of its business.    Purchaser shall indemnify Vendor and hold Vendor harmless from and against any and all loss, costs or damages which Vendor may suffer by reason of or in connection with or arising from any access or inspection of or on behalf of Purchaser.    Notwithstanding anything to the contrary stated elsewhere in this Agreement, the obligations of Purchaser pursuant to this Section constitute legally binding obligations of Purchaser and shall survive any termination of this Agreement.

## 2.7     Representations and Warranties

(a)     Vendor hereby represents and warrants in favour of Purchaser that except as may be disclosed in the Due Diligence Materials or disclosed by Vendor in writing to Purchaser prior to the Closing:

   (i)

        (A)     NNTC is, and will at Closing be, the legal and the beneficial owner of the Freehold Lands and Freehold Premises subject only to the Title Reservations and Permitted Encumbrances, and subject to the CCAA Proceedings; and

        (B)     NNL is, and will at Closing be, in accordance with the provisions of the Ground Lease, the legal and beneficial owner of the leasehold interest in the Leasehold Lands and owner of the Leasehold Premises, subject only to the Title Reservations and Permitted Encumbrances, and subject to the CCAA Proceedings;

   (ii)     NNL has been duly incorporated under the laws of Canada and NNTC has been duly incorporated under the laws of the Province of Nova Scotia, and each of NNL and NNTC is duly subsisting under its governing jurisdiction.    Subject to the CCAA Proceedings, all necessary corporate action has been taken by Vendor to authorize its execution and performance of its obligations under this Agreement in accordance with the terms hereof. At Closing, subject to obtaining the Approval and Vesting Order, the conveyance of the Purchased Assets and, in the case of NNL, the execution and delivery of the Nortel Lease and performance of its obligations thereunder shall be authorized by the Approval and Vesting Order; and

   (iii)     Vendor is not a non-resident of Canada within the meaning of the *Income Tax Act* (Canada) or the *Investments Canada Act* (Canada);

- 19 -

(b) Purchaser hereby represents, warrants and covenants to Vendor (and shall renew same on Closing) that:

    (i) Purchaser has the power, capacity and authority and is authorized to enter into this Agreement and fulfill its obligations hereunder, subject to the terms herein, and will be authorized on the Closing Date to enter into and fulfill its obligations under the Closing Documents;

    (ii) Purchaser shall be the "recipient" (as defined in the *Excise Tax Act* (Canada) of a supply, and the Ontario equivalent statute) of the Purchased Assets for purposes of such statutes and shall, prior to Closing, be registered for purposes of such statutes if so required to be at law;

    (iii) Purchaser, and consequently Vendor, is not required to comply with the requirements of the *Competition Act* (Canada) or the *Investment Canada Act* (Canada) in respect of the Transaction; and

    (iv) Purchaser has not retained the services of any real estate broker or agent in connection with the Transaction to whom a commission or other payment is payable by Vendor.

## ARTICLE III – PURCHASE PRICE

**3.1**    **Deposit**

(a) On or before October 21, 2010, Purchaser shall pay as an initial deposit the amount of **Two Million ($2,000,000)** Dollars by way of a cheque issued by the Receiver General for Canada payable to the Vendor's Solicitors "in trust" to be held by Vendor's Solicitors in an interest bearing trust account forming part of their law firm's trust account on the terms and conditions referred to hereinafter in Subsections 3.1(c), 3.1(d) and 3.1(e).

(b) Within three (3) Business Days next following the Environmental and Physical Plant Due Diligence Date, provided that all of the Purchaser's Condition Precedents as set out in Article 4.3 except the Treasury Board Condition have been satisfied or waived, the Purchaser shall pay by way of a cheque issued by the Receiver General of Canada, payable to the Vendor's Solicitors "in trust" the sum of **Seven Million ($7,000,000)** Dollars (which amount together with the initial deposit amount referred to in subsection 3.1(a), is referred to collectively as the "**Deposit**") to be held by the Vendor's Solicitors in an interest bearing trust account forming part of their law firm's trust account on the terms and conditions referred to hereinafter in Subsections 3.1(c), 3.1(d) and 3.1(e).

(c) Interest earned on the Deposit shall, provided Purchaser is not in default hereunder, be to the credit of Purchaser and shall be so credited in Purchaser's favour on the Statement of Adjustments utilized for Closing.

- 20 -

(d)     Subject to Subsections 4.4 (a) and 5.4 (a) and Section 6.2 hereof, if Purchaser fails to complete the Transaction in accordance with the provisions of this Agreement, or repudiates this Agreement after all of the Conditions Precedent for Purchaser have been satisfied or waived by Purchaser, each as determined by the Vendor acting reasonably, then the Deposit together with interest thereon shall be held by the Vendor's Solicitors, "in trust", as security for any claims for damages which are made or to be made by the Vendor (for greater certainty, the amount of the Deposit shall not constitute a limitation on, and will be held without prejudice to, any other claims, damages or remedies which Vendor may have or be entitled at law or in equity, against Purchaser). Without the written agreement of, or direction from, each of Vendor and Purchaser, or an unappealed award of binding arbitration ( if arbitration is agreed to) or a final unappealed court order of a court of competent jurisdiction, the Deposit may not be paid or disbursed out of the Vendor's Solicitor's Trust Account. Under no circumstance whatsoever shall the Vendor be entitled to forfeit the Deposit.

(e)     If Vendor fails to complete the Transaction in accordance with the provisions of this Agreement or repudiates this Agreement after all Conditions Precedent for Vendor have been satisfied or waived by the Vendor, the Deposit together with accrued interest thereon shall forthwith be refunded to Purchaser upon written demand delivered by Purchaser to Vendor and the Vendor's Solicitors, without prejudice to any other claims, damages or remedies which Purchaser may have or be entitled at law or in equity, against Vendor.

## 3.2    Payment of Purchase Price

The Purchase Price shall be satisfied by Purchaser on Closing as follows:

(a)     by receiving credit on the Statement of Adjustments for the Deposit and for the interest (or reasonably estimated interest) accrued thereon up until the day before the Closing Date; and

(b)     by payment of the balance of the Purchase Price to Vendor or as Vendor may direct in writing, by wire transfer, subject to the Adjustments (the "**Balance**").

## 3.3    General Adjustments

(a)     Subject to those items referred to in Section 3.5, the adjustments (herein referred to as the "**Adjustments**") shall include all operating costs, realty taxes, local improvement rates and charges, water and assessment rates, current rents, prepaid rents and interest thereon (if any), current expense and operating expense recoveries from any Tenant, prepaid amounts under the Leases and current amounts payable under the Leases (for greater certainty, excluding the Early Termination Penalty under the Ciena Leases), utility deposits (including replacement letters of credit or letters of guarantee therefore), and all other adjustments established by usual practice in the City of Ottawa for the purchase and sale of real property similar in type to the Complex herein. In addition, the

- 21 -

Adjustments shall include the other matters referred to in this Agreement which are stated to be the subject of adjustment and shall exclude the other matters in this Agreement which are stated not to be the subject of adjustment.

(b)    Adjustments shall be made as of the Closing Date. Except as otherwise provided in this Agreement, the Vendor shall be responsible for all expenses and entitled to all revenues accrued from the Purchased Assets for the period ending on the day before the Closing Date. Except as otherwise provided in this Agreement the Purchaser shall be responsible for all expenses and shall be entitled to all revenues accruing from the Purchased Assets for the period from and including the Closing Date and thereafter. The Closing Date shall be for the account of the Purchaser.

(c)    It is agreed by and between the parties hereto that if the final cost or amount of any item which is to be adjusted under Subsections 3.3(a) and 3.3 (b) cannot be determined at the Closing Date then the initial adjustment for such item made at the Closing Date shall be estimated on the basis of the best evidence available at the Closing Date as to what the final cost or amount of the said item will be. In each case when such cost or amount is determined Purchaser shall, within thirty (30) days of such determination, provide a true and complete statement thereof to Vendor and within thirty (30) days thereafter the parties hereto shall make a final adjustment as of the Closing Date for the item in question. The parties shall cooperate with respect to year-end adjustments and reconciliation of accounts with respect to additional rent and operating cost contributions paid by the Tenants during the calendar year in which the Closing takes place. The provisions of this Section shall survive the Closing and shall continue in full force and effect until all accounting and reconciliation has been satisfactorily completed, but in no event for a period greater than twelve (12) months following the Closing Date (the "**Final Adjustment Date**").

(d)    The parties acknowledge that under the terms of the Leases, portions of certain payments, such as realty taxes and operating costs, although paid by the landlord, are charged to and payable by the Tenants under such Leases (the "**Rechargeable Sums**") and are collected from such Tenants in monthly instalments on the basis of the landlord's estimates (the "**Rechargeable Sum Estimates**"). The Rechargeable Sum Estimates are subject to adjustment with the Tenants when the total amounts of the Rechargeable Sums are finally determined. For greater certainty, Rechargeable Sums shall not include any expenditures or any portion thereof which are not recoverable from the Tenants under the Leases including as a result of Leases having terminated. An adjustment for the Rechargeable Sum Estimates shall be made as of the Closing but Purchaser shall be responsible to conclude all final reconciliations and to make all payments and satisfy all obligations with all Tenants and collect all monies owing from Tenants relating to the Rechargeable Sums and Rechargeable Sum Estimates. Provided, however, that Vendor and Purchaser shall re-adjust any amount which either Purchaser or Vendor determine, acting reasonably, prior to the Final Adjustment Date, as a result of such final reconciliations with Tenants or as a result of an audit by a

- 22 -

Tenant, was incorrectly or inaccurately adjusted or neglected to be adjusted between Purchaser and Vendor pursuant to the terms hereof.

(e)     A statement setting out the Adjustments in connection with the Transaction (the "**Statement of Adjustments**") shall be delivered to Purchaser at least five (5) Business Days prior to the Closing Date and shall have annexed to it details of all calculations used by the Vendor to arrive at all debits and credits reflected therein. Vendor shall give the Purchaser's authorized representatives reasonable access to Vendor's working papers and backup materials in order to confirm the items reflected in the Statement of Adjustments.

**3.4     Specific Adjustments**

Vendor and Purchaser hereby acknowledge and agree that:

(a)     no adjustment will be made in favour of Vendor on Closing of any arrears of rent or other amounts payable by any Tenant prior to the Closing Date ("**Rent Receivables**") and Vendor retains ownership of the Rent Receivables. Vendor shall have the right to take all actions necessary to collect same except Vendor's right to recover shall not include the right to seek termination or the right to distress.  Purchaser covenants to cooperate with Vendor in that regard and to forward any monies to Vendor which Purchaser may receive from the Tenants on account of Rent Receivables.  Purchaser shall not be entitled to compromise any of the Rent Receivables without the written consent of Vendor.  Any sums received by Purchaser shall first be imputed to rent due to Purchaser under the applicable Lease and then to Rent Receivables; and

(b)     all right, title and benefit to any realty tax appeals and reassessments and any rebates (including, without limitation, vacancy rebates), refunds or reassessments of realty taxes for the Purchased Assets in respect of periods preceding the Closing Date (the "**Realty Tax Refunds**") shall remain the property of Vendor and shall not form part of the Purchased Assets. Vendor shall be entitled to continue all proceedings relating to such Realty Tax Refunds after Closing and Purchaser shall co-operate with Vendor with respect thereto. Vendor agrees that forthwith following its receipt of any Realty Tax Refunds, it will refund to Tenants any portions of such Realty Tax Refunds properly refundable to such Tenants under the Leases. Purchaser agrees to pay to Vendor, promptly after the completion of any successful assessment appeal, the net proceeds of any Realty Tax Refunds received by Purchaser in respect of any period prior to the Closing Date (provided that Purchaser shall first remit any portion thereof payable to any Tenants at law). Vendor agrees to pay to Purchaser, promptly after the completion of any successful assessment appeal, the net proceeds of any rebate, refund or reassessment of realty taxes for the Purchased Assets received by Vendor in respect of any period after the Closing Date.

- 23 -

**3.5    Letters of Credit and Security Deposits**

(a)    Purchaser covenants and agrees with Vendor that, on Closing, it will issue security deposits or make other satisfactory arrangements relating to, letters of credit and deposits, if any, made by Vendor to any Governmental Authority in respect of any site plan control or development agreement relating to the Complex or with any utility company in respect of the Purchased Assets, and will cooperate with Vendor by using reasonable commercial efforts in obtaining the return of Vendor's letters of credit/security deposits.

(b)    On Closing, any guarantee ("**Tenant Guarantees**") provided in connection with a Lease shall be assigned to Purchaser.  In respect of security from Tenants in the form of letters of credit ("**Tenant LC Documents**"), such Tenant LC Documents shall be dealt with in accordance with the Closing Agreement.

**3.6    Price Allocation**

The Parties agree to negotiate in good faith to determine an allocation of the Purchase Price among the Purchased Assets within ten (10) days prior to the Closing Date. The Parties agree (i) to be bound by the allocation accepted by the Parties and (ii) to act in accordance with such allocation for all purposes relating to Transfer Taxes, including the preparation and filing of any Transfer Tax returns. Notwithstanding the foregoing, if the Parties have not reached agreement on the allocation on or before the date that a Transfer Tax return is required to be filed with the relevant tax authority (giving effect to any valid extensions), then such Transfer Tax return shall be timely filed in the manner that the Purchaser reasonably determines.

**3.7    Taxes**

Purchaser shall be liable for and shall pay any land transfer taxes, retail sales taxes, excise taxes and HST payable in connection with its purchase of the Purchased Assets ("**Transfer Taxes**"). Purchaser will indemnify and hold harmless Vendor for all such Transfer Taxes, interest and penalties that Vendor may be required to pay or be exposed to, to the extent Vendor does not charge or collect from Purchaser any such Transfer Taxes due to Purchaser's claimed entitlement to an exemption which is subsequently disallowed or not accepted by the applicable tax authority or in reliance upon Purchaser's election to directly pay the taxes which are required to be paid in respect of the assignment, transfer and sale of the Purchased Assets. On Closing, Purchaser shall promptly pay directly to the appropriate tax authority all applicable Transfer Taxes; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by Vendor such Transfer Taxes shall be paid by Purchaser to Vendor. Notwithstanding the foregoing, Purchaser shall not be required to pay HST to Vendor in respect of that portion of the Purchase Price allocated to real property for purposes of the Excise Tax Act (Canada) (the "**Excise Tax Act**") in the event it has provided evidence, satisfactory to the Vendor, that Purchaser is at the time of Closing registered under subdivision (d) of Part IX of the Excise Tax Act, such evidence to include a statutory declaration of an officer or authorized signatory of Purchaser confirming such registration and that Purchaser's registration number under the Excise Tax Act has not been varied or revoked.

- 24 -

Vendor warrants that it is registered for the purposes of Part IX of the *Excise Tax Act* with registration number 119409258 RT0001 (NNL) and 118802974 RT0001 (NNTC), and is registered in Ontario for purposes of the provincial tax legislation with registration number 7947-0009 (NNL) and 0274-3442 (NNTC). On Closing the Purchaser shall deliver its HST Undertaking and Indemnity pursuant to Section 5.2(i).

## ARTICLE IV – CONDITIONS PRECEDENT TO THE OBLIGATION TO CLOSE

**4.1    Mutual Conditions Precedent to Closing**

(a)    The obligation of Vendor and Purchaser to complete the Transaction is subject to the satisfaction of the following conditions precedent (the "**Mutual Conditions Precedent**") on or before the Closing Date:

   (i)    Vendor has obtained the Approval and Vesting Order and delivered a true copy thereof to Purchaser, and all appeal periods with regard to the Approval and Vesting Order have expired,

   (ii)    Vendor has obtained, and provided written notice to Purchaser that Vendor has obtained, the NCC Consent, together with evidence thereof, and

   (iii)    prior to the release of the sale proceeds to Vendor from the escrow arrangements set out in the Closing Agreement, the Approval and Vesting Order is registered on title to the Lands, together with the Monitor's Certificate.

(b)    The Mutual Conditions Precedent as herein set out in Section 4.1(a) cannot be waived by either party and are conditions precedent to completing the Transaction which must be met.

**4.2    Conditions Precedent for Vendor**

(a)    In addition to the satisfaction of the Mutual Conditions Precedent, the obligation of Vendor to complete the Transaction shall be subject to the following conditions precedent (the "**Conditions Precedent for Vendor**"):

   (i)    within ten (10) Business Days after the execution of this Agreement by both Purchaser and Vendor, Vendor shall have obtained all necessary senior management and Monitor approvals to this Agreement and the Transaction contemplated herein;

   (ii)    by the Documents and Title Due Diligence Date, Vendor is satisfied with:

      (A)    the terms and conditions of the Ground Lease Amendment Agreement and the anticipated terms and conditions of the NCC Consent, and

      (B)    the final form and content of the Nortel Lease,

   Vendor undertaking to negotiate reasonably, diligently and in good faith to

- 25 -

attempt to achieve agreement in respect of such terms and conditions and form and content within such time frame. Vendor confirms that it has reviewed and generally accepts the form of Nortel Lease attached hereto as Schedule G with respect to the substantive financial and business terms, areas demised, term, rents, assignment rights, termination rights and surrender rights in the Nortel Lease;

(iii)    by the Environmental and Physical Plant Due Diligence Date, Vendor is satisfied with the terms and conditions of the Closing Agreement, Vendor undertaking to negotiate reasonably, diligently and in good faith to attempt to achieve such agreement within such time frame;

(iv)    on Closing, the representations and warranties of Purchaser set out in Section 2.7(b) shall be true and correct in all material respects; and

(v)    by Closing, all of the terms, covenants and conditions of this Agreement to be complied with or performed by Purchaser on or before the Closing shall have been complied with or performed in all material respects.

(b)    The Conditions Precedent for Vendor herein set forth are for the sole benefit of Vendor and may be waived in whole or in part by Vendor by notice to Purchaser prior to the applicable date set forth above.

**4.3    Conditions Precedent for Purchaser**

(a)    In addition to the satisfaction of the Mutual Conditions Precedent, the obligation of Purchaser to complete the Transaction shall be subject to the following conditions precedent ("**Conditions Precedent for Purchaser**"):

(i)    on or before the Documents and Title Due Diligence Date, Purchaser shall be satisfied, acting reasonably:

(A)    with the results of its search of Vendor's title to the Purchased Assets as at the date hereof, and that on Closing the Purchaser shall obtain good and marketable title to the Purchased Assets subject only to the Title Reservations and Permitted Encumbrances and the Ground Lease (as amended by the Ground Lease Amendment Agreement) pursuant to the Approval and Vesting Order;

(B)    with the results of its review of the planning, zoning, and land use restrictions on the Lands imposed by both the City of Ottawa and the NCC, as well as the form and content of the Ground Lease Amendment Agreement and future fencing and security arrangements Purchaser wishes to implement for the Lands. Within five (5) Business Days after the execution of this Agreement, the parties agree that Purchaser shall, notwithstanding Section 2.6(c) hereof, meet with the NCC to discuss its requested minor modifications to the Ground Lease and its future fencing and security requirements for the Complex. Following such direct contact and meetings between the Purchaser and the NCC, the Purchaser's

- 26 -

Solicitor shall deliver to the Vendor's Solicitor for review and discussion with the NCC the Purchaser's requested minor modifications to the Ground Lease, which Purchaser wishes the NCC to implement in the Ground Lease Amendment Agreement solely for the purpose of reflecting provisions consistent with a federal government department's lease of lands, and not for the purpose of attempting to implement material amendments to the uses, or permitting additional buildings or structures on the Leased Lands (which latter initiatives Purchaser may be discussing with the NCC after the Closing Date). Vendor and Purchaser shall each make diligent efforts to obtain, and if required, cooperate in jointly approaching the NCC to seek approval of, such minor modifications to the Ground Lease proposed by Purchaser in the Ground Lease Amending Agreement by the Documents and Title Due Diligence Date so that the required Government of Canada Treasury Board approvals of the NCC Consent can be expedited. In the event the Purchaser's Solicitor fails to deliver to the Vendor's Solicitor any proposed minor modifications within such five (5) Business Day period, the parties agree that Vendor shall proceed to request the NCC to approve the Ground Lease Amendment Agreement and deliver the NCC Consent on the basis of Schedule H to the draft form of Agreement of Purchase and Sale set forth in the Data Room as of the date of this Agreement;

(C)    with the result of its review of all Leases, as well as its review of any other agreement or contract which involves or relates to the Purchased Assets. If a Permitted Lease is not finalized by the date required for Deliveries under Section 2.3, Vendor shall, within such time frame contemplated in Section 2.3, provide to Purchaser the most recent draft of the Permitted Lease or a memorandum of the proposed Permitted Lease identifying all the key terms to be contained therein together with identifying the form of lease to used (including without limitation, the proposed general areas of the proposed occupancy, the essential financial terms relating to such occupancy and the proposed duration of the proposed occupancy), and shall provide the final Permitted Leases to the Purchaser as soon as same become available; and

(D)    with:

(1)    the terms and conditions of the Ground Lease Amendment Agreement and the anticipated terms and conditions of the NCC Consent, and

(2)    the final form and content of the Nortel Lease,

Purchaser undertaking to negotiate reasonably, diligently and in good faith to attempt to achieve agreement in respect of such terms and condition and form and content within such time frame. Purchaser confirms that it has reviewed and generally accepts the form of Nortel Lease attached hereto

- 27 -

as Schedule G with respect to the substantive financial and business terms, areas demised, term, rents, assignment rights, termination rights and surrender rights in the Nortel Lease;

(ii)    on or before the Environmental and Physical Plant Due Diligence Date, Purchaser shall be satisfied that the environmental condition of the Purchased Assets and that the condition, repair and maintenance of the Complex is not materially different from that represented in the Due Diligence Materials, or the Third Party Prepared Reports. In the event that, prior to the Environmental and Physical Plant Due Diligence Date, Purchaser discovers (A) a material environmental condition not disclosed in the Due Diligence Materials, or the Third Party Prepared Reports, that would require notification to Governmental Authorities and remediation under Environmental Laws, or (B) a material condition of disrepair or lack of maintenance of the Complex not disclosed in the Due Diligence Materials, and particularly the Third Party Prepared Reports, that would require repair or remediation to permit use and occupation of the Complex as a whole, Purchaser shall provide written Notice thereof to Vendor, and Vendor and Purchaser shall, each acting reasonably, diligently and in good faith, determine within a period of ten (10) Business Days following Vendor's receipt of such Notice, a mutually agreeable resolution of the matter so as to put the parties in as close a position as they would have been had the matter not been discovered, and, failing such agreement within such ten (10) Business Day period, the provisions of Section 4.4 shall apply;

(iii)    by the Environmental and Physical Plant Due Diligence Date, Purchaser is satisfied with the terms and conditions of the Closing Agreement, including the terms of the Interim Transition Services Agreement pursuant to Section 6.3, Purchaser undertaking to negotiate reasonably, diligently and in good faith to attempt to achieve such agreement within such time frame;

(iv)    on or before December 17, 2010 (the "**Treasury Board Approval Date**"), Purchaser receives approval from the Treasury Board of Canada to complete the Transaction, with any conditions as may be imposed by Treasury Board to be satisfied or waived by Purchaser prior to the Closing Date (the "**Treasury Board Condition**");

(v)    on Closing, the representations and warranties of Vendor set out in Section 2.7(a) shall be true and correct in all material respects; and

(vi)    by Closing, all of the terms, covenants and conditions of this Agreement to be complied with or performed by Vendor on or before the Closing shall have been complied with or performed in all material respects.

(b)    The Conditions Precedents for Purchaser set forth in Section 4.3 are for the benefit of Purchaser, and may be waived in whole or in put by Purchaser by notice to Vendor prior to the relevant date set forth above for the satisfaction of each Condition Precedent for Purchaser.

- 28 -

**4.4    Non Satisfaction of Conditions Precedent**

(a)    In the event that the Mutual Conditions Precedent set forth in Section 4.1, any of the Conditions Precedent for Vendor set forth in Section 4.2, or any of the Conditions Precedent for Purchaser set forth in Section 4.3 are not satisfied or waived as therein provided on or before the applicable date referred to in the applicable Section, the Deposit and all accrued interest thereon shall be returned to Purchaser and this Agreement shall be terminated, become null and void and of no further force or effect whatsoever and Purchaser and Vendor shall be released from all obligations under this Agreement (except those stated to survive termination).

(b)    Provided that in the event the Conditions Precedent for Purchaser are not satisfied due to the fault, act or omission of Purchaser, as determined by the Vendor acting reasonably, such event shall be deemed to be a failure to complete the Transaction and the Deposit and all accrued interest thereon shall be dealt with in accordance with Section 3.1 (d).

(c)    If by the applicable date referred to in the applicable Section, the party (or parties) having the benefit of the Condition Precedent has not given Notice to the other that a Condition Precedent has not been satisfied and waived, such Condition Precedent shall be deemed not to have been satisfied or waived.

**4.5    Title Requisitions**

Purchaser acknowledges and agrees that it has until the Documents and Title Due Diligence Date to satisfy itself as to title to the Purchased Assets. Purchaser acknowledges and agrees that on Closing title to the Purchased Assets will be subject only to the Title Reservations and Permitted Encumbrances and Purchaser agrees to accept title to the Purchased Assets subject only to the Title Reservations and Permitted Encumbrances.

**ARTICLE V – CLOSING DOCUMENTS AND CLOSING ARRANGEMENTS**

**5.1    Vendor's Closing Documents**

On or before Closing, subject to the provisions of this Agreement, Vendor shall execute or cause to be executed and shall deliver or cause to be delivered to Purchaser the following:

(a)    the Ground Lease Amendment Agreement (also executed by the NCC);

(b)    the assignment of the Ground Lease, the Ground Lease Assumption Agreement and the NCC Consent (also executed by the NCC);

(c)    the Nortel Lease;

(d)    the Assignment and Assumption of Leases;

(e)    a Tenant Estoppel Certificate from each Tenant (executed by each Tenant); provided that if a Tenant Estoppel Certificate is not available by the Closing Date, Purchaser agrees to accept a certificate of an officer or authorized signatory of the

- 29 -

Vendor dated the Closing Date certifying to the best of the Vendor's knowledge that all matters set out in the unavailable Tenant Estoppel Certificate are true and correct as of the Closing Date;

(f)     a notice to the Tenants advising of the sale of the Purchased Assets and directing that all rents payable after Closing be paid to Purchaser or as Purchaser directs;

(g)     a direction as to the payee or payees of the Purchase Price;

(h)     the Statement of Adjustments;

(i)     an undertaking by Vendor to readjust the Adjustments;

(j)     all keys and access codes to the Purchased Assets to the extent in Vendor's possession and control;

(k)     a certificate from an authorized signatory of Vendor confirming that Vendor's representations and warranties given in this Agreement are true as of the Closing Date;

(l)     a statutory declaration by an officer of Vendor or other evidence satisfactory to Purchaser, acting reasonably, that Vendor is not a non-resident of Canada pursuant to the *Income Tax Act* of Canada;

(m)     the originals of all assigned Leases, reports, studies, plans, drawings and specifications of the Purchased Assets in the possession of Vendor, and the consent of the NCC to the applicable Leases;

(n)     reliance letters addressed to the Purchaser with respect to the Third Party Prepared Reports, in the form contained in the Data Room;

(o)     assignment of any Tenant Guarantees;

(p)     the Closing Agreement together with the BLJC Interim Transition Services Agreement;

(q)     a Court certified copy of the Approval and Vesting Order in registerable form to effect the conveyance of the Purchased Assets;

(r)     the Monitor's Certificate referred to in the Approval and Vesting Order to be delivered to the Purchaser on Closing;

(s)     a copy of the Early Termination Notice provided by Nortel Networks Technology Corporation and the direction to the escrow agent to pay Ciena Canada, Inc. pursuant to subsection 2.4(d), and evidence of delivery of the same in accordance with the escrow release arrangements to be set out in the Closing Agreement;

(t)     a copy of all notices given to Tenants pursuant to subsection 2.4(e);

- 30 -

(u) a copy of any Permitted Lease entered into by Vendor prior to Closing; and

(v) all other documents which are reasonably required by Purchaser to give effect to the Transaction.

All of the foregoing documentation shall be prepared by the Vendor, where applicable, and shall be in form and substance acceptable to Purchaser and Vendor each acting reasonably and in good faith, provided that none of such documents shall contain covenants, representations or warranties which are in addition to or more onerous upon either Vendor or Purchaser than those expressly set forth in this Agreement.

**5.2 Purchaser's Closing Documents**

On or before Closing, subject to the provisions of this Agreement, Purchaser shall execute or cause to be executed and shall deliver or cause to be delivered to Vendor's Solicitors the following:

(a) the Balance of the Purchase Price;

(b) the Nortel Lease, including notice thereof for registration;

(c) the Ground Lease Amendment Agreement;

(d) the assignment of the Ground Lease, the Ground Lease Assumption Agreement, and, if required to be signed by the Purchaser, the NCC Consent;

(e) the Assignment and Assumption of Leases;

(f) an undertaking by Purchaser to re adjust the Adjustments;

(g) a certificate from an authorized signatory of Purchaser confirming that Purchaser's representations and warranties given in this Agreement are true as of the Closing Date;

(h) written notice to Vendor requesting that Vendor exercise the Early Termination Right of the landlord under the Ciena Leases and issue the Early Termination Notice to Ciena Canada, Inc. pursuant to Article 27 of the Ciena Leases;

(i) the HST Undertaking and Indemnity;

(j) the Closing Agreement together with the BLJC Interim Transition Services Agreement; and

(k) all other documents which are reasonably required by Vendor to give effect to the Transaction.

All documentation shall be in form and substance acceptable to Purchaser and Vendor each acting reasonably and in good faith, provided that none of such documents shall contain

covenants, representations or warranties which are in addition to or more onerous upon either Vendor or Purchaser than those expressly set forth in this Agreement.

### 5.3    Registration and Other Costs

Vendor shall be responsible for the costs of the Vendor's Solicitors in respect of the Transaction and for the registration of the discharge of encumbrances which are not Permitted Encumbrances. Purchaser shall be responsible for the costs of the Purchaser's Solicitors in respect of the Transaction. Purchaser shall be responsible for and pay any land transfer taxes payable on the transfer of the Purchased Assets (if payable by Purchaser), all registration fees payable in respect of registration by it of any documents on Closing including the costs of registration of the Approval and Vesting Order, and all federal and provincial sales and other taxes payable by the Purchaser upon or in connection with the conveyance or transfer of the Purchased Assets, including the HST and provincial retail sales taxes (if payable by Purchaser). Purchaser shall indemnify and save harmless the Vendor from all claims, actions, causes of action, proceedings, losses, damages, costs, liabilities and expenses incurred, suffered or sustained as a result of a failure by Purchaser:

(a)    to pay any federal, provincial or other taxes payable by Purchaser in connection with the conveyance or transfer of the Purchased Assets whether arising from a reassessment or otherwise, including provincial retail sales tax and goods and services tax, if applicable, and/or  HST and/or retail sales tax, now harmonized, on the Purchased Assets; and

(b)    to file any returns, certificates, filings, elections, notices or other documents required by law to be filed by Purchaser with any federal, provincial or municipal taxing authorities in connection with the conveyance or transfer of the Purchased Assets.

Purchaser shall execute and deliver to Vendor on Closing the HST Undertaking and Indemnity, which shall survive, and shall not merge on, Closing.

### 5.4    Closing Arrangements

(a)    Closing of the Transaction will occur on or about 10:00 am (Ottawa time) on the Closing Date. "**Closing Date**" means the later of (i) December 31, 2010 and (ii) the day which is ten (10) Business Days following the satisfaction or waiver of the last of the Conditions Precedent to Closing set out in Article 4 hereof, but in no event later than March 31, 2011 without the further written agreement of the parties hereto, failing which this Agreement shall be terminated and of no further force and effect (save for those provisions which are stated to survive termination) and the Deposit and all accrued interest thereon shall be returned to Purchaser.

(b)    On Closing, Vendor and Purchaser shall enter into the Closing Agreement generally in the form attached hereto as Schedule I ("**Closing Agreement**") to address the matters set out in the Closing Agreement. Purchaser confirms that the terms and conditions of the draft Closing Agreement attached hereto as Schedule I have been reviewed and are generally acceptable. Purchaser and Vendor agree to

- 32 -

act reasonably, diligently and in good faith to negotiate and finalize the Closing Agreement and all schedules thereto with all due dispatch prior to the Environmental and Physical Plant Due Diligence Date.

(c)     Vendor and Purchaser acknowledge and agree that the Closing Agreement shall set out, *inter alia*, Closing escrow arrangements and mechanics to be agreed by the parties (the "**Closing Escrow Arrangements**") to deal with such matters as the delivery of notices to Tenants as contemplated in this Agreement, the delivery of all executed Closing Documents and the Balance of the Purchase Price, the written confirmation of satisfaction with all Closing Documents by each party, the release of the Approval and Vesting Order and Monitor's Certificate to enable the Approval and Vesting Order and accompanying Monitor's Certificate to be registered on the title to the Lands to evidence the conveyance of the Purchased Assets to Purchaser, and the timing and terms and conditions relating to the release of the Purchase Price and the balance of all remaining Closing Documents to the applicable recipient thereof.

## ARTICLE VI– OPERATION UNTIL CLOSING AND AFTER CLOSING

**6.1     Operation Before Closing/Leasing**

(a)     From the date hereof until Closing, Vendor shall continue to operate the Complex consistent with the manner it has operated the Complex during the CCAA Proceedings save and except it will not enter into any leases, licenses or occupancy agreements in the Complex other than Permitted Leases, and will carry out all routine day to day repairs and maintenance thereof. In so doing, Vendor shall have no obligation to expend any money with respect to non routine repairs and maintenance.

(b)     Until Closing, the Purchased Assets shall remain at the risk of Vendor and Vendor agrees to operate the Purchased Assets consistent with the manner it has operated the Purchased Assets during the CCAA Proceedings.

**6.2     Damage Before Closing**

The Vendor confirms that it holds, in good standing, an all risks insurance policy, or policies, insuring the Freehold Premises and the Leasehold Premises.

The interest of Vendor in and to the Purchased Assets being purchased, acquired and assumed by Purchaser pursuant to the terms and conditions of this Agreement shall be at the risk of Vendor until Closing. If any loss or damage resulting from insured perils or risks to the Purchased Assets in excess of $5,000,000.00 occurs prior to Closing:

(a)     Vendor shall forthwith (and, in any event, prior to Closing) give the Purchaser notice of such loss and damage and the extent thereof upon becoming aware of same; and

(b)     Purchaser shall have the option to either:

- 33 -

(i)     elect to complete the purchase of the Purchased Assets in which event Purchaser shall be entitled to the proceeds of insurance, if any, in respect of the loss or damage and Vendor (to the extent same are not recoverable pursuant to the Leases) shall pay any deductibles in respect of such loss or damage; or

(ii)     elect not to complete the purchase of the Purchased Assets in which latter case this Agreement shall be terminated and of no further force and effect (save for those provisions which are stated to survive termination) and the Deposit plus interest accrued thereon shall be returned to Purchaser.

The Purchaser's foregoing option shall be exercisable by notice in writing to Vendor within ten (10) days after the later of the date that the Vendor gives such notice of such loss or damage to Purchaser and the date that the Purchaser otherwise becomes aware of such loss or damage.

If loss or damage resulting from insured perils or risks to the Purchased Assets of less than or equal to $5,000,000.00 occurs, and provided that proceeds of insurance are directed to the Purchaser to cover the full cost (less reasonable deductibles) of repairing such loss or damage (subject to the use of any such proceeds for the purpose of effecting repairs to the Purchased Assets prior to Closing as may be required by the Leases), Purchaser shall have no right to terminate this Agreement. Vendor shall act diligently to initiate the insurance claim, shall cooperate with Purchaser and provide all information reasonably required to expedite the claim, and shall assist in pursuing payment of any claims, including the payment of any deductibles, pursuant to the Leases in respect of such loss or damage, if applicable. Purchaser shall be entitled to all proceeds of insurance in respect of such loss or damage, and the parties shall complete the within Transaction.

## 6.3    Operation Transition Matters

Operational control of the Complex shall be transitioned by Vendor to Purchaser, and the voice/data switch currently serving the Complex shall be dealt with, in accordance with the provisions of the Closing Agreement. In respect of the "Transition of Operational Control of the Complex", Vendor and Purchaser confirm the covenants set out in section 3.1 of the Closing Agreement and undertake to act reasonably, diligently and in good faith to achieve an Interim Transition Services Agreement with BLJC (defined in the Closing Agreement) on terms and conditions generally consistent with the terms and conditions currently applicable to the BLJC service contract for the Complex and for a period of time agreeable to all parties provided that if Vendor and Purchaser fail to reach an agreement with BLJC for an expanded scope of services or longer duration than ninety (90) days after Closing, the parties agree that Closing will take place on the basis of such existing service terms and conditions for a period of ninety (90) days after Closing. On Closing the Purchaser agrees to assume the services contract for management of the Complex on the terms and conditions contemplated above and in the Closing Agreement.

## 6.4    Post Closing Obligations

From and after and notwithstanding the Closing, Vendor and Purchaser agree that Vendor shall continue to perform the works, deliver the services and enjoy the benefits set out in the Closing

- 34 -

Agreement and the Nortel Lease, in accordance with and subject to the conditions set out in the Closing Agreement and the Nortel Lease.

## ARTICLE VII– GENERAL

### 7.1    Invalidity

If any immaterial covenant, obligation, agreement or part thereof set out herein or the application thereof to any Person or circumstance, to any extent, shall be invalid or unenforceable, the remainder of this Agreement or the application of such covenant, obligation or agreement or part thereof to any Person, party or circumstance other than those to which it is held invalid or unenforceable shall not be affected thereby. Each covenant, obligation and agreement in this Agreement shall be separately valid and enforceable to the fullest extent permitted by law.

### 7.2    Amendment of Agreement

No supplementary modification, waiver or termination (other than a termination pursuant to Sections 4.4, 5.4 and 6.2 of this Agreement) shall be binding unless executed in writing by the parties hereto in the same manner as the execution of this Agreement.

### 7.3    Further Assurance

Each of the parties hereto shall from time to time hereafter and upon any reasonable request of the other, execute and deliver, make or cause to be made, all such further acts, deeds, assurances and things as may be required or necessary to more effectually implement and carry out the true intent and meaning of this Agreement.

### 7.4    Entire Agreement

This Agreement and any agreements, instruments and other documents herein contemplated to be entered into between, by or including the parties hereto constitute the entire agreement between the parties hereto pertaining to the purchase and sale of the Purchased Assets provided for herein and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect thereto. There are no other warranties or representations and no other agreements between the parties hereto in connection with the Transaction except as specifically set forth in this Agreement or the Schedules attached hereto.

### 7.5    Waiver

No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall any waiver constitute a continuing waiver unless otherwise expressed or provided.

### 7.6    Solicitors as Agents and Tender

Any notice, approval, waiver, agreement, instrument, document or communication permitted, required or contemplated in this Agreement may be given or delivered and accepted or received by the Purchaser's Solicitors on behalf of Purchaser and by the Vendor's Solicitors on behalf of

- 35 -

Vendor, and any tender of Closing Documents and the Balance may be made upon the Vendor's Solicitors and the Purchaser's Solicitors, as the case may be.

## 7.7   Merger

Except as otherwise expressly set out herein, this Agreement shall merge with the Closing of the Transaction contemplated herein.

## 7.8   Successors and Assigns

All of the covenants and agreements in this Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall enure to the benefit of and be enforceable by the parties hereto and their respective successors and their permitted assigns pursuant to the terms and conditions of this Agreement.

## 7.9   Assignment

Purchaser may, at any time after the Due Diligence Date and payment of the Second Deposit, assign its rights and/or obligations hereunder with the prior written consent of Vendor, which consent may not be unreasonably withheld, provided that the assignee enters into an assumption agreement acceptable to Vendor, acting reasonably, or at Closing, Purchaser may direct title to a third party acceptable to Vendor, acting reasonably, and in either event Purchaser shall remain liable for the performance of Purchaser's obligations under this Agreement notwithstanding such assignment or direction.

## 7.10   Notice

Any notice, waiver, demand, approval, consent, information, agreement, offer, request or other communication (hereinafter referred to as a "**Notice**") to be given under or in connection with this Agreement shall be in writing and shall be given by personal delivery during Business Hours on any Business Day, or by facsimile transmission or other electronic communication during Business Hours on any Business Day, which results in a written or printed notice being given, addressed or sent as set out below or to such other address or electronic number as may from time to time be the subject of a Notice:

**Vendor:**

Nortel Networks
5945 Airport Road,
Suite 360
Mississauga, Ontario   L4V 1R9
Attention: Anna Ventresca
Facsimile:(905) 863-2057
e-mail:  annav@nortel.com

With a copy to:

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Attention: D. John Naccarato
Facsimile: (613) 230-5459
e-mail:  jnaccarato@ogilvyrenault.com

- 36 -

With a further copy to:

the Monitor for Nortel Networks
Ernst & Young Inc.
Ernst & Young Tower,
222 Bay Street, P. O. Box 251,
Toronto, ON Canada  M5K 1J7
Attention: Sharon S Hamilton, Senior Vice
President- Transaction Advisory Services
Facsimile: 416 943 3300
e-mail: Sharon.S.Hamilton@ca.ey.com


**Purchaser:**

Public Works and Government Services
Canada
Office Accommodation and Real Estate
Services
Place des Explorateurs, 3rd Floor
191, Promenade du Portage
Gatineau QC  K1A 0S5
Attn : Denis Charette
Director, NCA Real Estate Services
Telephone: 819-956-7519
Fax: 819-956-5636
E-mail: denis.charette@tpsgc-pwgsc.gc.ca


With a further copy to:

Department of Justice
Legal Services, Public Works and
Government Services Canada
1C1 Place du Portage, Phase III
Gatineau QC  K1A 0S5
Attn:  Michael Siddons
Telephone:  819-934-0515
Fax:  819-956-0014
E-mail:  michael.siddons@pwgsc.gc.ca

Any notice, if personally delivered, shall be deemed to have been validly and effectively given and received on the date of such personal delivery, and if sent by facsimile transmission or other electronic communication with confirmation of transmission, shall be deemed to have been validly and effectively given and received on the Business Day it was sent.

DOCSOTT: 829408\8

- 37 -

### 7.11    Planning Act

This Agreement and the transactions reflected herein are subject to compliance with Section 50 of the *Planning Act* of Ontario. Vendor shall undertake any application to comply with the provisions of the *Planning Act*, if necessary.

### 7.12    Effect of Termination of Agreement

Notwithstanding the termination of this Agreement for any reason, the confidentiality provisions contained in Section 2.5 of this Agreement and all other provisions stated to survive termination shall survive termination and shall remain in full force and effect.

### 7.13    No Registration of Agreement

Purchaser shall not register this Agreement or any notice of this Agreement on the title to the Lands.

### 7.14    Commissions

Purchaser represents and warrants to Vendor that Purchaser has not utilized the services of any real estate agent or broker or salesperson in connection with the purchase and sale of the Purchased Assets contemplated hereby, to whom any fees, commissions or compensation will be payable by Vendor. Subject to the foregoing, Vendor acknowledges that the real estate commissions and fees payable by Vendor to Vendor's Agent, or the BMO Capital Markets Real Estate Group, in respect of this Agreement shall be the sole responsibility of and payable by Vendor.

### 7.15    Facsimile and Counterparts

All parties agree that this Agreement may be transmitted by facsimile or other electronic transmission and executed in counterparts (each such counterpart constituting one and the same instrument) and that the reproduction of signatures by way of facsimile or other electronic transmission will be treated as though such reproduction were executed originals, and each party undertakes to provide the other with a copy of this Agreement bearing actual signatures within a reasonable time after the date of execution.