# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
:     Chapter 11

*In re*
:

Nortel Networks Inc., *et al.,*[1]
:     Case No. 09-10138 (KG)

            Debtors.
:     Jointly Administered

:

:     **Hearing date: November 23, 2010 at 10:00am (ET)**
:     **(proposed)**
:     **Objections due: November 16, 2010 at 4:00pm (ET)**
:     **(proposed)**
:
-------------------------------------------------------X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE SALE OF LIMITED PARTNERSHIP AND LIMITED LIABILITY COMPANY INTERESTS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING ENTRY INTO A PURCHASE AND SALE AGREEMENT; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; (IV) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL; AND (V) GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI"), and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), pursuant to

sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

"Local Rules"), for the entry of an order substantially in the form attached hereto as Exhibit A (i) authorizing the sale of certain limited partnership and limited liability corporation interests held by NNI (as described further herein, the "LP Interests") free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code (the "Transaction"), (ii) authorizing and approving entry into that certain purchase and sale agreement dated as of November 3, 2010 among NNI and non-debtor Nortel Ventures LLC ("NVLLC"), on the one hand (together, the "Sellers") and CS Strategic Partners IV VC Holdings, L.P. ("CS") and Amberbrook V, LLC ("Amberbrook") on the other hand (together, the "Purchasers") for the sale of the LP Interests (including certain LP Interests of NVLLC) as described therein, substantially in the form attached hereto as Exhibit B (the "Agreement")[2], (iii) authorizing and approving the assumption and assignment of the Assumed and Assigned Contracts (as defined below), (iv) authorizing the Debtors to file certain documents under seal, and (v) granting them such other and further relief as the Court deems just and proper.

## Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 2002, 6004, 6006, 9014, and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 6004-1 and 9018-1 of the of the Local Rules of Bankruptcy

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Background**

**A.     Procedural History**

3.     On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b), which provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.     Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

---

[3]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

7.       On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.       On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA").  NNSA was authorized to continue to operate as a going concern until completion of the sale of the GSM/GSM-R business.  While NNSA's operations have now terminated, the French Proceedings are continuing and, in accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA.  On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code.[5]

---

[4]       The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[5]       Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (the "Israeli Companies"), filed an

9.      On January 26, 2009, U.S. Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  The Bondholder Group was also organized.  No trustee or examiner has been appointed in the Debtors' cases.

10.      On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA"), an affiliate of NNI and itself one of the Debtors, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the other Debtors' chapter 11 cases [D.I. 1099].  From time to time, other Nortel affiliates have sought and may seek relief through the commencement of creditor protection or other insolvency or dissolution proceedings around the world.

**B.      Debtors' Corporate Structure and Business**

11.      Prior to its significant business divestitures, Nortel was a global supplier of end-to-end networking products and solutions serving both service providers and enterprise customers.  Nortel's technologies spanned access and core networks and supported multimedia and business-critical applications.  Nortel's networking solutions consisted of hardware, software and services.  Nortel designed, developed, engineered, marketed, sold, licensed, installed, serviced and supported these networking solutions worldwide.

---

application with the Tel-Aviv-Jaffa District Court (the "Israeli Court"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Companies under the Israeli Companies Law (the "Joint Israeli Administrators").

12.     Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[6]

## C.     Case Milestones

13.     On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event it were unable to maximize value through sales.  To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; and (vii) the sale of certain assets of its Carrier Voice Over IP and Application Solutions business to GENBAND US LLC [D.I. 2632].  In addition, the Debtors have obtained Court approval for the sale of certain assets of the Debtors' Multi-Service Switch (formerly known as "Passport") business to Ericsson [D.I. 4054].  From time to time the Debtors have and may continue to sell,

---

[6]     Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

transfer and assign their interests in other assets as efforts continue to be made with respect to the realization of value from Nortel's remaining assets.

14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 p.m. (Eastern Time) as the general bar date for filing proofs of claim or interests against the Debtors (other than NN CALA) [D.I. 1280].  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 p.m. (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

15.     On July 13, 2010, the Debtors filed the Joint Chapter 11 Plan of Nortel Networks Inc. and Its Affiliated Debtors [D.I. 3580].  On September 3, 2010, the Debtors filed the Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and Its Affiliated Debtors [D.I. 3874].

## Relief Requested

16.     By this motion, the debtors seek an order (i) authorizing and approving the sale of the Debtors' LP Interests free and clear of all liens, claims and encumbrances; (ii) authorizing and approving entry into the Agreement; (iii) authorizing and approving the assumption and assignment of certain executory contracts; (iv) authorizing the filing of certain documents under seal; and (v) granting related relief.

## Facts Relevant to this Motion

### A.     The LP Interests

17.     The Debtors launched a venture capital investment program in October 1997 in order to establish formal relationships with the venture capital community and to obtain privileged access to early-stage companies owned by venture capital firms for commercial partnering opportunities and M&A options.  Accordingly, Nortel invested in 17 venture capital

firms focused on communications and network solutions and located in the United States, Canada, Israel, Europe, and Asia.

18.     As a result of these investments, NNI and NVLLC (a non-debtor subsidiary of NNI) currently hold various venture capital fund investments as limited partners in thirteen separate venture capital firms, in addition to membership interests in a limited liability company, MILCOM Technologies, LLC ("MILCOM").  One of the venture capital fund investments held by NVLLC, Infotech Pacific Ventures, L.P., is being redeemed following an offer from the fund's general partner to return Nortel's contributed capital.  The remaining nineteen venture capital fund investments, along with the investment in MILCOM, are being sold as part of the Transaction.  The interests in sixteen (including MILCOM) are held by NNI, while four are held by NVLLC.  All are being sold pursuant to the Agreement on similar terms.

**B.     Efforts to Market the LP Interests**

19.     The Sellers began actively marketing the LP Interests together with certain direct minority equity investments in July 2010.  The Sellers signed non-disclosure agreements with over thirty potential purchasers, and summary financial information was provided beginning in early August 2010.  The Sellers sent an initial process letter to twenty-seven potential purchasers who continued to express interest, and provided all such potential purchasers access to an electronic data room containing information on the investments and draft agreements.  The Sellers received initial bids on September 17, 2010 from four potential purchasers who bid for the entire portfolio of LP interests, along with three additional bids for specific funds.  In response to receiving these initial bids, the Sellers issued a second process letter to certain potential purchasers requesting a best and final offer for the nineteen venture capital fund investments and the membership interests in MILCOM.  The Sellers required that the best and final offers include a breakout of bid price by each fund and a full markup of the draft sale

8

agreement.  On October 6, 2010, Purchasers submitted a joint bid that represented the highest

offer, bidding a total of $22.77 million, pursuant to a proposed purchase and sale agreement, for

the limited partnership interests in the nineteen venture capital fund investments held by both

NVLLC and NNI and the membership interests in MILCOM held by NNI, which was an

increase of approximately 10% over their initial bid price and approximately 9% higher than the

next highest bid price.

20.     Upon determining that Purchasers' joint bid was the highest offer from the best

and final offer round, the Sellers engaged in good-faith negotiations with Purchasers regarding

the terms of the Agreement.  These negotiations resulted in the Agreement.

## C.     The Agreement[7]

21.     On November 3, 2010, NNI, NVLLC, and the Purchasers executed the

Agreement, which contains the following material terms:[8]

- Purchase Price.  At each Closing Date, the Purchasers will pay to the Sellers the sum of the
  purchase prices listed on Schedule A of the Agreement for Funds participating in such
  Closing.  The Aggregate Purchase Price for all of the Funds shall be $22,774,057.00, plus
  any capital contributions made by the Sellers after the Account Balance Date and prior to the
  Effective Date, less the amount of any distributions made in that timeframe, and less the
  purchase price having been allocated by the Purchasers to any LP Interests related to any
  fund excluded from the Transaction because a right of first refusal has been exercised or that
  is otherwise considered an Excluded Interest.  The total portion of the purchase price
  allocated to Funds where rights of first refusal may be exercised is $5,836,069.00.

- LP Interests.  Purchasers agree to purchase from the Sellers all right, title, and interest in and
  to the LP Interests set forth on Schedule A of the Agreement.

- Sale Free and Clear.  NNI will sell and transfer all of its right, title and interest in NNI's LP
  Interests, free and clear of all Liens other than those created by or through the Purchasers to
  the fullest extent permitted by section 363 of the Bankruptcy Code and other applicable law.

---

[7]     To the extent that there are inconsistencies between any summary description of the Agreement contained
herein and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

[8]     Any capitalized terms used in this Section C but not otherwise defined herein, shall have the meaning
assigned in the Agreement.

- <u>Assignment of Operative Documents</u>.  Upon each Closing Date, the Sellers shall assign all rights and obligations under the Operative Documents to the Purchasers.  Operative Documents include any fund agreement, shareholder agreement, management agreement, bylaws, side letters and other documents and agreements governing the rights and obligations of the relevant Seller as an investor in each Fund.

- <u>No Good Faith Deposit</u>.  The portion of the Purchase Price relating to Funds participating in each Closing will be paid in full at each Closing.  No good faith deposit will be made.

- <u>Restrictions on Solicitation of Competing Bids and No Auction</u>.  As the Debtors have thoroughly marketed the LP Interests, no further public auction is contemplated for the LP Interests.  From the time of the signing of the Agreement until the Sale Order becomes a Final Order, the Debtors shall not solicit bids for the sale of the LP Interests, but may furnish information to and participate in discussions with any third party that presents an alternative offer for the LP Interests that has a higher price on substantially the same terms as the Transaction.

- <u>Duties and Obligations Related to LP Interests</u>.  As of the Closing Date for an LP Interest in a particular Fund, Purchasers shall assume and perform the duties and obligations of the relevant Seller with respect to the applicable LP Interests under the applicable Operative Documents.  Any liabilities for taxes, fees or other governmental charges attributable to the ownership by the relevant Seller of any LP Interest on or prior to the Closing Date for that Fund or the sale by the relevant Seller of any LP Interest pursuant to this Agreement shall be the responsibility of the relevant Seller and such Seller will indemnify, hold harmless and reimburse the relevant Purchaser in respect of any such liabilities for taxes, fees or other governmental charges for which such Seller is liable for a period up to six (6) months after the Closing for that Fund.  Any liabilities for taxes, fees or other governmental charges attributable to the ownership by the relevant Purchaser of any LP Interest after the Closing Date for that Fund will be the responsibility of the relevant Purchaser.  Sellers shall also be responsible for paying over any Distributions received on and after the Closing Date for that Fund, provided that Seller shall not be liable to pay over any Distributions to any Purchaser that are received by Sellers or that become payable to Sellers on or after the date that is nine (9) months after the final Closing Date.

- <u>Closing Conditions</u>.  In addition to customary closing conditions, the Agreement requires the Sellers to use commercially reasonable efforts to obtain all required consents from general partners of the Funds and any other general partner approvals required to consummate the Transaction.  Sellers are also required to use commercially reasonable best efforts to deliver at the closing for each Fund certificates from the general partner of each Fund relating to the LP Interests certifying the amount of the Seller's commitments and other outstanding obligations, the absence of any defaults, and other matters relating to the Seller's LP Interest in each Fund.  Such general partner consents must be obtained with respect to LP Interests with a total allocated purchase price equal to or greater than $13,664,434.20 (the "<u>Minimum Closing Amount</u>").  The Agreement also requires the entry of a Sale Order approving the Agreement and requires that the order become a Final Order, as defined in the Agreement, prior to the first Closing.

10

- <u>Multiple Closings</u>.  The first Closing Date shall be December 31, 2010, provided that LP Interests with a total allocated purchase price equal or greater to the Minimum Closing Amount have met all the above closing conditions and can participate in such Closing.  Any remaining LP Interests not transferred on the first Closing Date must be transferred, with all required consents having been obtained, by the later of April 15, 2011 or the date that is 120 days after the entry of the Sale Order.

22.     Based on their extensive marketing efforts to date, and the good-faith negotiations with Purchasers, the Debtors believe that the consideration and terms set forth in the Agreement represent the highest and best offer available for the LP Interests, that further marketing of the LP Interests would not yield a better offer and that further marketing of the LP Interests may result in a reduction in the Purchase Price or the loss of the Transaction with the Purchasers altogether.  Accordingly, the Debtors intend to proceed by private sale and consent to the Agreement.   In addition, because the LP Interests consist entirely of limited partnership and minority equity interests, the ability of the Debtors to dictate the terms of a sale is materially limited by the consents of the general partners of the funds in which the LP Interests are held, some of whom, among other things, have a right of first refusal.  Furthermore, in the event that an offer for the LP Interests that has a higher price on substantially the same terms as the Transaction is received from an alternative purchaser, the Sellers are free under the Agreement to consider such offers and communicate with such alternative purchasers.

23.     The Debtors have consulted with counsel for the Committee and the Bondholders Group regarding the Transaction, and understand that both are supportive of the Transaction as described herein.

**D.      The Assumption and Assignment of Contracts**

24.     To facilitate and effect the sale of the LP Interests, the Debtors seek authorization to assume certain prepetition executory contracts of the Debtors related to the LP Interests as

listed in Exhibit C (the "<u>Assumed and Assigned Contracts</u>"), and to assign such contracts to the Purchasers.

25.     Included in the Assumed and Assigned Contracts designated for assumption and assignment to the Purchasers are the Operative Documents, which, as defined in the Agreement, include, with respect to each Fund, the Fund Agreement and any shareholder agreements, management agreements, bylaws, side letters and other documents and agreements governing the rights and obligations of the relevant Seller as an investor in such Fund.  The Operative Documents are an integral part of the value of the LP Interests, as they contain all the rights and obligations pertaining to the LP Interests.

26.     Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one motion upon authorization of the Court or if all executory contracts are to be assumed and assigned jointly to the same assignee.  Here, each of the Assumed and Assigned Contracts are to be assigned to the Purchasers jointly.

### Cure Amounts

27.     To the extent necessary to consummate the Sale, the Debtors shall pay the amounts, if any, necessary to be paid to cure any existing defaults under the Assumed and Assigned Contracts in accordance with section 365(b) and 365(f)(2) of the Bankruptcy Code (the "<u>Cure Amount</u>") promptly.  To the best of the Debtors' knowledge, there are no Cure Amounts to be paid under the Assumed and Assigned Contracts.

### Adequate Assurance of Future Performance

28.     The Debtors submit that the Purchasers are able to comply with section 365 of the Bankruptcy Code and to perform the obligations under the Assumed and Assigned Contracts. The Purchasers have extensive experience in managing limited partnership interests and the

obligations similar to those contained in the Assumed and Assigned Contracts and regularly engage in agreements similar to the Transaction.  CS is part of the Alternative Investments group of Credit Suisse, which has more than $160 billion under management and is a Qualified Purchaser under the Investment Company Act of 1940 and an Accredited Investor under Regulation D of the Securities Act of 1933.  CS, together with its affiliate and predecessor funds, has completed over 570 transactions and holds approximately 1,050 funds.  Amberbrook's managing member is Willowridge Partners, Inc., which was founded in 1995 and has completed over 225 transactions acquiring interests in more than 350 separate private equity partnerships and direct holdings in over 100 companies, with a specialty in older fund interests like the LP Interests.  Willowridge Partners, Inc. is already a limited partner in six of the thirteen groups of funds being sold in the Transaction.  Any counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code if the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the relevant Assumed and Assigned Contract.

29.     Under the terms of the Agreement, if it becomes necessary to provide any additional assurance of its future performance, Purchasers have agreed to perform all actions and bear all such costs and expenses as may be necessary or advisable without recourse to the Sellers.

### Counterparty Objections

30.     Any counterparty that wishes to object to the assumption and assignment of an Assumed and Assigned Contract must comply with the procedures outlined in this Counterparty Objections section of the Motion (the "Counterparty Objection Procedures").

31.     To the extent that any counterparty wishes to object to any matter pertaining to the proposed assumption and assignment of the Assumed and Assigned Contracts, including without limitation the proposed Cure Amount and the adequate assurance of future performance by the Purchaser under the applicable Assumed and Assigned Contract, such counterparty must file with this Court and serve a written objection by no later than **4:00 p.m. (ET) on November 16, 2010** on (a) counsel to the Debtors:  Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Facsimile:  (212) 225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989 (Attention:  Derek C. Abbott); (b) counsel to the Purchasers:  Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Facsimile: (212) 351-6277 (Attention:  Janet M. Weiss); (c) counsel to the Committee:  Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax:  (212) 872-1002 (Attention:  Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention:  Christopher M. Samis), (d) counsel to the Bondholder Group:  Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax:  (212) 822-5735 (Attention:  Roland Hlawaty) and (e) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Fax:  (302) 573-6497 (Attention: Thomas P. Tinker).

32.     All counterparty objections must specify the grounds for such objection, including stating the counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount) if the counterparty disagrees with the Debtors'

proposed Cure Amount and any other defaults or termination events the counterparty alleges must be cured to effect assignment of the Assumed and Assigned Contract.

33.    To the extent that any counterparty does not timely file and serve an objection as set forth above, such counterparty will be (i) deemed to have consented to the Cure Amount set forth on Exhibit C to this Motion (as Exhibit C may be amended from time to time pursuant to the procedures set forth below), if any, and to the assumption and assignment of the applicable Assumed and Assigned Contract; (ii) bound to such corresponding Cure Amount, if any; (iii) deemed to have agreed that the Purchasers have provided adequate assurance of future performance within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B); (iv) deemed to have agreed that all defaults under the Assumed and Assigned Contract arising or continuing prior to the effective date of the assignment have been cured as a result of or as a precondition to the assignment, such that the Purchasers or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the Assumed and Assigned Contract shall remain in full force and effect for the benefit of the Purchasers and the counterparty in accordance with its terms; (v) deemed to have waived any right to terminate the Assumed and Assigned Contract or designate an early termination date under the applicable Assumed and Assigned Contract as a result of any default that occurred and/or was continuing prior to the assignment date; and (vi) deemed to have agreed that the terms of the order granting this Motion shall apply to the assumption and assignment of the applicable Assumed and Assigned Contract.

### Reservation of Rights

34.    The Debtors' assumption and assignment of the Assumed and Assigned Contracts is subject to Court approval and consummation of the sale of the LP Interests to the Purchasers.

The Debtors shall be deemed to have assumed each of the Assumed and Assigned Contracts and assigned such contracts to the Purchasers as of the date of and effective only upon the Closing Date for the LP Interests relating to such contracts.  Absent such closing, the Assumed and Assigned Contracts shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

35.     The Purchasers shall have no rights in and to a particular Assumed and Assigned Contract until such time as the particular Assumed and Assigned Contract is assumed and assigned pursuant to this Motion.

36.     In the event objections to the assumption and assignment of certain contracts are not resolved prior to the relevant Closing Date for the LP Interests relating to such contracts, including objections related to Cure Amounts, the Debtors, in consultation with the Purchasers, may elect to (i) not assume such Assumed and Assigned Contracts, or (ii) postpone the assumption of such Assumed and Assigned Contracts until the resolution of such objections. Any Cure Amounts outstanding on the Closing Date for the contracts relating to the LP Interests being transferred on that Closing Date shall be paid by the relevant Seller to the appropriate counterparty as a condition precedent to such assumption and assignment of the relevant Assumed and Assigned Contracts.

37.     The Debtor reserves and does not waive the right to amend, supplement, withdraw or otherwise modify the information contained in Exhibit C with respect to any particular Assumed and Assigned Contract.

### *Supplemental Contract Procedures*

38.     If at any time, whether before or after each Closing, the Sellers identify additional prepetition executory contracts to be assumed and assigned to the Purchasers as Assumed and

Assigned Contracts (each a "Supplemental Assumed and Assigned Contract"), the Debtors shall

serve this Motion, including an individualized Exhibit C, listing such Supplemental Assumed

and Assigned Contract by first class mail, postage prepaid, facsimile, electronic transmission,

hand delivery or overnight mail on the counterparty to such contract (and its attorney, if known)

at the last known address available to the Debtors by no later than ten (10) calendar days before

the proposed effective date of the assignment.

39.    Unless the counterparty or any other entity properly files an objection to the

assumption and assignment of a Supplemental Assumed and Assigned Contract in accordance

with the Counterparty Objection Procedures within ten (10) calendar days of the date of the

service of the Motion on such counterparty, the Debtors may assume and assign the

Supplemental Assumed and Assigned Contract, subject to the occurrence of the Closing for the

LP Interest relating to such contract, without further order or notice of hearing.  If an objection is

filed and served in accordance with the Counterparty Objection Procedures within ten (10)

calendar days of the date of the service of the Motion on such counterparty, and the objection

cannot be resolved consensually, then the Debtors will schedule a hearing to consider the

objection on the next scheduled omnibus hearing date.

40.    If the list of Assumed and Assigned Contracts subject to this Motion changes, the

Debtors shall file an amended Exhibit C listing the Assumed and Assigned Contracts with the

Court within ten (10) days of the Closing for the LP Interests relating to such contracts and with

successive changes to the list of Assumed and Assigned Contracts thereafter.

**E.    Sale Free and Clear of All Bankruptcy Claims**

41.    Pursuant to this Court's order approving the Agreement (the "Order"), except as

otherwise expressly set forth in the Agreement, the Debtors have agreed to relinquish, sell,

transfer and assign pursuant to section 363 of the Bankruptcy Code, the Debtors' right, title and

17

interest in the LP Interests, free and clear of all claims, including any claim, interest or liability

relating to any debt, claim, obligation, liability, demand, guaranty, option, right, contractual or

other commitment, indemnity, indemnity obligation and warranty relating to any act, omission or

circumstance arising prior to the Closing Date (as defined in the Agreement) for such LP Interest

or otherwise arising under any doctrine of successor liability, whether known or unknown,

contingent or otherwise, whether arising prior to or subsequent to the commencement of the

Debtors' chapter 11 cases, and whether imposed by agreement, understanding, law, equity or

otherwise.  Any and all such claims shall attach to NNI's ratable portion of the net proceeds as

provided for in the Agreement, with the same priority, validity, force and effect as they now have

against the LP Interests and subject to any rights, claims or defenses of the Debtors or their

estates with respect thereto.

## Basis for Relief

### A.    Entry into the Agreement Is a Product of the Debtors' Reasonable Business Judgment

42.    Section 363(b)(1) of the Bankruptcy Code provides:  "The trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "The court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title."

43.    Virtually all courts have held that approval of a proposed sale of assets of a debtor

under section 363 of the Bankruptcy Code, outside the ordinary course of business and prior to

the confirmation of a plan of reorganization, is appropriate if a court finds that the transaction

represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See

In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry.

18

Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors

may be considered by a court in determining whether there is a sound business purpose for an

asset sale:  "the proportionate value of the asset to the estate as a whole; the amount of elapsed

time since the filing; the effect of the proposed disposition of [sic] the future plan of

reorganization; the amount of proceeds to be obtained from the sale versus appraised values of

the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc.,

164 B.R. 730, 732 (Bankr. M.D. Pa. 1993); Titusville Country Club v. Pennbank (In re Titusville

Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration

& Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722

F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986);

In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel

Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for

approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and

equitable, that there is a good business reason for completing the sale and the transaction is in

good faith").

44.     The "sound business reason" test requires a trustee or debtor-in-possession to

establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the

ordinary course of business; (2) that accurate and reasonable notice has been provided to

interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and

reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re

19

Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[9]

45.    The transfer of the LP Interests in connection with the Transaction meets the "sound business reason" test.  First, sound business purposes justify the Transaction.  The Debtors believe that a prompt sale of the LP Interests presents the best opportunity to realize the maximum value of the LP Interests for the Debtors' estate and its creditors.  The Debtors further believe that this benefit to their creditors will be adversely affected, or perhaps lost, absent a prompt transfer of the LP Interests.  See In re Lionel Corp., 722 F.2d at 1071 (finding that of factors for courts to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").  In light of the potential decrease in the value of the LP Interests, the Debtors believe that a prompt transfer is both necessary and justified to maximize the value of the LP Interests for the benefit of the Debtors' creditors and estates.

46.    Second, notice of the Motion will be provided to interested parties in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and applicable Court orders as appropriate under the circumstances.

47.    Third, the Debtors believe they have obtained a fair and reasonable price for the LP Interests that constitutes reasonably equivalent value and fair consideration for the LP Interests.  The consideration agreed to in the Agreement is the result of a marketing effort by NNI over several months and the culmination of rigorous, arm's-length negotiations among NNI, NVLLC and the Purchasers.  The Sellers diligently and in good faith analyzed all other available

---

[9]    Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable.  In re Lionel, 722 F.2d at 1071.

options in connection with the disposition of the LP Interests and determined that the terms and conditions set forth in the Agreement are all fair and reasonable and that the purchase price contemplated in the Agreements constitutes the highest or otherwise best value obtainable for such LP Interests.

48.     Finally, the marketing and negotiation process satisfies the good faith requirement of Abbotts Dairies.  788 F.2d at 149-50.  The Debtor submits that the Agreement is the product of good faith solicitation efforts and arm's-length negotiations among NNI, NVLLC and the Purchasers with respect to the price and other terms of the Agreement.  The price received by NNI for the LP Interests is reasonable in light of comparable secondary market sales of interests similar to the LP Interests.

**B.     The Sale of the LP Interests without Auction is Justified**

49.     Under Bankruptcy Rule 6004, a debtor may sell assets outside of the ordinary course of business by private sale or public auction.  See Fed. R. Bankr. P. 6004 ("All sales not in the ordinary course of business may be by private sale or by public auction.").

50.     The Debtors believe that the sale of the LP Interests to the Purchasers without an auction is the best way to maximize value for their estates.  As described above, the proposed Agreement is the result of an effort by Nortel to market the interests over several months to dozens of potential buyers and two rounds of bidding among prospective purchasers.

51.     NNI and NVLLC are limited partners (or, in the case of MILCOM, minority stockholders) in the venture capital funds and limited liability company in which the LP Interests are held.  As limited partners, there are a series of general partner consents which must be received, and there are certain rights of first refusal associated with several of the LP Interests, all of which present material limitations to NNI and NVLLC's efforts to influence the outcome of a sale.  The Purchasers have indicated that the conduct of an auction would render the

21

Transaction infeasible.  It would also, in all likelihood, fail to attract any higher or better offers,

given the extensive marketing efforts already completed.

**C.      The Purchasers Should be Granted the Protection of Bankruptcy Code Section 363(m)**

52.      As described above, the Purchasers and the Sellers negotiated the Agreement in

good faith and at arm's length.  Accordingly, the Debtors maintain that the Purchasers are

entitled to the protections afforded by Bankruptcy Code section 363(m).

53.      Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

54.      While the Bankruptcy Code does not define "good faith," the Third Circuit in In

re Abbotts Dairies of Pa., Inc., has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated

Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding

that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take

grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610

(S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re

Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case,

concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting <u>In re</u> <u>Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198 (7th Cir. 1978)).

55.     The Purchasers and Sellers have spent a considerable amount of time and resources over the past several weeks assembling a bid for the LP Interests over multiple rounds of bidding and negotiating the Agreement at arm's length, with give and take on both sides.  All parties have acted in good faith to advance their interests in this arm's-length process.

56.     Neither the Purchasers nor any of their affiliates is an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.  Neither the Purchasers nor any of their affiliates are (i) a mere continuation of the Debtors or their estates and there is no continuity between the Purchasers and their affiliates and the Debtors or (ii) holding themselves out to the public as a continuation of the Debtors.  The Transaction is not being undertaken for the purpose of escaping liability for the Debtors' debts.  Under the circumstances, this Court should find that the Purchasers are entitled to all of the protections of Bankruptcy Code section 363(m).

**D.     The Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)**

57.     As set forth above, the Sellers and the Purchasers have been negotiating with the Parent at arm's length and in good faith regarding the Agreement.  Moreover, the Debtors do not believe that the Agreement to be the result of collusion or other bad faith between bidders or that the price under the Agreement has been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).  The Debtors are not aware of any agreement between Purchasers and any other entity relating to bidding for the LP Interests.

23

58.     As set forth above, the Agreement has been negotiated, and proposed, and will be entered into by the Sellers and the Purchasers without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Sellers nor the Purchasers nor any of their affiliates have engaged in any conduct that could cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n).

**E.     Sale of the LP Interests Should Be Free and Clear of Bankruptcy Claims**

59.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to transfer, convert, cancel or otherwise dispose of NNI's right, interest and title in the LP Interests to the Purchasers free and clear of all Liens, as defined in the Agreement and except as set forth in the Agreement, with such Liens to attach to the proceeds of the sale of the LP Interests as applicable, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.  Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written in the disjunctive and thus, court may approve sale "free and clear" provided at least one of the requirements is met).

60.      With respect to each creditor that asserts a Lien, the Debtors submit that one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) will be satisfied.  Those holders of Liens who do not object or who withdraw their objections to the Motion or the Transaction will be deemed to have consented to the Motion and the Transaction pursuant to Bankruptcy Code § 363(f)(2).  The Debtors also submit that, for holders of Liens who do object, their Liens will fall within one or more of the other subsections of Bankruptcy Code section 363(f).

61.      A sale free and clear of Liens is necessary to maximize the value of the LP Interests.  The Purchasers would not have entered into the Agreement and will not consummate the Transaction if the LP Interests were not transferred to the Purchasers free and clear of all Liens (except as permitted by the Agreement).  A transfer of the LP Interests other than one free and clear of all Liens would yield substantially less value for the Debtors' estates, with less certainty than the proposed Agreement.  The consideration being paid by Purchasers in connection with the Transaction constitutes sufficient and valuable consideration for the releases of any potential claims of successor liability of the Purchasers and their affiliates.  Therefore, the Transaction is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  A sale free and clear of Liens is particularly appropriate under the circumstances because any lien or claim in, to or against the Debtors' right, interest and title in the LP Interests that exists immediately prior to the relevant Closing for such LP Interest will attach to the proceeds with the same validity, priority, force and effect as existed with respect to the LP Interests at such time, subject to the rights and defenses of the Debtors or any party in interest. The Debtors submit that holders of Liens, if any, will be adequately protected by the availability of the proceeds of the Transaction to satisfy their claims and interests.

25

**F.      The Assumption and Assignment of Executory Operative Documents Should Be Authorized**

62.      Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor.  This subsection provides:

> (b) (1)      If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> > (A)      cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)      compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)      provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --
>
> > (A)      the trustee assumes such contract or lease in accordance with the provisions of this section; and
> >
> > (B)      adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

63.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  EBG

26

<u>Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)</u>, 139

B.R. 585, 593 (S.D.N.Y. 1992).

64.     Among other things, adequate assurance may be provided by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  <u>See, e.g.</u>, <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding

adequate assurance of future performance present when prospective assignee of lease from

debtor has financial resources and has expressed willingness to devote sufficient funding to

business in order to give it strong likelihood of succeeding).  As stated above, the Purchasers are

uniquely qualified in this respect since they manage a large portfolio of limited partnership

interests that include commitments similar to those in the Assumed and Assigned Contracts.

65.     To the extent any defaults exist under any Assumed and Assigned Contracts, any

such default will be promptly cured or adequate assurance that such default will be cured will be

provided prior to the assumption and assignment.  If necessary, the Purchasers will submit facts

prior to or at the hearing on this Motion to show the financial credibility of the Purchasers and

Purchasers' willingness and ability to perform under the Assumed and Assigned Contracts.  The

hearing on this Motion will therefore provide the Court and other interested parties the

opportunity to evaluate and, if necessary, challenge the ability of the Purchasers to provide

adequate assurance of future performance under the Assumed and Assigned Contracts, as

required under section 365(b)(1)(C) of the Bankruptcy Code.

66.     In addition, the Debtors submit that it is an exercise of their sound business

judgment to assume and assign the Assumed and Assigned Contracts to the Purchasers, and that

the assumption, assignment, and sale of the Assumed and Assigned Contracts is in the best

interests of the Debtors, their estates and creditors, and all other parties in interest.  The Assumed

and Assigned Contracts being assigned to the Purchasers are an integral part of the LP Interests

being purchased by the Purchasers, and accordingly, such assumption, assignment, and sale of

Assumed and Assigned Contracts are reasonable and enhance the value of the Debtor's estate.

The Court should therefore authorize the Debtors to assume and assign the Assumed and

Assigned Contracts as set forth herein.

**G.    Information Regarding the LP Interests Contained in Schedule A Is Confidential Commercial Information and Should Be Filed Under Seal**

67.    The Debtors respectfully submit that it is appropriate to allow Schedule A to the

Agreement ("Schedule A") be filed under seal.  Schedule A contains substantial sensitive

commercial information concerning the LP Interests, including the valuation of the LP Interests

for each particular fund in which the LP Interests are held, distributions, and capital contributions

and commitments.

68.    The relief requested by the Debtors is squarely authorized under the Bankruptcy

Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to

issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information. . . .

11 U.S.C. § 107(b).

69.    Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

70.     This Court has defined "commercial information" in the context of section 107(b)

as follows:

> Commercial information is information which would result in 'an
> unfair advantage to competitors by providing them information as
> to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion

Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section

107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid

'affording an unfair advantage to competitors by providing them information as to the

commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr.

D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

71.     Schedule A constitutes "commercial information" subject to the protection of

section 107(b).  Other limited partners of funds in which the LP Interests are held regularly

engage in secondary sales of their interests, and the valuation at which these sales are transacted

are kept strictly confidential to preserve other limited partners' flexibility in future sale

negotiations.  Additionally, Schedule A contains information regarding capital commitments and

contributions as well as distributions that, if available to other investors that compete with the

funds in which the LP Interests are held, would allow them to gain an advantage in acquisition

activities by providing information regarding the financial wherewithal of the funds in which the

LP Interests are held.  Public disclosure of the terms of these private transactions therefore would

have an adverse impact on the funds' ongoing sale efforts and acquisition activity.

29

72.     In keeping with this confidentiality policy, the general partners of certain funds in which the LP interests are held have indicated that they would provide certain consents required for the consummation of the Transaction if and only if Schedule A is filed under seal.  The filing of Schedule A under seal is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

73.     Since information related to the LP Interests is "commercial information" within the ambit of section 107, the Court should enter an order permitting the Debtors to file under seal all confidential information related to the LP Interests.

### Notice

74.     Notice of the Motion has been given via overnight or hand delivery to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) Purchasers; (v) counterparties and other parties in interest to the Assumed and Assigned Contracts (as limited by the following paragraph); and (vi) the general service list established in these chapter 11 cases.  The Debtor submits that under the circumstances no other or further notice is necessary.

75.     The general partners of the funds in which NNI holds LP Interests are the sole counterparties and parties in interest under the Assumed and Assigned Contracts with respect to the majority of the Assumed and Assigned Contracts.  Three funds in which the LP Interests are held, however, contain provisions in their respective Fund Agreements that provide other limited partners certain rights of first refusal relating to transfers of the LP Interests, and require notice of proposed transfers to be provided to those limited partners.  The general partners of these funds containing rights of first refusal, however, have refused to provide the identities of these limited partners, citing the privacy concerns of limited partners referred to earlier in this Motion. Such general partners have agreed, however, to notify such limited partners, via electronic correspondence, of this Motion within two (2) days of the filing of this Motion.  Accordingly, the

30

Debtors, through this Motion, seek to limit notice to the limited partners of these three funds and deem electronic notice via the general partners of such funds to constitute appropriate notice under the circumstances and complies with sections 107(b), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9018 and Local Rule 6004-1.

## **No Prior Request**

76.    No prior request for the relief sought herein has been made to this or any other court.


*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtor respectfully requests that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  November 4, 2010
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*