## **Exhibit B**

Purchase and Sale Agreement

**EXECUTION COPY**

PURCHASE AND SALE AGREEMENT, dated November 3, 2010 (the "Agreement"), by and between Nortel Networks Inc., a Delaware corporation ("NNI") and Nortel Ventures LLC, ("NVLLC") a Delaware limited liability company (each a "Seller" and together, the "Sellers"), on the one hand, and CS Strategic Partners IV VC Holdings, L.P., a Delaware limited partnership, and Amberbrook V LLC, a Delaware limited liability company (each a "Purchaser" and together severally, and not jointly, the "Purchasers"), on the other hand.

**Recitals**

WHEREAS, NNI is a debtor-in-possession under the Bankruptcy Code (as defined below) which commenced its case under Chapter 11 of the Bankruptcy Code on January 14, 2009 by filing a voluntary petition for relief before the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Case");

WHEREAS, each Seller is a limited partner or member in each partnership or limited liability company (each, a "Fund") set forth opposite such Seller's name on Schedule A and desires to (i) sell, assign and transfer to the relevant Purchaser its limited partnership or membership interest described on Schedule A in each applicable Partnership (each such interest, subject to Section 2.5 herein, an "LP Interest") and (ii) with respect to NNI assume and assign pursuant to section 365 of the Bankruptcy Code, and with respect to NVLLC assign, to each Purchaser, all of the Sellers' interests in the applicable Operative Documents (as defined below).

WHEREAS, each Purchaser desires to purchase, to the extent applicable, all of the LP Interests and take an assignment of all of the Sellers' interests in the applicable Operative Documents on the terms and subject to the conditions set forth herein, and pursuant to, for the NNI LP Interests (as defined below), sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the parties acknowledge and agree that the purchase by each Purchaser is being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of either Seller or its Affiliates and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by each Purchaser.

NOW, THEREFORE, the parties hereto agree as follows:

**ARTICLE 1**

**DEFINITIONS**

1.1    <u>Definitions</u>.  Except as otherwise provided herein, capitalized terms used herein shall have the meanings assigned to them in this Section:

"Account Balance Date" means June 30, 2010.

"Action" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"Affiliate" means, as to any person, any other person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such person.

"Aggregate Purchase Price" has the meaning set forth in Section 2.2(a).

"Aggregate ROFR Purchase Price" means the sum of the purchase price(s) listed on Schedule A for all Excluded ROFR Funds.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" means the sale, transfer or other disposition of the LP Interests in a transaction with a purchaser other than the Purchasers and/or their Affiliates.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Proceedings" means the Chapter 11 Case and any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning any of the Sellers or their respective Affiliates that are held from time to time.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

"Bondholder Group" means the ad hoc group of bondholders organized in the Chapter 11 Case.

"Business Day" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York are authorized or required by statute to close.

"Capital Commitment" means all obligations of the owner of any LP Interest pursuant to the Operative Documents to make capital contributions to the Fund and to pay management fees and other fees and expenses to such Fund or the relevant general partner or managing member.

"Capital Contributions" means all cash payments or deemed payments made in respect of the relevant Seller's Capital Commitments to the Funds (other than payments or deemed payments on account of tax liabilities of the relevant Seller attributable to the ownership by such Seller of the relevant LP Interest for periods prior to the relevant Closing Date), excluding the Excluded ROFR Funds.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing Dates" has the meaning set forth in Section 2.6.

"Closings" has the meaning set forth in Section 2.6.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors as representative for the unsecured creditors of NNI.

"Confidentiality Agreements" means the confidentiality agreement by and among the Sellers and DLJ MB Advisors, Inc., an indirect general partner of CS Strategic Partners IV VC Holdings, L.P., among other parties, dated May 28, 2010, and the confidentiality agreement by and among the Sellers and Amberbrook V LLC, among other parties, dated May 1, 2010.

"Designated Courts" has the meaning set forth in Section 7.14(b).

"Distributions" means all cash payments and other distributions paid or made (or deemed paid or made, excluding any Distributions deemed paid or made in respect of withholding taxes through the date of this Agreement) by the Funds (excluding any Excluded ROFR Funds) to the relevant Seller relating to the LP Interests.  The value of all "in-kind" payments, dividends or other distributions received by the relevant Seller from the relevant Fund shall be the value assigned thereto as of the date of distribution by the general partner or managing member thereof.

"Effective Dates" means the Closing Dates.

"Excluded ROFR Funds" has the meaning set forth in Section 2.5.

"Final Order" means an order of the Bankruptcy Court, any court of competent jurisdiction or other government entity (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue, and that nothing contained in this Agreement shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event each Purchaser shall be able to assert the benefits of section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, any appeal of the Sale Order shall become moot.

"Fund Agreement" means, with respect to each Fund, the limited partnership or limited liability company agreement of such Fund, as amended and/or restated to date.

3

"Funds" has the meaning set forth in the Recitals.

"General Partner Consent" means, with respect to each Fund, the consent of, and any other action as required under the terms of the applicable Fund Agreement by, the general partner or managing member of such Fund to the transfer of a LP Interest to the relevant Purchaser and admission (in respect of such LP Interest) of such Purchaser as a limited partner or member of such Fund.

"Law" means any U.S., UK, supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"Lien" means any lien, mortgage, pledge, claim or security interest, hypothec, encumbrance or charge, restriction or limitation of any kind.

"LP Interest" has the meaning set forth in the Recitals.

"Material Adverse Effect" means a material adverse effect on the business, operations, results of operations or assets of the Sellers, taken as a whole, but any effect of the following shall not be taken into account in determining whether a "Material Adverse Effect" has occurred: (a) changes, events and occurrences in the industries in which the Funds and the companies they invest in operate generally, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, (c) changes in law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, including any effect on the Sellers resulting from failure to take any action to which any Purchaser refused consent under this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of any Purchaser, (f) the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts, or (g) matters known to or reasonably foreseeable by any Purchaser, taking into account the financial condition, business and operations of the Sellers and the fact that the Sellers are involved in the Bankruptcy Proceedings; it being understood that the failure of the Sellers to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect.

"Milcom" has the meaning set forth in Section 1.3.

 "New York Courts" has the meaning set forth in Section 7.14(b).

"NNI" has the meaning set forth in the Preamble.

"NNI LP Interests" means those LP Interests listed opposite NNI on Schedule A, together with the Operative Documents relating to those LP Interests and any applicable interests, rights, and obligations thereunder.

"NVLLC" has the meaning set forth in the Preamble.

"Operative Documents" means, with respect to each Fund, the Fund Agreement and any shareholders agreements, management agreements, bylaws, side letters and other documents and

agreements governing the rights and obligations of the relevant Seller as an investor in such Fund.

"OFAC" means the U.S. Office of Foreign Asset Control.

"PEP" means a politically exposed person who holds or has held a prominent public position in a non-U.S. country.

"Pre-Closing Notice" has the meaning set forth in Section 4.7.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Authorized Agent" has the meaning set forth in Section 7.14(c).

"Purchase Price" has the meaning set forth in Section 2.2(c).

"ROFR Funds" means the Funds listed on Schedule B.

"Sale Hearing" has the meaning set forth in Section 4A.1.

"Sale Motion" has the meaning set forth in Section 4A.1.

"Sale Order" means an order (or orders) of the Bankruptcy Court, which has been entered on the Bankruptcy Court docket and which is not subject to a stay or injunction, in form and substance reasonably acceptable to the relevant Purchaser, approving this Agreement, the transactions contemplated hereby and all of the terms and conditions hereof, and approving, authorizing and directing NNI to consummate the transactions contemplated hereby.  Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the NNI LP Interests shall be sold, assumed, assigned and transferred to the relevant Purchaser free and clear of all Liens (any such Liens to attach to the Aggregate Purchase Price attributable to the NNI LP Interests) to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code; (ii) the relevant Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof; (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, NNI or any chapter 7 or chapter 11 trustee of NNI; and (vi) such order shall be effective immediately upon entry and the 14-day stay provided by Bankruptcy Rules 6004(h) and 6006(d) shall not apply.

"Seller" has the meaning set forth in the Preamble.

"Termination Date" has the meaning set forth in Section 6.1(b).

"Transfer Agreement" means, with respect to each Fund, the agreement effective as of the relevant Closing Date among the relevant Seller, the relevant Purchaser and the general partner or managing member of such Fund which relates to the transfer of a LP Interest to the

relevant Purchaser and the admission (in respect of such LP Interest) of such Purchaser as a limited partner or member of such Fund, in a form reasonably satisfactory to the relevant Seller and the relevant Purchaser.

      1.2     Alternate Investment Vehicles.  References to a "LP Interest" and a "Fund" include references to any alternative investment vehicle associated with the relevant Fund and the relevant Seller's interest therein, and this Agreement shall be construed accordingly.

      1.3     Milcom Technologies.  References to a "LP Interest" and a "Fund" include references to Milcom Technologies, LLC ("Milcom") and NNI's interest in Milcom, and this Agreement shall be construed accordingly.

## ARTICLE 2

## PURCHASE AND SALE OF LP INTERESTS

      2.1     Purchase and Sale.  Upon and subject to the terms and conditions of this Agreement, each Purchaser severally and not jointly agrees to purchase from the relevant Seller, and such Seller agrees to sell and transfer to such Purchaser all of its right, title and interest in and to the LP Interests set forth on Schedule A and to assume and assign to the relevant Purchaser the interests of such Seller in the applicable Operative Documents. NNI agrees to sell and transfer all of its right, title and interest in the NNI LP Interests, free and clear of all Liens (other than Liens created by or through the Purchaser or any of its Affiliates), to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

      2.2     Purchase Price.

      (a)     The aggregate purchase price (the "Aggregate Purchase Price") payable by the Purchasers for the LP Interests and the interests of the Sellers in the Operative Documents shall be equal to (i) $22,774,057.00, plus (ii) with respect to the LP Interests that are not Excluded ROFR Funds, the aggregate amount of any Capital Contributions after the Account Balance Date and prior to the respective Effective Date of each relevant Fund, minus (iii) with respect to the LP Interests that are not Excluded ROFR Funds, the aggregate amount of any Distributions made to the Sellers after the Account Balance Date and prior to the respective Effective Date of each relevant Fund, and minus (iv) the Aggregate ROFR Purchase Price, and shall be payable without any withholding or deduction.  Any Capital Contribution or Distribution made after the Account Balance Date shall be confirmed in writing by the Funds, other than Milcom, prior to and as a condition to being included in the Aggregate Purchase Price pursuant to (ii) or (iii) above.

      (b)     Each Purchaser shall allocate the related purchase price as indicated on Schedule A to the LP Interests to be acquired by each such Purchaser.

      (c)     On each Closing Date, each Purchaser shall severally and not jointly pay to the Sellers the sum of the purchase prices listed on Schedule A for the Funds to be acquired by such Purchaser at such Closing (the "Purchase Price").

2.3    Distributions.

(a)    During the period from and after the date hereof through the last Closing Date, promptly and in any event within ten Business Days after receipt by the relevant Seller of any Distributions, such Seller shall notify each Purchaser of the receipt by such Seller of such Distributions and the amount, nature and time of receipt of such Distributions.

(b)    From and after the relevant Closing Date, if a Seller receives Distributions from any Funds in respect of LP Interests that have already been transferred to the Purchasers, such Seller shall maintain such Distributions in its account(s) in trust for each Purchaser, such Seller shall have no legal or beneficial interest in such Distributions and shall promptly pay over any such Distributions to the applicable Purchaser.  If a Purchaser acquires knowledge of any Distribution paid or to be paid to a Seller at any time, such Purchaser shall provide written notice thereof to such Seller as soon as practicable but in any event within ten Business Days after acquiring such knowledge.  Notwithstanding the above, such Sellers shall not be liable to pay over any Distributions to any Purchaser that are received by Sellers or that become payable to Sellers on or after the date that is nine (9) months after the final Closing Date.

2.4    Liabilities.  From and after each relevant Closing Date, and upon the terms and subject to the conditions set forth in this Agreement and the Transfer Agreements, each Purchaser shall assume and perform the duties and obligations of the relevant Seller with respect to the applicable LP Interests acquired by such Purchaser at such Closing Date under the applicable Operative Documents and the Transfer Agreements in accordance with the terms of such agreements. Any liabilities for taxes, fees or other governmental charges attributable to the ownership by the relevant Seller of any LP Interest on or prior to the relevant Closing Date in respect of such LP Interest or the sale by the relevant Seller of any LP Interest pursuant to this Agreement shall be the responsibility of the relevant Seller.  Any liabilities for taxes, fees or other governmental charges attributable to the ownership by the relevant Purchaser of any LP Interest after the relevant Closing Date in respect of such LP Interest shall be the responsibility of the relevant Purchaser.  Notwithstanding anything to the contrary in this Agreement, the relevant Seller shall be required to indemnify, hold harmless and reimburse the relevant Purchaser in respect of any liabilities for taxes, fees or other governmental charges to which such Seller is liable pursuant to this Section 2.4 only for a period up to six (6) months after the relevant Closing in respect of each applicable LP Interest.  For the avoidance of doubt, any tax on gain realized by the Sellers upon the sale of LP interests pursuant to this Agreement will be borne by the Sellers.

2.5    ROFR Funds.  Each Seller shall provide the general partner, the managing member or the limited partners, as applicable, of each ROFR Fund with the right to acquire each LP interest of such ROFR Fund, as required in the constituent documents of such ROFR Fund. Each LP Interest in any ROFR Fund that is acquired or to be acquired by the general partner, the managing member or the limited partners of such ROFR Fund, as applicable, shall be removed from Schedule A hereto, shall not be considered "LP Interests" hereunder and shall be excluded from the transactions contemplated herein (each such ROFR Fund, the "Excluded ROFR Fund").

2.6     Closings.  Subject to satisfaction or waiver of all conditions precedent set forth in Article 5, the closings of the transactions contemplated by this Agreement (the "Closings") will take place at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006 on one or more closing dates (the "Closing Dates") with the first such Closing Date being December 31, 2010; provided that no Closing shall occur unless LP Interests with a total allocated purchase price as indicated on Schedule A (i.e., prior to any adjustments pursuant to Section 2.2 hereof) equal to or greater than $13,664,434.20 can be transferred to the Purchasers at such Closing, and LP Interests in respect of at least three (3) Funds shall be required for each Closing other than the final Closing.

2.7     Deliveries at Closings.

(a)     At the first Closing, the Sellers shall deliver a certified copy of the Sale Order.

(b)     At each Closing, upon satisfaction or waiver of the conditions set forth in Article 5 hereof:

(i)     each Purchaser will (A) pay the Purchase Price to the relevant Seller for the LP Interests being acquired in such Closing by such Purchaser in accordance with Section 2.2(c), and (B) deliver to each relevant Seller its signature to each of the applicable Transfer Agreements; and

(ii)     each Seller shall deliver to the relevant Purchaser such Seller's signature to each applicable Transfer Agreement.

(c)     At each Closing, each Seller and each Purchaser shall deliver to the other party all of the other documents and instruments required to be delivered pursuant to the terms of this Agreement or any Transfer Agreement

(d)     With respect to each Closing, each Seller and each Purchaser shall use commercially reasonable efforts, on or prior to such Closing, to execute and deliver all such other instruments, documents or certificates as may be necessary to effect the consummation at such Closing of the transactions contemplated by this Agreement.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties of the Sellers.  Each Seller hereby represents and warrants to each Purchaser that:

(a)     Authorization.  Such Seller is an entity duly organized and validly existing in good standing under the laws of Delaware.  Subject to entry of the Sale Order with respect to NNI, such Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Agreements to which such Seller is a party and to perform all of the obligations to be performed by it hereunder and thereunder.  Subject to entry of the Sale Order with respect to NNI, this Agreement and the Transfer Agreements to which it

8

is a party have been duly authorized, executed and delivered by it, and constitute a valid and binding obligation of such Seller, enforceable against it in accordance with its terms.

        (b)     <u>Title to Interest</u>.  Each of NNI, subject to the entry of the Sale Order, and NVLLC owns all right, title and interest (legal and beneficial) in and to the LP Interests opposite its name in Schedule A, free and clear of all Liens other than liens created by or through the relevant Purchaser or any of its Affiliates.

        (c)     <u>No Conflicts</u>.  Subject to entry of the Sale Order with respect to NNI, the execution and delivery of this Agreement and the Transfer Agreements to which it is a party and the performance or consummation of the transactions contemplated hereby and thereby by such Seller does not conflict with or result in a breach or violation of any of the terms or provisions of its organizational documents or result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which it is a party or by which it is bound, nor will any such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Subject to entry of the Sale Order with respect to NNI, neither the execution and delivery of this Agreement nor the Transfer Agreements to which it is a party nor the performance or consummation of the transactions contemplated hereby and thereby by such Seller will constitute an event that, with the lapse of time or with action by a third party, could result in the default under any of the foregoing or result in the creation of any Lien upon any LP Interest owned by such Seller, except for such defaults that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

        (d)     <u>Funded and Unfunded Capital Commitment; Operative Documents</u>.  Set forth on Schedule A, expressed in U.S. dollars and other than with respect to Milcom, is such Seller's total Capital Commitment to each Fund, such Seller's capital account balance in such Fund (based on information received from such Fund), the aggregate amount of capital contributions such Seller has made in respect of such Fund since the Account Balance Date, the aggregate amount of Distributions made by such Fund to such Seller since the Account Balance Date, and the amount of the unfunded Capital Commitment to such Fund with respect to the LP Interest in such Fund, in each case as of the Account Balance Date.  With respect to Milcom, the financial information as provided in the electronic data room is the most recent information available to NNI.  Such Seller has not received any notice of default under any applicable Operative Document and has made all Capital Contributions through and including the Account Balance Date.  Such Seller has not opted out or been excluded, voluntarily or involuntarily, from any investment of any applicable Fund pursuant to the terms of the relevant Operative Documents or otherwise.  To such Seller's knowledge, (i) true, complete and correct copies of all Operative Documents have been posted to the electronic data room and (ii) no correspondence between such Seller and the Funds modifies the Operative Documents in any material respect.

(e)    Distributions and Capital Contributions.  Except as set forth on Schedule A, such Seller has not, since the Account Balance Date, received, or been notified that it is entitled to receive, any Distributions, and such Seller has not made any Capital Contribution, or agreed to make any Capital Contribution, between the Account Balance Date and the date hereof.  Such Seller has not received notice of any obligation to return any Distributions previously received from any Fund.

(f)    Certain Conduct.  Since the Account Balance Date, such Seller has not (i) sold, assigned, transferred, delivered or otherwise disposed of all or any portion of any LP Interest held by such Seller, (ii) converted, exchanged or redeemed all or any portion of such LP Interest, or (iii) agreed to do any of the foregoing.

(g)    Broker's Fee; No Public Offering.  No person or entity acting on behalf of such Seller or under the authority of such Seller shall be entitled to any broker's, finder's, or similar fee or commission in connection with the transactions contemplated by this Agreement, other than the financial advisors retained by NNI (and the Bondholder Group and Committee) in the Chapter 11 Case.  Such Seller has not offered, nor has it authorized any person acting on its behalf to offer, any LP Interest to the public or engaged in any general solicitation or public advertising with respect to the offer and sale of any LP Interest.

(h)    No Reliance on Purchaser.  Except as specifically set forth in this Agreement, such Seller has not relied on any information provided or representations made by any Purchaser in connection with this Agreement.  Such Seller acknowledges that each Purchaser may have access to information material to the value of the LP Interests that has not been shared with such Seller, and such Seller waives any right to obtain such information.

(i)    Compliance with Law.

(i)    To such Seller's actual knowledge, its ownership of the LP Interests has been conducted in all material respects in accordance with all applicable Laws.

(ii)    The monies used to fund such Seller's acquisition and funding of LP Interests were such Seller's own monies and were not and are not directly or indirectly derived from or related in any way to activities that may contravene U.S. Federal, State or international laws and regulations, including anti-money laundering laws and regulations.

(ii)    To the best of its knowledge, none of such Seller, any person controlling or controlled by such Seller, any person having a beneficial interest in such Seller if such Seller is a privately held entity, or any person for whom such Seller is acting as agent or nominee in connection with this Agreement, or any affiliate of such Seller that has directly or indirectly contributed funds to such Seller, (1) is named on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC, Department of the Treasury, and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation, or is a person or entity prohibited under programs administered by OFAC, or (2) is a PEP or person or entity

10

associated with a PEP, or (3) has, to its knowledge, been convicted of or charged with a felony relating to money laundering or other similar or related illegal activity, or (4) is, to its knowledge, under investigation by any governmental authority for money laundering or any other similar or related illegal activity.

    3.2    <u>Representations and Warranties of the Purchaser</u>.  Each Purchaser hereby, severally and not jointly, represents and warrants to the Sellers that:

    (a)    <u>Authorization</u>.  Such Purchaser is an entity duly organized and validly existing in good standing under the laws of its jurisdiction of organization.  Such Purchaser has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Agreements and to perform all of the obligations to be performed by it hereunder and thereunder.  This Agreement has been, and upon their execution each of the Transfer Agreements will have been, duly authorized, executed and delivered by such Purchaser, and this Agreement constitutes, and upon their execution each of the Transfer Agreements will constitute, a valid and binding obligation of such Purchaser, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other Laws or general application affecting enforcement of creditors' rights generally.

    (b)    <u>No Conflicts</u>.  The execution and delivery of this Agreement and the Transfer Agreements and the performance or consummation of the transactions contemplated hereby by such Purchaser hereunder and thereunder does not conflict with or result in a breach or violation of any of the terms or provisions of its organizational documents or result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which it is a party or by which it is bound, nor will any such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except to the extent that such conflicts, violations, defaults or accelerations would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Agreements.  Neither the execution and delivery of this Agreement nor the Transfer Agreements nor the performance or consummation of the transactions contemplated hereby or thereby will constitute an event that, with the lapse of time or with action by a third party, could result in the default under any of the foregoing, except to the extent that such defaults would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Agreements.  The execution and delivery by such Purchaser of this Agreement and the Transfer Agreements and the performance by such Purchaser of its obligations hereunder and thereunder will not require any registration, filing, consent or approval under any Law, rule, regulation, judgment, order, writ, decree, permit or license, or any consent or approval of any other party to such Purchaser's constituent documents, or any other contract, agreement, instrument, commitment or restriction binding upon such Purchaser, except for the Sale Order, the General Partner Consents and any post closing filings required by Law.

    (c)    <u>Independent Appraisal</u>.

11

(i)       Such Purchaser acknowledges that the Sellers may be in possession of material, nonpublic information relating to the LP Interests and, in that event, the Sellers will not disclose such information to such Purchaser.  Such Purchaser further acknowledges and agrees that the Sellers have no obligation to disclose to such Purchaser any such material, nonpublic information except as may be required for a representation and warranty of the Sellers hereunder to be accurate and correct.  Such Purchaser further acknowledges that (A) it is not relying on there having been disclosed any such material or potentially material information which is not disclosed, and (B) any such information may be materially adverse to such Purchaser's interests.  Such Purchaser further acknowledges that it is prepared to purchase the LP Interests from the Sellers on the foregoing basis and hereby waives any right to rescind or invalidate the purchase of the LP Interests from the Sellers or to seek any damages or other remuneration from the Sellers based on the possession of any such material, nonpublic information by the Sellers.

(ii)       Such Purchaser acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to buy the LP Interests, and that it is responsible for making its own evaluation of any information about the LP Interests, the Funds or the Sellers that it may receive either directly from the Funds or the Sellers, and that none of the Funds or the Sellers nor any Affiliate, partner, employee, officer or director thereof (A) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement or (B) shall be under any obligation to provide access to or advise such Purchaser or any other person of the existence of any additional information or to review, update or correct any inaccuracy in any information about the LP Interests, the Funds or the Sellers (or any assumptions upon which such information is based) supplied by it or by any person or be otherwise liable to the Funds or the Sellers or any other person with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

(d)       Accredited Investor; Qualified Purchaser.  Such Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the *Securities Act of 1933*, as amended and a "qualified purchaser" within the meaning of Section 2(a) (51) (A) of the *Investment Company Act of 1940*, as amended, and the rules promulgated thereunder.

(e)       No Resale.  Such Purchaser's purchase of the LP Interests is for its own account for investment and not with a view to the distribution or resale thereof, except in compliance with the *Securities Act of 1933*, as amended, and applicable state securities laws.

(f)       Broker's Fee.  No person or entity acting on behalf of the Purchaser or under the authority of such Purchaser shall be entitled to any broker's, finder's, or similar fee or commission in connection with the transactions contemplated by this Agreement.

(h)     Adequate Assurance of Future Performance.  To the extent required by the Bankruptcy Code or other Laws, the relevant Purchaser will be able to provide, at Closing or on such earlier date as is designated by the Bankruptcy Court, adequate assurance of its future performance in accordance with the applicable requirements regarding assignment of the rights and obligations under the Operative Documents to each Purchaser in satisfaction of section 365(f)(2)(B) of the Bankruptcy Code.  Such Purchaser acknowledges and agrees that, if it becomes necessary to provide any additional assurances of its future performance under the Bankruptcy Code or other Laws, such Purchaser shall perform all actions and bear all such costs and expenses as may be necessary or advisable in connection with its obligations under this Section 3.2(h) without recourse to the Sellers.

# ARTICLE 4

## MUTUAL COVENANTS

4.1     General Partner Consents and Other Approvals:  Cooperation.  Each Seller and each Purchaser agrees to use commercially reasonable efforts to take all necessary actions to obtain the applicable General Partner Consents and any other approvals required for the sale and the transfer of the LP Interests, and otherwise to consummate the transactions contemplated hereby; provided that if the relevant Seller and the relevant Purchaser are unable to obtain necessary consents and approvals to consummate the transactions contemplated hereby for any Fund by the Termination Date, such Fund shall be treated as an Excluded ROFR Fund and will be excluded from the transactions contemplated herein.

4.2     Transfer.  In addition to the Transfer Agreements, each Seller agrees to execute all other assignments and/or transfer agreements as may be reasonably required by the Funds, acting reasonably, to effect the transfer of the LP Interests to each Purchaser as indicated on Schedule A.

4.3     Assumption.  In addition to the Transfer Agreements, each Purchaser agrees that it will execute all other assumption and other agreements as may be reasonably required by the Funds to effect the transfer of the LP Interests and the assumption by such Purchaser of the obligations it has agreed to assume hereunder and under the Transfer Agreements.

4.4     Tax Matters.  Each Purchaser and each Seller shall request that, for tax reporting purposes, the Funds shall give effect to the transfer of the LP Interests as of the Effective Dates and shall allocate taxable income of such Funds for the taxable year including the Effective Dates of this Agreement between such Purchaser and such Seller using the closing of the books method as of the Effective Dates.  To the extent the general partner of a Fund uses or is required to use a different allocation method under Section 706(d) of the Code and applicable Treasury Regulations, such allocation shall be binding on each of the Sellers and the Purchasers.  All transfer taxes, if any, incurred in connection with the consummation of the transactions contemplated by this Agreement shall be borne by the Purchaser.

4.5     Compliance with Operative Documents.  From the date hereof until each relevant Closing, each Seller will comply with the terms of the applicable Operative Documents,

13

including without limitation, by giving any required notice of the proposed transfer of the LP Interests.

4.6    <u>Pre-Closing Notice</u>.  Prior to each Closing, the Sellers shall deliver to the Purchasers a notice (a "Pre-Closing Notice") setting forth the calculation of the Purchase Price, including the aggregate amount of all Capital Contributions and Distributions included in such determination.  Each Seller shall use commercially reasonable efforts in connection with such Closing to (i) verify with the general partners or managing members the information provided in <u>Schedule A</u> and (ii) provide any such verification to each Purchaser.

4.7    <u>General Partner Certificates</u>.  At or prior to each Closing, each Seller shall use commercially reasonable efforts to request and cause each general partner or managing member of such Funds participating in such Closing, other than Milcom, to provide a certificate, substantially in the form set forth in Exhibit I hereto, to the Purchasers; <u>provided</u> that the failure to obtain such certificates shall not excuse the Purchasers from performing their obligations under this Agreement.

4.8    <u>Confidentiality</u>.  Each Seller and each Purchaser acknowledges that the Confidentiality Agreements remain in full force and effect in accordance with their terms, which are incorporated herein by reference, and agrees to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the parties shall be at liberty to disclose the terms of this Agreement: (i) to the extent required by Law or any Action in respect of the Sellers or any Purchaser, (ii) to any court, any liquidator or any member of any committee of creditors, tax authority or government entity, (iii) in connection with obtaining the Sale Order from the Bankruptcy Court, (iv) in connection with any information or disclosure document prepared by the relevant Seller, the relevant Purchaser or any affiliate of either, to be provided to investors or prospective investors of such Seller or such Purchaser, provided that such investors or prospective investors shall be obligated to keep such terms confidential, (v) to their respective accountants, attorneys, advisors and beneficial owners, or (vi) subject to entering into a confidentiality agreement with the relevant third party, in connection with acquiring, merging or otherwise combining, or being acquired by, or selling all or part of its assets to any third party (whether in a single transaction or a series of related transactions and whether structured as an acquisition of assets, securities or otherwise).  Each Purchaser also acknowledges that in the course of attempting to sell the LP Interests, the Sellers have entered or may enter into confidential agreements with third parties in respect of information relating to the LP Interests and have disclosed and may disclose such information to certain of those third parties.

## ARTICLE 4A

## BANKRUPTCY COURT MATTERS

4A.1    <u>Sale Motion</u>.  As promptly as possible, but in no event later than November 5, 2010, NNI shall (i) file with the Bankruptcy Court one or more motions (the "Sale Motion"), along with the proposed Sale Order, seeking (A) approval of the sale of the NNI LP Interests and assumption and assignment of the Operative Documents to which NNI is a party to each Purchaser, (B) fix the time, date and location of the hearing to approve the consummation of the

14

transactions contemplated by this Agreement (the "Sale Hearing") and (C) establish that the Sale Hearing shall not be later than thirty (30) days after the date of this Agreement, subject to court availability; (ii) notify, as required by the Bankruptcy Code and the Bankruptcy Rules, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court, and such additional parties as such Purchaser may reasonably request, and (iii) use reasonable best efforts to obtain Bankruptcy Court approval of the Sale Order.

4A.2    Non-Solicitation; Alternative Transaction.  From the Date of this Agreement until the Sale Order becomes a Final Order, Sellers and their representatives shall not (x) solicit, initiate, knowingly facilitate or knowingly encourage the submission of, or any inquiries with respect to, any Alternative Transaction by a third party; (y) participate in any discussions or negotiations with a third party regarding, or furnish to any third party any information or data with respect to, or otherwise cooperate in any way with respect to, a proposed Alternative Transaction; or (z) enter into any letter of intent, memorandum of understanding, acquisition agreement or other agreement, arrangement or understanding that contemplates an Alternative Transaction; provided, that the Sellers, may, in connection with any bona fide proposal related to an Alternative Transaction received by the Sellers without any violation of clause (x) above, furnish information and data to a third party and take any other action referred to in clause (y) above, if: (A) Sellers determine in good faith, in consultation with the Committee and the Bondholder Group, that such proposal constitutes an offer for the LP Interests, that has a higher price on substantially the same terms as the transaction embodied in this Agreement; and (B) Sellers give each Purchaser prompt written notice of the Sellers' intention to furnish information or data to or to engage in negotiations or discussions with the third party submitting such proposal.

4A.3    Sale Order.

(a)    The Sale Order shall, among other things approve the execution, delivery and performance of this Agreement by NNI and the process for the sale, assumption and assignment of the NNI LP Interests.

(b)    NNI shall use reasonable best efforts to cause the Bankruptcy Court to enter the Sale Order within five days of the Sale Hearing.

4A.4    Consultation; Notification.

(b)    Each Purchaser and NNI shall cooperate with filing and prosecuting the Sale Motion, and NNI shall deliver to each Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for each Purchaser and its respective counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other material papers to be filed by NNI in connection with such motions and relief requested therein.

(c)    If the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), NNI agrees to, and agrees to

cause its Affiliates to, use their reasonable best efforts, to defend against such appeal, petition or motion, and each Purchaser agrees to cooperate reasonably in such efforts. Each of the parties hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

# ARTICLE 5

## CONDITIONS TO CLOSING

5.1    <u>Mutual Conditions</u>. The respective obligations of each Seller and each Purchaser to effect a Closing are subject to the satisfaction or waiver by the other party of the following conditions on or prior to each Closing Date:

(a)    All approvals, including the General Partner Consents, required to permit the consummation of such Closing with respect to the transfer of each of the LP Interests to the relevant Purchaser shall have been obtained with respect to the LP Interests to be transferred at such Closing; and

(b)    The Sale Order (i) shall have been entered and (ii) shall have become a Final Order.

5.2    <u>Conditions to the Obligation of each Purchaser</u>. The obligation of each Purchaser to effect a Closing is subject to the satisfaction or waiver by such Purchaser of the following additional conditions on or prior to each Closing Date:

(a)    The representations and warranties of the relevant Seller contained in this Agreement shall be true and correct in all material respects both on the date of this Agreement and as of such Closing Date with respect to the LP Interests to be transferred at such Closing (provided, that those representations and warranties that are qualified as to materiality shall be true and accurate in all respects, in each case as of the date when made and at and as of such Closing Date with respect to the LP Interests to be transferred at such Closing), except to the extent that such representations and warranties are by their express provisions made as of the date of this Agreement or another specified date, and such Purchaser shall have received a certificate of the relevant Seller to the foregoing effect;

(b)    All agreements, covenants and obligations required by the terms of this Agreement to be performed and complied with by the relevant Seller on or before such Closing Date with respect to the LP Interests to be transferred at such Closing in connection with the transactions contemplated by this Agreement shall have been so performed or complied with, and such Purchaser shall have received such evidence as it may reasonably request to establish the consummation of such transactions and the taking of all proceedings in connection therewith;

(c)    With respect to the first Closing, General Partner Consents shall have been obtained with respect to LP Interests with a total allocated purchase price as indicated on Schedule A (i.e., prior to any adjustments pursuant to Section 2.2 hereof) equal to or greater than $13,664,434.20.

16

(d)    Such Purchaser shall have received a copy of each Transfer Agreement for the LP Interests to be transferred at such Closing, executed by the general partner or managing member of the applicable Fund and the relevant Seller, and such other instruments of sale, transfer, conveyance and assignment as are necessary, in the aggregate, to effect the transfer of such LP Interests;

(e)    Such Purchaser shall have received an updated Schedule A to reflect all Distributions received and Capital Contributions related to the LP Interests (other than NNI's interest in Milcom) that have not been transferred to the Purchasers in prior Closings, made, received or returned during the period commencing on the Account Balance Date and ending on such Closing Date, and the amounts set forth in Schedule A attached hereto;

(f)    Such Purchaser shall have received a certification of non-foreign status from each Seller satisfying the requirements of Treasury Regulations Section 1.1445-2(b)(2)(i); and

(g)    The Committee and all members thereof shall have received notice of the Sale Motion, and any objection therefrom, if any, shall have been withdrawn.

5.3    <u>Conditions to the Obligation of the Sellers</u>.  The obligation of each Seller to effect a Closing is subject to the satisfaction or waiver by such Seller of the following additional conditions on or prior to each Closing Date:

(a)    The representations and warranties of the relevant Purchaser contained in this Agreement shall be true and correct in all material respects both on the date of this Agreement and as of such Closing Date with respect to the LP Interests to be transferred at such Closing (provided, that those representations and warranties that are qualified as to materiality shall be true and accurate in all respects, in each case as of the date when made and at and as of such Closing Date with respect to the LP Interests to be transferred at such Closing), except to the extent that such representations and warranties are by their express provisions made as of the date of this Agreement or another specified date, and the Seller shall have received a certificate from such Purchaser to the foregoing effect;

(b)    All agreements, covenants and obligations required by the terms of this Agreement to be performed and complied with by the relevant Purchaser on or before such Closing Date with respect to the LP Interests to be transferred at such Closing in connection with the transactions contemplated hereby shall have been so performed or complied with in all material respects and such Seller shall have received the Purchase Price to be paid to such Seller by wire transfer of immediately available funds such evidence as it may reasonably request to establish the consummation of such transactions and the taking of all proceedings in connection therewith; and

(c)    Such Seller shall have received a copy of each Transfer Agreement for the LP Interests to be transferred at such Closing, executed by the general partner or managing member of the applicable Fund and the relevant Purchaser.

17

## ARTICLE 6

## TERMINATION

6.1     <u>Grounds for Termination</u>.  This Agreement may be terminated at any time:

(a)     by mutual agreement of the Sellers and each Purchaser;

(b)     by either the Sellers or any Purchaser if the first Closing has not occurred by the later of April 15, 2011 or the date that is 120 days after the entry of the Sale Order (the "Termination Date");

(c)     by either the Sellers or each Purchaser in the event of a material breach of the representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 5, and, in each case, which, if capable of being cured, has not been cured within thirty days from receipt of a written notice thereof from the non-breaching party; <u>provided</u>, <u>however</u>, that the party terminating this Agreement pursuant to this Section 6.1 will give written notice of the termination to the other parties and that the right to terminate this Agreement pursuant to Sections 6.1(b) or 6.1(c) shall not be available to the party seeking to terminate if such party is then in breach of this Agreement or such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement; or

(d)     automatically, if the Sellers agree to an Alternative Transaction.

6.2     <u>Effect of Termination</u>.  If this Agreement is terminated as permitted by Section 6.1:

(a)     no party to this Agreement will have any liability or further obligation to the other party pursuant to this Agreement; <u>provided</u>, however, that the agreements of each Seller and each Purchaser set forth in Sections 4.8 and 7.4 shall survive such termination; <u>provided further</u> <u>however</u> that the termination of this Agreement will not affect any actions taken at any Closing held prior to the date of termination;

(b)     each Purchaser shall return to the relevant Seller all documents, work papers and other material of such Seller relating to the transactions contemplated hereby, whether obtained before or after the execution hereof or certify that such documents have been destroyed; and

(c)     the provisions of the Confidentiality Agreements will continue in full force and effect.

# ARTICLE 7

# OTHER MATTERS

7.1     <u>Waiver, Amendment</u>.  Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of the amendment, by each party to this Agreement or, in the case of a waiver, by the party or parties that would have benefited by the provision had it not been waived.

7.2     <u>Remedies</u>.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

7.3     <u>No Survival of Representations and Warranties or Covenants</u>.  No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the relevant Closing Date, except for covenants and agreements that by their terms are to be satisfied after the relevant Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

7.4     <u>Expenses</u>.  Except as otherwise provided in this Agreement or the Transfer Agreements, each of the Purchasers, on the one hand, and the Sellers, on the other hand, shall bear their own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the Transfer Agreements and the transactions contemplated hereby and thereby; <u>provided</u>, <u>however</u>, that the Purchasers, on the one hand, and the Sellers, on the other hand, shall each pay an equal share of any and all third-party costs and expenses of the Funds, including, but not limited to, legal and accounting fees, incurred in connection with the transactions contemplated hereby, to the extent required to be reimbursed, notwithstanding anything to the contrary contained in the Operative Documents.

7.5     <u>Notices</u>.  All notices, requests and other communications under this Agreement to a party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile transmission (with confirmation) during normal business hours, (b) on the Business Day following the Business Day of sending, if delivered by nationally recognized overnight courier, or (c) on the third Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such party at its address (or number) set forth below or such other address (or number) as the party may specify by notice to the other party hereto.

If to the Sellers:

    Nortel Networks Inc.
    Legal Department
    220 Athens Way, Suite 300
    Nashville, Tennessee, USA 37228

Attention:  Lynn C. Egan
                 Assistant Secretary
Facsimile: +1-615-432-4067

If to the Purchasers:

CS Strategic Partners IV VC Holdings, L.P.
CS Strategic Partners
Eleven Madison Avenue, 16th Floor
New York, NY 10010
Attention:  Brian Kolin
Facsimile: +1-646-935-7908

Amberbrook V LLC
Willowridge Partners
25 East 86th Street
New York, NY 10028
Attention:  Michael Bego
Facsimile:  +1-212-369-5661

      7.6    <u>Specific Performance</u>.  Each of the Sellers, on the one hand, and the Purchasers, on the other hand, hereby acknowledge and agree that money damages would not be a sufficient remedy for failure of a party to perform any one of its covenants or agreements set forth in this Agreement or any other agreement delivered pursuant to this Agreement.  In such event, each agrees that the other party shall have the right in addition to any other rights it may have (whether at law or in equity) to seek specific performance and injunctive or other equitable relief as a remedy for any such breach of this Agreement.  No failure or delay by any party hereto in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

      7.7    <u>Entire Understanding; No Third-Party Beneficiaries</u>.  This Agreement, the Transfer Agreements and the Confidentiality Agreements together set forth the entire understanding of the parties relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the parties with respect to the subject matter of this Agreement.  In the event of any conflict between this Agreement and the Transfer Agreements or the Confidentiality Agreements, the provisions of this Agreement shall prevail.  No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any party in entering into this Agreement.  Nothing in this Agreement, expressed or implied, is intended to confer on any person, other than the parties hereto or their respective successors, any rights, remedies, obligations or liabilities.

      7.8    <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party hereto and any purported assignment in violation of this Section 7.8 will be void, except for the following assignments which shall not

require any consent and will not be void:  (i) assignment to an Affiliate of either party (provided that such party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other party) and (ii) assignment by the relevant Seller to a succeeding entity following its emergence from the Chapter 11 Cases.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties to this Agreement and their respective successors and permitted assigns.

7.9     Counterparts.  This Agreement may be executed in two or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

7.10    Severability.  If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then it is the intention of the parties to this Agreement that the provisions be deemed to be automatically amended to the extent necessary to comply with applicable Law and permit enforcement provided that such amendment would not effect a material change in the rights or obligations of the parties hereunder.  If any of the provisions of this Agreement are found to be wholly or partially invalid, such determination will not affect the binding effect of the other provisions of this Agreement.

7.11    Intentionally omitted.

7.12    No Presumption.  Each Seller and each Purchaser agrees that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations.  Each Seller and each Purchaser represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a party on the grounds that such party drafted or was more responsible for drafting the provisions.

7.13    Access to and Retention of Records.  All books and records retained by the Sellers which relate to the LP Interests shall be open for inspection by representatives of the Purchaser thereof at any time during regular business hours, subject to reasonable advance notice and compliance with reasonable security rules, for a period of one year from the final Closing Date.  Neither Seller shall destroy any such books and records without providing each Purchaser with written notice detailing the contents thereof and providing each Purchaser with the opportunity to obtain such books and records at least 90 days prior to the destruction thereof.

7.14    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any party, shall be governed exclusively by the Bankruptcy Code and the laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, each party: (i) agrees that any claim, action, proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Case or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, Borough of Manhattan (collectively, the "New York Courts"), if brought after entry of a final decree closing the Chapter 11 Case (the courts specified in clauses (A) and (B) collectively, the "Designated Courts"), and shall not be brought in each case, in any other court in the United States of America or any court in any other country; (ii) agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 7.5 or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSFER AGREEMENTS OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSFER AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.14.

7.15    <u>Damages</u>.  No party hereto shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including business interruption, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement.

7.16    <u>Interpretation</u>.  (a)  As used in this Agreement, references to:

(1)    the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.

(2)    the Preamble, Recitals, Sections or Exhibits refers to the Preamble, a Recital or Section of, or an Exhibit to this Agreement unless otherwise indicated.

(3)    this Agreement refers to this Agreement and the Exhibits to it.

(b)    Wherever this Agreement requires a party to take an action, the requirement constitutes an undertaking by the party to cause its subsidiaries, and to use its commercially reasonable efforts to cause its other Affiliates, to take appropriate action in connection therewith.

(c)    Whenever the words "include", "includes" or "including" are used is this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the person referred to may require.

(d)    The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

(e)    It is the intention of the parties hereto that this Agreement not be construed more strictly with regard to one party than with regard to the other party hereto.

[Remainder of page intentionally left blank]

23

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**CS STRATEGIC PARTNERS IV VC HOLDINGS, L.P.**
By: CS Strategic Associates IV, L.P., its general partner

By:  DLJ MB Advisors, Inc., its indirect general partner

By:  _____
  Name: CARL WODGE
  Title:  VICE PRESIDENT

**AMBERBROOK V LLC**
By:  Willowridge V LLC
Its:  Managing Member

By:  _____
  Name:
  Title:

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**CS STRATEGIC PARTNERS IV VC HOLDINGS, L.P.**
By: CS Strategic Associates IV, L.P., its general partner

By:  DLJ MB Advisors, Inc., its indirect general partner

By:  _____
       Name:
       Title:

**AMBERBROOK V LLC**
By:  Willowridge V LLC
Its:  Managing Member

By:  _____
       Name: Michael Bego
       Title: Manager

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**CS STRATEGIC PARTNERS IV VC HOLDINGS, L.P.**
By:  DLJ MB Advisors, Inc., its indirect general partner

By:  _____
      Name:
      Title:

**AMBERBROOK V LLC**
By:  Willowridge V LLC
Its:  Managing Member

By:  _____
      Name:
      Title:

**NORTEL NETWORKS INC.**

By:  _____
      Name:
      Title:  Lynn C. Egan, Secretary

**NORTEL VENTURES LLC**

By:  _____
      Name:
      Title:  Lynn C. Egan, Secretary

**SCHEDULE A**

**FILED UNDER SEAL PURSUANT TO [PROPOSED] ORDER (I) AUTHORIZING AND APPROVING THE SALE OF LIMITED PARTNERSHIP AND LIMITED LIABILITY COMPANY INTERESTS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING ENTRY INTO A PURCHASE AND SALE AGREEMENT; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; (IV) AUTHORIZING THE FILING OF <u>CERTAIN DOCUMENTS UNDER SEAL; AND (V) GRANTING RELATED RELIEF</u>**

**SCHEDULE B**

| ROFR Fund | Condition |
|---|---|
| STARTech Seed Fund II L.P. | The Seller shall have received confirmation that the general partner of the fund, partners of the general partner or entities affiliated with such partners, or a combination of the foregoing have not exercised the right to purchase the LP Interest being sold, pursuant to section 17(h) of the Agreement of Limited Partnership of STARTech Seed Fund II L.P., dated March 22, 2000. |
| VantagePoint Communications Partners, L.P. | The Seller shall have received confirmation that (a) pursuant to section 7.2(e) of the Limited Partnership Agreement of VantagePoint Communications Partners, L.P., dated April 3, 1998 (the "VantagePoint Communications LPA"), the general partner of the fund, the limited partners of the fund whose capital commitment equal at least $5 million and the affiliates of such limited partners have not exercised the right to purchase the LP Interest being sold or (b) the general partner of the fund has waived the application of section 7(e) of the VantagePoint Communications LPA. |
| VantagePoint Venture Partners 2006, L.P. | The Seller shall have received confirmation that (a) pursuant to section 7.2(e) of the Limited Partnership Agreement of VantagePoint Venture Partners 2006, L.P., dated December 15, 2015 (the "VantagePoint 2006 LPA"), the general partner of the fund, the limited partners of the fund whose capital commitment equal at least $5 million and the affiliates of such limited partners have not exercised the right to purchase the LP Interest being sold or (b) the general partner of the fund has waived the application of section 7(e) of the VantagePoint 2006 LPA. |
| Accel Internet Fund II L.P. | The Seller shall have received confirmation that (a) the limited partners of the fund have not exercised the right to purchase the LP Interest being sold under section 13.5 of the Agreement of Limited Partnership of Accel Internet Fund II L.P., dated March 12, 1998 (the "Accel II LPA") or (b) the general partner of the fund has waived the application of section 13.5 of the Accel II LPA, pursuant to section 13.1.8 of the Accel II LPA. |
| Accel Internet Fund III L.P. | The Seller shall have received confirmation that (a) the limited partners of the fund have not exercised the right to purchase the LP Interest being sold under section 13.5 of the Amended and Restated Agreement of Limited Partnership of Accel Internet Fund III L.P. (the "Accel III LPA") or (b) the general partner of the fund has waived the application of section 13.5 of the Accel III LPA, pursuant to section 13.1.8 of the Accel III LPA. |
| Accel Internet Fund IV L.P. | The Seller shall have received confirmation that (a) the limited partners of the fund have not exercised the right to purchase the LP Interest being sold under section 13.5 of the Amended and Restated Agreement of Limited Partnership of Accel Internet Fund IV L.P., dated June 30, 2000 (the "Accel IV LPA") or |

| | |
|---|---|
| | (b) the general partner of the fund has waived the application of section 13.5 of the Accel IV LPA, pursuant to section 13.1.8 of the Accel IV LPA. |
| Milcom Technologies, LLC | The Seller shall have received confirmation that the Company has not exercised the right to purchase the membership units being sold, pursuant to section 6.4(b) of the Third Amended and Restated Limited Liability Company Operating Agreement of Milcom Technologies, LLC, dated October 28, 2004. |

**EXHIBIT I – FORM OF GP CERTIFICATE**

The Seller shall request a certificate from the general partner of each Fund (other than Milcom) providing confirmation of the following matters:

1.  The amount of Seller's total Capital Commitment, unfunded Capital Commitment, capital account balance, Contributions made and Distributions received;

2.  There are no Operative Documents of the Fund other than those posted on the electronic data room;

3.  The general partner has not, and does not presently intend to issue the Seller a notice of default or deem the Seller in default under any of the Operative Documents;

4.  Seller has not made any voluntary capital contributions to the Fund;

5.  Seller is not under any present obligation to return any Distributions previously received from the Fund, other than with respect to amounts subject to recall under the Fund's recycling provisions; and

6.  Seller has not opted out or been excluded, voluntarily or involuntarily, from any investment or waived any material right as an investor in the Fund.

7.  Seller's LP Interest in the Fund constitutes an interest in an entity treated as a partnership for United States federal income tax purposes and the Seller is not by virtue of owning such LP Interest, a direct or indirect owner of an interest in an entity treated as a corporation for United States federal income tax purposes, other than a portfolio company.