**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- X
                                                        :
In re                                                   :     Chapter 11
                                                        :
Nortel Networks Inc., et al.,¹                          :     Case No. 09-10138 (KG)
                                                        :
                                      Debtors.          :     Jointly Administered
                                                        :
                                                        :     Hearing date: December 15, 2010 at 10:00 am (ET)
                                                        :     Objections due: December 1, 2010 at 4:00 pm (ET)
                                                        :
------------------------------------------------------- X
```

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**ENFORCING THE ORDER AUTHORIZING THE**
**SALE OF CERTAIN ASSETS OF THE DEBTORS'**
**CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS**
**BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), pursuant to

Sections 105(a) and 363 of Title 11 of the United States Code (the "Bankruptcy Code") for the

entry of an order substantially in the form attached hereto as Exhibit A (i) enforcing the *Order*

*Authorizing And Approving (A) The Sale Of Certain Assets Of The Debtors' Carrier Voice Over*

*IP And Communications Solutions Business Free And Clear Of All Liens, Claims And*

*Encumbrances, And (B) The Assumption And Assignment Of Certain Executory Contracts*

---

¹　　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

(the "Sale Order") [D.I. 2632] against GENBAND Inc. (n/k/a GENBAND US LLC)

("GENBAND"); (ii) directing the release of $4,859,745 plus accumulated interest currently held

in escrow by escrow agent, Wells Fargo Bank, National Association ("Wells Fargo"), pursuant to

the Escrow Agreement dated as of January 6, 2010, by and among Wells Fargo, Nortel Networks

Corporation, NNI, Nortel Networks Limited, Nortel Networks UK Limited (in administration)

and GENBAND (as amended from time to time, the "Escrow Agreement"); and (iii) granting

them such other and further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT

1.      The Debtors bring this motion to enforce the Sale Agreement governing the sale

of their Carrier Voice over IP and Communications Solutions ("CVAS business" to GENBAND.

GENBAND has sought to drastically and improperly reduce the CVAS purchase price by

claiming a purchase price adjustment that ignores the clear terms of the Sale Agreement.  The

Sale Agreement provides, among other things, that the purchase price will be adjusted based on

certain assumed liabilities, including the "Deferred Profit Amount," which is to be determined

based on "deferred revenues for services to be performed or products to be provided by the

Business after the Closing Date." Sale Agreement at 11.  Based on this clear definition, and

applying it in a manner consistent with a previous sale transaction, the Deferred Profit Amount

adjustment is $34,284,392, and the total purchase price is $179,508,745.  But GENBAND seeks

to ignore the clear terms of the definition of Deferred Profit Amount in order to include deferred

revenues for services performed or products provided before the Closing Date, and for which no

services were to be performed or products provided after the Closing Date.  On this basis,

GENBAND seeks to add $36,285,608 to the Deferred Profit Amount figure, inflating that figure

to $70,570,000, and drastically reducing the purchase price to $142,904,000.

2

2.      GENBAND seeks to avoid this Court's clear jurisdiction along with the Ontario

Superior Court of Justice (the "Canadian Court") over this matter and instead wishes to have the

dispute referred to an accounting arbitrator, based on a provision in the Sale Agreement that

provides for certain disagreements to be resolved by an accounting arbitrator.  But there is

nothing here for an accounting arbitrator to decide.  To the contrary, the parties and their

accountants agree on the figures that would determine the Deferred Profit Amount if the proper

interpretation of "services to be performed or products to be provided by the Business after the

Closing Date" is applied.  Id.  In fact, the parties jointly developed and agreed upon these figures

in the course of determining the assumed assets and liabilities that GENBAND would assume

upon the acquisition of the CVAS Business.  Thus, there is nothing in this dispute for an

accountant to decide.  To the contrary, this is a disagreement about the clear terms of the Sale

Agreement – and, in particular, GENBAND's attempt to disregard those clear terms.

3.      Thus, this dispute is squarely within the jurisdiction the Court expressly reserved

under the CVAS Sale Order, to "(1) interpret, implement and enforce the terms and provisions of

this Order . . . and the terms of the Sale Agreement . . . (4) compel the Purchaser to perform all of

its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to

the Sale Agreement . . . ."  Sale Order, at ¶ 32.  In addition, Section 10.6(b) of the Sale

Agreement further confirms that

> each Party (i) agrees that any claim, action or proceeding by such
> Party seeking any relief whatsoever arising out of, or in connection
> with, this Agreement, or the transactions contemplated hereby shall
> be brought only in (a) either the U.S. Bankruptcy Court, if brought
> prior to the entry of a final decree closing the Chapter 11 Cases, or
> the Canadian Court, if brought prior to the termination of the
> CCAA Cases.

Hence, under both the Sale Order and the Sale Agreement, this Court is to decide the dispute at issue.

4.     In addition to the dispute created by GENBAND's effort to disregard the definition of Deferred Profit Amount, there are two smaller disputes that the Debtors ask the Court to resolve. First, after the closing of the sale to GENBAND, the CVAS Business was able to recover approximately $1.8 million from Verizon based on a disputed matter relating to products and systems that the Nortel CVAS Business provided to Verizon long before the sale. Because that recovery is clearly not to be included in the sale to GENBAND, this $1.8 million amount properly belongs to Nortel. Second, in connection with the Sale Agreement, GENBAND owes to Nortel Canadian transfer taxes in the amount of $1,000,390. GENBAND has indicated a disagreement with the transfer tax amount and has failed to remit this payment, which also properly belongs to Nortel.

5.     In sum, the Debtors seek an order from this Court enforcing the clear terms of the Sale Agreement and confirming the correct purchase price. In addition, based on the correct purchase price, the Sellers (as defined below) are entitled to recover $4,859,745 plus accumulated interest currently held in escrow. Accordingly, the Debtors request that the Court order the immediate release of these funds held in escrow.

## JURISDICTION

6.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. In addition, the parties have submitted to this Court's jurisdiction pursuant to Section 10.6(b) of the Sale Agreement.

4

7.    The statutory bases for the relief requested herein are Sections 105(a) and 363 of the Bankruptcy Code.

## BACKGROUND

A.    **Procedural History**

8.    On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.    The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

10.    On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Canadian Court under the Companies' Creditors Arrangement Act (Canada) (the "CCAA), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition

---

[2]    Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[3]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates

(collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the

control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other

Nortel affiliates have commenced and in the future may commence additional creditor

protection, insolvency and dissolution proceedings around the world.

      11.    On June 19, 2009, Nortel announced that it was advancing in discussions with

external parties to sell its businesses and that it would assess other restructuring alternatives for

its businesses in the event that it were unable to maximize value through sales.  Since then,

Nortel has sold many of its business units and assets to various purchasers.  Efforts continue to

be made with respect to the realization of value from Nortel's remaining assets.  For further

information regarding these chapter 11 cases, reference may be made to the Monthly Operating

Reports filed by the Debtors and http://dm.epiq11.com/nortel.

**B.**    **Debtors' Corporate Structure and Business**

      12.    Prior to its significant business divestitures, Nortel was a global supplier of end-

to-end networking products and solutions serving both service providers and enterprise

customers.  Nortel's technologies spanned access and core networks and supported multimedia

and business-critical applications.  Nortel's networking solutions consisted of hardware, software

---

[4]    The EMEA Debtors include the following entities:  Nortel Networks UK Limited (in administration), Nortel Networks S.A. (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel GmbH (in administration), Nortel Networks France S.A.S.(in administration), Nortel Networks Oy (in administration), Nortel Networks Romania SRL (in administration), Nortel Networks AB (in administration), Nortel Networks N.V. (in administration), Nortel Networks S.p.A. (in administration), Nortel Networks B.V. (in administration), Nortel Networks Polska Sp. z.o.o. (in administration), Nortel Networks Hispania, S.A. (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks, s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal S.A. (in administration), Nortel Networks Slovensko (in administration), s.r.o. (in administration) and Nortel Networks International Finance & Holding B.V. (in administration).

and services.  Nortel designed, developed, engineered, marketed, sold, licensed, installed,

serviced and supported these networking solutions worldwide.

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek an order enforcing the Sale Order against

GENBAND, affirming that GENBAND's calculation of Deferred Profit Amount in the Closing

Statement contravenes the Sale Agreement (as defined below) and that, under the terms of the

Sale Agreement, this dispute is not properly determined by an Accounting Arbitrator.  Given the

lack of a legitimate dispute as to the Sellers' entitlement to a portion of the escrowed funds, the

Debtors also seek the release of $4,859,745 plus accumulated interest currently held in escrow by

Wells Fargo in accordance with Section 4 of the Escrow Agreement and such other relief as the

Court may deem just and proper.

## FACTS RELEVANT TO THIS MOTION

**A.      The Sale of the Debtors' CVAS Business to GENBAND**

14.     This Motion relates to Nortel's sale of assets associated with its CVAS Business

(as defined below) to GENBAND.  Specifically, on December 23, 2009, the Debtors filed the

*Debtors' Motion for Order (I)(A) Authorizing Debtors' Entry Into The Stalking Horse*

*Agreement, (B) Authorizing And Approving The Bidding Procedures And Bid Protections, (C)*

*Approving Payment Of An Incentive Fee, (D) Approving The Notice Procedures And The*

*Assumption And Assignment Procedures, (E) Authorizing The Filing Of Certain Documents*

*Under Seal And (F) Setting A Date For The Sale Hearing, And (II) Authorizing And Approving*

*(A) The Sale Of Certain Assets Of Debtors' Carrier Voice Over IP And Application Solutions*

*Business Free and Clear Of All Liens, Claims And Encumbrances And (B) The Assumption And*

*Assignment Of Certain Executory Contracts* [D.I. 2193] (the "CVAS Sale Motion") seeking

approval of the sale of substantially all of the assets relating to Nortel's Carrier Voice over IP

and Communications Solutions Business (the "CVAS Business") to GENBAND pursuant to a

stalking-horse purchase agreement (the "Stalking Horse Agreement"), subject to the receipt of a

higher and better offer at auction. The bidding procedures approved by the Court required

competing bids to be made based on the form of the Stalking Horse Agreement agreed on by

GENBAND.

15.    Following the Court's approval of the bidding procedures by order dated January

8, 2010 [D.I. 2259], Nortel marketed the CVAS Business to other potentially interested parties,

based on the terms of the Stalking Horse Agreement. Two parties expressed potential interest in

the assets and were qualified as Qualified Bidders as defined under the bidding procedures.

Ultimately, these two parties decided not to submit Qualified Bids, and Nortel announced that it

would not proceed to auction and would work toward closing the asset sale agreement with

GENBAND. The Court approved the sale of the CVAS Business to GENBAND pursuant to the

Stalking Horse Agreement dated as of December 22, 2009, by and among the Main Sellers and

the EMEA Sellers (the "Sellers" and together with GENBAND the "Parties") and GENBAND

(the "Sale Agreement")[5] by order dated March 4, 2010 [D.I. 2632]. The Canadian Court

likewise approved both the bidding procedures by order dated January 6, 2010, and the sale of

the CVAS Business to GENBAND pursuant to the Sale Agreement by order dated March 4,

2010. The Sale Agreement was later amended pursuant to Amendment No. 1 to the Asset Sale

Agreement dated as of May 28, 2010, to address provisions not relevant to this dispute.

16.    On May 25, 2010, prior to the Closing, the Sellers provided GENBAND with an

Estimated Purchase Price statement as contemplated by Section 2.2.2 of the Sale Agreement.

The Estimated Purchase Price statement provided for an estimated Deferred Profit Amount of

---

[5]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in
the Sale Agreement.

$37,867,000 and an estimated Purchase Price of $182,649,000. In calculating the Estimated

Purchase Price, the Sellers applied the same clear terms of the definition of Deferred Profit

Amount that they seek to enforce in this Motion, and thus included only "deferred revenues for

services to be performed or products to be provided by the Business after the Closing Date."

GENBAND did not challenge these calculations and the sale of the CVAS Business to

GENBAND closed on May 28, 2010, approximately five months after the signing of the Stalking

Horse Agreement.

   17.  In connection with the sale of the CVAS Business, Wells Fargo, NNI, NNL,

NNUK and GENBAND entered into an Escrow Agreement, dated as of January 6, 2010 and

amended on May 28, 2010. The Escrow Account was established, with Wells Fargo as escrow

agent, to hold the Escrow Amount, which consists of, among other things, a Purchase Price

Adjustment Escrow Amount in the principal sum of $8,000,000 that relates to certain potential

post-closing purchase price adjustments that could be made pursuant to Section 2.2.3 of the Sale

Agreement. Under Section 4 of the Escrow Agreement, funds may be released from the Escrow

Account either pursuant to the delivery of a joint written instruction by NNI, NNL, NNUK and

GENBAND to Wells Fargo directing the release of funds, or by a final, non-appealable court

order directing the release of funds.

**B.  The Closing Statement and Calculation of the Purchase Price Adjustment**

   18.  On September 15, 2010, as contemplated by the Sale Agreement, GENBAND

delivered to the Sellers a written closing statement (the "Closing Statement"), a copy of which is

attached hereto as Exhibit B, that contained GENBAND's proposed calculation of certain post-

closing purchase price adjustments provided for under the Sale Agreement. The Closing

Statement proposed a net purchase price adjustment in favor of GENBAND in the amount of

$139,096,000, which included a calculated Deferred Profit Amount of $70,570,000. Thus, the

Final Purchase Price pursuant to GENBAND's proposed calculation was $142,904,000.

19.    GENBAND's proposed calculation of the Final Purchase Price disregards the

clear definition of "Deferred Profit Amount," as discussed above. Accordingly, on October 13,

2010, as contemplated by and in accordance with the Sale Agreement, the Sellers delivered to

GENBAND a written disagreement notice.  On November 16, 2010, the Sellers delivered to

GENBAND a corrected disagreement notice to account for a small calculation error (the

"Disagreement Notice"), a copy of which is attached hereto as Exhibit C.  In the Disagreement

Notice the Sellers set forth a net purchase price adjustment in favor of GENBAND in the amount

of $102,491,255, which included a calculated Deferred Profit Amount of $34,284,392. Thus, the

final purchase price pursuant to the Sellers' calculation was $179,508,745. After accounting for

other amounts accepted by GENBAND,[6] there is currently a dispute over the final purchase

price reflecting the $36,285,608 difference between the Deferred Profit Amount calculated by

GENBAND and the Deferred Profit Amount calculated by the Sellers.

20.    The standard for calculating the purchase price adjustment, and particularly the

Deferred Profit Amount, is set forth in the Sale Agreement.  Section 2.2.3.1(a) generally

provides that the purchase price adjustment shall be calculated by subtracting various liabilities,

one of which is the Deferred Profit Amount, from the Base Purchase Price of $282,000,000.

Section 2.2.3.1(a) of the Sale Agreement provides that the Closing Statement "shall be prepared

in accordance with the Nortel Accounting Principles and the terms hereof." Sale Agreement, p.

48 (emphasis supplied).

---

[6]    GENBAND subsequently agreed with the Sellers' adjustments to the Closing Unbilled
Accounts Receivable Amount and Closing Specified Employee Liabilities Amount as set forth in
the Disagreement Notice.

21.    The Sale Agreement defines the Deferred Profit Amount as:

> both short term and long term (i) deferred revenues for <u>services to</u> <u>be performed or products to be provided by the Business after the</u> <u>Closing Date</u> but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in Connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business . . . [f]or the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.

Sale Agreement, at 11 (definition of Deferred Profit Amount) (emphasis supplied).

22.    Thus, by the Sale Agreement's unambiguous language, the Deferred Profit Amount includes only deferred revenues and associated deferred costs in respect of services to be performed and products to be provided <u>after</u> the Closing Date. Yet GENBAND seeks to disregard the phrase "after the Closing Date" in the definition of Deferred Profit Amount. Thus, GENBAND seeks to include deferred revenue items for services to be performed or products to be provided by the Business <u>before</u> the Closing Date – that is, revenues associated with work that was completed in the past and for which there are no "services to be performed or products to be provided by the Business <u>after</u> the Closing date."

23.    There is no disagreement between the Parties about accounting analysis or mathematical calculations. Indeed, in the course of calculating the assets and liabilities that GENBAND would assume upon the acquisition of the CVAS business, the Parties made the same determination of deferred revenues for services to be performed or products to be provided by the CVAS business after the Closing Date. Thus, the Parties agreed on the calculation of items that dictate the Deferred Profit Amount to be reflected on GENBAND's books for operation of the Business after the Closing Date. Accordingly, if the clear terms of the definition of Deferred Profit Amount are enforced, there is no legitimate disagreement that the resulting

11

figure is the one that the Sellers have used in calculating the purchase price. Thus, the Sellers

seek to enforce the clear terms of the Sale Agreement by including only deferred revenues and

associated deferred costs in respect of services performed and products delivered <u>after</u> the

Closing Date.

24.     Notably, the Sellers' position is also consistent with the manner in which a term

with the same definition was applied by the Sellers and the purchaser in a prior sale transaction.

The sale agreement executed in connection with Nortel's divestiture of its Metro Ethernet

Networks Business ("<u>MEN</u>") to Ciena Corporation ("<u>Ciena</u>"), which occurred in 2010, used

substantially identical language to define the deferred revenue amount that would impact the

purchase price adjustment, ███████████████████████████████████████████

████████████████████████████. In the MEN sale agreement, the term was

referred to as "Closing Net Deferred Revenues," and the definition of the term was substantively

identical to the definition of "Deferred Profit Amount" in the CVAS Sale Agreement.

Specifically, Closing Net Deferred Revenues was determined based on:

> deferred revenues for services to be performed or products to be
> provided by the Business after the Closing Date but for which an
> account receivable has been recorded prior to the Closing Date
> <u>minus</u> (y) associated deferred costs to the extent incurred by the
> Business prior to the Closing Date in connection with such
> products or services, in each case, that would be required to be
> reflected on a balance sheet of the Business as of such date
> prepared in accordance with GAAP applied in a manner consistent
> with the Nortel Accounting Principles (to the extent consistent
> with GAAP).

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ Thus, both the purchaser and the sellers in the MEN

transaction applied this definition according to its clear terms, just as Sellers seek to do here.

25.     In addition to the dispute caused by GENBAND's attempt to disregard the clear

definition of "Deferred Profit Amount," GENBAND also included an item in its calculation that

clearly does not belong – specifically a $1,629,132 negative deferred cost-of-sales balance

belonging to Nortel Networks (Luxembourg) S.A. ("Nortel Luxembourg"), which should not be

included simply because Nortel Luxembourg is not a party to the CVAS sale.  Because Nortel

Luxembourg is neither a Seller under the Sale Agreement nor an EMEA Seller, this negative

deferred cost-of-sales balance should not be included in the calculation of the Deferred Profit

Amount.

### C.     Purchaser's Non-Compliance with the Sale Agreement in Calculating the Deferred Profit Amount

26.     Notably, the concept and definition of Deferred Profit Amount was introduced

into the Stalking Horse Agreement by GENBAND on or about December 5, 2009.  After

GENBAND drafted the definition in dispute, the Parties continued to review and revise the draft

agreement for nearly three additional weeks, exchanging multiple drafts leading up to the signing

of the Stalking Horse Agreement.  The definition of Deferred Profit Amount that GENBAND

proposed never changed and became part of the Stalking Horse Agreement and the final Sale

Agreement.  Yet GENBAND now insists on ignoring the express terms of the duly executed Sale

Agreement that it proposed.

27.     GENBAND has suggested that its proposed reading of "Deferred Profit Amount"

or, more accurately, its disregard of the clear terms of the definition, is supported by purported

discussions prior to the execution of the Stalking Horse Agreement.  But the clear terms of the

Sale Agreement govern.  Moreover, the Sale Agreement contains an integration clause that

expressly forbids GENBAND from doing what it now seeks to accomplish.  Section 10.12(a)

provides: "This Agreement . . . set[s] forth the entire understanding of the Parties relating to the

subject matter thereof, and all prior or contemporaneous understandings, agreements,

representations and warranties, whether written or oral are superseded by this Agreement . . . ."

Sale Agreement, at 136.

**D.     Purchaser's Non-Compliance with the Sale Agreement by Refusing to Pay to Nortel Settlement Payments Received from Verizon**

28.     In addition to the dispute caused by GENBAND's attempt to avoid the clear

definition of Deferred Profit Amount, GENBAND failed to comply with the Sale Agreement by

refusing to pay Nortel certain payments received from Verizon Services Corp. ("Verizon") in

connection with products delivered by NNI to Verizon prior to the Closing Date.

29.     NNI and Verizon are parties to a certain General Product Purchase Agreement for

Softswitch and TDM Products and Services (the "GPPA Agreement").  Under the GPPA

Agreement, which was executed in 2004, Verizon purchased certain switches and software

licenses from NNI.  In 2009, Nortel conducted an audit of the switches purchased by Verizon

and discovered that Verizon had begun using certain software, resident on the switches, for

which it had not purchased accompanying licenses.  The value of these licenses was

approximately $2,000,000.  This value, owed to Nortel for products delivered to and used by

Verizon prior to 2009, was not recorded on Nortel's books as a receivable because Nortel was

not in possession of appropriate GAAP-compliant documentation that allowed for the value to be

accounted for as a receivable at the time.

30.     Accordingly, NNI entered into discussions with Verizon concerning the unpaid

licensing fees, over which a dispute as to payment arose and those discussions were continuing

as of the Closing Date.

31.     The GPPA Agreement was ultimately assigned to GENBAND, pursuant to the Sale Agreement, before NNI was able to resolve the dispute with Verizon.  Pursuant to Section 2.1.1(b) of the Sale Agreement, the Sellers transferred and assigned to GENBAND all of the Seller's right title and interest in and to, among other things, the Sellers' Unbilled Accounts Receivable relating to the CVAS business.  "Unbilled Accounts Receivable" is expressly defined in the Sale Agreement to mean "amounts classified in Construction-in-Process Accounts in a manner consistent with the Nortel Accounting Principles as of a certain date" ("Construction-in-Process Accounts").  Sale Agreement, at 33.  All other accounts receivable, whether billed or unbilled, are an "Excluded Asset" pursuant to Section 2.1.2(a) of the Sale Agreement.  Excluded Assets remain with Nortel.

32.     Following the Closing Date, the Sellers learned that former Nortel employees – now employed by GENBAND – continued working with Verizon to resolve the dispute, and that Verizon and GENBAND executed a settlement agreement (the "Settlement Agreement") under which Verizon has agreed to pay GENBAND ███████ for the licenses provided by NNI prior to the Closing Date (the "Verizon Receivables").

33.     The Verizon Receivables were not classified in "Construction-in-Process Accounts" and therefore do not constitute Unbilled Accounts Receivables.  Rather, the Verizon Receivables – which represent fees for licenses that NNI delivered and Verizon utilized before the GPPA Agreement was assigned to GENBAND – are an Excluded Asset that remained with the Sellers under the Sale Agreement.[7]  Under Section 5.12 of the Sale Agreement, GENBAND has agreed to promptly deliver to the Sellers any payment or instrument received by GENBAND

---

[7]     Furthermore, under section 2.1.2(a) of the Sale Agreement, claims relating to any Excluded Liability (as defined in the Sale Agreement), which includes liabilities relating to any Excluded Asset, also constitute an Excluded Asset.  Sale Agreement, p. 37.

that is for the account of the Sellers under the terms of the Sale Agreement.  Sale Agreement, pp. 86-7.

34.    Therefore, the Debtors respectfully request that the Court issue an Order directing GENBAND to: (i) provide the Sellers with a fully executed copy of the Settlement Agreement and the name and contact information of representatives of Verizon with whom GENBAND has been in discussions with respect to the Settlement Agreement; (ii) deliver to the Sellers an accounting of all purchase orders received and expected to be received by GENBAND from Verizon with respect to the Verizon Receivables, copies of such purchase orders, and the related invoices issued by GENBAND; (iii) deliver to the Sellers any amounts received by GENBAND in payment for the Verizon Receivables as of the date hereof, and any purchase orders and amounts that GENBAND may receive from Verizon after the date hereof with respect to the Verizon Receivables; and (iv) fully cooperate with the Sellers and Verizon in the resolution of this matter.

**E.    Purchaser's Non-Compliance with the Sale Agreement by Refusing to Pay to Nortel Certain Canadian Transfer Taxes**

35.    Finally, there is one additional dispute as to which Nortel seeks this Court's intervention.  GENBAND has failed to comply with the Sale Agreement by refusing to pay Nortel certain Canadian transfer taxes.  Nortel has been in communication with GENBAND's counsel for six months to reach an agreement on the appropriate amount of transfer taxes owing to Nortel in connection with transfer of the tangible and intangible assets.

36.    Nortel issued draft invoices to GENBAND in the amount of $1,000,390 on September 28, 2010 for the taxes owed based on an understanding that the Parties had reached agreement as to the proper figure.  GENBAND subsequently indicated that it was not in agreement with the figure and informed Nortel that it would revert with specific objections.  To

16

date, GENBAND has yet to respond to Nortel's repeated requests for additional information concerning GENBAND's objections and the payment of transfer taxes to Nortel is past due.

37.    Therefore, the Debtors respectfully request that the Court issue an order directing GENBAND to: (i) immediately remit payment in accordance with the September 28, 2010 invoices for the Canadian transfer taxes owed to Nortel; or (ii) deliver to the Sellers a written statement of its objections to the same; and (iii) fully cooperate with the Sellers in the resolution of this matter.

## ARGUMENT

### A.    The Court Retains Exclusive Jurisdiction Over this Dispute and Has Authority to Enforce the Terms of the Sale Order

38.    Pursuant to the Sale Order, this Court retains, "jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (1) interpret, implement and enforce the terms and provisions of this Order . . . and the terms of the Sale Agreement . . . (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Sale Agreement . . ." Sale Order, at ¶ 32.

39.    Further, Section 10.6(b) of the Sale Agreement provides that:

> [t]o the fullest extent permitted by applicable Law, each Party (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases.

The "U.S. Bankruptcy Court" means "the U.S. Bankruptcy Court for the District of Delaware."

Sale Agreement, p. 131.[8]

40.    Section 105(a) of the Bankruptcy Code additionally provides that the Court "may

issue any order, process or judgment that is necessary or appropriate to carry out the provisions

[of the Bankruptcy Code]." 11 U.S.C. § 105(a).  Bankruptcy courts, based on the reference of the

inherent power of the district court contained in Section 157(c) of Title 28 of the United States

Code and on the broad statutory grant of equitable powers in Section 105 of the Bankruptcy

Code, have the inherent authority to enforce compliance with their lawful orders, to the extent

such power is not restricted by statute.  See, e.g., In re WorldCorp., Inc., 252 B.R. 890, 897

(Bankr. D. Del. 2000) (compelling party to make payment in accordance with agreement that

was previously approved by court order); U.S. Lines, Inc. v. GAC Marine Fuels Ltd. (In re

McLean Indus. Inc.), 68 B.R. 690, 695-97 (Bankr. S.D.N.Y. 1986); Johns-Manville Sales Corp.

v. Doan (In re Johns-Manville Corp.), 26 B.R. 919, 924 (Bankr. S.D.N.Y. 1983); Baer v. Bowser

(In re Jones), Case No. 97-41205-7, 2003 Bankr. LEXIS 2056, at *15 (Bankr. D. Kan. Nov. 10,

2003) ("[T]he Court can think of no better use of its equity powers under § 105 than to issue an

order that compels compliance with a previous order."); JMF Acquisitions Co. v. Boccella (In re

Edgehill Nursing Home, Inc.), 68 B.R. 413, 415-16 (Bankr. E.D. Pa. 1986).

41.    Further, this Court has jurisdiction to determine whether the present dispute falls

within the scope of Section 2.2.3.1(c) of the Sale Agreement, the so-called arbitration clause.

The law is clear that a court decides the threshold issue of whether a particular dispute falls

within the scope of an arbitration agreement.  See e.g., AT&T Techs, Inc. v. Commc'ns Workers

of Am., 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide

---

[8]    The Debtors have been informed that the Main Sellers who are Canadian Debtors are seeking similar relief from the Canadian Court.

otherwise, the question of whether the parties agreed to arbitrate [a particular grievance] is to be

decided by the court, not the arbitrator."); In re MLL Investors Servs., Inc., 620 N.Y.S.2d 605,

607 (3rd Dep't 1994).

42.    Accordingly, this Court has the authority, and has indeed specifically reserved its

jurisdiction, to interpret and enforce the Sale Order and the terms of the Sale Agreement and the

Escrow Agreement.

**B.     GENBAND Attempts to Disregard the Clear Definition of "Deferred Profit Amount"**

43.    By the definition set forth in the Sale Agreement, the Parties expressly agreed that

the Deferred Profit Amount would be calculated by using deferred revenues and associated

deferred costs in respect of services performed and products delivered <u>after</u> the Closing Date.

However, in its Closing Statement GENBAND seeks to disregard the clear meaning of Deferred

Profit Amount by: (i) overstating the Closing Deferred Profit Amount by $36,285,608 as a result

of incorrectly including deferred revenues and associated deferred costs in respect of services

performed and products delivered <u>prior to</u> the Closing Date; and (ii) by including a negative

deferred cost-of-sales balance of $1,629,132 with respect to Nortel Luxembourg, which is

neither a Seller under the Sale Agreement nor an EMEA Seller.

44.    Having itself proposed the definition of Deferred Profit Amount in the Sale

Agreement, and unequivocally agreed to this definition in signing the Sale Agreement,

GENBAND cannot now urge that the express language be disregarded.  As the Sale Agreement

makes clear, the proper use of a Closing Statement is for GENBAND to calculate the Purchase

Price Adjustment in strict accordance with the terms set forth in the Sale Agreement.  The

Closing Statement was never intended, and cannot now be used, as a means to renegotiate the

terms of a component of the Purchase Price Adjustment formulation or any other contract term.

19

Yet GENBAND is attempting to improperly use the Closing Statement as an opportunity to reform the Sale Agreement and strike a deal with drastically different economics from the one approved by the Court and the multiple constituents and selling parties that were not present at business-level discussions, and which was marketed to other potential bidders, including the Qualified Bidders. Indeed, to sanction GENBAND's conduct would reduce the value received by the Sellers and their creditors from the Transaction by $36,285,608 or approximately 20% of the Final Purchase Price. Furthermore, adopting GENBAND's position would result in GENBAND receiving the financial benefit of goods and services provided by the Sellers prior to the Closing Date for which GENBAND will bear no costs.

45.    GENBAND's expected attempt to disregard the clear terms of the Sale Agreement and to proffer alleged discussions during the negotiation process to change the terms of the Sale Agreement is improper. As set forth above, Section 10.12(a) of the Sale Agreement contains an integration clause which affirms that the contract sets forth the entire agreement between the Parties, and that all prior discussions or understandings are superseded by its terms. This provision is of particular import here, where the sale of Nortel's global business operations required the terms of the Sale Agreement to be approved by multiple selling parties around the world who were not all present at negotiating sessions, and where the Sellers used the terms of the Sale Agreement to market the CVAS Business to other potential purchasers to ensure they achieved the highest and best value for their creditors.

46.    Enforcing the clear terms of the definition of "Deferred Profit Amount" is especially important in light of the fact that GENBAND was approved as the highest and best bidder for the assets following a formal, court approved auction process. The Deferred Profit Amount, along with certain other enumerated purchase price adjustments, determines the final

20

Purchase Price for the assets. The sellers solicited competing bids and qualified certain other bidders based on the publicly filed Stalking Horse Agreement. Any other potential bidder would have been held to a purchase price adjustment based on the meaning of "Deferred Profit Amount" as written, and would have read the agreement to determine its impact on the purchase price when it considered whether to offer a competing bid for the CVAS Business. It would be improper and unfair to allow GENBAND to now substitute a <u>different</u> meaning of "Deferred Profit Amount" that would have given it a hidden and uneven $36,285,608 advantage throughout the auction process by allowing it to obtain a lower purchase price from the same headline purchase price than other potential bidders bidding on the exact same form of purchase agreement.

47.    Further, if GENBAND had had any disagreement with the clear definition of "Deferred Profit Amount" in the Sale Agreement, it should have raised that disagreement before the Closing Date. GENBAND had multiple opportunities to raise objections before signing the Sale Agreement or participating in the bidding procedures hearing or sale hearing (at which its counsel was present, but notably did not object or indicate any dispute) or the closing of the sale. Indeed, the Sellers provided GENBAND with an Estimated Purchase Price three days prior to the Closing, which reflected calculations based on the proper application of "Deferred Profit Amount." GENBAND raised no objection. Had a timely objection been raised, the Sellers could have considered the dispute in deciding whether to close the Sale and would not be forced to bear the cost of enforcing the terms of the Sale Agreement as written.

48.    Integration clauses are widely used and generally enforced under New York law[9] as a valid means of protecting the final written agreement between parties from later being challenged by extrinsic evidence of prior negotiations between those parties. See, e.g., Norman Bobrow & Co. v. Loft Realty Co., 577 N.Y.S.2d 36, 36 (1st Dep't 1991) ("Parol evidence is not admissible to vary the terms of a written contract containing a merger clause."). The effect of an integration clause is that a party to a written agreement will not be permitted to produce extrinsic evidence of a prior or contemporaneous understanding or representation that differs from the terms of an unambiguous and complete written agreement. See Jarecki v. Louie, 745 N.E.2d 1006, 1009 (N.Y. 2001) ("The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing."). Here, the Sellers understand that GENBAND is relying on purported conversations to support its attempt to disregard the clear definition of Deferred Profit Amount. Such an argument is precisely what the Parties intended to exclude by incorporating the Section 10.12 integration clause. Therefore, GENBAND should not be permitted to alter the unambiguous definition of Deferred Profit Amount.

49.    In addition, the closing Deferred Profit Amount calculated by GENBAND improperly includes a negative deferred cost-of sales balance of $1,629,132 with respect to Nortel Luxembourg. As Nortel Luxembourg is neither a Seller nor an EMEA Seller,[10] the amount of $1,629,132 should not have been included in GENBAND's calculation of the Closing Deferred Profit Amount. Therefore, the Deferred Profit Amount should be reduced accordingly.

---

[9]    The Sale Agreement is governed by New York law in accordance with Section 10.6(a). Sale Agreement, p. 131.

[10]    Indeed, Nortel Luxembourg would only be an EMEA Seller, and not a MAIN Seller, but it unequivocally was not.

## C.    Arbitration is Not the Proper Forum to Resolve the Deferred Profit Amount Dispute

50.    As GENBAND's reading of Deferred Profit Amount contravenes the terms of the Sale Agreement, the Court may enforce the terms of the Sale Order and direct the release of escrowed funds in excess of other disputed amounts without the need for the Parties to resort to the use of an Accounting Arbitrator.

51.    Section 2.2.3.1(c) of the Sale Agreement provides for the use of an Accounting Arbitrator if the Sellers and GENBAND "are unable to resolve any disagreement <u>as contemplated by Section 2.2.3.1(b)</u> [of the Sale Agreement] within fifteen (15) days after delivery of a Disagreement Notice." Sale Agreement at 49 (emphasis supplied). The Accounting Arbitrator's authority is clearly restricted to disputes appropriately raised under the Sale Agreement's purchase price adjustment procedures. The present dispute has not been properly raised. Section 2.2.3.1(a) clearly requires that a Closing Statement be "prepared in accordance with the Nortel Accounting Principles <u>and the terms hereof</u>." Sale Agreement at 48 (emphasis supplied). By improperly seeking to reform the Sale Agreement GENBAND has disregarded its obligation to prepare the Closing Statement in accordance with the terms of the Sale Agreement it signed, and which served as the basis of the auction process. The difference between GENBAND's and the Sellers' respective calculations of Deferred Profit Amount is not the result of any accounting disagreement or mathematical discrepancy, but rather is the product of GENBAND's attempt to disregard the clear terms of the Sale Agreement. The Debtors did not agree to delegate to the Accounting Arbitrator the power to rewrite the terms of the Sale Agreement, as GENBAND now seeks to do. Accordingly, the Debtors should not be required to expend further time or resources rebutting arguments that lack even arguable merit under the Sale Agreement. Accordingly, the Debtors respectfully request that the Court issue an order

23

enforcing the terms of the Sale Agreement and calculating the Deferred Profit Amount in accordance with the express terms of the Sale Agreement.

**D.    The Court Should Order the Release of the Escrow Funds**

52.    Because the correctly calculated Purchase Price Adjustment Escrow Amount exceeds the maximum purchase price adjustment by $4,859,745, there is no basis for the continued reserve of those excess amounts. On November 16, 2010, the Sellers delivered escrow release instructions to GENBAND requesting that GENBAND authorize the release of the escrow funds; however, GENBAND has not yet agreed to do so. Accordingly, because GENBAND has not raised a legitimate dispute with respect to the calculation of the Deferred Profit Amount, the Debtors respectfully request that the Court enter an order directing GENBAND to execute instructions to Wells Fargo to release to the Distribution Agent (as defined in the Escrow Agreement) those amounts currently held in escrow in excess of $3,140,255 (*i.e.* $4,859,745), and authorizing Wells Fargo to release such amount under the terms of the Sale Agreement and to release the balance to GENBAND.

53.    As the Court is aware, the Sellers are in the process of negotiating the allocation proceeds of the numerous asset dispositions undertaken in the course of Nortel's global insolvency proceedings. In doing so, the Debtors, their estates and their creditors will benefit from having as accurate an estimate of the funds to be allocated from each asset disposition as is reasonably possible. Accordingly, it is especially important that the escrowed funds that are properly owed to the Sellers be released as soon as possible. Accordingly, the Debtors request that the Court order the immediate release of $4,859,745 from the Escrow Account to the Sellers.

54.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion that otherwise could apply under Bankruptcy Rule 6004(h), which

provides that, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise," such that the undisputed amounts held in escrow may be released upon the entry of the order.

**E.    GENBAND Has Failed To Abide By the Terms of the Sale Agreement Regarding the Verizon Receivables**

55.    As set forth above, the Verizon Receivables do not constitute Construction-in-Process receivables and are therefore an Excluded Asset that remained with the Sellers under the Sale Agreement.  Furthermore, under Section 2.1.2(a) of the Sale Agreement, claims relating to any Excluded Liability (as defined in the Sale Agreement), which includes liabilities relating to any Excluded Asset, also constitute an Excluded Asset.  Sale Agreement at 37.  Finally, under Section 5.12 of the Sale Agreement, GENBAND has agreed to promptly deliver to the Sellers any payment or instrument received by GENBAND that is for the account of the Sellers under the terms of the Sale Agreement.  Sale Agreement at 86-7.

56.    Therefore, the Debtors respectfully request that the Court issue an order directing GENBAND to: (i) provide the Sellers with a fully executed copy of the Settlement Agreement and the name and contact information of representatives of Verizon with whom GENBAND has been in discussions with respect to the Settlement Agreement; (ii) deliver to the Sellers an accounting of all purchase orders received and expected to be received by GENBAND from Verizon with respect to the Verizon Receivables, copies of such purchase orders, and the related invoices issued by GENBAND; (iii) deliver to the Sellers any amounts received by GENBAND in payment for the Verizon Receivables as of the date hereof, and any purchase orders and amounts that GENBAND may receive from Verizon after the date hereof with respect to the

Verizon Receivables; and (iv) fully cooperate with the Sellers and Verizon in the resolution of this matter.

**F.  GENBAND Has Failed To Abide By The Terms Of The Sale Agreement Regarding The Canadian Transfer Taxes**

57.    As set forth above, GENBAND has failed to comply with the Sale Agreement by refusing to pay Nortel certain Canadian transfer taxes.  Nortel invoiced GENBAND in the amount of $1,000,390 on September 28, 2010 for the taxes owed; GENBAND subsequently indicated that it was not in agreement with the figure and informed Nortel that it would revert with specific objections.  GENBAND has yet to respond to Nortel's repeated requests for additional information concerning GENBAND's objections and has failed to remit payment.

58.    Therefore, the Debtors respectfully request that the Court issue an Order directing GENBAND to: (i) immediately remit payment in accordance with the September 28, 2010 invoices for the Canadian transfer taxes owed to Nortel; or (ii) deliver to the Sellers a written statement of its objections to the same; and (iii) fully cooperate with the Sellers in the resolution of this matter.

**NOTICE**

59.    Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to GENBAND; (v) Wells Fargo Bank, National Association, as escrow agent and (vi) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

**NO PRIOR REQUEST**

60.    No prior request for the relief sought herein has been made to this or any other court.

26

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other

and further relief as it deems just and proper.

Dated: November 17, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*