**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| NORTEL NETWORKS INC., | |
| Plaintiff, | |
| - v. - | Adv. Pro. No. 09 - _____ (KG) |
| NOKIA SIEMENS NETWORK US LLC, *et al.*, | **ADVERSARY COMPLAINT** |
| Defendants. | |

Nortel Networks Inc. ("NNI"), by its undersigned attorneys, for its complaint against defendants Nokia Siemens Network Oy ("NSN Oy") and Nokia Siemens Network US LLC ("NSN US", together with NSN Oy, "NSN"), alleges on the basis of knowledge with respect to itself and its own conduct and on information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.  NNI has commenced this adversary proceeding because NSN has failed to meet its contractual obligation to compensate NNI for the actual and final cost of certain trial equipment designed to operate under the Long Term Evolution networking standard ("LTE Trial Equipment") manufactured by NNI for NSN pursuant to that certain purchase and license agreement between NNI and NSN, dated June 26, 2009 (as amended effective July 13, 2009, the "Purchase and License Agreement"). NSN's breach of the Purchase and License Agreement came on the heels of an affiliate of NSN, Nokia Siemens Networks B.V. ("NSN B.V."), being

outbid for the purchase of the mobility networking solutions business and LTE technology (the "CDMA Sale") owned by NNI and certain other members of the Nortel group of companies (collectively "Nortel"). This breach occurred notwithstanding the fact that NSN B.V. served as the stalking horse bidder in the CDMA Sale process and was paid a break-up fee and expense reimbursement in the total amount of $22.5 million on August 4, 2010 pursuant to an order of this Court.

2. By this action, NNI seeks, among other things, an order: (1) finding that NSN breached the Purchase and License Agreement by failing to compensate NNI for the actual and final cost of the LTE Trial Equipment purchased by NSN; (2) finding that NSN breached the implied covenant of good faith and fair dealing imbedded in the Purchase and License Agreement; (3) finding that NSN's failure to perform has created an obligation to pay NNI under the doctrine of promissory estoppel; and (4) awarding damages to NNI in an amount not less than NNI's out-of-pocket costs arising from the terminated orders as provided for under the Purchase and License Agreement.

## THE PARTIES

3. Nortel Networks Inc. is a corporation organized and existing under the laws of Delaware, with a principal place of business at 4001 E. Chapel Hill-Nelson Hwy., P.O. Box 13010, Research Triangle Park, NC 27709-3010.

4. Nokia Siemens Networks Oy is a corporation established under the laws of Finland having its principal place of business at Karaportti 3, P.I. Box 1, Fl-020220, Espoo, Finland.

5.  Nokia Siemens Networks US LLC is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 6000 Connection Drive, Mail Drop 4C-1580, Irving, Texas 75039.

## JURISDICTION AND VENUE

6.  On January 14, 2009, NNI filed a voluntary petition for reorganization relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. 101-1330, as amended (the "Bankruptcy Code"). NNI continues to manage and operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334, 2201 and 2202. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.  The statutory bases for the relief requested herein are sections 105 and 541 of the Bankruptcy Code, as supplemented by Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

9.  On January 14, 2009 (the "Petition Date"), NNI and certain of its affiliates, as debtors and debtors in possession, other than NN CALA (as defined below) (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

10.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11. On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

12. Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[1] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

13. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

14. On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[2] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint

---

[1] The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[2] The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

4

Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended and the liquidation operations were temporarily suspended on October 1, 2009. On March 25, 2010, the French Court ended the suspension of the liquidation operations. In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA, although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France. On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code.[3]

15.    On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

---

[3]    Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

5

16.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].  From time to time, other Nortel affiliates have sought and in the future may seek relief through the commencement of creditor protection or other insolvency or dissolution proceedings around the world.

17.     Prior to its significant business divestitures, Nortel was a global supplier of end-to-end networking products and solutions serving both service providers and enterprise customers.  Nortel's technologies spanned access and core networks and support multimedia and business-critical applications.  Nortel's networking solutions consisted of hardware, software and services.  Nortel designed, developed, engineered, marketed, sold, licensed, installed, serviced and supported these networking solutions worldwide.

**A.     The Negotiation Of The Purchase and License Agreement**

18.     In April of 2009, NSN approached NNI about the possibility of collaborating to jointly develop Long Term Evolution ("LTE") products.  In connection with these discussions, NNI and NSN began to review existing product designs and product development plans, began to develop and market LTE solutions and began to negotiate the terms of a joint development agreement.  As part of the negotiations surrounding the terms of a joint development agreement, the parties discussed the fact that NSN wanted to use the LTE Trial Equipment in trials scheduled to take place in August of 2009.

19. In connection with discussions relating to the joint development agreement that ultimately became the Purchase and License Agreement, NNI began to place orders on suppliers and began consuming its own component inventory in the manufacture of the LTE Trial Equipment in order to meet the proposed August trial dates.

20. During the entire period of negotiations leading up to the execution of the Purchase and License Agreement, NNI regularly informed NSN as to the status of the manufacture of LTE Trial Equipment as well as the fact that it was incurring related expenses, all so that NNI would be able to meet the August delivery dates. NSN never communicated any objection to NNI's projected costs. Any items that were ordered, consumed, or expenses that were incurred, by NNI prior to the execution of the Purchase and License Agreement were ordered or consumed in connection with the Purchase and License Agreement and were reflected in purchase orders subsequently issued by NSN to NNI.

21. On or about June 19, 2009, NNI and NSN B.V. entered into an asset sale agreement in relation to the sale of Nortel's mobility networking solutions business **and** LTE technology (respectively, the "CDMA Sale" and the "CDMA Business"), whereby NSN B.V. agreed to serve as the stalking-horse bidder in the auction for the sale of the CDMA Business.

22. On June 26, 2009, NNI and NSN Oy and its subsidiaries and affiliated companies entered into the Purchase and License Agreement relating to the manufacture of the LTE Trial Equipment. NNI and NSN Oy and its subsidiaries and affiliated companies subsequently amended the Purchase and License Agreement, effective July 13, 2009, to allow NSN US to become a designated purchaser authorized to place orders with NNI directly.

23. On June 30, 2009, the U.S. Bankruptcy Court for the District of Delaware ("Bankruptcy Court") entered an order authorizing an auction for the CDMA Sale and approving

7

certain bidding procedures, including a break-up fee and expense reimbursement for NSN B.V. as stalking horse bidder.

24. The Purchase and License Agreement related directly to NSN B.V.'s intended purchase of the CDMA Business, which business included rights to the LTE technology that was the subject of the Purchase and License Agreement.

25. Pursuant to the Purchase and License Agreement, NSN US issued four purchase orders to NNI for certain LTE Trial Equipment: one purchase order on ■■■■■■, one purchase order on ■■■■■■, and two purchase orders on ■■■■■■.

26. On or about July 24, 2009, NNI held an auction in connection with the CDMA Sale. After several rounds of bidding, NSN B.V. was outbid by the successful bidder and NSN B.V. was designated as the alternate bidder.

27. On July 28, 2009, the Bankruptcy Court authorized and approved the sale of the CDMA Business to the successful bidder.

28. On July 28, 2009, Matt Conrod, Leader of the 4G BTS Product Management group at NNI, sent an email to Joerg Siewerth, a representative in NSN's Radio Access Productivity Management group, stating ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■"

29. Mr. Siewerth responded that same day, July 28, 2009, by email, stating "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

30. Mr. Conrod responded to Mr. Siewerth approximately one half hour later by email, stating "██████████████████████████████████████████████████████████████████████"

31. On August 3, 2009, representatives from NNI sent a letter to representatives from NSN with a description of the cancelled orders under the Purchase and License Agreement with estimated out-of-pocket costs of $█████████.

32. On August 4, 2009, NSN B.V. was paid a break-up fee and expense reimbursement of $22.5 million as a result of the approval of the sale of the CDMA Business to an entity other than NSN B.V.

33. Beginning on July 28, 2009, before NNI had even received formal notice of termination from NSN, NNI attempted to minimize the costs associated with NSN's early termination of the Purchase and License Agreement. Indeed, NNI approached third parties to find out whether they would be interested in purchasing some of the ordered equipment and attempted to negotiate with its manufacturers to take back equipment, reuse equipment for other customers and projects, or accept full cancellation of the purchase orders. As a result of these efforts, NNI was able to reduce the final out-of-pocket costs associated with NSN's early termination from $█████████ to $█████████

34. On October 16, 2009, NNI sent a letter informing NSN that NNI's actual and final out-of-pocket costs relating to the cancelled purchase orders had been reduced to

9

$■■■■■■  The letter enclosed a detailed summary of the total costs and supporting invoices.

35. Despite several attempts by NNI to resolve the current dispute, NSN has refused to meet its obligations under the Purchase and License Agreement.

**B.  Material Provisions Of The Purchase and License Agreement**

36. Pursuant to Section 3 of the Purchase and License Agreement, NSN had the right to cancel orders seven days prior to each scheduled delivery date subject to its obligation to compensate NNI for the actual and final out-of-pocket costs incurred in connection with the manufacture of LTE Trial Equipment.

37. Section 3 of the Purchase and License Agreement states in relevant part:



---

[4]  Section 1(g) of the Purchase and License Agreement ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■"

38. Pursuant to Section 6(a), the parties agreed ███████████████████████████████████████████████████████████████████████████████████████████████████████

39. Section 6(a) of the Purchase and License Agreement states in relevant part:



### FIRST CLAIM– BREACH OF CONTRACT

40. NNI repeats and realleges paragraphs 1 through 39 inclusive as if fully set forth herein.

41. The Purchase and License Agreement constitutes a valid and enforceable contract.

42. NSN's failure to pay the actual and final out-of-pocket costs borne by NNI constitutes a breach of NSN's obligations under, among other things, Sections 3 and 6(a) of the Purchase and License Agreement.

43. NSN's failure to comply with the terms of the Purchase and License Agreement, including but not limited to Sections 3 and 6(a), has injured NNI by, among other things, depriving it of NSN's contractual undertakings.

44. As a direct and proximate result of NSN's breach, NNI is entitled to a judgment declaring that it is entitled to damages arising out of NSN's breach of the Purchase and License Agreement, including without limitation, all actual and final out-of-pocket expenses

incurred under the Purchase and License Agreement as set forth in Sections 3 and 6(a) of the Purchase and License Agreement or otherwise.

45. All conditions precedent to the institution and maintenance of this action and the granting of the relief sought herein have occurred, have been waived or have otherwise been satisfied.

## SECOND CLAIM– BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

46. NNI repeats and realleges paragraphs 1 through 39 inclusive as if fully set forth herein.

47. The Purchase and License Agreement contains within it, as with all binding contracts, an implied covenant that requires all parties to act with good faith and with fair dealing in performing their contractual obligations.

48. NSN has failed to comply with the implied covenant of good faith and fair dealing by failing to perform its contractual obligations owed to NNI in the transactions at issue, including but not limited to its obligations to comply with Sections 3 and 6(a) of the Purchase and License Agreement.

49. For the foregoing reasons, NSN breached the implied covenant of good faith and fair dealing contained in the Purchase and License Agreement.

50. NSN's breach of the implied covenant of good faith and fair dealing has injured NNI by, among other things, depriving it of NSN's contractual undertakings.

51. NSN's breach of the implied covenant of good faith and fair dealing has also injured NNI by requiring it to incur substantial costs associated with excess inventory in the form of LTE Trial Equipment, which, having been built to early 2009 design specifications, is not saleable or usable for other applications.

52. NSN's breach of the implied covenant of good faith and fair dealing has further injured NNI by requiring it to incur substantial costs associated with bringing this action, including, but not limited to, attorneys' fees.

53. As a direct and proximate result of NSN's breach of the implied covenant of good faith and fair dealing, NNI is entitled to a judgment declaring that it is entitled to damages arising out of NSN's breach of the Purchase and License Agreement, including without limitation, all actual and final out-of-pocket expenses incurred pursuant to Sections 3 and 6(a) of the Purchase and License Agreement or otherwise.

54. All conditions precedent to the institution and maintenance of this action and the granting of the relief sought herein have occurred, have been waived or have otherwise been satisfied.

### THIRD CLAIM– PROMISSORY ESTOPPEL

55. NNI repeats and realleges paragraphs 1 through 39 inclusive as if fully set forth herein.

56. NNI's reliance upon NSN's statements and conduct indicating that NSN would reimburse all out-of-pocket expenses was both reasonable and foreseeable.

57. As a result of NNI's reliance upon NSN's statements and conduct indicating that NSN would reimburse all of its out-of-pocket expenses, NNI has incurred, and will continue to incur, substantial costs associated with excess inventory in the form of LTE Trial Equipment, which, having been built to early 2009 design specifications, is not saleable or usable for other applications.

58. As a result of NNI's reliance upon NSN's statements and conduct indicating that NSN would reimburse all out-of-pocket expenses, NNI has incurred, and will

continue to incur, substantial costs associated with bringing this action, including, but not limited to, attorneys' fees.

59. As a direct and proximate result of NNI's good faith reliance on NSN's performance and NSN's subsequent breach, NNI is entitled to a judgment declaring that it is entitled to damages arising out of NSN's breach of the Purchase and License Agreement, including without limitation, all actual and final out-of-pocket expenses incurred pursuant to Sections 3 and 6(a) of the Purchase and License Agreement or otherwise.

60. All conditions precedent to the institution and maintenance of this action and the granting of the relief sought herein have occurred, have been waived or have otherwise been satisfied.

## **PRAYER FOR RELIEF**

WHEREFORE, NNI demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and respectfully requests that the Court enter an order:

1. Finding that the Purchase and License Agreement is valid and binding;

2. Finding that NSN breached the Purchase and License Agreement;

3. Granting judgment to NNI and awarding liquidated damages on the First Claim in an amount to be ascertained at trial, but not less than $1,774,186.00, the total amount of NNI's actual and final out-of-pocket costs;

4. Granting judgment to NNI and awarding liquidated damages on the Second Claim in an amount to be ascertained at trial;

5. Granting judgment to NNI and awarding damages on the Third Claim in an amount to be ascertained at trial; and

6.      Granting any such other or further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
November 1: , 2010

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By: */s/ Raymond H. Lemisch*
Raymond H. Lemisch, Esq. (No. 4204)
Jennifer R. Hoover, Esq. (No. 5111)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
Email: rlemisch@beneschlaw.com
Email: jhoover@beneschlaw.com

*Attorneys for Plaintiff*