**EXHIBIT A**

#1019044-v1

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD**
**VOLUME 1 OF 2**
**(returnable December 15, 2010)**

November 30, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC# 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | DOCUMENT | PAGE |
|---|---|---|
| | **Volume 1** | |
| 1. | Notice of Motion, returnable December 15, 2010 | 1 |
| 2. | Affidavit of John Doolittle, sworn November 30, 2010 | 30 |
| A. | Sale Agreement, dated December 22, 2009 | 39 |
| B. | Amendment No. 1 to Sale Agreement, dated May 28, 2010 | 186 |
| C. | Affidavit of George Riedel, sworn February 26, 2010 | 204 |
| D. | Approval and Vesting Order, dated March 3, 2010 | 214 |
| E. | Estimated Purchase Price Statement, dated May 25, 2010 | 222 |
| | **Volume 2** | |
| F. | Escrow Agreement, dated January 6, 2010, and Amendment, dated May 28, 2010 | 230 |

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| G. | Closing Statement, dated September 15, 2010 | 270 |
| H. | Disagreement Notice, dated November 16, 2010 | 274 |
| I. | Email from Thomas Malone to Victor Lewkow and Evan Schwartz, dated December 7, 2009 at 12:37AM EST | 302 |
| J. | Draft invoices, dated September 28, 2010 | 459 |
| K. | Correspondence from Nortel Networks Inc. to Genband US LLC, dated November 18, 2010 | 462 |
| L. | Genband Motion, dated November 18, 2010 | 463 |
| 3. | Draft Order | 473 |

# TAB 1

1.

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**
**(returnable December 15, 2010)**

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively, the "Applicants") will make a motion to Justice Morawetz of the Commercial List Court on Wednesday, December 15, 2010 at 10:00 a.m., or as soon after that time as the motion can be heard, at 393 University Avenue, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

THE MOTION IS FOR AN ORDER, AMONG OTHER THINGS:

(a)     if necessary, abridging and validating the time for service of the Notice of Motion and the Motion Record in respect of this motion and dispensing with further service thereof;



(b)     declaring that this Court together with the U.S. Court have the exclusive authority and jurisdiction to determine the dispute relating to the "Deferred Profit Amount";

(c)     declaring that Genband Inc.'s (n/k/a Genband US LLC) ("Genband") calculation of the "Deferred Profit Amount" shall include only deferred revenues for services to be performed or products to be provided by the Business after the Closing Date;

(d)     declaring that the negative deferred cost-of-sales balance of US$1,629,132 with respect to Nortel Networks Luxembourg S.A. ("Nortel Luxembourg") shall not be included in the calculation of the "Deferred Profit Amount";

(e)     directing Genband to: (i) immediately remit payment in accordance with the September 28, 2010 invoice for the Canada transfer taxes owed to Nortel; or (ii) deliver to the Sellers a written statement of its objections to the same; and (iii) fully cooperate with the Sellers in the resolution of this matter; and

(f)     directing Genband to execute, within five (5) days of the entry of this Order, instructions to Wells Fargo, as escrow agent, that provide for the release of US$4,859,745 plus accumulated interest from the Escrow Fund to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) by wire transfer of immediately available funds;

(g)     directing the Seller Parties (as defined in the Escrow Agreement) to execute forthwith upon the release of the funds to the Distribution Agent, instructions to Wells Fargo, as escrow agent, that provide for the release of the balance of the Escrow Fund to Genband by wire transfer of immediately available funds; and

(h)     Such further and other relief as counsel may request and this Honourable Court deems just.

**THE GROUNDS FOR THE MOTION ARE:**

**BACKGROUND**

(i)     References to "Nortel" herein are references to the global enterprise as a whole;

(j)     Capitalized terms used herein and not otherwise defined have the meaning given to them in the Sale Agreement;

(k)     On January 14, 2009 (the "Filing Date"), the Applicants were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as Monitor in the CCAA proceedings;

(l)     Also on January 14, 2009, certain of NNC's and NNL's U.S. subsidiaries, including the principal U.S. operating subsidiary Nortel Networks Inc. ("NNI" and together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code;

(m)    Additionally, on January 14, 2009, certain subsidiaries (the "EMEA Debtors") of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986;

(n)     On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code;

**THE SALE OF THE CVAS BUSINESS**

(o)     On January 6, 2010 this Court granted an Order approving the sale agreement dated as of December 22, 2009 among Genband and the Sellers (the "Sale Agreement") as a stalking horse agreement as well as certain bidding procedures for a sales process for the Sellers' Carrier Voice Over IP and Application Solutions Business (the "CVAS Business");

(p)     Pursuant to an Order (the "Approval and Vesting Order") of this Court made on March 4, 2010, the Sale Agreement was approved;

(q)     Similar relief was granted by the U.S. Court on March 4, 2010;

(r)     The sale of the CVAS Business to the Purchaser closed on May 28, 2010 (the "Closing");

(s)     In connection with the sale of the CVAS Business, Wells Fargo, NNI, Nortel Networks UK Limited (in administration) and the Purchaser entered into the Escrow Agreement dated as of January 6, 2010 and amended on May 28, 2010 the "Escrow Agreement");

(t)     The Escrow Account was established to hold among other things, a Purchase Price Adjustment Escrow Amount of US$8 million that relates to certain potential post-closing purchase price adjustments that could be made pursuant to Section 2.2.3 of the Sale Agreement;

## CLOSING STATEMENT

(u)     On September 15, 2010, in accordance with the Sale Agreement, Genband delivered to the Sellers the closing statement (the "Closing Statement") that contained its calculation of certain post-closing purchase price adjustments, including the Deferred Profit Amount, provided for under the Sale Agreement;

(v)     The Closing Statement provided for a net purchase price adjustment in favour of the purchaser in the amount of US$139,096,000, which included a calculated Deferred Profit Amount of US$70,570,000;

(w)     According to Genband's calculation, the final purchase price is US$142,904,000;

## THE DISAGREEMENT NOTICE AND CALCULATION OF THE PURCHASE PRICE ADJUSTMENT

(x)     Following Genband's delivery of the Closing Statement, the Sellers and the EMEA Sellers delivered a written Disagreement Notice to Genband on October 13, 2010, and on November 16, 2010, the Sellers and the EMEA Sellers delivered to Genband a

corrected disagreement notice to account for a small calculation error (the "Disagreement Notice");

(y)    In the Disagreement Notice, the Sellers and the EMEA Sellers assert that the Deferred Profit Amount in the Closing Statement should be reduced by:

      (i)    US$34,656,476 due to Genband's improper inclusion of deferred revenues and associated deferred costs relating to services performed and products provided by the CVAS Business <u>prior</u> to the Closing Date; and

      (ii)   US$1,629,132 due to Genband's improper inclusion of a negative deferred cost-of-sales balance with respect to Nortel Luxembourg.

The final purchase price according to the Sellers' and the EMEA Sellers' calculation is US$179,508,745;

(z)    The agreed method for calculating a purchase price adjustment under the Sale Agreement, and particularly the "Deferred Profit Amount", is contained in the Sale Agreement;

(aa)   By the Sale Agreement's unambiguous language, the Deferred Profit Amount includes only deferred revenues and associated deferred costs in respect of services to be performed or products to be provided by the Business <u>after</u> the Closing Date;

(bb)   However, Genband's calculation of the Deferred Profit Amount includes deferred revenue items for services performed or products provided by the CVAS Business <u>before</u> the Closing Date;

(cc)   Any attempt by Genband to justify its calculation of the Deferred Profit Amount based on an understanding purportedly garnered during the negotiation process as the justification for disregarding the definition of Deferred Profit Amount is contrary to the Sale Agreement, which contains an entire agreement clause that expressly provides that, *inter alia*, the Sale Agreement, together with the other transaction documents, represents the entire understanding of the parties with respect to the subject matter thereof and supersedes any prior or contemporaneous understandings or agreements;

**ADDITIONAL MATTER**

*Canada transfer taxes*

(dd)    Under the Sale Agreement, Genband owes to Nortel Canada transfer taxes in the amount of US$1,000,390.  Genband has indicated a disagreement with the transfer tax amount and has failed to remit this payment;

(ee)    Genband informed Nortel that it would revert with specific objections; however, to date, Genband has not done so and the payment of transfer taxes to Nortel is past due;

**JURISDICTION TO RESOLVE DISPUTE RELATING TO THE DEFERRED PROFIT AMOUNT**

(ff)    Genband has asserted that instead of this Court and the U.S. Court resolving the dispute, the matter must be referred to an accounting arbitrator, based on a provision in the Sale Agreement that provides for certain disagreements to be resolved by an accounting arbitrator;

(gg)    Nortel disagrees.  There is nothing for an accounting arbitrator to decide.  The parties and their accountants agree on the figures that would determine the Deferred Profit Amount if the terms of the Sale Agreement are applied;

(hh)    Accordingly, the Applicants bring this motion before the Canadian Court, and the U.S. Debtors have brought a parallel motion before the U.S. Court, to seek the requested relief;

**MISCELLANEOUS**

(ii)    The provisions of the CCAA; and

(jj)    Such further and other grounds as counsel may advise and this Honourable Court permit.

THE FOLLOWING EVIDENCE will be used at the hearing of the motion:

(a)    the Affidavit of John Doolittle, sworn November 30, 2010; and

7.

(b)      such further materials as may be filed.

November 30, 2010                    **OGILVY RENAULT LLP**
                                     Suite 3800
                                     Royal Bank Plaza, South Tower
                                     200 Bay Street
                                     Toronto, Ontario  M5J 2Z4  CANADA

                                     **Derrick Tay LSUC#: 21152A**
                                     Tel: (416) 216-4832
                                     Email: dtay@ogilvyrenault.com

                                     **Jennifer Stam LSUC #46735J**
                                     Tel: (416) 216-2327
                                     Email: jstam@ogilvyrenault.com

                                     Fax: (416) 216-3930

                                     Lawyers for the Applicants


TO:      Attached Service List

Court File No.  09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### SERVICE LIST

TO:     **OGILVY RENAULT LLP**
        Royal Bank Plaza, South Tower
        200 Bay Street, Suite 3800
        Toronto, Ontario M5J 2Z4

        Derrick Tay
        Tony Reyes
        Jennifer Stam

        Email:    dtay@ogilvyrenault.com
                  treyes@ogilvyrenault.com
                  jstam@ogilvyrenault.com

        Tel:      416.216.4000
        Fax:      416.216.3930

        Lawyers for the Applicants

- 2 -

**9**

TO:  **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:  nortel.monitor@ca.ey.com

Tel:     416.943.3016
Fax:    416.943.3300

AND
TO:  **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:  jcarfagnini@goodmans.ca
           jpasquariello@goodmans.ca
           grubenstein@goodmans.ca
           fmyers@goodmans.ca
           carmstrong@goodmans.ca

Tel:     416.597.4107
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO:  **OSLER HOSKIN AND HARCOURT
LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:  lbarnes@osler.com
           rchartrand@osler.com
           esellers@osler.com
           ahirsh@osler.com

Tel:     416.362.2111
Fax:    416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO:  **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:  dmilner@fasken.com
           akauffman@fasken.com
           elamek@fasken.com
           jlevin@fasken.com

Tel:     416.868.3538
Fax:    416.364.7813

Lawyers for Export Development Canada

10

| | |
|---|---|
| AND TO: | **EXPORT DEVELOPMENT CANADA**<br>151 O'Connor Street<br>Ottawa, ON K1A 1K3<br><br>Jennifer Sullivan<br><br>Email:   jsullivan@edc.ca<br><br>Tel:      613.597.8651<br>Fax:     613.598.3113 | AND TO: | **THORNTON GROUT FINNIGAN LLP**<br>3200-100 Wellington Street West<br>Toronto-Dominion Centre, Canadian Pacific Tower<br>Toronto, ON M5K 1K7<br><br>Robert I. Thornton<br>Rachelle Moncur<br>Leanne M. Williams<br><br>Email:   rthornton@tgf.ca<br>            rmoncur@tgf.ca<br>            lwilliams@tgf.ca<br><br>Tel:      416.304.1616<br>Fax:     416.304.1313<br><br>Lawyers for Flextronics Telecom Systems Ltd. |

**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON K1A 1K3

Jennifer Sullivan

Email:   jsullivan@edc.ca

Tel:      613.597.8651
Fax:     613.598.3113

AND TO:

**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON M5K 1K7

Robert I. Thornton
Rachelle Moncur
Leanne M. Williams

Email:   rthornton@tgf.ca
            rmoncur@tgf.ca
            lwilliams@tgf.ca

Tel:      416.304.1616
Fax:     416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO:

**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:   john.stringer@mcinnescooper.com
            stephen.kingston@mcinnescooper.com

Tel:      902.425.6500
Fax:     902.425.6350

Lawyers for Convergys EMEA Limited

AND TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart

Email:   jcarhart@millerthomson.com

Tel:      416.595.8615/8577
Fax:     416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO:

**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:   barry.wadsworth@caw.ca
            lewis.gottheil@caw.ca

Tel.:     416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel employees represented by the CAW-Canada

AND TO:

**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC V7X 1S8

R. Hoops Harrison

Email:   hharrison@boughton.ca

Tel:      604.687.6789
Fax:     604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd., in its capacity as duly authorized agent for Holdings 1506 Enterprises Ltd.

**11.**

AND TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:    416. 367.6646
Fax:    416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:    416.367.6266
Fax:    416.361.7067

Email:  srappos@blgcanada.com
Tel:    416.367.6033
Fax:    416.361.7306

Lawyers for Bell Canada

AND TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:  ray.leach@siskinds.com
        dimitri.lascaris@siskinds.com
        monique.radlein@siskinds.com

Tel:    519.672.2121
Fax:    519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:

**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

John Contini
Aaron Rousseau

Email   jcontini@langmichener.ca
Tel:    416.307.4148
Fax:    416.304.3767

Email   arousseau@langmichener.ca
Tel:    416.307.4081
Fax:    416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email:  zychk@bennettjones.com
Tel:    416.777.5738
Fax:    416.863.1716

Email:  orzyr@bennettjones.com
Tel:    416.777.5737
Fax:    416.863.1716

Email:  finlaysong@bennettjones.com
Tel:    416.777.5762
Fax:    416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

*12*

| | | | | |
|---|---|---|---|---|
| AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 | | AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 |

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:       416.595.2090
Fax:      416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:       416.595.2104
Fax:      416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:       416.595.2130
Fax:      416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:       416.595.2150
Fax:      416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:       416.595.2701
Fax:      416.204.2909

Lawyers for the Former Employees of Nortel

---

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:       416.595.2090
Fax:      416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:       416.595.2104
Fax:      416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:       416.595.2130
Fax:      416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:       416.595.2150
Fax:      416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:       416.595.2701
Fax:      416.204.2909

Lawyers for the LTD Beneficiaries

**13**

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email:   msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Email:   jmklotz@millerthomson.com
Tel:      416.595.4373
Fax:      416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:   joseph.kim@lge.com

Tel:      +82.2.3777.3171
Fax:      +82.2.3777.5345

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email   msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:      416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

14

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:   ken.rosenberg@paliareroland.com
Tel:      416.646.4304
Fax:     416.646.4301

Email:   max.starnino@paliareroland.com
Tel:      416.646.7431
Fax:     416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:      416.646.4326
Fax:     416.646.4301

Email:   tina.lie@paliareroland.com
Tel:      416.646.4332
Fax:     416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:   Shayne.kukulowicz@fmc-law.com
            Alex.macfarlane@fmc-law.com
            Michael.wunder@fmc-law.com
            ryan.jacobs@fmc-law.com

Tel:      416.863.4511
Fax:     416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:   patrick.shea@gowlings.com

Tel:      416.369.7399
Fax:     416.862.7661

Lawyers for Westcon Group

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:   rslattery@mindengross.com
            dullmann@mindengross.com
Tel:      416.369.4149
Fax:     416.864.9223

Lawyers for Verizon Communications Inc.

AND TO:

**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:  hfogul@airdberlis.com
Tel:    416.865.7773
Fax:    416.863.1515

Email:  pczegledy@airdberlis.com
Tel:    416.865.7749
Fax:    416.863.1515

Lawyers for Microsoft Corporation

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:  renglish@airdberlis.com
        smitra@airdberlis.com

Tel:    416.863.1500
Fax:    416.863.1515

Lawyers for Tata Consultancy Services Limited and Tata America International Corporation

AND TO:

**ALEXANDER HOLBURN BEAUDIN & LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:  surquhart@ahbl.ca
Tel:    604.484.1757
Fax:    604.484.1957

Lawyers for Algo Communication Products Ltd.

AND TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:    416.865.6655
Fax:    416.865.6636

Email:  vdare@foglers.com
Tel:    416.865.6641
Fax:    416.865.6636

Lawyers for Andrew, LLC

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:  mfleming@millerthomson.com
Tel:    416.595.8686
Fax:    416.595.8695

Lawyers for Verint Americas Inc. and Verint Systems, Inc.

AND TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:    416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Lawyers for Perot Systems Corporation

AND TO:

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

Email:  dgrieve@casselsbrock.com
Tel:    416.860.5219
Fax:    416.350.6923

Lawyers for Alvarion Ltd.

AND TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:  andrew.kent@mcmillan.ca
Tel:    416.865.7160
Fax:    416.865.7048

Email:  hilary.clarke@mcmillan.ca
Tel:    416.865.7286
Fax:    416.865.7048

Email:  tushara.weerasooriya@mcmillan.ca
Tel:    416.865.7262
Fax:    416.865.7048

Lawyers for Royal Bank of Canada

AND TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:  lawrence.crozier@mcmillan.ca
Tel:    416.865.7178
Fax:    416.865.7048

Email:  adam.maerov@mcmillan.ca
Tel:    416.865.7285
Fax:    416.865.7048

Lawyers for Citibank

AND TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:  dmagisano@blaney.com
Tel:    416.593.2996
Fax:    416.593.5437

Lawyers for Expertech Network Installation Inc.

17

| | | | |
|---|---|---|---|
| AND TO: | **GARDINER ROBERTS LLP** | AND TO: | **LANG MICHENER LLP** |

<table>
<tr><td>AND<br>TO:</td><td><b>GARDINER ROBERTS LLP</b><br>Suite 3100, Scotia Plaza<br>40 King Street West<br>Toronto, ON  M5H 3Y2</td><td>AND<br>TO:</td><td><b>LANG MICHENER LLP</b><br>Brookfield Place<br>Suite 2500, 181 Bay Street<br>P.O. Box 747<br>Toronto, Ontario  M5J 2T7</td></tr>
</table>

AND TO: **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:      416.865.6636

Email:   vdare@foglers.com
Tel:      416.865.6641
Fax:      416.865.6636

Lawyers for Amphenol Corporation

AND TO: **LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Aaron Rousseau

Email:   arousseau@langmichener.ca
Tel:      416.307.4081
Fax:      416.365.1719

Lawyer for Right Management Inc.

AND TO: **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra

Email:   smitra@airdberlis.com

Tel:      416.863.1500
Fax:      416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND TO: **CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:   bleonard@casselsbrock.com
              hgarman@casselsbrock.com
              mcasey@casselsbrock.com

Tel:      416.860.6455
Fax:      416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

| AND TO: | **MCFARLANE LEPSOE**<br>Barristers & Solicitors<br>70 Gloucester Street, Third Floor<br>Ottawa, Ontario  K2P 0A2 | AND TO: | **COLBY, MONET DEMERS, DELAGE &<br>CREVIER LLP**<br>Tour McGill College<br>1501 McGill College Avenue<br>Suite 2900<br>Montreal, Quebec  H3A 3M8 |
|---|---|---|---|

**MCFARLANE LEPSOE**

AND TO:

Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:      613.233.2679
Fax:     613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management,
Inc.

AND TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:      416.601.7627
Fax:     416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:      416.601.7750
Fax:     416.868.0673

Lawyers for Frank Andrew Dunn

AND TO:

**COLBY, MONET DEMERS, DELAGE &
CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:   ddropsy@colby-monet.com
Tel:      514.284.3663
Fax:     514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
            steven.levitt@nelligan.ca
            christopher.rootham@nelligan.ca

Tel:      613.231.8245
Fax:     613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND TO:  **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:    chris.besant@bakernet.com

Tel:      416.865.2318
Fax:      416.863.6275

Email:    lydia.salvi@bakernet.com

Tel:      416.865.6944
Fax:      416.863.6275

Lawyers for Jabil Circuit Inc.

AND TO:  **SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:    dgoldstein@schneidergaggino.com
          mgaggino@schneidergaggino.com

Tel:      514.631.8787
Fax:      514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND TO:  **EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:    nanci@eurodata.ca
Tel:      613.745.0921
Fax:      613.745.1172

AND TO:  **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:    ryanbellr@bennettjones.com
          laugesenm@bennettjones.com

Tel:      416.863.1200
Fax:      416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND TO:  **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:    tdunn@mindengross.com
Tel:      416.369.4335
Fax:      416.864.9223

Lawyers for 2748355 Canada Inc.

AND TO:  **BALDWIN LAW PROFESSIONAL CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:    lbrady@baldwinlaw.ca
Tel:      613.771.9991
Fax:      613.771.9998

Lawyers for Sydney Street Properties Corp.

AND TO:   **AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:       714.998.4351
Fax:       714.998.7142

Lawyers for AETL Testing, Inc.

AND TO:   **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:       416.865.7726
Fax:       416.863.1515

Email:   iaversa@airdberlis.com
Tel:       416.865.3082
Fax:       416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND TO:   **SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:       416.214.5213
Fax:       416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND TO:   **SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:       416.214.5213
Fax:       416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND TO:   **LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :  jysimard@lavery.ca
Tel :     514.871.1522
Fax :     514.871.8977

Lawyers for Texas Landlords to Nortel
Networks Inc.

AND TO:   **NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:       714.998.4351

21

| | | | |
|---|---|---|---|
| AND<br>TO: | **GOWLING LAFLEUR HENDERSON LLP**<br>Suite 1600, First Canadian Place<br>100 King Street West<br>Toronto, ON  M5X 1G5 | AND<br>TO: | **DAVIS LLP**<br>1 First Canadian Place<br>Suite 5600<br>100 King Street West<br>Toronto, ON  M5X 1E2 |

<div style="display:flex">
<div>

**AND
TO:**

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com

Tel:      416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.


**AND
TO:**

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:   rschwill@dwpv.com
Tel:      416.863.0900
Fax:     416.863.0871

Email:   mgottlieb@dwpv.com
Tel:      416.863.0900
Fax:     416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

</div>
<div>

**AND
TO:**

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:     416.365.7886

Lawyers for Computershare Trust Company of
Canada


**AND
TO:**

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:   tosullivan@counsel-toronto.com
Tel:      416.598.1744
Fax:     416.598.3730

Email:   slaubman@counsel-toronto.com
Tel:      416.598.1744
Fax:     416.598.3730

Lawyers for William A. Owens

</div>
</div>

**22**

| | |
|---|---|
| AND TO: | **BAKER & McKENZIE LLP**<br>Brookfield Place, P.O. Box 874<br>181 Bay Street, Suite 2100<br>Toronto, Ontario M5J 2T3<br><br>Lydia Salvi<br><br>Email: lydia.salvi@bakernet.com<br><br>Tel: 416.865.6944<br>Fax: 416.863.6275<br><br>Lawyers for Wipro Limited |

AND TO: **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Steven L. Graff
Ian E. Aversa

Email: sgraff@airdberlis.com
Tel: 416.865.7726
Fax: 416.863.1515

Email: iaversa@airdberlis.com
Tel: 416.865.3082
Fax: 416.863.1515

Lawyers for the Current and Former Employees
of Nortel Networks Inc. who are or were
Participants in the Long-Term Investment Plan
Sponsored by Nortel Networks Inc.

AND TO: **McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario M5K 1E6

Heather Meredith

Email: hmeredith@mccarthy.ca
Tel: 416.601.8342
Fax: 416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND TO: **TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario M5K 1N2

Scott Bomhof

Email: sbomhof@torys.com
Tel: 416.865.7370
Fax: 416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND TO: **DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario M5X 1K6

Diane Winters

Email: dwinters@justice.gc.ca
Tel: 416.973.3172
Fax: 416.973.0810

AND TO: **LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email: sseigel@langmichener.ca
Tel: 416.307.4063
Fax: 416.365.1719

Lawyers for The Bank of New York Mellon

| | | | | |
|---|---|---|---|---|
| AND TO: | **BLAKE, CASSELS & GRAYDON LLP** | | AND TO: | **BLAKE, CASSELS & GRAYDON LLP** |

<table>
<tr>
<td>AND<br>TO:</td>
<td>

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:     416.863.2572
Fax:    416.863.2653

Email:  marc.flynn@blakes.com
Tel:     416.863.2685
Fax:    416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson (publ)

</td>
<td>AND<br>TO:</td>
<td>

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:     416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:     416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:     416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:     416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers LLC, MatlinPatterson Global Opportunities Partners III L.P. and MatlinPatterson Opportunities Partners (Cayman) III L.P.

</td>
</tr>
<tr>
<td>AND<br>TO:</td>
<td>

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:  kmcelcheran@mccarthy.ca
Tel:     416.601.7730
Fax:    416.868.0673

Email:  rstabile@mccarthy.ca
Tel:     416.601.8335
Fax:    416.868.0673

Lawyers for Avaya Inc.

</td>
<td>AND<br>TO:</td>
<td>

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:     416.979.6425
Fax:    416.591.7333

Email:  dbrown@sgmlaw.com
Tel:     416.979.4050
Fax:    416.591.7333

Lawyers for Edmund Fitzgerald

</td>
</tr>
</table>

AND TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:    jspiegelman@foglers.com
Tel:       416.864.9700
Fax:      416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO:

**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:    sdunphy@stikeman.com
Tel:       416.869.5662
Fax:      416.947.0866

Lawyers for GENBAND Inc.

AND TO:

**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

E-mail:   thomas.wallis@vdg.ca
Tel:       613.241.2701
Fax:      613.241.2599

Lawyers for La Regie des Rentes du Quebec

AND TO:

**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:    gncameron@stikeman.com
Tel:       212.845.7464
Fax:      212.371.7087

Email:    rferguson@stikeman.com
Tel:       212.845.7477
Fax:      212.371.7087

Lawyers for GENBAND Inc.

AND TO:

**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:    jmarshall@blgcanada.com
Tel:       416.367.6024
Fax:      416.361.2763

Email:    chill@blgcanada.com
Tel:       416.367.6156
Fax:      416.631.7301

Lawyers for the U.K. Pensions Regulator

AND TO:

**ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON  M5H 2K1

Joel P. Rochon

Email:    jrochon@rochongenova.com
Tel:       416.363.1867
Fax:      416.363.0263

Lawyers for the Opposing LTD Employees

AND
TO:
**BLAKE, CASSELS & GRAYDON**
Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, Ontario  M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email:   pamela.huff@blakes.com
Tel:     416.863.2958
Fax:     416.863.2653

Email:   jeremy.forgie@blakes.com
Tel:     416.863.3888
Fax:     416.863.2653

Lawyers for The Northern Trust Company,
Canada

AND
TO:
**CLEARY GOTTLIEB STEEN &**
**HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer

Email:   lschweitzer@cgsh.com
         jbromley@cgsh.com
Tel:     212.225.2000
Fax:     212.225.3999

Lawyers for Nortel Networks Inc.

AND
TO:
**LERNERS LLP**
130 Adelaide St. West
Suite 2400
Toronto, ON  M5H 3P5

William E. Pepall

Email:   wpepall@lerners.ca
Tel:     416.601.2352
Fax:     416.867.2415

Lawyers for the Former Employees in Respect
of the Distribution of the Corpus of the Health
and Welfare Trust

AND
TO:
**MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email:   kyle.kashuba@macleoddixon.com
Tel:     403.267.8399
Fax:     403.264.5973

Constellation NewEnergy Canada Inc.

AND
TO:
**SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email:   pengelmann@sgmlaw.com
Tel:     613-482-2452
Fax:     613-235-3041

Email:   fcampbell@sgmlaw.com
Tel:     613-482-2451
Fax:     613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust

AND
TO:
**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

D. Brent McPherson

Email:   bmcpherson@langmichener.ca
Tel:     416.307.4103
Fax:     416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to Wachovia
Bank, N.A., in its capacity as Servicer for the Nortel
Networks Pass-Through Trust, Series 1-1

26

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage

E-mail:  bboake@mccarthy.ca
Tel:      416.601.7557
Fax:      416.868.0673

Email:   jgage@mccarthy.ca
Tel:      416.601.7539
Fax:      416.686.0673

Lawyers for Morneau Sobeco Limited
Partnership

AND
TO:

**DAVID STEER**
10 Cypress Court
Nepean, ON  K2H 8Z8

E-mail:  davidsteer127@sympatico.ca

- 20 -

*27*

## COURTESY COPIES:

| | |
|---|---|
| AND TO: | **LEWIS AND ROCA**<br>40 North Central Avenue<br>Phoenix, Arizona<br>USA  85004-4429<br><br>Scott K. Brown<br><br>Email:    sbrown@lrlaw.com<br><br>Tel:      602.262.5321<br>Fax:     602.734.3866<br><br>Lawyers for The Prudential Insurance<br>Company of America |
| AND TO: | **CURTIS, MALLET-PREVOST, COLT &<br>MOSLE LLP**<br>101 Park Avenue<br>New York, New York 10178-0061<br><br>Steven J. Reisman<br>James V. Drew<br><br>E-mail:  sreisman@curtis.com<br>            jdrew@curtis.com<br><br>Tel:      212.696.6000<br>Fax:     212-697-1559<br><br>Lawyers for Flextronics International |

| | |
|---|---|
| AND TO: | **AKIN GUMP STRAUSS HAUER &<br>FELD LLP**<br>One Bryant Park<br>New York, NY  10036<br><br>Fred S. Hodara<br><br>Email:    fhodara@akingump.com<br><br>Tel:      212.872.1000<br>Fax:     212.872.1002<br><br>U.S. Lawyers for the Official Committee of<br>Unsecured Creditors |
| AND TO: | **MILBANK, TWEED, HADLEY<br>McCLOY LLP**<br>1 Chase Manhattan Plaza<br>New York, NY  10005<br><br>Dennis F. Dunne<br>Andrew M. Leblanc<br>Albert A. Pisa<br><br>Email:    DDunne@milbank.com<br>Tel:      212.530.5770<br>Fax:     212.530.5219<br><br>Email:    ALeblanc@milbank.com<br>Tel:      212.835.7574<br>Fax:     212.530.5219<br><br>Email:    APisa@milbank.com<br>Tel:      212.530.5319<br>Fax:     212.530.5219<br><br>U.S. Lawyers for The Informal Nortel<br>Noteholder Group |

| | |
|---|---|
| AND TO: | **VEDDER PRICE P.C.**<br>1633 Broadway, 47th Floor<br>New York, New York 10019 |

Michael L. Schein

Email:   mschein@vedderprice.com

Tel:     212.407.6920
Fax:     212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:     **MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :   andrew.robertson@macleoddixon.com
          caylee.rieger@macleoddixon.com

Tel :    403.267.8222
Fax :    403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:     **BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois  60601

Eric S. Prezant

Email:    eric.prezant@bryancave.com
Tel:      312.602.5033
Fax:      312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:     **LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel :    212.906.1373
Fax :    212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

Court File No: 09-CL-7950

**29**

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**(returnable December 15, 2010)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

# TAB 2

**30.**

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF JOHN DOOLITTLE**
**(sworn November 30, 2010)**

I, John Doolittle, of the City of Oakville in the Province of Ontario, MAKE OATH AND
SAY:

1.    I am the Senior Vice-President, Corporate Services and CFO of Nortel Networks
Corporation ("NNC") and Nortel Networks Limited ("NNL").  From August 10, 2009 to March
21, 2010 I was the Senior Vice-President, Finance and Corporate Services for NNC and NNL.
From June 23, 2008 to August 9, 2009 I was the Treasurer of NNC and NNL and from October
14, 2002 to June 12, 2006 I was the Vice-President, Tax of NNC and NNL.  From March 13,
2000 to October 13, 2002 I was the Assistant Treasurer of NNC and NNL.  From January 7,
2009 to October 26, 2009, I was the Vice-President of Nortel Networks Inc. ("NNI") and from
October 27, 2009 to March 15, 2010, I was the President of NNI.  As such, I have personal
knowledge of the matters to which I hereinafter depose in this Affidavit.  Where I do not possess
personal knowledge, I have stated the source of my information and, in all such cases, believe it
to be true.

2.    I swear this Affidavit in support of the motion to enforce the Sale Agreement (as defined
herein) governing the sale of the Sellers' (as defined below) Carrier Voice Over IP and
Application Solutions business (the "CVAS Business") to Genband Inc. (n/k/a Genband US

LLC) ("Genband").  The Applicants seek to enforce the provisions of the Sale Agreement relating to the calculation of Deferred Profit Amount against Genband, and to confirm the correct purchase price.  Additionally, the Applicants are seeking directions with respect to outstanding Canada transfer taxes owed by Genband to Nortel.

3.      All references to "Nortel" herein are references to the enterprise as a whole. All dollar references herein are in US$ unless otherwise indicated.

4.      Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

**BACKGROUND**

5.      On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court (the "Court" or the "Canadian Court") and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

6.      Also on the Filing Date, certain of NNC's and NNL's U.S. subsidiaries, including the principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code").  On the same date, the Canadian Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

7.      Additionally, on January 14, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries (the "EMEA Debtors") of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986.



8.      On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

9.      On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

10.     Further details regarding the background to these proceedings and the various other proceedings are set out in affidavits previously filed in these proceedings and are therefore not repeated herein.

**THE SALE OF THE CVAS BUSINESS**

11.     On January 6, 2010, this Court granted an Order (the "Bidding Procedures Order") approving a stalking horse agreement dated as of December 22, 2009 (the "Sale Agreement") among Genband and the Sellers as well as certain bidding procedures for a sales process of the CVAS Business to Genband.  After obtaining the Bidding Procedures Order, Nortel implemented the sales process.

12.     Following the sales process, this Court granted an Order (the "Approval and Vesting Order") on March 3, 2010 approving the Sale Agreement.  Similar relief was granted by the U.S. Court on the same day.   The Sale Agreement was subsequently amended pursuant to Amendment No. 1 to the Asset Sale Agreement dated as of May 28, 2010 (the "Amendment No. 1"), to address provisions not relevant to this dispute. Copies of the Sale Agreement (without exhibits or appendices), Amendment No. 1, the affidavit of George Riedel sworn February 26, 2010, originally sworn in support of the motion for the Approval and Vesting Order, and the Approval and Vesting Order are attached as Exhibits "A", "B", C" and "D" respectively.

13.     On May 25, 2010, prior to the Closing (as defined herein), the Sellers and the EMEA Sellers provided Genband with an Estimated Purchase Price statement as contemplated by Section 2.2.2 of the Sale Agreement (the "Estimated Purchase Price Statement").  A copy of the Estimated Purchase Price Statement is attached as Exhibit "E".  The Estimated Purchase Price statement provided for an estimated Deferred Profit Amount of $37,867,000 and an estimated Purchase Price of $182,649,000.  In calculating the Estimated Purchase Price, the Sellers applied the same clear terms of the definition of Deferred Profit Amount that they seek to enforce in this

Motion, and thus included only "deferred revenues for services to be performed or products to be provided by the Business after the Closing Date." Genband did not challenge these calculations and the sale of the CVAS Business to Genband closed on May 28, 2010 (the "Closing").

14.     In connection with the sale of the CVAS Business, Wells Fargo Bank, National Association ("Wells Fargo"), NNI, NNL, NNUK and Genband entered into an escrow agreement dated as of January 6, 2010 and amended on May 28, 2010 (the "Escrow Agreement"). A copy of the Escrow Agreement is attached as Exhibit "F".

15.     The Escrow Account was established, with Wells Fargo as escrow agent, to hold among other things, a Purchase Price Adjustment Escrow Amount in the principal sum of $8 million that relates to certain potential post-closing purchase price adjustments that could be made pursuant to section 2.2.3 of the Sale Agreement. Under section 4 of the Escrow Agreement, funds may be released from escrow either by delivery of a joint written instruction by NNI, NNL, NNUK and Genband to Wells Fargo directing the release of funds, or by a final, non-appealable court order directing the release of funds.

## DISAGREEMENT OVER DEFERRED PROFIT AMOUNT

*The Closing Statement*

16.     On September 15, 2010, as contemplated by the Sale Agreement, Genband delivered to the Sellers a written closing statement (the "Closing Statement"). A copy is attached as Exhibit "G". The Closing Statement contained Genband's proposed calculation of certain post-closing purchase price adjustments provided for under the Sale Agreement. The Closing Statement claimed a net purchase price adjustment in favor of Genband in the amount of $139,096,000. That amount included a calculated Deferred Profit Amount of $70,570,000. The Final Purchase Price according to Genband's proposed calculation is $142,904,000.

*The Disagreement Notice and Calculation of the Deferred Profit Amount*

17.     Genband's proposed calculation of the Final Purchase Price in the Closing Statement disregarded the clear definition of "Deferred Profit Amount" in the Sale Agreement. Accordingly, on October 13, 2010, the Sellers and the EMEA Sellers delivered to Genband a written disagreement notice. On November 16, 2010, the Sellers and the EMEA Sellers



delivered to Genband a corrected disagreement notice to account for a small calculation error (the "Disagreement Notice"), a copy of which is attached (without Annex B) as Exhibit "H".

18.    In the Disagreement Notice, the Sellers and the EMEA Sellers assert that the Deferred Profit Amount in the Closing Statement should be reduced by:

> (a)    $34,656,476 due to Genband's improper inclusion of deferred revenues and associated deferred costs relating to services performed and products provided by the CVAS Business prior to the Closing Date; and

> (b)    $1,629,132 due to Genband's improper inclusion of a negative deferred cost-of-sales balance with respect to Nortel Luxembourg (as defined below).

According to the Disagreement Notice, the Deferred Profit Amount should therefore be reduced from $70,570,000 (Genband's calculation) to $34,284,392 (the Sellers' calculation).  The final purchase price according to the Sellers' and the EMEA Sellers' calculation is $179,508,745.

19.    The agreed method for calculating a purchase price adjustment under the Sale Agreement, and particularly the Deferred Profit Amount, is contained in the Sale Agreement. Section 2.2.3.1(a) of the Sale Agreement provides that the purchase price adjustment shall be calculated by adding various assets and various liabilities, one of which is the Deferred Profit Amount, from the Base Purchase Price of $282,000,000.  Section  2.2.3.1(a) of the Sale Agreement provides that the Closing Statement "shall be prepared in accordance with the Nortel Accounting Principles and the terms hereof."[1]

20.    Deferred Profit Amount is defined in the Sale Agreement as:

> both short term and long term (i) deferred revenues for <u>services to be performed or products to be provided by the Business after the Closing Date</u> but for which an account receivable has been recorded or cash has been received prior to the Closing Date minus (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business..[f]or the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred

---

[1] Sale Agreement, p. 48.

revenue consistent with Nortel Accounting Principles.[2] [emphasis added]

21.     By the Sale Agreement's unambiguous language, the Deferred Profit Amount includes only deferred revenues and associated deferred costs in respect of services to be performed and products to be provided <u>after</u> the Closing Date.

22.     However, I am advised by Sidney Beausoleil-Grant of NNI that in the Closing Statement Genband includes deferred revenue items for services performed or products provided by the Business <u>before</u> the Closing Date – i.e., revenues associated with work that was completed in the past and for which there are no "services to be performed or products to be provided by the Business after the Closing Date."   In the course of calculating the assets and liabilities that Genband would assume upon the acquisition of the CVAS Business, the Parties each made the same determination of deferred revenues for services to be performed or products to be provided by the CVAS Business <u>after</u> the Closing Date.  Thus, the Parties agreed on the calculation of the items that dictate the Deferred Profit Amount to be reflected on Genband's books for operation of the Business after the Closing Date.  However, the Closing Statement does not reflect this.

23.     In addition, the Deferred Profit Amount calculated by Genband in the Closing Statement includes a negative deferred cost-of-sales balance of $1,629,132 belonging to Nortel Networks (Luxembourg) S.A. ("Nortel Luxembourg").  Since Nortel Luxembourg is neither a Seller under the Sale Agreement nor an EMEA Seller, this negative deferred cost-of-sales balance should not be included in the calculation of the Deferred Profit Amount.

*Nature of the Dispute*

24.     The present dispute is over the application of the clear terms of the Sale Agreement, not accounting analysis or arithmetic calculations.  If the clear terms of the Sale Agreement are applied, there is no legitimate dispute that the Sellers and the EMEA Sellers' calculation of the Deferred Profit Amount, and therefore the final purchase price calculated by them, is correct.

25.     I understand that the concept and definition of Deferred Profit Amount was introduced into the Sale Agreement by Genband on or about December 5, 2009, as reflected in the email attached along with the relevant attachment as Exhibit "I".  After Genband drafted the definition,

---

[2] Page 11 of the Sale Agreement.



the Parties continued to negotiate the draft agreement for nearly three additional weeks, exchanging multiple drafts leading up to its finalization. The same definition of Deferred Profit Amount that Genband proposed never changed and became part of the Sale Agreement.

26.     With respect to any possible attempt by Genband to rely upon an understanding purportedly garnered during the negotiation process as the justification for disregarding the definition of Deferred Profit Amount, it is important to observe that the Sale Agreement contains an entire agreement clause that expressly forbids any attempt to rely upon purported discussions, understandings or agreements that are not set forth in the Sale Agreement. Section 10.12(a) provides: "This Agreement . . . set[s] forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral are superseded by this Agreement . . ."[3]

## ADDITIONAL MATTER

*Genband's refusal to pay to Nortel certain Canada transfer taxes*

27.     The Applicants are also seeking to enforce the terms of the Sale Agreement in respect of certain Canada transfer taxes owed by Genband to Nortel. Under the Sale Agreement, Genband owes to Nortel Canadian transfer taxes in the amount of $1,000,390. Genband has indicated a disagreement with the transfer tax amount and has failed to remit this payment.

28.     I am advised by Rosanne Culina of NNI that Nortel has been in communication with Genband's counsel for six months to reach an agreement on the appropriate amount of transfer taxes owing to Nortel in connection with transfer of the tangible and intangible assets. Nortel issued draft invoices to Genband in the amount of $1,000,390 on September 28, 2010 for the taxes owed based on an understanding that the Parties had reached agreement as to the proper figure. A copy of the draft invoices is attached as Exhibit "J". Genband subsequently indicated that it was not in agreement with the figure and informed Nortel that it would revert with specific objections.

29.     On November 18, 2010, NNI sent a letter requesting a response to Nortel's repeated requests for additional information concerning Genband's disagreement. A copy of the letter sent is attached as Exhibit "K".

---

[3] Sale Agreement, p. 136.

- 8 -



30.    To date, Genband has not responded to Nortel's repeated requests for additional information concerning Genband's objections and the payment of transfer taxes to Nortel is past due.

## JURISDICTION TO RESOLVE DISAGREEMENT OVER DEFERRED PROFIT AMOUNT

31.    On November 18, 2010, Genband filed a motion (the "Genband Motion") for relief from the automatic stay under the Code and to compel arbitration pursuant to a provision in the Sale Agreement that provides for accounting and calculation disagreements to be resolved by an accounting arbitrator.  A copy of the Genband Motion is attached as Exhibit "L".  I am not aware of any similar motion having been brought by Genband in Canada.

32.    Nortel disagrees that this provision applies to the disagreement over the Deferred Profit Amount.  There is nothing in this dispute for an accounting arbitrator to decide.  To the contrary, the parties and their accountants agree on the figures that would determine the Deferred Profit Amount if the terms of the Sale Agreement are applied.  As noted above, the parties jointly developed and agreed upon these figures in the course of determining the assets and liabilities that Genband would assume upon the acquisition of the CVAS Business.  Rather, this is a disagreement about the clear terms of the Sale Agreement – and, in particular, Genband's attempt to disregard those terms.

33.    Accordingly, Nortel is now moving before this Court and the U.S. Court for an Order, among other things:

(a)    declaring that this Court together with the U.S. Court have the exclusive authority and jurisdiction to determine the dispute relating to the "Deferred Profit Amount";

(b)    declaring that Genband's calculation of the "Deferred Profit Amount" in the Closing Statement is not a dispute that is subject to determination by an Accounting Arbitrator as a purchase price adjustment dispute pursuant to Section 2.2.3(1)(c) of the Sale Agreement;

Case 09-10138-MFW   Doc 4448-1   Filed 12/01/10   Page 45 of 89   38.

- 9 -

(c)     declaring that Genband's calculation of the "Deferred Profit Amount" shall include only deferred revenues for services to be performed or products to be provided by the Business after the Closing Date;

(d)     declaring that the negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Luxembourg shall not be included in the calculation of the "Deferred Profit Amount";

(e)     declaring that for the avoidance of doubt, the "Deferred Profit Amount" shall be $34,284,392 and the Final Purchase Price shall be $179,508,745;

(f)     directing Genband to: (i) immediately remit payment in accordance with the September 28, 2010 invoice for the Canadian transfer taxes owed to Nortel; or (ii) deliver to the Sellers a written statement of its objections to the same; and (iii) fully cooperate with the Sellers in the resolution of this matter;

(g)     directing Genband to execute, within five (5) days of the entry of this Order, instructions to Wells Fargo, as escrow agent, that provide for the release of $4,859,745 plus accumulated interest from the Escrow Fund to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) by wire transfer of immediately available funds; and

(h)     directing the Seller Parties (as defined in the Escrow Agreement) to execute forthwith upon the release of the funds to the Distribution Agent, instructions to Wells Fargo, as escrow agent, that provide for the release of the balance of the Escrow Fund to Genband by wire transfer of immediately available funds.

**SWORN BEFORE ME** at the City of _Mississauga_ , in the Province of Ontario on this _30_ day of November, 2010.

_____
Commissioner for Taking Affidavits or
Notary Public

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of Instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

_____
JOHN DOOLITTLE

# EXHIBIT A

**39.**

**EXECUTION VERSION**

---

**ASSET SALE AGREEMENT**

**BY AND AMONG**

**NORTEL NETWORKS CORPORATION**

**NORTEL NETWORKS LIMITED**

**NORTEL NETWORKS INC.**

**AND**

**THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS**

**AND**

**GENBAND INC.**

**DATED AS OF December 22, 2009**

This is Exhibit........ "A" ................referred to in the
affidavit of.... JOHN DOOLITTLE ........................
sworn before me, this.... 3 0 ........................................
day of.. NOVEMBER ........................ 20..10 ...

_Donna Woollett_

A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

**TABLE OF CONTENTS**

*40*

Page

**ARTICLE I INTERPRETATION** ...........................................................................................**3**

Section 1.1.    Definitions.......................................................................................3
Section 1.2.    Interpretation...................................................................................34
            1.2.1.    Gender and Number......................................................................34
            1.2.2.    Certain Phrases and Calculation of Time....................................34
            1.2.3.    Headings, etc.................................................................................34
            1.2.4.    Currency........................................................................................34
            1.2.5.    Statutory References .....................................................................35

**ARTICLE II PURCHASE AND SALE OF ASSETS**.............................................................**35**

Section 2.1.    Purchase and Sale. .........................................................................35
            2.1.1.    Assets 35
            2.1.2.    Excluded Assets............................................................................36
            2.1.3.    Assumed Liabilities......................................................................38
            2.1.4.    Excluded Liabilities .....................................................................40
            2.1.5.    Assumption and/or Assignment or Rejection of 365 Contracts and
                     Assumption and Sublease and/or License of 365 Real Estate
                     Leases ...........................................................................................42
            2.1.6.    Assignment of Non-365 Contracts and Sublease or License of
                     Non-365 Real Estate Leases. ........................................................43
            2.1.7.    Cure Costs; Adequate Assurance; Efforts.....................................44
            2.1.8.    Local Sale Agreements .................................................................45
            2.1.9.    EMEA Asset Sale Agreement .......................................................45
            2.1.10. Non-Assignable Assets .................................................................45
Section 2.2.    Purchase Price.................................................................................46
            2.2.1.    Purchase Price................................................................................46
            2.2.2.    Estimated Purchase Price..............................................................46
            2.2.3.    Purchase Price Adjustment. ..........................................................48
            2.2.4.    Reserved........................................................................................50
            2.2.5.    Good Faith Deposit. ......................................................................50
Section 2.3.    Escrow.............................................................................................51
Section 2.4.    Closing. ...........................................................................................51
            2.4.1.    Closing Date..................................................................................51
            2.4.2.    Closing Actions and Deliveries ....................................................51
Section 2.5.    Designated Purchaser(s)..................................................................53

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** .......**53**

Section 3.1.    Organization and Corporate Power.................................................54
Section 3.2.    Authorization; Binding Effect; No Breach. ....................................54
Section 3.3.    Financing.........................................................................................55
Section 3.4.    Purchaser Financial Statements .....................................................55
Section 3.5.    Adequate Assurance of Future Performance ..................................56

i

Section 3.6.    Purchaser's Acknowledgments; Exclusivity of Representations and
                Warranties .................................................................................................56
Section 3.7.    Brokers. .....................................................................................................58

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ..............58**

Section 4.1.    Organization and Corporate Power. ...........................................................58
Section 4.2.    Authorization; Binding Effect; No Breach. ...............................................58
Section 4.3.    Title to Tangible Assets; Sufficiency of Assets. ........................................59
Section 4.4.    Material Contracts. .....................................................................................60
Section 4.5.    Intellectual Property. ..................................................................................61
Section 4.6.    Litigation. ...................................................................................................64
Section 4.7.    Financial Statements. .................................................................................65
Section 4.8.    Compliance with Laws; Consents. .............................................................66
Section 4.9.    Real Property. .............................................................................................66
Section 4.10.   Environmental Matters. ..............................................................................67
Section 4.11.   Labor and Employee Benefits Matters. ......................................................68
Section 4.12.   Taxes. .........................................................................................................70
Section 4.13.   Brokers. .......................................................................................................71
Section 4.14.   Cultural Business .........................................................................................72
Section 4.15.   Representations and Warranties by the Other Sellers................................72
        4.15.1. Organization and Corporate Power. ...........................................................72
        4.15.2. Authorization; Binding Effect; No Breach. ...............................................72

**ARTICLE V COVENANTS AND OTHER AGREEMENTS.................................................73**

Section 5.1.    U.S. Bankruptcy Actions ............................................................................73
Section 5.2.    Canadian Bankruptcy Actions. ..................................................................74
        5.2.1.  Canadian Sales Process Order ...................................................................74
        5.2.2.  Canadian Approval and Vesting Order ......................................................74
        5.2.3.  Additional Requests ...................................................................................75
Section 5.3.    Consultation; Notification. .........................................................................75
Section 5.4.    Pre-Closing Cooperation. ...........................................................................76
Section 5.5.    Antitrust and Other Regulatory Approvals. ...............................................77
Section 5.6.    Pre-Closing Access to Information. ............................................................80
Section 5.7.    Public Announcements. ..............................................................................82
Section 5.8.    Further Actions ...........................................................................................83
Section 5.9.    Conduct of Business ...................................................................................83
Section 5.10.   Transaction Expenses. ................................................................................85
Section 5.11.   Confidentiality. ...........................................................................................85
Section 5.12.   Certain Payments or Instruments Received from Third Parties.................86
Section 5.13.   Non-Assignable Contracts. .........................................................................87
Section 5.14.   Bundled Contracts. ......................................................................................88
Section 5.15.   Post-Closing Assistance for Litigation. ......................................................90
Section 5.16.   Delivery of Assets. ......................................................................................91
Section 5.17.   Termination of Overhead and Shared Services and French
                Company Licenses. ......................................................................................91

Section 5.18.    Financing............................................................................92
Section 5.19.    Insurance Matters................................................................93
Section 5.20.    Deposits, Guarantees and Other Credit Support of the Business.............94
Section 5.21.    Use of Trademarks..............................................................94
Section 5.22.    Maintenance of Books and Records. ..............................................95
Section 5.23.    Certain Ancillary Agreements....................................................96
Section 5.24.    Closing Unaudited Financial Statements.........................................97
Section 5.25.    Closing Audited Financial Statements...........................................98
Section 5.26.    Additional Bankruptcy Proceedings; Adverse International
                 Injunctions...................................................................98
Section 5.27.    Transition Services Agreement..................................................99
Section 5.28.    Avoidance Actions..............................................................99
Section 5.29.    Competing Transaction..........................................................99
Section 5.30.    Purchaser Financial Statements ...............................................100
Section 5.31.    Subleases......................................................................101
Section 5.32.    Direct Leases..................................................................101
Section 5.33.    Licenses.......................................................................101

ARTICLE VI TAX MATTERS...........................................................................101

Section 6.1.     Transfer Taxes. ...............................................................101
Section 6.2.     Withholding Taxes..............................................................102
Section 6.3.     Tax Characterization of Payments Under This Agreement .........................103
Section 6.4.     Apportionment of Taxes. .......................................................103
Section 6.5.     Records .......................................................................103
Section 6.6.     Tax Disclosure ................................................................105
Section 6.7.     Tax Returns....................................................................105
Section 6.8.     Canadian Tax Matters...........................................................107
Section 6.9.     Purchase Price Allocation. ....................................................107
Section 6.10.    Other Tax Matters .............................................................108
Section 6.11.    North American Tax Escrow .....................................................109

ARTICLE VII EMPLOYMENT MATTERS ..................................................................111

Section 7.1.     Employment Obligations with Respect to Non-Union Employees .........111
    7.1.1.       Employment Terms..............................................................111
    7.1.2.       Employee Benefits.............................................................114
Section 7.2.     Employment Obligations with Respect to Union Employees.................117
Section 7.3.     Excluded Employee Liabilities.................................................118
Section 7.4.     Other Employee Covenants. ....................................................118
Section 7.5.     Canadian Pension Plans. ......................................................121
Section 7.6.     Sole Benefit of the Sellers and the Purchaser ...............................123

ARTICLE VIII CONDITIONS TO THE CLOSING ..........................................................124

Section 8.1.     Conditions to Each Party's Obligation ........................................124
Section 8.2.     Conditions to Sellers' Obligation.............................................125
Section 8.3.     Conditions to Purchaser's Obligation .........................................125

iii

43

**ARTICLE IX TERMINATION** ..............................................................................**126**

    Section 9.1.    Termination............................................................126
    Section 9.2.    Expense Reimbursement and Break-Up Fee. ...........................128
    Section 9.3.    Effects of Termination .............................................129

**ARTICLE X MISCELLANEOUS** .......................................................................**130**

    Section 10.1.   No Survival of Representations and Warranties or Covenants...............130
    Section 10.2.   Remedies.............................................................130
    Section 10.3.   No Third Party Beneficiaries .......................................130
    Section 10.4.   Consent to Amendments; Waivers...........................................130
    Section 10.5.   Successors and Assigns...............................................131
    Section 10.6.   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.........131
    Section 10.7.   Notices ..............................................................133
    Section 10.8.   Exhibits; Sellers Disclosure Schedule. .................................135
    Section 10.9.   Counterparts .........................................................135
    Section 10.10. No Presumption ......................................................135
    Section 10.11. Severability .........................................................135
    Section 10.12. Entire Agreement.....................................................136
    Section 10.13. Availability of Equitable Relief; Sole Remedy ........................136
    Section 10.14. Bulk Sales Laws......................................................137
    Section 10.15. Main Sellers as Representatives of Other Sellers. ....................137
    Section 10.16. Execution by Other Sellers ..........................................137
    Section 10.17. Obligations of the Sellers...........................................138

44

## EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Israeli Companies; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Adjusted Net Working Capital Statement

Exhibit F – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit G – [Reserved]

Exhibit H – Form of Intellectual Property License Agreement

Exhibit I – Knowledge of the Purchaser

Exhibit J – Form of Loaned Employee Agreement

Exhibit K – Mandatory Antitrust Approvals - Relevant Antitrust Authorities

Exhibit L – Other Seller Revenue

Exhibit M – Real Estate Terms and Conditions

Exhibit N – Form of Trademark License Agreement

Exhibit O – Form of Transition Services Agreement

Exhibit 3.3(a) – Commitment Letter

Exhibit 5.1(a) – Form of U.S. Bidding Procedures Order

Exhibit 5.1(b) – Form of U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.4(a) – Form of Letter

Exhibit 5.4(c) – Form of Notice to Microsoft Corporation

Exhibit 5.4(d) – Cross-Licenses for Spin-Out

45

Exhibit 5.7 – Permitted Disclosures and Announcements

Exhibit 5.15(c) – Cross-Licenses for Assignment

Exhibit 5.23  –  Interdependencies in the CVAS Business

Exhibit 5.27 –Transition Services Agreement

46

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of December 22, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Other Sellers (as defined below) (the Other Sellers, together with the Main Sellers, the "**Sellers**") and GENBAND Inc., a corporation organized under the laws of Delaware (the "**Purchaser**").

W I T N E S S E T H:

WHEREAS, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**"), beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date (as defined herein), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on December 18, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "**Israeli Companies**") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "**Israeli Court**"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint**

**47**

**Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by the EMEA Sellers;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets and the EMEA Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates, and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser and the Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

WHEREAS, in addition, at the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers are entering into the following ancillary agreements: (i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Transition Services Agreement, (iv) the Trademark License Agreement, (v) the Loaned Employee Agreement and the Purchaser will use its commercially reasonable efforts to negotiate in good faith and enter into the following agreements with the applicable parties thereto: (vi) specified development and supply agreements with respect to interdependencies of the Business as contemplated in Section 5.23, (vii) the Subcontract Agreement, (viii) the Contract Manufacturing Inventory Agreements, (ix) the LGN Distribution Agreement and (x) the NN Turkey Agreements (together, the "**Ancillary Agreements**").

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows.

2

**48**

## ARTICLE I

## INTERPRETATION

Section 1.1.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means the amount of compensation with respect to the accrued and unused vacation with respect to each Specified Transferred Employee (including all Taxes required to be withheld on behalf of the applicable Specified Transferred Employee by his or her respective employer) calculated by taking, with respect to each such employee an amount equal to (i) the product of (A) a number (not less than zero) of such employee's accrued and unused vacation hours as of the Closing Date as set forth on Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule of this Agreement for Specified Transferred Employees and (B) such employee's hourly rate of pay (with such hourly rate of pay derived by dividing such employee's annual base salary set forth on Section 4.11(b) of the Sellers Disclosure Schedule by the number of standard work hours per year for such employee).

"**Action**" means any litigation, action, hearing, investigation, suit (whether civil, criminal or administrative), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding.

"**Additional Bankruptcy Proceeding**" has the meaning set forth in Section 5.26(a).

"**Additional Employees**" has the meaning set forth in Section 7.1.1(a).

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts in the form provided in Exhibit E hereto.

"**Adverse International Injunction**" has the meaning set forth in Section 5.26(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, that (i) no EMEA Seller or Subsidiary of an EMEA Seller (other than those Subsidiaries that are Sellers hereunder) shall be deemed an Affiliate of any Seller, and (ii) no joint venture listed in Section 1.1(a) of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.

"**Aggregate Escrow Amount**" means the aggregate of the Purchase Price Escrow Amount, the TSA Escrow Amount, the Tax Escrow Amount and the EMEA Tax Escrow Amount.

3

**49**

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Bidder**" has the meaning set forth in the Bidding Procedures.

"**Alternative Transaction**" means (A) the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a substantial portion of the Business or all or a substantial portion of the Assets and the EMEA Assets, considered as a whole, in a transaction or a series of transactions (x) with one or more Persons other than the Purchaser and/or its Affiliates or (y) with a Successful Bidder, and other than the Purchaser, which may include multiple bidders whose bids are combined or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or a majority of the Business, or all or a majority of the Assets and the EMEA Assets taken as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers pursuant to which all or a majority of the reorganized entity or its assets is acquired by one or more Persons (other than the third-party creditors or the Purchaser and/or the Purchaser's Affiliates) in a transaction announced prior to such reorganization or within six (6) months of such reorganization, rather than being retained by the creditors generally, provided, however, that an "Alternative Transaction" shall not include (i) except as specified in clause (B) above, the retention of all or any portion of the Business, the Assets or the EMEA Assets by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) under a standalone plan of reorganization or plan of arrangement approved by the U.S. Bankruptcy Court or another Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business, the Assets or the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the Competition Act Approval and the Mandatory Antitrust Approvals.

"**Antitrust Laws**" means the Competition Act, the HSR Act, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement or by the EMEA Asset Sale Agreement.

"**ARD Transferring Employees**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

4

**50**

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, (ii) the Designated Non-365 Contracts (iii) the Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset and pursuant to their terms are assignable by the Seller party thereto at no cost to such Seller, or to the extent assignable by such Seller with an associated cost, where Purchaser pays such associated cost to obtain such assignment, and (iv) specified contracts as described in Sections 5.13 and 5.14.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(f).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the Israeli Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, the Israeli Companies Law and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases, and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

"**Base Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Bid**" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

"**Bidding Procedures**" means the procedures to be employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities to be approved by the U.S. Bankruptcy Court and the Canadian Court pursuant to the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively.

"**Break-Up Fee**" means five million dollars ($5,000,000).

"**Bundled Contracts**" has the meaning set forth in Section 5.14.

"**Business**" means, collectively:

(i)      the business through which the Sellers and the EMEA Sellers research, advertise, design, develop, process components, directly or indirectly manufacture

5

through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers, channel partners and any other counterparty to a customer Contract that is not a carrier or channel partner, the CVAS Products (as defined below), including prior versions (if currently supported or if any Contract existing as of the date hereof related to the Business requires the support of such prior versions), current versions and future versions listed in the Plan of Record; and

(ii)    the following services, to the extent provided, or being developed, in relation to the CVAS Products, that the Sellers and the EMEA Sellers market, advertise, distribute and sell globally to carriers, channel partners and any other counterparty to a customer Contract that is not a carrier or channel partner: (A) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support system services; (B) network support services, including technical support, technical account manager service, network prime engineer service, online support and technical support for special projects, repair services, managed spares service, Third Party products spares management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services; and (C) assisted operator services (which are resources provided to customers of CVAS Products for a limited period of time to provide an initial knowledge transfer of CVAS Products) (collectively, the "**CVAS Services**");

all as conducted by the Sellers and the EMEA Sellers as of the date of this Agreement, but excluding, in each of clauses (i) and (ii) above: (A) any business, asset, product or service run, owned, managed and/or provided by the LGN Joint Venture, NN Turkey or GDNT; (B) any Excluded Asset; (C) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (D) any products and/or services provided by businesses or business segments of any Seller or EMEA Seller other than those specified in clauses (i) and (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means, whether in paper, digital or other tangible form, (i) if used exclusively in connection with the Business, all books, records, files, ledgers, sales literature or similar documents in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information on past, present and prospective customers and suppliers, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset or Assumed Liability, documents containing information relating to the research and development of the CVAS Products or the CVAS Services (whether relating to activities by the Sellers and the EMEA Sellers associated with the CVAS Products and CVAS Services as of the Closing or any time prior thereto), documents containing technical information, operating and production records, quality control records, blueprints, research and development notebooks and

52

files, customer credit data, manuals, documents containing engineering and scientific data, sales and promotional literature, drawings, technical plans, business plans, budgets and price lists and (ii) if used, but not exclusively, in connection with the Business or in respect of any Asset or Assumed Liability, to the extent reasonably separable from such items of any other business of the Sellers, copies of all books, records, files, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers (including information on past, present and prospective customers and suppliers), policies and procedures and materials and procurement documentation used in the Business or in respect of any Asset or Assumed Liability, financial records, documents containing information relating to the research and development of the CVAS Products or the CVAS Services (whether relating to activities by the Sellers and the EMEA Sellers associated with the CVAS Products and CVAS Services as of the Closing or any time prior thereto), documents containing technical information, operating and production records, quality control records, blueprints, research and development notebooks and files, customer credit data, manuals, documents containing engineering and scientific data, sales and promotional literature, drawings, technical plans, business plans, budgets and price lists; provided, that with regards to copies provided pursuant to clause (ii) Business Information shall not include the competitively sensitive portions of the foregoing that relate to Excluded Assets, Excluded Liabilities or other business lines of the Sellers, and provided, further, that Business Information shall not include the Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian DB Replacement Plan**" has the meaning set forth in Section 7.5(c).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Non-Union DC Replacement Plan**" has the meaning set forth in Section 7.5(a).

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"**Canadian Union DC Replacement Plan**" has the meaning set forth in Section 7.5(d).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Claim Notice**" has the meaning set forth in Section 6.11(b).

"**Clean Team Confidentiality Agreement**" means the clean team confidentiality agreement by and between NNL and the Purchaser, dated as of June 22, 2009, as amended from time to time.

"**Clean Room Agreements**" means the Clean Team Confidentiality Agreement and any other agreements by and between NNL and the Purchaser and/or, where applicable, other persons, in relation to the operation of clean rooms or clean teams relating to the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement.

"**Closing**" has the meaning set forth in Section 2.4.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Audited Financial Statements**" has the meaning set forth in Section 5.25.

"**Closing Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.4.1.

"**Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Deferred Profit Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing EMEA Holiday Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Excess ARD Employees Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing French Excess ARD Employees Amount**" has the meaning set forth in Section 2.2.3.1.

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

54

"**Closing Pre-Close Employment Payments Amount**" has the meaning set forth in Section 2.2.3.1.

"**Closing Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Product Exposures Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing TFR Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Unaudited Financial Statements**" has the meaning set forth in Section 5.24.

"**Closing Unbilled Accounts Receivable Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Competing Transaction**" has the meaning set forth in Section 5.29.

"**Competition Act**" means the Competition Act (Canada), R.S. 1985, C. C-34, as it is now in effect and as it may be amended.

"**Competition Act Approval**" means that: (i) the waiting period, including any extension thereof, under Section 123 of the Competition Act shall have expired or been terminated or the obligation to provide a pre-merger notification in accordance with Part IX of the Competition Act shall have been waived in accordance with paragraph 113(c) of the Competition Act, and in either case the Purchaser shall have been advised in writing by the Commissioner that he or she is of the view that grounds do not exist as of the date of the advice to initiate proceedings under the merger provisions of the Competition Act in respect of the transactions contemplated by this

Agreement or by the EMEA Asset Sale Agreement (as applicable) and such advice shall have not been rescinded or amended; or (ii) the Commissioner shall have issued an advance ruling certificate pursuant to Subsection 102(1) of the Competition Act to the effect that the Commissioner is satisfied that he or she would not have sufficient grounds upon which to apply to the Competition Tribunal for an order under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement or by the EMEA Asset Sale Agreement (as applicable).

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser and the Seller parties listed therein dated April 17, 2009, as amended.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by or notice to any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Designation Date**" means, (i) with respect to the 365 Contracts and Non-365 Contracts listed in the Sellers Disclosure Schedule as of the date hereof, the date that is sixty (60) days from the date hereof and (ii) with respect to any Contract that is added to the 365 Customer Contract List or the Non-365 Customer Contract List after the date hereof pursuant to Section 2.1.5(e) or 2.1.6(f), as applicable, the later of (A) the date that is sixty (60) days from the date hereof and (B) the date that is five (5) Business Days after such Contract is added to or included in the relevant list.

"**Contract Manufacturing Inventory Agreements**" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(b) of the Sellers Disclosure Schedule that the relevant Parties will use their commercially reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.23 and the term sheet attached hereto as Exhibit F.

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business, net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors or governing body of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

10

56

"**Covered Assets and Persons**" means the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cross-License Agreements**" means all Contracts between any Sellers, EMEA Sellers, or any of their respective Affiliates and any other Person under which any of such Sellers, EMEA Sellers, or their respective Affiliates, as applicable, both (i) grant a license under Patents owned by (or licensed to) them and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party (but other than inbound and/or outbound license agreements where the only grant back from the licensee is under improvements on the licensed intellectual property), to the extent the scope of such licenses include Patents licensed under the Intellectual Property License Agreement or assigned pursuant to the terms of this Agreement or that are otherwise used in the Business.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under an Assumed and Assigned Contract and any actual pecuniary losses that have resulted from such defaults under such Seller Contracts, and (ii) with respect to any Designated Non-365 Contract, any amounts required to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date.

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides CVAS Products and/or CVAS Services to a customer, reseller or distributor.

"**CVAS Products**" means the software and/or hardware products set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

"**CVAS Services**" has the meaning set forth in the definition of "Business" above.

"**Deferred Profit Amount**" means, as of the Closing Date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(g).

"**Designated Purchaser**" has the meaning set forth in Section 2.5.

11

**57**

"**Direct Lease**" has the meaning set forth in Section 5.32.

"**Direct Lease Real Estate**" has the meaning set forth in Section 4.9(a).

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser by and not later than five (5) Business Days before the Closing.

"**Downward Adjustment**" has the meaning set forth in Section 5.26(b).

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EFTA**" means the European Free Trade Association.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Business**" has the meaning set forth in the definition of Business except that all references to the Sellers are stricken therefrom.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Deposit**" has the meaning attributed to that term in the Transition Services Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in Schedule 7 of the EMEA Asset Sale Agreement.

"**EMEA Escrow Agent**" has the meaning attributed to that term in the Transition Services Agreement.

"**EMEA Holiday Calculation**" has the meaning set forth in Section 2.2.2 of the Sellers Disclosure Schedule.

**58**

"**EMEA Holiday Downward Adjustment**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Tax Escrow Amount**" means $2,500,000 (two million five hundred thousand dollars).

"**EMEA Transferred Intellectual Property**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Employee**" means any employee of the Sellers engaged in the Business, as listed in Section 4.11(b) of the Sellers Disclosure Schedule.

"**Employee Data**" has the meaning set forth in Section 7.4(b).

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees offered employment pursuant to Section 7.1 or Section 7.2.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees or Transitional Employees in accordance with this Agreement, 11:59 p.m. local time in such jurisdiction on the calendar day on which the Closing Date occurs.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating: (i) the management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable laws or any analogous foreign, state, provincial or local laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible personal property, excluding any Inventory, Intellectual Property and, to the extent required by Law, any items of tangible property personally assigned to the Transferring Employees, but including all trade fixtures and fixtures, furniture,

13

**59**

furnishings, fittings, equipment, apparatus, appliances, business supplies and other articles of tangible personal property.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any corporation which is a member of a controlled group or any trade or business (whether or not incorporated) which is under common control with the Sellers or any Subsidiary within the meaning of Sections 414(b) and 414(c) of the Code.

"**Escrow Agreement**" means an escrow agreement among NNC, NNL, NNI, NNUK, the Purchaser and the Escrow Agent to be entered into on or prior to the entry of the Bidding Procedures on terms and conditions reasonably satisfactory to each of the NNC, NNL, NNI, NNUK, the Purchaser and the Escrow Agent.

"**Escrow Agent**" means Wells Fargo Bank, National Association.

"**Estimated Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing TFR Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Deferred Profit Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated EMEA Holiday Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Excess ARD Employees Amount**" means an amount that is equal to the Severance Amount multiplied by the number of Excess ARD Transferring Employees which the EMEA Sellers estimated that the Purchaser will have identified to the EMEA Sellers within

14

ninety (90) days of the Transfer Date as having been provisionally selected for redundancy, subject only to completion of applicable consultation.

"**Estimated French Excess ARD Employees Amount**" means an amount that is equal to $109,000 multiplied by the number of French Excess ARD Transferring Employees which the EMEA Sellers estimated that the Purchaser will have identified to the EMEA Sellers within 90 days of the Transfer Date.

"**Estimated Pre-Close Employment Payments Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Product Exposures Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Unbilled Accounts Receivable Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excess ARD Employees Amount**" has the meaning given to it in the EMEA Asset Sale Agreement.

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller or EMEA Seller other than the Business.

"**Excluded Taxes**" has the meaning set forth in Section 6.11(a).

"**Excluded 365 Customer Contracts**" has the meaning set forth in Section 2.1.5(d).

"**Exclusion Criteria**" means any Customer Contract or Bundled Contract that contains any non-competition provision with restrictions on the Sellers.

15

**61**

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Expense Reimbursement**" means Purchaser's reasonable and documented fees, out-of-pocket costs and expenses (including fees and expenses of the Purchaser's advisors and notification and filing fees) in connection with the preparation, execution and performance of this Agreement and the EMEA Asset Sale Agreement and the transactions contemplated hereby and thereby, in an amount which shall not exceed five million dollars ($5,000,000).

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Financing**" has the meaning set forth in Section 3.3(a).

"**Financing Commitment**" has the meaning set forth in Section 3.3(a).

"**French Excess ARD Employees Amount**" has the meaning given to it in the EMEA Asset Sale Agreement.

"**GAAP**" means the United States generally accepted accounting principles.

"**GDNT**" means Guangdong-Nortel Telecommunications Equipment Co. Ltd.

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.5(a).

"**Government Entity**" means any United States, Canadian, United Kingdom, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services tax or harmonized sales tax payable under Part IX of the Excise Tax Act (Canada) and the Quebec sales tax payable under an Act respecting the Quebec sales tax.

16

62

"**Hazardous Materials**" means any chemical, material, waste or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received (i) notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement or by the EMEA Asset Sale Agreement (as applicable) that are subject to the provisions of Part IV of the Investment Canada Act are likely to be of net benefit to Canada and (ii) any other approvals, clearances or authorizations required under the Investment Canada Act to effect the Closing as contemplated by this Agreement or by the EMEA Asset Sale Agreement (as applicable).

"**Identified Employees**" has the meaning set forth in Section 7.1.1(a).

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser or Designated Purchaser's offer of employment as provided in Section 7.1.1(a) and are on a Seller-approved leave of absence as of the Employee Transfer Date and are expected to return and actually return to work within the relevant time period set out below.  An Employee shall be an Inactive Employee for purposes hereof if and only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work within six (6) months following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(j).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means KPMG LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm within 10 Business Days of the request of either Primary Party, by KPMG LLP at the request of the first Primary Party to move for the appointment of such Independent Auditor.

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means any and all intellectual and industrial property, whether protected or arising under the laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) Trademarks; (b) Patents; (c) works of authorship (whether or not published) and copyrights (including any registrations therefor or applications for registration); (d) mask works (including any registrations therefor or applications for registration); (e) trade secrets, know-how and confidential information; (f) industrial designs and other rights in designs (including any registrations therefor or applications for registrations); (g) *sui generis* data base rights and (h) any Software and technology.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit H.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

"**Inventory Value**" means, as of any given date, the book value of the Owned Inventory and the EMEA Owned Inventory, in each case net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Investment Canada Act**" means the Investment Canada Act, R.S. 1985, c.28, as it is now in effect and as it may be amended.

"**IP Escrow Agreements**" has the meaning set forth in Section 5.9(c).

"**IRS**" means the United States Internal Revenue Service.

"**Israeli Companies**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Companies Law**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Court**" has the meaning set forth in the recitals to this Agreement.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**Joint Israeli Administrators**" has the meaning set forth in the recitals to this Agreement.

18



"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware in part on March 5, 2009 and in part on March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Known Product Defects**" has the meaning set forth in the Nortel Accounting Principles.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware by an order dated March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(d) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit I.

"**Law**" means any U.S., Canadian, UK, Israeli, foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial or administrative order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Leased Real Property**" means all real property subject to a Lease which is an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Lease(s)**" means all leases, subleases, real-property licenses and other agreements (written or oral), including all amendments, extensions and renewals thereof, pursuant to which real property is held.

"**LGN Distribution Agreement**" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and the LGN Joint Venture, on the other hand governing the distribution of certain CVAS Products by the LGN Joint Venture that the Purchaser will use commercially reasonable efforts to negotiate with the LGN Joint Venture and execute on or before the Closing pursuant to Section 5.23.

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

19



"**License**" has the meaning set forth in Section 5.33.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.5(c).

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

"**Loaned Employee Agreement**" means the agreement between the Main Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit J.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" has the meaning set forth in Section 6.11(a).

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Antitrust Approvals**" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit K (the "**Relevant Antitrust Authorities**") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit K, authorizing or not objecting to the transactions contemplated by this Agreement and by the EMEA Asset Sale Agreement (as applicable), which includes any decision or consent by any such Relevant Antitrust Authority setting forth conditions or obligations on the Purchaser or any of its Affiliates.

"**Market Value**" means, in respect of the Restricted Assets and Restricted Liabilities, the greater of (i) the fair market value of the same, determined by reference to an amount equal to the product of (x) the sum of the revenues for the one year period ended on December 31, 2008 (the "**2008 Revenues**") for such Restricted Seller as set forth on Exhibit L, times (y) 0.2078 and (ii) the net book value of such Restricted Assets and Restricted Liabilities.

"**Material Adverse Effect**" means any event, change, circumstance, development, condition, fact, occurrence or effect that, individually or together with any other events, changes, circumstances, developments, conditions, facts, occurrences or effects has had, or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, results of operations or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes, circumstances, developments, conditions,

20



facts, occurrences or effects to the extent resulting from (a) general changes to the industries and markets in which the Business operates, but only to the extent that such changes do not have a disproportionate effect on to the Business relative to other businesses in such industries and markets, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, earthquakes, hurricanes, floods, tornados and similar natural causes, war, terrorism or hostilities, but only to the extent that such factors, rates, conditions, natural causes, war, terrorism or hostilities, in each case, do not have a disproportionate effect on the Business, relative to other businesses in the industries or markets in which the Business operates, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, (e) the transactions contemplated hereby or any announcement of this Agreement or the identity of the Purchaser in accordance with the terms of this Agreement, (f) the pendency of the Bankruptcy Proceedings and any action approved by the Bankruptcy Courts, (g) the attrition of customers or employees prior to the Closing Date (<u>provided</u>, that the reason for customer attrition, if not otherwise excluded pursuant to the other clauses of this definition in determining whether there has been a Material Adverse Effect pursuant to the other clauses in this definition, shall be included in determining whether there has been a Material Adverse Effect), (h) actions taken by the Sellers at the specific written request of the Purchaser or (i) the failure of the Business to achieve internal or external financial forecasts or projections, by itself, <u>provided, however</u>, that the effect of any underlying event, change, circumstance, development, condition, fact, occurrence or effect giving rise to any such failure to meet forecasts or projections, if not otherwise excluded pursuant to the other clauses of this definition in determining whether there has been a Material Adverse Effect pursuant to the other clauses in this definition, shall be included in determining whether a Material Adverse Effect has occurred.

"**Material Contracts**" has the meaning set forth in Section 4.4.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Mutual Development and Support Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers or the purchasers of former businesses, business segments or divisions of the Sellers, governing the development (i) by the Purchaser and/or any Designated Purchasers or any of their Affiliates of new features of certain of the products used by the Sellers or the purchasers of former businesses, business segments or divisions of the Sellers, and/or (ii) by the relevant Sellers or the purchasers of former businesses, business segments or divisions of the Sellers, of new features of certain of the CVAS Products, that the relevant Parties will use commercially reasonable efforts to negotiate with each other and such relevant purchasers and execute on or before the Closing pursuant to Section 5.23.

"**New York Courts**" has the meaning set forth in Section 10.6(b).

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

**67**

"**NN India**" has the meaning set forth in Section 2.1.8(b).

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" has the meaning set forth in the recitals to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock co. corporation formed under the laws of Turkey.

"**NN Turkey Agreements**" means the NN Turkey Master Development Agreement, the NN Turkey Distribution Agreement and the NN Turkey Services Agreement.

"**NN Turkey Distribution Agreement**" means the agreement between NN Turkey, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing the distribution of certain CVAS Products by NN Turkey.

"**NN Turkey Services Agreement**" means the agreement between NN Turkey, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing the provision of services by NN Turkey to the Business.

"**NN Turkey Master Development Agreement**" means the agreement between NN Turkey, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing research and development operations by NN Turkey.

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Exclusive Supply Contract**" means any supply Contract to which any Seller is a party that relates to the Business and also relates to one or more other businesses of the Sellers.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-365 Customer Contract List**" has the meaning set forth in Section 2.1.6(a).

"**Non-365 Customer Contract**" has the meaning set forth in Section 2.1.6(a).

"**Non-365 Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.6(c).

"**Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

22



"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Unaudited Financial Statements, as set forth in Section 1.1(e) of the Sellers Disclosure Schedule.

"**Nortel Canadian Pension Plan**" has the meaning set forth in Section 7.5(a).

"**Nortel Retained Businesses**" has the meaning set forth in the Intellectual Property License Agreement.

"**OCNIS**" means (i) supply chain overhead costs (including supply chain management, procurement and manufacturing not otherwise covered pursuant to the Transition Service Agreement); (ii) sustaining engineering costs; (iii) "return on invested capital" or other third party overhead recovery costs (including additional materials pricing to cover contractual third party costs); (iv) royalty costs (where applicable); and (v) warranty costs (where applicable). OCNIS does not include inventory provision, Known Product Defects, outbound freight and logistics.

"**Offer**" or "**Offers**" has the meaning set forth in Section 7.1.1(a).

"**Offer Consideration Period**" has the meaning set forth in Section 7.1.1(a).

"**Omitted Cross-License Agreement**" has the meaning set forth in Section 4.5(g).

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Order**" means any award, writ, injunction, judgment, order or decree entered into, issued, made or rendered by any Government Entity.

"**Ordinary Course**" means the ordinary course of the Business consistent with recent past practice as modified since the filing of the Bankruptcy Proceedings, and as such practice may be modified from time to time (i) to the extent necessary to reflect the Bankruptcy Proceedings or (ii) as may be required in the reasonable judgment of the Sellers to further effectuate the separation of the Business from the other businesses of the Sellers in a manner consistent with the Transaction Documents.

"**Other Loaned Employees**" means Employees located in or employed by the Sellers in Canada, who have accepted Offers of employment or whose employment transfers by operation

23

69

of Law, and who would otherwise be Transferred Employees immediately following the Closing Date but for the fact that the Purchaser or Designated Purchaser, despite their commercially reasonable efforts, are not ready to employ such employees as of such date.

**"Other Sellers"** means the Affiliates of the Main Sellers listed in Exhibit A hereto, except to the extent that (i) any such entity listed on Exhibit A is liquidated or wound up between the date of this Agreement and the Closing Date or (ii) despite the commercially reasonable efforts of the Main Sellers, they are unable to cause any such entity listed on Exhibit A to agree to execute this Agreement on or prior to the Closing Date, then such entities shall not be considered "Other Sellers" (and therefore, shall also not be considered Sellers) for any purposes of this Agreement notwithstanding their inclusion on Exhibit A and any Assets and Liabilities of such entities will not be transferred as part of this Agreement.

**"Overhead and Shared Services"** means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided (or were provided prior to any recent divestiture by any Seller since the filing of the Bankruptcy Proceedings) to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith.

**"Outbound License Agreement"** has the meaning set forth in Section 4.5(k).

**"Owned Equipment"** means (i) those items of Equipment owned by any of the Sellers that are held or used exclusively in connection with the Business including items of Equipment owned by any of the Sellers that are held or used exclusively in connection with the Business that are (A) located at the shared labs specified in Section 1.1(f) of the Sellers Disclosure Schedule or (B) on loan to NN Turkey or the Sellers' contract manufacturers as listed in Section 1.1(f) of the Sellers Disclosure Schedule, and (ii) the other Equipment listed in Section 1.1(g) of the Sellers Disclosure Schedule, provided, however, that "Owned Equipment" shall not include any (A) Owned Inventory, (B) any items of tangible property personally assigned to Employees who are not (w) Transferred Employees as of the Employee Transfer Date, (x) Visa Employees, (y) Other Loaned Employees, or (z) Transitional Employees, (C) any Intellectual Property, (D) information technology assets, such as data servers and large scale storage devices or (E) any furniture and fixtures other than trade fixtures located at the Direct Lease Real Estate, or any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease.

24

*76*

"**Owned Inventory**" means (i) Inventory owned by any of the Sellers that is held or used exclusively in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or any other Person, and (ii) the other Inventory listed in Section 1.1(h) of the Sellers Disclosure Schedule.

"**Partial Allocation**" has the meaning set forth in Section 6.9.

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national (including the United States and Canada) and multinational statutory invention registrations, patents, patent applications and provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and which are set forth on Schedule 1.1(i), in each case, for which adequate reserves have been established in accordance with GAAP, other than Liens that will be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) Liens arising hereunder or under any Assigned Contracts (after giving effect to the assignment hereunder); (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(i) of the Sellers Disclosure Schedule; and (vi) zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" means January 14, 2009, except with respect to Nortel Networks (CALA) Inc. in which case "Petition Date" shall mean July 14, 2009.

"**Plan of Record**" means the CVAS Products under development by the Sellers as of the date hereof, as set forth in the "Plan of Record" portion of Section 1.1(c) of the Sellers Disclosure Schedule.

"**Pre-Close Employment Payments Amount**" has the same meaning as "Pre-Close Employment Payments" has under the EMEA Asset Sale Agreement.

25

71

"**Pre-Closing Segregation Costs**" has the meaning set forth in Exhibit 5.27.

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Prepaid Expenses**" means prepaid expenses specifically identified as relating to the Business as indicated in the Adjusted Net Working Capital Statement.

"**Prepaid Expenses Amount**" means, as of any given date, the amounts classified as Prepaid Expenses of the Business, determined in a manner consistent with the Nortel Accounting Principles.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Product Exposures Provision**" means the provision (also known as "KPD provision") with respect to defects (other than defects covered by the Warranty Provision) of CVAS Products and/or CVAS Services that have been sold by the Sellers and the EMEA Sellers prior to Closing.

"**Product Exposures Provision Amount**" means the amount as of any date of the Product Exposures Provision determined in accordance with the Nortel Accounting Principles.

"**Property Taxes**" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"**Provider**" has the meaning set forth in the Transition Services Agreement.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchase Price Escrow Amount**" means eight million dollars ($8,000,000).

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Audited Financial Statements**" has the meaning set forth in Section 3.4(a).

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Determination**" has the meaning set forth in Section 6.11(a).

"**Purchaser Disclosure Schedule**" means the disclosure schedule delivered by the Purchaser to the Sellers on the date hereof.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, termination or retirement indemnity

26

72

plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Financial Statements**" has the meaning set forth in Section 3.4(b).

"**Purchaser Party**" has the meaning set forth in Section 6.11(a).

"**Purchaser Unaudited Financial Statements**" has the meaning set forth in Section 3.4(b).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Agreements**" means the leases, subleases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in accordance with and as provided by the RETC.

"**Real Estate Lease**" means any Seller Contract that is a lease, sublease, license or other agreement for occupancy of real property.

"**Real Property**" means, collectively, the Direct Lease Real Estate and the Leased Real Property.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Sellers, each acting reasonably.

"**Regulatory Approvals**" means the Antitrust Approvals and the ICA Approval.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Relevant Antitrust Authorities**" has the meaning set forth in the definition of "Mandatory Antitrust Approvals" above.

"**Replacement Financing**" means debt financing to be disbursed on the Closing Date which the Purchaser wishes to obtain in replacement for part or all of the Financing.

"**Representatives**" has the meaning set forth in Section 5.29.

73

"**Respective Affiliates**" has the meaning set forth in Section 10.15(c).

"**Restricted Assets**" has the meaning set forth in Section 5.26(a).

"**Restricted Liabilities**" has the meaning set forth in Section 5.26(b).

"**Restricted Seller**" has the meaning set forth in Section 5.26(b).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Retained Contracts**" means any of those (i) 365 Customer Contracts or Non-365 Customer Contracts rejected by the Purchaser under either of Sections 2.1.5(d) or 2.1.6(e), (ii) Bundled Contracts that Purchaser chooses not to unbundle under any of clause (i), (ii) or (iii) of Section 5.14(a) or (iii) customer Contracts of the Business that are outside the scope of this Agreement and retained by the Sellers as a result of the jurisdiction in which they were originated or otherwise.

"**RETC**" means the Real Estate Terms and Conditions attached hereto as Exhibit M.

"**Royalty Liability Amount**" means, as of any given date, the amount of the royalty liabilities, net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Sales Employees**" has the meaning set forth in Section 7.1.1(a).

"**Seller Authorized Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Bid**" has the meaning set forth in Section 2.1.1(k).

"**Seller Break-Up Fee**" means an amount equal to two-thirds (2/3) of the Break-Up Fee.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(j)

"**Seller Contracts**" means (i) those Contracts of a Seller that relate exclusively to the Business or to the Assets (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset, but excluding any other licenses of Intellectual Property), and (ii) the Contracts of a Seller listed in Section 1.1(j) of the Sellers Disclosure Schedule.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred

28

**74**

compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers) with respect to Employees, and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers) maintaining such plan prior to the Closing Date.

"**Seller Expense Reimbursement**" means an amount equal to two-thirds (2/3) of the Expense Reimbursement.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.21.

"**Severance Amount**" has the meaning given to it in the EMEA Asset Sale Agreement.

"**Software**" means any and all (i) computer programs, applications and interfaces, whether in source code or object code, (ii) computerized databases and compilations, and (iii) all user manuals and architectural and design specifications, training materials and other documentation relating to any of the foregoing.

"**Special Arrangements**" has the meaning set forth in Section 4.11(a).

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(i).

"**Specified Employee Liabilities Amount**" means the amount specified on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule with respect to each of the following: (i) gratuity payments due to Transferred Employees in India, (ii) long service leave due to Transferred Employees in Australia, (iii) long service leave due to Transferred Employees in New Zealand, (iv) end of service payments due to Transferred Employees in Saudi Arabia, (v) end of service

29

75

payments due to Transferred Employees in the United Arab Emirates, and (vi) end of service payments due to Transferred Employees in Tunisia. .

**"Specified Transferred Employees"** has the meaning set forth in Section 7.1.2(c)(ii).

**"Straddle Period"** has the meaning set forth in Section 6.4(b).

**"Subcontract Agreement"** means one or more agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing in a form mutually agreed to by the Parties so as to pass through the benefits and burdens of the underlying Contract with customers as if the Purchaser or the applicable Designated Purchaser were party thereto.

**"Sublease"** has the meaning set forth in Section 5.31.

**"Subsidiary"** of any Person means any Person Controlled by such first Person.

**"Successful Bidder"** has the meaning set forth in the Bidding Procedures.

**"Target Working Capital"** means seventy three million dollars ($73,000,000).

**"Tax"** means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes, fees, levies, assessments or other impositions by or on behalf of any Government Entity, including net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, levies, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest, penalties, additions to tax and additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay any such amounts owing by any Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

**"Tax Authority"** means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K. or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world, including any Government Entity with responsibility for the imposition, collection or administration of any form of Tax or exercising Tax regulatory authority.

**"Tax Claim"** has the meaning set forth in Section 6.11(b).

**"Tax Claim Notice"** has the meaning set forth in Section 6.11(b).

**"Tax Credit Purchaser"** has the meaning set forth in Section 6.5(b).

**"Tax Escrow Amount"** means $2,500,000 (two million five hundred thousand dollars), which amount shall secure the Sellers' obligations under Section 6.11.

76

"**Tax Returns**" means all returns, reports (including elections, declarations, designations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**TFR Amount**" means the amount of the actual unfunded obligation accrued in any period preceding the Closing Date that is assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing under the Trattamento di Fine Rapporto in Italy, to the extent that it is required to be accounted for under FAS 87 (paragraphs 11, 72 and 73). The amount will be determined in accordance with GAAP.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Third Party Operator**" has the meaning set forth in Section 7.1.2(f).

"**365 Contract**" means any Contract of a U.S. Debtor that is an Executory Contract and was entered into before the Petition Date that can be assumed and assigned by the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code.

"**365 Customer Contract**" has the meaning set forth in Section 2.1.5(a).

"**365 Customer Contract List**" has the meaning set forth in Section 2.1.5(a).

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(b).

"**365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, trade names, corporate names, business names, domain names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including, but not limited to, all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between NNL, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in respect of certain Trademarks used in respect of the CVAS Products and/or CVAS Services to be entered into on or before the Closing in the form attached hereto as Exhibit N.

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Date**" has the meaning given to it in the EMEA Asset Sale Agreement.

31

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, documentary, filing, recordation, value added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.7(a).

"**Transferred Employees**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1.1(a) and (c) or Section 7.2, and (ii) those Employees whose employment transfers by operation of Law.  For the avoidance of doubt, Transitional Employees shall not be considered Transferred Employees.

"**Transferred Employee Plan**" means any Seller Employee Plan that is (x) established or maintained in accordance with a Collective Labor Agreement that is transferred to the Purchaser or a Designated Purchaser under the terms of Section 7.2, and transferred (or the liabilities of which are transferred) to the Purchaser or Designated Purchaser pursuant to this Agreement or by operation of Law or (y) transferred (or the liabilities of which are transferred) to the Purchaser or Designated Purchaser pursuant to this Agreement or by operation of Law, in each case, excluding the Specified Employee Liabilities assumed by Purchaser pursuant to Section 2.1.3(i).

"**Transferred Intellectual Property**" means (i) the Transferred Patents, (ii) the Trademarks set forth in Section 1.1(k) of the Sellers Disclosure Schedule, and (iii) any Intellectual Property (other than Patents or Trademarks) owned by any of the Sellers that is used exclusively in connection with the Business.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees as set forth in Section 1.1(l) of the Sellers Disclosure Schedule.

"**Transferred Patents**" means the Patents listed in Section 1.1(m) of the Sellers Disclosure Schedule.

"**Transferring Employee**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**Transition Services Agreement**" means an agreement between the relevant Sellers or EMEA Sellers (or their Affiliates), on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit O, except that the schedules to such agreement shall be agreed between the Parties in accordance with Section 5.27 hereof.

"**Transitional Employees**" means Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1.1(f).

*78*

"**TSA Escrow Amount**" means ten million dollars ($10,000,000).

"**2008 Revenues**" has the meaning set forth in the definition of "Market Value" above.

"**Unaudited Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Unbilled Accounts Receivable**" means, as of a given date, amounts classified in Construction-in-Process accounts in a manner consistent with the Nortel Accounting Principles.

"**Unbilled Accounts Receivable Amount**" means, as of any given date, the amount of Unbilled Accounts Receivable of the Business determined in accordance with the Nortel Accounting Principles.

"**Unexpired Leases**" means leases that constitute "unexpired leases" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Union Employee**" means an Employee whose terms and conditions of employment are covered by a Collective Labor Agreement as specified in Section 4.11(b) of the Sellers Disclosure Schedule.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures and Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Bidding Procedures Order**" has the meaning set forth in Section 5.1(a).

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

"**Visa Employees**" means Employees (other than Transitional Employees and Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.11(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence or continue on the Employee Transfer Date solely due to Purchaser or Designated Purchaser's inability to obtain the required visa or permit with respect to such Employee's employment on the Employee Transfer Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law relating to plant closing or mass layoff.

33

79

"**Warranty Obligations**" means the warranty obligations relating to CVAS Products and CVAS Services assumed by the Purchaser and/or a Designated Purchaser and/or an EMEA Designated Purchaser pursuant to Section 2.1.3(b) and Section 2.1.3(e) of this Agreement and Clauses 2.3.2(C) and 2.3.3.6 of the EMEA Asset Sale Agreement, excluding those warranty obligations that relate to Products Exposure Provisions.

"**Warranty Provision**" means the provision to be recognized and measured by the Business pursuant to the Nortel Accounting Principles for potential claims by customers under the Warranty Obligations.

"**Warranty Provision Amount**" means the amount of the Warranty Provision as of any given date as calculated in accordance with the Nortel Accounting Principles.

Section 1.2.    Interpretation.

1.2.1.    Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.    Certain Phrases and Calculation of Time.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", (iv) the use of the words "or" and "any" shall not be exclusive, and (v) in determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis or casual uses outside the Business shall not be considered.  If the last day of any such period is not a Business Day, such period will end on the next Business Day. References to "Assets" and "Assumed Liabilities" in Articles III, IV and IX and Section 5.9 shall omit "at the Closing", "at the Closing Date" and terms of similar meaning from the definitions of the terms that comprise such definitions.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3.    Headings, etc.  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4.    Currency.  All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.  All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency.  All payments required under this Agreement shall be paid in United States currency in



immediately available funds, unless otherwise specifically indicated herein.  Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the *Wall Street Journal* (Eastern Edition) newspaper for the day in question.

      1.2.5.  <u>Statutory References</u>.  Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

<div align="center">

**ARTICLE II**

**PURCHASE AND SALE OF ASSETS**

</div>

      Section 2.1.  <u>Purchase and Sale</u>.

      2.1.1.  <u>Assets</u>.  Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or accept assignment and assume from the relevant Sellers, and each Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers, all of such Seller's right, title and interest in and to the following assets (such assets, excluding the Excluded Assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear of all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

            (a) the Owned Inventory as of the Closing Date;

            (b) the Unbilled Accounts Receivable as of the Closing Date;

            (c) the Owned Equipment as of the Closing Date;

            (d) the Assigned Contracts in force as of the Closing Date;

            (e) the Prepaid Expenses as of the Closing Date;

            (f) all rights of the Sellers as of the Closing Date under non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts or, to the extent they relate exclusively to the Business or the Assets, with Transferred Employees (to the extent assignable without the applicable Transferred Employee's consent), contractors and agents of the Sellers or with other Third Parties;

<div align="center">35</div>

81

(g) the tangible embodiments of the Business Information (whether in paper, digital or other tangible form) existing as of the Closing Date, subject to Section 2.1.2(f);

(h) the Transferred Intellectual Property as of the Closing Date, subject to the licenses granted to NNL, NNI and each of the EMEA Sellers pursuant to the Intellectual Property License Agreement and subject to any and all licenses granted under such Intellectual Property prior to the Closing Date not in violation of Section 5.9, together with (A) all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property (except for (x) any income, royalties, damages and payments from claims asserted prior to the Closing Date or payment obligations accrued for periods prior to the Closing Date, whether or not due or payable after the Closing Date, and (y) any income or royalties payable under any contract, arrangement or agreement other than the Assigned Contracts), (B) the right, if any, to register, prosecute, maintain and defend the Transferred Intellectual Property before any public or private agency or registrar, and (C) the right to sue and recover damages or other compensation for past, present or future infringements, dilutions, misappropriations, or other violations thereof, the right to sue and obtain equitable relief in respect of such infringements, dilutions, misappropriations and other violations, and the right to fully and entirely stand in the place of the Sellers in all matters related thereto;

(i) all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers, contractors, and Third Parties to the extent related to the Assets;

(j) to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**");

(k) all rights that may be freely transferred as of the Closing Date arising from or in connection with any Bid made prior to the Closing Date by any Seller or by a contractor team or joint venture in which any Seller is participating, which is capable of acceptance after the Closing and, if accepted, would result in the award of a Customer Contract that (if entered into after the date hereof and prior to the Closing Date) would be an Assigned Contract hereunder or to which the Purchaser has provided its prior written consent (to the extent required pursuant to Section 5.9) (any such Bid, a "**Seller Bid**");

(l) any net insurance proceeds received or to be received in respect of the Owned Equipment, to the extent payable to the Purchaser pursuant to Section 5.19; and

(m) any Tax records required by Law to be transferred to the Purchaser or a Designated Purchaser.

2.1.2.  <u>Excluded Assets</u>.  Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the other Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to, any of the following assets (the "**Excluded Assets**"):

36