*191*

(a)     The first sentence of Section 3.1(a) is deleted and replaced with the following:  "On the date hereof, the Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, and as of the Closing Date, the Purchaser will be a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware."

(b)     Section 3.3(a) is hereby deleted in its entirety and replaced as follows, and all references in the Agreement to "Commitment Letter" are changed to "Financing Commitment":

      (i)     The Purchaser has delivered to the Main Sellers and the Joint Administrators correct and complete copies of an executed commitment letter from One Equity Partners III, L.P. of even date herewith and addressed to the Purchaser, a copy of which is attached as Exhibit 3.3(a) (the "**Financing Commitment**"), pursuant to which One Equity Partners III, L.P. has committed to invest an amount equal to the Estimated Purchase Price in Purchaser for purposes of funding the transactions contemplated herein and under the EMEA Asset Sale Agreement and otherwise in connection with this Agreement and the EMEA Asset Sale Agreement (the "**Financing**").

13.     <u>Pre-Closing Cooperation</u>.

(a)     Section 5.4(c) is hereby amended such that the words "shall execute at Closing" are replaced with the words "shall execute at or within a reasonable amount of time after Closing".

(b)     Section 5.4(c) is hereby amended such that the words "Sellers have sold the Business to Purchaser at Closing" are replaced with the words "Sellers have sold the Business to Purchaser and the applicable Designated Purchasers at Closing".

(c)     Section 5.4(d) is hereby amended such that the words "shall execute at Closing" are replaced with the words "shall execute at or within a reasonable amount of time after Closing".

(d)     Section 5.4(d) is hereby amended such that the words "they shall not exhaust any such rights they may have between the date hereof and the Closing" are replaced with "they shall not exhaust any such rights they may have between the date hereof and the date that is sixty (60) days following the Closing".

6

192

14.    <u>Updated HR SAP Data Elements</u>. Section 5.6(e) is hereby amended such that the words "ten (10) Business Days prior to" are replaced with the words "within three (3) Business Days following".

15.    <u>Non-Assignable Contracts</u>. The first sentence of Section 5.13(a) is hereby amended by adding the words "of a customer" immediately following the words "Seller Contract".

16.    <u>Unbundling of Certain Contracts</u>. Section 5.14 is hereby amended to add a new subsection (d):

    (d)    Notwithstanding the language of Section 5.14(c), (i) promptly following the entry by Kapsch CarrierCom AG and one or more of the Sellers into any of the agreements listed on 5.14(d)(i) of the Sellers Disclosure Schedule, the Purchaser shall accept assignment of such agreements to the extent relating to CVAS Products and/or CVAS Services and (ii) the Purchaser shall accept assignment of the agreements listed in Section 5.14(d)(ii) of the Sellers Disclosure Schedule to the extent relating to CVAS Products and/or CVAS Services.

17.    <u>Deposits, Guarantees and Other Credit Support of the Business</u>. Section 5.20 is hereby amended by adding the following clause at the end thereof:

    (b)    Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement Section 5.20(a)(i)(B) of the Sellers Disclosure Schedule from time to time by written notices to the Purchaser; provided, that within five (5) Business Days of Closing no update and/or supplement shall be permitted without Purchaser's prior written consent.

18.    <u>Certain Ancillary Agreements</u>. Section 5.23(b) is hereby deleted and replaced with the following: "The Parties and the EMEA Sellers acknowledge that, as of the date hereof, the Business entertains several bilateral relationships with other businesses, business segments or divisions (or former businesses, business segments or divisions) of certain Sellers or their Affiliates for the supply and/or development of products and services (including certain CVAS Products and CVAS Services). To the extent such relationships are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter (for the duration of any individual customer contract including frame contracts), the Primary Parties and the relevant EMEA Sellers shall use their commercially reasonable efforts to negotiate, or to cause to be negotiated, in good faith, commercially reasonable terms in order to address the interdependencies among current and former businesses of the Sellers set forth on

193

Exhibit 5.23, including through one or more Mutual Development and Support Agreements, supply agreements, or other appropriate commercial arrangements; provided, that, Sellers shall keep Purchaser informed regarding the negotiation of such agreements between Sellers' business units or between Sellers and Third Parties, which agreements, in each case, relate to CVAS Products or CVAS Services, and Seller shall use reasonable efforts to consult with Purchaser with respect to such agreements. The Primary Parties shall also use their commercially reasonable efforts to negotiate in good faith the Subcontract Agreement pursuant to which the Seller will subcontract to Purchaser the rights and obligations of the Sellers under Retained Contracts, Non-Assigned Contracts and those Bundled Contracts for which the arrangements mentioned in Section 5.14(a) have not been entered into prior to the Closing Date. Notwithstanding the above, on or prior to the Closing Date, the Purchaser will enter into supply agreements with Ericsson AB related to the CDMA and GSM interdependencies set forth on Exhibit 5.23, or, if the Purchaser has been unable to enter into such agreements with Ericsson AB prior to the Closing Date, execute on or prior to the Closing Date supply agreements identical to the supply agreements between Nortel and Ericsson AB with regard to such interdependencies except that such agreements shall be solely as between the Purchaser and Ericsson AB and Schedule A to such new agreements shall be redacted to include only those Products (as defined therein) relating to the Business. The Purchaser will assume all obligations under any warranty liabilities relating to CVAS Products and CVAS Services which have been supplied prior to Closing under such agreements mentioned in the immediately preceding sentence. For the avoidance of doubt, other than the Intellectual Property License Agreement, the Transition Services Agreement, the Loaned Employee Agreement, the Real Estate Agreements and the agreements with Ericsson AB with respect to the CDMA and GSM interdependencies mentioned in this Section 5.23(b), the failure to execute and deliver at Closing any of the Ancillary Agreements shall not be deemed a failure of any condition precedent to this Agreement or allow any Party to terminate this Agreement."

19. <u>Pre-Closing Segregation Costs</u>. The fourth sentence of Paragraph (h) of Exhibit 5.27 to the Agreement is hereby deleted in its entirety and replaced as follows:

> Purchaser will pay to the Main Sellers and the TSA EMEA Sellers, as applicable, fifty percent of the Monetary Cost incurred by the Main Sellers and the TSA EMEA Sellers and their affiliates in providing such Pre-Closing Segregation Projects (the "**Pre-Closing Segregation Costs**") promptly after receipt of an invoice of the Pre-Closing Segregation Costs from the Main Sellers and the TSA EMEA Sellers, as applicable, which invoice shall be sent as soon as reasonably practicable after Closing, provided that to the extent the aggregate Pre-Closing Segregation Costs

exceeds four million USD ($4,000,000), Purchaser shall bear all of such excess costs.

20.     TSA Testing Protocols.

    (a)     The definition of "**April Test**" in Exhibit 5.27 to the Agreement is hereby deleted in its entirety.

    (b)     The following definition shall be added to Exhibit 5.27 to the Agreement:

"**Notice of Disagreement**" has the meaning set forth in paragraph (k) of this Exhibit 5.27.

    (c)     Paragraph (i) of Exhibit 5.27 to the Agreement is hereby deleted in its entirety and replaced as follows:

        (i)     The Parties shall cooperate to jointly determine the Testing Protocols between the date of this Agreement and April 14, 2010 or such later date as the Parties may agree upon and, to the extent the Parties do not agree on the Testing Protocols by such date, the TSA Arbitrator shall determine the Testing Protocols in accordance with paragraph (l) of this Exhibit 5.27.  Pursuant to this paragraph (i) of this Exhibit 5.27, the Parties shall jointly determine whether or not Closing Day Ready has been achieved in accordance with the Testing Protocols (any such exercise, and any necessary repetition of such exercise within the applicable time limits for such testing, a "**Test**").  Pursuant to a Test, the Parties shall provide the other Parties with such access as is reasonably required to determine whether Closing Day Ready has been achieved.  As promptly as reasonably practicable but in no event later than five (5) Business Days after completion of a Test, the Parties, acting reasonably and with good faith, shall make a determination whether Closing Day Ready has been achieved.

        (ii)     The first Test shall occur prior to May 31, 2010 (the "**May Test**").  In the event that the Parties agree that the May Test demonstrates that Closing Day Ready has been achieved, then the Closing shall occur as soon as reasonably practicable, subject to Article VIII.  In the event that the Purchaser reasonably believes that the May Test demonstrates that Closing Day Ready has not been achieved, then the Purchaser shall provide the Sellers with a list of the relevant Deficiencies and the Parties shall submit the dispute to the TSA Arbitrator in accordance with paragraph (l) of this Exhibit 5.27.  To the extent that the TSA Arbitrator determines that (a) Closing Day Ready has been achieved, then the Closing shall occur as soon as reasonably practicable, subject to Article

VIII or (b) Closing Day Ready has not been achieved, then, subject to Article VIII, the Closing shall be delayed until such time as the Parties shall agree that Closing Day Ready occurs but, in any event, no later than June 30, 2010, on which date the Closing shall occur in accordance with Section 2.4 of the Agreement (Closing Date).

(iii)    Unless Closing occurs, a second Test (the "**June Test**") shall be conducted prior to June 30, 2010.  In the event that Purchaser reasonably believes that the June Test demonstrates that Closing Day Ready has not been achieved, then the Purchaser shall provide the Sellers with a list of the relevant Deficiencies and the Parties shall submit the dispute to the TSA Arbitrator in accordance with paragraph (l) of this Exhibit 5.27.  To the extent that the TSA Arbitrator determines that Closing Day Ready has not been achieved, then the Sellers shall pay to the Purchaser an amount of ten million USD ($10,000,000)

(d)    The second sentence of the third paragraph of Annex A of Exhibit 5.27 to the Agreement is hereby amended such that the words "March 15, 2010" are replaced with the words "April 30, 2010 or such later date as the Parties may agree upon".

(e)    TSA Arbitrator.  Paragraph (k) of Exhibit 5.27 to the Agreement is hereby deleted in its entirety and replaced as follows:

If a dispute arises prior to Close between the Parties relating to the Included Services or the Extra Services, the Monetary Costs thereof, the Third Party Consents and the Purchaser Licenses, Closing Day Ready or any other dispute related to this Exhibit 5.27, such affected Party shall send a written notice of disagreement ("**Notice of Disagreement**") to the other Party specifying in reasonable detail the nature and basis of any disagreement asserted.  Upon receipt of such Notice of Disagreement (the "**Arbitration Trigger Date**"), the Parties shall appoint David L. Wedding of Grant Thornton LLP or such other mutually satisfactory principal of an information technology consultancy firm who is impartial and independent of Purchaser and Sellers, has appropriate expertise in implementing transition services arrangements ancillary to M&A transactions, and that involve sophisticated enterprise resource planning systems that are similar in scope and complexity to the systems required by the Transition Services Agreement (the "**TSA Arbitrator**"), provided, that if the Parties cannot appoint the TSA Arbitrator within five (5) days following the Arbitration Trigger Date, the TSA Arbitrator shall be selected by the Independent Auditor (after having taken all appropriate steps to establish necessary ethical walls) prior to ten (10) days following the Arbitration Trigger

10

**196**

Date.  If the TSA Arbitrator has been appointed but is unable to fulfill his/her responsibilities, an alternative TSA Arbitrator shall be appointed by the Parties in accordance with the foregoing requirements, or if the Parties have not mutually agreed on the appointment within three (3) days of the request to do so by one of the Parties, the TSA Arbitrator shall be appointed by the Independent Auditor.  All enquiries made by the TSA Arbitrator and all information and data provided to the TSA Arbitrator shall be delivered and shared forthwith with all other Parties.

21.    Loaned Employees.

(a)    For purposes of the calculations set forth in Section 2.2 (including for purposes of interpreting defined terms used therein), each Loaned Employee shall (i) be deemed a Specified Transferred Employee solely for purposes of calculating the Accrued Vacation Amount and (ii) be deemed a Transferred Employee solely for the purposes of calculating the Specified Employee Liabilities Amount.

(b)    Section 7.1.2(c)(ii) is hereby amended such that the words "Transferred Employees" are replaced with the words "Transferred Employees and Loaned Employees", and the words "Transferred Employee" are replaced with the words "Transferred Employee and Loaned Employee".

After giving effect to this Amendment, Section 7.1.2(c)(ii) shall provide as follows:

The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees and Loaned Employees (excluding those Transferred Employees and Loaned Employees specified in Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule, which shall include Union Employees (the "**Specified Transferred Employees**")), up to their Effective Hire Date, to such Transferred Employees and Loaned Employees at or as soon as reasonably practicable following their Effective Hire Date or such earlier time as may be required under applicable Law.  With respect to those Transferred Employees and Loaned Employees located in Canada, the payment by the Sellers pursuant to this Section 7.1.2(c)(ii) shall be in exchange for an acknowledgement and consent, which shall be included by Purchaser in the Offer, by each such Transferred Employee and Loaned Employee that he or she has received or will receive full compensation from the Sellers for such accrued and unused vacation hours and has no entitlement to the vacation time associated therewith following receipt thereof.  The Purchaser will, and

11

197

will cause the relevant Designated Purchasers to, use its commercially reasonable efforts to accommodate requests for unpaid time off of such Transferred Employees, and Loaned Employees who become employees of the Purchaser or a Designated Purchaser, until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

22.    Employee Benefits.

(a)    Section 7.1.2(c)(v) is hereby deleted in its entirety and replaced as follows:

The Purchaser or Designated Purchaser shall provide each Transferred Employee and Loaned Employee who becomes an employee of the Purchaser or a Designated Purchaser employed in India with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of gratuity payment, at such time, if any, as such payment thereof is due and owing to each such Transferred Employee or Loaned Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee or Loaned Employee as set forth in the Employee Information and such Transferred Employee or Loaned Employee's service with Purchaser (and, if a Loaned Employee, the Sellers under the Loaned Employee Agreement) on and after the Closing Date. The Purchaser or Designated Purchaser shall provide each Transferred Employee and Loaned Employee who becomes an employee of the Purchaser or Designated Purchaser employed in Australia and New Zealand with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of long service leave and sick leave and each Transferred Employee and Loaned Employee who becomes an employee of the Purchaser or a Designated Purchaser located in Hong Kong with the benefit of the amount set forth in Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of sick leave, at such time, if any, as payment of such amount is due and owing to each such Transferred Employee or Loaned Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee or Loaned Employee as set forth in the Employee Information and such Transferred Employee or Loaned Employee's service with Purchaser (and, if a Loaned Employee, the Sellers under the Loaned Employee Agreement) on and after the Closing Date. The Purchaser or Designated Purchaser shall provide each Transferred Employee and Loaned Employee who becomes an employee of the Purchaser or a Designated Purchaser employed in the United Arab Emirates and Saudi Arabia with any end of service payment for which they are eligible upon the termination of such Transferred Employee or Loaned Employee's employment, taking into account such Transferred Employee or Loaned Employee's service with Sellers as set out in Section

12

**198**

7.1.2(c)(v) of the Sellers Disclosure Schedule and such Transferred Employee or Loaned Employee's service with Purchaser (and, if a Loaned Employee, the Sellers under the Loaned Employee Agreement) on and after the Closing Date. Section 7.1.2(c)(v) of the Sellers Disclosure Schedule shall be updated as of the Closing Date to reflect status changes and attrition, and further accruals or reductions or other changes from the date hereof to the Closing Date.

(b)  Each of Sections 7.1.2(c)(iii) and 7.1.2(c)(iv) are hereby amended such that the words "vacation days" are replaced with the words "vacation hours".

23.  <u>Employee Designation</u>. Section 7.1.1(a) is hereby amended such that the words "Within thirty (30) days following the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order" are replaced with the words, "By or before April 21, 2010".

24.  <u>Final Updated Employee Information</u>. Section 7.4(c) is hereby amended such that the words "ten (10) Business Days prior to the Closing Date" are replaced with the words "no earlier than three (3) Business Days prior to the Closing Date and no later than the Closing Date".

25.  <u>Non-Solicitation of Employees</u>. Section 7.4(g) is hereby amended by adding the following clause at the end thereof:

Notwithstanding anything to the contrary in this Section 7.4(g), the Purchaser and/or the Designated Purchasers (A) shall be permitted at any time, whether prior to, during, or following the Non-Solicitation Period, to, without the Seller's advance written consent, directly or indirectly solicit for employment or, subject to the consummation of the transactions contemplated by this Agreement, hire (I) any current or former employees of the Sellers or their Affiliates who are located in Brazil, (II) employees of the Sellers or their Affiliates who are located in Chile and who are listed on Section 7.4(g) of the Sellers Disclosure Schedule, and (III) the employee who is located in Argentina and who is listed on Section 7.4(g) of the Sellers Disclosure Schedule , and (B) shall not be required to reimburse the Sellers for any pay in lieu of notice or severance payments paid by the Sellers to such employees or obtain releases from such employees of any rights to such payments from the Sellers.

26.  <u>Sales Compensation</u>. Article VII is hereby amended to add a new Section 7.7 and Section 7.7 shall read as follows:

Section 7.7.  <u>Sales Compensation</u>.

13

199

(a)      The Sellers and the Purchaser hereby agree to the following with respect to Transferred Employees who participate as of the Closing Date in Nortel's Global Sales Incentive Compensation Plan (effective January 1, 2010) (the "SIC Plan," and such employees, "Non-EMEA Transferred Sales Employees"):

The Sellers shall be responsible for paying sums due under the SIC Plan in respect of the Non-EMEA Transferred Sales Employees to the extent accrued prior to and on the Closing Date.  The Purchaser shall, or shall procure that the relevant Designated Purchaser shall, be responsible for paying sums due under the SIC Plan in respect of the Non-EMEA Transferred Sales Employees to the extent accrued after the Closing Date.  For the period starting the day after the Closing Date to June 30, 2010 (inclusive), such sums shall be calculated by the Sellers on a basis which is consistent with the applicable terms of Exhibit P hereto.  Such calculations shall be delivered promptly by the Sellers in writing to the Purchaser in a form reasonably acceptable to the Purchaser.  The Purchaser shall, or shall procure that the relevant Designated Purchaser shall, pay such sums to the Non-EMEA Transferred Sales Employees within 30 Business Days of the receipt of such calculations from the Sellers.

(b)      The Sellers and the Purchaser hereby further agree to the following with respect to Employees, other than Transferred Employees, who participate in the SIC Plan as of the first day of the month in which the Closing Date occurs (such employees being the "Non-Transferred Sales Employees"):

(i)      The Sellers shall pay to each Non-Transferred Sales Employee the amount due under the SIC Plan to the extent accrued prior to and including the Closing Date, as determined in accordance with the terms of the SIC Plan and the Sellers' customary practices (the "Pre-Closing Sales Compensation Amount").  Such payment shall be made on approximately the same date the Sellers pay similarly-situated employees of the Sellers who participate in the SIC Plan.

(ii)      The Sellers shall calculate the amount due under the SIC Plan for each Non-Transferred Sales Employee to the extent accrued from but excluding the Closing Date through the last day of the month in which the Closing Date occurs, in accordance with the applicable methodology set out in Exhibit P hereto ("Post-Closing Sales Compensation Amount") at such time as the Sellers perform similar calculations for similarly-situated employees of the Sellers who participate in the SIC Plan.  Such calculations shall be delivered promptly by the Sellers in writing to the Purchaser in a form reasonably acceptable to the Purchaser along with a calculation of the employer tax due on such Post-Closing Sales Compensation Amount ("Employer Tax" and, together with the Post-Closing Sales Compensation Amount, the "Total Post-Closing Payment").

14



      (iii)     Within ten (10) Business Days of receipt of such calculations with respect to the Total Post-Closing Payment with respect to each Non-Transferred Sales Employee, the Purchaser shall remit to the Sellers the Total Post-Closing Payment with respect to each such Non-Transferred Sales Employee.

      (iv)     Following the Sellers' receipt of such amounts as set out in paragraph (iv) above, the Sellers shall pay the Post-Closing Sales Compensation Amount, less applicable withholdings, to each Non-Transferred Sales Employee at the end of the next complete payroll period applicable to the Sellers' similarly situated employees, and the Sellers shall remit to the appropriate Government Entity an amount equal to Employer Tax and such withholdings as are due to the Government Entity. If a Seller fails to pay such Post-Closing Sales Compensation Amount to any Non-Transferred Sales Employee by the end of such payroll period, the Seller shall remit to the Purchaser within ten (10) Business Days the Total Post-Closing Payment with respect to such Non-Transferred Sales Employee.

27.    <u>Alternative Employment Arrangements</u>.  Notwithstanding anything to the contrary in the Agreement or this Amendment No. 1, the Parties acknowledge and agree that (a) the terms and conditions of the transition of employment of certain Employees (which Employees may include those located in Saudi Arabia and the United Arab Emirates) shall be described through one or more written agreements (other than the Agreement and this Amendment No. 1) by and between the Parties and their Affiliates (collectively, "<u>Other Employment Arrangements</u>"), and (b) the Agreement and this Amendment No. 1 will be interpreted to the fullest extent possible to give effect to the Other Employment Arrangements and no necessary or appropriate action or omission effectuating the intent of Other Employment Arrangements shall constitute a breach of the Agreement or this Amendment No. 1.  For the avoidance of doubt, except as set forth in the Other Employment Arrangements, this Section 27 shall not affect the rights and obligations of the Parties following the commencement of employment with the Purchaser or the Designated Purchasers of any Employees affected by the Other Employment Arrangements.

28.    <u>Conditions to Purchaser's Obligation</u>. Section 8.3(b) is hereby amended such that the words "Purchaser or Designated Purchaser" are replaced with the word "Sellers".

29.    <u>Exhibits and Seller Disclosure Schedules</u>.  Exhibits A, B and C to the Agreement and Sections 1.1(b), 1.1(d), 1.1(f), 1.1(g), 1.1(i), 1.1(k), 1.1(m), 2.1.5(a), 2.1.5(c), 2.1.6(a), 2.1.6(c), 4.4, 4.5(f), 4.6, 4.8, 4.11(b), 4.12, 5.14, 5.20(a)(i)(B), 7.1.1(a), 7.1.2(c)(iii), 7.1.2(c)(v) and 10.15(a)(ii) of the Sellers Disclosure Schedule are hereby deleted and replaced in their entirety by Exhibits A, B and C and

15



Schedules 1.1(b), 1.1(d), 1.1(f), 1.1(g), 1.1(i), 1.1(k), 1.1(m), 2.1.5(a), 2.1.5(c), 2.1.6(a), 2.1.6(c), 4.4, 4.5(f), 4.6, 4.8, 4.11(b), 4.12, 5.14, 5.20(a)(i)(B), 7.1.1(a), 7.1.2(c)(iii), 7.1.2(c)(v) and 10.15(a)(ii), respectively, attached hereto. Sections 2.1.6(g), 4.5(n), 5.14(d), 7.1.2(d), 7.4(g) of the Sellers Disclosure Schedule and Exhibit P to the Agreement are hereby added in the form attached hereto.

30.  <u>Effectiveness</u>.  This Amendment No. 1 shall become effective as of the date first written above (the "**First Amendment Effective Date**").

31.  <u>Reference to and Effect on the Agreement</u>.

   (a)  On or after the First Amendment Effective Date, each reference in the Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import referring to the Agreement shall mean and be a reference to the Agreement as amended by this Amendment No. 1.

   (b)  Except as amended hereby, the provisions of the Agreement are and shall remain in full force and effect.

   (c)  References in this Amendment No. 1 to "Sections" shall refer to the applicable Sections of the Agreement.

   (d)  Sections 10.4, 10.6, 10.9, 10.10 and 10.11 are incorporated in this Amendment No. 1 by reference but with references to the "Agreement" instead referring to this Amendment No. 1.

**[Remainder of this page intentionally left blank.]**

16



IN WITNESS WHEREOF, the Parties have duly entered into this Amendment No. 1 as of the date first written above.

NORTEL NETWORKS CORPORATION

By: _____
    Name: John Doolittle
    Title: SVP, Corporate Services and CFO

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and Corporate Secretary

NORTEL NETWORKS LIMITED

By: _____
    Name: John Doolittle
    Title: SVP, Corporate Services and CFO

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and Corporate Secretary

NORTEL NETWORKS INC.

By: _____
    Name: Anna Ventresca
    Title: Chief Legal Officer

[Signature Page – Amendment No. 1]

203

IN WITNESS WHEREOF, the Parties have duly entered into this Amendment No. 1 as of the date first written above.

**GENBAND US LLC**

By: _____

Name: Charles Vogt

Title:   President and Chief Executive Officer

[Signature Page – Amendment No. 1]

# EXHIBIT C

204
15/2

This is Exhibit........"C".............referred to in the
affidavit of.....JOHN DOOLITTLE
sworn before me, this....30 th
day of....NOVEMBER.....20 10

..........Donna Woollett..........
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 30, 2013.

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn February 26, 2010)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH
AND SAY:

1.     I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel
Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have
personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do
not possess personal knowledge, I have stated the source of my information and, in all such
cases, believe it to be true.

2.     I swear this Affidavit in support of the motion to approve, among other things, the
transaction (the "Transaction") contemplated by an asset sale agreement dated as of December
22, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. ("NNI") and certain
other entities identified therein as sellers (together, the "Sellers") and GENBAND Inc., as
purchaser ("GENBAND" or the "Purchaser") for the sale (the "Sale") of certain assets of the
Sellers' Carrier Voice Over IP and Application Solutions business (the "CVAS Business") as
described therein (the "Assets") as a "stalking-horse" sale agreement.

- 2 -



3.      A copy of the Sale Agreement (without exhibits or schedules) was attached as an appendix to the thirty-fourth report (the "Thirty-Fourth Report") of the Monitor (as defined below) dated January 3, 2010.

4.      References to "Nortel" herein are references to the global enterprise of NNC, NNL, NNI and their respective affiliates as a whole.

5.      In connection with entering into the Stalking Horse Agreement, a corresponding asset sale agreement relating to the sale and purchase of the EMEA Assets (as defined in the EMEA Agreement) among certain of the EMEA Debtors (defined below) and their affiliates (the "EMEA Sellers"), the Joint Administrators (defined below), the Joint Israeli Administrators (defined below), and the Stalking Horse Purchaser dated December 23, 2009 (the "EMEA Agreement" and together with the Stalking Horse Agreement, the "Purchase Agreements").

6.      All dollar references are US$ unless otherwise indicated.

## BACKGROUND

7.      On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

8.      Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code").  On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

9.      Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA")

- 3 -



each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986.

10.    On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators (the "Joint Israeli Administrators") of the Israeli Company under the Israeli Companies Law.

11.    On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

12.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009.    In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.  On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA.  On November 30, 2009, the French Court approved an order to extend the aforementioned suspension for a further period of three months and authorized the continuation of the business of NNSA during that period.

13.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code.  On June 26, 2009, the U.S.

- 4 -



Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

14.     On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

15.     Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

## THE TRANSACTION

16.     Capitalized terms used in this section of my Affidavit not otherwise defined herein shall have the meanings given to them in the Sale Agreement.

*The CVAS Business*

17.     Nortel's CVAS Business provides telecom service providers with network solutions that help them improve operational efficiency, reduce costs, and generate new revenue through the deployment of multimedia applications and voice over internet protocol ("VoIP") solutions that enhance the communications experience for businesses and consumers.

18.     The CVAS Business specializes in deploying new VoIP networks for operators, in helping carriers transition their older voice infrastructure to state-of-the-art VoIP networks, and in delivering advanced multimedia offerings that unify and simplify communications for users.

19.     The CVAS Business unit sells VoIP platforms (such as softswitches and media gateways), TDM switching systems (for local, toll and long-distance deployments), and associated services (such as installation, technical support, repairs management).  These and other products from the CVAS portfolio are combined into solutions that address specific service provider requirements and opportunities, including: business voice and multimedia, consumer voice and multimedia, transit and multimedia interconnect, and class 5.

20.     Nortel's CVAS Business has a global presence – with nearly 2,100 employees in North America, Europe, the Middle East, Africa, Caribbean, Latin America, Asia-Pacific – and a worldwide customer base.  Nortel's CVAS customers include many of the world's large carriers



(including two-thirds of the top 20 service providers globally), leading regional operators, and major cable operators.

21.    Nortel's principal competitors include Alcatel-Lucent, Huawei Technologies, Nokia Siemens Networks, Ericsson, Sonus Networks, GENBAND, Broadsoft and MetaSwitch. Despite a challenging economic environment and increasing competition in the carrier VoIP market space, CVAS remains the number one carrier VoIP and softswitch market leader, a position Nortel has held for the past seven and half years according to industry analyst firm Dell'Oro Group.

*The Sale Agreement*

22.    On January 6, 2010, this Court granted an order (the "Bidding Procedures Order") approving the Sale Agreement as a stalking horse agreement as well as certain bidding procedures for a sales process for the Business. The motion for the Bidding Procedures Order proceeded as a joint hearing with the U.S. Court and a similar order (together with the Bidding Procedures Order, the "Bidding Procedures Orders") was entered by the U.S. Court on January 8, 2010. A copy of the Bidding Procedures Order will be attached as an appendix to the fortieth report of the Monitor dated February 26, 2010 (the "Fortieth Report").

23.    The Sale Agreement (then, the Stalking Horse Agreement) was described in greater detail in my affidavit sworn December 23, 2010 as well as the Thirty-Fourth Report. Briefly, the Sale Agreement provides for the following:

(a)    *Purchase Price.* A base purchase price of $282 million in cash, subject to balance sheet and other adjustments currently estimated at approximately $100 million.

(b)    *Good Faith Deposit.* The payment of a good faith deposit of $14,100,000 in cash.

(c)    *Assets.* The Assets to be acquired by the Purchaser include, among other things, certain (i) inventory and supplies, (ii) unbilled accounts receivable, (iii) equipment, (iv) contracts and certain bids made by the Sellers for a contract which could result in a contract after the Closing Date, (v) prepaid expenses, (vi) tangible embodiment of business information, (vii) intellectual property, (viii) rights under warranties, representations and guarantees by suppliers,



manufacturers and contractors and third parties related to the Assets, (ix) net insurance proceeds to be received in respect of equipment, and (x) tax records required by law to be transferred. The assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (excluding receivables that are unbilled as of the Closing date), bank account balances and petty cash, and certain assets and rights (for example, the right to tax refunds, credits, or similar benefits, and rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period.

(d)     *Assigned Contracts.*  The Sellers agree to assign certain Seller Contracts, including customer contracts, to the Purchaser, and to cooperate with the Purchaser to assist in the transition of Bundled Contracts to the Purchaser as they relate to the CVAS Business.  The Sellers have agreed to pay the Cure Costs associated with the assignment of customer contracts.

(e)     *Assumed Liabilities.*  The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the CVAS Business by the Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities and (vi) certain liabilities related to employees and employee benefit plans and under employment laws.

(f)     *Fees.*  The Sale Agreement also contemplated the payment of certain fees which is discussed in greater detail below.

(g)     *Employees:*  As part of the Sale Agreement, the Purchaser has agreed to make offers to at least 1,638 Nortel employees associated with the CVAS Business.

(h)     *Closing Conditions:*  The closing of the transactions contemplated by the Sale Agreement are subject to certain closing conditions including the granting of an order of this Court approving the Transaction and vesting title in the Purchaser.



*Break Up Fee and Expense Reimbursement and Incentive Fee Agreement*

24.     The Stalking Horse Agreement also contemplated the payment of a break up fee and expense reimbursement of a total of $10 million to be payable in certain circumstances. Under the Stalking Horse Agreement and the EMEA Agreement, two-thirds of the aggregate Bid Protections would be payable by the Sellers, including the Applicants that are Sellers, and the remaining one-third will be payable by the EMEA Sellers.

25.     Additionally, as part of the bidding procedures motions before this Court and the U.S. Court, the Applicants and the U.S. Debtors sought approval of the payment of an incentive fee payable to One Equity Partners III, L.P. ("OEP") in the amount of $3,600,000 (the "Incentive Fee"). The Incentive Fee was to be payable within five (5) business days following completion of the Auction regardless of the outcome of the Auction and whether the Stalking Horse ASA and the Sale are ultimately approved as a Successful Bid (as defined in the Bidding Procedures) by this Court or any other court, so long as GENBAND participates in the Auction and the financing commitment letter provided by OEP remains in full force and effect. Alternatively, in the event that (i) the Auction was not conducted because no Qualified Bids (as defined in the Bidding Procedures) other than the Purchase Agreements received from GENBAND are received or (ii) the Auction was terminated prior to the selection of a Successful Bid or (iii) the Purchase Agreements were terminated by the Sellers or the EMEA Sellers prior to the Auction for any reason other than as a result of a breach by GENBAND under the Purchase Agreements, the Incentive Fee was to be payable within five (5) business days following the filing by the Monitor with this Court of a certificate (the "Monitor's Certificate") confirming that no Auction will be conducted or the Auction is terminated prior to the selection of a Successful Bid or the termination of the Purchase Agreements, as applicable. The payment of the Incentive Fee is discussed in greater detail below.

*The Sale and Bid Process*

26.     The Bidding Procedures approved by the Bidding Procedures Orders contemplated, among other things:

   (a)     a process pursuant to which interested parties could become "Qualified Bidders";

- 8 -



(b)     an initial bid deadline of 4pm (ET) on February 23, 2010 (the "Initial Bid Deadline");

(c)     criteria for designating bids as "Qualified Bids"; and

(d)     an auction (the "Auction") scheduled to be held at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City on February 25, 2010.

27.     Upon obtaining the Bidding Procedures Orders, Nortel, with the assistance of its financial advisor, Lazard Frères & Co. ("Lazard") renewed its marketing efforts with respect to the CVAS Business.  In particular,

(a)     Notices were published in the Globe and Mail (National Edition), the Financial Times (National Edition) and The Wall Street Journal (National Edition);

(b)     Nortel or Lazard contacted approximately 28 potentially interested parties in connection with the CVAS Business;

(c)     two (2) interested parties executed non-disclosure agreements or acknowledgments in respect of their existing non-disclosure agreement;

(d)     two (2) parties submitted expressions of interest and were deemed "Qualified Bidders" – the two Qualified Bidders also notified the Sellers of their intention to work together; and

(e)     these two (2) Qualified Bidders were provided access to extensive due diligence information including management presentations.

28.     At the Bid Deadline, neither of the Qualified Bidders submitted a bid and neither of the Qualified Bidders requested an extension of the Bid Deadline.  As such, on February 25, 2010, the Monitor filed the Monitor's Certificate with this Court confirming that there would be no Auction and U.S. Debtors filed a certificate of no Auction with the U.S. Court.  It is anticipated that in accordance with the Bidding Procedures Order, NNC will pay its portion of the Incentive Fee within the five (5) business days contemplated by the



Bidding Procedures Order.  I am aware that a copy of the Monitor's Certificate will be attached as an appendix to the Fortieth Report.

## CONCLUSION

29.    As set out in my December 23, 2009 affidavit, even prior to the Bidding Procedures Orders, Nortel had previously marketed the CVAS Business since April 2009.  Upon entry of the Bidding Procedures Orders, the Applicants, the U.S. Debtors and their advisors (including, in particular, Lazard) thoroughly re-canvassed the market for higher or better offers than the Stalking Horse Agreement.  No bids were received as a result of those offers and I do not believe further marketing efforts would result in greater value.  I believe that the process undertaken the by the Applicants, the Chapter 11 Debtors and their advisors, including with input from the official committee of unsecured creditors of NNI and the ad hoc bondholders committee, was in compliance with the Bidding Procedures and that maximum value for the Assets has been achieved.

SWORN BEFORE ME at the City of WESTON         ,   in  the   State   of MASSACHUSETTS on this 26th day of February, 2010

_____
Commissioner for Taking Affidavits or
Notary Public
RitA LoffA
Notary Public
My Commission EX 11/09/2012

_____
George Riedel

48

213

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
(sworn February 26, 2010)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1881927\3

# EXHIBIT D



This is Exhibit......." D "......referred to in the
affidavit of....JOHN DOOLITTLE.............
sworn before me, this....30 th....................
day of....NOVEMBER........20 10.

.....Donna Woollett.....
A COMMISSIONER FOR TAKING AFFIDAVITS

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Court File No.: 09-CL-7950

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 3rd |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF MARCH, 2010 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER
(CVAS)**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global
Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for
the relief set out in the Applicants' Notice of Motion dated February 26, 2010 including, the
approval of a transaction (the "Transaction") to sell Assets pursuant to an asset sale agreement
dated as of December 22, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc.
("NNI") and certain other entities identified therein as sellers (together, the "Sellers") and
GENBAND Inc., as purchaser ("GENBAND" or the "Purchaser") for the sale (the "Sale") of

DOCSTOR: 1721699\6

- 2 -

**215**

certain assets of the Sellers' Carrier Voice Over IP and Application Solutions business (the "CVAS Business") as described therein (the "Assets") was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of George Riedel sworn February 26, 2010 and the thirty-fourth report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated January 3, 2010 and the fortieth report of the Monitor dated February 26, 2010 (the "Fortieth Report") and on hearing the submissions of counsel for the Applicant, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn March 1, 2010, filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Fortieth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS AND DECLARES that capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement.

3.      THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution, delivery and performance of the Sale Agreement by the Applicants is hereby authorized and approved, and the Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Assets to the Purchaser.

4.      THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser or the Designated Purchaser (as such term is defined in the Sale Agreement) free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Orders made in these proceedings

- 3 -

**216**

including the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which are collectively referred to as the "Encumbrances", but excluding Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order) and Assumed Liabilities). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

5.      THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

6.      THIS COURT ORDERS that all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

7.      THIS COURT ORDERS AND ACKNOWLEDGES that the Applicants and the U.S. Debtors (together, the "North American Debtors") recognize that the provision of transition services by each of the North American Debtors under the transition services agreement[s]

related to the sale of the CVAS Business and the sales of the other principal lines of Nortel's business are and will be provided by a business organization that operates on a cross-jurisdictional basis using personnel and assets of several of the North American Debtors, including, without limitation Nortel Networks Inc. and NNL.  In light of the foregoing and in order to address certain concerns raised by official committee of unsecured creditors of NNI (the "Committee") and the Monitor, the North American Debtors have agreed to allocate certain risks and costs of providing such transition services, acting reasonably, including, without limitation, consent fees and segregation costs, sunset costs, indemnification claims and under-recoveries from the respective purchasers, in the same proportion as the "Sales Proceeds" of such sales to each of the North American Debtors are allocated  (as determined in accordance with the "Interim Sale Protocol" contemplated by the IFA or mutual agreement of the relevant "Selling Debtors" (as such terms are defined in the IFA)), and that the side agreement reflecting the foregoing shall be on such terms and conditions as the North American Debtors may agree not inconsistent with the foregoing, acting promptly and in good faith and subject to the consent of the Committee, the Bondholders' Committee (as defined in the IFA) and the Monitor.

8.      THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

9.      THIS COURT ORDERS that, notwithstanding:

(a)      the pendency of these proceedings;

(b)      any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

(c)      any assignment in bankruptcy made in respect of any of the Applicants;

the provisions of the Transaction Documents, the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor

- 5 -

218

constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

10.    THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

11.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

12.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

MAR 0 4 2010

PER / PAR.    Joanne Nicoara
Registrar, Superior Court of Justice

DOCSTOR: 1721699\6

**Schedule A – Form of Monitor's Certificate**

**219**

Court File No.: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
### R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
### NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
### NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
### INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
### CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
### R.S.C. 1985, c. C-36, AS AMENDED

### MONITOR'S CERTIFICATE
### (CVAS)

## RECITALS

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.      Pursuant to an Order of the Court dated ●, 2010, the Court approved an asset sale transaction (the "Transaction") contemplated by an asset sale agreement dated as of December 22, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. and certain other entities identified therein as sellers (together, the "Sellers") and GENBAND Inc., as purchaser ("GENBAND" or the "Purchaser") and provided for the vesting in the Purchaser or a Designated Purchaser of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the



delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from each of NNC, NNL and the Purchaser, as applicable, that: (i) the Purchaser has paid the Purchase Price for the Assets as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in Article ● of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Applicants and the Purchaser.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.      NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and [●] has received the Purchase Price payable for the Assets on the Closing Date pursuant to the terms of the Sale Agreement;

2.      NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in Article ● of the Sale Agreement have been satisfied or waived by the Applicants and/or the Purchaser, as applicable;

3.      NNC, NNL and the Purchaser have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants; and

4.      The Purchaser has advised the Monitor that the Transaction ahs been completed to the satisfaction of the Purchaser.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ 2010.

**ERNST & YOUNG INC. in its capacity as monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**

Per:      _____

Name:

Title:

221

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER
(CVAS)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1721699\6

# EXHIBIT E

222

This is Exhibit..........``E``..........referred to in the
affidavit of.....JOHN DOOLITTLE.....
sworn before me, this.....30 th.....
day of.....NOVEMBER.....20..10

_A COMMISSIONER FOR TAKING AFFIDAVITS_



**NØRTEL**

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

May 25, 2010

**GENBAND Inc.**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Attention: General Counsel
Facsimile: +1-972-265-3581

**BY FACSIMILE**

Re: Estimated Purchase Price Statement pursuant to Section 2.2.2 of the Asset Sale Agreement

Ladies and Gentlemen:

Reference is made to the Asset Sale Agreement, dated as of December 22, 2009, as may be amended from time to time in accordance with its terms (the "Agreement"), by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and the Affiliates of the foregoing listed in Exhibit A to the Agreement (collectively, the "Sellers") and GENBAND Inc. (the "Purchaser"). Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Agreement.

Pursuant to Section 2.2.2 of the Agreement, the Sellers enclose herewith a statement setting forth (i) the Estimated Closing Inventory Value, (ii) the Estimated Warranty Provision Amount, (iii) the Estimated Unbilled Accounts Receivable Amount, (iv) the Estimated Prepaid Expenses Amount, (v) the Estimated Contractual Liabilities Amount, (vi) the Estimated Royalty Liability Amount, (vii) the Estimated Product Exposures Amount, (viii) the Estimated Adjusted Net Working Capital, (ix) the Estimated Closing Accrued Vacation Amount, (x) the Estimated Specified Employee Liabilities Amount, (xi) the Estimated Deferred Profit Amount, (xii) the Estimated Aggregate EMEA Downward Adjustment, (xiii) the Estimated Aggregate Downward Adjustment, (xiv) the Estimated Excess ARD Employees Amount, (xv) the Estimated TFR Amount, (xvi) the Estimated EMEA Holiday Downward Adjustment, (xvii) the Estimated French Excess ARD Employees Amount, (xviii) the Estimated Pre-Close Employment Payments Amount, and (xix) the Estimated Purchase Price.

*[Remainder of page intentionally left blank.]*

223

Very truly yours,

**NORTEL NETWORKS CORPORATION**

By:_____
Name: John Doolittle
Title:  Senior Vice-President, Corporate
Services and Chief Financial Officer

By:_____
Name: Clarke Glaspell
Title:  Controller


**NORTEL NETWORKS LIMITED**

By:_____
Name: John Doolittle
Title:  Senior Vice-President, Corporate
Services and Chief Financial Officer

By:_____
Name: Clarke Glaspell
Title:  Controller


**NORTEL NETWORKS INC.**

By:_____
Name: Lynn C. Egan
Title:  Secretary


cc                                cc:                              cc:
**Latham & Watkins LLP**          **Baker Botts LLP**              **Stikeman Elliott LLP**
885 Third Avenue                  2001 Ross Avenue, Suite 600      445 Park Avenue, 7th Floor
New York, New York  10022         Dallas, Texas  75201            New York, New York  10022
United States                     Attention:  Don J. McDermett, Jr., Esq.   Attnention: Ron Ferguson, Esq.
Attention: David S  Allinson, Esq.           Curt Anderson, Esq.  Facsimile: +1-212-371-7087
Facsimile: +1-212-751-4864        Facsimile:  +1-214-661-4454
                                              +1-214-661-4900


Signature Page to Estimated Purchase Price Statement



**Estimated Purchase Price Statement**

**May 25, 2010**

     This Estimated Purchase Price Statement is being provided pursuant to Section 2.2.2(a) of the Asset Sale Agreement by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and the other entities identified therein as Sellers and GENBAND Inc., dated as of December 22, 2009 (the "ASA"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the ASA. The following amounts are estimates determined as of the date first listed above in accordance with Section 2.2.2 of the ASA and prepared in good faith in accordance with the Nortel Accounting Principles and the terms of the ASA.

**Estimated Adjusted Net Working Capital:**

| | |
|---|---:|
| Estimated Closing Inventory Value, plus | US$15,173,000.00 |
| Estimated Unbilled Accounts Receivable Amount, plus | US$26,041,000.00 |
| Estimated Prepaid Expenses Amount; minus | US$419,000.00 |
| Estimated Contractual Liabilities Amount, minus | US$932,000.00 |
| Estimated Royalty Liability Amount; minus | US$150,000.00 |
| Estimated Warranty Provision Amount; minus | US$25,710,000.00 |
| Estimated Product Exposures Amount | US$400,000.00 |
| **Estimated Adjusted Net Working Capital** | US$14,441,000.00 |

**Estimated Purchase Price:**

| | |
|---|---:|
| Base Purchase Price, plus | US$282,000,000.00 |
| The difference, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital minus Target Working Capital; minus | US$(58,559,000.00) |
| Estimated Aggregate EMEA Downward Adjustment (if any); minus | US$0.00 |
| Estimated Aggregate Downward Adjustment (if any); minus | US$0.00 |
| Estimated Deferred Profit Amount; minus | US$37,867,000.00 |
| Estimated Closing Accrued Vacation Amount; minus | US$1,529,000.00 |
| Estimated Specified Employee Liabilities Amount; minus | US$540,000.00 |
| Estimated TFR Amount, minus | US$472,000.00 |
| Estimated Excess ARD Employees Amount, minus | US$0.00 |
| Estimated EMEA Holiday Downward Adjustment, minus | US$384,000.00 |
| Estimated French Excess ARD Employees Amount, minus | US$0.00 |
| Estimated Pre-Close Employment Payments Amount | US$0.00 |
| **Estimated Purchase Price** | **US$182,649,000.00** |

225



# hp LaserJet 4345mfp series

| Fax Call Report | 1 |
|---|---|

CLEARY GOTTLIEB NEW YORK
212-225-3999
2010-May-25 08.35 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|---|---|---|---|---|---|---|
| 129 | 2010-May-25 08:34 PM | Send | 919722653581 | 1 12 | 0 | No answer ( 0 ) |

*DELIVERED BY*
*EMAIL TO*
*SHAUNA MARTIN*

## CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000

### FACSIMILE

| From: | Aaron Meyers | Date: | May 25, 2010 |
|---|---|---|---|
| Sender's direct dial | +1 212 225-2844 | For retransmission: | |
| Sender's fax | +1 212 225 3999 | Total pages sent: | 4 |
| To: | GENBAND Inc. Attention: General Counsel | Fax: +1 972 265 3581   Phone: | |
| cc: | Latham & Watkins LLP David S. Allinson, Esq. | Fax: +1 212 751 4864 | |
| cc: | Baker Botts LLP Don J. McDermott, Jr., Esq. Curt Anderson, Esq. | Fax: +1 214 661 4454 +1 214 661 4900 | |
| cc: | Stikeman Elliott LLP Ron Ferguson, Esq. | Fax: +1 212 371 7087 | |

**Please disregard the Estimated Purchase Price Statement
delivered by facsimile earlier today, which is superseded by the
enclosed, revised Estimated Purchase Price Statement.**

This facsimile message is being sent by or on behalf of a lawyer; it is intended for the exclusive use of the addressee named above and may constitute information that is privileged or confidential or otherwise legally exempt from disclosure. If you have received this facsimile message in error, please do not read, copy or disseminate. Notify us immediately by telephone and return the original facsimile to us by mail.

**226**

# hp LaserJet 4345mfp series



## Fax Call Report

1

CLEARY GOTTLIEB NEW YORK
212-225-3999
2010-May-25 08 37 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|-----|-----------|------|----------------|----------|-------|--------|
| 130 | 2010-May-25 08:35 PM | Send | 912127514864 | 1:15 | 4 | Success |

## CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000

### FACSIMILE

| From: | Aaron Meyers | Date: | May 25, 2010 |
|-------|-------------|-------|--------------|
| Sender's direct dial | +1 212 225-2844 | For retransmission: | |
| Sender's fax | +1 212 225 3999 | Total pages sent: | 4 |
| To: | GENBAND Inc.<br>Attention: General Counsel | Fax: +1 972 265 3581   Phone: | |
| cc: | Latham & Watkins LLP<br>David S. Allinson, Esq. | Fax: +1 212 751 4864 | |
| cc: | Baker Botts LLP<br>Don J. McDermott, Jr., Esq.<br>Curt Anderson, Esq. | Fax: +1 214 661 4454<br>+1 214 661 4900 | |
| cc: | Stikeman Elliott LLP<br>Ron Ferguson, Esq. | Fax: +1 212 371 7087 | |

**Please disregard the Estimated Purchase Price Statement delivered by facsimile earlier today, which is superseded by the enclosed, revised Estimated Purchase Price Statement.**

This facsimile message is being sent by or on behalf of a lawyer; it is intended for the exclusive use of the addressee named above and may constitute information that is privileged or confidential or otherwise legally exempt from disclosure. If you have received this facsimile message in error, please do not read, copy or disseminate. Notify us immediately by telephone and return the original facsimile to us by mail.

**227** 

# hp LaserJet 4345mfp series

| Fax Call Report | 1 |

CLEARY GOTTLIEB NEW YORK
212-225-3999
2010-May-25 08·38 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|-----|-----------|------|----------------|----------|-------|--------|
| 131 | 2010-May-25 08 37 PM | Send | 912146614454 | 1·25 | 4 | Success |

## CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000

### FACSIMILE

| From: | Aaron Meyers | Date: | May 25, 2010 |
|-------|--------------|-------|--------------|
| Sender's direct dial | +1 212 225-2844 | For retransmission: | |
| Sender's fax | +1 212 225 3999 | Total pages sent: | 4 |
| To: | GENBAND Inc. Attention: General Counsel | Fax: +1 972 265 3581   Phone: | |
| cc: | Latham & Watkins LLP David S. Allinson, Esq. | Fax: +1 212 751 4864 | |
| cc: | Baker Botts LLP Don J. McDermett, Jr., Esq. Curt Anderson, Esq. | Fax: +1 214 661 4454 +1 214 661 4900 | |
| cc: | Stikeman Elliott LLP Ron Ferguson, Esq. | Fax: +1 212 371 7087 | |

**Please disregard the Estimated Purchase Price Statement delivered by facsimile earlier today, which is superseded by the enclosed, revised Estimated Purchase Price Statement.**

This facsimile message is being sent by or on behalf of a lawyer; it is intended for the exclusive use of the addressee named above and may constitute information that is privileged or confidential or otherwise legally exempt from disclosure. If you have received this facsimile message in error, please do not read, copy or disseminate. Notify us immediately by telephone and return the original facsimile to us by mail.

**228**

# hp LaserJet 4345mfp series



## Fax Call Report 1

CLEARY GOTTLIEB NEW YORK
212-225-3999
2010-May-25 08:40 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|-----|-----------|------|----------------|----------|-------|--------|
| 132 | 2010-May-25 08 38 PM | Send | 912146614900 | 1 25 | 4 | Success |

### CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000

#### FACSIMILE

| From: | Aaron Meyers | Date: | May 25, 2010 |
|-------|--------------|-------|--------------|
| Sender's direct dial | +1 212 225-2844 | For retransmission: | |
| Sender's fax | +1 212 225 3999 | Total pages sent: | 4 |
| To: | GENBAND Inc.<br>Attention: General Counsel | Fax: +1 972 265 3581 | Phone: |
| cc: | Latham & Watkins LLP<br>David S. Allinson, Esq. | Fax: +1 212 751 4864 | |
| cc: | Baker Botts LLP<br>Don J. McDermett, Jr., Esq.<br>Curt Anderson, Esq. | Fax: +1 214 661 4454<br>+1 214 661 4900 | |
| cc: | Stikeman Elliott LLP<br>Ron Ferguson, Esq | Fax: +1 212 371 7087 | |

**Please disregard the Estimated Purchase Price Statement
delivered by facsimile earlier today, which is superseded by the
enclosed, revised Estimated Purchase Price Statement.**

This facsimile message is being sent by or on behalf of a lawyer; it is intended for the exclusive use of the addressee named above and may constitute information that is privileged or confidential or otherwise legally exempt from disclosure. If you have received this facsimile message in error, please do not read, copy or disseminate. Notify us immediately by telephone and return the original facsimile to us by mail.



# hp LaserJet 4345mfp series

## Fax Call Report                                                                1

CLEARY GOTTLIEB NEW YORK
212-225-3999
2010-May-25 08:41 PM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|-----|-----------|------|----------------|----------|-------|--------|
| 133 | 2010-May-25 08 40 PM | Send | 912123717087 | 0.54 | 4 | Success |

### CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000

#### FACSIMILE

| From: | Aaron Meyers | Date: | May 25, 2010 |
|-------|--------------|-------|--------------|
| Sender's direct dial | +1 212 225-2844 | For retransmission: | |
| Sender's fax | +1 212 225 3999 | Total pages sent: | 4 |
| To: | GENBAND Inc. Attention: General Counsel | Fax: +1 972 265 3581 | Phone: |
| cc: | Latham & Watkins LLP David S. Allinson, Esq. | Fax: +1 212 751 4864 | |
| cc: | Baker Botts LLP Don J. McDermett, Jr., Esq. Curt Anderson, Esq. | Fax: +1 214 661 4454 +1 214 661 4900 | |
| cc: | Stikeman Elliott LLP Ron Ferguson, Esq. | Fax: +1 212 371 7087 | |

**Please disregard the Estimated Purchase Price Statement delivered by facsimile earlier today, which is superseded by the enclosed, revised Estimated Purchase Price Statement.**

This facsimile message is being sent by or on behalf of a lawyer; it is intended for the exclusive use of the addressee named above and may constitute information that is privileged or confidential or otherwise legally exempt from disclosure. If you have received this facsimile message in error, please do not read, copy or disseminate. Notify us immediately by telephone and return the original facsimile to us by mail.

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

MOTION RECORD
VOLUME 1 OF 2
(returnable December 15, 2010)

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC: #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### MOTION RECORD
### VOLUME 2 OF 2
### (returnable December 15, 2010)

November 30, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC# 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

Court File No. 09-CL-7950

## *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | DOCUMENT | PAGE |
|---|---|---|
| | **Volume 1** | |
| 1. | Notice of Motion, returnable December 15, 2010 | 1 |
| 2. | Affidavit of John Doolittle, sworn November 30, 2010 | 30 |
| A. | Sale Agreement, dated December 22, 2009 | 39 |
| B. | Amendment No. 1 to Sale Agreement, dated May 28, 2010 | 186 |
| C. | Affidavit of George Riedel, sworn February 26, 2010 | 204 |
| D. | Approval and Vesting Order, dated March 3, 2010 | 214 |
| E. | Estimated Purchase Price Statement, dated May 25, 2010 | 222 |
| | **Volume 2** | |
| F. | Escrow Agreement, dated January 6, 2010, and Amendment, dated May 28, 2010 | 230 |

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| G. | Closing Statement, dated September 15, 2010 | 270 |
| H. | Disagreement Notice, dated November 16, 2010 | 274 |
| I. | Email from Thomas Malone to Victor Lewkow and Evan Schwartz, dated December 7, 2009 at 12:37AM EST | 302 |
| J. | Draft invoices, dated September 28, 2010 | 459 |
| K. | Correspondence from Nortel Networks Inc. to Genband US LLC, dated November 18, 2010 | 462 |
| L. | Genband Motion, dated November 18, 2010 | 463 |
| 3. | Draft Order | 473 |

# EXHIBIT F

230.

*Execution Version*

## ESCROW AGREEMENT

This **ESCROW AGREEMENT** (the "**Escrow Agreement**"), dated as of January 6, 2010 is being entered into by and among (i) GENBAND Inc., a corporation organized under the laws of Delaware ("**Purchaser**"), (ii) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), (iii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), (iv) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"), (v) Nortel Networks UK Limited (in administration), a limited company organized under the laws of England ("**NNUK**" and, together with NNC, NNL and NNI, acting jointly as the "**Seller Parties**"), and (vi) Wells Fargo Bank, National Association, as escrow agent (the "**Escrow Agent**").

### RECITALS

WHEREAS, pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement (each as defined below), Purchaser will be acquiring the CVAS business segment from the Sellers and the EMEA Sellers;

WHEREAS, as of December 22, 2009, the (i) Purchaser, (ii) NNC, NNL and NNI (collectively, the "**Main Sellers**"), and (iii) the affiliates of the Main Sellers listed in Exhibit A to the Asset Sale Agreement (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") entered into the Asset Sale Agreement (the "**Asset Sale Agreement**"). Capitalized terms used and not otherwise defined in this Escrow Agreement are used herein as defined in the Asset Sale Agreement;

WHEREAS, simultaneously with the execution of the Asset Sale Agreement, the EMEA Sellers, Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (collectively, the "**Joint Administrators**"), Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") and the Purchaser entered into the EMEA Asset Sale Agreement (the "**EMEA Asset Sale Agreement**"), which provides for the sale by the EMEA Sellers of the assets of the Business (as defined in the EMEA Asset Sale Agreement) held by the EMEA Sellers to the Purchaser or the EMEA Designated Purchasers;

WHEREAS, for the purposes of this Escrow Agreement, "Distribution Agent" means the Person that will act as distribution agent of the sale proceeds under the Asset Sale Agreement and the EMEA Asset Sale Agreement for the Sellers and the EMEA Sellers, whose identity shall be provided in writing by the Seller Parties to the Purchaser and the Escrow Agent by and not later than five (5) Business Days before the Closing or, to the extent of any Escrow Funds to be delivered to the Seller Parties prior to Closing, by and not later than one (1) Business Day prior to such delivery date;

This is Exhibit.............."F".............referred to in the affidavit of.... JOHN DOOLITTLE  
sworn before me, this.... 30th  
day of.... NOVEMBER.... 20. 10

*Donna Woollett*  
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel, limited to the attestation of instruments and the taking of affidavits, for Nortel Networks Corporation and its subsidiaries. Expires January 29, 2011.

231

**WHEREAS**, the Purchaser has agreed to deliver to the Escrow Agent (i) the Good Faith Deposit (as defined in the Asset Sale Agreement) pursuant to Section 2.2.5 of the Asset Sale Agreement and Clause 3.5 of the EMEA Asset Sale Agreement and (ii) on the Closing Date, $8,000,000.00 to be held in escrow in accordance with Section 2.3 of the Asset Sale Agreement pending the final calculation of the Purchase Price adjustments pursuant to Section 2.2.3.2 of the Asset Sale Agreement and Clause 3.3 of the EMEA Asset Sale Agreement; and

**WHEREAS**, Purchaser and the Seller Parties desire to appoint the Escrow Agent to act as escrow agent hereunder in the manner hereinafter set forth, and the Escrow Agent is willing to act in such capacity.

<u>AGREEMENT</u>

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser, the Seller Parties and the Escrow Agent hereby agree as follows:

1.    <u>Appointment of the Escrow Agent</u>.  Purchaser and the Seller Parties jointly appoint the Escrow Agent to receive, hold, administer and deliver the Escrow Funds (as defined below) in accordance with this Escrow Agreement and the Escrow Agent accepts such appointment, all subject to the terms and conditions set forth in this Escrow Agreement.

2.    <u>Establishment of Escrow Accounts</u>.

(a)    <u>Good Faith Deposit Escrow</u>.

(i)    <u>Establishment</u>. Pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement, the Purchaser will, in accordance with Section 2.2.5 of the Asset Sale Agreement and Clause 3.5 of the EMEA Asset Sale Agreement, deliver or cause to be delivered to the Escrow Agent the Good Faith Deposit, to serve as earnest money under the Asset Sale Agreement and the EMEA Asset Sale Agreement, which together with any and all interest or profit thereon, or proceeds therefrom, from time to time held by the Escrow Agent pursuant to the terms hereof is referred to as the "**Good Faith Deposit Escrow Funds**."

(ii)    <u>Release of Funds</u>. The Good Faith Deposit Escrow Funds shall be held by the Escrow Agent until the Closing or, in the event the Asset Sale Agreement and/or the EMEA Asset Sale Agreement is terminated before the Closing, shall be distributed to the applicable parties pursuant to the terms of Section 2.2.5(b) of the Asset Sale

**232**

Agreement. Any release from the Good Faith Deposit Escrow Account (as defined below) shall only be made in accordance with Section 4(a) hereto.

(b) <u>Purchase Price Adjustment Escrow</u>. Pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement, the Purchaser will on the Closing Date deliver or cause to be delivered to the Escrow Agent cash in an amount of $8,000,000.00 (the "**Purchase Price Adjustment Escrow Amount**") to serve as a security for the Purchase Price adjustments described in Section 2.2.3.2 of the Asset Sale Agreement and Clause 3.3 of the EMEA Asset Sale Agreement in accordance with Section 2.4.2(b)(i) of the Asset Sale Agreement and Clause 3.1.2 of the EMEA Asset Sale Agreement, which amount, together with any and all interest or profit thereon, or proceeds therefrom, from time to time held by the Escrow Agent pursuant to the terms hereof is referred to as the "**Purchase Price Adjustment Escrow Funds**," (and together with the Good Faith Deposit Escrow Funds, the "**Escrow Funds**.")  Any funds or investments remaining in the Purchase Price Adjustment Escrow Account (as defined below) after application of any payment to be made in accordance with Section 4(a) hereof and Sections 2.2.3.2 and 2.3 of the Asset Sale Agreement and Clauses 3.3, 3.8, 3.9 and Schedule 7 of the EMEA Asset Sale Agreement shall be released to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) in accordance with Section 4(a) hereto.

(c) <u>Escrow Accounts</u>. The Escrow Agent hereby agrees to hold and invest the Good Faith Deposit Escrow Funds and the Purchase Price Adjustment Escrow Funds in separate accounts (respectively, the "**Good Faith Deposit Escrow Account**", the "**Purchase Price Adjustment Escrow Account**" and together, the "**Escrow Accounts**") as provided in this Escrow Agreement.  Except as set forth in Section 5(c), the Purchaser shall have the rights of a secured party in the Escrow Funds and the Escrow Accounts, and none of the Escrow Funds and the Escrow Accounts shall be subject to any security interest, lien or attachment of any party or of any creditor of any party other than Purchaser or a successor or permitted assign of the Purchaser or any of their respective creditors.  Purchaser's rights (if any) in the Escrow Funds prior to release thereof or Escrow Accounts prior to termination thereof, other than its rights as a secured party, shall be subject to a first priority security interest in favor of the Seller Parties (for and behalf of the Sellers and the EMEA Sellers) in the Escrow Funds and Escrow Accounts as security for the Purchaser's obligations under Sections 2.2.3.2 and 2.2.5(a) of the Asset Sale Agreement and/or Clauses 3.3, 3.5 and Schedule 7 of the EMEA Asset Sale Agreement.

3.   <u>Investment of the Escrow Funds</u>.

(a)  The Escrow Agent shall invest the Escrow Funds in any combination of the following investments at the joint written direction of Purchaser and the Seller Parties:

**233**

(i)     marketable obligations of, or obligations fully and directly guaranteed by, the United States, which obligations have a maturity of not more than 90 days;

(ii)    repurchase obligations with a term of not more than ten days for underlying securities of the types described in Section 3(a)(i) entered into with any bank organized under the laws of the United States or any state thereof, the commercial paper of which bank is rated A-2 or better by Standard & Poor's Ratings Group or Prime-2 or better by Moody's Investors Service, Inc.;

(iii)   money market funds (including tax-free funds) registered under the Investment Company Act of 1940, as amended from time to time, which have the highest rating available from a nationally recognized rating agency (e.g., AAA from Standard & Poors);

(iv)    investment grade bonds (including tax free bonds) with maturity dates prior to the Release Date (as defined below); and

(v)     such other investments as Purchaser and the Seller Parties may jointly authorize the Escrow Agent to make from time to time.

(b)  In the absence of written investment instructions from the Purchaser and the Seller Parties, the Escrow Agent shall invest the Escrow Funds in the Wells Fargo Advantage Funds Heritage Money Market Fund, which is further described herein on Schedule I hereto. The Purchaser and the Seller Parties acknowledge that each has read and understands Schedule I. The Escrow Agent shall bear no responsibility for losses resulting from investment or sale of investment of the Escrow Funds in accordance with this Escrow Agreement. The Purchaser and the Seller Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations or advice.

4.   Disposition of the Escrow Funds.

(a)  Payment of Escrow Funds. The Purchaser and the Seller Parties acknowledge and agree that as among the Purchaser and the Seller Parties, in the event of any conflict between this Escrow Agreement and the Asset Sale Agreement and/or the EMEA Asset Sale Agreement, the Asset Sale Agreement and/or the EMEA Asset Sale Agreement shall control, and the Purchaser and the Seller Parties shall provide and deliver to the Escrow Agent joint written instructions with respect of the Escrow Funds consistent with and as required by the Asset Sale Agreement and the EMEA Asset Sale Agreement, notwithstanding anything that may be provided in this Escrow Agreement to the contrary. Without limiting the foregoing, the Escrow Funds shall be payable to the Purchaser or the Distribution Agent (as agent for the Sellers and the EMEA Sellers) as provided in joint

4

234

written instructions delivered by the Purchaser and the Seller Parties pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement, and the Purchaser and the Seller Parties agree to comply with Section 2.3(b) of the Asset Sale Agreement and Clause 3.9 of the EMEA Asset Sale Agreement and provide the Escrow Agent joint written instructions to pay to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) or the Purchaser, as applicable, funds from the relevant Escrow Account any time that such Person becomes entitled to such payment from the relevant Escrow Account pursuant to the Asset Sale Agreement or the EMEA Asset Sale Agreement, and the Escrow Agent agrees to distribute amounts from the Escrow Account in accordance with such joint instructions.

(b) <u>Disputes</u>. Subject to Section 4(a), if any dispute arises as to amounts due from, or the disposition of, the Escrow Funds, or any other dispute arises under this Escrow Agreement with respect to the rights of Purchaser or any of the Seller Parties (for and on behalf of the Sellers and the EMEA Sellers) to the Escrow Funds, in any case that is not settled by mutual agreement of Purchaser and the Seller Parties on behalf of the Sellers and the EMEA Sellers (with such mutual agreement evidenced by joint written instructions signed by Purchaser and the Seller Parties and delivered to the Escrow Agent), then upon receipt of a final, non-appealable order of a court of competent jurisdiction, a copy of which order shall have been delivered to the Escrow Agent, the Purchaser and the Seller Parties and which court order shall be accompanied by a legal opinion by counsel for the presenting party reasonably satisfactory to the Escrow Agent to the effect that said court order is final and non-appealable (any such court order, a "**Final Court Order**"), the Escrow Agent shall deliver the portion of the Escrow Funds specified in such Final Court Order to Purchaser or the Distribution Agent (on behalf of the relevant Sellers and/or the relevant EMEA Sellers) as directed in such Final Court Order. The Escrow Agent shall also be entitled to interplead the Escrow Funds as provided in Section 6(e) hereto.

(c) <u>Closing</u>. On or prior to the Closing, but subject to the satisfaction or valid waivers of the conditions to Closing set forth in the Asset Sale Agreement and the EMEA Asset Sale Agreement, the Purchaser and the Seller Parties shall deliver to the Escrow Agent joint written instructions to liquidate all investments of amounts held in the Good Faith Deposit Escrow Account and deliver to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) on the Closing all amounts held by the Escrow Agent in the Good Faith Deposit Escrow Account by wire transfer in immediately available funds (less the Seller Parties' portion of the fees and expenses due to the Escrow Agent pursuant to Section 6(i) hereof).

5.  <u>Certain Additional Agreements</u>.

(a) The Purchaser and the Seller Parties will execute and deliver to the Escrow Agent such additional joint written instructions and certificates hereunder as may be required to

**235**

give effect to the provisions of this Escrow Agreement, the Asset Sale Agreement and the EMEA Asset Sale Agreement.

(b)  Whenever the Escrow Agent shall be required to make a payment from the Escrow Accounts from Escrow Funds held in investments pursuant to Section 3, the Escrow Agent shall pay such amounts by liquidating such investments as shall be directed in joint written instructions signed by the Seller Parties and Purchaser or as necessary for the Escrow Agent to distribute Escrow Funds in accordance with a Final Court Order.

(c)  For tax purposes, the Escrow Funds and all interest and profit thereon shall be considered owned by the Purchaser and reported as such by the Purchaser for all tax reporting purposes.  The Purchaser and the Seller Parties shall pay or reimburse the Escrow Agent upon request for any transfer taxes or other taxes relating to the Escrow Funds incurred in connection herewith (to be split on an equal basis between the Purchaser on the one hand and the Seller Parties on the other hand) and shall indemnify and hold harmless the Escrow Agent from any amounts that it is obligated to pay in the way of such taxes.  Any payments of income from the Escrow Accounts shall be subject to withholding regulations then in force with respect to United States taxes.  The parties hereto will provide the Escrow Agent with appropriate Forms W-9 for taxpayer identification number certifications, or Forms W-8 for non-resident alien certifications.  It is understood that the Escrow Agent is not responsible for any tax reporting.  The parties acknowledge and agree that this Section 5(c) is only for the purpose of determining ownership of the Escrow Funds for tax purposes and shall have no effect on the relative rights of the parties with respect to the Escrow Funds, including without limitation, the relative rights set forth in Section 2(c) hereof.  Notwithstanding anything to the contrary in this Agreement, the Escrow Agent shall distribute quarterly to Purchaser out of the Escrow Funds an amount equal to the product of (i) all interest and profit to be included in the income of Purchaser pursuant to this Section 5(c) for such quarter and (ii) forty percent (40%).  The Escrow Agent shall make such distributions not later than five (5) Business Days after the end of each such fiscal quarter (or, if earlier, the date on which any disbursement of Escrow Funds is made to the Seller Parties); provided, however, that the first such payment shall be made no later than April 5, 2010.

6.  Escrow Agent.

(a)  The Escrow Agent shall have only the duties and responsibilities specified in this Escrow Agreement, and shall not have any duty to review or interpret the Asset Sale Agreement or the EMEA Asset Sale Agreement.  The duties of the Escrow Agent hereunder are purely ministerial in nature, and under no circumstances shall the Escrow Agent be deemed a fiduciary to the Purchaser, the Sellers, the EMEA Sellers, nor to any other party under this Escrow Agreement.

**236**

(b)  If the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions from any of the undersigned with respect to the Escrow Accounts, which, in its opinion, are in conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action until it shall be directed otherwise in joint written instructions signed by Purchaser and the Seller Parties or by a Final Court Order. The Escrow Agent shall be protected in acting upon any notice, request, waiver, consent, receipt or other document reasonably believed by the Escrow Agent to be signed by the proper party or parties.

(c)  The Escrow Agent shall not be liable for any error or judgment or for any act done or step taken or omitted by it or for any mistake of fact or law, or for anything that it may do or refrain from doing in connection herewith, except its own gross negligence or willful misconduct, and the Escrow Agent shall have no duties to anyone except those parties signing this Escrow Agreement.  In no event shall the Escrow Agent be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including without limitation lost profits), even if it has been advised of the possibility of such loss or damage and regardless of the form of action.

(d)  The Escrow Agent may consult legal counsel in the event of any dispute or question as to the construction of this Escrow Agreement, or the Escrow Agent's duties hereunder, and the Escrow Agent shall incur no liability and shall be fully protected with respect to any action taken or omitted in good faith in accordance with the opinion and instructions of such counsel.

(e)  In the event of any disagreement between the undersigned or any of them, and/or any other person, resulting in adverse claims and demands being made in connection with or for all or any portion of the Escrow Funds, the Escrow Agent shall be entitled at its option to refuse to comply with any such claim or demand, so long as such disagreement shall continue, and in so doing the Escrow Agent shall not be or become liable for damages or interest to the undersigned or any of them or to any person named herein for its failure or refusal to comply with such conflicting or adverse demands.  The Escrow Agent shall be entitled to continue to so refrain and refuse to so act until all differences with respect thereto shall have been resolved by agreement of Purchaser and the Seller Parties and the Escrow Agent shall have been notified thereof in joint written instructions signed by Purchaser and the Seller Parties.  In the event of such disagreement which continues for ninety (90) days or more, the Escrow Agent in its discretion may file a suit in interpleader for the purpose of having the respective rights of the claimants adjudicated, and may deposit with the court all documents and property held hereunder.  Purchaser and the Seller Parties agree to pay all reasonable out-of-pocket costs and expenses incurred by the Escrow Agent in such action, including reasonable attorney's fees, it being understood that the parties will use reasonable efforts to cause such costs and expenses to be included and apportioned between Purchaser,

**237**

and the Seller Parties in the judgment in any such action (and absent such apportionment, Purchaser and the Seller Parties shall bear equal shares of such costs and expenses, being 50% by the Purchaser and 50% by the Seller Parties).

(f)    Purchaser, NNC, NNL and NNI hereby jointly and severally indemnify, defend and hold the Escrow Agent harmless from all loss, liability or expense arising out of or in connection with (i) the Escrow Agent's execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense is due to the gross negligence or willful misconduct of the Escrow Agent, (ii) the Escrow Agent's reliance upon and compliance with instructions or directions from the Purchaser or the Seller Parties, except to the extent that such loss, liability or expense is due to the gross negligence or willful misconduct of the Escrow Agent, it being understood that the failure of the Escrow Agent to verify or confirm that the person giving the instructions or directions, is, in fact, an authorized person does not constitute gross negligence or willful misconduct and (iii) the Escrow Agent's following any instructions or other directions from Purchaser or the Seller Parties. As between the Purchaser, NNC, NNL and NNI, such indemnification shall be borne 50% by the Purchaser and 50% by NNC, NNL and NNI and shall survive termination of this Escrow Agreement until extinguished by any applicable statute of limitations; provided, that Purchaser, on the one hand, and NNC, NNL and NNI, on the other hand, shall indemnify and hold the other harmless to the extent such indemnification of the Escrow Agent arose out of or is related to the negligent acts or omissions of Purchaser or any of NNC, NNL or NNI, respectively, or acts or omissions of Purchaser or any of NNC, NNL or NNI, respectively, in breach of this Agreement, the Asset Sale Agreement or the EMEA Asset Sale Agreement.  Notwithstanding the foregoing, nothing in this Section 6(f) shall be construed as creating an indemnification obligation of NNUK in favor of the Escrow Agent.

(g)    The Escrow Agent does not own or have any interest in the Escrow Accounts or the Escrow Funds but is serving as escrow holder only, having only possession thereof and agreeing to hold and distribute the Escrow Funds in accordance with the terms and conditions of this Escrow Agreement.  This paragraph shall survive notwithstanding any termination of this Escrow Agreement or the resignation of the Escrow Agent.

(h)    The Escrow Agent (and any successor escrow agent) may at any time resign as such by delivering the Escrow Funds to (i) any banking corporation or trust company organized under the laws of the United States or of any state, which corporation or company is jointly designated by the other parties hereto in writing as successor escrow agent and consents in writing to act as successor escrow agent or (ii) any court of competent jurisdiction; whereupon the Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Escrow Agreement.  The resignation of the Escrow Agent will take effect on the earlier of (x) the appointment of a successor escrow agent by designation by the Purchaser and the Seller Parties and delivery of the Escrow Funds to such

**238**

successor escrow agent (or delivery of the Escrow Funds to any court of competent jurisdiction) or (y) the day that is sixty (60) days after the date of delivery of its written notice of resignation to the Purchaser and the Seller Parties. If at the time of effectiveness of resignation the Escrow Agent has not received a designation of a successor escrow agent, the Escrow Agent's sole responsibility after that time shall be to safekeep the Escrow Funds until the earlier of receipt of a designation by the other parties hereto of a successor escrow agent, a joint written instruction as to disposition of the Escrow Funds by the other parties hereto, or a final order of a court of competent jurisdiction mandating disposition of the Escrow Funds.

(i)   The Escrow Agent hereby accepts its appointment and agrees to act as escrow agent under the terms and conditions of this Escrow Agreement. Purchaser and the Seller Parties shall pay to the Escrow Agent as payment in full for its services hereunder the Escrow Agent's compensation set forth in Schedule II hereto. Purchaser and the Seller Parties further agree to reimburse the Escrow Agent for all reasonable out-of-pocket expenses, disbursements and advances incurred or made by the Escrow Agent in the performance of its duties hereunder (including reasonable fees and out-of-pocket expenses and disbursements of its counsel). Purchaser, on the one hand, and the Seller Parties, on the other hand, shall each pay one half of the amounts required to be paid under this Section 6(i); provided, however, that the Seller Parties' share of any such costs and expenses shall be paid from the Good Faith Deposit Escrow Funds, and the Escrow Agent may withdraw such one-half share from such Good Faith Deposit Escrow Account when due, and as applicable, provided that the Escrow Agent gives the Seller Parties and the Purchaser reasonable advance notice of each such withdrawal, including reasonable documentation supporting such expenses, fees and disbursements.

(j)   The Escrow Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Escrow Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God, war, earthquakes, fires, floods, wars, civil or military disturbances, sabotage, acts of terrorism, epidemics, riots, loss or malfunctions of utilities or communications service, labor disputes, acts of civil or military authority or governmental actions); it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(k)   Concurrently with the execution of this Escrow Agreement, the Purchaser and the Seller Parties shall deliver to the Escrow Agent authorized signers' lists in the form of Exhibit A-1, Exhibit A-2, Exhibit A-3, Exhibit A-4 and Exhibit A-5 to this Escrow Agreement.

9

**239**

7.  Exclusion of Liability and Acknowledgments regarding Joint Administrators.

(a)  The Seller Parties agree that the Joint Administrators have negotiated and are entering into this Escrow Agreement as agents for NNUK to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal Liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Escrow Agreement or under or in relation to any associated arrangements or negotiations.

(b)  Notwithstanding anything in Sections 16 or 17, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal Liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of NNUK and their remaining as current joint administrators thereof under this Escrow Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

8.  Notices.  All certificates, instructions, notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Escrow Agreement must be in writing and must be delivered, given or otherwise provided:

(a)  by hand (in which case, it will be effective upon delivery);

(b)  by facsimile (in which case, it will be effective on written or telephonic confirmation of receipt from the recipient); or

(c)  by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the first business day after being deposited with such courier service).

in each case, to the address (or facsimile number) listed below:

If to Purchaser, to:

> **GENBAND Inc.**
> 3605 E. Plano Pkwy., Suite 100
> Plano, Texas 75074
> Attention: General Counsel
> Facsimile: +1-972-265-3581

with copies (which shall not constitute notice) to:



Latham & Watkins LLP
885 Third Avenue
New York NY 10022
United States
Attention:      David S. Allinson, Esq.
Facsimile:      +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:      Don J. McDermett, Jr., Esq.
                Curt Anderson, Esq.
Facsimile:      +1-214-661-4454
                +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue  7th Floor
New York, New York  10022
Attnention:     Ron Ferguson, Esq.
Facsimile:      +1-212-371-7087

If to the Seller Parties, to:

**Nortel Networks Limited and Nortel Networks Corporation**
5945 Airport Road
Suite 360
Mississauga, Ontario, Canada  L4V 1R9
Attention:      Anna Ventresca
                General Counsel-Corporate, Corporate Secretary and
                Chief Compliance Officer
Facsimile:      +1-905-863-2057

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, TN  37228
USA
Attention:      Lynn C. Egan
                Assistant Secretary
Facsimile:      +1-615-432-4067

241

**Nortel Networks UK Limited (in administration)**
Maidenhead Office Park
Westacott Way
Maidenhead
Berks SL6 3QH
Attention:    Chris Hill, Administrator (EMEA)
Facsimile:    +44 (0)20-7951-1345

-and-

Ernst & Young LLP
1 More London Place
London  SE1 2AF
United Kingdom
Attention:    Alan Bloom / Stephen Harris
Facsimile:    + 44 (0)20 7951 1345

with copies (which shall not constitute notice) to:

**Nortel Networks Limited and Nortel Networks Corporation**
5270 Sycamore Avenue
Bronx, NY 10471
Attention:    Robert Fishman
                    Senior Counsel

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006
USA
Attention:    Victor I. Lewkow
Facsimile:    +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, ON  M5J 2Z4
Canada
Attention:    Michael Lang
Facsimile:    416-216-3930

*242*

-and-

Herbert Smith LLP
Exchange House
London EC2A 2HS
Facsimile:     + 44 (0)20 7098 4618
Attention:     Alex Kay / Alan Montgomery

If to the Escrow Agent, to:

Wells Fargo Bank, N.A.
45 Broadway, 14th Floor
New York, NY  10006
Attn: Lisa D'Angelo
Facsimile: 212.509.1716

(or to such other addresses and facsimile numbers as a party may designate as to itself by notice to the other parties given pursuant to this Section 8).  Notwithstanding any of the foregoing, any computation of a time period which is to begin after receipt of a notice by the Escrow Agent shall run from the date of receipt by it.

9.    Termination.  This Escrow Agreement shall automatically terminate upon the final distribution of the Escrow Funds in accordance with the terms hereof; provided, however, that the provisions of Sections 4(a), 5(c), 6(f), 6(g) and 8 through 20 shall survive such termination of this Escrow Agreement and/or the resignation or removal of the Escrow Agent.

10.    Successors and Assigns.  This Escrow Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto, provided that this Escrow Agreement may not be assigned by any party without the prior written consent of the other parties, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, the following assignments shall not require consent of any party: (a) assignment by a Seller that is a U.S. Debtor to an entity that is the surviving, resulting or acquiring entity of, and successor to, such U.S. Debtor pursuant to a final court order confirming a chapter 11 plan of reorganization for such U.S. Debtor and (b) assignment by any Seller that is a Canadian Debtor pursuant to any plan of arrangement approved by the Canadian Court.  Any banking association or corporation into which the Escrow Agent may be merged, converted or with which the Escrow Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any banking association or corporation to which all or substantially all of the corporate trust business of the Escrow Agent shall be sold or otherwise transferred, shall succeed to all the Escrow Agent's rights, obligations

**243**

and immunities hereunder without the execution or filing of any instrument or any further act, any provision herein to the contrary notwithstanding.

11. <u>Severability</u>. Any term or provision of this Escrow Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

12. <u>Entire Agreement</u>. This Escrow Agreement (together with any documents, instruments and certificates explicitly referred to herein, including the Asset Sale Agreement and the EMEA Asset Sale Agreement, as they pertain to the Purchaser and the Seller Parties only) constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

13. <u>Amendments</u>. This Escrow Agreement may not be amended or modified at any time except in such manner as may be agreed upon by a written instrument executed by each of Purchaser, the Seller Parties and the Escrow Agent.

14. <u>Waiver</u>. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party. The failure of any party to require the performance of any term or obligation of this Escrow Agreement, or the waiver by any party of any breach of this Escrow Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

15. <u>Headings</u>. The headings contained in this Escrow Agreement are for convenience purposes only and will not in any way affect the meaning or interpretation hereof.

16. <u>Governing Law</u>. This Escrow Agreement, the rights of the parties and any questions, claims, disputes, remedies or actions arising from or related to this Escrow Agreement, and any relief or remedies sought by any parties, shall be governed exclusively by the laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction that would cause any laws other than the laws of the State of New York to be applied.

17. <u>Consent to Jurisdiction; Venue</u>.

14



(a)   To the fullest extent permitted by applicable Law, each of the parties: (i) agrees that any claim, action, proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Escrow Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (x) a final decree closing the Chapter 11 Cases has not been entered and (y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of New York (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in Clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Escrow Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 8 of this Escrow Agreement or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

(b)   The Purchaser hereby appoints Stikeman Elliot LLP, Barristers & Solicitors, 5300 Commerce Court West, 199 Bay Street, Toronto, ON, Canada M5L1B9, as its authorized agent (the "**Purchaser Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Escrow Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable.  The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid.  Service of process upon the Purchaser Authorized Canadian Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

**245**

(c)   Each Seller Party hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Escrow Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the New York Courts by any other party hereto, and (ii) NNL as its authorized agent (the "**Seller Authorized Canadian Agent**" and together with the Seller Authorized U.S. Agent, the "**Seller Authorized Agents**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Escrow Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid.  Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to NNL and NNI shall be deemed, in every respect, effective service of process upon every such Seller Party.

18.   Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS ESCROW AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS ESCROW AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

19.   Counterparts.  This Escrow Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  This Escrow Agreement will become effective when duly executed by each party hereto.

20.   No Presumption.  The parties agree that this Escrow Agreement was negotiated fairly between them at arm's length and that the final terms of this Escrow Agreement are the product of the parties' negotiations.  Each party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Escrow Agreement and the rights and obligations affected hereby.  The parties agree that this Escrow Agreement shall be deemed to have been jointly and equally drafted by them, and that the

246

provisions of this Escrow Agreement therefore should not be construed against a party on the grounds that such party drafted or was more responsible for drafting the provisions.

*[The remainder of this page is intentionally left blank.  Signatures follow.]*

**247**

**IN WITNESS WHEREOF**, the undersigned have executed this Escrow Agreement as of the date first written above.

**ESCROW AGENT**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as escrow agent

By: _____

Name: LISA D'ANGELL

Title: VICE PRESIDENT

*Signature Page to Escrow Agreement*

**248**

**PURCHASER:**

**GENBAND INC.**

By: _____

    Name: Charlie Vogt
    Title: President and Chief Executive
    Officer

**249.**

**SELLER PARTIES**

**NORTEL NETWORKS CORPORATION**

By: _____
    Name: Anna Ventresca
    Title:  General Counsel-Corporate
    and Corporate Secretary

By: _____
    Name: John Doolittle
    Title:  SVP, Finance and Corporate
    Services

**NORTEL NETWORKS LIMITED**

By: _____
    Name: Anna Ventresca
    Title:  General Counsel-Corporate
    and Corporate Secretary

By: _____
    Name: John Doolittle
    Title:  SVP, Finance and Corporate
    Services

**NORTEL NETWORKS INC.**

By: _____
    Name:  Anna Ventresca
    Title:  Chief Legal Officer

*Signature Page for Escrow Agreement*

250

**SIGNED** for and on behalf of **Nortel**    )
**Networks UK Limited** (in administration)    )
by Christopher Hill    )
    )

................................................
Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence
of:


Witness signature

................................................    )
Name:  Jessica Henson    )
Address: Herbert Smith LLP, Exchange Square,  )
Primrose Street, London, EC2A 2HS, England



**Agency and Custody Account Direction**
**For Cash Balances**

Direction to use Wells Fargo Advantage Funds for Cash Balances for the escrow account or accounts (the "Account") established under the Escrow Agreement to which this Schedule I is attached.

In the absence of written investment instructions, the Escrow Agent is hereby directed to invest, as indicated below or as Purchaser and the Seller Parties shall direct further through joint written instruction from time to time, all cash in the Account in the following money market portfolio of Wells Fargo Advantage Funds (the "Fund") or another permitted investment of the Purchaser and Seller Parties' joint choice:

**Wells Fargo Advantage Funds, Heritage Money Market Fund**

Purchaser and Seller Parties acknowledge that they have received, at their request, and reviewed the Fund's prospectus and have determined that the Fund is an appropriate investment for the Account.

Purchaser and the Seller Parties understand from reading the Fund's prospectus that Wells Fargo Funds Management, LLC ("Wells Fargo Funds Management"), a wholly-owned subsidiary of Wells Fargo & Company, provides investment advisory and other administrative services for the *Wells Fargo Advantage Funds*. Other affiliates of Wells Fargo & Company provide sub-advisory and other services for the Funds. Boston Financial Data Services serves as transfer agent for the Funds. The Funds are distributed by Wells Fargo Funds Distributor, LLC, Member NASD/SIPC, an affiliate of Wells Fargo & Company. Purchaser and the Seller Parties also understand that Wells Fargo & Company will be paid, and its bank affiliates may be paid, fees for services to the Funds and that those fees may include Processing Organization fees as described in the Fund's prospectus.

Purchaser and the Seller Parties understand that the Escrow Agent will not exclude amounts invested in the Fund from Account assets subject to fees under the Account agreement between us.

Purchaser and the Seller Parties understand that investments in the Fund are not obligations of, or endorsed or guaranteed by, Wells Fargo Bank or its affiliates and are not insured by the Federal Deposit Insurance Corporation.

Purchaser and the Seller Parties acknowledge that they have, through joint agreement, full power to direct investments of the Account.

Purchaser and the Seller Parties understand that they may change this direction at any time and that it shall continue in effect until revoked or modified by Purchaser and the Seller Parties by joint written notice to the Escrow Agent.

Purchaser and the Seller Parties understand that if they choose to communicate this joint written investment direction solely via facsimile, then the investment direction will be understood to be enforceable and binding.

**252**

<u>Schedule II</u>

<u>Compensation of the Escrow Agent</u>

See attached.

Wells Fargo Corporate Trust Services
Fee Schedule for Escrow Agent Services for the

## GENBAND, Inc., NNC, NNL, NNI and NNUK Escrow Agreement

**253**

Wells Fargo Bank is a leading provider of quality, cost-efficient Corporate Trust Services. Our staff is qualified and proficient, drawing on years of experience in the field.  Because we value your business, we are committed to bringing you personal and professional service.

| Acceptance Fee: | Waived |
|---|---|

Initial Fees as they relate to Wells Fargo Bank acting in the capacity of Escrow Agent – includes final review of the Escrow Agreement; acceptance of the Escrow appointment; setting up of the Escrow Account(s) and accounting records; and coordination of receipt of funds for deposit to the Escrow Account(s).

| Escrow Agent Administration Fee: | $2,500.00 |
|---|---|

For ordinary administration services by Escrow Agent – includes daily routine account management; investment transactions; cash transaction processing (including wire and check process) and disbursement of funds in accordance with the agreement.  Generation of 1099's (if applicable) for up to 15 investors is included in the Escrow Administration fee.

This fee is payable in advance, with payment due at the time of Escrow Agreement execution.

**Wells Fargo's fee quote is based on the following assumptions:**

- Maximum number of investors:  15
- Duration of the escrow is 12 months or less
- Appointment subject to receipt of requested due diligence information as per the USA Patriot Act
- This proposal assumes that balances in escrow account will be invested in money market funds
- All funds will be received from or distributed to a domestic or an approved foreign entity
- If the account(s) does not open within three (3) months of the date shown below, this proposal will be deemed to be null and voice

| Out-of-Pocket Expenses | At Cost |
|---|---|

We will charge for out-of-pocket expenses in response to specific tasks assigned by the client or provided for in the Escrow Account. Possible expenses would be, but are not limited to, express mail and messenger charges, travel expenses to attend closing or other meetings. Wells Fargo does not typically retain outside counsel to review Escrow Agreements but should we elect to we will charge for their fees and expenses should substantial comments be made to the Escrow Agreement.

**254**

*This fee schedule is based upon the assumptions listed above which pertain to the responsibilities and risks involved in Wells Fargo undertaking the role of Escrow Agent. These assumptions are based on information provided to us as of the date of this fee schedule. Our fee schedule is subject to review and acceptance of the final documents. Should any of the assumptions, duties or responsibilities change, we reserve the right to affirm, modify or rescind our fee schedule. Extraordinary services (services other than the ordinary administration services of Escrow Agent described above) are not included in the administration fee and will be billed as incurred at the rates in effect from time to time.*

Submitted on:  December 21, 2009

I, on behalf of the Company, am duly authorized to sign on behalf of and bind the Company and hereby confirm receipt and agreement with all of the Terms and Conditions of this Schedule of Fees.

GENBAND Inc.

By:   Charlie Vogt                                                    Date:  January 6, 2010
Title: President and Chief Executive Officer

255

Exhibit A-1
## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-1 is attached, on behalf of Purchaser

Name / Title                          Specimen Signature

Name: Charlie Vogt
Title:  President and Chief Executive Officer
_____
Signature

Name: Jeff Kupp
Title:   Executive Vice President and Chief
          Financial Officer
_____
Signature

Name:  Shauna Martin
Title:    Executive Vice President and
          General Counsel
_____
Signature

**256**

Exhibit A-1
## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-1 is attached, on behalf of Purchaser

Name / Title                          Specimen Signature

Name: Charlie Vogt
Title:  President and Chief Executive Officer
_____
Signature

Name: Jeff Kupp
Title:   Executive Vice President and Chief
         Financial Officer
_____
Signature

Name:  Shauna Martin
Title:    Executive Vice President and
          General Counsel
_____
Signature

**Exhibit A-2**

**257**

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Nortel Networks Limited and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-2 is attached, on behalf of Nortel Networks Limited.

| Name / Title | Specimen Signature |
|---|---|
| Anna Ventresca | |
| Name | Signature |
| General Counsel-Corporate and Corporate Secretary | |
| Title | |
| John Doolittle | |
| Name | Signature |
| Senior Vice-President, Finance and Corporate Services | |
| Title | |
| Clarke Glaspell | |
| Name | Signature |
| Controller | |
| Title | |

**258**

Exhibit A-3

CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Nortel Networks Inc. and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-3 is attached, on behalf of Nortel Networks Inc.

Name / Title                                    Specimen Signature


Anna Ventresca
Name                                             Signature

Chief Legal Officer
Title


John Doolittle
Name                                             Signature

Vice-President
Title



Clarke Glaspell
Name                                             Signature

Vice-President, Finance
Title

*Signature Page for Escrow Agreement*

**259**

<u>Exhibit A-4</u>
## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Nortel Networks UK Limited and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-4 is attached, on behalf of Nortel Networks UK Limited.

<u>Name / Title</u>                                   <u>Specimen Signature</u>

Alan Robert Bloom
Name                                                _____
                                                         Signature

Joint Administrator
Title

Stephen John Harris
Name                                                _____
                                                         Signature

Joint Administrator
Title

Christopher John Wilkinson Hill
Name                                                _____
                                                         Signature

Joint Administrator
Title

Alan Michael Hudson
Name                                                _____
                                                         Signature

Joint Administrator
Title

*260*

Exhibit A-4
## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Nortel Networks UK Limited and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-4 is attached, on behalf of Nortel Networks UK Limited.

| Name / Title | Specimen Signature |
|---|---|
| Alan Robert Bloom <br> Name | _____ <br> Signature |
| Joint Administrator <br> Title | |
| Stephen John Harris <br> Name | _____ <br> Signature |
| Joint Administrator <br> Title | |
| Christopher John Wilkinson Hill <br> Name | _____ <br> Signature |
| Joint Administrator <br> Title | |
| Alan Michael Hudson <br> Name | _____ <br> Signature |
| Joint Administrator <br> Title | |

**261**

Exhibit A-5

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Nortel Networks Corporation and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-5 is attached, on behalf of Nortel Networks Corporation.

Name / Title                                    Specimen Signature

Anna Ventresca
_____
Name

General Counsel-Corporate and Corporate
Secretary
_____
Title                                            _____
                                                  Signature

John Doolittle
_____
Name                                             _____
                                                  Signature

Senior Vice-President, Finance and
Corporate Services
_____
Title

Clarke Glaspell
_____
Name                                             _____
                                                  Signature

Controller
_____
Title

262

*Execution Version*

## AMENDMENT NO. 1

## TO THE ESCROW AGREEMENT

AMENDMENT NO. 1, dated as of May 28, 2010 (this "Amendment No. 1"), to the Escrow Agreement, dated as of January 6, 2010 (the "Escrow Agreement") by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI") and Nortel Networks UK Limited (in administration) ("NNUK" and together with NNC, NNL and NNI, acting jointly as the "Seller Parties") and GENBAND Inc. (the "Purchaser") and Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agent", and together with the above, the "Parties").

WHEREAS, the Parties wish to amend the Escrow Agreement; and

WHEREAS, pursuant to Section 13 of the Escrow Agreement, the Escrow Agreement may be amended pursuant to a written agreement among the Parties;

NOW, THEREFORE, in consideration of the premises herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

1.  <u>Definitions</u>.  Unless otherwise defined herein or amended hereby, capitalized terms used herein which are defined in the Escrow Agreement, as amended at any time and from time to time hereafter, shall have the meanings ascribed to them in the Escrow Agreement.

2.  <u>Second and Third Recital</u>. In the second recital, the words "(as may be amended from time to time)" shall be inserted directly after the words "Asset Sale Agreement" where they are first used. In the third recital, the words "(as may be amended from time to time)" shall be inserted directly after the words "EMEA Asset Sale Agreement" where they are first used.

3.  <u>Fifth Recital</u>. The fifth recital is deleted in its entirety and replaced with the following:

    **WHEREAS**, (i) the Purchaser has agreed to deliver to the Escrow Agent the Good Faith Deposit (as defined in the Asset Sale Agreement) pursuant to Section 2.2.5 of the Asset Sale Agreement and Clause 3.5 of the EMEA Asset Sale Agreement and (ii) on the Closing Date, the Purchaser and the Designated Purchasers shall deliver to the Escrow Agent (a) $8,000,000.00 to be held in escrow in accordance with Section 2.3 of the Asset Sale Agreement pending the final calculation of the Purchase Price adjustments pursuant to Sections 2.2.2 and 2.2.3 of the Asset Sale Agreement and Clause 3.3 of the EMEA Asset Sale Agreement, (b) $2,500,000.00 to be held in escrow in accordance with Section 6.11 of the Asset Sale Agreement, (c) $2,500,000.00 to be held in escrow in accordance with Clause 3.10 of the EMEA Asset Sale Agreement; and

1

263

4.    Purchase Price Adjustment Escrow. The language "(and together with the Good Faith Deposit Escrow Funds, the "**Escrow Funds.**") shall be deleted from Section 2(b) and replaced with a period. The comma in "**Purchase Price Adjustment Escrow Funds,**" in Section 2(b) shall be deleted and "**Escrow Funds**" shall be redefined in Section 2(d) (as amended by this Amendment No. 1).

5.    Establishment of Additional Escrow Accounts. Section 2(c) will be deleted in its entirety and replaced with the following:

(c) Tax Escrow. Pursuant to the Asset Sale Agreement, the Purchaser will on the Closing Date deliver or cause to be delivered to the Escrow Agent cash in an amount of $2,500,000.00 (the "**Tax Escrow Amount**") as described in Section 6.11 of the Asset Sale Agreement in accordance with Section 2.4.2(b)(i) of the Asset Sale Agreement, which amount, together with any and all interest or profit thereon, or proceeds therefrom, from time to time held by the Escrow Agent pursuant to the terms hereof is referred to as the "**Tax Escrow Funds.**" Any funds or investments remaining in the Tax Escrow Account (as defined below) after application of any payment to be made in accordance with Section 4(a) hereof and Section 6.11(b) of the Asset Sale Agreement shall be released to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) in accordance with Section 6.11(c) of the Asset Sale Agreement and Section 4(a) hereto.

(d) EMEA Tax Escrow. Pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement, the Purchaser will on the Closing Date deliver or cause to be delivered to the Escrow Agent cash in an amount of $2,500,000.00 (the "**EMEA Tax Escrow Amount**") as described in Clause 3.10 of the EMEA Asset Sale Agreement in accordance with Section 2.4.2(b)(i) of the Asset Sale Agreement, which amount, together with any and all interest or profit thereon, or proceeds therefrom, from time to time held by the Escrow Agent pursuant to the terms hereof is referred to as the "**EMEA Tax Escrow Funds,**" and together with the Good Faith Deposit Escrow Funds, Purchase Price Adjustment Escrow Funds and Tax Escrow Funds, the "**Escrow Funds**". Any funds or investments remaining in the EMEA Tax Escrow Account (as defined below) after application of any payment to be made in accordance with Section 4(a) hereof and Clause 3.10.2 of the EMEA Asset Sale Agreement shall be released to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) in accordance with Clause 3.10.3 of the EMEA Asset Sale Agreement and Section 4(a) hereto.

(e) Escrow Accounts. The Escrow Agent hereby agrees to hold and invest the Good Faith Deposit Escrow Funds, Purchase Price Adjustment Escrow Funds, Tax Escrow Funds and EMEA Tax Escrow Funds in separate accounts (respectively, the "**Good Faith Deposit Escrow Account**", the "**Purchase Price Adjustment Escrow Account**", the "**Tax Escrow Account**" and the "**EMEA

2

**264**

**Tax Escrow Account"** and together, the **"Escrow Accounts"**) as provided in this Escrow Agreement.  Except as set forth in Section 5(c), the Purchaser shall have the rights of a secured party in the Escrow Funds and the Escrow Accounts, and none of the Escrow Funds and the Escrow Accounts shall be subject to any security interest, lien or attachment of any party or of any creditor of any party other than Purchaser or a successor or permitted assign of the Purchaser or any of their respective creditors.  Purchaser's rights (if any) in the Escrow Funds prior to release thereof or Escrow Accounts prior to termination thereof, other than its rights as a secured party, shall be subject to a first priority security interest in favor of the Seller Parties (for and behalf of the Sellers and the EMEA Sellers) in the Escrow Funds and Escrow Accounts as security for the Purchaser's obligations under Sections 2.2.3.2, 2.2.5(a) and 6.11 of the Asset Sale Agreement and/or Clauses 3.3, 3.5, 3.10 and Schedule 7 of the EMEA Asset Sale Agreement.

6.    <u>Effectiveness</u>.  This Amendment No. 1 shall become effective as of the date first written above (the **"First Amendment Effective Date"**).

7.    <u>Reference to and Effect on the Escrow Agreement</u>.

    (a)    On or after the First Amendment Effective Date, each reference in the Escrow Agreement to "this Escrow Agreement," "hereunder," "hereof," "herein," or words of like import referring to the Escrow Agreement shall mean and be a reference to the Escrow Agreement as amended by this Amendment No. 1.

    (b)    Except as amended hereby, the provisions of the Escrow Agreement are and shall remain in full force and effect.

8.    <u>Counterparts</u>.  This Amendment No. 1 may be executed in any number of counterparts, each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment No. 1 by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Amendment No. 1.

9.    <u>Exclusion of Liability and Acknowledgments regarding Joint Administrators</u>.

    (a)    The parties hereto agree that the Joint Administrators have negotiated and are entering into this Amendment No. 1 as agents for NNUK to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal Liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply

3

**255**

with any of its obligations under this Amendment No.1 or under or in relation to any associated arrangements or negotiations.

(b)    Notwithstanding any other provision hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal Liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of NNUK and their remaining as current joint administrators thereof under this Amendment No. 1 shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

10.    <u>Miscellaneous</u>.  Sections 8 and 10 through to 20 (both inclusive) of the Escrow Agreement (as amended) shall apply as if stated in full as the final sections of this Amendment No. 1, save that references in all places in those section to "Escrow Agreement" shall be read as references to this "Amendment No. 1" except for the final time that it is used in Section 17(a)(iv), in which case "this Escrow Agreement" shall be read as "the Escrow Agreement".

**[Remainder of this page intentionally left blank.]**

4



IN WITNESS WHEREOF, the Parties have duly entered into this Amendment No. 1 as of the date first written above.

**ESCROW AGENT**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as escrow agent

By: _____

Name: LISA D ...

Title: ...CE PRESID...

[Signature Page – Amendment No. 1]

**267**

Purchaser:

**GENBAND US LLC**

By: _____

Name: Shauna Martin

Title:   Executive Vice-President and General
             Counsel

[Escrow Agreement – Amendment No. 1]

268

**SELLER PARTIES**

**NORTEL NETWORKS CORPORATION**

By:
Name: John Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

By:
Name: Anna Ventresca
Title: General Counsel-Corporate
and Corporate Secretary

**NORTEL NETWORKS LIMITED**

By:
Name: John Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

By:
Name: Anna Ventresca
Title: General Counsel-Corporate and
Corporate Secretary

**NORTEL NETWORKS INC.**

By:
Name: Anna Ventresca
Title: Chief Legal Officer

[Signature Page – Amendment No. 1]

269

SIGNED for and on behalf of Nortel        )
Networks UK Limited (in administration)   )        .................................................
by Christopher Hill as Joint Administrator )        Christopher Hill
(acting as agent and without personal     )
liability) in the presence of:            )

Witness signature

..........................................................        )
Name: Ardil Salem                                                )
Address: Herbert Smith LLP, Exchange House,                      )
Primrose Street, London EC2A 2HS, England

[Signature Page – Amendment No. 1]

# EXHIBIT G

**270**


**GENBAND**

Shawn Martin
office: 972.265.3896
facsimile: 972.461.7516
shawn.martin@genband.com

This is Exhibit......."G"........ referred to in the
affidavit of...JOHN DOOLITTLE
sworn before me, this....30th
day of....NOVEMBER....20.10

_A COMMISSIONER FOR TAKING AFFIDAVITS_
DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

September 15, 2010

| | | |
|---|---|---|
| Nortel Networks Corporation and Nortel Networks Limited 5945 Airport Road, Suite 360 Mississauga, Ontario, Canada L4V 1R9 Facsimile: +1-905-863-2057 Attn: Anna Ventresca, *General Counsel-Corporate and Corporate Secretary* Attn: Khush Dadyburjor, *Vice President, Mergers and Acquisitions* | Nortel Networks Inc. Legal Department 220 Athens Way, Suite 300 Nashville, Tennessee, USA 37228 Facsimile: +1-615-432-4413 Attn: Lynn C. Egan *Secretary* | Alan Bloom / Stephen Harris Ernst & Young LLP 1 More London Place London SE1 2AF United Kingdom Facsimile: +44 (0)20 7951 1345 |
| Sharon Rolston / Simon Freemantle Maidenhead Office Park Westacott Way Maidenhead Berkshire SL6 3QH United Kingdom Facsimile: +44 (0)20 1628 432 416 | Avi D. Pelossof Zellermayer, Pelossof & Co. The Rubenstein House 20 Lincoln Street Tel Aviv 67131 Israel Facsimile: +972 3 6255500 | |

Ladies and Gentlemen,

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., the other entities identified therein as Sellers, GENBAND Inc. and the other Designated Purchasers that became parties thereto, dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

**271**

Pursuant to Section 2.2.3.1 of the ASA, we hereby deliver the attached Closing Statement.  Please contact us if you have any questions.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-265-3581

**272**

Copies to:

| | | |
|---|---|---|
| Latham & Watkins LLP<br>885 Third Avenue<br>New York, New York<br>10022<br>United States<br>Attention: David S.<br>Allinson, Esq.<br>Facsimile: +1-212-751-<br>4864 | Baker Botts LLP<br>2001 Ross Avenue, Suite<br>600<br>Dallas, Texas 75201<br>Attention: Don J.<br>McDermett, Jr., Esq.<br>Curt Anderson, Esq.<br>Facsimile: +1-214-661-4454<br>                +1-214-661-<br>4900 | Stikeman Elliott LLP<br>445 Park Avenue 7th Floor<br>New York, New York<br>10022<br>Attention: Ron Ferguson,<br>Esq.<br>Facsimile: +1-212-371-<br>7087 |
| Nortel Networks Limited<br>and Nortel Networks Inc.<br>5270 Sycamore Avenue<br>Bronx, New York 10471<br>Attention: Robert Fishman<br>                Senior<br>Counsel | Cleary Gottlieb Steen &<br>Hamilton LLP<br>One Liberty Plaza<br>New York, New York<br>10006<br>United States<br>Attention: Laurent Alpert<br>Facsimile: +1-212-225-<br>3999 | Ogilvy Renault LLP<br>200 Bay Street<br>Suite 3800, P.O. Box 84<br>Royal Bank Plaza, South<br>Tower<br>Toronto, Ontario M5J 2Z4<br>Canada<br>Attention: Michael Lang<br>Facsimile: +1-416-216-<br>3930 |
| Alex Kay / Gareth Roberts<br>Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Facsimile: +44 (0) 20 7098<br>4447 | Sandy Shandro<br>3-4 South Square<br>Gray's Inn<br>London<br>WC1R 5HP<br>Facsimile: +44 (0)20 7696<br>9911 | Avner Ben-Gera<br>Hughes Hubbard & Reed<br>One Battery Park Plaza<br>New York<br>NY 10004<br>Facsimile:  (212) 422 -4726 |

**273**

# Closing Statement

All amounts are in United States dollars.

### Closing Adjusted Net Working Capital:

| | |
|---|---:|
| Closing Inventory Value, plus | $  13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 |
| Closing Prepaid Expenses Amount, minus | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 |
| Closing Product Exposures Amount | 416,000 |
| **Closing Adjusted Net Working Capital** | $    8,331,000 |

### Final Purchase Price:

| | |
|---|---:|
| Base Purchase Price, plus | $ 282,000,000 |
| The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | - |
| Closing Aggregate Downward Adjustment (if any), minus | - |
| Closing Deferred Profit Amount, minus | 70,570,000 |
| Closing Accrued Vacation Amount, minus | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 |
| Closing TFR Amount, minus | 402,000 |
| Closing Excess ARD Employees Amount, minus | - |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 |
| Closing French Excess ARD Employees Amount, minus | - |
| Closing Pre-Close Employment Payments Amount | - |
| **Final Purchase Price** | $ 142,904,000 |

4

# EXHIBIT H

274

This is Exhibit.......... "H " ..........referred to in the
affidavit of....JOHN BOOLITTLE
sworn before me, this......30-H-
day of....NOVEMBER............20.10

.....Dorn Wollt
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

**NØRTEL**

November 16, 2010

VIA FACSIMILE

GENBAND US LLC
GENBAND Inc.
3605 E. Plano Pkwy., Suite 100
Plano, Texas  75074
Attn:  General Counsel

Ladies and Gentlemen:

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA").  Terms used but not defined in this letter have the meanings ascribed to them in the ASA, save that the terms "EMEA Non-Debtor Seller Directors", "Israeli Assets", "Israeli Company" and "Israeli Liabilities" have the meanings ascribed to them in the EMEA Asset Sale Agreement.

We are in receipt of the Closing Statement prepared by GENBAND dated September 15, 2010 (the "GB Closing Statement").  Pursuant to Section 2.2.3.1(b) of the ASA, please find attached hereto as Annex A a corrected Disagreement Notice from Nortel and the EMEA Sellers in respect of the GB Closing Statement.  We note that the disagreement with the Closing Deferred Profit Amount in the GB Closing Statement arises primarily from differences between GENBAND and Nortel in the interpretation of the definition of "Deferred Profit Amount" in the ASA, rather than differences over calculations.  Accordingly, any disagreement over the interpretation of the "Deferred Profit Amount" definition is a matter of contractual interpretation and we do not intend to waive and expressly reserve our right to pursue all available remedies to resolve any disputes over the Deferred Profit Amount, whether by recourse to judicial relief or otherwise.

**275**

In addition, NNI hereby reiterates its position as set forth in its letter to GENBAND dated August 13, 2010 (attached hereto as <u>Annex B</u> for your reference) with respect to the Verizon Receivables, as defined in such letter.

Notwithstanding that this letter shall have been signed by the Joint Administrators and the Joint Israeli Administrators both in their capacities as administrators of the EMEA Debtors for and on behalf of the EMEA Debtors and of the Israeli Company for and on behalf of the Israeli Company, respectively, and in their personal capacities, it is hereby expressly declared that no personal Liability, or any Liability whatsoever, under or in connection with this letter shall fall on the Joint Administrators, the Joint Israeli Administrators or their respective firm, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act, or otherwise howsoever.

The Joint Administrators and the Joint Israeli Administrators are signatories to this letter in their personal capacities only for the purpose of receiving the benefit of the previous paragraph. Otherwise, for all purposes of this letter, the Joint Administrators and Joint Israeli Administrators act without personal liability as agents of the EMEA Debtors and the Israeli Company, respectively.

It is hereby expressly declared that no personal Liability, or any Liability whatsoever, under or in connection with this letter shall fall on any of the EMEA Non-Debtor Seller Directors howsoever such Liability should arise.

2

**276**

Very truly yours,

NORTEL NETWORKS INC.

By _____
    Name:   Lynn C. Egan
    Title:    Secretary


NORTEL NETWORKS CORPORATION

By _____
    Name:
    Title:


By _____
    Name:
    Title:


NORTEL NETWORKS LIMITED

By _____
    Name:
    Title:


By _____
    Name:
    Title:

**277**

Very truly yours,

NORTEL NETWORKS INC.

By _____
     Name:  Lynn C. Egan
     Title:   Secretary

**NORTEL NETWORKS CORPORATION**

By: _____
    Name:  John M. Doolittle
    Title:  Senior Vice-President, Corporate Services
         and Chief Financial Officer

By: _____
    Name:  Clarke E. Glaspell
    Title:   Controller

**NORTEL NETWORKS LIMITED**

By: _____
    Name:  John M. Doolittle
    Title:  Senior Vice-President, Corporate Services
         and Chief Financial Officer

By: _____
    Name:  Clarke E. Glaspell
    Title:   Controller

278

SIGNED for and on behalf of **Nortel Networks** )
**UK Limited** (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

............................................
Alan Bloom

Witness signature

............................................ )
Name: RICHARD LAWTON )
Address: HERBERT SMITH LLP )
EXCHANGE HOUSE
PRIMROSE ST
LONDON EC2A 2HS

SIGNED for and on behalf of **Nortel GmbH** )
(in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

............................................
Alan Bloom

Witness signature

............................................ )
Name: RICHARD LAWTON )
Address: HERBERT SMITH LLP )
EXCHANGE HOUSE
PRIMROSE ST
LONDON EC2A 2HS

SIGNED for and on behalf of **Nortel Networks** )
**SpA** (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

............................................
Alan Bloom

Witness signature

............................................
Name: RICHARD LAWTON )
Address: HERBERT SMITH LLP )
EXCHANGE HOUSE
PRIMROSE ST
LONDON EC2A 2HS

279

**SIGNED** for and on behalf of Nortel Networks )
Hispania S.A. (in administration) by )    ............................................
Alan Bloom )    Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

............................................
Name:    RICHARD LAWTON )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE )
         PRIMROSE ST )
         LONDON EC2A 2HS )

**SIGNED** for and on behalf of Nortel Networks )
B.V. (in administration) by )    ............................................
Alan Bloom )    Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

............................................
Name:    RICHARD LAWTON )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE )
         PRIMROSE ST )
         LONDON EC2A 2HS )

**SIGNED** for and on behalf of Nortel Networks )
N.V. (in administration) by )    ............................................
Alan Bloom )    Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

............................................
Name:    RICHARD LAWTON )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE )
         PRIMROSE ST )
         LONDON EC2A 2HS )

280

**SIGNED** for and on behalf of Nortel Networks )
**(Austria) GmbH** (in administration) by )         .......................................
Alan Bloom )                                        Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

.......................................  )
Name: RICHARD LAWTON  )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

**SIGNED** for and on behalf of Nortel Networks )
**Polska Sp. z.o.o.** (in administration) by )      .......................................
Alan Bloom )                                        Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

.......................................  )
Name: RICHARD LAWTON  )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

**SIGNED** for and on behalf of Nortel Networks )
**Portugal S.A.** (in administration) by )          .......................................
Alan Bloom )                                        Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

.......................................  )
Name: RICHARD LAWTON  )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

281

SIGNED for and on behalf of Nortel Networks )
AB (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Alan Bloom

Witness signature

..........................................................  )
Name:  RICHARD  LAWTON  )
Address:  HERBERT  SMITH LLP )
EXCHANGE HOUSE
PRIMROSE ST LONDON EC2A 2HS
SIGNED for and on behalf of Nortel Networks )
Slovensko s.r.o. (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Alan Bloom

Witness signature

..........................................................  )
Name:  RICHARD  LAWTON  )
Address:  HERBERT  SMITH LLP )
EXCHANGE HOUSE
PRIMROSE ST
LONDON EC2A 2HS
SIGNED for and on behalf of Nortel Networks )
s.r.o. (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Alan Bloom

Witness signature

..........................................................  )
Name:  RICHARD  LAWTON  )
Address:  HERBERT  SMITH LLP )
EXCHANGE HOUSE
PRIMROSE ST
LONDON EC2A 2HS

282

**SIGNED** for and on behalf of **Nortel Networks**          )
**Romania S.R.L. (in administration) by**                    )     ...................................................................
Alan Bloom                                                   )     Alan Bloom
as Joint Administrator (acting as agent and                  )
without personal liability) in the presence of:              )


Witness signature

...........................................................          )
Name:    RICHARD WINSTON                              )
Address: HERBERT SMITH LLP                            )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

**283**

SIGNED for and on behalf of Nortel Networks )
France S.A.S. (in administration) by )
Kerry Trigg )
acting as authorised representative for )
Christopher Hill )
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Kerry Trigg

Witness signature

Name: SHARON PERLMUTTER
Address:

ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

284

SIGNED for and on behalf of Nortel Networks    )
(Ireland) Limited (in administration) by    )
DAVID HUGHES    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

.................................................    )
Name:    Nithe J Poveney    )
Address:    c/o Ernst + Young    )
H Harcourt Street
Dublin 2.

285

SIGNED by Richard Banbury )
duly authorised for and on behalf of Nortel )   Richard Banbury
Networks o.o.o. in the presence of: )

Witness signature

.......................................... )
Name: *Svetlana Galina* )
Address: *121603 Moscow Russia*
*Rublevskoye shosse*
*52.377*

286

SIGNED by Simon Freemantle          )
duly authorised for and on behalf of **Nortel**    )        Simon Freemantle
**Networks AG** in the presence of:       )

Witness signature

.........................................................    )
Name: Perihan Yücel               )
Address: Nortel Networks UK Limited    )
westacott Way
Maidenhead office Park
SL6 3QH    Maidenhead

**287**

SIGNED for and on behalf of Nortel Networks
Israel (Sales and Marketing) Limited (in
administration) by Yaron Har-Zvi and Avi D.
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in
connection with the Israeli Assets and Israeli
Liabilities:

)
)
)
)
)
)
)
)
)

הנאמן בהקפאת הליכים

....................................................
Yaron Har-Zvi

הנאמן בהקפאת הליכים

....................................................
Avi D. Pelossof

Witness signature

איתי לביא,
מ.ר. 47647

)
)
)

Name: Itay Lavi
Address: 20 Lincoln St.
Tel-Aviv, Israel

288

**SIGNED** by Alan Bloom

In his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
letter expressed to be conferred on or given to
the Joint Administrators:

)
)
)

............................................................
Alan Bloom

Witness signature

............................................................
Name:   RICHARD WALTON
Address: HERBERT SMITH LLP
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

)
)
)

**289**

SIGNED by Yaron Har-Zvi

)
)
)

וקפאת הליכים

Yaron Har-Zvi

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

Witness signature

איתי לביא עו"ד
47667

Name: Itay Lavi
Address: 20 Lincoln St.
Tel Aviv, Israel

SIGNED by Avi D. Pelossof

)
)
)

הואמן בוקפאת הליכים

Avi D. Pelossof

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

Witness signature

איתי לביא עו"ד
47667

)
)
)

Name: Itay Lavi
Address: 20 Lincoln St.
Tel Aviv, Israel

**290**

cc:    Latham & Watkins LLP
       885 Third Avenue
       New York, New York 10002
       United States
       Attention:  David S. Allinson, Esq.

       Baker Botts LLP
       2001 Ross Avenue, Suite 600
       Dallas, Texas 75201
       Attention:   Don J. McDermett, Jr., Esq.
                   Curt Anderson, Esq.

       Stikeman Elliott LLP
       445 Park Avenue, 7th Floor
       New York, New York 10022
       Attention:  Ron Ferguson, Esq.

*For the companies listed below (the "Companies"), The Institute of Chartered Accountants in England and Wales authorises A R Bloom, S Harris and C Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, A R Bloom, S Harris, AM Hudson and C Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and D Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

**291**

### Annex A

### Disagreement Notice

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this Disagreement Notice have the meanings ascribed to them in the ASA.

Nortel has received the Closing Statement prepared by GENBAND dated September 15, 2010 (the "GB Closing Statement"). Pursuant to Section 2.2.3.1(b) of the ASA, Nortel and the EMEA Sellers notify GENBAND as follows:

- Nortel and the EMEA Sellers do not dispute the following line items within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement: Closing Inventory Value, Closing Prepaid Expenses Amount, Closing Contractual Liabilities Amount, Closing Royalty Liability Amount, Closing Warranty Provision Amount and Closing Product Exposures Amount.

- Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement and, as a result, Nortel and the EMEA Sellers dispute the Closing Adjusted Net Working Capital in the GB Closing Statement. Specifically, Nortel and the EMEA Sellers disagree with GENBAND's deduction from Closing Unbilled Accounts Receivable of accounts receivable amounts of $191,515 and $28,960, which relate to certain customer contracts with Axtel and Telefonica Argentina, respectively.[1] As the contracts with Axtel and Telefonica Argentina were included in Assigned Contracts, the Closing Unbilled Accounts Receivable Amount should be increased by $220,475, resulting in Closing Unbilled Accounts Receivable being equal to $21,611,475 (rather than $21,391,000) and Closing Adjusted Net Working Capital being equal to $8,551,475 (rather than $8,331,000).

- Nortel and the EMEA Sellers do not dispute the following line items within the Final Purchase Price calculation in the GB Closing Statement: Base Purchase Price, Closing Aggregate EMEA Downward Adjustment, Closing Aggregate Downward Adjustment,

---

[1] The contracts are: EWP 2010 Support Plan between Nortel Networks de Argentina S.A. and Telefonia Moviles Argentina S.A. dated January 31, 2010; Designacion Proveedor Centralita Movil between Nortel Networks (CALA) Inc. and Telefonica Moviles Argentina S.A. dated September 30, 2008; Purchase and License Agreement for NGN among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; Purchase and License Agreement for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; and Technical Assistance and Support Services Agreement for NGN Products and Services and for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V..

**292**

Closing Accrued Vacation Amount, Closing TFR Amount, Closing Excess ARD Employees Amount, Closing EMEA Holiday Downward Adjustment, Closing French Excess ARD Employees Amount and Closing Pre-Close Employment Payments Amount.

- Since Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within Closing Adjusted Net Working Capital in the GB Closing Statement and, as a result, dispute Closing Adjusted Net Working Capital in the GB Closing Statement, Nortel and the EMEA Sellers dispute the line item in the Final Purchase Price calculation in the GB Closing Statement that is arrived at by subtracting the Target Working Capital, i.e., $73,000,000, from the Closing Adjusted Net Working Capital. Subtracting Target Working Capital from the Closing Adjusted Net Working Capital calculated by Nortel, i.e., $8,551,475, the resulting line item should be $(64,448,525) rather than $(64,669,000).

- Nortel and the EMEA Sellers dispute the line item Closing Deferred Profit Amount in the GB Closing Statement for two reasons: First, the Closing Deferred Profit Amount calculated by GENBAND improperly includes a negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Networks (Luxembourg) S.A. (NNLSA). As NNLSA is not an EMEA Seller or a Seller, the amount of $1,629,132 should not have been included in GENBAND's calculation of the Closing Deferred Profit Amount.

    Second, GENBAND overstated the Closing Deferred Profit Amount by $34,656,476 as a result of incorrectly including in its calculations deferred revenues and associated deferred costs in respect of services performed and products delivered prior to the Closing Date. "Deferred Profit Amount," as defined in the ASA, means:

    > ". . . as of the Closing Date, both short term and long term (i) deferred revenues for <u>services to be performed or products to be provided by the Business after the Closing Date</u> but for which an account receivable has been recorded or cash has been received prior to the Closing Date minus (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles." (emphasis added)

    The Closing Deferred Profit Amount in the GB Closing Statement should be reduced by (i) $34,656,476 due to GENBAND's improper inclusion of deferred revenues and associated deferred costs relating to services performed and products provided by the Business prior to the Closing Date and (ii) $1,629,132 due to GENBAND's improper inclusion of a negative deferred cost-of-sales balance with respect to NNLSA. Accordingly, the Closing Deferred Profit Amount should be reduced by $36,285,608 from $70,570,000 to $34,284,392.

**293**

- Nortel and the EMEA Sellers disagree with the Closing Specified Employee Liabilities Amount in the GB Closing Statement, which should be reduced by $98,662. The Closing Specified Employee Liabilities Amount in the GB Closing Statement included an Australian long-service leave amount of $1,131,689. For the calculation of the Australian long-service leave amount, GENBAND apparently did not recalculate the Australian Dollar amount into the U.S. Dollar amount using the exchange rate published in the *Wall Street Journal* (Eastern Edition) for the day in question (the Closing Date), as required under the ASA. Using the Australian Dollar/U.S. Dollar exchange rate published in the *Wall Street Journal* (Eastern Edition) for the Closing Date (i.e., 1.1755 Australian Dollars to one U.S. Dollar), Australian long-service leave amount in Australian Dollars of A$1,214,323 (according to Nortel's SAP accounting ledger) translates into $1,033,027. Accordingly, the Australian long-service leave amount of $1,131,689 used in GENBAND's calculation of the Closing Specified Employee Liabilities Amount in the GB Closing Statement is overstated by $98,662, which requires that the Closing Specified Employee Liabilities Amount in the GB Closing Statement be reduced from $1,487,000 to $1,388,338.

- Since Nortel and the EMEA Sellers dispute, in the GB Closing Statement, (i) the line item arrived at by subtracting the Target Working Capital from the Closing Adjusted Net Working Capital, (ii) the Closing Specified Employee Liabilities Amount and (iii) the Closing Deferred Profit Amount, all as described above, Nortel and the EMEA Sellers dispute the Final Purchase Price in the GB Closing Statement, which should be increased by $36,604,745 from $142,904,000 to $179,508,745.

For your reference, the GB Closing Statement, the adjustments set forth herein, and the Closing Statement, as adjusted herein, are set forth below.

**294**

Revisions to CLOSING STATEMENT

| | GB Closing Statement | Adjustments | Adjusted Closing Statement |
|---|---|---|---|
| **Closing Adjusted Net Working Capital:** | | | |
| Closing Inventory Value, plus | $ 13,747,000 | | 13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 | 220,475 | 21,611,475 |
| Closing Prepaid Expenses Amount, minus | 939,000 | | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 | | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 | | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 | | 26,295,000 |
| Closing Product Exposures Amount | 416,000 | | 416,000 |
| **Closing Adjusted Net Working Capital** | $ 8,331,000 | $ 220,475 | $ 8,551,475 |
| | | | |
| **Final Purchase Price:** | | | |
| Base Purchase Price, plus | $ 282,000,000 | | $ 282,000,000 |
| The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) | $ 220,475 | (64,448,525) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | - | | |
| Closing Aggregate Downward Adjustment (if any), minus | - | | |
| Closing Deferred Profit Amount, minus | 70,570,000 | ( 36,285,608) | 34,284,392 |
| Closing Accrued Vacation Amount, minus | 1,730,000 | | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 | (98,662) | 1,388,338 |
| Closing TFR Amount, minus | 402,000 | | 402,000 |
| Closing Excess ARD Employees Amount, minus | - | | |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 | | 238,000 |
| Closing French Excess ARD Employees Amount, minus | - | | |
| Closing Pre-Close Employment Payments Amount | - | | |
| **Final Purchase Price** | $ 142,904,000 | $ 36,604,745 | $ 179,508,745 |

295

**<u>Annex B</u>**

See attached

296

November 16, 2010

**Via Facsimile (212-509-1716) and Email (Lisa.Dangelo@wellsfargo.com)**

Wells Fargo Bank, N.A.
45 Broadway, 14th Floor
New York, NY 10006
Attn: Lisa D'Angelo

Re:    Joint Instructions Under the Escrow Agreement

Ladies and Gentlemen:

Reference is made to the Escrow Agreement (as amended from time to time, the "Escrow Agreement"), dated as of January 6, 2010, by and among (i) GENBAND US LLC (the "Purchaser"), (ii) Nortel Networks Corporation ("NNC"), (iii) Nortel Networks Limited ("NNL"), (iii) Nortel Networks Inc. ("NNI"), (iv) Nortel Networks UK Limited ("NNUK" and, together with NNL and NNI, acting jointly as the "Seller Parties"), and (v) Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agent"), entered into in connection with the Asset Sale Agreement and the EMEA Asset Sale Agreement (each as defined in the Escrow Agreement). Capitalized terms used but not defined herein shall have the meanings given to them in the Escrow Agreement.

Instructions to you as the Escrow Agent:

Pursuant to Section 4(a) of the Escrow Agreement, the Purchaser and the Seller Parties hereby instruct the Escrow Agent to immediately release $4,859,745 plus accrued interest to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) out of the Purchase Price Adjustment Escrow Fund, in accordance with the following wire transfer instructions:

| | |
|---|---|
| Bank Name: | JP Morgan Chase Bank N.A. |
| Account Name: | Nortel/EMEA Filed Entities/EMEA Non-Filed Entities/The Israeli Companies/The Estate Fiduciaries Agreement |
| Account Number: | 865370050 |
| ABA Routing: | 021000021 |
| ABA Swift: | CHASUS33 |
| F/F/C: | Funds released from GENBAND/Nortel Escrow Account in connection with Purchase Price adjustment |

The Purchaser and the Seller Parties further instruct the Escrow Agent to immediately release $3,140,255 plus accrued interest to the Purchaser out of the Purchase Price Adjustment Escrow Fund, in accordance with the following wire transfer instructions:

Bank Name:
Account Name:
Account Number:

1