**297**

ABA Routing:
ABA Swift:
F/F/C:

Should you have any questions about this letter, please contact the Purchaser and the Seller Parties at your earliest convenience.

This letter is signed by a Joint Administrator as administrator (acting as agent only) of NORTEL NETWORKS UK LIMITED (in administration) and it is hereby expressly declared that no personal liability, or any liability whatsoever, under or in connection with this letter shall fall on the Joint Administrators or their respective firm, partners, employees, agents, advisers or representatives whether such liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act 1986 (as amended), or otherwise howsoever.

Thank you for your assistance with this matter.

*For the companies listed below (the "Companies"), the Institute of Chartered Accountants in England and Wales authorises A R Bloom, S Harris and C Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, A R Bloom, S Harris, A M Hudson and C Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and D Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

2

**29⁸**

Sincerely,

**Purchaser**                              **GENBAND US LLC**

By: _____
    Name:
    Title:

299

**Seller Parties**

**NORTEL NETWORKS INC.**

By: _____
    Name:  Lynn C. Egan
    Title:    Secretary

**NORTEL NETWORKS CORPORATION**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**NORTEL NETWORKS LIMITED**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

300

Seller Parties

NORTEL NETWORKS INC.

By: _____
    Name:  Lynn C. Egan
    Title:   Secretary

NORTEL NETWORKS CORPORATION

By: _____
    Name:  John M. Doolittle
    Title:  Senior Vice-President, Corporate Services
           and Chief Financial Officer

By: _____
    Name:  Clarke E. Glaspell
    Title:   Controller

NORTEL NETWORKS LIMITED

By: _____
    Name:  John M. Doolittle
    Title:  Senior Vice-President, Corporate Services
           and Chief Financial Officer

By: _____
    Name:  Clarke E. Glaspell
    Title:   Controller

**301**

**NORTEL NETWORKS UK LIMITED** (in
administration) by C.T.Hill , as Joint
Administrator (acting as agent only and without any
personal liability whatsoever)

By: _____
    Name: C. T. Hill
    Title: Joint Administrator

Witness signature

Name      RICHARD LAWTON

Address    HERBERT SMITH LLP
        EXCHANGE HOUSE
        PRIMROSE ST
        LONDON EC2A 2HP

# EXHIBIT I

302

This is Exhibit _____ "I" _____ referred to in the
affidavit of ___JOHN DOO LITTLE___
sworn before me, this ___30 th___
day of ___NOVEMBER___ 20___10___

_____
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

---

**From:** Thomas.Malone
**Sent:** 12/07/2009 12:37 AM EST
**To:** Victor LEWKOW; Evan Schwartz
**Cc:** David.Allinson@lw.com; Alexandra.Croswell@lw.com; don.mcdermett@bakerbotts.com; curtis.anderson@bakerbotts.com;
Shauna.Martin@genband.com
**Subject:** Revised CVAS ASA

Vic and Evan,

    Attached please find the revised CVAS ASA (clean and marked), as well as two of the three NETAS agreements (clean and
marked). The third NETAS Agreement should be forthcoming early this week. I will also send the NETAS agreements to the
EMEA team. Please let us know if you have any questions.

Best regards,
Tom

**CVAS**
<<#1582469v7_NY_ - December CVAS ASA Draft.DOC>> <<DV_Comparison_#1582469v2_NY_ - October 25, 2009 CVAS
ASA Draft-#1582469v7_NY_ - December CVAS ASA Draft.rtf>>

**NETAS**
<<Netas Development Agreement_Redline.120409.doc>> <<Netas Distribution Agreement_Redline_120409.doc>> <<DAL02-
#551430-v1-Genband-Netas_Joint_Development_A.DOC>> <<DAL02-#551358-v2-Genband-Netas_Product_Distributio.DOC>>

Thomas J. Malone

**LATHAM & WATKINS** LLP
885 Third Avenue
New York, NY 10022-4834
Direct Dial: +1.212.906.1248
Fax: +1.212.751.4864
Email: thomas.malone@lw.com
http://www.lw.com

**303**

```
************************************************************************
To comply with IRS regulations, we advise you that any discussion of Federal
tax issues in this
e-mail was not intended or written to be used, and cannot be used by you, (i)
to avoid any penalties
imposed under the Internal Revenue Code or (ii) to promote, market or recommend
to another party any
transaction or matter addressed herein.

For more information please go to  http://www.lw.com/docs/irs.pdf
************************************************************************


This email may contain material that is confidential, privileged and/or
attorney work product for
the sole use of the intended recipient.  Any review, reliance or distribution
by others or forwarding
without express permission is strictly prohibited.  If you are not the intended
recipient, please
contact the sender and delete all copies.

Latham & Watkins LLP

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.
```

This message (including any attachments) is CONFIDENTIAL and may be PRIVILEGED. If you are not an intended recipient you are hereby notified that any distribution, copying or use by you of this information is strictly prohibited. If you have received this message in error please immediately notify the sender and delete all copies of this information from your system. // L'information contenue dans le présent courriel (y compris les pièces jointes, le cas échéant) est CONFIDENTIELLE et peut être PRIVILÉGIÉE. Si vous n'êtes pas le destinataire prévu, vous êtes par la présente avisé(e) que toute diffusion, copie ou utilisation de ladite information est strictement interdite. Si vous avez reçu cette communication par erreur, veuillez nous en aviser immédiatement en répondant à l'expéditeur et effacer de votre ordinateur toute trace de cette information.

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under United States federal, state or local tax law. // Tout conseil de fiscalité américaine contenu, le cas échéant, dans le présent courriel ne visait pas à éviter des pénalités pouvant être imposées en vertu des lois fiscales fédérales, étatiques ou locales des États-Unis, n'a pas été rédigé dans ce but et ne doit pas être utilisé à cette fin par le destinataire.

CGSHL&W **Draft** NovemberDecember **5, 2009**
**Private and Confidential**

**304**

# ASSET SALE AGREEMENT[1]

## BY AND AMONG

## NORTEL NETWORKS CORPORATION

## NORTEL NETWORKS LIMITED

## NORTEL NETWORKS INC.

### AND

## THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

### AND

## [PURCHASER]

### DATED AS OF [●], 2009

---

[1] Note to Seller:  Draft is subject to further review by local counsel.  Also subject to further revisions upon completion of successor/transferring liability diligence, which we expect to be completed within the next 7 to 10 days.  Certain assets may need to be excluded (for example, in Brazil) or other protections afforded to Purchaser against liabilities transferred by law.  As discussed, work streams on certain specialists matters (such as TSA, Real Estate, etc.) are progressing on separate paths and in certain instances are not integrated in this document.

**Error! Unknown document property name.**

**TABLE OF CONTENTS**

**305**

Page

**ARTICLE I INTERPRETATION** ..................................................................................3

Section 1.1.    Definitions.................................................................................3
Section 1.2.    Interpretation.........................................................................~~31~~33
    1.2.1.    Gender and Number ............................................................~~31~~33
    1.2.2.    Certain Phrases and Calculation of Time.......................~~31~~33
    1.2.3.    Headings, etc. .....................................................................~~31~~34
    1.2.4.    Currency.............................................................................~~31~~34
    1.2.5.    Statutory References .........................................................~~31~~34

**ARTICLE II PURCHASE AND SALE OF ASSETS**.......................................~~32~~35

Section 2.1.    Purchase and Sale. ...............................................................~~32~~35
    2.1.1.    Assets  ~~32~~ **35**
    2.1.2.    Excluded Assets .................................................................~~33~~36
    2.1.3.    Assumed Liabilities ...........................................................~~35~~38
    2.1.4.    Excluded Liabilities ...........................................................~~37~~41
    2.1.5.    Assumption and/or Assignment or Rejection of 365 Contracts............~~39~~42
    2.1.6.    Assignment of Non-365 Contracts....................................~~39~~43
    2.1.7.    Cure Costs; Adequate Assurance; Efforts.......................~~40~~44
    2.1.8.    Local Sale Agreements ......................................................~~41~~45
    2.1.9.    EMEA Asset Sale Agreement............................................~~41~~45
    2.1.10.    Non-Assignable Assets .....................................................~~41~~45
Section 2.2.    Purchase Price. ...................................................................~~42~~46
    2.2.1.    Purchase Price.....................................................................~~42~~46
    2.2.2.    Estimated Purchase Price. ..................................................~~42~~46
    2.2.3.    Purchase Price Adjustment. ...............................................~~43~~47
    **2.2.4.    Purchase Price Allocation. [●]...................................................50**
    **2.2.5.**    Good Faith Deposit. ........................................................~~45~~50
Section 2.3.    [Escrow. ..............................................................................~~46~~50
Section 2.4.    Closing. ................................................................................~~46~~51
    2.4.1.    Closing Date.........................................................................~~46~~51
    2.4.2.    Closing Actions and Deliveries ........................................~~46~~51
Section 2.5.    Designated Purchaser(s)......................................................~~48~~53

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...~~48~~53**

Section 3.1.    Organization and Corporate Power.....................................~~48~~53
Section 3.2.    Authorization; Binding Effect; No Breach. .......................~~49~~54
Section 3.3.    Financing.............................................................................~~50~~54
Section 3.4.    Purchaser Financial Statements .........................................~~51~~55
Section 3.5.    Adequate Assurance of Future Performance ......................~~51~~56
Section 3.6.    Purchaser's Acknowledgments; Exclusivity of Representations and
    Warranties .........................................................................~~52~~56

Section 3.7.    Brokers. ..................................................................5358

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ..........5358**

Section 4.1.    Organization and Corporate Power. .....................................5458
Section 4.2.    Authorization; Binding Effect; No Breach. ...........................5458
Section 4.3.    Title to Tangible Assets; Sufficiency of Assets. ....................5559
Section 4.4.    Material Contracts. .......................................................5560
Section 4.5.    Intellectual Property. ....................................................5761
Section 4.6.    Litigation. ..................................................................5965
Section 4.7.    Financial Statements. ....................................................5965
Section 4.8.    Compliance with Laws; Consents. ......................................6066
Section 4.9.    Real Property. .............................................................6166
Section 4.10.   Environmental Matters. ..................................................6166
Section 4.11.   Labor and Employee Benefits Matters. .................................6167
Section 4.12.   Taxes. 6571
Section 4.13.   Brokers. ....................................................................6572
Section 4.14.   Cultural Business .........................................................6572
Section 4.15.   Representations and Warranties by the Other Sellers. ..............6572
               4.15.1. Organization and Corporate Power. ............................6673
               4.15.2. Authorization; Binding Effect; No Breach. .....................6673

**ARTICLE V COVENANTS AND OTHER AGREEMENTS ...............................6774**

Section 5.1.    U.S. Bankruptcy Actions .................................................6774
Section 5.2.    Canadian Bankruptcy Actions. ...........................................7178
               5.2.1. Canadian Sales Process Order ....................................7178
               5.2.2. Canadian Approval and Vesting Order ............................7178
               5.2.3. Additional Requests ...............................................7279
Section 5.3.    Consultation; Notification. ..............................................7279
Section 5.4.    Pre-Closing Cooperation. ................................................7380
Section 5.5.    Antitrust and Other Regulatory Approvals. .............................7481
Section 5.6.    Pre-Closing Access to Information. ......................................7783
Section 5.7.    Public Announcements. ..................................................7885
Section 5.8.    Further Actions ...........................................................7885
Section 5.9.    Conduct of Business .....................................................7885
Section 5.10.   Transaction Expenses. ...................................................8088
Section 5.11.   Confidentiality. ...........................................................8188
Section 5.12.   Certain Payments or Instruments Received from Third Parties ...........8289
Section 5.13.   Non-Assignable Contracts. ...............................................8290
Section 5.14.   Bundled Contracts. .......................................................8391
Section 5.15.   Post-Closing Assistance for Litigation. .................................8592
Section 5.16.   Delivery of Assets. ........................................................8593
Section 5.17.   Termination of Overhead and Shared Services and French
               Company Licenses. .........................................................8694
Section 5.18.   Financing. ..................................................................8694

Error! Unknown document property name.

Section 5.19.  Insurance Matters....................................................................8896
Section 5.20.  Deposits, Guarantees and Other Credit Support of the Business..........8997
Section 5.21.  Use of Trademarks...................................................................8998
Section 5.22.  Maintenance of Books and Records. ..............................................9098
Section 5.23.  Certain Ancillary Agreements.......................................................9199
Section 5.24.  Closing Unaudited Financial Statements.......................................92100
Section 5.25.  Closing Audited Financial Statements..........................................93101
Section 5.26.  Additional Bankruptcy Proceedings; Adverse International
              Injunctions.........................................................................93101
Section 5.27.  Finalization of Schedules to Transition Services Agreement;
              Disputes.............................................................................94102
Section 5.28.  Avoidance Actions...................................................................94103
Section 5.29.  Competing Transaction..............................................................94103
Section 5.30.  Purchaser Financial Statements ...................................................95104

ARTICLE VI TAX MATTERS.......................................................................95104

Section 6.1.   Transfer Taxes. .......................................................................95104
Section 6.2.   Withholding Taxes....................................................................97105
Section 6.3.   Tax Characterization of Payments Under This Agreement ................97106
Section 6.4.   Apportionment of Taxes.............................................................97106
Section 6.5.   Records .................................................................................97106
Section 6.6.   Tax Disclosure .......................................................................99108
Section 6.7.   Tax Returns............................................................................99108
Section 6.8.   Canadian Tax Election..............................................................100109
Section 6.9.   Purchase Price Allocation.........................................................101110
Section 6.10.  Other Tax Matters...................................................................102110

ARTICLE VII EMPLOYMENT MATTERS ....................................................102111

Section 7.1.   Employment Obligations with Respect to Non-Union Employees ...102111
   7.1.1.     Employment Terms...................................................................102111
   7.1.2.     Employee Benefits. .................................................................105113
Section 7.2.   Employment Obligations with Respect to Union Employees...........107116
Section 7.3.   Excluded Employee Liabilities...................................................108116
Section 7.4.   Other Employee Covenants. ......................................................108117
Section 7.5.   Canadian Pension Plans...........................................................111119
Section 7.6.   Sole Benefit of the Sellers and the Purchaser ..............................112121

ARTICLE VIII CONDITIONS TO THE CLOSING .......................................113121

Section 8.1.   Conditions to Each Party's Obligation ........................................113121
Section 8.2.   Conditions to Sellers' Obligation ..............................................114122
Section 8.3.   Conditions to Purchaser's Obligation .........................................114123

ARTICLE IX TERMINATION .......................................................................115124

Section 9.1.    Termination ............................................................................... ~~115~~**124**
Section 9.2.    Expense Reimbursement and Break-Up Fee. ................................... ~~117~~**126**
Section 9.3.    Effects of Termination ................................................................. ~~118~~**127**

**ARTICLE X MISCELLANEOUS** ............................................................................ ~~118~~**128**

Section 10.1.    No Survival of Representations and Warranties or Covenants.......... ~~118~~**128**
Section 10.2.    Remedies................................................................................... ~~119~~**128**
Section 10.3.    No Third Party Beneficiaries ...................................................... ~~119~~**128**
Section 10.4.    Consent to Amendments; Waivers................................................ ~~119~~**128**
Section 10.5.    Successors and Assigns............................................................... ~~119~~**128**
Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial... ~~119~~**129**
Section 10.7.    Notices ..................................................................................... ~~121~~**130**
Section 10.8.    Exhibits; Sellers Disclosure Schedule ~~122~~ ........................................ **132**
Section 10.9.    Counterparts.............................................................................. ~~123~~**132**
Section 10.10.   No Presumption ......................................................................... ~~123~~**132**
Section 10.11.   Severability ............................................................................... ~~123~~**133**
Section 10.12.   Entire Agreement. ...................................................................... ~~124~~**133**
Section 10.13.   Availability of Equitable Relief; Sole Remedy ................................ ~~124~~**133**
Section 10.14.   Bulk Sales Laws......................................................................... ~~125~~**134**
Section 10.15.   Main Sellers as Representatives of Other Sellers. .......................... ~~125~~**134**
Section 10.16.   Execution by Other Sellers ......................................................... ~~125~~**135**
Section 10.17.   Obligations of the Sellers ........................................................... ~~125~~**135**

309

# EXHIBITS[2]

Exhibit A  −  Other Sellers

Exhibit B  −  EMEA Sellers

Exhibit C  −  Canadian Debtors; U.S. Debtors; EMEA Debtors; Israeli Companies; Non-Debtor Sellers

Exhibit D  −  EMEA Asset Sale Agreement

Exhibit E  −  Adjusted Net Working Capital Statement

Exhibit F  −  Contract Manufacturing Inventory Agreements Term Sheet[13]

Exhibit G  −  Escrow Agreement

Exhibit H  −  [GDNT Agreement Term Sheet]

Exhibit I  −  Intellectual Property License Agreement

Exhibit J   −  Knowledge of the Purchaser

Exhibit K  −  [LGN Distribution Agreement Term Sheet]

Exhibit L  −  Loaned Employee Agreement[24]

Exhibit M  − Mandatory Antitrust Approvals - Relevant Antitrust Authorities

Exhibit N  −  Restricted Seller Revenue

Exhibit O  −  ~~Mutual Development Agreement Term Sheet~~**[Reserved]**

Exhibit P  −  [Purchaser Supply Agreement Term Sheet]

Exhibit Q  −  Seller Supply Agreement Term Sheet

Exhibit R  −  Subcontract Agreement Term Sheet

---

[2] **Note to Seller: Purchaser understands many of these may not be provided pre-signing. Please revise accordingly regarding what will be provided.**

[13] Note to Purchaser: Approach to existing contract manufacturing relationships to be discussed. **Note to Seller: Purchaser will provide revisions to the draft contract manufacturer term sheet shortly.**

[24] Note to Purchaser: This agreement will provide for the continued services of Visa Employees for a specified period of time if Purchaser is not able to obtain necessary visas prior to Employee Transfer Date. **Note to Seller: please let us know when a draft of this will be available so we can review and then figure out which employees this should apply to.**

3/0

Exhibit S  –  Trademark License Agreement

Exhibit T  –  Transition Services Agreement

Exhibit 5.1(a) – Form of U.S. Bidding Procedures Order

Exhibit 5.1(b) – Form of U.S. Sale Order

Exhibit 5.2.1 –  Form of Canadian Sales Process Order

Exhibit 5.2.2 –  Form of Canadian Approval and Vesting Order

Exhibit **5.4**   **–  Form of Letter**

**Exhibit 5.7   –  Public Announcements**

**Exhibit** 5.9   ⹀   Conduct of Business Notice Addresses

Exhibit 5.23   ⹀   Interdependencies in the CVAS Business

NY\1582469.7

[New York #2071434 v4]                                                            vi                                              Error! Unknown document
                                                                                                                                          property name.

**311**

# ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of [●], 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Other Sellers (as defined below) (the Other Sellers, together with the Main Sellers, the "**Sellers**") and [●], a [●] organized under the laws of [●] (the "**Purchaser**").[5]

WITNESSETH:

WHEREAS, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**"), beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date (as defined herein), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on July 30, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "**Israeli Companies**") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "**Israeli Court**"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of

---

[5] Note to Seller: Proposed construction of "Other Sellers" is being reviewed.

312

proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by the EMEA Sellers;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets and the EMEA Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates, and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser and the Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

WHEREAS, in addition, at the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**"): (i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Transition Services Agreement, (iv) the Trademark License Agreement, [(v) the Loaned Employee Agreement and will use their **commercially** reasonable best efforts to negotiate in good faith and enter into [(vi) the Mutual Development**Purchaser Supply** Agreement, (vii) the Purchaser**Seller** Supply Agreement, (viii) the Seller Supply**Subcontract** Agreement, (ix) the Subcontract Agreement, (x) the Contract Manufacturing Inventory Agreements, (xix) the LGN Distribution Agreement, (xiixi) the NN Turkey Agreements, and (xiii) the GDNT Agreement (each as defined below).]

2

2

**Error! Unknown document property name.**

313

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.   Definitions.   Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means the amount of compensation with respect to the accrued and unused vacation with respect to each Specified Transferred Employee **[and each Transferring Employee]**[6] (including all Taxes required to be withheld on behalf of the applicable Specified Transferred Employee **[and Transferring Employee]** by his or her respective employer) calculated by taking, with respect to each such employee an amount equal to **(i) for hourly employees,** the product of (A) a number (not less than zero) of such employee's accrued and unused vacation hours as of the Closing Date as set forth on Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule **of this Agreement for Specified Transferred Employees [and on [      ] of the EMEA Asset Sale Agreement for Transferring Employees]** and (B) such employee's hourly rate of pay (with such hourly**set forth on Section 4.11(b) of the Sellers Disclosure Schedule and (ii) for salaried employees, the product of (A) a number (not less than zero) of such employee's accrued and unused vacation days as of the Closing Date as set forth on Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule of this Agreement for Specified Transferred Employees [and on [      ] of the EMEA Asset Sale Agreement for Transferring Employees] and (B) such employee's daily rate of pay (with such daily** rate of pay derived by dividing such employee's annual base salary set forth on Section 4.11(b) of the Sellers Disclosure Schedule by the number of standard work hours**days** per year for such employee).

"**Action**" means any litigation, action, **hearing, investigation,** suit (whether civil, criminal or administrative), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding.

"**Additional Bankruptcy Proceeding**" has the meaning set forth in Section 5.26(a).

"**Additional Employees**" **has the meaning set forth in Section 7.1.1(a).**

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

---

[6] Note to Seller:  To be discussed in connection with the treatment of such benefits under the EMEA ASA.

314

"[Adjusted Net Working Capital Statement" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts in the form provided in Exhibit E hereto.]

"Adverse International Injunction" has the meaning set forth in Section 5.26(a).

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; [provided, that (i) no EMEA Seller or Subsidiary of an EMEA Seller (other than those Subsidiaries that are Sellers hereunder) shall be deemed an Affiliate of any Seller, and (ii) no joint venture listed in Section [●] of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.]

"Agreement" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"Allocation" has the meaning set forth in Section 2.2.4.[7]

"Alternative Transaction" means (A~~i~~) the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a ~~majority~~**substantial portion** of the Business or all or a ~~majority~~**substantial portion** of the Assets and~~or~~ the EMEA Assets~~,~~ (considered as a whole), in a transaction or a series of transactions ~~(x)~~ with one or more Persons other than the Purchaser and/or its Affiliates ~~or (y) with a Successful Bidder (as such term has been defined in Exhibit [5.1(a)]), which may include multiple bidders whose bids are combined or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or a majority of the Business, or all or a majority of the Assets and the EMEA Assets taken as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers pursuant to which all or a majority of the reorganized entity or its assets is acquired by one or more Persons (other than the third-party creditors or the Purchaser and/or the Purchaser's Affiliates) in a transaction announced prior to such reorganization or within [three (3) months] of such reorganization, rather than being retained by the creditors generally, provided, however, that an "Alternative Transaction" shall not include (i) except as specified in clause (B) above, the retention of all or any portion~~**, including a transaction or series of transactions that results or evolves from a Successful Bid, an Alternate Bid or a Qualified Bid (each as defined in the U.S. Bidding Procedures Order), (ii) the retention of all or substantially all** of the Business, the Assets or the EMEA Assets by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) under a standalone plan of reorganization or plan of arrangement approved by the U.S. Bankruptcy Court or another Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (~~iii~~**iii**) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business, the Assets or the EMEA Assets (~~other than~~

---

[7] **Note to Seller: Allocations sections TBD.**

315

~~as a going concern)~~ in connection with the closure, liquidation or winding up of the Business or any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the Competition Act Approval, the [EC Merger Regulation Approval] and the Mandatory Antitrust Approvals.[38]

"**Antitrust Laws**" means the Competition Act, the HSR Act, [the EC Merger Regulation,] and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

["**Arbitration Trigger Date**" has the meaning set forth in Section 5.27(c).]

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, (ii) the Designated Non-365 Contracts ~~and~~ (iii) **the Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset, and (iv)** specified contracts as described in Section 5.14.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(e**d**).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the Israeli Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, the Israeli Companies Law and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases, and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

---

[38] Note to Seller:  Subject to continuing diligence.

316

**"Base Purchase Price"** has the meaning set forth in Section 2.2.1.

**"Bid"** means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

**"Bidding Procedures"** means the procedures to be employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities to be approved by the U.S. Bankruptcy Court and the Canadian Court pursuant to the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively.

**"Break-Up Fee"** has the meaning set forth in Section 9.2(b).

**"Bundled Contracts"** has the meaning set forth in Section 5.14.

**"Business"** means, collectively~~, the following business segments of the Sellers and the EMEA Sellers as described below~~:

(i)    the business through which the Sellers and the EMEA Sellers individually, jointly or in collaboration with or pursuant to contracts with Third Parties **and other Persons** research, advertise, design, develop, process components, directly or indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers ~~and~~**,** channel partners **and other Persons**, the CVAS Products (as defined below), including prior versions (if currently supported **or if any Contract related to the Business contemplates the support of such prior versions**), current versions and future versions listed in the Plan of Record;[9] and

(ii)    the following services, to the extent provided**, or being developed,** in relation to the CVAS Products, that the Sellers and the EMEA Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties **and other Persons**, market, advertise, distribute and sell globally to carriers ~~and~~**,** channel partners **and other Persons**: (A) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support system services; (B) network support services, including technical support, technical account manager service, network prime engineer service, online support and technical support for special projects, repair services, managed spares service, Third Party products spares management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services**; and (C) [network management services]**[10] (collectively, the **"CVAS Services"**);

all as conducted by the Sellers and the EMEA Sellers as of the date of this Agreement **(provided, that with respect to researching and developing the CVAS Products or**

---

[9] Note to Seller: Subject to final review of the Plan of Record.
[10] Note to Seller: Specific language TBD.

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

**317**

the development of the CVAS Services associated therewith, the Business shall include activities by the Sellers and the EMEA Sellers at any time), but excluding, in each of clauses (i) and (ii) above: (A) any business, asset, product or service run, owned, managed and/or provided by the LGN Joint Venture, NN Turkey or GDNT; (B) any Excluded Asset; (C) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (D) any products and/or services provided by businesses or business segments of any Seller or EMEA Seller other than those specified in clauses (i) and (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means, whether in paper, digital or other ~~tangible~~ form, (i) if used exclusively in connection with the Business, all books, records, files, ledgers, sales literature or similar documents in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information on past, present and prospective customers and suppliers, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset, ~~financial records,~~ **or Assumed Liability, Tax records that relate solely to the Business, technical information, operating and** production records, quality control records, **blueprints, research and development notebooks and files,** customer credit data, **manuals, engineering and scientific data,** sales and promotional literature, **drawings, technical plans, business plans,** budgets and price lists and (ii) if used ~~primarily,~~ but not exclusively, in connection with the Business **or in respect of any Asset or Assumed Liability**, to the extent reasonably separable from such items of any other business of the ~~Sellers or the EMEA~~ Sellers, copies of all books, records, files, ledgers, **documentation,** sales literature or similar documents in the possession or under control of the Sellers (including information on past, present and prospective customers and suppliers), policies and procedures and **materials and** procurement documentation used ~~primarily~~ in the Business or in respect of any Asset **or Assumed Liability,** financial records, **technical information, operating and** production records, quality control records, **blueprints, research and development notebooks and files,** customer credit data, **manuals, engineering and scientific data,** sales and promotional literature, **drawings, technical plans, business plans,** budgets and price lists~~,~~ **, including, in each of clauses (i) and (ii), any Employee Records; provided, that with regards to copies provided pursuant to clause (ii)** Business Information shall not include ~~any Employee Records or Tax Records~~**the competitively sensitive portions of the foregoing that relate to the other business lines of the Sellers**.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

*318*

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian DB Replacement Plan**" has the meaning set forth in Section 7.5(c).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Non-Union DC Replacement Plan**" has the meaning set forth in Section 7.5(a).

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"**Canadian Union DC Replacement Plan**" has the meaning set forth in Section 7.5(d).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Receivables**" means, as of a given date, amounts classified in Construction-in-Process accounts in a manner consistent with the Nortel Accounting Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business determined in accordance with the Nortel Accounting Principles.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Clean Team Confidentiality Agreement**" means the clean team confidentiality agreement by and between [NNL] and the Purchaser, dated as of [●], as amended from time to time.

"**Clean Team Data Room**" has the meaning attributed to the term "Clean Data Room" in the Clean Team Confidentiality Agreement.

~~"**Clean Team Members**" has the meaning attributed to that term in the Clean Team Confidentiality Agreement.~~

"**Closing**" has the meaning set forth in Section 2.4.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

319

"**Closing Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Audited Financial Statements**" has the meaning set forth in Section 5.25.

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.4.1.

"**Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Deferred Revenue Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Unaudited Financial Statements**" has the meaning set forth in Section 5.24.

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

2

9

Error! Unknown document property name.

**320**

"**Competing Transaction**" has the meaning set forth in Section 5.29.

"**Competition Act**" means the Competition Act (Canada), R.S. 1985, C. C-34, as it is now in effect and as it may be amended.

"**Competition Act Approval**" means that: (i) the waiting period, including any extension thereof, under Section 123 of the Competition Act shall have expired or been terminated or the obligation to provide a pre-merger notification in accordance with Part IX of the Competition Act shall have been waived in accordance with paragraph 113(c) of the Competition Act, and in either case the Purchaser shall have been advised in writing by the Commissioner that he or she is of the view that grounds do not exist as of the date of the advice to initiate proceedings under the merger provisions of the Competition Act in respect of the transactions contemplated by this Agreement and such advice shall have not been rescinded or amended; or (ii) the Commissioner shall have issued an advance ruling certificate pursuant to Subsection 102(1) of the Competition Act to the effect that the Commissioner is satisfied that he or she would not have sufficient grounds upon which to apply to the Competition Tribunal for an order under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement.

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser and the Seller parties listed therein dated [●], 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by or notice to any Government Entity or other Third Party.

"**Contract**" means any ~~written~~ binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.[4]

"**Contract Designation Date" means, the later of the date that is (i) [thirty (30)] Business Days from the date hereof; (ii) [fourteen (14)] Business Days after such Contract is added to or included in the relevant list pursuant to Section 2.1.5(c) or Section 2.1.6(c), as applicable; or (iii) [fourteen (14)] Business Days after the date on which complete unredacted copies of such Contract are made available to the Purchaser and the Purchaser's employees and representatives.[11]**

[" **Contract Manufacturing Inventory Agreements**" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(a) of the Sellers Disclosure Schedule that the relevant

---

[4] ~~Note to Purchaser:  The concept of a Contract Designation Date is not needed as there are no exclusive supply agreements for the Business and the Purchaser will take all Customer Contracts.~~[11]  **Note to Seller:  Parties to discuss timeline with respect to when contracts will be made available (both before and after signing) to work out an appropriate timeline.**

**10**

NY\1582469.7

[New York #2071434 v4]                     10                     **Error! Unknown document property name.**

321

Parties will use their **commercially** reasonable ~~best~~ efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.23 and the term sheet attached hereto as Exhibit F.] [5] [12]

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business, net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors or governing body of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cross-License Agreements**" means **all** Contracts between any Sellers**, EMEA Sellers,** or any of their **respective** Affiliates and any other Person ~~that relate to the Business,~~ under which any of such Sellers**, EMEA Sellers,** or their **respective** Affiliates, as applicable, both (i) grant a license under Patents owned by (or licensed to) them and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party,~~,~~ (~~but excluding Contracts where the only license granted by one of the parties to such a Contract~~ **other than inbound and/or outbound license agreements where the only grant back from the licensee** is under improvements on the **licensed intellectual property) in such case, to the extent the scope of such licenses include Patents licensed under the** Intellectual Property ~~licensed to it by the other party~~**License Agreement or assigned pursuant to the terms of this Agreement or that are otherwise used in the Business**.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under an Assumed and Assigned Contract and any actual pecuniary losses that have resulted from such defaults under such Seller Contracts, and (ii) with respect to any Designated Non-365 Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts required to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date.

---

[5] [12] Note to Purchaser: Parties to discuss approach to Contract Manufacturers.

NY\1582469.7

11

[New York #2071434 v4]    **Error! Unknown document property name.**

**322**

["**Current Services**" has the meaning set forth in Section 5.27(a).]

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides CVAS Products and/or CVAS Services to a customer, reseller or distributor.

"**CVAS Products**" means the software and/or hardware products set forth in Section 1.1(b) of the Sellers Disclosure Schedule.[13]

"**CVAS Services**" has the meaning set forth in the definition of "Business" above.

~~"**Debt Commitment Letters**" has the meaning set forth in Section 3.3(a).~~

~~"**Debt Financing**" has the meaning set forth in Section 3.3(a).~~

~~["**Deferred Revenue Amount**" means [●].][6]~~

"**Deferred Revenue Amount**" means, as of the Closing Date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Revenue Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(e**d**).

"**Designated Purchaser**" has the meaning set forth in Section 2.5.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means [●], as distribution agent for the Sellers and the EMEA Sellers hereunder and under the EMEA Asset Sale Agreement.

"**Downward Adjustment**" has the meaning set forth in Section 5.26(b).

---

[13] Note to Seller:  Schedules are still under review by Purchaser.  Parties to discuss including the following products:  (i) the Sprint, MCI/Verizon and UCS versions of DMS-250; (ii) ERS8600 (PP8600); (iii) ServiceBuilder and NAV (from Rochester); and (iv) certain MDed/EOL products, including TOPS, MCI Operator Services.

[6] Note to Purchaser:  Parties to discuss.

**Error! Unknown document property name.**

**323**

["**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.]

["**EC Merger Regulation Approval**" means (i) that the Purchaser shall have received notification from the European Commission that the transactions contemplated in this Agreement and the EMEA Asset Sale Agreement are compatible with the common market or there has been a deemed declaration in respect of the transactions contemplated in Transaction Documents under Article 10(6) of the EC Merger Regulation or (ii) where the transactions contemplated in this Agreement and the EMEA Asset Sale Agreement have been referred to an EU or EFTA Member State under Article 4(4) or Article 9 of the EC Merger Regulation, confirmation shall have been received by the Purchaser that the transactions contemplated in this Agreement and the EMEA Asset Sale Agreement have (x) been approved or have been approved subject to such conditions, obligations, modifications or undertakings as shall be accepted or shall be required to be accepted by the Parties under Section 5.5 or (y) been approved in accordance with the relevant legislation of that EU or EFTA Member State.][714]

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EFTA**" means the European Free Trade Association.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in [●] of the EMEA Asset Sale Agreement.

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

---

[714] Note to Purchaser: EU merger notifications/approvals to be discussed depending on European operations of Purchaser.

**13**

**Error! Unknown document property name.**

**324**

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Transferred Intellectual Property**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Upward Adjustment**" has the meaning attributed to the term "Upward Adjustment" in [•] of the EMEA Asset Sale Agreement.

"**EMEA Warranty Obligations**" means the warranty obligations relating to CVAS Products and CVAS Services assumed by Purchaser and/or a Designated Purchaser pursuant to [Sections • and •] of the EMEA Asset Sale Agreement.

"**Employee**" means any employee of the Sellers engaged in the Business, as listed in Section 4.11(b) of the Sellers Disclosure Schedule.

"**Employee Data**" has the meaning set forth in Section 7.4(b).

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees offered employment pursuant to Section 7.1 or Section 7.2 other than Employees whose employment transfers by operation of Law.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating: (i) the management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable laws or any analogous foreign, state, provincial or local laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible personal property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, business supplies and other articles of tangible personal property.

NY\1582469.7

[New York #2071434 v4]

Error! Unknown document property name.

**325**

"**Equity Commitment Letters**" has the meaning set forth in Section 3.3(a).

"**Equity Financing**" has the meaning set forth in Section 3.3(a).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) which is a member of a controlled group or which is under common control with the Sellers or any Subsidiary within the meaning of Section 414 of the Code.

"**Escrow Agreement**" means the Escrow Agreement to be entered into on or prior to Closing substantially in the form attached hereto as Exhibit G.

"**Escrow Agent**" has the meaning ascribed to such term in the Escrow Agreement.

"**Escrow Amount**" means $●.

"**Escrow Deadline**" means the earliest of the following events: (i) the issuance of a tax clearance certificate under subsection 159(2) of the Income Tax Act (Canada) with respect to the dissolution of NNL or NNTC, as the case may be; (ii) the corporate dissolution of NNL or NNTC, as the case may be; and (iii) the date following the expiration of all periods allowed for objecting to or appealing from the final determination of any proceedings relating to any assessment, reassessment or additional assessment of NNL or NNTC, as the case may be, by any Governmental Entity in respect of any taxation year ending on or prior to the Closing Date. For these purposes, a final determination shall mean (A) the expiry of the delay to appeal from or object to the relevant assessment, reassessment or additional assessment by the Canada Revenue Agency or other Taxing Authority if no appeal is taken or no objection is made, (B) the entering into of any agreement by NNL or NNTC and such a Taxing Authority in settlement of a dispute regarding such assessment, reassessment, additional assessment or proposed assessment, reassessment or additional assessment or (C) the decision by a court or tribunal of competent jurisdiction regarding the relevant assessment, reassessment or additional assessment from which no appeal may be taken or the period during which an appeal may be taken has expired and no appeal has been taken.

"**Estimated Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.2(a).

NY\1582469.7

[New York #2071434 v4]

Error! Unknown document property name.

**326**

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Deferred Revenue Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).[8]

"**Estimated Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded 365 Customer Contracts**" has the meaning set forth in Section 2.1.5(b).

"**Excluded Non-365 Customer Contracts**" has the meaning set forth in Section 2.1.6(b).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller or EMEA Seller other than the Business.

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Expense Reimbursement**" has the meaning set forth in Section 9.2(a).

["**Extra Services**" has the meaning set forth in Section 5.27(b).]

---

[8] Note to Purchaser: To be addressed as a covenant in the EMEA Asset Sale Agreement rather than a purchase price adjustment.

327

["**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect.][915]

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Financing**" has the meaning set forth in Section 3.3.**3.3(a).**

"**Financing Commitments**" has the meaning set forth in Section 3.3(a).

"**GAAP**" means the United States generally accepted accounting principles.

["**GDNT**" means Guangdong-Nortel Telecommunications Equipment Co. Ltd.]

["**GDNT Agreement**" means the agreement to be entered into between the relevant Sellers, the Purchaser (or the relevant Designated Purchasers), and GDNT, on or prior to the Closing on the basis of the term sheet attached hereto as Exhibit H.]

["**General Scope of Included Services**" has the meaning set forth in Section 5.27(a).]

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.4**2.2.5**(a).

"**Government Entity**" means any United States, Canadian, United Kingdom, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services tax **or harmonized sales tax** payable under Part IX of the Excise Tax Act (Canada). **and the Quebec sales tax payable under an Act respecting the Quebec sales tax.**

"**Hazardous Materials**" means any chemical, material, waste or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

---

[915] Note to Purchaser: To be discussed.

NY\1582469.7

17    **Error! Unknown document property name.**

[New York #2071434 v4]

**328**

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received (i) notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada and (ii) any other approvals, clearances or authorizations required under the Investment Canada Act to effect the Closing as contemplated by this Agreement.[16]

"**Identified Employees**" has the meaning set forth in Section 7.1.1(a).

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser or Designated Purchaser's offer of employment as provided in Section 7.1 and are on a Seller-approved leave of absence as of the Employee Transfer Date and are expected to return and actually return to work within the relevant time period set out below.  An Employee shall be an Inactive Employee for purposes hereof if and only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work within [six (6)] months following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(h̶ĵ).

["**Included Services**" has the meaning set forth in Section 5.27(a).]

"**Inclusion Criteria**" means the criteria described in Section 1.1 [●] of the Sellers Disclosure Schedule.[17]

---

[16] Note to Seller:  To be discussed in connection with the Investment Canada Act generally.

[17] **Note to Seller:  Note that under Purchaser's formulation, the Inclusion Criteria will not apply to the top CVAS Customers.  The Inclusion Criteria is currently expected to include all Contracts, other than the major CVAS Customers (Purchaser will provide a list) except those that contain:**

(i)  **R&D obligations reasonably expected to be more than $[2,500,000] after Closing;**

(ii)  **any non-competition, exclusivity or other provision that would, if assumed, restrict Purchaser from directly or indirectly engaging in any business activity anywhere in the world (whether such agreement is exclusive by geography, product type or otherwise), including with respect to Purchaser's business prior to the signing date;**

(iii)  **indemnity provisions that (A) contemplate the payment of special, incidental, consequential or any other damages besides direct damages or (B) would fail to release the Purchaser from intellectual property indemnity obligations in instances where infringement resulted from (w) a combination of**

**18**

**Error! Unknown document property name.**

**329**

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means [●] or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm within [●] Business Days of the request of either Primary Party, by [●] at the request of the first Primary Party to move for the appointment of such Independent Auditor.

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means any and all intellectual and industrial property, whether protected or arising under the laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) Trademarks; (b) Patents; (c) works of authorship (whether or not published) and copyrights (including any registrations therefor or applications for registration); (d) mask works (including any registrations therefor or applications for registration); (e) trade secrets, know-how and confidential information; (f) industrial designs and other rights in designs (including any registrations therefor or applications for registrations); (g) *sui generis* data base rights and (h) any Software **and technology**.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit I.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

---

the Purchaser's products with other materials not provided by the Purchaser, (x) specifications or modifications suggested by or made by customer, (y) customer's failure to use updated products to avoid a claim of infringement or (z) any use or sale of the products in a manner not contemplated by the contract; or

(iv)    requires the Purchaser to maintain a CVAS Product or Service for a period longer than [10] years.

(v)

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

*330*

"**Inventory Value**" means, as of any given date, the book value of the Owned Inventory and the EMEA Owned Inventory, in each case net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Investment Canada Act**" means the Investment Canada Act, R.S. 1985, c.28, as it is now in effect and as it may be amended.

"**IRS**" means the United States Internal Revenue Service.

"**Israeli Companies**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Companies Law**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Court**" has the meaning set forth in the recitals to this Agreement.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**Joint Israeli Administrators**" has the meaning set forth in the recitals to this Agreement.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware in part on March 5, 2009 and in part on March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware by an order dated March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KPD Provision**" means the provision for "Known Product Defects" to be recognized and measured by the Business pursuant to the Nortel Accounting Principles with respect to defects (other than defects covered by the Non-KPD Warranty Provision) of CVAS Products and/or CVAS Services that have been sold by the Sellers and the EMEA Sellers.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(c) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit J.

"**Law**" means any U.S., Canadian, UK, Israeli, foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial or administrative order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

NY\1582469.7

[New York #2071434 v4]

**Error! Unknown document property name.**

**331**

["**LGN Distribution Agreement**" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and the LGN Joint Venture, on the other hand governing the distribution of certain CVAS Products by the LGN Joint Venture on the basis of the term sheet attached hereto as Exhibit K.]

["**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.]

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the [Purchaser or the relevant Designated Purchasers] under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

"**Loaned Employee Agreement**" means the agreement between [●], on the one hand, and the [Purchaser and/or any Designated Purchasers], on the other hand, to be executed on or before the Closing attached hereto as Exhibit L.[18]

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Antitrust Approvals**" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit M (the "**Relevant Antitrust Authorities**") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit M, authorizing or not objecting to the transactions contemplated by this Agreement and by the EMEA Asset Sale Agreement (as applicable), which includes any decision or consent by any such Relevant Antitrust Authority setting forth conditions or obligations on the Purchaser or any of its Affiliates.[19]

---

[18] Note to Seller: Parties to discuss the potential duration of this agreement.

[19] Note to Purchaser: List of merger notifications/approvals to be discussed – will depend on locations and operations of Purchaser.

**21**

**Error! Unknown document property name.**

**332**

[**"Market Value"** means, in respect of the Restricted Assets and Restricted Liabilities, the fair market value of the same, determined by reference to an amount equal to the product of (x) the sum of the revenues for the one year period ended on December 31, 2008 (the "**2008 Revenues**") for such Restricted Seller as set forth on Exhibit N, times (y) [●][120].]

**"Material Adverse Effect"** means any event, change, circumstance, development, condition, fact, occurrence or effect that, individually or together with any other events, changes, circumstances, developments, conditions, facts, occurrences or effects has had, or would reasonably be expected to have a material adverse effect on the business, operations, assets, **liabilities,** results of operations or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes, circumstances, developments, conditions, facts, occurrences or effects to the extent resulting from (a) general changes to the industries and markets in which the Business operates, but only to the extent that such changes do not have a ~~materially~~ disproportionate effect on to the Business relative to other businesses in such industries and markets, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, earthquakes, hurricanes, floods, tornados and similar natural causes, war, terrorism or hostilities, but only to the extent that such factors, rates, conditions, natural causes, war, terrorism or hostilities, in each case, do not have a ~~materially~~ disproportionate effect on the Business, relative to other businesses in the industries or markets in which the Business operates, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, ~~including any effect on the Business resulting from failure to take any action to which the Purchaser refused consent under this Agreement,~~ (e) the transactions contemplated hereby or any announcement of this Agreement or the identity of the Purchaser in accordance with the terms of this Agreement, (f) the pendency of the Bankruptcy Proceedings and any action approved by the Bankruptcy Courts, (g) the attrition of customers or employees ~~or other deterioration of the Business~~ prior to the Closing Date **(provided, that the reason for customer attrition should be excluded in determining whether there has been a Material Adverse Effect)**, (h) actions taken by the Sellers ~~that the Purchaser intended to take post-Closing with respect to the Business and previously disclosed in writing to the Sellers~~**at the specific written request of the Purchaser** or (i) the failure of the Business to achieve internal or external financial forecasts or projections, by itself, provided, however, that the ~~factors~~**effect of any** underlying **event, change, circumstance, development, condition, fact, occurrence or effect giving rise to any** such failure ~~may~~**shall** be ~~considered~~**included** in determining whether ~~or not there has been~~ a Material Adverse Effect **has occurred**.

**"Material Contracts"** has the meaning set forth in Section 4.4.

**"Monitor"** means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

---

[120] Note to Purchaser: This number will be the revenue multiple/fraction for the CVAS business, arrived at by dividing the Base Purchase Price by the 2008 aggregate revenues of the Business. **Note to Seller: Under review**

**22**

NY\1582469.7

[New York #2071434 v4]   **Error! Unknown document property name.**

333

[~~"**Mutual Development Agreement**" means the agreement between [the Purchaser and/or any Designated Purchasers], on the one hand, and [the relevant Sellers], on the other hand, governing the development (i) by the Purchaser and/or any Designated Purchasers or any of their Affiliates of new features of certain of the products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the CVAS Products, that the relevant Parties will use their reasonable best efforts to negotiate among themselves on the basis of the term sheet attached hereto as Exhibit O and execute on or before the Closing pursuant to Section 5.23.]~~[14]

["**Neutral Arbitrator**" has the meaning set forth in Section 5.27(e).]

"**New York Courts**" has the meaning set forth in Section 10.6(b).

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" has the meaning set forth in the recitals to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock co. corporation formed under the laws of Turkey.[15][21]

["**NN Turkey Agreements**" means the NN Turkey Master Development Agreement, the NN Turkey Distribution Agreement and the NN Turkey Services Agreement.]

["**NN Turkey Distribution Agreement**" means the agreement between NN Turkey, on the one hand, and the **[Purchaser and/or any Designated Purchasers]**, on the other hand, governing the distribution of certain CVAS Products by NN Turkey.][16][22]

["**NN Turkey Services Agreement**" means the agreement between NN Turkey, on the one hand, and the **[Purchaser and/or any Designated Purchasers]**, on the other hand, governing the provision of services by NN Turkey to the Business.]

["**NN Turkey Master Development Agreement**" means the agreement between NN Turkey, on the one hand, and the **[Purchaser and/or any Designated Purchasers]**, on the other hand, governing research and development operations by NN Turkey.]

---

[14] ~~Note to Purchaser:  This agreement will govern the development (i) by the Purchaser and/or any Designated Purchasers of new features of certain of products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the CVAS Products~~

[15][21] Note to Purchaser:  We deleted your definition of "Netas" since it was not used and is already included here.

[16][22] Note to Purchaser:  NN Turkey Agreements to be discussed in connection with this Agreement and the EMEA ASA.

**23**

**334**

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.[1723]

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

["**Non-Designating Party**" has the meaning set forth in Section 5.27(c).]

"**Non-KPD Warranty Provision**" means the provision to be recognized and measured by the Business pursuant to the Nortel Accounting Principles for potential claims by customers under the Warranty Obligations and the EMEA Warranty Obligations.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-365 Customer Contract List**" has the meaning set forth in Section 2.1.6(a).

"**Non-365 Customer Contract**" has the meaning set forth in Section 2.1.6(a).

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

["**Non-US Plan**" has the meaning set forth in Section 4.11(~~l~~k).][1824]

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Unaudited Financial Statements, as set forth in Section 1.1(d) of the Sellers Disclosure Schedule.[1925]

"**Nortel Retained Businesses**" has the meaning set forth in the Intellectual Property License Agreement.

"**Notice Parties**" has the meaning set forth in Section 5.1(b).

["**Notifying Party**" has the meaning set forth in Section 5.27(e).]

"**Offer**" or "**Offers**" has the meaning set forth in Section 7.1.1(a).

"**Offer Consideration Period**" has the meaning set forth in Section 7.1.1(a).

---

[1723] Note to Purchaser:  We do not disagree with this premise, but believe it is already covered by the last sentence of Section 5.13(a).

[1824] Note to Purchaser:  We likely will not need this definition.

[1925] Note to Seller:  To be discussed pending Purchaser's review of the final Schedule 1.1(f) **and the documents referenced therein**.

**24**

24                          Error! Unknown document property name.

[New York #2071434 v4]

**335**

**"Omitted Cross-License Agreement" has the meaning set forth in Section 4.5(g).**

**"Open Source Software"** means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

**"Order" means any award, writ, injunction, judgment, order or decree entered into, issued, made or rendered by any Government Entity.**

**"Ordinary Course"** means the ordinary course of the Business consistent with recent past practice**, including as modified** since the filing of the Bankruptcy Proceedings, **and** as such practice may be modified from time to time (i) to the extent necessary to reflect the Bankruptcy Proceedings or (ii) as may be required in the reasonable judgment of the Sellers to further effectuate the separation of the Business from the other businesses of the Sellers in a manner consistent with the Transaction Documents.  In addition, actions taken that are set forth on Section [●] of the Sellers Disclosure Schedule shall be deemed to be taken in the Ordinary Course.[2026]

**"Other Sellers"** means the Affiliates of the Main Sellers listed in Exhibit A hereto, except to the extent that (i) any such entity listed on Exhibit A is liquidated or wound up between the date of this Agreement and the Closing Date or (ii) despite the **commercially** reasonable best efforts of the Main Sellers, they are unable to cause any such entity listed on Exhibit A to agree to execute this Agreement on the Closing Date, then such entities shall not be considered "Other Sellers" (and therefore, shall also not be considered Sellers) for any purposes of this Agreement notwithstanding their inclusion on Exhibit A and any Assets and Liabilities of such entities will not be transferred as part of this Agreement.

**"Overhead and Shared Services"** means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided (or were provided prior to any recent divestiture by any Seller since the filing of the Bankruptcy Proceedings) to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits

---

[2026] Note to Seller:  Parties to discuss what business plans related to Sellers' consolidation efforts may be scheduled **– finalization of this definition subject to mutual agreement on the operating covenants and representations that ordinary course practices to maintain the business as a going concern will be observed**.

**336**

services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith.

<u>**"Outbound License Agreement" has the meaning set forth in Section 4.5(k).**</u>

"**Owned Equipment**" means (i) those items of Equipment owned by the Sellers that are held or used primarily in connection with the Business and [are located in the specific designated locations within sites as specified in Section [•] of the Sellers Disclosure Schedule,][27] (ii) other items of Equipment owned by any of the Sellers that are held or used exclusively in connection with the Business, and (iii) the other Equipment listed in Section 1.1(e) of the Sellers Disclosure Schedule, <u>provided</u>, <u>however</u>, that "Owned Equipment" shall not include any (A) Owned Inventory, (B) any items of tangible property personally assigned to Employees who are not (x) Transferred Employees as of the Employee Transfer Date or (y) Visa Employees, (C) any Intellectual Property, (D) information technology assets, such as data servers and large scale storage devices or (E) [any fixtures other than trade fixtures located at the [Direct Lease Real Estate], or any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease.][28]

"**Owned Inventory**" means (i) Inventory owned by any of the Sellers that is held or used exclusively in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or any other Person, and (ii) the other Inventory listed in Section 1.1(f) of the Sellers Disclosure Schedule.[29]

"**Partial Allocation**" has the meaning set forth in Section 6.9.

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national (including the United States and Canada) and multinational statutory invention registrations, patents, patent applications and provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations, and all rights therein provided by multinational treaties or conventions.

<u>**"PBGC" has the meaning set forth in Section 4.11(g).**</u>

"**Pension Benefits**" has the meaning set forth in Section 4.11(lk).

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by

---

[27] <u>Note to Seller: Due to the real estate consolidation at Sellers, this definition only works if it is a set period of time when Purchaser has had an opportunity to substantiate the assets.</u>
[28] <u>Note to Seller: Treatment of fixtures subject to real estate discussion.</u>
[29] <u>Note to Seller: TBD regarding tying to Nortel Accounting Principles.</u>

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]