IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
:
*In re*                                         :   Chapter 11
:
:   Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]              :
:   Jointly Administered
Debtors.                              :
:   **Related Docket No. 4347**
:
:
---------------------------------------------------------X

### DEBTORS' OBJECTION TO MOTION OF GENBAND INC. FOR ENTRY OF AN ORDER PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE GRANTING RELIEF FROM THE AUTOMATIC STAY TO COMPEL ARBITRATION

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby respectfully respond and object to the motion of GENBAND Inc. (n/k/a GENBAND US LLC) ("GENBAND") for Entry of an Order Granting Relief from the Automatic Stay to Compel Arbitration [D.I. 4347] (the "Stay Motion").

The Debtors understand that Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and the other Canadian Debtors will be filing a separate Response, Request for Joint Hearing and Reservation of Rights to GENBAND's Stay Motion to the extent it purports to seek relief from this Court to compel NNC and NNL, which are not debtors in proceedings pending before this Court, to arbitrate the dispute over the Purchase Price Adjustment. The Canadian Debtors also will request that GENBAND's motion be heard in a joint hearing with the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Ontario Superior Court of Justice (the "Canadian Court"), along with the CVAS Motion and a similar motion filed by the Canadian Debtors before the Canadian Court, which the Debtors support.

**PRELIMINARY STATEMENT**

1. In an effort to circumvent addressing the merits of the *Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds*, dated November 17, 2010 [D.I. 2632] (the "CVAS Motion")[2] – which seeks to have this Court enforce the clear terms of the duly executed Sale Agreement governing the sale of the Debtors' CVAS Business to GENBAND – GENBAND has filed the instant Stay Motion seeking to compel arbitration of a dispute that is plainly not subject to arbitration under the terms of the Sale Agreement governing the CVAS Sale.[3]

2. The Debtors brought the CVAS Motion to enforce the Sale Agreement governing the sale of their Carrier Voice over IP and Communications Solutions ("CVAS Business") to GENBAND. GENBAND has sought to drastically and improperly reduce the CVAS purchase price by claiming a purchase price adjustment that ignores the clear terms of the Sale Agreement. The Sale Agreement provides, among other things, that the purchase price will be adjusted based on certain assumed liabilities, including the "Deferred Profit Amount," which is to be determined based on "deferred revenues for services to be performed or products to be provided by the Business after the Closing Date." Sale Agreement at 11. Based on this clear definition, and

---

[2] The Debtors respectfully refer the Court to the CVAS Motion for a more detailed discussion of the merits and only summarize the principal points here.

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the CVAS Motion.

applying it in a manner consistent with a previous sale transaction, the Deferred Profit Amount adjustment is $34,284,392, and the total purchase price is $179,508,745.[4]

3.  But GENBAND seeks to ignore the clear terms of the definition of Deferred Profit Amount in order to include deferred revenues for services performed or products provided <u>before</u> the Closing Date, and for which no services were to be performed or products provided <u>after</u> the Closing Date. On this basis, GENBAND seeks to add $36,285,608 to the Deferred Profit Amount figure, inflating that figure to $70,570,000, and drastically reducing the purchase price to $142,904,000.

4.  The dispute precipitated by GENBAND's attempt to disregard the terms of the Sale Agreement is squarely within the jurisdiction the Court expressly reserved under the CVAS Sale Order, to "(1) interpret, implement and enforce the terms and provisions of this Order . . . and the terms of the Sale Agreement . . . (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Sale Agreement . . . ." Sale Order, at ¶ 32. In addition, Section 10.6(b) of the Sale Agreement further mandates that any claim brought prior to the closing of the Chapter 11 cases seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby, "shall be brought <u>only</u>" in the U.S. Bankruptcy Court or the Canadian Court. Thus, not only does this Court have jurisdiction to resolve the matter, the parties agreed that this Court (and/or the Canadian Court) is to be the <u>only</u> forum for resolving such matters.

---

[4] Employees of the Debtors and GENBAND, working together, have recently agreed upon the calculation of certain other accounting deferred revenue line items relating to a Telus Communications contract in Canada which was substantially completed as of the Closing Date that generate an additional adjustment of $2,544,016 to the Deferred Profit Amount and result in a revision of the Sellers' Final Purchase Price calculation from $179,508,745 to $182,052,761. The Debtors intend to serve an amended Disagreement Notice on GENBAND to reflect this additional amount.

Hence, the Debtors should not be required to bear the burden and expense of engaging in a separate arbitral proceeding to enforce the plain terms of the Sale Agreement.

5.  Yet GENBAND seeks to avoid this Court's clear jurisdiction along with the Canadian Court over this matter and instead wishes to have the dispute referred to an accounting arbitrator, based on a provision in the Sale Agreement that provides for certain disagreements to be resolved by an accounting arbitrator. But there is nothing here for an accounting arbitrator to decide. To the contrary, the parties and their accountants <u>agree</u> on the figures that would determine the Deferred Profit Amount if the proper interpretation of "services to be performed or products to be provided by the Business after the Closing Date" is applied. <u>Id.</u> In fact, the parties jointly developed and agreed upon these figures in the course of determining the assets and liabilities that GENBAND would assume upon the acquisition of the CVAS Business.

6.  Hence, this is not an accounting dispute. To the contrary, this is a matter of GENBAND seeking to evade the Sale Agreement's clear terms. Indeed, GENBAND has never – including in its papers on the instant motion – set forth its position in writing as to the nature of any <u>accounting</u> objection to the Sellers' calculation of Deferred Profit Amount that purportedly requires arbitration. Instead, GENBAND simply maintains that <u>any</u> dispute that impacts the purchase price adjustment must be arbitrated. But that is simply wrong. As discussed below, courts consistently reject attempts like GENBAND's to refer a matter to an accounting arbitrator when the dispute, though affecting the purchase price, is not truly an accounting matter but instead arises from a party's attempt to disregard the terms of the sale agreement itself.

7.  For all of these reasons, on November 17, 2010, the Debtors filed the CVAS Motion and noticed it for hearing on December 15, 2010 – the next available Joint Hearing date – based on the expectation (communicated to GENBAND in the CVAS Motion) that the

4

Canadian Debtors would file a parallel motion in the Canadian Court seeking similar relief, which the Canadian Debtors have now done. See CVAS Motion at n.8.[5] The CVAS Motion requests, inter alia, that the Court determine that it – not an Accounting Arbitrator – has the authority to resolve the purchase price dispute, and further requests that the Court declare the Debtors' purchase price as correct and direct GENBAND to execute instructions providing for release of the relevant sale escrows consistent with such purchase price.

8.  The day after the Debtors filed the CVAS Motion, on November 18, 2010, GENBAND filed the instant motion seeking relief from the Automatic Stay "to compel arbitration between Nortel Networks Corporation, Nortel Networks Limited, and Nortel Networks Inc." Stay Motion at 1. In its Stay Motion, GENBAND does not address or even acknowledge the earlier-filed CVAS Motion, but instead seeks to avoid the merits of the CVAS Motion by demanding that the Court refer this dispute to an accounting arbitrator. Notwithstanding the fact that GENBAND's Stay Motion is subsumed by the CVAS Motion and, moreover, purports to have this Court lift the automatic stay to compel arbitration among itself, the US Debtors and the Canadian Debtors on the very same matters that are the subject of the Debtor's CVAS Motion, GENBAND noticed its Stay Motion for a December 8, 2010 hearing before this Court only (and not the Canadian Court), and it subsequently refused to consent to moving its hearing to the December 15th Joint Hearing Date.[6]

9.  As noted above, the Debtors understand that the Canadian Debtors will be filing a separate Response, Request for Joint Hearing and Reservation of Rights to GENBAND's Stay

---

[5]  The Canadian Debtors filed a motion with the Canadian Court on November 30, 2010 seeking relief similar to the relief sought by the Debtors in the CVAS Motion. The motion record is filed on the docket in this Court as well [D.I. 4448].

[6]  To date, GENBAND has not sought similar relief against the Canadian Debtors in the Canadian Court overseeing their insolvency proceedings.

Motion in which, among other things, they will request that GENBAND's motion be heard in a joint hearing along with the CVAS Motion. The Debtors support that request, and they respectfully ask the Court to grant the CVAS Motion and to deny GENBAND's Stay Motion.

## ARGUMENT

### I.   The Deferred Profit Amount Dispute Is Not Arbitrable

10.     This Court has joint jurisdiction, along with the Canadian Court, to decide the threshold question of whether Section 2.2.3.1(c) of the Sale Agreement contemplates resolution of this dispute by an Accounting Arbitrator. See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) ("The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'").

#### A.   *No Presumption of Arbitrability Exists for the Narrow Arbitration Clause of Section 2.2.3.1(c)*

11.     Section 2.2.3.1(c) is a narrow exception to the parties' broad agreement under Section 10.6(b) that "any claim, action or proceeding . . . seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby . . . <u>shall be brought</u> in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases." (Emphasis supplied).

12.     In deciding whether a dispute falls within the scope of an arbitration provision, courts first determine whether the clause is "broad" or "narrow." See Local 827, Int'l Bhd. of Elec. Workers, AFL-CIO v. Verizon N.J., Inc., 458 F.3d 305, 310 (3d Cir. 2006) (distinguishing broad versus narrow arbitration clauses). "'Broad' clauses purport to refer all disputes to arbitration; 'narrow' clauses limit arbitration to specific types of disputes." Camferdam v. Ernst

6

& Young Int'l, Inc., No. 02 Civ. 10100 (BSJ), 2004 WL 1124649, at *1 (S.D.N.Y. May 19, 2004) (citation omitted). Where, as here, "a contract contains both a broad disputes provision permitting lawsuits and also an arbitration requirement set forth in one narrow context, courts routinely limit the arbitration requirement to disputes arising squarely in that narrow context." E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F. Supp. 2d 273, 285 (S.D.N.Y. 2006) (citations omitted).

13.  The Third Circuit has indicated that the strong federal policy in favor of arbitration, upon which GENBAND purports to rely, applies only to broad arbitration clauses – and not to narrow provisions such as the one contained in the Sale Agreement. Local 827, Int'l Brotherhood of Elec. Workers v. Verizon NJ, Inc., 458 F.3d 305, 310-11 (3d Cir. 2006) (holding that district court erred by applying presumption of arbitrability to "narrow" provision that "clearly limits matters subject to arbitration"); Trap Rock Indus., Inc v Local 825, Int'l Union of Operating Eng'rs, AFL-CIO, 982 F.2d 884, 888 n.5 (3d Cir. 1992) (holding that presumption of arbitrability was "inapposite" in case involving "narrowly crafted" arbitration provision). The Third Circuit has emphasized that where an arbitration clause "clearly delimits the issues subject to arbitration," the presumption of arbitrability gives way because "'we cannot presume, as we might if [the arbitration clause] were drafted broadly, that the parties [ ] agreed to submit all disputes to arbitration.'" Local 827, 458 F.3d at 310-11 (quoting Trap Rock, 982 F.2d at 888 n.5)).[7]

---

[7]  The cases upon which GENBAND relies to support its argument that this dispute must be arbitrated in light of federal and Third Circuit policy favoring arbitration are inapposite. In each, the arbitration clauses were broad clauses easily distinguishable from the narrow arbitration provision of Section 2.2.3.1(c) of the Sale Agreement. See Mintze v. Am. Gen. Fin. Servs., Inc (In re Mintze), 434 F.3d, 222, 226 (3d Cir. 2006) (arbitration clause in relevant loan agreement provided that "'all claims and disputes arising out of, in connection with, or relating to [the] loan' must 'be resolved by binding arbitration'"); Official Comm. Of Unsecured Creditors of TEU Holdings, Inc. v. Kemeny (In re TEU Holdings, Inc.), 287 B.R. 26, 40 (Bankr. D. Del. 2002) (court describes relevant arbitration clause as "expansive and cover[ing] any claim arising out of the [agreement]"); MCI Telecomm. Corp. v. Gurga (In

14.     Thus, as the court explained in RCM Techs, Inc. v. Construction Servs. Assocs, Inc., 149 F. Supp. 2d 109 (D. N.J. 2001), "a broad arbitration clause carries with it a certain presumption of arbitrability.  With narrower clauses, however, a court considering the appropriate range of arbitrable issues must 'consider whether the [question at] issue is on its face within the purview of the clause.'"  Id. at 112 (quoting McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988) (citations omitted) (emphasis supplied)).  "Where an agreement to arbitrate is limited in its substantive scope, courts should not allow "the federal policy favoring arbitration . . . to override the will of the parties by giving the arbitration clause greater coverage than the parties intended."  Id. at 112-13 (quoting PaineWebber, Inc. v. Hartmann, 921 F.2d 507, 513 (3d Cir. 1990) (emphasis supplied)) (internal quotation marks omitted).

15.     As the Supreme Court emphasized again this year, "[W]e have said on numerous occasions that the central or 'primary' purpose of the FAA is to ensure that 'private agreements to arbitrate are enforced according to their terms.'"  Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp., 130 S. Ct. 1758, 1773 (2010) (citations omitted).   "In this endeavor, 'as with any other contract, the parties' intentions control.'"  Id. at 1774 (citation omitted).  "Underscoring the consensual nature of private dispute resolution, we have held that parties are "'generally free to structure their arbitration agreements as they see fit.'"  Id. (citation omitted).  And thus "parties may agree to limit the issues they choose to arbitrate."  Id.

16.     Here, the arbitration clause in Section 2.2.3.1(c) of the Sale Agreement is narrow.  It carves out a specific category of dispute concerning accounting expertise to be arbitrated by an Accounting Arbitrator.  Courts consistently hold that arbitration provisions limited to purchase

---

re Gurga), 176 B.R. 196, 197 (B.A.P. 9th Cir. 1994) (compelling arbitration where arbitration clause in agreement provided that "[a]ny disputes arising in any manner under this Agreement" must be arbitrated).

price adjustment disputes are narrow in scope. See, e.g., HDS Inv. Holding Inc. v. Home Depot, Inc., CIV.A. 3968-CC, 2008 WL 4606262, at *5 (Del. Ch. Oct. 17, 2008) (holding that arbitration clause was "narrow" where it "only refers to arbitration those issues regarding the calculation of the [purchase price adjustment])."[8] Because Section 2.2.3.1(c) is a "narrow" arbitration clause, it does not enjoy the presumption of arbitrability applicable to broad arbitration provisions. See Local 827, 458 F.3d at 310-11. Thus, the Court must be careful not to allow any policy favoring arbitration "to override the will of the parties by giving the arbitration clause greater coverage than the parties intended." PaineWebber, 921 F.2d at 513.

**B.** *The Deferred Profit Amount Dispute Is a Legal Question of Contractual Enforcement*

17.     Under the plain language of the Sale Agreement, this dispute is beyond the scope of Section 2.2.3.1(c)'s narrow purchase price adjustment arbitration clause. The dispute is a simple issue of contractual enforceability: GENBAND's expected effort to disregard the definition of Deferred Profit Amount based on purported pre-execution discussions is nothing more than an attempt to circumvent and repudiate a clear and enforceable term of the Sale Agreement. See Bratt Enters, Inc. v. Noble Int'l Ltd., 338 F.3d 609, 613 (6th Cir. 2003) (reversing order compelling accounting arbitration of dispute over validity of contractual term related to purchase price adjustment). To resolve this legal issue, GENBAND would have the Accounting Arbitrator disregard the phrase "after the Closing Date" and improperly modify the Deferred Profit Amount provision to enable GENBAND to include deferred revenue items for services to be performed or products to be provided by the Business before the Closing Date. This is demonstrably not the role of an accounting arbitrator, and certainly not the role the

---

[8]     See also Blue Tee Corp. v. Koehring Co., 999 F.2d 633, 634-35 (2d Cir. 1993) (describing as a "narrow arbitration clause" a provision "requiring disputes regarding the computation of the final statement to be resolved by accountants"); CAE Indus. Ltd. v. Aerospace Holdings Co., 741 F. Supp. 388, 392 (S.D.N.Y. 1989) (finding an arbitration provision narrow in scope where it required "'any objections Buyer may have to any of the matters set forth' in the Closing Date Balance Sheet 'be submitted to an independent accounting firm'").

9

Parties envisioned such an arbitrator would play when the Sale Agreement was negotiated and executed.

18. Section 2.2.3.1(c) delegates to the Accounting Arbitrator only those disagreements "<u>as contemplated by Section 2.2.3.1(b)</u>" that the parties "are unable to resolve . . . within fifteen (15) days after delivery of a Disagreement Notice . . . " (emphasis supplied). In turn, Section 2.2.3.1(b) contemplates only those disputes that are set forth in the Closing Statement that concern "[m]atters included in the <u>calculations</u> in the Closing Statement" (emphasis supplied). Contrary to GENBAND's arguments, the Accounting Arbitrator does not have jurisdiction to adjudicate a matter simply because it is included in a Disagreement Notice or because resolution of the dispute could potentially impact the Closing Statement or the Purchase Price Adjustment. See <u>XL Capital, Ltd. v. Kronenberg</u>, 145 F. App'x. 384, 384 (2d Cir. 2005) (disputes that had the effect of reducing "Earned Payout Amount" were not within the jurisdiction of the accounting arbitrator because they were not "simply accounting issues in disguise").

19. To be sure, enforcing the clear terms of the definition of Deferred Profit Amount here will affect the Closing Statement and Purchase Price Adjustment. But that does not mean that GENBAND's effort to avoid those clear terms falls within the Accounting Arbitrator's jurisdiction under Section 2.2.3.1(c). See <u>Bratt</u>, 338 F.3d at 613 (reversing order compelling accounting arbitration of a dispute over the validity of a contractual term that implicated purchase price adjustment calculations). The <u>Bratt</u> court's reasoning is apt here:

> While [Purchaser's] claim would obviously require reference to the closing balance sheet to determine matters of valuation should [Purchaser] prevail on this issue, the dispute regarding the validity of the limitation provision does not itself involve a 'disagree[ment] with any of the amounts included in the Closing Balance Sheet.' Rather, it involves a determination of whether the parties' intent regarding [Seller's] retained

>liabilities was based upon the parties' sharing a misunderstanding about an essential term of their agreement. Thus, this [dispute] is not within the scope of the arbitration clause and is, therefore, not arbitrable.

Id.

20.     Similarly, in <u>100 William Co. v. Aetna Ins. Co.</u>, the court distinguished between purely computational challenges relating to a rental rate adjustment – which were arbitrable under a lease – and "a determination of the very formula at issue," which was an issue for the court.  558 N.Y.S.2d 34, 35  (1st Dep't 1990) (affirming stay of arbitration because narrow arbitration clause in commercial lease covering any controversy over manner of computation of rental rate adjustment did not include tenant's challenge to meaning of formula for adjusting rent).  The <u>100 William</u> court characterized the tenant's attempt to arbitrate the dispute over the meaning of a contractual term used to calculate the rental rate adjustment as an attempt to improperly "reform" the lease agreement.  558 N.Y.S.2d at 35.  So too here, GENBAND's attempt to disregard the clear definition of Deferred Profit Amount via an accounting arbitration is likewise an improper attempt to reform the Sale Agreement.

21.     If any issue that has the potential to impact the Closing Statement or Purchase Price Adjustment were enough to trigger the Accounting Arbitrator's jurisdiction, then the parties' intent to litigate all disputes under Section 10.6(b) of the Sale Agreement except for those falling into the narrow exception circumscribed by Section 2.2.3.1(c) would be turned on its head.  In other words, GENBAND's position that Section 2.2.3.1 gives the Accounting Arbitrator the authority to decide "'any disagreement' relating to the Purchase Price Adjustment," Stay Motion at ¶ 2, would allow the narrow exception of Section 2.2.3.1 to effectively swallow much of this Court's jurisdiction reserved under Section 10.6 of the Sale Agreement.  See <u>XL Capital</u>, 145 F. App'x. at 385 (finding that arbitration clause referring issues "with respect to the calculations of the . . . Earned Payout Amount" – as distinct from separate

clause addressing all disputes arising under the operative agreement – favored a narrow reading of the relevant arbitration clause limiting its scope to "pure accounting issues").

22.     The decision in HDS is also instructive here. 2008 WL 4606262, at *1 (applying New York contract law). There, the plaintiff asked the court to declare that certain issues were beyond the narrow jurisdiction of an accounting arbitrator, which the parties authorized to resolve certain disputes regarding the calculation of a "post-closing purchase price adjustment." Id. In a Notice of Disagreement, the defendant disputed the plaintiff's inclusion of Bonus and Retention Payment Liability in its calculation of the Applicable Amount in its Closing Statement. The defendant argued "that since it disputed the inclusion of the Bonus and Retention Payment Liability in the Notice of Disagreement, the entire issue of the Bonus and Retention Payments should be decided by the [accounting arbitrator]" because the calculation of the Bonus and Payment Liability in the Closing Statement is "inextricably linked" to the related payment requirement under another section of the sale agreement. Id. at *6.

23.     Acknowledging that "the issues that arise under a contract are often interconnected in ways that make it difficult to divide them between a court and an arbitrator," the HDS Investment court held that "[defendant's] line of reasoning would give to the [accounting arbitrator] contractual disputes that are clearly outside the scope of the arbitration provision." Id. at *1. Thus, the Court refused to send to arbitration a dispute over a contractual term notwithstanding the fact that resolution of the dispute had the potential to impact the purchase price adjustment.

24.     Here too, the matter at issue is a contractual dispute outside the scope of the Sale Agreement's accounting arbitration clause. Section 2.2.3.1(b), as incorporated in Section 2.2.3.1(c), provides that "[m]atters included in the calculations in the Closing Statement"—that

12

is, <u>calculation</u> <u>matters</u>, are to be referred to the Accounting Arbitrator. By contrast, *legal* issues of contractual enforcement are for the court to decide under Section 10.6(b), which as noted mandates that "any claim, action or proceeding . . . seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby . . . <u>shall be brought</u> in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA cases." (emphasis supplied).

25.     Further, the fact that disputes subject to Section 2.2.3.1(c) are to referred to an <u>Accounting</u> Arbitrator, rather than to an ordinary arbitral tribunal that is equipped to address legal disputes, is further evidence that the parties did not intend for the arbitration provision to encompass legal disputes concerning the enforcement of the terms of the Sale Agreement. As the Second Circuit aptly observed in <u>See</u> <u>XL Capital</u>, "the fact that the chosen arbitrator is an accounting firm verifies the import of the plain language: that the scope of the clause is limited to those issues closely related to accounting." 145 F. App'x. at 385. Thus, <u>legal</u> issues such as the instant dispute, even if they may impact the Closing Statement or Purchase Price Adjustment, are for this Court to resolve.

**II.     No Cause Exists To Lift The Automatic Stay**

26.     GENBAND seeks relief from the automatic stay to proceed with arbitration. To the extent that the automatic stay would need to be lifted in connection with GENBAND's motion seeking to compel arbitration, its request similarly fails, as GENBAND has failed to meet its burden of establishing that it would face a relatively greater hardship from having this dispute heard by the Court and a likelihood that it would succeed on the merits. <u>See</u> <u>Am., Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.</u>), 152 B.R. 420, 424 (D. Del. 1993) (citing <u>Int'l Bus. Machines v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van</u>

Co.), 938 F.2d 731, 734-37 (7th Cir. 1991)); see also Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.), 141 B.R. 574, 576-77 (Bankr. D. Del. 1992) (moving party bears burden of demonstrating that cause exists to terminate or modify the stay).

27. "'[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Local 827, 458 F.3d at 309 (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)). The Debtors never agreed to authorize the Accounting Arbitrator to decide issues of contractual enforceability of express provisions of the Sale Agreement, such as the definition of Deferred Profit Amount in Section 1.1. Thus, the Sellers will suffer significant prejudice if they were required to expend time and resources to participate in an arbitration over a legal issue which an Accounting Arbitrator would have no knowledge, expertise or background to decide.

28. The diversion of the Sellers' resources and attention away from their restructuring that will result granting the request to compel arbitration is significant and, in and of itself, provides sufficient justification to deny GENBAND's motion. See Anderson v. Hoechst Celanese Corp. (In re United States Brass Corp.), 173 B.R. 1000, 1006 (Bankr. E.D. Tex.1994) (citing In re Curtis, 40 B.R. 795, 806 (Bankr. D. Utah 1984) ("When balancing the hardships in lifting the stay, the most important factor is the effect of such litigation on the administration of the estate; even slight interference with the administration may be enough to preclude relief."). Because lifting the stay or granting any similar relief directing arbitration of the current dispute would impose substantial burdens and costs on the Debtors, the prejudice to the Debtors further mandates the denial of GENBAND's motion.

29. Similarly, GENBAND has failed to establish a probability of success on the merits or other grounds that would entitle it to relief. See In re Continental Airlines, Inc., 152

B.R. at 426 (D. Del. 1993) (noting that the probability of success should be weighed only after determining that the balance of hardships weighs in favor of movant, and has little or no remaining significance where other elements not met). GENBAND has submitted no evidence to support its position and thus it has not demonstrated that a dispute contemplated by Section 2.2.3.1(b) exists. In other words, GENBAND has never provided to the Sellers in its dispute notice or related correspondence the basis for its calculation of Deferred Profit Amount, as contained in GENBAND's Closing Statement, or the nature of any <u>accounting</u> objection to the Sellers' calculation of Deferred Profit Amount, which was done in accordance with the clear terms of the Sale Agreement. As noted, the parties and their accountants <u>agree</u> on the figures that would determine the Deferred Profit Amount if the language "services to be performed or products to be provided by the Business after the Closing Date" is applied as written. This is a clear-cut contractual dispute, in which the relevant provision is unambiguous. The Sale Agreement's integration clause expressly forbids GENBAND from attempting to disregard or reform the contract, as it seeks to do here, and thus GENBAND cannot possibly succeed on the merits. Accordingly, the Court should reject GENBAND's effort to circumvent the Debtors' CVAS Motion, and the Court should retain jurisdiction to expeditiously resolve this matter.

**CONCLUSION**

30. For the reasons set forth above, GENBAND's Motion for Entry of an Order Granting Relief from the Automatic Stay to Compel Arbitration should be denied.

| | |
|---|---|
| Dated: December 1, 2010<br>Wilmington, Delaware | CLEARY GOTTLIEB STEEN & HAMILTON LLP<br><br>James L. Bromley (admitted *pro hac vice*)<br>Lisa M. Schweitzer (admitted *pro hac vice*)<br>David H. Herrington (admitted *pro hac vice*)<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225-2000<br>Facsimile: (212) 225-3999<br><br>- and -<br><br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br>*/s/ Ann C. Cordo*<br>Derek C. Abbott (No. 3376)<br>Eric D. Schwartz (No. 3134)<br>Ann C. Cordo (No. 4817)<br>Andrew R. Remming (No. 5120)<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, Delaware 19801<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989<br><br>*Counsel for the Debtors*<br>*and Debtors in Possession* |