**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| NORTEL NETWORKS INC., *et al.* ) | Case No. 09-10138 (KG) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |
| ) | **Re: Docket No. 4345** |
| ) | |
| ) | **Objection Date: December 1, 2010 at 4:00 p.m.** |
| ) | **Hearing Date: December 15, 2010 at 10:00 a.m.** |

**OBJECTION OF GENBAND INC. TO THE DEBTORS' MOTION
FOR ENTRY OF AN ORDER ENFORCING THE ORDER
AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS'
CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS,
AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS**

GENBAND US LLC (formerly GENBAND Inc., ("GENBAND")), by and through its undersigned counsel, hereby files this Objection to Nortel Networks Inc.'s (collectively, with Nortel Networks Corporation and Nortel Networks Limited, "Nortel," and, together with its affiliate filing entities, the "Debtors") *Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds* [D.I. 4345] (the "Debtors' Motion"). In support of the Objection, GENBAND respectfully submits as follows.

**PRELIMINARY STATEMENT**

1.    The United States Supreme Court has ruled that "as a matter of federal law, **any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration**."[1]  Nortel asks the Court to do precisely the opposite.

2.    The Debtors' Motion represents Nortel's attempt to avoid the final and binding arbitration process it agreed to when it entered into the Asset Sale Agreement, dated as of December 22, 2009, by and among Nortel, GENBAND and the entities identified as sellers therein (the "ASA"),[2] and approved by this Court's *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts* (the "Sale Order") [D.I. 2632].

3.    A disagreement has arisen between GENBAND and Nortel regarding the Purchase Price Adjustment under the ASA.  Contrary to Nortel's assertions, GENBAND disagrees with Nortel on both its interpretation of the relevant terms and the calculations that Nortel performs under that interpretation.

4.    Section 2.2.3.1(c) of the ASA (the "Mandatory Arbitration Provision"), which was negotiated for and contemplated as part of consideration under the ASA, and which this Court approved in the Sale Order, states that "*any disagreement*" relating to the Purchase Price

---

[1]    *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (emphasis added).

[2]    All terms not otherwise defined herein shall have the meaning ascribed to them under the ASA. The ASA was filed as Exhibit B to GENBAND's *Motion for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration* ("Motion for Relief from Stay and to Compel Arbitration") [D.I. 4347].

Adjustment shall be submitted to arbitration. The purpose of that provision was to ensure a prompt and final resolution of any such disagreements, rather than protracted litigation with endless discovery and rights of appeal. Indeed, the Mandatory Arbitration Provision expressly obligates the parties to use their commercially reasonable efforts to cause the arbitration to be completed "as promptly as practicable" and "in no event later than thirty (30) days after" the arbitrator is appointed.

5.    Incredibly, Nortel argues that this Court has the power under the ASA to resolve these issues because Section 10.6(b) states that any proceeding arising out of the agreement shall be brought only in the "U.S. Bankruptcy Court" or the "Canadian Court." (Debtors' Motion, at ¶ 3.) But Nortel omits Section 10.6(e), which provides that "Section 10.6(b) **shall not limit the jurisdiction**" of the arbitrator appointed pursuant to Section 2.2.3.1(c), and that actions may be brought in this Court "**for purposes of enforcing the jurisdiction**" of the arbitrator. Read in its entirety, Section 10.6 thus provides exactly the *opposite* of what Nortel suggests.

6.    Nortel also states that "the parties and their accountants agree on the figures that would determine the Deferred Profit Amount" if Nortel's interpretation of "Deferred Profit Amount" were accepted. Nortel's assertion is both wrong and irrelevant. First, there is nothing in the ASA that excludes disagreements about the meaning of "Deferred Profit Amount" from the scope of "any disagreement" concerning the Closing Statement. If these sophisticated parties, both represented by able counsel, had intended a narrow and restricted scope for the arbitration they would have written it very differently. Second, the parties *absolutely do* disagree about "the figures that would determine the Deferred Profit Amount," regardless of how "Deferred Profit Amount" is defined. It is therefore abundantly clear that there will need

3

to be an arbitration at some point; the only issue is whether that will take place now, in a unified process, or after a protracted, collateral federal litigation as Nortel requests. The Federal Arbitration Act, and the plain language of the ASA, prohibit any such waste of time and resources.

7. Despite the express contractual obligation to participate in an efficient, quick, final, and binding arbitration process, Nortel refuses to do so. Instead, Nortel would have this Court consider and determine the outcome of a dispute that Nortel explicitly agreed would be arbitrated. To do so, Nortel argues that the parties' disagreement regarding the Purchase Price Adjustment disagreement is somehow not within the scope of "*any disagreement*" under the Mandatory Arbitration Provision. Nortel's argument is fundamentally at odds with the governing law and the strong federal policy requiring rigorous enforcement and liberal interpretation of arbitration clauses. The Court should deny Nortel's motion and instead order Nortel to submit the disagreement to arbitration.[3]

8. Finally, should the Court determine that the substance of the underlying disagreement shall be heard before the Court, rather than arbitration, GENBAND will need time to conduct discovery, prepare experts, and fully brief the issues. GENBAND vigorously disputes Nortel's assertions, but it should not be forced to litigate those issues in this Court until the threshold question has been resolved.

---

[3] Nortel also raises disputes regarding Canadian transfer taxes and a settlement agreement reached with Verizon Services Corp. ("Verizon"), but those issues are peripheral to the real dispute at hand: whether the dispute regarding the Purchase Price Adjustment falls within the scope of "any disagreement" with regards to the Purchase Price Adjustment that must be submitted to arbitration.

**JURISDICTION**

9. This Court has jurisdiction to decide whether the parties' disagreement should be submitted to arbitration under 9 U.S.C. § 1 *et seq*. pursuant to 28 U.S.C. §§ 157 and 1334. The Court does not have jurisdiction to hear the dispute regarding the Purchase Price Adjustment due to the Mandatory Arbitration Provision. Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

**BACKGROUND**

10. On December 22, 2009, Nortel and GENBAND entered into the ASA.

11. The ASA provides for a Purchase Price that will be adjusted after the Closing Date based on the parties' valuation of assets and liabilities included in the agreement. Specifically, Section 2.2.3.1 of the ASA provides a procedure after the Closing Date through which: (1) GENBAND provides Nortel with its calculation of the Final Purchase Price; (2) Nortel, if it disagrees with GENBAND's calculation, provides notice to GENBAND that it disagrees; (3) the parties negotiate for 15 days to resolve the disagreements; and (4) any disagreements the parties are unable to resolve within that period are then submitted to arbitration.

12. After the Closing Date, accountants for GENBAND and Nortel corresponded frequently regarding the calculation of the Purchase Price under the ASA. This correspondence

revealed that the parties had disagreements both as to the proper approach to calculating the Purchase Price Adjustment as well as the performance of the actual calculations.[4]

13.     On September 15, 2010, pursuant to Section 2.2.3.1(a) of the ASA, GENBAND timely delivered to Nortel a letter and written statement (the "Closing Statement"), attached hereto as Exhibit E, which declared GENBAND's position regarding the Purchase Price Adjustment.

14.     On October 13, 2010, pursuant to Section 2.2.3.1(b) of the ASA, Nortel delivered to GENBAND a letter (the "October 13 Letter") with attached a written statement (the "Disagreement Notice"), both attached hereto as Exhibit F, which provided Nortel's position regarding the Purchase Price Adjustment, and which detailed the disagreements that Nortel raised with GENBAND's Closing Statement.

15.     Section 2.2.3.1(c) of the ASA provides that if the parties "are unable to resolve *any disagreement* as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of a Disagreement Notice by [Nortel], the Independent Auditor shall serve as arbitrator . . . to resolve such disagreement." The "Independent Auditor" is defined in the ASA as "KPMG LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm within 10 Business Days of the request of either Primary Party, by

---

[4] Although many of the communications between GENBAND and Nortel employees were oral, letters sent by GENBAND to Nortel during this time period indicate that the disagreements were over both the proper accounting approach and its application. This is demonstrated in a letter sent on August 6, 2010 (the "August 6 Letter"), attached hereto as Exhibit A, a letter sent on August 18, 2010 (the "August 18 Letter"), attached hereto as Exhibit B, a letter sent on August 20, 2010 (the "August 20 Letter"), attached hereto as Exhibit C, and a letter sent on August 27, 2010 (the "August 27 Letter"), attached hereto as Exhibit D.

KPMG LLP at the request of the first Primary Party to move for the appointment of such Independent Auditor."

16. Section 2.2.3.1(c) also provides that the parties must use their "commercially reasonable efforts to cause the Accounting Arbitrator to deliver . . . as promptly as practicable (and in no event later than thirty (30) days after his or her appointment), a written report setting forth the resolution of any such disagreement." The obvious purpose of that provision is to ensure a speedy, efficient, and final process to resolve any disagreements over the Purchase Price Adjustment.

17. In the October 13 Letter, Nortel indicated that it might not honor the Mandatory Arbitration Provision. Specifically, the October 13 Letter stated that Nortel "expressly reserves our right to pursue all available remedies to resolve any disputes over the Deferred Profit Amount, whether by recourse to judicial relief or otherwise."

18. In a letter dated October 25, 2010 (the "October 25 Letter"), attached hereto as Exhibit G, GENBAND responded to Nortel's October 13 Letter and stated that Nortel's refusal to arbitrate the disagreement regarding the Purchase Price Adjustment would constitute a breach of the ASA because arbitration is the exclusive process for the resolution of *any disagreement* regarding the Purchase Price Adjustment.

19. On October 28, 2010, the fifteen-day period for resolving disputes regarding the Purchase Price Adjustment ended, without the parties resolving all of their disagreements. Nortel thus became contractually bound to submit the remaining disagreements to arbitration.

20.     Nortel did not do so, and did not respond to GENBAND's October 25 Letter.  In a letter to Nortel dated November 9, 2010 (the "November 9 Letter"), attached hereto as Exhibit H, GENBAND reiterated Nortel's contractual obligation to commence arbitration with regard to the disagreement and noted that Nortel had neither provided an explanation why the parties' disagreement was not "any disagreement" subject to the Mandatory Arbitration Provision nor pointed to any provision in the ASA that justified its position.

21.     In a letter dated November 10, 2010 (the "November 10 Letter"), attached hereto as Exhibit I, Nortel finally responded, refusing to submit to arbitration as required by the ASA and thus repudiating its contractual obligations.

22.     Nortel, in Debtors' Motion, now requests that this Court ignore the Mandatory Arbitration Provision and instead resolve for itself the parties' disagreement regarding the Purchase Price Adjustment.  GENBAND respectfully submits that this Court should decline the invitation and compel Nortel to arbitrate as it agreed to in the ASA.

**RELIEF REQUESTED**

23.     By this Objection, and its separately filed Motion for Relief from Stay and to Compel Arbitration [D.I. 4347], GENBAND requests that the Court (i) deny the relief sought in the Debtors' Motion, (ii) enter an order lifting the automatic stay pursuant to Sections 105 and 362(d) of the Bankruptcy Code to allow arbitration to commence, and (iii) compel the commencement of arbitration pursuant to Section 2.2.3.1(c) of the ASA.

**BASIS FOR RELIEF**

**I.    THE PARTIES' DISAGREEMENT SHOULD BE SUBMITTED TO ARBITRATION**

24.    "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Shubert v. Wellspring Media, Inc.*, 335 B.R. 556, 562 (Bankr. D. Del. 2005) (quoting *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24–25). "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quoting *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (citation omitted)).

25.    When presented with a motion to compel arbitration, courts in this Circuit have considered the strong federal policy that favors arbitration. *See In re Mintze*, 434 F.3d 222, 229 (3d Cir. 2006) ("The FAA has established a strong policy in favor of arbitration . . . . To overcome enforcement of arbitration, a party must establish congressional intent to create an exception to the FAA's mandate with respect to the party's statutory claims."). "It is well established that arbitration is a favored mechanism for resolving disputes, especially where the parties previously agreed to utilize arbitration." *In the Matter of TEU Holdings, Inc.*, 287 B.R. 26, 36 (Bankr. D. Del. 2002); *see also In re Gurga, d/b/a Source Commcs.*, 176 B.R. 196, 200 (B.A.P. 9th Cir. 1994) (citing *Graham Oil Co. v. ARCO Products, Inc.*, 43 F.3d 1244, 1247 (9th Cir. 1994), for the proposition that "arbitration is a form of dispute resolution that finds favor in the courts").

26. The United States Supreme Court has held that the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, establishes a federal policy favoring arbitration that requires courts to "rigorously enforce agreements to arbitrate." *Shearson/Am. Exp. v. McMahon*, 482 U.S. 220, 226 (1987) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *see also Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir. 1989) (citations omitted); *Dickenson v. Heinold Securities, Inc.*, 661 F.2d 638, 643 (7th Cir. 1981) (discussing strong federal policy favoring enforcement of arbitration agreements). As such, when a dispute is subject to the terms of an arbitration agreement, the FAA requires a court to stay its proceedings and compel arbitration, except in limited circumstances. *McMahon*, 482 U.S. at 226.

27. The Third Circuit has similarly held that "[w]here an otherwise applicable arbitration clause exits, a bankruptcy court lacks the authority and discretion to deny its enforcement, *unless* the party opposing arbitration can establish congressional intent . . . to preclude waiver of judicial remedies for the statutory rights at issue." *In re Mintze*, 434 F.3d at 231 (emphasis in original); *see also Shubert*, 335 B.R. at 567 ("An agreement to arbitrate before a specific tribunal is, in effect, a specialized kind of forum selection clause. Moreover, based on the recent Supreme Court arbitration cases we have previously reviewed, the national policy favoring enforcement of agreements to arbitrate is at least as strong or stronger than that favoring enforcement of forum selection agreements.") (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974) (citation omitted)). This Court, applying this precedent, has determined it lacks the authority not to send disputes "arising from [a] contract and the alleged breach thereof" to arbitration. *See Jalbert v. Pac. Employers Ins. Co. (In re Olympus Healthcare Group, Inc.)*, 352 B.R. 603, 610–12 (Bankr. D. Del. 2006) (citing *In re Mintze*, 434 F.3d at 229–31). The mere

10

fact that the ultimate decision might have an effect on the rights of other creditors to the estate is not sufficient to create an inherent conflict between the Bankruptcy Code's underlying purposes and arbitration. *In re Mintze*, 434 F.3d at 229.

28. In *Shubert v. Wellspring Media, Inc.*, this Court sent to arbitration a disagreement very similar to the one at hand. 335 B.R. at 569. In *Shubert*, the bankruptcy Trustee, like Nortel, sought to resolve a dispute regarding a working capital calculation in the Bankruptcy Court rather than through the agreed-upon arbitration process. *Id.* at 566–67. The disagreement concerned the calculation of working capital and an adjustment to purchase price, and the disagreement was subject to an arbitration clause under the parties' contract. *Id.* at 563 ("Under the terms of the agreement, the Court cannot compel payment of the purchase price without a determination of what Wellspring owes on the Note."). The Court rejected the Trustee's request, because the "Agreement . . . provides for an agreed-upon mechanism to resolve this dispute." *Id.* The Court stated that where the Trustee sought to avoid "the exact procedure contemplated by the parties to the Agreement," that party "cannot now use this alternate forum as a reason to circumvent the agreed-upon dispute resolution procedures." *Id.* at 566. The parties to the agreement, "in agreeing to the arbitration clause, determined that arbitration, and not this Court, would be the avenue through which this issue should be addressed."[5] *Id.* at 566–67.

---

[5] This Court also recognized the "strong federal policy in favor of arbitration" in *Alderwoods Group, Inc. v. Charter Funerals, Inc.*, 344 B.R. 727, 731 (Bankr. D. Del. 2006). In *Alderwoods Group*, there was an arbitration clause in an asset sale agreement that had been approved by the Bankruptcy Court pursuant to a sale order. 344 B.R. at 728. The arbitration clause at issue was permissive, inasmuch as the Bankruptcy Court had discretion under the contract at issue as to whether to send the dispute to arbitration or to resolve the dispute itself. *Id.* at 729. Even though arbitration was not required under that contract, this Court nonetheless determined that arbitration was appropriate due to the "desire to enforce freely entered into agreements" and "the speed and efficiencies attendant to arbitration proceedings." *Id.* at 731 (citing *Dean Witter Reynolds*, 470 U.S. at 220–21). The Court explained that "arbitration will further the goals of the Bankruptcy Code by providing the parties with a quick and efficient resolution." *Id.* (quoting *In re NorthWestern Corp.*, 2005 Bankr. LEXIS 795, at *8 (Bankr. D. Del. May 5, 2005)).

11

29. The same conclusion applies here. Resolution of the parties' disagreement by the Bankruptcy Court—rather than by an arbitrator—would deprive GENBAND of its bargained-for and paid-for dispute resolution procedure. The arbitration process, which is efficient, fast, and binding, is the bargained-for expectation of GENBAND. In comparison, resolution by the Bankruptcy Court could very well lead to protracted litigation. *See, e.g.*, *Johnson v. Pfizer, Inc.*, 2004 U.S. Dist. LEXIS 25217, 2004 WL 2898076, *3 n.2 (D. Kan. 2004) ("One of the reasons arbitration is favored is the presumption that arbitration . . . will resolve disputes more quickly and at less expense to the parties than litigation in court."). Nortel's approach would also deny GENBAND the finality it bargained for, because even the Bankruptcy Court's findings of fact regarding the Purchase Price Adjustment would be reviewable by a district court on appeal for clear error. *See* FED. R. BANKR. P. 8013; *see also, e.g.*, *Sovereign Bank v. Schwab*, 414 F.3d 450, 452, n.3 (3d Cir. 2005); *Schwab v. PennSummit Tubular, LLC (In re Old Summit Mfg., LLC)*, 523 F.3d 134, 137 (3d Cir. 2008).

30. It bears noting, finally, that the time to commence arbitration under the ASA was October 28, 2010, fifteen days after Nortel provided its Disagreement Notice. If Nortel had honored the Mandatory Arbitration Provision, the Purchase Price Adjustment could already be concluded as of this date. Nortel's delay has precluded this orderly process and denied GENBAND the benefit of its bargain.

## II. NORTEL'S ARGUMENT THAT THE PURCHASE PRICE ADJUSTMENT DISAGREEMENT IS NOT "ANY DISAGREEMENT" IS MERITLESS

31. Nortel would have this Court determine the substance of the underlying dispute itself, rather than simply determine whether Nortel agreed to arbitrate the dispute under the Mandatory Arbitration Provision. That puts the cart before the horse, as it requires the Court to

12

pre-judge the substance of the accounting disagreements and assumes the outcome Nortel desires.

32. In asking this Court to assume the role of the arbitrator, Nortel points to specific words in the contract defining the term "Deferred Profit Amount." Nortel suggest that these are contractual interpretation issues rather than accounting issues, and that this Court is a better forum to resolve them. Nortel's argument fails for at least two reasons. First, if Nortel wanted to have some issues decided by this Court and some other issues decided by the arbitrator, it should have said so in the ASA rather than using the broad phrase "any disagreement." That is not what GENBAND agreed to. Second, Nortel conveniently omits that the very definition it asks this Court to interpret concludes with the phrase "the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles," which confirms that it is invariably intertwined with accounting issues.

33. Nortel admits that under Section 2.2.3.1(c) of the ASA, the parties must submit to arbitration "any disagreement as contemplated by Section 2.2.3.1(b)" of the ASA. Debtors' Motion, at ¶ 51. Nortel also correctly points out that this Court retains jurisdiction to interpret the terms of the ASA, pursuant to Section 10.6(b) of the ASA—but Nortel again omits a key part of that section stating that "Section 10.6(b) shall not limit the jurisdiction of . . . the Accounting Arbitrator set forth in Section 2.2.3.1(c)."

34. The terms of the ASA are thus abundantly clear. Nortel agreed to the Mandatory Arbitration Provision and this Court approved it in the Sale Order. Rather than submit to this contractually required and Court-approved process, however, Nortel argues that the parties' disagreement regarding the Purchase Price Adjustment is somehow not within the scope of "any

disagreement" with regard to the Purchase Price Adjustment. Nortel's myopic interpretation cannot be reconciled with the governing precedent requiring liberal construction of arbitration clauses and providing that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Shubert*, 335 B.R. at 562.

35. Nortel argues that only disagreements that are "properly" raised under the ASA Purchase Price Adjustment procedures are subject to arbitration, and the "present dispute has not been properly raised." Debtors' Motion, at ¶ 51. That is sophistry. Nortel's assertion that the claim was not "properly" raised is based entirely on its <u>own</u> view that its interpretation of the ASA is correct. Specifically, Nortel argues that because GENBAND and Nortel have different interpretations of the term "Deferred Profit Amount," an operative accounting concept crucial to the Purchase Price Adjustment, Nortel argues that GENBAND "disregarded its obligation to prepare the Closing Statement in accordance with the terms of the [ASA] . . . ." *Id.*

36. While artfully phrased, Nortel's argument is really just a different way of asking the Court to resolve the underlying dispute itself. When Nortel says that the disagreement was not "properly" raised, all it means is that Nortel disagrees with GENBAND's interpretation of the contract.[6] If that were a sufficient basis to avoid an arbitration clause, such clauses would have no meaning at all. It cannot be the case that the existence of a disagreement about a term in the contract *precludes* this Court from enforcing the agreed procedure for resolving such a disagreement.

---

[6] Similarly, when Nortel states that it "did not agree to delegate to the Accounting Arbitrator the power to rewrite the terms of the [ASA]," Debtors' Motion, at ¶ 51, all that really means is "we disagree with GENBAND's interpretation." But the existence of a dispute is not a valid basis on which to avoid the agreed-upon mechanism for resolving the dispute.

37. Importantly, arbitration is inevitable under *either* Nortel's or GENBAND's interpretation of "Deferred Profit Amount." Nortel's assertion that "[t]he difference between GENBAND's and the Sellers' respective calculations of Deferred Profit Amount is not the result of any accounting disagreement or mathematical discrepancy" is flat-out wrong. There exist *both* contractual interpretation disagreements and accounting disagreements between the parties, and both constitute "any disagreement" subject to arbitration pursuant to the Mandatory Arbitration Provision. Even if the Court were to accept Nortel's argument and determine that Nortel's interpretation of Deferred Profit Amount is correct, there would still need to be an arbitration regarding the application of Nortel's interpretation. That sort of two-stage process would be antithetical to the fast and efficient process mandated in the parties' agreement.

38. GENBAND has not addressed the merits of the underlying disagreement regarding the Purchase Price Adjustment because that disagreement belongs in arbitration and because the question of whether the disagreement should be sent to arbitration is a threshold issue that should be determined first. If, however, the Court wishes to resolve the underlying disagreement, GENBAND will need discovery, the testimony of experts, and an opportunity to brief the issue in full. In that circumstance, GENBAND would request adjournment of the scheduled hearing for this motion to allow time for this process.

39. As discussed above, every step in the dispute resolution procedure laid out in Section 2.2.3.1 of the ASA has been followed, save for the final step: submitting to arbitration. Nortel agrees that the arbitrator would resolve "any disagreement" with regards to accounting

approach and calculations.[7] The ASA does not provide for any separate process for other types of disagreements; all must be arbitrated. This Court should compel Nortel to honor that agreement.

### III. NORTEL'S OTHER ARGUMENTS, PERIPHERAL TO THE ARBITRATION QUESTION, SHOULD BE REJECTED

40. In an attempt to avoid mandatory arbitration in connection with the Purchase Price Adjustment, Nortel has included in the Debtors' Motion a number of peripheral, unrelated issues. Nortel implies that because this Court may properly hear these peripheral disputes between GENBAND and Nortel, it may also hear and decide the dispute with regard to the Purchase Price Adjustment, notwithstanding the fact that the Mandatory Arbitration Provision requires that the parties bring such dispute before an arbitrator. However, Nortel's assertion is simply incorrect. GENBAND does not seek to avoid the jurisdiction of this Court with respect to these unrelated issues. GENBAND simply requests that this Court honor the terms of the ASA, including the Mandatory Arbitration Provision.

#### A. Canadian Transfer Tax

41. Nortel argues, in what it admits is a smaller and unrelated dispute, that GENBAND owes Nortel certain Canadian transfer taxes.[8]

42. Contrary to Nortel's assertion, GENBAND does not seek to avoid the jurisdiction of either this Court or the Ontario Superior Court of Justice (the "Canadian Court") on this issue.

---

[7] Nortel points to a negative deferred cost-of-sales balance belonging to Nortel Networks (Luxembourg) S.A. that should not have been included in GENBAND's calculation of Deferred Profit Amount, Debtors' Motion, at ¶¶ 25, 43, 49, which is exactly the type of issue that should be submitted to the arbitrator pursuant to the Purchase Price Adjustment dispute resolution procedures under the ASA.

[8] Nortel states that it invoiced GENBAND in the amount of $1,000,390 on September 28, 2010. Debtors' Motion, at ¶¶ 35–37, 57–58.

Rather, GENBAND submits that this issue should be properly argued and heard before the appropriate court at a later date. The resolution of the Canadian transfer tax issue depends on a final determination of the Purchase Price under the ASA. GENBAND's ability to calculate the Purchase Price for determining the proper payment to Nortel with regard to Canadian transfer taxes has been hindered by GENBAND's lack of access to Nortel's books and records.[9] Although such payment for Canadian transfer taxes is owed to Nortel, the amount of such payment is unclear at this time due to the fact that the issue was raised only recently by Nortel and because there has been delay in access to contractually owed books and records. GENBAND is committed to investigate the issue internally and, with GENBAND's Canadian counsel, will work to resolve the issue with Nortel and will remit to Nortel proper payment for Canadian transfer taxes. Until the amount of such remittance may be verified, however, GENBAND cannot do so. GENBAND respectfully suggests that the Court should order Nortel to provide the necessary documents and order the parties to wok in good faith toward an agreed resolution of this issue.

    **B.**    **Verizon**

43. Nortel argues, in another smaller and unrelated dispute, that GENBAND has failed to comply with the ASA by refusing to pay to Nortel consideration paid by Verizon to GENBAND under a settlement agreement pertaining to a contract assigned by Nortel to GENBAND.

---

[9] Nortel has consistently dragged its feet in allowing GENBAND access to books and records that GENBAND is entitled to under the ASA and that are necessary to investigate fair value and to conduct business. GENBAND sought cooperation from Nortel regarding access to its books and records, but only after multiple letters threatening to submit the issue to this Court has Nortel provided access to books and records that are necessary to determine the amount of the Canadian transfer tax. The exhaustive process to extract needed information from Nortel is detailed in the August 6 Letter, the August 18 Letter, the August 20 Letter, and the August 27 Letter. *See* Exhibits A–D.

17

44. GENBAND does not seek to avoid the jurisdiction of this Court in connection with this dispute, either. Rather, GENBAND submits that this issue should be properly argued and heard before this Court at a later date. To be sure, Nortel notified GENBAND of this issue on August 13, 2010, and GENBAND responded on September 3, 2010, with a request for additional information regarding Nortel's request.[10] GENBAND notified Nortel that pursuant to the terms of the ASA, GENBAND was not prepared to remit to Nortel any payment made pursuant to an assigned contract based on agreement made with Verizon subsequent to the Closing Date. GENBAND believes that any such agreement does not pertain to Nortel, as the underlying contract had been assigned pursuant to the ASA. Nortel did not provide any additional argument or information subsequent to its request, and instead included this issue in Debtors' Motion before this Court. GENBAND has still not been provided clarification regarding Nortel's argument as to why it is entitled to funds provided to GENBAND by Verizon pursuant to assigned contracts after the Closing Date.

45. Without further explanation from Nortel, GENBAND cannot characterize any payment by Verizon as an Excluded Asset due to Nortel under the ASA. Due to all of the above, GENBAND respectfully submits that this issue is not ripe for consideration by this Court, and should be considered further and resolved by the parties.

**C. Escrow**

46. Nortel argues that "[b]ecause the correctly calculated Purchase Price Adjustment Escrow Amount exceeds the maximum purchase price adjustment . . . there is no basis for the continued reserve of those excess amounts." Debtors' Motion, at ¶ 52. This disagreement,

---

[10] GENBAND, in its September 3, 2010 letter, attached hereto as Exhibit J, stated that Nortel's assertions regarding a settlement agreement with Verizon was not clear. GENBAND has not received further clarification from Nortel on this point.

18

however, as argued above, should be submitted to arbitration. As such, release of the Escrow Amount would be improper pending the arbitration.

## CONCLUSION

WHEREFORE, GENBAND respectfully requests that the Court (a) deny the relief sought in the Debtors' Motion, and (b) enter an order (i) lifting the automatic stay pursuant to Sections 105 and 362(d) of the Bankruptcy Code to allow arbitration to commence, (ii) compelling the commencement of arbitration pursuant to Section 2.2.3.1(c) of the ASA, and (iii) granting such further and other relief as the Court deems just.

Dated: December 1, 2010　　　　　　　Respectfully submitted,
　　　　　Wilmington, Delaware

　　　　　　　　　　　　　　　　　　　　*/s/ Michael R. Lastowski*
　　　　　　　　　　　　　　　　　　　　Michael R. Lastowski (No. 3892)
　　　　　　　　　　　　　　　　　　　　Sommer L. Ross (No. 4598)
　　　　　　　　　　　　　　　　　　　　DUANE MORRIS, LLP
　　　　　　　　　　　　　　　　　　　　1100 North Market Street, Suite 1200
　　　　　　　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　　　　　　　Telephone: (302) 657-4900
　　　　　　　　　　　　　　　　　　　　Facsimile: (302) 657-4901
　　　　　　　　　　　　　　　　　　　　E-mail:　　mlastowski@duanemorris.com
　　　　　　　　　　　　　　　　　　　　　　　　　slross@duanemorris.com

　　　　　　　　　　　　　　　　　　　　and

　　　　　　　　　　　　　　　　　　　　Blair Connelly (Admitted *Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　Eli J. Kay-Oliphant (Admitted *Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　LATHAM & WATKINS LLP
　　　　　　　　　　　　　　　　　　　　885 Third Avenue, Suite 1200
　　　　　　　　　　　　　　　　　　　　New York, New York 10022-4834
　　　　　　　　　　　　　　　　　　　　Telephone: (212) 906-1200
　　　　　　　　　　　　　　　　　　　　Facsimile: (212) 751-4864
　　　　　　　　　　　　　　　　　　　　E-mail:　　blair.connelly@lw.com
　　　　　　　　　　　　　　　　　　　　　　　　　eli.kay-oliphant@lw.com

　　　　　　　　　　　　　　　　　　　　*Counsel for GENBAND Inc.*