**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
                                                         :
*In re*                                                  :    Chapter 11
                                                         :
Nortel Networks Inc., *et al.*,[1]                       :    Case No. 09-10138 (KG)
                                                         :
                              Debtors.                   :    Jointly Administered
                                                         :
                                                         :    **Hearing date: December 8, 2010 at 10:00 am (ET)**
                                                         :
---------------------------------------------------------X    **Re: D.I. 4345, D.I. 4452**

**DEBTORS' REPLY IN FURTHER SUPPORT OF THEIR MOTION
TO ENFORCE THE CVAS SALE ORDER AND FOR RELATED RELIEF**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), respectfully submit this reply in further support of, and

in response to the Objection (the "Objection") of GENBAND Inc. to, the Debtors' Motion For

Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors'

Carrier Voice Over IP and Applications Solutions Business, and Directing the Release of Certain

Escrowed Funds (the "CVAS Motion").[2]

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation
(9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc.
(4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel
Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical
Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International
Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc.
(4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://dm.epiq11.com/nortel.

[2]      Capitalized terms used but not defined herein shall have the same meaning ascribed to
them in the CVAS Motion.

1.      A review of the Debtors' and GENBAND's motions and objections related to the current CVAS purchase price dispute makes clear that there are only two issues before the Court. First, does the Court have the authority to enforce the Sale Agreement against GENBAND, and second, are the Debtors entitled to receive their calculated Final Purchase Price?  The answer to both questions is plainly yes.[3]

2.       In the many briefing papers already filed in connection with these intertwined motions, GENBAND continues to avoid the central issue relevant to deciding the first question regarding the scope of the Court's authority, i.e., the substantive grounds for its purported objection to the Sellers' application of the Sale Agreement's clear definition of Deferred Profit Amount.  Rather than plainly stating the basis for its disagreement on this critical issue, GENBAND offers only conclusory references to "contractual interpretation disagreements and accounting disagreements between the parties." Objection ¶ 37.  GENBAND maintains that it need not explain further because the "disagreement belongs in arbitration and because the question of whether [it] should be sent to arbitration is a threshold issue that should be determined first." Objection ¶ 38.

3.      The Debtors agree that this Court, and the Canadian Court if a joint hearing is granted,[4] may first consider their authority to enforce the Sale Agreement against GENBAND

---

[3]      On November 29, 2010, in a telephonic conference with the Parties, the Court ordered that it would hear "all issues relating to jurisdiction" at the December 8, 2010 hearing, whether arising under the Debtors' CVAS Motion or GENBAND's motion.  Nov. 29, 2010 Tr. at 25:20-22.  Accordingly, this Reply focuses on the threshold jurisdictional issues and does not address, inter alia, disputes concerning the Canada transfer tax and the Verizon Receivables (both of which are addressed in the CVAS Motion) in light of the fact that GENBAND states in its Objection that it "does not seek to avoid the jurisdiction of this Court with respect to these [] issues." Objection ¶ 40.  The Debtors reserve the right to submit additional briefing with respect to those issues once the threshold issues are decided.

[4]      The Canadian Debtors filed a motion with the Canadian Court on November 30, 2010 (which is also filed on this Court's docket at D.I. 4448) seeking relief similar to the relief sought

before determining the Debtors have calculated the correct number for the Final Purchase Price,

applying the Sale Agreement as written.  However, the Debtors disagree with GENBAND's

suggestion that this Court can determine the scope of its authority with respect to this dispute

merely by following a general federal policy supporting arbitration, without understanding the

exact matters that would be arbitrated.   Simply put, the Court cannot be asked to determine its

authority to decide a dispute without understanding what the dispute is.

      4.     <u>First</u>, the federal policy favoring arbitration is not absolute – the strong

presumption of arbitrability advanced in the cases cited by GENBAND, <u>see</u> Objection ¶¶ 25-26,

only applies to broad arbitration clauses rather than narrowly crafted clauses like the one at issue

that is found in Section 2.2.3.1(c) of the Sale Agreement.[5]  <u>See, e.g.</u>, <u>Local 827, Int'l Bhd. of</u>

<u>Elec. Workers v. Verizon N.J., Inc.</u>, 458 F.3d 305, 310-11 (3d Cir. 2006); <u>Trap Rock Indus., Inc</u>

<u>v Local 825, Int'l Union of Operating Eng'rs, AFL-CIO</u>, 982 F.2d 884, 888 n.5 (3d Cir. 1992).

None of the cases upon which GENBAND relies are on point, because each involves an

arbitration provision that was unquestionably broad and thus is easily distinguishable from the

narrow arbitration clause found in Section 2.2.3.1(c) of the Sale Agreement.   <u>Mintze v. Am.</u>

<u>Gen. Fin. Servs., Inc (In re Mintze)</u>, 434 F.3d, 222, 226 (3d Cir. 2006) (arbitration clause in

relevant loan agreement provided that "all claims and disputes arising out of, in connection with,

---

by the Debtors in the CVAS Motion.  In addition, the Canadian Debtors separately filed a
Response, Request for Joint Hearing and Reservation of Rights to GENBAND's Stay Motion in
which the Canadian Debtors raised, <u>inter alia</u>, jurisdictional arguments in connection with the
Stay Motion and requested that any hearing on the Stay Motion be adjourned to the December
15, 2010 Joint Hearing.  The Debtors support the Canadian Debtors' request for a joint hearing.
At the time of the filing of this Reply, the Court has not ruled on the Canadian Debtors' joint
hearing request.

[5]    The Debtors respectfully refer the Court to their Objection to GENBAND's Stay Motion
[D.I. 4451] for their complete argument as to why this dispute is not subject to arbitration.  In
this Reply, the Debtors intend to only briefly respond to points raised in GENBAND's Objection
to the CVAS Motion.

or relating to [the] loan must be resolved by binding arbitration") (internal quotation marks omitted); <u>Official Comm. Of Unsecured Creditors of TEU Holdings, Inc. v. Kemeny (In re TEU Holdings, Inc.)</u>, 287 B.R. 26, 40 (Bankr. D. Del. 2002) (court describes relevant arbitration clause as "expansive and cover[ing] any claim arising out of the [agreement]"); <u>MCI Telecomm. Corp. v. Gurga (In re Gurga)</u>, 176 B.R. 196, 197 (B.A.P. 9th Cir. 1994) (compelling arbitration where arbitration clause in agreement provided that "[a]ny disputes arising in any manner under this Agreement" must be arbitrated).

5.      In <u>Local 827</u>, the Third Circuit made clear that, notwithstanding Supreme Court precedent endorsing the presumption of arbitrability, courts in this Circuit must distinguish between broad and narrow arbitration clauses for purposes of the presumption:

> The Supreme Court has previously set forth the applicability of the presumption of arbitrability. . . . This court, however, has held that the presumption of arbitrability does not apply in all circumstances.  Where the arbitration provision is narrowly crafted, we cannot presume, as we might if it were drafted broadly, that the parties [] agreed to submit all disputes to arbitration.

<u>Local 827</u>, 458 F.3d at 309-10 (internal quotation marks and citation omitted).[6]

6.      In direct contrast to the presumption of arbitrability which GENBAND proffers, courts in this Circuit are in fact mindful not to extend arbitration clauses beyond their agreed upon scope.  See <u>RCM Techs, Inc. v. Constr. Servs. Assocs, Inc.</u>, 149 F. Supp. 2d 109, 112-13 (D.N.J. 2001) ("Where an agreement to arbitrate is limited in its substantive scope, courts should

---

[6]      The remaining cases GENBAND cites in support of its presumption of arbitrability argument predate the Third Circuit's decision in <u>Local 827</u>; <u>see</u> <u>Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 885 F.2d 1149 (3d Cir. 1989); <u>Dickinson v. Heinold Secs., Inc.</u>, 661 F.2d 638 (7th Cir. 1981); or address the issue of a court's authority to compel arbitration of a dispute <u>that falls within the scope of a broad arbitration clause</u> based on its status as a core v. non-core proceeding under the Bankruptcy Code.  See <u>Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)</u>, 434 F.3d 222, 231-31 (3d Cir. 2006); <u>Jalbert v. Pac. Employers Ins. Co. (In re Olympus Healthcare Grp., Inc.)</u>, 352 B.R. 603, 609-611 (Bankr. D. Del. 2006).

not allow the 'federal policy favoring arbitration . . . to override the will of the parties by giving

the arbitration clause greater coverage than the parties intended.'") (emphasis supplied) (quoting

PaineWebber, Inc. v. Hartmann, 921 F.2d 507, 513 (3d Cir. 1990) (internal quotation marks

omitted)).  Here, Section 10.6(b) of the Sale Agreement and the Sale Order grant the Court

(and/or the Canadian Court) jurisdiction to decide all matters that do not fall within the narrow

accounting issues subject to arbitration under Section 2.2.3.1(c) of the Sale Agreement.  See Sale

Agreement, at 131-32; Sale Order ¶ 32.  Section 2.2.3.1(c) is indisputably a narrow arbitration

clause that carves out from this Court's (and the Canadian Court's) jurisdiction over all claims

concerning the CVAS Sale a very specific category of dispute – namely purchase price

adjustment disputes, the resolution of which requires substantive accounting expertise – to be

determined by an Accounting Arbitrator.   Thus, the Federal Arbitration Act – and the strong

presumption in favor of arbitrability that courts apply to broad arbitration provisions – plainly

does not dictate the outcome here.[7]

7.      Second, in assessing whether a dispute is subject to an arbitration provision,

particularly a narrow provision like the one at issue here, the court must consider what actually is

in dispute – that is, the nature of the parties' positions – in order to determine whether the matter

is subject to arbitration.  The dispute here concerns GENBAND's attempt to disregard a clear

term of the Sale Agreement – the definition of "Deferred Profit Amount."   That GENBAND's

---

[7]      GENBAND's attempt to analogize the present case to this Court's decision in Shubert v.
Wellspring Media, Inc. (In re Winstar Comnc'ns , Inc.), 335 B.R. 556 (Bankr. D. Del. 2005), is
wholly misplaced because Shubert is easily distinguishable.  There, the parties agreed that their
arbitration clause encompassed the dispute at issue; they disagreed only about whether the
arbitration clause, which used the word "may," was mandatory or permissive.  See Shubert,  335
B.R. at 561.  That is not the issue here.  Moreover, Shubert was decided before Local 827, which
established that the strong federal policy favoring arbitration applies only if the arbitration clause
is broad.

attempt to do so has an impact on the Purchase Price Adjustment does not mean this is a matter for accounting arbitration.

8.    In other words, GENBAND cannot conjure an arbitrable dispute merely by advancing a different Purchase Price Adjustment than the one calculated by the Sellers, when GENBAND's position is the product of disregarding (or attempting to reform) the plain terms of the Sale Agreement.    See Bratt Enters., Inc. v. Noble Int'l Ltd., 338 F.3d 609, 613 (6th Cir. 2003) (in dispute over validity of contractual term related to purchase price adjustment, finding that dispute "does not itself involve  a disagree[ment] with any amounts included in the Closing Balance Sheet [but rather] involve[s] a determination of whether the parties' intent regarding [Seller's] retained liabilities was based upon . . . a misunderstanding about an essential term of their agreement" and is therefore not subject to arbitration) (internal quotation marks omitted); HDS Inv. Holding Inc. v. Home Depot, Inc., CIV.A. No. 3968-CC, 2008 WL 4606262, at *5 (Del. Ch. Oct. 17, 2008) (holding that a dispute over a contractual term that had potential to impact the purchase price adjustment  is not subject to arbitration clause covering disputes regarding the calculation of a post-closing purchase price adjustment); see also, XL Capital Ltd. V. Kronenberg III, 145 F. App'x. 384, 384-85 (2d Cir. 2005) (disputes that had the effect of reducing "Earned Payout Amount" were not within the jurisdiction of the accounting arbitrator because they were not "simply accounting issues in disguise") (internal quotation marks omitted); 100 William Co. v. Aetna Ins. Co., 558 N.Y.S.2d 34, 35 (1st Dep't 1990) (rejecting tenant's attempt to arbitrate a dispute over the meaning of a contractual term used to calculate a rental rate adjustment as an attempt to improperly "reform" the lease agreement).   GENBAND's alleged dispute with the Sellers' Final Purchase Price is not an arbitrable dispute both because it does not implicate accounting issues and because GENBAND's position is not even supported

by the contract as written.   At best, this dispute arises from GENBAND's attempt to disregard

the clear terms of the definition of "Deferred Profit Amount" in order to "reform" that provision

of the agreement.  Such arguments are plainly legal matters over which this Court and the

Canadian Court have sole jurisdiction and that have no place before an Accounting Arbitrator.[8]

9.    Further, GENBAND's failure to identify the nature of its objection to Nortel's

application of the Deferred Profit Amount provision bolsters the Debtors' position that this

dispute concerns a legal issue of contract enforcement and not a matter of substantive accounting

subject to the expertise of an Accounting Arbitrator.  In calculating the Deferred Profit Amount,

and ultimately the Final Purchase Price, Nortel has followed the plain language of the relevant

provision of the Sale Agreement, which defines Deferred Profit Amount as:

> both short term and long term (i) <u>deferred revenues for services to be performed or products to be provided by the Business after the Closing Date</u> but for which an account receivable has been recorded or cash has been received prior to the Closing Date minus (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in Connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business . . . [f]or the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.

Sale Agreement, at 11 (definition of Deferred Profit Amount) (emphasis supplied).

10.    In calculating the Deferred Profit Amount in this manner, Nortel accountants have

followed a contractual methodology – agreed to and in fact proposed by GENBAND – for

---

[8]    GENBAND is correct that Section 10.6(e) of the Sale Agreement provides that Section 10.6(b)'s general grant of jurisdiction to this Court and the Canadian Court "shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1(c)." Sale Agreement, at 132.  But the relevant question is whether the Accounting Arbitrator has jurisdiction over the present dispute pursuant to Section 2.2.3.1(c)'s arbitration clause.  Section 10.6(e) does not grant the Accounting Arbitrator any greater jurisdiction than what is provided in Section 2.2.3.1(c). GENBAND's implication that the Debtors deliberately "omitted" this language to somehow mislead the Court with respect to Section 10.6(b) is meritless.

determining deferred revenue balances in respect of future deliverables as of the Closing Date

that would transfer to GENBAND per the Sale Agreement's Deferred Profit Amount definition.

That GENBAND refuses to even state the nature of its objection to this methodology is telling.

The implication of GENBAND's evasion is clear:  GENBAND seeks to reform the Sale

Agreement so that it can include in its calculation of Deferred Profit Amount over $38 million in

deferred revenue for services performed or products completed <u>before</u> the Closing Date –

revenue which rightly belongs to Nortel because it concerns work that Nortel alone completed

prior to selling the CVAS Business to GENBAND and for which GENBAND will bear no future

obligation or cost.

11.    This is especially true here, where the Sale Agreement, which included numerous

Sellers from several continents and, was put through a public auction process before the CVAS

Sale to GENBAND was finally approved by the Court.  Other potential bidders were asked to

bid on and would have been held to the unambiguous terms of the Sale Agreement – and not an

improved extracontractual version of the deal with an associated $38 million purchase price

reduction.  GENBAND should not be permitted to now advance extracontractual arguments to

lower the purchase price beyond the benefit of the bargain it negotiated last year, much less to be

allowed to raise such arguments before an accountant who does not have any expertise in

considering their validity.

12.    The definition of Deferred Profit Amount could not be more clear in providing

that only deferred revenue and associated deferred costs in respect of services to be performed

and products to be provided <u>after</u> the Closing Date are included in the Deferred Profit Amount.

GENBAND seeks to disregard the "after the Closing Date" language in the definition, but offers

no explanation for why it should be permitted to do so.  Indeed, there is no legal basis for

GENBAND's position; the Sale Agreement contains a valid and binding integration clause that expressly forbids GENBAND from doing what it implicitly seeks to do. Section 10.12(a) provides: "This Agreement . . . set[s] forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement . . . ." Sale Agreement, at 136. That GENBAND may wish it negotiated a different definition to be included in the Sale Agreement (even though GENBAND itself introduced the existing language) is of no consequence. As GENBAND itself points out, the Parties to the Sale Agreement are both "sophisticated parties" who were "represented by able counsel." Objection ¶ 6. The Sale Agreement's integration clause controls. Moreover, to the extent GENBAND may claim it had a different understanding of the purchase price adjustment than the language memorialized in the Sale Agreement, it had five months from the time it signed the agreement in December 2009 until the sale closed in May 2010 to raise the existence of such a purported error. In fact, it did not do so at any time prior to the closing of the sale. Of course, as a threshold matter, it is not clear that GENBAND will make any or all of these arguments, as GENBAND continues to refuse to explain the grounds for its purported dispute.

13.      Finally, GENBAND's suggestion that arbitration is appropriate here because it would be "efficient" and "fast" relative to potential "protracted litigation" in the Bankruptcy Court is ironic and misplaced. Objection ¶ 29. The most efficient – and plainly the proper – way to resolve this matter is for this Court (and the Canadian Court) to enforce the clear terms of the Sale Agreement and thus rule that GENBAND is obligated to follow those terms.[9] This is

---

[9]      GENBAND also suggests in its Objection that Nortel has acted improperly in filing the CVAS Motion after the conclusion of the fifteen-day negotiation period following delivery of the Disagreement Notice, and that Nortel "became contractually bound to submit [this dispute] to

precisely the relief the CVAS Motion requests, and for all of the reasons stated above and in the

CVAS Motion and in the Debtors' Objection to GENBAND's Stay Motion, this Court should

rule that it is the proper forum for resolution of this dispute and GENBAND should be held to its

obligations under the Sale Agreement.

*[Reminder of Page Intentionally Left Blank]*

---

arbitration" after this fifteen days elapsed. See Objection ¶¶19, 30.   This is patently incorrect.
The dispute is either arbitrable or not arbitrable regardless of the time frame provided in the Sale
Agreement for arbitration to occur.  The Debtors were under no obligation to file a motion prior
to the conclusion of the fifteen-day period, and the fact that the fifteen days elapsed and no
resolution was reached in no way converts this dispute into an arbitrable dispute.  Further, the
Sellers reserved all rights in connection with this issue in their various notices to GENBAND.

WHEREFORE, the Debtors respectfully request that this Court (i) grant the CVAS

Motion and the relief requested therein; (ii) enter the proposed order attached thereto; and

(iii) grant such other and further relief as it deems just and proper.

Dated:  December 3, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Wilmington, Delaware

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

     - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*