**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| NORTEL NETWORKS INC., *et al.* ) | Case No. 09-10138 (KG) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |
| ) | **Re: Docket No. 4347 and 4451** |
| ) | |
| ) | **Hearing Date: December 8, 2010 at 10:00 a.m.** |

**REPLY OF GENBAND US LLC TO DEBTORS' OBJECTION TO
MOTION OF GENBAND INC. FOR ENTRY OF AN ORDER PURSUANT TO
SECTION 362(D) OF THE BANKRUPTCY CODE GRANTING RELIEF
FROM THE AUTOMATIC STAY TO COMPEL ARBITRATION**

GENBAND US LLC (formerly GENBAND Inc., ("GENBAND")), by and through its undersigned counsel, hereby files this reply (the "Reply") to Nortel Networks Inc.'s (collectively, with Nortel Networks Corporation and Nortel Networks Limited, "Nortel," and, together with its affiliate filing entities, the "Debtors") *Objection to Motion of GENBAND Inc. for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration* [D.I. 4451] (the "Debtors' Objection"). In support of this Reply, as well as its previously filed *Motion for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration* [D.I. 4347] ("GENBAND's Motion"), GENBAND respectfully submits as follows:

**PRELIMINARY STATEMENT**

1. Nortel's entire argument is based on a selective quotation of the disputed term. When read in its entirety, as it must be, there is no doubt that the parties' disagreement is exactly the type that the parties agreed must be arbitrated. The Court should therefore lift the automatic stay and order the parties to submit the matter to arbitration.

2. The Asset Sale Agreement, dated as of December 22, 2009, by and among Nortel, GENBAND and the entities identified as sellers therein (the "ASA"),[1] approved by this Court's *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts* (the "Sale Order") [D.I. 2632], in Section 2.2.3.1(c) (the "Mandatory Arbitration Provision") states that "*any disagreement*" concerning the Closing Statement must be submitted to the arbitrator.

3. Nortel argues that even though the ASA requires the parties to arbitrate "any disagreement" about the Closing Statement, the parties actually intended to arbitrate only some of those disagreements: those requiring accounting determinations. As an initial matter, Nortel relies upon inapposite cases involving either materially different contract language, disputes far removed from the scope of the relevant arbitration clause, or both. But more fundamentally, Nortel's argument fails even if one accepts Nortel's premise—because when read in its entirety (rather than as selectively quoted by Nortel), *the very definition of the term at issue requires interpretation and application of accounting rules*.

---

[1] All terms not otherwise defined herein shall have the meaning ascribed to them under the ASA. The ASA was filed as Exhibit B to GENBAND's Motion [D.I. 4347].

4.  Nortel states that the interpretation of "Deferred Profit Amount" is "a legal issue which an Accounting Arbitrator would have no knowledge, expertise or background to decide." Nortel Objection at ¶ 28.  But Nortel omits the most important part of the definition of "Deferred Profit Amount," which shows that it absolutely *does* require accounting determinations.  Under the ASA, "Deferred Profit Amount" means:

> as of the Closing date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, **in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).  For the avoidance of doubt, the Deferred Profit amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles**.

ASA at 11 (emphasis added).

5.  The term "Nortel Accounting Principles" is defined as "the accounting principles employed in the preparation of the Unaudited Financial Statements," which are defined as "the unaudited management statements of certain assets and liabilities of the Business as of September 30, 2009 and the related unaudited management statements of income of the Business for the nine (9) month period ended on September 30, 2009."  ASA at 11, 33, 65.

6.  The parties thus did *not* agree, as Nortel suggests, to determine the "Deferred Profit Amount" in an interpretive vacuum.  Rather, they agreed that it would be determined based on a particular set of accounting rules, as applied in a particular set of unaudited financial statements.  It is therefore *impossible* to determine the "Deferred Profit Amount" without

3

determining whether the deferred revenues (minus the associated deferred costs) "would be required to be reflected on a balance sheet of the Business" as of the Closing Date, if that balance sheet had been "prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP)," as reflected in the Unaudited Financial Statements.  These are exactly the sort of issues that the parties agreed to submit to arbitration.[2]

7. It should be obvious by now why Nortel is trying so hard to avoid the process to which it agreed.  Nortel is well aware that the interpretation it offers is *not* consistent with how the Deferred Profit Amount was determined in the Unaudited Financial Statements pursuant to the Nortel Accounting Principles, to the extent consistent with GAAP.  Nortel is well aware that any arbitrator who examines these concepts will reject Nortel's position.  In an effort to avoid that day of reckoning, Nortel has selectively quoted the definition at issue and tried to cast it as a pure question of contract interpretation.  But Nortel's desire to avoid the outcome does not permit it to ignore the terms of the contract.  Accordingly, the Court should order Nortel to arbitrate these issues as the parties agreed.

## ARGUMENT

I. **THE DETERMINATION OF "DEFERRED PROFIT AMOUNT" NECESSARILY REQUIRES INTERPRETATION AND APPLICATION OF ACCOUNTING RULES AND PRINCIPLES**

8. It is axiomatic that contracts must be read in their entirety, and in a manner that gives each part of the contract meaning.  *See Empire Prop. Corp. v. Mfr. Trust Co.*, 43 N.E. 2d 25, 28 (N.Y. 1942); *Ins. Co. of N.Y. v. Central Mut. Ins. Co.*, 850 N.Y.S. 2d 56, 58 (N.Y. App. Div. 1st Dep't 2008).  It follows that the Court cannot simply excise one part of the definition of

---

[2] Indeed, even the terms "deferred revenues" and "deferred costs" involve accounting issues.

"Deferred Profit Amount" and interpret it in isolation—particularly where the part of the contract Nortel seeks to avoid *is the very definition of the term at issue*. When read in its entirety, as it must be, the determination of "Deferred Profit Amount" requires a careful analysis of highly technical accounting principles as applied in particular financial statements. As a result, there can be no legitimate dispute that the determination of the Deferred Profit Amount is within the scope of "any disagreement" that must be submitted to the Accounting Arbitrator.

> **A.    The ASA Requires Arbitration of "Any Disagreement" Regarding the Closing Statement, Including Any "Items" Contained Within It**

9. The ASA requires the Purchaser to deliver a "Closing Statement" that contains the Purchaser's calculation of 19 specific items, one of which is "the Deferred Profit Amount as of the Closing." ASA at § 2.2.3.1(a). The ASA provides that the Closing Statement "shall be prepared in accordance with the Nortel Accounting Principles and the terms hereof." *Id*.

10. If the sellers "disagree with the determination of the Closing Statement," they are to "notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement" in a "Disagreement Notice." ASA at § 2.2.3.1(b). The Disagreement Notice must "set forth, in reasonable detail, *any disagreement with*, and any requested adjustment to, the Closing Statement." *Id*. (emphasis added). Any "*matters included in* the calculations in the Closing Statement" to which the sellers do not object are deemed accepted.[3] *Id*.

11. If the parties "are unable to resolve *any disagreement* as contemplated by Section 2.2.3.1(b)" within 15 days after delivery of the Disagreement Notice, "the Independent Auditor

---

[3]    Nortel's assertion that the ASA only requires arbitration of disagreements about "calculations" is plainly wrong. Nortel Objection at ¶ 18. First, the clause Nortel cites describes matters that will not be arbitrated. Second, the clause refers not merely to "calculations" but also to any "matters included in" those calculations. ASA § 2.2.3.1(b).

*shall serve as arbitrator*" to resolve that disagreement.[4]  ASA at § 2.2.3.1(c) (emphasis added). As noted above, a "disagreement . . . as contemplated by Section 2.2.3.1(b)" means "any disagreement with . . . the Closing Statement." ASA at § 2.2.3.1(b).  The arbitrator is to "consider" only those "items *and* amounts set forth in the Closing Statement" as to which the parties have not resolved their disagreement, and is "to conduct such proceedings as it considers necessary to resolve such disagreement." *Id.* (emphasis added).  The arbitrator is to deliver his report "as promptly as practicable" and "in no event later than thirty (30) days after his or her appointment." *Id*.

      **B.**      **The Determination of the "Deferred Profit Amount" Requires Analysis of the "Nortel Accounting Principles"as Used in the "Unaudited Financial Statements," "To the Extent Consistent with GAAP"**

      12.      The parties did not leave the term "Deferred Profit Amount" to be defined by a court using common law principles.  Rather, it is expressly defined by reference to a specific set of accounting principles, as those principles were applied in a particular set of financial statements.  The ASA provides that "Deferred Profit Amount" means:

> as of the Closing date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).  For the avoidance of doubt, the Deferred Profit amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.

---

[4]    The "Independent Auditor" is defined as "KPMG LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation" that the parties agree upon or, failing that, is selected by KPMG.  ASA at 18.

6

ASA at 11.

13.   The term "Nortel Accounting Principles" is defined as "the accounting principles employed in the preparation of the Unaudited Financial Statements." ASA at 23. Those, in turn, are defined as "the unaudited management statements of certain assets and liabilities of the Business as of September 30, 2009 and the related unaudited management statements of income of the Business for the nine (9) month period ended on September 30, 2009." ASA at 33.

14.   The Nortel Accounting Principles themselves consist of a voluminous set of particularized accounting rules and policies that Nortel applied in running the business. Indeed, the Nortel Accounting Policies are so voluminous that they were provided by Nortel to GENBAND in a three-megabyte "zip" file of electronic documents.[5] *See* Email from Nortel's Counsel, dated August 16, 2010, attached hereto as <u>Exhibit A</u>.

15.   Thus, the "Deferred Profit Amount" is <u>not</u> determined simply by calculating in a vacuum the short and long term "deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date" and then subtracting the "associated deferred costs to the extent incurred by the Business prior to the closing date in connection with such products or services."[6] Rather, both must be determined based on whether

---

[5]   Rather than burden the Court's file with the entire set of the Nortel Accounting Principles, GENBAND will provide an electronic copy on a separate disk. If the Court wishes to review some or all of the Nortel Accounting Principles in hard copy form, GENBAND will of course provide them.

[6]   It bears noting, in addition, that Nortel's interpretation of Deferred Profit Amount would read the words "*minus* . . . associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services." ASA at 11. Under Nortel's approach, there would never be anything to subtract. That would violate the fundamental rule of construction under New York law that contracts must be read in their entirety and with meaning given to each part. *See Empire Prop. Corp.*, 43 N.E. 2d at 28; *Ins. Co. of N.Y.*, 850 N.Y.S. 2d at 58.

they "would be required to be reflected on a balance sheet of the Business" as of the Closing date" if that balance sheet was "prepared in accordance with GAAP applied in a manner consistent with" the voluminous Nortel Accounting Principles, and then only "to the extent consistent with GAAP."  And even then, "for the avoidance of doubt," the determination must include "advance billings and deferred revenue consistent with" those same Nortel Accounting Principles.[7]  Given these express provisions in the definition of "Deferred Profit Amount," Nortel cannot seriously contend that "there is nothing here for an accounting arbitrator to decide."  Nortel Objection at ¶ 5.

## II. THE FEDERAL ARBITRATION ACT REQUIRES THAT THE PARTIES' DISAGREEMENT BE SUBMITTED TO ARBITRATION

### A. Even When Their Subject Matter Is Limited, Arbitration Clauses Are Liberally Construed in Favor of Arbitrating Matters Within Their Scope

16.     Nortel's argument that the Mandatory Arbitration Provision is "narrow" rather than "broad" is a red herring.  Of course GENBAND recognizes that the subject matter that should be arbitrated is limited to disagreements concerning the Closing Statement.  In that sense, the Mandatory Arbitration Provision is indeed "narrow."  But that does not mean that the *scope* of the Mandatory Arbitration Provision is to be interpreted narrowly, as Nortel argues.  Even when the scope of the issues is limited, if the language that <u>applies</u> to that scope is broad, courts will interpret it broadly.

17.     The Supreme Court has held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).  Indeed, one of the cases Nortel relies upon states that "[t]he presumption in favor of arbitration *still applies to narrow arbitration clauses*; however,


the Court must still consider the boundaries of the arbitration provision . . . ." *HDS Inv. Holding Inc. v. Home Depot, Inc.*, 2008 WL 4606262, at *5 (Del. Ch. Ct. Oct 17, 2008) (emphasis added). The presumption applies even if "the problem at hand is the construction of the contract language, itself." *See Moses H. Cone Memorial Hosp.*, 460 U.S. at 24–25. The presumption of arbitrability, which is founded on the strong federal policy in favor of arbitration, applies when determining *either* the "existence or *the scope* of an arbitration agreement." *Shubert v. Wellspring Media, Inc.*, 335 B.R. 556, 562 (Bankr. D. Del. 2005) (emphasis added) (holding that a "narrow" arbitration clause should still be broadly construed) (quoting *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (citation omitted)).

18.     The cases on which Nortel relies involved arbitration clauses that expressly limited what may be arbitrated to matters of "calculation," "computation," or particular "amounts." For example, the provision at issue in *Bratt Enters, Inc. v. Noble Int'l Ltd.* stated that the parties would submit to arbitration any disagreements about "any of the *amounts* included in the Closing Balance Sheet." 338 F.3d 609, 611 (6th Cir. 2003) (emphasis added). Under the asset purchase agreement in *Bratt*, the buyer agreed to assume the seller's liabilities, including its accounts payable, which was to be capped at a certain amount. *Id.* The dispute at issue arose when one party claimed that the cap on accounts payable was not intended to be included in the contract and that there was a mutual mistake. The court, faced with an issue of contract reformation, denied arbitration because the dispute did not involve a disagreement solely with regard to the *amounts* in the closing balance sheet, and the arbitration clause was limited to such "amounts." *Id.* at 613.

19.     Similarly, in *HDS Inv. Holding Inc. v. Home Depot, Inc.*, the arbitration provision provided that only where there were "any *amounts* remaining in dispute, then all *amounts*

remaining in dispute" may be submitted to arbitration. 2008 WL 4606262, *5 (Del. Ch. Oct. 17, 2008) (emphasis added). Based on that language, the court stated that "the arbitration clause in the Agreement is narrow because it only refers to arbitration those issues regarding the *calculation* of the Applicable Amount in dispute . . . ." *Id.* Likewise, in *100 William Co. v. Aetna Ins. Co.*, the court noted that the arbitration clause in a lease was "narrowly limited" to controversies concerning the "*computation*" of the escalation rate under the lease. Because the respondent sought a "determination of the very meaning of the formula for adjusting the fringe benefit" and "such a determination . . . was never intended to be arbitrated pursuant to the lease," the claims were not arbitrable. The arbitration clause at issue in *Blue Tee Corp. v. Koehring Co.* was almost identical. 999 F.2d 633, 634 (2d Cir. 1993) (denying arbitration where the applicable arbitration clause provided that "in the event that Buyer shall disagree with the *computation* of the Final Statement by Seller" the parties shall submit the dispute to arbitration).

### B. The ASA Requires "Any Disagreement" Concerning the Closing Statement to Be Arbitrated

20. The Mandatory Arbitration Provision in the ASA, in stark difference to those in the cases Nortel cites, does not limit what is arbitrable to such limited concepts of "calculation," "computation," or particular "amounts." Rather, the Mandatory Arbitration Provision states that "*any disagreement*" with regard to the Closing Statement must be sent to arbitration. In this way, this case is much more like *Shubert*, where the arbitration clause pertained to "any objections" regarding a working capital adjustment and this Court determined that the disagreement must be arbitrated.[8] *Shubert*, 335 B.R. at 560, 569. In *Shubert*, the bankruptcy

---

[8] Notably, in two of the cases cited by Nortel, the courts compelled arbitration despite finding the arbitration clause to be "narrow." *See CAE Indus., Ltd. v. Aerospace Holdings Co.*, 741 F.Supp. 388, 393 (2d Cir. 1989) (compelling arbitration where the arbitration clause made arbitrable "any objections Buyer may have"); *Camferdam v. Ernst & Young Int'l, Inc.* 2004 WL 1124649, at *2 and n.3 (S.D.N.Y. May 19,

Trustee, like Nortel, sought to resolve a dispute regarding a working capital calculation in the Bankruptcy Court rather than through the agreed-upon arbitration process. *Id.* at 566-67.  The disagreement concerned the calculation of working capital and an adjustment to purchase price, and the disagreement was subject to an arbitration clause under the parties' contract. *Id.* at 563 ("Under the terms of the agreement, the Court cannot compel payment of the purchase price without a determination of what Wellspring owes on the Note.").  The Court rejected the Trustee's request, because the "Agreement . . . provides for an agreed-upon mechanism to resolve this dispute." *Id.*  The parties to the agreement, "in agreeing to the arbitration clause, determined that arbitration, and not this Court, would be the avenue through which this issue should be addressed." *Id.* at 566–67.

21.     This case is also strikingly similar to *Compucom Sys., Inc. v. Getronics Finance Holdings B.V.*, 635 F. Supp. 2d 371 (D. Del. 2009).  In *Compucom*, as here, a dispute arose concerning an asset purchase agreement with procedures for a final purchase price adjustment.  The purchase price was to include an estimate of net working capital, which the agreement defined as "the net book value of [the seller's] current assets minus its current liabilities at the time of closing." *Id.* at 374.  The agreement provided that this number was "to be determined in accordance with International Financial Reporting Standards ("IFRS") consistently applied to Exhibit E of the Agreement." *Id.*  Exhibit E, in turn, incorporated items under the net working capital calculation, including inventory. *Id.*  Inventory was to be "computed in a manner consistent with the Financial Information," and "'Financial Information' was defined in the

---

2004) (stating that a dispute is arbitrable under a narrow clause if it is "relating to" the enumerated arbitrable issue stated in the clause, and "relating to" means the broad category of "having a connection with or reference to.").

Agreement as 'the historical financial information contained in the VDD Report,'" a document that was separately defined. *Id.*

22.     The arbitration clause in *Compucom* provided that "'disagreements based on mathematical errors or the Proposed Purchase Price Calculation not being calculated in accordance' with the Agreement" must be arbitrated. *Id.* at 375. The court held that the arbitration clause was "narrow" because it did not refer *all* disputes under the contract to arbitration. However, "with the backdrop of the narrow arbitration clause in mind, the court turns its focus to 'the factual underpinnings of the claim . . . .'" *Id.* at 378 (citing *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (internal quotations omitted). The court noted that the buyer had disputed the classification of the issue as an accounting dispute, but nevertheless found that arbitration was appropriate because "the focal point of the conflict" was the propriety of using the seller's method of calculating inventory in the purchase price adjustment and "the FAA requires that, if a suit is brought in a district court 'upon any issue referable to arbitration under an agreement in writing of such arbitration,'" the court must order arbitration. *Id.* at 378 (citing 9 U.S.C. § 3).

23.     Applying these principles to the ASA shows that the parties' disagreement must be arbitrated. The parties agreed to arbitrate "*any disagreement*" concerning "the determination of the Closing Statement," which was to be prepared "in accordance with the Nortel Accounting Principles." The arbitrator is empowered to resolve any items set forth in the Closing Statement about which the parties disagree, not merely the "amounts" of those "items." One of those "items" is the Deferred Profit Amount, which must be determined based on the Nortel Accounting Principles, as reflected in the Unaudited Financial Statements, to the extent consistent with GAAP. As in *Compucom*, the "focal point of the conflict" requires application of

accounting rules, which is unquestionably the sort of dispute that belongs before the Accounting Arbitrator. The Court should enforce the contract and provide GENBAND with the quick, final and binding process for which it bargained.

### III. THE COURT SHOULD LIFT THE AUTOMATIC STAY TO COMPEL ARBITRATION

24. Nortel states that there is no cause to lift the automatic stay and to compel arbitration because GENBAND has not shown a likelihood that it will succeed on the merits. That is not true. For the reasons stated above, GENBAND has shown a likelihood of success on the merits for the question of whether this disagreement should be submitted to arbitration.

25. There is also no doubt that this Court's determination of the underlying disagreement would deprive GENBAND of the deal it bargained for. To be clear, GENBAND bargained for a fast, efficient, binding, and final process of arbitration for this disagreement. As such, GENBAND would face substantial hardship if forced to litigate the issue in this Court. As discussed above, litigation of this issue will require a technical analysis of accounting principles, which will require expert testimony. And because there will be disputes about how Nortel applied the complicated accounting principles discussed above, discovery will also be necessary. All of this will require substantial and unnecessary time and expense, which is the antithesis of what GENBAND bargained for.

26. Finally, it bears repeating that Nortel's repeated assertion that the parties have agreed upon the calculations Nortel performed under its interpretation of Deferred Profit Amount is demonstrably incorrect, as reflected in the parties' correspondence.[9] As such, arbitration will

---

9    As discussed in Exhibit D to GENBAND's *Objection to Nortel's Motion for Entry of an Order Enforcing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds* ("GENBAND's Objection") [D.I. 4452],

13

be inevitable under either party's interpretation of Deferred Profit Amount, which would contribute to these hardships.

## **CONCLUSION**

WHEREFORE, GENBAND respectfully requests that the Court enter an order (i) lifting the automatic stay pursuant to Sections 105 and 362(d) of the Bankruptcy Code to allow arbitration to commence, (ii) compelling the commencement of arbitration pursuant to Section 2.2.3.1(c) of the ASA, and (iii) granting such further and other relief as the Court deems just.

Dated:  December 3, 2010
        Wilmington, Delaware

Respectfully submitted,

/s/ *Michael R. Lastowski*
Michael R. Lastowski (No. 3892)
Sommer L. Ross (No. 4598)
DUANE MORRIS, LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail:    mlastowski@duanemorris.com
           slross@duanemorris.com

and

Blair Connelly (Admitted *Pro Hac Vice*)
Eli J. Kay-Oliphant (Admitted *Pro Hac Vice*)
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1200
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
E-mail:   blair.connelly@lw.com
          eli.kay-oliphant@lw.com

*Counsel for GENBAND US LLC*

---

GENBAND has long notified Nortel that "We disagree . . . with Nortel's *interpretation* of Deferred Profit and Nortel's insistence in *applying* purchase accounting." (emphasis added).  See also Exhibit B to GENBAND's Objection.