## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X

|  |  |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors.[1] | Jointly Administered |
|  | **Hearing date: December 15, 2010 10:00 am (ET)** |
|  | **Re: D.I. 4345, 4347, 4451, 4452, 4470 and 4471** |

-------------------------------------------------------- X

### JOINDER OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC, ET AL. TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS, AND RELATED PLEADINGS

The Official Committee of Unsecured Creditors (the "Committee") of Nortel Networks

Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the

"Debtors"), by and through its undersigned counsel, hereby joins (the "Joinder") in (A) the

*Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain*

*Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing*

*the Release of Certain Escrowed Funds* (the "Debtors' Enforcement Motion"), (B) the *Debtors'*

*Objection to Motion of GENBAND Inc for Entry of an Order Pursuant to Section 362(d) of the*

*Bankruptcy Code Granting Relief From the Automatic Stay to Compel Arbitration* (the "Debtors'

Objection"), and (C) the *Debtors' Reply in Further Support of Their Motion to Enforce the CVAS*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

*Sale Order and for Related Relief* (the "Debtors' Reply" and, together with the Debtors'

Enforcement Motion and the Debtors' Objection, the "Debtors' Pleadings").  In support of the

Joinder, the Committee respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      Completely disregarding the clear terms of a negotiated, marketed and court-

approved contract, GENBAND Inc. ("GENBAND") seeks to improperly inflate a purchase price

adjustment in its favor, thereby drastically reducing the proceeds available to the Nortel estates.

Moreover, GENBAND seeks to have this contractual issue determined not by the Courts (as

defined below), but by an accountant in an arbitral proceeding.  The Committee joins the Debtors

in seeking a determination that the Courts have jurisdiction to resolve this legal question, and a

finding that GENBAND has ignored the clear terms of the Sale Agreement (as defined below)[2]

to improperly adjust the purchase price in its favor.

2.      First, the Courts have jurisdiction to resolve this purchase price dispute, and the

Debtors should not be compelled to submit to accounting arbitration.  At issue is the application

of the definition of "Deferred Profit Amount" in the Sale Agreement – a legal question of

contract compliance properly before the Courts under the terms of the CVAS Sale Order (as

defined below) and the Sale Agreement.  What is not at issue is a dispute over a mathematical

calculation that would, pursuant to the Sale Agreement, be determined by an independent

accountant at arbitration.

3.      Second, GENBAND's flawed interpretation of Deferred Profit Amount is a

blatant attempt to re-write the terms of a contract that was (i) heavily negotiated by the parties,

(ii) subjected to a marketing and auction process, and (iii) relied upon by the Debtors, the Courts,

---

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale
Agreement

the Committee and the Debtors' stakeholders to determine that GENBAND's bid was the highest

and best for the CVAS Business.

4.      The Sale Agreement provides, among other things, that the purchase price will be

adjusted based on certain assumed liabilities, including the "Deferred Profit Amount" which

amount is calculated based on "deferred revenues for services to be performed or products to be

provided *after* the Closing Date ..." See Sale Agreement, at 11 (emphasis added).  Contrary to

this unequivocal language, GENBAND seeks to include in its calculation of the Deferred Profit

Amount deferred revenue items for services performed by Nortel *before* the Closing Date,

adjusting the purchase price in GENBAND's favor by approximately $36 million.  This

interpretation not only dramatically reduces the amount of proceeds available to Nortel's

creditors, but also flies in the face of the plain meaning of the terms of the Sale Agreement relied

upon by the Debtors, the Debtors' stakeholders and the Courts in approving the CVAS Sale to

GENBAND.  GENBAND cannot now seek to re-write the terms of the Sale Agreement for its

own benefit.

## BACKGROUND

5.      On January 14, 2009 (the "Petition Date"), each of the Debtors filed voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy

Court").  On that same day, the Debtors' ultimate corporate parent, Nortel Networks Corporation

("NNC"), together with Nortel Networks Limited ("NNL" and, together with NNC and their

affiliates, including the Debtors, "Nortel") and certain of their Canadian affiliates (collectively,

the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the

3

"Canadian Court" and, together with the Bankruptcy Court, the "Courts") for a plan of
compromise or arrangement. The Canadian Court appointed Ernst & Young Inc. as "Monitor."

6.    On January 22, 2009, pursuant to Bankruptcy Code section 1102, the United
States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee. The
Committee currently consists of three members, as follows: (i) Law Debenture Trust Company of
New York, as indenture trustee; (ii) Pension Benefit Guaranty Corporation; and (iii) The Bank of
New York Mellon, as indenture trustee. No trustee or examiner has been appointed in these
chapter 11 cases.

7.    On December 23, 2009, the Debtors filed the *Debtors' Motion for Order (I)(A)*
*Authorizing Debtors' Entry Into The Stalking Horse Agreement, (B) Authorizing And Approving*
*The Bidding Procedures And Bid Protections, (C) Approving Payment Of An Incentive Fee, (D)*
*Approving The Notice Procedures And The Assumption And Assignment Procedures, (E)*
*Authorizing The Filing Of Certain Documents Under Seal And (F) Setting A Date For The Sale*
*Hearing, And (II) Authorizing And Approving (A) The Sale Of Certain Assets Of Debtors' Carrier*
*Voice Over IP And Application Solutions Business Free and Clear Of All Liens, Claims And*
*Encumbrances And (B) The Assumption And Assignment Of Certain Executory Contracts* (the
"CVAS Bidding Procedures Motion") seeking approval of a stalking-horse purchase agreement
(the "Stalking Horse Agreement") for the sale of Nortel's Carrier Voice over IP and
Communications Solutions Business (the "CVAS Business") to GENBAND, as well as bidding
procedures governing the submission of competing bids and a potential auction (the "CVAS
Bidding Procedures"). On January 8, 2010, this Court entered an order approving the CVAS
Bidding Procedures Motion. The CVAS Bidding Procedures required that, among other things,

4

competing bids be made based on the form of the Stalking Horse Agreement agreed on by
GENBAND.

8.    On March 4, 2010, following a joint hearing with the Canadian Court, the
Bankruptcy Court entered an order granting final approval of the CVAS Sale (the "CVAS Sale
Order") to GENBAND pursuant to the Stalking Horse Agreement dated as of December 22,
2009, by and among the Main Sellers and the EMEA Sellers (the "Sellers" and together with
GENBAND the "Parties") and GENBAND (the "Sale Agreement"). The Sale Agreement
provides, among other things, that the purchase price will be adjusted based on certain assumed
liabilities, including the "Deferred Profit Amount," which amount is calculated based on
"deferred revenues for services to be performed or products to be provided *after* the Closing
Date ..." See Sale Agreement, at 11 (emphasis added).

9.    Pursuant to the terms of the Sale Agreement, prior to closing, the Sellers provided
to GENBAND an Estimated Purchase Price statement, which provided for an estimated Deferred
Profit Amount of $37,867,000 and an estimated Purchase Price of $182,649,000. Debtors'
Enforcement Motion, at ¶ 16. On September 15, 2010, GENBAND delivered to the Sellers a
closing statement (the "Closing Statement") proposing a Deferred Profit Amount of $70,570,000.
Subsequently, the Sellers delivered to GENBAND a disagreement notice, which asserted a
Deferred Profit Amount of $34,284,392, over $36 million less than the amount asserted by
GENBAND in the Closing Statement. Id. at ¶ 19.

10.    On November 17, 2010, the Debtors filed the Debtors' Enforcement Motion
seeking an order of the Bankruptcy Court enforcing the CVAS Sale Order with respect to the
determination of the Deferred Profit Amount, and directing the release of certain escrowed funds
relating to post-closing purchase price adjustments. See id. at ¶ 13. In the Debtors' Enforcement

5

Motion, the Debtors argue, among other things, that: (a) GENBAND seeks to improperly reduce the purchase price for the CVAS Sale by disregarding the clear definition of Deferred Profit Amount to include deferred revenues for services performed or products provided <u>before</u> the Closing Date; (b) GENBAND is effectively seeking to reform the Sale Agreement, which was relied upon by the Debtors, the Courts, and the Debtors' creditors in determining that the sale to GENBAND represented the highest and best offer for the CVAS Business; and (c) the dispute is properly before the Courts, rather than an Accounting Arbitrator, because it is a matter of contract interpretation over which the Bankruptcy Court reserved jurisdiction pursuant to the CVAS Sale Order. <u>See</u> <u>id.</u> at ¶¶ 1-3.

11.　　The following day, GENBAND filed the *Motion of GENBAND Inc. for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief From the Automatic Stay to Compel Arbitration* (the "<u>GENBAND Motion</u>"), by which GENBAND seeks relief from the automatic stay to compel arbitration for the purposes of resolving the dispute with respect to the Deferred Profit Amount and the calculation of the purchase price adjustment. <u>See</u> <u>GENBAND Motion</u>, at ¶ 1. Specifically, GENBAND asserts that the current disagreement over the determination of the Deferred Profit Amount falls under the arbitration clause in Section 2.2.3.1(c) of the Sale Agreement (the "<u>Accounting Arbitration Clause</u>"), which GENBAND broadly interprets to require the arbitration of any disagreement regarding the adjustment of the purchase price. <u>See</u> <u>id.</u>, at ¶ 4.

12.　　On December 1, 2010, GENBAND filed an objection to the Debtors' Enforcement Motion, reiterating the arguments in the GENBAND Motion that the dispute over the Deferred Profit Amount should be before the Accounting Arbitrator rather than the Courts.

13.    On that same date, the Debtors filed the Debtors' Objection, arguing further that the instant dispute is properly before the Courts, rather than the Accounting Arbitrator, because, among other things: (a) the Accounting Arbitration Clause is a narrow carve-out from the Courts' reserved jurisdiction over disputes regarding the interpretation and enforcement of the Sale Agreement; (b) the instant dispute is a legal question of compliance with a duly executed contract, rather than a disagreement over an accounting calculation; and (c) GENBAND has failed to meet the necessary burden for relief from the automatic stay to compel arbitration.

14.    On December 3, 2010, the Debtors filed the Debtors' Reply, further arguing that the Courts have jurisdiction to decide this purchase price dispute, and that GENBAND's interpretation of Deferred Profit Amount would deprive the Debtors of the benefit of the bargain for which they negotiated in the CVAS Sale. On that same date, GENBAND filed a reply to the Debtors' Objection, asserting that the language of the Sale Agreement supports its argument that this dispute falls under the Accounting Arbitration Clause.

## THE COMMITTEE'S JOINDER

15.    Based on the facts available to the Committee, the Committee agrees with the arguments set forth in the Debtors' Pleadings and, accordingly, files this Joinder in support thereof.

16.    The Committee supports the Debtors' position that the interpretation of the definition of Deferred Profit Amount is a legal issue subject to the jurisdiction of the Courts, and is not subject to arbitration under the Accounting Arbitration Clause. Pursuant to the CVAS Sale Order, the Bankruptcy Court has retained jurisdiction to "interpret … the terms of the Sale Agreement…." CVAS Sale Order, at ¶ 32. Additionally, Section 10(6) of the Sale Agreement broadly requires that "any claim, action or proceeding by such Party seeking any relief

7

whatsoever arising out of, or in connection with [the Sale Agreement] ... shall be brought only in" the Bankruptcy Court or the Canadian Court.    A fair and common-sense reading of the Accounting Arbitration Clause, on the other hand, makes clear that the jurisdiction of the Accounting Arbitrator is merely a narrow carve-out of the Courts' broad jurisdiction to interpret and enforce the terms of the Sale Agreement to address accounting calculation disagreements that may arise between the Parties.[3]

17.    Further, the Committee supports the Debtors' application of Deferred Profit Amount and likewise opposes GENBAND's attempt to disregard the clear terms of the Sale Agreement.  GENBAND's self-serving interpretation of Deferred Profit Amount is nothing shy of an attempt to reform the Sale Agreement to benefit itself at the expense of Nortel's creditors. Deferred Profit Amount is defined in the Sale Agreement to include "deferred revenue for services to be performed or products to be provided by the Business *after* the Closing Date." Sale Agreement, at 11 (emphasis added).  GENBAND ignores this unambiguous contractual term to include in its determination of Deferred Profit Amount certain deferred revenue for services performed or products provided by Nortel *before* the Closing Date, resulting in a significant purchase price adjustment in its favor.

18.    GENBAND's overt attempt to renegotiate the terms of the Sale Agreement after the fact should be rejected, particularly in light of the reliance of the Debtors, the Committee, the Courts and other parties in interest on the clear terms of the Sale Agreement in determining that GENBAND's offer was the highest and best bid for the CVAS Business, and maximized value for Nortel's estates.  The Deferred Profit Amount definition has been in the Sale Agreement since before the execution of the Stalking Horse Agreement, which agreement was subject to heavy

---

[3] In fact, the selection of the Accounting Arbitrator is itself instructive.  KPMG LLC, the firm identified to serve as Accounting Arbitrator, while a widely respected accounting and auditing firm, is hardly qualified to provide legal opinions on the interpretation of contractual provisions

8

negotiations between the Parties, a marketing and auction process with other potential bidders, and two joint hearings before the Courts. At no point during this process did the definition of Deferred Profit Amount change. The Debtors and the Committee, as fiduciaries for the Debtors' various stakeholders, as well as numerous other parties in interest, sought approval of GENBAND's offer as the highest and best bid for the CVAS Business based on the duly executed Sale Agreement, and the Courts approved the CVAS Sale based on the representation that the Debtors achieved maximum value for their estates. GENBAND now seeks to re-write the terms of the Sale Agreement to reduce the purchase price by approximately $36 million. Such a result is not only legally impermissible (as the Debtors aptly argue in the Debtors' Pleadings), but would be inequitable and detrimental to the Debtors' unsecured creditors.

## CONCLUSION

19.     For all of the foregoing reasons, the Committee respectfully requests that the Court (a) grant the relief requested in the Debtors' Enforcement Motion, (b) deny the relief requested in the GENBAND Motion, and (c) grant the Committee such other and further relief as the Court deems just, proper and equitable

9

Dated: December 9, 2010
        Wilmington, Delaware

Respectfully submitted,

By:_____

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Tel.:  (302) 651-7700

and

Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036
Tel.:  (212) 872-1000

Co-counsel to the Committee

10