## EXHIBIT A

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**SECOND SUPPLEMENTAL MOTION RECORD**
**(returnable December 15, 2010)**

December 9, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC# 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

*November, 2010*

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

### SERVICE LIST

TO:    **OGILVY RENAULT LLP**
Royal Bank Plaza, South Tower
200 Bay Street, Suite 3800
Toronto, Ontario M5J 2Z4

Derrick Tay
Tony Reyes
Jennifer Stam

Email:    dtay@ogilvyrenault.com
treyes@ogilvyrenault.com
jstam@ogilvyrenault.com

Tel:    416.216.4000
Fax:    416.216.3930

Lawyers for the Applicants

- 2 -

TO:  **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:   nortel.monitor@ca.ey.com

Tel:      416.943.3016
Fax:     416.943.3300

AND   **GOODMANS LLP**
TO:    Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:   jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
fmyers@goodmans.ca
carmstrong@goodmans.ca

Tel:      416.597.4107
Fax:     416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND   **OSLER HOSKIN AND HARCOURT**
TO:    **LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:   lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
ahirsh@osler.com

Tel:      416.362.2111
Fax:     416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND   **FASKEN MARTINEAU DUMOULIN LLP**
TO:    66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:   dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:      416.868.3538
Fax:     416.364.7813

Lawyers for Export Development Canada

- 3 -

AND TO:

**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:   jsullivan@edc.ca

Tel:       613.597.8651
Fax:      613.598.3113

AND TO:

**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific
Tower
Toronto, ON  M5K 1K7

Robert I. Thornton
Rachelle Moncur
Leanne M. Williams

Email:   rthornton@tgf.ca
            rmoncur@tgf.ca
            lwilliams@tgf.ca

Tel:       416.304.1616
Fax:      416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO:

**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:   john.stringer@mcinnescooper.com
            stephen.kingston@mcinnescooper.com

Tel:       902.425.6500
Fax:      902.425.6350

Lawyers for Convergys EMEA Limited

AND TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart

Email:   jcarhart@millerthomson.com

Tel:       416.595.8615/8577
Fax:      416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO:

**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:   barry.wadsworth@caw.ca
            lewis.gottheil@caw.ca

Tel.:      416.495.3776
Fax:      416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada

AND TO:

**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:   hharrison@boughton.ca

Tel:       604.687.6789
Fax:      604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.,
in its capacity as duly authorized agent for
Holdings 1506 Enterprises Ltd.

- 6 -

| | | | |
|---|---|---|---|

AND
TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:   mmacnaughton@blgcanada.com
Tel:      416. 367.6646
Fax:      416. 682.2837

Email:   rjaipargas@blgcanada.com
Tel:      416.367.6266
Fax:      416.361.7067

Email:   srappos@blgcanada.com
Tel:      416.367.6033
Fax:      416.361.7306

Lawyers for Bell Canada

AND
TO:

**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON M5J 2T7

John Contini
Aaron Rousseau

Email    jcontini@langmichener.ca
Tel:      416.307.4148
Fax:      416.304.3767

Email    arousseau@langmichener.ca
Tel:      416.307.4081
Fax:      416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND
TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:   ray.leach@siskinds.com
             dimitri.lascaris@siskinds.com
             monique.radlein@siskinds.com

Tel:      519.672.2121
Fax:      519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email:   zychk@bennettjones.com
Tel:      416.777.5738
Fax:      416.863.1716

Email:   orzyr@bennettjones.com
Tel:      416.777.5737
Fax:      416.863.1716

Email:   finlaysong@bennettjones.com
Tel:      416.777.5762
Fax:      416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

| | | | | |
|---|---|---|---|---|
| AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 | | AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 |

AND
TO:     **KOSKIE MINSKY**
        20 Queen Street West
        Suite 900
        Toronto, ON  M5H 3R3

        Mark Zigler
        Susan Philpott
        Demetrios Yiokaris
        Andrea McKinnon
        Celeste Poltak

        Email:  mzigler@kmlaw.ca
        Tel:    416.595.2090
        Fax:    416.204.2877

        Email:  sphilpott@kmlaw.ca
        Tel:    416.595.2104
        Fax:    416.204.2882

        Email:  dyiokaris@kmlaw.ca
        Tel:    416.595.2130
        Fax:    416.204.2810

        Email:  amckinnon@kmlaw.ca
        Tel:    416.595.2150
        Fax:    416.204.2874

        Email:  cpoltak@kmlaw.ca
        Tel:    416.595.2701
        Fax:    416.204.2909

        Lawyers for the Former Employees of Nortel

AND
TO:     **KOSKIE MINSKY**
        20 Queen Street West
        Suite 900
        Toronto, ON  M5H 3R3

        Mark Zigler
        Susan Philpott
        Demetrios Yiokaris
        Andrea McKinnon
        Celeste Poltak

        Email:  mzigler@kmlaw.ca
        Tel:    416.595.2090
        Fax:    416.204.2877

        Email:  sphilpott@kmlaw.ca
        Tel:    416.595.2104
        Fax:    416.204.2882

        Email:  dyiokaris@kmlaw.ca
        Tel:    416.595.2130
        Fax:    416.204.2810

        Email:  amckinnon@kmlaw.ca
        Tel:    416.595.2150
        Fax:    416.204.2874

        Email:  cpoltak@kmlaw.ca
        Tel:    416.595.2701
        Fax:    416.204.2909

        Lawyers for the LTD Beneficiaries

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:   jcarhart@millerthomson.com
Tel:     416.595.8615
Fax:     416.595.8695

Email:   msims@millerthomson.com
Tel:     416.595.8577
Fax:     416.595.8695

Email:   jmklotz@millerthomson.com
Tel:     416.595.4373
Fax:     416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:
**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:   joseph.kim@lge.com

Tel:     +82.2.3777.3171
Fax:     +82.2.3777.5345

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
Tel:     416.595.8615
Fax:     416.595.8695

Email   msims@millerthomson.com
Tel:     416.595.8577
Fax:     416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:
**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:     416.218.1129
Fax:     416.218.1849

Lawyers for IBM Canada Limited

AND
TO:    **PALIARE ROLAND ROSENBERG
       ROTHSTEIN LLP**
       Suite 501
       250 University Avenue
       Toronto, ON  M5H 3E5

       Kenneth T. Rosenberg
       Massimo (Max) Starnino
       Lily Harmer
       Tina Lie

       Email:  ken.rosenberg@paliareroland.com
       Tel:    416.646.4304
       Fax:    416.646.4301

       Email:  max.starnino@paliareroland.com
       Tel:    416.646.7431
       Fax:    416.646.4301

       Email:  lily.harmer@paliareroland.com
       Tel:    416.646.4326
       Fax:    416.646.4301

       Email:  tina.lie@paliareroland.com
       Tel:    416.646.4332
       Fax:    416.646.4301

       Lawyers for the Superintendent of Financial
       Services as Administrator of the Pension
       Benefits Guarantee Fund

AND
TO:    **FRASER MILNER CASGRAIN LLP**
       1 First Canadian Place
       100 King Street West
       Toronto, ON  M5X 1B2

       R. Shayne Kukulowicz
       Alex MacFarlane
       Michael J. Wunder
       Ryan Jacobs

       Email:  Shayne.kukulowicz@fmc-law.com
               Alex.macfarlane@fmc-law.com
               Michael.wunder@fmc-law.com
               ryan.jacobs@fmc-law.com

       Tel:    416.863.4511
       Fax:    416.863.4592

       Canadian Lawyers for the Official Committee of
       Unsecured Creditors

AND
TO:    **GOWLING LAFLEUR HENDERSON LLP**
       Suite 1600, First Canadian Place
       100 King Street West
       Toronto, ON  M5X 1G5

       E. Patrick Shea

       Email:  patrick.shea@gowlings.com

       Tel:    416.369.7399
       Fax:    416.862.7661

       Lawyers for Westcon Group

AND
TO:    **MINDEN GROSS LLP**
       145 King Street West, Suite 2200
       Toronto, ON  M5H 4G2

       Raymond M. Slattery
       David T. Ullmann

       Email:  rslattery@mindengross.com
               dullmann@mindengross.com
       Tel:    416.369.4149
       Fax:    416.864.9223

       Lawyers for Verizon Communications Inc.

AND TO:  **AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:  hfogul@airdberlis.com
Tel:    416.865.7773
Fax:    416.863.1515

Email:  pczegledy@airdberlis.com
Tel:    416.865.7749
Fax:    416.863.1515

Lawyers for Microsoft Corporation

AND TO:  **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:  renglish@airdberlis.com
        smitra@airdberlis.com

Tel:    416.863.1500
Fax:    416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND TO:  **ALEXANDER HOLBURN BEAUDIN & LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:  surquhart@ahbl.ca
Tel:    604.484.1757
Fax:    604.484.1957

Lawyers for Algo Communication Products Ltd.

AND TO:  **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:    416.865.6655
Fax:    416.865.6636

Email:  vdare@foglers.com
Tel:    416.865.6641
Fax:    416.865.6636

Lawyers for Andrew, LLC

AND TO:  **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND TO:  **MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:  mfleming@millerthomson.com
Tel:    416.595.8686
Fax:    416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

| Email: | bdarlington@davis.ca |
| Tel: | 416.365.3529 |
| Fax: | 416.369.5210 |

| Email: | jdavissydor@davis.ca |
| Tel: | 416.941.5397 |
| Fax: | 416.365.7886 |

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services


AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

| Email: | sgraff@airdberlis.com |
| Tel: | 416.865.7726 |
| Fax: | 416.863.1515 |

| Email: | iaversa@airdberlis.com |
| Tel: | 416.865.3082 |
| Fax: | 416.863.1515 |

Lawyers for Perot Systems Corporation


AND TO:

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

| Email: | dgrieve@casselsbrock.com |
| Tel: | 416.860.5219 |
| Fax: | 416.350.6923 |

Lawyers for Alvarion Ltd.


AND TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

| Email: | andrew.kent@mcmillan.ca |
| Tel: | 416.865.7160 |
| Fax: | 416.865.7048 |

| Email: | hilary.clarke@mcmillan.ca |
| Tel: | 416.865.7286 |
| Fax: | 416.865.7048 |

| Email: | tushara.weerasooriya@mcmillan.ca |
| Tel: | 416.865.7262 |
| Fax: | 416.865.7048 |

Lawyers for Royal Bank of Canada


AND TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

| Email: | lawrence.crozier@mcmillan.ca |
| Tel: | 416.865.7178 |
| Fax: | 416.865.7048 |

| Email: | adam.maerov@mcmillan.ca |
| Tel: | 416.865.7285 |
| Fax: | 416.865.7048 |

Lawyers for Citibank


AND TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

| Email: | dmagisano@blaney.com |
| Tel: | 416.593.2996 |
| Fax: | 416.593.5437 |

Lawyers for Expertech Network Installation Inc.

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:  vdare@foglers.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Amphenol Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra

Email:  smitra@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Aaron Rousseau

Email:  arousseau@langmichener.ca
Tel:      416.307.4081
Fax:     416.365.1719

Lawyer for Right Management Inc.

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:  bleonard@casselsbrock.com
              hgarman@casselsbrock.com
              mcasey@casselsbrock.com

Tel:      416.860.6455
Fax:     416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND
TO:
**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario K2P 0A2

Paul K. Lepsoe

Email:  pklepsoe@mcfarlanelaw.com

Tel:    613.233.2679
Fax:    613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management,
Inc.

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:  theintzm@mccarthy.ca
Tel:    416.601.7627
Fax:    416.868.0673

Email:  jsirivar@mccarthy.ca
Tel:    416.601.7750
Fax:    416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:
**COLBY, MONET DEMERS, DELAGE &
CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec H3A 3M8

David J. Dropsy

Email:  ddropsy@colby-monet.com
Tel:    514.284.3663
Fax:    514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND
TO:
**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:  janice.payne@nelligan.ca
        steven.levitt@nelligan.ca
        christopher.rootham@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:     416.865.2318
Fax:     416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:     416.865.6944
Fax:     416.863.6275

Lawyers for Jabil Circuit Inc.

AND TO:

**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
         mgaggino@schneidergaggino.com

Tel:     514.631.8787
Fax:     514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND TO:

**EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:     613.745.0921
Fax:     613.745.1172

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
         laugesenm@bennettjones.com

Tel:     416.863.1200
Fax:     416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:     416.369.4335
Fax:     416.864.9223

Lawyers for 2748355 Canada Inc.

AND TO:

**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:   lbrady@baldwinlaw.ca
Tel:     613.771.9991
Fax:     613.771.9998

Lawyers for Sydney Street Properties Corp.

- 13 -

AND TO:
**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351
Fax:      714.998.7142

Lawyers for AETL Testing, Inc.

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND TO:
**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email: arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND TO:
**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email: arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND TO:
**LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :  jysimard@lavery.ca
Tel :    514.871.1522
Fax :    514.871.8977

Lawyers for Texas Landlords to Nortel
Networks Inc.

AND TO:
**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:      714.998.4351

- 14 -

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com

Tel:      416.369.6667
Fax:      416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:      416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:      416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND
TO:

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:   rschwill@dwpv.com
Tel:      416.863.0900
Fax:      416.863.0871

Email:   mgottlieb@dwpv.com
Tel:      416.863.0900
Fax:      416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:      416.598.1744
Fax:      416.598.3730

Email:   slaubman@counsel-toronto.com
Tel:      416.598.1744
Fax:      416.598.3730

Lawyers for William A. Owens

- 15 -

AND TO:
**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario M5J 2T3

Lydia Salvi

Email:   lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Wipro Limited


AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:   iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Lawyers for the Current and Former Employees
of Nortel Networks Inc. who are or were
Participants in the Long-Term Investment Plan
Sponsored by Nortel Networks Inc.


AND TO:
**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:    416.601.8342
Fax:    416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.


AND TO:
**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:   sbomhof@torys.com
Tel:    416.865.7370
Fax:    416.865.7380

Lawyers for Nokia Siemens Networks B.V.


AND TO:
**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:    416.973.3172
Fax:    416.973.0810


AND TO:
**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:  sseigel@langmichener.ca
Tel:    416.307.4063
Fax:    416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:      416.863.2572
Fax:     416.863.2653

Email:  marc.flynn@blakes.com
Tel:      416.863.2685
Fax:     416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:      416.863.2958
Fax:     416.863.2653

Email:  milly.chow@blakes.com
Tel:      416.863.2594
Fax:     416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:      416.863.2426
Fax:     416.863.2653

Email:  craig.thorburn@blakes.com
Tel:      416.863.2965
Fax:     416.863.2653

Lawyers for MatlinPatterson Global Advisers
LLC, MatlinPatterson Global Opportunities
Partners III L.P. and MatlinPatterson
Opportunities Partners (Cayman) III L.P.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:  kmcelcheran@mccarthy.ca
Tel:      416.601.7730
Fax:     416.868.0673

Email:  rstabile@mccarthy.ca
Tel:      416.601.8335
Fax:     416.868.0673

Lawyers for Avaya Inc.

AND
TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:      416.979.6425
Fax:     416.591.7333

Email:  dbrown@sgmlaw.com
Tel:      416.979.4050
Fax:     416.591.7333

Lawyers for Edmund Fitzgerald

AND
TO:
**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:   jspiegelman@foglers.com
Tel:     416.864.9700
Fax:     416.941.8852

Lawyers for Belden (Canada) Inc.


AND
TO:
**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:   gncameron@stikeman.com
Tel:     212.845.7464
Fax:     212.371.7087

Email:   rferguson@stikeman.com
Tel:     212.845.7477
Fax:     212.371.7087

Lawyers for GENBAND Inc.


AND
TO:
**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:   sdunphy@stikeman.co m
Tel:     416.869.5662
Fax:     416.947.0866

Lawyers for GENBAND Inc.


AND
TO:
**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:   jmarshall@blgcanada.com
Tel:     416.367.6024
Fax:     416.361.2763

Email:   chill@blgcanada.com
Tel:     416.367.6156
Fax:     416.631.7301

Lawyers for the U.K. Pensions Regulator


AND
TO:
**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

E-mail:  thomas.wallis@vdg.ca
Tel:     613.241.2701
Fax:     613.241.2599

Lawyers for La Regie des Rentes du Quebec


AND
TO:
**ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON  M5H 2K1

Joel P. Rochon

Email:   jrochon@rochongenova.com
Tel:     416.363.1867
Fax:     416.363.0263

Lawyers for the Opposing LTD Employees

- 18 -

| | |
|---|---|
| AND TO: | **BLAKE, CASSELS & GRAYDON**<br>Box 25, Commerce Court West<br>199 Bay Street, Suite 2800<br>Toronto, Ontario  M5L 1A9 |

Pamela J. Huff
J. Jeremy Forgie

Email:   pamela.huff@blakes.com
Tel:      416.863.2958
Fax:     416.863.2653

Email:   jeremy.forgie@blakes.com
Tel:      416.863.3888
Fax:     416.863.2653

Lawyers for The Northern Trust Company,
Canada

AND
TO:      **CLEARY GOTTLIEB STEEN &**
          **HAMILTON LLP**
          One Liberty Plaza
          New York, NY 10006

James Bromley
Lisa Schweitzer

Email:   lschweitzer@cgsh.com
            jbromley@cgsh.com
Tel:      212.225.2000
Fax:     212.225.3999

Lawyers for Nortel Networks Inc.

AND
TO:      **LERNERS LLP**
          130 Adelaide St. West
          Suite 2400
          Toronto, ON  M5H 3P5

William E. Pepall

Email:   wpepall@lerners.ca
Tel:      416.601.2352
Fax:     416.867.2415

Lawyers for the Former Employees in Respect
of the Distribution of the Corpus of the Health
and Welfare Trust

AND
TO:      **MACLEOD DIXON LLP**
          3700 Canterra Tower
          400 Third Avenue SW
          Calgary, Alberta
          T2P 4H2

Kyle D. Kashuba

Email:   kyle.kashuba@macleoddixon.com
Tel:      403.267.8399
Fax:     403.264.5973

Constellation NewEnergy Canada Inc.

AND
TO:      **SACK GOLDBLATT MITCHELL**
          500 – 30 rue Metcalfe St.
          Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email:   pengelmann@sgmlaw.com
Tel:      613-482-2452
Fax:     613-235-3041

Email:   fcampbell@sgmlaw.com
Tel:      613-482-2451
Fax:     613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust

AND
TO:      **LANG MICHENER LLP**
          Brookfield Place, Suite 2500
          181 Bay Street
          Toronto, ON  M5J 2T7

D. Brent McPherson

Email:   bmcpherson@langmichener.ca
Tel:      416.307.4103
Fax:     416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to Wachovia
Bank, N.A., in its capacity as Servicer for the Nortel
Networks Pass-Through Trust, Series 1-1

AND
TO:     **McCARTHY TETRAULT LLP**
        Suite 5300, Toronto Dominion Bank Tower
        Toronto, Ontario  M5K 1E6

        Barbara J. Boake
        James D. Gage

        E-mail:  bboake@mccarthy.ca
        Tel:     416.601.7557
        Fax:     416.868.0673

        Email:   jgage@mccarthy.ca
        Tel:     416.601.7539
        Fax:     416.686.0673

        Lawyers for Morneau Sobeco Limited
        Partnership

AND
TO:     **DAVID STEER**
        10 Cypress Court
        Nepean, ON  K2H 8Z8

        E-mail:  davidsteer127@sympatico.ca

## COURTESY COPIES:

AND TO: **LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:   sbrown@lrlaw.com

Tel:     602.262.5321
Fax:     602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND TO: **CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:  sreisman@curtis.com
         jdrew@curtis.com

Tel:     212.696.6000
Fax:     212-697-1559

Lawyers for Flextronics International

AND TO: **AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara

Email:   fhodara@akingump.com

Tel:     212.872.1000
Fax:     212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND TO: **MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:   DDunne@milbank.com
Tel:     212.530.5770
Fax:     212.530.5219

Email:   ALeblanc@milbank.com
Tel:     212.835.7574
Fax:     212.530.5219

Email:   APisa@milbank.com
Tel:     212.530.5319
Fax:     212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:  mschein@vedderprice.com

Tel:     212.407.6920
Fax:    212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :  andrew.robertson@macleoddixon.com
            caylee.rieger@macleoddixon.com

Tel :    403.267.8222
Fax :   403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email:  eric.prezant@bryancave.com
Tel:     312.602.5033
Fax:    312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel :    212.906.1373
Fax :   212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

# INDEX

Court File No. 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | DOCUMENT | PAGE |
|---|---|---|
| 1. | Affidavit of Katie Legree, sworn December 9, 2010 | 1 |
| A. | Debtors' Motion for Entry of n Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business and Directing the Release of Certain Escrowed Funds dated November 17, 2010 | 3 |
| B. | Objection of Genband Inc. to the Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business and Directing the Release of Certain Escrowed Funds dated December 1, 2010 | 84 |
| C. | Debtors' Reply in Further Support of their Motion to Enforce the CVAS Sale Order and for Related Relief dated December 3, 2010 | 187 |
| D. | Debtors' Objection to Motion of Genband Inc. for Entry of an Order pursuant to Section 362 (d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration dated December 1, 2010 | 198 |

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| E. | Reply of Genband US LLC to Debtors' Objection to Motion of Genband Inc. for Entry of an Order pursuant to Section 362 (d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration dated December 3, 2010 | 215 |

# TAB 1

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF KATIE LEGREE**
**(sworn December 9, 2010)**

I, Katie Legree, of the City of Toronto, in the Province of Ontario, MAKE OATH AND
SAY:

1.      I am a law clerk at Ogilvy Renault LLP, counsel to Nortel Networks Corporation
("**NNC**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Global Corporation, Nortel
Networks International Corporation and Nortel Networks Technology Corporation (collectively
the "**Applicants**"). As such, I have personal knowledge of the matters to which I hereinafter
depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of
my information and, in all such cases, believe it to be true.

2.      Attached hereto as Exhibit "A" is a motion (the "**U.S. Debtors' Motion**") filed by
Nortel Networks Inc. and certain of its affiliates (the "**U.S. Debtors**") on November 17, 2010, in
the proceedings pending before the United States Bankruptcy Court for the District of Delaware
(the "**U.S. Court**") under Chapter 11 of the United States Bankruptcy Code to enforce that the
CVAS Sale Order granted by the U.S. Court on March 3, 2010.

3.      Attached hereto as Exhibit "B" is an objection (the **"GENBAND Objection"**) filed by GENBAND Inc. (**"GENBAND"**) on December 1, 2010, in the proceedings pending before the U.S. Court in respect of the U.S. Debtors' Motion.

4.      Attached hereto as Exhibit "C" is a response filed by the U.S. Debtors with the U.S. Court on December 3, 2010, in response to the GENBAND Objection.

5.      Attached hereto as Exhibit "D" is an objection (**"U.S. Debtors Objection"**) filed by the U.S. Debtors with the U.S. Court on December 1, 2010, to the motion filed by GENBAND on November 18, 2010, in the U.S. Court under Chapter 11 of the United States Bankruptcy Code to lift the automatic stay and compel arbitration.

6.      Attached hereto as Exhibit "E" is an response filed by GENBAND with the U.S. Court on December 3, 2010, in response to the U.S. Debtors Objection.


SWORN BEFORE ME at the City of
Toronto        , in the Province of Ontario on
this 4th day of December, 2010.

_____
Commissioner for Taking Affidavits or
Notary Public

Robin Anne Cardillo, a Commissioner, etc.,
City of Toronto, for Ogilvy Renault LLP / S.E.N.C.R.L., s.r.l.,
Barristers and Solicitors.
Expires March 24, 2011.

_____
KATIE LEGREE

# TAB A

This is Exhibit ...... referred to in the
affidavit of ...Robie Bigley...........
sworn before me, this ...........................
day of .....December....... 20..10.

....................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

Robin Anne Cardillo, a Commissioner, etc.,
City of Toronto, for Ogilvy Renault LLP / S.E.N.C.R.L., s.r.l.,
Barristers and Solicitors.
Expires March 24, 2011.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------X
                                          :
In re                                     :      Chapter 11
                                          :
Nortel Networks Inc., et al.,¹            :      Case No. 09-10138 (KG)
                                          :
                  Debtors.                :      Jointly Administered
                                          :
                                          :      Hearing date: December 15, 2010 at 10:00 am (ET)
                                          :      Objections due: December 1, 2010 at 4:00 pm (ET)
------------------------------------------------------X
```

### DEBTORS' MOTION FOR ENTRY OF AN ORDER
### ENFORCING THE ORDER AUTHORIZING THE
### SALE OF CERTAIN ASSETS OF THE DEBTORS'
### CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS
### BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), pursuant to

Sections 105(a) and 363 of Title 11 of the United States Code (the "Bankruptcy Code") for the

entry of an order substantially in the form attached hereto as Exhibit A (i) enforcing the *Order*

*Authorizing And Approving (A) The Sale Of Certain Assets Of The Debtors' Carrier Voice Over*

*IP And Communications Solutions Business Free And Clear Of All Liens, Claims And*

*Encumbrances, And (B) The Assumption And Assignment Of Certain Executory Contracts*

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation
(9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc.
(4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel
Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical
Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International
Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc.
(4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://dm.epiq11.com/nortel.

(the "Sale Order") [D.I. 2632] against GENBAND Inc. (n/k/a GENBAND US LLC)

("GENBAND"); (ii) directing the release of $4,859,745 plus accumulated interest currently held

in escrow by escrow agent, Wells Fargo Bank, National Association ("Wells Fargo"), pursuant to

the Escrow Agreement dated as of January 6, 2010, by and among Wells Fargo, Nortel Networks

Corporation, NNI, Nortel Networks Limited, Nortel Networks UK Limited (in administration)

and GENBAND (as amended from time to time, the "Escrow Agreement"); and (iii) granting

them such other and further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT

1.     The Debtors bring this motion to enforce the Sale Agreement governing the sale

of their Carrier Voice over IP and Communications Solutions ("CVAS business" to GENBAND.

GENBAND has sought to drastically and improperly reduce the CVAS purchase price by

claiming a purchase price adjustment that ignores the clear terms of the Sale Agreement. The

Sale Agreement provides, among other things, that the purchase price will be adjusted based on

certain assumed liabilities, including the "Deferred Profit Amount," which is to be determined

based on "deferred revenues for services to be performed or products to be provided by the

Business after the Closing Date." Sale Agreement at 11. Based on this clear definition, and

applying it in a manner consistent with a previous sale transaction, the Deferred Profit Amount

adjustment is $34,284,392, and the total purchase price is $179,508,745. But GENBAND seeks

to ignore the clear terms of the definition of Deferred Profit Amount in order to include deferred

revenues for services performed or products provided before the Closing Date, and for which no

services were to be performed or products provided after the Closing Date. On this basis,

GENBAND seeks to add $36,285,608 to the Deferred Profit Amount figure, inflating that figure

to $70,570,000, and drastically reducing the purchase price to $142,904,000.

5

2.      GENBAND seeks to avoid this Court's clear jurisdiction along with the Ontario Superior Court of Justice (the "Canadian Court") over this matter and instead wishes to have the dispute referred to an accounting arbitrator, based on a provision in the Sale Agreement that provides for certain disagreements to be resolved by an accounting arbitrator. But there is nothing here for an accounting arbitrator to decide. To the contrary, the parties and their accountants agree on the figures that would determine the Deferred Profit Amount if the proper interpretation of "services to be performed or products to be provided by the Business after the Closing Date" is applied. Id. In fact, the parties jointly developed and agreed upon these figures in the course of determining the assumed assets and liabilities that GENBAND would assume upon the acquisition of the CVAS Business. Thus, there is nothing in this dispute for an accountant to decide. To the contrary, this is a disagreement about the clear terms of the Sale Agreement – and, in particular, GENBAND's attempt to disregard those clear terms.

3.      Thus, this dispute is squarely within the jurisdiction the Court expressly reserved under the CVAS Sale Order, to "(1) interpret, implement and enforce the terms and provisions of this Order . . . and the terms of the Sale Agreement . . . (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Sale Agreement . . . ." Sale Order, at ¶ 32. In addition, Section 10.6(b) of the Sale Agreement further confirms that

> each Party (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases.

3

6 .

Hence, under both the Sale Order and the Sale Agreement, this Court is to decide the dispute at issue.

4.      In addition to the dispute created by GENBAND's effort to disregard the definition of Deferred Profit Amount, there are two smaller disputes that the Debtors ask the Court to resolve. First, after the closing of the sale to GENBAND, the CVAS Business was able to recover approximately $1.8 million from Verizon based on a disputed matter relating to products and systems that the Nortel CVAS Business provided to Verizon long before the sale. Because that recovery is clearly not to be included in the sale to GENBAND, this $1.8 million amount properly belongs to Nortel. Second, in connection with the Sale Agreement, GENBAND owes to Nortel Canadian transfer taxes in the amount of $1,000,390. GENBAND has indicated a disagreement with the transfer tax amount and has failed to remit this payment, which also properly belongs to Nortel.

5.      In sum, the Debtors seek an order from this Court enforcing the clear terms of the Sale Agreement and confirming the correct purchase price. In addition, based on the correct purchase price, the Sellers (as defined below) are entitled to recover $4,859,745 plus accumulated interest currently held in escrow. Accordingly, the Debtors request that the Court order the immediate release of these funds held in escrow.

## JURISDICTION

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. In addition, the parties have submitted to this Court's jurisdiction pursuant to Section 10.6(b) of the Sale Agreement.

4

7

7.     The statutory bases for the relief requested herein are Sections 105(a) and 363 of the Bankruptcy Code.

## BACKGROUND

A.     **Procedural History**

8.     On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.     The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

10.    On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Canadian Court under the Companies' Creditors Arrangement Act (Canada) (the "CCAA), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition

---

[2]     Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[3]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates

(collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the

control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators"). Other

Nortel affiliates have commenced and in the future may commence additional creditor

protection, insolvency and dissolution proceedings around the world.

      11.    On June 19, 2009, Nortel announced that it was advancing in discussions with

external parties to sell its businesses and that it would assess other restructuring alternatives for

its businesses in the event that it were unable to maximize value through sales. Since then,

Nortel has sold many of its business units and assets to various purchasers. Efforts continue to

be made with respect to the realization of value from Nortel's remaining assets. For further

information regarding these chapter 11 cases, reference may be made to the Monthly Operating

Reports filed by the Debtors and http://dm.epiq11.com/nortel.

**B.    Debtors' Corporate Structure and Business**

      12.    Prior to its significant business divestitures, Nortel was a global supplier of end-

to-end networking products and solutions serving both service providers and enterprise

customers. Nortel's technologies spanned access and core networks and supported multimedia

and business-critical applications. Nortel's networking solutions consisted of hardware, software

---

[4]     The EMEA Debtors include the following entities: Nortel Networks UK Limited (in administration), Nortel Networks S.A. (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel GmbH (in administration), Nortel Networks France S.A.S.(in administration), Nortel Networks Oy (in administration), Nortel Networks Romania SRL (in administration), Nortel Networks AB (in administration), Nortel Networks N.V. (in administration), Nortel Networks S.p.A. (in administration), Nortel Networks B.V. (in administration), Nortel Networks Polska Sp. z.o.o. (in administration), Nortel Networks Hispania, S.A. (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks, s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal S.A. (in administration), Nortel Networks Slovensko (in administration), s.r.o. (in administration) and Nortel Networks International Finance & Holding B.V. (in administration).

and services. Nortel designed, developed, engineered, marketed, sold, licensed, installed, serviced and supported these networking solutions worldwide.

### RELIEF REQUESTED

13.     By this Motion, the Debtors seek an order enforcing the Sale Order against GENBAND, affirming that GENBAND's calculation of Deferred Profit Amount in the Closing Statement contravenes the Sale Agreement (as defined below) and that, under the terms of the Sale Agreement, this dispute is not properly determined by an Accounting Arbitrator. Given the lack of a legitimate dispute as to the Sellers' entitlement to a portion of the escrowed funds, the Debtors also seek the release of $4,859,745 plus accumulated interest currently held in escrow by Wells Fargo in accordance with Section 4 of the Escrow Agreement and such other relief as the Court may deem just and proper.

### FACTS RELEVANT TO THIS MOTION

**A.     The Sale of the Debtors' CVAS Business to GENBAND**

14.     This Motion relates to Nortel's sale of assets associated with its CVAS Business (as defined below) to GENBAND. Specifically, on December 23, 2009, the Debtors filed the *Debtors' Motion for Order (I)(A) Authorizing Debtors' Entry Into The Stalking Horse Agreement, (B) Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving Payment Of An Incentive Fee, (D) Approving The Notice Procedures And The Assumption And Assignment Procedures, (E) Authorizing The Filing Of Certain Documents Under Seal And (F) Setting A Date For The Sale Hearing, And (II) Authorizing And Approving (A) The Sale Of Certain Assets Of Debtors' Carrier Voice Over IP And Application Solutions Business Free and Clear Of All Liens, Claims And Encumbrances And (B) The Assumption And Assignment Of Certain Executory Contracts* [D.I. 2193] (the "CVAS Sale Motion") seeking approval of the sale of substantially all of the assets relating to Nortel's Carrier Voice over IP

/O .

and Communications Solutions Business (the "CVAS Business") to GENBAND pursuant to a stalking-horse purchase agreement (the "Stalking Horse Agreement"), subject to the receipt of a higher and better offer at auction. The bidding procedures approved by the Court required competing bids to be made based on the form of the Stalking Horse Agreement agreed on by GENBAND.

15.    Following the Court's approval of the bidding procedures by order dated January 8, 2010 [D.I. 2259], Nortel marketed the CVAS Business to other potentially interested parties, based on the terms of the Stalking Horse Agreement. Two parties expressed potential interest in the assets and were qualified as Qualified Bidders as defined under the bidding procedures. Ultimately, these two parties decided not to submit Qualified Bids, and Nortel announced that it would not proceed to auction and would work toward closing the asset sale agreement with GENBAND. The Court approved the sale of the CVAS Business to GENBAND pursuant to the Stalking Horse Agreement dated as of December 22, 2009, by and among the Main Sellers and the EMEA Sellers (the "Sellers" and together with GENBAND the "Parties") and GENBAND (the "Sale Agreement")[5] by order dated March 4, 2010 [D.I. 2632]. The Canadian Court likewise approved both the bidding procedures by order dated January 6, 2010, and the sale of the CVAS Business to GENBAND pursuant to the Sale Agreement by order dated March 4, 2010. The Sale Agreement was later amended pursuant to Amendment No. 1 to the Asset Sale Agreement dated as of May 28, 2010, to address provisions not relevant to this dispute.

16.    On May 25, 2010, prior to the Closing, the Sellers provided GENBAND with an Estimated Purchase Price statement as contemplated by Section 2.2.2 of the Sale Agreement. The Estimated Purchase Price statement provided for an estimated Deferred Profit Amount of

---

[5]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Agreement.

/ / .

$37,867,000 and an estimated Purchase Price of $182,649,000. In calculating the Estimated

Purchase Price, the Sellers applied the same clear terms of the definition of Deferred Profit

Amount that they seek to enforce in this Motion, and thus included only "deferred revenues for

services to be performed or products to be provided by the Business after the Closing Date."

GENBAND did not challenge these calculations and the sale of the CVAS Business to

GENBAND closed on May 28, 2010, approximately five months after the signing of the Stalking

Horse Agreement.

17.    In connection with the sale of the CVAS Business, Wells Fargo, NNI, NNL,

NNUK and GENBAND entered into an Escrow Agreement, dated as of January 6, 2010 and

amended on May 28, 2010. The Escrow Account was established, with Wells Fargo as escrow

agent, to hold the Escrow Amount, which consists of, among other things, a Purchase Price

Adjustment Escrow Amount in the principal sum of $8,000,000 that relates to certain potential

post-closing purchase price adjustments that could be made pursuant to Section 2.2.3 of the Sale

Agreement. Under Section 4 of the Escrow Agreement, funds may be released from the Escrow

Account either pursuant to the delivery of a joint written instruction by NNI, NNL, NNUK and

GENBAND to Wells Fargo directing the release of funds, or by a final, non-appealable court

order directing the release of funds.

**B.    The Closing Statement and Calculation of the Purchase Price Adjustment**

18.    On September 15, 2010, as contemplated by the Sale Agreement, GENBAND

delivered to the Sellers a written closing statement (the "Closing Statement"), a copy of which is

attached hereto as Exhibit B, that contained GENBAND's proposed calculation of certain post-

closing purchase price adjustments provided for under the Sale Agreement. The Closing

Statement proposed a net purchase price adjustment in favor of GENBAND in the amount of

9

*12.*

$139,096,000, which included a calculated Deferred Profit Amount of $70,570,000. Thus, the Final Purchase Price pursuant to GENBAND's proposed calculation was $142,904,000.

19.    GENBAND's proposed calculation of the Final Purchase Price disregards the clear definition of "Deferred Profit Amount," as discussed above. Accordingly, on October 13, 2010, as contemplated by and in accordance with the Sale Agreement, the Sellers delivered to GENBAND a written disagreement notice. On November 16, 2010, the Sellers delivered to GENBAND a corrected disagreement notice to account for a small calculation error (the "Disagreement Notice"), a copy of which is attached hereto as Exhibit C. In the Disagreement Notice the Sellers set forth a net purchase price adjustment in favor of GENBAND in the amount of $102,491,255, which included a calculated Deferred Profit Amount of $34,284,392. Thus, the final purchase price pursuant to the Sellers' calculation was $179,508,745. After accounting for other amounts accepted by GENBAND,[6] there is currently a dispute over the final purchase price reflecting the $36,285,608 difference between the Deferred Profit Amount calculated by GENBAND and the Deferred Profit Amount calculated by the Sellers.

20.    The standard for calculating the purchase price adjustment, and particularly the Deferred Profit Amount, is set forth in the Sale Agreement. Section 2.2.3.1(a) generally provides that the purchase price adjustment shall be calculated by subtracting various liabilities, one of which is the Deferred Profit Amount, from the Base Purchase Price of $282,000,000. Section 2.2.3.1(a) of the Sale Agreement provides that the Closing Statement "shall be prepared in accordance with the Nortel Accounting Principles and the terms hereof." Sale Agreement, p. 48 (emphasis supplied).

---

[6]    GENBAND subsequently agreed with the Sellers' adjustments to the Closing Unbilled Accounts Receivable Amount and Closing Specified Employee Liabilities Amount as set forth in the Disagreement Notice.

10

*13*

21.     The Sale Agreement defines the Deferred Profit Amount as:

> both short term and long term (i) deferred revenues for <u>services to be performed or products to be provided by the Business after the Closing Date</u> but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in Connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business . . . [f]or the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.

Sale Agreement, at 11 (definition of Deferred Profit Amount) (emphasis supplied).

22.     Thus, by the Sale Agreement's unambiguous language, the Deferred Profit Amount includes only deferred revenues and associated deferred costs in respect of services to be performed and products to be provided <u>after</u> the Closing Date. Yet GENBAND seeks to disregard the phrase "after the Closing Date" in the definition of Deferred Profit Amount. Thus, GENBAND seeks to include deferred revenue items for services to be performed or products to be provided by the Business <u>before</u> the Closing Date – that is, revenues associated with work that was completed in the past and for which there are no "services to be performed or products to be provided by the Business <u>after</u> the Closing date."

23.     There is no disagreement between the Parties about accounting analysis or mathematical calculations. Indeed, in the course of calculating the assets and liabilities that GENBAND would assume upon the acquisition of the CVAS business, the Parties made the same determination of deferred revenues for services to be performed or products to be provided by the CVAS business after the Closing Date. Thus, the Parties agreed on the calculation of items that dictate the Deferred Profit Amount to be reflected on GENBAND's books for operation of the Business after the Closing Date. Accordingly, if the clear terms of the definition of Deferred Profit Amount are enforced, there is no legitimate disagreement that the resulting

11

14.

figure is the one that the Sellers have used in calculating the purchase price. Thus, the Sellers

seek to enforce the clear terms of the Sale Agreement by including only deferred revenues and

associated deferred costs in respect of services performed and products delivered <u>after</u> the

Closing Date.

24.    Notably, the Sellers' position is also consistent with the manner in which a term

with the same definition was applied by the Sellers and the purchaser in a prior sale transaction.

The sale agreement executed in connection with Nortel's divestiture of its Metro Ethernet

Networks Business ("<u>MEN</u>") to Ciena Corporation ("<u>Ciena</u>"), which occurred in 2010, used

substantially identical language to define the deferred revenue amount that would impact the

purchase price adjustment, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. In the MEN sale agreement, the term was

referred to as "Closing Net Deferred Revenues," and the definition of the term was substantively

identical to the definition of "Deferred Profit Amount" in the CVAS Sale Agreement.

Specifically, Closing Net Deferred Revenues was determined based on:

> deferred revenues for services to be performed or products to be
> provided by the Business after the Closing Date but for which an
> account receivable has been recorded prior to the Closing Date
> <u>minus</u> (y) associated deferred costs to the extent incurred by the
> Business prior to the Closing Date in connection with such
> products or services, in each case, that would be required to be
> reflected on a balance sheet of the Business as of such date
> prepared in accordance with GAAP applied in a manner consistent
> with the Nortel Accounting Principles (to the extent consistent
> with GAAP).

12

15

███████████████████████ Thus, both the purchaser and the sellers in the MEN

transaction applied this definition according to its clear terms, just as Sellers seek to do here.

25.    In addition to the dispute caused by GENBAND's attempt to disregard the clear

definition of "Deferred Profit Amount," GENBAND also included an item in its calculation that

clearly does not belong – specifically a $1,629,132 negative deferred cost-of-sales balance

belonging to Nortel Networks (Luxembourg) S.A. ("Nortel Luxembourg"), which should not be

included simply because Nortel Luxembourg is not a party to the CVAS sale.  Because Nortel

Luxembourg is neither a Seller under the Sale Agreement nor an EMEA Seller, this negative

deferred cost-of-sales balance should not be included in the calculation of the Deferred Profit

Amount.

**C.    Purchaser's Non-Compliance with the Sale Agreement in Calculating the Deferred
        Profit Amount**

26.    Notably, the concept and definition of Deferred Profit Amount was introduced

into the Stalking Horse Agreement by GENBAND on or about December 5, 2009.  After

GENBAND drafted the definition in dispute, the Parties continued to review and revise the draft

agreement for nearly three additional weeks, exchanging multiple drafts leading up to the signing

of the Stalking Horse Agreement.  The definition of Deferred Profit Amount that GENBAND

proposed never changed and became part of the Stalking Horse Agreement and the final Sale

Agreement.  Yet GENBAND now insists on ignoring the express terms of the duly executed Sale

Agreement that it proposed.

27.    GENBAND has suggested that its proposed reading of "Deferred Profit Amount"

or, more accurately, its disregard of the clear terms of the definition, is supported by purported

discussions prior to the execution of the Stalking Horse Agreement.  But the clear terms of the

Sale Agreement govern.  Moreover, the Sale Agreement contains an integration clause that

16

expressly forbids GENBAND from doing what it now seeks to accomplish. Section 10.12(a) provides: "This Agreement . . . set[s] forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral are superseded by this Agreement . . . ." Sale Agreement, at 136.

**D.    Purchaser's Non-Compliance with the Sale Agreement by Refusing to Pay to Nortel Settlement Payments Received from Verizon**

28.    In addition to the dispute caused by GENBAND's attempt to avoid the clear definition of Deferred Profit Amount, GENBAND failed to comply with the Sale Agreement by refusing to pay Nortel certain payments received from Verizon Services Corp. ("Verizon") in connection with products delivered by NNI to Verizon prior to the Closing Date.

29.    NNI and Verizon are parties to a certain General Product Purchase Agreement for Softswitch and TDM Products and Services (the "GPPA Agreement"). Under the GPPA Agreement, which was executed in 2004, Verizon purchased certain switches and software licenses from NNI. In 2009, Nortel conducted an audit of the switches purchased by Verizon and discovered that Verizon had begun using certain software, resident on the switches, for which it had not purchased accompanying licenses. The value of these licenses was approximately $2,000,000. This value, owed to Nortel for products delivered to and used by Verizon prior to 2009, was not recorded on Nortel's books as a receivable because Nortel was not in possession of appropriate GAAP-compliant documentation that allowed for the value to be accounted for as a receivable at the time.

30.    Accordingly, NNI entered into discussions with Verizon concerning the unpaid licensing fees, over which a dispute as to payment arose and those discussions were continuing as of the Closing Date.

14

17

31.    The GPPA Agreement was ultimately assigned to GENBAND, pursuant to the Sale Agreement, before NNI was able to resolve the dispute with Verizon. Pursuant to Section 2.1.1(b) of the Sale Agreement, the Sellers transferred and assigned to GENBAND all of the Seller's right title and interest in and to, among other things, the Sellers' Unbilled Accounts Receivable relating to the CVAS business. "Unbilled Accounts Receivable" is expressly defined in the Sale Agreement to mean "amounts classified in Construction-in-Process Accounts in a manner consistent with the Nortel Accounting Principles as of a certain date" ("Construction-in-Process Accounts"). Sale Agreement, at 33. All other accounts receivable, whether billed or unbilled, are an "Excluded Asset" pursuant to Section 2.1.2(a) of the Sale Agreement. Excluded Assets remain with Nortel.

32.    Following the Closing Date, the Sellers learned that former Nortel employees – now employed by GENBAND – continued working with Verizon to resolve the dispute, and that Verizon and GENBAND executed a settlement agreement (the "Settlement Agreement") under which Verizon has agreed to pay GENBAND ▮▮▮▮▮ for the licenses provided by NNI prior to the Closing Date (the "Verizon Receivables").

33.    The Verizon Receivables were not classified in "Construction-in-Process Accounts" and therefore do not constitute Unbilled Accounts Receivables. Rather, the Verizon Receivables – which represent fees for licenses that NNI delivered and Verizon utilized before the GPPA Agreement was assigned to GENBAND – are an Excluded Asset that remained with the Sellers under the Sale Agreement.[7] Under Section 5.12 of the Sale Agreement, GENBAND has agreed to promptly deliver to the Sellers any payment or instrument received by GENBAND

---

[7]    Furthermore, under section 2.1.2(a) of the Sale Agreement, claims relating to any Excluded Liability (as defined in the Sale Agreement), which includes liabilities relating to any Excluded Asset, also constitute an Excluded Asset. Sale Agreement, p. 37.

18

that is for the account of the Sellers under the terms of the Sale Agreement.  Sale Agreement, pp. 86-7.

34.     Therefore, the Debtors respectfully request that the Court issue an Order directing GENBAND to: (i) provide the Sellers with a fully executed copy of the Settlement Agreement and the name and contact information of representatives of Verizon with whom GENBAND has been in discussions with respect to the Settlement Agreement; (ii) deliver to the Sellers an accounting of all purchase orders received and expected to be received by GENBAND from Verizon with respect to the Verizon Receivables, copies of such purchase orders, and the related invoices issued by GENBAND; (iii) deliver to the Sellers any amounts received by GENBAND in payment for the Verizon Receivables as of the date hereof, and any purchase orders and amounts that GENBAND may receive from Verizon after the date hereof with respect to the Verizon Receivables; and (iv) fully cooperate with the Sellers and Verizon in the resolution of this matter.

### E.     Purchaser's Non-Compliance with the Sale Agreement by Refusing to Pay to Nortel Certain Canadian Transfer Taxes

35.     Finally, there is one additional dispute as to which Nortel seeks this Court's intervention.  GENBAND has failed to comply with the Sale Agreement by refusing to pay Nortel certain Canadian transfer taxes.  Nortel has been in communication with GENBAND's counsel for six months to reach an agreement on the appropriate amount of transfer taxes owing to Nortel in connection with transfer of the tangible and intangible assets.

36.     Nortel issued draft invoices to GENBAND in the amount of $1,000,390 on September 28, 2010 for the taxes owed based on an understanding that the Parties had reached agreement as to the proper figure.  GENBAND subsequently indicated that it was not in agreement with the figure and informed Nortel that it would revert with specific objections.  To

16

*19*

date, GENBAND has yet to respond to Nortel's repeated requests for additional information concerning GENBAND's objections and the payment of transfer taxes to Nortel is past due.

37.     Therefore, the Debtors respectfully request that the Court issue an order directing GENBAND to: (i) immediately remit payment in accordance with the September 28, 2010 invoices for the Canadian transfer taxes owed to Nortel; or (ii) deliver to the Sellers a written statement of its objections to the same; and (iii) fully cooperate with the Sellers in the resolution of this matter.

## ARGUMENT

**A.      The Court Retains Exclusive Jurisdiction Over this Dispute and Has Authority to Enforce the Terms of the Sale Order**

38.     Pursuant to the Sale Order, this Court retains, "jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (1) interpret, implement and enforce the terms and provisions of this Order . . . and the terms of the Sale Agreement . . . (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Sale Agreement . . ." Sale Order, at ¶ 32.

39.     Further, Section 10.6(b) of the Sale Agreement provides that:

> [t]o the fullest extent permitted by applicable Law, each Party (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases.

17

20

The "U.S. Bankruptcy Court" means "the U.S. Bankruptcy Court for the District of Delaware." Sale Agreement, p. 131.[8]

40.     Section 105(a) of the Bankruptcy Code additionally provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions [of the Bankruptcy Code]." 11 U.S.C. § 105(a).  Bankruptcy courts, based on the reference of the inherent power of the district court contained in Section 157(c) of Title 28 of the United States Code and on the broad statutory grant of equitable powers in Section 105 of the Bankruptcy Code, have the inherent authority to enforce compliance with their lawful orders, to the extent such power is not restricted by statute.  See, e.g., In re WorldCorp., Inc., 252 B.R. 890, 897 (Bankr. D. Del. 2000) (compelling party to make payment in accordance with agreement that was previously approved by court order); U.S. Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus. Inc.), 68 B.R. 690, 695-97 (Bankr. S.D.N.Y. 1986); Johns-Manville Sales Corp. v. Doan (In re Johns-Manville Corp.), 26 B.R. 919, 924 (Bankr. S.D.N.Y. 1983); Baer v. Bowser (In re Jones), Case No. 97-41205-7, 2003 Bankr. LEXIS 2056, at *15 (Bankr. D. Kan. Nov. 10, 2003) ("[T]he Court can think of no better use of its equity powers under § 105 than to issue an order that compels compliance with a previous order."); JMF Acquisitions Co. v. Boccella (In re Edgehill Nursing Home, Inc.), 68 B.R. 413, 415-16 (Bankr. E.D. Pa. 1986).

41.     Further, this Court has jurisdiction to determine whether the present dispute falls within the scope of Section 2.2.3.1(c) of the Sale Agreement, the so-called arbitration clause. The law is clear that a court decides the threshold issue of whether a particular dispute falls within the scope of an arbitration agreement.  See e.g., AT&T Techs. Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide

---

[8]     The Debtors have been informed that the Main Sellers who are Canadian Debtors are seeking similar relief from the Canadian Court.

21.

otherwise, the question of whether the parties agreed to arbitrate [a particular grievance] is to be decided by the court, not the arbitrator."); In re MLL Investors Servs., Inc., 620 N.Y.S.2d 605, 607 (3rd Dep't 1994).

42.    Accordingly, this Court has the authority, and has indeed specifically reserved its jurisdiction, to interpret and enforce the Sale Order and the terms of the Sale Agreement and the Escrow Agreement.

**B.    GENBAND Attempts to Disregard the Clear Definition of "Deferred Profit Amount"**

43.    By the definition set forth in the Sale Agreement, the Parties expressly agreed that the Deferred Profit Amount would be calculated by using deferred revenues and associated deferred costs in respect of services performed and products delivered after the Closing Date. However, in its Closing Statement GENBAND seeks to disregard the clear meaning of Deferred Profit Amount by: (i) overstating the Closing Deferred Profit Amount by $36,285,608 as a result of incorrectly including deferred revenues and associated deferred costs in respect of services performed and products delivered prior to the Closing Date; and (ii) by including a negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Luxembourg, which is neither a Seller under the Sale Agreement nor an EMEA Seller.

44.    Having itself proposed the definition of Deferred Profit Amount in the Sale Agreement, and unequivocally agreed to this definition in signing the Sale Agreement, GENBAND cannot now urge that the express language be disregarded. As the Sale Agreement makes clear, the proper use of a Closing Statement is for GENBAND to calculate the Purchase Price Adjustment in strict accordance with the terms set forth in the Sale Agreement. The Closing Statement was never intended, and cannot now be used, as a means to renegotiate the terms of a component of the Purchase Price Adjustment formulation or any other contract term.

19

22

Yet GENBAND is attempting to improperly use the Closing Statement as an opportunity to reform the Sale Agreement and strike a deal with drastically different economics from the one approved by the Court and the multiple constituents and selling parties that were not present at business-level discussions, and which was marketed to other potential bidders, including the Qualified Bidders. Indeed, to sanction GENBAND's conduct would reduce the value received by the Sellers and their creditors from the Transaction by $36,285,608 or approximately 20% of the Final Purchase Price. Furthermore, adopting GENBAND's position would result in GENBAND receiving the financial benefit of goods and services provided by the Sellers prior to the Closing Date for which GENBAND will bear no costs.

45.    GENBAND's expected attempt to disregard the clear terms of the Sale Agreement and to proffer alleged discussions during the negotiation process to change the terms of the Sale Agreement is improper. As set forth above, Section 10.12(a) of the Sale Agreement contains an integration clause which affirms that the contract sets forth the entire agreement between the Parties, and that all prior discussions or understandings are superseded by its terms. This provision is of particular import here, where the sale of Nortel's global business operations required the terms of the Sale Agreement to be approved by multiple selling parties around the world who were not all present at negotiating sessions, and where the Sellers used the terms of the Sale Agreement to market the CVAS Business to other potential purchasers to ensure they achieved the highest and best value for their creditors.

46.    Enforcing the clear terms of the definition of "Deferred Profit Amount" is especially important in light of the fact that GENBAND was approved as the highest and best bidder for the assets following a formal, court approved auction process. The Deferred Profit Amount, along with certain other enumerated purchase price adjustments, determines the final

23

Purchase Price for the assets. The sellers solicited competing bids and qualified certain other bidders based on the publicly filed Stalking Horse Agreement. Any other potential bidder would have been held to a purchase price adjustment based on the meaning of "Deferred Profit Amount" as written, and would have read the agreement to determine its impact on the purchase price when it considered whether to offer a competing bid for the CVAS Business. It would be improper and unfair to allow GENBAND to now substitute a different meaning of "Deferred Profit Amount" that would have given it a hidden and uneven $36,285,608 advantage throughout the auction process by allowing it to obtain a lower purchase price from the same headline purchase price than other potential bidders bidding on the exact same form of purchase agreement.

47.    Further, if GENBAND had had any disagreement with the clear definition of "Deferred Profit Amount" in the Sale Agreement, it should have raised that disagreement before the Closing Date. GENBAND had multiple opportunities to raise objections before signing the Sale Agreement or participating in the bidding procedures hearing or sale hearing (at which its counsel was present, but notably did not object or indicate any dispute) or the closing of the sale. Indeed, the Sellers provided GENBAND with an Estimated Purchase Price three days prior to the Closing, which reflected calculations based on the proper application of "Deferred Profit Amount." GENBAND raised no objection. Had a timely objection been raised, the Sellers could have considered the dispute in deciding whether to close the Sale and would not be forced to bear the cost of enforcing the terms of the Sale Agreement as written.

21

24.

48.    Integration clauses are widely used and generally enforced under New York law[9] as a valid means of protecting the final written agreement between parties from later being challenged by extrinsic evidence of prior negotiations between those parties.  See, e.g., Norman Bobrow & Co. v. Loft Realty Co., 577 N.Y.S.2d 36, 36 (1st Dep't 1991) ("Parol evidence is not admissible to vary the terms of a written contract containing a merger clause.").  The effect of an integration clause is that a party to a written agreement will not be permitted to produce extrinsic evidence of a prior or contemporaneous understanding or representation that differs from the terms of an unambiguous and complete written agreement.  See Jarecki v. Louie, 745 N.E.2d 1006, 1009 (N.Y. 2001) ("The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing.").  Here, the Sellers understand that GENBAND is relying on purported conversations to support its attempt to disregard the clear definition of Deferred Profit Amount.  Such an argument is precisely what the Parties intended to exclude by incorporating the Section 10.12 integration clause.  Therefore, GENBAND should not be permitted to alter the unambiguous definition of Deferred Profit Amount.

49.    In addition, the closing Deferred Profit Amount calculated by GENBAND improperly includes a negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Luxembourg.  As Nortel Luxembourg is neither a Seller nor an EMEA Seller,[10] the amount of $1,629,132 should not have been included in GENBAND's calculation of the Closing Deferred Profit Amount.  Therefore, the Deferred Profit Amount should be reduced accordingly.

---

[9]      The Sale Agreement is governed by New York law in accordance with Section 10.6(a). Sale Agreement, p. 131.

[10]     Indeed, Nortel Luxembourg would only be an EMEA Seller, and not a MAIN Seller, but it unequivocally was not.

25

**C.** **Arbitration is Not the Proper Forum to Resolve the Deferred Profit Amount Dispute**

50.    As GENBAND's reading of Deferred Profit Amount contravenes the terms of the Sale Agreement, the Court may enforce the terms of the Sale Order and direct the release of escrowed funds in excess of other disputed amounts without the need for the Parties to resort to the use of an Accounting Arbitrator.

51.    Section 2.2.3.1(c) of the Sale Agreement provides for the use of an Accounting Arbitrator if the Sellers and GENBAND "are unable to resolve any disagreement <u>as contemplated by Section 2.2.3.1(b)</u> [of the Sale Agreement] within fifteen (15) days after delivery of a Disagreement Notice." Sale Agreement at 49 (emphasis supplied). The Accounting Arbitrator's authority is clearly restricted to disputes appropriately raised under the Sale Agreement's purchase price adjustment procedures. The present dispute has not been properly raised. Section 2.2.3.1(a) clearly requires that a Closing Statement be "prepared in accordance with the Nortel Accounting Principles <u>and the terms hereof.</u>" Sale Agreement at 48 (emphasis supplied). By improperly seeking to reform the Sale Agreement GENBAND has disregarded its obligation to prepare the Closing Statement in accordance with the terms of the Sale Agreement it signed, and which served as the basis of the auction process. The difference between GENBAND's and the Sellers' respective calculations of Deferred Profit Amount is not the result of any accounting disagreement or mathematical discrepancy, but rather is the product of GENBAND's attempt to disregard the clear terms of the Sale Agreement. The Debtors did not agree to delegate to the Accounting Arbitrator the power to rewrite the terms of the Sale Agreement, as GENBAND now seeks to do. Accordingly, the Debtors should not be required to expend further time or resources rebutting arguments that lack even arguable merit under the Sale Agreement. Accordingly, the Debtors respectfully request that the Court issue an order

23

26.

enforcing the terms of the Sale Agreement and calculating the Deferred Profit Amount in accordance with the express terms of the Sale Agreement.

**D.    The Court Should Order the Release of the Escrow Funds**

52.    Because the correctly calculated Purchase Price Adjustment Escrow Amount exceeds the maximum purchase price adjustment by $4,859,745, there is no basis for the continued reserve of those excess amounts. On November 16, 2010, the Sellers delivered escrow release instructions to GENBAND requesting that GENBAND authorize the release of the escrow funds; however, GENBAND has not yet agreed to do so. Accordingly, because GENBAND has not raised a legitimate dispute with respect to the calculation of the Deferred Profit Amount, the Debtors respectfully request that the Court enter an order directing GENBAND to execute instructions to Wells Fargo to release to the Distribution Agent (as defined in the Escrow Agreement) those amounts currently held in escrow in excess of $3,140,255 (*i.e.* $4,859,745), and authorizing Wells Fargo to release such amount under the terms of the Sale Agreement and to release the balance to GENBAND.

53.    As the Court is aware, the Sellers are in the process of negotiating the allocation proceeds of the numerous asset dispositions undertaken in the course of Nortel's global insolvency proceedings. In doing so, the Debtors, their estates and their creditors will benefit from having as accurate an estimate of the funds to be allocated from each asset disposition as is reasonably possible. Accordingly, it is especially important that the escrowed funds that are properly owed to the Sellers be released as soon as possible. Accordingly, the Debtors request that the Court order the immediate release of $4,859,745 from the Escrow Account to the Sellers.

54.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion that otherwise could apply under Bankruptcy Rule 6004(h), which

24

27

provides that, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise," such that the undisputed amounts held in escrow may be released upon the entry of the order.

**E.    GENBAND Has Failed To Abide By the Terms of the Sale Agreement Regarding the Verizon Receivables**

55.    As set forth above, the Verizon Receivables do not constitute Construction-in-Process receivables and are therefore an Excluded Asset that remained with the Sellers under the Sale Agreement.  Furthermore, under Section 2.1.2(a) of the Sale Agreement, claims relating to any Excluded Liability (as defined in the Sale Agreement), which includes liabilities relating to any Excluded Asset, also constitute an Excluded Asset.  Sale Agreement at 37.  Finally, under Section 5.12 of the Sale Agreement, GENBAND has agreed to promptly deliver to the Sellers any payment or instrument received by GENBAND that is for the account of the Sellers under the terms of the Sale Agreement.  Sale Agreement at 86-7.

56.    Therefore, the Debtors respectfully request that the Court issue an order directing GENBAND to: (i) provide the Sellers with a fully executed copy of the Settlement Agreement and the name and contact information of representatives of Verizon with whom GENBAND has been in discussions with respect to the Settlement Agreement; (ii) deliver to the Sellers an accounting of all purchase orders received and expected to be received by GENBAND from Verizon with respect to the Verizon Receivables, copies of such purchase orders, and the related invoices issued by GENBAND; (iii) deliver to the Sellers any amounts received by GENBAND in payment for the Verizon Receivables as of the date hereof, and any purchase orders and amounts that GENBAND may receive from Verizon after the date hereof with respect to the

28

Verizon Receivables; and (iv) fully cooperate with the Sellers and Verizon in the resolution of this matter.

**F.      GENBAND Has Failed To Abide By The Terms Of The Sale Agreement Regarding The Canadian Transfer Taxes**

57.      As set forth above, GENBAND has failed to comply with the Sale Agreement by refusing to pay Nortel certain Canadian transfer taxes.  Nortel invoiced GENBAND in the amount of $1,000,390 on September 28, 2010 for the taxes owed; GENBAND subsequently indicated that it was not in agreement with the figure and informed Nortel that it would revert with specific objections.  GENBAND has yet to respond to Nortel's repeated requests for additional information concerning GENBAND's objections and has failed to remit payment.

58.      Therefore, the Debtors respectfully request that the Court issue an Order directing GENBAND to: (i) immediately remit payment in accordance with the September 28, 2010 invoices for the Canadian transfer taxes owed to Nortel; or (ii) deliver to the Sellers a written statement of its objections to the same; and (iii) fully cooperate with the Sellers in the resolution of this matter.

## NOTICE

59.      Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to GENBAND; (v) Wells Fargo Bank, National Association, as escrow agent and (vi) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

60.      No prior request for the relief sought herein has been made to this or any other court.

29.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other

and further relief as it deems just and proper.

Dated: November 17, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

                                  James L. Bromley (admitted *pro hac vice*)
                                  Lisa M. Schweitzer (admitted *pro hac vice*)
                                  David H. Herrington (admitted *pro hac vice*)
                                  One Liberty Plaza
                                  New York, New York 10006
                                  Telephone:  (212) 225-2000
                                  Facsimile:  (212) 225-3999

                                         - and -

                                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                  Derek C. Abbott (No. 3376)
                                  Eric D. Schwartz (No. 3134)
                                  Ann C. Cordo (No. 4817)
                                  Andrew R. Remming (No. 5120)
                                  1201 North Market Street
                                  P.O. Box 1347
                                  Wilmington, Delaware 19801
                                  Telephone:  (302) 658-9200
                                  Facsimile: (302) 658-3989

                                  *Counsel for the Debtors*
                                  *and Debtors in Possession*

27

30

31.

**EXHIBIT A**


**Proposed Form of Order**

32.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------X
                                                          :
                                                          :    Chapter 11
                                                          :
*In re*                                                   :
                                                          :    Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]                        :
                                                          :    Jointly Administered
                        Debtors.                          :
                                                          :    RE: D.I. _____
                                                          :
----------------------------------------------------------X

### ORDER ENFORCING THE ORDER AUTHORIZING THE
### SALE OF CERTAIN ASSETS OF THE DEBTORS'
### CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS
### BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

Upon the motion dated November 17, 2010 (the "Motion"),[2] of Nortel Networks Inc. and

its affiliated debtors, as debtors and debtors in possession in the above-captioned cases (the

"Debtors"), for entry of an order, as more fully described in the Motion, enforcing the *Order*

*Authorizing And Approving (A) The Sale Of Certain Assets Of The Debtors' Carrier Voice Over*

*IP And Communications Solutions Business Free And Clear Of All Liens, Claims And*

*Encumbrances, And (B) The Assumption And Assignment Of Certain Executory Contracts* (the

"Sale Order") [D.I. 2193] against GENBAND Inc. (n/k/a GENBAND US LLC) ("GENBAND"),

and directing the release of $4,859,745 plus accumulated interest currently held in escrow by

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc.
(9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable
Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]        Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

33.

escrow agent, Wells Fargo Bank, National Association ("Wells Fargo"), pursuant to the Amended and Restated Escrow Agreement dated as of January 6, 2010, by and among Wells Fargo, NNI, Nortel Networks Limited, Nortel Networks UK Limited (in administration) and GENBAND (the "Escrow Agreement"); and adequate notice of the Motion having been given as set forth in the Motion; and it appearing that no other or further notice is necessary; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having determined that consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief requested in the Motion, and that such relief is in the best interests of the Debtors, their estates, their creditors and the parties in interest; and upon the record in these proceedings; and after due deliberation;

IT IS HEREBY DETERMINED AND ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Purchaser's interpretation of the term "Deferred Profit Amount" included in the Closing Statement delivered by the Purchaser dated September 15, 2010, does not constitute a valid interpretation of the term under the terms of the Sale Agreement and the Purchaser's dispute with the application of the Deferred Profit Amount term under the terms of the Sale Agreement is not a valid dispute that is susceptible to arbitration as a purchase price adjustment dispute pursuant to Section 2.2.3(c) of the Sale Agreement.

3.      The calculation of "Deferred Profit Amount" shall include only deferred revenues for services to be performed or products to be provided by the Business after the Closing Date. Accordingly, the Deferred Profit Amount adjustment is $34,284,392, and the Final Purchase Price is $179,508,745.

2

34.

4.    The Purchaser is directed to execute, within five (5) days of the entry of this Order, instructions to Wells Fargo, as escrow agent, that provide for the release of $4,859,745 plus accumulated interest from the Escrow Fund to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) by wire transfer of immediately available funds.  Wells Fargo also is authorized upon presentment of this Order by the Sellers, with or without the receipt of separate joint instructions, to release such amounts in accordance with section 4(b) of the Escrow Agreement.

5.    The Purchaser is hereby ordered to: (i) provide the Sellers with a fully executed copy of the settlement agreement and the name and contact information of representatives of Verizon with whom GENBAND has been in discussions with respect to the Settlement Agreement; (ii) deliver to the Sellers an accounting of all purchase orders received and expected to be received by GENBAND from Verizon with respect to the Verizon Receivables, copies of such purchase orders, and the related invoices issued by GENBAND; (iii) deliver to the Sellers any amounts received by GENBAND in payment for the Verizon Receivables as of the date hereof, and any purchase orders and amounts that GENBAND may receive from Verizon after the date hereof with respect to the Verizon Receivables; and (iv) fully cooperate with the Sellers and Verizon in the resolution of this matter.

6.    The Purchaser is hereby ordered to: (i) immediately remit payment in accordance with the September 28, 2010 invoices for the Canadian transfer taxes owed to Nortel; or (ii) deliver to the Sellers a written statement of its objections to the same; and (iii) fully cooperate with the Sellers in the resolution of this matter.

7.    Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary: (i) the terms of this Order shall be immediately effective and enforceable upon its

3

35

entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement or

realization of the relief granted in this Order; and (iii) the Debtors may, in their discretion and

without further delay, take any action and perform any act authorized under this Order.

8.      The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

Dated: _____, 2010
          Wilmington, Delaware

          _____
          THE HONORABLE KEVIN GROSS
          UNITED STATES BANKRUPTCY JUDGE

36

37

## EXHIBIT B


**Closing Statement**



Shauna Martin
office: 972.265.3890
facsimile: 972.461.7516
shauna.martin@genband.com

September 15, 2010

| | | |
|---|---|---|
| **Nortel Networks Corporation and Nortel Networks Limited** 5945 Airport Road, Suite 360 Mississauga, Ontario, Canada L4V 1R9 Facsimile: +1-905-863-2057 Attn: Anna Ventresca, *General Counsel- Corporate and Corporate Secretary* Attn: Khush Dadyburjor, *Vice President, Mergers and Acquisitions* | **Nortel Networks Inc.** Legal Department 220 Athens Way, Suite 300 Nashville, Tennessee, USA 37228 Facsimile: +1-615-432-4413 Attn: Lynn C. Egan *Secretary* | **Alan Bloom / Stephen Harris** **Ernst & Young LLP** 1 More London Place London SE1 2AF United Kingdom Facsimile: +44 (0)20 7951 1345 |
| **Sharon Rolston / Simon Freemantle** Maidenhead Office Park Westacott Way Maidenhead Berkshire SL6 3QH United Kingdom Facsimile: +44 (0)20 1628 432 416 | **Avi D. Pelossof** **Zellermayer, Pelossof & Co.** The Rubenstein House 20 Lincoln Street Tel Aviv 67131 Israel Facsimile: +972 3 6255500 | |

Ladies and Gentlemen,

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., the other entities identified therein as Sellers, GENBAND Inc. and the other Designated Purchasers that became parties thereto, dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

1

39

Pursuant to Section 2.2.3.1 of the ASA, we hereby deliver the attached Closing
Statement. Please contact us if you have any questions.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-265-3581

2

Copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York
10022
United States
Attention: David S.
Allinson, Esq.
Facsimile: +1-212-751-
4864

Baker Botts LLP
2001 Ross Avenue, Suite
600
Dallas, Texas 75201
Attention: Don J.
McDermott, Jr., Esq.
Curt Anderson, Esq.
Facsimile: +1-214-661-4454
                    +1-214-661-
4900

Stikeman Elliott LLP
445 Park Avenue 7th Floor
New York, New York
10022
Attention: Ron Ferguson,
Esq.
Facsimile: +1-212-371-
7087

Nortel Networks Limited
and Nortel Networks Inc.
5270 Sycamore Avenue
Bronx, New York 10471
Attention: Robert Fishman
                    Senior
Counsel

Cleary Gottlieb Steen &
Hamilton LLP
One Liberty Plaza
New York, New York
10006
United States
Attention: Laurent Alpert
Facsimile: +1-212-225-
3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South
Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael Lang
Facsimile: +1-416-216-
3930

Alex Kay / Gareth Roberts
Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS
Facsimile: +44 (0) 20 7098
4447

Sandy Shandro
3-4 South Square
Gray's Inn
London
WC1R 5HP
Facsimile: +44 (0)20 7696
9911

Avner Ben-Gera
Hughes Hubbard & Reed
One Battery Park Plaza
New York
NY 10004
Facsimile: (212) 422 -4726

3

## Closing Statement

All amounts are in United States dollars.

**Closing Adjusted Net Working Capital:**

| | |
|---|---:|
| Closing Inventory Value, plus | $ 13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 |
| Closing Prepaid Expenses Amount, minus | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 |
| Closing Product Exposures Amount | 416,000 |
| **Closing Adjusted Net Working Capital** | $   8,331,000 |

**Final Purchase Price:**

| | |
|---|---:|
| Base Purchase Price, plus | $282,000,000 |
| The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | - |
| Closing Aggregate Downward Adjustment (if any), minus | - |
| Closing Deferred Profit Amount, minus | 70,570,000 |
| Closing Accrued Vacation Amount, minus | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 |
| Closing TFR Amount, minus | 402,000 |
| Closing Excess ARD Employees Amount, minus | - |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 |
| Closing French Excess ARD Employees Amount, minus | - |
| Closing Pre-Close Employment Payments Amount | - |
| **Final Purchase Price** | $ 142,904,000 |

4

42

43

**EXHIBIT C**

**Disagreement Notice**




# N☒RTEL

November 16, 2010

<u>VIA FACSIMILE</u>

GENBAND US LLC
GENBAND Inc.
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Attn: General Counsel

Ladies and Gentlemen:

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("<u>NNC</u>"), Nortel Networks Limited ("<u>NNL</u>"), Nortel Networks Inc. ("<u>NNI</u>"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "<u>Nortel</u>"), GENBAND Inc. ("<u>GB</u>") and the other Designated Purchasers that became parties thereto (together with GB, "<u>GENBAND</u>"), dated December 22, 2009, as amended from time to time (the "<u>ASA</u>"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA, save that the terms "EMEA Non-Debtor Seller Directors", "Israeli Assets", "Israeli Company" and "Israeli Liabilities" have the meanings ascribed to them in the EMEA Asset Sale Agreement.

We are in receipt of the Closing Statement prepared by GENBAND dated September 15, 2010 (the "<u>GB Closing Statement</u>"). Pursuant to Section 2.2.3.1(b) of the ASA, please find attached hereto as <u>Annex A</u> a corrected Disagreement Notice from Nortel and the EMEA Sellers in respect of the GB Closing Statement. We note that the disagreement with the Closing Deferred Profit Amount in the GB Closing Statement arises primarily from differences between GENBAND and Nortel in the interpretation of the definition of "Deferred Profit Amount" in the ASA, rather than differences over calculations. Accordingly, any disagreement over the interpretation of the "Deferred Profit Amount" definition is a matter of contractual interpretation and we do not intend to waive and expressly reserve our right to pursue all available remedies to resolve any disputes over the Deferred Profit Amount, whether by recourse to judicial relief or otherwise.

45

In addition, NNI hereby reiterates its position as set forth in its letter to GENBAND dated August 13, 2010 (attached hereto as Annex B for your reference) with respect to the Verizon Receivables, as defined in such letter.

Notwithstanding that this letter shall have been signed by the Joint Administrators and the Joint Israeli Administrators both in their capacities as administrators of the EMEA Debtors for and on behalf of the EMEA Debtors and of the Israeli Company for and on behalf of the Israeli Company, respectively, and in their personal capacities, it is hereby expressly declared that no personal Liability, or any Liability whatsoever, under or in connection with this letter shall fall on the Joint Administrators, the Joint Israeli Administrators or their respective firm, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act, or otherwise howsoever.

The Joint Administrators and the Joint Israeli Administrators are signatories to this letter in their personal capacities only for the purpose of receiving the benefit of the previous paragraph. Otherwise, for all purposes of this letter, the Joint Administrators and Joint Israeli Administrators act without personal liability as agents of the EMEA Debtors and the Israeli Company, respectively.

It is hereby expressly declared that no personal Liability, or any Liability whatsoever, under or in connection with this letter shall fall on any of the EMEA Non-Debtor Seller Directors howsoever such Liability should arise.

2

46

Very truly yours,

NORTEL NETWORKS INC.

By _____
    Name:   Lynn C. Egan
    Title:    Secretary


NORTEL NETWORKS CORPORATION

By _____
    Name:
    Title:


By _____
    Name:
    Title:


NORTEL NETWORKS LIMITED

By _____
    Name:
    Title:


By _____
    Name:
    Title:

47

Very truly yours,

NORTEL NETWORKS INC.

By _____
      Name:  Lynn C. Egan
      Title:    Secretary

**NORTEL NETWORKS CORPORATION**

By: _____
    Name:  John M. Doolittle
    Title:  Senior Vice-President, Corporate Services
          and Chief Financial Officer

By: _____
    Name:  Clarke E. Glaspell
    Title:  Controller

**NORTEL NETWORKS LIMITED**

By: _____
    Name:  John M. Doolittle
    Title:  Senior Vice-President, Corporate Services
          and Chief Financial Officer

By: _____
    Name:  Clarke E. Glaspell
    Title:  Controller

48

SIGNED for and on behalf of Nortel Networks )
UK Limited (in administration) by )      .............................................
Alan Bloom )      Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature
.............................................
Name: RICHARD LAWTON )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS )

SIGNED for and on behalf of Nortel GmbH )
(in administration) by )      .............................................
Alan Bloom )      Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature
.............................................
Name: RICHARD LAWTON )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

SIGNED for and on behalf of Nortel Networks )
SpA (in administration) by )      .............................................
Alan Bloom )      Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature
.............................................
Name: RICHARD LAWTON )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE )
         PRIMROSE ST
         LONDON EC2A 2HS

49

**SIGNED** for and on behalf of Nortel Networks )
**Hispania S.A.** (in administration) by )          Alan Bloom
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.................................................. )
Name:  RICHARD LAWTON )
Address:  HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

**SIGNED** for and on behalf of Nortel Networks )
**B.V.** (in administration) by )          Alan Bloom
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.................................................. )
Name:  RICHARD LAWTON )
Address:  HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

**SIGNED** for and on behalf of Nortel Networks )
**N.V.** (in administration) by )          Alan Bloom
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.................................................. )
Name:  RICHARD LAWTON )
Address:  HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

50

SIGNED for and on behalf of Nortel Networks )
(Austria) GmbH (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Alan Bloom

Witness signature

.........................................................)
Name:  RICHARD LAWTON )
Address:  HERBERT SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON  EC2A 2HS

SIGNED for and on behalf of Nortel Networks )
Polska Sp. z.o.o. (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Alan Bloom

Witness signature

.........................................................)
Name:  RICHARD LAWTON )
Address:  HERBERT SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON  EC2A 2HS

SIGNED for and on behalf of Nortel Networks )
Portugal S.A. (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Alan Bloom

Witness signature

.........................................................)
Name:  RICHARD LAWTON )
Address:  HERBERT SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON  EC2A 2HS

51.

SIGNED for and on behalf of Nortel Networks )
AB (in administration) by )          Alan Bloom
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

Name:   RICHARD   LAWTON )
Address:   HERBERT   SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST LONDON ₂ₕₒ

SIGNED for and on behalf of Nortel Networks )
Slovensko s.r.o. (in administration) by )    Alan Bloom
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

Name:   RICHARD   LAWTON )
Address:   HERBERT   SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON EC2A 2HS

SIGNED for and on behalf of Nortel Networks )
s.r.o. (in administration) by )          Alan Bloom
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

Name:   RICHARD   LAWTON )
Address:   HERBERT   SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON EC2A 2HS

52

SIGNED for and on behalf of Nortel Networks    )
Romania S.R.L. (in administration) by          )    ................................................................
Alan Bloom                                     )    Alan Bloom
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of: )

Witness signature

................................................................    )
Name:    RICHARD  LAWTON      )
Address:  HERBERT  SMITH LLP )
          EXCHANGE  HOUSE
          PRIMROSE  ST
          LONDON  EC2A 2HS

53

SIGNED for and on behalf of Nortel Networks )

France S.A.S. (in administration) by )    Kerry Trigg

Kerry Trigg )

acting as authorised representative for )

Christopher Hill )

as Joint Administrator (acting as agent and

without personal liability) in the presence of:

Witness signature

.........................................................  )

Name: SHARON PERLMUTTER

Address: )

ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

54

SIGNED for and on behalf of Nortel Networks )
(Ireland) Limited (in administration) by )
DAVID HUGHES
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

Name:      Nathan J. Devaney )
Address:   c/o Ernst + Young )
           Harcourt Street
              Dublin 2.

55

SIGNED by Richard Banbury                    )
duly authorised for and on behalf of Nortel      )      Richard Banbury
Networks o.o.o. in the presence of:           )

Witness signature

...................................................)
Name: Svetlana LALINA              )
Address: 121603 Moscow Russia
Rublevskoye shosse
52.377

S6

**SIGNED** by Simon Freemantle                    )
duly authorised for and on behalf of **Nortel**     )   Simon Freemantle
**Networks AG** in the presence of:                 )


Witness signature

Name: Perihan Yuzcel                               )
Address: Nortel Networks UK Limited                )
westacott Way
Maidenhead office Park
SL6 · 3QH   Maidenhead

57

SIGNED for and on behalf of Nortel Networks
Israel (Sales and Marketing) Limited (in
administration) by Yaron Har-Zvi and Avi D.
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in
connection with the Israeli Assets and Israeli
Liabilities:

)
)
)
)
)
)
)
)
)

הנאמן בהקפאת הליכים

Yaron Har-Zvi

הנאמן בהקפאת הליכים

Avi D. Pelossof

Witness signature

אותי לביא, עו"ד
מ.ר. 47667

)
)
)

Name: Itay Lavi
Address: 20 Lincoln st.
Tel-Aviv, Israel

58

SIGNED by Alan Bloom                              )
                                                   )    ......................................................
                                                   )    Alan Bloom
In his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
letter expressed to be conferred on or given to
the Joint Administrators:


Witness signature

......................................................     )
Name:    RICHARD WALTON                             )
Address: HERBERT SMITH LLP                          )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

59

SIGNED by Yaron Har-Zvi                           )      וקפאת הליכים
                                                  )      ......................................................
in his own capacity and on behalf of the Joint    )      Yaron Har-Zvi
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

Witness signature        איתי לביא עו"ד
                            47667-ב.מ
..........................................................
Name:  I by lavi
Address: 20 Lincoln st.
         Tel Aviv, Israel
SIGNED by Avi D. Pelossof                          )      הנאמן נותקפאת הליכים
                                                   )      ......................................................
in his own capacity and on behalf of the Joint     )      Avi D. Pelossof
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

Witness signature        איתי לביא עו"ד
                            47667-ב.מ
..........................................................
Name:  Itay Lavi
Address: 20 Lincoln st.
         Tel Aviv, Israel

60

cc:    Latham & Watkins LLP
       885 Third Avenue
       New York, New York 10002
       United States
       Attention: David S. Allinson, Esq.

       Baker Botts LLP
       2001 Ross Avenue, Suite 600
       Dallas, Texas 75201
       Attention:   Don J. McDermett, Jr., Esq.
                    Curt Anderson, Esq.

       Stikeman Elliott LLP
       445 Park Avenue, 7th Floor
       New York, New York 10022
       Attention: Ron Ferguson, Esq.

*For the companies listed below (the "Companies"), The Institute of Chartered Accountants in England and Wales authorises A R Bloom, S Harris and C Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, A R Bloom, S Harris, AM Hudson and C Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and D Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

61.

**Annex A**

**Disagreement Notice**

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this Disagreement Notice have the meanings ascribed to them in the ASA.

Nortel has received the Closing Statement prepared by GENBAND dated September 15, 2010 (the "GB Closing Statement"). Pursuant to Section 2.2.3.1(b) of the ASA, Nortel and the EMEA Sellers notify GENBAND as follows:

- Nortel and the EMEA Sellers do not dispute the following line items within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement: Closing Inventory Value, Closing Prepaid Expenses Amount, Closing Contractual Liabilities Amount, Closing Royalty Liability Amount, Closing Warranty Provision Amount and Closing Product Exposures Amount.

- Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement and, as a result, Nortel and the EMEA Sellers dispute the Closing Adjusted Net Working Capital in the GB Closing Statement. Specifically, Nortel and the EMEA Sellers disagree with GENBAND's deduction from Closing Unbilled Accounts Receivable of accounts receivable amounts of $191,515 and $28,960, which relate to certain customer contracts with Axtel and Telefonica Argentina, respectively.[1] As the contracts with Axtel and Telefonica Argentina were included in Assigned Contracts, the Closing Unbilled Accounts Receivable Amount should be increased by $220,475, resulting in Closing Unbilled Accounts Receivable being equal to $21,611,475 (rather than $21,391,000) and Closing Adjusted Net Working Capital being equal to $8,551,475 (rather than $8,331,000).

- Nortel and the EMEA Sellers do not dispute the following line items within the Final Purchase Price calculation in the GB Closing Statement: Base Purchase Price, Closing Aggregate EMEA Downward Adjustment, Closing Aggregate Downward Adjustment,

---

[1] The contracts are: EWP 2010 Support Plan between Nortel Networks de Argentina S.A. and Telefonia Moviles Argentina S.A. dated January 31, 2010; Designacion Proveedor Centralita Movil between Nortel Networks (CALA) Inc. and Telefonica Moviles Argentina S.A. dated September 30, 2008; Purchase and License Agreement for NGN among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; Purchase and License Agreement for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; and Technical Assistance and Support Services Agreement for NGN Products and Services and for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V..

62.

Closing Accrued Vacation Amount, Closing TFR Amount, Closing Excess ARD Employees Amount, Closing EMEA Holiday Downward Adjustment, Closing French Excess ARD Employees Amount and Closing Pre-Close Employment Payments Amount.

- Since Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within Closing Adjusted Net Working Capital in the GB Closing Statement and, as a result, dispute Closing Adjusted Net Working Capital in the GB Closing Statement, Nortel and the EMEA Sellers dispute the line item in the Final Purchase Price calculation in the GB Closing Statement that is arrived at by subtracting the Target Working Capital, i.e., $73,000,000, from the Closing Adjusted Net Working Capital. Subtracting Target Working Capital from the Closing Adjusted Net Working Capital calculated by Nortel, i.e., $8,551,475, the resulting line item should be $(64,448,525) rather than $(64,669,000).

- Nortel and the EMEA Sellers dispute the line item Closing Deferred Profit Amount in the GB Closing Statement for two reasons: First, the Closing Deferred Profit Amount calculated by GENBAND improperly includes a negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Networks (Luxembourg) S.A. (NNLSA). As NNLSA is not an EMEA Seller or a Seller, the amount of $1,629,132 should not have been included in GENBAND's calculation of the Closing Deferred Profit Amount.

Second, GENBAND overstated the Closing Deferred Profit Amount by $34,656,476 as a result of incorrectly including in its calculations deferred revenues and associated deferred costs in respect of services performed and products delivered prior to the Closing Date. "Deferred Profit Amount," as defined in the ASA, means:

> ". . . as of the Closing Date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date minus (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles." (emphasis added)

The Closing Deferred Profit Amount in the GB Closing Statement should be reduced by (i) $34,656,476 due to GENBAND's improper inclusion of deferred revenues and associated deferred costs relating to services performed and products provided by the Business prior to the Closing Date and (ii) $1,629,132 due to GENBAND's improper inclusion of a negative deferred cost-of-sales balance with respect to NNLSA. Accordingly, the Closing Deferred Profit Amount should be reduced by $36,285,608 from $70,570,000 to $34,284,392.

63

- Nortel and the EMEA Sellers disagree with the Closing Specified Employee Liabilities Amount in the GB Closing Statement, which should be reduced by $98,662. The Closing . Specified Employee Liabilities Amount in the GB Closing Statement included an Australian long-service leave amount of $1,131,689. For the calculation of the Australian long-service leave amount, GENBAND apparently did not recalculate the Australian Dollar amount into the U.S. Dollar amount using the exchange rate published in the *Wall Street Journal* (Eastern Edition) for the day in question (the Closing Date), as required under the ASA. Using the Australian Dollar/U.S. Dollar exchange rate published in the *Wall Street Journal* (Eastern Edition) for the Closing Date (<u>i.e.</u>, 1.1755 Australian Dollars to one U.S. Dollar), Australian long-service leave amount in Australian Dollars of A$1,214,323 (according to Nortel's SAP accounting ledger) translates into $1,033,027. Accordingly, the Australian long-service leave amount of $1,131,689 used in GENBAND's calculation of the Closing Specified Employee Liabilities Amount in the GB Closing Statement is overstated by $98,662, which requires that the Closing Specified Employee Liabilities Amount in the GB Closing Statement be reduced from $1,487,000 to $1,388,338.

- Since Nortel and the EMEA Sellers dispute, in the GB Closing Statement, (i) the line item arrived at by subtracting the Target Working Capital from the Closing Adjusted Net Working Capital, (ii) the Closing Specified Employee Liabilities Amount and (iii) the Closing Deferred Profit Amount, all as described above, Nortel and the EMEA Sellers dispute the Final Purchase Price in the GB Closing Statement, which should be increased by $36,604,745 from $142,904,000 to $179,508,745.

For your reference, the GB Closing Statement, the adjustments set forth herein, and the Closing Statement, as adjusted herein, are set forth below.

64.

**Revisions to CLOSING STATEMENT**

| | GB Closing Statement | Adjustments | Adjusted Closing Statement |
|---|---|---|---|
| **Closing Adjusted Net Working Capital:** | | | |
| Closing Inventory Value, plus | $ 13,747,000 | | 13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 | 220,475 | 21,611,475 |
| Closing Prepaid Expenses Amount, minus | 939,000 | | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 | | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 | | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 | | 26,295,000 |
| Closing Product Exposures Amount | 416,000 | | 416,000 |
| **Closing Adjusted Net Working Capital** | $   8,331,000 | $    220,475 | $   8,551,475 |
| | | | |
| **Final Purchase Price:** | | | |
| Base Purchase Price, plus | $ 282,000,000 | | $ 282,000,000 |
| The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) | $    220,475 | (64,448,525) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | - | | |
| Closing Aggregate Downward Adjustment (if any), minus | - | | |
| Closing Deferred Profit Amount, minus | 70,570,000 | ( 36,285,608) | 34,284,392 |
| Closing Accrued Vacation Amount, minus | 1,730,000 | | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 | (98,662) | 1,388,338 |
| Closing TFR Amount, minus | 402,000 | | 402,000 |
| Closing Excess ARD Employees Amount, minus | - | | |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 | | 238,000 |
| Closing French Excess ARD Employees Amount, minus | - | | |
| Closing Pre-Close Employment Payments Amount | - | | |
| **Final Purchase Price** | $ 142,904,000 | $  36,604,745 | $ 179,508,745 |

65

**Annex B**

**FILED UNDER SEAL**

66 .

—

67

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------X
                                                    :    Chapter 11
In re                                               :
                                                    :    Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,¹                      :
                                                    :    Jointly Administered
                              Debtors.              :
                                                    :    Hearing Date: December 15, 2010 at 10:00 am (ET)
                                                    :    Objections Due: December 1, 2010 at 4:00 pm (ET)
                                                    :
------------------------------------------------------------X
```

## NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

PLEASE TAKE NOTICE that the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, have today filed the attached **Debtors' Motion For Entry Of An Order Enforcing The Order Authorizing The Sale Of Certain Assets Of The Debtors' Carrier Voice Over IP And Application Solutions Business, And Directing The Release Of Certain Escrowed Funds** ("Motion").

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **December 1, 2010 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

At the same time, you must serve such Objection on counsel for the Debtors so as to be received by the Objection Deadline.

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **DECEMBER 15, 2010 AT 10:00 A.M. (EASTERN TIME)** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

68

FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801. ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: November 17, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

                                  James L. Bromley (*admitted pro hac vice*)
                                  Lisa M. Schweitzer (*admitted pro hac vice*)
                                  David H. Herrington (*admitted pro hac vice*)
                                  One Liberty Plaza
                                  New York, New York 10006
                                  Telephone: (212) 225-2000
                                  Facsimile: (212) 225-3999

                                         - and -

                                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                  Derek C. Abbott (No. 3376)
                                  Eric D. Schwartz (No. 3134)
                                  Ann C. Cordo (No. 4817)
                                  Andrew R. Remming (No. 5120)
                                  1201 North Market Street
                                  P.O. Box 1347
                                  Wilmington, Delaware 19801
                                  Telephone: (302) 658-9200
                                  Facsimile: (302) 658-3989

                                  *Counsel for the Debtors and Debtors in Possession*

3907560.1

69.

70

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------X
                                                 :
In re                                            :      Chapter 11
                                                 :
Nortel Networks Inc., et al.,¹                   :      Case No. 09-10138 (KG)
                                                 :
                            Debtors.             :      Jointly Administered
                                                 :
                                                 :      Hearing date: December 15, 2010 at 10:00 am (ET)
                                                 :      Objections due: December 1, 2010 at 4:00 pm (ET)
                                                 :
------------------------------------------------------------X
```

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO FILE UNDER SEAL AND IN REDACTED FORM CERTAIN PORTIONS OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS'CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Sealing Motion") for the

entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections

105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9018 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9018-1(b) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

---

¹       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

District of Delaware (the "Local Rules"), authorizing the Debtors to file under seal and in redacted form certain portions of the Debtors' Motion for the Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 107(b) the Bankruptcy Code.

## BACKGROUND

3.      Contemporaneous with the filing of this Sealing Motion, the Debtors are filing the Debtors' Motion for the Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds (the "Motion"), which seeks entry of an order (i) enforcing the *Order Authorizing And Approving (A) The Sale Of Certain Assets Of The Debtors' Carrier Voice Over IP And Communications Solutions Business Free And Clear Of All Liens, Claims And Encumbrances, And (B) The Assumption And Assignment Of Certain Executory Contracts* (the "Sale Order") [D.I. 2193] against GENBAND Inc. (n/k/a GENBAND US LLC) ("GENBAND"); (ii) directing the release of $4,859,745 plus accumulated interest currently held in escrow by escrow agent, Wells Fargo Bank, National Association ("Wells Fargo"), pursuant to the Escrow Agreement dated as of January 6, 2010, by and among Wells Fargo, Nortel Networks Corporation, NNI, Nortel Networks Limited, Nortel Networks UK Limited (in administration)

2

and GENBAND (as amended from time to time, the "Escrow Agreement"); and (iii) granting

them such other and further relief as the Court deems just and proper.

       4.      The Debtors respectfully refer the Court to the Motion for additional information

concerning the relevant background and procedural history of this matter.

**RELIEF REQUESTED**

       5.      By this Sealing Motion, the Debtors seek an order pursuant to Sections 105(a) and

107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1 authorizing the

Debtors to file under seal and in redacted form certain portions of the Motion, specifically

discrete references to a settlement amount that the relevant parties desire to remain confidential

and discrete references to information regarding the sale of the Debtors' Metro Ethernet

Networks Business.

**FACTS RELEVANT TO THIS MOTION**

       6.      This Sealing Motion relates to Nortel's sale of assets associated with its Carrier

Voice over IP and Communications Solutions Business (the "CVAS Business") to GENBAND.

The Court approved the sale of the CVAS Business to GENBAND pursuant to the Stalking

Horse Agreement dated as of December 22, 2009, by and among the Main Sellers and the EMEA

Sellers (the "Sellers," and together with GENBAND the "Parties,") and GENBAND (the "Sale

Agreement") by order dated March 4, 2010 [D.I. 2193].

**A. The Settlement Agreement Between Verizon and GENBAND**

       7.      NNI and Verizon Services Corp. ("Verizon") are parties to a certain General

Product Purchase Agreement for Softswitch and TDM Products and Services (the "GPPA

Agreement"). Under the GPPA Agreement, Verizon purchased certain switches and software

licenses from NNI. In 2009, Nortel discovered that Verizon had begun using certain software,

3

resident on the switches, for which it had not purchased accompanying licenses. The value of these licenses was approximately $2,000,000.

8.    Prior to the closing of the Sale Agreement, a dispute arose between Nortel and Verizon concerning payment to Nortel of these licensing fees (the "Verizon Receivables"). Before this dispute was resolved, the GPPA Agreement was assigned to GENBAND, pursuant to the Sale Agreement.

9.    Following the Closing Date, the Sellers learned that Verizon and GENBAND executed a settlement agreement (the "Settlement Agreement") with respect to the Verizon Receivables.

10.    The Sellers understand that the Settlement Agreement contains a confidentiality clause providing that the terms of the Settlement Agreement remain confidential. Accordingly, Nortel seeks to respect the confidential nature of the Settlement Agreement, and specifically the settlement amount, which is referenced in the Motion.

**B. The Asset Sale Agreement With Ciena**

11.    The Sellers and Ciena Corporation ("Ciena") are parties to a certain sale agreement, the Asset Sale Agreement by and among NNC, NNL, NNC, and the Other Entities Identified Herein as Sellers and Ciena (the "Ciena Sale Agreement") for the sale of the Sellers' Metro Ethernet Networks Business ("MEN") to Ciena.

12.    The Ciena Sale Agreement contained substantially identical language defining the deferred revenue amount that was used to calculate the purchase price adjustment. In the MEN sale agreement, the term was referred to as "Closing Net Deferred Revenues," and the definition of the term was substantively identical to the definition of "Deferred Profit Amount" in the

4

74.

CVAS Sale Agreement. The parties exchanged financial information relevant to calculating the "Closing Net Deferred Revenues" amount as detailed in the Motion.

13.       The Ciena Sale Agreement contains a confidentiality clause providing that certain terms of the Ciena transaction remain confidential. Accordingly, the Sellers seek to respect the confidential nature of the exchange of financial information referenced in the Motion.

14.       Therefore, by this Sealing Motion, the Debtors respectfully request that the Court permit discrete references in the Motion to the settlement amount and the closing of the MEN transaction (the "Redacted Material") to be redacted in the public filing, Annex B to Exhibit C, which contains references to the settlement amount to be omitted from the public filing in its entirety (the "Sealed Exhibit"), and that the unredacted version of the Motion be filed under seal.

### BASIS FOR RELIEF

15.       The relief requested by the Debtors is authorized under the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information . . . .

11 U.S.C. § 107(b).

16.       Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

75 .

Fed. R. Bankr. P. 9018.

      17.    Local Rule 9018-1 requires any party who seeks to file documents under seal to file a motion to that effect. Del. Bankr. L.R. 9018-1(b).

      18.    A movant is not required to demonstrate "good cause" to file under seal. Rather, if the material sought to be filed under seal falls within one of the categories identified in Section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting party and has no discretion to deny the application." In re Orion Pictures Corp., 21 F.3d 24, 27 (2d Cir. 1994). Bankruptcy Rule 9018 is intended to "protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury." In re Global Crossing Ltd., 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003).

      19.    The settlement amount, contained in the confidential Settlement Agreement and certain details relating to the closing of the MEN sale, are sensitive commercial information. The Settlement Agreement contains sensitive business information its parties wish not to disclose.  Furthermore, the redacted portions of the Motion contain confidential financial information relating to the MEN Business now operated by Ciena.  This information should therefore be redacted and filed under seal in accordance with Section 107(b) of the Bankruptcy Code.

## NOTICE

      20.    Notice of the Sealing Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to GENBAND; (v) Wells Fargo Bank, National Association, as escrow agent and (vi) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

76.

## NO PRIOR REQUEST

21.    No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Sealing

Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and

(iii) grant such other and further relief as it deems just and proper.

Dated: November 17, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

7

77

78

## <u>EXHIBIT A</u>

**Proposed Form of Order**

79.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
                                                            :
*In re*                                                     :   Chapter 11
                                                            :
Nortel Networks Inc., *et al.*,[1]                          :   Case No. 09-10138 (KG)
                                                            :
                                   Debtors.                 :   Jointly Administered
                                                            :
                                                            :   RE: D.I. _____
                                                            :
------------------------------------------------------------X

## ORDER AUTHORIZING THE DEBTORS TO FILE UNDER SEAL AND IN REDACTED FORM CERTAIN PORTIONS OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS'CARRIER VOICE OVER IP AND APPLICATION SOLUTIONSBUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

Upon the motion dated November 17, 2010 (the "Sealing Motion"),[2] of Nortel Networks

Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the

"Debtors"), for entry of an order, as more fully described in the Sealing Motion, pursuant to

sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule

9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9018-

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sealing Motion.

80.

1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules"), authorizing the Debtors to file under seal

and in redacted form certain portions of the Debtors' Motion for the Entry of an Order Enforcing

the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and

Application Solutions Business, and Directing the Release of Certain Escrowed Funds; and

adequate notice of the Sealing Motion having been given as set forth in the Sealing Motion, and

it appearing that no other or further notice is necessary; and the Court having jurisdiction to

consider the Sealing Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and

1334; and the Court having determined that consideration of the Sealing Motion is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and

factual bases set forth in the Sealing Motion establish just cause for the relief requested in the

Sealing Motion, and that such relief is in the best interests of the Debtors, their estates, their

creditors and the parties in interest; and upon the record in these proceedings; and after due

deliberation;

   IT IS HEREBY ORDERED THAT:

   1.    The Sealing Motion is GRANTED.

   2.    The Redacted Material contained in the Motion be redacted in the public filing.

   3.    The Sealed Exhibit be omitted from the public filing in its entirety.

   4.    The unredacted version of the Motion delivered to the Court by the Debtors shall

be kept segregated and under seal by the Clerk of the Court and shall not be made publicly

available pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018

and Local Rule 9018-1(b). The Debtors shall provide the unredacted Settlement Agreement to

the Clerk's Office of the United States Bankruptcy Court for the District of Delaware in a

2

81

prominently marked envelope with a coversheet attached containing: (i) the caption, (ii) the

docket number of the Motion, (iii) the docket number of this Order, and (iv) the legend

"DOCUMENTS TO BE KEPT UNDER SEAL" in bold print pursuant to local Rules 9018-1(b).

     5.     Notwithstanding any provision of the Federal Rules of Bankruptcy Procedure to

the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its

entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or

realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and

without further delay, take any action and perform any act authorized under this Order.

     6.     The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.


Dated: _____, 2010
       Wilmington, Delaware

                                     _____
                                       THE HONORABLE KEVIN GROSS
                                       UNITED STATES BANKRUPTCY JUDGE

82.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------X
                                   :

*In re*                              :

Nortel Networks Inc., *et al.*,[1]      :

                    Debtors.       :

                                   :

------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing Date: December 15, 2010 at 10:00 am (ET)**
**Objections Due: December 1, 2010 at 4:00 pm (ET)**

## NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO FILE UNDER SEAL AND IN REDACTED FORM CERTAIN PORTIONS OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

        PLEASE TAKE NOTICE that the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, have today filed the attached **Debtors' Motion For Entry Of An Order Authorizing The Debtors To File Under Seal And In Redacted Form Certain Portions Of The Debtors' Motion For Entry Of An Order Enforcing The Order Authorizing The Sale Of Certain Assets Of The Debtors' Carrier Voice Over IP And Application Solutions Business, And Directing The Release Of Certain Escrowed Funds** ("Motion").

        PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **December 1, 2010 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

        At the same time, you must serve such Objection on counsel for the Debtors so as to be received by the Objection Deadline.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

83

      PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **DECEMBER 15, 2010 AT 10:00 A.M. (EASTERN TIME)** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801. ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

      IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: November 17, 2010
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
David H. Herrington (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

3907564.1

# TAB B

84.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NORTEL NETWORKS INC., *et al.* | ) Case No. 09-10138 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Re: Docket No. 4345** |
| | ) |
| | ) **Objection Date: December 1, 2010 at 4:00 p.m.** |
| | ) **Hearing Date: December 15, 2010 at 10:00 a.m.** |

## OBJECTION OF GENBAND INC. TO THE DEBTORS' MOTION
## FOR ENTRY OF AN ORDER ENFORCING THE ORDER
## AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS'
## CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS,
## AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

GENBAND US LLC (formerly GENBAND Inc., ("GENBAND")), by and through its

undersigned counsel, hereby files this Objection to Nortel Networks Inc.'s (collectively, with

Nortel Networks Corporation and Nortel Networks Limited, "Nortel," and, together with its

affiliate filing entities, the "Debtors") *Motion for Entry of an Order Enforcing the Order*

*Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application*

*Solutions Business, and Directing the Release of Certain Escrowed Funds* [D.I. 4345] (the

"Debtors' Motion"). In support of the Objection, GENBAND respectfully submits as follows.

This is Exhibit ....*B*.......... referred to in the
affidavit of ...*Kari Legree*..............
sworn before me, this ...............*7th*....
day of ...*December*................ 20*10*.

....................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

Robin Anne Cardillo, a Commissioner, etc.,
City of Toronto, for Ogilvy Renault LLP / S.E.N.C.R.L., s.r.l.,
Barristers and Solicitors,
Expires March 24, 2011.

85.

## PRELIMINARY STATEMENT

1.      The United States Supreme Court has ruled that "as a matter of federal law, **any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration**."[1]  Nortel asks the Court to do precisely the opposite.

2.      The Debtors' Motion represents Nortel's attempt to avoid the final and binding arbitration process it agreed to when it entered into the Asset Sale Agreement, dated as of December 22, 2009, by and among Nortel, GENBAND and the entities identified as sellers therein (the "ASA"),[2] and approved by this Court's *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts* (the "Sale Order") [D.I. 2632].

3.      A disagreement has arisen between GENBAND and Nortel regarding the Purchase Price Adjustment under the ASA.  Contrary to Nortel's assertions, GENBAND disagrees with Nortel on both its interpretation of the relevant terms and the calculations that Nortel performs under that interpretation.

4.      Section 2.2.3.1(c) of the ASA (the "Mandatory Arbitration Provision"), which was negotiated for and contemplated as part of consideration under the ASA, and which this Court approved in the Sale Order, states that "*any disagreement*" relating to the Purchase Price

---

[1]      *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (emphasis added).

[2]      All terms not otherwise defined herein shall have the meaning ascribed to them under the ASA. The ASA was filed as Exhibit B to GENBAND's *Motion for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration* ("Motion for Relief from Stay and to Compel Arbitration") [D.I. 4347].

2

86 .

Adjustment shall be submitted to arbitration.  The purpose of that provision was to ensure a

prompt and final resolution of any such disagreements, rather than protracted litigation with

endless discovery and rights of appeal.  Indeed, the Mandatory Arbitration Provision expressly

obligates the parties to use their commercially reasonable efforts to cause the arbitration to be

completed "as promptly as practicable" and "in no event later than thirty (30) days after" the

arbitrator is appointed.

     5.     Incredibly, Nortel argues that this Court has the power under the ASA to resolve

these issues because Section 10.6(b) states that any proceeding arising out of the agreement

shall be brought only in the "U.S. Bankruptcy Court" or the "Canadian Court."  (Debtors'

Motion, at ¶ 3.)  But Nortel omits Section 10.6(e), which provides that "Section 10.6(b) **shall

not limit the jurisdiction**" of the arbitrator appointed pursuant to Section 2.2.3.1(c), and that

actions may be brought in this Court "**for purposes of enforcing the jurisdiction**" of the

arbitrator.  Read in its entirety, Section 10.6 thus provides exactly the *opposite* of what Nortel

suggests.

     6.     Nortel also states that "the parties and their accountants <u>agree</u> on the figures that

would determine the Deferred Profit Amount" if Nortel's interpretation of "Deferred Profit

Amount" were accepted.  Nortel's assertion is both wrong and irrelevant.  First, there is nothing

in the ASA that excludes disagreements about the meaning of "Deferred Profit Amount" from

the scope of "any disagreement" concerning the Closing Statement.  If these sophisticated

parties, both represented by able counsel, had intended a narrow and restricted scope for the

arbitration they would have written it very differently.  Second, the parties *absolutely do*

disagree about "the figures that would determine the Deferred Profit Amount," regardless of

how "Deferred Profit Amount" is defined.  It is therefore abundantly clear that there will need

87

to be an arbitration at some point; the only issue is whether that will take place now, in a unified

process, or after a protracted, collateral federal litigation as Nortel requests. The Federal

Arbitration Act, and the plain language of the ASA, prohibit any such waste of time and

resources.

7.       Despite the express contractual obligation to participate in an efficient, quick,

final, and binding arbitration process, Nortel refuses to do so. Instead, Nortel would have this

Court consider and determine the outcome of a dispute that Nortel explicitly agreed would be

arbitrated. To do so, Nortel argues that the parties' disagreement regarding the Purchase Price

Adjustment disagreement is somehow not within the scope of *"any disagreement"* under the

Mandatory Arbitration Provision. Nortel's argument is fundamentally at odds with the

governing law and the strong federal policy requiring rigorous enforcement and liberal

interpretation of arbitration clauses. The Court should deny Nortel's motion and instead order

Nortel to submit the disagreement to arbitration.[3]

8.       Finally, should the Court determine that the substance of the underlying

disagreement shall be heard before the Court, rather than arbitration, GENBAND will need

time to conduct discovery, prepare experts, and fully brief the issues. GENBAND vigorously

disputes Nortel's assertions, but it should not be forced to litigate those issues in this Court until

the threshold question has been resolved.

---

[3]       Nortel also raises disputes regarding Canadian transfer taxes and a settlement agreement reached
with Verizon Services Corp. ("Verizon"), but those issues are peripheral to the real dispute at hand:
whether the dispute regarding the Purchase Price Adjustment falls within the scope of "any disagreement"
with regards to the Purchase Price Adjustment that must be submitted to arbitration.

**JURISDICTION**

9.     This Court has jurisdiction to decide whether the parties' disagreement should be submitted to arbitration under 9 U.S.C. § 1 *et seq*. pursuant to 28 U.S.C. §§ 157 and 1334.  The Court does not have jurisdiction to hear the dispute regarding the Purchase Price Adjustment due to the Mandatory Arbitration Provision.  Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

**BACKGROUND**

10.     On December 22, 2009, Nortel and GENBAND entered into the ASA.

11.     The ASA provides for a Purchase Price that will be adjusted after the Closing Date based on the parties' valuation of assets and liabilities included in the agreement. Specifically, Section 2.2.3.1 of the ASA provides a procedure after the Closing Date through which: (1) GENBAND provides Nortel with its calculation of the Final Purchase Price; (2) Nortel, if it disagrees with GENBAND's calculation, provides notice to GENBAND that it disagrees; (3) the parties negotiate for 15 days to resolve the disagreements; and (4) any disagreements the parties are unable to resolve within that period are then submitted to arbitration.

12.     After the Closing Date, accountants for GENBAND and Nortel corresponded frequently regarding the calculation of the Purchase Price under the ASA.  This correspondence

revealed that the parties had disagreements both as to the proper approach to calculating the

Purchase Price Adjustment as well as the performance of the actual calculations.[4]

13.    On September 15, 2010, pursuant to Section 2.2.3.1(a) of the ASA, GENBAND

timely delivered to Nortel a letter and written statement (the "Closing Statement"), attached

hereto as Exhibit E, which declared GENBAND's position regarding the Purchase Price

Adjustment.

14.    On October 13, 2010, pursuant to Section 2.2.3.1(b) of the ASA, Nortel delivered

to GENBAND a letter (the "October 13 Letter") with attached a written statement (the

"Disagreement Notice"), both attached hereto as Exhibit F, which provided Nortel's position

regarding the Purchase Price Adjustment, and which detailed the disagreements that Nortel

raised with GENBAND's Closing Statement.

15.    Section 2.2.3.1(c) of the ASA provides that if the parties "are unable to resolve

*any disagreement* as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of

a Disagreement Notice by [Nortel], the Independent Auditor shall serve as arbitrator . . . to

resolve such disagreement." The "Independent Auditor" is defined in the ASA as "KPMG LLP

or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm

of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they

cannot agree on any such firm within 10 Business Days of the request of either Primary Party, by

---

[4]    Although many of the communications between GENBAND and Nortel employees were oral, letters sent by GENBAND to Nortel during this time period indicate that the disagreements were over both the proper accounting approach and its application. This is demonstrated in a letter sent on August 6, 2010 (the "August 6 Letter"), attached hereto as Exhibit A, a letter sent on August 18, 2010 (the "August 18 Letter"), attached hereto as Exhibit B, a letter sent on August 20, 2010 (the "August 20 Letter"), attached hereto as Exhibit C, and a letter sent on August 27, 2010 (the "August 27 Letter"), attached hereto as Exhibit D.

90 .

KPMG LLP at the request of the first Primary Party to move for the appointment of such Independent Auditor."

16.     Section 2.2.3.1(c) also provides that the parties must use their "commercially reasonable efforts to cause the Accounting Arbitrator to deliver . . . as promptly as practicable (and in no event later than thirty (30) days after his or her appointment), a written report setting forth the resolution of any such disagreement." The obvious purpose of that provision is to ensure a speedy, efficient, and final process to resolve any disagreements over the Purchase Price Adjustment.

17.     In the October 13 Letter, Nortel indicated that it might not honor the Mandatory Arbitration Provision. Specifically, the October 13 Letter stated that Nortel "expressly reserves our right to pursue all available remedies to resolve any disputes over the Deferred Profit Amount, whether by recourse to judicial relief or otherwise."

18.     In a letter dated October 25, 2010 (the "October 25 Letter"), attached hereto as Exhibit G, GENBAND responded to Nortel's October 13 Letter and stated that Nortel's refusal to arbitrate the disagreement regarding the Purchase Price Adjustment would constitute a breach of the ASA because arbitration is the exclusive process for the resolution of *any disagreement* regarding the Purchase Price Adjustment.

19.     On October 28, 2010, the fifteen-day period for resolving disputes regarding the Purchase Price Adjustment ended, without the parties resolving all of their disagreements. Nortel thus became contractually bound to submit the remaining disagreements to arbitration.

7

*91.*

20.    Nortel did not do so, and did not respond to GENBAND's October 25 Letter.  In a letter to Nortel dated November 9, 2010 (the "November 9 Letter"), attached hereto as Exhibit H, GENBAND reiterated Nortel's contractual obligation to commence arbitration with regard to the disagreement and noted that Nortel had neither provided an explanation why the parties' disagreement was not "any disagreement" subject to the Mandatory Arbitration Provision nor pointed to any provision in the ASA that justified its position.

21.    In a letter dated November 10, 2010 (the "November 10 Letter"), attached hereto as Exhibit I, Nortel finally responded, refusing to submit to arbitration as required by the ASA and thus repudiating its contractual obligations.

22.    Nortel, in Debtors' Motion, now requests that this Court ignore the Mandatory Arbitration Provision and instead resolve for itself the parties' disagreement regarding the Purchase Price Adjustment.  GENBAND respectfully submits that this Court should decline the invitation and compel Nortel to arbitrate as it agreed to in the ASA.

## **RELIEF REQUESTED**

23.    By this Objection, and its separately filed Motion for Relief from Stay and to Compel Arbitration [D.I. 4347], GENBAND requests that the Court (i) deny the relief sought in the Debtors' Motion, (ii) enter an order lifting the automatic stay pursuant to Sections 105 and 362(d) of the Bankruptcy Code to allow arbitration to commence, and (iii) compel the commencement of arbitration pursuant to Section 2.2.3.1(c) of the ASA.

## BASIS FOR RELIEF

I.     THE PARTIES' DISAGREEMENT SHOULD BE SUBMITTED TO ARBITRATION

24.    "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Shubert v. Wellspring Media, Inc.*, 335 B.R. 556, 562 (Bankr. D. Del. 2005) (quoting *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24–25). "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quoting *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (citation omitted)).

25.    When presented with a motion to compel arbitration, courts in this Circuit have considered the strong federal policy that favors arbitration. *See In re Mintze*, 434 F.3d 222, 229 (3d Cir. 2006) ("The FAA has established a strong policy in favor of arbitration . . . . To overcome enforcement of arbitration, a party must establish congressional intent to create an exception to the FAA's mandate with respect to the party's statutory claims."). "It is well established that arbitration is a favored mechanism for resolving disputes, especially where the parties previously agreed to utilize arbitration." *In the Matter of TEU Holdings, Inc.*, 287 B.R. 26, 36 (Bankr. D. Del. 2002); *see also In re Gurga, d/b/a Source Commcs.*, 176 B.R. 196, 200 (B.A.P. 9th Cir. 1994) (citing *Graham Oil Co. v. ARCO Products, Inc.*, 43 F.3d 1244, 1247 (9th Cir. 1994), for the proposition that "arbitration is a form of dispute resolution that finds favor in the courts").

*93*

26.     The United States Supreme Court has held that the Federal Arbitration Act, 9

U.S.C. § 1 *et seq.*, establishes a federal policy favoring arbitration that requires courts to

"rigorously enforce agreements to arbitrate." *Shearson/Am. Exp. v. McMahon*, 482 U.S. 220,

226 (1987) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *see also Hays*

*& Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir. 1989)

(citations omitted); *Dickenson v. Heinold Securities, Inc.*, 661 F.2d 638, 643 (7th Cir. 1981)

(discussing strong federal policy favoring enforcement of arbitration agreements).  As such,

when a dispute is subject to the terms of an arbitration agreement, the FAA requires a court to

stay its proceedings and compel arbitration, except in limited circumstances. *McMahon*, 482

U.S. at 226.

27.     The Third Circuit has similarly held that "[w]here an otherwise applicable

arbitration clause exits, a bankruptcy court lacks the authority and discretion to deny its

enforcement, *unless* the party opposing arbitration can establish congressional intent . . . to

preclude waiver of judicial remedies for the statutory rights at issue." *In re Mintze*, 434 F.3d at

231 (emphasis in original); *see also Shubert*, 335 B.R. at 567 ("An agreement to arbitrate before

a specific tribunal is, in effect, a specialized kind of forum selection clause.  Moreover, based on

the recent Supreme Court arbitration cases we have previously reviewed, the national policy

favoring enforcement of agreements to arbitrate is at least as strong or stronger than that favoring

enforcement of forum selection agreements.") (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S.

506, 519 (1974) (citation omitted)).  This Court, applying this precedent, has determined it lacks

the authority not to send disputes "arising from [a] contract and the alleged breach thereof" to

arbitration. *See Jalbert v. Pac. Employers Ins. Co. (In re Olympus Healthcare Group, Inc.)*, 352

B.R. 603, 610–12 (Bankr. D. Del. 2006) (citing *In re Mintze*, 434 F.3d at 229–31).  The mere

10

94.

fact that the ultimate decision might have an effect on the rights of other creditors to the estate is

not sufficient to create an inherent conflict between the Bankruptcy Code's underlying purposes

and arbitration. *In re Mintze*, 434 F.3d at 229.

28.    In *Shubert v. Wellspring Media, Inc.*, this Court sent to arbitration a disagreement

very similar to the one at hand. 335 B.R. at 569. In *Shubert*, the bankruptcy Trustee, like Nortel,

sought to resolve a dispute regarding a working capital calculation in the Bankruptcy Court

rather than through the agreed-upon arbitration process. *Id.* at 566–67. The disagreement

concerned the calculation of working capital and an adjustment to purchase price, and the

disagreement was subject to an arbitration clause under the parties' contract. *Id.* at 563 ("Under

the terms of the agreement, the Court cannot compel payment of the purchase price without a

determination of what Wellspring owes on the Note."). The Court rejected the Trustee's request,

because the "Agreement . . . provides for an agreed-upon mechanism to resolve this dispute." *Id.*

The Court stated that where the Trustee sought to avoid "the exact procedure contemplated by

the parties to the Agreement," that party "cannot now use this alternate forum as a reason to

circumvent the agreed-upon dispute resolution procedures." *Id.* at 566. The parties to the

agreement, "in agreeing to the arbitration clause, determined that arbitration, and not this Court,

would be the avenue through which this issue should be addressed."[5] *Id.* at 566–67.

---

[5]    This Court also recognized the "strong federal policy in favor of arbitration" in *Alderwoods Group, Inc. v. Charter Funerals, Inc.*, 344 B.R. 727, 731 (Bankr. D. Del. 2006). In *Alderwoods Group*, there was an arbitration clause in an asset sale agreement that had been approved by the Bankruptcy Court pursuant to a sale order. 344 B.R. at 728. The arbitration clause at issue was permissive, inasmuch as the Bankruptcy Court had discretion under the contract at issue as to whether to send the dispute to arbitration or to resolve the dispute itself. *Id.* at 729. Even though arbitration was not required under that contract, this Court nonetheless determined that arbitration was appropriate due to the "desire to enforce freely entered into agreements" and "the speed and efficiencies attendant to arbitration proceedings." *Id.* at 731 (citing *Dean Witter Reynolds*, 470 U.S. at 220–21). The Court explained that "arbitration will further the goals of the Bankruptcy Code by providing the parties with a quick and efficient resolution." *Id.* (quoting *In re NorthWestern Corp.*, 2005 Bankr. LEXIS 795, at *8 (Bankr. D. Del. May 5, 2005)).

95

29.    The same conclusion applies here.  Resolution of the parties' disagreement by the Bankruptcy Court—rather than by an arbitrator—would deprive GENBAND of its bargained-for and paid-for dispute resolution procedure.  The arbitration process, which is efficient, fast, and binding, is the bargained-for expectation of GENBAND.  In comparison, resolution by the Bankruptcy Court could very well lead to protracted litigation.  *See, e.g., Johnson v. Pfizer, Inc.,* 2004 U.S. Dist. LEXIS 25217, 2004 WL 2898076, *3 n.2 (D. Kan. 2004) ("One of the reasons arbitration is favored is the presumption that arbitration . . . will resolve disputes more quickly and at less expense to the parties than litigation in court.").  Nortel's approach would also deny GENBAND the finality it bargained for, because even the Bankruptcy Court's findings of fact regarding the Purchase Price Adjustment would be reviewable by a district court on appeal for clear error.  *See* FED. R. BANKR. P. 8013; *see also, e.g., Sovereign Bank v. Schwab,* 414 F.3d 450, 452, n.3 (3d Cir. 2005); *Schwab v. PennSummit Tubular, LLC (In re Old Summit Mfg., LLC),* 523 F.3d 134, 137 (3d Cir. 2008).

30.    It bears noting, finally, that the time to commence arbitration under the ASA was October 28, 2010, fifteen days after Nortel provided its Disagreement Notice.  If Nortel had honored the Mandatory Arbitration Provision, the Purchase Price Adjustment could already be concluded as of this date.  Nortel's delay has precluded this orderly process and denied GENBAND the benefit of its bargain.

## II.    NORTEL'S ARGUMENT THAT THE PURCHASE PRICE ADJUSTMENT DISAGREEMENT IS NOT "ANY DISAGREEMENT" IS MERITLESS

31.    Nortel would have this Court determine the substance of the underlying dispute itself, rather than simply determine whether Nortel agreed to arbitrate the dispute under the Mandatory Arbitration Provision.  That puts the cart before the horse, as it requires the Court to

96.

pre-judge the substance of the accounting disagreements and assumes the outcome Nortel
desires.

32.     In asking this Court to assume the role of the arbitrator, Nortel points to specific
words in the contract defining the term "Deferred Profit Amount." Nortel suggest that these are
contractual interpretation issues rather than accounting issues, and that this Court is a better
forum to resolve them. Nortel's argument fails for at least two reasons. First, if Nortel wanted
to have some issues decided by this Court and some other issues decided by the arbitrator, it
should have said so in the ASA rather than using the broad phrase "any disagreement." That is
not what GENBAND agreed to. Second, Nortel conveniently omits that the very definition it
asks this Court to interpret concludes with the phrase "the Deferred Profit Amount will include
advance billings and deferred revenue consistent with Nortel Accounting Principles," which
confirms that it is invariably intertwined with accounting issues.

33.     Nortel admits that under Section 2.2.3.1(c) of the ASA, the parties must submit to
arbitration "any disagreement as contemplated by Section 2.2.3.1(b)" of the ASA. Debtors'
Motion, at ¶ 51. Nortel also correctly points out that this Court retains jurisdiction to interpret
the terms of the ASA, pursuant to Section 10.6(b) of the ASA—but Nortel again omits a key part
of that section stating that "Section 10.6(b) shall not limit the jurisdiction of . . . the Accounting
Arbitrator set forth in Section 2.2.3.1(c)."

34.     The terms of the ASA are thus abundantly clear. Nortel agreed to the Mandatory
Arbitration Provision and this Court approved it in the Sale Order. Rather than submit to this
contractually required and Court-approved process, however, Nortel argues that the parties'
disagreement regarding the Purchase Price Adjustment is somehow not within the scope of "any

13

97

disagreement" with regard to the Purchase Price Adjustment. Nortel's myopic interpretation cannot be reconciled with the governing precedent requiring liberal construction of arbitration clauses and providing that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Shubert*, 335 B.R. at 562.

35.     Nortel argues that only disagreements that are "properly" raised under the ASA Purchase Price Adjustment procedures are subject to arbitration, and the "present dispute has not been properly raised." Debtors' Motion, at ¶ 51. That is sophistry. Nortel's assertion that the claim was not "properly" raised is based entirely on its <u>own</u> view that its interpretation of the ASA is correct. Specifically, Nortel argues that because GENBAND and Nortel have different interpretations of the term "Deferred Profit Amount," an operative accounting concept crucial to the Purchase Price Adjustment, Nortel argues that GENBAND "disregarded its obligation to prepare the Closing Statement in accordance with the terms of the [ASA] . . . ." *Id.*

36.     While artfully phrased, Nortel's argument is really just a different way of asking the Court to resolve the underlying dispute itself. When Nortel says that the disagreement was not "properly" raised, all it means is that Nortel disagrees with GENBAND's interpretation of the contract.[6] If that were a sufficient basis to avoid an arbitration clause, such clauses would have no meaning at all. It cannot be the case that the existence of a disagreement about a term in the contract *precludes* this Court from enforcing the agreed procedure for resolving such a disagreement.

---

[6]     Similarly, when Nortel states that it "did not agree to delegate to the Accounting Arbitrator the power to rewrite the terms of the [ASA]," Debtors' Motion, at ¶ 51, all that really means is "we disagree with GENBAND's interpretation." But the existence of a dispute is not a valid basis on which to avoid the agreed-upon mechanism for resolving the dispute.

*98*

37.     Importantly, arbitration is inevitable under *either* Nortel's or GENBAND's interpretation of "Deferred Profit Amount." Nortel's assertion that "[t]he difference between GENBAND's and the Sellers' respective calculations of Deferred Profit Amount is not the result of any accounting disagreement or mathematical discrepancy" is flat-out wrong. There exist *both* contractual interpretation disagreements and accounting disagreements between the parties, and both constitute "any disagreement" subject to arbitration pursuant to the Mandatory Arbitration Provision. Even if the Court were to accept Nortel's argument and determine that Nortel's interpretation of Deferred Profit Amount is correct, there would still need to be an arbitration regarding the application of Nortel's interpretation. That sort of two-stage process would be antithetical to the fast and efficient process mandated in the parties' agreement.

38.     GENBAND has not addressed the merits of the underlying disagreement regarding the Purchase Price Adjustment because that disagreement belongs in arbitration and because the question of whether the disagreement should be sent to arbitration is a threshold issue that should be determined first. If, however, the Court wishes to resolve the underlying disagreement, GENBAND will need discovery, the testimony of experts, and an opportunity to brief the issue in full. In that circumstance, GENBAND would request adjournment of the scheduled hearing for this motion to allow time for this process.

39.     As discussed above, every step in the dispute resolution procedure laid out in Section 2.2.3.1 of the ASA has been followed, save for the final step: submitting to arbitration. Nortel agrees that the arbitrator would resolve "any disagreement" with regards to accounting

15

approach and calculations.[7]  The ASA does not provide for any separate process for other types

of disagreements; all must be arbitrated.  This Court should compel Nortel to honor that

agreement.

### III.  NORTEL'S OTHER ARGUMENTS, PERIPHERAL TO THE ARBITRATION QUESTION, SHOULD BE REJECTED

40.    In an attempt to avoid mandatory arbitration in connection with the Purchase

Price Adjustment, Nortel has included in the Debtors' Motion a number of peripheral, unrelated

issues.  Nortel implies that because this Court may properly hear these peripheral disputes

between GENBAND and Nortel, it may also hear and decide the dispute with regard to the

Purchase Price Adjustment, notwithstanding the fact that the Mandatory Arbitration Provision

requires that the parties bring such dispute before an arbitrator.  However, Nortel's assertion is

simply incorrect.  GENBAND does not seek to avoid the jurisdiction of this Court with respect

to these unrelated issues.  GENBAND simply requests that this Court honor the terms of the

ASA, including the Mandatory Arbitration Provision.

### A.    Canadian Transfer Tax

41.    Nortel argues, in what it admits is a smaller and unrelated dispute, that

GENBAND owes Nortel certain Canadian transfer taxes.[8]

42.    Contrary to Nortel's assertion, GENBAND does not seek to avoid the jurisdiction

of either this Court or the Ontario Superior Court of Justice (the "Canadian Court") on this issue.

---

[7]    Nortel points to a negative deferred cost-of-sales balance belonging to Nortel Networks (Luxembourg) S.A. that should not have been included in GENBAND's calculation of Deferred Profit Amount, Debtors' Motion, at ¶¶ 25, 43, 49, which is exactly the type of issue that should be submitted to the arbitrator pursuant to the Purchase Price Adjustment dispute resolution procedures under the ASA.

[8]    Nortel states that it invoiced GENBAND in the amount of $1,000,390 on September 28, 2010. Debtors' Motion, at ¶¶ 35–37, 57–58.

*100*

Rather, GENBAND submits that this issue should be properly argued and heard before the appropriate court at a later date. The resolution of the Canadian transfer tax issue depends on a final determination of the Purchase Price under the ASA. GENBAND's ability to calculate the Purchase Price for determining the proper payment to Nortel with regard to Canadian transfer taxes has been hindered by GENBAND's lack of access to Nortel's books and records.[9] Although such payment for Canadian transfer taxes is owed to Nortel, the amount of such payment is unclear at this time due to the fact that the issue was raised only recently by Nortel and because there has been delay in access to contractually owed books and records. GENBAND is committed to investigate the issue internally and, with GENBAND's Canadian counsel, will work to resolve the issue with Nortel and will remit to Nortel proper payment for Canadian transfer taxes. Until the amount of such remittance may be verified, however, GENBAND cannot do so. GENBAND respectfully suggests that the Court should order Nortel to provide the necessary documents and order the parties to wok in good faith toward an agreed resolution of this issue.

### B.    Verizon

43.    Nortel argues, in another smaller and unrelated dispute, that GENBAND has failed to comply with the ASA by refusing to pay to Nortel consideration paid by Verizon to GENBAND under a settlement agreement pertaining to a contract assigned by Nortel to GENBAND.

---

[9]    Nortel has consistently dragged its feet in allowing GENBAND access to books and records that GENBAND is entitled to under the ASA and that are necessary to investigate fair value and to conduct business. GENBAND sought cooperation from Nortel regarding access to its books and records, but only after multiple letters threatening to submit the issue to this Court has Nortel provided access to books and records that are necessary to determine the amount of the Canadian transfer tax. The exhaustive process to extract needed information from Nortel is detailed in the August 6 Letter, the August 18 Letter, the August 20 Letter, and the August 27 Letter. *See* Exhibits A–D.

17

44.    GENBAND does not seek to avoid the jurisdiction of this Court in connection with this dispute, either.  Rather, GENBAND submits that this issue should be properly argued and heard before this Court at a later date.  To be sure, Nortel notified GENBAND of this issue on August 13, 2010, and GENBAND responded on September 3, 2010, with a request for additional information regarding Nortel's request.[10]  GENBAND notified Nortel that pursuant to the terms of the ASA, GENBAND was not prepared to remit to Nortel any payment made pursuant to an assigned contract based on agreement made with Verizon subsequent to the Closing Date.  GENBAND believes that any such agreement does not pertain to Nortel, as the underlying contract had been assigned pursuant to the ASA.  Nortel did not provide any additional argument or information subsequent to its request, and instead included this issue in Debtors' Motion before this Court.  GENBAND has still not been provided clarification regarding Nortel's argument as to why it is entitled to funds provided to GENBAND by Verizon pursuant to assigned contracts after the Closing Date.

45.    Without further explanation from Nortel, GENBAND cannot characterize any payment by Verizon as an Excluded Asset due to Nortel under the ASA.  Due to all of the above, GENBAND respectfully submits that this issue is not ripe for consideration by this Court, and should be considered further and resolved by the parties.

C.    **Escrow**

46.    Nortel argues that "[b]ecause the correctly calculated Purchase Price Adjustment Escrow Amount exceeds the maximum purchase price adjustment . . . there is no basis for the continued reserve of those excess amounts."  Debtors' Motion, at ¶ 52.  This disagreement,

---

[10]    GENBAND, in its September 3, 2010 letter, attached hereto as _Exhibit J_, stated that Nortel's assertions regarding a settlement agreement with Verizon was not clear.  GENBAND has not received further clarification from Nortel on this point.

18

102

however, as argued above, should be submitted to arbitration.  As such, release of the Escrow Amount would be improper pending the arbitration.

## CONCLUSION

WHEREFORE, GENBAND respectfully requests that the Court (a) deny the relief sought in the Debtors' Motion, and (b) enter an order (i) lifting the automatic stay pursuant to Sections 105 and 362(d) of the Bankruptcy Code to allow arbitration to commence, (ii) compelling the commencement of arbitration pursuant to Section 2.2.3.1(c) of the ASA, and (iii) granting such further and other relief as the Court deems just.

Dated:  December 1, 2010
       Wilmington, Delaware

Respectfully submitted,

*/s/ Michael R. Lastowski*
Michael R. Lastowski (No. 3892)
Sommer L. Ross (No. 4598)
DUANE MORRIS, LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail:    mlastowski@duanemorris.com
          slross@duanemorris.com

and

Blair Connelly (Admitted *Pro Hac Vice*)
Eli J. Kay-Oliphant (Admitted *Pro Hac Vice*)
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1200
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
E-mail:  blair.connelly@lw.com
       eli.kay-oliphant@lw.com

*Counsel for GENBAND Inc.*

19

103

104.

**<u>EXHIBIT A</u>**



August 6, 2010

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan, Secretary


Dear Ladies and Gentlemen,

As you may know, in recent weeks we have made several oral and e-mail requests of you for books and records of the CVAS business. As of the time of our delivery of this letter, we have not yet been provided these materials in full.

Pursuant to Section 2.1.1(g) of the Asset Sale Agreement by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., the other entities identified therein as Sellers, GENBAND Inc., and the other Designated Purchasers that became party thereto, dated December 22, 2009, as amended from time to time (the "ASA"), the Sellers were required at the closing of our transaction to provide to us the tangible embodiments of the "Business Information." Furthermore, pursuant to Section 5.22(b) of the ASA, the Sellers are required to provide us with access to records related to the CVAS business.

Despite our previous requests for outstanding Business Information and copies of certain records related to the CVAS business, we have not yet been provided access to such materials. While a full transfer of all Business Information and the previously requested records that you have not yet delivered to us is an important priority, it is particularly important to us that you provide copies of all of the materials described on <u>Annex A</u> to this letter as soon as possible. In addition to requiring these materials for the proper operation of our business, they are necessary for our completion of the Closing Statement pursuant to the ASA. To the extent that any of the requested materials do not exist, we seek the records of the data necessary to create these materials.