420 F.Supp.2d 273
**(Cite as: 420 F.Supp.2d 273)**

which relief can be granted ... may be made ... by motion for judgment on the pleadings"). "[T]he district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *Patel, 259 F.3d at 126.* However, " 'conclusions of law or unwarranted deductions of fact are not admitted.' " *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994)* (quoting 2A Moore & Lucas, *Moore's Federal Practice* ¶ 12.08, at 2266-69 (2d ed.1984)). The motion should be granted if the court is satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief. *Patel, 259 F.3d at 126.*

[6] In deciding such a motion, a court may consider, in addition to the factual allegations of the complaint, "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir.2000); see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991)* (even though they were not attached to complaint or incorporated by reference, court could consider stock purchase agreement, offering memorandum, and warrant on motion to dismiss because plaintiff had documents either in their possession or had knowledge of them and relied upon them in bringing suit); *Citadel Mgmt. Inc. v. Telesis Trust, Inc., 123 F.Supp.2d 133, 147 n. 3 (S.D.N.Y.2000)* (although plaintiffs could not submit materials that were not attached or incorporated in complaint in opposing motion, "the contract submitted by the defendants in support of the motion to dismiss may be considered, as Citadel had notice of the document's existence and in fact relied on it in the Amended Complaint").

### The Action Is Not Barred By The SPA

According to Deutsche Bank, in entering into the Closing Balance Sheet Adjustment, Deutsche Bank and E*Trade "agreed to resolve their differences with respect to the final Close Balance Sheet of DRAFCO." (Letter Agreement, p. 1.) Defendant argues that under New York law, the Closing Balance Sheet Adjustment represents a valid and binding compromise of the parties' disputes over the Closing Balance Sheet. *See N.Y. Protective Covering Indus., Inc. v. Stevens Technical Servs., Inc., No. 96 CV 0418, 1997 WL 104767, at *2 (E.D.N.Y. Feb.18, 1997); Plant City Steel Corp. v. Nat'l Mach. Exch., Inc., 23 N.Y.2d 472, 477, 297 N.Y.S.2d 559, 562,*

245 N.E.2d 213 (1969); *Ermco Erectors, Inc. v. Grand Iron Works, Inc., 93 A.D.2d 878, 878, 461 N.Y.S.2d 423, 424 (2d Dep't), aff'd, 60 N.Y.2d 634, 467 N.Y.S.2d 355, 454 N.E.2d 938 (1983).*

***284** Deutsche Bank further argues that, regardless of the binding nature of the Closing Balance Sheet Adjustment, the claims for breach of implied covenant of good faith and fair dealing and unjust enrichment are redundant, derivative of or subsumed by the breach of contract claims and must be dismissed. *See Kamfar v. New World Rest. Group, Inc., 347 F.Supp.2d 38, 52 (S.D.N.Y.2004); Foxley v. Sotheby's Inc., 893 F.Supp. 1224, 1234 (S.D.N.Y.1995).*

Finally, Deutsche Bank contends that the SPA's purchase price adjustment procedure is controlling, *see Luxottica Group, S.p.A. v. Bausch & Lomb Inc., 160 F.Supp.2d 552 (S.D.N.Y.2001),* and asserts that arbitration clauses in stock purchase agreements are applicable under circumstances involving disputes over closing balance sheets.

Deutsche Bank also relies on Section 9.01 of the SPA which provides that "[t]he representations and warranties set forth in this Agreement or any certificate delivered pursuant hereto shall survive for a period of 18 months following the Closing Date," arguing that the complaint was not filed until some 25 months after the closing date.

### No General Release

[7] Because E*Trade has alleged that in October 2003 it was unaware of the facts giving rise to its claims here, E*Trade did not and could not release any of its tort or statutory claims. This is true with respect to the common-law fraud claims E*Trade raises in its first amended complaint, whether judged under New York law (the law selected by the SPA) or California law (where E*Trade was located when Deutsche Bank committed the fraud). *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F.Supp.2d 293, 299 (S.D.N.Y.2004)* ("A release that employs general terms will not bar claims outside the parties' contemplation at the time the release was executed. New York law does not construe a general release to bar claims for injuries unknown at the time the release was executed, even when the release contains broad language") (internal citations omitted);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

420 F.Supp.2d 273
**(Cite as: 420 F.Supp.2d 273)**

Cal. Civ.Code § 1542 (West 2005) ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.").

Relying upon *DIMON Inc. v. Folium, Inc.,* 48 F.Supp.2d 359 (S.D.N.Y.1999), E*Trade has alleged in the FAC that Deutsche Bank repeatedly misrepresented the value of the Deferred Tax Asset in numerous communications other than the DRAFCO balance sheet and that Deutsche Bank also breached the SPA's representations and covenants unrelated to the DRAFCO balance sheet, including SPA §§ 3.06, 3.07, 3.08, 3.14, 5.01, 5.02, 5.08, 7.01, and 7.05. (FAC ¶¶ 160 & 167.) Finally, E*trade asserts causes of action about the $10 million tax credit that Deutsche Bank hid from E*Trade and then applied to its books in 2004 after E*Trade discovered it. *See* Counts III & IV.

[8] The Letter Agreement does not contain any general release of "all claims" or "known or unknown claims." It states that the parties should "resolve their differences with respect to the final closing balance sheet of DRAFCO by agreeing to make the adjustments as set forth on Schedule A hereof." It is the Plaintiffs' position that the intent of the Letter Agreement was to resolve the three specific issues identified by the parties-not to release claims unknown at the time. *Cf. Neuman v. Harmon,* 965 F.Supp. 503, 509 (S.D.N.Y.1997) (under New York law, dispositive **285 factor in determining scope of release is parties' intent); *Kaminsky v. Gamache,* 298 A.D.2d 361, 362-62, 751 N.Y.S.2d 254 (2d Dept.2002) (if language shows "release is to be limited to any particular claims, demands or obligations, the instrument will be operative as to those matters alone") (citation omitted). E*Trade communicated this interpretation of the letter to Deutsche Bank, without objection. (FAC ¶ 60.) In view of the brevity of the Letter Agreement, this dispute about the parties' subjective intent is a triable issue. *E.g., Information Superhighway, Inc. v. Talk Am., Inc.,* 274 F.Supp.2d 466, 471 (S.D.N.Y.2003) ("Both parties have offered reasonable interpretations regarding the scope of the release, and these interpretations cannot be resolved on a motion to dismiss."); *DKR Capital, Inc. v. AIG Int'l West Broadway Fund, Ltd.,* No. 03 Civ. 1568, 2003 WL 22283836, at *4

(S.D.N.Y. Oct. 2, 2003) (disputed interpretations of contract is triable question of fact).

*Arbitration Is Not Required*

[9] The Deutsche Bank's contention with respect to arbitration fails to accommodate the SPA's general dispute-resolution provision in § 11.12, which permits litigation in the U.S. District Court for the Southern District of New York over E*Trade's claims arising under the SPA:

> All actions and proceedings arising out of or relating to this Agreement may be heard and determined in any New York state or federal court sitting in the City of New York. The parties hereto unconditionally and irrevocably agree and consent to the exclusive jurisdiction of, and service of process and venue in, the United States District Court for the Southern District of New York ... and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

SPA § 11.12.

Deutsche Bank's contention is based on § 2.06. Section 2.06 relates only to the "Closing Balance Sheet," and provides for adjustments that are identified within 30 days of its delivery to E*Trade. E*Trade's claims under the SPA, however, involve numerous breaches unrelated to preparation of the DRAFCO Balance Sheet, including breaches with respect to the Reference Balance Sheet and other financial statements (§ 3.06), failure to disclose existing liabilities (§ 3.07), failure to eliminate liabilities (§ 5.08), failure to retain a reserve for tax liabilities (§ 3.14), and failure to retain its records for seven or eight years and make them available to E*Trade (§§ 5.02 & 7.05). These claims do not fall within the scope of § 2.06.

Section 3.12 of the SPA identifies the "Residual Interest" as the only asset of DRAFCO, and nowhere identifies the Deferred Tax Asset. In addition, the FAC alleges that the fraudulent representations about the value of the Deferred Tax Asset were an "inducement" to E*Trade to purchase the Deferred Tax Asset for $15.3 million (¶¶ 47, 99), which this Court has held means that the fraud was "collateral" to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

420 F.Supp.2d 273
**(Cite as: 420 F.Supp.2d 273)**

contract. *See EED Holdings v. Palmer Johnson Acq. Corp.,* 387 F.Supp.2d 265, 279 (S.D.N.Y.2004) (fraud claim was not duplicative of breach of contract claim, where alleged fraudulent statements induced plaintiff to enter contract).

When a contract contains both a broad disputes provision permitting lawsuits and also an arbitration requirement set forth in one narrow context, courts routinely limit the arbitration requirement to disputes arising squarely in that narrow context. *See Cummings v. Fedex Ground Package, Inc.,* 404 F.3d 1258, 1262 (10th Cir.2005) **\*286** (arbitration clause did not refer to "all disputes," but instead was "narrowly limit[ed] ... to specific disputes"); *New Hampshire Ins. Co. v. Canali Reinsurance Co., Ltd.,* No. 03 CIV 8889, 2004 WL 769775, at \*3 (S.D.N.Y. April 12, 2004) (contract's express permission that party could file lawsuit required arbitration clause to be limited to specific type of dispute); *Fabry's SRL v. IFT Int'l, Inc.,* No. 02 CIV 9855, 2003 WL 21203405, at \*6 (S.D.N.Y. May 21, 2003) (arbitration clause was narrow in scope, given contract's more sweeping disputes clause). Because certain of E\*Trade's fraud, statutory, and breach of contract claims are outside the scope of § 2.06, the private disputes provision in § 2.06 is entirely inapplicable.

[10][11] The Plaintiffs also contend that even if Deutsche Bank had a right under the SPA to demand "arbitration" of E\*Trade's claims here, it has waived that right. Defendants are free to waive arbitration requirements. *See In re Currency Conversion Fee Antitrust Litig.,* 361 F.Supp.2d 237, 257 (S.D.N.Y.2005). Waiver occurs where a defendant avails itself of the court's jurisdiction by taking advantage of the court's procedures, especially where those procedures are not available in arbitration. *See Manos v. Geissler,* 321 F.Supp.2d 588, 593 (S.D.N.Y.2004) (Factors for court to consider in determining whether party has waived right to arbitrate includes "taking advantage of pre-trial discovery not available in arbitration, delay and expense"); *see also Dembitzer v. Chera,* 305 A.D.2d 531, 761 N.Y.S.2d 60, 62 (2d Dept.2003) (defendants' participation in discovery waived right to arbitral forum).

In reply Deutsche Bank has noted the factors relating to the application of arbitration procedures, (1) whether the parties agreed to arbitrate; (2) whether the claims fall within the scope of the arbitration clause; (3) whether Congress intended such claims to be non-arbitrable; and (4) if only some of the claims are arbitrable, whether to stay the balance of the proceedings pending arbitration. *Sinnett v. Friendly Ice Cream Corp.,* 319 F.Supp.2d 439, 443 (S.D.N.Y.2004). The resolution of these issues in the posture of these motions is premature. In addition, even if the value of the Deferred Tax Asset issue were resolved by the arbitration process, the Plaintiffs' claims based upon $10 million tax credits would remain.

E\*Trade has relied on *Westmoreland Coal Co. v. Entech, Inc.,* 100 N.Y.2d 352, 763 N.Y.S.2d 525, 794 N.E.2d 667 (2003) (" *Westmoreland* "). There, the parties executed a stock purchase agreement for the sale of several coal mining subsidiaries. Any disputes not amicably resolved had to be submitted to an independent accountant, whose decisions would be final and binding on the parties. Separately, the contract provided that disputes over representations and warranties had to be "resolved by litigation in a court of competent jurisdiction." *Westmoreland,* 100 N.Y.2d at 357, 763 N.Y.S.2d 525, 794 N.E.2d 667. The buyer submitted objections, contending that the entire value of the subsidiaries was misstated. The court rejected the buyer's demand for arbitration because its claims asserted breaches of representations, and not merely as requests to adjust the closing certificate. The "claims may only be pursued in a court of law, with its attendant protections of discovery, rules of evidence, burden of proof, and full appellate review." *Id.* at 360, 763 N.Y.S.2d 525, 794 N.E.2d 667.

In addition, Deutsche Bank fails to give appropriate weight to SPA § 11.12. In the same provision, Deutsche Bank "unconditionally and irrevocably agree[d] and consent[ed] to the exclusive jurisdiction of ... the United States District Court for the Southern District of New York," and **\*287** Deutsche Bank "waive [d] any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to [the SPA]." *Id.* Deutsche Bank does not overcome the SPA provisions that: (1) permit E\*Trade to raise fraud claims (§ 9.01); (2) require Deutsche Bank to indemnify E\*Trade for breaches of any representation, warranty, covenant or agreement (§ 9.01(b)); and (3) to indemnify E\*trade for breaches of tax representations (§ 7.01). The indemnification provisions are similar in nature to those in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

420 F.Supp.2d 273
**(Cite as: 420 F.Supp.2d 273)**

*Westmoreland,* where the seller represented that its financial statements were prepared in accordance with GAAP. *See* 100 N.Y.2d at 356-59, 763 N.Y.S.2d 525, 794 N.E.2d 667.

Using the analysis in *Westmoreland,* the breach of the representations in SPA §§ 3.06, 3.07 and 3.14 would have to be litigated in court in accordance with SPA § 11.12. *Id.* at 359-60, 763 N.Y.S.2d 525, 794 N.E.2d 667. The same can be said for all of Deutsche Bank's breaches of other covenants and representations, as well as E*Trade's fraud claims and its claim under California unfair competition law.

*No Time Bar Applies*

[12] In contending that E*Trade's claims are time-barred, Deutsche Bank has sought to invoke SPA § 9.01, which provides that certain representations would "expire" after 18 months. This section states that certain "representations and warranties" by Deutsche Bank expired 18 months after the "closing date." Deutsche Bank argues that since the closing date was December 23, 2002, (*see* Deutsche Bank Memo in Support, p. 4), the representations expired 18 months later, on June 18, 2004.

The Appellate Division has considered and rejected Deutsche Bank's attempt to turn this language into a shortening of the statute of limitations. In *Hurlbut v. Christiano,* 63 A.D.2d 1116, 405 N.Y.S.2d 871 (4th Dep't 1978), the court interpreted a contract like the parties have here that said representations would "survive the closing for a period of three (3) years." *Id.* at 1117-18, 405 N.Y.S.2d 871. The court stated:

> The language of the agreement is clear and unambiguous and suggests nothing from which a shortened period of limitations can be inferred ... The language of the escrow agreement rendered the sellers liable for existing deficiencies which would be formally noticed during a three-year period after closing. The parties neither expressly nor impliedly shortened the applicable six-year Statute of Limitations.

*Id.* Under *Hurlbut,* the "expiration" of representations means that E*Trade had 18 months after closing to identify the breach and/or to notify Deutsche Bank of any breach.

E*Trade has alleged that it both realized the breach that had occurred and notified Deutsche Bank of the breach within the 18-month period that Deutsche Bank proffers. (FAC ¶ 82.) Specifically, the closing date of the DRAFCO transaction was October 20, 2003, the date of the Letter Agreement. (FAC ¶ 58.) As such, representations concerning DRAFCO would have expired 18 months later on April 20, 2005. Therefore, even if § 9.01 had the effect Deutsche Bank has ascribed to it, Deutsche Bank's representations concerning DRAFCO had not expired when E*Trade filed this action on January 26, 2005.

For the foregoing reasons, taking E*Trade's allegations to be true, SPA § 9.01 is no bar to E*Trade's amended claims.

**\*288 *The Amendments Are Not Futile***

[13] Plaintiff's fraud claims have been properly plead. Under New York law, the elements of a fraud claim are: (1) that the defendant made a material false representation, (2) that the defendant intended to defraud the plaintiff thereby, (3) that the plaintiff reasonably relied upon the representation, and (4) that the plaintiff suffered damage as a result of such reliance. *See Manning v. Utils. Mut. Ins. Co.,* 254 F.3d 387, 400 (2d Cir.2001) (*quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs.,* 98 F.3d 13, 19 (2d Cir.1996)); *see Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370, 1373 (1996); 60A William H. Danne, Jr., N.Y. Jur. § 14.

Pursuant to Fed.R.Civ.P. 9(b), a fraud claim must be stated with particularity. The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (*quoting Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

[14] Rule 9(b) requires that to allege a claim for fraud adequately, a complaint must contain particularized facts that "give rise to a strong inference" of scienter on the part of the defendant. *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 663-64

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

420 F.Supp.2d 273
**(Cite as: 420 F.Supp.2d 273)**

(2d Cir.1997) (affirming dismissal of fraud claims where "allegations, even taken together, [were] insufficient to raise a strong inference of fraudulent intent").

[15] The requisite "strong inference" of scienter may be established "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

**1. *Specificity***

[16] Deutsche Bank has contended that "it is not clear what, precisely", they [E*Trade] claim they were defrauded into doing and what remedy is available. The complaint is utterly vague on this point. (Memo in Opposition at 16.) However, E*Trade has identified 17 separate communications from Deutsche Bank that furthered or concealed Deutsche Bank's fraudulent misrepresentations about the value of DRAFCO. These allegations expressly identify the "who, what, when, where and how" of the fraud. *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990). E*Trade has satisfied Rule 9(b).

**2. *Reliance***

[17][18] One party reasonably relies on another party's documentation if the documents "would not, on their face, have alerted [plaintiffs] to potential fraud." *JP Morgan Chase Bank v. Winnick,* 350 F.Supp.2d 393, 409 (S.D.N.Y.2004). The only time a party's reliance is not "reasonable" is if it "has been put on notice of the existence of material facts which have not been documented." *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1542 (2d Cir.1997); *see also JP Morgan,* 350 F.Supp.2d at 408 (only "direct" evidence of mistake or fraud or "arouse[d] suspicion" would make reliance unreasonable). No authority holds reliance to be unreasonable unless the plaintiff saw "red flags" or "other circumstances" existed that made reliance "unquestionably unreasonable." **\*289** *Doehla v. Wathne Ltd., Inc.,* 1999 WL 566311 at \*12 (S.D.N.Y. Aug.3, 1999).[FN2]

> FN2. E*Trade argued that California law governs E*Trade's fraud claims. (*See* E*Trade Opposition to Deutsche Bank's

Motion for Judgment on the Pleadings ("E*Trade Opp.") at 15 n. 2). Deutsche Bank ignores the argument and concludes without analysis that only New York law applies. (*See* Deutsche Bank Opp. at 15-16).

Drawing all inferences in E*Trade's favor, it has not been established as a matter of law from the allegations in the FAC that E*Trade's reliance was unreasonable. E*Trade has alleged that it asked Deutsche Bank for documentary support and that all of the documents Deutsche Bank provided before closing on their face supported Deutsche Bank's representation of DRAFCO's value. (FAC ¶¶ 27-54.) For example, E*Trade alleges that:

• Deutsche Bank provided what it purported was a report from outside auditor KPMG that supported the value of DRAFCO. (FAC ¶ 32.) E*Trade only learned much later, well after closing, that the outside auditor was provided "garbage" by Deutsche Bank so that the report was worthless. (FAC ¶ 86.)

• Deutsche Bank provided E*Trade's outside auditor from Ernst & Young with materials which the auditor reviewed closely and from which he confirmed the alleged value of DRAFCO. (FAC ¶ 53.) E*Trade learned well after closing that Deutsche Bank withheld information from E*Trade's auditor that revealed the false value of DRAFCO. (FAC ¶ 68.)

Beyond this, E*Trade alleges that it received over a dozen communications from Deutsche Bank that purported to support the false value of DRAFCO. E*Trade also specifically alleges that it had no information before closing that would have raised a "red flag." (FAC ¶ 55.)

In light of the FAC's allegations, the reasonableness of E*Trade's reliance is a fact-specific inquiry that survives under the Rule 12 standard applicable here. *See Keywell Corp. v. Weinstein,* 33 F.3d 159, 164 (2d Cir.1994) (dismissal under Rule 12 for lack of reasonable reliance is permissible only where plaintiff "was placed on guard or practically faced with the facts"); *accord Doehla,* 1999 WL 566311, at \*10.

**3. *Scienter***

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

420 F.Supp.2d 273
**(Cite as: 420 F.Supp.2d 273)**

[19] Deutsche Bank has contended that E*Trade never alleged scienter: E*trade "ha[s] not asserted that [Deutsche Bank] had knowledge of the Deferred Tax Asset's status as a 'liability' prior to the parties' execution of the DRAFCO sale, or that there was any motive for overstating the value of a deferred tax asset".

[20] However, in Count I, E*Trade alleges:

98. Deutsche Bank knew its representations were false and/or Deutsche Bank acted with recklessness as to the lack of truthfulness of its representations.

99. Deutsche bank intended to defraud E*Trade through the material false representations Deutsche Bank made to E*Trade. Deutsche Bank intended to induce E*Trade to pay a purchase price for DRAFCO inflated by over $15 million to reflect the value of the Deferred Tax Asset, when in fact the true value of the Deferred Tax Asset was less than zero.

(FAC ¶¶ 98-99.) [FN3] E*Trade similarly alleges Deutsche Bank's scienter for Count **290** II (FAC ¶¶ 108-09) and Count III (FAC ¶¶ 117-19.)

> FN3. Reckless indifference to the truth-as well as intentional deception-is sufficient scienter to constitute fraud. _In re Livent, Inc. Sec. Litig.,_ 78 F.Supp.2d 194, 217 (S.D.N.Y.1999) (recklessness sufficient scienter); _Fidelity & Deposit Co. of Md. v. Arthur Andersen & Co.,_ 131 A.D.2d 308, 311, 515 N.Y.S.2d 791 (1st Dep't 1987) (same).

### The California § 17200 Claim

[21] Deutsche Bank also has contended that § 17200 cannot apply because SPA § 11.12 selects New York law as governing. But SPA § 11.12 applies New York law for disputes only about the construction or enforcement of the SPA: "This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, applicable to contracts executed in and to be performed entirely within that state." This language is narrow and purposefully does not apply New York law to any actions "related to" the transaction, such as tort or other claims. _See Finance One Pub. Co. Ltd. v. Lehman Bros. Special_

_Fin., Inc.,_ 414 F.3d 325, 335 (2d Cir.2005) (contractual choice of law will not apply to torts where the choice of law is limited to contract claims, even if parties consent to jurisdiction of New York courts for tort claims); _see also Krock v. Lipsay,_ 97 F.3d 640, 645 (2d Cir.1996) (tort claims did not fall within selection of law clause). Consequently, the choice of law in SPA § 11.12 does not apply to E*Trade's non-contract claims, including its § 17200 claim. _See Medical Instrument Dev. Labs. v. Alcon Labs.,_ 2005 WL 1926673, at *3 (N.D.Cal. Aug.10, 2005) (§ 17200 applies even though contract selected Texas law for contract claims). The FAC states a claim under § 17200.

### E*Trade Did Not Agree To Waive Its Amended Claims Of Which It Was Unaware

[22] Deutsche Bank argues that E*Trade's amended claims were "waived" because they were not made during the "one-time limited opportunity to challenge" the value of DRAFCO. (Deutsche Bank Opp. at 11.) But the parties' October 20 Letter Agreement, on which Deutsche Bank's argument is based, does not state that unknown claims would be waived, and courts consistently refuse to read an implied waiver into a contract. _See Information Superhighway, Inc. v. Talk Am., Inc.,_ 274 F.Supp.2d 466, 472 (S.D.N.Y.2003), (quoting _Abramowitz v. New York Univ. Dental Ctr. Coll. of Dentistry,_ 110 A.D.2d 343, 494 N.Y.S.2d 721, 723 (2d Dep't 1985)).

### Constructive Fraud

[23] E*Trade has pled facts that constitute constructive fraud. Under the "special facts doctrine," Deutsche Bank had a duty to disclose information if Deutsche Bank knew E*Trade was mistaken about DRAFCO's value because Deutsche Bank was not providing the information it solely possessed proving otherwise. _See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,_ 57 F.3d 146, 155 (2d Cir.1995) (setting out test). The FAC alleges all of the facts that, if true, meet the special facts doctrine. (FAC ¶¶ 126-132.) Therefore, E*Trade has adequately pled constructive fraud.

### Negligent Misrepresentation

[24] Deutsche Bank has contended that E*Trade fails to allege the elements required for a negligent mis-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

420 F.Supp.2d 273
**(Cite as: 420 F.Supp.2d 273)**

representation claim. However, E*Trade has alleged
Deutsche Bank held unique knowledge about the
value of the Deferred Tax Asset, was aware of how
E*Trade would put such information to use, and sup-
plied it for that purpose. (FAC ¶¶ 137-142.) In light
of these allegations, pleading the existence of a spe-
cial relationship between parties may not be neces-
sary. *See, e.g., Suez Equity Investors, L.P. v. Toronto-
Dominion Bank,* 250 F.3d 87, 103-04 (2d Cir.2001).
However, E*Trade has alleged the existence of a spe-
cial relationship, the existence**\*291** of which has
been held to be a factual question not to be resolved
under a Rule 12 standard, *see Wells Fargo Bank
N.W., N.A. v. Taca Int'l Airlines, S.A.,* 247 F.Supp.2d
352, 366-67 (S.D.N.Y.2002), and which may coexist
with contract between sophisticated parties.
*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.
LLC,* 2005 WL 1631144, at \*15 (S.D.N.Y. July 6,
2005); *Fresh Direct LLC v. Blue Martini Software,
Inc.,* 7 A.D.3d 487, 489, 776 N.Y.S.2d 301 (2d Dep't
2004).

### *Quantum Meruit And Unjust Enrichment*

[25][26][27] Quasi-contract claims are permitted if
they arise from services not covered by a contract.
*Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386,
403 (2d Cir.2001); *U.S. East Telecomms., Inc. v. U.S.
West Communications Servs., Inc.,* 38 F.3d 1289,
1298 (2d Cir.1994). E*Trade can plead these along-
side contract claims. *Curtis Props. Corp. v. Greif
Cos.,* 236 A.D.2d 237, 239, 653 N.Y.S.2d 569 (1st
Dep't 1997). E*Trade is alleging in the alternative
that, after the DRAFCO sale closed, E*Trade under-
took great efforts at its expense to recalculate
DRAFCO's books, from which E*Trade determined
that Deutsche Bank should have taken a $10 million
tax credit. (FAC ¶ 178.) E*Trade communicated this
conclusion to Deutsche Bank. *Id.* E*Trade alleges
that Deutsche Bank acted on this information and
took the $10 million tax credit. (FAC ¶ 80.) None of
these events are governed by the SPA. Therefore,
these facts state a claim for *quantum meruit* or unjust
enrichment under New York law.

### *Conclusion*

For the reasons set forth above, Deutsche's motion for
judgment on the pleadings is denied, and E*Trade's
motion for leave to file its FAC is granted.

It is so ordered.

S.D.N.Y.,2006.
E*Trade Financial Corp. v. Deutsche Bank AG
420 F.Supp.2d 273

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB  5

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
**(Cite as: 2008 WL 4606262 (Del.Ch.))**

**C**Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
HDS INVESTMENT HOLDING INC. (f/k/a Pro
Acquisition Corp.), a Delaware corporation, Plaintiff,
v.
The HOME DEPOT, INC., a Delaware corporation,
Defendant.
**Civil Action No. 3968-CC.**

Submitted: Sept. 10, 2008.
Decided: Oct. 17, 2008.

Paul J. Lockwood, of Skadden, Arps, Slate, Meagher
& Flom LLP, Wilmington, Delaware; of Counsel: Jay
B. Kasner, Christopher P. Malloy, and Scott D. Mu-
soff, of Skadden, Arps, Slate, Meagher & Flom LLP,
New York, New York; Dan F. Laney and Alan C.
Leet, of Rogers & Hardin LLP, Atlanta, Georgia,
Attorneys for Plaintiff.

Martin P. Tully and Kevin M. Coen, of Morris, Nich-
ols, Arsht & Tunnell LLP, Wilmington, Delaware; of
Counsel: Stephen R. Neuwirth, Kevin S. Reed, and
Deborah K. Brown, of Quinn Emanuel Urquhart
Oliver & Hedges LLP, New York, New York, Attor-
neys for Defendant.

### ORDER

CHANDLER, Chancellor.

**\*1** For the reasons set forth in this Court's Memoran-
dum Opinion entered in this case on this date, it is,

ORDERED:

1. Count I of the complaint is dismissed.

2. Defendant's motion to dismiss Counts II, III, IV,
V, VI, and VII is denied.

3. Defendant's motion to stay the proceedings in

this case is denied.

4. Plaintiff's motion for a preliminary injunction is
granted and all arbitration proceedings in this mat-
ter are hereby enjoined pending resolution of the
contractual claims before this Court.

### *MEMORANDUM OPINION*

This case requires the Court to interpret the scope of
an arbitration provision designed by the parties to
send to a neutral auditor certain disputes regarding a
post-closing purchase price adjustment. While this
approach may work as intended in some instances,
complications can arise because the potential disputes
under a contract cannot be easily divided and as-
signed to separate decision-makers. As this case illus-
trates, the issues that arise under a contract are often
interconnected in ways that make it difficult to divide
them between a court and an arbitrator.

The present dispute arises out of the purchase of HD
Supply, Inc ("HD Supply") by HDS Investment
Holding, Inc ("HDS" or "plaintiff") from The Home
Depot, Inc. ("Home Depot" or "defendant"). Home
Depot and HDS designed a process by which the
purchase price paid by HDS would be adjusted based
on the working capital of HD Supply on the day be-
fore the closing. The parties agreed that certain dis-
putes surrounding the purchase price adjustment fea-
ture would be resolved by arbitration before a neutral
auditor. The parties now call on this Court to inter-
pret the scope of the arbitration provision and deter-
mine which disputes should properly be submitted to
arbitration.

HDS filed a complaint asking this Court to declare
that certain of the parties' disputes are outside the
scope of the arbitration provision and should be de-
cided by the Court. HDS also filed a motion request-
ing that the Court enter a preliminary injunction
postponing proceedings before the arbitrator pending
the resolution of proceedings before the Court. Home
Depot filed a motion seeking dismissal of HDS's
claims or, in the alternative, a stay of the proceedings
in this Court pending the outcome of the arbitration
proceedings.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
**(Cite as: 2008 WL 4606262 (Del.Ch.))**

The parties ask the Court to determine whether the following three disputes should be submitted to arbitration or resolved by the Court: (1) whether and how Home Depot must reimburse HDS for certain payments made to employees; (2) whether Home Depot has rights to cash left in HD Supply's bank accounts after the closing; and (3) whether the neutral auditor should be allowed to consider HDS's revised statement of its purchase price adjustment calculation.

For the reasons set forth below, I grant plaintiff's motion for a preliminary injunction and deny defendant's motion to stay the proceedings before this Court. Defendant's motion to dismiss is granted with respect to Count I because the parties now agree that the role of the American Arbitration Association ("AAA") is to appoint a neutral auditor and not to administer the arbitration. Defendant's motion to dismiss is denied with respect to Count II because the issue of whether the neutral auditor can consider the revised closing statement will be resolved when the Court reaches the merits of the contractual disputes. Count III survives because I have determined that the Court will resolve the issue regarding Home Depot's responsibility to reimburse HDS for certain payments made to employees. Count V regarding the parties' conflicting claims to cash that remained in HD Supply's bank accounts is a contractual issue for the Court. Count VII involving plaintiff's claim for damages for breach of § 6.1 will also be resolved by the Court. Counts IV and VI (raising issues regarding the scope of the auditor's authority to calculate the Applicable Amount) will be addressed in the context of briefing on the contractual disputes to be resolved by the Court. Further explanation for these decisions follows a presentation of the pertinent facts.

## I. BACKGROUND

**\*2** Plaintiff HDS and defendant Home Depot are Delaware corporations headquartered in Atlanta, Georgia. On June 19, 2007, HDS and Home Depot entered into a Purchase and Sale Agreement (the "Agreement") whereby HDS would purchase HD Supply from Home Depot for an estimated purchase price of $8.5 billion. The deal was consummated on August 30, 2007 (the "Closing Date").

*A. The Agreement*

The Agreement provided for adjustment of the purchase price based on the working capital of HD Supply on August 29, 2007, the day before completion of the transaction. The purchase price was to be calculated before and after the merger based on a calculation of the excess of current assets over current liabilities as defined in the agreement (the "Applicable Amount").[FN1]

> [FN1]. Under § 1.1 of the Agreement, current assets are defined as "the sum of accounts receivable, inventories and other current assets, in each case determined in accordance with GAAP using accounting policies and procedures consistent with those applied in the preparation of the Applicable Amount Schedule, *excluding* cash and cash equivalents...." Current liabilities are defined as "the sum of accounts payable (excluding reclassified outstanding checks), accrued compensation and benefits, other accrued expenses and current installments of capital lease obligations in each case determined in accordance with GAAP applying accounting policies and procedures consistent with those applied in the preparation of the Applicable Amount Schedule...." Because a motion to dismiss based on an arbitration clause goes to the Court's subject matter jurisdiction, the Court may consider documents outside the complaint in deciding the motion. *NAMA Holdings, LLC v. Related World Market Center, LLC,* 922 A.2d 417, 429 n. 15 (Del. Ch.2007).

The Agreement specified a process by which the parties would calculate the Applicable Amount and, ideally, reach an agreement regarding the purchase price adjustment. First, Home Depot was to prepare a schedule that represented a calculation of the Applicable Amount on April 29, 2007 (the "Applicable Amount Schedule") that would serve as a baseline for later adjustments to the purchase price. The price to be paid by HDS at the closing was based on a report, completed five business days prior to the closing, that constituted Home Depot's good faith estimate of what the Applicable Amount would be on the day prior to the closing (the "Preliminary Statement"). The purchase price to be paid at closing was to be based on the difference between the calculation of the Applicable Amount in the Applicable Amount Schedule

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
**(Cite as: 2008 WL 4606262 (Del.Ch.))**

and the calculation of the Applicable Amount in the Preliminary Statement.

After the closing, HDS was to submit a statement to Home Depot containing a calculation of the Applicable Amount as of the day prior to the Closing Date (the "Closing Statement"). The Agreement specified that the Closing Statement should be delivered "no later than" ninety days after the Closing Date. [FN2] If Home Depot disagreed with the calculations in the Closing Statement, then Home Depot could send a notice specifying any disagreement (the "Notice of Disagreement") to HDS within ninety days of the delivery of the Closing Statement and related schedules and work papers.

> FN2. Agreement at § 2.5(a).

After the delivery of the Notice of Disagreement, the Agreement called for a thirty-day period (the "Resolution Period") during which the parties would use their reasonable best efforts to reach an agreement on the disputed amounts. If, at the end of this thirty-day period, the parties could not reach agreement, the amounts remaining in dispute would be submitted to a neutral auditor. The Agreement provided that Ernst & Young would serve as the neutral auditor. If Ernst & Young was unable or unwilling to serve as the neutral auditor and the parties could not agree on a neutral auditor within fifteen days of the end of the Resolution Period, the Agreement allowed either party to request that the AAA appoint a neutral auditor. The neutral auditor would then be required to reach a final determination within forty-five days of its selection.

**\*3** Once the final Applicable Amount was determined (the "Final Applicable Amount"), either by the parties' agreement or by the neutral auditor, the purchase price would be adjusted by comparing the Final Applicable Amount to the estimate of the Applicable Amount in the Preliminary Statement. The purchase price would be (1) increased dollar for dollar by the amount by which the Final Applicable Amount exceeded the Applicable Amount in the Preliminary Statement and (2) decreased dollar for dollar by the amount by which the Final Applicable Amount was less than the Applicable Amount in the Preliminary Statement.

Other provisions in the Agreement specified the par-

ties' rights and obligations in connection with the sale. Section 5.4(b) gave Home Depot the right to remove cash and cash equivalents from HD Supply's bank accounts prior to the closing. Section 6.1 of the Agreement required Home Depot to reimburse HDS for certain bonuses and retention payments made to employees by HD Supply (the "Bonus and Retention Payments").

*B. The Closing and Post-Closing Events* [FN3]

> FN3. Since this Court is deciding the scope of the arbitration provision and whether to stay the current proceeding or enjoin the arbitration, the details of the post-closing activity are not particularly relevant. Accordingly, only a brief summary of the post-closing events is provided.

Five days before the closing, Home Depot delivered the Preliminary Statement to HDS. The transaction closed on August 30, 2007. HDS sent a Closing Statement to Home Depot on November 27, 2007. On December 21, 2007, Home Depot sent HDS a request for additional documents supporting the Closing Statement. On March 5, 2008, Home Depot's Vice President, Richard McPhail, sent a letter to Vidya Chauhan of HD Supply stating that Home Depot would not reimburse HDS for the Bonus and Retention Payments because Home Depot was concerned that the liability associated with the payments was included in the Closing Statement submitted by HDS. The letter invited HDS to submit a revised Closing Statement that did not include the Bonus and Retention Payment liability.

On March 28, 2008, HDS submitted to Home Depot a revised Closing Statement (the "Revised Closing Statement") along with eighteen binders of information. In an April 2, 2008 letter, Home Depot advised HDS that Home Depot would not consider the Revised Closing Statement because it was submitted more than 90 days after the closing. Home Depot submitted a Notice of Disagreement on June 26, 2008, detailing Home Depot's disagreement with the Closing Statement. Thus the thirty-day Resolution Period ran from June 26, 2008 to July 26, 2008. Home Depot and HDS were unable to agree on the items disputed in the Notice of Disagreement during this period. On August 11, 2008, Home Depot asked the AAA to appoint a neutral auditor. [FN4]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
(Cite as: 2008 WL 4606262 (Del.Ch.))

FN4. Although the parties disagree on what Home Depot originally requested of the AAA, the parties now agree that the role of the AAA is to appoint a neutral auditor and not to administer the arbitration. Accordingly, Count I of the complaint, requesting the Court to declare that the only role of the AAA is to appoint a neutral auditor, is dismissed.

HDS filed a complaint in this Court on August 13, 2008. In the complaint, HDS asks the Court to declare that certain issues that Home Depot seeks to submit to the neutral auditor are contractual issues not included in the arbitration provision in § 2.5(d) of the Agreement. On August 18, 2008, Home Depot filed a motion asking the court to dismiss the complaint or stay the action pending completion of the proceedings before the neutral auditor. On August 27, 2008, HDS filed a motion requesting that the Court issue a preliminary injunction preventing the parties from proceeding with arbitration pending resolution of proceedings in this Court.

## II. ANALYSIS

*4 In my view, both motions can be resolved by deciding which disputes, if any, should be decided by the Court instead of the neutral auditor. I begin this analysis by reviewing the standard under which the Court must review the arbitration provision. I will then address whether HDS has made the required showing for a preliminary injunction.

*A. Home Depot's Motion to Dismiss or Stay Pending Arbitration*

*1. The Standard for Interpreting the Arbitration Provision*

Home Depot moved to dismiss this action because the entire dispute is subject to arbitration or, in the alternative, stay the action pending resolution of proceedings before the neutral auditor. As explained below, this motion requires the Court to determine whether any or all of the parties' disputes should be decided by the Court before the parties are allowed to proceed before the neutral auditor.

Since the Agreement and the arbitration provision involve interstate commerce, the Federal Arbitration Act (the "FAA") governs consideration of this case.[FN5] The FAA is a "congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." [FN6] Under the FAA, however, a court should apply ordinary state-law principles in deciding whether parties agreed to arbitrate a certain matter.[FN7] Although there is a policy under the FAA in favor of enforcing agreements to arbitrate, the United States Supreme Court "has determined that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " [FN8] The purpose of the FAA "was to make arbitration agreements as enforceable as other contracts, *but not more so.*" [FN9] Because the Agreement contains a choice of law provision selecting New York law,[FN10] this Court must apply New York law to determine which disputes the parties agreed to arbitrate.[FN11]

FN5. 9 U.S.C. §§ 1-2; *James & Jackson, LLC v. Willie Gary, LLC,* 906 A.2d 76, 80 (Del.2006) (citing *Allied-Bruce Terminix Cos., Inc. v. Dobson,* 513 U.S. 265, 273-74 (1995)); *McLaughlin v. McCann,* 942 A.2d 616, 621 (Del. Ch.2008). The Delaware Uniform Arbitration Act does not apply in this case. According to 10 *Del. C.* § 5702(a), the Delaware Uniform Arbitration Act only applies when the parties execute an agreement "providing for arbitration in this State." *See TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Securities, Inc.,* C.A. No. 3603-CC, 2008 WL 2855116, at *2 n. 5 (Del. Ch. July 24, 2008).

FN6. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983).

FN7. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter ... courts generally ... should apply ordinary state-law principles that govern the formation of contracts ."); *Orner v. Country Grove Inv. Group, LLC,* C.A. No. 2245-VCS, 2007 WL 3051152, at *6 (Del. Ch. Oct. 12, 2007) ("To determine whether a dispute is governed by a contractual arbitra-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
**(Cite as: 2008 WL 4606262 (Del.Ch.))**

tion provision, courts acting under the FAA have been directed by the United States Supreme Court to apply the contract law of the state whose law governs the contract."); *Willie Gary LLC v. James & Jackson LLC,* C.A. No. 1781, 2006 WL 75309, at \*5 (Del. Ch. Jan. 10, 2006) ("The FAA ... simply requires that contracts with arbitration clauses be interpreted in accordance with the ordinary principles of contract interpretation that would otherwise govern and that no anti-arbitration state law policies override the intentions of commercial parties to contract to have their disputes resolved by arbitration.").

FN8. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960)).

FN9. *McDonell Douglas Fin. Corp. v. Pa. Power & Light Co.,* 858 F .2d 825, 831 (2d Cir.1988) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12 (1967)).

FN10. Agreement at § 11.4(a).

FN11. *See Orner,* 2007 WL 3051152, at \*6.

In the end, however, the application of the FAA does not have a material effect on the outcome of this case. The federal policy of enforcing arbitration agreements is the same as the policy favoring enforcement of arbitration agreements under New York law.[FN12] The Court of Appeals of New York made this clear by stating that New York's "body of arbitration law ... is not inimical to the policies of the FAA. Significantly, the FAA was modeled after New York's arbitration law." [FN13] Additionally, "no significant distinction can be drawn between the policies supporting the FAA and the arbitration provisions of the CPLR." [FN14] It should also be noted that Delaware's policy of enforcing arbitration agreements is substantially similar to the policies under the FAA and New York law [FN15].

FN12. *Smith Barney, Harris Upham & Co. v. Luckie,* 647 N.E.2d 1308, 1315 (N.Y.1995).

FN13. *Id.*

FN14. *Id.*

FN15. *Orner,* 2007 WL 3051152, at \*6 (stating that applicability of the FAA did not affect the outcome of the dispute because Delaware's policy would require enforcement of an arbitration provision as interpreted by the law of the state whose law governs the contract); *Willie Gary,* 2006 WL 75309, at \*5 ("[T]he federal policy in favor of voluntarily-chosen arbitration is identical to the policy of [Delaware], which requires this court to enforce contracts to arbitrate and to resolve doubts about whether a claim must be arbitrated in favor of arbitration.").

*2. The Scope of the Arbitration Provision*

The parties entered into a valid and enforceable arbitration agreement. The provision is located in § 2.5(d) of the Agreement, and calls for certain disputes to be resolved by a neutral auditor. As described above, § 2.5 outlines the procedure by which the parties were to reach agreement on the calculation of the Applicable Amount necessary for the purchase price adjustment. After each party submitted its calculation of the Applicable Amount, the Agreement provided for a thirty-day Resolution Period during which time the parties were directed to use their reasonable best efforts to reach agreement on disputed items or amounts. The Agreement then provided that the parties would resolve remaining disputes as follows:

**\*5** If at the conclusion of the Resolution Period there are any amounts remaining in dispute, then all amounts remaining in dispute may at any time thereafter be submitted to Ernst & Young ... no later than the 15th day after the expiration of the resolution period. If Ernst & Young is unwilling or unable to serve ... then [Home Depot and HDS] shall each have the right to request the American Arbitration Association to appoint the Neutral Arbitrators.... The Neutral Auditors shall act as an arbitrator to determine, based solely on presentations by [Home Depot and HDS], and not by independent review, only those issues still in dispute. The Neutral Auditor's determination of any disputed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
**(Cite as: 2008 WL 4606262 (Del.Ch.))**

amount shall not be higher than the highest amount
proposed by either party or lower than the lowest
amount proposed by either party. [FN16]

FN16. Agreement at § 2.5(d).

In determining the scope of an arbitration provision it
is often helpful to distinguish between broad and nar-
row arbitration clauses. [FN17] An arbitration clause is
broad if it refers all disputes under the agreement to
arbitration and, in contrast, an arbitration clause is
narrow if arbitration is limited to specific types of
disputes. [FN18] When construing narrow arbitration
clauses, courts must carefully determine which dis-
putes the parties intended to be decided by arbitration
and only send to arbitration those disputes that the
parties expressly agreed should be arbitrated. [FN19] The
presumption in favor of arbitration applies to narrow
arbitration clauses; however, the Court must still con-
sider the boundaries of the arbitration provision and
not require a party to arbitrate an issue they did not
agree to arbitrate. [FN20]

FN17. *McDonell Douglas,* 858 F.2d at 832.

FN18. *See id; Camferdam v. Ernst & Young
Int'l, Inc.,* No. 02 Civ. 10100(BSJ), 2004
WL 1124649, at *1 (S.D.N.Y. May 19,
2004).

FN19. *See Camferdam,* 2004 WL 1124649,
at *1 ("[W]hen dealing with a narrow arbi-
tration clause, the court must consider
whether the disputed issue is, on its face,
within the purview of the clause, and the
court 'must be careful to carry out the spe-
cific and limited intent of the parties.' ")
(quoting *McDonell Douglas,* 858 F.2d at
832); *Matter of Robert Stigwood Org., Ltd.,*
83 A.D.2d 123, 126 (N.Y.App.Div.1981)
("An agreement to arbitrate must be express,
direct and unequivocal as to the issues or
disputes to be submitted to arbitration. This
principle is particularly applicable in the in-
stance of a limited arbitration clause.") (cita-
tion omitted).

FN20. *Chevron U.S.A. Inc. v. Consol. Edi-
son Co.,* 872 F.2d 534, 537-38 (2d
Cir.1989).

The arbitration clause in the Agreement is narrow
because it only refers to arbitration those issues re-
garding the calculation of the Applicable Amount in
dispute after the Resolution Period. [FN21] The specifica-
tion of Ernst & Young, an accounting firm, as the
first choice as neutral auditor is further evidence that
the parties did not intend the arbitration provision to
encompass legal disputes arising out of other clauses
in the Agreement. [FN22] Based on the language of the
arbitration provision and its location in § 2.5 of the
Agreement, I conclude that the parties only agreed to
arbitrate disputes regarding determination of the Ap-
plicable Amount that remained after the Resolution
Period.

FN21. *See Blue Tee Corp. v. Koehring Co.,*
999 F.2d 633, 634-35 (2d. Cir.1993) (de-
scribing as a "narrow arbitration clause" a
provision "requiring disputes regarding the
computation of the final statement to be re-
solved by accountants"); *CAE Indus. Ltd. v.
Aerospace Holdings Co.,* 741 F.Supp. 388,
392 (S.D.N.Y.1989) (finding an arbitration
provision narrow in scope where it required
" 'any objections Buyer may have to any of
the matters set forth' in the Closing Date
Balance Sheet 'be submitted to an independ-
ent accounting firm' ").

FN22. *See XL Capital, Ltd. v. Kronenberg
III,* No. 04 Civ. 5496(JSR), 2004 WL
2101952, at *2 (S.D.N.Y. Sept. 20, 2004),
*aff'd,* 145 F. App'x. 384 (2d Cir.2005).

*i. The Bonus and Retention Payments*

Section 6.1 of the Agreement provides that Home
Depot will reimburse HDS for certain Bonus and
Retention Payments made to employees. [FN23] Home
Depot, while acknowledging the obligation to reim-
burse the Bonus and Retention Payments, has refused
to pay pending resolution of what Home Depot be-
lieves is a threatened "double payment" of these ob-
ligations. HDS included the liability associated with
the Bonus and Retention Payments (the "Bonus and
Retention Payment Liability") in its calculation of the
Applicable Amount in its Closing Statement, and
Home Depot disputed this inclusion in the Notice of
Disagreement.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
(Cite as: 2008 WL 4606262 (Del.Ch.))

FN23. Agreement at § 6.1(b)-(c) ("[Home Depot] shall contemporaneously reimburse [HDS] in an amount equal to the aggregate amount of the Retention Payments.... [Home Depot] shall reimburse [HDS] for a portion of the annual bonuses in respect of the 2007 fiscal year of [Home Depot] representing service from the period commencing on January 29, 2007 and ending on the Closing Date....").

**\*6** Home Depot argues that it will be forced to "double pay" if it reimburses the Bonus and Retention Payments in cash and the Bonus and Retention Payment Liability is reflected in the Closing Statement. Under the purchase price adjustment feature in the Agreement, an increase in liabilities on the balance sheet results in a decrease in the purchase price and a decrease in liabilities on the balance sheet results in an increase in the purchase price. Thus, according to Home Depot, if it reimburses the Bonus and Retention Payments in cash and the purchase price is reduced by the inclusion of the Bonus and Retention Payment Liability, Home Depot will be reimbursing the Bonus and Retention Payments twice. Home Depot argues that it could reimburse the Bonus and Retention Payments through the inclusion of the Bonus and Retention Payment Liability in the Closing Statement *or* through a cash payment to HDS.

Home Depot contends that since it disputed the inclusion of the Bonus and Retention Payment Liability in the Notice of Disagreement, the entire issue of the Bonus and Retention Payments should be decided by the neutral auditor. The payment requirement under § 6.1 and the calculation of the Bonus and Retention Payment Liability in the Closing Statement are, according to Home Depot, "inextricably linked" and must therefore both be submitted to the neutral auditor.

I disagree. Home Depot's line of reasoning would give to the neutral auditor contractual disputes that are clearly outside the scope of the arbitration provision. The parties included a narrow arbitration provision in § 2.5(d) that authorizes the parties to submit disputes regarding the calculation of the Applicable Amount to a neutral auditor. Nothing in the Agreement or the narrow arbitration provision in § 2.5(d) authorizes the neutral auditor to resolve disputes regarding § 6.1 of the Agreement. Home Depot cannot

squeeze into arbitration disputes arising under other provisions in the Agreement by claiming that it is possible to settle these disputes through a purchase price adjustment and then challenging the purchase price calculation in the Notice of Disagreement.[FN24]

FN24. *See XL Capital,* 2004 WL 2101952, at *2.

Under the guidance of the FAA and New York law, the Court should send to the neutral auditor only those disputes that the parties agreed would be submitted to arbitration. Under the narrow arbitration provision in the Agreement, the parties agreed to arbitrate disputes regarding the parties' calculations of the Applicable Amount that remained unresolved after the Resolution Period. Thus, disputes arising under any other provisions in the Agreement are not properly brought before the neutral auditor, even if it is theoretically possible to resolve those disputes through the calculation of the Applicable Amount under § 2.5(d) of the Agreement. Accordingly, the Court will resolve the contractual dispute involving § 6.1 of the Agreement asserted in Count III of the complaint.

Nevertheless, out of the same respect for the intent of the parties, this Court will not decide issues that the parties clearly agreed would be decided by the neutral auditor. The policies of the FAA and New York law require the Court to carefully honor the intent of the parties when the parties clearly and expressly state in their agreement that certain disputes should be arbitrated. Thus, this Court will leave for the neutral auditor disputes regarding the Applicable Amount that the parties intended to send to arbitration. The Court will, therefore, not attempt to calculate the Applicable Amount or decide issues that the parties reserved for the neutral auditor in the arbitration provision in § 2.5 of the Agreement.

**\*7** At this stage in the proceedings, however, it is impossible to determine whether the parties intended the Bonus and Retention Payment Liability to be included in current liabilities for purposes of calculating the Applicable Amount. That may be an appropriate issue for the neutral auditor. A more complete record and further briefing will enable the Court to decide whether the neutral auditor retains authority to consider whether the Bonus and Retention Payment Liability should be included in current liabilities

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
**(Cite as: 2008 WL 4606262 (Del.Ch.))**

when calculating the Applicable Amount.

*ii. The Cash Issue*

Under § 5.4(b) of the Agreement, Home Depot was permitted to "remove all cash and cash equivalents from [HD Supply]" prior to the closing.[FN25] Ultimately, however, the cash was not removed from the bank accounts, and the parties disagree about whether Home Depot has a right to the cash. Home Depot takes the position that to the extent the cash was not returned, the issue could be remedied by "moving" cash into accounts receivable when calculating the Applicable Amount. Accounts receivable, unlike cash, are accounted for in the Applicable Amount because they are included in the definition of current assets in § 1.1 of the Agreement. Home Depot argues that this dispute is an issue for the neutral auditor because the accounting treatment of the cash was disputed in the Notice of Disagreement.

> FN25. Agreement at § 5.4(b).

Home Depot alleges, in essence, that the issue of whether Home Depot has rights to the cash left in HD Supply's bank accounts should be decided by the neutral auditor because it is *possible* to return the cash by adjusting the purchase price. I am not convinced by this argument. A contractual issue does not come within the arbitration provision merely because it was disputed in the Notice of Disagreement and *could* be resolved by adjusting the purchase price.

Whether Home Depot has any rights to the cash left in HD Supply's accounts is a contractual issue for the Court to decide under § 5.4(b) of the Agreement. The narrow arbitration provision in § 2.5(d) should not be extended to include disputes under other provisions of the Agreement merely because it is *possible* to deal with those issues by adjusting the Applicable Amount. Although I am mindful of the policies favoring arbitration under the FAA and New York law, the arbitration provision should only be interpreted as broadly as the parties expressly intended it to be.

Consistent with my earlier determination regarding the issue under § 6.1 of the Agreement, I conclude that it is premature to consider whether the neutral auditor may consider the § 5.4(b) issue when resolving disputes regarding the Applicable Amount. Whether the neutral auditor will have authority to

consider such arguments will become clear after further briefing or trial in this matter.

*iii. The Revised Closing Statement*

Both parties argue that this Court should decide the issue of whether the neutral auditor is permitted to consider the March 28, 2008 Revised Closing Statement that was submitted later than the allotted ninety days after the Closing Date.[FN26] In the arbitration provision, the parties agreed to send disputes regarding the calculation of the Applicable Amount remaining after the Resolution Period to the neutral auditor. Section 2.5(d) provides that:

> FN26. It should be noted that this Court, in interpreting the arbitration provision, looks to the intent of the parties as evidenced by the written words and their context in the Agreement. The intent of the parties at the time of the agreement is controlling, and the agreement of the parties at the time of litigation is not dispositive. The role of this Court is to interpret the contract that the parties drafted, a document intended to be a representation of the agreement made by the parties.

*8 The Neutral Auditors shall act as an arbitrator to determine, based solely on the presentations by [Home Depot and HDS], and not by independent review, only those issues still in dispute. The Neutral Auditor's determination of any disputed amount shall not be higher than the highest amount proposed by either party or lower than the lowest amount proposed by either party.[FN27]

> FN27. Agreement at § 2.5(d).

Section 2.5(a) of the Agreement specifies that HDS should submit its Closing Statement with its calculation of the Applicable Amount "[a]s promptly as practicable but no later than ninety (90) days after the Closing Date...."

Home Depot argues that the neutral auditor should not be permitted to consider the Revised Closing Statement submitted by HDS. HDS makes several arguments as to why the neutral auditor should be able to consider the Revised Closing Statement, not-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
**(Cite as: 2008 WL 4606262 (Del.Ch.))**

withstanding the late submission. The only question presently before this Court is whether the Court or the neutral auditor should decide whether the neutral auditor can consider the Revised Closing Statement.

Whether the Revised Closing Statement can be considered by the neutral auditor is a contractual issue that should be decided by the Court.[FN28] As explained above, the arbitration provision in the Agreement is narrow and thus the Court should only send to arbitration those issues that the parties expressly agreed to arbitrate.[FN29] The neutral auditor is charged with resolving disputes regarding the calculation of the Applicable Amount that remain after the Resolution Period. Nothing in the arbitration provision indicates that the parties agreed that the neutral auditor would determine contractual issues regarding whether a revised or delayed Closing Statement could be considered by the neutral auditor. I will not expand the arbitration agreement beyond the express intent of the parties. Therefore, I will resolve the Revised Closing Statement issue presented in Count II of the complaint.

> FN28. *See In re Allegiance Telecom, Inc.,* 356 B.R. 93, 110-11 (Bankr.S.D.N.Y.2006) (holding that post-deadline working capital adjustment could be considered by the accounting referee). *See also Nash v. Dayton Superior Corp.,* 728 A.2d 59, 63-64 (Del. Ch.1998) (holding that the issue of whether a party was permitted to revise the closing balance sheet was not "clearly arbitrable" and was therefore an issue for the Court to decide).

> FN29. *See Camferdam,* 2004 WL 1124649, at *1; *Stigwood,* 83 A.D.2d at 126.

*B. HDS's Motion for a Preliminary Injunction*

Although I am required to apply New York law in interpreting the Agreement, Delaware law supplies the procedural standard for determining whether to grant a preliminary injunction.[FN30] A preliminary injunction may be granted where the moving party demonstrates: "(1) a reasonable probability of success on the merits at a final hearing; (2) an imminent threat of irreparable injury; and (3) a balance of the equities that tips in favor of issuance of the requested relief." [FN31] The moving party is required to make

some showing for each element, and a "strong demonstration as to one element may serve to overcome a marginal demonstration of another." [FN32] A preliminary injunction is an extraordinary remedy that should only be granted sparingly. [FN33] For the reasons stated briefly below, I grant HDS's motion for a preliminary injunction.

> FN30. *Deloitte & Touche USA LLP v. Lamela,* C.A. No. 1542-N, 2005 WL 2810719, at *5 (Del. Ch. Oct. 21, 2005).

> FN31. *Brown v. T-Ink, LLC,* C.A. No. 3190-VCP, 2007 WL 4302594, at *13 (Del. Ch. Dec. 4, 2007).

> FN32. *Id.*

> FN33. *Id.*

*1. Probability of Success on the Merits*

In evaluating the first prong of the three-part test, the Court must not assess the reasonable probability of success on the ultimate dispute between the parties, but must consider whether the parties are required to submit these disputes to arbitration.[FN34] Thus, in order to show a probability of success on the merits HDS must only show that it will likely succeed on its claims that certain disputes that Home Depot seeks to send to the neutral auditor should be decided by the Court. As explained above, the Court, and not the neutral auditor, should decide (1) the Bonus and Retention Payment issue under § 6.1, (2) the cash issue under § 5.4(b), and (3) the Revised Closing Statement issue under § 2.5(a). Because I have found that these issues are properly brought before the Court, HDS has met its burden of showing a probability of success on the merits.

> FN34. *See id.*

*2. Imminent Threat of Irreparable Injury*

*9 This Court has clearly held that a party faced with immediate arbitration of non-arbitrable issues is threatened with irreparable harm sufficient to warrant an injunction.[FN35] If the arbitration proceeds, HDS will be forced to arbitrate issues that this Court has determined are outside the scope of the arbitration

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)
**(Cite as: 2008 WL 4606262 (Del.Ch.))**

provision. HDS has therefore met its burden of show-
ing irreparable harm.

> FN35. *Id.* at * 16 ("Delaware courts have
> consistently found that threatened, wrongful
> enforcement of an arbitration clause consti-
> tutes sufficient irreparable harm to justify an
> injunction."); *Parfi Holding AB v. Mirror
> Image Internet, Inc.,* 842 A.2d 1245, 1259
> (Del. Ch.2004) ("It is well settled that ... the
> procession of an unwarranted arbitration
> poses the threat of irreparable injury to the
> party rightfully resisting arbitration.").

3. *Balance of the Equities*

In considering the balance of the equities, the Court
must consider the potential harm in wrongfully grant-
ing the injunction, discounted by its probability,
against the harm of wrongfully denying the prelimi-
nary injunction, discounted by its probability.[FN36] The
balance of the harms in this case favors granting the
injunction. If the injunction is not granted, HDS will
be harmed by being forced to arbitrate non-arbitrable
issues. If the injunction is granted then the parties
will proceed before the Court on the non-arbitrable
issues before proceeding before the neutral auditor on
the arbitrable issues. No great harm is threatened by
proceeding in this order. Additionally, because I have
already determined that three of the disputes are out-
side the scope of the arbitration provision and prop-
erly before this Court, the probability of wrongfully
enjoining the arbitration in order for the Court to de-
cide those issues is eliminated.

> FN36. *See Crown Books Corp. v. Bookstop,
> Inc.,* C.A. No. 11255, 1990 WL 26166, at *7
> (Del. Ch. Feb. 28, 1990).

### III. CONCLUSION

After considering the arbitration provision and the
Agreement as a whole, I find three controversies un-
der the agreement that do not fall within the bounds
of the arbitration provision: (1) the Bonus and Reten-
tion Payment issue under § 6.1; (2) the cash issue
under § 5 .4(b); and (3) the Revised Closing State-
ment issue under § 2.5(a). The most efficient way to
proceed is for the Court to decide the contractual is-
sues before the parties proceed with arbitration. The
neutral auditor cannot properly proceed until the

Court has decided the contractual issues, especially in
light of the fact that one of the issues for the Court is
whether the Revised Closing Statement can be con-
sidered by the neutral auditor.

For the reasons set forth above, I grant plaintiff's mo-
tion for a preliminary injunction and deny defendant's
motion to stay the proceedings before this Court. Any
and all arbitration proceedings in this matter are
hereby enjoined pending the resolution of the con-
tractual claims before this Court.

The parties should confer and submit a proposed
scheduling order to resolve the contractual claims
remaining before the Court. An Order has been is-
sued consistent with this decision.

Del.Ch.,2008.
HDS Inv. Holding Inc. v. Home Depot, Inc.
Not Reported in A.2d, 2008 WL 4606262 (Del.Ch.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB  6

149 F.Supp.2d 109
**(Cite as: 149 F.Supp.2d 109)**

**c**

United States District Court,
D. New Jersey.
RCM TECHNOLOGIES, INC., Plaintiff,
v.
CONSTRUCTION SERVICES ASSOCIATES,
INC., f/k/a Computer Software Associates, Inc.;
Edwin J. Smith, Defendants.
**No. CIV.A. 00-5527 (JEI).**

May 21, 2001.

Purchaser of business brought action against vendor alleging that vendor either submitted false financial information about the business or failed to disclose material adverse changes to the business prior to the closing. Vendor moved to stay action and compel arbitration. The District Court, Irenas, J., held that purchaser's claims for fraudulent inducement, negligent misrepresentation, unjust enrichment, and breach of contract were not within scope of purchase agreement's arbitration clause.

Motion denied.

West Headnotes

**[1] Federal Courts 170B ☜403**

170B Federal Courts
  170BVI State Laws as Rules of Decision
    170BVI(C) Application to Particular Matters
      170Bk403 k. Arbitration. Most Cited Cases
      (Formerly 33k2.2 Arbitration)
The decision as to whether the parties agree to arbitrate the dispute must be made by applying the federal substantive law of arbitrability, applicable to any arbitration within the coverage of the Federal Arbitration Act. 9 U.S.C.A. § 1 et seq.

**[2] T ☜113**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(A) Nature and Form of Proceeding
      25Tk113 k. Arbitration Favored; Public Policy. Most Cited Cases
      (Formerly 33k6.2 Arbitration)
The decision as to whether the parties agree to arbitrate the dispute must be made with a healthy regard for the federal policy favoring arbitration. 9 U.S.C.A. § 1 et seq.

**[3] T ☜139**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(B) Agreements to Arbitrate
      25Tk136 Construction
        25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases
        (Formerly 33k7.1 Arbitration)
The Federal Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. 9 U.S.C.A. § 1 et seq.

**[4] T ☜210**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(D) Performance, Breach, Enforcement, and Contest
      25Tk204 Remedies and Proceedings for Enforcement in General
        25Tk210 k. Evidence. Most Cited Cases
        (Formerly 33k23.10 Arbitration)
A broad arbitration clause carries with it a presumption of arbitrability. 9 U.S.C.A. § 1 et seq.

**[5] T ☜200**

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(D) Performance, Breach, Enforcement, and Contest
      25Tk197 Matters to Be Determined by Court
        25Tk200 k. Arbitrability of Dispute. Most Cited Cases
        (Formerly 33k7.1 Arbitration)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

149 F.Supp.2d 109
**(Cite as: 149 F.Supp.2d 109)**

T ☞137

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk136 Construction
                25Tk137 k. In General. <u>Most Cited Cases</u>
    (Formerly 33k7.1 Arbitration)
With narrow arbitration clauses, a court considering the appropriate range of arbitrable issues must consider whether the issue is on its face within the purview of clause; in determining whether a particular dispute falls within the scope of narrow and specific arbitration clause, the tone of the clause as a whole must be considered. <u>9 U.S.C.A. § 1</u> et seq.

[6] T ☞113

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk113 k. Arbitration Favored; Public Policy. <u>Most Cited Cases</u>
    (Formerly 33k7.1 Arbitration)

T ☞138

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk136 Construction
                25Tk138 k. Liberal or Strict Construction. <u>Most Cited Cases</u>
    (Formerly 33k7.1 Arbitration)
Where an agreement to arbitrate is limited in its substantive scope, courts should not allow the federal policy favoring arbitration to override the will of the parties by giving the arbitration clause greater coverage than the parties intended. <u>9 U.S.C.A. § 1</u> et seq.

[7] T ☞145

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk142 Disputes and Matters Arbitrable Under Agreement
                25Tk145 k. Sales Contracts Disputes. <u>Most Cited Cases</u>

    (Formerly 33k7.7 Arbitration)
Purchaser's claims of fraudulent inducement and negligent misrepresentation against seller in connection with sale of business were not within scope of purchase agreement's arbitration clause requiring arbitration for "disputes as to interpretation" of the agreement. <u>9 U.S.C.A. § 1</u> et seq.

**[8]  Implied and Constructive Contracts 205H ☞55**

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(D) Effect of Express Contract
            205Hk55 k. In General. <u>Most Cited Cases</u>
Recovery on a theory of unjust enrichment is predicated on the absence of a valid contract on the same subject.

[9] T ☞145

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk142 Disputes and Matters Arbitrable Under Agreement
                25Tk145 k. Sales Contracts Disputes. <u>Most Cited Cases</u>
    (Formerly 33k7.7 Arbitration)
Purchaser's claim for unjust enrichment against vendor in connection with sale of business was not within scope of purchase agreement's arbitration clause requiring arbitration for "disputes as to interpretation" of the agreement; unjust enrichment claim inherently did not involve contract interpretation because recovery was based upon lack of written contract. <u>9 U.S.C.A. § 1</u> et seq.

[10] T ☞143

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk142 Disputes and Matters Arbitrable Under Agreement
                25Tk143 k. In General. <u>Most Cited Cases</u>
    (Formerly 33k7.5 Arbitration)
Every breach of contract claim conceivably raises issues of contract interpretation; however, not every

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

149 F.Supp.2d 109
(Cite as: 149 F.Supp.2d 109)

breach of contract claim properly falls within the ambit of an arbitration clause limited to contract interpretation.

**[11]** T ⬡➡137

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk136 Construction
            25Tk137 k. In General. Most Cited Cases
   (Formerly 33k7 Arbitration)
Determining whether a dispute is within the scope of an arbitration clause, the focus is on the factual allegations in the complaint rather than the legal causes of action asserted.

**[12]** T ⬡➡145

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk142 Disputes and Matters Arbitrable Under Agreement
            25Tk145 k. Sales Contracts Disputes. Most Cited Cases
   (Formerly 33k7.7 Arbitration)
Purchaser's claim for breach of contract against vendor in connection with sale of business was not within scope of purchase agreement's arbitration clause requiring arbitration for "disputes as to interpretation" of the agreement, where bases of claim were vendor's alleged false representations of business's income and alleged concealment of material adverse changes prior to execution of purchase agreement, which were not issues of interpretation of the agreement. 9 U.S.C.A. § 1 et seq.

**\*110** Steven Kudatzky, Bazelon Less & Feldman, P.C., Marlton, NJ, for Plaintiff.

Joseph Edward Sales, Norris, McLaughlin & Marcus, Somerville, NJ, for Defendants.

## OPINION

IRENAS, District Judge:

Presently before the Court is Defendants' Motion to Compel Arbitration and Stay Proceedings. For the

reasons set forth below, Defendants' Motion is denied.

### I.

On February 1, 1999, Plaintiff RCM Technology, Inc. ("RCM") and Defendants Construction Service Associates ("CSA"), **\*111** formerly known as Computer Software Associates, and Edwin J. Smith, the owner of CSA, entered into an Asset Purchase Agreement ("APA") whereby RCM was to purchase substantially all of CSA's assets. The purchase price for the assets was $6,750,000, subject to certain post-closing adjustments specified by the APA. (APA ¶ 3.1) Pursuant to the agreement, RCM paid $2,500,000 at the closing. (*Id.* ¶ 3.2(i)). The remainder of the purchase price was to be paid as deferred consideration based on the financial performance of the purchased business. (*Id.* ¶ 3.2).

Among the representations and warranties made by Defendants as "a material inducement" for Plaintiff to enter into the APA was a promise that CSA's "closing net operating income' was not less than $1,200,000." (*Id.* ¶ 5; ¶ 5.23). Defendants also warranted that CSA's business had suffered no "materially adverse changes in the business, condition (financial or otherwise, results of operations, properties, assets, liabilities, earnings or net worth....") (*Id.* ¶ 5.5). According to the APA, these representations were conditions precedent to any of Plaintiff's obligations under the contract. (*Id.* ¶ 10.2).

At some point after the execution of the APA, Plaintiff discovered that CSA's closing net operating income was in fact less than $ 1,200,000. Plaintiff claims that Defendants either submitted false numbers reflecting CSA's financial performance through October 1998 or that the Defendants failed to disclose that CSA had suffered "materially adverse changes" prior to the closing. (Pl.'s Opp. at 3).

On October 2, 2000, Plaintiff brought suit in New Jersey Superior Court, asserting claims of fraudulent inducement, negligent misrepresentation, unjust enrichment, and breach of contract. Subsequently, on November 9, 2000, Defendants removed the matter to this Court. On November 17, 2000, Defendants simultaneously filed an Answer and the instant Motion. Defendants seek to stay these proceedings and compel arbitration based on the APA's arbitration clause,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

149 F.Supp.2d 109
(Cite as: 149 F.Supp.2d 109)

which provides in relevant part that "[i]f a dispute arises as to interpretation of this Agreement, it shall be decided finally by three arbitrators in an arbitration proceeding...." (*Id.* ¶ 12). The agreement further provides for arbitration to be held in Phoenix, Arizona.[FN1]

> FN1. Thus, this matter is complicated by this Court's lack of authority to compel arbitration outside of its district in the contractually chosen forum of Arizona. *See Optopics Laboratories Corp. v. Nicholas,* 947 F.Supp. 817 (D.N.J.1996). However, if the Court found the matter to be arbitrable, it could transfer the matter to district court in Arizona. Nevertheless, because, as discussed below, the Court finds that the instant dispute does not fall within the scope of the arbitration clause, the Court need not concern itself with these contingencies.

## II.

The Supreme Court has long recognized that the Federal Arbitration Act embodies a strong federal policy favoring arbitration. *See Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 424-25, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Pursuant to the Act, an arbitration clause in a "transaction involving commerce" is "valid, irrevocable, and enforceable" except on "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 of the Act requires a court in which suit has been brought on an issue referable to arbitration under a written arbitration agreement "to stay the court action pending**112 arbitration once it is satisfied that the issue is arbitrable under the agreement." *Prima Paint Corp.,* 388 U.S. at 400, 87 S.Ct. 1801 (discussing 9 U.S.C. § 3).[FN2] Upon motion by "[a] party aggrieved by the alleged failure, neglect, or refusal" to honor such an arbitration agreement, Section 4 directs the court "to order arbitration once it is satisfied that an agreement for arbitration has been made and has not been honored." *Id.* at 400, 87 S.Ct. 1801 (discussing 9 U.S.C. § 4).

> FN2. In *Prima Paint,* the parties agreed to a

broad arbitration clause, which read in part:

> Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the rules then obtaining of the American Arbitration Association....

There is no dispute that the APA involves interstate commerce or that the construction of its arbitration clause is governed by the Federal Arbitration Act. (Pl.'s Opp. at 5; Defs.' Br. at 4). However, the parties disagree as to the result under the Act. Defendants urge this Court to stay litigation and compel arbitration while Plaintiff contends that its claims do not fall within the scope of the APA's arbitration clause.

[1][2][3] The Supreme Court has instructed that "the first task for a court asked to compel arbitration of a dispute is to determine whether the parties agree to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). That decision must be made "by applying the 'federal substantive law of arbitrability, applicable to any arbitration within the coverage of the Act.' " *Id.* (citations omitted). Further, it must be made "with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. 927. The Arbitration Act establishes that, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Id.* at 24-25, 103 S.Ct. 927. However, the Supreme Court has made clear that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Nevertheless, the Court has instructed that "[a]n order to arbitration should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 582-83, 80 S.Ct. 1347 (discussing arbitration under Labor Management Relations Act). Accordingly, doubts as to arbitrability are to be "resolved in favor of coverage." *Id.* at 583, 80 S.Ct. 1347.

[4][5][6] Thus, a broad arbitration clause carries with it a certain presumption of arbitrability. *See Kiefer*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

149 F.Supp.2d 109
(Cite as: 149 F.Supp.2d 109)

*Specialty Flooring v. Tarkett, Inc.,* 174 F.3d 907, 910
(7th Cir.1999); *McDonnell Douglas Fin. Corp. v.
Pennsylvania Power & Light Co.,* 858 F.2d 825, 832
(2d Cir.1988) (citations omitted).

> With narrower clauses, however, a court consider-
> ing the appropriate range of arbitrable issues must
> "consider whether the [question at] issue is on its
> face within the purview of clause." ... In determin-
> ing whether a particular dispute falls within the
> scope of a narrow and specific arbitration clause,
> "[t]he tone of the clause as a whole must be con-
> sidered."

*McDonnell Douglas Fin. Corp.,* 858 F.2d at 832
(citations omitted). Where an agreement to arbitrate
is limited in its substantive scope, courts should not
allow **\*113** " 'the federal policy favoring arbitration
... to override the will of the parties by giving the
arbitration clause greater coverage than the parties
intended.' " *PaineWebber, Inc. v. Hartmann,* 921
F.2d 507, 513 (3d Cir.1990) (quoting *National R.R.
Passenger Corp. v. Boston & Maine Corp.,* 850 F.2d
756, 760-61 (D.C.Cir.1988)). As indicated above, the
arbitration clause at issue here is by its terms limited
to "disputes as to interpretation" of the APA.[FN3] The
issue before this Court is thus whether Plaintiff's
claims of fraudulent inducement, negligent misrepre-
sentation, unjust enrichment, and breach of contract
fall within the purview of this relatively narrow arbi-
tration clause. In addressing that issue, this Court
must be respectful of the parties' intent. *See
McDonnell Douglas Fin. Corp.,* 858 F.2d at 832.

> FN3. Compare this arbitration clause with
> the clause at issue in *Prima Paint* which was
> held to cover claims of fraudulent induce-
> ment. *See supra* note 1.

According to Defendants, the parties plainly "envi-
sioned that all disputes relating to the meaning and
application of the various provision of the APA
would be submitted" to arbitration. (Defs.' Br. at 3).
Further, Defendants contend that any resolution of
RCM's breach of contract claims "necessarily re-
quires 'interpretation of the Agreement,' " thereby
invoking the arbitration clause of the APA. (*Id.*).
Plaintiff counters that the clause is narrow and "con-
tains an explicit and restrictive definition of the dis-
putes" that the parties contracted to submit to arbitra-
tion. (Pl.'s Opp. at 8).

## A) Fraudulent Inducement and Negligent Misrep-
resentation Claims

[7] The Supreme Court has held that if there is no
claim that fraud was directed at the arbitration clause
itself, claims of fraudulent inducement are arbitrable.
*See Prima Paint,* 388 U.S. at 402-04, 87 S.Ct. 1801.
However, that does not mean that the question of
whether Plaintiff's claims of fraudulent inducement
and negligent misrepresentation fall within the scope
of the APA's limited arbitration provision must be
answered in the affirmative. In fact, that inquiry must
be answered negatively.

In *Prima Paint,* the Supreme Court held that an arbi-
tration clause referring "[a]ny controversy or claim
arising out of or relating to" the agreement covered
the plaintiff's claim of fraud in the inducement. 388
U.S. at 398, 406, 87 S.Ct. 1801. Because the plaintiff
raised no claim that the defendant had fraudulently
induced it to enter into the arbitration agreement, the
Court held that the claim that the defendant had
fraudulently procured the contract was one for the
arbitrator. *Id.* at 406, 87 S.Ct. 1801. As in *Prima
Paint,* Plaintiff here does not contend that the arbitra-
tion clause itself was procured by fraud. However,
unlike the arbitration clause in that case, the clause at
issue here is limited to disputes as to "interpretation."
This narrow provision is not broad enough to encom-
pass claims of fraud in the inducement. *See generally*
Jay M. Zitter, *Claim of fraud in inducement of con-
tract as subject to compulsory arbitration clause con-
tained in contract,* 1982 WL 198591, 11 A.L.R.4th
774 (1982) (discussing language held to include such
claims and language held not to include such claims).

In *Baker v. Paine, Webber, Jackson & Curtis,* 637
F.Supp. 419 (D.N.J.1986), the Court was faced with
an arbitration clause covering "disputes 'arising out
of the handling of transactions referred to in this
agreement.' " *Id.* at 421. Among other contentions,
the plaintiffs there claimed that they were fraudu-
lently induced to invest in certain funds managed by
the defendants.**\*114** *Id.* at 420-21. The Court de-
clined to remit the plaintiffs' claims of fraudulent
inducement to the arbitrator because "[s]uch fraudu-
lent inducement ha[d] nothing to do with the transac-
tions referred to in the agreement...." *Id.* at 421. Simi-
larly, here, Plaintiff's claims of fraud and negligent
misrepresentation have nothing to do with the inter-

149 F.Supp.2d 109
(Cite as: 149 F.Supp.2d 109)

pretations of the terms of the APA. The very terms of the arbitration clause "plainly manifests the parties intent to limit arbitration to the interpretation...." *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 10 (1st Cir.2000) (discussing arbitration clause covering "ambiguities or questions of interpretation"). Thus, because Plaintiff's claims of fraudulent inducement and negligent misrepresentation are not such disputes, it would be improper for this Court to refer them to arbitration.

**B) Unjust Enrichment Claim**

[8][9] Plaintiff's quantum meruit claim is likewise not within the ambit of the arbitration agreement. Recovery on a theory of unjust enrichment is predicated on the absence of a valid contract on the same subject. *In re Penn Central Transp. Co.*, 831 F.2d 1221 (3d Cir.1987) (citing *Mediterranean Enter., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir.1983)). Thus, an unjust enrichment claim inherently does not involve contract "interpretation." However, this is not to say that an unjust enrichment claim could not properly be referred to arbitration but only that Plaintiff's may not. Parties to an arbitration agreement covering disputes as to "interpretation" of the contract cannot not be forced to arbitrate such claims.

**C) Breach of Contract Claim**

Defendants argue that a determination of the breach of contract claim necessarily requires an interpretation of the terms "normalized," "closing net operating income," and "material adverse changes." Thus, according to Defendants, the claim should properly be decided by an arbitrator. Although Defendants' presents a stronger argument for arbitrability on this claim than the others, nevertheless, Plaintiff's breach of contract claim does not fall within the purview of the arbitration clause.

[10][11] In theory, every breach of contract claim conceivably raises issues of contract interpretation. However, not every breach of contract claim properly falls within the ambit of an arbitration clause limited to contract interpretation. It is not enough to label Plaintiff's claim as a "breach of contract claim" and find that it thus falls within the scope of the arbitration agreement. *See Mutual Benefit Life Ins. Co. v. Zimmerman*, 783 F.Supp. 853, 869 (D.N.J.1992). Determining whether a dispute is within the scope of

an arbitration clause, "the focus is on the 'factual allegations in the complaint rather than the legal causes of action asserted.' " *Id.* at 869 (D.N.J.1992).

[12] Here, the bases of Plaintiff's claim are defendants' alleged false representations of CSA's Closing Net Operating Income and/or their purported "concealment of material adverse changes suffered by [CSA] prior to the execution of the APA." (Pl's Opp. at 11). Thus, a determination of the claim will require a determination of the truth of CSA's representation of its Closing Net Operating Income and of whether the company suffered from any material financial changes not disclosed to Plaintiff. Such determinations are not truly issues of "interpretation." Consequently, Plaintiff's breach of contract claim does not fall within the scope of the arbitration agreement. *See Coady*, 223 F.3d at 10 (finding clause limited to "ambiguities or questions of interpretation" did not encompass\*115 breach of contract claims involving no issues of contract interpretation).

### III.

For the reasons set forth above, Defendants' Motion is Denied. The Court will issue an appropriate order.

D.N.J.,2001.
RCM Technologies, Inc. v. Construction Services Associates, Inc.
149 F.Supp.2d 109

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB 7

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
**(Cite as: 982 F.2d 884)**

▷
United States Court of Appeals,
Third Circuit.
TRAP ROCK INDUSTRIES, INC., Appellant,
v.
LOCAL 825, INTERNATIONAL UNION OF OP-
ERATING ENGINEERS, AFL-CIO, Appellee.
No. 92-5281.

Argued Nov. 17, 1992.
Decided Dec. 30, 1992.

Employer filed complaint seeking declaration that its
decision to demote and discharge haul truck driver
from open pit quarry was not subject to arbitration
under terms of collective bargaining agreement. Em-
ployer and union filed cross-motions for summary
judgment. The United States District Court for the
District of New Jersey, Garrett E. Brown, Jr., J.,
granted union's motion to compel arbitration. Em-
ployer appealed. The Court of Appeals, Garth, Cir-
cuit Judge, held that: (1) collective bargaining
agreement provided employer with sole discretion to
demote or discharge employees based on lack of
qualifications or poor performance, and (2) unsub-
stantiated allegations that driver was demoted be-
cause of supervisor's personal animosity toward
driver did not create fact question.

Reversed with directions.

West Headnotes

**[1] Federal Courts 170B ⬤⇒554.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)1 In General
                170Bk554 Nature, Scope and Effect of
Decision
                    170Bk554.1 k. In General. Most
Cited Cases
    (Formerly 170Bk554)
Court of Appeals has jurisdiction to review district
court's order compelling arbitration in response to
cross motions for summary judgment. 28 U.S.C.A. §
1291.

**[2] Labor and Employment 231H ⬤⇒1541**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)3 Arbitration Agreements
                231Hk1541 k. In General. Most Cited
Cases
    (Formerly 232Ak415 Labor Relations)

**Labor and Employment 231H ⬤⇒1549(4)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)3 Arbitration Agreements
                231Hk1543 Construction and Operation
                    231Hk1549 Matters Subject to Arbi-
tration Under Agreement
                        231Hk1549(4) k. Arbitrability.
Most Cited Cases
    (Formerly 232Ak415 Labor Relations)
Arbitration of labor disputes is a matter of contract
and party cannot be required to submit to arbitrate
any dispute without that party's agreement to so sub-
mit.

**[3] Labor and Employment 231H ⬤⇒1549(4)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)3 Arbitration Agreements
                231Hk1543 Construction and Operation
                    231Hk1549 Matters Subject to Arbi-
tration Under Agreement
                        231Hk1549(4) k. Arbitrability.
Most Cited Cases
    (Formerly 232Ak434.4 Labor Relations)
Unless clearly and unmistakably provided otherwise,
question of whether parties to labor dispute agreed to
arbitrate is to be decided by court, not arbitrator.

**[4] Labor and Employment 231H ⬤⇒1556(3)**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
**(Cite as: 982 F.2d 884)**

231H Labor and Employment
   231HXII Labor Relations
     231HXII(H) Alternative Dispute Resolution
      231HXII(H)3 Arbitration Agreements
        231Hk1552 Enforcement of Agreement
to Arbitrate
        231Hk1556 Proceedings
          231Hk1556(3) k. Scope of Inquiry; Merits of Controversy. Most Cited Cases
    (Formerly 232Ak416.8, 232Ak416 Labor Relations)
When deciding whether parties to labor dispute agreed to submit particular grievance to arbitration, court is not to rule on potential merits of underlying claims.

**[5] Labor and Employment 231H ⟨⟩1549(2)**

231H Labor and Employment
   231HXII Labor Relations
     231HXII(H) Alternative Dispute Resolution
      231HXII(H)3 Arbitration Agreements
        231Hk1543 Construction and Operation
        231Hk1549 Matters Subject to Arbitration Under Agreement
          231Hk1549(2) k. Arbitration Favored; Presumption of Arbitrability. Most Cited Cases
    (Formerly 232Ak434.1 Labor Relations)
Presumption of arbitrability did not apply to collective bargaining agreement in which arbitration provision was narrowly crafted to apply only to certain disciplinary discharges and layoffs; presumption applies only where arbitration clause is broad one covering any differences arising with respect to interpretation of contract.

**[6] Labor and Employment 231H ⟨⟩1549(16)**

231H Labor and Employment
   231HXII Labor Relations
     231HXII(H) Alternative Dispute Resolution
      231HXII(H)3 Arbitration Agreements
        231Hk1543 Construction and Operation
        231Hk1549 Matters Subject to Arbitration Under Agreement
          231Hk1549(16) k. Promotion, Demotion, and Transfer; Work Assignments. Most Cited Cases
    (Formerly 232Ak434.8 Labor Relations)

**Labor and Employment 231H ⟨⟩1549(19)**

231H Labor and Employment
   231HXII Labor Relations
     231HXII(H) Alternative Dispute Resolution
      231HXII(H)3 Arbitration Agreements
        231Hk1543 Construction and Operation
        231Hk1549 Matters Subject to Arbitration Under Agreement
          231Hk1549(19) k. Discharge and Layoff. Most Cited Cases
    (Formerly 232Ak434.8 Labor Relations)
Employer could not be compelled to arbitrate decision to demote or discharge employee based on lack of qualifications or poor performance where union and employer agreed in collective bargaining agreement that employer would have sole discretion to demote or discharge employees.

**[7] Federal Civil Procedure 170A ⟨⟩2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2497 Employees and Employment Discrimination, Actions Involving
          170Ak2497.1 k. In General. Most Cited Cases
    (Formerly 170Ak2497)
Unsupported allegations that haul truck driver employed at open pit quarry was demoted because of supervisor's personal animosity did not create fact question sufficient to preclude summary judgment in suit to compel arbitration under collective bargaining agreement; employer submitted undisputed evidence that truck driver was demoted for failing to perform duties properly, lacked required qualifications, and collective bargaining agreement expressly granted employer sole discretion to demote or discharge for those reasons. Labor Management Relations Act, 1947, § 301(a), 29 U.S.C.A. § 185(a); Fed.Rules Civ.Proc.Rule 56(c, e), 28 U.S.C.A.

**\*884** Jeffrey L. Braff (argued), Cohen, Shapiro, Polisher, Shiekman and Cohen, Philadelphia, PA, for appellant.

David Grossman (argued), Schneider, Cohen, Solomon, Leder & Montalbano, Cranford, NJ, for appellee.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
**(Cite as: 982 F.2d 884)**

**\*885** Before MANSMANN, HUTCHINSON and GARTH, Circuit Judges.

OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal presents for our review the question of the effect to be given a clause in a collective bargaining agreement which reserved to the employer's discretion the right to demote and ultimately to discharge an employee who failed to perform assigned duties properly or who failed to meet the qualifications of his job. The district court ruled against the employer and granted the Union's motion to compel arbitration. We reverse.

## I.

Trap Rock Industries, Inc. ("Trap Rock") is engaged in the quarrying industry and was the employer of Freddy Torres, a member of Local 825 of the International Union of Operating Engineers, AFL-CIO ("Union"). The Union is the exclusive bargaining representative for certain of Trap Rock's employees, including, as stated, Freddy Torres.

On June 1, 1990, the Union and Trap Rock entered into a collective bargaining agreement ("CBA") covering the three year period from June 1, 1990 through May 31, 1993. Among its several provisions, the CBA includes two complementary clauses that are pertinent to Trap Rock's appeal. Article III, paragraph 6, the "Reservation Clause," provides:

> The Employer reserves the right, which right shall not be subject to Arbitration, to determine the qualifications of any Employee covered hereunder and if, in the Employer's opinion, the Employee does not meet the qualifications or fails to perform his duties properly, then the Employer can Discharge or demote the Employee, whichever the Employer desires. The Employer will notify the Employloyee [sic] and Union of such action.

The "Arbitration Clause," Article VII, paragraph C, provides for binding arbitration in other particular instances where disputes between Trap Rock and the Union have not been resolved through an internal grievance procedure. This provision expressly limits the arbitrator's jurisdictional reach:

> [t]he Arbitrator's powers are limited as follows:

> He shall have no power to add to, or subtract from, or modify any of the terms of any Agreement....

> He shall have no power to substitute his discretion for the Employer's discretion in cases where the Employer is given the discretion by this Agreement or by any supplementary Agreement, except that where he finds a disciplinary layoff or discharge is in violation of this Agreement, then he may make appropriate modifications of the penalty.

Freddy Torres was employed as a truck driver at Trap Rock's open pit quarry in Pennington, New Jersey. Among his duties, Torres was required to drive a 29-ton, 6-wheel "haul truck" on steep, unpaved dirt roads into the quarry, where the truck was loaded with stone. Torres then drove the laden truck, often weighing in excess of 150,000 pounds, to a "stone crusher," into which the rock was deposited.

Over a period of fourteen months, Torres received several written and verbal warnings from his supervisor regarding his failure to perform his duties properly. Specifically, Torres was warned for excessive absenteeism, (A. 29); for reading a newspaper in his truck at the primary "crusher," (A. 29; 32; 33); for failing to stop his truck at a designated point before downshifting to first gear and for shifting to reverse while moving forward, (A. 30, 33-34); and for sustaining a gash in a truck tire after driving over a large, sharp-edged rock. (A. 34; *see* A. 30).

On October 26, 1990, Torres was demoted to the job of "laborer." (A. 30). Torres' supervisor determined that Torres' work was "defective," (A. 35); that he failed to perform his truck driving duties properly and failed to meet the qualifications for being a truck driver, (A. 20); and that "for the safety of Fred Torres and the other Employees and the wear and tear on the **\*886** trucks he should be demoted to a laborer to keep the man employed." (A. 34).

On October 29, 1990, Torres complained to his supervisor that his new job was unsafe; he also complained about his hourly wage and about his demotion in general. (A. 22-23). On the same day, Torres

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
(Cite as: 982 F.2d 884)

signed an "Employee Warning Record" drafted by his supervisor which stated, "On Oct. 29, 1990, employee refused to work because of demotion." (A. 31).

According to Torres, and apparently due to his refusal to work, the supervisor told him to "punch out and go home." (A. 23). Torres claims that when he returned the following day, the supervisor did not allow him to return to work, telling Torres that it was not his, the supervisor's, place to hire him back. (A. 23). That same day Torres filed a grievance acknowledging that he was demoted because "[t]hey said I failed to meet the requirements to drive a truck," (A. 17), but alleging that, because other employees had committed similar infractions without being demoted, "Trap Rock is discriminating me [sic] forcing me to quit." (A. 18).

On April 11, 1991, Trap Rock filed a complaint in the District Court for the District of New Jersey seeking a declaratory judgment that the Torres dispute was not subject to arbitration, as well as an order enjoining the Union from submitting the Torres dispute to arbitration. On January 21, 1992, Trap Rock filed a motion for summary judgment and, on the same date, the Union cross-moved to compel arbitration, pursuant to § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) and the Federal Arbitration Act, 9 U.S.C. § 4. On April 22, 1992, the district court issued a memorandum and order denying Trap Rock's motion for summary judgment and granting the Union's cross-motion to compel arbitration. This appeal followed.

## II.

The district court commenced its analysis of the two motions by restating the well-settled standards governing summary judgment, and by setting forth what it considered to be the law of this circuit governing the arbitrability of disputes. Apparently due to the mere presence in the CBA of the Article VII, paragraph C "Arbitration Clause," the district court invoked, without discussion or analysis, the "presumption of arbitrability" required in certain circumstances under *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986). [FN1] The district court then employed an analytical framework for applying that presumption as set forth by this court in

*E.M. Diagnostic Systems, Inc. v. Local 169, International Brotherhood of Teamsters*, 812 F.2d 91, 95 (3d Cir.1987):

> FN1. "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of arbitration.' " *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (citation omitted).

(1) Does the present dispute come within the scope of the arbitration clause? (2) does any other provision of the contract expressly exclude this kind of dispute from arbitration? and (3) is there any other "forceful evidence" indicating that the parties intended such an exclusion?
*E.M. Diagnostic*, 812 F.2d 91 (3d Cir.1987).

Focusing on the second of these inquiries, the district court concluded that "[t]he dispositive issue in this case is whether, as Trap Rock argues, [Article III, paragraph 6] expressly excludes from arbitration the subject matter of Mr. Torres's grievance." The district court then held that Article III, paragraph 6 "does not exclude from arbitration the subject matter of the Torres dispute." The district court reasoned that Torres was demoted because of his supervisor's "personal animosity" towards him and that the expressed reasons for the demotion-safety infractions, poor performance and a lack of qualifications-were "merely pretext." The court concluded that "this is not a dispute about whether *887 Mr. Torres met the qualifications required for the position" and that, therefore, the dispute did not fall within Article III's exemption from arbitration.

In the alternative, the district court, concluding that the first clause of paragraph 6 [FN2] was severable from the second clause, [FN3] held that even if the dispute did involve Torres' qualifications, Article III, paragraph 6 did not exclude such disputes from arbitration in the first instance. Thus, according to the district court, only Trap Rock's right to determine an employee's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
(Cite as: 982 F.2d 884)

qualifications is non-arbitrable, while the demotion or discharge of an unqualified or poorly performing employee must be submitted to arbitration. Accordingly, the district court held that Torres's dispute, even if arising from a demotion based on qualifications or a failure of performance, must be arbitrated.

> FN2. "The Employer reserves the right, which right shall not be subject to Arbitration, to determine the qualifications of any employee covered hereunder...."

> FN3. "... and if, in the Employer's opinion, the Employee does not meet the qualifications or fails to perform his duties properly, then the employer can Discharge or demote the Employee, whichever the Employer desires."

### III.

[1] We have jurisdiction over the district court's final order compelling arbitration pursuant to 28 U.S.C. § 1291. See *Goodall-Sanford, Inc. v. Textile Workers of America, A.F.L. Local 1802,* 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031 (1957); *Zosky v. Boyer,* 856 F.2d 554 (3d Cir.), *cert. denied,* 488 U.S. 1042, 109 S.Ct. 868, 102 L.Ed.2d 992 (1988). In light of the manner in which the procedure developed in the district court, where a motion for summary judgment was countered with a motion to compel arbitration, the order compelling arbitration is deemed by us to be tantamount to an order granting a cross-motion for summary judgment. When an appeal from a denial of summary judgment is raised, as it is here, in tandem with an appeal of an order granting a cross-motion for summary judgment, as we deem the district court's arbitration order to be, we have jurisdiction to review the propriety of the denial of summary judgment by the district court. *Sacred Heart Medical Center v. Sullivan,* 958 F.2d 537, 543 (3d Cir.1992); *Nazay v. Miller,* 949 F.2d 1323, 1328 (3d Cir.1991); *First National Bank v. Lincoln National Life Insurance Co.,* 824 F.2d 277, 281 (3d Cir.1987). Thus, we simultaneously review both the district court's order compelling arbitration and the order denying Trap Rock's motion for summary judgment. Our standard of review is plenary.

Because we review the district court's order compelling arbitration as a grant of summary judgment, we will apply the same summary judgment test as that applied by a district court. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3rd Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Thus, pursuant to Fed.R.Civ.P. 56(c), we ask: "(1) is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?" *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3rd Cir.1992) (quoting *Country Floors, Inc. v. Gepner,* 930 F.2d 1056, 1060 (3rd Cir.1991) (quoting *Int'l Union, UMWA v. Racho Trucking Co.,* 897 F.2d 1248, 1252 (3rd Cir.1990))). Moreover, where we review both a denial of a motion for summary judgment and a grant of a cross-motion for summary judgment, and "where, as here, the facts are uncontroverted, we are free to enter an order directing summary judgment in favor of the [party whose motion had been denied by the district court.]" *Sacred Heart,* 958 F.2d at 543; (quoting *Nazay,* 949 F.2d at 1328; *First National Bank,* 824 F.2d at 281).

### A.

[2][3][4][5] We begin our discussion with the law governing the arbitrability of labor disputes, as first articulated by the Supreme Court in the *Steelworkers Trilogy* [FN4] and **\*888** restated in *AT & T, supra.* First, although federal policy generally favors arbitration of disputes between a union and an employer, the federal courts have made it clear that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.' " *AT & T,* 475 U.S. at 648, 106 S.Ct. at 1418 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960)). *See also United Steelworkers v. Lukens Steel Co.,* 969 F.2d 1468, 1473 (3d Cir.1992) (quoting *AT & T* and *Warrior & Gulf* ); *Morristown Daily Record v. Graphic Communications Union, Local 8N,* 832 F.2d 31, 33 (3d Cir.1987) (quoting *AT & T; Warrior & Gulf* ); *E.M. Diagnostic,* 812 F.2d at 94 (quoting *Warrior & Gulf* ). Second, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T,* 475 U.S. at 649, 106 S.Ct. at 1418. *See also John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 546-47, 84 S.Ct. 909, 912-13, 11 L.Ed.2d 898 (1964); *Lukens Steel,* 969 F.2d at 1473-74 (quoting *AT & T;* citing *John Wiley* ); *Morristown Daily,* 832 F.2d at 33

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
**(Cite as: 982 F.2d 884)**

(citing *AT & T* ); *E.M. Diagnostic,* 812 F.2d at 94-95 (citing *AT & T* ). Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT & T,* 475 U.S. at 649, 106 S.Ct. at 1419. *See also Lukens Steel,* 969 F.2d at 1474 (quoting *AT & T* ); *Morristown Daily,* 832 F.2d at 33 (citing *AT & T; United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)).<u>FN5</u>

> FN4. *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

> FN5. The district court's invocation of the "presumption of arbitrability" as set forth in *AT & T, supra,* was inappropriate here. The *AT & T* Court gave us specific guidance on the applicability of that presumption, advising that it "is particularly applicable where the [arbitration] clause is a *broad one,*" covering " '*any differences* arising with respect to the interpretation of this contract or the performance of any obligation hereunder,' " *AT & T, supra,* 475 U.S. at 650, 106 S.Ct. at 1419. (emphasis added), and that in such cases " 'only the most forceful evidence of a purpose to exclude a particular grievance from arbitration can prevail.' " *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419 (citation omitted).

This court has adhered to that guidance, also recognizing that the presumption is to be invoked where an arbitration provision is a "*broad one.*" *E.M. Diagnostic Systems, Inc. v. Local 169, International Brotherhood of Teamsters,* 812 F.2d 91, 95 (3d Cir.1987) (emphasis added). *See also United Steelworkers v. Lukens Steel Co.,* 969 F.2d 1468, 1474 (3d Cir.1992) ("[w]hen, as here, the collective bargaining agreement contains a *broad* grievance and arbitration clause, the presumption of

arbitrability applies") (emphasis added). In *E.M. Diagnostic,* for example, the broad arbitration provision applied to "*[a]ny dispute* arising out a claimed violation of this Agreement [the CBA]," 812 F.2d at 92 (emphasis added), and provided that the "[a]rbitrator's decisions shall be binding and final upon all parties." *Id.* at 93. Unlike the provision before us, the *E.M. Diagnostic* provision did not by its explicit terms expressly limit the range of arbitrable disputes to a single category or function, such as limiting the arbitrator's power to modifying a penalty where only disciplinary layoffs or discharges which violate the terms of the CBA are involved. *Compare also Lukens Steel,* 969 F.2d at 1470 (broad arbitration clause provides for arbitration of *all* disputes arising from suspension and discharge, without limitation); *Morristown Daily Record v. Graphic Communications Union, Local 8N,* 832 F.2d 31, 34 (3d Cir.1987) (provision authorizes arbitration of unresolved grievances over "any dispute" over meaning or violation of CBA, or over discharge, without limitation).

Because the arbitration provision of Article VII is narrowly crafted to apply only to certain disciplinary discharges and layoffs, we cannot presume, as we might if it were drafted broadly, that the parties here agreed to submit all disputes to arbitration, particularly where the employer has expressly reserved to itself the rights found in Article III, paragraph 6. Thus, the presumption of arbitrability and the *E.M. Diagnostic* test, which were central to the district court's analysis, are inapposite.

B.

[6] In applying these principles to a particular collective bargaining agreement, the "courts must carefully analyze the contractual language to determine whether a particular dispute is arbitrable." *Morristown Daily,* 832 F.2d at 34-35 (3d Cir.1987). Here, the pertinent language of Articles III and VII of the CBA clearly reveals**889** that the parties have

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
**(Cite as: 982 F.2d 884)**

agreed that where an employee's qualifications or job performance are at issue, the employer, and not the arbitrator, should have the sole discretion to demote or discharge an employee.

When read together, the "Reservation Clause" of Article III and the "Arbitration Clause" of Article VII disclose the parties' agreement to restrict an arbitrator's powers to the modification of a penalty where only certain disciplinary layoffs or discharges which are in violation of the CBA are arbitrated.[FN6] They have done so, while at the same expressly providing that there shall be no arbitration of discharges or demotions arising from deficiencies in qualifications or performance.

> FN6. Thus, the arbitrator's limited authority is threefold: first, he must determine whether a layoff or discharge was the result of disciplinary action provoked by the employee's conduct; second, he must determine whether the disciplinary layoff or discharge violated the terms of the CBA; and third, if so, he may do no more than modify the "penalty" assessed.

We thus reject the district court's interpretation of the agreement which, we conclude, unjustifiably misconstrues the structure of Article III. First, the district court's reading disregards the parallel use of a salient term, "qualifications," which appears on both sides of the "equation"-in both the first and second clauses of Article III, paragraph 6. That parallel structure clearly suggests that the provision's introductory pronouncement of non-arbitrability was intended to be overarching, applying both to the determination, and then to the sanction, involving an employee's "qualifications."

More important, the district court's interpretation would deprive the "Reservation Clause" of its logical coherence. First, as a practical matter, Trap Rock's independent judgment that an employee lacks qualifications simply cannot give rise to a dispute with the Union until some further action, such as the demotion or discharge of an unqualified employee, is taken with respect to that judgment. Moreover, as a functional matter, Trap Rock's exclusive authority to determine whether its employees are qualified, without resort to arbitration, would be rendered entirely toothless if actions taken to effectuate those determi-

nations must be submitted to arbitration. Indeed, nowhere in the CBA does any limitation on the employer's customary prerogative of determining employees' qualifications appear. If this provision is to have any practical significance, it must be construed as vesting in Trap Rock the authority not only to determine whether an employee is qualified, but also the authority to act upon such a determination, free from arbitration, with the same degree of autonomy.

We thus conclude that the correct interpretation of Article III's "Reservation Clause," which is both consistent with its structure and which permits of a practical application, must reflect the parties' express agreement to reserve to Trap Rock, in its discretion and without resort to arbitration, the right to determine whether an employee is qualified, and to demote and ultimately to discharge an employee who is unqualified or who fails to perform assigned duties properly. So construed, the "Reservation Clause" directly complements Article VII's "Arbitration Clause," which represents the parties' express agreement that only disputes over disciplinary layoffs or discharges which violate the terms of the CBA may be submitted to an arbitrator, and then only for the limited purpose of modifying the "penalty."

We have discussed Article VII because, as stated, it complements and gives additional meaning to the "Reservation Clause" of Article III. In its brief and at oral argument, however, the Union at no time addressed Article VII's "Arbitration Clause" or its relationship to Article III's "Reservation Clause." [FN7] Trap Rock did discuss the "Arbitration Clause" in its brief and at oral argument, but only to the extent **\*890** that it prohibits the arbitrator from encroaching upon the employer's vested discretion under the CBA. Neither Trap Rock nor the Union has addressed, as we have here, the relationship of these two clauses, each to the other. Nor did either discuss the limitation on the arbitrator's powers as found in Article VII.

> FN7. At oral argument, counsel for the Union referred to the "arbitration clause" only in response to an inquiry into its applicability to demotions. Counsel answered that the clause did not apply to Trap Rock's decisions to demote.

Finally, the district court itself makes reference to the "Arbitration Clause," but only to note that it "would

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
**(Cite as: 982 F.2d 884)**

be a nullity if Trap Rock's reading of article three, section 6 were correct." To support this statement, the district court then asked the rhetorical question: "[i]f Trap Rock's discharge of an employee were not subject to arbitration, how could an arbitrator ever find that the discharge violated the terms of the agreement?" That question is readily answered, however. Articles III and VII together identify two types of discharges: (1) discharges based on improper performance or a lack of qualifications, which are not subject to arbitration, under Article III, and (2) disciplinary discharges,[FN8] which may be submitted to the arbitrator as to whether the employer's penalty should be modified, if the employee's discharge violated the terms of the CBA, under Article VII.

> FN8. The CBA furnishes no content as to what is meant by a "disciplinary" discharge, and the parties have called our attention to no provision of the CBA pertaining thereto, a burden which we believe rests upon the Union in this proceeding. We assume that the agreement must be read as implicitly referring to actions taken by an employee such as drunkenness, ingestion of controlled substances, theft, and the like, none of which are central either to qualifications or performance, and any of which would commonly result in a disciplinary penalty.

Given the terms of the agreement before us, therefore, Trap Rock may not be compelled by a federal court to arbitrate a demotion or discharge based on a lack of qualifications or poor performance. *See AT & T,* 475 U.S. at 648, 106 S.Ct. at 1418 (quoting *Warrior & Gulf,* 363 U.S. at 582, 80 S.Ct. at 1352). *See also Lukens Steel,* 969 F.2d at 1473 (3d Cir.1992) (quoting *AT & T* and *Warrior & Gulf* ); *E.M. Diagnostic,* 812 F.2d at 94 (3d Cir.1987) (quoting *Warrior & Gulf* ).

## IV.

[7] After our independent review of the record, we conclude that there is no genuine issue. The undisputed facts clearly demonstrate that Torres was demoted because he performed his duties improperly and because he lacked the requisite qualifications of a haul truck driver. Because we have concluded that the "Reservation Clause" of Article III precludes arbitration over such demotions or discharges, Trap

Rock is entitled to summary judgment as a matter of law.[FN9] *See Sacred Heart,* 958 F.2d at 543; *Nazay,* 949 F.2d at 1328; *First National,* 824 F.2d at 281; note 1, *supra.*

> FN9. As discussed in text, above, we read Article III, paragraph 6 as an exclusive right to demote or discharge in the exercise of the employer's discretion. Moreover, at no time has the Union claimed that Torres' alleged discharge invoked the terms of Article VII, even if that article were relevant here. Nor has any colorable claim of any violation of the CBA ever been identified by the Union.

Summary judgment is required where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although the "burden to demonstrate the absence of material fact issues remains with the moving party regardless of which party would have the burden of persuasion at trial," *Levendos v. Stern Entertainment,* 860 F.2d 1227, 1229 (3rd Cir.1988) (internal quotation marks and citation omitted), the moving party's "burden" under Rule 56(c) "is discharged by 'showing'-that is, pointing out to the District Court-that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

A non-moving party may not "rest upon mere allegations, general denials or ... vague statements...." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3rd Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991). If the non-moving party's**891 evidence " 'is merely colorable, ... or is not significantly probative, ... summary judgment may be granted.' " *Gray,* 957 F.2d at 1078 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986)).

The district court reasoned, and the Union here argues, that Torres was demoted because of his supervisor's personal animosity towards him rather than because of poor performance or a lack of qualifications, and that, therefore, the "Reservation Clause" did not bar arbitration of this dispute. This assertion, however, is not supported by the record. Torres him-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
**(Cite as: 982 F.2d 884)**

self concedes that he received numerous verbal and written warnings from his supervisor. (Torres Aff. at A. 22). These warnings, attached as exhibits to an affidavit submitted by Trap Rock, were issued for careless driving, safety infractions and defective work. (Warning Notices, Exh. C to Caropreso Aff. at A. 29-31).

Torres concedes that he slashed a tire by driving over a large, sharp rock, (Torres Aff., at A. 22), and that he was reading a newspaper in his truck at the primary crusher. (Grievance, Exh. A to Torres Aff. at A. 17). The record also establishes that Torres was issued warnings for failing to stop his truck at a designated safety point before downshifting into first gear and putting his truck into reverse, and for driving a truck unsatisfactorily. (Warning Notices, Exh. C to Caropreso Aff. at A. 29-31). Supervisor Bray's affidavit states, among other things,

\* \* \* \* \* \*

3. Freddy Torres ("Torres") was a truck driver for Trap Rock at the Pennington Quarry. His Responsibilities as a truck driver included driving a 29-ton, 6-wheel (each of which is approximately 6 feet high) haul truck into the quarry, waiting for it to be filled with heavy stone, driving the loaded truck (often weighing over 150,000 pounds) to the stone crusher, and dumping it there. Much of the driving must be done on unpaved dirt roads with relatively steep grades. The very nature of the job places a great premium on safety. [A] driver who does not perform his duties properly exposes not only himself, but all of those around him/her, to serious dangers.

4. On October 26, 1990, after Torres received five written warnings within the prior fourteen months (four of which were within the prior six weeks) for, among other things, disobedience, misconduct, carelessness, safety infractions, and defective work, *I demoted Freddy Torres because, in my opinion, he had failed to perform his truck driving duties properly and he failed to meet the qualifications of being a truck driver. I demoted Torres to the position of laborer.*

(A. 19-20) (emphasis added).

Nowhere in the record does the Union contradict by affidavit or sworn testimony the allegations made by Trap Rock under oath that Torres was unqualified and performed poorly. The Union merely asserts in the text of its brief that the conduct which led to Torres' demotion "had nothing to do with his ability or qualification to drive a truck." Union Brief at 17.

Nor has the union articulated any facts by its affidavits which substantiate its claim that Torres was demoted due to personal animosity. The submitted affidavits contain only Torres' general allegations that "Mr. Bray harassed me and treated me unfairly," (Torres Aff. at A. 22); that "[e]ver since they change the supervisor, they have been treating me unfair," (Grievance, Exh. A to Torres Aff. at A. 17); and that "Trap Rock is discriminating me [sic] forcing me to quit." (Grievance, Exh. A to Torres Aff. at A. 18). Such general allegations, absent any factual foundation, fall short of raising a genuine issue of material fact.[FN10] *See Quiroga* 934 F.2d at 500.[FN11]

FN10. Torres also alleges that other employees committed infractions similar to his but were neither demoted or discharged, and that this demonstrates that he was treated in a discriminatory fashion. Torres does not, however, deny that he performed his duties improperly; nor does he point to any part of the record which might demonstrate some degree of similarity between the circumstances, severity and frequency of his infractions and those of other employees.

FN11. *See also* Fed.R.Civ.P. 56(e): "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

**\*892** Significantly, in concluding that personal animosity motivated Torres' demotion, the district court relied solely on arguments and allegations raised in the Union's *brief.* However, this court has made it clear that arguments, allegations or "facts" contained

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123 Lab.Cas. P 10,488
**(Cite as: 982 F.2d 884)**

in briefs, and that are not evidentiary because they
are not sworn to, are insufficient to overcome a mo-
tion for summary judgment based on sworn affida-
vits. *See Thornton v. United States,* 493 F.2d 164,
167 (3d Cir.1974) ("A statement in a brief or in oral
argument does not constitute evidence" for purposes
of summary judgment). Thus, the allegations raised
solely in the Union's brief do not suffice to raise any
genuine issue of material fact regarding the reason
for Torres' demotion.

Because the undisputed evidence demonstrates that
Torres was demoted for failing to perform his duties
properly and for failing to meet the qualifications of
his job, and because the CBA's "Reservation Clause"
expressly grants Trap Rock the sole discretion to de-
mote or discharge an employee for those reasons
without resorting to arbitration, Trap Rock is entitled
to summary judgment as a matter of law.

V.

We will reverse the district court's order of April 22,
1992 denying Trap Rock's motion for summary
judgment and direct that the district court enter
judgment in favor of Trap Rock and against the Un-
ion. Accordingly, we will also reverse the district
court's order of the same date granting the Union's
motion to compel arbitration.

C.A.3 (N.J.),1992.
Trap Rock Industries, Inc. v. Local 825, Intern. Un-
ion of Operating Engineers, AFL-CIO
982 F.2d 884, 142 L.R.R.M. (BNA) 2300, 123
Lab.Cas. P 10,488

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

BOOK OF AUTHORITIES OF THE APPLICANTS
CVAS Dispute
(Motion returnable December 15, 2010)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants