**EXHIBIT A**

**ADDREX AGREEMENT**

EXECUTION VERSION

# ADDREX AGREEMENT

THIS ADDREX AGREEMENT (this "Agreement") is made, as of November 24, 2010 (the "the <u>Effective Date</u>"), between Nortel Networks, Inc., a Delaware corporation (the "<u>Seller</u>"), and Addrex, Inc., a Delaware corporation (the "<u>Broker</u>") with respect to the Legacy Numbers (as defined below).

*WHEREAS*, Seller wishes to engage and appoint Broker, as its exclusive broker with the right to find a buyer(s) to purchase Seller's rights in the Legacy Numbers (a "<u>Buyer</u>") on the terms and conditions set forth herein; and

*WHEREAS*, Broker wishes to act as the exclusive broker for the Seller in selling the Legacy Numbers;

*NOW THEREFORE*, in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Broker hereby agree as follows:

## 1.0 <u>BASIC TERMS</u>

### 1.1 <u>Term and Expiration Date</u>:

The "<u>Term</u>" of this Agreement shall begin on the date set forth above and continue for nine (9) months from the Effective Date (the "<u>Initial Term</u>"). This Agreement shall automatically renew at the end of the current term for successive six (6) month periods, unless either party gives written notice, in accordance with **Section 5** of this Agreement, of its intention not to renew thirty (30) days or more prior to the expiration of the current term.

### 1.2 <u>Legacy Numbers</u>:

Seller intends to offer for sale its rights in the IPv4 Number Blocks listed on <u>Exhibit A</u> for which no allocation or assignment agreement exists between Seller and any regional Internet registry (hereafter, the "<u>Legacy Numbers</u>"). Seller from time to time may supplement <u>Exhibit A</u> to designate additional Legacy Numbers. Seller and Broker acknowledge that the Legacy Numbers listed on <u>Exhibit A</u> under the heading "TSA Numbers" (the "<u>TSA Numbers</u>") are in use by certain third parties pursuant to Transition Services Agreements between such parties (the "<u>TSA Counterparties</u>") and Seller and its affiliates until the relevant Transition Services Agreements expire or are terminated.

### 1.3 <u>Commission and Other Costs</u>:

(i)    <u>Commission</u>:  Seller agrees to pay to Broker a commission (the "<u>Commission</u>") equal to five-percent (5%) of the total sale price received by

Seller in consideration of the sale or other conveyance of Legacy Numbers to Buyer (the "Sale Price").

(ii)    Retainer:  A retainer in the amount of two hundred thousand dollars ($200,000) (the "Retainer") shall be paid by Seller to Broker within five (5) business days of the date upon which final approval of this Agreement by the U.S. Bankruptcy Court has been obtained, and which shall be subtracted from (i.e., credited against) any amounts due and payable to the Broker under this Agreement, such credit to be calculated and applied against the first two hundred thousand dollars ($200,000) due to Broker hereunder. Such Retainer shall be non-refundable, except in the case that this Agreement is terminated by Seller for reason of Broker's material breach, in which case the excess of the Retainer over the net amounts then due to Broker under this Agreement, if any, shall be refunded to Seller within thirty (30) days of a written request by Seller.

(iii)   Travel and Other Expenses:  Seller agrees to reimburse Broker for Broker's reasonable and documented travel and other out-of-pocket expenses, in each case in compliance with Seller's internal guidelines.

(iv)   Invoice:  Broker shall provide to Seller invoices with respect to all payments to be made under this Agreement and all such payments shall be made to the bank account designated in Exhibit B hereto, unless agreed otherwise.

## 2.0    BROKER'S ENGAGEMENT; OBLIGATIONS AND LIMITATIONS

2.1    Appointment:  Seller hereby engages and appoints Broker to be the Seller's exclusive broker and grants Broker the right to solicit and procure Buyer(s) during the Term of this Agreement to purchase the Legacy Numbers for an amount and on terms acceptable to the Seller, it being understood that Seller retains the right to solicit and procure Buyer(s) at its discretion.  Broker accepts this appointment and agrees, with respect to the Legacy Numbers, to use its good faith and commercially reasonable efforts to assist Seller in conducting due diligence as requested by Seller and to facilitate a sale of the Legacy Numbers that is (i) free and clear of any allocations, sub-allocations and assignments of the Legacy Numbers, (ii) in compliance with any applicable laws, regulations and polices (including assisting Seller in researching such laws, regulations and policies) and (iii) otherwise upon  terms and conditions acceptable to Seller.  Seller agrees not to employ during the Term any third-party broker, other than Broker, for the sale of the Legacy Numbers.

2.2    Chain of Custody:  Broker agrees, as part of its duties under this Agreement, to identify and review the allocations, sub-allocations and assignments, if any, of the Legacy Numbers.  The scope of such evaluation will be at Seller's discretion, but may include a thorough review of Seller's books and records and a comparison of the data with public database information, in order to establish and confirm Seller's rights to such Legacy Numbers.

2.3     Limitation of Broker Authority:  Broker is not the legal agent of Seller and has no authority to make any representations on behalf of Seller or to incur any obligation or liability binding upon Seller.  Broker is an independent contractor; no principal-agent relationship is established under this Agreement.  Only the Seller is authorized to execute any sale or other conveyance agreement transferring any right, title or interest of Seller in all or any part of the Legacy Numbers to the Buyer.

2.4     Auction:  Broker shall solicit and procure prospective Buyers and, to the extent requested by Seller, shall assist Seller in facilitating and conducting an auction between such prospective Buyers and Seller.  Broker acknowledges that the format and conduct of such auction is subject to all applicable laws including bankruptcy, insolvency and similar laws in any jurisdiction.  Broker shall assist Seller in determining the legal sufficiency of any final agreement and other documentation relating to any transaction between Seller and a Buyer, provided, however, that Seller and its counsel shall have absolute discretion with respect to any such final agreement and other documentation.

2.5     Broker Third-Party Representation:

        (i)     Broker acknowledges and hereby informs Seller that Broker, in some instances, may have represented a Buyer in other transactions and that such a situation could present a conflict of interest.  Broker shall not represent both Seller and a Buyer in the same transaction, unless Broker has first obtained the written consent of both Buyer and Seller before proceeding.  If Broker is unable to obtain such written consent from both Buyer and Seller, then Broker may only represent Seller in the transaction.  In any event, Broker shall not disclose any Confidential Information of Seller to Buyer without the prior written consent of Seller.

        (ii)    Broker agrees not to sell, offer for sale, or solicit the sale of any IP numbers (other than the Legacy Numbers) to any potential Buyer that is or was (including prior to this Agreement) solicited or procured by Seller (as such potential Buyers are listed on Exhibit C, which may be amended by Seller from time to time), until Seller accepts purchase offer(s) from any Buyer(s) with respect to all Legacy Numbers and, if Seller determines to hold an auction with respect to any Legacy Numbers, the auction(s) for the sale of such Legacy Numbers is or are completed with the announcement of any Buyer(s) as the successful winners and acquirers of the Legacy Numbers.

2.6     Broker Representations and Warranties:  Broker hereby represents and warrants that (i) the execution, delivery and performance of this Agreement by it does not and will not conflict with, or constitute a breach or default under, its charter documents or any agreement, contract, commitment or instrument to which it is a party; (ii) it is a corporation duly organized and validly existing and in good standing under the Laws of Delaware and has the requisite power and authority to enter into, deliver and perform its obligations pursuant to this Agreement, and is qualified to do business as contemplated by this Agreement; and (iii) it will perform its obligations under this Agreement in a high-quality, professional and competent matter.

2.7     Confidentiality:  It is understood that the parties to this Agreement shall be providing each other with certain confidential information, as defined below.  To mutually ensure the protection of such information, each of the parties agrees that, for a period of two (2)

years from the date of disclosure, it shall limit disclosure of Confidential Information within its own organization to its directors, officers, partners, members and/or employees having a need to know and shall not disclose Confidential Information to any third party (whether an individual, corporation, or other entity) without prior written consent.  No obligations will follow under this Agreement if the Confidential Information was (a) in the public domain at the time it was disclosed, (b) entered the public domain subsequent to disclosure, through no fault of a receiving party, or (c) was communicated to the receiving party by a third party who was free of any obligation of confidentiality regarding such Confidential Information at the time of such party's receipt.  "<u>Confidential Information</u>" shall mean:

(i)      <u>Broker Confidential Information</u>:  Confidential Information of Broker includes, but is not limited to, Broker's business methods, business policies, procedures, techniques, research or development projects or results, past sales information of any kind and financial information of Broker;

(ii)     <u>Seller Confidential Information</u>:  Seller's Confidential Information includes, but is not limited to, any and all information concerning the Legacy Numbers, their use, their allocations and or sub-allocations and their chain of custody, specific information related to the sale of Seller's Legacy Numbers, Seller's business methods, business policies, procedures, techniques, research or development projects or results, past sales information of any kind and financial information of Seller or its affiliates; and

(iii)    <u>Other Confidential Information</u>:  Any information embodied in tangible form and labeled as "Confidential" or, if disclosed orally or visually, identified as "Confidential" at the time of the disclosure and confirmed in a writing to the other Party within thirty (30) days of such disclosure, bearing a specific reference to the date, time, and information disclosed.

2.8      <u>Non-Disclosure</u>:  Each Party hereby agrees not to disclose the terms and conditions of this Agreement, unless agreed otherwise in any further written agreement or as the Seller may determine is necessary or appropriate in connection with its Chapter 11 bankruptcy proceedings.

2.9      <u>Proprietary Materials</u>:  Broker understands and acknowledges that during the course of Broker's representation of Seller, Seller may provide to Broker certain marketing-related materials, including "teasers," presentations, prospectuses and other promotional, marketing or sales documents, as well as information on marketing methods or unique marketing strategies (the "<u>Marketing Materials</u>").  Broker acknowledges and agrees that all right, title and interest in and to the Marketing Materials (including intellectual property rights) are and shall remain owned by Seller.  Subject to **Subsection 2.7**, Seller hereby grants to Broker during the Term a non-exclusive, worldwide, royalty-free, non-transferable, non-sublicensable license to use, reproduce and display the Marketing Materials solely for the purpose of promoting and effecting Seller's sale of the Legacy Numbers.  Within ten (10) business days of the expiration or termination of this Agreement, Broker will return to Seller or destroy all Marketing Materials, unless agreed otherwise by Seller.

2.10    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTIONS 2 AND 3, NONE OF THE PARTIES, OR ANY EMPLOYEE, OFFICER, DIRECTOR, ACCOUNTANT, FINANCIAL, LEGAL OR OTHER REPRESENTATIVE OF THE PARTIES HAS MADE ANY, AND THERE IS NO, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE LEGACY NUMBERS (INCLUDING ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR TITLE OF ANY OF THE LEGACY NUMBERS).

3.0    SELLER'S RIGHTS AND OBLIGATIONS

3.1    Rights Reserved To Seller:  Seller retains the absolute right in all events to approve or to disapprove the form, substance, and content of any and all agreements with any Buyer, except for the limitation contained in **Subsection 3.2**.  Prior to the commencement of any auction for particular Legacy Numbers, Seller retains the right to adjust the terms and conditions of any offer to sell, including the right to withdraw from negotiations or to decline to enter into any final agreement, for any reason whatsoever at any time and without liability or obligation to Broker.  Subject to all applicable laws, including bankruptcy laws, and subject to Seller's fiduciary duties, once Seller sets a reserve price and an auction begins, however, Seller is committed to that sale, provided the reserve price is met.

3.2    Seller's Obligations:  Seller agrees to use commercially reasonable efforts to cooperate with Broker in bringing about a sale or other conveyance of the Legacy Numbers. Subject to **Subsection 2.7**, Seller shall provide to Broker all available information concerning the Legacy Numbers, including its history and current allocations or sub-allocations, if any.  Seller further agrees that, unless otherwise agreed by the Parties, the Legacy Numbers sold or otherwise transferred to Buyer will be free and clear of any known current allocations or sub-allocations at the time of sale to Buyer, or such allocations and/or sub-allocations shall be disclosed to and agreed to by Buyer.  Seller shall not sell Legacy Numbers in blocks smaller than 256 Legacy Numbers.  Seller shall refer to Broker all offers, inquiries or expressions of interest received during the Term from prospective purchasers or anyone else interested in the Legacy Numbers or prospective transaction.

3.3    Seller Representation:  Seller hereby represents that to the Seller's knowledge, Seller is the holder or assignee of rights in the Legacy Numbers.  Seller represents that the Legacy Numbers offered for sale are not under an allocation or assignment agreement with any regional Internet registry.  Seller further represents that Seller will use reasonable efforts to assist Buyer in updating any relevant registration records, to reflect the sale or other conveyance to Buyer.

3.4    Tax Liabilities:  Seller agrees to consult its own tax advisor regarding the tax consequences, if any, of the sale or other transfer of the Legacy Numbers.  Seller acknowledges that Broker's participation in such sale or other transfer is solely as a broker or facilitator and not as a seller, retailer, wholesaler or vendor.  Accordingly, Broker makes no representations and assumes no responsibility for the potential tax liabilities of Seller that may arise from Seller's sale or other transfer of the Legacy Numbers, including sales and use tax collection and remittance obligations, if any.

3.5     Compensation of Broker:  Seller agrees to pay Broker a Commission, as set forth in **Subsection 1.3** above and in accordance with **Section 4.0** below.

3.6     Seller's Option to Amend Exhibit A:  Seller anticipates that it may sell approximately six-hundred and sixty-six thousand six hundred and twenty-four to seven-hundred and ninety-seven thousand, four-hundred and forty (666,624 to 797,440) Legacy Numbers, and in consideration for Seller appointing Broker as Seller's exclusive broker for the initial sale of Legacy Numbers, Broker hereby agrees to extend an option to Seller to amend Exhibit A during the Term of this Agreement to include further IPv4 Address Numbers as Legacy Numbers (provided no agreement exists with any regional Internet registry governing such Legacy Numbers), subject to the same terms and conditions as the initial sale, without the payment of any advances.

4.0     COMMISSION

4.1     Calculation:  Broker's Commission shall be calculated upon the Sale Price.  If only part of the Legacy Numbers is sold or otherwise conveyed to Buyer for value, the Commission will be a consistent percentage applied only to the part sold or conveyed.

4.2     When Earned:   The Commission shall be earned for services rendered when, during the Term, all of the following events occur:  (i) Broker and/or Seller produce at least one Buyer ready, willing, and able to purchase the Legacy Numbers or a portion thereof; (ii) Seller accepts such Buyer's purchase offer; (iii) such Legacy Numbers are sold or otherwise conveyed for value to such Buyer and Seller receives payment for such sale or conveyance; and (iv) such Legacy Numbers are successfully registered in the name of such Buyer and the respective IP address routes are successfully propagated, advertised and registered by an Internet Routing Registry ("IRR") of good standing and mirrored by RADb or a similar IRR.  Broker's services shall be complete, with respect to any Legacy Numbers, when the Commission has been earned for such Legacy Numbers in accordance with the foregoing.

4.3     When Paid:  The Commission shall be paid only if and when the Commission is earned and the Sale Price is paid by the Buyer to the Seller in cash, or, if an escrow agent is employed between Seller and Buyer (including in connection with TSA Numbers), the proceeds are paid out of escrow to the Seller.

4.4     Rights After Term:  Seller shall pay Broker the Commission, in accordance with the terms of this Agreement, if, within one hundred twenty (120) calendar days after the expiration or early termination of the Term, the Legacy Numbers are sold or conveyed for value to a Buyer which Broker first introduced to Seller (i.e., Seller had not previously been in contact with such Buyer regarding purchase of the Legacy Numbers prior to Broker's introduction) during, and prior to the expiration or termination of, the Term.

5.0     NOTICES

All notices and demands of any kind, including a change in address, which either party may be required or may desire to serve the other in connection with this Agreement shall be in writing and shall be deemed sufficiently given or rendered if delivered by hand (provided a

signed receipt is obtained) or if sent by registered or certified mail (return receipt requested) or by a nationally recognized overnight delivery service making receipted deliveries, addressed to Seller or Broker, as the case may be, at the addresses set forth below:

| | |
|---|---|
| To Seller: | Nortel Networks, Inc.<br>Legal Department<br>220 Athens Way, Suite 300<br>Nashville, Tennessee, USA 37228 |
| Copy to: | Cleary Gottlieb Steen & Hamilton, LLP<br>1 Liberty Plaza<br>New York, NY 10006<br>Attn:  Daniel Ilan |
| To Broker: | Addrex, Inc.<br>1775 Wiehle Avenue, Suite 400<br>Reston, VA 20190<br>Attn:  Charles M. Lee, President |

6.0    <u>GENERAL PROVISIONS</u>

    6.1    <u>Governing Law and Jurisdiction</u>:    Any questions, claims, disputes, remedies or actions arising from or related to this Agreement, and any relief or remedies sought by either of the Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.  To the fullest extent permitted by applicable Law, each party: (i) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court"), if brought prior to the entry of a final decree closing the Seller's Chapter 11 case pending before the U.S. Bankruptcy Court (Case No. 09-10138 (KG) (Jointly Administered)) (the "<u>Chapter 11 Case</u>") and (B) in the United States District Court for the Southern District of New York, if brought after entry of a final decree closing the Chapter 11 Cases and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Bankruptcy Court, and the United States District Court for the Southern District of New York, as applicable, pursuant to the preceding clauses (A) and (B) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any such court or any claim that any such action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in **Section 5** or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

6.2    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.    EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT.

6.3    <u>Limitation of Liability</u>: The liability of either party shall not exceed the Commission and fees, as agreed to in **Subsection 1.3** and **Section 4.0**, owed or paid to Broker by Seller.  Neither party will be liable for incidental or consequential damages or damages for business interruption, lost profits or similar damages, incurred by either party.  THE LIMITATIONS OF LIABILITY SET FORTH IN THIS SUBSECTION SHALL NOT APPLY TO DAMAGES RESULTING FROM WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF A PARTY OR ITS PERSONNEL.

6.4    <u>Independent Contractor</u>:  It is the express intent of the Parties that Broker is an independent contractor and not an employee, agent, joint venturer or partner of the Seller. Nothing in this Agreement shall be interpreted or construed as creating the relationship of employer and employee between the Seller and Broker and/or Broker's employees or agents.

6.5    <u>Taxes</u>:  Broker is responsible for paying all required state and federal taxes or other amounts due as a result of the payment of compensation by the Seller under this Agreement.

6.6    <u>Amendment or Modification</u>:  Subject to Seller's option pursuant to **Subsection 3.6**, this Agreement may be amended or modified only by mutual written agreement of Seller and Broker.

6.7    <u>Assignment</u>:  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party; provided, however, that either party may, without such consent, assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business or assets, or in the event of its merger, consolidation, change in control or other similar transaction.

6.8    <u>Termination</u>:  After the Initial Term, this Agreement may be terminated by either party on thirty (30) days written notice served upon the other party in accordance with **Section 5.0**.  Upon any expiration or termination of this Agreement, the provisions of **Subsections 1.3(ii)**, **2.3**, **2.5**, **2.6**, **2.7**, **2.8**, **2.9**, **2.10**, **4.4**, and this **Section 6** shall survive.

8

6.9    Counterparts:  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.10    Headings:  The headings of the Sections of this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

6.11    Due Authority:  Each individual signing this Agreement on behalf of a party warrants and represents to the other party that he or she has the authority to execute this Agreement on such party's behalf and to bind such party to the terms hereof.

6.12    Severability:   In the event any term or provision of this Agreement shall be determined by a court of competent jurisdiction to be illegal, invalid or unenforceable for any reason whatsoever, that provision shall be severed from this Agreement and shall not affect the validity of the remainder of the Agreement.

6.13    Third Parties:   Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement.

6.14    Court Approval:  The Parties acknowledge that Seller and certain Seller affiliate entities are currently subject to creditor protection proceedings under chapter 11 of the U.S. Bankruptcy Code and other similar laws in other jurisdictions and that this Agreement and any resulting sale of the Legacy Numbers is subject to approval by the U.S. Bankruptcy Court and may be subject to approval by other similar courts in any jurisdiction, as applicable.

6.15    No Waiver:  Either party's failure to exercise any right under this Agreement shall not constitute a waiver of any other terms or conditions of this Agreement with respect to any other or subsequent breach, or a waiver by such Party of its right at any time thereafter to require exact and strict compliance with the terms of this Agreement.  In order to be effective, all waivers under this Agreement must be in writing and signed by the waiving Party.

6.16    Entire Agreement:  This Agreement, including any Exhibits or Addenda hereto, sets forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations and warranties, whether oral or written, by any officer, employee or representative of any party hereto.

9

IN WITNESS WHEREOF, this Agreement has been executed by Seller and Broker through their duly authorized representatives, as of the date first above written.

SELLER:                                          BROKER:

By: _____              By: _____

Name:  John Ray                                  Name:  Charles Lee

Title:                                           Title:    President

SIGNATURE PAGE

*IN WITNESS WHEREOF*, this Agreement has been executed by Seller and Broker through their duly authorized representatives, as of the date first above written.

SELLER:

By: _____

Name: John Ray

Title:

BROKER:

By: _____

Name: Charles Lee

Title:    President

SIGNATURE PAGE