## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- X

In re:                                              : Chapter 11

NORTEL NETWORKS INC., *et al.*,[1]                  : Case No. 09-10138 (KG)

                    Debtors.                : (Jointly Administered)

                                   : Proposed Objection Deadline: 12/16/10 at 4:00 p.m. (ET)

-------------------------------------------------------------------- X  Proposed Hearing Date: 12/20/10 at 3:30 p.m. (ET)

### THE EMEA ADMINISTRATORS' MOTION
### FOR LIMITED RELIEF FROM THE AUTOMATIC STAY

The court-appointed administrators and authorized foreign representatives (collectively, the "EMEA Administrators")[2] for Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NN Ireland") and certain of their affiliates (collectively, and including NNUK, the "EMEA Debtors")[3] located in the region known as EMEA (Europe, Middle East, and Africa) in proceedings (the "UK Proceedings") under the *Insolvency Act 1986* (the "English Insolvency Act"), pending before the High Court of Justice of England and Wales

---

[1]    The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

[2]    The Administrators in the UK Proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris. The Administrators in the UK Proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

[3]    The EMEA Debtors are: Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z. o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

(the "English Court"), hereby move this Court on an emergency and expedited basis (the

"Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, pursuant

to section 362(d)(1) of title 11 of the United States Code (the "Bankruptcy Code"), Rules

4001(a) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules") granting limited relief from

the automatic stay to enable the EMEA Administrators to commence actions in England and

Ireland against Nortel Networks, Inc. ("NNI"), one of the debtors-in-possession in these chapter

11 proceedings, and certain of its past and present officers and directors (the "Officers and

Directors"), so as to preserve certain Intercompany Claims (as defined below) before the

potentially applicable limitation periods governing such Intercompany Claims under English and

Irish law expire (which may be as early as December 22, 2010).  Following commencement, the

EMEA Administrators do not intend to serve process on NNI or otherwise proceed against it in

the actions without further leave from this Court.  In support of this motion, the EMEA

Administrators rely upon the *Declaration of John Haydn Whiteoak in Support of the EMEA*

*Administrators' Motion for Limited Relief from the Automatic Stay* ("Whiteoak Declaration")

filed concurrently herewith, and respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334 of the Bankruptcy Code.  This matter is a core proceeding within the meaning of 28

U.S.C. § 157(b)(2).  Venue in this proper pursuant to 28 U.S.C. § 1408 and 1409.

## BACKGROUND

2.     On January 14, 2009, the NNI and certain of its affiliates (collectively, the "U.S. Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and have thereafter continued to operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  On the Petition Date, NNI's ultimate corporate parent, Nortel Networks Corporation ("NNC" and together with its affiliates and subsidiaries, "Nortel" or the "Nortel Group"), NNI's direct corporate parent, Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court") under the Companies' Creditors Arrangement Act, seeking relief from creditors (the "Canadian Proceedings").  The Canadian Proceedings have been recognized by this Court as foreign main proceedings pursuant to chapter 15 of the Bankruptcy Code.[4]

3.     Also on the Petition Date, the EMEA Debtors commenced the UK Proceedings under the English Insolvency Act before the English Court, whereby the EMEA Administrators were appointed.  NNUK's administration proceedings were recognized as a foreign main proceeding by this Court on June 26, 2009[5] and petitions for recognition of the UK Proceedings for the remainder of the EMEA Debtors as foreign main proceedings are currently pending before this Court.

4.     With NNC's headquarters in Toronto serving as the global headquarters, the Nortel Companies, including the EMEA Debtors, operated in a highly integrated manner globally and the individual Nortel entities are interdependent.  In order to allow the Nortel group

---

[4]    *In re Nortel Networks Corp., et al.*, Case No. 09-10164 (Bankr. D. Del. Jan. 14, 2009).

[5]    *In re Nortel Networks UK Limited, et al.*, Case No. 09-11972 (Bankr. D. Del. June 26, 2009).

YCST01:10484462.1                                                                          068476.1001

to operate on a global basis and to allocate profits, losses and certain costs across the corporate entities, several Nortel Companies entered into separate bilateral distribution agreements with NNL (the "Distribution Agreements"). Additionally, and for the same purposes, NNL, NNI, NNUK, NN Ireland, and other affiliates (who are no longer parties to the agreement) entered into the Master Research and Development Agreement, dated December 22, 2004 (as amended from time to time, the "Master R&D Agreement"). The Distribution Agreements and the Master R&D Agreement together with the documents and agreements listed in Annex A and Annex B of the Interim Funding and Settlement Agreement (the "IFSA"), entered into between certain Nortel entities, on or about June 9, 2009 and approved by this Court on June 29, 2009 (the "IFSA") form the "Transfer Pricing Agreements."

5.      Pursuant to the escrow agreements for each of the business dispositions and the IFSA, the proceeds of the global sale transactions have been placed into escrow until the allocation of proceeds between the individual Nortel companies is determined. The money held in the escrow account cannot be distributed unless: (i) the parties agree to distribute the funds or (ii) in the case where the parties fail to reach an agreement, a determination of the proper allocation is made by the relevant dispute resolution authority. Under the IFSA, the Nortel parties agreed to negotiate in good faith to arrive at a protocol that would provide for, among other things, a mechanism to resolve allocation disputes but have been unable to do so. The parties are currently engaged in mediation efforts toward the same goal.

6.      Significant progress has been made on the restructuring of the Nortel Companies, including the EMEA Debtors. At the heart of the restructuring, however, are issues regarding the allocation of the sale proceeds of the various business divestures and the settlement of intercompany claims.

7.    In relation to these issues, the EMEA Debtors seek recompense in respect of claims (including, but not limited to, breach of contract and fiduciary duty claims) it may have against NNI and its Officers and Directors arising from a general pattern in which NNI and/or its Officers and Directors allegedly transferred value away from the EMEA Debtors to the benefit of other entities within the Nortel Group.[6] In broad terms, the EMEA Administrators seek to assert under English and Irish law claims that NNUK and NN Ireland may have against NNI and its Officers and Directors arising out of or in connection with the Transfer Pricing Agreements, certain intercompany loans, and the underfunding of the UK Pension Plan (collectively, the "Intercompany Claims"). For a detailed explanation of the nature of the Intercompany Claims and the potentially applicable limitation periods governing those Intercompany Claims under English and Irish law, the EMEA Administrators respectfully refer the Court to the Whiteoak Declaration, filed concurrently herewith. The EMEA Administrators continue to participate in the mediation and negotiation process that is underway, but are compelled, as fiduciaries of the EMEA Debtors, to commence formal proceedings in the English Court prior to the impending expiry of the statute of limitations under English and Irish law.

8.    In particular, the EMEA Administrators and the EMEA Debtors believe that the limitations period applicable to some of the Intercompany Claims may expire as early as December 22, 2010, six years following NNUK's and NN Ireland's entry into the MRDA. Because the statute of limitation issues to which the Intercompany Claims give rise are complex, not least because of the multi-jurisdictional aspects of the Nortel insolvency, the EMEA Administrators cannot say with absolute certainty that the relevant limitation periods in respect

---

6.    UK Administrators are also seeking relief from the stay imposed by the Ontario Court in the Canadian Proceedings in order to pursue certain intercompany claims against NNC and NNL and certain of their past and present officers and directors.

of certain Intercompany Claims will expire by December 22, 2010. The EMEA Administrators, however, wish to avoid any debate on the issue and thus desire to preserve all of their rights in respect of such Intercompany Claims without question. The pressing limitation issues that are the subject of this Motion only apply to certain of the Intercompany Claims of NNUK and NN Ireland (or certain aspects of such Intercompany Claims). Many of NNUK and NN Ireland's Intercompany Claims (or aspects of those claims) do not give rise to pressing limitation issues, and such claims are not the subject of this Motion.

9.      Accordingly, the EMEA Administrators seek to commence actions in England and Ireland no later than December 21, 2010 in order to preserve their rights to pursue the Intercompany Claims at a later time. Specifically, the EMEA Administrators seek to do no more than:

a)      issue a claims form in the English Court against NNI and its Officers and Directors (the "English Claim Form")(such action referred to as the "English Action"); and

b)      issue a summons in the High Court of Ireland (the "Irish Court") against NNI and its Officers and Directors (the "Irish Summons") (such action referred to as the "Irish Action" and together with the English Action, the "EMEA Actions").

10.     Commencement of the EMEA Actions is procedural in nature and is aimed to protect the EMEA Debtors and prevent them from suffering prejudice resulting from expiration of any relevant limitation periods in respect of the Intercompany Claims. The EMEA Administrators simply wish to ensure that, irrespective of the forum in which the Intercompany Claims are finally resolved, there can be no argument that English law or Irish law limitation periods have expired.

11.    Other than issue the English Claim Form and the Irish Summons, the EMEA Administrators do not intend to take any further steps in respect of the pursuit of the Intercompany Claims in those proceedings, including but not limited to serving the English Claim Form and the Irish Summons upon NNI, which actions would necessitate the filing of responsive pleadings.  Rather, immediately upon filing, the EMEA Administrators will take no further action to serve process on NNI, or otherwise proceed against NNI, without further leave from this Court.  As there is no tolling provision under the English Insolvency Law akin to section 108(c) of the Bankruptcy Code available to a company in administration, the EMEA Administrators could be forever time-barred from asserting certain Intercompany Claims against NNI and its Officers and Directors under English and Irish law if they are not granted this limited relief from the automatic stay.

## RELIEF REQUESTED

12.    The EMEA Administrators respectfully request that this Court enter an order pursuant to section 362(d) of the Bankruptcy Code granting them limited relief from the automatic stay to permit the EMEA Administrators to commence actions against NNI in England and Ireland so as to preserve certain Intercompany Claims before the potentially applicable limitation periods governing such Intercompany Claims under English and Irish law expire. Following the filing of the English Claim Form and the Irish Summons, the EMEA Administrators will not serve process on NNI or otherwise proceed against NNI in the EMEA Actions pending further order of this Court, and the proposed order being submitted on this motion so provides.

## BASIS FOR THE RELIEF REQUESTED

13.    Section 362 of the Bankruptcy Code was designed to provide a breathing spell for debtors to promote the possibility for a successful reorganization, but was not intended

7

as an impenetrable barrier to any and all forms of litigation. Congress enacted the automatic stay

provision:

> "To prevent certain creditors from gaining a preference for their
> claims against the Debtors; to forestall the depletion of the
> Debtors' assets due to legal costs defending proceedings against it;
> and, in general to avoid interference with order of liquidation or
> rehabilitation of the Debtor." *Borman v. Raymark Ind. Inc.*, 946
> Fed.2d 103, 1036 (3rd Cir. 1991) ("quotations omitted"). *See also
> St. Croix Condominium Owners v. St. Croix Hotel*, 682 Fed.2d
> 446, 448 (3rd Cir. 1982) (quoting H.R. Rep #95-595, 95th Cong.,
> 1st session 340 (1977), reprinted in 1978 U.S. Code Cong.). The
> automatic stay, however, is "not meant to be in definite or
> absolute" or to shield a debtor from all litigation. *In re Renexe
> Prods. Co.*, 141 B.R. 574, 576 (citing *Wedgewood Inv. Fund Ltd.
> v. Wedgewood Realty Group, Ltd. (In re Wedgewood)*, 878 Fed.2d
> 693, 697 (3rd Cir. 1999).

14.    Section 362(a) of the Bankruptcy Code provides that the bankruptcy court

shall, for "cause," grant relief from the automatic stay, including "terminating, annulling,

modifying or conditioning" such stay.  11 U.S.C. § 362(d)(1).  Specifically, section 362(d)

provides, in pertinent part:

> On request of a party in interest an after notice and a hearing, the
> court shall grant relief from the stay provided the stay provided
> under subsection (a) of this section, such as by terminating,
> annulling, modifying, or conditioning such stay -
>
> > (1) for cause, including the lack of adequate protection of
> > an interest in property of such party in interest . . . .

11 U.S.C. § 362(d)(1).  Congress included "lack of adequate protection" in section 362(d)(1) as

merely one prominent example of a situation that justifies relief from the stay.  The legislative

history of section 362(d) clearly shows that it was the intent of Congress to provide for relief

from the stay in other situations as well:

> The lack of adequate protection of an interest in the property of the
> party requesting relief from the automatic stay is one cause for

8

> relief, but it is not the only cause.  As noted above, a desire to
> permit an action to proceed to completion in another tribunal may
> provide another cause.  Other causes might include any lack of any
> connection with or interference with the pending bankruptcy case.

H.R. Rep. No. 950595, 95th Cong., 1st Sess., 343-44 (1976); S.R. Rep. No. 95-989, 95th Cong.,

2d Sess. 52-53 (1976).  The party requesting termination of the stay "bears the initial burden to

produce evidence that cause exists to grant relief from the automatic stay." *In re DBSI, Inc.*, 407

B.R. 159, 166 (Bankr. D. Del. 2009); *citing, In re Rexene Prods. Co.*, 141 B.R. 574, 577 (Bankr.

D. Del. 1992).  But, "if the movant meets its burden, then the burden shifts to [the] opposing

party" to show that they are entitled to continuation of the stay. *DBSI*, 407 B.R. at 166; citing,

*Rexene*, 141 B.R. at 577.

      15.    Although "cause" is not defined by the Bankruptcy Code, the bankruptcy

court has discretion in determining whether cause exists to modify the stay. *See e.g., In re The*

*SCO Group, Inc.,* 395 B.R. 852, 856 (Bankr. D. Del. 2007) ("Cause is a flexible concept and

courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the

circumstances to determine whether sufficient cause exists to lift the stay."); *Rexene,* 141 B.R. at

576 ("'cause' is not defined in the Code; it must be 'determined on a case by case basis.'"); *In re*

*Continental Airlines, Inc.,* 152 B.R. 420, 424 (D. Del. 1993).  Courts have wide latitude in

crafting relief from the automatic stay. *See Bladino* v. *Wilson (In re Wilson),* 116 F.3d 87, 90

(3d Cir. 1997); *In re Siciliano,* 13 F.3d 748, 751 (3d Cir. 1994).

      16.    As part of the "cause" analysis, bankruptcy courts frequently conduct a

multifactor inquiry in order to balance the benefit to the moving party of relief from the stay

against any prejudice to the debtor or the bankruptcy proceeding that may result.  This Court has

"developed a three-part balancing test to evaluate what cause exists in a specific case" which

analyzes:

              

a) whether prejudice to the bankruptcy estate of the debtor will result if the [other action] proceeds;

b) whether hardship to the party seeking relief outweighs the hardship to the debtor; and

c) whether the creditor has any probability of prevailing on the merits.

*DBSI*, 407 B.R. at 166 (quoting *SCO Group*, 395 B.R. at 857 (Bankr. D. Del. 2007) (citing *Rexene*, 141 B.R. at 576)). The balance of the *Rexene* factors weighs heavily in favor of lifting the stay for the limited relief sought by the EMEA Administrators.

17. The bankruptcy court is vested with the flexibility to fashion a form of relief from the stay that is appropriate to the "particular circumstances of the case." *3 Collier on Bankruptcy* ¶ 362.07[1] (Matthew Bender 16th Ed. Revised 2010) ("[i]n some cases, modification or conditioning of the stay may be sufficient to protect the nondebtor party by permitting the exercise of some but not all of the party's rights"). Thus, it is not necessary in all cases to lift the stay altogether as to a party or a matter; sometimes a more narrowly-tailored form of relief will be both warranted and desirable. The EMEA Administrators expressly adopt such a position.

18. Under the first prong of *Rexene*, any prejudice to the U.S. Debtors or their estates caused by allowing the EMEA Administrators to initiate the EMEA Actions would be *de minimis* or non-existent. Here, the EMEA Administrators seek relief from the stay only to the extent necessary to permit them to issue the English Claim Form and Irish Summons against NNI in order to preserve certain Intercompany Claims before the potentially applicable limitation periods governing such claims expire under English and Irish law. Such an undertaking is merely one of commencement, analogous to those employed in this country (such as the filing of a summons and complaint), which will preserve the EMEA Administrators' right to pursue

YCST01:10484462.1                                                                              068476.1001

certain Intercompany Claims under English and/or Irish law, if it ever becomes necessary to do

so, and subject to the further leave of this Court. (And, of course, NNI retains all of its defenses;

none are implicated on this motion.)  The EMEA Administrators do not by this Motion seek

modification of the automatic stay so as to allow it to (i) enforce any rights against any of the

U.S. Debtors or the property of the U.S. Debtors' estates or (ii) recover damages from the U.S.

Debtors.  Simply allowing the EMEA Administrators to preserve the limitations period by

commencing the EMEA Actions, without actually pursuing a foreign judgment against NNI,

would not deplete the U.S. Debtors' bankruptcy estates, hinder the present chapter 11

proceedings or otherwise disadvantage the U.S. Debtors.  Moreover, the mere commencement of

the EMEA Actions without pursuing further action would not require the U.S. Debtors to incur

litigation costs or other expenses.

19.     Conversely, it is clear that the EMEA Debtors will suffer significant harm

by a refusal to modify the stay in order to allow for the commencement of the EMEA Actions.

Without such commencement, certain of the Intercompany Claims will arguably become time-

barred under English and Irish law and the EMEA Administrators would therefore be forever

denied their right to pursue the Intercompany Claims against NNI.   Clearly, the balance of the

harms contemplated by the first two prongs of *Rexene* weigh heavily in favor of granting the

present Motion.  As fiduciaries, the EMEA Administrators are obligated to investigate and

prosecute meritorious claims on behalf of the EMEA Debtors.   While an investigation into NNI

is still underway, it appears at this juncture that meritorious claims exist.   Accordingly, the

EMEA Administrators are duty bound to preserve their right to prosecute such claims on behalf

of the EMEA Debtors if ongoing efforts to resolve all intercompany and allocation disputes

prove unsuccessful.

11

20.    In one analogous case, this Court faced the prospect of the imminent death of critical witnesses; the movant therefore sought relief from the stay only to the extent necessary to depose those witnesses so that their testimony would not be forever lost. *In re W.R. Grace & Co.*, 386 B.R. 17, 35-36 (Bankr. D. Del. 2008) (creating new procedures with court supervision of various depositions). Here, it is not evidence that could be lost if relief is not granted, but the substantive rights to pursue certain causes of action under English and Irish law.

21.    While the first two prongs of *Rexene* counsel strongly for the limited relief requested, the third prong simply cannot be applicable to the present Motion. Here, the EMEA Administrators are seeking only limited relief from the stay for the purpose of bringing a timely claim, rather than full relief which would allow for adjudication of that claim to proceed. Since the case will not be litigated pending further order of this Court, the EMEA Actions will not proceed to the merits of the claims. Accordingly, the third prong is inapposite to the circumstances and should not overwhelm the first two *Rexene* factors, which weigh heavily in favor of granting the relief requested herein.

## RELIEF FROM BANKRUPTCY RULE 4001(a)(3) IS APPROPRIATE

22.    Federal Rule of Bankruptcy Procedure 4001(a)(3) provides that "[a]n order granting a motion for relief from an automatic stay . . . is stayed until the expiration of 14 days after the entry of the order, <u>unless the court orders otherwise</u>." Fed. R. Bankr. P. 4001(a)(3) (emphasis added). Relief from Bankruptcy Rule 4001(a)(3) is appropriate here because of the EMEA Administrators' immediate need to file the EMEA Actions due to the potentially imminent expiration of the limitation periods governing certain Intercompany Claims. Accordingly, the EMEA Administrators respectfully request that this Court waive the 14-day stay imposed by Bankruptcy Rule 4001(a)(3).

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the EMEA Administrators respectfully request that this Court (i) enter an order substantially in the form attached hereto as Exhibit A, granting the EMEA Administrators limited relief from the automatic stay to commence the EMEA Actions so as to preserve the limitation periods that may be applicable under English and Irish law; and (ii) grant such further relief as this Court deems just and proper.

Dated:   Wilmington, Delaware         **YOUNG CONAWAY STARGATE & TAYLOR, LLP**
         December 13, 2010

                                      /s/ *Edwin J. Harron*
                                      James L. Patton (No. 2202)
                                      Edwin J. Harron (No. 3396)
                                      Jaime N. Luton (No. 4936)
                                      The Brandywine Building
                                      1000 West Street, 17th Floor
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 571–6600
                                      Facsimile: (302) 571–1253

                                      - and -

                                      **HUGHES HUBBARD & REED LLP**
                                      Michael Luskin
                                      Derek J.T. Adler
                                      Ashley J. Laurie
                                      One Battery Park Plaza
                                      New York, New York 10004
                                      Telephone: (212) 837–6000
                                      Facsimile: (212) 422–4726

                                      - and -

YCST01:10484462.1                                      068476.1001

**HERBERT SMITH LLP**
Kevin Lloyd
John Whiteoak
Richard Lawton
Exchange House
Primrose Street
London
EC2A 2HS

*Counsel for the Administrators*

068476.1001