# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
                                                           :
In re:                                                     : Chapter 11
                                                           :
NORTEL NETWORKS INC., *et al.*,[1]                         : Case No. 09-10138 (KG)
                                                           :
                                            Debtors.       : (Jointly Administered)
                                                           :
---------------------------------------------------------- X

## DECLARATION OF JOHN HAYDN WHITEOAK IN SUPPORT
## OF THE EMEA ADMINISTRATORS' MOTION
## FOR LIMITED RELIEF FROM THE AUTOMATIC STAY

I, JOHN HAYDN WHITEOAK, under penalty of perjury, pursuant to 28 U.S.C. § 1746, declare:

1. Alan Robert Bloom, Stephen John Harris, Christopher John Wilkinson Hill and Alan Michael Hudson are the court appointed administrators and authorized foreign representatives of Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in the region known as EMEA (Europe, Middle East and Africa) and as listed in Schedule "A" hereto (collectively, the "EMEA Debtors"), save in respect of Nortel Networks (Ireland) Limited ("NN Ireland") where David Martin Hughes, of Ernst & Young Chartered Accountants, and Alan Robert Bloom were appointed administrators and authorized foreign representatives (collectively, the "EMEA Administrators"). Where "EMEA Administrators" is used herein in relation to NN Ireland, I am referring to Alan Robert Bloom and David Hughes.

---

[1] The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc. (collectively, the "U.S. Debtors")

2.	I am a partner with Herbert Smith LLP, solicitors for the EMEA Administrators to the EMEA Debtors and, as such, I have knowledge of the matters to which I hereinafter depose in this declaration.

3.	I am over the age of 21 years, of sound mind, am fully competent to testify to the matters set forth herein. All facts set forth in this declaration are based upon my personal knowledge, and where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

4.	I respectfully submit this declaration in support of the *EMEA Administrators' Motion for Limited Relief from the Automatic Stay* (the "Stay Relief Motion"), wherein the EMEA Administrators request limited relief from the automatic stay imposed in these chapter 11 proceedings in order to commence actions in the English Court and Irish Court (each as defined below) (together, the "EMEA Actions") against Nortel Networks Inc. ("NNI") and certain of its past or present officers and directors (collectively, the "Officers and Directors"). The EMEA Administrators seek to commence the EMEA Actions so as to preserve certain intercompany company claims (the "Intercompany Claims") that the EMEA Debtors may have against NNI and its Officers and Directors before the potentially applicable limitation periods governing such Intercompany Claims under English and Irish law expire. Specifically, the EMEA Administrators and EMEA Debtors seek to do no more than:

(a)	issue a claim form in the High Court of Justice of England and Wales (the "English Court") against NNI and its Officers and Directors (the "English Claim Form"); and

(b)	issue a summons in the High Court of Ireland (the "Irish Court") against NNI and its Officers and Directors (the "Irish Summons").

5. Commencement of the EMEA Actions is procedural in nature and is aimed to protect the EMEA Debtors and prevent them from suffering prejudice resulting from expiration of any relevant limitation periods in respect of the Intercompany Claims. The EMEA Administrators simply wish to ensure that, irrespective of the forum in which the Intercompany Claims are finally resolved, there can be no argument that English law or Irish law limitation periods have expired.

6. Other than issuance of the English Claim Form and the Irish Summons, the EMEA Debtors and the EMEA Administrators do not intend to take any further steps in respect of the pursuit of the Intercompany Claims in those proceedings as against NNI without further reference to this Court, including but not limited to serving the English Claim Form and the Irish Summons upon NNI.

7. The EMEA Administrators therefore request from this Court limited relief from the automatic stay to allow the EMEA Administrators to issue the English Claim Form and the Irish Summons so as to preserve the limitation periods in respect of certain Intercompany Claims.

I.  **Background**

8. The EMEA Administrators were appointed in respect of the insolvency proceedings of the EMEA Debtors (collectively, the "UK Proceedings"), pursuant to the initial orders (the "UK Administration Orders") granted by the English Court on January 14, 2009 (the "Petition Date") pursuant to the provisions of the English *Insolvency Act 1986*. The UK Administration Orders remain in full force and effect and are not subject to any appeal or motions to vary or set aside.

9.  Also on the Petition Date, insolvency proceedings were commenced by Nortel Networks Corporation ("NNC" and together with its affiliates and subsidiaries, "Nortel" or the "Nortel Group"), and certain of its direct and indirect Canadian subsidiaries in the Ontario Superior Court of Justice (Commercial List) (collectively, the "Canadian Debtors") and (ii) NNI, the primary U.S. operating subsidiary, and certain of its direct and indirect U.S. subsidiaries (collectively, the "U.S. Debtors") in this Court under chapter 11 of the Bankruptcy Code.

10. A significant issue in the administration of the EMEA Debtors involves determining and valuing the intercompany claims between and among the EMEA Debtors, the Canadian Debtors and the U.S. Debtors.

11. Nortel has sold substantially all of its operating businesses in the course of insolvency proceedings in Canada, England and the United States. The proceeds are being held in escrow pending determination of how they are to be allocated among the Nortel companies. To date, various efforts have failed to resolve the allocation of these sale proceeds, and also to settle various intercompany claims sounding in statute, contract and tort.

12. The EMEA Debtors desire to commence the EMEA Actions so as to preserve any rights, claims and causes of action they may have against NNI and certain Officers and Directors, and to avoid any prejudice that may arise from any delay in asserting any such rights, claims or causes of action. They wish to ensure that English law and Irish law causes of action are preserved so that such causes of action can be relied upon for the purposes of resolving the Intercompany Claims irrespective of the forum in which such Intercompany Claims may ultimately be resolved.

## II. The Need to Lift the Automatic Stay

13. The EMEA Debtors are concerned that, due to the delay in resolving the Intercompany Claims (through the current consensual and mediation process) and the stay that prohibits commencing actions outside of the chapter 11 proceedings, applicable limitation periods under English law, Irish law and or any other applicable law governing certain of the Intercompany Claims will soon expire and thereby preclude the EMEA Administrators from pursuing such Intercompany Claims at a later date.

14. In general, the limitation periods relevant to certain of the Intercompany Claims are 6 year limitation periods running from the time of the relevant breach or damage as appropriate (although in respect of certain of the claims the EMEA Debtors will argue that there is no such limitation and the EMEA Debtors also reserve the right to contend more generally for a longer or different limitation period). The limitation issues to which the Intercompany Claims give rise are, however, complex, not least because of the multi-jurisdictional aspects of the Nortel insolvency. It is therefore not possible to say with complete certainty that the relevant limitation periods in respect of certain Intercompany Claims will expire by December 22, 2010 (six years from the date on which various Nortel companies entered into the MRDA (as defined below)), but the EMEA Debtors and the EMEA Administrators wish to avoid any debate on the issue and thus desire to preserve all of their rights in respect of such Intercompany Claims without any question.

15. Further, the course of action proposed by the EMEA Debtors and the EMEA Administrators simply issuing the English Claim Form and the Irish Summons would cause no prejudice to NNI or its Officers and Directors.

16. The EMEA Administrators' delay in seeking relief from the stay to commence the UK Actions is wholly justified. It was not until recently that the EMEA Administrators became aware of the impending expiry of the potential limitation periods. The EMEA Administrators have in recent months been focusing their attention and time upon the consensual resolution and mediation processes. They have been investigating and analyzing such claims for the purpose of asserting such claims in those processes. Such investigation of the potential claims against the U.S. Debtors raised many complex legal issues, which were complicated further by the multi-jurisdictional issues to which the Nortel insolvency gives rise, and which required comprehensive and painstaking analyses. The EMEA Administrators have therefore, necessarily, focused upon the substantive aspects of those claims for the purposes of the mediation. It should be remembered that the mediation process has been conducted on a very tight timetable, given the multitude and complexity of the issues with which it is concerned. Accordingly, the EMEA Administrators have devoted a significant amount of resources and time to that process to resolve the intercompany and allocation disputes (including hours dedicated to preparation of mediation papers, significant document disclosure and review exercises involving thousands of documents, and frequent travel overseas, including to attend meetings with the other estates, in New York, in particular). In addition to this, the EMEA Administrators' overall analysis has been slowed by the EMEA Administrators' intimate involvement in the (1) EMEA pension proceedings,[2] and (2) further sales of certain Nortel businesses.

---

2. Since September 7, 2010 there have been ongoing proceedings in the English Court to determine the status within the administrations of certain EMEA Debtors of a potential liability of up to £2.1 billion arising out of the NNUK Pension plan.

6

61246021_3

17. In short, therefore, the EMEA Administrators' efforts have until now been primarily focused upon the consensual resolution process, rather than the precise manner in which the Intercompany Claims may need to be litigated.

18. As the settlement process has gone on longer, and been more demanding in terms of the EMEA Administrators' time, than expected, the EMEA Administrators have only recently begun to consider in greater detail potential contingencies in the event that consensual resolutions are not reached. Such contingency planning has raised myriad complicated cross jurisdictional legal issues. It is only in the course of this contingency planning process that the potential limitation issues have come to light.

19. While the EMEA Debtors are still committed to the goals of the mediation, they must take action now to preserve their claims before expiration of the limitation periods, should such efforts to reach a consensual agreement ultimately prove unsuccessful.

20. Accordingly, the EMEA Administrators, on behalf of the EMEA Debtors, are seeking an order of this Court granting limited relief from the automatic stay to allow the EMEA Administrators to commence actions against NNI in England and Ireland so as to preserve any and all statutes of limitations or other notice or limitation periods in connection with the Intercompany Claims. If such relief is not granted, there is a possibility that the Intercompany Claims could quickly become time-barred under English and Irish law, and that the EMEA Administrators would therefore lose forever the ability to pursue those Intercompany Claims based on English or Irish law against NNI and its Officers and Directors. As fiduciaries, the EMEA Administrators are duty bound to preserve their right to prosecute the Intercompany Claims on behalf of the EMEA Debtors.

### III.  Intercompany Claims

21.  The pressing limitation issues discussed in this Declaration only apply to certain of the Intercompany Claims of NNUK and NN Ireland (or certain aspects of such Intercompany Claims). Many of NNUK and NN Ireland's Intercompany Claims (or aspects of those claims) do not give rise to pressing limitation issues, although such claims are not the subject of the Stay Relief Motion.

22.  The Intercompany Claims which are affected (either in whole or in part) by pressing potential limitation issues include those set out below in paragraphs 23 to 33. Paragraphs 23 to 33 set out my understanding of the claims and allegations that the EMEA Administrators intend to make and bring against NNI on behalf of NNUK and NN Ireland in the English Claim Form and Irish Summons respectively.

*(a) <u>The MRDA, Ownership of IP and Transfer Pricing</u>*

23.  NNUK and NN Ireland are parties with NNL, NNI and other Nortel entities to a Master R&D Agreement ("the <u>MRDA</u>"), which NNUK and NN Ireland entered into on December 22, 2004. Pursuant to the MRDA, NNUK and NN Ireland (amongst others) contributed to R&D activity which generated intellectual and other property to which NNL had legal title (albeit it is alleged that NNUK and NN Ireland, as contributing entities, remained interested beneficially). Under the MRDA, transfer pricing adjustments were to be made between the parties ostensibly to reflect the value of their contribution on an arms-length basis. It is alleged by NNUK and NN Ireland that the transfer pricing adjustments made from December 2004 onwards did not reflect the value of NNUK and NN Ireland's contributions on an arms-length basis. It will be alleged that the effect of the operation of the MRDA was to transfer value improperly from NNUK and NN Ireland to NNL and/or NNI and/or NNC, in particular.

24. NNUK and NN Ireland intend to claim that intellectual property assets to which NNUK and NN Ireland have contributed and/or their proceeds are held by NNL and/or NNI, and/or NNC for NNUK and NN Ireland beneficially, to the extent of NNUK's and NN Ireland's respective contributions (whether pursuant to the provisions of the MRDA or by reason of a constructive alternatively resulting trust in respect of the same, and/or by reason of proprietary estoppel), together with consequential relief as identified further below.

25. Further or alternatively, NNUK and NN Ireland intend to claim that the MRDA, and alternatively transactions thereunder, were entered into in alleged breach of the fiduciary duties owed to NNUK and NN Ireland by their respective directors, which is alleged to include NNL and/or NNC and/or NNI, as de facto directors, and/or certain Officers and Directors. On these premises, it will be alleged that the assets transferred by NNUK and NN Ireland and/or received by NNL and/or NNI and/or NNC ostensibly under the MRDA were transferred in breach of fiduciary duty to the knowledge of NNL and/or NNI and/or NNC and/or certain Officers and Directors and were, and are (together with their proceeds), held by NNL and/or NNI and/or NNC in constructive trust for NNUK and NN Ireland. Further or alternatively, NNUK and NN Ireland intend to claim damages for all such alleged breaches of duty.

26. Alternatively, NNUK and NN Ireland intend to claim equitable damages and/or an account of profits from NNL and/or NNI and/or NNC for any alleged dishonest assistance and/or participation in such alleged breaches of duty.

27. In the further alternative, NNUK and NN Ireland intend to seek a monetary adjustment from NNI and NNL to reflect the full value of NNUK's and NN Ireland's respective contributions on an arms-length basis.

*(b) Intercompany Loans*

28. Commencing in December 2003 I understand that NNUK provided NNL with a series of interest-free unsecured loans, which were extended and/or renewed annually (collectively, the "Intercompany Loans"). It will be alleged that the Intercompany Loans were contrary to the interests of NNUK, which it will be alleged was at all material times in a financially vulnerable condition, and were entered into in alleged breach of the fiduciary duties owed to NNUK by its directors, which is alleged to include NNL and/or NNC and/or NNI, as de facto directors, and/or certain Officers and Directors.

29. NNUK intends to claim that the Intercompany Loans and/or their proceeds are held by NNL in constructive trust for NNUK.

30. Further or alternatively, NNUK intends to claim damages for alleged breach of duty from NNL and/or NNC and/or NNI, as alleged de facto directors, and/or certain Officers and Directors.

31. In the further alternative, NNUK intends to claim equitable damages and/or an account of profits from NNL and/or NNC and/or NNI for any alleged dishonest assistance and/or participation in such alleged breaches of duty.

*(c) Pension Funding Claims*

32. In so far as value was being transferred away from NNUK to other Nortel entities, NNUK intends to claim that the directors of NNUK, which is alleged to include NNL and/or NNC and/or NNI, as alleged de facto directors, failed, in alleged breach of their duties to NNUK, to ensure that appropriate provision was made to meet the liabilities of the NNUK pension plan, leading to a funding deficit of up to £2,100,000,000 (the "Pension Funding Claims").

33. NNUK intends to claim damages and other relief in respect of such alleged breaches, including indemnification (or contribution) in respect of any liability to the UK Pensions Regulator in respect of the matters currently the subject of a Warning Notice.

*(d) Limitation Periods in Respect of the Intercompany Claims*

34. Although certain aspects of the above claims do not give rise to limitation issues, others do so. To the extent that the above claims are concerned with alleged breaches of contract, or duty (including fiduciary duty) or dishonest assistance and/or participation the limitation period in respect of such claims runs for 6 years from the relevant event.

35. In respect of claims arising in connection with the MRDA and other transfer pricing agreements, such event could, at the earliest, be the entry into the MRDA on December 22, 2004. In respect of the Intercompany Loans, this period could run from the point in time at which the relevant loans (or tranches of such loans) were advanced. In respect of the Pension Funding Claims, the limitation period could have run from the point in time at which the failure to fund the pension plan occurred.

**IV. Procedure**

*(a) The English Action*

36. In order to commence a claim in the English Court, the EMEA Debtors would need to file the English Claim Form with the English Court and request that the claim form be issued.

37. The effect of the English Claim Form being issued would be that any limitation periods applicable to the claims set out in the English Claim Form would cease to run.

38. Having issued the English Claim Form the EMEA Debtors would have:

…
…

(a)     four months in which to serve the claim form against any defendants within the jurisdiction; and

(b)     six months in which to serve the claim form (in accordance with Section IV of the Civil Procedure Rules applicable in England and Wales (the "CPR")) against any defendants outside the jurisdiction.

39.     The EMEA Debtors and the EMEA Administrators would not be able to continue the proceedings against NNI or its Officers and Directors without serving the English Claim Form.

40.     I understand that the EMEA Debtors and the EMEA Administrators do not intend to serve the English Claim Form on NNI during the above periods without further order of this Court.

41.     There are two methods by which the EMEA Debtors and the EMEA Administrators could extend the validity period of the English Claim Form. First, the EMEA Administrators could agree to an extension with NNI (effectively a stay of proceedings). Second, there is a jurisdiction under Rule 7.6 of the CPR, whereby the English Court can, in an appropriate case, extend the validity period of the English Claim Form.

42.     In the absence of an agreement to extend time from the U.S. Debtors, the EMEA Debtors and the EMEA Administrators do not intend to serve the English Claim Form upon NNI without further leave from this Court.

43.     As a result of the above, neither NNI nor any of its Officers and Directors would be required to submit any form of defense to the Intercompany Claims set out in the English Claim Form until a time to which they agreed or until such further action is permitted by this Court.

*(b) The Irish Procedure*

44. I understand from Irish counsel that the procedure for the issue of the Irish Summons would be as follows. Irish Counsel has reviewed this section of my affidavit and confirms that it is an accurate reflection of the relevant procedure.

45. In order to commence a claim in the Irish Court the EMEA Debtors would need to file the Irish Summons with the Irish Court and request that the Irish Summons be issued.

46. The effect of the Irish Summons being issued would be that any limitation periods applicable to the claims set out in the Summons would cease to run.

47. Having issued the Irish Summons, the EMEA Debtors would have twelve months in which to serve the Irish Summons against any defendants.

48. The EMEA Debtors and the EMEA Administrators would not be able to continue the proceedings against NNI or its Officers and Directors without serving the Irish Summons.

49. I understand that, following issuance of the Irish Summons in the Irish Court, the EMEA Debtors and the EMEA Administrators do not intend to serve the Irish Summons on NNI during the above periods without further order of this Court.

50. The EMEA Debtors and the EMEA Administrators could renew the Irish Summons by applying ex parte to the Irish Court for a further six month period to execute service of the Irish Summons.

51. As a result of the above, NNI would not be required to submit any form of defense to the Intercompany Claims set out in the Irish Summons until at least 21 days after service of the Irish Summons, and the EMEA Administrators intend to seek further order of this Court before effecting such service.

## V. Conclusion

52. The U.S. Debtors will not be prejudiced at all by the filing of the English Claim Form and the Irish Summons because they will not be required, without further leave from this Court, to respond or expend any resources in connection with such writs.

53. The EMEA Debtors and the EMEA Administrators will be materially and unduly prejudiced if they are not permitted to file the English Claim Form and the Irish Summons as a failure to commence these actions before December 22, 2010 may preclude them from ever pursuing certain of the Intercompany Claims under English and Irish law. Consequently, the EMEA Administrators' (who, as fiduciaries, have an affirmative duty to pursue such claims on behalf of the EMEA Debtors) and the EMEA Debtors' substantive rights in connection with advancing such claims may forever be extinguished without due cause. Accordingly, sufficient cause exists to grant limited relief from the automatic stay on an expedited basis.

Executed on the 13 day of December 2010.

_____
John Whiteoak