# EXHIBIT B

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD
VOLUME 2 OF 2
(returnable December 15, 2010)**

November 30, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC# 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | DOCUMENT | PAGE |
|---|---|---|
| | **Volume 1** | |
| 1. | Notice of Motion, returnable December 15, 2010 | 1 |
| 2. | Affidavit of John Doolittle, sworn November 30, 2010 | 30 |
| A. | Sale Agreement, dated December 22, 2009 | 39 |
| B. | Amendment No. 1 to Sale Agreement, dated May 28, 2010 | 186 |
| C. | Affidavit of George Riedel, sworn February 26, 2010 | 204 |
| D. | Approval and Vesting Order, dated March 3, 2010 | 214 |
| E. | Estimated Purchase Price Statement, dated May 25, 2010 | 222 |
| | **Volume 2** | |
| F. | Escrow Agreement, dated January 6, 2010, and Amendment, dated May 28, 2010 | 230 |

| TAB | DOCUMENT | PAGE |
|---|---|---|
| G. | Closing Statement, dated September 15, 2010 | 270 |
| H. | Disagreement Notice, dated November 16, 2010 | 274 |
| I. | Email from Thomas Malone to Victor Lewkow and Evan Schwartz, dated December 7, 2009 at 12:37AM EST | 302 |
| J. | Draft invoices, dated September 28, 2010 | 459 |
| K. | Correspondence from Nortel Networks Inc. to Genband US LLC, dated November 18, 2010 | 462 |
| L. | Genband Motion, dated November 18, 2010 | 463 |
| 3. | Draft Order | 473 |

# EXHIBIT F

230.

*Execution Version*

## ESCROW AGREEMENT

This **ESCROW AGREEMENT** (the "**Escrow Agreement**"), dated as of January 6, 2010 is being entered into by and among (i) GENBAND Inc., a corporation organized under the laws of Delaware ("**Purchaser**"), (ii) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), (iii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), (iv) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"), (v) Nortel Networks UK Limited (in administration), a limited company organized under the laws of England ("**NNUK**" and, together with NNC, NNL and NNI, acting jointly as the "**Seller Parties**"), and (vi) Wells Fargo Bank, National Association, as escrow agent (the "**Escrow Agent**").

## RECITALS

**WHEREAS**, pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement (each as defined below), Purchaser will be acquiring the CVAS business segment from the Sellers and the EMEA Sellers;

**WHEREAS**, as of December 22, 2009, the (i) Purchaser, (ii) NNC, NNL and NNI (collectively, the "**Main Sellers**"), and (iii) the affiliates of the Main Sellers listed in Exhibit A to the Asset Sale Agreement (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") entered into the Asset Sale Agreement (the "**Asset Sale Agreement**"). Capitalized terms used and not otherwise defined in this Escrow Agreement are used herein as defined in the Asset Sale Agreement;

**WHEREAS**, simultaneously with the execution of the Asset Sale Agreement, the EMEA Sellers, Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (collectively, the "**Joint Administrators**"), Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") and the Purchaser entered into the EMEA Asset Sale Agreement (the "**EMEA Asset Sale Agreement**"), which provides for the sale by the EMEA Sellers of the assets of the Business (as defined in the EMEA Asset Sale Agreement) held by the EMEA Sellers to the Purchaser or the EMEA Designated Purchasers;

**WHEREAS**, for the purposes of this Escrow Agreement, "Distribution Agent" means the Person that will act as distribution agent of the sale proceeds under the Asset Sale Agreement and the EMEA Asset Sale Agreement for the Sellers and the EMEA Sellers, whose identity shall be provided in writing by the Seller Parties to the Purchaser and the Escrow Agent by and not later than five (5) Business Days before the Closing or, to the extent of any Escrow Funds to be delivered to the Seller Parties prior to Closing, by and not later than one (1) Business Day prior to such delivery date;

This is Exhibit............."F".............referred to in the affidavit of....JOHN DOOLITTLE

sworn before me, this....30TH

day of....NOVEMBER............20..10

_Donna Woollett_

A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel, limited to the attestation of instruments and the taking of affidavits, for Nortel Networks Corporation and its subsidiaries. Expires January 29, 2011.

231

WHEREAS, the Purchaser has agreed to deliver to the Escrow Agent (i) the Good Faith Deposit (as defined in the Asset Sale Agreement) pursuant to Section 2.2.5 of the Asset Sale Agreement and Clause 3.5 of the EMEA Asset Sale Agreement and (ii) on the Closing Date, $8,000,000.00 to be held in escrow in accordance with Section 2.3 of the Asset Sale Agreement pending the final calculation of the Purchase Price adjustments pursuant to Section 2.2.3.2 of the Asset Sale Agreement and Clause 3.3 of the EMEA Asset Sale Agreement; and

WHEREAS, Purchaser and the Seller Parties desire to appoint the Escrow Agent to act as escrow agent hereunder in the manner hereinafter set forth, and the Escrow Agent is willing to act in such capacity.

AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser, the Seller Parties and the Escrow Agent hereby agree as follows:

1.    Appointment of the Escrow Agent.  Purchaser and the Seller Parties jointly appoint the Escrow Agent to receive, hold, administer and deliver the Escrow Funds (as defined below) in accordance with this Escrow Agreement and the Escrow Agent accepts such appointment, all subject to the terms and conditions set forth in this Escrow Agreement.

2.    Establishment of Escrow Accounts.

    (a)  Good Faith Deposit Escrow.

        (i)      Establishment. Pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement, the Purchaser will, in accordance with Section 2.2.5 of the Asset Sale Agreement and Clause 3.5 of the EMEA Asset Sale Agreement, deliver or cause to be delivered to the Escrow Agent the Good Faith Deposit, to serve as earnest money under the Asset Sale Agreement and the EMEA Asset Sale Agreement, which together with any and all interest or profit thereon, or proceeds therefrom, from time to time held by the Escrow Agent pursuant to the terms hereof is referred to as the "**Good Faith Deposit Escrow Funds.**"

        (ii)      Release of Funds. The Good Faith Deposit Escrow Funds shall be held by the Escrow Agent until the Closing or, in the event the Asset Sale Agreement and/or the EMEA Asset Sale Agreement is terminated before the Closing, shall be distributed to the applicable parties pursuant to the terms of Section 2.2.5(b) of the Asset Sale

**232**

Agreement. Any release from the Good Faith Deposit Escrow Account (as defined below) shall only be made in accordance with Section 4(a) hereto.

(b) Purchase Price Adjustment Escrow. Pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement, the Purchaser will on the Closing Date deliver or cause to be delivered to the Escrow Agent cash in an amount of $8,000,000.00 (the "**Purchase Price Adjustment Escrow Amount**") to serve as a security for the Purchase Price adjustments described in Section 2.2.3.2 of the Asset Sale Agreement and Clause 3.3 of the EMEA Asset Sale Agreement in accordance with Section 2.4.2(b)(i) of the Asset Sale Agreement and Clause 3.1.2 of the EMEA Asset Sale Agreement, which amount, together with any and all interest or profit thereon, or proceeds therefrom, from time to time held by the Escrow Agent pursuant to the terms hereof is referred to as the "**Purchase Price Adjustment Escrow Funds**," (and together with the Good Faith Deposit Escrow Funds, the "**Escrow Funds**.") Any funds or investments remaining in the Purchase Price Adjustment Escrow Account (as defined below) after application of any payment to be made in accordance with Section 4(a) hereof and Sections 2.2.3.2 and 2.3 of the Asset Sale Agreement and Clauses 3.3, 3.8, 3.9 and Schedule 7 of the EMEA Asset Sale Agreement shall be released to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) in accordance with Section 4(a) hereto.

(c) Escrow Accounts. The Escrow Agent hereby agrees to hold and invest the Good Faith Deposit Escrow Funds and the Purchase Price Adjustment Escrow Funds in separate accounts (respectively, the "**Good Faith Deposit Escrow Account**", the "**Purchase Price Adjustment Escrow Account**" and together, the "**Escrow Accounts**") as provided in this Escrow Agreement. Except as set forth in Section 5(c), the Purchaser shall have the rights of a secured party in the Escrow Funds and the Escrow Accounts, and none of the Escrow Funds and the Escrow Accounts shall be subject to any security interest, lien or attachment of any party or of any creditor of any party other than Purchaser or a successor or permitted assign of the Purchaser or any of their respective creditors. Purchaser's rights (if any) in the Escrow Funds prior to release thereof or Escrow Accounts prior to termination thereof, other than its rights as a secured party, shall be subject to a first priority security interest in favor of the Seller Parties (for and behalf of the Sellers and the EMEA Sellers) in the Escrow Funds and Escrow Accounts as security for the Purchaser's obligations under Sections 2.2.3.2 and 2.2.5(a) of the Asset Sale Agreement and/or Clauses 3.3, 3.5 and Schedule 7 of the EMEA Asset Sale Agreement.

3.    Investment of the Escrow Funds.

(a) The Escrow Agent shall invest the Escrow Funds in any combination of the following investments at the joint written direction of Purchaser and the Seller Parties:

**233**

(i)    marketable obligations of, or obligations fully and directly guaranteed by, the United States, which obligations have a maturity of not more than 90 days;

(ii)    repurchase obligations with a term of not more than ten days for underlying securities of the types described in Section 3(a)(i) entered into with any bank organized under the laws of the United States or any state thereof, the commercial paper of which bank is rated A-2 or better by Standard & Poor's Ratings Group or Prime-2 or better by Moody's Investors Service, Inc.;

(iii)    money market funds (including tax-free funds) registered under the Investment Company Act of 1940, as amended from time to time, which have the highest rating available from a nationally recognized rating agency (e.g., AAA from Standard & Poors);

(iv)    investment grade bonds (including tax free bonds) with maturity dates prior to the Release Date (as defined below); and

(v)    such other investments as Purchaser and the Seller Parties may jointly authorize the Escrow Agent to make from time to time.

(b)  In the absence of written investment instructions from the Purchaser and the Seller Parties, the Escrow Agent shall invest the Escrow Funds in the Wells Fargo Advantage Funds Heritage Money Market Fund, which is further described herein on Schedule I hereto. The Purchaser and the Seller Parties acknowledge that each has read and understands Schedule I.  The Escrow Agent shall bear no responsibility for losses resulting from investment or sale of investment of the Escrow Funds in accordance with this Escrow Agreement.  The Purchaser and the Seller Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations or advice.

4.    Disposition of the Escrow Funds.

(a)  Payment of Escrow Funds.  The Purchaser and the Seller Parties acknowledge and agree that as among the Purchaser and the Seller Parties, in the event of any conflict between this Escrow Agreement and the Asset Sale Agreement and/or the EMEA Asset Sale Agreement, the Asset Sale Agreement and/or the EMEA Asset Sale Agreement shall control, and the Purchaser and the Seller Parties shall provide and deliver to the Escrow Agent joint written instructions with respect of the Escrow Funds consistent with and as required by the Asset Sale Agreement and the EMEA Asset Sale Agreement, notwithstanding anything that may be provided in this Escrow Agreement to the contrary. Without limiting the foregoing, the Escrow Funds shall be payable to the Purchaser or the Distribution Agent (as agent for the Sellers and the EMEA Sellers) as provided in joint

**234**

written instructions delivered by the Purchaser and the Seller Parties pursuant to the Asset Sale Agreement and the EMEA Asset Sale Agreement, and the Purchaser and the Seller Parties agree to comply with Section 2.3(b) of the Asset Sale Agreement and Clause 3.9 of the EMEA Asset Sale Agreement and provide the Escrow Agent joint written instructions to pay to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) or the Purchaser, as applicable, funds from the relevant Escrow Account any time that such Person becomes entitled to such payment from the relevant Escrow Account pursuant to the Asset Sale Agreement or the EMEA Asset Sale Agreement, and the Escrow Agent agrees to distribute amounts from the Escrow Account in accordance with such joint instructions.

(b) <u>Disputes</u>. Subject to Section 4(a), if any dispute arises as to amounts due from, or the disposition of, the Escrow Funds, or any other dispute arises under this Escrow Agreement with respect to the rights of Purchaser or any of the Seller Parties (for and on behalf of the Sellers and the EMEA Sellers) to the Escrow Funds, in any case that is not settled by mutual agreement of Purchaser and the Seller Parties on behalf of the Sellers and the EMEA Sellers (with such mutual agreement evidenced by joint written instructions signed by Purchaser and the Seller Parties and delivered to the Escrow Agent), then upon receipt of a final, non-appealable order of a court of competent jurisdiction, a copy of which order shall have been delivered to the Escrow Agent, the Purchaser and the Seller Parties and which court order shall be accompanied by a legal opinion by counsel for the presenting party reasonably satisfactory to the Escrow Agent to the effect that said court order is final and non-appealable (any such court order, a "**Final Court Order**"), the Escrow Agent shall deliver the portion of the Escrow Funds specified in such Final Court Order to Purchaser or the Distribution Agent (on behalf of the relevant Sellers and/or the relevant EMEA Sellers) as directed in such Final Court Order. The Escrow Agent shall also be entitled to interplead the Escrow Funds as provided in Section 6(e) hereto.

(c) <u>Closing</u>. On or prior to the Closing, but subject to the satisfaction or valid waivers of the conditions to Closing set forth in the Asset Sale Agreement and the EMEA Asset Sale Agreement, the Purchaser and the Seller Parties shall deliver to the Escrow Agent joint written instructions to liquidate all investments of amounts held in the Good Faith Deposit Escrow Account and deliver to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) on the Closing all amounts held by the Escrow Agent in the Good Faith Deposit Escrow Account by wire transfer in immediately available funds (less the Seller Parties' portion of the fees and expenses due to the Escrow Agent pursuant to Section 6(i) hereof).

5. <u>Certain Additional Agreements</u>.

(a) The Purchaser and the Seller Parties will execute and deliver to the Escrow Agent such additional joint written instructions and certificates hereunder as may be required to

5

**235**

give effect to the provisions of this Escrow Agreement, the Asset Sale Agreement and the EMEA Asset Sale Agreement.

(b)  Whenever the Escrow Agent shall be required to make a payment from the Escrow Accounts from Escrow Funds held in investments pursuant to Section 3, the Escrow Agent shall pay such amounts by liquidating such investments as shall be directed in joint written instructions signed by the Seller Parties and Purchaser or as necessary for the Escrow Agent to distribute Escrow Funds in accordance with a Final Court Order.

(c)  For tax purposes, the Escrow Funds and all interest and profit thereon shall be considered owned by the Purchaser and reported as such by the Purchaser for all tax reporting purposes.  The Purchaser and the Seller Parties shall pay or reimburse the Escrow Agent upon request for any transfer taxes or other taxes relating to the Escrow Funds incurred in connection herewith (to be split on an equal basis between the Purchaser on the one hand and the Seller Parties on the other hand) and shall indemnify and hold harmless the Escrow Agent from any amounts that it is obligated to pay in the way of such taxes.  Any payments of income from the Escrow Accounts shall be subject to withholding regulations then in force with respect to United States taxes.  The parties hereto will provide the Escrow Agent with appropriate Forms W-9 for taxpayer identification number certifications, or Forms W-8 for non-resident alien certifications.  It is understood that the Escrow Agent is not responsible for any tax reporting.  The parties acknowledge and agree that this Section 5(c) is only for the purpose of determining ownership of the Escrow Funds for tax purposes and shall have no effect on the relative rights of the parties with respect to the Escrow Funds, including without limitation, the relative rights set forth in Section 2(c) hereof.  Notwithstanding anything to the contrary in this Agreement, the Escrow Agent shall distribute quarterly to Purchaser out of the Escrow Funds an amount equal to the product of (i) all interest and profit to be included in the income of Purchaser pursuant to this Section 5(c) for such quarter and (ii) forty percent (40%).  The Escrow Agent shall make such distributions not later than five (5) Business Days after the end of each such fiscal quarter (or, if earlier, the date on which any disbursement of Escrow Funds is made to the Seller Parties); provided, however, that the first such payment shall be made no later than April 5, 2010.

6.   Escrow Agent.

(a)  The Escrow Agent shall have only the duties and responsibilities specified in this Escrow Agreement, and shall not have any duty to review or interpret the Asset Sale Agreement or the EMEA Asset Sale Agreement.  The duties of the Escrow Agent hereunder are purely ministerial in nature, and under no circumstances shall the Escrow Agent be deemed a fiduciary to the Purchaser, the Sellers, the EMEA Sellers, nor to any other party under this Escrow Agreement.

**236**

(b)  If the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions from any of the undersigned with respect to the Escrow Accounts, which, in its opinion, are in conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action until it shall be directed otherwise in joint written instructions signed by Purchaser and the Seller Parties or by a Final Court Order. The Escrow Agent shall be protected in acting upon any notice, request, waiver, consent, receipt or other document reasonably believed by the Escrow Agent to be signed by the proper party or parties.

(c)  The Escrow Agent shall not be liable for any error or judgment or for any act done or step taken or omitted by it or for any mistake of fact or law, or for anything that it may do or refrain from doing in connection herewith, except its own gross negligence or willful misconduct, and the Escrow Agent shall have no duties to anyone except those parties signing this Escrow Agreement.  In no event shall the Escrow Agent be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including without limitation lost profits), even if it has been advised of the possibility of such loss or damage and regardless of the form of action.

(d)  The Escrow Agent may consult legal counsel in the event of any dispute or question as to the construction of this Escrow Agreement, or the Escrow Agent's duties hereunder, and the Escrow Agent shall incur no liability and shall be fully protected with respect to any action taken or omitted in good faith in accordance with the opinion and instructions of such counsel.

(e)  In the event of any disagreement between the undersigned or any of them, and/or any other person, resulting in adverse claims and demands being made in connection with or for all or any portion of the Escrow Funds, the Escrow Agent shall be entitled at its option to refuse to comply with any such claim or demand, so long as such disagreement shall continue, and in so doing the Escrow Agent shall not be or become liable for damages or interest to the undersigned or any of them or to any person named herein for its failure or refusal to comply with such conflicting or adverse demands.  The Escrow Agent shall be entitled to continue to so refrain and refuse to so act until all differences with respect thereto shall have been resolved by agreement of Purchaser and the Seller Parties and the Escrow Agent shall have been notified thereof in joint written instructions signed by Purchaser and the Seller Parties.  In the event of such disagreement which continues for ninety (90) days or more, the Escrow Agent in its discretion may file a suit in interpleader for the purpose of having the respective rights of the claimants adjudicated, and may deposit with the court all documents and property held hereunder.  Purchaser and the Seller Parties agree to pay all reasonable out-of-pocket costs and expenses incurred by the Escrow Agent in such action, including reasonable attorney's fees, it being understood that the parties will use reasonable efforts to cause such costs and expenses to be included and apportioned between Purchaser,

7

**237**

and the Seller Parties in the judgment in any such action (and absent such apportionment, Purchaser and the Seller Parties shall bear equal shares of such costs and expenses, being 50% by the Purchaser and 50% by the Seller Parties).

(f)  Purchaser, NNC, NNL and NNI hereby jointly and severally indemnify, defend and hold the Escrow Agent harmless from all loss, liability or expense arising out of or in connection with (i) the Escrow Agent's execution and performance of this Escrow Agreement, except to the extent that such loss, liability or expense is due to the gross negligence or willful misconduct of the Escrow Agent, (ii) the Escrow Agent's reliance upon and compliance with instructions or directions from the Purchaser or the Seller Parties, except to the extent that such loss, liability or expense is due to the gross negligence or willful misconduct of the Escrow Agent, it being understood that the failure of the Escrow Agent to verify or confirm that the person giving the instructions or directions, is, in fact, an authorized person does not constitute gross negligence or willful misconduct and (iii) the Escrow Agent's following any instructions or other directions from Purchaser or the Seller Parties. As between the Purchaser, NNC, NNL and NNI, such indemnification shall be borne 50% by the Purchaser and 50% by NNC, NNL and NNI and shall survive termination of this Escrow Agreement until extinguished by any applicable statute of limitations; provided, that Purchaser, on the one hand, and NNC, NNL and NNI, on the other hand, shall indemnify and hold the other harmless to the extent such indemnification of the Escrow Agent arose out of or is related to the negligent acts or omissions of Purchaser or any of NNC, NNL or NNI, respectively, or acts or omissions of Purchaser or any of NNC, NNL or NNI, respectively, in breach of this Agreement, the Asset Sale Agreement or the EMEA Asset Sale Agreement.  Notwithstanding the foregoing, nothing in this Section 6(f) shall be construed as creating an indemnification obligation of NNUK in favor of the Escrow Agent.

(g)  The Escrow Agent does not own or have any interest in the Escrow Accounts or the Escrow Funds but is serving as escrow holder only, having only possession thereof and agreeing to hold and distribute the Escrow Funds in accordance with the terms and conditions of this Escrow Agreement.  This paragraph shall survive notwithstanding any termination of this Escrow Agreement or the resignation of the Escrow Agent.

(h)  The Escrow Agent (and any successor escrow agent) may at any time resign as such by delivering the Escrow Funds to (i) any banking corporation or trust company organized under the laws of the United States or of any state, which corporation or company is jointly designated by the other parties hereto in writing as successor escrow agent and consents in writing to act as successor escrow agent or (ii) any court of competent jurisdiction; whereupon the Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Escrow Agreement.  The resignation of the Escrow Agent will take effect on the earlier of (x) the appointment of a successor escrow agent by designation by the Purchaser and the Seller Parties and delivery of the Escrow Funds to such

8

238

successor escrow agent (or delivery of the Escrow Funds to any court of competent jurisdiction) or (y) the day that is sixty (60) days after the date of delivery of its written notice of resignation to the Purchaser and the Seller Parties. If at the time of effectiveness of resignation the Escrow Agent has not received a designation of a successor escrow agent, the Escrow Agent's sole responsibility after that time shall be to safekeep the Escrow Funds until the earlier of receipt of a designation by the other parties hereto of a successor escrow agent, a joint written instruction as to disposition of the Escrow Funds by the other parties hereto, or a final order of a court of competent jurisdiction mandating disposition of the Escrow Funds.

   (i)   The Escrow Agent hereby accepts its appointment and agrees to act as escrow agent under the terms and conditions of this Escrow Agreement. Purchaser and the Seller Parties shall pay to the Escrow Agent as payment in full for its services hereunder the Escrow Agent's compensation set forth in Schedule II hereto. Purchaser and the Seller Parties further agree to reimburse the Escrow Agent for all reasonable out-of-pocket expenses, disbursements and advances incurred or made by the Escrow Agent in the performance of its duties hereunder (including reasonable fees and out-of-pocket expenses and disbursements of its counsel). Purchaser, on the one hand, and the Seller Parties, on the other hand, shall each pay one half of the amounts required to be paid under this Section 6(i); provided, however, that the Seller Parties' share of any such costs and expenses shall be paid from the Good Faith Deposit Escrow Funds, and the Escrow Agent may withdraw such one-half share from such Good Faith Deposit Escrow Account when due, and as applicable, provided that the Escrow Agent gives the Seller Parties and the Purchaser reasonable advance notice of each such withdrawal, including reasonable documentation supporting such expenses, fees and disbursements.

   (j)   The Escrow Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Escrow Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God, war, earthquakes, fires, floods, wars, civil or military disturbances, sabotage, acts of terrorism, epidemics, riots, loss or malfunctions of utilities or communications service, labor disputes, acts of civil or military authority or governmental actions); it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

   (k)   Concurrently with the execution of this Escrow Agreement, the Purchaser and the Seller Parties shall deliver to the Escrow Agent authorized signers' lists in the form of Exhibit A-1, Exhibit A-2, Exhibit A-3, Exhibit A-4 and Exhibit A-5 to this Escrow Agreement.

**239**

7.   Exclusion of Liability and Acknowledgments regarding Joint Administrators.

(a)  The Seller Parties agree that the Joint Administrators have negotiated and are entering into this Escrow Agreement as agents for NNUK to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal Liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Escrow Agreement or under or in relation to any associated arrangements or negotiations.

(b)  Notwithstanding anything in Sections 16 or 17, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal Liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of NNUK and their remaining as current joint administrators thereof under this Escrow Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

8.   Notices.  All certificates, instructions, notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Escrow Agreement must be in writing and must be delivered, given or otherwise provided:

(a)  by hand (in which case, it will be effective upon delivery);

(b)  by facsimile (in which case, it will be effective on written or telephonic confirmation of receipt from the recipient); or

(c)  by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the first business day after being deposited with such courier service).

in each case, to the address (or facsimile number) listed below:

If to Purchaser, to:

> **GENBAND Inc.**
> 3605 E. Plano Pkwy., Suite 100
> Plano, Texas 75074
> Attention: General Counsel
> Facsimile: +1-972-265-3581

with copies (which shall not constitute notice) to:



Latham & Watkins LLP
885 Third Avenue
New York NY 10022
United States
Attention:      David S. Allinson, Esq.
Facsimile:      +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:      Don J. McDermett, Jr., Esq.
                Curt Anderson, Esq.
Facsimile:      +1-214-661-4454
                +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue  7th Floor
New York, New York  10022
Attnention:     Ron Ferguson, Esq.
Facsimile:      +1-212-371-7087

If to the Seller Parties, to:

**Nortel Networks Limited and Nortel Networks Corporation**
5945 Airport Road
Suite 360
Mississauga, Ontario, Canada  L4V 1R9
Attention:    Anna Ventresca
              General Counsel-Corporate, Corporate Secretary and
              Chief Compliance Officer
Facsimile:    +1-905-863-2057

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, TN  37228
USA
Attention:    Lynn C. Egan
              Assistant Secretary
Facsimile:    +1-615-432-4067

241

**Nortel Networks UK Limited (in administration)**
Maidenhead Office Park
Westacott Way
Maidenhead
Berks SL6 3QH
Attention:     Chris Hill, Administrator (EMEA)
Facsimile:     +44 (0)20-7951-1345

-and-

Ernst & Young LLP
1 More London Place
London  SE1 2AF
United Kingdom
Attention:     Alan Bloom / Stephen Harris
Facsimile:     + 44 (0)20 7951 1345

with copies (which shall not constitute notice) to:

**Nortel Networks Limited and Nortel Networks Corporation**
5270 Sycamore Avenue
Bronx, NY 10471
Attention:     Robert Fishman
                    Senior Counsel

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006
USA
Attention:     Victor I. Lewkow
Facsimile:     +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, ON  M5J 2Z4
Canada
Attention:     Michael Lang
Facsimile:     416-216-3930

**242**

-and-

Herbert Smith LLP
Exchange House
London EC2A 2HS
Facsimile:      + 44 (0)20 7098 4618
Attention:      Alex Kay / Alan Montgomery

If to the Escrow Agent, to:

Wells Fargo Bank, N.A.
45 Broadway, 14th Floor
New York, NY  10006
Attn: Lisa D'Angelo
Facsimile: 212.509.1716

(or to such other addresses and facsimile numbers as a party may designate as to itself by notice to the other parties given pursuant to this Section 8).  Notwithstanding any of the foregoing, any computation of a time period which is to begin after receipt of a notice by the Escrow Agent shall run from the date of receipt by it.

9.    Termination.  This Escrow Agreement shall automatically terminate upon the final distribution of the Escrow Funds in accordance with the terms hereof; provided, however, that the provisions of Sections 4(a), 5(c), 6(f), 6(g) and 8 through 20 shall survive such termination of this Escrow Agreement and/or the resignation or removal of the Escrow Agent.

10.    Successors and Assigns.  This Escrow Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto, provided that this Escrow Agreement may not be assigned by any party without the prior written consent of the other parties, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, the following assignments shall not require consent of any party: (a) assignment by a Seller that is a U.S. Debtor to an entity that is the surviving, resulting or acquiring entity of, and successor to, such U.S. Debtor pursuant to a final court order confirming a chapter 11 plan of reorganization for such U.S. Debtor and (b) assignment by any Seller that is a Canadian Debtor pursuant to any plan of arrangement approved by the Canadian Court.  Any banking association or corporation into which the Escrow Agent may be merged, converted or with which the Escrow Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any banking association or corporation to which all or substantially all of the corporate trust business of the Escrow Agent shall be sold or otherwise transferred, shall succeed to all the Escrow Agent's rights, obligations

13

**243**

and immunities hereunder without the execution or filing of any instrument or any further act, any provision herein to the contrary notwithstanding.

11. Severability. Any term or provision of this Escrow Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

12. Entire Agreement. This Escrow Agreement (together with any documents, instruments and certificates explicitly referred to herein, including the Asset Sale Agreement and the EMEA Asset Sale Agreement, as they pertain to the Purchaser and the Seller Parties only) constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

13. Amendments. This Escrow Agreement may not be amended or modified at any time except in such manner as may be agreed upon by a written instrument executed by each of Purchaser, the Seller Parties and the Escrow Agent.

14. Waiver. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party. The failure of any party to require the performance of any term or obligation of this Escrow Agreement, or the waiver by any party of any breach of this Escrow Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

15. Headings. The headings contained in this Escrow Agreement are for convenience purposes only and will not in any way affect the meaning or interpretation hereof.

16. Governing Law. This Escrow Agreement, the rights of the parties and any questions, claims, disputes, remedies or actions arising from or related to this Escrow Agreement, and any relief or remedies sought by any parties, shall be governed exclusively by the laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction that would cause any laws other than the laws of the State of New York to be applied.

17. Consent to Jurisdiction; Venue.



(a)  To the fullest extent permitted by applicable Law, each of the parties: (i) agrees that any claim, action, proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Escrow Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (x) a final decree closing the Chapter 11 Cases has not been entered and (y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of New York (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in Clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Escrow Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 8 of this Escrow Agreement or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

(b)  The Purchaser hereby appoints Stikeman Elliot LLP, Barristers & Solicitors, 5300 Commerce Court West, 199 Bay Street, Toronto, ON, Canada M5L1B9, as its authorized agent (the "**Purchaser Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Escrow Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable.  The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid.  Service of process upon the Purchaser Authorized Canadian Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.



(c)  Each Seller Party hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Escrow Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the New York Courts by any other party hereto, and (ii) NNL as its authorized agent (the "**Seller Authorized Canadian Agent**" and together with the Seller Authorized U.S. Agent, the "**Seller Authorized Agents**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Escrow Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to NNL and NNI shall be deemed, in every respect, effective service of process upon every such Seller Party.

18.  <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS ESCROW AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS ESCROW AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

19.  <u>Counterparts</u>. This Escrow Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. This Escrow Agreement will become effective when duly executed by each party hereto.

20.  <u>No Presumption</u>. The parties agree that this Escrow Agreement was negotiated fairly between them at arm's length and that the final terms of this Escrow Agreement are the product of the parties' negotiations. Each party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Escrow Agreement and the rights and obligations affected hereby. The parties agree that this Escrow Agreement shall be deemed to have been jointly and equally drafted by them, and that the

**246**

provisions of this Escrow Agreement therefore should not be construed against a party on the grounds that such party drafted or was more responsible for drafting the provisions.

*[The remainder of this page is intentionally left blank.  Signatures follow.]*

**247**

    **IN WITNESS WHEREOF,** the undersigned have executed this Escrow Agreement as of the date first written above.

**ESCROW AGENT**

                           **WELLS FARGO BANK, NATIONAL ASSOCIATION,** as escrow agent

                           By:
                           Name: LISA D'ANGELO
                           Title: VICE PRESIDENT

*Signature Page to Escrow Agreement*

248

**PURCHASER:**

**GENBAND INC.**

By: _____

Name: Charlie Vogt
Title: President and Chief Executive
Officer

*Signature Page to Escrow Agreement*

**249.**

**SELLER PARTIES**

**NORTEL NETWORKS CORPORATION**

By:_____

    Name: Anna Ventresca
    Title:   General Counsel-Corporate
    and Corporate Secretary

By:_____

    Name:  John Doolittle
    Title:   SVP, Finance and Corporate
    Services

**NORTEL NETWORKS LIMITED**

By:_____

    Name: Anna Ventresca
    Title:   General Counsel-Corporate
    and Corporate Secretary

By:_____

    Name:  John Doolittle
    Title:   SVP, Finance and Corporate
    Services

**NORTEL NETWORKS INC.**

By:_____

    Name:  Anna Ventresca
    Title:   Chief Legal Officer

250

**SIGNED** for and on behalf of **Nortel** )
**Networks UK Limited** (in administration) )
by Christopher Hill )
 )

.................................................
Christopher Hill

as Joint Administrator (acting as agent and
without personal liability) in the presence
of:


Witness signature

..................................................... )
Name:  Jessica Henson )
Address: Herbert Smith LLP, Exchange Square, )
Primrose Street, London, EC2A 2HS, England



**Agency and Custody Account Direction**
**For Cash Balances**

Direction to use Wells Fargo Advantage Funds for Cash Balances for the escrow account or accounts (the "Account") established under the Escrow Agreement to which this Schedule I is attached.

In the absence of written investment instructions, the Escrow Agent is hereby directed to invest, as indicated below or as Purchaser and the Seller Parties shall direct further through joint written instruction from time to time, all cash in the Account in the following money market portfolio of Wells Fargo Advantage Funds (the "Fund") or another permitted investment of the Purchaser and Seller Parties' joint choice:

**Wells Fargo Advantage Funds, Heritage Money Market Fund**

Purchaser and Seller Parties acknowledge that they have received, at their request, and reviewed the Fund's prospectus and have determined that the Fund is an appropriate investment for the Account.

Purchaser and the Seller Parties understand from reading the Fund's prospectus that Wells Fargo Funds Management, LLC ("Wells Fargo Funds Management"), a wholly-owned subsidiary of Wells Fargo & Company, provides investment advisory and other administrative services for the *Wells Fargo Advantage Funds*. Other affiliates of Wells Fargo & Company provide sub-advisory and other services for the Funds. Boston Financial Data Services serves as transfer agent for the Funds. The Funds are distributed by Wells Fargo Funds Distributor, LLC, Member NASD/SIPC, an affiliate of Wells Fargo & Company. Purchaser and the Seller Parties also understand that Wells Fargo & Company will be paid, and its bank affiliates may be paid, fees for services to the Funds and that those fees may include Processing Organization fees as described in the Fund's prospectus.

Purchaser and the Seller Parties understand that the Escrow Agent will not exclude amounts invested in the Fund from Account assets subject to fees under the Account agreement between us.

Purchaser and the Seller Parties understand that investments in the Fund are not obligations of, or endorsed or guaranteed by, Wells Fargo Bank or its affiliates and are not insured by the Federal Deposit Insurance Corporation.

Purchaser and the Seller Parties acknowledge that they have, through joint agreement, full power to direct investments of the Account.

Purchaser and the Seller Parties understand that they may change this direction at any time and that it shall continue in effect until revoked or modified by Purchaser and the Seller Parties by joint written notice to the Escrow Agent.

Purchaser and the Seller Parties understand that if they choose to communicate this joint written investment direction solely via facsimile, then the investment direction will be understood to be enforceable and binding.

**252**

<u>Schedule II</u>

<u>Compensation of the Escrow Agent</u>

See attached.

Wells Fargo Corporate Trust Services
Fee Schedule for Escrow Agent Services for the
## GENBAND, Inc., NNC, NNL, NNI and NNUK Escrow Agreement

**253**

Wells Fargo Bank is a leading provider of quality, cost-efficient Corporate Trust Services. Our staff is qualified and proficient, drawing on years of experience in the field.  Because we value your business, we are committed to bringing you personal and professional service.

| Acceptance Fee: | Waived |
|---|---|

Initial Fees as they relate to Wells Fargo Bank acting in the capacity of Escrow Agent – includes final review of the Escrow Agreement; acceptance of the Escrow appointment; setting up of the Escrow Account(s) and accounting records; and coordination of receipt of funds for deposit to the Escrow Account(s).

| Escrow Agent Administration Fee: | $2,500.00 |
|---|---|

For ordinary administration services by Escrow Agent – includes daily routine account management; investment transactions; cash transaction processing (including wire and check process) and disbursement of funds in accordance with the agreement.  Generation of 1099's (if applicable) for up to 15 investors is included in the Escrow Administration fee.

This fee is payable in advance, with payment due at the time of Escrow Agreement execution.

**Wells Fargo's fee quote is based on the following assumptions:**

- Maximum number of investors:  15
- Duration of the escrow is 12 months or less
- Appointment subject to receipt of requested due diligence information as per the USA Patriot Act
- This proposal assumes that balances in escrow account will be invested in money market funds
- All funds will be received from or distributed to a domestic or an approved foreign entity
- If the account(s) does not open within three (3) months of the date shown below, this proposal will be deemed to be null and voice

| Out-of-Pocket Expenses | At Cost |
|---|---|

We will charge for out-of-pocket expenses in response to specific tasks assigned by the client or provided for in the Escrow Account. Possible expenses would be, but are not limited to, express mail and messenger charges, travel expenses to attend closing or other meetings. Wells Fargo does not typically retain outside counsel to review Escrow Agreements but should we elect to we will charge for their fees and expenses should substantial comments be made to the Escrow Agreement.

**254**

*This fee schedule is based upon the assumptions listed above which pertain to the responsibilities and risks involved in Wells Fargo undertaking the role of Escrow Agent. These assumptions are based on information provided to us as of the date of this fee schedule. Our fee schedule is subject to review and acceptance of the final documents. Should any of the assumptions, duties or responsibilities change, we reserve the right to affirm, modify or rescind our fee schedule. Extraordinary services (services other than the ordinary administration services of Escrow Agent described above) are not included in the administration fee and will be billed as incurred at the rates in effect from time to time.*

**Submitted on:  December 21, 2009**

**I, on behalf of the Company, am duly authorized to sign on behalf of and bind the Company and hereby confirm receipt and agreement with all of the Terms and Conditions of this Schedule of Fees.**

**GENBAND Inc.**

By:   Charlie Vogt                                                    Date:  January 6, 2010
Title: President and Chief Executive Officer

**255**

Exhibit A-1
CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have
been designated as authorized representatives of Purchaser and are authorized to initiate and
approve transactions of all types for the escrow account or accounts established under the
Escrow Agreement to which this Exhibit A-1 is attached, on behalf of Purchaser

Name / Title                                        Specimen Signature


Name: Charlie Vogt
Title:  President and Chief Executive Officer        _____
                                                              Signature

Name: Jeff Kupp
Title:   Executive Vice President and Chief
          Financial Officer                          _____
                                                              Signature

Name:  Shauna Martin
Title:    Executive Vice President and
           General Counsel                           _____
                                                              Signature

**256**

Exhibit A-1
## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-1 is attached, on behalf of Purchaser

<u>Name / Title</u>                        <u>Specimen Signature</u>

Name: Charlie Vogt
Title:  President and Chief Executive Officer    _____
                                                        Signature

Name: Jeff Kupp
Title:   Executive Vice President and Chief     _____
            Financial Officer                              Signature

Name:  Shauna Martin
Title:    Executive Vice President and          _____
            General Counsel                               Signature

Exhibit A-2

**257**

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Nortel Networks Limited and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-2 is attached, on behalf of Nortel Networks Limited.

Name / Title                                          Specimen Signature

Anna Ventresca
Name                                                    Signature

General Counsel-Corporate and Corporate
Secretary
Title

John Doolittle
Name                                                    Signature

Senior Vice-President, Finance and
Corporate Services
Title

Clarke Glaspell
Name                                                    Signature

Controller
Title

**258**

Exhibit A-3

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Nortel Networks Inc. and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-3 is attached, on behalf of Nortel Networks Inc.

Name / Title                                           Specimen Signature

Anna Ventresca
Name                                                     Signature

Chief Legal Officer
Title

John Doolittle
Name                                                     Signature

Vice-President
Title

Clarke Glaspell
Name                                                     Signature

Vice-President, Finance
Title

*Signature Page for Escrow Agreement*

**259**

<u>Exhibit A-4</u>
CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Nortel Networks UK Limited and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-4 is attached, on behalf of Nortel Networks UK Limited.

<u>Name / Title</u>                          <u>Specimen Signature</u>

Alan Robert Bloom
Name
                                             Signature
Joint Administrator
Title

Stephen John Harris
Name
                                             Signature
Joint Administrator
Title

Christopher John Wilkinson Hill
Name
                                             Signature
Joint Administrator
Title

Alan Michael Hudson
Name
                                             Signature
Joint Administrator
Title

**266**

<u>Exhibit A-4</u>
CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Nortel Networks UK Limited and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-4 is attached, on behalf of Nortel Networks UK Limited.


<u>Name / Title</u>                                   <u>Specimen Signature</u>


Alan Robert Bloom
Name                                                _____
                                                         Signature

Joint Administrator
Title

Stephen John Harris
Name                                                _____
                                                         Signature

Joint Administrator
Title

Christopher John Wilkinson Hill
Name                                                _____
                                                         Signature

Joint Administrator
Title

Alan Michael Hudson
Name                                                _____
                                                         Signature

Joint Administrator
Title

Exhibit A-5

**261**

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Nortel Networks Corporation and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit A-5 is attached, on behalf of Nortel Networks Corporation.

<table>
<tr><td align="center">Name / Title</td><td align="center">Specimen Signature</td></tr>
<tr><td></td><td></td></tr>
<tr><td align="center">Anna Ventresca<br>Name</td><td align="center">Signature</td></tr>
<tr><td align="center">General Counsel-Corporate and Corporate<br>Secretary<br>Title</td><td></td></tr>
<tr><td align="center">John Doolittle<br>Name</td><td align="center">Signature</td></tr>
<tr><td align="center">Senior Vice-President, Finance and<br>Corporate Services<br>Title</td><td></td></tr>
<tr><td align="center">Clarke Glaspell<br>Name</td><td align="center">Signature</td></tr>
<tr><td align="center">Controller<br>Title</td><td></td></tr>
</table>

*Signature Page for Escrow Agreement*

262

*Execution Version*

## AMENDMENT NO. 1

### TO THE ESCROW AGREEMENT

AMENDMENT NO. 1, dated as of May 28, 2010 (this "Amendment No. 1"), to the Escrow Agreement, dated as of January 6, 2010 (the "Escrow Agreement") by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI") and Nortel Networks UK Limited (in administration) ("NNUK" and together with NNC, NNL and NNI, acting jointly as the "Seller Parties") and GENBAND Inc. (the "Purchaser") and Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agent", and together with the above, the "Parties").

WHEREAS, the Parties wish to amend the Escrow Agreement; and

WHEREAS, pursuant to Section 13 of the Escrow Agreement, the Escrow Agreement may be amended pursuant to a written agreement among the Parties;

NOW, THEREFORE, in consideration of the premises herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

1.  Definitions. Unless otherwise defined herein or amended hereby, capitalized terms used herein which are defined in the Escrow Agreement, as amended at any time and from time to time hereafter, shall have the meanings ascribed to them in the Escrow Agreement.

2.  Second and Third Recital. In the second recital, the words "(as may be amended from time to time)" shall be inserted directly after the words "Asset Sale Agreement" where they are first used. In the third recital, the words "(as may be amended from time to time)" shall be inserted directly after the words "EMEA Asset Sale Agreement" where they are first used.

3.  Fifth Recital. The fifth recital is deleted in its entirety and replaced with the following:

    WHEREAS, (i) the Purchaser has agreed to deliver to the Escrow Agent the Good Faith Deposit (as defined in the Asset Sale Agreement) pursuant to Section 2.2.5 of the Asset Sale Agreement and Clause 3.5 of the EMEA Asset Sale Agreement and (ii) on the Closing Date, the Purchaser and the Designated Purchasers shall deliver to the Escrow Agent (a) $8,000,000.00 to be held in escrow in accordance with Section 2.3 of the Asset Sale Agreement pending the final calculation of the Purchase Price adjustments pursuant to Sections 2.2.2 and 2.2.3 of the Asset Sale Agreement and Clause 3.3 of the EMEA Asset Sale Agreement, (b) $2,500,000.00 to be held in escrow in accordance with Section 6.11 of the Asset Sale Agreement, (c) $2,500,000.00 to be held in escrow in accordance with Clause 3.10 of the EMEA Asset Sale Agreement; and

1

**263**

4.    Purchase Price Adjustment Escrow.  The language "(and together with the Good
Faith Deposit Escrow Funds, the "**Escrow Funds**.") shall be deleted from Section
2(b) and replaced with a period.  The comma in "**Purchase Price Adjustment
Escrow Funds**," in Section 2(b) shall be deleted and "**Escrow Funds**" shall be
redefined in Section 2(d) (as amended by this Amendment No. 1).

5.    Establishment of Additional Escrow Accounts.  Section 2(c) will be deleted in its
entirety and replaced with the following:

(c) Tax Escrow.  Pursuant to the Asset Sale Agreement, the Purchaser will on
the Closing Date deliver or cause to be delivered to the Escrow Agent cash in an
amount of $2,500,000.00 (the "**Tax Escrow Amount**") as described in Section
6.11 of the Asset Sale Agreement in accordance with Section 2.4.2(b)(i) of the
Asset Sale Agreement, which amount, together with any and all interest or profit
thereon, or proceeds therefrom, from time to time held by the Escrow Agent
pursuant to the terms hereof is referred to as the "**Tax Escrow Funds.**" Any funds
or investments remaining in the Tax Escrow Account (as defined below) after
application of any payment to be made in accordance with Section 4(a) hereof and
Section 6.11(b) of the Asset Sale Agreement shall be released to the Distribution
Agent (as agent for the Sellers and the EMEA Sellers) in accordance with Section
6.11(c) of the Asset Sale Agreement and Section 4(a) hereto.

(d) EMEA Tax Escrow.  Pursuant to the Asset Sale Agreement and the
EMEA Asset Sale Agreement, the Purchaser will on the Closing Date deliver or
cause to be delivered to the Escrow Agent cash in an amount of $2,500,000.00
(the "**EMEA Tax Escrow Amount**") as described in Clause 3.10 of the EMEA
Asset Sale Agreement in accordance with Section 2.4.2(b)(i) of the Asset Sale
Agreement, which amount, together with any and all interest or profit thereon, or
proceeds therefrom, from time to time held by the Escrow Agent pursuant to the
terms hereof is referred to as the "**EMEA Tax Escrow Funds**," and together with
the Good Faith Deposit Escrow Funds, Purchase Price Adjustment Escrow Funds
and Tax Escrow Funds, the "**Escrow Funds**". Any funds or investments
remaining in the EMEA Tax Escrow Account (as defined below) after application
of any payment to be made in accordance with Section 4(a) hereof and Clause
3.10.2 of the EMEA Asset Sale Agreement shall be released to the Distribution
Agent (as agent for the Sellers and the EMEA Sellers) in accordance with Clause
3.10.3 of the EMEA Asset Sale Agreement and Section 4(a) hereto.

(e) Escrow Accounts.  The Escrow Agent hereby agrees to hold and invest the
Good Faith Deposit Escrow Funds, Purchase Price Adjustment Escrow Funds,
Tax Escrow Funds and EMEA Tax Escrow Funds in separate accounts
(respectively, the "**Good Faith Deposit Escrow Account**", the "**Purchase Price
Adjustment Escrow Account**", the "**Tax Escrow Account**" and the "**EMEA

2

264

Tax Escrow Account" and together, the "Escrow Accounts") as provided in this
Escrow Agreement. Except as set forth in Section 5(c), the Purchaser shall have
the rights of a secured party in the Escrow Funds and the Escrow Accounts, and
none of the Escrow Funds and the Escrow Accounts shall be subject to any
security interest, lien or attachment of any party or of any creditor of any party
other than Purchaser or a successor or permitted assign of the Purchaser or any of
their respective creditors. Purchaser's rights (if any) in the Escrow Funds prior to
release thereof or Escrow Accounts prior to termination thereof, other than its
rights as a secured party, shall be subject to a first priority security interest in
favor of the Seller Parties (for and behalf of the Sellers and the EMEA Sellers) in
the Escrow Funds and Escrow Accounts as security for the Purchaser's
obligations under Sections 2.2.3.2, 2.2.5(a) and 6.11 of the Asset Sale Agreement
and/or Clauses 3.3, 3.5, 3.10 and Schedule 7 of the EMEA Asset Sale Agreement.

6.   Effectiveness. This Amendment No. 1 shall become effective as of the date first
     written above (the "First Amendment Effective Date").

7.   Reference to and Effect on the Escrow Agreement.

     (a)   On or after the First Amendment Effective Date, each reference in the
           Escrow Agreement to "this Escrow Agreement," "hereunder," "hereof,"
           "herein," or words of like import referring to the Escrow Agreement shall
           mean and be a reference to the Escrow Agreement as amended by this
           Amendment No. 1.

     (b)   Except as amended hereby, the provisions of the Escrow Agreement are
           and shall remain in full force and effect.

8.   Counterparts. This Amendment No. 1 may be executed in any number of
     counterparts, each of which will be an original and all of which together will
     constitute one and the same instrument. Delivery of an executed counterpart of a
     signature page to this Amendment No. 1 by facsimile or other electronic means
     shall be effective as delivery of a manually executed counterpart of this
     Amendment No. 1.

9.   Exclusion of Liability and Acknowledgments regarding Joint Administrators.

     (a)   The parties hereto agree that the Joint Administrators have negotiated and
           are entering into this Amendment No. 1 as agents for NNUK to which
           they are appointed and that none of the Joint Administrators, their firm,
           partners, employees, advisers, representatives or agents shall incur any
           personal Liability whatsoever whether on their own part or in respect of
           any failure on the part of any other Party to observe, perform or comply

3

**265**

with any of its obligations under this Amendment No.1 or under or in relation to any associated arrangements or negotiations.

(b)     Notwithstanding any other provision hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal Liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of NNUK and their remaining as current joint administrators thereof under this Amendment No. 1 shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

10.    <u>Miscellaneous</u>. Sections 8 and 10 through to 20 (both inclusive) of the Escrow Agreement (as amended) shall apply as if stated in full as the final sections of this Amendment No. 1, save that references in all places in those section to "Escrow Agreement" shall be read as references to this "Amendment No. 1" except for the final time that it is used in Section 17(a)(iv), in which case "this Escrow Agreement" shall be read as "the Escrow Agreement".


**[Remainder of this page intentionally left blank.]**


4



IN WITNESS WHEREOF, the Parties have duly entered into this Amendment No. 1 as of the date first written above.

**ESCROW AGENT**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as escrow agent

By: _____

Name: LISA D. ~~~

Title: ~~~ PRESIDENT

[Signature Page – Amendment No. 1]

267

**Purchaser:**

**GENBAND US LLC**

By: _____

Name: Shauna Martin
Title:  Executive Vice-President and General
        Counsel

**268**

SELLER PARTIES

NORTEL NETWORKS CORPORATION

By:

Name: John Doolittle

Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

By:

Name: Anna Ventresca

Title: General Counsel-Corporate
and Corporate Secretary

NORTEL NETWORKS LIMITED

By:

Name: John Doolittle

Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

By:

Name: Anna Ventresca

Title: General Counsel-Corporate and
Corporate Secretary

NORTEL NETWORKS INC.

By:

Name: Anna Ventresca

Title: Chief Legal Officer

[Signature Page – Amendment No. 1]

269

**SIGNED** for and on behalf of **Nortel**
**Networks UK Limited** (in administration)    )
by Christopher Hill as Joint Administrator    )
(acting as agent and without personal    )
liability) in the presence of:

..............................................................
Christopher Hill

Witness signature

.......................................................    )
Name: Ardil Salem    )
Address: Herbert Smith LLP, Exchange House,    )
Primrose Street, London EC2A 2HS, England

[Signature Page – Amendment No. 1]

# EXHIBIT G

**270**



**GENBAND**

Shauna Martin
office: 972.265.3800
facsimile: 972.461.7516
shauna.martin@genband.com

This is Exhibit........."G ".........referred to in the
affidavit of JOHN DOOLITTLE
sworn before me, this.....3 0 th
day of NOVEMBER..................20 10

____Donna Woollett____

A COMMISSIONER FOR TAKING AFFIDAVITS
DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

September 15, 2010

Nortel Networks
Corporation and Nortel
Networks Limited
5945 Airport Road, Suite
360
Mississauga, Ontario,
Canada L4V 1R9
Facsimile: +1-905-863-
2057
Attn: Anna Ventresca,
  General Counsel-
Corporate and Corporate
Secretary
Attn: Khush Dadyburjor,
  Vice President, Mergers
and Acquisitions

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA
37228
Facsimile: +1-615-432-
4413
Attn: Lynn C. Egan
  Secretary

Alan Bloom / Stephen
Harris
Ernst & Young LLP
1 More London Place
London
SE1 2AF
United Kingdom
Facsimile: +44 (0)20 7951
1345

Sharon Rolston / Simon
Freemantle
Maidenhead Office Park
Westacott Way
Maidenhead
Berkshire SL6 3QH
United Kingdom
Facsimile: +44 (0)20 1628
432 416

Avi D. Pelossof
Zellermayer, Pelossof &
Co.
The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile: +972 3 6255500

Ladies and Gentlemen,

    Reference is made to the Asset Sale Agreement by and among Nortel Networks
Corporation, Nortel Networks Limited, Nortel Networks Inc., the other entities identified
therein as Sellers, GENBAND Inc. and the other Designated Purchasers that became
parties thereto, dated December 22, 2009, as amended from time to time (the "ASA").
Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

1

**271**

Pursuant to Section 2.2.3.1 of the ASA, we hereby deliver the attached Closing Statement.  Please contact us if you have any questions.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-265-3581

2

**272**

Copies to:

| | | |
|---|---|---|
| Latham & Watkins LLP<br>885 Third Avenue<br>New York, New York<br>10022<br>United States<br>Attention: David S.<br>Allinson, Esq.<br>Facsimile: +1-212-751-4864 | Baker Botts LLP<br>2001 Ross Avenue, Suite<br>600<br>Dallas, Texas 75201<br>Attention: Don J.<br>McDermett, Jr., Esq.<br>Curt Anderson, Esq.<br>Facsimile:+1-214-661-4454<br>+1-214-661-4900 | Stikeman Elliott LLP<br>445 Park Avenue 7th Floor<br>New York, New York<br>10022<br>Attention: Ron Ferguson,<br>Esq.<br>Facsimile: +1-212-371-7087 |
| Nortel Networks Limited<br>and Nortel Networks Inc.<br>5270 Sycamore Avenue<br>Bronx, New York 10471<br>Attention: Robert Fishman<br>Senior<br>Counsel | Cleary Gottlieb Steen &<br>Hamilton LLP<br>One Liberty Plaza<br>New York, New York<br>10006<br>United States<br>Attention: Laurent Alpert<br>Facsimile: +1-212-225-3999 | Ogilvy Renault LLP<br>200 Bay Street<br>Suite 3800, P.O. Box 84<br>Royal Bank Plaza, South<br>Tower<br>Toronto, Ontario M5J 2Z4<br>Canada<br>Attention: Michael Lang<br>Facsimile: +1-416-216-3930 |
| Alex Kay / Gareth Roberts<br>Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Facsimile: +44 (0) 20 7098<br>4447 | Sandy Shandro<br>3-4 South Square<br>Gray's Inn<br>London<br>WC1R 5HP<br>Facsimile: +44 (0)20 7696<br>9911 | Avner Ben-Gera<br>Hughes Hubbard & Reed<br>One Battery Park Plaza<br>New York<br>NY 10004<br>Facsimile: (212) 422 -4726 |

3

09/15/10  18:13 FAX 212 906 3008        LATHAM & WATKINS        ☒005

**273**

## Closing Statement

All amounts are in United States dollars.

**Closing Adjusted Net Working Capital:**

| | |
|---|---:|
| Closing Inventory Value, plus | $ 13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 |
| Closing Prepaid Expenses Amount, minus | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 |
| Closing Product Exposures Amount | 416,000 |
| **Closing Adjusted Net Working Capital** | **$ 8,331,000** |

**Final Purchase Price:**

| | |
|---|---:|
| Base Purchase Price, plus | $ 282,000,000 |
| The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | - |
| Closing Aggregate Downward Adjustment (if any), minus | - |
| Closing Deferred Profit Amount, minus | 70,570,000 |
| Closing Accrued Vacation Amount, minus | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 |
| Closing TFR Amount, minus | 402,000 |
| Closing Excess ARD Employees Amount, minus | |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 |
| Closing French Excess ARD Employees Amount, minus | - |
| Closing Pre-Close Employment Payments Amount | - |
| **Final Purchase Price** | **$ 142,904,000** |

4

# EXHIBIT H



274

This is Exhibit................"H".............referred to in the
affidavit of....JOHN DOOLITTLE....
sworn before me, this....30th....
day of....NOVEMBER....20.10.

.....Donna Woollett....
A COMMISSIONER FOR TAKING AFFIDAVITS

**NORTEL**

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

November 16, 2010

<u>VIA FACSIMILE</u>

GENBAND US LLC
GENBAND Inc.
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Attn: General Counsel

Ladies and Gentlemen:

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA, save that the terms "EMEA Non-Debtor Seller Directors", "Israeli Assets", "Israeli Company" and "Israeli Liabilities" have the meanings ascribed to them in the EMEA Asset Sale Agreement.

We are in receipt of the Closing Statement prepared by GENBAND dated September 15, 2010 (the "GB Closing Statement"). Pursuant to Section 2.2.3.1(b) of the ASA, please find attached hereto as <u>Annex A</u> a corrected Disagreement Notice from Nortel and the EMEA Sellers in respect of the GB Closing Statement. We note that the disagreement with the Closing Deferred Profit Amount in the GB Closing Statement arises primarily from differences between GENBAND and Nortel in the interpretation of the definition of "Deferred Profit Amount" in the ASA, rather than differences over calculations. Accordingly, any disagreement over the interpretation of the "Deferred Profit Amount" definition is a matter of contractual interpretation and we do not intend to waive and expressly reserve our right to pursue all available remedies to resolve any disputes over the Deferred Profit Amount, whether by recourse to judicial relief or otherwise.

**275**

In addition, NNI hereby reiterates its position as set forth in its letter to GENBAND dated August 13, 2010 (attached hereto as <u>Annex B</u> for your reference) with respect to the Verizon Receivables, as defined in such letter.

Notwithstanding that this letter shall have been signed by the Joint Administrators and the Joint Israeli Administrators both in their capacities as administrators of the EMEA Debtors for and on behalf of the EMEA Debtors and of the Israeli Company for and on behalf of the Israeli Company, respectively, and in their personal capacities, it is hereby expressly declared that no personal Liability, or any Liability whatsoever, under or in connection with this letter shall fall on the Joint Administrators, the Joint Israeli Administrators or their respective firm, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act, or otherwise howsoever.

The Joint Administrators and the Joint Israeli Administrators are signatories to this letter in their personal capacities only for the purpose of receiving the benefit of the previous paragraph. Otherwise, for all purposes of this letter, the Joint Administrators and Joint Israeli Administrators act without personal liability as agents of the EMEA Debtors and the Israeli Company, respectively.

It is hereby expressly declared that no personal Liability, or any Liability whatsoever, under or in connection with this letter shall fall on any of the EMEA Non-Debtor Seller Directors howsoever such Liability should arise.

2

276

Very truly yours,

NORTEL NETWORKS INC.

By    _____
      Name:   Lynn C. Egan
      Title:    Secretary

NORTEL NETWORKS CORPORATION

By    _____
      Name:
      Title:

By    _____
      Name:
      Title:

NORTEL NETWORKS LIMITED

By    _____
      Name:
      Title:

By    _____
      Name:
      Title:

277

Very truly yours,

NORTEL NETWORKS INC.

By   _____

        Name:  Lynn C. Egan
        Title:    Secretary

**NORTEL NETWORKS CORPORATION**

By: _____

    Name: John M. Doolittle
    Title:  Senior Vice-President, Corporate Services
          and Chief Financial Officer

By: _____

    Name: Clarke E. Glaspell
    Title:  Controller

**NORTEL NETWORKS LIMITED**

By: _____

    Name: John M. Doolittle
    Title:  Senior Vice-President, Corporate Services
          and Chief Financial Officer

By: _____

    Name: Clarke E. Glaspell
    Title:  Controller

**278**

SIGNED for and on behalf of **Nortel Networks**    )
**UK Limited** (in administration) by    )    Alan Bloom
Alan Bloom    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

..................................................... )
Name:   RICHARD LAWTON    )
Address:   HERBERT SMITH LLP    )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON EC2A 2HS

SIGNED for and on behalf of **Nortel GmbH**    )
(in administration) by    )    Alan Bloom
Alan Bloom    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

..................................................... )
Name:   RICHARD LAWTON    )
Address:   HERBERT SMITH LLP    )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON EC2A 2HS

SIGNED for and on behalf of **Nortel Networks**    )
**SpA** (in administration) by    )    Alan Bloom
Alan Bloom    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

..................................................... )
Name:   RICHARD LAWTON    )
Address:   HERBERT SMITH LLP    )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON EC2A 2HS

279

**SIGNED** for and on behalf of Nortel Networks )
**Hispania S.A.** (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

........................................................................
Alan Bloom

Witness signature

..........................................  )
Name:   RICHARD LAWTON  )
Address:  HERBERT SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON EC2A 2HS

**SIGNED** for and on behalf of Nortel Networks )
**B.V.** (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

........................................................................
Alan Bloom

Witness signature

..........................................  )
Name:   RICHARD LAWTON  )
Address:  HERBERT SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON EC2A 2HS

**SIGNED** for and on behalf of Nortel Networks )
**N.V.** (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

........................................................................
Alan Bloom

Witness signature

..........................................  )
Name:   RICHARD LAWTON  )
Address:  HERBERT SMITH LLP )
          EXCHANGE HOUSE
          PRIMROSE ST
          LONDON EC2A 2HS

280

SIGNED for and on behalf of Nortel Networks )
(Austria) GmbH (in administration) by )
Alan Bloom )   ..............................................
as Joint Administrator (acting as agent and )   Alan Bloom
without personal liability) in the presence of: )

Witness signature

..............................................
Name:    RICHARD LAWTON
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE )
         PRIMROSE ST )
         LONDON EC2A 2HS

SIGNED for and on behalf of Nortel Networks )
Polska Sp. z.o.o. (in administration) by )
Alan Bloom )   ..............................................
as Joint Administrator (acting as agent and )   Alan Bloom
without personal liability) in the presence of: )

Witness signature

..............................................
Name:    RICHARD LAWTON )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE )
         PRIMROSE ST
         LONDON EC2A 2HS

SIGNED for and on behalf of Nortel Networks )
Portugal S.A. (in administration) by )
Alan Bloom )   ..............................................
as Joint Administrator (acting as agent and )   Alan Bloom
without personal liability) in the presence of: )

Witness signature

..............................................
Name:    RICHARD LAWTON )
Address: HERBERT SMITH LLP )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

281

**SIGNED** for and on behalf of Nortel Networks    )
**AB** (in administration) by    )    .................................
Alan Bloom    )    Alan Bloom
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

.................................    )
Name:   RICHARD    LAWTON    )
Address:  HERBERT   SMITH LLP  )
         EXCHANGE HOUSE
         PRIMROSE ST LONDON EC2
**SIGNED** for and on behalf of Nortel Networks    )    .................................
**Slovensko s.r.o.** (in administration) by    )    Alan Bloom
Alan Bloom    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

.................................    )
Name:   RICHARD   LAWTON   )
Address:  HERBERT   SMITH LLP  )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS
**SIGNED** for and on behalf of Nortel Networks    )    .................................
**s.r.o.** (in administration) by    )    Alan Bloom
Alan Bloom    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

.................................    )
Name:   RICHARD   LAWTON   )
Address:  HERBERT   SMITH LLP  )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

282

**SIGNED** for and on behalf of **Nortel Networks**    )
**Romania S.R.L.** (in administration) by    )    ....................................................
Alan Bloom    )    Alan Bloom
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

...............................................    )
Name:    RICHARD  LAWSON    )
Address:  HERBERT  SMITH LLP )
          EXCHANGE  HOUSE
          PRIMROSE  ST
          LONDON  EC2A 2HS

**283**

SIGNED for and on behalf of Nortel Networks    )    *Kerry Trigg*
France S.A.S. (in administration) by                     )    ........................................................
Kerry Trigg                                                        )    Kerry Trigg
acting as authorised representative for               )
Christopher Hill                                                  )
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature
........................................................    )
Name:  SHARON PERLMUTTER
Address:                                                )


            ERNST & YOUNG LLP
            1 More London Place
            London
            SE1 2AF

284

SIGNED for and on behalf of Nortel Networks    )
(Ireland) Limited (in administration) by    )
DAVID HUGHES    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

Name:    Nithia J Devoney    )
Address:    c/o Ernst + Young    )
    Harcourt Street
    Dublin 2.

285

SIGNED by Richard Banbury  )
duly authorised for and on behalf of Nortel  )
Networks o.o.o. in the presence of:  )

Richard Banbury

Witness signature

..................................................  )
Name: Svetlysheva LA Lina  )
Address: 121603 Moscow Russia
Rublevskoye shosse
52. 377

**286**

SIGNED by Simon Freemantle
duly authorised for and on behalf of **Nortel**
**Networks AG** in the presence of:

)
)      Simon Freemantle
)

Witness signature

.......................................................      )
Name: Perihan Yuzcl      )
Address: Nortel Networks UK Limited )
Westacott Way
Maidenhead office Park
SL6 3QH    Maidenhead

**287**

SIGNED for and on behalf of Nortel Networks )
Israel (Sales and Marketing) Limited (in )
administration) by Yaron Har-Zvi and Avi D. )
Pelossof as Joint Israeli Administrators (acting )
jointly and without personal liability) in )
connection with the Israeli Assets and Israeli )
Liabilities: )
)
)

הנאמן בהקפאת הליכים

.............................................................

Yaron Har-Zvi

הנאמן בהקפאת הליכים

.............................................................

Avi D. Pelossof

Witness signature

אייתי לביא, עו"ד
מ.ר. 44647

.................................................. )
Name:  Itay Lavi )
Address: 20 Lincoln St. )
         Tel-Aviv, Israel

**288**

**SIGNED** by Alan Bloom                        )

)    Alan Bloom

in his own capacity and on behalf of the Joint    )
Administrators without personal liability and
solely for the benefit of the provisions of this
letter expressed to be conferred on or given to
the Joint Administrators:

Witness signature

.........................................................    )
Name:    RICHARD LAWTON                         )
Address:    HERBERT SMITH LLP                   )
EXCHANGE HOUSE
PRIMROSE ST
LONDON EC2A 2HS

**289**

SIGNED by Yaron Har-Zvi

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

)

וקפאת הליכים

)
)  .........................................
   Yaron Har-Zvi

Witness signature

איתי לביא עו"ד
מ.ר. 47687
.........................................

Name: Itay Lavi

Address: 20 Lincoln st.
         Tel Aviv, Israel

SIGNED by Avi D. Pelossof

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

)
)
)

הנאמן בהקפאת הליכים

)
)  .........................................
   Avi D. Pelossof

Witness signature

איתי לביא עו"ד
מ.ר. 47667
.........................................

Name: Itay Lavi

Address: 20 Lincoln st.
         Tel Aviv, Israel

)
)
)

**290**

cc:    Latham & Watkins LLP
       885 Third Avenue
       New York, New York 10002
       United States
       Attention: David S. Allinson, Esq.

       Baker Botts LLP
       2001 Ross Avenue, Suite 600
       Dallas, Texas 75201
       Attention:   Don J. McDermett, Jr., Esq.
                    Curt Anderson, Esq.

       Stikeman Elliott LLP
       445 Park Avenue, 7th Floor
       New York, New York 10022
       Attention:  Ron Ferguson, Esq.

*For the companies listed below (the "Companies"), The Institute of Chartered Accountants in England and Wales authorises A R Bloom, S Harris and C Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, A R Bloom, S Harris, AM Hudson and C Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and D Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

**291**

<u>Annex A</u>

**Disagreement Notice**

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this Disagreement Notice have the meanings ascribed to them in the ASA.

Nortel has received the Closing Statement prepared by GENBAND dated September 15, 2010 (the "GB Closing Statement"). Pursuant to Section 2.2.3.1(b) of the ASA, Nortel and the EMEA Sellers notify GENBAND as follows:

- Nortel and the EMEA Sellers do not dispute the following line items within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement: Closing Inventory Value, Closing Prepaid Expenses Amount, Closing Contractual Liabilities Amount, Closing Royalty Liability Amount, Closing Warranty Provision Amount and Closing Product Exposures Amount.

- Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement and, as a result, Nortel and the EMEA Sellers dispute the Closing Adjusted Net Working Capital in the GB Closing Statement. Specifically, Nortel and the EMEA Sellers disagree with GENBAND's deduction from Closing Unbilled Accounts Receivable of accounts receivable amounts of $191,515 and $28,960, which relate to certain customer contracts with Axtel and Telefonica Argentina, respectively.[1]  As the contracts with Axtel and Telefonica Argentina were included in Assigned Contracts, the Closing Unbilled Accounts Receivable Amount should be increased by $220,475, resulting in Closing Unbilled Accounts Receivable being equal to $21,611,475 (rather than $21,391,000) and Closing Adjusted Net Working Capital being equal to $8,551,475 (rather than $8,331,000).

- Nortel and the EMEA Sellers do not dispute the following line items within the Final Purchase Price calculation in the GB Closing Statement: Base Purchase Price, Closing Aggregate EMEA Downward Adjustment, Closing Aggregate Downward Adjustment,

---

[1] The contracts are: EWP 2010 Support Plan between Nortel Networks de Argentina S.A. and Telefonia Moviles Argentina S.A. dated January 31, 2010; Designacion Proveedor Centralita Movil between Nortel Networks (CALA) Inc. and Telefonica Moviles Argentina S.A. dated September 30, 2008; Purchase and License Agreement for NGN among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; Purchase and License Agreement for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; and Technical Assistance and Support Services Agreement for NGN Products and Services and for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V..

*292*

Closing Accrued Vacation Amount, Closing TFR Amount, Closing Excess ARD Employees Amount, Closing EMEA Holiday Downward Adjustment, Closing French Excess ARD Employees Amount and Closing Pre-Close Employment Payments Amount.

- Since Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within Closing Adjusted Net Working Capital in the GB Closing Statement and, as a result, dispute Closing Adjusted Net Working Capital in the GB Closing Statement, Nortel and the EMEA Sellers dispute the line item in the Final Purchase Price calculation in the GB Closing Statement that is arrived at by subtracting the Target Working Capital, i.e., $73,000,000, from the Closing Adjusted Net Working Capital. Subtracting Target Working Capital from the Closing Adjusted Net Working Capital calculated by Nortel, i.e., $8,551,475, the resulting line item should be $(64,448,525) rather than $(64,669,000).

- Nortel and the EMEA Sellers dispute the line item Closing Deferred Profit Amount in the GB Closing Statement for two reasons: First, the Closing Deferred Profit Amount calculated by GENBAND improperly includes a negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Networks (Luxembourg) S.A. (NNLSA). As NNLSA is not an EMEA Seller or a Seller, the amount of $1,629,132 should not have been included in GENBAND's calculation of the Closing Deferred Profit Amount.

Second, GENBAND overstated the Closing Deferred Profit Amount by $34,656,476 as a result of incorrectly including in its calculations deferred revenues and associated deferred costs in respect of services performed and products delivered prior to the Closing Date. "Deferred Profit Amount," as defined in the ASA, means:

> ". . . as of the Closing Date, both short term and long term (i) deferred revenues for <u>services to be performed or products to be provided by the Business after the Closing Date</u> but for which an account receivable has been recorded or cash has been received prior to the Closing Date minus (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles." (emphasis added)

The Closing Deferred Profit Amount in the GB Closing Statement should be reduced by (i) $34,656,476 due to GENBAND's improper inclusion of deferred revenues and associated deferred costs relating to services performed and products provided by the Business prior to the Closing Date and (ii) $1,629,132 due to GENBAND's improper inclusion of a negative deferred cost-of-sales balance with respect to NNLSA. Accordingly, the Closing Deferred Profit Amount should be reduced by $36,285,608 from $70,570,000 to $34,284,392.

**293**

- Nortel and the EMEA Sellers disagree with the Closing Specified Employee Liabilities Amount in the GB Closing Statement, which should be reduced by $98,662. The Closing . Specified Employee Liabilities Amount in the GB Closing Statement included an Australian long-service leave amount of $1,131,689. For the calculation of the Australian long-service leave amount, GENBAND apparently did not recalculate the Australian Dollar amount into the U.S. Dollar amount using the exchange rate published in the *Wall Street Journal* (Eastern Edition) for the day in question (the Closing Date), as required under the ASA. Using the Australian Dollar/U.S. Dollar exchange rate published in the *Wall Street Journal* (Eastern Edition) for the Closing Date (i.e., 1.1755 Australian Dollars to one U.S. Dollar), Australian long-service leave amount in Australian Dollars of A$1,214,323 (according to Nortel's SAP accounting ledger) translates into $1,033,027. Accordingly, the Australian long-service leave amount of $1,131,689 used in GENBAND's calculation of the Closing Specified Employee Liabilities Amount in the GB Closing Statement is overstated by $98,662, which requires that the Closing Specified Employee Liabilities Amount in the GB Closing Statement be reduced from $1,487,000 to $1,388,338.

- Since Nortel and the EMEA Sellers dispute, in the GB Closing Statement, (i) the line item arrived at by subtracting the Target Working Capital from the Closing Adjusted Net Working Capital, (ii) the Closing Specified Employee Liabilities Amount and (iii) the Closing Deferred Profit Amount, all as described above, Nortel and the EMEA Sellers dispute the Final Purchase Price in the GB Closing Statement, which should be increased by $36,604,745 from $142,904,000 to $179,508,745.

For your reference, the GB Closing Statement, the adjustments set forth herein, and the Closing Statement, as adjusted herein, are set forth below.

**294**

Revisions to CLOSING STATEMENT

| | GB Closing Statement | Adjustments | Adjusted Closing Statement |
|---|---|---|---|
| **Closing Adjusted Net Working Capital:** | | | |
| Closing Inventory Value, plus | $ 13,747,000 | | 13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 | 220,475 | 21,611,475 |
| Closing Prepaid Expenses Amount, minus | 939,000 | | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 | | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 | | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 | | 26,295,000 |
| Closing Product Exposures Amount | 416,000 | | 416,000 |
| **Closing Adjusted Net Working Capital** | $ 8,331,000 | $ 220,475 | $ 8,551,475 |
| | | | |
| **Final Purchase Price:** | | | |
| Base Purchase Price, plus | $ 282,000,000 | | $ 282,000,000 |
| The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) | $ 220,475 | (64,448,525) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | - | | |
| Closing Aggregate Downward Adjustment (if any), minus | - | | |
| Closing Deferred Profit Amount, minus | 70,570,000 | ( 36,285,608) | 34,284,392 |
| Closing Accrued Vacation Amount, minus | 1,730,000 | | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 | (98,662) | 1,388,338 |
| Closing TFR Amount, minus | 402,000 | | 402,000 |
| Closing Excess ARD Employees Amount, minus | - | | |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 | | 238,000 |
| Closing French Excess ARD Employees Amount, minus | - | | |
| Closing Pre-Close Employment Payments Amount | - | | |
| **Final Purchase Price** | $ 142,904,000 | $ 36,604,745 | $ 179,508,745 |

295

## **Annex B**

See attached

**296**

November 16, 2010

**Via Facsimile (212-509-1716) and Email (Lisa.Dangelo@wellsfargo.com)**

Wells Fargo Bank, N.A.
45 Broadway, 14th Floor
New York, NY 10006
Attn: Lisa D'Angelo

      Re:    <u>Joint Instructions Under the Escrow Agreement</u>

Ladies and Gentlemen:

    Reference is made to the Escrow Agreement (as amended from time to time, the "<u>Escrow Agreement</u>"), dated as of January 6, 2010, by and among (i) GENBAND US LLC (the "<u>Purchaser</u>"), (ii) Nortel Networks Corporation ("<u>NNC</u>"), (iii) Nortel Networks Limited ("<u>NNL</u>"), (iii) Nortel Networks Inc. ("<u>NNI</u>"), (iv) Nortel Networks UK Limited ("<u>NNUK</u>" and, together with NNL and NNI, acting jointly as the "<u>Seller Parties</u>"), and (v) Wells Fargo Bank, National Association, as escrow agent (the "<u>Escrow Agent</u>"), entered into in connection with the Asset Sale Agreement and the EMEA Asset Sale Agreement (each as defined in the Escrow Agreement). Capitalized terms used but not defined herein shall have the meanings given to them in the Escrow Agreement.

    <u>Instructions to you as the Escrow Agent</u>:

    Pursuant to Section 4(a) of the Escrow Agreement, the Purchaser and the Seller Parties hereby instruct the Escrow Agent to immediately release $4,859,745 plus accrued interest to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) out of the Purchase Price Adjustment Escrow Fund, in accordance with the following wire transfer instructions:

| | |
|---|---|
| Bank Name: | JP Morgan Chase Bank N.A. |
| Account Name: | Nortel/EMEA Filed Entities/EMEA Non-Filed Entities/The Israeli Companies/The Estate Fiduciaries Agreement |
| Account Number: | 865370050 |
| ABA Routing: | 021000021 |
| ABA Swift: | CHASUS33 |
| F/F/C: | Funds released from GENBAND/Nortel Escrow Account in connection with Purchase Price adjustment |

    The Purchaser and the Seller Parties further instruct the Escrow Agent to immediately release $3,140,255 plus accrued interest to the Purchaser out of the Purchase Price Adjustment Escrow Fund, in accordance with the following wire transfer instructions:

    Bank Name:
    Account Name:
    Account Number:

1

*297*

ABA Routing:
ABA Swift:
F/F/C:

Should you have any questions about this letter, please contact the Purchaser and the Seller Parties at your earliest convenience.

This letter is signed by a Joint Administrator as administrator (acting as agent only) of NORTEL NETWORKS UK LIMITED (in administration) and it is hereby expressly declared that no personal liability, or any liability whatsoever, under or in connection with this letter shall fall on the Joint Administrators or their respective firm, partners, employees, agents, advisers or representatives whether such liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act 1986 (as amended), or otherwise howsoever.

Thank you for your assistance with this matter.

For the companies listed below (the "Companies"), the Institute of Chartered Accountants in England and Wales authorises A R Bloom, S Harris and C Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.

The affairs, business and property of the Companies are being managed by the Joint Administrators, A R Bloom, S Harris, AM Hudson and C Hill who act as agents of the Companies only and without personal liability.

The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV.

The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and D Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.

2

**29 %**

Sincerely,

**Purchaser**                                                **GENBAND US LLC**

                                                   By: _____
                                                       Name:
                                                       Title:

299

**Seller Parties**

**NORTEL NETWORKS INC.**

By: _____

Name:  Lynn C. Egan

Title:    Secretary


**NORTEL NETWORKS CORPORATION**

By: _____

Name:

Title:


By: _____

Name:

Title:


**NORTEL NETWORKS LIMITED**

By: _____

Name:

Title:


By: _____

Name:

Title:

300

**Seller Parties**                                **NORTEL NETWORKS INC.**

By: _____
     Name:  Lynn C. Egan
     Title:    Secretary

**NORTEL NETWORKS CORPORATION**

By: _____
Name:  John M. Doolittle
Title:   Senior Vice-President, Corporate Services
       and Chief Financial Officer

By: _____
Name:  Clarke E. Glaspell
Title:   Controller

**NORTEL NETWORKS LIMITED**

By: _____
Name:  John M. Doolittle
Title:   Senior Vice-President, Corporate Services
       and Chief Financial Officer

By: _____
Name:  Clarke E. Glaspell
Title:   Controller