301

**NORTEL NETWORKS UK LIMITED** (in administration) by _C.J. Hill_, as Joint Administrator (acting as agent only and without any personal liability whatsoever)

By: _____

    Name:   _C. J. Hill_

    Title:   _Joint Administrator_

Witness signature

Name        RICHARD LAWTON

Address    HERBERT SMITH LLP
             EXCHANGE HOUSE
             PRIMROSE ST
             LONDON EC2A 2HS

# EXHIBIT I

302

This is Exhibit................"⏟............referred to in the
affidavit of....JOHN DOOLITTLE
sworn before me, this....3 0 th
day of....NOVEMBER....20...10

.........Donna Woollett.........
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

---

From: Thomas.Malone
Sent: 12/07/2009 12:37 AM EST
To: Victor LEWKOW; Evan Schwartz
Cc: David.Allinson@lw.com; Alexandra.Croswell@lw.com; don.mcdermett@bakerbotts.com; curtis.anderson@bakerbotts.com;
Shauna.Martin@genband.com
Subject: Revised CVAS ASA

Vic and Evan,

    Attached please find the revised CVAS ASA (clean and marked), as well as two of the three NETAS agreements (clean and
marked).  The third NETAS Agreement should be forthcoming early this week.  I will also send the NETAS agreements to the
EMEA team.  Please let us know if you have any questions.

Best regards,
Tom

**CVAS**
<<#1582469v7_NY_ - December CVAS ASA Draft.DOC>> <<DV_Comparison_#1582469v2_NY_ - October 25, 2009 CVAS
ASA Draft-#1582469v7_NY_ - December CVAS ASA Draft.rtf>>

**NETAS**
<<Netas Development Agreement_Redline.120409.doc>> <<Netas Distribution Agreement_Redline_120409.doc>> <<DAL02-
#551430-v1-Genband-Netas_Joint_Development_A.DOC>> <<DAL02-#551358-v2-Genband-Netas_Product_Distributio.DOC>>

**Thomas J. Malone**

**LATHAM & WATKINS** LLP
885 Third Avenue
New York, NY 10022-4834
Direct Dial: +1.212.906.1248
Fax: +1.212.751.4864
Email: thomas.malone@lw.com
http://www.lw.com

**303**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
To comply with IRS regulations, we advise you that any discussion of Federal
tax issues in this
e-mail was not intended or written to be used, and cannot be used by you, (i)
to avoid any penalties
imposed under the Internal Revenue Code or (ii) to promote, market or recommend
to another party any
transaction or matter addressed herein.

For more information please go to  http://www.lw.com/docs/irs.pdf
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This email may contain material that is confidential, privileged and/or
attorney work product for
the sole use of the intended recipient.  Any review, reliance or distribution
by others or forwarding
without express permission is strictly prohibited.  If you are not the intended
recipient, please
contact the sender and delete all copies.

Latham & Watkins LLP

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

This message (including any attachments) is CONFIDENTIAL and may be PRIVILEGED. If you are not an intended recipient you
are hereby notified that any distribution, copying or use by you of this information is strictly prohibited. If you have received this
message in error please immediately notify the sender and delete all copies of this information from your system. // L'information
contenue dans le présent courriel (y compris les pièces jointes, le cas échéant) est CONFIDENTIELLE et peut être
PRIVILÉGIÉE. Si vous n'êtes pas le destinataire prévu, vous êtes par la présente avisé(e) que toute diffusion, copie ou utilisation
de ladite information est strictement interdite. Si vous avez reçu cette communication par erreur, veuillez nous en aviser
immédiatement en répondant à l'expéditeur et effacer de votre ordinateur toute trace de cette information.

Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the
recipient for the purpose of avoiding penalties that may be imposed under United States federal, state or local tax law. // Tout
conseil de fiscalité américaine contenu, le cas échéant, dans le présent courriel ne visait pas à éviter des pénalités pouvant être
imposées en vertu des lois fiscales fédérales, étatiques ou locales des États-Unis, n'a pas été rédigé dans ce but et ne doit pas
être utilisé à cette fin par le destinataire.

~~CGSH~~L&W Draft ~~November~~December 5, 2009
Private and Confidential

**304**

# ASSET SALE AGREEMENT[1]

## BY AND AMONG

## NORTEL NETWORKS CORPORATION

## NORTEL NETWORKS LIMITED

## NORTEL NETWORKS INC.

### AND

## THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

### AND

## [PURCHASER]

## DATED AS OF [●], 2009

---

[1] Note to Seller:  Draft is subject to further review by local counsel.  Also subject to further revisions upon completion of successor/transferring liability diligence, which we expect to be completed within the next 7 to 10 days.  Certain assets may need to be excluded (for example, in Brazil) or other protections afforded to Purchaser against liabilities transferred by law.  As discussed, work streams on certain specialists matters (such as TSA, Real Estate, etc.) are progressing on separate paths and in certain instances are not integrated in this document.

Error! Unknown document property name.

## TABLE OF CONTENTS

**305**

Page

**ARTICLE I INTERPRETATION** ......................................................................3
Section 1.1.  Definitions...................................................................3
Section 1.2.  Interpretation.............................................................3̶1̶33
1.2.1.  Gender and Number.....................................3̶1̶33
1.2.2.  Certain Phrases and Calculation of Time................3̶1̶33
1.2.3.  Headings, etc..................................................3̶1̶34
1.2.4.  Currency.....................................................3̶1̶34
1.2.5.  Statutory References ....................................3̶1̶34

**ARTICLE II PURCHASE AND SALE OF ASSETS**......................3̶2̶35
Section 2.1.  Purchase and Sale. ..................................3̶2̶35
2.1.1.  Assets 3̶2̶ 35
2.1.2.  Excluded Assets..............................................3̶3̶36
2.1.3.  Assumed Liabilities .......................................3̶5̶38
2.1.4.  Excluded Liabilities ......................................3̶7̶41
2.1.5.  Assumption and/or Assignment or Rejection of 365 Contracts............3̶9̶42
2.1.6.  Assignment of Non-365 Contracts.................3̶9̶43
2.1.7.  Cure Costs; Adequate Assurance; Efforts................4̶0̶44
2.1.8.  Local Sale Agreements ....................................4̶1̶45
2.1.9.  EMEA Asset Sale Agreement..........................4̶1̶45
2.1.10. Non-Assignable Assets ..................................4̶1̶45
Section 2.2.  Purchase Price...........................................4̶2̶46
2.2.1.  Purchase Price..............................................4̶2̶46
2.2.2.  Estimated Purchase Price................................4̶2̶46
2.2.3.  Purchase Price Adjustment. ............................4̶3̶47
2.2.4.  **Purchase Price Allocation. [●]**..................50
**2.2.5.**  Good Faith Deposit. .................................4̶5̶50
Section 2.3.  [Escrow. .....................................................4̶6̶50
Section 2.4.  Closing. ....................................................4̶6̶51
2.4.1.  Closing Date...............................................4̶6̶51
2.4.2.  Closing Actions and Deliveries ........................4̶6̶51
Section 2.5.  Designated Purchaser(s)..............................4̶8̶53

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**...4̶8̶53
Section 3.1.  Organization and Corporate Power......................4̶8̶53
Section 3.2.  Authorization; Binding Effect; No Breach. ............4̶9̶54
Section 3.3.  Financing...................................................5̶0̶54
Section 3.4.  Purchaser Financial Statements .........................5̶1̶55
Section 3.5.  Adequate Assurance of Future Performance ...........5̶1̶56
Section 3.6.  Purchaser's Acknowledgments; Exclusivity of Representations and Warranties ..................................................5̶2̶56

306

Section 3.7.    Brokers. ......................................................................................5358

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ..........5358**

Section 4.1.    Organization and Corporate Power. .........................................5458
Section 4.2.    Authorization; Binding Effect; No Breach. .............................5458
Section 4.3.    Title to Tangible Assets; Sufficiency of Assets. ......................5559
Section 4.4.    Material Contracts. ....................................................................5560
Section 4.5.    Intellectual Property. .................................................................5761
Section 4.6.    Litigation ....................................................................................5965
Section 4.7.    Financial Statements. .................................................................5965
Section 4.8.    Compliance with Laws; Consents ..............................................6068
Section 4.9.    Real Property. .............................................................................6166
Section 4.10.   Environmental Matters. .............................................................6166
Section 4.11.   Labor and Employee Benefits Matters. .....................................6167
Section 4.12.   Taxes. 6571
Section 4.13.   Brokers .......................................................................................6572
Section 4.14.   Cultural Business .......................................................................6572
Section 4.15.   Representations and Warranties by the Other Sellers. ..............6572
                4.15.1. Organization and Corporate Power. ..............................6673
                4.15.2. Authorization; Binding Effect; No Breach. ...................6673

**ARTICLE V COVENANTS AND OTHER AGREEMENTS ................................6774**

Section 5.1.    U.S. Bankruptcy Actions ...........................................................6774
Section 5.2.    Canadian Bankruptcy Actions. ..................................................7178
                5.2.1. Canadian Sales Process Order ........................................7178
                5.2.2. Canadian Approval and Vesting Order ............................7178
                5.2.3. Additional Requests .........................................................7279
Section 5.3.    Consultation; Notification ..........................................................7279
Section 5.4.    Pre-Closing Cooperation. ...........................................................7380
Section 5.5.    Antitrust and Other Regulatory Approvals. ...............................7481
Section 5.6.    Pre-Closing Access to Information. ............................................7783
Section 5.7.    Public Announcements. ..............................................................7885
Section 5.8.    Further Actions ...........................................................................7885
Section 5.9.    Conduct of Business ...................................................................7885
Section 5.10.   Transaction Expenses .................................................................8088
Section 5.11.   Confidentiality. ..........................................................................8188
Section 5.12.   Certain Payments or Instruments Received from Third Parties ............8289
Section 5.13.   Non-Assignable Contracts. .........................................................8290
Section 5.14.   Bundled Contracts .......................................................................8391
Section 5.15.   Post-Closing Assistance for Litigation. .....................................8592
Section 5.16.   Delivery of Assets .......................................................................8593
Section 5.17.   Termination of Overhead and Shared Services and French
                Company Licenses. ......................................................................8694
Section 5.18.   Financing ....................................................................................8694

Section 5.19.   Insurance Matters. ...................................................................88<u>96</u>
Section 5.20.   Deposits, Guarantees and Other Credit Support of the Business..........89<u>97</u>
Section 5.21.   Use of Trademarks ................................................................89<u>98</u>
Section 5.22.   Maintenance of Books and Records. ....................................90<u>98</u>
Section 5.23.   Certain Ancillary Agreements. ............................................91<u>99</u>
Section 5.24.   Closing Unaudited Financial Statements .............................92<u>100</u>
Section 5.25.   Closing Audited Financial Statements .................................93<u>101</u>
Section 5.26.   Additional Bankruptcy Proceedings; Adverse International
                Injunctions .........................................................................93<u>101</u>
Section 5.27.   Finalization of Schedules to Transition Services Agreement;
                Disputes .............................................................................94<u>102</u>
Section 5.28.   Avoidance Actions ..............................................................94<u>103</u>
Section 5.29.   Competing Transaction .......................................................94<u>103</u>
Section 5.30.   Purchaser Financial Statements ..........................................95<u>104</u>

**ARTICLE VI TAX MATTERS** ..................................................................95<u>104</u>

Section 6.1.    Transfer Taxes. ...................................................................95<u>104</u>
Section 6.2.    Withholding Taxes ..............................................................97<u>105</u>
Section 6.3.    Tax Characterization of Payments Under This Agreement .................97<u>106</u>
Section 6.4.    Apportionment of Taxes. ....................................................97<u>106</u>
Section 6.5.    Records ..............................................................................97<u>106</u>
Section 6.6.    Tax Disclosure ...................................................................99<u>108</u>
Section 6.7.    Tax Returns. .......................................................................99<u>108</u>
Section 6.8.    Canadian Tax Election. .......................................................100<u>109</u>
Section 6.9.    Purchase Price Allocation. .................................................101<u>110</u>
Section 6.10.   Other Tax Matters ..............................................................102<u>110</u>

**ARTICLE VII EMPLOYMENT MATTERS** ............................................102<u>111</u>

Section 7.1.    Employment Obligations with Respect to Non-Union Employees ...102<u>111</u>
   7.1.1.       Employment Terms. ...........................................................102<u>111</u>
   7.1.2.       Employee Benefits. ............................................................105<u>113</u>
Section 7.2.    Employment Obligations with Respect to Union Employees..........107<u>116</u>
Section 7.3.    Excluded Employee Liabilities ...........................................108<u>116</u>
Section 7.4.    Other Employee Covenants. ...............................................108<u>117</u>
Section 7.5.    Canadian Pension Plans. ....................................................111<u>119</u>
Section 7.6.    Sole Benefit of the Sellers and the Purchaser .....................112<u>121</u>

**ARTICLE VIII CONDITIONS TO THE CLOSING** ...............................113<u>121</u>

Section 8.1.    Conditions to Each Party's Obligation ...............................113<u>121</u>
Section 8.2.    Conditions to Sellers' Obligation ......................................114<u>122</u>
Section 8.3.    Conditions to Purchaser's Obligation ................................114<u>123</u>

**ARTICLE IX TERMINATION** ................................................................115<u>124</u>

308

Section 9.1.   Termination................................................................................115124
Section 9.2.   Expense Reimbursement and Break-Up Fee. ...................117126
Section 9.3.   Effects of Termination .................................................118127

**ARTICLE X MISCELLANEOUS** ..................................................................118128

Section 10.1.   No Survival of Representations and Warranties or Covenants..........118128
Section 10.2.   Remedies.....................................................................119128
Section 10.3.   No Third Party Beneficiaries ......................................119128
Section 10.4.   Consent to Amendments; Waivers................................119128
Section 10.5.   Successors and Assigns..............................................119128
Section 10.6.   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial...119129
Section 10.7.   Notices .......................................................................121130
Section 10.8.   Exhibits; Sellers Disclosure Schedule 122, ...............................132
Section 10.9.   Counterparts...............................................................123132
Section 10.10. No Presumption ..........................................................123132
Section 10.11. Severability .................................................................123133
Section 10.12. Entire Agreement. ........................................................124133
Section 10.13. Availability of Equitable Relief; Sole Remedy ................124133
Section 10.14. Bulk Sales Laws...........................................................125134
Section 10.15. Main Sellers as Representatives of Other Sellers. ............125134
Section 10.16. Execution by Other Sellers ...........................................125135
Section 10.17. Obligations of the Sellers.............................................125135

**309**

## EXHIBITS[2]

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Israeli Companies; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Adjusted Net Working Capital Statement

Exhibit F – Contract Manufacturing Inventory Agreements Term Sheet[13]

Exhibit G – Escrow Agreement

Exhibit H – [GDNT Agreement Term Sheet]

Exhibit I – Intellectual Property License Agreement

Exhibit J – Knowledge of the Purchaser

Exhibit K – [LGN Distribution Agreement Term Sheet]

Exhibit L – Loaned Employee Agreement[24]

Exhibit M – Mandatory Antitrust Approvals - Relevant Antitrust Authorities

Exhibit N – Restricted Seller Revenue

Exhibit O – ~~Mutual Development Agreement Term Sheet~~[Reserved]

Exhibit P – [Purchaser Supply Agreement Term Sheet]

Exhibit Q – Seller Supply Agreement Term Sheet

Exhibit R – Subcontract Agreement Term Sheet

---

[2] Note to Seller: Purchaser understands many of these may not be provided pre-signing. Please revise accordingly regarding what will be provided.

[13] Note to Purchaser: Approach to existing contract manufacturing relationships to be discussed. Note to Seller: Purchaser will provide revisions to the draft contract manufacturer term sheet shortly.

[24] Note to Purchaser: This agreement will provide for the continued services of Visa Employees for a specified period of time if Purchaser is not able to obtain necessary visas prior to Employee Transfer Date. Note to Seller: please let us know when a draft of this will be available so we can review and then figure out which employees this should apply to.

v                    Error! Unknown document property name.

[New York #2071434 v4]

**3/0**

Exhibit S  – Trademark License Agreement

Exhibit T  – Transition Services Agreement

Exhibit 5.1(a) – Form of U.S. Bidding Procedures Order

Exhibit 5.1(b) – Form of U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit **5.4   – Form of Letter**

**Exhibit 5.7  – Public Announcements**

**Exhibit** 5.9  = Conduct of Business Notice Addresses

Exhibit 5.23  = Interdependencies in the CVAS Business

**311**

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of [●], 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Other Sellers (as defined below) (the Other Sellers, together with the Main Sellers, the "**Sellers**") and [●], a [●] organized under the laws of [●] (the "**Purchaser**").[5]

## W I T N E S S E T H:

WHEREAS, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**"), beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date (as defined herein), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on July 30, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "**Israeli Companies**") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "**Israeli Court**"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of

---

[5] Note to Seller: Proposed construction of "Other Sellers" is being reviewed.

~~Error! Unknown document property name.Error!~~

~~[New York #2071434 v4]~~
NY\1582469.7

**312**

proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by the EMEA Sellers;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets and the EMEA Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates, and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser and the Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

WHEREAS, in addition, at the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**"): (i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Transition Services Agreement, (iv) the Trademark License Agreement, {(v) the Loaned Employee Agreement and will use their **commercially** reasonable ~~best~~ efforts to negotiate in good faith and enter into [(vi) the ~~Mutual Development~~**Purchaser Supply** Agreement, (vii) the ~~Purchaser~~**Seller** Supply Agreement, (viii) the ~~Seller Supply~~**Subcontract** Agreement, (ix) the ~~Subcontract Agreement, (x) the~~ Contract Manufacturing Inventory Agreements, (~~xi~~**x**) the LGN Distribution Agreement, (~~xii~~**xi**) the NN Turkey Agreements, and (xiii) the GDNT Agreement (each as defined below).]

NY\1582469.7

[New York #2071434 v4]

Error! Unknown document property name.

**313**

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means the amount of compensation with respect to the accrued and unused vacation with respect to each Specified Transferred Employee **[and each Transferring Employee]**[6] (including all Taxes required to be withheld on behalf of the applicable Specified Transferred Employee **[and Transferring Employee]** by his or her respective employer) calculated by taking, with respect to each such employee an amount equal to **(i) for hourly employees,** the product of (A) a number (not less than zero) of such employee's accrued and unused vacation hours as of the Closing Date as set forth on Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule **of this Agreement for Specified Transferred Employees [and on [      ] of the EMEA Asset Sale Agreement for Transferring Employees]** and (B) such employee's hourly rate of pay ~~(with such hourly~~**set forth on Section 4.11(b) of the Sellers Disclosure Schedule and (ii) for salaried employees, the product of (A) a number (not less than zero) of such employee's accrued and unused vacation days as of the Closing Date as set forth on Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule of this Agreement for Specified Transferred Employees [and on [      ] of the EMEA Asset Sale Agreement for Transferring Employees] and (B) such employee's daily rate of pay (with such daily** rate of pay derived by dividing such employee's annual base salary set forth on Section 4.11(b) of the Sellers Disclosure Schedule by the number of standard work ~~hours~~**days** per year for such employee).

"**Action**" means any litigation, action, **hearing, investigation,** suit (whether civil, criminal or administrative), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding.

"**Additional Bankruptcy Proceeding**" has the meaning set forth in Section 5.26(a).

"**Additional Employees**" has the meaning set forth in Section 7.1.1(a).

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

---

[6] Note to Seller:  To be discussed in connection with the treatment of such benefits under the EMEA ASA.

**Error! Unknown document property name.**

**314**

"[**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts in the form provided in Exhibit E hereto.]

"**Adverse International Injunction**" has the meaning set forth in Section 5.26(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; [provided, that (i) no EMEA Seller or Subsidiary of an EMEA Seller (other than those Subsidiaries that are Sellers hereunder) shall be deemed an Affiliate of any Seller, and (ii) no joint venture listed in Section [●] of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.]

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Allocation**" has the meaning set forth in Section 2.2.4.[7]

"**Alternative Transaction**" means (A<u>i</u>) the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a ~~majority~~<u>substantial portion</u> of the Business or all or a ~~majority~~<u>substantial portion</u> of the Assets ~~and~~<u>or</u> the EMEA Assets~~,~~ (considered as a whole<u>)</u>, in a transaction or a series of transactions ~~(x)~~ with one or more Persons other than the Purchaser and/or its Affiliates ~~or (y) with a Successful Bidder (as such term has been defined in Exhibit [5.1(a)]), which may include multiple bidders whose bids are combined or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or a majority of the Business, or all or a majority of the Assets and the EMEA Assets taken as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers pursuant to which all or a majority of the reorganized entity or its assets is acquired by one or more Persons (other than the third-party creditors or the Purchaser and/or the Purchaser's Affiliates) in a transaction announced prior to such reorganization or within [three (3) months] of such reorganization, rather than being retained by the creditors generally, provided, however, that an "Alternative Transaction" shall not include (i) except as specified in clause (B) above, the retention of all or any portion~~, **including a transaction or series of transactions that results or evolves from a Successful Bid, an Alternate Bid or a Qualified Bid (each as defined in the U.S. Bidding Procedures Order), (ii) the retention of all or substantially all** of the Business, the Assets or the EMEA Assets by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) under a standalone plan of reorganization or plan of arrangement approved by the U.S. Bankruptcy Court or another Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (~~ii~~<u>iii</u>) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business, the Assets or the EMEA Assets ~~(other than~~

---

**315**

~~as a going concern)~~ in connection with the closure, liquidation or winding up of the Business or any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the Competition Act Approval, the [EC Merger Regulation Approval] and the Mandatory Antitrust Approvals.[38]

"**Antitrust Laws**" means the Competition Act, the HSR Act, [the EC Merger Regulation,] and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

["**Arbitration Trigger Date**" has the meaning set forth in Section 5.27(c).]

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, (ii) the Designated Non-365 Contracts ~~and~~ (iii) **the Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset, and (iv)** specified contracts as described in Section 5.14.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(e~~d~~).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the Israeli Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, the Israeli Companies Law and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases, and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

---

[38] Note to Seller:  Subject to continuing diligence.

**31¢**

"**Base Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Bid**" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

"**Bidding Procedures**" means the procedures to be employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities to be approved by the U.S. Bankruptcy Court and the Canadian Court pursuant to the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively.

"**Break-Up Fee**" has the meaning set forth in Section 9.2(b).

"**Bundled Contracts**" has the meaning set forth in Section 5.14.

"**Business**" means, collectively~~, the following business segments of the Sellers and the EMEA Sellers as described below~~:

      (i)    the business through which the Sellers and the EMEA Sellers individually, jointly or in collaboration with or pursuant to contracts with Third Parties **and other Persons** research, advertise, design, develop, process components, directly or indirectly manufacture through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers ~~and~~**,** channel partners **and other Persons**, the CVAS Products (as defined below), including prior versions (if currently supported **or if any Contract related to the Business contemplates the support of such prior versions**), current versions and future versions listed in the Plan of Record;[9] and

      (ii)    the following services, to the extent provided**, or being developed,** in relation to the CVAS Products, that the Sellers and the EMEA Sellers, individually, jointly or in collaboration with or pursuant to contracts with Third Parties **and other Persons**, market, advertise, distribute and sell globally to carriers ~~and~~**,** channel partners **and other Persons**: (A) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support system services; (B) network support services, including technical support, technical account manager service, network prime engineer service, online support and technical support for special projects, repair services, managed spares service, Third Party products spares management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services**; and (C) [network management services]**[10] (collectively, the "**CVAS Services**");

all as conducted by the Sellers and the EMEA Sellers as of the date of this Agreement **(provided, that with respect to researching and developing the CVAS Products or**

---

[9] Note to Seller: Subject to final review of the Plan of Record.
[10] Note to Seller: Specific language TBD.

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

**317**

**the development of the CVAS Services associated therewith, the Business shall include activities by the Sellers and the EMEA Sellers at any time)**, but excluding, in each of clauses (i) and (ii) above: (A) any business, asset, product or service run, owned, managed and/or provided by the LGN Joint Venture, NN Turkey or GDNT; (B) any Excluded Asset; (C) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (D) any products and/or services provided by businesses or business segments of any Seller or EMEA Seller other than those specified in clauses (i) and (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means, whether in paper, digital or other ~~tangible~~ form, (i) if used exclusively in connection with the Business, all books, records, files, ledgers, sales literature or similar documents in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information on past, present and prospective customers and suppliers, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset, ~~financial records,~~ **or Assumed Liability, Tax records that relate solely to the Business, technical information, operating and** production records, quality control records, **blueprints, research and development notebooks and files,** customer credit data, **manuals, engineering and scientific data,** sales and promotional literature, **drawings, technical plans, business plans,** budgets and price lists and (ii) if used ~~primarily,~~ but not exclusively, in connection with the Business **or in respect of any Asset or Assumed Liability**, to the extent reasonably separable from such items of any other business of the ~~Sellers or the EMEA~~ Sellers, copies of all books, records, files, ledgers, **documentation,** sales literature or similar documents in the possession or under control of the Sellers (including information on past, present and prospective customers and suppliers), policies and procedures and **materials and** procurement documentation used ~~primarily~~ in the Business or in respect of any Asset **or Assumed Liability**, financial records, **technical information, operating and** production records, quality control records, **blueprints, research and development notebooks and files,** customer credit data, **manuals, engineering and scientific data,** sales and promotional literature, **drawings, technical plans, business plans,** budgets and price lists~~-~~**, including, in each of clauses (i) and (ii), any Employee Records; provided, that with regards to copies provided pursuant to clause (ii)** Business Information shall not include ~~any Employee Records or Tax Records~~**the competitively sensitive portions of the foregoing that relate to the other business lines of the Sellers**.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

318

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian DB Replacement Plan**" has the meaning set forth in Section 7.5(c).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Non-Union DC Replacement Plan**" has the meaning set forth in Section 7.5(a).

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"**Canadian Union DC Replacement Plan**" has the meaning set forth in Section 7.5(d).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Receivables**" means, as of a given date, amounts classified in Construction-in-Process accounts in a manner consistent with the Nortel Accounting Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business determined in accordance with the Nortel Accounting Principles.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Clean Team Confidentiality Agreement**" means the clean team confidentiality agreement by and between [NNL] and the Purchaser, dated as of [●], as amended from time to time.

"**Clean Team Data Room**" has the meaning attributed to the term "Clean Data Room" in the Clean Team Confidentiality Agreement.

"~~**Clean Team Members**" has the meaning attributed to that term in the Clean Team Confidentiality Agreement.~~

"**Closing**" has the meaning set forth in Section 2.4.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

NY\1582469.7

[New York #2071434 v4]

**Error! Unknown document property name.**

3l9

"**Closing Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Audited Financial Statements**" has the meaning set forth in Section 5.25.

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.4.1.

"**Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Deferred Revenue Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Unaudited Financial Statements**" has the meaning set forth in Section 5.24.

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

NY\1582469.7

[New York #207]434-v4]
Error! Unknown document property name.

**320**

"**Competing Transaction**" has the meaning set forth in Section 5.29.

"**Competition Act**" means the Competition Act (Canada), R.S. 1985, C. C-34, as it is now in effect and as it may be amended.

"**Competition Act Approval**" means that: (i) the waiting period, including any extension thereof, under Section 123 of the Competition Act shall have expired or been terminated or the obligation to provide a pre-merger notification in accordance with Part IX of the Competition Act shall have been waived in accordance with paragraph 113(c) of the Competition Act, and in either case the Purchaser shall have been advised in writing by the Commissioner that he or she is of the view that grounds do not exist as of the date of the advice to initiate proceedings under the merger provisions of the Competition Act in respect of the transactions contemplated by this Agreement and such advice shall have not been rescinded or amended; or (ii) the Commissioner shall have issued an advance ruling certificate pursuant to Subsection 102(1) of the Competition Act to the effect that the Commissioner is satisfied that he or she would not have sufficient grounds upon which to apply to the Competition Tribunal for an order under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement.

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser and the Seller parties listed therein dated [•], 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by or notice to any Government Entity or other Third Party.

"**Contract**" means any ~~written~~ binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.[4]

"**Contract Designation Date**" **means, the later of the date that is (i) [thirty (30)] Business Days from the date hereof; (ii) [fourteen (14)] Business Days after such Contract is added to or included in the relevant list pursuant to Section 2.1.5(c) or Section 2.1.6(c), as applicable; or (iii) [fourteen (14)] Business Days after the date on which complete unredacted copies of such Contract are made available to the Purchaser and the Purchaser's employees and representatives.**[11]

["**Contract Manufacturing Inventory Agreements**" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(a) of the Sellers Disclosure Schedule that the relevant

---

[4] ~~Note to Purchaser: The concept of a Contract Designation Date is not needed as there are no exclusive supply agreements for the Business and the Purchaser will take all Customer Contracts.~~[11] **Note to Seller: Parties to discuss timeline with respect to when contracts will be made available (both before and after signing) to work out an appropriate timeline.**

321

Parties will use their **commercially** reasonable ~~best~~ efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.23 and the term sheet attached hereto as Exhibit F.] [5][12]

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business, net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors or governing body of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cross-License Agreements**" means **all** Contracts between any Sellers**, EMEA Sellers,** or any of their **respective** Affiliates and any other Person ~~that relate to the Business,~~ under which any of such Sellers**, EMEA Sellers,** or their **respective** Affiliates, as applicable, both (i) grant a license under Patents owned by (or licensed to) them and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party~~,~~ **(**but ~~excluding Contracts where the only license granted by one of the parties to such a Contract~~ **other than inbound and/or outbound license agreements where the only grant back from the licensee** is under improvements on the **licensed intellectual property) in such case, to the extent the scope of such licenses include Patents licensed under the** Intellectual Property ~~licensed to it by the other party~~**License Agreement or assigned pursuant to the terms of this Agreement or that are otherwise used in the Business**.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under an Assumed and Assigned Contract and any actual pecuniary losses that have resulted from such defaults under such Seller Contracts, and (ii) with respect to any Designated Non-365 Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts required to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date.

---

[5][12] Note to Purchaser: Parties to discuss approach to Contract Manufacturers.

["**Current Services**" has the meaning set forth in Section 5.27(a).]

**322**

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides CVAS Products and/or CVAS Services to a customer, reseller or distributor.

"**CVAS Products**" means the software and/or hardware products set forth in Section 1.1(b) of the Sellers Disclosure Schedule.[13]

"**CVAS Services**" has the meaning set forth in the definition of "Business" above.

"~~Debt Commitment Letters~~" ~~has the meaning set forth in Section 3.3(a).~~

"~~Debt Financing~~" ~~has the meaning set forth in Section 3.3(a).~~

[~~"Deferred Revenue Amount" means [●].~~][6]

**"Deferred Revenue Amount" means, as of the Closing Date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date _minus_ (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Revenue Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.**

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(e<u>d</u>).

"**Designated Purchaser**" has the meaning set forth in Section 2.5.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means [●], as distribution agent for the Sellers and the EMEA Sellers hereunder and under the EMEA Asset Sale Agreement.

"**Downward Adjustment**" has the meaning set forth in Section 5.26(b).

---

[13] Note to Seller:  Schedules are still under review by Purchaser.  Parties to discuss including the following products:  (i) the Sprint, MCI/Verizon and UCS versions of DMS-250; (ii) ERS8600 (PP8600); (iii) ServiceBuilder and NAV (from Rochester); and (iv) certain MDed/EOL products, including TOPS, MCI Operator Services.

[6] ~~Note to Purchaser:  Parties to discuss.~~

12

NY\1582469.7

[New York #207[434 v4]

**Error! Unknown document property name.**

**323**

["**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.]

["**EC Merger Regulation Approval**" means (i) that the Purchaser shall have received notification from the European Commission that the transactions contemplated in this Agreement and the EMEA Asset Sale Agreement are compatible with the common market or there has been a deemed declaration in respect of the transactions contemplated in Transaction Documents under Article 10(6) of the EC Merger Regulation or (ii) where the transactions contemplated in this Agreement and the EMEA Asset Sale Agreement have been referred to an EU or EFTA Member State under Article 4(4) or Article 9 of the EC Merger Regulation, confirmation shall have been received by the Purchaser that the transactions contemplated in this Agreement and the EMEA Asset Sale Agreement have (x) been approved or have been approved subject to such conditions, obligations, modifications or undertakings as shall be accepted or shall be required to be accepted by the Parties under Section 5.5 or (y) been approved in accordance with the relevant legislation of that EU or EFTA Member State.][714]

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EFTA**" means the European Free Trade Association.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in [●] of the EMEA Asset Sale Agreement.

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

---

[714] Note to Purchaser: EU merger notifications/approvals to be discussed depending on European operations of Purchaser.

**13**

NY\1582469.7

13                    **Error! Unknown document**
[New York #2071434 v4]                    **property name.**

**324**

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Transferred Intellectual Property**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Upward Adjustment**" has the meaning attributed to the term "Upward Adjustment" in [•] of the EMEA Asset Sale Agreement.

"**EMEA Warranty Obligations**" means the warranty obligations relating to CVAS Products and CVAS Services assumed by Purchaser and/or a Designated Purchaser pursuant to [Sections • and •] of the EMEA Asset Sale Agreement.

"**Employee**" means any employee of the Sellers engaged in the Business, as listed in Section 4.11(b) of the Sellers Disclosure Schedule.

"**Employee Data**" has the meaning set forth in Section 7.4(b).

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees offered employment pursuant to Section 7.1 or Section 7.2 other than Employees whose employment transfers by operation of Law.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating: (i) the management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable laws or any analogous foreign, state, provincial or local laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible personal property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, business supplies and other articles of tangible personal property.

NY\1582469.7

[New York #2071434 v4]

Error! Unknown document property name.

**325**

"Equity Commitment Letters" has the meaning set forth in Section 3.3(a).

"Equity Financing" has the meaning set forth in Section 3.3(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

**"ERISA Affiliate" means any trade or business (whether or not incorporated) which is a member of a controlled group or which is under common control with the Sellers or any Subsidiary within the meaning of Section 414 of the Code.**

"Escrow Agreement" means the Escrow Agreement to be entered into on or prior to Closing substantially in the form attached hereto as Exhibit G.

"Escrow Agent" has the meaning ascribed to such term in the Escrow Agreement.

"Escrow Amount" means $●.

**"Escrow Deadline" means the earliest of the following events: (i) the issuance of a tax clearance certificate under subsection 159(2) of the Income Tax Act (Canada) with respect to the dissolution of NNL or NNTC, as the case may be; (ii) the corporate dissolution of NNL or NNTC, as the case may be; and (iii) the date following the expiration of all periods allowed for objecting to or appealing from the final determination of any proceedings relating to any assessment, reassessment or additional assessment of NNL or NNTC, as the case may be, by any Governmental Entity in respect of any taxation year ending on or prior to the Closing Date. For these purposes, a final determination shall mean (A) the expiry of the delay to appeal from or object to the relevant assessment, reassessment or additional assessment by the Canada Revenue Agency or other Taxing Authority if no appeal is taken or no objection is made, (B) the entering into of any agreement by NNL or NNTC and such a Taxing Authority in settlement of a dispute regarding such assessment, reassessment, additional assessment or proposed assessment, reassessment or additional assessment or (C) the decision by a court or tribunal of competent jurisdiction regarding the relevant assessment, reassessment or additional assessment from which no appeal may be taken or the period during which an appeal may be taken has expired and no appeal has been taken.**

"Estimated Adjusted Net Working Capital" has the meaning set forth in Section 2.2.2(a).

"Estimated Aggregate Downward Adjustment" has the meaning set forth in Section 2.2.2(a).

"Estimated Aggregate EMEA Downward Adjustment" has the meaning set forth in Section 2.2.2(a).

"Estimated Aggregate EMEA Upward Adjustment" has the meaning set forth in Section 2.2.2(a).

NY\1582469.7

[New York #2071434 v4]

**Error! Unknown document property name.**

**326**

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Deferred Revenue Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).[8]

"**Estimated Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded 365 Customer Contracts**" has the meaning set forth in Section 2.1.5(b).

"**Excluded Non-365 Customer Contracts**" has the meaning set forth in Section 2.1.6(b).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller or EMEA Seller other than the Business.

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Expense Reimbursement**" has the meaning set forth in Section 9.2(a).

["**Extra Services**" has the meaning set forth in Section 5.27(b).]

---

[8] Note to Purchaser: To be addressed as a covenant in the EMEA Asset Sale Agreement rather than a purchase price adjustment.

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

**327**

["**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect.][9]<sub>15</sub>

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Financing**" has the meaning set forth in Section 3.3 **3.3(a).**

"**Financing Commitments**" has the meaning set forth in Section 3.3(a).

"**GAAP**" means the United States generally accepted accounting principles.

["**GDNT**" means Guangdong-Nortel Telecommunications Equipment Co. Ltd.]

["**GDNT Agreement**" means the agreement to be entered into between the relevant Sellers, the Purchaser (or the relevant Designated Purchasers), and GDNT, on or prior to the Closing on the basis of the term sheet attached hereto as Exhibit H.]

["**General Scope of Included Services**" has the meaning set forth in Section 5.27(a).]

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.4 **2.2.5**(a).

"**Government Entity**" means any United States, Canadian, United Kingdom, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services tax <u>**or harmonized sales tax**</u> payable under Part IX of the Excise Tax Act (Canada). <u>**and the Quebec sales tax payable under an Act respecting the Quebec sales tax.**</u>

"**Hazardous Materials**" means any chemical, material, waste or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

---

[9]<sub>15</sub> Note to Purchaser: To be discussed.

NY\1582469.7

[New York #2071431 v4]

17

17

Error! Unknown document property name.

**328**

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received (i) notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada and (ii) any other approvals, clearances or authorizations required under the Investment Canada Act to effect the Closing as contemplated by this Agreement.[~~16~~16]

"**Identified Employees**" has the meaning set forth in Section 7.1.1(a).

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser or Designated Purchaser's offer of employment as provided in Section 7.1 and are on a Seller-approved leave of absence as of the Employee Transfer Date and are expected to return and actually return to work within the relevant time period set out below.  An Employee shall be an Inactive Employee for purposes hereof if and only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work within [six (6)] months following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(~~h~~i).

["**Included Services**" has the meaning set forth in Section 5.27(a).]

"**Inclusion Criteria**" means the criteria described in Section 1.1 [●] of the Sellers Disclosure Schedule.[17]

---

[~~16~~16] Note to Seller:  To be discussed in connection with the Investment Canada Act generally.

[17] Note to Seller:  Note that under Purchaser's formulation, the Inclusion Criteria will not apply to the top CVAS Customers.  The Inclusion Criteria is currently expected to include all Contracts, other than the major CVAS Customers (Purchaser will provide a list) except those that contain:

(i)    R&D obligations reasonably expected to be more than $[2,500,000] after Closing;

(ii)   any non-competition, exclusivity or other provision that would, if assumed, restrict Purchaser from directly or indirectly engaging in any business activity anywhere in the world (whether such agreement is exclusive by geography, product type or otherwise), including with respect to Purchaser's business prior to the signing date;

(iii)  indemnity provisions that (A) contemplate the payment of special, incidental, consequential or any other damages besides direct damages or (B) would fail to release the Purchaser from intellectual property indemnity obligations in instances where infringement resulted from (w) a combination of

**Error! Unknown document property name.**

**329**

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means [●] or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm within [●] Business Days of the request of either Primary Party, by [●] at the request of the first Primary Party to move for the appointment of such Independent Auditor.

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means any and all intellectual and industrial property, whether protected or arising under the laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) Trademarks; (b) Patents; (c) works of authorship (whether or not published) and copyrights (including any registrations therefor or applications for registration); (d) mask works (including any registrations therefor or applications for registration); (e) trade secrets, know-how and confidential information; (f) industrial designs and other rights in designs (including any registrations therefor or applications for registrations); (g) *sui generis* data base rights and (h) any Software **and technology**.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit I.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

---

the Purchaser's products with other materials not provided by the Purchaser, (x) specifications or modifications suggested by or made by customer, (y) customer's failure to use updated products to avoid a claim of infringement or (z) any use or sale of the products in a manner not contemplated by the contract; or

(iv)    requires the Purchaser to maintain a CVAS Product or Service for a period longer than [10] years.

(v)

**19**

NY\1582469.7

~~[New York #2071434-v4]~~                    ~~19~~          **Error! Unknown document property name.**

330

"**Inventory Value**" means, as of any given date, the book value of the Owned Inventory and the EMEA Owned Inventory, in each case net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Investment Canada Act**" means the Investment Canada Act, R.S. 1985, c.28, as it is now in effect and as it may be amended.

"**IRS**" means the United States Internal Revenue Service.

"**Israeli Companies**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Companies Law**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Court**" has the meaning set forth in the recitals to this Agreement.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**Joint Israeli Administrators**" has the meaning set forth in the recitals to this Agreement.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware in part on March 5, 2009 and in part on March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware by an order dated March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KPD Provision**" means the provision for "Known Product Defects" to be recognized and measured by the Business pursuant to the Nortel Accounting Principles with respect to defects (other than defects covered by the Non-KPD Warranty Provision) of CVAS Products and/or CVAS Services that have been sold by the Sellers and the EMEA Sellers.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(c) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit J.

"**Law**" means any U.S., Canadian, UK, Israeli, foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial or administrative order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

**331**

["**LGN Distribution Agreement**" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and the LGN Joint Venture, on the other hand governing the distribution of certain CVAS Products by the LGN Joint Venture on the basis of the term sheet attached hereto as Exhibit K.]

["**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.]

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the [Purchaser or the relevant Designated Purchasers] under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

"**Loaned Employee Agreement**" means the agreement between [●], on the one hand, and the [Purchaser and/or any Designated Purchasers], on the other hand, to be executed on or before the Closing attached hereto as Exhibit L.[18]

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Antitrust Approvals**" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit M (the "**Relevant Antitrust Authorities**") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit M, authorizing or not objecting to the transactions contemplated by this Agreement and by the EMEA Asset Sale Agreement (as applicable), which includes any decision or consent by any such Relevant Antitrust Authority setting forth conditions or obligations on the Purchaser or any of its Affiliates.[19]

---

[18] Note to Seller: Parties to discuss the potential duration of this agreement.

[19] Note to Purchaser: List of merger notifications/approvals to be discussed – will depend on locations and operations of Purchaser.

**332**

["**Market Value**" means, in respect of the Restricted Assets and Restricted Liabilities, the fair market value of the same, determined by reference to an amount equal to the product of (x) the sum of the revenues for the one year period ended on December 31, 2008 (the "**2008 Revenues**") for such Restricted Seller as set forth on Exhibit N, times (y) [●][120].]

"**Material Adverse Effect**" means any event, change, circumstance, development, condition, fact, occurrence or effect that, individually or together with any other events, changes, circumstances, developments, conditions, facts, occurrences or effects has had, or would reasonably be expected to have a material adverse effect on the business, operations, assets, **liabilities,** results of operations or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes, circumstances, developments, conditions, facts, occurrences or effects to the extent resulting from (a) general changes to the industries and markets in which the Business operates, but only to the extent that such changes do not have a ~~materially~~ disproportionate effect on to the Business relative to other businesses in such industries and markets, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, earthquakes, hurricanes, floods, tornados and similar natural causes, war, terrorism or hostilities, but only to the extent that such factors, rates, conditions, natural causes, war, terrorism or hostilities, in each case, do not have a ~~materially~~ disproportionate effect on the Business, relative to other businesses in the industries or markets in which the Business operates, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, ~~including any effect on the Business resulting from failure to take any action to which the Purchaser refused consent under this Agreement,~~ (e) the transactions contemplated hereby or any announcement of this Agreement or the identity of the Purchaser in accordance with the terms of this Agreement, (f) the pendency of the Bankruptcy Proceedings and any action approved by the Bankruptcy Courts, (g) the attrition of customers or employees ~~or other deterioration of the Business~~ prior to the Closing Date **(provided, that the reason for customer attrition should be excluded in determining whether there has been a Material Adverse Effect)**, (h) actions taken by the Sellers ~~that the Purchaser intended to take post-Closing with respect to the Business and previously disclosed in writing to the Sellers~~**at the specific written request of the Purchaser** or (i) the failure of the Business to achieve internal or external financial forecasts or projections, by itself, provided, however, that the ~~factors~~**effect of any** underlying **event, change, circumstance, development, condition, fact, occurrence or effect giving rise to any** such failure ~~may~~**shall** be ~~considered~~**included** in determining whether ~~or not there has been~~ a Material Adverse Effect **has occurred**.

"**Material Contracts**" has the meaning set forth in Section 4.4.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

---

[120] Note to Purchaser: This number will be the revenue multiple/fraction for the CVAS business, arrived at by dividing the Base Purchase Price by the 2008 aggregate revenues of the Business. **Note to Seller: Under review**

**22**

**333**

[~~"**Mutual Development Agreement**" means the agreement between [the Purchaser and/or any Designated Purchasers], on the one hand, and [the relevant Sellers], on the other hand, governing the development (i) by the Purchaser and/or any Designated Purchasers or any of their Affiliates of new features of certain of the products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the CVAS Products, that the relevant Parties will use their reasonable best efforts to negotiate among themselves on the basis of the term sheet attached hereto as Exhibit O and execute on or before the Closing pursuant to Section 5.23.]~~[14]

["**Neutral Arbitrator**" has the meaning set forth in Section 5.27(e).]

"**New York Courts**" has the meaning set forth in Section 10.6(b).

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" has the meaning set forth in the recitals to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock co. corporation formed under the laws of Turkey.[~~15~~21]

["**NN Turkey Agreements**" means the NN Turkey Master Development Agreement, the NN Turkey Distribution Agreement and the NN Turkey Services Agreement.]

["**NN Turkey Distribution Agreement**" means the agreement between NN Turkey, on the one hand, and the **[Purchaser and/or any Designated Purchasers]**, on the other hand, governing the distribution of certain CVAS Products by NN Turkey.][~~16~~22]

["**NN Turkey Services Agreement**" means the agreement between NN Turkey, on the one hand, and the **[Purchaser and/or any Designated Purchasers]**, on the other hand, governing the provision of services by NN Turkey to the Business.]

["**NN Turkey Master Development Agreement**" means the agreement between NN Turkey, on the one hand, and the **[Purchaser and/or any Designated Purchasers]**, on the other hand, governing research and development operations by NN Turkey.]

---

[14] ~~Note to Purchaser: This agreement will govern the development (i) by the Purchaser and/or any Designated Purchasers of new features of certain of products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the CVAS Products~~

[~~15~~21] Note to Purchaser: We deleted your definition of "Netas" since it was not used and is already included here.

[~~16~~22] Note to Purchaser: NN Turkey Agreements to be discussed in connection with this Agreement and the EMEA ASA.

**Error! Unknown document property name.**

[New York #2071434 v4]

334

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.[1723]

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

["**Non-Designating Party**" has the meaning set forth in Section 5.27(c).]

"**Non-KPD Warranty Provision**" means the provision to be recognized and measured by the Business pursuant to the Nortel Accounting Principles for potential claims by customers under the Warranty Obligations and the EMEA Warranty Obligations.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-365 Customer Contract List**" has the meaning set forth in Section 2.1.6(a).

"**Non-365 Customer Contract**" has the meaning set forth in Section 2.1.6(a).

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

["**Non-US Plan**" has the meaning set forth in Section 4.11(1k).][1824]

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Unaudited Financial Statements, as set forth in Section 1.1(d) of the Sellers Disclosure Schedule.[1925]

"**Nortel Retained Businesses**" has the meaning set forth in the Intellectual Property License Agreement.

"**Notice Parties**" has the meaning set forth in Section 5.1(b).

["**Notifying Party**" has the meaning set forth in Section 5.27(e).]

"**Offer**" or "**Offers**" has the meaning set forth in Section 7.1.1(a).

"**Offer Consideration Period**" has the meaning set forth in Section 7.1.1(a).

---

[1723] Note to Purchaser:  We do not disagree with this premise, but believe it is already covered by the last sentence of Section 5.13(a).

[1824] Note to Purchaser: We likely will not need this definition.

[1925] Note to Seller:  To be discussed pending Purchaser's review of the final Schedule 1.1(f) **and the documents referenced therein**.

**"Omitted Cross-License Agreement" has the meaning set forth in Section 4.5(g).** **335**

**"Open Source Software"** means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

**"Order" means any award, writ, injunction, judgment, order or decree entered into, issued, made or rendered by any Government Entity.**

**"Ordinary Course"** means the ordinary course of the Business consistent with recent past practice**, including as modified** since the filing of the Bankruptcy Proceedings,**_ and_** as such practice may be modified from time to time (i) to the extent necessary to reflect the Bankruptcy Proceedings or (ii) as may be required in the reasonable judgment of the Sellers to further effectuate the separation of the Business from the other businesses of the Sellers in a manner consistent with the Transaction Documents. In addition, actions taken that are set forth on Section [●] of the Sellers Disclosure Schedule shall be deemed to be taken in the Ordinary Course.²⁰²⁶

**"Other Sellers"** means the Affiliates of the Main Sellers listed in Exhibit A hereto, except to the extent that (i) any such entity listed on Exhibit A is liquidated or wound up between the date of this Agreement and the Closing Date or (ii) despite the **commercially** reasonable best efforts of the Main Sellers, they are unable to cause any such entity listed on Exhibit A to agree to execute this Agreement on the Closing Date, then such entities shall not be considered "Other Sellers" (and therefore, shall also not be considered Sellers) for any purposes of this Agreement notwithstanding their inclusion on Exhibit A and any Assets and Liabilities of such entities will not be transferred as part of this Agreement.

**"Overhead and Shared Services"** means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided (or were provided prior to any recent divestiture by any Seller since the filing of the Bankruptcy Proceedings) to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits

---

²⁰²⁶ Note to Seller: Parties to discuss what business plans related to Sellers' consolidation efforts may be scheduled **– finalization of this definition subject to mutual agreement on the operating covenants and representations that ordinary course practices to maintain the business as a going concern will be observed**.

**33ᴸ**

services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith.

**"Outbound License Agreement" has the meaning set forth in Section 4.5(k).**

"**Owned Equipment**" means (i) those items of Equipment owned by the Sellers that are held or used primarily in connection with the Business and [are located in the specific designated locations within sites as specified in Section [•] of the Sellers Disclosure Schedule,][27] (ii) other items of Equipment owned by any of the Sellers that are held or used exclusively in connection with the Business, and (iii) the other Equipment listed in Section 1.1(e) of the Sellers Disclosure Schedule, provided, however, that "Owned Equipment" shall not include any (A) Owned Inventory, (B) any items of tangible property personally assigned to Employees who are not (x) Transferred Employees as of the Employee Transfer Date or (y) Visa Employees, (C) any Intellectual Property, (D) information technology assets, such as data servers and large scale storage devices or (E) [any fixtures other than trade fixtures located at the [Direct Lease Real Estate], or any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease.][28]

"**Owned Inventory**" means (i) Inventory owned by any of the Sellers that is held or used exclusively in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or any other Person, and (ii) the other Inventory listed in Section 1.1(f) of the Sellers Disclosure Schedule.[29]

"**Partial Allocation**" has the meaning set forth in Section 6.9.

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national (including the United States and Canada) and multinational statutory invention registrations, patents, patent applications and provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations, and all rights therein provided by multinational treaties or conventions.

**"PBGC" has the meaning set forth in Section 4.11(g).**

"**Pension Benefits**" has the meaning set forth in Section 4.11(k).

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by

---

[27] Note to Seller: Due to the real estate consolidation at Sellers, this definition only works if it is a set period of time when Purchaser has had an opportunity to substantiate the assets.
[28] Note to Seller: Treatment of fixtures subject to real estate discussion.
[29] Note to Seller: TBD regarding tying to Nortel Accounting Principles.

NY\1582469.7

[New York #2071434 v4]   **Error! Unknown document property name.**

**337**

appropriate proceedings and **which are set forth on Schedule [•], in each case,** for which adequate reserves have been established in accordance with GAAP, other than Liens that ~~may~~**will** be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) Liens arising hereunder or under any Assigned Contracts (after giving effect to the assignment hereunder); (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(g) of the Sellers Disclosure Schedule; and (vi) zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which [do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" means January 14, 2009, except with respect to Nortel Networks (CALA) Inc. in which case "Petition Date" shall mean July 14, 2009.

"**Plan of Record**" means the CVAS Products [and CVAS Services] under development by the Sellers as of the date hereof, as set forth in the "Plan of Record" portion of Section 1.1(b) of the Sellers Disclosure Schedule.

"**Post-Closing Taxable Period**" means any taxable period or portion thereof beginning after the Closing Date.

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

[**"Prepaid Expenses**" means prepaid expenses specifically identified as relating to the Business as indicated in the Adjusted Net Working Capital Statement.][21]

[**"Prepaid Expenses Amount**" means, as of any given date, the amounts classified as Prepaid Expenses of the Business, determined in a manner consistent with the Nortel Accounting Principles.]

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

---

[21] ~~Note to Purchaser: Treatment of these prepaid expenses to be discussed. This draft anticipates that these Prepaid Expenses would be included in the Working Capital Adjustment, but Sellers intent is to manage such Prepaid Expenses down to zero pre-Closing.~~

**33 8**

["**Property Taxes**" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.]

"**Provider**" has the meaning set forth in the Transition Services Agreement.

["**Provider's Cost**" has the meaning set forth in the Transition Services Agreement.]

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Audited Financial Statements**" has the meaning set forth in Section 3.4(a).

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Cure Costs**" means any Cure Costs allocable to Purchaser in accordance with Section 2.1.7.

"**Purchaser Disclosure Schedule**" means the disclosure schedule delivered by the Purchaser to the Sellers on the date hereof.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Financial Statements**" has the meaning set forth in Section 3.4(b).

"**Purchaser Supply Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, that the relevant Parties will use their **commercially** reasonable best efforts to negotiate among

**339**

themselves on the basis of the term sheet attached hereto as Exhibit P and execute on or before the Closing pursuant to Section 5.23.[2230]

"**Purchaser Unaudited Financial Statements**" has the meaning set forth in Section 3.4(b).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

["**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing.]

["**Real Estate Lease**" means any Seller Contract that is a lease, sublease, license or other agreements for occupancy of real estate.]

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Sellers, each acting reasonably.

"**Regulatory Approvals**" means the Antitrust Approvals and the ICA Approval.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Relevant Antitrust Authorities**" has the meaning set forth in the definition of "**Mandatory Antitrust Approvals**" above.

"**Replacement Financing**" has the meaning set forth in Section 3.3(b).

"**Representatives**" has the meaning set forth in Section 5.29.

"**Respective Affiliates**" has the meaning set forth in Section 10.15(c).

"**Restricted Assets**" has the meaning set forth in Section 5.26(a).

"**Restricted Information**" has the meaning set forth in Section 5.6(d).

"**Restricted Liabilities**" has the meaning set forth in Section 5.26(b).

"**Restricted Seller**" has the meaning set forth in Section 5.26(b).

---

[2230] Note to Purchaser: This agreement may govern the supply by the Purchaser and/or any Designated Purchasers to the relevant Sellers of certain required products and services if necessary or applicable for a limited period of time ([•] days).

Error! Unknown document property name.



"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Royalty Liability Amount**" means, as of any given date, the amount of the royalty liabilities, net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

["**Schedule 1 Included Services**" has the meaning set forth in Section 5.27(a).]

["**Scope Guidelines**" has the meaning set forth in Section 5.27(a).]

"~~Securities Disclosure Documents~~**Security Deposits**" has the meaning set forth in ~~ARTICLE IV~~**Section 5.20(a)(i)(A)**.

"**Seller Authorized Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Bid**" has the meaning set forth in Section 2.1.1(k).

"**Seller Consents**" has the meaning set forth in Section 2.1.1(j).

"**Seller Contracts**" means (i) those Contracts of a Seller that relate exclusively to the Business or to the Assets (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset, but excluding any other licenses of Intellectual Property), and (ii) the Contracts of a Seller listed in Section 1.1(h) of the Sellers Disclosure Schedule.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers) with respect to Employees, and (ii) any other employee benefit plan with respect to which the Purchaser or any

**30**

NY\1582469.7

30                                    **Error! Unknown document**
[New York #2071434-v4]                              **property name.**

**34/**

of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers) maintaining such plan prior to the Closing Date.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.[31]

"**Seller Supply Agreement**" means the agreement between the **[relevant Sellers]**, on the one hand, and the **[Purchaser and/or any Designated Purchasers]**, on the other hand, governing the supply by the relevant Sellers to the Purchaser and/or any Designated Purchasers of certain products and services on which the Business is dependent as at the Closing Date, that the relevant Parties will use their **commercially** reasonable ~~best~~ efforts to negotiate among themselves on the basis of the term sheet attached hereto as Exhibit Q and execute on or before the Closing pursuant to Section 5.23.[23][32]

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.21.

"**Software**" means any and all (i) computer programs, applications and interfaces, whether in source code or object code, ~~and~~ (ii) computerized databases and compilations**, and (iii) all user manuals and architectural and design specifications, training materials and other documentation relating to any of the foregoing**.

"**Special Arrangements**" has the meaning set forth in Section 4.11(a).

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(j).

"**Specified Employee Liabilities Amount" means [●].**

"**Specified Transferred Employees**" has the meaning set forth in Section 7.1.2(c)(ii).

---

[31] Note to Seller: Definition (particularly use of the revised "Affiliate" definition) subject to completion of diligence.

[23][32] Note to Purchaser: It is generally anticipated that Purchaser will be responsible for entering into its own supply arrangements in respect of the Business. To the extent appropriate, Sellers may be able to "unbundle" certain supply agreements and/or provide a continuing supply to Purchaser, in either case, for a limited period of time ([●] days). This agreement may govern the supply by the relevant Sellers to the Purchaser and/or any Designated Purchasers of certain products and services on which the Business is dependent as at the Closing Date, if necessary or applicable. Parties to discuss potential duration.

**342**

"**Sponsors**" has the meaning set forth in Section 3.3(a).

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, that such parties will use their **commercially** reasonable ~~best~~ efforts to negotiate and execute on or prior to the Closing pursuant to Section 5.23 on the basis of the term sheet attached hereto as Exhibit R so as to pass through the benefits and burdens of the underlying Contract with customers as if the Purchaser and applicable Designated Purchaser were party thereto.

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Target Working Capital**" means $[●].

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes, fees, levies, assessments or other impositions by or on behalf of any Government Entity, including net income, gross income, individual income, capital, value added, goods and services, gross receipts, **goods and services,** sales, use, **value-added,** ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, levies, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest, penalties, additions to tax and additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay any such amounts owing by any Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K. or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world, including any Government Entity with responsibility for the imposition, collection or administration of any form of Tax or exercising Tax regulatory authority.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Returns**" means all returns, reports (including elections, declarations, **designations,** disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

**343**

"**365 Contract**" means any Contract of a U.S. Debtor that is an Executory Contract and was entered into before the Petition Date that can be assumed and assigned by the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code.

"**365 Customer Contract**" has the meaning set forth in Section 2.1.5(a).

"**365 Customer Contract List**" has the meaning set forth in Section 2.1.5(a).

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, trade names, corporate names, business names, domain names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including, but not limited to, all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the [relevant Sellers], on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in respect of certain Trademarks used in respect of the CVAS Products and/or CVAS Services to be entered into on or before the Closing in the form attached hereto as Exhibit S. [2433]

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, ~~gross receipts,~~ documentary, filing, recordation, [value-added], stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees **but excluding value-added and similar Taxes, which shall be the subject of Section [•]** ), together with interest, penalties and additional amounts imposed with respect thereto.[34]

"**Transfer Tax Returns**" has the meaning set forth in Section 6.7(a).

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 or Section 7.2, and (ii) those Employees whose employment transfers by operation of Law.

---

[2433] Note to Purchaser:  It is anticipated that this agreement would provide for the continuing use of certain "Nortel" trademarks for a limited transitional period of time (to sell any existing inventory), as well as use of other trademarks used in the Business for a limited transitional period of time.
[34] Note to Seller:  Value-added tax to be addressed in a separate provision.

**344**

["**Transferred Employee Plan**" means any Seller Employee Plan that is (x) established or maintained in accordance with a Collective Labor Agreement that is transferred to the Purchaser or a Designated Purchaser under the terms of Section 7.2, and transferred (or the liabilities of which are transferred) to the Purchaser or Designated Purchaser pursuant to this Agreement or by operation of Law or (y) transferred (or the liabilities of which are transferred) to the Purchaser or Designated Purchaser pursuant to this Agreement or by operation of Law, in each case, excluding the Specified Employee Liabilities assumed by Purchaser pursuant to Section 2.1.3(j).][25][35]

"**Transferred Intellectual Property**" means (i) the Transferred Patents, (ii) the Trademarks set forth in Section 1.1(i) of the Sellers Disclosure Schedule, and (iii) any Intellectual Property (other than Patents or Trademarks) owned by any of the Sellers that is used exclusively in connection with the Business.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees as set forth in Section 1.1(j) of the Sellers Disclosure Schedule.

"**Transferred Patents**" means the Patents listed in Section 1.1(k) of the Sellers Disclosure Schedule.[26][36]

"**Transferring Employee**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**Transition Services Agreement**" means an agreement between [the relevant **Sellers or EMEA** Sellers] (or their Affiliates), on the one hand, and the [Purchaser and/or any Designated Purchasers], on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit T, [except that the Schedules to such agreement shall be agreed between the Parties in accordance with Section 5.27 hereof.]

"**2008 Revenues**" has the meaning set forth in the definition of "**Market Value**" above.

["**Type 1 Extra Services**" has the meaning set forth in Section 5.27(b).]

["**Type 2 Extra Services**" has the meaning set forth in Section 5.27(b).]

"**Unaudited Financial Statements**" has the meaning set forth in Section 4.7(b).

---

[25][35] Note to Seller: Seller's Disclosure Schedule indicates that there are no Transferred Employee Plans. Subject to confirmation, we will amend the applicable sections accordingly. Note to Purchaser: This change is intended to explicitly carve out the India gratuity pay, Australia long service leave/sick leave, and Hong Kong sick leave, which are Specified Employee Liabilities that Sellers are asking Purchaser to assume. We are awaiting confirmation that with this change, there are no Transferred Employee Plans.

[26][36] Note to Purchaser: It is Seller's intention to transfer all Patents that are predominately used in the Business.

**345**

"**Union Employee**" means an Employee whose terms and conditions of employment are covered by a Collective Labor Agreement as specified in Section 4.11(b) of the Sellers Disclosure Schedule.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures and Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Bidding Procedures Order**" has the meaning set forth in Section 5.1(a).

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

"**Visa Employees**" means Employees (other than Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.11(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence or continue on the Employee Transfer Date solely due to Purchaser or Designated Purchaser's inability to obtain the required visa or permit with respect to such Employee's employment on the Employee Transfer Date.[2737]

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law relating to plant closing or mass layoff.

"**Warranty Obligations**" means the warranty obligations relating to CVAS Products and CVAS Services assumed by the Purchaser and/or a Designated Purchaser pursuant to Section 2.1.3(b) and Section 2.1.3(e).

"**Warranty Provision Amount**" means the sum of (i) the KPD Provision and (ii) the Non-KPD Warranty Provision.

~~"**Wholly-Owned Subsidiary**" means any Subsidiary all of the capital stock or capital which is held directly or indirectly by the Purchaser, except for any capital stock which is held by a director of such Subsidiary as required by applicable Laws.~~

---

[2737] Note to Purchaser: There is an expectation that between signing and Closing Purchaser will try to obtain visas or permits that are required for Purchaser to employ these employees. If unsuccessful, Purchaser's efforts are expected to continue while the employee is employed pursuant to the Loaned Employee Agreement.

Section 1.2.    <u>Interpretation</u>.



1.2.1.    <u>Gender and Number</u>.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.    <u>Certain Phrases and Calculation of Time</u>.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv<u>(iv) the use of the words "or" and "any" shall not be exclusive, and (v</u>) in determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis or casual uses outside the Business shall not be considered.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.  [References to "Assets" and "Assumed Liabilities" in all sections of this Agreement other than <u>Article II</u>, shall omit "at the Closing", "at the Closing Date" and terms of similar meaning from the definitions of such terms.]

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3.    <u>Headings, etc.</u>  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4.    <u>Currency</u>.  All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.  All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency.  All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein.  Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the *Wall Street Journal* (Eastern Edition) newspaper for the day in question.

1.2.5.    <u>Statutory References</u>.  Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

NY\1582469.7

[New York #2071434 v4]

Error! Unknown document property name.

**ARTICLE II**

**347**

**PURCHASE AND SALE OF ASSETS**

Section 2.1.    Purchase and Sale.

2.1.1.    Assets.  Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or accept assignment and assume from the relevant Sellers [(as set forth in Exhibit 2.1.1)][28,38], and each Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers [(as set forth in Exhibit 2.1.1)], all of such Seller's right, title and interest in and to the following assets (such assets, excluding the Excluded Assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear of all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

(a)    the Owned Inventory as of the Closing Date;

(b)    the CIP Receivables as of the Closing Date;

(c)    the Owned Equipment as of the Closing Date;

(d)    the Assigned Contracts in force as of the Closing Date;

(e)    the Prepaid Expenses as of the Closing Date;[29,30]

(f)    all rights of the Sellers as of the Closing Date under non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts or, to the extent they relate exclusively to the Business or the Assets, with Transferred Employees (to the extent assignable without the applicable Transferred Employee's consent), contractors and agents of the Sellers or with other Third Parties;

(g)    the ~~tangible embodiments of the~~ Business Information **(including tangible embodiments thereof)** existing as of the Closing Date, subject to Section 2.1.2(~~g~~f);

---

[28,38] Note to Purchaser:  Purchaser to clarify what was intended as Exhibit was not added to the Exhibit list.

[29] ~~Note to Seller:  Please confirm that "Prepaid Expenses" includes prepaid expenses under the Assigned Contracts.~~
[30] ~~Note to Purchaser:  Supplies have been added to the definition of Equipment.~~

37

Error! Unknown document property name.

**348**

(h)    the Transferred Intellectual Property as of the Closing Date, subject to any and all licenses granted under such Intellectual Property prior to the Closing Date not in violation of Section 5.9, together with (A) all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property, (except for ~~(x)~~ any income, royalties, damages and payments from claims asserted prior to the Closing Date or payment obligations accrued for periods prior to the Closing ~~Date, whether or not due or payable after the Closing Date, and (y) any income or royalties payable under any contract, arrangement or agreement other than the Assigned Contracts;~~, **solely to the extent set forth on Section 2.1.1(h) of the Sellers Disclosure Schedule),** (B) the right, if any, to register, prosecute, maintain and defend the Transferred Intellectual Property before any public or private agency or registrar, and (C) the right to sue and recover damages or other compensation for past**, present** or future infringements, dilutions, misappropriations, or other violations thereof, the right so sue and obtain equitable relief in respect of such infringements, dilutions, misappropriations and other violations, and the right to fully and entirely stand in the place of the Sellers in all matters related thereto;

(i)    all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers, contractors, and Third Parties to the extent related to the Assets;

(j)    to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business, [including the Consents listed in Section 2.1.1(j) of the Sellers Disclosure Schedule] (the "**Seller Consents**");

(k)    all rights that may be freely transferred as of the Closing Date arising from or in connection with any Bid made prior to the Closing Date by any Seller or by a contractor team or joint venture in which any Seller is participating, which is capable of acceptance after the Closing and, if accepted, would result in the award of a Customer Contract that (if entered into after the date hereof and prior to the Closing Date) would be an Assigned Contract **(that meets the Inclusion Criteria)** hereunder or to which the Purchaser has provided its prior written consent (to the extent required pursuant to Section 5.9) (any such Bid, a "**Seller Bid**"); ~~and~~

(l)    any net insurance proceeds received or to be received in respect of the Owned Equipment, to the extent payable to the Purchaser pursuant to Section ~~5.19~~**5.19; and**

**(m)    any Tax records required by Law to be transferred to the Purchaser or a Designated Purchaser.**

2.1.2.    Excluded Assets. Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the other Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to, any of the following assets (the "**Excluded Assets**"):

**38**

~~Error! Unknown document~~

~~property name.~~

**349**

(a)    cash and cash equivalents, accounts receivable (including intercompany receivables but excluding CIP Receivables as of the Closing Date), bank account balances and all petty cash of the Sellers;

(b)    all rights to Tax refunds, Tax credits or similar Tax benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date-**, for the avoidance of doubt, excluding any such item with respect to Transfer Taxes, which shall be for the benefit of the Purchaser;**

(c)    without limiting Section 5.28, all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party);

(d)    other than the Assigned Contracts and any other contract rights transferred in connection with the Assets, any rights of the Sellers under any Contract (including, for the avoidance of doubt, and without limiting any rights under, the Subcontract Agreement, the Non-Assigned Contracts (except as provided for in Section 5.13), the Bundled **Contracts, the Excluded 365 Customer Contracts, the Excluded Non-365 Customer** Contracts and the Seller Insurance Policies (except pursuant to Section 2.1.1(l)));

(e)    the minute books, stock ledgers and Tax records of the Sellers **other than the Tax records described in Section 2.1.1(m)**;

(f)    (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clause (iii) of this subsection (f)), (ii) any Employee Records other than those required to be delivered to the Purchaser pursuant to ARTICLE VII and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privacy but subject to any exemption from those Laws included in the Canadian Approval and Vesting Order or the U.S. Sale Order) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law or such agreement);

(g)    any right to any Intellectual Property (i) of any Seller (including Sellers' names) or any Affiliates of any Seller, with the exception of (A) the Transferred Intellectual Property, and (B) Intellectual Property to the extent rights are granted thereto pursuant to the Intellectual Property License Agreement or the Trademark License Agreement, and (ii) of any Third Party, except to the extent licensed under an Assigned Contract or otherwise granted pursuant to Section 5.4(c);

(h)    all rights of the Sellers under this Agreement and the other Transaction Documents;

(i)    subject to Section 5.28, all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions



of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

      (j)    all records prepared in connection with the sale of the Assets;

      (k)    all stock or other equity interests in any Person;

      (l)    any assets set forth on Section 2.1.2(l) of the Sellers Disclosure Schedule;

      (m)   any assets owned by NN Turkey, the LGN Joint Venture or GDNT; and

      (n)    any refunds due from, or payments due on, claims with the insurers of any Sellers in respect of losses arising prior to the Closing Date, other than as specified in Section 2.1.1(l);

      (o)    [any security deposits made by or on behalf the Sellers (including those relating to Assigned Contracts);][³¹³⁹]

      (p)    any and all other assets and rights of the Sellers not specifically included in Section 2.1.1 (including any assets and rights of entities listed on Exhibit A who are ultimately not deemed to be Other Sellers)~~.~~**; and**

      **(q)    any Contract deemed an Excluded 365 Customer Contract or an Excluded Non-365 Customer Contract pursuant to Section 2.1.5 or Section 2.1.6.**

    In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information to which the Sellers in good faith determine they are reasonably likely to need access for bona fide business or legal purposes.

    2.1.3.   Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due the following Liabilities ~~(such~~**, other than any Excluded Liability (such Liabilities, excluding the Excluded** Liabilities, the "Assumed Liabilities"):

      (a)    all Liabilities arising after the Closing Date, to the extent related to the conduct, operation or ownership by Purchaser of the Business after the Closing Date, including (i) all such Liabilities with respect to the ownership and operation of the Assets after the Closing Date, (ii) all such Liabilities related to Actions or claims brought against the Business after the Closing Date, (iii) all such Liabilities under any Environmental Laws after the Closing Date, (iv) all such Liabilities under any products liability Laws or similar Laws concerning defective products after the Closing Date, and (v) all such Liabilities under any applicable Laws in relation to telecommunications providers after the Closing Date;

---

³¹³⁹ Note to Purchaser:  To be discussed pending finalization of Real Estate Terms and Conditions.



**40**

**Error! Unknown document property name.**

**35l**

(b)    (i) all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof) or any arrangements entered into pursuant to Section 5.13 or 5.14 (or breach thereof) after the Closing Date, (ii) any Cure Costs payable pursuant to Section 2.1.7, (iii) any obligation under any Assigned Contract to buy back from the relevant resellers the CVAS Products sold by the Business to such resellers under such Assigned Contract, and (iv) any obligations under any warranty ~~and indemnity~~ Liabilities relating to CVAS Products and CVAS Services which have been supplied under any Assigned Contract;

(c)    (i) all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to Third Parties, solely to the extent that the terms of such licensing assurances, declarations, agreements, or undertakings require assignees of the Transferred Intellectual Property to assume such Liability, and (ii) Liabilities resulting from the assurances, declarations and undertakings made to standard-setting bodies as listed in Section 2.1.3(c) of the Sellers Disclosure Schedule (including, with respect to such Liabilities, the name of each relevant standard-setting body and, to the extent available, any Patents included in the Transferred Intellectual Property that are subject to such Liability), it being understood that Sellers or their Affiliates may have made other licensing assurances, declarations or undertakings to various standard-setting bodies concerning the Transferred Intellectual Property, the Liabilities for such other assurances, declarations or undertakings are not assumed hereunder but are being referenced merely to provide notice thereof;[3240]

(d)    all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI;

(e)    all obligations under any warranty liabilities relating to CVAS Products and CVAS Services which have been supplied under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under any Subcontract Agreement;

(f)    except to the extent otherwise expressly set forth in ARTICLE VII, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated Purchasers' (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees arising on or after the Closing Date; (ii) except where such Liability is attributable ~~primarily~~ to an act or omission of the Sellers, the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') offer of employment or notice of continued employment (including any Liability, other than a Liability attributable ~~primarily~~ to an act or omission by the Sellers, arising as a result of any breach of applicable employment Law by the Purchaser or relevant Designated Purchaser in connection with any pre-employment screening process), as applicable, to any Employee pursuant to the terms of Section 7.1 ~~or 7.2~~; (iii) the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') decision to make or not make offers of employment to Employees, to the extent such offer violates applicable Law with

---

[3240] Note to Seller: Parties to discuss. Purchaser requires information regarding the location and value of assets to be transferred in connection with the transaction to complete its tax due diligence.

**41**

**352**

respect to discrimination among employees or potential employees and except where such Liability is attributable primarily to an act or omission of the Sellers, (iv) the employment, prospective employment or termination of employment of any Employee whose employment transfers by operation of Law arising after the Closing Date; and (v) the failure of the Purchaser or any Designated Purchasers or their Affiliates to satisfy their obligations with respect to the Employees, including the Transferred Employees, as set out in ARTICLE VII;

(g)    all Liabilities that relate to or arise from or in connection with any Purchaser Employee Plan;

(h)    [all Liabilities that relate to or arise from or in connection with any Transferred Employee Plan;][41]

(i)    any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event that occurs on or after such Transferred Employees' Effective Hire Date;

(j)    [all Liabilities related to the Transferred Employees set forth on Section 2.1.3(j) of the Sellers Disclosure Schedule (the "**Specified Employee Liabilities**");][42][43]

(k)    all Liabilities related to Transferred Employees expressly assumed by Purchaser or a Designated Purchaser as set out in ARTICLE VII;

(l)    [Liabilities related to the obligation to repurchase Business-related Inventory under contract manufacturing agreements, as specified in the Contract Manufacturing Inventory Agreements;][44]

(m)    all Liabilities relating to executory supply purchase orders for products or services (other than raw materials, manufactured or purchased parts, work in process,

---

[41] Note to Purchaser: Inclusion is subject to confirmation that there are no Transferred Employee Plans.

[42] Note to Seller:  Discussion of Specified Employee Liabilities is subject to further revision following review by local counsel. **May be necessary to be expand this definition to include other Employee Liabilities that neither Party can prevent from transferring.**

[35] Note to Purchaser:  This schedule will include the liabilities to be assumed by the Purchaser in respect of long service leave and sick leave for Transferred Employees in Australia, gratuity payments in respect of Transferred Employees in India and sick leave for Transferred Employees in Hong Kong.

[43] **Note to Purchaser:  This schedule will include the liabilities to be assumed by the Purchaser in respect of long service leave and sick leave for Transferred Employees in Australia, gratuity payments in respect of Transferred Employees in India and sick leave for Transferred Employees in Hong Kong. Note to Seller: Purchaser requests that Seller provide information regarding the nature and extent of these liabilities, including estimates thereof.**

[44] Note to Seller:  Obligations to be discussed in connection with the negotiation of the Contract Manufacturing Agreements.

**42**

**Error! Unknown document property name.**

**353**

packaging, stores, tooling, finished goods or supplies, in each case to be delivered to contract manufacturers), entered into by the Sellers in connection with the Business in the Ordinary Course before the Closing with any Person (other than a contract manufacturer) who is a supplier of the Business as of the date hereof (or a replacement supplier for any such supplier) and under which products and/or services have not been delivered or supplied as of the Closing Date; [45]

(n)    [all Liabilities reflected in the computation of Adjusted Net Working Capital (including the Contractual Liabilities Amount, the Royalty Liability Amount and the Warranty Provision Amount);][46] and

(o)    all Liabilities related to a Seller Bid;

(p)    all other Liabilities listed in Section 2.1.3(p) of the Sellers Disclosure Schedule.

2.1.4.  Excluded Liabilities.  For the avoidance of doubt, none of the Purchaser or the Designated Purchasers, as applicable, shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates other than the Assumed Liabilities (collectively the "**Excluded Liabilities**").  Without limiting the generality of the foregoing, Excluded Liabilities include:

(a)    all Indebtedness of the Sellers and their Affiliates;

(b)    all Liabilities arising out of the Contracts that are not Assigned Contracts;

(c)    other than as specifically set forth herein, all Liabilities arising out of or relating to the Excluded Assets or the operation by the Sellers of any business other than the Business, whether before, on or after the Closing Date;

(d)    other than as specifically set forth herein, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of the Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business) including any liability with respect to Cure Costs payable by the Sellers pursuant to Section 2.1.7(b);

(e)    other than as specifically set forth herein, litigation and related claims and Liabilities or any other claims against any Seller of any kind or nature whatsoever involving or relating to facts, events or circumstances arising or occurring prior to the Closing, no matter when raised (including Liability for breach, misfeasance or under any other theory relating to any Seller's conduct, performance or non-performance);

---

[45] Note to Seller: Purchaser's acceptance of this liability as drafted makes Purchaser's construction of Section 5.9 particularly important to Purchaser.
[46] Note to Seller: TBD whether this is necessary in connection with other delineated items.

Error! Unknown document property name.

**354**

(f)    all guarantees of Third Party obligations by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit;

(g)    all accounts payable and trade payables of the Sellers, including intercompany payables (other than with respect to Assigned Contracts);

(h)    all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(i)    all Excluded Employee Liabilities;

(j)    all Liabilities for, or related to any obligation for, any Tax that the Sellers are required to bear under ARTICLE VI; **for the avoidance of doubt, the Parties intend that no Purchaser or Designated Purchase shall have any transferee or successor liability for any Tax that the Sellers bear under ARTICLE VI.**

(k)    all obligations to provide continuation ~~health~~ coverage pursuant to COBRA or any similar Law to any Person who has been employed in the Business and who does not become a Transferred Employee**, it being understood that the Sellers will provide such continuation coverage**;

(l)    [except with respect to the Assumed Liabilities, all Liabilities or other obligations arising from Seller Employee Plans other than Transferred Employee Plans; ][37][47]

(m)    any Liability of the Sellers or any ~~of their Affiliates~~**ERISA Affiliate** under Title IV of ERISA;

(n)    any pension or retirement Liability of the Sellers or any ~~of their Affiliates~~**ERISA Affiliate**, which, for purposes of clarification, shall not include the Specified Employee Liabilities assumed by Purchaser pursuant to Section 2.1.3(j);

(o)    all Liabilities of Sellers arising under this Agreement and the Ancillary Agreements; and

(p)    [those Liabilities set forth on Section 2.1.4(p) of the Sellers Disclosure Schedule.]

2.1.5.    Assumption and/or Assignment or Rejection of 365 Contracts.

(a)    Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth a list (the "**365 Customer Contract List**") of substantially all Customer Contracts of a U.S. Debtor that are Executory Contracts and were entered into before the Petition Date (Contracts that may be included on the 365 Customer Contract List, the "**365 Customer Contracts**"), which the

---

[37][47] Note to Purchaser: Inclusion is subject to confirmation that there are no Transferred Employee Plans.

[New York #2071434 v4]

**Error! Unknown document property name.**

**355**

relevant U.S. Debtor will, **subject to Section 2.1.5(b) and** to the extent permitted by applicable Law, assume and assign to the Purchaser or a Designated Purchaser at Closing pursuant to section 365 of the U.S. Bankruptcy Code.

**(b)    The Purchaser shall have until the Contract Designation Date (but not thereafter) to designate, by written notice to NNI, any 365 Customer Contracts listed on the 365 Customer Contract List (as supplemented and/or updated in accordance with Section 2.1.5(c)), except for those 365 Customer Contracts listed on Exhibit [    ],[48] that do not meet the Inclusion Criteria that the Purchaser wishes to reject, which such 365 Customer Contracts shall be referred to as "Excluded 365 Customer Contracts" and shall not be Assigned Contracts hereunder.**

**(c)**    ~~(b)~~ Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement the 365 Customer Contract List from time to time by written notices to the Purchaser; provided, that ~~within~~**after** [●____] ~~Business Days of the Closing,~~ **2010,** no update and/or supplement shall be permitted without Purchaser's prior written consent, and provided further that Sellers shall use **commercially** reasonable ~~best~~ efforts to update the 365 Customer Contract List as soon as commercially practicable.  **The Sellers shall make available to the Purchaser and the Purchaser's employees and representatives, complete unredacted copies of any Contract added to the 365 Customer Contract List on the date that is the later of (i) the date that is two (2) Business Days after the date on which the Sellers add the Contract to the 365 Customer Contract List or (ii) the date on which complete unredacted copies of such Contract must be provided pursuant Section 5.6 hereof .**

**(d)**    ~~(c)~~ The Contracts listed in the 365 Customer Contract List (as updated and/or supplemented) **pursuant to Section 2.1.5(c)), that are not Excluded 365 Customer Contracts,** are collectively referred to as the **"Assumed and Assigned Contracts."**

**(e)**    ~~(d)~~ The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to permit the assumption and assignment of the Assumed and Assigned Contracts as part of the U.S. Sale Order in accordance with Section 5.1.

2.1.6.    Assignment of Non-365 Contracts.

(a)    Section 2.1.6(a) of the Sellers Disclosure Schedule sets forth a list (the **"Non-365 Customer Contract List"**) of all Customer Contracts other than 365 Customer Contracts (Contracts that may be included on the Non-365 Customer Contract List, the **"Non-365 Customer Contracts"**), which the relevant Seller will**, subject to Section 2.1.6(b),** assign to the Purchaser or a Designated Purchaser at Closing.

**(b)    The Purchaser shall have until the Contract Designation Date (but not thereafter) to designate, by written notice to NNI, any Non-365 Customer Contracts listed on the Non-365 Customer Contract List (as supplemented and/or updated in accordance with Section 2.1.6(c)), except for those Non-365 Customer Contracts listed on Exhibit**

---

[48] **Exhibit will include major CVAS Contracts Purchaser will assume regardless of Inclusion Criteria.**

**45**

**356**

**[   ], that do not meet the Inclusion Criteria that the Purchaser wishes to reject, which such Non-365 Customer Contracts shall be referred to as "Excluded Non-365 Customer Contracts" and shall not be Assigned Contracts hereunder.**

(c)    ~~(b)~~ Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement the Non-365 Customer Contract List from time to time by written notice**s** to the Purchaser; provided**,** that ~~within~~**after** [•____]~~Business Days of the Closing,~~ **2010,** no update and/or supplement shall be permitted without Purchaser's prior written consent**,** and provided further that Sellers shall use **commercially** reasonable ~~best~~ efforts to update the Non-365 Customer Contract List as soon as commercially practicable.[38]  **The Sellers shall make available to the Purchaser and the Purchaser's employees and representatives, complete unredacted copies of any Contract added to the Non-365 Customer Contract List on the date that is the later of (i) the date that is two (2) Business Days after the date on which the Sellers add the Contract to the Non-365 Customer Contract List or (ii) the date on which complete unredacted copies of such Contract must be provided pursuant Section 5.6 hereof.**

(d)    ~~(c)~~ The Contracts listed in the Non-365 Customer Contract List (as updated and/or supplemented**) pursuant to Section 2.1.6(c)), that are not Excluded Non-365 Customer Contracts,** are collectively referred to as the "**Designated Non-365 Contracts**~~".~~**."**

(e)    ~~(d)~~ Subject to Section 2.1.7(d), Section 2.1.10 and Section 5.13 and the receipt of any required Consent, all the Designated Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at the Closing pursuant to Section 2.1.1(d).

2.1.7.  Cure Costs; Adequate Assurance; Efforts.

(a)    To the extent that the assumption and assignment of any 365 Customer Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order.

(b)    To the extent that assignment to the Purchaser or a Designated Purchaser of any Non-365 Customer Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction.

(c)    The Sellers shall not be responsible for any other Cure Costs in connection with any other Seller Contract other than as set forth immediately above.

---

[38] ~~Note to Purchaser:  Because the Purchaser will assume all Customer Contracts, this date must be sufficiently close to the Closing so as to allow all such contracts to be added to the list and transferred to Purchaser at Closing.~~

**357**

      (d)    Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall provide adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

      (e)    The Parties shall, and shall cause the Other Sellers and the Designated Purchasers, as applicable, to, use **commercially** reasonable ~~best~~ efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts in force as of the Closing Date; provided, however, that the Sellers shall be under no obligation to seek any such Consent prior to the completion of the Auction (as defined in the Bidding Procedures) or to compromise any right, asset or benefit or to expend any amount or incur any Liability or provide any other consideration in seeking such Consents; provided, further, that the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

     2.1.8.  Local Sale Agreements.  Subject to the terms and conditions hereof, to the extent necessary to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in the countries where such Local Sale Agreements are required, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them.  In the event of a conflict between this Agreement and the Local Sale Agreements, this Agreement shall prevail.

     2.1.9.  EMEA Asset Sale Agreement.  Except as expressly set forth in [Section 2.2, Section 5.23, Section 9.2, Section 9.3, and Section 10.13] none of the EMEA Sellers or the Joint Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into the EMEA Asset Sale Agreement) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Sellers or the Joint Administrators in any manner whatsoever.  The only assets, rights, properties and Liabilities of the EMEA Sellers or Joint Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement.  Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers and, with respect to [Section 2.2, Section 5.23, Section 9.2, Section 9.3, and Section 10.13 only, the EMEA Sellers].

**358**

2.1.10. <u>Non-Assignable Assets</u>. Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without such Consent (in each case, after taking into account the effect of the U.S. Sale Order, the Canadian Approval and Vesting Order, and any other order of a court of competent jurisdiction), would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset. For greater certainty, except as explicitly set forth in ARTICLE VIII, failure to obtain any such Consent shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.[39][49] [40][50]

Section 2.2.    <u>Purchase Price</u>.[41][51]

2.2.1. <u>Purchase Price</u>. Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the purchase, sale, assignment and conveyance of the Sellers' and EMEA Sellers' right, title and interest in, to and under the Assets and the EMEA Assets, respectively, pursuant to the terms hereof, and pursuant to the terms of the EMEA Asset Sale Agreement, respectively, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and the EMEA Assumed Liabilities and (y) subject to adjustment following the Closing in accordance with Section 2.2.3.2, pay to the Distribution Agent, as agent for the Sellers and the EMEA Sellers, an amount of cash (the "**Purchase Price**") equal to [●] dollars ($ [●]) (the "**Base Purchase Price**"), as adjusted pursuant to this Agreement and as further adjusted pursuant to Section [●] of the EMEA Asset Sale Agreement.

2.2.2. <u>Estimated Purchase Price</u>.

(a)    For the purpose of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser (on its own behalf and as agent for the Designated Purchasers) to the Distribution Agent as agent for the Sellers and the EMEA Sellers at the Closing pursuant to Section 2.4.2(b), at least three (3) Business Days prior to the Closing Date, the Main Sellers and the EMEA Sellers shall deliver to the Purchaser a statement prepared in good faith in accordance with the Nortel Accounting Principles and the terms hereof setting forth (i) the estimated Inventory Value as of the Closing (the "**Estimated Closing Inventory Value**"), (ii) the estimate of the Warranty Provision Amount as of the Closing (the "**Estimated**

---

[39][49] Note to Seller: Consents to be discussed in connection with the provision of schedules. Purchaser needs assurance that all material assets can be transferred.

[40][50] Note to Purchaser: In light of the language in Section 5.13 we do not believe this addition is necessary.

[41][51] Note to Seller: Purchase price and adjustments thereto to be discussed by the parties.

NY\1582469.7

Error! Unknown document property name.

[New York #2071434 v4]

**359**

**Closing Warranty Provision Amount"**), (iii) the estimated amount of the CIP Receivables Amount as of the Closing (the "**Estimated CIP Receivables Amount"**), (iv) the estimated Prepaid Expenses Amount as of the Closing (the "**Estimated Prepaid Expenses Amount"**), (v) the estimated Contractual Liabilities Amount as of the Closing (the "**Estimated Contractual Liabilities Amount"**), (vi) an estimate of the Royalty Liability Amount as of the Closing (the "**Estimated Royalty Liability Amount"**), (vii) an estimate of the **Accrued Vacation Amount as of the Closing (the "Estimated Closing Accrued Vacation Amount"), (viii) an estimate of the amount of the Specified Employee Liabilities as of the Closing (the "Estimated Specified Employee Liabilities Amount"), (ix) an estimate of the** Adjusted Net Working Capital at Closing (the "**Estimated Adjusted Net Working Capital"**), (viii**x) an estimate of the Deferred Revenue Amount as of the Closing (the "Estimated Deferred Revenue Amount"), (xi)** an estimate of the aggregate of all EMEA Downward Adjustments (the "**Estimated Aggregate EMEA Downward Adjustment"**), (ix) an **xii) an** estimate of of the aggregate of all EMEA Upward Adjustments (the "**Estimated Aggregate EMEA Upward Adjustment"**), (x**"), (xiii)** an estimate of the aggregate of all Downward Adjustments (the "**Estimated Aggregate Downward Adjustment"**), and (xi**xiv)** the Estimated Purchase Price.

(b)   As used in this Agreement, "**Estimated Purchase Price**" means an amount equal to:[52]

(i)   the Base Purchase Price; plus

(ii)   the difference, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital minus Target Working Capital; plus

(iii)   the Estimated Aggregate EMEA Upward Adjustment (if any); minus

(iv)   the Estimated Aggregate EMEA Downward Adjustment (if any); minus

(v)   the Estimated Aggregate Downward Adjustment (if any).; [42]**minus**

**(vi)   the Estimated Deferred Revenue Amount.**

(c)   As used in this Agreement and shown in the attached Adjusted Net Working Capital Statement in Exhibit E,[53] the "**Adjusted Net Working Capital**" means an amount equal to:

[52] Note to Seller: Removal of adjustment for unexpected employee transfers subject to completion of diligence that the covenant will protect against this risk. Also subject to further diligence/discussions confirming that there is a downward adjustment for any transferred employee liabilities.

[42] Note to Purchaser: We intend to address the articulated concern regarding advance billing on maintenance contracts in a conduct of business covenant rather than a purchase price adjustment.

[53] Note to Seller: In order to confirm agreement, Purchaser would appreciate a copy of Exhibit E (based upon the latest formulation) as soon as possible.

49

**360**

> (i)    the Closing Inventory Value; <u>plus</u>
>
> (ii)    the CIP Receivables Amount; <u>plus</u>
>
> (iii)    the Prepaid Expenses Amount; <u>minus</u>
>
> (iv)    the Contractual Liabilities Amount; <u>minus</u>
>
> (v)    the Royalty Liability Amount; <u>minus</u>
>
> (vi)    the Warranty Provision Amount.~~[43]~~<u>; minus</u>
>
> **(vii)    the Accrued Vacation Amount; minus**
>
> **(viii)    the Specified Employee Liabilities Amount.**

2.2.3.    Purchase Price Adjustment.

> 2.2.3.1. Closing Statement; Dispute Resolution.

(a)    As promptly as practicable (and in any event within ~~thirty~~[<u>ninety</u> (~~30~~<u>90</u>)]<u>[54]</u> Business Days after the Closing), the Purchaser shall deliver to the Main Sellers and the EMEA Sellers a written statement (the "**Closing Statement**") that shall contain the Purchaser's final calculation of (i) the Inventory Value as of the Closing (the "**Closing Inventory Value**"), (ii) the Warranty Provision as of the Closing (the "**Closing Warranty Provision Amount**"), (iii) the CIP Receivables Amount as of the Closing (the "**Closing CIP Receivables Amount**"), (iv) the Prepaid Expenses Amount as of the Closing (the "**Closing Prepaid Expenses Amount**"), (v) the Contractual Liabilities Amount as of the Closing (the "**Closing Contractual Liabilities Amount**"), (vi) the Royalty Liability Amount as of the Closing (the "**Closing Royalty Liability Amount**"), (vii) the ~~Adjusted Net Working Capital~~<u>Accrued Vacation Amount</u> as of the Closing (the "**Closing ~~Adjusted Net Working Capital~~**"), <u>(viii</u>~~Accrued Vacation Amount</u>"), (viii) the amount of the Specified Employee Liabilities as of the Closing (the "Closing Specified Employee Liabilities Amount"), (ix) the Adjusted Net Working Capital as of the Closing (the "Closing Adjusted Net Working Capital"), (x)</u> the aggregate of all EMEA Downward Adjustments (the "**Closing Aggregate EMEA Downward Adjustment**"), (~~ix~~<u>xi</u>) the aggregate of all EMEA Upward Adjustments (the "**Closing Aggregate EMEA Upward Adjustment**"), (~~x~~<u>xii</u>) the aggregate of all Downward Adjustments (the "**Closing Aggregate Downward Adjustment**"); ~~and (xi~~ <u>(xiii)</u> <u>the Deferred Revenue Amount as of the Closing (the "Closing Deferred Revenue Amount") and (xiv)</u> the aggregate of all EMEA Downward Adjustments (the final Purchase Price based on the foregoing which shall be equal to the Base Purchase Price; <u>plus</u> (a) the difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital <u>minus</u> the Target Working Capital; <u>plus</u> (b) the Closing Aggregate EMEA Upward Adjustment (if any); <u>minus</u> (c) the Closing Aggregate EMEA Downward Adjustment (if any); <u>minus</u> (d) the Closing Aggregate Downward

---

[43] ~~Note to Purchaser: The Accrued Vacation Amount payment concept has been added into Article VII.~~
<u>[54] Note to Seller: To be discussed in connection with availability of information.</u>

NY\1582469.7

**Error! Unknown document**
[New York #2071434 v4]                                      **property name.**

361

Adjustment (if any)**; minus (e) the Closing Deferred Revenue Amount** (the Purchase Price, so adjusted as provided in this Section 2.2.3.1, the "**Final Purchase Price**"). The Closing Statement shall be prepared in accordance with the Nortel Accounting Principles and the terms hereof.

(b)     If the Main Sellers and the EMEA Sellers disagree with the determination of the Closing Statement, the Main Sellers and the EMEA Sellers shall notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the "**Disagreement Notice**"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Main Sellers and the EMEA Sellers fail to deliver the Disagreement Notice by the end of such thirty- (30-) day period, the Main Sellers and the EMEA Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers or the EMEA Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and the EMEA Sellers and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3.1(b) are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers, the EMEA Sellers and their respective accountants access to the books, records and personnel of the Business and all documents, schedules and workpapers used by the Purchaser in the preparation of the Closing Statement or that are otherwise reasonably necessary for the Main Sellers, the EMEA Sellers and their respective accountants to review the Closing Statement (other than any such documents, schedules and workpapers that are subject to attorney-client privilege; it being understood, however, that Purchaser and the Designated Purchasers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Main Sellers and the EMEA Sellers or their respective representatives to occur without so jeopardizing privilege). The Main Sellers, the EMEA Sellers and the Purchaser shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Main Sellers, the EMEA Sellers and the Purchaser shall be final and binding upon the Parties.

(c)     If the Main Sellers, the EMEA Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within [●] ([●]) days after delivery of a Disagreement Notice by the Main Sellers and EMEA Sellers, the Independent Auditor shall serve as arbitrator (the "**Accounting Arbitrator**") to resolve such disagreement. The Primary Parties and NNUK shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers, the EMEA Sellers and the Purchaser have not resolved their disagreement and to conduct such hearing as it considers necessary to resolve such disagreement. The Main Sellers, the EMEA Sellers and the Purchaser shall use their **commercially** reasonable ~~best~~ efforts to cause the Accounting Arbitrator to deliver to the Primary Parties and NNUK, as promptly as practicable (and in no event later than [●] ([●]) days after his or her appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Sellers, the EMEA Sellers, the Purchaser and any Designated Purchaser. In

**362**

the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by aggregate dollar amount) of the disputed items, then the Sellers and the EMEA Sellers shall share the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers and EMEA Sellers were correct as to a majority (by aggregate dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

>2.2.3.2. Purchase Price Adjustment.

(a)    If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, is less than the Estimated Purchase Price, (A) the Parties shall cause the Escrow Agent to pay to the Purchaser the lesser of (x) the excess of the Estimated Purchase Price over the Final Purchase Price, or (y) the Escrow Amount, and (B) the Sellers and the EMEA Sellers shall pay the amount of any such excess not paid by the Escrow Agent pursuant to the preceding clause (A); provided, that in the event that the excess of the Estimated Purchase Price over the Final Purchase Price is less than the Escrow Amount, the Parties agree to cause the Escrow Agent to pay to the Distribution Agent the balance of the Escrow Amount; and provided further that in no event shall the Sellers and the EMEA Sellers, in the aggregate, have any obligations to pay any amounts hereunder or under the EMEA Asset Sale Agreement in excess of the Base Purchase Price less the Escrow Amount.

(b)    If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, exceeds the Estimated Purchase Price, Purchaser shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, the amount by which the Final Purchase Price exceeds the Estimated Purchase Price and the Escrow Agent shall pay the full Escrow Amount to the Sellers.

(c)    Any payment to be made by a Party under this Section 2.2.3.2 shall be by wire transfer of immediately available U.S. dollar funds to an account designated by the Party receiving payment, within (3) three Business Days after the final determination of the Final Purchase Price, plus interest on such amount, accrued from the Closing Date to the date of such payment at a rate per annum of three percent (3%). Such interest shall accrue from day to day.

**2.2.4.  Purchase Price Allocation. [●]**

**2.2.5.**  2.2.4. Good Faith Deposit.

(a)    ~~On the date hereof~~**Within five (5) Business Days after the entry of the Sale Order (if the Purchaser is the Successful Bidder)**, the Purchaser ~~has~~**shall** delivered to the ~~Distribution Agent (as agent for the Sellers and the EMEA Sellers)~~**Escrow Agent** an amount in U.S. dollars equal to five percent (5%) of the Base Purchase Price in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the **"Good Faith Deposit"**)~~, to be held by the Distribution Agent on behalf of, the Sellers and the EMEA Sellers in an interest bearing account at [Distribution Agent] to serve as earnest money under this Agreement.~~

**Error! Unknown document property name.**

**363**

(b)    The Good Faith Deposit shall:

(i)    be applied to the Estimated Purchase Price to be paid by the Purchaser to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) at Closing pursuant to Section 2.4.2(b); or

(ii)    become property of the Sellers and the EMEA Sellers in the event that this Agreement is terminated by the Main Sellers pursuant to Section 9.1(c)(i) or Section 9.1(e~~b~~)(vii); or

(iii)    become property of the Sellers and the EMEA Sellers in the event that this Agreement is terminated by any Primary Party pursuant to Section 9.1(b)(v) in the event that the EMEA Asset Sale Agreement is terminated by the EMEA Sellers pursuant to Sections [●] of the EMEA Asset Sale Agreement; or

(iv)    be promptly returned by the Distribution Agent to the Purchaser if this Agreement is terminated for any other reason.

Section 2.3.    [Escrow.

(a)    At or prior to the Closing, each of the Main Sellers and the Purchaser shall enter into the Escrow Agreement with the Escrow Agent in the form of Exhibit G.

(b)    Each of the Main Sellers and the Purchaser hereby undertake to promptly execute and deliver to the Escrow Agent, in accordance with the terms set forth in the Escrow Agreement, instructions to pay to the Sellers or the Purchaser, as applicable, funds from the escrow account established pursuant to the Escrow Agreement any time that such Person becomes entitled to such payment from the escrow account pursuant to Section 2.2.3.2.]__[55]__

Section 2.4.    Closing.

2.4.1.    Closing Date.  The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall occur simultaneously with the closing of the transactions contemplated by the EMEA Asset Sale Agreement and shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 10:00 a.m. local time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions which by their nature are to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), **unless such date is sooner than [        ], 2010, in which case the Closing shall occur on [        ], 2010,**[56] or on such other place, date and time as shall be mutually

---

[55] **Note to Seller:  Parties to discuss necessity of additional escrows upon Purchaser's completion of tax due diligence.**
[56] **Note to Seller:  Subject to completion of diligence.  Purchaser needs to make sure it has ample time to review contracts once they are provided, create local entities and fulfill certain other pre-Closing duties.**

53

agreed upon in writing by the Purchaser, the Main Sellers and the EMEA Sellers (the day on  which the Closing takes place being the "**Closing Date**").

Legal title, equitable title and risk of loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

2.4.2.   Closing Actions and Deliveries.

At the Closing:

(a)    the Sellers and the Purchaser shall, and the Purchaser shall cause the Designated Purchasers to, enter into the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into and subject to Section 5.23 and [Section 5.27];

(b)    the Purchaser shall deliver:

(i)    to (i) the Distribution Agent, as agent for the Sellers and the EMEA Sellers an amount equal to the Estimated Purchase Price, less the aggregate of the Good Faith Deposit and the Escrow Amount, by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Distribution Agent as agent for the Sellers and the EMEA Sellers in a written notice to the Purchaser; and (ii) to the Escrow Agent, an amount equal to the Escrow Amount;

(ii)    [to the Main Sellers, the Pre-Closing Segregation Costs due under Section 5.27 (to the extent then due);]

(iii)    executed counterparts of the Transition Services Agreement, the Intellectual Property License Agreement and the Real Estate Agreements and any other Ancillary Agreements that have been executed at such time;[57]

(iv)    to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2.

(c)    NNI shall deliver or cause to be delivered:

(i)    an updated Section 4.11(b) of the Sellers Disclosure Schedule (if applicable), dated as of a date no earlier than three (3) days prior to the Closing;

(ii)    a duly executed certificate of an executive officer of NNI certifying the fulfillment of the conditions set forth in Section 8.3(a) and Section 8.3(b);

---

[57] Note to Seller: Loaned Employee Agreement TBD.

**365**

(iii)    executed counterparts of the Transition Services Agreement, the Intellectual Property License Agreement**, the Trademark License Agreement** and the Real Estate Agreements and any other Ancillary Agreements that have been executed at such time**;**

**(iv)    such bills and instruments of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, duly executed by the applicable Sellers, in form reasonable satisfactory to the Purchaser, as the Purchaser may reasonably request to vest in the Purchaser all the right, title and interest of the Sellers in, to or under any or all of the Assets**;

**(v)**    (iv) copies of the U.S. Sale Order and the Canadian Approval and Vesting Order;

**(vi)**    (v) true and complete copies of the Closing Unaudited Financial Statements; and

**(vii)**    (vi) in the case of a Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate dated as of the Closing Date and substantially in the form set forth in Treasury Regulations Section 1.1445-2(b)(2)(iv), sworn to under penalties of perjury, setting forth such Person's name, address and federal employer identification number and stating that such Person is not a "foreign person" within the meaning of Section 1445 of the Code.

(d)    each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

Section 2.5.    Designated Purchaser(s).  The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.5, one or more Wholly-Owned Subsidiaries**Affiliates** to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ certain Transferred Employees on and after the Closing Date (any such Subsidiary**Affiliate** of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a **"Designated Purchaser"**); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (y) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the Assumed and Assigned Contracts, and (z) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the Assets, assumed the Assumed Liabilities and/or employed the Transferred Employees, and which Liability is not fully reimbursed by or on behalf of the Purchaser.  No such designation shall relieve the Purchaser of any of its obligations hereunder.  Any breach hereof by a Designated Purchaser

**366**

shall be deemed a breach by Purchaser. The Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations assumed by any of them hereunder. The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the thirtieth (30th) day prior to the Closing Date, which written notice shall contain appropriate information about the Designated Purchaser(s) and shall indicate which Assets, Assumed Liabilities and Transferred Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.[58]

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.    Organization and Corporate Power.

(a)    The Purchaser is a [●] duly organized, validly existing and in good standing under the Laws of [●]. Each Designated Purchaser other than the Purchaser is a [●] duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized. The Purchaser has, and each Designated Purchasers will at Closing have, the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b)    The Purchaser is, and each Designated Purchasers is or will be at Closing, duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the other Transaction Documents to which it is or will become a party.

Section 3.2.    Authorization; Binding Effect; No Breach.

(a)    The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is, or at the Closing will be, a party have been or at Closing will be duly authorized by the Purchaser and the relevant Designated

---

[58] Note to Seller: Purchaser desires to maintain structuring flexibility. If there is a particular concern why Seller changed "Affiliate" to "Wholly-Owned Subsidiary" then let's discuss a different way to address.

**367**

Purchasers, as applicable. This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto. Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is, or at the Closing will be, a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms.

(b)    The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, or require any Consent (other than the Regulatory Approvals and ●) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any Contract or other document to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not individually or in the aggregate materially hinder, delay or impair the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

Section 3.3.    Financing.

(a)    The Purchaser has delivered to the Main Sellers and the Joint Administrators correct and complete copies of: (i) executed equity commitment letters of even date herewith and addressed to Purchaser and NNC (with consent rights in respect of any amendment thereto, exercisable by NNC in its sole discretion) (such equity commitment letters, the "**Equity Commitment Letters" or "Financing Commitments**"), pursuant to which [●] (the "**Sponsors**") have committed, subject solely to the terms and conditions thereof, to invest an aggregate amount of $[●] in equity financing in Purchaser for purposes of funding the transactions contemplated herein and under the EMEA Asset Sale Agreement and paying any other amount due hereunder or in respect hereof including in respect of any breach hereof or thereof by Purchaser (the "**Equity Financing**"), (ii) executed debt commitment letters dated [●], 2009 and [●], 2009 and related term sheets (such debt commitment letters, the "**Debt Commitment Letters**" and, together with the Equity Commitment Letters, the "**Financing Commitments**"), pursuant to which certain lenders have committed, subject solely to the terms and conditions thereof, to provide Purchaser with an aggregate amount of $[●] in debt financing (the "**Debt Financing**" and, together with the Equity Financing, the "**Financing**") for purposes of funding the transactions contemplated herein and under the EMEA Asset Sale Agreement and paying any other amount due hereunder or thereunder or in respect hereof including in respect of any breach hereof or thereof by Purchaser and (iii) the executed limited

NY\1582469.7

57

Error! Unknown document property name.

[New York #2071434 v4]

**368**

~~guarantee of the Sponsors in favor of the Sellers including in respect of any breach hereof or of the EMEA Asset Sale Agreement by Purchaser.~~**Financing").** [59]

(b)    As of the date hereof, the Financing Commitments in the form so delivered are valid and in full force and effect.  The Financing Commitments have not been and prior to Closing, shall not be, withdrawn, terminated, assigned or otherwise amended or modified in ~~any respect~~**a manner that could reasonably be expected to adversely impact or delay in any material respect the ability of the Purchaser to consummate the Financing contemplated by the Commitment Letters** without the prior express written consent of the Main Sellers unless substitute financing on substantially the same terms and which is reasonably acceptable to the Main Sellers, which, if made available on the date hereof as the Financing Commitments, would permit the representations in this Section 3.3 to be true and correct, is contemporaneously committed to the Purchaser (the **"Replacement Financing"**).  No event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of the Purchaser or the Sponsors or, to the Knowledge of the Purchaser, of the lenders under any term or condition in the Financing Commitments.  ~~The Financing Commitments, together with a separate fee letter (which does not have any substantive provisions other than with respect to payment by the Purchaser of any fees), constitute, as of the date hereof, the entire and complete agreements among the parties thereto with respect to the financing contemplated thereby, and, except as set forth, described or provided for therein~~**With respect to the Financing Commitments**, (i) there are no conditions precedent to the respective obligations of the Sponsors and lenders to provide the Financing, and (ii) there are no contractual contingencies or other provisions under any agreement (including any side letters) or any understanding or commitment relating to the transactions contemplated by this Agreement to which the Purchaser, the Sponsors or any of their respective Affiliates is a party that would permit any of the Sponsors or lenders to reduce the total amount of the Financing or impose any additional condition precedent to the availability of the Financing or limit the ability of the Purchaser to seek and obtain specific performance of the Sponsors' and lenders' respective obligations thereunder.  Assuming the Sellers' timely compliance with the terms of the Transaction Documents, as of the date hereof, the Purchaser has no reason to believe that any of the conditions to the Financing will not be satisfied on a timely basis.  ~~The Purchaser has fully paid any and all commitment fees, if any, or other fees required by the Financing Commitments to be paid as of the date hereof.~~  Subject to its terms and conditions, the aggregate proceeds of the Financing, when funded in accordance with the Financing Commitments, will, together with unrestricted cash that the Purchaser has available on the date hereof and will continue to have available at all times until the Closing (and will make available at Closing), provide financing sufficient to pay the Base Purchase Price, all other amounts to be paid or repaid by the Purchaser under this Agreement and the EMEA Asset Sale Agreement ~~(whether payable on or after the Closing or in the event of termination of this Agreement), and all of the Purchaser's and its Affiliates' fees and expenses associated with the transactions contemplated in this Agreement and the EMEA Asset Sale Agreement~~**the Closing**.  The Purchaser acknowledges and agrees that receipt of the aggregate (or any)

---

[59] **Note to Seller:  The Financing Commitment will fund 100% of its commitment in connection with the closing of the transaction and 50% of any amount to pay breaches.**

**369**

proceeds of the Financing by the Purchaser is not a condition precedent to the Purchaser's obligation to consummate the transactions contemplated hereby.

Section 3.4.    Purchaser Financial Statements.

(a)    Section 3.4(a) of the Purchaser Disclosure Schedule sets forth true and complete copies of the audited consolidated balance sheets of the Purchaser and its consolidated Subsidiaries as of December 31, 2008 and December 31, 2007 and the related consolidated audited statements of income, cash flows and statements of changes of stockholders' equity for the years then ended, accompanied by the reports thereon of the Purchasers' independent auditors (collectively referred to as the "**Purchaser Audited Financial Statements**").  The Purchaser Audited Financial Statements have been prepared based upon the financial books and records maintained by the Purchaser in accordance with GAAP, and fairly present in all material respects the consolidated financial position, results of operations, cash flows and stockholders' equity of the Purchaser and its consolidated Subsidiaries as of their respective dates and for the respective periods indicated.

(b) Section 3.4(b) of the Purchaser Disclosure Schedule sets forth the unaudited consolidated balance sheets of Purchaser and its consolidated Subsidiaries as of **November 30, 2009,** September 30, 2009 and September 30, 2008 and the related consolidated unaudited statements of income, cash flows and statements of changes of stockholders' equity of Purchaser for the nine (9) month periods ended on **November 30, 2009,** September 30, 2009 and September 30, 2008 (the "**Purchaser Unaudited Financial Statements**", and together with the Purchaser Audited Financial Statements, the "**Purchaser Financial Statements**").  Except as set forth in the Purchaser Unaudited Financial Statements, such Purchaser Unaudited Financial Statements were prepared based on the financial books and records maintained by the Purchaser, have been prepared in accordance with GAAP and fairly present in all material respects the consolidated financial position, results of operation, cash flows and stockholders' equity of the Purchaser and its consolidated Subsidiaries as of their respective dates and for the respective periods indicated.

Section 3.5.    Adequate Assurance of Future Performance.  To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code.  The Purchaser acknowledges and agrees that, if it becomes necessary to provide an Assumed and Assigned Contract counterparty with additional assurances to satisfy the Purchaser's or a Designated Purchaser's obligations under Section 2.1.7, the Purchaser shall, and shall cause the relevant Designated Purchasers to, perform all actions and bear all such costs and expenses as may be necessary or advisable in connection with their obligations under Section 2.1.7 without recourse to any Seller.

Section 3.6.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties

Error! Unknown document property name.

[New York #2071434 v4]

(a)   The Purchaser is experienced and sophisticated with respect to **370** transactions of the type contemplated by the Transaction Documents. In consultation with experienced counsel and advisors of its choice, the Purchaser has conducted its own independent review and analysis of the Business, the Assets, the EMEA Assets, the Assumed Liabilities and the EMEA Assumed Liabilities and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents. [The Purchaser acknowledges that it and/or its representatives (including its outside counsel) have been permitted such access to the books and records, facilities, equipment, contracts and other properties and assets of the Business as it required to complete its review, and that it and its representatives have had an opportunity to meet with the officers and other employees of the Sellers, the EMEA Sellers and the Business to discuss the Business.]

(b)   The Purchaser acknowledges and agrees that:

(i)   except for the representations and warranties expressly set forth in ARTICLE IV herein, in the EMEA Asset Sale Agreement or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers, the EMEA Sellers or any Affiliate of any such Person or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or the EMEA Sellers or their respective Affiliates in determining whether to enter into this Agreement;

(ii)   except for the representations and warranties expressly set forth in ARTICLE IV herein, the EMEA Asset Sale Agreement or in any Ancillary Agreement, none of the Sellers, the EMEA Sellers, or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, the EMEA Sellers or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets or the EMEA Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets or the EMEA Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, the EMEA Assumed Liabilities, or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers, the EMEA Sellers or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)   no Seller, EMEA Seller or any other Person shall have or be subject to any liability to the Purchaser, any Designated Purchaser or any Affiliate or representative of the Purchaser or any Designated Purchaser resulting from the distribution to the Purchaser or any Designated Purchaser, or the Purchaser's or any Designated Purchaser's use, of the information referred to in Section 3.6(b)(ii);

(iv)   except for the representations and warranties expressly set forth in the Transaction Documents, subject to the terms of the Bankruptcy Consents, the

**371**

Purchaser or any Designated Purchaser takes the Assets on an "as is" and "where is" basis;

(v)    the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents; and

(vi)    notwithstanding anything to the contrary contained herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

(c)    Without limiting the generality of the foregoing, PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN OR IN THE OTHER TRANSACTION DOCUMENTS, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT (I) OF ANY ASSETS, INCLUDING WITH RESPECT TO THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR (II) REGARDING THE SCOPE, VALIDITY OR ENFORCEABILITY OF ANY TRANSFERRED INTELLECTUAL PROPERTY OR LICENSED INTELLECTUAL PROPERTY RIGHTS.

Section 3.7.    Brokers.  Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Except (a) as set forth in the Sellers Disclosure Schedule, (b) as set forth in the registration statements, prospectuses, reports, schedules, forms and other filings (excluding any exhibits thereto but including any documents incorporated by reference and any amendments thereto) filed by the Sellers with the U.S. Securities and Exchange Commission or the Canadian securities regulatory authorities (collectively, the "Securities Disclosure Documents") (but excluding any forward-looking disclosures in Securities Disclosure Documents as to risk factors, forward-looking statements and other similarly cautionary or generic disclosure contained or incorporated by reference therein) and/or in any filings made in the Bankruptcy Proceedings, in each case publicly filed between January 1, 2007 and the date hereof, (c) as expressly contemplated by this Agreement or (d) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in Sections 4.1 through 4.14 below:

Section 4.1.    Organization and Corporate Power.

61

NY\1582469.7

61    **Error! Unknown document**
[New York #2071434 v4]    **property name.**

**372**

(a)    Each Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Bidding Procedures Order and the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Sales Process Order and Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the **"Bankruptcy Consents"**), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business in the Ordinary Course.

(b)    Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business in the Ordinary Course, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2.    Authorization; Binding Effect; No Breach.

(a)    Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by each Main Seller of the Transaction Documents to which such Main Seller is, or at the Closing will be, a party has been or at Closing will be duly authorized by such Main Seller and (ii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Other Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement.  Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is or will be a party, will constitute, a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)    Subject to receipt of the Bankruptcy Consents and the Regulatory Approvals, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and any other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any Material Contract to which the relevant Seller is a party or to which any of its or their assets are subject, (iii) any order of any Government Entity applicable to any Seller or by

NY\1582469.7

Error! Unknown document

[New York #2071434-v4]                                        property name.

**373**

which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii) or (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect **(disregarding for these purposes clause (e) of the definition of Material Adverse Effect)**.

Section 4.3.    Title to Tangible Assets; Sufficiency of Assets.

(a)    Except for Permitted Encumbrances and Liens created by or through the Purchaser or the Designated Purchasers or any of their Affiliates, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and such Sellers have good and marketable title thereto.

(b)    All tangible assets included in the Owned Equipment are in satisfactory operating condition for the uses to which they are being put, subject to ordinary wear and tear and ordinary maintenance requirements, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    ~~As of the date hereof and assuming~~**Assuming** the assignment or novation of all Seller Contracts to the Purchaser or a Designated Purchaser and the receipt of all Seller Consents, the Assets and the rights of, or to be acquired by, the Purchaser and/or Designated Purchasers under this Agreement and the EMEA Asset Sale Agreement, together with the rights to be provided to the Purchaser and/or Designated Purchasers under the other Transaction Documents, considered together, include such assets, properties and rights of every type and description, whether real or personal ~~(other than Intellectual Property,~~**, tangible or intangible (other than Inbound License Agreements and Cross-License Agreements set forth in Section 4.3(c) of the Sellers Disclosure Schedule**, Overhead and Shared Services, non-exclusive supply Contracts of the Business, and the services of those Employees that will not be considered Transferred Employees for purposes of this Agreement and any services currently being provided to the Business as of the Closing Date that are offered to the Purchaser, but that the Purchaser elects not to receive under the Transition Services Agreement and other than the real estate assets of the Business) as are necessary and sufficient to conduct the Business substantially in the manner conducted by the Sellers as of the date hereof (as such conduct may reasonably be modified as a result of the headcount restructuring plan previously disclosed to the Purchaser set forth in Section 4.3(c) of the Sellers Disclosure Schedule), except where the absence of such assets or rights would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.4.    Material Contracts.

(a)    Section 4.4(a) of the Sellers Disclosure Schedule **(divided into appropriate subsections)** sets forth, as of the date hereof, a list of every Seller Contract, **Bundled Contract (with respect to those portions relating to the CVAS Products or CVAS Services) and other Contract (to the extent such Contract would be applicable if only the portions of such Contract relating to the signatory and the Business were to comprise the entire Contract),** but excluding (a) all licenses of Intellectual Property, all of

**Error! Unknown document property name.**

**374**

which are addressed in Section 4.5 below and (b) all [Leases], all of which are addressed by Section 4.9 below, other than purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:[60]

(i)    in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than $5,000,000 per annum in the aggregate or (B) the receipt by the Business of more than $5,000,000 per annum in the aggregate, except any Contracts referred to in any other subsection of this Section 4.4(a);

(ii)    is a non-competition, exclusivity, or other agreement that materially restricts the Business from directly or indirectly engaging in any business activity anywhere in the world (whether such agreement is exclusive by geography, product type or otherwise);

(iii)    is a material joint venture, partnership or alliance Contract, or other agreement that involves the sharing of profits, losses, costs or liabilities in respect of the Business, Assets or Assumed Liabilities;

(iv)    is a research and development Contract involving consideration or expenditures in excess of $2,500,000 in the most recent fiscal year or which is reasonably expected to involve consideration or expenditures of more than $2,500,000 per annum after the date hereof;

(v)    is a Contract involving the sale or distribution of the CVAS Products, valued at more than $2,500,000 in the most recent fiscal year or which is reasonably expected to be valued at more than $2,500,000 in the aggregate per annum after the date hereof;

(vi)    is a distribution Contract that contains any express inventory repurchase requirement (whether contingent or otherwise);

(vii)    relates to Indebtedness (including personal property leases) in excess of $[1,000,000];

(viii)    has "take or pay" or "requirements" provisions committing the Seller party thereto to purchase goods or services in excess of $[2,500,000] in 2009 or any calendar year thereafter;

(ix)    involves capital expenditures in excess of $[2,500,000] after the date hereof;

---

[60] Note to Seller: It is important for Purchaser's diligence and plans for implementing the Business that this disclosure extend beyond customer contracts, particularly because of Seller's process of not permitting Purchaser's internal people to have full access to contracts. If scheduling burden is a concern then the parties should discuss the appropriate thresholds.

**375**

(x)    involves a security deposit, letter of credit, performance bond or surety;

(xi)    contains any material obligation secured by a Lien on any material Asset (other than by a Permitted Encumbrance or by any encumbrance that will be released prior to or on the Closing Date); ~~or~~

(xii)    requires the posting of a letter of credit, performance bond or surety; **or**

**(xiii)    is an inbound and/or outbound license of Intellectual Property used or held for use in connection with the Business (other than (i) Cross-License Agreements and (ii) shrink wrap, click wrap, and other commercially available off-the-shelf software with license, maintenance, support and other fees of less than $20,000 annually)**.

(all the above, collectively, the "**Material Contracts**").

(b)    Complete copies (including all waivers and amendments) of all Material Contracts have been made available (i) to the Purchaser or (ii) to certain of the Purchaser's representatives (including external counsel) in the Clean Team Data Room.

Section 4.5.    Intellectual Property.

(a)    The Transferred Intellectual Property**, the EMEA Transferred Intellectual Property** and the Licensed Intellectual Property include all the Intellectual Property owned at least in part by the Sellers **and the EMEA Sellers** that~~, as of the date hereof,~~ covers or is used in the conduct and operation of the Business, except with respect to any Intellectual Property used in connection with any Overhead and Shared Services~~.~~ **(but only to the extent such Intellectual Property is not otherwise used in connection with the Business).**

(b)    An accurate, true and complete list of all the Transferred Intellectual Property registered or applied for in the name of the Sellers is set forth in Section 4.5(b) of the Sellers Disclosure Schedule (the Intellectual Property disclosed in Section 4.5(b) of the Sellers Disclosure Schedule is collectively referred to as the "**Business Registered IP**"). The foregoing list of Business Registered IP includes: (a) for each issued Patent and Patent application, the Patent number or application serial number for each jurisdiction in which filed, and date issued and filed; (b) for each Trademark registration or application, the application serial number or registration number and the date of such registration or application, by country and state; and (c) for any domain names, the registration date and name of registry. [44] **To the Knowledge of the Sellers, the EMEA Sellers do not own any issued patents,**

---

[44] ~~Note to Purchaser: There are no registrations or applications for registration for copyrights, industrial designs or mask works.~~

**376**

**pending patent applications or registered Trademarks, registered or applied for in their names that are included in the EMEA Transferred Intellectual Property.**

(c)    The Transferred Intellectual Property, the EMEA Transferred Intellectual Property, the Licensed Intellectual Property and the Intellectual Property rights granted to the Sellers under the Cross-License Agreements and the Inbound License Agreements together include all the material Intellectual Property that, as of the date hereof, is used by the Sellers **and the EMEA Sellers** in connection with the conduct and operation of the Business, in each case except with respect to any Intellectual Property used in connection with any Overhead and Shared Services **(but only to the extent such Intellectual Property is not otherwise used in connection with the Business)**.

(d)    To the Knowledge of the Sellers, the**neither the Transferred Intellectual Property nor the EMEA** Transferred Intellectual Property is ~~not~~ subject to any Liens other than Permitted Encumbrances and, to the Knowledge of the Sellers, except for Material Contracts referenced in Section 4.4(a)(ii), none of the Sellers **or EMEA Sellers** have entered into any contract or agreement containing a covenant not to compete with respect to the Transferred Intellectual Property or **the EMEA Transferred Intellectual Property or** otherwise limiting the Purchaser's ability to use any of the **Transferred Intellectual Property or the EMEA** Transferred Intellectual Property to conduct the Business, in each case, that would bind the Purchaser or an Affiliate of the Purchaser after the Closing. **To the Knowledge of the Sellers, none of the Transferred Intellectual Property or EMEA Transferred Intellectual Property is subject to any outstanding order, judgment or stipulation restricting the use, transfer or exploitation thereof by the Sellers or the EMEA Sellers in any material respect.**

**(e)    The Sellers have no Knowledge that any Third Party infringes upon, misappropriates, dilutes or otherwise violates the Transferred Intellectual Property or the EMEA Transferred Intellectual Property, and no Seller or EMEA Seller has brought or threatened to bring any claim alleging any of the foregoing during the past two (2) years (or earlier, if the claim is presently unresolved).**

**(f)** ~~(e)~~ With respect to the Transferred Intellectual Property, the Sellers ~~or~~**own all right, title, and interest in and to each such item of Intellectual Property and with respect to the EMEA Transferred Intellectual Property,** the EMEA Sellers own **all** right, title, and interest in and to each such item of Intellectual Property.  **To the Knowledge of the Sellers, such rights, title and interest are sufficient for the Sellers to independently bring suit against a Third Party to enforce the issued patents, registered trademarks and registered service marks included in the Transferred Intellectual Property.** With respect to the Licensed Intellectual Property (other than any Intellectual Property owned by a Third Party**, but including, for the avoidance of doubt, any Intellectual Property assigned or transferred by the Sellers or the EMEA Sellers to a Third Party in connection with divestitures of the Nortel Retained Businesses by any Seller since the filing of the Bankruptcy Proceedings)**, to the Knowledge of the Sellers, the Sellers ~~or~~ **,** the EMEA Sellers ~~own~~**or Third Party purchasers of the Nortel Retained Businesses own all** right, title, and

NY\1582469.7

**Error! Unknown document**

[New York #2071434 v4]

**property name.**

**371**

interest in and to each such item of Intellectual Property, ~~such rights, title, and interest being~~ ~~sufficient to permit the~~**and** Sellers ~~or~~**and** the EMEA Sellers **have sufficient rights** to license such Intellectual Property as set forth in the Intellectual Property License Agreement and the Trademark License Agreement.  The Parties acknowledge and agree that the foregoing sentence does not constitute, and shall not be construed as, a representation or warranty with respect to non-infringement or non-misappropriation of Intellectual Property.

**(g)**    ~~(f)~~ To the Knowledge of the Sellers, Section 4.5(f**g**) of the Sellers Disclosure Schedule sets forth all Cross-License Agreements, **indicating for each Cross-License Agreement, the title and the parties thereto,** except to the extent a Cross-License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to obtain, in which case it has been omitted from Section 4.5(f**g**) of the Sellers Disclosure Schedule **(an "Omitted Cross-License Agreement")**, but the number of such Cross-License Agreements that have been omitted is set forth in Section 4.5(f**g**) of the Sellers Disclosure Schedule, and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Cross-License Agreements, the disclosure of which does not breach such prohibition.  **No royalties or other amounts are due or payable by or on behalf of Nortel under any such Omitted Cross-License Agreements, nor will any such royalties or other amounts be due or payable by Purchaser under any Omitted Cross-License Agreement in connection with entering into this Agreement.**

**(h)**    ~~(g)~~ To the Knowledge of the Sellers, there has been no assertion or claim made in writing to the Sellers**, the EMEA Sellers or any of their respective Affiliates** during the past two (2) years preceding the date of this Agreement asserting invalidity, misuse or unenforceability of the Transferred Intellectual Property or **the EMEA Transferred Intellectual Property or** challenging the Sellers**', the EMEA Sellers', or any of their respective Affiliates'** right to use, right to transfer, or ownership of the Transferred Intellectual Property **or the EMEA Transferred Intellectual Property**; in each case, ~~except where~~ ~~such~~**excluding any** assertions or claims **that** would not reasonably be expected to ~~have;~~ ~~individually or in the aggregate, a Material Adverse Effect~~**result in any invalidity, unenforceability, loss or other material impairment of any rights or interest in the subject Intellectual Property**.

**(i)**    ~~(h)~~ None of the Sellers has**, and to the Knowledge of the Sellers, none of their Affiliates (nor any EMEA Seller or its Affiliates) has,** received any written assertions, during the past two (2) years preceding the date of this Agreement that (i) any Seller's**, EMEA Seller's or any of their respective Affiliates'** operation of the Business, including ~~such~~ ~~Seller's~~**the** use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the CVAS Products sold by the Business or of the CVAS Services rendered by the Business infringes, misappropriates, dilutes or otherwise violates any Intellectual Property right or moral right of any Third Party; or (ii) any of the Transferred Intellectual Property**, EMEA Transferred Intellectual Property** or Licensed Intellectual Property infringes, dilutes or otherwise violates any Intellectual Property right or moral right of, or was misappropriated from, a Third Party~~, or is invalid or~~

67

~~[New York #2071434 v4]~~    **Error! Unknown document** **property name.**

**378**

~~unenforceable; in each case, except where such assertions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.~~

(j) ~~(i)~~ To the Knowledge of the Sellers, Section 4.5(~~i~~j) of the Sellers Disclosure Schedule sets forth a list of all material Contracts (other than Cross-License Agreements) granting to the Sellers**, the EMEA Sellers** or any of their **respective** Affiliates any license under or to any Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated into the CVAS Products, used in the provision of CVAS Services, or otherwise utilized by the Business in its operations in the ordinary course (collectively, the "**Inbound License Agreements**"), indicating for each Inbound License Agreement, ~~the title and the parties thereto, except to the extent an Inbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to obtain, in which case it has been omitted from Section 4.5(i) of the Sellers Disclosure Schedule~~**the title and the parties thereto**.

**(k)    To the Knowledge of the Sellers, Section 4.5(k) of the Sellers Disclosure Schedule sets forth a complete and accurate list of all Contracts in effect (other than (i) Cross-License Agreements, (ii) non-exclusive object code licenses granted to end users or other purchasers of CVAS Products or non-exclusive licenses granted by the Sellers or their Affiliates (or the EMEA Sellers or their Affiliates) to customers, distributors or suppliers in connection with the manufacture or sale of CVAS Products or CVAS Services and (iii) any non-exclusive license granted to any purchaser of any subsidiary or assets of a business unit of the Sellers, the EMEA Sellers or their respective Affiliates the sale of which was consummated during the past two (2) years preceding the date of this Agreement) under which the Sellers, the EMEA Sellers or any of their respective Affiliates grant a license to a Third Party under Transferred Intellectual Property or the EMEA Transferred Intellectual Property (collectively, the "Outbound License Agreements"), indicating the title and the parties thereto.**

**(l)    To the Knowledge of the Sellers, there is no outstanding dispute or disagreement with respect to (i) any Inbound License Agreement, (ii) any Outbound License Agreement or (iii) any Cross-License Agreement, in each case, that materially affects any of the Intellectual Property rights granted to the Purchaser herein.  To the Knowledge of the Sellers, the Sellers have made available to Purchaser or its counsel true and complete copies of each Inbound License Agreement, Outbound License Agreement and Cross-License Agreement (excluding Omitted Cross-License Agreements).**

(m) ~~(i)~~ To the Knowledge of the Sellers, each of the registrations for the Transferred Intellectual Property is valid and subsisting, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The foregoing will not be construed as a warranty that any Patent, or any Trademark registration, will issue based on a Patent or Trademark application.

**(n)    To the Knowledge of the Sellers, the conduct of the Business, including the design, development, testing, manufacturing, sale, distribution, support or servicing of any CVAS Products or the use or exploitation of any Transferred Intellectual**

68

**Error! Unknown document property name.**

**379**

**Property, EMEA Transferred Intellectual Property or Licensed Intellectual Property or the provision of any CVAS Services by any Seller, EMEA Seller, or any of their respective Affiliates in connection with any of the foregoing, does not infringe upon, misappropriate or otherwise violate in any material respect any Intellectual Property of any Third Party.**

(o) ~~(k)~~ To the Knowledge of the Sellers, Section 4.5(k̲o̲) of the Sellers Disclosure Schedule sets forth a true, accurate and complete list of any Open Source Software used in each of the CVAS Products and describes (i) the specific Open Source Software used; (ii) the specific Open Source Software version; and (iii) the CVAS Products or portions thereof into which such Open Source Software is incorporated. To the Knowledge of the Sellers, the Business is in full compliance with all license obligations associated with such Open Source Software, except as would not reasonably be expected to have, individually, or in the aggregate, a Material Adverse Affect.

(p) ~~(l)~~ The Sellers (with respect to the Business) have used reasonable efforts to establish measures regarding data security. To the Knowledge of the Sellers, with respect to data security, the Business is in compliance with all the requirements of Law, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.[45]

(q) ~~(m)~~ Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation, and non-misappropriation of Intellectual Property.

Section 4.6.    Litigation.    ~~As of the date hereof, except~~ **Except** for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity against any Seller involving the Business ~~or,~~ the Assets **or Assumed Liabilities**, that would be material to the Business taken as a whole. [To the Knowledge of the Sellers, except for the Bankruptcy Proceedings, there is no outstanding Order to which the Sellers are subject in respect of the Business or the Assets only, and not any other business segments or assets of the Sellers, nor are any of the Sellers in default with respect to any such Order.][46]

Section 4.7.    Financial Statements.[61]

(a)    Section 4.7(a) of the Sellers Disclosure Schedule sets forth true and complete copies of the audited balance sheets of the Business as of December 31, 2008 and December 31, 2007 and the related audited statements of income for the years then ended, accompanied by the reports thereon of the Sellers' independent auditors (collectively referred to as the "**Audited Financial Statements**"). The Audited Financial Statements have been prepared in accordance with GAAP**, consistently applied,** and fairly present in all material

---

[45] ~~Note to Purchaser: We believe this issue is sufficiently covered by Section 4.5(a).~~
[46] ~~Note to Purchaser: To be discussed pending explanation of defined term "Order".~~
[61] **Note to Seller: Characterization of Financial Statements TBD now that they have made available.**

NY\1582469.7

69          **Error! Unknown document property name.**

[New York #2071434 v4]

**380**

respects the consolidated financial position, results of operation and cash flows of the Business as of their respective dates and for the respective periods indicated~~, except that they do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity~~.

(b)     Section 4.7(b) of the Sellers Disclosure Schedule sets forth the unaudited management statements of certain assets and liabilities of the Business as of September 30, 2009 and the related unaudited management statements of income of the Business for the nine (9) month period ended on September 30, 2009 (the **"Unaudited Financial Statements"**, and together with the Audited Financial Statements, the **"Financial Statements"**). ~~Except as set forth in the Unaudited Financial Statements, such Unaudited Financial Statements were prepared based on the financial books and records maintained by the Sellers, and the EMEA Sellers, for the Business on the basis of the Nortel Accounting Principles and represent the Sellers' good faith estimate of the selected balance sheet accounts, income statements and results of operations set forth therein for the Business, in each case as of the dates and for the periods presented therein.~~ The Unaudited Financial Statements ~~(a) have not been~~**were** prepared in accordance with GAAP~~, except as set forth in~~ **using** the Nortel Accounting Principles, ~~(b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the Closing), (c) include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) reflect the estimated historical operation of the Business (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity~~**and fairly present in all material respects the combined financial position, results of operations and cash flows of the Business as of the date thereof and for the periods covered thereby**.

(c)     ~~[As of the date hereof, except~~**Except** as set forth in Section 4.7(c) of the Sellers Disclosure Schedule, there are no Assumed Liabilities or EMEA Assumed Liabilities of a type that would be required to be included on a balance sheet of the Business prepared in accordance with GAAP **(or reflected in the notes thereto)** except Liabilities that (i) in the aggregate are set forth or reflected in the Financial Statements; (ii) have been incurred in the Ordinary Course since the date of the last balance sheet included in the Financial Statements; **or** (iii) have been incurred in connection with this Agreement or the transactions contemplated hereby~~; or (iv) which (excluding any Liabilities referred to in clauses (i) through (iii) above) would not have a Material Adverse Effect.]~~**.**

Section 4.8.     Compliance with Laws; Consents.

(a)     ~~To the Knowledge of the Sellers, no~~**No** Seller is in violation of any applicable Law in connection with the Business, except for violations that would not reasonably be expected to be material to the Business taken as a whole.  None of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business or the Assets with any applicable Law nor are there, based on the Knowledge of the

NY\1582469.7

70     **Error! Unknown document property name.**

[New York #2071434 v4]