Sellers, any such notice or claims threatened or pending, except where such claims would not  reasonably be expected to be material to the Business taken as a whole.

(b)    ~~To the Knowledge of the Sellers:~~ (i) a**A**ll of the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business or the ownership of the Assets as conducted or owned, as applicable, on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations that would not reasonably be expected to be material to the Business taken as a whole.  None of the Sellers has received any written notice or written claims from any Government Entity relating to any material non-compliance of the Business or the Assets with such Consents nor are there, based on the Knowledge of the Sellers any such notice or claims threatened or pending, except where such claims would not reasonably be expected to be material to the Business taken as a whole.

Section 4.9.    Real Property.

(a)    [To come]

Section 4.10.    Environmental Matters.

(a)    ~~To the Knowledge of the Sellers, the~~**The** Business and the Assets are in compliance with Environmental Laws and have obtained and are in compliance with all Environmental Permits, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to be material to the Business taken as a whole.

(b)    There are no Actions relating to the Business or the Assets pending or, to the Knowledge of the Sellers, threatened against any of the Sellers pursuant to Environmental Laws, in each case except those Actions that would not reasonably be expected to be material to the Business taken as a whole.

(c)    Notwithstanding anything in this ARTICLE IV to the contrary, none of the representations and warranties in this ARTICLE IV other than this Section 4.10 shall relate to environmental matters.

Section 4.11.    Labor and Employee Benefits Matters.

(a)    Section 4.11(a) of the Sellers Disclosure Schedule contains a true and complete list, by country, of (i) all material Seller Employee Plans [(and separately identifies those Seller Employee Plans that are Transferred Employee Plans)] and (ii) all employment agreements or other commitments for employment or engagement by the Sellers or their Affiliates with respect to Employees that deviate in any material respect from the standard form of offer letter for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits to the Employees, excluding in each case Seller Employee Plans (collectively, the "**Special Arrangements**"). The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each

NY\1582469.7

[New York #2071434 v4]                                    71                    **Error! Unknown document property name.**

**382**

material Seller Employee Plan or, if such plan document or summary plan description does not exist, an accurate written summary of the material terms of such Seller Employee Plan [and, with respect to any Seller Employee Plan that is a Transferred Employee Plan, the following additional documents, to the extent applicable: (i) the most recent actuarial report; (ii) all trust, custodial, investment management, administrative services or similar agreements; (iii) the most recent annual report required to be filed with any Government Entity (including, if applicable, the most recent Form 5500 Annual Report with audited financial statements and schedules); (iv) for each Transferred Employee Plan which is intended to be tax-advantaged under applicable Law (including Section 401(a) of the Code), the most recent determination or opinion letters received from the Internal Revenue Service; and (v) all material filings made with any governmental authority, including any filings under the Voluntary Compliance Resolution or Closing Agreement Program or the Department of Labor Delinquent Filer Program. The Sellers have provided the Purchaser with a true and complete copy of the standard form (or where such individual agreement is materially different from the standard form, the individual written agreement) of the employment, retention, change in control or severance agreements between the Sellers (or any Affiliate of Sellers) and any Employee.]^[762]

(b)     The information contained in Section 4.11(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) job title/position, (iv) annual base salary and annual target incentive, (v) work location, (vi) visa type, if any, and expiry date (vii) the applicable Collective Labor Agreement, if any, (viii) leave status, reason for the leave, the start date of the leave and expected return date, (ix) vacation accrual rate, (x) status as full-time or part-time, (xi) home country of residence, (xii) Job Complexity Indicator, (xiii) country of payroll, (xiv) sales indicator, (xv) Exempt/Non-Exempt status (for Employees in the United States only), (xvi) payment currency, (xvii) department/function to the extent applicable, (xviii) work schedule, (xix) whether such Employee has any individual agreement as to length of notice or severance payment required to terminate his or her employment other than as results by Law from the employment of an employee without an individual agreement as to notice or severance or a Seller Employee Plan as a result of which there could be a payment to such employee in excess of $50,000 in addition to such payment required by applicable Law or such Seller Employee Plan. Such information shall be updated in accordance with the requirements of Section 7.4(c). **In addition, Section 4.11(b) of the Sellers Disclosure Schedule provides a summary of the material terms of any Special Arrangements.**

(c)     There has not been for a period of ~~twelve (12~~**twenty-four (24)** consecutive months prior to the date hereof, nor is there existent or, to the Knowledge of the Sellers, has been threatened, any strike, **material grievance under a Collective Labor Agreement,** slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees **or (ii) any unfair labor practice charge, labor arbitration proceeding or other labor dispute.**

---

^[762] Note to Purchaser: We are confirming whether there will be any Transferred Employee Plans. If there are, we will consider appropriate representations with respect to such plans.

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

**383**

(d)    Section 4.11(d) of the Sellers Disclosure Schedule lists (i) all the Collective Labor Agreements in effect with respect to the Employees and, for those that have expired, whether notice to bargain has been given and the status of the bargaining process and (ii) any material grievance pending under such Collective Labor Agreements.  For a period of ~~twelve (12~~**twenty-four (24)** consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, works council, collective bargaining agent (including any unit clarification proceeding under the National Labor Relations Act or analogous law), employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers **or any Affiliates** with respect to Employees, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees.  The Sellers have provided the Purchaser with a true and complete copy of the Collective Labor Agreements listed in Section 4.11(d) of the Sellers Disclosure Schedule.  **The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any material breach or other violation of any Collective Labor Agreement set forth on Section 4.11(d) of the Sellers Disclosure Schedule.  The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any material breach or other violation of any Collective Labor Agreement set forth on Section 4.11(d) of the Sellers Disclosure Schedule.**

(e)    To the Knowledge of the Sellers, all of the Employees employed in the United States are either United States citizens or are legally entitled to work in the United States under the Immigration Reform and Control Act of 1986, as amended, other United States immigration Laws and the Laws related to the employment of non-United States citizens applicable in the state in which the Employees are employed.  To the Knowledge of the Sellers, all Employees employed outside the United States are legally entitled to work in the country in which they are employed.

**(f)    None of the Sellers or any ERISA Affiliate has incurred any direct or indirect liability under, arising out of or by operation of Title IV of ERISA and, to the Knowledge of the Sellers, no fact or event exists that is reasonably likely to give rise to any such Liability (whether absolute or contingent) to the Sellers.  There are no Seller Employee Plans that are multiemployer plans within the meaning of Section 3(37) or 4001(a)(3) of ERISA, and none of the Sellers or any of their ERISA Affiliates has, within the past six (6) years, ever maintained, contributed to or participated in, or been required to maintain, contribute to or participate in, any such multiemployer plans.[63]**

**(g)**    ~~(f)~~ [There are no Transferred Employee Plans, except as set forth in Section 4.11(~~f~~**g**) of the Sellers Disclosure Schedule.  With respect to each Transferred Employee Plan: (i) if intended to qualify under Section 401(a), 401(k) or 403(a) of the Code, such plan and the related trust are so qualified and have received a favorable determination

---

[63] **Note to Seller:  Please schedule any necessary exceptions.**

**73**

letter from the IRS that has not been revoked and to the Knowledge of the Sellers, no event or circumstance exists that has or is likely to adversely affect such qualification or exemption; (ii) it has been operated and administered in all material respects in compliance with its terms and applicable Law; (iii) there are no pending or threatened actions, liens, complaints or claims in writing against, by or on behalf of any Transferred Employee Plan or the assets, fiduciaries or administrators thereof (other than routine claims for benefits); (iv) all required employer contributions, premiums and expenses to or in respect of such Transferred Employee Plans have been timely paid in full or, to the extent not yet due, have been adequately accrued; (v) all reports, returns, notices and other documentation that are required to have been filed with or furnished to the Internal Revenue Service, the U.S. Department of Labor, the Pension Benefit Guaranty Corporation (the "**PBGC**"), the SEC or any other Government Entity have been filed or furnished on a timely basis; (vi) within the last three (3) years, it has not been the subject of an application or filing under, or is a participant in, a government-sponsored amnesty, voluntary compliance, self-correction or similar program; (vii) no circumstance exists, nor has any event occurred that has resulted or is likely to result in the imposition of any fine, penalty or excise Tax on any Person in respect of the funding or operation of such plan; and (viii) to the Knowledge of the Sellers, no prohibited transaction (as described in Section 406 of ERISA or Section 4975 of the Code) which can reasonably be expected to result in material liability has occurred or is reasonably likely to occur.]^{4864}

(h)    (g) To the Knowledge of the Sellers, no Employee who is an executive or manager of any Seller is a party to any confidentiality, noncompetition, proprietary rights or other such agreement with any Person other than such Seller which has a ~~m~~Material ~~a~~Adverse ~~e~~Effect on such executive or manager's ability to perform his applicable services to the Business. To the Knowledge of the Sellers, no Employee is in violation of any term of any employment contract, confidentiality, noncompetition or other proprietary rights agreement or any other contract relating **(i)** to the right of such Employee to be employed by, or provide services to, such Seller with respect to the Business **or (ii) [except as set forth on Section 4.11(h) of the Sellers Disclosure Schedules]**^{65} **to the knowledge or use of trade secrets or proprietary information with respect to any such Employee's employment with the Sellers, in each case except for such violation as would not have, individually or in the aggregate, a Material Adverse Effect.**

(i)    (h) None of the Sellers (excluding the EMEA Sellers) has, with respect to the Business, any Liability to provide retiree welfare benefits to any Person for any reason, except as may be required by COBRA, a Seller Employee Plan listed on Section 4.11(a) of the Sellers Disclosure Schedule, or applicable Law.

(j)    (i) With respect to the Employees: (i) the Sellers are in compliance in all material respects with all applicable Laws relating to labor and employment, including but not limited to Laws relating to discrimination, disability, labor relations, hours of work, payment of

---

^{4864} Note to Purchaser: Rep will be removed if we confirm that there are no Transferred Employee Plans. If we determine there are Transferred Employee Plans, Sellers are willing to discuss appropriately limited representations regarding such plans.
^{65} Note to Seller: Any exceptions should be set forth in the applicable schedule

**385**

wages and overtime wages, characterization of workers as employees or independent contractors, pay equity, immigration, workers compensation, working conditions, employee scheduling, occupational safety and health, family and medical leave, employment and reemployment of members of the uniformed services, employee terminations and mass layoffs; (ii) the Sellers have not incurred **any Liability or obligation which remains unsatisfied under the WARN Act or any similar state or local Laws regarding the termination or layoff of such Employees (iii) the Sellers have not incurred**, and no circumstances exist under which the Sellers would reasonably be expected to incur, any liability arising from the misclassification of employees as exempt from the requirements of the Fair Labor Standards Act or analogous Laws or the misclassification of employees as independent contractors~~, in each case except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect~~ ; and ~~(iii)~~ **; and (iv)** no arbitration, court decision or governmental order to which the Sellers are or would reasonably be expected to become a party or are subject to in any way limits or restricts any of the Sellers from relocating or closing any of the operations of such Seller.

**(k)** ~~(i)~~ [With respect to any Transferred Employee Plan for the benefit of Employees (or dependents thereof) who perform services or who are employed outside of the United States (a "**Non-US Plan**"): (i) if intended to qualify for special tax treatment, each Non-US Plan meets all requirements for such treatment; (ii) if intended to be funded and/or book reserved, each Non-US Plan is fully funded and/or book reserved, as appropriate, based upon reasonable actuarial assumptions; (iii) no material Liability exists or reasonably could be imposed upon the assets of the Sellers or any of their Affiliates by reason of the Non-US Plan; (iv) no Employee who is domiciled outside of the United States (or any of their dependents) is entitled to any pension, superannuation, retirement (including on early retirement) or death benefits (including in the form of a lump sum) (together, "**Pension Benefits**") that become payable before their normal retirement age as stated in their contract of employment or the Non-US Plan itself; (v) apart from any general indemnity in favor of the trustees given by the Sellers or their Affiliates under the governing documents of a Non-US Plan, neither the Sellers nor any of its Affiliates has given any indemnity, undertaking or guarantee in respect of any Non-US Plan; (vi) the assets of each Non-US Plan that provided Pension Benefits are sufficient to satisfy its respective Liabilities (current and contingent) as at the date of this Agreement; and (vii) neither the Sellers nor any of their Affiliates have any legal or ex-gratia arrangement or practice to pay pensions, gratuities, superannuation, allowances or any other benefit or sum to any person who is not an employee of the Sellers or any of their Affiliates or dependent of an employee of the Sellers or their Affiliates.][4966]

**(l)    No circumstance exists which has resulted in or likely to result in a liability to the Purchaser or any Designated Purchaser, whether by reason of reimbursement obligation or otherwise, in respect of a failure to comply with Code Section 409A.**

---

[4966] Note to Seller:  Subject to further revision following review by local counsel.

NY\1582469.7

[New York #2071434 v4]

**Error! Unknown document property name.**

**386**

(m)  (k) Except as required under the terms of this Agreement, a Seller Employee Plan, a Special Arrangement or under applicable Law, neither the execution or delivery of this Agreement, shareholder approval of this Agreement nor the consummation of the transactions contemplated by this Agreement will**could reasonably**, either alone or in conjunction with any other event (whether contingent or otherwise, including, without limitation, any termination of employment), (i) result in **any severance or increase in severance pay upon any termination of employment after the date of this Agreement, (ii) result in**, cause the accelerated vesting or delivery of, or materially increase the amount or value of, any payment or benefit to any Employee, [(ii**iii**) result in any new obligation or material increase any funding or obligation pursuant to any of the Transferred Employee Plans, or (iii**iv**) require or accelerate funding of any Transferred Employee Plan.]⁵⁰]⁶⁷ **(v) results in any limitation or restriction on the right of the Purchaser or its Affiliates to merge, amend or terminate any Purchaser Employee Plan, or (vi) result in any "excess parachute payment" (as defined in Section 280G of the Code) that would be (A) be paid to any Transferred Employee or (B) result in a non-deductible payment by the Purchaser or any of its Affiliates.**

Section 4.12.  Taxes.

(a)  **The Sellers have timely filed with the appropriate Tax Authorities all material Tax Returns required to be filed with respect to the Assets and the Business and all such Tax Returns are true, correct and complete in all material respects. All material Taxes due and payable with respect to the Assets and the Business have been timely paid.**

(b)  **No deficiency for material Taxes has been claimed, proposed or assessed by any Tax Authority against any Seller and there is no pending audit, examination or other proceeding or Action in respect of material Taxes, in each case relating to any Asset or the Business. The Sellers have delivered to the Purchaser correct and complete copies of all material income Tax Returns (in the case of a consolidated, combined or unitary Tax Return, pro forma with respect to the Sellers), examination reports and statements of deficiency filed or received by any Seller since December 31, 2006, in each case, with respect to the Assets or the Business.**

(c)  **No Seller has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of material Taxes relating to any Asset or the Business.**

(d)  (a) There is no Lien for Taxes on any Asset other than Permitted Encumbrances.

---

⁵⁰ Note to Purchaser: Will be removed if we confirm there are no Transferred Employee Plans and will be appropriately modified if there are any Transferred Employee Plans.
⁶⁷ **Note to Purchaser: Will be removed if we confirm there are no Transferred Employee Plans and will be appropriately modified if there are any Transferred Employee Plans.**

**Error! Unknown document property name.**

**387**

(e)    (b) [None of the Assets located within the United States or which is owned by a U.S. Debtor (i) is property required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code or (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code.

(f)    (e) No Seller other than Sellers which are "United States persons" under section 7701 of the Code or applicable Treasury Regulations will transfer any United States real property interest (within the meaning of Section 897(c)(1) of the Code) to Purchaser or any Designated Purchaser pursuant to this Agreement.]

(g)    The Sellers are duly registered for the purposes of the GST under the following numbers:[68]

(h)    No Seller other than a Seller that is not a non-resident of Canada (as defined in the Income Tax Act (Canada)) will transfer property that is a taxable Canadian property (as defined in the Income Tax Act (Canada))

(i)    Notwithstanding the foregoing, the representations and warranties set forth in Sections 4.12(a) through 4.12(d) shall not be applicable to the extent that no Asset can be made subject to a Tax Lien and neither the Purchaser nor any Designated Purchaser can be held liable for Taxes relating to any matter constituting a breach of any such representation or warranty.

Section 4.13.    Brokers.  Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

Section 4.14.    Cultural Business.  The Assets are not used to provide any of the services, and are not engaged in any of the activities of a "cultural business" within the meaning of the Investment Canada Act.

Section 4.15.    Representations and Warranties by the Other Sellers.  Except as set forth in the Sellers Disclosure Schedule, each Other Seller severally but not jointly will, as of the date such Other Seller will execute this Agreement pursuant to Section 10.16, represent and warrant to the Purchaser as follows:

4.15.1. Organization and Corporate Power.

(a)    Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to the receipt of the Bankruptcy Consents, at

---

[68] Note to Seller:  Please provide relevant reference numbers.

**Error! Unknown document**

[New York #2071434 v4]    **property name.**

**388**

the time it executes this Agreement, such Other Seller will have the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is a party or, at the Closing Date, will become a party.

(b)     Such Other Seller is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business as it is currently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.15.2. Authorization; Binding Effect; No Breach.

(a)     Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of each Transaction Document to which such Other Seller will be a party will have been duly authorized by such Other Seller. Subject to the receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, each Transaction Document to which such Other Seller will be a party constitutes a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)     Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, result in the creation or imposition of any Lien upon any of the Assets owned by such Other Seller, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of such Other Seller, (ii) any Material Contract to which such Other Seller is a party or to which any of the Assets or the Business is subject or (iii) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller, is subject, except, in the case of (ii) and (iii), for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

NY\1582469.7

Error! Unknown document property name.

[New York #2071434 v4]

**ARTICLE V**

**389**

**COVENANTS AND OTHER AGREEMENTS**

Section 5.1.    <u>U.S. Bankruptcy Actions</u>.  On the timetables and subject to the terms set forth below, the Sellers who are U.S. Debtors shall (i) file with the U.S. Bankruptcy Court one or more motions and proposed orders as set forth below, (ii) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules, and an order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 9.1, and the U.S. Bidding Procedures Order, if entered, use their **commercially** reasonable ~~best~~ efforts to obtain U.S. Bankruptcy Court approval of such orders.

(a)    As promptly as practicable, the U.S. Debtors shall file with the U.S. Bankruptcy Court a motion (the "**U.S. Bidding Procedures and Sale Motion**") and two proposed orders substantially in the forms set forth in Exhibit 5.1(a) and Exhibit 5.1(b), without material modification thereto unless the parties consent in writing to such modification (which consent shall not be unreasonably withheld, conditioned or delayed) (as approved, the "**U.S. Bidding Procedures Order**" and the "**U.S. Sale Order**"[51/69]) seeking approval by the U.S. Bankruptcy Court of, respectively, (i) as for the U.S. Bidding Procedures Order, the Bidding Procedures and the provision of a Break-Up Fee and Expense Reimbursement, and (ii) as for the U.S. Sale Order, the sale of the Assets to the Purchaser or a Designated Purchaser and the assumption by the U.S. Debtors and assignment to the Purchaser or a Designated Purchaser of the Assumed and Assigned Contracts and the Assumed Liabilities pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code, as specified below.

(b)    The U.S. Debtors shall provide notice of the U.S. Bidding Procedures and Sale Motion to: (i) all Tax Authorities or recording offices which have a reasonably known interest in the relief requested, (ii) the United States Trustee for the District of Delaware in the Chapter 11 Cases, (iii) the Monitor, (iv) counsel to the Official Committee of Unsecured Creditors in the Chapter 11 Cases, (v) counsel to the Ad-Hoc Committee of Bondholders in such Chapter 11 Cases, (vi) all federal, state, and local regulatory authorities with jurisdiction over the U.S. Debtors, (vii) each of the entities that had received an invitation from the Sellers to acquire or had previously expressed an interest in acquiring the Assets; and (viii) the general service list established in the Chapter 11 Cases pursuant to U.S. Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

(c)    The Sellers who are U.S. Debtors shall use their **commercially** reasonable ~~best~~ efforts to cause the U.S. Bankruptcy Court to (i) schedule a hearing to consider the U.S.

---

[51/69] Note to Purchaser:  Purchaser's bankruptcy counsel to circulate a draft of the proposed sale order.

**79**

NY\1582469.7

[New York #2071434 v4]    79    **Error! Unknown document property name.**

**390**

Bidding Procedures and Sale Motion and (ii) enter the U.S. Bidding Procedures Order within [_____ (__) days]⁵²⁷⁰ of the filing of the U.S. Bidding Procedures and Sale Motion.

(d)    The U.S. Bidding Procedures Order shall be substantially in the form of Exhibit 5.1(a) hereto (with such changes thereto as the Purchaser and the Seller both shall approve in writing (such approval not to be unreasonably withheld, conditioned or delayed)), and shall, among other matters, contain the following provisions:⁵³⁷¹

(i)    [an authorization and approval of the Break-Up Fee and Expense Reimbursement and provision, that if the U.S. Debtors become obligated to pay the Purchaser the U.S. Debtors' portion of the Break-Up Fee or the Expense Reimbursement, such obligation shall constitute an administrative expense under Sections 503(b) and 507(a)(2) of the U.S. Bankruptcy Code and shall be payable in accordance with the provisions of this Agreement without further order of the U.S. Bankruptcy Court;

(ii)    a provision establishing notice and service requirements with respect to creditors, potential creditors and parties in interest, which shall include the requirement that notice of such hearing be given to the Notice Parties;

(iii)    an authorization and approval of the Bidding Procedures; and

(iv)    a provision scheduling a hearing to consider entry of the U.S. Sale Order providing that notice of such hearing be given to the Notice Parties, and providing that the Sellers will publish notice of such hearing in The Wall Street Journal (National Edition), The Globe & Mail (National Edition) and The Financial Times (International Edition).]⁵⁴⁷²

(e)    The U.S. Sale Order shall be substantially in the form of Exhibit 5.1(b) hereto (with such changes thereto as the Purchaser and the Sellers both shall approve in writing, such approval not to be unreasonably withheld, conditioned or delayed) and shall, among other matters, contain the following provisions (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court as part of the U.S. Sale Order):⁵⁵⁷³

(i)    [a finding and conclusion that, as of the Closing Date, the sale of all of the U.S. Debtors' right, title and interest (including common law rights) to the Assets, the assignment of the Assumed and Assigned Contracts by the U.S. Debtors to the Purchaser or any Designated Purchasers in accordance with this Agreement (a) are or will be legal, valid and effective transfers of such Assets and assignment of such

---

⁵²⁷⁰ Note to Purchaser:  Timing to be discussed.

⁵³⁷¹ Note to Seller:  Under review.

⁵⁴⁷² Note to Purchaser: Terms to be removed from the body of the Agreement by the Parties once Order is finalized and attached.

⁵⁵⁷³ Note to Seller:  Under review.  Please note that the transfer of Assets free and clear of any liens and claims shall be subject to the "to the extent permitted by Section 363(f) of the Bankruptcy Code" qualifier.

**80**

NY\1582469.7

[New York #2071434 v4]    **80**    **Error! Unknown document property name.**

**39/**

Assumed and Assigned Contracts, (b) vest or will vest the Purchaser or the relevant Designated Purchasers with all right, title and interest of the U.S. Debtors in and to the Assets pursuant to Section 363(f) of the U.S. Bankruptcy Code free and clear of any and all Liens (other than Permitted Encumbrances and Liens created by the Purchaser or a Designated Purchaser), the Excluded Liabilities (to the extent permitted by applicable Law) and Claims, including Claims held by creditors of U.S. Debtors, other than Claims that are specifically Assumed Liabilities and any Permitted Encumbrances identified in clauses (i) – (v) of the definition thereof;

(ii)    except as provided herein, a provision that the U.S. Bankruptcy Court retains exclusive jurisdiction to interpret, construe and enforce the provisions of, and to resolve any and all disputes that may arise under or in connection with the assumption and/or assignment of any U.S. Debtor Contract or under this Agreement and the Ancillary Agreements, and the U.S. Sale Order, in all respects, and further to hear and determine any and all disputes among the Sellers, the Sellers' Affiliates, the Purchaser or its Affiliates, as the case may be, and any non-Sellers party thereto that may arise under or in connection with (a) the assumption and/or assignment of any Assumed and Assigned Contract or (b) Excluded Liabilities of the U.S. Debtors;

(iii)    a conclusion that the transactions contemplated by this Agreement, the Ancillary Agreements and the U.S. Sale Order are undertaken by the U.S. Debtors, the Purchaser and the Designated Purchasers, as applicable, at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the U.S. Bankruptcy Code, and that such parties are entitled to the protections of Section 363(m) of the U.S. Bankruptcy Code;

(iv)    a determination that approval of this Agreement and the U.S. Sale Order, and consummation of the transactions contemplated by this Agreement, are in the best interests of the U.S. Debtors, their creditors and estates;

(v)    a determination that the terms and conditions of this Agreement including the transfer of all of the U.S. Debtors' right, title and interest (including common law rights) to the Assets free and clear of any and all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by the Purchaser or a Designated Purchaser) and Claims, are fair and reasonable;

(vi)    a conclusion that the U.S. Debtors may assign and transfer to the Purchaser or the relevant Designated Purchasers all of the U.S. Debtors' right, title and interest (including common law rights) to all of their intangible property included in the Assets they each own, the Assigned Contracts to which they are a party, subject to their obtaining actual or deemed Consents to the extent required by applicable Law;

(vii)    a provision that any stay of orders authorizing the assignment of an Executory Contract as provided for in Bankruptcy Rules 6004(h) or 6006(d) shall not apply to the U.S. Sale Order and that the U.S. Sale Order is immediately effective and enforceable;

NY\1582469.7

[New York #2071434 v4]    ~~Error! Unknown document property name.~~

(viii)    an authorization and approval of the U.S. Debtors' assumption and assignment to the Purchaser or the relevant Designated Purchaser of the Assumed and Assigned Contracts pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code;

(ix)    an order that the Assumed and Assigned Contracts to be assumed by the Sellers and assigned to the Purchaser or the relevant Designated Purchaser pursuant to this Agreement will be transferred to, and remain in full force and effect for the benefit of the Purchaser or the relevant Designated Purchaser, notwithstanding any provision in any such Seller Contract or any requirement of Law (including those described in Sections 365(b)(2) and (f) of the U.S. Bankruptcy Code) that prohibits, restricts or limits in any way such assignment or transfer;

(x)    an approval of the execution of and performance under any other agreement executed in connection with the transfer of the Assets to the Purchaser or the relevant Designated Purchaser to the extent provided by this Agreement;

(xi)    a finding that the Sellers gave due and proper notice of the transactions contemplated hereby to each party entitled thereto;

(xii)    a finding that the Purchaser and the relevant Designated Purchasers have satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the U.S. Bankruptcy Code to provide adequate assurance of future performance of the Assumed Contracts;

(xiii)    a provision enjoining and forever barring the non-debtor party or parties to each Assumed and Assigned Contract from asserting against the Purchaser, any Designated Purchasers or any of the Assets: (A) any default existing as of the Closing Date and (B) any objection to the assumption and assignment of such Assigned Contract;

(xiv)    a finding that, to the extent permitted by Law, neither the Purchaser nor any Designated Purchaser is a successor to the Seller or its bankruptcy estate by reason of any theory of law or equity, and neither the Purchaser nor any Designated Purchaser shall assume or in any way be responsible for any Liability of any of the Sellers and/or their bankruptcy estates, except as otherwise expressly provided in this Agreement;

(xv)    a determination or a provision for the determination of the Cure Costs under the Assumed and Assigned Contracts and an order that the applicable Party pay such Cure Costs as set forth in this Agreement; and

(xvi)    a provision that (a) the Intellectual Property License Agreement shall be binding on the U.S. Debtors, any chapter 11 trustee or chapter 7 trustee appointed in the bankruptcy cases of the U.S. Debtors, and any of their respective successors and assigns, and (b) all Intellectual Property licensed to Purchaser or Designated Purchaser under the Intellectual Property License Agreement shall not be sold, transferred,

NY\1582469.7

[New York #2071434 v4]

Error! Unknown document
property name.

**393**

conveyed or assigned absent the assumption by the buyer or assignee of all obligations of the U.S. Debtors under the Intellectual Property Agreement.][5674]

(f)    The U.S. Debtors shall request that the U.S. Bankruptcy Court schedule, subject to the availability of the U.S. Bankruptcy Court, a Sale Hearing on the third (3rd) Business Day following the conclusion of the Auction and shall use their **commercially** reasonable best efforts to cause the Sale Hearing to be heard on that date or the earliest date thereafter permitted by the Bankruptcy Court's schedule.

Section 5.2.    Canadian Bankruptcy Actions.

5.2.1.    Canadian Sales Process Order.  As promptly as practicable, but in no event later than the date on which the U.S. Bidding Procedures Order is granted, the Canadian Debtors shall file with the Canadian Court a motion (the "**Canadian Sales Process Order Motion**") and a proposed order (as approved, the "**Canadian Sales Process Order**") seeking approval of the execution, delivery and performance of this Agreement, including payment of the Break-Up Fee, the Expense Reimbursement and a process for the sale of the Business, each substantially in the form set forth in Exhibit 5.2.1 (subject to any changes consented to in writing by the Parties).[5775]

5.2.2.    Canadian Approval and Vesting Order.  As promptly as practicable, but in no event later than the date on which the U.S. Sale Order is granted, and subject to their rights and obligations set forth in the Canadian Sales Process Order, the Canadian Debtors shall file with the Canadian Court one or more motions (the "**Canadian Approval and Vesting Order Motion**") seeking an order substantially in the form set forth in Exhibit 5.2.2 (subject to any changes consented to in writing by the Parties) (such order as approved, the "**Canadian Approval and Vesting Order**") of the Canadian Court approving this Agreement and the transactions contemplated herein.  The Canadian Approval and Vesting Order shall include the following:[5876]

(a)    the transactions contemplated by this Agreement are approved, and a statement to the effect that this Agreement is in the best interests of the Canadian Debtors and its stakeholders (it being recognized that such a determination is a finding of fact or conclusion of Law to be made by the Canadian Court as part of the endorsement of reasons issued in connection with the Canadian Approval and Vesting Order);

(b)    the execution of this Agreement by the Canadian Debtors is authorized and approved, and the Canadian Debtors are authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the transactions contemplated in this Agreement and for the conveyance of the Canadian Debtors' right, title and interest in the Assets to the Purchaser or a Designated Purchaser, as applicable;

---

[5674] Note to Purchaser: Terms to be removed from the body of the Agreement by the Parties once Order is finalized and attached.

[5775] Note to Seller:  Under review.

[5876] Note to Seller:  Under review.

NY\1582469.7

**Error! Unknown document**

[New York #2071434 v4]                                                   **property name.**

**394**

(c)    all of the Canadian Debtors' right, title and interest in and to the Assets shall vest absolutely in the Purchaser, free and clear of and from any and all Liens (except Permitted Encumbrances) and to the extent permitted by applicable Law, Excluded Liabilities; and

(d)    the sale of the Assets is exempt from the application of the Bulk Sales Act (Ontario); **and of any other similar provincial legislation and the Sellers and the Purchaser and any Designated Purchaser are discharged from any obligation under Section 6 of the Retail Sales Tax Act (Ontario) and from any other similar obligations under similar provincial legislation.**

5.2.3.    Additional Requests.  In connection with the foregoing, the Canadian Debtors shall seek in good faith in the Canadian Approval and Vesting Order Motion to (i) have the Canadian Approval and Vesting Order include a finding that, to the extent permitted by Law, neither the Purchaser nor any relevant Designated Purchaser is a successor to the Sellers or their bankruptcy estate by reason of any theory of law or equity, and neither the Purchaser nor any Designated Purchaser shall assume or in any way be responsible for any Liability of any of the Sellers and/or their bankruptcy estates, except as otherwise expressly provided in this Agreement or the Transaction Documents; and (ii) have the endorsement of the Canadian Approval and Vesting Order or the order itself, include a finding that the consideration provided by the Purchaser and any Designated Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Assets. For greater certainty, nothing herein shall require the items in the preceding sentence to be included in the Canadian Approval and Vesting Order or any endorsement thereof, notwithstanding that such provisions may be included in the form of the order set forth in Exhibit 5.2.2.

Section 5.3.    Consultation; Notification.

(a)    The Purchaser and the U.S. Debtors shall cooperate with filing and prosecuting the U.S. Bidding Procedures and Sale Motion, and obtaining entry of the U.S. Bidding Procedures Order and the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, responses to objections, notices, statements, schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein and any challenges thereto.

(b)    The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Sales Process Order Motion and the Canadian Approval and Vesting Order Motion, and obtaining issuance and entry of the Canadian Sales Process Order and the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any challenges thereto.

**Error! Unknown document property name.**

**395**

(c)    If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to, and to cause their Affiliates to, use their **commercially** reasonable best efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts.  Each of the Parties hereby agrees to use its **commercially** reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section 5.3(c) shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)    If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates to, take all reasonable steps, and use their **commercially** reasonable best efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts.  Each of the Parties hereby agrees to use its **commercially** reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section 5.3(d) shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

Section 5.4.    Pre-Closing Cooperation.

(a)    Prior to, and in connection with, the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its **commercially** reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including: (i) the preparation and filing of all forms, registrations, notices, applications and submissions required **or advisable** to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent (other than Consents in respect of Assigned Contracts, which are covered by Section 2.1.7(d)); {provided that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities, all of which shall be paid or reimbursed by the Purchaser) in order to obtain any Consent;}[59] (ii) defending all Actions by or before any Government Entity challenging this Agreement or the consummation of the Closing, (iii)

---

[59] Note to Seller:  To be discussed.

**Error! Unknown document property name.**

**396**

~~causing~~**using commercially reasonable efforts to cause** to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity that would prohibit, prevent, restrict or materially delay the consummation of the transactions contemplated by this Agreement, and (iv) cooperating in any reorganization of the Sellers that the Sellers consider necessary for the Sellers to facilitate the transactions contemplated hereby, any such reorganization to occur on or prior to the Closing Date.  **With respect to all Contracts related to the Business (other than Bundled Contracts and Customer Contracts, which are addressed separately), the Sellers shall (i) at the Purchaser's request, send a letter substantially in the form set forth in Exhibit [•] to each of the counterparties to such Contracts and (ii) provide to the Purchaser such contact information as is reasonably requested by the Purchaser with respect to the counterparties to such Contracts.**[77]

(b)    Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such Party's Knowledge, of any event or condition, or the existence, to such Party's Knowledge, of any fact, that would reasonably be expected to result in any of the conditions set forth in ARTICLE VIII not being satisfied.

(c)    [Each Seller agrees, both prior to and following the Closing, to take such steps and execute such documents as reasonably requested by Purchaser and as contemplated or otherwise permitted under the Cross-License Agreements listed on Exhibit [•], such that the Business shall continue to be licensed thereunder or shall otherwise retain the applicable rights and benefits thereof following the Closing.][60][78]

Section 5.5.    Antitrust and Other Regulatory Approvals.

(a)    In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties agrees (i) to prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from the date of this Agreement an appropriate filing of a Notification and Report Form pursuant to the HSR Act and a request for an advance ruling certificate pursuant to Section 102 of the Competition Act, and if deemed advisable by the Purchaser, acting reasonably, a pre-merger notification filing under the Competition Act; [(ii) prepare and file as promptly as practicable, and in any event by no later than fifteen (15) Business Days from the date of this Agreement an initial draft Form CO filing pursuant to the EC Merger Regulation and the final Form CO within a reasonable time thereafter as soon as acceptable to the European Commission;] and [(iii) prepare and file as promptly as practicable, and in any event by no later than fifteen (15) Business Days from the date of this Agreement all other necessary documents, registrations, statements, petitions, filings and applications for other Regulatory Approvals, and any other Consent of any other Government Entities either

---

[77] **Note to Seller:  Parties to discuss the timetable on which this assistance shall be afforded to Purchaser.**
[60][78] Note to Purchaser:  To be discussed after Purchaser has provided the list of Cross-License Agreements relating to this request~~.~~ **– subject to diligence.  Note to Seller:  Discuss process for Seller to obtain consents to assignment prior to signing if possible.**

required or that the Primary Parties mutually agree are advisable to satisfy the condition set forth in Section 8.1(a).][6129]

(b)    If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated hereby and/or by the EMEA Asset Sale Agreement, then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)    The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement and work cooperatively in connection with obtaining the Regulatory Approvals of each applicable Government Entity, including:

(i)    cooperating with each other in connection with filings required to be made by any Party under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement, and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, and except for any filings made pursuant to the Investment Canada Act, to the extent permitted by Law or Government Entity, no Party will make any notification or other filing with or to any Governmental Entity in relation to the transactions contemplated hereunder without first providing the other Parties or their respective outside counsels on an outside counsel only basis with a copy of such notification in draft form (except with respect to any documents relating to Item 4(c) of the notification form required by the HSR Act) and giving such other party or its outside counsel a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Party or its outside counsel in this respect. For the avoidance of doubt, draft filings, materials or information provided under this section or under any other provision of this Agreement to the other Party's counsel on an outside counsel only basis shall only be given to outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient without the advance written consent of the Party providing such draft filing or materials;

(ii)    furnishing to the other Primary Parties or its outside counsel all information within its possession that is required for any application or other filing to be made by the other Party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, including the Investment Canada Act, in

---

[6129] Note to Seller: Filing timelines will be dependent upon the jurisdiction in which filings are required. Parties to discuss.

**378**

connection with the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement; provided, however, that (a) no such information shall be required to be provided by a Party if it determines, acting reasonably, that such information is material and competitively sensitive or that the provision of such information could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement were not completed or if it determines, acting reasonably, after good faith discussions with the other Party's counsel, that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the Parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other Parties to occur without so jeopardizing privilege), and (b) in any such case the Purchaser and the Main Sellers shall cooperate with a view to establishing a mutually satisfactory procedure for providing such information directly to the Government Entity requiring or requesting such information, and the relevant Main Seller or the Purchaser or the relevant Designated Purchaser required to provide such information shall provide it directly to such Government Entity requiring or requesting such information;

        (iii)    promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement and ensuring to the extent permitted by Law or Government Entity that each of the Primary Parties is entitled to attend any meetings with or other appearances before any Government Entity with respect to the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement;

        (iv)    consulting and cooperating with one another in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party hereto in connection with proceedings under or relating to the Antitrust Laws or any Laws regulating foreign investment of any jurisdiction including the Investment Canada Act in connection with the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement; and

        (v)    without prejudice to any rights of the Parties hereunder, consulting and cooperating in all respects with the other in defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement.

        (d)    [In addition, subject to any limitations set forth in Section 5.5(e<u>d</u>), the Purchaser shall, and shall cause each of the Designated Purchasers to, use its ~~best~~<u>commercially reasonable</u> efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1 and to take, or cause to be taken, all other action and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by

**399**

this Agreement and/or by the EMEA Asset Sale Agreement, including using its ~~best~~commercially reasonable efforts to submit all required regulatory filings and obtain all Regulatory Approvals, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement.

(e)    The obligations of the Purchaser pursuant to Section 5.5(d) shall include committing, and causing the Designated Purchasers to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets or the Assets and/or the EMEA Assets or conduct of business arrangements or terminating any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated hereby and/or by the EMEA Asset Sale Agreement, including taking any and all actions necessary in order to ensure the receipt of the necessary Consents and Regulatory Approvals.]⁶²⁸⁰

(f)    For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

Section 5.6.    Pre-Closing Access to Information.

(a)    Without prejudice to the clauses of this Agreement governing the Sellers' ~~reasonable best efforts~~ obligations to make available ~~to the Purchaser or appropriate Clean Team Members~~ documentation and information relating to certain Seller Contracts or Bundled Contracts, prior to the Closing but after entry of the U.S. Sale Order, the Main Sellers shall, and shall cause their respective Subsidiaries (other than the EMEA Debtors or EMEA Sellers) to, (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers and other facilities and properties of the Business, **including access to personnel, managers, officers and other employees in order to conduct interviews for the purposes of identifying Identified Employees and otherwise complying with the Purchaser's obligations pursuant to ARTICLE VII,** (ii) permit the Purchaser and its representatives to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request, (iii) cause the officers of the Sellers to furnish the Purchaser with such financial and operating data and other information with respect to the Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request; **(iv) without limiting the generality of subsections (i), (ii) and (iii), deliver to the Purchaser no later than [ten (10)] Business Days following the end of each fiscal quarter a report containing such information as is set forth in Section 5.6(a) of the Sellers Disclosure Schedule;**⁸¹ provided, however, that (A) any such access shall

---

⁶²⁸⁰ Note to Seller:  Awaiting confirmatory diligence report.

⁸¹ **Note to Seller:  Quarterly reports to include information regarding sales, op ex, COGS, forecast, headcount update and severance costs, research and development and the Plan of Record update – please explain why** ~~**82**~~

NY\1582469.7

89

[New York #2071434 v4]    89    ~~Error! Unknown document property name.~~

400

be conducted at Purchaser's expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the Business or the other businesses of the Sellers and their Affiliates, (B) the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records[63] ~~and (C) access to information which the Main Sellers reasonably consider to be commercially sensitive shall only be provided to appropriate Clean Team Members in accordance with applicable Law and subject to the provisions of the Clean Team Confidentiality Agreement and the Confidentiality Agreement, as applicable.~~ **if the provision of such Employee Records would cause the Sellers to be in contravention of any applicable law (but will be required to cooperate in good faith and use commercially reasonable efforts to provide the Purchaser with the maximum employee information, excluding heath and protected status data, allowed by Law).[82]**

      (b)    Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof (other than Section 6.5), the Sellers shall not have any obligation to make available to the Purchaser or its representatives, or provide the Purchaser or its representatives with, (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material, or (ii) more generally, any information if, in the good faith opinion of the Sellers, making such information available would (A) result in the loss of any attorney-client or other legal privilege or (B) cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement existing on the date hereof (including any confidentiality agreement to which the Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

      (c)    To the extent not already made available to the Purchaser ~~or~~**and** the Purchaser's **employees and** representatives ~~(including its outside counsel), and subject to the terms of this Section 5.6(e), the Sellers shall use their reasonable best efforts to provide~~**, the Sellers shall make available to the Purchaser and the Purchaser's employees and representatives** complete unredacted copies of all Seller Contracts and Bundled Contracts (however in the case of any Bundled Contracts, only the portion of any Bundled Contracts that are applicable to the Business **to the extent Sellers desire to make such redactions**), promptly after the completion of the Auction **and in no event later than five (5) Business Days following the Auction** (or in the event that any such Contract is subject to confidentiality restrictions, promptly following the receipt of any required consent which the Sellers will cooperate with the Purchaser to obtain as promptly as practicable). ~~Any such disclosures shall~~

---

**this was deleted. This information is important to Purchaser for business planning and is the same type of information that Seller has been providing to date.**

[63] ~~Note to Purchaser: The Parties to discuss and agree on the scope and timing of employee data to be provided to Purchaser prior to Closing.~~

[82] **Note to Purchaser: The Parties to discuss and agree on the scope and timing of employee data to be provided to Purchaser prior to Closing.**

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

**401**

~~be made to appropriate representatives of the Purchaser who are designated by the Purchaser and who have executed the applicable Clean Team Confidentiality Agreements.[83]~~

Section 5.7.    Public Announcements.    Subject to (a) the provisions of Section 7.4(a) with respect to communications and announcements to the Employees and the employees of the Purchaser and the Designated Purchasers and (b) each Party's disclosure obligations imposed by Law (including any obligations under any Bankruptcy Laws), during the period from the date hereof until the Closing Date, the Purchaser and the Main Sellers shall, and shall cause their respective Affiliates to, (i) cooperate with the other Primary Party in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and Employees with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (ii) not issue any such announcement or statement prior to consultation with, and the approval of, the other Primary Parties (such approval not to be unreasonably withheld or delayed); provided, that, approval shall not be required where the disclosing Primary Party determines, based on advice of counsel and after consultation with the other Primary Parties, that such disclosure is required by Law.; **provided, further, that the Purchaser shall be permitted to make disclosures and announcements in accordance with the terms set forth in Exhibit [•] hereto.[84]**  For the avoidance of doubt, this Section 5.7 shall not impose any restrictions in addition to those set forth in the Confidentiality Agreement with respect to non-public communications between the Purchaser and its direct shareholders.

Section 5.8.    Further Actions.    From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and give effect to the transactions contemplated herein, including the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement; provided that, subject to Section 2.1.7 and Section 5.5, neither the Purchaser nor the Sellers shall be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities.

Section 5.9.    Conduct of Business.    The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise expressly contemplated or permitted by this Agreement or another Transaction Document, including Section 5.4, (iv) required by Law (including any applicable Bankruptcy Law or by order of a Bankruptcy Court) **(provided, that no Seller shall seek or support (and the Sellers shall object to) any order that would conflict with this Section 5.9 in the absence of this clause (iv) and shall cooperate with the Purchaser to resist any such**

---

[83] **Note to Seller:  It is important to Purchaser that Seller's employees be given access to the Contracts at this stage.  The date on in Purchaser's closing condition related to passage of time is, in part, tied to when full access will be provided.**
[84] **Note to Seller:  Parties to discuss criteria for certain releases as of signing.**

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

402

order), or (v) relates ~~solely~~ to Excluded Assets or Excluded Liabilities **in a manner that does not relate to or materially affect the Business, Assets or Assumed Liabilities,** the Sellers shall,[ **and shall cause their Affiliates to,**][85] (A) conduct the Business and maintain the ~~Owned Equipment in the Ordinary Course, and (B~~**Assets and Assumed Liabilities in the Ordinary Course (it being understood that the sale of Owned Inventory and assumption of Assumed Liabilities in the Ordinary Course is included in the maintenance of the Assumed Assets and Assumed Liabilities), (B) use commercially reasonable efforts in the context of the Bankruptcy Proceedings to continue operating the Business as a going concern, maintain the business organizations of the Business intact and preserve intact goodwill and relationships with customers, suppliers, Governmental Entities, partners, lessors, licensors, licensees, contractors, distributors, agents, officers and employees, and (C)** abstain from any of the following actions:

        (a)    (i) sell, lease or dispose of a material portion of the Assets **or any Assets material to the Business**, in any single transaction or series of related transactions, other than in the Ordinary Course**; provided, that for purposes of this clause (i) the definition of Ordinary Course includes Seller's obligation to maintain the value of the Business as a going-concern**, or (ii) enter into any exclusive license agreement that would restrict the Business or the Assets after the Closing in any material respect;

        (b)    incur any Lien on any Assets, other than (i) Liens that will be discharged at or prior to Closing or (ii) Permitted Encumbrances;

        (c)    (A) sell, assign or transfer any Transferred Intellectual Property, (B) grant any ~~material~~ licenses to the Transferred Intellectual Property other than (i) licenses or sublicenses granted **to suppliers, resellers and customers** in the Ordinary Course, **and** (ii) such licenses ~~or sublicenses~~ as would be permitted by the grant back license rights set forth in the Intellectual Property License Agreement~~, or (iii) licenses or sublicenses granted pursuant to source code escrow arrangements listed in Section 5.9(c) of the Sellers Disclosure Schedule~~ **(if such agreement were in effect as of the date hereof)**, or (C) intentionally fail to make any filing, pay any fee, or take any other action necessary to maintain the ownership, validity and enforceability of any material Transferred Intellectual Property; provided that if the Sellers unintentionally fail to make any filing, pay any fee, or take any other action necessary to maintain the ownership, validity and enforceability of any material Transferred Intellectual Property, the Sellers will, upon becoming aware of any such failure, make all reasonable efforts to correct any adverse effects of such failure;

        (d)    increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Employees, other than (i) increases in the Ordinary Course or as required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof, or pursuant to the KEIP or KERP (provided that the Sellers provide the Purchaser with notice of amendments, modifications, supplements or replacements to the KEIP or to the KERP as may be approved by the Canadian Court or the U.S. Bankruptcy Court), or as otherwise approved by the Bankruptcy Court from time to time,

---

[85] **Note to Seller:  Deletion subject to completion of diligence on Seller list and Assets.**

**403**

or (ii) increases to welfare benefits that apply to substantially all similarly situated employees (including the Employees) of the Sellers or the applicable Affiliates of the Sellers;

(e)    [adopt, amend in any way that would materially increase its costs or terminate any Seller Employee Plan that would be a Transferred Employee Plan, except as required by applicable Law or any Collective Labor Agreement or as required for such Seller Employee Plan to become a Transferred Employee Plan;][486]

(f)    enter into or amend ~~any Special Arrangements~~ to provide for greater benefits **under any Special Arrangements**, except as required by applicable Law;

(g)    enter into any Collective Labor Agreement affecting Employees, except as required by applicable Law;

(h)    take any action, [other than ~~actions that an employer in bankruptcy would take~~**in the Ordinary Course**[87], to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be such an employee (other than termination for cause or termination of Employees who failed to receive an Offer (as defined below) from the Purchaser or a Designated Purchaser pursuant to this Agreement; provided that the Sellers ~~make a reasonable effort to~~ provide notice to the Purchaser prior to any such employment termination);

(i)    voluntarily terminate, waive any material right under, or materially amend (including by materially increasing the obligations of the Sellers under a supply Contract, materially reducing the obligations of a customer under a customer Contract of the Sellers, or materially modifying the standard warranty terms or return policy for CVAS Products or CVAS Services under a Material Contract so as to materially increase the Liabilities of the Sellers thereunder) any Material Contract or Bundled Contract material to the Business (other than as necessary to effect the unbundling of any Bundled Contract required with respect to any other business or business segment of the Sellers), unless such Contract has become a Non-Assigned Contract**, an Excluded 365 Customer Contract, an Excluded Non-365 Customer Contract** or will not be assigned to the Purchaser or any Designated Purchaser at Closing and other than in the Ordinary Course;

**(j)    fail to maintain the inventory and supplies of the Business in the Ordinary Course (including with respect to entering into purchase orders of the type contemplated by Section 2.1.3(m)); provided, that for purposes of this clause (j) the definition of Ordinary Course includes Seller's obligation to maintain the value of the Business as a going-concern;**

**(k)**    ~~(j)~~ waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or

---

[486] Note to Purchaser:  This section will be deleted if there are no Transferred Employee Plans.
[87] **Note to Seller:  "Ordinary Course" already includes the ordinary course of the Business consistent with recent past practice** *since the filing of the Bankruptcy Proceedings.***"**

**404**

realized, on the Business that will bind the Purchaser or a Designated Purchaser after the Closing Date and is materially adverse to the Business;

(l)    (k) enter into any Material Contract pursuant to Section 4.4(a)(ii) or amend any Contract to thereafter be a Material Contract pursuant to Section 4.4(a)(ii) that would reasonably be expected to bind the Purchaser or any of its Affiliates in any material respect after the Closing;

(m)    (l) fail to maintain tangible property which, individually or in the aggregate, is material to the Business and which is included in the Assets, in the Ordinary Course;

(n)    (m) fail to maintain the material Consents with respect to the Business in the Ordinary Course;

**(o)    (i) settle or otherwise compromise any audit, proceeding or Action with respect to a material amount of Taxes which settlement or compromise could affect a Purchaser's or Designated Purchaser's Liability for Taxes relating to the Business for any Post-Closing Taxable Period or (ii) make or rescind any material election in relation to Taxes that would materially and adversely impact the Purchaser or a Designated Purchase after the Closing; or**

(p)    (n) authorize, or commit or agree to take, any of the foregoing actions.

If a Seller desires to take any action described in this Section 5.9, the Main Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9. The Purchaser shall **use its commercially reasonably efforts to** respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day of delivery of such electronic mail or facsimile. The **;** *provided,* **that the** failure of the Purchaser to respond within such two (2) Business Days shall not **(i)** be deemed to be consent to such action **and (ii) be a material breach of this Agreement**.

Section 5.10.    Transaction Expenses.    Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 5.11.    Confidentiality.

(a)    The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction

process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns.

(b)    From the Closing Date until the date that is five (5) years after the Closing Date, the Sellers shall not, and shall cause their Affiliates not to, and shall use **commercially** reasonable ~~best~~ efforts to cause the respective representatives of the Sellers and their Affiliates not to, use or disclose to any Third Party, any Confidential Information. For purposes of this Agreement, "**Confidential Information**" consists of all competitively sensitive information and data related to the Business or the Assets (including Transferred Intellectual Property and competitively sensitive Business Information existing as of the Closing Date), Purchaser or its Affiliates that is not, in each case, already available to the public (it being agreed that disclosure of Confidential Information to prospective purchasers, their representatives and other Persons affiliated with the sale process of the Business shall not be public disclosure thereof), underlined provided that nothing herein or in the other Transaction Documents shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, Seller's Affiliates or their respective representatives to (i) disclose the terms of any of the Transaction Documents to any court or to any liquidator or in connection with any auction process approved by a Bankruptcy Court and show appropriate figures in their administration records, accounts and return; (ii) exercise or enforce any of their rights, or perform any obligations under this Agreement or the other Transaction Documents, including the Transition Services Agreement and the Intellectual Property License Agreement, (iii) make permitted disclosures under Section 5.7; (iv) make any disclosures that are required by applicable Law; (v) own, use or disclose Confidential Information that is not exclusive to the Business to the extent necessary to (in the reasonable judgment of the Sellers) operate the other business segments of the Sellers or their Affiliates ~~or otherwise engage in any manner in any business activities unrelated to the Business~~; (vi) use Confidential Information to the extent necessary to perform any Seller Contracts not assigned to the Purchaser; (vii) share information to the extent reasonably necessary to allocate the purchase proceeds from the sale of the Assets; or (viii) make customary disclosures, subject to customary confidentiality agreements, regarding Confidential Information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).

(c)    It is acknowledged by the Purchaser and the Sellers that in the course of attempting to sell the Assets, one or more of the Sellers has entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and has disclosed such information to certain of those Third Parties.

Section 5.12.    Certain Payments or Instruments Received from Third Parties.  To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to

**95**

NY\1582469.7

95

[New York #2071434 v4]    ~~Error! Unknown document property name.~~

**406**

promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the Business, the Sellers shall, and shall cause the other Sellers to promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable. All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its **commercially** reasonable ~~best~~ efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

Section 5.13.  Non-Assignable Contracts.

(a)  To the extent that any Seller Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing, or cannot be entered into (A) without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity) or (B) without Sellers' and their Affiliates' compromising any right, asset or benefit or expending any amount or incurring any Liability or providing any other consideration (collectively, the **"Non-Assignable Contracts"**), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless and until any such Consent is obtained, including any Consents obtained following Closing; provided, however, that the Sellers will use **commercially** reasonable ~~best~~ efforts (without incurring any third party costs) to (i) cooperate with the Purchaser in any reasonable arrangement to provide the Purchaser the same interest, benefits, rights and liabilities under any such Non-Assignable Contracts that are not licenses of Intellectual Property as the applicable Seller had immediately prior to the Closing, including using **commercially** reasonable ~~best~~ efforts to enter into one or more mutually agreed Subcontract Agreements, and (ii) facilitate Purchaser's negotiation with the other party to each Non-Assignable Contract that is a license of Intellectual Property to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing (including that Sellers shall request such Third Party's Consent if so requested by the Purchaser); provided that there shall be no obligation on Sellers or their Affiliates to compromise any material right, asset or benefit or expend any amount or incur any Liability. As between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts described above shall be deemed to be assigned and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder. Notwithstanding the foregoing sentences, (x) nothing in this Section 5.13 shall require any Seller to renew, modify or amend any Non-Assignable Contract once it has expired, (y) any efforts required of the Sellers pursuant to this paragraph shall be strictly on an interim basis and in no event shall such efforts or arrangements be required after one hundred and eighty (180) days from the Closing Date, and (z) the Sellers shall have the right, any time after the day that is one hundred and eighty one (181) days after the Closing Date, to exercise any right to terminate any Non-Assignable Contract. The Purchaser or the Designated Purchaser, as applicable, shall reimburse the relevant Seller for the out-of-pocket expenses incurred or asserted, as a result of any actions taken pursuant to this Section 5.13.

NY\1582469.7

~~Error! Unknown document property name.~~

[New York #2071434 v4]

407

The Parties acknowledge that the fact that any Contract constitutes a Non-Assignable Contract shall not (i) constitute a breach of any covenant hereunder, (ii) entitle Purchaser to terminate this Agreement or (iii) result in any reduction of the Purchase Price payable hereunder. Any Non-Assignable Contract assigned pursuant to the terms of this Section 5.13 shall, when assigned, constitute an Assigned Contract hereunder from and after such date.

(b)    For the purposes of this Agreement (including Section 5.13(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any Assumed and Assigned Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Purchaser or the Designated Purchasers such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7.

Section 5.14.    Bundled Contracts.[688]

(a)    Section 5.14(a)(i) of the Sellers Disclosure Schedule lists each Contract that the Sellers have entered into prior to the date hereof providing for the sale or provision of CVAS Products or CVAS Services and the sale or provision of other products or services of the Sellers or their Affiliates (each, a "**Bundled Contract**"). Subject to applicable Law and the terms of such Bundled Contracts, each of the Purchaser and the Sellers shall (and the Purchaser shall cause any relevant Designated Purchaser to), as applicable, use their reasonable best efforts to, at least fifteen (15) Business Days prior to the Closing Date, cause the counterparty to each Bundled Contract listed on Section 5.14(a)(i) of the Sellers Disclosure Schedule to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the CVAS Products and the CVAS Services and to enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the Purchaser or applicable Designated Purchaser and such applicable customer which only relates to CVAS Products and CVAS Services, in which event such new Contract shall be deemed to be an Assigned Contract; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in obtaining such arrangements and the failure to enter into such arrangements with respect to any Bundled Contract shall not entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder; **provided, further, that the Purchaser shall not be obligated to enter into any such new Contract that does not meet the Inclusion Criteria unless the applicable Bundled Contract is set forth on Section 5.14(a)(ii)[89] of the Sellers Disclosure Schedule.** Without the express written consent of Purchaser, Sellers shall not agree to amend the material terms applicable to the Business of any Bundled Contract as a condition of such counterparty agreeing to amend such portion of such Bundled Contract. To the extent permitted by the terms of such Bundled Contract and applicable Law, each of the Sellers and the Purchaser shall

---

[688] Note to Seller:  Purchaser requires schedules and to review the contracts to comment further.  Parties to also discuss Seller providing assistance to "unbundle" supply contracts or otherwise provide Purchaser assistance to obtain replacement contracts in connection with either this covenant of the Seller Supply Agreement.
[89] **Note to Seller:  Schedule to cover the major bundled contracts.**

**Error! Unknown document property name.**

**408**

notify the other Party if any customer has contacted such Party with regard to the matters set forth in this Section 5.14 and shall keep such other Party reasonably informed regarding the content of any discussions with the customer. For the avoidance of doubt, nothing in this Section 5.14(a) shall restrict the Sellers from taking any actions with respect to Bundled Contracts, including any amendments thereof, to the extent they relate to businesses or business segments of the Sellers or their Affiliates other than the Business **and such actions do not materially affect the Business**.

(b)    Subject to applicable Law and the terms of such Bundled Contracts, for those Bundled Contracts for which the arrangements mentioned in Section 5.14(a) could not be entered into fifteen (15) Business Days prior to the Closing Date, (i) the relevant Sellers shall, until the date that is [~~ninety days~~**one (~~90~~1)**] **year** after the Closing Date, to the extent requested by the Purchaser, use their **commercially** reasonable ~~best~~ efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to CVAS Products and/or CVAS Services, including by making available those employees who are responsible for managing the customer relationships with the customers of such Bundled Contracts (to the extent reasonably practicable and to the extent such employees remain in the employ of the Sellers), reasonably cooperating with the Purchaser to jointly contact each counterparty to such Bundled Contracts by making such contacts (by phone or in person) as may be reasonably requested by the Purchaser and by sending a joint letter, in form and substance satisfactory to each of Sellers and the Purchaser notifying the counterparty to each such Bundled Contract of the transactions and requesting the counterparty to agree to amending such Bundled Contract after the Closing Date or (ii) the Sellers and the Purchaser shall use their **commercially** reasonable ~~best~~ efforts to cooperate in any commercially reasonable arrangement to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits, rights and liabilities under any such Bundled Contract only to the extent relating to CVAS Products and/or CVAS Services as the applicable Seller had immediately prior to the Closing under such Bundled Contract, in so far as they relate to the Business, including using **commercially** reasonable ~~best~~ efforts to enter into one or more mutually agreed Subcontract Agreements with respect to such Bundled Contracts; _provided_ that (A) nothing in this Section 5.14 shall require the Sellers to renew any Bundled Contract once it has expired, (B) the Sellers shall have the right, any time after the date that is [~~ninety~~**one (~~90~~1)** ~~days~~**year**] after the Closing Date, to exercise any right to terminate any Bundled Contract, and (C) the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in order to comply with its obligations under this sentence. Upon the execution of the relevant Subcontract Agreements the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants of the relevant Seller under the applicable Bundled Contracts (to the extent relating to the Business and including obligations relating to warranties [and Known Product Defects (as defined in the Nortel Accounting Principles)). Without limiting the generality of the foregoing, the Purchaser expressly agrees that any obligations under any warranty liabilities or any obligations associated with any Known Product Defects relating to CVAS Products and CVAS Services which have been supplied under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under any Subcontract Agreement shall be assumed by the Purchaser or such Designated Purchaser and no Sellers shall have or

**409**

retain any Liability, cost or expenses in connection with any such warranty liabilities or Known Product Defects_related to the CVAS Products and CVAS Services.]⁶⁶

Section 5.15.   Post-Closing Assistance for Litigation.  After the Closing, the Purchaser shall, upon the request of the Sellers, and at no cost to the Sellers (other than reimbursement of reasonable and documented out of pocket expenses of the Purchaser or a Designated Purchaser and the payment of a reasonable per diem to the Purchaser or a Designated Purchaser, which per diem shall be based upon the total compensation of the affected Transferred Employee at the applicable time), require the Transferred Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchasers or their Affiliates hereunder shall only extend to the employees of such Purchasers or Purchasers' Affiliates as of the date such employees are to be made available and shall not apply to former employees of such Purchaser or Purchaser's Affiliates that have been terminated prior to such date.

(b)    After the Closing, the Sellers and their Affiliates shall, upon the request of the Purchaser, and at no cost to the Purchaser or its Affiliates (other than reimbursement of reasonable and documented out of pocket expenses of the Sellers and their applicable Affiliates and the payment of a reasonable per diem to a Seller or Seller Affiliate, which per diem shall be based upon the total compensation of the affected employee at the applicable time) require their employees that were not Transferred Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Sellers or their Affiliates hereunder shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of Purchaser's request and so long thereafter as they continue to be employed by such Seller or its Affiliates and shall not apply at any time with respect to individuals no longer employed by such Sellers or Seller's Affiliates and shall not require any Sellers or Seller's Affiliates to continue the employment of any such employee.

Section 5.16.   Delivery of Assets.⁹⁰

(a)    [In accordance with the procedures and timeline set forth on Section 5.16(a) of the Sellers Disclosure Schedule, ]⁶⁷⁹¹ The Purchaser shall, and shall cause the

⁶⁶ Note to Seller:  Subject to confirmation of a proper KPD purchase price adjustment.
⁹⁰ Note to Seller:  Subject to real estate discussion.
⁶⁷⁹¹ Note to Purchaser:  Timing to be discussed.

NY\1582469.7

**Error! Unknown document**

[New York #2071434 v4]   **property name.**

**410**

relevant Designated Purchasers to, at Purchaser's sole cost and expense, [within thirty (30) days after the Closing Date ]relocate all tangible Assets and Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing other than those premises to be occupied by the Purchaser or any Designated Purchasers after the Closing Date pursuant to the provisions of the Real Estate Agreements.

(b)    As promptly as reasonably practicable, and in no event more than thirty (30) days, after the Closing Date, the Sellers shall deliver to the Purchaser copies of filings, prosecution files, dockets and certifications relating to the filing, prosecution, issuance, renewal and enforcement of the Business Registered IP, provided that all items to be delivered hereunder shall be delivered solely by remote telecommunication to the extent the Purchaser may so request. Without limiting the generality of the foregoing, within thirty (30) days of Closing, the Sellers shall and shall cause their Affiliates to, instruct their current attorneys and agents to deliver to the Purchaser, or attorneys designated by Purchaser, any and all records in the possession of such attorneys and agents relating to the prosecution of any applications, registrations and renewals of any Business Registered IP.

Section 5.17.   Termination of Overhead and Shared Services and French Company Licenses.[92]

(a)    The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business.

(b)    [The Sellers shall, on or before Closing, provide the Purchaser with reasonable evidence confirming that Nortel Networks S.A. has agreed:

(i)    not to assert its Intellectual Property and exclusive license rights, if any, in a manner that could restrict or conflict with the ability of the Purchaser or its successors, assigns, licensees, sub-licensees or customers to operate in the field of the Business and its natural evolutions; and

(ii)    to the fullest extent permitted under French Law, to relinquish, waive and terminate all its Intellectual Property and license rights (including any enforcement rights) to the extent (but only to the extent) that they relate to the Intellectual Property that is sold or licensed to the Purchaser in connection with the sale of the Business.][68][93]

Section 5.18.   Financing.

---

[92] Note to Seller:  Subject to completion of diligence that French licenses are all that require termination.

[68][93] Note to Purchaser:  As discussed, it is currently contemplated that the Nortel entities holding relevant licenses will be parties to the IPLA.

NY\1582469.7

Error! Unknown document property name.

[New York #2071434 v4]

411

(a)    The Purchaser shall obtain the Financing on the terms and conditions described in the Financing Commitments or Replacement Financing **(with such amendments thereto so long as they could not reasonably be expected to adversely impact or delay in any material respect the ability of the Purchaser to consummate the financing contemplated by the Commitment Letters)**, and shall: (i) enter into definitive agreements with respect to the Financing on substantially the terms and conditions contemplated by the Financing Commitments or Replacement Financing**, as amended**; (ii) to the extent within its control, **use its commercially reasonably efforts to** fully satisfy on a timely basis all conditions applicable in such definitive agreements to such Person obtaining the Financing set forth therein; and (iii) consummate the Financing contemplated by the Financing Commitments or Replacement Financing at Closing.  The Purchaser shall not amend or modify the terms of the Financing Commitments in ~~any manner that might be adverse to the Sellers~~**a manner that could reasonably be expected to adversely impact or delay in any material respect the ability of the Purchaser to consummate the financing contemplated by the Commitment Letters** without the prior express written consent of the Main Sellers.  In the event any portion of the Financing expires or is terminated or otherwise becomes unavailable on the terms and conditions contemplated in the Financing Commitments or any lender or Sponsor shall have asserted that any conditions of the Financing have not been, or may not be, satisfied, the Purchaser shall promptly (and in any event within two (2) Business Days) notify the Sellers of such unavailability or assertion and the reasons therefor, and shall (in consultation with the Main Sellers) enforce its rights under the Financing Commitments (including by seeking specific performance) and use its **commercially** reasonable ~~best~~ efforts to arrange Replacement Financing or to obtain alternative financing from alternative sources as promptly as practicable following the occurrence of such event.  In such event, the Purchaser shall promptly notify the Sellers when it obtains alternative financing.  The Purchaser shall keep the Sellers informed on a reasonably prompt basis, and in reasonable detail of the status of the Financing and any alternative financing.  The Purchaser shall provide notice to the Sellers promptly upon receiving the Financing and shall furnish correct and complete copies of the definitive agreements with respect thereto to the Sellers promptly upon their execution, to the extent executed prior to the Closing and subject to any confidentiality undertakings.

(b)    From and after the date hereof, Sellers shall~~,~~ and shall ~~use their reasonable best efforts to~~ cause their respective Affiliates, officers, directors, employees, agents and representatives to, provide to the Purchaser commercially reasonable cooperation requested by the Purchaser with respect to actions that are necessary, proper or advisable in connection with obtaining the Financing ~~and~~**,** the Replacement Financing **and any other financing**, including in each case, to the extent commercially reasonable and requested with reasonable advance notice (i) participation in meetings, presentations, due diligence sessions and sessions with financing sources and rating agencies, (ii) assisting with the preparation of Purchaser's materials for rating agency presentations, offering documents, business projections  and similar marketing documents required by Purchaser in connection with the Financing ~~or~~**,** the Replacement Financing **or any other financing**, (iii) **as promptly as practical,** furnishing ~~the~~ Purchaser and its debt financing sources with financial and other information regarding the Business as may be reasonably requested by the Purchaser ~~and prepared by the Sellers in the Ordinary Course~~, including **financial statements,** pro forma financial information, financial

101

412

data, audit reports and other information, and (iv) **issuing customary representation letters to auditors (including pursuant to Section 5.25),** using commercially reasonable efforts to take any corporate or similar **obtain accountants' work papers, comfort letters and consents to the use of accountants' audit reports relating to the Business, legal opinions, surveys, title insurance and other documentation and items relating to the Financing or any other financing as reasonably requested by the Purchaser, (v) promptly providing interim financial statements (excluding footnotes) of the Business to the extent available, (vi) reasonably facilitating the pledging of collateral (including obtaining releases, terminations, waivers, consents, estoppels and approvals as may be required in connection therewith), (vii) delivery to Buyer and its financing sources of information with respect to the Business, Acquired Assets and Assumed Liabilities as may be reasonably requested by Buyer or such financing source, including due diligence information reasonably requested by the financing sources (which shall be subject to customary confidentiality agreements) in connection with the preparation of the marketing material and (viii) taking all** actions necessary to permit the consummation of the Financing and any **, the** Replacement Financing **and any other financing**; provided that (A) such requested cooperation does not unreasonably interfere with the ongoing operations of the Sellers and their Affiliates and (B) none of the Sellers or their Affiliates shall be required to pay any commitment or other similar fee or incur any other Liability in connection with the Financing.[6094]

      (c)    Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of the Financing or any financing from any other Person, and (ii) failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.4). The Purchaser and its Affiliates shall not take any action that impairs the ability of the Purchaser to fulfill its obligations hereunder or make any payment required in respect of this Agreement or the EMEA Asset Sale Agreement.

      Section 5.19.  Insurance Matters.[7095]

      (a)    The Purchaser acknowledges and agrees that coverage of the Covered Assets and Persons under the Seller Insurance Policies shall cease as of the Closing Date and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Except to the extent provided in Section 2.1.1(l) or Section 5.19(c), the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business.

---

[6094] Note to Purchaser: Subject to further discussion pending receipt of applicable Financing Commitments from Purchaser.

[7095] Note to Seller: Under **Remains subject to** review by the Purchaser's insurance consultant.

NY\1582469.7

Error! Unknown document property name.

[New York #2071434 v4]

413

(b)    If after the Closing Date the Purchaser, a Designated Purchaser, or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

(c)    Prior to Closing, the Sellers shall at all times maintain their current property insurance in respect of the Owned Equipment, or in the event any such policies are cancelled or otherwise terminated, shall obtain other substantially comparable insurance policies that have substantially the same terms and conditions and make and diligently pursue any applicable insurance claims related to damage or destruction to any Owned Equipment. Notwithstanding anything in this Agreement to the contrary if and to the extent that any piece of Owned Equipment, wherever located, is destroyed or damaged prior to Closing, and is not replaced or repaired or restored to its condition prior to such damage or destruction, then at Closing, the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received in respect of such Owned Equipment (excluding any insurance proceeds related to business interruption insurance) that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted. For the avoidance of doubt, in the event that the Sellers transfer such proceeds to the Purchaser, the Sellers shall have no further obligations with respect to the Owned Equipment that was destroyed or damaged and the Purchaser shall not be entitled to terminate this Agreement and such events shall not result in any reduction of the Purchase Price payable hereunder.

**Section 5.20.    Deposits, Guarantees and Other Credit Support of the Business.**[96]

(a)    ~~Section 5.20. Deposits, Guarantees and Other Credit Support of the Business.~~[74] Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchaser to:

----

[96] **Note to Seller: Subject to review of schedules of such items.**

103

**Error! Unknown document property name.**

**414**

(i)    procure the return and/or release by the applicable counterparty, as soon as reasonably practicable but in no event later than thirty (30) days after the Closing Date, of:

**(A)** [(A) any lease security deposits given by the Sellers under any Real Estate Leases, including subleases) that are Assigned Contracts (the "**Security Deposits**");]

**(B)** (B) any continuing obligation of any Seller or any Affiliate thereof with respect to any Assigned Contract or any Contract, asset or obligation of the Business (including any guarantee or credit support provided by, or any letter of credit, performance bond or surety posted by, any Seller or any of its Affiliates [or any Third Party on behalf of the Sellers (and with a counter guarantee of the Sellers)]) listed in Section 5.20(a)(i)**(B)** of the Sellers Disclosure Schedule; and

(ii)    [if the Security Deposits are not released or returned to the relevant Seller within thirty (30) days from Closing, pay to the relevant Seller an amount equal to such outstanding Security Deposits (in which case, effective upon such payment, the relevant Seller shall assign to the Purchaser any right or credit against the relevant lessor relating to such Security Deposit); and]

(iii)    indemnify and hold harmless the Sellers and their Affiliates from and against any Loss resulting from any failure of the Purchaser or Designated Purchasers to comply with the obligations set forth in clauses (a)(i) and (a)(ii) of this Section 5.20.

Section 5.21.   Use of Trademarks.   Except as expressly provided in the Trademark License Agreement, **as of the Closing Date,** neither the Purchaser nor any Designated Purchaser shall have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or any of their Affiliates or any other Trademark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing (collectively, the "**Sellers' Trademarks**").

Section 5.22.   Maintenance of Books and Records.

(a)    After the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until at least the fifth (5th) anniversary of the Closing Date, all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person.   After the Closing Date and up until at least the fifth (5th) anniversary of the Closing Date, upon any reasonable request from the Sellers or their representatives, the Purchaser shall, and/or shall cause the Person holding such records to, (i) provide to the Sellers or their representatives reasonable access to such records during normal business hours and (ii) permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses). In addition, in the event that the financial statements of the Business are audited for any period

---

71  Subject to review of schedules of such items.

**415**

prior to the Closing Date, upon execution of a customary access letter if required, the Sellers and their representatives (including their outside accountants) shall be granted access to all relevant work papers, schedules, memoranda and other documents prepared by the Business or their representatives (including outside accountants) in connection with the Sellers' completing the audit of their accounts for the 2009 fiscal year; provided, however, that nothing herein shall require the Purchaser to disclose any information to the Sellers if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement) or, other than as provided in Section 6.5, require the Purchaser to disclose its Tax records. Such records may be sought under this Section 5.22(a) for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the Sellers (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, (y) any and all such records may be destroyed by the Purchaser if the Purchaser sends to the Sellers written notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Sellers notify the destroying party that the Sellers desire to obtain possession of such records, in which event the Purchaser shall transfer or cause to be transferred the records to the Sellers and the Sellers shall pay all reasonable expenses of the Purchaser in connection therewith and (z) other than as provided in Section 6.5, the Purchaser shall not be required to provide the Sellers access to, or copies of, any Tax records.

      (b)    After the Closing, Sellers shall preserve, until the fifth (5th) anniversary of the Closing Date, all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such ~~Person~~**Sellers or any of Sellers' Affiliates**. After the Closing Date and up until the fifth (5th) anniversary of the Closing Date, upon any reasonable request from the Purchaser, any Designated Purchaser or their respective representatives, the relevant Seller shall, and/or shall cause the Person holding such records to, (i) provide to the Purchaser, any Designated Purchaser or their respective representatives reasonable access to such records during normal business hours and (ii) permit the Purchaser, any Designated Purchaser or their respective representatives to make copies of such records, in each case at no cost to the Purchaser, any Designated Purchaser or their respective representatives (other than for reasonable out-of-pocket expenses); provided, however, that nothing herein shall require the Sellers or their Affiliates to disclose any information to the Purchaser, any Designated Purchaser or their respective representatives if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser, any Designated Purchaser or their respective representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement)~~, or to require the Sellers to disclose their Tax records~~. Such records may be sought under this Section 5.22(b) for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

416

securities disclosure or other similar needs of the Purchaser, any Designated Purchaser or their respective representatives (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, (y) any and all such records may be destroyed by the Sellers if the Sellers send to the Purchaser written notice of their intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Purchaser notifies the destroying party that the Purchaser or any Designated Purchaser desire to obtain possession of such records, in which event the Sellers shall transfer or cause to be transferred the records to the Purchaser and the Purchaser shall pay all reasonable expenses of the Sellers in connection therewith and (z) the Sellers shall not be required to provide the Purchaser, any Designated Purchaser or their respective representatives access to, or copies of, any Tax records or audited financial statements covering any pre-Closing period, except as specifically required pursuant to the terms of this Agreement.

Section 5.23.   Certain Ancillary Agreements.[7292]

(a)   The Primary Parties and, to the extent applicable, the relevant EMEA Sellers, shall [use their **commercially** reasonable ~~best~~ efforts] to:

(i)   promptly negotiate in good faith with the relevant contract manufacturers and finalize the terms of the Contract Manufacturing Inventory Agreements based on the term sheet attached hereto as Exhibit F;

(ii)   [promptly negotiate in good faith with GDNT the GDNT Agreement based on the term sheet attached hereto as Exhibit H];

(iii)   [promptly negotiate in good faith with the LGN Joint Venture the LGN Distribution Agreement based on the term sheet attached hereto as Exhibit K; and]

(iv)   [promptly negotiate in good faith with NN Turkey the NN Turkey Agreements].

(b)   The Parties and the EMEA Sellers acknowledge that, as of the date hereof, the Business entertains several bilateral relationships with other businesses, business segments or divisions of certain Sellers or their Affiliates for the supply and/or development of products and services (including certain CVAS Products and CVAS Services). To the extent such relationships are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter (for the duration of any individual customer contract including frame contracts), the Primary Parties and the relevant EMEA Sellers shall use their **commercially** reasonable ~~best~~ efforts to negotiate, or to cause to be negotiated, in good faith commercially reasonable terms in order to address the interdependencies among businesses set forth on Exhibit 5.23, including through a ~~Mutual Development Agreement, a~~ Purchaser Supply Agreement and a Seller Supply Agreement [(the

---

[7292] Note to Seller:  Parties to discuss the Ancillary Agreements generally (including process timeline).

NY\1582469.7

Error! Unknown document

[New York #2071434 v4]                                                property name.

**4l7**

term sheets of which are attached hereto as Exhibits O, P and Q)] or other appropriate commercial arrangements. The Primary Parties shall also use their ~~best~~ **commercially** reasonable efforts to negotiate in good faith the Subcontract Agreements. For the avoidance of doubt, other than the Intellectual Property License Agreement, the Transition Services Agreement and the Real Estate Agreements, the failure to execute and deliver at Closing any of the Ancillary Agreements shall not be deemed a failure of any condition precedent to this Agreement or allow any Party to terminate this Agreement.[98]

Section 5.24.  <u>Closing Unaudited Financial Statements</u>.  Prior to the Closing Date, the Sellers shall cause to be prepared and shall deliver to the Purchaser unaudited management statements of certain assets and liabilities of the Business as of the Closing Date and the related unaudited management statements of income of the Business for the fiscal year ended December 31, 2009 and the period from January 1, 2010 until the end of the last fiscal quarter prior to the Closing Date; <u>provided</u>, that if the Closing Date is less than ~~twenty-five~~ **[fifteen** (~~25~~**15)]**[99] Business Days following the end of a fiscal quarter, then the last fiscal quarter prior to the Closing Date shall be deemed to be the previous fiscal quarter (together, the **"Closing Unaudited Financial Statements"**).  The Closing Unaudited Financial Statements shall be prepared based upon the financial books and records maintained by the Sellers and the EMEA Sellers for the Business on the basis of the Nortel Accounting Principles and shall represent the Seller's good faith estimate of the selected balance sheet accounts, income statements and results from operations set forth therein for the Business for the applicable date and period. The Closing Unaudited Financial Statements (a) will not be prepared in accordance with GAAP, except as set forth in the Nortel Accounting Principles, (b) will include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the Closing), (c) will include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) will reflect the estimated historical operation of the Business (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) will not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

Section 5.25.  <u>Closing Audited Financial Statements</u>.  The Sellers shall **cause KPMG (as their independent accountants) to** create the audited balance sheets of the Business and the related statement of earnings and cash flows for the Business for **(i)** the fiscal year ended December 31, 2009 **and (ii) the period from January 1, 2010 until the Closing Date** (the **"Closing Audited Financial Statements"**).  The Closing Audited Financial Statements shall be prepared based upon the financial books and records maintained by the Sellers and the EMEA Sellers for the Business on the basis of GAAP**, consistently applied,** and shall present the selected balance sheet accounts, income statements and results from operations set forth therein for the Business for the applicable date and period, except that they will not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity. The Sellers shall deliver the Closing Audited Financial Statements to the Purchaser as soon as reasonably practicable and in no event later than

---

[98] Note to Seller: TBD in connection with visa employees and Local Sale Agreements.
[99] Note to Seller: TBD.

**418**

[four (4)] months following the Closing Date. **For the avoidance of doubt, Sellers shall furnish customary representation letters in connection with the Closing Audited Financial Statements.**

Section 5.26. <u>Additional Bankruptcy Proceedings; Adverse International Injunctions.</u>[73][100]

(a) If at any time prior to the Closing Date, (i) any Seller that is a Non-Debtor Seller as of the date hereof shall have commenced Bankruptcy Proceedings in any country or other jurisdiction (other than the U.S., Canada or the United Kingdom) (an "**Additional Bankruptcy Proceeding**"), (ii) there shall be in effect any Law, material order, injunction, decree or judgment of any court or other Government Entity prohibiting in such jurisdiction (other than the U.S., Canada or the United Kingdom) the consummation of the transactions contemplated hereby (such Law, material order, injunction, decree or judgment, an "**Adverse International Injunction**") or (iii) any entity is not deemed an Other Seller pursuant to clause (ii) of the definition thereto, then (A) the Main Sellers shall reasonably promptly notify the Purchaser of the commencement of such Additional Bankruptcy Proceeding, the issuance of such an Adverse International Injunction or the exclusion of such entity as an Other Seller, as applicable, and, to the extent the Main Sellers are aware of the same, identify the Assets that are subject to such Additional Bankruptcy Proceeding, Adverse International Injunction or belong to such entity listed on Exhibit A (the "**Restricted Assets**") and (B) the Parties shall, in respect of the Restricted Assets, use their **commercially** reasonable ~~best~~ efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to assign all of Sellers' right, title and interest in the Restricted Assets to Purchaser or a Designated Purchaser, as applicable, as contemplated hereby on the Closing Date, notwithstanding the Additional Bankruptcy Proceeding, Adverse International Injunction or inability of the Main Sellers to cause such entity listed on Exhibit A to sign this Agreement, as applicable.

(b) If, ten (10) Business Days prior to the Closing Date, it has become apparent to the Parties that such Additional Bankruptcy Proceeding, Adverse International Injunction or inability of the Main Sellers to cause such entity listed on Exhibit A to sign this Agreement, will prevent a Seller or entity listed on Exhibit A, as applicable (the "**Restricted Seller**") from assigning the Restricted Assets to the Purchaser or a Designated Purchaser, as applicable, as of the Closing Date, then, as of the Closing Date, such Restricted Assets shall automatically be deemed Excluded Assets hereunder, the Restricted Seller shall be excused from delivering the Restricted Assets and, without prejudice to all other obligations of the Purchaser and the other Sellers hereunder, Purchaser shall be relieved from its rights and obligations to acquire such Restricted Assets or assume any Assumed Liabilities in respect thereof (the "**Restricted Liabilities**") and the Purchase Price shall be reduced by an amount equivalent to the Market Value of such Restricted Assets and Restricted Liabilities (the "**Downward Adjustment**").~~[;~~ **it being understood, however, that if the Market Value in**

---

[73][100] <u>Note to Seller</u>: Subject to the Purchaser's completion of due diligence on the assets. Likely scenarios to be discussed.

**411**

**respect of such Restricted Assets and Restricted Liabilities is not a positive number, then such Market Value shall be deemed to be zero and there shall not be any adjustment to the Purchase Price.]**[101]

(c)    For a period of [one-hundred eighty (180) days] following the Closing, the Sellers and the Purchaser shall, in respect of the Restricted Assets that have become Excluded Assets pursuant to Section 5.26(b), continue to use their **commercially** reasonable ~~best~~ efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to assign such Restricted Assets of the relevant Restricted Seller to Purchaser or a Designated Purchaser, as promptly as reasonably practicable within such period.  To the extent the Restricted Assets are assigned to Purchaser or a Designated Purchaser, as applicable, Purchaser or a Designated Purchaser shall assume the related Restricted Liabilities, then as of the transfer date (i) the Restricted Assets and the Restricted Liabilities shall be deemed respectively Assets and Assumed Liabilities hereunder and (ii) Purchaser shall pay to the Distribution Agent by wire transfer to the account designated by the Main Sellers pursuant to Section 2.4 an amount in cash equal to the Downward Adjustment.

Section 5.27.    Finalization of Schedules to Transition Services Agreement; Disputes.[74][102]

(a)

Section 5.28.    Avoidance Actions. The Sellers covenant that they shall not commence any action under sections 544 through 551, 553 and 558 of the U.S. Bankruptcy Code against any customer, contract party or vendor of the Business in relation to the Business.

Section 5.29.    Competing Transaction. From the date of this Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction (as defined in the U.S. Bidding Procedures Order) until the Closing Date or termination of this Agreement, neither any Seller nor any Affiliate of any Seller shall, directly or indirectly through any of its officers, directors, employees, agents, professional advisors or other representatives (collectively, the "**Representatives**"), (i) solicit, initiate or encourage or engage in discussions or negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its affiliates) relating to in each case any transaction that would be considered an Alternative Transaction (a "**Competing Transaction**"), (ii) furnish any information with respect to, or participate in, or assist, any effort or attempt by any Person to do or seek the foregoing, (iii) execute any letter of intent or agreement providing for a Competing Transaction, or (iv) seek or support Bankruptcy Court approval of a motion or [Order] inconsistent with the transactions contemplated herein (provided, however, that nothing contained herein shall prohibit the Sellers from providing any Person with the Bidding Procedures and related documents, answering

---

[101] Note to Seller:  While Purchaser will examine whether this is even possible, Purchaser's position is that the exclusion of Sellers (which is not within Purchaser's control) should not increase the purchase price.

[74] ~~NTD~~[102] Note to Seller:  Section to be negotiated and completed in connection with the TSA discussions. Purchaser expects appropriate guarantees of day-one readiness.

**109**

Error! Unknown document property name.

420

questions about the Bidding Procedures or announcing the execution of this Agreement or the Auction). Notwithstanding the foregoing, from the date of this Agreement until the entry of the U.S. Bidding Procedures Order, the Sellers may provide continued access to written due diligence materials about the Business in an electronic data room (including written responses to requests for information made after the date hereof), to only such Person or Persons (and their representatives) that (A) have access to such electronic data room as of the date hereof and (B) have satisfied the requirements of paragraph (a) of the "Participation Requirements" of the U.S. Bidding Procedures Order within ten (10) Business Days from the date hereof (it being understood that, during such ten (10) Business Day period, the Sellers will be allowed to (x) request such Persons to enter into amendments to their existing confidentiality agreements in order to render them compliant with the requirements of the U.S. Bidding Procedures, (y) discuss and negotiate such amendments with those Persons and (z) execute such amendments, and each such action shall not constitute a breach of this Section 5.29); provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials. Without prejudice to any other methods or actions that may result in the cure of any breach of this Section 5.29, the Parties acknowledge and agree that in the event that any officer or other employee of any Seller acting alone (without the assistance of outside advisors) in violation of a corporate policy approved by the board of directors of NNC takes an action that constitutes a breach of clause (i) of this Section 5.29 but does not constitute a breach of any other clause of this Section 5.29, such breach shall be deemed cured in the event such action ceases and one or more of the Sellers notifies the counterparty or counterparties to the potential Competing Transaction in writing that the Sellers will not undertake such Competing Transaction, in each case no later than the fifth (5th) day after the Sellers become aware of such breach (for such purposes excluding the knowledge of the employee or officer whose action constitutes such breach), provided that such action that constituted the breach did not involve substantive negotiations regarding the terms of such Competing Transaction.

Section 5.30.   Purchaser Financial Statements.  To the extent the Closing has not occurred prior to [March 1, 2010], prior to the Closing the Purchaser shall provide to the Main Sellers true and complete copies of the audited consolidated balance sheets of the Purchaser and its consolidated Subsidiaries as of December 31, 2009 and December 31, 2008 and the related consolidated audited statements of income, cash flows and statements of changes of stockholders' equity for the years then ended, accompanied by the reports thereon of the Purchasers' independent auditors.  Such financial statements shall be prepared based upon the financial books and records maintained by the Purchaser in accordance with GAAP and fairly present in all material respects the consolidated financial position, results of operations, cash flows and stockholders' equity of the Purchaser and its consolidated Subsidiaries as of their respective dates and for the respective periods indicated.

# ARTICLE VI

# TAX MATTERS

Section 6.1.   Transfer Taxes.

421

(a)    The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes ~~that may be~~ imposed upon or payable or collectible or incurred ~~in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document,~~ **in each case, as a direct result of the transfer of Assets to the Purchaser or a Designated Purchaser pursuant to this Agreement**; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate**, representative** or agent, as applicable, at the Closing or thereafter, as **required by applicable Law and** requested of or by the applicable Seller**. To the extent that any Seller or any Subsidiary, Affiliate, representative or agent thereof is required to collect, remit or pay such Transfer Taxes but is entitled to a deduction, credit or refund for such Transfer Taxes, such Seller shall pay to Purchaser or the relevant Designated Purchaser the amount of such deduction, credit or refund within thirty (30) days of the use or receipt of such deduction, credit or refund by such Seller or other Person. The Sellers hereby agree to claim or apply for any deduction, credit or refund in all jurisdictions where permissible pursuant to applicable Law.** For the avoidance of doubt, Purchaser shall ~~remain~~**be** liable in respect of any Transfer Taxes **as provided in this Section 6.1(a)** regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)    [The Sellers, **the Purchaser and any Designated Purchasers shall cooperate in timely filing all Tax Returns as may be required in connection with the payment of such Transfer Taxes. The Sellers,** on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, shall, as appropriate, **use commercially reasonable efforts to** execute and deliver all instruments and certificates reasonably necessary to enable the other to comply with any filing requirements and Laws relating to any such Transfer Taxes.][~~75~~103]

(c)    If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, VAT or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser or such Designated

---

[~~75~~103] Note to Purchaser: Please list required certificates, and Seller will determine on a case-by-case basis which it can provide.

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

422

Purchaser, as the case may be. All Parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

        (d)    Provided that in the opinion of the relevant Sellers **or the Purchaser** the sale qualifies for such an election **or application**, the Purchaser and the relevant Designated Purchasers shall jointly execute with the applicable Seller an election under Section 167(1) of Part IX of the Excise Tax Act (Canada) ~~and any equivalent~~**, application for "Transfer of Going Concern" treatment in the United Kingdom and any similar** election **or application** provided under ~~provincial~~**applicable** Laws, in the forms prescribed for such purposes, such that the sale of the Assets will take place without payment of any GST**, value-added Tax or similar Tax**. The Purchaser or the relevant Designated Purchaser, as the case may be, shall file within the prescribed filing period all forms supporting ~~the said~~**such** election **or application** with the relevant Tax Authority, together with its Tax Returns for the applicable reporting periods during which the sale of the Assets contemplated herein occurs**. The Sellers and the Purchaser hereby agree that the sale of the assets of Nortel Networks Australia Pty Limited constitutes the supply of a going concern and is not subject to goods and services Tax.**

        **(e)    Notwithstanding anything to the contrary, the Purchaser or any Designated Purchaser that is a GST registrant may withhold the amount of any GST payable until the earlier of (i) the day the relevant Seller is legally required to remit such GST to the appropriate Tax Authorities; or (ii) the day the Purchaser or any Designated Purchaser receives its GST credit or refund, in order to enable such Purchaser or Designated Purchaser to seek to receive its GST credit or refund before such payment is legally required to be remitted to the appropriate Tax Authorities by the relevant Seller**.

        Section 6.2.    Withholding Taxes. To the extent that the Purchaser or a Designated Purchaser is required under the Code or any provision of U.S. state or local, or non-U.S. Law to deduct and withhold an amount on payment of the Purchase Price, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Persons in respect of which such deductions and withholdings were made. The Purchaser and the Designated Purchasers shall promptly remit such withheld amounts to the appropriate Government Entity. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price under the Code or any provision of U.S. state or local, or non-U.S. Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing ~~d~~**D**ate, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers.

        Section 6.3.    Tax Characterization of Payments Under This Agreement. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes to the extent permitted under applicable Tax Law.

        Section 6.4.    Apportionment of Taxes.

[New York #2071424 v4]    Error! Unknown document property name.

423

(a)    Except as otherwise provided in this ARTICLE VI, (i) the Sellers shall and shall cause the other Sellers, as the case may be, to bear (A) all Taxes of any kind relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof ending on or before the Closing Date and (B) all Taxes of any Seller imposed on or measured by such Seller's net income**, gross income, capital, gross receipts, profits, and all Taxes of the same or of a similar nature,** for any Tax period and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Property Tax (other than Transfer Taxes allocated under Section 6.1), the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of all other Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be determined from the books and records of the relevant Person as though the taxable period terminated at the close of business on the Closing Date.

Section 6.5.    Records.

(a) Notwithstanding the provisions of Section 5.22, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this paragraph shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

NY\1582469.7

Error! Unknown document property name.

**424**

(b) At any time ~~within the ten (10) years immediately following the Closing~~**prior to the Escrow Deadline**, the Sellers may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending ~~no later than ten (10) years after the Closing Date~~**on the Escrow Deadline** in accordance with an escrow agreement between the Purchaser (or the Designated Purchaser, as applicable), the Sellers and the Records Custodian, in form satisfactory to the Purchaser (or the Designated Purchaser) and the Sellers.  The Purchaser (or the Designated Purchaser) shall have no obligation to provide any assistance to the Sellers with respect to placing copies of Restricted Technical Records into escrow unless the Sellers pay all of the Purchaser's (or the Designated Purchaser's) reasonable costs and expenses in connection with the foregoing, including a reasonable per diem rate for access to former employees of NNL or Nortel Networks Technology Corporation ("**NNTC**"), as the case may be (based on the total compensation of the employee at the time access is provided).  The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser (or the Designated Purchaser), acting reasonably.  The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c) The Purchaser or the Designated Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser or the Designated Purchaser.

(d) **The Purchaser shall have no obligation to provide any access under this provision unless the Sellers (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).**

(**e**) The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

NY\1582469.7

~~Error! Unknown document property name.~~

[New York #2071434 v4]

**425**

Section 6.6.    Tax Disclosure.  Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any Party may (i) consult any Tax adviser regarding the U.S. and Canadian federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all Persons, without limitation of any kind, the U.S. and Canadian federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to such Person relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any non-public commercial or financial information); provided, however, that clause (ii) of this Section 6.6 shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. and Canadian federal income Tax treatment of the transactions contemplated hereunder.

Section 6.7.    Tax Returns.

(a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**")), the preparation of which is described below in Section 6.7(b)).  Such Tax Returns shall be true, correct and complete in all material respects.  Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law. **The Sellers shall provide drafts of such Tax Returns with respect to non-income Taxes to the Purchaser no later than fifteen (15) Business Days prior to the relevant due date and shall in good faith consider any comments made by the Purchaser with respect thereto.**

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any other Transaction Document shall be prepared by the Party that has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws.  Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.7(b) shall be made available to the Purchaser at least ~~five~~ten (~~5~~10) Business Days before such Tax Returns are due to be filed. ~~Notwithstanding the above, the Sellers shall use their reasonable best efforts to~~ **and shall not be filed without the Purchaser's prior written consent, which shall not be unreasonably withheld. The Sellers shall** make available to the Purchaser such information as will enable the Purchaser to review that portion of the Transfer Tax Returns applicable to the sale and purchase transaction contemplated by this Agreement no later than ~~eight~~ten (~~8~~10) Business Days prior to the date on which such Transfer Tax Returns are due to be filed. ~~Purchaser shall be entitled to comment on any Transfer Tax Return prepared by a Seller prior to making any payment in respect thereof, such comments to be provided at least three (3) Business Days before such Transfer Tax Returns are due to be filed, and the Sellers shall in good faith consider any comments made by the Purchaser with respect thereto.  In the event of disagreement between the Parties, the relevant Transfer Tax Return shall be filed in accordance~~

NY\1582469.7

**Error! Unknown document**

[New York #2071434 v4]    **property name.**

426

~~with Seller's reasonable determination, it being understood that the Purchaser shall remain~~ ~~responsible for any Transfer Taxes whether or not shown on such Tax Return.~~  The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.7(b) at least one (1) Business Day before such Transfer Tax becomes due and payable~~.~~**, in each case to the extent such Transfer Taxes are the responsibility of the Purchaser pursuant to Section 6.1(a).**

(c)    The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business for all Straddle Periods.  Such Tax Returns shall be true, correct and complete in all material respects.  All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law, except for such Taxes that are the responsibility of Sellers pursuant to this ARTICLE VI.  Taxes that are the responsibility of the Sellers pursuant to this ARTICLE VI shall be paid by the Sellers to the Purchaser or Designated Purchaser no later than three (3) Business Days prior to the due date for the applicable Straddle Period Tax Return.

(d)    The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.7(b)) prepared by the Purchaser or a Designated Purchaser for any Straddle Period before any such Tax Return is filed.  The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least ~~ninety (90)[~~\_\_\_\_\_] days before the date such Tax Return is required to be filed with the relevant Tax Authority.  The Main Sellers shall have ~~thirty (30)[~~\_\_\_\_\_] days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return.  The Purchaser shall notify the Main Sellers within ~~fifteen (15)[~~\_\_\_\_\_] days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments.  To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within ~~ten (10)[~~\_\_\_\_\_] days, the Parties immediately shall appoint an Independent Auditor to determine the correct manner for reporting the items that are in dispute and shall provide to the Independent Auditor all relevant information.  The Independent Auditor shall have ~~thirty (30)[~~\_\_\_\_\_] days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith.  The fees and expenses of the Independent Auditor shall be paid by the Party whose position is deemed to be least correct by the Independent Auditor.

**(e)    Prior to Closing, the Seller shall deliver to the Purchaser a certificate issued by the Ministry of Finance of British Columbia pursuant to section 99 of the Social Service Tax Act (British Columbia) and a similar certificate issued under similar legislation in other relevant provinces (if applicable) indicating that all requisite Taxes collectable or payable under such Act and similar legislation have been paid by the Sellers.**

**427**

Section 6.8.    <u>Canadian Tax Election</u>.

(a)    The Sellers and the Purchaser ~~acknowledge that a portion of the Assets transferred pursuant to this Agreement by the Sellers to the Purchaser or each Designated Purchaser which is a resident of Canada for purposes of the Income Tax Act (Canada) is being transferred to the Purchaser (or the relevant Designated Purchaser) in consideration for the Purchaser (or the relevant Designated Purchaser) assuming prepaid obligations of the Seller to deliver goods or provide services in the future.  The Sellers and the Purchaser (or the relevant Designated Purchaser) will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) as to such assumption hereunder, and prepare their respective Tax Returns~~**or Designated Purchaser shall elect jointly under Section 22 of the Income Tax Act (Canada) and the corresponding provision of any other provincial legislation to the sale of the CIP Receivables** in a manner consistent with ~~such joint election.  The elected amount will be jointly determined by the Sellers and the Purchaser (or relevant Designated Purchaser), acting reasonably.  The Sellers and the Purchaser (or relevant Designated Purchaser) will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply mutatis mutandis in respect thereof.~~**the Allocation.**

(b)    ~~To the extent the Seller and the Purchaser (or the relevant Designated Purchaser) cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada), the Seller and the Purchaser (or the relevant Designated Purchaser) promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant Parties immediately shall appoint an Independent Auditor to determine the correct amount to be elected and shall provide to the Independent Auditor all relevant information.  The Independent Auditor shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith.  The fees and expenses of the Independent Auditor shall be paid by the Party whose position is deemed to be least correct by the Independent Auditor.~~

Section 6.9.    <u>Purchase Price Allocation</u>.

(a) The Parties shall [(i) first allocate to the tangible Assets **and the CIP Receivables** a proportion of the Purchase Price (and to the extent properly taken into account under applicable Tax Laws, the Assumed Liabilities) equal to [the net book value] of such Assets as of the Closing Date and (ii) then allocation the balance of the Purchase Price, as adjusted in clause (i) of this Section, to the intangible Assets.  **Such allocation shall be consistent with the allocation prepared pursuant to Section 2.2.4.]**[104]

(b) To the extent necessary to file ~~Transfer~~ Tax Returns, the Parties agree to negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury

---

[104] **TBD**

**117**

**428**

regulations promulgated thereunder and other applicable Tax Laws (such allocation, a "**Partial Allocation**"). The Partial Allocation shall be consistent with the principles of Section 6.9(a). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Independent Auditor, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including, for this purpose, an allocation required, approved or authorized pursuant to a Bankruptcy Proceeding), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation (but in all cases shall be subject to the principles of Section 6.9(a) **to the extent permitted by such Government Entity**). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Independent Auditor has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.7(b), then such Transfer Tax Return shall be timely filed in the manner that the Party with primary responsibility for filing such return**Purchaser** reasonably determines and **the Party responsible for filing such Transfer Tax Return** shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Independent Auditor (as modified to be consistent with the allocation required by a Government Entity, as described in the foregoing sentence), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation, filing and audit of any Transfer**of filing** Tax Returns.

Section 6.10.    Other Tax Matters.    **The Sellers, on the one hand, and the Purchaser, on the other hand, shall cooperate fully with each other in the conduct of any audit, litigation or other proceeding or Action relating to Taxes involving the Assets or the Partial Allocation.** [The Sellers shall promptly notify the Purchaser in writing upon receipt by any Seller of notice of any pending or threatened Tax audit, assessment or Action relating to the income, properties or operations of the Sellers that reasonably may be expected to relate to or give rise to a Lien on the Assets prior to Closing, other than Permitted Encumbrances.] The Sellers, on the one hand, and the Purchaser, on the other hand, shall promptly notify the other in writing upon receipt of written notice of any pending or threatened Tax audit, assessment or Action challenging the Partial Allocation in a material way.

## ARTICLE VII

## EMPLOYMENT MATTERS

Section 7.1.    Employment Obligations with Respect to Non-Union Employees. Except for the provisions of Section 7.1.1(a)-(d) and Section 7.1.2(c)(iii), which shall apply to all Transferred Employees, the provisions of this Section 7.1 shall apply only to Non-Union Employees. Subject to the clarifying wording in Section 7.1.1(a), and the provisions relating to [●], the provisions of this Agreement shall not apply to EMEA Employees.

7.1.1.    Employment Terms.

**118**

429

(a)    The Purchaser hereby agrees to offer employment to ~~the number of Employees employed by Sellers in each country that is at least equal to the number of employees set forth for each country in Section 7.1.1 of the Sellers Disclosure Schedule (which Section 7.1.1 of the Sellers Disclosure Schedule~~**a minimum of [one thousand seven hundred (1,700) Employees]**[105]**, which** shall include all Employees who transfer by operation of Law (including all Union Employees employed in Canada) [~~and all Transferring Employees, whose employment shall be governed by the EMEA Asset Sale Agreement (for the avoidance of doubt, no Offers will be required to be made to ARD Transferring Employees (as defined in the EMEA Asset Sale Agreement) whose contracts of employment will transfer to the Purchaser by operation of Law), but the number of Transferring Employees will be included within the minimum number set forth above, and the terms of Offers made to Non-ARD Transferring Employees (as defined in the EMEA Asset Sale Agreement) will be governed by the EMEA Asset Sale Agreement)]~~[76]. [Within thirty (30) days following the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order,][106] the Purchaser shall notify the Sellers of the identity of the Employees on Section 4.11(b) of the Sellers Disclosure Schedule by unique identifier (the "**Identified Employees**") to whom the Purchaser or a Designated Purchaser intends to provide a written offer of employment or notice of continued employment (each an "**Offer**" and collectively, the "**Offers**"); provided that, promptly after the date hereof, the Sellers and their Affiliates have provided the Purchaser with access to such information as the Purchaser reasonably requires in accordance with Section 5.6(a) and Section 7.4(e**d**) in order to make such identifications (except as prohibited by Law); provided, further, that up to ~~three (3)~~**two** weeks prior to the Closing Date and subject to Section 7.4(g), the Purchaser shall be permitted to notify the Sellers of names of additional Employees who remain employed with the Sellers at the time of such notice that the Purchaser shall wish to make an Offer to in the event that the initial Employees who receive Offers do not meet the contingencies in the Offer set forth below (other than the contingency in clause (D)) or do not accept the Offer, and  such additional Employees shall be deemed to be Identified Employees upon the later to occur of the initial Employees' (who receive Offers) failure to meet the contingencies in the Offer or accept the Offer and Purchaser's notice to Seller of the names of such additional employees. ~~For the avoidance of doubt, Sellers shall not be required to continue the employment of any such additional~~ **(such employees, "Additional Employees")**. Promptly following Purchaser's notification to Seller of Identified Employees, but in any event no later than the time required to provide the Offer Consideration Period described below, the Purchaser shall, or shall cause a Designated Purchaser to, extend Offers to the Identified Employees. ~~Such Offers to Identified Employees (who are not Transferring Employees and whose employment does not transfer by operation of Law to the Purchaser or Designated Purchaser) shall be in a form agreed by the Primary Parties and in compliance with applicable~~

---

[105] Note to Seller:  Parties to discuss a mechanism where the Purchaser may hire (or retain as consultants) additional "transitional" employees above and beyond the 1,700 employees noted herein (as such number may be increased by the Purchaser) to the extent that such employees are not coming over in connection with the TSA.  Purchaser contemplates that such "transitional employees" would be employed by the Purchaser for a limited period of time following Closing.  The Purchaser would not covenant to any ongoing obligations with respect to such employees.

[76] ~~Note to Seller:  To be discussed in conjunction with the EMEA ASA.~~
[106] Time period to be discussed.

NY\1582469.7

[New York #2071434 v4]

**Error! Unknown document property name.**

430

~~Law with such employment to take effect under the terms stated herein as of the Effective Hire Date, as defined below~~**The Sellers shall have the right to review any form of Offer with respect to a particular jurisdiction (and any Offer that deviates in any material respect from the form of Offer with respect to the relevant country)**. Except with respect to Union Employees, such Offers shall, except to the extent otherwise required by Law, be for employment on terms and conditions that are substantially comparable to those terms and conditions of employment of similarly situated employees of the Purchaser or a Designated Purchaser, as applicable and, without limiting the generality of the foregoing, shall include (i) an annual base salary and annual target incentive for each such Employee that is ~~equal~~**substantially comparable** to the annual base salary and annual target incentive for ~~such Employee as set out in the Employee Information, (ii) employment in a reasonably comparable position as set out for the Employee in the Employee Information, (iii) a location reasonably contiguous to their current location as set out in the Employee Information and (iv~~**similarly situated employees of the Purchaser or a Designated Purchaser, as applicable and (ii)** other terms and conditions of employment as set forth in this Section 7.1. The Purchaser shall provide in its Offers that the Employee's acceptance of such Offer will be deemed to be a consent to the transfer of such Employee's particular Employee Record as provided in Section 7.4(e). ~~For purposes of this Agreement, to the extent certain terms and conditions of employment are required to be maintained under applicable Law or Seller Employee Plans in order to avoid Sellers' incurring severance or other employment termination obligations or Liability under the WARN Act with respect to Employees at any time on or after the Closing Date such terms and conditions shall be deemed to be required by applicable Law.~~ Seller shall provide to the Purchaser such available and relevant information in accordance with Section 5.6(a), and Seller and Purchaser shall cooperate in good faith, so as to enable Purchaser to comply with its undertakings under this Section 7.1.1. Employees' employment with Purchaser or a Designated Purchaser or, with respect to Employees whose employment transfers by operation of Law, continued employment after the Employee Transfer Date, shall not include a probationary period but may be contingent, except with respect to Union Employees (A) on each such Employee passing a background check ~~and, if such Employee is located in the United States, drug screening, in each case to the extent such screening process is required by applicable Law, a relevant Purchaser or Designated Purchaser contract, or other customer requirement~~**, to the extent permitted and consistent with applicable Law and any applicable Collective Labor Agreement,** (B) on such Employee's production of evidence that he or she is legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law, (C) in the case of Inactive Employees (other than Employees whose employment transfers by operation of Law), upon their return to active status with the Purchaser or one of its Affiliates and (D) upon the Closing.   The Offers shall be made prior to the Closing in compliance with this Section 7.1.1 and shall provide each such Employee with a consideration period prior to the Closing that is no less than two weeks, or such longer period as required by applicable Law (the "**Offer Consideration Period**"). [As soon as reasonably practicable following the Sellers' receipt from the Purchaser of the notice containing the Identified Employees (as required pursuant to the second sentence of this Section 7.1.1(a)) but in all events prior to Closing, the Sellers shall take any and all action permitted under applicable Law and applicable Collective Labor Agreements legally necessary to cause the termination of employment, effective prior to the Closing, of each Employee set forth on

NY\1582469.7

~~[New York #2071434 v4]~~                                          ~~**Error! Unknown document property name.**~~

**431**

Section 4.11(b) of Sellers Disclosure Schedule who is not an Identified Employee but only to the extent such employment would otherwise transfer to the Purchaser or a Designated Purchaser by operation of Law.}

(b)    [Purchaser shall notify the Main Sellers of the acceptance and rejections of offers of employment that have been received from each of the Employees (x) on at least a weekly basis during the Offer Consideration Period and (y) in total within three (3) Business Days following the end of the Offer Consideration Period. ]

(c)    Any Identified Employee who accepts such offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employees whose employment transfers by operation of Law, shall be deemed to be a Transferred Employee for all purposes of this Agreement.  Inactive Employees shall remain employed by the relevant Seller until the first (1st) Business Day immediately following the date such Inactive Employee reports to work with the Purchaser or a Designated Purchaser after having been released to return to active employment in accordance with Sellers' leave policies.  Visa Employees shall remain employed by the relevant Seller under the terms and conditions of the Loaned Employee Agreement.  The Purchaser or a Designated Purchaser shall use its **commercially** reasonable ~~best~~ efforts from the date of notification to Sellers of the Identified Employees (as provided for in Section 7.1.1(a)) until the Closing Date to obtain, at its cost, such visas or permits as are required for the Purchaser or Designated Purchaser to employ Visa Employees who accept Offers effective as of the Effective Hire Date.

(d)    The Effective Hire Date is (i) the Employee Transfer Date for those Employees other than Inactive Employees and Visa Employees, (ii) 12:01 a.m. on the first Business Day following the date each Inactive Employee reports to work with the Purchaser or a Designated Purchaser after having been released to return to active employment in accordance with Sellers' leave policies for all Inactive Employees and (iii) the date specified in the Loaned Employee Agreement with respect to Visa Employees.

(e)    As of the Effective Hire Date and, except as otherwise provided herein, for a period of not less than twelve (12) months after the Closing Date, the employment of Transferred Employees shall be on terms and conditions set forth in Section 7.1 or on terms and conditions that are substantially the same in the aggregate thereto except as otherwise required by applicable Law.

7.1.2.  <u>Employee Benefits</u>.

(a)    The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes, including membership~~, vesting, benefit accrual~~ and entitlement to benefits under all relevant Purchaser Employee Plans, but not for purposes of benefit accrual**, vesting** or otherwise for determination of the amount or duration of benefits under any Purchaser Employee Plan that is a defined benefit pension plan {or under an equity incentive plan}, except as otherwise provided herein, ~~or~~**and to the extent each such Transferred Employee was entitled to recognition of such service date under the**

**121**

NY\1582469.7

121

[New York #2071434 v4]                                    **Error! Unknown document property name.**

**432**

**corresponding Seller Employee Plan in which such Transferred Employee participated immediately prior to Closing, and** to the extent that such crediting would not result in duplication of benefits or the funding thereof.

(b)     After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees as applicable from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

(c)     Without limiting the generality of the foregoing, the Sellers and the Purchaser shall, or shall cause their relevant Affiliates to, as applicable, provide the following benefits to Transferred Employees:

(i)     [For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with the same severance payments and benefits as similarly situated employees of Purchaser or a Designated Purchaser following the crediting of such Transferred Employees with service as provided in Section 7.1.2(a).][107]

(ii)     The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees (excluding those Transferred Employees specified in Section 7.1.2(c)(ii) of the Sellers Disclosure Schedule, which shall include Union Employees (the "**Specified Transferred Employees**"))[77108], up to their Effective Hire Date, to such Transferred Employees at or as soon as reasonably practicable following their Effective Hire Date or such earlier time as may be required under applicable Law**. With respect to those Transferred Employees located in Canada, the payment by the Sellers pursuant to this Section 7.1.2(c)(ii) shall be in exchange for an acknowledgement and consent by each such Transferred Employee that he or she has received full compensation from the Sellers for such accrued and unused vacation days and has no entitlement to the vacation time associated therewith**. The Purchaser will, and will cause the relevant Designated Purchasers to, use its **commercially** reasonable ~~best~~ efforts to accommodate requests for unpaid time off of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

(iii)     Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule sets forth the Accrued Vacation Amount and the number of accrued and unused vacation days that are due and owing to the Specified Transferred Employees as of the date hereof and updated by Sellers as of the Closing Date.  The Purchaser shall, or shall cause its relevant

---

[107] **Note to Seller: "Transitional employees" will not be provided severance equal to that of similarly situated employees of the Purchaser or Designated Purchaser.**

[77108] Note to Seller:  Discussion of Specified Employee Liabilities is subject to further revision following review by local counsel.

NY\1582469.7

122

122

~~[New York #2071434 v4]~~     **Error! Unknown document property name.**

**433**

Affiliates to, grant each Specified Transferred Employee covered by Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule paid time off in an amount equal to such accrued unused vacation days for Specified Transferred Employee as set forth in the Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule. If such Specified Transferred Employee terminates employment with the Purchaser or an Affiliate of the Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Specified Transferred Employee an amount equal to any such unused paid time off upon such employment termination. ~~The Sellers shall reimburse the Purchaser in cash for the Accrued Vacation Amount as of the Closing Date within ten (10) Business Days of the final determination of such amount. Any disputes surrounding the calculation of the Accrued Vacation Amount shall be resolved pursuant to the provisions of Section 2.2.3.1 *mutatis mutandis.*~~ **; provided that the Purchaser shall only be required to make such payment if such Specified Transferred Employee's employment terminates prior to the date which is twelve (12) months following the Closing Date, unless otherwise required by applicable Law.**

(iv)    The vacation accrual rate and maximum accrual of each Transferred Employee on and after the Effective Hire Date shall be determined (i) under the vacation policy of the Purchaser or the Designated Purchaser applicable to similarly situated employees, if any, located in the country where such Transferred Employee is employed **(or if no such employees exist in the applicable country, at the discretion of the Purchaser)** as of the relevant Effective Hire Date, and (ii) following the crediting of such Transferred Employee with service as provided in Section 7.1.2(a). For the avoidance of doubt, such vacation accrual rate and maximum accrual applicable to Specified Transferred Employees shall not be decreased by the Purchaser or an Affiliate of the Purchaser as a result of the obligation in this Section 7.1.2(c) that the Purchaser or its Affiliates grant such Specified Transferred Employees accrued and unused vacation days due and owing as of the Closing Date.

(v)    [The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in India with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of gratuity payment, at such time, if any, as such payment thereof is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in Australia with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of long service leave and sick leave and each Transferred Employee located in Hong Kong with the benefit of the amount set forth in Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of sick leave, at such time, if any, as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. Section 7.1.2(c)(v) of the Sellers

NY\1582469.7

[New York #2071434 v4]

**Error! Unknown document property name.**

**434**

Disclosure Schedule shall be updated no later than ten (10) Business Days prior to the Closing Date to reflect status changes and attrition, and further accruals or reductions or other changes from the date hereof to the Closing Date.[109]

(vi)    ~~Each~~**To the extent permitted under the applicable Purchaser Employee Plans, with respect to each** Transferred Employee (and their eligible dependents, as applicable), ~~shall be eligible as of the relevant Effective Hire Date to participate in and accrue benefits under the Purchaser Employee Plans, in each case under the terms of such Purchaser Employee Plans, which apply to employees of the Purchaser or a Designated Purchaser in the country where such Transferred Employee is employed as of the relevant Effective Hire Date and at a cost to such Transferred Employee, which is no greater than  the costs of those benefit plans to similarly situated employees of the Purchaser.  With respect to each Transferred Employee (and their eligible dependents, as applicable),~~ the Purchaser or the relevant Purchaser's Affiliates shall use **commercially** reasonable ~~best~~-efforts to cause such ~~plans~~**Purchaser Employee Plans** to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs; *provided* that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates, and in each case to the extent waived, inapplicable to such Transferred Employee, or honored under the Seller Employee Plans in which such Transferred Employee participated immediately prior to the Closing and to the extent doing so will not result in the duplication of benefits.

(d)    The Sellers shall be solely responsible for any required notice under the WARN Act **or similar state or local laws** with respect to terminations of employment of Employees other than Transferred Employees that occur on or prior to the Closing Date and for any individual who does not become a Transferred Employee regardless of the date of termination *provided* that the Purchaser or Designated Purchaser, as applicable, has satisfied its obligations as set out in this ARTICLE VII.  The Purchaser shall be solely responsible for any required notice under the WARN Act ~~or similar state or local Laws~~ with respect to terminations of employment of Transferred Employees that occur after the Closing Date**.  At or prior to the Closing, the Sellers shall provide the Purchaser, in writing, the number of employees of the Sellers, by facility and operating unit, who have experienced an "employment loss" (as defined under the WARN Act) in the ninety (90) days immediately preceding the Closing**.

(e)    Nothing express or implied in this Agreement (including without limitation anything set forth in this Section 7.1) restricts the right of the Purchaser or any Designated Purchaser after the Closing Date to terminate the employment of any Transferred Employee, to modify the compensation or employee benefits of any Transferred Employee or

---

[109] **Note to Seller:  Subject to review by local counsel.**

**Error! Unknown document property name.**

**435**

relocate any Transferred Employee's principal place of employment, provided any such termination, modification or relocation is effected in accordance with applicable Law, the terms of any applicable Purchaser Employee Plan [or Transferred Employee Plan] and the terms and conditions of this Section 7.1.

Section 7.2.    Employment Obligations with Respect to Union Employees.  The provisions of this Section 7.2 shall apply to Union Employees. As of the Closing Date the Purchaser or its relevant Affiliate will be bound by the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of Union Employees who are Transferred Employees as a successor, assign or purchaser of the relevant Seller and shall employ such Union Employees in accordance therewith. Notwithstanding anything to the contrary herein, nothing in this Section 7.2 shall be deemed to preclude the Purchaser or the relevant Affiliates from renegotiating the terms of any Collective Labor Agreement after the Closing Date.

Section 7.3.    Excluded Employee Liabilities.  For purposes of clarity, the Sellers shall retain, and neither the Purchaser nor any of the Designated Purchasers or Purchaser Employee Plans shall assume at the Closing, any of the following Liabilities of the Sellers, their Affiliates or Seller Employee Plans (the "**Excluded Employee Liabilities**"):

(a)    Liabilities related to the Seller Employee Plans or any employee plans or arrangements related to former employees of the Business employed by the Sellers, including the Sellers' (excluding the EMEA Sellers) or any of their Affiliates' or Seller Employee Plans' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan, except with respect to (i) the [Specified Employee Liabilities][110], (ii) the [Transferred Employee Plans,] (iii) the Assumed Liabilities, and (iv) as specified in the Loaned Employee Agreement;

(b)    any Liability with respect to the KERP, the KEIP or any other retention plan, program or arrangement of the Sellers that provides benefits to any Transferred Employee;

(c)    any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Effective Hire Date including, for avoidance of doubt, an Employee's termination of employment from the Sellers or their Affiliates;

(d)    Except with respect to the Assumed Liabilities and as provided for in Article VII, Liabilities relating to (i) any Employee's or a former employee's employment or termination of employment with any of the Sellers or their Affiliates, including any severance or similar obligations that may arise as a result of the transfer of an Employee's employment to

---

[110] Note to Seller:  Discussion of Specified Employee Liabilities is subject to further review by local counsel.

NY\1582469.7

[New York #2071434 v4]                    125            Error! Unknown document property name.

**436**

the Purchaser or one of its Affiliates or as a result of the Employee's refusal of the Offer[78] and any Liabilities that relate to the Inactive Employees' and Visa Employees' employment or termination of employment with any of the Sellers or their Affiliates, except as otherwise provided in the Loaned Employee Agreement, or (ii) an applicant with respect to potential employment with any of the Sellers or their Affiliates in the Business;

(e)    Except with respect to the Assumed Liabilities and as provided for in Article VII or the Loaned Employee Agreement, Liabilities resulting from any Action relating to any Seller Employee Plan [that is not a Transferred Employee Plan] or any Employee with respect to periods ~~of employment with Sellers~~ prior to the Effective Hire Date.[79]

Section 7.4.    Other Employee Covenants.

(a)    After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Sellers, the Purchaser, nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby.  If requested, the non-requesting Party shall reasonably cooperate with the requesting Party in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)    The Purchaser undertakes to keep the Employee Information ~~and any additional information provided to the Purchaser by the Sellers with respect to individually identifiable Employees~~ (collectively, "**Employee Data**") in confidence including taking the following actions (until the relevant Effective Hire Date with respect to those Employees who become Transferred Employees, and at all times with respect to those Employees who do not become Transferred Employees):

(i)    the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Data only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)    the Employee Data shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

---

[78] ~~Note to Purchaser: Acceptance of this provision is contingent on Purchaser's making offers on the terms and conditions specified in Section 7.1.1.~~
[79] ~~Note to Purchaser: Acceptance of this provision is contingent on Purchaser's making offers on the terms and conditions specified in Section 7.1.1.~~

Error! Unknown document property name.

**437**

(iii)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    The Sellers shall use reasonable efforts to provide updated Employee Information to the Purchaser on the first Business Day of each month beginning after the date hereof, provided that from and after the date on which the Purchaser notifies Seller of its initial list of Identified Employees to whom Offers shall be made under Section 7.1.1, the Sellers shall provide updated Employee Information only with respect to the Identified Employees **and Additional Employees**, and shall provide the Purchaser with the final updated Employee Information with respect to Identified Employees **(including any applicable Additional Employees)** to whom the Purchaser has made Offers under Section 7.1.1 ten (10) Business Days prior to the Closing Date in order to reflect Employee hiring, promotions, demotions, transfers, or other status changes and attrition, and further accruals or reductions or, if and to the extent applicable to such schedule, other changes in each Employee's compensation from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

(d)    The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable (including the providing of any information by the Sellers to the Purchaser as may be reasonably requested by the Purchaser for purposes of complying with its obligations pursuant to ARTICLE VII, subject to Section 5.6(a)), and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

(e)    Within ~~sixty~~**fourteen** (~~60~~**14**) days following the relevant Effective Hire Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee to be obtained by the Purchaser or Designated Purchaser in his or her Offer (including any consent, if required, to transfer Employee Records across geographical boundaries), or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with the Employee Records (or a copy thereof) of Transferred Employees ~~that are maintained on Sellers' Human Resources SAP system but~~ excluding data related to such Transferred Employees protected status under applicable Law. Further, after the Effective Hire Date, the Purchaser may request in writing an individual Employee Record in relation to a reasonably contemplated employment termination by the Purchaser or a Designated Purchaser and, except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee to be obtained by the Purchaser or Designated Purchaser in his or her Offer (including any consent, if required, to transfer Employee Records across geographical boundaries), the Seller shall provide such individual Employee Record within [_____**two** (~~2~~**2**)] Business Days. With respect to such Employee Records provided by the Sellers to the Purchaser or Designated Purchasers, in the event that the Sellers reasonably need access to such Employee Records for purposes of complying with a subpoena or in connection with any pending or threatened Action, the Purchaser or Designated Purchaser will allow the Sellers reasonable access to such Employee Records for the sole purpose of obtaining

127

**438**

information for use as aforesaid and will permit the Sellers to make copies thereof as may be necessary or convenient.

(f)     During the Non-Solicitation Period, the Sellers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the advance written consent of the Purchaser, either directly or indirectly solicit for employment or hire any Transferred Employee unless the employment of such Transferred Employee is involuntarily terminated (other than in connection with such Transferred Employee seeking employment with the Sellers or their Affiliates following the Employee Transfer Date) by the Purchaser or Designated Purchaser prior to such action by the Sellers; provided, however, that nothing in this Section 7.4(f) shall prevent the Sellers from (i) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferred Employees or (ii) hiring such Transferred Employees identified through such employment searches.

(g)     During the Non-Solicitation Period, the Purchaser and the Designated Purchasers shall not, without the Seller's advance written consent or as expressly permitted by this Agreement or an Ancillary Agreement, either directly or indirectly solicit for employment or hire (i) any of the employees of the Sellers who are not Employees, unless the employment of such employee is involuntarily terminated by the Sellers (other than in connection with such Transferred Employee seeking employment with the Purchasers or their Affiliates) prior to such action by the Purchaser or the Designated Purchasers, (ii) any Employees who have rejected their Offer or objected to their transfer of employment to the Purchaser or Designated Purchasers pursuant to this Agreement, or (iii) any Employees to whom the Purchaser or any Designated Purchaser have not made an Offer; provided, however, that nothing in this Section 7.4(g) shall prevent the Purchaser or the Designated Purchasers from (x) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Sellers or (y) hiring such employees or former employees of the Sellers identified through such employment searches; provided, further, that, with respect to any Employee described in clauses (ii) and (iii) above who becomes employed with the Purchaser or a Designated Purchaser (other than by operation of Law) during the twelve (12) month period following the Closing Date, the Purchaser and the Designated Purchasers shall be required to reimburse the Sellers, if applicable, for any pay in lieu of notice (including WARN Act notice) and/or severance payments to the extent paid by the Sellers to such Employee and, if applicable, obtain releases from such Employees of any rights to such payments from Sellers.

(h)     As of the Effective Hire Date, neither the Sellers nor any of their Affiliates shall enforce any non-competition, non-solicitation, confidentiality or similar contractual obligation in respect of the Business or Assets binding to the Transferred Employees which would survive the termination of the employment relationship between the Sellers and the Transferred Employees.

NY\1582469.7

[New York #2071434 v4]

**Error! Unknown document property name.**

Section 7.5. <u>Canadian Pension Plans</u>.[80][111]                                    **439**

(a) <u>Non-Union Defined Benefit</u>. As of the relevant Effective Hire Date, the Non-Union Employees who have any entitlement to defined benefits under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan, whether such Non-Union Employees were accruing such benefits as of the Effective Hire Date or whether accrual had ceased prior to the Effective Hire Date, shall cease to participate actively in such Seller Employee Plan. The Purchaser shall cause such Non-Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan (the "**Canadian Non-Union DC Replacement Plan**") to be established by the relevant Designated Purchaser effective as of the day after the Closing Date. The Purchaser shall cause the Canadian Non-Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purpose of eligibility to participate, vesting and entitlement to benefits. The Canadian Non-Union DC Replacement Plan shall contain an employer contribution formula ~~of at least 5% of the salary of such Transferred Employees, subject to any~~**as required by** applicable ~~tax~~ Law. The Designated Purchaser shall maintain the Canadian Non-Union DC Replacement Plan in respect of such Transferred Employees for at least ~~five~~**two** (~~5~~**2**) years after the Closing Date or their respective employment termination dates with the Designated Purchaser, whichever is earlier, without any adverse amendment. ~~For greater certainty, there shall be no transfer of assets or liabilities from the Nortel Networks Managerial and Non-Negotiated Pension Plan to the Canadian Non-Union DC Replacement Plan or any other Purchaser Employee Plan in respect of defined benefit accruals.~~

(b) <u>Non-Union Defined Contribution</u>. As of the relevant Effective Hire Date, the Non-Union Employees who participate in the defined contribution component of the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such Seller Employee Plan. The Purchaser shall cause such Non-Union Employees who become Transferred Employees to participate in the Canadian Non-Union DC Replacement Plan beginning as of the relevant Effective Hire Date. The Purchaser shall cause the Canadian Non-Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits. The Canadian Non-Union DC Replacement Plan shall contain an employer contribution formula ~~of at least 5% of the salary of such Transferred Employees, subject to any~~**as required by** applicable ~~tax~~ Law.

(c) <u>Union Defined Benefit</u>. As of the relevant Effective Hire Date, the Union Employees who were accruing defined benefits under the Nortel Networks Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such Seller Employee Plan. The Purchaser shall cause such Union Employees who become Transferred Employees to participate in a defined benefit registered pension plan (the "**Canadian DB Replacement Plan**") to be established by the relevant Designated Purchaser effective as of the day after the Closing Date and which shall contain a benefit formula which is no less favorable than the formula in the Nortel Networks Negotiated Pension Plan and which shall otherwise comply

---

[80][111] Note to Seller: Subject to Canadian Counsel Review. The Purchaser should only be obligated by this Agreement to take those actions required by law.

**440**

with the terms and obligations of the applicable Collective Labor Agreements. . The Purchaser shall cause the Canadian DB Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits, but not for the purpose of benefit accrual. ~~For greater certainty, there shall be no transfer of assets or liabilities from the Nortel Networks Negotiated Pension Plan to the Canadian DB Replacement Plan or any other Purchaser Employee Plan.~~

(d)    Union Defined Contribution. As of the relevant Effective Hire Date, the Union Employees who participate in the defined contribution component of the Nortel Networks Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such plan. The Purchaser shall cause such Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan (the "**Canadian Union DC Replacement Plan**") to be established by the Purchaser effective as of the day after the Closing Date. The Purchaser shall cause the Canadian Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits. The Canadian Union DC Replacement Plan shall comply with the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of the relevant Union Employees as a successor, assign or purchaser of the relevant Seller and shall not affect or change in any respect the provisions in such Collective Labor Agreement.

(e)    Pension Liability. For greater certainty, (i) none of the Seller, the Nortel Networks Managerial and Non-Negotiated Pension Plan, nor the Nortel Networks Negotiated Pension Plan shall have any obligation to transfer, and none of the Purchaser, the Canadian Non-Union DC Replacement Plan, the Canadian DB Replacement Plan, the Canadian Union DC Replacement Plan, nor any other Purchaser Employee Plan shall have any obligation to accept assets or Liabilities in respect of defined benefit or defined contribution accruals accrued prior to the Closing Date, and (ii) any Liability with respect to any pension entitlement accrued by any Non-Union Employee or Union Employee prior to the Closing Date shall remain the exclusive liability of the Seller, the Nortel Networks Managerial and Non-Negotiated Pension Plan, and the Nortel Networks Negotiated Pension Plan, as the case may be, and none of the Purchaser, the Canadian Non-Union DC Replacement Plan, the Canadian DB Replacement Plan, the Canadian Union DC Replacement Plan, nor any other Purchaser Employee Plan shall have any Liability or obligation with respect to any pension entitlement accrued prior to the Closing Date.

Section 7.6.    Sole Benefit of the Sellers and the Purchaser. The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, subject to the Purchaser's compliance with the provisions of ARTICLE VII, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit or employment plan, program, agreement or arrangement after the Closing Date,

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

**441**

subject to the Purchaser's compliance with the provisions of ARTICLE VII, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferred Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees, and collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

Section 8.1.   <u>Conditions to Each Party's Obligation</u>.  The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)   *Regulatory Approvals*.  All Regulatory Approvals shall have been obtained and shall remain in force and have not been set aside or modified, on appeal or otherwise.

(b)   *No Injunctions or Restraints*.  There shall be in effect no Law~~, material order, injunction, decree or judgment~~ **or Order** of any court or other Government Entity in the U.S., Canada or the United Kingdom prohibiting the consummation of the transactions contemplated hereby**,** or ~~which would reasonably be expected to have a Material Adverse Effect on the Business or a materially adverse impact on the right or ability of the Purchaser to own, operate or transfer the Business after the Closing.~~**proceeding seeking such a prohibition.**

<u>**(c)   *U.S. Bidding Procedures Order and Canadian Sales Process Order.*  The U.S. Bidding Procedures Order and the Canadian Sales Process Order, which shall include provisions that are substantially similar to the provisions set forth in the form of orders in Exhibit 5.1(b) (in the case of the U.S. Sale Order) and Exhibit 5.2.1 (in the case of the Canadian Sales Process Order), shall have been entered and become Final Orders.**</u>

<u>**(d)**</u>   ~~(e)~~ *U.S. Sale Order and Canadian Approval and Vesting Order*.  The U.S. Sale Order and the Canadian Approval and Vesting Order, which shall include provisions that are substantially similar to the provisions set forth in Exhibit 5.1(b) (in the case of the U.S. Sale Order) and Exhibit 5.2.2 (in the case of the Canadian Approval and Vesting Order), <u>**(i)**</u> shall have been entered and <u>**(ii)**</u> shall not have been stayed as of the Closing Date and shall not be subject to appeal, stay, reversal or modification as of the Closing Date, provided that this condition ~~shall be deemed satisfied even if the U.S. Sale Order has been appealed, so long as (i) the applicable appeal period has expired, (ii) the effectiveness of the U.S. Sale Order has not been stayed by the U.S. Bankruptcy Court pending appeal, and (iii) in the reasonable good faith judgment of the U.S. Debtors after consultation with their counsel and taking into account Section 363(m) of the U.S. Bankruptcy Code, the reversal or modification of U.S. Sale Order~~

**Error! Unknown document property name.**



~~as a result of any then pending appeal would not have a Material Adverse Effect.~~**under Section 8.1(d)(ii) may be waived by the Purchaser in its sole discretion.**

(e)    ~~(d)~~*Satisfaction of Conditions under EMEA Asset Sale Agreement.*  The conditions to Closing of the EMEA Asset Sale Agreement set out in article [15.1, 15.2 and 15.3] thereof (other than the condition regarding the satisfaction or waiver of the conditions hereunder) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement (provided, that a Party may not assert the failure of this condition to be satisfied in the event that such failure is the result of, or has been caused by, a breach by such Party or its Affiliates of this Agreement or the EMEA Asset Sale Agreement that caused the applicable condition to Closing in the EMEA Asset Sale Agreement to not be satisfied).

(f)    ~~(e)~~*Consummation of Closing under EMEA Asset Sale Agreement.*  The transactions contemplated by the EMEA Asset Sale Agreement shall be completed simultaneously with the Closing hereunder.

Section 8.2.    <u>Conditions to Sellers' Obligation</u>.  The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)    No Breach of Representations and Warranties.

(i)    Each of the representations and warranties set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually or together with such other failures, has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(ii)    Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.*  The ~~material~~covenants, obligations and agreements contained in this Agreement to be complied with by the Purchaser or the Designated Purchasers on or before the Closing shall not have been breached in any material respect **(it being understood that the Sellers will use their commercially reasonable efforts to provide notice to the Purchaser of any breach by the Purchaser (that the Sellers are aware of) so that the Purchaser may endeavor to avoid such breach arising to a material level)**.

Section 8.3.    <u>Conditions to Purchaser's Obligation</u>.  The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to

**443**

the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    No Breach of Representations and Warranties.

(i)    Each of the representations and warranties set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually or together with such other failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(ii)    Each of the representations and warranties set forth in Sections 4.1, 4.2, 4.3(a) and 4.15, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.*  The ~~material~~ covenants, obligations and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall not have been breached in any material respect **(it being understood that the Purchaser will use its commercially reasonable efforts to provide notice to the Sellers of any breach by the Sellers (that the Purchaser is aware of) so that the Sellers may endeavor to avoid such breach arising to a material level)**.

(c)    *Transfer of Assets.*  The failure to transfer the Restricted Assets (if any), as set forth in Section 5.26, would not reasonably be expected to be materially adverse to the operations, results of operations or financial condition of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, as compared to a transfer including such Restricted Assets.

(d)    *No Injunctions or Restraints.*  **There shall be in effect no Law or Order of any court or other Government Entity in the U.S., Canada or the United Kingdom reasonably be expected to have a Material Adverse Effect on the Business or a materially adverse impact on the right or ability of the Purchaser to own, operate or transfer the Business after the Closing.**[112]

---

[112] **Note to Seller:  this condition was previously in the mutual closing conditions – moved here because Purchaser should have a right to assume the business in a materially impaired state if it so chooses.**

NY\1582469.7

~~Error! Unknown document property name.~~

~~[New York #2071434 v4]~~

444

# ARTICLE IX

# TERMINATION

Section 9.1.    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:[113]

        (a)    by mutual written consent of the Primary Parties;

        (b)    by either the Main Sellers or the Purchaser, upon written notice to the other:

        (i)    if the U.S. Bidding Procedures Order, in substantially the form attached as Exhibit 5.1(a) or in a form reasonably acceptable to the Purchaser and the Canadian Sales Process Order in substantially the form attached as Exhibit 5.2.1 or in a form reasonably acceptable to the Purchaser have not been entered within thirty (30) days from the date of this Agreement, then this agreement may be terminated within ~~five~~**ten** (~~5~~**10**) Business Days of the end of such thirty (30) day period, but shall not be capable of termination **pursuant to this Section 9.1(b)(i)** thereafter;

        (ii)    if the U.S. Sale Order in substantially the form attached as Exhibit 5.1(b) or in a form reasonably acceptable to the Purchaser and the Canadian Approval and Vesting Order in substantially the form attached as Exhibit 5.2.2 or in a form reasonably acceptable to the Purchaser are not entered within [~~forty-five (45)~~___] days after completion of the Auction (as defined in the U.S. Bidding Procedures Order);

        (iii)    upon the entry of an order by the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction;

        (iv)    if a Governmental Entity in the U.S., Canada or the United Kingdom **(other than a Bankruptcy Court)** issues a ~~ruling or~~ [Final Order] prohibiting the transactions contemplated hereby;

        (v)    if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

        (vi)    if the Closing does not take place within [one-hundred and eighty (180) days] from the date of this Agreement~~.~~**; or**

        **(vii)    upon written notice to the other Party, upon such other Party's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof;**

---

[113] **Note to Seller:  Bankruptcy counsel to discuss.  Purchaser seeks the fastest reasonably achievable timeline.**

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

**445**

(c)    (i) by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.1(d), 8.1(e) or 8.2 or (ii) by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.1(d), 8.1(e), 8.3(a) or 8.3(b), as applicable, and, in each case, which, if capable of being cured, is not cured within twenty-five (25) days from receipt of a written notice from the non-breaching Party; or

(d)    by the Purchaser, upon written notice to the Main Sellers:

(i)    upon the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers other than as reflected in any Downward Adjustment or EMEA Downward Adjustment; or

(ii)    if the Auction does not conclude by [sixty (60)] Business Days after the later of the entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order; or

(iii)    if the Purchaser is not selected as the Successful Bidder or the Alternate Bidder (as defined in U.S. Bidding Procedures Order); **or**

~~(e) by the Main Sellers, upon written notice to the Purchaser, upon Purchaser's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Main Sellers;~~

**(iv)    upon withdrawal, revocation or alteration in a manner adverse to the Purchaser of the Bidding Procedures (as defined in the U.S. Bidding Procedures Order), the Bidding Process (as defined in the U.S. Bidding Procedures Order), the Auction, the U.S. Sale Order or the Canadian Vesting and Approval Order;**

provided, however, that the right to terminate this Agreement pursuant to Section 9.1(b)(i), Section 9.1(b)(ii), **Section 9.1(b)(iv),** Section 9.1(b)(v), Section 9.1(b)(vi), **Section 9.1(b)(vii),** Section 9.1(d)(ii) and Section 9.1(d)(iii) shall not be available to any Party whose breach hereof, or the EMEA Asset Sale Agreement, has been the principal cause of, or has directly resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses; provided, further, that a Party shall not be permitted to terminate this Agreement under Section 9.1(b)(v) or Section 9.1(c) if such Party is then itself in material breach of this Agreement.

NY\1582469.7

Error! Unknown document property name.

[New York #2071434 v4]

**446**

Section 9.2.    Expense Reimbursement and Break-Up Fee.[114]

(a)    In the event that (i) this Agreement is terminated pursuant to Section 9.1(b)(ii)(unless terminated by the Seller pursuant to Section 9.1(b)(ii) at a time when the Purchaser does not have a right to terminate), Section 9.1(b)(iii), Section 9.1(b)(iv)(unless terminated by the Seller pursuant to Section 9.1(b)(iv) at a time when the Purchaser does not have a right to terminate, Section 9.1(b)(v) (pursuant to Sections [____] of the EMEA Asset Sale Agreement), Section 9.1(b)(vi)( unless terminated by the Seller pursuant to Section 9.1(b)(vi) at a time when the Purchaser does not have a right to terminate), Section 9.1(b)(vii)(by the Purchaser), Section 9.1(c)(ii), Section 9.1(d)(i), Section 9.1(d)(ii) ~~or Section 9.1(d)(iii) and (ii) (x) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement as a result of a breach which would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 or Section 8.2 of this Agreement and (y) with respect to termination pursuant to Section 9.1(b)(vi) only, in addition to the requirement set forth in clause (x), the Purchaser has not been in breach of this Agreement for a material period of time prior to the date of termination which contributed to the failure to consummate the transactions by the time period set forth in Section 9.1(b)(vi), then the,~~ Section 9.1(d)(iii) or Section 9.1(d)(iv), then the Sellers the EMEA Sellers shall pay to the Purchaser a cash fee equal to the Purchaser's reasonable and documented fees, out-of-pocket costs and expenses (including fees and expenses of the Purchaser's advisors and notification and filing fees) in connection with the preparation, execution and performance of this Agreement and the EMEA Asset Sale Agreement and the transactions contemplated hereby and thereby (the "**Expense Reimbursement**"), in an amount which shall not exceed $[●].  The Expense Reimbursement shall be paid by wire transfer of immediately available funds to an account designated by the Purchaser and shall be paid after the termination of this Agreement within five (5) Business Days following receipt by the Main Sellers and NNUK of written notice from the Purchaser describing the fees and expenses that constitute Expense Reimbursement in reasonable detail.

(b)    ~~(i) (A)~~ If this Agreement is (i) terminated pursuant to Section 9.1(b)(ii)(by the Purchaser pursuant to Section 9.1(b)(ii) at a time when the Sellers do not have a right to terminate), Section 9.1(b)(iii), Section 9.1(b)(v) (pursuant to Sections [____] of the EMEA Asset Sale Agreement), Section 9.1(b)(vi)(by the Purchaser pursuant to Section 9.1(b)(vi) at a time when the Sellers do not have a right to terminate), Section 9.1(b)(vii)(by the Purchaser), Section 9.1(c)(ii), ~~Section 9.1(d)(i) or Section 9.1(d)(iii), (B) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or~~ or Section 9.1(d)(i) or (ii) (A) terminated pursuant to Section 9.1(b)(ii)(unless terminated pursuant to Section 9.1(b)(ii) by Sellers at a time when the Purchaser does not have a right to terminate), Section 9.1(b)(iv)(by the Purchaser pursuant to Section 9.1(b)(iv) at a time when the Sellers do not have a right to terminate), Section 9.1.(b)(v)(pursuant to Sections [____] of the EMEA Asset Sale Agreement ~~as a result of a breach which would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 or Section 8.2 of this Agreement and (C)~~, Section 9.1(b)(vi)(unless terminated pursuant to Section 9.1(b)(vi) by

[114] Note to Seller:  Parties to discuss scope of Break-up Fee payment generally.

136

Error! Unknown document property name.



**Sellers at a time when the Purchaser does not have a right to terminate), Section 9.1(d)(ii), Section 9.1(d)(iii) or Section 9.1(d)(iv) and (B)** either (x) the U.S. Bankruptcy Court or the Canadian Bankruptcy Court approves an Alternative Transaction or (y) the Sellers enter into or, publicly ~~announce~~**propose or consummate** a definitive agreement in respect of **(or otherwise effect)** an Alternative Transaction, ~~in each case,~~ within ~~nine~~**twelve** (9**12**) months following the termination of this Agreement ~~and such Alternative Transaction approved or announced within such nine (9) month period is ultimately consummated,~~**,** then the Sellers **and the EMEA Sellers** shall, in addition to the Expense Reimbursement ~~(to the extent not already paid)~~, pay to the Purchaser pursuant to a wire transfer of immediately available funds to an account designated by the Purchaser, a cash fee equal to $[●] (the "**Break-Up Fee**"); **provided**, that if the Sellers **and the EMEA Sellers** shall have previously paid the Expense Reimbursement to the Purchaser then the amount of the Break-Up Fee shall be reduced by the amount of the Expense Reimbursement paid to the Purchaser. ~~The Break-Up~~**If the Break-Up Fee is payable pursuant to clause (i) of the preceding sentence then the Break-Up Fee shall be payable with three (3) Business Days of termination. If the Break-up Fee is payable pursuant to clause (ii) of this first sentence of this Section 9.2(b) then the Break-up** Fee shall be payable within three (3) Business Days of **the earlier of (i) the earlier of the U.S. Bankruptcy Court's and the Canadian Bankruptcy Court's approval of the Alternative Transaction and (ii) the** consummation of the Alternative Transaction **(or the consummation of the first definitive step in respect of an Alternative Transaction if such is an Alternative Transaction pursuant to clause (ii) or (iii) of the definition of Alternative Transaction)**.

(c)    Other than equitable relief to the extent permitted under Section 10.13, payment of the Expense Reimbursement and the Break-Up Fee as specified in this Section 9.2 shall be the sole and exclusive remedy of the Purchaser, whether at Law or in equity, for any failure by the Sellers, the EMEA Sellers or any of their respective Affiliates to consummate the transactions contemplated hereby or for any pre-Closing breach of this Agreement or the EMEA Asset Sale Agreement.

(d)    The Sellers shall pay [●] and the EMEA Sellers shall pay [●] of the Break-Up Fee and the Expense Reimbursement, if payable hereunder.   The Sellers' and the EMEA Sellers' obligations to pay their respective shares of the Break-Up Fee and the Expense Reimbursement pursuant to this Section 9.2 shall be several and not joint (but the obligation of the Sellers to pay [●] of the Break-Up Fee and the Expense Reimbursement shall be joint and several among the Sellers and the obligation of the EMEA Sellers to pay [●] of the Break-Up and the Expense Reimbursement shall be several among the EMEA Sellers) and shall survive termination of this Agreement and shall, to the extent owed by the U.S. Debtors, constitute an administrative expense of the U.S. Debtors under section 364(c)(1) of the U.S. Bankruptcy Code with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the U.S. Bankruptcy Code, to the extent owed by the Canadian Debtors be secured by an Inter-company Charge and, to the extent owed by the EMEA Debtors, constitute an expense of the administration

NY\1582469.7

137                                    **Error! Unknown document**
[New York #2071434 v4]                              **property name.**

**448**

(e)    Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Break-Up Fee pursuant to this Section 9.2 is expressly subject to entry of the Bidding Procedures Order.

Section 9.3.    Effects of Termination.  If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.7 (Public Announcements), (ii) Section 5.10 (Transaction Expenses), (iii) Section 5.11 (Confidentiality), (iv) Section 7.4(b)(ii) (Other Employee Covenants), (v) Section 9.1 (Termination), (vi) Section 9.2 (Expense Reimbursement and Break-Up Fee), (vii) Section 9.3 (Effects of Termination) and (viii) ARTICLE X (Miscellaneous); provided, that neither the termination of this Agreement nor anything in this Section 9.3 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof;

(b)    except as required by applicable Law, the Purchaser shall return to the Sellers all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof to the extent and in the manner required by the Confidentiality Agreement; and

(c)    the provisions of the Confidentiality Agreement shall continue in full force and effect.

# ARTICLE X

## MISCELLANEOUS

Section 10.1.  No Survival of Representations and Warranties or Covenants.  Except for the representations set forth in Section 3.6, no representations, warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants in ARTICLE VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.2.  Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

Section 10.3.  No Third Party Beneficiaries.  Except for the rights of the Parties' Affiliates explicitly set forth herein and any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Sellers or the Joint Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any

NY\1582469.7

Error! Unknown document property name.

[New York #2071434 v4]

449

legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4. <u>Consent to Amendments; Waivers</u>. No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

Section 10.5. <u>Successors and Assigns</u>. Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for any of the following assignments which shall not require consent (i) assignment to an Affiliate of a Party (<u>provided</u>, (A) that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties and (B) any such assignment by Purchaser complies with Section 2.5 if applicable), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11 and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court. Any assignment other than in accordance with this Section 10.5 shall be null and void.

Section 10.6. <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a) Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction that would cause any Laws other than the Laws of the State of New York to be applied.

(b) To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, <u>provided</u> that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or the Canadian Debtors may, in accordance with the Cross-Border Protocol, request that the U.S. Bankruptcy Court or the Canadian Court, as case may be, hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, and (b) in the Federal Courts in the Southern District of New York and the state

 Error! Unknown document property name.

**450**

courts of the State of New York, County of New York (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, or the New York Courts, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)    The Purchaser hereby appoints [●], as its authorized agent (the "**Purchaser Authorized Canadian Agent**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid.  Service of process upon the applicable Purchaser Authorized Canadian Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)    Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the NY Courts by any other party hereto, and (ii) NNL as its authorized agent (the "**Seller Authorized Canadian Agent**" and together with the Seller Authorized U.S. Agent, the "**Seller Authorized Agents**")) upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Main Sellers shall be deemed, in every respect, effective service of process upon every such Seller.

**Error! Unknown document property name.**

**451**

(e)    Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1(c), (ii) any of the arbitrators set forth in Section 5.28 although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or arbitrator(s), as applicable.

(f)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

Section 10.7.    Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

[•]

With copies (that shall not constitute notice) to:

If to the Main Sellers or the Sellers, to:

[NNC]
[•]
Attention: [•]
Facsimile: [•]

**[NNL]**
**[•]**
**Attention: [•]**
**Facsimile: [•]**

452

[NNI]
[●]
**Attention:** [●]
**Facsimile:** [●]

With copies (that shall not constitute notice) to:

[●]

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
United States
Attention: [●]
Facsimile: +1-212-225-3999

and

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: [●]
Facsimile: [●]

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

Section 10.8.   <u>Exhibits; Sellers Disclosure Schedule</u>.  The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b) For purposes of the representations and warranties of the Parties contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule [or the Purchaser Disclosure Schedule], of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers[ or the Purchaser, as the case may be,] calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule [or the Purchaser Disclosure Schedule, as the case may be,] that such disclosure is applicable.  The inclusion of any information in any section of the Sellers Disclosure Schedule

NY\1582469.7

**Error! Unknown document property name.**

[New York #2071434 v4]

**453**

[or the Purchaser Disclosure Schedule], or other document delivered by the Sellers [or the Purchaser] pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 10.9.  Counterparts.  The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or e-mail attachment shall be effective as delivery of a manually executed counterpart of this Agreement. The party sending the facsimile or e-mail attachment will also deliver the original signed counterpart to the other Parties, however, failure to deliver the original signed counterpart shall not invalidate this Agreement.

Section 10.10. No Presumption.  The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations.  Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.  The Parties do not intend that the presumptions of any Laws relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive the effects of such Laws.

Section 10.11. Severability.  If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Section 10.12. Entire Agreement.

(a)    This Agreement, the other Transaction Documents, the Confidentiality Agreement and the Clean Team Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents, the Confidentiality

**143**

NY\1582469.7

[New York #2071434 v4]                                                           143          **Error! Unknown document property name.**

454

Agreement or the Clean Team Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the other Transaction Documents, the Confidentiality Agreement or the Clean Team Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain other Transaction Documents, such as the Local Sale Agreements (if any), may be subject to different governing Laws.

(b)    For the sake of clarity, the provisions of the EMEA Asset Sale Agreement have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement shall be interpreted independently and without reference to each other.

Section 10.13. <u>Availability of Equitable Relief; Sole Remedy</u>. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.13 and Section 9.2(c), each of the Parties shall, without the posting of bond or other security (any requirement for which the Parties hereby waive), be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement, and no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at Law except as expressly provided in this Section 10.13. Other than payment of the Break-Up Fee and Expense Reimbursement as provided pursuant to Section 9.2, equitable remedies shall constitute the sole remedy of the Purchaser under or in respect of this Agreement; provided, however, that notwithstanding anything herein to the contrary, it is acknowledged and agreed that no equitable remedy or other remedy other than payment of the Break-Up Fee shall be available to the Purchaser hereunder in the event the Break-Up Fee becomes payable in accordance with the terms hereof. Without limiting the preceding sentence, it is acknowledged and agreed that under no circumstances shall any Party be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct.

Section 10.14. <u>Bulk Sales Laws</u>. Subject to the entry of the U.S. Sale Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section 10.15. <u>Main Sellers as Representatives of Other Sellers</u>. For all purposes of this Agreement:

NY\1582469.7

Error! Unknown document property name.

[New York #2071434 v4]

**455**

        (i)     each Other Seller listed in Section 10.15(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

        (ii)    each Other Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

        (iii)   each Other Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

        (b)    Pursuant to Section 10.15(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

        (c)    For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNC, each Other Seller listed in Section 10.15(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule.

        (d)    Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate pursuant to this Section 10.15(d) for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

        Section 10.16. <u>Execution by Other Sellers</u>.  The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof.  This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so.  Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 10.15 hereof.

        Section 10.17. <u>Obligations of the Sellers</u>.  When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller).

        **[Remainder of this page intentionally left blank.  Signature page follows.]**

**Error! Unknown document property name.**

456

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

[PURCHASER]

By: _____
    Name:
    Title:

Nortel Networks Corporation

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Nortel Networks Limited

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Nortel Networks Inc.

By: _____
    Name:
    Title:

Signature Page – Asset Sale Agreement

NY\1582469.1 1582469.7

Error! Unknown document property name.

[New York #2071434 v4]

457

The undersigned EMEA Sellers are executing this Agreement solely for purposes of agreeing to [Section 2.2, Section 5.23, Section 9.2, Section 9.3, and Section 10.13] of this Agreement.


**SIGNED** for and on behalf of [●] (in administration) by [●] as Joint Administrator (acting as agent and without personal liability) in the presence of:
)
)
)
)
[●]

Witness signature

Name:
Address:
)
)
)


**SIGNED** by
duly authorized for and on behalf of [●] in the presence of:
)
)
)
[●]

Witness signature

Name:
Address:
)
)
)


Signature Page – Asset Sale Agreement

458

**SIGNED** by [●] in his own capacity and on      )
behalf of the Joint Administrators without      )      [●]
personal liability and solely for the purpose      )
of obtaining the benefit of the provisions of      )
this Agreement expressed to be conferred      )
on or given to the Joint Administrators  in      )
the presence of:      )


Witness signature


                                     )
Name:      )
Address:      )


**SIGNED** by      )
        duly authorized for and on behalf of      )      [Director]
[            ] in the presence of:      )


Witness signature


                                     )
Name:      )
Address:      )

# EXHIBIT J

459

This is Exhibit............"J".............referred to in the
affidavit of.... JOHN DOOLITTLE
sworn before me, this.......30th
day of.... NOVEMBER.........20 10

_____
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

# NØRTEL NETWORKS

## INVOICE

**Nortel Networks Limited**
5945 Airport Rd
Suite 360
Mississauga, Ontario
CANADA
L4V 1R9

For Inquiries: John Wolaco
Telephone: 972-684-4837
Fax:
E-mail: johnwp@nortel.com

| | |
|---|---|
| Invoice Number | |
| Invoice Date | 28/02/2010 |
| Page | 1 of 1 |

| Customer ID | Customer Purchase Order No | NT Job No | NT Sales Order No | Original Inv No | Carry Contract ID | Trans Type | GEO Tax Code |
|---|---|---|---|---|---|---|---|

| Terms of Sale | | | Billing Start Date | Billing End Date | | | | Ship Date |
|---|---|---|---|---|---|---|---|---|
| NET 30 DAYS | | | | | | | | |

| Line No | Item Number | Common Product Code (CPC) | Description | | UM | Return | MFG | Post | CPR | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 6% GST X Fixed Assets of $845,691.65 = | $44,294.58 USD | | | | | | | $ 44,284.58 |
| | | | 6% GST x Inventory of $1,779,972.13 = | $96,789.61 USD | | | | | | | $ 96,789.61 |
| | | | 6% ON PST X Fixed Assets of $851,121.06 = | $89,097.71 USD | | | | | | | $ 89,097.71 |
| | | | 7.2% GST X Fixed Assets of $1,020.29 = | $79.77 USD | | | | | | | $ 79.77 |
| | | | 7.5% GST X Inventory of $1,042,190.26= | $52,972.48 | | | | | | | $ 52,972.48 |
| | | | | | | | | | | | |
| GST/HST 119405288 RT0001 | | | | | | | | | | | |
| QST 1001062101 TQ0007 | | | | | | | | | | | |
| | | | | | | | | Sub/Total | | | $ 283,314.15 |

| | BILL TO | Genband Canada ULC | | | | | Bus Total Sales Tax | | | | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3500 Carling Ave | | | | | | | | | $ 283,314.15 |
| | | Ottawa, ON | | | | | | | | | |
| | | Canada | | | | | | | | | |
| | | K2H 8E9 | | | | | Total Tax | | | | |

| S
H
I
P

T
O | Genband Canada ULC
3500 Carling Ave
Ottawa, ON
Canada
K2H 8E9 | | REMIT TO Nortel Networks, Inc.
ADDRESS 2050 Crescent Center Drive
Chicago, IL 62955 | | | | **Total Due
$USD** | | | | **$283,3...** |
|---|---|---|---|---|---|---|---|---|---|---|---|

Payment terms: Payment due net thirty (30) days from invoice date. Past due amounts will incur interest at 1% per month. Material cannot be returned without first obtaining authorization.

460

# N⊘RTEL NETWORKS

**Nortel Networks Limited**
5945 Airport Rd
Suite 360
Mississauga, Ontario
CANADA
L4V 1R9

## INVOICE

| Invoice Number | |
|---|---|
| Invoice Date | 28/09/2010 |
| Page | 1 of 1 |

For Inquiries: John McAdoo
Telephone 972-684-4657
Fax
E-mail johnmc@nortel.com

| Customer ID | Customer Purchase Order No | | NT Sales Order No | | | Original Inv No | | Clarity Contact ID | | | | | Trans Type | GEO Tax Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Terms of Sale | NT Job No | | | | | | | | | | | | Ship Date | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NET 30 DAYS | | | | | | | | | | | | | | |

| Line No | Item Number | Common Product Code (CPC) | Description | Billing Start Date | Billing End Date | U/M | Noun | MFG | Pcat | CPR | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Nortel Networks Limited Transfer Tax Liability on the CVAS INTANGIBLE Assets of $2,660,000 USD to Genband Ireland | | | | | | | | 13% HST x intangible Asset of $2.66M USD = $345,800 USD | 345,800.00 |

GST/HST 119409258 RT0001

SubTotal                                            345,800.00

| S H I P T O | Genband Ireland Limited 10 McCurtain Hill CO Cork Ireland | B I L L T O | Genband Ireland Limited 10 McCurtain Hill CO Cork Ireland |
|---|---|---|---|

|  |  |
|---|---|
| Sub Total | 0.00 |
| Sales Tax | 345,800.00 |
| Total Tax | 0.00 |

**Total Due**
$USD                    **$345,800.00**

Payment Terms : Payment is a net thirty (30) days from invoice date. Past due amounts will incur interest at 1% per month. Material cannot be returned without first obtaining authorization.

REMIT TO Nortel Networks, Inc
ADDRESS 3965 Collection Center Drive
Chicago, IL 60693

461

**Nortel Networks Technology Corporation**
8945 Airport Rd
Suite 360
Mississauga, Ontario
CANADA
L4V 1R9

# N☼RTEL
## NETWORKS

## INVOICE

For Inquiries: John McAdoo
Telephone: 972-684-4857
Fax:
E-mail: johnmc@nortel.com

| | |
|---|---|
| Invoice Number | |
| Invoice Date | 28/06/2010 |
| Page | 1 of 1 |

| Customer ID | Customer Purchase Order No | | | NT Sales Order No | Original Inv No | | | Clarify Contract ID | | | | Trans Type | GEO Tax Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Terms of Sale | | NT Job No | | | | | | | | | | | Ship Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NET 30 DAYS | | | | | | | | | | | | | |

| Line No | Item Number | Common Product (CPC) | Code | Description | Billing Start Date | Billing End Date | U/M | Noun | MFG | Post | CPR | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | NT Sales Order No $371,276.79 USD | | | | | | | | | 371,276.79 |
| | | | | 5% GST x Fixed Assets of $7,425,535.79 | | | | | | | | | |

GST/HST 118802574 RT0001

| | | | | | | Sub Total | | | | | 371,276.79 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| BILL TO | Gresham Canada ULC<br>3500 Carling Ave<br>Ottawa ON<br>Canada<br>K2H 8E9 | | | | Sub Total | 0.00 |
|---|---|---|---|---|---|---|
| | | | | | Sales Tax | 371,276.79 |
| | | | | | Total Tax | 0.00 |

| SHIP TO | Gresham Canada ULC<br>3500 Carling Ave<br>Ottawa ON<br>Canada<br>K2H 8E9 | **Total Due** | **$371,276.79** |
|---|---|---|---|
| | | $USD | |

REMIT TO: Nortel Networks, Inc
ADDRESS: 5985 Collection Center Drive
Chicago, IL 60693

Payment Terms: Payment due net thirty (30) days from invoice date.
Past due amounts will incur interest at 1½ per month. Material cannot
be returned without first obtaining authorization.

# EXHIBIT K

This is Exhibit............"K"..............referred to in the
affidavit of....JOHN DOOLITTLE......
sworn before me, this......30th......
day of.....NOVEMBER........20 10.

...........Donna Woollett..........
A COMMISSIONER FOR TAKING AFFIDAVITS

## N⊘RTEL

November 18, 2010

**VIA FACSIMILE**

GENBAND US LLC
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Attn: Shauna Martin, General Counsel
Facsimile: +1-972-265-3599

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

Ladies and Gentlemen:

Reference is made to the Asset Sale Agreement by and among Nortel Networks
Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the
other entities identified therein as Sellers (together with NNC, NNL and NNC, "Nortel"),
GENBAND US LLC ("GENBAND"), dated December 22, 2009, as amended from time to time
(the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the
ASA.

I write concerning the issue of payment by GENBAND to Nortel of certain Canadian
transfer taxes in connection with the ASA. As you are aware, Nortel has been in communication
with your counsel at Stikeman Elliott for 6 months to reach an agreement on the appropriate
amount of Canadian transfer taxes owing to Nortel in connection with transfer of the tangible
and intangible assets. It is my understanding that the parties reached an agreement on this matter
and accordingly Nortel issued draft invoices to GENBAND for the amounts owed on October 1,
2010. GENBAND then indicated disagreement with the agreed upon figures and informed
Nortel it would revert with specifics as to its disagreement.

GENBAND, through Stikeman Elliott, has yet to respond to Nortel's repeated requests
for additional information concerning GENBAND's disagreement. The payment of transfer
taxes to Nortel are past due. Nortel requests that GENBAND immediately remit payment, or, at
a minimum, provide Nortel with specific information as to GENBAND's disagreement over the
transfer tax amount.

Nortel does not intend to waive, and expressly reserves our right to pursue, any and all
available remedies with respect to the matters in dispute.

Sincerely,

Nortel Networks Inc.

Lynn Egan, Secretary

# EXHIBIT L

463

This is Exhibit____"L"____ referred to in the
affidavit of____JOHN DOOLITTLE____
sworn before me, this____30th____
day of____NOVEMBER____20__10

_____
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTEL NETWORKS INC., *et al.* | ) | Case No. 09-10138 (KG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | Objection Date: December 1, 2010 at 4:00 p.m. |
|  | ) | Hearing Date: December 8, 2010 at 10:00 a.m. |

**MOTION OF GENBAND INC. FOR ENTRY OF AN ORDER PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE GRANTING RELIEF FROM THE AUTOMATIC STAY TO COMPEL ARBITRATION**

GENBAND Inc. ("GENBAND"), by and through its undersigned counsel, hereby moves

(the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the

"Order"), granting relief from the automatic stay pursuant to Section 105 and 362(d) of Title 11

of the United States Code (the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to compel arbitration between Nortel

Networks Corporation, Nortel Networks Limited, and Nortel Networks Inc. (collectively,

"Nortel," and, together with its affiliate filing entities, the "Debtors") and GENBAND pursuant

to the terms of the Asset Sale Agreement, dated as of December 22, 2009, by and among Nortel,

GENBAND and the entities identified as sellers therein (the "ASA"),[1] attached hereto as Exhibit

B. In support of this Motion, GENBAND respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    GENBAND seeks relief from the automatic stay to compel arbitration pursuant to

Section 2.2.3.1(c) of the ASA (the "Mandatory Arbitration Provision") for the purpose of

resolving a dispute with respect to the Purchase Price Adjustment (as defined below).

464

2.    A dispute has arisen between GENBAND and Nortel regarding the Purchase Price Adjustment pursuant to the ASA. The Mandatory Arbitration Provision states that "any disagreement" relating to the Purchase Price Adjustment shall be submitted to arbitration. However, Nortel refuses to do so. GENBAND has therefore been forced to ask this Court to intervene and order Nortel to comply with the promise it made in return for the substantial consideration already paid by GENBAND.

3.    This Court should enforce the Mandatory Arbitration Provision. Third Circuit precedent emphasizes the importance of arbitration provisions, finding that "[w]here an otherwise applicable arbitration clause exits, a bankruptcy court lacks the authority and discretion to deny its enforcement, *unless* the party opposing arbitration can establish congressional intent . . . to preclude waiver of judicial remedies for the statutory rights at issue." *Mintze v. Am. Gen. Fin. Serv., Inc. (In re Mintze)*, 434 F.3d 222, 231 (3d Cir. 2006) (emphasis in original).

4.    The Mandatory Arbitration Provision was negotiated for and contemplated as part of the consideration under the ASA. Neither Nortel nor the Debtors' estate will be prejudiced if compelled to comply with the clear agreement provided for in the Mandatory Arbitration Provision. GENBAND, on the other hand, will suffer substantial hardship if it is denied the quick, efficient, and final process that is the part of the benefit of the bargain it made with Nortel when it entered into the ASA. The plain language of the Mandatory Arbitration Provision leaves no doubt that the parties agreed to arbitrate *"any disagreement"* regarding the Purchase Price Adjustment. It is therefore abundantly clear that GENBAND's claim is not frivolous, which is all GENBAND need show.

---

[1] All terms not otherwise defined herein shall have the meaning ascribed to them under the ASA.

2

465

5.    For these reasons, the Court should lift the stay and compel arbitration pursuant to the Mandatory Arbitration Provision.

## JURISDICTION

6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.    The statutory bases for the relief sought is Section 362 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014.

## BACKGROUND

8.    On December 22, 2009, Nortel and GENBAND entered into the ASA.

9.    On September 15, 2010, and pursuant to Section 2.2.3.1(a) of the ASA, GENBAND timely delivered to Nortel a letter and written statement (the "Closing Statement"), attached hereto as Exhibit C, which declared GENBAND's position with regards to the purchase price adjustment (the "Purchase Price Adjustment") necessary to determine the final purchase price under the ASA (the "Final Purchase Price").

10.    On October 13, 2010, and pursuant to Section 2.2.3.1(b) of the ASA, Nortel timely delivered to GENBAND a letter and written statement (the "Disagreement Notice"), attached hereto as Exhibit D, which provided Nortel's position with regards to the Purchase Price Adjustment, and which detailed the disputes that Nortel was raising with GENBAND's Closing Statement.

11.    Section 2.2.3.1(b) of the ASA provides, in the event of disagreement between the parties with regards to the Closing Statement, the Disagreement Notice, or the Purchase Price Adjustment, that the parties would negotiate in good faith over a fifteen-day period to resolve such disagreement.

3

466

12.     Section 2.2.3.1(c) of the ASA provides that if the parties "are unable to resolve *any disagreement* as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of a Disagreement Notice by [Nortel], the Independent Auditor shall serve as arbitrator . . . to resolve such disagreement."

13.     The ASA requires, again under Section 2.2.3.1(c), that the parties use their "commercially reasonable efforts to cause the Accounting Arbitrator to deliver . . . as promptly as practicable (and in no event later than thirty (30) days after his or her appointment), a written report setting forth the resolution of any such disagreement." This provision was intended to ensure that a speedy, efficient and final process would be used to resolve any disputes over the Purchase Price Adjustment.

14.     In the letter included in the Disagreement Notice, Nortel informed GENBAND that it did not intend to waive its right to pursue all available remedies, including judicial relief, in order to resolve disputes in connection with the Purchase Price Adjustment.

15.     In a letter dated October 25, 2010 (the "October 25 Letter"), attached hereto as Exhibit E, GENBAND responded to Nortel's letter included with the Disagreement Notice and stated in no uncertain terms that refusing to arbitrate with regards to the dispute with regards to the Purchase Price Adjustment violated the agreed terms of the ASA. GENBAND notified Nortel, specifically, that pursuant to the express terms of Section 2.2.3.1(b) the ASA, arbitration is the exclusive procedure available for the resolution of *any disagreement* regarding the Purchase Price Adjustment.

16.     Nortel did not respond to the October 25 Letter. In a letter to Nortel dated November 9, 2010 (the "November 9 Letter"), attached hereto as Exhibit F, GENBAND again emphasized its desire to initiate arbitration pursuant to the Mandatory Arbitration Provision.

4

467

GENBAND noted that Nortel had failed to provide any explanation as to why it was not

prepared to begin the arbitration process, and that it could not point to any provision in the ASA

that justified its position.

17.     In a letter dated November 10, 2010 (the "November 10 Letter"), attached hereto

as Exhibit G, Nortel finally responded to GENBAND and refused to submit to arbitration as

required by the ASA.

18.     Nortel has thus repudiated its obligations under the ASA.

## RELIEF REQUESTED

19.     By this Motion, GENBAND respectfully requests that this Court enter an Order,

pursuant to Section 362(d)(1) of the Bankruptcy Code, lifting the automatic stay and compelling

Arbitration for the purpose of resolving the dispute with respect to the Purchase Price

Adjustment.

## BASIS FOR RELIEF

20.     When presented with a motion to compel arbitration, courts in this Circuit have

considered the strong federal policy that favors the arbitration of disputes. *See In re Mintze*, 434

F.3d at 229 ("The FAA has established a strong policy in favor of arbitration . . . . To overcome

enforcement of arbitration, a party must establish congressional intent to create an exception to

the FAA's mandate with respect to the party's statutory claims."). "It is well established that

arbitration is a favored mechanism for resolving disputes, especially where the parties previously

agreed to utilize arbitration." *In the Matter of TEU Holdings, Inc.*, 287 B.R. 26, 36 (Bankr. D.

Del. 2002); *see also In re Gurga, d/b/a Source Commcs.*, 176 B.R. 196, 200 (B.A.P. 9th Cir.

1994) (citing *Graham Oil Co. v. ARCO Products, Inc.*, 43 F.3d 1244, 1247 (9th Cir. 1994), for

the proposition that "arbitration is a form of dispute resolution that finds favor in the courts").

468

21.    The issues raised in the Arbitration are common state law issues. Where the arbitration is based upon state law claims, "neither the Bankruptcy Code nor its legislative history contain anything which would prevent a court of arbitration from determining whether [a claimant's] claims are valid." *In re Gurga*, 176 B.R. at 200.

22.    In fact, the United States Supreme Court has held that the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, establishes a federal policy favoring arbitration that requires courts to "rigorously enforce agreements to arbitrate." *Shearson/Am. Exp. v. McMahon*, 482 U.S. 220, 226 (1987) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985); *see also Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir. 1989) (citations omitted). The Court in *McMahon* held that when a dispute is subject to the terms of an arbitration agreement, the FAA requires a court to stay its proceedings and compel arbitration, except in limited circumstances. *McMahon*, 482 U.S. at 226. The Third Circuit, relying on *McMahon*, has held that "[w]here an otherwise applicable arbitration clause exits, a bankruptcy court lacks the authority and discretion to deny its enforcement, *unless* the party opposing arbitration can establish congressional intent . . . to preclude waiver of judicial remedies for the statutory rights at issue." *In re Mintze*, 434 F.3d at 231.

23.    This Court may lift the stay pursuant to Section 362(d) of the Bankruptcy Code, which provides, in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (A) of this section, such as by terminating, annulling, modifying or conditioning such stay – (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . .

11 U.S.C. § 362(d).

24.    "Cause," undefined by the Bankruptcy Code, must be determined on a case-by-case basis. *See In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *Int'l*

6

469

*Bus. Machines v. Fernstrom Storage and Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991)). The legislative history of Section 362 indicates that "cause may be established by a single factor such as 'a desire to permit an action to proceed . . . in another tribunal,' or 'lack of any connection with or interference with the pending bankruptcy case.'" *Id.* (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 343-44 (1977)).

25.    In determining whether there is "cause" to modify the automatic stay, this Court has considered "whether: (a) [a]ny great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit, (b) the hardship to the [non-bankrupt party] by maintenance of the stay considerable outweighs the hardship of the debtor, and (c) the creditor has a probability of prevailing on the merits." *In re Rexene Prods. Co.*, 141 B.R. at 576. *See also In re Downey Fin. Corp*, 428 B.R. 595 (Bankr. D. Del. 2010).

26.    Nortel will not be prejudiced by allowing the Arbitrator to resolve the dispute regarding the Purchase Price Adjustment. The arbitration contemplated by the mutually-agreed-to Section 2.2.3.1(c) of the ASA, would provide an efficient and final determination with regards to the disputes regarding the Purchase Price Adjustment. Such efficient and final resolution would inure to the benefit of Debtors' estate because Debtors would suffer with lengthy and expensive litigation in this Court, which could hinder the Debtors' reorganization efforts and reduce the value of Debtors' estate. The issues in dispute are insubstantial in number and complexity, and the correspondence between the parties demonstrates that little preparation time will be required to proceed to the Arbitration.

27.    On the other hand, continued enforcement of the automatic stay would result in great hardship to GENBAND because it would be denied the benefit of the negotiated Mandatory Arbitration Provision of the ASA. The parties agreed to such provision with the sole

7

470

purpose of preventing the type of burdensome litigation that would ensue in the Bankruptcy Court if the stay were enforced. GENBAND would be forced to dedicate valuable time and resources to litigating an issue that it and Nortel expressly agreed to arbitrate, for these very reasons.

28.     In order to demonstrate that it has a probability of prevailing on the merits, GENBAND must show only that its claim is not frivolous. *See In re Levitz Furniture Corp.*, 267 B.R. 516, 523 (Bankr. D. Del. 2000) (citing *In re Rexene Prods. Co.*, 141 B.R. at 578). This Court need not engage in an in-depth review of the merits of the claim because "one of the primary purposes in granting relief from the stay . . . is to economize judicial resources. To require a merits analysis in every case would in large part defeat this objective and frustrate the effort to resolve § 362(d) motions expeditiously." *Peterson v. Cundy (In re Peterson)*, 116 B.R. 247, 250 (D. Colo. 1990).

29.     In this case, the mutually agreed upon Mandatory Arbitration Provision is a valid and enforceable provision of the type typically favored by this Court. GENBAND submits that the Mandatory Arbitration Provision meets the standard set forth in *In re Rexene Prods. Co.*; therefore, the Court should lift the automatic stay and compel arbitration.

## NOTICE

30.     Notice of this Motion has been given to: (a) counsel for the Debtors; (b) counsel for the Committee; (c) counsel for the Office of the United States Trustee; and (d) those parties who have filed and served notices of appearance pursuant to Bankruptcy Rule 2002. No other or further notice is necessary.

## NO PRIOR REQUEST

31.     No prior motion for the relief requested herein has been made to this Court or any other court.

8

471

## CONCLUSION

32.    WHEREFORE, GENBAND respectfully requests that the Court enter an Order (i)

lifting the automatic stay pursuant to Sections 105 and 362(d) of the Bankruptcy Code to allow

arbitration to commence, (ii) compelling the commencement of arbitration pursuant to Section

2.2.3.1(c) of the ASA, and (iii) granting such further and other relief as the Court deems just.


Dated:  November 18, 2010            Respectfully submitted,
        Wilmington, Delaware


                                     /s/ Michael R. Lastowski
                                     Michael R. Lastowski (No. 3892)
                                     Sommer L. Ross (No. 4598)
                                     DUANE MORRIS, LLP
                                     1100 North Market Street, Suite 1200
                                     Wilmington, Delaware 19801
                                     Telephone: (302) 657-4900
                                     Facsimile: (302) 657-4901
                                     E-mail:    mlastowski@duanemorris.com
                                                slross@duanemorris.com

                                     and

                                     Blair Connelly
                                     Eli J. Kay-Oliphant
                                     LATHAM & WATKINS LLP
                                     885 Third Avenue, Suite 1200
                                     New York, New York 10022-4834
                                     Telephone:  (212) 906-1200
                                     Facsimile:  (212) 751-4864
                                     E-mail:   blair.connelly@lw.com
                                               eli.kay-oliphant@lw.com

                                     *Counsel for GENBAND Inc.*


9

472

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**AFFIDAVIT OF JOHN DOOLITTLE**
**(sworn November 30, 2010)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2064530\2A

# TAB 3

**473.**

Court File No.: 09-CL-7950

## *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE | ) | WEDNESDAY, THE 15th DAY |
| | ) | |
| MR. JUSTICE MORAWETZ | ) | OF DECEMBER, 2010 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

### ORDER
### (Genband Disagreement Notice)

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notice of Motion dated November 30, 2010 was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn November 30, 2010 (the "Doolittle Affidavit") and on hearing the submissions of counsel for the Applicants, Ernst & Young Inc. in its capacity as the Monitor (the "Monitor"), and those other parties present, no one appearing for



any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn November 30, 2010, filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS that capitalized terms used in this Order and not otherwise defined shall have the meanings given to them in the Doolittle Affidavit.

3.      THIS COURT ORDERS AND DECLARES that this Court together with the U.S. Court have the exclusive authority and jurisdiction to hear the dispute relating to the "Deferred Profit Amount".

4.      THIS COURT ORDERS AND DECLARES that Genband Inc.'s (n/k/a Genband US LLC) (the "Purchaser") calculation of the "Deferred Profit Amount" in the written closing statement dated September 15, 2010 (the "Closing Statement") is not a dispute that is subject to determination by an Accounting Arbitrator as a purchase price adjustment dispute pursuant to Section 2.2.3.1.(c) of the Sale Agreement.

5.      THIS COURT ORDERS AND DECLARES that the Purchaser's calculation of the "Deferred Profit Amount" shall include only deferred revenues for services to be performed or products to be provided by the Business after the Closing Date.

6.      THIS COURT ORDERS AND DECLARES that the negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Networks (Luxembourg) S.A shall not be included in the calculation of the "Deferred Profit Amount".

7.      THIS COURT ORDERS AND DECLARES that for the avoidance of doubt, the "Deferred Profit Amount" shall be $34,284,392 and the Final Purchase Price shall be $179,508,745.

8.      THIS COURT ORDERS AND DIRECTS the Purchaser to: (i) immediately remit payment in accordance with the September 28, 2010 invoice for the Canadian transfer taxes

owed to Nortel; or (ii) deliver to the Sellers a written statement of its objections to the same; and (iii) fully cooperate with the Sellers in the resolution of this matter.

9.      THIS COURT ORDERS AND DIRECTS (i) the Purchaser to execute, within five (5) days of the entry of this Order, instructions to Wells Fargo Bank, National Association ("Wells Fargo"), as escrow agent, that provide for the release of $4,859,745 plus accumulated interest from the Escrow Fund established under an escrow agreement dated as of January 6, 2010 and amended on May 28, 2010 among Wells Fargo, the Purchaser, NNC, NNL, Nortel Networks Inc., Nortel Networks UK Limited (in administration) (the "Escrow Agreement") to the Distribution Agent (as agent for the Sellers and the EMEA Sellers) by wire transfer of immediately available funds. Wells Fargo also is authorized upon presentation of this Order by the Sellers or the Purchaser, with or without the receipt of separate joint instructions, to release such amounts in accordance with section 4(b) of the Escrow Agreement.

10.      THIS COURT ORDERS AND DIRECTS (i) the Seller Parties (as defined in the Escrow Agreement) to execute, forthwith upon the release of the funds contemplated by paragraph 9 of this Order, instructions to Wells Fargo, as escrow agent, that provide for the release of the balance of the Escrow Fund to the Purchaser by wire transfer of immediately available funds. Wells Fargo also is authorized upon presentation of this Order by the Sellers or the Purchaser, with or without the receipt of separate joint instructions, to release such amounts in accordance with section 4(b) of the Escrow Agreement.

11.      THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.



12.     THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**ORDER**
**(Genband Disagreement Notice)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2065469\1A

Court File No:  09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS
CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION,
NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

| |
|---|
| *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding commenced at Toronto |
| **MOTION RECORD**<br>**VOLUME 2 OF 2**<br>**(returnable December 15, 2010)** |
| **OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario  M5J 2Z4<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel: (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Jennifer Stam LSUC: #46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br><br>Fax: (416) 216-3930<br><br>Lawyers for the Applicants |