53

SIGNED for and on behalf of Nortel Networks    )
France S.A.S. (in administration) by    )      Kerry Trigg
Kerry Trigg    )
acting as authorised representative for    )
Christopher Hill    )
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

.......................................    )
Name:    SHARON PERLMUTTER
Address:    )

ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

54

SIGNED for and on behalf of Nortel Networks )
(Ireland) Limited (in administration) by )
DAVID HUGHES )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.................................................... )
Name:    Nitha J Coveney )
Address:  c/o Ernst + Young )
          Harcourt Street
          Dublin 2.

55

SIGNED by Richard Banbury
duly authorised for and on behalf of Nortel
Networks o.o.o. in the presence of:

)
)  Richard Banbury
)

Witness signature

..........................................................  )
Name: *Svetlyahev 3 Galina*  )
Address: *121603 Moscow Russia*
*Rublevskoye shosse*
*52 · 377*

"Нортел
Нетворис"
Limited Liability Company
"Nortel Networks OOO"
МОСКВА

56

SIGNED by Simon Freemantle
duly authorised for and on behalf of **Nortel
Networks AG** in the presence of:

)
)
)

Simon Freemantle

Witness signature

)
)

Name: Perihan Yuzcel
Address: Nortel Networks UK Limited )
westacott Way
Maidenhead Office Park
SL6 · 3QH    Maidenhead

57

SIGNED for and on behalf of Nortel Networks
Israel (Sales and Marketing) Limited (in
administration) by Yaron Har-Zvi and Avi D.
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in
connection with the Israeli Assets and Israeli
Liabilities:

)
)
)
)
)
)
)
)
)

הנאמן בהקפאת הליכים

Yaron Har-Zvi

הנאמן בהקפאת הליכים

Avi D. Pelossof

Witness signature

איתי לביא, עו"ד
מ.ר. 47661

)
)
)

Name: Itay Lavi
Address: 20 Lincoln St.
         Tel-Aviv, Israel

58

**SIGNED** by Alan Bloom                )
                                         )   ........................................................
In his own capacity and on behalf of the Joint    )   Alan Bloom
Administrators without personal liability and
solely for the benefit of the provisions of this
letter expressed to be conferred on or given to
the Joint Administrators:

Witness signature

........................................................    )
Name:   RICHARD WALTON                   )
Address: HERBERT SMITH LLP               )
         EXCHANGE HOUSE
         PRIMROSE ST
         LONDON EC2A 2HS

59

**SIGNED by Yaron Har-Zvi**

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

)
)
)

קפאת הליכים

..................................................................
Yaron Har-Zvi

Witness signature

..................................................................
Name: I bay lavi
Address: 20 Lincoln st.
Tel Aviv, Israel

)
)
)

הנאמן בהקפאת הליכים

..................................................................
Avi D. Pelossof

**SIGNED by Avi D. Pelossof**

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

)
)
)

Witness signature

..................................................................
Name: Itay Lavi
Address: 20 Lincoln st.
Tel Aviv, Israel

)
)
)

60

cc:    Latham & Watkins LLP
       885 Third Avenue
       New York, New York 10002
       United States
       Attention: David S. Allinson, Esq.

       Baker Botts LLP
       2001 Ross Avenue, Suite 600
       Dallas, Texas 75201
       Attention:   Don J. McDermett, Jr., Esq.
                   Curt Anderson, Esq.

       Stikeman Elliott LLP
       445 Park Avenue, 7th Floor
       New York, New York 10022
       Attention: Ron Ferguson, Esq.

*For the companies listed below (the "Companies"), The Institute of Chartered Accountants in England and Wales authorises A R Bloom, S Harris and C Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, A R Bloom, S Harris, AM Hudson and C Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and D Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

61.

**Annex A**

**Disagreement Notice**

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this Disagreement Notice have the meanings ascribed to them in the ASA.

Nortel has received the Closing Statement prepared by GENBAND dated September 15, 2010 (the "GB Closing Statement"). Pursuant to Section 2.2.3.1(b) of the ASA, Nortel and the EMEA Sellers notify GENBAND as follows:

- Nortel and the EMEA Sellers do not dispute the following line items within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement: Closing Inventory Value, Closing Prepaid Expenses Amount, Closing Contractual Liabilities Amount, Closing Royalty Liability Amount, Closing Warranty Provision Amount and Closing Product Exposures Amount.

- Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement and, as a result, Nortel and the EMEA Sellers dispute the Closing Adjusted Net Working Capital in the GB Closing Statement. Specifically, Nortel and the EMEA Sellers disagree with GENBAND's deduction from Closing Unbilled Accounts Receivable of accounts receivable amounts of $191,515 and $28,960, which relate to certain customer contracts with Axtel and Telefonica Argentina, respectively.[1] As the contracts with Axtel and Telefonica Argentina were included in Assigned Contracts, the Closing Unbilled Accounts Receivable Amount should be increased by $220,475, resulting in Closing Unbilled Accounts Receivable being equal to $21,611,475 (rather than $21,391,000) and Closing Adjusted Net Working Capital being equal to $8,551,475 (rather than $8,331,000).

- Nortel and the EMEA Sellers do not dispute the following line items within the Final Purchase Price calculation in the GB Closing Statement: Base Purchase Price, Closing Aggregate EMEA Downward Adjustment, Closing Aggregate Downward Adjustment,

---

[1] The contracts are: EWP 2010 Support Plan between Nortel Networks de Argentina S.A. and Telefonia Moviles Argentina S.A. dated January 31, 2010; Designacion Proveedor Centralita Movil between Nortel Networks (CALA) Inc. and Telefonica Moviles Argentina S.A. dated September 30, 2008; Purchase and License Agreement for NGN among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; Purchase and License Agreement for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; and Technical Assistance and Support Services Agreement for NGN Products and Services and for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V..

62 .

Closing Accrued Vacation Amount, Closing TFR Amount, Closing Excess ARD Employees Amount, Closing EMEA Holiday Downward Adjustment, Closing French Excess ARD Employees Amount and Closing Pre-Close Employment Payments Amount.

- Since Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within Closing Adjusted Net Working Capital in the GB Closing Statement and, as a result, dispute Closing Adjusted Net Working Capital in the GB Closing Statement, Nortel and the EMEA Sellers dispute the line item in the Final Purchase Price calculation in the GB Closing Statement that is arrived at by subtracting the Target Working Capital, i.e., $73,000,000, from the Closing Adjusted Net Working Capital. Subtracting Target Working Capital from the Closing Adjusted Net Working Capital calculated by Nortel, i.e., $8,551,475, the resulting line item should be $(64,448,525) rather than $(64,669,000).

- Nortel and the EMEA Sellers dispute the line item Closing Deferred Profit Amount in the GB Closing Statement for two reasons: First, the Closing Deferred Profit Amount calculated by GENBAND improperly includes a negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Networks (Luxembourg) S.A. (NNLSA). As NNLSA is not an EMEA Seller or a Seller, the amount of $1,629,132 should not have been included in GENBAND's calculation of the Closing Deferred Profit Amount.

Second, GENBAND overstated the Closing Deferred Profit Amount by $34,656,476 as a result of incorrectly including in its calculations deferred revenues and associated deferred costs in respect of services performed and products delivered prior to the Closing Date. "Deferred Profit Amount," as defined in the ASA, means:

> ". . . as of the Closing Date, both short term and long term (i) deferred revenues for <u>services to be performed or products to be provided by the Business after the Closing Date</u> but for which an account receivable has been recorded or cash has been received prior to the Closing Date minus (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles." (emphasis added)

The Closing Deferred Profit Amount in the GB Closing Statement should be reduced by (i) $34,656,476 due to GENBAND's improper inclusion of deferred revenues and associated deferred costs relating to services performed and products provided by the Business prior to the Closing Date and (ii) $1,629,132 due to GENBAND's improper inclusion of a negative deferred cost-of-sales balance with respect to NNLSA. Accordingly, the Closing Deferred Profit Amount should be reduced by $36,285,608 from $70,570,000 to $34,284,392.

63

- Nortel and the EMEA Sellers disagree with the Closing Specified Employee Liabilities Amount in the GB Closing Statement, which should be reduced by $98,662. The Closing Specified Employee Liabilities Amount in the GB Closing Statement included an Australian long-service leave amount of $1,131,689. For the calculation of the Australian long-service leave amount, GENBAND apparently did not recalculate the Australian Dollar amount into the U.S. Dollar amount using the exchange rate published in the *Wall Street Journal* (Eastern Edition) for the day in question (the Closing Date), as required under the ASA. Using the Australian Dollar/U.S. Dollar exchange rate published in the *Wall Street Journal* (Eastern Edition) for the Closing Date (i.e., 1.1755 Australian Dollars to one U.S. Dollar), Australian long-service leave amount in Australian Dollars of A$1,214,323 (according to Nortel's SAP accounting ledger) translates into $1,033,027. Accordingly, the Australian long-service leave amount of $1,131,689 used in GENBAND's calculation of the Closing Specified Employee Liabilities Amount in the GB Closing Statement is overstated by $98,662, which requires that the Closing Specified Employee Liabilities Amount in the GB Closing Statement be reduced from $1,487,000 to $1,388,338.

- Since Nortel and the EMEA Sellers dispute, in the GB Closing Statement, (i) the line item arrived at by subtracting the Target Working Capital from the Closing Adjusted Net Working Capital, (ii) the Closing Specified Employee Liabilities Amount and (iii) the Closing Deferred Profit Amount, all as described above, Nortel and the EMEA Sellers dispute the Final Purchase Price in the GB Closing Statement, which should be increased by $36,604,745 from $142,904,000 to $179,508,745.

For your reference, the GB Closing Statement, the adjustments set forth herein, and the Closing Statement, as adjusted herein, are set forth below.

64.

**Revisions to CLOSING STATEMENT**

| | GB Closing Statement | Adjustments | Adjusted Closing Statement |
|---|---|---|---|
| **Closing Adjusted Net Working Capital:** | | | |
| Closing Inventory Value, plus | $ 13,747,000 | | 13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 | 220,475 | 21,611,475 |
| Closing Prepaid Expenses Amount, minus | 939,000 | | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 | | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 | | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 | | 26,295,000 |
| Closing Product Exposures Amount | 416,000 | | 416,000 |
| **Closing Adjusted Net Working Capital** | $   8,331,000 | $   220,475 | $   8,551,475 |
| | | | |
| **Final Purchase Price:** | | | |
| Base Purchase Price, plus | $ 282,000,000 | | $ 282,000,000 |
| The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) | $   220,475 | (64,448,525) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | - | | |
| Closing Aggregate Downward Adjustment (if any), minus | - | | |
| Closing Deferred Profit Amount, minus | 70,570,000 | ( 36,285,608) | 34,284,392 |
| Closing Accrued Vacation Amount, minus | 1,730,000 | | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 | (98,662) | 1,388,338 |
| Closing TFR Amount, minus | 402,000 | | 402,000 |
| Closing Excess ARD Employees Amount, minus | - | | |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 | | 238,000 |
| Closing French Excess ARD Employees Amount, minus | - | | |
| Closing Pre-Close Employment Payments Amount | - | | |
| **Final Purchase Price** | $ 142,904,000 | $  36,604,745 | $ 179,508,745 |

65

## Annex B

## FILED UNDER SEAL

66.

67

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------X
                                                       :      Chapter 11
                                                       :
In re                                                  :
                                                       :      Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,¹                          :
                                                       :      Jointly Administered
                       Debtors.                        :
                                                       :      Hearing Date: December 15, 2010 at 10:00 am (ET)
                                                       :      Objections Due: December 1, 2010 at 4:00 pm (ET)
                                                       :
------------------------------------------------------------X
```

## NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

PLEASE TAKE NOTICE that the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, have today filed the attached **Debtors' Motion For Entry Of An Order Enforcing The Order Authorizing The Sale Of Certain Assets Of The Debtors' Carrier Voice Over IP And Application Solutions Business, And Directing The Release Of Certain Escrowed Funds** ("Motion").

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **December 1, 2010 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

At the same time, you must serve such Objection on counsel for the Debtors so as to be received by the Objection Deadline.

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **DECEMBER 15, 2010 AT 10:00 A.M. (EASTERN TIME)** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT

---

¹       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

68

FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801. ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: November 17, 2010
     Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
David H. Herrington (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

    - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

3907560.1

69.

7D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- X
                                       :

*In re*                                  :        Chapter 11

Nortel Networks Inc., *et al.*,[1]    :        Case No. 09-10138 (KG)

                Debtors.    :        Jointly Administered

                                  :        **Hearing date: December 15, 2010 at 10:00 am (ET)**
                                  :        **Objections due: December 1, 2010 at 4:00 pm (ET)**
------------------------------------------------------- X

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING
THE DEBTORS TO FILE UNDER SEAL AND IN REDACTED
FORM CERTAIN PORTIONS OF THE DEBTORS' MOTION FOR
ENTRY OF AN ORDER ENFORCING THE ORDER
AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE
DEBTORS'CARRIER VOICE OVER IP AND APPLICATION
SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF
CERTAIN ESCROWED FUNDS**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Sealing Motion") for the

entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections

105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9018 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9018-1(b) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation
(9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc.
(4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel
Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical
Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International
Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc.
(4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://dm.epiq11.com/nortel.

71.

District of Delaware (the "Local Rules"), authorizing the Debtors to file under seal and in redacted form certain portions of the Debtors' Motion for the Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds.

**JURISDICTION**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 107(b) the Bankruptcy Code.

**BACKGROUND**

3.      Contemporaneous with the filing of this Sealing Motion, the Debtors are filing the Debtors' Motion for the Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds (the "Motion"), which seeks entry of an order (i) enforcing the *Order Authorizing And Approving (A) The Sale Of Certain Assets Of The Debtors' Carrier Voice Over IP And Communications Solutions Business Free And Clear Of All Liens, Claims And Encumbrances, And (B) The Assumption And Assignment Of Certain Executory Contracts* (the "Sale Order") [D.I. 2193] against GENBAND Inc. (n/k/a GENBAND US LLC) ("GENBAND"); (ii) directing the release of $4,859,745 plus accumulated interest currently held in escrow by escrow agent, Wells Fargo Bank, National Association ("Wells Fargo"), pursuant to the Escrow Agreement dated as of January 6, 2010, by and among Wells Fargo, Nortel Networks Corporation, NNI, Nortel Networks Limited, Nortel Networks UK Limited (in administration)

2

and GENBAND (as amended from time to time, the "Escrow Agreement"); and (iii) granting them such other and further relief as the Court deems just and proper.

4.      The Debtors respectfully refer the Court to the Motion for additional information concerning the relevant background and procedural history of this matter.

## RELIEF REQUESTED

5.      By this Sealing Motion, the Debtors seek an order pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1 authorizing the Debtors to file under seal and in redacted form certain portions of the Motion, specifically discrete references to a settlement amount that the relevant parties desire to remain confidential and discrete references to information regarding the sale of the Debtors' Metro Ethernet Networks Business.

## FACTS RELEVANT TO THIS MOTION

6.      This Sealing Motion relates to Nortel's sale of assets associated with its Carrier Voice over IP and Communications Solutions Business (the "CVAS Business") to GENBAND. The Court approved the sale of the CVAS Business to GENBAND pursuant to the Stalking Horse Agreement dated as of December 22, 2009, by and among the Main Sellers and the EMEA Sellers (the "Sellers," and together with GENBAND the "Parties,") and GENBAND (the "Sale Agreement") by order dated March 4, 2010 [D.I. 2193].

### A. The Settlement Agreement Between Verizon and GENBAND

7.      NNI and Verizon Services Corp. ("Verizon") are parties to a certain General Product Purchase Agreement for Softswitch and TDM Products and Services (the "GPPA Agreement"). Under the GPPA Agreement, Verizon purchased certain switches and software licenses from NNI. In 2009, Nortel discovered that Verizon had begun using certain software,

*73* .

resident on the switches, for which it had not purchased accompanying licenses. The value of these licenses was approximately $2,000,000.

8.     Prior to the closing of the Sale Agreement, a dispute arose between Nortel and Verizon concerning payment to Nortel of these licensing fees (the "Verizon Receivables"). Before this dispute was resolved, the GPPA Agreement was assigned to GENBAND, pursuant to the Sale Agreement.

9.     Following the Closing Date, the Sellers learned that Verizon and GENBAND executed a settlement agreement (the "Settlement Agreement") with respect to the Verizon Receivables.

10.     The Sellers understand that the Settlement Agreement contains a confidentiality clause providing that the terms of the Settlement Agreement remain confidential. Accordingly, Nortel seeks to respect the confidential nature of the Settlement Agreement, and specifically the settlement amount, which is referenced in the Motion.

**B. The Asset Sale Agreement With Ciena**

11.     The Sellers and Ciena Corporation ("Ciena") are parties to a certain sale agreement, the Asset Sale Agreement by and among NNC, NNL, NNC, and the Other Entities Identified Herein as Sellers and Ciena (the "Ciena Sale Agreement") for the sale of the Sellers' Metro Ethernet Networks Business ("MEN") to Ciena.

12.     The Ciena Sale Agreement contained substantially identical language defining the deferred revenue amount that was used to calculate the purchase price adjustment. In the MEN sale agreement, the term was referred to as "Closing Net Deferred Revenues," and the definition of the term was substantively identical to the definition of "Deferred Profit Amount" in the

4

74.

CVAS Sale Agreement. The parties exchanged financial information relevant to calculating the "Closing Net Deferred Revenues" amount as detailed in the Motion.

13.    The Ciena Sale Agreement contains a confidentiality clause providing that certain terms of the Ciena transaction remain confidential. Accordingly, the Sellers seek to respect the confidential nature of the exchange of financial information referenced in the Motion.

14.    Therefore, by this Sealing Motion, the Debtors respectfully request that the Court permit discrete references in the Motion to the settlement amount and the closing of the MEN transaction (the "Redacted Material") to be redacted in the public filing, Annex B to Exhibit C, which contains references to the settlement amount to be omitted from the public filing in its entirety (the "Sealed Exhibit"), and that the unredacted version of the Motion be filed under seal.

### BASIS FOR RELIEF

15.    The relief requested by the Debtors is authorized under the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information . . . .

11 U.S.C. § 107(b).

16.    Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

5

75 .

Fed. R. Bankr. P. 9018.

17.    Local Rule 9018-1 requires any party who seeks to file documents under seal to file a motion to that effect. Del. Bankr. L.R. 9018-1(b).

18.    A movant is not required to demonstrate "good cause" to file under seal. Rather, if the material sought to be filed under seal falls within one of the categories identified in Section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting party and has no discretion to deny the application." In re Orion Pictures Corp., 21 F.3d 24, 27 (2d Cir. 1994). Bankruptcy Rule 9018 is intended to "protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury." In re Global Crossing Ltd., 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003).

19.    The settlement amount, contained in the confidential Settlement Agreement and certain details relating to the closing of the MEN sale, are sensitive commercial information. The Settlement Agreement contains sensitive business information its parties wish not to disclose. Furthermore, the redacted portions of the Motion contain confidential financial information relating to the MEN Business now operated by Ciena. This information should therefore be redacted and filed under seal in accordance with Section 107(b) of the Bankruptcy Code.

## NOTICE

20.    Notice of the Sealing Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to GENBAND; (v) Wells Fargo Bank, National Association, as escrow agent and (vi) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

76.

## NO PRIOR REQUEST

21.   No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Sealing

Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and

(iii) grant such other and further relief as it deems just and proper.


Dated: November 17, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

                                  James L. Bromley (admitted *pro hac vice*)
                                  Lisa M. Schweitzer (admitted *pro hac vice*)
                                  David H. Herrington (admitted *pro hac vice*)
                                  One Liberty Plaza
                                  New York, New York 10006
                                  Telephone: (212) 225-2000
                                  Facsimile: (212) 225-3999

                                       - and -

                                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                  Derek C. Abbott (No. 3376)
                                  Eric D. Schwartz (No. 3134)
                                  Ann C. Cordo (No. 4817)
                                  Andrew R. Remming (No. 5120)
                                  1201 North Market Street
                                  P.O. Box 1347
                                  Wilmington, Delaware 19801
                                  Telephone: (302) 658-9200
                                  Facsimile: (302) 658-3989

                                  *Counsel for the Debtors*
                                  *and Debtors in Possession*

7

77

78

## EXHIBIT A

**Proposed Form of Order**

79.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------X

*In re*                                              :      Chapter 11

Nortel Networks Inc., *et al.*,[1]                   :      Case No. 09-10138 (KG)

             Debtors.                :      Jointly Administered

                                                   :      RE: D.I. _____

------------------------------------------------------X

## ORDER AUTHORIZING THE DEBTORS TO FILE UNDER SEAL AND IN REDACTED FORM CERTAIN PORTIONS OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

Upon the motion dated November 17, 2010 (the "Sealing Motion"),[2] of Nortel Networks

Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the

"Debtors"), for entry of an order, as more fully described in the Sealing Motion, pursuant to

sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule

9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9018-

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sealing Motion.

80

1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules"), authorizing the Debtors to file under seal

and in redacted form certain portions of the Debtors' Motion for the Entry of an Order Enforcing

the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and

Application Solutions Business, and Directing the Release of Certain Escrowed Funds; and

adequate notice of the Sealing Motion having been given as set forth in the Sealing Motion, and

it appearing that no other or further notice is necessary; and the Court having jurisdiction to

consider the Sealing Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and

1334; and the Court having determined that consideration of the Sealing Motion is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and

factual bases set forth in the Sealing Motion establish just cause for the relief requested in the

Sealing Motion, and that such relief is in the best interests of the Debtors, their estates, their

creditors and the parties in interest; and upon the record in these proceedings; and after due

deliberation;

      IT IS HEREBY ORDERED THAT:

    1.     The Sealing Motion is GRANTED.

    2.     The Redacted Material contained in the Motion be redacted in the public filing.

    3.     The Sealed Exhibit be omitted from the public filing in its entirety.

    4.     The unredacted version of the Motion delivered to the Court by the Debtors shall

be kept segregated and under seal by the Clerk of the Court and shall not be made publicly

available pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018

and Local Rule 9018-1(b). The Debtors shall provide the unredacted Settlement Agreement to

the Clerk's Office of the United States Bankruptcy Court for the District of Delaware in a

81

prominently marked envelope with a coversheet attached containing: (i) the caption, (ii) the docket number of the Motion, (iii) the docket number of this Order, and (iv) the legend "DOCUMENTS TO BE KEPT UNDER SEAL" in bold print pursuant to local Rules 9018-1(b).

5.    Notwithstanding any provision of the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

6.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated: _____, 2010
       Wilmington, Delaware
                                    _____
                                    THE HONORABLE KEVIN GROSS
                                    UNITED STATES BANKRUPTCY JUDGE

*82.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------X
                                                      :
In re                                                 :
                                                      :
Nortel Networks Inc., et al.,¹                        :
                                                      :
                          Debtors.                    :
                                                      :
                                                      :
                                                      :
------------------------------------------------------X
```

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing Date: December 15, 2010 at 10:00 am (ET)**
**Objections Due: December 1, 2010 at 4:00 pm (ET)**

## NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO FILE UNDER SEAL AND IN REDACTED FORM CERTAIN PORTIONS OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

PLEASE TAKE NOTICE that the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, have today filed the attached **Debtors' Motion For Entry Of An Order Authorizing The Debtors To File Under Seal And In Redacted Form Certain Portions Of The Debtors' Motion For Entry Of An Order Enforcing The Order Authorizing The Sale Of Certain Assets Of The Debtors' Carrier Voice Over IP And Application Solutions Business, And Directing The Release Of Certain Escrowed Funds** ("Motion").

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **December 1, 2010 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

At the same time, you must serve such Objection on counsel for the Debtors so as to be received by the Objection Deadline.

---

¹       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

*83*

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **DECEMBER 15, 2010 AT 10:00 A.M. (EASTERN TIME)** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801. ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: November 17, 2010
     Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
David H. Herrington (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

3907564.1

# TAB B

84.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.* | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Re: Docket No. 4345** |
| | **Objection Date: December 1, 2010 at 4:00 p.m.** |
| | **Hearing Date: December 15, 2010 at 10:00 a.m.** |

### OBJECTION OF GENBAND INC. TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

GENBAND US LLC (formerly GENBAND Inc., ("GENBAND")), by and through its undersigned counsel, hereby files this Objection to Nortel Networks Inc.'s (collectively, with Nortel Networks Corporation and Nortel Networks Limited, "Nortel," and, together with its affiliate filing entities, the "Debtors") *Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds* [D.I. 4345] (the "Debtors' Motion"). In support of the Objection, GENBAND respectfully submits as follows.

*This is Exhibit ....B.............. referred to in the affidavit of ...Katri..Legrif.......... sworn before me, this ......................... day of ...December............... 20...0.*

A COMMISSIONER FOR TAKING AFFIDAVITS

Robin Anne Cardillo, a Commissioner, etc.,
City of Toronto, for Ogilvy Renault LLP / S.E.N.C.R.L., s.r.l.,
Barristers and Solicitors.
Expires March 24, 2011.

85.

## PRELIMINARY STATEMENT

1.      The United States Supreme Court has ruled that "as a matter of federal law, **any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.**"[1] Nortel asks the Court to do precisely the opposite.

2.      The Debtors' Motion represents Nortel's attempt to avoid the final and binding arbitration process it agreed to when it entered into the Asset Sale Agreement, dated as of December 22, 2009, by and among Nortel, GENBAND and the entities identified as sellers therein (the "ASA"),[2] and approved by this Court's *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts* (the "Sale Order") [D.I. 2632].

3.      A disagreement has arisen between GENBAND and Nortel regarding the Purchase Price Adjustment under the ASA.  Contrary to Nortel's assertions, GENBAND disagrees with Nortel on both its interpretation of the relevant terms and the calculations that Nortel performs under that interpretation.

4.      Section 2.2.3.1(c) of the ASA (the "Mandatory Arbitration Provision"), which was negotiated for and contemplated as part of consideration under the ASA, and which this Court approved in the Sale Order, states that "*any disagreement*" relating to the Purchase Price

---

[1]      *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (emphasis added).

[2]      All terms not otherwise defined herein shall have the meaning ascribed to them under the ASA. The ASA was filed as Exhibit B to GENBAND's *Motion for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration* ("Motion for Relief from Stay and to Compel Arbitration") [D.I. 4347].

*86.*

Adjustment shall be submitted to arbitration. The purpose of that provision was to ensure a prompt and final resolution of any such disagreements, rather than protracted litigation with endless discovery and rights of appeal. Indeed, the Mandatory Arbitration Provision expressly obligates the parties to use their commercially reasonable efforts to cause the arbitration to be completed "as promptly as practicable" and "in no event later than thirty (30) days after" the arbitrator is appointed.

5.      Incredibly, Nortel argues that this Court has the power under the ASA to resolve these issues because Section 10.6(b) states that any proceeding arising out of the agreement shall be brought only in the "U.S. Bankruptcy Court" or the "Canadian Court." (Debtors' Motion, at ¶ 3.) But Nortel omits Section 10.6(e), which provides that "Section 10.6(b) **shall not limit the jurisdiction**" of the arbitrator appointed pursuant to Section 2.2.3.1(c), and that actions may be brought in this Court "**for purposes of enforcing the jurisdiction**" of the arbitrator. Read in its entirety, Section 10.6 thus provides exactly the *opposite* of what Nortel suggests.

6.      Nortel also states that "the parties and their accountants agree on the figures that would determine the Deferred Profit Amount" if Nortel's interpretation of "Deferred Profit Amount" were accepted. Nortel's assertion is both wrong and irrelevant. First, there is nothing in the ASA that excludes disagreements about the meaning of "Deferred Profit Amount" from the scope of "any disagreement" concerning the Closing Statement. If these sophisticated parties, both represented by able counsel, had intended a narrow and restricted scope for the arbitration they would have written it very differently. Second, the parties *absolutely do* disagree about "the figures that would determine the Deferred Profit Amount," regardless of how "Deferred Profit Amount" is defined. It is therefore abundantly clear that there will need

3

to be an arbitration at some point; the only issue is whether that will take place now, in a unified process, or after a protracted, collateral federal litigation as Nortel requests. The Federal Arbitration Act, and the plain language of the ASA, prohibit any such waste of time and resources.

7.      Despite the express contractual obligation to participate in an efficient, quick, final, and binding arbitration process, Nortel refuses to do so. Instead, Nortel would have this Court consider and determine the outcome of a dispute that Nortel explicitly agreed would be arbitrated. To do so, Nortel argues that the parties' disagreement regarding the Purchase Price Adjustment disagreement is somehow not within the scope of "*any disagreement*" under the Mandatory Arbitration Provision. Nortel's argument is fundamentally at odds with the governing law and the strong federal policy requiring rigorous enforcement and liberal interpretation of arbitration clauses. The Court should deny Nortel's motion and instead order Nortel to submit the disagreement to arbitration.[3]

8.      Finally, should the Court determine that the substance of the underlying disagreement shall be heard before the Court, rather than arbitration, GENBAND will need time to conduct discovery, prepare experts, and fully brief the issues. GENBAND vigorously disputes Nortel's assertions, but it should not be forced to litigate those issues in this Court until the threshold question has been resolved.

---

[3]      Nortel also raises disputes regarding Canadian transfer taxes and a settlement agreement reached with Verizon Services Corp. ("Verizon"), but those issues are peripheral to the real dispute at hand: whether the dispute regarding the Purchase Price Adjustment falls within the scope of "any disagreement" with regards to the Purchase Price Adjustment that must be submitted to arbitration.

4

88

## JURISDICTION

9.      This Court has jurisdiction to decide whether the parties' disagreement should be submitted to arbitration under 9 U.S.C. § 1 *et seq*. pursuant to 28 U.S.C. §§ 157 and 1334.  The Court does not have jurisdiction to hear the dispute regarding the Purchase Price Adjustment due to the Mandatory Arbitration Provision.  Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

## BACKGROUND

10.     On December 22, 2009, Nortel and GENBAND entered into the ASA.

11.     The ASA provides for a Purchase Price that will be adjusted after the Closing Date based on the parties' valuation of assets and liabilities included in the agreement. Specifically, Section 2.2.3.1 of the ASA provides a procedure after the Closing Date through which: (1) GENBAND provides Nortel with its calculation of the Final Purchase Price; (2) Nortel, if it disagrees with GENBAND's calculation, provides notice to GENBAND that it disagrees; (3) the parties negotiate for 15 days to resolve the disagreements; and (4) any disagreements the parties are unable to resolve within that period are then submitted to arbitration.

12.     After the Closing Date, accountants for GENBAND and Nortel corresponded frequently regarding the calculation of the Purchase Price under the ASA.  This correspondence

5

revealed that the parties had disagreements both as to the proper approach to calculating the

Purchase Price Adjustment as well as the performance of the actual calculations.[4]

13.    On September 15, 2010, pursuant to Section 2.2.3.1(a) of the ASA, GENBAND

timely delivered to Nortel a letter and written statement (the "Closing Statement"), attached

hereto as Exhibit E, which declared GENBAND's position regarding the Purchase Price

Adjustment.

14.    On October 13, 2010, pursuant to Section 2.2.3.1(b) of the ASA, Nortel delivered

to GENBAND a letter (the "October 13 Letter") with attached a written statement (the

"Disagreement Notice"), both attached hereto as Exhibit F, which provided Nortel's position

regarding the Purchase Price Adjustment, and which detailed the disagreements that Nortel

raised with GENBAND's Closing Statement.

15.    Section 2.2.3.1(c) of the ASA provides that if the parties "are unable to resolve

*any disagreement* as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of

a Disagreement Notice by [Nortel], the Independent Auditor shall serve as arbitrator . . . to

resolve such disagreement." The "Independent Auditor" is defined in the ASA as "KPMG LLP

or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm

of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they

cannot agree on any such firm within 10 Business Days of the request of either Primary Party, by

---

[4]    Although many of the communications between GENBAND and Nortel employees were oral, letters sent by GENBAND to Nortel during this time period indicate that the disagreements were over both the proper accounting approach and its application. This is demonstrated in a letter sent on August 6, 2010 (the "August 6 Letter"), attached hereto as Exhibit A, a letter sent on August 18, 2010 (the "August 18 Letter"), attached hereto as Exhibit B, a letter sent on August 20, 2010 (the "August 20 Letter"), attached hereto as Exhibit C, and a letter sent on August 27, 2010 (the "August 27 Letter"), attached hereto as Exhibit D.

90

KPMG LLP at the request of the first Primary Party to move for the appointment of such Independent Auditor."

16.    Section 2.2.3.1(c) also provides that the parties must use their "commercially reasonable efforts to cause the Accounting Arbitrator to deliver . . . as promptly as practicable (and in no event later than thirty (30) days after his or her appointment), a written report setting forth the resolution of any such disagreement." The obvious purpose of that provision is to ensure a speedy, efficient, and final process to resolve any disagreements over the Purchase Price Adjustment.

17.    In the October 13 Letter, Nortel indicated that it might not honor the Mandatory Arbitration Provision. Specifically, the October 13 Letter stated that Nortel "expressly reserves our right to pursue all available remedies to resolve any disputes over the Deferred Profit Amount, whether by recourse to judicial relief or otherwise."

18.    In a letter dated October 25, 2010 (the "October 25 Letter"), attached hereto as Exhibit G, GENBAND responded to Nortel's October 13 Letter and stated that Nortel's refusal to arbitrate the disagreement regarding the Purchase Price Adjustment would constitute a breach of the ASA because arbitration is the exclusive process for the resolution of *any disagreement* regarding the Purchase Price Adjustment.

19.    On October 28, 2010, the fifteen-day period for resolving disputes regarding the Purchase Price Adjustment ended, without the parties resolving all of their disagreements. Nortel thus became contractually bound to submit the remaining disagreements to arbitration.

7

*91.*

20.     Nortel did not do so, and did not respond to GENBAND's October 25 Letter.  In a letter to Nortel dated November 9, 2010 (the "November 9 Letter"), attached hereto as Exhibit H, GENBAND reiterated Nortel's contractual obligation to commence arbitration with regard to the disagreement and noted that Nortel had neither provided an explanation why the parties' disagreement was not "any disagreement" subject to the Mandatory Arbitration Provision nor pointed to any provision in the ASA that justified its position.

21.     In a letter dated November 10, 2010 (the "November 10 Letter"), attached hereto as Exhibit I, Nortel finally responded, refusing to submit to arbitration as required by the ASA and thus repudiating its contractual obligations.

22.     Nortel, in Debtors' Motion, now requests that this Court ignore the Mandatory Arbitration Provision and instead resolve for itself the parties' disagreement regarding the Purchase Price Adjustment.  GENBAND respectfully submits that this Court should decline the invitation and compel Nortel to arbitrate as it agreed to in the ASA.

### RELIEF REQUESTED

23.     By this Objection, and its separately filed Motion for Relief from Stay and to Compel Arbitration [D.I. 4347], GENBAND requests that the Court (i) deny the relief sought in the Debtors' Motion, (ii) enter an order lifting the automatic stay pursuant to Sections 105 and 362(d) of the Bankruptcy Code to allow arbitration to commence, and (iii) compel the commencement of arbitration pursuant to Section 2.2.3.1(c) of the ASA.

*91*

## BASIS FOR RELIEF

### I.    THE PARTIES' DISAGREEMENT SHOULD BE SUBMITTED TO ARBITRATION

24.    "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Shubert v. Wellspring Media, Inc.*, 335 B.R. 556, 562 (Bankr. D. Del. 2005) (quoting *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24–25). "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quoting *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (citation omitted)).

25.    When presented with a motion to compel arbitration, courts in this Circuit have considered the strong federal policy that favors arbitration. *See In re Mintze*, 434 F.3d 222, 229 (3d Cir. 2006) ("The FAA has established a strong policy in favor of arbitration . . . . To overcome enforcement of arbitration, a party must establish congressional intent to create an exception to the FAA's mandate with respect to the party's statutory claims."). "It is well established that arbitration is a favored mechanism for resolving disputes, especially where the parties previously agreed to utilize arbitration." *In the Matter of TEU Holdings, Inc.*, 287 B.R. 26, 36 (Bankr. D. Del. 2002); *see also In re Gurga, d/b/a Source Commcs.*, 176 B.R. 196, 200 (B.A.P. 9th Cir. 1994) (citing *Graham Oil Co. v. ARCO Products, Inc.*, 43 F.3d 1244, 1247 (9th Cir. 1994), for the proposition that "arbitration is a form of dispute resolution that finds favor in the courts").

26.     The United States Supreme Court has held that the Federal Arbitration Act, 9

U.S.C. § 1 *et seq.*, establishes a federal policy favoring arbitration that requires courts to

"rigorously enforce agreements to arbitrate." *Shearson/Am. Exp. v. McMahon*, 482 U.S. 220,

226 (1987) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *see also Hays*

*& Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir. 1989)

(citations omitted); *Dickenson v. Heinold Securities, Inc.*, 661 F.2d 638, 643 (7th Cir. 1981)

(discussing strong federal policy favoring enforcement of arbitration agreements).  As such,

when a dispute is subject to the terms of an arbitration agreement, the FAA requires a court to

stay its proceedings and compel arbitration, except in limited circumstances. *McMahon*, 482

U.S. at 226.

27.     The Third Circuit has similarly held that "[w]here an otherwise applicable

arbitration clause exits, a bankruptcy court lacks the authority and discretion to deny its

enforcement, *unless* the party opposing arbitration can establish congressional intent . . . to

preclude waiver of judicial remedies for the statutory rights at issue." *In re Mintze*, 434 F.3d at

231 (emphasis in original); *see also Shubert*, 335 B.R. at 567 ("An agreement to arbitrate before

a specific tribunal is, in effect, a specialized kind of forum selection clause.  Moreover, based on

the recent Supreme Court arbitration cases we have previously reviewed, the national policy

favoring enforcement of agreements to arbitrate is at least as strong or stronger than that favoring

enforcement of forum selection agreements.") (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S.

506, 519 (1974) (citation omitted)).  This Court, applying this precedent, has determined it lacks

the authority not to send disputes "arising from [a] contract and the alleged breach thereof" to

arbitration.  *See Jalbert v. Pac. Employers Ins. Co. (In re Olympus Healthcare Group, Inc.)*, 352

B.R. 603, 610–12 (Bankr. D. Del. 2006) (citing *In re Mintze*, 434 F.3d at 229–31).  The mere

10

*94.*

fact that the ultimate decision might have an effect on the rights of other creditors to the estate is not sufficient to create an inherent conflict between the Bankruptcy Code's underlying purposes and arbitration. *In re Mintze*, 434 F.3d at 229.

28.    In *Shubert v. Wellspring Media, Inc.*, this Court sent to arbitration a disagreement very similar to the one at hand. 335 B.R. at 569. In *Shubert*, the bankruptcy Trustee, like Nortel, sought to resolve a dispute regarding a working capital calculation in the Bankruptcy Court rather than through the agreed-upon arbitration process. *Id.* at 566–67. The disagreement concerned the calculation of working capital and an adjustment to purchase price, and the disagreement was subject to an arbitration clause under the parties' contract. *Id.* at 563 ("Under the terms of the agreement, the Court cannot compel payment of the purchase price without a determination of what Wellspring owes on the Note."). The Court rejected the Trustee's request, because the "Agreement . . . provides for an agreed-upon mechanism to resolve this dispute." *Id.* The Court stated that where the Trustee sought to avoid "the exact procedure contemplated by the parties to the Agreement," that party "cannot now use this alternate forum as a reason to circumvent the agreed-upon dispute resolution procedures." *Id.* at 566.  The parties to the agreement, "in agreeing to the arbitration clause, determined that arbitration, and not this Court, would be the avenue through which this issue should be addressed."[5] *Id.* at 566–67.

---

[5]    This Court also recognized the "strong federal policy in favor of arbitration" in *Alderwoods Group, Inc. v. Charter Funerals, Inc.*, 344 B.R. 727, 731 (Bankr. D. Del. 2006). In *Alderwoods Group*, there was an arbitration clause in an asset sale agreement that had been approved by the Bankruptcy Court pursuant to a sale order.  344 B.R. at 728.  The arbitration clause at issue was permissive, inasmuch as the Bankruptcy Court had discretion under the contract at issue as to whether to send the dispute to arbitration or to resolve the dispute itself. *Id.* at 729.  Even though arbitration was not required under that contract, this Court nonetheless determined that arbitration was appropriate due to the "desire to enforce freely entered into agreements" and "the speed and efficiencies attendant to arbitration proceedings." *Id.* at 731 (citing *Dean Witter Reynolds*, 470 U.S. at 220–21).  The Court explained that "arbitration will further the goals of the Bankruptcy Code by providing the parties with a quick and efficient resolution." *Id.* (quoting *In re NorthWestern Corp.*, 2005 Bankr. LEXIS 795, at *8 (Bankr. D. Del. May 5, 2005)).

11

95

29.    The same conclusion applies here.  Resolution of the parties' disagreement by the

Bankruptcy Court—rather than by an arbitrator—would deprive GENBAND of its bargained-for

and paid-for dispute resolution procedure.  The arbitration process, which is efficient, fast, and

binding, is the bargained-for expectation of GENBAND.  In comparison, resolution by the

Bankruptcy Court could very well lead to protracted litigation.  *See, e.g., Johnson v. Pfizer, Inc.*,

2004 U.S. Dist. LEXIS 25217, 2004 WL 2898076, *3 n.2 (D. Kan. 2004) ("One of the reasons

arbitration is favored is the presumption that arbitration . . . will resolve disputes more quickly

and at less expense to the parties than litigation in court.").  Nortel's approach would also deny

GENBAND the finality it bargained for, because even the Bankruptcy Court's findings of fact

regarding the Purchase Price Adjustment would be reviewable by a district court on appeal for

clear error.  *See* FED. R. BANKR. P. 8013; *see also, e.g., Sovereign Bank v. Schwab*, 414 F.3d 450,

452, n.3 (3d Cir. 2005); *Schwab v. PennSummit Tubular, LLC (In re Old Summit Mfg., LLC)*,

523 F.3d 134, 137 (3d Cir. 2008).

30.    It bears noting, finally, that the time to commence arbitration under the ASA was

October 28, 2010, fifteen days after Nortel provided its Disagreement Notice.  If Nortel had

honored the Mandatory Arbitration Provision, the Purchase Price Adjustment could already be

concluded as of this date.  Nortel's delay has precluded this orderly process and denied

GENBAND the benefit of its bargain.

## II.    NORTEL'S ARGUMENT THAT THE PURCHASE PRICE ADJUSTMENT DISAGREEMENT IS NOT "ANY DISAGREEMENT" IS MERITLESS

31.    Nortel would have this Court determine the substance of the underlying dispute

itself, rather than simply determine whether Nortel agreed to arbitrate the dispute under the

Mandatory Arbitration Provision.  That puts the cart before the horse, as it requires the Court to

12

96.

pre-judge the substance of the accounting disagreements and assumes the outcome Nortel desires.

32.    In asking this Court to assume the role of the arbitrator, Nortel points to specific words in the contract defining the term "Deferred Profit Amount." Nortel suggest that these are contractual interpretation issues rather than accounting issues, and that this Court is a better forum to resolve them. Nortel's argument fails for at least two reasons. First, if Nortel wanted to have some issues decided by this Court and some other issues decided by the arbitrator, it should have said so in the ASA rather than using the broad phrase "any disagreement." That is not what GENBAND agreed to. Second, Nortel conveniently omits that the very definition it asks this Court to interpret concludes with the phrase "the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles," which confirms that it is invariably intertwined with accounting issues.

33.    Nortel admits that under Section 2.2.3.1(c) of the ASA, the parties must submit to arbitration "any disagreement as contemplated by Section 2.2.3.1(b)" of the ASA. Debtors' Motion, at ¶ 51. Nortel also correctly points out that this Court retains jurisdiction to interpret the terms of the ASA, pursuant to Section 10.6(b) of the ASA—but Nortel again omits a key part of that section stating that "Section 10.6(b) shall not limit the jurisdiction of . . . the Accounting Arbitrator set forth in Section 2.2.3.1(c)."

34.    The terms of the ASA are thus abundantly clear. Nortel agreed to the Mandatory Arbitration Provision and this Court approved it in the Sale Order. Rather than submit to this contractually required and Court-approved process, however, Nortel argues that the parties' disagreement regarding the Purchase Price Adjustment is somehow not within the scope of "any

13

97

disagreement" with regard to the Purchase Price Adjustment. Nortel's myopic interpretation

cannot be reconciled with the governing precedent requiring liberal construction of arbitration

clauses and providing that "any doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration." *Shubert*, 335 B.R. at 562.

35.    Nortel argues that only disagreements that are "properly" raised under the ASA

Purchase Price Adjustment procedures are subject to arbitration, and the "present dispute has not

been properly raised." Debtors' Motion, at ¶ 51. That is sophistry. Nortel's assertion that the

claim was not "properly" raised is based entirely on its <u>own</u> view that its interpretation of the

ASA is correct. Specifically, Nortel argues that because GENBAND and Nortel have different

interpretations of the term "Deferred Profit Amount," an operative accounting concept crucial to

the Purchase Price Adjustment, Nortel argues that GENBAND "disregarded its obligation to

prepare the Closing Statement in accordance with the terms of the [ASA] . . . ." *Id.*

36.    While artfully phrased, Nortel's argument is really just a different way of asking

the Court to resolve the underlying dispute itself. When Nortel says that the disagreement was

not "properly" raised, all it means is that Nortel disagrees with GENBAND's interpretation of

the contract.[6] If that were a sufficient basis to avoid an arbitration clause, such clauses would

have no meaning at all. It cannot be the case that the existence of a disagreement about a term in

the contract *precludes* this Court from enforcing the agreed procedure for resolving such a

disagreement.

---

[6]    Similarly, when Nortel states that it "did not agree to delegate to the Accounting Arbitrator the power to rewrite the terms of the [ASA]," Debtors' Motion, at ¶ 51, all that really means is "we disagree with GENBAND's interpretation." But the existence of a dispute is not a valid basis on which to avoid the agreed-upon mechanism for resolving the dispute.

14

98

37.     Importantly, arbitration is inevitable under *either* Nortel's or GENBAND's

interpretation of "Deferred Profit Amount." Nortel's assertion that "[t]he difference between

GENBAND's and the Sellers' respective calculations of Deferred Profit Amount is not the result

of any accounting disagreement or mathematical discrepancy" is flat-out wrong. There exist

*both* contractual interpretation disagreements and accounting disagreements between the parties,

and both constitute "any disagreement" subject to arbitration pursuant to the Mandatory

Arbitration Provision. Even if the Court were to accept Nortel's argument and determine that

Nortel's interpretation of Deferred Profit Amount is correct, there would still need to be an

arbitration regarding the application of Nortel's interpretation. That sort of two-stage process

would be antithetical to the fast and efficient process mandated in the parties' agreement.

38.     GENBAND has not addressed the merits of the underlying disagreement

regarding the Purchase Price Adjustment because that disagreement belongs in arbitration and

because the question of whether the disagreement should be sent to arbitration is a threshold

issue that should be determined first. If, however, the Court wishes to resolve the underlying

disagreement, GENBAND will need discovery, the testimony of experts, and an opportunity to

brief the issue in full. In that circumstance, GENBAND would request adjournment of the

scheduled hearing for this motion to allow time for this process.

39.     As discussed above, every step in the dispute resolution procedure laid out in

Section 2.2.3.1 of the ASA has been followed, save for the final step: submitting to arbitration.

Nortel agrees that the arbitrator would resolve "any disagreement" with regards to accounting

15

approach and calculations.[7] The ASA does not provide for any separate process for other types of disagreements; all must be arbitrated. This Court should compel Nortel to honor that agreement.

### III.    NORTEL'S OTHER ARGUMENTS, PERIPHERAL TO THE ARBITRATION QUESTION, SHOULD BE REJECTED

40.    In an attempt to avoid mandatory arbitration in connection with the Purchase Price Adjustment, Nortel has included in the Debtors' Motion a number of peripheral, unrelated issues. Nortel implies that because this Court may properly hear these peripheral disputes between GENBAND and Nortel, it may also hear and decide the dispute with regard to the Purchase Price Adjustment, notwithstanding the fact that the Mandatory Arbitration Provision requires that the parties bring such dispute before an arbitrator. However, Nortel's assertion is simply incorrect. GENBAND does not seek to avoid the jurisdiction of this Court with respect to these unrelated issues. GENBAND simply requests that this Court honor the terms of the ASA, including the Mandatory Arbitration Provision.

### A.    Canadian Transfer Tax

41.    Nortel argues, in what it admits is a smaller and unrelated dispute, that GENBAND owes Nortel certain Canadian transfer taxes.[8]

42.    Contrary to Nortel's assertion, GENBAND does not seek to avoid the jurisdiction of either this Court or the Ontario Superior Court of Justice (the "Canadian Court") on this issue.

---

[7]    Nortel points to a negative deferred cost-of-sales balance belonging to Nortel Networks (Luxembourg) S.A. that should not have been included in GENBAND's calculation of Deferred Profit Amount, Debtors' Motion, at ¶¶ 25, 43, 49, which is exactly the type of issue that should be submitted to the arbitrator pursuant to the Purchase Price Adjustment dispute resolution procedures under the ASA.

[8]    Nortel states that it invoiced GENBAND in the amount of $1,000,390 on September 28, 2010. Debtors' Motion, at ¶¶ 35–37, 57–58.

*100*

Rather, GENBAND submits that this issue should be properly argued and heard before the

appropriate court at a later date. The resolution of the Canadian transfer tax issue depends on a

final determination of the Purchase Price under the ASA. GENBAND's ability to calculate the

Purchase Price for determining the proper payment to Nortel with regard to Canadian transfer

taxes has been hindered by GENBAND's lack of access to Nortel's books and records.[9]

Although such payment for Canadian transfer taxes is owed to Nortel, the amount of such

payment is unclear at this time due to the fact that the issue was raised only recently by Nortel

and because there has been delay in access to contractually owed books and records.

GENBAND is committed to investigate the issue internally and, with GENBAND's Canadian

counsel, will work to resolve the issue with Nortel and will remit to Nortel proper payment for

Canadian transfer taxes. Until the amount of such remittance may be verified, however,

GENBAND cannot do so. GENBAND respectfully suggests that the Court should order Nortel

to provide the necessary documents and order the parties to wok in good faith toward an agreed

resolution of this issue.

### B.      Verizon

43.     Nortel argues, in another smaller and unrelated dispute, that GENBAND has

failed to comply with the ASA by refusing to pay to Nortel consideration paid by Verizon to

GENBAND under a settlement agreement pertaining to a contract assigned by Nortel to

GENBAND.

---

[9]      Nortel has consistently dragged its feet in allowing GENBAND access to books and records that
GENBAND is entitled to under the ASA and that are necessary to investigate fair value and to conduct
business. GENBAND sought cooperation from Nortel regarding access to its books and records, but only
after multiple letters threatening to submit the issue to this Court has Nortel provided access to books and
records that are necessary to determine the amount of the Canadian transfer tax. The exhaustive process
to extract needed information from Nortel is detailed in the August 6 Letter, the August 18 Letter, the
August 20 Letter, and the August 27 Letter. *See* Exhibits A–D.

101

44.    GENBAND does not seek to avoid the jurisdiction of this Court in connection with this dispute, either.  Rather, GENBAND submits that this issue should be properly argued and heard before this Court at a later date.  To be sure, Nortel notified GENBAND of this issue on August 13, 2010, and GENBAND responded on September 3, 2010, with a request for additional information regarding Nortel's request.[10]  GENBAND notified Nortel that pursuant to the terms of the ASA, GENBAND was not prepared to remit to Nortel any payment made pursuant to an assigned contract based on agreement made with Verizon subsequent to the Closing Date.  GENBAND believes that any such agreement does not pertain to Nortel, as the underlying contract had been assigned pursuant to the ASA.  Nortel did not provide any additional argument or information subsequent to its request, and instead included this issue in Debtors' Motion before this Court.  GENBAND has still not been provided clarification regarding Nortel's argument as to why it is entitled to funds provided to GENBAND by Verizon pursuant to assigned contracts after the Closing Date.

45.    Without further explanation from Nortel, GENBAND cannot characterize any payment by Verizon as an Excluded Asset due to Nortel under the ASA.  Due to all of the above, GENBAND respectfully submits that this issue is not ripe for consideration by this Court, and should be considered further and resolved by the parties.

**C.    Escrow**

46.    Nortel argues that "[b]ecause the correctly calculated Purchase Price Adjustment Escrow Amount exceeds the maximum purchase price adjustment . . . there is no basis for the continued reserve of those excess amounts."  Debtors' Motion, at ¶ 52.  This disagreement,

---

[10]    GENBAND, in its September 3, 2010 letter, attached hereto as Exhibit J, stated that Nortel's assertions regarding a settlement agreement with Verizon was not clear.  GENBAND has not received further clarification from Nortel on this point.

18

*101*

however, as argued above, should be submitted to arbitration.  As such, release of the Escrow

Amount would be improper pending the arbitration.

## CONCLUSION

WHEREFORE, GENBAND respectfully requests that the Court (a) deny the

relief sought in the Debtors' Motion, and (b) enter an order (i) lifting the automatic stay pursuant

to Sections 105 and 362(d) of the Bankruptcy Code to allow arbitration to commence, (ii)

compelling the commencement of arbitration pursuant to Section 2.2.3.1(c) of the ASA, and (iii)

granting such further and other relief as the Court deems just.

Dated:  December 1, 2010
      Wilmington, Delaware

Respectfully submitted,

/s/ Michael R. Lastowski
Michael R. Lastowski (No. 3892)
Sommer L. Ross (No. 4598)
DUANE MORRIS, LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail:    mlastowski@duanemorris.com
        slross@duanemorris.com

and

Blair Connelly (Admitted *Pro Hac Vice*)
Eli J. Kay-Oliphant (Admitted *Pro Hac Vice*)
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1200
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
E-mail:  blair.connelly@lw.com
      eli.kay-oliphant@lw.com

*Counsel for GENBAND Inc.*

19

103

104

**EXHIBIT A**

105

 **GENBAND**

August 6, 2010

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan, Secretary

Dear Ladies and Gentlemen,

As you may know, in recent weeks we have made several oral and e-mail requests of you for books and records of the CVAS business. As of the time of our delivery of this letter, we have not yet been provided these materials in full.

Pursuant to Section 2.1.1(g) of the Asset Sale Agreement by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., the other entities identified therein as Sellers, GENBAND Inc., and the other Designated Purchasers that became party thereto, dated December 22, 2009, as amended from time to time (the "ASA"), the Sellers were required at the closing of our transaction to provide to us the tangible embodiments of the "Business Information." Furthermore, pursuant to Section 5.22(b) of the ASA, the Sellers are required to provide us with access to records related to the CVAS business.

Despite our previous requests for outstanding Business Information and copies of certain records related to the CVAS business, we have not yet been provided access to such materials. While a full transfer of all Business Information and the previously requested records that you have not yet delivered to us is an important priority, it is particularly important to us that you provide copies of all of the materials described on Annex A to this letter as soon as possible. In addition to requiring these materials for the proper operation of our business, they are necessary for our completion of the Closing Statement pursuant to the ASA. To the extent that any of the requested materials do not exist, we seek the records of the data necessary to create these materials.

GENBAND
August 6, 2010
Page 2

    We believe it is in our mutual best interests for us to be able to provide you the Closing Statement as soon as possible, and therefore we seek these materials as promptly as possible. Please contact us as soon as possible to discuss the most efficient method to transmit these requested materials.

                Sincerely,

                Shauna Martin, General Counsel
                **GENBAND**
                3605 E. Plano Pkwy., Suite 100
                Plano, Texas 75074
                Facsimile: +1-972-265-3581

cc:

Nortel Networks Limited and Nortel Networks Inc.
5270 Sycamore Avenue
Bronx, New York  10471
*Attn:  Robert Fishman, Senior Counsel*

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Facsimile: +1-212-225-3999
*Attn: Laurent Alpert*

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Facsimile: +1-416-216-3930
*Attn: Michael Lang*

Latham & Watkins LLP
885 Third Avenue
New York NY 10022
Facsimile: +1-212-751-4864
*Attn: David S. Allinson, Esq.*

107

## Annex A

GENERAL
- As of 5/28 (immediately preceding the divestiture of the business), please provide Balance Sheet (unaudited) by country – similar to 3/31 Balance Sheet already provided

UNBILLED ACCOUNTS RECEIVABLE (CIP)
- As of 5/28 (immediately preceding the divestiture of the business), please provide detail list of unbilled A/R ending balance by company code, G/L account, and by customer/contract/NTID

DEFERRED REVENUE
- As of 4/30 and 5/28 (immediately preceding the divestiture of the business), please provide detail list of the components comprising the CVAS **deferred revenue balance**, including: Company code, General Ledger Account, Customer Name, end-user country, Contract Number, NTID / ROOTID, Product Type and Revenue Indicator, as shown on the books and records of Nortel-CVAS.
- As of 4/30 and 5/28 (immediately preceding the divestiture of the business), please provide detail list of the components comprising the CVAS **deferred cost balance**, including: Company code, General Ledger Account, Customer Name, end-user country, Contract Number, NTID / ROOTID, Product Type and Revenue Indicator, as shown on the books and records of Nortel-CVAS.
- As of 4/30 and 5/28 (immediately preceding the divestiture of the business), please provide the Life-to-Date (LTD Report) for the **deferred revenue balances** by NTID/ROOT ID including: end-user country, Contract Value (CV), Revenue, Billings, Deferred Revenue, COGS, EAC (total budget costs), and Remaining Budget
- For each customer with a **deferred revenue balance** greater than $500k on the 4/30 and 5/28 (immediately preceding the divestiture of the business) trial balances provide supporting package including: contracts, quotes, POs, packing slips, shipping confirmation, software confirmation, memos, checklist (if any), and actual PSI or COT costs.

ACCRUED VACATION and SPECIFIED EMPLOYEE LIABILITIES
- As a follow up to a prior request for sample employees chosen by Genband:  1 remaining Italy sample selection & 4 France sample employees chosen by Genband, please provide support for each component of the calculation of the accrual that was transferred to Genband.  (For instance:  Salary * Hours accrued = accrued vacation; we would need HR system support for salary of the employee and hours of vacation accrued which ties to the actual amount being calculated)

OTHERS LT (a.k.a TFR or other pension liabilities)

108

- Obtain most recent US GAAP actuarial report(s) for each country's employee benefit plan. None were available as part of the electronic data room access recently provided. Report does not need to list amounts specific to individual employees, only needed for the overall plan as transferred to Genband.
- Contact details for the administrator/provider for pension plans in Russia, France, Israel, and Portugal.

JULY ADJUSTMENTS TO GOODWILL BOOKED IN TSA COMPANY CODES
- Details and journal entry support for each entry that was booked to 255001 or 137899 (if not already provided).
- Understanding of whether these entries are included in the current web forum lead sheets
- Close these accounts for posting upon Genband's request

109.

110 .

**EXHIBIT B**

| | |



Shauna Martin
office: 972.265.3890
facsimile: 972.461.7516
shauna.martin@genband.com

August 18, 2010

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA 37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan
  *Secretary*

Ladies and Gentlemen,

We have received your letter dated August 13, 2010 responding to our numerous requests for information to which we are entitled pursuant to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL, and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter (including Annex A) have the meanings ascribed to them in the ASA.

We disagree with many of the statements included in the August 13, 2010 Letter and that you have made to us with respect to Nortel's interpretation of various provisions of the ASA. In particular, Nortel's effort to apply purchase accounting in this process is completely at odds with both the letter and intent of the ASA. We expressly reserve the right to raise those issues in the future, if necessary. However, there is no need to debate them now, because our right to receive records is in no way dependent upon the resolution of those matters.

As you know, pursuant to Section 5.22(b) of the ASA, Nortel must preserve all pre-Closing Date records and provide GENBAND "reasonable access to such records during normal business hours." Moreover, "[s]uch records may be sought under this

1

112.

Section 5.22(b) for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure, financing or other similar needs . . . ."

We have requested on many occasions, both verbally and in writing, and beginning prior to Closing under the ASA, that Nortel provide us with pre-Closing Date records; and in violation of the ASA, Nortel personnel have still refused to provide us these records. Our most recent request, by letter dated April 6, 2010, was refused by Nortel via the above-discussed letter dated August 13, 2010.

The August 13, 2010 letter states, in essence, that various records will not be provided because (a) Nortel believes we do not need them, and/or (b) it would be difficult or time-consuming for Nortel to retrieve the information.

The first point is entirely unavailing, as we are entitled to receive such information for any reasonable purpose—in this case, so that we can prepare our Closing Statement pursuant to Section 2.2.3.1(a) of the ASA. Your apparent disagreement with us about how that calculation should be made is no excuse under the ASA for failing to provide us with access to the necessary records. Further, the information is needed in any event for independent business reasons. To cite just two examples, it is necessary for historical records regarding the performance of the business and to create an accurate opening balance sheet.

To the extent that Nortel believes it would be difficult or time-consuming to retrieve the requested information, that is also irrelevant. We are prepared to review the necessary records to obtain the information ourselves, during regular business hours, as expressly contemplated by Section 5.22(b) of the ASA. So that your personnel can prepare for our team's arrival, we have prepared a description of the records that we will need to review, which is attached hereto as Annex A. Nortel's refusal to provide the records to this point (in violation of the ASA) has jeopardized if not made impossible our ability to produce the Closing Statement by the date it is due, August 31, 2010. As such, the inspection will need to begin within the next 5 business days. Therefore, please let us know by the close of business tomorrow where our team should go to inspect the records and the specific day when the inspection may begin.

GENBAND expressly reserves all of its rights and remedies.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-265-3581

2

113.

Copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
United States
Attention:     David S. Allinson, Esq.
Facsimile:     +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:     Don J. McDermett, Jr., Esq.
               Curt Anderson, Esq.
Facsimile:     +1-214-661-4454
               +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue 7th Floor
New York, New York 10022
Attention:     Ron Ferguson, Esq.
Facsimile:     +1-212-371-7087

**Nortel Networks Limited and Nortel Networks Inc.**
5270 Sycamore Avenue
Bronx, New York 10471
Attention:     Robert Fishman
               Senior Counsel

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
United States
Attention:     Laurent Alpert
Facsimile:     +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:     Michael Lang
Facsimile:     +1-416-216-3930

3

114.

## Annex A

**GENERAL**

Access to CVAS general ledger trial balance (or equivalent document) as of 5/28 (prior to carve-out procedures), and all supporting documents used to determine the underlying basis from which all 5/28 balances transferred to Genband were derived.

Access to support personnel responsible for determining amounts and balances presented to Genband, who can explain any and all variances between the 5/28 general ledger trial balance (or equivalent document) amounts and the balances presented to Genband.

Access to any and all supporting documents, schedules, and workpapers used to determine the amounts and balances presented to Genband and the reconciliation between such amounts and balances and the 5/28 general ledger trial balance (or equivalent document).

**UNBILLED ACCOUNTS RECEIVABLE (CIP)**

Detail of, and access to any and all documents supporting, unbilled A/R as of 5/28 (prior to carve-out procedures) for all data elements readily available, including, but not limited to, field attributes such as customer name, company code, G/L account, and unique identifier for the arrangement (e.g., NTID/ROOTID number).

**DEFERRED REVENUE**

Detail of, and access to any and all documents supporting, deferred revenue ledgers as of 5/28 (prior to carve-out procedures, and agreeing to 5/28 general ledger trial balance, reconciled as necessary) for all data elements readily available, including, but not limited to, field attributes such as customer name, unique identifier for the arrangement (e.g., NTID/ROOTID number), country, contract number, product type, revenue indicator/guidance (e.g., SOP 81-1, SOP 97-2), and G/L account.

Detail of, and access to any and all documents supporting, deferred cost ledgers as of 5/28 (prior to carve-out procedures, and agreeing to 5/28 general ledger trial balance, reconciled as necessary) for all data elements readily available, including, but not limited to, field attributes such as customer name, unique identifier for the arrangement (e.g., NTID/ROOTID number), country, contract number, product type, revenue indicator/guidance (e.g., SOP 81-1, SOP 97-2), and G/L account.

Access to any and all documents detailing any arrangements with a deferred revenue balance as of 5/28 (prior to carve-out procedures), which provide product arrangement status (e.g., Life-to-Date, or LTD, Report) for data elements readily available, including, but not limited to, field attributes such as deferred revenue balance, total contract value, total billings, revenue recognized to-date, total estimated costs, costs recognized to-date, remaining budget, end-user country and unique identifier for the arrangement (e.g., NTID/ROOTID number).

Access to any and all documents detailing any arrangements with a deferred revenue balance as of 5/28 (prior to carve-out procedures), including providing all contracts, contract accounting memos, checklists, and process documentation as of most recent date available (which may include June 30, 2010 if completed quarterly).

Provide all documents, schedules, and workpapers utilized to complete carve-out calculations for deferred revenue and deferred cost as of 5/28.

4

115

**ACCRUED VACATION and SPECIFIED EMPLOYEE LIABILITIES**

Access to any and all underlying documentation and access to personnel responsible for France and Italy, including assistance to properly understand certain elements of employee accrual data provided via Web Forum and by screen shot information received August 4, 2010. For example, for France need to understand adjustments applied to employee hourly rates for certain employee accrual calculations, as salary data is not consistently applied in worksheets utilized to calculate employee accruals per Web Forum. And for Italy, unable to locate support for hours accrued in order to recalculate certain employee accruals per Web Forum.

Access to any and all supporting documents, schedules, and workpapers for any employee liabilities not previously identified to Genband but for which a liability exists and should be transferred to Genband as of 5/28, such as PTO or sales commissions earned but not paid as of 5/28.

**OTHERS LT (a.k.a, TFR, other pension liabilities)**

Access to plan documents for all countries with defined benefit and/or defined contribution employee benefit plans with liabilities transferred to Genband and/or liabilities assumed for plans managed and setup by Genband.

For defined benefit pension liabilities transferred to and/or assumed by Genband, access to:

- all schedules, workpapers and calculations to support the pension liability accrual, including actuarial assumptions;
- most recent actuarial valuation report under local accounting, including but not limited to data attributes such as liability calculations, summary of assumptions and methods, and description of census data; and
- most recent actuarial valuation report under US GAAP, including but not limited to data attributes such as liability calculations, summary of assumptions and methods, and description of census data.

For any actuarial valuation report calculated for Nortel employees in general (and not just for CVAS employees), access to separate documentation describing the portion of the liability attributable to CVAS with similar data attributes as noted above.

For any employee benefit plan liabilities transferred to and/or assumed by Genband with related asset positions transferred as well, access to detail listing of assets transferred, by employee benefit plan, market value as of 5/28, and source for market value

**JULY ADJUSTMENTS TO GOODWILL BOOKED IN TSA COMPANY CODES**

Access to any and all personnel responsible for journal entry for USD $1,148,737 (Dr. #120005 Unbilled A/R, Cr. #255001 Goodwill) booked to Co 8200 by NBS via SAP feed received by Genband on August 12, 2010.
Access to any and all personnel responsible for the July adjustments to goodwill booked in TSA company codes, to determine whether these entries are included in the current web forum lead sheets.

5

116.

117

**EXHIBIT C**



119

Shauna Martin
office: 972.265.3890
facsimile: 972.461.7516
shauna.martin@genband.com

August 20, 2010

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan
  *Secretary*

Ladies and Gentlemen,

In our letter to you dated August 18, 2010, we once again requested that Nortel comply with its contractual obligation to provide us access to pre-Closing Date records, per Section 5.22(b) of the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL, and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA").

We require the records for multiple "reasonable purposes," including that they are necessary to produce the Closing Statement by the date it is due, August 31, 2010. Indeed, Nortel's refusal to provide the records has made impossible GENBAND's timely performance with regards to the Closing Statement.  Because time is of the essence, our August 18, 2010 Letter requested that you contact us, before the close of business on August 19, 2010, to inform us of the time and place you will allow our team to inspect the requested records.  You did not contact us or respond in any way.

Nortel is in breach of the ASA.  Unfortunately, you leave us no choice but to go to the Bankruptcy Court to compel your compliance with the ASA.

1

119.

GENBAND expressly reserves all of its rights and remedies.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-265-3581

2

/20 .

Copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
United States
Attention:     David S. Allinson, Esq.
Facsimile:     +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:     Don J. McDermett, Jr., Esq.
               Curt Anderson, Esq.
Facsimile:     +1-214-661-4454
               +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue 7th Floor
New York, New York 10022
Attention:     Ron Ferguson, Esq.
Facsimile:     +1-212-371-7087

**Nortel Networks Limited and Nortel Networks Inc.**
5270 Sycamore Avenue
Bronx, New York 10471
Attention:     Robert Fishman
               Senior Counsel

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
United States
Attention:     Laurent Alpert
Facsimile:     +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:     Michael Lang
Facsimile:     +1-416-216-3930
August 18, 2010

3

/2/.

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan
  *Secretary*

4

122

123.

**EXHIBIT D**

/24.

 **GENBAND**

**Shauna Martin**
**3605 E. Plano Parkway**
**Plano, Texas 75074**
office: 972.265.3890
facsimile: 972.461.7516
shauna.martin@genband.com

August 27, 2010

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA 37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan
  *Secretary*

Ladies and Gentlemen,

        We have received your letter dated August 21, 2010 (the "August 21 Letter")
responding to our numerous requests for information, including in our letter to you dated
August 18, 2010 (the "August 18 Letter"). We appreciate many of your proposals in the
August 21 Letter, and recognize the cooperative spirit with which you have made them.
As stated in the August 18 Letter, though, it must be restated that we are entitled to the
records listed on Annex A to the August 18 Letter pursuant to that certain Asset Sale
Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as
Sellers (together with NNC, NNL, and NNI, "Nortel"), GENBAND Inc. ("GB") and the
other Designated Purchasers that became parties thereto (together with GB,
"GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA").
Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

        We disagree with many of the statements included in the August 21, 2010 Letter
and that you have made to us with respect to Nortel's interpretation of various provisions
of the ASA. We disagree, first, with Nortel's interpretation of Deferred Profit and
Nortel's insistence in applying purchase accounting. This approach contradicts the plain

1

125

meaning of the ASA and the clear record of the negotiations between, and mutual agreement of, the parties. We disagree, second, with your assertion that Section 5.22(b) of the ASA does not provide GENBAND the right to the records listed on Annex A of the August 18 Letter. GENBAND has the right to these records for any of the multiple "reasonable purposes" that we have previously explained and the plain reading of the contract clearly supports our position. We note, as well, that your reference to other Nortel asset sales to which GENBAND was not a party is irrelevant to our rights. GENBAND negotiated and paid for certain rights under the ASA, including the right to records under Section 5.22(b); other parties' neglect to either negotiate for or enforce their rights has no bearing on our current disagreement, which pertains only to the ASA.

Despite these disagreements, which are not limited to the two specific disagreements above, and with the express reservation that we may raise these or other points in the future, we are prepared to accept certain of your proposals included in the August 21 Letter. As discussed in our conference call on August 24, 2010 (the "August 24 Conference Call"), we agree, first, to Nortel's proposal that the time for GENBAND to deliver to Nortel the Closing Statement be extended until September 15, 2010. As stated in the August 18 Letter, however, GENBAND's ability to timely produce the Closing Statement depends on Nortel's compliance with its contractual duties under the ASA. Thus, GENBAND's ability to deliver the Closing Statement by the new September 15, 2010 deadline depends on Nortel providing the needed records. We appreciate that during the August 24 Conference Call you agreed that the September 15, 2010 deadline may be modified should GENBAND not have timely access to the needed records.

We agree, second, to Nortel's proposal that Nortel reexamine its ability to provide the records requested on Annex A of the August 18 Letter, provide such information to GENBAND, and schedule a meeting between the accounting representatives from Nortel and GENBAND to discuss in detail the records provided. We appreciate that during the August 24 Conference Call you agreed that this should occur as soon as is mutually agreeable between the finance professionals.

We agree, third, to Nortel's proposal that Price Waterhouse Cooper ("PWC") produce an unaudited carve-out closing balance sheet, subject to agreement between us with respect to the methodology PWC is to apply. We look forward to resolving this and any other issues as soon as possible so that PWC can finish this work as soon as possible.

Our failure to comment on any statement in the August 21 Letter does not constitute our acceptance with or agreement to it. GENBAND expressly reserves all of its rights and remedies.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-461-7516

2

126

Copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
United States
Attention:     David S. Allinson, Esq.
Facsimile:     +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:     Don J. McDermett, Jr., Esq.
               Curt Anderson, Esq.
Facsimile:     +1-214-661-4454
               +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue 7th Floor
New York, New York 10022
Attention:     Ron Ferguson, Esq.
Facsimile:     +1-212-371-7087

**Nortel Networks Limited and Nortel Networks Inc.**
5270 Sycamore Avenue
Bronx, New York 10471
Attention:     Robert Fishman
               Senior Counsel

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
United States
Attention:     Laurent Alpert
Facsimile:     +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:     Michael Lang
Facsimile:     +1-416-216-3930

3

127 .

*128*

**EXHIBIT E**

*129.*


**GENBAND**

Shauna Martin
office: 972.265.3890
facsimile: 972.461.7516
shauna.martin@genband.com

September 15, 2010

| | | |
|---|---|---|
| **Nortel Networks Corporation and Nortel Networks Limited** 5945 Airport Road, Suite 360 Mississauga, Ontario, Canada L4V 1R9 Facsimile: +1-905-863-2057 Attn: Anna Ventresca, *General Counsel-Corporate and Corporate Secretary* Attn: Khush Dadyburjor, *Vice President, Mergers and Acquisitions* | **Nortel Networks Inc.** Legal Department 220 Athens Way, Suite 300 Nashville, Tennessee, USA 37228 Facsimile: +1-615-432-4413 Attn: Lynn C. Egan *Secretary* | **Alan Bloom / Stephen Harris Ernst & Young LLP** 1 More London Place London SE1 2AF United Kingdom Facsimile: +44 (0)20 7951 1345 |
| **Sharon Rolston / Simon Freemantle** Maidenhead Office Park Westacott Way Maidenhead Berkshire SL6 3QH United Kingdom Facsimile: +44 (0)20 1628 432 416 | **Avi D. Pelossof Zellermayer, Pelossof & Co.** The Rubenstein House 20 Lincoln Street Tel Aviv 67131 Israel Facsimile: +972 3 6255500 | |

Ladies and Gentlemen,

      Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., the other entities identified therein as Sellers, GENBAND Inc. and the other Designated Purchasers that became parties thereto, dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

1

*130*

Pursuant to Section 2.2.3.1 of the ASA, we hereby deliver the attached Closing Statement. Please contact us if you have any questions.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-265-3581

2

/31

Copies to:

| | | |
|---|---|---|
| Latham & Watkins LLP<br>885 Third Avenue<br>New York, New York<br>10022<br>United States<br>Attention: David S.<br>Allinson, Esq.<br>Facsimile: +1-212-751-4864 | Baker Botts LLP<br>2001 Ross Avenue, Suite 600<br>Dallas, Texas 75201<br>Attention: Don J.<br>McDermett, Jr., Esq.<br>Curt Anderson, Esq.<br>Facsimile:+1-214-661-4454<br>         +1-214-661-4900 | Stikeman Elliott LLP<br>445 Park Avenue 7th Floor<br>New York, New York<br>10022<br>Attention: Ron Ferguson, Esq.<br>Facsimile: +1-212-371-7087 |
| Nortel Networks Limited<br>and Nortel Networks Inc.<br>5270 Sycamore Avenue<br>Bronx, New York 10471<br>Attention: Robert Fishman<br>         Senior<br>Counsel | Cleary Gottlieb Steen &<br>Hamilton LLP<br>One Liberty Plaza<br>New York, New York<br>10006<br>United States<br>Attention: Laurent Alpert<br>Facsimile: +1-212-225-3999 | Ogilvy Renault LLP<br>200 Bay Street<br>Suite 3800, P.O. Box 84<br>Royal Bank Plaza, South Tower<br>Toronto, Ontario M5J 2Z4<br>Canada<br>Attention: Michael Lang<br>Facsimile: +1-416-216-3930 |
| Alex Kay / Gareth Roberts<br>Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Facsimile: +44 (0) 20 7098 4447 | Sandy Shandro<br>3-4 South Square<br>Gray's Inn<br>London<br>WC1R 5HP<br>Facsimile: +44 (0)20 7696 9911 | Avner Ben-Gera<br>Hughes Hubbard & Reed<br>One Battery Park Plaza<br>New York<br>NY 10004<br>Facsimile: (212) 422 -4726 |

3