*131*

## Closing Statement

All amounts are in United States dollars.

**Closing Adjusted Net Working Capital:**

| | |
|---|---:|
| Closing Inventory Value, plus | $ 13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 |
| Closing Prepaid Expenses Amount, minus | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 |
| Closing Product Exposures Amount | 416,000 |
| **Closing Adjusted Net Working Capital** | $ 8,331,000 |

**Final Purchase Price:**

| | |
|---|---:|
| Base Purchase Price, plus | $ 282,000,000 |
| The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | - |
| Closing Aggregate Downward Adjustment (if any), minus | - |
| Closing Deferred Profit Amount, minus | 70,570,000 |
| Closing Accrued Vacation Amount, minus | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 |
| Closing TFR Amount, minus | 402,000 |
| Closing Excess ARD Employees Amount, minus | - |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 |
| Closing French Excess ARD Employees Amount, minus | - |
| Closing Pre-Close Employment Payments Amount | - |
| **Final Purchase Price** | $ 142,904,000 |

4

133.

134

# **EXHIBIT F**

/35



# N⊘RTEL

October 13, 2010

<u>VIA FACSIMILE</u>

GENBAND US LLC
GENBAND Inc.
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Attn: General Counsel

Ladies and Gentlemen:

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("<u>NNC</u>"), Nortel Networks Limited ("<u>NNL</u>"), Nortel Networks Inc. ("<u>NNI</u>"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "<u>Nortel</u>"), GENBAND Inc. ("<u>GB</u>") and the other Designated Purchasers that became parties thereto (together with GB, "<u>GENBAND</u>"), dated December 22, 2009, as amended from time to time (the "<u>ASA</u>"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA, save that the terms "EMEA Non-Debtor Seller Directors", "Israeli Assets", "Israeli Company" and "Israeli Liabilities" have the meanings ascribed to them in the EMEA Asset Sale Agreement.

We are in receipt of the Closing Statement prepared by GENBAND dated September 15, 2010 (the "<u>GB Closing Statement</u>"). Pursuant to Section 2.2.3.1(b) of the ASA, please find attached hereto as <u>Annex A</u> a Disagreement Notice from Nortel and the EMEA Sellers in respect of the GB Closing Statement. We note that the disagreement with the Closing Deferred Profit Amount in the GB Closing Statement arises primarily from differences between GENBAND and Nortel in the interpretation of the definition of "Deferred Profit Amount" in the ASA, rather than differences over calculations. Accordingly, any disagreement over the interpretation of the "Deferred Profit Amount" definition is a matter of contractual interpretation and we do not intend to waive and expressly reserves our right to pursue all available remedies to resolve any disputes over the Deferred Profit Amount, whether by recourse to judicial relief or otherwise.

In addition, NNI hereby reiterates its position as set forth in its letter to GENBAND dated August 13, 2010 (attached hereto as <u>Annex B</u> for your reference) with respect to the Verizon Receivables, as defined in such letter.

136.

Notwithstanding that this letter shall have been signed by the Joint Administrators and the Joint Israeli Administrators both in their capacities as administrators of the EMEA Debtors for and on behalf of the EMEA Debtors and of the Israeli Company for and on behalf of the Israeli Company, respectively, and in their personal capacities, it is hereby expressly declared that no personal Liability, or any Liability whatsoever, under or in connection with this letter shall fall on the Joint Administrators, the Joint Israeli Administrators or their respective firm, partners, employees, agents, advisers or representatives whether such Liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act, or otherwise howsoever.

The Joint Administrators and the Joint Israeli Administrators are signatories to this letter in their personal capacities only for the purpose of receiving the benefit of the previous paragraph. Otherwise, for all purposes of this letter, the Joint Administrators and Joint Israeli Administrators act without personal liability as agents of the EMEA Debtors and the Israeli Company, respectively.

It is hereby expressly declared that no personal Liability, or any Liability whatsoever, under or in connection with this letter shall fall on any of the EMEA Non-Debtor Seller Directors howsoever such Liability should arise.

2

08/28/2007  23:45    6154324413              LYNN AT NORTEL              PAGE  01/01    137

Very truly yours,

NORTEL NETWORKS INC.

By     _____
         Name:  Lynn C. Egan
         Title:   Secretary


NORTEL NETWORKS CORPORATION

By     _____
         Name:
         Title:


By     _____
         Name:
         Title:


NORTEL NETWORKS LIMITED

By     _____
         Name:
         Title:


By     _____
         Name:
         Title:

138

Very truly yours,

NORTEL NETWORKS INC.

By _____

Name:

Title:

NORTEL NETWORKS CORPORATION

By _____

Name:    John Doolittle

Title:    Senior Vice President,
          Corporate Services and
          Chief Financial Officer

By _____

Name:    Clarke Glaspell

Title:    Controller

NORTEL NETWORKS LIMITED

By _____

Name:    John Doolittle

Title:    Senior Vice President,
          Corporate Services and
          Chief Financial Officer

By _____

Name:    Clarke Glaspell

Title:    Controller

*139*

SIGNED for and on behalf of **Nortel Networks**        )
**UK Limited** (in administration) by                  )   Alan Bloom
Alan Bloom                                             )
as Joint Administrator (acting as agent and           )
without personal liability) in the presence of:

Witness signature

W. Graham

Name:      WILMA   GRAHAM                              )
Address:   .  .  .  .                                  )
           1 More London Place                        )
           London
           SE1 2AF

SIGNED for and on behalf of **Nortel GmbH**            )
(in administration) by                                )   Alan Bloom
Alan Bloom                                             )
as Joint Administrator (acting as agent and           )
without personal liability) in the presence of:

Witness signature

W. Graham

Name:      WILMA  GRAHAM                               )
Address:   .  .  .  .                                  )
           1 More London Place                        )
           London
           SE1 2AF

SIGNED for and on behalf of **Nortel Networks**        )
**SpA** (in administration) by                         )   Alan Bloom
Alan Bloom                                             )
as Joint Administrator (acting as agent and           )
without personal liability) in the presence of:

Witness signature

W. Graham

Name:      WILMA  GRAHAM                               )
Address:   .  .  .  .                                  )
           1 More London Place                        )
           London
           SE1 2AF

140

SIGNED for and on behalf of Nortel Networks )
Hispania S.A. (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Alan Bloom

Witness signature:

................ W. Graham ..................... )
Name:      WILMA  GRAHAM )
Address: [illegible] )
             1 More London Place
             London
             SE1 2AF
SIGNED for and on behalf of Nortel Networks )
B.V. (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Alan Bloom

Witness signature:

................ W. Graham ..................... )
Name:      WILMA  GRAHAM )
Address: [illegible] )
             1 More London Place
             London
             SE1 2AF
SIGNED for and on behalf of Nortel Networks )
N.V. (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Alan Bloom

Witness signature:

................ W. Graham ..................... )
Name:      WILMA  GRAHAM )
Address: [illegible] )
             1 More London Place
             London
             SE1 2AF

/41

SIGNED for and on behalf of Nortel Networks )
(Austria) GmbH (in administration) by )    .................................................
Alan Bloom )    Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

.................................................  )
Name:       WILMA   GRAHAM )
Address:    F   [illegible]  )
            1 More London Place )
            London
            SE1 2AF
SIGNED for and on behalf of Nortel Networks )
Polska Sp. z.o.o. (in administration) by )    .................................................
Alan Bloom )    Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

.................................................  )
Name:       WILMA   GRAHAM )
Address:    [illegible] )
            1 More London Place )
            London
            SE1 2AF

SIGNED for and on behalf of Nortel Networks )
Portugal S.A. (in administration) by )    .................................................
Alan Bloom )    Alan Bloom
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

.................................................  )
Name:       WILMA   GRAHAM )
Address:    [illegible] )
            1 More London Place )
            London
            SE1 2AF

142

SIGNED for and on behalf of Nortel Networks    )
AB (in administration) by                       )    Alan Bloom
Alan Bloom                                      )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of: )


Witness signature

..........W. Graham..........                    )
Name:       WILMA GRAHAM                         )
Address:    [                 ]                  )
            1 More London Place
            London
SIGNED for and on behalf of Nortel Networks     )
Slovensko s.r.o. (in administration) by         )    Alan Bloom
Alan Bloom                                      )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of: )


Witness signature

..........W. Graham..........                    )
Name:       WILMA GRAHAM                         )
Address:    [                 ] LP               )
            1 More London Place
            London
            SE1 2AF
SIGNED for and on behalf of Nortel Networks     )
s.r.o. (in administration) by                   )    Alan Bloom
Alan Bloom                                      )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of: )


Witness signature

..........W. Graham..........                    )
Name:       WILMA GRAHAM                         )
Address:    [                 ]                  )
            1 More London Place
            London
            SE1 2AF

Case 09-10138-MFW    Doc 4599-10    Filed 12/14/10    Page 12 of 80

143

SIGNED for and on behalf of Nortel Networks )
Romania S.R.L. (in administration) by )
Alan Bloom )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Alan Bloom

Witness signature

..........................W. Graham.......................... )
Name:        WILMA GRAHAM )
Address:     [....................] )
             1 More London Place
             London
             SE1 2AF

144

SIGNED for and on behalf of Nortel Networks )
France S.A.S. (in administration) by )
Kerry Trigg )
acting as authorised representative for )
Christopher Hill )
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Kerry Trigg

Witness signature,

Name:  SHARON PELLMUTTER )
Address: )

E. ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

145

SIGNED for and on behalf of Nortel Networks )
(Ireland) Limited (in administration) by      )
DAVID HUGHES                                   )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

Name:    NIGEL J CARMODY                       )
Address:  ℅ ERNST & YOUNG                      )
          HARCOURT CENTRE                      )
          HARCOURT ST. DUBLIN 2

146

SIGNED by Richard Banbury                    )
duly authorised for and on behalf of Nortel  )    Richard Banbury
Networks o.o.o. in the presence of:          )


Witness signature

Name: _Wei Githewa GALINA_ )
Address: _m 603 moreau Russia_
         _Rutherhoue Shosse_
              _52. 377_

147

SIGNED by Simon Freemantle
duly authorised for and on behalf of Nortel
Networks AG in the presence of:

)
)    Simon Freemantle
)

Witness Signature

Name: Anthony Platt
Address: 31 Hermitage Rd
     Twyford
     Berks
     RG10 9HT

148

SIGNED for and on behalf of Nortel Networks )
Israel (Sales and Marketing) Limited (in )
administration) by Yaron Har-Zvi and Avi D. )
Pelossof as Joint Israeli Administrators (acting )
jointly and without personal liability) in )
connection with the Israeli Assets and Israeli )
Liabilities: )
)
)

Witness signature:

Name: Itzy Lavi
Address: 20 Lincoln st.
Tel-Aviv, Israel )
)
)

חתאמן בהקפאת הליכים

Yaron Har-Zvi

בא. בהקפאת הליכים

Avi D. Pelossof

149

**SIGNED** by Alan Bloom                          )

In his own capacity and on behalf of the Joint          )
Administrators without personal liability and       )
solely for the benefit of the provisions of this
letter expressed to be conferred on or given to
the Joint Administrators:

Alan Bloom

Witness signature

W. Graham

Name:        WILMA GRAHAM                )
Address:                                        )
          1 More London Place
          London
          SE1 2AF

150

תאאמן בהקפאת הליכים

SIGNED by Yaron Har-Zvi

)
)
)

Yaron Har-Zvi

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

Witness signature אריקן שרי

Name: Itay Lavi
Address: 20 Lincoln st.
Tel aviv, Israel

SIGNED by Avi D. Pelossof

)
)
)
)
)

תאמן בהקפאת הליכים

Avi D. Pelossof

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this letter expressed to be conferred on or given
to the Joint Israeli Administrators:

Witness signature

יתוג שלבכן שרי

Name: Itay Lavi
Address: 20 Lincoln st.
Tel-Aviv, Israel

)
)
)

Oct-13-2010 12:48 PM CLEARY GOTTLIEB NEW YORK 2122253999    Page 20 of 80    18/26

Case 09-10138-MFW    Doc 4599-10    Filed 12/14/10    Page 20 of 80

|5|

cc:   Latham & Watkins LLP
885 Third Avenue
New York, New York 10002
United States
Attention: David S. Allinson, Esq.

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:  Don J. McDermett, Jr., Esq.
Curt Anderson, Esq.

Stikeman Elliott LLP
445 Park Avenue, 7th Floor
New York, New York 10022
Attention: Ron Ferguson, Esq.

*For the companies listed below (the "Companies"), The Institute of Chartered Accountants in England and Wales authorises A R Bloom, S Harris and C Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, A R Bloom, S Harris, AM Hudson and C Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel Networks GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV.*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and D Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

|52.

### Annex A

### Disagreement Notice

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this Disagreement Notice have the meanings ascribed to them in the ASA.

Nortel has received the Closing Statement prepared by GENBAND dated September 15, 2010 (the "GB Closing Statement"). Pursuant to Section 2.2.3.1(b) of the ASA, Nortel and the EMEA Sellers notify GENBAND as follows:

- Nortel and the EMEA Sellers do not dispute the following line items within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement: Closing Inventory Value, Closing Prepaid Expenses Amount, Closing Contractual Liabilities Amount, Closing Royalty Liability Amount, Closing Warranty Provision Amount and Closing Product Exposures Amount.

- Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within the Closing Adjusted Net Working Capital calculation in the GB Closing Statement and, as a result, Nortel and the EMEA Sellers dispute the Closing Adjusted Net Working Capital in the GB Closing Statement. Specifically, Nortel and the EMEA Sellers disagree with GENBAND's deduction from Closing Unbilled Accounts Receivable of accounts receivable amounts of $191,515 and $28,960, which relate to certain customer contracts with Axtel and Telefonica Argentina, respectively.[1] As the contracts with Axtel and Telefonica Argentina were included in Assigned Contracts, the Closing Unbilled Accounts Receivable Amount should be increased by $220,475, resulting in Closing Unbilled Accounts Receivable being equal to $21,611,475 (rather than $21,391,000) and Closing Adjusted Net Working Capital being equal to $8,551,475 (rather than $8,331,000).

- Nortel and the EMEA Sellers do not dispute the following line items within the Final Purchase Price calculation in the GB Closing Statement: Base Purchase Price, Closing Aggregate EMEA Downward Adjustment, Closing Aggregate Downward Adjustment,

---

[1] The contracts are: EWP 2010 Support Plan between Nortel Networks de Argentina S.A. and Telefonia Moviles Argentina S.A. dated January 31, 2010; Designacion Proveedor Centralita Movil between Nortel Networks (CALA) Inc. and Telefonica Moviles Argentina S.A. dated September 30, 2008; Purchase and License Agreement for NGN among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; Purchase and License Agreement for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V. dated March 20, 2003; and Technical Assistance and Support Services Agreement for NGN Products and Services and for Non-FWA Equipment among Nortel Networks Limited, Nortel Networks de Mexico S.A. de C.V. and Axtel S.A. de C.V..

153

Closing Accrued Vacation Amount, Closing TFR Amount, Closing Excess ARD Employees Amount, Closing EMEA Holiday Downward Adjustment, Closing French Excess ARD Employees Amount and Closing Pre-Close Employment Payments Amount.

- Since Nortel and the EMEA Sellers dispute the line item Closing Unbilled Accounts Receivable Amount within Closing Adjusted Net Working Capital in the GB Closing Statement and, as a result, dispute Closing Adjusted Net Working Capital in the GB Closing Statement, Nortel and the EMEA Sellers dispute the line item in the Final Purchase Price calculation in the GB Closing Statement that is arrived at by subtracting the Target Working Capital, i.e., $73,000,000, from the Closing Adjusted Net Working Capital. Subtracting Target Working Capital from the Closing Adjusted Net Working Capital calculated by Nortel, i.e., $8,551,475, the resulting line item should be $(64,448,525) rather than $(64,669,000).

- Nortel and the EMEA Sellers dispute the line item Closing Deferred Profit Amount in the GB Closing Statement for two reasons: First, the Closing Deferred Profit Amount calculated by GENBAND improperly includes a negative deferred cost-of-sales balance of $1,629,132 with respect to Nortel Networks (Luxembourg) S.A. (NNLSA). As NNLSA is not an EMEA Seller or a Seller, the amount of $1,629,132 should not have been included in GENBAND's calculation of the Closing Deferred Profit Amount.

Second, GENBAND overstated the Closing Deferred Profit Amount by $34,875,868 as a result of incorrectly including in its calculations deferred revenues and associated deferred costs in respect of services performed and products delivered prior to the Closing Date. "Deferred Profit Amount, " as defined in the ASA, means:

> ". . . as of the Closing Date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date minus (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles." (emphasis added)

The Closing Deferred Profit Amount in the GB Closing Statement should be reduced by (i) $34,875,868 due to GENBAND's improper inclusion of deferred revenues and associated deferred costs relating to services performed and products provided by the Business prior to the Closing Date and (ii) $1,629,132 due to GENBAND's improper inclusion of a negative deferred cost-of-sales balance with respect to NNLSA. Accordingly, the Closing Deferred Profit Amount should be reduced by $36,505,000 from $70,570,000 to $34,065,000.

- Nortel and the EMEA Sellers disagree with the Closing Specified Employee Liabilities Amount in the GB Closing Statement, which should be reduced by $98,662. The Closing Specified Employee Liabilities Amount in the GB Closing Statement included an Australian long-service leave amount of $1,131,689. For the calculation of the Australian long-service leave amount, GENBAND apparently did not recalculate the Australian Dollar amount into the U.S. Dollar amount using the exchange rate published in the *Wall Street Journal* (Eastern Edition) for the day in question (the Closing Date), as required under the ASA. Using the Australian Dollar/U.S. Dollar exchange rate published in the *Wall Street Journal* (Eastern Edition) for the Closing Date (i.e., 1.1755 Australian Dollars to one U.S. Dollar), Australian long-service leave amount in Australian Dollars of A$1,214,323 (according to Nortel's SAP accounting ledger) translates into $1,033,027. Accordingly, the Australian long-service leave amount of $1,131,689 used in GENBAND's calculation of the Closing Specified Employee Liabilities Amount in the GB Closing Statement is overstated by $98,662, which requires that the Closing Specified Employee Liabilities Amount in the GB Closing Statement be reduced from $1,487,000 to $1,388,338.

- Since Nortel and the EMEA Sellers dispute, in the GB Closing Statement, (i) the line item arrived at by subtracting the Target Working Capital from the Closing Adjusted Net Working Capital, (ii) the Closing Specified Employee Liabilities Amount and (ii) the Closing Deferred Profit Amount, all as described above, Nortel and the EMEA Sellers dispute the Final Purchase Price in the GB Closing Statement, which should be increased by $36,824,137 from $142,904,000 to $179,728,137.

For your reference, the GB Closing Statement, the adjustments set forth herein, and the Closing Statement, as adjusted herein, are set forth below.



**Revisions to CLOSING STATEMENT**

| | GH Closing Statement | Adjustments | Adjusted Closing Statement |
|---|---|---|---|
| **Closing Adjusted Net Working Capital:** | | | |
| Closing Inventory Value, plus | $ 13,747,000 | | 13,747,000 |
| Closing Unbilled Accounts Receivable Amount, plus | 21,391,000 | 220,475 | 21,611,475 |
| Closing Prepaid Expenses Amount, minus | 939,000 | | 939,000 |
| Closing Contractual Liabilities Amount, minus | 887,000 | | 887,000 |
| Closing Royalty Liability Amount, minus | 148,000 | | 148,000 |
| Closing Warranty Provision Amount, minus | 26,295,000 | | 26,295,000 |
| Closing Product Exposures Amount | 416,000 | | 416,000 |
| Closing Adjusted Net Working Capital | $ 8,331,000 | $ 220,475 | $ 8,551,475 |
| | | | |
| **Final Purchase Price:** | | | |
| Base Purchase Price, plus | $ 282,000,000 | | $ 282,000,000 |
| . The difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus Target Working Capital, minus | (64,669,000) | $ 220,475 | (64,448,525) |
| Closing Aggregate EMEA Downwards Adjustment (if any), minus | • | | |
| Closing Aggregate Downward Adjustment (if any), minus | • | | |
| Closing Deferred Profit Amount, minus | 70,570,000 | ( 36,505,000) | 34,065,000 |
| Closing Accrued Vacation Amount, minus | 1,730,000 | | 1,730,000 |
| Closing Specified Employee Liabilities Amount, minus | 1,487,000 | (98,662) | 1,388,338 |
| Closing TFR Amount, minus | 402,000 | | 402,000 |
| Closing Excess ARD Employees Amount, minus | • | | |
| Closing EMEA Holiday Downward Adjustment, minus | 238,000 | | 238,000 |
| Closing French Excess ARD Employees Amount, minus | • | | |
| Closing Pre-Close Employment Payments Amount | • | | |
| **Final Purchase Price** | $ 142,904,000 | $ 36,824,137 | $ 179,728,137 |

Case 09-10138-MFW    Doc 4599-10    Filed 12/14/10

156

## **Annex B**

**See attached**

157



# N☮RTEL

August 13, 2010

Shauna Martin
General Counsel
Genband Inc.
3605 E. Plano Parkway
Plano, Texas 75074
Fax 972-265-3581

Re:    Verizon Receivables

Dear Shauna:

Pursuant to Section 2.1.1(b) of the Asset Sale Agreement ("ASA") dated December 22, 2009 as amended, executed by Nortel Networks Corporation and certain of its affiliates ("Nortel") and Genband Inc. ("Genband"), Nortel has transferred and assigned to Genband all of Nortel's right, title and interest in and to, among other things, Nortel's Unbilled Accounts Receivable relating to the CVAS business, defined in the ASA as amounts classified as Construction-in-Process accounts.  Other accounts receivable, either billed or unbilled, are an "Excluded Asset" pursuant to Section 2.1.2(a) of the ASA, and remain with Nortel.

Nortel Networks Inc. and Verizon Services Corp. ("Verizon") are parties to that certain General Product Purchase Agreement for Softswitch and TDM Products and Services, Contract no. C0404520, executed on or about 8/5/2004 ("GPPA"), which contract was assigned to Genband pursuant to the ASA. Under the GPPA, several years ago, Verizon purchased from Nortel DMS-100 and DMS-10 switches and Nortel licenses to certain software resident on such switches. In 2009, Nortel conducted an audit of the switches and discovered that Verizon was using certain software resident on the switches for which Verizon had not purchased a license. The value of such licenses was approximately $2,000,000. Nortel provided such audit to Verizon in January 2010.

It has come to our attention that, following the closing of Genband's purchase of the CVAS business pursuant to the ASA on May 28, 2010, former Nortel employees who became Genband employees have continued to work with Verizon to resolve the dispute, and that Verizon and Genband have executed a settlement agreement under which Verizon has agreed to pay to Genband $1,817,100 for the Nortel licenses (the "Verizon Receivables"). We have been informed that Verizon has sent purchase orders to Genband with respect to amounts due under the Nortel licenses, and that Genband has invoiced Verizon for such amounts as the POs have been received.

Nortel Networks Inc.
220 Athens Way, Nashville, Tennessee 37228-1304 USA   nortel.com



Shauna Martin
Genband Inc.
August 13, 2010
Page 2 of 3

Since the Verizon Receivables do not constitute Construction-in-Process receivables, they are an Excluded Asset under the ASA and remain with Nortel. Furthermore, under Section 2.1.2(c) of the ASA, claims relating to any Excluded Liability as defined in the ASA (which includes liabilities relating to any Excluded Asset) also constitute an Excluded Asset. Finally, under Section 5.12 of the ASA, Genband has agreed to promptly deliver to Nortel any payment or instrument received by Genband that is for the account of Nortel under the terms of the ASA.

Therefore we ask that you promptly take the following actions:

- provide us with a copy of the settlement agreement and the name and contact information of representatives of Verizon with whom you have been in discussions with respect to the settlement agreement;

- deliver to Nortel an accounting of all purchase orders received and expected to be received by Genband from Verizon with respect to the Verizon Receivables, copies of such purchase orders, and the related invoices issued by Genband;

- deliver to Nortel any amounts received by Genband in payment for the Verizon Receivables as of the date hereof, and any purchase orders and amounts that you may receive from Verizon after the date hereof with respect to the Verizon Receivables; and

- fully cooperate with Nortel and Verizon in the resolution of this matter.

If you have questions regarding this matter, please contact me at 615-432-4289, LynnEgan@nortel.com.

Very truly yours,

Lynn C. Egan
Senior Counsel

cc:    Khush Dadyburjor
       Robert Fishman



**Shauna Martin**
**Genband Inc.**
**August 13, 2010**
**Page 3 of 3**

> **David S. Allinson, Latham & Watkins**
> **Don J. McDermett, Jr., Baker Botts**
> **Curt Anderson, Baker Botts**
> **Ron Ferguson, Stikeman Elliott**

160

161

**EXHIBIT G**

162.

 **GENBAND**

October 25, 2010


**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan
  *Secretary*


Ladies and Gentlemen,

We are in receipt of your letter, dated October 13, 2010 (the "October 13 Letter") and the subsequent email that Robert Fishman sent me on October 15, 2010 (the "October 15 Email"). I write regarding the dispute resolution procedure provided for in that certain Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL, and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

During the conference call we had the morning of October 20, 2010 (the "October 20 Conference Call"), we discussed your Disagreement Notice, dated October 13, 2010 (the "Disagreement Notice"), which was attached to the October 13 Letter, and GENBAND's Closing Statement, dated September 15, 2010 (the "Closing Statement"). As you know, and per the dispute resolutions procedure outlined in the ASA, the Closing Statement and the Disagreement Notice were properly and timely provided with respect to each party's disagreement with the other with regards to the Purchase Price Adjustment, pursuant to Sections 2.2.3.1(a) and Section 2.2.3.1(b) of the ASA, respectively. Any disagreements between the parties after the fifteen (15) day period following delivery of the Disagreement Notice must be submitted to an arbitrator pursuant to Section 2.2.3.1(c) of the ASA.

163 .

We were surprised by your statements in the October 13 Letter, the October 15 Email, and on the October 20 Conference Call that you are not prepared to begin the process of submitting all disagreements to arbitration. To be completely clear, Section 2.2.3.1(c) of the ASA provides the exclusive procedure available: "If [Nortel] . . . and [GENBAND] are unable to resolve <u>any disagreement</u> as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of a Disagreement Notice by [Nortel], the Independent Auditor shall serve as arbitrator . . . to resolve such disagreement." (emphasis added).

You gave no reason why you would not prepare for this contractually-mandated arbitration, other than to suggest that you did not think the arbitrator would be up to the task. When we asked why our disagreement would not fall within the category of "any disagreement" as discussed above, you could not point to any provision in the ASA that justifies your position.

As you know, GENBAND bargained, negotiated, and paid for the arbitration clause associated with the Purchase Price Adjustment which provides for an efficient, fast, and final process for resolving these disputes. Nortel's threatened attempt to avoid arbitration with regard to a disagreement over the Purchase Price Adjustment therefore would constitute a breach of the ASA, and would deprive us of the benefit of that bargain.

The fifteen-day timeframe for the parties to resolve any disagreements relating to the calculation of the Purchase Price is currently ongoing, but the October 20 Conference Call made clear that the disagreements likely will not be resolved within that time. As such, both parties should prepare for arbitration. We would welcome the opportunity to discuss arbitrators with you, because although KPMG is named as the arbitrator in the ASA, we question whether they will be able to do so. As such, this question should be resolved and potential alternative arbitrators should be discussed. If Nortel is not willing to move forward with preparing for arbitration, or if Nortel interferes with or frustrates the arbitration in any way, we reserve all rights, including without limitation to seek recovery of any costs and attorneys fees incurred in enforcing the arbitration provision.

We appreciate that you agree with us that the issues regarding Verizon Receivables, raised in the October 13 Letter, which do not relate to the Closing Statement, are not subject to arbitration. Our failure to comment on any statement in the October 13 Letter does not constitute our acceptance with or agreement to it. GENBAND expressly reserves all of its rights and remedies.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-461-7516

164

Copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
United States
Attention:      David S. Allinson, Esq.
Facsimile:      +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:      Don J. McDermett, Jr., Esq.
                Curt Anderson, Esq.
Facsimile:      +1-214-661-4454
                +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue 7th Floor
New York, New York 10022
Attention:      Ron Ferguson, Esq.
Facsimile:      +1-212-371-7087

**Nortel Networks Limited and Nortel Networks Inc.**
5270 Sycamore Avenue
Bronx, New York 10471
Attention:      Robert Fishman
                Senior Counsel

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
United States
Attention:      Laurent Alpert
Facsimile:      +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:      Michael Lang
Facsimile:      +1-416-216-3930

165

166

# **EXHIBIT H**

167

 **GENBAND**

November 9, 2010


**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan
  *Secretary*


Ladies and Gentlemen,

I write regarding the dispute resolution procedure provided for in that certain Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

As stated in the letter we sent you on October 25, 2010 (the "October 25 Letter"), attached hereto as <u>Exhibit A</u>, the dispute resolution process with regards to the Purchase Price Adjustment is unambiguous. Section 2.2.3.1(c) of the ASA provides that "If [Nortel] . . . and [GENBAND] are unable to resolve <u>any disagreement</u> as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of a Disagreement Notice by [Nortel], the Independent Auditor shall serve as arbitrator . . . to resolve such disagreement." (emphasis added).

You did not respond to the October 25 Letter. Additionally, you have provided no explanation as to why, in the face of this completely clear contractual obligation to arbitrate, you stated, first, in your letter to GENBAND on October 13, 2010 (the "October 13 Letter"), second, in an email from Robert Fishman to me on October 15, 2010 (the "October 15 Email"), and third, during our conference call held on October 20, 2010 (the "October 20 Conference Call") that you are not prepared to begin the process

168

of submitting all disagreements to arbitration. You have not pointed to any provision in the ASA that justifies your position because you cannot. You have not taken the opportunity provided in the October 25 Letter to discuss preferred arbitrators. Rather, during telephone conversations between Robert Fishman and myself on November 2, 2010, you stated again that Nortel is unwilling to proceed to arbitration and requested an extension of the fifteen-day period to resolve disputes. These statements and the statements in the October 13 Letter, the October 15 Email, and the October 20 Conference Call constitute breaches of Section 2.2.3.1(c) of the ASA.

The Disagreement Notice was sent on October 13, 2010. The fifteen-day period for resolving disputes has lapsed. Pursuant to Section 2.2.3.1(c), <u>any disagreement</u> regarding the Purchase Price Adjustment must be submitted to arbitration. This efficient, fast, and final process is what GENBAND bargained, negotiated, and paid for. You are in breach of the ASA, and we have no option other than to enforce our rights in Bankruptcy Court.

We otherwise reserve all rights, including without limitation to seek recovery of any costs and attorneys fees incurred in enforcing the arbitration provision. Our failure to comment on any statement in the October 13 Letter does not constitute our acceptance with or agreement to it. GENBAND expressly reserves all of its rights and remedies.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-265-3581

169.

Copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
United States
Attention:      David S. Allinson, Esq.
Facsimile:      +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:      Don J. McDermett, Jr., Esq.
                Curt Anderson, Esq.
Facsimile:      +1-214-661-4454
                +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue 7th Floor
New York, New York 10022
Attention:      Ron Ferguson, Esq.
Facsimile:      +1-212-371-7087

**Nortel Networks Limited and Nortel Networks Inc.**
5270 Sycamore Avenue
Bronx, New York 10471
Attention:      Robert Fishman
                Senior Counsel

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
United States
Attention:      Laurent Alpert
Facsimile:      +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:      Michael Lang
Facsimile:      +1-416-216-3930

170

## Exhibit A

171

 **GENBAND**

October 25, 2010

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan
  *Secretary*

Ladies and Gentlemen,

     We are in receipt of your letter, dated October 13, 2010 (the "October 13 Letter") and the subsequent email that Robert Fishman sent me on October 15, 2010 (the "October 15 Email"). I write regarding the dispute resolution procedure provided for in that certain Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL, and NNI, "Nortel"), GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto (together with GB, "GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

     During the conference call we had the morning of October 20, 2010 (the "October 20 Conference Call"), we discussed your Disagreement Notice, dated October 13, 2010 (the "Disagreement Notice"), which was attached to the October 13 Letter, and GENBAND's Closing Statement, dated September 15, 2010 (the "Closing Statement"). As you know, and per the dispute resolutions procedure outlined in the ASA, the Closing Statement and the Disagreement Notice were properly and timely provided with respect to each party's disagreement with the other with regards to the Purchase Price Adjustment, pursuant to Sections 2.2.3.1(a) and Section 2.2.3.1(b) of the ASA, respectively. Any disagreements between the parties after the fifteen (15) day period following delivery of the Disagreement Notice must be submitted to an arbitrator pursuant to Section 2.2.3.1(c) of the ASA.

We were surprised by your statements in the October 13 Letter, the October 15 Email, and on the October 20 Conference Call that you are not prepared to begin the process of submitting all disagreements to arbitration. To be completely clear, Section 2.2.3.1(c) of the ASA provides the exclusive procedure available: "If [Nortel] . . . and [GENBAND] are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of a Disagreement Notice by [Nortel], the Independent Auditor shall serve as arbitrator . . . to resolve such disagreement." (emphasis added).

You gave no reason why you would not prepare for this contractually-mandated arbitration, other than to suggest that you did not think the arbitrator would be up to the task. When we asked why our disagreement would not fall within the category of "any disagreement" as discussed above, you could not point to any provision in the ASA that justifies your position.

As you know, GENBAND bargained, negotiated, and paid for the arbitration clause associated with the Purchase Price Adjustment which provides for an efficient, fast, and final process for resolving these disputes. Nortel's threatened attempt to avoid arbitration with regard to a disagreement over the Purchase Price Adjustment therefore would constitute a breach of the ASA, and would deprive us of the benefit of that bargain.

The fifteen-day timeframe for the parties to resolve any disagreements relating to the calculation of the Purchase Price is currently ongoing, but the October 20 Conference Call made clear that the disagreements likely will not be resolved within that time. As such, both parties should prepare for arbitration. We would welcome the opportunity to discuss arbitrators with you, because although KPMG is named as the arbitrator in the ASA, we question whether they will be able to do so. As such, this question should be resolved and potential alternative arbitrators should be discussed. If Nortel is not willing to move forward with preparing for arbitration, or if Nortel interferes with or frustrates the arbitration in any way, we reserve all rights, including without limitation to seek recovery of any costs and attorneys fees incurred in enforcing the arbitration provision.

We appreciate that you agree with us that the issues regarding Verizon Receivables, raised in the October 13 Letter, which do not relate to the Closing Statement, are not subject to arbitration. Our failure to comment on any statement in the October 13 Letter does not constitute our acceptance with or agreement to it. GENBAND expressly reserves all of its rights and remedies.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-461-7516

173

174.

**EXHIBIT I**

AS

**NORTEL**



November 10, 2010

**GENBAND US LLC**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Attention: Shauna Martin, General Counsel
Facsimile: +1-972-461-7516

Ladies and Gentlemen:

Reference is made to the Asset Sale Agreement by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the other entities identified therein as Sellers (together with NNC, NNL and NNC, "Nortel"), GENBAND US LLC ("GENBAND"), dated December 22, 2009, as amended from time to time (the "ASA"). Terms used but not defined in this letter have the meanings ascribed to them in the ASA.

Nortel has received the letters from Shauna Martin, General Counsel of GENBAND, dated October 25, 2010 and November 9, 2010. As you know, it is Nortel's position that the primary dispute between the parties does not involve any accounting matter subject to resolution by an Accounting Arbitrator under Section 2.2.3.1(b), and accordingly the fifteen day period for resolving agreements under Section 2.2.3.1(c) is inapplicable. Instead, the dispute arises from GENBAND's attempt to ignore the ASA's clear definition of "Deferred Profit Amount," which is to be calculated based on "deferred revenues for services to be performed or products to be provided by the Business after the Closing Date." GENBAND's effort to rewrite this text is plainly a matter for the Bankruptcy Court, not an Accounting Arbitrator.

Nortel does not intend to waive, and expressly reserves our right to pursue, any and all available remedies with respect to the matters in dispute.

Sincerely,

Robert Fishman, Esq.
Nortel Networks Inc.

176

Copies to:

Latham & Watkins LLP
885 Third Avenue
New York NY 10022
United States
Attention:    David S. Allinson, Esq.
Facsimile:    +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:    Don J. McDermett, Jr., Esq.
              Curt Anderson, Esq.
Facsimile:    +1-214-661-4454
              +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue 7th Floor
New York, New York 10022
Attention:    Ron Ferguson, Esq.
              +1-212-371-7087

177

F78

## **EXHIBIT J**



179

**Shauna Martin**
3605 E. Plano Parkway
Plano, Texas 75074
office: 972.265.3890
facsimile: 972.461.7516
shauna.martin@genband.com

September 3, 2010

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V 1R9
Facsimile: +1-905-863-2057
Attn: Anna Ventresca,
  *General Counsel-Corporate and Corporate Secretary*
Attn: Khush Dadyburjor,
  *Vice President, Mergers and Acquisitions*

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA 37228
Facsimile: +1-615-432-4413
Attn: Lynn C. Egan
  *Secretary*

Dear Lynn Egan,

We have received your letter dated August 13, 2010 (the "August 13 Letter")
regarding "Verizon Receivables", a copy of which we are attaching hereto as **Annex A**.
Capitalized terms used but not defined in this letter have the meanings ascribed to them
in that certain Asset Sale Agreement by and among Nortel Networks Corporation, Nortel
Networks Limited, Nortel Networks Inc., the other entities identified therein as Sellers,
GENBAND Inc. ("GB") and the other Designated Purchasers that became parties thereto
(together with GB, "GENBAND"), dated December 22, 2009, as amended from time to
time (the "ASA").

In the August 13 Letter, you describe a dispute with Verizon related to Nortel's
January 2010 audit of an Assigned Contract, which you say revealed unpaid licenses with
a value of $2,000,000. You state that GENBAND entered into an agreement with
Verizon post-Closing to settle this dispute, which required Verizon to pay to GENBAND
$1,817,100 for the licenses under the Assigned Contract, which such payable you define
as the "Verizon Receivables." Without commenting on the accuracy or completeness of
your description of the foregoing facts, we do not understand and therefore cannot agree
with your assertions as to why the "Verizon Receivables" are Excluded Assets, and as
such, we believe your requests on the second page of the August 13 Letter to be
inappropriate.

1

*180*

It appears that your fundamental assertion is that the "Verizon Receivables" (as defined in the August 13 Letter) are "accounts receivable" of the Sellers, which are Excluded Assets. However, we don't believe that under Nortel Accounting Principles or GAAP Nortel would be permitted to recognize the amounts in dispute with Verizon as "accounts receivable" prior to Closing because the payables in question were (according to you) in dispute. Any accounts receivable resulting from an agreement entered into between GENBAND and Verizon post-Closing (which is what you describe in the August 13 Letter) are the property of GENBAND rather than Nortel.

Your statement in the August 13 Letter that "since the 'Verizon Receivables' do not constitute Construction-in-Process receivables, they are an Excluded Asset" inaccurately describes the mechanics of the ASA. Without commenting on whether the "Verizon Receivables" would be Construction-in-Process receivables, the mere fact that something is not a Construction-in-Process receivable clearly does not make it an Excluded Asset under the ASA. Your statement regarding "claims related to any Excluded Liability … constitut[ing] an Excluded Asset" similarly is unclear with regards to the ASA's terms, as you fail to identify any Excluded Liability or claims related to such.

Our failure to comment on any statement in the August 13 Letter does not constitute our acceptance with or agreement to it. GENBAND expressly reserves all of its rights and remedies.

If you have any questions about the contents of this letter, or if you wish to clarify your position in the August 13 Letter, we would welcome the opportunity to discuss this matter with you.

Sincerely,

Shauna Martin, General Counsel
**GENBAND**
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074
Facsimile: +1-972-265-3581

2

181

Copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
United States
Attention:     David S. Allinson, Esq.
Facsimile:    +1-212-751-4864

Baker Botts LLP
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Attention:     Don J. McDermett, Jr., Esq.
               Curt Anderson, Esq.
Facsimile:    +1-214-661-4454
              +1-214-661-4900

Stikeman Elliott LLP
445 Park Avenue 7th Floor
New York, New York 10022
Attention:     Ron Ferguson, Esq.
Facsimile:    +1-212-371-7087

**Nortel Networks Limited and Nortel Networks Inc.**
5270 Sycamore Avenue
Bronx, New York 10471
Attention:     Robert Fishman
               Senior Counsel

**Nortel Networks Corporation and Nortel Networks Limited**
5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V IR9
Attention:     Anna Ventresca
               General Counsel-Corporate and Corporate Secretary
Attention:     Khush Dadyburjor
               Vice President, Mergers and Acquisitions
Facsimile:    + 1-905-863-2057

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA 37228
Attention:     Lynn C. Egan
               Secretary
Facsimile:    +1-615-432-4413

3

182.

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
United States
Attention:      Laurent Alpert
Facsimile:      +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:      Michael Lang
Facsimile:      +1-416-216-3930

4

183 .

**<u>Annex A</u>**

# N⊘RTEL

August 13, 2010

Shauna Martin
General Counsel
Genband Inc.
3605 E. Plano Parkway
Plano, Texas 75074
Fax 972-265-3581

Re:   Verizon Receivables

Dear Shauna:

Pursuant to Section 2.1.1(b) of the Asset Sale Agreement ("ASA") dated December 22, 2009 as amended, executed by Nortel Networks Corporation and certain of its affiliates ("Nortel") and Genband Inc. ("Genband"), Nortel has transferred and assigned to Genband all of Nortel's right, title and interest in and to, among other things, Nortel's Unbilled Accounts Receivable relating to the CVAS business, defined in the ASA as amounts classified as Construction-in-Process accounts. Other accounts receivable, either billed or unbilled, are an "Excluded Asset" pursuant to Section 2.1.2(a) of the ASA, and remain with Nortel.

Nortel Networks Inc. and Verizon Services Corp. ("Verizon") are parties to that certain General Product Purchase Agreement for Softswitch and TDM Products and Services, Contract no. C0404520, executed on or about 8/5/2004 ("GPPA"), which contract was assigned to Genband pursuant to the ASA. Under the GPPA, several years ago, Verizon purchased from Nortel DMS-100 and DMS-10 switches and Nortel licenses to certain software resident on such switches. In 2009, Nortel conducted an audit of the switches and discovered that Verizon was using certain software resident on the switches for which Verizon had not purchased a license. The value of such licenses was approximately $2,000,000. Nortel provided such audit to Verizon in January 2010.

It has come to our attention that, following the closing of Genband's purchase of the CVAS business pursuant to the ASA on May 28, 2010, former Nortel employees who became Genband employees have continued to work with Verizon to resolve the dispute, and that Verizon and Genband have executed a settlement agreement under which Verizon has agreed to pay to Genband $1,817,100 for the Nortel licenses (the "Verizon Receivables"). We have been informed that Verizon has sent purchase orders to Genband with respect to amounts due under the Nortel licenses, and that Genband has invoiced Verizon for such amounts as the POs have been received.

Shauna Martin
Genband Inc.
August 13, 2010
Page 2 of 3



Since the Verizon Receivables do not constitute Construction-in-Process receivables, they are an Excluded Asset under the ASA and remain with Nortel. Furthermore, under Section 2.1.2(c) of the ASA, claims relating to any Excluded Liability as defined in the ASA (which includes liabilities relating to any Excluded Asset) also constitute an Excluded Asset. Finally, under Section 5.12 of the ASA, Genband has agreed to promptly deliver to Nortel any payment or instrument received by Genband that is for the account of Nortel under the terms of the ASA.

Therefore we ask that you promptly take the following actions:

- provide us with a copy of the settlement agreement and the name and contact information of representatives of Verizon with whom you have been in discussions with respect to the settlement agreement;

- deliver to Nortel an accounting of all purchase orders received and expected to be received by Genband from Verizon with respect to the Verizon Receivables, copies of such purchase orders, and the related invoices issued by Genband;

- deliver to Nortel any amounts received by Genband in payment for the Verizon Receivables as of the date hereof, and any purchase orders and amounts that you may receive from Verizon after the date hereof with respect to the Verizon Receivables; and

- fully cooperate with Nortel and Verizon in the resolution of this matter.

If you have questions regarding this matter, please contact me at 615-432-4289, LynnEgan@nortel.com.


Very truly yours,


Lynn C. Egan
Senior Counsel


cc:    Khush Dadyburjor
       Robert Fishman

Shauna Martin
Genband Inc.
August 13, 2010
Page 3 of 3

David S. Allinson, Latham & Watkins
Don J. McDermett, Jr., Baker Botts
Curt Anderson, Baker Botts
Ron Ferguson, Stikeman Elliott

# TAB C

*This is Exhibit* ... *referred to in the*
*affidavit of* ............ *Kate Legree* .........
*sworn before me, this* ............................
*day of* ...... *December* ........ 20..10.

................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

Robin Anne Cardillo, a Commissioner, etc.,
City of Toronto, for Ogilvy Renault LLP / S.E.N.C.R.L., s.r.l.,
Barristers and Solicitors.
Expires March 24, 2011.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------X

In re
                                   Chapter 11

Nortel Networks Inc., *et al.,*[1]
                                   Case No. 09-10138 (KG)

              Debtors.
                                   Jointly Administered

                                   **Hearing date: December 8, 2010 at 10:00 am (ET)**

--------------------------------------------------- X     **Re: D.I. 4345, D.I. 4452**

## DEBTORS' REPLY IN FURTHER SUPPORT OF THEIR MOTION
## TO ENFORCE THE CVAS SALE ORDER AND FOR RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), respectfully submit this reply in further support of, and

in response to the Objection (the "Objection") of GENBAND Inc. to, the Debtors' Motion For

Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors'

Carrier Voice Over IP and Applications Solutions Business, and Directing the Release of Certain

Escrowed Funds (the "CVAS Motion").[2]

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation
(9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc.
(4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel
Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical
Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International
Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc.
(4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://dm.epiq11.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the same meaning ascribed to
them in the CVAS Motion.

1

1.      A review of the Debtors' and GENBAND's motions and objections related to the current CVAS purchase price dispute makes clear that there are only two issues before the Court. First, does the Court have the authority to enforce the Sale Agreement against GENBAND, and second, are the Debtors entitled to receive their calculated Final Purchase Price? The answer to both questions is plainly yes.[3]

2.      In the many briefing papers already filed in connection with these intertwined motions, GENBAND continues to avoid the central issue relevant to deciding the first question regarding the scope of the Court's authority, i.e., the substantive grounds for its purported objection to the Sellers' application of the Sale Agreement's clear definition of Deferred Profit Amount. Rather than plainly stating the basis for its disagreement on this critical issue, GENBAND offers only conclusory references to "contractual interpretation disagreements and accounting disagreements between the parties." Objection ¶ 37. GENBAND maintains that it need not explain further because the "disagreement belongs in arbitration and because the question of whether [it] should be sent to arbitration is a threshold issue that should be determined first." Objection ¶ 38.

3.      The Debtors agree that this Court, and the Canadian Court if a joint hearing is granted,[4] may first consider their authority to enforce the Sale Agreement against GENBAND

---

[3]      On November 29, 2010, in a telephonic conference with the Parties, the Court ordered that it would hear "all issues relating to jurisdiction" at the December 8, 2010 hearing, whether arising under the Debtors' CVAS Motion or GENBAND's motion. Nov. 29, 2010 Tr. at 25:20-22. Accordingly, this Reply focuses on the threshold jurisdictional issues and does not address, inter alia, disputes concerning the Canada transfer tax and the Verizon Receivables (both of which are addressed in the CVAS Motion) in light of the fact that GENBAND states in its Objection that it "does not seek to avoid the jurisdiction of this Court with respect to these [] issues." Objection ¶ 40. The Debtors reserve the right to submit additional briefing with respect to those issues once the threshold issues are decided.

[4]      The Canadian Debtors filed a motion with the Canadian Court on November 30, 2010 (which is also filed on this Court's docket at D.I. 4448) seeking relief similar to the relief sought

2

before determining the Debtors have calculated the correct number for the Final Purchase Price,

applying the Sale Agreement as written. However, the Debtors disagree with GENBAND's

suggestion that this Court can determine the scope of its authority with respect to this dispute

merely by following a general federal policy supporting arbitration, without understanding the

exact matters that would be arbitrated. Simply put, the Court cannot be asked to determine its

authority to decide a dispute without understanding what the dispute is.

    4.    <u>First</u>, the federal policy favoring arbitration is not absolute – the strong

presumption of arbitrability advanced in the cases cited by GENBAND, <u>see</u> Objection ¶¶ 25-26,

only applies to broad arbitration clauses rather than narrowly crafted clauses like the one at issue

that is found in Section 2.2.3.1(c) of the Sale Agreement.[5] <u>See, e.g., Local 827, Int'l Bhd. of</u>

<u>Elec. Workers v. Verizon N.J., Inc.,</u> 458 F.3d 305, 310-11 (3d Cir. 2006); <u>Trap Rock Indus., Inc</u>

<u>v Local 825, Int'l Union of Operating Eng'rs, AFL-CIO,</u> 982 F.2d 884, 888 n.5 (3d Cir. 1992).

None of the cases upon which GENBAND relies are on point, because each involves an

arbitration provision that was unquestionably broad and thus is easily distinguishable from the

narrow arbitration clause found in Section 2.2.3.1(c) of the Sale Agreement. <u>Mintze v. Am.</u>

<u>Gen. Fin. Servs., Inc (In re Mintze),</u> 434 F.3d, 222, 226 (3d Cir. 2006) (arbitration clause in

relevant loan agreement provided that "all claims and disputes arising out of, in connection with,

---

by the Debtors in the CVAS Motion. In addition, the Canadian Debtors separately filed a
Response, Request for Joint Hearing and Reservation of Rights to GENBAND's Stay Motion in
which the Canadian Debtors raised, <u>inter alia</u>, jurisdictional arguments in connection with the
Stay Motion and requested that any hearing on the Stay Motion be adjourned to the December
15, 2010 Joint Hearing. The Debtors support the Canadian Debtors' request for a joint hearing.
At the time of the filing of this Reply, the Court has not ruled on the Canadian Debtors' joint
hearing request.

[5]    The Debtors respectfully refer the Court to their Objection to GENBAND's Stay Motion
[D.I. 4451] for their complete argument as to why this dispute is not subject to arbitration. In
this Reply, the Debtors intend to only briefly respond to points raised in GENBAND's Objection
to the CVAS Motion.

190

or relating to [the] loan must be resolved by binding arbitration") (internal quotation marks omitted); Official Comm. Of Unsecured Creditors of TEU Holdings, Inc. v. Kemeny (In re TEU Holdings, Inc.), 287 B.R. 26, 40 (Bankr. D. Del. 2002) (court describes relevant arbitration clause as "expansive and cover[ing] any claim arising out of the [agreement]"); MCI Telecomm. Corp. v. Gurga (In re Gurga), 176 B.R. 196, 197 (B.A.P. 9th Cir. 1994) (compelling arbitration where arbitration clause in agreement provided that "[a]ny disputes arising in any manner under this Agreement" must be arbitrated).

   5.    In Local 827, the Third Circuit made clear that, notwithstanding Supreme Court precedent endorsing the presumption of arbitrability, courts in this Circuit must distinguish between broad and narrow arbitration clauses for purposes of the presumption:

> The Supreme Court has previously set forth the applicability of the presumption of arbitrability. . . . This court, however, has held that the presumption of arbitrability does not apply in all circumstances.    Where the arbitration provision is narrowly crafted, we cannot presume, as we might if it were drafted broadly, that the parties [] agreed to submit all disputes to arbitration.

Local 827, 458 F.3d at 309-10 (internal quotation marks and citation omitted).[6]

   6.    In direct contrast to the presumption of arbitrability which GENBAND proffers, courts in this Circuit are in fact mindful not to extend arbitration clauses beyond their agreed upon scope. See RCM Techs. Inc. v. Constr. Servs. Assocs. Inc., 149 F. Supp. 2d 109, 112-13 (D.N.J. 2001) ("Where an agreement to arbitrate is limited in its substantive scope, courts should

---

[6]    The remaining cases GENBAND cites in support of its presumption of arbitrability argument predate the Third Circuit's decision in Local 827; see Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149 (3d Cir. 1989); Dickinson v. Heinold Secs., Inc., 661 F.2d 638 (7th Cir. 1981); or address the issue of a court's authority to compel arbitration of a dispute that falls within the scope of a broad arbitration clause based on its status as a core v. non-core proceeding under the Bankruptcy Code. See Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze), 434 F.3d 222, 231-31 (3d Cir. 2006); Jalbert v. Pac. Employers Ins. Co. (In re Olympus Healthcare Grp., Inc.), 352 B.R. 603, 609-611 (Bankr. D. Del. 2006).

*191*

not allow the 'federal policy favoring arbitration . . . to override the will of the parties by giving

the arbitration clause greater coverage than the parties intended.'") (emphasis supplied) (quoting

PaineWebber, Inc. v. Hartmann, 921 F.2d 507, 513 (3d Cir. 1990) (internal quotation marks

omitted)). Here, Section 10.6(b) of the Sale Agreement and the Sale Order grant the Court

(and/or the Canadian Court) jurisdiction to decide all matters that do not fall within the narrow

accounting issues subject to arbitration under Section 2.2.3.1(c) of the Sale Agreement. See Sale

Agreement, at 131-32; Sale Order ¶ 32. Section 2.2.3.1(c) is indisputably a narrow arbitration

clause that carves out from this Court's (and the Canadian Court's) jurisdiction over all claims

concerning the CVAS Sale a very specific category of dispute – namely purchase price

adjustment disputes, the resolution of which requires substantive accounting expertise – to be

determined by an Accounting Arbitrator.  Thus, the Federal Arbitration Act – and the strong

presumption in favor of arbitrability that courts apply to broad arbitration provisions – plainly

does not dictate the outcome here.[7]

  7. Second, in assessing whether a dispute is subject to an arbitration provision,

particularly a narrow provision like the one at issue here, the court must consider what actually is

in dispute – that is, the nature of the parties' positions – in order to determine whether the matter

is subject to arbitration.  The dispute here concerns GENBAND's attempt to disregard a clear

term of the Sale Agreement – the definition of "Deferred Profit Amount."  That GENBAND's

---

[7] GENBAND's attempt to analogize the present case to this Court's decision in Shubert v.
Wellspring Media, Inc. (In re Winstar Comnc'ns , Inc.), 335 B.R. 556 (Bankr. D. Del. 2005), is
wholly misplaced because Shubert is easily distinguishable. There, the parties agreed that their
arbitration clause encompassed the dispute at issue; they disagreed only about whether the
arbitration clause, which used the word "may," was mandatory or permissive. See Shubert, 335
B.R. at 561. That is not the issue here. Moreover, Shubert was decided before Local 827, which
established that the strong federal policy favoring arbitration applies only if the arbitration clause
is broad.

attempt to do so has an impact on the Purchase Price Adjustment does not mean this is a matter for accounting arbitration.

8.      In other words, GENBAND cannot conjure an arbitrable dispute merely by advancing a different Purchase Price Adjustment than the one calculated by the Sellers, when GENBAND's position is the product of disregarding (or attempting to reform) the plain terms of the Sale Agreement.    See Bratt Enters., Inc. v. Noble Int'l Ltd., 338 F.3d 609, 613 (6th Cir. 2003) (in dispute over validity of contractual term related to purchase price adjustment, finding that dispute "does not itself involve  a disagree[ment] with any amounts included in the Closing Balance Sheet [but rather] involve[s] a determination of whether the parties' intent regarding [Seller's] retained liabilities was based upon . . . a misunderstanding about an essential term of their agreement" and is therefore not subject to arbitration) (internal quotation marks omitted); HDS Inv. Holding Inc. v. Home Depot, Inc., CIV.A. No. 3968-CC, 2008 WL 4606262, at *5 (Del. Ch. Oct. 17, 2008) (holding that a dispute over a contractual term that had potential to impact the purchase price adjustment  is not subject to arbitration clause covering disputes regarding the calculation of a post-closing purchase price adjustment); see also, XL Capital Ltd. V. Kronenberg III, 145 F. App'x. 384, 384-85 (2d Cir. 2005) (disputes that had the effect of reducing "Earned Payout Amount" were not within the jurisdiction of the accounting arbitrator because they were not "simply accounting issues in disguise") (internal quotation marks omitted); 100 William Co. v. Aetna Ins. Co., 558 N.Y.S.2d 34, 35 (1st Dep't 1990) (rejecting tenant's attempt to arbitrate a dispute over the meaning of a contractual term used to calculate a rental rate adjustment as an attempt to improperly "reform" the lease agreement).  GENBAND's alleged dispute with the Sellers' Final Purchase Price is not an arbitrable dispute both because it does not implicate accounting issues and because GENBAND's position is not even supported

by the contract as written.  At best, this dispute arises from GENBAND's attempt to disregard

the clear terms of the definition of "Deferred Profit Amount" in order to "reform" that provision

of the agreement.  Such arguments are plainly legal matters over which this Court and the

Canadian Court have sole jurisdiction and that have no place before an Accounting Arbitrator.[8]

9.      Further, GENBAND's failure to identify the nature of its objection to Nortel's

application of the Deferred Profit Amount provision bolsters the Debtors' position that this

dispute concerns a legal issue of contract enforcement and not a matter of substantive accounting

subject to the expertise of an Accounting Arbitrator.  In calculating the Deferred Profit Amount,

and ultimately the Final Purchase Price, Nortel has followed the plain language of the relevant

provision of the Sale Agreement, which defines Deferred Profit Amount as:

> both short term and long term (i) <u>deferred revenues for services to
> be performed or products to be provided by the Business after the
> Closing Date</u> but for which an account receivable has been
> recorded or cash has been received prior to the Closing Date minus
> (ii) associated deferred costs to the extent incurred by the Business
> prior to the Closing Date in Connection with such products or
> services, in each case, that would be required to be reflected on a
> balance sheet of the Business . . . [f]or the avoidance of doubt, the
> Deferred Profit Amount will include advance billings and deferred
> revenue consistent with Nortel Accounting Principles.

Sale Agreement, at 11 (definition of Deferred Profit Amount) (emphasis supplied).

10.     In calculating the Deferred Profit Amount in this manner, Nortel accountants have

followed a contractual methodology – agreed to and in fact proposed by GENBAND – for

---

[8]      GENBAND is correct that Section 10.6(e) of the Sale Agreement provides that Section
10.6(b)'s general grant of jurisdiction to this Court and the Canadian Court "shall not limit the
jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1(c)." Sale Agreement, at
132.  But the relevant question is whether the Accounting Arbitrator has jurisdiction over the
present dispute pursuant to Section 2.2.3.1(c)'s arbitration clause.  Section 10.6(e) does not grant
the Accounting Arbitrator any greater jurisdiction than what is provided in Section 2.2.3.1(c).
GENBAND's implication that the Debtors deliberately "omitted" this language to somehow
mislead the Court with respect to Section 10.6(b) is meritless.

*194.*

determining deferred revenue balances in respect of future deliverables as of the Closing Date that would transfer to GENBAND per the Sale Agreement's Deferred Profit Amount definition. That GENBAND refuses to even state the nature of its objection to this methodology is telling. The implication of GENBAND's evasion is clear: GENBAND seeks to reform the Sale Agreement so that it can include in its calculation of Deferred Profit Amount over $38 million in deferred revenue for services performed or products completed before the Closing Date – revenue which rightly belongs to Nortel because it concerns work that Nortel alone completed prior to selling the CVAS Business to GENBAND and for which GENBAND will bear no future obligation or cost.

11.     This is especially true here, where the Sale Agreement, which included numerous Sellers from several continents and, was put through a public auction process before the CVAS Sale to GENBAND was finally approved by the Court. Other potential bidders were asked to bid on and would have been held to the unambiguous terms of the Sale Agreement – and not an improved extracontractual version of the deal with an associated $38 million purchase price reduction. GENBAND should not be permitted to now advance extracontractual arguments to lower the purchase price beyond the benefit of the bargain it negotiated last year, much less to be allowed to raise such arguments before an accountant who does not have any expertise in considering their validity.

12.     The definition of Deferred Profit Amount could not be more clear in providing that only deferred revenue and associated deferred costs in respect of services to be performed and products to be provided after the Closing Date are included in the Deferred Profit Amount. GENBAND seeks to disregard the "after the Closing Date" language in the definition, but offers no explanation for why it should be permitted to do so. Indeed, there is no legal basis for

8

GENBAND's position; the Sale Agreement contains a valid and binding integration clause that expressly forbids GENBAND from doing what it implicitly seeks to do.  Section 10.12(a) provides: "This Agreement . . . set[s] forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement . . . ."  Sale Agreement, at 136.  That GENBAND may wish it negotiated a different definition to be included in the Sale Agreement (even though GENBAND itself introduced the existing language) is of no consequence.  As GENBAND itself points out, the Parties to the Sale Agreement are both "sophisticated parties" who were "represented by able counsel."  Objection ¶ 6.  The Sale Agreement's integration clause controls.  Moreover, to the extent GENBAND may claim it had a different understanding of the purchase price adjustment than the language memorialized in the Sale Agreement, it had five months from the time it signed the agreement in December 2009 until the sale closed in May 2010 to raise the existence of such a purported error.  In fact, it did not do so at any time prior to the closing of the sale.  Of course, as a threshold matter, it is not clear that GENBAND will make any or all of these arguments, as GENBAND continues to refuse to explain the grounds for its purported dispute.

13.    Finally, GENBAND's suggestion that arbitration is appropriate here because it would be "efficient" and "fast" relative to potential "protracted litigation" in the Bankruptcy Court is ironic and misplaced.  Objection ¶ 29.  The most efficient – and plainly the proper – way to resolve this matter is for this Court (and the Canadian Court) to enforce the clear terms of the Sale Agreement and thus rule that GENBAND is obligated to follow those terms.[9]  This is

---

[9]    GENBAND also suggests in its Objection that Nortel has acted improperly in filing the CVAS Motion after the conclusion of the fifteen-day negotiation period following delivery of the Disagreement Notice, and that Nortel "became contractually bound to submit [this dispute] to

9

*P96*

precisely the relief the CVAS Motion requests, and for all of the reasons stated above and in the

CVAS Motion and in the Debtors' Objection to GENBAND's Stay Motion, this Court should

rule that it is the proper forum for resolution of this dispute and GENBAND should be held to its

obligations under the Sale Agreement.


*[Reminder of Page Intentionally Left Blank]*


arbitration" after this fifteen days elapsed. See Objection ¶¶19, 30.   This is patently incorrect.
The dispute is either arbitrable or not arbitrable regardless of the time frame provided in the Sale
Agreement for arbitration to occur.  The Debtors were under no obligation to file a motion prior
to the conclusion of the fifteen-day period, and the fact that the fifteen days elapsed and no
resolution was reached in no way converts this dispute into an arbitrable dispute.  Further, the
Sellers reserved all rights in connection with this issue in their various notices to GENBAND.

*197*

WHEREFORE, the Debtors respectfully request that this Court (i) grant the CVAS

Motion and the relief requested therein; (ii) enter the proposed order attached thereto; and

(iii) grant such other and further relief as it deems just and proper.

Dated:  December 3, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Wilmington, Delaware

                                  James L. Bromley (admitted *pro hac vice*)
                                  Lisa M. Schweitzer (admitted *pro hac vice*)
                                  David H. Herrington (admitted *pro hac vice*)
                                  One Liberty Plaza
                                  New York, New York 10006
                                  Telephone:  (212) 225-2000
                                  Facsimile:  (212) 225-3999

                                          - and -

                                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                  */s/ Ann C. Cordo*
                                  Derek C. Abbott (No. 3376)
                                  Eric D. Schwartz (No. 3134)
                                  Ann C. Cordo (No. 4817)
                                  1201 North Market Street
                                  P.O. Box 1347
                                  Wilmington, Delaware 19801
                                  Telephone:  (302) 658-9200
                                  Facsimile: (302) 658-3989

                                  *Counsel for the Debtors*
                                  *and Debtors in Possession*

**TAB D**

Page 69 of 80 ... referred to in the
affidavit of ... Kathe Legoff ...
sworn before me, this ...
day of ... December ... 20.10.

A COMMISSIONER FOR TAKING AFFIDAVITS

Robin Anne Cardillo, a Commissioner, etc.,
City of Toronto, for Ogilvy Renault LLP / S.E.N.C.R.L., s.r.l.,
Barristers and Solicitors.
Expires March 24, 2011.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------X
: 
                                                              : **Chapter 11**

*In re*                                        : **Case No. 09-10138 (KG)**

Nortel Networks Inc., *et al.*,[1]         :

               Debtors.      : **Jointly Administered**

                                                      : **Related Docket No. 4347**

---------------------------------------------------X

### DEBTORS' OBJECTION TO MOTION OF GENBAND INC. FOR ENTRY OF AN ORDER PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE GRANTING RELIEF FROM THE AUTOMATIC STAY TO COMPEL ARBITRATION

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby respectfully respond and object to the motion of GENBAND Inc. (n/k/a GENBAND US LLC) ("GENBAND") for Entry of an Order Granting Relief from the Automatic Stay to Compel Arbitration [D.I. 4347] (the "Stay Motion").

The Debtors understand that Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and the other Canadian Debtors will be filing a separate Response, Request for Joint Hearing and Reservation of Rights to GENBAND's Stay Motion to the extent it purports to seek relief from this Court to compel NNC and NNL, which are not debtors in proceedings pending before this Court, to arbitrate the dispute over the Purchase Price Adjustment. The Canadian Debtors also will request that GENBAND's motion be heard in a joint hearing with the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Ontario Superior Court of Justice (the "Canadian Court"), along with the CVAS Motion and a similar motion filed by the Canadian Debtors before the Canadian Court, which the Debtors support.

### PRELIMINARY STATEMENT

1.     In an effort to circumvent addressing the merits of the *Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds*, dated November 17, 2010 [D.I. 2632] (the "CVAS Motion")[2] – which seeks to have this Court enforce the clear terms of the duly executed Sale Agreement governing the sale of the Debtors' CVAS Business to GENBAND – GENBAND has filed the instant Stay Motion seeking to compel arbitration of a dispute that is plainly not subject to arbitration under the terms of the Sale Agreement governing the CVAS Sale.[3]

2.     The Debtors brought the CVAS Motion to enforce the Sale Agreement governing the sale of their Carrier Voice over IP and Communications Solutions ("CVAS Business") to GENBAND.  GENBAND has sought to drastically and improperly reduce the CVAS purchase price by claiming a purchase price adjustment that ignores the clear terms of the Sale Agreement. The Sale Agreement provides, among other things, that the purchase price will be adjusted based on certain assumed liabilities, including the "Deferred Profit Amount," which is to be determined based on "deferred revenues for services to be performed or products to be provided by the Business after the Closing Date."  Sale Agreement at 11.  Based on this clear definition, and

---

[2]     The Debtors respectfully refer the Court to the CVAS Motion for a more detailed discussion of the merits and only summarize the principal points here.

[3]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the CVAS Motion.

2

$2\infty$

applying it in a manner consistent with a previous sale transaction, the Deferred Profit Amount adjustment is $34,284,392, and the total purchase price is $179,508,745.[4]

3.      But GENBAND seeks to ignore the clear terms of the definition of Deferred Profit Amount in order to include deferred revenues for services performed or products provided before the Closing Date, and for which no services were to be performed or products provided after the Closing Date. On this basis, GENBAND seeks to add $36,285,608 to the Deferred Profit Amount figure, inflating that figure to $70,570,000, and drastically reducing the purchase price to $142,904,000.

4.      The dispute precipitated by GENBAND's attempt to disregard the terms of the Sale Agreement is squarely within the jurisdiction the Court expressly reserved under the CVAS Sale Order, to "(1) interpret, implement and enforce the terms and provisions of this Order . . . and the terms of the Sale Agreement . . . (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Sale Agreement . . . ." Sale Order, at ¶ 32. In addition, Section 10.6(b) of the Sale Agreement further mandates that any claim brought prior to the closing of the Chapter 11 cases seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby, "shall be brought only" in the U.S. Bankruptcy Court or the Canadian Court. Thus, not only does this Court have jurisdiction to resolve the matter, the parties agreed that this Court (and/or the Canadian Court) is to be the only forum for resolving such matters.

---

[4]      Employees of the Debtors and GENBAND, working together, have recently agreed upon the calculation of certain other accounting deferred revenue line items relating to a Telus Communications contract in Canada which was substantially completed as of the Closing Date that generate an additional adjustment of $2,544,016 to the Deferred Profit Amount and result in a revision of the Sellers' Final Purchase Price calculation from $179,508,745 to $182,052,761.  The Debtors intend to serve an amended Disagreement Notice on GENBAND to reflect this additional amount.

3

Hence, the Debtors should not be required to bear the burden and expense of engaging in a separate arbitral proceeding to enforce the plain terms of the Sale Agreement.

5.      Yet GENBAND seeks to avoid this Court's clear jurisdiction along with the Canadian Court over this matter and instead wishes to have the dispute referred to an accounting arbitrator, based on a provision in the Sale Agreement that provides for certain disagreements to be resolved by an accounting arbitrator.  But there is nothing here for an accounting arbitrator to decide.  To the contrary, the parties and their accountants agree on the figures that would determine the Deferred Profit Amount if the proper interpretation of "services to be performed or products to be provided by the Business after the Closing Date" is applied.  Id.  In fact, the parties jointly developed and agreed upon these figures in the course of determining the assets and liabilities that GENBAND would assume upon the acquisition of the CVAS Business.

6.      Hence, this is not an accounting dispute.  To the contrary, this is a matter of GENBAND seeking to evade the Sale Agreement's clear terms.  Indeed, GENBAND has never – including in its papers on the instant motion – set forth its position in writing as to the nature of any accounting objection to the Sellers' calculation of Deferred Profit Amount that purportedly requires arbitration.  Instead, GENBAND simply maintains that any dispute that impacts the purchase price adjustment must be arbitrated.  But that is simply wrong.  As discussed below, courts consistently reject attempts like GENBAND's to refer a matter to an accounting arbitrator when the dispute, though affecting the purchase price, is not truly an accounting matter but instead arises from a party's attempt to disregard the terms of the sale agreement itself.

7.      For all of these reasons, on November 17, 2010, the Debtors filed the CVAS Motion and noticed it for hearing on December 15, 2010 – the next available Joint Hearing date – based on the expectation (communicated to GENBAND in the CVAS Motion) that the

202

Canadian Debtors would file a parallel motion in the Canadian Court seeking similar relief,

which the Canadian Debtors have now done. See CVAS Motion at n.8.[5]  The CVAS Motion

requests, inter alia, that the Court determine that it – not an Accounting Arbitrator – has the

authority to resolve the purchase price dispute, and further requests that the Court declare the

Debtors' purchase price as correct and direct GENBAND to execute instructions providing for

release of the relevant sale escrows consistent with such purchase price.

       8.     The day after the Debtors filed the CVAS Motion, on November 18, 2010,

GENBAND filed the instant motion seeking relief from the Automatic Stay "to compel

arbitration between Nortel Networks Corporation, Nortel Networks Limited, and Nortel

Networks Inc." Stay Motion at 1. In its Stay Motion, GENBAND does not address or even

acknowledge the earlier-filed CVAS Motion, but instead seeks to avoid the merits of the CVAS

Motion by demanding that the Court refer this dispute to an accounting arbitrator.

Notwithstanding the fact that GENBAND's Stay Motion is subsumed by the CVAS Motion and,

moreover, purports to have this Court lift the automatic stay to compel arbitration among itself,

the US Debtors and the Canadian Debtors on the very same matters that are the subject of the

Debtor's CVAS Motion, GENBAND noticed its Stay Motion for a December 8, 2010 hearing

before this Court only (and not the Canadian Court), and it subsequently refused to consent to

moving its hearing to the December 15th Joint Hearing Date.[6]

       9.     As noted above, the Debtors understand that the Canadian Debtors will be filing a

separate Response, Request for Joint Hearing and Reservation of Rights to GENBAND's Stay

---

[5]      The Canadian Debtors filed a motion with the Canadian Court on November 30, 2010 seeking relief similar to the relief sought by the Debtors in the CVAS Motion. The motion record is filed on the docket in this Court as well [D.I. 4448].

[6]      To date, GENBAND has not sought similar relief against the Canadian Debtors in the Canadian Court overseeing their insolvency proceedings.

Motion in which, among other things, they will request that GENBAND's motion be heard in a joint hearing along with the CVAS Motion. The Debtors support that request, and they respectfully ask the Court to grant the CVAS Motion and to deny GENBAND's Stay Motion.

## ARGUMENT

### I.    The Deferred Profit Amount Dispute Is Not Arbitrable

10.    This Court has joint jurisdiction, along with the Canadian Court, to decide the threshold question of whether Section 2.2.3.1(c) of the Sale Agreement contemplates resolution of this dispute by an Accounting Arbitrator. See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) ("The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'").

### A.    *No Presumption of Arbitrability Exists for the Narrow Arbitration Clause of Section 2.2.3.1(c)*

11.    Section 2.2.3.1(c) is a narrow exception to the parties' broad agreement under Section 10.6(b) that "any claim, action or proceeding . . . seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby . . .  shall be brought in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases." (Emphasis supplied).

12.    In deciding whether a dispute falls within the scope of an arbitration provision, courts first determine whether the clause is "broad" or "narrow." See Local 827, Int'l Bhd. of Elec. Workers, AFL-CIO v. Verizon N.J., Inc., 458 F.3d 305, 310 (3d Cir. 2006) (distinguishing broad versus narrow arbitration clauses). "'Broad' clauses purport to refer all disputes to arbitration; 'narrow' clauses limit arbitration to specific types of disputes." Camferdam v. Ernst

204.

& Young Int'l, Inc., No. 02 Civ. 10100 (BSJ), 2004 WL 1124649, at *1 (S.D.N.Y. May 19,

2004) (citation omitted). Where, as here, "a contract contains both a broad disputes provision

permitting lawsuits and also an arbitration requirement set forth in one narrow context, courts

routinely limit the arbitration requirement to disputes arising squarely in that narrow context."

E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F. Supp. 2d 273, 285 (S.D.N.Y. 2006) (citations

omitted).

      13.    The Third Circuit has indicated that the strong federal policy in favor of

arbitration, upon which GENBAND purports to rely, applies only to broad arbitration clauses –

and not to narrow provisions such as the one contained in the Sale Agreement. Local 827, Int'l

Brotherhood of Elec. Workers v. Verizon NJ, Inc., 458 F.3d 305, 310-11 (3d Cir. 2006) (holding

that district court erred by applying presumption of arbitrability to "narrow" provision that

"clearly limits matters subject to arbitration"); Trap Rock Indus., Inc v Local 825, Int'l Union of

Operating Eng'rs, AFL-CIO, 982 F.2d 884, 888 n.5 (3d Cir. 1992) (holding that presumption of

arbitrability was "inapposite" in case involving "narrowly crafted" arbitration provision). The

Third Circuit has emphasized that where an arbitration clause "clearly delimits the issues subject

to arbitration," the presumption of arbitrability gives way because "'we cannot presume, as we

might if [the arbitration clause] were drafted broadly, that the parties [ ] agreed to submit all

disputes to arbitration.'" Local 827, 458 F.3d at 310-11 (quoting Trap Rock, 982 F.2d at 888

n.5)).[7]

---

[7]    The cases upon which GENBAND relies to support its argument that this dispute must be arbitrated in light of federal and Third Circuit policy favoring arbitration are inapposite. In each, the arbitration clauses were broad clauses easily distinguishable from the narrow arbitration provision of Section 2.2.3.1(c) of the Sale Agreement. See Mintze v. Am. Gen. Fin. Servs., Inc (In re Mintze), 434 F.3d, 222, 226 (3d Cir. 2006) (arbitration clause in relevant loan agreement provided that "'all claims and disputes arising out of, in connection with, or relating to [the] loan' must 'be resolved by binding arbitration'"); Official Comm. Of Unsecured Creditors of TEU Holdings, Inc. v. Kemeny (In re TEU Holdings, Inc.), 287 B.R. 26, 40 (Bankr. D. Del. 2002) (court describes relevant arbitration clause as "expansive and cover[ing] any claim arising out of the [agreement]"); MCI Telecomm. Corp. v. Gurga (In

7

14.    Thus, as the court explained in <u>RCM Techs, Inc. v. Construction Servs. Assocs,</u> <u>Inc.,</u> 149 F. Supp. 2d 109 (D. N.J. 2001), "a <u>broad</u> arbitration clause carries with it a certain presumption of arbitrability. With <u>narrower</u> clauses, however, a court considering the appropriate range of arbitrable issues must 'consider whether the [question at] issue is on its face within the purview of the clause.'" <u>Id.</u> at 112 (quoting <u>McDonnell Douglas Fin. Corp. v. Pa.</u> <u>Power & Light Co.,</u> 858 F.2d 825, 832 (2d Cir. 1988) (citations omitted) (emphasis supplied)). "Where an agreement to arbitrate is limited in its substantive scope, courts should <u>not</u> allow "the federal policy favoring arbitration . . . to override the will of the parties by giving the arbitration clause greater coverage than the parties intended." <u>Id.</u> at 112-13 (quoting <u>PaineWebber, Inc. v.</u> <u>Hartmann,</u> 921 F.2d 507, 513 (3d Cir. 1990) (emphasis supplied)) (internal quotation marks omitted).

15.    As the Supreme Court emphasized again this year, "[W]e have said on numerous occasions that the central or 'primary' purpose of the FAA is to ensure that 'private agreements to arbitrate are enforced according to their terms.'" <u>Stolt-Nielsen S.A. v. Animalfeeds Int'l</u> <u>Corp.,</u> 130 S. Ct. 1758, 1773 (2010) (citations omitted).   "In this endeavor, 'as with any other contract, the parties' intentions control.'" <u>Id.</u> at 1774 (citation omitted). "Underscoring the consensual nature of private dispute resolution, we have held that parties are "'generally free to structure their arbitration agreements as they see fit.'" <u>Id.</u> (citation omitted). And thus "parties may agree to limit the issues they choose to arbitrate." <u>Id.</u>

16.    Here, the arbitration clause in Section 2.2.3.1(c) of the Sale Agreement is narrow. It carves out a specific category of dispute concerning accounting expertise to be arbitrated by an Accounting Arbitrator.   Courts consistently hold that arbitration provisions limited to purchase

---

re Gurga), 176 B.R. 196, 197 (B.A.P. 9th Cir. 1994) (compelling arbitration where arbitration clause in agreement provided that "[a]ny disputes arising in any manner under this Agreement" must be arbitrated).

*206.*

price adjustment disputes are narrow in scope. See, e.g., HDS Inv. Holding Inc. v. Home Depot, Inc., CIV.A. 3968-CC, 2008 WL 4606262, at *5 (Del. Ch. Oct. 17, 2008) (holding that arbitration clause was "narrow" where it "only refers to arbitration those issues regarding the calculation of the [purchase price adjustment]).'"[8]  Because Section 2.2.3.1(c) is a "narrow" arbitration clause, it does not enjoy the presumption of arbitrability applicable to broad arbitration provisions. See Local 827, 458 F.3d at 310-11. Thus, the Court must be careful not to allow any policy favoring arbitration "to override the will of the parties by giving the arbitration clause greater coverage than the parties intended." PaineWebber, 921 F.2d at 513.

**B.**   ***The Deferred Profit Amount Dispute Is a Legal Question of Contractual Enforcement***

17.    Under the plain language of the Sale Agreement, this dispute is beyond the scope of Section 2.2.3.1(c)'s narrow purchase price adjustment arbitration clause. The dispute is a simple issue of contractual enforceability: GENBAND's expected effort to disregard the definition of Deferred Profit Amount based on purported pre-execution discussions is nothing more than an attempt to circumvent and repudiate a clear and enforceable term of the Sale Agreement. See Bratt Enters, Inc. v. Noble Int'l Ltd., 338 F.3d 609, 613 (6th Cir. 2003) (reversing order compelling accounting arbitration of dispute over validity of contractual term related to purchase price adjustment). To resolve this legal issue, GENBAND would have the Accounting Arbitrator disregard the phrase "after the Closing Date" and improperly modify the Deferred Profit Amount provision to enable GENBAND to include deferred revenue items for services to be performed or products to be provided by the Business before the Closing Date. This is demonstrably not the role of an accounting arbitrator, and certainly not the role the

---

[8]    See also Blue Tee Corp. v. Koehring Co., 999 F.2d 633, 634-35 (2d Cir. 1993) (describing as a "narrow arbitration clause" a provision "requiring disputes regarding the computation of the final statement to be resolved by accountants"); CAE Indus. Ltd. v. Aerospace Holdings Co., 741 F. Supp. 388, 392 (S.D.N.Y. 1989) (finding an arbitration provision narrow in scope where it required "'any objections Buyer may have to any of the matters set forth' in the Closing Date Balance Sheet 'be submitted to an independent accounting firm'").

Parties envisioned such an arbitrator would play when the Sale Agreement was negotiated and executed.

18.    Section 2.2.3.1(c) delegates to the Accounting Arbitrator only those disagreements "as contemplated by Section 2.2.3.1(b)" that the parties "are unable to resolve . . . within fifteen (15) days after delivery of a Disagreement Notice . . . " (emphasis supplied).  In turn, Section 2.2.3.1(b) contemplates only those disputes that are set forth in the Closing Statement that concern "[m]atters included in the calculations in the Closing Statement" (emphasis supplied).  Contrary to GENBAND's arguments, the Accounting Arbitrator does not have jurisdiction to adjudicate a matter simply because it is included in a Disagreement Notice or because resolution of the dispute could potentially impact the Closing Statement or the Purchase Price Adjustment.  See XL Capital, Ltd. v. Kronenberg, 145 F. App'x. 384, 384 (2d Cir. 2005) (disputes that had the effect of reducing "Earned Payout Amount" were not within the jurisdiction of the accounting arbitrator because they were not "simply accounting issues in disguise").

19.    To be sure, enforcing the clear terms of the definition of Deferred Profit Amount here will affect the Closing Statement and Purchase Price Adjustment.  But that does not mean that GENBAND's effort to avoid those clear terms falls within the Accounting Arbitrator's jurisdiction under Section 2.2.3.1(c).  See Bratt, 338 F.3d at 613 (reversing order compelling accounting arbitration of a dispute over the validity of a contractual term that implicated purchase price adjustment calculations).  The Bratt court's reasoning is apt here:

> While [Purchaser's] claim would obviously require reference to the closing balance sheet to determine matters of valuation should [Purchaser] prevail on this issue, the dispute regarding the validity of the limitation provision does not itself involve a 'disagree[ment] with any of the amounts included in the Closing Balance Sheet.' Rather, it involves a determination of whether the parties' intent regarding [Seller's] retained

10

208.

> liabilities was based upon the parties' sharing a misunderstanding about an
> essential term of their agreement. Thus, this [dispute] is not within the
> scope of the arbitration clause and is, therefore, not arbitrable.

Id.

20.     Similarly, in 100 William Co. v. Aetna Ins. Co., the court distinguished between purely computational challenges relating to a rental rate adjustment – which were arbitrable under a lease – and "a determination of the very formula at issue," which was an issue for the court. 558 N.Y.S.2d 34, 35  (1st Dep't 1990) (affirming stay of arbitration because narrow arbitration clause in commercial lease covering any controversy over manner of computation of rental rate adjustment did not include tenant's challenge to meaning of formula for adjusting rent). The 100 William court characterized the tenant's attempt to arbitrate the dispute over the meaning of a contractual term used to calculate the rental rate adjustment as an attempt to improperly "reform" the lease agreement. 558 N.Y.S.2d at 35. So too here, GENBAND's attempt to disregard the clear definition of Deferred Profit Amount via an accounting arbitration is likewise an improper attempt to reform the Sale Agreement.

21.     If any issue that has the potential to impact the Closing Statement or Purchase Price Adjustment were enough to trigger the Accounting Arbitrator's jurisdiction, then the parties' intent to litigate all disputes under Section 10.6(b) of the Sale Agreement except for those falling into the narrow exception circumscribed by Section 2.2.3.1(c) would be turned on its head. In other words, GENBAND's position that Section 2.2.3.1 gives the Accounting Arbitrator the authority to decide "'any disagreement' relating to the Purchase Price Adjustment," Stay Motion at ¶ 2, would allow the narrow exception of Section 2.2.3.1 to effectively swallow much of this Court's jurisdiction reserved under Section 10.6 of the Sale Agreement. See XL Capital, 145 F. App'x. at 385 (finding that arbitration clause referring issues "with respect to the calculations of the . . . Earned Payout Amount" – as distinct from separate

11

clause addressing all disputes arising under the operative agreement – favored a narrow reading of the relevant arbitration clause limiting its scope to "pure accounting issues").

22.     The decision in <u>HDS</u> is also instructive here. 2008 WL 4606262, at *1 (applying New York contract law). There, the plaintiff asked the court to declare that certain issues were beyond the narrow jurisdiction of an accounting arbitrator, which the parties authorized to resolve certain disputes regarding the calculation of a "post-closing purchase price adjustment." <u>Id</u>. In a Notice of Disagreement, the defendant disputed the plaintiff's inclusion of Bonus and Retention Payment Liability in its calculation of the Applicable Amount in its Closing Statement. The defendant argued "that since it disputed the inclusion of the Bonus and Retention Payment Liability in the Notice of Disagreement, the entire issue of the Bonus and Retention Payments should be decided by the [accounting arbitrator]" because the calculation of the Bonus and Payment Liability in the Closing Statement is "inextricably linked" to the related payment requirement under another section of the sale agreement. <u>Id</u>. at *6.

23.     Acknowledging that "the issues that arise under a contract are often interconnected in ways that make it difficult to divide them between a court and an arbitrator," the <u>HDS Investment</u> court held that "[defendant's] line of reasoning would give to the [accounting arbitrator] contractual disputes that are clearly outside the scope of the arbitration provision." <u>Id</u>. at *1. Thus, the Court refused to send to arbitration a dispute over a contractual term notwithstanding the fact that resolution of the dispute had the potential to impact the purchase price adjustment.

24.     Here too, the matter at issue is a contractual dispute outside the scope of the Sale Agreement's accounting arbitration clause. Section 2.2.3.1(b), as incorporated in Section 2.2.3.1(c), provides that "[m]atters included in the calculations in the Closing Statement"—that

12