210

is, calculation matters, are to be referred to the Accounting Arbitrator. By contrast, *legal* issues of contractual enforcement are for the court to decide under Section 10.6(b), which as noted mandates that "any claim, action or proceeding . . . seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby . . . shall be brought in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA cases." (emphasis supplied).

25.     Further, the fact that disputes subject to Section 2.2.3.1(c) are to referred to an Accounting Arbitrator, rather than to an ordinary arbitral tribunal that is equipped to address legal disputes, is further evidence that the parties did not intend for the arbitration provision to encompass legal disputes concerning the enforcement of the terms of the Sale Agreement.   As the Second Circuit aptly observed in See XL Capital, "the fact that the chosen arbitrator is an accounting firm verifies the import of the plain language:  that the scope of the clause is limited to those issues closely related to accounting." 145 F. App'x. at 385.  Thus, legal issues such as the instant dispute, even if they may impact the Closing Statement or Purchase Price Adjustment, are for this Court to resolve.

## II.   No Cause Exists To Lift The Automatic Stay

26.     GENBAND seeks relief from the automatic stay to proceed with arbitration.  To the extent that the automatic stay would need to be lifted in connection with GENBAND's motion seeking to compel arbitration, its request similarly fails, as GENBAND has failed to meet its burden of establishing that it would face a relatively greater hardship from having this dispute heard by the Court and a likelihood that it would succeed on the merits.  See Am., Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.), 152 B.R. 420, 424 (D. Del. 1993) (citing Int'l Bus. Machines v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van

13

211

Co.), 938 F.2d 731, 734-37 (7th Cir. 1991)); see also Izzarelli v. Rexene Prods. Co. (In re

Rexene Prods. Co.), 141 B.R. 574, 576-77 (Bankr. D. Del. 1992) (moving party bears burden of

demonstrating that cause exists to terminate or modify the stay).

27.    "'[A] party cannot be required to submit to arbitration any dispute which he has

not agreed so to submit.'" Local 827, 458 F.3d at 309 (quoting United Steelworkers v. Warrior

& Gulf Navigation Co., 363 U.S. 574, 582 (1960)). The Debtors never agreed to authorize the

Accounting Arbitrator to decide issues of contractual enforceability of express provisions of the

Sale Agreement, such as the definition of Deferred Profit Amount in Section 1.1. Thus, the

Sellers will suffer significant prejudice if they were required to expend time and resources to

participate in an arbitration over a legal issue which an Accounting Arbitrator would have no

knowledge, expertise or background to decide.

28.    The diversion of the Sellers' resources and attention away from their restructuring

that will result granting the request to compel arbitration is significant and, in and of itself,

provides sufficient justification to deny GENBAND's motion. See Anderson v. Hoechst

Celanese Corp. (In re United States Brass Corp.), 173 B.R. 1000, 1006 (Bankr. E.D. Tex.1994)

(citing In re Curtis, 40 B.R. 795, 806 (Bankr. D. Utah 1984) ("When balancing the hardships in

lifting the stay, the most important factor is the effect of such litigation on the administration of

the estate; even slight interference with the administration may be enough to preclude relief.").

Because lifting the stay or granting any similar relief directing arbitration of the current dispute

would impose substantial burdens and costs on the Debtors, the prejudice to the Debtors further

mandates the denial of GENBAND's motion.

29.    Similarly, GENBAND has failed to establish a probability of success on the

merits or other grounds that would entitle it to relief. See In re Continental Airlines, Inc., 152

14

212

B.R. at 426 (D. Del. 1993) (noting that the probability of success should be weighed only after determining that the balance of hardships weighs in favor of movant, and has little or no remaining significance where other elements not met). GENBAND has submitted no evidence to support its position and thus it has not demonstrated that a dispute contemplated by Section 2.2.3.1(b) exists. In other words, GENBAND has never provided to the Sellers in its dispute notice or related correspondence the basis for its calculation of Deferred Profit Amount, as contained in GENBAND's Closing Statement, or the nature of any accounting objection to the Sellers' calculation of Deferred Profit Amount, which was done in accordance with the clear terms of the Sale Agreement. As noted, the parties and their accountants agree on the figures that would determine the Deferred Profit Amount if the language "services to be performed or products to be provided by the Business after the Closing Date" is applied as written. This is a clear-cut contractual dispute, in which the relevant provision is unambiguous. The Sale Agreement's integration clause expressly forbids GENBAND from attempting to disregard or reform the contract, as it seeks to do here, and thus GENBAND cannot possibly succeed on the merits. Accordingly, the Court should reject GENBAND's effort to circumvent the Debtors' CVAS Motion, and the Court should retain jurisdiction to expeditiously resolve this matter.

213

## CONCLUSION

30.    For the reasons set forth above, GENBAND's Motion for Entry of an Order

Granting Relief from the Automatic Stay to Compel Arbitration should be denied.

Dated: December 1, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

                                 James L. Bromley (admitted *pro hac vice*)
                                 Lisa M. Schweitzer (admitted *pro hac vice*)
                                 David H. Herrington (admitted *pro hac vice*)
                                 One Liberty Plaza
                                 New York, New York 10006
                                 Telephone:  (212) 225-2000
                                 Facsimile:  (212) 225-3999

                                        - and -

                                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                 */s/ Ann C. Cordo*
                                 Derek C. Abbott (No. 3376)
                                 Eric D. Schwartz (No. 3134)
                                 Ann C. Cordo (No. 4817)
                                 Andrew R. Remming (No. 5120)
                                 1201 North Market Street
                                 P.O. Box 1347
                                 Wilmington, Delaware 19801
                                 Telephone:  (302) 658-9200
                                 Facsimile: (302) 658-3989

                                 *Counsel for the Debtors*
                                 *and Debtors in Possession*

214.

## CERTIFICATE OF SERVICE

I, Ann C. Cordo, certify that I am not less than 18 years of age, and that service of the foregoing **Debtors' Objection To Motion Of GENBAND Inc. For Entry Of An Order Pursuant To Section 362(d) Of The Bankruptcy Code Granting Relief From The Automatic Stay To Compel Arbitration** was caused to be made on December 1, 2010, in the manner indicated upon the entities identified below.

Date: December 1, 2010

_/s/ Ann C. Cordo_
Ann C. Cordo (# 4817)

### VIA HAND DELIVERY

Thomas P. Tinker, Esq.
Office of the U.S. Trustee
844 King Street
Suite 2207, Lockbox 35
Wilmington, DE 19801-3519

Mark D. Collins, Esq.
Christopher M. Samis, Esq.
Richards Layton & Finger
One Rodney Square
920 N King St
Wilmington, DE 19801

Michael R. Lastowksi, Esq.
Sommer L. Ross, Esq.
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801

Mary F. Caloway, Esq.
Buchanan Ingersoll & Rooney
1000 West Street
Suite 1410
Wilmington, DE 19801

### VIA FIRST CLASS MAIL

Fred S. Hodara, Esq.
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036

Blair Connelly, Esq.
Eli J. Kay-Oliphant, Esq.
Latham & Watkins LLP
885 Third Avenue, Suite 1200
New York, NY 10022-4834

Ken Coleman, Esq.
Lisa J.P. Kraidin, Esq.
Allen & Overy LLP
1221 Avenue of the Americas
20th Floor
New York, NY 10020

3925390

# TAB E

This is Exhibit ...9.1............ referred to in the
affidavit of ........Kabe Leary.........
sworn before me, this ...........................
day of ......December............. 20..10

Robin Anne Cardillo, a Commissioner, etc.,
City of Toronto, for Ogilvy Renault LLP / S.E.N.C.R.L., s.r.l.,
Barristers and Solicitors.
Expires March 24, 2011.

215

.................................
T [...] ING AFFIDAVITS

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.* | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Re: Docket No. 4347 and 4451** |
| | ) | |
| | ) | **Hearing Date: December 8, 2010 at 10:00 a.m.** |
| | ) | |

**REPLY OF GENBAND US LLC TO DEBTORS' OBJECTION TO
MOTION OF GENBAND INC. FOR ENTRY OF AN ORDER PURSUANT TO
SECTION 362(D) OF THE BANKRUPTCY CODE GRANTING RELIEF
FROM THE AUTOMATIC STAY TO COMPEL ARBITRATION**

GENBAND US LLC (formerly GENBAND Inc., ("GENBAND")), by and through its

undersigned counsel, hereby files this reply (the "Reply") to Nortel Networks Inc.'s

(collectively, with Nortel Networks Corporation and Nortel Networks Limited, "Nortel," and,

together with its affiliate filing entities, the "Debtors") *Objection to Motion of GENBAND Inc.*

*for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from*

*the Automatic Stay to Compel Arbitration* [D.I. 4451] (the "Debtors' Objection"). In support of

this Reply, as well as its previously filed *Motion for Entry of an Order Pursuant to Section*

*362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration*

[D.I. 4347] ("GENBAND's Motion"), GENBAND respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      Nortel's entire argument is based on a selective quotation of the disputed term. When read in its entirety, as it must be, there is no doubt that the parties' disagreement is exactly the type that the parties agreed must be arbitrated. The Court should therefore lift the automatic stay and order the parties to submit the matter to arbitration.

2.      The Asset Sale Agreement, dated as of December 22, 2009, by and among Nortel, GENBAND and the entities identified as sellers therein (the "ASA"),[1] approved by this Court's *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts* (the "Sale Order") [D.I. 2632], in Section 2.2.3.1(c) (the "Mandatory Arbitration Provision") states that "*any disagreement*" concerning the Closing Statement must be submitted to the arbitrator.

3.      Nortel argues that even though the ASA requires the parties to arbitrate "any disagreement" about the Closing Statement, the parties actually intended to arbitrate only some of those disagreements: those requiring accounting determinations. As an initial matter, Nortel relies upon inapposite cases involving either materially different contract language, disputes far removed from the scope of the relevant arbitration clause, or both. But more fundamentally, Nortel's argument fails even if one accepts Nortel's premise—because when read in its entirety (rather than as selectively quoted by Nortel), *the very definition of the term at issue requires interpretation and application of accounting rules.*

---

[1]      All terms not otherwise defined herein shall have the meaning ascribed to them under the ASA. The ASA was filed as Exhibit B to GENBAND's Motion [D.I. 4347].

2

4.    Nortel states that the interpretation of "Deferred Profit Amount" is "a legal issue which an Accounting Arbitrator would have no knowledge, expertise or background to decide." Nortel Objection at ¶ 28. But Nortel omits the most important part of the definition of "Deferred Profit Amount," which shows that it absolutely *does* require accounting determinations. Under the ASA, "Deferred Profit Amount" means:

> as of the Closing date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, **in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.**

ASA at 11 (emphasis added).

5.    The term "Nortel Accounting Principles" is defined as "the accounting principles employed in the preparation of the Unaudited Financial Statements," which are defined as "the unaudited management statements of certain assets and liabilities of the Business as of September 30, 2009 and the related unaudited management statements of income of the Business for the nine (9) month period ended on September 30, 2009." ASA at 11, 33, 65.

6.    The parties thus did *not* agree, as Nortel suggests, to determine the "Deferred Profit Amount" in an interpretive vacuum. Rather, they agreed that it would be determined based on a particular set of accounting rules, as applied in a particular set of unaudited financial statements. It is therefore *impossible* to determine the "Deferred Profit Amount" without

3

determining whether the deferred revenues (minus the associated deferred costs) "would be required to be reflected on a balance sheet of the Business" as of the Closing Date, if that balance sheet had been "prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP)," as reflected in the Unaudited Financial Statements. These are exactly the sort of issues that the parties agreed to submit to arbitration.[2]

7.      It should be obvious by now why Nortel is trying so hard to avoid the process to which it agreed. Nortel is well aware that the interpretation it offers is *not* consistent with how the Deferred Profit Amount was determined in the Unaudited Financial Statements pursuant to the Nortel Accounting Principles, to the extent consistent with GAAP. Nortel is well aware that any arbitrator who examines these concepts will reject Nortel's position. In an effort to avoid that day of reckoning, Nortel has selectively quoted the definition at issue and tried to cast it as a pure question of contract interpretation. But Nortel's desire to avoid the outcome does not permit it to ignore the terms of the contract. Accordingly, the Court should order Nortel to arbitrate these issues as the parties agreed.

## ARGUMENT

### I.    THE DETERMINATION OF "DEFERRED PROFIT AMOUNT" NECESSARILY REQUIRES INTERPRETATION AND APPLICATION OF ACCOUNTING RULES AND PRINCIPLES

8.      It is axiomatic that contracts must be read in their entirety, and in a manner that gives each part of the contract meaning. *See Empire Prop. Corp. v. Mfr. Trust Co.*, 43 N.E. 2d 25, 28 (N.Y. 1942); *Ins. Co. of N.Y. v. Central Mut. Ins. Co.*, 850 N.Y.S. 2d 56, 58 (N.Y. App. Div. 1st Dep't 2008). It follows that the Court cannot simply excise one part of the definition of

---

[2]       Indeed, even the terms "deferred revenues" and "deferred costs" involve accounting issues.

*219.*

"Deferred Profit Amount" and interpret it in isolation—particularly where the part of the contract Nortel seeks to avoid *is the very definition of the term at issue*. When read in its entirety, as it must be, the determination of "Deferred Profit Amount" requires a careful analysis of highly technical accounting principles as applied in particular financial statements. As a result, there can be no legitimate dispute that the determination of the Deferred Profit Amount is within the scope of "any disagreement" that must be submitted to the Accounting Arbitrator.

A.   **The ASA Requires Arbitration of "Any Disagreement" Regarding the Closing Statement, Including Any "Items" Contained Within It**

9.      The ASA requires the Purchaser to deliver a "Closing Statement" that contains the Purchaser's calculation of 19 specific items, one of which is "the Deferred Profit Amount as of the Closing." ASA at § 2.2.3.1(a). The ASA provides that the Closing Statement "shall be prepared in accordance with the Nortel Accounting Principles and the terms hereof." *Id.*

10.     If the sellers "disagree with the determination of the Closing Statement," they are to "notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement" in a "Disagreement Notice." ASA at § 2.2.3.1(b). The Disagreement Notice must "set forth, in reasonable detail, *any disagreement with*, and any requested adjustment to, the Closing Statement." *Id.* (emphasis added). Any "*matters included in* the calculations in the Closing Statement" to which the sellers do not object are deemed accepted.[3] *Id.*

11.     If the parties "are unable to resolve *any disagreement* as contemplated by Section 2.2.3.1(b)" within 15 days after delivery of the Disagreement Notice, "the Independent Auditor

---

[3]      Nortel's assertion that the ASA only requires arbitration of disagreements about "calculations" is plainly wrong. Nortel Objection at ¶ 18. First, the clause Nortel cites describes matters that will not be arbitrated. Second, the clause refers not merely to "calculations" but also to any "matters included in" those calculations. ASA § 2.2.3.1(b).

5

*shall serve as arbitrator*" to resolve that disagreement.[4]  ASA at § 2.2.3.1(c) (emphasis added).

As noted above, a "disagreement . . . as contemplated by Section 2.2.3.1(b)" means "any

disagreement with . . . the Closing Statement." ASA at § 2.2.3.1(b).  The arbitrator is to

"consider" only those "items *and* amounts set forth in the Closing Statement" as to which the

parties have not resolved their disagreement, and is "to conduct such proceedings as it considers

necessary to resolve such disagreement." *Id*. (emphasis added).  The arbitrator is to deliver his

report "as promptly as practicable" and "in no event later than thirty (30) days after his or her

appointment." *Id*.

> **B.    The Determination of the "Deferred Profit Amount" Requires Analysis of the "Nortel Accounting Principles"as Used in the "Unaudited Financial Statements," "To the Extent Consistent with GAAP"**

12.    The parties did not leave the term "Deferred Profit Amount" to be defined by a

court using common law principles.  Rather, it is expressly defined by reference to a specific set

of accounting principles, as those principles were applied in a particular set of financial

statements. The ASA provides that "Deferred Profit Amount" means:

> as of the Closing date, both short term and long term (i) deferred
> revenues for services to be performed or products to be provided
> by the Business after the Closing Date but for which an account
> receivable has been recorded or cash has been received prior to the
> Closing Date *minus* (ii) associated deferred costs to the extent
> incurred by the Business prior to the Closing Date in connection
> with such products or services, in each case, that would be required
> to be reflected on a balance sheet of the Business as of such date
> prepared in accordance with GAAP applied in a manner consistent
> with the Nortel Accounting Principles (to the extent consistent
> with GAAP).  For the avoidance of doubt, the Deferred Profit
> amount will include advance billings and deferred revenue
> consistent with Nortel Accounting Principles.

---

[4]    The "Independent Auditor" is defined as "KPMG LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation" that the parties agree upon or, failing that, is selected by KPMG. ASA at 18.

ASA at 11.

13.    The term "Nortel Accounting Principles" is defined as "the accounting principles

employed in the preparation of the Unaudited Financial Statements." ASA at 23. Those, in turn,

are defined as "the unaudited management statements of certain assets and liabilities of the

Business as of September 30, 2009 and the related unaudited management statements of income

of the Business for the nine (9) month period ended on September 30, 2009." ASA at 33.

14.    The Nortel Accounting Principles themselves consist of a voluminous set of

particularized accounting rules and policies that Nortel applied in running the business. Indeed,

the Nortel Accounting Policies are so voluminous that they were provided by Nortel to

GENBAND in a three-megabyte "zip" file of electronic documents.[5] *See* Email from Nortel's

Counsel, dated August 16, 2010, attached hereto as Exhibit A.

15.    Thus, the "Deferred Profit Amount" is not determined simply by calculating in a

vacuum the short and long term "deferred revenues for services to be performed or products to

be provided by the Business after the Closing Date but for which an account receivable has been

recorded or cash has been received prior to the Closing Date" and then subtracting the

"associated deferred costs to the extent incurred by the Business prior to the closing date in

connection with such products or services."[6] Rather, both must be determined based on whether

---

[5]    Rather than burden the Court's file with the entire set of the Nortel Accounting Principles, GENBAND will provide an electronic copy on a separate disk. If the Court wishes to review some or all of the Nortel Accounting Principles in hard copy form, GENBAND will of course provide them.

[6]    It bears noting, in addition, that Nortel's interpretation of Deferred Profit Amount would read the words "*minus* . . . associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services." ASA at 11. Under Nortel's approach, there would never be anything to subtract. That would violate the fundamental rule of construction under New York law that contracts must be read in their entirety and with meaning given to each part. *See Empire Prop. Corp.*, 43 N.E. 2d at 28; *Ins. Co. of N.Y.*, 850 N.Y.S. 2d at 58.

*222*

they "would be required to be reflected on a balance sheet of the Business" as of the Closing

date" if that balance sheet was "prepared in accordance with GAAP applied in a manner

consistent with" the voluminous Nortel Accounting Principles, and then only "to the extent

consistent with GAAP." And even then, "for the avoidance of doubt," the determination must

include "advance billings and deferred revenue consistent with" those same Nortel Accounting

Principles.[7]  Given these express provisions in the definition of "Deferred Profit Amount,"

Nortel cannot seriously contend that "there is nothing here for an accounting arbitrator to

decide." Nortel Objection at ¶ 5.

## II.    THE FEDERAL ARBITRATION ACT REQUIRES THAT THE PARTIES' DISAGREEMENT BE SUBMITTED TO ARBITRATION

### A.    Even When Their Subject Matter Is Limited, Arbitration Clauses Are Liberally Construed in Favor of Arbitrating Matters Within Their Scope

16.    Nortel's argument that the Mandatory Arbitration Provision is "narrow" rather

than "broad" is a red herring.  Of course GENBAND recognizes that the subject matter that

should be arbitrated is limited to disagreements concerning the Closing Statement.  In that sense,

the Mandatory Arbitration Provision is indeed "narrow."  But that does not mean that the *scope*

of the Mandatory Arbitration Provision is to be interpreted narrowly, as Nortel argues.  Even

when the scope of the issues is limited, if the language that applies to that scope is broad, courts

will interpret it broadly.

17.    The Supreme Court has held that "any doubts concerning the scope of arbitrable

issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury

Constr. Corp.*, 460 U.S. 1, 24–25 (1983).  Indeed, one of the cases Nortel relies upon states that

"[t]he presumption in favor of arbitration *still applies to narrow arbitration clauses*; however,

8

223

the Court must still consider the boundaries of the arbitration provision . . . ." *HDS Inv. Holding Inc. v. Home Depot, Inc.*, 2008 WL 4606262, at \*5 (Del. Ch. Ct. Oct 17, 2008) (emphasis added). The presumption applies even if "the problem at hand is the construction of the contract language, itself." *See Moses H. Cone Memorial Hosp.*, 460 U.S. at 24–25. The presumption of arbitrability, which is founded on the strong federal policy in favor of arbitration, applies when determining *either* the "existence or *the scope* of an arbitration agreement." *Shubert v. Wellspring Media, Inc.*, 335 B.R. 556, 562 (Bankr. D. Del. 2005) (emphasis added) (holding that a "narrow" arbitration clause should still be broadly construed) (quoting *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (citation omitted)).

18.     The cases on which Nortel relies involved arbitration clauses that expressly limited what may be arbitrated to matters of "calculation," "computation," or particular "amounts." For example, the provision at issue in *Bratt Enters, Inc. v. Noble Int'l Ltd.* stated that the parties would submit to arbitration any disagreements about "any of the *amounts* included in the Closing Balance Sheet." 338 F.3d 609, 611 (6th Cir. 2003) (emphasis added). Under the asset purchase agreement in *Bratt*, the buyer agreed to assume the seller's liabilities, including its accounts payable, which was to be capped at a certain amount. *Id.* The dispute at issue arose when one party claimed that the cap on accounts payable was not intended to be included in the contract and that there was a mutual mistake. The court, faced with an issue of contract reformation, denied arbitration because the dispute did not involve a disagreement solely with regard to the *amounts* in the closing balance sheet, and the arbitration clause was limited to such "amounts." *Id.* at 613.

19.     Similarly, in *HDS Inv. Holding Inc. v. Home Depot, Inc.*, the arbitration provision provided that only where there were "any *amounts* remaining in dispute, then all *amounts*

9

remaining in dispute" may be submitted to arbitration.  2008 WL 4606262, *5 (Del. Ch. Oct. 17,

2008) (emphasis added).  Based on that language, the court stated that "the arbitration clause in

the Agreement is narrow because it only refers to arbitration those issues regarding the

*calculation* of the Applicable Amount in dispute . . . ." *Id.*  Likewise, in *100 William Co. v.

Aetna Ins. Co.*, the court noted that the arbitration clause in a lease was "narrowly limited" to

controversies concerning the "*computation*" of the escalation rate under the lease.  Because the

respondent sought a "determination of the very meaning of the formula for adjusting the fringe

benefit" and "such a determination . . . was never intended to be arbitrated pursuant to the lease,"

the claims were not arbitrable.  The arbitration clause at issue in *Blue Tee Corp. v. Koehring Co.*

was almost identical.  999 F.2d 633, 634 (2d Cir. 1993) (denying arbitration where the applicable

arbitration clause provided that "in the event that Buyer shall disagree with the *computation* of

the Final Statement by Seller" the parties shall submit the dispute to arbitration).

      **B.**      **The ASA Requires "Any Disagreement" Concerning the Closing Statement to Be Arbitrated**

      20.      The Mandatory Arbitration Provision in the ASA, in stark difference to those in

the cases Nortel cites, does not limit what is arbitrable to such limited concepts of "calculation,"

"computation," or particular "amounts."  Rather, the Mandatory Arbitration Provision states that

"*any disagreement*" with regard to the Closing Statement must be sent to arbitration.  In this

way, this case is much more like *Shubert*, where the arbitration clause pertained to "any

objections" regarding a working capital adjustment and this Court determined that the

disagreement must be arbitrated.[8]  *Shubert*, 335 B.R. at 560, 569.  In *Shubert*, the bankruptcy

---

[8]      Notably, in two of the cases cited by Nortel, the courts compelled arbitration despite finding the arbitration clause to be "narrow."  *See CAE Indus., Ltd. v. Aerospace Holdings Co.*, 741 F.Supp. 388, 393 (2d Cir. 1989) (compelling arbitration where the arbitration clause made arbitrable "any objections Buyer may have"); *Camferdam v. Ernst & Young Int'l, Inc.* 2004 WL 1124649, at *2 and n.3 (S.D.N.Y. May 19,

225

Trustee, like Nortel, sought to resolve a dispute regarding a working capital calculation in the Bankruptcy Court rather than through the agreed-upon arbitration process. *Id.* at 566-67. The disagreement concerned the calculation of working capital and an adjustment to purchase price, and the disagreement was subject to an arbitration clause under the parties' contract. *Id.* at 563 ("Under the terms of the agreement, the Court cannot compel payment of the purchase price without a determination of what Wellspring owes on the Note."). The Court rejected the Trustee's request, because the "Agreement . . . provides for an agreed-upon mechanism to resolve this dispute." *Id.* The parties to the agreement, "in agreeing to the arbitration clause, determined that arbitration, and not this Court, would be the avenue through which this issue should be addressed." *Id.* at 566–67.

21.    This case is also strikingly similar to *Compucom Sys., Inc. v. Getronics Finance Holdings B.V.*, 635 F. Supp. 2d 371 (D. Del. 2009). In *Compucom*, as here, a dispute arose concerning an asset purchase agreement with procedures for a final purchase price adjustment. The purchase price was to include an estimate of net working capital, which the agreement defined as "the net book value of [the seller's] current assets minus its current liabilities at the time of closing." *Id.* at 374. The agreement provided that this number was "to be determined in accordance with International Financial Reporting Standards ("IFRS") consistently applied to Exhibit E of the Agreement." *Id.* Exhibit E, in turn, incorporated items under the net working capital calculation, including inventory. *Id.* Inventory was to be "computed in a manner consistent with the Financial Information," and "'Financial Information' was defined in the

---

2004) (stating that a dispute is arbitrable under a narrow clause if it is "relating to" the enumerated arbitrable issue stated in the clause, and "relating to" means the broad category of "having a connection with or reference to.").

226

Agreement as 'the historical financial information contained in the VDD Report,'" a document that was separately defined. *Id.*

22.     The arbitration clause in *Compucom* provided that "'disagreements based on mathematical errors or the Proposed Purchase Price Calculation not being calculated in accordance' with the Agreement" must be arbitrated. *Id.* at 375. The court held that the arbitration clause was "narrow" because it did not refer *all* disputes under the contract to arbitration. However, "with the backdrop of the narrow arbitration clause in mind, the court turns its focus to 'the factual underpinnings of the claim . . . .'" *Id.* at 378 (citing *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (internal quotations omitted). The court noted that the buyer had disputed the classification of the issue as an accounting dispute, but nevertheless found that arbitration was appropriate because "the focal point of the conflict" was the propriety of using the seller's method of calculating inventory in the purchase price adjustment and "the FAA requires that, if a suit is brought in a district court 'upon any issue referable to arbitration under an agreement in writing of such arbitration,'" the court must order arbitration. *Id.* at 378 (citing 9 U.S.C. § 3).

23.     Applying these principles to the ASA shows that the parties' disagreement must be arbitrated. The parties agreed to arbitrate "*any disagreement*" concerning "the determination of the Closing Statement," which was to be prepared "in accordance with the Nortel Accounting Principles." The arbitrator is empowered to resolve any items set forth in the Closing Statement about which the parties disagree, not merely the "amounts" of those "items." One of those "items" is the Deferred Profit Amount, which must be determined based on the Nortel Accounting Principles, as reflected in the Unaudited Financial Statements, to the extent consistent with GAAP. As in *Compucom*, the "focal point of the conflict" requires application of

12

227

accounting rules, which is unquestionably the sort of dispute that belongs before the Accounting Arbitrator. The Court should enforce the contract and provide GENBAND with the quick, final and binding process for which it bargained.

### III. THE COURT SHOULD LIFT THE AUTOMATIC STAY TO COMPEL ARBITRATION

24. Nortel states that there is no cause to lift the automatic stay and to compel arbitration because GENBAND has not shown a likelihood that it will succeed on the merits. That is not true. For the reasons stated above, GENBAND has shown a likelihood of success on the merits for the question of whether this disagreement should be submitted to arbitration.

25. There is also no doubt that this Court's determination of the underlying disagreement would deprive GENBAND of the deal it bargained for. To be clear, GENBAND bargained for a fast, efficient, binding, and final process of arbitration for this disagreement. As such, GENBAND would face substantial hardship if forced to litigate the issue in this Court. As discussed above, litigation of this issue will require a technical analysis of accounting principles, which will require expert testimony. And because there will be disputes about how Nortel applied the complicated accounting principles discussed above, discovery will also be necessary. All of this will require substantial and unnecessary time and expense, which is the antithesis of what GENBAND bargained for.

26. Finally, it bears repeating that Nortel's repeated assertion that the parties have agreed upon the calculations Nortel performed under its interpretation of Deferred Profit Amount is demonstrably incorrect, as reflected in the parties' correspondence.[9] As such, arbitration will

---

9       As discussed in Exhibit D to GENBAND's *Objection to Nortel's Motion for Entry of an Order Enforcing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds* ("GENBAND's Objection") [D.I. 4452],

13

be inevitable under either party's interpretation of Deferred Profit Amount, which would contribute to these hardships.

## CONCLUSION

WHEREFORE, GENBAND respectfully requests that the Court enter an order (i) lifting the automatic stay pursuant to Sections 105 and 362(d) of the Bankruptcy Code to allow arbitration to commence, (ii) compelling the commencement of arbitration pursuant to Section 2.2.3.1(c) of the ASA, and (iii) granting such further and other relief as the Court deems just.

Dated:  December 3, 2010                 Respectfully submitted,
       Wilmington, Delaware

                                     */s/ Michael R. Lastowski*
                                     Michael R. Lastowski (No. 3892)
                                     Sommer L. Ross (No. 4598)
                                     DUANE MORRIS, LLP
                                     1100 North Market Street, Suite 1200
                                     Wilmington, Delaware 19801
                                     Telephone: (302) 657-4900
                                     Facsimile: (302) 657-4901
                                     E-mail:     mlastowski@duanemorris.com
                                                 slross@duanemorris.com

                                   and

                                   Blair Connelly (Admitted *Pro Hac Vice*)
                                   Eli J. Kay-Oliphant (Admitted *Pro Hac Vice*)
                                   LATHAM & WATKINS LLP
                                   885 Third Avenue, Suite 1200
                                   New York, New York 10022-4834
                                   Telephone:  (212) 906-1200
                                   Facsimile:  (212) 751-4864
                                   E-mail:   blair.connelly@lw.com
                                                 eli.kay-oliphant@lw.com

                                   *Counsel for GENBAND US LLC*

---

GENBAND has long notified Nortel that "We disagree . . . with Nortel's *interpretation* of Deferred Profit and Nortel's insistence in *applying* purchase accounting." (emphasis added). *See also* Exhibit B to GENBAND's Objection.

229

230

**EXHIBIT A**

231

**Malone, Thomas (NY)**

| | |
|---|---|
| **From:** | Casey J Davison [cdavison@cgsh.com] |
| **Sent:** | Monday, August 16, 2010 10:53 PM |
| **To:** | Croswell, Alexandra (NY) |
| **Cc:** | Woods, Mark (NY); Malone, Thomas (NY) |
| **Subject:** | Re: GENBAND / Nortel - Disclosure Schedule 1.1(e) (Nortel Accounting Principles) |
| **Attachments:** | Nortel Accounting Principles.zip |

Alex,

Please see attached. Hope you have had a pleasant summer.

Best,
Casey

Casey J. Davison
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2566 | f: +1 212 225 3999
www.clearygottlieb.com  |  cdavison@cgsh.com

Alexandra.Croswell@lw.com

To cdavison@cgsh.com

12 August 2010  01:14 PM

cc Thomas.Malone@lw.com, Mark.Woods@lw.com

Subject GENBAND / Nortel - Disclosure Schedule 1.1(e) (Nortel
Accounting Principles)

Casey,

I hope all is well.  On Schedule 1.1(e) of the Sellers Disclosure Schedule (Nortel Accounting Principles) we make reference to several documents that are in the data site.  I attempted to locate these documents today, but could not find them.  Could you please send me the files referenced below or direct me to their location in the VDR?   Schedule 1.1(e) is set forth below for your reference.

Thanks in advance,

Alex

### Schedule 1.1(e)

| Merrill Data room Location | Document Name |
|---|---|
| 1.1.1.15 | FPG2007 Appendix C Determining the Arrangement |
| 1.1.1.16 | FPG2013 Global Revenue Governance Documentation Requirements |
| 1.1.1.17 | FPG2013 Determining the Appropriate Revenue Recognition |
| 1.1.1.18 | AG1009 - Appendix A - Basic Revenue Recognition Criteria |
| 1.1.1.19 | AG1009 - Appendix B - Revenue Risk Indicators |
| 1.1.1.20 | AG1009 - Appendix C - Examples of Basic Revenue Recognition Criteria |

1.1.1.21    AG1009 - Appendix D - Example of Inconsequential or Perfunctory Designation
1.1.1.22    AG1009 - Appendix E - FAQ on Inconsequential or Perfunctory Designation
1.1.1.23    AG1009 - Appendix F - Bill and Hold Transactions
1.1.1.24    AG1009 - Appendix G - Service Elements - Undelivered Element Accounting
1.1.1.25    AG1009 - Revenue Recognition - General Overview (SAB 104)
1.1.1.26    AG1010 - Appendix A - Example of Percentage of Completion Method
1.1.1.27    AG1010 - Revenue Recognition - Contract Revenue
1.1.1.28    AG1011 - Appendix A -  FAQ on Separately Priced Extended Warranty & Maintenance Contracts
1.1.1.29    AG1011 - Appendix B - Example of Service Revenue
1.1.1.30    AG1011 - Revenue Recognition - Services Revenue (FTB 90-1)
1.1.1.31    AG1013 - Revenue Recognition - Customer Acceptance
1.1.1.32    AG1014 - Revenue Recognition - Contractual Penalties
1.1.1.33    AG1014 Appendix A - Flowchart of Contractual Penalties in Single & Multiple Unit of Accounting Arrangements
1.1.1.34    AG1014 Appendix B - Flowchart of Product Performance Contractual Penalties
1.1.1.35    AG1014 Appendix C - Flowchart of Contractual Penalties in SOP 81-1 Arrangements
1.1.1.36    AG1015 - Appendix A - Example Cash Incentives
1.1.1.37    AG1015 - Appendix B - Examples of Non Cash Incentives
1.1.1.38    AG1015 - Appendix C - FAQ on Breakage
1.1.1.39    AG1015 - Appendix D - Accounting for Concessions
1.1.1.40    AG1015 - Revenue Recognition - Cash and Non-Cash Incentives
1.1.1.41    AG1016 - Appendix A - Identification of Upgrades, PCS & Software Products
1.1.1.42    AG1016 - Appendix B - Examples of Specified & Unspecified Software Upgrades
1.1.1.43    AG1016 - Appendix C - FAQ on Catch-up Accounting of Undelivered Service Elements
1.1.1.44    AG1016 - Appendix D - FAQ on Corrections of Errors in Software (Bug Fixes or Patches)
1.1.1.45    AG1016 - Appendix E - FAQ on Overcoming Implicit PCS
1.1.1.46    AG1016 - Appendix F - Example of Basic Revenue Recognition Criteria (SOP 97-2)
1.1.1.47    AG1016 - Appendix G - Basic Revenue Recognition Criteria
1.1.1.48    AG1016 - Revenue Recognition - Software Revenue (SOP 97-2)
1.1.1.49    AG1017 - Revenue Recognition - Cost Deferrals
1.1.1.50    AG1026 - Appendix A - Flowchart of Criteria for Determining Unit(s) of Accounting (EITF 00-21)
1.1.1.51    AG1026 - Appendix B - Example of No VSOE for Undelivered Services
1.1.1.52    AG1026 - Multiple Element Arrangements (EITF 00-21)
1.1.1.53    CP 303.44  Evidencing Fair Value in Revenue Arrangements
1.1.2.1 302 Appendix A.doc
1.1.2.2 302 Appendix B.doc
1.1.2.3 302 Appendix C.doc
1.1.2.4 302 Appendix D.doc
1.1.2.5 302 Appendix E.doc
1.1.2.6 302 Appendix F.doc
1.1.2.7 AG 1033 Inventory Cost of Sales fv1 0
1.1.2.8 CP 302-47 Revaluation of Inventory
1.1.2.9 AG1004 - Appendix A - Example of E&O Provision Process
1.1.2.10     AG1004 - Excess and Obsolete Inventory Provision
1.1.4.1 AG1001 - Appendix A – Examples of Expense Accruals
1.1.4.2 AG1001 - Expense Accruals
1.1.4.3 AG1002 - Appendix A - Example of Contingency
1.1.4.4 AG1002 - Contingencies
1.1.4.5 AG1003 - Appendix A - Example of KPD Provision
1.1.4.6 AG1003 - Appendix B - Example of Non-KPD Warranty Provision
1.1.4.7 AG1003 - Warranty Provision
1.1.4.8 AG1007 - Allowance for Doubtful Accounts
1.1.4.9 AG1007 - Appendix A - Examples of Allowance for Doubtful Account Provisions
1.1.4.10     AG1008 - Appendix A - Example of Financial Statement Translation
1.1.4.11     AG1008 - Appendix B - Example of Foreign Currency Transaction

233

1.1.4.12    AG1008 - Foreign Exchange
1.1.4.13    AG1028 - Research and Development Activities
1.1.4.14    AG1020 - Internal-Use Software and Other Intangibles
1.1.4.15    FPG2009 Intercompany Markup

**Alexandra H. Croswell**

**LATHAM ᴬ WATKINS** ᴸᴸᴾ

885 Third Avenue

New York, NY 10022-4834

Direct Dial: +1.212.906.4615

Fax: +1.212.751.4864

Email: alexandra.croswell@lw.com

http://www.lw.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
To comply with IRS regulations, we advise you that any discussion of Federal tax issues
in this
e-mail was not intended or written to be used, and cannot be used by you, (i) to avoid
any penalties
imposed under the Internal Revenue Code or (ii) to promote, market or recommend to
another party any
transaction or matter addressed herein.

For more information please go to  http://www.lw.com/docs/irs.pdf
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This email may contain material that is confidential, privileged and/or attorney work
product for
the sole use of the intended recipient.  Any review, reliance or distribution by others
or forwarding
without express permission is strictly prohibited.  If you are not the intended recipient
please
contact the sender and delete all copies.

Latham & Watkins LLP

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

3

234

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

AFFIDAVIT OF KATIE LEGREE
(sworn December 9, 2010)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2076094\1

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

|  |  |
|---|---|
| | *ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST)<br><br>Proceeding commenced at Toronto |
| | **SECOND SUPPLEMENTAL<br>MOTION RECORD**<br>(returnable December 15, 2010) |
| | **OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario M5J 2Z4<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel: (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Jennifer Stam LSUC: #46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br><br>Fax: (416) 216-3930<br><br>Lawyers for the Applicants |