# EXHIBIT F

Commercial List Court File No. 09-CL-7950

# ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## BOOK OF AUTHORITIES OF THE APPLICANTS
CVAS Dispute
(Motion returnable December 15, 2010)

December 9, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay   LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam   LSUC#: 46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2076628\1

TO:        The Service List

.

*November, 2010*

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

### SERVICE LIST

TO:     **OGILVY RENAULT LLP**
        Royal Bank Plaza, South Tower
        200 Bay Street, Suite 3800
        Toronto, Ontario M5J 2Z4

        Derrick Tay
        Tony Reyes
        Jennifer Stam

        Email:     dtay@ogilvyrenault.com
                   treyes@ogilvyrenault.com
                   jstam@ogilvyrenault.com

        Tel:     416.216.4000
        Fax:     416.216.3930

        Lawyers for the Applicants

TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:  nortel.monitor@ca.ey.com

Tel:     416.943.3016
Fax:    416.943.3300

AND TO: **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:  jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
fmyers@goodmans.ca
carmstrong@goodmans.ca

Tel:     416.597.4107
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND TO: **OSLER HOSKIN AND HARCOURT LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:  lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
ahirsh@osler.com

Tel:     416.362.2111
Fax:    416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND TO: **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:  dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:     416.868.3538
Fax:    416.364.7813

Lawyers for Export Development Canada

AND
TO:

**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:  jsullivan@edc.ca

Tel:      613.597.8651
Fax:     613.598.3113


AND
TO:

**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific
Tower
Toronto, ON  M5K 1K7

Robert I. Thornton
Rachelle Moncur
Leanne M. Williams

Email:  rthornton@tgf.ca
          rmoncur@tgf.ca
          lwilliams@tgf.ca

Tel:      416.304.1616
Fax:     416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.


AND
TO:

**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:  john.stringer@mcinnescooper.com
          stephen.kingston@mcinnescooper.com

Tel:      902.425.6500
Fax:     902.425.6350

Lawyers for Convergys EMEA Limited


AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart

Email:  jcarhart@millerthomson.com

Tel:      416.595.8615/8577
Fax:     416.595.8695

Lawyers for Toronto-Dominion Bank


AND
TO:

**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:  barry.wadsworth@caw.ca
          lewis.gottheil@caw.ca

Tel.:     416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada


AND
TO:

**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:  hharrison@boughton.ca

Tel:      604.687.6789
Fax:     604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.,
in its capacity as duly authorized agent for
Holdings 1506 Enterprises Ltd.

- 4 -

AND TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:     416. 367.6646
Fax:     416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:     416.367.6266
Fax:     416.361.7067

Email:  srappos@blgcanada.com
Tel:     416.367.6033
Fax:     416.361.7306

Lawyers for Bell Canada

AND TO:

**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

John Contini
Aaron Rousseau

Email   jcontini@langmichener.ca
Tel:     416.307.4148
Fax:     416.304.3767

Email   arousseau@langmichener.ca
Tel:     416.307.4081
Fax:     416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:  ray.leach@siskinds.com
          dimitri.lascaris@siskinds.com
          monique.radlein@siskinds.com

Tel:     519.672.2121
Fax:     519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email:  zychk@bennettjones.com
Tel:     416.777.5738
Fax:     416.863.1716

Email:  orzyr@bennettjones.com
Tel:     416.777.5737
Fax:     416.863.1716

Email:  finlaysong@bennettjones.com
Tel:     416.777.5762
Fax:     416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

| | | | | |
|---|---|---|---|---|
| AND TO: | **KOSKIE MINSKY** | | AND TO: | **KOSKIE MINSKY** |
| | 20 Queen Street West | | | 20 Queen Street West |
| | Suite 900 | | | Suite 900 |
| | Toronto, ON  M5H 3R3 | | | Toronto, ON  M5H 3R3 |

<table>
<tr><td>Mark Zigler<br>Susan Philpott<br>Demetrios Yiokaris<br>Andrea McKinnon<br>Celeste Poltak</td><td>Mark Zigler<br>Susan Philpott<br>Demetrios Yiokaris<br>Andrea McKinnon<br>Celeste Poltak</td></tr>
</table>

| | | | | |
|---|---|---|---|---|
| Email: | mzigler@kmlaw.ca | | Email: | mzigler@kmlaw.ca |
| Tel: | 416.595.2090 | | Tel: | 416.595.2090 |
| Fax: | 416.204.2877 | | Fax: | 416.204.2877 |
| | | | | |
| Email: | sphilpott@kmlaw.ca | | Email: | sphilpott@kmlaw.ca |
| Tel: | 416.595.2104 | | Tel: | 416.595.2104 |
| Fax: | 416.204.2882 | | Fax: | 416.204.2882 |
| | | | | |
| Email: | dyiokaris@kmlaw.ca | | Email: | dyiokaris@kmlaw.ca |
| Tel: | 416.595.2130 | | Tel: | 416.595.2130 |
| Fax: | 416.204.2810 | | Fax: | 416.204.2810 |
| | | | | |
| Email: | amckinnon@kmlaw.ca | | Email: | amckinnon@kmlaw.ca |
| Tel: | 416.595.2150 | | Tel: | 416.595.2150 |
| Fax: | 416.204.2874 | | Fax: | 416.204.2874 |
| | | | | |
| Email: | cpoltak@kmlaw.ca | | Email: | cpoltak@kmlaw.ca |
| Tel: | 416.595.2701 | | Tel: | 416.595.2701 |
| Fax: | 416.204.2909 | | Fax: | 416.204.2909 |

Lawyers for the Former Employees of Nortel          Lawyers for the LTD Beneficiaries

- 6 -

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:    jcarhart@millerthomson.com
Tel:       416.595.8615
Fax:      416.595.8695

Email:    msims@millerthomson.com
Tel:       416.595.8577
Fax:      416.595.8695

Email:    jmklotz@millerthomson.com
Tel:       416.595.4373
Fax:      416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:
**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:    joseph.kim@lge.com

Tel:       +82.2.3777.3171
Fax:      +82.2.3777.5345

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:    jcarhart@millerthomson.com
Tel:       416.595.8615
Fax:      416.595.8695

Email    msims@millerthomson.com
Tel:       416.595.8577
Fax:      416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:
**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:    harvey@chaitons.com

Tel:       416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:    ken.rosenberg@paliareroland.com
Tel:       416.646.4304
Fax:      416.646.4301

Email:    max.starnino@paliareroland.com
Tel:       416.646.7431
Fax:      416.646.4301

Email:    lily.harmer@paliareroland.com
Tel:       416.646.4326
Fax:      416.646.4301

Email:    tina.lie@paliareroland.com
Tel:       416.646.4332
Fax:      416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:    Shayne.kukulowicz@fmc-law.com
            Alex.macfarlane@fmc-law.com
            Michael.wunder@fmc-law.com
            ryan.jacobs@fmc-law.com

Tel:       416.863.4511
Fax:      416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:    patrick.shea@gowlings.com

Tel:       416.369.7399
Fax:      416.862.7661

Lawyers for Westcon Group

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:    rslattery@mindengross.com
            dullmann@mindengross.com
Tel:       416.369.4149
Fax:      416.864.9223

Lawyers for Verizon Communications Inc.

AND
TO:

**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:    hfogul@airdberlis.com
Tel:        416.865.7773
Fax:       416.863.1515

Email:    pczegledy@airdberlis.com
Tel:        416.865.7749
Fax:       416.863.1515

Lawyers for Microsoft Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:    renglish@airdberlis.com
              smitra@airdberlis.com

Tel:        416.863.1500
Fax:       416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND
TO:

**ALEXANDER HOLBURN BEAUDIN &**
**LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:    surquhart@ahbl.ca
Tel:        604.484.1757
Fax:       604.484.1957

Lawyers for Algo Communication Products Ltd.

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:    jwigley@gardiner-roberts.com
Tel:        416.865.6655
Fax:       416.865.6636

Email:    vdare@foglers.com
Tel:        416.865.6641
Fax:       416.865.6636

Lawyers for Andrew, LLC

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:    sgraff@airdberlis.com
Tel:        416.865.7726
Fax:       416.863.1515

Email:    iaversa@airdberlis.com
Tel:        416.865.3082
Fax:       416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:    mfleming@millerthomson.com
Tel:        416.595.8686
Fax:       416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

- 9 -

AND  **DAVIS LLP**
TO:  1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:  416.365.3529
Fax:  416.369.5210

Email:  jdavissydor@davis.ca
Tel:  416.941.5397
Fax:  416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services


AND  **AIRD & BERLIS LLP**
TO:  Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:  416.865.7726
Fax:  416.863.1515

Email:  iaversa@airdberlis.com
Tel:  416.865.3082
Fax:  416.863.1515

Lawyers for Perot Systems Corporation


AND  **CASSELS BROCK & BLACKWELL LLP**
TO:  40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

Email:  dgrieve@casselsbrock.com
Tel:  416.860.5219
Fax:  416.350.6923

Lawyers for Alvarion Ltd.


AND  **McMILLAN LLP**
TO:  Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:  andrew.kent@mcmillan.ca
Tel:  416.865.7160
Fax:  416.865.7048

Email:  hilary.clarke@mcmillan.ca
Tel:  416.865.7286
Fax:  416.865.7048

Email:  tushara.weerasooriya@mcmillan.ca
Tel:  416.865.7262
Fax:  416.865.7048

Lawyers for Royal Bank of Canada


AND  **McMILLAN LLP**
TO:  Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:  lawrence.crozier@mcmillan.ca
Tel:  416.865.7178
Fax:  416.865.7048

Email:  adam.maerov@mcmillan.ca
Tel:  416.865.7285
Fax:  416.865.7048

Lawyers for Citibank


AND  **BLANEY McMURTRY LLP**
TO:  Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:  dmagisano@blaney.com
Tel:  416.593.2996
Fax:  416.593.5437

Lawyers for Expertech Network Installation Inc.

- 10 -

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:     416.865.6655
Fax:     416.865.6636

Email:   vdare@foglers.com
Tel:     416.865.6641
Fax:     416.865.6636

Lawyers for Amphenol Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario M5J 2T9

Sanjeev P.R. Mitra

Email:   smitra@airdberlis.com

Tel:     416.863.1500
Fax:     416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario M5J 2T7

Aaron Rousseau

Email:   arousseau@langmichener.ca
Tel:     416.307.4081
Fax:     416.365.1719

Lawyer for Right Management Inc.

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:   bleonard@casselsbrock.com
         hgarman@casselsbrock.com
         mcasey@casselsbrock.com

Tel:     416.860.6455
Fax:     416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND TO:

**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario K2P 0A2

Paul K. Lepsoe

Email: pklepsoe@mcfarlanelaw.com

Tel: 613.233.2679
Fax: 613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management,
Inc.

AND TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email: theintzm@mccarthy.ca
Tel: 416.601.7627
Fax: 416.868.0673

Email: jsirivar@mccarthy.ca
Tel: 416.601.7750
Fax: 416.868.0673

Lawyers for Frank Andrew Dunn

AND TO:

**COLBY, MONET DEMERS, DELAGE & CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec H3A 3M8

David J. Dropsy

Email: ddropsy@colby-monet.com
Tel: 514.284.3663
Fax: 514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email: janice.payne@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel: 613.231.8245
Fax: 613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

- 12 -

AND TO:   **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:    416.865.2318
Fax:    416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Jabil Circuit Inc.

AND TO:   **SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
mgaggino@schneidergaggino.com

Tel:    514.631.8787
Fax:    514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND TO:   **EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:    613.745.0921
Fax:    613.745.1172

AND TO:   **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
laugesenm@bennettjones.com

Tel:    416.863.1200
Fax:    416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND TO:   **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:    416.369.4335
Fax:    416.864.9223

Lawyers for 2748355 Canada Inc.

AND TO:   **BALDWIN LAW PROFESSIONAL CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:   lbrady@baldwinlaw.ca
Tel:    613.771.9991
Fax:    613.771.9998

Lawyers for Sydney Street Properties Corp.

AND
TO:

**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:  raffy.lorentzian@ntscorp.com
Tel:     714.998.4351
Fax:    714.998.7142

Lawyers for AETL Testing, Inc.

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:     416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:     416.865.3082
Fax:    416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email: arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:    416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :   416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email: arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:    416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :   416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND
TO:

**LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :  jysimard@lavery.ca
Tel :    514.871.1522
Fax :    514.871.8977

Lawyers for Texas Landlords to Nortel
Networks Inc.

AND
TO:

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:  raffy.lorentzian@ntscorp.com
Tel:     714.998.4351

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:  david.cohen@gowlings.com

Tel:    416.369.6667
Fax:   416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:   416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:   416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND
TO:

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:  rschwill@dwpv.com
Tel:    416.863.0900
Fax:   416.863.0871

Email:  mgottlieb@dwpv.com
Tel:    416.863.0900
Fax:   416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:      416.598.1744
Fax:     416.598.3730

Email:  slaubman@counsel-toronto.com
Tel:      416.598.1744
Fax:     416.598.3730

Lawyers for William A. Owens

AND TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:   lydia.salvi@bakernet.com

Tel:      416.865.6944
Fax:     416.863.6275

Lawyers for Wipro Limited

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for the Current and Former Employees
of Nortel Networks Inc. who are or were
Participants in the Long-Term Investment Plan
Sponsored by Nortel Networks Inc.

AND TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:      416.601.8342
Fax:     416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND TO:

**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:   sbomhof@torys.com
Tel:      416.865.7370
Fax:     416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:      416.973.3172
Fax:     416.973.0810

AND TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:  sseigel@langmichener.ca
Tel:      416.307.4063
Fax:     416.365.1719

Lawyers for The Bank of New York Mellon

AND TO:
**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:    416.863.2572
Fax:    416.863.2653

Email:  marc.flynn@blakes.com
Tel:    416.863.2685
Fax:    416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson (publ)

AND TO:
**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:    416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:    416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:    416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers LLC, MatlinPatterson Global Opportunities Partners III L.P. and MatlinPatterson Opportunities Partners (Cayman) III L.P.

AND TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:  kmcelcheran@mccarthy.ca
Tel:    416.601.7730
Fax:    416.868.0673

Email:  rstabile@mccarthy.ca
Tel:    416.601.8335
Fax:    416.868.0673

Lawyers for Avaya Inc.

AND TO:
**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:    416.979.6425
Fax:    416.591.7333

Email:  dbrown@sgmlaw.com
Tel:    416.979.4050
Fax:    416.591.7333

Lawyers for Edmund Fitzgerald

AND TO:
**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com
Tel:      416.864.9700
Fax:     416.941.8852

Lawyers for Belden (Canada) Inc.


AND TO:
**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:  gncameron@stikeman.com
Tel:      212.845.7464
Fax:     212.371.7087

Email:  rferguson@stikeman.com
Tel:      212.845.7477
Fax:     212.371.7087

Lawyers for GENBAND Inc.


AND TO:
**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:  sdunphy@stikeman.co m
Tel:      416.869.5662
Fax:     416.947.0866

Lawyers for GENBAND Inc.


AND TO:
**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:  jmarshall@blgcanada.com
Tel:      416.367.6024
Fax:     416.361.2763

Email:  chill@blgcanada.com
Tel:      416.367.6156
Fax:     416.631.7301

Lawyers for the U.K. Pensions Regulator


AND TO:
**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

E-mail:  thomas.wallis@vdg.ca
Tel:       613.241.2701
Fax:      613.241.2599

Lawyers for La Regie des Rentes du Quebec


AND TO:
**ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON  M5H 2K1

Joel P. Rochon

Email:  jrochon@rochongenova.com
Tel:      416.363.1867
Fax:     416.363.0263

Lawyers for the Opposing LTD Employees

AND TO: **BLAKE, CASSELS & GRAYDON**
Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, Ontario  M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email:  pamela.huff@blakes.com
Tel:     416.863.2958
Fax:    416.863.2653

Email:  jeremy.forgie@blakes.com
Tel:     416.863.3888
Fax:    416.863.2653

Lawyers for The Northern Trust Company,
Canada

AND TO: **CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer

Email:  lschweitzer@cgsh.com
           jbromley@cgsh.com
Tel:     212.225.2000
Fax:    212.225.3999

Lawyers for Nortel Networks Inc.

AND TO: **LERNERS LLP**
130 Adelaide St. West
Suite 2400
Toronto, ON  M5H 3P5

William E. Pepall

Email:  wpepall@lerners.ca
Tel:     416.601.2352
Fax:    416.867.2415

Lawyers for the Former Employees in Respect
of the Distribution of the Corpus of the Health
and Welfare Trust

AND TO: **MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email:  kyle.kashuba@macleoddixon.com
Tel:     403.267.8399
Fax:    403.264.5973

Constellation NewEnergy Canada Inc.

AND TO: **SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email:  pengelmann@sgmlaw.com
Tel:     613-482-2452
Fax:    613-235-3041

Email:  fcampbell@sgmlaw.com
Tel:     613-482-2451
Fax:    613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust

AND TO: **LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

D. Brent McPherson

Email:  bmcpherson@langmichener.ca
Tel:     416.307.4103
Fax:    416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to Wachovia
Bank, N.A., in its capacity as Servicer for the Nortel
Networks Pass-Through Trust, Series 1-1

- 19 -

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage

E-mail:  bboake@mccarthy.ca
Tel:       416.601.7557
Fax:      416.868.0673

Email:    jgage@mccarthy.ca
Tel:       416.601.7539
Fax:      416.686.0673

Lawyers for Morneau Sobeco Limited
Partnership

AND
TO:

**DAVID STEER**
10 Cypress Court
Nepean, ON  K2H 8Z8

E-mail:  davidsteer127@sympatico.ca

## COURTESY COPIES:

<table>
<tr>
<td>AND<br>TO:</td>
<td><b>LEWIS AND ROCA</b><br>40 North Central Avenue<br>Phoenix, Arizona<br>USA 85004-4429<br><br>Scott K. Brown<br><br>Email:  sbrown@lrlaw.com<br><br>Tel:  602.262.5321<br>Fax:  602.734.3866<br><br>Lawyers for The Prudential Insurance<br>Company of America</td>
<td>AND<br>TO:</td>
<td><b>AKIN GUMP STRAUSS HAUER &amp;<br>FELD LLP</b><br>One Bryant Park<br>New York, NY 10036<br><br>Fred S. Hodara<br><br>Email:  fhodara@akingump.com<br><br>Tel:  212.872.1000<br>Fax:  212.872.1002<br><br>U.S. Lawyers for the Official Committee of<br>Unsecured Creditors</td>
</tr>
<tr>
<td>AND<br>TO:</td>
<td><b>CURTIS, MALLET-PREVOST, COLT &amp;<br>MOSLE LLP</b><br>101 Park Avenue<br>New York, New York 10178-0061<br><br>Steven J. Reisman<br>James V. Drew<br><br>E-mail:  sreisman@curtis.com<br>          jdrew@curtis.com<br><br>Tel:  212.696.6000<br>Fax:  212-697-1559<br><br>Lawyers for Flextronics International</td>
<td>AND<br>TO:</td>
<td><b>MILBANK, TWEED, HADLEY<br>McCLOY LLP</b><br>1 Chase Manhattan Plaza<br>New York, NY 10005<br><br>Dennis F. Dunne<br>Andrew M. Leblanc<br>Albert A. Pisa<br><br>Email:  DDunne@milbank.com<br>Tel:  212.530.5770<br>Fax:  212.530.5219<br><br>Email:  ALeblanc@milbank.com<br>Tel:  212.835.7574<br>Fax:  212.530.5219<br><br>Email:  APisa@milbank.com<br>Tel:  212.530.5319<br>Fax:  212.530.5219<br><br>U.S. Lawyers for The Informal Nortel<br>Noteholder Group</td>
</tr>
</table>

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:   mschein@vedderprice.com

Tel:      212.407.6920
Fax:     212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :   andrew.robertson@macleoddixon.com
            caylee.rieger@macleoddixon.com

Tel :     403.267.8222
Fax :    403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email:   eric.prezant@bryancave.com
Tel:      312.602.5033
Fax:     312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel :     212.906.1373
Fax :    212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

# INDEX

## Canadian Authorities

| Tab | Authority |
|-----|-----------|
| 1.  | *Cut & Run Holdings Ltd. V. Booze Bros. Holdings Inc.*, [2005] B.C.J. No. 229, 2005 BCSC 167, [2005] 6 W.W.R. 708, 39 B.C.L.R. (4th) 218, 2 B.L.R. (4th) 14, 2005 CarswellBC 252 |
| 2.  | *Ontario v. Abilities Frontier Co-operative Homes Inc.*, [1996] O.J. No. 2586, 10 O.T.C. 27, 5 C.P.C. (4th) 81, 64 A.C.W.S. (3d) 528 |
| 3.  | *T1T2 Limited Partnership v. Canada*, [1994] O.J. No. 2614, 23 O.R. (3d) 66, 19 B.L.R. (2d) 72, 35 C.P.C. (3d) 353, 51 A.C.W.S. (3d) 584 |

## U.S. Authorities

| Tab | Authority |
|-----|-----------|
| 4.  | *E*Trade Financial Corporation and E*Trade Bank v. Deutsche Bank* AG, (420 F.Supp.2d 273) |
| 5.  | *HDS Investment Holdings Inc.*(f/k/a Pro Acquisition Corp.) a Delaware corporation *v. The Home Depot Inc.*, a Delaware corporation, (2008 WL 4606262 (Del.Ch.)) |
| 6.  | *RCM Technologies Inc. v. Construction Services Associates Inc.*, (149 F.Supp.2d 109) |
| 7.  | *Trap Rock Industries, Inc. v. Local 825, International Union Of Operating Engineers, AFL-CIO*, (982 F.2d 884) |

TAB  1

*Case Name:*

# Cut & Run Holdings Ltd. v. Booze Bros. Holdings Inc.

**Between**
**Cut & Run Holdings Ltd., petitioner, and**
**Booze Bros. Holdings Inc. and Liquor Quicker Ltd.,**
**respondents**

**[2005] B.C.J. No. 229**

2005 BCSC 167

[2005] 6 W.W.R. 708

39 B.C.L.R. (4th) 218

2 B.L.R. (4th) 14

2005 CarswellBC 252

Vancouver Registry No. L042669

British Columbia Supreme Court
Vancouver, British Columbia

**B.M. Davies J.**

Heard: December 13, 2004.
Judgment: February 8, 2005.

(56 paras.)

*Administrative law -- Arbitration -- Agreement to arbitrate -- Interpretation -- Arbitrators -- Juris-*
*diction -- Jurisdiction of the court -- Stay of court proceedings -- Civil procedure -- Trials -- Stay of*
*proceedings -- Corporations and associations law -- Corporations -- Actions -- Against corpora-*
*tions or directors -- Oppressive conduct -- Dissolution -- Winding up.*

Application by the respondent, Booze Bros. Holdings, against the petitioner, Cut & Run Holdings,
for a stay of proceedings commenced by Cut & Run. Cut & Run sought an order under the oppres-
sion provisions of the Business Corporations Act that Cut & Run be entitled to purchase Booze

Bros.' shares in Liquor Quicker or, alternatively, for the liquidation and dissolution of Liquor Quicker. Booze Bros. relied upon an arbitration agreement entered into by the parties and s. 15 of the Commercial Arbitration Act in support of its application. The issue to be determined was whether the arbitration agreement between the parties extended to all dealings between the parties so that the court was obliged to stay this petition. This determination involved an assessment of the scope of the arbitration agreement and whether an arbitrator had the jurisdiction or power to order the relief sough by Cut & Run in its petition. Liquor Quicker was a private liquor store. Cut & Run and Booze Bros. were equal shareholders in the store and Booze Bros. operated the store pursuant to a licensee retail store agreement (LRS). The LRS stated that the parties would enter into a separate buy-sell agreement regarding their interest in the store, however this did not happen. The store was a success but the parties had various disputes. They implemented the dispute resolution process in the LRS. Booze Bros. delivered a notice of arbitration to the British Columbia International Arbitration Centre pursuant to the LRS. The notice concerned a fee claimed by Booze Bros.

HELD: Application dismissed. The existence of the clause in the LRS concerning the buy-sell agreement proved that the parties did not envision the subject matter of the petition. The LRS contemplated the winding up or dissolution of the Liquor Quicker only with the unanimous approval of the shareholders, subject to the provisions contained in the Business Corporations Act. This was construed as deliberately leaving to the court the question of whether the liquidation or dissolution of Liquor Quicker was an appropriate statutory remedy arising if oppression was established by Cut & Run. Thus, the arbitration provisions of the LRS did not oust the jurisdiction of the court to determine whether the conduct of Booze Bros. justified the remedy of the liquidation or winding up of Liquor Quicker.

**Statutes, Regulations and Rules Cited:**

Business Corporations Act, S.B.C. 2002, c. 57, ss. 324, 227.

Commercial Arbitration Act, R.S.B.C. 1996, c. 55, ss. 15, 23.

Ontario Business Corporations Act, R.S.O. 1990, c. B.16.

**Counsel:**

Counsel for the Petitioner: L.B. Herbst

Counsel for the Respondent, Booze Bros. Holdings Inc.: J.L. Williams

---

### B.M. DAVIES J.:--

### I.    NATURE OF APPLICATION

**1**    This is an application by the respondent, Booze Bros. Holdings Inc. ("Booze Bros.") for a stay of these proceedings commenced by the petitioner, Cut & Run Holdings Inc. ("Cut & Run"). In these proceedings, Cut & Run seeks an order under the oppression provisions of the Business Corporations Act, S.B.C. 2002, c. 57 (the "BCA") that Cut & Run be entitled to purchase Booze Bros.'

shares in the respondent Liquor Quicker ("Liquor Quicker") or, alternatively for the liquidation and dissolution of Liquor Quicker.

**2**   In support of its application for a stay of this petition, Booze Bros. relies upon an arbitration agreement entered into by the parties and s. 15 of the Commercial Arbitration Act, R.S.B.C. 1996, c. 55 (the "CAA"), which provides that:

> 15(1) If a party to an arbitration agreement commences legal proceedings in a court against another party to the agreement in respect of a matter agreed to be submitted to arbitration, a party to the legal proceedings may apply, before or after entering an appearance and before delivery of any pleadings or taking any other step in the proceedings, to that court to stay the legal proceedings.
>
> (2)   In an application under subsection (1), the court must make an order staying the legal proceedings unless it determines that the arbitration is void, inoperative or incapable of being performed.

## II.   ISSUES

**3**   The issue that arises for determination is whether the arbitration agreement between the parties extends to all dealings between the parties so that the court must stay this petition. That determination involves an assessment of the scope of the arbitration agreement and also whether an arbitrator appointed under the agreement would have the jurisdiction or power to order the relief now sought by Cut & Run in its petition so as to oust the court's jurisdiction under the BCA.

## III.   BACKGROUND

**4**   The business which is the subject matter of this dispute is a private liquor store ("Liquor Store") in Tsawwassen, British Columbia, that is operated under the name Liquor Quicker.

**5**   Although Cut & Run and Booze Bros. are equal shareholders in Liquor Quicker; the Liquor Store is operated by Booze Bros. pursuant to a Licensee Retail Store Agreement (the "LRS Agreement").

**6**   The Liquor Store opened in July 2003 and has been a success under Booze Bros.' management, producing gross sales of over $2,666,000. After deducting the management fees payable to Booze Bros., Liquor Quicker had a profit of approximately $250,000 in its first year. Pursuant to the LRS Agreement, that profit was split evenly between Cut & Run and Booze Bros., but disputes have arisen as to whether Booze Bros. improperly charged fees to the operation of the Liquor Store that reduced the profit of Liquor Quicker.

**7**   Higher sales for the Liquor Store are projected for the coming year.

**8**   Notwithstanding the success of the operation of the Liquor Store, the parties have been able to agree upon very little concerning the conduct of the affairs of Liquor Quicker and Cut & Run says that it has entirely lost confidence in both the integrity and ability of Booze Bros. Further, no directors' meetings or annual general meetings have ever been held and the parties' respective principals have been unable to agree upon a year end for the company or upon who should prepare its financial statements.

**9**    In an attempt to resolve their ongoing disputes, the parties have implemented the dispute resolution process they agreed to in the LRS Agreement. Section 8.11 of the LRS Agreement provides:

> If a dispute arises between the parties <u>relating to this Agreement,</u> or arising out of this Agreement, the parties agree to use the following procedure as a condition precedent to any party pursuing other available remedies:
>
> Either party may notify the other by written notice ("Notice") of the existence of a dispute and a desire to resolve the dispute by mediation.
>
> (a)    A meeting will be held promptly between the parties, attended by individuals with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the dispute.
>
> (b)    If, within 14 days after such meeting or such further period as is agreeable to the parties, the parties have not succeeded in negotiating a resolution of the dispute, they agree to submit to mediation and to bear equally the costs of mediation.
>
> (c)    The parties will jointly appoint a mutually acceptable mediator, seeking assistance from the British Columbia International Commercial Arbitration Centre if they have been unable to agree upon such appointment within 20 days following the conclusion of the negotiation period.
>
> (d)    The parties agree to participate in good faith in the mediation and negotiations related thereto for a period of 30 days following appointment of a mediator, or for such longer period as the parties may agree. If the parties are not successful in resolving the dispute through mediation, or if the mediation has not commenced within 30 days following the delivery of the Notice, then the parties agree that the dispute will be settled by a single arbitrator in accordance with the Commercial Arbitration Act, R.S.B.C. 1996, c. 55 as amended. The decision of the arbitrator will be final and binding and will not be subject to appeal on a question of fact, law or mixed fact and law.
>
> (e)    The costs of mediation or arbitration will be shared equally between the parties. Costs will not include costs incurred by a party for representation by counsel.

[Emphasis added]

**10**    Simply put, the LRS Agreement establishes a three stage dispute resolution process: the first stage requires good faith negotiation; the second stage requires mediation; and, the third stage requires binding arbitration of disputes by a single arbitrator.

**11**    Following that process, the parties first attempted to resolve their disputes at a negotiation meeting. They were, however, unsuccessful either at that meeting or in the subsequent 14 day period. The parties then pursued mediation which also proved incapable of resolving the parties' dis-

putes. As a consequence of that failure, on October 27, 2004, counsel for Booze Bros. advised Cut
& Run of Booze Bros.' intent to proceed to binding arbitration.

**12**    In answer to that letter, but without responding directly to it, on October 29, 2004, Cut & Run
commenced this proceeding invoking ss. 324 and 227 of the BCA.

**13**    To the extent relevant to the issues now before the court, those sections provide:

> s.    324(1) On an application made in respect of a company ... the court may
> order that the company be liquidated and dissolved if
>
> ...
>
> (b)    the court otherwise considers it just and equitable to do so.
>
> ...
>
> (3)    If the court considers that an applicant for an order referred to in subsec-
> tion (1)(b) is a person who is entitled to relief either by liquidating and dis-
> solving the company or under section 227, the court may do one of the fol-
> lowing:
> (a)    make an order that the company be liquidated and dissolved;
> (b)    make any order under section 227(3) it considers appropriate.
> s.    227(3) ... the court may, with a view to remedying or bringing to an end
> the matters complained of ... make any interim or final order it considers
> appropriate, including an order ...
> (h)    directing a shareholder to purchase some or all of the shares of any other
> shareholder

**14**    Significantly, clause 3.1(k) of the LRS Agreement provides that:

> Subject to the provisions of the Company Act [now the BCA], the following mat-
> ters will be only be undertaken with the unanimous approval of Cut & Run and
> T. Davis [the predecessor to Booze Bros. under the LRS Agreement]: (k) any
> proceedings taken or instituted for the winding up of the Operator [Liquor
> Quicker].

**15**    Significantly also, the parties addressed the question of the creation of a buy-sell agreement
concerning their respective interests in Liquor Quicker. Clause 7.4 of the LRS Agreement provides
that "[t]he parties will enter into a separate Buy-Sell Agreement with respect to their interest in the
Operator". There is, however, no evidence that any such agreement was ever negotiated.

**16**    Notwithstanding that Cut & Run had filed this petition seeking alternative remedies under the
BCA, Booze Bros. delivered a notice of arbitration to the British Columbia International Arbitration
Centre Pursuant to the LRS Agreement on November 8, 2004. That Notice to Arbitrate concerns the
management fee which Booze Bros. claims pursuant to clause 5.1 of the LRS Agreement.

**17**    No other issues between the parties have been submitted to arbitration.

## IV.  DISCUSSION AND ANALYSIS

**18**   Prince George (City) v. McElhanney Engineering Services Ltd., [1995] 9 W.W.R. 503, 9 B.C.L.R. (3d) 368 (C.A.), leave to appeal to S.C.C. refused, [1995] S.C.C.A. No. 467 [McElhanney cited to W.W.R.] is the leading case in British Columbia concerning the application of s. 15 of the CAA and stays of pending litigation due to the existence of an agreement to arbitrate disputes.

**19**   In McElhanney, the Court of Appeal determined (at [paragraph] 22) that the following three prerequisites had to be met for an applicant to establish entitlement to the granting of a stay under s. 15 of the CAA:

> (1)   that a party to an arbitration agreement has commenced legal proceedings against another party to the agreement;
>
> (2)   that the legal proceedings are in respect of a matter agreed to be submitted to arbitration; and
>
> (3)   that the application has been timely brought, i.e. before the applicant has taken a step in the proceeding.

**20**   Booze Bros. submits that if the court considers it even arguable that these prerequisites have been met, then the stay must be granted and the issues that are raised by the petition must be submitted to and resolved by arbitration (see: McElhanney at [paragraph] 53).

**21**   There is no issue in this case that the first and third conditions to the granting of a stay have been established by Booze Bros. The LRS Agreement provides for the submission of disputes between Cut & Run and Booze Bros. to arbitration under that agreement and this application was brought immediately upon the filing of this petition.

**22**   The question of whether a stay must be granted under s. 15 of the CAA must therefore be decided by determining whether the disputes raised and claims advanced by Cut & Run in the petition "relate to or arise out" of the LRS Agreement so that they are governed by its arbitration provisions.

**23**   In this case, the question of whether Cut & Run's oppression claims relate to or arise out of the LRS Agreement engages the consideration of not only the arbitration provisions of the LRS Agreement, but also of the potential relationship or interplay between those provisions and the statutory remedies that may be available to an affected party who establishes the existence of oppressive conduct under the provisions of the BCA.

**24**   It is, in my view, fundamental to the consideration of the relationship between the potentially competing contractual and statutory rights and remedies that may be available to the parties to this litigation to bear in mind that it is well settled law that parties to an agreement containing an arbitration clause cannot be presumed to have agreed to submit all matters which may arise between them to arbitration.

**25**   In that regard, I adopt the following statement from Mart Huleatt-James and Nicholas Gould, International Commercial Arbitration: A Handbook (London: LLP, 1996) at 62:

> Given the consensual nature of arbitration, it is clear that no one should be obliged to submit to arbitration without having agreed to it. Furthermore, <u>having agreed to the arbitration of a particular dispute, a party to the arbitration should not have to acquiesce in the inclusion in the arbitration of further disputes which</u>

the other party may try to include in it, but which are outside the scope of the
parties' agreement. These latter disputes may be of a kind which the respondent
party, for good reason, does not wish to have settled by arbitration.

[emphasis added]

**26**   Thus, an arbitrator errs when, "having jurisdiction conferred upon him to decide certain mat-
ters only, he [goes] on and decide[s] matters not referred to him at all" (BC Gas Inc. v. Westcoast
Energy Inc., [1990] B.C.J. No. 2924 at [paragraph] 30 (S.C.)).

**27**   Cut & Run submits that the underlying issues concerning the dissolution of Liquor Quicker
due to stalemate and the corporate wrongs committed by Booze Bros. alleged in the petition are
fundamentally different from the types of dispute the parties have agreed to submit to arbitration
under the LRS Agreement.

**28**   Cut & Run also submits that the LRS Agreement is only concerned with the operation of the
Liquor Store. It says that corporate disputes that give rise to the availability of oppression remedies
under the BCA arising from the relationship of the parties as shareholders in Liquor Quicker fall
outside of the ambit of the parties' agreement to arbitrate. Further, Cut & Run submits that the op-
pression relief sought in the nature of a forced sale of Booze Bros.' shares in Liquor Quicker or, in
the alternative, relief by way of the liquidation and dissolution of Liquor Quicker, is relief that is
available only through the court under the provisions of the BCA and thus not subject to the juris-
diction of an arbitrator.

**29**   In response, Booze Bros. submits that the arbitration clause in the LRS Agreement must be
widely construed and that since the issues in dispute between the parties all emanate from the opera-
tion of the Liquor Store and since the LRS Agreement provides that the operation of the Liquor
Store will be effected through the corporate entity Liquor Quicker, those disputes both "relate to"
and "arise out" of the LRS Agreement so that under s. 15 of the CAA the petition must be stayed.

**30**   Booze Bros. further submits that the court does not have exclusive jurisdiction to grant the
specific relief sought by Cut & Run since under s. 23 of the CAA an arbitrator "must adjudicate the
matter before the arbitrator by reference to law ... ". Counsel for Booze Bros. submits that the issue
of dissolution is specifically raised by the LRS Agreement under clause 3.1(k) thus giving jurisdic-
tion over that issue to an arbitrator. He also submits that since Safarik v. Ocean Fisheries Ltd.,
[1996] B.C.J. No. 2520 (C.A.) has determined that the courts have the power to fashion oppression
remedies in the nature of imposed buy-sell agreements, it follows by implication that a properly ap-
pointed arbitrator may also do so.

**31**   In support of its argument that the arbitration provisions of the LRS Agreement require that
the court must impose a mandatory stay of Cut & Run's petition, Booze Bros. relies primarily upon
the Ontario decisions in Woolcock v. Bushert, [2004] O.J. No. 4498 (C.A.) and Butt v. Express Plus
Inc. (2004), 42 B.L.R. (3d) 189 (Ont. Sup. Ct.).

**32**   Those decisions considered the relationship between the oppression provisions of the Ontario
Business Corporations Act, R.S.O. 1990, c. B.16, and agreements to arbitrate disputes and deter-
mined that the agreements in issue in those cases were sufficiently broad that the fact that the nature
of the dispute also alleged involved oppressive conduct did not preclude resort to arbitration.

**33**   Before turning to a detailed consideration of an analysis of whether the LRS Agreement re-
quires arbitration of the two alternative remedies sought by Cut & Run under the oppression provi-

sions of the BCA, I believe it would be useful to put into perspective the Ontario decisions upon which Booze Bros. relies in advancing its stay of proceedings application.

**34**   Although counsel for Booze Bros. relies on these two cases as establishing that the existence of an arbitration clause will deny resort to statutory oppression remedies, I am of the view that neither case stands as authority for such a broad principle. In my view, both cases are only authority for the proposition that where there is an alleged breach of an agreement which calls for arbitration in circumstances where that alleged breach could also constitute oppressive conduct, the jurisdiction of an arbitrator to determine whether there has been a breach is dependent upon the breadth of the arbitration clause at issue. Further, neither case specifically discussed or determined the issue of whether an arbitrator has exclusive jurisdiction to make orders consequent upon a finding of a breach that would be similar or identical to the remedial orders a court could make consequent upon a finding of oppression.

**35**   In that regard I also note that in Armstrong v. Northern Eyes Inc., [2001] O.J. No. 1085 (C.A.), the Ontario Superior Court of Justice, Divisional Court also considered the jurisdiction of an arbitrator to grant oppression remedies in Ontario. In Armstrong, Campbell J., speaking for the court, determined that the court's jurisdiction to provide oppression remedies will be ousted only where the parties' agreement: (1) clearly provides for an alternative but similar mechanism by which the parties can obtain relief; and (2) that mechanism is clearly subject to the arbitration clause in the agreement. In Armstrong, the fact that the agreement between the parties specifically provided for relief similar to that available by way of a statutory remedy, appears to have been the basis upon which the trial decision allowing an oppression motion to proceed in the face of that arbitration agreement was overturned.

**36**   In my view, it is significant that in this case the relief sought by Cut & Run for the alleged oppressive conduct of Booze Bros. includes the remedy of the forced acquisition of the shares of Booze Bros. in Liquor Quicker, and the alternative remedy that Liquor Quicker be liquidated and dissolved. No relief similar to either remedy is specifically addressed by the LRS Agreement.

**37**   Further, in Weber v. Ontario Hydro, [1995] 2 S.C.R. 929 at 958 to 959, the Supreme Court of Canada determined that it is proper for the court to consider whether a remedy may be required which the arbitrator is not empowered to grant so as to avoid the deprivation of an ultimate remedy.

**38**   With that overview of the concerns that may arise when the issues raised pursuant to an agreement to arbitrate are either coincidental with or in conflict with remedies sought in oppression proceedings, I will turn to my consideration of the specific alternate remedies sought by Cut & Run in this case.

        1.    The "Forced Sale" remedy under s. 227 of the BCA

**39**   The only arbitration provisions entered into between Cut & Run and Booze Bros. are those governed by clause 8.11 of the LRS Agreement.

**40**   As I have stated above, it is settled law that parties to an agreement containing an arbitration clause cannot be presumed to have agreed to submit all matters which may arise between them to arbitration. The agreement to arbitrate must be interpreted to determine whether the parties have agreed that a particular dispute will be submitted to arbitration.

**41**    While arbitration clauses will generally be liberally and broadly construed, care must still be taken to ensure that disputes which are outside the scope of the parties' agreement are not made the subject of arbitration. In my view, that is particularly so in a case such as this where the parties have entered into only one agreement that contains an arbitration clause, but there is also another agreement (a Third Party Use agreement dated March 21, 2003) that also governs some of the relationships between the parties.

**42**    Applying those principles in this case, it must be noted that the parties expressly provided by clause 7.4 of the LSR Agreement would enter into a "separate" agreement regarding the interests of the parties in Liquor Quicker.

**43**    In my view, that clause must be taken as conclusively proving that the parties did not envision the subject matter of the petition, which at its core seeks the imposition of a remedy in the nature of a buy-sell agreement, as falling within the LRS Agreement.

2.    Liquidation and dissolution under s. 324 of the BCA

**44**    Given that clause 3.1(k) of the LRS Agreement states that any proceedings instituted for the dissolution of Liquor Quicker shall only be undertaken with the unanimous approval of the parties, the issues to be decided are:

(1)    must the court stay these oppression proceedings because the issues of the potential liquidation and dissolution of Liquor Quicker must be said to "relate to or arise out" of the LRS Agreement so that they are mandated to be determined by arbitration;

(2)    does clause 3.1(k) specifically oust the court's jurisdiction under the oppression provisions of the BCA to order liquidation or dissolution; and

(3)    if so, is such a clause enforceable?

**45**    I am satisfied that since clause 3.1(k) of the LRS Agreement contemplates the possibility of the winding up or dissolution of Liquor Quicker only with the unanimous approval of its shareholders, there could be little doubt that the question of whether unanimous approval to wind up or dissolve the company had been reached would be a dispute governed by the arbitration provisions of the LRS Agreement.

**46**    The issues raised by Cut & Run in these oppression proceedings do not, however, go to the issue of whether there was unanimous approval. Rather, they contemplate a situation where unanimous approval could never be reached. It is, therefore, the alleged fact of the existence of a deadlock and relief sought in relation to that deadlock rather than an inquiry into whether a decision was unanimous that is engaged by these oppression proceedings.

**47**    It must be noted that clause 3.1(k) of the LRS Agreement has as a preamble to the requirement for the unanimous approval of the parties the words "subject to the provisions contained in the Company Act [now the BCA]".

**48**    In my opinion, the inclusion of that phrase must be construed as deliberately leaving to the court the question of whether the liquidation or dissolution of Liquor Quicker is an appropriate statutory remedy arising if oppression under the BCA is established by Cut & Run.

**49**    While the Ontario cases of Woolcock v. Bushert, supra, and Butt v. Express Plus Inc., supra, upon which Booze Bros. relies, could possibly be interpreted as allowing an arbitrator to determine whether a company should be wound up or liquidated due to oppressive conduct, I am satisfied that such a finding would be wrong in this case because:

> (1)    clause 3.1(k) is specifically made subject to the Company Act [now the BCA]";
>
> (2)    the oppression provisions of the BCA provide that it is the "court" that has the power to provide relief. Section 1 of the BCA defines "court" as the "Supreme Court" and s. 29 of the Interpretation Act, R.S.B.C. 1996, c. 238 defines "Supreme Court" as the "Supreme Court of British Columbia"; and
>
> (2)    as I have previously noted in Armstrong, supra, the Ontario Divisional Court determined that the court's jurisdiction to order oppression remedies will be ousted only where the parties' agreement: (1) clearly provides for an alternative but similar mechanism by which the parties can obtain relief; and (2) that mechanism is clearly subject to the arbitration clause in the agreement. Neither of those circumstances exist in this case.

**50**    I have accordingly decided that the arbitration provisions of clause 8.11 of the LRS Agreement do not oust the jurisdiction of this court to determine whether the conduct of Booze Bros. as alleged in these oppression proceedings justifies the remedy of the liquidation or winding up of Liquor Quicker.

**51**    Having reached the decision that the subject matter of these proceedings do not either "relate to or arise out" of the LRS Agreement and that clause 8.11 of the LRS Agreement does not require that any of the disputes that are the subject of this oppression petition be determined exclusively by arbitration, it is not necessary for me to consider issues of public policy that may arise from an attempt to "contract out" of the dissolution provisions of the BCA.

**52**    I do not intend to determine that issue in *obiter dicta* since, in my view, such an important question should be decided with the benefit of full legal analysis in a known factual context.

**53**    I do, however, take the opportunity to observe that there is an apparent divergence of authority in relation to this "contracting out" issue which may one day have to be resolved in this province. I say that because the Ontario decisions in Woolcock v. Bushert, supra, Butt v. Express Plus Inc., supra, and Armstrong v. Northern Eyes Inc., supra, to which I have referred in some detail, appear to support an analysis which could allow parties to contract out of the involvement of the courts in the enforcement of statutory rights and remedies if they do so in clear, unequivocal language.

**54**    On the other hand, authorities in other Commonwealth jurisdictions have taken a far more strict approach to the interpretation of arbitration provisions that might impact upon the court's role in corporate affairs, including in relation to the contracting out issue. I refer specifically to: In re Yenidje Tobacco Co. (1916), 86 L.J. Ch. 1 at 2 (U.K. C.A.); In the Matter of James E. McCabe Limited and In the Matter of City of Belfast Warehousing Limited and In the Matter of Wine Inns Limited (14 April 2000), Transcript (H.C. Ch. - Northern Ireland) at p. 7, aff'd in Re: Wines Inns Limited (30 June 2000) Transcript/CARE 3225 (C.A.)); and especially, A Best Floor Sanding Pty Ltd. v. Skyer Australian Pty. Ltd., 1999 BC 9903185 (Vic. S.C.), in which the Supreme Court of Victoria held at p. 4 that an arbitration clause which expressly referred to the dissolution of a company was null and void.

**55**     Any attempt to determine which of these apparently contradictory lines of authority should be applied in British Columbia will not only engage philosophical issues concerning the extent to which parties may seek extra-judicial remedies by way of arbitration, but also require a detailed analysis of the statutory regimes under which the various authorities were decided as well as a comparison of those regimes to the provisions of both the BCA and CAA.

V.    CONCLUSION

**56**     Booze Bros.' application to stay the petitioner's petition under s. 15 of the CAA is dismissed with costs to be determined in the cause.

B.M. DAVIES J.

cp/i/qlsmw/qlemo/qlhjk

TAB 2

*Indexed as:*
## Ontario v. Abilities Frontier Co-operative Homes Inc.

**Between**
**Her Majesty the Queen in Right of Ontario, applicant, and
Abilities Frontier Co-operative Homes Inc., Amistad Housing
Co-operative Inc., Centennial Park Housing Co-operative,
Clarence Williams Co-operative Homes Inc., City of Roses
Co-operative Homes Inc., Co-operative D'Habitation L'Arbre De
Vie Inc., Co-operative D'Habitation, St. Georges Housing Corp.
Inc., Eileen Tallman Co-operative, Evergreen Community
Housing, Co-operative of Muskoka Inc., Four Winds Community
Housing, Co-operative Global Housing, Co-operative of Windsor
Hargraft, Housing Co-operative Harmony, Hollow Homes
Co-operative, High Ridge Non-Profit Housing Corp., Jambo
Non-Profit Housing Corp., Jambo Non-Profit Housing
Corporation, K-W Urban Native, Wigwam Project Newcomer
Housing, Co-operative New Rainbow, Co-operative Homes
Palmdale, Co-operative Homes Pavia Place, Co-operative Home
Prism, Co-operative Homes Inc. (Phase II), Sheppards Ridge
Co-operative, Todmorden Co-operative Homes, Tranquility Hill
Homes Inc., Trent-Moira Co-operative Estates Inc., Whispering
Winds Co-operative Homes Inc., Winchevsky Co-operative Homes
Inc., 1095 Jalna Non-Profit Homes, respondents**

**[1996] O.J. No. 2586**

**10 O.T.C. 27**

**5 C.P.C. (4th) 81**

**64 A.C.W.S. (3d) 528**

**Court File No. RE 6246/96**

**Ontario Court of Justice (General Division)**
**Toronto, Ontario**

**Sharpe J.**

Heard: June 17-19, 1996.
Judgment: July 12, 1996.

(19 pp.)

*Arbitration -- Stay of proceedings -- Arbitration clause, interpretation of -- Whether dispute arbitrable.*

Application by the Ministry of Municipal Affairs and Housing for an injunction and a declaration that the arbitration agreement provided for in a performance agreement was not an arbitration agreement within the meaning of the Arbitration Act. In 1992 the Ontario government provided funding to Sponsor Groups under the jobsOntarioHomes Program to construct co-operative and non-profit housing. The respondent Sponsor Groups had entered into performance agreements with the Ministry which set out the respective obligations of the parties for the stage by stage development of the projects. The new provincial government cancelled all funding for the projects in 1995. The Sponsor Groups sued for damages and specific performance and argued that they were entitled to arbitration pursuant to a clause in the performance agreement. The Ministry refused to participate in the arbitration and sought to restrain the respondents from commencing or continuing any arbitration proceedings.

HELD: Declaration and injunction granted. The dispute between the parties did not fall under the arbitration clause. The language of the arbitration clause implied that it was intended to deal with disputes that might arise during the various stages of completion of these projects. The dispute among the parties, however, was whether the respondents had the right to insist that the Ministry carry through the projects contemplated by the performance agreements. The language of the arbitration clause was not as expansive and open-ended as that of universal arbitration clauses designed to remit all disputes to arbitration.

**Statutes, Regulations and Rules Cited:**

Arbitration Act, S.O. 1991, c. 17, ss. 17, 45, 48, 48(1)(c), 48(2).

**Counsel:**

Leah Price and Stephen Scharbach, for the applicant.
Charles Campbell and Lara Morris, for the respondents.

---

**SHARPE J.:--**

INTRODUCTION

1    In the spring of 1992, the Ontario provincial government created the jobsOntarioHomes Program, designed to create new jobs through the construction of 20,000 cooperative and non-profit housing units. In the summer of 1995, a new government with a very different perception of the fiscal priorities of the province cancelled that program. This application is brought to determine

whether those who assert that the province is contractually bound to honour the commitments of government of 1992 are entitled to have their claims resolved by way of arbitration or whether they must proceed by action in the courts.

BACKGROUND

**2**    Under the jobsOntarioHomes program, provincial funding was provided to non-profit and co-operative corporations known as Sponsor Groups. The funding was intended to pay all the costs associated with development and construction of these housing projects and took the form of grants, subsidies and loan and mortgage guarantees. Sponsor Groups accepted into the program participated in a multi-stage process dealing with site selection, development and construction. It was contemplated that a portion of housing units would be offered on a rent-geared-to-income basis and that further provincial subsidies would be required to make these projects viable.

**3**    Each Sponsor Group entered into a "Performance Agreement" with the Ministry of Municipal Affairs and Housing. The Performance Agreement sets out the respective responsibilities of the Sponsor Groups and the Ministry for the stage by stage development of the projects. The respondents to this application are 28 Sponsor Groups who had entered performance agreements.

**4**    Following the provincial election in June 1995, the new government announced a moratorium and then cancellation of provincial funding of 385 projects under the program which had not yet received approval to purchase land or commence construction. The cancelled projects included those of the respondents. The respondents estimate the cost to complete their 28 projects at over $200 million.

**5**    The Performance Agreement contains an arbitration clause in the following terms:


PART 7:    DEALING WITH PROBLEMS AND DISPUTES


The Ministry and the Sponsor Group acknowledge that differences of view can arise in the development and construction of a non-profit housing project even when both the Ministry and Sponsor Group share similar goals and are acting with goodwill, and therefore agree that:


7.1        If there are disputes about the interpretation of this Agreement or about actions taken under this Agreement, the Sponsor Group and the Ministry agree to arbitration of the dispute under the Arbitration Act 1991, and that the arbitration award shall be final and binding and not subject to appeal. However, arbitration can only be used after attempts to resolve the dispute through the Ministry's internal review process have failed;


**6**    Each of the respondents has served a Demand for Arbitration pursuant to this clause. The relief requested in each Demand for Arbitration is specific performance of the Performance Agreement as well as damages for further losses suffered because of the cancellation project. The damages claim

includes the assertion of a right to the subsidies which the Sponsor Groups expected to receive pursuant to "Operating Agreements" referred to in the Performance Agreement, but not signed at the date the program was cancelled The Sponsor Groups assert a right pursuant to these agreements to operating subsidies for their non-profit housing projects for a 35 year period.

7    The Ministry refused to participate in the arbitration and brings this application for a declaration pursuant to the Arbitration Act S.O. 1991 c. 17 s. 48, the relevant portions of which provide as follows:

> 48(1) At any stage during or after an arbitration, on the application of a party who has not participated in the arbitration, the court may grant a declaration that the arbitration is invalid because,
>
> > (b)    the arbitration agreement is invalid or ceased to exist;
> > (c)    the subject-matter of the dispute is not capable of being the subject of arbitration under Ontario law; or
> > (d)    the arbitration agreement does not apply to the dispute.
>
> (2)    When the court grants the declaration, it may also grant an injunction against the commencement or continuation of the arbitration.

8    The applicant Ministry seeks the following relief:

> (a)    A declaration that Part 7 of the document entitled "Performance Agreement" signed on behalf of the applicant ("the P.A.") is not an arbitration agreement within the meaning of the Arbitration Act, 1991, S.O. 1991, c. 17, or in the alternative, that it has ceased to exist;
> (b)    A declaration that Part 7 of the P.A. does not apply to the cancellation of funding for new development under the jobsOntarioHomes Program;
> (c)    A declaration that there is no jurisdiction in any arbitrator under the Arbitration Act, 1991, to determine the issue of whether the P.A. is a legally binding, enforceable contract;
> (d)    A declaration that Part 7 of the P.A. does not apply to any matters in dispute between the parties;
> (e)    A declaration that the arbitration proposed by the respondents in invalid;
> (f)    An injunction restraining the respondents from commencing or continuing any arbitration proceedings in respect of the document or of the cancellation of funding for new development under the jobsOntarioHomes Program.

9    The respondents resist this application and bring a cross-application for an order appointing an arbitrator and consolidating the arbitrations. The respondents also invite the court to make certain legal determinations respecting the existence and enforceability of both the Performance Agreements and the Operating Agreements in order to provide guidance to the arbitrator with respect to his or her jurisdiction.

ISSUES

**10**    In light of the application, cross-application and arguments addressed on this motion, the is-
sues raised are the following:

> 1.    Does the arbitration agreement apply to the dispute?
> 2.    Is the subject-matter of the dispute capable of being the subject of arbitra-
>        tion?
> 3.    Is the arbitration agreement invalid or has it ceased to exist?
> 4.    If a declaration is granted in favour of the Ministry, should an injunction
>        also issue to restrain the arbitration?
> 5.    If the matter is to proceed to arbitration, should this court pronounce upon
>        the enforceability of either or both the Performance Agreements and the
>        Operating Agreements?

ANALYSIS

> 1.    Does the arbitration agreement apply to the dispute?

**11**    The authorities establish that a two-step test is to be applied where a party seeks a stay or simi-
lar relief on the ground that the arbitration agreement does not apply to the dispute raised by the
proposed arbitration. First, the court should ascertain the precise nature of the dispute which has
arisen. Second, the court should determine whether the dispute is one which falls within the terms
of the arbitration clause: see Heyman v. Darwin Ltd. [1942] A.C. 356 at 370; T1T2 Limited Part-
nership v. Canada (1994) 23 O.R. (3d) 66 at 73.

> (a)    Nature of the Dispute

**12**    It is clear from the Demands for Arbitration and from the positions taken by the Respondents
on this motion that the nature of the dispute that has arisen is quite simply whether the respondent
Sponsor Groups have the right in law to insist that the Ministry carry through to completion the pro-
jects contemplated by the Performance Agreements and proposed Operating Agreements. The Min-
istry takes the position that the Sponsor Groups have no such right in law and that the current gov-
ernment was legally entitled to terminate the program as a matter of re-ordering the fiscal priorities
of the Province.

**13**    To understand the specific legal basis for these positions, it is necessary to examine the Per-
formance Agreement. The agreement contains a "purpose" clause which provides as follows:

> 2.1 The purpose of this Agreement is:

>> a)    to set out what the Ministry requires of the Sponsor Group, in return
>>        for facilitating funding for the Sponsor Group, for the development
>>        and construction of community-based non-profit housing; and
>> b)    to govern the dealings between the Ministry and the Sponsor Group
>>        during the development and construction of the non-profit housing
>>        project;

**14**    Each of the 28 Performance Agreements at issue here was entered after the Sponsor Group
had received an allocation of a number or range of housing units for a project. The Performance
Agreements specify three stages in the development and construction of the project namely, the "se-

lect site stage," the "develop project stage" and the "construct project stage." The agreement speci-
fied the requirements a Sponsor Group had to meet to proceed through each stage.

**15**    Within twelve months of the initial commitment, the Sponsor Group was required to provide
environmental assessment, a planning status report, a building design, a project capital budget, and
a market appraisal. If the Ministry approved the site, the Sponsor Group could enter a conditional
purchase and sale agreement at a price approved by the Ministry. Within six months, a final site
analysis was to be provided which would include further environmental assessment, building de-
sign, geotechnical report, a revised capital budget and market appraisal.

**16**    Of the 28 respondents, 10 had not yet received approval for a proposed site while 3 had re-
ceived preliminary site approval but had not yet requested approval for conditional agreements of
purchase and sale. One group proposed acquisition and rehabilitation of existing buildings but had
not yet entered conditional agreements for those buildings. Six respondents had entered conditional
agreements of purchase and sale or lease but had not yet completed the remaining requirements of
the site select stage.

**17**    Seven of the respondents had received a stage 2 commitment letter permitting them to proceed
to the develop project stage. This stage required the Sponsor Group to secure Municipal approvals,
prepare construction contract documents, submit those documents to the Ministry for costing review
and tender for construction after approval had been granted. The Performance Agreement also re-
quired submission of various legal documents, municipal approvals, capital budget information re-
garding administration and regulatory requirements, insurance and other related matters. None of
the respondents had completed this stage.

**18**    The final "construct project stage", as its name suggests, involved closing the agreement of
purchase and sale, entering into a construction contract and proceeding with the construction of the
non-profit housing project.

**19**    The Ministry published a large volume of "program publications" the precise legal status of
which is at issue between the parties. These publications specified in considerable detail the criteria
the Ministry would use in assessing the projects at their various stages of development. The Per-
formance Agreement provided that Sponsor Groups were required to "comply with the jobsOn-
tarioHomes program requirements for non-profit housing project development and construction es-
tablished by the Ministry as set out in the program publications issued by the Ministry from time to
time." The respondents take the position that these publications had contractual force while the
Ministry submits that they were mere guidelines which the Ministry was free to change in its discre-
tion and as it saw fit.

**20**    Another significant issue between the parties concerns the status of the Operating Agreements.
As already mentioned, these projects involved non-profit housing and a significant component of
rent-geared-to-income units. It seems clear that it was contemplated by all from the outset that some
form of long-term provincial subsidies would be required to make these projects financially viable.
The Performance Agreement contemplated the Operating Agreement in the following language:

2.4          The Sponsor Group will enter into a Project Operating Agreement which
             will set out the responsibilities of the Sponsor Group and the Ministry dur-
             ing the period of operation of the non-profit housing project. This require-

ment will remain in effect even through this Agreement has ended;

**21**    It is common ground that no Operating Agreements had been signed. It is also common ground that at the time the program was cancelled, there were on-going negotiations between the Ministry and representatives of the co-operative housing community with respect to appropriate terms for the Operating Agreement to be used for this program. It is the position of the respondents that the Ministry had made a commitment that they were entitled to assume that an existing form of agreement used with reference to other co-operative housing projects would be used in default of final agreement on other terms. This contention is strongly resisted by the Ministry. It is the position of the Ministry that the terms for the Operating Agreement were never settled and that there was no commitment or understanding that the form of agreement in use for other projects would apply.

**22**    The position of the respondents is that the Performance Agreements are legally enforceable contracts which, when read with the program documents, provide detailed criteria for each Sponsor Group to proceed through the various stages of the project and completion of construction. It is also the respondents' position that the Performance Agreements give them a legally enforceable right to insist upon an Operating Agreement providing long-term Provincial subsidies for these non-profit housing units if they follow all the steps contemplated by the Performance Agreement.

**23**    It is the respondents' position that the Ministry had no right to terminate the program and that in purporting to do so, the Ministry is in breach of its contracts and the respondents are entitled at law by virtue of their contracts to insist upon full performance. The Demands for Arbitration request specific performance of the Performance Agreements and damages for breach of the Operating Agreements in amount sufficient to provide the subsidies for these projects for a 35 year period following completion of construction. If specific performance is not ordered, damages in lieu of specific performance are sought.

**24**    These claims are strenuously resisted by the Ministry. The Ministry takes the position that the Performance Agreements are not legally enforceable contracts and that the Government of Ontario had every right to terminate this program in accordance with its determination of appropriate fiscal priorities for the Province. The Ministry contends that the Performance Agreements are not legally binding contracts on two related grounds. First, the Ministry argues that virtually all of the essential items concerning these projects were yet to be determined when the Performance Agreement were signed. In many cases, the precise number of housing units had not been determined. The specific location of the land on which the proposed development would be built was unknown as was the identity of the vendor, the date of purchase, the price of the land, the amount of land to be acquired, the identity of the builder or builders, the information relating to construction including the cost of construction, the amount of mortgages or mortgage guarantees required and the amount of any subsidies. The Ministry takes the position that the Performance Agreements are so lacking in precision as to be void for uncertainty, that they do not comply with the requirements of the Statute of Frauds and that at best, they constitute unenforceable "agreements to agree".

**25**    Second, the Ministry contends that the Performance Agreements are not legally binding contracts but rather an expression of government policy. It asserts that a statement by government of a willingness to consider providing future subsidies in a non-specified amount cannot constitute a contract. The Ministry strenuously resists the attempt to obtain relief under Operating Agreements which had not yet been signed or, in its submission, for which the terms had yet to be determined.

(b)    Terms of the Arbitration Clause

**26**    Having identified the nature of the dispute, I turn to the second question and ask whether this dispute falls within the terms of the arbitration clause. It is apparent that the dispute concerns fundamental issues of contract formation, enforceability and remedies. The dispute also involves fundamental issues of public law and the competing claims of respect for contractual obligations on the one hand and the right of government to reorder it fiscal priorities on the other.

**27**    While I accept that there has been "a clear shift in policy towards encouraging parties to submit their differences to arbitration where an arbitration agreement exists" (Casey, International and Domestic Commercial Arbitration, 1993 para. 3.5) it is my view that the arbitration clause contained in the Performance Agreements cannot properly be read as embracing the dispute which has arisen between the parties.

**28**    It is clear from the authorities that the scope of each arbitration clause has to be determined in light of its particular language and the nature of the relationship between the parties: Casey, supra at 3-8. A distinction has been drawn in the case law between limited or "executory" arbitration clauses which provide for the adjustment of disputes concerned with working out the details of a contract and clauses of a "universal" character which are intended to submit all disputes which might arise between the parties: see Heyman v. Darwin Ltd., supra at 393 per Lord Porter; Sanderson and Son v. Armor and Company Ltd. (1922) S.C. (H.L.) 117 at 125 per Lord Dunedin.

**29**    It is my view that the language of the clause, read in the context of the overall agreement and relationship between the parties, indicates that it was intended to perform a limited purpose identified with clauses of the executory variety.

**30**    The preamble to the clause states: "The Ministry and the Sponsor Group acknowledge that differences of view can arise in the development and construction of a non-profit housing project even when both the Ministry and Sponsor Group share similar goals and are acting with good will." It is apparent that the development of these projects was bound to be lengthy and complex procedure. Virtually all of the details had to be worked out in the stage by stage process contemplated by the Agreement. While the Ministry laid down criteria for the Sponsor Group to proceed from stage to stage in its program documents, given the number of matters to be determined and approved, there were bound to be differences along the way. Indeed, in attempting to meet the Ministry's argument that the Performance Agreements were void for vagueness or mere agreements to agree, the respondents contend that the arbitration clause could be relied on to fill in any missing gaps. In my view, the language of the preamble suggests that the arbitration clause was intended to deal with differences of the detail and gap-filling variety, and was not intended to deal with every conceivable dispute that might arise between the parties. The category of dispute suggested by the preamble certainly does not include with disputes as fundamental as the one which has arisen and which the respondents seek to arbitrate.

**31**    The language of the operative provision of the clause is, in my view, strongly suggestive of a limited purpose. There are three elements of the clause that lead me to this conclusion. First, it refers to "disputes about the interpretation of this agreement or about actions taken under this agreement." Read with the preamble, this language is indicative of disputes that might arise in working through the various stages of the project, disputes internal to the agreement itself which must be resolved to preserve and maintain an on-going relationship between the parties. This contractual language is a far cry from that typically found in arbitration clauses of the "universal" variety which

refer any disputes arising from or relating to the agreement. For a comparison, one need only refer to the terms of the existing Operating Agreement (which the respondents say would apply in default of a new agreement being worked out) para. 2.7 of which provides for the arbitration of "any dispute, difference or question between the parties under the Agreement." Similarly, in Heyman v. Darwin supra, the agreement provided for arbitration "if any dispute shall arise between the parties hereto in respect of this agreement or any of the provisions herein contained or anything arising hereunder." There is a demonstrable difference between the language of those agreements, indicating a contractual intention to provide for a much more all-encompassing arbitration clause, and the language of the clause in question here.

**32**    Second, Part 7 of the Performance Agreement specifically provides that "arbitration can only be used after attempts to resolve the dispute through the Ministry's internal review process have failed." This contemplates that there shall be a preliminary internal Ministry process through which all disputes subject to the clause must first proceed. Again, this is indicative of a contractual intention to limit the arbitration of disputes arising in the course of working through the details of the project. It is, in my view, inconceivable that a dispute of the dimensions that has arisen between these parties could fit the category of dispute appropriate for the "Ministry's internal review process". As that process is identified as the screen through which all disputes subject to arbitration must pass, I conclude that disputes not appropriate for such a process are excluded.

**33**    The third element is that the clause makes the arbitration award "final and binding and not subject to appeal." Read in conjunction with the Arbitration Act, s. 45, the clause has the effect of immunizing the arbitrator's decision from appellate review. Standing by itself such a provision would not limit the reach of a more expansive clause giving generous definition of the nature of disputes subject to arbitration. However, in my view, read in light of the factors I have already mentioned, this provision provides an added indicator of the limited scope of this clause. This provision is indicative of an intention to create an arbitration process designed to deal in a efficient and expeditious manner with disputes that might arise along the way to completion of the project. It indicates that the disputes contemplated have to be resolved quickly and finally so that the project is not stalled. In stark contrast to disputes of that description, the nature of the dispute that has arisen gives rise to fundamental issues of public law and the relationship of government decision-making and priority-setting to the contractual obligations of government. I find it difficult to imagine that absent more generous language, a dispute of this nature should be seen as appropriate for decision by a single adjudicator without further recourse to the courts.

**34**    Read as a whole, it is my view that the arbitration clause was intended to deal with the day-to-day disputes that were bound to arise in the development of these long-term and complex projects. It provided a mechanism to resolve differences in an efficient and expeditious fashion so that the projects would not be stalled in the event of a dispute. The language of this clause is distinguishable from the more expansive and open-ended language of arbitration clauses designed to remit all manner of disputes arising between the parties to arbitration.

**35**    Accordingly I find that the applicant has demonstrated that the arbitration agreement does not apply to the dispute that has arisen between the parties and accordingly, the applicant is entitled to a declaration that the arbitration is invalid.

2.    Is the subject-matter of the dispute capable of being the subject of arbitration?

**36**   In view of the my finding with respect to Issue 1, it is not strictly necessary for me to deal with this question. However, as considerable emphasis was placed on this point by counsel for the Ministry, it is perhaps appropriate for the sake of completeness for me briefly to indicate my view on this issue.

**37**   The Ministry based its argument that "the subject-matter of the dispute is not capable of being the subject of arbitration under Ontario law" within the meaning of s. 48(1)(c) of the Arbitration Act on the contention that where the existence of a legally enforceable agreement containing an arbitration clause is at issue, that dispute is not subject to arbitration. Reliance is placed on the following passage from the speech of Lord MacMillan in Heyman v. Darwin, supra at pp. 370-71:

> If it appears that the dispute is whether there has ever been a binding contract between the parties, such a dispute cannot be covered by an arbitration clause in the challenged contract. If there has never been a contract at all, there has never been as part of it an agreement to arbitrate. The greater includes the less.

It is submitted that this passage continues to represent the law of Ontario and that the principle which underlies it is embraced by s. 48(1)(c).

**38**   Contrary to the argument advanced by the Ministry, I fail to see how s. 48 (1)(c) has any application to the situation where the existence or validity of the agreement containing the arbitration clause is at issue. The question of whether or not the parties have entered a binding contract is a matter which, under the law of Ontario, is capable of being the subject of arbitration. The discussion of the provision in Casey, supra at 4-8 - 4-9 suggests that, as its language suggests, s. 48 (1)(c) is designed to deal with disputes that should be dealt with by the courts for reasons of public policy. That was not the basis of the Ministry's submission before me.

**39**   Moreover, in my view, the Ministry's argument ignores s. 17 which provides as follows:

> 17(1) An arbitral tribunal may rule on its own jurisdiction to conduct the arbitration and may in that connection rule on objections with respect to the existence or validity of the arbitration agreement.
>
> (2)   If the arbitration agreement forms part of another agreement, it shall, for the purposes of a ruling on jurisdiction, be treated as an independent agreement that may survive even if the main agreement is found to be invalid.

This provision would appear to overcome "the greater includes the lesser" conundrum posed by Lord MacMillan in Heyman v. Darwin. The arbitrator is given explicit authority to determine his or her own jurisdiction, even where the validity or existence of the agreement containing the arbitration clause is contested. The statute appears designed to preclude a party from avoiding arbitration by putting the agreement to arbitrate in question.

**40**   Accordingly, had it been necessary to decide the point, I would have denied the relief sought by the Ministry on this ground of argument.

      3.   Is the arbitration agreement invalid or has it ceased to exist?

**41**   For similar reasons, I would have rejected the Ministry's argument on this ground. Section 17 expressly confers authority on the arbitrator to determine the validity of the agreement to arbitrate. It is also clearly established that if the language of the arbitration clause is sufficiently wide to en-compass the dispute, a party cannot avoid arbitration by relying on its own breach as terminating the contract: Heyman v. Darwin, supra.

> 4.   If a declaration is granted in favour of the Ministry, should an injunction also is-sue to restrain the arbitration?

**42**   Section 48(2) of the Arbitration Act provides that an injunction may be granted against the commencement or continuation of the arbitration where such a declaration is made. As the respon-dents have initiated steps toward arbitration, it is appropriate to grant an injunction prohibiting the respondents from proceeding with the demands for arbitration which they have served.

> 5.   If the matter is to proceed to arbitration, should this court pronounce upon the en-forceability of either or both the Performance Agreements and the Operating Agreements?

**43**   As I have found that this matter is not within the terms of the arbitration clause, I need not and should not attempt to decide these fundamental questions on this motion. Indeed, although I was invited to do so by both parties, I seriously doubt that it would have been appropriate for me to find that the matter was appropriate for arbitration but at the same time decide on this preliminary mo-tion issues which go to the heart of the dispute.

CONCLUSION

**44**   Accordingly, the applicant Ministry is entitled to a declaration that Part 7 of the Performance Agreement does not apply to the matter in dispute between the parties and an injunction restraining the respondents from commencing or continuing any arbitration proceedings in respect of the Per-formance Agreement. The cross-application is dismissed. If the parties are unable to agree as to the costs of this proceeding, I may be spoken to.

SHARPE J.

qp/s/ln/mii/DRS/qlesm

TAB 3

*Indexed as:*
## T1T2 Limited Partnership v. Canada

### T1T2 Limited Partnership et al. v.
### The Queen in Right of Canada

**[1994] O.J. No. 2614**

23 O.R. (3d) 66

19 B.L.R. (2d) 72

35 C.P.C. (3d) 353

51 A.C.W.S. (3d) 584

Court File No. 94-CQ-55762

Ontario Court (General Division),

**Borins J.**

November 10, 1994

**Counsel:**

Ivan G. Whitehall, Q.C., David Sgayias, Q.C., and Paul Vickery, for moving party (defendant).

Ronald G. Slaght, Q.C., for responding parties (plaintiffs).

---

**1   BORINS J.:** -- This is a motion brought by the defendant pursuant to s. 106 of the Courts of Justice Act, R.S.O. 1990, c. C.43, for an order staying the plaintiffs' action. It is the position of the defendant that the plaintiffs are precluded from bringing this action as they have made a submission in accordance with the arbitration provisions contained in what are described in this action as the Airport Contracts. In the alternative, the court is asked to exercise its discretion under s. 106 of the Act to stay the proceedings on grounds which will be discussed below. Central to the resolution of this motion is the proper interpretation of the arbitration provisions which, for convenience, will be referred to as the "arbitration provision".

**2**    There is no dispute between the parties as to the events leading up to this action. The Airport Contracts provide for the privatization of Terminals 1 and 2 of the Lester B. Pearson International Airport. From March through July 1993, the plaintiffs and the defendant negotiated and agreed upon the fundamental terms of the Airport Contracts. In August 1993, the federal Cabinet and the Treasury Board approved these terms. The Airport Contracts were signed by the plaintiffs and the defendant on October 7, 1993, and the transaction closed on that date. Although the Airport Contracts consist of approximately 40 agreements, there are three principal agreements -- the Ground Lease, the Development Agreement and the Management and Operations Agreement. Each of these agreements contain an identical arbitration provision. Comprehensively, the Airport Contracts deal with all aspects of the leasing, redevelopment and operation of Terminals 1 and 2 until 2030, with an option to extend the agreements to 2050.

**3**    After October 25, 1993, the Minister of Transport requested that the plaintiffs delay the take-over of Terminals 1 and 2, scheduled for November 1, 1993, and the commencement of the first stage of construction, scheduled for December 1, 1993, in order to permit the defendant, which was then represented by a new government, to review the Airport Contracts. The plaintiffs agreed to this request. On December 3, 1993, the defendant, represented by the Prime Minister, announced that it intended to cancel the Airport Contracts forthwith, notwithstanding the absence of a cancellation provision in the agreements. Subsequent to this announcement, the defendant has not permitted the plaintiffs to occupy Terminals 1 and 2 with the result that the plaintiffs have been unable to perform their obligations under the Airport Contracts.

**4**    In April 1994, the government introduced in the House of Commons Bill C-22, which is described as "An Act respecting certain agreements concerning the redevelopment and operation of Terminals 1 and 2 at Lester B. Pearson International Airport". The Act purports to declare that the Airport Contracts had not come into force and to have no legal effect and provides that all existing legal recourse or entitlement to compensation from the Crown is negated, and purports to prohibit the plaintiffs from access to the courts in relation to the Airport Contracts. However, the Act authorizes the Minister of Transport, with the approval of the Governor in Council, to enter into agreements for the payment of amounts in connection with the coming into force of the Act. Some negotiations have taken place with Mr. Robert Wright concerning such payments. Bill C-22 was passed by the House of Commons on June 16, 1994, and was referred to the Senate. The Senate did not pass the Act, and recommended amendments deleting those provisions which deny the plaintiffs access to the courts. Bill C-22 has since been reaffirmed by the House of Commons and is, again, before the Senate.

**5**    The plaintiffs commenced their action with the issuance of their statement of claim on September 14, 1994. On September 16, 1994 the plaintiffs obtained an order under rule 20.01(2) of the Rules of Civil Procedure, on the ground of special urgency, granting leave to serve a notice of motion for summary judgment together with their statement of claim. On September 20, 1994 the defendant was served with the statement of claim, a notice of motion for summary judgment returnable November 21, 1994, and supporting motion materials.

**6**    The plaintiffs' claim is contained in para. 1 of the statement of claim which reads as follows:

      1. The plaintiffs claim:

    (a)   a declaration that the defendant committed a breach of the Airport Con-
            tracts on or about December 3, 1993, and has repudiated the Airport Con-
            tracts;

    (b)   a declaration that the defendant shall save the plaintiffs harmless from and
            against all claims, demands, losses, costs, damages, actions, suits or pro-
            ceedings brought against the plaintiffs by third parties with whom the
            plaintiffs contracted or with whom the plaintiffs entered into commitments
            or arrangements for the purpose of financing, designing, building, develop-
            ing and operating the Terminals 1 and 2 complex and generally carrying
            out the duties and obligations of the plaintiffs under the Airport Contracts;

    (c)   an order directing a reference to an arbitration tribunal appointed pursuant
            to the provisions of the Airport Contracts to assess the plaintiffs' losses and
            damages resulting from the defendant's breach, and judgment for the
            amount so determined by the arbitration tribunal . . .

Pursuant to the order of Conant J., granted on October 11, 1994, the plaintiffs provided particulars
of the claim contained in para. 1(b).

**7**    As I understand the plaintiffs' action, the order requested in para. 1(c) referring the assessment
of damages to an arbitration tribunal appointed pursuant to the provisions of Airport Contracts is
sought because the plaintiffs are required by the arbitration provision to submit the assessment of
damages to arbitration. Indeed, as I will explain below, on a proper interpretation of the arbitration
provision it is necessary that the court determine whether the defendant has committed a breach of
the Airport Contracts and whether the defendant must legally indemnify the plaintiffs for damages
which they have incurred to third parties by reason of their inability to perform the Airport Con-
tracts consequent to the defendant's alleged breach. Therefore, the declaratory judgments which the
plaintiffs claim in paras. 1(a) and 1(b) are required before they can ask the arbitration tribunal to
assess their damages.

**8**    Typical of the arbitration provisions in the three principal Airport Contracts is Article 49 in the
Ground Lease, which states:

ARTICLE 49

Arbitration

49.1

    (a)   Any dispute or difference between the parties hereto arising under this
            Lease except a dispute or difference involving a question of law may be re-
            ferred to an arbitration tribunal for an award and determination by written
            submission signed by either the Landlord or the Tenant.

    (b)   The parties agree that the award and determination of the arbitration tribu-
            nal shall be final and binding on the parties hereto.

(c)     The arbitration tribunal shall be governed by the Commercial Arbitration Code referred to in the Commercial Arbitration Act. (R.S.C. 1985 Chap. c-34.6).

49.2

(a)     The arbitration tribunal shall consist of three (3) arbitrators, one (1) appointed by the Landlord, one (1) appointed by Tenant and the third appointed by the first two (2) arbitrators.

(b)     The arbitration tribunal shall decide the dispute or difference in accordance with the laws referred to in Section 1.6. The arbitration tribunal shall not be authorized to decide ex aequo et bono or as amiable compositeur.

49.3

(a)     The proceedings shall take place in the Province of Ontario, unless the parties hereto agree otherwise.

(b)     The language to be used in the proceedings is English, unless the parties hereto agree otherwise.

(c)     The parties hereto, and not the arbitration tribunal, may appoint experts to give evidence in the arbitration proceedings.

49.4 During the progress of arbitration, the parties hereto shall continue to perform their obligations under this Lease.

49.5 If the Landlord should not be subject to the Commercial Arbitration Act (R.S.C. 1985, Chap. c. 34.6), the corresponding arbitration statute of the Province of Ontario shall apply.

**9**     The Commercial Arbitration Code ("Code"), referred to in art. 49.1(c), is a schedule to the Commercial Arbitration Act, R.S.C. 1985, c. 17 (2nd Supp.). It is based on the model law adopted by the United Nations Commission on International Trade Law on June 21, 1985. Counsel for the defendant has placed reliance on the following articles of the Code:

Article 5

Extent of Court Intervention

In matters governed by this Code, no court shall intervene except where so provided in this Code.

. . . . .

Chapter II. Arbitration Agreement

Article 7

Definition and Form of Arbitration Agreement

(1) "Arbitration agreement" is an agreement by the parties to submit to arbitration all or certain disputes which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not. An arbitration agreement may be in the form of an arbitration clause in a contract or in the form of a separate agreement.

. . . . .

Article 8

Arbitration Agreement and Substantive Claim before Court

(1) A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed.

(2) Where an action referred to in paragraph (1) of this article has been brought, arbitral proceedings may nevertheless be commenced or continued, and an award may be made, while the issue is pending before the court.

. . . . .

Chapter IV. Jurisdiction of Arbitral Tribunal

Article 16

Competence of Arbitral Tribunal to Rule on its Jurisdiction

(1) The arbitral tribunal may rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement. For that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause.

(2) A plea that the arbitral tribunal does not have jurisdiction shall be raised not later than the submission of the statement of defence. A party is not precluded from raising such a plea by the fact that he has appointed, or participated in the appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be be-