# EXHIBIT H

Court File No.  09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE - COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C.
1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION,  NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

### BOOK OF AUTHORITIES OF GENBAND US LLC
### (Returnable December 15, 2010)

### VOLUME I of II

December 10, 2010

**STIKEMAN ELLIOTT LLP**
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada  M5L 1B9

**Sean F. Dunphy  LSUC#: 24941J**
Tel: (416) 869-5662
**Alexander D. Rose  LSUC#: 49415P**
Tel: (416) 869-5261
**Erica Tait   LSUC#: 55996O**
Tel: (416) 869-6805
Fax: (416) 947-0866

Lawyers for the Moving Party,
Genband US LLC

**TO:**       Attached Service List

*Updated as of Monday, November 29, 2010*

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### SERVICE LIST

TO:      **OGILVY RENAULT LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Tony Reyes
         Jennifer Stam

         Email:   dtay@ogilvyrenault.com
                  treyes@ogilvyrenault.com
                  jstam@ogilvyrenault.com

         Tel:     416.216.4000
         Fax:     416.216.3930

         Lawyers for the Applicants

DOCSTOR: 1600901\3

- 2 -

TO:    **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:    nortel.monitor@ca.ey.com

Tel:    416.943.3016
Fax:    416.943.3300

AND
TO:    **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:    jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
fmyers@goodmans.ca
carmstrong@goodmans.ca

Tel:    416.597.4107
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO:    **OSLER HOSKIN AND HARCOURT LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:    lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
ahirsh@osler.com

Tel:    416.362.2111
Fax:    416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO:    **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:    dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:    416.868.3538
Fax:    416.364.7813

Lawyers for Export Development Canada

- 3 -

AND TO:
**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON K1A 1K3

Jennifer Sullivan

Email: jsullivan@edc.ca

Tel:      613.597.8651
Fax:     613.598.3113

AND TO:
**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON M5K 1K7

Robert I. Thornton
Rachelle Moncur
Leanne M. Williams

Email:    rthornton@tgf.ca
          rmoncur@tgf.ca
          lwilliams@tgf.ca

Tel:      416.304.1616
Fax:     416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO:
**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:    john.stringer@mcinnescooper.com
          stephen.kingston@mcinnescooper.com

Tel:      902.425.6500
Fax:     902.425.6350

Lawyers for Convergys EMEA Limited

AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart

Email:    jcarhart@millerthomson.com

Tel:      416.595.8615/8577
Fax:     416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO:
**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:    barry.wadsworth@caw.ca
          lewis.gottheil@caw.ca

Tel.:     416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada

AND TO:
**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC V7X 1S8

R. Hoops Harrison

Email:    hharrison@boughton.ca

Tel:      604.687.6789
Fax:     604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.,
in its capacity as duly authorized agent for
Holdings 1506 Enterprises Ltd.

DOCSTOR: 1600901\3

- 4 -

AND TO:
**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:     416. 367.6646
Fax:    416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:     416.367.6266
Fax:    416.361.7067

Email:  srappos@blgcanada.com
Tel:     416.367.6033
Fax:    416.361.7306

Lawyers for Bell Canada

AND TO:
**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

John Contini
Aaron Rousseau

Email   jcontini@langmichener.ca
Tel:     416.307.4148
Fax:    416.304.3767

Email   arousseau@langmichener.ca
Tel:     416.307.4081
Fax:    416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:
**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:  ray.leach@siskinds.com
           dimitri.lascaris@siskinds.com
           monique.radlein@siskinds.com

Tel:     519.672.2121
Fax:    519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:
**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email:  zychk@bennettjones.com
Tel:     416.777.5738
Fax:    416.863.1716

Email:  orzyr@bennettjones.com
Tel:     416.777.5737
Fax:    416.863.1716

Email:  finlaysong@bennettjones.com
Tel:     416.777.5762
Fax:    416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

| | | | | |
|---|---|---|---|---|
| AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 | | AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 |

| | |
|---|---|
| Mark Zigler<br>Susan Philpott<br>Demetrios Yiokaris<br>Andrea McKinnon<br>Celeste Poltak | Mark Zigler<br>Susan Philpott<br>Demetrios Yiokaris<br>Andrea McKinnon<br>Celeste Poltak |

| | | | |
|---|---|---|---|
| Email:<br>Tel:<br>Fax: | mzigler@kmlaw.ca<br>416.595.2090<br>416.204.2877 | Email:<br>Tel:<br>Fax: | mzigler@kmlaw.ca<br>416.595.2090<br>416.204.2877 |
| Email:<br>Tel:<br>Fax: | sphilpott@kmlaw.ca<br>416.595.2104<br>416.204.2882 | Email:<br>Tel:<br>Fax: | sphilpott@kmlaw.ca<br>416.595.2104<br>416.204.2882 |
| Email:<br>Tel:<br>Fax: | dyiokaris@kmlaw.ca<br>416.595.2130<br>416.204.2810 | Email:<br>Tel:<br>Fax: | dyiokaris@kmlaw.ca<br>416.595.2130<br>416.204.2810 |
| Email:<br>Tel:<br>Fax: | amckinnon@kmlaw.ca<br>416.595.2150<br>416.204.2874 | Email:<br>Tel:<br>Fax: | amckinnon@kmlaw.ca<br>416.595.2150<br>416.204.2874 |
| Email:<br>Tel:<br>Fax: | cpoltak@kmlaw.ca<br>416.595.2701<br>416.204.2909 | Email:<br>Tel:<br>Fax: | cpoltak@kmlaw.ca<br>416.595.2701<br>416.204.2909 |

| | |
|---|---|
| Lawyers for the Former Employees of Nortel | Lawyers for the LTD Beneficiaries |

DOCSTOR: 1600901\3

- 6 -

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email:   msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Email:   jmklotz@millerthomson.com
Tel:      416.595.4373
Fax:      416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:
**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:   joseph.kim@lge.com

Tel:      +82.2.3777.3171
Fax:      +82.2.3777.5345

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email   msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:
**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:      416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

- 7 -

| | |
|---|---|
| AND TO: | **PALIARE ROLAND ROSENBERG ROTHSTEIN LLP** |
| | Suite 501 |
| | 250 University Avenue |
| | Toronto, ON  M5H 3E5 |

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:  ken.rosenberg@paliareroland.com
Tel:    416.646.4304
Fax:    416.646.4301

Email:  max.starnino@paliareroland.com
Tel:    416.646.7431
Fax:    416.646.4301

Email:  lily.harmer@paliareroland.com
Tel:    416.646.4326
Fax:    416.646.4301

Email:  tina.lie@paliareroland.com
Tel:    416.646.4332
Fax:    416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND TO: **FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:  Shayne.kukulowicz@fmc-law.com
        Alex.macfarlane@fmc-law.com
        Michael.wunder@fmc-law.com
        ryan.jacobs@fmc-law.com

Tel:    416.863.4511
Fax:    416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND TO: **GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:  patrick.shea@gowlings.com

Tel:    416.369.7399
Fax:    416.862.7661

Lawyers for Westcon Group

AND TO: **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:  rslattery@mindengross.com
        dullmann@mindengross.com
Tel:    416.369.4149
Fax:    416.864.9223

Lawyers for Verizon Communications Inc.

DOCSTOR: 1600901\3

- 8 -

| | |
|---|---|
| AND TO: | **AIRD & BERLIS**<br>Brookfield Place<br>181 Bay Street, Suite 1800<br>Toronto, ON  M5J 2T9 |

Harry Fogul
Peter K. Czegledy

Email:   hfogul@airdberlis.com
Tel:      416.865.7773
Fax:     416.863.1515

Email:   pczegledy@airdberlis.com
Tel:      416.865.7749
Fax:     416.863.1515

Lawyers for Microsoft Corporation

AND TO:   **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:   renglish@airdberlis.com
            smitra@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND TO:   **ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:   surquhart@ahbl.ca
Tel:      604.484.1757
Fax:     604.484.1957

Lawyers for Algo Communication Products Ltd.

AND TO:   **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:   vdare@foglers.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Andrew, LLC

AND TO:   **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND TO:   **MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:   mfleming@millerthomson.com
Tel:      416.595.8686
Fax:     416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

DOCSTOR: 1600901\3

- 9 -

AND
TO:
**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:      416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:      416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services


AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for Perot Systems Corporation


AND
TO:
**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

Email:   dgrieve@casselsbrock.com
Tel:      416.860.5219
Fax:      416.350.6923

Lawyers for Alvarion Ltd.


AND
TO:
**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:      416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:      416.865.7286
Fax:      416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:      416.865.7262
Fax:      416.865.7048

Lawyers for Royal Bank of Canada


AND
TO:
**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:   lawrence.crozier@mcmillan.ca
Tel:      416.865.7178
Fax:      416.865.7048

Email:   adam.maerov@mcmillan.ca
Tel:      416.865.7285
Fax:      416.865.7048

Lawyers for Citibank


AND
TO:
**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:      416.593.2996
Fax:      416.593.5437

Lawyers for Expertech Network Installation Inc.

DOCSTOR: 1600901\3

- 10 -

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:    416.865.6655
Fax:    416.865.6636

Email:  vdare@foglers.com
Tel:    416.865.6641
Fax:    416.865.6636

Lawyers for Amphenol Corporation

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Aaron Rousseau

Email:  arousseau@langmichener.ca
Tel:    416.307.4081
Fax:    416.365.1719

Lawyer for Right Management Inc.

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra

Email:  smitra@airdberlis.com

Tel:    416.863.1500
Fax:    416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:  bleonard@casselsbrock.com
        hgarman@casselsbrock.com
        mcasey@casselsbrock.com

Tel:    416.860.6455
Fax:    416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

- 11 -

| | | | | |
|---|---|---|---|---|
| AND TO: | **MCFARLANE LEPSOE**<br>Barristers & Solicitors<br>70 Gloucester Street, Third Floor<br>Ottawa, Ontario  K2P 0A2 | | AND TO: | **COLBY, MONET DEMERS, DELAGE & CREVIER LLP**<br>Tour McGill College<br>1501 McGill College Avenue<br>Suite 2900<br>Montreal, Quebec  H3A 3M8 |

AND TO:

**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:    pklepsoe@mcfarlanelaw.com

Tel:    613.233.2679
Fax:    613.233.3774

Lawyers for Iron Mountain Canada Corporation and Iron Mountain Information Management, Inc.

AND TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:    theintzm@mccarthy.ca
Tel:    416.601.7627
Fax:    416.868.0673

Email:    jsirivar@mccarthy.ca
Tel:    416.601.7750
Fax:    416.868.0673

Lawyers for Frank Andrew Dunn

AND TO:

**COLBY, MONET DEMERS, DELAGE & CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:    ddropsy@colby-monet.com
Tel:    514.284.3663
Fax:    514.284.1961

Lawyers for GFI INC., a division of Thomas & Betts Manufacturing Inc.

AND TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:    janice.payne@nelligan.ca
             steven.levitt@nelligan.ca
             christopher.rootham@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel Canadian Continuing Employees – Post CCAA as at January 14, 2009

- 12 -

| | | | |
|---|---|---|---|
| AND TO: | **BAKER & McKENZIE LLP**<br>Brookfield Place, P.O. Box 874<br>181 Bay Street, Suite 2100<br>Toronto, Ontario  M5J 2T3 | AND TO: | **BENNETT JONES LLP**<br>1 First Canadian Place<br>Suite 3400<br>Toronto, Ontario  M5X 1A4 |

AND TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:      416.865.2318
Fax:     416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:      416.865.6944
Fax:     416.863.6275

Lawyers for Jabil Circuit Inc.

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
            laugesenm@bennettjones.com

Tel:      416.863.1200
Fax:     416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND TO:

**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
            mgaggino@schneidergaggino.com

Tel:      514.631.8787
Fax:     514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:      416.369.4335
Fax:     416.864.9223

Lawyers for 2748355 Canada Inc.

AND TO:

**EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:      613.745.0921
Fax:     613.745.1172

AND TO:

**BALDWIN LAW PROFESSIONAL CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:   lbrady@baldwinlaw.ca
Tel:      613.771.9991
Fax:     613.771.9998

Lawyers for Sydney Street Properties Corp.

- 13 -

AND
TO:

**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:     714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:     416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:     416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND
TO:

**LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :   jysimard@lavery.ca
Tel :     514.871.1522
Fax :     514.871.8977

Lawyers for Texas Landlords to Nortel
Networks Inc.

AND
TO:

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:   raffy.lorentzian@ntscorp.com
Tel:     714.998.4351

- 14 -

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com

Tel:      416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:     416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND
TO:

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:   rschwill@dwpv.com
Tel:      416.863.0900
Fax:     416.863.0871

Email:   mgottlieb@dwpv.com
Tel:      416.863.0900
Fax:     416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:   tosullivan@counsel-toronto.com
Tel:      416.598.1744
Fax:     416.598.3730

Email:   slaubman@counsel-toronto.com
Tel:      416.598.1744
Fax:     416.598.3730

Lawyers for William A. Owens

DOCSTOR: 1600901\3

- 15 -

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:   lydia.salvi@bakernet.com

Tel:     416.865.6944
Fax:     416.863.6275

Lawyers for Wipro Limited

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:     416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:     416.865.3082
Fax:     416.863.1515

Lawyers for the Current and Former Employees
of Nortel Networks Inc. who are or were
Participants in the Long-Term Investment Plan
Sponsored by Nortel Networks Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:     416.601.8342
Fax:     416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:

**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:   sbomhof@torys.com
Tel:     416.865.7370
Fax:     416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND
TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:     416.973.3172
Fax:     416.973.0810

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:   sseigel@langmichener.ca
Tel:     416.307.4063
Fax:     416.365.1719

Lawyers for The Bank of New York Mellon

- 16 -

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:      416.863.2572
Fax:      416.863.2653

Email:  marc.flynn@blakes.com
Tel:      416.863.2685
Fax:      416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:      416.863.2958
Fax:      416.863.2653

Email:  milly.chow@blakes.com
Tel:      416.863.2594
Fax:      416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:      416.863.2426
Fax:      416.863.2653

Email:  craig.thorburn@blakes.com
Tel:      416.863.2965
Fax:      416.863.2653

Lawyers for MatlinPatterson Global Advisers
LLC, MatlinPatterson Global Opportunities
Partners III L.P. and MatlinPatterson
Opportunities Partners (Cayman) III L.P.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:  kmcelcheran@mccarthy.ca
Tel:      416.601.7730
Fax:      416.868.0673

Email:  rstabile@mccarthy.ca
Tel:      416.601.8335
Fax:      416.868.0673

Lawyers for Avaya Inc.

AND
TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:      416.979.6425
Fax:      416.591.7333

Email:  dbrown@sgmlaw.com
Tel:      416.979.4050
Fax:      416.591.7333

Lawyers for Edmund Fitzgerald

DOCSTOR: 1600901\3

- 17 -

| | | | | |
|---|---|---|---|---|
| AND TO: | **FOGLER, RUBINOFF LLP**<br>Barristers and Solicitors<br>Suite 1200<br>Toronto-Dominion Centre<br>95 Wellington Street West<br>Toronto, Ontario  M5J 2Z9<br><br>Jeffrey K. Spiegelman<br><br>Email:  ispiegelman@foglers.com<br>Tel:     416.864.9700<br>Fax:    416.941.8852<br><br>Lawyers for Belden (Canada) Inc. | | AND TO: | **STIKEMAN ELLIOTT LLP**<br>445 Park Avenue, 7th Floor<br>New York, NY  10022<br><br>Gordon Cameron<br>Ron Ferguson<br><br>Email:  gncameron@stikeman.com<br>Tel:     212.845.7464<br>Fax:    212.371.7087<br><br>Email:  rferguson@stikeman.com<br>Tel:     212.845.7477<br>Fax:    212.371.7087<br><br>Lawyers for GENBAND Inc. |

AND TO: **FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:  ispiegelman@foglers.com
Tel:     416.864.9700
Fax:    416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO: **STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:  gncameron@stikeman.com
Tel:     212.845.7464
Fax:    212.371.7087

Email:  rferguson@stikeman.com
Tel:     212.845.7477
Fax:    212.371.7087

Lawyers for GENBAND Inc.

AND TO: **STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:  sdunphy@stikeman.com
Tel:     416.869.5662
Fax:    416.947.0866

Lawyers for GENBAND Inc.

AND TO: **BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:  jmarshall@blgcanada.com
Tel:     416.367.6024
Fax:    416.361.2763

Email:  chill@blgcanada.com
Tel:     416.367.6156
Fax:    416.631.7301

Lawyers for the U.K. Pensions Regulator

AND TO: **VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

E-mail:  thomas.wallis@vdg.ca
Tel:     613.241.2701
Fax:    613.241.2599

Lawyers for La Regie des Rentes du Quebec

AND TO: **ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON  M5H 2K1

Joel P. Rochon

Email:  jrochon@rochongenova.com
Tel:     416.363.1867
Fax:    416.363.0263

Lawyers for the Opposing LTD Employees

- 18 -

AND TO:
**BLAKE, CASSELS & GRAYDON**
Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, Ontario  M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email:   pamela.huff@blakes.com
Tel:     416.863.2958
Fax:     416.863.2653

Email:   jeremy.forgie@blakes.com
Tel:     416.863.3888
Fax:     416.863.2653

Lawyers for The Northern Trust Company, Canada

AND TO:
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer

Email:   lschweitzer@cgsh.com
         jbromley@cgsh.com
Tel:     212.225.2000
Fax:     212.225.3999

Lawyers for Nortel Networks Inc.

AND TO:
**LERNERS LLP**
130 Adelaide St. West
Suite 2400
Toronto, ON  M5H 3P5

William E. Pepall

Email:   wpepall@lerners.ca
Tel:     416.601.2352
Fax:     416.867.2415

Lawyers for the Former Employees in Respect of the Distribution of the Corpus of the Health and Welfare Trust

AND TO:
**MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email:   kyle.kashuba@macleoddixon.com
Tel:     403.267.8399
Fax:     403.264.5973

Constellation NewEnergy Canada Inc.

AND TO:
**SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email:   pengelmann@sgmlaw.com
Tel:     613-482-2452
Fax:     613-235-3041

Email:   fcampbell@sgmlaw.com
Tel:     613-482-2451
Fax:     613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the Distribution of the Corpus of the Health and Welfare Trust

AND TO:
**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

D. Brent McPherson

Email:   bmcpherson@langmichener.ca
Tel:     416.307.4103
Fax:     416.304.3769

Lawyers for Wells Fargo Bank, National Association, as successor by merger to Wachovia Bank, N.A., in its capacity as Servicer for the Nortel Networks Pass-Through Trust, Series 1-1

- 19 -

| | | | |
|---|---|---|---|
| AND TO: | **McCARTHY TETRAULT LLP**<br>Suite 5300, Toronto Dominion Bank Tower<br>Toronto, Ontario  M5K 1E6 | AND TO: | **DAVID STEER**<br>10 Cypress Court<br>Nepean, ON  K2H 8Z8 |

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage

E-mail:  bboake@mccarthy.ca
Tel:     416.601.7557
Fax:     416.868.0673

Email:  jgage@mccarthy.ca
Tel:     416.601.7539
Fax:     416.686.0673

Lawyers for Morneau Sobeco Limited
Partnership

AND
TO:

**DAVID STEER**
10 Cypress Court
Nepean, ON  K2H 8Z8

E-mail:  davidsteer127@sympatico.ca

DOCSTOR: 1600901\3

- 20 -

**COURTESY COPIES:**

AND TO: **LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:   sbrown@lrlaw.com

Tel:    602.262.5321
Fax:    602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND TO: **AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036

Fred S. Hodara

Email:   fhodara@akingump.com

Tel:    212.872.1000
Fax:    212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND TO: **CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:  sreisman@curtis.com
         jdrew@curtis.com

Tel:    212.696.6000
Fax:    212-697-1559

Lawyers for Flextronics International

AND TO: **MILBANK, TWEED, HADLEY McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:   DDunne@milbank.com
Tel:    212.530.5770
Fax:    212.530.5219

Email:   ALeblanc@milbank.com
Tel:    212.835.7574
Fax:    212.530.5219

Email:   APisa@milbank.com
Tel:    212.530.5319
Fax:    212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

DOCSTOR: 1600901\3

- 21 -

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:  mschein@vedderprice.com

Tel:  212.407.6920
Fax:  212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email:  eric.prezant@bryancave.com
Tel:  312.602.5033
Fax:  312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :  andrew.robertson@macleoddixon.com
caylee.rieger@macleoddixon.com

Tel :  403.267.8222
Fax :  403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email:  michael.riela@lw.com

Tel :  212.906.1373
Fax :  212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

# INDEX

Court File No.  09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE - COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,  NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED

### BOOK OF AUTHORITIES OF GENBAND US LLC
### (Returnable December 15, 2010)

### INDEX

| TAB | AUTHORITIES |
|-----|-------------|
| **Volume I** | |
| 1. | *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*, [1998] O.J. No. 2637 (Gen. Div. [Commercial List]). |
| 2. | *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. (3d) 254 (C.A.). |
| 3. | *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.). |
| 4. | *Woolcock v. Bushert*, [2004] O.J. No. 4498 (C.A.). |
| **Volume II** | |
| 5. | *Plan Group v. Bell Canada*, [2009] O.J. No. 2829 (C.A.). |
| 6. | *Bakorp Management Ltd. v. Pepsi-Cola Canada Ltd.*, [1994] O.J. No. 873. |

| TAB | AUTHORITIES |
|-----|-------------|
| 7. | *Re Lehndorff General Partner Ltd.* [1993] O.J. No. 14 (Gen. Div. [Commercial List]). |
| 8 | Lloyd W. Houlden et al., *The 2011 Annotated Bankruptcy and Insolvency Act* (Toronto: Carswell, 2010). |
| 9. | *R. v. Wilson,* [1983] 2 S.C.R. 594. |
| 10. | *Re Canadian Airlines Corp.*, [2000] A.J. No. 1692 (Alta. Q.B.). |
| 11. | R. H. McLaren, *Canadian Commercial Reorganization: Preventing Bankruptcy,* looseleaf (Aurora: Canada Law Book, 2009). |

TAB  1

*Indexed as:*
## Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

**Between**
**The Toronto-Dominion Bank, plaintiff, and**
**Peat Marwick Thorne Inc. in its capacity as Trustee of the**
**Estate of Leigh Instruments Limited, a Bankrupt: The Plessey**
**Company plc; GEC Siemens plc: and the General Electric**
**Company plc, defendants**

[1998] O.J. No. 2637

63 O.T.C. 1

40 B.L.R. (2d) 1

81 A.C.W.S. (3d) 117

Court File No. 51353/90 and Commercial List Court File No.

B195/94

Ontario Court of Justice (General Division)
Commercial List

**Winkler J.**

Heard: January 13, 1997 to May 1, 1998.
Judgment: June 24, 1998.

(277 pp.)

*Banks and banking -- Letters of comfort -- Validity -- Contracts -- Formation of contract --*
*Intention -- Terms -- Representations -- Representation v. warranty -- Interpretation -- Ambiguity --*
*Contra proferentum rule -- Mistake -- Relief -- Rectification -- Fraud and misrepresentation --*
*Fraud and misrepresentation -- Negligent misrepresentation -- Elements of actionable*
*misrepresentation -- Reliance -- Fraudulent misrepresentation (deceit) -- What constitutes fraud.*

Action by Toronto-Dominion Bank against Plessey Company and GEC for damages for breach of contract and negligent misrepresentation. The action resulted from a letter provided by Plessey to the Bank on behalf of its subsidiary, Leigh Instruments. Leigh was a high-tech company that was involved in the defence industry. Plessey was a large British company that acquired Leigh in April 1988. Leigh had borrowed funds from the Bank prior to Plessey's acquisition. The Bank financed the takeover of Leigh. It could not obtain a guarantee from Plessey. It agreed to accept a comfort letter in order to obtain more business from Plessey. The letter stated that Plessey would not change its ownership position in Leigh until it provided prior notice to the Bank. It contained a policy statement that Leigh would be managed in a manner that would enable it to meet its financial obligations. As Leigh borrowed more money, new comfort letters were provided that replaced their predecessors. The Bank was consulted for the wording of some of the letters. It was given the opportunity to make modifications. The indebtedness started at $10 million and increased to $38 million because of Leigh's financial problems. In September 1989, GEC Siemens, a joint venture of General Electric and Siemens, completed a hostile takeover of Plessey. The joint venture conducted a review and division of the Plessey subsidiaries. In the interim, Leigh required more funds. The Bank agreed to increase the loan to $45 million, provided that it received a new comfort letter. The new letter, dated December 15, 1989, stated that it was not a legally binding commitment. It was accepted by the Bank. The Bank called Leigh's loan after the joint venture refused to guarantee it. Leigh made an assignment in bankruptcy on April 11, 1990. The Bank did not rely on Leigh's financial state. It knew that Leigh could not repay the loan without assistance. It submitted that Plessey had breached its promise to ensure that Leigh would meet its financial obligations. The Bank claimed that it was entitled to rectification to eliminate the statement that the letter was not a legally binding commitment. The Bank also submitted that the letter contained material misrepresentations, as Plessey was not involved in the management of Leigh, and it had no policy regarding its subsidiaries.

HELD: Action dismissed. The final comfort letter applied. It superseded the previous letters. It was accepted by the Bank. The defendants were not liable in contract because it was not a legally binding commitment. The letter was a representation and not a warranty. It did not contain a legally enforceable promise. It was merely a statement of present policy. The letter was not ambiguous. Rectification was not available because the Bank reviewed the letter and accepted it. The claims in tort also failed. The policy statement did not mislead the Bank. Statements made by Plessey and GEC personnel did not support the claim of misrepresentation. The statements were not made, did not mislead the Bank or were not relied upon by the Bank. The evidence did not support the fraud claim. Letters of comfort were not guarantees or formal security, and were not enforceable as such. They were moral obligations. They were only effective if the giver could be swayed by the negative effect non-compliance would have on its creditworthiness and reputation in the marketplace.

[Ed. note: Supplementary reasons for judgment released October 26, 1998. See [1998] O.J. No. 4221.

A Corrigendum was released by the Court September 3, 1998 and the corrections have been made to the text.]

**Counsel:**

John A. Campion, Peter Downard and Paul F. Monahan, for the plaintiff.
Earl A. Cherniak, Q.C., Robert J. Morris, Susan B. Wortzman and Lisa C. Munro, for the defendant the Plessey Company plc.
Peter F.C. Howard, Johanna Superina and Adrian C. Lang, for the defendant the General Electric Company plc.

---

**WINKLER J.:--**

Table of Contents

PART I

    INTRODUCTION
    OVERVIEW
    THE TRIAL
    DISPOSITION
    The Claim in Contract
    The Claim in Tort

PART II

    THE EVIDENCE
    The Bank and Leigh prior to April 1988
    Spring 1988 - The Takeover by Plessey,
    First Comfort Letter and
    Amalgamation
    The Second Comfort Letter
    The Multi-Option Facility
    September 1988 to April 1989 -
    The Third Comfort Letter
    The Fourth Comfort Letter and the Bulge
    The GEC Siemens Takeover
    Fall 1989 and the Fifth Comfort Letter
    Winter - Spring 1990 - The Bankruptcy
    of Leigh

The Parties' Understanding of Comfort
Letters
THE WITNESSES
The Bank Witnesses
The Plessey Witnesses
The GEC Witnesses
The Leigh Witness
The Expert Banking Witness


PART  III

ISSUES AND LAW
OVERVIEW
The Claims in Contract
The Claims in Tort
Conduct outside the Comfort Letters
THE CLAIMS IN CONTRACT
PRINCIPLES OF CONTRACTUAL INTERPRETATION
Factual Matrix
Ambiguity
APPLICATION TO THE CIRCUMSTANCES OF
THIS CASE
Interpretation of the comfort Letter on
its Face
The Statement of Policy in the Third
Paragraph
The Factual Matrix
Ambiguity
Circumstances Leading up to the First
Comfort Letter
Evidence Regarding the Subsequent Comfort
Letters
Evidence of Subsequent Conduct
Contra Proferentem
Rectification
NEGLIGENT AND FRAUDULENT MISREPRESENTATION
THE LAW

Negligent Misrepresentation
1. There must be a Duty of Care based
on a "Special Relationship"
2. The Representation in Question
must be Untrue, Inaccurate
or Misleading
3. The Representor must have acted
Negligently in Making
the Misrepresentation
4. The Representee must have Relied,
in a Reasonable Manner, on the
Negligent
Fraudulent Misrepresentation
APPLICATION TO THE FACTS OF THIS CASE
Misrepresentation in the First Four
Comfort Letters
Existence of a "Special Relationship"
The Representation Must be Untrue,
Inaccurate or Misleading
The Plaintiffs Interpretation of the
Comfort Letter
Untrue, Inaccurate or Misleading
Fraud and Negligent Misrepresentation in
the Fifth Comfort Letter
Conduct Outside the Letters
Tantamount to a Guarantee
The Justice Statements
The Anderson Statement
The February 26 Memo

PART IV

DAMAGES
The Claim in Contract
The Claim in Misrepresentation based on
the Comfort Letters
Conduct Outside the Letters

INTEREST

PAR  V
T
      CONCLUSION

APPENDIX A - Dramatis Personae

APPENDIX B - Corporate Structure

APPENDIX C - Leigh Loan Balances

**1**    This is an action on a comfort letter brought by The Toronto-Dominion Bank against The Plessey Company plc., the U.K. parent of a Canadian company Leigh Instruments Ltd., and one of Plessey's shareholders General Electric Company plc. The claim is for damages for breach of contract and in the alternative damages for the tort of negligent misrepresentation. The bank alleges fraud.

PART I

INTRODUCTION

**2**    The short unhappy life of Leigh Instruments Ltd. provides the centre-piece for this action. Leigh was a high-tech company on the leading edge of the Canadian defence industry. The events described here occurred during the brief period of two years from April 1988 to April 1990.

**3**    In April 1988, Leigh was acquired as the result of a successful takeover bid by The Plessey Company plc., a large U.K. company with a focus on electronics and defence products. A year and a half later, in September 1989, GEC Siemens plc, a joint venture consisting of General Electric Company plc. and Siemens A.G., completed a hostile takeover of Plessey. GEC has been described as the largest industrial enterprise in the U.K. Siemens is a vast German multinational company. Both companies are heavily into the electronics and defence businesses.

**4**    The Toronto-Dominion Bank is one of Canada's five main chartered banks with operations world wide. TD is the plaintiff in this action and was banker to Leigh. Over the two-year period in question Leigh's borrowing increased from nil at the time of the take-over by Plessey in April 1988, to $40.5 million in April 1990 when Leigh went into bankruptcy.

**5**    Although the Banks line of credit to Leigh was unsecured and the parent company had not formally guaranteed the loan, the Bank did have a letter of comfort issued in its favour by Plessey in respect of the Leigh loan.

**6**    In this proceeding, TD seeks to recover from Plessey and GEC the amount advanced by it to

Leigh. It bases its claim on the letter of comfort and alleges breach of contract and negligent misrepresentation. The bank also alleges fraud. My overview of the facts, key findings and points of argument follow.

OVERVIEW

**7**    Leigh's banking relationship with TD dated back to 1982. At that time Leigh was a public company with operations at Kanata, Ontario. In 1983 the bank had been concerned about Leigh's financial condition and the reliability of its security for the borrowing, to the extent that it considered forcing Leigh into bankruptcy or ridding itself of Leigh as a customer. With the assistance of a bank work-out specialist and the bank's co-operation, Leigh survived this crisis.

**8**    The relationship continued and on March 1, 1988, Leigh and TD entered into a facility agreement pursuant to which Leigh had a $5.4 million loan facility, secured by a floating charge debenture and an assignment of book debts. Leigh however, did not draw down on the facility and had approximately $10 million in its treasury. At the same time, Leigh had entered into a number of long-term, fixed-price contracts with the Canadian government to design and build defence products. Two of the largest programs were the Ship Interior Communications System Program (SHINCOM) and Tactical Air Navigational System Program (TACAN). All of this must have seemed attractive because at least two takeover bids for Leigh were mounted in the early spring of 1988.

**9**    The bid by the Plessey Company plc. through its acquisition vehicle Plessey Canada (1988) Inc. was successful and Leigh was acquired for $104 million in April 1988.

**10**    In order partially to assist with the financing of the acquisition, TD made available to Plessey Canada a $10 million uncommitted loan facility. This was a short-term acquisition loan, unsecured and payable on demand. It was understood that this facility would be re-paid from the $10 million in the Leigh treasury once Plessey had complete ownership of Leigh, expected to occur about three months later.

**11**    The loan was based on the creditworthiness of the parent company, since there were no financial statements for the acquisition vehicle, Plessey Canada. Operating in the mistaken belief, at least initially, that Plessey did not provide guarantees for loans to its subsidiaries but more pointedly because a guarantee from the parent company was not on offer, TD proposed that Plessey supply it with a letter of comfort, which Plessey agreed to provide. TD noted that a "strong letter of comfort" would be obtained by TD in London and forwarded to the bank in Toronto. The first comfort letter dated April 20, 1988 was sent to TD on April 27, two to three weeks after the funds were drain down.

**12**    The internal structure of the bank was such that Corporate Banking Division was responsible for direct customer contact, monitoring accounts, preparation of credit applications and documentation. Credit Division, on the other hand, was charged with reviewing credit risks to the

bank and approving loans subject to whatever terms it felt appropriate.

**13**    TD's willingness to accommodate Plessey, as demonstrated above, was it seems motivated to no small extent by its desire to retain the Leigh business in Canada, since it had no prior relationship with Plessey. TD also hoped to use this as a bridgehead for development of business with Plessey itself in Canada and abroad. Therefore, although the line with Plessey Canada was clearly a short-term bridge loan, TD put it through as an operating line. The facility contained no financial reporting provision.

**14**    Letters of comfort are at the heart of this proceeding. A letter of comfort is an improvisation of the banking industry which grew out of the increased competitiveness between banks, making it more difficult for banks to obtain parent company guarantees for loans to subsidiaries. A comfort letter may be described as a letter provided by a parent company to a bank concerning the borrowings of a subsidiary intended to give to the bank a degree of comfort about the transaction but also intended to fall short of a guarantee to repay the debts of the subsidiary. Comfort letters generally are not legally binding in terms of imposing an obligation to repay the debt of the subsidiary, and are perceived in the business world as moral agreements.

**15**    Typically a comfort letter may contain statements or obligations such as an acknowledgment of awareness of the debt facility, an obligation to maintain ownership of the subsidiary or to provide notice of any change in such ownership. It may contain a statement of general corporate policy.

**16**    Those commercial considerations which might impact on a bank's decision to accept a comfort letter as opposed to insisting on a formal and legally enforceable guarantee could include the overall relationship of the bank with the corporate group involved, its general reputation, the volume of business and profit margins that the bank enjoyed from them as well as the degree of risk inherent in the instant transaction. In short, the terms which comprise a letter of comfort will likely be negotiated individually, address some or all of the above issues and be somewhat idiosyncratic reflecting the respective bargaining power of the parties.

**17**    Moving from the general to the particular, the Plessey letter of comfort referenced the loan to Plessey Canada. It stated that Plessey would not change its ownership position in the subsidiary without providing prior notice to TD. Finally, it contained a policy paragraph which stated:

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc., be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts owing under the above facility.

Two points were clear. The Plessey letter of comfort was not formal security and it was not a formal guarantee. Nonetheless, Plessey included it in its guarantee register for convenience.

**18**    On June 30, 1988, Plessey Canada was amalgamated with Leigh; the new entity was known as

of July 1, 1988 as Leigh Instruments Limited. When it came time, however, to pay down the Plessey Canada loan from the funds in the Leigh treasury, as had been the plan, it was determined that the cash had been depleted. As a consequence, the loan was rolled over, with Plessey acknowledging on August 1, 1988, that the comfort letter applied to what was now a loan to Leigh. This became known as the second comfort letter.

**19**    The financial structure of Leigh was settled by Plessey and Leigh, largely in accordance with the initial plan, with approximately $25 million in equity and $69 million in inter-company debt owed to Plessey, plus the $10 million loan from TD. As a result of acquisition accounting adjustments made to bring Leigh's accounting policies into line with those of Plessey, the book value of the assets of Leigh was devalued from $51 million to $13 million. All of this was known to TD.

**20**    Deloitte, Haskins and Sells, Plessey's auditors, had prepared a due diligence report for Plessey prior to the acquisition of Leigh, in March, 1988. The report stated that Plessey's policies regarding valuation of inventory and revenue recognition were more conservative than those of Leigh. It noted also that there were missed milestones and projected margins regarding certain of Leigh's major contracts. It drew attention to liquidated damages consequences in certain of the contracts for delays. These prognostications boded ill for the future, for in the summer and fall of 1988 the bank loan began an upward climb due to these very problems, culminating ultimately in the bankruptcy of Leigh on April 12, 1990.

**21**    Although the bank was aware of all of this, it is clear to me that the preoccupation of the bank throughout this period was with its relationship with Plessey and business development. At the same time, the bank's credit division was concerned about the need for financial information from Leigh. The corporate banking division was less than diligent in obtaining such information for them.

**22**    In September 1988, it became apparent to Leigh and Plessey that Leigh would require an increase in its borrowing limit to $30 million to the end of December, due to slippage in production in the two major contracts, SHINCOM and TACAN. Notwithstanding that an existing facility letter between Leigh and the bank provided security for the demand loan in the form of a floating charge debenture and an assignment of book debts, and notwithstanding the existence of Plessey comfort letter number two, the bank extended the line of $15.4 million on a temporary basis only to October 31, 1988, due to the absence of audited financial statements, and in order to obtain fresh documentation and a new letter of comfort.

**23**    On October 6, 1988, Jonathan Exton manager of corporate finance at the bank's office in London, together with a Toronto-based vice-president of the bank, made a courtesy call on Ian Musgrave, group treasurer of Plessey. Leigh was discussed only briefly, the conversation centering on the banks 5 million pound participation in a Plessey 200 million pound Multi-Option Facility.

**24**    By the beginning of November, what had begun as a short-term bridge loan of $10 million to assist Plessey with the Leigh acquisition had been transformed in a little more than seven months

into an operating line of about $17 million to Leigh. The bank continued to be driven by a desire to retain the Leigh business, obtain the Plessey business in Canada from the Bank of Montreal, and to position itself to obtain $2 billion of business which it projected Plessey would generate in Canada over the next ten years. This hope had been expanded by TD's participation in the Multi-Option Facility. However, Leigh had not repaid the $ 10 million acquisition loan as planned, the acquisition accounting would significantly affect Leigh's balance sheet and income statement negatively, and Leigh's financial situation was deteriorating, as evidenced by the increasing bank loan. Although the bank's motivation had not changed, the underlying purpose and circumstances relating to the loan had shifted dramatically, without, it seems, the bank's Corporate Banking Division adjusting its approach to reflect this reality. Credit Division, mindful of the problem flew storm warnings throughout the bank saying that the facility should be regularized, and the bank should avoid being dragged along.

25    In the fall of 1988, Plessey requested that the bank release the Leigh Security. A further temporary increase or "bulge" to $20 million in the bank line was required in November, and it was expected that Leigh might need a further extension to $30 million. In this period Leigh went into an overdraft position several times. On December 16 Credit Division approved an increase to $25 million to regularize the exposure of more than $24 million, pending fresh documentation.

26    The bank, appeared to concede internally that the comfort letter did not amount to a formal guarantee, noting "we are confident Plessey will support Leigh as required". The concern was expressed that the parent might not honour the comfort letter in the event of a hostile takeover. In the context of commenting on the Jack of reliable financials for Leigh, the comfort letter was characterized by a Senior Vice-President Credit Division in a November note as "support, albeit informal" from Plessey. More conclusively, in the Corporate Credit Reviews of Leigh prepared by Corporate Banking Division and sent to Credit Division for processing, the bank consistently rated the risk of Leigh as opposed to that of Plessey thus making it clear that they did not hold the belief that the comfort letter was in the nature of a guarantee or that it constituted a legally binding obligation to pay.

27    In November, 1988, GEC Siemens launched a hostile takeover bid for Plessey, an earlier bid by GEC having failed in 1985. The bid was referred to the U.K. Mergers and Monopolies Commission in January, 1989. Jonathan Exton of the bank's London office met with a Plessey representative the day after the bid was announced and offered the bank's support in resisting the hostile takeover bid. Also around this time, the bank's account manager for Leigh, Greg Young expressed a concern in an internal memorandum that the comfort letter for Leigh might not be honoured in the event of a successful hostile takeover.

28    Leigh's borrowing came up for annual review by the bank in January 1989. Credit Division reviewed the request for an increase in the bank line to $35 million, and approved the requested release of security contingent upon a postponement of the inter-company debt of $69 million. This would subordinate the inter-company debt to the bank in which would now be unsecured. Also

required was a "strong" comfort letter in the same form as the second letter. The audited financial statements for Leigh as at June 30, 1988 and an unaudited balance sheet at September 30, 1988 were provided to the bank at this time.

**29**　As background, at the time of the January review, both Corporate Banking and the Credit Division were aware that: Leigh faced cash and working capital deterioration; Leigh had problems with major contracts; and that in light of the known details of the financial structure, debt and tax considerations of Leigh, Leigh could not support the debt on its own. The bank noted that the relationship with Plessey was growing, but remained cognizant of the outstanding hostile takeover bid.

**30**　Ultimately, over the next three months, the Corporate Banking Division took it upon itself to waive the Credit Division's condition that the inter-company debt be postponed and agreed to release its security over the assets of Leigh. Meanwhile however, because of its effect on the Leigh balance sheet and tax considerations, reasons entirely unrelated to the banking issues, Plessey decided to convert the Leigh intercompany debt to equity, capitalizing the debt as preferred shares, and thereby rendering the postponement of debt problem moot, effective April 1, 1989. The bank did not agree to remove its security over the assets of Leigh based on anything that Plessey said or did but rather for its own purposes.

**31**　On March 29, 1989. TD revised the $35 million facility, deleting reference to the inter-company debt. Security was to be released upon receipt of a revised comfort letter. On April 4 and 10, the form of the third comfort letter was approved by Plessey and TD respectively. On April 20, 1989 an executed comfort letter dated March 31, 1989 was delivered to the bank. The third comfort letter by its terms replaced the prior two. The $34 million facility letter was executed by Leigh on June 27, 1989, and an executed copy was received by the bank on July 21, accompanied by Leigh's year-end and quarterly financials. With this process completed Leigh had fulfilled the conditions set out in the April 7 letter from the bank for release of the security over its assets.

**32**　In the months that followed, attention within Plessey began to focus on defending against the hostile GEC Siemens bid. At Leigh the cash problems continued with a request of TD for a $4 million bulge from $34 to $38 million.

**33**　The negotiation and delivery of the new facility between Leigh and TD and third comfort letter between TD and Plessey took place over a period of some six months in early 1989. While this was happening two events of note occurred. The first was the launching of the GEC Siemens takeover bid of which mention has been made. The second was a decision of the English Court of Appeal, released February 2, 1989, which has a direct bearing in several ways on the instant case. Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd, [1989] 1 All E.R. 785 (C.A.) (Leave to appeal to the House of Lords refused) involved the enforceability of a letter of comfort and overturned the trial decision which had held that the comfort letter was enforceable. This was a landmark decision in the world of banking and commerce, not because of the result, which seems

not to have been unexpected, but rather due to the dearth of court authority on the subject. All parties to this proceeding were aware generally of both the trial and appeal decisions in Kleinwort Benson. The timing of the decision as it pertains to the case at bar is striking especially in light of the banks decision some six weeks later in March of 1989 to rest its exposure with Leigh solely on the comfort letter from Plessey.

**34**    In the summer of 1989, Leigh requested and received approval for a further temporary $4 million bulge from the bank, necessary due to delays in the SHINCOM and TACAN contracts. Plessey did not provide another comfort letter to secure the additional borrowing, although it undertook to do so if the funds were required beyond the end of August. Although TD made no request for delivery of the further comfort letter, Plessey nevertheless on September 7, forwarded a fourth comfort letter dated August 31, 1989 revised to cover the full amount of the Leigh borrowings. The letter was sent, in part, as a consequence of the impending hostile takeover. This letter was the same as the prior one except for the amount and by its terms replaced the earlier letters. Approval of the comfort letter was one of the last acts performed by Plessey group treasurer Ian Musgrave, before leaving the company on August 31, 1989.

**35**    During this period, Leigh also underwent personnel changes at the executive level. On August 8, 1989 Frank Driscoll took over as president of Leigh from Barry Flower who had departed Leigh for Plessey in June. At the very outset of his tenure, Driscoll began a review of progress on all major outstanding Leigh contracts. This revealed that the estimates to completion for both the SHINCOM and TACAN contracts were woefully inaccurate.

**36**    Slightly more than one week later, on August 17, 1989, GEC Siemens submitted its final offer for Plessey. The bid was successful on September 8, 1989, and GEC Siemens took over Plessey in late September.

**37**    Somewhat obliquely, the TD account manager Greg Young reported to Credit Division at TD on August 30, 1989 that the bank has enjoyed a long relationship with Leigh and a good relationship with Plessey. He commented mistakenly that the GEC Siemens takeover was unlikely to succeed before October 31st. He reported as well that he had met the new president of Leigh. He concluded with reference to goodwill generation and potential new business. He characterized the comfort letter as "quite strong" and his superiors concurred that the letter was "strong".

**38**    Shortly after the takeover, Young referred in a corporate credit review of Leigh to the hostile takeover, stated he was comfortable with the quality of GEC Siemens' credit, and expressed the hope of developing a relationship with GEC. On the other hand he identified a "significant weakness" in terms of the uncertain fate of Leigh as a result of the takeover. Canadian Marconi, a GEC subsidiary and client of the Royal Bank of Canada, might be merged with Leigh. Young noted ID had been unable to establish a relationship with GEC in London, despite several attempts. As of October 2, 1989, the Leigh loan was about $36 million.

**39**    September was a long month at GEC Siemens. Plessey was not a single business enterprise. It

consisted. between 1988 and 1989 of between 80 and 100 companies located in 43 different countries around the world. The strategy of the joint venture was a matter of public record. In the bid document made public in August 1989, the proposal was to disband Plessey and divide the spoils between GEC and Siemens 50-50; certain of its businesses were intended to be transferred 100 per cent to GEC; others 100 per cent to Siemens, with the remainder to remain within Plessey, where they would be operated jointly until such time as they were sold or otherwise disposed of.

**40** The bid package revealed that Leigh was intended to be owned 100 per cent by GEC. Also noteworthy was the fact that Leigh was but a tiny piece of the Plessey pie. To put this in perspective, Leigh had comprised two per cent of the group sales of Plessey and three and a half per cent of its group assets. Plessey was a 1.5 billion pounds to 1.8 billion pounds company. The significance of Leigh paled even further in the context of GEC Siemens. GEC alone was a 6.5 billion pound company, and held over 100 companies world-wide prior to the Plessey acquisition. Both Plessey and GEC were holding companies with small, central staffs. Plessey was headquartered at Ilford, England. GEC maintained its head office at Stanhope Gate, in London. Plessey had arranged that the MOF would fund its acquisitions. GEC, on the other hand, was cash rich and referred to as a cash mountain with over 1 billion pounds in cash reserves on its balance sheet. Thus, in either case, Leigh and its borrowings did not make a significant impact within the framework of Plessey or GEC Siemens.

**41** It was understood in a firm sense between GEC Siemens and the UK regulatory agencies that the Plessey companies would be divided or "hived-up" between the two parent companies by March 8, 1990. Additionally, there were constraints as to which company could acquire certain parts of Plessey. Indeed, it was a requirement of the bid approval by the Mergers and Monopolies Commission that Siemens, as a German company, was not permitted to own certain of the defence industry businesses. As a consequence, GEC and Siemens had to decide the ultimate destinations, and transfer ownership of all the Plessey companies by this deadline. As part of this process. GEC and Siemens had to agree on valuations for all the Plessey companies, since the division was to be approximately 50-50. The purchase price of Plessey was 2.2 billion pounds. Since the takeover was a hostile one, the new parents had very little information about the financial situation of the Plessey businesses. In essence, they walked into Plessey "blind". In addition, shortly after the takeover most of those Plessey executives who had not already resigned were terminated by the new owners. The departure of these executives signalled the departure of valuable information about the operation of the Plessey empire, and created hurdles for the new owners both in terms of valuing the companies and also their ongoing administration.

**42** To fill this vacuum, each shareholder appointed a point person to act in concert as managing directors of Plessey. GEC's representative was Simon Weinstock, a GEC executive and manager and son of the GEC managing director Lord Weinstock. Siemens appointed Dr. Philip Gerdine, an experienced mergers and acquisitions accountant from its U.S. operation. Those companies slated to be transferred 100 per cent to either GEC or Siemens were to be supervised directly by the intended parent until the transfer was completed, while the companies to be held jointly within Plessey were

supervised through it.

**43**    Leigh was earmarked in the bid document to go to GEC. GEC in turn was considering a possible merger of Leigh with one of its Canadian subsidiaries, Canadian Marconi where there would be obvious synergies. Jonathan Exton learned of this possibility for Leigh on a goodwill call to David Newlands, finance director at GEC on October 3, 1989, although it was clear a final decision on the merger was not expected until mid-1990. The bank was made aware of GEC Siemens plan for Plessey when it received a refinancing package from the joint venture, GEC Siemens plan containing a copy of the bid document. As a consequence of the takeover, it was necessary to refinance Plessey, and on October 30, 1989, the joint venture company and Plessey invited some 40 banks on the open market to provide quotes for the refinancing. One of these was ID.

**44**    Due to the possible merger of Leigh with CMC, it was natural that GEC Marconi, also a GEC subsidiary would provide technical and finance people to assume responsibility for evaluating Leigh. To this end, David Newlands, GEC finance director, and David Rickard, finance director for GEC Marconi, visited Leigh on October, 20, 1989, to appraise Leigh. Newlands had in hand a briefing document from Colin Justice at Plessey who was assigned to Leigh, in which Justice alerted Newlands to the fact that the technical baseline at Leigh was sufficiently insecure that the financial results of the company could not be relied upon. Newlands was quick to identify problems at Leigh. He was critical of management, in particular David Dean, the vice-president of finance. Newlands concluded that Plessey's budgets for Leigh were hopelessly optimistic. Included in the material presented to Newlands and Rickard were the draft six-month financial results for the period ended September 30, 1989, which showed a cumulative loss of $2.858 million to the end of September and the bank line outstanding at approximately $36 million. Leigh was trading at a loss, absorbing cash, and there was no indication it would improve.

**45**    Plessey described Leigh internally in the August 1989 as a "major loss maker". Between the October 20 meeting at Kanata with Newlands and Rickard, and the end of November, Frank Driscoll provided numerous reports and financial information to GEC and GEC Marconi, as well as to Lord Weinstock personally. These included a President's report for October and revised half-yearly reports to September 30, 1989 with forecasts to the end of the financial year in March 1990. The seriousness of the problems at Leigh was apparent to Driscoll and the recipients of his reports, and were underscored by the variances from previous budgets and forecasts. Leigh was pursuing explanations for the variances from budget and gas seeking cost-cutting solutions. As of mid-November 1989 there was a variance from budgeted profit of negative $19 million.

**46**    Back at the bank, on October 3, 1989 account manager Greg Young sent to Leigh the facility letter for $38 million, which was to become the last facility agreement entered into by the bank and Leigh. Young stated that the facility was contingent upon the year-end financials at July 31, 1990 and referenced the fourth comfort letter. This was accepted by Leigh on October 26, 1989. The following day Dean returned the facility to Young, referred to problems with SHINCOM and

enclosed cash flow forecasts. There seems to have been no suggestion from anyone at TD that they seek to obtain a new comfort letter from GEC or Siemens.

**47**   Jonathan Exton, in England, was pursuing larger fish, and met with David Newlands on October 3 at Stanhope Gate to discuss possible new business with GEC, in his words, "to further our marketing relationship with GEC". They discussed the plan to dismantle Plessey and also Leigh's tax position and low profits.

**48**   As noted earlier, GEC, Siemens and Plessey on October 30, 1989 wrote to some 40 banks including TD with a view to replacing the Plessey MOF, which was to be cancelled on November 23. This package contained the final offer for Plessey, financial data on all three companies, and the proposed restructuring of Plessey. GEC and Siemens were offering 50-50 several guarantees to secure the proposed facilities. On November 17 Jonathan Exton forwarded a 50 million pound facility for Plessey to Ross Anderson, group treasurer for GEC. Plessey never drew down on the facility.

**49**   On October 31, 1989, Greg Young, the account manager for Leigh, left the bank's employ. He was replaced by Rob Wilson. Wilson was given the sparest of briefing by Young on his hand over, but was left on his own to review the files. Young and Wilson met once with Dean at Leigh. Wilson's supervisor at TD, Wendy Leaney also gave him little help in familiarizing himself with his accounts, which included the troubled Leigh. Wilson did not see or review the comfort letter.

**50**   Upon Ian Musgrave's departure from the position of finance director at Plessey on August 31, 1989, his duties had been assumed by his former assistant, Denise Beard. On November 3, 1989, Denise Beard also left Plessey. Beard had been deeply involved in Leigh's affair, particularly the first comfort letter and the details surrounding the lifting of security on the Leigh assets at the time of the negotiation of the facility agreement and the third comfort letter in early 1989. The exit of Musgrave, Young and Beard from the scene all at about the same time did not enhance the ability of TD and Plessey to adapt to the GEC Siemens takeover. To make matters worse, all Plessey's senior management left following the takeover, including managing director Stephen Walls, signatory, to the first four comfort letters. As replacement TD account manager Rob Wilson observed in a memorandum to file in late November 1989, Leigh's numbers were getting worse and the comfort letter was from the old Plessey management.

**51**   The unaudited quarterly financial statements of Leigh were due to be provided to the bank by Leigh, according to the terms of the facility agreement, by the end of October for the quarter ending September 30, 1989. These were not sent. On November 8, 1989, in a meeting with Young and Wilson, David Dean advised them the financial statements were unavailable due to the implementation of the purchase accounting adjustments necessitated by the GEC Siemens takeover. The bankers did not ask for any alternative financial information. Colin Justice of Plessey assisting at Leigh gave this identical explanation to the bank on December 21, 1989. Dean left Leigh on December 18, 1989, as part of a cost-cutting general layoff. Dean was replaced by his assistant,

Patrick Smith. Frank Driscoll, president of Leigh, was personally unaware of this reporting obligation to the bank. The bank was not provided with financial statements until March 21, 1990.

**52**    The figures reported by Leigh in October and November indicate the state of disarray of Leigh. At the October 20 meeting with Newlands and Rickard, Leigh reported a cumulative loss to September 30 of $2.85 million and the bank line at $36.081 million. Six days later in the Presidents Report for September, Driscoll reported a revised loss, to date, of $15.634 million and a bank loan of $37.17 million. Financial results for that period were due to the bank four days later. On November 17 in the Presidents Report for October, he reported a loss for the seven months to October 27 of $16.677 million and the loan at $38.534 million. At the end of November, at the six-month review at Stanmore, he reported a cumulative loss to September 30 of $18.850 million and a bank line of $38.745 as at November 24.

**53**    Leigh was in breach of the facility agreement by not providing to TD the unaudited quarterly financial statements, given that there were in fact some statements in existence, albeit not in the form that Leigh wished to provide. However, up until his departure in December, Dean spoke by telephone with Wilson, and conveyed to him some details of Leigh's cash flow position and the contract overruns. Although the messages were at best mixed, they were such that they ought to have given rise to questions which inexplicably were never put by the bank to Leigh.

**54**    The half-year review for Leigh was to take place at Stanmore in the U.K., the home of GEC Marconi, on November 28 and 29, 1989. In attendance were representatives of Leigh, GEC Marconi and GEC. Although Driscoll's approach was seen as positive, two serious problems were presented. To begin with, Leigh predicted a $19.6 million loss for the year. As a cost-cutting measure they proposed a staff reduction of 250 persons. Also, Leigh was preparing a plan for sale of its components division. Problems with the SHINCOM and TACAN contracts were reported in detail. Leigh was asked to re-attend later to deal with the operational problems.

**55**    To make matters worse however, Leigh was anticipating a problem meeting its payroll, and submitted a proposal for approval of an increase in its bank line from $38 million to $45 million. An increase to the borrowing limit of Leigh required prior approval of Plessey and GEC, in order for Leigh to make a request to the bank. David Newlands and Simon Weinstock considered the request and Newlands "reluctantly" approved the increase in the Leigh bank line, on the basis that any drawdown over $41 million had to be approved specifically by Anderson or someone else with similar authority. Leigh was given the go-ahead to request the increase from the bank.

**56**    Wilson at TD meanwhile, produced a detailed corporate credit review of Leigh on December 6, 1989, in which he referred to the proposed layoffs, an $8.4 million contract payment due to Leigh in early January, 1990, the support by Plessey in converting the intercompany debt to equity, and the possible sale to or merger with Canadian Marconi. As negatives, he referred to the dynamic of the defence industry, delay's and slow payments, and uncertainty about Leigh ultimate ownership. His recommendation of approval for the request for an increase to $45 million was accepted by

Credit Division on the condition that the fifth comfort letter be delivered by Plessey in the same form and substance as the fourth letter of August 31, 1989, especially the third paragraph, the policy paragraph noted above. These conditions were never communicated to Leigh, Plessey or GEC by anyone at TD. Wilson included reference in the CCR to TD's intention to bid on providing a fairness opinion in the event that the CMC purchase of Leigh proceeded, and reference to the London offices continued attempts to build a relationship with GEC.

**57**    At GEC, Ross Anderson was advised that David Newlands had approved the increase to Leigh's bank line. Anderson was charged with preparing the fifth comfort letter. Working on his prior experience, he revised the existing comfort letter, adding among other things an additional phrase which stated that the letter "... does not constitute a legally binding commitment". The police paragraph was unchanged. This letter, as had its predecessors, by its terms replaced the prior letters. Anderson ran the draft of the revised letter past David Newlands, who approved the wording, in a brief meeting in the corridor outside his office. Anderson then forwarded the letter to Plessey company secretary Bernard Huntbatch for his review and processing. Copies were sent to a number of GEC and Siemens executives, including the Siemens treasury person Andy Hafner and Dr. Gerdine. There were no representations to TD by anyone on behalf of Plessey that the letter would be in the same form as the prior letters. Nor were the conditions stipulated by Noonan regarding the comfort letter communicated by Wilson or anyone else to Plessey or to Anderson. The signed letter became the fifth comfort letter in the piece, dated December 15, 1989, received by the bank's London office on December 27. TD filed the letter without commenting on the changes to either Leigh, Plessey, GEC or Siemens. No one at TD acknowledges having read the comfort letter until sometime in April 1990. I find, however, that Wendy Leaney received, read and accepted the letter on behalf of the bank in January 1990.

**58**    The Leigh Presidents Report for November, dated December 14, 1989, recorded a loss of $18.6 million, $21.4 million below budget. The report was not sent to the bank.

**59**    On January 8 and 9, 1990 representatives of Leigh re-attended in London for budget meetings and to review Leigh's status. Leigh management were dispatched at the conclusion of this meeting to review five options available to the company. At the same time, GEC and Siemens were engaged in valuing the Plessey companies. On January 8, Exton and Wilson called Anderson at GEC from Canada to advise of Leigh's loan balance and to introduce Wilson. On January 11, Newlands wrote to Dr. Mackenrodt Vice President at Siemens, describing Leigh's situation as "very serious". Appended to the letter was a proposal showing Leigh in the Plessey rump of jointly-held companies rather than going to GEC.

**60**    In late January, representatives of Leigh and GEC Marconi were debating the intended future of Leigh, which had been expressed as a series of options at the meetings in early January. These options included shut down or wind down of Leigh, sale to a third party, or fold in to Canadian Marconi, the original plan. One of the options considered was to re-negotiate the TACAN and SHINCOM contracts with the Canadian Government. Newlands and Gerdine based on their

experience still thought this was a possibility. An $8.4 million payment was received from Paramax in mid-January, with a corresponding effect on the bank loan. One executive noted 'so far so good'. On February 1 and 2, 1990 representatives of Leigh and GEC Marconi met again to discuss Leigh's analysis of the five options.

**61**    Bill Alexander of GEC Marconi met Canadian government officials in Ottawa on January 22 and 23, 1990, in an attempt to negotiate some relief from the provisions of the government contracts. The government was advised of the "desperate situation" at Leigh, heavy losses on SHINCOM and acute cash problems. He reported back that there was some sympathy and that he was less pessimistic than previously. Simon Weinstock, appearing to be losing patience, contacted Shearson, Lehmann, an American investment banking firm, seeking an evaluation of Leigh. Copying Gerdine, Weinstock described the viability of the company as being in question. Other at GEC and Siemens disagreed. The prospect of Leigh going to CMC was still being debated.

**62**    On February 8, 1990, GEC and Siemens met to finalize the valuations and disposition of the Plessey companies. It was agreed that Leigh would be placed in the Plessey rump, to be held 50-50 until sold. Leading up to this, Dr. Gerdine had become involved with Leigh at the end of January 1990, at the insistence of Dr. Mackenrodt of Siemens. Shortly thereafter at the instance of Simon Weinstock, he met with Shearson Lehmann, the investment banking firm, to canvas the possibility of selling the three Plessey companies in North America, including Leigh, together as a package. By late January it is clear that GEC had decided not to take 100 per cent ownership of Leigh. Dr. Gerdine knew this around this same time, at least by February 8, 1990.

**63**    Newlands, since his visit to Leigh on October 20, 1989 had seen Leigh's long-term, fixed price contracts with the Canadian government as a problem. Dr. Gerdine was of the same view after becoming involved with Leigh in late January. Both were highly experienced in the defence industry and felt relief through contract re-negotiations was possible. It was commonplace in the industry for the customer to agree to re-negotiation, so why not here? This had been broached at meetings held with the Canadian government on January 22 and 23, 1990. Further such meetings, attended by Dr. Gerdine, took place on March 27.

**64**    A more serious problem however, was the technical problem with the contracts, in particular SHINCOM, and the issue of whether they could be performed by Leigh at all. As a consequence, the GEC Marconi technical review of Leigh was pivotal in the decision as to what was to be done with Leigh. The technical team assigned this task was dubbed the Red Team and their report was expected in early April, 1990. On February 28, Dr. Gerdine visited Leigh on behalf of Siemens, and was shocked by the projected year-end loss of $68.3 million. If this was accurate, he felt bankruptcy for Leigh was not out of the question. On March 6, Shearson Lehmann concluded Leigh was unsaleable to a third party, a view with which Simon Weinstock and Dr. Gerdine reluctantly agreed.

**65**    Frank Driscoll inadvertently brought the matter to a head. On February 26 he had become aware for the first time of the reporting obligation of Leigh contained in the facility letter with the

Bank. For some unexplained reason, he felt he needed the direction of GEC and Siemens before complying with this obligation. Despite repeated requests for such a direction, none was forthcoming, although Dr. Gerdine is adamant that he advised Driscoll orally to do so on at least two occasion, at the February 28 meeting and again on March 15. Finally, on March 21, 1990, not having heard from GEC, Driscoll instructed Pat Smith to send the financials to the bank.

**66**    In fact, the six-month results forwarded were outdated numbers which had been presented Newlands when he visited Leigh on October 20, 1989. However, the financial statements provided to TD also included the nine-month results to the end of December, 1989, which showed a loss of $21.3 million. Even this information was not sufficient to prod TD into action. It was not until Dr. Gerdine telephoned Wendy Leaney and Rob Wilson at the bank on March 26th or 27th, to inquire whether they knew what was going on at Leigh financially that they reacted to the data. As a consequence, the bank line was frozen on March 27, 1990 following Gerdine's indication that GEC and Siemens might not commit to the Plessey comfort letter.

**67**    GEC Siemens did not give up on Leigh without further effort. On April 9, 1990, Dr. Gerdine and others met again with Government officials in Ottawa, in the hope of negotiating contract relief, but to no avail. By this time, on April 3, the GEC Marconi technical RED Team had completed its review of SHINCOM, confirming that Leigh had serious technical problems and casting doubt on its ability to complete the contracts, absent new personnel and funding. When GEC and Siemens refused to guarantee the Leigh loan, the bank called the loan on April 11, 1990. The next day, on April 12, Leigh made an assignment in bankruptcy. Thus ended ignominiously the short, unhappy life of Leigh instruments and set the stage for this lawsuit.

**68**    This concludes the basic chronology. The following observations emerge.

**69**    The transitional effect of the movement of personnel on and off of the scene was highly disruptive to all parties. Frank Driscoll arrived as president of Leigh on August 8, 1989. One month later to the day the hostile takeover occurred. Ian Musgrave left Plessey at the end of August after approving the fourth comfort letter. Almost all of the senior management at Plessey departed at this time. GEC and Siemens people were required to assist. The account manager at TD, Greg Young left at the end of October. The treasury person at Plessey, Denise Beard, left on November 3. All of these people filled critical roles at a material time in the life of Leigh. However, the most significant change from the standpoint of the fifth, operative comfort letter, was the change in the management group at Plessey, as noted by Rob Wilson in late November 1989.

**70**    The bank at the same time as it was advancing funds to Leigh was preoccupied with the parent companies' business potential and appeared heedless of its exposure at Leigh. The bank paid scant attention to detail at Leigh and reaped the consequences.

**71**    From the time of the third comfort letter in April, 1989 and the decision of the bank to remove its security over Leigh's assets, the bank rested its risk solely on the comfort letter. Although at first glance it might appear from the bank's lack of diligence in monitoring the financial situation at

Leigh, that Wilson and Leaney were not acting as prudent bankers, rather, the approach by TD toward Leigh makes it plain and obvious that TD was not relying upon the financial condition of Leigh or any representations in that regard, since it knew Leigh was not capable of repaying the loan without assistance. The bank assumed this assistance would come from Leigh's parents, and to that end, relied upon the moral obligation they believed the comfort letter to contain. The final proof of this lies in the fact that TD did not cap the loan until it was advised by Dr. Gerdine in March, 1990 that Plessey might not honour the comfort letter.

**72**   There were many victims of the disaster which befell Leigh. One such victim was certainly the TD bank. But also victims of almost equal proportion were Plessey and ultimately GEC Siemens which lost their total investment. On a personal level, Frank Driscoll and the other employees of Leigh were casualties. The Government of Canada likewise suffered losses at the hands of Leigh.

**73**   The question in this proceeding is, simply put, whether Plessey and GEC are responsible to TD for the losses of the bank.

THE TRIAL

**74**   This trial commenced January 13, 1997 and concluded on May 1, 1998. There are more than 15,000 pages of trial transcript, and thousands of pages of exhibits some lengthy and many detailed. The parties submitted extensive written argument consisting of more than 1200 pages, followed by oral submissions.

**75**   During the openings by counsel it was stated that the amended statement of claim contained more than one hundred and fifty alleged causes of action. During the trial the issues were not narrowed. even though the court urged the plaintiff to do so. This did not occur until the time of filing of written submissions. Any alleged causes of action not pursued in argument are abandoned.

DISPOSITION

The Claim in Contract

**76**   I have concluded that Wendy Leaney received, read and accepted on behalf of the bank the fifth comfort letter dated December 15, 1989 in January 1990. This letter by its terms supersedes all prior comfort letters. There was no representation that the fifth comfort letter would be in the same form as the prior ones. There are no collateral agreements or warranties. Hence, the operative comfort letter is the fifth comfort letter which was delivered to the bank by Plessey in December 1989.

**77**   The bank asserts that this comfort letter contains in paragraph three, the policy paragraph, a contractual commitment by Plessey to directly or indirectly pay the bank the amount of the Leigh loan. The added words in the fifth comfort letter that "The letter ... does not constitute a legally binding commitment," are a complete answer to this contention and dispose of the claim in contract.

Moreover, even disregarding those words, a literal reading of the paragraph which I find to be clear and unambiguous is to like effect. The paragraph does not contain a contractual promise enforceable in law. Rather it is a statement of present policy of Plessey. The added words do not alter that meaning. Indeed, the extrinsic evidence, if admitted, does not assist the bank. Instead it confirms two things: first, the paragraph does not contain a latent ambiguity, and second, the literal reading of the paragraph discloses its true meaning. The claim in contract fails.

The Claim in Tort

**78**    The bank asserts a number of causes of action in negligent and fraudulent misrepresentation, based on the statement of policy in the third paragraph of all of the comfort letters, and in the alternative, based solely on the policy statement in the fifth letter. For the reasons that follow, I find that the statement of policy in the comfort letters was not misleading and the claim in this respect is dismissed. The bank also claims damages for misrepresentation based on certain alleged statements made by Justice, Anderson and Musgrave to the bank. For the reasons below, I find that none of these claims have been made out, either because the statements did not take place, were not misleading, or were not relied upon by the bank.

**79**    The bank has alleged fraud against Plessey and GEC based on their conduct in failing to direct Leigh to provide the financial statements, and also based upon alleged statements by Colin Justice and Ross Anderson to the bank. There is no basis in the evidence for a finding of fraud. Accordingly, and in light of my appreciation of the totality of the evidence, I decline to make a finding of fraud against Plessey, GEC or either of Justice and Anderson. The claim in fraud is dismissed.

**80**    A review of the evidence, my findings and reasons follow.

PART II

THE EVIDENCE

The Bank and Leigh prior to April 1988.

**81**    The relationship between TD and Leigh dates back to the early 1980s, when Leigh acquired a company called Marsland Engineering Limited. At that time, Marsland had been a client of TDs for several years, however Leigh terminated the relationship with TD following the takeover. In consequence, TD solicited the business of Leigh and eventually succeeded in bringing Leigh in as a client. From the outset however, the bank had concerns about Leigh's financial performance. By July of 1983, the Leigh account had been classified by the bank as satisfactory and removed from the discretion of the branch manager. In an internal bank memo, F.G. McDowell, then vice-chairman of the banks described the Leigh account as a "persistent worry" and recommended that the bank divest itself of the relationship with Leigh.

**82**    In 1983 the bank appointed management consultants Woods Gordon to review the Leigh contracts and management. Following on recommendations of Woods Gordon, Leigh sold certain subsidiaries, raised capital and changed management. The company began to turn a profit and the bank decided to continue the banking relationship.

**83**    In March of 1984 the Leigh risk was again classed as unsatisfactory, and the bank expressed concern that the working capital of Leigh was being used to pay off secured debt, to the detriment of the banks position.

Spring 1988 - The Takeover by Plessey, First Comfort Letter and Amalgamation

**84**    Leigh Instruments was a supplier of high-technology products and systems for the defence and aerospace markets. The company's main products included secure voice communications systems, ground-based navigation systems and flight data recording systems.

**85**    The bulk of Leigh's business was composed of contracts to supply two sophisticated products, SHINCOM and TACAN. SHINCOM was a ship interior communications system program and TACAN was a tactical air navigation program. The bulk of Leigh's contracts were the Canadian Department of National Defence either directly or as subcontractor to other with companies with government contracts, and were long-term contracts for fixed prices. SHINCOM was being installed by the Canadian Navy as part of its program to refit older destroyers.

**86**    In January 1988, Leigh acquired all the shares of a Nova Scotia based company known as Micronav Ltd. for $2.8 million. Micronav had developed a microwave landing system, which was a leading-edge airport landing system. TD was the banker for Micronav both before and after the takeover, and noted in a credit review of Leigh on February 29th, 1988 that "MLS is widely recognized as the next generation of airport landing systems with a world market estimated to be several billion dollars during the next decade. For example, Transport Canada has recommended MLS for up to 40 airports in Canada."

**87**    At this time, Leigh was a publicly traded company. In late February of 1988, a Halifax based Aerospace company. IMP Group Ltd., made a public offer of $80 million for all the shares of Leigh. Leigh's board of directors rejected the bid and retained Dominion Securities and First Boston to advise it on defensive strategies.

**88**    In order to assist in the defence of the takeover bid, TD offered Leigh a $10 million operating line with a number of conditions attached. In approving the credit application on February 29, 1988 however, senior vice president James Laitner noted: "this is not the type of company that should have a lot of debt." The bank rated the risk of this borrowing at 3A and included as a condition that Leigh provide to the bank quarterly unaudited financial statements and audited year end statements. Leigh did not accept this offer, but chose instead to accept the straight renewal of its existing operating facility of $5.4 million, which to date had not been drawn upon. That facility included a requirement that Leigh provide to the bank its quarterly/annual financial statements within 30/90

days from the end of the respective financial period.

**89**    In early March, 1988, while the hostile IMP takeover bid was still outstanding, Plessey announced a friendly takeover bid for Leigh, offering $96.4 million for the outstanding shares of Leigh. When TD learned of the bid, Howard Baker of TD's London office immediately telephoned the Plessey treasury department, and then wrote to Ian Musgrave, group treasurer of Plessey, offering to provide financial assistance in connection with thee takeover. On March 24, Plessey increased its offer for Leigh to $104 million, leading IMP to drop out of the running and withdraw its offer on April 5th. The Plessey bid succeeded that same day.

**90**    In connection with the bid, Plessey retained Deloitte, Haskins & Sells to prepare a due diligence report on Leigh, which was delivered on March 6th. This report was reviewed in detail by Ian Musgrave, who was in charge of structuring Leigh's acquisition, and others at Plessey. The report noted that Leigh's major source of revenue was from government contracts associated with the TACAN, SHINCOM, and LSI programs, and that Leigh's revenue recognition policies for the contract were, from an accounting perspective, less conservative than Plessey's. Other accounting policies were also less conservative than Plessey's and the report cautioned that application of the accounting principles used by Plessey would result in a significant writedown of the value of Leigh's inventories. Deloitte's also noted that Leigh had failed to meet certain contract milestones for the TACAN program, had not yet filed its corporate tax return for 1987, and had made no payments towards its tax liabilities for the 1987 or 1988 fiscal years. The report failed to note the security held by TD over Leigh's assets.

**91**    As treasurer, Ian Musgrave was responsible for the structure of the Leigh acquisition. In evidence, he explained the structure was designed to provide the most favourable tax results for Plessey. In order to minimize the amount of profit on which Leigh would have to pay tax, Plessey imposed a capital structure on Leigh of 25 percent equity and 75 percent interest-bearing intercompany debt. The intercompany debt was payable to Plessey, with the notion that the interest payments on the debt would reduce or eliminate Leigh's taxable profits. In the final analysis, the structure consisted of $69 million intercompany debt, $25 million in equity, plus the TD loan for the total purchase price of $ 104 million. There was a $3 million acquisition cost for a total outlaw of $107 million.

**92**    In order to facilitate the transition, Plessey incorporated a holding company called Plessey Canada (1988) Inc., with the 75-25 debt to equity capital structure. This company was to be used to purchase the shares of Leigh and then the two companies were to be amalgamated, with the merged company assuming the intercompany debt held by the acquisition vehicle. At the time of the acquisition, the Leigh balance sheet showed approximately $ 10 million in cash. Accordingly, Plessey decided to borrow $10 million of the acquisition financing from the TD bank, through Plessey Canada, with the intention that this $10 million would be re-paid to the bank from Leigh's cash balances following the amalgamation.

**93**    TD had approached Plessey immediately after the announcement of the takeover bid, and offered to assist with acquisition financing. Initially, TD offered Plessey a $50 million facility, with the provision that $10 million be made available to Plessey Canada (1988) Inc. directly.

**94**    The procedures and responsibilities within the bank in terms of processing and approving credit applications for customers was addressed by numerous bank witnesses in the course of the trial. The Corporate Banking Division ("Corporate Banking") had responsibility for direct customer contact. It was charged with the responsibility for preparing documentation of a credit best which has then submitted to the Credit Division. Corporate Banking had no lending authority. The Credit Division's role was that of decision maker - it had no liaison with customers or documentation role after a credit was approved. Those duties were left to Corporate Banking, and included responsibility for ensuring that any condition placed on an approval of a credit by the Credit Division was implemented. There was no procedure in place within the bank by which the Credit Division could ensure that its conditions had been complied with, and the Credit Division simply relied on Corporate Banking to do so. For example, the account manager in Corporate Banking was responsible for obtaining the requisite security or other documentation for a loan, in keeping with the bank's requirements. Similarly, if a loan went into an overdraft position, it was the responsibility of the account manager to obtain approval of an increased loan limit from the Credit Division. Once that approval was obtained, the account manager was charged with obtaining a new facility agreement from the Customer reflecting the increased amount, and obtaining any other associated documentation.

**95**    For the purpose of standardizing credit applications, the bank had in place a Credit Procedures Manual. This manual was described by bank witnesses as a "guideline" on how to complete a Corporate Credit Review (CCR). Although its purpose was described variously by bank witnesses as to standardize the format of submissions for ease of processing or as being "mechanical", there were aspects of it which were admitted to be requirements, as opposed to discretionary guidelines. Portions of the manual were for use by Corporate Banking and were available to every manager responsible for the Leigh account, and certainly Wendy Leaney.

**96**    The manual expressly provided that a corporate guarantee be accompanied by a solicitor's opinion and a resolution of the board of directors authorizing the guarantee. No such stipulation applied to comfort letters, which the manual described as "documentation" rather than "security", unlike a guarantee. It stated that comfort letters were "not legally enforceable in the collection of our loan." In contrast, guarantees were to be in the bank's standard form. Guarantees not conforming with the standard form were to be vetted and approved by the bank's legal counsel.

**97**    Within the Credit Division, each person had an authorized credit approval limit, which conferred upon them the discretion to approve any loan which fell within that limit, as long as they were satisfied with the risk. If a credit application exceeded the authorized limit, the person to whom it had been sent would review it and add whatever comments were appropriate. The application would be forwarded up the chain to someone with a higher limit, and this might happen

several times before the credit was approved by the ultimate decision maker. Each person who signed off on a credit would review it and the comments of the persons below them in the chain of approval. Persons reviewing a credit also had the authority to recommend changes in the terms and conditions of the credit, or to recommend rejection.

**98**    Once the credit was approved, the application was returned to the Corporate Banking Division, along with the comments or conditions added by the Credit Division. It fell then to the Corporate Banking people to ensure that the conditions were complied with and documentation obtained, and Wendy Leaney testified the department had its own internal procedures in this regard. If these terms and conditions were not complied with, it was the responsibility of the account manager to report this to the Credit Division.

**99**    Patrick Noonan, senior vice president, Credit Division, testified that he assumed everyone below him on a credit approval application had read all of the material he received, because any recommendation was based upon it. Since a recommendation could be approved with conditions attached, he assumed it would be read by everyone on its way back down the chain. There was no process by which Credit Division could ensure those below adhered to conditions it imposed so that the responsibility for this rested on the account manager in Corporate Banking. Hence, it was not for Credit Division to pass on a comfort letter. It was for the account manager to see to it that a comfort letter was satisfactory to the bank. Noonan testified that he had never spoken to anyone at Plessey, GEC, GEC Marconi or CMC at any time material to this proceeding.

**100**    In accordance with standard bank procedure for the approval of credit applications, a Corporate Credit Review of Plessey was prepared by the account manager, in this case Howard Baker, manager of corporate finance in the Bank's London office. The account was given a risk rating of 2, a rate which the bank reserved for corporate borrowers with strong balance sheets, strong earnings, good access to public markets and a top corporate credit. Although the CCR indicated the bank had had a relationship with Plessey since 1982, it listed facilities then available to Plessey, none of which had been drawn upon. In the section entitled purpose of review/use of credit, Baker noted "We view Plessey risk as entirely acceptable for this transaction. A successful bid will enhance our relationship with Plessey in London (which currently consists only of occasional FX business), and of course in Canada where we hope to maintain our relationship with Leigh, and further build on Plessey's growth in Canada. ... Plessey intends to use Leigh as its platform to sell communications, avionics and defence equipment in Canada, estimating that it would be able to bid for 500 million pounds of Canadian contracts over the next five years." Under pricing Baker noted "we would therefore seek your guidance on lowering the pricing ... on the basis of our relationship with Leigh in Canada and the important one-off opportunity we have been presented with." The security for the $50 million short-term, uncommitted line was listed as nil, with the explanatory note "Borrowings by Plessey Canada (1988) Inc. will not be guaranteed by the parent. Plessey & Co. plc do not provide guarantees for any subsidiaries borrowing." The CCR was sent to the bank's Credit Division in Toronto for approval.

**101**    Ian Musgrave testified that Baker's observation was incorrect, and while Plessey had a group policy of ordinarily avoiding guarantees, that Plessey did guarantee the borrowings of its subsidiaries in certain circumstances. I accept his evidence. Although Musgrave was not involved in negotiation of the terms of this facility, he was treasurer of the Company at the time. The negotiations were conducted largely by Denise Beard, who reported directly to Musgrave. No evidence was led as to the source of Baker's mistaken conclusion that Plessey did not give guarantees. This observation was critical however, in that it led Patrick Noonan, then a senior vice president in TD's Credit Division, to recommend as a condition of the credit approval, that a letter of comfort be obtained from the parent, Plessey Company plc. Musgrave did confirm in evidence that bank was correct in noting that a Plessey guarantee was not on offer for the Plessey Canada borrowing.

**102**    In recommending that the credit be approved, Noonan noted:

> Credit risk of U.K. parent acceptable. Appl'n requests Cdn $10MM to Plessey Canada (1988) Inc. which is obviously a new vehicle for this investment. It is not listed as a subsidiary of the U.K. parent in last annual report. No gtee will be provided.

> As there are no financials we should have an appropriate comfort letter from parent. Would agree on this basis in light of interim finance requested.

**103**    In this period, Noonan testified he was reviewing well over 1000 CCRs a year. Noonan explained he was not surprised to see that a guarantee was not on offer because "it was common for major companies not to guarantee borrowings of subsidiaries and I was aware that the common practice was to provide comfort letters in some cases." He testified that he specified an "appropriate comfort letter" because the bank had no financials for Plessey Canada and therefore no basis upon which to assess the company's debt service capacity, its ability to repay, nor at that time, information on how the loan was to be repaid. Hence, he explained that he wanted "a clear undertaking from the Plessey Company Plc that they would see the bank whole on any portion that may be taken by the Canadian company." Regarding his reference to an ongoing Canadian bank role, Noonan testified that since they were the sole bankers for Leigh and had no active relationship with Plessey, he hoped the bank would preserve the relationship with Leigh. He described this aspect of the credit as a marketing aspect between the corporate account manager at the bank and Plessey. He explained that each member of the bank's Credit Division had a discretionary lending limit. If the credit application was for an amount within that limit, then the person reviewing it had authority to approve the risk. If not, the application would be passed to a more senior member of the department who had a higher lending limit. Noonan testified that he reviewed the Plessey application from the perspective of acceptance of credit risk. As the $50 million limit was in excess of his discretionary lending authority, he recommended that the credit be approved, and forwarded the CCR to the senior executive.

**104**    In the case of the $50 million Plessey facility, the CCR was passed above to William T. Brock, Executive Vice President, Credit, who recommended that the application be approved and noted "this is a short term bridge loan and we are bankers to Leigh which will now be expanded by Plessey. We would not want to lose this to a Canadian competitor." The credit application was ultimately approved by the chairman of the bank himself, Richard Thomson, and the requirement that an appropriate comfort letter be obtained was left unchanged.

**105**    The credit was approved the same day as the application was made. In notifying the London office of the approval, Noonan advised:

> Insofar as CDN $10,000,000 being available under the name of Plessey Canada (1988) Inc., which is obviously a new vehicle for this investment, as there are no financials, we should have an appropriate comfort letter from the parent. We note your remarks that no guarantee would be available. However in light of short-term requested, we are agreeable on the above basis. ... We would not want to lose this financing to Canadian competitor, particularly with our long-standing account relationship in Canada where we are the sole bankers to Leigh.

**106**    Noonan explained in evidence that while it was his idea to obtain a comfort letter, he did not provide any of the language or participate in the drafting of the letter. Nor could he recall indicating what, in his view, constituted an appropriate comfort letter. He explained that according to bank procedure it was the responsibility of the account manager, in consultation with legal counsel, to obtain the appropriate documentation, including in this case, the comfort letter. While on occasion he would provide some verbal guidance to Corporate Banking officers if approached by them. Noonan said he could not recall having spoken to Baker or his assistant J.A. Read concerning the Plessey letter.

**107**    The bank learned subsequently that Plessey did not intend to use the $50 million loan facility, but did wish to draw upon the $10 million amount which had been called out for use by Plessey Canada.

**108**    Howard Baker, of TD's London office, and Greg Young, a manager of Corporate Banking in Toronto, were responsible for obtaining an "appropriate letter of comfort" from Plessey. Young had been in charge of the Leigh account in Toronto since early 1987, and was responsible for determining that the comfort letter was acceptable. Since Baker was the bank officer then in charge of the relationship with Plessey, he was charged with obtaining the letter from Plessey and forwarding it to Young for approval. Young testified it was reasonable to assume that Baker had received Noonan's comments when he contacted Plessey.

**109**    Baker had available to him a draft comfort letter, which he used as a template for drafting the Plessey letter. The template letter stated:

> We understand that Toronto-Dominion Bank has agreed to place at the disposal

of [blank] a subsidiary of [blank] banking facilities of C $3,750,000 (three million seven hundred and fifty thousand Canadian dollars).

This letter will confirm that [blank] is aware of and approves of the above-mentioned facilities. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of [blank] will be conducted on a sound basis. Furthermore, we undertake to retain control of this subsidiary company as long as any indebtedness to you may be outstanding.

It is our policy that our subsidiary companies including [blank] be managed and operated in such a way as to be always in a position to meet their financial obligations when they become due and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity.

**110**    Baker did not use the template letter verbatim, and instead sent Plessey an amended version. No evidence was led as to the reason for these changes. On April 7, 1988, Baker faxed to Ms. Beard a draft of a proposed comfort letter which stated:

We understand that the Toronto-Dominion Bank ("the bank") has in place at the disposal of Plessey Canada (1988) Inc., a wholly-owned subsidiary of The Plessey Company PLC, borrowing facilities of up to C $10,000,000 (ten million Canadian dollars).

This letter confirms that The Plessey Company Plc is aware of and approves of this facility, and undertakes to advise the Bank if any reduction in ownership of Plessey Canada (1988) Inc. is contemplated. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis.

That same day, Denise Beard responded by sending Baker the following draft comfort letter, which was in a form Plessey had used on other occasions:

This is to confirm that The Plessey Company plc has full knowledge of the facility of C $10,000,000 (ten million Canadian dollars) which has been granted by Toronto-Dominion Bank to Plessey Canada (1988) Inc.

Plessey Canada (1988) Inc. is currently a wholly-owned subsidiary of Plessey Overseas Limited which is a wholly-owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc. or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc. be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

**111**    In evidence, Musgrave said it was common for Plessey to negotiate the language of the comfort letters it gave, and that quite often the bank concerned would produce a form and Plessey would then respond with its own form of letter. He said there was some degree of negotiation in most cases and that Plessey's comfort letters were reviewed by its in-house counsel, Tony Noon, "as a matter of course." In respect of comfort letter number one, no party called Baker or Beard to give evidence about the extent of the negotiations.

**112**    Upon receipt of the Plessey draft, Baker in London forwarded the letter to Young in Toronto with a note saying that Plessey wanted the line in place by the next day. Young had previously been involved in several other files involving comfort letters, however this was his first experience in actually taking one. Upon receipt of the draft, Young showed it to Alex Norton, in-house counsel at the bank. Young testified that following the brief meeting with Norton, he believed the Plessey letter was "a strong comfort letter" and "legally binding." Neither Plessey's counsel, Tony Noon, nor TD's counsel, Alex Norton, testified at trial.

**113**    Young did not show the draft letter to Noonan in the Credit Division, nor did Noonan see the first comfort letter until after it had been executed. On April 7, Baker faxed a letter to Beard confirming that TD had made available a short-term $10 million facility for use by Plessey Canada, noting "documentation to formalize this facility will follow due course."

**114**    On April 11, 1988, Young sent a facility letter to J. Palazzi of Plessey U.S. containing the terms of the $10 million loan facility. This term sheet described the borrower as Plessey Canada, noted that repayment was on demand, that the loan was unsecured, and did not contain any financial reporting requirements. It listed that documentation would include "a Comfort Letter from the Plessey Company PLC in the form attached." The attached comfort letter was in the same form as that which Plessey had forwarded to the bank and which Young had shown to Norton. On April 12, prior to receipt of an executed comfort letter by the bank, Plessey Canada drew down the amount of $10 million from the bank, which it used as part of the acquisition financing for Leigh. Plessey group treasurer Ian Musgrave explained in evidence that from time to time the drawdown of cash

would precede completion of the formal documentation with a bank. He said that normally by that time all the terms and conditions would be pretty well agreed, and there would be no contentious items left unresolved. The documentation would amount to the completion of paperwork in the terms agreed. Plessey Canada accepted the terms as offered and signed the facility letter on April 15, 1988.

**115**    In connection with this facility, the bank prepared a second, separate Corporate Credit Review of Plessey Canada, on April 19, after the loan facility had been offered by the bank and accepted by Plessey Canada. The CCR was prepared by Randi Winston, of the Corporate Banking Division in Toronto. It rated the risk of the borrowing as 2 low risk, which was the same as the risk rating given to Plessey Plc in the April 5 CCR, and listed security as nil. Documentation was "to be obtained" and included "comfort letter from The Plessey Company PLC."

**116**    The April 19 CCR enclosed the draft Plessey comfort letter and a copy of the April 5 CCR of Plessey Plc. In the remarks section Winston noted:

> The purchase of Leigh should enable Plessey Company to bid for about $2 billion in Canadian contracts over the next 10 years. The Department of National Defence proposes to spend several billion dollars to acquire a fleet of nuclear powered submarines which should provide Plessey with an opportunity to market its sonar equipment, currently used on the British submarines.

> While Bank of Montreal is Plessey Canada's banker, the company has expressed in interest in adding another financial institution and splitting their banking business. For the time being, Plessey has indicated that Leigh's facilities with the TD bank will remain intact.

Under "Use of Credit and Repayment" the CCR noted that the loan was to assist in the purchase of Leigh and that repayment of the advances under the facility was to be derived from Leigh's cash balances. The loan was to mature in 90 days, on July 11. Winston also observed:

> Plessey Canada has advised us that this is a short-term need and have not requested a formal operating line of credit. However, having available an authorized facility would place TD in good standing in the event that Plessey decides to split its banking business. At this time we note that EMEA division was unsuccessful in winning Plessey Company PLC's $50 million deal.

The security section stated that "While there is no security per se, a strong comfort letter from the Plessey Company Plc will be obtained by EMEA division and forwarded to us shortly." Winston explained the risk assessment as follows "Given the short term nature of this facility and the comfort letter to be obtained the risk is acceptable to the bank. Given the strong financial position of the Plessey Company PLC we are recommending account rating of 2." Young also signed the CCR

which was ultimately approved by Noonan, who stipulated that the bank should obtain financials of the borrowing entity as soon as possible.

**117**    In reviewing the credit application Noonan testified that he noted the purchase of Leigh should enable Plessey to bid for Canadian contracts over the next 10 years and that while Bank of Montreal were the bankers for Plessey Canada, there might be opportunity for TD to be involved in their ongoing banking requirements. He testified that while this was a noteworthy point, it had no bearing on his risk assessment. Noonan testified that he noted the facility was for a short-term and that a formal operating line was not requested by the customer. He said other points of note were that the $10 million was to be repaid from Leigh's cash balances once Plessey had obtained the 100 percent ownership, and that while there was no security per se, a strong comfort letter would be forwarded by Plessey.

**118**    Noonan said he read the attached draft comfort letter, and in particular, paragraph 3. He said that, at the time, he took the view that the language of the comfort letter provided a commitment from Plessey to see that Plessey Canada was in funds or solvent to meet its financial obligations, including the amounts due under the TD facility. Noonan testified he formed this view based on the wording of the third paragraph and based also on the standing, strength and reputation of Plessey, which he described as "of paramount importance." In that regard, he said when a draft comfort letter was given by a company with a reputation that, enjoyed access to the public markets of the world, then he believed it was a company which valued its reputation, and that the bank in turn could believe in its word. As well, he said he took Plessey at its word, as expressed in the letter, because the comfort letter had been signed by two authorized signatories, and because he believed the people who gave the comfort letter also controlled finances and were in a position to provide the flow of funds to the appropriate subsidiaries. He said "in my view it's a quasi-solvency guarantee that they, in turn, will always meet their financial obligations." He elaborated that while he did not view the comfort letter as a guarantee per se, he viewed it as a quasi-guarantee from the point of view of ensuring that the subsidiary was in a solvent position.

**119**    Meanwhile, within Plessey, Denise Beard was arranging for formal approval of the comfort letter. While group treasurer Musgrave was not involved in negotiating the comfort letter, he testified that Beard would "almost certainly" have shown him the final draft before it was signed. Musgrave explained that Plessey controlled the borrowings of its subsidiaries and that approval of the Plessey main board was required for both a borrowing limit and a guarantee limit for each of its subsidiaries. Once approved by the board, the borrowing limit would entitle the subsidiary to borrow in amounts up to that limit, without exceeding it. The guarantee limit was Musgrave's authority to negotiate with the banks the degree of support Plessey could offer in connection with those borrowings. He said the degree of support to be offered by Plessey was within his discretion, and that he could choose to offer no support, a comfort letter, or a guarantee if one was necessary. Once a guarantee limit had been approved, it was not necessary to have the support approved by the main board, although, in light of the group policy, Musgrave testified that if a guarantee was offered, he would consult with Stephen Walls, managing director of Plessey, first. He said the main

board would not have seen the wording of the comfort letter itself.

**120**    On April 20, Denise Beard sent a memo to Stephen Walls requesting authorization of the comfort letter by him and one other board member, and the letter was in fact signed by Walls and Mayes. Musgrave explained that it was somewhat unusual to issue a comfort letter without prior main board approval of a guarantee limit, but that this happened from time to time if a transaction was taking place at high speed and there wasn't a board meeting scheduled in time. Hence on April 29, after the letter had already been issued, Musgrave placed the issue of retrospective approval of a guarantee limit for Plessey Canada on the of the next main board meeting. On May 6, 1988, the Plessey main board retrospectively approved both a borrowing limit and guarantee limit for Plessey Canada of $ 10 million.

**121**    Musgrave testified that the Plessey treasury department maintained a "guarantee register" in which it recorded all guarantees and comfort letters, including the comfort letter provided to TD. Although designated as a guarantee register, Musgrave explained in evidence that the title of the register did not mean every document recorded there was a guarantee. He said that in addition to guarantees, comfort letters were recorded there for the sake of convenience, but were separately identified. Musgrave testified that the register included documents which did not require Plessey to pay the debt of a subsidiary. I accept Musgrave's explanation, and hence his evidence on this point.

**122**    Although the TD comfort letter was recorded in the guarantee register, Musgrave stated in evidence that his personal intention at the time was that the comfort letter would not bind Plessey to repay the indebtedness of Plessey Canada. Further, he testified that while he could not recall discussing the question specifically with Stephen Walls, Walls was a highly experienced finance director and Musgrave stated he would be very surprised if Walls did not understand the difference between a comfort letter and a guarantee.

**123**    Notwithstanding this however, Musgrave testified that in his view, the comfort letter still had value for the bank. In respect of the first paragraph of the letter, Musgrave said the statement that Plessey was aware of the facility should prevent the bank from feeling vulnerable that it was advancing money to a subsidiary without knowledge of the parent. Regarding paragraph 2, Musgrave said it was his belief at the time that this statement would have significant value to the bank. He said notification of any intention of Plessey's to reduce its shareholding would give the bank the opportunity to withdraw its facility, which was a demand loan. He said the third paragraph would also have value for the bank in that Plessey was stating its policy that its subsidiaries are expected to manage their affairs so as to be always in position to meet their financial obligations. Musgrave testified that he expected the bank to take the statements into account in deciding whether to make the facility available to Plessey Canada, that he expected the bank to rely upon the statements as being factually correct, and that they were intended to give the bank a degree of comfort about the proposed facility. He said he and Plessey would have known that the bank would not advance the funds without the comfort letter.

**124**    On April 27, 1988, Plessey forwarded to the bank a comfort letter dated April 20, 1988 executed by authorized signatories Stephen Walls and Derek Mayes, which was identical to the draft previously submitted to the bank by Beard. This the first comfort letter, stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C$10,000,000 (Ten million Canadian dollars) which has been granted by Toronto Dominion Bank to Plessey Canada (1988) Inc.

> Plessey Canada (1988) Inc is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

**125**    By this time, the acquisition of Leigh had been completed, and Plessey Canada held the shares of Leigh. As an acquisition vehicle, Plessey Canada simply held the shares of Leigh. It did not cam on business and was run by Plessey's lawyers in Canada acting on direction from Plessey in London. Once the transaction had been completed, Musgrave said all the cash holdings in Plessey Canada were paid out, and conceded that Plessey Canada would not have had the cash to pay the TD loan, if payment had been demanded. He said there were options available to Plessey Canada however, and at least one other bank was interested in assisting. At the time of the takeover, Leigh had available to it a $5.4 million facility from TD, although it had not drawn down upon it, and the amount outstanding was nil.

**126**    Although Plessey paid $104 million for the shares of Leigh, when the transaction was completed Plessey determined that the book value of Leigh's assets was about $50 million. Of that $104 million, $10 million was drawn down on the TD bank line. The remaining $94 million was structured as $69 million intercompany debt held by Plessey and $25 million equity. In consequence, Leigh's total debt load was within the order of $79 million.

The Second Comfort Letter

**127**    Following the acquisition, Plessey, commenced a process of purchase accounting adjustments, whereby the Leigh balance sheet was adjusted to reflect the introduction of Plessey accounting principles. Although this process was not completed until several months later, it spoke

as of the date of the takeover. Due to the fact that Plessey's accounting principles were more conservative than Leigh's, their introduction led to a $38.5 million reduction in the book value of Leigh's assets, leaving Leigh with a book value, on paper, of $13.1 million.

**128**    On June 30, 1988, Leigh and Plessey Canada were amalgamated under the name Leigh Instruments Limited. Thus, Leigh became responsible for the $10 million acquisition loan from TD held by Plessey Canada. Around this time, Musgrave spoke to Greg Young, the account manager for Leigh at TD's Corporate Banking Division in Toronto, and assured him the bank needn't worry about the amalgamation and that "as far as we were concerned, the letter of comfort still stood."

**129**    Following the amalgamation, Plessey determined that, in fact, Leigh did not have the anticipated $10 million in cash on its books. At the same time, Leigh advised Plessey it required an additional $2 million working capital. As a result, Leigh was unable to repay the $10 million facility to TD on its maturity date of July 11. On July 4, Musgrave sent a memo to Stephen Walls, apprising him of the situation and proposing that the $10 million facility be rolled over. As well, he requested permission from Walls to advance the additional $2 million to Leigh. Walls approved both requests.

**130**    Musgrave then requested an explanation for the Leigh shortfall from Andrew Akerman the financial analyst at PESL, the group to which Leigh belonged. Akerman reported that most of the shortfall was due to adverse phasing variances on the TACAN contract. In evidence, Musgrave explained this sort of shortfall was fairly common within Plessey. He said most of Plessey's business consisted of long-term advanced technology contracts, and that it would not be unusual at any point in time for several of these contracts to experience difficulties on a technical level. He said such technical difficulties resulted in cash flow variances, since often the customer would only make progress payments on the contract once specific technical milestones had been met. If there was a delay in meeting these milestones, it would affect the company's cash flow. Musgrave testified that while Leigh did not have sufficient rash to repay the loan at this point, it did have other options available to it. He said if TD had called the loan, Leigh could have sold some of its assets or perhaps approached the Bank of Montreal, which he said was keen to get involved.

**131**    In a July 11 memo to Noonan at TD Credit Division, Young reported the conversation with Musgrave about the comfort letter and that he had confirmed with the bank's legal department that the comfort letter would continue to apply. He also noted that contrary to prior expectation, Leigh did not have the $10 million to repay the outstanding loan, and that Leigh's cash balances had declined due to a temporary delay on a major contract. Young requested that the existing loan be rolled over for a further 90 days and continued in the name of Leigh, concluding "We are satisfied that the risk is still acceptable based on the comfort letter".

**132**    Plessey delivered written confirmation to the bank in a letter dated August 1, 1988, that the comfort letter applied to Leigh. This letter was vetted by Plessey in-house counsel before being sent, and was signed by Walls and Huntbatch. This second comfort letter stated: "We confirm that the comfort letter dated April 20, 1988 remains valid and now applies to Leigh Instruments

Limited."

The Multi-Option Facility

**133**    In August 1988, Jonathan Exton of the Bank's London office received an invitation from Plessey to submit a bid to participate in a 250 million pound multi-option facility, which Exton explained was a "facility which permitted the borrower to draw down in different currencies of its choice". Due to the size of the facility, this invitation had been extended to a number of banks. Exton testified that when he received the invitation, he prepared a Corporate Credit Review of Plessey, which he sent to the Credit Division in Toronto. The CCR, dated August 24, described its purpose as a request for approval to underwrite 5 million pounds of the 200/250 million pound five-year multi-option facility, arranged for Plessey by Barclays de Zoete Wedd Limited. The CCR gave Plessey a risk rating of 2 (unchanged). Under documentation, Exton noted that the MOF agreement included standard events of default, including a material adverse change clause and a negative pledge.

**134**    In the section pertaining to use of credit, Exton noted that TD had been invited to participate due to its "close relationship in Canada as the principal beer of its subsidiary Leigh Instruments of Canada ... since the acquisition TD has also taken the banking business of Plessey Canada, who were formerly with the bank of Montreal." Exton went on to state that the pricing on the MOF would not provide much profit for the bank. Nevertheless, he was seeking approval to participate for "relationship reasons and the opportunity to gain future business," and added that the bank had recently offered Plessey a 20 million pound uncommitted short-term facility which had been fully drawn down. In his financial summary of Plessey, Exton observed that the company's turnover had fallen by 9 percent as senior management had devoted resources to fighting off a recent hostile takeover bid by GEC. Also, Plessey's net worth had been reduced by 335 million pounds from 623 million pounds as a result of a write-off of goodwill associated with a series of recent acquisitions, one of which was Leigh. Despite this, Exton described the company as "financially strong". The CCR was also signed by Hugh Rising, vice president of corporate finance for the EMEA division, who added: "We are proposing to participate in this facility at the minimum level for existing relationship reasons, feeling as well opportunities will be presented going forth. This will assure our prominent position as bankers to the Canadian operations and afford us with opportunities in the US and specifically the UK relative to FX and Capital Market products." The application was approved by McDowell, who noted that the bank should obtain a capital adequacy clause. In evidence, McDowell said concern about losing the Plessey business to a competitor would not have affected his decision, but agreed that building up the relationship with Plessey was an important consideration for the bank. The MOE was signed on September 20, 1988.

September 1988 to April 1989 - The Third Comfort Letter

**135**    Plessey completed the purchase accounting adjustments for Leigh by early September 1988. The opening balance sheet showed Leigh's assets were valued at $51.66 million on March 31, 1988.

This figure was arrived at using Leigh's accounting principles. Once the asset value had been calculated using Plessey's more conservative accounting principles, Leigh's assets were reduced to $13.16 million as at April 5, 1988. Musgrave explained in evidence that Plessey took a more conservative view than Leigh on the valuation of contracts in progress. He explained that Leigh and Plessey were both involved in large long-term contracts, and with such contracts it was necessary to book profit on the contract as it progressed. He said if the contract ran over a period of several years, profit would accrue over the life of the contract and there was a certain amount of discretion as to how and when the profit was booked or recognized on the balance sheet. Plessey was more conservative than Leigh in recognizing profit, so when Leigh's balance sheet was adjusted according to Plessey principles, it resulted in the write-down to $13.16 million.

**136**    In late September 1988, only five months after the Leigh acquisition, Leigh advised that it would have a total borrowing requirement for the quarter ended December 1988, of $30 million. Leigh's cash requirements included $3.55 million for the payment to Plessey of interest on the $69 million intercompany debt which had been imposed following the acquisition.

**137**    Although the interest payment on the intercompany debt was payable on September 15, Leigh did not make this payment. Plessey was not pleased at this turf events. In a memo to file in late October. Musgrave recorded that he had been informed by David Dean, the vice president, finance at Leigh, that the loan interest payments to Plessey might have to be further deferred due to contract slippages. Musgrave noted "we cannot allow trading cash flow slippages to be accommodated by the deferral of loan obligations."

**138**    In late September, Andrew Akerman, financial analyst at PESL, advised Musgrave that Leigh required increased working capital due to delays in start-up of the TACAN program, and due to technical problems plaguing the SHINCOM program. However, Leigh was forecasting that its bank borrowings would decrease from $30 million at the end of December, to $19.89 million by the end of March 1989.

**139**    Based on the information from Akerman, Musgrave drafted a submission to Plessey's main board, requesting an increase in Leigh's borrowing and guarantee limit to $30 million. Board approval was granted on September 30, 1988.

**140**    On September 26, Greg Young at TD prepared a Corporate Credit Review of Leigh for the purpose of renewing the outstanding facilities, and placing the $10 million acquisition facility in Leigh's name, since it had previously been in the name of Plessey Canada. The total of Leigh's outstanding borrowings at the date of the review was $13.782 million.

**141**    In the CCR, the Leigh account was given the risk rating of 3A for all the facilities which, Noonan explained, denoted a normal banking risk, with the A indicating an improving trend. It is significant that this was the same risk rating which had been applied by the bank to the Leigh operating line prior to the acquisition. The $10 million acquisition facility had been given a lower risk rating of 2 when it was held by Plessey Canada, 2 being the same rating as the parent. Plessey

Plc. In evidence, Noonan testified that the $10 million acquisition facility, as secured by the comfort letter, was still rated at 2, but that the practice and policy of the bank was that if a portion of the credit facilities of the borrower had a more adverse rating than any other, then the total account rating for the borrower would receive the higher risk.

**142** Notwithstanding Noonan's evidence, it is clear that the risk rating applied by the bank to all the facilities was that of Leigh and not Plessey. Plessey Canada was merely a shell company incorporated for the sole purpose of the Leigh acquisition. Since it was not an operating company, there was no basis for a risk rating other than the risk of the parent. Once the acquisition loan had been placed in Leigh's name following the amalgamation, the risk was rated as that of Leigh rather than Plessey. This conclusion is further reinforced by the risk rating given by the bank subsequently in the January 10, 1989 CCR. As is set out in more detail below, in that CCR the bank merged all the Leigh facilities into one operating line, released all its formal security and rested its exposure solely on the comfort letter. The risk rating of the account remained that of Leigh however. This risk rating is inconsistent with the bank's subsequently professed view that the comfort letter contained an obligation to pay or was in the nature of a guarantee.

**143** Security was listed in the September 26 CCR as a registered general assignment of book debts and documentation for the $5.4 million operating line was listed as a loan agreement containing normal representations, warranties and covenants. For the second line of credit, documentation was described as a letter agreement and the comfort letter from Plessey. Repayment was "As funds permit/on demand (subject to contract maturities)."

**144** In the remarks section, Young noted that Leigh's financing requirements had increased substantially due to the acquisition and subsequent amalgamation, and that Leigh had advised they would request an increased operating facility of $25 million. Young reported that the introduction of Plessey accounting principles had altered Leigh's balance sheet significantly, but recommended the risk as acceptable, despite the deterioration in Leigh's financial position. He made his recommendation, in part, on the basis that the lines were payable on demand and fully secured by receivables, and because "facility No. 2 is backed by a strong comfort letter from Plessey and we are confident that Plessey will support Leigh as required". The review concluded that the low pricing on the $10 million facility had been recommended by Credit Division to ensure that the bank kept the Leigh relationship.

**145** Although this CCR was intended to serve as Leigh's annual review, Noonan refused to approve it on that basis. He renewed Leigh's facilities only until October 31 and noted that based on a review of Leigh's balance sheet, outside security such as a comfort letter would be required for the expected loan increase.

**146** Noonan testified that he limited the renewal period of the facilities to Oct. 31 because the bank had only the draft accounts, and he wanted to see a full set of audited financials for the company. Noonan said he specified a new comfort letter because the amount of the anticipated

increase would exceed the value of the receivables over which the bank held a charge.

**147** A subsequent Credit for Executive Circulation dated September 30, 1988, reviewed the Leigh facilities and concluded "our lines are fully secured by the assets of the company and supported by comfort letter from Plessey. We are confident that Plessey will support Leigh as required." This document was initialled by Brock, McDowell, and Noonan.

**148** That same day, Young sent Noonan a memo requesting a temporary increase or bulge in Leigh's operating line of $1 million, until the company could provide the amalgamated financials. Young reported that the Leigh borrowings were at $15.8 million (an increase of $2 million over the past four days), some $400,000 in excess of the authorized limit. In recommending approval of the bulge, Wendy Leaney, general manager, Corporate Banking Division and Young's immediate superior, described Plessey as a "valued connection." The request was approved, and initialled by both Noonan and McDowell.

**149** On October 6, 1988, Brock, who was visiting the U.K., attended a meeting with Musgrave at Plessey, accompanied by Jonathan Exton, manager, corporate finance in the bank's London office. Musgrave explained that this sort of visit happened quite frequently. He said someone senior would visit from overseas and would be taken around to meet major customers or potential customers of the bank. In fact, requests for appointments like this were so common, Musgrave had instructed his secretary to limit them to two per week.

**150** In his reporting memo following the meeting. Exton commented that the bank's last visit to Plessey had been more than two and half years earlier. Plessey had not been prepared to accept visits, despite repeated attempts, and so he was pleased to be able to make this call. Exton did not record any discussion about Leigh, but did note that Plessey intended to drawdown on the MOE sometime in the next month.

**151** By the first of November, Leigh again requested a temporary increase in its loan facility, this time of $4 million. In a memorandum to Noonan on that date, Young stated the bank was still awaiting a copy of the amalgamated financial statements, which they expected to receive by mid-November. The total outstandings to Leigh at this point were $16.851 million. No explanation was provided in the memo regarding the need for an increase, however Young did point out that the London office felt the Leigh relationship had assisted in the efforts with Plessey, and that Brock had recently called on the company. As well, he reported that Plessey's board had approved Leigh's request for an increased operating line of $30 million. Included in the description of security was the comfort letter.

**152** In recommending the increase, Young's supervisor Wendy Leaney, noted that while the Leigh relationship was thing a long time to "regularize", this was the bank's only relationship with Plessey, although this latter observation was in error. Leaney explained in evidence that she did not object to the inclusion of the comfort letter under security, because she considered it part of the security package.

**153**    This particular credit did not go to Noonan, who was away from the office. Instead, it was reviewed by Sid Owen, senior vice president, Credit Division. Owen approved the requested increase until months end, but commented that the lack of presentation of reasonable figures was difficult to understand, and that they must be tabled if the bank was to consider restructuring the loan. He concluded cautiously "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to regularize this company's facilities by Nov 30/88. We must resist being dragged along."

**154**    When asked in evidence about the reference to informal support, Noonan said that, although he had not seen the note at that time, the comfort letter in his view amounted to a quasi-guarantee. He explained that while a comfort letter might not be supported by a formal resolution and all the protective clauses that accompany a guarantee, he believed it could convey a quasi-guarantee to perform certain functions.

**155**    Meanwhile, on November 16, GEC announced a second hostile takeover bid for Plessey, this time in partnership with Siemens, a German company. The two companies formed GEC Siemens plc as a vehicle for the joint venture. As Musgrave explained, this was the second such hostile bid from GEC, and it was most certainly not welcomed by Plessey, which wished to remain independent. Also, Musgrave said there had been a long-standing adversarial relationship between the chairman of Plessey and the chairman of GEC. Exton she bank's London office wasted no time in offering the bank's support to Plessey. He met with Denise Beard of Plessey's Treasury Department on Nov. 17. In evidence, Exton explained the purpose of the call was to develop further business opportunities with Plessey. In his report of the meeting, Exton described the purpose of the call as, among other things, to advise of the bank's willingness to support Plessey in any defence strategy against the hostile bid, and to follow up on amendments to credit facilities for Leigh. Exton reported that Plessey would put a freeze on meeting other bankers while the bid was on, and that they were Plessey's last visitors for the time being. He noted that the bank's pledge of support was greatly appreciated by Plessey, and that Plessey's main need was credit facilities.

**156**    Also in this meeting, Beard requested that the bank release its formal security over the assets of Leigh. Exton testified that he understood the request for release of security was related to the terms of the MOF, which restricted negative pledges on the assets of Plessey. He said it was his understanding that Plessey was concerned about its level of encumbrances, which was approaching the percentage allowable under the MOF, and consequently it wished to reduce them.

**157**    This contrasts with the evidence of Musgrave, who indicated it was merely Plessey's preference not to have security over the assets of its subsidiaries, as it restricted Plessey's ability to deal with these assets, and because if security was granted to one bank, others might wish to follow suit. He explained that the Deloitte's due diligence report on Leigh had omitted any reference to the security TD held over Leigh's assets. Plessey only discovered the security when preparing for the MOF, since as an appendix to the MOF, Plessey had to list all the secured assets in the group at the time of signing. He said the MOF was signed with the Leigh security in place and listed in the

appendix. As well, he testified that Plessey was well within the allowable limit in secured assets contained in the MOF. As such, the terms of the MOF did not require that the security be released. However, when Musgrave became aware of the security, he asked Beard to try and have it removed. He said it was simply a matter of good housekeeping that the security be released.

**158**    To the extent that Musgrave's evidence conflicts with that of Exton regarding the reason for the requested release of security, I prefer the evidence of Musgrave. He was intimately acquainted with Plessey's policy on secured assets as group treasurer. Moreover, although Ms. Beard did not testify, she would have been aware that TD was a signatory to the MOE, and thus would have a copy of the MOF agreement. Accordingly, I conclude that Plessey requested the security be released simply because it preferred not to grant security over assets of the group, and not because it was required to do so by the MOF.

**159**    Leigh continued to experience cash flow problems and on November 18, Dean at Leigh advised A.G. Finnis, group taxation manager at Plessey, that the $3.5 million in interest owing on the intercompany debt, which had been due September 15, would not be paid before January. Leigh also advised that it would require a further increase in its borrowing limit. Musgrave responded to Finnis in a memo dated November 28 that a request would be submitted to the Plessey main board for an increase in the borrowing limit, in part to enable Leigh to pay the interest on the intercompany debt. In evidence however, Musgrave explained that payment of the interest had always been factored into Leigh's financing requirements, and that the need for an increased borrowing limit stemmed from cash flow problems related to Leigh's contracts.

**160**    By November 28, Leigh was in an "out of order" position on its TD facility. This probed Leaney to write to the senior vice president advising that Leigh's credit had been renewed to November 30, with an operating line increased to $10 million in addition to the $10 million acquisition loan. On November 29, Young advised Leigh's local account manager in Ottawa that a credit exposure for Leigh of $21 million had been verbally approved by the bank and was not to be exceeded.

**161**    In his record of the conversation, the account manager noted "the bank is concerned that the letter of comfort provided by Leigh Instruments' parent company (Plessey) will not be honoured in the event of a successful hostile takeover from G.E. and Simmons [sic] group."

**162**    The credit authorization was followed by a memo from Leaney and Young to the Ottawa account manager on November 30, authorizing a temporary renewal of the Leigh facilities, with the operating line at $11 million for total of $21 million. The memo observed that the bank was still awaiting updated financial information, expected on December 5, before proceeding with Leigh's request for lines totalling $30 million. Leaney added a handwritten note that "in the interim, no security is to be released."

**163**    Leigh's cash flow difficulties did not abate however, and by December 12th Leigh was again in an out of order position, with a credit exposure of over $22 million. The branch manager in

Ottawa called Leaney concerning this, and Leaney authorized the branch to manage the account over the $21 million which had been authorized. At the same time, she stipulated the Leigh position be reported to Corporate Banking Division on a daily basis. In evidence, Leaney said his was a judgment call she made, knowing Plessey had approved a $30 million limit, and that she knew it was only a matter of time before the bank received an increased comfort letter. Leaney conceded that it was beyond her authority to grant approval to manage the account above the authorized limit, and that she should have obtained approval from Credit Division. She said it was a judgment call she made, given that she had been delegated responsibility to manage the relationship, and she took it upon herself to give the approval. Leaney said she wasn't concerned about the account in view of the security package the bank had, but was annoyed at the way the account was being managed.

**164**    By December 16, the Leigh outstandings had risen to $24 million, and accordingly, Young and Leaney met with Noonan on that date and sought from him an exceptional approval of an increase in the Leigh limit to $25 million, to regularize the company's position on the books. Leaney advised Noonan that Plessey had approved a borrowing limit of $30 million, and that a credit review of Leigh was underway. Noonan approved the increase, on the basis that the credit review would be received in the week of December 19. Leaney and Young failed to provide the credit review within the stipulated time.

**165**    At Plessey, Musgrave was taking steps to have the Leigh borrowing limit increased even further, to $34 million, following a request from Dean on December 12. In his record of the conversation with Dean, Musgrave noted that the bank was "getting a little uneasy about the security for the local borrowings, in light of the GEC bid for Plessey," despite the $10 million letter of comfort and floating charge on inventory, and receivables. Musgrave told Dean he would prefer to secure the bank's position by an increased letter of comfort, "matched at the same time by an elimination of the bank's security on the inventory, and receivables."

**166**    Musgrave prepared a main board submission in the name of Walls, requesting that the Leigh borrowing and guarantee limits be increased from $30 million to $34 million. The need for the increase was attributed to delivery slippages and higher costs on the TACAN and SHINCOM programs. The submission noted that technical problems plaguing SHINCOM had been resolved and borrowing levels were expected to fall to $29 million by March 1989. The increase was approved by Plessey's executive committee on December 21.

**167**    Meanwhile, at Leigh, steps were being taken to find a new president of the company. To that end, Barry Flower and John Shepherd, president and chairman of the board of Leigh, respectively, met with Frank Driscoll, an engineer with an army background and long experience working for the military and later in the defence industry. Driscoll ultimately was to become president of Leigh in August, 1989. In that initial meeting however, both Flower and Shepherd expressed concern to Driscoll about the performance of David Dean. Driscoll testified that they expressed reservations to him about Dean's ability to perform in his role as vice president of finance, in view of the growth they had planned for Leigh.

**168**    On January 10, 1989, Leaney and Young finally submitted the credit review Noonan had expected in the week of December 19. By this time, Leigh had again exceeded its authorized credit of $25 million and had outstanding $25.552 million. The purpose of the review was to cancel the separate operating line and $10 million acquisition facility, and replace them with a single operating line of $35 million. The credit was ultimately approved by McDowell upon Noonan's recommendation, however both imposed changes and conditions in the proposal as submitted by Young. Young and Leaney had proposed that the account risk rating remain at 3 A, however Noonan changed the rating to 3 B, denoting a stable rather than improving trend. I note at this stage that the prior $10 million acquisition facility was given a risk rating of 2 by the bank, based on the comfort letter. However this new facility, which was also to be supported by a comfort letter, was given a much lower risk rating though still normal. This reinforces my conclusion above that the risk rating applied by the bank was clearly that of Leigh rather than that of Plessey. As such, the risk rating was inconsistent with any belief on the part of the bank that the comfort letter contained an obligation to pay Leigh's debts or amounted to a guarantee.

**169**    Security was listed in the credit review as the general assignment of book debts and floating charge debenture. Leaney had handwritten next to the description of security that it was to be released, however Noonan struck out her note and substituted "No! See below," in reference to his lengthy typewritten additional recommendations, set out below.

**170**    Under documentation, Young had listed the letter and loan agreements and comfort letter from Plessey Company. Beside the reference to the loan agreements for the cancelled facilities, Leaney had handwritten "to be released," to which Noonan added "only when new security package is in place." To the reference to the comfort letter, Noonan added the handwritten notations: "for $35 million and in the same form, wording and sign off as existing letter, including final paragraph," and "with negative pledge by Leigh Instruments Limited." Noonan explained in evidence his reason for adding this condition was to ensure, if the bank gave up its security on these assets, that Leigh would not be in a position to place security on them in favour of another party.

**171**    In the conditions section, Young included a requirement that Plessey maintain a majority interest in the voting stock of Leigh. In evidence, Young explained that he included this condition in view of the GEC/Siemens takeover bid and the uncertainty surrounding the ownership of Leigh. Even though the comfort letter contained an ownership clause, he explained that he wished to be able to trigger the loan agreement in the event that Leigh was no longer a subsidiary of Plessey. Young also included a condition that the intercompany debt be postponed in priority to the TD debt, to which Noonan added the word "formally." Attached as enclosures to the review were Leigh's audited financial statements for the period ending June 30, 1988, draft financials as at September 30 and a copy of the existing comfort letter.

**172**    Under use of credit and repayment, Young noted that while Leigh's balance sheet indicated some of Leigh's debt should be "termed out" they were prepared to increase Leigh's operating line based on the comfort letter from Plessey, noting as well that the facility was payable on demand. In

the security section, Young commented that Plessey had requested that the security be released, since it was Plessey's policy that all its debt and that of its subsidiaries be unsecured. He recommended acceding to this request in return for the comfort letter. In fact, Young's observation on this point was in error, as Musgrave testified. I accept Musgrave's evidence that Plessey did, on occasion, provide guarantees and other security where circumstances warranted. In support of this finding, I note that in April 1989, Musgrave issued a memo permitting a creditor of Micronav to maintain security over Micronav's assets in the amount of $700,000. Musgrave explained in evidence that there were good commercial reasons in that instance to leave the Micronav security in place.

**173**    In the section on risk assessment, Young observed that the six month delay in the TACAN project had adversely affected Leigh's cash flow and earnings to tune of about $5 million per month. He stated that the acquisition by Plessey and related financing has had a "major negative impact on Leigh's financial position" and that of the $81 million in debt carried by Leigh, $71 million of it was intercompany debt. "Clearly Leigh cannot support this level of debt on its own and consequently this credit depends on the support of Plessey," Young stated, noting that Plessey was prepared to provide a "strong" comfort letter similar to the one attached, and that the risk rating for Plessey itself was 2-low risk. He added that the bank's relationship with Plessey was growing and the Leigh account must be considered in that context, noting again that Plessey was the target of hostile takeover bid.

**174**    Leaney recommended the credit be approved, although she observed that "there is no question that the Plessey support is required here and on that basis, credit is recommended."

**175**    Noonan appended lengthy comments to the credit review and was clearly cautious about the risk. In respect of the request to release the security, he noted that the existing security predated the negative pledge in the MOE and should not be released until acceptable security package was in place. Noonan also observed that the existing comfort letter was "indeed strong," but stipulated that Corporate Banking Division request subordination of the intercompany debt to the TD facility. He recommended the credit on the basis, among other things, that the comfort letter be in the "same form, wording and sign-off as the existing letter, particularly paragraph 3". In cross-examination, Noonan said that although the facility was for an increased amount, and although it was now an operating line, rather than a short-term acquisition loan, he did not see any need to change the wording of the comfort letter, which was substantially the same as comfort letter number one.

**176**    Noonan also noted in the credit review that if a negative pledge was obtained from Leigh he would be flexible on the debt subordination. He retracted this suggestion in handwriting however, in light of the comments of McDowell, who ultimately approved the credit. Noonan testified that he added his own written retraction because he wanted to be absolutely sure the account manager realized that McDowell had overruled and wanted a full Subordination of the intercompany debt.

**177**    McDowell noted "it is preferable to have full subordination of the inter-company loan cause

Leigh will be in no position to repay for some time and in the absence of a call on assets, subordination adheres to spirit of the comfort letter." McDowell testified that it was not his practice to review the documentation accompanying a credit review, and that responsibility rested with the senior vice president who recommended the credit, in this case Noonan. McDowell said he had tremendous respect for Noonan and trusted him implicitly. In the board sheet remarks relating to the CCR, it was noted in reference to the comfort letter: "We are confident that Plessey will support Leigh as required."

**178**   In evidence, Noonan testified he felt the comfort letter was strong, in part because it was signed by people with authority to commit the company, and because in his view the third paragraph, coming from a company with the stature to fulfil its obligations, was a clear commitment to the bank that they would see that Leigh was in funds to repay the amounts due under the loan facility. He said the reputation of Plessey was significant to him, and that with its standing the bank could believe in what Plessey said.

**179**   Accordingly, the bank agreed to release its security and rest its risk on the comfort letter, without stipulating any changes to the wording of the comfort letter, notwithstanding that the form and substance of the letter had been initially approved in the context of a short-term acquisition facility. I must infer from all of this evidence that the bank made this decision based on a desire to foster its relationship with Plessey, as noted in the CCR.

**180**   On February 2 1989, less than a month after the credit was approved, and before a new facility agreement was in place, the English Court of Appeal released its decision in Kleinwort Benson Ltd. v. Malaysia Mining Corp., [1989] 1 All E.R. 785 (C.A) (leave to appeal to the House of Lords refused), overturning the trial decision and refusing to enforce payment on a letter of comfort. Noonan testified that he was aware of both the trial and appeal decisions, but that the appeal decision did not change his approach to comfort letters, as he had always practiced a policy of handling comfort letters with caution.

**181**   At this point, TD did not have an updated facility agreement to cover the outstanding Leigh borrowings. Indeed, the bank had not obtained a facility agreement with Leigh since its amalgamation with Plessey Canada following the acquisition, and the most recent facility agreement had been executed by Plessey Canada the previous April regarding the acquisition loan. The other facility agreement outstanding was for the $5.4 million Leigh operating line, which was dated March 1, 1988, and also predated the acquisition. On February 9, Dean forwarded to Beard at Plessey a proposed facility letter received from TD, which contained a clause requiring the subordination of the intercompany debt and attached a draft resolution to that end. Plessey did not wish to enter into this agreement. Musgrave explained in evidence that Plessey did not wish to subordinate the debt for reasons similar to their reluctance to grant security, and that if subordination had been agreed to, it would restrict Plessey's ability to deal as it liked with the capital structure of the group.

**182**    On the January 10 CCR, Young made a handwritten note on the last page, which he dated March 6, 1989, and which read: "Plessey has refused to provide postponement of the intercompany loan as they view comfort letter as tantamount to a guarantee, which it is. In consultation with WAL, we have agreed to waive that condition." In the body of the CCR, beside the reference to the request for postponement. Young wrote "Plessey has refused, since comfort letter is very strong. We waived postponement."

**183**    In evidence, Mr. Young testified that he wrote this note following a telephone conversation with Ian Musgrave, and that someone from the bank's London office was also on the line, although he could not recall who. Young said Musgrave told him the bank did not need the postponement, that Plessey viewed the comfort letter as tantamount to a guarantee, and that Musgrave's words were exactly as he had recorded them. He said the words "which it is" reflected his own view, arrived at after consultation with the bank's in-house counsel, Norton. This was the extent of Mr. Young's recollection.

**184**    Ms. Leaney testified that Young told her about this conversation immediately after it took place. She said that she and Young had discussed the question of the postponement, and that she had approved the decision to waive that requirement. I note that this was despite McDowell's condition that subordination be obtained.

**185**    This conversation, alleged to have taken place between Young and Musgrave, was a contentious issue in this trial, particularly the statement attributed to Musgrave that the comfort letter was "tantamount to a guarantee". Mr. Musgrave testified that he had no recollection of any conversation with the bank, apart from the call in spring of 1988, when he advised that the first comfort letter would continue to apply following the amalgamation. He said specifically he could not recall ever discussing the meaning and intent of the comfort letter with the bank, and that he did not hold the views expressed in the note. Musgrave conceded on cross-examination a that it was possible he spoke to Young and told him there would be no postponement of the intercompany loan, although he could not recall doing so.

**186**    Musgrave said that comfort letters and guarantees were quite different, and that he would be "amazed" if anyone at Plessey had said that a comfort letter was "tantamount to a guarantee". He elaborated that he and Beard had developed a standard response to the question of what a comfort letter meant, which was to tell anyone who asked that, as a matter of fact, in the entire time he had been at Plessey, the main board had never walked away from a comfort letter. He said the statement was intended to give the banks a degree of comfort, but at the same time they would make it quite clear as part of the response that the board saw comfort letters and guarantees as something quite different. Musgrave said he "certainly" didn't believe that the Leigh comfort letter was tantamount to a guarantee. In cross-examination, he had to concede that since he had no recollection of such a conversation, it was possible the conversation took place, however he thought it was highly unlikely.

**187**    I have considered the evidence of both Mr. Young and Mr. Musgrave on this point, and I prefer the evidence of Mr. Musgrave. Mr. Musgrave was group treasurer of Plessey, and used to dealing with banks and bank security on a daily basis. He was intimately acquainted with Plessey's policy and views regarding comfort letters. He had no recollection of saying a comfort letter was tantamount to a guarantee and thought it was highly unlikely that he had done so. Such a statement was contrary to his set response. Further, he testified that it was his practice, when he had dealings on a file in which someone else was involved, to dictate a note concerning the conversation. Musgrave said he had no recollection of making such a note, nor was he aware of the existence of one.

**188**    There is no reference in Young's note to Musgrave, nor indeed to a telephone call. Jonathan Exton, formerly of the bank's London office, gave evidence in this trial. He was the contact person for Plessey, and Young testified it was "a reasonable assumption" that Exton was the other person on the call. Yet Exton testified he could not recall any telephone conversation with Musgrave up to March 6, 1989, nor could he recall any conversation jointly with Musgrave and Young. No one else was ever identified as being the person from the bank's London office on the line.

**189**    Mr. Young himself, had very little recollection of this conversation, apart from the note. He conceded in cross-examination that the note was not contemporaneous with the phone call, but was made on March 6, 1989, following a conversation with Ms. Leaney. He could not recall how much time had elapsed between the phone call and when he wrote the note. The plaintiff did not produce any contemporaneous note of the phone call. Further, the note was made to record the decision which Young and Leaney had taken it upon themselves to make, to waive the requirement that Plessey postpone the intercompany debt, despite the strong comments from McDowell.

**190**    Finally, Young never again referred to the phone call, or to Plessey's alleged description of the comfort letter as tantamount to a guarantee, in any subsequent bank documentation. Nor did he refer to it in any other communication, written or oral, with Plessey. This description, as attributed to Plessey would have been significant, and would certainly have been recorded in internal bank documents or raised by the bank upon renewal of the comfort letter. However, there is no evidence that the bank ever made any further reference to the alleged statement, although it would have been in the bank's interest to have done so, had the statement actually been made. Since it is improbable that such a key statement, if made, would not have been referred to again in some fashion, the allegation lacks any ring of credibility. I conclude that the conversation between Young and Musgrave and the unnamed third person, did not take place, and that Musgrave did not state to Young that the comfort letter was tantamount to a guarantee. I find that TD did not give up its security, nor did it make any further advances to Leigh after this date, on the basis that such a statement had been made or was purported to have been made by Musgrave.

**191**    In the meantime, unbeknownst to the bank, Plessey was considering an alteration to Leigh's capital structure. In a February 16 memo to Musgrave, Alan Jones the managing director of PESL, expressed concern about the capital structure of Leigh and the high level of interest-bearing debt

which had been imposed upon Leigh for tax reasons. He informed Musgrave the government, as Leigh's main customer had expressed concerns about Leigh's long-term viability in the context of the debt load. At this point in time, Leigh had still not paid any of the interest owing on the intercompany debt from September 15, 1988, despite the increases in its bank line. Musgrave testified that in this period, Plessey began to realize that the financial structure of Leigh was not appropriate. He said that at some point in February or March, Plessey decided to waive any further payments of the interest owing on the debt, and on April 1, converted the intercompany debt into preference shares. He explained the debt had been put in place initially, to offset taxation of Leigh's profits, however Leigh was not generating enough profit to cover the expense. Conversion of the debt to equity removed the burden of the interest expense from Leigh.

**192**    This conversion essentially supplied the bank with the subordination they had requested, since the conversion of debt to equity removed the threat to priority of the bank's loan posed by the intercompany, debt. Musgrave testified, however, that the decision was taken purely for tax reasons, and not in response to the bank's request for subordination.

**193**    At the same time, TD was continuing its efforts to generate business with Plessey on other fronts. On March 16, Exton met again with Musgrave and Beard, and presented them with a revised facility letter for a short-term loan to Plessey of 20 million pounds. At this meeting, Exton also tried to interest Plessey in participating in a Canadian commercial paper program in connection with Leigh. Exton noted Plessey was interested in such a program, but wished to wait until the GEC/Siemens bid situation was over. Exton discussed the bid with Beard and Musgrave and noted that "the tables may be turning in favour of Plessey." They also discussed the Leigh account briefly. Leigh and TD had not yet agreed upon terms for the new facility agreement and Plessey requested a revised copy of the facility be sent to them.

**194**    On March 29, Young forwarded a fresh proposed facility to Exton, who in turn sent it to Beard the following day. By this point the Leigh borrowings were about $29 million and the bank still did not have a facility in place. Moreover, Young conceded on cross-examination that Leigh was well in excess of its authorized credit. Although the January 10 CCR had been approved, the conditions in it had not yet been fulfilled and Young agreed the approval was not operative. The prior authorization was only for $25 million, some $4 million less than the amount outstanding.

**195**    The revised facility letter did not contain a subordination clause. It provided an operating line of $35 million, payable on demand, and noted that the existing security was to be released upon receipt of a new comfort letter. The facility contained a negative pledge against Leigh's assets and requirement that Plessey maintain a majority interest in the voting stock of Leigh. The facility agreement also contained a reporting clause, requiring Leigh to provide the bank with audited financial statements within 90 days of Leigh's fiscal year end unaudited financial statements within 30 days of the end of each quarter.

**196**    On April 4, Beard responded by sending Exton a proposed draft of the comfort letter, asking

him to confirm that its content was acceptable, and that the security held by TD would be released as of March 31, 1989 (Plessey's year end and the date proposed for the comfort letter). Exton wrote Beard on April 10, enclosing a copy of a letter from Young confirming that the draft comfort letter was acceptable to the bank and that the bank would treat the Leigh facility as unsecured as of March 31, provided that Leigh accepted the proposed credit facility and that the letter of comfort was dated the 31st March.

**197**    On April 20, Beard sent Exton an executed copy of the letter of comfort, signed by Walls and Huntbatch and dated March 31. This, the third letter, stated:

> To this is to confirm that The Plessey Company plc has full knowledge of the facility of C $34,000,000 (Thirty four million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.

> Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

> This letter replaces our letters of 20th April 1988 and 1st August 1988.

**198**    Exton testified that when he received the letter, he simply checked to ensure the letter was for the right amount, and then forwarded it to Young in Toronto. He said he took no steps to determine whether the letter was acceptable to the bank, because this was the responsibility of the account manager. This proposed facility letter was never executed by Leigh.

**199**    Four days later, on April 24, Leigh received its audited financial statements for the year ending March 31, 1989, which showed a profit for the year, before taxes and one extraordinary item, of $4.659 million. The net income for the period was the same figure.

**200**    Meanwhile, the GEC/Siemens bid for Plessey was proceeding apace. Plessey had obtained an injunction to prevent GEC and Siemens for making the offer to its shareholders in December, however the injunction was overturned and GEC/Siemens issued the offer in late December. The

GEC/Siemens bid document indicated that the existing Plessey businesses were intended to be divided between GEC and Siemens and that GEC intended to take a majority interest in Plessey's North American defence electronics industries. The offer was referred to the British Monopolies and Mergers Commission in January, and in April the commission ruled the bid could proceed. The Commission stipulated, however, that certain of the Plessey businesses could not go to Siemens, a German company, for security reasons. Similarly, UK monopoly restrictions prevented certain of the businesses from going to GEC.

**201**    In response, Plessey continue to resist the bid. In a May 2 memo to all Plessey's businesses, managing director Stephen Walls stated:

> As part of our defence we will almost certainly be publishing a profit forecast to demonstrate the financial benefits starting to flow from strategies we have adopted.

> The provisional budget does not yet represent a sufficiently strong performance to fully achieve our objectives. The timing of our forecast requirements is as yet unclear but it is vital that we use forecast to be submitted with April results as the first opportunity to add profit improvement plans onto the budget to create a better platform for our bid defence. Would you please ensure, therefore that profit forecasts and improvements are closely scrutinized to enable us to maximize [sic] performance.

Musgrave said that while he did not recall seeing this memo at the time, he would expect it to be sent to stand alone subsidiaries like Leigh.

The Fourth Comfort Letter and the Bulge

**202**    By the 13th of June, Leigh was again experiencing financial difficulties. Dean contacted Musgrave and requested authorization for a further $4 million bulge in the bank line. That same day, Musgrave sent a memo to Walls asking for approval of "an emergency increase in the borrowing limit". Musgrave explained in evidence that although he could not recall the precise reason for the urgency, the request had to be turned around very quickly. He said Dean would have needed the money fairly rapidly, and could not wait until the next scheduled board meeting for approval of the increase. Walls approved the request, and Beard informed Dean on June 15 that the borrowing and guarantee limits bad been increased by $4 million to $38 million. The increase was approved to the end of August only, at which time it would revert back to $34 million.

**203**    Having received Plessey approval, Dean then wrote to Young at TD and requested the $4 million bulge, leading Young to prepare a CCR of Leigh dated June 15. Young described the submission as urgent and requested a decision as soon as possible. The purpose of the CCR was to lower the amount of the operating line from $35 million to $34 million, which was the amount

supported by the third comfort letter, and to obtain approval for a temporary $4 million line until a August 31st. The risk rating remained unchanged at 3B (normal risk). In the remarks section, Young noted that Leigh had missed milestones on both the TACAN and SHINCOM contracts, with a consequent impact on cash flow leading to the bulge request. Young pointed out that the bulge had been approved by Plessey, but that Plessey was reluctant to amend the comfort letter for such a short period. However, "Plessey has agreed to provide a new comfort letter if outstandings are not back in order by August 31/89." Young then observed that the general assignment of book debts and floating charge debenture over Leigh's assets had not yet been released, despite the fact the bank had received the new third comfort letter from Plessey, and that the security would not be released until the outstandings were back in order. He noted that TD London confirmed Plessey's account rating of 2 - low risk - and concluded "believe the risk is acceptable." Leaney recommended approval of the credit, which was then forwarded to James Laitner, senior vice president, Credit Division. Although he recommended approval as well, he stipulated that the security was not to be released until the bulge was repaid or a new comfort letter received for the increased amount. The credit was ultimately approved by William Brock, the executive vice president, Credit Division, without comment.

**204**    On June 26, Young sent Noonan a memo updating him on Leigh's credit situation and the condition that security not be released. He reported that in-house counsel had advised TD would be in a conflict of interest if it retained the security, given that TD had signed the MOF containing a negative pledge, and given the agreement in writing to release the security. Noting that Plessey had agreed to provide a new comfort letter if the bulge was required beyond the end of August, he stated "We have a good relationship with Plessey and believe the risk is acceptable. Although the hostile takeover bid by Siemens and GEC is a concern, it will likely take beyond Aug. 31/89 to complete or resolve. We request that the condition for the approval of the bulge, that our security not be released, be waived."

**205**    Leaney agreed, although she observed "clearly a higher comfort letter is the best solution but for relationship reasons would go along." Noonan added his own comments: "The new comfort letter is certainly strong & I am told by CBD actually boarded by Plessey Co PLC." He added that the bulge was clearly to the end of August only, but pointed out that the MOF did permit encumbrance of 10 percent of Plessey's group assets and that the bank security predated the MOF in any event. He concluded that he would agree to release the security "if it is the Co request to do so." The decision to release the security was alternately taken by Brock: "We have agreed to release the security and would proceed to do so, resting the exposure on the comfort letter." An executive review sheet regarding the release of security was initialled by Noonan, Brock, McDowell, bank president Robin Korthalls and Thomson, the chairman and CEO of the bank. It noted the risk rating of Leigh at 3B (unchanged) and specified the audited year-end financials be obtained prior to Leigh's annual review date of September 30, 1989. I note that Young's letter sent to Beard on April 10 stated the security would be released when the comfort letter was delivered and the credit facility accepted by Leigh. This latter condition had not yet been met.

**206**    On June 27, Young sent a new facility letter to Leigh. At this point, the most recent executed facilities remained that accepted by Plessey Canada in April, 1988 and the Leigh facility executed March 1, 1988. The facility offered an operating line of $34 million, was payable on demand, and listed security as nil, with a note that the existing security was to be released. The facility contained the same terms and conditions regarding Plessey majority interest in Leigh's voting stock and Leigh's financial reporting requirements as had been contained in the last proposed letter. In a separate letter, Young offered the $4 million temporary bulge, on the understanding that Plessey would provide a further comfort letter if the funds were required past the end of August. Both facility letters were accepted by Leigh the same day.

**207**    In London, Exton wrote to Beard on June 29, enclosing a draft letter of undertaking for Plessey to sign regarding the possible extension of the comfort letter at the end of August. Musgrave executed the letter without any change to the draft:

> We are writing to confirm our agreement with Mr. Michael Walzak on the telephone last week with respect to the temporary increase in the operating facilities for Leigh. We are aware that Leigh requires its operating line to be increased from C $34 million to C $38 million for a period of two months. Since at this time this is only a temporary requirement we will not revise the Letter of Comfort (dated 31st March 1989) to reflect the increased amount. However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the Letter of Comfort accordingly.

Exton forwarded the letter to Young on June 30th. The $34 million guarantee limit and $38 million borrowing limit for Leigh received retrospective approval of the Plessey main board on July 28.

**208**    On July 8, Leigh received its unaudited first-quarter financial statements for the quarter ending June 30. These financials showed net earnings for the quarter of $131,000 before deductions for taxes and an internal Plessey Group payment. After deductions, the financials showed a loss of $181,000 the financial statements included a quarterly forecast to the end of the fiscal year, projecting net earnings as at March 31, 1990 of $8.379 million. The information contained in these financial statements was sent to the bank pursuant to Leigh's reporting obligations, by letter of July 21, 1989, together with the executed facilities for the $34 million operating line and the $4 million bulge.

**209**    By the end of July however, Leigh was showing an increased loss. In the Plessey corporate finance report for the month of August, Leigh was listed under the heading "major loss makers". Leigh had budgeted a profit of 1.246 million pounds for the period to the end of July, but in fact reported a loss of 326,000 pounds. Hence Leigh reported a negative variance from its budget of 1.572 million pounds. The Plessey corporate finance reports were produced monthly by the Plessey treasury department. In evidence, Binnie Sammon, group chief accountant at Plessey, testified that

the corporate finance reports were distributed to a restricted list of recipients, including Walls, Musgrave and Huntbatch. Musgrave testified that while Leigh was showing a loss in that period, there were other subsidiaries with worse numbers, and there was nothing in the report which would have caused him to get "too excited".

**210**   On August 17, GEC and Siemens released their proposals for the Plessey businesses in the event that the takeover was successful. David Newlands, the GEC finance director, explained in evidence that there were two components of the Plessey businesses which particularly interested GEC and Siemens; the telecommunications aspect of the business and the defence electronics aspect. He said the original plan had been for GEC and Siemens to operate the Plessey businesses in partnership, however the Monopolies and Mergers Commission in Britain refused to permit Siemens to participate in certain defence businesses and refuse to allow GEC takeover other of the Plessey businesses for monopoly reasons. The conditions imposed by the commission led to the GEC/Siemens final offer document on August 17. In that document, GEC and Siemens set out their plans for restructuring Plessey and indicated that Leigh was intended to be wholly-owned by GEC if the bid was successful.

**211**   In TD's annual Corporate Credit Review of Plessey, dated August 25, the bank noted that a 20 million pound facility and the MOF were still in place, but had not been drawn upon. The CCR of Plessey also contained an update on the status of the takeover bid, however Brock noted "financial covenants protect if there were a takeover and restructuring."

**212**   Frank Driscoll had assumed his new role as president of Leigh on Aug. 8, and on August 23 had a short meeting with Young and Leaney, although he described it as a social, get acquainted meeting rather then a business meeting.

**213**   On August 29, Pat Smith of the Leigh finance department contacted Beard at Plessey and requested that the $4 million bulge be extended past the end of August to the end of November. The Leigh outstandings at that date were $34.8 million. The next day, Young relayed to Noonan a request for extension of the bulge to the end of October.

**214**   Young recommended approval of the request provided Leigh supply their written acknowledgment, and added that he did not believe it was necessary to obtain a new undertaking from Plessey. He based this recommendation on the fact that Leigh's balance sheet had improved dramatically with the conversion of intercompany debt, and noted that he and Leaney had met with Driscoll and believed this gesture would demonstrate the bank's support, thus generating goodwill and new business. Although he referred to the hostile takeover bid, he erroneously stated that it was unlikely to be completed before October 31st. Young noted in conclusion that the potential market for Leigh's MLS program was $300 million in Canada and $4 billion worldwide. The request was reviewed by Owen, who recommended the bulge be extended as long as Plessey was notified of the extension and Leigh formally requested it. Brock approved the extension without comment.

**215**   Meanwhile, several weeks earlier Musgrave had informed Walls he was leaving Plessey at