the end of August. Notwithstanding that the bank had not requested a further comfort letter relating to the bulge extension, Plessey nevertheless prepared one on its own initiative, in substantially the same form as the earlier letters. One of Musgrave's last acts before leaving the company was to review a draft of this letter. The comfort letter was executed by Walls and Huntbatch on behalf of Plessey and sent to Exton, who faxed it on to Young on September 7, with the explanation that "Plessey appreciated that the Bank was not requesting a revised Letter of Comfort, but as they had promised one, if the facility was required beyond August, and in view of GEC/Siemens bid, it was considered appropriate to do so." Exton testified he simply checked the amount and that the document was a comfort letter before forwarding it to Young. The fourth comfort letter stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C $38,000,000 (Thirty-eight million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.

> Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

> This letter replaces our letters of 31st March 1989 and 30th June 1989.

The GEC Siemens Takeover

**216**   On September 8, 1989 the GEC/Siemens offer to purchase the shares of Plessey was accepted by more than 50 percent of Plessey's shareholders, and the hostile takeover of Plessey succeeded. GEC and Siemens ultimately paid 2.2 billion pounds for Plessey shares. On September 22nd the new owners held a Plessey board meeting, at which they elected a new Board of Directors composed of representatives of GEC and Siemens, including GEC finance director David Newlands. Shortly following the takeover a great many of the Plessey senior management left the company, either having resigned or having been terminated by the new owners. Stephen Walls left on October 6th and Denise Beard left on November 3rd.

**217**   On September 28, each of GEC and Siemens put forward a candidate for managing director

of Plessey. The two nominees were to work together to manage Plessey from that date forward. Simon Weinstock was appointed by GEC and Phillip Gerdine by Siemens. Gerdine testified that from the outset he and Weinstock proceeded with several goals in mind. He said they intended to separate the Plessey businesses into units to be acquired by GEC and by Siemens. Those businesses remaining in the Plessey "rump" following this "hive-up" of the Plessey companies were to be liquidated. Gerdine explained that GEC and Siemens had purchased Plessey for about $4.5 billion U.S. and held the interest roughly 50-50. He stated that the hive-up exercise was a two-step process. The first step was that GEC and Siemens had to decide what companies would go where and then, how much the companies were valued at. He said allocation of the companies fell into two categories; those mandated by the U.K. government and those which were discretionary. Because it was a hostile takeover, the discretionary companies had been allocated preliminarily on the basis of very little information. Gerdine said GEC and Siemens put in place teams of people to determine the fair value of Plessey's assets, and each of the subsidiaries was subject to a review based on revenue earnings and net book value. Those values then had to be reconciled within the $4.5 billion purchase price.

**218**    Gerdine testified GEC and Siemens each took responsibility at the outset for the companies intended ultimately to be held solely by them. He said he took responsibility for the Sirens companies, Simon Weinstock for the GEC companies, and companies remaining in the rump were administered jointly. At the time of the takeover, Plessey had in place a set of rules and procedures governing financial reporting of the subsidiaries to the parent, and the new owners left those in place for the purpose of public filing of Plessey's financial reports. Each of GEC and Siemens applied additional internal financial reporting requirements in accordance with their respective practice.

**219**    News of the takeover was greeted by Exton as a further opportunity to develop business. He forwarded the original of the fourth comfort letter to Young in mid-September with the note: "As you know the GEC/Siemens bid for Plessey has been successful, and we now hope to develop our relationship with GEC. Hugh Rising and I will be visiting David Newlands, Finance Director, on 3rd October, 1989 and if you have any items for discussion, please advise me."

**220**    Almost immediately, the bank began to consider the effect of the takeover on Leigh. Ernest Mercier, executive vice president of the Corporate Banking Division contacted the bank's Montreal office which in turn contacted Canadian Marconi, which was owned 51 percent by GEC. A Montreal based vice-president of Corporate Banking wry to Mercier on September 13, noting that CMC had accepted in principal the notion of a merger with Leigh, in view of the similarity in their product lines.

**221**    On September 19, Mercier had an executive luncheon with Leigh president Frank Driscoll, the purpose of which was to solicit any business opportunities arising out of the takeover. In a briefing memo prepared in advance of the luncheon, Young advised Mercier of Leigh's contract related cash flow problems and of the Plessey comfort letters. Young pointed out the possibilities

for merger with CMC, and repeated the market estimates for the MLS system. He reminded Mercier that TD was Leigh's only banker, and that CMC did all its banking with the Royal Bank. He concluded that the London office had been unable to establish a meaningful relationship with GEC and "In addition to identifying opportunities arising out of the Plessey acquisition (e.g. fairness opinion on Leigh), we have a substantial interest to protect." Driscoll testified that when he met with Mercier, the discussion focused on the prospects for Micronav, and on the future of Leigh's banking relationship with TD in light of the possible CMC merger. The comfort letter was not discussed.

**222**   Driscoll testified that Leigh was aware it was intended to be wholly-owned by GEC fairly shortly after the takeover, if not earlier. He said that Dean attended a briefing on GEC accounting policies in England in late September or the first week of October.

**223**   The day after Driscoll's lunch with Mercier, on September 20, 1989, Young prepared a new CCR of Leigh in order to renew the existing facilities on the same terms, and to downgrade Leigh's risk rating from 3B to 4. In the remarks section, Young noted the recent acquisition of Plessey by GE Siemens and that Leigh was slated to go to GEC. "Although we were aware of the hostile takeover bid by GEC/Siemens, we are comfortable with the quality of their credit and hope to use our positions with Leigh/Plessey to develop a relationship with GEC." Young describe the uncertainty about Leigh's ownership and possible merger with CMC as a weakness however, leading to the revised risk rating of 4.

**224**   This CCR also mentioned the contract delays and missed milestones on SHINCOM and TACAN, observing that "A restructuring of the company's debt is clearly required". Young speculated that in view of GEC's cash resources and Leigh's tax position, it was likely that Leigh would receive an equity injection to pay out the bank. Young elaborated in evidence that Leigh had a number of research and development tax credits and carryforwards and that they were not taxable as a result. In that situation, he said it made sense for a parent with taxable cash to put in into the nontaxable subsidiary. He testified he vaguely recalled discussing this issue with Dean. The CCR concluded that TD Montreal would solicit opportunities arising out of the Plessey acquisition, including the possibility of providing a fairness opinion to CMC. Young explained in evidence that given 49 percent of CMC was publicly held, a fairness opinion on any acquisition or merger with Leigh would be required.

**225**   Leaney reviewed the CCR and recommended renewal of the facility but suggested, while the risk was increasing, that a rating of 3C was more appropriate, and Young agreed. Noonan in turn recommended the rating remain at 3 B in light of the "strong and renewed comfort letter" and the intercompany debt conversion. He testified that he reviewed the attached comfort letter at this time. McDowell agreed and authorized the credit.

**226**   An October 2 Credit for Executive Circulation distributed to senior bank executives regarding the Leigh credit misstated the terms of a comfort letter, describing it as at commitment "to

maintain ownership and to manage Leigh Instruments in such a way as to be always in a position to meet their financial obligations."

**227**   Just two weeks after the new Plessey board was in place, on October 3, Exton and Rising met with Newlands and reported GEC's intention to integrate Plessey's operating subsidiaries into its own businesses. Exton pointed out the bank's relationship with Leigh and observed that Newlands was familiar with Leigh's tax position and low profits, however Newlands advised refinancing of Leigh was premature. Exton noted GEC had not yet decided whether to sell Leigh 100 to CMC but that Newlands noted the bank's interest in providing a fairness opinion. As follow-up, Exton advised that the bank should maintain close contact with Leigh and CMC in Canada, and attempt to develop a relationship with GEC Treasury Department in the U.K. Newlands testified they did not discuss the Leigh comfort letter.

Fall 1989 and the Fifth Comfort Letter

**228**   Back at Leigh, by mid-October Driscoll had received some financial results for the month of September, which revealed a further deterioration. In September, shortly after arriving at Leigh, Driscoll had initiated an ETC review of all Leigh's SHINCOM and TACAN contracts in progress to estimate the cost of completing the contracts. The review involved the calculation of the ETC or estimate of the cost of completing the contract. That figure, combined with the actual cost incurred to date, would generate an estimated cost at completion of the contract of EAC. The EAC would then be compared to the contract price to measure the financial success of the contract. Driscoll testified that to the extent that a business had a fixed price contract, periodic calculation of EAC's was an important indicator of performance.

**229**   Driscoll explained that he attended reviews of Leigh's programs in August and became aware that the actual cost spent on SHINCOM had already exceeded the most recent EAC for that project, and there were several months left before completion of the contracts. He said this information, combined with the fact that there had not been a rigorous ETC review since early in the year, led him to implement the review. He said quarterly ETC reviews were ordinarily standard on larger contracts. When he arrived at Leigh, he said the company had about 20 major contracts and that the SHINCOM and TACAN programs comprised the larger part of the business.

**230**   David Newlands, finance director of GEC, visited Leigh in person on October 20, 1989, accompanied by David Rickard, finance director at GEC Marconi to learn more about the new acquisition. In preparation for the meeting, Newlands received a briefing memorandum on Leigh prepared by Colin Justice, divisional finance director at PESL, who was at Leigh participating the fair value exercise for the GEC Siemens hive up of Plessey. In addition, on October 2nd, very shortly after the takeover, Newlands had reviewed the opening balance sheet for Leigh incorporating the purchase accounting adjustments implemented by Plessey as of April 5.

**231**   Justice's briefing memo to Newlands noted the difficulties with SHINCOM and expressed the concern that Leigh's performance might not be technically adequate. He pointed out SHINCOM

had failed to meet some technical tests in the contract, giving rise to a need for additional program management and engineering expense. Justice observed that this was an area where they should be highly conservative in the fair value exercise. Newlands explained in evidence that accounting provision should be made for the contract risks in the context of the fair value exercise.

**232**    The Justice memo pointed out that there had been major program deterioration for both TACAN and SHINCOM and that the EAC's had worsened substantially. Regarding SHINCOM, Justice wrote that the product was not "technically secure and underwritten". Newlands testified that this statement put him on notice that all the financial information about the project was open to "extreme doubt." He said if the program was not technically secure, it could not produce a reliable EAC. The memo showed a forecast loss for the year ending March 1990, of $2.316 million.

**233**    The Newlands and Rickard visit took place in Leigh's Kanata, Ontario offices on Oct. 20. Leigh prepared a presentation for Newlands and Rickard on the company's programs and financial condition, including the ongoing ETC review and fair value exercise. The transition to GEC accounting principles was also discussed and Newlands instructed the company to take care to distinguish between operational issues, such as the ETC results, and adjustments to the balance sheet resulting from the fair value exercise.

**234**    Included in the material presented to Newlands and Rickard at the meeting were second-quarter financial statements, in Leigh accounting format, to the end of September. These results showed an actual loss to the end of September of $2.85 million and a forecast loss of $1.5 million to the end of the fiscal year. Newlands was also given a preliminary draft of the purchase accounting adjustments following the GEC takeover, and a copy of Leigh's cash requirements forecast. The forecast showed the bank line outstanding at $36.081 million as at October 16, with a forecast overdraft of $35.774 million at the year-end on March 31st 1990.

**235**    Newlands drafted a memo to file following his visit to Leigh in which he recorded his view that the business was in poor shape and, using GEC accounting principles, trading at a loss and absorbing cash. He noted that "The businesses have prepared September management accounts in GEC format but do not reflect current contract cost to complete reviews and changes to GEC accounting policies. As a result of the half year reviews, adoption of GEC accounting principles and purchase accounting, there will be significant changes to the results to 30 September, and the Balance Sheet will have to be restated in the October management accounts." Newlands added that these changes would leave Leigh showing a "significant loss."

**236**    He observed that, in his view, the Plessey budgets for the business were "hopelessly optimistic and should be disregarded," and that support from Marconi would be required to turn the business around. Newlands noted that Driscoll was "showing the right attitude," but that Dean was under pressure and in Newlands view not up to the job.

**237**    Six days later on Oct. 26, Leigh produced a revised half year forecast, which showed an actual loss of $15.634 million to Sept. 30 and forecast a loss for the year of $12.813 million.

Driscoll testified that these figures reflected an incorporation of some of the ETC results, including a loss on the SHINCOM program of $6.88 million. The report noted that the results would likely require further re-statement to reflect purchase accounting adjustments, and that a number of unquantifiable risks regarding SHINCOM and TACAN had not been provided for. This report was forwarded to Rickard, Justice, Flower and Shepherd.

**238**   Pursuant to the financial reporting obligations contained in Leigh's facility agreement, Leigh was obliged to provide TD with unaudited quarterly financial statements within 30 days of the end of the quarter. Thus, the quarterly statements for the period ending September 30 were due on October 30, four days after Driscoll's six-month results were prepared. Driscoll conceded in cross-examination that the six-month results did constitute an unaudited interim quarterly report.

**239**   Also on October 26, Young wrote to Dean, to confirm that the bank had agreed to discharge its security and would do so forthwith. The next day Dean wrote to Young and requested a further extension of the $4 million bulge to July 31, 1990, due to persisting problems with the SHINCOM program. Dean attached a copy of the cash flow forecast which had been presented to Newlands on Oct. 20 and which showed an estimate of the bank line at $35.57 million as at the end of December, and $35.774 million as at March 31, 1990. He enclosed an executed facility agreement renewing the operating line on the same terms and conditions, and a facility executed September 18 regarding extension of the bulge. The bulge facility offered an extension only until October 31st however, and the offer to extend had expired on September 15. The package sent to Young did not include the October 26 half year results, with their actual and forecast losses.

**240**   In a letter dated October 30, and sent to Exton along with about 40 other banks, GEC, Siemens and Plessey invited TD to provide Plessey with an uncommitted bank facility. The invitation was signed by Anderson, Huntbatch and Gerdine. Anderson testified that following the takeover, GEC and Siemens decide to cancel Plessey's MOE and instead borrow from one of a number of available bank facilities, depending on terms offered on any particular day. The package included a copy of the GEC Siemens final offer for Plessey with details of the proposed restructuring of Plessey. The letter noted "Siemens and GEC are prepared to guarantee, on a 50/50 several basis, such new borrowings. Therefore the terms of these new borrowing facilities should be based on the creditworthiness of Siemens and GEC." The letter added that in view of the security offered and the reduction in treasury staff at Plessey, preference would be given to those banks who accept the shortest, simplest, standard documentation. A committee of the GEC board passed a resolution prior to the issuance of this letter, authoring Anderson to sign, on behalf of the company, this letter which included a commitment to provide a several guarantee.

**241**   Several of the key players in the piece changed at the end of October. On November 3, Denise Beard, who had been assistant treasurer, left Plessey. On the same day, Greg Young, who had been in charge of the Leigh account since 1987, left TD and was replaced by Rob Wilson. His evidence was that there was a two or three week period when he overlapped with Young. During that period, he said he shadowed Young day-to-day to "assimilate" the relationships he would be

taking over. Wilson said he familiarized himself with Leigh account by discussing it with Young and reviewing the file. He said he did not discuss the Leigh file with his supervisor Leaney, nor did he review the comfort letters. Also during this period, GEC treasurer Ross Anderson began to receive weekly cash reports from Plessey.

**242**    On November 8, Young and Wilson met with David Dean at Leigh. In the meeting, Dean advised the bankers that Leigh's numbers were getting worse, and told them there were legal disputes with some of the contractors involved in the SHINCOM program. Wilson said Dean told them he could live with a $38 million operating line, but if there was no change, Leigh might require further funds from TD or GEC. In his notes of the meeting, Wilson jotted "new forecast forthcoming". In evidence, he said at this point in the meeting he asked Dean for financial statements. He said Dean told him there would be a new forecast forthcoming but that the financial statements were not available because the acquisition accounting issues had not been resolved. Wilson also noted "fold in or fund $10 million or more". He said Dean told him Leigh a couple of options available to it. One was an acquisition by CMC, or in the alternative they would need further funding of $10 million. Wilson testified Dean told them if other money was required from TD another comfort letter could be provided: "Q. From Whom? A. He said GEC, once they took it over, but I understood at this time that it would be a Plessey comfort letter consistent with the previous ones." Young testified he had no recollection of this meeting.

**243**    On November 15, Exton and three other managers of Corporate Banking produced a CCR of Plessey in relation to the invitation of Oct. 30 to provide Plessey with an uncommitted facility. The risk rating was 1 and was described as that of the parents, and the proposal was to increase the 20 million pound facility already available to Plessey to 50 million pounds. Under security, they noted that GEC and Siemens were offering unconditional and irrevocable 50-50 several guarantees. Documentation referred to a facility agreement containing a material adverse change clause. In the remarks section they noted that despite the fine pricing, TD had enjoyed a strong relationship with Plessey but had not had a relationship with GEC, and they hoped to forge such a relationship through Plessey. They noted other opportunities with CMC and Leigh merited this business for relationship reasons. Senior vice president, credit division, Sid Owen recommended the credit on the basis that the guarantees be supported by a directors' resolution and solicitors' letters of opinion. Brock also recommend the credit, which was ultimately approved by McDowell who reduced the risk rating to 2 on the basis that 1 was reserved for governments.

**244**    In mid-November, the corporate finance report for October showed a cumulative Leigh loss of $15.6 million to the end of October, and a forecast loss to year end of 8.45 million pounds. On Nov. 17, Driscoll forwarded a copy of the October President's Report to Lord Weinstock, managing director of GEC, directly. The financial results to October 27, which were attached, showed a cumulative loss to October 27 of $16.677 million, and the Leigh loan outstanding at $38.5 million, some $500,000 in excess of the authorized credit.

**245**    In the week of November 20, Leigh completed the ETC review process and Justice reed to

Leigh to assist in preparation for the half-year review meetings to be held at GEC's Marconi's offices in Stanmore, U.K. the following week. Wilson testified he had a conversation with Dean on November 23rd, in which Dean indicated his concern that Leigh might go into overdraft the next day. He said Dean also advised that Paramax, the major contractor in connection with SHINCOM, wished to withhold a $5 million payment due to Leigh until early in the new year. As a consequence, Dean asked for a further $5 million from the bank. Wilson said he wasn't concerned as Dean advised they would be invoicing Paramax about $10 million in December. Wilson's note of the call stated: "full comfort from Plessey, even GEC." He said Dean told him any additional borrowings would have full comfort from Plessey, and even GEC. Wilson said he did not ask about the overdue financial statements. It is clear to me, and I so find, that the term "full comfort" refers to the full amount of the authorized line of credit.

**246**    In late November, Dean called Wilson. Justice was on the call and since Wilson and Justice had not met previously, Dean introduced him to Wilson as the PESL divisional finance director. There was discussion concerning additional short term borrowing up to $41 million. Justice raised the possibility of a floating letter of comfort, but Wilson rejected this concept. Wilson testified that either Dean or Justice confirmed that the Paramax payments would be coming in January. Wilson was advised that Leigh planned to reduce its work force in the near future, possibly in March, but perhaps earlier, with consequent severance obligations. Wilson did not commit to the increased borrowings. He took the lay-off as "somewhat positive". There was no discussion of Leigh's financial statements.

**247**    Wilson stated in cross-examination that Justice had "indicated" to him during this conversation that "We'd get the same comfort letter." He conceded when pressed that Justice did not "expressly say that." "He did not say those words" but he said "we'd get full comfort" and "I clearly understood that we were getting the same comfort letter." Wilson said it was clear to him what Justice meant, and he took it the letter would be in the same form. He conceded further that Justice did not say the comfort letter would be in the same form. His note was silent on this point.

**248**    I am not satisfied that there was any discussion during this telephone conversation in late November concerning the form of the comfort letter or that it would be in the same form as the previous letters, and I find that Justice made no such statements, or representations to this effect to Wilson.

**249**    On November 28 and 29 Driscoll, Dean and Justice attended a series of meetings at GEC Marconi offices in Stanmore. The purpose of these meetings was the GEC half-year review. The first day, Driscoll testified they met with representatives of GEC Marconi and the second meeting was attended as well by Simon Weinstock and David Newlands. He said they presented a package of financial material on the first day and essentially responded to questions. The material had been prepared in Canada with the assistance of Justice and then finally revised the day before the meetings in England.

**250**   The financial information presented at the meeting disclosed a forecast loss to year end of $19.608 million. Driscoll said this increase in the projected loss from the October estimates was due in large part to the ETC review. The revised six-month figures to the end of September, also included in the package, showed an actual loss of $18.85 million.

**251**   Driscoll testified that the meeting on November 28 was largely a fact-finding meeting and that the GEC Marconi representatives commented from time to time but gave no broad reaction to the size of the losses, nor did they comment on any options for Leigh for the future. On the second day, the meeting was attended by Simon Weinstock and David Newlands. Driscoll said this meeting was much shorter and that Newlands zeroed in on SHINCOM and TACAN which Driscoll said were the largest components of the losses. He said again there was no comment on any future options for Leigh, but that Leigh's position in the GEC group could be characterized at this time as uncertain.

**252**   Driscoll testified that at the conclusion of the second day, he with the assistance of Justice, presented a written request for an increase in the bank line. He said some combination of Justice, Newlands, and Rickard said they would take care of the request, and that Justice and Rickard were charged with doing further work on the issue.

**253**   In cross-examination, Driscoll was asked whether Newlands was left in charge of the issue and he answered that he was not sure Newlands was. This is consistent with the evidence of Newlands, who testified that he probably led the discussion, and that Leigh and Marconi management were then charged with producing more support for the request. He said the request would have come back to him because he had led the discussion, but that treasury actually reported to Simon Weinstock. Newlands also testified that he had no recollection of any mention in the meeting that Leigh ought to be allowed to go bankrupt. Following the meetings Leigh was instructed to provide a weekly cash report to GEC, which Newlands explained was an attempt put pressure on the business to utilize its cash resources as sparingly as possible.

**254**   Driscoll testified that following these meetings he was of the opinion that Leigh was terminal, absent a significant change in its capital structure or relief from contractual requirements. There was no evidence that he expressed this view to anyone at Plessey or GEC at the time. In cross-examination, Newlands disagreed with Driscoll's assessment that the company was terminal on the basis that the technical baseline was not secure and hence, Driscoll didn't necessarily have all the information he needed to reach such a conclusion. However, I do note that a concerted effort to negotiate contract relief with the Canadian government was commenced by Leigh in early January, with the assistance of GEC and Plessey. These efforts continued right up until Leigh's bankruptcy.

**255**   Rickard wrote to Newlands on December 1 that Leigh had now demonstrated a need for essential payments, particularly payroll. He noted Justice would visit Leigh the following week to review the cash requirement in depth, and report back to him. In the meantime, he wrote that it would be sensible to extend the limit to $41 million and monitor it weekly. He closed by noting that

this would require an uplift in the comfort letter.

**256** On November 30, Derek Thorn, Plessey finance director, group services, faxed GEC treasurer Ross Anderson, with information on Leigh's line of credit and cash forecast, and a copy of the fourth comfort letter. Anderson and Hafner had been made available to assist the Plessey treasury department on an as-needed basis in view of the depletion of their personnel following the takeover. Regarding the proposed increase in the bank line, Thorn noted that Leigh had asked for an increase to $45 million but Justice had recommended it only be increased to $41 million. Thorn suggested that if Simon Weinstock and David Newlands approved the increase to $45 million, the company be instructed not to exceed $41 million without a specific approval from the U.K. In conclusion, Thorn asked Anderson to notify him when the increase had been approved, and "can we then discuss the mechanics, particularly the form of comfort letter that may be required."

**257** Anderson said when he received the memo he probably looked at the attached cash forecast but it did not indicate anything of significance to him. He said he could not recall discussing the increase with Newlands or Simon Weinstock but that he must have done to get their approval. Newlands reluctantly approved the requested increase, and Justice, who was at Leigh, was informed of the approval on Dec. 6.

**258** Upon receiving the package from Thorn, Anderson said he reviewed the copy of the fourth comfort letter which was included and made some changes to it. He explained in evidence that he did this in order to make the letter as accurate and as clear as he could. Anderson did two different markups on the comfort letter. He testified he would have done the first one at the same time or immediately after receiving the comfort letter and a second, more detailed markup a few days later. Anderson added to the third paragraph of the letter the words: "and does not constitute a legally binding commitment."

**259** Anderson testified that he did not make any inquiries into the terms of the Leigh facility, the history of the loan, or how the comfort letter had been arrived at. He did not view the comfort letter as a legally binding commitment, but testified that he added the words "does not constitute a legally binding commitment" to eliminate any doubt or uncertainty. He said he did not consider it to be a change of any substance, but he felt that with the added words, it was 100 percent certain that the letter was not binding, and without them it was slightly less certain. David Newlands testified that Anderson stopped him in the hall and showed him the comfort letter with the handwritten changes. He said Anderson asked him to read and "bless" it, which he did.

**260** Exton testified that Anderson called him on December 6 or 7 and advised that permission had been granted to increase the loan facility to $45 million but that the borrowings were not to go above $41 million without Anderson's explicit approval. Exton said this struck him as being an unusual request as Anderson was taking direct control of the advances to be made to a subsidiary of a joint venture involving GEC, and that he had never received such a request in his banking career.

**261** Exton testified that he and Anderson also discussed the possibility of TD providing a fairness

opinion on the possible Leigh CMC merger. As well, he said Anderson told him he would forward
to Exton a revised comfort letter for $45 million, and that this would be done with the full
knowledge and approval of GEC and Siemens. Exton passed this information on to Wilson.

**262**    Anderson testified in relation to this conversation that he might well have told Exton he
would forward a new comfort letter. Although he could not recall the conversation, he did not
believe he would have told Exton the comfort letter would be revised with respect to the amount of
the facility alone, because he had already started to amend the comfort letter by this time. He said
he did not discuss the changes in the comfort letter with Exton, nor did he tell him about the added
words "does not constitute a legally binding commitment." Anderson testified that if he had felt he
was making changes of substance, he likely would have told Exton. He said he had expected the
bank to read the letter, which was only a one page document, and said if the bank had not agreed to
any of the language of the comfort letter, he had expected they would indicate this upon receipt of
it. I accept Anderson's evidence. He was a credible and forthright witness.

**263**    Wilson at TD prepared a CCR of Leigh dated December 6, to formally cancel the $4 million
bulge and authorize an increased operating line of $45 million. The risk rating remained at 3B and
security was listed as nil. Documentation was described as a $45 million comfort letter and letter
agreement. The terms and conditions remained the same as the prior facility.

**264**    In the remarks section, Wilson noted that the funding was necessary due to the delays in
receiving cash payments from Paramax, the main contractor on the SHINCOM contracts. He
observed that:

> Any additional borrowings will be fully supported by a Plessey letter of comfort.
> Jonathan Exton of TD-London has been in contact with Ross Anderson, Group
> Treasurer of GEC regarding this. Anderson is providing a letter of comfort from
> Plessey with the full knowledge and approval of GEC and Siemens to cover
> Leigh borrowings up to $45.0 million. Internally, Plessey will cap Leigh's
> borrowings on a weekly basis at levels below the $45.0 MM to keep pressure on
> Leigh to manage its cash flow; consequently, while we will have authorized
> availability of $45.0 MM, Anderson will personally approve any excess
> borrowing requirements above $41.0 MM and he does not plan to disclose to
> Leigh the full extent of Plessey's letter of comfort support.

**265**    In the next paragraph, Wilson referred to Leigh's revised cash flow forecasts projecting peak
borrowings of $43.3 million in December, and expected to fall below $36 million upon receipt of
the Paramax payments in January.

**266**    Wilson noted as well that TD intended to bid on a fairness opinion for CMC regarding its
potential acquisition of Leigh, and that the bank had recently offered Plessey a 50 million pound
uncommitted facility. Under strengths, Wilson observed that the revised comfort letter covered
borrowings of Leigh, and that Plessey was ultimately owned by GEC and had access to significant

parent company resources. He listed Leigh's weaknesses as delayed contract payments which had impacted cash flow and dependence on defence industry expenditures which had suffered cutbacks. Finally, he noted: "There is still continued uncertainty over Leigh's ultimate ownership; however, we believe that this does not represent a significant credit risk in view of strong existing parent company support." Leaney concurred and recommended approval with the note "the support letter justifies."

**267**    Noonan reviewed the application on December 8th and recommended the credit on condition that the comfort letter was in the same form and substance as the Aug. 31/89 letter attached to the review, "particularly to include para. 3", and that no borrowings be extended beyond $41 million without the prior approval of GEC's group treasurer. These conditions were never communicated to Leigh. McDowell approved the credit on the assumption the bank was satisfied with the financial condition of Paramax and its ability to pay the amounts owing to Leigh.

**268**    Noonan testified it was incumbent on the Corporate Banking Division personnel to obtain a new facility agreement as condition of the credit, and that he received no request from corporate Banking Division that this requirement be waived. He said he also expected Corporate Banking to read both the Aug. 31 comfort letter and the one received in connection with the credit. McDowell testified that he agreed with Noonan's expectation of the Corporate Banking department. McDowell said he expected they would read and compare the comfort letters, and if the new document was in a different form than that stipulated, Corporate Banking would have to seek authorization from the Credit Division before accepting it. Noonan testified he received no such request.

**269**    Wilson sent a letter to Leigh's Ottawa branch advising of the approval on December 8 and cautioned that the $45 million limit was not to be disclosed to Leigh, "as it is an internal matter how GEC/Plessey manages a subsidiary's borrowings. Therefore, Leigh should be informed that availability only totals $41.0 MM."

**270**    On December 13, a Credit for Executive Circulation relating to the Leigh line was circulated among the bank's senior executive. The document referred to the GEC takeover and contained the same erroneous description of the comfort letter as had been included in the earlier Credit for Executive Circulation. The document was initialled by Noonan, McDowell, president Robin Korthalls, and the chairman and CEO of the bank, Richard Thomson.

**271**    Driscoll had completed the Presidents Report for the month of November by December 14. This report, which was forwarded to GEC, disclosed an actual loss as at November 24 of $20.301 million with an outstanding bank line of $38.745 million. Driscoll attributed these figures to the results of the ETC review and SHINCOM and TACAN contract delays.

**272**    On approximately the 14th of December, in the course of revising the comfort letter, Anderson called Dean at Leigh to ascertain whether there was a holding company in the corporate structure between Leigh and Plessey. Anderson testified he did not discuss Leigh's financial condition with Dean.

**273**    Anderson sent the revised comfort letter to Bernard Huntbatch at Plessey on December 15, with a copy to Andy Hafner, treasurer at Siemens' offices in London, Rickard, Justice, Simon Weinstock and Newlands. Anderson testified he sent the letter to everyone who had an interest in it, to give them an opportunity to comment. Mr. Huntbatch, who is now deceased, was Plessey's Company Secretary, a solicitor, and one of the few remaining members of the Plessey old guard. He had signed the second, third and fourth comfort letters as well. Anderson said in evidence that Huntbatch did not call him to comment on the letter or query it. Anderson said he would expect Huntbatch to review the letter and if he had any comments, to make them or to change the letter if necessary.

**274**    The other signatory to the letter was Brendan Sammon, group chief accountant at Plessey. Sammon testified that he knew the final paragraph constituted a change from the fourth letter and discussed this with Huntbatch. He said they concluded Plessey had never considered comfort letters to be binding, that this was simply GEC's "belt and braces", and hence they signed the letter. The letter was not forwarded to TD's London office until December 27. The fifth comfort letter stated:

> This is to confirm that The Plessey plc has full knowledge of the facility of C $45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion to Leigh.

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

> It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

> The letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 and does not constitute a legally binding commitment.

**275**    On December 18, Leigh laid off 80 people, including David Dean, the vice-president of finance and the bank's main contact person. Pat Smith took over his role. Driscoll testified the layoff was due in part to a decline in manufacturing, which meant Leigh had excess staff for its needs. He said it was also due in part to Leigh's losses.

**276**    Colin Justice had been travelling back and forth between Britain and Canada throughout the fall and was back at Leigh during this period. On December 21 Justice called Wilson at the bank to

advise him of the staff layoff and that Dean was no longer with the company. Justice attributed the layoff to difficult market conditions and told Wilson a second wave of layoffs might be forthcoming. In a memo to file following phone call, which he copied to Leaney and others, Wilson reported details of the call, including the staff layoff and the termination of Dean. Wilson noted that Justice would continue to be actively involved in the affairs of Leigh, having spent four of the past seven weeks in Canada, that he expected to be in Canada regularly, and would be returning for budget meetings in January. Wilson noted he took the opportunity to discuss with Justice the possibility of a Leigh merger with CMC in some detail, indicating TD would be "very interested" in providing a fairness opinion. Justice told him the question of the CMC acquisition of Leigh would be reviewed early in the new year. Wilson recorded in detail the aspects of the conversation dealing with the layoff and the fairness opinion.

**277**    In evidence, Wilson testified that although he had not recorded this in his memo, he had asked Justice in this conversation for Leigh's financial statements. He said Justice told him the financial statements were not ready due to the acquisition accounting issues related to the GEC/Siemens takeover. Wilson said he did not ask him about the accounting issues because this was consistent with what he had been told by Dean. This conversation is admitted by the defendant Plessey, who did not call Justice as a witness.

**278**    Also on December 21, Driscoll forwarded a draft budget for Leigh to Bill Alexander, managing director at GEC Marconi, in which Driscoll commented that "cash flow is awful" and that dramatic improvement would likely come only from a politically directed renegotiation of the TACAN and SHINCOM contracts, or a radical restructuring of their operations. The draft budget projected a worsening overdraft of $39 million in March of 1990 and $62 million by March of 1991. It estimated the bank line would be at $41.576 million by December 31st of the current year.

**279**    Justice had requested authorization from Newlands on December 19 to increase Leigh's line to $42.5 million, and on December 22, Anderson called Exton to tell him the increase had been approved. Exton did not receive the fifth comfort letter however, until December 27, at which point he sent it on to Wilson. Exton testified that when he received the letter he checked to see the amount was correct and that was the extent of his review of the comfort letter. He did not notice the added line that the comfort letter did not constitute a legally binding commitment. Exton said that his role regarding the letter was merely to pass it on to the account manager and no more. I accept his evidence on this point.

**280**    Wilson's evidence was that when he received the comfort letter, he advised his supervisor Leaney of its arrival and sent her a copy for her information, but did not discuss it with her any further.

**281**    Wilson testified that following the December 6 conversation with Anderson, Exton advised him that Anderson had said the new comfort letter would be the same form and substance as the prior letters, revised only as to amount. Wilson said that as a consequence, when he received the

fifth comfort letter, he simply checked to see the amount was accurate and instructed his secretary to file it. He said he felt he had fulfilled his responsibilities by doing this. Although he had never read the prior comfort letters, he did not compare the wording of the 4th and fifth comfort letters, nor did he notice the changed wording. Wilson said he felt Anderson made a verbal commitment that the letter would be changed only in amount, and so that was the only part of the letter he checked. He said he felt Noonan's condition that the comfort letter be in the same form and substance was satisfied based on his confirmation of the amount. He conceded in cross-examination he had not advised anyone at Leigh or Plessey about Noonan's condition.

282    I am unable to accept his explanation for this. Wilson did not record this alleged representation by Anderson in any note, credit review, or other document. Wilson was not party to the conversation between Anderson and Exton. None of the exhibits corroborates Wilson's evidence. Jonathan Exton was a witness at this trial and gave evidence about the conversation with Anderson. He did not testify that Anderson had said the letter would be in the same form and substance. Anderson also testified at trial and said he did not believe he would have said such a thing, as he had already changed the language of the letter by the time he spoke to Exton.

283    I accept the evidence of Anderson and Exton and I find as a fact that Anderson did not represent or state to Exton that the letter would be the same form and substance as the previous comfort letter. Hence, any failure on Wilson's part to read the fifth comfort letter was not due to the representation Wilson attributed to Anderson. I accept Wilson's statement that he had not read the prior letters before receiving comfort letter number five. Hence, either Wilson read the letter and did not realize the letter had been changed, or he did not read the letter at all. Even if he had read the letter, not having read the fourth comfort letter, he had no basis for comparison, and likely would not have noticed the alteration. In my view, however, responsibility for this oversight lies squarely on the shoulders of Wendy Leaney.

284    Leaney was general manager, Corporate Banking and Wilson's direct supervisor. She knew he had only been in his position for two months. She testified in another context that responsibility for managing the relationship had been delegated to her. She was aware of Leigh's climbing bank line, contracts difficulties, and of the recent hostile takeover, with the consequent changes in management personnel at Plessey. Wilson told her the letter had arrived and sent her a copy to review. She, at least, was familiar with the language of the prior letters, and knew of Noonan's condition that the fifth letter be of the same form and substance. She received the letter and placed her initials on the covering memo from Wilson to which the comfort letter was attached.

285    Leaney's evidence is that she did not read the comfort letter on or about December 28 when it was transmitted by Exton in London to Wilson in Toronto. She stated the covering memo from Wilson with the executed comfort letter attached Gas passed up to her "... in January 1990 when I returned from Christmas vacation, and it was just -- it was passed to me by Rob [Wilson]." She stated that she did not read it. "I expected that he would have read it and I -- I didn't read it myself."

**286**    She said she first heard about the words "does not constitute a legally binding obligation" the day she went on vacation on March 29, 1900, from Ernest Mercier, who had been in touch with the bank's office in London. She testified she was concerned about the words. She had not seen the letter, had not been "apprised" by Plessey "that there was going to be any change, that we assumed the letter was the same as we'd had before."

**287**    Leaney's evidence on discovery was that she had been told by Wilson in December that the bank had received the comfort letter, but in January she did not "look at it." Leaney testified at trial that she subsequently realized she did see the memo, but did not read the comfort letter. She conceded on cross-examination that her evidence on discovery had been mistaken. The covering memo has "Wendy FYI" handwritten on it in red ink, and the initials "W.L." in her handwriting in blue ink. She acknowledged on cross-examination she had only discovered the memo several months prior to trial, and then realized that she must have looked at the covering memo.

**288**    In cross-examination when asked to explain her initials on the covering memorandum she stated: "I didn't read the comfort letter for certain, and the covering memo I don't recall specifically reading. Obviously I saw it because my initials are there. But it was one of many pieces of paper that came across my desk, especially after coming back from vacation." "It was a piece of paper ... that was it. It was just information only."

**289**    Other exhibits in this trial contain Leaney's handwritten initials, which she testified meant she had read the document in question. Of all the 20 documents initialled by Leaney and made exhibits at this trial, neither she nor her counsel could point to one other she had initialled but not reviewed. The bank's outstanding exposure for some $40 million rested solely on the comfort letter and she conceded that she knew the letter was an important document. Nevertheless, Ms. Leaney maintained that when she received the fifth comfort letter, she merely glanced at it, and did not review it in depth because it had been sent to her for information purposes.

**290**    In the CCR of March 28, internal memos, and conversations with Anderson and Gerdine subsequently, no bank official ever raised the issue of the added sentence in comfort letter number five. Leaney had no explanation for this, nor could she explain the reference by Wilson to "the integrity of both GEC and Siemens, consistently demonstrated to us" in an April 5 letter to Newlands and Gerdine.

**291**    I find that Ms. Leaney read and accepted the fifth comfort letter dated December 15, 1989, when she received the letter and covering memo and initialled it in January, 1990. She could point to no other document she had initialled without reading it. Her explanation of relying on Wilson to read it is not credible. He was new on the job and had no involvement with the previous comfort letters. This was a large loan and the line was increasing steadily. The bank was resting its position entirely on the comfort letter and knew Leigh could not pay the debt itself.

**292**    The issue of the form and content of the comfort letter was never raised prior to the bankruptcy of Leigh on April 12, 1990. It was not referred to in any internal bank document,

including the March 28 CCR. Nor was it raised in the subsequent conversations with GEC and Siemens concerning Leigh. The reference in Wilson's April 5 letter to the integrity of GEC and Siemens is not consistent with the behaviour of a party upon whom a fraud has just been perpetrated. All of these facts are consistent however, with Leaney having read and accepted the comfort letter when she received it in January.

293     Leaney was disciplined by Ernest Mercier in June, 1990, and did not receive the bonus part of her compensation package that year, on the basis that she had accepted the fifth comfort letter. Mercier wrote to Leaney on June 25:

Re:      Credit Portfolio Management

Referring to your memorandum of May 22nd, 1990, and our discussions with regard to the captioned situation.

Upon review of your memorandum as well as the events surrounding the four accounts mentioned in said correspondence, we acknowledge that your actions on these accounts have generally demonstrated a positive commitment towards exercising appropriate credit judgment. The one situation which falls short of this standard is in the case of Leigh Instruments, and the acceptance of the Comfort Letter in December 1989 that was deficient in form from previous Comfort Letters we had received as a Bank. This was a serious oversight. Thin matter and its severity is accentuated by the significant exposure which the Bank has in regard to this credit facility.

Given the serious nature of this situation it has been decided that no Incentive Compensation Award will be granted to you this year.

A review of future Long Term Incentive Plan Awards will be considered at the appropriate time.

This letter will be placed in your Human Resource file and we ask that you acknowledge receipt by signing below. [Emphasis added]

294     This reprimand letter supports my conclusion that Ms. Leaney read and accepted the fifth comfort letter when it was received by TD, and that the bank shared this view.

Winter - Spring 1990 - The Bankruptcy of Leigh

**295**    GEC and Siemens were continuing the hive-up process and the valuation of the Plessey businesses. By January 8, a further valuation proposal exchanged between Siemens and GEC showed Leigh in the category of businesses to be held 50-50 or to be sold, and not in the list of businesses to go to GEC. In that document, GEC did not place a value on Leigh, but inserted a question mark rather than a number. Siemens, who had had little direct involvement with Leigh to that point, had assigned it a value of 70 million pounds.

**296**    GEC Marconi budget meetings were held annually within the first three or four months of the calendar year. Driscoll and Smith attended meetings at GEC Marconi's Stanmore offices in England on January 8 and 9, including a meeting January 9 chaired by Dr. Ian McBean, managing director of GEC Marconi, to discuss the preliminary Leigh budget for 1991. Following this review, at the end of the meeting, future options for Leigh were discussed very briefly. McBean instructed Driscoll and Smith to return to Canada and develop a series of options for Leigh, to be reviewed later in the month. Most of the options were identified in a brief discussion at the meeting, and included a restructuring of Leigh, integration with CMC, sale of Leigh to a third party, controlled shutdown and windup of the business, and immediate closing. Driscoll testified these were intended to cover the range of available options.

**297**    By January 11, Newlands' evidence was that he was of the view that the Leigh situation was serious. He said his initial impression from his visit in the fall was that the North American businesses were in poor shape and the monthly management accounts had not shown the position to be improving. He explained that GEC Marconi were analyzing the position and that McBean would have to determine whether the management of Leigh and personnel were capable of completing their contracts in a sensible time, or at all. He said no conclusion regarding the future of Leigh had been reached by this time in January, however he conceded that GEC was uncertain by this time whether they wanted to take Leigh, and in a further valuation proposal had listed it under 50-50 or to be sold.

**298**    Meanwhile, Leigh's financial position was still grim. The Plessey finance reports for December, available mid-January, showed a cumulative loss for Leigh to the end of December of 10.721 million pounds or roughly $20 million. By the 16th of January however, Leigh had received the expected Paramax payments and applied them to its overdraft, thus reducing the bank line to $31.646 million.

**299**    Driscoll and Shepherd had written several letters to the Canadian government in early January, outlining Leigh's financial situation, in the hope that relief could be negotiated on the TACAN and SHINCOM contracts. To that end, Driscoll, Shepherd, and Alexander attended a series of meetings with various Canadian government officials from Investment Canada, The Department of Industry, Trade and Technology and the Department of National Defence on January 22 and 23. At these meetings, Driscoll advised that there was a serious threat to the viability of Leigh and that

one of the options under consideration was the closure of Leigh. Driscoll also presented financial information on Leigh's situation giving a clear indication of the gravity of the situation. At the conclusion of the meeting with the Department of National Defence, Driscoll and Alexander were advised that the government would deal with the Leigh issues on an urgent basis.

**300**    On January 25th, Driscoll forwarded to GEC his presidents report for December, which showed a cumulative loss to the end of that month of $21.387 million.

**301**    Driscoll, Smith and Justice re-attended at Stanmore February 1 and 2 to review the list of options for Leigh, which they had prepared pursuant to McBean's direction in early January. Also present at the meeting were Rickard, McBean and Alexander. The options tabled for discussion included a restructuring of Leigh with a recapitalization to eliminate the bank debt; an integration with Canadian Marconi; sale of the company to a third party; a controlled shutdown and windup of the business; and immediate closure. Payment of the bank debt was listed as one of the steps to be taken pursuant to the last option and Driscoll testified it was discussed briefly. No decision was arrived at concerning what, if any option would be chosen for Leigh, and GEC Marconi took the matter under advisement.

**302**    Rickard wrote to Justice on February 6 as a follow-up to the options meeting held at Stanmore earlier in the week, and advised that the financial data presented at that meeting represented an "unacceptable deterioration over what appeared to have been a firmly established position on January 9th." He asked Driscoll to respond to McBean's requirement for a concise explanation for each item of deterioration.

**303**    On February 1, Gerdine was contacted by Simon Weinstock, who expressed concern that Leigh was losing a lot of money. Shortly after that he received a copy of Alexander's memorandum concerning the Ottawa meetings with government in which Alexander observed that Leigh was "running out of money" and "could be insolvent." On February 2nd, Rickard sent Simon Weinstock a copy of the preliminary purchase accounting adjustments for Leigh, which showed a writedown in Leigh's assets of $33 million.

**304**    Driscoll's evidence was that during this period he felt the likely outcome would be consolidation with CMC. However, on or about February 2, 1990, G. Stuurop, treasurer of CMC and Anderson met. Stuurop told Anderson that upon seeing the comfort letter, CMC seriously considered advising Plessey to walk away. Anderson had no recollection of this but testified he thought it meant that CMC no longer wanted to buy Leigh.

**305**    On February 8, GEC and Siemens formally decided to place Leigh in the Plessey rump, pending sale, closure or other solution. As a result, Philip Gerdine, the Siemens representative who was co-managing director of Plessey, became more involved with Leigh. Gerdine testified that prior to this time he did not pay much attention to Leigh.

**306**    Gerdine also testified that by early February, Siemens and GEC were considering selling

three of Plessey's North American companies, including Leigh, to a third party. To that end, Simon Weinstock wrote to investment bankers Shearson Lehman in New York, to arrange assistance in the sale of the companies. Gerdine had had previous dealings with the Shearson bankers and thus was asked to attend two meetings with them in early February, to discuss due diligence on the companies and preparation of a sales package.

**307**    Meanwhile, on other fronts the negotiations with the Canadian government were continuing. The government had not responded directly to the earlier approaches by Leigh, and on February 13, Driscoll and others again met with officials in the Department of National Defence in the hope of negotiating some contract relief. Driscoll presented the government with a detailed package of financial material, including analysis of the five options being considered for Leigh's future, and a revised a six-month balance sheet showing a loss as at September 30 1989, of $63.628 million. The projected loss to March 31st, 1990 was $67.7 million. Driscoll testified that these figures included adjustments reflecting both the ETC reviews, which were operational losses, and GEC fair value adjustments. On Feb. 14 Driscoll reported to Alexander on the outcome of the meeting and noted that "some assurance will be required from GEC before the government will proceed in any significant contractual areas."

**308**    Gerdine met with Justice the next day, on Feb. 15, to be briefed on the Leigh situation. Justice informed him of the projected $68 million loss, leading Gerdine to write to Simon Weinstock "we are appalled at the projected losses and bankruptcy is not out of the question if much of this is true." He questioned in the letter whether the sale of Leigh would even be possible. Weinstock had written on Feb. 5 to Shearson Lehman, copying Gerdine, stating that there were "major problems in the business" and noting that the future viability of the company was in question.

**309**    Wilson at TD telephoned Smith at Leigh on February 21, to get an update on the company's progress, find out more information about Leigh's contracts, and ask about the financial statements. In a memorandum of the conversation made the same day, Wilson noted that Smith told him there was some difficulty with the SHINCOM qualification testing, and that this might have an impact on the profitability of Leigh's fixed-price contracts if costs escalate, but that Leigh was negotiating with the Department of National Defence in this regard.

**310**    Wilson recorded that Smith had told him the budget for the fiscal year ending March 31, 1991 had not yet been finalized, but that Smith was predicting the sales for the year would be relatively flat, with a modest profit pre-debt service. Wilson testified that this meant a modest profit prior to interest payment on the outstanding debt. Wilson testified that he asked Smith for updated financial statements and Smith told him that the current year's results were difficult to forecast in view of the GEC Siemens takeover, but that he believed GEC would adopt conservative accounting, requiring Leigh to take up-front provisions for projects such as SHINCOM on Leigh's opening balance sheet. Wilson noted that "this is still under active discussion and results are therefore difficult to predict." Wilson testified this did not concern him as there had also been a delay in

producing financial statements following the Plessey takeover of Leigh.

**311**   Smith told Wilson that a merger with CMC was not imminent, given that GEC and Siemens had not yet decided how to divide Leigh's assets, and that Colin Justice was no longer actively involved with Leigh, as he was concentrating on the hive-up and valuation of Plessey's assets. Wilson noted that Siemens was scheduled to visit Leigh the following week. Wilson concluded the memo, referring to the current fiscal year: "In summary, Smith will therefore be closely managing his cash position, but acknowledged that it will be a "tight" year for Leigh. ... Smith expects to operate within his budget but is concerned with the high level of debt and related servicing burden. I confirmed that we are comfortable with the support provided by Plessey for Leigh's borrowings." Wilson testified that he took the reference to "tight" to mean modest profit to break even, although he conceded that Smith had not said that. Wilson noted as follow-up to keep Anderson informed, through Exton, which he testified referred to the Leigh borrowing levels. As follow up Wilson also listed a reminder to schedule a visit to Leigh in mid-March, although he testified that this visit never took place, but he could not recall why. Wilson testified that following this conversation he still had the same view that Leigh was performing satisfactorily, and that Smith did not tell him anything which would lead him to think otherwise. At the bottom of the memo, Wilson noted that a copy was to go to Exton.

**312**   In London, Exton met with Anderson in person on February 22 for the first time. He testified that he advised Anderson of the amount outstanding on the Leigh loan and discussed the bank generally. No evidence was led at trial that Anderson and Exton discussed the conversation between Smith and Wilson which had taken place the previous day. Nor did Anderson tell Exton of Leigh's financial condition, although he knew of the deterioration. Anderson testified that he asked Exton for a 50 million pound facility for GEC at this meeting.

**313**   Driscoll learned for the first time on February 23 that Leigh had a financial reporting requirement in its facility with the bank, and that Leigh was in violation of this term of the facility. He also discovered that the most recent financial information the bank had was the quarterly financial statements to the end of June 1989 and the 1989 year-end financials, which showed Leigh trading at a modest profit.

**314**   This discovery prompted Driscoll to write to Alexander on February 26, informing him that Leigh had not fulfilled its reporting requirements for the September and December quarters and noting that, although the bank had not requested the financial statements, he expected a request in light of the continually rising bank line. He asked Alexander for direction as to what information should be provided to the bank in terms of weigh's current financial position and projected cash flow. He sent a copy of the letter to Justice and Rickard, and Rickard noted in handwriting on the side of his copy of the memo "must tell if they ask". All parties agreed on this transcription of Rickard's note, although he was not called to give evidence about it. Driscoll testified that he expected some guidance from Alexander, but that he never received any response to the letter.

**315**    Also on February 26, Exton wrote Anderson at GEC, thanking him for the recent meeting and undertaking to keep him advised of Leigh outstanding levels of borrowing.

**316**    Two days later, Gerdine visited Leigh with Shearson Lehman as part of the due diligence process for the potential sale of Leigh through the investment bankers. This was his first visit to the company. Driscoll and Smith presented him with a detailed financial package similar to the material presented to the Department of National Defence earlier in the month. Gerdine became aware for the first time in this meeting of the depth and seriousness of the problems facing Leigh, including the TACAN and SHINCOM delays and technical problems. Gerdine testified that they advised him Leigh was in violation of its reporting requirements to the bank and Gerdine stated in evidence that he suggested forcibly to them that they send the financial information to the bank. In contrast, Driscoll's evidence was that while he did discuss reporting requirements with Gerdine, Gerdine gave him no direction he could recall. If he had received direction, he testified that he thought he would have acted upon it. Driscoll's version of events is supported by the memo he wrote to both Gerdine and Alexander on March 1, reiterating his request for guidance on the question of the information to be provided to the bank. Driscoll testified he could not recall receiving any guidance in response to the memo. Although I do not prefer his version of events to that of Gerdine, it is clear that if Driscoll thought any guidance was required, he thought it was required from both GEC and Siemens. Given Siemens' relatively recent involvement with Leigh, it seems unlikely that Driscoll would have acted on Gerdine's direction alone.

**317**    Also in this meeting, Gerdine became aware of the comfort letter in connection with the $37 million TD loan. Although he had seen the draft comfort letter in December, he testified he had not connected it with the Leigh loan.

**318**    Gerdine concluded following the meeting that, based on Leigh's losses, the company was technically insolvent and its future uncertain, although its ultimate viability was still unclear. Also uncertain was whether Leigh could pay its debts on a stand alone basis without some form of financial assistance. Gerdine had not, by this point, given up on Leigh as a going concern, and felt that Driscoll and Shepherd were taking positive steps regarding Leigh's future.

**319**    On March 5, following his visit, Gerdine reported to Simon Weinstock that he had found Leigh to be out of financial control, and confirmed that Shearson had informed him that morning Leigh was "unsaleable at this time". He noted however that shutting Leigh down "might hurt us all" in light of Leigh's close ties to the Canadian government.

**320**    The process of valuing and allocating the Plessey businesses was continuing, and by Feb. 22, GEC and Siemens had finalized division of the companies between GEC and Siemens, and determined which companies would remain in the Plessey "rump" ultimately to be liquidated or sold. The destination of each company was a matter of negotiation between the parties, with a view to the value allocated to each company and the overall acquisition cost of Plessey. Leigh was relegated to the Plessey "rump". As the companies in the "rump" were assigned one, lump sum

value, the parties never agreed on a specific valuation for Leigh. The hive-up transaction closed on March 8.

**321**    Driscoll flew to New York to meet with Gerdine, who was there on other business, on March 12. Driscoll testified he once again raised the issue of the financial reporting to the bank with Gerdine but received no direction he could recall. Gerdine testified to the contrary, that he instructed Driscoll again to send the statements, although his note of the meeting does not record such an instruction. It is apparent that Driscoll received no direction from GEC, but I am not prepared to find that Gerdine did not so direct.

**322**    On March 15 Driscoll wrote to Gerdine, Alexander, and Rickard, regarding guidance about the reporting requirements and noting "I propose to provide a copy of our September and December results and discuss our present cash flow position with the bank unless you advise otherwise." Driscoll testified he again received no response and on March 21st, acting on his own initiative, he instructed Smith to forward the financial statements to the bank. In view of Driscoll's repeated requests in writing, his evidence that if he had received instruction to provide the statements to the bank he likely would have done so, and in view of the fact that he did ultimately provide the statements to the bank on his own initiative, I accept his evidence that he received no response to his requests for guidance from GEC. That said, the obligation to provide the financial statements to the bank was the of Leigh and not the parent companies. Driscoll was the president of Leigh and thus ultimately responsible for delivering the statements to the bank. I must infer that his repeated requests for direction from GEC and Siemens were an attempt to transfer responsibility to them for his oversight in not knowing of the obligation to provide the statements to the bank, and for Leigh's failure to comply with the reporting requirements in the facility. GEC's failure to respond is understandable in this light. This inference is supported by the fact that Driscoll ultimately did provide the statements to the bank without any direction to do so from GEC.

**323**    On March 21, at Driscoll's direction, Smith sent a package of financial data to Wilson at the bank. The documents sent by Smith included financial information for the quarters ending September 30 and the end of December, 1989, and cash flow forecasts. Unfortunately, the financial statements that Smith sent to the bank were inaccurate. The six-month results to the end of September only reflected the Leigh financial position as it was known in October, and did not reflect the magnitude of the losses as they were known on March 21st. Indeed, the six-month results were the same figures as had been presented to David Newlands on October 20, 1989, when he visited Leigh, and showed an actual loss, as at September 30, 1989 of $2.858 million. The third-quarter results were more up-to-date, and included the president's report for the month of December. The consolidated management report for the quarter, included in the package, disclosed an actual loss to December 29, 1989 of $21.387 million. The cash flow forecast projected an overdraft of $40.976 million at the end of March 1990. All the financial statements were, according to Driscoll, prepared in Plessey format, and not using GEC accounting principles.

**324**    Driscoll conceded on cross-examination that the information provided to the bank did not

reflect all the information Leigh knew at the time, and did not include the revised loss figure of
$63.628 which had been disclosed by that time to GEC, Siemens, Plessey, and the Government of
Canada. Driscoll testified that he did not review the financial statements before they were sent to the
bank, but simply instructed Smith to send them. The president's report prepared only two days
previously showed an operational loss to the end of February of $24.402 million, although this data
was not sent to the bank.

325   Wilson's evidence was that he received the financial information on or about March 22, and
reviewed the financial statements and enclosures, particularly the profit and loss statements. He
testified that he had not been aware of the technical and manufacturing problems associated with
SHINCOM and TACAN, although I note that he had referred to contract delays in prior CCRs.

326   Gerdine attended a board meeting at Leigh on March 26, 1990, at which a number of
proposals regarding the future of Leigh were discussed, including a five-year plan for the company.
The issue of the reporting requirement to the bank was also placed on the agenda. Following the
meeting, Gerdine testified that he telephoned the bank, and spoke to Wilson and Leaney. Gerdine
asked Leaney if she was aware of the serious financial situation at Leigh, and that she sounded
surprised that anything was wrong. He said it seemed evident to him that she had not seen the
financial package which had been sent to the bank. He said she then brought up the subject of the
letter of comfort and asked if GEC and Siemens would countersign it. Gerdine testified that he did
not know what the legal effect of that would be, but that it seemed to be a "quick fix" to a lot of the
problems. He testified that Leaney pointed out Leigh was near its authorized credit limit, and
indicated that the bank would be willing to increase the line to $50 million if GEC and Siemens
signed the comfort letter. Gerdine testified that he told Leaney he would look into the question of
whether the comfort letter would be signed by the parents. Gerdine said he suggested that the bank
arrange for the assistance of a work-out specialist for Leigh, and that Leaney was receptive to the
idea, suggesting the see specialist who had worked with Leigh in the early 1980s. He said the
conversation concluded that he would speak to the treasury department at Siemens and the bank
would look into arranging a work-out specialist.

327   Gerdine testified that the next day, he again spoke with Leaney and Wilson and that the tone
of the conversation "suddenly changed about 180 degrees." Leaney advised Gerdine she was
freezing the loan, and Gerdine said the potential to involve a work-out specialist seemed to
evaporate at that point. Gerdine ultimately told Leaney that a letter of comfort was "just that" and
that parent company signatures on the letter of comfort were not "going to be forthcoming" in his
estimation.

328   Leaney testified that she felt Gerdine was "back-pedalling" from association with Leigh. She
testified regarding this conversation:

> Well, I brought the comfort letter up because I felt that at this point, given the
> serious situation at Leigh and the fact that Dr. Gerdine seemed to be

back-pedalling from the association with Leigh, I -- I can't put specific words in
his mouth, but he -- the impression I got was they were not -- Siemens was not
fully in support of the comfort letter that we had, uhm, from Plessey and, uhm,
we -- we said, you know, the only reason we were lending was because we had
the comfort letter, and he said Well, a comfort letter was just that, and, uhm, - but
he did agree that he would review -

**329**    Later that day, Gerdine attended a meeting with the Canadian government, which he
described as more positive than he would have expected. He said he proposed a "save Leigh"
program which would require participation from all the various parties, and that he thought at this
time there was still a chance that Leigh could be saved. He said the government indicated it would
want parent company guarantees. On the 29th of March, Gerdine composed a list of possible
options for Leigh, which he forwarded to Driscoll.

**330**    Following the conversations with Gerdine, Wilson at the bank prepared a memo to Noonan,
in which he summarized the discussion with Gerdine. Apart from a number of minor discrepancies
and the fact that the memo appears to collapse the two conversations into one, Gerdine confirmed in
evidence that the memo accurately reflected the conversations. Wilson noted in the memo, which
was incorporated into a CCR of Leigh dated March 28, that Gerdine had indicated Siemens felt
there were two potential alternatives in dealing with Leigh; to do nothing and go away, or to inject
capital and turn the company around. The CCR recommended that the risk rating for Leigh be
reclassified at 5, and that Leigh be placed on the "watch list". The CCR was reviewed by Yovhan
Burega, vice president of corporate banking, who noted "GEC and Siemens will have to provide us
with a very strong letter of comfort. They do not have an option to do nothing. If that was the case
we should immediately call the loan; also, we will not provide any concessions and GEC/Siemens
must honour all of Plessey's commitments." Pierre Boulanger, senior vice president in the Credit
Division, noted that "The situation is of concern and a firm stance is needed. We agree that we
should make it very clear to Siemens that we do not view the "do nothing" option as a viable
alternative for the company and we agree with Mr. Burega's position that unless we can shore-up
our position we should immediately call the loan in order to force their hand." He concluded that the
bank should not advance further funds to help the company pay interest when it was operating at a
loss. The CCR was initialled by Brock and Thomson. Wilson confirmed in evidence that the bank
decided in this period it would not offer Leigh any concessions, nor would it intercede with the
Canadian government to seek concessions on behalf of Leigh.

**331**    Wilson sent Exton a copy of the memo regarding the conversation with Gerdine, and
indicated he would be interested to hear the views expressed by GEC. In consequence, Exton called
Anderson on March 29th, and advised him of the bank's concern following the conversation with
Gerdine. He said Anderson told him Gerdine did not have authority to speak for the joint venture,
and that "the original intention for GEC is not abandoned, but has not happened," which Exton
interpreted as Anderson telling him GEC still intended to take over Leigh. After speaking to
Anderson, Exton called Wilson, who told him the line had been capped at $41 million. Exton then

called Anderson back the same day to advise him of this development. He said Anderson was "upset and disappointed" that the bank had decided not to stand by their arrangement. Exton testified that he told Anderson the bank definitely wanted the Plessey comfort letter to be acknowledged by GEC and Siemens, and that Anderson told him this was unlikely. Exton told Anderson someone from the bank in Toronto would call him.

**332**    Wendy Leaney did call Anderson shortly thereafter, and gave the following evidence regarding the call:

> I talked to him about the situation at Leigh and the fact that we capped the line of credit, and we had a conversation. He said that GEC had never reneged on any of its obligations and a number of other things, such as commenting about social life, that he and his wife would not be invited anywhere if they did renege on any of their obligations, and we just left it at that.

**333**    Anderson testified that while he did have a conversation with Leaney, he would not have made the remarks attributed to him, particularly since his wife had died of brain cancer five years earlier. His evidence in this regard was as follows:

> Q.    ... Mr. Anderson, it is alleged by the bank that during a phone call with Ms. Leaney on or about March 29 you said to her that you and your wife could not show up at social functions if such a letter of comfort was not honoured. Do you have any recollection of making that statement to her?
>
> A.    No recollection of saying that.
>
> Q.    Do you have any belief as to whether it is possible you said that?
>
> A.    Well, I think now that its inconceivable I could have said that.
>
> Q.    Why do you say that, sir?
>
> A.    Well, this is what date, March, 1990. My wife had died five years before then and it was not a very nice death and I haven't gone to a social function with ladies since then so I just feel that I couldn't have said such a thing.

**334**    Although Ms. Leaney was told of the death of Mrs. Anderson, in cross-examination she insisted that Mr. Anderson had made the statements in question:

> Q.    Ms. Leaney, have you become aware since the date of that conversation that Mr. Anderson was, at the time, widowed and his wife had died of brain cancer?
>
> A.    No.
>
> Q.    I suggest to you that -- is it possible your memory in that regard is mistaken?
>
> A.    Absolutely not. He talked about his -- he and his wife had been -- they were guests all the time at functions, and business -- corporate functions, if they did not honour their obligations, they wouldn't be invited. It was a bizarre statement. That's why I'm so strongly -
>
> Q.    You agree especially bizarre for a man who was a widower whose wife had died

of brain cancer?

A.    Maybe he was talking in the past. I don't know. He might well have been.

**335**    In my view, Ms. Leaney's evidence on this point's incapable of belief. I observed the demeanour of Mr. Anderson when questioned on this point. He was visibly upset by the line of questioning. Although Mr. Anderson had no recollection of the substance of the conversation, I prefer his evidence. Moreover, he testified in a different context that he did not view comfort letters as binding obligations. Accordingly I find as a fact that he did not make the statements attributed to him by Ms. Leaney, and in particular those concerning the comfort letter.

**336**    Ms. Leaney testified that following the conversation with Anderson, she met with Ernest Mercier, to update him on the situation. She said Mercier told her of the added line in the comfort letter, which she said was the first indication she had that the letter had been amended. In light of my finding above that she had read and accepted the letter when it was received, I do not accept her evidence on this point. She testified she told Mercier they had not been advised of the change by Plessey and she had assumed the letter would be the same as the prior letters. Leaney left on vacation following the conversation with Mercier and did not return until April 16, by which time Leigh had made an assignment in bankruptcy.

**337**    Meanwhile, on April 3, the Red Team delivered its report on Leigh, at a meeting attended by Simon Weinstock and Gerdine, among others. The Red Team was composed of technical people from GEC Marconi who had been hand-picked by MacBean and put in place in mid-February to review the technical assumptions underlying the Leigh contracts and the cost estimates of completing the SHINCOM contracts. Driscoll testified that this was a technical review rather than financial, and that it validated his belief about the state of the contracts. The report concluded that there were numerous engineering problems in relation to the contracts that would require significant investment, and that without changes in both investment and personnel, Leigh would not be able to deliver the product. David Newlands testified that he concluded from the review that Leigh had terminal problems unless Leigh could negotiate some relief from its customer, the Canadian government.

**338**    Also on April 3, Exton testified that he called Anderson concerning a shareholders meeting. Exton reported the call to Wilson by facsimile, stating that "given Leigh's financial performance and position, a joint guarantee would obviously be preferable, but I doubt whether this would be forthcoming." Exton explained himself in his testimony, stating "... I was aware that Toronto was very concerned about the letter of comfort that they had and whether or not it would be good security ..."

**339**    Wilson drafted a new comfort letter in consultation with Norton, the bank's in-house counsel, and sent it to Newlands and Gerdine on April 5, 1990. In his covering letter, he requested that the letter be executed by both GEC and Siemens, noting: "Our comfort and support for Leigh has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." Wilson made no

mention of the added wording in the fifth comfort letter, nor that Musgrave had allegedly told Young the comfort letter was tantamount to a guarantee, explaining in evidence that they were trying to be conciliatory and co-operative. The proposed letter stated:

> This is to confirm that we have full knowledge of the facility of C $45 million (Forty Five million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh Instruments Limited ("Leigh").

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc which is a wholly owned subsidiary of Plessey Overseas Limited which is in turn a wholly owned subsidiary of The Plessey Company plc which is owned jointly by GEC plc and Siemens AG. We undertake not to reduce out respective share-holdings in Leigh or its holding companies without your prior consent.

> We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates.

**340** On cross-examination, Wilson conceded there was no reference in the letter to the added language of the fifth comfort letter, namely that it did not constitute a legally binding obligation. Given that he testified that he felt "shock and dismay" when he read the fifth letter, his explanation of the reference to the integrity of GEC and Siemens is not believable. He was hard pressed to explain this apparent inconsistency, saying only that the reference to the parents' integrity was "somewhat of an overstatement on my part".

**341** In late March or early April, TD decided that it would not offer concessions as part of an overall solution for Leigh. Wilson testified that the bank had indicated it would not provide any concessions and would not approach the government with the shareholders to seek concessions.

**342** On April 6, Wilson and Anderson spoke. Wilson testified that Anderson told him "the news was not good" and that it was possible that neither GEC or Siemens would take Leigh. During the conversation, Wilson did not complain about the added words in the fifth comfort letter. His explanation for not doing so was that it should have been clear to Anderson by the deletion of the words from the proposed letter. Wilson makes no reference to this issue in his note of the call. I find his explanation unconvincing and that no complaint was registered concerning the added words.

**343** On April 9, Gerdine and Alexander came to Canada to meet with members of the Canadian government. Gerdine testified that the government officials refused any assistance, following which he concluded the only alternative was bankruptcy for Leigh. He said the group who he said was insistent that the parent companies sign "some kind of an instrument" regarding the Leigh

borrowings and Gerdine told him that they might not be able to do it. He said he told Burega "we will all have to do what we have to do" which ended the call. He said that since it was manifest that the shareholders were not going to put any cash into Leigh, following the call bankruptcy was the only alternative. During these final calls no mention was made of the wording of the fifth comfort letter by anyone at the bank. On April 10 Hugh Rising of the bank's London office called David Newlands. Newlands testified that Rising was seeking comfort that GEC would stand behind the Leigh loan. Newlands did not give him the comfort he was seeking.

**344**    On April 11, 1990, Exton, in a memorandum recording discussions between himself, Rising, Walzak, Burega and Wilson, concerning events between April 5 and April 11, outlined "key strategic areas identified by Rob Wilson." These included, "GEC & Siemens worldwide reputation - negative publicity, if the companies do not stand behind the Comfort Letter," government pressure, and poor relations with the Canadian government. Also a possible injunction which could "cause costly delays and be a major nuisance factor." In a separate memorandum of the same date, Wilson adverted to the these factors and added "Need to give GEC/Siemens lessons on doing business in Canada ... moreover, they are reneging on a commitment to a major Canadian bank, with public sympathy clearing [sic] falling on the side of TD rather than 2 European multinationals."

**345**    On April 11 and 12, abortive discussions were held between the government and Leigh in a last attempt to save Leigh. When these failed, Leigh applied for bankruptcy protection on April 12, 1990.

**346**    Newlands took part in GEC's decision not to pay TD. He could not recall who was in attendance at the meeting, but he believes it took place in Lord Weinstock's office. He testified they had a brief discussion and concluded that there was no reason why GEC should pay. Newlands participated in the a similar discussion regarding whether Plessey should pay TD and the same conclusion was reached.

**347**    The process followed by both the Plessey board and GEC accords with Musgrave's view of what a company issuing a letter of comfort ought to do when demand is made. Musgrave testified that, while he never saw a legal obligation for Plessey to pay under a comfort letter of this kind, he personally felt that the board of directors of the issuer had a moral obligation at least to consider a bank's request for payment. If the directors reviewed the matter but decided not to pay the borrower's outstanding loan, then they had, in his view, discharged that obligation.

The Parties' Understanding of Comfort Letters.

**348**    At the outset, I note that where the views of the witnesses constitute legal conclusions on issues before this court, I place no weight on their evidence.

**349**    The bank and Plessey were both large and sophisticated business organizations. Their states of mind was placed squarely in issue in this trial. Their knowledge of the use of comfort letters in the marketplace in which they both operated was the subject of considerable evidence.

**350**    Dealing first with the bank, Noonan testified that he used comfort letters with caution. It was he who first proposed that a comfort letter be obtained from Plessey, given that a guarantee was not on offer. The bank characterized the Plessey comfort letter as "strong" throughout, and knew that comfort letters varied in strength, according to their wording.

**351**    F.G. McDowell, vice chairman of the Credit Division and the most senior credit person involved with the Leigh facility (other than the chairman of the bank), testified that the bank was aware of the distinction between a comfort letter binding a parent to pay a subsidiary's debt and one that did not, even though he did not review the specific comfort letters accepted by the bank.

**352**    TD's Legal department was mindful of concerns about the enforceability of comfort letters. In a memo and dated September 8, 1982, as senior member TD's legal department, T.G. O'Connor identified a series of weaknesses and legal technicalities which accompanied comfort letters and concluded that "comfort letters are only of use where political assurances are better than legal assurances (which is seldom the case) or where a shadow of a guarantee is better than nothing at all. They are inappropriate for lenders who require a serious legal claim."

**353**    Neither Noonan nor McDowell had seen this memorandum but McDowell was aware that the TD legal department had "reservations" about comfort letters. Young did not know of the memorandum either but was aware of the "uncertainty of enforceability" of comfort letters.

**354**    On September 16, 1988 a "head office circular" emanated from the bank's general counsel and secretary, R.G. Bumstead, dealing with the use of comfort letters. Bumstead stated that comfort letters "invariably" fall short of a guarantee, are not a suitable substitute for a standard form of guarantee, and should not "normally" be used unless the bank is "otherwise well protected or secured." Where a comfort letter is all that is on offer and the bank is prepared to lend on that basis, he advised as to procedures to be followed. McDowell testified that this permanent circular reflected the legal department's opinion of comfort letters, he would have seen it and it would have been circulated to staff, including to the corporate bank banking department, and retained by them. He added that it was*merely an opinion however, and not binding. Evaluating credits was a matter of personal judgment, he stated, but the circular should have been read and considered.

**355**    McDowell stated that he did not agree with everything in the legal department memos, although he did not see them at the time. Noonan's evidence was substantially in line with that of McDowell. Leaney testified that she was not aware of the circular or the views expressed in it, either through the circular or other sources. Exton, Young and Wilson all testified that they also had not seen the circular. Leaney Young and Wilson differed somewhat as to what effect knowledge of the memo would have had on their.actions, but all agreed they would have had to at least consider it.

**356**    In a memorandum dated March 16, 1989 the bank's legal department reported on the decision of the English Court of Appeal in Kleinwort Benson, stating that "the enforceability of comfort letters is limited." The memorandum concluded:

If a fully protected legal obligation is sought, a standard guarantee, resolution and solicitor's letter of opinion should be obtained. The Bank cannot rely on comfort letters to do more than state a fact, which may or may not change in the future. If there is misrepresentation in the letter, the Bank may have an action against the signatory for misrepresentation but not in contract. A comfort letter is cold comfort for the Bank.

**357**    This document was addressed to the Credit Division, Corporate Banking Division, and senior vice presidents of the Line Division, and bore the handwritten notation "Sent-Mar 28" with the names of McDowell and Mercier, and "all Division SVPs".

**358**    McDowell and Noonan both testified they could not recall having received this memo. Noonan would have felt obliged to follow it he said, but not necessarily where existing customers or comfort letters were involved. McDowell would have expected persons required to deal with comfort letters to receive it, however, Leaney apparently did not. Exton, Young and Wilson had not seen the memo either. Exton and Young knew of Kleinwort Benson independently of the memo, but Wilson did not know of the case.

**359**    Noonan testified that he was aware of the trial decision in Kleinwort Benson and had, indeed drawn to the attention of Bumstead a financial Times of London clipping dealing with Kleinwort Benson in January, 1988. Noonan and Young were both involved in the first four Plessey comfort letters. Both testified that they were aware of the trial decision in Kleinwort Benson, and also of the subsequent Court of Appeal decision, reversing it. Young had consulted with a lawyer in the bank's legal department, Alex Norton, when he learned of the appellate decision. Leaney testified she never learned of the Kleinwort Benson decision at any time. Young however, said he thought it "likely" he would have discussed the case with her. Young recalled that at least one source of his knowledge of Kleinwort Benson was from a law firm circular, and any information circulated to him would have gone to Leaney as well.

**360**    TD had used comfort letters in other facilities and examples were introduced in evidence. McDowell stated that he expected the legal department to keep on top of developments in commercial law, including comfort letters, and advise the lending and credit officers of developments to the extent they felt appropriate. Non-lawyers were not expected to keep abreast of developments in the law on their own.

**361**    McDowell and Noonan agreed the bank would be or ought to be aware of major developments affecting the usefulness and enforceability of comfort letters, to the extent this received attention in the marketplace. There was evidence of a plethora of law firm circulars, articles, and other documents dealing with comfort letters, over and above those generated within the bank.

**362**    Noonan and Young had a general working familiarity with comfort letters based on their experience, but no formal education regarding them.

**363**    Noonan testified that his characterization of the comfort letter as strong was based on the language in the letter, the fact that two authorized persons signed it, and the company's reputation and ability pay. He testified he believed Plessey would do what it had said in the letter, although, as he stated, he never spoke to anyone at any of the corporate defendants. He stated that of paramount importance was the reputation of the giver of the letter, whether it had access to world markets, valued its reputation, and whether the bank could believe their word. He felt Plessey met all the above criteria; it was a "major world corporation" with the resources to flow money to the subsidiary to see the commitment fulfilled. Noonan said he thought the language of the comfort letter was appropriate and Plessey's reputation was such that the bank could take it at its word. He said he thought the same was true after the GEC siemens takeover.

**364**    McDowell testified that he knew Plessey as a very respectable U.K. corporation. Sir Alastair Frame was a director of both Plessey and the bank. The bank was soliciting an opportunity to do business with Plessey. McDowell noted, on a September, 1988 Group Credit for Board Presentation for the Plessey group including Leigh, that Plessey was "a leading U.K. high tech company and the parent of Leigh Instruments Ltd. in Canada. Well capitalized, profitable, and considered responsible. Loans to Leigh are supported by comfort letter."

**365**    McDowell's personal view was that a well-written comfort letter was one which was from a responsible corporation and signed by its authorized officers, which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if I make a commitment, I expect to fulfil it." McDowell did not see any of the Plessey comfort letters, and thus these views were of comfort letters generally and not a construction of any particular letter.

**366**    I turn next to Plessey, and its knowledge of and experience with comfort letters.

**367**    Musgrave was head of Plessey's Treasury Department. He was responsible for all comfort letters issued by Plessey. Since becoming group treasurer in 1982, he had acquired knowledge of comfort letters from varied sources ranging from professional organizations such as the Association of Corporate Treasurers, discussions with Plessey in-house counsel, a review of all of the Plessey comfort letters on file, and by following the literature on the subject. He learned of the Kleinwort Benson decisions through this professional literature, but testified that the decisions and subsequent comment upon them did not lead him to alter his views on comfort letters.

**368**    Musgrave testified that he knew the essential nature of a guarantee, which he described as a direct obligation to pay someone else's debt. Conversely, a comfort letter in most cases was intended to provide, in his view, "a degree of comfort" to the bank about a transaction, while falling short of the guarantee to repay the debt of a subsidiary. There was, he said, a "clear distinction between a comfort letter and a guarantee". He was aware of the range of language used in comfort letters, from mere awareness of a facility to "just short of a guarantee". He said comfort letters could

include legal or moral obligations.

**369**    Musgrave stated comfort letters were a means of avoiding giving a guarantee, and that Plessey did not like to give guarantees, except where necessary, such as for a large contract or at government insistence. His and Plessey's view was that a comfort letter did not impose an obligation to repay a subsidiary's debt. Lenders, he testified, accepted such letters based on commercial considerations such as the overall relationship with the lending group, the amount of business from the group, and an overall assessment of the risk in the transaction. He expected that a bank would look at the particular comfort letter and the overall relationship with the group in arriving at its decision.

**370**    Musgrave testified that during the period of his involvement from 1982 to 1989, it was a buyers market, and since Plessey was credit worthy, many banks wished to do business with it. He testified that comfort letters would be negotiated between the bank and Plessey in any given transaction. Since Plessey was reluctant to give guarantees, comfort letters were sought from time to time, as a lesser form of support for the facility sought by the subsidiary. Plessey produced several comfort letters it had used over the years, and Musgrave testified about two examples where Plessey had paid on a non-binding comfort letter. He said on one of those occasions, Plessey paid for relationship reasons, because public knowledge they had walked away could make future dealings with banks difficult. He stated that he would be "embarrassed" if Plessey signed a comfort letter and decided not to pay the debt associated with it, without first giving a request for payment reasonable consideration, because Plessey would have failed to live up to the spirit of the letter. He said he viewed comfort letters as imparting a moral obligation to consider whether or not to pay the debt of the subsidiary, and that as long as Plessey gave the comfort letter that consideration, that was all that was required. He said once Plessey had given that consideration, a decision not to pay would not embarrass him.

**371**    The evidence of Musgrave, Noonan and McDowell was not inconsistent in substance. Each of them essentially viewed comfort letters as gentlemen's agreements, and placed emphasis on considerations of reputation in the business community and ability to pay, when assessing a comfort letter.

THE WITNESSES

**372**    In light of my evidentiary findings, it is perhaps useful to share my impressions of the witnesses called by the three parties to the action.

**373**    This is a fact driven case, however there was no significant controversy about much of the evidence, with the exception of the evidence of the three witnesses to whom I now turn. It is necessary to make adverse credibility findings in respect of these three witnesses only.

The Bank Witnesses

**374**    I must comment generally on the evidence of the three bank witnesses from the Corporate Banking Division; Mr. Young, Mr. Wilson, and their supervisor, Ms. Leaney. Ms. Leaney graduated from the University of Toronto with a B.A. (Hons.) and immediately thereafter joined the TD Bank. After a brief training period she became a senior accounting officer at a branch and then moved up the ranks into middle management. She held a series of positions and gained experience in lending, credit and marketing. She had been involved with Leigh in 1983, in the period when it had experienced financial difficulties, resolved with the help of a work-out specialist. After a period in Corporate Finance, she returned to the Corporate Banking Division in 1988 as a general manager. The account manager responsible for the Leigh account, Young, and then Wilson, reported to her. She herself reported to Ernest Mercier, executive vice president of Corporate Banking. In 1990 she moved to the Corporate and Investment Banking Group as a vice president, and then into TD Securities Inc., from which she retired in 1996. I found Ms. Leaney to be alternatively aggressive, argumentative and defensive when giving evidence. Her evidence at trial contained a plethora of inconsistencies and contradictions with the evidence she gave on discovery.

**375**    Greg Young also has an MBA and worked as a chartered accountant at Clarkson Gordon until 1980. From 1981 until 1987 when he joined TD he held a series of positions at the Bank of Montreal, Citibank Canada and Royal Trust. He remained in TD's Corporate Banking Department until November, 1989, when he was replaced by Rob Wilson. He is presently self-employed as a management consultant.

**376**    Rob Wilson obtained a B.A. from University of Toronto in 1978 and an M.B.A. in 1980. He joined the Continental Illinois Bank following graduation and stayed there until the fall of 1983, when he entered a forestry program at the University of Toronto. Upon obtaining his diploma in resource management from the Department of Forestry, he attempted unsuccessfully to obtain employment in the forestry industry, and then joined the Bank of Nova Scotia in 1984. In 1985 he rejoined the Corporate Banking department of the Continental Illinois Bank, where he remained until 1987 when he again moved, this time to a merchant bank called Canadian Corporate Funding Limited. He left that position and joined TD in October, 1989. He is presently a vice president of TD Securities, where he has been since 1994.

**377**    These three members of the Corporate Banking Department were involved in management of the Leigh account during the period of time material to this proceeding. During that interval their handling of the account for the bank left much to be desired. In December, 1988 Leaney and Young extended credit to Leigh with Noonan's authorization, on condition that a revised credit review was received the following week. The credit review was not prepared until almost one month later.

**378**    On the occasion of the taking of the third comfort letter, Young and Leaney acted contrary to the specific direction of the Credit Division in waiving the requirement that the intercompany debt be postponed of their own volition, and releasing the security notwithstanding that the debt had not been postponed. Upon the assumption of Young's responsibilities by Wilson, the degree of supervision provided by Leaney to ensure continuity was unsatisfactory. From time to time the

account was out of order, facility letters were not updated and fresh documentation not obtained as directed by Credit Division, and good banking practice not always followed. Ms. Leaney authorized an extension of the authorized credit for Leigh when Leigh was in an overdraft position without consulting the Credit Division, and even though, as she conceded, she did not have the authority to do so. Mr. Wilson did not read the fourth comfort letter when he took over responsibility for the Leigh account, nor did he do so upon receipt of the fifth comfort letter. Thus, while he failed to read the fifth comfort letter, he would not, in any event, have been able to draw an informed comparison if he had done so. Ms. Leaney claims not to have read the comfort letter, which was the only support for a loan of over $40 million, even though her initials appear on the covering memorandum, and she was responsible for the account. When the Leigh situation came to a head, with Leigh on the brink of bankruptcy and the parent companies "back-pedalling" from the association with Leigh, Leaney left for a two-week vacation without, she maintains, having bothered to read the fifth comfort letter.

379     Throughout, the monitoring of the Leigh account was less than diligent, although it is apparent all three knew a good deal more about Leigh than they admitted to. There was a pre-occupation with maintaining existing business and generating new business which pervaded their approach and clouded their judgment. These three bank witnesses were the persons directly responsible for supervision and control of the Leigh account. All of this resulted, to varying degrees, in a retrospective reconstruction of events by each of these three witnesses in testimony, perhaps inadvertently, in an attempt to explain or minimize their errors and oversights and to cover their mistakes.

380     For all of these reasons, I must conclude that, where the evidence of these three witnesses conflicts with that of any other witness, I cannot rely on the evidence of the Corporate Banking witnesses, and I prefer the evidence of the others. These observations have no bearing, however, upon my perception of the evidence of the witnesses from the bank's Credit Division or that of Mr. Exton.

381     The other bank witnesses were Patrick Noonan and Ted McDowell. McDowell joined the bank out of high school in 1947 and rose through the ranks by dint of hard work. He was the senior credit officer for the bank, a post he had held from 1972 until his retirement in 1990. He was appointed vice-chair of the bank in 1981, and reported directly to the chairman and chief executive officer of the bank. He remained on the board of directors of the bank until 1995. Patrick Noonan began his banking career in 1948 with the Canadian Imperial Bank of Commerce, and joined TD in 1968. He held numerous senior positions in the bank, and was posted in the U.K. and Singapore, as well as Canada. He was appointed senior vice president, credit, in 1982, a position he held until his retirement in 1991. In 1986 he became one of only four senior vice presidents responsible for all credit, globally. Both these witnesses were seasoned professional bankers, who conducted themselves with integrity, and I found them to be knowledgeable and credible.

382     Jonathan Exton is a graduate of the City of London Business school, and received his MBA

from the University of British Columbia in Canada. He held positions with Canadian Pacific and the Bank of Montreal, before joining TD's London office in 1988 as manager of corporate finance. He subsequently was promoted to the position of director of corporate finance, a position he held until he left TD in 1994. He is presently the head of the European multi-nationals group for the Industrial Bank of Japan. I found him to be an honest, credible and forthright witness.

The Plessey Witnesses

**383**   Ian Musgrave is a chartered accountant, and joined Plessey in 1978. He became group finance director seven months later and group treasurer in 1982, a post he held until August, 1989, when he resigned shortly before the hostile takeover succeeded. He was an informed and experienced businessman, who gave his evidence in a responsive, forthright and credible manner. The word which comes to mind in connection with his evidence and his demeanour is honourable.

**384**   Brendon Sammon was Plessey group chief accountant from 1972 until he left in September, 1990. His, experience, duties and responsibilities at Plessey were in the accounting area and not general management. He executed the fifth comfort letter, not because it fell naturally within his purview, but more because the senior management of Plessey was depleted following the GEC Siemens takeover. He was a forthright witness, but I gave little, if any, weight to his evidence where it went beyond his area of experience and responsibility, for instance in the area of the general enforceability of comfort letters.

**385**   Dr. Philip Gerdine is a vice president of Siemens in New York, seconded to Siemens in Munich, in the mergers and acquisitions department. Dr. Gerdine has both an MBA and a Ph.D. and is a certified public accountant. Prior to joining Siemens, he served for about five years as manager in charge of acquisitions services for Price Waterhouse. Following the GEC Siemens acquisition of Plessey in September, 1990, he became the co-managing director of Plessey, along with Simon Weinstock. I found him to be a candid, forthright and credible witness, with a high degree of business acumen and sophistication.

The GEC Witnesses

**386**   David Newlands was finance director and a director of GEC plc until his retirement last year. He and Gerdine were both highly involved in the integration of the Plessey businesses into GEC and Siemens. This was a gargantuan task, especially given the lack of prior knowledge of Plessey due to the information constraints associated with a hostile takeover. Leigh was a minute portion of the Plessey whole, and more so in context of the size of the two parents, GEC and Siemens. The GEC group comprised some 145,000 employees, and the group sales in the 1989-90 fiscal year were 6.5 billion pounds, with a profit of 797 million pounds. GEC had cash reserves at the time of about 1 billion pounds and no borrowings. Newlands testified that a "miniscule" amount of his time, less than one per cent of it, was taken up with Leigh matters. I found his evidence to be straightforward, informed, and credible.

**387**   Ross Anderson joined GEC in London as deputy treasurer in 1975, and was promoted to treasurer in 1979. He has an M.A. from Oxford in jurisprudence and is a chartered accountant. His principal duty as treasurer was the regular, almost daily, investment of GEC's sizable resources. I found him to be a responsive, ingenuous witness who was believable in his testimony.

**388**   Simon Weinstock, who is now deceased, was a manager and executive director of GEC in the period of time material to this action, and reported directly to Lord Weinstock, the managing director of GEC and his father. He was the GEC appointee to act as co-managing director of Plessey following the hostile takeover and was intimately involved in the GEC Siemens hive-up of Plessey. Simon Weinstock was originally named as a defendant to this action and was examined for discovery prior to his death. At trial, the plaintiff vigorously cross-examined David Newlands on a number of areas touching upon the conduct of Simon Weinstock as a directing mind of Plessey. As a consequence, GEC moved to introduce the discovery transcript of Simon Weinstock, which I allowed. I have placed little weight on this discovery evidence however, in view of the fact that I did not have an opportunity to observe his viva voce evidence, and because the cross-examination of Simon Weinstock on discovery was likely less extensive than would have been the case at trial.

The Leigh Witness

**389**   Frank Driscoll became president and CEO of Leigh on August 8, 1989. His background was in the technical area with little, if any, experience in finance. At or about the time of the Stanmore meetings on Nov. 28 and 29, 1989, Driscoll became aware that the past president of Leigh, Barry Flower, who was then working with Plessey, was attempting to place blame for Leigh's contractual and other difficulties on Driscoll. Driscoll was of the view that these difficulties had their genesis prior to his arrival at Leigh, during Flower's watch. It is apparent that he felt taken advantage of and vulnerable, and felt in retrospect he had been deceived about the condition of Leigh when he was hired. Prior to the collapse of Leigh he asked for and was given an indemnity agreement by GEC and Siemens. Driscoll was originally named as a defendant in this action. When he was called by the bank to testify, the bank stated that though it had discontinued the action against him, it reserved the right to reinstate or recommence those claims at the end of trial. Prior to testifying, Driscoll invoked the protection of s. 9 of the Canada Evidence Act and s. 5 of the Ontario Evidence Act. His evidence must be considered in the light of all of these circumstances, and I have apportioned weight to it accordingly.

The Expert Banking Witness

**390**   The defendants proffered as expert banking evidence the report and testimony of Robert Wickham. He is a retired banker who spent 25 years with the Royal Bank of Scotland, based in London, until his retirement in 1993. This court ruled he was qualified as an expert in the area of banking, and particularly corporate lending in England, subject to later argument on admissibility.

**391**    Wickham's expert evidence related to banking practices generally and the use of comfort letters during the period of time material to this action. His evidence also describes the commercial context in which the Plessey letters were delivered to the bank. TD, through its bank witnesses, continually characterised the Plessey letters as strong. TD has pleaded and argued in the alternative that the comfort letters are ambiguous. Wickham's evidence was intended to counter these characterizations. In my opinion, Wickham's evidence meets the test of relevance necessary to assist the trier of fact, and is not subject to an exclusionary rule. It is given by a properly qualified expert. See: R. v. Mohan, [1994] 2 S.C.R. 9 at 20 per Sopinka J. It is accordingly admissible. Wickham's evidence was useful in respect of the commercial context in which the comfort letters were exchanged and buttressed other evidence in that regard, but was not essential to any findings. Where his evidence overlapped with issues which were to be decided by this Court, it was given no weight.

## PART III

## ISSUES AND LAW

## OVERVIEW

**392**    The plaintiff submits that several causes of action arise from Leigh and Plessey's failure to pay the TD loan and Leigh' assignment in bankruptcy, and has advanced claims against the defendants in both contract and tort. In the statement of claim, the plaintiff asserted approximately 150 causes of action against the defendants, however in argument many of these claims were abandoned. As set out below, the plaintiffs claims against Plessey in contract and tort remain outstanding, as do the claims against GEC in tort. All claims of the plaintiff other than those dealt with below have been abandoned.

## The Claims in Contract

**393**    The bank claims as against Plessey for breach of contract, and submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Leigh to be managed so as to be always in a position to meet its financial obligations, including all amounts owed to the bank pursuant to the bank's loan to Leigh. The plaintiff asserts that Plessey is in breach of this contractual promise to cause Leigh to be so managed, and is therefore liable to the bank in contract. The bank also seeks an order that the fifth comfort letter be rectified to conform with the agreement between the parties, or that it be set aside.

## The Claims in Tort

**394**    The plaintiff submits that Plessey is liable to the bank in misrepresentation on the basis that the third paragraph of the Plessey comfort letters misrepresented the Plessey policy regarding management of its wholly-owned subsidiaries. Specifically, the plaintiff claims that the letters misrepresented the policy because the letters did not disclose the following: that the policy was regarding the management of the subsidiaries by their own management rather than by Plessey; that

the policy in the third paragraph did not require Plessey to do anything so that the subsidiaries would always be in a position to pay their debts; that the letters were only a statement of Plessey's policy as at the date of the letter; and that the letter was so "commercially hollow" Leigh could go bankrupt and the bank would receive nothing under its loan facility. In the alternative, the plaintiff claims the third paragraph of each letter was a material misrepresentation because Plessey had adopted no policy regarding the management of its subsidiaries.

**395**    The bank claims in the alternative that if the policy did exist, it had ceased to exist or was subject to material qualifications by or after December 27, 1989. The plaintiff submits that GEC and Plessey knew the policy statement in the fourth comfort letter had been made and "knew, recklessly disregarded or should have known" of these material qualifications, and should not have made the statement of policy in the third comfort letter, or should have disclosed the material qualifications. The plaintiff submits the defendants' actions in this regard amount to fraud or negligent misrepresentation.

Conduct outside the Comfort Letters

**396**    In the further alternative, the plaintiff claims the defendant are liable in contract and tort for conduct separate and apart from the comfort letters. In particular, the bank submits that the alleged statement of Ian Musgrave, Plessey group treasurer, that the comfort letters were "tantamount to a guarantee" amounted to a misrepresentation upon which the bank relied to its detriment. Further, the plaintiff claims that certain statements of Colin Justice, made to the bank in November and December 1989, regarding the Leigh financial statements, were negligently or fraudulently made. In addition, the bank claims that certain statements allegedly made by Ross Anderson to Exton constituted negligent misrepresentations.

**397**    Finally, the bank claims that from no later than February 26, 1990, Plessey and GEC were aware that Leigh was knowingly withholding its unaudited financial statements from the bank, in breach of its express contractual requirements to deliver them. The plaintiff submits that Leigh's conduct in knowingly withholding the statements while continuing to take further funds constituted a deceit upon the bank, and that Plessey and GEC were parties to this deceit through their silence.

THE CLAIMS IN CONTACT

**398**    The plaintiff submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Plessey Canada and Leigh to be managed so as to be always in a position to meet their financial obligations, including all amounts due pursuant to the banks loan to Leigh. The bank claims that Plessey is in breach of that contractual promise to cause Leigh to be so managed and is liable to the bank for the amount of the bank's advances to Leigh.

**399**    In addition, the bank submits it is entitled to rectification of the fifth comfort letter to eliminate the words "and does not constitute a legally binding commitment" on the basis that it does

not reflect the agreement of the parties. In the alternative, the plaintiff seeks an order that the defendants cannot rely upon those words, or that the fifth comfort letter be set aside in its entirety.

**400**    In response, Plessey submits that the operative document is the fifth comfort letter, and asserts that the letter creates no legally binding obligation upon Plessey to directly or indirectly make good the indebtedness of Leigh to TD, regardless of the concluding words which, it submits, simply reinforce the plain meaning of the document.

**401**    Regarding the bank's assertions as to the contractual promises contained in the comfort letters, Plessey argues that such an interpretation would require the court to insert words into the third paragraph which are not there, and which would, if added, convert a statement of policy or representation into a promise amounting to a guarantee.

**402**    Plessey resists the request for rectification on the basis that the fifth comfort letter accurately records the understanding between Plessey and TD that the comfort letter did not create a binding legal obligation to pay Leigh's debt to the bank.

PRINCIPLES OF CONTRACTUAL INTERPRETATION

**403**    The aim of the court, in construing a written agreement, is to determine the intentions of the parties to the agreement, and in this regard, the cardinal presumption is that the parties have intended what they have said. Their words must be construed as they stand. See: Chitty on Contracts Volume 1, General Principles, 27th ed. (1994) at 580.

**404**    Where the agreement has been reduced to writing, the parol evidence rule operates to prohibit the introduction of extrinsic evidence to vary the written contract. This rule of interpretation is enunciated in G.H.L. Fridman, The Law of Contract in Canada, 3rd ed. (Toronto: Carswell, 1994) at pp. 455-456:

> The fundamental rule is that if the language of the written contract is clear and unambiguous, then no extrinsic parol evidence may be admitted to alter, vary, or interpret in any way the words used in the writing.

See also: Hawrish v. Bank of Montreal, [1969] S.C.R. 515 per Judson J.

**405**    This is consistent with the principle that where a document purports on its face to be the final and conclusive expression of the parties' agreement, the document will be taken to be a reliable record of the parties' latest agreement, and evidence of the negotiations leading up to it will not be admissible. See: S.M. Waddams, The Law of Contracts (3rd ed.) (Toronto: Canada Law Book, 1993) at 210. This principle was articulated by Lord Wilberforce in Prenn v. Simmonds, [1971] 1 W.L.R. 1381 (H.L.) at 1384-1385:

> The reason for not admitting evidence of these exchanges is not a technical one

or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to.

**406**    These principles were adopted by the Court of Appeal for Ontario in Craighampton Investments Ltd. v. Ayerswood Developments Ltd. et al., (1984), 4 O.A.C. 124 (C.A.) at 126:

> This case obviously demonstrates the practical sense of the parol evidence rule. When equals negotiate at length and arrive at a written agreement which can be interpreted by itself or by reference to matters which must be taken to have been known to both of them and which show the sense or meaning that the words must be taken to have had when the agreement was made, it verges on idle activity for a court to rehash the negotiations, activities and conduct of the parties and hear their now professed expression of what their intentions were at an earlier time.

Factual Matrix

**407**    The court need not be confined to a strict, literal interpretation of the language of the document however, and may admit evidence of the "factual matrix" or circumstances surrounding the conclusion of the agreement as an aid in interpretation. Lord Wilberforce stated in Prenn v. Simmonds, supra at 1383-4:

> In order for the agreement of July 6, 1960, to be understood, it must be placed in its context. The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. ... We must ... inquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view. Moreover, at any rate since 1859 ... it has been clear enough that evidence of mutually known facts may be admitted to identify the meaning of a descriptive term.

He rejected the notion, however, that evidence of the parties' subjective intentions ought to be admissible, at 1385:

> And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things teach side, yet may be accepted because that is the only way to get "agreement" and in the hope that disputes will not arise. The only course then can be to try to ascertain the "natural" meaning. Far more, and indeed totally, dangerous is it to admit evidence of one party's objective -- even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised ...

> In my opinion, then, evidence of negotiations, or of the parties' intentions, and a fortiori of Dr. Simmonds' intentions, ought not to be received, and evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the "genesis" and objectively the "aim" of the transaction. [Emphasis added]

Lord Wilberforce returned to this theme and elaborated upon the notion that evidence of the factual matrix may be admitted to construe a term in Reardon Smith Line Ltd. v. Hansen-Tangen et al., [1976] 3 All E.R. 570 (H.L.), at 574-575:

> When it comes to ascertaining whether particular words apply to a factual situation or, if one prefers, whether a factual situation comes within particular words, it is undoubtedly proper, and necessary, to take evidence as to the factual situation.

> ***

> It is less easy to define what evidence may be used in order to enable a term to be construed. ... [I]t does not follow that ... one must be confined within the four corners of the document. No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have

regard to is usually described as 'the surrounding circumstances' but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

\*\*\*

It is often said that, in order to be admissible in aid of construction, these extrinsic facts must be within the knowledge of both parties to the contract, but this requirement should not be stated in too narrow a sense. When one speaks of the intention of the parties to the contract, one is speaking objectively - the parties cannot themselves give direct evidence of what their intention was - and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly, when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties. It is in this sense and not in the sense of constructive notice or of estopping fact that judges are found using words like 'knew or must be taken to have known' ....

\*\*\*

I think that all of their Lordships are saying, in different words, the same thing - what the court must do must be to place itself in thought in the same factual matrix as that in which the parties were. All of these opinions seem to me implicitly to recognize that, in the search for the relevant background, there may be facts, which form part of the circumstances in which the parties contract, in which one or both may take no particular interest, their minds being addressed to or concentrated on other facts, so that if asked they would assert that they did not have these facts in the forefront of their mind, but that will not prevent those facts from forming part of an objective setting in which the contract is to be construed.

**408**    The Supreme Court of Canada has adopted the notion that a court may look at evidence of the surrounding circumstances when construing a document. In Hill v. Nova Scotia (Attorney General), [1997] 1 S.C.R. 69, the court cited with approval the dicta of LaForest J. (as he then was), in White, Fluhman and Eddy v. Central Trust Co. and Smith Estate (1984), 54 N.B.R. (2d) 293 at

310-311:

> What the statement quoted means is that in determining what was contemplated
> by the parties, the words used in a document need not be looked at in a vacuum.
> The specific context in which a document was executed may well assist in
> understanding the words used. It is perfectly proper, and indeed may be
> necessary, to look at the surrounding circumstances in order to ascertain what the
> parties were really contracting about.

**409**    From these authorities can be gleaned certain principles which should guide the court in
interpreting an agreement. The document should be looked at as a whole, with each contractual term
considered in the context of the entire document. See: G.H.L. Fridman, The Law of Contract in
Canada, 3rd ed. (Toronto: Carswell, 1994) at 469. The court should make every effort to construe
the document on its face, without regard to extrinsic evidence.

**410**    Where an agreement is clear and unambiguous on its face, the parol evidence rule operates to
prohibit admission of evidence to alter or vary the written terms of the contract. However, the court
may admit evidence of the surrounding circumstances, including evidence of the commercial
purpose of the contract, the genesis of the transaction, the background, the context, and the market
in which the parties were operating. In this regard, evidence to be admitted must be objective in the
sense of what reasonable persons in the position of the parties would have had in mind, rather than
subjective evidence of the parties' actual intentions.

Ambiguity

**411**    A contract which appears clear and unambiguous on its face may, nevertheless, contain a
latent ambiguity. Such an ambiguity may only become apparent when the court seeks to apply the
language of the agreement to the facts. Extrinsic evidence of the factual matrix of the agreement
may also disclose such an ambiguity, by revealing a meaning attributable to the language of the
document apparent only in light of evidence of the commercial context. Where the court determines
that a document contains a latent ambiguity, further extrinsic evidence is admissible to clear up the
ambiguity. See: Leitch Gold Mines v. Texas Gulf Sulphur Co., [1969] 1 O.R. 469 (N.C.). The role
of the court in interpreting an ambiguous commercial contract was stated by Estey J. in
Consolidated-Bathurst Export Limited v. Mutual Boiler & Machinery Insurance Company, [1980] 1
S.C.R. 888, at 901:

> [T]he normal rules of construction lead a court to search for an interpretation
> which, from the whole of the contract, would appear to promote or advance the
> true intent of the parties at the time of entry into the contract. Consequently,
> literal meaning should not be applied where to do so would bring about an
> unrealistic result or a result which would not be contemplated in the commercial
> atmosphere in which the insurance was contracted. Where words may bear two
> constructions, the more reasonable one, that which produces a fair result, must

certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

412     The nature of the evidence to be admitted as an aid to interpretation was considered by the Court of Appeal for Ontario in the seminal case of Alampi v. Swartz, [1964] I O.R. 488 (C.A.). In that case, McGillivray J.A. for the court held that extrinsic evidence was not admissible to vary the terms of a written contract, but could be admitted to explain the document and to prove the facts upon which interpretation of the document depends, including the validity of the document, the identity of the parties and to explain technical terms or commercial usage. Justice McGillivray held that such evidence may not contradict a term of the contract, but is adduced to relate the terms of the contract to the proper subject matter or to assign to the terms a definite meaning. Once such evidence is admitted, it may disclose that a term of the contract is ambiguous and capable of more than one meaning. In that case, he noted at p. 493, "Such an ambiguity, a "latent ambiguity", because not apparent on the face of the writing, demands evidence of intention to establish whether there was an agreement at all, or if the parties intended a particular one of alternate meanings to prevail." Evidence of intention may only be admitted however, once the latent ambiguity has been established.

413     This issue was later considered by Cory J.A. (as he then was), in TransCanada Pipelines Ltd. v. Northern and Central Gas Corp. Ltd. (1983), 41 O.R. (2d) 447 (C.A.), who noted that every effort should be made to construe the contract based on the wording. Where, however, a doubt arises as to the true sense and meaning of the words or there is difficulty in their application to the circumstances, resort may be had to extrinsic evidence. Mr. Justice Cory held that once the court is of the opinion the contract is difficult to interpret, extrinsic evidence may be admitted to determine whether, in fact, the agreement contains a latent defect, and noted that if, at a later stage, another court was able to interpret the document without regard to that evidence, no harm would result from its admission. At p. 452 Cory J.A. adopted and paraphrased the reasoning of Gale C.J.O. in Leitch Gold Mines v. Texas Gulf Sulphur Co., supra:

(1)     The extrinsic evidence admitted may establish that there is no latent ambiguity in the written document relevant to the issue in dispute. In such a case obviously the written document governs.

(2)     The extrinsic evidence may demonstrate that there is latent ambiguity in the terms of the written document which are in dispute. Nonetheless, upon a consideration of all the surrounding circumstances, it requires the choice to be made in favour of the meaning of the agreement which would appear from a reading of the whole document without any extrinsic evidence to show ambiguity.

(3)     The extrinsic evidence establishes that there is a latent ambiguity. However, a

consideration of the surrounding circumstances requires the choice of a meaning consistent with the words of the document but different from their patent meaning. The party contending that there is a latent ambiguity must not only establish that there is such an ambiguity but also resolve that ambiguity by evidence from which the court can find what agreement was made and what the choice of alternative meanings should be. The party contending for the latent ambiguity must show that the extrinsic evidence dictates the selection of a meaning which is generally consistent with the wording of the written document but different from its patent meaning.

(4)   The extrinsic evidence indicates that there is a latent ambiguity of such an extent that the true agreement between the parties is different from the agreement expressed in the written document. That is, the extrinsic evidence established that there is a case of mistake.

(5)   The extrinsic evidence establishes that there is a latent ambiguity and goes further and demonstrates that the minds of the parties never really met upon the subject matter concerning which there is an agreement. In other words, there is in fact no agreement upon the terms which would decided the issue between the parties. The court then cannot, on the balance of probabilities, make the necessary finding of consensus ad idem.

Similarly in Arthur Andersen Inc. v. Toronto-Dominion Bank et al (1994), 17 O.R. (3d) 363 (C.A.), Grange and McKinlay JJ.A. stated at 372:

> First, the words of the contract must be analyzed "in its factual matrix", and a conclusion arrived at that there are two possible interpretations of the contract. Then, and only then, may the trial judge look at other facts, including facts leading up to the making of the agreement, circumstances existing at the time the agreement was made, and evidence of subsequent conduct of the parties to the agreement.

**414**   Accordingly, where there is some doubt as to the meaning of language used in the contract, or the court has difficulty in applying it to the facts, the court should, in light of the factual matrix, search for an interpretation which would appear to advance the true intent of the parties. The more reasonable construction of the words, which produces a fair result consistent with the commercial atmosphere, is the interpretation which the court should adopt.

**415**   The court may have regard to extrinsic evidence in order to resolve the ambiguity, and no harm will come from its admission, however extrinsic evidence of facts leading up to the making of the agreement, circumstances existing at the time of the agreement and subsequent conduct of the parties may only be considered once an ambiguity has been found. Extrinsic evidence demonstrating the intention of the parties is only admissible however, once an ambiguity has been found, and in my view, should be objective, rather than subjective evidence of the parties'

intentions.

APPLICATION TO THE CIRCUMSTANCES OF THIS CASE

Interpretation of the Comfort Letter on its Face

**416**    The starting point of any analysis must be identification of the document to be construed. In the present case, the operative document is clearly the fifth comfort letter, dated December 15, 1989 and delivered to the bank on December 27, 1989. This was the last comfort letter delivered to TD prior to the bankruptcy of Leigh in April, 1990. Moreover, the letter states on its face "This letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 ...." Applying the principles enunciated by Professor Waddams, supra, the fifth comfort letter purports on its face to be the most recent iteration of the parties' agreement. Subject to the plaintiffs submission that the letter should be rectified or set aside, the fifth letter is the document to be construed by the court in the context of the claim in contract.

**417**    Applying the principles of contractual interpretation set out above, the first step in any analysis must be an attempt on the part of the court to construe the document according to the language on its face, without reference to extrinsic evidence of any sort. The fifth comfort letter states, in its entirety:

> This is to confirm that The Plessey plc has full knowledge of the facility of C $45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh.

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

> It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

> The letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 and does not constitute a legally binding commitment.

**418**    The last line of the letter is, in my view, dispositive of the plaintiffs contract argument. Having regard to the principle that contracting parties are presumed to intend what they say, the

fifth comfort letter states on its face that it replaces all prior comfort letters, and must therefore be taken to be a reliable record of the parties' latest agreement. Moreover, the letter states that it does not constitute a legally binding agreement and must be taken as conclusive of Plessey's intention that it not be so bound. This is a full and complete answer to the plaintiffs claim in contract.

The Statement of Policy in the Third Paragraph

**419**    The plaintiff submits that the statement of policy in the this paragraph of the comfort letter amounts to a contractual promise by Plessey that it had and would have a policy, as long as the bank's loans were outstanding, to cause Leigh to be managed in such a way that it could pay the bank when called upon to do so. Hence, the plaintiff asserts that the added words in the last line of the document operate to eliminate the contractual promise contained in the third paragraph.

**420**    In response, Plessey asserts that, notwithstanding the added words in the last line, the statement in the third paragraph is merely a representation as to its policy speaking as at the date of the letter, and not a binding contractual promise. As such, the added words in the last line do not change the effect or alter the meaning of the third paragraph. Plessey argues that the interpretation urged by the plaintiff amounts to a contractual promise that Plessey would see to it that the bank be paid, either directly or indirectly, and that in order to arrive at such an interpretation, the court would have to read into the comfort letter words that are not there.

**421**    The difference between a contractual promise and a representation was articulated by Professor Fridman in The Law Of Contract in Canada, supra, at 3-4 as follows:

> Promises are fundamental to the idea of contract. A promise is an undertaking as to the future conduct of the party promising, the promisor, with respect to the party to whom the promise is given, the promisee. ... It is the idea of promise which distinguishes contract from representation. A representation is not an undertaking, although, sometimes, it may resemble a promise in its form, for example, where a seller of goods states that the goods in question are "top quality". Representations are statements as to an existing or past fact, not promises as to future events or states of affairs. Although representations can have legal consequences, if made falsely or negligently, or, on occasion, without either fraud or negligence on the part of the representor, such consequences are non-contractual in their nature. They stem from the misleading nature of a statement, not from any promissory character. [Emphasis added]

**422**    The leading case on the interpretation of comfort letters in the decision of the English court of appeal in Kleinwort Benson Ltd. v. Malaysia Mining Corp., [1989] 1 All E.R. 785 (C.A.) (leave to appeal to the House of Lords refused). In that case, Ralph Gibson L.J. held that a comfort letter given in support of a subsidiaries borrowing did not have contractual effect.

**423**    The plaintiffs seek to rely upon the decision of Rogers C.J. in Banque Brussels Lambert SA

v. Australian National Industries Ltd. (1989), 21 NSWLR 502, in which the Supreme Court of New South Wales held that a comfort letter was a legally enforceable obligation. In my view that case can have no application to the facts before me. In this regard I adopt the reasoning of Chadwick J. in Re Atlantic Computers plc, [1995] B.C.C. 696 (Ch.D - Companies Court) at 699:

> I was referred also, understandably, to the decision of Rogers C.J. in the Supreme Court of New South Wales in the case of Banque Brussels Lambert SA v. Australian National Industries Ltd. (1989), 21 NSWLR 502. It is clear from remarks on p. 523 that the Chief Justice found the approach of the Court of Appeal in Kleinwort Benson somewhat unreal. He took the view that the construction reached by the Court of Appeal rendered the document in that case nothing but a scrap of paper.

> It would not be open to me to follow the Chief Justice's decision, even if I were to accept his criticism of the Court of Appeal's approach; but I draw attention to the fact that, as he acknowledged, the test prescribed by the law of Australia to determine whether a statement is promissory or only representational is different from that in England (see p. 524A). In my view, the law of England is clear. A document in the terms of these two letters of comfort does not impose a contractual promise as to future conduct.

424    In Kleinwort Benson, as in the present case, the paragraph in issue was the third paragraph containing a statement of policy of the parent company that: "It is our policy to ensure that the business of MMC Metals Limited is at all times in a position to meet its liabilities to you un r the above arrangements." I note in passing that the language used in that comfort letter, including the word "ensure" is arguably stronger than that used in the comfort letter before me.

425    The question before the court in Kleinwort Benson was whether the paragraph was a contractual promise as to the parent company's future conduct, or, whether it was simply a statement of present fact regarding the company's intentions. Although the wording and factual matrix of that comfort letter differ from those in the case at bar, nevertheless I find the reasoning to be instructive. In holding that the paragraph was a representation, the court stated at 792:

> In my judgment the defendants made a statement as to what their policy was, and did not in para 3 of the comfort letter expressly promise that such policy would be continued in future. It is impossible to make up for the lack of express promise by implying such a promise, and, indeed, no such implied promise is pleaded. My conclusion rests on what, in my judgment, is the proper effect and meaning which, on the evidence, is to be given to para 3 of the comfort letters.

426    In my view, the statement in the third paragraph of the comfort letter is, on its face, a representation and not a contractual promise or warranty. The paragraph does not use promissory

language or language of undertaking. It simply contains a statement or representation as to Plessey policy at the time the letter was executed, and does not coin a contractual promise that it will cause Leigh to be so managed nor a promise that the bank will be paid. Moreover, the paragraph must be construed in the context of the document as a whole. A comparison of the wording in the second and third paragraphs is instructive in this regard. The second paragraph states: "We undertake not to reduce our share-holding in Leigh ..." The use of words of promise or undertaking stands in sharp contrast to the wording of paragraph three: "It is our policy ...".

**427**  In order to arrive at the construction urged by the plaintiff, if would be necessary to add or imply the words "It is Plessey's policy to cause Leigh to be managed in such a way ..." or "Plessey undertakes to ensure that Leigh be managed ..." or other, similar language. The word policy itself, given its common usage, means a guideline or principle, and does not amount to a promise to do anything or a requirement that the terms of the policy be adhered to. A consideration of the policy statement, placed in the context of the letter as a whole, supports this construction of the word, for the reasons set out below. Further, the words "it is our policy" are, in my view, a representation of present policy and not a contractual undertaking to have the policy in the future. The paragraph does not say "it is and will be our policy", and in order to construe the statement of policy as a statement of future intention, it would again be necessary to imply into it words which are not there. The word "always" in the third paragraph has the effect of making the representation as to policy a continuing representation, although subject to change. Absent the word "always", the policy statement could be taken as speaking only as at the date of the letter. The word "always" does not have the effect of elevating the policy statement to the level of a contractual promise to have the policy in the future.

**428**  If the construction urged by the plaintiff is adopted, namely that Plessey promises to have the policy as long as the loan is outstanding and that Plessey will cause Leigh to be managed in accordance with the policy, the effect is to emasculate the preceding two paragraphs of the comfort letter. In this regard, the reasoning in Kleinwort Benson at 795-796 is apposite:

> Next, the first draft of the comfort letter was produced by the plaintiffs. Paragraph 1 contained confirmation that the defendants knew of and approved of the granting of the facilities in question by the plaintiffs to Metals, and para 2 contained the express confirmation that the defendants would not reduce their current financial interest in Metals until (in effect) facilities had been paid or the defendants consented. Both are relevant to the present and future moral responsibility of the defendants. If the words of para 3 are to be treated as intended to express a contractual promise by the defendants as to their future policy, which Hirst J. held the words to contain, then the recitation of the plaintiffs' approval and the promise not to reduce their current financial interest in Metals would be of no significance. If the defendants have promised that at all times in the future it will be the defendants' policy to ensure that Metals is in a position to meet its liabilities to the plaintiffs under the facility it would not matter whether they had approved or disapproved, or whether they had disposed

of their shares in Metals. Contracts may, of course, contain statements or promises which are caused to be of no separate commercial importance by the width of a later promise in the same document. Where, however, the court is examining a statement which is by its express words no more than a representation of fact, in order to consider whether it is shown to have been intended to be of the nature of a contractual promise or warranty, it seems to me to be a fact suggesting at least the absence of such intention if, as in this case, to read the statement as a contractual promise is to reduce to no significance two paragraphs included in the plaintiff's draft, both of which have significance if the statement is read as a representation of fact only. [Emphasis added]

**429**    Similarly, in the case at bar, the first paragraph of the comfort letter contains a statement of Plessey's awareness of the facility extended by TD to Leigh, and the second paragraph contains an undertaking on the part of Plessey not to reduce its shareholding without prior notification to the bank. If the third paragraph is read as a contractual obligation that Plessey will continue to have the policy while the facility is outstanding, and that it will cause Leigh to be managed so that it can meet its obligations under the facility, the preceding two paragraphs would become irrelevant. To paraphrase Ralph Gibson L.J., there would be no reason to waste ink or paper on the first two paragraphs.

**430**    Finally, in interpreting the document as a whole, the third paragraph must also be construed in light of the last line, stating that the comfort letter (and thus the third paragraph) does not constitute a legally binding commitment. Hence, the fifth comfort letter is clear and unambiguous on its face, does not contain any contractual promise, and the bank's claim in contract must fail.

The Factual Matrix

**431**    A consideration of the comfort letter in its factual matrix does not alter this conclusion. Plessey and TD have both made submissions as to the appropriate evidence of the surrounding circumstances which the court ought to consider. I have reviewed the evidence carefully, and having regard to the principles outlined above, in my view the following evidence is admissible to place the comfort letter in its factual matrix. Plessey was a large, multinational corporation with subsidiaries in 43 countries. TD is a Canadian Bank with branches throughout the world. Both are large, sophisticated parties, and both were intimately familiar with commercial lending transactions and the various forms of security used in such transactions, including loan guarantees. Prior to the delivery of the Leigh comfort letters, both parties had been involved in other transactions involving comfort letters. Both parties knew that there was no single "standard form" of comfort letter in use in the financial marketplace, and both knew that the legal effect of a comfort letter depended on the wording of the letter. Plessey and the Bank were both aware that in the commercial context in which they were operating, a confirmation by a parent company that it was aware of the borrowings of its subsidiary was considered to have some significance, as was an undertaking to notify the bank of any reduction by the parent in its shareholding in the subsidiary. It would also have been known

to both parties that banks competed for the business of companies of the size and prominence of Plessey and actively solicited them to develop business opportunities. TD had solicited Plessey for business unsuccessfully in the past. The aim of the transaction was to arrange bank financing for Leigh on terms that were acceptable to both parties.

**432**     Regarding the specific transaction in issue and its genesis, as is outlined above the bank approached Plessey when the Leigh takeover bid was announced, and offered to assist in financing the purchase of Leigh. Plessey ultimately availed itself of a $10 million short-term acquisition loan, to be used by the acquisition vehicle, Plessey Canada (1988) Inc. Plessey also provided a letter of comfort to the bank, in a form which was agreed upon following negotiation, and which the bank accepted. The first comfort letter was in substantially the same form as the fifth letter, absent the last sentence.

**433**     The factual matrix surrounding the comfort letter does not alter my conclusion that the comfort letter is clear and unambiguous. The parties were sophisticated and accustomed to operating in international financial markets. The comfort letter contained statements of commercial significance to the bank. The first paragraph contained a representation that Plessey was aware of the facility which had been granted to Leigh by, the bank. The second paragraph contained an undertaking, using express contractual language, that Plessey would not reduce its shareholding in Leigh without prior notification to the bank. Such notification would provide the bank with an opportunity to call the loan or take whatever steps it deemed necessary.

**434**     The third paragraph contained a representation as to the policy of Plessey. The paragraph does not contain express promissory language, in direct contrast with the contractual undertaking given in the second paragraph. This contrast is significant given that both parties were sophisticated and used to negotiating the terms of security. Both parties also knew what a guarantee was and the appropriate language of guarantee. The comfort letter was arrived at in a commercial marketplace in which banks, including TD, solicited large companies like Plessey for business, and competed with other banks for that business. In that context, to construe the third paragraph as a promise to do anything, including a promise to pay the bank, in the absence of express language to that effect, defies both legal and commercial sense.

**435**     The plaintiff asserts that to construe the third paragraph as a representation makes no commercial sense, in that the bank would be no better off than it would have been with a letter from Leigh itself, saying that it intended to manage its own affairs in such a way as to be always in a position to meet its financial obligations. I do not agree with this submission. While Plessey is not obliged to pay the bank, nor to have the policy stated, the letter nevertheless has commercial value. Delivery of the letter provides the bank with a recourse it would not otherwise have had, namely, to approach the parent company and ask it to pay. The possibility that the parent will consider paying must give the bank more comfort than such a letter from Leigh standing alone, without potential recourse to a parent. Moreover, to interpret the third paragraph as a representation rather than a contractual promise is not to render it commercially hollow or devoid of meaning. An interpretation

of the paragraph as not obliging Plessey to do anything to have or enforce such a policy does not mean that, in fact, Plessey did not take such steps. A comfort letter containing a representation as to policy must, in my view, have more commercial value than a letter which did not contain such a statement.

**436**    The third paragraph does not amount to a contractual promise by Plessey to have the policy described, either at the date of the letter or in the future. Nor is it a promise by Plessey to cause Leigh to be managed in accordance with the policy, or that Plessey would cause the bank to be paid. In order to reach such conclusions, it would be necessary to read into the paragraph words which are not there, and there is no basis in the evidence for the implication of such terms. See: C.P. Hotels v. Bank of Montreal, [1987] 1 S.C.R. 711; Charles P. Rowan & Associates Inc. v. Ciba-Geigy Canada (1994), 19 O.R. (3d) 205 (C.A.). My conclusion is reinforced when the paragraph is viewed in the context of the entire letter, including the final sentence disavowing any binding legal obligation.

Ambiguity

**437**    Both the bank and Plessey assert that the comfort letter is not ambiguous, although each urges the court to adopt a different construction of the third paragraph, based upon the same wording. The bank asserts that the third paragraph amounts to an ongoing contractual promise to have the policy set out in the paragraph for as long as the loan was outstanding, and a contractual promise that Plessey would cause Leigh to be managed so that it could pay the bank. Plessey, on the other hand, submits that the paragraph contains no contractual obligation, and is simply a statement of present intention. In their submission, the paragraph is merely a representation that on the date of the comfort letter Plessey had the policy described, and that a policy, as opposed to a obligation of some kind, merely speaks to Plessey's expectation as to the management of Leigh, and not to any requirement that it be so managed.

**438**    As was noted by Cory J.A. (as he then was) in TransCanada Pipelines Lid. v. Northern and Central Gas Corp. Ltd., supra, a document which appears clear on its face, may nevertheless disclose an ambiguity if a doubt arises as to the true meaning of the words, or if the court has difficulty in applying the language to the facts. I agree with the submissions of both parties that the letter is not ambiguous on its face and, for the reasons outlined above, a consideration of the letter in its factual matrix does not disclose any ambiguity, nor any reason to depart from a construction of the document based upon its express wording. I find the document contains no latent ambiguity. However, even had I found there was such an ambiguity, the extrinsic evidence which would then be admissible does not assist the plaintiff. Although it is not necessary that I review it, the extrinsic evidence supports the conclusion that there is no latent ambiguity and defeats the construction urged by the plaintiff. The salient details of this extrinsic evidence are outlined below.

Circumstances Leading up to the First Comfort Letter

**439**    The starting point must be that the bank knew from the outset that a guarantee was not on

offer by Plessey. When Plessey announced its friendly takeover bid for Leigh, the bank approached Plessey and offered to assist with funding for the acquisition. Although the bank had made loan facilities available to Plessey prior to this, none had been drawn upon, and Baker referred to the possibilities for developing business opportunities with Plessey in his CCR recommending that the loan be approved. Baker also noted in the CCR that a guarantee was not on offer for the borrowing, which would be unsecured. Indeed, it was this notation which led Noonan in the Credit Division to stipulate that an appropriate comfort letter be obtained from Plessey, instead.

**440**    The form of comfort letter which was ultimately delivered to the bank was the subject of negotiation between the bank and Plessey. Drafts were exchanged. Howard Baker sent an initial draft to Plessey, based on a template comfort letter. The template Baker was working from included a line which contained language which, in my view, amounted to a contractual promise: "and in this particular instance, we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Baker deleted this line from the proposed draft which he sent to Plessey. Baker's draft concluded "We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis." Plessey responded with its own draft, which was accepted by the bank without amendment.

**441**    I can only conclude from the foregoing that the bank was aware Plessey was not prepared to provide a guarantee for the borrowings of Plessey Canada, that the bank agreed to accept a comfort letter rather than a guarantee in order to develop the business relationship with Plessey, and that the bank was consulted as to the terms of the comfort letter to be provided. In this regard, it is significant that in October 1989, the bank was invited to (and did) tender a bid to provide Plessey with an uncommitted facility, security for which was offered as the unconditional and irrevocable 50-50 several guarantees of GEC and Siemens. In my opinion, none of this evidence supports a finding that the comfort letter contains a latent ambiguity, nor that the third paragraph of the letter contains any contractual promise.

Evidence Regarding the Subsequent Comfort Letters.

**442**    The corporate credit reviews of the Leigh account are replete with references to the bank's relationship with Plessey and later GEC, and to the bank's desire to generate further business with these companies. Throughout, the comfort letter is listed as documentation rather than security, in accordance with the bank's Credit Procedures Manual. At the same time, from the time of delivery of the third comfort letter, the risk rating in these credit reviews is clearly that of Leigh, and not that of the parent companies. The risk rating deteriorates as the Leigh bank line grows, a fact which is inconsistent with an understanding on the part of the bank that they had a guarantee or enforceable contractual commitment from Plessey that they would be paid. Indeed, the bank explicitly recognized that the support from Plessey was informal. In his comment on the Nov. 1, 1988 request that the Leigh line be extended by $4 million, Sid Owen noted: "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to

regularize this company's facilities by November 30, 1988. We must resist being dragged along." This observation is, in my view, completely inconsistent with the notion that the bank thought it had a contractual promise from Plessey that it be paid.

**443**  In the fall of 1988, Plessey discovered that the bank held security over the assets of Leigh in the form of a general assignment of book debts and a floating charge debenture. Plessey requested that the bank release this security and the bank agreed. The Credit Division required as a term of this agreement that Plessey subordinate its intercompany debt in priority to the debt of the bank. Plessey refused to do this, and the Corporate Banking Division agreed to waive that condition, and also agreed to release its security over Leigh's assets. At no time did the bank suggest that the wording of the comfort letter be altered or amended in any way, notwithstanding that the line of credit was now an operating loan rather than a short-term acquisition loan, and that the amount of the loan had increased substantially. This is so even though Plessey forwarded a draft of the third comfort letter to the bank and requested confirmation that its terms were acceptable, thus providing TD with an opportunity to suggest changes in the wording. It is noteworthy that the loan was repayable on demand, and thus could have been called by the bank at any time.

**444**  Prior to delivery of the fourth comfort letter, the bank agreed to extend credit to Leigh in excess of the amount referred to in the comfort letter. Plessey executed a letter to this effect which had been provided in draft form by the bank, without amending its terms, which stated: "However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the letter of comfort accordingly." This document contains words which amount to a contractual promise to provide a further comfort letter if one gas needed, in language which was supplied by the bank. Plessey complied with the terms of this undertaking, and forwarded the fourth comfort letter to the bank, despite the fact the bank had not requested it. This is significant, both because the bank clearly was familiar with promissory language and requested it when it felt such language was appropriate, and also because having given an enforceable undertaking, Plessey honoured it.

**445**  In the fall of 1989, Plessey was the subject of a successful hostile takeover. The bank was aware of this and noted the GEC Siemens plan to divide up the assets of Plessey in the September 20, 1989 CCR. Almost all of the senior personnel at Plessey left shortly after the takeover, and were replaced by representatives of GEC and Siemens. The bank viewed this as an opportunity to develop a business relationship with GEC, and made no effort to renegotiate the terms of the comfort letter or call the loan.

**446**  Finally, as I have found above, the bank read and accepted the fifth comfort letter, including the last line which stated that the comfort letter did not constitute a legally binding obligation.

**447**  All of this extrinsic evidence displays a clear focus on the part of the bank on generation of further business with Plessey and GEC, and, in a competitive marketplace, indicates to me that the bank was prepared to assume risks and make concessions in order to further that goal. Moreover, all

of this evidence, including Plessey's refusal to provide a guarantee at the outset; the descriptions of the support from Plessey as informal; the fact that the relevant risk rating was that of Leigh rather than Plessey; the parties' use of contractual language prior to delivery of the fourth comfort letter; and the offer of joint and several guarantees in the October 1989 Plessey uncommitted facility; all of this is inconsistent with an understanding on the part of the bank that they had obtained a contractual promise in the comfort letter that they would be paid directly or indirectly' by' Plessey. It is also inconsistent with a belief by the bank that it had obtained a promise that Leigh would remain solvent.

Evidence of Subsequent Conduct.

**448**    The bank read and accepted the fifth comfort letter. At no time up until the bankruptcy of Leigh on April 12, 1990, did anyone from the bank comment or complain to any of the defendants regarding the additional wording in the last line, let alone ask that the language be deleted. In conversations with Gerdine and Anderson, the bank requested that GEC and Siemens formally acknowledge the existing Plessey comfort letter. On April 5, 1990, the bank sent both GEC and Siemens a letter enclosing a draft comfort letter which it requested that they execute. The covering letter stated: "Our comfort and support for high has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." The bank's reference to its reliance on the integrity of the parent companies is, in my view, inconsistent with an understanding on their part that they were in possession of a binding contract in the comfort letter. Further, the accompanying comfort letter contained no reference to Plessey's policy, but did contain express promissory language which might well have amounted to a contractual obligation, had the letter been executed: "We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates."

**449**    The subsequent conduct of the bank is consistent with an understanding on its part that it did not have a binding contract with Plessey. It is also consistent with an understanding that the third paragraph did not contain a promise that the bank would be paid, nor a promise that Plessey would cause Leigh to be managed in accordance with the policy. In light of all of my findings above, there is no basis in the evidence for a finding of any collateral contract or collateral warranty. See: Hawrish v. Bank of Montreal supra, and Esso Petroleum Co. Ltd. v. Mardon, [1997] 2 All E.R. 5 (C.A.). For all of the foregoing reasons, I conclude that the comfort letter is clear and unambiguous, and the construction of the comfort letter urged by the plaintiff is not supported either by the wording of the document or the evidence.

Contra Proferentem

**450**    TD seeks to rely upon the doctrine of contra proferentem and argues that any ambiguity in the comfort letters should be resolved in favour of the bank. In my view, even had I found an ambiguity in the comfort letter, the doctrine of contra proferentum would have no application on

these facts.

**451**    Only where the court finds an ambiguity and the other rules of construction fail to resolve that ambiguity may the court invoke the contra proferentem doctrine and interpret the document strictly against its drafter. Contra proferentem is a principle of last resort. See Hillis Oil and Sales Limited v. Wynn's Canada Limited, [1986] 1 S.C.R. 57 at 68-69; Consolidated-Bathurst Export Limited v Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888 at 900-901; and Alex Duff Realty Limited v. Eaglecrest Holdings Limited, [1983] 5 W.W.R. 61 (Alta. C.A.). In Hillis Oil and Sales v. Wynn's Canada, supra, at p. 69, Le Dain J. speaking for the court, quoted from Anson's Law of Contract, 25th ed., (1979) at p. 151, as follows:

> The words of written documents are construed more forcibly against the party using them. The rule is based on the principle that a man is responsible for ambiguities in his own expression and has no right to induce another to contract with him on the supposition that his words mean one thing while he hopes the court will adopt a construction by which they would mean another thing, more to his advantage.

**452**    Le Dain J., in Hillis Oil, also made it clear that, as a general principle relevant to the construction of all contracts, contra proferentem may only be applied where there has been no opportunity for the other side to review and modify the disputed or ambiguous terms. He said (at p. 68):

> [T]he rule is, however, one of general application whenever, as in the case at bar, there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording.

**453**    Even if I had found the comfort letter to be ambiguous, which I have not, TD cannot rely upon the doctrine of contra proferentem on the facts of this case. The bank was consulted on the wording of the first and third comfort letters, and given an opportunity to modify the language used. The bank agreed to the language contained in the third paragraph, and accepted the comfort letters as drafted. The bank read and accepted the fifth comfort letter. If it was dissatisfied with the language used, it could have requested a revision, refused to advance further funds until the revision was obtained, or indeed, it could have called the loan, which was repayable on demand. It did none of these things. Accordingly, in my view, the comfort letter is not ambiguous and in any event, the plaintiff had a full opportunity to modify its wording. The doctrine of contra proferentum has no application.

Rectification

**454**    The plaintiff requests an order of this court that the fifth comfort letter be rectified to conform with the agreement between the parties by striking out the last line, or in the alternative,

seeks an order that the fifth comfort letter be set aside in its entirety. It is not necessary to deal with these arguments in depth, in light of my finding above, that the bank, and specifically Wendy Leaney, read and accepted the fifth comfort letter upon its receipt. In light of the bank's failure to make any comment or complaint regarding the last line of the letter at the time of its delivery or at any time up to the bankruptcy of Leigh on April 12, 1990, it was reasonable for Plessey to conclude that the bank had accepted the revised comfort letter, including the final sentence. It is not now open to the bank to claim rectification.

**455**    In any event in view of my conclusions above regarding the interpretation of the third paragraph of the comfort letter, the orders sought by the plaintiff would be of no effect. All parties concede that the fourth comfort letter is substantially the same as the fifth, but for the last line, and I agree. While an order granting rectification might have some effect on the promissory wording contained in the second paragraph, that paragraph is not in issue, and in my view the third paragraph does not contain any contractual promise. Hence, rectification would be of no assistance to the plaintiff.

## NEGLIGENT AND FRAUDULENT MISREPRESENTATION

**456**    In the alternative to its claim in contract, the plaintiff has advanced a number of causes of action in negligent and fraudulent misrepresentation. The bank claims that the statement in paragraph three of all five of the comfort letters amounted to a material misrepresentation because, it submits, the paragraph failed to disclose the following: that the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed by their own management; that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not be taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank would receive nothing under its loan facility.

**457**    In the alternative, TD claims that the third paragraph of each of the letters of comfort was a material misrepresentation because Plessey had, in fact, adopted no policy regarding any of its subsidiaries, including Leigh. In support of this allegation, the bank asserts that nowhere in any of Plessey's internal documentation is it demonstrated that the Board of Plessey actually adopted the policy described in the letters.

**458**    In the further alternative, TD claims that even if Plessey had a policy which was accurately described in the letters of comfort, that policy ceased to exist or became subject to material qualifications prior to receipt by the bank of the fifth comfort letter on December 27, 1989. In the alternative, the bank pleads that the policy ceased to exist or became subject to material qualifications between receipt by the bank and the bankruptcy of Leigh on April 12, 1990. The bank submits that Plessey and GEC knew, recklessly disregarded or should have known of these material

qualifications to the statement of policy in the August 31, 1989 letter, and had an obligation to disclose them to the bank. The bank alleges that GEC and Plessey's conduct in this regard amounts to fraudulent misrepresentation or negligent misrepresentation.

**459**    In addition to claims arising out of the comfort letters, the plaintiff alleges certain representations made by representatives of GEC and Plessey amount to fraudulent or negligent misrepresentation.

THE LAW

Negligent Misrepresentation

**460**    The law of negligent misrepresentation in Canada was set out by the Supreme Court of Canada in the seminal case of Queen v. Cognos Inc., [1993] 1 S.C.R. 87. In that case, Iacobucci J., speaking for the court, stated the five elements of a claim in negligent misrepresentation at 110:

> The required elements for a successful Hedley Byrne claim have been stated in many authorities, sometimes in varying forms. The decisions of this court cited above suggest five general requirements:
>
> (1)    There must be a duty of care based on a "special relationship" between the representor and the representee;
> (2)    The representation in question must be untrue, inaccurate or misleading;
> (3)    The representor must have acted negligently in making said misrepresentation;
> (4)    The representee must have relied, in a reasonable manner, on said negligent misrepresentation; and
> (5)    The reliance must have been detrimental to the representee in the sense that damages resulted.

**461**    Each of these elements must be made out in order for the plaintiff to be successful in its claim of negligent misrepresentation.

> 1.    There must be a Duty of Care based on a "Special Relationship"

**462**    In Queen, supra, Iacobucci J. considered the nature of the special relationship that must exist between the parties before a duty of care will arise, and applied the approach adopted by the House of Lords in Caparo Industries plc v. Dickman, [1990] 1 All E.R. 568 (H.L.), in which their Lordships held that three criteria determine the imposition of a duty of care, and hence, the existence of a "special relationship": foreseeability of damage, proximity of relationship and the reasonableness of imposing a duty. In so doing, he noted at p. 117-118 that the duty of care is no longer restricted to situations of reliance on professional advice:

> In my opinion, confining this duty of care to "professionals" who are in the business of providing information and advice, such as doctors, lawyers, bankers, architects and engineers, reflects an overly simplistic view of the analysis required in cases such as the present one. The question of whether a duty of care with respect to representations exists depends on a number of considerations including, but not limited to, the representor's profession. While this factor may provide a good indication as to whether a "special relationship" exists between the parties, it should not be treated in all cases as a threshold requirement. There may be situations where the surrounding circumstances provide sufficient indicia of a duty of care, notwithstanding the representor's profession.

**463**    The Supreme Court revisited and refined the criteria for establishment of a "special relationship" in the recent case Hercules Managements Lid. v. Ernst & Young, [1997] 2 S.C.R. 165. In that case, LaForest J. held for the court that there ought not, in principle, to be any difference between the criteria used to establish a duty of care in negligent misrepresentation and the criteria applied in any other negligence case, and adapted the two-part test first described in Anns v. Merton London Borough Council, [1978] A.C. 728 (H.L.). The Anns test mandates that where there is a sufficient relationship of proximity between the parties such that carelessness on the part of one may be likely to cause damage to the other, it will give rise to a prima facie duty of care. Once the court has found that such a duty of care exists, it is then necessary to consider whether there are any considerations which ought to limit the scope of the duty or the class of persons to whom it is owed.

**464**    In adapting the notion of proximity to cases of negligent misrepresentation, LaForest J. stated at 188:

> In cases of negligent misrepresentation, the relationship between the plaintiff and defendant arises through reliance by the plaintiff on the defendant's words. Thus, if "proximity" is meant to distinguish the cases where the defendant has a responsibility to take reasonable care of the plaintiff from those where he or she has no such responsibility, then in negligent misrepresentation cases, it must pertain to some aspect of the relationship of reliance. To my mind, proximity can be seen to inhere between a defendant-representor and a plaintiff-representee when two criteria relating to reliance may be said to exist on the facts: (a) the defendant ought reasonably to foresee that the plaintiff will rely on his or her representations and (b) reliance by the plaintiff would, in the particular circumstances of the case, be reasonable. To use the term employed by my colleague, Iacobucci J., in Cognos, ... the plaintiff and the defendant can be said to be in a "special relationship" whenever these two factors inhere. [Emphasis added]

**465**    Regarding the second limb of the Anns test, Mr. Justice LaForest held at p. 197 that the court, in a claim of negligent misrepresentation, may look to such factors as "knowledge of the

plaintiff (or an identifiable class of plaintiffs) on the part of the defendant" and "use of the statements at issue for the precise purpose or transaction for which they were prepared", in order to determine whether there are any policy considerations which should limit the scope of the duty, such as the potential for indeterminate liability on the part of the defendants.

> 2.    The Representation in Question must be Untrue, Inaccurate or Misleading

**466**    In order to satisfy the second requirement of a claim in misrepresentation, the plaintiff must establish that the statement relied upon was untrue, inaccurate or misleading. In this regard, Iacobucci J. held in Cognos, supra, at p. 653 that failure to divulge highly pertinent information may, in some circumstances, amount to a negligent misrepresentation.

**467**    In addition, the court held at p. 658-659 that in some circumstances, an implied representation, as opposed to an actual representation, may give rise to actionable negligence:

> In my view, there is no compelling reason in principle, authority or policy for the proposition that, as a general rule, an implied representation cannot under any circumstances give rise to actionable negligence. ... On the other hand, there is considerable authority for the more flexible view that, in appropriate circumstances, implied representations can and often do, give rise to actionable negligence.
>
> In my opinion, a flexible approach to this issue is preferable. It is arbitrary and premature to declare as a general rule that nothing less than express or direct representations can succeed under the Hedley Byrne doctrine. ... It is unnecessary for me to set out in detail the circumstances in which so-called implied representations can be enough to sustain an action in tort for negligent misrepresentation. I prefer to leave this task to trial judges dealing with specific factual situations. [Emphasis in original]

**468**    This reasoning was followed by Mr. Justice Linden in Spinks v. Canada (1996), 134 D.L.R. (4th) 223 (Fed. C.A.) who noted that silence as to a fact may give rise to an implied representation. He stated at 236:

> A person may be "misled" by a failure to divulge as much as by advice that is inaccurate or untrue. In the same way that absent information can be "erroneous", as discussed above, missing information can be misleading. ... Consequently, the duty may be breached not only by positive misstatements but also my omissions, for they may be just as misleading.

**469**    In Cognos, it was argued that only representations of existing facts, and not those relating to future occurrences, can give rise to actionable negligence. Mr. Justice Iacobucci noted that there

were a number of authorities cited in support of this proposition, and proceeded on the assumption that these authorities were correct, without deciding the point, on the basis that the representations at the heart of the case before him concerned representations of existing fact.

**470**     The question of when a representation will amount to a material misrepresentation was considered by the British Columbia Court of Appeal in Kripps v. Touche Ross & Co. (1997), 35 C.C.L.T. (2d) 60 (B.C.C.A.) (Leave to appeal to the Supreme Court of Canada refused, [1997] S.C.C.A. No. 380, Nov. 7, 1997). Following a review of the case law, Finch J.A. stated at 85:

> From these submissions it would appear that there are two or three different tests for materiality. The first test is whether a representation might possibly affect a decision [made by a representee]; the second is whether a representation is capable of affecting a decision; and the third is whether a representation would probably affect a decision. I think that the first two tests are the same, and that the real distinction is between a representation that might possibly affect a decision and one that would probably affect a decision. [Emphasis in original]

**471**     The court did not decided which of these two tests was applicable, as on the facts before it, Finch J.A. was of the view that even the higher standard was met. In either case, the test is an objective one of the effect that the statement would have had on a reasonable person in the circumstances of the representee.

>          3.     The Representor must have acted Negligently in Making the Misrepresentation

**472**     The standard of care to be exercised by the representor is the same standard as is applied in other negligence cases, that of the reasonable person. This standard of care is an objective one, namely, what a reasonable person would do in the circumstances. The duty requires not only that the representor be honest and truthful, but that the representor exercise such reasonable care as the circumstances of the case dictate, to ensure that representations made are accurate and not misleading. See: Queen v. Cognos, supra. At p. 651-652 Iacobucci J. cited with approval the following passage from L.N. Klar, Tort Law (Toronto: Thomson Professional Publishing Canada, 1991) at 160:

> An advisor does not guarantee the accuracy of the statements made, but is only required to exercise reasonable care with respect to it. As with the issue of standard of care in negligence in general, this is a question of fact which must be determined in the circumstances of the case. Taking into account the nature of the occasion, the purpose for which the statement was made, the foreseeable use of the statement, the probable damage which will result from an inaccurate statement, the status of the advisor and the level of competence generally observed by others similarly placed, the trier of fact will determine whether the advisor was negligent.

Iacobucci J. elaborated upon the requirements of the duty, noting that it was not a duty of full disclosure, but rather a duty to take reasonable care. He added at p. 654 that the representor's belief in the truth of his representations is not relevant to a determination of whether the duty has been breached:

> Although the representor's subjective belief in the accuracy of the representations and his moral blameworthiness, or lack thereof, is highly relevant when considering whether or not a misrepresentation was fraudulently made, it serves little, if any, purpose in an inquiry into negligence. As noted above, the applicable standard of care is that of the objective reasonable person. The representor's belief in the truth of his or her representations is irrelevant to that standard of care. The position adopted by the Court of Appeal seems to absolve those who make negligent misrepresentations from liability if they believe that their representations are true. Such a position would virtually eliminate liability for negligent misrepresentation as liability would result only where there is actual knowledge that the representation made is not true; the basis of fraudulent misrepresentation. [Emphasis in original]

4.    The Representee must have Relied, in a Reasonable Manner, on the Negligent Misrepresentation

**473**    The fourth element of the tort is that the plaintiff must reasonably have relied upon the representation made by the defendant. As Mr. Justice Linden observed in Spinks v. Canada, supra, at p. 239, this is simply the universal requirement of proof of causation, necessary in all negligence cases in order to found liability.

**474**    In Kripps, supra, the British Columbia Court of Appeal considered the nature of reasonable reliance in a negligent misrepresentation case, and concluded that in some circumstances, reliance may be inferred by the court. However, the circumstances in that case were unusual, in that the trial judge had heard no oral evidence but proceeded on the basis of affidavits and transcripts of cross-examinations. As well, the trial judge had made no findings on the reliance issue, having previously found there was no misrepresentation. In addition, the plaintiffs claims of presumed or deemed reliance had been struck at the pleadings stage of the action, leaving only the claims of actual reliance. Hence, the court of appeal held it was in as good a position to draw these inferences as the trial judge had been. Finch J.A. stated at 89-90:

> Whether a representation was made negligently or fraudulently, reliance upon that representation is an issue of fact as to the representee's state of mind. There are cases where the representee may be able to give direct evidence as to what, in fact, induced him to act as he did. Where such evidence is available, its weight is a question for the trier of fact. In many cases however, as the authorities point

out, it would be reasonable to expect such evidence to be given, and if it were it might well be suspect as self-serving. This is such a case.

The distinction between cases of negligent and fraudulent misrepresentation is that proof of a dishonest or fraudulent frame of mind on the defendant's part is required in actions of deceit. That, too, is an issue of fact and one which may also, of necessity, fall to be resolved by way of inference. There is, however, nothing in that which touches on the issue of the plaintiffs reliance. I can see no reason why the burden of proving reliance by the plaintiff, and the drawing of inferences with respect to the plaintiffs state of mind, should be any different in cases of negligent misrepresentation than it is in cases of fraud.

**475**    The court concluded that it was sufficient, in a negligent misrepresentation action, for the plaintiff to prove that the misrepresentation was at least one factor which induced the plaintiff to act to his or her detriment. Where the misrepresentation was one which was calculated to induce the plaintiff to act or one which would naturally induce the plaintiff to act, the court held that reliance may be inferred. The inference of reliance may be rebutted by the representor.

**476**    Proof of the element of reliance on a misrepresentation involves a two step test. The first is a factual test, namely, whether the plaintiff relied upon the representation in fact. The second limb of the test requires a determination by the court, on an objective basis, as to whether the reliance was reasonable. This second requirement was described in Allen M. Linden, Canadian Tort Law, 6th ed (Butterworths: Toronto, 1997) at 445-446:

Reliance not only must be proven in fact but also must be demonstrated to be reasonable. The second part of the fourth requirement, therefore, means that only those injuries resulting from reliance reasonably placed on a defendant will be compensable. It follows that, to the extent injuries were sustained as a result of unreasonable reliance, recovery may be barred. In most cases, however, a plaintiff will be barred from recovery only to the extent the reliance was unreasonable. The notion of unreasonableness here simply suggests a limit on the degree of reliance a given factual scenario may bear. It does not suggest that, if a plaintiff steps beyond that limit, all recovery must be lost.

Nevertheless, where the facts suggest that any reliance whatsoever is unreasonable, recovery is rightly barred.

Fraudulent Misrepresentation

**477**    Fraud is the most serious civil tort which can be alleged, and must be both strictly pleaded and strictly proved. The main distinction between the elements of fraudulent misrepresentation and

negligent misrepresentation has been touched upon above, namely the dishonest state of mind of the representor. The state of mind was described in the seminal case Derry v. Peek (1889), 14 App. Cas. 337 (H.L.) which held fraud is proved where it is shown that a false representation has been made knowingly, or without belief in its truth, or recklessly, without caring whether it is true or false. The intention to deceive or reckless disregard for the truth is critical.

**478**    Where fraudulent misrepresentation is alleged against a corporation, the intention to deceive must still be strictly proved. Further, in order to attach liability to a corporation for fraud, the fraudulent intent must have been held by an individual person who is either a directing mind of the corporation, or who is acting in the course of their employment through the principle of respondeat superior or vicarious liability. In B.G. Checo v. B.C. Hydro (1990), 4 C.C.L.T. (2d) 161 at 223 (Aff'd, [1993] 1 S.C.R. 12), Hinkson J.A., writing for the majority, traced the jurisprudence on corporate responsibility in the context of a claim in fraudulent misrepresentation at 222-223:

> Subsequently, in H.L. Bolton (Engineering) Co. v. T.J Graham & Sons Ltd., [1957] 1 Q.B. 159, [1956] 3 All E.R. 624 (C.A.), Denning L.J. said at p. 172:

> \*\*\*

> "A company may in many ways be likened to a human body. It has a brain and nerve centre which controls what it does. It also has hands which hold the tools and act in accordance with directions from the centre. Some of the people in the company are mere servants and agents who are nothing more than hands to do the work and cannot be said to represent the mind or will. Others are directors and managers who represent the directing mind and will of the company, and control what it does. The state of mind of these managers is the state of mind of the company and is treated by the law as such. So you will find that in cases where the law requires personal fault as a condition of liability in tort, the fault of the manager will be the personal fault of the company. That is made clear by Lord Haldane's speech in Leonard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd."

> \*\*\*

> In the field of criminal law, corporate responsibility has its roots in civil law. In Canadian Dredge & Dock Co. v. R., [1985] 1 S.C.R. 662 ... Estey J., speaking for the Supreme Court of Canada, discussed the directing mind or identification theory and the respondeat superior approaches to corporate liability in a criminal context.

In tracing the development of the law, Estey J. referred to the decision of the Lord Chancellor, Viscount Haldane in Lennard's Carrying Co. v. Asiatic Petroleum Co., supra. He also made reference to the decision in Tesco Supermarkets Ltd. v. Nattrass, supra. After analyzing the previous decisions in this field of the law, Estey J. said at p. 311 [of C.R., p. 691 of S.C.R.]:

"In summary, therefore, the courts in this country can be said to this date to have declined generally to apply the principle of respondeat superior in the determination of corporate criminal responsibility. Criminal responsibility in our courts thus far has been achieved in the mens rea offences by the attribution to the corporation of the acts of its employees and agents on the more limited basis of the doctrine of the directing mind or identification. Corporate responsibility in both strict and absolute liability offences has been found to arise on the direct imposition of a primary duty in the corporation in the stature in question, as construed by the court. By what appears to be the same purely pragmatic reasoning, the courts of the United Kingdom find criminal liability in a corporation only by the attribution to it of the conduct of its employees and agents where those natural persons represent the core mind and spirit of the corporation. The United States federal courts are inclined, as we have seen, to find criminal liability in the corporation by vicarious liability where any employee-agent commits in the course of his employment, the criminal act."

\*\*\*

It is apparent that the law in Canada dealing with the responsibility of a corporation for the tort of deceit is still evolving. In view of the English decisions and the decision of the Supreme Court of Canada in the Dredging case, supra, it would appear that the concept of vicarious responsibility based upon respondeat superior is too narrow a basis to determine the liability of a corporation. The structure and operations of corporations are becoming more complex. However, the fundamental proposition that the plaintiff must establish an intention to deceive on the part of the defendant still applies.

See also: Standard Investments Ltd. et al. v. Canadian Imperial Bank of Commerce (1985), 52 O.R. (2d) 473 (C.A.) (Leave to appeal to Supreme Court of Canada refused Feb. 3, 1986).

**479**    In the case of fraudulent misrepresentation, there are circumstances where silence may attract

liability. If a material fact which was true at the time a contract was executed becomes false while the contract remains executory, or if a statement believed to be true at the time it was made is discovered to be false, then the representor has a duty to disclose the change in circumstances. The failure to do so may amount to a fraudulent misrepresentation. See: P. Perell, "False Statements" (1996), 18 Advocates' Quarterly 232 at 242.

**480**    In Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co. (1988), 54 D.L.R. (4th) 43 (B.C.C.A.) (Aff'd on other grounds [1991] 3 S.C.R. 3), the British Columbia Court of Appeal overturned the trial judge's finding of fraud through non-disclosure on the basis that the defendant did not remain silent as to the changed fact but was simply slow to respond to the change and could only be criticized for its "communications arrangements". In so doing, the court adopted the approach to fraud through silence established by the House of Lords in Brownlie v. Campbell, (1880), 5 App. Cas. 925 at 950. Esson J.A. stated at 67-68:

> There is much emphasis in the plaintiffs submissions and in the reasons of the trial judge on the circumstance that this is not a case of fraud "of the usual kind" involving positive representations of fact but is, rather, one concerned only with non-disclosure by a party which has become aware of an altered set of circumstances. It is, I think, potentially misleading to regard these as different categories of fraud rather than as a different factual basis for a finding of fraud. Where the fraud is alleged to arise from failure to disclose, the plaintiff remains subject to all of the stringent requirements which the law imposes upon those who allege fraud. The authority relied upon by the trial judge was the speech of Lord Blackburn in Brownlie v. Campbell. ... The trial judge quoted this excerpt:

>> ... when a statement or representation has been made in the bona fide belief that it is true, and the party who has made it afterwards comes to find out that it is untrue, and discovers what he should have said, he can no longer honestly keep up that silence on the subject after that has come to his knowledge, thereby allowing the other party to go on, and still more, inducing him to go on, upon a statement which was honestly made at the time at which it was made, but which he has not now retracted when he has become aware that it can be no long honestly perservered [sic] in.

> The relationship between the two bases for fraud appears clearly enough if one reads that passage in the context of the passage which immediately precedes it:

>> I quite agree in this, that whenever a man in order to induce a contract says that which is in his knowledge untrue with the intention to mislead the

other side, and induce them to enter into the contract, that is downright fraud; in plain English, and Scotch also, it is a downright lie told to induce the other party to act upon it, and it should of course be treated as such. I further agree in this: that when a statement or representation ...

**481**    Fraud through "active non-disclosure" was considered by the Court of Appeal for Ontario in Abel v. McDonald, [1964] 2 O.R. 256 (C.A.) in which the court held at 259: "By active non-disclosure is meant that the defendants, with knowledge that the damage to the premises had occurred actively prevented as far as they could that knowledge from coming to the notice of the appellants."

## APPLICATION TO THE FACTS OF THIS CASE

Misrepresentation in the First Four Comfort Letters

**482**    The plaintiff asserts a cause of action in negligent misrepresentation against Plessey based on the wording of the third paragraph of the first four comfort letters. In particular, the bank claims that the paragraph did not disclose that the policy referred to the management of Plessey Canada and Leigh by their own management, rather than by Plessey; that the policy did not require Plessey to do anything so that its subsidiaries would be in a position to pay their debts; that the letters were only statements of policy as at the date of the letters, and could not be taken to be statements of Plessey's policy as at the date of receipt of the letters by the bank, when the policy "might or might not" be that stated in the letter; and that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank receive nothing. In the alternative, the bank pleads that the third paragraph was a material misrepresentation because Plessey had, in fact, adopted no policy regarding Leigh, and asserts that there was no direct evidence led at trial that the board of Plessey had adopted the policy. I propose to deal with the latter submission first.

Existence of a "Special Relationship"

**483**    Plessey concedes that there exists a special relationship between it and the bank regarding the text of the comfort letters, and I agree. Applying the principles set out in Hercules Management, supra, it is reasonably foreseeable that the bank would rely on the statements in the comfort letter and reliance upon those statements, in the circumstances, would be reasonable. There are no policy considerations, such as indeterminate liability of the defendant, to preclude a finding that Plessey owed TD a duty of care.

The Representation Must be Untrue, Inaccurate or Misleading

The Plaintiffs Interpretation of the Comfort Letter.

**484**    The plaintiff submits that the third paragraph of the letters is materially misleading because Plessey had, in fact, adopted no policy with respect to any of its subsidiaries, including Leigh. TD's

misrepresentation argument is premised on the same interpretation of the comfort letter as was advanced above in the contract argument, namely that the bank understood the policy paragraph to mean that Plessey would manage its subsidiaries, including Leigh so that the subsidiaries would always be in a position to meet their financial obligations, and that Plessey had not adopted this policy. Hence, they assert that the policy paragraph was misleading. I have rejected this construction of the comfort letter above, in the contract portion of these reasons, and I adopt and reiterate that reasoning here. The interpretation urged by the plaintiff requires that words be implied into the third paragraph which are not there. In my view there is no basis in the evidence to find such an implied representation.

**485**    The bank's interpretation of the comfort letter is based upon the testimony of Patrick Noonan that this was his subjective understanding of the policy paragraph. The proper test however, is not what the plaintiff subjectively thought of the representation, but what a reasonable person, in all of the circumstances of the plaintiff, would have thought. See: Cognos, supra, at 131-132. In my view, the bank's interpretation of the comfort letter is not reasonable in the circumstances, nor is it supported by the totality of the evidence of Noonan and McDowell.

**486**    Noonan testified that he read the letter with a high regard for Plessey's standing, strength and reputation, and financial capacity to give effect to the stated policy. This is consistent with McDowell's evidence as to what constituted a strong comfort letter. McDowell testified that a well-written comfort letter was one from a responsible corporation and signed by its authorized officers. Which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if I make a commitment, I expect to fulfil it." These criteria are consistent with a perception of comfort letters as moral, rather than legal obligations.

**487**    Noonan testified that he was not involved in the negotiation or drafting of the first comfort letter, he never discussed the wording of the letter with anyone at Leigh, Plessey or GEC, nor did he direct the terms to be used in it. It was not his practice to discuss the wording of comfort letters with bank counsel, nor did he do so regarding the Leigh letter. He did not discuss the letter with Baker, who negotiated the letter from the bank's London office. In fact, it was never the responsibility of Noonan or anyone else in the Credit Division to negotiate the terms of documents like comfort letters. That responsibility rested with the account manager in the Corporate Banking Division.

**488**    Further, Howard Baker, who did negotiate the wording of the first letter, worked from a template comfort letter, which contained in the policy paragraph the additional words: "and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Those words were deleted by Baker from the draft comfort letter he sent to Plessey and were never included in the Leigh letters.

**489**    Finally, a Plessey guarantee was not on offer for the Leigh loan, and the bank knew this prior

to negotiating the first comfort letter. I am of the view that the interpretation urged by the bank, based on the evidence of Patrick Noonan's subjective view of the letter, is not one which would be held by a reasonable person in all the circumstances. The evidence does not support a finding that Plessey impliedly represented that it would cause Leigh to be managed in accordance with the policy. Such an interpretation amounts to a promise that directly or indirectly, the bank would be paid, and both parties knew a guarantee was not on offer.

Untrue, Inaccurate or Misleading

**490**    The plaintiff submits that the statement of policy in the third paragraph of the comfort letters was materially misleading because Plessey had adopted no policy at all with respect to Leigh. In this regard, the plaintiff asserts that nowhere in the internal Plessey documentation produced was there any evidence that the Plessey board had adopted a formal policy regarding management of its subsidiaries. The bank argues that if Plessey had such a company-wide policy, it would have to have been in writing and published throughout the company so that everyone required to know about the policy would be aware of it and understand it. I do not accept this submission, and the evidence is to the contrary.

**491**    I find as a fact that Plessey did have the policy stated in the third paragraph of the comfort letter. Indeed, such a policy is virtually axiomatic from a business management perspective. While the Plessey board may not have published a company-wide policy statement to the effect of paragraph three, Musgrave prepared a submission for the Plessey main board regarding each of the comfort letters, and the board did formally approve the issuance of each. The Plessey board did authorize the signatories to sign the comfort letters on behalf of the company, and this, in my view, is sufficient formal confirmation that Plessey had the policy.

**492**    It was the evidence of Ian Musgrave, which I accept, that Plessey did have the policy set out in the third paragraph, regarding both Plessey Canada and later Leigh, for the duration of his tenure at Plessey. Musgrave gave the following evidence regarding board's adoption of the policy:

> Q.    So just to be absolutely certain, the general instructions in writing dealt with the company policy that the wholly-owned subsidiaries of Plessey Company plc would be managed in such a way as to always be in a - or to be - such as to always be in a position to pay or to meet their financial obligations.
>
> A.    That's my understanding. Yes.
>
> Q.    Now, we - where is that written general instruction?
>
> A.    The section I'd always read as covering this is actually in general instruction number 215, which is at tab "C" in 227. ... It reads:
>
>> This instruction supersedes all current General Instructions in matters relating to levels of delegated authority where in conflict. However, it must be noted that it does not remove any statutory,

legal or contractual obligations of the directors or employees of The Plessey Company or any of its subsidiaries.

Certainly in the context of U.K. company law, it was a statutory, legal obligation of the directors of U.K. subsidiaries to manage the affairs of the company concerned so that they could meet all their obligations as they fell due. If they didn't, I think they were trading illegally, going under U.K. company law, and they should legally stop trading. So that's the section I had always looked at on that point. There is another section in the finance manual itself. Let me just find this, if I might. Yes. If you look at Exhibit 227, 1C. ... This section is headed "Policies Financial Accounting Balance Sheet". ... And then on the third page there's a paragraph at the top headed "Creditors":

> It is company policy to pay suppliers in accordance with the agreed credit terms. It is not permitted to take excessive credit, which may damage the Group's reputation or result in difficulty in obtaining supplies or services. Creditors and liabilities are recorded by reference to goods delivered and services received ...

Now, I fully expect that was written with trade creditors in mind, but I think the principle equally applies to any supply of services, which would include supply of credit.

So those are the bits I looked at to, if you like, to back up the claim that the company had a policy in that area. It's not something that I'm looking at post the event. These are sections which I looked at at the time to justify that type of statement.

Musgrave was pressed on the point and said:

A.    The policy is not defined precisely in the general instruction, nor anywhere else, as far as I can see, in precisely the same words that were used in Paragraph 3 of the comfort letter. However, my view at the time was that the second paragraph of the introduction section to GIP.215 set out a policy which had the same meaning, did not use the same words, or it didn't get there in quite the same way, but the meaning is the same. I don't think there was any particular need in the comfort letter to use precisely the same words as might have appeared in an internal company document.

**493**    In addition, Musgrave testified as to the application of the policy to the Plessey group:

> A.    Yes. I do. This was a policy that Plessey applied to the whole group, to all its subsidiaries and to joint venture companies where it was able to apply it. Essentially, the policy was that the management of the company concerned should manage the business of that company in such a way as to be always in a position, etc., etc.
>
> Q.    What role did the Plessey plc management have in that policy?
>
> A.    Well, they laid down the policy in the first place and I think if it came to their attention that the policy was not being applied by the management of any particular subsidiary, they would clearly, at least in the first instance, remind the management of the policy. That would hopefully be enough to ensure policy was applied by the management.
>
> Q.    During your time, and did that policy predate this day, December 22nd, 1988?
>
> A.    I'm certain it did.
>
> Q.    And in your time at Plessey till you left Plessey at the end of August, 1989, did that policy ever change?
>
> A.    No.

Musgrave elaborated on the meaning of the policy under cross-examination:

> THE WITNESS: Excuse me, your Honour. There's actually something I'd like to say just before we start. There was an answer I gave to Mr. Campion on Thursday afternoon which, at the time, I wasn't comfortable with. I've reflected quite a lot on the weekend and I think - I gave him the wrong answer. It concerns the area of participation in a company's management. I think Mr. Campion suggested that a parent company, by setting down through policies, procedures, levels of delegated authority, but the parent company was actually participating in the management of the subsidiary -- concerned. I agreed with that. I was uncomfortable with it at the time. I have reflected on it. I don't now agree with the suggestion. It seems to me that the legal responsibility for managing the affairs of a subsidiary lies with the board of the subsidiaries concerned. That is certainly the case in English law, and I expect it is in Canadian law, as well. And nobody can take that await from them.
>
> Now, having said that, the management has to manage the affairs of the company, manage the business within a whole series of constraints. They might be constraints laid down by the government in the form of law environmental laws, labour laws, customer protection laws. The management has to have regard to all of those. The management may have to regard - have regard to policies laid down by a regulator, if it's operating a regulated industry. The management

might have to have regard to policies and procedures laid down by some professional body, if that's relevant. In the case of a company which is a subsidiary within a group, almost certainly it will have to have regard to the policies and procedures laid down by the parent company of the group. But I don't see any difference with any of that - I don't think any of those situations involve the person who is setting out the policies, procedures, laws, regulations, whatever, participating in the management of the group. I think the management of the subsidiary have to manage the affairs of the company concerned within those policies and procedures.

So, on reflection, I disagree with Mr. Campion's suggestion. I think you can actually take it a stage further. As I said earlier, certainly in the U.K. it is the board of a company who are responsible for the management of that company. And they can't give away that responsibility. If they allowed someone else who wasn't a member of that board or didn't report to that board to participate in the management of the company, I think they would be in a very shaky legal position, and I'm certain that Plessey did not structure its delegated authorities to put the members of all its subsidiaries' boards in that sort of position. So I'm afraid I have got to change my mind on that one. [Emphasis added]

494    In addition to the evidence of Musgrave, I note that shortly following its takeover of Leigh, Plessey implemented a series of financial controls, in order to monitor Leigh's performance. These included a requirement that Leigh provide Plessey with key financial data on a monthly, basis, including external sales, operating profit, profit before tax and cash flow. Binnie Sammon testified that Plessey would have begun receiving this information from Leigh by July 1988. In addition, Plessey controlled the borrowing and guarantee limits of Leigh, which were set by the Plessey main board. Leigh could not exceed these limits without main board approval. Leigh, along with the other Plessey subsidiaries, was required to produce an annual budget, for approval by Plessey. This requirement was continued by GEC following the takeover of Plessey. When it became apparent, in the spring of 1989, that Leigh could not support the interest payments associated with the intercompany debt, Plessey converted the debt to preference shares, thus increasing the equity capital on Leigh's books and eliminating the interest payments. Finally, throughout the period of the first four comfort letters, Leigh did meet its financial obligations, and no evidence has been led to the contrary. All of this evidence supports the finding that Plessey did have the policy as stated on the face of the comfort letters, and acted in accordance with it, even though it had no legal obligation to do so. Accordingly, I find that the comfort letter was not misleading in this respect, and the bank's claim in this regard must fail.

495    In the alternative, the bank claims that the comfort letter was materially misleading because the policy paragraph did not disclose that: 1. the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed

by their own management; 2. that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; 3. that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and 4. that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank would receive nothing under its loan facility. These submissions are premised upon an acceptance by the bank of the evidence of Ian Musgrave as to the interpretation of the comfort letters and an assertion that this evidence is inconsistent with the bank's interpretation of the comfort letters. I have rejected the bank's interpretation for the reasons set out above.

**496**    Ian Musgrave left Plessey in 1989 prior to the hostile takeover by GEC Siemens, and prior to Leigh's demise. He was approached by National Power plc in 1989 and accepted an offer from them. For the past three years he has been employed as group cash manager for a Norwegian company called Kvaerner, which has between 400 and 500 subsidiaries worldwide. In that position, Musgrave is responsible for setting up the group banking systems globally and controlling the day to day liquidity of the entire group. Borrowings for the group are in the range of 1.5 billion pounds, and Musgrave testified that he deals with banks on a daily basis. I accept Musgrave's evidence, which in my view is in accord with a reasonable, objective interpretation of the comfort letter. In addition, I note that Musgrave's evidence was consistent with that of Robert Wicknam, the expert banking witness.

**497**    The first of the bank's assertions is that the policy statement was misleading because it did not disclose that Leigh was to be managed by its own officers and directors. I cannot accede to this submission. In my view, it is self evident, and would be to any reasonable person in the circumstances of the bank, that Leigh was to be managed by its own management. In this regard, I note the evidence of Musgrave, above, that it would be an improper delegation of authority of the board of directors of Leigh to permit the company to be managed by a party other than an office holder of the company. I agree. A bank is a commercially sophisticated plaintiff, and a reasonable party in the position of the bank would have been aware of this provision of company law.

**498**    The second assertion of the bank is that the paragraph was misleading in that it did not disclose that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay the bank. On the contrary, I am of the view that this is exactly what the policy paragraph says, clearly and on its face. I have set out the reasons for this conclusion in the section on contract, and need not repeat them again here. Similarly, the comfort letter does carry a degree of value in the commercial context, and for the reasons outlined above, is not commercially hollow.

**499**    Regarding the third assertion, while I found above that the wording of the third paragraph does not contain a contractual promise by Plessey to have the policy into the future, I am of the view that the comfort letter does contain a continuing representation as to Plessey policy. The letter is not misleading in this respect, as this is consistent with the bank's reading of the letter and also

with Musgrave's evidence:

> Q.    I take it that it was your understanding that this was a statement of continuing policy.
>
> A.    I think, as the word stands, it's a statement of our policy at that point in time. It is our policy. We don't say our policy will continue to be. But I think, if the policy changed, if it had changed at any point in time, I would, I think almost certainly, have gone back to the bank, this bank and any other bank who had a similar comfort letter, and say; Look, our policy has changed.
>
> Q.    I see. So you'd feel obliged to go to the bank, policy changed?
>
> A.    Yes. I don't think we were obliged in the legal sense, because it's simply a statement of policy at the time saying it doesn't commit us to notify the bank of a change of policy. But as a matter of good practice, I think I would have gone back and informed the banks, not just Toronto-Dominion but any bank, if policy in this area had changed.
>
> Q.    But you weren't legally obliged here?
>
> A.    I don't think we were.

Hence, for all of the above reasons, I find that the first four comfort letters are neither untrue, inaccurate, nor misleading, and the bank's claim in negligent misrepresentation must fail.

Fraud and Negligent Misrepresentation in the Fifth Comfort Letter

**500**    In the alternative, the bank claims that even if Plessey had a policy which was accurately described in the first four comfort letters, that policy ceased to exist or became subject to "material qualifications" prior to the bank's receipt of the fifth letter. In the further alternative, the bank asserts that the policy changed at some time following receipt of the letter on December 27, 1989 and the bankruptcy of Leigh on April 12, 1990. The bank claims that Plessey and GEC knew, recklessly disregarded, or should have known of the "material qualifications" to the policy, and had an obligation to disclose them to TD. Their failure to do so, the bank asserts, amounts to fraudulent or negligent misrepresentation.

**501**    The bank submits, as the basis for this claim, that GEC, knowing of Leigh's financial results following the Stanmore meetings in late November, had not adopted any settled policy with respect to Leigh. I cannot accede to these submissions. While GEC, in the months following the Stanmore meetings, may have had reservations as to whether it wanted to become 100 per cent owner of Leigh, these reservations and the uncertainty as to Leigh's ultimate ownership, were unrelated to the management policy for Leigh as stated in the fifth comfort letter, and the letter is not misleading in this respect.

**502**    The bank also asserts, as the basis for this claim, that Plessey, GEC and Siemens did not have a common understanding of what their policy was for Leigh and that GEC and Siemens never discussed or came to a specific agreement as to what Plessey's policy for Leigh was to be. I

disagree. Anderson testified that following his revisions to the comfort letter, he sent a copy of it to everyone at GEC, Siemens and Plessey who had an interest in the letter, in order that they might comment upon it. Both Andy Hafner and Philip Gerdine received a copy of the letter, and neither commented upon it to Anderson, who interpreted this as approval from Siemens. Moreover, I find that the evidence of Gerdine and Newlands is consistent as to the application and substance of the policy.

**503**   The policy stated in the third paragraph was a policy as to Leigh's management, and I find as a fact, based on a consideration of all the evidence, that policy remained in place throughout the material period of time, right up until immediately before the bankruptcy of Leigh.

**504**   Both David Newlands and Philip Gerdine gave evidence in this trial, and both testified that Plessey continued to have the policy stated in the third paragraph of the comfort letter following the takeover. Gerdine, who was the co-managing director of Plessey following the takeover, stated in evidence:

> Q.   I'm suggesting to you that in April, 1990, as you look back on the period September '89 to April '90, you must have concluded that Plessey never had the policy referred to in the third paragraph of the letter we have just referred to during that period, namely September '89 to April '90. Do you agree with me?
>
> A.   I don't agree for this reason: That I think that with respect to worldwide operations, Plessey had this policy, which is a very simple policy, which says that we are going to supply the direction on the resources so that - and delegate to the 178 affiliates of Plessey so that they would be in a position to be managed in this way to meet financial obligations, because there are just so many alternatives available. The opposite one is simply unacceptable, that they would be unable to meet any financial obligations. So that would not be acceptable. There's another one which is Plessey's policy to run each of these subsidiaries, and it certainly didn't do that, it delegated. And I thought about this at some length about what this policy meant. It had to be in place during the entire period, and then come shortly before all the facts were in, that there was something terribly wrong here, that policy would change with respect to Leigh on that day. And that was a unique event. But frankly, even today, Plessey's policy is as stated here, in my opinion.

Gerdine also testified as to the substance of the policy:

> Q.   Do I take it that what you're saying is, is that Plessey had a policy that - Plessey would see that Leigh would be managed in such a way as to always be in a position to meet its financial obligations?
>
> A.   Well, yes, again, it's just slightly different from that. It's that Plessey would provide the resources in management, in financial instruction, in various things

that would permit Leigh to run its business in a position to meet its financial
obligations. And there is an important distinction there of what Plessey was
doing, because there is a policy at Plessey on delegation which is important, that
these people operate their own businesses, and Plessey sets the guidelines.

Q.    As I understand your answer, as part of that, Plessey would supply resources,
management, and financial instructions and various things to Leigh as part of that
policy.

A.    Yes.

Q.    And when you use the term "resources", that would include the financial support
from Plessey.

A.    It would include basic investment, because the way Plessey or any parent would
manage a subsidiary, at least in my view, is, it provides the management and the
basic financial resource to carry on its business. And it - then the business itself
does the business itself.

Q.    And when you say that, it would, in this resources, provide financial support if
needed.

A.    I'm not sure you can say that. It might or it might not, depending on the
circumstances.

Q.    And I take it, then, having regard to those answers, that I'm correct in saying that
you read this policy as saying - read this paragraph as saying that as long as the
policy was in place, Leigh would be able to pay The Toronto-Dominion Bank.

A.    I'm not sure if that follows. I mean, the policy warn place for the fundamental
input, but I'm not sure that the last part of that sentence would apply necessarily.
We would hope it would apply, but what Plessey did was provide this
fundamental policy guidance and support by, making the investment and putting
the management, and that was Plessey's policy. What they do with it is their
business. That's how I understood it.

505    David Newlands was the finance director of GEC and the person who "blessed" Anderson's
revisions of the comfort letter prior to its signature and delivery. His evidence was, in substance, the
same as that of Gerdine:

A.    Thirdly, that it was Plessey's policy that Leigh be managed so that it could pay its
bills as they fell due.

Q.    Yes.

A.    And fourthly, the letter replaced earlier letters and did not constitute a legally
binding commitment.

Q.    And again, I want you to focus on what you thought at the time. Do you recall
anything further as to why you thought it was fine?

A.    I thought all those statements were explicit and statements that Plessey could
properly make. This was from a common sense point of view.

***

Q.   I take it that except by agreement during the period takeover date to the corridor conversation date, this policy, as stated in the latter August 31, 1989 found at tab 21, was not in place.

A.   I wouldn't take that at all. I can't envisage how, when a company has a policy, that its subsidiaries be managed in such a way that they meet their bills as and when they fall due can ever be a policy that wouldn't exist. It would be a very odd company that didn't have such a policy. Any company - I mean, it's almost a statement of the obvious, that you would seek to have your subsidiaries run in such - in that sort of way, which is why I didn't have any problem with the policy in the 31st of August letter, and I don't believe that Ross's changes actually changed the meaning of that statement, either. So it seemed to me - I don't mean to put it the wrong way, but a motherhood statement, it seems a sensible policy for any company to have.

***

Q.   Now, obviously in the letter, in the third paragraph, there is the Plessey policy statement.

A.   Yes.

Q.   Or statement about the Plessey policy. I take it that the policy, as far as you understood, was in place certainly when the letter was sent and was true when the letter was sent.

A.   Yes.

506   In addition to the evidence of Newlands and Gerdine, I find that Plessey and GEC acted in accordance with the policy throughout the material time. Colin Justice, divisional finance director of PESL was dispatched to Leigh to assist with the transition to GEC accounting principles and to assist the Plessey management with the ETC reviews, which were ongoing. Justice visited Leigh periodically through the fall of 1989 and assisted in the preparation of financial data presented at the Nov. 28 and 29 meetings at Stanmore, and at the meetings with Dr. MacBean in early January, 1990. At these January meetings, MacBean, who by then was aware of the increasingly bleak financial picture at Leigh, tasked Driscoll with preparation of a feasibility analysis of the various options available to Leigh. While these options did include closure of the business, other options contemplated the continued viability of Leigh, including restructuring, integration with Canadian Marconi, and sale to a third party. Justice assisted in the analysis. It is clear that Plessey and GEC were still trying to find solutions which would enable Leigh to continue as a viable entity. In this period, Driscoll, along with various representatives of Plessey and GEC Marconi met repeatedly

with the Canadian government. The government was Leigh's main customer, and the purpose of the meetings was to negotiate some contractual relief for Leigh.

**507**    In the same period, the Red Team review was initiated to investigate the technical situation at Leigh and to ascertain the source of Leigh's contractual difficulties. Throughout this period, Leigh continued to meet its obligations as they became due.

**508**    Once Plessey co-managing director Philip Gerdine became involved with Leigh, he too made vigorous efforts on Leigh's behalf, attending a number of meetings with the Canadian government, and meeting with Leigh management. Even after the bank had frozen the loan, Gerdine prepared a "save Leigh" proposal. In early April, the Red Team had reported that Leigh had numerous serious engineering problems in relation to the SHINCOM contracts, and that Leigh was incapable of performing its contracts from a technological perspective. Nevertheless, Gerdine and others continued their efforts on Leigh's behalf and made further attempts to negotiate relief from the Canadian government. It was not until the government finally indicated on April 9 that no relief would be forthcoming, that the decision was taken to place Leigh into bankruptcy. Throughout this period, Leigh continued to meet its obligations as they became due.

**509**    Accordingly, if Plessey did change its stated policy regarding the management of Leigh, I find that such change did not take place until the decision was taken that Leigh was terminal and bankruptcy was the only option. Only then did the policy of Plessey, as stated in the third paragraph of the comfort letter, become misleading. Up until that point, Plessey had actively supervised the management of Leigh and endeavoured to solve its problems. By the time the decision was made to abandon Leigh, the bank had already frozen the loan, no further funds had been advanced, and no damages incurred by the bank. Hence, there is no basis for a finding of negligent or fraudulent misrepresentation in the fifth comfort letter.

**510**    Even if I had found that the statement of policy in the fifth comfort letter was materially misleading, I am of the view that any reliance placed upon, the statement of policy by the bank was not reasonable, having regard to all the evidence.

**511**    Plessey became the target of a hostile takeover bid by GEC and Siemens in November, 1988. The bank was aware of this from the time the hostile bid was announced, and was also aware that GEC and Siemens intended to dismantle Plessey and divide up its assets between them. One of Musgrave's last acts at Plessey was to review the fourth comfort letter, which Plessey sent to the bank even though the bank had not asked for it. When Exton forwarded the letter to Young, he noted that Plessey felt it was "appropriate" to send the letter, due in part to the hostile takeover bid.

**512**    Following the success of the hostile takeover bid in September 1989, the Plessey management was decimated. Virtually all of the prior Plessey executive and managers either resigned or were terminated by the new owners. These were the people with whom the bank had been dealing regarding Leigh. The new owners, and particularly GEC, were large companies with whom TD had no existing relationship, despite repeated attempts to develop one over the years.

**513**    Plessey was a borrower of funds from banks, while GEC was referred to as a "cash mountain" with over 1 billion pounds in cash reserves, over and above its other assets. One of Anderson's main responsibilities was the daily investment of this surplus on the most favourable terms possible. Rather than being dependant on banks and their goodwill for funding, GEC dealt with banks as a depositor of huge sums of money. Banks eagerly vied for GEC's business, including TD.

**514**    Throughout the piece, both before and after the hostile takeover, Leigh kept the bank informed of its contract difficulties, including delays and missed milestones, all of which had a negative impact on Leigh's cash flow. The bank knew that the Leigh loan was continually climbing. On several occasions Leigh exceeded its authorized credit and went into an overdraft position. Leigh provided cash flow forecasts to the bank, including a forecast in late November projecting a peak of borrowings in December of $43.3 million. In December, the bank was informed that Leigh had laid off 80 people, and that a second tranche of layoffs was anticipated early in the new year.

**515**    Finally, Leaney read and accepted the fifth comfort letter, which included the added language in the last paragraph that the letter did not constitute a legally binding commitment. This was the first comfort letter received from Plessey since the hostile takeover, and the change from the wording of the four prior letters should have signalled a warning to the bank.

**516**    In all of these circumstances, I find that any reliance placed upon the policy paragraph by the bank was not reasonable, and hence the claim in misrepresentation must be dismissed.

Conduct Outside the Letters

**517**    In addition to the causes of action arising out of delivery of the comfort letters, the bank asserts a number of causes of action in negligent or fraudulent misrepresentation arising out of the conduct of several individuals.

Tantamount to a Guarantee

**518**    In particular, the bank asserts that Plessey is liable in negligent misrepresentation for the alleged statement by Ian Musgrave to Greg Young at TD that the Plessey comfort letter was "tantamount to a guarantee". Following a careful consideration of all the evidence, and for reasons which are set out above in my recounting of the evidence I have found as a fact, on a balance of probabilities, that Musgrave did not make this statement to Wilson. Consequently, the bank's claim in this regard must fail.

The Justice Statements

**519**    In addition, the bank claims that statements made by Colin Justice in two telephone conversations with Wilson of the bank constituted fraudulent or negligent misrepresentations. Regarding both conversations, the evidence is uncontroverted. TD urges the Court to draw an