adverse inference from the fact that Plessey chose not to call Justice as a witness, though the nature of the inference to be drawn is not particularized. I decline to draw an adverse inference, on the basis that the statements attributed to Justice were admitted by the defendant, and his evidence was not necessary. I observe that the plaintiff did not call Smith or Dean from Leigh's finance department to testify.

**520**   The bank alleges that in the first conversation, which took place in late November, Justice and Dean were both on the call. Either Justice or Dean discussed the financial condition of Leigh and advised Wilson that Leigh would be receiving payments totalling $11.4 million in January. The bank alleges that Justice was aware at the time of the call that Leigh was reporting a loss to the end of September, 1989 of $18.85 million, and knew of the ETC results regarding Leigh's contracts. The bank asserts that "Justice was conveying to the bank that the Bank could increase line to Leigh because Leigh was merely suffering cash flow problems" and that Justices statements amount to negligent misrepresentations.

**521**   I am unable to accede to this submission. This conversation must be placed in context. The late November conversation was the first of only two occasions on which Justice ever spoke to the bank. On November 8, Wilson met with Dean at Leigh's offices, and Dean informed him that "Leigh's numbers are getting worse" that there were legal disputes with some of the SHINCOM contractors, and that Leigh might require a further $10 million from the bank. On November 23, Wilson had a conversation with Dean alone, in which Dean requested a further $5 million from the bank, as Paramax was withholding payments owed to Leigh. In that conversation, Dean informed Wilson that Leigh would invoice Paramax for about $10 million in December, which they expected to receive in January.

**522**   Regarding the conversation in which Justice participated, this was the first time Justice had had any contact with anyone at TD. Wilson was unable to recall who had said Leigh would receive Paramax payments in January, Justice or Dean. On this basis alone, I am not prepared to find that Justice made a negligent misrepresentation to TD. Moreover, regardless of who made the statement, it was true. Leigh did expect to receive the payments, did in fact receive them in early January, and applied them to pay down the TD operating line. Finally, I am not persuaded that even if Justice had said the payments were due in January, that Wilson would have relied upon the statement from Justice. Wilson had never spoken to Justice before. He knew that Dean was the vice president of finance at Leigh and had spoken to him on several occasions. Dean was the person who had previously broached the subject of the extended line of credit and the expected payments in January. If Wilson did rely on these representations, it is more probable that he relied on the statements made by Dean, and I so find.

**523**   The second conversation between Justice and Wilson took place on December 21. In that conversation. Wilson asked Justice for financial statements for Leigh, and Justice responded that the statements were "not available", "due to the takeover with acquisition accounting issues". The fact that Justice made these statements is admitted by Plessey. The bank asserts that to Justice's

knowledge, some financial statements for Leigh were available and that this statement by Justice was intentionally false, or made so recklessly as to amount to fraud. In the alternative, the bank asserts that the statement amounted to a negligent misrepresentation.

**524**   In my view, the explanation given by Justice to Wilson, that the financial statements were not ready due to the acquisition accounting issues, was misleading. Although the explanation was accurate as far as it went, in that the adjusted financial statements were not available (and indeed were never finalized prior to Leigh's bankruptcy), the statement was misleading in what it failed to disclose. By the time Justice made this statement to Wilson, he had assisted in the preparation of the financial information presented at the Stanmore meetings on November 28 and 29. He had attended those meetings with Dean and Driscoll, and knew that Leigh had some financial data available, even though the reports were not finalized using GEC format. He also knew that by this time, Leigh was reporting a loss to the end of September 1989 of more than $16 million, and that it was the quarterly financial statements for this same period, to the end of September, which had been due to the bank almost two months earlier. In these circumstances, it was misleading of once to simply tell Wilson that the statements were not available due to the purchase accounting issues, and to omit any reference to the financial results Leigh did have.

**525**   However, while the statement made by Justice was misleading, I am not prepared, on the evidence before me, to find that the bank relied upon it. Again, the December conversation must be placed in context. At the November 8 meeting at Leigh, Dean was asked for the financial statements for the third quarter and he responded that they were not available "due to the acquisition accounting issues had not been resolved." As noted above, Dean told Wilson at this meeting that Leigh's numbers were getting worse, that there were difficulties with the SHINCOM program, and that Leigh might require an increase in its bank line. Dean also said that a new cash flow forecast would be forthcoming, and subsequently sent the bank a revised forecast projecting peak borrowings of $43.3 million in December.

**526**   In the late November phone call, Justice was introduced to Wilson as the Plessey Divisional Finance Director. His explanation of his role was that he was "assisting GEC with respect to Leigh," without further elaboration. In this phone call, Wilson was advised of the intended layoff at Leigh, which he considered somewhat positive. He did not ask about the overdue financial statements. By December 6, Wilson had received the revised cash flow forecast from Leigh, and also knew that Ross Anderson at GEC was personally monitoring the Leigh borrowings weekly, and that Plessey had authorized availability of $45 million but had only advised Leigh of a $41 million limit in order to "keep pressure on Leigh to manage its cash flow".

**527**   The conversation on December 21 was initiated by Justice to tell Wilson of the lay-off at Leigh and to advise him that Dean had been terminated and replaced by Pat Smith. This was the second and final conversation Justice had with the bank. Wilson noted in his memo of the call that he took the opportunity to discuss with Justice "in some detail" the possibility of TD providing a fairness opinion in connection with the potential merger with Canadian Marconi, and that he told

Justice TD "would be very interested" in providing the opinion. In his detailed record of the call, Wilson devoted half of his memo to discussion of the layoff at Leigh, and the other half to the fairness opinion issue. Wilson made no reference whatever in his memo to the request for financial statements or Justice's reply that they were not ready due to the acquisition accounting issues. Nor did he ask Justice any questions about the accounting issues in the phone call, or if there were any financial statements available in some other format.

528     Justice told Wilson that he would return to Canada in January to assist with Leigh's budget meetings. Implicit in the notion of budget meetings is that there is a budget to be discussed, yet Wilson never followed up on this. He neither asked for the results of the budget meetings in January, nor did he ask for a copy of the budget or any underlying documentation. Indeed, he did not contact Leigh to ask about the financial statements again until February 21, two months later.

529     Finally, when the bank did receive the financial statements in March, 1990, they did not react to them. It was not until Gerdine called the bank himself, several days after the statements had been delivered, that anyone from the bank made any comment upon them. Even then it was Gerdine's evidence that Leaney sounded surprised that anything was wrong, and he testified that it was evident to him she had not seen the financial package. In all of these circumstances, and particularly in light of the scant contact between Justice and the bank; the fact that Wilson failed to record any reference to the statement by Justice in his detailed memo of the call; the fact that the responsibility for providing the statements lay with Leigh and not Justice; the fact that the bank did not know the extent of Justice's involvement with Leigh's finances; the fact that Dean had made the same statement to the bank himself two months earlier; and in light of the bank's failure to react to the statements until contacted by Gerdine, I am unable to find that the bank relied or acted upon the statement made by Justice. Hence, one of the essential elements of negligent and fraudulent misrepresentation has not been made out. Further, the Justice statement was not a representation of a continuing nature and, as is set out below, the plaintiff has suffered no damages. The claims in negligent and fraudulent misrepresentation are dismissed.

530     I note in passing that the question of any liability which may attach to Leigh for misrepresentation or fraud is not before this court, and thus I make no comment upon it.

531     Even if I had found that the remarks made by Justice amounted to a negligent misrepresentation, I would not have found the statement to be fraudulent. I am mindful of the requirement that fraud must be strictly pleaded and strictly proved. In order to prove fraud, the dishonest mind must be established. The statements made by Justice were, strictly speaking, true. Leigh never produced a finalized set of financial statements adjusted for purchase accounting issues prior to the bankruptcy. In addition, Newlands testified that Justice had provided him with a memo in October, 1989 indicating the technical baseline at Leigh was insecure, thus casting doubt on the accuracy of all the numbers Leigh produced. For these reasons, and given the paucity of evidence, I am not prepared, on a balance of probabilities, to draw the inference that Justice acted deliberately or recklessly in making the statement to Wilson.

**532**    Moreover, applying the principles set out in Canadian Dredge & Dock Co., and supra, B.G. Checo, supra, I am not persuaded, on the basis of the evidence before me, that Justice was a directing mind of either GEC or Plessey, such that the corporations should be liable in fraud. Justice was not directly employed by GEC. He was the divisional finance director for PESL, however, no evidence was led as to the nature or scope of his responsibilities in that position. I am unable to conclude that he represented a directing mind of either GEC or Plessey, nor that he was acting within the scope of his authority as an employee when he discussed the financial statements of Leigh with the bank. For this reason as well, the claim in fraud must fail.

The Anderson Statement

**533**    On February 22, 1990, at a meeting in London, Anderson told Exton that the possibilities for Leigh "include Marconi acquisition or Siemens acquisition but the main problem is valuation of Leigh's worth to GEC or Siemens." The bank asserts that prior to this conversation, on February 2, Anderson had been told by the treasurer of CMC, Gerry Stuurop, that "Leigh will owe banks $50 to $60 million soon and is worth about negative C $30 million versus cost $110 million" and that Stuurop had told him, as he recorded in a note: "CMC very seriously considered advising Plessey to walk away, when they saw "my" letter of support to Toronto Dominion." The bank had asserted a cause of action against GEC in fraud based upon these statements, however, the fraud allegation was abandoned by the plaintiff in argument. In any event, I find that there is absolutely no evidence to support such an allegation.

**534**    The bank submits that Anderson did not convey this information to Exton and that as a consequence, GEC is liable in negligent misrepresentation. I am not persuaded by this submission. Mr. Anderson had virtually no recollection of either the meeting with Stuurop or the meeting with Exton, and his evidence regarding both was purely reconstructed. He said under cross-examination that he did not recall receiving the information from Stuurop on Feb. 2, but that it was possible. He gave this evidence based on an entry in his diary, and because his notes of the information from Stuurop were written on the face of a memo dated December 21. The next document on top of this in his file was a letter from Wilson dated Feb. 21. Anderson testified his practice was to make notes on the top memo in his file until the document was superceded by a new addition to the file, although he also testified that the documents were sometimes out of order, as they were simply placed loosely in a plastic file and were not held together in order by any kind of document clip.

**535**    Further, the meeting must be placed in context. Mr. Exton was not responsible for the Leigh account. Anderson was the treasurer of a huge multinational corporation, with whom the bank, and particularly Mr. Exton, had been attempting to develop a direct business relationship for some time. Leigh was a minuscule part of the GEC group. Leigh was purchased by Plessey for $107 million cdn. Plessey was itself purchased by GEC and Siemens for $4.5 billion U.S., and GEC alone was worth 6.5 billion pounds. The purpose of the meeting was not to discuss Leigh and find that Leigh was discussed in the meeting only in passing. Exton used the Leigh relationship only as a door-opener with GEC, in order to develop business opportunities with the company. Indeed,

Anderson asked Exton for a separate 50 million pound loan facility in the meeting.

**536**    In these circumstances, I cannot find that Anderson owed Exton a duty of care. In my view, it was not reasonably foreseeable that Exton or the bank would rely on the statement about the valuation of Leigh, or any omission from that statement, to its detriment. This claim in negligent misrepresentation is dismissed.

The February 26 Memo

**537**    The bank asserts that GEC and Plessey are liable in fraud for their failure to direct Driscoll to deliver the financial statements due to the bank, following his February 26 memo asking for direction in this regard. The bank argues that Leigh's behaviour in knowingly failing to produce the financial statements amounts to fraud and deceit, and that Plessey and GEC were parties to this deception, as "Plessey and GEC must be taken to have known that Leigh was not going to deliver the financial statements to the bank without their direction." I cannot accede to this submission.

**538**    In the first instance, I note that TD raised this allegation of fraud for the very first time in its written argument submitted at the conclusion of trial. It was not pleaded in the statement of claim, although the claim has been amended twice, most recently in April, 1996 when several new claims were added. The parties spent over six years in pre-trial preparation. The statement of claim does refer to Driscoll's February 26 memo, and hence, the bank could have pleaded the fraud allegation, since it was aware of the document upon which it is based.

**539**    The defendants were denied the opportunity to respond to this very serious allegation through cross-examining witnesses or calling witnesses of their own in order to refute it. The prejudice to the defendants in this regard is considerable.

**540**    Moreover, the bank has not identified any specific person at GEC or Siemens who is alleged to have had the dishonest mind which is an integral part of any fraud claim. In order to attach liability to a corporation for fraud, as noted above, the fraudulent intent must be established on the part of a natural person. I reiterate that fraud must be strictly pleaded and strictly proved.

**541**    Notwithstanding that the defendants have not had an opportunity to properly meet this allegation, in my view the plaintiff has failed to establish a case for fraud. The contractual obligation to provide the financial statements was that of Leigh and not of either GEC or Plessey. The memo was sent by Driscoll to Rickard and Alexander, both of GEC Marconi, and to Justice. None of these people gave evidence at this trial, nor was detailed evidence led about the nature or scope of their duties and responsibilities. No evidence was led as to their reaction, if any, to the memo. The only evidence of any, response to Driscoll's memo is a copy of the memo, produced by GEC, with the handwritten notation "must tell if they ask". This notation is admitted by GEC to be in the handwriting of David Rickard. Rickard and Alexander were not employed by GEC, but by GEC Marconi, a GEC subsidiary which is not a party to this action. The plaintiff has failed to establish a dishonest intent on the part of any person sufficient to attach liability to either GEC or

Plessey. I am not prepared to draw an inference of dishonest intent in these circumstances, and this claim in fraud must fail. In this respect, the observation of Essen J.A. in Rainbow Industrial, supra at p. 69 is apt:

> It seems, most regrettably, to have become fashionable to allege fraud in commercial cases without much regard for the fundamental rule that fraud must be strictly pleaded and strictly proven. To some extent, this may be an off-shoot of the mistaken notion, to which I referred earlier, that those stringent requirements do not apply to fraud by non-disclosure.

PART IV

DAMAGES

**542**    I have not found either GEC or Plessey liable in either contract or tort under any of the causes of action asserted. However, if I had done so, I would have assessed the damages in the following amounts.

**543**    The applicable principles concerning the measure of damages in contract and for the tort of negligent misrepresentation are set out by the majority of the Supreme Court of Canada in B.G. Checo, supra at 37:

> The measure of damages in contract and for the tort of negligent misrepresentation are:
>
> Contract: The plaintiff is to be put in the position it would have been in had the contract been performed as agreed.
>
> Tort: The plaintiff is to be put in the position it would have been in had the misrepresentation not been made.

See also MacGregor on Damages, 15th ed. (London: Sweet & Maxwell, 1997) at pp. 9-11.

**544**    I assess the damages in respect of each of the plaintiffs claims as follows:

The Claim in Contract

**545**    I have held that the comfort letter does not contain a contractual obligation on Plessey to pay the bank nor to have the policy referenced in the third paragraph. I have also found that there was no breach of the policy paragraph. If there was a contract which was breached, the plaintiff should be placed in the same position as it would have been had the contract been performed. I assess the damages flowing from a breach of that contract as follows. The amount of the Leigh loan

outstanding at the time of the bankruptcy was $40,489,427.09. Leigh had in its account a positive cash balance of $1 million, which the bank seized and applied to the outstanding loan. Accordingly, the damages must be reduced by this amount. As well, the bank recovered $398,710.87 in an action against Leigh's auditors Deloitte, Haskins & Sells regarding the Leigh loan. The damages should be reduced by this amount as well. Accordingly, I assess damages for breach of contract at $39,090,716.22.

**546**    I am not prepared to reduce the damages by the amount of any taxation provision taken by the bank on account of the loss. The evidence does not establish with certainty what the bank's tax treatment of the Leigh loan was, nor the amount of any tax saving which may have accrued to the bank. In the event that damages were awarded the bank, any recapture of this provision could be adjusted for in future tax returns.

The Claim in Misrepresentation based on the Comfort Letters

**547**    I have held that the comfort letters did not contain a misrepresentation from their inception in April 1988 forward. If I had held Plessey liable in misrepresentation from the date of the first comfort letter, I would assess the damages in the same amount as in the contract claim above, that is $39,090,716.22.

**548**    I have held that the fifth comfort letter dated December 15, 1989 and delivered on December 27, 1989 did not amount to a negligent or fraudulent misrepresentation and could not be reasonably relied upon by the bank. Had I held otherwise, I would assess the damages so as to put the plaintiff in the same position it would have been in if the misrepresentation had not been made. Given that this representation was a continuing representation, in my view the plaintiff would be entitled to recovery of all amounts advanced in reliance on the representation. In this case, Leigh received payments which reduced its loan balance in January, however further amounts were advanced by the bank thereafter. In fact, the full amount of funds advanced following the reduction in the Leigh loan and prior to the bankruptcy was $8,843,140.04, although the loan balance was actually slightly higher at the date of delivery of the comfort letter than it was at the date of the bankruptcy. Accordingly, I would assess damages at $8,843,140.04, less the plaintiffs recovery of $1 million from the Leigh bank account and $398,710.87 from the Deloitte's settlement for a total of $7,444,429.17.

Conduct Outside the Letters

**549**    I have found that the bank did not give up its security at the time of delivery of the third comfort letter in April 1989 nor did it make advances thereafter based on the alleged statements by Musgrave that the letter was tantamount to a guarantee. I have found such statement was not made by him. The bank did not give up its security or make further advances based on anything Plessey said or did at that time. Had I found liability on the basis of the alleged statement by Musgrave, I would assess damages flowing from such a claim as follows. The value of TD's security over Leigh's assets was $14,300,000.00. Assuming that the bank would have called the Leigh loan as at

the date of the representation by Musgrave, from March 6, 1989 to the date of bankruptcy, the bank advanced to Leigh the sum of $12,279,290.03, for a total of $26,579,290.03. I would subtract the sums recovered from the Deloitte's settlement and the Leigh bank account above, for a total damages award of $25,180,579.16.

**550**   Had I found liability on the basis of the statements made by Colin Justice to the bank in late November, 1989 and on December 21, 1989, I would have assessed damages as at November 30 at $919,698.09, being the difference between the loan balance on that date of $38,171,018.13 and at the date of bankruptcy, less the recovery above. Applying the same calculation to December 21, I would assess the damages at that date as ($330,052.04). Hence, the plaintiff would have suffered no damages.

**551**   Regarding the Anderson meeting with Exton, applying the same calculation to the loan balance outstanding on February 22 of $36,482,251.92, I would assess damages at $2,608,464.30.

**552**   TD claims damages in respect of Plessey's and GEC failure to direct Leigh to provide to the bank the financial information which Leigh was required to provide pursuant to the terms of the facility letter reporting provisions. I would assess any damages flowing therefrom if liability had been found, at $2,544,543.81, based on a loan balance of $36,546,172.41 on February 26, 1990, and applying the calculation above.

**553**   The bank has pleaded fraud against GEC and Plessey. I have found that there is a total absence of any evidence of fraud and I have rejected this assertion by TD. Nevertheless, the measure of damages would be the same as for negligent misrepresentation. See Smith v. Scrimgeour Vickers, [1996] 4 All E.R. 769 (H.L.) at 792 and S.M. Waddams, The Law of Damages, 2nd ed. (Toronto: Canada Law Book, 1993 ) at 5-19.

INTEREST

**554**   During the period up to the freezing of the line by the bank interest was either included in the amount of the loan or paid. Accordingly, I would assess pre-judgment interest from March 30, 1990. I would assess both pre-judgment and post-judgment interest in accordance with the Courts of Justice Act.

PART V

CONCLUSION

**555**   Letters of comfort are just that, comfort. They are not guarantees or formal security nor are they enforceable as such. They are gentlemen's agreements and moral obligations. This is common knowledge in the business community. The bank recognized this fact of life in its credit manual and in its references to comfort letters in its CCRs and other internal documents.

**556** Mr. McDowell, one of the most senior officers of the bank, stated that he expected the bank's legal department to follow and provide updates on issues such as comfort letters to those persons at the bank making and approving loans. Noonan, Leaney, Young and Wilson acknowledged that this would be important to them although they either could not recall or denied receiving information from the legal department. If those opinions were not circulated, or if circulated not paid due attention, this is sparse consolation. The opinions of the bank's highly qualified legal department accurately reflected the quality, in law, of comfort letters.

**557** One might rightfully ask why it is that parties exchange language such as that in the policy paragraph of the Plessey comfort letter. More so, when the language conspicuously lacks words of promise or contract, and where there has been no attempt to provide otherwise. In such circumstances one may only conclude that it was not intended that such words be enforceable as a contract. These were both, after all, large commercially sophisticated parties.

**558** The defendants criticize the bank for its characterization of the comfort letters as "strong". It seems to me that this censure is unfair. To begin with, the bank did not state the letters to be strong in law. This would have been wrong, both in the face of the bank's legal advice and in general principle. A comfort letter may nevertheless be strong, even though not legally strong because its essence is that of a gentleman's agreement or moral obligation. Hence the test of the true strength of such a document is whether it will be honoured and paid on when presented for payment. Musgrave testified that Plessey, had paid pursuant to two comfort letters which were not legally enforceable. Whether Plessey, prior to the GEC-Siemens hostile takeover, would have paid on their letter to TD is a matter for speculation.

**559** As Musgrave, and the expert banker Wicknam testified, companies may pay on non-binding comfort letters based on commercial considerations, such as corporate reputation and concern that a refusal to honour a comfort letter may undercut the company's relationship with the affected bank or become public knowledge and make future dealings with other banks difficult. Plessey paid on one comfort letter for these exact reasons, although this was not known to TD. Based on such considerations of which McDowell and Noonan were certainly mindful, TD was perhaps justified in regarding the Plessey comfort letter as "strong" given the reputation of Plessey in the marketplace, up to the time of the hostile takeover in September 1989.

**560** The takeover is a clear break point in this chronology. Although not a factor in anything that followed, TD had backed Plessey in its losing gamut to fend off the GEC-Siemens bid. It had no prior relationship with the new Plessey shareholders. It also knew that the takeover proposal was to dismantle Plessey and distribute the Plessey companies between GEC and Siemens. The Plessey management with whom TD had been dealing, as is to be expected in such circumstances, was decimated after the takeover. TD, lacking any relationship with the GEC and Siemens personnel, attempted to use the Plessey situation as a beachhead to develop a relationship and generate new business with GEC. In this environment, however, for the bank to rest its risk on a comfort letter which in turn depends for its integrity on relationship, was not only decidedly unwise, it was

foolhardy. It is not as though TD was without options. Its facility with Leigh was payable on demand. As such it could have called the loan prior to the takeover. Or, it could have renegotiated the arrangement with Plessey immediately afterwards by broaching the subject directly.

**561**    The leverage available to the lender in enforcing a comfort letter is that stated above - a possible impairment, in the event of refusal to honour the letter, of the creditworthiness of the giver of the letter in the marketplace. In short, the reputation of the giver is on the line should it fail to honour a moral commitment, notwithstanding it is unenforceable at law. Plessey, pre takeover, was a user of credit. GEC, on the other hand, was variously described as a cash mountain, debt free, and one of the richest companies in the U.K. The GEC treasurer Ross Anderson had as one of his main duties the almost daily investment of the company's cash surplus measured in billions of pounds. Such a company was not dependent on the banking industry for its goodwill. It was a lender not a borrower. Thus leverage of reputation among and access to the banking industry was not a factor in the case of GEC. TD overlooked this critical distinction.

**562**    Nevertheless, when TD asked Plessey to pay on the comfort letter and was met with a refusal, it sought to fall back on the traditional strategy in such a situation, marketplace pressure and the threat of its consequences, only to learn to its chagrin that Plessey with its new shareholders was immune to such tactics. This trial appears to be the last move by TD in its execution of this strategy.

**563**    At the beginning of these reasons I said that this case had at the centre Leigh Instruments and TD, a bank and its customer. It also involves TD and, like itself, Plessey another large multinational company, not in a banker-customer relationship and an effort by one to recover on a moral commitment, unsuccessfully.

**564**    It is not the role of the courts to re-write bargains, to substitute a better bargain than the one that the parties made for themselves or to enforce moral obligations and gentlemen's agreements. McDowell stated that, in his world, his word was his bond and if he made a commitment he expected to fulfil it. Unfortunately, the converse of that proposition is that if one accepts another person's word instead of taking their bond, one does so at their own peril. This does not however, condone the actions of a large multinational company with over a billion pounds sterling in cash reserves in walking away from a gentleman's business agreement to support its subsidiary.

**565**    I may be spoken to regarding costs.

WINKLER J.

* * * * *

APPENDIX A

DRAMATIS PERSONAE

## THE TORONTO-DOMINION BANK

Baker, Howard M.

Manager, Corporate Finance, London, England

Boulanger, Pierre de G.

Senior Vice-President, Credit Division (from September 1988)

Brock, William T.

Executive Vice-President, Credit

Bumstead, R. Glenn

Senior Vice-President & General Counsel and Secretary

Burega, Yovhan M.

Vice-President, Corporate Banking Division

Exton, Jonathan

Manager, Corporate Finance, London, England (from May 1988 to end of 1989)
Director, Corporate Finance, London, England (from end of 1989)

Klingenstierna, Goran G. Manager, Corporate Banking Division

Kriss, Merle

Assistant General Manager, Corporate Banking Division

Laitner, James

Senior Vice-President, Credit Division

Leaney, Wendy A.

General Manager, Corporate Banking Division

Mercier, Ernest C.

Executive Vice-President, Corporate Banking Division

McDowell, F.G. (Ted)

Vice-Chairman, Credit Division

Noonan, Patrick C.

Senior Vice-President, Credit Division

Norton, Alec I.

Assistant General Counsel

Owen, Sidney C.

Senior Vice-President, Credit Division

Read, J.A.                          Assistant General Manager, London, England

Rising, Hugh                        Vice-President, Corporate Finance, London, England

Thomson, Richard

Chairman and CEO

Walzak, Mike

Assistant General Manager, Credit, London, England

Wilson, Robert                      Manager, Corporate Banking (as of October 31, 1989)

Winston, Randi                      Assistant Manager, Corporate Banking Division

Young, Gregory G.

Manager, Corporate Banking Division

LEIGH INSTRUMENTS LIMITED

Dean, David

Vice-President, Finance (laid off on December 20, 1989)

Driscoll, Frank                     President and CEO (from August 8, 1989)

Flower, Barry

President and CEO (to June, 1989)

Plumley, Kent                       Secretary

Shepherd, John                      Chairman/Director

Smith, Pat                          Finance Director (replaced Dean)

THE PLESSEY DEFENDANTS

The Plessey Company plc:

Beard, Denise

Treasury Department:
Group Banking Manager (to August 31,
1989); Assistant Treasurer (Sept. 1,
1989); (left Plessey November 3,
1989)

Finnis, A.G.

Group Taxation Manager

Dr. Gerdine, Philip V.

(a director, as of February, 1990); Co-managing Director of Plessey
(Siemens representative) after GEC/Siemens takeover of Plessey

Huntbatch, Kenneth
Bernard

Company Secretary and Director of
Administration (to Jan. 3, 1989);
Director of Administration (from Jan.
3, 1989) (Company Secretary until his
resignation on June 29, 1990)
(died in latter part of 1990)
(a director)

Musgrave, Ian C.

Group Treasurer (previously Group Finance Director) resigned as
Group Treasurer on August 31, 1989

Noon, Anthony J.

Director of Legal and Contract Services

Sammon, Brendon P. (Binny)

Group Chief Accountant (to September 1990)

Thorn, Derek G.

Finance Director, Group Services (deceased - December, 1989)

Walls, Stephen R.

Managing Director (a director) (promoted from Finance Director in
1988) (resigned October 6, 1989)

Plessey Incorporated, White Plains, New York

Palazzi, J.L.

                Finance Director

Plessey Electronic Systems Limited ("PESL")

Akerman, Andrew C.

                Financial Analyst (to February, 1989)

Flower, Barry

                Managing Director - International Defense (from July 1, 1989)

Justice, Colin J.

                Finance Director (from Aug. 1, 1988)

## THE GEC DEFENDANTS

The General Electric Company plc

Anderson, Ross K.

                Treasurer

Bates, Malcolm                Deputy Managing Director/Director

MacBean, Ian                Director

Newlands, David

                Finance Director/Director (from September 1989)

Robinson, Tony

                Assistance Finance Director

Weinstock, Lord                Managing Director/Director

Weinstock, Simon                Commercial Director/Director

GEC Marconi

Alexander, Bill

|  |  |
|---|---|
|  | Managing Director, GEC Avionics |
| MacBean, Ian | Managing Director, GEC Marconi |
| Rickard, David | Finance Director, GEC Marconi |
| Canadian Marconi |  |
| Simons, John |  |
|  | President |
| Stuurop, G. | Treasurer |

### SIEMENS AKTIENGESELLSCHAFT

|  |  |
|---|---|
| Baumann, Dr. Karl |  |
|  | Executive Vice-President, Finance |
| Gerdine, Dr. Philip | Executive Director |
| Hafner, Andreas | Treasurer |
| Mackenrodt, Dr. Jochen |  |
|  | Vice-President, Central Finance, Foreign Affiliates |

[Editor's note: Appendix B could not be reproduced online.]

### APPENDIX C

### Leigh Loan Balances

May 17, 1990

LEIGH BORROWINGS:

| MONTH | B/A's | OVERDRAFT | TOTAL |
|---|---|---|---|
| January 1989 |  |  |  |
| 1 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |

| | | | |
|---|---|---|---|
| 2 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |
| 3 | 10,600,000 | 12,176,688.72 | 22,776,688.72 |
| 4 | 10,600,000 | 12,214,143.35 | 22,814,143.35 |
| 5 | 10,600,000 | 12,333,052.16 | 22,933,052.16 |
| 6 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 7 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 8 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| 9 | 10,600,000 | 13,146,357.80 | 23,746,357.80 |
| 10 | 10,600,000 | 13,255,838.06 | 23,855,838,06 |
| R/O 11 | 20,000,000 | 4,200,956.94 | 24,200,956.94 |
| 12 | 20,000,000 | 4,274,752.88 | 24,274,752.88 |
| 13 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| 14 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| 15 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| 16 | 20,000,000 | 4,513,489.16 | 24,513,489.16 |
| 17 | 20,000,000 | 4,805,016.65 | 24,805,016.65 |
| 18 | 20,000,000 | 4,955,113.19 | 24,955,113.19 |
| 19 | 20,000,000 | 4,920,040.60 | 24,920,040.60 |
| 20 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| 21 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| 22 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| 23 | 20,000,000 | 5,892,985.50 | 25,892,985.50 |
| 24 | 20,000,000 | 5,989,040.15 | 25,989,040.15 |
| 25 | 20,000,000 | 6,282,432.32 | 26,282,432.32 |
| 26 | 20,000,000 | 6,878,134.17 | 26,878,134.17 |
| 27 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| 28 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| 29 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| 30 | 20,000,000 | 6,898,160.20 | 26,898,160.20 |
| 31 | 20,000,000 | 7,021,523.63 | 27,021,523.63 |

February 1989

| | | | |
|---|---|---|---|
| 1 | 20,000,000 | 7,126,693.17 | 27,126,693.17 |
| 2 | 20,000,000 | 7,413,772.56 | 27,413,772.56 |
| 3 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
| 4 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |

| | | | |
|---|---|---|---|
| 5 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
| 6 | 20,000,000 | 8,290,740.86 | 28,290,740.86 |
| 7 | 20,000,000 | 8,328,058.19 | 28,328,058.19 |
| 8 | 20,000,000 | 8,289,384.74 | 28,289,384.74 |
| 9 | 20,000,000 | 8,426,878.83 | 28,426,878.83 |
| 10 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| 11 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| 12 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
| 13 | 20,000,000 | 9,421,372.38 | 29,421,372.38 |
| 14 | 20,000,000 | 9,666,167.87 | 29,666,167.87 |
| R/O 15 | 25,200,000 | 3,529,973.98 | 28,729,973.98 |
| 16 | 25,200,000 | 3,627,371.49 | 28,827,371.46 |
| 17 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
| 18 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
| 19 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
| 20 | 25,200,000 | 3,797,809.52 | 28,997,809.52 |
| 21 | 25,200,000 | 3,971,011.86 | 29,171,011.66 |
| 22 | 25,200,000 | 3,978,941.88 | 29,178,941.88 |
| 23 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| 24 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| 25 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| 26 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
| 27 | 25,200,000 | 4,479,813.36 | 29,679,813.36 |
| 28 | 25,200,000 | 2,645,394.72 | 27,845,394.72 |

March 1989

| | | | |
|---|---|---|---|
| 1 | 25,200,000 | 2,778,153.15 | 27,978,153.15 |
| 2 | 25,200,000 | 2,347,556.87 | 27,547,556.87 |
| 3 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| 4 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| 5 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
| 6 | 25,200,000 | 3,010,137.06 | 28,210,137.06 |
| 7 | 25,200,000 | 2,942,566.24 | 28,142,566.24 |
| 8 | 25,200,000 | 875,753.18 | 26,075,753.18 |
| 9 | 25,200,000 | 613,084.43 | 25,813,084.43 |
| 10 | 25,200,000 | 960,205.40 | 26,160,205.40 |

| | | | |
|---|---|---|---|
| 11 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 12 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 13 | 25,200,000 | 967,037.38 | 26,167,037.38 |
| 14 | 25,200,000 | 1,019,345.36 | 26,219,345.36 |
| 15 | 25,200,000 | 1,385,809.09 | 26,585,809.09 |
| 16 | 25,200,000 | 1,393,298.34 | 26,593,298.34 |
| 17 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 18 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 19 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 20 | 25,200,000 | 2,185,732.95 | 27,385,732.95 |
| R/O 21 | 25,300,000 | 2,459,049.45 | 27,759,049.45 |
| 22 | 25,300,000 | 1,654,251.16 | 26,954,251.16 |
| 23 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 24 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 25 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 26 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 27 | 25,300,000 | 2,147,265.85 | 27,447,265.85 |
| 28 | 25,300,000 | 2,106,861.67 | 27,406,861.67 |
| 29 | 25,300,000 | 2,113,873.01 | 27,413,873.01 |
| 30 | 25,300,000 | 1,881,398.58 | 27,181,398.58 |
| 31 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |

April 1989

| | | | |
|---|---|---|---|
| 1 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 2 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 3 | 25,300,000 | 2,442,323.39 | 27,742,323.39 |
| 4 | 25,300,000 | 2,536,700.93 | 27,836,700.93 |
| 5 | 25,300,000 | 2,296,313.54 | 27,596,313.54 |
| 6 | 25,300,000 | 2,384,335.89 | 27,684,335.89 |
| 7 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 8 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 9 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 10 | 25,300,000 | 3,512,317.61 | 28,812,317.61 |
| 11 | 25,300,000 | 3,732,516.46 | 29,032,516.46 |
| 12 | 25,300,000 | 3,761,812.59 | 29,061,812.59 |
| 13 | 25,300,000 | 3,773,262.71 | 29,073,262.71 |

| | | | |
|---|---|---|---|
| 14 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 15 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 16 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 17 | 25,300,000 | 4,685,046.55 | 29,985,046.55 |
| 18 | 25,300,000 | 4,729,857.98 | 30,029,857.98 |
| 19 | 25,300,000 | 4,828,939.81 | 30,128,939.81 |
| 20 | 25,300,000 | 2,782,380.50 | 28,082,380.50 |
| 21 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 22 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 23 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 24 | 25,300,000 | 2,914,336.09 | 28,214,336.09 |
| R/O 25 | 30,000,000 | 615,774.45 | 30,615,774.45 |
| 26 | 30,000,000 | 595,369.26 | 30,595,369.26 |
| 27 | 30,000,000 | 1,611,577.04 | 31,611,577.04 |
| 28 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| 29 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| 30 | 30,000,000 | 930,467.56 | 30,930,467.56 |

May 1989

| | | | |
|---|---|---|---|
| 1 | 30,000,000 | 572,124.83 | 30,572,124.83 |
| 2 | 30,000,000 | 312,673.05 | 30,312,673,05 |
| 3 | 30,000,000 | 332,028.81 | 30,332,028.81 |
| 4 | 30,000,000 | 316,847.53 | 30,316,847.53 |
| 5 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 6 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 7 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 8 | 30,000,000 | 446,373.25 | 30,446,373.25 |
| 9 | 30,000,000 | 330,426.43 | 30,330,426.43 |
| 10 | 30,000,000 | 3,369.55 | 30,003,369.55 |
| 11 | 30,000,000 | 165,814.06 | 30,165,814.06 |
| 12 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 13 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 14 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 15 | 30,000,000 | 1,314,848.53 | 31,314,848.53 |
| 16 | 30,000,000 | 1,464,716.98 | 31,464,716.98 |
| 17 | 30,000,000 | 1,631,817.02 | 31,631,817.02 |

| | | | |
|---|---|---|---|
| 18 | 30,000,000 | 1,221,046.01 | 31,221,046.01 |
| 19 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 20 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 21 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 22 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 23 | 30,000,000 | 1,862,398.81 | 31,862,398.81 |
| 24 | 30,000,000 | 1,984,855.44 | 31,984,855.44 |
| 25 | 30,000,000 | 2,450,199.76 | 32,450,199.76 |
| 26 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 27 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 28 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 29 | 30,000,000 | 3,169,024.65 | 33,169,024.65 |
| 30 | 30,000,000 | 3,272,847.14 | 33,272,847.14 |
| 31 | 30,000,000 | 3,421,007.24 | 33,421,007.24 |

June 1989

| | | | |
|---|---|---|---|
| 1 | 30,000,000 | 3,807,906.22 | 33,807,906.22 |
| 2 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 3 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 4 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 5 | 30,000,000 | 4,183,246.54 | 34,183,246.54 |
| 6 | 30,000,000 | 4,221,107.60 | 34,221,107.60 |
| 7 | 30,000,000 | 4,286,095.12 | 34,286,095.12 |
| 8 | 30,000,000 | 4,276,486.77 | 34,276,486.77 |
| 9 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 10 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 11 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 12 | 30,000,000 | 3,869,384.91 | 33,869,384.91 |
| 13 | 30,000,000 | 3,870,629.94 | 33,870,629.94 |
| 14 | 30,000,000 | 3,906,792.83 | 33,906,792.83 |
| 15 | 30,000,000 | 3,901,483.73 | 33,901,483.73 |
| 16 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 17 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 18 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 19 | 30,000,000 | 1,326,243.09 | 31,326,243.09 |
| 20 | 30,000,000 | 1,792,483.59 | 31,792,483.59 |
| 21 | 30,000,000 | 1,940,661.74 | 31,940,661.74 |

| 22 | 30,000,000 | 114,015.07 | 30,114,015.07 |
| 23 | 30,000,000 | 1,392,525.52 | 31,362,525.52 |
| 24 | 30,000,000 | 1,392,525.52 | 31,362,525.52 |
| 25 | 30,000,000 | 1,392,525.52 | 31,362,525.52 |
| 26 | 30,000,000 | 1,699,284.94 | 31,699,284.94 |
| 27 | 30,000,000 | 1,740,425.93 | 31,740,425.93 |
| 28 | 30,000,000 | 1,619,155.96 | 31,619,155.96 |
| 29 | 30,000,000 | 1,645,231.57 | 31,645,231.56 |
| R/O 30 | 30,000,000 | 1,659,173.91 | 31,659,173.91 |

July 1989

| 1 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 2 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 3 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 4 | 30,700,000 | 904,935.09 | 31,604,935.09 |
| 5 | 30,700,000 | 1,132,744.32 | 31,832,744.32 |
| 6 | 30,700,000 | 1,933,687.99 | 32,633,687.99 |
| 7 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 8 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 9 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 10 | 30,700,000 | 3,362,740.73 | 34,062,740.73 |
| 11 | 30,700,000 | 3,219,776.51 | 33,919,776.51 |
| 12 | 30,700,000 | 3,210,332.88 | 33,910,332.88 |
| 13 | 30,700,000 | 3,481,122.61 | 34,181,122.61 |
| 14 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 15 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 16 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 17 | 30,700,000 | 2,887,189.99 | 33,587,189.99 |
| 18 | 30,700,000 | 2,920,771.73 | 33,620,771.73 |
| 19 | 30,700,000 | 3,013,625.52 | 33,713,625.52 |
| 20 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 21 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 22 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 23 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 24 | 30,700,000 | 4,588,772.15 | 35,288,772.15 |
| 25 | 30,700,000 | 5,023,958.06 | 35,723,958.06 |

| | | | |
|---|---|---|---|
| 26 | 30,700,000 | 4,762,514.74 | 35,462,514.74 |
| 27 | 30,700,000 | 4,828,507.48 | 35,528,507.48 |
| 28 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 29 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 30 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 31 | 30,700,000 | 4,280,482.57 | 34,980,482.57 |

August 1989

| | | | |
|---|---|---|---|
| 1 | 30,700,000 | 6,059,098.65 | 36,759,098.65 |
| R/O 2 | 30,700,000 | 6,004,154.56 | 36,704,154.56 |
| 3 | 30,700,000 | 2,375,802.44 | 33,075,802.44 |
| 4 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 5 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 6 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 7 | 30,700,000 | 3,104,314.68 | 33,804,314.68 |
| 8 | 30,700,000 | 3,164,896.67 | 33,864,896.67 |
| 9 | 30,700,000 | 3,000,534.07 | 33,700,534.07 |
| 10 | 30,700,000 | 3,365,019.83 | 34,065,019.83 |
| 11 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 12 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 13 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 14 | 30,700,000 | 3,474,923.56 | 34,174,923.56 |
| 15 | 30,700,000 | 3,561,681.48 | 34,261,681.48 |
| 16 | 30,700,000 | 3,751,602.27 | 34,451,602.27 |
| 17 | 30,700,000 | 3,780,700.45 | 34,480,700.45 |
| 18 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 19 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 20 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 21 | 30,700,000 | 4,392,378.08 | 35,092,378.08 |
| 22 | 30,700,000 | 4,904,112.81 | 35,604,112.81 |
| 23 | 30,700,000 | 5,006,737.32 | 35,706,737.32 |
| 24 | 30,700,000 | 5,308,323.67 | 36,008,323.67 |
| 25 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 26 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 27 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 28 | 30,700,000 | 4,364,417.93 | 35,064,417.93 |
| 29 | 30,700,000 | 4,228,592.01 | 34,928,592.01 |

| | | | |
|---|---|---|---|
| 30 | 30,700,000 | 4,306,706.93 | 35,006,706.93 |
| 31 | 30,700,000 | 3,184,769.20 | 33,884,768.20 |

September 1989

| | | | |
|---|---|---|---|
| 1 | 30,700,000 | 3,184,768.20 | 33,884,768.20 |
| 2 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| 3 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| 4 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| R/O 5 | 30,700,000 | 4,210,666.17 | 34,910,666.17 |
| 6 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| R/O 7 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| 8 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 9 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 10 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 11 | 30,700,000 | 3,735,418.60 | 34,435,418.60 |
| R/O 12 | 30,700,000 | 3,841,093.34 | 34,541,093.34 |
| 13 | 30,700,000 | 4,418,509.99 | 35,118,509.99 |
| R/O 14 | 30,700,000 | 4,478,971.44 | 35,178,971.44 |
| 15 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 16 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 17 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 18 | 30,700,000 | 5,515,347.94 | 36,215,347.94 |
| R/O 19 | 30,700,000 | 4,152,908.82 | 34,852,908.82 |
| 20 | 30,700,000 | 4,307,175.52 | 35,007,175.52 |
| R/O 21 | 31,000,000 | 4,023,254.92 | 35,023,254.92 |
| 22 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 23 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 24 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 25 | 31,000,000 | 5,139,590.56 | 36,139,590.56 |
| 26 | 31,000,000 | 5,170,884.55 | 36,170,884.55 |
| 27 | 31,000,000 | 5,265,858.00 | 36,265,858.00 |
| 28 | 31,000,000 | 5,109,688.79 | 36,109,688.79 |
| R/O 29 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |

| 30 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
|---|---|---|---|

October 1989

| 1 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
|---|---|---|---|
| 2 | 31,000,000 | 5,005,795.86 | 36,005,795.86 |
| 3 | 31,000,000 | 5,064,463.04 | 36,064,463.04 |
| 4 | 31,000,000 | 5,108,529.51 | 36,108,529.51 |
| 5 | 31,000,000 | 3,147,895.01 | 34,147,895.01 |
| R/O 6 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 7 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 8 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 9 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 10 | 30,000,000 | 5,071,186.84 | 35,071,186.84 |
| 11 | 30,000,000 | 5,032,946.25 | 35,032,946.25 |
| 12 | 30,000,000 | 5,025,761.02 | 35,025,761.02 |
| 13 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 14 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 15 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 16 | 30,000,000 | 6,148,109.84 | 36,148,109.84 |
| 17 | 30,000,000 | 6,272,575.37 | 36,727,575.37 |
| 18 | 30,000,000 | 6,475,771.31 | 36,475,771.31 |
| 19 | 30,000,000 | 6,520,320.96 | 36,520,320.96 |
| R/O 20 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 21 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 22 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 23 | 30,000,000 | 6,937,449.81 | 36,937,449.81 |
| 24 | 30,000,000 | 6,756,758.68 | 36,756,758.68 |
| 25 | 30,000,000 | 7,246,658.57 | 37,246,658.57 |
| 26 | 30,000,000 | 7,177,329.10 | 37,177,329.10 |
| R/O 27 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 28 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 29 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 30 | 30,000,000 | 9,192,083.03 | 39,192,083.03 |
| 31 | 30,000,000 | 9,111,727.71 | 39,111,727.71 |

November 1989

| | | | |
|----|-----------|--------------|---------------|
| 1  | 30,000,000 | 9,177,322.75 | 39,177,322.75 |
| 2  | 30,000,000 | 9,093,386.46 | 39,093,386.46 |
| 3  | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 4  | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 5  | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 6  | 30,000,000 | 6,770,013.70 | 36,770,013.70 |
| 7  | 30,000,000 | 6,794,751.71 | 36,794,751.71 |
| 8  | 30,000,000 | 6,910,148.70 | 36,910,148.70 |
| 9  | 30,000,000 | 6,983,774.72 | 36,983,774.72 |
| 10 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 11 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 12 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 13 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 14 | 30,000,000 | 7,357,647.97 | 37,357,647.97 |
| 15 | 30,000,000 | 7,532,161.84 | 37,532,161.84 |
| 16 | 30,000,000 | 7,554,032.80 | 37,554,032.80 |
| 17 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 18 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 19 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 20 | 30,000,000 | 7,808,426.72 | 37,808,426.72 |
| 21 | 30,000,000 | 7,757,066.84 | 37,757,066.84 |
| 22 | 30,000,000 | 7,915,046.19 | 37,915,046.19 |
| 23 | 30,000,000 | 7,940,170.04 | 37,940,170.04 |
| 24 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 25 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 26 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 27 | 30,000,000 | 8,087,463.15 | 38,087,463.15 |
| 28 | 30,000,000 | 8,071,525.94 | 38,071,525.94 |
| 29 | 30,000,000 | 8,192,922.73 | 38,192,922.73 |
| 30 | 30,000,000 | 8,171,018.13 | 38,171,018.13 |

December 1989

| | | | |
|----|-----------|--------------|---------------|
| 1  | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 2  | 30,000,000 | 8,172,202.80 | 38,172,202.80 |

| 3 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 4 | 30,000,000 | 8,317,144.93 | 38,317,144.93 |
| 5 | 30,000,000 | 8,398,592.62 | 38,398,592.62 |
| 6 | 30,000,000 | 8,482,020.38 | 38,482,020.38 |
| 7 | 30,000,000 | 8,501,066.61 | 38,501,066.61 |
| 8 | 30,000,000 | 9,293,161.61 | 39,293,161,61 |
| 9 | 30,000,000 | 9,293,161.61 | 39,293,161,61 |
| 10 | 30,000,000 | 9,293,161.61 | 39,293,161,61 |
| 11 | 30,000,000 | 9,419,747.97 | 39,491,747.97 |
| 12 | 30,000,000 | 9,353,653.80 | 39,353,653,80 |
| 13 | 30,000,000 | 9,401,980.70 | 39,401,980.70 |
| 14 | 30,000,000 | 9,482,030.69 | 39,482,030.69 |
| 15 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 16 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 17 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 18 | 30,000,000 | 9,399,857.48 | 39,399,857.48 |
| 19 | 30,000,000 | 9,527,175.77 | 39,527,175.77 |
| 20 | 30,000,000 | 9,552,579.42 | 39,552,579.42 |
| 21 | 30,000,000 | 9,420,768.26 | 39,420,768.26 |
| 22 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 23 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 24 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 25 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 26 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 27 | 30,000,000 | 10,635,970.30 | 40,635,970.30 |
| 28 | 30,000,000 | 10,697,291.73 | 40,697,291.73 |
| 29 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 30 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 31 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |

January 1990

| 1 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 2 | 30,000,000 | 10,754,186.13 | 40,754,186.13 |
| 3 | 30,000,000 | 11,481,214.94 | 41,481,214.94 |
| 4 | 30,000,000 | 9,818,104.83 | 39,818,104.83 |
| 5 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 6 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |

| | | | |
|---|---|---|---|
| 7 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 8 | 30,000,000 | 8,519,719.51 | 38,519,719.51 |
| 9 | 30,000,000 | 8,793,567.82 | 38,793,567.82 |
| 10 | 30,000,000 | 9,391,486.94 | 39,391,486.94 |
| 11 | 30,000,000 | 4,519,480.39 | 34,519,480.36 |
| 12 | 30,000,000 | 4,636,852.71 | 34,636,852.71 |
| 13 | 30,000,000 | 4,636,852.71 | 34,636,852.71 |
| 14 | 30,000,000 | 4,636,852.71 | 34,636,852.71 |
| 15 | 30,000,000 | 4,859,292.27 | 34,859,292.27 |
| 16 | 30,000,000 | 1,646,287.05 | 31,646,287.05 |
| 17 | 30,000,000 | 1,760,211.90 | 31,760,211.90 |
| 18 | 30,000,000 | 1,787,825.23 | 31,787,828.23 |
| 19 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 20 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 21 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 22 | 30,000,000 | 2,934,734.46 | 32,934,734.46 |
| 23 | 30,000,000 | 3,207,365.71 | 33,207,365.71 |
| 24 | 30,000,000 | 3,906,014.36 | 33,906,014.36 |
| 25 | 30,000,000 | 3,976,907.17 | 33,976,907.17 |
| 26 | 30,000,000 | 3,165,852.02 | 33,165,852,02 |
| 27 | 30,000,000 | 3,165,852.02 | 33,165,852,02 |
| 28 | 30,000,000 | 3,165,852.02 | 33,165,852,02 |
| R/O 29 | 30,000,000 | 3,377,469.60 | 33,337,469.60 |
| 30 | 30,000,000 | 3,487,811.03 | 33,487,811.03 |
| 31 | 30,000,000 | 3,604,761.96 | 33,604,761.96 |

February 1990

| | | | |
|---|---|---|---|
| 1 | 30,000,000 | 3,783,285.08 | 33,783,285.08 |
| 2 | 30,000,000 | 4,579,337.41 | 34,579,337.41 |
| 3 | 30,000,000 | 4,579,337.41 | 34,579,337.41 |
| 4 | 30,000,000 | 4,579,337.41 | 34,579,337.41 |
| 5 | 30,000,000 | 4,494,132.41 | 34,494,132.41 |
| 6 | 30,000,000 | 4,132,872.96 | 34,132,872.96 |
| 7 | 30,000,000 | 4,507,118.28 | 34,507,118.28 |
| 8 | 30,000,000 | 4,608,245.77 | 34,608,245.77 |
| 9 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |

| | | | |
|---|---|---|---|
| 10 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 11 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 12 | 30,000,000 | 4,781,593.95 | 34,781,593.95 |
| 13 | 30,000,000 | 4,774,292.88 | 34,774,292.88 |
| 14 | 30,000,000 | 4,775,563.95 | 34,775,563.95 |
| 15 | 30,000,000 | 4,907,788.81 | 34,907,788.81 |
| 16 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 17 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 18 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 19 | 30,000,000 | 5,821,451.91 | 35,821,451.91 |
| 20 | 30,000,000 | 5,982,391.96 | 35,982,391.96 |
| 21 | 30,000,000 | 6,430,392.55 | 36,430,392.55 |
| 22 | 30,000,000 | 6,482,251.92 | 36,482,251.92 |
| 23 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 24 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 25 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 26 | 30,000,000 | 6,546,172.41 | 36,546,172.41 |
| 27 | 30,000,000 | 7,070,969.01 | 37,070,969.01 |
| 28 | 30,000,000 | 7,179,650.03 | 37,179,650.03 |

March 1990

| | | | |
|---|---|---|---|
| 1 | 30,000,000 | 7,161,620.64 | 37,161,620.64 |
| 2 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| 3 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| 4 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| R/O 5 | 30,000,000 | 7,822,176.33 | 37,822,176.33 |
| 6 | 30,000,000 | 7,941,922.94 | 37,941,922.94 |
| 7 | 30,000,000 | 8,286,889.99 | 38,286,889.99 |
| 8 | 30,000,000 | 8,480,590.42 | 38,480,590.42 |
| 9 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 10 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 11 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| 12 | 30,000,000 | 8,709,952.06 | 38,709,952.06 |
| 13 | 30,000,000 | 8,537,558.70 | 38,537,558.70 |
| 14 | 30,000,000 | 8,712,265.42 | 38,712,265.42 |
| 15 | 30,000,000 | 8,542,273.30 | 38,542,273.30 |
| 16 | 30,000,000 | 9,374,689.38 | 39,374,689.38 |

| 17 | 30,000,000 | 9,374,689.38  | 39,374,689.38 |
| 18 | 30,000,000 | 9,374,689.38  | 39,374,689.38 |
| 19 | 30,000,000 | 9,443,816.07  | 39,443,816.07 |
| 20 | 30,000,000 | 9,565,672.22  | 39,565,672.22 |
| 21 | 30,000,000 | 9,926,127.87  | 39,926,127.87 |
| 22 | 30,000,000 | 10,210,851.53 | 40,210,851.53 |
| 23 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 24 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 25 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| 26 | 30,000,000 | 10,216,162.75 | 40,216,162.75 |
| 27 | 30,000,000 | 10,425,698.00 | 40,425,698.00 |
| 28 | 30,000,000 | 10,409,060.50 | 40,409,060.50 |
| 29 | 30,000,000 | 10,482,581.14 | 40,482,581.14 |
| 30 | 30,000,000 | 10,489,427.09 | 40,489,427.09 |

qp/s/bbd/mjb/mjb/qlhcs/qlsxs

TAB  2

**Ventas, Inc. et al. v. Sunrise Senior Living Real Estate Investment Trust et al.**
**[Indexed as: Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust]**

85 O.R. (3d) 254

Court of Appeal for Ontario,

**Blair, MacFarland and LaForme JJ.A.**

March 23, 2007

*Contracts -- Interpretation and construction -- Vendor's board of trustees offering to sell its assets through auction process and entering into Confidentiality Agreements with interested bidders which contained Standstill Agreements preventing each prospective acquiring party from attempting hostile unsolicited takeover bid -- Vendor signing purchase agreement with one bidder subject to unitholder approval -- Second bidder then submitting superior bid -- Application judge not erring in interpreting purchase agreement as imposing obligation on vendor to enforce its Standstill Agreement with second bidder and as precluding it from considering acquisition proposal submitted by that bidder.*

Sunrise was a Canadian public real estate investment fund which owned and invested in senior living communities. It undertook a strategic sale process of its assets. Both HCPI and Ventas were interested in bidding, and each was required to enter into a Confidentiality Agreement with Sunrise in order to prevent non-public information exchanged by the parties from being publicly disclosed. The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements"). Ventas submitted a successful bid to acquire all of the assets for a price of $15 per unit, subject to shareholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid, after it knew what Ventas had offered, of $18 per unit. Ventas brought an application for a declaration that Sunrise was required to enforce the Standstill Agreement it had entered into with HCPI, thereby preventing it from considering the HCPI Proposal. The application was granted. Sunrise and HCPI appealed.

Held, the appeal should be dismissed.

The application judge was correct in interpreting s. 4.4 of the Purchase Agreement as imposing an obligation on Sunrise to enforce the Standstill Agreement between it and HCPI, thus precluding it from considering the acquisition proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. She found this to be objectively reasonable and a form of protection afforded to Ventas as part of the package negotiated between it and Sunrise. The application judge did not fail to consider the factual matrix underlying the negotiation of the Purchase Agreement and did not fail to give effect to the "commercial sense" component of contract interpretation. The application judge was sensitive to the fiduciary out provisions of the Agreement that permitted other bona fide written unsolicited Acquisition Proposals. In her view, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation made commercial sense. It was unnecessary to adopt the principle gleaned from some American authorities that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable. That was not what happened in this case. The trustees did not contract away their fiduciary obligations. Rather, they complied with [page255] them by setting up an auction process that was designed to maximize the unit price obtained for Sunrise's assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. The application judge viewed "bona fide" as meaning acting "in good faith; sincere; genuine", and found that the HCPI Acquisition Proposal was not bona fide because it was made in breach of the HCPI Standstill Agreement. The application judge did not err in her assessment and use of the term "bona fide".

Cases referred to

ACE Ltd. v. Capital Re Corp., 747 A. 2d. 95 (Del. Ch. 1999); BG Checo International Ltd. v. British Columbia Hydro & Power Authority, [1993] 1 S.C.R. 12, [1993] S.C.J. No. 1, 7 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 147 N.R. 81, [1993] 2 W.W.R. 321, 14 C.C.L.T. (2d) 233; Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888, [1979] S.C.J. No. 133, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. Â1-1176; CW Shareholdings Inc. v. WIC Western International Communications Ltd. (1998), 39 O.R. (3d) 755, [1998] O.J. No. 1886, 160 D.L.R. (4th) 131, 38 B.L.R. (2d) 196 (Gen. Div.); Eli Lilly and Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129, [1998] S.C.J. No. 59, 161 D.L.R. (4th) 1, 227 N.R. 201, 80 C.P.R. (3d) 321; Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd. v. Scott's Food Services Inc., [1998] O.J. No. 4368, 114 O.A.C. 357 (C.A.); Maple Leaf Foods Inc. v. Schneider Corp. (1998), 42 O.R. (3d) 177, [1998] O.J. No. 4142, 44 B.L.R. (2d) 115 (C.A.); Paramount Communications, Inc. v. QVC Network Inc., 637 A. 2d 34 (Del. 1994); Scanlon v. Castlepoint Development Corp. (1992), 11 O.R. (3d) 744, [1992] O.J. No. 2692, 9 D.L.R. (4th) 153, 29 R.P.R. (2d) 60 (C.A.); Toronto (City) v. W.H. Hotel Ltd., [1966] S.C.R. 434, [1966] S.C.J. No.

23, 56 D.L.R. (2d) 539; Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of) (1999), 45 O.R. (3d) 417, [1999] O.J. No. 3290, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64 (C.A.), affg [1998] O.J. No. 2637, 40 B.L.R. (2d) 1 (Gen. Div.); Venture Capital USA Inc. v. Yorkton Securities Inc. (2005), 75 O.R. (3d) 325, [2005] O.J. No. 1885, 197 O.A.C. 264, 4 B.L.R. (4th) 324 (C.A.)

Authorities referred to

McCamus, J.D., The Law of Contracts (Toronto: Irwin Law, 2005)

APPEAL from the order of Pepall J., [2007] O.J. No. 908, 156 A.C.W.S. (3d) 343 (S.C.J.), allowing an application for a declaration that the vendor was prevented by its agreement with the applicant from considering a bid submitted by the respondent.

Peter F.C. Howard and Eliot Kolers, for appellants Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, and Sunrise REIT GP Inc.

Jeffrey S. Leon and Derek J. Bell, for appellants Health Care Property Investors, Inc.

Mark A. Gelowitz and Laura K. Fric, for respondents Ventas, Inc. and numbered companies.

Luis G. Sarabia and Cynthia Spry, for respondent Sunrise Senior Living Inc. [page256]

---

The judgment of the court was delivered by

**BLAIR J.A.:** --

Overview

[1] Sunrise REIT is a Canadian public real estate investment trust whose units are traded on the Toronto Stock Exchange. It owns and invests in senior living communities in Canada and the United States. In September 2006, Sunrise's board of trustees determined that a strategic sale process of its assets would be beneficial to its unitholders, thus effectively putting Sunrise "in play" on the public markets.

[2] To carry out this plan, the Trustees developed a two-stage auction process with a view to maximizing the value of Sunrise's units. Ventas, Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCPI") were two of seven initially interested prospective purchasers in the auction process. They emerged from the preliminary round as the only two potential bidders asked to participate in the final round.

[3] Ventas submitted a successful bid to acquire all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per unit), subject to unitholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid -- after it knew what Ventas had offered -- "topping up" the Ventas offer by 20 per cent to $18 per unit. This increased offer represents an additional $227.5 million for the unitholders, who are to meet on March 30, 2007, to consider the Ventas proposal.

[4] Hence the urgency of this appeal.

[5] The appeal turns on the interpretation of the terms of the purchase agreement executed by Sunrise and Ventas following acceptance of the Ventas bid. The issue is whether Sunrise is obliged to enforce the terms of a prior standstill agreement entered into between it and HCPI in the course of the auction process and which prohibits HCPI from making an offer for the Sunrise assets without Sunrise's consent. If the answer to that question is "Yes", Sunrise will be precluded from considering or accepting the richer HCPI offer pending the unitholders' meeting.

[6] Following an urgent application, determined on March 6, 2007, Justice Pepall answered the foregoing question in the affirmative. Sunrise and HCPI appeal from that decision. Ventas supports it.

[7] For the reasons that follow, I would dismiss the appeal and uphold the decision of the application judge. [page257]

Facts

[8] As mentioned above, Sunrise owns and invests in senior living communities in Canada and the United States. The properties are managed by Sunrise Senior Living, Inc. ("SSL"), a U.S. public company whose shares are traded on the New York Stock Exchange.

[9] HCPI is a self-administered real estate investment trust that also invests in healthcare facilities. Ventas is a U.S.-based health care real estate investment trust whose shares are listed on the New York Stock Exchange.

[10] In September 2006, after Sunrise's board of trustees determined that a strategic sale process of the Trust's assets would be beneficial to its unitholders, it began an auction process with a view to maximizing unitholder value.

[11] Parties who were interested in acquiring Sunrise (including HCPI and Ventas) were required to enter into a confidentiality agreement with it in order to prevent non-public information exchanged by the parties from being publicly disclosed (the "Confidentiality Agreements"). The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements").

[12] Although the parties' Confidentiality Agreements were largely similar, Ventas's Standstill Agreement was worded differently from HCPI's in that the Ventas standstill ceased to apply if, among other things, Sunrise entered into an agreement to sell more than 20 per cent of its assets to a third party. Notably, HCPI's Standstill Agreement did not contain a similar termination clause.

[13] On November 21, 2006, Sunrise invited potential bidders to submit bids in the non-binding preliminary round of an auction. After the first round of bids, Sunrise invited HCPI and Ventas to engage in further negotiations and on December 29, 2006, it invited them to submit final binding bids in the second round of the auction by January 8, 2007. Sunrise waived the Standstill Agreements with those bidders for that purpose, and HCPI and Ventas were expressly told not to assume that the "winning" bid was assured of actually acquiring Sunrise at the price agreed upon or that they would be given an opportunity to rebid, renegotiate, or improve the terms of their proposal.

[14] Ventas submitted a second bid on January 8, but HCPI withdrew from the auction and did not.

[15] On January 14, 2007, Ventas and Sunrise signed an agreement contemplating the purchase by Ventas of all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per Unit), subject to Unitholder approval (the [page258] "Purchase Agreement"). This price represented a 35.8 per cent premium over the closing price of the units on January 12, 2007. The Purchase Agreement contemplated subsequent third-party unsolicited bids and allowed Sunrise to accept such a bid if it was financially superior to Ventas's bid.

[16] On January 17, 2007, Sunrise notified HCPI of the agreement with Ventas and asked for the return of Sunrise's confidential materials. In the letter, Sunrise's solicitor reminded HCPI of the terms of the Confidentiality Agreement it signed in November 2006.

[17] On February 14, 2007, HCPI submitted a proposal to acquire all of Sunrise's assets for $18 per unit (the "HCPI Proposal"), conditional on HCPI's ability to reach a management agreement with SSL. Sunrise treated the HCPI Proposal as an unsolicited third-party bid, but it concluded that it was not in a position to determine whether the bid was a superior bid because of the SSL condition.

[18] The Confidentiality Agreements entered into in the course of the auction process contained a provision prohibiting prospective purchasers from communicating with SSL. This was because SSL was viewed as a possible bidder. Following the preliminary round of the auction, in late November 2006, and after realizing that SSL was not an interested purchaser, Sunrise had authorized its financial advisors to arrange to allow HCPI and Ventas to contact SSL for purposes of the second round of bidding. On February 15, 2007, however -- after learning of the HCPI Proposal -- Ventas advised Sunrise that, if it permitted communications between SSL and HCPI, Sunrise would be in breach of the Purchase Agreement. It did not assert that HCPI would be in breach of its Standstill Agreement because it apparently assumed that HCPI's Standstill Agreement was worded similarly

to the Ventas Standstill Agreement, which meant that the restraint on an unsolicited bid was no longer enforceable since Sunrise had entered into an agreement with a third party.

[19] On February 18, 2007, Sunrise served application materials upon Ventas, HCPI and SSL indicating its intention to seek the court's interpretation of the Purchase Agreement, specifically on the issue of communications between HCPI and SSL. It is at this point that Ventas learned of the specific terms of HCPI's Confidentiality Agreement and realized that HCPI's Standstill Agreement did not contain the same termination clause as Ventas's Standstill Agreement. On February 21, 2007, Ventas brought the within application seeking a declaration that Sunrise was required to enforce its Standstill Agreement with HCPI, thereby preventing it from considering the HCPI Proposal. [page259]

[20] The application judge found that Sunrise had agreed with Ventas that it would enforce existing Standstill Agreements and that any bid made in breach of an existing Standstill Agreement would not be bona fide. She then concluded that Sunrise was required to enforce the Standstill Agreement with HCPI and that HCPI did not have prior written consent to submit its bid. She dismissed Sunrise's application on the grounds that the issue was moot in light of her earlier conclusion.

The Provisions of the Agreement

[21] Section 4 of the Purchase Agreement deals generally with the covenants of the parties. Section 4.4 deals with Sunrise's "Covenants Regarding Non-Solicitation". Because of their importance, I reproduce the provisions of s. 4.4 in their entirety (the underlining is mine):

> 4.4(1) Following the date hereof, Sunrise REIT shall not, directly or indirectly, through any trustee, officer, director, agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,

>> (i)    solicit, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or proposals regarding, or other action that constitutes, or may reasonably be expected to lead to, an actual or potential Acquisition Proposal,

>> (ii)    participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries,

>> (iii)    approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition

Proposal,

(iv)   accept or enter into any agreement, arrangement or understanding, related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

(v)   withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2) Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with regard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (that did not result from a breach of this Section 4.4), from furnishing or disclosing non-public information to such Person if and only to the extent that: [page260]

(i)   the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

(ii)   such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

(3) Notwithstanding anything, contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this Section 4.4) ("Proposed Agreement") if and only to the extent that:

(i)   it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

(ii)   the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such

        determination,

(iii)    a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv)    if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments, and

(v)    if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the Securities Act relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

    (4) If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, [page261] Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

    (5) Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of section 4.4.

    (6) During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the

Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7) Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8)    Sunrise REIT shall

   (i)     ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its [sic] and its Subsidiaries' officers, directors, trustees or representatives;

   (ii)    immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

   (iii)   require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons; [page262]

   (iv)   terminate access for all Persons (other than the Purchasers and its

Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

(v)    not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties.

[22] The Purchase Agreement defines "Acquisition Proposal" and "Superior Proposal" as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or, of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

(a)    is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

(b)    in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

(c)    would, if consummated in accordance with its terms, result in a transaction more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that

> for purposes of this definition the references in the definition of
> Acquisition Proposal to "20%" shall be deemed to be references to
> "100%".

Analysis

[23] The central issue on this appeal, as it was before the application judge, is whether the provisions of s. 4.4 of the Purchase Agreement impose an obligation on Sunrise to enforce the Standstill [page263] Agreement between it and HCPI, thus precluding it from considering the Acquisition Proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. In my view, they do.

[24] Counsel accept that the application judge correctly outlined the principles of contractual interpretation applicable in the circumstances of this case. I agree. Broadly stated -- without reproducing in full the relevant passages from her reasons (paras. 29-34) in full -- she held that a commercial contract is to be interpreted,

   (a)    as a whole, in a manner that gives meaning to all of its terms and avoids an
          interpretation that would render one or more of its terms ineffective;[1]
   (b)    by determining the intention of the parties in accordance with the language
          they have used in the written document and based upon the "cardinal
          presumption" that they have intended what they have said;[2]
   (c)    with regard to objective evidence of the factual matrix underlying the
          negotiation of the contract, but without reference to the subjective intention
          of the parties;[3] and (to the extent there is any ambiguity in the contract),
   (d)    in a fashion that accords with sound commercial principles and good
          business sense, and that avoid a commercial absurdity.[4] [page264]

[25] The appellants assert, however, that the application judge misapplied the principles of contractual interpretation that she had properly enunciated. They say she did so essentially,

   (a)    by misapprehending the interplay between ss. 4.4(1), 4.4(2), 4.4(3) and
          4.4(8)(v) of the Purchase Agreement and, in particular by failing to
          appreciate, and to reconcile, the differences between the wording of ss.
          4.4(1) and 4.4(8), and more generally,
   (b)    by failing to understand the "architecture" of s. 4.4 of the Purchase
          Agreement and to consider it against the background of the factual matrix
          in which the Agreement was negotiated.

[26] I do not agree.

The application judge's reasoning

[27] The thrust of the application judge's reasoning in this regard is found at paras. 35, 36, 38 and 39 of her reasons:

> Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

> Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

> . . . . .

> It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

> Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement [page265] operated to permit such a proposal. It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

(Footnote omitted)

The scheme and interpretation of section 4.4

[28] I agree with the application judge that an important purpose of this part of the Purchase Agreement is to ensure the enforcement of standstill agreements entered into by previous players in the auction process. The negotiating context demonstrates that Ventas has been skilful in protecting its own position with respect to competition and standstills -- unlike the HCPI Standstill, the Ventas/Sunrise Standstill Agreement expired at the conclusion of the auction -- and it is objectively reasonable, given this background, that it would seek protection against competition from those who were unsuccessful in the auction, particularly its principle competitor.

[29] From Sunrise's perspective, the safety valve lies in the unitholders' meeting. If the unitholders believe that there is a more favourable offer available -- one worth the risk of rejecting the Ventas proposal -- they may well vote to reject the Ventas proposal at their meeting on March 30.

[30] The language used by the parties in the Purchase Agreement supports this interpretation.

[31] Viewed contextually, ss. 4.4(1), 4.4(2), 4.4(3) and 4.4(8) form part of a section of the Purchase Agreement that deals with the general covenant of Sunrise not to shop for other offers pending unitholder consideration of the Ventas bid. Viewed in light of the factual matrix in which the Agreement was negotiated, the provisions provide deal protection for Ventas, as the successful bidder in the auction, subject to Sunrise REIT's fiduciary out obligations.

[32] As I read s. 4.4 of the Agreement, it has four major components. First, it contains the overriding obligation of Sunrise not to solicit other bids, buttressed by the commitment of Sunrise to enforce existing standstill agreements that may be in place with bidders who have already engaged in the auction process (s. 4.4(1)). Secondly, it contains the "fiduciary out" protection for the Sunrise Trustees (and unitholders), permitting the Trustees to consider bona fide unsolicited Acquisition Proposals from third parties (that are not in breach of the provisions of section 4.4) (ss. 4.4(2) and 4.4(3)). Thirdly, it contains a series of provisions dealing with how the parties are to address a situation [page266] where a permitted Acquisition Proposal is received (ss. 4.4(3)-4.4(7)).[5] Lastly, s. 4.4(8)(v) returns to the general non-solicitation obligation, reinforcing it by ensuring that Sunrise will (i) ensure all of its officers, Trustees and agents are aware of the non-solicitation provisions, (ii) immediately stop negotiating with anyone previously involved in the bidding process, (iii) require those bidders to return any confidential documentation and information they may have received during the process, (iv) terminate access to the data room by anyone other than Ventas and its representatives, and finally (a reiteration of the requirement set out in s. 4.4(1)):

> (v)    not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties.

[33] Contrary to the appellants' submissions, however, it is not any Acquisition Proposal that the Trustees are free to consider as part of the fiduciary out scenario; it is only an Acquisition Proposal from a third party that is not in breach of section 4.4 of the Agreement.

[34] Properly understood in this fashion, then, a reading of s. 4.4 demonstrates that there is no conflict between the provisions of ss. 4.4(1)(ii), 4.4(2), 4.4(3) and 4.4(8)(v). The repeated standstill enforcement terms complement one another. As the application judge pointed out, the opening phrases of ss. 4.4(2) and 4.4(3) -- "notwithstanding anything contained in Section 4.4(1)" -- do not have the words "or Section 4.4(8)(v)" added to them. This reinforces the interpretation that s. 4.4(8)(v) is there to clarify that Sunrise's obligation to enforce its Standstill Agreements with third parties is not negated by the fiduciary out clause. An unsolicited proposal by a prior bidder bound by a Standstill Agreement is a proposal that is otherwise in breach of s. 4.4, because it violates s. 4.4(8)(v), and therefore is not immunized by the fiduciary out provisions.

[35] In that sense, contrary to the appellants' submissions, the application judge's reading of the Purchase Agreement does not reduce s. 4.4(8)(v) to simply the functional equivalent of s. 4.4(1)(ii). Nor is it a case of s. 4.4(8)(v) continuing to require the enforcement of a Standstill Agreement even when the fiduciary out clause is otherwise applicable. The fiduciary out clause [page267] does not apply where the unsolicited proposal is tendered in breach of the non-solicitation provisions of the Purchase Agreement, i.e., in breach of a Standstill Agreement that Sunrise is obliged to enforce. The fiduciary out formula is an important feature of the non-solicitation format, but it does not allow Sunrise to resile from the terms of its Standstill Agreements with earlier bidders, in my opinion.

The difference in wording between sections 4.4(1)(ii) and 4.4(8)(v)

[36] Mr. Howard emphasized what he argued was a difference in wording between those two provisions. He points out that s. 4.4(1)(ii) expressly refers to situations involving "an actual or potential Acquisition Proposal" whereas s. 4.4(8)(v) contains no such reference, and further, that other subsections of s. 4.4(8) -- namely, ss. 4.4(8)(ii) and (iii) -- refer to Acquisition Proposals as well, although not in the context of standstill agreements (4.4(8)(ii) and 4.4(8)(iii)). Because s. 4.4(8)(v) does not refer to "Acquisition Proposals", Mr. Howard submits it does not apply in the context of such a proposal and therefore does not apply in the context of the HCPI Acquisition Proposal.

[37] There are several problems with this argument. First, it misapprehends the fact that any proposal to acquire more than 20 per cent of the assets of Sunrise -- whether made before or after the close of the auction -- constitutes an "Acquisition Proposal" as defined in the Agreement. Consequently, s. 4.4(8) (v) can only apply in the context of an Acquisition Proposal of some sort, regardless of its wording.

[38] Secondly, the argument appears to be founded on the unarticulated premise that an Acquisition Proposal, as referenced in ss. 4.4(1)(ii), 4.4(2) and 4.4(3), is the equivalent of a

Superior Proposal. The appellants' theory of the Agreement is that the Trustees are entitled to consider any Acquisition Proposal received after the close of the auction, and that the commitment in s. 4.4(8)(v) to enforce standstill agreements only applies in the event that a subsequent Acquisition Proposal received by the Trustees does not make the grade as a Superior Proposal. The function of s. 4.4(8)(v), they say, is to permit the Trustees in such circumstances to prevent a bidder in such a case -- whether a prior bidder or not -- from continuing to participate in the bidding process.

[39] It is not the case, however, that an Acquisition Proposal and a Superior Proposal are the same thing. The latter is a narrower concept than the former. While an Acquisition Proposal is essentially an offer by anyone to acquire more than 20 per cent of [page268] the assets of Sunrise, a Superior Proposal is an Acquisition Proposal[6] that is more favourable to the unitholders from a financial point of view than the Ventas bid. Sunrise submits, at para. 43 of its factum, that s. 4.4(8)(v) "is part of the filtering protection for both Ventas and Sunrise REIT that allows and obliges Sunrise REIT to deal summarily with offers that do not meet the Acquisition Proposal threshold". Sunrise does not mean the "Acquisition Proposal threshold" in this statement, however; it means the "Superior Proposal threshold". To support the appellants' argument, the reference to "Acquisition Proposal" in s. 4.4(1)(ii) would have to be read as "Superior Proposal". That is not what it says.

[40] Moreover, and in any event, a careful reading of s. 4.4(1)(ii) does not bear out the nexus between the reference to "Acquisition Proposal" and the commitment to enforce the standstill agreements. For ease of reference I repeat the wording of s. 4.4(1)(ii) here:

> 4.4(1) Following the date hereof, Sunrise REIT shall not . . .

> (ii)   participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries.

[41] Section 4.4(1)(ii) in reality contains two prohibitions, not one. The language does not work otherwise. Sunrise agrees not to participate in discussions or negotiations regarding actual or potential Acquisition Proposals. It also agrees not to release anyone from, or fail to enforce, existing Standstill Agreements. The drafters could well have divided s. 4.4(1) into six general prohibitions rather than five. The commitment to enforce the Standstill Agreements is not, therefore, tied to "Acquisition Proposals" in a way that s. 4.4(8)(v) is not.

[42] Accordingly, I agree with the application judge's observation that while the appellants' interpretation arguments are creative, they are strained. As she said [at para. 39], "They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a

whole."

An interpretation that reflects the "factual matrix", is "commercially sensible", and accords with the fiduciary obligations of the Sunrise trustees

[43] Nor do I accept the submission that the application judge failed to consider the factual matrix underlying the negotiation of [page269] the Purchase Agreement, or that she failed to give effect to the "commercial sense" component of contract interpretation.

[44] In a blended argument, the appellants submit that the application judge's interpretation of the Purchase Agreement ignores the factual matrix in which the Agreement was negotiated, defies commercial sense and reasonableness, and eviscerates the fiduciary out mechanism that was central to the parties' agreement. Respectfully, I do not read the application judge's reasons in this fashion.

The factual matrix

[45] Contracts are not made in a vacuum, and there is no dispute that the surrounding circumstances in which a contract is negotiated are relevant considerations in interpreting contracts. As this court noted in Kentucky Fried Chicken, supra, at para. 25, "[w]hile the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance."

[46] Sunrise points to a number of surrounding circumstances which it says the application judge ignored in arriving at her decision. These include that:

(a)    the Purchase Agreement was entered into at the conclusion of the second stage of a private sale auction process where it was clear that the overall objective of Sunrise was to maximize value for [its] unitholders;

(b)    the expectations of the bidders, objectively determined, could not have been that the "winner" of the auction was assured of acquiring the Sunrise assets, because everyone was aware that there would be a fiduciary out clause and that superior proposals could displace the winning bid;

(c)    Ventas's own standstill terms ceased to apply in the event that Sunrise entered into a sales transaction with a third party, and Ventas could not know whether the other Standstill Agreements rested on the same footing (and did not know that HCPI's did not);

(d)    Ventas never told Sunrise it believed the participants in the auction would be excluded from the operation of the fiduciary out provision; and

(e)    Ventas had bargained for, and achieved, considerable deal protection, in the form of the "no shop" provision, the right [page270] to match any Superior Proposal, and the right to receive a $39.8 million break fee if it chose not to match such an offer.

[47] Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such matters. Here, the experienced Commercial List judge was exercising a function common to that role -- the interpretation of a commercial contract -- and, while she may not have dealt with the foregoing themes expressly as the appellants would like, her reasons, read as a whole, indicate that she was alive to most, if not all, of them. She was certainly aware of the facts contained in points (a), (b), (c) and (e) above, as she dealt with them at one time or another in the reasons. The factor mentioned in (d) is not dispositive of anything.

[48] At the conclusion of her consideration of the interpretation issue, as noted earlier, the application judge said (at paras. 38 and 39):

> It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.
>
> Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone else who is in breach of its standstill agreement.

(Emphasis added, footnote omitted)

[49] I can find no basis for concluding the applications judge was not attuned to the need to keep the factual matrix in mind when conducting her interpretative exercise.

[50] Nor do I accept that she either ignored the need to interpret the contract in a way that reflected sound commercial sense, or that she failed to give it such an interpretation. It is apparent from her recitation of the principles of contract interpretation that she was aware of the relevance of the "sound commercial sense" theme. She cited the following passage from this court's decision in Kentucky Fried Chicken, supra, at para. 27:

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity: [Toronto (City) v. W.H. Hotel Ltd., [1966] S.C.R. 434, [1966] S.C.J. No. 23, 56 D.L.R. (2d) 539, at p. 548 D.L.R.]. Rather, the document should be construed in accordance with sound commercial principles [page271] and good business sense: [Scanlon v.

Castlepoint Development Corporation (1992), 11 O.R. (3d) 744, [1992] O.J. No. 2692 (C.A.], at p. 770 O.R.]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

[51] The appellants' argument that the application judge failed to interpret the Purchase Agreement in a fashion that accords with sound commercial sense is grounded in the belief that she overlooked the importance of the "maximizing value" principle and the centrality of the Trustees' fiduciary obligations in that regard, in cases of this nature. She did neither, in my view.

[52] As noted above, the application judge was sensitive to the fiduciary out provisions that permitted other bona fide written unsolicited Acquisition Proposals. In her view, however, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation makes commercial sense, in my view.

[53] On behalf of HCPI, Mr. Leon placed great emphasis on the sanctity of the fiduciary out mechanism in acquisition agreements of this nature. There is no doubt that the directors of a corporation that is the target of a takeover bid -- or, in this case, the Trustees -- have a fiduciary obligation to take steps to maximize shareholder (or unitholder) value in the process: see CW Shareholdings Inc. v. WIC Western International Communications Ltd. (1998), 39 O.R. (3d) 755, [1998] O.J. No. 1886 (Gen. Div.), at pp. 768 and 774 O.R. That is the genesis of the "fiduciary out" clauses in situations such as the case at hand. They enable directors or trustees to comply with their fiduciary obligations by ensuring that they are not precluded from considering other bona fide offers that are more favourable financially to the shareholders or unitholders than the bid in hand.

[54] It is not necessary -- nor would it be wise, in my view -- to go as far as HCPI suggests this court might go, and adopt the principle gleaned from some American authorities, that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable: see Paramount Communications, Inc. v. QVC Network Inc., 637 A. 2d 34 (Del. 1994), and ACE Ltd. v. Capital Re Corp., 747 A. 2d 95 (Del. Ch. 1999), at p. 105. That is not what happened in this case.

[55] The Trustees did not contract away their fiduciary obligations. Rather, they complied with them by setting up an auction process, in consultation with their professional advisers, that was designed to maximize the unit price obtained for Sunrise's [page272] assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. In this case, that turned out to be only HCPI.

[56] An auction process is well-accepted as being one -- although only one -- "appropriate mechanism to ensure that the board of a target company acts in a neutral manner to achieve the best

value reasonably available to shareholders in the circumstances": Maple Leaf Foods Inc. v. Schneider Corp. (1999), 42 O.R. (3d) 177, [1999] O.J. No. 4142 (C.A.), at p. 200 O.R. Here, the trustees, acting reasonably and on professional advice, formed the view that an auction process was the best way to maximize value, and conducted such an auction to the point where they attracted a successful bidder. This is not a case where the Trustees were unable to judge the adequacy of the bid (Schneider, at p. 200 O.R.). They had dealt with seven prospective purchasers in the course of the two auction rounds, and had received preliminary proposals. Ventas's $15-per-unit price represented a 35.8 per cent increase over the market price of the Units on the date the auction closed. I do not think the Trustees can be said to have failed in the exercise of their fiduciary obligations to their unitholders in these circumstances simply by agreeing in the Purchase Agreement to preclude earlier bidders, who had bound themselves under Standstill Agreements not to do so, from coming in after the auction was concluded and the "successful" bidder had showed its cards and attempting to "top up" that bid.

[57] It is well accepted that "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation": John D. McCamus, The Law of Contracts (Toronto: Irwin Law, 2005) at p. 729. Advancing this principle, the appellants argue that we should be loathe to adopt an interpretation of the Purchase Agreement that is inconsistent with overarching fiduciary obligations. While I accept the principle put forward, however, I do not think it applies in the context of this case for the reasons outlined above. The interpretation given to the Purchase Agreement by the application judge is not inconsistent with the Trustee's fiduciary obligation to maximize unitholder value. Indeed, it is consistent with that obligation.

[58] Finally, Mr. Leon emphasizes the importance of the word "nothing" in the opening language of ss. 4.4(2) and 4.4(3) of the Purchase Agreement. Both provisions open with the words [page273] "Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from . . ." (emphasis added). Mr. Leon submits that "nothing" means what it says, and must be given the full scope of that meaning, in order to ensure that "nothing" in the Purchase Agreement or otherwise is permitted to stand in the way of the Trustees performing their duty to maximize shareholder value. This point involves parsing the Purchase Agreement in a microscopic fashion that is a little too fine, in my view. The use of the word "nothing" in ss. 4.4(2) and 4.4(3) is nothing more than a different way of saying "Notwithstanding anything contained in Section 4.4(1) . . . the Board is not prevented from . . .". I would not ascribe to it the expanded role that HCPI proposes.

The meaning of "bona fide"

[59] The appellants also attack the conclusion of the application judge that the HCPI Acquisition Proposal was not a "bona fide" offer. She accepted the Ventas submission that "a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be bona fide", noting that ss. 4.4(2) and 4.4(3) of the Purchase Agreement contemplate an Acquisition

Proposal from a third party "that did not result from a breach of . . . Section 4.4".

[60] There was much debate about the meaning of "bona fide". The application judge viewed it as meaning acting "in good faith; sincere, genuine", relying upon The Oxford English Dictionary.[7] She found that the HCPI Acquisition Proposal was not bona fide because it was made in breach of the HCPI Standstill Agreement, which Sunrise was obliged by s. 4.4 to enforce. The appellants agree that bona fide means "genuine" or "made in good faith", but submit that a bona fide Acquisition Proposal, as contemplated by the Purchase Agreement, is one that is "genuine" or "authentic" in the sense that it is not a sham and is reasonably capable of becoming a Superior Proposal, and that this decision must be made in the context of the entire situation.

[61] In the end, there is not much difference between the parties as to the meaning of the term "bona fide". As with the principles of contract interpretation, they differ on the application of the term in the circumstances of this case. Given the language of the Purchase Agreement, and the context in which it was negotiated -- particularly the language "that did not result from a breach of this Section 4.4" in ss. 4.4(2) and 4.4(3) -- I do not think [page274] the application judge erred in her assessment and use of the term "bona fide" here.

Miscellaneous

[62] Two additional points were made by the appellants, but need not be dealt with at length.

[63] First, HCPI argued that Sunrise had given its prior consent to HCPI to make its subsequent Acquisition Proposal following completion of the auction process and the execution of the Purchase Agreement. This consent is said to derive from the waiver Sunrise gave to both HCPI and Ventas as part of the invitation to bid in the second round. The application judge made a specific finding against this position, however, concluding that the December 29, 2006 letter "cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement". There is no basis for interfering with this finding.

[64] Secondly, HCPI submitted that the position of Ventas on these applications was tantamount to saying that the benefit of the HCPI Standstill Agreement had been assigned to it. The application judge correctly found that there was no merit in this argument. I agree with her that neither the Standstill Agreement nor its benefits had been assigned to anyone, and no one was taking the position that they had.

The HCPI Cross-Appeal

[65] HCPI applied for a declaration that communications between it and SSL regarding Sunrise were permitted. The application judge declined to deal with this request, given her ruling which effectively precluded the HCPI Acquisition Proposal from being pursued. She concluded the application was moot.

[66] I agree and for the same reason find it unnecessary to deal with the cross-appeal for the same relief.

Conclusion

[67] For the foregoing reasons, then, I would dismiss both the appeal and the cross-appeal.

[68] If the parties are unable to agree as to costs, they may make brief written submissions in that regard, not to exceed five pages in length.

[69] In closing, I would like to thank all counsel for their able presentations and assistance.

Appeal dismissed. [page275]

Notes

1 BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12, [1993] S.C.J. No. 1, at pp. 23-24 S.C.R.; Scanlon v. Castlepoint Development Corp. (1992), 11 O.R. (3d) 744, [1992] O.J. No. 2692 (C.A.), at p. 770 O.R.

2 Toronto-Dominion Bank v. Leigh Instruments Ltd. (Trustee of), [1998] O.J. No. 2637, 40 B.L.R. (2d) 1 (Gen. Div.) at para. 403, affd (1999), 45 O.R. (3d) 417, [1999] O.J. No. 3290 (C.A.); Venture Capital USA Inc. v. Yorkton Securities Inc. (2005), 75 O.R. (3d) 325, [2005] O.J. No. 1885 (C.A.), at para. 26; Eli Lilly & Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129, [1998] S.C.J. No. 59, at pp. 166-68 S.C.R. ("Eli Lilly").

3 Eli Lilly, ibid, at p. 166 S.C.R.; Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd. v. Scott's Food Services Inc. [1998] O.J. No. 4368, 114 O.A.C. 357 (C.A.), at paras 25-27 ("Kentucky Fried Chicken").

4 Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888, [1979] S.C.J. No. 133, at p. 133, at p. 901 S.C.R.; Kentucky Fried Chicken, ibid.

5 The Proposal has to be a Superior Proposal; Sunrise has to notify Ventas of the Proposal and provide it with all relevant documentation; Ventas had the right to match the Proposal within five days (as defined) and, if it chooses not to, to terminate the Agreement and receive the break fee (see also, s. 5.3 and Schedule "B" (definition of "Termination Payment"))

6 That meets the s. 4.4.(2) requirements of being bona fide and unsolicited.

7 2d ed., s.v. "bona fide".

TAB   3

*Indexed as:*

# Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc.

**Novopharm Limited, appellant;**

v.

**Eli Lilly and Company and Eli Lilly Canada Inc., respondents,**
and
**The Minister of National Health and Welfare, respondent.**
And between
**Apotex Inc., appellant;**
v.
**Eli Lilly and Company and Eli Lilly Canada Inc., respondents,**
and
**The Minister of National Health and Welfare, respondent.**

[1998] 2 S.C.R. 129

[1998] S.C.J. No. 59

File Nos.: 25402, 25348.

Supreme Court of Canada

1998: January 21 / 1998: July 9.

**Present: L'Heureux-Dubé, Gonthier, Cory, McLachlin,
Iacobucci, Major and Bastarache JJ.**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Patents -- Infringement -- Sublicensing -- Licensee agreeing to supply patented medicine to
unlicensed third party -- Licence expressly prohibiting sublicensing -- Breach of licence terms
grounds for termination of licence -- Whether supply agreement between licence holder and third
party a sublicence or having legal effect of creating a sublicence.*

*Agency -- Supply agreement -- Licensed party to obtain patented bulk medicine for unlicensed
party -- Whether licensed party acting as agent of unlicensed party in carrying out contractual*

*obligations.*

*Patents -- Notice of allegation (NOA) -- Proper date for assessing NOA.*

*Jurisdiction -- Declaratory relief -- Whether declaration should issue as to patent holder's failure to show notice of allegation unjustified or that it was entitled to terminate compulsory licence -- Whether appropriate to declare that supply agreement not constituting sublicence or transfer of compulsory licence.*

*Patents -- Medicine -- Reformulation of patented product -- Bulk medicine reformulated into final-dosage form -- Whether reformulation of patented product amounting to infringement of patent.*

Eli Lilly and Co. ("Eli Lilly") owned the Canadian patents for nizatidine and for its manufacturing process. It alone held a notice of compliance (NOC) to produce and market certain final-dosage forms of the medicine. Novopharm held a compulsory licence, obtained under the Patent Act (the "Act") as it existed prior to February, 1993, which permitted it to use the patented process to make nizatidine for the preparation or production of medicine and to import and/or sell medicine made by the process. The licence stipulated that it was non-transferable, prohibited Novopharm from granting any sublicence, and provided Eli Lilly with the option to terminate the licence upon any breach of its terms.

In anticipation of the 1993 amendments to the Act, which radically altered the procedures for the issuance of NOCs and eliminated the compulsory licensing regime entirely, Novopharm and Apotex entered a "supply agreement" in November, 1992. The agreement provided that, where one party held a licence for a patented medicine for which the other did not, the licensed party would obtain, at the request and direction of the unlicensed party, specified quantities of that medicine, and supply it to the unlicensed party at cost plus a four per cent royalty. In April, 1993, Apotex commenced efforts to obtain a NOC for certain final-dosage forms of nizatidine, and issued a notice of allegation ("NOA") alleging that no claim for nizatidine or for its use would be infringed. In support of this allegation, Apotex relied upon the licence issued to Novopharm and the "mutual understanding" with Novopharm. On the same date, Apotex notified Novopharm of its intention to request Novopharm to supply it with nizatidine. However, Apotex also indicated that, because it did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased.

Eli Lilly and Eli Lilly Canada Inc. ("Eli Lilly Canada") brought an application (Eli Lilly and Co. v. Apotex Inc., S.C.C., No. 25348 (Apotex #1)), under s. 6(1) of the Patented Medicines (Notice of Compliance) Regulations (the "Regulations"), for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under the amended Patent Act, would be the first date on

which Apotex, without a NOC, would be entitled to import nizatidine for consumption in Canada. On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence, alleging that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. The Federal Court --Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence but nonetheless granted the prohibition order on the grounds that, because the reformulation of nizatidine for consumption in Canada would infringe Eli Lilly's patent, the NOA was not justified. The Federal Court of Appeal dismissed Apotex's appeal, but on the grounds that the agreement did constitute a sublicence.

In July 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to nizatidine and relied on its own compulsory licence as the basis for the non-infringement of the patents. Eli Lilly and Eli Lilly Canada brought an application before the Federal Court--Trial Division (Eli Lilly and Co. v. Novopharm Ltd., S.C.C., No. 25402 (the Novopharm proceeding)), requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way. The application was dismissed at trial but this decision was reversed by the Federal Court of Appeal.

The issue common to both appeals is whether the agreement between Apotex and Novopharm constituted a sublicence, such as to justify Eli Lilly's purported termination of Novopharm's compulsory licence. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. Each appeal also raises other discrete issues. Specifically, in the Novopharm proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in Apotex #1 to the Novopharm appeal, whether as res judicata or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which the NOA proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In Apotex #1, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

      Held:    The appeals should be allowed.

A sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. By the grant of a licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. Thus, for Novopharm to have granted a sublicence to Apotex, it must have granted, either expressly

or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence. This may have been accomplished either by virtue of some express provision or provisions of the agreement, or by virtue of its actual legal effect (even if this runs contrary to the subjective intentions of the parties).

The ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination. It is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. Here, there was no ambiguity to the contract entered into between Apotex and Novopharm and further interpretive aids were therefore unnecessary. The evidence as to the subjective intentions of the principals at the time of drafting was thus inadmissible by virtue of the parol evidence rule especially since it did not go to the circumstances surrounding the making of the contract.

Nothing in the wording of the document suggested that the parties intended to grant sublicences to each other. Rather, every indication was that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. While no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But there was no indication that Apotex acquired any other independent rights under the compulsory licence. In fact, such an interpretation would be inconsistent with the combined effect of certain express provisions of the agreement.

To prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed. The sale of a licensed article, while it does transfer to the purchaser the rights of use and alienation, does not have the automatic effect of constituting the purchaser a sublicensee; thus, the fact that a third party enjoys these rights cannot alone be indicative of the existence of a sublicence. Any number of ways exist in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. The rights of use and alienation can only be determinative of the existence of a sublicence where there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type. Where the rights of the unlicensed party are derived from a sale of licensed material, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted. This situation was plainly contemplated by the supply agreement here, under which the only way Apotex could acquire bulk nizatidine was by purchasing it from Novopharm, not directly from Novopharm's supplier.

Further, because legitimate transfers were to take place between separate entities, dealing at arm's length, the contemplated transactions could not be characterized, ex ante, as shams. While it was theoretically possible that the agreement could be implemented in an infringing way, it had not yet been implemented at all and thus any suggestion of infringement was speculative. The agreement did not, on its face or in its actual legal effect, amount to a sublicence.

The degree of control likely to be exercised by Apotex over the acquisition of nizatidine would not result in a situation where Novopharm in reality would be acting as Apotex's agent. Nor would Novopharm, because of its allegedly standing in the shoes of Apotex, become an unlicensed entity. Under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations.

Given that the agreement was properly characterized as a supply agreement and given that the agreement had not been implemented at the material time, it was not necessary to decide if the Federal Court of Appeal erred in applying its decision in Apotex #1 to its decision in Novopharm.

Since the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued (see Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare, S.C.C., No. 25419 (Apotex #2)), Novopharm's NOA was not premature and therefore unjustified. Pursuant to s. 39.14 of the Patent Act, it was entitled to manufacture the medicine itself or through Canadian agents seven years after the date of the issue of the first NOC to Eli Lilly Canada. As this seven-year period had expired before the date the application was heard, Novopharm was entitled, as of the date of hearing, to manufacture or have made the drug for its own use, for sale for consumption in Canada. The NOA did not specify that the nizatidine was to be imported and not produced in Canada, and so, at the date of hearing, there existed at least one non-infringing way for Apotex to obtain the necessary medicine.

In light of its other findings, it was not necessary for the Court to grant declaratory relief to the effect that Eli Lilly failed to show either that the NOA was not justified, or that it was entitled to terminate the compulsory licence. Moreover, in light of the limited nature of these judicial review proceedings, it would be inappropriate for this Court to declare conclusively, and for purposes other than those of these appeals, that the supply agreement did not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex. Accordingly, the requested declaratory relief was denied.

Absent express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he or she sees fit, so long as such dealings do not infringe the rights conferred by the

patent. The reformulation of nizatidine into final-dosage form would not have the effect of creating a new article, such as to infringe Eli Lilly's patent. Rather, reformulation is more akin to repackaging the substance into a commercially usable form, which is not a violation of any rights under the patents. The right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, encompasses the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. This is, in reality, the only practical use of bulk medicine in the hands of a purchaser, which may explain why reformulation was implicitly contemplated by the compulsory licence held by Novopharm. Apotex therefore would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right. Thus, in the absence of some express prohibition in the compulsory licence, the right to reformulate should be seen as inherent to the purchaser's right to deal with licensed material as he or she sees fit. Eli Lilly accordingly failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

## Cases Cited

Distinguished:  E.I. du Pont de Nemours & Co. v. Shell Oil Co., 227 USPQ 233 (1985); referred to: Apotex Inc. v. Merck Frosst Canada Inc., [1998] 2 S.C.R. 193; Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare) (1997), 75 C.P.R. (3d) 129; David Bull Laboratories (Canada) Inc. v. Pharmacia Inc., [1995] 1 F.C. 588; Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888; Merck & Co. v. Apotex Inc. (1994), 59 C.P.R. (3d) 133, rev'd in part [1995] 2 F.C. 723; Carey v. United States, 326 F.2d 975 (1964); Howard and Bullough, Ld. v. Tweedales and Smalley (1895), 12 R.P.C. 519; Lampson v. City of Quebec (1920), 54 D.L.R. 344; Joy Oil Co. v. The King, [1951] S.C.R. 624; Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497; Badische Anilin und Soda Fabrik v. Isler, [1906] 1 Ch. 605; Gillette v. Rea (1909), 1 O.W.N. 448; Betts v. Willmott (1871), L.R. 6 Ch. App. 245; Intel Corp. v. ULSI System Technology Inc., 995 F.2d 1566 (1993); Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (1996); Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare) (1994), 55 C.P.R. (3d) 302; National Phonograph Co. of Australia, Ltd. v. Menck, [1911] A.C. 336; Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd., [1970] S.C.R. 833, aff'g [1969] 1 Ex. C.R. 529; Rucker Co. v. Gavel's Vulcanizing Co. (1985), 7 C.P.R. (3d) 294.

## Statutes and Regulations Cited

Food and Drug Regulations, C.R.C., c. 870, s. C.08.004.
Patent Act, R.S.C., 1985, c. P-4, s. 39(4), 39.11 [ad. c. 33 (3rd Supp.), s. 15], 39.14 [idem].
Patent Act Amendment Act, 1992, S.C. 1993, c. 2, s. 11(1).
Patented Medicines (Notice of Compliance) Regulations, SOR/93-133, ss. 4(1), 5, 6, 7.

**Authors Cited**

Fox, Harold G.  The Canadian Law and Practice Relating to Letters Patent for Inventions, 4th ed. Toronto: Carswell, 1969.
Fridman, G. H. L.  The Law of Contract in Canada, 3rd ed. Scarborough, Ont.: Carswell, 1994.
Melville, Leslie W.  Forms and Agreements on Intellectual Property and International Licensing, vol. 1, 3rd ed. rev.  New York:  West Group, 1997 (loose-leaf updated August 1997, release 29).

APPEAL (Eli Lilly and Co. v. Novopharm Ltd., S.C.C., No. 25402) from a judgment of the Federal Court of Appeal (1996), 67 C.P.R. (3d) 377, 197 N.R. 291, [1996] F.C.J. No. 576 (QL), allowing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 181, 91 F.T.R. 161, [1995] F.C.J. No. 238 (QL), granting an application for judicial review and prohibiting the Minister from issuing a notice of compliance. Appeal allowed.

APPEAL (Eli Lilly and Co. v. Apotex Inc., S.C.C., No. 25348) from a judgment of the Federal Court of Appeal (1996), 66 C.P.R. (3d) 329, 195 N.R. 378, [1996] F.C.J. No. 425 (QL), dismissing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 206, 91 F.T.R. 181, [1995] F.C.J. No. 237 (QL), dismissing an application for judicial review. Appeal allowed.

Harry B. Radomski, Richard Naiberg and David Scrimger, for the appellant Apotex Inc.
Donald N. Plumley, Q.C., Mark Mitchell and Stephanie Chong, for the appellant Novopharm Limited.
Anthony G. Creber and David Watson, Q.C., for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

Solicitors for the appellant Apotex Inc.: Goodman, Phillips & Vineberg, Toronto.
Solicitors for the appellant Novopharm Limited: Ridout & Maybee, Toronto.
Solicitors for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.: Gowling, Strathy & Henderson, Ottawa.

---

The judgment of the Court was delivered by

**1    IACOBUCCI J.**:-- A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "Novopharm" and "Apotex #1", reasons in Apotex Inc. v. Merck Frosst Canada Inc., [1998] 2 S.C.R. 193 ("Apotex #2"), are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the

two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

**2**    Owing to the intertwining nature of the lower court decisions in Novopharm and Apotex #1, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

    I.    Background

A. The Patents and the Compulsory Licence

**3**    Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the Patent Act, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

> 39.... (4)... (a) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or production of which the invention has been used or sell any medicine in the preparation or production of which the invention has been used, or

> (b)    where the invention is other than a process, to import, make, use or sell the invention for medicine or for the preparation or production of medicine. . .

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the applicant a licence to do the things specified in the application unless there existed a good reason not to grant such licence.

**4**    These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the process by which the medicine is made. On December 31, 1987, the Department of National Health and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"), pursuant to s. C.08.004 of the Food and Drug Regulations, C.R.C., c. 870, thereby permitting Eli Lilly Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

**5**    On January 17, 1990, Novopharm applied under s. 39(4) of the Patent Act for a compulsory licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly, but, it was found that none of the objections constituted a valid reason to refuse the application and the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make nizatidine for the preparation or production of medicine, and to import and/or sell medicine made by the process. It also permits Novopharm to make, use, sell and import either or both of the invention for medicine and the invention for the preparation or the production of medicine. The royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final-dosage form is fixed at six percent of the selling price. The Commissioner of Patents, in a decision dated October 21, 1991, found that the licence is not restricted to the forms of medicine listed by Novopharm in its application, as such "would place unnecessary limits on [Novopharm's] operations under the licence".

**6**    Certain other specific terms and conditions of the licence are also relevant. Paragraph 1 contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to arm's length purchasers and contemplates the sale of the medication by Novopharm in both final-dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling prices and royalty computations resulting from the operations of arm's length purchasers of the medicine, non-arm's length purchasers of the medicine in final-dosage form, and any subsequent non-arm's length purchasers from the latter.

**7**    Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and that Novopharm is prohibited from granting "any sublicence".

  B.    The Supply Agreement Between Novopharm and Apotex

**8**    On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the Patent Act, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

    WHEREAS THE Federal Government has introduced Bill C-91 which, if passed,

would eliminate compulsory licensing under the Patent Act,

AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,

AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,

AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,

AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,

NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.  At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

2.  In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3.  In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the

unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4.    In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5.    In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

6.    The licensed party shall comply with the terms of the licence.

7.    The licensed party shall not be excused from performing any act as directed by the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence has remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8.    For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9. The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10. Neither party will engage in preventing or blocking the accessability [sic] of HPB clearance of any raw material affecting present and future pharmaceutical products.

11. This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

12. Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for which a licence was issued to any one or more licence [sic] prior to December 20, 1991, then this agreement shall be terminated.

13. Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994, advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

**9**    On February 15, 1993, most of the provisions of the Patent Act Amendment Act, 1992, S.C. 1993, c. 2, were proclaimed into force. On March 12, 1993, the Patented Medicines (Notice of Compliance) Regulations, SOR/93-133 (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare) (1997), 75 C.P.R. (3d) 129 (F.C.T.D.), at pp. 131-32:

A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the Food and Drug Regulations, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the Patent Act Amendment Act, 1992, ... (the "Patent Act") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file

what is called a Notice of Allegation under Section 5 of the Regulations.

...

> In effect, under Subsection 5(3) of the Regulations, in a "Notice of Allegation", the generic drug manufacturer, "the second person", signals its compliance with the patents embodied in a medicine. Under Section 4 of the Regulations, the patent owner or licensee, usually a brand name drug manufacturer like the applicants, submits a list of the patents that contain claims for the medicine itself or the use of the medicine. Under Section 3 of the Regulations, the Minister compiles the patent lists into a public document called the "Patent Register".

**10**    As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

**11**    Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(b) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding" whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

**12**    The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased. Although Apotex did apparently locate a source for the nizatidine, it had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

**13**    Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the Patent Act, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in Apotex #1, upon which I shall elaborate shortly.

**14**   On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

C. The Novopharm Proceeding

**15**   On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court--Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

**16**   Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court--Trial Division to grant the relief sought, but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be sufficient to justify an order prohibiting the Minister from issuing a NOC.

**17**   On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licenses". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

**18**   Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a

supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the Patent Act which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

**19**   McGillis J. of the Federal Court--Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in Apotex #1, infra, held that a sublicence had in fact been conferred by virtue of the supply agreement.

       D.    The Apotex #1 Proceeding

**20**   In cross-examination on the hearing of the application for a prohibition order in Apotex #1, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents, given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

**21**   Relying on her analysis in Novopharm, McGillis J. of the Federal Court--Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

**22**   The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no

non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final-dosage form would not have infringed the patents.

    II.    Relevant Statutory Provisions

**23**    Patent Act, R.S.C., 1985, c. P-4

> 39.11 (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,

>     (a)    where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or

>     (b)    where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.

> (2) The prohibition under subsection (1) expires in respect of a medicine

>     ...

>     (c)    ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.

> 39.14 (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,

>     (a)    where the invention is a process, to use the invention for the preparation or production of medicine, or

>     (b)    where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of

medicine

for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

Patented Medicines (Notice of Compliance) Regulations, SOR/93-133

5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,

    (a)    state that the person accepts that the notice of compliance will not issue until the patent expires; or

    (b)    allege that

    (i)    the statement made by the first person pursuant to paragraph 4(2)(b) is false,

    (ii)    the patent has expired,

    (iii)    the patent is not valid, or

    (iv)    no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(b) or subsection (2) the person shall

    (a)    provide a detailed statement of the legal and factual basis for

the allegation; and

(b)    serve a notice of the allegation on the first person and proof of such service on the Minister.

6. (1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(b), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the expiration of one or more of the patents that are the subject of an allegation.

(2) The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

(a)    the expiration of 30 days after the coming into force of these Regulations,

(b)    the day on which the second person complies with section 5,

(c)    subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(d)    subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(b) in respect of any patent on the patent list,

(e)    subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(f)    the expiration of any patent that is the subject of an order

pursuant to subsection 6(1).

(2) Paragraph (1)(e) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

    (a)    the patent has expired; or

    (b)    the court has declared that the patent is not valid or that no claim for the medicine itself and no claim for the use of the medicine would be infringed.

(3) Paragraphs (1)(c), (d) and (e) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(e) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(e) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

III.    Judicial History

A.    Novopharm Ltd. v. Eli Lilly and Co.

(1)    Federal Court--Trial Division (1995), 60 C.P.R. (3d) 181

24    As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the Regulations is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to David Bull Laboratories (Canada) Inc. v. Pharmacia Inc., [1995] 1 F.C. 588 (C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited

or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

**25**    Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novopharm's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

**26**    Relying on the decision of this Court in Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888, McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract". She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted, was inadmissible on the basis of the parol evidence rule. In her view, Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

**27**    With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex". In her view, at p. 199, the true nature of the agreement was that of "a supply agreement dressed up to look like a sublicence". In other words, despite the presence in the supply agreement of wording which might tend to suggest the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

**28**    In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicensed to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

**29**    Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on Consolidated-Bathurst, supra. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she dismissed the application for a prohibition order.

**30**    As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in David Bull Laboratories, supra, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

(2)    Federal Court of Appeal (1996), 67 C.P.R. (3d) 377

**31**    In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in Apotex #1, infra, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

**32**    The court held that, while the previous decision was not res judicata, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in Apotex #1 was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence unique to its own record, the analysis of the supply

agreement in Apotex #1 could therefore be applied to Novopharm. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had indeed been granted. Accordingly, the appeal was allowed.

B.    Apotex Inc. v. Eli Lilly and Co.


(1)    Federal Court--Trial Division (1995), 60 C.P.R. (3d) 206

**33**    In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

**34**    In concluding in Novopharm, supra, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in Novopharm that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in Novopharm applied equally to the case at bar.

**35**    Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in Merck & Co. v. Apotex Inc. (1994), 59 C.P.R. (3d) 133 (F.C.T.D.), and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier" (p. 218).

**36**    Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

(2) Federal Court of Appeal (1996), 66 C.P.R. (3d) 329

(a) MacGuigan J.A. (Robertson J.A. concurring)

**37**    In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions,

Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

**38**    MacGuigan J.A. noted that the conclusion of McGillis J. in Novopharm as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could only have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: see Consolidated-Bathurst, supra.

**39**    MacGuigan J.A. relied on the decision of the Delaware Supreme Court in E.I. du Pont de Nemours & Co. v. Shell Oil Co., 227 USPQ 233 (1985) ("du Pont"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on Carey v. United States, 326 F.2d 975 (Ct. Cl. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

**40**    In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to look like a supply agreement" (p. 338). While he recognized that the subjective intention of the parties was to avoid creating a sublicence, he found that this was at odds with the objective intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

**41**    MacGuigan J.A. also found that, in accordance with his reading of Consolidated-Bathurst, supra, any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation -- the objective analysis of the actual words used by the parties -- and the application of the contra proferentum doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

**42**    Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

(b)    Pratte J.A., dissenting

**43**    Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did not disclose the true nature of the arrangement -- that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug -- there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement". In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

**44**    Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it". He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore, Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

IV.    Issues

**45**    As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

**46**    Specifically, in the Novopharm proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in Apotex #1 to the Novopharm appeal, whether as res judicata or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In Apotex #1, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

V.    Analysis

A.    The Agreement Between Apotex and Novopharm

**47**    The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

(1)    The Nature of a Sublicence

**48**    Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a licence": see Leslie W. Melville, Forms and Agreements on Intellectual Property and International Licensing, vol. 1 (3rd ed. rev. 1997 (loose-leaf)), at sec. 3.18.

**49**    To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a

licence. In Harold G. Fox, The Canadian Law and Practice Relating to Letters Patent for Inventions (4th ed. 1969), the concept is expressed as follows (at p. 285):

> A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done. [Emphasis added.]

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

**50**    Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, Howard and Bullough, Ld. v. Tweedales and Smalley (1895), 12 R.P.C. 519, at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

**51**    For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will examine each of these possibilities in turn.

(2)    Contractual Interpretation and the Intentions of the Parties

**52**    In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In Consolidated-Bathurst, supra, at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of contra proferentem as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

**53**    From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of contra proferentem. Contra proferentem operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that contra proferentem should be applied to interpret the contract against both contracting parties. Indeed, a third party has no basis at all upon which to rely upon contra proferentem: see G. H. L. Fridman, The Law of Contract in Canada (3rd ed. 1994), at p. 471. Therefore, I would, as a preliminary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

**54**    The trial judge appeared to take Consolidated-Bathurst to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.