**55**    Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in Lampson v. City of Quebec (1920), 54 D.L.R. 344 (P.C.), at p. 350:

> . . . the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself .... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses. . . ."

**56**    When there is no ambiguity in the wording of the document, the notion in Consolidated-Bathurst that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words. This is consistent with the following dictum of this Court, in Joy Oil Co. v. The King, [1951] S.C.R. 624, at p. 641:

> . . . in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

**57**    In my view, there was no ambiguity to the contract entered into between Apotex and Novopharm. No attempt was made to disguise the true purpose of the arrangement, or the circumstances surrounding its drafting. Clearly, the agreement was meant to minimize the deleterious effects of the amendments to the Patent Act, which were expected to and did eventually place severe restrictions on the former scheme of compulsory licensing, by maximizing the access of each party to as wide a variety of patented medicines as possible. This was to be accomplished by obliging each party to obtain such material for the other in the event that one party possessed a licence which the other lacked and could no longer readily obtain. All of this is evident on a plain reading of the recitals to the supply agreement. Leaving aside the question of circumventing the legislation, which has no bearing on the interpretation of the contract, the parties' intentions are clear on the face of the agreement. Accordingly, it cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretive aids are necessary.

**58**    More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497 (S.C.C.), at pp. 502-3.

**59**    Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

**60**    Therefore, I am of the opinion that the trial judge erred, in the Novopharm proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in Apotex #1, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

**61**    Having established that no extrinsic evidence is admissible, what does the text of the agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence. Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to act pursuant to the licence.

**62**    Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: four percent of the cost of the material sold. In this way, the royalty does no more than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

**63**    It is true that, in the recitals, the parties refer to a mutual intention to "share their rights",

which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention not to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

64     Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party ... on the grounds that there is doubt as to whether or not the licence ... permits the requested acts" (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

65     Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim. However, it too must be read in light of the rest of the agreement, which simply does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only indirect enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

66     In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various

patented medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

(3)    The Legal Effect of the Supply Agreement

**67**    Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

(i)    Sublicence Versus Purchase and Sale

**68**    By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the Patent Act, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

**69**    As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see Badische Anilin und Soda Fabrik v. Isler, [1906] 1 Ch. 605, at p. 610; see also Gillette v. Rea (1909), 1 O.W.N. 448 (H.C.); Betts v. Willmott (1871), L.R. 6 Ch. App. 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

**70**    But the sale of a licensed article obviously does not have the automatic effect of constituting

the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see Intel Corp. v. ULSI System Technology Inc., 995 F.2d 1566 (Fed. Cir. 1993).

**71**    Thus, practically speaking, the rights of use and alienation can only be determinative of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

**72**    In the present case, it is plainly the latter situation which is contemplated by the supply agreement between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

**73**    A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in Intel, supra, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself would have constituted a sublicence.

**74**    In the instant appeals, the Federal Court of Appeal relied on du Pont, supra, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view du Pont as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal

principle propounded. In du Pont, it was more significant that the unlicensed party actually manufactured the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

75     But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal personnae, and legitimate transfers of property do, in fact, take place. In Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished du Pont, supra, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

76     In my view, Cyrix is much more closely analogous than du Pont to the instant appeal, a case in which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to Apotex. The only real difference is that, where in Cyrix the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed four percent royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

77     Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in du Pont. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, inter alia, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would

result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

**78**    Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and de facto transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would necessarily render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of licensed rights transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

**79**    As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

(4)    The Agency Argument

**80**    In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

**81**    To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the

agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

(5)   Conclusion as to the Nature of the Supply Agreement

**82**   The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the Federal Court of Appeal held otherwise, it was, with respect, in error.

**83**   That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in du Pont, supra. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the Patent Act or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

**84**   Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts: a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is entirely possible that a different result might be reached on the specific facts of another case.

B.    Other Issues in the Novopharm Appeal

(1)    Did the Federal Court of Appeal Err in Applying its Decision in Apotex #1
to its Decision in Novopharm?

**85**    Novopharm submits that, even if the supply agreement were properly interpreted by the
Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be
considered a sublicence for the purposes of the Novopharm appeal. The reason advanced for this
distinction is that nothing on the face of the agreement can be seen as constituting a sublicence, and,
whereas the conclusion of the court in Apotex #1 may have been premised in part on Dr. Sherman's
evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had
actually been taken to implement the agreement. Thus, it is argued that, while it might have been
open to the court to grant the requested prohibition order in Apotex #1 if Dr. Sherman's proposed
implementation would have resulted in the conferral of a sublicence, this evidence was not before
the court in Novopharm and, in fact, was inconsistent with Mr. Dan's evidence as to his
understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into
consideration this material evidentiary difference, it is suggested, this constituted an error of law.

**86**    It is certainly true that each case must be considered on its own facts, and I have already
expressed the view that the implementation of the agreement in a certain way might well result,
hypothetically, in the creation of a sublicence. As such, I agree that it would have been
inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second,
whether as res judicata or otherwise, without considering any material factual differences which
might have existed between the two cases. However, in light of my earlier conclusion as to the
character of the supply agreement, together with the fact that the agreement had not been
implemented at the material time, it is not necessary to decide this issue. None of the parol evidence
considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

(2)    Was Novopharm's Notice of Allegation Premature and Therefore not
Justified?

**87**    Even the unequivocal conclusion as to the character of the supply agreement does not put the
Novopharm matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's
NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully
terminated.

**88**    Pursuant to s. 39.11(2)(c) of the Patent Act, Novopharm was prohibited from importing, under
its compulsory licence, medicine in respect of which a previous NOC had been granted after June
27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed
by the Patent Act Amendment Act, 1992, s. 11(1) of that Act provides that licences granted under
the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39
to 39.14 of the former Act continue to apply to such licences as if those sections had not been

repealed.

**89**    A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

**90**    However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the Patent Act. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

**91**    Pursuant to s. 39.14 of the Patent Act, Novopharm was entitled to use the patented invention for the preparation or production of medicine -- that is, to manufacture the medicine itself or through Canadian agents -- after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

**92**    In Apotex #2, supra, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the Patent Act by obtaining the medicine either from a Canadian supplier or not at all.

    (3)    Jurisdiction to Grant Declaratory Relief

**93**    The final issue to be determined with respect to the Novopharm appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order against the issuance of a NOC, to grant declaratory relief. Specifically,

Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

94    In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

95    As for the third request, I am of the view that it would be inappropriate for this Court to grant the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the summary judicial review that is to be conducted on an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare) (1994), 55 C.P.R. (3d) 302 (F.C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

> In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

> In this connection, it may be noted that, while s. 7(2)(b) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding. [Emphasis added.]

96    This point was reinforced more recently by Strayer J.A. in David Bull Laboratories, supra, at p. 600:

> If the Governor in Council had intended by these Regulations to provide

for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application. As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary nature. If a full trial of validity or infringement issues is required this can be obtained in the usual way by commencing an action. [Emphasis added.]

**97** While the relief requested of the Federal Court of Appeal in these cases touched on issues pertaining to the infringement and/or invalidity of the actual patents, not the effect of an external agreement, I believe that the reasoning involved is also applicable to the Novopharm appeal. The nature of the inquiry on this judicial review proceeding requires only a determination as to whether or not the NOA was justified in the circumstances of this case. While this necessarily entails a decision as to whether, in these particular circumstances, the supply agreement constituted a sublicence and thus justified the termination of the licence, this is not to be taken as a final decision on the nature of the agreement for all purposes. For this Court to make a binding declaration concerning the private rights and obligations of the parties to the agreement would go well beyond the limited scope of the proceeding. Accordingly, I would deny the declaratory relief requested by Novopharm.

    C.    Other Issues in the Apotex #1 Appeal

        (1)    Would the Reformulation of Nizatidine by Apotex into Final-dosage Form Infringe the Patent Held by Eli Lilly?

**98** Even assuming that the supply agreement did not constitute a sublicence, that Novopharm's licence remains in force, and that Apotex is therefore able to purchase bulk nizatidine under the supply agreement as a third-party purchaser, the possibility remains that the use to which Apotex proposes, in its NOA, to put the drug would infringe Eli Lilly's patent. In this vein, Eli Lilly submits that the Federal Court of Appeal erred in holding that the formulation of final-dosage capsules by Apotex would not infringe the patent. Specifically, it is submitted that the rights of use and sale that are inherent in the unrestricted purchase of a licensed article do not permit the making of a new article.

**99** In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

        If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody

knows, "the right to possess and use the thing, the right to its produce and accession, and the right to destroy, encumber or alienate it".... If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, by selling the patented article that he made, the patentee impliedly renounces, with respect to that article, to [sic] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.

The same principles obviously apply when a patented article is sold by a licensee who, under his licence, is authorized to sell without restrictions. It follows that, if Apotex were to purchase bulk Nizatidine manufactured or imported by Novopharm under its licence, Apotex could, without infringing Lilly's patents, make capsules from that substance or use it in any other possible way. [Emphasis added.]

**100**    Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see Badische Anilin und Soda Fabrik v. Isler, supra, at p. 610. Unless otherwise stipulated in the licence to sell a patented article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see National Phonograph Co. of Australia, Ltd. v. Menck, [1911] A.C. 336 (P.C.).

**101**    Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any

rights under the patents.

**102**    No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in Merck & Co. v. Apotex Inc., supra, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged throughout the reformulation process. It exists in the same chemical form in the final-dosage product as in the bulk product. However, the two products are substantially different, in that the bulk form is essentially a powder without other form or shape, while the final-dosage form is a coloured tablet, consisting of the bulk medicine and other ingredients and shaped in a form associated with a particular dosage. Indeed, in the view of MacKay J., the process so described was such a significant transformation that the final-dosage form of enalapril maleate sold by Apotex was not protected by s. 56 of the Patent Act, which authorizes the use and sale of a "specific" patented article by a party who purchased, constructed, or acquired the article before the patent application became open to the inspection of the public. In other words, MacKay J. was unwilling to accept that the final-dosage form was the same "specific article" as the bulk enalapril maleate purchased by Apotex prior to the date on which Merck's patent application became open for inspection.

**103**    However, this conclusion was rejected by the Federal Court of Appeal, in a judgment reported at [1995] 2 F.C. 723. At p. 738, MacGuigan J.A., writing for a unanimous court, expressed the view that "the right to use or sell the 'specific article, etc.' is independent of the form in which the invention is purchased: any form of the invention may be used or sold within the immunity conferred by s. 56" (emphasis in original). In so holding, MacGuigan J.A. relied on the following statement of Hall J. in Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd., [1970] S.C.R. 833, at p. 839, affirming the judgment of Thurlow J. (as he then was) in the court below (reported at [1969] 1 Ex. C.R. 529):

> The question in this case is with respect to the extent of the meaning of "using" and it arises because with respect to "vending" the right of the owner of the specific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] if the owner could not put it to the only use for which it is usable without being liable for infringement. [Emphasis added.]

**104**    Accordingly, MacGuigan J.A. concluded, at p. 741, that:

> The use and sale of the product of a machine, particularly if production is the

only possible use of the machine, is accorded protection under section 56 as a use of the machine itself. . . . In my view, use must be given the same sense in the case of a chemical invention. [Emphasis added.]

**105**    The Merck & Co. v. Apotex Inc. decision highlights the fact that there is really no commercial use for bulk medicine other than its reformulation into final-dosage form, for consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things produced with the article, though reached in the specific context of a s. 56 defence, applies with equal force to the case at bar. That is, the right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar, the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right.

**106**    Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an examination of Novopharm's compulsory licence, which specifically contemplates the sale of the licensed material in bulk form by providing a formula for calculating royalties on product thus sold. As I see it, because there is no other practical use for bulk medicine, this must also be taken to contemplate and implicitly permit the reformulation of the product by the purchaser into final-dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated royalty rates are based on the amounts received by subsequent purchasers in consideration of the sale of final-dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain such use of the medication, he would have provided for this expressly, or, at least, would not have specifically delineated the procedure that is to compensate the patentee for such use.

**107**    Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the right to reformulate is premised on the inherent right of an owner of property to deal with that property as he or she sees fit. In the absence of some express term in the compulsory licence, prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

**108**    I would emphasize, however, that this conclusion is in no way premised upon, and should not

be taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, Rucker Co. v. Gavel's Vulcanizing Ltd. (1985), 7 C.P.R. (3d) 294 (F.C.T.D.). Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

**109**    In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

    VI.    Disposition

            A.      Novopharm Ltd. v. Eli Lilly and Co.

**110**    For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court--Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.

            B.      Apotex Inc. v. Eli Lilly and Co.

**111**    Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.

cp/d/hbb

# TAB  4

*Case Name:*
## Woolcock v. Bushert

**Between**
**Peter Woolcock, plaintiff (respondent), and**
**K. Craig Bushert, Cosmic Frontier Group Inc.,**
**. defendants (appellants)**

[2004] O.J. No. 4498

246 D.L.R. (4th) 139

192 O.A.C. 16

50 B.L.R. (3d) 85

36 C.C.E.L. (3d) 211

3 C.P.C. (6th) 25

134 A.C.W.S. (3d) 756

2004 CanLII 35081

Docket: C41117

Ontario Court of Appeal
Toronto, Ontario

**Goudge, Sharpe and Cronk JJ.A.**

Heard: June 11, 2004.
Judgment: November 5, 2004.

(36 paras.)

*Arbitration -- Stay of proceedings -- Arbitration clause, effect of -- When available -- Bar to stay, arbitration proceedings inadequate.*

Appeal by the defendants from an order that refused to stay the action of Woolcock. Woolcock and the defendant Bushert entered into an agreement to organize the defendant Cosmic Frontier Group. Cosmic was a computer software development company. The agreement provided for the sale of Woolcock and Bushert's shares in Cosmic under certain circumstances. Woolcock and Bushert were the sole directors and equal shareholders in Cosmic. The agreement also contained a compulsory arbitration clause. The parties' relationship deteriorated and Woolcock commenced this action. The defendants applied for an order to stay the action pending arbitration. The application was dismissed because the judge found that only some of Woolcock's claims were arbitrable under the agreement. A partial or full stay of the action was inappropriate. The defendants submitted that all of the claims fell within the scope of the clause and that resort to arbitration was mandatory. Only the arbitrator had jurisdiction to determine the arbitrability of Woolcock's claims.

HELD: Appeal allowed. The court had jurisdiction under the Arbitration Act to determine the scope of the clause. The jurisdiction of an arbitrator to determine the arbitrability of claims was not exclusive. However, all of Woolcock's claims fell within the scope of the clause. The clause was to be widely construed. It had to be interpreted within the context of the entire agreement. The agreement was concerned with the organization of Cosmic and Woolcock and Bushert's roles in it. The parties agreed that disputes between them were to be resolved by arbitration. Nothing was exempted from the scope of the clause. All of Woolcock's claims related to the interpretation and implementation of the agreement. The circumstances under the Act that entitled a court to refuse to grant a stay did not apply.

**Statutes, Regulations and Rules Cited:**

Arbitration Act, 1991, S.O. 1991, c. 17, ss. 7(1), 7(2), 17(1).

**Appeal From:**

On appeal from the order of Justice T.M. Dunn of the Superior Court of Justice dated November 25, 2003, reported at [2003] O.J. No. 4935.

**Counsel:**

Karen E. Jolley, for the appellant.

Donald J. Brown, Q.C., for the respondent.

---

The judgment of the Court was delivered by

1    **CRONK J.A.**:-- This appeal concerns whether an action commenced by the respondent Peter

Woolcock against the appellants K. Craig Bushert and Cosmic Frontier Group Inc. should be stayed in favour of arbitration of the disputes among the parties.

I.    Background

**2**    On July 13, 2001, Woolcock and Bushert entered into a memorandum of agreement (the "Agreement") to provide for the organization of Cosmic, a computer software development company, and the sale of Woolcock and Bushert's shares in Cosmic under certain circumstances. Cosmic is a party to the Agreement.

**3**    Under the Agreement, Woolcock and Bushert became the sole directors and equal shareholders of Cosmic. In addition, Woolcock became the chief executive officer and Bushert became the president of Cosmic.

**4**    The Agreement provides for the governance of Cosmic's affairs and the distribution of profits between Woolcock and Bushert. The parties agreed that unanimity between the shareholders and directors of Cosmic would be required for any matter to be determined by vote of the shareholders or directors. The Agreement also contains share transfer, right of first refusal' and buy-sell' provisions, whereunder one Cosmic share-holder can transfer his shares in Cosmic to a third party or acquire the other shareholder's shares under certain conditions.

**5**    The Agreement contains a compulsory arbitration clause. Section 9.1 of the Agreement states:

> Any dispute or controversy between the parties hereto relating to the interpretation or implementation of any provision(s) of this Agreement shall be resolved by arbitration. ... The arbitration shall proceed in accordance with the provisions of the Arbitration Act (Ontario). It is further agreed that such arbitration shall be a condition precedent to the commencement of any action at any court. The decision arrived at by the arbitrator shall be final and binding and no appeal shall lie therefrom. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

**6**    By December 2002, the relationship between Bushert and Woolcock had deteriorated significantly. Bushert caused Cosmic to stop paying Woolcock his customary remuneration, locked Woolcock out of the corporate premises and denied Woolcock access to Cosmic's accounting records. In February 2003, Bushert purported to exercise his rights under the buy-sell provision of the Agreement by delivering a buy-sell notice to Woolcock. On March 21, 2003, a closing was conducted at the offices of Cosmic's solicitors, whereby Bushert purported to implement the buy-sell provision of the Agreement by purchasing Woolcock's shares in Cosmic.

**7**    On April 7, 2003, Woolcock issued a notice of action against Bushert and Cosmic. In his notice of action and subsequent statement of claim, Woolcock sought various declaratory relief and damages, including:

(i)     declarations that Cosmic's business and affairs had been conducted in an
        oppressive and unfairly prejudicial manner that disregarded his interests
        and that Bushert had wrongfully conducted himself in a similar fashion;

(ii)    an order declaring Bushert's buy-sell notice to be null and void and setting
        aside Bushert's purported acquisition of Woolcock's shares in Cosmic;

(iii)   orders re-appointing Woolcock as a director and the chief executive officer
        of Cosmic and granting him access to Cosmic's corporate and financial
        records;

(iv)    reinstatement of Woolcock's monthly remuneration from Cosmic;

(v)     damages as against Bushert in the amount of $500,000 for breach of the
        Agreement;

(vi)    damages in the amount of $120,000 as against Cosmic for wrongful
        dismissal or, in the alternative, as against Bushert for inducing Cosmic's
        breach of its employment contract with Woolcock;

(vii)   punitive damages in the amount of $100,000 as against Bushert;

(viii)  damages in the amount of $50,000 as against Bushert for spoliation of
        documents and evidence relevant to the matters in dispute;

(ix)    injunctive relief to prevent Bushert from seizing control of Cosmic while
        Woolcock remained a shareholder of the company; and

(x)     an order winding-up Cosmic or granting other oppression remedy-related
        relief.

**8**   Woolcock then moved for interim orders granting him access to specific corporate records of
Cosmic, requiring payment to him of certain remuneration withheld by Cosmic, reinstating his
rights and privileges as an officer of Cosmic and restraining the transfer or disposition of any
Cosmic shares. Woolcock was granted partial interim relief on this motion, from which Bushert and
Cosmic do not appeal.

**9**   As well, Bushert and Cosmic brought a cross-motion for an order staying Woolcock's action
pending arbitration of the matters in dispute among the parties. By order dated November 25, 2003,
Dunn J. of the Superior Court of Justice dismissed this cross-motion, holding that only some of
Woolcock's claims were arbitrable under the Agreement and that a partial or full stay of Woolcock's
action was inappropriate.

**10**   Bushert and Cosmic appeal from the denial of their request for a stay. They do not challenge
the motions judge's discretionary decision to refuse a partial stay. Instead, they argue that all of
Woolcock's claims come within the scope of the arbitration clause under the Agreement and,
consequently, that resort to arbitration is mandatory in this case. They also argue that, given the
provisions of the Agreement, an arbitrator rather than the courts should determine the arbitrability
of Woolcock's claims.

II.     Issues

**11**    Two issues arise on this appeal: (i) whether the motions judge had jurisdiction to determine the scope of the arbitration clause under the Agreement; and (ii) if the motions judge had such jurisdiction, whether he erred in denying a stay of Woolcock's action.

III.    Analysis

(i)    Jurisdiction to Determine Arbitrability

**12**    Section 9.1 of the Agreement states that an arbitration thereunder shall proceed in accordance with the provisions of the Arbitration Act, 1991, S.O. 1991, c. 17 (the "Act"). Section 17(1) of the Act reads, in part: "An arbitral tribunal may rule on its own jurisdiction to conduct the arbitration ..." Thus, under s. 17(1) of the Act, an arbitrator properly appointed under s. 9.1 of the Agreement would have jurisdiction to determine whether Woolcock's claims come within the scope of the arbitration clause.

**13**    However, as observed by a majority of the Supreme Court of Canada in Unifund Assurance Co. v. Insurance Corp. of British Columbia, [2003] 2 S.C.R. 63 at para. 38, there is nothing in the Act to suggest that the jurisdiction conferred upon arbitrators under s. 17(1) was intended in all circumstances to be exclusive. Moreover, in this case, the Agreement does not provide that an appointed arbitrator has exclusive jurisdiction to determine the reach of s. 9.1.

**14**    This court has recognized that where a stay application can be brought and a dispute arises between the parties to an arbitration agreement concerning the scope of the agreement, the courts may determine the arbitrability of the disputed claims. In the recent decision of Mantini v. Smith Lyons LLP (2003), 64 O.R. (3d) 505, the court stated (at para. 17):

> In order to determine whether a claim should be stayed under s. 7(1) of the Arbitration Act, *the court first interprets the arbitration provision, then analyzes the claims to determine whether they must be decided by an arbitrator under the terms of the agreement, as interpreted by the court.* If so, then under s. 7(1), the court is required to stay the action and refer the claims to arbitration subject to the limited exceptions in s. 7(2) [citations omitted; emphasis added]

See also Ontario Hydro v. Denison Mines Ltd., [1992] O.J. No. 2948 (Gen. Div.), Venneri v. Bascom (1996), 28 O.R. (3d) 281 (Gen. Div.) and Onex Corp. v. Ball Corp., [1994] O.J. No. 98 (Gen. Div.), where the courts determined whether a stay in favour of arbitration should be granted by analyzing the nature of the claims advanced in the context of the facts relevant to the dispute and interpreting the scope of the arbitration agreement.

**15**    The motions judge in this case denied a full stay of Woolcock's action on the basis that certain of Woolcock's claims against the appellants fell outside the ambit of the arbitration clause under the Agreement. In Brown v. Murphy (2002), 59 O.R. (3d) 404, this court held that where a motions

judge decides that a matter is not subject to arbitration, an appeal from that decision is not precluded by the Act.

**16** For these reasons, I am unable to accept the appellants' assertion that the motion's judge lacked jurisdiction to determine the scope of s. 9.1 of the Agreement. Accordingly, I would reject this ground of appeal.

(ii)   Denial of a Stay

**17** In denying the appellants' request for a stay of Woolcock's action, the motions judge stated (at paras. 11-13):

> The claims of Woolcock are not solely limited to matters within the purview contemplated by the shareholder's agreement. *The exclusion of Woolcock points to a situation where oppression exists.* He is barred from the premises and access to the records of the day-to-day operations and the development of the software that Woolcock was working on. This underlines the plaintiff's dilemma.

> *The plaintiff has now issued and served a statement of claim reflective of an oppression action.* That action also seeks a declaration or order setting aside the buy/sell procedure initiated by the defendant and the subsequent purchase by the defendant of the plaintiff's interest in the company. Certainly these latter matters might very well fall into the purview of arbitration matters contemplated by the shareholder's agreement.

> *The plaintiff also, however, claims wrongful dismissal or damages for inducing breach of contract. These and other matters referred to in the statement of claim would not fall within the ambit of the shareholder's agreement requirement for arbitration.* I would conclude that there are some matters to which the arbitration requirement applies but some others, of course, to which it does not [emphasis added].

**18** Thus, in the motions judge's view, Woolcock's claims for damages for wrongful dismissal and for the inducement of Cosmic's breach of its employment contract with Woolcock fall outside the scope of s. 9.1 of the Agreement. In addition, as I read the motions judge's reasons, he also concluded that Woolcock's oppression remedy-related claims are not arbitrable under the Agreement.

**19** Woolcock defends these holdings. He argues that his oppression remedy-related claims, his claim for punitive damages and his claims concerning wrongful dismissal and induced breach of contract are not subject to mandatory arbitration under s. 9.1 of the Agreement.

**20**    I do not agree. In my view, for several reasons, all of Woolcock's pleaded claims come within the reach of the arbitration clause contained in the Agreement.

**21**    First, the language utilized by the parties in s. 9.1 suggests that the scope of the clause is to be widely construed. Under s. 9.1, the parties agreed that "*any* dispute or controversy between the parties ... *relating to* the interpretation *or* implementation of *any provision(s) of this Agreement* shall be resolved by arbitration [emphasis added]".

**22**    In Mantini, supra, at para. 19 this court held that the phrase "*any* dispute *in connection with this agreement*" [emphasis added]", as it appeared in an arbitration clause, should receive a broad interpretation. The court concluded that this phrase had a wider scope than the words arising out of', as the disputes subject to arbitration need only be connected to the agreement between the parties and need not arise from' or arise out of' a specific provision of the agreement.

**23**    In this case, although the language of s. 9.1 is tied to the provisions of the Agreement, it nevertheless encompasses any and all manner of disputes "relating to" either the interpretation or implementation of any provision of the Agreement. The words "relating to" enjoy a wide compass. So long as the matter in dispute is referable to the interpretation or implementation of some provision of the Agreement, it is arbitrable under s. 9.1.

**24**    Second, s. 9.1 must be interpreted in the context of the Agreement as a whole. The Agreement is concerned with the organization of Cosmic and Woolcock and Bushert's roles in Cosmic, as well as their dealings and interests in connection with Cosmic. The provisions of the Agreement address the corporate governance of Cosmic and the respective employment positions, profits entitlements and shareholdings of Woolcock and Bushert in Cosmic. In that context, the parties agreed that disputes among them were to be resolved by arbitration. No disputes concerning the interpretation or implementation of the Agreement are exempted from this dispute-resolution model.

**25**    Accordingly, as in Mantini, the thrust of the parties' consensual bargain under s. 9.1 was to agree to a general or universal resort to arbitration in matters concerning the interpretation or implementation of the Agreement. This is confirmed by the introductory language of s. 9.1, to which I have referred, and by the parties' express agreement under s. 9.1 that "[A]rbitration shall be a condition precedent to the commencement of any action at any court." This direction is consistent with the legislative policy enunciated in the Act, which favours arbitration over litigation where the parties so provide by agreement: see Denison Mines, supra.

**26**    Third, in my opinion, and contrary to the findings of the motions judge, all of Woolcock's pleaded claims relate generally to the interpretation or implementation of one or more provisions of the Agreement. Woolcock argues that his claims for punitive damages, wrongful dismissal and the induced breach of his employment contract by Cosmic are not encompassed by the arbitration clause in the Agreement. I disagree.

**27**    Section 2.5 of the Agreement provides for the employment by Cosmic of Woolcock and

Bushert. Section 4.1 concerns, in part, the salaried remuneration and profits entitlements of Woolcock and Bushert. The Agreement is a triparte agreement to which Cosmic, Woolcock's employer, is a party. Woolcock's position and compensation as chief executive officer of Cosmic flow from the Agreement. In these circumstances, his wrongful dismissal and breach of employment contract claims relate to' the interpretation and implementation of these provisions of the Agreement.

28    Woolcock's claim for punitive damages is also related to the implementation of the terms of the Agreement. This claim rests on Woolcock's challenge of Bushert's actions concerning Woolcock's employment with and equity position in Cosmic and his participation in the affairs of Cosmic. These are matters specifically dealt with under the Agreement.

29    As well, Woolcock's oppression remedy-related claims flow from his assertions that Bushert improperly exercised his rights under the buy-sell provision of the Agreement and excluded Woolcock from access to and participation in Cosmic. His complaint, essentially, concerns the events leading up to and the consequences of Bushert's purported acquisition of Woolcock's shares in Cosmic. These relate to one of the foundational matters addressed in the Agreement: the involuntary disposition by one Cosmic shareholder of his shares in Cosmic to the other shareholder.

30    Woolcock relies on Deluce Holdings Inc. v. Air Canada (1992), 12 O.R. (3d) 131 (Gen. Div.) to argue that oppressive conduct triggers an overriding discretion in the court to stay arbitration proceedings where such a stay will not cause prejudice to the majority or other shareholders. In my view, Deluce does not assist Woolcock.

31    In Deluce, a stay of arbitration in favour of court proceedings was ordered as a consequence of demonstrated oppression by a majority shareholder that struck at the heart of the arbitration agreement itself. That is not this case. Here, a stay of court proceedings is sought, in accordance with the legislative preference for the arbitration of disputes expressed in the Act. The stay is opposed, not by a majority shareholder who is alleged to have visited oppression upon a minority shareholder, but by an equal shareholder who claims to have been injured by oppression. The evidence in Deluce was held to "strongly support" the conclusion that the impugned conduct by the majority shareholder could be found to be unfairly prejudicial to and to have unfairly disregarded the interests of the minority shareholder. In contrast, the evidentiary record before this court is insufficient to compel such a conclusion. Although the motions judge held that the exclusion of Woolcock from Cosmic's business "points to a situation where oppression exists" (at para. 11), he also stated (at para. 10): "It may very well be that Bushert acted in his role with Cosmic ... in the best interest of the corporation. This, however, remains to be seen."

32    In addition, in Deluce, the invocation of the arbitration agreement was itself viewed as oppressive conduct. No such assertion is made in this case. Instead, the suggested oppressive conduct by the appellants occurred, not through resort to the Agreement, but through conduct said to be in breach of the Agreement.

33    Accordingly, the type of circumstances that justified the denial of arbitration in Deluce do not apply in this case. Absent the type of circumstances applicable in Deluce, the fact that part of the dispute among the parties involves oppressive conduct does not preclude resort to arbitration where the dispute is captured by an arbitration agreement made by the parties: see Kassem v. Secure Distribution Services Inc., [2004] O.J. No. 508 (Ont. S.C.) and Armstrong v. Northern Eyes Inc. (2000), 48 O.R. (3d) 442 (Div. Ct.), affirmed [2001] O.J. No. 1085 (C.A.).

34    The appellants argue that resort to arbitration is mandatory in the circumstances of this case and that Woolcock's action should be stayed in its entirety pending arbitration. I agree. Section 7(1) of the Act states:

> If a party to an arbitration agreement commences a proceeding in respect of a matter to be submitted to arbitration under the agreement, the court in which the proceeding is commenced shall, on the motion of another party to the arbitration agreement, stay the proceeding.

35    The court is entitled to refuse the stay mandated by s. 7(1) of the Act only in limited circumstances as enumerated in s. 7(2) of the Act. These are not engaged here.

    IV.    Disposition

36    Accordingly, for the reasons given, I would allow the appeal, direct a stay of Woolcock's action and refer the matters in dispute among the parties to arbitration under s. 9.1 of the Agreement. The appellants are entitled to their costs of the appeal on a partial indemnity basis fixed in the amount of $8,000, inclusive of disbursements and Goods and Services Tax. The costs of the appellants' stay motion before the motions judge are referred to the arbitrator for determination.

CRONK J.A.
    GOUDGE J.A. -- I agree.
    SHARPE J.A. -- I agree.

cp/e/qw/qlaxc/qlgxc

```
---- End of Request ----
Print Request: Current Document: 1
Time Of Request: Wednesday, December 08, 2010  16:06:51
```

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

BOOK OF AUTHORITIES OF
GENBAND US LLC

VOLUME I OF II

STIKEMAN ELLIOTT LLP
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada  M5L 1B9

Sean F. Dunphy LSUC#: 24941J
Tel: (416) 869-5662
Alexander D. Rose  LSUC#: 49415P
Tel: (416) 869-5261
Erica Tait  LSUC#: 55996O
Tel: (416) 869-6805
Fax: (416) 947-0866

Lawyers for the Moving Party,
Genband US LLC