# EXHIBIT I

Court File No.  09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE - COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C.
1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION,  NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. c-36, AS AMENDED

BOOK OF AUTHORITIES OF GENBAND US LLC
(Returnable December 15, 2010)

VOLUME II of II

December 10, 2010

STIKEMAN ELLIOTT LLP
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada  M5L 1B9

**Sean F. Dunphy  LSUC#: 24941J**
Tel: (416) 869-5662
**Alexander D. Rose  LSUC#: 49415P**
Tel: (416) 869-5261
**Erica Tait  LSUC#: 55996O**
Tel: (416) 869-6805
Fax: (416) 947-0866

Lawyers for the Moving Party,
Genband US LLC

**TO:**      Attached Service List

*Updated as of Monday, November 29, 2010*

Court File No. 09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### SERVICE LIST

TO:    **OGILVY RENAULT LLP**
Royal Bank Plaza, South Tower
200 Bay Street, Suite 3800
Toronto, Ontario M5J 2Z4

Derrick Tay
Tony Reyes
Jennifer Stam

Email:    dtay@ogilvyrenault.com
treyes@ogilvyrenault.com
jstam@ogilvyrenault.com

Tel:    416.216.4000
Fax:    416.216.3930

Lawyers for the Applicants

- 2 -

TO:    **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:   nortel.monitor@ca.ey.com

Tel:    416.943.3016
Fax:   416.943.3300

AND
TO:    **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:   jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
fmyers@goodmans.ca
carmstrong@goodmans.ca

Tel:    416.597.4107
Fax:   416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO:    **OSLER HOSKIN AND HARCOURT LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:   lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
ahirsh@osler.com

Tel:    416.362.2111
Fax:   416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO:    **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:   dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:    416.868.3538
Fax:   416.364.7813

Lawyers for Export Development Canada

- 3 -

AND TO:
**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON K1A 1K3

Jennifer Sullivan

Email:   jsullivan@edc.ca

Tel:     613.597.8651
Fax:     613.598.3113

AND TO:
**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON M5K 1K7

Robert I. Thornton
Rachelle Moncur
Leanne M. Williams

Email:   rthornton@tgf.ca
         rmoncur@tgf.ca
         lwilliams@tgf.ca

Tel:     416.304.1616
Fax:     416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO:
**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:   john.stringer@mcinnescooper.com
         stephen.kingston@mcinnescooper.com

Tel:     902.425.6500
Fax:     902.425.6350

Lawyers for Convergys EMEA Limited

AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart

Email:   jcarhart@millerthomson.com

Tel:     416.595.8615/8577
Fax:     416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO:
**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:   barry.wadsworth@caw.ca
         lewis.gottheil@caw.ca

Tel.:    416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada

AND TO:
**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC V7X 1S8

R. Hoops Harrison

Email:   hharrison@boughton.ca

Tel:     604.687.6789
Fax:     604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.
in its capacity as duly authorized agent for
Holdings 1506 Enterprises Ltd.

AND TO: **BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email: mmacnaughton@blgcanada.com
Tel: 416. 367.6646
Fax: 416. 682.2837

Email: rjaipargas@blgcanada.com
Tel: 416.367.6266
Fax: 416.361.7067

Email: srappos@blgcanada.com
Tel: 416.367.6033
Fax: 416.361.7306

Lawyers for Bell Canada

AND TO: **LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON M5J 2T7

John Contini
Aaron Rousseau

Email jcontini@langmichener.ca
Tel: 416.307.4148
Fax: 416.304.3767

Email arousseau@langmichener.ca
Tel: 416.307.4081
Fax: 416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO: **SISKINDS LLP**
680 Waterloo Street
London, ON N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email: ray.leach@siskinds.com
dimitri.lascaris@siskinds.com
monique.radlein@siskinds.com

Tel: 519.672.2121
Fax: 519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO: **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email: zychk@bennettjones.com
Tel: 416.777.5738
Fax: 416.863.1716

Email: orzyr@bennettjones.com
Tel: 416.777.5737
Fax: 416.863.1716

Email: finlaysong@bennettjones.com
Tel: 416.777.5762
Fax: 416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

| | | | |
|---|---|---|---|
| AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 | AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 |

Mark Zigler                    Mark Zigler
Susan Philpott                 Susan Philpott
Demetrios Yiokaris             Demetrios Yiokaris
Andrea McKinnon                Andrea McKinnon
Celeste Poltak                 Celeste Poltak

Email:   mzigler@kmlaw.ca              Email:   mzigler@kmlaw.ca
Tel:     416.595.2090                  Tel:     416.595.2090
Fax:     416.204.2877                  Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca            Email:   sphilpott@kmlaw.ca
Tel:     416.595.2104                  Tel:     416.595.2104
Fax:     416.204.2882                  Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca            Email:   dyiokaris@kmlaw.ca
Tel:     416.595.2130                  Tel:     416.595.2130
Fax:     416.204.2810                  Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca            Email:   amckinnon@kmlaw.ca
Tel:     416.595.2150                  Tel:     416.595.2150
Fax:     416.204.2874                  Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca              Email:   cpoltak@kmlaw.ca
Tel:     416.595.2701                  Tel:     416.595.2701
Fax:     416.204.2909                  Fax:     416.204.2909

Lawyers for the Former Employees of Nortel        Lawyers for the LTD Beneficiaries

- 6 -

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:     416.595.8695

Email:   msims@millerthomson.com
Tel:      416.595.8577
Fax:     416.595.8695

Email:   jmklotz@millerthomson.com
Tel:      416.595.4373
Fax:     416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:   joseph.kim@lge.com

Tel:      +82.2.3777.3171
Fax:     +82.2.3777.5345

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:     416.595.8695

Email    msims@millerthomson.com
Tel:      416.595.8577
Fax:     416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:      416.218.1129
Fax:     416.218.1849

Lawyers for IBM Canada Limited

DOCSTOR: 1600901\3

- 7 -

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:    ken.rosenberg@paliareroland.com
Tel:      416.646.4304
Fax:      416.646.4301

Email:    max.starnino@paliareroland.com
Tel:      416.646.7431
Fax:      416.646.4301

Email:    lily.harmer@paliareroland.com
Tel:      416.646.4326
Fax:      416.646.4301

Email:    tina.lie@paliareroland.com
Tel:      416.646.4332
Fax:      416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:    Shayne.kukulowicz@fmc-law.com
          Alex.macfarlane@fmc-law.com
          Michael.wunder@fmc-law.com
          ryan.jacobs@fmc-law.com

Tel:      416.863.4511
Fax:      416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:    patrick.shea@gowlings.com

Tel:      416.369.7399
Fax:      416.862.7661

Lawyers for Westcon Group

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:    rslattery@mindengross.com
          dullmann@mindengross.com
Tel:      416.369.4149
Fax:      416.864.9223

Lawyers for Verizon Communications Inc.

DOCSTOR: 1600901\3

- 8 -

| | | | |
|---|---|---|---|
| AND TO: | **AIRD & BERLIS**<br>Brookfield Place<br>181 Bay Street, Suite 1800<br>Toronto, ON  M5J 2T9 | AND TO: | **GARDINER ROBERTS LLP**<br>Suite 3100, Scotia Plaza<br>40 King Street West<br>Toronto, ON  M5H 3Y2 |

Harry Fogul
Peter K. Czegledy

Email:   hfogul@airdberlis.com
Tel:      416.865.7773
Fax:      416.863.1515

Email:   pczegledy@airdberlis.com
Tel:      416.865.7749
Fax:      416.863.1515

Lawyers for Microsoft Corporation

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:      416.865.6636

Email:   vdare@foglers.com
Tel:      416.865.6641
Fax:      416.865.6636

Lawyers for Andrew, LLC

AND TO:   **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:   renglish@airdberlis.com
          smitra@airdberlis.com

Tel:      416.863.1500
Fax:      416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND TO:   **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND TO:   **ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:   surquhart@ahbl.ca
Tel:      604.484.1757
Fax:      604.484.1957

Lawyers for Algo Communication Products Ltd.

AND TO:   **MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:   mfleming@millerthomson.com
Tel:      416.595.8686
Fax:      416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

- 9 -

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:     416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:     416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:      416.865.7286
Fax:     416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:      416.865.7262
Fax:     416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Perot Systems Corporation

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:   lawrence.crozier@mcmillan.ca
Tel:      416.865.7178
Fax:     416.865.7048

Email:   adam.maerov@mcmillan.ca
Tel:      416.865.7285
Fax:     416.865.7048

Lawyers for Citibank

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

Email:   dgrieve@casselsbrock.com
Tel:      416.860.5219
Fax:     416.350.6923

Lawyers for Alvarion Ltd.

AND
TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:      416.593.2996
Fax:     416.593.5437

Lawyers for Expertech Network Installation Inc.

- 10 -

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:     416.865.6655
Fax:    416.865.6636

Email:  vdare@foglers.com
Tel:     416.865.6641
Fax:    416.865.6636

Lawyers for Amphenol Corporation

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Aaron Rousseau

Email:  arousseau@langmichener.ca
Tel:     416.307.4081
Fax:    416.365.1719

Lawyer for Right Management Inc.

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra

Email:  smitra@airdberlis.com

Tel:     416.863.1500
Fax:    416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:  bleonard@casselsbrock.com
          hgarman@casselsbrock.com
          mcasey@casselsbrock.com

Tel:     416.860.6455
Fax:    416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

DOCSTOR: 1600901\3

| AND TO: | **MCFARLANE LEPSOE** | AND TO: | **COLBY, MONET DEMERS, DELAGE & CREVIER LLP** |

AND TO:

**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:    pklepsoe@mcfarlanelaw.com

Tel:    613.233.2679
Fax:    613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management,
Inc.

AND TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:    theintzm@mccarthy.ca
Tel:    416.601.7627
Fax:    416.868.0673

Email:    jsirivar@mccarthy.ca
Tel:    416.601.7750
Fax:    416.868.0673

Lawyers for Frank Andrew Dunn

AND TO:

**COLBY, MONET DEMERS, DELAGE & CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:    ddropsy@colby-monet.com
Tel:    514.284.3663
Fax:    514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:    janice.payne@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

DOCSTOR: 1600901\3

- 12 -

AND
TO:
**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario M5J 2T3

Chris Besant
Lydia Salvi

Email: chris.besant@bakernet.com

Tel: 416.865.2318
Fax: 416.863.6275

Email: lydia.salvi@bakernet.com

Tel: 416.865.6944
Fax: 416.863.6275

Lawyers for Jabil Circuit Inc.

AND
TO:
**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email: ryanbellr@bennettjones.com
laugesenm@bennettjones.com

Tel: 416.863.1200
Fax: 416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND
TO:
**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec H9S 2A5

Dan Goldstein
Marco Gaggino

Email: dgoldstein@schneidergaggino.com
mgaggino@schneidergaggino.com

Tel: 514.631.8787
Fax: 514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND
TO:
**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario M5H 4G2

Timothy R. Dunn

Email: tdunn@mindengross.com
Tel: 416.369.4335
Fax: 416.864.9223

Lawyers for 2748355 Canada Inc.

AND
TO:
**EURODATA**
2574 Sheffield Road
Ottawa, Ontario K1B 3V7

Nanci Shore

Email: nanci@eurodata.ca
Tel: 613.745.0921
Fax: 613.745.1172

AND
TO:
**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email: lbrady@baldwinlaw.ca
Tel: 613.771.9991
Fax: 613.771.9998

Lawyers for Sydney Street Properties Corp.

- 13 -

AND
TO:

**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:  raffy.lorentzian@ntscorp.com
Tel:      714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:  iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as
at January 14, 2009

AND
TO:

**LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :  jysimard@lavery.ca
Tel :     514.871.1522
Fax :    514.871.8977

Lawyers for Texas Landlords to Nortel
Networks Inc.

AND
TO:

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:  raffy.lorentzian@ntscorp.com
Tel:      714.998.4351

- 14 -

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com

Tel:     416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:     416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:     416.941.5397
Fax:     416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND
TO:

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:   rschwill@dwpv.com
Tel:     416.863.0900
Fax:     416.863.0871

Email:   mgottlieb@dwpv.com
Tel:     416.863.0900
Fax:     416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:     416.598.1744
Fax:     416.598.3730

Email:   slaubman@counsel-toronto.com
Tel:     416.598.1744
Fax:     416.598.3730

Lawyers for William A. Owens

DOCSTOR: 1600901\3

- 15 -

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:  lydia.salvi@bakernet.com

Tel:     416.865.6944
Fax:     416.863.6275

Lawyers for Wipro Limited

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:    sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:    iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for the Current and Former Employees
of Nortel Networks Inc. who are or were
Participants in the Long-Term Investment Plan
Sponsored by Nortel Networks Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:  hmeredith@mccarthy.ca
Tel:     416.601.8342
Fax:     416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:

**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:    sbomhof@torys.com
Tel:      416.865.7370
Fax:      416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND
TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:  dwinters@justice.gc.ca
Tel:     416.973.3172
Fax:     416.973.0810

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:  sseigel@langmichener.ca
Tel:     416.307.4063
Fax:     416.365.1719

Lawyers for The Bank of New York Mellon

DOCSTOR: 1600901\3

- 16 -

AND TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:    416.863.2572
Fax:    416.863.2653

Email:  marc.flynn@blakes.com
Tel:    416.863.2685
Fax:    416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:    416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:    416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:    416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers
LLC, MatlinPatterson Global Opportunities
Partners III L.P. and MatlinPatterson
Opportunities Partners (Cayman) III L.P.

AND TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:  kmcelcheran@mccarthy.ca
Tel:    416.601.7730
Fax:    416.868.0673

Email:  rstabile@mccarthy.ca
Tel:    416.601.8335
Fax:    416.868.0673

Lawyers for Avaya Inc.

AND TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:    416.979.6425
Fax:    416.591.7333

Email:  dbrown@sgmlaw.com
Tel:    416.979.4050
Fax:    416.591.7333

Lawyers for Edmund Fitzgerald

- 17 -

AND TO:
**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:   jspiegelman@foglers.com
Tel:     416.864.9700
Fax:     416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO:
**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:   gncameron@stikeman.com
Tel:     212.845.7464
Fax:     212.371.7087

Email:   rferguson@stikeman.com
Tel:     212.845.7477
Fax:     212.371.7087

Lawyers for GENBAND Inc.

AND TO:
**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:   sdunphy@stikeman.com
Tel:     416.869.5662
Fax:     416.947.0866

Lawyers for GENBAND Inc.

AND TO:
**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:   jmarshall@blgcanada.com
Tel:     416.367.6024
Fax:     416.361.2763

Email:   chill@blgcanada.com
Tel:     416.367.6156
Fax:     416.631.7301

Lawyers for the U.K. Pensions Regulator

AND TO:
**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

E-mail:  thomas.wallis@vdg.ca
Tel:     613.241.2701
Fax:     613.241.2599

Lawyers for La Regie des Rentes du Quebec

AND TO:
**ROCHON GENOVA LLP**
121 Richmond Street West
Suite 900
Toronto, ON  M5H 2K1

Joel P. Rochon

Email:   jrochon@rochongenova.com
Tel:     416.363.1867
Fax:     416.363.0263

Lawyers for the Opposing LTD Employees

- 18 -

AND TO:

**BLAKE, CASSELS & GRAYDON**
Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, Ontario  M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email:   pamela.huff@blakes.com
Tel:     416.863.2958
Fax:     416.863.2653

Email:   jeremy.forgie@blakes.com
Tel:     416.863.3888
Fax:     416.863.2653

Lawyers for The Northern Trust Company,
Canada

AND TO:

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer

Email:   lschweitzer@cgsh.com
         jbromley@cgsh.com
Tel:     212.225.2000
Fax:     212.225.3999

Lawyers for Nortel Networks Inc.

AND TO:

**LERNERS LLP**
130 Adelaide St. West
Suite 2400
Toronto, ON  M5H 3P5

William E. Pepall

Email:   wpepall@lerners.ca
Tel:     416.601.2352
Fax:     416.867.2415

Lawyers for the Former Employees in Respect
of the Distribution of the Corpus of the Health
and Welfare Trust

AND TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email:   kyle.kashuba@macleoddixon.com
Tel:     403.267.8399
Fax:     403.264.5973

Constellation NewEnergy Canada Inc.

AND TO:

**SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email:   pengelmann@sgmlaw.com
Tel:     613-482-2452
Fax:     613-235-3041

Email:   fcampbell@sgmlaw.com
Tel:     613-482-2451
Fax:     613-235-3041

Lawyers for the LTD Beneficiaries in Respect of the
Distribution of the Corpus of the Health and Welfare
Trust

AND TO:

**LANG MICHENER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

D. Brent McPherson

Email:   bmcpherson@langmichener.ca
Tel:     416.307.4103
Fax:     416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to Wachovia
Bank, N.A., in its capacity as Servicer for the Nortel
Networks Pass-Through Trust, Series 1-1

DOCSTOR: 1600901\3

- 19 -

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage

E-mail:  bboake@mccarthy.ca
Tel:     416.601.7557
Fax:     416.868.0673

Email:   jgage@mccarthy.ca
Tel:     416.601.7539
Fax:     416.686.0673

Lawyers for Morneau Sobeco Limited
Partnership

AND
TO:

**DAVID STEER**
10 Cypress Court
Nepean, ON  K2H 8Z8

E-mail:  davidsteer127@sympatico.ca

DOCSTOR: 1600901\3

- 20 -

## COURTESY COPIES:

AND TO:

**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:   sbrown@lrlaw.com

Tel:   602.262.5321
Fax:   602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND TO:

**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:   sreisman@curtis.com
              jdrew@curtis.com

Tel:   212.696.6000
Fax:   212-697-1559

Lawyers for Flextronics International

AND TO:

**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY 10036

Fred S. Hodara

Email:   fhodara@akingump.com

Tel:   212.872.1000
Fax:   212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND TO:

**MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:   DDunne@milbank.com
Tel:   212.530.5770
Fax:   212.530.5219

Email:   ALeblanc@milbank.com
Tel:   212.835.7574
Fax:   212.530.5219

Email:   APisa@milbank.com
Tel:   212.530.5319
Fax:   212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

- 21 -

| | | | |
|---|---|---|---|
| AND TO: | **VEDDER PRICE P.C.**<br>1633 Broadway, 47th Floor<br>New York, New York 10019 | AND TO: | **BRYAN CAVE LLP**<br>161 North Clark Street, Suite 4300<br>Chicago, Illinois 60601 |

AND
TO:

**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:  mschein@vedderprice.com

Tel:    212.407.6920
Fax:    212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND
TO:

**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email:  eric.prezant@bryancave.com
Tel:    312.602.5033
Fax:    312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:

**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :  andrew.robertson@macleoddixon.com
         caylee.rieger@macleoddixon.com

Tel :    403.267.8222
Fax :    403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel :    212.906.1373
Fax :    212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

# INDEX

Court File No.  09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE - COMMERCIAL LIST

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,  NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED**

### BOOK OF AUTHORITIES OF GENBAND US LLC
### (Returnable December 15, 2010)

### INDEX

| TAB | AUTHORITIES |
|-----|-------------|
| **Volume I** | |
| 1. | *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of),* [1998] O.J. No. 2637 (Gen. Div. [Commercial List]). |
| 2. | *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. (3d) 254 (C.A.). |
| 3. | *Eli Lilly & Co. v. Novopharm Ltd.,* [1998] 2 S.C.R. 129 (S.C.C.). |
| 4. | *Woolcock v. Bushert,* [2004] O.J. No. 4498 (C.A.). |
| **Volume II** | |
| 5. | *Plan Group v. Bell Canada,* [2009] O.J. No. 2829 (C.A.). |
| 6. | *Bakorp Management Ltd. v. Pepsi-Cola Canada Ltd.,* [1994] O.J. No. 873. |

| TAB | AUTHORITIES |
|-----|-------------|
| 7. | *Re Lehndorff General Partner Ltd.* [1993] O.J. No. 14 (Gen. Div. [Commercial List]). |
| 8 | Lloyd W. Houlden et al., *The 2011 Annotated Bankruptcy and Insolvency Act* (Toronto: Carswell, 2010). |
| 9. | *R. v. Wilson,* [1983] 2 S.C.R. 594. |
| 10. | *Re Canadian Airlines Corp.*, [2000] A.J. No. 1692 (Alta. Q.B.). |
| 11. | R. H. McLaren, *Canadian Commercial Reorganization: Preventing Bankruptcy,* looseleaf (Aurora: Canada Law Book, 2009). |

# TAB 5

*Case Name:*

# The Plan Group v. Bell Canada

**Between**
**Bell Canada, Respondent (Appellant), and**
**The Plan Group, 1248163 Ontario Limited, 1248164 Ontario**
**Limited and 1248165 Ontario Limited, Applicants (Respondents)**

[2009] O.J. No. 2829

2009 ONCA 548

252 O.A.C. 71

96 O.R. (3d) 81

81 C.L.R. (3d) 9

62 B.L.R. (4th) 157

2009 CarswellOnt 3807

179 A.C.W.S. (3d) 40

Docket: C48892

Ontario Court of Appeal
Toronto, Ontario

**S.T. Goudge, E.E. Gillese and R.A. Blair JJ.A.**

Heard: December 18, 2008.
Judgment: July 7, 2009.

(215 paras.)

*Alternative dispute resolution -- Binding arbitration -- Voluntary binding arbitration -- Agreement*
*to arbitrate -- Interpretation -- Appeal by Bell Canada from application judge's interpretation of an*
*arbitration clause allowed -- Application judge erred in his failure to give meaning to important*
*term of arbitration clause specifying that arbitration was to be conducted "under the then-current*

*rules" of Institute -- He further erred in interpretation of phrase "to file" in waiver provision of arbitration clause as "to deliver" or "to serve" the notice upon Bell, which could not be sustained.*

*Administrative law -- Judicial review and statutory appeal -- Standard of review -- Correctness -- Appeal by Bell Canada from application judge's interpretation of an arbitration clause allowed -- Application judge erred in his failure to give meaning to important term of arbitration clause specifying that arbitration was to be conducted "under the then-current rules" of Institute -- He further erred in interpretation of phrase "to file" in waiver provision of arbitration clause as "to deliver" or "to serve" the notice upon Bell, which could not be sustained.*

*Contracts -- Interpretation -- General principles -- Ordinary meaning -- Consider the entire contract -- Appeal by Bell Canada from application judge's interpretation of an arbitration clause allowed -- Application judge erred in his failure to give meaning to important term of arbitration clause specifying that arbitration was to be conducted "under the then-current rules" of Institute -- He further erred in interpretation of phrase "to file" in waiver provision of arbitration clause as "to deliver" or "to serve" the notice upon Bell, which could not be sustained.*

Appeal by Bell Canada from an application judge's interpretation of an arbitration agreement. Bell and The Plan Group entered into an Alliance Agreement in February 1999 concerning joint projects for the delivery of services to customers on cabling projects. The Agreement contained a two-step dispute resolution process. The parties were first to engage in good faith discussions using their commercially-reasonable efforts to settle the dispute. Thereafter, if those discussions failed, the parties were to resort to arbitration. The arbitration clause stipulated that it was to be conducted under the Arbitration Act "and the then-current rules" of the Institute. In this regard there were two sets of rules that were considered by the application judge - those that were in effect at the time the Agreement was negotiated (the 1999 Rules), and those that were in effect at the time the dispute arose between the parties (the Current Rules). In 2005, a dispute arose between Bell and The Plan Group in relation to work performed under the Agreement for the Greater Toronto Airport Authority. The differences could not be resolved, and in August 2005 The Plan Group delivered to Bell a draft notice demanding arbitration. In December 2005, it delivered a final notice demanding arbitration. However, no notice to arbitrate the dispute was ever filed with the Institute. The arbitration clause's waiver provision specified that a failure to file a notice of arbitration in time would constitute an irrevocable waiver of the claim. The application judge held that the arbitration clause did not mandate delivery and filing of a Notice of Arbitration. The arbitration clause contemplated that after commencement of the arbitration and the appointment of the arbitrator, the arbitrator would apply the 1999 ADR Rules during the proceedings. The arbitration clause did not express the intention of the parties that any dispute or any arbitration under the Agreement was to be arbitrated and resolved in accordance with the rules of the Institute. On a plain reading, the arbitration clause limited the reach of the 1999 Rules to the conduct of the arbitration rather than requiring compliance with all such Rules. The arbitration clause expressly stipulated the procedure for the appointment of the arbitrator, thus contemplating a procedure for the appointment of an

arbitrator outside the Rules of the Institute. The parties agreed that the arbitrator was to apply the procedural rules of the Institute in effect from time to time in the conduct of the arbitration and did not agree that either the remaining rules of the Institute were also to be applied in respect of any arbitration under the Agreement or that the Institute was to administer any such arbitration. By the reference to the then-current rules of the Institute in the second sentence of the arbitration clause, the parties did not agree to accept the possibility that their agreement could be overridden by a substitution of the Current Rules for the 1999 Rules by the Institute.

HELD: Appeal allowed, order set aside, and arbitration under the Alliance Agreement directed to be commenced by filing a Notice of Request to Arbitrate with the Institute. The application judge's interpretation of the arbitration clause was to be reviewed on a standard of correctness. The application judge erred in his failure to give meaning and effect to an important term of the arbitration clause specifying that the arbitration was to be conducted "under the then-current rules" of the Institute. He further erred in his interpretation of the phrase "to file" in the waiver provision of the clause as "to deliver" or "to serve" the notice upon Bell, which could not be sustained. The application judge erred by misapplying, or failing to apply, the principle that a contract was to be interpreted in a manner that gave meaning to all of its terms and avoided an interpretation that rendered one or more of its terms ineffective. The error stemmed in large part from his undue focus on the parties' "conceptual approaches" to the arbitration rather than on the wording of the arbitration clause itself. His approach led him to ground his interpretation on a set of Institute rules (the 1999 Rules) that had no direct application and, even to the extent they provided "context" to the interpretive exercise, did not support the interpretation he adopted. That error reinforced the narrow interpretation of the arbitration clause he embraced, premised on his erroneous conclusion as to the nature of the arbitration the parties had agreed to. This led to his refusal to give effect to the set of Institute rules that were applicable (the Current Rules) because - in his view - they represented a "fundamental change" from that flawed view of the nature of the arbitration process agreed to. In refusing to apply the Current Rules, the application judge ignored, and failed to give effect to, the clear and unequivocal language of the arbitration clause stipulating that the arbitration was to be conducted under "the then-current rules" of the Institute. The application judge equated the word "filing" in the waiver clause with "delivering" the notice to, or "serving" it upon, the other side. In the context of a legal document relating to the resolution of disputes, "filing" could not be properly or reasonably interpreted to bear such a meaning. "Filing" was a well-understood concept in the dispute resolution milieu. It meant placing or depositing a document with the institutional overseer of the proceeding. It did not mean delivering the document to, or leaving it with, or serving it upon, the other party. The application judge's erroneous interpretation of the waiver provision served to bolster his conclusion that the type of arbitration agreed to was not one that was to be administered by the Institute and that the clause was to be interpreted largely in light of the application of the 1999 Rules.

**Statutes, Regulations and Rules Cited:**

Arbitration Act, 1991, S.O. 1991, c. 17, s. 2(1), s. 6, s. 23

**Appeal From:**

On appeal from the judgment of Justice Herman J. Wilton-Siegel of the Superior Court of Justice dated April 29, 2008 and reported at (2008), 71 C.L.R. (3d) 205, [2008] O.J. No. 1633.

**Counsel:**

Matthew P. Gottlieb and James D. Bunting, for the appellant.

Neal J. Smitheman and Antonio Di Domenico, for the respondents.

---

Reasons for judgment were delivered by R.A. Blair J.A., concurred in by S.T. Goudge J.A. Separate dissenting reasons were delivered by E.E. Gillese J.A.

**R.A. BLAIR J.A.:--**

## I. BACKGROUND

**1**    Bell and The Plan Group entered into an Alliance Agreement on February 1, 1999, concerning joint projects for the delivery of services to customers on cabling projects in the Greater Toronto Region. The Agreement contained a two-step dispute resolution process, found in section 22. The parties were first to engage in good faith discussions using "their commercially reasonable efforts to settle the dispute" (s. 22.1). Thereafter, if those discussions failed, the parties were to resort to arbitration (s. 22.2).

**2**    Section 22.2, the arbitration clause - the interpretation of which is at the heart of this appeal - reads as follows:

> Bell and [The Plan Group] will settle by arbitration any dispute arising out of or related to this Agreement or any Sub-contract that is not finally resolved pursuant to Section 21.1 hereof.[1] *A single arbitrator will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the Arbitration and Mediation Institute of Ontario Inc.* Bell and [The Plan Group] will select the arbitrator from a panel of persons knowledgeable in business information and the construction industry. The decision and award of the arbitrator will be final and binding and the award so rendered may be entered into any court having jurisdiction thereof. The arbitration will be held in Toronto, Ontario. The arbitrator will not be empowered to award punitive damages to either Party. *Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.*

[Emphasis added.][2]

**3**   The second sentence of the arbitration clause (which I shall refer to as "the conduct of arbitration provision") stipulates that the arbitration will be conducted under the *Arbitration Act, 1991*, S.O. 1991, c. 17, "and the then-current rules" of the Institute. In this regard there are two sets of rules that were considered by the application judge - those that were in effect at the time the Agreement was negotiated (the "1999 Rules"), and those that were in effect at the time the dispute arose between the parties (the "Current Rules").

**4**   In 2005, a dispute arose between Bell and The Plan Group in relation to certain work performed under the Agreement for the Greater Toronto Airport Authority. Invoices exceeding $40 million in value were at the heart of the dispute. The differences could not be resolved through "commercially reasonable efforts to settle." Accordingly, on August 26, 2005, The Plan Group delivered to Bell a draft notice demanding arbitration. On December 14, 2005 it delivered a final notice demanding arbitration. No notice to arbitrate the dispute was - nor has one ever been - filed with the Institute, however. The last sentence of the arbitration clause (which I will refer to as the "waiver provision") specifies that a failure to file a notice of arbitration in time will constitute an irrevocable waiver of the claim.

## II. THE POSITIONS OF THE PARTIES

**5**   Bell has repeatedly taken the position that, in order to commence the arbitration, The Plan Group must deliver to Bell and file with the Institute, a written notice of request to arbitrate. This position is based upon section 22.2 of the Agreement, and the requirements of Articles 11 and 13 of the Current Rules. Article 11 provides for the submission of disputes under agreements to arbitration "by delivering a written Notice of Request to Arbitrate to the respondent". Article 13 specifies that, "The arbitration *is deemed to have commenced* when a Notice of Request to Arbitrate ... *has been filed with the Institute* and the initial filing fee has been paid" (emphasis added). Bell also relies on Article 5, which says that, "By agreeing to the Rules, the parties agree that the arbitration shall be administered by the Institute", and the stipulation in Article 3 that, "To the extent that the Rules conflict with the Act, the provisions of the Rules shall apply".

**6**   The Plan Group contends, on the other hand, that no notice of arbitration need be filed with the Institute for the arbitration to be commenced. It submits that none of the Rules of the Institute apply to govern the initiation or commencement of the arbitration and that the Rules are only engaged after the arbitrator has been chosen and only to the extent that the Institute's rules pertain to the procedural conduct of the arbitration. The arbitration may be commenced in any way permissible under the Act, The Plan Group argues, and it has complied with section 23(1)3 of the Act by delivering provisional and final notices demanding arbitration upon Bell.

**7**   Underlying all of these arguments is the real issue between the parties. It is Bell's position that as a result of The Plan Group's failure to file a notice of arbitration with the Institute, its complaints are time barred by virtue of the closing sentence of Section 22.2 cited above. For reasons that are

not entirely clear on the record, this issue has not been addressed directly. Instead, it has been equated by the parties - and by the application judge - with the issue of how the arbitration is to be commenced.

## III. LAW AND ANALYSIS

### Interlocutory/Final Order

**8**　The Plan Group argues that the judgment below is interlocutory in nature and, therefore, that Bell requires leave to appeal, which it has not sought. I disagree. The decision is a final order because it finally determined the only issue raised in the application before the application judge.

**9**　The Plan Group's theory is that the practical and legal result of the decision is to confirm that an arbitration proceeding has already been commenced, given the declaration that the filing of a notice of arbitration was not necessary to commence the arbitration. The decision was therefore an intervention by the court to assist in the conduct of the arbitration in order to ensure that the arbitration was being conducted in accordance with the arbitration clause in the Agreement, as contemplated by s. 6 of the *Arbitration Act, 1991*. So far as is relevant, s. 6 provides:

> ### Court intervention limited
>
> 6.　No court shall intervene in matters governed by this Act, except for the following purposes, in accordance with this Act:
>
> 1.　To assist the conducting of arbitrations.
> 2.　To ensure that arbitrations are conducted in accordance with arbitration agreements.

**10**　The Plan Group accordingly submits that the decision below was simply interlocutory in nature, within the context of an ongoing arbitration proceeding; it did not finally determine any substantive matter in the arbitration.

**11**　There is no merit in this argument. It misconceives the nature and purpose of the interlocutory/final order dichotomy, which is to act as a gatekeeper for appeals to a higher court in the particular proceeding before the courts. An application, like an action, is a free-standing proceeding.

**12**　The classic explanation of whether an order is final or interlocutory is that of Middleton J.A. in *Hendrickson v. Kallio*, [1932] O.R. 675 (C.A.), at p. 678:

> The interlocutory order from which there is no appeal is an order which does not determine the real matter in dispute between the parties - the very subject matter

of the litigation, but only some matter collateral. It may be final in the sense that it determines the very question raised by the application,[3] but it is interlocutory if the merits *of the case* remain to be determined. [Emphasis added.]

**13**    Here, the merits *of the case* - i.e., of the application proceeding before the court - have been determined.

**14**    In my view, the decision of this Court in *Buck Bros. Ltd. v. Frontenac Builders Ltd.* (1994), 19 O.R. (3d) 97 (C.A.), is determinative of this issue. There, Morden A.C.J.O. made it quite clear that ancillary proceedings are not relevant in determining whether an order of a judge is final or interlocutory.

**15**    In *Buck Bros.*, the application judge, [1994] O.J. No. 37, ordered that whether a condition precedent for arbitration had been met should be determined, not by the court, but by a panel of arbitrators appointed in accordance with the arbitration agreement. An appeal was launched, but the responding party moved to have the appeal quashed. The argument was that the order under appeal was interlocutory, because the real subject-matter of the litigation between the parties was still to be determined on the merits in the arbitration, and therefore the appeal was not properly before the court.

**16**    Morden A.C.J.O rejected this argument. At p. 100, after citing the passage from *Hendrickson v. Kallio* set out above, he said:

> In one sense, it can be said that the order in question does not determine "the real matter in dispute between the parties" (which is the right of the moving parties to be paid fair and equitable consideration by the responding parties and, if so, its amount, or, something less than this, whether the condition precedent to commencing an arbitration proceeding has been met). I do not think, however, that, in the circumstances, the order is interlocutory. I read the passage from *Hendrickson v. Kallio* as referring to "the real matter in dispute between the parties" *in the proceeding which is before the court* and not in some other proceeding which may, or may not, then be in existence. In accordance with this interpretation, I read "the litigation" in "the very subject matter of the litigation" as referring to the proceeding in which the order in question is made. Similarly, I read "the case" in "if the merits of the case remain to be determined" as also referring to the proceeding in which the order is made. [Emphasis in original.]

**17**    Contrary to the submission of The Plan Group, the decision of the British Columbia Court of Appeal in *Tamarack Capital Advisors Inc. v. SEM Holdings Ltd.* (2006), 54 B.C.L.R. (4th) 80 (C.A.), does not conflict with *Buck Bros.* In *Tamarack*, the proposed appeal was from an order dismissing a motion for a stay of the action. It was a not a final order because it did not determine a substantive matter in the litigation; it had merely refused to stay the proceeding.

**18**    I conclude that the judgment of Wilton-Siegel J. here is a final order. Leave to appeal from it is not necessary.

## Standard of Review

**19**    The parties disagree on the standard of review applicable to the application judge's interpretation of the Agreement. Bell submits that the interpretation of the Agreement is a question of law, and therefore is reviewable on a standard of correctness. The Plan Group argues that the interpretation of the Agreement involves questions of mixed fact and law, and that this court cannot intervene absent palpable and overriding error.

**20**    The historical view is that the interpretation of a contract is a question of law, and reviewable on the standard of correctness. However, the standard of appellate review in matters of contractual interpretation is not as straightforward as it once appeared to be, and there has been considerable debate about it in the jurisprudence since the decision of the Supreme Court of Canada in *Housen v. Nikolaisen*, [2002] 2 S.C.R. 235.

**21**    *Housen* is considered to be the leading authority on the standard of appellate review, directing that the applicable standard of review will depend upon the nature of the question - whether the alleged error is one of law, mixed fact and law, or fact. But, it is fair to say that appellate courts across the country have sent mixed signals about the standard of review in contract interpretation cases in the post-*Housen* era. In British Columbia, the general approach seems to be to treat contractual interpretation as a matter of mixed fact and law attracting review on a deferential basis.[4] In Alberta, on the other hand, the opposite appears to be the case. The interpretation of contracts is considered to be a question of law, giving rise to a standard of correctness.[5] New Brunswick and Nova Scotia appear to hold to the traditional view that the standard of review in contractual interpretation is correctness, while recognizing that a trial judge's findings of fact and drawing of factual inferences should be accorded deference.[6]

**22**    Steel J.A. addressed the current status of this dialogue in *Prairie Petroleum Products Ltd. v. Husky Oil Ltd.* (2008), 295 D.L.R. (4th) 146 (Man. C.A.), at paras. 34-36, where she said:

> Until recently, interpretation of a contract was considered a question of law reviewable by an appellate court on a standard of correctness.

> At present, however, the standard of appellate review will depend on the nature of the question, whether it is a question of law, a question of fact or a question of mixed fact and law. *A question of law attracts the correctness standard, while a palpable and overriding error must be found with respect to a question of fact or mixed fact and law. See Housen.*

> The proper interpretation and application of the principles of contractual interpretation is a question of law. A trial judge's determination of the factual matrix, consideration of extrinsic evidence and consideration of the evidence as a whole is a question of fact. Finally, the application of the legal principles to the language of the contract in the context of the relevant facts, or a question involving an intertwining of fact and law, is a question of mixed fact and law. [Citations omitted; emphasis added.]

**23**    I generally agree with Steel J.A.'s summary, except for her categorical statement - purportedly reflecting *Housen* - suggesting that questions of mixed fact and law always attract the palpable and overriding error standard. In my view, *Housen* does not stand for such a definitive statement, nor does the jurisprudence in this Court.

**24**    It must be remembered, particularly when considering the appropriate standard of review for questions of mixed fact and law, that the Court in *Housen* did not tackle that subject in the context of contractual interpretation. It did so *clearly and explicitly* in the context of a negligence action, an entirely different brand of case.

**25**    The distinction between these two types of cases is meaningful for these purposes, it seems to me. Whereas the application of legal principles to the facts in a negligence action is very much a fact-driven exercise, the interpretation of a contract - leaving aside the factual issues that may underlie the task - is not; it is very much a legal exercise. In my view, Lang J.A. of this Court accurately summarized the effect of *Housen* in *MacDougall v. MacDougall* (2006), 262 D.L.R. (4th) 120, at para. 25, when she said:

> The leading authority on standard of review is *Housen v. Nikolaisen. Housen* does not address directly the standard of review for the interpretation of a contract. Rather, it canvasses the standard of review in a case involving the application of the law of negligence to findings of fact. *In that context*, it distinguishes among questions of fact, questions of law, and questions of mixed fact and law concluding that questions of fact are reviewed on the standard of palpable and overriding error and questions of law on the standard of correctness. Where the question of fact and of law are inextricably intertwined so that the question is one of mixed fact and law, the trial judge's finding is entitled to deference. [Citations omitted; emphasis added.]

**26**    In determining the proper standard of review, however, it is important to keep in mind the distinction between the nature of the question addressed by the trial court (i.e. a question of fact, a question of law, or a question of mixed fact and law) and the standard of appellant review of the trial court's disposition of that question. The distinction does not matter if the trial court was answering a question of fact (where the standard of appellant review is palpable and overriding error) or a question of law (where it is correctness). But the distinction *is* important where the

question addressed was one of mixed fact and law. To say that a matter raises a question of mixed fact and law, by itself, does not mean that the standard of appellate review is necessarily one of palpable and overriding error. As *Housen* tells us, at para. 36, "matters of mixed fact and law lie along a spectrum." Thus, where the question at issue is determined to be one of mixed fact and law, the appellate court must take a further step and go on to locate the precise question at the proper point on the *Housen* spectrum in order to determine the applicable standard of appellate review.

**27**    Where the matter referred to is more a matter of legal principle and sits towards the error of law end of the spectrum, the standard is correctness. Where the matter is one in which the legal principle and the facts are inextricably intertwined - where the facts dominate, as it were - it falls more towards the factual end of the spectrum, and significant deference must be accorded. Contractual interpretation, in my opinion, is generally the type of case that falls within the former category, negligence one that generally falls into the latter.

**28**    In my view, this distinction between the nature of the question to be determined and the standard of appellate review to be applied to that determination can help in clarifying a number of cases that might otherwise be misunderstood. For example, in *Casurina Limited Partnership et al. v. Rio Algom Ltd. et al.* (2004), 181 O.A.C. 19 (C.A.), at para. 34, Feldman J.A. concluded that, "The construction of a written instrument is a question of mixed fact and law". She did not say, however - nor should she be understood to have said, I think - that a deferential standard of appellate review must *always* be applied to the interpretation of a contract. Indeed, in *Palumbo v. Research Capital Corp.* (2005), 72 O.R. (3d) 241 (C.A.), Laskin J.A. observed at para. 32 that, "The standard of review of the interpretation of a contract provision ordinarily is correctness."

**29**    The palpable and overriding error standard of review, it seems to me, is designed to afford deference to trial judges in their essential fact-finding functions, including the drawing of inferences from the facts and the determination of issues where law and facts are inextricably intermixed. We leave it to trial judges to sort these matters out with good reason. They have seen and heard the witnesses and are attuned to the dynamics of the trial. In *Waxman et al. v. Waxman et al.* (2004), 186 O.A.C. 201, at para. 292, this Court articulated the policy reasons for giving such deference to trial judges:

> The "palpable and overriding" standard demands strong appellate deference to findings of fact made at trial. Some regard the standard as neutering the appellate process and precluding the careful second hard look at the facts that justice sometimes demands. This viewpoint is tenable only if facts found on appeal are more likely to be accurate than those determinations made at trial. If findings of fact were to be made on appeal they might be different from those made at trial. Most cases that go through trial and onto appeal will involve evidence open to more than one interpretation. Merely because an appellate court might view the evidence differently from the trial judge and make different findings is not, however, any basis for concluding that the appellate court's findings will be more

accurate and its result more consistent with the justice of the particular case than the result achieved at trial.

**30**    The exercise of interpreting a contract is not essentially a fact-finding exercise, however. As the authorities cited above have noted, there may be questions involving the determination of the factual context in which the contract was negotiated, or considerations of extrinsic evidence, that evoke the fact-finding functions. Those decisions are to be addressed from the palpable and overriding error perspective. In substance, though, the exercise of interpreting a contract is a legal exercise, calling upon the learning and training that judges and lawyers acquire over years of experience. Apart from the truly factual aspects that may underlie the task, trial judges have no particular advantage over appellate judges in the art of contractual interpretation.

**31**    In my view, certainty in contract is an important policy value underlying the construction of contracts. This factor alone is sufficient to push the standard of review in such cases towards correctness and away from deference. At the very least, contractual interpretation is an exercise that generally falls much more towards the error of law end of the *Housen* spectrum, once the factual issues referred to above have been resolved or if - as is the case here - they are not in dispute. The Supreme Court of Canada has yet to consider the standard of review in contractual interpretation cases post-*Housen*. I am not entirely persuaded that it makes sense to take one type of analysis (the *Housen* analysis) that is designed to discourage appellate courts from re-trying *the factual issues* in cases, and apply its analytical paradigm (the facts/mixed fact and law/law spectrum) to what is essentially *a legal exercise*.

**32**    In any case, I am satisfied that the decision of the application judge must be set aside in this case whether the standard of review is properly one of correctness, or palpable and overriding error.

**33**    In my view, the issues raised on appeal tend toward questions of law, attracting review by this court on a standard of correctness. There were no underlying evidentiary or factual issues of a contested nature that the application judge was required to resolve. The arbitration clause was to be interpreted in light of its own wording in the context of the Agreement as a whole and having regard to the 1999 Rules and the Current Rules. There was no dispute as to what these Rules were. The application judge was in no better position than we are to ascertain the meaning of the arbitration clause in those circumstances.

**34**    Even if it can be said that the standard is palpable and overriding error, the decision cannot stand. In *H.L. v. Canada (Attorney General)*, [2005] 1 S.C.R. 401, at para. 110, the Supreme Court of Canada observed that "clearly wrong" and "unreasonable" are the "functional equivalents" of palpable and overriding error. Respectfully, in my view, the arbitration clause cannot reasonably bear the interpretation endorsed by the application judge.

**35**    The errors in the application judge's reasoning manifest themselves particularly in two areas: (i) in his failure to give meaning and effect to an important term of the arbitration clause, namely the requirement in the conduct of arbitration provision that the arbitration was to be conducted

"under ... the then-current rules [of the Institute]"; and (ii) in his interpretation of the phrase "to file" in the waiver provision as "to deliver" or "to serve" the notice upon Bell, which cannot be sustained.

**36**    I turn briefly now to a review of the relevant principles of contractual interpretation before resuming the analysis of the errors in the application judge's reasons, and the interpretation of the arbitration clause itself.

## Principles of Contractual Interpretation

**37**    Little, if anything is to be found in the application judge's reasons about the principles of interpretation he invoked. Broadly speaking, however - as this Court noted in *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. (3d) 254, at para. 24 - a commercial contract is to be interpreted,

> (a)    as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;
> (b)    by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;
> (c)    with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and (to the extent there is any ambiguity in the contract),
> (d)    in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity. [Footnotes omitted.]

**38**    In addition, as Doherty J.A. observed in *Glimmer Resources Inc. v. Exall Resources Ltd.* (1999), 119 O.A.C. 78 (C.A.), at para. 17, each word in an agreement is not to be "placed under the interpretative microscope in isolation and given a meaning without regard to the entire document and the nature of the relationship created by the agreement." Courts should not strain to dissect a written agreement into isolated components and then interpret them in a way that - while apparently logical at one level - does not make sense given the overall wording of the document and the relationship of the parties. Yet that is precisely the effect of accepting The Plan Group's interpretation of the word "conduct" in the arbitration clause and of minimizing or eliminating the import of the words "the then-current rules [of the Institute]."

## Interpreting the Arbitration Clause

**39**    For ease of reference, I set out the text of section 22.2 of the Agreement - the arbitration clause - again here:

> Bell and [The Plan Group] will settle by arbitration any dispute arising out of or related to this Agreement or any Sub-contract that is not finally resolved pursuant

to Section 21.1 hereof.[7] *A single arbitrator will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the Arbitration and Mediation Institute of Ontario Inc.* Bell and [The Plan Group] will select the arbitrator from a panel of persons knowledgeable in business information and the construction industry. The decision and award of the arbitrator will be final and binding and the award so rendered may be entered into any court having jurisdiction thereof. The arbitration will be held in Toronto, Ontario. The arbitrator will not be empowered to award punitive damages to either Party. *Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.* [Emphasis added.]

**40** I understand The Plan Group's argument to be the following. Arbitrations are governed by the provisions of the *Arbitration Act, 1991*, except to the extent that the parties have contracted out of those provisions, expressly or by implication. With that proposition, I do not quarrel. The Plan Group goes on to submit, however, that they and Bell have not contracted out of the provisions of the Act with respect to the commencement of arbitration proceedings; instead, they agreed only that the arbitrator, once appointed by the parties, would "conduct" the arbitration by applying only the Institute's procedural rules, that is, that portion of the Institute rules dealing with the procedural "conduct" of the arbitration by the arbitrator. The parts of the Institute's rules relating to commencement of the arbitration, the administration of the arbitration generally, and anything other than procedural conduct, have no application. Accordingly, The Plan Group properly commenced the arbitration, they say, by delivering a preliminary and final Notice of Request to Arbitrate to Bell in accordance with s. 23(1)3 of the Act which permits arbitration to be commenced in that fashion.

**41** The application judge accepted this argument. Respectfully, I do not think it is tenable. As I have mentioned, his interpretation fails to give meaning to an important term in the arbitration clause specifying that the arbitration would be conducted under the "then-current rules" of the Institute, and further, assigned an unsustainable interpretation to the word "file" in the waiver portion of the clause.

Failure to Give Effect to the Phrase "The Then-Current Rules [of the Institute]"

**42** The application judge did not apply the Current Rules. His interpretation failed to give meaning and effect to a critical term of the parties' agreement calling for conduct of the arbitration under "the then-current rules [of the Institute]." Early in his reasons, at para. 19, the application judge recognized that "[v]iewed on its own, the second sentence in the Arbitration Clause constitutes a straight-forward agreement to comply with the provisions of both the Act and *the rules of the Institute from time to time*" (emphasis added). He added that he "[saw] no reason not to give effect to the express wording of this provision." That is not what he did, however. In this respect, he erred in law by misapplying, or failing to apply, the principle that a contract is to be interpreted in a manner that gives meaning to all of its terms and avoids an interpretation that renders one or more

of its terms ineffective.

### (i) The Application Judge's Focus on "Conceptual Approaches"

**43**    Some background is necessary to understand how the application judge arrived at this result. The error stems in large part, in my view, from his undue focus on the parties' "conceptual approaches" to the arbitration rather than on the wording of the arbitration clause itself. Indeed, he was persuaded that, "*The issue on this application [turned] on* which of such conceptual approaches is applicable" (para. 15; emphasis added). Instead of asking himself what the clear wording of the conduct of arbitration provision meant - viewed in the context of the arbitration clause and the Agreement as a whole, and the Institute rules - he embarked upon a search for the proper "conceptual approach" to the type of arbitration agreed to by the parties.

**44**    The application judge's approach led him to ground his interpretation on a set of Institute rules (the 1999 Rules) that had no direct application and, even to the extent they provide "context" to the interpretive exercise, they did not support the interpretation he adopted. That error reinforced the narrow interpretation of the arbitration clause he embraced, premised on his erroneous conclusion as to the nature of the arbitration the parties had agreed to. This, in turn, led to his refusal to give effect to the set of Institute rules that were applicable (the Current Rules) because - in his view - they represented a "fundamental change" from that flawed view of the nature of the arbitration process agreed to.

**45**    An understanding of the two concepts put forward is therefore important to provide insight into his reasoning process. The two different conceptual approaches were summarized by the application judge at paras. 16 and 17 of his reasons:

> Plan says that the parties did not agree that the Institute would administer any arbitration under the Agreement. It submits that the parties agreed only to be bound by the procedural rules of the Institute (whether the 1999 Rules or the Current Rules) that apply in the conduct of an arbitration after the appointment of an arbitrator, and only to the extent that the arbitrator chooses to apply them. Accordingly, Plan submits that the rules of the Institute do not apply to determine the method of initiating arbitration. It also argues that the Arbitration Clause permits an arbitration to be commenced by any means recognized under law, including delivery of a notice demanding arbitration, using the language of paragraph 23(1)3 of the Act.

> Bell argues that the parties agreed that (1) the Institute is to administer any arbitration under the Agreement; and (2) any such arbitration must be commenced by filing a Notice to Arbitrate with the Institute. Bell relies on the reference in the second sentence of the Arbitration Clause to the "then-current rules" of the Institute, and the substitution of the Current Rules for the 1999

Rules including, in particular, section 5 of the Current Rules. Bell says that, collectively, these provisions have the result that the parties are bound by the Current Rules of the Institute in their entirety including, in particular, the provisions respecting commencement of an arbitration.

**46**  The application judge adopted The Plan Group's conceptual approach.

**47**  I do not mean to suggest that the different conceptual approaches to the arbitration clause are meaningless. They shaped a good part of the debate between the parties. However, the meaning of a document is not determined by the conceptual approaches taken by the parties to it; it is the meaning of their written document that sheds light on their chosen conceptual approach. Here, the application judge tackled the interpretative exercise in the reverse. He ascertained what he believed to be the proper "conceptual approach" to the arbitration clause by relying on a set of Institute rules that had no application (the 1999 Rules). He then used that conceptual approach to interpret the arbitration clause in a way that would justify his refusal to give effect to the set of Institute rules that did apply (the Current Rules).

**48**  But, as outlined below, the structure of the arbitration clause read as a whole, and in the context of the 1999 Rules and the Current Rules, simply does not support the conceptual approach and interpretation advanced by The Plan Group and adopted by the application judge, in my opinion.

### (ii)  The Structure of the Arbitration Clause

**49**  The structure of the arbitration clause and the sequence in which it evolves are themselves of some significance. In fact, the parties outline their concept of the arbitration at the very outset of the clause. They do not agree that they will arbitrate their disputes by first appointing their arbitrator and then leaving it to the arbitrator to "conduct" the procedural aspects of the arbitration and the hearing in accordance with the procedural portion of the rules of the Institute. Rather, in the first two sentences of the arbitration clause, they agree (a) to resolve their disputes by arbitration, (b) to resort to a single arbitrator to do so, and (c) to have the arbitration conducted by the single arbitrator "under the Arbitration Act, 1991 (Ontario) and *the then-current rules* [of the Institute]." That is their "conceptual approach" to their dispute-resolution mechanism: a single-decision-maker arbitration held under the Act and the rules of the Institute in effect at the time the dispute arises.

**50**  The parties *then* turn their attention to a number of specifics about the arbitration process. They will themselves select the arbitrator from a panel of knowledgeable persons (contrary to the application judge's reasoning, this does "carve out" a right that would otherwise be governed by the rules of the Institute). The arbitrator's decision will be final and binding, and enforceable. The arbitration will take place in Toronto. The arbitrator will not be empowered to award punitive damages. Finally, the parties create what is in effect a limitation period for the bringing of claims which is tied to the filing of a notice of arbitration.

**51**    I see nothing in the structure or development of the arbitration clause itself to suggest that the applicable rules of the Institute are to be limited to procedural rules to be applied by the arbitrator. Indeed, had the parties intended that to be the case they would have said "under the then-current rules [of the Institute] *pertaining to the procedural conduct of the arbitration and the hearing by the arbitrator*". They did not do so.

> *(iii) The Arbitration Clause in Context: The Agreement, the 1999 Rules, and the Current Rules*

**52**    This view is buttressed by the language of the arbitration clause in the context of the Agreement and the rules of the Institute in effect at the time the Agreement was negotiated (the 1999 Rules).

**53**    A major flaw in The Plan Group's reasoning is to assume - as the application judge appears to have concluded - that the parties agreed to be bound (i) by a particular bundle of rules that could conveniently be amputated from the 1999 Rules (Part IV - Conduct of the Arbitration) and (ii) by any future changes to that specific bundle of rules only. That is not the case, however. The 1999 Rules may be of some assistance as an interpretive aid - they provide part of the context or factual matrix existing at the time the Agreement was negotiated - but they do not apply to this arbitration directly, nor did the parties ever agree that they would apply to any arbitration other than one that happened to be commenced during the period when they were in force. The parties did not agree in the arbitration clause to be bound by any particular set of rules. They agreed only that that the arbitration would be conducted under whatever set of Institute rules were operative at the time the arbitration in question took place.

**54**    The Agreement itself was for a five-year term which was renewable.[8] The parties had therefore agreed to a long-term contractual relationship. They clearly contemplated that disputes arising during that relationship would be resolved through arbitration conducted under the rules of the Institute and that those rules could change from time to time during the term of the Agreement.

**55**    Moreover - to the extent they may provide some guidance - the 1999 Rules do not support the amputation approach to the "conduct" of the arbitration or the lack of involvement of the Institute. The application judge drew comfort from the fact that the 1999 Rules are conveniently divided in four Parts: Part I - General; Part II - Commencing the Arbitration; Part III - The Arbitrators; and Part IV - Conduct of the Arbitration. He found reinforcement for The Plan Group's conceptual approach to the arbitration in these separate divisions of those Rules and, in particular, Part IV - Conduct of the Arbitration. The logic does not work, however.

**56**    First, it would be purely fortuitous if successor Institute rules continued to be similarly structured and divided. While it happened that the 1999 Rules were conveniently divided into Parts and that Part IV was conveniently entitled "Conduct of the Arbitration", the Current Rules are not divided in that fashion and there is no obvious successor to Part IV. The Current Rules consist of 49 individual rules and two Schedules. How the application judge understood the parties would

determine what were revisions to or changes in the procedural rules in Part IV in such circumstances is unknown.

**57** Second, the view that rules relating to the conduct of the arbitration can be separated into those that are "procedural" and those that are not, makes no sense. Rules relating to the conduct of arbitrations are in essence procedural in nature. They are not "substantive". They provide for the process or procedure to be followed by the parties in having the substantive nature of their dispute resolved by the arbitrator. Indeed, the set up of the 1999 Rules themselves is incompatible with the notion that only Part IV relates to "the conduct of arbitrations" (in spite of the title to that Part). The 1999 Rules are entitled: "Rules of Procedure for the Conduct of Arbitrations". In Article 1(d), they define themselves - taken in their entirety - as meaning "these *Rules for the conduct of arbitrations of the Institute*" (emphasis added). Thus, when the parties agreed that the arbitration would be conducted "under ... the then-current rules [of the Institute]", they were agreeing - so long as the 1999 Rules remained in effect, in any event - that it would be conducted under "these Rules for the conduct of arbitrations of the Institute", which, as worded, necessarily refers to the Rules as a whole.

**58** Third, both the 1999 Rules and the Current Rules provide for the arbitration to be administered by the Institute. Rule 5 of the Current Rules expressly states that by agreeing to arbitration under the Rules, the parties agree that the arbitration shall be administered by the Institute. Article 3.1 of the 1999 Rules likewise stipulates that where parties have provided for arbitration under the auspices of the Institute, the arbitration is to take place in accordance with the rules in affect at the date of commencement of the arbitration. In both instances, then, once the parties agree to conduct the arbitration under the rules of the Institute, they accept that the arbitration will be administered by the Institute. This is consistent with the jurisprudence indicating that where parties agree to use the rules of an institutional arbitration body, they cannot cherry pick the rules they wish to apply and ignore the rest; they are bound to follow all of the rules: see e.g. *Spectra Innovations Inc. v. Mitel Corp.*, [1999] O.J. No. 1870 (S.C.).

**59** In short, neither the 1999 Rules nor the Current Rules are amenable to be adopted by parties intending to administer their arbitration privately. Had the parties wished to adopt an arbitration mechanism that borrowed already existing arbitration rules but maintained a privately administered arbitration, they could easily have done so, for example, by resorting to the UNCITRAL Arbitration Rules or the CPR Institute for Conflict Prevention & Resolution - Non-Administered Arbitration Rules. Both those regimes permit such an opt-in or opt-out. The rules of the Institute do not.

**60** Fourth, even the opening provision in Part IV of the 1999 Rules envisages the conduct of the arbitration "in all respects" - that is, not just what is touched on in Part IV - to be governed by the Act, the Rules, and the parties' agreements. Article 10.1 states:

> Subject to Article 2.1, the arbitration shall be *conducted in all respects* in accordance with the provision of the *Arbitration Act*, these Rules, the Arbitration

> Agreements and any other agreement of the parties applicable to the conduct of the proceedings. [Emphasis added.]

**61**    Finally, the provisions of Part IV clearly contemplate the involvement of the Institute in overseeing the arbitration - again, refuting the notion that the arbitration was to be a "non-administered" arbitration with the parties borrowing only the procedural-conduct related rules of the Institute for the purposes of their own arbitration. Notices, statements and written communications may be sent to the other parties "at the address set out on the records of the Institute" (Article 11.1). The parties are jointly and severally liable for costs and expenses of the arbitration, "including the administrative fees of the Institute" (12.1). The arbitrator or the Institute "may request supplementary deposits for the costs and expenses" (12.2). After the completion of the arbitration and delivery of the award, "the Institute shall provide an accounting" (12.3). Significantly, "the Institute", as well as the arbitrator, "may extend or abridge any time prescribed by these Rules" (14.2). Finally, the Institute's Schedule of Fees completes Part IV.

**62**    With respect, I am at a loss to understand how the framework of the 1999 Rules - even if Part IV of those Rules alone is to be considered - can be said to support the non-administered arbitration interpretation adopted by the application judge. But that is the interpretation that led to his failure to apply the Current Rules.

**63**    After a lengthy analysis of the arbitration clause in light of the 1999 Rules, the application judge then went on to consider whether the legal result would be any different with regard to the Current Rules. He answered that question in the negative because he concluded that the application of the Current Rules would result in a fundamental change from Plan Group's "conceptual approach," which he had accepted as applicable following his analysis of the impact of the 1999 Rules. At paras. 21, 56 and 59 of his reasons, he said:

> For the reasons set out below, I find that the Arbitration Clause did not mandate delivery and filing of a Notice of Arbitration in compliance with sections 4.1 and 4.3 of the 1999 Rules in order to initiate an arbitration. Instead, I find that the Arbitration Clause contemplated that after commencement of the arbitration and the appointment of the arbitrator, the arbitrator would apply the 1999 Rules during the proceedings.
>
> ...
>
> Moreover, even if they had agreed to the possibility of a change of some nature to the fundamental conceptual approach in the Arbitration Clause by means of a revision of the 1999 Rules, there is no basis for concluding that the parties agreed to the involvement of the Institute in the administration of any arbitration under the Agreement, which is implied by Bell's position.
>
> ...

> In summary, I do not think that the Court can find that the parties agreed to be bound by any revisions to, or replacement of, the 1999 Rules beyond revisions to, or changes in, the procedural rules in Part IV of the 1999 Rules in the absence of either (1) wording in the Arbitration Clause that is more extensive than the phrase relied upon by Bell or (2) other contextual evidence, both of which are lacking in this proceeding.

64    For the reasons I have articulated, these conclusions are unsustainable.

> *(iv) The Effect of the Term "The Then-Current Rules" of the Institute*

65    In the end, the application judge refused to apply the Current Rules. In doing so, he ignored, and failed to give effect to, the clear and unequivocal language of the arbitration clause stipulating that the arbitration was to be conducted under "the then-current rules" of the Institute. The "then-current rules" cannot mean anything other that the Current Rules in the context of this arbitration. The Current Rules call for an arbitration administered by the Institute and commenced by the filing of a notice of arbitration with the Institute.

66    Four provisions of the Current Rules, in particular, are important for determining whether commencement of arbitration under the Agreement requires a party to file a request to arbitrate with the Institute. They are:

> 3.    (a) The Rules shall apply where the parties have agreed that the National Arbitration Rules of the ADR Institute of Canada apply. ... *To the extent that the Rules conflict with the Act, the provisions of the Rules shall apply* except to the extent that the parties may not lawfully contract out of the provision of the Act...[9]

> 5.    By agreeing to the Rules, the parties agree that the arbitration shall be administered by the Institute. ...

> 11.    Where a dispute falls under an arbitration clause or agreement, a party, as claimant, *may submit that dispute to arbitration by delivering* a written Notice of Request to Arbitrate to the respondent...

> 13.    The arbitration is *deemed to have commenced* when a Notice of Request to Arbitrate ... has been *filed with the Institute and the initial filing fee has been paid*. The Institute shall notify the parties when an arbitration has been commenced and shall deliver to them a Notice of Commencement of Arbitration.

[Emphasis added.]

67    Clearly, where the Current Rules govern the arbitration - as in my view they do here - a

dispute under an agreement is submitted to arbitration by delivering a Notice of Request to Arbitrate to the other party, but the arbitration is not deemed to have been "commenced" for purposes of its administration until that Notice is filed with the Institute and the initial filing fee paid. The Plan Group has not taken that step.

**68**    Were the arbitration governed by the 1999 Rules, The Plan Group would be in a different position. While sections 4.1 and 4.4 of those Rules call for the filing of a notice of arbitration with the Institute, the 1999 Rules also provided that in the event of a conflict between them and the Arbitration Act, the Act prevailed. Section 23(1)3 of the Act stipulates that an arbitration may be commenced in any way recognized by law, including where "[a] party serves on the other parties a notice demanding arbitration under the agreement." That is what the Plan Group did here.

**69**    But this arbitration is not to be conducted under the 1999 Rules. It is to be conducted under the Current Rules, which provide that *they* trump the Act (s. 3(a)), and which require a Notice of Request to Arbitrate to be filed with the Institute before the arbitration is deemed to have been commenced (s. 13).

The Waiver Provision

**70**    The second major error of the application judge is found in his treatment of the words "failure *to file* a notice of arbitration" (emphasis added) in the waiver provision of the arbitration clause, which states:

> Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.

**71**    The concept of "filing" the notice of arbitration signals that it is to be deposited or placed with an organization or institution overseeing the proceeding. The application judge equated it, however, with "delivering" the notice to, or "serving" it upon, the other side. In the context of a legal document relating to the resolution of disputes, "filing" cannot be properly or reasonably interpreted to bear such a meaning.

**72**    The application judge addressed the meaning of the phrase "failure to file a notice of arbitration" only incidentally. He did so in the course of his lengthy examination of what he calls the "Operation of the Arbitration Clause in 1999." In the result, he rejected Bell's interpretation of the arbitration clause as providing for arbitration administered by the Institute and commenced by filing a notice to arbitrate with the Institute. This rejection - or, at least, his conclusion that the last sentence of the arbitration clause "is at best equivocal with respect to the agreement of the parties" - rests, as he saw it, on the failure of the parties to make reference to three things in that sentence, namely:

> (i)    the failure to specify filing with the Institute in accordance with Article 4.1 of the 1999 Rules and to identify the "notice of arbitration" as the notice of

arbitration provided for in Article 4 of those Rules;

(ii)  the failure to insert the words "with the Institute" after the words "failure to file a notice of arbitration" (leaving open The Plan Group's suggested interpretation equating "filing" with "delivery" to the other party, he concludes); and

(iii)  the failure to clarify, for limitation purposes, which of the filing requirements under Article 4.2 or Article 4.4 - one requires the filing of a single notice; the other of three copies - applied.

**73**    There are a number of reasons why this rationale for the rejection of Bell's position is not sustainable under the language of the arbitration clause, even as interpreted through the lens of the 1999 Rules.

**74**    In the first place, the language of the arbitration clause makes it clear that the arbitration is to be conducted, not in accordance with the 1999 Rules (unless the arbitration happens to be commenced when they are in force), but in accordance with the Rules of the Institute in place from time to time - the "then-current rules." Consequently, there was no reason for the parties to refer specifically to any particular provisions in the 1999 Rules. Indeed, to have done so might well have created problems of interpretation in the future because references to specific rules might set up a conflict with different rules in effect at a later time.

**75**    Secondly, the notion that "filing" may be equated with "delivery" - or with "service", or with "giving notice" - in the context of a legal-related proceeding is seriously flawed. "Filing" is a well-understood concept in the dispute resolution milieu. It means placing or depositing a document with the institutional overseer of the proceeding. It does not mean delivering the document to, or leaving it with, or serving it upon the other party.

**76**    A cursory review of any number of dictionary resources confirms the distinction between these concepts. For example, *The Shorter Oxford English Dictionary*, 3d ed., defines the verb "file" to mean "to place in due manner among the records of a court or public office," and the verb "deliver" to mean "to hand over to another's possession or keeping."[10] Service involves the formal delivery of a document to someone: *Black's Law Dictionary*, 8th ed., *s.v.* "service".

**77**    Both the 1999 Rules and the Current Rules of the Institute use the terms "file", "deliver" and "serve" in distinct contexts. "Filing," is used in the context of depositing a document with the Institute - for example, a notice of arbitration or a pleading. Often, filing is what triggers the requirement for an administrative fee payment. Article 4.4 of the 1999 Rules requires the claimant to "*file at the office of the Institute* three copies of the Notice of Arbitration together with the administrative fee". Articles 4.6 - 4.8 provide that the pleadings are to be *served* on the opposite party *and filed* with the Institute. Rule 13 of the Current Rules deems the arbitration to have been commenced "when a Notice of Request to Arbitrate ... *has been filed with the Institute* and the initial filing fee has been paid." Under the Current Rules, pleadings are "delivered" to the parties

and to the Institute, but they are not "filed" with the other party.

**78**    Finally, it was not necessary for the parties to the arbitration clause to have added the words "with the Institute" after the words "failure to file a notice of arbitration" in the final sentence of the arbitration clause. The fact that the notice was to be filed with the Institute is self-evident from a reading of the arbitration clause as a whole. The arbitration was to be conducted in accordance with the Rules of the Institute.

**79**    The application judge's treatment of the waiver provision in the last sentence of the arbitration clause had several unfortunate consequences. It caused him to lose sight of the simple, straight-forward meaning of that stipulation in the arbitration clause: a notice of arbitration must be filed with the Institute within 12 months of the occurrence upon which the claim is based; otherwise the claim is irrevocably waived. Of equal importance, however, it skewed his interpretation of the balance of the arbitration clause. Instead of leading him to conclude - as it should have done - that the parties had agreed to an arbitration procedure to be administered by the Institute, his erroneous interpretation served to bolster his conclusion that type of arbitration agreed to was not one that was to be administered by the Institute and that the clause was to be interpreted largely in light of the application of the 1999 Rules.

**The Dissent**

**80**    I have had the opportunity to review the dissenting reasons of my colleague, Justice Gillese. Respectfully, I do no share her view of the proper disposition of the appeal for the reasons I have given.

**81**    In completion I should address an issue she has raised as a preliminary matter, namely, the question whether the matters in the application should have been referred to the arbitrator for determination, based on the principles set out in *Dell Computer Corp. v. Union des Consommateurs*, [2007] 2 S.C.R. 801. The parties to this appeal are sophisticated commercial parties represented by sophisticated commercial counsel. They did not argue or ask us to deal with this issue, presumably for their own practical reasons. I would be reluctant to determine the appeal on that basis.

**82**    In any event, I do not see the application (and the appeal) as raising a question regarding the jurisdiction of the arbitrator, but rather a question of whether there *is* an arbitration within which the arbitrator may or may not exercise a jurisdiction.

**IV. DISPOSITION**

**83**    Accordingly, for the foregoing reasons, I would allow the appeal, set aside the order of the application judge, and in its place direct that arbitration under the Alliance Agreement must be commenced by filing a Notice of Request to Arbitrate with the Institute.

**84**    Bell is entitled to its costs of the appeal and of the application. Counsel have agreed on amounts. In accordance with that agreement, the costs of the appeal are fixed at $20,000 and the costs of the application at $30,000. Both amounts are inclusive of fees, disbursements and GST.

R.A. BLAIR J.A.
S.T. GOUDGE J.A.:-- I agree.

**85**    E.E. GILLESE J.A. (dissenting):-- I have read the draft reasons of my colleague, Blair J.A. With respect, I do not agree that the application judge's interpretation of the arbitration clause is to be reviewed on a standard of correctness. In any event, however, in my view, the application judge's interpretation is not only reasonable, it is correct. Accordingly, I would dismiss the appeal.

**86**    As will become apparent, the factual context plays a significant role in the disposition of this appeal. Thus, I begin there.

## BACKGROUND[11]

### *The Alliance Agreement*

**87**    Going into the 1990s, Bell Gateways (a division of the appellant, Bell Canada ("Bell")) was dominant in the structured cabling market. Its competitors were principally small, unsophisticated cabling installation contractors. This changed in the early 1990s when electrical contractors entered the structured cabling market and larger contractors began providing the same value-added services as Bell. Electrical contractors brought sophisticated project-management skills to the cabling market and developed relationships with general contractors, project managers, electrical engineers and Bell's clients. Over time, customers gave their electrical and cabling work to electrical contractors.

**88**    These developments posed a problem for Bell Gateways because it found it difficult to penetrate the longstanding relationships that electrical contractors had with project managers and general contractors. Bell Gateways increasingly lost market share to electrical contractors, including the Plan Group, a premier structured cabling contractor.

**89**    In early 1998, Bell and the Plan Group joined forces and began to jointly pursue cabling projects. Success in those projects led Bell and the respondents ("Plan") to enter into an agreement dated February 1, 1999 (the "Alliance Agreement").

**90**    The Alliance Agreement contemplated that Plan would perform electrical and cabling services contracted in Bell's name and Bell would provide marketing, bonding and project financing services for Plan. It reflected the parties' expectation that a number of projects would be started during the term of the agreement. The initial term of the Alliance Agreement was for five years, ending on January 31, 2004.

**91**    Article 22 of the Alliance Agreement establishes a two-step process for resolving disputes that

might arise between the parties. The first step in the process is set out in art. 22.1. It requires the party that considers a dispute to exist to provide written notice to the other. The parties must then make good faith efforts to resolve the dispute through a structured discussion process.

**92**    If the good faith efforts fail to resolve the dispute, the parties move to the second step of the dispute resolution process. The second step, contained in art. 22.2 (the "Arbitration Clause"), requires the dispute to be settled by arbitration. The last sentence in the Arbitration Clause provides that a failure to file a notice of arbitration within twelve months of the occurrences supporting a claim constitutes an irrevocable waiver of that claim (the "Waiver").

**93**    The full text of art. 22 is set out below.[12] The critical portions of the Arbitration Clause read as follows:

> 22.2 Bell and [Plan] will settle by arbitration any dispute arising out of or related to this Agreement or any Sub-contract that is not finally resolved pursuant to Section 22.1 hereof. A single arbitrator will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the Arbitration and Mediation Institute of Ontario Inc. ... Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.

### *The Dispute*

**94**    The parties contracted to provide the Greater Toronto Airport Authority ("GTAA") with electrical systems in its new airport terminal. Plan continued to work on the GTAA project after January 31, 2004, the end date of the initial five-year term of the Alliance Agreement.

**95**    By October 2004, Bell had not paid Plan for invoices it had rendered in relation to the GTAA project. The invoices claimed for amounts in excess of $40 million. Without collecting a significant amount of the invoiced amounts, Plan would have gone bankrupt.

**96**    On December 16, 2004, Plan accepted $23 million as settlement for the invoiced amounts (the "Settlement"). Plan says that it was compelled to accept the significantly reduced amount because it was in a vulnerable financial state. It further alleges that its compromised financial state was brought about by Bell's capital investment demands of Plan that were made as part of the Alliance Agreement, coupled with Bell's subsequent breach of cash flow obligations.

**97**    Plan wished to dispute the Settlement in accordance with art. 22.

**98**    On August 26, 2005, Plan took the first step in the dispute resolution process to which the parties are bound by virtue of art. 22 of the Alliance Agreement. It delivered written notice to Bell that a dispute existed between the parties. In addition, Plan alerted Bell to the possibility that the

dispute might proceed to arbitration by attaching to the notice of dispute a 20-page draft "Notice Demanding Arbitration" (the "Draft Notice"), which set out particulars of its claim. Among other things, the Draft Notice asserted Plan's claim to compensation in respect of the Settlement.

99    What happened thereafter is most easily understood by means of a timeline.

### A Chronology of the Events that Followed

September 8, 2005

-    Fall and winter 2005 Bell responds to Plan's notice of dispute and Draft Notice. It asserts that Plan's claim was waived, pursuant to art. 22.2, as it was in respect of occurrences that took place over 12 months previously. It says nothing about the need to file a notice of arbitration with the Arbitration and Mediation Institute of Ontario Inc. (the "Institute") or in accordance with the Institute's rules. Bell also agrees to meet with Plan pursuant to art. 22.1.

Fall and winter 2005

-    Bell asks for extensive particulars of Plan's claim. Plan provides them.

December 12, 2005

-    Although discussions between the parties continue, Plan delivers a final notice demanding arbitration (the "Notice") to counsel for Bell. In the cover letter that accompanies the Notice, Plan states that it wishes to preserve its rights under the Alliance Agreement, reiterates its willingness to continue with settlement discussions and asks counsel for Bell to confirm that it can accept service of the Notice. The Notice complies with the requirements for commencement of arbitration in s. 23(1)3 of the *Arbitration Act, 1991*, S.O. 1991, c. 17.

January 17, 2006

-    As Plan has received no response to the Notice, it contacts Bell by email, asking when it might hear back.

January 20, 2006

- Bell responds by email, saying that it is continuing to review Plan's claim and asks for further particulars. It raises no issue about the adequacy of the Notice or the need for it to be filed with the Institute. It says that it has not ruled out the possibility of further meetings and discussions.

March 2, 2006

- Plan provides Bell with further particulars.

April 11, 2006

- Plan concludes that Bell is not making good-faith efforts to settle the dispute. It sends Bell a letter to that effect and advises that it will proceed in accordance with the Arbitration Clause. It asks Bell to contact it by April 18 to discuss the selection of a suitable arbitrator.

April 19, 2006

- Bell responds saying it will make an application to the court to seek relief consistent with its position that Plan's claims are not arbitrable because they have been waived and, in some cases, released. It says it will serve a notice of application shortly. Counsel for Bell asks counsel for Plan not to commence arbitration proceedings until it serves its notice of application.

Spring and summer 2006

- Plan makes a number of inquiries of Bell about the status of the notice of application and is assured repeatedly that the notice will be sent.

August 11, 2006

- Bell serves Plan with the notice of application. The relief sought includes a declaration that Plan had waived its claim and that Plan is barred from commencing arbitration by virtue of its failure to file a notice of arbitration in accordance with the Arbitration Clause.

September 20, 2006

- Bell serves Plan with the supporting affidavit material.

December 7, 2006

- Plan brings a motion seeking to stay Bell's application and refer the dispute to arbitration on the basis that Bell's application required the determination of arbitrable issues.

Spring or summer of 2007

- Settlement discussions take place in respect of Bell's application and Plan's motion. The parties agree to withdraw their respective court proceedings (*i.e.* the application and stay motion), without prejudice to their ability to advance their positions at arbitration.

Summer or fall of 2007

- Plan and Bell agree on the Honourable Coulter Osborne as arbitrator of the dispute.

September 2007

- The application and stay motion are withdrawn.

Fall 2007

- Bell refuses to appoint the Honourable Coulter Osborne or schedule a

hearing of the arbitration until Plan files a notice of request to arbitrate in accordance with s. 11 of the Institute's rules.

### *The Proceedings Below*

**100**    Plan found itself in a "catch 22" position. It could not get the matter before the arbitrator because Bell refused to accept that Plan had commenced arbitration and would not appear before the arbitrator unless Plan filed a notice of request to arbitrate with the Institute. If Plan took that step however, it was concerned that it would jeopardize its position in respect of the Waiver.

**101**    On November 8, 2007, in an attempt to get the court's help to break the deadlock, Plan brought a notice of application to the Superior Court of Justice. The relief sought was an order appointing the Honourable Coulter Osborne as arbitrator of the dispute, pursuant to art. 22.2 of the Alliance Agreement.

**102**    On January 23, 2008, the parties agreed that they would advise the application judge that the only issue for determination was whether commencement of arbitration under the Alliance Agreement required a party to file a written request to arbitrate with the Institute. They also agreed not to rely on disputed evidence.

**103**    Plan maintains that it asked the court, alternatively, to resolve the impasse by appointing an arbitrator to interpret the Arbitration Clause regarding commencement of arbitration. It says that the agreement between counsel concerning the scope of the application pertained only to the relevance of disputed evidence and the suitability for summary determination by way of application. It says it did not abandon its alternative position that if the court declined to determine the matter summarily in accordance with the principles in *Dell Computer Corp. v. Union des consommateurs*, [2007] 2 S.C.R. 801, then the matter should be decided by an arbitrator appointed by the court, without prejudice to either party's position concerning the proper procedure for commencing arbitration.

**104**    On February 28, 2008, Wilton-Siegel J. heard the application.

**105**    By order dated April 29, 2008 (the "Order"), the court declared that as of December 14, 2005, the Arbitration Clause did not require a party commencing arbitration under the Alliance Agreement to file a Notice of Request to Arbitrate with the Institute.

**106**    Bell appeals.

## ARTICLE 22 OF THE ALLIANCE AGREEMENT

**107**    For ease of reference, art. 22 is set out in full, below:

22.    DISPUTE RESOLUTION

22.1

The Parties seek to avoid disputes whenever possible. In the event of a dispute between the Parties concerning any matter arising from or connected with this Agreement, the Parties shall use their commercially reasonable efforts to settle the dispute in accordance with the following procedures:

(a)     A Party which considers that a dispute exists shall provide written notice (in this paragraph 22.1(a), a "Notice of Dispute") to the other Party to the attention of the other Party's representative. For this purpose the nominated representative of Bell shall be its Assistant Vice-President Internetworking and the nominated representative for [Plan] shall be either of Bill Kurtin or Marshel Cohen. (Either Party may change its representative(s) on written notice to the other Party.) Following the provision of a Notice of Dispute to a Party's representative, the representatives of the Parties will forthwith make commercially reasonable efforts to, in good faith, resolve all disputes which are the subject of such notice in no more than 10 days from the date of the notice.

(b)     Should the dispute between the Parties not be resolved pursuant to the settlement process set out in Paragraph 22.1(a) hereof during the 10 day period referred to therein, the dispute shall be referred for resolution to Bell's Vice-President Gateways and to either of Bill Kurtin or Marshel Cohen. Following such referral, such persons will forthwith make commercially reasonable efforts, in good faith, to resolve all disputes which are the subject of such referral within 10 days from the date of such referral.

22.2

*Bell and [Plan] will settle by arbitration any dispute arising out of or related to this Agreement or any Sub-contract that is not finally resolved pursuant to Section 22.1 hereof. A single arbitrator will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the Arbitration and Mediation Institute of Ontario Inc.* Bell and [Plan] will select the arbitrator from a panel of persons knowledgeable in business information and the construction industry. The decision and award of the arbitrator will be final and binding and the award so rendered may be entered in any court having jurisdiction thereof. The arbitration will be held in Toronto, Ontario. The arbitrator will not be empowered to award punitive damages to either Party. *Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.* [Emphasis added.]

## THE REASONS OF THE APPLICATION JUDGE

**108**    The application judge understood the application to have raised a single issue: did the Arbitration Clause require a party to file a "Notice of Request to Arbitrate" with the Institute in

order to commence arbitration? He noted that the parties had very different conceptions of how the Arbitration Clause operated and that the issue turned on which conceptual approach applied. At paras. 16 and 17 of the reasons, the application judge set out the parties' conceptual approaches:

> Plan says that the parties did not agree that the Institute would administer any arbitration under the Agreement. It submits that the parties agreed only to be bound by the procedural rules of the Institute (whether the 1999 Rules or the Current Rules) that apply in the conduct of an arbitration after the appointment of an arbitrator, and only to the extent that the arbitrator chooses to apply them. Accordingly, Plan submits that the rules of the Institute do not apply to determine the method of initiating arbitration. It also argues that the Arbitration Clause permits an arbitration to be commenced by any means recognized under law, including delivery of a notice demanding arbitration, using the language of paragraph 23(1)3 of the Act.

> Bell argues that the parties agreed that (1) the Institute is to administer any arbitration under the Agreement; and (2) any such arbitration must be commenced by filing a Notice to Arbitrate with the Institute. Bell relies on the reference in the second sentence of the Arbitration Clause to the "then-current rules" of the Institute, and the substitution of the Current Rules for the 1999 Rules including, in particular, section 5 of the Current Rules. Bell says that, collectively, these provisions have the result that the parties are bound by the Current Rules of the Institute in their entirety including, in particular, the provisions respecting commencement of an arbitration.

**109**   The application judge summarized the two relevant sets of Institute rules at paras. 5-14 of the reasons:

> ### The 1999 Rules

> The Rules of the Institute that applied at the time of execution of the Agreement (the "1999 Rules") were divided into four parts under the following headings: "General", "Commencing the Arbitration", "The Arbitrators" and "Conduct of the Arbitration". The following provisions have relevance to the issue herein.

> First, in Part I, section 2.1 provided that the provisions of the *Arbitration Act, 1991*, S.O. 1991, c.17 (the "Act") would govern in the event of any conflict between the Act and the 1999 Rules.

Second, in Part II (entitled "Commencing the Arbitration"), section 4.1 required that written notice of a proposed arbitration be given by a party initiating arbitration to the Institute and all other necessary parties. Section 4.2 provided that the arbitration would be deemed to commence on the date on which the Institute received a Notice of Arbitration from the claimant (presumably, but not expressly, the written notice contemplated by section 4.1).

Third, in Part IV (entitled "Conduct of the Arbitration"), section 10.1 provided that the arbitration was to be conducted in accordance with the Act, the 1999 Rules and any applicable agreement between the parties including the arbitration agreement.

### The Current Rules

Since at least 2003, the Institute has applied the ADR Institute of Canada, Inc. National Arbitration Rules (the "Current Rules"). The Current Rules are not divided into discrete sections in the manner of the 1999 Rules.

Section 3 of the Current Rules provides that the Current Rules, rather than the Act, govern in the event of any conflict, except to the extent that the parties may not lawfully contract out of the provisions in the Act.

The first sentence of section 5, upon which Bell places considerable reliance, provides that "[b]y agreeing to the Rules, the parties agree that the arbitration shall be administered by the Institute".

Section 11 of the Current Rules requires the delivery of a "Notice of Request to Arbitrate" to the respondent and to the Institute to commence an arbitration. Section 11 also specifies in detail the required content of a Notice of Request to Arbitrate.

Section 13 provides that an arbitration is deemed to have commenced when a Notice of Request to Arbitrate has been filed with the Institute and the initial filing fee has been paid.

More generally, in addition to the matters addressed by the 1999 Rules, the Current Rules address a number of procedural and substantive issues that are also addressed in the Act. The Current Rules essentially constitute a complete code for the commencement and conduct of an arbitration.

**110** The application judge considered the operation of the Arbitration Clause at the time the Alliance Agreement was executed in 1999 and then considered whether the legal result was different under the Current Rules. He found that the Arbitration Clause did not mandate delivery and filing of a Notice of Arbitration in compliance with ss. 4.1 and 4.3 of the 1999 Rules in order to initiate arbitration.

**111** Instead, the application judge interpreted the Arbitration Clause as providing that after commencement of arbitration and the appointment of the arbitrator, the arbitrator would apply the Institute rules to the conduct of the arbitration. He reached this conclusion because, on its face, he found the Arbitration Clause favoured Plan's interpretation. He gave several reasons for this conclusion, the most significant of which may be summarized as follows:

1. <u>The wording and order of the second and third sentences in the Arbitration Clause</u>. The Arbitration Clause does not say that any dispute or arbitration under the Alliance Agreement is to be resolved in accordance with the Institute rules. Instead, it refers specifically to the "conduct" of the arbitration being subject to the Act and the then-current Institute rules. Thus, "on a plain reading", the Arbitration Clause limits the reach of the 1999 Rules to the conduct of arbitration rather than compliance with all of the Institute rules. Part IV of the 1999 Rules is entitled "Conduct of the Arbitration". It is separate and distinct from Part II of the 1999 Rules which is entitled "Commencing the Arbitration."

2. <u>The Arbitration Clause contemplates a procedure for appointment of an arbitrator outside the Rules</u>. Had the parties intended the reference in the second sentence of the Arbitration Clause to constitute an agreement to comply with all of the 1999 rules, the third sentence should have carved the appointment process out of the rules. The fact that it doesn't suggests the parties did not intend all of the Institute rules to apply.

3. <u>Plan's interpretation is more consistent with the context in which the Arbitration Clause was negotiated</u>. The application judge gave a detailed explanation for this view, based on the 1999 Rules and the wording of the Arbitration Clause. For example, Bell's interpretation was based on its position that the Institute would administer the arbitration. However, this position was based on s. 5 of the Current Rules, for which there was no counterpart in the 1999 Rules. Moreover, there is nothing in the Arbitration Clause to say that the Institute would administer the arbitration. Further, Plan's interpretation is consistent with the 1999 Rules which are divided into parts, making it feasible that only the parts governing conduct of the arbitration would apply.

**112**    After concluding that the Arbitration Clause did not mandate compliance with the 1999 Rules for commencement of arbitration, the application judge considered whether the Current Rules had that effect. This question arose because the Arbitration Clause provides that the arbitration will be conducted in accordance with the "then-current" Institute rules. Bell argued that if the Arbitration Clause did not mandate filing of a Notice to Arbitrate under the 1999 Rules, the result is different because of ss. 3 and 5 of the Current Rules. The effect of those sections, read together with the Arbitration Clause, Bell argued, was that any arbitration must be commenced in accordance with the Current Rules, *i.e.* by filing a Notice of Request to Arbitrate with the Institute under s. 11.

**113**    After outlining Plan's response to this argument, the application judge explained that the difference between the parties turned on fundamentally different views of the nature of the agreement between the parties in 1999 with respect to (1) the scope of the rules to which the parties agreed to be bound, and (2) the involvement of the Institute in the administration of an arbitration. He concluded that the parties agreed that the arbitrator was to apply the procedural rules of the Institute in effect from time to time in the conduct of the arbitration. He did not agree that either (1) the remaining rules of the Institute were also to be applied in respect of any arbitration under the Agreement; or (2) the Institute was to administer any such arbitration.

**114**    Thus, the issue was whether, by the reference to the then-current rules of the Institute in the second sentence of the Arbitration Clause, the parties agreed to accept the possibility that their agreement could be overridden by a substitution of the Current Rules for the 1999 Rules by the Institute.

**115**    He gave two reasons for rejecting the notion that by referring to the "then-current" Institute rules, the parties intended that they would be bound by anything more than changes to procedural rules. First, he found it unlikely that the parties turned their minds to the possibility that by virtue of a change to the Institute rules, the fundamental approach to arbitration embodied in the Arbitration Clause could be changed without their involvement. There was nothing in the limited scope of the 1999 Rules or the Act to suggest the possibility of such a fundamental change. He saw it as far more likely that the parties envisaged that possible changes to the Institute rules would relate to the conduct of arbitration.

**116**    The second reason, given at paras. 55-58 of the reasons, is a contextual consideration:

> Most important, the Agreement was the product of a negotiation between two sophisticated commercial parties represented by legal counsel. In the absence of wording suggesting otherwise, the Court should proceed on the basis that the conceptual approach to arbitration set out in the Arbitration Clause was meaningful to the parties. In the absence of express wording suggesting otherwise, I do not think the Court should interpret the acknowledgment in the Arbitration Clause of possible revisions to the 1999 Rules to constitute an agreement to be bound by rules that change the fundamental conceptual approach

in the Arbitration Clause without the consent of the parties.

Moreover, even if they had agreed to the possibility of a change of some nature to the fundamental conceptual approach in the Arbitration Clause by means of a revision of the 1999 Rules, there is no basis for concluding that the parties agreed to the involvement of the Institute in the administration of any arbitration under the Agreement, which is implied by Bell's position.

If the parties were agreeable to Institute administration of any such arbitration, they could have selected this approach from the outset. Despite the more limited set of provisions in the 1999 Rules, they could have agreed that the arbitration was to be governed in all respects by the 1999 Rules. Alternatively, they could have addressed the possibility of future Institute involvement in the Arbitration Clause. They did neither. The failure to do either reinforces the conclusion that the parties did not agree to accept Institute administration of any arbitration.

In addition, the position of Bell implies that the parties agreed to accept all revised rules of the Institute, sight unseen and without any opportunity to consider the consequences thereof for any arbitration under the Agreement. While I think it is reasonable to contemplate an agreement of this nature extending to revisions of procedural rules designed to facilitate the conduct of an arbitration, it is unreasonable to expect that the parties in this proceeding would have agreed to be bound by a revision that broadened the scope of the operation of the rules of the Institute. For example, I do not think it is reasonable to conclude that the parties agreed to comply with any revision to the rules that imposed additional costs of arbitration upon the parties without their consent by imposing Institute involvement in respect of any arbitration.

**117**   Accordingly, the application judge could not find that the parties agreed to be bound by any revisions to, or replacement of, the 1999 Rules beyond changes to procedural rules in the absence of either wording to that effect in the Arbitration Clause or other contextual evidence.

**118**   In the result, he concluded that as of December 14, 2005, the Arbitration Clause did not require that in order to commence arbitration, a party had to file a "Notice of Request to Arbitrate" with the Institute.

## THE ISSUE

**119**   The Order declared that as of December 14, 2005, the Arbitration Clause did not require a party commencing arbitration under the Alliance Agreement to file a Notice of Request to Arbitrate

with the Institute. Thus, the issue on appeal is whether the application judge erred in making that declaration.

**120**    The application judge was required to interpret the Arbitration Clause in order to reach the conclusion that such notice was not required. Accordingly, the first step in the analysis is to determine what standard of review applies to the application judge's interpretation of art. 22.2.

**121**    Before turning to the standard of review, however, a preliminary matter needs to be addressed.

## A PRELIMINARY MATTER

**122**    In *Dell* at paras. 84-86, the Supreme Court laid down "a general rule that in any case involving an arbitration clause, a challenge to the arbitrator's jurisdiction must be resolved first by the arbitrator." The court should "depart from the rule of systematic referral to arbitration only if the challenge to the arbitrator's jurisdiction is based solely on a question of law" or a question of mixed law and fact where "the questions of fact require only superficial consideration of the documentary evidence in the record." Further, "[b]efore departing from the general rule of referral, the court must be satisfied that the challenge to the arbitrator's jurisdiction is not a delaying tactic and that it will not unduly impair the conduct of the arbitration proceeding." Thus, "even when considering one of the exceptions, the court might decide that to allow the arbitrator to rule first on his or her competence would be best for the arbitration process."

**123**    This court has endorsed a similarly deferential approach that mandates referral to arbitration where it is arguable that a dispute falls within the scope of an arbitration clause: see *Dalimpex Ltd. v. Janicki* (2003), 64 O.R. (3d) 737 (C.A.); *Greenfield Ethanol Inc. v. Suncor Energy Products Inc.*, 2007 ONCA 823 (C.A.), aff'g [2007] O.J. No. 3104 (S.C.); *Dancap Productions Inc. v. Key Brand Entertainment, Inc.* (2009), 246 O.A.C. 226 (C.A.). Moerover, although the court has concurrent jurisdiction to decide the arbitrability of a dispute under the *Arbitration Act, 1991*, it will construe broadly drafted arbitration clauses generously, "consistent with the legislative policy... which favours arbitration over litigation where the parties so provide by agreement": see *Woolcock v. Bushert* (2004), 246 D.L.R. (4th) 139 (Ont. C.A.), at paras. 23, 25; *Greenfield* at para. 11.

**124**    In my view, it may well have been preferable had the application judge been asked to refer the whole matter to arbitration, including the dispute regarding the validity of commencement. Such an approach would have been consistent with the parties' agreement in art. 22.2 to have all disputes "arising out of or related to" the Alliance Agreement resolved by arbitration. Further, Bell's stance appears to be a delaying tactic, and, as the decision of my colleague may permanently prevent the arbitration from taking place, it cannot be said that the court proceedings have been "best for the arbitration process". However, the application judge did not refer the issue of commencement to the arbitrator and neither party asked this court to approach the appeal on this basis.

**125**    Having said that, it is significant that the Order is consonant with the *Dell* principles, set out

above, and the jurisprudence of this court. The Order does not state that Plan has commenced arbitration. It simply says that as of the relevant date, it was not necessary to file a notice with the Institute to commence arbitration pursuant to art. 22.2 of the Alliance Agreement. That is, the Order leaves the question of whether Plan commenced arbitration with the arbitrator, just as the jurisprudence urges.

**126**    I do not see the form of the Order as some kind of happenstance. The Order takes its form from the conscious decision of counsel for both parties to ask the application judge to perform a single task and decide a single question: interpret the Arbitration Clause and determine whether, on December 14, 2005, a party had to file a notice with the Institute to commence arbitration. The parties did not ask the application judge to decide if Plan had commenced the arbitration nor did he decide that question. Consequently, it is open to Bell to raise that matter as an issue once the parties are before the arbitrator.

**127**    I raise this preliminary matter for a single purpose - it provides an additional reason for dismissing the appeal. If the Order stands, the parties can appear before the arbitrator and have him decide whether Plan commenced the arbitration. That is, the arbitration will be conducted in a way that conforms with the guidance of this court and that of the Supreme Court.

## THE STANDARD OF REVIEW IN CONTRACTUAL INTERPRETATION

**128**    I agree with much of what my colleague has said generally in respect of appellate review on matters of contractual interpretation. However, I disagree with the view that the question of contractual interpretation in this appeal attracts a standard of review of correctness. To explain my position, I must recap some of the discussion on the guiding legal principles.

### *The Guiding Legal Principles*

**129**    As my colleague noted, historically, interpretation of a contract was treated as a question of law, reviewable on a standard of correctness. However, *Housen v. Nikolaisen*, [2002] 2 S.C.R. 235 dictates that a more nuanced approach be taken by reviewing courts. The standard of review in contractual interpretation - as in other types of civil proceedings - depends on the nature of the question that the trial judge decided: was it one of law, fact, or mixed law and fact? Questions of law are reviewable on a standard of correctness. Questions of fact are reviewable on a standard of palpable and overriding error, or the "functional equivalents" of "clearly wrong", "unreasonable" or "not reasonably supported by the evidence": *H.L. v. Canada (Attorney General)*, [2005] 1 S.C.R. 401, at para. 110. Questions of mixed law and fact, however, lie along a spectrum, with some questions being more akin to questions of law and others being more akin to questions of fact.

**130**    At para. 36, *Housen* explains the approach that appellate courts are to take when determining the standard of review to apply to a question of mixed law and fact. Such matters

lie along a spectrum. Where, for instance, an error with respect to a finding of

negligence can be attributed to the application of an incorrect standard, a failure to consider a required element of a legal test, or similar error in principle, such an error can be characterized as an error of law, subject to a standard of correctness. Appellate courts must be cautious, however, in finding that a trial judge erred in law in his or her determination of negligence, as it is often difficult to extricate the legal questions from the factual. It is for this reason that these matters are referred to as questions of "mixed law and fact". Where the legal principle is not readily extricable, then the matter is one of "mixed law and fact" and is subject to a more stringent standard. The general rule... is that, where the issue on appeal involves the trial judge's interpretation of the evidence as a whole, it should not be overturned absent palpable and overriding error.

**131**    While *Housen* is a negligence case, this court recognized in *MacDougall v. MacDougall* (2005), 262 D.L.R. (4th) 120, that the *Housen* principles inform the standard of review to be applied by appellate courts when reviewing decisions based on the interpretation of contracts.

**132**    Writing for the court, Lang J.A. explained in *MacDougall* at para. 30, that the trial judge must apply the proper principles of contract interpretation and that a failure to follow such principles is an error of law attracting review on a correctness standard. At para. 31, Lang J.A. states that when the task of interpretation includes consideration of extrinsic evidence or a determination of the factual matrix, the trial judge is making findings of fact or drawing factual inferences. Such findings are not to be overturned except in the case of palpable and overriding error. At para. 32, she states that where the trial judge applies legal principles to the language of the contract in the context of the relevant facts and inferences, he or she is applying law to fact, which is a question of mixed law and fact. Similarly, if the question is an "inextricable intertwining" of law and fact, it is a question of mixed law and fact. Questions of mixed law and fact are to be reviewed in accordance with the principles from *Housen*, quoted above: *MacDougall* at para. 33.

**133**    Based on *Housen* and in accordance with *MacDougall*, I understand that an appellate court should determine the standard of review in matters of contractual interpretation in the following way. Begin by identifying the nature of the question that the trial judge decided. This first step is extremely important as a mischaracterization of the question can obscure the true issues and alter the applicable standard of review.

**134**    If the question is either one of law or fact, the standard of review is straight forward - the former is to be reviewed on a standard of correctness; the latter on a standard of palpable and overriding error or its "functional equivalents".

**135**    If, however, the question is one of mixed law and fact, the standard of review may be either correctness or palpable and overriding error. To decide which of those standards applies, the appellate court must determine whether the trial judge made an "extricable" error in legal principle in arriving at his or her interpretation. In the area of contractual interpretation, errors in principle

include the failure to apply proper principles of contractual interpretation,[13] the application of an incorrect standard,[14] or the failure to consider a required element of a legal test.[15] Such errors constitute errors of law.

**136**    If an error of law can be identified (*i.e.* extricated), the trial judge's interpretation is subject to review on a standard of correctness. Where, however, the alleged error cannot be extricated from the factual findings, the trial judge's interpretation is to be subjected to a more deferential standard of review. In such cases, appellate courts should review the decision on a standard of palpable and overriding error or its "functional equivalents".

### Determining the Standard of Review in Matters of Contractual Interpretation

**137**    Before determining the standard of review in accordance with these principles, it is useful to recognize that three matters complicate the application of the *Housen* principles to matters of contractual interpretation.

**138**    First, it can be difficult to determine the nature of the question. For example, in the present case Bell asserts that the contractual interpretation question decided by the application judge is one of law whereas Plan says it is a question of mixed law and fact.

**139**    Second, if the question is one of mixed law and fact, it is difficult to establish where it lies on the spectrum. A spectrum is not an "either-or" proposition. I do not think it is possible to place a question at a precise point on the spectrum. At most, it appears to me that a question of mixed law and fact can be seen to lie more closely toward one end of the spectrum, rather than the other.

**140**    In my view, however, *Housen* resolves this second difficulty as it provides that if the trial judge has not made an extricable error of law, the question is to be reviewed on the standard of palpable and overriding error.

**141**    The third challenge arises from the nature of the task that the trial judge performs when interpreting a contract. When interpreting contracts, trial judges are engaged in the application of settled legal principles - which are designed to give effect to the mutual intentions of the parties - to the contractual provisions. However, the "proper" interpretation often depends, to a greater or lesser extent, on a consideration of the factual matrix and the weighing of evidence. Thus, the very nature of the task performed by the trial judge can make it difficult to determine whether an "extricable" error in law has been committed.

### A Deferential Standard of Review is Owed in the Present Case

**142**    In my view, the application judge's interpretation of art. 22.2 of the Alliance Agreement is reviewable on a standard of palpable and overriding error or its functional equivalents of clearly wrong, unreasonable or not reasonably supported by the evidence.

**143**    I reach this conclusion for three reasons. First, the question in this case is one of mixed law and fact. Second, the application judge committed no extricable error of law. Third, there are sound policy reasons for a deferential standard of review in this case.

### 1. The question is one of mixed law and fact

**144**    As I have mentioned, the first step in determining the standard of review is to identify the nature of the question that the application judge decided. My colleague treats the question as one of law or, if mixed law and fact, as falling at the correctness end of the spectrum. I do not agree.

**145**    The reasons of the application judge make it clear that his interpretation of the Arbitration Clause depends on the application of legal principles to the language used by the parties with due consideration for the factual matrix, particularly the facts as he found them to be in 1999 when the Alliance Agreement was entered into. As I explain more fully below, it is not possible to interpret the Arbitration Clause without regard to such factual determinations. Accordingly, the application judge was deciding a question of mixed law and fact.

**146**    My colleague gives three reasons for viewing the question as one of law or strongly akin to a question of law. The first is that the application judge heard the matter in writing, without oral evidence, and the same written materials are available to this court. However, the law is clear that a first instance judge's findings are to be accorded deference by an appellate court, even when he or she heard no oral evidence: *Equity Waste Management of Canada v. Halton Hills (Town)* (1997), 35 O.R. (3d) 321 (C.A.), at pp. 334-35. There are numerous reasons for giving deference to factual findings of trial judges apart from those that arise when the trial judge has heard testimony firsthand and observed witnesses: *Housen* at para. 24.

**147**    The second reason given by my colleague for holding that a correctness standard applies is that there are no underlying evidentiary or factual issues of a contested nature. This, however, does not necessarily make the question one of law alone. To reiterate, a question of mixed law and fact is one in which the trial judge "applies the legal principles to the language of the contract in the context of the relevant facts and inferences": *MacDougall* at para. 32.

**148**    In the recent decision of *Dumbrell v. The Regional Group of Companies Inc.* (2007), 85 O.R. (3d) 616 (C.A.), at para. 52, Doherty J.A. explained that contractual interpretation involves the interplay between the words of a contract and the context in which those words were chosen:

> No doubt, the dictionary and grammatical meaning of the words (sometimes called the "plain meaning") used by the parties will be important and often decisive in determining the meaning of the document. However, the former cannot be equated with the latter. The meaning of a document is derived not just from the words used, but from the context or the circumstances in which the words were used. Professor John Swan puts it well in *Canadian Contract Law* (Markham, Ont.: Butterworths, 2006) at 493:

> There are a number of inherent features of language that need to be noted. Few, if any words, can be understood apart from their context and no contractual language can be understood without some knowledge of its context and the purpose of the contract. Words, taken individually, have an inherent vagueness that will often require courts to determine their meaning by looking at their context and the expectations that the parties may have had.

**149**   In the present case, the application judge was called on to interpret the Arbitration Clause within the Alliance Agreement as a whole and in the context of these parties, in the particular circumstances at the time the Alliance Agreement was created, with regard to the expectations the parties had at that time. That is, the application judge was called on to decide a question of mixed law and fact, not one of law alone.

**150**   The third reason given by my colleague for a correctness standard of review is that the interpretation of a contract is "very much a legal exercise". I agree that interpreting the language of a contract is a legal exercise. That, however, does not change the fact that the application judge was required to interpret art. 22.2 within its unique factual matrix. The application judge did not decide a question of wide or general application nor did he answer a broad jurisdictional question. In fact, he answered a very narrow, discrete question - as of December 2005, did art. 22.2 of the Alliance Agreement require a party to commence arbitration by means of filing a notice with the Institute? Identifying the precise question that the application judge was called on to decide reinforces my view that the true nature of the question is one of mixed law and fact. The question builds into it the factual context, namely, the situation of the parties and their expectations at the time the agreement was entered into.

## 2. The application judge committed no extricable error of law

**151**   In interpreting a particular clause of an agreement, the trial judge is engaged in drawing a legal inference as to what the parties intended from the objective standpoint of the law of contract. Such an inference, although a conclusion of law, may be dependent on findings of fact regarding the words of the document and the surrounding circumstances. In such situations, the meaning of the words in the contract cannot be divorced from their context and the factual circumstances in which the agreement was made. That is, it may be inherently difficult to "extricate the legal questions from the factual" in matters of contractual interpretation, just as in negligence: *Housen* at para. 36.

**152**   This is just such a case. The application judge held that the Arbitration Clause did not require the delivery and filing of a notice of arbitration with the Institute in order to commence the arbitration. In his view, the Arbitration Clause contemplated that after the commencement of arbitration and the appointment of the arbitrator, the arbitrator would apply the Institute's procedural rules, as amended from time to time. The application judge held that the subsequent replacement of

the 1999 Rules with the Current Rules could not retroactively change the intention of the parties as of 1999 when the Alliance Agreement was executed.

**153**    In drawing a legal conclusion as to what the parties mutually intended from the words of the contract and the surrounding circumstances, the application judge was involved in a context-driven inquiry that depended on the weighing of documentary and other evidence, findings of fact and factual inferences. The end result is a legal conclusion that cannot be neatly or easily separated from its factual underpinnings.

**154**    Although the application judge did not recite the principles of contractual interpretation when interpreting the Arbitration Clause, he carefully and thoughtfully applied them. He thoroughly dealt with the arguments of both parties and gave cogent reasons for choosing the interpretation advanced by Plan. In so doing, he indicated the principles of contractual interpretation that guided him.

**155**    On my reading of his reasons, the application judge interpreted art. 22.2 in the context of the whole agreement and the factual matrix. Unlike my colleague, as I explain below, I view the application judge as having given meaning and effect to the requirement in the second sentence of art. 22.2 that the arbitration be conducted under the then-current Institute rules and to the meaning of "file" in the Waiver. In my view, his reasons demonstrate no extricable error of law.

### 3. Policy reasons favour a deferential approach in this case

**156**    Since the nature of the question is one of mixed law and fact, in the absence of an extricable error of law, this court should accord deference to the trial judge's interpretation. This conclusion flows from *Housen* and is based on sound judicial policy.

**157**    Although it may be difficult to identify the nature of the question and the standard of review - particularly where questions of mixed law and fact are involved - *Housen* provides guidance in two ways. First, it grounds the issue of the standard of review in the different roles that trial and appellate courts play. The "primary role of trial courts is to resolve individual disputes based on the facts before them and settled law". The primary role of appellate courts, by contrast, "is to delineate and refine legal rules and ensure their universal application": *Housen* at para. 9.

**158**    Because of the different roles of trial and appellate courts, the precedential value of the question can be of some relevance in determining its nature and the standard of review. If the question is "apt... to be of much interest to judges and lawyers in the future", or if the dispute is over a "general proposition that might qualify as a principle of law", it is more likely to be a question of law reviewable for correctness: *Housen* at para. 28, citing *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748, at para. 37. Conversely, where "the matrices of facts at issue... are so particular, indeed so unique" that the decision would not have precedential value, it "draws nigh to being an unqualified question of mixed law and fact" that is generally subject to a more stringent standard, unless the error is traceable to an error in principle that would engage the law-making function of an appellate court: *Housen* at paras. 28, 36-37; *Southam* at para.

37.

**159**    In the present case, the interpretation of the Arbitration Clause is of little or no precedential value. The dispute regarding art. 22.2 depends on a unique matrix of facts that is particular to two parties to a specific negotiated agreement. Further, there is no identifiable error in legal principle at issue that would engage the law-making function of the appellate court.

**160**    The second way in which *Housen* provides guidance is that it directs appellate courts to be cautious in finding that a trial judge erred in law in his or her determination of negligence because it is "often difficult to extricate the legal questions from the factual": *Housen* at para. 36. In my view, and for the same reason, this court should be reluctant to find the application judge's interpretation to be attributable to an error of law. As I have explained, the application judge was engaged in the application of settled legal principles to the evidence and the facts of the case. His legal conclusion regarding the parties' intentions is an "inextricable intertwining of fact and law": *MacDougall* at para. 33.

**161**    Furthermore, a deferential approach reflects sound judicial policy. In *Bradscot (MCL) Ltd. v. Hamilton-Wentworth Catholic District School Board* (1999), 42 O.R. (3d) 723 (C.A.), Laskin J.A. deferred to a trial judge's interpretation of a contractual provision that was reasonable (and therefore not "unreasonable"), noting that the appellant had not alleged any error in the application of the relevant legal principles. In my view, this approach is consistent with *Housen*. As discussed above, where the question is one of mixed law and fact and no extricable error in principle has been made, deference should be paid to the trial judge's interpretation of a contractual provision in the absence of palpable and overriding error or an interpretation that is clearly wrong, unreasonable or not reasonably supported by the evidence.

**162**    In *Bradscot*, Laskin J.A. referred to his earlier decision in *Gottardo Properties (Dome) Inc. v. Toronto (City)* (1998), 162 D.L.R. (4th) 574 (Ont. C.A.). In *Gottardo*, he stated at para. 48:

> Deference is desirable for several reasons: to limit the number and length of appeals, to promote the autonomy and integrity of the trial or motion court proceedings on which substantial resources have been expended, to preserve the confidence of litigants in those proceedings, to recognize the competence of the trial judge or motion judge and to reduce needless duplication of judicial effort with no corresponding improvement in the quality of justice.

**163**    This passage was quoted with approval by the majority in *Housen* at para. 12 in relation to findings of fact and the drawing of factual inferences. In relation to questions of mixed law and fact, the majority held that "in the absence of a legal error or a palpable and overriding error, a finding of negligence by a trial judge should not be interfered with": *Housen* at para. 31. As the majority explained at para. 32, since both legal and factual inferences

are intertwined with the weight assigned to the evidence, the numerous policy

reasons which support a deferential stance to the trial judge's inferences of fact, also, to a certain extent, support showing deference to the trial judge's inferences of mixed fact and law.

**164** In contractual interpretation, as in negligence, it can be inherently difficult to extricate the legal questions from the factual. Owing to the fact-sensitive nature of the inquiry - ascertaining the parties mutual and objective intentions - courts frequently make conclusions regarding the "proper interpretation" of a contractual provision without directly applying the interpretive principles or canons of construction. Conclusions as to the "proper interpretation" of a contractual clause summarily express conclusions of law as to what the parties are objectively taken to have intended based on a set of facts. In these situations, as I have said, the interpretation of a contract is a question of mixed law and fact.

**165** While courts express opinions on the "proper interpretation" of a contract, there may be more than one reasonable interpretation. It is not uncommon, for instance, for various guidelines or canons of construction to point in different directions on a set of facts and for different courts to reach different conclusions regarding the interpretation of a particular clause.

**166** Accordingly, a deferential approach to the application judge's interpretation of a contract, given the absence of an identifiable error of law, is grounded in sound judicial policy and consistent with the guidelines laid down by the Supreme Court in *Housen*.

## INTERPRETING THE ARBITRATION CLAUSE

**167** The application judge's interpretation of the Arbitration Clause underlies the Order. If his interpretation is reviewed on a palpable and overriding error standard, I see no basis on which to interfere with it. He made no extricable error in legal principle and his interpretation is not "plainly unreasonable". While one might reasonably interpret the Arbitration Clause other than as the application judge did, that is a function of its wording and does not make the application judge's interpretation unreasonable.

**168** In any event, however, as I have said, in my view, the application judge was correct in finding that a party did not have to file a notice with the Institute in order to commence arbitration. I reach that conclusion based on the following chain of reasoning:

1. The Arbitration Clause does not specify how arbitration is to be commenced;
2. The Arbitration Clause does specify that the arbitration will be conducted in accordance with the *Arbitration Act, 1991* and the then-current Institute rules;
3. Article 24.6 of the Alliance Agreement says that Ontario law governs;
4. In 1999, when the Alliance Agreement was executed and at the time of the dispute in 2005, the *Arbitration Act, 1991* was the Ontario law that applied to the Alliance Agreement;
5. Section 23(1) of the *Arbitration Act, 1991* reads as follows:

An arbitration may be commenced in any way recognized by law, including the following:

1.   A party to an arbitration agreement serves on the other parties notice to appoint or to participate in the appointment of an arbitrator under the agreement.
2.   If the arbitration agreement gives a person who is not a party power to appoint an arbitrator, one party serves notice to exercise that power on the person and serves a copy of the notice on the other parties.
3.   *A party serves on the other parties a notice demanding arbitration under the agreement.* [Emphasis added.]

6.   Thus, as the application judge held, in 2005, the Arbitration Clause did not require a party commencing arbitration in respect of a dispute under the Alliance Agreement to file a notice of request to arbitrate with the Institute. It appears from s. 23 of the Act that filing such a notice would have been an acceptable way of commencing arbitration, just as was the method chosen by Plan (*i.e.* service on Bell of a notice demanding arbitration under the agreement);
7.   The Waiver does not detract from this reasoning;
8.   This reasoning promotes a result that is reasonable, fair and sensible.

**169**   Below, I explain how I arrive at the foregoing reasoning. Before doing so, I make the following observations about the principles that guide the courts when interpreting contracts.

### The Principles that Guide Contractual Interpretation

**170**   The primary goal when interpreting a contract is to give effect to the intention of the parties. There is no need to repeat the general principles of contractual interpretation which assist in achieving that goal as they are well set out in the reasons of the majority. However, the following quotation from *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance*, [1980] I S.C.R. 888, at p. 901 provides useful guidance:

[T]he normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. *Where words may bear two*

> *constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties.* Similarly, an interpretation which defeats the intention of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. [Emphasis added.]

**171**    What, then, was the true intent of the parties in February 1999 when they entered into the Alliance Agreement? Did they intend that if a dispute arose between them that could not be resolved through good faith discussions, the party with the claim could commence arbitration in only one way, namely, by complying with the Institute's rules for commencement of arbitration? I turn now to the analysis which leads me to conclude that the answer to that question is "no".

### Article 22

**172**    The Arbitration Clause does not stand alone - it is but one part of art. 22. Article 22 establishes a two-step process for dispute resolution. Given that art. 22.2 governs the second step in a two-step dispute resolution process, the first of which is contained in art. 22.1, both logic and the guiding principles of contractual interpretation dictate that article 22 be considered as a whole.

**173**    Article 22 reflects the parties' shared intention to resolve disputes quickly, co-operatively and without recourse to the courts. The first step in the dispute resolution process is laid out in art. 22.1. Pursuant to art. 22.1(a), a party who considers a dispute to exist must provide a designated representative of the other party with written notice to that effect. Within 10 days of the date of the notice, designated representatives of both parties must make commercially reasonable efforts, in good faith, to resolve the dispute. If the dispute is not resolved within 10 days, pursuant to art. 22.1(b) the dispute "shall" be referred to other designated persons in the two organizations (the "second tier"). Within a further 10 days, the second tier must again make commercially reasonable efforts, in good faith, to resolve the dispute.

**174**    It is worthy of note that while art. 22.1(a) makes it clear how the dispute resolution process is to be commenced (*i.e.* by written notice delivered by the party alleging the dispute to a designated representative of the other party), art. 22.1(b) does not indicate how the dispute is to be referred to the second tier should the initial good faith discussions fail to resolve the dispute. That is, it says nothing about how to commence the second tier discussions.

**175**    If the dispute is unresolved through the good faith efforts required by art. 22.1, the parties move to the second step of the dispute resolution process. Art. 22.2 governs the second step; it states that the parties "will settle by arbitration" any disputes unresolved through the first step. It goes on to stipulate that a single arbitrator, selected by the parties from a panel of persons knowledgeable in business information and the construction industry, will conduct the arbitration in Toronto in accordance with the *Arbitration Act, 1991* and the then-current rules of the Institute. Failure to file a notice of arbitration within 12 months "after the occurrences supporting a claim"

constitutes an irrevocable waiver of that claim.

**176**    Three things are immediately apparent on reading art. 22.2. First, it says nothing expressly about how arbitration is to be commenced. In that regard, it stands in sharp contrast with art. 22.1(a) which, as has been noted, spells out the requirements for commencing the dispute resolution process.

**177**    Second, while art. 22.2 is silent on how the arbitration is to be commenced, as already indicated, a number of other aspects of the arbitration process are specified.

**178**    Third, the Waiver is in the last sentence of art. 22.2 and it says nothing expressly about commencement of arbitration. That makes sense. The Waiver, on which more is said below, is an important provision which affects substantive rights. How a party commences arbitration is a procedural matter.

### *How is arbitration to be commenced under art. 22.2?*

**179**    I return to the question which lies at the heart of this appeal. In February 1999, when the parties entered into the Alliance Agreement, did they intend that arbitration could be commenced by only one method, namely, in accordance with the then-current Institute rules?

**180**    Art. 22.2 does not say that and, with respect, there is no basis on which to imply such an intention. What is clear is this: the parties intended that if the good faith efforts called for by art. 22.1 failed to resolve the dispute, the matter would go to arbitration. How was the arbitration to be commenced? In the absence of any specified manner, I see no reason why the Arbitration Clause must be interpreted so as to permit a party to commence arbitration by one method only, namely, compliance with the Institute rules. The parties to the Alliance Agreement are sophisticated, experienced businesses. Legal counsel assisted in the drafting of the agreement. Had they intended to stipulate a single method by which to commence the arbitration process, that matter would have been specified, just as the method for commencement of the first step in the process in art. 22.1 is specified and just as so many other aspects of the arbitration process are specified.

**181**    Moreover, art. 24.6 of the Alliance Agreement provides that it is to be governed and construed in accordance with Ontario law.[16] Accordingly, in 1999, when the parties entered into the Alliance Agreement, the *Arbitration Act, 1991* applied to the agreement. Section 2(1) of the *Arbitration Act, 1991* provides that, subject to exceptions that do not apply in this case, the Act applies to arbitrations conducted under an arbitration agreement. "[A]rbitration agreement" is defined as "an agreement by which two or more persons agree to submit to arbitration a dispute that has arisen or may arise between them". Clearly, art. 22.2 is such an agreement. Thus, as I have said, the *Arbitration Act, 1991* applied to art. 22.2.

**182**    Consequently, I see the true intention of the parties - as expressed in the Arbitration Clause - to be that arbitration could be commenced "in any way recognized by [Ontario] law". Thereafter,

the parties would select an arbitrator with the specified background who would conduct the arbitration in accordance with the Act and the Institute rules, as amended.

**183**    This interpretation is consistent with the flow and structure of art. 22. As has been noted, the method for commencing the dispute resolution process itself is spelt out in art. 22.1(a) but, thereafter, nothing is specified in terms of how notice should be given to move the dispute resolution forward. Art. 22.1(b) says nothing as to how the dispute is to be placed before the second tier, should the initial good faith discussions fail. Similarly, art. 22.2 says nothing as to how to commence arbitration should both tiers of the good faith discussions fail. This suggests that the parties' intention was that once the dispute resolution process was commenced, they would co-operate in seeing it through to settlement.

**184**    It is also consistent with the Alliance Agreement as a whole. Under the terms of the Alliance Agreement, Bell and Plan agreed to work collaboratively and cooperatively. The Alliance Agreement is not a standard form contract, nor is it a contract in which one party provides goods or services and the other pays for them. It is not a detailed agreement. Rather, it sets out the parties respective rights and obligations in broad terms to create a unique arrangement in which the parties agree to work together to deliver expensive, complicated, technical electrical cabling projects.

**185**    The parties' agreement to extensive levels of co-operation in all aspects of the joint venture is evident throughout the Alliance Agreement, beginning with the preambles in which the parties recognize that each has unique capabilities and express the desire to cooperate in providing their services on cabling projects. In art. 2, the parties agree to co-ordinate their marketing efforts in respect of existing and new customers and to collaborate in pursuing business opportunities. In art. 3, Plan agrees to refer to Bell all of its cabling project customers in the region and Bell agrees to use Plan to provide customer services to all of its customers in the region. In arts. 8 and 9, the parties agree to provide one another with all training necessary to support customer inquiries in respect of deliverables. The parties also agree to forego any other similar types of alliance agreements in the region and to work together on all new cabling projects.

**186**    In short, within the structure created by the Alliance Agreement, co-operation between the parties is the hallmark. Similarly, the interpretation I offer for how arbitration is to be commenced relies on the parties' co-operation, within the agreed-on structure provided by art. 22.

**187**    Furthermore, the factual matrix supports this interpretation. The parties had been working together in a co-operative fashion. As has been mentioned, they were sophisticated, experienced business people working with legal counsel. Their whole approach - both from a legal and a business perspective - was to set out, in broad strokes, that which they wished to accomplish and then co-operate in seeing the matter through to fruition.

**188**    The interpretation given by my colleague is restrictive and technical - arbitration can be commenced in only one way, by filing a notice with the Institute. In my view, for the reasons already given, such an interpretation is not consistent with the flow and structure of the overall

dispute resolution process in art. 22, with the Alliance Agreement as a whole or the factual matrix.

**189**    Furthermore, the interpretation adopted by my colleague relies heavily on the statement in art. 22.2 that the arbitration is to be conducted under the Institute's rules. There are two responses to this. First, recall that the sole reference to the Institute in art. 22.2 is in the second sentence, which provides that the arbitrator "will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the... Institute". One cannot conduct an arbitration unless it has been commenced. Thus, on a plain reading, art. 22.2 says that the Institute rules are to apply to the conduct of the arbitration, not to its commencement.

**190**    Second, and in any event, even if "conduct" of the arbitration is taken to include its commencement, I see no reason to constrain it to include commencement only by compliance with the Institute rules. That is not what art. 22.2 says. Art. 22.2 says that the arbitrator is to conduct the arbitration under both the *Arbitration Act, 1991* and the Institute rules. Both contain rules for the commencement of arbitration. There is nothing in the wording of art. 22.2 to suggest that the Institute's rules are to govern commencement. Indeed, there is force to the argument that as art. 22.2 refers to the *Arbitration Act, 1991* before the Institute rules, the parties' evinced an intention that the rules set out in the *Arbitration Act, 1991* are to govern commencement of arbitration.

**191**    Nor do I see *Spectra Innovations Inc. v. Mitel Corp.*, [1999] O.J. No. 1870 (S.C.) as supportive of the interpretation advanced by my colleague. The wording of the clause in *Spectra* is materially different than the Arbitration Clause. The clause in *Spectra* provided that the arbitration tribunal should determine the matter "*acting in accordance with the Rules [of the ICC]*" (emphasis added). However, the Arbitration Clause stipulates that the arbitrator "will *conduct* the arbitration *under the Arbitration Act, 1991* (Ontario) and the then-current [Institute rules]" (emphasis added).

**192**    Moreover, as the application judge noted at para. 41 of his reasons:

> While the arbitration clause in *Spectra* also addresses the appointment of the arbitrator by the parties (in this case, an arbitration board), it does not refer to compliance with the applicable rules in the context of the conduct of the arbitration by the arbitrator so appointed. This difference points to a specific intention in the Arbitration Clause that the arbitrator, once appointed, would be required to apply the procedural rules in the Act and in the rules of the Institute, as in effect from time to time, rather than to a more general intention that the Institute was to administer all aspects of the arbitration, as was held to be the case in *Spectra*. Accordingly, rather than supporting the interpretation of the Arbitration Agreement proposed by Bell, I think that the decision in *Spectra* actually supports the interpretation of Plan by identifying the unique feature of the Arbitration Clause that distinguishes it from clauses that would contemplate the administrative involvement of the Institute.

**193**    Further, in *Spectra*, the court relied on the factual matrix in interpreting the clause. After

observing that the applicant was based in Singapore, the respondent was based in Ontario and the agreement concerned the supply of product in India, the court in *Spectra* concluded at para. 17:

> ...The I.C.C. court which was founded in Paris in 1923, has a long-standing reputation as one of the leading institutions for arbitration of international commercial disputes. *In this context*, it would be altogether logical that the parties would want to resolve any dispute by setting up an arbitration board acting in accordance with the Rules of conciliation and arbitration of the I.C.C. [Emphasis added.]

**194**     No such inter-jurisdictional commercial considerations operate in the case at bar, in which all aspects of the business arrangement take place in Ontario and the parties have expressly chosen to have their agreement governed by Ontario law.

**195**     Finally, the Waiver is an exclusionary provision which warrants strict interpretation as its operation affects substantive rights. In contrast, the clause in *Spectra* dealt with matters of mere procedure.

### *The Waiver*

**196**     The Waiver is the mechanism chosen by the parties to ensure that claims under the Alliance Agreement are dealt with in a timely fashion - file a notice of arbitration within 12 months of the occurrences which support a claim or the claim is to be treated as irrevocably waived.

**197**     Bell contends that the Waiver dictates that arbitration could have been commenced in only one way - by filing a notice with the Institute. It says that the word "file" in the Waiver must mean to file with the Institute and, as the Notice was not filed and issued through the Institute, Plan's claim is extinguished. In large measure, my colleague accepts that contention by interpreting the word "file" in the Waiver as a crucial indicator of the parties' intention that the Institute rules were to govern the commencement of arbitration.

**198**     With respect, I see the Waiver to be of little significance in determining whether the arbitration has been commenced.

**199**     "Waiver" of a claim and "commencement" of arbitration are not synonymous. The Waiver may be a defence to be raised in the arbitration but it does not dictate whether and how the arbitration is to be commenced.

**200**     Similarly, I see no reason to adopt an unnecessarily restrictive meaning of "file". "File" is not a defined term in the Alliance Agreement. As the parties intended that disputes would be resolved without recourse to the courts, it does not make sense to ascribe to that word a narrow, strictly legal meaning. Where the parties wanted to closely circumscribe some aspect of the dispute resolution process they did so - good faith discussions were to be conducted within 10 days of the date of the

notice of dispute, the arbitration was to be in Toronto, the arbitrator was to be selected from a panel of persons with a particular background and so on.

**201**    Further, the broader dictionary meaning of "file" includes delivery and receipt and to do that which is necessary to commence a legal proceeding. The common meaning of "file" includes "actual delivery" to the recipient (as opposed to simply mailing) or to initiate proceedings by proper formal procedure. For example, *The Canadian Dictionary of Law*, 3d ed. defines "file" as follows:

> **File**. v. 1. To leave with the appropriate office for keeping. 2. Register. 3. Requires actual delivery. A mailed document is not filed until received by the other party.

**202**    These broad meanings of "file" are consistent with the commencement of arbitration under s. 23 of the *Arbitration Act, 1991*.

**203**    To the extent that there is ambiguity in the Waiver, as it is an exclusionary provision, it ought to be construed strictly against the forfeiture of legal rights. This principle of interpretation is particularly apt in the present case where Plan sought to commence arbitration in a manner which complied with a plain reading of the Arbitration Clause and with the express purpose of protecting its rights and Bell raised no objection to the form of the purported commencement of arbitration until many months later. The broader interpretation advanced here recognizes commencement of arbitration by any means allowable in law and would not work an injustice by causing the loss of rights.

**204**    I do not intend to suggest that the Waiver is irrelevant or unimportant. To the contrary. On its own, the Waiver is important as it is the mechanism that the parties chose to ensure that claims would be raised in a timely fashion. Furthermore, if this matter were permitted to proceed to arbitration, as I have mentioned, it raises a significant issue for the arbitrator to decide.

### *The result is reasonable, fair and commercially sensible*

**205**    In the quotation from *Consolidated Bathurst* set out above, the Supreme Court states that where a provision admits of more than one construction, the court should choose the one which produces a result that is more reasonable, fair and commercially sensible.

**206**    The result, on the interpretation advanced above, is that Plan may assert that it commenced arbitration on December 12, 2005, when it delivered to Bell the Notice pursuant to s. 23 of the *Arbitration Act, 1991*, if not earlier. That matter, however, remains to be determined by the arbitrator. I say that because, as I have already explained, the Order does not declare that Plan has commenced arbitration and, if so, on what date. By answering the question in the manner in which the parties had framed it (*i.e.* in the negative), the application judge left the question of when Plan commenced arbitration, if at all, to be determined by the arbitrator.

**207** In my view, this result is reasonable, fair and commercially sensible.

**208** When parties have agreed that disputes are to be settled by arbitration and that the *Arbitration Act, 1999* applies, it is reasonable for the parties to follow the provisions of that legislation regarding commencement of arbitration.

**209** Moreover, this interpretation promotes a fair result as it would permit the arbitration to proceed while leaving it to the parties to pursue the issues of both commencement and operation of the Waiver before the arbitrator.

**210** There is no commercial necessity that would augur in favour of excluding the operation of s. 23 of the *Arbitration Act, 1991.*

**211** No commercial injustice arises from this interpretation. Bell was given ample notice of Plan's intention to take its claim to arbitration. It took advantage of that notice by demanding extensive particulars in respect of the claim. Moreover, Bell was manifestly aware of all the elements of a notice of request to arbitrate under the Institute's then-current rules.

**212** There is no evidence that Bell would suffer any prejudice from this interpretation of the Arbitration Clause. Instead, the evidence suggests opportunism on the part of Bell. It seeks - very late in the day - to invoke the Waiver on grounds that are entirely formalistic in nature. Plan delivered the Draft Notice to Bell on August 26, 2005, when it initiated the good faith discussions required by art. 22.1(a). Bell raised no objection then to the fact that the Draft Notice was made under the *Arbitration Act, 1991* instead of the Institute rules. Nor did it suggest that such a notice would not be adequate to preserve Plan's rights with respect to the Waiver. It raised the Waiver, but only to suggest that Plan's claim was out of time as the occurrences on which it was based had taken place over 12 months previously.

**213** In the context of good faith discussions, Bell should have raised this objection at that time, if it were genuine. At the very least, if no objection were raised when the Draft Notice was delivered, Bell should have raised its concerns when the Notice was delivered on December 12, 2005. Instead, Bell remained silent on this issue, demanded further particulars and suggested that the good faith discussions might continue.

**214** In summary, interpreting the Arbitration Clause to allow commencement of arbitration in any manner recognized by s. 23 of the *Arbitration Act, 1991*- which would include the Institute rules as well as delivery of a notice demanding arbitration - meets the reasonable expectations of the parties, reflects their intention as expressed in the Alliance Agreement in 1999 when they executed the agreement, and produces a result that is reasonable, fair and commercially sensible.

**DISPOSITION**

**215** Accordingly, I would dismiss the appeal with costs to the respondents fixed at $20,000,

inclusive of disbursements and G.S.T.

E.E. GILLESE J.A.

cp/e/qlaim/qlpxm/qlaxw/qlced/q!hcs/qlmxl/qlaxr/qlhcs/qlcal

1 This appears to be a mistake. The reference should be to Section 22.1.

2 I have italicized the two provisions in the Agreement that are central to the appeal.

3 "Application" here is used in the sense of "motion". See *Buck Bros., infra*, at p. 1000.

4 See e.g. *Petty v. Telus Corp.* (2002), 164 B.C.A.C. 152 (C.A.); *IWA - Forest Industry Pension Plan (Trustees of) v. Aspen Planers Ltd.*, (2006), 56 B.C.L.R. (4th) 1 (C.A.); *A.L. Sott Financial (FIR) Inc. v. PDF Training Inc.* (2008), 77 B.C.L.R. (4th) 154 (C.A.).

5 See e.g. *Double N Earthmovers Ltd. v. Edmonton (City)* (2005), 363 A.R. 201 (C.A.), aff'd [2007] 1 S.C.R. 116; *Alberta v. Western Irrigation District* (2002), 312 A.R. 358 (C.A.); *Dreco Energy Services Ltd. v. Wenzel* (2008), 440 A.R. 273 (C.A.); *942925 Alberta Ltd. v. Thompson* (2008), 432 A.R. 177 (C.A.).

6 See e.g. *Robichaud, Williamson, Theriault and Johnstone v. Pharmacie Acadienne de Beresford Ltée* (2008), 328 N.B.R. (2d) 205 (C.A.), at para. 16; *Ryan v. Sun Life Assurance* (2005), 230 N.S.R. (2d) 132 (C.A.), at para. 15; *White v. E.B.F. Manufacturing Ltd.* (2005), 239 N.S.R. (2d) 270 (C.A.), at para. 16; *United Gulf Developments Ltd. v. Iskandar* (2008), 267 N.S.R. (2d) 318 (C.A.), at para. 5.

7 This appears to be a mistake. The reference should be to Section 22.1.

8 That it was ultimately not renewed is immaterial.

9 The latter caveat has no relevance to the case at bar.

10 See also, *The Canadian Oxford Dictionary*, 2d ed., *s.v.* "file" and "deliver"; *Black's Law Dictionary*, 8th ed. *s.v.* "file" and "deliver".

11 **The facts are taken largely from the Notice Demanding Arbitration prepared by Plan.**

12 It can be found at para. 107 below.