*Indexed as:*
## Lehndorff General Partner Ltd. (Re)

**IN THE MATTER OF The Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36
AND IN THE MATTER OF The Courts of Justice Act, R.S.O. 1990,
c. C. 43
AND IN THE MATTER OF a plan of compromise in respect of
Lehndorff General Partner Ltd., in its own capacity and in
its capacity as general partner of
Lehndorff United Properties (Canada)
Lehndorff Properties (Canada)
- and -
Lehndorff Properties (Canada) II
and in respect of certain of their nominees
Lehndorff United Properties (Canada) Ltd.,
Lehndorff Canadian Holdings Ltd.,
Lehndorff Canadian Holdings II Ltd.,
Baytemp Properties Limited and
102 Bloor Street West Limited
and in respect of
The Lehndorff Vermogensverwaltung GmbH in
in its capacity as limited partner of
Lehndorff United Properties (Canada)
Applicants**

[1993] O.J. No. 14

9 B.L.R. (2d) 275

17 C.B.R. (3d) 24

37 A.C.W.S. (3d) 847

Court File No. B366/92

Ontario Court of Justice - General Division
Toronto, Ontario

**Farley J.**

Heard: December 24, 1992
Judgment: January 6, 1993

(36 pp.)

Alfred Apps, Robert Harrison and Melissa J. Kennedy, for the Applicants.
L. Crozier, for the Royal Bank of Canada.
R.C. Heintzman, for the Bank of Montreal.
J. Hodgson, Susan Lundy and James Hilton, for Canada Trustco Mortgage Corporation.
Jay Schwartz, for Citibank Canada.
Stephen Golick, for Peat Marwick Thorne Inc., proposed monitor.
John Teolis, for the Fuji Bank Canada.
Robert Thorton for certain of the advisory boards.

---

**FARLEY J.**:-- These are my written reasons relating to the relief granted the applicants on December 24, 1992 pursuant to their application under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 ("CCAA") and the Courts of Justice Act, R.S.O. 1990, c. C. 43 ("CJA"). The relief sought was as follows:

    (a)   short service of the notice of application;

    (b)   a declaration that the applicants were companies to which the CCAA applies;

    (c)   authorization for the applicants to file a consolidated plan of compromise;

    (d)   authorization for the applicants to call meetings of their secured and unsecured creditors to approve the consolidated plan of compromise;

    (e)   A stay of all proceedings taken or that might be taken either in respect of the applicants in their own capacity or on account of their interest in Lehndorff United Properties (Canada) ("LUPC"), Lehndorff Properties (Canada) ("LPC") and Lehndorff Properties (Canada) II ("LPC II") and collectively (the "Limited Partnerships") whether as limited partner, as general partner or as registered titleholder to certain of their assets as bare trustee and nominee; and

    (f)   certain other ancillary relief.

The applicants are a number of companies within the larger Lehndorff group ("Group") which operates in Canada and elsewhere. The group appears to have suffered in the same way that a

number of other property developers and managers which have also sought protection under the CCAA in recent years. The applicants are insolvent; they each have outstanding debentures issued under trust deeds; and they propose a plan of compromise among themselves and the holders of these debentures as well as those others of their secured and unsecured creditors as they deemed appropriate in the circumstances. Each applicant except THG Lehndorff Vermogensverwaltung GmbH ("GmbH") is an Ontario corporation. GmbH is a company incorporated under the laws of Germany. Each of the applicants has assets or does business in Canada. Therefore each is a "company" within the definition of s. 2 of the CCAA. The applicant Lehndorff General Partner Ltd. ("General Partner Company") is the sole general partner of the Limited Partnerships. The General Partner Company has sole control over the property and businesses of the Limited Partnerships. All major decisions concerning the applicants (and the Limited Partnerships) are made by management operating out of the Lehndorff Toronto Office. The applicants aside from the General Partner Company have as their sole purpose the holding of title to properties as bare trustee or nominee on behalf of the Limited Partnerships. LUPC is a limited partnership registered under the Limited Partnership Act, R.S.O. 1990, c. L.16 ("Ontario LPA"). LPC and LPC II are limited partnerships registered under Part 2 of the Partnership Act, R.S.A. 1980, c. P-2 ("Alberta PA") and each is registered in Ontario as an extra provincial limited partnership. LUPC has over 2,000 beneficial limited partners, LPC over 500 and LPC II over 250, most of whom are residents of Germany. As at March 31, 1992 LUPC had outstanding indebtedness of approximately $370 million, LPC $45 million and LPC II $7 million. Not all of the members of the Group are making an application under the CCAA. Taken together the Group's indebtedness as to Canadian matters (including that of the applicants) was approximately $543 million. In the summer of 1992 various creditors (Canada Trustco Mortgage Company, Bank of Montreal, Royal Bank of Canada, Canadian Imperial Bank of Commerce and the Bank of Tokyo Canada) made demands for repayment of their loans. On November 6, 1992 Funtanua Investments Limited, a minor secured lendor also made a demand. An interim standstill agreement was worked out following a meeting of July 7, 1992. In conjunction with Peat Marwick Thorne Inc. which has been acting as an informal monitor to date and Fasken Campbell Godfrey the applicants have held multiple meetings with their senior secured creditors over the past half year and worked on a restructuring plan. The business affairs of the applicants (and the Limited Partnerships) are significantly intertwined as there are multiple instances of intercorporate debt, cross-default provisions and guarantees and they operated a centralized cash management system.

    This process has now evolved to a point where management has developed a consolidated restructuring plan which plan addresses the following issues:

(a)    The compromise of existing conventional, term and operating indebtedness, both secured and unsecured.
(b)    The restructuring of existing project financing commitments.
(c)    New financing, by way of equity or subordinated debt.
(d)    Elimination or reduction of certain overhead.
(e)    Viability of existing businesses of entities in the Lehndorff Group.

(f)    Restructuring of income flows from the limited partnerships.

(g)    Disposition of further real property assets aside from those disposed of earlier in the process.

(h)    Consolidation of entities in the Group; and

(i)    Rationalization of the existing debt and security structure in the continuing entities in the Group.

Formal meetings of the beneficial limited partners of the Limited Partnerships are scheduled for January 20 and 21, 1993 in Germany and an information circular has been prepared and at the time of hearing was being translated into German. This application was brought on for hearing at this time for two general reasons: (a) it had now ripened to the stage of proceeding with what had been distilled out of the strategic and consultative meetings; and (b) there were creditors other than senior secured lenders who were in a position to enforce their rights against assets of some of the applicants (and Limited Partnerships) which if such enforcement did take place would result in an undermining of the overall plan. Notice of this hearing was given to various creditors: Barclays Bank of Canada, Barclays Bank PLC, Bank of Montreal, Citibank Canada, Canada Trustco Mortgage Corporation, Royal Trust Corporation of Canada, Royal Bank of Canada, the Bank of Tokyo Canada, Funtauna Investments Limited, Canadian Imperial Bank of Commerce, Fuji Bank Canada and First City Trust Company. In this respect the applicants have recognized that although the initial application under the CCAA maybe made on an ex parte basis (s. 11 of the CCAA; Re Langley's Ltd., (1938) O.R. 123, (1938) 3 D.L.R. 230 (C.A.); Re Kennoch Development Ltd. (1991), 8 C.B.R. (3d) 95 (N.S.S.C.T.D.). The court will be concerned when major creditors have not been alerted even in the most minimal fashion (Re Inducon Development Corporation (1992), 8 C.B.R. (3d) 306 (Ont. Gen. Div.) at p. 310). The application was either supported or not opposed.

"Instant" debentures are now well recognized and respected by the courts: see Re United Maritime Fisherman Co-Op (1988), 67 C.B.R. (N.S.) 44, at pp. 55-6, varied on reconsideration (1988), 68 C.B.R. (N.S.) 170, reversed on different grounds (1988), 69 C.B.R. (N.S.) 161 at pp. 165-6; Re Stephanie's Fashions Ltd. (1990), 1 C.B.R. (3d) 248 (B.C.S.C.) at pp. 250-1; Elan Corp. v. Comiskey (1990), 1 O.R. (3d) 289, 1 C.B.R. (3d) 101 (C.A.) per Doherty J.A., dissenting on another point, at pp. 306-310 (O.R.); Ultracare Management Inc. v. Gammon (1990), 1 O.R. (3d) 321 (Gen. Div.) at p. 327. The applicants would appear to me to have met the technical hurdle of s. 3 and as defined s. 2) of the CCAA in that they are debtor companies since they are insolvent, they have outstanding an issue of debentures under a trust deed and the compromise or arrangement that is proposed includes that compromise between the applicants and the holders of those trust deed debentures. I am also satisfied that because of the significant intertwining of the applicants it would be appropriate to have a consolidated plan. I would also understand that this court (Ontario Court of Justice (General Division)) is the appropriate court to hear this application since all the applicants except GmbH have their head office or their chief place of business in Ontario and GmbH, although it does not have a place of business within Canada, does have assets located within Ontario.

The CCAA is intended to facilitate compromises and arrangements between companies and

their creditors as an alternative to bankruptcy and, as such, is remedial legislation entitled to a liberal interpretation. It seems to me that the purpose of the statute is to enable insolvent companies to carry on business in the ordinary course or otherwise deal with their assets so as to enable plan of compromise or arrangement to be prepared, filed and considered by their creditors and the court. In the interim, a judge has great discretion under the CCAA to make order so as to effectively maintain the status quo in respect of an insolvent company while it attempts to gain the approval of its creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors. See the preamble to and sections 4, 5, 6, 7, 8 and 11 of the CCAA; in Re Companies' Creditors Arrangement Act; A.G. Can. v. A.G. Que., (1934) S.C.R. 659 at p. 661; 16 C.B.R. 1; (1934) 4 D.L.R. 75; Meridian Developments Inc. v. Toronto-Dominion Bank; Meridian Developments Inc. v. Nu-West Group Ltd., (1984) 5 W.W.R. 215 at pp. 219-20; Norcen Energy Resources v. Oakwood Petroleums Limited. et al. (1988), 72 C.B.R. (N.S.) 1, 63 Alta. L.R. (2d) 361 (Alta., Q.B.), at pp. 12-13 (C.B.R.); Re Ouintette Coal Limited (1990), 2 C.B.R.(3d) 303 (B.C.C.A), at pp. 310-1, affirming Ouintette Coal Limited v. Nippon Steel Corporation et al. (1990) 2 C.B.R. (3d) 291, 47 B.C.L.R. 193 (B.C.S.C.), leave to appeal to S.C.C. dismissed (1991), 7 C.B.R. (3d) 164 (S.C.C.).; Elan, supra at p. 307 (O.R.); Fine's Flowers v. Creditors of Fine's Flowers (1992), 7 O.R. (3d) 193 (Gen. Div.), at p. 199 and "Re-Organizations under the Companies' Creditors Arrangement Act", Stanley E. Edwards, (1947), 25 Cdn. Bar Rev. 587 at p. 592.

The CCAA is intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both. Where a debtor company realistically plans to continue operating or to otherwise deal with its assets but it requires the protection of the court in order to do so and it is otherwise too early for the court to determine whether the debtor company will succeed, relief should be granted under the CCAA. See Elan, supra at pp. 297 and p. 316; Stephanie's, supra, at pp. 251-2 and Ultracare, supra, at p. 328 and p. 330. It has been held that the intention of the CCAA is to prevent any manoeuvres for positioning among the creditors during the period required to develop a plan and obtain approval of creditors. Such manoeuvres could give an aggressive creditor an advantage to the prejudice of others who are less aggressive and would undermine the company's financial position making it even less likely that the plan will succeed: see Meridian, supra, at p. 220 (W.W.R.). The possibility that one or more creditors may be prejudiced should not affect the court's exercise of its authority to grant a stay of proceedings under the CCAA because this affect is offset by the benefit to all creditors and to the company of facilitating a reorganization. The court's primary concerns under the CCAA must be for the debtor and all of the creditors: see Ouintette, supra, at pp. 108-110; Chef Ready Foods Ltd. v. Hongkong Bank of Canada (1990), 4 C.B.R. (3d) 311, 51 B.C.L.R. (2d) 84 (B.C.C.A.), at pp. 315-318, (C.B.R.) and Stephanie's, supra, at pp. 251-2.

One of the purposes of the CCAA is to facilitate ongoing operations of a business where its assets have a greater value as part of an integrated system than individually. The CCAA facilitates reorganization of a company where the alternative, sale of the property piecemeal, is likely to yield far less satisfaction to the creditors. Unlike the Bankruptcy Act, R.S.C. 1985, c. B-3, before the amendments effective November 30, 1992 to transform it into the Bankruptcy and Insolvency Act

("BIA"), it is possible under the CCAA to bind secured creditors it has been generally speculated that the CCAA will be resorted to by companies that are generally larger and have a more complicated capital structure and that those companies which make an application under the CCAA will be generally smaller and have a less complicated structure. Reorganization may include partial liquidation where it is intended as part of the process of a return to long term viability and profitability. See Chef Ready, supra, at p. 318 and Re Assoc. Investors of Can. Ltd. (1987), 67 C.B.R. (N.S.) 237 at pp. 245; rev'd on other grounds at (1988), 71 C.B.R. 72. It appears to me that the purpose of the CCAA is also to protect the interests of creditors and to enable an orderly distribution of the debtor company's affairs. This may involve a winding-up or liquidation of a company or simply a substantial downsizing of its business operations, provided the same is proposed in the best interests of the creditors generally. See Assoc. Investors, supra, at p. 318; Re Amirault Co. (1951), 32 C.B.R. 1986, (1951) 5 D.L.R. 203 (N.S.S.C.) at pp. 187-8 (C.B.R.).

It strikes me that each of the applicants in this case has a realistic possibility of being able to continue operating, although each is currently unable to meet all of its expenses albeit on a reduced scale. This is precisely the sort of circumstance in which all of the creditors are likely to benefit from the application of the CCAA and in which it is appropriate to grant an order staying proceedings so as to allow the applicant to finalize preparation of and file a plan of compromise and arrangement.

Let me now review the aspect of the stay of proceedings. Section 11 of the CCAA provides as follows:

> 11.  Notwithstanding anything in the Bankruptcy Act or the Winding-up Act, whenever an application has been made under this Act in respect of any company, the court, on the application of any person interested in the matter, may, on notice to any other person or without notice as it may see fit,
>
> (a)  make an order staying, until such time as the court may prescribe or until any further order, all proceedings taken or that might be taken in respect of the company under the Bankruptcy Act and the Winding-up Act or either or them;
>
> (b)  restrain further proceedings in any action, suit or proceeding against the company on such terms as the court sees fit; and
>
> (c)  make an order that no suit, action or other proceeding shall be proceeded with or commenced against the company except with the leave of the court and subject to such terms as the court imposes.

The power to grant a stay of proceeding should be construed broadly in order to permit the CCAA to accomplish its legislative purpose and in particular to enable continuance of the company seeking CCAA protection. The power to grant a stay therefore extends to a stay which affects the position not only of the company's secured and unsecured creditors, but also all non-creditors and

other parties who could potentially jeopardize the success of the plan and thereby the continuance of the company. See Norcen, supra at pp. 12-7 (C.B.R.) and Ouintette, supra, at pp. 296-8 (B.C.S.C.) and pp. 312-4 (B.C.C.A.) and Meridian, supra, at pp. 219 ff. Further the court has the power to order a stay that is effective in respect of the rights arising in favour of secured creditors under all forms of commercial security: see Chef Ready, supra, at p. 320 where Gibbs J.A. for the Court stated:

> The trend which emerges from this sampling will be given effect here by holding that where the word "security" occurs in the C.C.A.A., it includes s. 178 security and, where the word creditor occurs, it includes a bank holding s. 178 security. To the extent that there may be conflict between the two statutes, therefore, the broad scope of the C.C.A.A. prevails.

The power to grant a stay may also extend to preventing persons seeking to terminate or cancel executory contracts, including, without limitation agreements with the applying companies for the supply of goods or services, from doing so: see Wynden Canada Inc. v. Gaz Métropolitain Inc. (1982), 44 C.B.R. (N.S.) 285 (Que. S.C. in Bankruptcy) at pp. 290-1 and Ouintette, supra, at pp. 311-2 (B.C.C.A.). The stay may also extend to prevent a mortgagee from proceeding with foreclosure proceedings (see Re Northland Properties Limited et al. (1988), 73 C.B.R. (N.S.) 141 (B.C.S.C.) or to prevent landlords from terminating leases, or otherwise enforcing their rights thereunder (see In Re Nathan Feifer et al. v. Frame Manufacturing Corporation (1947), 28 C.B.R. 124 (Qué. C.A.)). Amounts owing to landlords in respect of arrears of rent or unpaid rent for the unexpired portion of lease terms are properly dealt with in a plan of compromise or arrangement: see Sklar-Peppler Furniture Corporation (1992), 8 C.B.R. (3d) 312 (Ont. Gen. Div.) especially at p. 318. The jurisdiction of the court to make orders under the CCAA in the interest of protecting the debtor company so as to enable it to prepare and file a plan is effective notwithstanding the terms of any contract or instrument to which the debtor company is a party. Section 8 of the CCAA provides:

> 8.   This act extends and does not limit the provisions of any instrument now or hereafter existing that governs the rights of creditors or any class of them and has full force and effect notwithstanding anything to the contrary contained in that instrument.

The power to grant a stay may also extend to prevent persons from exercising any right of set off in respect of the amounts owed by such a person to the debtor company, irrespective of whether the debtor company has commenced any action in respect of which the defense of set off might be formally asserted: see Ouintette, supra, at pp. 312-4 (B.C.C.A.).

It was submitted by the applicants that the power to grant a stay of proceedings may also extend to a stay of proceedings against non-applicants who are not companies and accordingly do not come within the express provisions of the CCAA. In support thereof they cited a CCAA order

which was granted staying proceedings against individuals who guaranteed the obligations of a debtor-applicant which was a qualifying company under the terms of the CCAA: see In the Matter of the Proposal of Norman Slavik, unreported, [1992] B.C.J. No. 341. However in the Slavik situation the individual guarantors were officers and shareholders of two companies which had sought and obtained CCAA protection. Vickers J. in that case indicated that the facts of that case included the following unexplained and unamplified fact:

> 5.    The order provided further that all creditors of Norvik Timber Inc. be enjoined from making demand for payment upon that firm or upon any guarantor of an obligation of the firm until further order of the Court.

The CCAA reorganization plan involved an assignment of the claims of the creditors to "Newco" in exchange for cash and shares. However the basis of the stay order originally granted was not set forth in this decision.

It appears to me that Dickson J. in International Donut Corp. v. 050863 N.B. Ltd., unreported, (1992) N.B.J. No. 339 (N.B.Q.B.T.D.) was focusing only on the stay arrangements of the CCAA when concerning a limited partnership situation he indicated:

> In August 1991 the limited partnership, through its general partner the plaintiff, applied to the Court under the Companies' Creditors Arrangement Act, R.S.C., c. C-36 for an order delaying the assertion of claims by creditors until an opportunity could be gained to work out with the numerous and sizable creditors a compromise of their claims. An order was obtained but it in due course expired without success having been achieved in arranging with creditors a compromise. That effort may have been wasted, because it seems questionable that the federal Act could have any application to a limited partnership in circumstances such as these. (Emphasis added).

I am not persuaded that the words of s. 11 which are quite specific as relating as to a company can be enlarged to encompass something other than that. However it appears to me that Blair J. was clearly in the right channel in his analysis in Campeau v. Olympia & York Developments Ltd. unreported, (1992) O.J. No. 1946 at pp. 4-7.

The Power to Stay

> The Court has always had an inherent jurisdiction to grant a stay of proceedings whenever it is just and convenient to do so, in order to control its process or prevent an abuse of that process: see Canada Systems Group (Est) Ltd. v. Allendale Mutual Insurance Co. (1982), 29 C.P.C. 60 (H.C.),

and cases referred to therein. In the civil context, this general power is also embodied in the very broad terms of s. 106 of the Courts of Justice Act, R.S.O. 1990, Chap. C. 43, which provides as follows:

> s.    106 A court, on its own initiative or on motion by any person, whether or not a party, may stay any proceeding in the court on such terms as are considered just.

Recently, Mr. Justice O'Connell has observed that this discretionary power is "highly dependent on the facts of each particular case": Arab Monetary Fund v. Hashim (unreported), [1992] O.J. No. 1330.

Apart from this inherent and general jurisdiction to stay proceedings, there are many instances where the Court is specifically granted the power to stay in a particular context, by virtue of statute or under the Rules of Civil Procedure. The authority to prevent multiplicity of proceedings in the same court, under Rule 6.01(1), is an example of the latter. The power to stay judicial and extra-judicial proceedings under s. 11 of the CCAA, is an example of the former. Section 11 of the CCAA provides as follows:

...

The Power to Stay in the Context of CCAA Proceedings:

By its formal title the CCAA is known as "An Act to facilitate compromises and arrangements between companies and their creditors". To ensure the effective nature of such a "facilitative" process it is essential that the debtor company be afforded a respite from the litigious and other rights being exercised by creditors, while it attempts to carry on as a going concern and to negotiate an acceptable corporate restructuring arrangement with such creditors.

In this respect it has been observed that the CCAA is "to be used as a practical and effective way of restructuring corporate indebtedness.": see the case comment following the report of Norcen Energy Resources Ltd. v. Oakwood Petroleums Ltd. (1988), 72 C.B.R. (N.S.) 1 (Q.B.), and the approval of that remark as "a perceptive observation about the attitude of the courts" by Gibbs J.A. in Quintette Coal Ltd. v. Nippon Steel Corp.

(1990), 51 B.C.L.R. (2d) 105 at p. 113 (B.C.C.A.).

Gibbs J.A. continued with this comment:

> To the extent that a general principle can be extracted from the new cases directly on point, and the others in which there is persuasive obiter, it would appear to be that the courts have concluded that under s. 11 there is a discretionary power to restrain judicial or extra judicial conduct against the debtor company the effect of which is, or would be, seriously to impair the ability of the debtor company to continue in business during the compromise or arrangement negotiating period (emphasis added).

I agree with those sentiments and would simply add that, in my view, the restraining power extends as well to conduct which could seriously impair the debtor's ability to focus and concentrate its efforts on the business purpose of negotiating the compromise or arrangement. (In this respect, see also Sairex GmbH v. Prudential Steel Ltd. (1991), 8 C.B.R. (3d) 62 (Ont. Gen. Div.) at p. 77).

I must have regard to these foregoing factors while I consider, as well, the general principles which have historically governed the Court's exercise of its power to stay proceedings. These principles were reviewed by Mr. Justice Montgomery in Canada Systems Group (EST) Ltd. v. Allendale Mutual Insurance, supra (a "Mississauga Derailment" case), at pp. 65-66. The balance of convenience must weigh significantly in favour of granting the stay, as a party's right to have access to the courts must not be lightly interfered with. The Court must be satisfied that a continuance of the proceeding would serve as an injustice to the party seeking the stay, in the sense that it would be oppressive or vexatious or an abuse of the process of the court in some other way. The stay must not cause an injustice to the plaintiff.

It is quite clear from Empire-Universal Films Limited et al. v. Rank et al., (1947) O.R. 775 (H.C.) that McRuer C.J.H.C. considered that the Judicature Act then [and now the CJA] merely confirmed a statutory right that previously had been considered inherent in the jurisdiction of the court with respect to its authority to grant a stay of proceedings. See also McCordic et al. v. Township of Bosanquet (1974) 5 O.R. (2d) 53 (H.C.) and Canada Systems Group (Est) Ltd. v. Allendale Mutual

Insurance Co. (1982) 29 C.P.C. 60 (H.C.) at pp. 65-6.

Montgomery J. in Canada Systems, supra, at pp. 65-6 indicated:

> Goodman J. (as he then was) in McCordic v. Bosanquet (1974), 5 O.R. (2d) 53 in granting a stay reviewed the authorities and concluded that the inherent jurisdiction of the Court to grant a stay of proceedings may be made whenever it is just and reasonable to do so. "This court has ample jurisdiction to grant a stay whenever it is just and reasonable to do so." (Per Lord Denning M.R. in Edmeades v. Thames Board Mills Ltd., [1969] 2 Q.B. 67 at 71, [1969] 2 All E.R. 127 (C.A.)). Lord Denning's decision in Edmeades was approved by Lord Justice Davies in Lane v. Willis; Lane v. Beach (Executor of Estate of George William Willis), [1972] 1 All E.R. 430, [1972] 1 W.L.R. 326 (sub nom. Lane v. Willis; Lane v. Beach) (C.A.).

> ...

> In Weight Watchers Int. Inc. v. Weight Watchers of Ont. Ltd. (1972), 25 D.L.R. (3d) 419, 5 C.P.R. (2d) 122, appeal allowed by consent without costs (sub nom. Weight Watchers of Ont. Ltd. v. Weight Watchers Inc. Inc.) 42 D.L.R. (3d) 320n, 10 C.P.R. (2d) 96n (Fed. C.A.), Mr. Justice Heald on an application for stay said at p. 426 [25 D.L.R.]:

>> "The principles which must govern in these matters are clearly stated in the case of Empire Universal Films Ltd. et al. v. Rank et al., [1947] O.R. 775 at p. 779, as follows [quoting St. Pierre et al. v. South American Stores (Gath & Chaves), Ltd. et al., [1936] 1 K.B. 382 at p. 398]:

>> '(1.) A mere balance of convenience is not a sufficient ground for depriving a plaintiff of the advantages of prosecuting his action in an English Court if it is otherwise properly brought. The right of access to the King's Court must not be lightly refused. (2.) In order to justify a stay two conditions must be satisfied, one positive and the other negative: (a) the defendant must satisfy the Court that the continuance of the action would work an injustice because it would be oppressive or vexatious to him or would be an abuse of the process of the Court in some other way; and (b) the stay must not cause an injustice to the plaintiff. On both the burden of proof is on the defendant.'"

Thus it appears to me that the inherent power of this court to grant stays can be used to supplement s. 11 of the CCAA when it is just and reasonable to do so. Is it appropriate to do so in the circumstances? Clearly there is jurisdiction under s. 11 of the CCAA to grant a stay in respect of any of the applicants which are all companies which fit the criteria of the CCAA. However the stay requested also involved the limited partnerships to some degree either (i) with respect to the applicants acting on behalf of the Limited Partnerships or (ii) the stays being effective vis-a-vis any proceedings taken by any party against the property assets and Undertaking of the Limited Partnerships in respect of which they hold a direct interest (collectively the "Property") as set out in the terms of the stay provisions of the order paragraphs 4 through 18 inclusive attached as an appendix to these reasons. I believe that an analysis of the operations of a limited partnership in this context would be beneficial to an understanding of how there is a close inter-relationship to the applicants involved in this CCAA proceedings and how the Limited Partnerships and their Property are an integral part of the operations previously conducted and the proposed restructuring.

A limited partnership is a creation of statute, consisting of one or more general partners and one or more limited partners. The limited partnership is an investment vehicle for passive investment by limited partners. It in essence combines the flow through concept of tax depreciation or credits available to "ordinary" partners under general partnership law with limited liability available to shareholders under corporate law. See Ontario LPA sections 2(2) and 3(1) and Lyle R. Depburn, Limited Partnerships, De Boo (1991), at p. 1-2 and 1-12. I would note here that the limited partnership provisions of the Alberta PA are roughly equivalent to those found in the Ontario LPA with the interesting side aspect that the Alberta legislation in s. 75 does allow for judgment against a limited partner to be charged against the limited partner's interest in the limited partnership. A general partner has all the rights and powers and is subject to all the restrictions and liabilities of a partner in a partnership. In particular a general partner is fully liable to each creditor of the business of the limited partnership. The general partner has sole control over the property and business of the limited partnership: see Ontario LPA ss. 8 and 13. Limited partners have no liability to the creditors of the limited partnership's business; the limited partners' financial exposure is limited to their contribution. The limited partners do not have any "independent" ownership rights in the property of the limited partnership. The entitlement of the limited partners is limited to their contribution plus any profits thereon, after satisfaction of claims of the creditors. See Ontario LPA sections 9, 11, 12(1), 13, 15(2) and 24. The process of debtor and creditor relationships associated with the limited partnership's business are between the general partner and the creditors of the business. In the event of the creditors collecting on debt and enforcing security, the creditors can only look to the assets of the limited partnership together with the assets of the general partner including the general partner's interest in the limited partnership. This relationship is recognized under the Bankruptcy Act (now the BIA) sections 85 and 142.

A general partner is responsible to defend proceedings against the limited partnership in the firm name, so in procedural law and in practical effect, a proceeding against a limited partnership is a proceeding against the general partner. See Ontario Rules of Civil Procedure, O. Reg. 560/84 Rules 8.01 and 8.02.

It appears that the preponderance of case law supports the contention that contention that a partnership including a limited partnership is not a separate legal entity. See Lindley on Partnership, 15th ed. (1984), at p. 33-5; Seven Mile Dam Contractors v. R. in Right of British Columbia (1979), 13 B.C.L.R. 137 (S.C.) affirmed (1980), 25 B.C.L.R. 183 (C.A.) and "Extra-Provincial Liability of the Limited Partner", Brad E. Milne, (1985) 23 Alta. Law Rev. 345, at p. 350-1. Milne in that article made the following observations:

> The preponderance of case law therefore supports the contention that a limited partnership is not a separate legal entity. It appears, nevertheless, that the distinction made in Re Thorne between partnerships and trade unions could not be applied to limited partnerships which, like trade unions, must rely on statute for their validity. The mere fact that limited partnerships owe their existence to the statutory provision is probably not sufficient to endow the limited partnership with the attribute of legal personality as suggested in Ruzicks unless it appeared that the Legislature clearly intended that the limited partnership should have a separate legal existence. A review of the various provincial statutes does not reveal any procedural advantages, rights or powers that are fundamentally different from those advantages enjoyed by ordinary partnerships. The legislation does not contain any provision resembling section 15 of the Canada Business Corporation Act [S.C. 1974-75, c. 33] which expressly states that a corporation has the capacity, both in and outside of Canada, of a natural person. It is therefore difficult to imagine that the Legislature intended to create a new category of legal entity.

It appears to me that the operations of a limited partnership in the ordinary course are that the limited partners take a completely passive role (they must or they will otherwise lose their limited liability protection which would have been their sole reason for choosing a limited partnership vehicle as opposed to an "ordinary" partnership vehicle). For a lively discussion of the question of "control" in a limited partnership as contrasted with shareholders in a corporation, see R. Flannigan, The Control Test of Investor Liability in Limited Partnerships (1983), 21 Alta L. Rev. 303; E. Apps, Limited Partnerships and the "Control" Prohibition: Assessing the Liability of Limited Partners (1991), 70 Can. Bar. Rev. 611; R. Flannigan, Limited Partner Liability: A Response (1992), 11 Can. Bar Rev. 552. The limited partners leave the running of the business to the general partner and in that respect the care, custody and the maintenance of the property, assets and undertaking of the limited partnership in which the limited partners and the general partner hold an interest. The ownership of this limited partnership property, assets and undertaking is an undivided interest which cannot be segregated for the purpose of legal process. It seems to me that there must be afforded a protection of the whole since the applicants' individual interest therein cannot be segregated without in effect dissolving the partnership arrangement. The limited partners have two courses of action to take if they are dissatisfied with the general partner or the operation of the limited partnership as carried on by the general partner - the limited partners can vote to (a) remove

the general partner and replace it with another or (b) dissolve the limited partnership. However Flannigan strongly argues that an unfettered right to remove the general partner would attach general liability for the limited partners (and especially as to the question of continued enjoyment of favourable tax deductions) so that it is prudent to provide this as a conditional right: Control Test, (1992), supra, at pp. 524-5. Since the applicants are being afforded the protection of a stay of proceedings in respect to allowing them time to advance a reorganization plan and complete it if the plan finds favour, there should be a stay of proceedings (vis-a-vis) any action which the limited partners may wish to take as to replacement or dissolution) through the period of allowing the limited partners to vote on the reorganization plan itself.

It seems to me that using the inherent jurisdiction of this court to supplement the statutory stay provisions of s. 11 of the CCAA would be appropriate in the circumstances; it would be just and reasonable to do so. The business operations of the applicants are so intertwined with the limited partnerships that it would be impossible for relief as to a stay to be granted to the applicants which would affect their business without at the same time extending that stay to the undivided interests of the limited partners in such. It also appears that the applicants are well on their way to presenting a reorganization plan for consideration and a vote; this is scheduled to happen within the month so there would not appear to be any significant time inconvenience to any person interested in pursuing proceedings. While it is true that the provisions of the CCAA allow for a cramdown of a creditor's claim (as well as an interest of any other person), those who wish to be able to initiate or continue proceedings against the applicants may utilize the comeback clause in the order to persuade the court that it would not be just and reasonable to maintain that particular stay. I seems to me that in such a comeback motion the onus would be upon the applicants to show that in the circumstances it was appropriate to continue the stay.

The order is therefore granted as to the relief requested including the proposed stay provisions.

FARLEY J.

* * * * *

APPENDIX A

THE STAY

4.    THIS COURT ORDERS that each of the Applicants shall remain in possession of its property, assets and undertaking and of the property, assets and undertaking of the Limited Partnerships in which they hold a direct interest (collectively the "Property") until March 15, 1993 (the "Stay Date") and shall be authorized, but not required, to make payment to Conventional Mortgage Creditors and to trade

creditors incurred in the ordinary course prior to this Order including, without limitation, fees owing to professional advisors, wages, salaries, employee benefits, crown claims, unremitted source deductions in respect of income tax payable, Canada Pension Plan contributions payable, unemployment insurance contributions payable, realty taxes, and other taxes, if any, owing to any taxing authority and shall continue to carry on its business in the ordinary course, except as otherwise specifically authorized or directed by this Order, or as this Court may in future authorize or direct.

5.   THIS COURT ORDERS that without in any way restricting the generality of paragraph 4 hereof, each of the Applicants, whether on behalf of a Limited Partnership or otherwise, be and is hereby authorized and empowered, subject to the existing rights of Creditors and any security granted in their favour, to:

(a)   borrow such additional sums as it may deem necessary,

(b)   grant such additional security as it may deem necessary to any lender providing new advances subsequent to the date of this Order provided that such additional security expressly states that it ranks subsequent in priority to all then existing security including all floating charges, whether crystallized or uncrystallized,

(c)   grant such additional security as it may deem necessary to any lender providing new advances subsequent to the date of this Order which may rank ahead of existing security if the consent is obtained of all secured creditors having an interest in the collateral in respect of which the additional security is granted to the granting of the additional security, and

(d)   dispose of any of its Property subject, however, to the terms of any security affecting same, provided that no disposition of any Property charged in favour of any secured lender shall be made unless such secured lender consents to such disposition and to the manner in which the proceeds derived from such disposition are distributed,

the whole on at least three (3) business days' prior notice to all of the Senior Creditors and the Monitor and on such terms as to notice to any other affected creditor as this Court may direct, but nothing in this Order shall prevent any Applicant, whether on behalf of a Limited Partnership or otherwise, from borrowing further funds or granting further security against the Londonderry Mall substantially in accordance with any existing agreements in order to fund the project completion and leasing costs of the Londonderry Mall and nothing in this Order shall prevent any Senior Creditor from advancing further funds to any of the Applicants or the Limited Partnerships under any existing security, subject to the existing rights of such Senior Creditor and any subordinate creditor

including pursuant to any postponements or subordinations as may be extant in respect thereof.

6.    THIS COURT ORDERS that, until the Stay Date, the General Partner Company and LUPC shall cause the monthly interest and, as applicable, amortization owing by LUPC under CT1 and CT3, but not the arrears thereof, to be paid as and when due and to cause LUPC to perform all of its obligations to CT in respect of CT2 under its existing arrangement in respect of the segregation and application of the net operating income of the Northgate Mall.

7.    THIS COURT ORDERS that, subject to paragraphs 4 and 6 and to subparagraph 5(d) hereof, the Applicants and Limited Partnerships be and are hereby directed, until further Order of this Court:

(a)    to make no payments, whether of capital, interest thereon or otherwise, on account of amounts owing by the Applicants to the Affected Creditors, as defined in the Plan, as of this date; and

(b)    to grant no mortgages, charges or other security upon or in respect of the Property other than for the specific purpose of borrowing new funds as provided for in paragraph 5 hereof.

but nothing in this Order shall prevent the General Partner Company or LUPC from making payments to Senior Creditors of interest and/or principal in accordance with existing agreements and nothing in this Order shall prevent the General Partner Company or the Limited Partnerships from making any funded monthly interest payments for loans secured against the Londonderry Mall.

8.    THIS COURT ORDERS that until the Stay Date, the existing collateral position of Creditors in respect of marketable securities loans or credit facilities shall be frozen as at the date of this Order and all margin requirements in respect of such loans or credit facilities shall be suspended.

9.    THIS COURT ORDERS that the Applicants shall be authorized to continue to retain and employ the agents, servants, solicitors and other assistants and consultants currently in its employ with liberty to retain such further assistants and consultants as they acting reasonably deem necessary or desirable in the ordinary course of their business or for the purpose of carrying out the terms of this Order or, subject to the approval of this Court.

10.    THIS COURT ORDERS that, subject to paragraph 13 hereof, until the Stay Date or further Order of this Court:

(a)  any and all proceedings taken or that may be taken by any of the Creditors, any other creditors, customers, clients, suppliers, lessors (including ground lessors), tenants, co-tenants, governments, limited partners, co-venturers, partners or by any other person, firm, corporation or entity against or in respect of any of the Applicants or the Property, as the case may be, whether pursuant to the Bankruptcy and Insolvency Act, S.C. 1992, c. 27, the Winding up Act, R.S.C. 1985, c. W-11 or otherwise shall be stayed and suspended;

(b)  the right of any person, firm, corporation or other entity to take possession of, foreclose upon or otherwise deal with any of the Property, or to continue such actions or proceedings if commenced prior to the date of this Order, is hereby restrained;

(c)  the right of any person, firm, corporation or other entity to commence or continue realization in respect of any encumbrance, lien, charge, mortgage, attornment of rents or other security held in relation to the Property, including the right of any Creditor to take any step in asserting or perfecting any right against any Applicant or Limited Partnership, is hereby restrained, but the foregoing shall not prevent any Creditor from effecting any registrations with respect to existing security granted or agreed to prior to the date of this Order or from obtaining any third party consents in relation thereto;

(d)  the right of any person, firm, corporation or other entity to assert, enforce or exercise any right, option or remedy available to it under any agreement with any of the Applicants or in respect of any of the Property, as the case may be, arising out of, relating to or triggered by the making or filing of these proceedings, or any allegation contained in these proceedings including, without limitation, the making of any demand, the sending of any notice or the issuance of any margin call is hereby restrained;

(e)  no suit, action or other proceeding shall be proceeded with or commenced against any of the Applicants or in respect of any of the Property, as the case may be;

(f)  all persons, firms, corporations and other entities are restrained from exercising any extra-judicial right or remedy against any of the Applicants or in respect ,of any of the Property, as the case may be;

(g)  all persons, firms, corporations and other entities are restrained from registering or re-registering any of the Property which constitutes securities into the name of such persons, firms, corporations or other entities or their nominees, the exercise of any voting rights attaching to such securities, any right of distress, repossession, set off or consolidation of accounts in relation to amounts due or accruing due in respect of or arising from any

indebtedness or obligation as at the date hereof; and

(h) notwithstanding paragraph 9(g) hereof, a Creditor may set off against its indebtedness to an Applicant, as the case may be, pursuant to any existing interest rate swap agreement any corresponding indebtedness of such Applicant, as the case may be, to such Creditor under the same interest rate swap agreement,

but nothing in this Order shall prevent suppliers of goods and services involved in completing the construction of the Londonderry Mall from commencing or continuing with any construction lien claims they may have in relation to the Londonderry Mall and nothing in this Order shall prevent the Bank of Montreal ("BMO") and the Applicants from continuing to operate the existing bank accounts of the Applicants and of the Limited Partnerships maintained with BMO, in the same manner as those bank accounts were operated prior to the date of this Order including any rights of set off in relation to monies deposited therein and nothing in this Order shall prevent CIBC from realizing upon its security in respect of CIBC1 and nothing in this Order shall prevent or affect either FB or CT in the enforcement of the security it holds on the Sutton Place Hotel and the Carleton Place Hotel, respectively.

11.   THIS COURT ORDERS that no Creditor shall be under any obligation to advance or re-advance any monies after the date of this Order to any of the Applicants or to any of the Limited Partnerships, as the case may be, provided, however, that cash placed on deposit by any Applicant with any Creditor from and after this date, whether in an operating account or otherwise and whether for its own account or for the account of a Limited Partnership, shall not be applied by such Creditor, other than in accordance with the terms of this Order, in reduction or repayment of amounts owing as of the date of this Order or which may become due on or before the Stay Date or in satisfaction of any interest or charges accruing in respect thereof.

12.   THIS COURT ORDERS that all persons, firms, corporations and other entities having agreements with an Applicant or with a Limited Partnership, as the case may be, whether written or oral, for the supply or purchase of goods and/or services to such Applicant or Limited Partnerships, as the case may be, including, without limitation, ground leases, commercial leases, supply contracts, and service contracts, are hereby restrained from accelerating, terminating, suspending, modifying or cancelling such agreements without the written consent of such Applicant or Limited Partnership, as the case may be, or with the leave of this Court. All persons, firms, corporations and other entities are hereby restrained until further order of this Court from discontinuing, interfering or

cutting off any utility (including telephone service at the present numbers used by any of the Applicants or Limited Partnerships, as the case may be, whether such telephone services are listed in the name of one or more of such Applicants or Limited Partnerships, as the case may be, or in the name of some other person), the furnishing of oil, gas, water, heat or electricity, the supply of equipment or other services so long as such Applicant or Limited Partnerships, as the case may be, pays the normal prices or charges for such goods and services received after the date of this Order, as the same become due in accordance with such payment terms or as may be hereafter negotiated by such Applicant or Limited Partnerships, as the case may be, from time to time. All such persons, firms, corporations or other entities shall continue to perform and observe the terms and conditions contained in any agreements entered into with an Applicant or Limited Partnerships, as the case may be, and, without further limiting the generality of the foregoing, all persons, firms, corporations and other entities including tenants of premises owned or operated by any of the Applicants or Limited Partnerships, as the case may be, be and they are hereby restrained until further order of this Court from terminating, amending, suspending or withdrawing any agreements, licenses, permits, approvals or supply of services and from pursuing any rights or remedies arising thereunder.

13. THIS COURT ORDERS that, upon the failure by any of the Applicants to perform their obligations pursuant to this Order, any Creditor affected by such failure may, on at least one day's notice to each of the Applicants and to all Senior Creditors and the Monitor, bring a motion to have the provisions of paragraphs 10, 11 or 12 of this Order set aside or varied, either in whole or in part.

14. THIS COURT ORDERS that from 9:00 o'clock a.m. on December 24, 1992 to the time of the granting of this Order, any act or action taken or notice given by any Creditors receiving such Notice of Application in furtherance of their rights to commence or continue realization, will be deemed not to have been taken or given, as the case may be, subject to the right of such Creditors to further apply to this Court in respect of such act or action or notice given, provided that the foregoing shall not apply to prevent any Creditor who, during such period, effected any registrations with respect to security granted prior to the date of this Order or who obtained third party consents in relation thereto.

15. THIS COURT ORDERS that all floating charges granted by any of the Applicants prior to the date of this Order, whether granted on behalf of any of the Limited Partnerships or otherwise, shall be crystallized, and shall be deemed to be crystallized, effective for all purposes immediately prior to the granting of this Order.

16. THIS COURT ORDERS that the Applicants shall be entitled to take such steps as may be necessary or appropriate to discharge any construction, builders,

mechanics or similar liens registered against any of their property including, without limitation, the posting of letters of credit or the making of payments into Court, as the case may be, and no lender to any Applicant shall be prevented from doing likewise or from making such protective advances as may be necessary or appropriate, in which case such lender, in respect of such advances, shall be entitled to the benefit of any existing security in its favour as of the date of this Order in accordance with its terms.

17.    THIS COURT ORDERS that the Applicants on or before January 1, 1993, shall provide the Senior Creditors with projections as to the monthly general, administrative and restructuring ("GAR") costs for the months of January, February and March, 1993, together with a cash-flow projection for LUPC for the period commencing on January 1, 1993 through to April 30, 1993 inclusive.

18.    THIS COURT ORDERS that, notwithstanding the terms of this Order, the gross operating cash flow generated during the period commencing on the date of this Order to and until the Stay Date (the "Interim Period") by the Londonderry Mall shall be reserved and expended on the property in accordance with existing agreements, but all property management or other similar fees payable to any Applicant shall continue to be paid therefrom subject to the terms of any existing loan agreements affecting same.

TAB 8

# THE 2011 ANNOTATED BANKRUPTCY AND INSOLVENCY ACT

Including
*General Rules under the Act*
*Orderly Payment of Debts Regulations*
*Companies' Creditors Arrangement Act*
*CCAA Regulations and Forms*
*Farm Debt Mediation Act*
*Wage Earner Protection Program Act*
*Directives and Circulars*

**The Honourable L. W. Houlden**, B.A., LL.B.
Formerly a Judge of the Court of Appeal for Ontario

**The Honourable Geoffrey B. Morawetz**, B.A., LL.B.
of the Superior Court of Justice

**Dr. Janis P. Sarra**, B.A., M.A., LL.B., LL.M., S.J.D.
of University of British Columbia
Faculty of Law and the Ontario Bar

*STATUTES OF CANADA ANNOTATED*

# CARSWELL®

that subsection (2) not apply in respect of one or more of the actions, suits or proceedings taken by or before the regulatory body if in the court's opinion

> (a) a viable compromise or arrangement could not be made in respect of the company if that subsection were to apply; and

> (b) it is not contrary to the public interest that the regulatory body be affected by the order made under section 11.02.

(4) **Declaration — enforcement of a payment —** If there is a dispute as to whether a regulatory body is seeking to enforce its rights as a creditor, the court may, on application by the company and on notice to the regulatory body, make an order declaring both that the regulatory body is seeking to enforce its rights as a creditor and that the enforcement of those rights is stayed.

1997, c. 12, s. 124; 2001, c. 9, s. 576; 2005, c. 47, s. 128; 2007, c. 29, s. 106; 2007, c. 36, s. 65

**11.11** [Repealed 2005, c. 47, s. 128. [Amended 2007, c. 36, s. 65.].]

## N§63 — Stay of Proceedings, Generally

Section 11 provides the court with a general power to make any order that it considers appropriate in of the circumstances of the *CCAA* proceeding. It distinguishes between stays under the initial application and stays other than under the initial application.

Section 11.01 sets out the rights of suppliers, specifying that no order under s. 11 or s. 11.02 has the effect of prohibiting a person from requiring immediate payment for goods and services provided after the order is made, or requiring the further advance of money or credit.

Section 11 is constitutionally valid, even though it may be used to stay the claims of persons who are not creditors: *Norcen Energy Resources Ltd. v. Oakwood Petroleums Ltd.* (1988), 72 C.B.R. (N.S.) 1, 63 Alta. L.R. (2d) 361, 92 A.R. 81 (Q.B.).

The stay of proceedings restrains judicial or extra-judicial conduct that could impair the ability of the debtor company to continue in business and the debtor's ability to focus and concentrate its efforts on the negotiating of a compromise or arrangement: *Campeau v. Olympia & York Developments Ltd.* (1992), 14 C.B.R. (3d) 303 (Ont. Gen. Div.); *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 4 C.B.R. (3d) 311, 1990 CarswellBC 394 (B.C.C.A.) and *Re Air Canada [Always Travel Inc. — Leave to Proceed Motion]* (2004), 47 C.B.R. (4th) 177, 2004 CarswellOnt 481 (Ont. S.C.J. [Commercial]); *Toronto Stock Exchange Inc. v. United Keno Hill Mines Ltd.* (2000), 48 O.R. (3d) 746, 2000 CarswellOnt 1770, 19 C.B.R. (4th) 299 (S.C.J. [Commercial List.])

The purpose of s. 11 is to maintain the *status quo* for a period of time so that proceedings can be taken under the *CCAA* for the well-being of the debtor company and of the creditors: *Re Northland Properties Ltd.* (1988), 73 C.B.R. (N.S.) 141 (B.C. S.C.); *Sairex GmbH v. Prudential Steel Ltd.* (1991), 8 C.B.R. (3d) 62 (Ont. Gen. Div.). The stay order prevents any creditor from obtaining an advantage over other creditors while the company is attempting to reorganize the affairs of the debtor company: *Re Woodward's Ltd.* (1993), 17 C.B.R. (3d) 236, 79 B.C.L.R. (2d) 257 (S.C.).

Section 11 of the *CCAA* provides a broad jurisdiction to impose terms and conditions on the granting of the stay, including the power to vary the stay and allow the company to enter into agreements to facilitate the restructuring, provided that the creditors have the final decision under s. 6 whether or not to approve the plan: *Re Stelco Inc.* (2005), 2005 CarswellOnt 6283,

# TAB  9

*Indexed as:*

# R. v. Wilson

**James Stephen Wilson, appellant;**
**and**
**Her Majesty The Queen, respondent.**

[1983] 2 S.C.R. 594

File No.: 16931.

Supreme Court of Canada

1983: March 14 / 1983: December 15.

**Present: Laskin C.J. and Dickson, Estey, McIntyre and**
**Chouinard JJ.**

ON APPEAL FROM THE COURT OF APPEAL FOR MANITOBA

*Courts -- Collateral proceedings -- Superior court wiretap authorizations -- Evidence obtained pursuant to authorizations found inadmissible by inferior court -- Whether or not superior court can be collaterally attacked in any court and in particular by an inferior court -- Criminal Code, R.S.C. 1970, c. C-34, ss. 178.12(1)(b),(g), 178.13(1)(b), 178.14, 178.16(1)(a), 178.16(3)(b).*

Appellant was acquitted in provincial court on the collapse of the Crown's case following the judge's ruling that the Crown's wiretap evidence was inadmissible as illegally obtained. The ruling was based on the information obtained from the cross-examination of the deponent of the affidavits that were made in support of the applications for authorization to wiretap in the Court of Queen's Bench. The authorizations were valid on their face and the trial judge did not open the sealed packets. The Manitoba Court of Appeal allowed an appeal from the acquittals and ordered a new trial. At issue here is whether or not a judge of an inferior court can look behind the apparently valid order of a superior court and rule the evidence obtained under that order inadmissible.

Held:    The appeal should be dismissed.

Per Laskin C.J. and Estey and McIntyre JJ.: A court order that has not been varied or set aside on appeal cannot be collaterally attacked and must receive full effect according to its terms. This rule has not been altered with respect to wiretap authorizations by Part IV.1 of the Code except to the extent that a trial judge must consider the admissibility of wiretap evidence, but without going beyond the face of the authorization. In the absence of the right of appeal from an authorization, and given the inapplicability of certiorari, any application for review of an authorization must be made to the court that made it. As it is not always practical or possible to apply for review to the same judge who made the order, another judge of the same court can review an ex parte order if: 1) he has the power to discharge the order, 2) he acts with the consent of, or in the event of the unavailability of, the judge who made the order, and 3) he hears the motion de facto as to both the facts and the law involved. A judge reviewing a wiretap authorization must, in addition, not substitute his discretion for that of the authorizing judge.

Per Dickson and Chouinard JJ.: Subsections 178.16(1) and 176.16(3) in combination require a trial judge to go behind an apparently valid authorization to consider its validity and therefore have modified the rule that a court order not be impeached except by appeal, by action to set aside or by prerogative writ. These subsections make no distinction between information on the face of the record and information dehors the record, and to restrict a trial judge to considering only the former as a matter of statutory interpretation would unnecessarily fetter his ability to determine admissibility. Section 178.16, too, makes no suggestion as to review of an authorization by anyone but the trial judge and s. 178.14 contemplates that the packet be opened by any judge of a superior court of criminal jurisdiction or by a judge as defined by s. 482. The common law doctrine that the authorization could only be reviewed by the Court making it, and preferably by the actual judge, was therefore overridden. Further, it was implicit in the language of ss. 176.16(1) and (3)(b) that an inferior court judge could attack a superior court's authorization.

Prima facie evidence of fraud, non-disclosure or misleading disclosure are valid reasons for opening the sealed packet. Once a foundation for opening the packet is established, a trial judge within the contemplation of s. 178.14 can open the packet and make a full review for compliance with Part IV.I. Section 178.16(3)(b) grants a discretion to cure non-substantive defects, but substantive defects in the application render the evidence inadmissible. The trial judge cannot decide that he would have exercised his discretion differently from the authorizing judge.

The deponent of an affidavit supporting an authorization request can be cross-examined to determine if the pre-conditions of s. 178.13(b) have been met. The questions can be put so as not to disclose information considered confidential by the judge and yet uncover any basis on which to argue invalidity.

The trial judge here was not authorized to order the opening of the sealed packet. The trial should have been adjourned to allow an application under s. 178.14 for an order to open the packet and the judge acting under that section would determine if the packet should be opened. The trial judge, however, would examine the packet's contents and decide if the authorization was valid. The ruling

by the trial judge that admitting evidence obtained from unlawful wiretaps would bring the administration of justice into disrepute was irrelevant here. Section 178.16(2) does not deal with primary evidence of this kind but rather with derivative evidence.

**Cases Cited**

Poje v. Attorney General for British Columbia, [1953] 1 S.C.R. 516, affirming sub nom. Canadian Transport (U.K.) Ltd. v. Alsbury, [1953] 1 D.L.R. 385; Royal Trust Co. v. Jones, [1962] S.C.R. 132; Re Donnelly and Acheson and The Queen (1976), 29 C.C.C. (2d) 58, considered; Pashko v. Canadian Acceptance Corp. Ltd. (1957), 12 D.L.R. (2d) 380; Gibson v. Le Temps Publishing Co. (1903), 6 O.L.R. 690; Clark v. Phinney (1896), 25 S.C.R. 633; Maynard v. Maynard, [1951] S.C.R. 346; Badar Bee v. Habib Merican Noordin, [1909] A.C. 615; R. v. Welsh and Iannuzzi (No. 6) (1977), 32 C.C.C. (2d) 363; R. v. Wong (No. 1) (1976), 33 C.C.C. (2d) 506; Charette v. The Queen, [1980] 1 S.C.R. 785, affirming R. v. Parsons (1977), 37 C.C.C. (2d) 497; Dickie v. Woodworth (1883), 8 S.C.R. 192; Stewart v. Braun, [1924] 3 D.L.R. 941; Re Stewart and The Queen (1976), 30 C.C.C. (2d) 391, affirming (1975), 23 C.C.C. (2d) 306; Re Turangan and Chui and The Queen (1976), 32 C.C.C. (2d) 254, affirming (1976), 32 C.C.C. (2d) 249; Bidder v. Bridges (1884), 26 Ch. D. 1; Boyle v. Sacker (1888), 39 Ch. D. 249; Gulf Islands Navigation Ltd. v. Seafarers' International Union (1959), 18 D.L.R. (2d) 625; R. v. Dass (1979), 47 C.C.C. (2d) 194; R. v. Gill (1980), 56 C.C.C. (2d) 169; R. v. Ho (1976), 32 C.C.C. (2d) 339; Re Miller and Thomas and The Queen (1976), 23 C.C.C. (2d) 257; Goldman v. The Queen, [1980] 1 S.C.R. 976; R. v. Miller and Thomas (No. 4) (1975), 28 C.C.C. (2d) 128; R. v. Newall (No. 1) (1982), 67 C.C.C. (2d) 431; R. v. Johnny and Billy (1981), 62 C.C.C. (2d) 33; R. v. Bradley (1980), 19 C.R. (3d) 336; Re Royal Commission Inquiry into the Activities of Royal American Shows Inc. (No. 3) (1978), 40 C.C.C. (2d) 212; Re Zaduk and The Queen (1977), 37 C.C.C. (2d) 1; R. v. Haslam (1977), 36 C.C.C. (2d) 250; Re Regina and Kozak (1976), 32 C.C.C. (2d) 235; R. v. Kalo. Kalo and Vonschober (1975), 28 C.C.C. (2d) 1; R. v. Blacquiere (1980), 57 C.C.C. (2d) 330; Re Regina and Collos (1977), 37 C.C.C. (2d) 405, reversing on other grounds (1977), 34 C.C.C. (2d) 313; R. v. Robinson (1977), 39 C.R.N.S. 158; R. v. Hollyoake (1975), 27 C.C.C. (2d) 63; R. v. Crease (No. 2) (1980), 53 C.C.C. (2d) 378; R. v. Cardoza (1981), 61 C.C.C. (2d) 412; R. v. Gabourie (1976), 31 C.C.C. (2d) 471; R. v. Hancock and Proulx (1976), 30 C.C.C. (2d) 544, referred to.

APPEAL from a judgment of the Manitoba Court of Appeal, [1982] 2 W.W.R. 91, 13 Man. R. (2d) 155, 65 C.C.C. (2d) 507, allowing an appeal from appellant's acquittals by Dubienski Prov. Ct. J. Appeal dismissed.

Robert L. Pollack, for the appellant.
John D. Montgomery, Q.C., for the respondent.

Solicitors for the appellant: Skwark, Myers, Baizley and Weinstein, Winnipeg.
Solicitors for the respondent: Manitoba Department of the Attorney-General, Winnipeg.

The judgment of Laskin C.J. and Estey and McIntyre JJ. was delivered by

**McINTYRE J.**:-- The appellant was charged with nine counts relating to betting. He was tried before Dubienski, Provincial Court Judge in the Manitoba Provincial Court. The Crown's case depended on evidence obtained by wiretap for which it had procured four authorizations under the provision of Part IV.1 of the Criminal Code from judges of the Court of Queen's Bench of Manitoba. Each authorization contained the following words:

> AND UPON hearing read the affidavit of Detective Sergeant Anton Cherniak;

> AND UPON being satisfied that it is in the best interests of the administration of justice to grant this authorization and that other investigative procedures have been tried and have failed, that other investigative procedures are unlikely to succeed, and that the urgency of the matter is such that it would be impractical to carry out the investigation of the undermentioned offences using only other investigative procedures;

At trial, on cross-examination of the police officer Cherniak who is referred to in the authorizations, evidence was given that Cherniak had had the sole direction of the investigation and that he had made the applications for the authorizations. He said that the interceptions were made under the authorizations, that they were the sole investigations made and that no other investigation was done or ordered by him after the first authorization. He was unaware of any other investigating steps. It is evident that counsel for the appellant by this line of cross-examination was attempting to ascertain whether or not the above-quoted words from the authorization were true and whether the prescriptions of s. 178.13(1)(b) of the Code had been satisfied. That section reads:

> 178.13 (1) An authorization may be given if the judge to whom the application is made is satisfied.

> ...

> (b)    that other investigative procedures have been tried and have failed, other investigative procedures are unlikely to succeed or the urgency of the matter is such that it would be impractical to carry out the investigation of the offence using only other investigative procedures.

No objection was taken by the Crown to this line of examination.

On the basis of the cross-examination of the police officer, the trial judge made the following finding:

> "No other investigative procedures had been tried and failed, that there was no evidence that investigative procedures were likely to succeed, nor that there was any urgency."

As a result, the trial judge held that the interceptions of the private communications of the appellant had not been lawfully made as required by s. 178.16 of the Criminal Code and he ruled the evidence obtained by the wiretaps inadmissible. The case for the Crown collapsed and the appellant was acquitted on all counts.

On appeal to the Manitoba Court of Appeal, the Crown argued that the provincial court judge was without jurisdiction to go behind the authorizations and thereby make a collateral attack upon the order of a superior court. The appeal was allowed and a new trial was ordered. Monnin J.A. (as he then was), with whom Matas J.A. concurred, held that an authorization granted by a superior court judge could not be collaterally attacked in a provincial court. O'Sullivan J.A., concurring in the result, went further and said that: "In my opinion, where there is an authorization granted by a superior court of record, it cannot be collaterally attacked in any court and it cannot be attacked at all in an inferior court." A further argument was advanced by the appellant Wilson that there was no evidence of proper notice of intention to adduce wiretap evidence as required under s. 178.16(4) of the Code. This argument was rejected in the Court of Appeal and, on an acknowledgment that there was some five months' notice given, it was rejected in this Court as well. The only remaining issue then is whether or not the trial judge erred in law in refusing to admit the wiretap evidence.

In the Manitoba Court of Appeal, Monnin J.A. said:

> The record of a superior court is to be treated as absolute verity so long as it stands unreversed.

I agree with that statement. It has long been a fundamental rule that a court order, made by a court having jurisdiction to make it, stands and is binding and conclusive unless it is set aside on appeal or lawfully quashed. It is also well settled in the authorities that such an order may not be attacked collaterally and a collateral attack may be described as an attack made in proceedings other than those whose specific object is the reversal, variation, or nullification of the order or judgment. Where appeals have been exhausted and other means of direct attack upon a judgment or order, such as proceedings by prerogative writs or proceedings for judicial review, have been unavailing, the only recourse open to one who seeks to set aside a court order is an action for review in the High Court where grounds for such a proceeding exist. Without attempting a complete list, such grounds would include fraud or the discovery of new evidence.

Authority for these propositions is to be found in many cases. A particularly clear statement of the law, together with reference to many of the authorities, is to be found in Canadian Transport (U.K.) Ltd. v. Alsbury, [1953] 1 D.L.R. 385, a judgment of the British Columbia Court of Appeal. In that case striking employees picketed the wharf where a vessel was waiting to take on cargo. The shipowner secured an ex parte injunction in the Supreme Court restraining the defendant and others from picketing. The injunction was disobeyed and contempt proceedings were commenced against the defendant. At first instance before the Chief Justice of the Supreme Court of British Columbia the defendants contended that an attachment for contempt should not issue for the reason that the injunction order, made by a judge of the Supreme Court, was a nullity and could not therefore form the basis for a contempt order. This collateral attack was rejected by the Chief Justice, attachment issued, and penalties for contempt including fines and imprisonment were imposed. In the Court of Appeal the appeal was dismissed with one dissent and, at p. 406, Sidney Smith J.A. said:

> First it was said that the injunction order of Clyne J. was a nullity that could be ignored with impunity, and could form no basis for contempt proceedings. Many objections were levelled at this learned Judge's order, chief among them being: (1) that it was based on improper and inadmissible evidence; (2) that the injunction was in conflict with the Trade-unions Act and the Laws Declaratory Act; (3) that the injunction was in permanent form and no Court could grant a permanent injunction ex parte.

> To this the general answer is made that the order of a Superior Court is never a nullity; but, however wrong or irregular, still binds, cannot be questioned collaterally, and has full force until reversed on appeal. This seems to be established by the authorities cited by counsel for the Attorney-General, viz. Scott v. Bennett (1871), L.R. 5 H.L. 234 at p. 245; Revell v. Blake (1873), L.R. 8 C.P. 533 at p. 544; Scotia Construction Co. v. Halifax, [1935] 1 D.L.R. 316, S.C.R. 124; and to these I might add Re Padstow (1882), 20 Ch.D. 137 at p. 145, and Hughes v. Northern Elec. etc. Co. (1915), 21 D.L.R. 358 at pp. 362-3, 50 S.C.R. 626 at pp. 652-3. To these general authorities may be added the more specific line of cases holding that an injunction, however wrong, must be obeyed until it is set aside, as shown by the authorities cited in Kerr on Injunctions, 6th ed., p. 668, and 7 Hals., p. 32, which include the authoritative decision in Eastern Trust Co. v. MacKenzie, Mann & Co., 22 D.L.R. 410 at pp. 418-9, [1915] A.C. 750 at p. 761, where a party was held to be rightly committed for disobeying an injunction, later set aside. Other authorities for holding that an injunction, though wrong, must be obeyed till set aside, are Leberry v. Braden (1900), 7 B.C.R. 403, and Bassel's Lunch Ltd. v. Kick, [1936], 4 D.L.R. 106 at p. 110, O.R. 445 at p. 456, 67 Can. C.C. 131 at p. 135.

Bird J.A., who wrote a separate concurring judgment, made the following comments, at p. 418:

> The order under review is that of a Superior Court of Record, and is binding and conclusive on all the world until it is set aside, or varied on appeal. No such order may be treated as a nullity.

and later, at pp. 418-19:

> In Eastern Trust Co. v. MacKenzie. Mann & Co., 22 D.L.R. at p. 418, [1915] A.C. at p. 760, Sir George Farwell, speaking for their Lordships of the Judicial Committee, said: "(The injunction) was, or course, interlocutory, not final, but it is binding on all parties to the order so long as it remains undischarged."

Duff C.J.C., approved the same principle in Scotia Construction Co. v. Halifax, [1935], 1 D.L.R. 316, S.C.R. 124, and expressed the principle in these terms (p. 317 D.L.R., p. 128 S.C.R.) "In any case, no appeal was attempted, and whether appealable or not, it was a judgment of a Court of general jurisdiction, possessing ... authority to pronounce conclusively, subject to appeal if the law gave an appeal, upon any question of its own jurisdiction."

In my opinion these submissions must be rejected.

On appeal to this Court, sub nom. Poje v. Attorney General for British Columbia, [1953] 1 S.C.R. 516, the appeal was dismissed. The question of a collateral attack upon a court order was not specifically dealt with. Kerwin J. expressed no opinion on the matter, but Estey J. in a short concurring judgment said at p. 528:

> I agree the appeal should be dismissed. The learned Chief Justice, in my opinion, upon this record had jurisdiction to hear the motion. I am in respectful agreement with the conclusions of the majority of the learned judges in the Court of Appeal, both with respect to the objections taken to the order as made by Mr. Justice Clyne and the findings of the learned Chief Justice. In view of the foregoing it is unnecessary to determine the nature and character of the contempt.

The case was referred to in Pashko v. Canadian Acceptance Corp. Ltd. (1957), 12 D.L.R. (2d) 380, in the British Columbia Court of Appeal.

In addition to these authorities and those referred to in judgments of the majority in the Canadian Transport case, reference may be made as well to the words of Osler J.A. in Gibson v. Le Temps Publishing Co. (1903), 6 O.L.R. 690, at pp. 694-95, where a judgment was attacked on the basis of a deficiency in service during the earlier proceedings which gave rise to the judgment. Osler J.A. said:

> If the judgment in the Quebec action is to be regarded as a judgment against a corporation or body corporate, and therefore not capable of being the

foundation of an action thereon against a partnership firm of the same name, that is an objection which should have been taken on the motion to enter summary judgment, and it appears not to have been then taken. This was the substantial ground of defence to the action, and, so far as I can see, it was not brought to the attention of the Court at the proper stage and has never been decided. A similar difficulty attends the objection as to the service of the writ on the manager. On the motion for judgment it might have been shewn (unless the defendants had done something to waive the objection) that the requirements of Rule 224 had not been complied with, and therefore that there had never been an effective service of the writ upon the firm, the person served not being, in fact, a partner, and not having been informed by the prescribed notice that he was served as manager: Snow's Annual Practice, 1902, p. 655; Yearly Practice, 1904, p. 504. Or the firm might have moved to set aside the faulty service on the manager: Nelson v. Pastorino (1883), 49 L.T.N.S. 564. Neither of these courses was taken and there is now a judgment against a partnership firm, which stands unimpeached, and which cannot be attacked in a collateral proceeding. While it stands, the plaintiff has the right to enforce it by any means open to him under Rule 228.

Further authority in support of the rule against collateral attack may be found in Clark v. Phinney (1896), 25 S.C.R. 633; Maynard v. Maynard, [1951] S.C.R. 346; Badar Bee v. Habib Merican Noordin, [1909] A.C. 615; and particularly in Royal Trust Co. v. Jones, [1962] S.C.R. 132. In that case the validity of a codicil to a will was upheld in proceedings in the Supreme Court of British Columbia. The trial judgment was affirmed in the Court of Appeal. The unsuccessful party brought a new action to set aside this judgment which succeeded notwithstanding the confirmation on appeal of the earlier judgment. No appeal was taken and the trustee proceeded for a period of fifteen years to administer the estate on the basis that the codicil was invalid. On an application for directions on a matter which did not directly involve the validity of the codicil and which involved parties not in the first proceeding, the Court of Appeal on its own motion declared that the trial judge, Manson J., who had declared the codicil invalid and set aside the earlier judgment, was without jurisdiction to do so and reversed his judgment. On appeal to this Court the appeal was allowed. Cartwright J. (as he then was) said, at p. 145:

An examination of the authorities leads me to the conclusion that it has long been settled in England that the proper method of impeaching a judgment of the High Court on the ground of fraud or of seeking to set it aside on the ground of subsequently discovered evidence is by action, whether or not the judgment which is attacked has been affirmed or otherwise dealt with by the Court of Appeal or other appellate tribunal.

The first judgment had therefore been properly challenged by a direct action. The second judgment, not having been appealed or directly challenged, was binding. Cartwright J. said, at p. 146:

It follows that Manson J. had jurisdiction to entertain the action which was brought before him and his judgment in that action, not having been appealed from or otherwise impeached, is a valid judgment of the Court binding upon all those who were parties to it.

The cases cited above and the authorities referred to therein confirm the well-established and fundamentally important rule, relied on in the case at bar in the Manitoba Court of Appeal, that an order of a court which has not been set aside or varied on appeal may not be collaterally attacked and must receive full effect according to its terms.

The authorizations in question here are all orders of a superior court. Unless Parliament has altered or varied the rule above-described it would apply in this case. It would then follow that in this action to determine the guilt or innocence of the accused the trial judge was in error in entertaining a collateral attack on the validity of the authorizations and, in effect, going behind them. Support for this view, with some qualifications for cases where there has been a defect on the face of the authorization or fraud, is to be found in R. v. Welsh and Iannuzzi (No. 6) (1977), 32 C.C.C. (2d) 363 (Ont. C.A.), where Zuber J.A., at pp. 371-72, said:

> Ordinarily the trial Court is obliged to simply accept the authorization at face value. Cases in which a trial Court could decline to accept the authorization would be rare indeed and, without attempting to set out an exhaustive list, would include cases in which the authorization was defective on its face, or was vitiated by reason of having been obtained by a fraud. However, even an authorization that was said to be defective on its face may attract the curative provisions of s. 178.16(2)(b) [now s. 178.16(3)(b)].

In the case at bar, the trial judge preferred to follow the reasoning of Meredith J., of the British Columbia Supreme Court, in R. v. Wong (No. 1) (1976), 33 C.C.C. (2d) 506, where he asserted a broader power in the trial judge to go behind the authorization.

The question then is: has Parliament by the enactment of Part IV.1 of the Criminal Code altered the rule which would render the authorizations immune from collateral attack? In my opinion, the answer must be no.

Section 178.16(1) deals with the admissibility of evidence obtained under the authority of the authorization. Subsection (3) gives the trial judge a discretion to admit evidence that is inadmissible under subs. (1) "by reason only of a defect of form or an irregularity in procedure not being a substantive defect or irregularity, in the application for or the giving of the authorization". The trial judge may be required to determine whether he will admit under subs. (3) evidence otherwise inadmissible under the provisions of Part IV.1 of the Code. This step, it would seem, would require some examination of the procedures followed in obtaining the authorization in order to determine whether evidence has been rendered inadmissible only by a defect or an irregularity of a none substantive nature.

It is my opinion that the trial judge in reaching a conclusion on this subject is limited to a consideration of defects and irregularities which are apparent on the face of the authorization and he may not go behind it. Such a step would involve a collateral attack upon the authorization. It would require, in my opinion, much clearer statutory language than that employed in subs. (3) of s. 178.16 to permit such a step in the face of the clearly established rule. I find additional support for this view in the fact that once an authorization is granted s. 178.14 provides that all documents connected with it, save the authorization itself, be sealed in a packet and kept in the custody of the court, to be opened only for the purposes of a renewal or by an order of a judge of a superior court of criminal jurisdiction or a judge defined in s. 482 of the Code. Many trial judges will not fall into either of those categories and accordingly will not have authority to direct the opening of the sealed packet. It follows that a trial judge qua trial judge has not, and was not intended to have, access to the materials necessary to review the granting of the authorization. This makes any collateral attack on the authorization a virtual impossibility.

It should be observed as well that subs. (3) of s. 178.16 gives no power to go behind the authorization and no power to vary or question it. It merely provides that if in the performance of his task of determining the admissibility of evidence the trial judge forms the opinion that a relevant, private communication is inadmissible because of subs. (1) of s. 178.16 he may, if the admissibility results only because of a defect in form or an irregularity in procedure which is not substantive in the giving of the authorization, admit the evidence notwithstanding subs. (1). This subsection gives a power to the trial judge in appropriate circumstances to admit evidence despite its inadmissibility under the authorization, but it includes no power to attack the authorization itself. I have not overlooked the fact that this Court in Charette v. The Queen, [1980] 1 S.C.R. 785, approved the judgment of Dubin J.A. in the Ontario Court of Appeal in R. v. Parsons (1977), 37 C.C.C. (2d) 497, and that Dubin J.A. said in that case, at pp. 501-02:

> A voir dire is not held to pass on the sufficiency of the evidence, but only to determine questions of admissibility. In cases such as these, initial issues as to the admissibility of the tendered evidence immediately arise. In order to render evidence of intercepted private communications admissible when Crown counsel relies upon an authorization, Crown counsel must first satisfy the trial Judge that the statutory conditions precedent have been fulfilled, i.e., that the interceptions were lawfully made, and that the statutory notice was given. In a case where the Crown relies upon an authorization it is for the trial Judge to pass upon such matters as the validity of the authorization, and that the investigation authorized had been carried out in the manner provided for in the authorization. He must be satisfied that the authorization includes either as a named or unnamed person any of the parties to the communication, and, as I have said, that the statutory notice has been complied with.

In my view, these words do not support the notion that the trial judge may go behind the authorization. They indicate that consideration of the validity of the authorization on the part of the

trial judge is limited to matters appearing on its face, and it is my opinion that Dubin J.A. did not in that case assert a power in the trial judge to do more.

Since no right of appeal is given from the granting of an authorization and since prerogative relief by certiorari would not appear to be applicable (there being no question of jurisdiction), any application for review of an authorization must, in my opinion, be made to the court that made it. There is authority for adopting this procedure. An authorization is granted on the basis of an ex parte application. In civil matters, there is a body of jurisprudence which deals with the review of ex parte orders. There is a widely recognized rule that an ex parte order may be reviewed by the judge who made it. In Dickie v. Woodworth (1883), 8 S.C.R. 192, Ritchie C.J. said, at p. 195:

> The judge having in the first instance made an ex parte order, it was quite competent for him to rescind that order, on its being shown to him that it ought not to have been granted, and when rescinded it was as if it had never been granted ....

This view is reflected in the words of Mathers C.J.K.B. in the case of Stewart v. Braun, [1924] 3 D.L.R. 941 (Man. K.B.), at p. 945:

> But it frequently happens that Judges and judicial officers are called upon to make orders ex parte, where only one side is represented and where the order granted is not the result of a deliberate judicial decision after a hearing and argument. An application to rescind or vary an ex parte order is neither an appeal nor an application in the nature of an appeal and therefore the Judge or officer by whom such an order has been made, has since the Judicature Act, as he had before, the right to rescind or vary it ....

Such power of review has been asserted and exercised in respect of authorizations to intercept private communications in Re Stewart and The Queen (1975), 23 C.C.C. (2d) 306 (County Court, Ottawa-Carleton Judicial District (Ont.)), application for certiorari dismissed: (1976), 30 C.C.C. (2d) 391 (Ont.H.C.); Re Turangan and Chui and The Queen (1976), 32 C.C.C. (2d) 249 (B.C.S.C.), appeal dismissed for lack of jurisdiction (1976), 32 C.C.C. (2d) 254 (B.C.C.A.)

The exigencies of court administration, as well as death or illness of the authorizing judge, do not always make it practical or possible to apply for a review to the same judge who made the order. There is support for the proposition that another judge of the same court can review an ex parte order. See, for example, Bidder v. Bridges (1884), 26 Ch.D. 1 (C.A.), and Boyle v. Sacker (1888), 39 Ch.D. 249 (C.A.) In the case of Gulf Islands Navigation Ltd. v. Seafarers' International Union (1959), 18 D.L.R. (2d) 625 (B.C.C.A.), Smith J.A. said, at pp. 626-27:

> After considering the cases, which are neither as conclusive nor as consistent as they might be, I am of opinion that the weight of authority supports the following propositions as to one Judge's dealings with another Judge's ex

parte order: (1) He has power to discharge the order or dissolve the injunction; (2) he ought not to exercise this power, but ought to refer the motion to the first Judge, except in special circumstances, e.g., where he acts by consent or by leave of the first Judge, or where the first Judge is not available to hear the motion; (3) if the second Judge hears the motion, he should hear it de novo as to both the law and facts involved.

I would accept these words in the case of review of a wiretap authorization with one reservation. The reviewing judge must not substitute his discretion for that of the authorizing judge. Only if the facts upon which the authorization was granted are found to be different from the facts proved on the ex parte review should the authorization be disturbed. It is my opinion that, in view of the silence on this subject in the Criminal Code and the confusion thereby created, the practice above-described should be adopted.

An application to challenge an authorization should be brought as soon as possible. In most cases, because of the requirement for reasonable notice of intention to adduce wiretap evidence, it may be that the application can be made before trial. Otherwise, defence counsel wishing to challenge an authorization may, in accordance with the suggestion made by O'Sullivan J.A. in the case at bar, have to apply for an adjournment for this purpose.

It may be argued that where a trial judge happens to be of the same court that made the authorization order (as was the case in Wong (No. 1), supra) an application to review the authorization could be made to him directly, rather than incurring extra expense and needless delay by instituting completely separate proceedings. There may be some merit to this argument but, if such a review were undertaken, it would be done by the judge in his capacity as a judge of the court that made the original order and not in his capacity as trial judge.

In the case at bar, the trial judge held the wiretap evidence to be inadmissible and at the same time he stated that he did not need to go behind the authorizations. In my opinion, he did go behind the authorizations even though he did not consider it necessary to open the sealed packets. In so doing, for the reasons discussed above, he exceeded his jurisdiction. I am in substantial agreement with the Manitoba Court of Appeal that the trial judge was in error in refusing to admit the evidence which was tendered by the Crown. I would therefore dismiss the appeal and confirm the order for a new trial.

    The reasons of Dickson and Chouinard JJ. were delivered by

DICKSON J.:-- The issue is whether a trial judge, who is a provincial court judge, can look behind an apparently valid wiretap authorization given by a superior court judge and rule intercepted private communications in admissible in evidence.

I          The Facts and Judicial History

The appellant, James Stephen Wilson, was tried before Dubienski Prov. Ct. J. of the Manitoba Provincial Court (Criminal Division) on nine counts, all related to betting. The Crown sought to adduce wiretap evidence. Dubienski Prov. Ct. J. ruled the evidence inadmissible as having been illegally obtained. The Crown's case collapsed and Wilson was acquitted on all nine counts. The issue on appeal is whether Dubienski Prov. Ct. J. exceeded his jurisdiction in refusing to admit the intercepted communications in evidence.

The tapes were made pursuant to four authorizations, obtained from judges of the Manitoba Court of Queen's Bench, concerning the accused Wilson and authorizing interceptions at named addresses. In each of the authorizations the following words appear:

> AND UPON hearing read the affidavit of Detective Sergeant Anton Cherniak;

> AND UPON being satisfied that it is in the best interests of the administration of justice to grant this authorization and that other investigative procedures have been tried and have failed, that other investigative procedures are unlikely to succeed, and that the urgency of the matter is such that it would be impractical to carry out the investigation of the undermentioned offences using only other investigative procedures;

Counsel for Wilson concedes all four authorizations are valid on their face. Police Inspector Anton Cherniak testified as to the manner in which the authorizations had been obtained. Cherniak said, in respect of the first authorization:

> ... while in company with Mr. John Guy [a Crown counsel and designated agent] we attended in judges chambers before Mr. Justice Hunt. Mr. Justice Hunt was supplied with an application. He appeared to read it. He was supplied with an affidavit. He appeared to read it. He was then supplied with an authorization. He appeared to read it and he then applied his signature, in my presence, to the authorization.

Testimony with respect to the other authorizations was virtually the same. On cross-examination, Inspector Cherniak added that he might have been asked a number of questions. Wilson's counsel spent considerable time cross-examining Cherniak about the matters referred to in ss. 178.12(1)(g) and 178.13(1)(b) of the Criminal Code:

> 178.12 (1) An application for an authorization shall be made ex parte and

in writing...

and shall be accompanied by an affidavit which may be sworn on the information and belief of a peace officer or public officer deposing to the following matters, namely:

...

(g)    whether other investigative procedures have been tried and have failed or why it appears they are unlikely to succeed or that the urgency of the matter is such that it would be impractical to carry out the investigation of the offence using only other investigative procedures.

178.13 (1) An authorization may be given if the judge c to whom the application is made is satisfied

(a)    that it would be in the best interests of the administration of justice to do so; and

(b)    that other investigative procedures have been tried and have failed, other investigative procedures are unlikely to succeed or the urgency of the matter is such that it would be impractical to carry out the investigation of the offence using only other investigative procedures.

The questions related to the actual state of facts at the time the authorizations were applied for and not to the contents of the affidavits. The Crown made no objection to this line of questioning. On the basis of Cherniak's testimony at trial, Dubienski Prov. Ct. J. decided none of the three alternative pre-conditions of s. 178.13(1)(b) had been met at the time the authorizations were given: (i) no other investigative procedures had been tried and failed, (ii) there was no evidence other investigative procedures were unlikely to succeed, (iii) there was no urgency. The judge concluded that the improper granting of the authorizations was not due to any error on the part of the authorizing judges, but due to the fault of the police.

My whole problem was that the evidence that was before me, as presented by the police, was quite different from the evidence that would appear to have been given and upon which the authorizations were based.

He further commented:

I am inclined to say the police have developed a pattern of application based on routine.

It would be carrying it too far to say Dubienski Prov. Ct. J. concluded the authorizations had been obtained by fraud, but, at least, he assumed there had been insufficient or false information in the affidavits. This determination was reached without examination of the affidavits. They remain in sealed packets, pursuant to s. 178.14 of the Code, and Dubienski Prov. Ct. J., as a provincial court judge, had no authority to order the opening of the packets. The judge decided the interceptions of private communications had not been lawfully made and to admit the evidence would bring the administration of justice into disrepute. He therefore excluded the evidence.

The Crown appealed the acquittals to the Manitoba Court of Appeal, which unanimously allowed the appeal and ordered a new trial. Monnin J.A., as he then was, and Matas J.A. concurring, concluded that an authorization issued by a superior court could not be collaterally challenged in a provincial court. In separate reasons, O'Sullivan J.A. said that an authorization granted in a superior court could not be collaterally attacked in any court and could not be attacked at all in an inferior court.

In the Manitoba Court of Appeal and in this Court counsel for Wilson argued, as an additional point, that the requirement under s. 178.16(4) to give notice of intention to adduce wiretap evidence had not been proven at trial. The Manitoba Court of Appeal rejected this argument. In this Court we gave our opinion on the day of hearing that notice had been sufficiently proven. Thus, the only outstanding issue is the trial judge's treatment of the authorizations.

II      The Reviewability of Authorizations

An authorization to intercept a private communication is an ex parte order which may be made by a judge of a superior court of criminal jurisdiction, as defined in s. 2 of the Criminal Code, or a judge, as defined in s. 482. That means that in Manitoba authorizations may be obtained from judges of the Court of Appeal, the Court of Queen's Bench, or a County Court. The designations in other provinces are slightly different; I will use the Manitoba references in the following discussion.

To what extent, if any, and in what manner are authorizations reviewable? The Manitoba Court of Appeal identified two problems in the present case: (i) an inferior court had refused to accept the validity of superior court authorizations, and (ii) collateral attack. I will deal with the latter point first.

(A)    Collateral Attack

In dealing with the issue of collateral attack I will, for the moment, put to one side the question of a trial judge assessing an authorization given by a higher court. I will assume that the

trial judge is of the same court, or a higher court, than the judge who gave the authorization.

The collateral attack issue is this: in the absence of an actual application to set aside the authorization, can a trial judge, qua trial judge, consider the validity of an authorization in order to determine the admissibility of evidence? O'Sullivan J.A., as I indicated, expressed the view that a superior court authorization could not be collaterally attacked in any court. That was perhaps implicit in the judgment of Monnin J.A. In the earlier case of R. v. Dass (1979), 47 C.C.C. (2d) 194 (Man. C.A.), Huband J.A., speaking for a five judge Court, said this, at p. 214:

> A question arose as to whether objection could be taken in this Court, to evidence flowing from an interception which had been authorized by a Court order made by a Justice of the Manitoba Court of Queen's Bench ... . There is a well-recognized rule that the orders of a superior Court cannot be made the subject of a collateral attack: see Re Sproule (1886), 12 S.C.R. 140 at p. 193. In this instance, however, defence counsel does not complain that an application to intercept communications was made. He does not complain that an order was granted. He does not complain as to the terms or the wording of the order, except for the substitution of one location for another as previously discussed. The complaint is not as to the order itself, but rather as to the means by which the order was implemented. The issue raised is therefore not an attack on the order itself, and consequently it is an appropriate subject-matter for the consideration of this Court on appeal. [Emphasis added.]

The exception was, however, a broad qualification. There had been a renewal of the authorization in which a new location had been added; the Court of Appeal concluded that was improper; to that extent the renewal was invalid, and any communications intercepted at the new location should not have been admitted in evidence. (Nonetheless, s. 613(1)(b)(iii) was applied.) Despite its asseveration to the contrary, it is hard to conclude that the Manitoba Court of Appeal did not, in effect, collaterally attack the authorization in Dass.

I accept the general proposition that a court order, once made, cannot be impeached otherwise than by direct attack by appeal, by action to set aside, or by one of the prerogative writs. This general rule is, however, subject to modification by statute. In my view, Parliament has indeed modified the rule in the enactment of two provisions of Part IV.I of the Criminal Code, ss. 178.16(1) and 178.16(3)(b):

> 178.16(1) A private communication that has been intercepted is inadmissible as evidence against the originator of the communication or the person intended by the originator to receive it unless
>
> (a) the interception was lawfully made; or

     (b)   the originator thereof or the person intended by the originator to receive it has expressly consented to the admission thereof;

but evidence obtained directly or indirectly as a result of information acquired by interception of a private communication is not inadmissible by reason only that the private communication is itself inadmissible as evidence.

        ...

     (3) Where the judge or magistrate presiding at any proceedings is of the opinion that a private communication that, by virtue of subsection (1), is inadmissible as evidence in the proceedings

     (a)   is relevant to a matter at issue in the proceedings, and
     b)   is inadmissible as evidence therein by reason only of a defect of form or an irregularity in procedure, not being a substantive defect or irregularity, in the application for or the giving of the authorization under which such private communication was intercepted,

he may, notwithstanding subsection (1), admit such private communication as evidence in the proceedings.

The present s. 178.16(3) was formerly, with slightly different wording, s. 178.16(2).

    (i)     Invalidity on the Face of the Authorization

    On what basis can a trial judge assess the validity? This Court has been receptive to the view that a trial judge can collaterally attack an authorization. In Charette v. The Queen, [1980] 1 S.C.R. 785, affirming, sub nom. R. v. Parsons (1977), 37 C.C.C. (2d) 497 (Ont. C.A.), the trial judge had concluded the superior court authorization was invalid on its face and refused to admit the evidence obtained pursuant to it. The Ontario Court of Appeal disagreed, holding the authorization was valid on its face, but the Court accepted the submission that the trial judge had jurisdiction to consider the validity of the authorization. In Charette this Court adopted the reasons of Dubin J.A., which included the following passage at pp. 501-02:

        A voir dire is not held to pass on the sufficiency of the evidence, but only to determine questions of admissibility. In cases such as these, initial issues as to admissibility of the tendered evidence immediately arise. In order to render evidence of intercepted private communications admissible when Crown counsel

relies upon an authorization, Crown counsel must first satisfy the trial Judge that the statutory conditions precedent have been fulfilled, i.e., that the interceptions were lawfully made, and that the statutory notice was given. In a case where the Crown relies upon an authorization it is for the trial Judge to pass upon such matters as the validity of the authorization, and that the investigation authorized had been carried out in the manner provided for in the authorization. He must be satisfied that the authorization includes either as a named or unnamed person any of the parties to the communication and, as I have said, that the statutory notice has been complied with.

The determination of whether the statutory conditions precedent have been fulfilled rests exclusively with the trial Judge and are properly determined in a voir dire. [Emphasis added.]

The trial judge has the responsibility of deciding upon the admissibility of evidence. Section 178.16(1) says that, absent consent, evidence of a private communication can only be introduced if the interception was lawful. Absent consent, an interception is only lawful if made pursuant to an authorization given in accordance with Part IV.I of the Criminal Code. The fact that an authorization purports to be made under Part IV.I is insufficient. Section 178.16(3)(b) gives the trial judge discretion to admit unlawfully obtained evidence if there is a non-substantive defect in form or irregularity in procedure in the giving of the authorization. The corollary would seem to be that if the defect or irregularity is substantive, there is no such discretion and the evidence is inadmissible. If a court order authorizing the interception were conclusive, even if it did not comply with Part IV.I, there would be no need for the curative provisions of s. 178.16(3)(b). The combination of ss. 178.16(1)(a) and 178.16(3)(b) requires the trial judge to consider whether the authorization was valid. The fact that it amounts to what might be called a collateral attack is no bar.

(ii)    Going Behind an Apparently Valid Authorization

Does the same rationale apply when the question is one of going behind an apparently valid authorization? In the present case Dubienski, Prov. Ct. J. claimed he was not going behind the authorizations. In my view that position is untenable. When a trial judge rules evidence inadmissible because the authorization, although valid on its face, was not lawfully obtained, it can scarcely be said that he is not going behind the authorization. He is not necessarily declaring the authorization invalid for all purposes; he is not actually setting it aside; but he is, for the purpose of determining the admissibility of evidence, going behind the authorization. Is there jurisdiction to do so?

I am of the view that ss. 178.16(1)(a) and 178.16(3)(b) apply to give the trial judge authority to go behind an apparently valid authorization. There is nothing in the language of the sections justifying a distinction between that which appears on the face of the record and that which is

dehors the record. There is nothing limiting the trial judge to an examination only of what appears on the face of the authorization. To impose such a restriction as a matter of statutory interpretation would unnecessarily fetter his ability to determine whether the wiretap evidence is admissible. In many cases wiretap evidence may be the only evidence against the accused. It must be noted that not only does s. 178.16(3)(b) refer to defects or irregularities in the giving of the authorization, but also in the application for the authorization. Once again, since s. 178.16(3)(b), in effect, gives a discretion to cure for non-substantive defects or irregularities it would seem to follow as a necessary inference that substantive defects or irregularities in the application for the authorization will result in the evidence being inadmissible. In R. v. Gill (1980), 56 C.C.C. (2d) 169 (B.C.C.A.), Lambert J.A. expressed this view at p. 176:

> Subsection (2)(b) [now 178.16(3)(b)] of that section contemplates that any defect or irregularity in the application for or the giving of the authorization may make a private communication inadmissible, and that if it is inadmissible and if the defect or irregularity is a substantive one, then there is no discretion in the trial Judge to admit the private communication.

> I think that s. 178.16 defines its own concepts and that if, in the application for the authorization, or in the giving of the authorization, there is a substantive defect or irregularity, then the interception cannot be regarded as being lawfully made within the meaning of s. 178.16(1)(a). A private communication intercepted under such an authorization would be inadmissible. In reaching that conclusion, I disagree on this narrow point with the reasons of Anderson J. of the Supreme Court of British Columbia in Re Miller and Thomas and The Queen (1976), 23 C.C.C. (2d) 257, 59 D.L.R. (3d) 679, 32 C.R.N.S. 192, and with the reasons of McDonald J. of the Alberta Supreme Court, Trial Division, in Re Donnelly and Acheson and The Queen (1976), 29 C.C.C. (2d) 58, [1976] W.W.D. 100.

A view similar to that of Lambert J.A. was expressed by Meredith J. in R. v. Wong (No. 1) (1976), 33 C.C.C. (2d) 506 (B.C.S.C.), a case relied upon by Dubienski Prov. Ct. J. Wong (No. 1) involved, as does the present case, a question of compliance with s. 178.13(1)(b).

> Notwithstanding what has been said by D.C. McDonald, J., in the case cited above, it seems to me to follow by necessary inference that a substantive defect of form or irregularity in procedure in an application for or the giving of the authorization may render the evidence of the communication intercepted as a result, inadmissible as unlawful. Thus, it seems to me that as I am the Judge who must rule on the admissibility of evidence in this case, I must consider whether there has been a substantive defect of form or irregularity in procedures as might render the evidence inadmissible. I do not think that such an examination

requires that the ex parte order by which the authorization was granted be reviewed or set aside. [At pp. 509-10].

R. v. Ho (1976), 32 C.C.C. (2d) 339 (Vancouver Co. Ct. (B.C.)) is to the same effect. See Krever J. in Re Stewart and The Queen (1976), 30 C.C.C. (2d) 391 (Ont. H.C.), at p. 400. See also Manning, The Protection of Privacy Act, (1974) at pp. 135-37; Bellemare, La révision d'une autorisation en écoute électronique (1979), 39 R. du B. 496.

    As noted in the above-quoted passages, there is a contrary view, expressed most strongly by McDonald J. in Re Donnelly and Acheson and The Queen (1976), 29 C.C.C. (2d) 58 (Alta. S.C.), and by Anderson J. in Re Miller and Thomas and The Queen (1976), 23 C.C.C. (2d) 257 (B.C.S.C.) I will refer specifically to the arguments raised by McDonald J. in Donnelly and Acheson, considerably influenced by the wording of s. 178.14:

> 178.14(1) All documents relating to an application made pursuant to section 178.12 or subsection 178.13(3) are confidential and, with the exception of the authorization, shall be placed in a packet and sealed by the judge to whom the application is made immediately upon determination of such application, and such packet shall be kept in the custody of the court in a place to which the public has no access or in such other place as the judge may authorize and shall not be

>     (a) opened or the contents thereof removed except

>         (i)    for the purpose of dealing with an application for renewal of the authorization, or
>         (ii)   pursuant to an order of a judge of a superior court of criminal jurisdiction or a judge as defined in section 482; and

>     (b) destroyed except pursuant to an order of a judge referred to in subparagraph (a)(ii).

>     (2) An order under subsection (1) may only be made after the Attorney General or the Solicitor General by whom or on whose authority the application was made for the authorization to which the order relates has been given an opportunity to be heard.

McDonald J. started with the assumption that, but for s. 178.16(2)(b) (now 3(b)), he would have thought "lawfully made" in s. 178.16(1)(a) meant in accordance with an apparently valid

authorization. He conceded that s. 178.16(2)(b) appeared to imply that the evidence was inadmissible if there were a substantive defect in form or irregularity in procedure in the application for the authorization. He declined, however, to draw this inference, at the same time acknowledging that this relegated portions of s. 178.16(2)(b) to mere surplusage. He sought to avoid three consequences he asserted would flow if s. 178.16(2)(b) were interpreted to enable a trial judge to go behind an apparently valid authorization.

(1) That which was on its face lawfully done, pursuant to an order (i.e., the authorization) of a Judge of a superior or district Court, would be held to have been unlawful. The trial Judge would retrospectively render unlawful that which had appeared to be lawful. I should think that a statute which is said to give a trial Judge such a power should be scrutinized very carefully to determine whether such a power has in fact been given by Parliament.

(2) The contents of the affidavit would be disclosed to public view even though it might reveal investigations not only which led to the prosecution of the accused but also those which might relate to continuing or concluded investigations of other persons not yet charged or tried. I should think that a statute which is said to enable a trial Judge to do an act with such a consequence should be held to do so only if that power is given expressly or by necessary inference.

(3) The Protection of Privacy Act, 1973-74, c. 50, amended both the Criminal Code and the Crown Liability Act, R.S.C. 1970, c. C-38.

7.2(1) Subject to subsection (2), where a servant of the Crown, by means of an electromagnetic, acoustic, mechanical or other device, intentionally intercepts a private communication, in the course of his employment, the Crown is liable for all loss or damage caused by or attributable to such interception, and for punitive damages in an amount not exceeding $5,000 to each person who incurred such loss or damage.

(2) The Crown is not liable under subsection (1) for loss or damage or punitive damages referred to therein where the interception complained of

(a)     was lawfully made; (b) was made with the consent, express or implied, of the originator of the private communication or of the person intended by the originator thereof to receive it; or (c) was

made by an officer or servant of the Crown in the course of random monitoring that is necessarily incidental to radio frequency spectrum management in Canada.

Whatever interpretation is placed upon the words "lawfully made" in s. 178.16(1)(a) of the Criminal Code must surely be given also to s. 7.2(2)(a) of the Crown Liability Act, both those provisions having been created by the same statute. It would follow as well that where the issue arises not as one of the admissibility of an intercepted communication (or derivative evidence at a trial but as one of liability under the Crown Liability Act, the contention of the defence would entail that liability would flow from an act of interception which when done by a servant of the Crown had been done pursuant to an authorization which on its face made the interception lawful. [At pp. 64 and 65.]

With respect, I do not find these three arguments to be wholly persuasive. As to the third consequence, a majority of this Court was not convinced by an argument along the same line in Goldman v. The Queen, [1980] 1 S.C.R. 976, at pp. 998-99. Mr. Justice McDonald's first and third consequences are related. It does not necessarily follow that a determination of "not lawfully made" for the purposes of admissibility makes an interception unlawful for all purposes under Part IV.I. The evidence may be inadmissible yet there might be a defence to a criminal or civil proceeding arising from the interception. That question does not arise in this case and need not be decided here. The second consequence predicted by McDonald J. tends to overstatement. The affidavit would not need to be made public in order to rule evidence inadmissible; selected aspects only could be made public. As Stanley A. Cohen suggests in his work Invasion of Privacy: Police and Electronic Surveillance in Canada (1983), the integrity of the packet might be preserved "through initial judicial screening, and, if necessary, judicial editing" (p. 155). Due regard to the confidentiality provisions of s. 178.14 is not inconsistent with ruling evidence inadmissible under s. 178.16.

I therefore conclude that s. 178.16(1)(a) and 178.16(3)(b) do enable a trial judge to go behind an apparently valid authorization.

(iii)   Examining the Contents of the Sealed Packet

In most cases it will be necessary to examine the contents of the sealed packet in order to determine whether there was a defect or irregularity in the application for the authorization.

In the present case Dubienski Prov. Ct. J. ruled that the requirements of s. 178.13(1)(b) had not been met, without examining the contents of the sealed packet. In this respect he followed Meredith J. in Wong (No. 1), supra, and in my view fell into error. It is important to note that s. 178.13 does not require that the authorization contain a list of the reasons which prompted the judge to give the authorization. In order finally to determine whether other investigative procedures had been tried and failed, other investigative procedures were unlikely to succeed, or that there was

urgency, it would be necessary to examine the affidavits. This would enable the trial judge to say whether the apparent conflict between the evidence at trial and what can be assumed to have been said in the affidavits is actual. It may be that the comparison will give rise to clarification, showing that one of the three pre-conditions had been met. For example, in the present case little was said in the testimony at trial as to whether other investigative procedures were unlikely to succeed. If one were to examine the affidavits, there might be an explanation that would satisfy the requirements of s. 178.12(1)(g) and 178.13(1)(b) and hence make the authorizations valid. I therefore conclude Dubienski Prov. Ct. J. could not properly decide the interceptions were not lawfully made without examining the contents of the sealed packets.

If this case had been before a superior court trial judge would it have been proper for the judge to order the opening of the sealed packet under s. 178.14? Most of the cases have assumed that only rarely is this proper; there appears to be a reticence to go behind an apparently valid authorization; R. v. Gill, supra; Re Stewart and The Queen, supra; R. v. Miller and Thomas (No. 4) (1975), 28 C.C.C. (2d) 128 (Yale Co. Ct. (B.C.)); R. v. Newall (No. 1) (1982), 67 C.C.C. (2d) 431 (B.C.S.C.); R. v. Johnny and Billy (1981), 62 C.C.C. (2d) 33 (B.C.S.C.); R. v. Bradley (1980), 19 C.R. (3d) 336 (Que. S.C.); Re Royal Commission Inquiry into the Activities of Royal American Shows Inc. (No. 3) (1978), 40 C.C.C. (2d) 212 (Alta. S.C.); Re Zaduk and The Queen (1977), 37 C.C.C. (2d) 1 (Ont. H.C.); R. v. Has lam (1977), 36 C.C.C. (2d) 250 (Nfld. District Ct.); Re Regina and Kozak (1976), 32 C.C.C. (2d) 235 (B.C.S.C.); contra R. v. Kalo, Kalo and Vonschober (1975), 28 C.C.C. (2d) 1 (Peel Co. Ct. (Ont.)) It is not necessary to decide whether this restricted view of s. 178.14 is correct. There is a broad consensus that prima facie evidence of fraud or non-disclosure is a valid reason for opening the packet. Misleading disclosure would be in the same category. The present case is one in which the trial judge made a primafacie finding of either misleading disclosure or non-disclosure.

Opening the sealed packet, and holding an authorization to be invalid, on the basis of fraud, non-disclosure, or misleading disclosure is, in a sense, a less serious interference with the authorizing judge's decision than a finding of invalidity on the face of the authorization. The latter conclusion connotes that the authorizing judge did something wrong--he signed an order not in accordance with the Criminal Code. On the other hand, a finding of invalidity based on fraud, non-disclosure, or misleading disclosure means that the authorizing judge acted properly on the basis of evidence before him--the invalidity arose because the evidence was false or incomplete--the fault of others.

Once a foundation is laid for the opening of the packet, I would say that the trial judge, assuming him to be a judge of a superior court of criminal jurisdiction or a judge as defined in s. 482, can open the packet and make a full review for compliance with Part IV.I. He cannot, of course, decide whether, in the exercise of his discretion, he would have granted the authorization. He can only decide whether it was lawfully obtained. He can also apply the curative provisions of s. 178.16(3)(b) to non-substantive defects or irregularities. A failure to comply with a mandatory provision such as 178.12(1)(g) or 178.13(1)(b) would, in my view, amount to a substantive and

non-curable defect.

Although I conclude that Dubienski Prov. Ct. J. was in error in holding the authorizations to have been unlawfully made without examining the contents of the sealed packet, I also conclude, contrary to the Manitoba Court of Appeal, that a collateral attack by a trial judge, either in respect of invalidity on the face of the authorization or going behind an apparently valid authorization, is contemplated by Part IV.I of the Criminal Code.

(iv)    Cross-examination of the Deponent

Cross-examination was conducted in the present case in order to determine whether any of the preconditions of s. 178.13(1)(b) had been met. The Crown made no objection, but in other cases objections have been made, and in some instances successfully. Such cross-examination of the deponent to the affidavit was ruled improper in R. v. Blacquiere (1980), 57 C.C.C. (2d) 330 (P.E.I. S.C.); Re Regina and Collos (1977), 37 C.C.C. (2d) 405 (B.C.C.A.), reversing on other grounds (1977), 34 C.C.C. (2d) 313 (B.C.S.C.); R. v. Haslam, supra; R. v. Robinson (1977), 39 C.R.N.S. 158 (Vancouver Co. Ct. (B.C.)) The rationale was that permitting such cross-examination would, by implication at least, reveal the contents of the sealed packet declared to be confidential by s. 178.14. On the other hand, cross-examination has been permitted in R. v. Johnny and Billy, supra, and in R. v. Hollyoake (1975), 27 C.C.C. (2d) 63 (Ont. Prov. Ct.) I prefer the latter view. These authorizations are made ex parte and in camera. If it is admitted that there is a right of the trial judge to go behind an apparently valid authorization, it must be possible to ask questions on cross-examination to find out if there is any basis upon which to argue invalidity. It is of little avail to defence counsel to have a statement of law that an authorization can be held to be invalid if obtained, for example, by material non-disclosure and then preclude counsel from asking questions tending to show there has in fact been non-disclosure. The questioning can be such as to enable defence counsel to get some indication of whether the authorization was properly obtained, without the disclosure of information which, in the opinion of the judge, ought to be kept confidential. Examples of such confidential information would be the identity of undercover agents and informers or specific information which would jeopardize a continuing police investigation. The interest in confidentiality expressed in s. 178.14 and defence counsel's interest in testing the validity of the authorization need not lead to conflict.

v)    Review by a Judge Other than the Trial Judge

I have said that in my view Part IV.I contemplates that the trial judge is the proper person to review the validity of the authorization whether on its face or otherwise. The Manitoba Court of Appeal, as I have indicated, thought otherwise. O'Sullivan J.A. said that Part IV.I contemplated a different form of review of authorizations; he suggested the trial could be adjourned and the review of the validity of the authorization would be conducted in the court that gave the authorization. At the hearing before this Court, Crown counsel adopted this position, adding that it was preferable that the actual judge who gave the authorization be the one to review it. Absent the statutory scheme

of interception of private communications, and, in particular, s. 178.16, I would agree with this view. The law recognizes a general right of review of an ex parte order by the court which made the order and preferably by the judge who made the order. The statutory provisions, however, override the common law rules. As I read s. 178.16 Parliament mandated that the trial judge conduct such a review.

The language of s. 178.16 does not suggest review by anyone other than the trial judge. The only other provision that seems to say anything about review is s. 178.14, concerning the opening of the sealed packet. This would normally be used where an attempt was being made to go behind an apparently valid authorization. As a matter of statutory construction s. 178.14 seems to contemplate that the packet may be opened by any judge of a superior court of criminal jurisdiction or a judge as defined in s. 482, and is not confined to either the court or the judge who granted the authorization. The policy consideration underlying this broader approach may lie in a desire to avoid any suggestion that the judge who granted the authorization might be inclined simply to reaffirm his previous order without serious consideration.

I do find statutory support for the proposition that the trial judge shall review an authorization, and I find no statutory support for the proposition that only the judge or court that made the order can review an authorization.

There is a further point. Any decision of the trial judge regarding admissibility of evidence, therefore including questions as to the validity of authorizations, will be subject to appeal on a question of law in the ordinary way. In contrast if only the court that made the order can review an authorization, there is no right of appeal from this review because the Criminal Code does not grant an appeal.

The suggestion of O'Sullivan J.A. that the trial be adjourned for review of the authorization by the court granting the authorization would result in needless delays and be costly in terms of trial economy.

(B)   Trial Judges Dealing with Authorizations Given By Judges of Higher Courts

One issue identified by the Manitoba Court of Appeal remains to be addressed. Does the situation which I have been describing change when, as here, a provincial court judge is dealing with an authorization given by a superior court judge? There are examples in the cases of inferior courts purporting to review superior court authorizations, particularly for invalidity on the face of the authorization. In none of these cases, however, was the question of a trial judge in an inferior court assessing the validity of a superior court authorization mentioned as a problem or an issue.

As earlier noted, in Charette v. The Queen, supra, this Court approved the statement [found at (1977), 37 C.C.C. (2d) 497, at pp. 501-02]:

>      ... it is for the trial Judge to pass upon such matters as the validity of the

authorization ....

The determination of whether the statutory conditions precedent have been fulfilled rests exclusively with the trial Judge...

The appeal case in Charette discloses that the trial judge was a county court judge and the authorization had been given by a superior court judge.

Other examples of an inferior trial court assessing the validity of a superior court authorization are: R. v. Welsh and Iannuzzi (No. 6) (1977), 32 C.C.C. (2d) 363 (Ont. C.A.); R. v. Crease (No. 2) (1980), 53 C.C.C. (2d) 378 (Ont. C.A.); R. v. Cardoza (1981), 61 C.C.C. (2d) 412 (York Co. Ct. (Ont.)); R. v. Gabourie (1976), 31 C.C.C. (2d) 471 (Ont. Prov. Ct.); R. v. Hancock and Proulx (1976), 30 C.C.C. (2d) 544 (B.C.C.A.)

None of the above cases is persuasive in view of the fact that the inferior court/superior court problem was not addressed, but it is curious that it was not identified as a problem.

In my opinion the implicit assumption that an inferior court can attack a superior court authorization is correct. At first glance, this may sound heretical, but I think the justification lies in the statutory language. As discussed earlier, I conclude that ss. 176.16(1)(a) and (3)(b) give the trial judge, qua trial judge, the authority to decide the validity of an authorization. There is nothing in the wording of s. 178.16 which suggests that certain trial judges are in a different position than other trial judges. I would not be prepared to read in such a distinction.

If an inferior court trial judge can determine the validity of a superior court authorization for the purpose of deciding admissibility of evidence, what happens when, as in the present case, the trial judge is not authorized to order the opening of the sealed packet? The answer must be, in obedience to the statutory language, that the trial be adjourned to allow counsel to apply under s. 178.14 for an order permitting the opening of the packet. The judge acting under s. 178.14 would not examine the contents of the packet or decide the validity of the authorization (see Bellemare, supra). That is the responsibility of the trial judge. This does not mean that the judge acting under s. 178.14 is performing a mere formality. He has a discretion whether to order opening of the packet. He may refuse, and if so the provincial court judge will have to abide by that decision: see Re Regina and Kozak, supra.

III Bringing the Administration of Justice into Disrepute

After concluding that the interceptions were not lawfully made, Dubienski Prov. Ct. J. went on to hold that to admit the evidence would bring the administration of justice into disrepute. In the circumstances, this was an irrelevant consideration. Section 178.16(2) contains the only reference to bringing the administration of justice into disrepute:

178.16(1) A private communication that has been intercepted is inadmissible as evidence against the originator of the communication or the person intended by the originator to receive it unless

(a) the interception was lawfully made; or

(b)   the originator thereof or the person intended by the originator to receive it has expressly consented to the admission thereof;

but evidence obtained directly or indirectly as a result of information acquired by interception of a private communication is not inadmissible by reason only that the private communication is itself inadmissible as evidence.

(2) Notwithstanding subsection (1), the judge or magistrate presiding at any proceedings may refuse to admit evidence obtained directly or indirectly as a result of information acquired by interception of a private communication that is itself inadmissible as evidence where he is of the opinion that the admission thereof would bring the administration of justice into disrepute.

Section 178.16(2) deals with derivative evidence only, i.e. evidence discovered as a result of intercepting the private communication. It does not relate to primary evidence, i.e. evidence of the private communication itself--the wiretap. That was what was under consideration in this case. Once the interception is held to have been unlawful (and absent consent) it is inadmissible unless the curative provisions of s. 178.16(3)(b) are applied.

IV    Conclusion

I conclude that Dubienski Prov. Ct. J. erred in deciding, without examining the contents of the sealed packet, that none of the three alternate preconditions of s. 178.13(1)(b) had been met.

I would dismiss the appeal and confirm the order of the Manitoba Court of Appeal directing a new trial on all counts.

Appeal dismissed.

TAB  10

*Case Name:*

# Canadian Airlines Corp. (Re)

**IN THE MATTER OF Canadian Airlines Corporation
and Canadian Airlines International Ltd.**
**Between**
**The Bank of Nova Scotia Trust Company of New York,
As Trustee for the Holders of Senior Secured Notes
and Montreal Trust Company of Canada, As Collateral
Agent for the Holders of Senior Secured Notes,
Plaintiffs, and
Canadian Airlines Corporation, Canadian Airlines
International Ltd., Canadian Regional Airlines Ltd.,
Canadian Regional Airlines (1998) Ltd. and Canadian
Airlines Fuel Corporation Inc., defendants**

[2000] A.J. No. 1692

19 C.B.R. (4th) 1

Docket: 0001-05071, 0001-05044

Alberta Court of Queen's Bench
Judicial District of Calgary

**Paperny J.**

Oral Judgment: May 4, 2000.

(41 paras.)

Application by holders of senior secured notes in corporation for order lifting stay of proceedings against them in Companies' Creditors Arrangement Act proceeding to allow for appointment of receiver and manager over assets and property charged in their favour and for order appointing court officer with exclusive right to negotiate sale of assets or shares of corporation's subsidiary.

**Counsel:**

G. Morawetz, A.J. McConnell and R.N. Billington, for Bank of Nova Scotia Trust Co. of New York and Montreal Trust Co. of Canada.

A.L. Friend, Q. C., and H.M. Kay, Q. C., for Canadian Airlines.

S. Dunphy, for Air Canada and 853350 Alberta Ltd.

R. Anderson, Q.C., for Loyalty Group.

H. Gorman, for ABN AMRO Bank N.V.

P. McCarthy, for Monitor - Price Waterhouse Cooper.

D. Haigh, Q.C, and D. Nishimura, for Unsecured noteholders - Resurgence Asset Management.

C.J. Shaw, for Airline Pilots Association International.

G. Wells, for NavCanada.

D. Hardy, for Royal Bank of Canada.

---

**1    PAPERNY J.** (orally):-- Montreal Trust Company of Canada, Collateral Agent for the holders of the Senior Secured Notes, and the Bank of Nova Scotia Trust Company of New York, Trustee for the holders of the Senior Secured Notes, apply for the following relief:

1. In the CCAA proceeding (Action No. 0001-05071) an order lifting the stay of proceedings against them contained in the orders of this court dated March 24, 2000 and April 19, 2000 to allow for the court-ordered appointment of Ernst & Young Inc. as receiver and manager over the assets and property charged in favour of the Senior Secured Noteholders; and

2. In Action No. 0001-05044, an order appointing Ernst & Young Inc. as a court officer with the exclusive right to negotiate the sale of the assets or shares of Canadian Regional Airlines (1998) Ltd.

**2**    Canadian Airlines Corporation ("CAC") is a Canadian based holding company which, through its majority owned subsidiary Canadian Airlines International Ltd. ("CAC") provides domestic, U.S.-Canada transborder and international jet air transportation services. CAC also provides regional transportation through its subsidiary Canadian Regional Airlines (1998) Ltd. ("Canadian Regional"). Canadian Regional is not an applicant under the CCAA proceedings.

**3**    The Senior Secured Notes were issued under an Indenture dated April 24, 1998 between CAC and the Trustee. The principal face amount is $175 million U.S. As well, there is interest outstanding. The Senior Secured Notes are directly and indirectly secured by a diverse package of assets and property of the CCAA applicants, including spare engines, rotables, repairables, hangar leases and ground equipment. The security comprises the key operational assets of CAC and CAIL. The security also includes the outstanding shares of Canadian Regional and the $56 million intercompany indebtedness owed by Canadian Regional to CAIL.

**4**    Under the terms of the Indenture, CAC is required to make an offer to purchase the Senior Secured Notes where there is a "change of control" of CAC. It is submitted by the Senior Secured Noteholders that Air Canada indirectly acquired control of CAC on January 4, 2000 resulting in a change of control. Under the Indenture, CAC is then required to purchase the notes at 101 percent of the outstanding principal, interest and costs. CAC did not do so. According to the Trustee, an Event of Default occurred, and on March 6, 2000 the Trustee delivered Notices of Intention to Enforce Security under the Bankruptcy and Insolvency Act.

**5**    On March 24, 2000, the Senior Secured Noteholders commenced Action No. 0001-05044 and brought an application for the appointment of a receiver over their collateral. On the same day, CAC and CAIL were granted CCAA protection and the Senior Secured Noteholders adjourned their application for a receiver. However, the Senior Secured Noteholders made further application that day for orders that Ernst & Young be appointed monitor over their security and for weekly payments from CAC and CAIL of $500,000 U.S. These applications were dismissed.

**6**    The CCAA Plan filed on April 25, 2000, proposes that the Senior Secured Noteholders constitute a separate class and offers them two alternatives:

1.    To accept repayment of less than the outstanding amount; or
2.    To be unaffected by the CCAA Plan and realize on their security.

**7**    On April 26th, 2000, the Senior Secured Noteholders met and unanimously rejected the first option. They passed a resolution to take steps to realize on the security.

**8**    The Senior Secured Noteholders argue that the time has come to permit them to realize on their security. They have already rejected the Plan and see no utility in waiting to vote in this regard on May 26th, 2000, the date set by this court.

**9**    The Senior Secured Noteholders submit that since the CCAA proceedings began five weeks ago, the following has occurred:

-interest has continued to accrue at approximately $2 million U.S. per month;

-the security has decreased in value by approximately $6 million Canadian;

-the Collateral Agent and the Trustee have incurred substantial costs;

-no amounts have been paid for the continued use of the collateral, which is key to the operations of CAIL;

-no outstanding accrued interest has been paid; and-they are the only secured creditor not getting paid.

**10**    The Senior Secured Noteholders emphasize that one of the end results of the Plan is a transfer of CAIL's assets to Air Canada. The Senior Secured Noteholders assert that the Plan is sponsored by this very solvent proponent, who is in a position to pay them in full. They are argue that Air Canada has made an economic decision not to do so and instead is using the CCAA to achieve its own objectives at their expense, an inappropriate use of the Act.

**11**    The Senior Secured Noteholders suggest that the Plan will not be impacted if they are permitted to realize on their security now instead of after a formal rejection of the Plan at the court scheduled vote on May 26, 2000. The Senior Secured Noteholders argue that for all of the preceding reasons lifting the stay would be in accordance with the spirit and intent of the CCAA.

**12**    The CCAA is remedial legislation which should be given a large and liberal interpretation: See, for example, Citibank Canada v. Chase Manhattan Bank of Canada (1991), 5 C.B.R. (3d) 165 (Ont. Gen. Div.). It is intended to permit the court to make orders which will effectively maintain the status quo for a period while the struggling company attempts to develop a plan to compromise its debts and ultimately continue operations for the benefit of both the company and its creditors: See for example, Meridian Development Inc. v. Toronto Dominion Bank (1984), 52 C.B.R. (N.S.) 109 (Alta. Q.B.), and Hongkong Bank of Canada v. Chef Ready Foods Ltd. (1990), 4 C.B.R. (3d) 311 (B.C.C.A.).

**13**    This aim is facilitated by the power to stay proceedings provided by Section 11 of the Act. The stay power is the key element of the CCAA process.

**14**    The granting of a stay under Section 11 is discretionary. On the debtor's initial application, the court may order a stay at its discretion for a period not to exceed 30 days. The burden of proof to obtain a stay extension under Section 11(4) is on the debtor. The debtor must satisfy the court that circumstances exist that make the request for a stay extension appropriate and that the debtor has acted, and is acting, in good faith and with due diligence. CAC and CAIL discharged this burden on April 19, 2000. However, unlike under the Bankruptcy and Insolvency Act, there is no statutory test under the CCAA to guide the court in lifting a stay against a certain creditor.

**15**    In determining whether a stay should be lifted, the court must always have regard to the particular facts. However, in every order in a CCAA proceeding the court is required to balance a number of interests. McFarlane J.A. states in his closing remarks of his reasons in Re Pacific National Lease Holding Corp. (1992), 15 C.B.R. (3d) 265 (B.C.C.A. [In Chambers]):

> In supervising a proceeding under the C.C.A.A. orders are made, and orders are varied as changing circumstances require. Orders depend upon a careful and delicate balancing of a variety of interests and problems.

**16**    Also see Blair J.'s decision in Campeau v. Olympia & York Developments Ltd. (1992), 14 C.P.C. (3d) 339 (Ont. Gen. Div.), for another example of the balancing approach.

**17**    As noted above, the stay power is to be used to preserve the status quo among the creditors of the insolvent company. Huddart J., as she then was, commented on the status quo in Re Alberta-Pacific Terminals Ltd (1991), 8 C.B.R. (3d) 99 (B.C.S.C.). She stated:

> The status quo is not always easy to find... Nor is it always easy to define. The preservation of the status quo cannot mean merely the preservation of the relative pre-stay debt status of each creditor. Other interests are served by the CCAA. Those of investors, employees, and landlords among them, and in the case of the Fraser Surrey terminal, the public too, not only of British Columbia, but also of the prairie provinces. The status quo is to be preserved in the sense that manoeuvres by creditors that would impair the financial position of the company while it attempts to reorganize are to be prevented, not in the sense that all creditors are to be treated equally or to be maintained at the same relative level. It is the company and all the interests its demise would affect that must be considered.

**18**    Further commentary on the status quo is contained in Quintette Coal Ltd. v. Nippon Steel Corp. (1990), 80 C.B.R. (N.S.) 98 (B.C.S.C.). Thackray J. comments that the maintenance of the status quo does not mean that every detail of the status quo must survive. Rather, it means that the debtor will be able to stay in business and will have breathing space to develop a proposal to remain viable.

**19**    Finally, in making orders under the CCAA, the court must never lose sight of the objectives of the legislation. These were concisely summarized by the chambers judge and adopted by the British Columbia Court of Appeal in Re Pacific National Lease Holding Corp. (1992), 15 C.B.R. (3d) 265 (B.C.C.A. [In Chambers]):

> (1)    The purpose of the CCAA is to allow an insolvent company a reasonable period of time to reorganize its affairs and prepare and file a plan for its continued operation subject to the requisite approval of the creditors and court.
>
> (2)    The CCAA is intended to serve not only the company's creditors but also a broad

constituency which includes the shareholders and employees.

(3)     During the stay period, the Act is intended to prevent manoeuvres for positioning amongst the creditors of the company.

(4)     The function of the court during the stay period is to play a supervisory role to preserve the status quo and to move the process along to the point where a compromise or arrangement is approved or it is evident that the attempt is doomed to failure.

(5)     The status quo does not mean preservation of the relative pre-stay debt status of each creditor. Since the companies under CCAA orders continue to operate and having regard to the broad constituency of interests the Act is intended to serve, the preservation of the status quo is not intended to create a rigid freeze of relative pre-stay positions.

(6)     The court has a broad discretion to apply these principles to the facts of the particular case.

**20**     At pages 342 and 343 of this text, *Canadian Commercial Reorganization:*

Preventing Bankruptcy (Aurora: Canada Law Book, looseleaf), R.H. McLaren describes situations in which the court will lift a stay:

1.     When the plan is likely to fail;
2.     The applicant shows hardship (the hardship must be caused by the stay itself and be independent of any pre-existing condition of the applicant creditor);
3.     The applicant shows necessity for payment (where the creditors' financial problems are created by the order or where the failure to pay the creditor would cause it to close and thus jeopardize the debtor's company's existence);
4.     The applicant would be severely prejudiced by refusal to lift the stay and there would be no resulting prejudice to the debtor company or the positions of creditors;
5.     It is necessary to permit the applicant to take steps to protect a right which could be lost by the passage of time;
6.     After the lapse of a significant time period, the insolvent is no closer to a proposal than at the commencement of the stay period.

**21**     I now turn to the particular circumstances of the applications before me.

**22**     I would firstly address the matter of the Senior Secured Noteholders' current rejection of the compromise put forward under the Plan. Although they are in a separate class under CAC's Plan and can control the vote as it affects their interest, they are not in a position to vote down the Plan in its entirety. However, the Senior Secured Noteholders submit that where a plan offers two options to a class of creditors and the class has selected which option it wants, there is no purpose to be

served in delaying that class from proceeding with its chosen course of action. They rely on the
Nova Metal Products Inc. v. Comiskey (Trustee of) (1990), 1 C.B.R. (3d) 101 (Oat. CA.) at 115, as
just one of several cases supporting this proposition. Re Philip's Manufacturing Ltd. (1992), 9
C.B.R. (3d) 25 (B.C.C.A.) at pp. 27-28, leave to appeal to S.C.C. refused (1992), 15 C.B.R. (3d) 57
(note) (S.C.C.), would suggest that the burden is on the Senior Secured Noteholders to establish that
the Plan is "doomed to fail". To the extent that Nova Metal and Philip's Manufacturing articulate
different tests to meet in this context, the application of either would not favour the Senior Secured
Noteholders.

23    The evidence before me suggests that progress may still be made in the negotiations with the
representatives of the Senior Secured Noteholders and that it would be premature to conclude that
any further discussions would be unsuccessful. The parties are continuing to explore revisions and
alternative proposals which would satisfy the Senior Secured Noteholders.

24    Mr. Carty's affidavit sworn May 1, 2000, in response to these applications states his belief that
these efforts are being made in good faith and that, if allowed to continue, there is a real prospect
for an acceptable proposal to be made at or before the creditors' meeting on May 26, 2000. Ms.
Allen's affidavit does not contain any assertion that negotiations will cease. Despite the emphatic
suggestion of the Senior Secured Noteholders' counsel that negotiations would be "one way",
realistically I do not believe that there is no hope of the Senior Secured Noteholders coming to an
acceptable compromise.

25    Further, there is no evidence before me that would indicate the Plan is "doomed to fail". The
evidence does disclose that CAC and CAIL have already achieved significant compromises with
creditors and continue to work swiftly and diligently to achieve further progress in this regard. This
is reflected in the affidavits of Mr. Carty and the reports from the Monitor.

26    In any case, there is a fundamental problem in the application of the Senior Secured
Noteholders to have a receiver appointed in respect of their security which the certainty of a "no"
vote at this time does not vitiate: It disregards the interests of the other stakeholders involved in the
process. These include other secured creditors, unsecured creditors, employees, shareholders and
the flying public. It is not insignificant that the debtor companies serve an important national need
in the operation of a national and international airline which employs tens of thousands of
employees. As previously noted, these are all constituents the court must consider in making orders
under the CCAA proceeding.

27    Paragraph 11 of Mr. Carty's May 1, 2000 affidavit states as follows:

> In my opinion, the continuation of the stay of proceedings to allow the
> restructuring process to continue will be of benefit to all stakeholders including
> the holders of the Senior Secured Notes. A termination of the stay proceedings as
> regards the security of the holders of the Senior Secured Notes would
> immediately deprive CAIL of assets which are critical to its operational integrity

and would result in grave disruption of CAIL's operations and could lead to the cessation of operations. This would result in the destruction of value for all stakeholders, including the holders of the Senior Secured Notes. Furthermore, if CAIL ceased to operate, it is doubtful that Canadian Re-gional Airlines (1998) Ltd. ("CRAL98"), whose shares form a significant part of the security package of the holders of the Senior Secured Notes, would be in a position to continue operating and there would be a very real possibility that the equity of CAIL and CRAL, valued at approximately $115 million for the purposes of the issuance of the Senior Secured Notes in 1998, would be largely lost. Further, if such seizure caused CAIL to cease operations, the market for the assets and equipment which are subject to the security of the holders of the Senior Secured Notes could well be adversely affected, in that it could either lengthen the time necessary to realize on these assets or reduce realization values.

28    The alternative to this Plan proceeding is addressed in the Monitor's reports to the court. For example, in Paragraph 8 of the Monitor's third report to the court states:

The Monitor believes the if the Plan is not approved and implemented, CAIL will not be able to continue as a going concern. In that case, the only foreseeable alternative would be a liquidation of CAIL's assets by a receiver and manager and/or by a trustee. Under the Plan, CAIL's obligations to parties it considers to be essential in order to continue operations, including employees, customers, travel agents, fuel, maintenance, catering and equipment suppliers, and airport authorities, are in most cases to be treated as unaffected and paid in full. In the event of a liquidation, those parties would not, in most cases, be paid in full and, except for specific lien rights, statutory priorities or other legal protection, would rank as ordinary unsecured creditors. The Monitor estimates that the additional unsecured claims which would arise if CAIL were to cease operation as a going concern and be forced into liquidation would he in excess of $1.1 billion.

29    This evidence is uncontradicted and flies in the face of the Senior Secured Noteholders' assertion that realizing on their collateral at this point in time will not affect the Plan. Although, as the Senior Secured Noteholders heavily emphasized the Plan does contemplate a "no" vote by the Senior Secured Noteholders, the removal of their security will follow that vote. 9.8(c) of the Plan states that:

If the Required Majority of Affected Secured Noteholders fails to approve the Plan, arrangements in form and substance satisfactory to the Applicants will have been made with the Affected Secured Noteholders or with a re-ceiver appointed over the assets comprising the Senior Notes Security, which arrangements provide for the transitional use by [CALL], and subsequent sale, of the assets comprising the Senior Notes Security.

**30**    On the other side of the scale, the evidence of the Senior Secured Noteholders is that the value of their security is well in excess of what they are owed. Paragraph 15(a) of the Monitor's third report to the court values the collateral at $445 million. The evidence suggests that they are not the only secured creditor going unpaid. CAIL is asking that they be permitted to continue the restructuring process and their good faith efforts to attempt to reach an acceptable proposal with the Senior Secured Noteholders until the date of the creditors meeting, which is in three weeks. The Senior Secured Noteholders have not established that they will suffer any material prejudice in the intervening period.

**31**    The appointment of a receiver at this time would negate the effect of the order staying proceedings and thwart the purposes of the CCAA.

**32**    Accordingly, I am dismissing the application, with leave to reapply in the event that the Senior Secured Noteholders vote to reject the Plan on May 26, 2000.

**33**    An alternative to receivership raised by the Senior Secured Noteholders was interim payment for use of the security. The Monitor's third report makes it clear that the debtor's cash flow forecasts would not permit such payments.

**34**    The Senior Secured Noteholders suggested Air Canada could make the payments and, indeed, that Air Canada should pay out the debt owed to them by CAC. It is my view that, in the absence of abuse of the CCAA process, simply having a solvent entity financially supporting a plan with a view to ultimately obtaining an economic benefit for itself does not dictate that that entity should be required to pay creditors in full as requested. In my view, the evidence before me at this time does not suggest that the CCAA process is being improperly used. Rather, the evidence demonstrates these proceedings to be in furtherance of the objectives of the CCAA.

**35**    With respect to the application to sell shares or assets of Canadian Regional, this application raises a distinct issue in that Canadian Regional is not one of the debtor companies. In my view, Paragraph 5(a) of Chief Justice Moore's March 24, 2000 order encompasses marketing the shares or assets of Canadian Regional. That paragraph stays, inter alia:

> ...any and all proceedings ... against or in respect of ... any of the Petitioners' property ... whether held by the Petitioners directly or indirectly, as principal or nominee, beneficially or otherwise...

**36**    As noted above, Canadian Regional is CAC's subsidiary, and its shares and assets are the "property" of CAC and marketing of these would constitute a "proceeding ... in respect of ... the Petitioners' property" within the meaning of Paragraph 5(a) and Section 11 of the CCAA.

**37**    If I am incorrect in my interpretation of Paragraph 5(a), I rely on the inherent jurisdiction of the court in these proceedings.

**38**   As noted above, the CCAA is to be afforded a large and liberal interpretation. Two of the landmark decisions in this regard hail from Alberta: Meridian Development Mc. v. Toronto Dominion Bank, supra, and Norcen Energy Resources Ltd. v. Oakwood Petroleums Ltd. (1988), 72 C.B.R. (NS.) 20 (Alta. Q.B.). At least one court has also recognized an inherent jurisdiction in relation to the CCAA in order to grant stays in relation to proceedings against third parties: Re Woodward's Ltd. (1993), 17 C.B.R. (3d) 236 (B.C.S.C.). Tysoe J. urged that although this power should be used cautiously, a prerequisite to its use should not be an inability to otherwise complete the reorganization. Rather, what must be shown is that the exercise of the inherent jurisdiction is important to the reorganization process. The test described by Tysoe J. is consistent with the critical balancing that must occur in CCAA proceedings. He states:

> In deciding whether to exercise its inherent jurisdiction, the court should weigh the interests of the insolvent company against the interests of parties who will be affected by the exercise of the inherent jurisdiction. If, in relative terms, the prejudice to the affected party is greater than the benefit that will be achieved by the insolvent company, the court should decline to its inherent jurisdiction. The threshold of prejudice will be much lower than the threshold required to persuade the court that it should not exercise its discretion under Section 11 of the CCAA to grant or continue a stay that is prejudicial to a creditor of the insolvent company (or other party affected by the stay).

**39**   The balancing that I have described above in the context of the receivership application equally applies to this application. While the threshold of prejudice is lower, the Senior Secured Noteholders still fail to meet it. I cannot see that it is important to the CCAA proceedings that the Senior Secured Noteholders get started on marketing Canadian Regional. Instead, it would be disruptive and en-danger the CCAA proceedings which, on the evidence before me, have progressed swiftly and in good faith.

**40**   The application in Action No. 0001-05044 is dismissed, also with leave to reapply after the vote on May 26, 2000.

**41**   I appreciate that the Senior Secured Noteholders will be disappointed and likely frustrated with the outcome of these applications. I would emphasize that on the evidence before me their rights are being postponed and not eradicated. Any hardship they experience at this time must yield to the greater hardship that the debtor companies and the other constituents would suffer were the stay to be lifted at this time.

PAPERNY J.

cp/s/qw/qlmmm

# TAB  11



# CANADIAN COMMERCIAL REORGANIZATION

## PREVENTING BANKRUPTCY



### VOLUME 1

### RICHARD H. McLAREN

H.B.A., LL.B., LL.M., C.Arb.

*Professor of Law, University of Western Ontario*
*with the assistance of*
Sabrina Gherbaz, B.A., LL.B.

CANADA LAW BOOK
A Division of The Cartwright Group Ltd.
240 Edward Street, Aurora, Ontario, L4G 3S9

www.canadalawbook.ca

August 2010

© 2010
**THE CARTWRIGHT GROUP LTD.**

All rights reserved. No part of this book may be reproduced
in any form by any photographic,
electronic, mechanical or other means, or used
in any information storage and retrieval system, without the
written permission of the publisher.

The publisher, and every person involved in the creation of this publication,
disclaims any warranty as to the accuracy, completeness or currency of the contents
of this publication. This publication is intended for information purposes only. The
publisher is not engaged in rendering legal or other professional advice and this
publication should not be relied upon as providing such advice. The publisher, and
every person involved in the creation of this publication, disclaims all liability in
respect of the results of any actions taken or not taken in reliance upon information
in this publication.

**Canadian Cataloguing in Publication Data**

McLaren, Richard H., 1945-
    Canadian commercial reorganization

Includes bibliographical references and index.
ISBN 0-88804-147-0 (v. 1)    ISBN 0-88804-294-9 (v. 2)

1. Corporate reorganizations — Canada. 2. Business
failures — Law and legislation — Canada. 3. Bankruptcy —
Canada. 4. Debtor and creditor — Canada. I. Title.

KE1497.5.M35 1994    346.71'078    C94-931716-0
KF1501.M35 1994

**3.3450**    Generally, the courts will lift a stay order where:[135]

1.    The plan is likely to fail.[135]

2.    The applicant shows hardship (the hardship must be caused by the stay

---

Where an application is made to set aside or vary a stay order, the application should be made to the judge who made the original order: *Philip's Manufacturing Ltd. (Re)* (1992), 9 C.B.R. (3d) 25, 67 B.C.L.R. (2d) 84 (C.A.), leave to appeal to S.C.C. refused 15 C.B.R. (3d) 57n.

135   In *Inducon Development Corp. (Re)* (1991), 8 C.B.R. (3d) 306 (Ont. Ct. (Gen. Div.)), Farley J. stated that: "It is of course . . . fruitless to proceed with a plan that is doomed to failure at a further stage." In deciding whether a plan is doomed to failure, the Court of Appeal in *Stelco Inc. (Re)*, [2005] O.J. No. 4733 (QL) (C.A.), stated that it is a matter of judgment of the supervising judge to determine whether the plan is doomed to fail. A supervising judge may find merits in the plan even though the creditor with veto power did not want to accept the plan. In *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 4 C.B.R. (3d) 311 at p. 315, [1991] 2 W.W.R. 136 (B.C.C.A.), Gibbs J.A. stated:

> . . . the Court is called upon to play a kind of supervisory role to preserve the status quo and to move the process along to the point where a compromise or arrangement is approved or it is evident that *the attempt is doomed to failure*. [Emphasis added.]

Thus, it is clear that an opposing party may attempt to have a stay lifted by presenting evidence that the plan or arrangement will fail. Such evidence may include proof that the requirements of s. 6 of the CCAA will not be met. This ground for denying an initial order, or subsequent extension of a stay, was also considered in *Rio Nevada Energy (Re)* (2000), 283 A.R. 146 (Q.B.). In this case, the major secured creditor opposed an extension of the initial stay on the grounds that any proposal or plan would be "doomed to failure". One issue was the manner in which the "doomed to failure" test was to be applied and who bore the burden of proof. The court held that the "doomed to failure" ground for preventing or terminating CCAA proceedings is not merely a factor to be considered in whether the court should grant an extension of the stay, but rather is a separate issue. The court found this preferable as it would ensure that the burden of proof is applied appropriately. In seeking an initial order, or an extension of a stay, the debtor has the burden of proving the requisites for a stay, but does not have the burden of proving that a plan would not be doomed to failure. Conversely, the applicant seeking termination of CCAA proceedings bears the burden of proving that any plan is "doomed to failure" (*Philips Manufacturing (Re)*, *Bargain Harold's*). The court also noted that two standards have been suggested for determining whether a plan is "doomed to failure". The first is that the applicant creditor must lead evidence showing that an attempt at a plan is indeed doomed to failure (*Philips Manufacturing*; *Sharp-Rite Technologies (Re)* (2000), 94 A.C.W.S. (3d) 421, [2000] B.C.J. No. 135 (QL) (S.C.), at para. 25, affd 19 C.B.R. (4th) 135, 2000 BCCA 402). The second is lower, the applicant only needing to show that there is no reasonable change that any plan would be accepted (citing *Bargain Harold's*). Noting that the first standard would be extremely difficult to demonstrate, especially in the earlier stages of a CCAA proceeding, the court adopted the second standard as the proper one to follow. In *Hickman Equipment (1985) Ltd. (Re)* (2003), 224 Nfld. & P.E.I.R. 62, 5 P.P.S.A.C. (3d) 124 (Nfld. & Lab. S.C.T.D.), the debtor applied for relief under the CCAA. The court granted the relief sought, including an order staying proceedings against the debtor. However, once it became apparent that the debtor would not be able to formulate a scheme of arrangement under the CCAA which would be acceptable to its creditors, the court granted an application by the debtor and a secured creditor which sought to discontinue the stay so that a petition in bankruptcy could be filed. See also *Marine Drive Properties Ltd. (Re)*, 2009 BCSC 145, where the court concluded that a plan of arrangement was doomed to fail, and there was therefore no reason to continue the order. In making this decision, the court considered the petitioner's equity situation, the nature of the petitioner's business, the fact that foreclosure proceedings were currently ongoing to all of the petitioners' developments, and the financing arrangement between the petitioners and their creditors. The petitioner's inability to find financing, the subsequent falling real estate market in British Columbia, and the global credit crunch seriously impacted the petitioners in this case. In addition, many mortgagees were now opposed to any compromise, and a number brought motions to set aside the order.

itself and be independent of any pre-existing condition of the applicant creditor).[136]

3.  The applicant shows necessity for payment (where the creditors' financial problems are created by the order or where the failure to pay the creditor would cause it to close and thus jeopardize the debtor company's existence).[137]

4.  The applicant would be significantly prejudiced by refusal to lift the stay and there would be no resulting prejudice to the debtor company or the positions of the creditors.[138]

---

[136]  In *Alberta-Pacific Terminals Ltd. (Re)* (1991), 8 C.B.R. (3d) 99 (B.C.S.C.), the harbour commission had an operating agreement with Fraser Surrey Docks Ltd. ("FSDL"). FSDL ran into financial difficulties and sought protection under the CCAA. The court ordered a stay of proceedings against the petitioners, prohibiting the commission from taking any steps to terminate the agreement and ordering that any contracts that might give a benefit to any petitioner be maintained. The stay left the management of FSDL a significant area of discretion in the application of its cash flow. The commission applied for an order directing the payment of the amounts that fell due monthly under the operating agreement. Huddart J. stated that it was not appropriate for the court to intervene with management's exercise of its discretion without some reason, such as evidence of hardship to the commission or erosion of its property. As there was no evidence of any hardship to the commission, the court held that FSDL should not be ordered to pay moneys pursuant to the operating agreement pending the termination of the stay.

[137]  In *Quintette Coal Ltd. v. Nippon Steel Corp.* (1990), 80 C.B.R. (N.S.) 98 (B.C.S.C.), an *ex parte* order was made to give the debtor protection from its creditors so that it could prepare a plan. The order provided that the debtor pay off creditors owed less than $200,000 because these creditors might be faced with insolvency if not paid. Unsecured creditors owed more than $200,000 alleged that the order did not maintain the *status quo*. RT Inc. applied to vary the order to allow payment of creditors in financial hardship. The court stated that if RT Inc. would be forced to close without payment, thus jeopardizing the reorganization and existence of the debtor, the doctrine of necessity of payment could come into play. The court concluded, however, that there was no evidence to suggest that RT Inc. would be forced to close without payment. In *EarthFirst Canada Inc. (Re)* (2009), 1 Alta. L.R. (5th) 311 (Q.B.), Earthfirst Canada Inc. ("EarthFirst") was under the protection of an initial order granted under the CCAA, but sought to establish a "hardship fund" that would be used to allow it to pay pre-filing obligations owing to certain suppliers and contractors operating in the community near which it was developing a wind farm project. Having not received payment from EarthFirst in several months, some of these local contractors and suppliers faced immediate financial difficulty, including the inability to fund payroll and purchase critical supplies to continue operations. If some relief was not available, these local operations faced bankruptcy. This could have led to a domino effect, as these businesses were dependant on the continued development of the project, which in turn was dependant on the continued involvement of the suppliers and contractors. The court thus determined that the future benefit to the company of these relatively modest payments of pre-filing debt to protect the project, EarthFirst's primary asset, was considerable and outweighed the prejudice to other creditors.

[138]  In *Algoma Steel Corp. v. Royal Bank of Canada* (1992), 93 D.L.R. (4th) 98, 11 C.B.R. (3d) 11 (C.A.), leave to appeal to S.C.C. refused 59 O.A.C. 326n, 145 N.R. 395n, representatives of a child who had suffered serious injuries when a wheel manufactured by Kelsey-Hayes Canada Ltd. broke away from a truck brought an action against Kelsey-Hayes. In turn, Kelsey-Hayes sought contribution and indemnity from Algoma, the manufacturer of the steel used in the wheel. All proceedings against Algoma were stayed by an order under the CCAA as a plan of arrangement had been approved. Kelsey-Hayes argued that the existence of the plan did not prevent the court from permitting them to sue Algoma. The court stated [at p. 102] that:

  ... generally speaking, the plan of arrangement is consensual and the result of agreement and that if it is fair and reasonable . . . it is not to be interfered with by the court unless: (a) the Act authorizes the court to affect the plan, and (b) there are compelling reasons justifying the court's action. Generally speaking again, the court ought not to interfere where to do so would

5.   It is necessary to permit the applicant to take steps to protect a right which could be lost by the passing of time.[138a]

*[The next page is 3-56.3]*

---

prejudice the interests of the company or the creditors. But where no prejudice would result and the needs of justice are to be met, the court may act if the C.C.A.A., properly interpreted, authorizes intervention.

Subsequently, when determining whether any of the parties would be prejudiced, the court found that several interests would be prejudiced if the leave by the court had the effect of giving potential access to assets over and above the policy limits. The court concluded that only insurance proceeds that might become available to Algoma could be the subject of any recovery against Algoma.

In *Landawn Shopping Centres Ltd. v. Harzena Holdings Ltd.* (1997), 75 A.C.W.S. (3d) 204 (Ont. Ct. (Gen. Div.)), the court applied the test set out in *Algoma* in considering a motion to have the stay under the Plan lifted with respect to claims by a landlord. The court denied the motion, stating that allowing the landlord to pursue its claims would prejudice the interests of other creditors and threaten the continued existence of the Plan itself. Furthermore, the court rejected the landlord's claim that a lifting of the stay was necessary to ensure that the "needs of justice" be met, holding that the landlord's contentions did not have the substance to constitute, and in the words of the Court of Appeal in *Algoma*, "compelling reasons" for the court to interfere in this case. See also *Ivaco Inc. (Re)* (2007), 29 C.B.R. (5th) 145 (Ont. S.C.J.), where the court ordered a lift on the stay of proceedings allowing the Ontario Pension Benefits Guarantee Fund ("PBGF") to make a payment to the fund of the salaried employees of Ivaco. Without the payment and upon the bankruptcy of Ivaco the non-unionized pensioners would have suffered harm because the assets of Ivaco were not sufficient to cover the large unfunded pension liability. The court allowed the lift reasoning that the payment by the PBGF to the fund of the salaried employees would never form any part of Ivaco's estate. The payment could not affect the validity or quantum of any claim by Ivaco's creditors. In *Humber Valley Resort Corp. (Re)* (2008), 280 Nfld. & P.E.I.R. 268 (N.L.S.C. (T.D.)), the court refused to lift a stay for M Inc., which held capital leases on the debtor's equipment. The court concluded that, when lifting a stay, a court must strike a balance between the prejudice to the creditor if the stay is not lifted and the prejudice to the debtor and other creditors if the stay is lifted. In this case, the court was not satisfied that the prejudice to M Inc. would substantially outweigh the prejudice to the debtor. In addition, the court was also not satisfied that M Inc. used its best efforts in its own interest or in the interest of the debtor when marketing the equipment.

138a   In *Scaffold Connection Corp. (Re)* (2000), 15 C.B.R. (4th) 289, [2000] 7 W.W.R. 516 (Alta. Q.B.), a motion by two creditor companies was made to have a mechanics lien registered against the debtor company *nunc pro tunc*. The creditor companies argued that their claim would be prejudiced, as the limitation period in the *Mechanics' Liens Act*, R.S.N.B. 1973, c. M-6, would expire before the stay was concluded. After reviewing the different ways in which limitation periods are dealt with in the context of an insolvency statute stay, the court held that the limitation period was "postponed" and only resumed once the stay was concluded. The court pointed to the wording of the actual stay order to find that the limitation period was extended by a period of time equal to the duration of the stay of proceedings and any further order of the court. In *PSInet Ltd.*

6.   After the lapse of a significant time period, the insolvent is no closer to a
proposal than at the commencement of the stay period.[139]

---

*(Re)* (2002), 33 C.B.R. (4th) 284, [2002] O.J. No. 1156 (QL) (S.C.J. (Comm. List)), a parent
company thought it was an unsecured creditor in the assets of its subsidiary. The parent company
later realized it held a security interest in the assets but the period of perfection had lapsed. The
parent company tried to reperfect it under s. 30(6) of the PPSA. The court lifted the stay granted
under the CCAA and allowed the parent company to reperfect its interest. The parent company re-
established priority over the unsecured creditors even though it was previously unaware that it held
a security interest and had been negligent in letting the original registration expire. In *Ivaco (Re)*
(2003), 1 C.B.R. (5th) 204 (Ont. S.C.J.), an insurance financier sought an order lifting the stay of
proceedings imposed under the CCAA. The insurance financier had provided insurance premium
financing to Ivaco and wanted to realize on its security by cancelling the insurance policy and
retaining the premiums refunded by the insurance company. The insurance financier argued that its
security was being depleted with the passage of time. The court refused to lift the stay. It was held
that the insurance premium financing contract was an unsecured pre-filing obligation which would
be dealt with under the Plan. Granting permission to the insurance financier to recover the unearned
premiums would have given the insurance financier priority over secured and unsecured creditors.
See also *Stelco Inc. (Re)* (2005), 253 D.L.R. (4th) 524 (Ont. C.A.), revg 49 C.B.R. (4th) 283
(S.C.J.), where the insurance financier moved for the same relief it had sought in *Ivaco*. Stelco had
been given protection from creditors under the CCAA. Once again, the insurance financier sought
an order lifting the stay of proceedings imposed under the CCAA because the insurance financier
had provided insurance premium financing to Stelco and wanted to realize on its security — the
*unearned insurance premium*. The court refused to lift the stay of proceedings. To lift the stay of
proceedings and allow the insurance financier to cancel the insurance contract and collect the
unearned premiums would be to give the insurance financier an inappropriate advantage over other
unsecured and secured creditors. Cafo appealed this decision. On Appeal, the Court of Appeal did
not revisit this issue. Rather, the court focused on whether in substance unearned premiums are
exempted from the scope of the PPSA. In holding that unearned premiums are exempt, the court
noted that values of certainty, uniformity, and ease of commerce are promoted if the unearned
insurance premiums are outside the scope of the PPSA. The court refused to determine the effect if
any on the priority between Cafo and other secured creditors and added that such matters awaited
resolution another day using the general BIA or common law principles. Stelco had recently
obtained protection from creditors under the CCAA. Once again, the insurance financier sought an
order lifting the stay of proceedings imposed under the CCAA because the insurance financier had
provided insurance premium financing to Stelco and wanted to realize on its security — the
unearned insurance premiums. The court refused to lift the stay of proceedings. To lift the stay of
proceedings and .allow the insurance financier to cancel the insurance contract and collect the
unearned premiums would be to give the insurance financier an inappropriate advantage over other
unsecured and secured creditors. In *JTI-MacDonald Corp. (Re)* (2004), 5 C.B.R. (5th) 76 (Ont.
S.C.J.), a stay was immediately lifted for the limited purpose of issuing a petition in bankruptcy
within the five-year limitation period. Nearly identical facts are found in *Ascent Ltd. (Re)* (2006),
18 C.B.R. (5th) 269 (Ont. S.C.J.), in which an order had been made while the bankrupt was in
Notice of Intention proceedings, to hold for an insurance financier a reserve of cash as the
equivalent of a wasting asset in the form of an insurance premium instalment contract, pending the
outcome of the decision in *Stelco Inc. (Re)*. When the bankrupt failed to set aside the funds, the
insurance premium continued to be paid and the secured interest wasted away, forcing the financier
to bring an application appealing the denial of the proof of claim for a property interest in the funds
that were to be set aside, on the basis of unjust enrichment of the bankrupt. The court held that the
bankrupt was unjustly enriched, and imposed a remedial constructive trust over assets of the
bankrupt in the amount of the prior court order not complied with, to prevent injustice to
commercial morality.

139  In *Timber Lodge Ltd. v. Timber Lodge Ltd. (Creditors of)* (1992), 17 C.B.R. (3d) 126, 104 Nfld.
& P.E.I.R. 104 (P.E.I.S.C.), the court lifted the stay to permit the creditors to take whatever action
they deemed necessary, because the company was no closer to making a plausible proposal than it
had been when it originally applied for the stay. In *Air Canada (Re)* (2003), 121 A.C.W.S. (3d)
994, [2003] O.J. No. 1158 (QL) (S.C.J. (Comm. List)), the applicant made an *ex parte* application
for CCAA protection and ancillary relief. In granting the relief sought, the court noted that the

7. There is a real risk that a creditor's loan will become unsecured during the stay period.[139a]

8. It is necessary to allow the applicant to perfect a right that existed prior to the commencement of the stay period.[139b]

9. It is in the interests of justice to do so.[139c]

**3.3455**   A stay will be granted where it is not contrary to the purpose of the CCAA. The CCAA attempts to strike a compromise between an insolvent debtor company and its creditors, to the end that the company is able to continue in business. The court will lift a stay of proceedings where it

application was a product of intense, virtually round-the-clock work over a period of a few days. As a result, the application would contain some glitches, which would have to be thought through. The court accepted the application nonetheless and encouraged the parties involved to make appropriate use of a comeback clause to demonstrate to the court that the relief sought was warranted, with or without amendment.

139a *Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 1 C.B.R. (3d) 101, 1 O.R. (3d) 289 *sub nom. Elan Corp. v. Comiskey* (C.A.); *Rio Nevada Energy Inc. (Re)* (2000), 102 A.C.W.S. (3d) 18, [2000] A.J. No. 1596 (QL) (Q.B.).

139b In *PSInet Ltd., supra,* footnote 138a, a motion was brought by a creditor company to have a stay lifted to allow a lapsed registration of the creditor company's GSA to be re-registered under the *Personal Property Security Act,* R.S.O. 1990, c. P.10 ("PPSA"). The court held that despite the creditor company's lack of knowledge for a lengthy period of its perfected and subsequent lapsed registration it should not be prevented from re-registering and lifted the stay for that purpose. However, the court imposed certain conditions as a prerequisite to that permission pursuant to its discretionary CCAA jurisdiction. The creditor company was held responsible for all parties' costs related to their request to re-register. Finally, the court suggested that the creditor, as the owner of the debtor company, should compensate other creditors affected by the creditor company's unawareness of the lapse of registration of their interest. See also *TRG Services Inc. (Re)* (2006), 26 C.B.R. (5th) 203 (Ont. S.C.J.), in which C, a creditor with a security interest that had attached but was unperfected, sought the lifting of a stay of CCAA proceedings in order to register and perfect its security interest, to take priority over unsecured creditors. C filed for proof of claim nearly six months after the initial CCAA order which had included a come-back clause asking all creditors to apply for an amendment to the order within seven days of issuance of same. The court held that since C held a valid security interest, it had the discretion to lift the stay order to permit the creditor to register and perfect its security interest. The court held that through negative inference, the PPSA implies that a holder of a security interest has priority over an unsecured creditor of the debtor. Only if the security interest is unperfected and the competing creditor has seized the collateral is this priority lost. The court acknowledged that a ruling according secured creditor status to the holder of a deliberately unregistered and unperfected security interest would create enormous uncertainty in the CCAA process and would lead to many potential inequities. Where any prejudice was incurred by the other creditors who had made reorganization efforts, the court allowed the creditors to ask C to bear reasonable expenses associated to its delay in perfection.

139c In *360networks inc. (Re)* (2003), 45 C.B.R. (4th) 151, [2003] B.C.J. No. 1553 (QL) (S.C.), the court held that it was in the interests of justice to lift the stay of proceedings and allow a party to file a petition and abridge the notice requirements for the hearing of that petition. This allowed the party's petition to be heard at the same time as its appeal of a notice of disallowance regarding a claim for the purposes of the plan of arrangement. The court concluded that the extent of the party's unsecured claim for the purposes of the restructuring plan may depend on the outcome of the petition's claims. The court also concluded that there was a possibility of inconsistent findings if the claims were determined on separate occasions and, as a result, these inconsistent holdings could produce an injustice to one of the parties. This paragraph was cited with approval in *Canadian Airlines Corp. (Re)* (2000), 19 C.B.R. (4th) 1 (Alta. Q.B.). Also, in *Humber Valley Resort Corp. (Re)* (2008), 280 Nfld. & P.E.I.R. 268 (N.L.S.C. (T.D.)), the court referred to this paragraph as cited in *Canadian Airlines Corp.* with approval.

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
## SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

## BOOK OF AUTHORITIES OF GENBAND US LLC

## VOLUME II OF II

STIKEMAN ELLIOTT LLP
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada  M5L 1B9

Sean F. Dunphy LSUC#: 24941J
Tel: (416) 869-5662
Alexander D. Rose  LSUC#: 49415P
Tel: (416) 869-5261
Erica Tait  LSUC#: 55996O
Tel: (416) 869-6805
Fax: (416) 947-0866

Lawyers for the Moving Party,
Genband US LLC