## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
:
*In re*                                      :      Chapter 11
:
Nortel Networks Inc., *et al.*,[1]          :      Case No. 09-10138 (KG)
:
                  Debtors.    :      Jointly Administered
:
                                       :      **Hearing date: January 12, 2011 9:30 a.m. (ET)**
                                       :      **Objections due: January 5, 2011 4:00 p.m. (ET)**

--------------------------------------------------------- X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO FUND CERTAIN SUBSIDIARY AND AFFILIATE WIND-DOWN COSTS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b), 363(c)(1), 503(b)(1) and 507(a)(8) and 541 of title 11 of the United States Code (the "Bankruptcy Code") (i) authorizing the Debtors to advance or expend funds to their non-debtor subsidiaries and foreign branch offices or for their benefit, as necessary to facilitate the wind-down of the subsidiaries and foreign offices pursuant to local law; and (ii) granting such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors respectfully represent as follows:

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a)(8) and 541 of the Bankruptcy Code.

**Background**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

_____

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Arrangement Act (Canada) (the "CCAA), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court. Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators"). Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.     On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales. Since then, Nortel has sold many of its business units and assets to various purchasers. Efforts continue to be made with respect to the realization of value from Nortel's remaining assets. For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

### Facts Relevant to this Motion

7.     As discussed in the Debtors' Motion for Entry of an Order Authorizing the Debtors to Make Certain Transfers and Provide Financial Support to their Non-Debtor Subsidiaries [D.I. 994] (the "Financial Support Motion"), from time to time prior to the Petition Date certain Nortel affiliates, including NNI and NN CALA, funded intercompany loans and

---

[4]     The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

made certain capital contributions to their subsidiaries on an as-needed basis to fund working capital in the course of business. Financial Support Motion ¶ 10. The Court's order granting the Financial Support Motion (the "Financial Support Order") authorized the Debtors to make loans or capital contributions to one or more of their subsidiaries in their discretion to "maintain or improve the subsidiaries' working capital positions" up to an aggregate post-petition amount of up to $2 million.[5] Financial Support Motion ¶ 12. The Court granted similar relief in its Order Approving the Debtors' Motion for an Order Authorizing Payment of Prepetition Obligations to Certain Foreign Vendors [D.I. 71] (the "Foreign Vendors Order"), which permits satisfaction of prepetition debts to foreign creditors, including foreign tax authorities, incurred by certain of the Debtors' branch offices, subject to certain enumerated caps.

8.      As of the date hereof, the Debtors have 16 remaining non-debtor subsidiaries (the "Non-Debtor Subsidiaries") and approximately five branch offices registered under the laws of foreign jurisdictions (the "Branch Offices" and, together with the Non-Debtor Subsidiaries, the "Foreign Offices"), all of which the Debtors expect ultimately will be liquidated or dissolved pursuant to local law.[6] Because the Debtors' operations in the Foreign Offices are being wound down, the Foreign Offices' potential need for working capital has been replaced by a possible need for funding to pay for their liquidation processes. While the Debtors are still in the process of determining the full extent of the liabilities incurred by Foreign Offices and the local assets available to satisfy those obligations, they have completed sufficient diligence to conclude that at least certain of the Foreign Offices  have limited or no assets and cannot efficiently dissolve

---

[5]      As of the date hereof, the Debtors have provided less than $1 million to their Non-Debtor Subsidiaries pursuant to the Financial Support Order, but propose that all support provided by the Debtors to their Non-Debtor Subsidiaries subsequent to the granting of this Motion shall be pursuant to the terms and caps set forth in the order granting this Motion rather than the Financial Support Order.

[6]      The Debtors have been informed that with respect to their Branch Offices, certain local foreign laws may require the Branch Office to pay all of its creditors or obtain creditor consent to the assignment of debts to the U.S. corporate books before the Branch Office can be deregistered by the local authorities.

unless certain funds are advanced or transferred to pay for the costs of liquidation, including local counsel fees, auditing expenses, and minor third party debts.   In most cases, these costs are not anticipated to exceed $100,000 per entity.

9.    In addition to the liquidation costs, a number of the Foreign Offices may have obligations to local tax authorities that are either outstanding from prior accounting periods or that may be incurred during the course of dissolution, such as through cancellation of debts to or rights to payment from the parent entity.   The amounts of these tax obligations cannot be precisely determined until final accounts are prepared and the relevant local tax authorities have completed whatever audits they require.  In at least two jurisdictions, however, they are expected to be substantial.

10.    In particular, NN CALA estimates that its Puerto Rico Branch Office currently owes the Puerto Rico taxing authorities approximately $1 million in unpaid taxes.  In 2008, NN CALA prepared and submitted financial statements through 2004 to the local authorities, at which point NN CALA claimed that it was entitled to a tax refund of over $2 million.  This refund was never paid, and NN CALA delayed submission of additional statements pending approval of the 2001-2004 statements.  In January 2010, NN CALA prepared a reconciliation statement that incorporated income, sales and use taxes through 2009.   According to NN CALA's current records, the tax refund credit has been exhausted and NN CALA is now indebted to the Puerto Rico taxing authorities.

11.    The Debtors also estimate that their two offices in Trinidad & Tobago, the NN CALA branch office (the "T&T Branch Office") and NN CALA's subsidiary, Nortel Networks Trinidad & Tobago Ltd. ("NTTL"), together owe over $3 million in outstanding VAT and corporate taxes to the local taxing authorities.   Although the T&T Branch Office ceased

operations in 2009, the Debtors estimate that it owes $2,027,128[7] for value added taxes ("VAT") incurred in the prepetition period from November 2006 through July 2009 (the "NN CALA Tax Obligations").[8] In addition, in May, 2006, NN CALA formed NTTL to perform certain of NN CALA's contracts in Trinidad & Tobago. The Debtors estimate that between 2007 and 2009 NTTL incurred, but did not pay, corporate, VAT and other local tax obligations that currently total approximately $1,226,231[9] (the "NTTL Tax Obligations" and, together with the NN CALA Tax Obligations, the "T&T Tax Obligations").[10] There are insufficient funds at either entity available to meet the expected outstanding tax obligations and, pursuant to Trinidad & Tobago law, they may not conclude their wind-up processes until they have satisfied these debts and received tax clearance certificates from the Trinidad & Tobago taxing authorities.

12. Satisfaction of the T&T Tax Obligations will also resolve certain Nortel intercompany disputes. For administrative convenience, payments under certain agreements between the T&T Branch Office and Telecommunications Services of Trinidad & Tobago were historically made to a Canadian Debtor, NNIC, rather than directly to NN CALA. NNIC is currently holding approximately $7.1 million in such payments, which they have agreed to release to NN CALA when the T&T Tax Obligations have been fulfilled.

---

[7]    VAT tax obligations incurred subsequent to the date on which NN CALA commenced its chapter 11 case will be paid in the ordinary course of the Debtors' business and are not within the scope of this Motion. All amounts calculated herein are in U.S. dollars at the September 2010 month-end rate. Actual payment may vary slightly, as returns are filed in local currency.

[8]    Because, for purposes of the relevant Trinidad & Tobago tax statutes, NN CALA did not have a fixed place of business in Trinidad & Tobago during the relevant periods, NN CALA has been advised that it must pay VAT taxes but is not subject to corporate or other income taxes.

[9]    This sum includes income tax of $1,155,691, $7,540 in a local tax called the "Green Fund Levy", and approximately $63,000 in VAT.

[10]    These estimates are based upon NN CALA and NTTL's books and records and remain subject to final approval from the Trinidad & Tobago taxing authorities.

**Relief Requested**

13.     By this Motion, the Debtors seek entry of an order authorizing the Debtors to make loans or capital contributions to one or more of their Foreign Offices sufficient to fund Foreign Offices' reasonable liquidation costs, including payment of outstanding local tax obligations (collectively, the "Wind-Down Costs"), from time to time in their business judgment in an aggregate post-petition amount not to exceed $8 million.  To the extent this relief is granted, the Debtors would not use the remaining authority granted through the approval of the Financial Support Motion to expend funds for these purposes.

14.     Prior to executing any payment, transfer, intercompany loan or equity infusion that would result in outstanding post-petition payments of Wind-Down Costs in excess of $100,000 being extended to or on behalf of a specific Foreign Office, the Debtors will (i) file with the Court a notice disclosing the amount and nature of the Wind-Down Cost payment and (ii) provide counsel to the Committee and the U.S. Trustee at least five (5) business days prior written notice of the proposed disbursement for Wind-Down Costs (including by electronic mail), including the amount and nature of Wind-Down Costs to be paid, along with any relevant statement documenting the Wind-Down Costs, if available.  If the Committee or the U.S. Trustee provides the Debtors' counsel with a written objection (including by electronic mail) to payment of such Wind-Down costs within that five (5) business day period, then to the extent such objection cannot be resolved, the Debtors will seek Court approval, including on an expedited basis if necessary, prior to making the proposed payment of Wind-Down Costs.

15.     If the Wind-Down Costs are not paid, the Debtors expect that there is a substantial risk that the relevant local authorities will not permit the timely wind-down of Nortel's operations in that jurisdiction.  In particular, if such obligations are not met the foreign

authorities may seek to: (i) impose civil penalties against the Foreign Office or attempt to attach or seize their local assets, including bank accounts, notwithstanding the automatic stay imposed by section 362(a) of the Bankruptcy Code (for Branch Offices); (ii) initiate audits of Nortel's operations in that jurisdiction, which would impose additional costs on the Debtors' estates and impose unnecessary delays on the administration of the Debtors' Chapter 11 cases; or (iii) attempt to hold current or former officers and directors personally liable for unpaid obligations, which could distract key employees from their duties related to the Debtors' restructuring or result in other secondary costs or distraction for the Debtors.

16.    Additional delay in satisfying the Wind-Down Costs also may result in imposition of penalties and accrual of interest that would be avoided by prompt satisfaction of these obligations. The government of Trinidad & Tobago, for example, has recently announced a tax amnesty for penalties and interest on outstanding tax liabilities for all tax years up to 2009 if outstanding tax obligations are paid by May 31, 2011. Taking advantage of this temporary amnesty could reduce the total amount of the Trinidad & Tobago tax obligations by more than $1.2 million, a potentially significant savings to those entities.

17.    Payment of the costs of each entity as proposed in this Motion will enable each of the Foreign Offices to expeditiously complete their wind-down processes and avoid potential delays of the Debtors' emergence from chapter 11 and distribution of payment to their creditors.

**Basis for Relief**

18.    The Debtors submit that the relief requested herein is reasonable and necessary under the circumstances and justified by applicable law.

A.      **Payment of the Non-Debtor Subsidiary Wind-Down Costs**

19.     Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a), which codifies the inherent equitable powers of a bankruptcy court, empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

20.     Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C.  § 363.  The use or transfer of estate property under this provision must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071).  In addition, a Debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange.  See In re

<u>Decora Industries, Inc.</u>, 2002 WL 32332749, at *2; <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. at 176.

21.    In the Debtors' business judgment, payment of the Non-Debtor Subsidiary Wind-Down Costs constitutes a proper and beneficial use of their assets under 363 of the Bankruptcy Code, consistent with ordinary course business practices prior to the Petition Date.[11]    As discussed herein, payment of the Wind-Down Costs will facilitate the orderly wind-down of the Debtors' operations in each of the relevant jurisdictions and will preclude any litigation regarding shareholder or director and officer liability for the unpaid obligations.

**B.    Payment of the Branch Office Wind-Down Costs**

22.    Under section 105(a) of the Bankruptcy Code, courts may permit pre-plan payments of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

23.    The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated by the <u>United States Supreme Court in Miltenberger v. Logansport</u>, C. & S. W. R. Co., 106 U.S. 286 (1882).    The Third Circuit recognized the "necessity of payment" doctrine in <u>In re Lehigh & New England Railway Co.</u>, 657 F.2d 570, 581 (3d Cir. 1981). ), in which it held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.    <u>Id.</u> (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will

---

[11]    While the Debtors seek authority to make such transfers under section 363(b)(1) of the Bankruptcy Code, they submit that such transfers would arguably constitute ordinary course payments authorized under section 363(c) of the Bankruptcy Code. <u>In re Nellson Nutraceutical, Inc.</u>, 369 B.R. 787, 797 (Bankr. D. Del. 2007) ("[I]f the Court determines that a transaction is in the ordinary course of a debtor's business, the Court will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code."); <u>In re Roth American, Inc.</u>, 975 F.2d 949, 952 (3d Cir. 1992) ("The framework of section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary.").

employ an immediate economic sanction, failing such payment"). See also In re Just for Feet, Inc., 242 B.R. 821, 824-26 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

24.    Today, the rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 Collier on Bankruptcy § 105.04[5][a] (15th ed. rev. 2004) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

11

25.     Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is unquestionably empowered to grant the relief requested herein.  As discussed above, the foreign authorities may take drastic action if they are not paid, including an assertion that they are not subject to the jurisdiction of this Court and, as such, not subject to the automatic stay provisions of 11 U.S.C. § 362(a).

26.     It is also possible that the taxing authorities could attempt to assert that certain of the Debtors' current or former directors and officers are personally liable if the Debtors fail to meet their obligations even if the failure to timely pay the Branch Office obligations was not a result of any malfeasance on their part.  Such potential litigation would distract the Debtors and the named directors and officers, from the substantial efforts required to bring these cases to a prompt resolution, causing the Debtors' estates immediate and irreparable harm.  See In re Calpine Corp., 365 B.R. 401, 410 (S.D.N.Y. 2007) (holding that potential for distractions to employees constitutes "imminent irreparable harm" if they would impact the restructuring process).

27.     Bankruptcy courts routinely grant authorization for chapter 11 debtors to pay claims owing to foreign entities, including taxing authorities, against which the automatic stay cannot be readily enforced in the United States and as to which it would be unduly time-consuming and expensive to seek to enforce an order of the bankruptcy court in the creditor's home country.  See, e.g., In re Nortel Networks Inc., No. 09-10138 (KG) (Bankr. D. Del. Jan. 16, 2009) [D.I. 71]; In re Delta Air Lines, Inc., No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005); In re Northwest Airlines Corp., No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005); In re US Airways Group, Inc., No. 02-83983 (SSM) (Bankr. E.D. Va. Aug. 12, 2002); In re WorldCom, Inc., No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 22, 2002 and Aug. 13, 2002); In re

Global Crossing Ltd., Nos. 02-40187 through 02-40241 (REG) (Bankr. S.D.N.Y. Jan. 28, 2002); In re Kmart Corp., No. 02-02474 (SPS) (Bankr. N.D. Ill. Jan. 25, 2002); In re Enron Corp., No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 4, 2001).

28.     Similarly, this Court has regularly authorized debtors to pay prepetition claims of certain creditors, including taxing authorities.  See, e.g., In re Nortel Networks, Inc., No. 09-10138 (KG) (Bankr. D. Del. Jan. 15, 2009) [D.I. 48]; In re ACG Holdings, Inc., No. 08-114467 (CSS) (Bankr. D. Del. July 15, 2008); In re Progressive Molded Products, Inc., No. 08-11253 (KJC) (Bankr. D. Del. June 20, 2008); In re Wickes Holdings, LLC, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 3, 2008); In re Pope & Talbot, Inc., No. 07-11738 (CSS) (Bankr. D. Del. Nov. 19, 2007); In re American Home Mortgage Holdings, Inc., No. 07-11047 (CSS) (Bankr. D. Del. Aug. 6, 2007).  The Debtors submit that the present circumstances warrant similar relief.

29.     Nothing contained herein is intended or should be construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds or assert any counterclaims or affirmative defenses; (iii) a promise to pay any claim; or (iv) an implication or admission that any particular claim would constitute an obligation of the Debtors.

### Notice

30.     Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

31.     Except to the extent referenced in this Motion, no prior request for the relief sought herein has been made to this or any other court.

13

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  December 22, 2010
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Alissa T. Gazze (No. 5338)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*