# EXHIBIT A

Court File No. 09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### SUPPLEMENTAL FIFTY-EIGHTH REPORT OF THE MONITOR DATED JANUARY 13, 2011

## PURPOSE

1.  The purpose of this Supplemental Fifty-Eighth Report of the Monitor (the "Supplemental Fifty-Eighth Report") is to provide further information to this Honourable Court in light of the objections raised by the Joint Administrators to the EMEA Claims Procedure Order sought by the Applicants in their motion returnable January 14, 2011.

## TERMS OF REFERENCE

2.  In preparing this Supplemental Fifty-Eighth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on such information contained in this Supplemental Fifty-Eighth Report.

3.  Capitalized terms not defined in this Supplemental Fifty-Eighth Report are as defined in the Affidavit of John Doolittle dated January 14, 2009, the Pre-Filing Report or the Fifty-Eighth Report of the Monitor dated December 22, 2010 (the "Fifty-Eighth Report").

## THE INAPPLICABILITY OF THE IFSA TO EMEA CLAIMS

4.    At the time of negotiating and entering into the stalking-horse sale agreement for the first significant global Nortel sale transaction (the CDMA transaction), NNL, NNI, the Joint Administrators and certain other Nortel parties entered into the Interim Funding and Settlement Agreement on June 9, 2009 (the "IFSA"). The IFSA struck two key bargains with respect to global sale transactions, namely that no Nortel party would make agreement on an allocation of sale proceeds a pre-condition to entering into a binding sale agreement, and that the sale proceeds from the various Nortel global sale transactions would be held in escrow pending agreement as to their allocation or, failing such agreement, determination by the relevant dispute resolver(s) under the terms of an allocation protocol to be agreed to among the parties. The IFSA does not address inter-company claims other than to memorialize the settlement of certain post-filing transfer pricing matters.

5.    The Joint Administrators have suggested that EMEA Claims must be resolved in accordance with the allocation protocol for global sale proceeds contemplated by Section 12.c. of the IFSA. Section 12.c. of the IFSA provides as follows:

> Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on *a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions* (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation. [emphasis added]

The proposed EMEA Claims Procedure Order does not concern "the allocation of Sale Proceeds from Sale Transactions", but rather a process for the calling and resolution of claims that may be advanced by the EMEA Debtors against the Applicants. Such a process is a normal and required step in any CCAA proceeding. Although the Monitor acknowledges that certain matters relevant to sale proceeds allocation (e.g. Nortel's transfer pricing regime) may also be relevant in the context of certain of the claims likely to be advanced by the EMEA Debtors, the process for resolving sale proceeds allocation,

on the one hand, and the process for determination of claims against the Applicants, on the other, are separate matters and, absent a negotiated global settlement, any claims advanced against the Applicants will only be resolved by way of a claims process approved by this Honourable Court.

## THE MEDIATION, THE PROPOSED EMEA CLAIMS PROCEDURE ORDER AND THE IMPORTANCE OF RESOLVING THE EMEA CLAIMS

6.  As noted at paragraph 18 of the Fifty-Eighth Report, a voluntary non-binding mediation process is currently underway through which various Nortel global entities are attempting to negotiate a comprehensive settlement to resolve all material inter-estate matters. The Joint Administrators have suggested that the calling for EMEA Claims will "subvert" this mediation process. As the mediation is directed towards resolving all inter-estate matters, it by necessity encompasses both the allocation of sale proceeds and the settlement of inter-company claims. However, while the Monitor and the Applicants are prepared to attempt to resolve both the allocation issue and inter-company claims consensually, they have never agreed that inter-company claims against the Applicants would be resolved other than through a claims process approved by this Honourable Court or otherwise derogated from this Honourable Court's exclusive jurisdiction to determine claims against the Applicants. Further, as reported at paragraph 18 of the Fifty-Eighth Report, absent reaching a comprehensive settlement of allocation and claims issues, the Monitor is of the view that EMEA Claims need to be resolved first.

7.  As is evident from the Affidavit of John Haydn Whiteoak sworn December 13, 2010 (the "Whiteoak Affidavit"), filed by the Joint Administrators in connection with the EMEA Tolling Order granted by this Honourable Court on December 20, 2010, the Joint Administrators have had significant time to consider potential EMEA Claims. As outlined in the Whiteoak Affidavit, a copy of which (without exhibits) is attached as Appendix "A" hereto, the EMEA Claims against the Applicants may include allegations that Nortel's transfer pricing regime or other pre-filing intercompany transactions were flawed or improper, that the EMEA Debtors have trust or proprietary claims in relation to Nortel's intellectual property, that the Applicants breached fiduciary duties owed to the EMEA Debtors, and that the Applicants have liability in relation to NNUK's pension scheme. Based on this description, it is clear that the EMEA Claims will be significant and that

- 4 -

their resolution, whether through a negotiated settlement in connection with the ongoing mediation, or through the proposed EMEA claims process, is a fundamental prerequisite to being able to advance the administration of these CCAA proceedings toward the ultimate goal of the development of a Plan.

8. With respect to the mediation, the Monitor is of the view that the timely resolution of EMEA Claims in accordance with the proposed EMEA Claims Procedure Order will facilitate rather than hinder that process insofar as it will provide the parties with a process to resolve such claims and, ultimately, a binding resolution of those claims. In the absence of such a process being imposed, the parties are likely to have divergent views as to the legitimacy and value of the EMEA Claims. Accordingly, the implementation of a process for the resolution of the EMEA Claims will assist the parties in attempting to reach a negotiated global resolution on all inter-estate matters.

9. With respect to these CCAA proceedings more generally, there is the possibility that, despite the best intentions of the parties, a negotiated settlement may not be reached. In light of that possibility, it is imperative that the Applicants be permitted to implement the proposed EMEA claims process now and proceed on a "dual-track" basis given the likely significance of the EMEA Claims to these CCAA proceedings. Accordingly, the Monitor is of the view that the proposed EMEA claims process should be implemented now both to facilitate the mediation efforts underway and, in any event, to ensure that these CCAA proceedings can move forward in a timely fashion.

## MONITOR'S RECOMMENDATION

10. In light of the foregoing, the Monitor reiterates its recommendation contained in the Fifty-Eighth Report that this Honourable Court grant the EMEA Claims Procedure Order as proposed by the Applicants.

- 5 -

All of which is respectfully submitted this 13th day of January, 2011.


**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants
and not in its personal capacity


Per:

Murray A. McDonald
President


\5928574

# APPENDIX "A"

## [ATTACHED]

30

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

### AFFIDAVIT OF JOHN HAYDN WHITEOAK
### (SWORN DECEMBER 13, 2010)

I, John Haydn Whiteoak, of London, England, **MAKE OATH AND SAY**:

1.         Alan Robert Bloom, Stephen John Harris, Christopher John Wilkinson Hill and Alan Michael Hudson are the court appointed administrators and authorized foreign representatives of Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in the region known as EMEA (Europe, Middle East and Africa) and as listed in Schedule "A" hereto (together the "**EMEA Debtors**"), save in respect of Nortel Networks (Ireland) Limited ("**Nortel Ireland**")

- 2 -

where David Martin Hughes, of Ernst & Young Chartered Accountants and Alan Robert Bloom were appointed administrators and authorized foreign representatives. I will refer to them collectively in this Affidavit as the "Joint Administrators". Where I use this term in relation to Nortel Ireland, I am referring to Alan Robert Bloom and David Hughes.

2.        I am a partner with Herbert Smith LLP, solicitors for the Joint Administrators to the EMEA Debtors and as such I have knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

3.        I swear this Affidavit in support of a motion to: (a) toll any and all limitation periods under Canadian Law, English Law, Irish Law and or any other applicable law with respect to Inter-Company Claims which any of the EMEA Debtors and Joint Administrators have against any one or more of the Nortel Canadian CCAA Debtors and their present, past and future directors and officers (as defined below); and (b) lift the stay of proceedings provided for in the Initial Order (as defined below) in order to permit the EMEA Debtors and Joint Administrators to:

(a)      issue a claim form in the High Court of Justice of England and Wales (the **"English Court"**) against one or more of the Nortel Canadian CCAA Debtors  and their present or past directors and

- 3 -

officers so as to preserve certain Inter-Company Claims (as defined below) (the "English Claim Form"); and

(b)     issue a Summons in the High Court in Ireland (the "Irish Court") against one or more of the Nortel Canadian CCAA Debtors  and their present or past directors and officers so as to preserve certain Inter-Company Claims (as defined below) (the "Irish Summons").

4.          This Motion is procedural in nature and is aimed to protect the EMEA Debtors and prevent them from suffering prejudice resulting from expiration of any relevant limitation periods in respect of the Inter-Company Claims.  The EMEA Debtors and the Joint Administrators wish to ensure that, irrespective of the forum in which the Inter-Company Claims are finally resolved, there can be no argument that limitation periods under English Law, Irish Law or any other applicable law have expired.

5.          Other than issue the English Claim Form and the Irish Summons the EMEA Debtors and the Joint Administrators do not intend to take any further steps in respect of the pursuit of the  Inter-Company Claims in those proceedings as against any one or more of the Nortel Canadian CCAA Debtors and their present, past and future directors and officers without further reference to this Court, including but not limited to serving the English Claim Form and the Irish Summons upon any of the Nortel Canadian CCAA Debtors and their present, past and future directors and officers.

- 4 -

6.          The Joint Administrators and the EMEA Debtors therefore seek the permission of this Court to the lifting of the stay for the limited purpose of allowing them to issue the English Claim Form and the Irish Summons so as to preserve the limitation periods in respect of certain of the Inter-Company Claims.

7.          References to "Nortel" herein are references to the global enterprise as a whole.

## Background

8.          The Joint Administrators were appointed in respect of the EMEA Debtors, pursuant to Administration Orders (the "**UK Administration Orders**") granted by the High Court of Justice of England and Wales (the "**UK Court**") on 14 January 2009 (the "**Filing Date**") pursuant to the provisions of the *Insolvency Act 1986* (UK) (collectively, the "**UK Proceeding**").   The UK Administration Orders remain in full force and effect and are not subject to any appeal or motions to vary or set aside.

9.          A significant issue in the administration of the EMEA Debtors involves determining and valuing the inter-company claims between and among the EMEA Debtors and the Canadian Nortel debtors who filed for and obtained protection under the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36 (the "CCAA") pursuant to an order of this Court made on the Filing Date (the "**Nortel Canada CCAA Proceedings**").   The Canadian Nortel debtors are: Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**"), Nortel Technology Corporation ("**NTC**"), Nortel Networks International Corporation

34

- 5 -

("**NIC**") and Nortel Networks Global Corporation (collectively, the "**Nortel Canada CCAA Debtors**").

10.        Nortel has sold substantially all of its operating businesses in the course of insolvency proceedings in Canada, England and also the United States.  The proceeds are being held in escrow pending determination of how they are to be allocated among the Nortel companies.  To date various efforts have failed to resolve the allocation of these sale proceeds, and also to settle various statutory, contract and tort inter-company claims.

11.        The Amended and Restated Claims Procedure Order dated July 30, 2009 and issued by this court on October 7, 2009 (the "**Claims Procedure Order**") does not pertain to certain inter-company claims as described in paragraph 3(t)(ii) of the Claims Procedure Order (the "**Inter-Company Claims**"). A copy of the Claims Procedure Order is attached hereto as Exhibit "**A**".

12.        To date, no claims procedure as been initiated in respect of the Inter-Company Claims.

13.        The EMEA Debtors desire to preserve any rights, claims and causes of action they may have against the Nortel Canada CCAA Debtors and their former, current or future directors or officers, and to avoid any prejudice that may arise from any delay in asserting any such rights, claims or causes of action. They wish to ensure that English Law, Irish Law and any other applicable law causes of action are preserved so that such causes of action can be relied upon

- 6 -

for the purposes of resolving the Inter-Company Claims, irrespective of the forum in which such Inter-Company Claims may ultimately be resolved.

14.      The Claims Procedure Order or any other Order made in these proceedings does not provide for the tolling of any limitation periods.

### The Need for a Tolling Order

15.      The EMEA Debtors are concerned that, due to the delay in resolving Inter-Company Claims (through the current consensual and mediation process) and the stay that prohibits commencing claims outside of the CCAA process, applicable limitation periods under Canadian Law, English Law, Irish Law and or any other applicable law governing certain of the various statutory, contractual, tort and other claims they have against the Nortel Canada CCAA Debtors and their former, current or future directors or officers will expire and thereby preclude such Inter-Company Claims from being advanced at a later date.

16.      In general, the limitation periods relevant to the Inter-Company Claims are 6 year limitation periods running from the relevant breach or damage as appropriate (although in respect of certain of the claims the EMEA Debtors and Joint Administrators will argue that there is no such limitation, and the EMEA Debtors also reserve the right to contend more generally for a longer or different limitation period). The limitation issues to which the Inter-Company Claims give rise are, however, complex, not least because of the multi-jurisdictional aspects of the Nortel insolvency.   It is not therefore possible to say with complete

36

- 7 -

certainty that the relevant limitation periods in respect of certain claims will expire by 22 December 2010 (six years from the date on which various Nortel Companies entered into the MRDA (as defined below)), but the EMEA Debtors and the Joint Administrators wish to avoid any debate on the issue and therefore desire to preserve all of their rights in respect of such Inter-Company Claims without any question.

17.        Further, the course of action proposed by the EMEA Debtors and the Joint Administrators in simply issuing the English Claim Form and the Irish Summons would cause no prejudice to the Nortel Canada CCAA Debtors and their former, current or future directors or officers.

18.        Accordingly, the EMEA Debtors are seeking an order of this Court to confirm that that status quo as of the Filing Date is preserved in connection with the Inter-Company Claims such that any and all statutes of limitations or other notice or limitation periods in connection with any Inter-Company Claims against the Nortel Canada CCAA Debtors and their former, current or future directors or officers ceased to continue running as of the Filing Date and, for greater certainty, that all time elapsed since the Filing Date shall not be counted in determining such time periods.

**The Need to Lift the Stay**

19.        The Initial Order approved by this Court on the Filing Date, as amended and restated to date (the "**Initial Order**") includes at paragraphs 14 and 15 a stay of proceedings and the commencement of proceedings against the

*37*

- 8 -

Nortel Canada CCAA Debtors and their former, current or future directors and officers.  A copy of the Initial Order is attached hereto as Exhibit "B".

20.        The EMEA Debtors and the Joint Administrators may be precluded from relying upon certain English Law and/or Irish Law causes of action against certain of the  Nortel Canada CCAA Debtors and their former, current or future directors and officers if they do not file the English Claim Form and the Irish Summons before December 22, 2010.

*The English procedure*

21.        In order to commence a claim in the English Court the EMEA Debtors would need to file the English Claim Form with the English Court and request that the claim form be issued.

22.        The effect of the English Claim Form being issued would be that any limitation periods applicable to the claims set out in the Claim Form would cease to run.

23.        Having issued the English Claim Form the EMEA Debtors would have

(a)        four months in which to serve the claim form against any defendants within the jurisdiction and;

(b)        six months in which to serve the claim form (in accordance with Section IV of the Civil Procedure Rules applicable in England (the "CPR")) against any defendants outside the jurisdiction.

- 9 -

24.      The EMEA Debtors and the Joint Administrators would not be able to continue the proceedings against any of the Nortel Canada CCAA Debtors or their former, current or future directors without serving the English Claim Form.

25.      I understand that the EMEA Debtors and the Joint Administrators do not intend to serve the English Claim Form on any of the Nortel Canada CCAA Debtors or their former, current or future directors during the above periods without further order of this Court.

26.      There are two methods by which the EMEA Debtors and the Joint Administrators could extend the validity period of the Claim Form:

    (a)      First, the Joint Administrators could agree to an extension with the Nortel Canada CCAA Debtors and their former or current directors (effectively a stay of proceedings);

    (b)      Second, there is a jurisdiction under Rule 7.6 of the CPR whereby, the Court can, in an appropriate case, extend the validity period of the English Claim Form.

27.      In the absence of an agreement to extend time from the Nortel Canada CCAA Debtors or their former, current or future directors the EMEA debtors and the Joint Administrators would not serve the English Claim Form upon any of the Nortel Canada CCAA Debtors or their former, current or future directors without further leave form this Court.

- 10 -

28.          As a result of the above, none of the Nortel Canada CCAA Debtors or their former, current or future directors would be required to submit any form of defence to the claims set out in the English Claim Form until a time which they agreed (as envisaged in paragraph 26 above) or until such further action is permitted by this Court.

*The Irish procedure*

29.          I understand from Irish Counsel that the procedure for the issue of the Irish Summons would be as follows.  Irish Counsel has reviewed this section of my affidavit and confirms that it is an accurate reflection of the relevant procedure.

30.          In order to commence a claim in the Irish Court the EMEA Debtors would need to file the Irish Summons with the Irish Court and request that the Summons be issued.

31.          The effect of the Irish Summons being issued would be that any limitation periods applicable to the claims set out in the Summons would cease to run.

32.          Having issued the Irish Summons the EMEA Debtors would have twelve months in which to serve the Irish Summons against any defendants.

33.          The EMEA Debtors and the Joint Administrators would not be able to continue the proceedings against any of the Nortel Canada CCAA Debtors or their former, current or future directors without serving the Irish Summons.

*40*

- 11 -

34.        I understand that the EMEA Debtors and the Joint Administrators do not intend to serve the Irish Summons on any of the Nortel Canada CCAA Debtors or their former, current or future directors during the above periods without further order of this Court.

35.        The EMEA Debtors and the Joint Administrators could renew the Irish Summons by applying ex parte to the Irish Court for a further six month period to execute service of the Irish Summons.

36.        As a result of the above, none of the Nortel Canada CCAA Debtors or their former, current or future directors would be required to submit any form of defence to the claims set out in the Irish Summons until such further action is permitted by this Court.

*The Claims*

37.        The pressing limitation issues discussed in this Affidavit only apply to certain of the Inter-Company Claims of NNUK and NN Ireland (or certain aspects of such Intercompany Claims).  Many of NNUK and NN Ireland's Inter-Company Claims (or aspects of those claims) do not give rise to pressing limitation issues, although such claims are not the subject of this Application.

38.        The Inter-Company Claims which are affected (either in whole or in part) by pressing potential limitation issues include those set out below in paragraphs 39 to 49.  Paragraphs 39 to 49 set out my understanding of the claims and allegations that the EMEA Administrators intend to make and bring

41

- 12 -

against NNI on behalf of NNUK and NN Ireland in the English Claim Form and the Irish Summons respectively.

(a) *The MRDA, Ownership of IP and Transfer Pricing*

39.        NNUK and NN Ireland are parties with NNL, NNI and other Nortel entities to a Master R&D Agreement (the "**MRDA**"), which NNUK and NN Ireland entered into on December 22, 2004. Pursuant to the MRDA, NNUK, NN Ireland and Nortel Networks SA ("**NNSA**") (amongst others) contributed to R&D activity which generated intellectual and other property to which NNL had legal title (albeit it is alleged that NNUK, NNSA and NN Ireland, as contributing entities, remained interested beneficially). Under the MRDA, transfer pricing adjustments were to be made between the parties ostensibly to reflect the value of their contribution on an arms-length basis. It is alleged by NNUK and NN Ireland that the transfer pricing adjustments made from December 2004 onwards did not reflect the value of NNUK, NNSA and NN Ireland's contributions on an arms-length basis. It will be alleged that the effect of the operation of the MRDA was to transfer value improperly from NNUK, NNSA and NN Ireland to NNL and/or NNI, in particular.

40.        NNUK, NNSA and NN Ireland intend to claim that intellectual property assets to which NNUK, NNSA and NN Ireland have contributed and/or their proceeds are held by NNL and/or NNI, for NNUK, NNSA and NN Ireland beneficially, to the extent of NNUK's, NNSA's and NN Ireland's respective contributions (whether pursuant to the provisions of the MRDA or by reason of a constructive alternatively resulting trust in respect of the same, and/or by reason

42

- 13 -

of proprietary estoppel), together with consequential relief as identified further below.

41.        Further or alternatively, NNUK, NNSA and NN Ireland intend to claim that the MRDA, and alternative transactions thereunder, were entered into in alleged breach of the fiduciary duties owed to NNUK, NNSA and NN Ireland by their respective directors, which is alleged to include NNL and/or NNC and/or NNI, as de facto directors, and/or certain of their past and present officers and directors.  On these premises, it will be alleged that the assets transferred by NNUK, NNSA and NN Ireland and/or received by NNL and/or NNI and/or NNC ostensibly under the MRDA were transferred in breach of fiduciary duty to the knowledge of NNL and/or NNI and/or NNC and/or certain of their past and present officers and directors and were, and are (together with their proceeds), held by NNL and/or NNI and/or NNC in constructive trust for NNUK, NNSA and NN Ireland.  Further or alternatively, NNUK, NNSA and NN Ireland intend to claim damages for all such alleged breaches of duty.

42.        Alternatively, NNUK, NNSA and NN Ireland intend to claim equitable damages and/or an account of profits from NNL and/or NNI and/or NNC for any alleged dishonest assistance and/or participation in such alleged breaches of duty.

43.        In the further alternative, NNUK, NNSA and NN Ireland intend to seek a monetary adjustment from NNI and NNL to reflect the full value of NNUK's and NN Ireland's respective contributions on an arms-length basis.

- 14 -

*(b) Intercompany Loans*

44.          Commencing in December 2003 I understand that NNUK provided NNL with a series of interest-free unsecured loans, which were extended and/or renewed annually (collectively, the "**Intercompany Loans**").  It will be alleged that the Intercompany Loans were contrary to the interests of NNUK, which it will be alleged was at all material times in a financially vulnerable condition, and were entered into in alleged breach of the fiduciary duties owed to NNUK by its directors, which is alleged to include NNL and/or NNC and/or NNI, as de facto directors, and/or certain of its past and present officers and directors.

45.          NNUK intends to claim that the Intercompany Loans and/or their proceeds are held by NNL in constructive trust for NNUK.

46.          Further or alternatively, NNUK intends to claim damages for alleged breach of duty from NNL and/or NNC and/or NNI, as alleged de facto directors, and/or certain of its past and present officers and directors.

47.          In the further alternative, NNUK intends to claim equitable damages and/or an account of profits from NNL and/or NNC and/or NNI for any alleged dishonest assistance and/or participation in such alleged breaches of duty.

*(c) Pension Funding Claims*

48.          In so far as value was being transferred away from NNUK to other Nortel entities, NNUK intends to claim that the directors of NNUK, which is alleged to include NNL and/or NNC and/or NNI, as alleged de facto directors,

44

- 15 -

failed, in alleged breach of their duties to NNUK, to ensure that appropriate provision was made to meet the liabilities of the NNUK pension plan, leading to a funding deficit of up to £2,100,000,000 (the "**Pension Funding Claims**").

49.        NNUK intends to claim damages and other relief in respect of such alleged breaches, including indemnification (or contribution) in respect of any liability to the UK Pensions Regulator in respect of the matters currently the subject of a Warning Notice.

### (d) Limitation Periods in Respect of the Intercompany Claims

50.        Although certain aspects of the above claims do not give rise to limitation issues, others do so.    To the extent that the above claims are concerned with alleged breaches of contract, or duty (including fiduciary duty), or dishonest participation the limitation period in respect of such claims potentially runs for 6 years from the relevant event.

51.        In respect of claims arising in connection with the MRDA and other transfer pricing agreements, such event could, at the earliest, be the entry into the MRDA on December 22, 2004.  In respect of the Intercompany Loans, this period could run from the point in time at which the relevant loans (or tranches of such loans) were advanced.   In respect of the Pension Funding Claims, the limitation period could have run from the point in time at which the failure to fund the pension plan occurred.

### Conclusion

45

- 16 -

52.        Nortel Canada CCAA Debtors and their former, current or future directors and officers will not be prejudiced at all by the filing of the English Claim Form or the Irish Summons because they will not be required, without further leave of his Court, to respond or expend any resources in dealing with such writs.

53.        The EMEA Debtors and the Joint Administrators will be materially and unduly prejudiced if they are not permitted to file the English Claim Form and the Irish Summons as a failure to file same before December 22, 2010 will preclude them from ever pursuing certain of those claims and, therefore as explained above, their substantive rights in connection with advancing such claims may be extinguished without due cause.

54.        The EMEA Debtor and the Joint Administrators do not want to be or be seen to be taking an action which this Court may later consider to have been in breach of the stay provisions contained in the Initial Order.


SWORN BEFORE ME at _London_

on December 13, 2010

_____
Commissioner for taking affidavits

_____
John Haydn Whiteoak

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**SUPPLEMENTAL FIFTY-EIGHTH REPORT**
**OF THE MONITOR**
**DATED JANUARY 13, 2011**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.