## IN THE UNITED STATES BANKRUTPCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NORTEL NETWORKS, INC., et al.,[1]<br><br>Debtors. | Case No. 09-10138 (KG)<br>(Jointly Administered)<br><br>Chapter 11<br><br>**Hearing Date: January 27, 2011 @ 9:30 AM**<br>**Objection Deadline: January 20, 2011 @ 4:00 PM** |

## RESPONSE AND OBJECTION OF AUTOMOTIVE RENTALS, INC., TO MOTION OF NORTEL NETWORKS INC.'S, MOTION FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST AUTOMOTIVE RENTALS. INC.

Automotive Rentals, Inc. ("ARI"), through its attorneys, Archer and Greiner, hereby responds and objects to Motion of Nortel Networks Inc.'s ("Nortel"), Motion for Entry of an Order Enforcing the Automatic Stay against Automotive Rentals. Inc. (the "Motion") as follows:

### STATEMENT OF FACTS

1.     ARI is engaged in the business of the leasing of motor vehicles and providing fleet management and maintenance services to business entities throughout the United States and North America.  Nortel has been a customer of ARI for many years dating back to 1993.

2.     Effective January 15, 1993 ARI entered into a Vehicle Lease Agreement with Nortel Networks, Inc., successor by change of name to Northern Telecom, Inc. ("Nortel") (the "Lease").  A copy of the Lease and it various amendments is attached to the Motion as Exhibit "A" to the Izzard Declaration, Exhibit "D" to the Motion.

---

[1] In addition to Nortel Networks, Inc. ("NNI"), the Debtors in the Chapter 11 cases are:  Nortel Networks Capital corporation, Nortel Altsystems, Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc. ("NN CALA").  Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://dm.epiq11.com/nortel.

3.      Over these years ARI has leased approximately 3,500 vehicles to Nortel of which approximately 750 existed as of the Petition Date.  Under the Lease, ARI has provided all fleet services to Nortel which include, gas, repairs, insurance repairs, titling, registration, filing and payment of personal property taxes and literally all other services (collectively the "Fleet Management Charges") relating to maintaining the Nortel vehicle fleet.

4.      The Lease provides that ARI would lease to Nortel new vehicles as may be ordered by Nortel.  The vehicles remain owned by and titled and/or registered in the name of ARI throughout the term of the Lease.  Nortel had no right or option to purchase any of the vehicles at any time except for the fair market value of the vehicle.  (Exhibit "A" to the Izzard Declaration, Exhibit "D" to the Motion, hereinafter referred to as Las Exhibit "A" to the Izzard Declaration, Exhibit "D" to the Motion hereinafter referred to as "Lease", Art. 1.1).

5.      The Lease required Nortel to pay a monthly rental fee for the use of each vehicle leased from ARI during the term of the lease for each such vehicle.  The monthly rental fee for each vehicle is computed by multiplying the vehicle's Capitalized Value by an applicable percentage and includes the addition of an interest factor plus a monthly administrative fee for each vehicle.

6.      Nortel is also obligated under the Lease to reimburse ARI for other various costs, including the cost of state and local inspections, license tags, plates and certificates of title, recording fees and registration and similar compliance required by state law with respect to the vehicles. (Lease, Art. 7.1).  Nortel is also required to service and maintain each vehicle in good repair.  (Lease, Art.15.1).  These amounts were invoiced to Nortel as part of the Fleet Management Charges.

2

7.    The Lease provides that the Lessee may at any time after the initial lease term terminate a lease with respect to any vehicle and retire the vehicle from service without replacement by giving ARI written notice to that effect and identifying the vehicle to be retired and when and where it will be surrendered to ARI.  The Lease with respect to such vehicle terminates upon surrender of the vehicle.  (Lease, Art. 9.1)

8.    Article 12 of the Lease provides that if any leased vehicle terminated prior to the expiration of the depreciation period, Nortel is obligated to pay to ARI the Depreciated Value of the vehicle.  The Depreciated Value is defined as the Capitalized Value of the vehicle less the Total Depreciation Reserve paid by Nortel.  The Total Depreciation Reserve for each vehicle is an amount computed by multiplying the number of months for which a monthly rental fee was paid by Lessee by the Capitalized Value for such vehicle and again by the monthly depreciation percentage applicable for the Depreciation Period for each such vehicle.  (Lease, Art.12.3).  The Depreciated Value for each vehicle is reduced when Lease payments are made.

9.    The Lease provides upon termination or expiration of the lease for each vehicle, ARI is obligated to use its best efforts to sell the vehicle at the highest possible price and in the most economical fashion then available.  The Lease as originally executed provided that ARI would remit to Nortel the excess of the Net Resale Proceeds over the Depreciated Value.  In the event that the Net Resale Proceeds are less than the Depreciated Value, then Nortel would have been obligated to remit the amount of any such deficiency to ARI.  In arriving at Net Resale Proceeds, ARI is entitled to further deduct all costs of sale including repairs and replacements necessary to market the vehicle.

10.     In Amendment No. 4 to the Lease, Article 12 was modified to provide guaranteed resale amounts to Nortel under certain circumstances and to provide that any excess of Net Resale Proceeds over Depreciated Value would be remitted to Nortel only as a rental adjustment.

11.     During the term of the Lease, ARI provided monthly invoices to Nortel broken down by divisions or departments as requested by Nortel that detailed the monthly charges due under the Lease for vehicle rent and Fleet Maintenance Charges.  Pre petition, all of these invoices were paid when due except for the invoices dated in December, 2008 and January, 2009 in the amounts of $294,336.23 for which ARI has filed a proof of claim.[2]

### The Contractual Dispute

12.     Nortel asserts in its Motion that it has terminated the Lease with respect to its leased vehicles and returned them to ARI.  Under the terms of the Lease, ARI has sold the vehicles and generated what Nortel asserts are excess sales proceeds over the Depreciated Value of the vehicles in the aggregate amount of $484,699.58 (the "Disposition Proceeds").

13.     Based upon the assertions in the Motion, Nortel appears to be taking the position that the Lease has either terminated or expired without being assumed or rejected.  Nortel contends that ARI is now obligated to remit the Disposition Proceeds to Nortel and that ARI's refusal to agree with Nortel's interpretation of the Lease constitutes a violation of the automatic stay.[3]  ARI's position is that the Lease remains in default as of the Petition Date, just as if the Lease was rejected.  Nortel effectively terminated the Lease by returning all the vehicles and

---

[2] Certain Fleet Management Charges applicable to the pre-petition period were included in invoices dated after the Petition Date since the charges were not received by ARI until after the Petition Date.  The prepetition amounts of these invoices were not paid by Nortel post-petition and are included in the ARI proof of claim.
[3] What Nortel has essentially asserted is a claim for the recovery of money from ARI in the form of a motion.  A claim for the recovery of money or property in these circumstances is a claim that can only be asserted as an adversary proceeding.  Federal Rule of Bankruptcy Procedure 7001.

ARI has no further performance obligations under the Lease, including the obligation to provide future rental credits.

### ARI Has Not Performed any Set Off of any Pre-petition Debt

14.    During the pendency of Nortel's Chapter 11 case, ARI has continued to provide all services required of it under the Lease, and Nortel has paid for these services. Nortel has neither assumed nor rejected the Lease. Despite Nortel's contentions to the contrary, ARI has not set off any amount which would be due to Nortel against any amount due to ARI. ARI's contractual position is that as of this moment, Nortel is in default of its obligations under the Lease as of the Petition Date and as a result is not due from ARI any amount resulting from the disposition of the leased vehicles. Even if an amount was due, it is due only as a future rental credit.

15.    ARI has nevertheless provided to Nortel reports of the sales of the vehicles. These reports have been computed as if all Lease payments have been made to ARI in order to arrive at the Depreciated Value for each vehicle which was deducted from the sales proceeds to arrive at the Net Sales Proceeds which was reported to Nortel. Since Nortel did not pay all Lease payments due to ARI, the Depreciated Value used for these computations is understated because it assumes that Nortel made payments which it did not. ARI has specifically not set off any amounts due from Nortel to adjust the Depreciated Value upward to account for the unpaid payments due under the Lease which were not made pre-petition. As a result, ARI has provided Nortel reports of credits which are over stated by approximately the amount of ARI's pre-petition claim, precisely because ARI has not performed any set off.

16.    On October 4, 2010, the same day that Nortel claims it provided notice to ARI of its alleged stay violation, Nortel filed a preference action (Adversary Proceeding No. 10-531676)

in which Nortel seeks to recover payments to ARI under the Lease in the amount of

$1,507,454.38 (the "Preference Action"). While ARI has asserted defenses to the Preference

Action, according to Nortel, the Preference Action raises the virtual certainty that ARI will be

obligated to return a substantial portion of the Lease payments. Assuming that Nortel is only one

third correct in its assessment of the viability of the Preference Action, ARI's return of Lease

payments in even the amount of $550,000 would also cause the actual Depreciated Value to

further increase. The potential effect is that the actual Depreciated Value would increase to such

a level that the Disposition Proceeds would become negative resulting in a loss on the sale of the

vehicles and no credits being due under any circumstances to Nortel.

17.    In its motion in footnote 4, Nortel argues that the amount of ARI's obligation to

remit the Disposition Proceeds is fixed when the vehicle is sold. This argument ignores the

Amendment No. 4 to the Lease which provides that any excess is only provided as a rental

credit. Nortel having elected to terminate the Lease by returning all the vehicles or to allow it to

expire, there is no future rental due against which to apply the credits, even if Nortel is

contractually entitled to them which ARI asserts it is not.

18.    As importantly, this argument ignores that the Depreciated Value is a function of

the Total Depreciation Reserve which is defined as a function of Lease payments actually paid

by Nortel. Taken to its illogical extreme, Nortel's position is that upon the sale of a vehicle,

Nortel is entitled to immediate payment of the difference between the Net Sales Proceeds and the

Depreciated Value calculated as if all Lease payments were made, regardless of whether Nortel

ever made any payment and the Total Depreciation Reserve was zero.

19.    Mr. Moyer has a different recollection of his conversation with Mr. Taylor

regarding the credits that Nortel claims that it is entitled to as well as the issue of the amounts

due from the Nortel's Canadian affiliate.  Mr. Moyer has never contended that Nortel was not

ultimately entitled to the credits, but rather that the credits that were being reported were over

stated for the reasons that are set forth above and could not be determined until ARI knew what

the payments on the Lease would ultimately turn out to be.  ARI has consistently told Nortel that

the amount of the Depreciate Value used to calculate the Disposition Proceeds is under stated

precisely because ARI has not set off the unpaid prepetition amounts due under the Lease to

reduce the Depreciation Reserve. (Moyer Declaration attached as Exhibit "A", ¶¶ 15-18)

20.     Despite Nortel's attempt to characterize this issue as a refusal to pay an agreed

upon claim, ARI has disputed both its obligation to pay the amount claimed and advised Nortel

that a determination of the amount is premature.

### The Relief Sought by Nortel Is Only Available in an Adversary Proceeding.

21.     What Nortel seeks to compel through this motion is recovery on what is a dispute

under a contract.  Under Rule 7001 of the Federal Rules of Bankruptcy Procedure a proceeding

to recover money or property other than a proceeding to compel the debtor to deliver property to

the trustee is an adversary proceeding.  Rule 7001 sets forth matters that may only be resolved

through an "adversary proceeding. *SLW Capital, LLC v. Janica Mansaray-Ruffin (In re Janica*

*Mansaray-Ruffin* , 530 F.3d 230, 234 (3d. Cir. 2008); *In re DBSI, Inc.*, 432 B.R, 126, 134

(Bankr.D.Del. 2010)(Rule 7001 require that a proceeding to recover money or for declaratory

relief be filed as an adversary proceeding); *In re WorldCORP, Inc.*, 252 B.R. 890, 895

(Bankr.D.Del. 2000)(Rule 7001 designates ten types of actions which must be brought as

adversary proceedings in bankruptcy cases. As relevant to the instant case, Rule 7001(1) and (7)

state that an adversary proceeding must be filed "(1) [to] recover money or property ...).

7

22.     ARI submits that if Nortel believes that it is contractually entitled to be paid the

Disposition Proceeds, and that these amounts must be paid without ARI first being able to

determine what the actual Depreciation Reserve is to accurately calculate the Disposition

Proceeds, then Nortel's remedy is to file an adversary proceeding as required by Rule 7001.

**ARI Is Entitled to Recoup any Amounts Due to ARI from Nortel.**

23.     The automatic stay prevents a creditor from setting off a prepetition obligation

from a debtor against a post-petition obligation owed to the debtor.  The exercise of the right of

recoupment, however, is not prevented by the automatic stay.  The Third Circuit articulated the

doctrine of recoupment as:

> The common law doctrine of recoupment provides an exception to
> setoff in bankruptcy cases. Recoupment "is the setting up of a
> demand arising from the same transaction as the plaintiff's claim or
> cause of action, strictly for the purpose of abatement or reduction of
> such claim.".... This doctrine is justified on the grounds that "where
> the creditor's claim against the debtor arises from the same
> transaction as the debtor's claim, it is essentially a defense to the
> debtor's claim against the creditor rather than a mutual obligation,
> and application of the limitations on setoff in bankruptcy would be
> inequitable." *Lee*, 739 F.2d at 875. Thus, so long as the creditor's
> claim arises out of the identical transaction as the debtor's, that claim
> may be offset against the debt owed to the debtor, without concern
> for the limitations put on the doctrine of setoff by Code section 553.

*In re University Medical Center*, 973 F.2d 1965, 1079-80 (3d Cir. 1992); *In re Communications*

*Dynamics, Inc.*, 382 B.R. 219, 236 (Bankr.D.Del. 2008); *In re Trans World Airlines, Inc.*, 275

B.R. 712, 720 (Bankr.D.Del. 2002).

24.     Recoupment is available as a defense to a lessor or creditor against claims

asserted by a debtor in commercial relationships such as the one between ARI and Nortel.  *In re*

*Flagstaff Realty Associates*, 60 F.3d 1031(3d Cir. 1995)(Tenant can recoup unreimbursed pre-

petition repairs from future rent due to debtor on rejected lease.); *In re HQ Global Holdings*,

*Inc.*, 290 B.R. 78 (Bankr.D.Del. 2003)(Subtenant could recoup unreimbursed pre-petition improvement allowance from post-petition rents owed to debtor *In re Communications Dynamics, Inc*, 300 B.R. 220 ((Bankr.D.Del. 2003)(Where single agreement between parties contemplates multiple sales of equipment, recoupment available to net debits and credits from the sale of multiples pieces of equipment.); *In re Trans World Airlines, Inc.*, 275 B.R. 712, 720 (Bankr.D.Del. 2002)(Claim for royalty payments under a credit card agreement subject to defense of recoupment for damages from violation of exclusivity and confidentiality agreement); *In re R&C Petroleum, Inc.*, 247 B.R, 203 (Bankr.E.D.Tex. 2000)(Pipeline entitled to recoup pre-petition credit against post-petition debit for gas delivered by Debtor into pipeline); *In re Buttes Gas and Oil*, 72 B.R, 236 (Bankr.S.D.Tex.1987)(Well operator can recoup unpaid pre-petition costs and expenses against post-petition amounts owed to debtor.).

25.    The relationship between ARI and Nortel is governed by a single master agreement, the Lease. Billings were generally submitted to Nortel on a consolidated basis in integrated single monthly invoices detailing the Lease charges and Fleet Maintenance Charges on a vehicle by vehicle basis.[4] As explained above under the Lease, the Disposition Proceeds are accurately determinable only after the ARI determines what has actually been paid by Nortel and retained by ARI. In short, the Disposition Proceeds, positive or negative, are the final sum remaining at the conclusion of this transaction, either in the aggregate or with respect to each vehicle. ARI submits that this is the classic relationship where a creditor is entitled to the defense of recoupment and that the utilization of that defense does not constitute a violation of the automatic stay.

## CONCLUSION

26.    The relief requested by Nortel should be denied for any number of reasons.  First

Nortel seeks to hide what is a contractual dispute under the cloak of a claim of violation of the

automatic stay.  It is not a violation of the automatic stay to disagree with Nortel as to what is

due on the Lease.  Nortel's claim for recovery of money should be brought as an adversary

proceeding.  Second, because ARI has not set off any amounts due to it in the calculation of the

Disposition Proceeds of the vehicles, the amounts reported to Nortel are over-stated.  The gross

amount to which Nortel claims it is entitled is not yet even determinable and depends on what

amounts ARI may actually recover on its claims and the outcome of the Preference Action.  Any

demand for ARI to pay Nortel anything is premature.  Third, ARI is entitled to recoup any

amounts owed to ARI from any amounts owed to Nortel.

WHEREFORE, for the reasons set forth above, ARI respectfully requests that the Motion

be denied.

Dated:  January 20, 2011

By: /s/ John V. Fiorella
     John V. Fiorella (DE No. 4330)
     Jennifer L. Story (DE No. 4918)
     ARCHER & GREINER
     A Professional Corporation
     300 Delaware Avenue, Suite 1370
     Wilmington, DE  19801
     Telephone:  302-777-4350
     Facsimile:  302-777-4352
     Email:  jfiorella@archerlaw.com
     Email:  jstory@archerlaw.com
     *Counsel for Defendant*

6331342v1

---

[4] Some invoices were broken out in by separate divisions as designated and requested by Nortel.  For example, one "division" was maintained for vehicles that had been in accidents and were being repaired.  Regardless, Nortel paid the invoices for all the division.