# EXHIBIT "A"

**IN THE UNITED STATES BANKRUTPCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Case No. 09-10138 (KG)<br>(Jointly Administered) |
| NORTEL NETWORKS, INC., et al.,[1] | |
| Debtors. | Chapter 11 |
| | Hearing Date:  January 27, 2011 @ 9:30 AM<br>Objection Deadline:  January 20, 2011 @ 4:00 PM |

**DECLARATION OF RICHARD E. MOYER IN SUPPPORT OF RESPONSE AND
OBJECTION OF AUTOMOTIVE RENTALS, INC., TO MOTION OF NORTEL
NETWORKS INC.'S, MOTION FOR ENTRY OF AN ORDER ENFORCING THE
AUTOMATIC STAY AGAINST AUTOMOTIVE RENTALS. INC.**

I Richard E. Moyer declare as follow:

1.      I am employed by Automotive Rentals, Inc. ("ARI"), as Credit & Litigation

Supervisor.  In this position I am responsible for the administration of Leases and lease

relationships where the lessee has filed a Bankruptcy Proceeding.

2.      ARI is engaged of the business of the leasing of fleets of motor vehicles and

providing fleet management and maintenance services to business entities throughout the United

States and North America.

3.      Effective January 15, 1993, ARI entered into a Vehicle Lease Agreement with

Nortel Networks, Inc., successor by change of name to Northern Telecom, Inc. ("Nortel") (the

---

[1] In addition to Nortel Networks, Inc. ("NNI"), the Debtors in the Chapter 11 cases are:  Nortel Networks Capital corporation, Nortel Altsystems, Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc. ("NN CALA").  Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://dm.epiq11.com/nortel.

"Lease").  A copy of the Lease and it various amendments is attached to the Motion as Exhibit "A" to the Izzard Declaration, Exhibit "D" to the Motion.

4.    Over these years ARI has leased approximately 3,500 vehicles to Nortel of which approximately 750 existed as of the Petition Date.  Under the Lease, ARI has provided or managed all fleet services for Nortel which include, gas, repairs, insurance repairs, titling, registration, filing and payment of personal property taxes and literally all other fleet related services (collectively the "Fleet Management Charges") relating to maintaining the Nortel vehicle fleet.

5.    The Lease provides that ARI will lease to Nortel new vehicles as may be ordered by Nortel.  The vehicles remain owned by and titled and/or registered in the name of ARI throughout the term of the Lease.  Nortel had no right or option to purchase any of the vehicles at any time except for the fair market value of the vehicle.  (Lease, Art. 1.1).

6.    The Lease requires Nortel to pay a monthly rental fee and the Fleet Management Charges for the use of each vehicle leased from ARI during the term of the lease for each such vehicle.  The monthly rental fee for each vehicle is computed by multiplying the vehicle's Capitalized Value by an applicable percentage and includes the addition of an interest factor plus a monthly administrative fee for each vehicle.

7.    Nortel is also obligated under the Lease to reimburse ARI for other various costs, including the cost of state and local inspections, license tags, plates and certificates of title, recording fees and registration and similar compliance required by state law with respect to the vehicles.  (Lease, Art. 7.1).  Nortel is also required to service and maintain each vehicle in good repair.  (Lease, Art.15.1).  These amounts were invoiced to Nortel as part of the Fleet Management Charges.

2

8.      The Lease provides that the Lessee may at any time after the initial lease term terminate a lease with respect to any vehicle and retire the vehicle from service without replacement by giving ARI written notice to that effect and identifying the vehicle to be retired and when and where it will be surrendered to ARI. The Lease with respect to such vehicle terminates upon surrender of the vehicle. (Lease, Art. 9.1).

9.      Article 12 of the Lease provides that if any leased vehicle terminated prior to the expiration of the depreciation period, Nortel is obligated to pay to ARI the Depreciated Value of the vehicle. The Depreciated Value is defined as the Capitalized Value of the vehicle less the Total Depreciation Reserve paid by Nortel. The Total Depreciation Reserve for each vehicle is an amount computed by multiplying the number of months for which a monthly rental fee was paid by Lessee by the Capitalized Value for such vehicle and again by the monthly depreciation percentage applicable for the Depreciation Period for each such vehicle. (Lease, Art.12.3). This formula results in the Depreciated Value for each vehicle being reduced when Lease payments are made.

10.      The Lease provides upon termination or expiration of the lease for each vehicle, ARI is obligated to use its best efforts to sell the vehicle at the highest possible price and in the most economical fashion then available. The Lease as originally executed provided that ARI would remit to Nortel the excess of the Net Resale Proceeds over the Depreciated Value. In the event that the Net Resale Proceeds are less than the Depreciated Value, then Nortel would have been obligated to remit the amount of any such deficiency to ARI. In arriving at Net Resale Proceeds, ARI is entitled to further deduct all costs of sale including repairs and replacements necessary to market the vehicle.

3

11.     In Amendment No. 4 to the Lease, Article 12 was modified to provide guaranteed resale amounts to Nortel under certain circumstances and to provide that any excess of Net Resale Proceeds over Depreciated Value would be remitted to Nortel only as a rental adjustment.

12.     During the term of the Lease, ARI provided monthly invoices to Nortel broken down by divisions or departments as requested by Nortel that detailed the monthly charges due under the Lease for vehicle rent and Fleet Maintenance Charges.  Pre petition, all of these invoices were paid when due expect for the invoices dated in December, 2008 and January, 2009 in the amounts of $294,336.23 for which ARI has filed a proof of claim.[2]

13.     During the pendency of Nortel's Chapter 11 case, ARI has continued to provide all services required of it under the Lease, and Nortel has paid for these services.  Nortel has neither assumed nor rejected the Lease.  Despite Nortel's contentions to the contrary, ARI has not set off any amount which would be due to Nortel against any amount due to ARI.  ARI's contractual position is that as of this moment, Nortel is in default of its obligations under the Lease as of the Petition Date and as a result is not due from ARI any amount resulting from the disposition of the leased vehicles.  Even if an amount was due, it is due only as a future rental credit.

14.     ARI has nevertheless provided to Nortel reports of the sales of the vehicles. These reports have been computed as if all Lease payments have been made to ARI in order to arrive at the Depreciated Value for each vehicle which was deducted from the sales proceeds to arrive at the amount reported to Nortel.  Since Nortel did not pay all Lease payments due to ARI, the Depreciated Value used for these computations is understated because it assumes that Nortel made payments which it did not.  ARI has specifically not set off any amounts due from Nortel

---

[2] Certain Fleet Management Charges applicable to the pre-petition period were included in invoices dated after the Petition Date since the charges were not received by ARI until after the Petition Date.  The pre-petition amounts of these invoices were not paid by Nortel post-petition and are included in the ARI proof of claim.

to adjust the Depreciated Value upward to account for the unpaid payments due under the Lease which were not made pre-petition. As a result, ARI has provided Nortel reports of credits which are over stated by approximately the amount of ARI's pre-petition claim, precisely because ARI has not performed any set off.

15.    I have spoken to Mark Taylor on at least the occasions that he refers to in his Declaration. He is correct that ARI has declined to pay to Nortel what he terms are amounts due to Nortel from the sale of the various vehicles returned to ARI under the Lease. I did also tell him the reasons that for ARI's refusal.

16.    I advised him that when the ARI sells a vehicle the calculation presumes that all Lease payments have been made. Precisely because ARI is not permitted to perform any set off of pre-petition amounts due to ARI, these calculations were not adjusted to reflect that amounts due to ARI so that the proceeds from the sale of the vehicles were calculated as if all pre-petition payments had, in fact, been made. I told him that in the event that ARI decided to waive its contractual position that these sales proceeds were not payable in the event that the Lease was in default, these calculations were nevertheless over-stated and that they would have to be adjusted later.

17.    I also advised Mr. Taylor, that it is ARI's position that ARI is entitled to recoup the amounts due to ARI against these proceeds. In my conversation with Mr. Taylor, I likely did not express precisely the difference between the concepts of recoupment and set off, but only that ARI believes that the Depreciated Value of the vehicle that is deducted from the actual Net Sales Proceeds should reflect the amounts actually paid to ARI for the vehicle under the Lease, the effect of which is ARI is entitled to deduct the amounts owed to it under the Lease from any amounts ultimately calculated as due to Nortel.

5

18.     When I spoke to Mr. Taylor, I was in error in my understanding that the vehicles supplied in Canada were the obligation of Nortel.  I did not focus on Amendment No. 1 to the Lease which provided that vehicles ordered from the Canadian affiliate were not the obligations of Nortel.  Since there was only one Lease, I assumed that Nortel remained obligated under the Lease for all the vehicles subject to the Lease including those vehicles ordered by Nortel's Canadian affiliate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: ___January 18, 2011___

_____

Richard E. Moyer