IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| Nortel Networks Corporation, *et al.*, ) | Case No. 09-10138(KG) |
| ) | (Jointly Administered) |
| Debtors. ) | |
| _____ ) | **Re: Dkt No. 4347** |

# **MEMORANDUM OPINION**[1]

The Debtors, Nortel Networks, Inc. ("NNI") and certain affiliates ("Nortel")[2] have successfully marketed and sold most of their assets under the Court's supervision and subject to the Court's approval. One such sale, which gives rise to the dispute at issue, involves Nortel's sale of its carrier voice over IP and Application Solutions Business ("CVAS" or "CVAS Sale") to GENBAND Inc., n/k/a GENBAND US, LLC ("GENBAND").

Nortel and GENBAND entered into an Asset Sale Agreement (the "ASA") on December 22, 2009. The Court approved Nortel's motion to authorize and approve a stalking horse agreement and bidding procedures for the sale of the CVAS. The Court, as

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

[2] Nortel was once a global supplier of networking products from hardware to software to services.

well as the Canadian Court,[3] approved the sale of the CVAS Business to GENBAND by Order, entered March 4, 2010 (D.I. 2632) (the "Sale Order").

A dispute exists over the purchase price and who, based on its nature, should resolve the dispute. Nortel wants the Court to decide the issue and GENBAND argues that the parties agreed to refer the dispute to arbitration. The parties' dispute is far from academic. Nortel's interpretation of the ASA's Deferred Profit Amount (discussed *infra*) results in an adjustment of $34,284,392, for a total purchase price of $179,508,745, or, for reasons not germane here, as much as $182,052,761. GENBAND would add $36,285,608 to the Deferred Profit Amount, for a total of $70,570,000, which would reduce the purchase price to $142,904,000.

GENBAND has filed a motion pursuant to 11 U.S.C. § 362(d) for relief from the automatic stay to compel arbitration (D.I. 4347) (the "Motion").[4] For the reasons which follow, the Court finds that arbitration is not appropriate and will deny the Motion.

---

[3] The Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC") and certain of their Canadian affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) the ("CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. The Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. This Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

[4] Also pending is Nortel's motion to enforce the terms of the ASA (D.I. 4345), which the parties agreed to adjourn until this Court and the Canadian Court decided GENBAND's motion.

**JURISDICTION**

The Court's jurisdiction over the dispute at hand arises from 28 U.S.C. §§ 157 and 1334.

**DISCUSSION**

A. <u>The Parties' Positions</u>

GENBAND is seeking a reduction in the CVAS purchase price relating to the Deferred Profit Amount which is defined in the ASA as follows:

> as of the Closing date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.

ASA at Section 1.1 (Definitions). There is reference in the quoted language to "Nortel Accounting Principles," a defined term meaning "the accounting principles employed in the preparation of the Unaudited Financial Statements." for the period ended September 30, 2009.

GENBAND further explains why "Deferred Profit Amount" requires the interpretation and application of accounting rules and principles. That is, to determine the "Deferred Profit Amount," it is necessary to establish what amounts must be reflected on a balance sheet prepared in accordance with Generally Accepted Accounting Principles (GAAP) and consistent with Nortel's accounting principles. GENBAND therefore is adamant that the dispute is all about accounting applications and concepts which requires submission to arbitration. GENBAND posits that Nortel is eager to avoid arbitration because it is fully aware that its interpretation is inconsistent with Nortel's method of determining Deferred Profit Amount in its unaudited financial statements.

Nortel, conversely, argues that the dispute is not an accounting dispute but, rather, GENBAND'S effort to evade the terms of the ASA. The Court, Nortel argues, is therefore required to exercise its jurisdiction to resolve the dispute.

GENBAND relies on Section 2.2.3.1 of the ASA for the proposition that arbitration is mandatory. Section 2.2.3.1(c) provides, in pertinent part:

2.2.3. <u>Purchase Price Adjustment</u>.

    2.2.3.1 <u>Closing Statement; Dispute Resolution</u>.

                        \*   \*   \*

    (b) If the Main Sellers and the EMEA Sellers disagree with the determination of the Closing Statement, the Main Sellers and EMEA Sellers shall notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the "Disagreement Notice"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjusting to, the Closing Statement. If the Main

Sellers and the EMEA Sellers fail to deliver the Disagreement Notice by the end of such thirty-(30) day period, the Main Sellers and the EMEA Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers or the EMEA Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and the EMEA Sellers and shall not be subject to further dispute or review. . . .

(c) If the Main Sellers, the EMEA Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of a Disagreement Notice by the Main Sellers and EMEA Sellers, the Independent Auditor[5] shall serve as arbitrator (the "Accounting Arbitrator") to resolve such disagreement. The Primary Parties and the Joint Administrators on behalf of the EMEA Sellers shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers, the EMEA Sellers and the Purchaser have not resolved their disagreement and to conduct such proceedings as it considers necessary to resolve such disagreement. . . . (Footnote supplied.)

\* \* \*

B. The Court's Analysis

There is no question that if the dispute between Nortel and GENBAND is in the nature of a dispute governed by Section 2.2.3.1, the Court will compel arbitration. The federal policy that strongly favors enforcement of arbitration provisions will control. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.* 460 U.S. 1, 24-25 (1983). The Court is satisfied that GENBAND bargained for arbitration in order to promptly resolve any Purchase Price Adjustment and finalize the CVAS Sale.

---

[5] KPMG LLP, is the Independent Auditor and thus the Arbitrator. ASA, Section 1.1 (Definitions).

5

Although arbitration is favored and the parties agreed on arbitration to resolve certain disputes, not all disputes are either appropriate for or entitled to arbitration. The present dispute does not qualify for ASA mandated arbitration.

Nortel argues convincingly that the dispute is not an accounting dispute. Nortel and GENBAND, including their respective accountants, agree on the dollar amounts to utilize in determining the Deferred Profit Amount. Instead, according to Nortel - - and the Court agrees, the dispute centers on the proper interpretation and application of "services to be performed or products to be provided by the Business after the Closing Date. . . ."

Nortel emphasizes the applicability of Section 10.6 of the ASA in support of its opposition to arbitration of the dispute. Section 10.6 provides, in pertinent part, that:

> Section 10.6. Governing Law;
> Submission to Jurisdiction; Waiver of Jury Trial.
>
> \* \* \*
>
> (b) To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases. . .
>
> \* \* \*

>      (e) Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitration set forth in Section 2.2.3.1(c), (ii) any of the arbitrators set forth in Section 5.28 although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or arbitrator(s), as applicable.

\* \* \*

The parties argue at length over the distinction between "narrow" and "broad" arbitration clauses in agreements. "Narrow" clauses limit arbitration to specifically delineated disputes. "Broad" clauses refer all disputes to arbitration. *Local 827, Int'l Bhd. of Elec. Workers, AFL-CIO v. Verizon N.J., Inc.*, 458 F.3d 305, 310 (3d Cir. 2006). The strong federal policy in favor of arbitration applies to the broad, rather than narrow, clauses. *Id*. At 310-11; *TrapRock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, AFL-CIO*, 982 F.2d 884, 888 n.5 (3d Cir. 1992).

The Court does not have to determine whether the agreement to arbitrate is "narrow" or "broad" to decide the Motion. It is the Court's responsibility to decide substantive issues where, as here, the resolution of the dispute will materially determine the financial outcome of the parties' agreement. If GENBAND is correct, the purchase price reduction will be very substantial, virtually changing the transaction the Court approved.

The Court therefore must evaluate for itself the real nature of the dispute over the Purchase Price Adjustment. The Court's review of GENBAND's Disagreement Notice compels the conclusion that GENBAND disputes the application of the contractual terms of the ASA, not the accounting principles leading to the calculation of the Deferred Profit

Amount. The issue the Court (and the Canadian Court if it also decides against arbitration) will have to determine is whether GENBAND's or Nortel's interpretation of the ASA is correct. GENBAND would include in the Deferred Profit Amount the deferred revenues for services performed or products provided before the Closing Date, and for which no services were to be performed or products provided after the Closing Date. Nortel says the ASA requires the Deferred Profit Amount to be determined based on deferred revenues for services to be provided after the Closing Date.

The Court finds persuasive the analysis and ruling in *Bratt Enters, Inc. v. Noble Int'l Ltd.*, 338 F.3d 609 (6th Cir. 2003), in which the appellate court reversed an order compelling arbitration of a dispute over a contractual term which, as here, related to purchase price adjustment. The Sixth Circuit's analysis is highly instructive here, *viz*:

> While [Purchaser's] claim would obviously require reference to the closing balance sheet to determine matters of valuation should [Purchaser] prevail on this issue, the dispute regarding the validity of the limitation provision does not itself involve a 'disagree[ment] with any of the amounts included in the Closing Balance Sheet.' Rather, it involves a determination of whether the parties' intent regarding [Seller's] retained liabilities was based upon the parties' sharing a misunderstanding about an essential term of their agreement. Thus, this [dispute] is not within the scope of the arbitration clause and is, therefore, not arbitrable.

*Bratt*, 338 F.3d at 613.

The issue addressed in *Bratt* is on point with the issue the Court is considering. The GENBAND - Nortel dispute is not about calculating "amounts," but, as in *Bratt*, over the parties' intent regarding a material element of the Purchase Price Adjustment.[6]

Under the circumstances the Court has described, and given the nature and size of the dispute, the Court will exercise its jurisdiction and decide whose contract interpretation is correct. The ASA commands the Court's intervention (ASA Section 10.6, *supra*). More importantly, the Sale Order compels the Court to act in its supervisory and enforcement roles under the ASA. The Court would be shirking its responsibilities to GENBAND, Debtors and the Debtors' Estate were it to refer the dispute to arbitration. The Order entered March 4, 2010 (D.I. 2632) authorizing and approving the CVAS Sale provides in relevant part; that:

> The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (1) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Sale Agreement, the Ancillary Agreements, all amendments thereto and any waivers and consents thereunder; (2) protect the Purchaser, or the Purchased Assets, from and against any of the Claims or Interests; (3) compel delivery of all Purchased Assets to the Purchaser; (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Sale Agreement, the Ancillary Agreements, the Sale or the Transactions.

---

[6] The ASA's call for arbitration may yet prove useful, as there may be matters for which arbitration is appropriate. This is not such a matter.

Sale Order at ¶ 32. The Court is prepared to schedule the dispute for hearing promptly, thus addressing GENBAND'S concern about a prompt adjudication. What the Sale Order emphasizes, however, is the Court's authority and responsibility to oversee the Court approved CVAS Sale and to make certain that the parties abide by the terms of the ASA. Therefore, the Court will not lift the automatic stay. 11 U.S.C. § 362(d) allows the Court to lift the automatic stay "for cause." Factors courts consider in determining if cause exists are (a) prejudice to the debtor's estate, (b) hardship to the moving party and (c) probability of success on the merits. *In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992). GENBAND does not satisfy these factors.

## CONCLUSION

The Court concludes and holds that the dispute over the Purchase Price Adjustment and related matters is outside the arbitration provision of the ASA. An Order will follow, denying the Motion.

Dated: January 21, 2011

_/s/ Kevin Gross_
KEVIN GROSS, U.S.B.J.