## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- X

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

**Hearing date: February 9, 2011 at 9:30 a.m. (ET)**
**Objections due: January 21, 2011 at 4:00 p.m. (ET)**

**Re: D.I. 4638**

------------------------------------------------------- X

**DEBTORS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 541, 542 AND 543 AND BANKRUPTCY RULE 9019 (I) APPROVING THE STIPULATION BY AND BETWEEN NNI AND U.S. BANK NATIONAL ASSOCIATION, (II) DIRECTING U.S. BANK NATIONAL ASSOCIATION TO TURN OVER PROPERTY TO NNI, AND (III) GRANTING RELATED RELIEF RELATED TO THE NORTEL NETWORKS U.S. DEFERRED COMPENSATION PLAN**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), respectfully submit this reply in further support of the Debtors' Motion For An Order Pursuant To 11 U.S.C. §§ 105, 541, 542 And 543 And Bankruptcy Rule 9019 (I) Approving The Stipulation By And Between NNI And U.S. Bank National Association, (II) Directing U.S. Bank National Association To Turn Over Property To NNI, And (III) Granting Related Relief Related To The Nortel Networks U.S. Deferred Compensation Plan (the "Motion"),[2] and in response to the various Objections and letters

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]    Capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion.

(collectively, the "Objections") to the Motion filed by various participants in the Plan (the "Objecting Employees").  The Debtors rely on the Declaration of Daniel Ray, dated February 4, 2011 (the "Ray Declaration") in further support of the Motion.

1.      The various Objections raise two primary arguments in opposition to the relief sought in the Motion: (1) the Objecting Employees did not know that the deferred compensation funds remained assets of NNI that were subject to the claims of the company's general creditors in the event of a bankruptcy; and (2) they are not highly compensated individuals as contemplated by the Plan.  As set forth below and in the Ray Declaration, the Participants were informed as to the terms and risks of the Plan at the time of enrollment and subsequently, and the Plan was offered to a select subset of employees as contemplated under the Employee Retirement Income Security Act of 1974 ("ERISA").

Plan Participants Received Disclosure As To The Risks Of Participating

2.      As further described in the Ray Declaration, NNI disclosed the risk that employees who participated in the Plan will suffer losses in the event of a bankruptcy.  Each Participant who enrolled in the Plan, including those Participants who were part of one of the predecessor plans that merged into the Plan, received an enrollment package.  (Ray Declaration Ex. C – Enrollment Package).  That package contained documents that set forth the terms and risks of enrolling in the Plan.

3.      The enrollment package included, among other things, a booklet describing the Plan, which stated that the Plan was similar to a 401(k) plan but had some differences in risk, including that "[t]here is an additional risk of being a general unsecured creditor which may result in a loss in the event of bankruptcy or insolvency of the corporation."  Ray Declaration Ex. C (ii) at 4.

4.      Section 8.4 of the Plan (Ray Declaration Ex. A), which was included in the

enrollment package, contained the following language:  "<u>No Secured Interest</u>.  Except as

otherwise provided by the Trust Agreement, the assets of the Trust, shall be subject to the claims

of creditors of the Company.  Except as provided in the Trust Agreement, the Participant (or the

Participant's Beneficiary) shall be a general unsecured creditor of the Company with respect to

the payment of Benefits under this Plan."  Ray Declaration Ex. A at 13; <u>see also</u> <u>id.</u> at 1 ("Plan

participants shall have the status of unsecured creditors of the Company with respect to the

payment of Plan benefits.").

5.      The enrollment package also included a prospectus for the Plan (Ray Declaration

Ex. C(iii) providing further information:

<u>Employee Retirement Income Security Act of 1974;</u>
<u>Administration of the Plan</u>

The Plan is an <u>unfunded plan</u> maintained primarily for the purpose of providing
deferred compensation for a select group of management or highly-compensated
employees, as described in Sections 201(2), 301(a)(3) and 401(a)(1) of the
Employee Retirement Income Security Act of 1974, as amended ("ERISA").  The
Plan is <u>not</u> subject to many of the provisions of ERISA…The Plan is not qualified
under the Internal Revenue Code of 1986.

Ray Declaration Ex. C(iii) at 2 (emphasis added).

6.      The prospectus further stated:

The Plan is an unfunded plan and no cash amounts will be paid into or set aside in
a trust or similar fund under the Plan.  We will retain all amounts deducted from
your earnings as part of our general assets, and the amounts will be credited to
your Account under the Plan.  We may establish one or more trusts, with such
trustee as the Committee may approve, for the purpose of providing for the
payment of deferred amounts and earnings thereon.  *Such trust or trusts may be
irrevocable, but the assets thereof shall be subject to the claims of our general
creditors in the event of bankruptcy or insolvency.*  To the extent any deferred
amounts are actually paid from any such trust, we will have no further obligation
with respect thereto, but to the extent not so paid, such amounts shall remain our
obligation.  *Your right, and the right of your beneficiary, to receive a distribution
under the Plan is an unsecured claim against our general assets, and neither you
nor any beneficiary has any rights in or against any of our specific assets.*

3

> *Nothing contained in the Plan or in this prospectus shall constitute a guarantee that our assets will be sufficient to pay any benefit under the Plan.*

Id. at 4 (emphasis added).

7.      Moreover, in order to enroll in the Plan, every Participant was required to sign and submit a one-page form containing the following acknowledgement:  "I understand that any compensation that I defer will remain an asset of the Company and subject to the claims of the general creditors of the Company, in the event of its bankruptcy or insolvency."  Ray Declaration Ex. C.  As explained in the Ray Declaration, completion of a signed enrollment form and submission to the Plan administrator, TBG Financial (later known as Mullin TBG), was required at the beginning of each year to participate in the Plan that year.  Ray Declaration at 3.

8.      Around the time the Plan was first introduced, in November 1999, the Debtors also offered numerous informational sessions to eligible employees to explain the terms of the Plan, including a PowerPoint slide presentation that was also provided as part of the enrollment package.  Ray Declaration Ex. C(iv) at 48-67.  That presentation stated that one of the risks of enrolling in the Plan was that a participant would be an unsecured creditor in the event of the company's bankruptcy.  Id. at 11.

The Predecessor Plans Were Similarly Administered

9.      As discussed in the Motion, three predecessor plans were merged into the Plan on January 1, 2000:  the deferral plans under the Senior Management Incentive Award Plan (the "SMIAP") and the Executive Management Incentive Plan (the "EMIP"), and the Bay Networks Inc. Deferred Compensation Plan (the "Bay Networks Plan").

10.     As explained in the Ray Declaration, NNI administered the deferral options under the SMIAP and EMIP prior to the establishment of the Plan, pursuant to an Agreement

Regarding The Deferral Option Of The Senior Management Incentive Award Plan And The

Executive Management Incentive Plan.  Ray Declaration at 5-6.

11.     As set forth in the Ray Declaration, the deferral plan under the SMIAP and EMIP

was completely unfunded, and NNI did not maintain any trust, even a rabbi trust, associated with

that plan.  Instead, the deferrals were made on NNI's general ledger, and payments under the

deferral plan were made out of NNI's general accounts.  Ray Declaration at 5-6.

12.     The Bay Networks Plan was put in place by Bay Networks, a company that NNI

acquired in 1998.  Following the acquisition, the Debtors worked to merge the Bay Networks

Plan with the existing deferral plans, which resulted in the Plan.  Ray Declaration at 5-6.  As of

the time of NNI's acquisition of Bay Networks, the terms of the Bay Networks Plan and the

manner in which it was administered were substantially similar to the terms and administration

of the Plan.

13.     NNI recognizes that some of the Objecting Employees and their families may be

facing personal circumstances that cause them hardship, and that it is disappointing that NNI and

its affiliates sought bankruptcy protection, resulting in the treatment of claims against the Plan as

unsecured claims against NNI.  However, NNI has made an effort to disclose these ultimate risks

to the participants at the inception of the Plan and at the time of annual enrollments and

renewals.

The Plan Was Offered To Only Select Employees And Qualified as a "Top Hat" Plan

14.     In order for a deferred compensation plan to be considered a "'top hat' plan

exempt from ERISA's substantive protections" it must be (i) "unfunded" and (ii) offered only to

a "select group of management or highly compensated employees." In re IT Group, Inc., 448

F.3d 661, 665 (3d Cir. 2006).  The Plan meets both requirements.

### *The Plan Is Unfunded*

15.     As was disclosed to participants and provided for under the Plan documents, the

Plan is an unfunded plan even though a rabbi trust was established by NNI.  As prior Third

Circuit precedent guides us, "the keys to the determination of whether a plan is 'funded' or

'unfunded' under ERISA are (1) whether beneficiaries of the plan can look to a res separate from

the general assets of the corporation to satisfy their claims; (2) whether beneficiaries of the plan

have a legal right greater than that of general, unsecured creditors to the assets of the corporation

or to some specific subset of corporate assets."  In re IT Group, at 669.  In this case, the Plan

provides that in the event of a bankruptcy, the Participants cannot look to any specific assets to

satisfy their claims and remain unsecured creditors of NNI's estate.

16.     The fact that NNI established a rabbi trust does not change this result.  The Trust,

which was established in January 2000, is a rabbi trust, or grantor trust, under which U.S. Bank

holds the Trust Assets for the benefit of NNI.  The terms of the Trust Agreement make clear that:

"Plan participants and their beneficiaries shall have no preferred claim, on or any beneficial

ownership interest in, any assets of the Trust.  Any rights created under the Plan and this Trust

Agreement shall be unsecured contractual rights of Plan participants and their beneficiaries

against the Employers. Any assets held by the Trust [are] subject to the claims of the Employers'

general creditors . . . in the event of Insolvency."  Ray Declaration Ex. B at Art. 1(d).

17.     It is appropriate for NNI to have used a rabbi trust in connection with the Plan.

"[A] rabbi trust used in combination with an unfunded deferred compensation plan provides the

employee with an additional measure of security without jeopardizing the plan's unfunded status.

Accordingly, the Plan remains unfunded despite the use of a rabbi trust." In re New Century

Holdings, Inc., 387 B.R. 95, 111 (Del. Bankr. 2008) (internal citations omitted).  The security

provided to employees through the establishment of a trust is not that they would be entitled to direct distribution of the trust's assets, but rather that some money had been retained by the company around the same time the unsecured Plan liabilities are incurred.

18.    Moreover, with respect to the deferrals made under the SMIAP/EMIP Agreement, NNI did not establish a rabbi trust or other trust at the time of such deferrals.  Instead, Participants' deferrals under the SMIAP/EMIP Agreement were commingled with the general assets of the Company, consistent with the language of the SMIAP/EMIP Agreement that was given to those Participants.  Ray Declaration at 6.

### The Plan Was Offered Only To A Select Group Of Management Or Highly Compensated Employees

19.    As contemplated under the Plan documents, the Plan was offered only to a select subset of employees, whose compensation package met certain guidelines.  The Preamble to the Plan states: "The Plan is sponsored by Nortel Networks, Inc., a Delaware corporation, for the purpose of providing a tax-deferred capital accumulation program through the deferral of Salary, Bonuses and Commissions as well as additional corporate contributions *to a select group of management or highly compensated employees* of the Company and its subsidiaries."  Ray Declaration at Ex. A at 1 (emphasis added).

20.    Section 2.1 of the Plan states: "Eligibility for participation in the Plan shall be limited to key management or highly compensated employees of the Employer who are selected by the Board [of Directors of NNI], in its sole discretion, to participate in the Plan.  Individuals who are in this select group shall be notified as to their eligibility to participate in the Plan." Id. at 5.

21.    As courts in this circuit have emphasized, "to satisfy the requirement that a 'top hat' plan be restricted to a 'select group of management or highly compensated employees,' the

standard must be met both quantitatively and qualitatively." IT Group, Inc. v. Bookspan, 305

B.R. 402, 410 (D. Del. 2004) (internal citation omitted).  The Plan satisfies both criteria.

22.    Prior case law provides that the quantitative measure can be satisfied by a

showing that the highest percentage of employees covered by the Plan was no more than 15%.

Id. (referring to Demery v. Extebank Deferred Comp. Plan, 216 F.3d 283, 283 (2d Cir. 2000).

23.    The Debtors were even more restrictive than that benchmark.  Throughout the

time that the Plan was active, NNI maintained a goal of providing the option to enroll in the Plan

to no more than 10% of the total then active employee population, and enrollment generally was

maintained between 6 – 8% of the total employee population, although the percentages would

vary each year depending on the number of employees who qualified based on the total

compensation threshold described below.  Ray Declaration at 2-3.

24.    The qualitative measure is satisfied by a finding that the participating employees

were all "high level," in that they were either "management" or "highly compensated." IT

Group at 410.  Individuals participating in a deferred compensation plan do not need to hold

management positions as long as they are "highly compensated" as that term is used for purposes

of the statute.  The Debtors established a compensation threshold as a condition to participation

in the Plan each year.  For example, in 2000, when the Plan was first established, the

compensation threshold was $145,200.  By 2008, that number had risen to $180,000.  For

comparison purposes, while the Department of Labor has refrained over the last 30 years from

mandating a minimum level of compensation required for "top hat" plans, the term "highly

compensated employee" was defined for purposes of the U.S. Internal Revenue Code as annual

compensation in excess of $90,000 in 2000, and $105,000 in 2008.  26 U.S.C. §414(q)(1)(b); see

also  IT Group at 411 (finding compensation threshold of $100,000 sufficient to meet "highly compensated" requirement).

25.    The Debtors are sympathetic to the participants who, outside of a bankruptcy, would be entitled to receive payments as contemplated under the terms of the Plan.  However, the Debtors are entitled to turnover of the Trust assets as a result of the bankruptcy filings, and seek those assets to make them available for distribution to their various unsecured creditors, including the participants and other employees of the Debtors as provided for under the Plan and Trust documents.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court grant the Motion and the

relief requested therein.

Dated:  February 4, 2011                CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Wilmington, Delaware

                                        James L. Bromley (admitted *pro hac vice*)
                                        Lisa M. Schweitzer (admitted *pro hac vice*)
                                        One Liberty Plaza
                                        New York, New York 10006
                                        Telephone:  (212) 225-2000
                                        Facsimile:  (212) 225-3999

                                            - and -

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                        */s/ Ann C. Cordo*
                                        Derek C. Abbott (No. 3376)
                                        Eric D. Schwartz (No. 3134)
                                        Ann C. Cordo (No. 4817)
                                        1201 North Market Street
                                        P.O. Box 1347
                                        Wilmington, Delaware 19801
                                        Telephone:  (302) 658-9200
                                        Facsimile: (302) 658-3989

                                        *Counsel for the Debtors*
                                        *and Debtors in Possession*