IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------X
                                                     :
                                                     :   Chapter 11
                                                     :
In re                                                :
                                                     :   Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,¹                       :
                                                     :   Jointly Administered
                        Debtors.                     :
                                                     :
                                                     :
-----------------------------------------------------X
```

### DECLARATION OF DANIEL RAY IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 541, 542 AND 543 AND BANKRUPTCY RULE 9019 (I) APPROVING THE STIPULATION BY AND BETWEEN NNI AND U.S. BANK NATIONAL ASSOCIATION, (II) DIRECTING U.S. BANK NATIONAL ASSOCIATION TO TURN OVER PROPERTY TO NNI, AND (III) GRANTING RELATED RELIEF RELATED TO THE NORTEL NETWORKS U.S. DEFERRED COMPENSATION PLAN

I, Daniel Ray, declare under penalty of perjury as follows:

1. I am currently a Senior Manager in Global Benefits at Nortel Networks Inc. ("NNI" or the "Company" and, together with the other above-captioned debtors, the "Debtors" or the "U.S. Debtors"). I have held my current position since August 2003. I have worked at NNI since April 1988 and in the Benefits Department since January 1990.

2. I submit this declaration in support of the Debtors' Motion For An Order Pursuant To 11 U.S.C. §§ 105, 541, 542 And 543 And Bankruptcy Rule 9019 (I) Approving The Stipulation By And Between NNI And U.S. Bank National Association, (II) Directing U.S. Bank

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

National Association To Turn Over Property To NNI, And (III) Granting Related Relief Related To The Nortel Networks U.S. Deferred Compensation Plan (the "Motion")[2] and the Debtors' reply (the "Reply") in further support of the Motion, and in response to the various Objections and letters (collectively, the "Objections") to the Motion filed and submitted by various participants in the Plan (the "Objectors").

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other employees of the Debtors or their affiliates and professionals retained by the Debtors, or learned from my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

The Plan

4. The Plan was established on January 1, 2000. A true and correct copy of the Plan is attached hereto as Exhibit A. As contemplated by sections 201(2), 301(a)(3) and 401(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Plan was operated as an unfunded employee benefit plan for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

*Eligibility Under the Plan*

5. During all years relevant to the deferrals of current Plan participants, the Debtors set a goal for employee eligibility to be 10% or less of the total employee population in any given year and enrollment generally was maintained between 6 - 8% of the total employee

---

[2] Capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion.

2

population, although the percentages would vary each year depending on the number of employees that qualified based on the total compensation threshold described below.

6.  Initially, when the Plan was established in 2000, only employees earning at least $145,200 in total compensation, which included commissions, were eligible to participate in the Plan. For subsequent years, the total compensation threshold was set at levels that gradually increased until it reached $180,000 for Plan year 2008.

7.  Eligibility determinations were made on an annual or semi-annual basis. In the event that an employee no longer met the requisite minimum level of total compensation, that employee was not permitted to make any deferrals during the relevant enrollment year, although he or she was permitted to maintain any existing account balances in the Plan.

*Required Election Forms Under the Plan*

8.  Consistent with the Plan, each year, eligible employees would fill out a deferral election form (Ray Declaration Ex. C(iv)), as described in more detail below) and send the form to TBG Financial (later known as Mullin TBG and referred to herein as "Mullin TBG"). Completion of a signed enrollment form was required at the beginning of each enrollment year to participate in the Plan for that year.

9.  None of the subsequent amendments to or versions or restatements of the Plan modified the provisions of the Plan in any material respect.

The Trust Agreement

10.  The Plan contemplates the formation of a rabbi trust, which NNI established pursuant to the Nortel Networks U.S. Deferred Compensation Plan Trust Agreement (as Amended and Restated as of January 1, 2000) (the "Trust Agreement"), a true and correct copy of which is attached hereto as Exhibit B, by and between NNI, as grantor, and U.S. Bank National Association, as Trustee.

Communications to Participants Regarding Plan

11.  In November 1999, in connection with the establishment of the Plan on January 1, 2000, NNI sent all participants in the SMIAP, EMIP and Bay Networks Plans, who qualified for the Plan, as well as other employees eligible to participate in the Plan, an enrollment package and held information sessions to describe the Plan.

12.  The enrollment package contains:

   a.  One of four cover letters, dated November 1999 from Martin Cozyn, Global Compensation and Benefits, a true and correct copy of which is attached hereto as Exhibits C(i)(a)-(d). Each of the letters informed participants that the risks involved in enrolling in the Plan were described in the enclosed enrollment materials.

   b.  Quick Enrollment Guide – 2000 Plan Year, a true and correct copy of which is attached hereto as Exhibit C(ii). This guide contained details regarding the operation of the Plan and, on page 4, explained the differences between the Plan and a 401(k) Plan, including the fact that participation in the Plan posed "an additional risk of being a general unsecured creditor which may result in a loss in the event of bankruptcy or insolvency of the corporation."

   c.  Plan Prospectus, dated February 24, 2000, as effective March 13, 2000, a true and correct copy of which is attached hereto as Exhibit C(iii), which explained the terms of the Plan, including:

      (i)  Introduction (p. 2): "The Plan is an unfunded plan maintained primarily for the purpose of providing deferred compensation for a select group of management or highly-compensated employees, as described in Sections 201(2), 301(a)(3) and 401(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Plan is not subject to many of the provisions of ERISA. The Plan is not qualified under the Internal Revenue Code of 1986." (emphasis in original)

      (ii)  Eligibility (p. 3): "In order to participate in the Plan, you must be a member of a group of management or highly-compensated employees as selected by the Board in its sole discretion."

      (iii)  Funding of Contributions (p. 4): "The Plan is an unfunded plan and no cash amounts will be paid into or set aside in a trust or similar fund under the Plan. We will retain all amounts deducted from your earnings as part of our general assets, and the amounts will be credited to your Account under the Plan. We may establish one or

4

more trusts, with such trustee as the Committee may approve, for the purpose of providing for the payment of deferred amounts and earnings thereon. *Such trust or trusts may be irrevocable, but the assets thereof shall be subject to the claims of our general creditors in the event of bankruptcy or insolvency.* To the extent any deferred amounts are actually paid from any such trust, we will have no further obligation with respect thereto, but to the extent not so paid, such amounts shall remain our obligation. *Your right, and the right of your beneficiary, to receive a distribution under the Plan is an unsecured claim against our general assets, and neither you nor any beneficiary has any rights in or against any of our specific assets. Nothing contained in the Plan or in this prospectus shall constitute a guarantee that our assets will be sufficient to pay any benefit under the Plan.*" (emphasis added)

    d.    Deferral Election Form – For the Plan Year January 1 – December 31, 2000, a true and correct copy of which is attached hereto as Exhibit C(iv). In order to defer compensation pursuant to the Plan, eligible employees were instructed to fill out the form and specify what percentage of their salary and/or commission they wanted to defer.

    (i)    The form contains an acknowledgment at the end of Section 1 that "to defer the compensation payable to me in subsequent Plan years, I must make a separate election during the enrollment period prior to the year in which the compensation is earned."

    (ii)    The form contains a further acknowledgement in Section 2(D) just above the signature line provided for participants that: "I understand that any compensation that I defer will remain an asset of the Company and subject to the claims of the general creditors of the Company, in the event of bankruptcy or insolvency."

    e.    PowerPoint Presentation, a true and correct copy of which is attached hereto as Exhibit C(v), which disclosed the risks of investing in the Plan.

13.    In subsequent years after the initial establishment of the Plan, new Participants under the Plan were given an enrollment package that was substantially the same as that described above and attached as Exhibit C.

## Prior Plans

14.    Prior to January 1, 2000, NNI maintained a deferral plan offered to certain eligible individuals under two incentive plans, pursuant to the Northern Telecom Inc. Agreement

Regarding the Deferral Option of the Senior Management Incentive Award Plan and the Executive Management Incentive Plan (the "SMIAP/EMIP Agreement"). Also prior to the establishment of the Plan, in September 1998, NNI merged with Bay Networks Inc. ("Bay Networks"). At the time of the merger, Bay Networks maintained the Bay Networks, Inc. Deferred Compensation Plan (the "Bay Networks Plan"). Following the merger, NNI created the Plan through an amendment and restatement of the Bay Networks Plan. The amendment and restatement also merged into the Plan the deferral option provided pursuant to the SMIAP/EMIP Agreement, previously offered to select NNI employees.

15. The SMIAP/EMIP Agreement was operated as an unfunded plan, and NNI did not establish a trust for that plan. Instead, eligible employee deferrals were made on NNI's general ledger, and payments under the SMIAP/EMIP Agreement were made out of NNI's general accounts. It was not until the SMIAP/EMIP Agreement was merged into the Plan in January 2000 that a rabbi trust was established with respect to deferrals under the SMIAP/EMIP Agreement.

16. The Plan was modeled after the Bay Networks Plan, and it is my understanding that, as of the time of NNI's acquisition of Bay Networks, the terms of the Bay Networks Plan and the manner in which it was administered were substantially similar to the terms and administration of the Plan.

Pre-Petition Withdrawal Requests

17. I understand from Mullin TBG, the Plan administrator, that certain Plan Participants, including those whose employments terminated on December 31, 2008, made requests to Mullin TBG to withdraw their funds prior to the filing of these chapter 11 proceedings. Section 6.3.3 of the Plan provides that, upon termination of a Participant's employment, "distribution of the Participant's Account shall commence as soon as

6

administratively feasible after the first day of the month following the end of the quarter in which the employment termination occurs." I understand from Mullin TBG that it was not administratively feasible for Mullin TBG to comply with the withdrawal requests it received in late December 2008 and early January 2009 prior to the filing of these chapter 11 proceedings on January 14, 2009.

Post-Petition Communications to Plan Participants

18. Following the commencement of these chapter 11 proceedings, beginning on March 31, 2009, account balance statements sent by Mullin TBG, the Plan administrator, to current Plan Participants contain the following language:

> "This report and the information contained within was generated by Nortel Networks Inc. (the Company) with the help of its advisors, in good faith and in reliance on all information presently available to the Company. The amount of your unsecured claim in the bankruptcy process may vary from the information contained in this report, and the company reserves the right to contest any such unsecured claim. This report shall not serve as an admission by the Company as to the amount of any unsecured claim against the estate."

A true and correct copy of a sample account balance statement containing the above language is attached hereto as Exhibit D.

19. On April 3, 2009, the Senior Vice President of Human Resources sent the then current Plan Participants a letter stating, in relevant part:

> Since filing for creditor protection in January, we have been working with external advisors to examine what options are available to us in relation to this plan, as we understand this is a very Important Issue to everyone who chose to participate. I regret to inform you that it's become clear that there are no options: under the terms of this plan all non-qualified deferred compensation funds are part of the general assets of the company, and therefore subject to claims by all company creditors. This is the case even if you had a disbursement request in the system that had not been completely processed and paid prior to January 14, 2009.

The letter also provided current Plan participants with the contact information of the claims agent for these chapter 11 proceedings. A true and correct copy of a sample of the April 3, 2009 letter is attached hereto as Exhibit E.

20. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 4, 2011
Nashville, TN

_____
Daniel Ray