# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | Hearing date: February 9, 2011 at 9:30 a.m. (ET)<br>Objections due: January 21, 2011 at 4:00 p.m. (ET) |

**OBJECTION TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 541, 542 AND 543 AND BANKRUPTCY RULE 9019 (I) APPROVING THE STIPULATION BY AND BETWEEN NNI AND U.S. BANK NATIONAL ASSOCIATION, (II) DIRECTING U.S. BANK NATIONAL ASSOCIATION TO TURN OVER PROPERTY TO NNI, AND (III) GRANTING RELATED RELIEF RELATED TO THE NORTEL NETWORKS U.S. DEFERRED COMPENSATION PLAN**

1.    Robert Horne ("Horne"), James Young ("Young") and the ad hoc group of beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan (the "Plan") (collectively, the "Beneficiaries")[2], file this objection (the "Objection") to the Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105, 541, 542 and 543 and Bankruptcy Rule 9019 (I) Approving the Stipulation By and Between NNI and U.S. Bank National Association, (II) Directing U.S. Bank National Association to Turn Over Property to NNI, and (III) Granting Related Relief Related to the Nortel Networks U.S. Deferred Compensation Plan (the "Turnover

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. ((3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2] Currently, over 80 participants have agreed to participate in the group.  The group is in the process of forming, determining issues of governance, etc.

Motion").[3]  The Turnover Motion should be denied because: (1) it does not comply with Fed. R. Bankr. P. 7001; (2) the Plan is not a "top hat" plan and therefore is subject to ERISA's substantive provisions or, at the very least, serious factual issues exist as to whether the plan is a "top hat" plan; and (3) even if the Plan is a "top hat" plan, the Plan Assets are only available for distribution to general unsecured creditors if the entity designated as the "Company" under the Plan was, as of the Petition Date, unable to pay its debts as they became due or filed its bankruptcy petition in the United States.

## I.    Jurisdiction, Venue and Statutory Basis for Relief

2.      This Court has jurisdiction over the Turnover Motion under 28 U.S.C. § 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding as defined in 28 U.S.C. § 157(b)(2). The Debtors premise their request for relief on 11 U.S.C. §§ 105, 541, 542 and 543, Fed. R. Bankr. P. 9019 and Local Rule 4001-1.

## II.    Background

3.      The Plan, which was executed on or about December 21, 1999 and became effective on January 1, 2000, purports to be an unfunded deferred compensation plan maintained or a "select group of management or highly compensated employees of the Company and its subsidiaries." Plan at 4.  The Plan further provides:

> **8.4 No Secured Interest.**  Except as otherwise provided by the Trust Agreement, the assets of the Trust, shall be subject to the claims of creditors of the Employers. Except as provided in the Trust Agreement, the Participants (or the Participant's

---

[3] The Beneficiaries recognize that this Objection is filed after the expiration of the objection deadline set forth above.  On February 7, 2011, the Beneficiaries retained the undersigned counsel which represented the Ad Hoc Committee of Beneficiaries of the HomeBanc Mortgage Corporation Deferred Compensation Plan in In re HomeBanc Mortgage Corporation, Case No. 07-11079 and the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and the New Century Financial Corporation Supplemental Executive Retirement Savings Plan in In re New Century TRS Holdings, Inc., Case No. 07-10416. Undersigned counsel filed this Objection as soon as practically possible after being retained and the Beneficiaries therefore respectfully request that this Court consider the merits of the Objection notwithstanding its late filing. Undersigned counsel is in the process of engaging local counsel and expect to finalize such an engagement imminently.

Beneficiary) shall be a general unsecured creditor of the Employers with respect to the payment of Benefits under this Plan.

<u>Plan</u> at ¶ 8.4.  "Company" is defined in the Plan as Nortel Networks Inc. ("<u>NNI</u>"), and any successor organization thereto.  <u>Plan</u> at ¶ 1.14.

4.    On or about January 1, 2000, NNI, U.S. Bank National Association (the "<u>Trustee</u>") and Nortel Networks NA Inc. executed the Nortel Networks U.S. Deferred Compensation Plan Trust Agreement (the "<u>Trust Agreement</u>") for the purpose of meeting the Company's obligations under the Plan.  The Trust Agreement incorporates by reference the Plan's definition of "Company."

5.    The Trust Agreement provides, *inter alia,* that:

> (d) The principal of the Trust, and any earning thereon shall be held separate and apart from the other funds of the Company and other Employers and shall be used exclusively for the uses and purposes of participants in the Plan and general creditors *as herein set forth.*  Plan participants and their beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust.  Any rights created under the Plan and this Trust Agreement shall be unsecured contractual rights of Plan participants and their beneficiaries against the Employers.  *Any assets held by the Trust will be subject to the claims of the Employers' general creditors under federal and state law in the event of Insolvency, as defined in Article 3(a) herein.*

<u>Trust Agreement</u> at Art. 1(d) (emphasis supplied).

6.    Insolvency is defined under the Trust Agreement as the inability to pay debts as they become due or "the Company is subject to a pending proceeding as a debtor under the *United States Bankruptcy Code*."  <u>Trust Agreement</u> at Art. 3(a) (emphasis supplied).

7.    On January 14, 2009 (the "<u>Petition Date</u>"), the Debtors in this case, including NNI, filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code.  Also on the Petition Date, the several affiliated entities, including Nortel Networks Corporation ("<u>NNC</u>"), the Debtors' ultimate parent, and Nortel Networks Limited ("<u>NNL</u>"), the direct corporate parent of NNI, filed for bankruptcy protection in Canada.

3

8.      As the Debtors state in the Turnover Motion, on March 8, 2000, NNI and Nortel Networks Corporation ("NNC"), the Debtors' ultimate parent and a Canadian company, entered into a letter agreement (the "3/8/00 Letter Agreement") pursuant to which NNC agreed to become the Plan sponsor, effective March 13, 2000, and NNI, on behalf of itself and its subsidiaries, would be responsible for funding the Plan.  Turnover Motion at ¶ 10.

9.      The next day, NNI and NNC entered into another letter agreement (the "3/9/00 Letter Agreement" and, together with the 3/8/00 Letter Agreement, the "Letter Agreements") pursuant to which NNC authorized NNI to pay Plan distributions directly to participants. Turnover Motion at ¶ 10.  The 3/9/00 Letter Agreement also names NNI the exclusive owner of the Trust Assets.  Id.

10.     The Plan documents were subsequently amended, effective as of March 13, 2000, to name NNC as the Plan sponsor and NNL as the party responsible for funding the Plan. Turnover Motion at ¶ 10.

### III.    Argument

11.     The Turnover Motion should be denied because: (1) it does not comply with Fed. R. Bankr. P. 7001; (2) the Plan is not a "top hat" plan and therefore is subject to ERISA's substantive provisions; and (3) even if the Plan is a "top hat" plan, the Plan Assets are only available for distribution to general unsecured creditors if the entity designated as the "Company" under the Plan was, as of the Petition Date, unable to pay its debts as they became due or filed its bankruptcy petition in the United States.

> ***A.     The Motion seeks relief which is not available outside of an adversary proceeding.***

12.     Pursuant to Fed. R. Bankr. P. 7001(a), proceedings to recover money or property, to determine the validity, priority or extent of an interest in property, to obtain an injunction or

other equitable relief, or to obtain a declaratory judgment are all adversary proceedings and, therefore, must be initiated in accordance with Fed. R. Bankr. P. 7003.  *See* Fed. R. Bankr. P. 7001(a)(1), (2), (7) and (9).

13.    In an attempt to escape the rigors of an adversary proceeding, the Debtors attempt to the cast the relief sought in the Turnover Motion as a motion to compromise a controversy pursuant to Fed. R. Bankr. P. 9019.  In describing the purported "controversy," the Debtors state:

> NNI, through its Principal Officer, made a request that the Trustee can turn over the Trust Assets to NNI.  The Trustee has indicated its willingness to do so, subject to NNI obtaining a Court order authorizing and directing U.S. Bank to do so. Accordingly, NNI and the Trustee have entered into the attached Stipulation that provides that the Trust Assets are property of NNI's estate, and shall be turned to NNI following entry of an Order granting this Motion.

Turnover Motion at ¶ 19.  Far from describing a controversy, this explanation actually evidences a relatively amicable relationship between the Trustee and the Debtors.

14.    The Turnover Motion does not, therefore, compromise a controversy, but rather seeks an order "confirming the authority of U.S. Bank to liquidate and turn over [the Trust Assets]" and "directing the Trustee to liquidate and turn over the Trust Assets to NNI." Turnover Motion at 1-2.  This relief clearly constitutes the recovery of property, a determination of an interest in property, equitable relief, and/or a declaratory judgment.

15.    Even if this motion is properly brought under Fed. R. Bankr. P. 9019, however, the Court cannot approve the compromise without first considering the impact of that compromise on the Beneficiaries' interest in the Trust assets.  *See* Will v. Northwestern University, 434 F.3d 639, 645 (3d Cir. 2006) (". . . we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle"); Key3Media Group, Inc. v. Pulver (In re Key3Media Group, Inc.), 2006 WL 2842642 at *2 (D. Del. Oct. 2, 2006) (same); In re Nutritional Sourcing Corp., 398 B.R. 816, 833 (Bankr. D. Del. 2008) (refusing to approve

settlement which "severely adversely impacts . . . creditors who were not at the negotiating table and who were not adequately represented in their absence").  Since the Beneficiaries were not represented in the negotiation of this compromise – a compromise which, if approved, would turn over to the Debtors' general creditors assets in which the Beneficiaries have an interest – the compromise may not be approved over the Beneficiaries' objection without some investigation into their rights to and interests in the Trust assets.

16.     Accordingly, the relief sought in this Motion should be sought in an adversary proceeding or, at the very least, the Beneficiaries should be afforded an opportunity to take discovery and present evidence as to the character of the Trust assets and their rights to and interests in those funds.

> **B.      The Plan is not a "top hat" plan and therefore the substantive provisions of ERISA preclude the distribution of Plan Assets to any individual or entity other than the Beneficiaries.**

17.     The Turnover Motion is premised entirely upon the Debtors' claim that the Plan has been and is maintained for purpose of providing a tax-deferred capital accumulation program through the deferral of salary, bonuses and commissions as well as additional discretionary corporate contributions to a 'select group of management and highly compensated employees' of NNI and its U.S. subsidiaries, within the meaning of Title 1 of the Employee Retirement Income Security Act of 1974, as amended."  Turnover Motion at ¶ 9.  In other words, the Debtors contend that the Plan is a "top hat" plan and, therefore, that the Plan Assets are available for distribution to the Debtors' general unsecured creditors.  To support this claim, the Debtors point to language in the Trust and Plan documents which state that that the Plan is unfunded and the Beneficiaries have no preferred claim on the Plan Assets.

18.     The Plan is undeniably an "employee benefit plan" under ERISA since it provides for deferred compensation and retirement benefits.  29 U.S.C. § 1002(3); Senior Executive

Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.), 89 F.3d 143, 148 (3d Cir. 1996)(ERISA definition of "employee benefit plan" extremely broad).  Accordingly, unless the Debtors are able to establish that the Plan falls under the "top hat" exception, the Plan is subject to an array of ERISA procedural and substantive requirements and protections designed to protect the interests of the participants in the funds in the Plan and Trust.

19.    Among those protections is the "exclusive benefit rule," which provides that all contributions to the plan must be and are held in trust for the exclusive benefit of the plan participants – the employees, former employees or their designated beneficiaries – and may not be used or diverted for the benefit of the employer or to satisfy the employer's obligations.  29 U.S.C. § 1103(c)(1).  Indeed the exclusive benefit rule is a "cardinal principle" of ERISA which is violated if there is *any* removal of plan assets for the benefit of the employer or *anyone* other than plan participants.  Resolution Trust Corp. v. Financial Institutions Retirement Fund, 71 F.3d 1553, 1557 (10th Cir. 1995).  The circuit courts have held that this rule is nearly inviolable and that the protection of the interests of participants in plan assets is paramount.  Id.

20.    In Financial Institutions Retirement Fund, the Tenth Circuit was faced with an attempt by the receiver of an insolvent financial institution to obtain a portion of plan assets, in the form of certain credits, where the plan was allegedly over-funded.  The receiver wanted to use the value of the credits to reduce the obligation of the failed institution.  The Court inquired whether "the ERISA objective of protecting plan participants and their beneficiaries [was] more important than RTC's objective of recovering 'assets' of a failed thrift for the benefit of the public at large" and answered in the affirmative, finding that "Congress has called for special concern for the beneficiaries of employee funds that mandates giving this fund precedence here." Id. at 1556.

7

21.    In addition, plan assets are protected by provisions preventing their voluntary or involuntary transfer or alienation.  29 U.S.C. § 1056(d); Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 110 S. Ct. 680, 107 L. Ed. 2d 782 (1990).  Under these and other provisions, assets in an employee benefit plan cannot ever become assets of the employer's bankruptcy estate, unless an exception contained within ERISA applies.  Patterson v. Shumate, 504 U.S. 753, 112 S.Ct. 2242, 119 L. Ed. 2d 519 (1992).  As the Court summarized in In re B.B. Walker Co.:

> As noted earlier, the assets of an ERISA plan are held solely for the benefit of the plan participants and their beneficiaries and may not inure to the benefit of the employer.  When the contribution is made, the trustee and/or plan administrator acquires control over the assets and the plan participants and their beneficiaries acquire the interest in the assets.  A contribution to the plan by the employer thus severs and terminates, subject to certain limited exceptions under ERISA which are not applicable in this case, any interest in or control over the assets that the employer previously possessed.  Therefore, the plan assets generally cannot be considered property of the [employer's] bankruptcy estate.

2002 WL 31770849, at *4 (Bankr. M.D.N.C.)(footnotes and internal citations omitted).  The exception for "top hat" plans, if applicable, is such an ERISA exception; that exception, however, is not available here.

22.    The term "top hat" plan is not found in ERISA, but is rather a colloquial term used to describe a plan that is "unfunded and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1); New Valley Corp., 89 F.3d at 148.  As the Third Circuit has noted:

> The elements of this definition make the top hat category a narrow one.  Not only must the plan be unfunded and exhibit the required purpose, it must also cover a "select group" of employees.  This final limitation has both quantitative and qualitative restrictions.  In number, the plan must cover relatively few employees.  In character, the plan must cover only high level employees.  Because of these limitations, top hat plans form a rare sub-

8

species of ERISA plans, and Congress created a special regime to cover them.

Id.  In addition, the "dominant characteristic of the special top hat regime is the near-complete exemption of top hat plans from ERISA's substantive requirements . . . [29 U.S.C.] Section 1101(a)(1) exempts top hat plans from ERISA's fiduciary responsibility provisions, including . . . the need to give control of plan funds to a trustee, . . . and limitations on transactions and investments." Id. at 148-49.  Congress exempted "top hat" plans from these protections because such plans are supposed to be strictly limited to a select group of employees who possess the sophistication, economic leverage and individual bargaining power necessary to protect themselves in the selection of benefit and pension plan options. E.g., Guiragoss v. Khoury, 444 F.Supp. 649, 661-662 (E.D. Va. 2006)(collecting authorities).  Such was not the case with the Plan.

23.    Determining if a plan is a top hat plan involves a fact-specific and fact-intensive analysis – an inquiry more appropriate for an adversary proceeding.  MacDonald v. Summit Orthopedics, Ltd., 681 F. Supp. 2d 1019 (D. Minn. 2010); Fenwick v. Merrill Lynch & Co., Inc., 2007 WL 2727436 at *3 (D. Conn. 2007).  As the statute requires and consistent with the rationale for the exception, courts look at three distinct elements.  To be designated a "top hat" plan, ERISA requires the court to determine (1) whether the plan is "unfunded"; (2) whether the plan is "maintained by an employer primarily for the purpose of providing deferred compensation for a *select* group of management or highly compensated employees";[4] and (3) whether the employees participating in the alleged "top hat" plan have sufficient influence within the company to negotiate compensation agreements that will protect their own interests where ERISA provisions do not apply."  Khoury, 444 F.Supp. 2d at 658-59 (emphasis supplied). *See*

---

[4] The Beneficiaries preserve the argument that the Plan in this case was, in fact, "funded" for ERISA purposes.

*also*, Bakri v. Venture Mfg. Co., 473 F.3d 677, 678-80 (6th Cir. 2007) (three elements cited; court finds plan not a top hat plan); Alfa Laval, Inc. v. Nichols, 2007 WL 984111 (E.D. Va. 2007)(citing three part analysis); Carraba v. Randalls Food Market, Inc., 38 F.Supp. 2d 469, 476-78 (N.D. Tex. 1999)(citing three-part test and finding plan not a top hat plan).  The burden is on the party seeking to establish top hat status to prove all of the elements.  *E.g.*, Carrabba, 38 F. Supp. 2d at 478; Virta v. Desantis Ent. Inc., 1996 WL 663970, at *3 (N.D.N.Y. 1996). Moreover, in applying the three-part test, courts must take into account that "ERISA is a remedial statute that should be liberally construed in favor of employee benefit fund participants. To that end, exemptions from . . . ERISA coverage should be confined to their narrow purpose." *E.g.*, New Valley Corp., *supra*; Khoury, 444 F. Supp. 2d at 659.

24.     The operative documents must, of course, be examined.  However, merely putting language in the operative documents that recites the top hat plan requirements is insufficient, as is the employer's sincere intent to create a top hat plan; the actual plan, in its actual implementation, must satisfy all of the top hat requirements.  Carraba, 38 F. Supp. 2d at 478; Virta, 1996 WL 663970, at *3.

25.     Analysis of the second requirement – whether the plan is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees – requires a fact-specific inquiry that examines both quantitative and qualitative factors.  *See* In re New Century Holdings, Inc., 387 B.R. 95, 111 (Bankr. D. Del. 2008). "Both the qualitative and quantitative elements must be met for a court to find that a plan qualifies as a top hat plan.  Id.

26.     First, the plan must be offered to a "select group."  Relevant factors include the percentage of the workforce invited and eligible to join the plan (quantitative) and the "nature of

their employment duties, the compensation disparity between the top hat members and non-members, and the actual language of the plan agreement (qualitative factors)." <u>Khoury</u>, 444 F. Supp. 2d. at 660.    Second, the select group must consist only of management or highly compensated individuals, an analysis turning on many of the same qualitative factors noted above. <u>Id</u>.

27.    While a "review of the published cases reflects that there is no existing authority that affirms top hat status for a plan representing more than 16% percent of the total workforce," this case law does not, as Debtors so boldly and incorrectly claim, create a "safe harbor" for deferred compensation plans offered to fifteen percent (15%) or less. <u>Khoury</u>, 444 F. Supp. 2d. at 660.    Existing precedent does not establish a bright line for when a plan is too large to satisfy the select group requirement and in the reported cases, the percentage of the workforce permitted to enroll in a "top hat" plan has been considerably smaller than 15%. <u>Id</u>. at 660-61.    *See also*, <u>The IT Group, inc. v. Bookspan (In re The IT Group, Inc.)</u>, 305 B.R. 402, 410 (Bankr. D. Del. 2004)(the "highest percentage of employees found to have been a 'top hat' plan, while not a bright line test, has been 15%")).    Critically, "the analysis should focus on the percentage of the workforce invited to participate in a potential 'top hat' plan, rather than on the percentage of the workforce that actually enrolled. *E.g.*, <u>Khoury</u>, 444 F.Supp.2d at 661, n. 14.

28.    If plan participation is not based upon managerial status or compensation level, the plan fails as a "top hat" plan regardless of participation rates. <u>Id</u>. at 661; <u>Starr v. JCI Data Processing, Inc.</u>, 757 F. Supp. 390, 394 (D.N.J. 1991).    There must be some well-established and meticulously applied standard for designating plan members as "high level" employees. *E.g.*, <u>Khoury</u>, 444 F.Supp.2d at 661.    The inclusion of employees whose base salary is low and who achieve higher earnings only as a result of commission income is particularly problematic.

Darden v. Nationwide Mutual Ins. Co., 717 F. Supp. 388 (E.D.N.C. 1989); Plazzo v. Nationwide Ins. Co., 697 F. Supp. 1437 (N.D. Ohio 1988), *rev'd on other grounds*, 892 F.2d 79 (6th Cir. 1989); Fraver v. North Carolina Farm Bureau Mutual Ins. Co. 643 F.Supp. 633 (E.C.N.C. 1985), *rev'd on other grounds*, 801 F.2d 675 (4th Cir. 1986).  Persons who might be "highly compensated" only if they earn significant commissions do *not* fit the characteristics needed for inclusion in a "top hat" plan, since "less motivated" employees would not be well-compensated: "These are not indicia of a consistently highly compensated select group of individuals." Plazzo, 697 F. Supp. at 1451.

29.     The final requirement, emphasized in DOL advisory opinions, is that the select group must consist of individuals who are in a position to protect their own interests by virtue of their favorable bargaining position.  The assumption underlying the "top hat" exception is that "top-level executives are in a favorable bargaining position to negotiate the terms of an agreement and, therefore, do not need a comprehensive regulatory scheme to protect their interests."  Khoury, 444 F. Supp. 2d at 662.  *See also*, Kemmerer v. ICI Americas, Inc., 70 F.3d 281, 286 (3d Cir. 1995).

30.     Accordingly, the courts have frequently found plans to fail the "top hat" criteria despite the clear intent of employers to create them and documents containing language creating a grantor trust.  Deal v. Kegler Brown Hill & Ritter, Co. L.P.A., 2008 WL 269617 at *5-6 (S.D. Ohio Jan. 29, 2008)(holding that despite the fact that employer reported to Department of Labor that oral ERISA plan qualified as a "top hat" plan, that plan did not qualify under the exception because, in part, the employer failed to meet its burden to establish that the plan was available to a limited number of employees and, furthermore, participating employee did not have the ability

to vote and therefore could not substantially influence the terms of the plan); <u>Bakri</u>, *supra*; <u>A.F. Plazzo</u>, *supra*; <u>R.E. Fraver</u>, *supra*; <u>Khoury</u>, *supra*; <u>Carrabba</u>, *supra*; <u>Virta</u>, *supra*; <u>Starr</u>, *supra*.

31.     A determination whether the Plan at issue here constitutes a "top hat" plan cannot possibly be made without the benefit of discovery.  The Debtors claim in their reply in further support of the Turnover Motion (the "<u>Reply</u>") and in the declaration of Daniel Ray filed in support of the Turnover Motion (the "<u>Ray Declaration</u>") that "the Debtors set a goal for employee eligibility to be 10% or less of the total employee population in any given year and enrollment generally was maintained between 6-8% of the total employee population, *although the percentages would vary each year depending on the number of employees that qualified based on the total compensation threshold described below*."  <u>Ray Dec.</u> at ¶ 5; <u>Reply</u> at ¶ 23.

32.     It is not immediately clear from either the Ray Declaration or the Debtors' papers whether the 6-8% enrollment figure, or the goal of 10% reflects the amount of employees actually enrolled in the Plan, or the number of employees invited to participate in the Plan.  As the case law makes abundantly clear, a "select group" is determined by examining the number of employees invited to participate, as opposed to number of employees actually enrolled.

33.     In both the HomeBanc and New Century cases, the debtors originally claimed that only a select number of employees were invited to participate in the deferred compensation plans at issue, but subsequent discovery in both cases revealed that much higher percentages of the workforce were offered enrollment than the debtors originally estimated.

34.     As evidence for their claim that the Plan participants were highly compensated, the Debtors state that "only employees earning at least $145,200 in total compensation [in 2000], which included commissions, were eligible to participate in the Plan."  <u>Turnover Motion</u> at ¶ 6.

The threshold increased gradually over subsequent years until 2008, when it reached $180,000. Id.

35.    Without more information, however, these thresholds tell us nothing about whether the participants have been properly characterized as highly compensated.  First, the thresholds include commissions which, as discussed above, are considered to be problematic in determined relative salary levels.  Second, without knowing the amount of salary paid to other employees, it is impossible to determine whether these thresholds are indeed high compared to employees not invited to participate.

36.    The Beneficiaries believe that discovery will establish that the Plan was offered to more than a select group of management and/or highly compensation employees. Mr. Horne, a long-time, high level employee of the Debtors, reviewed the list of Plan participants and identified only a very small number who were either management or highly compensation.  *See* Horne Declaration.  In fact, many of the Plan participants are retirees who were not members of management and, as a result of the status as retired employees, cannot possibly be considered highly compensated.

37.    In the end, the Debtors bear the burden of establishing that the Plan is a "top hat" plan, and blind reliance on the language found in the Plan and the Trust are simply not enough to satisfy that burden.   Accordingly, the Motion should be denied and the Plan Assets should continue to be held in trust for the exclusive benefit of the Beneficiaries.

> **C.**      ***Even if the Plan is a "top hat" plan the Plan Assets are subject to creditors only if the "Company" as referenced in the Plan documents, is insolvent.***

38.    The Motion seeks "the entry of an order directing the Trustee to return the assets of the Trust to the Debtors' bankruptcy estates for the benefit of the Debtors' general unsecured creditors."  Motion at ¶ 21.  However, both the Plan and the Trust specifically state that the Plan

Assets are to be used to pay the claims of general unsecured creditors in the event of Insolvency which is defined as: (1) the Company's inability to pay its debts as they become due, or (2) a pending proceeding in which the Company is a debtor under the United States Bankruptcy Code. *See* <u>Plan</u> at ¶ 8.4; <u>Trust</u> at ¶¶ 1(d), 3(a).

39.     Under the current facts, it is impossible to determine which entity was the "Company" at the time of the Petition Date. The Plan defines NNI as the Company on the date the Plan and Trust Agreement became effective, but as the subsequent Letter Agreements, and amendments and modifications to the Plan documents indicates, Plan sponsorship and funding responsibilities, and even the ownership of the Plan Assets shifted regularly among NNI, NNC and NNL.

40.     The Debtors have not claimed that any one of these three entities were insolvent as a result of their inability to pay its debtors as they became due and only one of the three entities is a debtor under the *United States* Bankruptcy Code. NNC and NNL are debtors under the laws of Canada.

41.     Accordingly, serious factual questions exist as to whether the Plan Assets even constitute property of the bankruptcy estate and if they do not, then they cannot be turned over in violation of the Trust Agreement.

42.     While federal law may determine what property becomes property of the estate, the extent of the debtor's and creditors' interest in property is defined by state law. <u>Butner v. United States</u>, 440 U.S. 48, 54-55, 99 S. Ct. 914, 917-18, 59 L.Ed.2d. 136 (1979). The bankruptcy estate's rights in property are limited to only those rights that the debtor possessed prepetition. <u>Integrated Solutions, Inc. v. Service Support Specialties, Inc.</u>, 124 F.3d 487, 492 (3d Cir. 1997). See also, <u>In re Roach</u>, 824 F.2d 1370, 1374 (3d Cir. 1987)(Under *Butner*, state law

governs questions of property rights); In the Matter of Celeste Court Apts, Inc., 47 B.R. 470, 473 (D. Del. 1985)("…state, not federal, law determines a creditor's property rights in bankruptcy"). Property interests are not enlarged, enhanced or altered by virtue of a bankruptcy filing.  In re Shoen, 193 B.R. 302, 317 (Bankr. D. Ariz. 1996)(citing *Butner*).  Neither the bankruptcy laws nor the bankruptcy court, as an equity court, can create or expand property rights not otherwise available under applicable state law.  Southern Rwy. Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3d Cir. 1985).

43.      In the case of the Plan Assets in this case, "all indicia of ownership in the Trust corpus are defined in all respects by the Trust Agreement" and the applicable state law of trusts. Bank of America v. Moglia (In re Outboard Marine Corp.), 278 B.R. 776, 787-791 (N.D. Ill. 2002), *affirmed* Bank of America v. Moglia, 330 F.2d 942 (7th Cir. 2003).  Restrictions on the use of the trust corpus set forth in the trust agreement forming the "rabbi trust" must be enforced in bankruptcy.  Id.  The trustee and beneficiaries cannot grant rights that they do not possess. Id. at 789.

44.      The bankruptcy courts have consistently held that restrictions on the use of a trust corpus must be enforced, even where the debtor is the settlor of the trust.  Tort Claimants Committee v. Roman Catholic Archbishop of Portland in Oregon (In re Roman Catholic Archbishop of Portland in Oregon), 345 B.R. 686 (Bankr. D. Or. 2006); Salisbury v. Ameritrust Texas, N.A. (In re Bishop College), 151 B.R. 394 (Bankr. N.D. Tex. 1993)("The bankruptcy estate, insofar as it includes the Trust's assets, takes them subject to all limitations and conditions that existed on the property, pre-petition").  As the court held in Roman Catholic Archbishop of Portland, even though the debtor-trustee's right to exercise powers over the trust and the debtor's beneficial interest therein became property of the estate, the funds in the trust were subject to all

restrictions on use contained in the trust instrument to the extent enforceable under nonbankruptcy law. 345 B.R. at 706-707. Funds designated for a particular use were limited to that use despite the fact that enforcing the use limits would reduce distributions to estate creditors. Id.

45.     Moreover, use restrictions with respect to a trust res define and limit the nature of the trustee's and the beneficiaries' property interests. Such use restrictions are not mere restraints on the alienation of otherwise unrestricted assets and are not "preempted" by the Bankruptcy Code. Roman Catholic Archbishop of Portland, supra. Compare In re Combustion Engineering, 391 F.3d 190 (3d Cir. 2004)(1123(a)(5) allows preemption of simple restriction on alienation in insurance policy) with Pacific Gas and Electric Company v. People of the State of California, 350 F.3d 932 (9th Cir. 2003)(section 1123(a)(5) limited to preempting statutory or contractual transfer restrictions tied to financial condition).

46.     Distribution of the Plan Assets under any circumstances other than those identified in the Trust Agreement would violate applicable state law and is an unlawful attempt to expand the estate's interest in property beyond that which the Debtors enjoyed at state law. This would clearly constitute "divert[ing] to others…the Trust assets." Butner and section 1129(a)(3) do not permit such an action, yet this is precisely the relief the Debtors request in their Turnover Motion, and, therefore, the Turnover Motion must be denied.

## IV.     Conclusion

This Motion simply cannot be granted under either Fed. R. Bankr. Rule 7001(a), ERISA, relevant case law or the terms of the Plan and the Trust. The determination of ownership interests in the assets of an employee benefit plan which purports to be a "top hat" plan involves a factually intensive inquiry and the Debtors, as proponents of the Plan's "top hat" status, bear

the burden under that analysis.  The Debtors have failed to meet that burden. Accordingly, the Beneficiaries respectfully request that this Court enter an order: (1) denying the Motion; (2) directing that the Plan Assets remain segregated from the Debtors' estates and continue to be held in trust for the exclusive benefit of the Beneficiaries; and (3) entering such other relief the Court deems necessary and appropriate.

Dated February 8, 2011                                    **BERNSTEIN, SHUR, SAWYER & NELSON**


                                                          /s/ Robert J. Keach
                                                          ROBERT J. KEACH
                                                          100 MIDDLE STREET
                                                          P.O. BOX 9729
                                                          PORTLAND, ME 04104-5029
                                                          TELEPHONE:  (207) 774-1200
                                                          TELECOPIER:  (207) 774-1127
                                                          EMAIL:  RKEACH@BERNSTEINSHUR.COM