**EXHIBIT B**

## AMENDED AND RESTATED MSS SIDE AGREEMENT

This AMENDED AND RESTATED MSS SIDE AGREEMENT (the "**Agreement**") is dated as of [●], 2011, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**" and, together with NNC, the "**Canadian Main Sellers**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with the Canadian Main Sellers, the "**Main Sellers**"); (iv) the affiliates of the Main Sellers listed in <u>Schedule A</u> hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"); (v) the entities listed on <u>Schedule B</u> hereto (the "**EMEA Sellers**"), which in the case of the EMEA Debtors are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited (in administration), for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "**Joint Administrators**") who act as agents only for the EMEA Debtors and without any personal liability whatsoever and, in the case of the Israeli Company (as defined below) is acting by its joint administrators Yaron Har-Zvi and Avi D. Pelossof (collectively, the "**Joint Israeli Administrators**") who act as agents only of the Israeli Company and without any personal liability whatsoever; (vi) Nortel Networks S.A. (in administration) ("**NNSA**") acting by the French Liquidator (as defined below), who acts as agent for NNSA without any personal liability whatsoever (NNSA, the Sellers and the EMEA Sellers being, together, the "**Selling Parties**"); (vii) Nortel Networks International Corporation, Nortel Networks Global Corporation, Nortel Altsystems Inc. (f/k/a Alteon Websystems, Inc.) and Nortel Networks o.o.o (the "**Non-Selling Parties**"); (viii) the Joint Administrators; and (ix) the Joint Israeli Administrators.

The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 3.1 (a) – (d), 3.3, 3.5, 3.8, 3.9 and 3.16. The Joint Israeli Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 3.2, 3.3, 3.5, 3.8, 3.9, and 3.16. The Non-Selling Parties are party to this Agreement for the sole purpose of amending and restating the Agreement and shall not be bound by any of the terms and conditions herein except as provided in Section 3.3 hereof.

## W I T N E S S E T H :

WHEREAS, on the Petition Date, the Canadian Debtors filed with the Canadian Court an application for protection under the CCAA and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time and most recently on October 27, 2010, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, the U.S. Debtors are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court except for Nortel Networks (CALA) Inc., which commenced its case by filing a voluntary petition for relief in the U.S. Bankruptcy Court on July 14, 2009;

1

WHEREAS, the EMEA Debtors on the Petition Date filed applications with the English Court pursuant to the Insolvency Act and the EC Regulation and the English Court appointed the Joint Administrators on the Petition Date as joint administrators of each of the relevant EMEA Debtors under the Insolvency Act;

WHEREAS, the Israeli Court, on January 19, 2009, granted Nortel Networks Israel (Sales and Marketing) Limited (in administration) (the "**Israeli Company**") with a stay of proceedings order and nominated the Joint Israeli Administrators as joint administrators of the Israeli Company.  On November 24, 2009, as part of such stay of proceedings, the Israeli Court approved a creditors' arrangement in connection with the Israeli Company, and further approved at a later date, the continuation of all relevant rights, duties and obligations of the Joint Israeli Administrators pursuant to such stay of proceedings order;

WHEREAS, while the administration proceedings in respect of NNSA, being main proceedings pursuant to Article 3(1) of the EC Regulation and under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation in the Republic of France pursuant to which Maître Cosme Rogeau was appointed *Liquidateur Judiciaire* of NNSA (the "**French Liquidator**") by the French Court (Docket No. 2009P00492);

WHEREAS, the Non-Debtor Sellers and the EMEA Non-Debtor Sellers are not subject to any Bankruptcy Proceedings;

WHEREAS, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators entered into an Interim Funding and Settlement Agreement (as may be amended from time to time in accordance with its terms, the "**IFSA**") governing certain intercompany matters, including the obligation of the parties thereto to (a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the "**Interim Sales Protocol**") for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (each as defined in the IFSA), which Interim Sales Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant parties in such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds);

WHEREAS, NNSA entered into an Accession and Amendment Agreement relating to the IFSA dated September 11, 2009, under which NNSA acceded to the IFSA;

WHEREAS, on August 26, 2010, the Sellers entered into the Stalking Horse NA Agreement and the EMEA Sellers entered into the Stalking Horse EMEA Agreement;

WHEREAS, on September 24, 2010, an auction was conducted in accordance with the Bidding Procedures and the Successful Bid (as defined in the Bidding Procedures) was submitted by Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "**Purchaser**"), making it the Successful Bidder (as defined in the Bidding Procedures);

2

WHEREAS, the Sellers have entered into an asset sale agreement with the Purchaser, dated as of September 24, 2010, relating to the assets of the Business owned and operated by the Sellers, and as may be further amended in accordance with its terms (the "**North American Agreement**");

WHEREAS, the EMEA Sellers, the Joint Administrators and Joint Israeli Administrators have entered into an Asset Sale Agreement, dated as of September 24, 2010, with the Purchaser relating to the part of the Business owned and operated by the EMEA Sellers and NNSA, and as may be further amended in accordance with its terms and this Agreement (the "**EMEA Agreement**" and, together with the North American Agreement, the "**Sale Agreements**");

WHEREAS, the Stalking Horse Purchaser terminated the Stalking Horse NA Agreement and the Stalking Horse EMEA Agreement on November 3, 2010, pursuant to Section 9.1(b)(ii) of the Stalking Horse NA Agreement and Section 15.4.2(B) of the Stalking Horse EMEA Agreement;

WHEREAS, in accordance with Section 9.2(c) of the Stalking Horse NA Agreement and Section 15.5 of the Stalking Horse EMEA Agreement, on November 16, 2010 the Stalking Horse Purchaser was paid an expense reimbursement in the amount of $1,500,000 (the "**Expense Reimbursement**"), with each of NNL, NNI and NNUK paying one-third (1/3) of the Expense Reimbursement;

WHEREAS, NNSA will enter into a license termination agreement in respect of the Transaction (as defined below) with a number of the Selling Parties including NNC, NNL, NNI and NNUK (the "**NNSA LTA**"). The parties to the NNSA LTA will recognize that NNSA is a "**Selling Debtor**" pursuant to Section 12.a of the IFSA for the purposes of this Transaction (and, as such, any reference in this Agreement to a Selling Party includes NNSA);

WHEREAS, as soon as practicable after the execution of this Agreement, in accordance with Section 12.b of the IFSA, the Selling Parties, the Monitor and the Committee (as defined in the U.S. Bidding Procedures Order) will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers, the EMEA Sellers, NNSA, and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules) of the Total Proceeds of the Transaction and other payments to be made by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Selling Parties under or in relation to the Sale Agreements;

WHEREAS, for the purpose of facilitating the completion of the Transaction and maximizing the value arising therefrom for their respective stakeholders, the Parties intend to assume certain mutual cooperation and other covenants relating to the pursuit and completion of the sale of the Business and the related termination of NNSA's rights in respect of the Business (the "**Transaction**") pursuant to the Sale Agreements and the NNSA LTA or otherwise, as well as govern certain other matters of common interest relating to the prospective Transaction, including certain matters relating to the allocation among the Parties of the benefits and burdens of the Transaction;

WHEREAS, the Selling Parties (other than PT Nortel Networks Indonesia), the Non-Selling Parties, the Joint Administrators and the Joint Israeli Administrators entered into that certain MSS Side Agreement on January 6, 2011 (the "**MSS Side Agreement**") and now desire to amend and restate the MSS Side Agreement in its entirety; and

WHEREAS, the Non-Selling Parties each entered into the MSS Side Agreement on the expectation of being a Seller and have, prior to the date hereof, each determined that they are not Sellers.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

ARTICLE I

INTERPRETATION

SECTION 1.1. <u>Definitions</u>.

(a)    To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the North American Agreement, (ii) to the extent they are not defined in the North American Agreement, in the EMEA Agreement, or (iii) to the extent they are not defined in the Sale Agreements, the TSA.

(b)    The following capitalized terms shall have the meanings set forth below:

(i)    "**Advisor Fees**" means any fees or other amounts paid or payable to (A) the Distribution Agent in accordance with the terms of the Distribution Escrow Agreement, (B) the Escrow Agent (in its capacity as agent for the various escrows contemplated by the Sale Agreements and the TSA), (C) the EMEA Escrow Agent, (D) the Independent Auditor, (E) the Accounting Arbitrator appointed in accordance with the Sale Agreements, and (F) the TSA Arbitrator.

(ii)    "**Agreed Respective Percentage**" means the percentage of Total Payments pertaining to each of the Parties and, with respect to NNI and NNL only, their respective Respective Affiliates, determined pursuant to the Allocation Rules.

(iii)    "**Allocation Rules**" means the rules (expressed as percentages or otherwise) to be used to allocate among the Selling Parties and other parties, as may be applicable, the benefit of the Total Proceeds and the burden of the Total Payments, as such rules shall be agreed upon among the relevant Selling Parties pursuant to Section 12.d and Section 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c of the IFSA.

(iv)    "**Canadian IT Amount**" has the meaning assigned to in <u>Section 2.6(a)(i)</u>.

4

(v)    **Court Approval Condition**" has the meaning assigned to it in Section 3.14.

(vi)    "**Dispute Resolver Retainer**" means any retainer paid or payable to one or more dispute resolvers appointed pursuant to the Interim Sales Protocol to determine the Allocation Rules, to the extent related to the Transaction.

(vii)    "**Distribution Agent**" means JP Morgan Chase Bank, N.A. or such other Person appointed with the consent of each of NNL, NNI and NNUK, provided that consent to appoint such Person shall not be withheld unreasonably.

(viii)    "**EMEA Debtors**" means those entities listed in Schedule 3 of the EMEA Agreement.

(ix)    "**Initial Respective Percentage**" means one third (1/3) for NNI and its Respective Affiliates, one third (1/3) for NNC, NNL and their Respective Affiliates, and one third (1/3) for the EMEA Sellers.

(x)    "**IT Payment Date**" means the date that is ten (10) Business Days following the IT Payment Trigger Date.

(xi)    "**IT Payment Trigger Date**" means the earlier of (i) July 1, 2011 and (ii) the date that the accrued IT Total Payment Amount equals or exceeds $12,000,000.

(xii)    "**IT Providers**" means NNL, NNI, and NNC.

(xiii)    "**IT Services**" means those Services listed in Schedules 1.A and 1.B of the TSA, and any Project in relation thereto.

(xiv)    "**IT Total Payment Amount**" has the meaning assigned to it in Section 2.6(a)(i).

████████████████████████████████

(xvi)    "**New Bankruptcy Proceedings**" means any voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings commenced after the date hereof.

(xvii)    "**NNI IT Amount**" has the meaning assigned to it in Section 2.6(a)(i).

(xviii)    "**NNUK**" means Nortel Networks UK Limited (in administration).

(xix)    "**Party**" means (A) each of the Canadian Main Sellers and their Respective Affiliates, (B) each of NNI and its Respective Affiliates, (C) each of NNUK and its Respective Affiliates, and (D) for the purposes of Sections 2.1, 2.2, 2.3, 3.1 (a) – (d), 3.3, 3.5, 3.8, 3.9 and 3.16 only, the Joint Administrators and for the purposes of Sections 2.1, 2.2, 2.3, 3.2, 3.3, 3.5, 3.8, 3.9, and 3.16 only the Joint Israeli Administrators, and "**Parties**" shall have a corresponding meaning.

(xx)   **"Respective Sale Agreement"** means (A) with respect to the Canadian Main Sellers, NNI and the Other Sellers, the North American Agreement and (B) with respect to the EMEA Sellers, the EMEA Agreement.

(xxi)   **"Respective Affiliates"** means (A) with respect to NNL, each of the other Canadian Debtors, (C) with respect to NNI and all other U.S. Debtors, each Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule, and (D) with respect to NNUK, all the other EMEA Sellers listed in Schedule B of this Agreement.

(xxii)   **"Secondary Proceedings"** shall have the meaning attributed to such words in the EMEA Agreement.

(xxiii)   **"Stalking Horse NA Agreement"** means that certain Asset Sale Agreement, dated as of August 26, 2010, among the Sellers and PSP Holding LLC.

(xxiv)   **"Stalking Horse EMEA Agreement"** means that certain Asset Sale Agreement, dated as of August 26, 2010, among the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and PSP Holding LLC.

(xxv)   **"Stalking Horse Purchaser"** means PSP Holding LLC.

(xxvi)   **"Total Payments"** means the aggregate of:

(A) the Expense Reimbursement;

(B)  the amount of $1,000,000 to be paid to the Stalking Horse Purchaser within three (3) Business Days following the Closing Date as a break-up fee, in accordance with Section 9.2(a) of the Stalking Horse NA Agreement and Section 15.5 of the Stalking Horse EMEA Agreement (the **"Break-Up Fee"**);

(C) all amounts paid or payable by the Selling Parties to third parties (1) to obtain intellectual property licenses and consents; and (2) to satisfy obligations arising from the failure to obtain such consents under intellectual property licenses, in each case in respect of intellectual property currently used by the Selling Parties but only to the extent directly connected to the obligation of the Selling Parties to deliver Services to the Purchaser under the TSA;

(D) all amounts paid or payable by the Selling Parties as Advisor Fees;

(E) all amounts paid or payable to the Purchaser under section 2.2.3.2 of the North American Agreement; and

(F) all amounts paid or payable by the Selling Parties in respect of the Dispute Resolver Retainer.

6

(xxvii) **"Total Proceeds"** means the aggregate amounts (A) paid by the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) to the Selling Parties under or in respect of the Sale Agreements as Purchase Price, Good Faith Deposit, Purchase Price adjustments, and damages, and (B) paid to the Selling Parties under any escrow arrangement pursuant to which a portion of the Purchase Price or Good Faith Deposit has been placed in escrow, but for greater certainty shall exclude any amounts not constituting a portion of the Purchase Price paid or payable by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to one or more Selling Party to compensate such Selling Party for costs incurred or to be incurred by such Selling Party, as contemplated to be paid directly to such Selling Party in accordance with the terms of the relevant Sale Agreement or other Transaction Document.

(xxviii)**"Transaction Documents"** means the Transaction Documents (as the term is defined under the North American Agreement) and the Transaction Documents (as the term is defined under the EMEA Agreement).

(xxix)  **"TSA"** means the Transition Services Agreement to be executed as of the Closing Date.

(xxx)  **"TSA Termination Date"** means the earlier of (i) the first day on which none of the IT Providers perform IT Services for the Purchaser pursuant to the TSA; and (ii) June 30, 2011.

(xxxi)  **"Under-Recovery Period"** means the period, if any, commencing on the Under-Recovery Start Date up to and including the TSA Termination Date.

(xxxii) **"Under-Recovery Start Date"** means the first day on which none of the IT Providers provide information technology services to any persons pursuant to any transition services agreement currently in effect as of the date of this Agreement (including such transition services agreements as are renewed, varied or novated after the date of this agreement, but, for the avoidance of doubt, not including the TSA).

SECTION 1.2. Interpretation.

1.2.1. Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2. Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3. Headings, etc. The division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4. Currency. All monetary amounts in this Agreement are stated in United States currency.

## ARTICLE II

## COVENANTS

SECTION 2.1. Efforts to Complete the Transaction.

(a)     Subject to the requirements of any applicable Law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other and the Purchaser in good faith in order to do all things necessary, proper or advisable under applicable Law to perform their obligations under their Respective Sale Agreement and consummate the transactions contemplated by the Sale Agreements and the NNSA LTA, as applicable, as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to the Purchaser's obligations to consummate the transactions contemplated by their Respective Sale Agreement.

(b)     The mutual efforts of the Parties pursuant to Section 2.1(a) shall include:

(i)     cooperating with the other Parties in good faith in any manner reasonably required to facilitate the consummation of the Transaction, including by sharing information to the extent necessary or opportune and keeping the other Parties informed of any matter of relevance relating to the Transaction and their Respective Sale Agreement;

(ii)     (A) defending all Actions by or before any Government Entity challenging the Sale Agreements, the NNSA LTA or the consummation of the Transaction and (B) seeking rescission or repeal of any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Transaction;

(iii)     cooperating with the other Parties and the Purchaser in good faith in any manner reasonably required to facilitate the preparation and making of any filings with Government Entities required to seek and obtain the Regulatory Approvals;

(iv)     upon becoming aware of any material issue that may result in a breach by the Sellers, the EMEA Sellers or NNSA under either Sale Agreement or

8

the NNSA LTA, promptly informing the other Parties of such potential breach and consulting with the other Parties with a view to ensuring that there is no breach of the relevant Sale Agreement or the NNSA LTA and/or any breach is timely cured in accordance with the Sale Agreements or the NNSA LTA; and

(v)     ensuring that the Total Proceeds are deposited in the form and in the amount paid by the Purchaser (and any Designated Purchaser or EMEA Designated Purchaser) or, upon release from escrow, the applicable escrow agent, to the Distribution Agent in accordance with the terms hereof and the Distribution Escrow Agreement.

SECTION 2.2.  Notice and Consultation.

(a)     Each of NNL, NNI and NNUK and, to the extent applicable, the Joint Administrators and/or the Joint Israeli Administrators (together, the **"Primary Parties"**), shall provide to the others as much notice as possible, and in any case no less than five (5) Business Days written advance notice if possible, and shall consult in good faith with the other Primary Parties, prior to taking or agreeing to take, any of the following actions under their Respective Sale Agreement:

(i)     subject to Section 2.3, amending any material provision of their Respective Sale Agreement;

(ii)     subject to Section 2.3, waiving any of their material rights or provisions under their Respective Sale Agreement;

(iii)     with respect to the EMEA Sellers only, consenting to the entry into, or requesting, promoting or instituting, any Secondary Proceedings in relation to any EMEA Seller;

(iv)     with respect to the Main Sellers only, voluntarily commencing, or otherwise consenting to, any New Bankruptcy Proceedings relating to any Non-Debtor Seller; and

(v)     delivering or otherwise consenting to the amount reflected in any Closing Statements, Disagreement Notice or any settlement of a dispute regarding the matters contained therein or the determination of Net Market Value contemplated by Schedule 7 to the EMEA Agreement.

(b)     If an EMEA Seller, after having acted in accordance with Section 2.2(a)(iii), resolves to enter into Secondary Proceedings and the Main Sellers have a right under the Law applicable to such Secondary Proceedings to appear at such Secondary Proceedings (under any capacity whatsoever), that EMEA Seller shall, as far as is reasonably practicable, facilitate the Main Sellers being heard at such Secondary Proceedings, to the maximum extent allowed by the Law applicable to them.

(c)     The Reserved Territory Sellers (as such term is defined in clause 1.1 of Schedule 6 of the EMEA Agreement) agree to deliver acceptance of Irrevocable Offers to the Purchaser as soon as possible after appropriate completion of each relevant consultation process.

SECTION 2.3.  <u>No Termination or Material Amendments</u>.  No Party shall, without the prior written consent of the other Parties (such consent not to be unreasonably withheld, delayed or conditioned):

(a)  exercise any termination right pursuant to their Respective Sale Agreement (excluding the Main Sellers' right to terminate the North American Agreement under Sections 9.1(b)(i) or 9.1(b)(ii) of the North American Agreement and the Joint Administrators' right to terminate the EMEA Agreement under Clauses 15.4.2(A) or 15.4.2(B) of the EMEA Agreement) or otherwise agree with the Purchaser to terminate such Respective Sale Agreement;

(b)  with respect to the Main Sellers only, amend the provisions of Sections 2.2, 2.3, Article VIII or Article IX of the North American Agreement;

(c)  with respect to the EMEA Sellers only, amend the provisions of Clauses 3, 4.1, 4.2, 4.3 and 15 of the EMEA Agreement or Schedule 7 to the EMEA Agreement; or

(d)  enter into any amendment to or waive any provision of its Respective Sale Agreement or any other Transaction Document to which such Party is a party that would cause a material detriment to any of the other Parties.

SECTION 2.4.  <u>Collection and Allocation of Total Proceeds</u>.

(a)  Subject to Section 2.4(c), Section 2.4(d) and Section 2.4(e), in accordance with the provisions of Section 12.b of the IFSA, the Parties agree that any payment due by the Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements, or, upon release from escrow, any escrow agreements provided for in the Sale Agreements or the Transaction Documents (including, without limitation, the Aggregate Escrow Amount and the TSA Escrow Amount) that is included in the Total Proceeds shall be collected and held in escrow in the Distribution Escrow Account by the Distribution Agent (as agent for the Selling Parties), which will then allocate and distribute the Total Proceeds in accordance with the Allocation Rules, this Agreement and the Distribution Escrow Agreement, <u>provided</u>, <u>however</u>, that any amounts owing under Section 2.5(b) hereof by any Selling Party (the "**Debtor Party**") to another Selling Party at the time of an intended distribution from the Distribution Escrow Account shall be paid out of the share of Total Proceeds otherwise payable to the Debtor Party.

(b)  The Parties agree and acknowledge that the Total Proceeds do not include amounts of or in respect of "VAT" or "Transfer Taxes" (each term as defined in the relevant Respective Sale Agreement) paid or payable by the Purchaser or any Designated Purchaser or any EMEA Designated Purchaser or any affiliate of the Purchaser to the Sellers or the EMEA Sellers or the Joint Administrators or the Joint Israeli Administrators pursuant to the terms of the Sale Agreements.  The Parties agree that it is not intended that such amounts of VAT or Transfer Taxes will be payable into the Distribution Escrow Account but, notwithstanding this Agreement, where such amounts are paid into the Distribution Escrow Account, the Distribution Agent shall be instructed under the procedures in the Distribution Escrow Agreement to promptly pay such amounts to the Selling Parties or the Joint Administrators or the Joint Israeli Administrators (as relevant).

10

(c)     To the extent that there are funds available in the Distribution Escrow Account that are attributable to the Transaction, the obligation of the Selling Parties to make any payment that constitutes part of the Total Payments shall (subject to Section 2.6 and adjustment in accordance with Section 2.5) be satisfied by causing the Distribution Agent to pay the relevant amount out of the Distribution Escrow Account.

(d)     To the extent that any payment that constitutes part of the Total Payments cannot be satisfied by payment out of the Distribution Escrow Account or is required to be paid prior to the Closing Date, any such amounts actually paid by any Selling Party to the Purchaser, the Distribution Agent, or any other Person, as applicable, shall be deducted from any subsequent amounts payable or paid into the Distribution Escrow Account under Section 2.4(a) and shall (subject to adjustment in accordance with Section 2.5) be paid directly to such Selling Party that made the relevant payment. The Parties acknowledge that each of NNL, NNI and NNUK paid $500,000 to the Stalking Horse Purchaser on November 16, 2010, to satisfy the Expense Reimbursement; and agree that, notwithstanding any other provision of this Agreement, (i) $1,500,000 shall be deducted from the Total Proceeds otherwise payable by the Purchaser to the Distribution Agent at Closing and $500,000 of such amount shall forthwith be paid to each of NNL, NNI and NNUK to reimburse them for payment of the Expense Reimbursement and (ii) $1,000,000 shall be deducted from the Total Proceeds otherwise payable by the Purchaser to the Distribution Agent at Closing and paid directly to the Stalking Horse Purchaser in consideration of the Selling Parties obligation to pay the Break-Up Fee.

(e)     It is acknowledged and agreed that, in determining how to allocate and distribute the Total Proceeds, except for the items constituting Total Payments (other than Clause E of such term) and the other expenses, damages and liabilities specifically allocated herein (including, for the avoidance of doubt, the Canadian IT Amount, the NNI IT Amount and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), the Parties reserve all rights in respect of expenses, damages, and all other liabilities, incurred in connection with the performance of their obligations under or pursuant to the Sale Agreements and the NNSA LTA and/or the Transaction Documents and any amount paid or payable by NNI to the Pension Benefit Guaranty Corporation pursuant to the Stipulation Among the Debtors, Certain Affiliates and Pension Benefit Guaranty Corporation [D.I. ●], and, in particular, whether such expenses, damages and other liabilities should be deducted from the Total Proceeds, or otherwise considered in connection with a distribution to the Selling Parties.

SECTION 2.5.  Allocation of Total Payments.

(a)     Irrespective of the individual/joint payment obligations of each Selling Party or their Respective Affiliates *vis-à-vis* the Purchaser pursuant to the Sale Agreements, *vis-à-vis* the Stalking Horse Purchaser pursuant to the Stalking Horse NA Agreement or the Stalking Horse EMEA Agreement, *vis-à-vis* the Distribution Agent pursuant to the Distribution Agreement (each of which shall be duly complied with by the relevant Selling Party in accordance with the terms thereof), or *vis-à-vis* the other recipients of the Total Payments, the Parties agree that, among them, each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) shall initially bear the Initial Respective Percentage and, when determined in accordance with the Allocation Rules, shall ultimately bear the Agreed Respective Percentage of the Total Payments, subject to Section 2.5(b).

(b)     To the extent the Agreed Respective Percentage differs from the Initial Respective Percentage, any amount actually paid by a Party that constitutes part of the Total

11

Payments shall be promptly (re)adjusted among the Parties so that each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) ultimately bears a share of those Total Payments that corresponds to its Agreed Respective Percentage. Except as set forth in Section 2.4(a), adjustment payments to be made among the Parties pursuant to the previous sentence shall be made without set off.

(c)     The Parties agree that the breach of any representation or warranty made under the North American Agreement or the inability to provide any certification concerning the accuracy or completion of any representation, warranty or covenant, in respect of the EMEA Sellers or any aspect of the Business of the EMEA Sellers and NNSA, in each case under the North American Agreement, shall not constitute a matter attributable to the action or omission of any of the Main Sellers, the Other Sellers, the Joint Administrators, the Joint Israeli Administrators,  the French Liquidator, NNSA or the EMEA Sellers.

SECTION 2.6.   <u>Under-Recovery Period; Allocation of Payments Related to TSA IT Costs</u>.

(a)     During the Under-Recovery Period the IT Providers shall use commercially reasonable efforts to wind-down all activities and costs in relation to the IT Services save as is reasonably necessary to support their respective obligations under the TSA, and the IT Providers agree to consult with and provide such information as may be reasonably requested by NNUK and the Joint Administrators in relation to such wind-down plans and activities and to use commercially reasonable efforts to update and inform the French Liquidator regarding the same; and

(i)     During the Under-Recovery Period, (i) an amount (the "**Canadian IT Amount**") shall accrue in respect of the Canadian Main Sellers at a per diem rate based (A) for the first thirty (30) days of the Under-Recovery Period on an amount of $1.6 million for such thirty (30) day period and (B) for each successive thirty (30) day period thereafter on an amount of $1.4 million for each such thirty (30) day period  and (ii) an amount (the "**NNI IT Amount**") shall accrue in respect of NNI at a per diem rate based (A) for the first thirty (30) days of the Under-Recovery Period on an amount of $2.4 million for such thirty (30) day period and (B) for each successive thirty (30) day period thereafter on an amount of $2.6 million for each such thirty (30) day period.  The Canadian IT Amount and the NNI IT Amount (together the "**IT Total Payment Amount**") shall be capped at, and shall not accrue beyond $12,000,000 in the aggregate.

(ii)     The Parties agree that on or as soon as reasonably practical after the IT Payment Date they shall take all necessary steps to direct the release of funds from the Distribution Escrow Account to pay an amount equal to the Canadian IT Amount to NNL (on behalf of the Canadian Main Sellers) and an amount equal to the NNI IT Amount to NNI (on behalf of the U.S. Debtors).

(b)     The Parties further agree that prior to the later of (i) the TSA Termination Date, at which time no amounts are due to NNL and NNI in respect of the Canadian IT Amount and the NNI IT Amount and (ii) the date following the IT Payment Trigger Date that amounts owing to NNL and NNI in respect of the Canadian IT Amount and the NNI IT Amount are due, the Parties shall not take any action to cause the Distribution Escrow Account to fall below

$12,000,000 or such other lesser amount that may be contained in the Distribution Escrow Account at such time.

(c)     If the Total Proceeds available on the IT Payment Date are less than the IT Total Payment Amount, the available funds shall be distributed from the Distribution Escrow Account between NNL (on behalf of the Canadian Main Sellers) and NNI (on behalf of the U.S. Debtors) *pro rata* to their respective entitlements to the aggregate  Canadian IT Amount and NNI IT Amount; provided that should any portion of the Total Proceeds become available after the IT Payment Date, the available funds shall be distributed from the Distribution Escrow Account between NNL (on behalf of the Canadian Main Sellers) and NNI (on behalf of the U.S. Debtors) *pro rata* to the extent amounts remain owing for the Canadian IT Amount or the NNI IT Amount.

(d)     The Parties hereto agree that payments pursuant to this Section 2.6 are the only payments from the Distribution Escrow Account that shall be made in respect of under-recoveries for the Under-Recovery Period in relation to the TSA, and that no Party shall have any liability in respect of such under-recoveries save as set out in this Agreement.

SECTION 2.7. ███████████████████████████.

(a)     



SECTION 2.8. Tax Cooperation.

(a)     In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation or a Selling Party is preparing any Partial Allocation with the Purchaser (whether by agreement or submission to the Accounting Arbitrator), the Selling Party responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Selling Parties and shall consider in good faith any comments by the other Selling Parties with respect to such Tax Return and any Partial Allocation related thereto, provided, and for the avoidance of doubt, that the other Selling Parties shall not have a consent or veto right with respect to such Tax Returns or Partial Allocations related thereto.  It is

understood that neither this Section 2.8 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, adopt, or have any impact whatsoever on, the allocation of proceeds from the Transaction among the Selling Parties.

(b)    In the event that the Purchaser prepares or files a Tax Return that requires an allocation of the proceeds from the Transaction, such Tax Return and any information contained therein shall not, or shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Selling Parties.

(c)    If, in connection with the preparation or filing of a Tax Return as described in subsections (a) and (b) of this section 2.8, or in connection with the transfer of the Purchase Price on the Closing Date, the Purchaser obtains any valuation calculation prepared at its request ("**Valuation**"), such Valuation and any information contained therein (other than information that may be derived therefrom that Purchaser publicly discloses, provided that the Purchaser shall not be considered to have publicly disclosed information solely by virtue of Purchaser giving notice of such information to the Sellers), shall not, or shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Selling Parties. The Parties agree that none of them shall request, suggest or otherwise encourage the Purchaser to make any Valuation or any information derived therefrom publicly available. Additionally, the Parties agree to oppose and to cooperate in opposing the use of the Tax Return or the Valuation by any entity before any dispute resolver(s) appointed pursuant to the Interim Sales Protocol, any court, or such other judicial or quasi-judicial body or similar authority that may determine the allocation or distribution of the Total Proceeds, in a manner inconsistent with this Agreement.

In the event a Party becomes aware that the Purchaser or a Designated Purchaser intends to deduct and withhold an amount from the Purchase Price as contemplated by Section 6.2(a) of the North American Agreement or otherwise under the Sale Agreements (a "**Withholding**"), such Party shall forthwith consult with each of NNL, NNI and NNUK with respect to such Withholding. No Party shall consent to a Withholding by the Purchaser or a Designated Purchaser without the prior written consent of NNL, NNI and NNUK.

SECTION 2.9.    Indemnification of Distribution Agent, Escrow Agent and EMEA Escrow Agent. The Selling Parties agree that the costs of any indemnification of the Distribution Agent, Escrow Agent or EMEA Escrow Agent pursuant to the Distribution Escrow Agreement or the escrow agreements under the Sale Agreements or the TSA shall be borne on a pro rata basis by the Selling Parties in accordance with their Agreed Respective Percentages and any Selling Party paying in excess of such pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Selling Party that has paid less than such pro rata share of such costs either directly to Distribution Agent, Escrow Agent or EMEA Escrow Agent or by payment to another Selling Party pursuant to this sentence; provided that if the costs of any such indemnification arise solely from a breach of the Distribution Escrow Agreement or the escrow agreements under the Sale Agreements and the TSA or other fault of a single Selling Party or Selling Parties, the Selling Party so in breach or at fault shall bear the cost of such indemnification and any Selling Party paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Selling Parties, shall have rights of contribution vis-à-vis any Selling Party that has paid less than its share of such costs either directly to the Distribution Agent, Escrow Agent or EMEA Escrow Agent or by payment to another Selling Party.

14

ARTICLE III

MISCELLANEOUS

SECTION 3.1.  Exclusion of Liability and Acknowledgments re Joint Administrators, the French Liquidator and Directors of EMEA Non-Debtor Sellers.

(a)    The Parties agree that (i) the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations, and (ii) the directors of the EMEA Non-Debtor Sellers shall not incur any personal liability whatsoever, in their capacity as such directors, in respect of the authorization, execution, delivery or performance of this Agreement, howsoever arising other than in respect of fraud by any such director.

(b)    The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Sections 2.1, 2.2, 2.3, this Section 3.1 (a) – (d), 3.3, 3.5, 3.8, 3.9 and 3.16.

(c)    Notwithstanding anything in Section 3.8, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the relevant EMEA Debtors and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

(d)    The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Debtors, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Debtors and their respective successors and assigns.

(e)    The Parties agree that the French Liquidator is entering into this Agreement as agent for NNSA to which he is appointed and that none of the French Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(f)    Notwithstanding anything in Section 3.8, any claim, action or proceeding against the French Liquidator arising from or related to (i) the personal liability of the French

15

Liquidator, his firm, partners, employees, advisers, representatives or agents or (ii) his appointment as Liquidateur Judiciaire of NNSA shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Courts.

      SECTION 3.2.   <u>Exclusion of Liability and Acknowledgments re Joint Israeli Administrators</u>.

      (a)    The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

      (b)    The Joint Israeli Administrators are a party to this Agreement: (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (1) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (2) enforcing the obligations of the other Parties to this Agreement and (3) for the purposes of Sections 2.1, 2.2, 2.3, this Section 3.2, 3.3, 3.5, 3.8, 3.9, and 3.16.

      (c)    Notwithstanding anything in Section 3.8, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

      (d)    The Parties agree that any breach of this Agreement by the Joint Israeli Administrators shall be deemed to be a breach by them in their capacities as administrators of the Israeli Company, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder against the Israeli Company and its respective successors and assigns.

      SECTION 3.3. <u>Non-Selling Parties</u>. The Parties agree that the Non-Selling Parties are entering into this Agreement solely for the purpose of amending and restating this Agreement and that none of the Non-Selling Parties shall be bound by the terms and conditions stated herein nor held liable for them, except as provided in the next sentence. Each Non-Selling Party acknowledges that it is not a "Selling Debtor" (as defined in the IFSA) for this Transaction.

      SECTION 3.4. <u>Remedies</u>.   No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

      SECTION 3.5.   <u>Third-Party Beneficiaries</u>. Except as provided in this Section 3.5 and Section 3.6, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, <u>provided, however</u>, that the Committee shall be a third party beneficiary of this

16

Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors party hereto only, to the fullest extent as if it were a signatory hereto and the directors of the EMEA Non-Debtor Sellers shall be deemed third party beneficiaries of Section 3.1(a) hereof and shall be entitled to enforce and take advantage of the benefit thereof to its fullest extent as if each were signatories hereto.

SECTION 3.6.  Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than five (5) days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Committee, the Bondholder Group (as defined in the U.S. Bidding Procedures Order) and the Monitor, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Agreement.

SECTION 3.7.  Successors.  Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the parties hereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 3.8.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 3.1 (a) – (d) shall be governed exclusively by English law, Section 3.1(e) and (f) shall be governed exclusively by French law and Section 3.2 shall be governed exclusively by Israeli law.

(b)     To the fullest extent permitted by Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the U.S. Bankruptcy Court if such claim, action, or proceeding would solely affect NNI or any of the other U.S. Debtors, the Canadian Court if such claim, action, or proceeding would solely affect NNC, NNL or any of the other Canadian Debtors, the English Court if such claim, action or proceeding would solely affect the EMEA Sellers or the EMEA Debtors, the French Court if such claim, action or proceeding would solely affect NNSA and the Israeli Court if such claim, action or proceeding would solely affect the Israeli Company, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such claim, action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law; provided, however, that any claim, action or proceeding set forth in or on the basis of Section 3.1 (a) - (d) shall be brought exclusively in the

17

English courts, any claim, action or proceeding set forth in or on the basis of Section 3.1 (e) – (f) shall be brought exclusively in the French courts and any claim, action or proceeding set forth in Section 3.2 shall be brought exclusively in the Israeli courts.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.8.

SECTION 3.9.  Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.9.

**If to NNI and its Respective Affiliates:**
c/o Nortel Networks Inc.
Attention:  Christopher Ricaurte
                  President, Nortel Business
                  Solutions
Address: 4001 E. Chapel Hill Nelson Highway
                  Research Triangle Park, NC 27709
                  U.S.A.
Facsimile No.: +1 919 905 4811

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley, Esq. and Lisa M.
Schweitzer, Esq.
Address: One Liberty Plaza
                  New York, New York 10006
                  U.S.A.
Facsimile No.: +1 212 225 3999

**If to the Canadian Main Sellers and their Respective Affiliates:**
c/o Nortel Networks Limited
                  Attention: Anna Ventresca
                  General Counsel-Corporate,
                  Corporate Secretary and Chief
                  Compliance Officer
Address: 5945 Airport Road, Suite 360
                  Mississauga, Ontario L4V 1R9
                  Canada
Facsimile No.: +1-905 863 8386

**With a copy to:**

Ogilvy Renault LLP
Attention: Michael Lang, Esq.
Address: Suite 3800
                  Royal Bank Plaza, South Tower
                  200 Bay Street, P.O. Box 84
                  Toronto, Ontario M5J 2Z4
                  Canada
Facsimile No.: +1 416 216 3930

**If to the EMEA Debtors and their Respective Affiliates:**

**With a copy to:**
Herbert Smith LLP

18

c/o Ernst & Young LLP
Attention: Alan Bloom and Chris Hill
Address: One More London Place
        London SE1 2AF
        United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

**If to the EMEA Non-Debtor Sellers:**
Simon Freemantle/ Dave Quane
Address: Maidenhead Office Park
        Westacott Way
        Maidenhead
        Berkshire SL6 3QH
        United Kingdom
Facsimile No.: +44 (0) 1628 432416

**If to the Joint Israeli Administrators:**
Avi D. Pelossof
Zellermayer, Pelossof & Co.
The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile: +972 3 6255500

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara and Stephen B. Kuhn, Esq.
One Bryant Park
New York, New York 10036
U.S.A.
Facsimile: +1 212 872 1002

**If to the Monitor:**
Murray A. McDonald
Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario M5K 1J7
Canada
Facsimile: +1 416 943 3300

**If to NNSA:**
Attention: Cosme Rogeau
Address: 26 avenue Hoche, 78000 Versailles,

Attention: Alex Kay
Address: Exchange House
        Primrose Street
        London EC2A 2HS
        United Kingdom
Facsimile No.: +44 (0) 20 7098 4447/4618

**With a copy to:**
Sandy Shandro
Address: 3-4 South Square
        Gray's Inn
        London WC1R 5HP
        United Kingdom
Facsimile No.: +44 (0) 20 7696 9911

**If to the Joint Administrators**
c/o Ernst & Young LLP
Attention: Alan Bloom and Chris Hill
Address: One More London Place
        London SE1 2AF
        United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy
Attention: Roland Hlawaty, Esq.
One Chase Manhattan Plaza
New York, New York 10006
U.S.A.
Facsimile: +1 212 822 5170

**With a copy to:**
Goodmans LLP
Attention: Joseph Pasquariello
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7
Canada
Facsimile: +1 416 979 1234

**With a copy to:**
Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard

19

France
Fascimile No. +33 1 39 49 44 63

Fabre
Address: 1bis, avenue Foch, 75116 Paris, France
Facsimile No.: + 33 1 45 00 08 19

**If to the French Liquidator**
Attention: Cosme Rogeau
Address: 26 avenue Hoche, 78000 Versailles, France
Facsimile No.: + 33 1 39 49 44 63

**With a copy to:**
Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard Fabre
Address: 1bis, avenue Foch, 75116 Paris, France
Facsimile No.: + 33 1 45 00 08 19

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 3.10. Counterparts. The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 3.11. Severability. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 3.12. Termination. This Agreement will automatically terminate on the earliest of (a) consummation of the Closing, and (b) termination of the North American Agreement or the EMEA Agreement by either the Purchaser or the Selling Parties. Upon termination, the Parties' rights and obligations under this Agreement, other than in respect of Sections 2.1(b)(v), 2.2(a)(v), 2.3(b), 2.3(c), 2.3(d), 2.4, 2.5, 2.6, 2.7, 2.8, 2.9 and 3.1 through 3.17, each of which shall continue in full force and effect without limitation as to time, shall cease immediately but without prejudice to the rights and obligations of the Parties existing prior to the termination of the Agreement.

SECTION 3.13. Obligations of the Parties.

(a)     The obligations of the Canadian Main Sellers and the other Canadian Debtors under this Agreement shall be joint and several.

(b)     The obligations of NNI and the other U.S. Debtors under this Agreement shall be joint and several.

(c)     The obligations of the EMEA Debtors under this Agreement shall be joint and several.

SECTION 3.14.   Effectiveness.

(a)     No provision of this Agreement, as amended herein, (other than as set forth in Section 3.14(d)) shall be effective until each of the U.S. Bankruptcy Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "**Court Approval Condition**").

(b)     All provisions of this Agreement, as amended herein, shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)     Each Party hereto shall:

(i)     use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)     keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

(iii)     use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)     Notwithstanding any of the foregoing, the following provisions of this Agreement shall be effective as of the date hereof: Sections 3.1 through 3.14.

SECTION 3.15.     Execution by certain Selling Parties. The Parties hereby acknowledge that certain Selling Parties are not executing this Agreement as of the date hereof. Subject to Section 3.14, this Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Selling Parties have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall use their reasonable best efforts to cause each Other Seller to execute a counterpart to this Agreement as soon as practicable, agreeing to be bound as a Party under this Agreement.

SECTION 3.16.     Limitations of Remedies. The Parties expressly agree that the sole and exclusive remedy of any Party (the "**Claiming Party**") against any other Party for a breach of this Agreement, the Sale Agreements or the other Transaction Documents where the Transaction is not completed shall be payment of damages to the Claiming Party in an amount not to exceed the amount, if any, actually paid by the Claiming Party to the Purchaser or a Designated Purchaser or an EMEA Designated Purchaser under the Sale Agreements and, the liability of any Party shall not exceed, in the aggregate, the Total Payments. For the avoidance

21

of doubt, the Parties further agree that in no event shall any Party be entitled to equitable relief, including in the form of an injunction or injunctions or orders for specific performance, to prevent or remedy breaches of this Agreement, the Sale Agreements or the other Transaction Documents by any other Party.

SECTION 3.17.    Reservation of Rights.  The Parties hereby agree that, except as specifically set forth in Article II hereof, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of proceeds from the Transaction among the Selling Parties.  Without limiting the generality of the foregoing, the Parties hereby agree that the Initial Respective Percentage among the Parties shall not in any way determine the final allocation or distribution of proceeds from the Transaction or otherwise bind the Parties in respect of the final allocation.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

IN WITNESS WHEREOF, the Parties have duly executed this Side Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**NORTEL NETWORKS LIMITED**

By:_____
    Name:
    Title:

_____
    Name:
    Title:

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

By:_____
    Name:
    Title:

**NORTEL NETWORKS
INTERNATIONAL CORPORATION**


By:_____
    Name:
    Title:


    _____
    Name:
    Title:


**NORTEL NETWORKS GLOBAL
CORPORATION**


By:_____
    Name:
    Title:


    _____
    Name:
    Title:


**NORTEL NETWORKS INC.**


By:_____
    Name:
    Title:

**NORTEL NETWORKS (CALA) INC.**

By:_____
    Name:
    Title:


_____
    Name:
    Title:


**NORTEL NETWORKS
INTERNATIONAL INC.**

By:_____
    Name:
    Title:


**NORTEL ALTSYSTEMS INC. (F/K/A/
ALTEON WEBSYSTEMS, INC.)**

By:_____
    Name:
    Title:


Signature Page – Amended and Restated
MSS Side Agreement

3

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **Nortel Networks UK Limited** (in administration) by Christopher Hill | ) ) ) ) | ................................................................<br>Christopher Hill |

as Joint Administrator (acting as agent and without personal liability) in the presence of:

Witness signature

| | | |
|---|---|---|
| ................................................................<br>Name:<br>Address: Ernst & Young, 1 More London Place, London, SE1 2AF | ) ) ) | |

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **Nortel Networks (Ireland) Limited** (in administration) by David Hughes as Joint Administrator (acting as agent and without personal liability) in the presence of: | ) ) ) ) | ................................................................<br>David Hughes |

Witness signature

| | | |
|---|---|---|
| ................................................................<br>Name:<br>Address: | ) ) ) | |

Signature Page – Amended and Restated
MSS Side Agreement

4

**SIGNED** for and on behalf of **Nortel GmbH**    )   .......................................................................

(in administration) by Christopher Hill       )   Christopher Hill

                                          )

as Joint Administrator (acting as agent and  )

without personal liability) in the presence of:

Witness signature

............................................................  )

Name:                                        )

Address: Ernst & Young, 1 More London Place,  )

London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**  )

**France S.A.S.** (in administration) by Kerry     )   .......................................................................

Trigg acting as authorised representative for    )   Kerry Trigg

Christopher Hill                           )

as Joint Administrator (acting as agent and  )

without personal liability) in the presence of:

Witness signature

............................................................  )

Name:                                        )

Address:                                       )

**SIGNED** for and on behalf of **Nortel Networks**  )  .............................................................................
**SpA** (in administration) by Christopher Hill    )  Christopher Hill
 )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of:

Witness signature

.............................................................................  )
Name:  )
Address: Ernst & Young, 1 More London Place,  )
London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**  )  .............................................................................
**Hispania S.A.** (in administration) by      )  Christopher Hill
Christopher Hill     )
as Joint Administrator (acting as agent and     )
without personal liability) in the presence of:

Witness signature

.............................................................................  )
Name:  )
Address: Ernst & Young, 1 More London Place,  )
London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**      )      ...........................................................................
**B.V.** (in administration) by Christopher Hill          )      Christopher Hill
                                                          )
as Joint Administrator (acting as agent and               )
without personal liability) in the presence of:


Witness signature


...................................................................      )
Name:                                                                   )
Address: Ernst & Young, 1 More London Place,                            )
London, SE1 2AF


**SIGNED** for and on behalf of **Nortel Networks**      )      ...........................................................................
**N.V.** (in administration) by Christopher Hill          )      Christopher Hill
                                                          )
as Joint Administrator (acting as agent and               )
without personal liability) in the presence of:


Witness signature


...................................................................      )
Name:                                                                   )
Address: Ernst & Young, 1 More London Place,                            )
London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**          )          ................................................................
**(Austria) GmbH** (in administration) by                    )          Christopher Hill
Christopher Hill                                             )
as Joint Administrator (acting as agent and                  )
without personal liability) in the presence of:

Witness signature

................................................................          )
Name:                                                        )
Address: Ernst & Young, 1 More London Place,                 )
London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**   )        ...............................................................
**Polska Sp. z.o.o.** (in administration) by         )        Christopher Hill
Christopher Hill                                      )
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:

Witness signature

...............................................................   )
Name:                                                )
Address: Ernst & Young, 1 More London Place,         )
London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**   )        ...............................................................
**Portugal S.A.** (in administration) by             )        Christopher Hill
Christopher Hill                                      )
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:

Witness signature

...............................................................   )
Name:                                                )
Address: Ernst & Young, 1 More London Place,         )
London, SE1 2AF

Signature Page – Amended and Restated
MSS Side Agreement

9

**SIGNED** for and on behalf of **Nortel Networks**   )   ............................................................................
**AB** (in administration) by   )   Christopher Hill
Christopher Hill   )
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:

Witness signature

............................................................   )
Name:   )
Address: Ernst & Young, 1 More London Place,   )
London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks**   )
**Romania s.r.l.** (in administration) by   )   ............................................................................
Christopher Hill   )   Christopher Hill
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:

Witness signature

............................................................   )
Name:   )
Address: Ernst & Young, 1 More London Place,   )
London, SE1 2AF

Signature Page – Amended and Restated
MSS Side Agreement

10

**SIGNED** for and on behalf of **Nortel Networks** )
**Slovensko, s.r.o.** (in administration) by )   .............................................................
Christopher Hill )   Christopher Hill
                                                  )

as Joint Administrator (acting as agent and
without personal liability) in the presence of:


Witness signature


.............................................................. )
Name: )
Address: Ernst & Young, 1 More London Place, )
London, SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks** )
**s.r.o.** (in administration) by Christopher Hill )   .............................................................
                                                  )   Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:


Witness signature


.............................................................. )
Name: )
Address: Ernst & Young, 1 More London Place, )
London, SE1 2AF


Signature Page – Amended and Restated
MSS Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**                )
**Israel (Sales and Marketing) Limited** by                          )     ..............................................................
Yaron Har-Zvi and Avi D. Pelossof as Joint                        )     Yaron Har-Zvi
Israeli Administrators (acting jointly and                            )
without personal liability) in connection with               )     ..............................................................
the Israeli Assets  and Liabilities:                                    )     Avi D. Pelossof
                                                                                       )
                                                                                       )
                                                                                       )

..........................................................................
Witness signature


                                                                                       )
Name:                                                                              )
Address:                                                                          )




Signature Page – Amended and Restated
MSS Side Agreement

**SIGNED** by Yaron Har-Zvi )

)

)     ............................................................................

in his own capacity and on behalf of the Joint        )     Yaron Har-Zvi
Israeli Administrators without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Israeli Administrators in the presence of:

Witness signature

............................................................     )
Name:                                                                )
Address:                                                            )

**SIGNED** by Avi D. Pelossof )

)

)     ............................................................................

in his own capacity and on behalf of the Joint        )     Avi D. Pelossof
Israeli Administrators without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Israeli Administrators in the presence of:

Witness signature

............................................................     )
Name:                                                                )
Address:                                                            )

Signature Page – Amended and Restated
MSS Side Agreement

**SIGNED** by Richard Banbury )       ...........................................................
duly authorised for and on behalf of **o.o.o.** )       Richard Banbury
**Nortel Networks** in the presence of: )


Witness signature

........................................................ )
Name: )
Address: )

Signature Page – Amended and Restated
MSS Side Agreement

2

**SIGNED** by [Simon Freemantle/Dave Quane]          )          ........................................................................
duly authorised for and on behalf of **Nortel**          )          [Simon Freemantle/Dave Quane]
**Networks AG** in the presence of:          )


Witness signature

........................................................................          )
Name:          )
Address:          )


Signature Page – Amended and Restated
MSS Side Agreement

3

**SIGNED** by Alan Bloom                )    ..........................................................

                                          )    Alan Bloom

in his own capacity and on behalf of the Joint    )
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:


Witness signature

..........................................................    )
Name:                                          )
Address:                                       )


Signature Page – Amended and Restated
MSS Side Agreement

4

SIGNED for and on behalf of **NORTEL NETWORKS SA (IN ADMINISTRATION)** by **MAÎTRE COSME ROGEAU** as *Liquidateur Judiciaire* (acting as agent and without personal liability) and

)
)
)
)

……………………………………………..
Maître Cosme Rogeau

Witness signature

…………………………………………………
Name:
Address:

**Schedule A – Other Sellers**

Nortel Networks Technology Corporation

Nortel Networks (CALA) Inc.

Nortel Networks International Inc.

Nortel Networks de Mexico, S.A. de C.V.

Nortel de Mexico, S. de R.L. de C.V.

Nortel Networks Peru S.A.C.

Nortel Networks Australia Pty Limited

Nortel Networks Japan (Japanese name is Nortel Networks Kabushiki Kaisha)

Nortel Networks Malaysia Sdn. Bhd.

Nortel Networks New Zealand Limited

Nortel Networks (Asia) Limited

Nortel Networks Singapore Pte. Ltd.

Nortel Networks (Thailand) Ltd.

Nortel Networks (China) Limited

PT Nortel Networks Indonesia

## Schedule B – EMEA Sellers

Nortel Networks UK Limited (in administration)

Nortel Networks (Ireland) Limited (in administration)

Nortel GmbH (in administration)

Nortel Networks France SAS (in administration)

Nortel Networks S.p.A. (in administration)

Nortel Networks Hispania, S.A. (in administration)

Nortel Networks BV (in administration)

Nortel Networks NV (in administration)

Nortel Networks (Austria) GmbH (in administration)

Nortel Networks Polska Sp. Z.o.o. (in administration)

Nortel Networks Portugal, S.A. (in administration)

Nortel Networks S.R.O. (in administration)

Nortel Networks Romania Srl (in administration)

Nortel Networks Slovensko, s.r.o. (in administration)

Nortel Networks AG

Nortel Networks Israel (Sales and Marketing) Limited

Nortel Networks AB