**EXHIBIT C**
**AGREEMENT**



## EXCLUSIVE SALES AND LEASE LISTING AGREEMENT

THIS EXCLUSIVE SALES AND LEASE LISTING AGREEMENT ("Agreement") is entered into as of the 17th day of February, 2011, by and between **CB Richard Ellis Inc.**, a Delaware corporation with an office located at 5430 LBJ Freeway, Suite 1100, Dallas, Texas 75240 ("CBRE") and **Nortel Networks Inc.**, a Delaware corporation, with an office address at 2221 Lakeside Boulevard, Richardson, Texas 75082 ("Owner").

### RECITALS

WHEREAS, Owner and/or Owner's affiliates own certain land, buildings and improvements as more fully described on Exhibit A, attached hereto and incorporated herein by reference (the "Property" or "Properties"), and

WHEREAS, except as otherwise expressly set forth herein, Owner desires to engage CBRE as its exclusive broker, and to grant to CBRE the right to list for sale and/or leasing the Property, and CBRE is agreeable to such engagement on the terms and conditions as set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties hereinafter expressed, the parties hereto agree as follows:

### ARTICLE ONE

### APPOINTMENT

1.1    Exclusive Right to Sell or Lease.  Except as otherwise provided herein, Owner hereby appoints CBRE as its exclusive agent and grants CBRE the exclusive right to solicit and procure prospective purchasers, tenants or other occupants for the Property (provided that reference to the Property shall mean all or any portion thereof); provided, however, that Clifford Fischer & Company ("Fischer") shall be permitted to continue pursuing (i) a potential sale of the Property to the Interested Bidder (as that term is defined in Schedule A) for a period of one hundred twenty (120) calendar days from the effective date of a Project Initiation Form between Owner and Fischer relating to the Property (as the same may be amended, modified or supplemented in accordance with its terms), such effective date occurring on November 11, 2010 (the "Fischer Period") and (ii) potential leasing or other occupancy arrangements with respect to all or a portion of the Property to tenants Fischer registers (as defined herein) prior to any such registration by CBRE during the Fischer Period; provided, that Fischer shall be deemed to have registered the Interested Bidder and ▮▮▮▮▮▮ including all successors and assigns.

1.2    Definition of "Sale" or "Purchase".  As used in this Agreement, the term "sale" or "purchase", in reference to the Property, shall include a sale or exchange of the Property or any other transaction identified in Section 5.2 below.

1.3    Definition of "Lease" or "Tenant".  As used in this Agreement, the term "lease", in reference to the Property, shall mean a leasehold or similar occupancy interest at all or any portion of the Property.  As used in this Agreement, the term "tenant", in reference to any lease or occupancy at the Property, shall mean a tenant, licensee or any other occupant of all or any portion of the Property.

1.4    Definition of "Registers".  As used in this Agreement, the term "registers" means that Fischer or CBRE, as the case may be, has received written acknowledgment from a prospective tenant, or such prospective tenant's Cooperating Broker, that the prospective tenant has expressed an interest in the Property and may be represented by such Cooperating Broker.

### ARTICLE TWO

### TERM

2.1    Term of Agreement.  The term ("Term") of this Agreement shall commence on the date hereof and shall end at midnight, June 30, 2011 unless sooner terminated or extended in accordance with the provisions of this Agreement.  The Term shall be extended only by an agreement in writing signed by the parties hereto.

## ARTICLE THREE

## CBRE'S REPRESENTATIONS AND DUTIES

3.1  <u>Licensing</u>.  CBRE hereby represents that it and its personnel providing services are, to the extent required by law, duly licensed.  CBRE shall, at its expense, obtain and keep in full force and effect throughout the Term of this Agreement all licenses and permits required to be maintained by CBRE in connection with the rendering of the services.

3.2  <u>Performance of Services</u>.  CBRE shall perform the services through able, qualified and trained personnel of CBRE in sufficient number to properly render the services in the manner appropriate for the Property as required by this Agreement.  CBRE shall have the exclusive right to hire, direct, discipline, compensate and terminate the personnel of CBRE, and shall exercise complete and exclusive control over the conduct of CBRE's personnel.  Such services shall include:

(a)  <u>Inspection, Review and Analysis</u>.  CBRE shall review the Property to determine its relative market appeal, quality of location, market and area trends, and potential for value enhancement prior to entering the market.  CBRE shall be entitled to rely on information provided by Owner, Owner's agents, and any property manager for the Property, and shall not be responsible for verifying the accuracy or completeness of any such information.

(b)  <u>Marketing Plan</u>.  CBRE shall develop and prepare for Owner's review and approval a detailed marketing plan (the "Marketing Plan") setting forth a comprehensive strategy for sale and/or lease of the Property including with respect to Owner's proposed entry into a leaseback lease (the "Leaseback Lease") with any purchaser; provided, that CBRE shall not develop a Marketing Plan with regard to the Interested Bidder unless Owner specifically requests otherwise.

(c)  <u>Offering Materials</u>.  CBRE shall assemble and produce for Owner's review and approval an offering brochure and/or other marketing materials of a type which is customary for similar properties.  Owner shall provide the information in its possession, custody or control regarding the Property necessary for CBRE to prepare a professional offering brochure. The brochure shall include, as appropriate, property facts, photographs, high-quality graphics, cash flow projections, market competition data, descriptive area and location information, site plan, and other relevant information as available.

(d)  <u>Marketing Efforts and Advertising</u>.  Owner has authorized CBRE to advertise the Property for sale and lease.  CBRE shall expose the Property to a wide variety of prospective purchasers and tenants via direct mail, print advertising and on the Internet, as deemed appropriate by CBRE.  CBRE shall provide prospective purchasers and tenants with additional information and coordinate site visits.  CBRE shall be permitted to place two (2) four (4) feet by eight (8) feet (4' X 8') signs on the Property which contain CBRE's logo and advertise the Property for sale and lease.  The cost of such signs shall be included within the Marketing Expenses (as defined in Section 5.5), unless otherwise approved by Owner in writing.  CBRE shall not disseminate any offering brochures or other written promotional materials, until approved by Owner in writing.  Upon completion of the sale or lease of the Property, CBRE may advertise or issue a press release or other public announcement regarding the sale or lease, in form and content reasonably acceptable to Owner.  Owner hereby consents to the use of a "tombstone" type ad and CBRE's internal newsletters and publications.

(e)  <u>Prospective Purchaser Qualification and Inspections</u>.  CBRE shall solicit and identify prospective purchasers and tenants of the Property, deliver the offering materials to such prospective purchasers and tenants and, in connection therewith, assist Owner in qualifying prospective purchasers and tenants prior to recommending acceptance of an offer to purchase or lease the Property or a portion thereof, including but not limited to, analysis and comparison of each offer and counteroffer made by prospective purchasers and tenants; provided, however, that Owner shall have the ultimate responsibility for determining the financial condition and capabilities of any prospective purchaser and tenant.  If requested by Owner, CBRE shall require each prospective purchaser and tenant to execute and deliver to CBRE Owner's form confidentiality agreement.  CBRE shall make the necessary arrangements with Owner or Owner's agent to permit prospective purchasers and tenants to physically inspect the Property.

(f)  <u>Inquiries</u>.  CBRE shall promptly inform Owner of all offers and inquiries received from brokers, prospective purchasers and tenants or anyone else with respect to the Property.

(g) <u>Negotiations and Legal and Tax Advice</u>.  All negotiations with prospective purchasers for the sale of the Property and tenants concerning occupancy of the Property and/or Owner's entry into a Leaseback Lease shall be conducted by CBRE in conjunction with Owner and Owner's counsel; provided, however, that negotiations involving the Interested Bidder, Fischer and potential tenants registered by Fischer shall be conducted without CBRE's participation, unless Owner expressly requests otherwise; and, provided further, that CBRE's duties, rights and obligations under this Agreement with respect to prospective purchasers and tenants shall not include the Interested Bidder or potential tenants registered by Fischer unless Owner expressly requests otherwise.  Owner and its counsel shall be responsible for determining the legal sufficiency of all documents relating to any transaction contemplated by this Agreement; and Owner and its financial advisors shall be solely responsible for determining the tax consequences of any transaction contemplated under this Agreement.

(h) <u>Closing</u>.  At Owner's request, CBRE shall assist Owner and Owner's counsel in the preparation and execution of the closing checklist and provide information necessary to complete closing documentation, and shall coordinate with the Owner, Owner's counsel and the property manager for the Property to secure all documents and information required for closing.

(i) <u>Additional Leasing Obligations</u>.  At Owner's request, CBRE shall advise Owner with respect to the approval and consenting to of any subleases.  All approvals and consents for subleases shall be executed by Owner.

3.3  <u>Staffing</u>.  CBRE's listing team for purposes of implementing the obligations of CBRE hereunder shall consist of Gary Carr, Eric Mackey, Dennis Barnes and William Lokey (the "Listing Team").  Owner and CBRE appoint the Listing Team as Owner's legal agent, to the exclusion of all other CBRE-affiliated brokers and salespersons (the "Non-Listing Team Agents").  The Listing Team shall assume primary responsibility for the initiation of all discussions and the conduct of all negotiations with prospective purchasers or tenants on the part of CBRE.  CBRE may replace any member of the Listing Team during the Term in the event a member of the Listing Team dies, becomes incapacitated or terminates his/her employment with CBRE, provided such replacement individual has similar or greater experience than the replaced member and provided that Owner consents, which consent shall not be unreasonably withheld.  Upon written request by Owner, any member of the Listing Team shall be replaced by another qualified salesperson employed by CBRE and with similar or greater experience than the replaced member, subject to Owner's approval, which approval shall not be unreasonably withheld.  For compensation purposes, Non-Listing Team Agents who represent prospective purchasers shall be treated as Cooperating Brokers under Section 3.6 below.

3.4  <u>Reports</u>.  CBRE shall submit to Owner, on a bi-weekly basis, no later than the fifth (5th) and twentieth (20th) day of each month, a report on the marketing of the Property which shall include an updated list of all prospective purchasers and tenants and a summary of the status of any offers or negotiations.

3.5  <u>Confidentiality</u>.

(a) As used in this Agreement, the term "Confidential Information" means information provided by Owner to CBRE pertaining to the Property which Owner believes in good faith contains legally protectable and/or otherwise confidential trade secrets, non-public research, development, or commercial information and which Owner designates as confidential, either written or orally, at the time such information is provided to CBRE.  Confidential Information does not include information that (i) was known to CBRE at the time it was provided by Owner, (ii) was publicly available at the time it was provided by Owner or thereafter becomes publicly available without breach by CBRE of its obligations hereunder, (iii) becomes available to CBRE on a non-confidential basis from a source other than Owner or its representatives or any other party that CBRE has no material reason to believe was bound to keep such information confidential, (iv) can be shown to have been developed independently by CBRE, (v) is required to be disclosed by court order, regulation, or other law or legal process; or (vi) is approved for release by written agreement of Owner.

(b) For a period of two (2) years from the latter of (i) (x) the closing of the sale of the Property or (y) the commencement date of a lease with respect to the entire Property or (ii) the termination or expiration of this Agreement, CBRE agrees to hold such Confidential Information in trust and confidence for Owner and agrees not to use Confidential Information other than as required in the performance of its obligations under this Agreement, which shall include disclosure to CBRE's personnel who have a

need to know in the performance of CBRE's obligations under this Agreement. Upon the termination of this Agreement, CBRE shall be permitted to destroy all Confidential Information of Owner in its possession at its sole expense, unless Owner directs that CBRE shall return such Confidential Information to Owner. Notwithstanding anything contained herein to the contrary, CBRE shall be permitted to retain one (1) set of copies of all Confidential Information as required by law and for purposes of prosecuting or defending any action arising under or related to this Agreement.

3.6     Cooperating Brokers. CBRE and the Listing Team are authorized to solicit and cooperate with other real estate brokers, including Non-Listing Team Agents, who represent prospective purchasers or tenants for the Property ("Cooperating Brokers").

(a)     Purchases of the Property. CBRE shall not share its fee or commission with any Cooperating Broker, and shall not be responsible for payment of any Cooperating Broker fee or commission due and payable as a result of a sale of the Property. Any such Cooperating Broker fee, commission or other compensation relating to the sale of the Property shall be the responsibility of the purchaser. With respect to purchases of the Property, CBRE shall not be obligated to provide any marketing materials or other information to any Cooperating Broker unless such Cooperating Broker agrees to execute (i) an agreement procured by Owner which shall provide that such Cooperating Broker shall (x) look solely to the purchaser for any commissions due to such Cooperating Broker in connection with the sale of the Property, (y) waive any claim it has or may have against Owner and/or CBRE for payment of any commission, fee or compensation in connection with this transaction and (z) indemnify and hold harmless Owner, CBRE and their respective affiliates, successors, assigns employees, officers and directors from any and all claims sustained or incurred by, or asserted against, Owner and/or CBRE arising out of any claim for brokerage commissions made by any other broker alleging to have dealt with or through such Cooperating Broker in connection with the transaction contemplated hereunder and (ii) a confidentiality agreement if required by Owner and on Owner's form.

(b)     Leasing of the Property. All payments of fees or commissions (as set forth in greater detail in Section 5.1) paid to such Cooperating Broker shall be made by Owner directly to such Cooperating Broker, pursuant to a separate agreement between Owner and the Cooperating Broker. If negotiations proceed with a prospective tenant to a point where it may reasonably be anticipated that a lease may be entered into, CBRE shall, at Owner's direction, use commercially reasonable efforts to procure from any Cooperating Broker representing such prospective tenant an agreement in form and substance reasonably satisfactory to Owner which shall provide that the commission shall be due to such Cooperating Broker only as, if, and when a leasing transaction is finally concluded and a commission or fee would be payable to CBRE hereunder and that such commission or fee shall be computed and payable in accordance with this Agreement. Owner may, in its sole discretion, determine whether a different amount of such fee will be payable to a Cooperating Broker on a case-by-case basis. CBRE shall not provide any marketing materials or other information to any Cooperating Broker unless such Cooperating Broker agrees to execute (i) an agreement procured by Owner which shall provide that such Cooperating Broker shall indemnify and hold harmless Owner, CBRE and their respective affiliates, successors, assigns, employees, officers and directors from any and all claims sustained or incurred by, or asserted against, Owner and/or CBRE arising out of any claim for brokerage commissions made by any other broker alleging to have dealt with or through such Cooperating Broker in connection with the transaction contemplated hereunder and (ii) a confidentiality agreement if required by Owner and on Owner's form; provided, that CBRE shall be permitted to provide Cooperating Brokers with standard marketing flyers including such information as the Property's name, size, age, quoted rental rates and floor plans and other facts and data customarily provided in a preliminary marketing flyer, without having to obtain from such Cooperating Brokers an indemnification or confidentiality agreement and, provided further, that CBRE shall provide no other marketing materials or information related to or concerning the Property without first obtaining an executed indemnification or confidentiality agreement from such Cooperating Brokers in accordance with the terms hereof.

3.7     Nondiscrimination. Owner and CBRE agree that the Property will be offered in compliance with all applicable federal, state and local anti-discrimination laws and regulations.

3.8     Compliance With Laws. CBRE shall comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, the Property or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act

and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act.

## ARTICLE FOUR

### CBRE'S AUTHORITY

4.1     Limitation of CBRE's Authority.  Notwithstanding any designation of CBRE as "agent" in this Agreement, CBRE shall have no right, power or authority to enter into any agreement with any prospective purchaser, tenant, real estate broker or any other person in the name of, on behalf of, or otherwise binding upon Owner, nor may CBRE create any other obligations or liabilities binding on Owner, except as otherwise provided by applicable law.

## ARTICLE FIVE

### FEES AND EXPENSES

5.1     Calculation of Purchase Fee and Lease Fee.  Subject to Bankruptcy Court (as defined below) approval, CBRE's sole and exclusive compensation for (i) its services hereunder related to the sale or purchase of the Property and/or the entry of the Owner into the Leaseback Lease shall be 1% of the gross sales price (the "Purchase Fee"), such gross sales price being the total gross cash consideration received by Owner for the purchase of the Property and (ii) its services hereunder related to the entry by Owner into a lease for all or a portion of the Property shall be calculated at the rate of 4.5% if the tenant is not represented by a Cooperating Broker and 2.25% if the tenant is represented by a Cooperating Broker of the aggregate of the first 120 base rental payments actually payable under the lease, excluding (a) additional rent and any other items, charges or fees payable pursuant to such lease, (b) any rent escalations applicable to items, charges or fees other than base rent (including, but not limited to, additional rent), (c) any termination fee or penalty that may be payable by a tenant under a lease, and (d) security deposits or letters of credit and; provided, that actual costs and expenses assumed or incurred by Owner in connection with a leasing transaction shall be deducted from the computation of base rent and shall be amortized on a straight line basis without interest over the entire initial term of the lease and deducted from the rent for each lease year prior to calculating the commission (the "Lease Fee").  If the tenant is represented by a Cooperating Broker, the commission payable to such Cooperating Broker shall be determined by Owner subject to a separate agreement between Owner and the Cooperating Broker, in Owner's sole and absolute discretion.

       5.2.1   Purchase Fee - When Earned.

(a)     The Purchase Fee shall be earned for services rendered if, during the Term: (i) the Property is sold to a purchaser procured by CBRE, Owner or anyone else; provided, that if the Property is sold to the Interested Bidder Section 5.6 shall apply, (ii) any contract for the sale of the Property is entered into by Owner or (iii) the Property is transferred due to eminent domain or the threat thereof, foreclosure, or conveyance in lieu of foreclosure.  For the avoidance of doubt, under no circumstances shall CBRE be entitled to the Purchase Fee as a result of Owner's entry into any lease, sublease or similar occupancy agreement with respect to space at the Property.

(b)     In the event the sale of the Property (or any other transaction enumerated in Section 5.2.1) fails to close for any reason, or no reason, whatsoever, including, but not limited to, Owner's default, CBRE shall not be entitled to the Purchase Fee, any fee, commission or other compensation; provided, however, that Owner shall remain liable for costs incurred by CBRE pursuant to Section 5.5.  Owner shall have no obligation to CBRE to: (x) waive any provision of any contract for the purchase and/or sale of the Property in order to permit closing to occur; (y) excuse any default of a purchaser thereunder; or (z) bring any action or proceeding or otherwise resort to any legal remedies for the enforcement of a purchaser's obligations under such contract.

       5.2.2   Lease Fee – When Earned.

(a)     The Lease Fee shall be earned for services rendered if, during the Term: (i) the Property is leased to a tenant procured by CBRE, Owner or anyone else; provided, that if the Property is leased to tenants registered by Fischer prior to the time that such tenant is registered by CBRE, Section 5.6 shall apply or (ii) any contract for the lease of the Property is entered into by Owner; provided, however, that under no circumstances shall CBRE (x) have any duties with respect to any tenant at the Property as of the date hereof (an "Existing Tenant") or (y) be entitled to the Lease Fee or Purchase Fee, as the case

may be, under any circumstance, if any Existing Tenant, or tenant registered by Fischer (including, but not limited to, the Interested Bidder or ▮▮▮▮), renews its lease, enters into an agreement with Owner to expand the premises subject to such lease (whether granted pursuant to the terms of such lease or not), enters into any lease amendment with respect to which such Existing Tenant or a tenant registered by Fischer (including, but not limited to, the Interested Bidder or ▮▮▮▮) is granted a right of first refusal or renewal term and/or enters into an agreement with Owner to purchase the Property (whether pursuant to the terms of such lease or not).

5.3    When Purchase Fee or Lease Fee Payable.  The Purchase Fee shall be payable hereunder at closing of escrow or recordation of the deed, whichever is earlier.  The Lease Fee shall be payable in accordance with Schedule B.  In the event Owner fails to make payments within the time limits set forth herein, then from the date due until paid, the delinquent amount shall bear interest at the lesser of twelve percent (12%) per year or the maximum rate permitted in the state in which the CBRE office executing this Agreement is located.

5.4    Rights After Term.  Owner shall pay CBRE the Purchase Fee and Lease Fee in accordance with the terms of this Agreement if, within one hundred twenty (120) calendar days after the expiration or earlier termination of the Term, the Property is sold to or a lease with respect to all or a portion of the Property is executed with, or Owner enters into a contract of sale concerning the Property with, any person or entity (including his/her/its successors, assigns or affiliates) with whom CBRE has negotiated (either directly or through another broker or agent) with respect to the Property during the Term; provided, however, that no Purchase Fee or Lease Fee shall be paid in the event Owner terminates this Agreement in accordance with Section 6.5.  CBRE is authorized to continue negotiations with such persons or entities during such one hundred twenty (120) calendar day period.  CBRE shall submit a list of such persons or entities to Owner no later than fifteen (15) calendar days following the expiration or termination of the Term; provided, however, that if a written offer has been submitted to Owner, then it shall not be necessary to include the offeror's name on the list.

5.5    Expenses.  CBRE shall assemble and produce for Owner's review and approval an offering brochure and/or other marketing materials of a type which is customary for similar properties. Owner shall provide the information in its possession, custody or control regarding the Property necessary for CBRE to prepare a professional offering brochure. The brochure shall include, as appropriate, property facts, photographs, high-quality graphics, cash flow projections, market competition data, descriptive area and location information, site plan, and other relevant information as available.  The actual, out-of-pocket (except as provided below) cost of such offering brochure, the use of CBRE's Financial Consulting Group and any necessary travel for the property shall be borne by Owner; provided, that any such costs incurred shall not exceed the sum of $15,000 (the "Marketing Expenses"). CBRE shall be responsible to make payment directly to the third party vendors involved in the preparation of the offering materials and will be promptly reimbursed by Owner upon submission by CBRE of an invoice (together with reasonable evidence of the incurrence of such costs or payments) to Owner and Bankruptcy Court approval of such Marketing Expenses. Owner acknowledges and agrees that the costs incurred by CBRE's in-house staff in preparing the offering materials is included in the reimbursable Marketing Expenses and that such costs will be based on the actual time expended by the staff in preparing such materials, but shall not exceed $7,500.

5.6    Excluded Parties.  Subject to Bankruptcy Court approval, (i) if the Property is sold to the Interested Bidder or any related entities that it owns or controls, then the Purchase Fee payable to CBRE shall be .50% and (ii) if the Property is leased to any tenant working with or registered by Fischer (including, but not limited to, the Interested Bidder or ▮▮▮▮, or any related entity that such tenant owns or controls, and any one such tenant (including, but not limited to, the Interested Bidder or ▮▮▮▮), or any related entity that such tenant owns or controls, enters into an agreement to lease the Property, then CBRE shall be entitled to no Lease Fee whatsoever and, provided further, that CBRE shall not be entitled to the Purchase Fee if such tenant (including, but not limited to, the Interested Bidder or ▮▮▮▮, whether pursuant to the terms of such lease or not, enters into an agreement with Owner to purchase the Property.

5.7    Late Fees.  Other than with respect to payment of the Purchase Fee and Lease Fee, which is provided for under Section 5.3 and Schedule B, respectively, if Owner fails to pay any amount due under this Agreement within, as applicable, thirty (30) calendar days of Owner's receipt of invoices or supporting documentation from CBRE and Bankruptcy Court approval of such Marketing Expenses, then the unpaid balance shall, from the end of such thirty (30) calendar day period until paid in full, accrue interest at eight percent (8%).

# ARTICLE SIX

# OWNER'S RIGHTS AND OBLIGATIONS

6.1     Refer All Inquiries.  Owner shall cooperate with CBRE in bringing about a sale or lease of the Property, shall provide all available information to permit CBRE to properly market the Property in accordance with the terms of this Agreement, and shall immediately refer to CBRE all offers and inquiries received from brokers, prospective purchasers and tenants or anyone else interested in the Property, other than those from the Interested Bidder or tenants registered by Fischer.

6.2     Rights Reserved By Owner.  Owner reserves the right, in all events and in Owner's sole and unfettered discretion, to approve, modify or disapprove any and all proposals and offers regarding pricing, marketing and terms of sale or lease of the Property, and to approve or reject any prospective purchaser or tenant.  Owner reserves the right to adjust the terms and conditions of any offer made or received, including, but not limited to, adjustment of the offering price for the Property, with respect either to a purchase or lease, upward or downward.

6.3     Withdrawal From The Market.  Owner may, by written notification to CBRE, at any time in its sole and unfettered discretion, remove the Property from the market, either with respect to purchases and sales or with respect to tenancies, in which event, Owner shall be responsible to pay to CBRE the Marketing Expenses, as set forth in Section 5.5 of this Agreement.

6.4     Termination By Owner Without Cause.  Owner, at any time during the Term of this Agreement, for any or no reason, in its sole and unfettered discretion, may terminate this Agreement by providing CBRE with thirty (30) calendar days' prior written notice, in which event, Owner shall be responsible to pay to CBRE the Marketing Expenses as set forth in Section 5.5 of this Agreement.

6.5     Termination By Owner For Cause.  Owner shall have the right to terminate this Agreement upon not less than fifteen (15) calendar days' prior written notice to CBRE in the event of a material breach or default by CBRE of any of its obligations hereunder.  The notice shall specify with particularity the material breach or default with respect to which the notice is given and the acts which CBRE must undertake to remedy such failure and, in the event that such material breach or default is not cured by that date which is fifteen (15) calendar days from CBRE's receipt of said notice, this Agreement shall terminate upon CBRE's receipt of a second written notice from Owner declaring such termination.  For the avoidance of doubt, (i) Owner shall be permitted to continue negotiating with prospective purchasers and tenants introduced to Owner by CBRE without any obligation of Owner to pay the Purchase Fee or Lease Fee set forth herein and (ii) Owner shall reserve all other rights available to it under law.

6.6     FIRPTA.  Owner represents that it is the owner of the property and that, except as may be disclosed in writing to CBRE, no person or entity who has an ownership interest in the property is a foreign person as defined in the Foreign Investment in Real Property Tax Act (commonly known as "FIRPTA").

6.7     Hazardous Materials.

(a)     The Property is being sold or leased in an "as is" condition, without representation or warranty of any kind, expressed or implied, oral or written, concerning the Property or any matter related thereto, including zoning, availability of access or utilities, the presence and location of asbestos, PCB transformers, other toxic, hazardous or contaminated substances, or underground storage tanks ("Hazardous Materials") in, on, or about the Property.  Prospective purchasers and tenants shall be advised of this fact and shall be allowed to make independent investigations of the Property made by their own experts, at their own expense, subject to Owner's sole and absolute discretion.  Language reflecting the above shall be inserted into any purchase and sale agreement or lease entered into by Owner, which language shall also disclaim any such representations regarding the condition of the Property by CBRE and any reliance on such representations by the prospective purchaser or tenant.  Notwithstanding anything contained herein to the contrary, nothing contained herein shall prohibit CBRE from making any disclosures required by law.

(b)     Owner and prospective purchasers are responsible for retaining qualified experts to detect and/or remediate any current, past or potential Hazardous Materials in, on or about the Property.  Owner hereby releases and forever discharges CBRE, its directors, officers, employees, agents, successors and assigns from any and all actions, causes of action, suits, covenants, judgments, claims and demands whatsoever, in law or in equity, for or on account of or in any manner connected with Hazardous Materials in, on or about the Property and the violation of any federal, state or local law, statute, ordinance

or regulation, any court or administrative order or decree or private agreement relating to the collection, storage, treatment or disposal of hazardous materials, excluding any such claims arising out of CBRE's gross negligence or intentional wrongful conduct.

6.8 <u>Compliance with Laws</u>. Owner agrees to comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, any Property that is the subject of an acquisition or proposed acquisition or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act (the "ADA"); provided, however, that the Parties understand and agree that Owner is not required to make any capital expenditures to effect compliance with the ADA.

**6.9 <u>OFAC Screening</u>. CBRE and Owner represent and warrant to the other that they are currently in compliance with in all material respects, and shall use their commercially reasonable efforts at all times during the term of this Agreement (including any extension thereof) to remain in compliance with in all material respects, the regulations of the Office of Foreign Asset Control ("<u>OFAC</u>") of the Department of the Treasury, and any statute, executive order or other governmental regulation relating thereto, including, but not limited to, Executive Order 13224 (dated September 23, 2001) "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism".**

## ARTICLE SEVEN

## CONFLICTS OF INTEREST

7.1 <u>CBRE as Intermediary/Designation of Listing Team</u>. Owner acknowledges that CBRE is a national and international real estate services company and that, in some cases, it may represent prospective purchasers and tenants. CBRE may act as an intermediary between Owner and any such prospective purchaser or tenants only if it obtains the prior written consent of Owner, which Owner shall be entitled to grant or withhold in its sole and absolute discretion, pursuant to an Intermediary Disclosure and Consent Waiver, a form of which is attached hereto as Exhibit B. CBRE expects to receive compensation solely from Owner, although there may be instances in which, as an intermediary, CBRE may also receive compensation from any purchaser or tenant it represents.

7.2 <u>Other Interests</u>. Owner acknowledges that, from time to time, CBRE may provide to other persons or other properties services that are similar to or in conflict with those that are to be provided pursuant to this Agreement, including, for example, listing other properties which may be competitive with the Property and showing prospective purchasers and tenants other properties in addition to the Property. Such other persons and/or properties may be in direct or indirect competition with Owner, and Owner consents thereto; provided, that CBRE shall not disclose the Confidential Information of Owner.

7.3 <u>CBRE Affiliated Entities</u>. Owner acknowledges that one or more CBRE Affiliated Entities, including, but not limited to, CBRE Capital Markets, may assist the Listing Team in structuring a sale or sales of the Property, or a lease of the Property, and may assist prospective purchasers or tenants with financing such transactions. Owner acknowledges and agrees that CBRE Affiliated Entities may earn fees or other compensation in connection with the financing of a sale or sales of the Property or the entry of a leasehold at the Property; however, in no circumstance shall Owner be liable for compensating such CBRE Affiliated Entities or any party for such services. Owner also acknowledges and agrees that referral fees may be paid by CBRE to CBRE Affiliated Entities, including CBRE Capital Markets; and/or CBRE Affiliated Entities, including CBRE Capital Markets, may pay referral fees to CBRE, but that, under no circumstances, shall Owner be required to pay any such referral fees.

## ARTICLE EIGHT

## INDEMNIFICATION

8.1 <u>Indemnification By CBRE</u>. CBRE agrees to indemnify and defend Owner from and against all claims, costs, liabilities, settlements and judgments, and all costs of defense against the foregoing (including reasonable attorneys' fees and disbursements) by a third party (collectively, "Claims") based upon CBRE's wrongful act, failure to act, or misrepresentation; provided, however, that in no event shall the costs payable hereunder exceed the Purchase Fee or Lease Fee, as appropriate. Such obligation to defend and indemnify will apply, however, only to the extent of CBRE's wrongdoing if the claim or cause of action is based upon or arises in any way out of an act, failure to act or representation of any other person or entity (including affiliates of Owner or its employees or agents), including, but not limited to, Owner providing to CBRE incorrect information or failing to disclose to CBRE information which should have otherwise been disclosed to such claimant or to CBRE. CBRE will have the sole and

absolute right to select and employ an attorney or attorneys to defend against such Claim and Owner will cooperate with CBRE and its attorneys in connection with the resolution of any Claims.  The indemnities set forth in this Section 8.1 shall survive the expiration or earlier termination of this Agreement.

   8.2  Indemnification By Owner.  Owner agrees to indemnify and defend CBRE from and against all Claims by a third party based upon Owner's wrongful act, failure to act, or misrepresentation, including, but not limited to, Owner providing to CBRE incorrect information or failing to disclose to CBRE information which should have otherwise been disclosed to such claimant or to CBRE; provided, however, that in no event shall the costs payable hereunder exceed the Purchase Fee or Lease Fee, as appropriate.  Such obligation to defend and indemnify will apply, however, only to the extent of Owner's wrongdoing if the claim or cause of action is based upon or arises in any way out of an act, failure to act or representation of any other person or entity (including affiliates of CBRE or its employees or agents), including, but not limited to, CBRE providing to Owner incorrect information or failing to disclose to Owner information which should have otherwise been disclosed to such claimant or to Owner.  Owner will have the sole and absolute right to select and employ an attorney or attorneys to defend against such Claim and CBRE will cooperate with Owner and with its attorneys.

   8.3  Procedure.  If either party (an "Indemnified Party") notifies the other party (the "Indemnifying Party") of any Claim for which the Indemnified Party is entitled to indemnification pursuant to his Article, the Indemnifying Party shall, within fifteen (15) days following receipt of such notice, notify the Indemnified Party whether it will assume defense of such Claim, assume defense of such Claim with a reservation of rights, or reject defense of such claim.  If the Indemnifying Party fails or refuses to defend such Claim or fails to timely give the notice required by this section, the Indemnified Party shall then have the right to employ counsel at the expense of the Indemnifying Party.  If an Indemnifying Party assumes the defense with a reservation of rights, the Indemnified Party shall have the right to employ counsel at its expense and participate in the defense with the full cooperation of the Indemnifying Party.  With respect to any Claim for which an Indemnifying Party assumes defense without a reservation of rights, such Indemnifying Party shall have the right to defend such action, employ counsel of its choice, and negotiate and carry out any settlement of such action.  Notwithstanding the foregoing, an Indemnifying Party shall not, without the prior written consent of the Indemnified Party, (i) settle or compromise any Claim or consent to the entry of any judgment in which the Indemnifying Party receives a more comprehensive release or hold harmless than the Indemnified Party; provided, that such settlement, compromise or judgment shall not affect the continuing obligation of the Indemnifying Party to indemnify the Indemnified Party hereunder; or (ii) settle or compromise any action, suit, proceeding or claim in any manner that may adversely affect the Indemnified Party or obligate the Indemnified Party to pay any sum or perform any obligation.

**ARTICLE NINE**

**NOTICES**

   9.1  Notices.  All notices or other communications required or permitted under this Agreement shall be in writing and shall be sent by a nationally recognized courier service or personally delivered (including by means of professional messenger service), or sent by registered or certified mail, postage prepaid, return receipt requested, or sent by facsimile or electronic transmission and promptly confirmed in writing, to the addresses set forth below, and shall be deemed received when actually received.

     To Owner:    Nortel Networks Inc.
              GMS 991-01-A10
              2221 Lakeside Boulevard
              Richardson, TX 75082
              Attn:  Real Estate Group
              Facsimile: (972) 684-3923

              with a copy (which shall not constitute notice) to:

              Cleary Gottlieb Steen & Hamilton LLP
              One Liberty Plaza
              New York, NY 10006
              Attention: Kimberly Brown Blacklow
              Facsimile: (212) 225-3999

     To CBRE:    CB Richard Ellis, Inc.
              5430 LBJ Freeway, Suite 1100
              Dallas, TX 75240
              Attn:  H. Mark Fewin
              Telephone: (972) 458-4800

>Facsimile: (972) 702-8315
>
>with a copy (which shall not constitute notice) to:
>
>CB Richard Ellis, Inc.
>5430 LBJ Freeway, Suite 1100
>Dallas, TX  75240
>Attn:  Gary Carr
>Telephone: (972) 458-4809
>Facsimile: (972) 458-4806

9.2 <u>Change of Notice</u>.  Notice of a change in address shall be given by notice in the manner set forth in this Article.

**ARTICLE TEN**

**GENERAL PROVISIONS**

10.1 <u>Governing Law</u>.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State in which the Property is located, without regard to its conflicts of laws principles.

10.2 <u>Disputes</u>.

(a) Any claim, controversy or dispute (a "Dispute"), whether sounding in contract, statute, tort, fraud, misrepresentation or other legal theory, related directly or indirectly to this Agreement, whenever brought and whether between the parties to this Agreement or between one of the parties to this Agreement and the employees, agents or affiliated businesses of the other party, shall be subject to this section.

(b) The venue of any Dispute shall, during the pendency of Owner's and its affiliates' chapter 11 cases under the U.S. Bankruptcy Code (the "Chapter 11 Cases"), lie in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and if such Dispute is brought after entry of final decree(s) closing the Chapter 11 Cases, in the jurisdiction where the Property is located or in which the claim arose, and shall be any appropriate jurisdiction in all other instances.

(c) Neither party shall be entitled to punitive damages, and the parties hereby waive all rights to, and claims for, relief other than for compensatory damages.  The prevailing party in any Dispute shall be entitled to recover its reasonable attorneys' fees, costs, and disbursements incurred in connection with any Dispute.

(d) Each party waives its right to a trial by jury with respect to any Dispute.

10.3 <u>Amendment, Modification and Termination</u>.  This Agreement may be amended, modified or terminated only by written agreement of CBRE and Owner.

10.4 <u>Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party; provided, however, that Owner may assign this Agreement or any of its rights, interests or obligations hereunder to a reorganized Owner or other successor to Owner's interest in this Agreement, the Property or the Leaseback Lease pursuant to a confirmed plan or plans of reorganization or liquidation or other order of the Bankruptcy Court.

10.5 <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.6 <u>Headings</u>.  The headings of the Sections and Articles of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

10.7 <u>Due Authority</u>.  Each individual signing this Agreement on behalf of a party warrants and represents to the other party that he has the authority to execute this Agreement on such party's behalf and to bind such party to the terms hereof.

10.8 <u>Severability</u>.  In the event any term or provision of this Agreement shall be determined by a court of competent jurisdiction to be illegal, invalid or unenforceable for any reason whatsoever,

that provision shall be severed from this Agreement and shall not affect the validity of the remainder of the Agreement.

      10.9    <u>Third Parties</u>.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement.

      10.10    <u>Entire Agreement</u>.  This Agreement, including the Exhibits hereto, sets forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations and warranties, whether oral or written, by any officer, employee or representative of any party hereto.

      10.11    <u>TREC Recovery Funds</u>.  CBRE is licensed and regulated by the Texas Real Estate Commission (TREC).  TREC administers two recovery funds which may be used to satisfy judgments against inspectors and real estate licensees involving a violation of the law.  Complaints or inquiries should be directed to the Texas Real Estate Commission, P.O. Box 12188, Austin, Texas 78711-2188, (512) 465-3960.

      10.12    <u>Receipt of Form OP-K</u>.  Owner acknowledges having received, prior to the execution of this Agreement, a copy of TREC Form No. OP-K, "Information About Brokerage Services" from CBRE.

IN WITNESS WHEREOF, this Agreement has been executed by Owner and CBRE, through their duly authorized representatives, as of the day and year first above written.

NORTEL NETWORKS INC.

By: *[signature]*
Name: Allan Lane
Title: Asset Manager, Americas

CB RICHARD ELLIS, INC.

By: *[signature]*
Name: M. Blair Oden
Title: Managing Director



**CB RICHARD ELLIS, INC.**
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER
FORM # OP-K

## INFORMATION ON BROKERAGE RELATIONSHIPS

Before working with a real estate broker, you should know that the duties of a broker depend on whom the broker represents. If you are a prospective seller or landlord (owner) or a prospective buyer or tenant (buyer), you should know that the broker who lists the property for sale or lease is the owner's agent. A broker who acts as a subagent represents the owner in cooperation with the listing broker. A broker who acts as a buyer's agent represents the buyer. A broker may act as an intermediary between the parties if the parties consent in writing. A broker can assist you in locating a property, preparing a contract or lease, or obtaining financing without representing you. A broker is obligated by law to treat you honestly.

**IF THE BROKER REPRESENTS THE OWNER:** The broker becomes the owner's agent by entering into an agreement with the owner, usually through a written listing agreement, or by agreeing to act as a subagent by accepting an offer of subagency from the listing broker. A subagent may work in a different real estate office. A listing broker or subagent can assist the buyer but does not represent the buyer and must place the interests of the owner first. The buyer should not tell the owner's agent anything the buyer would not want the owner to know because an owner's agent must disclose to the owner any material information known to the agent.

**IF THE BROKER REPRESENTS THE BUYER:** The broker becomes the buyer's agent by entering into an agreement to represent the buyer, usually through a written buyer representation agreement. A buyer's agent can assist the owner but does not represent the owner and must place the interests of the buyer first. The owner should not tell a buyer's agent anything the owner would not want the buyer to know, because a buyer's agent must disclose to the buyer any material information known to the agent.

**IF THE BROKER ACTS AS AN INTERMEDIARY:** A broker may act as an intermediary between the parties if the broker complies with The Texas Real Estate License Act. The broker must obtain the written consent of each party to the transaction to act as an intermediary. The written consent must state who will pay the broker and, in conspicuous bold or underlined print, set forth the broker's obligations as an intermediary. The broker is required to treat each party honestly and fairly and to comply with The Texas Real Estate License Act. A broker who acts as an intermediary in a transaction:

(1) shall treat all parties honestly;
(2) may not disclose that the owner will accept a price less than the asking price unless authorized in writing to do so by the owner;
(3) may not disclose that the buyer will pay a price greater than the price submitted in a written offer unless authorized in writing to do so by the buyer; and
(4) may not disclose any confidential information or any information that a party specifically instructs the broker in writing not to disclose unless authorized in writing to disclose the information or required to do so by The Texas Real Estate License Act or a court order or if the information materially relates to the condition of the property.

With the parties' consent, a broker acting as an intermediary between the parties may appoint a person who is licensed under The Texas Real Estate License Act and associated with the broker to communicate with and carry out instructions of one party and another person who is licensed under that Act and associated with the broker to communicate with and carry out instructions of the other party.

If you choose to have a broker represent you, you should enter into a written agreement with the broker that clearly establishes the broker's obligations and your obligations. The agreement should state how and by whom the broker will be paid. You have the right to choose the type of representation, if any, you wish to receive. Your payment of a fee to a broker does not necessarily establish that the broker represents you. If you have any questions regarding the duties and responsibilities of the broker, you should resolve those questions before proceeding.

TEXAS LAW REQUIRES THAT ALL REAL ESTATE LICENSEE'S PRESENT THIS INFORMATION TO PROSPECTIVE SELLERS, LANDLORDS, BUYERS OR TENANTS.

**ACKNOWLEDGMENT:** Please acknowledge your receipt of this information, for Broker's records:

*Company* Allan Lane - Nortel Network Inc   Date: 2/17/2011
*Name* Allan Lane
*Title* Asset Manager, Americas

13                                                                    ESLA IP/CBRE Standard

**EXHIBIT A**

**Property Description**

Nortel Campus         2201 & 2221 Lakeside Boulevard         Richardson, Texas 75082

**EXHIBIT B**

**Form of Intermediary Disclosure and Consent Waiver**

Pursuant to Section 1101.559 of the Texas Real Estate License Act, **NORTEL NETWORKS INC.** ("Owner") and [INSERT NAME OF OTHER PARTY] ("Buyer" or "Tenant", as appropriate), hereby consent to **CB RICHARD ELLIS, INC.** ("Broker") acting as an intermediary (as that term is defined in Section 1101.551 of the Texas Real Estate License Act), between Owner and [Buyer/Tenant] in connection with the sale and leasing of the real property located at 2201 & 2221 Lakeside Boulevard, Richardson, Texas 75082, and commonly known as the Nortel Campus ("Property").

In connection with such transaction, Broker expects to receive compensation solely from Owner, although there may be instances in which, as intermediary, Broker may also receive compensation from any purchaser or tenant it represents.

**Broker and any affiliated licensee(s) appointed as designated agents who act as intermediaries hereunder shall not: (1) disclose to any buyer, prospective purchaser or tenant that Owner will accept a price or rental payment less than the asking price or rental payment, as the case may be, unless otherwise instructed in a separate writing by Owner; (2) disclose to Owner that the buyer, potential purchaser or tenant will pay a price or rental payment greater than the price or rental payment submitted in a written offer to the Owner, as the case may be, unless otherwise instructed in a separate writing by the buyer, prospective purchaser or tenant; (3) disclose any confidential information or any information a party specifically instructs CBRE or any salesperson acting for CBRE in writing not to disclose, unless: (A) CBRE or such salesperson is otherwise instructed in a separate writing by the respective party; (B) CBRE or such salesperson is required to disclose the information pursuant to law or a court order; or (C) the information materially relates to the condition of the property; (4) treat a party to a transaction dishonestly; or (5) violate Sub-Chapter N of the Texas Real Estate License Act.**

Broker and any affiliated licensee(s) appointed as designated agents who act as intermediaries shall act fairly and impartially.

Owner and Broker appoint Gary Carr and Eric Mackey to act as designated agents of Owner. [Buyer/Tenant] and Broker appoint [•] to act as designated agents of [Buyer/Tenant].

| | |
|---|---|
| **OWNER:** | **[BUYER/TENANT]:** |
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____, 2011 | Date: _____, 2011 |

## SCHEDULE A

### Interested Bidder

[REDACTED]

## SCHEDULE B

### Lease Fee – When Payable

The Lease Fee shall be payable hereunder, subject to Bankruptcy Court approval, forty-five (45) calendar days from Owner's receipt of a written invoice prepared by CBRE for such Lease Fee; provided, that CBRE shall not be entitled to a Lease Fee, unless a lease has been executed and unconditionally delivered by both Owner and tenant and, provided further, that if such lease shall require a security deposit, letter of credit, advance rent, a lessee's certificate of insurance naming landlord as an additional insured under its CGL policy or any other documentation that may be required for the commencement of a lease in Owner's sole discretion, CBRE shall have delivered these items to Owner or Owner shall have received such items directly from the tenant prior to payment of the Lease Fee by Owner. The Owner may elect, in its sole discretion, to pay the Lease Fee in installments pursuant to the table attached hereto; provided, that the aforementioned items shall be delivered to Owner by CBRE, or Owner shall receive such items directly from the tenant, as applicable, prior to payment of the initial installment of the Lease Fee. If the lease term is less than twelve (12) months, the Lease Fee shall be prorated based upon the number of months included in the lease term.

| Lease Fee | Lease Fee Payment Date |
|---|---|
| $100,000 or less | Forty-five (45) calendar days after Owner's receipt of a written invoice prepared by CBRE and in accordance with other requirements pursuant to this Schedule B (the "Payment Timeframe"). |
| $100,000 - $500,000 | 50% payable in accordance with the Payment Timeframe and the balance payable forty-five (45) calendar days from Owner's receipt of a subsequent written invoice for the balance of the Lease Fee, which shall be provided by CBRE no earlier than three (3) months after the lease commencement date (the "Subsequent Payment Timeframe"). |
| Greater than (>) $500,000 | 50% payable in accordance with the Payment Timeframe, 25% payable in accordance with the Subsequent Payment Timeframe and the balance payable forty-five (45) calendar days from Owner's receipt of a third written invoice for the balance of the Lease Fee, which shall be provided by CBRE no earlier than six (6) months after the lease commencement date. |

In the event the lease is not executed and tenant does not begin paying rent thereunder, Owner shall still remain liable for costs incurred by CBRE pursuant to Section 5.5 of this Agreement. Owner shall have no obligation to CBRE to: (x) waive any provision of any contract for the lease of the Property in order to permit closing to occur; (y) excuse any default of a tenant thereunder; or (z) bring any action or proceeding or otherwise resort to any legal remedies for the enforcement of a tenant's obligations under such contract; however, under no circumstances shall CBRE be required to refund any part of the Lease Fee paid to CBRE, though CBRE shall still be bound by its obligations pursuant to Section 8.1 no matter whether such Lease Fee, or any portion thereof, is paid or not . The Lease Fee is also subject to the following provisions:

*Option(s) or Right(s) of First Refusal to Renew, Extend Lease or Occupy Additional Space:*
Notwithstanding section 5.2.2(a) of this Agreement, if a lease for which a Lease Fee is payable hereunder contains (i) an option or right of first refusal to renew or extend, and a lease term is renewed or extended whether strictly in accordance with the terms of such option or right or otherwise and/or (ii) an option or right of first refusal to expand, and a tenant occupies additional space whether strictly in accordance with the terms of such option or right or otherwise, then Owner shall pay a leasing commission in accordance with the provisions of this Schedule B on the additional leased space. Said commission shall be earned and payable at the time the extended term commences or the additional space is occupied, as applicable; provided, however, that with respect to such options or rights of first refusal to renew or extend, the Lease Fee shall be computed as if the term were added on to the initial term of the lease. For example, if there is a ten (10) year lease with a five (5) year right of renewal, commissions shall be computed for the five (5) year extension period as if the period were, in fact, the eleventh through fifteenth years of the lease term.

*Purchase of Property by Tenant:*
If a tenant procured by CBRE shall purchase the Property, pursuant to the terms of this Agreement, CBRE shall be entitled to the Purchase Fee pursuant to the terms of this Agreement; provided, that there shall be a credit against such Purchase Fee in the amount of the Lease Fee paid or to be paid to CBRE relating to that portion of the purchaser's lease term which is canceled by reason of such sale.  In no event shall such credit exceed the amount of such sales commission.

*Payment of Outstanding Lease Fees Upon Closing:*
In the event Owner sells the Property during the Term, or at any time thereafter while any Lease Fee is due and payable hereunder, Owner shall pay such Lease Fee(s) at the closing of the sale of the Property out of such sales proceeds.  Owner may direct any escrow or closing agent to remit any Lease Fee due and payable to CBRE hereunder out of the sales proceeds earned in connection with the sale of the Property.