# EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FIFTY-NINTH REPORT OF THE MONITOR**
**DATED FEBRUARY 18, 2011**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
    Networks International Corporation and Nortel Networks Global Corporation
    (collectively the "Applicants") filed for and obtained protection under the
    *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this
    Honourable Court dated January 14, 2009, as amended and restated (the "Initial
    Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the
    "Monitor") in the CCAA proceedings. The stay of proceedings was extended to
    February 28, 2011 by this Honourable Court in its Order dated October 27, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
    concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code
    (the "Code") in the United States Bankruptcy Court for the District of Delaware (the
    "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by

U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.  Subsequent to the filing date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

2

7. The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8. Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9. The purpose of this fifty-ninth report of the Monitor (the "Fifty-Ninth Report") is to report to this Honourable Court on the following matters:

   a) consolidated cash position and liquidity as at February 5, 2011;

   b) actual receipts and disbursements from October 3, 2010 until February 5, 2011;

   c) cash flow forecast for the period from February 6, 2011 until June 30, 2011;

   d) consolidated Canadian entities' net inter-company position by region;

   e) status of Applicants' claims process and cross-border claims;

   f) status of EMEA inter-company claims process;

   g) current status of the Group Supplier Protocol Agreement ("GSPA");

   h) status of Health and Welfare Trust ("HWT");

   i) status of Termination Fund;

   j) status of the Employee Hardship Application Process;

   k) asset divestitures and allocation matters;

3

l)   status of foreign proceedings;

m)  other restructuring activities; and

n)  the Applicants' request for an order that:

    i.  the employee hardship application criteria be amended such that sufficient hardship funds (the "Required Funds") be made available for payment of CAD $3,000 to each of those employees terminated from July 1, 2010 through to and including December 31, 2010 who meet the other criteria for Termination Fund payments, when combined with unused funds in the Termination Funds;

    ii.  the amount available for hardship applications be reduced by the Required Funds

    iii.  the Employee Hardship Application Process be extended up to June 30, 2011;

    iv.  the Eligibility Requirements and the Procedure with respect to Employee Hardship Payments Applications be amended consistent with (i) through (iii) above; and

    v.  the stay of proceedings be extended up to and including June 30, 2011.

**TERMS OF REFERENCE**

10. In preparing this Fifty-Ninth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Fifty-Ninth Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in US dollars.

12. Capitalized terms not defined in this Fifty-Ninth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT FEBRUARY 5, 2011**

14. As at February 5, 2011, Nortel's consolidated cash balance was approximately $6.1 billion including $3.1 billion of total treasury cash. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at February 5, 2011:

| Region | Gross Cash | Restricted | Unavailable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 526 | (19) | (238) | 269 |
| Other Canada | 34 | (22) | - | 12 |
| | | | | |
| NNI | 930 | (15) | - | 915 |
| NNI - Reserve MMF (ST/LT) | - | - | - | - |
| Other US (excluding NN CALA) | 54 | - | - | 54 |
| **North America** | **1,544** | **(56)** | **(238)** | **1,250** |
| | | | | |
| NN UK Limited | 380 | (20) | - | 360 |
| Other EMEA Filed Entities | 487 | (2) | - | 485 |
| JV - Netas | - | - | - | - |
| EMEA non-filed entities | 21 | - | - | 21 |
| **UK/Europe** | **888** | **(22)** | **-** | **866** |
| | | | | |
| Greater China | 151 | (3) | - | 148 |
| Other ASIA PAC (excl JVs) | 280 | (1) | - | 279 |
| Other JVs | 118 | (2) | (116) | - |
| **ASIA** | **549** | **(6)** | **(116)** | **427** |
| | | | | |
| NN CALA | 90 | - | - | 90 |
| Other CALA filed entities | - | - | - | - |
| CALA non-filed entities | 57 | - | - | 57 |
| **Cala** | **147** | **-** | **-** | **147** |
| | | | | |
| **Total Treasury Cash** | **3,128** | **(84)** | **(354)** | **2,690** |
| | | | | |
| **Divestiture Proceeds** | **2,957** | **(2,957)** | **-** | **-** |
| | | | | |
| **Other Funds held in Escrow** | **35** | **(35)** | **-** | **-** |
| | | | | |
| **Total Cash** | **6,120** | **(3,076)** | **(354)** | **2,690** |

6

15. As at February 5, 2011, the Canadian entities had cash available for operations and post-filing inter-company settlements of approximately $281 million.

16. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $12 million of cash collateral posted by Nortel in support of non-EDC performance bonds and letter of credit facilities, (ii) $12 million held in the D&O Trust as detailed in the Pre-Filing Report, (iii) $10 million held in escrow related to the settlement of the Global Class Action, (iv) $4 million in support of the EDC performance bonds issued in exotic foreign currencies, (v) $0.3 million held in relation to benefits paid through the HWT, (vi) $2 million held in escrow as cash collateral to support the Jabil supply agreement, and (vii) $1 million of cash collateral posted with EDC in support of post filing performance bonding. Unavailable Cash relates primarily to: (i) $8 million of net proceeds from the sale of the Strandherd Lands, (ii) $229 million held in a single purpose bank account received from the sale of NNL's interest in the LGN joint venture, and (iii) $1 million held in a single purpose bank account received from the sale of NNL's interest in the Relay business.

17. The U.S. entities had cash available for operations and post-filing inter-company settlements of approximately $969 million. NNI's Restricted Cash relates primarily to: (i) $1 million held in escrow for the benefit of utility providers in accordance with the First Day Order, and (ii) $14 million held in escrow as cash collateral to support the Jabil supply agreement.

18. The U.K. Administrators on behalf of NNUK and the other EMEA Debtors had available cash for operations and post–filing inter-company settlements of approximately $845 million. The EMEA non-filed entities had available cash of approximately $21 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

19. The NETAS sale transaction closed on December 21, 2010 and cash held by NETAS was transferred to the buyer. NETAS sale proceeds of $68 million and gross dividends of $16 million were received by Nortel Networks International Finance and Holdings BV, a subsidiary of NNUK, and are reflected in the Other EMEA Filed Entities balance.

20. Nortel entities in the APAC region have approximately $427 million of available cash for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $148 million are generally only available to fund operations within Greater China and inter-company settlements.

21. As at February 5, 2011, NN CALA and the CALA non-filed entities had available cash of $90 million and $57 million, respectively. This cash is expected to be used to fund their domestic operations and inter-company settlements.

22. On March 10, 2010, Nortel Networks Telecomunicacoes Do Brazil Ltda. ("NN Brazil") filed for bankruptcy protection, on April 15, 2010 Nortel Networks de Colombia S.A. ("NN Colombia") was placed into liquidation and on July 30, 2010 Nortel Networks de Venezuela C.A. ("NN Venezuela") ceased operations as its financial obligations exceeded its available funds. These balances have not been reflected as the entities are no longer participating in the Nortel global restructuring and are under the control of local officials in their respective jurisdictions.

23. Divestiture proceeds of approximately $3.0 billion are being held in escrow by various escrow agents (the "Divestiture Proceeds"). The funds held in escrow include:

    a) approximately $2.8 billion held in escrow by JPMorgan Chase Bank, N.A. until an agreement is reached regarding allocation of these proceeds among the various Nortel legal entities, including NNL. The current divestiture proceeds held in escrow include: (i) $1.0 billion from the sale of CDMA/LTE

8

Access assets, (ii) $18 million from the sale of the Layer 4-7 Business, (iii) $10 million from the sale of the Next Generation Packet Core business, (iv) $920 million from the sale of Enterprise assets, (v) $629 million from the sale of the MEN assets, (vi) $87 million from the sale of GSM assets, (vii) $159 million from the sale of CVAS assets;

b) $50 million held by CitiBank relating to the sale of CDMA/LTE Access assets. These divestiture proceeds are being held in support of the related Transition Service Agreement (the "TSA");

c) $29 million held by CitiBank relating to the sale of MEN assets. These divestiture proceeds include $15 million being held in support of the related TSA and $14 million being held subject to certain succession tax and other adjustments;

d) $0.6 million held by Ogilvy Renault LLP relating to the sale of MEN assets in support of certain real estate adjustments;

e) $24 million held by CitiBank relating to the sale of GSM assets. These divestiture proceeds are being held in support of the related TSA;

f) $13 million held by Wells Fargo relating to the sale of CVAS assets. These divestiture proceeds include $8 million in support of the finalization of purchase price adjustments and $5 million subject to resolution of certain tax liabilities in North America and EMEA; and

g) $10 million held by JP Morgan Chase Bank, N.A. consisting of $5 million in support of the CVAS TSA and $5 million in support of potential severance liabilities for a specified employee group in EMEA relating to the sale of CVAS assets.

9

24. Other unavailable funds include $35 million transferred from the CDMA/LTE Access asset divestiture proceeds escrow to a separate trust account pursuant to the Cascade Trust Indenture as more fully described in the Forty-First Report.

25. The consolidated cash position balances presented above do not reflect deposits of $1.3 million from Ericsson related to the pending sale of the MSS assets.

## ACTUAL RECEIPTS AND DISBURSEMENTS FROM OCTOBER 3, 2010 TO FEBRUARY 5, 2011

26. The Applicants' actual consolidated net cash inflow for the period October 3, 2010 to February 5, 2011 was $85.6 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Fifty-Fifth Report (the "Fifty-Fifth Report Forecast") is attached at Appendix "A".

27. Actual net cash flow exceeded forecast by $3.0 million. Significant items contributing to this favourable variance were as follows:

   a) a favourable permanent variance of $2.4 million with respect to the collection of accounts receivable primarily as a result of $2.2 million related to higher than forecast contract manufacturing receipts;

   b) a favourable permanent variance of $6.7 million with respect to Other Receipts primarily as a result of the following:

      i. $5.3 million reimbursement from LGN with respect to 2005 to 2009 expatriate charges;

      ii. $1.0 million primarily related to favourable foreign exchange translation on the Canadian denominated Carling facility sales proceeds; and

      iii. $0.4 million received from the release of the MEN real estate escrow.

c) a favourable timing variance of $9.2 million with respect to TSA recoveries from buyers primarily as a result of expedited collections on Enterprise and CVAS TSA billings.

d) a favourable net variance of approximately $0.3 million with respect to inter-company receipts and disbursements primarily as a result of the following:

    i. $4.7 million favourable timing variance relating to payment to NNUK with respect to the Shortfall Payment (as defined in the Interim Funding and Settlement Agreement ("IFSA") and more fully described in the Fifteenth Report of the Monitor) has been retimed from Q4 2010 to Q2 2011;

    ii. $0.8 million favourable permanent variance related to interest savings with respect to the NNI Loan being repaid earlier than forecast;

    iii. $2.5 million unfavourable timing variance as trade payables with NNI were settled earlier than originally forecast; and

    iv. $2.5 million unfavourable permanent variance related to inter-company settlements with the APAC and CALA regions being lower than originally forecast.

e) a favourable variance of $2.2 million with respect to payroll primarily as a result of the following:

    i. a favourable permanent variance of $1.2 million as a result of greater than forecast headcount reductions; and

    ii. a favourable timing variance of $1.0 million as payments with respect to the Termination Fund, pursuant to the terms of the Amended and Restated Employee Settlement Agreement, were retimed.

11

f) a favourable timing variance of $1.1 million with respect to benefits as a result of lower than forecast funding for the HWT;

g) an unfavourable variance of $3.7 million with respect to inventory purchases primarily related to last time buys from certain suppliers for MSS;

h) an unfavourable variance of $12.0 million with respect to non-inventory purchases primarily as a result of: (i) $7.7 million unfavourable permanent variance related to higher than forecast Directors and Officers Obligation and Fiduciary insurance premiums; (ii) $1.0 million unfavourable permanent variance related to higher than forecast audit fees; and (iii) approximately $3.3 million of timing variances relating to other trade amounts which were paid earlier than originally forecast; and

i) an unfavourable permanent variance of $3.2 million with respect to restructuring costs as professional fees were higher than originally forecast.

28. Available Cash was higher than forecast by approximately $5.4 million relating to a favourable foreign exchange translation on Canadian dollar denominated cash balances as a result of an appreciation of the Canadian dollar relative to the U.S. dollar.

29. Restricted Cash was lower than forecast by approximately $3.5 million primarily as a result of a decrease in the balance of HWT.

**CASH FLOW FORECAST FOR THE PERIOD FEBRUARY 6, 2011 TO JUNE 30, 2011**

30. The Applicants, with the assistance of the Monitor, have prepared an updated 21-week cash flow forecast for the period February 6, 2011 to June 30, 2011 (the "February 6[th] Forecast" and the "Forecast Period", respectively). A copy of the February 6th Forecast is attached as Appendix "B".

31. As at February 6, 2011, the Applicants have Available Cash balances of approximately $280.7 million, excluding Restricted Cash and Unavailable Cash of approximately $278.6 million.

32. Based on the February 6th Forecast, it is anticipated the Applicants will have total receipts of $67.4 million and total disbursements of $106.4 million resulting in a net cash outflow of $39.0 million during the Forecast Period.

33. Significant assumptions used in preparing the February 6th Forecast include the following:

   a)  the sale of the MSS business closes in March 2011;

   b)  monthly billings for transition services provided by the Applicants to buyers of the various Nortel assets and businesses, pursuant to the respective TSAs, are invoiced on an average 45 day billing cycle and subject to 30 day payment terms;

   c)  accounts payable disbursements relating to the CDMA/LTE Access assets continue to be administered by Nortel subsequent to closing of this sale transaction. During this transition period and in accordance with the relevant asset purchase agreement, Ericsson will pre-fund these expenses to Nortel resulting in no material working capital impact. The administration of accounts payable disbursements is assumed to continue throughout the Forecast Period;

   d)  divestiture proceeds from the CDMA/LTE Access assets, Enterprise business, MEN business, MSS business, GSM/GSM-R, and CVAS asset sale transactions are to be held in escrow, except as otherwise noted, and are not reflected in the February 6th Forecast;

13

e)  reimbursement from the divestiture proceeds of $30.0 million to the Applicants with respect to fees incurred in connection with the preparation of financial statement carve-outs will occur in the last week of March 2011;

f)  accounts receivable collections, consisting of the collection of residual accounts receivable not acquired by the purchasers as part of the divestiture of the business units, have been estimated by the Applicants' collection group based on historic customer collection experience;

g)  all pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

h)  inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities. Inter-company pre-filing trade accounts and loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

i)  payroll includes 2010 retention and AIP for the second half of 2010 and will be paid in March 2011. Q1 AIP for MSS and IP employees will be paid in June 2011;

j)  pursuant to the terms of the Amended and Restated Employee Settlement Agreement ("Settlement Agreement"), there are no further current funding contributions to the Applicants' defined benefit pension plans. Funding related to current employees' retirement savings plans are reflected in Benefits disbursements. Funding for non-registered pension or other retirement plans is stayed;

k)  run-off funding for the benefits incurred up to December 31, 2010 for pensioners and individuals on long term disability will be in accordance with the provisions of the Settlement Agreement;

14

l) all interest payments relating to the Company's pre-filing indebtedness are stayed;

m) disbursements include CAD $1.0 million of Termination Payments pursuant to the terms of the Settlement Agreement; and

n) inter-company disbursements include a payment of $4.7 million with respect to the Shortfall Payment owing to NNUK.

34. Based on an analysis prepared by the Monitor, the Applicants have sufficient cash resources to fund the CCAA proceedings through June 30, 2011.

## CONSOLIDATED CANADIAN ENTITIES' NET INTER-COMPANY POSITION BY REGION

35. Summarized below are the preliminary net inter-company book balances (including only trade and loan balances) as at December 31, 2010. For purposes of the summary, all Canadian entities (the Applicants and their Canadian non-filed subsidiaries) have been consolidated. These inter-company balances have been prepared by the Company under US GAAP and are subject to further adjustments. The Company, under US GAAP, has fully reserved against the net inter-company balances owing from filed entities. For presentation purposes the full amount of the inter-company balance, before the reserve, has been reflected.

36. For purposes of calculating the net inter-company balances between trading pairs, balances between the same legal entities have been set-off provided such balances both arose prior to January 14, 2009 ("Pre-filing Balances") or both arose after January 14, 2009 ("Post-filing Balances). No Pre-filing Balances have been set-off against Post-filing Balances.

15

37. Pre-filing Balances have been converted using January 14, 2009 foreign exchange rates. Post-filing Balances are converted using December 31, 2010 foreign exchange rates.

38. The net pre-filing inter-company payable position of $2.065 billion with the U.S. region includes a $62.7 million Revolver Claim by the U.S. Debtors which remains outstanding and is secured by a court-ordered charge in the CCAA proceedings. The balance of the pre-filing inter-company payable position is unsecured. Further details regarding this payable are provided at paragraph 45, below.

| | Region | Pre-filing (Jan. 14, 2009 FX rates) | | Post-filing (Dec 31, 2010 FX rates) |
|---|---|---|---|---|
| **Net Receivable Position** | | (in millions) | | |
| Filed Entities | CALA | 3 | ** | - |
| | EMEA | 101 | | 2 |
| | US * | 49 | *** | - |
| Filed Total | | 164 | | 2 |
| | | | | |
| Non Filed | | | | |
| | APAC | 70 | | 11 |
| | CALA | 42 | | 2 |
| | EMEA | 5 | | - |
| | US | 14 | | 2 |
| Non Filed Total | | 131 | | 14 |
| | | | | |
| Net Receivable Total | | 285 | | 16 |
| **Net Payable Position** | | | | |
| Filed Entities | | | | |
| | CALA | (24) | | - |
| | EMEA | (203) | | (1) |
| | US | (2,065) | | (6) |
| Filed Total | | (2,291) | | (8) |
| | | | | |
| Non Filed | APAC | (202) | | (4) |
| | CALA | - | | - |
| | EMEA | - | | - |
| Non Filed Total | | (202) | | (4) |
| | | | | |
| Net Payable Total | | (2,493) | | (12) |
| | | | | |
| Grand Total | | (2,209) | | 4 |

* includes NN CALA Inc., a US entity that filed for Chapter 11 protection on July 14, 2009.

** $2.3M of the CALA region pre-filing balance relate to amounts owing from NN Brazil and NN Columbia for the period from January 14, 2009 to March 10, 2010 and April 15, 2010, respectively and subject to a stay of proceedings

*** $4.9M of the US region pre-filing balance relate to amounts owing from NN CALA Inc. for the period from January 14, 2009 to July 14, 2009 and subject to a stay of proceedings.

**STATUS OF APPLICANTS' CLAIMS PROCESS AND CROSS BORDER CLAIMS**

39. On July 30, 2009, this Honourable Court issued an Order (as amended and restated, the "Claims Procedure Order") setting out the procedures for the filing of certain claims against the Applicants.

40. Pursuant to the provisions of the Claims Procedure Order, a claims bar date of September 30, 2009 was established (the "Claims Bar Date") whereby all claims were to be filed with the Monitor with the exception of the Excluded Claims, as defined in the Claims Procedure Order, including:

    a) Inter-company Claims;

    b) Compensation Claims of the current and former employees and directors of the Applicants;

    c) claims secured by any of the Charges in the Initial Order;

    d) claims for grievances under any collective agreements to which any of the Applicants are a party; and

    e) claims of any director or officer of the Applicants for indemnification and/or contribution, arising from such director's and officer's service to any Applicant.

41. By order dated August 4, 2009, the U.S. Court also established September 30, 2009 as its bar date for filing of claims in the Chapter 11 Proceedings with the exception of claims against NN CALA, for which the bar date was January 25, 2010.

42. On September 16, 2010, this Honourable Court issued an Order approving the methodology applicable for the review and determination of claims filed against the Applicants (the "Claims Resolution Order"). In a joint hearing on the same date, a Cross-Border Claims Protocol was approved which addresses matters relating to the resolution of overlapping claims and same-creditor claims, including, the level of

17

cooperation and consultation between the Applicants and U.S. Debtors with respect the resolution of such claims.

43. In its Fifty-Fifth Report, the Monitor provided an update as to the status of claims filed against the Applicants as of October 19, 2010.

44. The table below (the "Claims Report") provides an update as to the status of claims filed against the Applicants as of February 2, 2011. All claim amounts are in Canadian dollars using January 14, 2009 exchange rates.

**Nortel Networks - CCAA Applicants Overall Claims Status**
February 2, 2011
All amounts in CAD $ millions

| CCAA Applicant / Claim Category | Filed Proof of Claim # | $ | Under Review # | $ | Accepted or Reviewed and unadjusted # | $ | Value per Notice of Disallowance # | $ | Value per Notice of Dispute # | $ | Valued by Claims Officer # | $ | Valued by Court # | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Nortel Networks Corporation** | | | | | | | | | | | | | | | |
| Trade | 64 | 1,656.1 | 30 | 149.2 | 28 | 0.1 | - | - | 6 | 20.8 | - | - | - | - |
| Bonds | 2 | 4,808.7 | 2 | 4,808.7 | - | - | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,514.0 | 7 | 2,514.0 | - | - | - | - | - | - | - | - | - | - |
| Other | 161 | 727.6 | 71 | 723.5 | 67 | 0.6 | - | - | 23 | 2.4 | - | - | - | - |
| Total | 234 | 9,706.5 | 110 | 8,195.5 | 95 | 0.6 | - | - | 29 | 23.2 | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **Nortel Networks Global Corporation** | | | | | | | | | | | | | | | |
| Trade | 12 | 1,484.6 | 4 | 1.3 | 5 | 0.1 | - | - | 3 | 1.2 | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 213.6 | 35 | 213.6 | - | - | - | - | - | - | - | - | - | - |
| Total | 53 | 4,208.5 | 45 | 2,725.2 | 5 | 0.1 | - | - | 3 | 1.2 | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **Nortel Networks International Corporation** | | | | | | | | | | | | | | | |
| Trade | 7 | 1,483.2 | 4 | 0.1 | 3 | - | - | - | - | - | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 213.6 | 35 | 213.6 | - | - | - | - | - | - | - | - | - | - |
| Total | 48 | 4,207.2 | 45 | 2,724.0 | 3 | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **Nortel Networks Limited** | | | | | | | | | | | | | | | |
| Trade | 295 | 1,314.7 | 67 | 191.5 | 193 | 25.9 | 4 | 0.3 | 31 | 66.2 | - | - | - | - |
| Bonds | 4 | 5,243.1 | 4 | 5,243.1 | - | - | - | - | - | - | - | - | - | - |
| Inter-company (NNI claim) | 1 | 2,517.0 | - | - | 1 | 2,517.0 | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,510.7 | 7 | 2,510.7 | - | - | - | - | - | - | - | - | - | - |
| Other | 189 | 1,543.1 | 148 | 1,533.7 | 23 | 0.1 | - | - | 18 | 7.2 | - | - | - | - |
| Total | 496 | 13,126.6 | 226 | 9,679.1 | 217 | 2,543.0 | 4 | 0.3 | 49 | 73.4 | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **Nortel Networks Technology Corporation** | | | | | | | | | | | | | | | |
| Trade | 137 | 1,535.0 | 16 | 2.7 | 110 | 18.5 | - | - | 11 | 22.8 | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| Other | 36 | 213.7 | 36 | 213.7 | - | - | - | - | - | - | - | - | - | - |
| Total | 179 | 4,258.9 | 58 | 2,726.6 | 110 | 18.5 | - | - | 11 | 22.8 | - | - | - | - |

Notes:
Note 1: All amounts (other than Accepted) are subject to potential material change (i.e. through negotiation, appeal, etc.) as the process for the determination of claims proceeds.
Note 2: Amount and number of claims both in aggregate and for each Applicant may be materially different than previously presented for the following reasons:
- Claims filed have been split or transferred among Applicants
- Additional late filed claims and amendments to claims filed previously are included for presentation purposes only and without prejudice to the rights of the Applicants in connection with such Claims

45. Pursuant to the provisions of the Canadian Funding and Settlement Agreement, the Claims Report includes a claim by NNI against NNL for $2.0627 billion. This claim consists of two portions:

    a) $2.0 billion representing a pre-filing unsecured claim against NNL ranking pari passu with all other unsecured pre-filing claims; and

    b) $62.7 million representing a pre-filing secured claim pursuant to the provisions of the Initial Order relating to the Revolving Loan Agreement.

46. To date, 1,010 claims including cross-border Claims with a cumulative value of CAD $35.5 billion have been filed against the Applicants. This includes potential duplicative claims filed against multiple Applicants and claims filed subsequent to the Claims Bar Date. The Monitor, in conjunction with the Applicants, has reviewed 526 claims with a claim value of $9.5 billion. Of the claims reviewed, the Monitor has provisionally accepted 430 claims with a claim value of $2.6 billion.

47. Pursuant to the provisions of the Claims Resolution Order, the Monitor has provided the U.S. Debtors with supporting detail for the Claims Report as of February 2, 2011. A copy of the Claims Report has been posted on the Monitor's website.

48. The claims resolution process has progressed since the issuance of the Claims Resolution Order. The Monitor continues to review, revise and disallow claims, as applicable, and continues to work with the U.S. Debtors with respect to cross-border claims and will report to this Honourable Court further on these processes in subsequent reports.

**STATUS OF EMEA INTER-COMPANY CLAIMS PROCESS**

49. The Claims Procedure Order specifically identified certain claims, including inter-company claims, not subject to the provisions contained within the order.

19

50. On January 14, 2011, this Honourable Court issued an Order (the "EMEA Claims Procedure Order") stipulating a bar date and a mechanism for the filing, proving and resolution of claims by an EMEA Company (as defined in the EMEA Claims Procedure Order) against the Applicants, their property or their Directors and Officers (the "EMEA Claims").

51. Pursuant to the provisions of the EMEA Claims Procedure Order, a bar date of 4:00 p.m. (prevailing time in Toronto, Ontario, Canada), March 18, 2011 (the "EMEA Claims Bar Date") was established whereby EMEA Claims are to be filed with the Monitor, failing which they are forever barred and extinguished.

52. Pursuant to the provisions of the EMEA Claims Procedure Order, the Monitor:

    a)   has posted a copy of the Proof of Claim Document Package on its website at _www.ey.com/ca/nortel_;

    b)   has sent, on behalf of the Applicants, a copy of a Proof of Claim Document Package to the Administrators and the Administrators' counsel; and

    c)   will continue to provide a copy of the Proof of Claim Document Package to any person claiming to be an EMEA Creditor as soon as reasonably possible after receipt of such a request provided such request is received prior to the EMEA Claims Bar Date.

**CURRENT STATUS OF GSPA**

53. Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the CCAA proceedings (e.g. the Initial Order) and the Chapter 11 Proceedings and/or in accordance with the Code

(together, the "Trading Orders").    Trade between the EMEA Debtors and the Applicants is pursuant to the GSPA.

54. The purpose of the Trading Orders and GSPA is to ensure goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed as between the Nortel parties prior to the Filing Date.    In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amounts for post-filing purchases owing to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

55. The GSPA had continued to be extended by the parties substantially in the same form as the initial GSPA through the end of May 2010.    Subsequent to the expiry of the sixteenth extension of the GSPA on May 31, 2010, ongoing day to day trade of goods and services and settlement of post filing inter-company accounts continues in normal course.

## STATUS OF HEALTH AND WELFARE TRUST

56. By Court Order dated November 9, 2010, this Honourable Court approved an allocation methodology for the corpus of the HWT.    An application for leave to appeal therefrom to the Ontario Court of Appeal was dismissed on January 7, 2011.

57. By Court Order dated December 15, 2010, this Honourable Court approved an interim distribution from the HWT to Income Beneficiaries (as defined in such Order).    The interim distribution, in the amount of approximately CAD $3.1 million, was made on January 31, 2011 to 742 Income Beneficiaries (including 344 LTD Beneficiaries, 80 SIB Beneficiaries and 318 STB Beneficiaries).    A notice was sent to all Income Beneficiaries in January 2011 solely to advise them of this payment.

58. Prior to sending the notice of the interim payment, a Nortel HWT Personal Data Confirmation ("HWT - PDC") had been sent to those Income Beneficiaries who

21

were known to the Company at June 30, 2010. Following the November 2010 mailing of the HWT-PDC's, beneficiaries returned their HWT–PDC to the Monitor with changes to their information, including status changes. The changes were not significant to the amount of the interim distribution; however, the Monitor is working with the Company to validate the changes so that the effect of the changes on the actuarially determined value of the beneficiary's entitlement may be taken into account for further HWT distributions. The validated personal data will also be used to calculate claims against the estate. To the extent applicable, changes are being validated by reference to Company or external documents. Certain changes require information from the individual and the Monitor is seeking such information.

59. The receipt of the interim distribution has also resulted in communications from beneficiaries regarding the amounts of their payments. The Monitor believes certain of the inquiries have arisen as a result of the HWT - PDC being based on June 2010 payments while the interim distribution was based on December 2010 payments. The Monitor continues to work closely with the Company on finalizing HWT distribution matters, including gathering, updating and validating data to December 31, 2010.

**STATUS OF TERMINATION FUND**

60. In accordance with the settlement agreement, approved by this Honourable Court on March 31, 2010, the Applicants established a CAD $4.3 million fund for former employees of the Applicants (the "Termination Fund"). Under the settlement agreement, a former employee is eligible for payment from the Termination Fund to a maximum of CAD $3,000, if: (a) employment was terminated on or prior to June 30, 2010; (b) amounts are owing to the former employee for termination or severance payments; (c) the former employee has not been offered employment with a purchaser of Nortel's assets; and (d) the former employee did not receive certain other payments. Pursuant to the settlement agreement, any payments under the Termination Fund to former employees will be credited against allowed claims of

22

such individuals and such claims will be correspondingly reduced. To the extent that funds remain unused in respect of terminations prior to or on June 30, 2010, the Termination Fund may be used to make payments on account of terminations after June 30, 2010 to former employees who meet the eligibility requirements.

61. The Termination Fund in the amount of CAD $4.3 million consisted of a maximum CAD $100,000 for payment of fees and costs of Representative Counsel (as defined in the settlement agreement) and for payments to eligible former employees (based on an estimate of 1,400 eligible former employees). On September 17, 2010, 1,157 former employees were notified by mail they were eligible for a maximum payment of CAD $3,000 each from the Termination Fund and advised of the steps they were to take to receive their Termination Fund payment.

62. As of January 31, 2011, 1,105 of these 1,157 former employees have taken the necessary steps and received their payment. In aggregate, the payments to these former employees amounted to CAD $3,315,000. The Monitor understands the Company continues to work to contact the 52 former employees who have not yet taken the necessary steps to receive their payments. These 52 former employees have an entitlement of CAD $156,000.

63. Taking into account payments made to eligible former employees in the aggregate amount of CAD $3,315,000 and a reserve of CAD $156,000 for eligible former employees who have not yet completed the required documentation, there is an estimated CAD $729,000 remaining in the Termination Fund as of January 31, 2011. Accordingly, it is proposed the remaining funds in the Termination Fund be used to make payments to former employees who were terminated during the period from July 1, 2010 to and including December 31, 2010 and who otherwise meet the eligibility requirements.

64. Subsequent to June 30, 2010 and on or prior to December 31, 2010, an additional 363 employees were terminated (including 354 employees on Long Term Disability)

23

who would be eligible for Termination Fund payments (the "Additional Eligible Former Employees"). It is anticipated that employees who are terminated after December 31, 2010 will receive certain payments that otherwise prohibit their being eligible for the Termination Fund. The unused funds available in the Termination Fund are only sufficient to provide each Additional Eligible Former Employee terminated during this period with approximately CAD $2,000.

65. To date each eligible terminated employee has received CAD $3,000. The amount required to pay CAD $3,000 to each of the Additional Eligible Former Employees is CAD $1,086,000, or approximately CAD $360,000 (i.e. the Required Funds) in excess of the remaining funds available in the Termination Fund. In order to provide equitable treatment to the Additional Eligible Former Employees an amendment to the Employee Hardship Application Process is proposed, as discussed below, to permit the use of a portion of the amounts allocated to the Employee Hardship Application Process, in combination with the remaining funds in the Termination Fund, to pay CAD $3,000 to each of the Additional Eligible Former Employees, which payment would be credited against allowed claims of such individuals.

**STATUS OF EMPLOYEE HARDSHIP APPLICATION PROCESS AND FUND**

66. On July 30, 2009, an order was issued by this Honourable Court approving an employee hardship application process (the "Employee Hardship Order") as more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

67. On October 27, 2010, this Honourable Court approved the Applicants' request to extend the Application Period until February 28, 2011 and to amend the eligibility requirements in respect of the Employee Application Hardship Process to reflect the extended date.

68. The Monitor is continuing to administer the hardship payment application process and report thereon to the relevant representative counsel. There currently remains

24

available approximately CAD $626,000 of the original CAD $750,000 provided pursuant to the Employee Hardship Order. Applications continue to be received from former employees of the Applicants asserting financial hardship resulting from illness, healthcare costs or ineligibility for pension or employment insurance benefits.

69. As noted above approximately 354 of the 363 Additional Eligible Former Employees are LTD Beneficiaries. The LTD representative has advised the Monitor that many of those terminated on December 31, 2010 are experiencing financial difficulties and has requested that they receive the same payment of CAD $3,000 as those former employees terminated prior to June 30, 2010.

70. As noted in the Status of the Termination Fund update in this Fifty-Ninth Report, the Required Funds of approximately CAD $360,000 would allow payments of CAD $3,000 to be made to the Additional Eligible Former Employees, consistent with the amount awarded from the Termination Fund to the initial 1,157 former employees. Given that to date only about 20% of the hardship monies have been used, the Monitor considers that it would not cause undue prejudice to other former employees to use approximately half the amount remaining for the termination payments to this group.

71. Accordingly, the Monitor supports the Applicants' request that:

 a) the Employee Hardship Application Process criteria be amended such that the Required Funds be made available for payment of CAD $3,000 to each of the Additional Eligible Former Employees who meet the other criteria for Termination Fund payments;

 b) hardship funds so made available shall be treated in the same manner as payments from the Termination Fund and credited against allowed claims of such individuals;

25

c) the amount available for hardship applications be reduced by the Required Funds;

d) the Application Period be extended until and including June 30, 2011; and

e) Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended consistent with clauses (a) to (c) above.

72. A copy of the proposed amended Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications is attached as Appendix "C" to this Fifty-Ninth Report.

## ASSET DIVESTITURES AND ALLOCATION MATTERS

73. While Nortel has now completed the sale of most of its operating units, Nortel continues to assess the sale of its remaining assets, in consultation with its legal and financial advisors, while at the same time exploring other options in the event it cannot maximize value through sale transactions.

### Divestiture Activities

*MSS Business Sale*

74. As discussed in the Fifty-Fourth Report, NNC, NNL and certain of NNL's subsidiaries, including NNI, entered into an asset sale agreement dated September 24, 2010 with Ericsson for the sale of substantially all of the MSS Business for $65 million plus certain assumed liabilities.

75. The sale transaction was approved by this Honourable Court and the U.S. Court on September 30, 2010.

76. The sale transaction is currently targeted to close before the end of March 2011; however, due to the timing of the application process for EU anti-trust approval the closing may be further delayed.

26

*Carling Campus*

77. As discussed in the Fifty-Sixth Report, NNTC and NNL (the "Vendor") entered into an asset sale agreement for the sale of 3500 Carling Avenue, Ottawa, Ontario (the "Carling Campus") to Public Works and Government Services Canada (the "Purchaser") for an amount of CAD $208 million.  On November 8, 2010, this Honourable Court issued an order approving the sale.

78. The sale of the Carling Campus closed on December 17, 2010.

79. Net proceeds realized by the Vendor on closing amounted to approximately CAD $126.3 million after normal closing adjustments, payment of approximately CAD $3.1 million of real estate commissions and repayment in full of all principal and interest obligations owing to NNI pursuant to the NNI Loan Agreement (as described in the Fifty-Sixth Report) of approximately CAD $77.5 million.

80. Pursuant to the provisions of the asset sale agreement, the Vendor was directed by the Purchaser to exercise its early termination rights regarding two leases of portions of the Carling Campus with Ciena Canada, Inc., an affiliate of the purchaser of Nortel's Metro Ethernet Networks business.  The early termination right was exercised and an amount of $33.5 million (plus interest) was paid from the Carling Property Escrow Amount (as described in the Twenty-Fourth Report) to Ciena.

81. At closing, NNL entered into a three year lease for certain portions of the Carling Campus at reasonable market rates to facilitate completion of obligations it has pursuant to provisions of transition service agreements entered into with various purchasers of Nortel businesses, facilitate the sale of the MSS business and monetize its remaining intellectual property assets.  The lease is subject to early termination rights in favour of NNL.  In addition, NNL continues to have access to certain free space within the Carling Campus for varying periods up to one year to allow it to vacate lab equipment and other assets and to consolidate its remaining operations.

*Realization of Remaining Assets*

82. Nortel continues to make progress towards maximizing proceeds of realization on its residual assets. The Corporate Group remains focused on facilitating the sale of Nortel's residual businesses and assets, including the sale of GDNT, one of NNL's remaining joint ventures. In addition, the Corporate Group continues to explore the strategic alternatives available to best optimize the value of Nortel's remaining intellectual property assets.

*Allocation Matters and Mediation*

83. As previously reported by the Monitor, a voluntary non-binding mediation process is underway through which the Applicants, the U.S. Debtors, the Joint Administrators, various other Nortel entities and their respective stakeholders are attempting to negotiate a comprehensive settlement of all outstanding inter-estate matters, including sale proceeds allocation and inter-company claims. Mediation sessions were held with mediator Layn R. Phillips, a former U.S. federal district court judge, over four days in November 2010. The mediation was initially scheduled to continue in January 2011; however, by agreement of the estates, the continuation of the mediation was postponed until mid-April 2011.

**OTHER RESTRUCTURING ACTIVITIES**

*CVAS Purchase Price Dispute*

84. As detailed in the Thirty-Fourth Report of the Monitor, on December 22, 2009, NNC, NNL, NNI and various other Nortel entities entered into an asset sale agreement (the "Sale Agreement") for the sale of certain assets pertaining to Nortel's CVAS business to GENBAND Inc. (now Genband US LLC, "GENBAND"), which sale subsequently closed on May 28, 2010. Subsequent to the closing, certain disputes have arisen between Nortel and GENBAND as regards the final purchase price payable to Nortel, which disputes have centered around the interpretation of the

term "Deferred Profit Amount" in the Sale Agreement. Under Nortel's interpretation of the term, the final purchase price payable under the Sale Agreement, subject to the resolution of certain other outstanding disputes, would be approximately $182 million, whereas under GENBAND's interpretation, the final purchase price payable would be approximately $143 million.

85. This dispute resulted in each of Nortel and GENBAND bringing motions before the U.S. Court and this Honourable Court which, in the case of Nortel's motions, sought, amount others things, a declaration that the dispute was within the exclusive jurisdiction of the U.S. Court and this Honourable Court and an order enforcing Nortel's interpretation of the meaning of Deferred Profit Amount, and, in the case of GENBAND's motions, sought an Order that the dispute be referred to an accounting arbitrator.

86. The parties agreed to defer a hearing on the substantive dispute in order to permit the U.S. Court and this Honourable Court to consider the jurisdictional issue at a joint hearing held on December 16, 2010.

87. On January 21, 2011, both this Honourable Court and the U.S. Court issued reasons which confirmed the Deferred Profit Amount dispute was not subject to arbitration under the provisions of the Sale Agreement and that this Honourable Court and the U.S. Court retained exclusive jurisdiction to determine the dispute.

88. On February 1, 2011, GENBAND filed a Notice of Appeal with respect to the U.S. Court's order and on February 11, 2011, GENBAND sought leave to appeal this Honourable Court's decision to the Ontario Court of Appeal. The Applicants and the Monitor, in conjunction with NNI, are presently considering their options with respect to these matters.

*CTDI Litigation*

89. As further detailed in the Fifty-Fifth Report, on September 21, 2010, NNL commenced an adversary proceeding in the Chapter 15 proceedings against Communications Test Design, Inc. ("CTDI"). NNL alleges in its complaint that CTDI obtained or used its proprietary materials, components and information for unauthorized purposes, including but not limited to the manufacture of new products. NNL is asserting claims against CTDI for misappropriation of trade secrets, trademark infringement, dilution of a famous mark, false designation of origin, breach of contract, breach of covenant of good faith and fair dealing, fraud and unjust enrichment. NNI has commenced a related adversary proceeding against CTDI in the Chapter 11 Proceedings, which has been joined with NNL's proceeding. The parties are currently engaged in the discovery process. In addition, CTDI brought a motion before the U.S. Court to dismiss both complaints, which motion is pending before the U.S. Court. On January 3, 2011 CTDI answered NNI and NNL's complaints and asserted counterclaims of breach of contract against both NNI and NNL and has moved to join NNC as a counterclaim defendant. NNI has moved to dismiss CTDI's counterclaims and NNL has joined in that motion. Further, NNL has objected to the joinder of NNC.

*BreconRidge Dispute*

90. On November 15, 2010, the Applicants served a Notice of Motion seeking an Order compelling SCI Brockville Corp. ("SCI Brockville"), as successor to BreconRidge Corporation, to pay certain payables due and owing to NNL (the "BreconRidge Payable"). SCI Brockville is a subsidiary of Sanmina SCI Corporation ("Sanmina"). On December 1, 2010, SCI Brockville and Sanmina filed a responding motion record in which they allege SCI Brockville is entitled to set-off amounts claimed to be owing by various Nortel entities to Sanmina or its affiliates against the BreconRidge Payable. The Applicants and the Monitor take the position that SCI Brockville is not entitled to such a set-off and that the BreconRidge Payable is due in

30

full. The motion, originally scheduled to be heard on February 11, 2011, was adjourned to March 25, 2011, to allow the parties further time to discuss a potential settlement of these issues.

*Estate Separation Activities*

91. As discussed in previous reports, many of Nortel's corporate functions span multiple legal entities. As the divestiture of the various operating lines of business has largely been completed and with the expectation that transitional services provided to the various buyers will be completed during 2011, the interdependency of the Nortel entities is expected to diminish. The various Nortel estates are developing plans for the separation of various functions to allow each estate to operate going forward on a "standalone" basis.

92. Further analysis by the Applicants and the Monitor is required to finalize these plans and identify the resources required by the Applicants to ensure all necessary functions continue to operate allowing the administration of the Canadian estates to continue on an effective, efficient and independent basis.

93. The Monitor believes that it is in the best interest of the Applicants to position themselves, in the near term, to operate on an independent basis.

*French Employee Claims*

94. Approximately 128 former employees of NNSA of have commenced actions against; *inter alia*, NNC, NNL and the Monitor, before the Versailles employment tribunal in France. Although the specific relief claimed varies on a case by case basis, the central claim is that NNC and NNL are liable for various employment related claims on the grounds that they were "co-employers" with NNSA. The aggregate amount claimed is approximately €18 million. A consultation hearing before a French tribunal was held in France on November 24, 2010 and a full hearing has been scheduled before the French tribunal on October 31, 2011. The Applicants, in

consultation with the Monitor and their respective counsel, are reviewing the claims and considering their options.

*Appeal of the U.K. Pension Regulator*

95. On February 25, 2010, this Honourable Court heard a motion brought by the Monitor requesting certain relief with respect to "financial support direction" proceedings commenced by the U.K. Pensions Regulator (the "UKPR") against NNC and NNL. Additional information relating to this matter can be found in the Thirty-Eighth Report.

96. On February 26, 2010, this Honourable Court granted an Order providing, among other things, that all acts taken by the UKPR in the purported exercise of rights and in commencing any proceedings against any of the Applicants are null and void and shall be given no force or effect in these proceedings, nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertakings in Canada.

97. Notices of Motion for Leave to Appeal this Order were filed with the Ontario Court of Appeal by the UKPR, the Nortel Networks UK Pension Trust Limited and The Board of the UK Pension Protection Fund and leave to appeal was granted on May 10, 2010.

98. Following a hearing on June 16, 2010, the Ontario Court of Appeal dismissed the appeal. The UKPR subsequently sought leave to appeal to the Supreme Court of Canada. On January 27, 2011, the Supreme Court dismissed the UKPR's leave application.

**STATUS OF FOREIGN PROCEEDINGS**

*Chapter 11*

99. The following is a summary of the court orders that have been issued and the financial information that has been filed in the Chapter 11 Proceedings since the last update provided in the Monitor's Fifty-Fifth Report:

   a) on October 27, 2010, the U.S. Debtors obtained an order appointing Layn R. Phillips as the mediator for resolving disputes concerning the allocation of sale proceeds;

   b) on November 8, 2010, the U.S. Debtors obtained an order approving a stipulation between the U.S. Debtors, the Committee, and the UKPR regarding the UKPR's participation in the mediation;

   c) on November 23, 2010, the U.S. Debtors obtained an order approving the sale of limited partnership and limited liability company interests free and clear of all liens, claims and encumbrances to CS Strategic Partners IV VC Holdings, L.P. and Amberbrook V, LLC;

   d) on December 17, 2010, the U.S. Debtors obtained an order approving a stipulation between the U.S. Debtors and the Joint Administrators on behalf of NNUK and Nortel Networks (Ireland) Limited regarding the tolling of certain claims;

   e) on January 21, 2011, the U.S. Debtors obtained an order denying the motion of GENBAND US LLC to compel arbitration. On February 2, 2011, GENBAND US LLC filed a notice appealing this order; and

   f) the U.S. Debtors filed Debtor-in-Possession Monthly Operating Reports for the months of September, October and November on November 11, 2010, December 6, 2010 and December 22, 2010, respectively.

100. In addition, the U.S. Debtors obtained orders authorizing the expenditure of funds related to the wind-down of non-debtor subsidiaries and branch offices, extending the deadline for the Internal Revenue Service to complete its examination, granting omnibus objections to claims, authorizing the retention and payment of professionals, resolving certain claims and motions, and approving omnibus procedures to settle advance claims.

*Chapter 15*

101. The following is a summary of the filings in the Chapter 15 proceedings of the Applicants since the last update provided in the Monitor's Fifty-Fifth Report:

   a) the Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Honourable Court. The Monitor also filed notice of the Stay Extension Order and Endorsement of the Ontario Court dated October 27, 2010;

   b) on November 5, 2010, the Monitor obtained an order from the U.S. Court recognizing and enforcing the order of this Court approving a cross-border claims protocol establishing procedures to resolve overlapping and same-creditor claims in the CCAA proceedings and the Chapter 11 Proceedings. The US Court's order also recognized and enforced this Court's claims resolution order establishing mechanisms to determine the proven claims of creditors, including protocol claims; and

   c) on November 5, 2010, the Monitor obtained an order enforcing this Court's order approving the sale of certain MSS business assets by NNC, NNL, NNI, and certain of their affiliates, to Telefonaktiebolaget L M Ericsson.

**REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS**

102. The Stay Period presently expires on February 28, 2011. The Applicants are seeking a 122 day extension of the Stay Period up to and including June 30, 2011.

34

As stated above, based on the cash flow analysis, including the assumptions contained therein, the Applicants have sufficient cash resources to fund operations through the requested stay extension.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

103.  The Monitor has assisted and continues to assist the Applicants in their efforts to efficiently complete the realization and maximization of value from their assets, conduct the claims process and prepare a plan of arrangement.  The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a Plan.

104.  For the reasons outlined in this Fifty-Ninth Report, the Monitor supports the Applicants' request for the following:

a)  the employee hardship application criteria be amended such that the Required Funds be made available for payment of CAD $3,000 to the Additional Eligible Employees who meet the other criteria for Termination Fund payments, when combined with unused funds in the Termination Funds;

b)  the amount available for hardship applications be reduced by the Required Funds;

c)  an extension of the Employee Hardship Application Process to June 30, 2011;

d)  the Eligibility Requirements and the Procedure with Respect to Hardship Payments Applications be amended consistent with (a) through (c) above; and

e)  an extension of the stay up to and including June 30, 2011.

105.  The Monitor also supports the administrative amendments to the Initial Order proposed by the Applicants to remove references to the NNI Loan, the NNI Loan

35

Charge, the Goldman Charge and the Carling Facility Charge as the obligations to which those provisions and charges relate have been satisfied by the Applicants.

All of which is respectfully submitted this 18 day of February, 2011.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

36

APPENDIX A

**Nortel Networks - October 3, 2010 to February 5, 2011**
**CCAA Applicants**
Forecast Cash Flow - Variances
USD (Millions)
(Unaudited)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 03-Oct-10 | 03-Oct-10 | 03-Oct-10 |
| End of period | 05-Feb-11 | 05-Feb-11 | 05-Feb-11 |

**1 . Receipts & Disbursements**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 2.7 | 5.1 | 2.4 |
| Other Receipts | 203.9 | 210.6 | 6.7 |
| TSA Recoveries from Buyer | 43.8 | 53.0 | 9.2 |
| Payroll & AP reimbursement from Buyers | 10.8 | 8.6 | (2.2) |
| Intercompany Receipts | 17.5 | 14.3 | (3.2) |
| **Total Receipts** | 278.6 | 291.6 | 13.0 |
| **Disbursements** | | | |
| Payroll (Gross) | 23.0 | 20.8 | 2.2 |
| Benefits | 12.4 | 11.3 | 1.1 |
| Pension | - | - | - |
| Inventory Purchases | - | 3.7 | (3.7) |
| Non-Inventory Purchases | 36.2 | 48.2 | (12.0) |
| Payroll & AP payments on behalf of Buyers | 10.8 | 8.6 | 2.2 |
| Intercompany Disbursements | 83.9 | 80.4 | 3.5 |
| Restructuring Costs | 29.6 | 32.8 | (3.2) |
| **Total Disbursements** | 195.9 | 205.9 | (10.0) |
| **Net Cash Flow** | 82.7 | 85.6 | 3.0 |
| FX Impact | - | 5.4 | 5.4 |
| **Opening Available Cash Balance** | 189.6 | 189.6 | - |
| **Closing Available Cash Balance** | 272.3 | 280.7 | 8.4 |
| Unavailable Cash | 237.7 | 237.7 | - |
| **Total Cash** | 510.0 | 518.4 | 8.4 |
| Restricted Cash | 44.4 | 40.9 | (3.5) |
| **Total Cash + Restricted Cash** | 554.4 | 559.3 | 4.9 |

**Nortel Networks – February 6, 2011**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Millions)

## 1. Receipts & Disbursements

| | Feb-2011 | | | | Mar-2011 | | | | | Apr-2011 | | | | | May-2011 | | | | Jun-2011 | | | | Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of period | 06-Feb-11 | 13-Feb-11 | 20-Feb-11 | 27-Feb-11 | | 06-Mar-11 | 13-Mar-11 | 20-Mar-11 | 27-Mar-11 | | 03-Apr-11 | 10-Apr-11 | 17-Apr-11 | 24-Apr-11 | | 01-May-11 | 08-May-11 | 15-May-11 | 22-May-11 | 29-May-11 | 05-Jun-11 | 12-Jun-11 | 19-Jun-11 | 26-Jun-11 | 26-Jun-11 |
| End of period | 12-Feb-11 | 19-Feb-11 | 26-Feb-11 | 05-Mar-11 | 05-Mar-11 | 12-Mar-11 | 19-Mar-11 | 26-Mar-11 | 02-Apr-11 | 02-Apr-11 | 09-Apr-11 | 16-Apr-11 | 23-Apr-11 | 30-Apr-11 | 30-Apr-11 | 07-May-11 | 14-May-11 | 21-May-11 | 28-May-11 | 28-May-11 | 11-Jun-11 | 18-Jun-11 | 25-Jun-11 | 30-Jun-11 | 30-Jun-11 |

*Receipts*

| | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Collection of Accounts Receivable | | 0.2 | | | 0.1 | 0.1 | 0.1 | | | | | | | | | | | | | | | | | | 0.4 |
| Other Receipts | | | | | | | 30.0 | 30.0 | | | | | | | | | | | | | | | | | 30.0 |
| TSA Recoveries from Buyers | 4.3 | | 0.2 | | | | 11.0 | 11.0 | | | | 9.3 | | | | 8.2 | | | | | | | 4.2 | | 37.0 |
| Intercompany Receipts | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Receipts** | 4.3 | 0.2 | 0.2 | | 0.1 | 0.1 | 11.1 | 30.0 | | | | 8.3 | | | | 8.2 | | | | | | | 4.2 | | 67.4 |

*Disbursements*

| | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll (Gross) | 1.6 | 1.6 | | | 1.6 | | 21.2 | | | 0.7 | | 1.7 | 0.5 | 0.7 | | 0.7 | | 0.7 | 0.7 | | 0.7 | | 0.5 | | 31.6 |
| Benefits | 0.2 | 1.3 | | | 0.2 | | 1.2 | 0.5 | | 0.1 | 0.1 | 0.1 | | 0.1 | | 0.3 | | 0.3 | 0.1 | | 0.1 | | 0.3 | | 5.1 |
| Pension | | | | | | | | | | | | | | | | | | | | | | | | | |
| Inventory Purchases | | 0.5 | | | | | 0.5 | | | | | 0.5 | 0.5 | | | 0.5 | | | | | | | | | 2.5 |
| Non-Inventory Purchases | 0.8 | 3.2 | 0.6 | | 0.5 | 3.0 | 0.6 | 0.8 | | 0.5 | 2.3 | 0.5 | 0.5 | 0.5 | | 2.5 | | 0.5 | 0.5 | | 2.3 | | 0.5 | | 21.6 |
| Intercompany Disbursements | 0.2 | | 0.6 | | 0.6 | | 0.6 | | | 0.2 | | | 0.1 | 0.1 | | | | 0.1 | | | 0.1 | | | | 1.9 |
| Restructuring Costs | 1.9 | 1.9 | 1.9 | | 1.9 | 1.9 | 1.9 | 1.6 | | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | | 1.3 | | 1.3 | 1.3 | | 1.3 | | 1.3 | | 31.9 |
| **Total Disbursements** | 4.4 | 5.9 | 3.1 | | 4.3 | 4.9 | 33.4 | 2.7 | | 2.6 | 3.7 | 3.6 | 2.7 | 2.6 | | 4.5 | | 2.6 | 2.7 | | 4.4 | | 2.6 | | 105.4 |

| | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Cash Flow** | (0.2) | (5.7) | (2.9) | | (4.1) | (4.8) | (22.3) | 27.3 | | | | 4.7 | | | | 5.6 | | (2.7) | (1.9) | | (1.9) | | 1.6 | | |

| | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening Available Cash Balance | 280.7 | 280.5 | 275.6 | 269.9 | 269.9 | 266.8 | 262.6 | 257.7 | 235.4 | 262.7 | 262.7 | 260.1 | 256.4 | 253.9 | 256.8 | 256.8 | 256.0 | 250.5 | 256.1 | 256.1 | 253.4 | 253.5 | 253.5 | 247.1 | 280.7 |
| Closing Available Cash Balance | 280.5 | 275.6 | 269.9 | 269.9 | 266.8 | 262.6 | 257.7 | 235.4 | 262.7 | 262.7 | 260.1 | 256.4 | 253.9 | 256.8 | 256.8 | 256.0 | 250.5 | 256.1 | 256.1 | 253.4 | 253.5 | 253.5 | 247.1 | 240.1 | 240.1 |
| Unavailable Cash | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 | 232.7 |
| **Total Cash** | 513.3 | 507.6 | 504.5 | 502.5 | 499.4 | 495.3 | 490.3 | 468.0 | 495.3 | 495.3 | 492.7 | 489.1 | 486.6 | 489.5 | 489.5 | 488.7 | 483.3 | 488.7 | 488.8 | 488.8 | 486.1 | 486.2 | 479.8 | 472.7 | 472.7 |

| | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restricted Cash | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 |
| **Total Cash + Restricted Cash** | 559.1 | 554.2 | 548.5 | 545.4 | 541.1 | 536.2 | 531.2 | 541.3 | 541.3 | 538.7 | 535.0 | 532.5 | 530.0 | 530.8 | 530.4 | 529.1 | 524.7 | 529.7 | 530.1 | 530.1 | 527.5 | 529.7 | 518.7 | 520.3 | 520.3 |

**APPENDIX C**

**Eligibility Requirements and Procedure with Respect to Hardship Payment Applications**

1. **Eligibility** – A former employee would be eligible for hardship payments if he or she is resident in Canada and has no available source of income, being all monies receivable by the former employee including, without limitation, employment income such as wages, salary or bonuses, consulting income, or pension or disability payments or income replacement payments ("Income"), or Income of a spouse, as of the date of the application and has no reasonable expectation of being in receipt of Income during the Application Period (referred to below) and:

   a. The former employee is unable to work due to illness or is incurring costs in excess of 25% of his or her EI payments as a result of treatment for illness or healthcare costs, or as a result of the illness of a family member who is dependent on the former employee for support; or

   b. During the Application Period the former employee is not receiving a Nortel pension or employment insurance (EI) as a result of ineligibility for EI or exhaustion of EI benefits, and demonstrates some other significant hardship in dealing with financial obligations.

2. **Application Process** – Notice of the application process will be posted on the Monitor's website and the website of the Nortel Retiree Protection Committee (NRPC) in a form approved by the Court. An applicant would be required to complete an application form (to be approved by the Court) to be submitted to a person designated by the Monitor. The person so designated would be expected to deal with completed applications within 14 to 21 days and to make an initial determination to approve or reject the application. The first payment will proceed within seven business days subject to the payment parameters set out below. If not approved, the application is to be reviewed by an informal committee and the applicant will be given the right to be heard by the committee. The committee will be composed of one company appointee, one appointee of the Monitor and one appointee chosen by the NRPC, who will be compensated for his time on an hourly basis. A further appeal may be brought to the Court or an officer of the Court designated by the presiding judge, costs to be determined by the Court on the application.

3. **Payment Parameters** – Any successful applicant may be approved for a maximum payment of up to 8 weeks salary based on a maximum weekly salary of up to $1,200 per week payable in monthly instalments. The hardship committee will also have discretion to approve additional amounts in cases of medical and other emergencies in an amount up to $2,500.

4. **Application Period** – From the date of court approval to June 30, 2011.

5. **Miscellaneous**

   a. Hardship Payments are advances against distributions on claims, and will be deducted from any payments on claims that may be allowed in the ultimate claims process in these proceedings.

   b. The Monitor shall report to the Court on or before November 30, 2009 with respect to the processing and administration of hardship payment applications.

   c. The aggregate maximum amount available for hardship payments on applications approved during the Application Period is $750,000 less the Required Funds (as defined by paragraph 4 of the February X, 2011 Court order).

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

FIFTY-NINTH REPORT OF THE MONITOR
DATED FEBRUARY 18, 2011

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.