## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                                 :

*In re*                                :        Chapter 11
                                 :

Nortel Networks Inc., *et al.*,[1]         :        Case No. 09-10138 (KG)
                                 :

                  Debtors.     :        Jointly Administered
                                 :

                                 :        **Hearing date: April 26, 2011 at 9:30 am (ET)**
                                 :        **Objections due: April 4, 2011 at 4:00 pm (ET)**
                                 :

-------------------------------------------------------- X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE SALE OF INTERNET NUMBERS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (II) AUTHORIZING AND APPROVING ENTRY INTO A PURCHASE AND SALE AGREEMENT; (III) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (IV) GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI"), and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), pursuant to sections 105, 107(b)(1) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of an order substantially in the form attached hereto as Exhibit A (i) authorizing the sale, assignment and transfer of all of NNI's right, title and interest in and to

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

approximately 666,624 legacy IPv4 numbers (as described further in the Agreement, the "Internet Numbers") on an "as-is" and "where-is" basis, free and clear of all Liens,[2] Claims, encumbrances and interests, other than Assumed Liabilities, Permitted Encumbrances or Liens created by or through the Purchaser or any of its Affiliates, or as otherwise provided in the Agreement (collectively, the "Interests") pursuant to section 363 of the Bankruptcy Code (the "Transaction"), (ii) authorizing and approving entry into that certain purchase and sale agreement dated as of March 16, 2011 among NNI (the "Seller") and Microsoft Corporation (the "Purchaser") for the sale, assignment and transfer of the Internet Numbers as described therein, substantially in the form attached hereto as Exhibit B (the "Agreement"), (iii) authorizing the Debtors to file certain documents under seal and (iv) granting such other and further relief as the Court deems just and proper.

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

[3]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

2

operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized.

4.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[5] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

---

[4]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

5.      On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales.  Since then, Nortel has sold many of its business units and assets to various purchasers.  Efforts continue to be made with respect to the realization of value from Nortel's remaining assets.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

## Relief Requested

6.      By this motion, the Debtors seek an order (i) authorizing and approving the sale of the Internet Numbers free and clear of all Interests; (ii) authorizing and approving entry into the Agreement; and (iii) granting related relief.

## Facts Relevant to this Motion

**A.      The Internet Numbers**

7.      All devices connecting to the Internet, at home or via a business, require a unique Internet number space.  There are approximately 4.3 billion existing IPv4 numbers, most of which have already been allocated.  The Internet industry is preparing to transition to the next generation of Internet Protocol, IPv6.  IPv4 addresses will eventually be supplanted by IPv6 addresses, of which there is a virtually unlimited supply, but this is expected to take several years.  Because of the limited supply of IPv4 addresses, there is currently an opportunity to realize value from marketing the Internet Numbers, which opportunity will diminish over time as IPv6 addresses are more widely adopted.

8.      The Internet Numbers consist of 666,624 IPv4 Numbers that were allocated to NNI's predecessors in interest in the 1990s, which entities were ultimately merged into NNI.[6] Of the 666,624 IPv4 Numbers proposed to be transferred to the Purchaser pursuant to the Agreement, 470,016 are available for immediate use by the Purchaser (the "Initial Legacy Numbers"), and the remaining 196,608 are currently being used in connection with the provision of transition services to existing purchasers of Nortel's business lines, and would not be transferred to the Purchaser until those respective agreements terminate later this year (the "Subsequent Legacy Numbers").

**B.      Efforts to Market the Internet Assets**

9.      NNI began actively marketing the Internet Numbers in late 2010, following its research into the potential value of the assets and the opportunities to realize such value.  As more fully described in the *Application of the Debtors Pursuant to 11 U.S.C. § 327(a) to Retain and Employ Addrex Inc. Nunc Pro Tunc to November 24, 2010* (D.I. 4435), the Debtors retained Addrex, Inc. ("Addrex") to advise the Debtors on monetization of the Internet Numbers and to attract qualified purchasers.

10.      On behalf of the Seller, Addrex forwarded solicitation materials to over eighty (80) potential purchasers in early December, 2010.  The Seller signed non-disclosure agreements with fourteen (14) potential purchasers, who were then provided access to an electronic data room containing summary financial information, an initial process letter, chain of custody information, and draft agreements.  The Seller received bids in January, 2011 from four (4) potential purchasers who bid for the entire portfolio of Internet Numbers, along with three (3)

---

[6]      The Internet Numbers were assigned to NNI and its predecessors in interest prior to the formation of an applicable regional Internet registry ("RIR").  IPv4 numbers (like the Internet Numbers) that were not allocated by an RIR are commonly referred to as "legacy numbers."

additional bids for less than all of the Internet Numbers.  Pursuant to the bid process letter, the

bids included a full markup of the draft sale agreement.

11.     Following NNI's consideration of the various bids received and discussions with

the bidders, the Debtors determined that the Purchaser's bid represents the highest and best offer

for the assets.  NNI has engaged in good-faith negotiations with the Purchaser on the terms of the

sale, which negotiations resulted in the Agreement.

**C.     The Agreement[7]**

12.     On March 16, 2011, the Seller and the Purchaser executed the Agreement, which

contains the following material terms:[8]

- Purchase Price.  The Purchaser will pay to the Seller the Gross Purchase Price of $7,500,000.  On the Closing Date, the Purchaser will transfer to the Seller the percentage of the Gross Purchase price attributable to the Initial Legacy Numbers, less the Good Faith Deposit.  The balance of the Gross Purchase Price shall be paid into escrow, and on each Subsequent Transfer Date the Escrow Agent shall release to the Seller the amount of the Gross Purchase Price attributable to the Subsequent Legacy Numbers transferred on that date.    If any Subsequent Legacy Numbers have not been transferred on or before January 31, 2012, the Escrow Agent shall release the cash attributable to such numbers to the Purchaser, and those numbers will be excluded from the Transaction.

- Internet Assets.  Purchaser agrees to purchase from the Seller all of the Seller's right, title, and interest in and to the Internet Assets set forth on Schedule A of the Agreement.

- Sale Free and Clear.  Seller will transfer and assign all of its right, title and interest in and to the Internet Assets, on an "as is" and "where is" basis, free and clear of all Interests, to the fullest extent permitted by section 363 of the Bankruptcy Code and other applicable law.

- Good Faith Deposit.  No later than ten (10) days after Seller's execution of the Agreement, Purchaser will deliver to Seller cash in an amount of $225,000 (i.e. three percent (3%) of $7,500,000) to serve as earnest money under the Agreement.

---

[7]     To the extent that there are inconsistencies between any summary description of the Agreement contained herein and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

[8]     Any capitalized terms used in this Section C but not otherwise defined herein, shall have the meaning assigned in the Agreement.

- <u>Restrictions on Solicitation of Competing Bids and No Auction</u>.  As the Debtors have widely marketed the Internet Assets, no further public auction is contemplated for the Internet Assets.  From the time of the signing of the Agreement until the Sale Order becomes a Final Order, the Debtors shall not a solicit bid from any third party for the sale of the Internet Assets.

- <u>Duties and Obligations Related to Internet Assets</u>.  As of the applicable Transfer Date for each Internet Number, Purchaser shall assume all liabilities with respect to ownership and exploitation of the Internet Number relating to periods after the applicable Transfer Date, including all Liabilities related to actions or claims brought against or in relation to the Internet Number, and all maintenance fees, service charges, and registration costs, as applicable, related to the Internet Number.

- <u>Closing Conditions</u>.  The Agreement contains customary closing conditions, and requires the entry of a Sale Order approving the Agreement and providing, among other things, that the Internet Numbers shall be sold, assumed, assigned and transferred to the Purchaser free and clear of all Liens, claims and interests to the fullest extent permitted by section 363 of the Bankruptcy Code.  The sale shall be evidenced by changing the Point of Contact information in the applicable regional Internet registry's WHOIS database record.

- <u>Multiple Transfer Dates</u>.  The Closing shall take place five (5) business days after all of the closing conditions specified in the Agreement have been satisfied or, if permissible, waived by the applicable party, or as otherwise mutually agreed in writing by the Seller and the Purchaser.  Upon occurrence of the Closing, legal title, equitable title and risk of loss with respect to the Initial Legacy Numbers will transfer to the Purchaser, and the Assumed Liabilities will be assumed by the Purchaser.  The completion of the purchase and sale of the Subsequent Legacy Numbers shall take place on the date which is five (5) business days after the applicable date set out in Exhibit C to the Agreement, or on such other date and time as shall be mutually agreed upon in writing by the Purchaser and Seller.

13.    Based on NNI's broad marketing efforts to date, and the good-faith negotiations with Purchaser, the Debtors believe that the consideration and terms set forth in the Agreement represent the highest and best offer available for the Internet Assets, that further marketing of the Internet Assets would not yield a better offer and that further marketing of the Internet Assets could result in a reduction in the Purchase Price or the loss of the Transaction with the Purchaser altogether.  Accordingly, the Debtors intend to proceed with the sale contemplated by the Agreement at this time.  The Debtors have consulted with counsel for the Committee and counsel

to the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements (the "Bondholder Group") regarding the Transaction, and understand that they do not oppose the Transaction as described herein.

### D.    Sale Free and Clear of All Bankruptcy Claims

14.    Pursuant to this Court's order approving the Agreement (the "Order") on the terms set forth in the Agreement, the Debtors have agreed to sell, transfer and assign pursuant to section 363 of the Bankruptcy Code, NNI's right, title and interest in the Internet Numbers, free and clear of any and all interests to the fullest extent permitted by applicable law, including (without limitation) (i) any and all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, hypothecation, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, servitude, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, charge, prior claim, lease, conditional sale agreement, or other similar restriction of any kind (collectively, including "Liens" as defined in the Agreement, the "Liens"), and (ii) any and all Claims, debts, liabilities, and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, known or unknown, or determined or undeterminable, including any tax liability (collectively, the "Liabilities" and together with the Liens, the "Interests"), in each case other than Assumed Liabilities, Permitted Encumbrances and Liens created by or through the Purchaser or any of its Affiliates, with such Interests to attach to the sale proceeds in the same validity, extent and priority as immediately prior to the Transaction, subject to any rights, claims and defenses of the Debtors and other parties in interest.  Except as otherwise expressly provided in the Agreement, all such Interests (other than Assumed Liabilities, Permitted Encumbrances

and Liens created by or through the Purchaser or any of its Affiliates) will be released, terminated and discharged as to the Purchaser and the Internet Numbers.

15.    The Debtors seek a finding by the Court that upon the Closing, and except as otherwise provided in the Agreement, the Purchaser shall not be liable for any Claims against, and Interests and obligations of, the Debtors or of any the Debtors' predecessors or affiliates.

## **Basis for Relief**

### A.    **Entry into the Agreement Is a Product of the Debtors' Reasonable Business Judgment**

16.    Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

17.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code, outside the ordinary course of business and prior to the confirmation of a plan of reorganization, is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of

the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa. 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

18.    The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business;  (2) that accurate and reasonable notice has been provided to interested persons;  (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and  (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[9]

19.    The transfer of the Internet Numbers in connection with the Transaction meets the "sound business reason" test.  First, sound business purposes justify the Transaction.  The Debtors believe that a prompt sale of the Internet Numbers presents the best opportunity to realize the maximum value of the Internet Numbers for NNI's estate and its creditors.  The

---

[9]    Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable.  In re Lionel, 722 F.2d at 1071.

Debtors further believe that this benefit could be adversely affected, or perhaps lost, absent a prompt transfer of the Internet Numbers. See In re Lionel Corp., 722 F.2d at 1071 (finding that of factors for courts to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value"). In light of the current window of opportunity presented for the monetization of the Internet Numbers, coupled with the Debtors' current efforts to restructure or wind down their remaining assets, the Debtors believe that a prompt transfer will maximize the value of the Internet Numbers for the benefit of NNI's creditors and its estate.

20.    Second, notice of the Motion will be provided to interested parties as set forth in the Agreement and in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and applicable Court orders as appropriate under the circumstances.

21.    Third, the Debtors believe they have obtained a fair and reasonable price for the Internet Numbers that constitutes reasonably equivalent value and fair consideration for the Internet Numbers. The consideration agreed to in the Agreement is the result of a marketing effort by Seller that targeted the likely interested parties in these assets and the culmination of arm's-length negotiations between Seller and the Purchaser. Seller diligently and in good faith analyzed other available options in connection with the disposition of the Internet Numbers and determined that the terms and conditions set forth in the Agreement are all fair and reasonable and that the purchase price contemplated in the Agreements constitutes the highest or otherwise best value available for such Internet Numbers.

22.    Finally, the marketing and negotiation process satisfies the good faith requirement of Abbotts Dairies. 788 F.2d at 149-50. The Debtor submits that the Agreement is the product of good faith solicitation efforts and arm's-length negotiations among Seller and the Purchaser

11

with respect to the price and other terms of the Agreement. While there is limited public precedent for the sale of the Internet Numbers that could be directly compared to the Transaction, NNI has concluded that the price received by Seller for the Internet Numbers is reasonable in light of prices charged by certain Internet service providers for Internet number space, Nortel's estimate of its own cost to transition from IPv4 to IPv6 (including hardware, software and labor costs), internal and external projections of market conditions at and after IPv4 exhaustion, and the approximate amount of time until IPv4 numbers become obsolete.

**B.    The Sale of the Internet Numbers without Auction is Justified**

23.    Under Bankruptcy Rule 6004, a debtor may sell assets outside of the ordinary course of business by private sale or public auction. See Fed. R. Bankr. P. 6004 ("All sales not in the ordinary course of business may be by private sale or by public auction.").

24.    The Debtors believe that the sale of the Internet Numbers to the Purchaser without an auction is the best way to maximize value for their estates. As described above, the proposed Agreement is the result of an effort by Nortel to market the interests to numerous potential bidders and the Purchaser was selected as the highest and best bidder following the marketing process. Based on this marketing process, the Debtors have concluded that it is unlikely the Debtors would realize a higher purchase price for the Internet Numbers that would warrant the costs and delays associated with a further formal auction process.

**C.    The Purchasers Should be Granted the Protection of Bankruptcy Code Section 363(m)**

25.    As described above, the Seller and the Purchaser negotiated the Agreement in good faith and at arm's length. Accordingly, the Debtors maintain that the Purchaser is entitled to the protections afforded by Bankruptcy Code section 363(m).

12

26.     Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

27.     While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pa., Inc., has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

28.     The Seller and the Purchaser have spent a considerable amount of time and resources over the past several weeks finalizing proposed sale terms for the Internet Numbers and negotiating the Agreement at arm's length, with give and take on both sides.  All parties have acted in good faith to advance their interests in this arm's-length process.

13

29.     Neither the Purchaser nor any of its affiliates is an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.  Neither the Purchaser nor any of its affiliates is (i) a mere continuation of the Debtors or their estates and there is no continuity between the Purchaser and its affiliates and the Debtors or (ii) holding itself out to the public as a continuation of the Debtors.  The Transaction is not being undertaken for the purpose of escaping liability for the Debtors' debts.  Under the circumstances, this Court should find that the Purchaser is entitled to all of the protections of Bankruptcy Code section 363(m).

**D.      The Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)**

30.     As set forth above, Seller and the Purchaser have been negotiating at arm's length and in good faith regarding the Agreement.  Moreover, the Debtors do not believe the Agreement to be the result of collusion or other bad faith between bidders or that the price under the Agreement has been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).  The Debtors are not aware of any agreement between Purchaser and any other entity relating to bidding for the Internet Numbers.

31.     The Agreement has been negotiated, and proposed, and will be entered into by Seller and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither Seller nor the Purchaser nor any of their affiliates have engaged in any conduct that could cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n).

**E.      Sale of the Internet Numbers Should Be Free and Clear of Bankruptcy Claims**

32.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to transfer, convert, cancel or otherwise dispose of Seller's right, interest and title in the Internet

Numbers to the Purchaser free and clear of all Interests, as defined in the Agreement and except as set forth in the Agreement, with any Interests to attach to the proceeds of the sale of the Internet Numbers as applicable, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.   Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).   See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written in the disjunctive and thus, court may approve sale "free and clear" provided at least one of the requirements is met).

   33.   With respect to each creditor that asserts an Interest, the Debtors submit that one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) will be satisfied.   Those holders of Interests who do not object or who withdraw their objections to the Motion or the Transaction will be deemed to have consented to the Motion and the Transaction pursuant to Bankruptcy Code § 363(f)(2).   The Debtors also submit that, for holders of Interests who do

object, their Interests will fall within one or more of the other subsections of Bankruptcy Code section 363(f).

34.     A sale free and clear of Interests is necessary to maximize the value of the Internet Numbers.  The Purchaser would not have entered into the Agreement and will not consummate the Transaction if the Internet Numbers were not to be transferred to the Purchaser free and clear of all Interests (except as permitted by the Agreement).  A transfer of the Internet Numbers other than one free and clear of all Interests would yield substantially less value for the Debtors' estates, with less certainty than the proposed Agreement.   Therefore, the Transaction is in the best interests of NNI and its estate and creditors, and all other parties in interest.  A sale free and clear of Interests is particularly appropriate under the circumstances because any lien or claim in, to or against NNI's right, interest and title in the Internet Numbers that exists immediately prior to the relevant Closing for such Internet Numbers will attach to the proceeds with the same validity, priority, force and effect as existed with respect to the Internet Numbers at such time, subject to the rights and defenses of the Debtors or any party in interest.  NNI submits that holders of Interests, if any, will be adequately protected by the availability of the proceeds of the Transaction to satisfy their claims and interests.

**F.     Filing of Schedule and Exhibits Under Seal**

35.     The Debtors respectfully submit that it is appropriate to allow the exhibits and schedules to the Agreement (the "Schedules") to be filed under seal.  The Schedules contain substantial sensitive commercial information concerning the Debtors' business, records and related documentation, including without limitation the individual Internet Numbers that are subject to the Transaction, the public disclosure of which could lead to devaluation of the Internet Numbers based on inappropriate use of such internet numbers by third parties.

16

36.     The relief requested is squarely authorized under the Bankruptcy Code.  Section

107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders to

protect a party's confidential, commercial or proprietary information

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information . . . .

11 U.S.C. § 107(b).

37.     Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

38.     This Court has defined "commercial information" in the context of section 107(b)

as follows:

> Commercial information is information which would result in 'an
> unfair advantage to competitors by providing them information as
> to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion

Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section

107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid

'affording an unfair advantage to competitors by providing them information as to the

commercial operations of the debtor.'"   In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr.

Del. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982).

17

39.     Disclosure of this confidential commercial information would be damaging to the Debtors and the Purchaser if it is disclosed to their competitors.  The filing of the Schedules under seal is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein.

## Notice

40.     Notice of the Motion has been given via first class mail, facsimile, electronic transmission, hand delivery or overnight mail to (i) the Office of the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to the Purchaser; (v) all parties to any transition services or similar agreement pursuant to which any of the Internet Numbers are being used to provide services; (vi) the American Registry for Internet Numbers, ("ARIN") and (vii) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

41.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  March 21, 2011                  CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

                                     James L. Bromley (admitted *pro hac vice*)
                                   Lisa M. Schweitzer (admitted *pro hac vice*)
                                   One Liberty Plaza
                                   New York, New York 10006
                                   Telephone:  (212) 225-2000
                                   Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Alissa T. Gazze*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Alissa T. Gazze (No. 5338)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*