## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

SIXTIETH REPORT OF THE MONITOR
DATED MARCH 21, 2011

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to June 30, 2011, by this Honourable Court in its Order dated February 25, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy

Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings. In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

6.  Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.  The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have each been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.  Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9.  The purpose of this Sixtieth Report of the Monitor (the "Sixtieth Report") is to provide information regarding the Applicants' motion seeking approval of a sale of NNL's interest in 5,000,000 limited partnership units (the "Units") in Summerhill Ventures I LP (the "Partnership") pursuant to a Purchase and Sale Agreement dated February 23, 2011 (the "PSA"), between NNL and CS SP IV Investments Canada Corp. (the "Purchaser") and to provide the Monitor's support thereof.

**TERMS OF REFERENCE**

10. In preparing this Sixtieth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Sixtieth Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12. Capitalized terms not defined in this Sixtieth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the PSA, the Fee Agreement (as defined below), the Consent Agreement (as defined below), the Pre-Filing Report or previous reports of the Monitor.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**GENERAL BACKGROUND**

14. Nortel launched its Venture Capital Investment Program in 1998 to establish formal relationships with the venture capital ("VC") community, with the objective to obtain earlier and deeper access to their portfolio companies for commercial partnering opportunities, investment opportunities and merger and acquisition options. Nortel invested in approximately twelve VC firms focused on communications and networking solutions located in the U.S., Canada, Israel, Europe, and Asia. The majority of Nortel's VC investments are held by NNI.

15. Summerhill Venture Partners LP, the general partner (the "General Partner") of the Partnership, is an early stage VC firm focused on certain areas within the wireless, digital media, and information technology sectors.

16. NNL entered into the Summerhill Ventures I LP Partnership Agreement (the "Partnership Agreement") and made its initial investment in the Partnership on or about July 19, 2007, committing to total capital contributions over the life of the Partnership of $5,000,000. Subsequent to its initial investment in the Partnership, NNL has made the capital contributions to the Partnership, required by the Partnership Agreement with the most recent capital contribution of $106,340.18

being made on March 8, 2011. NNL has not yet funded the entire $5,000,000 committed and additional future capital contributions are expected. NNL's total net investment (total capital contributions less total distributions received) to date equals approximately $2.4 million.

17. As part of the ongoing restructuring efforts, Nortel decided to pursue the sale of its limited partnership interests, including NNL's Summerhill Ventures I LP interest, and commenced the process of seeking potential purchasers in May, 2010. This sale process was undertaken by Nortel, with periodic updates being provided to the Monitor throughout the process.

18. The Monitor understands that during this process thirty-three potential purchasers were contacted by Nortel, twenty-two of which signed non-disclosure agreements and received further information. As a result of this process, bids from three parties to purchase the Units were received.

19. Further discussions were conducted with the parties submitting bids, including the Purchaser.

20. While discussions with prospective purchasers were ongoing, NNL was advised by the General Partner that the Partnership had exited certain investments, resulting in NNL being entitled to receive further distributions. As a result, NNL, in consultation with the Monitor, delayed the sale process in order to collect such distributions. Since May 2010, NNL has received distributions from the Partnership totalling approximately $756,000. During this period, NNL also made capital contributions totalling approximately $520,000 (including the March 8, 2011 capital contribution referenced above), resulting in net proceeds received since May 2010 totalling approximately $236,000.

21. In early November 2010, NNL contacted the three parties who had previously submitted bids to purchase the Units and issued a process letter requesting best and final offers by November 17, 2010.

22. On November 17, 2010, NNL received a binding offer from the Purchaser to purchase the Units. After adjusting for capital calls and distributions, this offer was higher than the bids previously received, and no other new offer was received. Accordingly, NNL and the Purchaser entered into negotiations that ultimately resulted in NNL agreeing to sell the Units to the Purchaser pursuant to the PSA on the terms described below.

**THE PURCHASE AND SALE AGREEMENT**

23. On February 23, 2011, NNL and the Purchaser entered into the PSA. The PSA is attached as Appendix "A" hereto. A copy of Exhibit B to the PSA, the Fee Agreement (as defined below) and the Consent Agreement (as defined below) are attached as confidential Appendix "B" hereto. As this exhibit, the Fee Agreement and the Consent Agreement contain sensitive competitive and confidential information of the Partnership, the Applicants and the Monitor are requesting that confidential Appendix "B" to this Sixtieth Report be sealed by this Honourable Court.

24. A summary of the key provisions of the PSA is provided in the paragraphs that follow. Reference should be made directly to the PSA for a complete understanding of the terms governing the transaction.

   a) The Purchase Price for the Units is equal to the sum of:

      i.    $285,000 cash, plus;

      ii.   Any Capital Contributions after September 30, 2010 (the "Reference Date") and before the Closing Date, minus;

      iii.  Distributions after the Reference Date and before the Closing Date.

   As of March 11, 2011, the Purchase Price is estimated to be $557,441.25 as a result of capital contributions made by NNL after September 30, 2010.

b) On and after Closing, the Purchaser shall assume and perform NNL's obligations under the Partnership Agreement and related agreements.

c) Taxable income of the Partnership for the year ending December 31, 2011, shall be allocated between NNL and the Purchaser using the closing of the books method effective as of the Closing Date.

d) The Units are being sold substantially on an "as is, where is" basis, save for certain representations and warranties regarding capital contributions made and distributions received by NNL, and compliance with the Partnership Agreement and related agreements, which representations and warranties merge upon the Closing.

e) All Transfer Taxes, if any, incurred in connection with the consummation of the transactions contemplated by the PSA shall be borne by the Purchaser.

f) Closing is targeted to take place on April 1, 2011 or on such other date mutually agreed to by NNL and the Purchaser (the "Closing Date").

g) The Units to be transferred by NNL pursuant to the PSA are to be transferred free and clear of all liens, claims and encumbrances of any kind. Accordingly, the Applicants are seeking an order (the "Vesting Order") of this Honourable Court vesting in the Purchaser all of NNL's right, title and interest in the Units free and clear of all Liens.

h) Closing of the transactions contemplated by the PSA is subject to the granting of the Vesting Order as well as the satisfaction of certain other conditions, including prior written approval of the General Partner consenting to the transfer

of the Units and the General Partner not having exercised the Cancellation Right
under the Consent Agreement (discussed below).

*Agreement as to Fees*

25.  NNL, the Purchaser, and the General Partner have entered into an Agreement as to
Fees dated December 9, 2010 (the "Fee Agreement") under which NNL, in certain
circumstances, may be required to reimburse the General Partner for specified fees
and expenses incurred by the General Partner in connection with the transaction, as
contemplated by the Partnership Agreement. These fees and expenses are not
material and, if the Closing occurs on or prior to July 31, 2011, all such fees and
expenses will be paid by the Purchaser.

*Assignment, Assumption, Consent and Amendment Agreement*

26.  In order to effect the sale, NNL and the Purchaser required the consent of the
General Partner to transfer the Units.  The terms of the consent were negotiated
amongst NNL, the Purchaser and the General Partner.

27.  The General Partner ultimately provided its consent pursuant to the terms of an
Assignment, Assumption, Consent and Amendment Agreement among NNL, the
Purchaser and the General Partner dated February 23, 2011 (the "Consent
Agreement") which provides, among other things, that:

a)  NNL agrees to transfer its right, title and interest in the Units to the Purchaser;

b)  The Purchaser agrees to assume all of the obligations, commitments and
liabilities of NNL with respect to the Units;

c)  NNL and the Purchaser make certain securities law related representations and
warranties to the  General Partner and the Partnership regarding the transfer of
the Units;

d) The Partnership and the General Partner can give notice to NNL and the Purchaser prior to the date that is 90 days after the date of the Consent Agreement that the contemplated transfer of the Units would cause interests in the Partnership to be traded on an "established securities market" or "to be readily tradable on a secondary market or the substantial equivalent thereof" (as those terms are used in the U.S. Internal Revenue Code of 1986) in which case the transfer shall not be completed, or, if completed, shall be void ab initio. The General Partner, on behalf of itself and the Partnership, waived this right (the "Cancellation Right") by letter dated March 7, 2011;

e) NNL gives a limited indemnity to the Partnership, the General Partner and certain related parties for any damages resulting from a breach of the Consent Agreement by NNL. The indemnity survives for a period of 180 days from Closing and is capped at $285,000;

f) NNL and the General Partner, on behalf of itself and the Partnership, grant each other mutual releases; and

g) The General Partner consents to the assignment and transfer of the Units to the Purchaser, the admission of the Purchaser as a substitute Limited Partner in the Partnership, and the amendment of the records of the Partnership and the Partnership Agreement to reflect the transfer.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

28. The Monitor is satisfied that the sales process conducted by the Applicants with respect to the Units was reasonable and appropriate and that the Purchase Price for the Units constitutes fair and reasonable consideration for such Units. The Monitor therefore recommends that this Honourable Court approve the Applicants' motion

authorizing NNL to complete the transaction contemplated by the PSA and vesting all of NNL's right, title and interest in the Units to the Purchaser.

29. For the reasons described at paragraph 23, the Monitor recommends that confidential Appendix "B" to this Sixtieth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 21st day of March 2011.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of the Applicants**
**and not in its personal capacity**

*Sharon Hamilton*

Per:
Sharon Hamilton
Senior Vice-President

APPENDIX "A" - PSA

[ATTACHED]

PURCHASE AND SALE AGREEMENT, dated as of February 23, 2011 (the "**Agreement**"), by and between Nortel Networks Limited, a corporation formed under the laws of Canada (the "**Seller**") and CS SP IV Investments Canada Corp., an unlimited company formed under the laws of the Province of Nova Scotia (the "**Purchaser**").

## Recitals

WHEREAS, the Seller is the legal and beneficial owner of five million (5,000,000) limited partnership units (the "**Units**") in Summerhill Ventures I LP, a partnership formed pursuant to the laws of the State of Delaware (the "**Partnership**");

WHEREAS, the Seller desires to sell, assign and transfer to the Purchaser, and the Purchaser desires to purchase, all of the Units;

WHEREAS on January 14, 2009, Nortel Networks Limited and certain of its Canadian Affiliates commenced creditor protection proceedings (the "**CCAA Proceedings**") in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") under the Companies' Creditors Arrangement Act ("**CCAA**");

WHEREAS, the Seller has failed to comply with the terms of the Partnership Agreement (as defined below) by failing to timely make required Capital Contributions of (i) $53,732.13 to be made on September 27, 2007, and (ii) $26,702.93 to be made on November 13, 2007 (collectively, the "**Defaults**");

WHEREAS, the Defaults by Seller have been cured by the Seller; and

WHEREAS, the parties hereto acknowledge and agree that the purchase by the Purchaser is being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller or its Affiliates and the Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisition by the Purchaser.

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1     Definitions. Except as otherwise provided herein, capitalized terms used herein shall have the meanings assigned to them in this Section:

"**Action**" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"**Affiliate**" means, as to any person, any other person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such person;

"**Agreement**" has the meaning set forth in the recitals.

1

"**Assumed Liabilities**" has the meaning set forth in Section 2.2(b).

"**Business Day**" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York, United States or Toronto, Ontario, Canada, are required to close.

"**Canadian Approval and Vesting Order**" means an order of the Canadian Court substantially in the form attached hereto as Exhibit A or otherwise in a form satisfactory to the Purchaser, acting reasonably, approving this Agreement and the transactions contemplated hereby.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 4.3(a).

"**Canadian Court**" has the meaning set forth in the recitals.

"**Capital Commitment**" means all obligations of the owner of the Units pursuant to the Operative Documents to make capital contributions to the Partnership.

"**Capital Contributions**" means all cash payments or deemed payments made in respect of the Seller's Capital Commitments to the Partnership (other than payments or deemed payments on account of tax liabilities of the relevant Seller attributable to the ownership by the Seller of the Units for periods prior to the relevant Closing Date).

"**CCAA**" has the meaning set forth in the recitals.

"**CCAA Proceedings**" has the meaning set forth in the recitals.

"**Closing**" has the meaning set forth in Section 2.4.

"**Closing Date**" has the meaning set forth in Section 2.4.

"**Confidentiality Agreement**" means the confidentiality agreement by and among DLJ MB Advisors, Inc. and Nortel Networks Inc. dated May 28, 2010.

"**Defaults**" has the meaning set forth in the recitals.

"**Default Costs**" means all defaulted amounts, penalties, damages, fees, costs or expenses attributable or relating to the Default or any other late payment by the Seller or a predecessor in interest under the Partnership Agreement (including by deduction from the Seller's or the Purchaser's capital account, or set-off against any subsequent distribution, or otherwise) with respect to the Units.

"**Default Interest**" means the applicable interest accrued on the Defaults pursuant to the terms of the Partnership Agreement.

"**Distributions**" means all cash payments and other distributions paid or made (or deemed paid or made) by the Partnership to the Seller relating to the Units. The value of all "in-

2

kind" payments, dividends or other distributions received by the Seller from the Partnership shall be the value assigned thereto as of the date of distribution by the general partner thereof.

"**Fee Agreement**" means the Consent and Agreement as to Fees effective as of December 9, 2010 among the Seller, the Purchaser and the General Partner which relates to the payment of the Partnership's fees in connection with the transactions contemplated hereby.

"**General Partner**" means Summerhill Venture Partners LP, a limited partnership formed pursuant to the laws of the State of Delaware.

"**Head of Corporate Business Development**" means Hyacinth DeAlmeida.

"**Law**" means any U.S., Canadian, UK, supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Liens**" means the "Claims" as defined in the Canadian Approval and Vesting Order, excluding those Claims expressly assumed in writing by the Purchaser.

"**Operative Documents**" means the Partnership Agreement, and any side letters and other documents and agreements governing the rights and obligations of the Seller as an investor in the Partnership.

"**Partnership**" has the meaning set forth in the recitals.

"**Partnership Agreement**" means the Amended and Restated Limited Partnership Agreement by and among the General Partner and the limited partners of the Partnership, dated July 11, 2007, as amended from time to time.

"**Partnership Consent**" means the prior written consent of the General Partner that is required pursuant to the Partnership Agreement in connection with the transaction of purchase and sale contemplated by this Agreement.

"**Pre-Closing Notice**" has the meaning set forth in Section 4.8.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchase Price**" has the meaning set forth in Section 2.2(a)(ii).

"**Reference Date**" means September 30, 2010.

"**Seller**" has the meaning set forth in the preamble.

"**Tax Authority**" means any governmental authority in Canada, U.S. or any other country or jurisdiction having taxing authority responsible for, and competent to impose, collect or administer, any form of tax.

3

"**Transfer Taxes**" means all goods and services, harmonized sales, sales, excise, use, transfer, gross receipts, transfer documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar taxes, duties or other like charges, however denominated (including any real property transfer taxes and conveyance and recording fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transfer Agreement**" means an assignment, assumption, consent and amendment agreement dated as of February 23, 2011 among the Seller, the Purchaser and the General Partner which relates to the transfer of the Units to the Purchaser and the admission (in respect of the Units) of the Purchaser as a limited partner of the Partnership, in a form reasonably satisfactory to the Seller and the Purchaser.

"**Units**" has the meaning set forth in the recitals.

## ARTICLE 2

## PURCHASE AND SALE OF UNITS

2.1     <u>Purchase and Sale</u>. Upon and subject to the terms and conditions of this Agreement, the Purchaser agrees to purchase from the Seller, and the Seller agrees to sell, assign and transfer to the Purchaser, all right, title and interest it has in the Units which, after issuance of the Canadian Approval and Vesting Order, will be free and clear of all Liens as set forth in the Canadian Approval and Vesting Order.

2.2     <u>Purchase Price and Assumption of Liability</u>.

(a)     Upon and subject to the terms and conditions of this Agreement, in consideration of the sale, assignment and transfer of the Seller's right, title and interest in the Units, the Purchaser shall:

(i)     in accordance with Section 2.2(b), assume and become obligated to pay and perform, when due, the Assumed Liabilities, and

(ii)     pay to the Seller, on the Closing Date, without any withholding or deduction, an amount (the "**Purchase Price**") equal to the sum of:

(A) $285,000.00, <u>plus</u>

(B) any Capital Contributions made after the Reference Date and on or before the Closing Date, <u>minus</u>

(C) Distributions after the Reference Date and before the Closing Date.

(b)     Except as otherwise provided for in this Agreement, from and as of the Closing Date, and upon the terms and subject to the conditions set forth in this Agreement, the Transfer Agreement and the Canadian Approval and Vesting Order, the Purchaser shall assume and perform the rights, duties and obligations of the Seller with respect to the Units acquired by

4

the Purchaser at the Closing Date under the Operative Documents and the Transfer Agreement in accordance with the terms of such agreements not related to any default existing at, prior to or as a result of the Closing, including the obligations of the Seller to pay Capital Commitments relating to the Units (the "**Assumed Liabilities**") arising after the Closing; provided that any rights, duties or obligations to the extent arising out of the Letter Agreement, dated July 11, 2007, by and between the General Partner and the Seller, with respect to the Units, shall not be "Assumed Liabilities" and shall not be acquired by the Purchaser. Any liabilities for taxes, fees or other governmental charges attributable to the ownership by the Seller of the Units on or prior to the Closing Date shall be the responsibility of the Seller. Any liabilities for taxes, fees or other governmental charges attributable to the ownership by the Purchaser of the Units after the Closing Date in respect of the Units shall be the responsibility of the Purchaser. Notwithstanding anything to the contrary in this Agreement, the Seller shall be required to indemnify, hold harmless and reimburse the Purchaser in respect of any liabilities for taxes, fees or other governmental charges to which the Seller is liable pursuant to this Section 2.2. Notwithstanding anything to the contrary in this Agreement the Purchaser shall be required to indemnify, hold harmless and reimburse the Seller in respect of any liabilities for taxes, fees or other governmental charges to which the Purchaser is liable pursuant to this Section 2.2. For the avoidance of doubt, any tax on gain realized by the Seller upon the sale of the Units pursuant to this Agreement will be borne by the Seller.

2.3     Distributions. From and after the Closing, if the Seller receives Distributions from the Partnership in respect of the Units, the Seller shall maintain the Distributions in its account in trust for the Purchaser, the Seller shall have no legal or beneficial interest in such Distributions and shall promptly pay over any such Distributions to the Purchaser.

2.4     Closing. Subject to satisfaction or waiver of all conditions precedent set forth in Article 5, the closing of the transactions contemplated by this Agreement (the "**Closing**") will take place at the offices of Ogilvy Renault LLP, Suite 3800, Royal Bank Plaza, South Tower, 200 Bay Street, Toronto, Ontario, M5J 2Z4 within three (3) Business Days of satisfaction or waiver of all conditions set out in Article 5, or at such other place and on such other later date that the parties hereto may mutually agree (the "**Closing Date**").

2.5     Deliveries at Closing.

(a)     At the Closing, upon satisfaction or waiver of the conditions set forth in Article 5 hereof, the Purchaser will pay the Purchase Price to the Seller for the Units in accordance with Section 2.2(a).

(b)     At the Closing, the Seller and the Purchaser shall deliver to the other party hereto all of the other documents and instruments required to be delivered pursuant to the terms of this Agreement.

(c)     With respect to the Closing, the Seller and the Purchaser shall use commercially reasonable efforts, on or prior to the Closing, to execute and deliver all such other instruments, documents or certificates as may be necessary to effect the transfer to the Purchaser of the Units and for the consummation at the Closing of the transactions contemplated by this Agreement.

5

2.6    As is, where is. Except for the representations and warranties expressly set forth in this Agreement, subject to the terms of the Canadian Approval and Vesting Order, the Purchaser acknowledges that (i) the Units are being purchased on an "as is, where is" basis as they shall exist on the Closing Date and (ii) all written and oral information (including analyses, financial information and projections, compilations and studies) obtained by the Purchaser from the Seller or any of its directors, officers, employees, professional consultants or advisors with respect to the Units or otherwise relating to the transactions contemplated in this Agreement has been obtained for the convenience of the Purchaser only and is not warranted to be accurate or complete. Without limiting the foregoing, the Purchaser further acknowledges that there are no representations, warranties, terms, conditions, understandings or collateral agreements, express or implied, statutory or otherwise, with respect to the Units except for those expressly set forth in this Agreement and any document required to be delivered pursuant to this Agreement.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

3.1    Representations and Warranties of the Seller. The Seller hereby represents and warrants to the Purchaser that:

(a)    Authorization. The Seller is a corporation duly organized pursuant to the Laws of Canada. The Seller has the requisite power and authority to own and hold the Units and, subject to the receipt of the Canadian Approval and Vesting Order and the Partnership Consent, to enter into, execute and deliver this Agreement and the Transfer Agreement and to perform all of the obligations to be performed by it hereunder and thereunder.  Subject to the receipt of the Canadian Approval and Vesting Order and the Partnership Consent, this Agreement has been and upon the Seller's execution the Transfer Agreement will have been, duly authorized, executed and delivered by it and constitutes, and upon the Seller's execution of the Transfer Agreement will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium Laws and other Laws of general application affecting enforcement of debtors' rights generally.

(b)    Good and Marketable Title. The Seller is the legal and beneficial owner of all right, title and interest in and to the Units, and upon payment of the Purchase Price to the Seller by the Purchaser as provided in this Agreement, subject to receipt of the Partnership Consent and the Canadian Approval and Vesting Order, the Seller will convey to the Purchaser good and valid title to the Units, free and clear of all Liens.

(c)    No Conflicts. To the knowledge of the Head of Corporate Business Development: (A) the execution and delivery of this Agreement and the Transfer Agreement and the performance or consummation of the transactions contemplated hereby by the Seller hereunder and thereunder does not conflict with or result in a breach or violation of any of the terms or provisions of its organizational documents or result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which it is a party or by which it is bound, nor will any such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or

6

governmental agency or body having jurisdiction over it or its property, except to the extent that such conflicts, violations, defaults or accelerations would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Agreement; (B) neither the execution and delivery of this Agreement nor the Transfer Agreement nor the performance or consummation of the transactions contemplated hereby or thereby will constitute an event that, with the lapse of time or with action by a third party, could result in the default under any of the foregoing, except to the extent that such defaults would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Agreement; and (C) the execution and delivery by the Seller of this Agreement and the Transfer Agreement and the performance by the Seller of its obligations hereunder and thereunder will not require any registration, filing, consent or approval under any Law, rule, regulation, judgment, order, writ, decree, permit or license, or any consent or approval of any other party to the Seller's constituent documents, or any other contract, agreement, instrument, commitment or restriction binding upon the Seller, except (i) the Partnership Consent, (ii) the Canadian Approval and Vesting Order, or (iii) where such failure to make such registration or filing or obtain such consent or approval would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement.

(d)    Commitments and Contributions. Exhibit B hereto sets forth with respect to the Units, expressed in U.S. dollars, the following: (i) the Capital Commitment of the Seller to the Partnership, (ii) the aggregate Capital Contributions made by the Seller to the Partnership as of the Reference Date, (iii) the aggregate Capital Contributions made by the Seller to the Partnership from the Reference Date, (iv) the Seller's capital account balance at the Partnership as of the Reference Date, (v) the aggregate Distributions made by the Partnership to the Seller from the Reference Date, and (vi) the total unpaid Capital Commitment of the Seller to the Partnership as of the Reference Date. There are no distributions to the Seller from the Partnership that are returnable to the Partnership under the terms of the Partnership Agreement or applicable Law, other than as set forth in the Amendment to the Partnership Agreement, dated July 11, 2007.

(e)    Distributions and Capital Contributions. Except as set forth on Exhibit B, the Seller has not, since the Reference Date, received, or been notified that it is entitled to receive, any Distributions, and the Seller has not made any Capital Contribution, or agreed to make any Capital Contribution, between the Reference Date and the date hereof, except for the notification that the Seller received regarding a distribution and a capital contribution which the Seller forwarded to the Purchaser by email on February 22, 2011. The Seller has not received notice of any obligation to return any Distributions previously received from the Partnership.

(f)    Certain Conduct. Since the Reference Date, the Seller has not (i) sold, assigned, transferred, delivered or otherwise disposed of all or any portion of the Units, (ii) converted, exchanged or redeemed all or any portion of the Units, or (iii) agreed to do any of the foregoing.

(g)    No Waiver. The Seller has not waived any of its rights under the Partnership Agreement or any other rights with respect to the Units.

7

(h) <u>No Breach</u>. To the knowledge of the Head of Corporate Business Development, the Seller is not in breach of any Operative Document and, without limiting the generality of the foregoing, except for the Defaults and as set forth in Exhibit B hereto, has timely paid all capital contributions to the Partnership as required pursuant to the applicable provisions of the Partnership Agreement. To the knowledge of the Seller, the General Partner has not elected or pursued any remedy against the Seller pursuant to the Partnership Agreement. The General Partner has not given any notice to the Seller that it has so elected or intends to so pursue any such remedy. The Seller has discharged all Default Costs and Default Interest. To the knowledge of the Seller, there are no circumstances relating to the Seller's holding of the Units that, with the passage of time or action by a third party, would result in a breach of the Partnership Agreement by the Seller.

(i) <u>Operative Documents.</u> Exhibit C sets forth a list of all Operative Documents. To the knowledge of the Head of Corporate Business Development, the Seller has not received any notice of default under any Operative Document and has made all Capital Contributions through and including the Reference Date. To the knowledge of the Head of Corporate Business Development, the Seller has not opted out or been excluded, voluntarily or involuntarily, from any investment of the Partnership pursuant to the terms of the Operative Documents or otherwise.

(j) <u>No Proceedings</u>. With the exception of the CCAA Proceedings, no proceedings are pending or, to the Seller's knowledge, threatened against or affecting the Seller before any governmental authority, agency, bureau, commission, court, tribunal or similar entity which could reasonably be expected to adversely affect any action taken or to be taken by the Seller with respect to this Agreement.

(k) <u>No Additional Interest</u>. The Units represent the Seller's entire interest in the Partnership and the Seller does not hold an additional interest in the Partnership through one or more intermediate entities.

(l) <u>Broker's Fee</u>. No person or entity acting on behalf of the Seller or under the authority of the Seller shall be entitled to any broker's, finder's, or similar fee or commission in connection with the transactions contemplated by this Agreement.

(m) <u>No Reliance on Purchaser</u>. Except as specifically set forth in this Agreement, the Seller has not relied on any information provided or representations made by the Purchaser in connection with this Agreement. The Seller acknowledges that the Purchaser may have access to information material to the value of the Units that has not been shared with the Seller, and the Seller waives any right to obtain such information.

(n) <u>Compliance with Law</u>. To the Head of Corporate Business Development's actual knowledge, its ownership of the Units has been conducted in all material respects in accordance with all applicable Laws.

(o) <u>Residence</u>. The Seller is not a non-resident of Canada for the purposes of the *Income Tax Act* (Canada).

8

(p)    Tax. The Seller acquired the Units in the initial offering of limited partnership interests directly from the Partnership.

3.2    Representations and Warranties of the Purchaser. The Purchaser hereby represents and warrants to the Seller that:

(a)    Authorization. The Purchaser is an entity duly organized and validly existing in good standing under the laws of its jurisdiction of organization. The Purchaser has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Agreement and to perform all of the obligations to be performed by it hereunder. This Agreement has been, and upon the Purchaser's execution the Transfer Agreement will have been, duly authorized, executed and delivered by it, and this Agreement constitutes, and upon the Purchaser's execution of the Transfer Agreement will constitute, a valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other Laws of general application affecting enforcement of creditor's rights generally.

(b)    No Conflicts. The execution and delivery of this Agreement and the Transfer Agreement and the performance or consummation of the transactions contemplated hereby by the Purchaser hereunder and thereunder does not conflict with or result in a breach or violation of any of the terms or provisions of its organizational documents nor will any such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except to the extent that such conflicts, violations, or breaches would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Agreement. Neither the execution and delivery of this Agreement nor the Transfer Agreement nor the performance or consummation of the transactions contemplated hereby or thereby will constitute an event that, with the lapse of time or with action by a third party, could result in the default under any of the foregoing, except to the extent that such defaults would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Agreement. The execution and delivery by the Purchaser of this Agreement and the Transfer Agreement and the performance by the Purchaser of its obligations hereunder and thereunder will not require any registration, filing, consent or approval under any Law, rule, regulation, judgment, order, writ, decree, permit or license, or any consent or approval of any other party to the Purchaser's constituent documents, or any other contract, agreement, instrument, commitment or restriction binding upon the Purchaser, except (i) the Partnership Consent or (ii) where such failure to make such registration or filing or obtain such consent or approval would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement.

(c)    Independent Appraisal.

(i)    The Purchaser acknowledges that the Seller may be in possession of material, nonpublic information relating to the Units and, in that event, the Seller will not disclose such information to the Purchaser except as may be required for a representation and warranty of the Seller hereunder to be accurate and correct. The Purchaser further acknowledges and agrees that the Seller has no obligation to disclose to

9

the Purchaser any such material, nonpublic information except as may be required for a representation and warranty of the Seller hereunder to be accurate and correct. The Purchaser further acknowledges that, except as set forth in this Agreement, (A) it is not relying on there having been disclosed any such material or potentially material information which is not disclosed, and (B) any such information may be materially adverse to the Purchaser's interests. The Purchaser further acknowledges that it is prepared to purchase the Units from the Seller on the foregoing basis and hereby waives any right to rescind or invalidate the purchase of the Units from the Seller or to seek any damages or other remuneration from the Seller based on the possession of any such material, nonpublic information by the Seller which is not disclosed and which is not required to be disclosed in accordance with this Agreement.

(ii)    The Purchaser acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to buy the Units, and that it is responsible for making its own evaluation of any information about the Partnership or the Seller that it may receive either directly from the Partnership or the Seller, and that none of the Seller nor any Affiliate, partner, employee, officer or director thereof (A) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically contemplated in this Agreement or (B) shall be under any obligation to provide access to or advise the Purchaser or any other person of the existence of any additional information or to review, update or correct any inaccuracy in any information about the Partnership, the Units or the Seller (or any assumptions upon which such information is based) supplied by it or by any person or be otherwise liable to the Seller or any other person with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

(d)    Broker's Fee. Except for fees and commissions that will be paid by the Purchaser, no person or entity acting on behalf of the Purchaser or under the authority of the Purchaser shall be entitled to any broker's, finder's, or similar fee or commission in connection with the transactions contemplated by this Agreement.

## ARTICLE 4

## MUTUAL COVENANTS

4.1    Transfer.

(a)    The Seller agrees to execute the Transfer Agreement and all other assignments and/or transfer and assumption agreements or documentation as may be required by the Partnership and the Purchaser, acting reasonably, to effect the transfer of the Units to the Purchaser and the assumption of the Assumed Liabilities, including a transfer agreement with respect to the Units as may be necessary to obtain the Partnership Consent.

10

DOCSTOR: 2109844\5B

(b)     Each of the Seller and the Purchaser agrees to use commercially reasonable efforts to obtain the Partnership Consent and any other approvals required for the sale and transfer of the Units, and otherwise to consummate the transactions contemplated hereby.

4.2     Assumption. The Purchaser agrees to execute the Transfer Agreement and all other assignments and/or transfer and assumption agreements or documentation, as may be required pursuant to Section 13.8 of the Partnership Agreement or otherwise required by the General Partner or the Seller, acting reasonably, in order to transfer the rights that the Seller has in the Units to the Purchaser.

4.3     CCAA Proceedings.

(a)     As promptly as practicable following satisfaction or waiver of the condition specified in Section 5.1(f), the Seller shall file with the Canadian Court one or more motions (the "**Canadian Approval and Vesting Order Motion**") seeking to obtain the entry of the Canadian Approval and Vesting Order.

(b)     The Purchaser and the Seller shall cooperate with filing and prosecuting the Canadian Approval and Vesting Order Motion and in obtaining entry of the Canadian Approval and Vesting Order, and the Seller shall deliver to the Purchaser prior to filing, for review and comment, copies of all proposed pleadings, motions, notices, statements, applications, reports and other material papers to be filed by the Seller in connection with such motions and relief requested therein and any challenges thereto.

(c)     In the event an appeal is taken, or a stay pending appeal is requested, from the Canadian Approval and Vesting Order, Seller shall immediately notify the Purchaser of such appeal or stay request and shall provide the Purchaser promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide the Purchaser with written notice of any motion or application filed in connection with any appeal from the Canadian Approval and Vesting Order.

(d)     At the Closing, the Seller shall deliver written notice to the Purchaser indicating whether the Seller has, as of such time, been served with any motions to seek leave to appeal, or otherwise received any notices of appeal in respect of the Canadian Approval and Vesting Order.

4.4     Notice of Breach. Each of the Purchaser and the Seller shall give the other prompt notice of any event, condition or circumstance occurring from the date hereof through to the Closing Date that would constitute a breach of any representation, warranty, agreement or covenant of such party contained in this Agreement.

4.5     No Disposition. Except as consented to in writing by the Purchaser, the Seller shall not from the date of the this Agreement to the Closing Date other than pursuant to this Agreement, dispose, liquidate, mortgage, sell, assign, transfer, redeem, deliver or solicit any bids for, or enter into any discussions with a prospective purchaser of, the Units or agree to do any of the foregoing.

4.6     Tax Matters.

11

(a)    All Transfer Taxes, if any, incurred in connection with the consummation of the transactions contemplated by this Agreement shall be borne by the Purchaser.

(b)    The parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes imposed upon or payable or collectible or incurred, in each case, as a direct result of the transfer of the Units pursuant to this Agreement; provided, that if any such Transfer Taxes are required under applicable law to be collected, remitted or paid by the Seller, such Transfer Taxes shall be paid by the Purchaser to the Seller. To the extent that the Seller is required to collect, remit or pay such Transfer Taxes but is entitled to a deduction, credit or refund therefor, the Seller shall reimburse the Purchaser the amount of such deduction, credit or refund within thirty (30) days of the use or receipt of such deduction, credit or refund by the Seller. The Seller hereby agrees to use commercially reasonable efforts to claim or apply for any deduction, credit or refund permissible pursuant to applicable Law. The Seller shall not be obligated to disclose any information regarding its tax affairs or computations to the Purchaser other than as required for the parties to satisfy their obligations under this Section 4.6(a). Upon request from the Seller, the Purchaser shall provide to the Seller an original receipt (or such other evidence as shall be reasonably satisfactory to the Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 4.6(b) and, in the case set forth in the proviso of the second sentence of this Section 4.6(b), *vice versa.*

(c)    The Seller and the Purchaser shall cooperate in timely filing all tax returns as may be required in connection with the payment of such Transfer Taxes. The Seller, on the one hand, and the Purchaser, on the other hand, shall, as appropriate, use commercially reasonable efforts to execute and deliver all instruments and certificates reasonably necessary to enable the other to comply with any filing requirements and Laws relating to any such Transfer Taxes.

(d)    If the Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, the Purchaser shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Seller prior to the Closing with its permit number, GST, VAT or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser, as the case may be. All parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

(e)    The Purchaser and the Seller shall request that, for tax reporting purposes, the Partnership shall give effect to the transfer of the Units as of the Closing Date and shall allocate taxable income of the Partnership for the taxable year including the Closing Date between the Purchaser and the Seller using the closing of the books method as of the Closing Date. To the extent the general partner of a Partnership uses or is required to use a different allocation method under Section 706(d) of the Code and applicable Treasury Regulations, such allocation shall be binding on each of the Seller and the Purchaser.

12

(f)    To the extent the Partnership is, or elects to be treated as, an electing investment partnership for purposes of Section 743(e) of the Code for the taxable year that includes the Closing Date, the Seller represents and warrants to the Purchaser that it will comply with Section 743(e) of the Code, the Treasury Regulations promulgated thereunder and any guidance issued in respect thereof (including, but not limited to, Notice 2005-32), including supplying the Purchaser with all information necessary to enable the Purchaser to comply with Section 743(e) of the Code in respect of the Units.

4.7    Compliance with Operative Documents. From the date hereof until the Closing, the Seller will comply with the terms of the Operative Documents, including without limitation, by giving any required notice of the proposed transfer of the Units.

4.8    Pre-Closing Notice. Prior to the Closing, the Seller shall deliver to the Purchaser a notice (a "Pre-Closing Notice") setting forth the calculation of the Purchase Price, including the aggregate amount of all Capital Contributions and Distributions included in such determination. The Seller and the Purchaser shall use commercially reasonable efforts in connection with the Closing to verify with the General Partner the information provided in Exhibit B.

4.9    General Partner Certificate. At or prior to the Closing, the Seller and the Purchaser shall use commercially reasonable efforts to request and cause the General Partner to provide a certificate, substantially in the form set forth in Exhibit D hereto to the Purchaser, or include the information requested in such a certificate in the Transfer Agreement; provided that the failure to obtain such certificate shall not excuse the Purchaser from performing its obligations under this Agreement.

4.10    Confidentiality. Each of the Seller and the Purchaser acknowledges that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and agrees to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full and as if it had been an original signatory to the Confidentiality Agreement, except that the Seller and the Purchaser shall be at liberty to disclose the terms of this Agreement: (i) to the extent required by Law or any Action in respect of the Partnership, (ii) to any court or the monitor in the CCAA Proceedings, tax authority or government entity, (iii) in connection with any information or disclosure document prepared by the Seller, the Purchaser or any affiliate of either, to be provided to investors or prospective investors of the Seller or the Purchaser, provided that such investors or prospective investors shall be obligated to keep such terms confidential, (iv) to their respective accountants, attorneys, advisors and beneficial owners, or (v)  subject to entering into a confidentiality agreement with the relevant third party, in connection with acquiring, merging or otherwise combining, or being acquired by, or selling all or part of its assets to any third party (whether in a single transaction or a series of related transactions and whether structured as an acquisition of assets, securities or otherwise). The Purchaser also acknowledges that in the course of attempting to sell the Units, the Seller has entered into several confidentiality agreements with third parties in respect of information relating to the Units and has disclosed such information to certain of those third parties. However, notwithstanding anything to the contrary in this Section 4.10, the Purchaser shall be allowed to make a general disclosure to the public that it has acquired Units from the Seller after the successful conclusion of the transactions contemplated hereby, provided

13

that (i) the form of any such proposed public disclosure shall be delivered to the Seller at least five (5) Business Days prior to such intended disclosure, and (ii), such public disclosure shall be approved by the Seller, which approval shall not be unreasonably withheld.

## ARTICLE 5

### CONDITIONS TO CLOSING

5.1     <u>Mutual Conditions</u>. The respective obligations of each of the Seller and the Purchaser to effect the Closing are subject to the satisfaction or waiver by such party of the following conditions on or prior to the Closing Date:

(a)     no provision of any applicable Law shall prohibit the consummation of the Closing and no Action, suit, litigation, arbitration, proceeding or investigation shall have been instituted and be pending with regard to the transactions contemplated by this Agreement by any governmental authority;

(b)     the Canadian Approval and Vesting Order shall have been obtained;

(c)     the Partnership Consent shall have been obtained;

(d)     no motions to seek leave to appeal, or otherwise any notices of appeal, in respect of the Canadian Approval and Vesting Order shall have been served upon the Seller prior to the time of the Closing and shall not have been dismissed or denied;

(e)     the Seller, the Purchaser and the General Partner shall have executed and delivered the Transfer Agreement; and

(f)     the General Partner shall not have given the notice to the Seller and the Purchaser contemplated in Section 5(e) of the Transfer Agreement prior to the date that is ninety (90) days from the date of the Transfer Agreement.

5.2     <u>Conditions to the Obligation of the Purchaser</u>. The obligation of the Purchaser to effect the Closing is subject to the satisfaction or waiver by the Purchaser of the following additional conditions on or prior to the Closing Date:

(a)     The representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects both on the date of this Agreement and as of the Closing Date (provided, that those representations and warranties that are qualified as to materiality shall be true and accurate in all respects, in each case as of the date when made and at and as of the Closing Date), except (i) to the extent that such representations and warranties are by their express provisions made as of the date of this Agreement or another specified date, and (ii) for the effect of any activities or transactions which may have taken place after the date of this Agreement which are contemplated by this Agreement, and the Purchaser shall have received a certificate of the Seller to the foregoing effect;

(b)     At or prior to the Closing, the Seller shall have provided to the Purchaser an updated and true and correct copy of Exhibit B hereto to include all additional Capital

14

Contributions and Distributions related to the Units (and any other changes to the items set forth on Exhibit B hereto) after the date of this Agreement and prior to the Closing Date;

(c)    All agreements, covenants and obligations required by the terms of this Agreement to be performed and complied with by the Seller on or before the Closing Date in connection with the transactions contemplated by this Agreement shall have been so performed or complied with in all material respects, and the Purchaser shall have received evidence as it may reasonably request to establish the consummation of such transactions and the taking of all proceedings in connection therewith; and

(d)    The Seller shall have used commercially reasonable efforts to have the General Partner deliver to the Purchaser a certification from the Partnership satisfying the requirements of Treasury Regulations Section 1.1445-11T(d)(2)(i), to the effect that the Units are not an interest described in Treasury Regulations Section 1.1445-11T(d)(1).

5.3    Conditions to the Obligation of the Seller. The obligation of the Seller to sell and transfer the Units to the Purchaser is subject to the satisfaction or waiver by the Seller of the following additional conditions on or prior to the Closing Date:

(a)    The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects both on the date of this Agreement and as of the Closing Date (provided, that those representations and warranties that are qualified as to materiality shall be true and accurate in all respects, in each case as of the date when made and at and as of the Closing Date), except (i) to the extent that such representations and warranties are by their express provisions made as of the date of this Agreement or another specified date and (ii) for the effect of any activities or transactions which may have taken place after the date of this Agreement which are contemplated by this Agreement, and the Seller shall have received a certificate from the Purchaser to the foregoing effect; and

(b)    All agreements, covenants and obligations required by the terms of this Agreement to be performed and complied with by the Purchaser on or before the Closing Date with respect to the transfer of the Units and the transactions contemplated hereby shall have been so performed or complied with in all material respects and the Seller shall have received the Purchase Price by wire transfer of immediately available funds and such other evidence as it may reasonably request to establish the consummation of such transactions and the taking of all proceedings in connection therewith.

## ARTICLE 6

## TERMINATION

6.1    Grounds for Termination. This Agreement may be terminated at any time before the Closing Date:

(a)    by mutual written agreement of the Seller and the Purchaser;

(b)    by either the Seller or the Purchaser if the Closing has not occurred within one hundred fifty (150) days from the execution of this Agreement; or

15

(c)  by either the Seller or the Purchaser in the event of a material breach of the representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to the Closing set forth in Article 5, and, in each case, which, if capable of being cured, has not been cured within thirty (30) days from receipt of a written notice thereof from the non-breaching party;

provided, however, that the party terminating this Agreement pursuant to this Section 6.1 will give written notice of the termination to the other party and that the right to terminate this Agreement pursuant to Sections 6.1(b) or 6.1(c) shall not be available to the party seeking to terminate if such party is then in breach of this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement.

6.2  Effect of Termination. If this Agreement is terminated as permitted by Section 6.1:

(a)  no party to this Agreement will have any liability or further obligation to the other party pursuant to this Agreement; provided, however, that the agreements of the Seller and the Purchaser set forth in Sections 4.10, 7.3 and 7.4 shall survive such termination;

(b)  the Purchaser shall return to the Seller all documents, work papers and other material of the Seller relating to the transactions contemplated hereby, whether obtained before or after the execution hereof or certify that such documents have been destroyed; and

(c)  the provisions of the Confidentiality Agreement will continue in full force and effect.

## ARTICLE 7

## OTHER MATTERS

7.1  Waiver, Amendment. Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party or parties that would have benefited by the provision had it not been waived.

7.2  Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

7.3  No Survival of Representations and Warranties or Covenants. No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

16

7.4    Expenses. Except as otherwise provided in this Agreement, the Transfer Agreement or written agreement between the parties hereto, each of the Purchaser and the Seller shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby and thereby. The Seller agrees to pay all legal fees of the Seller associated with obtaining the Canadian Approval and Vesting Order.

7.5    Fee Agreement: Notwithstanding the terms of the Fee Agreement, the Purchaser agrees that if the Closing occurs on or prior to July 31, 2011, the Purchaser shall reimburse the General Partner for all Summerhill Transaction Fees (as such term is defined in the Fee Agreement) promptly after the Closing and following receipt of an invoice therefor from the General Partner.

7.6    Notices. All notices, requests and other communications under this Agreement to a party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile transmission (with confirmation) during normal business hours, (b) on the Business Day following the day of sending, if delivered by nationally recognized overnight courier, or (c) on the third Business Day following the day of sending, if mailed by registered or certified mail return receipt requested, in each case to such party at its address (or number) set forth below or such other address (or number) as the party may specify by notice to the other party hereto.

If to the Seller:

> Nortel Networks Limited
> 5945 Airport Road
> Suite 360
> Mississauga, ON  L4V 1R9
> Attention: Anna Ventresca, General Counsel and Corporate Secretary
> Facsimile: 905-863-7386
>
> with a copy to:
>
> Ogilvy Renault LLP          Telephone: 416-216-3939
> Suite 3800, Royal Bank Plaza,   Telecopier: 416-216-3930
> South Tower
> 200 Bay Street, P.O. Box 84
> Toronto, ON M5J 2Z4
> Attention: Michael Lang

If to the Purchaser:

> CS SP IV Investments Canada Corp.
> CS Strategic Partners
> Eleven Madison Avenue, 16th Floor
> New York, NY 10010
> Attention:  Brian Kolin

17

Facsimile: 646-935-7908

with a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention: Edward D. Sopher, Esq.
Facsimile: (212) 351-5217

7.7     Entire Understanding; No Third-Party Beneficiaries. This Agreement, the Transfer Agreement, the Fee Agreement and the Confidentiality Agreement together set forth the entire understanding of the parties relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the parties with respect to the subject matter of this Agreement. In the event of any conflict between this Agreement and the Transfer Agreement, the Fee Agreement or the Confidentiality Agreement, the provisions of this Agreement shall prevail. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any person, other than the parties hereto or their respective successors, any rights, remedies, obligations or liabilities.

7.8     Assignment. Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party hereto and any purported assignment in violation of this Section 7.8 will be void, except for the following assignments which shall not require any consent and will not be void: (i) assignment to an Affiliate of either party (provided that the assigning party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other party) and (ii) assignment by the Seller to a successor or related entity in connection with or following its emergence from the CCAA Proceedings. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties to this Agreement and their respective successors and permitted assigns.

7.9     Counterparts. This Agreement may be executed in two (2) or more counterparts (including counterparts executed by facsimile or PDF or similar electronic means, which shall be deemed to constitute originals) each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

7.10     Severability. If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then it is the intention of the parties to this Agreement that the provisions be deemed to be automatically amended to the extent necessary to comply with applicable Law and permit enforcement provided that such amendment would not effect a material change in the rights or obligations of the parties hereunder. If any of the provisions of this Agreement are found to be wholly or partially invalid, such determination will not affect the binding effect of the other provisions of this Agreement.

18

7.11    No Presumption. Each of the Seller and the Purchaser agrees that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations. Each of the Seller and the Purchaser represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The parties that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a party on the grounds that such party drafted or was more responsible for drafting the provisions.

7.12    Access to and Retention of Records. All books and records retained by the Seller which relate to the Units shall be open for inspection by representatives of the Purchaser at any time during regular business hours, subject to reasonable advance notice and compliance with reasonable security rules, for a period of one year from the Closing Date. The Seller shall not destroy any such books and records without providing the Purchaser with written notice detailing the contents thereof and providing the Purchaser with the opportunity to obtain such books and records at least 90 days prior to the destruction thereof.

7.13    Governing Law; Submission to Jurisdiction.

(a)    Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any party, shall be governed exclusively by the laws of the Province of Ontario and the federal laws of Canada applicable therein without regard to conflict of laws principles.

(b)    To the fullest extent permitted by applicable Law each of the parties hereto irrevocably attorns and submits to the exclusive jurisdiction of the Canadian Court and waives objection to the venue of any proceeding in such court.

7.14    Interpretation. (a) As used in this Agreement, references to:

(1)    the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(2)    the Preamble, Recitals, Sections or Exhibits refers to the Preamble, a Recital or Section of, or an Exhibit to this Agreement unless otherwise indicated; and

(3)    this Agreement refers to this Agreement and the Exhibits to it and all amendments to this Agreement made in accordance with Section 7.1.

(b)    Wherever this Agreement requires a party to take an action, the requirement constitutes an undertaking by the party to cause its subsidiaries, and to use its commercially reasonable efforts to cause its other Affiliates, to take appropriate action in connection therewith.

(c)    Whenever the words "include", "includes" or "including" are used is this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All

19

pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the person referred to may require.

      (d)    The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

      (e)    It is the intention of the parties hereto that this Agreement not be construed more strictly with regard to one party than with regard to the other party hereto.

      (f)    All references in this Agreement to "dollars", or to "$", unless otherwise specifically indicated, are expressed in U.S. currency.

      7.14    Time of Essence. Time is of the essence in this Agreement.

      [Remainder of page intentionally left blank]

DOCSTOR: 2109844\5B

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**CS SP IV INVESTMENTS CANADA CORP.**

By: _____

Name: CARL LODGE

Title: VICE PRESIDENT

[Signature page to Purchase and Sale Agreement]

NORTEL NETWORKS LIMITED

By: _____

Name: Anna Ventresca
Title: General Counsel-Corporate
and Corporate Secretary

By: _____

Name: John M. Doolittle
Title: Senior Vice-President, Corporate
Services and Chief Financial Officer

[Signature page to Purchase and Sale Agreement]

**EXHIBIT A**
**Form of Canadian Approval and Vesting Order**

See attached.

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | ●DAY, THE ● |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF ●, 2011 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**APPROVAL AND VESTING ORDER**
**(Summerhill)**

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an order approving the sale transaction (the "Transaction") contemplated by a purchase and sale agreement dated as of February 23, 2011 (the "Sale Agreement") among NNL and CS SP IV Investments Canada Corp. (the "Purchaser"), and as appended to the ● Report of Ernst & Young Inc., in it capacity as court-appointed monitor (the "Monitor") dated ●, 2011 (the "● Report"), and vesting in the Purchaser NNL's right, title and interest in and to the Units (as defined in the Sale Agreement), was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the Affidavit of ●, sworn ●, 2011 (the "● Affidavit"), the ● Report and on hearing the submissions of counsel for the Applicants and for the Monitor and those other

- 2 -

parties present, and from no one appearing for any other person on the service list, although properly served as appears from the affidavit of service of ● sworn ●, 2011 and filed:

1.      **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the ● Report and the Motion Record is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

3.      **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved and that the execution of the Sale Agreement by NNL is hereby authorized and approved, and the Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents ("Ancillary Agreements") as may be necessary or desirable for the completion of the Transaction and for the conveyance of NNL's right, title and interest in and to the Units to the Purchaser.

4.      **THIS COURT ORDERS AND DECLARES** that the Applicants are authorized and directed to perform their obligations, if any, under the Sale Agreement and each of the Ancillary Agreements.

5.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of NNL's right, title and interest in and to the Units shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Mr. Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system, excluding those Claims

- 3 -

expressly assumed in writing by the Purchaser under the Sale Agreement or any of the Ancillary Agreements. For greater certainty, this Court orders that all of the Claims affecting or relating to the Units are hereby expunged and discharged as against the Units, save and except for those Claims expressly assumed in writing by the Purchaser under the Sale Agreement or any of the Ancillary Agreements.

6.     **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of NNL's right, title and interest in and to the Units shall stand in the place and stead of the Units, and that from and after the delivery of the Monitor's Certificate all Claims shall attach to the net proceeds from the sale of NNL's right, title and interest in and to the Units with the same priority as they had with respect to the Units immediately prior to the sale, as if NNL's right, title and interest in and to the Units had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

7.     **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

8.     **THIS COURT ORDERS** that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "BIA") in respect of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of the Applicants;

the vesting of NNL's right, title and interest in and to the Units in the Purchaser pursuant to this Order shall be binding on any trustee-in-bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the BIA

- 4 -

or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

9. **THIS COURT ORDERS AND DECLARES** that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

10. **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representatives status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

11. **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

Schedule "A"
Form of Monitor's Certificate

Court File No.:  09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

MONITOR'S CERTIFICATE
(Summerhill)

RECITALS

A.      Pursuant to an Order of the Honourable Mr. Justice Morawetz of the Ontario Superior
Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel
Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and certain of their
Canadian affiliates (collectively, the "Applicants") commenced proceedings pursuant to the
*Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc., was appointed as
monitor (the "Monitor") in those proceedings.

B.      Pursuant to an Order of the Court dated ● ● 2011, the Court approved a sale transaction
(the "Transaction") contemplated by a purchase and sale agreement dated as of February 23,
2011 (the "Sale Agreement") among NNL and CS SP IV Investments Canada Corp. (the
"Purchaser"), and provided for the vesting in the Purchaser of NNL's right, title and interest in
and to the Units (as defined in the Sale Agreement), which vesting is to be effective with respect

- 2 -

to the Units upon the delivery by the Monitor to the Purchaser of a certificate confirming that
NNL has advised the Monitor: (i) the Purchaser has paid to NNL the Purchase Price for the
Units; (ii) that the conditions to closing as set out in Article 5 of the Sale Agreement have been
satisfied or waived by NNL and/or the Purchaser, as applicable; and (iii) the Transaction has
been completed to the satisfaction of NNL.

C.      Unless otherwise indicated herein, terms with initial capital have the meanings set out in
the Sale Agreement.

        **THE MONITOR CERTIFIES** the following:

1.      NNL has advised the Monitor that the Purchaser has paid and NNL has received the
Purchase Price for the Units payable on the Closing Date pursuant to the Sale Agreement;

2.      NNL has advised the Monitor that the conditions to Closing as set out in Article 5 of the
Sale Agreement have been satisfied or waived by NNL and/or the Purchaser as applicable; and

3.      NNL has advised the Monitor that the Transaction has been completed to the satisfaction
of NNL.

**THIS CERTIFICATE** was delivered by the Monitor at _____ [time] on _____
_____ [date].

                                    **ERNST & YOUNG Inc., in its capacity as**
                                    **Monitor in the Applicants' CCAA proceedings**
                                    **and not in its personal capacity**

                                    Per:

                                        _____

                                        Name:
                                        Title:

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
**(Summerhill)**

**OGILVY RENAULT LLP**
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario
M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1960443\4A

**EXHIBIT C**
**Operative Documents**

(a)  The Partnership Agreement.

(b)  A Letter Agreement dated July 11, 2007 between the General Partner and the Seller.

(c)  Amendment to the Partnership Agreement, regarding the definition of "Commitment Period" and "Ramp Down Date."

(d)  Amendment to the Partnership Agreement, regarding the sale of the Partnership's Portfolio Securities (as defined therein) in TD Security, Inc.

**EXHIBIT D**
**Form of General Partner Certificate**

The Seller shall request a certificate from the General Partner providing confirmation of the following matters:

1. The amount of the Seller's total Capital Commitment, unfunded Capital Commitment, capital account balance, Contributions made with the dates thereof and Distributions received with the dates thereof;

2. There are no Operative Documents other than those set forth on Exhibit C;

3. The General Partner has not, and does not presently intend to issue the Seller a notice of default or deem the Seller in default under any of the Operative Documents;

4. Seller has not made any voluntary capital contributions to the Partnership;

5. Seller is not under any present obligation to return any Distributions previously received from the Partnership, other than with respect to amounts subject to recall under the Partnership's recycling provisions;

6. Seller has not opted out or been excluded, voluntarily or involuntarily, from any investment or waived any material right as an investor in the Partnership; and

7. Seller's Units constitutes an interest in an entity treated as a partnership for United States federal income tax purposes and the Seller is not by virtue of owning such Units, a direct or indirect owner of an interest in an entity treated as a corporation for United States federal income tax purposes, other than a portfolio company.

## APPENDIX "B" – EXHIBIT "B" TO PSA, FEE AGREEMENT AND CONSENT AGREEMENT

### [CONFIDENTIAL]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**SIXTIETH REPORT OF THE MONITOR**
**DATED MARCH 21, 2011**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.