IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.* | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Re: Docket No. 4345** |
| | <u>**Hearing Date**</u>: To Be Determined |

**FURTHER OBJECTION OF GENBAND US LLC TO THE DEBTORS'
MOTION FOR ENTRY OF AN ORDER ENFORCING THE ORDER
AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS'
CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS,
<u>AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS</u>**

GENBAND US LLC (formerly GENBAND Inc., ("<u>GENBAND</u>")), by and through its

undersigned counsel, hereby files this Further Objection (the "<u>Supplemental Objection</u>") to

Nortel Networks Inc.'s (collectively, with Nortel Networks Corporation and Nortel Networks

Limited, "<u>Nortel</u>," and, together with its affiliate filing entities, the "<u>Debtors</u>") *Motion for Entry*

*of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier*

*Voice Over IP and Application Solutions Business, and Directing the Release of Certain*

*Escrowed Funds* [D.I. 4345] (the "<u>Debtors' Motion</u>").  In support of this Supplemental

Objection, GENBAND respectfully submits as follows.

## PRELIMINARY STATEMENT

1.      Debtors' Motion seeks to rewrite both contracts and history.  Nortel asks to recover from GENBAND payments made under an agreement that Verizon <u>admittedly</u> did not make until <u>after</u> the ASA transaction closed.  But Nortel can only show that those payments were "Excluded Assets" if it <u>first</u> shows that they "accounts receivable" <u>at the time of Closing</u>. Nortel does not even attempt to meet that burden, because Nortel knows it cannot.

2.      In the ASA, Nortel agreed to transfer "all" of its right, title, and interest in certain Assets to GENBAND, including its interest in certain defined Contracts, but excluding certain "Excluded Assets."  The ASA defines "Excluded Assets" to include, in relevant part, "accounts receivable (including intercompany receivables but excluding Unbilled Accounts Receivable as of the Closing Date) . . ."  Nortel's motion focuses entirely on the parenthetical <u>exception</u> to the definition, arguing that the payments from Verizon are <u>not</u> within the definition of "Unbilled Accounts Receivable."  Nortel's argument puts the cart before the horse:  Nortel never bothers to explain how the payment could possibly be considered "accounts receivable" in the first place.  But unless the payments are "accounts receivable" to begin with, it makes no difference whether they are "Unbilled Accounts Receivable"—the analysis never reaches that issue.

3.      There is a very good reason why Nortel avoids explaining how the payments from Verizon could be considered "accounts receivable" at the time of Closing: they can't.  By definition, an "account receivable" is a sum certain that is owed and is neither contingent nor variable.  At the time of Closing, the payments Verizon made were none of those things.  At best, Nortel had asserted a <u>claim</u> against Verizon for an amount that Verizon <u>might</u> have to pay, <u>if</u> Verizon chose to continue accepting the services.  Whatever else you might want to call that,

it's not an "account receivable."  Indeed, the best possible evidence of that fact is that <u>Nortel itself did not book any such "account receivable" before the ASA transaction closed</u>.

4.      What happened here is simple and straightforward.  Before the Closing, Nortel raised an issue with Verizon over amounts Nortel believed were due under the contract.  But Nortel did not reach any agreement with Verizon on that subject, and the issue remained nothing more than a contingent claim.  Nortel knew that it was not an account receivable, and quite properly did not treat it as such on its books.  Then, by agreement dated March 17, 2010, Nortel assigned "all" of its right, title, and interest, as well as its duties and obligations, under its contract with Verizon to GENBAND.  Nortel did not negotiate any exception for contingent claims for money allegedly due from Verizon.  After the ASA transaction closed, GENBAND took on the liability for continued performance of the contract.  Subsequently, GENBAND negotiated an agreement with Verizon, and Verizon made the payments.  Those payments belong to GENBAND, and Nortel's argument to the contrary is nothing more than a money grab.  The Court should deny the motion.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

## BACKGROUND

**A.      GENBAND and Nortel Enter Into the ASA**

6.      On December 22, 2009, GENBAND and Nortel, along with other entities identified as sellers therein, entered into an Asset Sale Agreement (the "<u>ASA</u>") by which GENBAND acquired Nortel's Carrier Voice Over IP business (the "<u>CVAS Business</u>").

7.    The ASA was approved by this Court's *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts* [D.I. 2632].

**B.    The ASA Provides for Nortel's Assignment of Certain Assets to GENBAND**

8.    The ASA provides that Nortel shall transfer or assign "all of [Nortel's] right, title and interest in . . . . the Assets." Transferred Assets include all "Assigned Contracts in force as of the Closing Date . . ." ASA § 2.1.1(d). Transferred Assets also include "all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers, contractors, and Third Parties . . . ." ASA § 2.1.1(i). Transferred Assets also include

> all rights that may be freely transferred as of the Closing Date arising from or in connection with any Bid made prior to the Closing Date by any Seller or by a contractor team or joint venture in which any Seller is participating, which is capable of acceptance after the Closing and, if accepted, would result in the award of a Customer Contract that (if entered into after the date hereof and prior to the Closing Date) would be an Assigned Contract hereunder . . . .

ASA § 2.1.1(k). The ASA defines a Bid as "any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract." ASA at page 5. The ASA defines a Contract as "any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking." ASA at page 10.

9.    The ASA provides, in Section 2.1.2(a), that Nortel shall not transfer or assign Excluded Assets, which include "cash and cash equivalents, accounts receivable (including intercompany receivables but excluding Unbilled Accounts Receivable as of the Closing Date), bank account balances and all petty cash of the sellers . . . ." The ASA defines Unbilled

Accounts Receivable as "amounts classified in Construction-in-Process accounts in a manner

consistent with the Nortel Accounting Principles." ASA at page 33.

**C.     Before the ASA Closed, Nortel Notified Verizon of a Potential Claim Under the GPPA Agreement**

10.     On January 8, 2010, Nortel sent Verizon a letter (the "January 8 Letter"), attached

hereto as Exhibit A. The January 8 Letter detailed Nortel's findings after auditing Verizon's use

of software and switches under the General Product Purchase Agreement for Softswitch and

TDM Products and Services, dated July 30, 2004 (the "GPPA Agreement").

11.     In the January 8 Letter, Nortel stated that any payment from Verizon was

completely contingent, as "Verizon may either pay the appropriate license fees or request Nortel

to remove the software, in which case, no license fees would be due." The January 8 Letter

stated that further negotiation would be necessary to determine the amount of any such payment,

stating that once Verizon has taken time to "review this information and its internal records, we

look forward to your feedback."

**D.     Nortel Assigns All Its Rights Under the GPPA Agreement to GENBAND**

12.     On March 17, 2010, Nortel, GENBAND, and Verizon Corporate Services Group

Inc. ("Verizon") entered into a Letter Agreement (the "Letter Agreement"), attached hereto as

Exhibit B. In the Letter Agreement, and as contemplated in the ASA, Nortel assigned to

GENBAND "certain of the rights and obligations of Nortel relating to the products and services

of the CVAS Business." Additionally, Nortel agreed to "convey, assign and transfer to

GENBAND for its use, benefit and behalf, all of Nortel's rights, title and interest as well as all of

Nortel's duties, obligations and liabilities in, to, under and arising from" specific agreements

listed in the Letter Agreement between Verizon and Nortel (the "Verizon Agreements").

13.     In the Letter Agreement, GENBAND agreed to "assume all of Nortel's rights, title and interest as well as all of Nortel's duties, obligations and liabilities" concerning the Verizon Agreements.  GENBAND agreed to "assume, perform and be responsible for all obligations, duties and liabilities . . . whether such duties obligations or liabilities arose prior to, contemporaneous with, or on and after" the date of Closing of the ASA.

14.     One of the agreements listed as a Verizon Agreement in the Letter Agreement was the GPPA Agreement.

**E.     After the GPPA Agreement Was Assigned to GENBAND, GENBAND and Verizon Negotiated a Payment Under the GPPA Agreement**

15.     After Nortel assigned all its rights and all its liabilities regarding the GPPA Agreement to GENBAND, GENBAND and Verizon agreed on a form of a settlement agreement, including the amount that Verizon owed under the GPPA Agreement.  Verizon then issued purchase orders to GENBAND, GENBAND invoiced Verizon under the GPPA Agreement, and Verizon paid those invoices.

**F.     Nortel Asserts that GENBAND Must Give Nortel the Payments GENBAND Negotiated with Verizon After Closing, Claiming they Are an "Excluded Asset" Under the ASA**

16.     On August 13, 2010, Nortel sent a letter to GENBAND (the "August 13 Letter"), attached hereto as Exhibit C.  In the August 13 Letter, Nortel acknowledged that the GPPA Agreement was assigned to GENBAND pursuant to the ASA.  The August 13 Letter asserted that after the ASA Closed and the GPPA Agreement was assigned to GENBAND, Verizon and GENBAND entered into a settlement agreement.  Nortel further alleged that the settlement agreement was made concerning a liability that Verizon owed under the GPPA Agreement prior to the date of Closing.

17.    The August 13 Letter stated that any purchases Verizon made in connection with any settlement agreement was not a "Construction-in-Process" receivable, as that term is defined under the ASA, and that such payments were therefore an Excluded Asset that should have been retained by Nortel at the time of Closing the ASA.  However, Nortel did not explain how the payments Verizon first agreed to make _after_ Closing could be considered an "account receivable" at the time of Closing.

18.    Without indicating what sections of the ASA require GENBAND's compliance, Nortel requested that GENBAND provide Nortel with, among other things, "a copy of the settlement agreement," "the name and contact information of representatives of Verizon with whom you have been in discussions with respect to the settlement agreement," "an accounting of all purchase orders received and expected to be received by Genband from Verizon" with related purchase orders and invoices, and any amounts received by GENBAND from Verizon in association with any settlement agreement. _See_ August 13 Letter.

**G.    GENBAND Asks For Additional Clarification Regarding Nortel's Request**

19.    On September 3, 2010, GENBAND sent a letter to Nortel (the "September 3 Letter"), attached hereto as Exhibit D, responding to the August 13 Letter.  In the September 3 Letter, GENBAND stated that it did "not understand and therefore cannot agree with [Nortel's] assertions as to why the 'Verizon Receivables' are Excluded Assets . . . ."  Further, the September 3 Letter stated that "[i]t appears that your fundamental assertion is that the 'Verizon Receivables' (as defined in the August 13 Letter) are 'accounts receivable' of the Sellers, which are Excluded Assets."  GENBAND pointed out that under accepted accounting standards, Nortel would not "be permitted to recognize the amounts in dispute with Verizon as 'accounts receivable' prior to Closing because the payables in question were (according to you) in

dispute," and that "accounts receivable resulting from an agreement entered into between

GENBAND and Verizon post-Closing . . . are the property of GENBAND rather than Nortel."

20.    GENBAND also pointed out that Nortel's assertion that "since the 'Verizon

Receivables' do not constitute Construction-in-Process receivables, they are an Excluded Asset"

inaccurately describes the mechanics of the ASA.  This is because the "mere fact that something

is not a Construction-in-Process receivable clearly does not make it an Excluded Asset under the

ASA."  Because Nortel's position is in conflict with all known accounting principles and thus

unintelligible, GENBAND concluded with an invitation for Nortel to clarify its position.

**H.    Nortel Files Debtors' Motion With the Bankruptcy Court**

21.    Rather than clarifying its position, and indeed while threatening GENBAND's

ongoing operations,[1] Nortel filed the Debtors' Motion.  The Debtors' Motion admits that Nortel

had not recorded any anticipated payments from Verizon on the company's books and records as

an "account receivable" at the date of Closing of the ASA.  Debtors' Motion ¶ 29–30 ("not

recorded on Nortel's books as a receivable because Nortel was not in possession of appropriate

GAAP-complaint documentation that allowed for the value to be accounted for as a receivable at

the time").

22.    The Debtors' Motion also admits that the "GPPA Agreement was ultimately

assigned to GENBAND, pursuant to the [ASA], before [Nortel] was able to resolve the dispute

with Verizon."  Debtors' Motion at ¶ 31 (emphasis added).  These facts make it impossible for

any amounts GENBAND subsequently invoiced Verizon under the GPPA Agreement to be

---

[1]    Nortel threatened to refuse to assign a further contract to GENBAND until GENBAND
complied with Nortel's demands relating to the payments GENBAND received from Verizon in
association with the assigned GPPA Agreement after Closing.  *See* email exchange in November
2010 between Lynn Egan, of Nortel, and Jim Strunge, of GENBAND (the "November 2010
Email Exchange"), attached hereto as Exhibit E.

characterized as "accounts receivable" prior to Closing. Despite this, the Debtors' Motion asserts that because any payments made by Verizon "were not classified in 'Construction-in-Process Accounts' and therefore do not constitute Unbilled Accounts Receivables" they "represent fees for licenses that [Nortel] delivered and Verizon utilized before the GPPA Agreement was assigned to GENBAND" and "are an Excluded Asset that remained with [Nortel] under the [ASA]." Debtors' Motion at ¶ 33.[2] Once again, Nortel did not explain how the payments that Verizon only agreed to make _after_ Closing could possibly be considered an "account receivable" at the time of Closing.

**I.     GENBAND Files Its Objection, Again Asking for Clarification From Nortel**

23.     On December 1, 2010, and in response to Debtors' Motion, GENBAND filed its _Objection of Genband Inc. to the Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds_ [D.I. 4452] (the "GENBAND Objection"). The GENBAND Objection states that GENBAND does not believe that payment is owed to Nortel because any payment made by Verizon was made pursuant to an assigned contract, and because GENBAND made that agreement with Verizon _after_ the Closing Date. GENBAND Objection at ¶ 44. GENBAND again invited Nortel to further explain how any payment from Verizon to GENBAND based on an agreement made between Verizon and GENBAND _after_ the Closing Date, and relevant to an agreement fully assigned to GENBAND, could possibly be characterized as an Excluded Asset at the time of Closing of the ASA. GENBAND Objection at ¶ 45.

24.     Nortel provided no further explanation.

---

[2]     Nortel cites to no authority or evidence to substantiate any of these allegations, as is their burden.

**RELIEF REQUESTED**

25.     By this Supplemental Objection GENBAND requests that the Court deny the

relief sought in the Debtors' Motion regarding the Verizon Settlement.

**BASIS FOR RELIEF**

26.     Nortel's argument must be rejected because no matter how one characterizes the

payments by Verizon to GENBAND—after both the Closing under the ASA and assignment of

the GPPA Agreement to GENBAND—they cannot possibly be deemed Nortel's "accounts

receivable" at the time of Closing.

27.     Under generally accepted accounting principles, amounts may not be recorded on

the books and records of a company until there is a sum certain owed that is not contingent or

variable.[3] Financial Accounting Standards Board Topic 450 states that a "gain contingency" is

"[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible

gain to an entity that will ultimately be resolved when one or more future events occur or fail to

occur." Topic 450 goes on to state that "[a] contingency that might result in a gain usually

should not be reflected in the financial statements because to do so might be to recognize

revenue before its realization." FASB ASC Topic 450, Contingencies, *available at*

http://www.fasb.org (emphasis added).  But as long as it remains contingent, it cannot be

considered an "account receivable."

28.     Consistent with these established rules, courts acknowledge that uncertain,

contingent, and unsettled amounts cannot be characterized as "accounts receivable." *See Am.*

*Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 704 F. Supp. 2d 177, 195 (E.D.N.Y.

2010) (taxpayer was not required to report outstanding liquidated damages claim, because any

---

[3]     This concept is discussed more fully in the Affidavit of Misty Kawecki, submitted
herewith.

prospective gain was contingent—not an "account receivable"—at the time the tax return was

submitted); *Bata Shoe Co., Inc. v. Silvestre Segarra e Hijos, S.A.*, 58 A.D.2d 133, 135 (N.Y. 1st

Dep't 1977) ("an account receivable does not depend on the occurrence of a future, uncertain

event").

29.     Nortel asserts that the payments by Verizon are Excluded Assets, but the only

way they can possibly be Excluded Assets is if they are accounts receivable.  There are three

independent reasons why these payments cannot be considered accounts receivable at the time of

Closing under the ASA.  First, before the date of Closing, Nortel did not record in its accounting

records any anticipated payment from Verizon as an account receivable.  Indeed, it could not

have done so, because any anticipated payment was both contingent and uncertain in amount.

Nortel admitted in its briefing of this issue that it did not record an account receivable.  Second,

any agreement by Verizon to make purchases under the GPPA Agreement were made after the

Closing Date of the ASA; as such those payments cannot be characterized as accounts receivable

before that date.  Third, any payment by Verizon to GENBAND was made pursuant to the GPPA

Agreement in which Nortel's rights were fully assigned to GENBAND.

I.     **PAYMENTS VERIZON FIRST AGREED TO MAKE AFTER THE CLOSING ARE INCLUDED ASSETS UNDER THE ASA**

    **A.     The Terms of the ASA Make Any Payment Under an Assigned Contract an Included Asset**

30.     Section 2.1.1 of the ASA describes the Assets that are included in the ASA and

transferred to GENBAND.  Under Section 2.1.1(d), all of Nortel's right and interest in Assigned

Contracts are transferred to GENBAND.  Under Section 2.1.1(i), all of Nortel's right and interest

in "all warranties, representations and guarantees made by suppliers, manufacturers, contractors,

and Third Parties" are transferred to GENBAND.  Under Section 2.1.1(k), all of Nortel's right

and interest in "all rights that may be freely transferred" in connection with any Bid, defined as

"any bid, proposal, offer or quotation which, if accepted, would result in the award of" "any

binding contract, agreement, subcontract, purchase order, work order, sales order, indenture,

note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking," is

transferred to GENBAND.

31.    Simply put, the GPPA Agreement was an Asset that was included in the ASA.

The ASA provides that the contract was assigned, along with any and all rights under that

contract. Any Bids prior to the date of Closing regarding the Asset transferred pursuant to the

ASA are GENBAND's as of Closing under the ASA, other than the specifically contemplated

Excluded Assets. The parties, including Nortel, agreed to this as part of the ASA and the Letter

Agreement. And the parties had the opportunity to draft the ASA to contemplate this issue.

Nortel understood the dispute it had raised (but had not concluded) prior to its assignment of the

Verizon Contracts to GENBAND and the Closing under the ASA. If Nortel wanted to treat any

payments from Verizon to GENBAND after Closing as an Excluded Asset, it could have easily

negotiated for that treatment in the ASA. Nortel did not do so. Instead, Nortel now advances a

post hoc lawyer's argument in an effort to claim a right to purchases that GENBAND negotiated

with Verizon after Nortel assigned its rights under the GPPA Agreement to GENBAND. That is

absurd on its face.

**B.    The Letter Agreement Assigned All of Nortel's Rights to GENBAND**

32.    The agreement between Verizon and GENBAND occurred after Nortel assigned

its rights and liabilities under the GPPA Agreement. Similarly, any settlement agreement

between Verizon and GENBAND occurred after the Closing under the ASA. Nortel admits in

the Debtors' Motion that there was no agreement between Verizon and Nortel regarding any

payment regarding the GPPA Agreement on or before the ASA Closed. That means that there

was no "account receivable" in existence at the time of Closing with respect to the post-Closing agreement between Verizon and GENBAND pursuant to the assigned GPPA Agreement. But it also means that the separate agreement between Verizon and GENBAND was negotiated by those two parties after all of Nortel's rights *and liabilities*, both before and after the date of Closing, had been fully transferred to GENBAND. That included the liability to continue performing under the GPPA Agreement. Having taken on the risk of continued performance under the GPPA Agreement, GENBAND was fully within its rights to negotiate and agree to a payment by Verizon under that contract.

II. **PAYMENTS VERIZON FIRST AGREED TO MAKE AFTER THE CLOSING ARE NOT EXCLUDED ASSETS UNDER THE ASA BECAUSE THEY WERE NOT ACCOUNTS RECEIVABLE AT THE TIME OF CLOSING**

33.    Nortel's only argument that the payments are Excluded Assets is that such payments were accounts receivable as of the date of Closing. *See* Debtors' Motion at ¶ 55 (the payments "do not constitute Construction-in-Process receivables and are therefore an Excluded Asset"); *see also id.* at ¶ 31. That argument must fail.

A.    **Nortel Admits There Was No "Account Receivable" at the Time of Closing**

34.    Nortel admits that Nortel did <u>not</u> book any payments owed by Verizon as "accounts receivable" prior to Closing of the ASA. *See* Debtors' Motion at ¶ 29–31. Nortel was "not in possession of appropriate GAAP-complaint documentation that allowed for the value to be accounted for as a receivable at the time" of Closing. *Id.* As such, it is impossible that any payments in question could have been an Excluded Asset at the time of Closing of the ASA.

35.    Indeed, the notice Nortel provided to Verizon in the form of the January 8 Letter recognized the amount Verizon should pay is contingent upon Verizon accepting an agreement with Nortel, and that any payment from Verizon would be for <u>future</u> use of software licenses rather than past use. These statements, which Nortel cannot now avoid, proves both that there

was no account receivable at the time of Closing and that the nature and amount of any payment

was uncertain and contingent.

**B.    There Is No Basis to Treat Any Amount Paid by Verizon as an Excluded Asset**

36.    According to the ASA, Excluded Assets are "cash and cash equivalents, accounts

receivable (including intercompany receivables but excluding Unbilled Accounts Receivable as

of the Closing Date), bank account balances and all petty cash of the sellers . . . ." ASA at ¶

2.2.2(a).  Nortel has never explained how either the settlement of a contingency <u>after</u> the date of

Closing, or any payments made by Verizon to GENBAND <u>after</u> the date of Closing, could

conceivably be a Nortel "account receivable" under the ASA.  This is because Nortel cannot do

so.

37.    Generally accepted accounting principles dictate that a company may not record

an amount as an "account receivable" until the amount is certain and the payment is not

contingent.  At the time of Closing under the ASA, any amounts due by Verizon under the GPPA

Agreement were both unknown and contingent.  As such, under generally accepted accounting

principles, the payments by Verizon to GENBAND subsequent to Closing under the ASA cannot

be characterized as Nortel's account receivable.  Courts have considered this concept, and agree

with the accounting principles.  At the time of Closing, there was no agreement between the

parties, and, in fact, Nortel offered Verizon the option of <u>not</u> paying Nortel if it did not use the

licenses in the future.  *See* January 8 Letter.  As such, any payment by Verizon was contingent

upon a future and uncertain event.  As such, it could not be characterized as an account

receivable until that future and uncertain event, namely, the agreement, occurs.  *See, e.g., Bata*

*Shoe Co.*, 58 A.D.2d at 135.

38.    Contrary to all known accounting principles, and without any legal support whatsoever, Nortel now argues that any settlement amount is an "account receivable" (and thus an Excluded Asset) simply because it is <u>not</u> a "Construction-in-Process Account." "Construction-in-Process Account" is the only kind of account receivable that is not an Excluded Asset.  But the fact that payments made by Verizon are <u>not</u> "Construction-in-Process Accounts" does not mean that they <u>are</u> "accounts receivable."[4]  Put another way, Nortel must prove that the payments are accounts receivable and thus an Excluded Asset, rather than what it has done, argue that the payments are not an exception to what is an accounts receivable.  GENBAND twice pointed out this logical flaw and requested clarification from Nortel.  Nortel instead filed the Debtors' Motion with this Court.

**[Remainder of Page Intentionally Left Blank]**

---

[4]    Because any payments from Verizon to GENBAND are not Excluded Assets, such payments are likewise not Excluded Liabilities under Section 2.1.2(a), as is discussed in the Debtors' Motion at footnote 7.

## CONCLUSION

WHEREFORE, GENBAND respectfully requests that the Court deny the relief sought in the Debtors' Motion with regards to the Verizon payments.

Dated: March 28, 2011          Respectfully submitted,
       Wilmington, Delaware

/s/ *Michael R. Lastowski*

Michael R. Lastowski (No. 3892)
Sommer L. Ross (No. 4598)
DUANE MORRIS, LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail:    mlastowski@duanemorris.com
           slross@duanemorris.com

and

Blair Connelly (Admitted *Pro Hac Vice*)
Eli J. Kay-Oliphant (Admitted *Pro Hac Vice*)
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1200
New York, New York 10022-4834
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
E-mail:   blair.connelly@lw.com
         eli.kay-oliphant@lw.com

*Counsel for GENBAND US LLC*

16