## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- X

In re

Nortel Networks Inc., *et al.*,[1]

                           Debtors.

--------------------------------------------------------- X

    :
    :
    :
    :
    :
    :
    :
    :
    :

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing Date:  May 24, 2011 at 9:30 a.m. (ET)**
**Objections Due:  May 17, 2011 at 4:00 p.m. (ET)**

## DEBTORS' MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY REQUESTS PROPOUNDED BY SNMP RESEARCH INTERNATIONAL, INC.

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to Rules 7026(c) and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7026-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") limiting the discovery sought by SNMP Research International, Inc. ("SNMP RI") in Creditor SNMP Research International, Inc's First Set of Interrogatories and Requests for Production of Documents Directed to the Debtors (the "Demands")[2]; and granting them such other and further relief as the Court deems just and proper.

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]       See Notice of Service of Discovery of Creditor SNMP Research International, Inc.'s First Set of Interrogatories and Requests for Production of Documents Directed to the Debtors [D.I. 5040].  A true

In support of this Motion, the Debtors rely on the Declaration of Steven Kenkel submitted in connection with this Motion (the "Kenkel Declaration" or "Kenkel Decl."), and further respectfully represent as follows:

## PRELIMINARY STATEMENT

During these bankruptcy proceedings, SNMP RI objected to nearly every sale of the Debtors' business lines on the basis that SNMP RI did not have information as to whether its software would be conveyed through the sales.  The Court rejected SNMP RI's argument that it was entitled to an audit or had any other basis for holding up the sales.

Having lost at the sale hearings, SNMP RI now seeks to use the claims objection process to get the discovery it was denied – an audit of all of the Debtors' sold business lines – as well as access to all of the software source code of global Nortel that was ever used in a released product or otherwise made available to third parties over the past 11 years.  But SNMP RI's Amended Claim is for to the unreported and unpaid royalties and other fees arising from the Debtors' use of a piece of SNMP RI's software in one business line pursuant to an unsigned license.  The Federal Rules of Civil Procedure do not permit the type of boundless fishing expedition, regarding issues beyond to SNMP RI's Amended Claim, on which SNMP RI plainly seeks to embark here.

Not only do SNMP RI's discovery requests extend well beyond its Amended Claim, but they are also grossly burdensome.  Prior to the service of SNMP RI's Demands, the Debtors consensually undertook an audit of the one business line, the Passport business, the sale of which had not yet closed or personnel been hired away or laid off.  That audit, which revealed that there had been no unlicensed use of any SNMP RI software by the Debtors, took approximately 500 to

and correct copy of the Demands is attached as Exhibit A to the Certification of Jane Kim, dated April 1, 2011 (the "Kim Cert.") which is being filed concurrently herewith.

600 hours of work by about ten individuals.  The discovery that SNMP RI requires of the

Debtors here would require personnel with expertise and knowledge of the Debtors' businesses –

personnel who no longer work for the Debtors following the completion of the sales of the

Debtors' business lines – and dwarf the time spent to conduct the Passport audit by many

multiples.

Finally, SNMP RI does not simply ask for the Debtors to conduct an audit, but SNMP RI

also seeks to perform its own audit of all of Nortel's software based on a collection of data the

Debtors are to provide.  To do so would require the Debtors to search through the Nortel

software repository in a manner far more invasive and time-consuming than even the business

line audits described above.  Moreover, SNMP RI would then have the Debtors give it access to

all of its source code extracted in this manner – an unprecedented level of access to highly

confidential trade secrets that the Debtors have worked hard to protect.  SNMP RI's discovery

requests are beyond the realm of anything permitted under the Federal Rules of Civil Procedure,

and the Debtors respectfully request that they be stricken.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Rule(s) 7026(c) and 9014(c)

of the Bankruptcy Rules and Rule 7026-1 of the Local Rules.

## BACKGROUND

3.      On December 23, 1999, SNMP RI and the Debtors' ultimate corporate parent,

Nortel Networks Corporation ("NNC"), entered into a licensing agreement (the "Agreement")

under which SNMP RI granted NNC, and certain of its subsidiaries, including NNI (all together

with NNC, "Nortel"), the right to use certain software, including source code and binary code (the "SNMP RI Software"), in products produced by Nortel.  NNI and each of the subsidiaries listed in Attachment 1 to the Agreement were able to issue purchase orders under Schedule A of the Agreement and receive access to the SNMP RI Software.

4.     On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and the cases were consolidated for procedural purposes only.  The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the U.S. Debtors [D.I.s 141, 142].  Also on the Petition Date, NNC and NNI's direct corporate parent, Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced proceedings under the Companies' Creditors Arrangement Act (Canada) (the "CCAA").

5.     On September 29, 2009, SNMP RI filed fifteen proofs of claim (the "Original Claims") against the Debtors, all of which were identical.[5]  Each of the Original Claims asserted general unsecured claims totaling $22,281, plus an unliquidated amount for unpaid license royalties.  Specifically, each of the Claims consisted of $11,781 of unpaid royalties, $10,500 of yearly software maintenance fees and unspecified additional amounts associated with royalties allegedly not reported.

---

[3]     Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].
[4]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.
[5]     See Proofs of Claim Nos. 4624-4638.  SNMP also filed six identical proofs of claim against the Canadian Debtors (the "Canadian Claims").

6.      On July 9, 2010, the Debtors filed their 12th Omnibus Claims Objection (the "Objection") [D.I. 3507].  In the Objection, the Debtors sought to (i) reduce and allow SNMP RI Claim No. 4625 filed against NNI from $22,281 to $11,781; (ii) disallow the remaining claim for maintenance fees in Claim No. 4625 as duplicative of the Canadian Claims; and (iii) disallow and expunge the other fourteen proofs of claim[6] filed by SNMP RI against the other Debtors on the basis that they are duplicates of Claim No. 4625.

7.      On August 4, 2010, SNMP RI filed a response to the Objection (the "Response") [D.I. 3759]. The Response alleged for the first time that the Debtors had used SNMP RI software without a license in connection with the operation of the Carrier Voice Over IP and Communications Solutions business.  Response ¶ 7.  The Response requested, *inter alia*, a scheduling order "to allow SNMP to take [unspecified] discovery for the purpose of justifying his [sic] claim."  Response ¶ 10.  In an attempt to resolve SNMP RI's request for discovery, the Debtors entered into discussions with SNMP RI.

8.      In a good faith effort to resolve SNMP RI's request for discovery, the Debtors agreed to perform an audit (the "Passport Audit") of the only remaining business line in which a sale had not already closed and for which Nortel still had the necessary personnel to conduct such an audit: the Multi-Service Switch/Passport ("Passport") business.  As described further in the Kenkel Declaration, the Passport Audit used certain broad search terms provided by SNMP RI and required the Debtors and other Nortel entities around the world to undertake several time-consuming steps, including: (1) compiling a list of all the source code databases (known as Versioned Object Bases or "VOBs") related to the various product lines in the Passport business; (2) developing precise and relevant search scripts to allow a computer program to crawl through the VOBs and find any of the search terms contained in the search scripts; and (3) reviewing and

---

[6]      Claim Nos. 4624 and 4626-4638.

interpreting the results of the search to determine whether the source code "hits" generated by the search belonged to the Debtors, to SNMP RI or to third parties.  <u>See</u> Kenkel Decl. ¶ 10-13. After an estimated 500 to 600 hours of work by a total of approximately ten individuals, the Passport Audit was completed on December 22, 2010.  <u>See</u> Kenkel Decl. ¶ 16.  The results of the Passport Audit confirmed that all SNMP RI software used in the Passport business was used pursuant to valid licenses for which the Debtors paid royalties in connection with such use.  <u>See</u> Kenkel Decl. ¶ 16.

9.    While the Passport Audit was in progress, on October 19, 2010, SNMP RI filed an amended proof of claim (the "<u>Amended Claim</u>")[7] for $1,517,038, consisting of $22,092 asserted in the Original Claims plus an additional $1,494,946 related to unpaid royalties, licensing and maintenance fees and late payment penalties associated with the alleged unauthorized use by the Debtors of a certain software product owned by SNMP RI, as well as "any and all additional amounts associated with licensing fees, royalties, and maintenance fees that have not been reported by the Debtors to date and are owed to SNMP."  Amended Claim at ¶ 1.

10.   Discussions between the Debtors, the Canadian Debtors and SNMP RI regarding SNMP RI's request for discovery have been ongoing since the conclusion of the Passport Audit. In the course of those discussions, the Debtors were dismayed at the breadth of SNMP RI's requests.  Specifically, SNMP RI demanded that the Debtors perform separate audits of each of the seven other businesses that have been sold in the Chapter 11 cases, in order to ascertain whether any SNMP RI software had been transferred to the purchasers.  The Debtors informed SNMP RI that such an undertaking would be impossible, given the cost and the lack of available personnel with sufficient knowledge of the product lines in each business.  Given the parties'

---

[7]    <u>See</u> Proof of Claim No. 7471.

inability to reach agreement on a narrowed request, the Debtors and SNMP RI agreed to a form

of scheduling order [D.I. 4782], which the Court entered on February 1, 2011.  SNMP RI

subsequently served the Demands pursuant to the Court scheduling order, consisting of five

interrogatories (each, an "Interrogatory") and four requests for documents (each, a "Request").

  11. Interrogatories Nos. 3 and 5, and Request Nos. 3 and 4 are subject to this motion.

As set forth below, these Demands are irrelevant to the Amended Claim and grossly

burdensome.

- Interrogatory No. 3 demands that the Debtors "Identify the Persons known to Nortel who have knowledge of the Nortel Software source code transferred or made available to each buyer in the Bankruptcy Sales."[8]

- Interrogatory No. 5 demands that the Debtors "Identify all Creditor Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales and Identify the Nortel Software that required the use of or was distributed with such Creditor Software."

- Request No. 3 demands "all Documents, including but not limited to any Documents or Communications that list or discuss any Creditor Software imbedded in, used in the development of, or distributed with Nortel Software that was transferred or made available in the Bankruptcy Sales."

- Request No. 4 demands that the Debtor "provide Creditor access to all Nortel Software, on a computer or computers of Nortel's choosing in source code format as extracted from the Nortel source code repository, that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited to as a direct or indirect result of the Bankruptcy Sales, during the Relevant Period. Creditor's access to the Nortel source code must allow Creditor to run specific scripts that search the Nortel source code for the presence of Creditor Software."

---

[8] "Bankruptcy Sales" means the sale of Nortel business line assets to (1) Radware Ltd. pursuant to a March 26, 2009 sale order [D.I. 539]; (2) Telefonaktiebolaget L M Ericsson (publ) pursuant to a July 28, 2009 sale order [D.I. 1205]; (3) Avaya Inc. pursuant to a September 16, 2009 sale order [D.I. 1514]; (4) Hitachi, Ltd. pursuant to an October 28, 2009 sale order [D.I. 1760]; (5) Telefonaktiebolaget L M Ericsson (publ) and Kapsch Carriercom AG pursuant to a December 2, 2009 sale order [D.I. 2065]; (6) Ciena Corp. pursuant to a December 3, 2009 sale order [D.I. 2070]; (7) GENBAND Corp. pursuant to a March 3, 2010 sale order [D.I. 2632]; and (8) Telefonaktiebolaget L M Ericsson (publ) pursuant to a September 30, 2010 sale order [D.I. 4054].

12.     Furthering the vast scope of the Demands, SNMP RI defines the relevant period of time related to the Demands as December 1, 1999 to the present, a stretch of over eleven years.  Similarly broad is SNMP RI's definition of "Nortel," which includes "Nortel Networks Inc. and any affiliate, subsidiary, member, officer, principal, employee, representative, or agent of Nortel as well as any person or any entity acting on behalf of Nortel."

13.     Concurrently with the filing of this Motion, the Debtors served on SNMP RI objections and responses to the Demands (the "Objections and Responses").  The Debtors have responded to the Interrogatories, to the extent not objectionable, and will produce documents in response to the Requests to the extent not objectionable.  The parties engaged in a telephonic meet and confer on March 30, 2011, but were unable to resolve the Debtors' objections to Interrogatories 3 and 5 and Requests 3 and 4.  See Kim Cert. ¶ 3.  A copy of the Objections and Responses is attached to the Kim Cert. as Exhibit B.

## RELIEF REQUESTED

14.     The Debtors request a protective order striking Interrogatories Nos. 3 and 5 and Requests Nos. 3 and 4 in their entirety.  The Debtors reserve the right to request further relief from this Court in the event that disputes arise from the Objections and Responses.

15.     The Debtors understand that the Canadian Debtors and the Monitor for the Canadian Debtors will be filing a request for a joint hearing before the Ontario Superior Court of Justice (Commercial List) and this Court to consider this Motion.  The Debtors agree that a joint hearing is appropriate under the Cross-Border Insolvency Protocol approved by the Court on June 29, 2009 (D.I. 990) and support the request for a joint hearing on this Motion.

## ARGUMENT

### A PROTECTIVE ORDER SHOULD BE ENTERED TO STRIKE INTERROGATORIES NOS. 3 AND 5 AND REQUESTS NOS. 3 AND 4

16.     The Amended Claim asserts claims for $1,500,000, all but $22,000 of which refers to unpaid licensing fees, royalties and maintenance fees relating to one piece of software. As described further below, the Demands include broad discovery requests far beyond what is relevant to the Amended Claim.  In particular, the Demands seek broad discovery regarding software transfers pursuant to Court-ordered sales that have no bearing on the claims alleged in the Amended Claim.

**I.     Interrogatories Nos. 3 and 5 and Request Nos. 3 and 4 Should Be Stricken As Wholly Irrelevant to the Amended Claim**

    **A.     Interrogatories Nos. 3 and 5 and Request No. 3 Improperly Seek Details Regarding the Bankruptcy Sales**

17.     The Amended Claim asserts a claim for unpaid, reported royalties and maintenance fees outstanding of $22,281 at the time of the filing, plus a claim for $1,494,946 for alleged unreported royalties and fees relating to one piece of software used by the Debtors in connection with one business line.[9]  The latter claim for unreported royalties and fees appears to serve as the basis for SNMP RI's all-inclusive Demands.  But the claim for alleged unreported royalties and fees does not support the vast scope of the discovery sought regarding all the software of global Nortel and the Bankruptcy Sales.  SNMP RI apparently provided the Debtors

---

[9] Specifically, the Amended Claim states the following: "SNMP Research International, Inc. ('SNMLP') asserts this general unsecured claim against each debtor in the Nortel Networks Inc. cases (collectively, the 'Debtors') in the amount of $1,517,038, which consists of the following: (i) an amount of $1,494,946 due to licensing fees, royalties, and maintenance fees associated with the unauthorized and illegal usage by the Debtors of EMANATE®/Lite with EPIC . . .; (ii) an amount of $22,092 previously asserted in SNMP's original proof of claim derived from unpaid royalties from the fourth quarter of 2008 through the portion of the first quarter of 2009 prior to the Debtors' filing for bankruptcy protection, along with yearly software maintenance fees; and (iii) any and all additional amounts associated with licensing fees, royalties, and  maintenance fees that have not been reported by the Debtors to date and are owed to SNMP." Proof of Claim No. 7471.

with Emanate Lite software pursuant to a license agreement that was never signed between the parties. In good faith and in reliance on the parties' mutual mistake, the Debtors used the Emanate Lite software on no more than 3,475 cards in the MG9000 system in the Carrier Voice IP and Applications Solutions business line from 2002 to 2008. In total, the Debtors believe that the royalties due as a result of the sale of the 3,475 cards would be approximately $10,425. See Objections and Responses, Interrogatory 4.

18.    Interrogatories Nos. 3 and 5 and Request No. 3 (collectively the "Sale Audit Demands") seek information wholly unrelated to this software or its use, and instead seek information about SNMP RI software and the software of global Nortel transferred or made available to the buyers in the Bankruptcy Sales, which is not the subject of any claims asserted in the Amended Claim. The requests are not relevant to the Amended Claim, and SNMP RI, thus, cannot justify any entitlement to discovery on such requests, much less the grossly overbroad and burdensome requests that it has made here. See, e.g., Iseley v. Talaber, No. 1: CV-05-0444, 2007 U.S. Dist. LEXIS 76891, at *7 (M.D. Pa. Sept. 28, 2007) (finding that "documents sought are not relevant or likely to lead to the discovery of admissible evidence" where subject matter of documents sought was not at issue in action).

19.    Under Fed. R. Civ. Pro. 26(b)(1), parties are only entitled to obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." The discovery of information and material that is relevant only to the broader subject matter of the action may be ordered by the court only upon a showing of good cause by the requesting party. Id. The current structure of Rule 26(b)(1) is the result of an amendment in 2000, which narrowed the scope of discovery. Prior to 2000, parties were entitled to discover nonprivileged matters relevant to the subject matter of the action without a court order for good cause shown.

"The rule change signal[ed] to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."  Advisory Committee Note to 2000 Amendment, FRCP 26(b)(1).

20.     In fact, rather than being relevant to the Amended Claim, the Sale Audit Demands are clear attempts by SNMP RI to re-tread the same arguments it raised in its objections to nearly every Bankruptcy Sale and which were already squarely rejected by this Court at the Passport sale hearing.  There, SNMP argued that the Debtors should be required to perform an audit and determine whether any of SNMP RI's software was transferred to the purchasers as part of the Bankruptcy Sales.  See Passport Sale Objection, attached to the Kim Cert. as Exhibit C.  At the Passport sale hearing, the Court refused SNMP RI's request to require the Debtors to perform an audit of the business line being sold or to require the inclusion of language in the sale order disclaiming the transferring of SNMP RI software.  See Excerpt of September 30, 2010 Hearing Transcript, attached as Exhibit D to the Kim Cert.[10]  Its sale objections having been denied,

---

[10]     Prior to the Court finding that no audit or disclaimer language was required, the Court and counsel for the Debtors had the following exchange:

MR. BROMLEY [for the Debtors]: When I look at the objection it says SNMP RI requests that the debtors perform an audit as a condition of the sale to determine if SNMP RI intellectual property will be transferred to the purchaser as part of the sale.
. . .
So what we're saying is that we have a license to use this intellectual property it relates to the business. We have told Mr. Ralston now that two of the licenses do relate to this business. We have told Ericsson, as the purchaser, that these two licenses relate to the business, along with others that are on that list, and that they need to deal with it, all right.  So it would seem to me --
THE COURT: That you're not assigning those licenses.
MR. BROMLEY: I'm not assigning those licenses.
. . .
So post-closing, Ericsson will not have a right to use those licenses . . . . So what Ericsson and what SNMP need to do is to go in and actually work on getting a new agreement, all right.  And if Ericsson uses SNMP intellectual property after the closing and they're not allowed to, Ericsson is not supposed to do that, and they would have a claim against Ericsson.
THE COURT: Correct.

SNMP RI now uses its Amended Claim as a pretext by which to get the same discovery the

Court refused to give it in the context of the Passport sale, even though the Amended Claim has

nothing to do with the transfer of software through the Bankruptcy Sales.  Such irrelevant

requests are invalid under Rule 26(b)(1), justifying the protective relief sought here.

> **B.      Request No. 4 Improperly Seeks a Premises Inspection for Transfers of
> Software**

21.      Request No. 4, which seeks that the Debtors provide SNMP RI "access to all

Nortel Software . . . that is or was shipped to customers or otherwise made available to

customers, potential customers of Nortel, or other third parties," should also be stricken because

it goes far beyond the Amended Claim.  SNMP RI seeks physical access to the global Nortel

software repository by requiring the Debtors to provide access to a specially created database so

that SNMP can inspect and survey all of the Nortel source code shipped or otherwise made

available to customers and potential customers of Nortel or other third parties.  But SNMP RI

cannot justify Request No. 4 as either a premises inspection under Rule 34(a)(2) or a document

demand.  In either case, the Demand is controlled by Fed. R. Civ. Pro. 26(b).  See Fed. R. Civ.

Pro. 34(a)(2).  As explained above, Rule 26(b) limits discovery to matters that are relevant to a

party's claims.  See Fed. R. Civ. Pro. 26(b)(1).  Courts decline to allow a premises inspection

when the inspection is irrelevant to any party's claims in the action.  See, e.g., Ehrlich v. Inc.

Vill. of Sea Cliff, CV 04-4025 (LDW) (AKT), 2007 U.S. Dist. LEXIS 39824, at *19-21

(E.D.N.Y. May 31, 2007) (denying plaintiff's request to inspect a property where the property

was not "similarly situated" and thus irrelevant to plaintiff's equal protection claim); see also

---

MR. BROMLEY: Not against us.
THE COURT: Correct.
Id. at 56:8-13, 56:18-57:3, 57:5-6, 57:21-58:3.

Iseley, 2007 U.S. Dist. LEXIS 76891, at *7 (holding document request to be irrelevant to claims asserted).

22.     Request No. 4 seeks access to all of global Nortel's software source code shipped or otherwise made available to customers and potential customers of Nortel.  The Amended Claim asserts a liquidated claim of $1.49 million for unreported and unpaid licensing fees, royalties and maintenance fees relating to one piece of SNMP RI's software and an unliquidated claim of an unspecified amount with an unspecified basis.  But the filing of a conclusory, unliquidated claim does not provide carte blanche to take discovery to determine whether such a clam can be justified.  Request No. 4 goes far beyond SNMP's claim that the Debtors failed to pay the necessary royalties, as actually asserted in the Amended Claim, and is instead an inquiry into every piece of Nortel software that was ever used in a product that was made available to customers over the past 11 years.  Such a fishing expedition is simply not permitted by Rule 26.  See, e.g., Ethypharm S.A. France v. Abbott Labs., No. 08-126-SLR-MPT, 2010 U.S. Dist. LEXIS 116156, at *17 (D. Del. Nov. 2, 2010) (where action was brought with respect to the prosecution of two patents, permitting discovery regarding an unrelated third patent "would authorize a fishing expedition beyond that which is nominally permitted by the Federal Rules").

## II.     Interrogatories Nos. 3 and 5 and Requests Nos. 3 and 4 Should Be Stricken As Unduly Burdensome

23.     In addition to their irrelevance to the Amended Claim, the Sale Audit Demands and Request No. 4 are each grossly burdensome.  Request No. 4 is uniquely burdensome as it requires the Debtors to provide complete, unfettered and unprecedented physical access to the software of global Nortel.

24.     The court must limit discovery where "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in

controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. Pro. 26(b)(2)(C)(iii). Where a discovery request imposes "undue burden or expense" and the non-requesting party can show good cause, the court can issue a protective order to prevent the discovery. Fed. R. Civ. Pro. 26(c)(1)(A). Good cause for a protective order is established when the moving party "demonstrate[s] a particular need for protection" by articulating the significant harm it will face in the absence of such an order. See Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).

25.     As set forth above, the Demands go far beyond the bounds of relevance to the Amended Claim. The Demands are not only irrelevant, however, but also would be grossly burdensome if not impossible for the Debtors to fulfill.

**A.     The Sale Audit Demands improperly require the Debtors to undertake a grossly burdensome and unreasonable audit of their software**

26.     The Sale Audit Demands seek to require the Debtors to conduct a broad internal investigation and audit of complex software questions that go far beyond the Amended Claim. Even assuming that SNMP RI could satisfy the threshold question of relevance – which it cannot – the software audit that it seeks through these Demands plainly exceeds the boundaries of reasonableness given the burden imposed on the Debtors.

27.     Interrogatory No. 5 demands the identification of "all [SNMP RI] Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales." Request No. 3 similarly demands all documents that list or discuss any such software. Interrogatory No. 3 demands that the Debtors identify all Persons who have knowledge of, not just SNMP RI's software, but all Nortel software transferred or made available to the purchasers in the Bankruptcy Sales. Together, these Demands would require an

audit of all of the software source code related to the business lines sold by the Debtors through the Bankruptcy Sales and of all people who had any involvement with the software in connection with those sales.

28.     Conducting an audit of all of the code related to the sold businesses (much less the people involved in the sales) would be impossible to perform and unduly burdensome to attempt. The Debtors would face a significant depletion of their already limited resources if they were required to spend the time and expense even to try to conduct such an audit. This depletion would be especially harmful considering the Debtors' ongoing attempt to wind down and would come at the cost of other creditors. This burden is especially objectionable since SNMP RI is in the best position to determine if they provided software to the Debtors and then failed to receive any royalties from the Debtors.

29.     The excessive burden caused by the Passport Audit proves this point. In an effort to resolve SNMP RI's concerns, the Debtors conducted an audit of the Passport Business because it was the only sale that had not closed at the time SNMP RI requested discovery in its Response and, thus, was the only business for which Nortel still had the necessary personnel to conduct such an audit. Because the other business sales have closed and personnel with technical expertise and knowledge of the relevant Nortel products are no longer at Nortel, SNMP RI's requested audits of the closed sales cannot be performed. See Kenkel Decl. ¶ 18. Moreover, even if the necessary personnel were available, the time and resources required to perform such an audit would be so great as to be prohibitive. See Kenkel Decl. ¶ 19.

30.     As further described in the Kenkel Declaration , ClearCase is a Software Configuration Management system that houses "every version (including both test and release versions of products) of every element related to a software project as it evolves over time."

Kenkel Decl. ¶ 4.  It contains over 3,700 databases of software source code.  Kenkel Decl. ¶ 6.

Those databases, collectively, hold "millions of files, each with multiple versions, and many

millions of lines of source code."  Kenkel Decl. ¶ 6.  Conducting an audit of each sold business

line would require the Debtors to conduct a detailed search of this repository using the very few

(if any) employees with the expertise to search through and evaluate the information in the

ClearCase repository.

31.     As further detailed in the Kenkel Declaration, the Passport Audit alone required

approximately 500-600 person hours to perform a search of approximately eighteen gigabytes of

code.  See Kenkel Decl. ¶ 16.  A search of all of the seven other business lines sold through the

Bankruptcy Sales would entail searching approximately eight terabytes of code**.**  See Kenkel

Decl. ¶ 6.  If the search time is related to the amount of data searched, then based on the amount

of time spent on the Passport Audit, an audit of all the businesses would require as many as

200,000 person hours.  Kenkel Decl. ¶ 19.

**B.     Request No. 4 improperly requires the Debtors to create a special database of
software to run their own audit and allow SNMP to view confidential trade
secrets**

32.     Not satisfied with requiring the Debtors to perform an audit, SNMP RI seeks to

conduct their own audit of all of Nortel's software source code.  SNMP RI does not seek

documents in Request No. 4.  Rather, it seeks to require the Debtors to comb through all of the

software in Nortel's ClearCase repository from December 1999 to the present.  After reviewing

over 11 years of software use for all the different business lines, SNMP RI would then have the

Debtors place massive quantities of the software source code in a database that would need to be

created specifically to answer Request No. 4.  Any such database necessarily would be filled

with confidential and proprietary property.  This unprecedented demand is grossly burdensome and intrusive and improper on its face.

33.     To respond to Request No. 4, the Debtors would first have to comb through the entire ClearCase software repository to identify which source code related to released products. <u>See</u> Kenkel Decl. ¶ 22.  The Debtors would then need to manually investigate whether each of the lines of code had ever actually been shipped or otherwise made available to customers, potential customers or other third parties.  <u>See</u> Kenkel Decl. ¶ 22.  The Debtors cannot even begin to estimate the massive cost and hours required to respond to SNMP RI's demand, but certainly it would be many times that which was required for the Passport Audit.  <u>See</u> Kenkel Decl. ¶ 22.

34.     Beyond the tremendous drain on the Debtors' financial and human resources, responding to Request No. 4 would require the Debtors to have the appropriate personnel available to conduct such an investigation.  To accurately determine which of the lines of source code in the ClearCase databases were made available to customers, potential customers or other third parties, a reviewer would need to have multiple training classes in the use of ClearCase, as well as possess "detailed knowledge of Nortel's software development process."  Kenkel Decl. ¶ 8-9.  As mentioned above, the Debtors have completed the sales of all of the individual business lines and lack employees who have the requisite training and knowledge to carry out the investigation required by Request No. 4.  Accordingly, it is not possible for the Debtors to respond to Request 4.

35.     Even if the Debtors were able to identify the relevant source code and create a special database to house it, such a request would require the Debtors to expose highly confidential trade secrets.  The Federal Rules specifically contemplate protecting the disclosure

of trade secrets in the discovery process.  Under Fed. R. Civ. Pro. 26(c)(1)(G), upon a showing

of good cause, the court can issue a protective order "requiring that a trade secret or other

confidential research, development, or commercial information not be revealed."  A protective

order is appropriate where the value and secrecy of source code outweighs the need for its

disclosure.  See Viacom Int'l Inc. v. YouTube Inc., 253 F.R.D. 256, 260-61 (S.D.N.Y. 2008)

(finding that a protective order was needed where the plaintiff sought access to the defendants'

source code to "allay [its] speculation" that the defendants' search software was identifying and

promoting copyright infringing video clips on their website).

36.     That Nortel's software source code constitutes trade secrets, the disclosure of

which would cause harm, is without question.  Indeed, the Debtors have always gone to great

lengths to protect this source code, including throughout these bankruptcy proceedings.  In fact,

the access to the Nortel computer systems and servers that the Nortel sellers provided to the

purchasers of the business lines, who paid billions of dollars for these assets, is far more

restrictive than the access that SNMP RI demands from the Debtors.

37.     For example, in every transition services agreement (each, a "TSA") entered into

with the buyers, the Nortel sellers:

> (1) restricted access to only those representatives of the buyers "with a bona fide
> need to have such access in connection with the Services"[11];
>
> (2) required that the buyers "limit such access solely to the use of such systems
> for purposes of the Services and shall not access or attempt to access any other
> Party's computer systems, files, software or services other than those agreed to by

---

[11]     See, e.g., Excerpt of TSA, dated November 13, 2009, with Telefonaktiebolaget LM Ericsson
(publ), attached to the Kim Cert. as Ex. E ("CDMA TSA"), at § 9(a).  The other TSAs, attached in
relevant excerpts to the Kim Cert., contain similar provisions to the CDMA TSA provisions cited in this
section.  "Services" is defined in each of the TSAs as those services that the sellers agree to provide the
purchaser pursuant to the relevant TSA.  See, e.g., CDMA TSA at § 2(a).

the Parties as being required for the Services, or those that are publicly available"[12];

(3) prohibited purchasers from "attempt[ing] to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems, or mak[ing] copies of any element of the Providers Information Systems"[13]

(4) required that the purchasers maintain firewalls and "implement procedures to segregate all Seller information, data and communications" from those employees of the buyers who were not authorized to access the Nortel sellers' systems;[14] and

(5) to the extent third-party consents were required to use or access software licensed by the Nortel sellers from a third party, required that the buyers acquire any necessary licenses and indemnify and hold harmless the Nortel sellers and their affiliates "from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such third party software."[15]

38.     The Nortel sellers, including the Debtors, understood the importance of preventing the disclosure of Nortel's software source code and appropriately set up highly restrictive conditions to any access by the purchasers, even where such access was necessary for the purchasers to transition the operation of their purchased business lines from Nortel. Thus, the unfettered access to Nortel's software source code that SNMP demands is unprecedented, grossly burdensome and highly inappropriate.

---

[12]     See, e.g, CDMA TSA at § 9(a).
[13]     See, e.g., id. at Ex. C, § 5.
[14]     See, e.g., id. at Ex. C, §§ 6(a), (b).
[15] See, e.g., id. at Ex. C § 8 ("Third-Party Technology: Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a third party. Purchaser acknowledges that third-party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by Purchaser . . . Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such third-party software. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain third-party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.").

## NOTICE

Notice of the Motion has been given via first class mail or hand delivery to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to SNMP; and (v) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

39.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  April 1, 2011
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*