## RULE 7026-1(c) CERTIFICATION

I, JANE KIM, do hereby certify as follows:

1.      I am an associate at the firm of Cleary Gottlieb Steen & Hamilton LLP, which maintains an office for the practice of law, among other places, at One Liberty Plaza, New York, New York 10006.  I am an attorney at law admitted to practice before the courts of the State of New York and the United States District Courts for the Eastern and Southern Districts of New York.  I am admitted *pro hac vice* in the above-captioned proceeding.  I submit this certification in support of the Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc. (the "Motion").[1]

2.      Following service of SNMP RI's Demands, I participated in a telephonic meet and confer on March 29, 2011, with Mark Ralston of Ciardi Ciardi & Astin and John Wood of Egerton, McAfee, Armistead & Davis, counsel for SNMP RI.

3.      In the course of this discussion, I informed counsel for SNMP RI that the Debtors' position was that Interrogatory Nos. 3 and 5 and Requests Nos. 3 and 4 were unduly burdensome and irrelevant to SNMP RI's Proof of Claim, and requested that they be withdrawn. Counsel for SNMP RI said that they would not withdraw the Interrogatories and Requests.  As a result, the parties have not been able to reach agreement regarding the production of documents or responses to interrogatories.

4.      Attached as Exhibit A hereto is a true and correct copy of the Demands.

5.      Attached as Exhibit B hereto is a true and correct copy of the Objections and Responses.

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Debtors' Motion.

6.      Attached as Exhibit C hereto is a true and correct copy of the Preliminary Objection and Reservation of Rights of SNMP Research International, Inc. to Debtors' Motion for Order (I)(A) Authorizing Debtors Entry Into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections, (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Approving a Side Agreement, (E) Authorizing the Filing of Certain Documents Under Seal and (F) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors Multi-Service Switch (Formerly Known as Passport) Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts (the "Passport Sale Objection") [D.I. 3993].

7.      Attached as Exhibit D hereto is a true and correct copy of an excerpted portion of the transcript of the September 30, 2010 hearing on the Debtors' Motion for Order (I)(A) Authorizing Debtors Entry Into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections, (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Approving a Side Agreement, (E) Authorizing the Filing of Certain Documents Under Seal and (F) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors Multi-Service Switch (Formerly Known as Passport) Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts.

8.      Attached as Exhibit E hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated November 13, 2009, with Telefonaktiebolaget L M Ericsson (publ).

9.    Attached as Exhibit F hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated March 31, 2009, with Radware Ltd.

10.    Attached as Exhibit G hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated December 18, 2009, with Avaya, Inc.

11.    Attached as Exhibit H hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated December 8, 2009, with Hitachi Communication Technologies America, Inc..

12.    Attached as Exhibit I hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated March 19, 2010, with Ciena Corporation.

13.    Attached as Exhibit J hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated March 31, 2010, with Telefonaktiebolaget L M Ericsson (publ).

14.    Attached as Exhibit K hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated March 31, 2010, with Kapsch CarrierCom AG.

15.    Attached as Exhibit L hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated May 28, 2010, with Genband US LLC.

16.    Attached as Exhibit M hereto is a true and correct copy of an excerpted portion of the Transition Services Agreement, dated March 11, 2011, with Telefonaktiebolaget L M Ericsson (publ).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 1, 2011.

JANE KIM

# **EXHIBIT A**

First Set of Interrogatories and Requests for Production of Documents

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| Nortel Networks Inc., *et al.* | : | Case No. 09-10138 (KG) |
| | : | |
| Debtors | : | |
| | : | |

### CREDITOR SNMP RESEARCH INTERNATIONAL, INC.'S FIRST
### SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF
### DOCUMENTS DIRECTED TO THE DEBTORS

COMES now the Creditor, SNMP Research International, Inc., by and through counsel, and serves the following Interrogatories and Requests for Production of Documents on the Debtors pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure as incorporated by Rules 9014, 7026, 7033 and 7034 of the Federal Rules of Bankruptcy Procedure.

### DEFINITIONS AND GENERAL INSTRUCTIONS

1.      For purposes of these discovery requests, the following words and phrases shall have the meaning ascribed to them as follows:

a.      **"Bankruptcy Sales"** means the sale of Nortel assets to (i) Radware Ltd. pursuant to a sale order dated  March 26, 2009, (ii) Telefonaktiebolaget LM Ericsson (Publ)  pursuant to a sale order dated July 28, 2009, (iii) Avaya Inc. pursuant to a sale order dated September 16, 2009, (iv) Hitachi, Ltd. pursuant to a sale order dated October 28, 2009, (v) Telefonaktiebolaget LM Ericsson (Publ) and Kapsch Carriercom AG pursuant to a sales order dated December 2, 2009, (vi) Ciena Corporation pursuant to a sales order dated December 3, 2009, (vii) GENBAND Inc. pursuant to a sales order dated March 4, 2010, and (viii) Telefonaktiebolaget LM Ericsson (Publ) pursuant to a sales order dated September 30, 2010.

1

b.     **"Communicate"** and **"Communication"** means every disclosure, transfer, or exchange of information in any manner, means, or medium, including but not limited to the following: by telephone, text, mail, personal delivery, facsimile, electronic mail, internet messaging, electronic transmission, face-to-face, or any other form of transmitting information, whether orally, electronically, or written;

c.     **"Creditor"** means SNMP Research International, Inc.

d.     **"Creditor Software"** means any software owned by Creditor or licensed to Creditor and any derivative works thereof, whether in binary or source form. The definition of Creditor Software includes software developed through the use of Creditor Software.

e.     **"Date"** means the exact date requested, but if the exact date is not known and cannot be determined using due diligence, then it means the applicable time period as specifically as possible, i.e. month, season, year, or range of years;

f.     **"Describe"** when used in reference to

     i.     A relationship between two Persons means to explain how the Persons became affiliated, the nature of the affiliation (business associates, social acquaintances, etc), approximately how often the Persons communicated with each other, and the length of the affiliation;

     ii.     An event or occurrence means to explain the characteristics of the event or occurrence as they appeared to Nortel.

g.     **"Document" or "documents"** have the meaning ascribed to them in Federal Rule of Civil Procedure 34 and include, without limitation, the original and any non-identical copies, regardless of origin or location, and regardless of whether it exists in hard print or electronic media, of any book, pamphlet, periodical, advertisement, catalog, letter,

2

opinion, report, form, electronic mail message, facsimile, telegram, cable, telex correspondence, report, record, notebook, writing, drawing, sketch, blueprint, manual, handwritten note, contract agreement, manuscript, minutes, intracorporate communication, bulletin, brochure, circular, instruction, memorandum, notice, working paper, diary, chart, paper, graph, laboratory record, computer printout, magnetic or optical media, work assignment, print tracing, survey, photograph, sound recording, image, phonorecord, microfilm, index, data sheet, data processing card, audio or video recording, or notes of or relating to any telephone or other conversation, or any other written, recorded, transcribed, filmed, or graphic material, however produced or reproduced, which is or has been in Nortel's possession, custody, or control or of which Nortel has knowledge;

h.      **"Identify," "identity," "identifying," or "identification,"** when used in reference to a

   i.      **Natural Person** means to state the person's full name, employer, occupation, job title, and position, present or last known residence address and telephone number, present or last known business address and telephone number, and the Person's relation to Nortel;

   ii.     **Person other than a Natural Person** means to state the full name, type of entity, business address, telephone number, and name and telephone number of the agent(s), employee(s), or representative(s) who acted on behalf of the Person in connection with the event, instance, occurrence, or circumstance described or referred to in the discovery request;

   iii.    **Document** means to state the type of Document (e.g., letter, electronic mail, chart, etc.) and its title, date, time sent or received, author, addressee, subject

3

matter, present location, and custodian, whether any drafts preceded the final version of the Document, all known recipients of the Document and any drafts, and, if the Document was but is no longer in Nortel's possession, state what disposition was made of it and the facts or reasons for such disposition;

    iv.      **Software** means to state the name and version number or version numbers of the Software, and where applicable the Nortel product on which such Software resides and the operating system and processor for the Nortel product.

i.      **"Nortel"** means the Debtor, Nortel Networks, Inc, and any affiliate, subsidiary, member, officer, principal, employee, representative, or agent of Nortel as well as any person or entity acting on behalf of Nortel;

j.      **"Person"** or **"persons"** means any natural person, firm, proprietorship, partnership, joint venture, corporation, association, or other business entity and all present and former officers, directors, agents, employees, and others acting for or purporting to act on behalf of such natural person, firm proprietorship, partnership, joint venture, corporation, association, or other business entity;

k.      **"Proof of Claim"** means the Amended Proof of Claim filed by SNMP Research International, Inc. dated October 19, 2010;

2.      **"Rule"** means the applicable Federal Rule of Civil Procedure.

3.      Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Information is relevant if it "appears reasonably calculated to lead to the discovery of admissible evidence."

4.    Rule 26(e) imposes a duty to supplement or correct a response to a discovery request under the following circumstances:

    i.    When a party learns that the disclosure or response is incomplete or incorrect in some material respect, "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing" or

    ii.    When an expert's report must be disclosed pursuant to Rule 26(a)(2)(B) and the information in the report or in the expert's deposition has changed in some respect by the time the party's Rule 26(a)(3) disclosures are due.

5.    If a party withholds information that is otherwise discoverable by asserting that the information is "privileged or subject to protection as trial preparation material," Rule 26(b)(5) requires that the party make the claim expressly and "describe the nature of the documents, communications, or things not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

## INTERROGATORIES

### Instructions

1.    As required by Rule 33(b)(3), please answer each Interrogatory separately and fully in writing under oath, unless objected to.

2.    If Nortel objects to an Interrogatory, please answer as much of the Interrogatory as can be answered without objection and state with specificity the grounds for objection, as required by Rule 33(b)(3), (b)(4).

3.    Please serve a copy of the answers and objections, if any, to the Interrogatories within 30 days after the service of these Interrogatories, as required by Rule 33.

## INTERROGATORIES

1.      Please Identify all Persons answering these Interrogatories or requests for production of Documents and all Persons who assisted or provided information for such answers or Documents.

**RESPONSE:**

2.      Please Identify all Persons known to Nortel who have knowledge of the facts or allegations in the Proof of Claim.

**RESPONSE:**

3.      Please Identify the Persons known to Nortel who have knowledge of the Nortel Software source code transferred or made available to each buyer in the Bankruptcy Sales, at the time the Bankruptcy Sale closed, categorized by each buyer;

**RESPONSE:**

4.      Please Identify all Creditor Software used or distributed by Nortel without a license from Creditor authorizing such use or distribution from December 1, 1999 to the present. In addition to the

6

Identification of the Creditor Software, Identify the (i) dates on which such use or distribution started and ended, (ii) Nortel Software that required the use of, or was distributed with the Creditor Software, (iii) each calendar quarter in which such Creditor Software was used or distributed, and (iv) amounts of such Creditor Software distributed by Nortel;

**RESPONSE:**

5.      Please Identify all Creditor Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales and Identify the Nortel Software that required the use of or was distributed with such Creditor Software.

**RESPONSE:**

7

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### Instructions

1.      Unless otherwise indicated, the date range applicable for all Requests for Production of Documents is from December 1, 1999 to the present. (the "Relevant Period")

2.      With respect to each Document or thing that is responsive to any Request for Production of Documents, please state whether Nortel will produce the Documents or things requested or its objection to the Request, as required by Rule 34.

3.      If Nortel is unable to completely answer a Request, please respond as fully as possible and then state a reason or reasons why Nortel cannot make a complete response.

4.      If Nortel objects to any of these Requests, please state the reasons for the objection, as required by Rule 34.

5.      If any Document or thing that is responsive to any Request for Production of Documents has been lost or destroyed, please identify the Document or thing, state the Request to which it would otherwise be responsive, and state, in detail, the circumstances of the loss or destruction of the document or thing.

6.      If any Document or thing that is responsive to any Request for Production of Documents is within Nortel's control but is not within Nortel's possession or custody, please Identify the Person who has possession or custody of the Document or thing.

7.      If any Document or thing that is responsive to any Request for Production of Documents was within Nortel's possession, custody, or control, but is not longer within Nortel's possession, custody or control, please state the disposition of the Document or thing, the Date or date range on or in which the disposition occurred, the reason or reasons for the disposition, and the Person who disposed of the Document or thing.

8

8.      These Requests for Production of Documents are not seeking the production of any Document or information protected by the attorney-client privilege, or trial preparation materials covered by Rule 26(b)(3). If Nortel claims that a privilege or protection prevents it from producing a Document, please state (1) the privilege or protection claimed, (2) the Documents or information protected by the privilege or protection, and (3) the basis for asserting the privilege or protection, as required by Rule 26(b)(5).

9.      Please serve upon Creditor a written response to these Requests for Production of Documents within 30 days after service of the Requests, as required by Rule 34(b)(2)(A).

10.     These Requests for Production of Documents shall be deemed continuing, and supplemental answers or responsive Documents shall be produced as required by Rule 26(e) if further responsive information is obtained subsequent to the time the responses are served.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      **Request No. 1:** Please produce all Documents, including but not limited to, Nortel's internal notes, email Communications, or other written Communications, containing any information relating to the Proof of Claim.

**RESPONSE:**

2.      **Request No. 2:** Please produce all Documents, including but not limited to, Nortel's internal notes, email Communications, or other written Communications, containing any information relating to the use or distribution of Creditor Software in any manner by Nortel without a license authorizing such use or distribution during the Relevant Period..

**RESPONSE:**

9

3.    **Request No. 3:** Please produce all Documents, including but not limited to any Documents or Communications that list or discuss any Creditor Software imbedded in, used in the development of, or distributed with Nortel Software that was transferred or made available in the Bankruptcy Sales.

**RESPONSE:**

4.    **Request No. 4:** Please provide Creditor access to all Nortel Software, on a computer or computers of Nortel's choosing in source code format as extracted from the Nortel source code repository, that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited to as a direct or indirect result of the Bankruptcy Sales, during the Relevant Period. Creditor's access to the Nortel source code must allow Creditor to run specific scripts that search the Nortel source code for the presence of Creditor Software.

**RESPONSE:**

10

Dated: March 1, 2011

CIARDI CIARDI & ASTIN

Daniel K. Astin (No. 4068)
Joseph J. McMahon, Jr. (No. 4819)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
dastin@ciardilaw.com
jmcmahon@ciardilaw.com

and

Mark H. Ralston
2603 Oak Lawn Avenue
Suite 200
Dallas, TX 75219
Phone: (214) 295-6416
Fax: (214) 602-1250

*Attorneys for SNMP Research International, Inc.*

11

# **EXHIBIT B**

Objections and Responses to the First Set of
Interrogatories and Requests for Production of Documents

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------X
                                                  :
*In re*                                           :       Chapter 11
                                                  :
Nortel Networks Inc., *et al.*,[1]                :       Case No. 09-10138 (KG)
                                                  :
                              Debtors.            :       Jointly Administered
                                                  :
                                                  :
                                                  :
------------------------------------------------------------- X

**DEBTORS' RESPONSES AND OBJECTIONS TO THE FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS OF**
**SNMP RESEARCH INTERNATIONAL, INC.**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), by its undersigned attorneys, hereby responds and

objects, pursuant to Rules 7026, 7033 and 7034 of the Federal Rules of Bankruptcy Procedure, to

the First Set of Interrogatories and Requests for Production of Documents dated March 1, 2011

(collectively, the "Demands"), served by SNMP Research International, Inc. ("SNMP RI"), as

follows:

**GENERAL OBJECTIONS**

Each of the Debtors' responses is subject to the following General Objections, and each

such General Objection is incorporated by reference in the Debtors' response to each individual

Demand as if fully set forth therein.

---
[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620),
Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma
Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications
Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks
HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc.
(0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and
Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions,
which are available at http://dm.epiq11.com/nortel.

1.     The Debtors' objections and responses are based upon readily accessible

information now reasonably available to them and are made without in any way waiving or

intending to waive but, on the contrary, intending to reserve and reserving: (a) the right to object

on any ground at any time to a request for any further response to the Demands or any other

discovery request; and (b) the right at any time to revise, supplement, correct, clarify or add to

these objections and responses.

2.     The Debtors object to the Demands (including without limitation the definitions

and instructions contained therein) to the extent that they purport to impose obligations beyond

those required or permitted by the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>"), the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "<u>Local Rules</u>").

3.     The Debtors object to the Demands to the extent that they are vague, ambiguous,

overbroad or unduly burdensome to respond to; to the extent that they purport to require

anything other than a reasonable search for readily accessible information from the files of the

NNI employees identified in the Debtors' responses to Interrogatories 1 and 2; to the extent the

Demands seek information beyond the facts as alleged in the Proof of Claim;  to the extent the

Demands seek information that is not relevant to SNMP RI's Proof of Claim or any defense

asserted thereto, and is not likely to lead to the discovery of admissible evidence relevant to

proceedings relating to the Proof of Claim.

4.     The Debtors object to the Demands to the extent that they seek information or

documents already in the possession of SNMP RI, or otherwise available to SNMP RI.

5.      The Debtors object to the Demands to the extent they seek information or documents that are protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, law or rule, or that were prepared in anticipation or because of litigation, that constitute or disclose the mental impressions, conclusions, opinions or legal theories of any attorney for the Debtors concerning any litigation or that are protected by any other applicable privilege or doctrine (such information or documents are referred hereinafter as "Privileged Information").  Any production, inadvertent or otherwise, of any Privileged Information shall not be deemed or construed to constitute a waiver of any rights or privileges or other protection, and shall not prejudice the right of the Debtors to object to any subsequent use of such Privileged Information.  The Debtors reserve the right to demand the return of any Privileged Information and the destruction of any materials that contain information derived from any such Privileged Information.

6.      The Debtors object to the instructions contained in the Document Requests to the extent that they purport to require the Debtors to provide a detailed written statement itemizing and describing all documents or communications for which a privilege is claimed, where such requests go beyond the requirements of the Federal Rules and/or would be unduly burdensome to implement.

7.      The Debtors object to the Demands to the extent that they call for information that is subject to confidentiality agreements with third parties, or for trade secrets or any proprietary or non-public information of a commercially or financially sensitive nature.

8.      The Debtors object to the Document Requests to the extent that they seek cumulative or duplicative documents or information.

9.      The Debtors object to the Demands to the extent that the terms or phrases used therein are vague, ambiguous or lack sufficient precision to allow the Debtors to formulate an appropriate response.

10.     The Debtors object to each Demand, definition and instruction to the extent that any such Demand, definition or instruction contains inaccurate, incomplete or misleading descriptions of the facts, persons, relationships, events and pleadings underlying this proceeding. The disclosure of any information shall not constitute the Debtors' agreement with or acquiescence to any such descriptions.

11.     The Debtors object to each and every Demand (including without limitation the instructions therein) as overly broad and unduly burdensome to the extent that they seek "all documents" or "any communications."

12.     The Debtors object to each and every Demand as overly broad and unduly burdensome to the extent that they seek responses or production of documents from entities other than NNI on the grounds that they are third parties who are beyond the Debtors' control.

13.     The Debtors object to the Demands to the extent they seek to require the Debtors to produce documents or provide information not within their possession, custody and control. All such instructions are vague, ambiguous, unduly burdensome and seek to impose burdens and obligations upon the Debtors beyond those required by the Federal Rules, the Bankruptcy Rules and the Local Rules.  The Debtors will not produce any documents or provide any information in the possession, custody or control of any separate legal entity or any third party, including any agent, outside attorney or affiliate of the Debtors.  To the extent that, notwithstanding the foregoing, the Debtors produce documents or provide information within the possession, custody

or control of a third party, including any of their affiliates, they do so without waiving this Objection with respect to any other documents or information sought by SNMP RI.

14.     The Debtors object to the definition of the terms "identify," "identity," "identifying" and "identification" as overly broad and unduly burdensome.  To the extent that the Debtors respond to Demands by identifying a natural person, they will do so by identifying the person's name and counsel or last known business address.

15.     The Debtors object to the definition of "Nortel" to the extent that it includes "any affiliate, subsidiary, member, officer, principal, employee, representative, or agent of Nortel as well as any person or entity acting on behalf of Nortel, on the grounds that it is unreasonable, unduly burdensome and includes information that is not relevant and is not likely to lead to the discovery of admissible evidence in this proceeding.  The Debtors further object to the definition of "Nortel" to the extent that it purports to call for production of documents of any agent for, outside counsel to or affiliate of the Debtors.  In all responses, the Debtors construe the term "Nortel" as used in the Demands to include solely the Debtors.

16.     The Debtors object to the undefined use of the term "Nortel Software" as vague, ambiguous and overly broad.

17.     The Debtors object to the undefined use of the term "distribution" as vague, ambiguous and overly broad.  The Debtors understand the term "distribution" to mean sell, and any responses or production of documents by the Debtors are provided subject to that understanding.

18.     The Debtors object to the Demands (including without limitation the instructions contained therein) on the basis that each Demand requires the Debtors to disclose or produce information or documents from December 1, 1999 to the present.  Such Demands are overly

broad and would impose an undue burden on the Debtors.  To the extent that the Debtors limit

the timeframe in their responses, they will indicate the period of time covered by the response.

      19.    To the extent that the Debtors respond to the Demands, they do so without

conceding the admissibility, materiality or relevance of any such substantive responses.  The

Debtors reserve all objections to the use of these responses.  All such objections may be

interposed by the Debtors at the time of trial or evidentiary hearing on the Motion or as

otherwise required by the rules or order of the Court.

## SPECIFIC RESPONSES AND OBJECTIONS TO THE INTERROGATORIES

      1.    Please identify all Persons answering these Interrogatories or requests for
production of Documents and all Persons who assisted or provided information for such answers
or Documents.

**RESPONSE**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Interrogatory on the grounds that it is vague and ambiguous.  The Debtors further object to

this Interrogatory to the extent that it requests the identification of individuals who obtained

information on a privileged basis as professionals retained by the Debtors or their affiliates.

Subject to the foregoing specific objections and the General Objections, the Debtors identify the

following individuals who assisted the Debtors in connection with these answers or whose files

will be reviewed in connection with the Document Requests:

> Richard Boris, NNI, c/o Cleary Gottlieb Steen & Hamilton LLP
> ("Cleary Gottlieb"), One Liberty Plaza, New York, NY 10006.

> Michelle Cook, NNI, c/o Cleary Gottlieb.

> Carolyn Shields, NNI, c/o Cleary Gottlieb.

> Nancy Belmares, c/o NNI, 220 Athens Way, Suite 300, Nashville,
> TN 37228 (Former NNI Employee).

> Paul Woodruff, 1489 Ramon Drive, Sunnyvale, CA 94087
> (Former NNI Employee).

Baiju Dalal, c/o Nortel Networks (India) Private Limited
("<u>NNIPL</u>"), C-227, Ground Floor, Near Garden of Five Senses,
Westend Marg, Paryavaran Complex, New Delhi 110 030.

Francis Prabhu, c/o NNIPL, Unit #701, 7th Floor, #147/2 and 10,
RMZ Centennial, Doddanekundi Village, Krishnarajapuram Hobli,
Bangalore, Binnamangala, India 560 048.

Lalitha Ramani, c/o NNIPL, Unit #701, 7th Floor, #147/2 and 10,
RMZ Centennial, Doddanekundi Village, Krishnarajapuram Hobli,
Bangalore, Binnamangala, India 560 048.

Rick Culkin, c/o Nortel Networks Limited ("<u>NNL</u>"), 250 Sidney
Street, P.O. Box 4000, Belleville, Ontario K8N 5B7 (Former NNL
Employee).

2.    Please Identify all Persons known to Nortel who have knowledge of the facts or
allegations in the Proof of Claim.

**<u>RESPONSE</u>**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Interrogatory to the extent that it requests the identification of individuals who obtained

information on a privileged basis as professionals retained by the Debtors or their affiliates.

Subject to the foregoing specific objection and the General Objections, the Debtors identify the

following individuals who, to the best of the Debtors' knowledge, information and belief, have

worked on or provided information in connection with the reconciliation of the Proof of Claim:

Richard Boris, NNI, c/o Cleary Gottlieb.

Michelle Cook, NNI, c/o Cleary Gottlieb.

Carolyn Shields, NNI, c/o Cleary Gottlieb.

Veronica Hearing, c/o NNI, 220 Athens Way, Suite 300, Nashville,
TN 37228 (Former NNI Employee).

Nancy Belmares, c/o NNI, 220 Athens Way, Suite 300, Nashville,
TN 37228 (Former NNI Employee).

Baiju Dalal, c/o NNIPL, C-227, Ground Floor, Near Garden of
Five Senses, Westend Marg, Paryavaran Complex, New Delhi110
030.

Francis Prabhu, c/o NNIPL, Unit #701, 7th Floor, #147/2 and 10,
RMZ Centennial, Doddanekundi Village, Krishnarajapuram Hobli,
Bangalore, Binnamangala, India 560 048.

Lalitha Ramani, c/o NNIPL, Unit #701, 7th Floor, #147/2 and 10,
RMZ Centennial, Doddanekundi Village, Krishnarajapuram Hobli,
Bangalore, Binnamangala, India 560 048.

Pierre Tremblay, c/o GENBAND, 3500 Carling Avenue, Ottawa,
Ontario K2H 8E9 (Former NNL Employee).

Rick Culkin, c/o NNL, 250 Sidney Street, P.O. Box 4000,
Belleville, Ontario K8N 5B7 (Former NNL Employee).

3.      Please Identify the Persons known to Nortel who have knowledge of the Nortel
Software source code transferred or made available to each buyer in the Bankruptcy Sales, at the
time the Bankruptcy closed, categorized by each buyer.

**RESPONSE**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Interrogatory on the grounds that it is irrelevant to SNMP RI's Proof of Claim and is not

reasonably calculated to lead to the discovery of admissible information relevant to the Proof of

Claim.

4.      Please Identify all Creditor Software used or distributed by Nortel without a
license from Creditor authorizing such use or distribution from December 1, 1999 to the present.
In addition to the Identification of the Creditor Software, Identify the (i) dates on which such use
or distribution started and ended, (ii) Nortel Software that required the use of, or was distributed
with the Creditor Software, (iii) each calendar quarter in which such Creditor Software was used
or distributed, and (iv) amounts of such Creditor Software distributed by Nortel.

**RESPONSE**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Interrogatory to the extent that it would require the Debtors to undertake a software audit for

each business line of the Debtors and their Nortel affiliates globally as overbroad and unduly

burdensome and to the extent that it goes beyond the facts as alleged in the Proof of Claim.

Subject to the foregoing specific objections and the General Objections, pursuant to an unsigned

license agreement with SNMP RI, SNMP RI provided the Debtors with Emanate Lite software,

and since 2002 to the present date, the Debtors and other Nortel entities worldwide shipped no

more than a total of 3,475 cards (including replacement cards for defective units) in the MG9000

systems in the Carrier Voice IP and Applications Solutions business line.  The royalties for such

sales would be no more than approximately $10,425 under the unsigned license (i.e., $3 per card

sold).  The Debtors further respond that the Debtors had a license with SNMP RI to use Emanate

software for internal research and development and for the creation and support of multi-service

devices known internally as "Neptune."  Prior to 2008, the Debtors, as part of their internal

research and development activities for the Virtual Services Switch (VSS) products, used

Emanate software in a module called PABLO for use in the development of the VSS products.

 In late 2008 and early 2009, the Debtors and SNMP RI engaged in negotiations to enter into a

development license governing the use of Emanate software in the development of the VSS

products, for a development fee of between $10,000 and $20,000.  To the best of the Debtors'

current information and knowledge, the Debtors are not aware that any such license was

executed.

5.    Please Identify all Creditor Software used or distributed by Nortel that was
transferred or made available to a buyer as a part of the Bankruptcy Sales and Identify the Nortel
Software that required the use of or was distributed with such Creditor Software.

**RESPONSE**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Interrogatory on the grounds that it is irrelevant to SNMP RI's Proof of Claim and is not

reasonably calculated to lead to the discovery of admissible information relevant to the Proof of

Claim.  The Debtors further specifically object to this Interrogatory on the grounds that it is

unduly burdensome because, inter alia, it would require the Debtors to obtain third-party

consents.

## SPECIFIC RESPONSES AND OBJECTIONS TO
## THE REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      Please produce all Documents, including but not limited to, Nortel's internal notes, email Communications, or other written Communications, containing any information relating to the Proof of Claim.

**RESPONSE**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Request on the grounds that it is vague, ambiguous, overbroad, unduly burdensome and on

its face seeks Privileged Information.  Subject to the foregoing specific objections and the

General Objections, the Debtors will produce non-privileged documents regarding the facts

alleged in SNMP RI's Proof of Claim.

2.      Please produce all Documents, including but not limited to, Nortel's internal notes, email Communications, or other written Communications, containing any information relating to the use or distribution of Creditor Software in any manner by Nortel without a license authorizing such use or distribution during the Relevant Period.

**RESPONSE**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Request on the grounds that it is vague, ambiguous, overbroad and unduly burdensome and

goes beyond the specific allegations of the Proof of Claim.  Subject to the foregoing objection

and the General Objections, the Debtors will produce non-privileged documents regarding the

facts alleged in the Proof of Claim.

3.      Please produce all Documents, including but not limited to any Documents or Communications that list or discuss any Creditor Software imbedded in, used in the development of, or distributed with Nortel Software that was transferred or made available in the Bankruptcy Sales.

**RESPONSE**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Request on the grounds that it is vague, ambiguous, overbroad, unduly burdensome and not

reasonably calculated to lead to the discovery of admissible information.  The Debtors further

specifically object to this Request on the grounds that it goes beyond the specific allegations of

the Proof of Claim, it is irrelevant to SNMP RI's Proof of Claim and is not reasonably calculated

to lead to the discovery of admissible information relevant to the Proof of Claim.

4.      Please provide Creditor access to all Nortel Software, on a computer or computers of Nortel's choosing in source code format as extracted from the Nortel source code repository, that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited to as a direct or indirect result of the Bankruptcy Sales, during the Relevant Period.  Creditor's access to the Nortel source code must allow Creditor to run specific scripts that search the Nortel source code for the presence of Creditor Software.

**RESPONSE**:  In addition to the foregoing General Objections, the Debtors specifically object to

this Request on the grounds that it is vague, ambiguous, overbroad, unduly burdensome and not

reasonably calculated to lead to the discovery of admissible information.  The Debtors further

specifically object to this Request on the grounds that it seeks information that is highly

confidential and subject to confidentiality agreements with third parties.

Respectfully submitted as to objections to the
Interrogatories and Requests

Dated:  April 1, 2011
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

_Deborah M. Buell_

Deborah M. Buell (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

12

I, Richard Boris, declare as follows:

I am Claims Management Leader of NNI. I have read the foregoing responses to SNMP RI's First Set of Interrogatories and Requests for Production of Documents and the responses to the interrogatories are true and correct to the best of my present knowledge, information and belief at this time. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Richard Boris

Sworn to before me this __|__ day of
April, 2011

NOTARY PUBLIC
Expire March 27, 2016

13

## **EXHIBIT C**

Passport Sale Objection

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.,* | : |  |
|  | : | Jointly Administered |
| Debtors. | : |  |
|  | : | Re: Docket No. 3832 |

**PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP
RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION FOR ORDERS (I)(A)
AUTHORIZING DEBTORS ENTRY INTO THE STALKING HORSE ASSET SALE
AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES
AND BID PROTECTIONS, (C) APPROVING THE NOTICE PROCEDURES AND THE
ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) APPROVING A SIDE
AGREEMENT, (E) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS
UNDER SEAL AND (F) SETTING A DATE FOR THE SALE HEARING, AND (II)
AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF
DEBTORS MULTI-SERVICE SWITCH (FORMERLY KNOWN AS PASSPORT)
BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES
AND (B) THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS**

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby

files this preliminary objection and reservation of rights (the "Objection") to the Motion of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") For Orders

(I)(A) Authorizing Debtors Entry Into The Stalking Horse Asset Sale Agreement, (B)

Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving The

Notice Procedures And The Assumption And Assignment Procedures, (D) Approving A Side

Agreement, (E) Authorizing The Filing Of Certain Documents Under Seal And (F) Setting A

Date For The Sale Hearing, And (II) Authorizing And Approving (A) The Sale Of Certain Assets

Of Debtors Multi-Service Switch (Formerly Known As Passport) Business Free And Clear Of

All Liens, Claims And Encumbrances And (B) The Assumption And Assignment Of Certain

Executory Contracts [Docket No. 3832] (the "Sale Motion"). In support of this Objection, SNMPRI respectfully represents as follows:

## The License Agreement

1.    SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are parties to a certain license agreement with an effective date of December 23, 1999 (the "License Agreement") executed prior to the Petition Date (defined herein) governing NNC's use of certain intellectual property described as source code and binary code licensed by SNMPRI to NNC. The License Agreement contains over 70 schedules that each list one or more specific products, development software, and run-time software licensed to NNC. Section 7.1 of the License Agreement permits NNC to assign the License Agreement as follows:

> [u]pon prior written notice of such to SNMPRI, NNC may assign this Agreement, in its entirety only, and only in conjunction with a change of ownership, merger, acquisition, sale or transfer of all of substantially all of its business or assets. Such assignment shall only be valid as to NNC's business units as of the date of such assignment, and the rights and licenses of this Agreement shall not be enlarged to encompass the entirety of the new entity, if larger, or the entirety of the new entity's product line, if larger. The terms and conditions of this Agreement shall bind and inure to each party's successors and assigns.

License Agreement at 7.1.

2.    Should NNC desire to assign only a portion of the License Agreement, section 7.2 of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a fresh copy of this Agreement, and payment of an Adoption Fee, a Specified Entity previously licensed under one or more Schedules A that is to be made an independent entity by NNC may adopt this Agreement as an agreement separate from NNC ("New Agreement"). The Adoption Fee shall be equal to the amount that SNMP would have charged the Specified Entity under the relevant Schedule A if the Specified Entity had not been a Nortel Networks Company (Standard Value), minus the amount previously paid

2

under the relevant Schedule A.  SNMP's liability under the New Agreement shall be limited to a straight line three year depreciation of the Standard Value, starting from the execution date of the new agreement.  The scope of the new license shall be to the named Specified Entity only, and shall not include the possibility of addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

3.    SNMPRI and NNC were parties to the License Agreement on the Petition Date (defined herein).

**Background**

4.    On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

5.    On August 27, 2010, the Debtors filed the Sale Motion. The Sale Motion, among other things, seeks the approval of: (i) authorizing and approving (a) the sale of the Assets (as defined in the Sale Motion), free and clear of all liens, claims and encumbrances, as provided in the Stalking Horse Agreement (as defined in the Sale Motion), and (b) the assumption and assignment of certain executory contracts pursuant to section 365 of the Bankruptcy Code. The Stalking Horse Agreement also provides for the sale of certain intellectual property. The specific contracts, executory or otherwise, and intellectual property contemplated by the Sale Motion and the Stalking Horse Agreement have not been disclosed.

6.    The Debtors have sold parts of its business pursuant to (i) an Asset Sale Agreement, dated as of July 24, 2009, by and among various Debtors and Telefonaktiebolaget L M Ericsson, (ii) an Asset Sale Agreement, dated as of November 2, 2009, by and among various Debtors and GENBAND Inc., ("GENBAND Sale") (iii) an Amended and Restated Asset and Share Sale Agreement, dated as of September 14, 2009, by and among various Debtors and Avaya, Inc., (iv) an Asset Sale Agreement, dated as of November 24, 2009, by and among

3

various Debtors and Telefonaktiebolaget L M Ericsson, (v) an Asset Sale Agreement, dated as of February 19, 2009, by and among various Debtors and Radware Ltd., (vi) an Amended and Restated Asset Sale Agreement, dated as of November 24, 2009, by and among various Debtors and Ciena Corporation, and (vii) a Transaction Agreement, dated as of October 24, 2009, by and among various Debtors and Hitachi, Ltd. (collectively "Previous Sales").

7.      As a result of the Previous Sales, the Debtors transferred SNMPRI intellectual property licensed to the Debtors under the License Agreement to the purchasers ("Previous Purchasers") in the Previous Sales.   The Debtors did not transfer all or part of the License Agreement as a part of the Previous Sales.   Simultaneously with the Previous Sales, SNMPRI has entered into a temporary license agreement with most of the Previous Purchasers who received SNMPRI intellectual property as a result of the Previous Sales, which authorizes the use of the SNMPRI intellectual property while  a permanent license agreement is negotiated between SNMPRI and the Previous Purchasers.

8.      As a result of the GENBAND Sale the Debtors knowingly transferred to GENBAND Inc.: (i) SNMPRI intellectual property licensed to the Debtors under the License Agreement; and (ii) SNMPRI intellectual property not licensed to the Debtors in any manner, both in violation of Paragraph 44 of the Order Authorizing and Approving (A) The Sale of Certain Assets of The Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of all Liens, Claims, and Encumbrances, and (B) The Assumption and Assignment of Certain Executory Contracts.   As of the date hereof, SNMPRI has not entered into a license agreement with GENBAND Inc. authorizing the use of SNMPRI intellectual property transferred from the Debtors.

9.      Because the Debtors have transferred SNMPRI intellectual property licensed

4

under the License Agreement to various Previous Purchasers, the Debtors cannot assign the entire License Agreement to the purchaser. Therefore, pursuant to Section 7.2 of the License Agreement, the purchaser must enter into a new license agreement with SNMPRI in order to use SNMPRI intellectual property.

### Preliminary Objection and Reservation of Rights

10.    Since SNMPRI cannot determine if the Debtors intend to transfer SNMPRI intellectual property as a part of the sale and because the Debtors have knowingly transferred SNMPRI intellectual property without authorization previously, SNMPRI requests that the Debtors perform an audit, as a condition of the sale, to determine if SNMPRI intellectual property will be transferred to the purchaser as a part of the sale.

11.    Since the License Agreement cannot be assigned in its entirety to the purchaser, SNMPRI requests that the Debtors include the following language in any order approving the sale:

> Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for or approves the transfer, assumption and/or assignment, whether under sections 363 or 365 of the Bankruptcy Code or otherwise, of any intellectual property or license agreement with SNMP Research International, Inc. ("SNMPRI"). Accordingly, no SNMPRI intellectual property and no SNMPRI intellectual property rights licensed to Nortel via contracts between Nortel and SNMPRI are conveyed or otherwise transferred by this Order or in the Sale Agreement or Ancillary Agreements. To the extent the Purchaser discovers they have improperly received SNMPRI's intellectual property or intellectual property rights, the Purchaser will make reasonable efforts to enter into a new license agreement with SNMPRI within a reasonable time after such discovery.

12.    Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be

assumed.  11 U.S.C. § 365(b).  To the extent that any parties to the sale seek to transfer SNMPRI's intellectual property, any defaults under the License Agreement must be cured and adequate assurance must be provided.  The Debtors have acknowledged not having a license for, and not paying for SNMPRI intellectual property used in the Debtors business since 1999 ("Unauthorized Use") and subsequently transferred to GENBAND Inc. as a part of the GENBAND SALE.  SNMPRI estimates that approximately $1,517,038 (US dollars) plus amounts associated with licensing fees, royalties, and maintenance fees that have not been reported by NNC to date are owed to SNMPRI as a result of the Unauthorized Use.  Such outstanding amounts must be paid.

13.     Finally, SNMPRI demands adequate assurance of future performance once the purchaser is identified.

14.     At this juncture, the specific intellectual property and contracts that the Debtors propose to include in the sale have not been disclosed.  SNMPRI reserves all rights to object to the sale and the transfer, assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

15.     SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI objects to the Sale Motion and reserves all rights.

Dated: September 22, 2010          CIARDI CIARDI & ASTIN
       Wilmington, Delaware

_Carl D. Neff_

Daniel K. Astin (No. 4068)
John D. McLaughlin, Jr. (No. 4123)
Joseph J. McMahon, Jr. (No. 4819)
Carl D. Neff (No. 4895)
919 N. Market Street, Suite 700

6

Wilmington, Delaware 19801
(302) 658-1100 telephone
(302) 658-1300 facsimile
dastin@ciardilaw.com
jmclaughlin@ciardilaw.com
jmcmahon@ciardilaw.com
cneff@ciardilaw.com

*Attorneys for SNMP Research*
*International, Inc.*

# **EXHIBIT D**

Excerpt of September 30, 2010 Transcript Hearing

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                       FOR THE DISTRICT OF DELAWARE


                            )
IN RE:                      )  Chapter 11
                            )
NORTEL NETWORKS INC., et al., )  Case No. 09-10138 (KG)
                            )
                            )  Courtroom 3
                            )  824 Market Street
_____Debtors._____ )  Wilmington, Delaware

                               September 30, 2010
                               11:10 a.m.


                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE KEVIN GROSS
                  UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                   Morris Nichols Arsht & Tunnell
                               BY:  DEREK C. ABBOTT, ESQ.
                               BY:  ANN C. CORDO, ESQ.
                               1201 North Market Street
                               18th Floor
                               P.O. Box 1347
                               Wilmington, DE 19899-1347
                               (302) 658-9200

                               Cleary Gottlieb Steen & Hamilton
                               BY:  JAMES L. BROMLEY, ESQ.
                               BY:  MEGAN FLEMING-DELACRUZ, ESQ.
                               BY:  SALVATORE F. BIANCA, ESQ.
                               One Liberty Plaza
                               New York, NY 10006
                               (212) 225-2000

ECRO:                          STEPHEN GRANT

Transcription Service:         DIAZ DATA SERVICES
                               331 Schuylkill Street
                               Harrisburg, Pennsylvania 17110
                               (717) 233-6664
                               www.diazdata.com


Proceedings recorded by electronic sound recording; transcript
produced by transcription service
```

1   14th.

2              THE COURT:  Mr. Levee?

3              MR. LEVEE:  In response to that, Your Honor, the

4   Lead Plaintiffs are bound by the PSLR discovery stay.  They

5   can't do anything until motions to dismiss are denied, motions

6   to dismiss can't be filed because of the stay imposed by this

7   Court and the Canadian Court, so we can't even take discovery

8   to determine what documents are where.  So our concern that the

9   documents not be destroyed.

10             THE COURT:  I am satisfied that the debtors are not

11  destroying documents.  I don't think that -- I do think that it

12  is an undue burden to place upon the debtors here to determine

13  which documents are originals, which are copies and I just

14  don't think that there is any showing that there is a real risk

15  of destruction of the documents.  And under those

16  circumstances, I will deny the motion -- or the objection,

17  forgive me.  It's an objection and I will overrule the

18  objection.

19             MR. BROMLEY:  Thank you very much, Your Honor.  The

20  last matter that we have -- last objection is an objection that

21  we've been trying to resolve.  It's an objection that's been

22  filed by a company, SNMP Research International.  It is at

23  Docket 3993.  It is a familiar objection because it is an

24  objection that has been filed in most, if not all, of our prior

25  sales.

1        SNMP provides an internet protocol that allows

2   certain parts of the equipment that Nortel has marketed and

3   invented to connect to the internet.  It's a relatively small

4   part of the panaplea of things that goes on in terms of any of

5   Nortel's businesses.  Indeed, prior to this, Your Honor, we

6   just asked our clients to give us a sense of the total amount

7   of money that was paid to SNMP on an annual basis when the

8   company was running, you know, globally, full force, and that's

9   about 40 or $50,000 a year in licensing fees, and there's no

10  question that there are licenses.

11       The objection that SNMP has filed is an objection

12  that we believe is resolved by the language that I read -- I

13  believe it's resolved by the language that Quest requested and

14  we're happy to repeat that or put in Quest and SNMP, we're

15  happy to add SNMP into the objecting party list.  We've even

16  talked about separate language for SNMP and we have been

17  rebuffed on that.  It seems that the key point that SNMP is

18  making in its objection -- well, there are two.

19       One is a complaint -- and I use that with a small

20  "c" -- that in connection with a prior deal, the sale to

21  GENBAND, that they believe they have evidence of some sort

22  which indicates that after the closing that their licenses have

23  continued to be used by GENBAND post-acquisition.  It's just an

24  allegation in the objection.  There's no evidence presented,

25  there's no motion that's been filed to seek enforcement of the

1   prior order.  There's no mention of whether they have been in
2   contact with GENBAND in connection with that or any way of
3   connecting GENBAND to this situation.  And, Your Honor, it's
4   not a -- the debtors are not in a position to actually confirm
5   or deny anything, because frankly nothing has been put before
6   us or before you that allows us to actually confirm or deny.
7   And I do believe that that is really what's driving the
8   objection.

9          The other request is for an audit.  An audit to
10  determine whether or not the intellectual property, the
11  licenses are implicated by the MSS business that's up for sale.
12  And I would note that, while we have asked for confidential
13  treatment of the exhibits and schedules, on this point the
14  debtors have conferred with Ericsson and we are going to peek
15  out behind the confidentiality a bit.

16         We have confirmed prior to coming into court with
17  SNMP that there is a schedule, Schedule 4.5(g)(1) -- sellers'
18  disclosure schedule 4.5(g)(1), which relates to Section 4.5(g)
19  of the sale agreement.  Section 4.5(g) of the sale agreement
20  references inbound license agreements.  Inbound license
21  agreements are licenses that Nortel has entered into -- and I
22  use Nortel in the broadest sense of the word --

23         THE COURT:  Okay.

24         MR. BROMLEY:  -- entered into with respect to
25  intellectual property that it uses in connection with the

1  business that's being sold.  There's nothing in the sale

2  agreement which attempts to transfer any of Nortel's rights by

3  operation of law in any of these inbound licenses, and that

4  includes SNMP's.  So we are not seeking to assume or assign

5  without SNMP's consent, or even with it.  We're not seeking any

6  permission from the Courts, either Court, whatsoever to do

7  anything to SNMP.

8          Indeed, the schedule lists two inbound licenses with

9  SNMP and notes that it's Ericsson's responsibility for dealing

10  with SNMP.  And when I say dealing with it, that could be

11  entering into a separate license, it could be agreeing that the

12  licenses that are in place with Nortel are transferred over and

13  assigned, the names are changed, it could be that Ericsson

14  decides that they don't need SNMP at all and replace it with

15  something else.

16          What the schedule is intended to do is to provide

17  notice that -- to Ericsson and also to absolve the sellers of

18  responsibility for having to transfer these things.  This is a

19  format that we've used in other sales, but the question that

20  SNMP asked in its objection was, please tell us whether or not

21  any of our licenses are implicated in the business being sold.

22  Let us audit.  The answer is, you don't need to audit.  The

23  answer is, yes.  It's on a schedule, Ericsson knows it, we're

24  now telling -- we've told them before we came in here and now

25  we're telling you, Your Honor.  So in terms of the relief that

1 | they're asking, that I'm happy to say we've granted.

2 | The question though is whether or not the Court is

3 | authorizing in connection with the sale order anything with

4 | respect to their licenses.  And the answer is we're not seeking

5 | the Court to do anything.  We're not asking that it be assumed

6 | or assigned in any way, shape or form.  Indeed, we recognize in

7 | this sale and other sales that intellectual property licenses

8 | require consent and this is actually one that is even more

9 | complicated than that because at times we do forget what Nortel

10 | was.

11 | And I do have, actually, a copy of the license.  And

12 | it's a license agreement made and entered into by and between

13 | Nortel Networks Corporation, and a corporation existing and

14 | organized under the laws of Canada, and SNMP Research

15 | International, Inc.  Now, the contract is between NNC and it's

16 | on behalf of itself and all of its affiliates, so it does

17 | include Nortel Networks Incorporated, but we're not talking

18 | about a -- simply a US contract.  This is a contract that in

19 | our jargon has been a bundled contract; it related to multiple

20 | businesses.  It's an international contract, meaning that is

21 | not resident solely in one jurisdiction.  We don't believe that

22 | there's a court in the world that could tell us that -- or tell

23 | SNMP that they have to perform under this contract with our

24 | purchaser and we've never said anything different.

25 | We talk a lot in bankruptcy court about reservations

1   of rights, and indeed Mr. Reedle (phonetic) sent me an email

2   during one hearing with the translation into Latin of

3   reservation of rights and suggested that I get a tattoo saying

4   that.  The question though is what are we trying to do here?

5   We are not asking for permission to transfer this license.

6   We're not asking for them to consent to.  We're not

7   conditioning the sale on the -- on an agreement with them.

8   We've simply told our purchaser that this license relates to

9   the business and you've got to deal with it.

10          Ericsson is here; they're willing to deal with it.

11  What happened -- whether it happened or didn't happen in

12  connection with the GENBAND transaction is really irrelevant.

13  It's irrelevant for a couple of reasons because one, there's

14  nothing procedurally before the Court to address.  There's no

15  evidence been put in.  It may be right, it may be wrong; I

16  simply don't know.  And even if it is correct, I'm not sure how

17  it has anything to do with the transaction today with Ericsson.

18  If GENBAND is using something they shouldn't be using, they

19  have a right to go against GENBAND.  The reservation of rights

20  that was placed in prior sale orders made it clear that this

21  Court was not ordering that anything happen with respect to

22  their licenses.

23          And then finally, Your Honor, when you come back to

24  it, this is again something that is -- with respect to dollars,

25  very small.  We have sold over $3 billion worth of assets; the

1  majority of the businesses that we have sold had some

2  relationship to SNMP, and to think that for 20 or 30 or $50,000

3  at most a year on a global basis, that we're going to have an

4  evidentiary hearing about this and that the reservation of

5  rights isn't sufficient, is somewhat frustrating.

6          What we have here is a very specific transaction.

7  We're not asking for any relief with respect to SNMP and all of

8  their rights are preserved.  If they think that something has

9  happened that shouldn't have happened in connection with prior

10 transactions, first of all, they're more than welcome to tell

11 us what they are.  The first we've ever heard of it was in the

12 one or two sentences contained in the objection.  And they're

13 certainly free to file a motion, but I don't think that the

14 objection is well placed.

15         I'm happy to give them their reservation of rights.

16 I don't think that anything that we're doing anyway implicates

17 it, but at this point I'm not sure what we can do.  We're not

18 -- we've given them their audit, we've told them in effect that

19 the licenses are already related to the products, that

20 purchaser has counsel here, they know this fact, the

21 transaction is not going to close for a couple months, they

22 have plenty of time to talk to each other about it.

23         And so with a reservation of rights and a

24 confirmation that the businesses do involve -- you know, do

25 relate -- have products that relate to these licenses, I think

1  that everything that they could want is here, other than a

2  point to complain about a prior transaction.  So that -- I cede

3  the podium to counsel to SNMP and would -- eager to hear what

4  they have to say.

5          THE COURT:  All right.  Thank you, Mr. Bromley.

6  Good afternoon, Mr. Neff.

7          MR. NEFF:  Thank you, Your Honor.  Carl Neff of

8  Ciardi, Ciardi and Astin, on behalf of SNMP.  I'm joined

9  telephonically by Mark Ralston, also of Ciardi, Ciardi and

10 Astin, whose pro hac vice has been granted by the Court.

11          THE COURT:  Thank you, Mr. Neff.  Mr. Ralston?

12          MR. RALSTON:  Your Honor, good afternoon.

13          THE COURT:  Good afternoon.

14          MR. RALSTON:  I'm here in Texas and it's sunny and

15 mid-80s.  Is it the same up there in Delaware?

16          THE COURT:  Far from it.

17          MR. RALSTON:  Your Honor, I think that -- we're not

18 here opposing the sale of Nortel and the debtors' assets, and

19 quite far from it.  We're a vendor, we appreciate the efforts

20 that the debtor has made to maximize the recovery and applaud

21 them for it.  Our basic concern, Your Honor, is that we don't

22 want the debtors selling what they don't own and what is

23 essentially SNMP's assets.  It's quite simple.

24          And let me -- I'd just like to address a couple of

25 the points made my Mr. Bromley, which I don't think are on

1   point to our issues.  Now, first off, we appreciate the 365

2   protection that has been afforded to Verizon and other parties

3   and we certainly want to be part of that.  That has been fairly

4   standard in prior sales.

5           Second, the dollar amount, Your Honor, is subject to

6   dispute.  We believe -- and I think as the Court recalls, I

7   appeared before Your Honor in person some weeks ago when the

8   debtor objected to our proof of claim and indicated that we got

9   evidence -- we think very strong evidence -- that the debtor

10  has been using SNMP intellectual property outside the bounds of

11  the licenses between the parties.  So the dollar amount -- we

12  don't know what the dollar amount is at this point.

13          As the Court recalls, Juliet Drake of Cleary

14  Gottlieb appeared and we've had further communications with

15  debtors' counsel regarding performing an audit.  And it's not

16  an audit of licenses.  It's an audit of code retained in the

17  repository of the software maintained by the debtors.  I don't

18  want to get too far into it because I'm a bankruptcy lawyer,

19  but we have had communications, we've had a conference call

20  with counsel and tech specialists from both sides, and I'm

21  pleased to say that I think the debtor is cooperating.  The

22  process is taking a bit longer than we like, but the audit is

23  not of the licenses.  It's of what -- it's the stuff that

24  Nortel is seeking to transfer and we have evidence, and I've

25  provided to Ms. Drake, the connection with GENBAND.  And we

1  have reason to believe that the same issues have arisen in

2  these other transactions.

3  The long and short of it is, in addition to the 365

4  protection that we want, we would like simply the order to

5  state that the debtor will not transfer SNMP intellectual

6  property, which consists of software code, to Ericsson.

7  Obviously Ericsson and SNMP come to an agreement, then either

8  SNMP or the debtors can transfer essentially SNMP's property to

9  Ericsson at that time or if there's an assumption and

10  assignment by order of this Court; same thing.  But until such

11  time as either of those two events occur, the debtor should not

12  be transferring what it doesn't own.  And we think that it's a

13  fairly simple request and a fairly reasonable one.  And in

14  fact, in prior orders regarding these types of sales, the

15  debtor has agreed to such a provision.  So it hasn't been

16  outside the bounds of what the parties have agreed to in the

17  past.

18  The second issue that we have raised is the need to

19  conduct this software audit.  It's not a difficult process and,

20  as I described earlier, the debtors and SNMP have been working

21  together on a voluntary basis to have this accomplished.  Given

22  the fact that this transaction is not closing for -- I think --

23  approximately eight weeks, this should not be an issue that we

24  just have the debtors do what essentially they appear to be

25  doing or have agreed to do already and do so in the near term.

1          So I don't think what we're asking for is

2   unreasonable.  I think it's especially reasonable in the light

3   of the fact that [indiscernible] prior sales and that we

4   prevent it from happening in this particular sale.  I think

5   it's in the best interest of the estate, in addition to that,

6   that the debtor not engage in the unauthorized transfer of

7   intellectual property.

8          THE COURT:  Just so I'm clear.  You've indicated

9   that you want the debtor to do what they're doing; is that

10  correct?  Mr. Ralston?  Are you still with us, Mr. Ralston?

11         MR. RALSTON:  Your Honor, I'm here.  Can you hear

12  me?

13         THE COURT:  Oh, yes.  Can you hear me?

14         MR. RALSTON:  Yes, I can hear you.

15         THE COURT:  Okay.  I just want to make -- be clear

16  that what you've indicated is you're asking the debtor to do

17  what they have been doing?

18         MR. RALSTON:  Well, we are at the preliminary stages

19  of having them do what they've been doing.  We would just like

20  to get it done, Your Honor, and if there's an issue, obviously

21  be able to come back to the Court and have the Court resolve

22  the issue.  We're asking them to get it done, essentially, Your

23  Honor, and I'm indicating that it's obviously not a burdensome

24  issue because the debtor essentially has -- is negotiating with

25  us regarding what needs to be done.

54

1        And I can describe the process itself.  Basically

2   there's a repository of Nortel software and Nortel through Ms.

3   Drake's communications to me, has indicated it's all contained

4   in some sort of application called Clear Case and it

5   essentially requires regular manpower to run to -- essentially

6   to an e-discovery protocol, running some search terms through

7   that Clear Case system.  We just want to get it done, Your

8   Honor.  We want to essentially get it done before the sale so

9   are we are assured that our property is not being conveyed.

10       THE COURT:  All right.  Thank you, Mr. Ralston.  Mr.

11  Bromley?

12       MR. BROMLEY:  I think, Your Honor, I'm having a

13  little bit of difficulty parsing through exactly what's going

14  on, but let me try to break apart what I see as some of the

15  issues.  One is there have been multiple proofs of claim filed

16  by SNMP, both in the United States and in Canada.  Every one of

17  those proofs of claim are against multiple debtors and everyone

18  is exactly the same.  We, in the United States, working

19  together with our colleagues in Canada, have been trying to go

20  through the proofs of claim, figuring out which ones belong in

21  the US and which ones belong in Canada.

22       Ms. Drake of my firm has been dealing with the

23  resolution of the issues relating to the proof of claim.  In

24  connection with the resolution of the issues of the proof of

25  claim, which relates very specifically to any claims that arose

1    prior to January 14th, 2009 pre-petition claims, that is the

2    process that we've been going through.  That is the objection

3    that it relates to.  In response to that, Mr. Ralston has made

4    certain allegations that relate to post-filing, post-petition

5    questions.  We do not have proofs of claim filed with respect

6    to the post-petition issues, all right.  So what we have are

7    pre-petition proofs of claim documented that have a process now

8    in both Courts to address and we have certain, simple

9    allegations, nothing more, with respect to post-petition

10   activity.

11          So when we talk about -- I think on one front Mr.

12   Ralston is talking about reconciling his claims, reconciling

13   the pre-petition claims which have been filed.  There's a

14   process, those claims are in existence, and that is what we're

15   trying to work on now.  There's been no administrative bar

16   date.  There's nothing that prevents him from filing a claim

17   for administrative expense damages; that has not been filed.

18   There's nothing that would prevent him from filing a claim

19   against GENBAND or any other purchaser; that has not been done.

20   None of that.

21          The Court has -- this Court, very specifically, with

22   respect to the United States, has retained jurisdiction with

23   respect to any alleged breaches or -- of any prior sale order

24   and Mr. Ralston has not brought anything before this Court with

25   any sort of supporting evidence, any kind of documentation, any

1   affidavits saying that anything in particular is wrong.  So

2   that is on the claims side of the register, in my mind.  And

3   yes, it's true, if those claims are made on a post-petition

4   basis, we should all try to work through them and find out

5   whether they have a basis or not and who's responsible for them

6   or not, but I don't see how that relates specifically to the

7   sale.

8            When I look at the objection it says SNMP RI

9   requests that the debtors perform an audit as a condition of

10  the sale to determine if SNMP RI intellectual property will be

11  transferred to the purchaser as part of the sale.  Now, this is

12  where we get a little metaphysical about what intellectual

13  property is and what code is, all right.  Mr. Ralston is

14  describing it as if it's a Lego block that we can simply remove

15  and put on a shelf someplace.  Intellectual property is, in

16  this particular case, not something that is physical, right?

17  And it's manifested by a license.

18           So what we're saying is that we have a license to

19  use this intellectual property it relates to the business.  We

20  have told Mr. Ralston now that two of the licenses do relate to

21  this business.  We have told Ericsson, as the purchaser, that

22  these two licenses relate to the business, along with others

23  that are on that list, and that they need to deal with it, all

24  right.

25           So it would seem to me --

1           THE COURT:  That you're not assigning those

2   licenses.

3           MR. BROMLEY:  I'm not assigning those licenses.  Now

4   I'm not hearing from Mr. Ralston that there's a -- so I'm not

5   giving them those licenses.  So post-closing, Ericsson will not

6   have a right to use those licenses.  Right?  And as I said,

7   they're worldwide licenses, right, so it's not simply an issue

8   for us here in Delaware, it's an issue for the EMEA debtors,

9   it's an issue for the Canadian debtors, it's an issue anywhere

10  this business is operating.

11          What we're trying to do though is identify, right,

12  what Ericsson needs to do in order to operate the business; we

13  have done that.

14          THE COURT:  Right.

15          MR. BROMLEY:  So and I'm -- so he's saying what

16  intellectual property is being transferred?  The intellectual

17  property, in my mind, is the license agreement; we are not

18  transferring the license agreement.  We are telling Ericsson

19  we're not transferring it, because we can't transfer it without

20  SNMP's consent.  We know that.

21          So what Ericsson and what SNMP need to do is to go

22  in and actually work on getting a new agreement, all right.

23  And if Ericsson uses SNMP intellectual property after the

24  closing and they're not allowed to, Ericsson is not supposed to

25  do that, and they would have a claim against Ericsson.

1          THE COURT:  Correct.

2          MR. BROMLEY:  Not against us.

3          THE COURT:  Correct.

4          MR. BROMLEY:  So we're telling everybody right now,

5    if they use it after closing, she's the one to sue, not us, and

6    SNMP knows that.  So -- and if that hasn't been clear in other

7    transactions, you know, I can understand.  These are very

8    complicated transactions and there's a lot of things that we've

9    learned as each one of those has gone down the pike, but I

10   would encourage SNMP and Ericsson to get in a room and figure

11   this out.  As I said, what we're talking about are relatively

12   small dollar license issues and I would think that a big

13   company like Ericsson and SNMP should be able to get in a room

14   and figure this out fairly quickly.  Ericsson has the form of

15   licenses that we had in place.  Ericsson is a huge company;

16   they may already have a license with SNMP; I don't know and I'm

17   not -- I don't think Ericsson's counsel in the room here today

18   knows it either.

19          So, you know, it's easy for somebody to say Nortel

20   can go, you know, run through some e-discovery, but that

21   relates to the claims process in my mind, not relating to the

22   sale.  And so, we don't want any permission, we're not seeking

23   any permission, and I think if Ericsson is using their

24   intellectual property without permission after the closing,

25   then that is something that they have to take up with Ericsson.

1   They shouldn't do it -- don't do it.

2        (Laughter)

3        THE COURT:  Mr. Ralston, anything further, briefly

4   if you will?

5        MR. RALSTON:  And again, I -- this may be a small

6   matter for the debtor, it's not a small matter for my client.

7   But that said, this is how I analogize it, Your Honor.  If I

8   have Microsoft Word, whether it's under a license or whether

9   it's not under a license on my computer, and I'm not authorized

10  by law to convey that package of software to another person,

11  and I sell my computer without taking the software off, then

12  that's -- I'm essentially transferring what is not rightfully

13  mine to transfer.  It may be licensed to me, it may not be, I

14  may be using without a license and -- but I shouldn't give it

15  to another person unless I'm permitted to do so, and that

16  essentially is all we're asking.

17        As for the software audit, I think it's a distinct

18  issue that's been -- that's arisen in our minds because of the

19  past discovery of transfer of our intellectual property.  That

20  said, I understand that this Court believes that it's not

21  appropriate to order debtors to conduct that audit and we're

22  certainly able to request that the Court compel it, if we can't

23  get it voluntarily to the debtors.

24        THE COURT:  That's right.

25        MR. RALSTON:  But as to -- I think it's important

1   point, Your Honor, and they -- and Nortel has agreed to it in

2   the past, the orders state that they're not permitted to

3   transfer our property because of the Ericsson issue.  Nortel is

4   not authorized to transfer intellectual property at this point

5   in time and they ought not to do so.  And they ought to take

6   reasonable efforts to make sure that what they are conveying to

7   Ericsson is what they own or otherwise are authorized to

8   transfer.  That's it, Your Honor.  It's not complicated.  It's

9   not burdensome and it's right.  Thank you.

10           THE COURT:  All right.  Thank you.  Under the

11   circumstances, I think that having heard the language that

12   Quest requested in its reservation of rights, I am going to

13   rule that -- that similar language should be inserted into the

14   sale agreement -- or the sale order.  And to the extent that

15   SNMP is unable to reach agreement with Ericsson they can bring

16   the matter back before me, but in the meantime I don't think

17   that it is an appropriate sale objection and I will overrule it

18   as modified as I've just ruled.

19           MR. BROMLEY:  Thank you very much, Your Honor.

20           THE COURT:  Yes.

21           MR. RALSTON:  Thank you, Your Honor.

22           MR. BROMLEY:  We'll make that change to the order.

23           THE COURT:  Very well.

24           MR. BROMLEY:  I think with that, Your Honor, we've

25   gone through all of our objections.  Obviously, we'd like to

1   give our Canadian colleagues an opportunity to be heard and

2   make presentations to Justice Marowitz.

3                   THE COURT:  All right.  Thank you.

4                   MR. BROMLEY:  Unless anyone else here wants to be

5   heard.

6                   THE COURT:  Thank you.  We'll turn it over now to

7   the Canadians, who seem to get along better than we Americans.

8                   JUSTICE MAROWITZ:  Well, we can at least inform Mr.

9   Ralston that it's sunny and 74 degrees in Toronto.

10                  THE COURT:  We're afraid to look outside here,

11  Justice Marowitz.

12                  JUSTICE MAROWITZ:  And now for the rest of the

13  story, Ms. Stam.

14                  MS. STAM:  Hi.  Good afternoon, Your Honor, Judge

15  Gross.

16                  THE COURT:  Good afternoon.

17                  MS. STAM:  Notice there's no microphone here at the

18  podium, so hopefully you can hear me in Delaware.

19                  THE COURT:  Yes, we can.

20                  MS. STAM:  Very good.  Thank you.  Your Honor, I

21  intend to be brief.  Mr. Bromley has gone through and

22  summarized both the sale process and the auction process.  Your

23  Honor also has the applicant's motion record, which contains

24  the affidavit of Mr. Dadyburjor, as well as the monitor's

25  fifty-fourth report, both of which set out the -- where we

1  started with the stalking horse bid and where we ended up with

2  the final ASA with Ericsson, which reflects an increase in

3  purchase price by a significant margin.

4           JUSTICE MAROWITZ:  I can tell you I've been through

5  the record, the affidavit and the fifty-fourth reports and

6  they're very comprehensive in their detail.

7           MS. STAM:  Thank you, Your Honor.

8           JUSTICE MAROWITZ:  I take it that based on the

9  submissions in the Delaware Court and I'm sure the reading time

10 that people have had, everybody is up to speed.

11          MS. STAM:  Very good, Your Honor.  So based on that,

12 I would just point out a few other things, which are one,

13 there's -- PSP isn't, as the stalking horse bidder, entitled to

14 a [indiscernible] circumstances and Paragraph 34 of the

15 monitor's report does set out that in the event that that

16 becomes payable, we will be working with the US debtors, the

17 EMEA debtors and others to sort that out.

18          And the last thing is just that we are asking for a

19 sealing of the exhibit -- the schedules as we have previously

20 in our submission, that the test in Sierra Club has been met.

21 Subject to that, Your Honor, I really don't have any other

22 submissions, unless you have any questions.

23          JUSTICE MAROWITZ:  The only question is, I was just

24 following along and I know that SNMP did not file an objection

25 here, but would there be any modifications required to either

1  Paragraph 6 or 7 of the draft order?  And for those in Delaware

2  that [indiscernible] license agreements and the trademark

3  license agreements.

4  MS. STAM:  Your Honor, I don't believe so.  I've had

5  no conversations or correspondence with anyone from SNMP about

6  this or any requests.  The intellectual property license

7  agreement, the approval of it in Paragraph 6 is what it is and

8  the -- and similarly, the reference to the sale agreement and

9  the ancillary agreements and the licenses and the lack of

10  repudiation is really for the benefit of Ericsson and not of

11  anyone else.

12  JUSTICE MAROWITZ:  All right.  That's what I

13  expected.  To the extent that that changes, I assume that when

14  Judge Gross and I take a recess prior to ruling on this, that

15  you can get it -- the issue sorted out.

16  MS. STAM:  Certainly, Your Honor.

17  JUSTICE MAROWITZ:  By that point you can turn the

18  BlackBerry back on.

19  MS. STAM:  The only thing I would point out, Your

20  Honor, is there is a minor typo in Paragraph 7, so we have

21  corrected that.  It's in the greater certainty language, it

22  refers to Paragraph 6, which should be a reference to Paragraph

23  7, so you'll see the handwritten change when I hand the order

24  up.

25  JUSTICE MAROWITZ:  Thank you.  Mr. Pasquariello,

## **<u>EXHIBIT E</u>**

Excerpt of Transition Services Agreement, dated November 13, 2009, with Telefonaktiebolaget
L M Ericsson (publ)

EXECUTION COPY

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement ("<u>Agreement</u>") is made and entered into as of November 13, 2009, by and between Nortel Networks Corporation, a Canadian corporation ("<u>NNC</u>"), Nortel Networks Limited, a Canadian corporation ("<u>NNL</u>"), Nortel Networks Inc., a Delaware corporation ("<u>NNI</u>"), each acting on its own behalf and as agent for the Providers, and Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden ("<u>Purchaser</u>"), each a "<u>Party</u>" and collectively, the "<u>Parties</u>".

WHEREAS, Purchaser and the Main Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated July 24, 2009 (the "<u>ASA</u>"), pursuant to which such Purchaser and the Designated Purchasers have agreed to purchase and the Main Sellers (and those other persons) have agreed to sell that part of the Business carried on by the Main Sellers (and those other persons) (the "<u>Transaction</u>");

WHEREAS, Purchaser desires to receive and Sellers (as defined below), acting on their own behalf and as agents for the Providers, have agreed to provide after the Closing Date certain transition services related to the Business on the terms and subject to the conditions of this Agreement and as set forth in the Schedules hereto and any subsequent Work Orders (as defined below);

NOW, THEREFORE, in consideration of the foregoing and the respective covenants, agreements, undertakings and obligations set forth herein and other consideration, the sufficiency and adequacy of which are hereby acknowledged, the Parties hereto agree as follows:

1.       **Definitions**.  Unless otherwise defined herein, any capitalized term used herein shall have the meanings assigned to such term in the ASA.  The following capitalized terms used in this Agreement shall have the meanings set forth below:

"<u>Accounting Arbitrator</u>" has the meaning set forth in Section 5(i).

"<u>Active Employees</u>" means those NPWs, Loaned Employees, Transferring Employees and Additional Employees using the Services in a given billing month.

"<u>Additional Employees</u>" means those employees of Purchaser, other than Transferring Employees, who require the use of Services in connection with the Business and are individually approved by Sellers, such approval not to be unreasonably withheld.

"<u>Agreement</u>" has the meaning set forth in the preamble, and for the purposes of Section 16 excludes the Exhibits, Schedules and the Work Orders (if any) hereto.

"<u>ASA</u>" has the meaning set forth in the recitals.

"<u>Assigned Minor Improvements</u>" has the meaning set forth in Section 2(f).

"<u>Authorized Workers</u>" has the meaning set forth in <u>Exhibit C</u>.

"<u>Business Services</u>" has the meaning set forth in Part C of <u>Schedule 1</u>.

"Term" means the date on which the terms of all the Services have expired or been terminated in accordance with this Agreement, which in no event shall be later than twenty-four (24) months following the date hereof.

"Transaction" has the meaning set forth in the recitals.

"TS Employees" means those employees of Providers engaged in delivering Business Services to Purchaser.

"TSA Period" means, with respect to any Service or sub-category of Service, the period of time set forth in the applicable Schedule or Work Order hereto (if any) during which a Provider will perform such Service or sub-category of Service, provided that in the event that no period of time is specified a 24-month time period shall apply.

"Work Order" means the document setting out the terms and conditions of a Project, a change to a Service or an additional service, as mutually agreed by the applicable Seller and Purchaser, the form of which is attached hereto as Exhibit B.

2.      **Services to be Provided**.

        (a)      Services. Each Seller hereby agrees to provide, or to cause one or more of the Providers to provide, each of the applicable services specified to be provided by that Seller in Schedule 1 (Certain Services) and in any Work Orders (collectively, the "Services") during the Term for the applicable TSA Period, upon the terms and conditions of this Agreement, its Exhibits, Schedules and Work Orders (if any).

        (b)      Standard of Performance. Each of the Sellers shall provide, or cause to be provided, the Services hereunder to Recipients with the same degree of care and skill with which such Seller has on average performed or caused to be performed similar services to the Business during the twelve-month period prior to the date hereof (the "Measuring Period"); provided, however, that performance of the Services is subject to (A) variations in the provision of such Services made at the request of Purchaser pursuant to the terms of this Agreement or (B) differences in quality and timeliness, if any, beyond such Seller's reasonable control that are caused by changes in the delivery of Services arising from performance of Services within Purchaser's environment, to the extent such environment materially differs from the environment of the Business during the Measuring Period and generally the same priority as provided to other third parties with respect to comparable services under comparable transition services agreements entered into by the Sellers or their Affiliates. In performing Services, Providers shall accord to the Recipients no less than the same priority under comparable circumstances as they have provided the Business during the Measuring Period.

        (c)      Changes.

                (i)      The Sellers will notify Purchaser in advance of planned changes to the Services or the manner in which those Services are delivered. The relevant Provider and Recipient will discuss in good faith each such change, and if they mutually agree with respect thereto, they shall complete and execute a corresponding Work Order.

6

9.    **Access and Cooperation**.

(a)    Access. The Purchaser agrees that it and the Designated Purchasers shall, without charge, provide such reasonable access to its premises and/or personnel, and such reasonable assistance as is required in order for the Providers to perform their obligations under this Agreement, to (i) the Providers, (ii) any Affiliate of the Providers and/or (iii) a third-party provider of the Services with whom a Provider has contracted for such Service. If any Party has access (either on-site or remotely) to any other Party's computer systems and/or information stores in relation to the Services, such Party shall limit such access solely to the use of such systems for purposes of the Services and shall not access or attempt to access any other Party's computer systems, files, software or services other than those agreed to by the Parties as being required for the Services, or those that are publicly available (e.g., public websites). Each Party shall limit such access to those of its Representatives with a bona fide need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Parties' security rules and procedures for restricting access to their computer systems. All user identification numbers and passwords disclosed by any Party to another Party and any information obtained by any Party as a result of such Party's access to and use of another Party's computer systems shall be deemed to be, and treated as, Confidential Information of the disclosing Party hereunder in accordance with the provisions set forth in Section 7, with the same degree of care as such receiving Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care. The Providers and Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of any Party. These provisions concerning computer access shall apply equally to any access and use by a Party of another Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of another Party, and any third-party software that may be accessible by any Party in connection with this Agreement.

(b)    Cooperation. Each Recipient shall comply with all reasonable operating standards and policies of any Provider of such Service as to which such Recipient has had sufficient prior written notice. Each Provider shall comply with all reasonable operating standards and policies of any Recipient of such Service as to which such Provider has had sufficient prior written notice.

10.    **Firewall Protection**. Notwithstanding anything to the contrary in Section 9 hereof, prior to performance of certain Services, and/or in connection with the termination of Services hereunder, action may need to be taken to insulate the Provider's or the Recipient's, as applicable, and/or their respective Affiliates' operations, assets, proprietary information, software, equipment or data from that of the other Parties (such insulation being referred to hereinafter as a "Firewall"). Each Party shall give notice to the other Parties indicating what aspects of the notifying Party's business information, if any, need to be isolated, the nature of the activities necessary to accomplish such isolation and the expected time involved. For avoidance of doubt, the Parties confirm their agreement that (i) those segregation services identified in Part 1 of Exhibit D ("Seller-Funded Segregation Services") are to be performed at Sellers' expense, and (ii) those segregation services identified in Part 2 of Exhibit D ("Purchaser-Funded

19

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS CORPORATION

By:_____

    Name: John Doolittle
    Title:  Senior Vice-President, Finance
    and Corporate Services

By:_____

    Name:  Anna Ventresca
    Title:   General Counsel – Corporate
    and Corporate Secretary


NORTEL NETWORKS LIMITED

By:_____

    Name: John Doolittle
    Title:  Senior Vice-President, Finance
    and Corporate Services

By:_____

    Name:  Anna Ventresca
    Title:   General Counsel – Corporate
    and Corporate Secretary


NORTEL NETWORKS, INC.

By:_____

    Name:  Anna Ventresca
    Title:   Chief Legal Officer

TELEFONAKTIEBOLAGET L M
ERICSSON (PUBL)

By:_____

    Name: *Per oscarsson*

    Title: *Authorized Signatory*

By:_____

    Name:

    Title:

TELEFONAKTIEBOLAGET L M
ERICSSON (PUBL)

By:_____
    Name:
    Title:

By: _~~~~~~~~~~~~~~~~~~~~~~~
    Name  Richard Guilbo
    Title:  Authorized Signatory

## Exhibit C

### Access to Providers Information Systems

In order to receive certain Services provided by the Providers pursuant to this Agreement (the "Purpose"), Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by the Providers (the "Providers Information Systems").

1.      **Access:** Subject to the terms and conditions of this Exhibit C, the Providers hereby grant access to Purchaser solely to those elements of Providers Information Systems (the "Permitted Systems") necessary for Purchaser to perform the Purpose, and to no other elements.

2.      **Purpose:** Purchaser agrees to use the Permitted Systems solely to carry out the Purpose and Purchaser agrees to use the Permitted Systems for no other purpose.

3.      **Conditions of Use:** Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit C and such reasonable further conditions and policies of use that the Providers may hereafter establish and make known to Purchaser, including, but not limited to the "Appropriate Use of Nortel's Network" policy and to which Purchaser agrees, based on Section 4 of this Exhibit C, attached to and incorporated in this Agreement. Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. Purchaser hereby undertakes full responsibility for all persons (including past employees of Purchaser) gaining access to the Providers Information Systems through Purchaser's computer systems. Purchaser shall cooperate in the investigation of any apparent unauthorized access to the Providers Information Systems.

4.      **Employee Access:** Purchaser shall limit access to the Permitted Systems to the Active Employees, it being understood that such Active Employees shall be informed by Purchaser of the obligations set forth in this Exhibit C and the confidentiality obligations set forth in Section 7 of the Agreement, provided that, upon the Providers' reasonable request in relation to certain Services, access to Permitted Systems will be restricted to only Restricted Access Active Employees (such employees who have access to the Permitted Systems pursuant to the foregoing, "Authorized Workers"). The Providers must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as the Providers' personnel. Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees of Purchaser or any Designated Purchaser who do not have an active role in supporting the Purpose) shall have no access to the Providers Information Systems. The Providers may terminate applicable access to such employees as of the date of notice to Purchaser that the Authorized Worker(s) identified in the notice has breached this Agreement.

5.      **Prohibitions:** Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information

C-1

Systems; (ii) make modifications, enhancements, adaptations or translations, in whole or in part, to or of any element of the Providers Information Systems; (iii) make copies of any element of the Providers Information Systems; (iv) probe host computers or networks; (v) breach the security controls of a host computer, network component or authentication system; (vi) monitor data on any network or system; (viii) interfere with the service of any user, host or network, or overload a server, network connected device, or network component; (ix) originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device; or (x) forge data or misrepresent the origination of a user or source.

6.      **Purchaser's Systems:**

(a)     **Access Security.**  Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable Firewall. Purchaser shall follow all of the Provider's security rules and procedures for restricting access to its computer system.

(b)     **Segregation Wall.**  Purchaser will ensure that Authorized Workers are effectively isolated from its personnel who are not Authorized Workers. Purchaser will implement procedures to segregate all the Seller information, data and communications (including, but not limited to Confidential Information) from other Purchaser's personnel who are not Authorized Workers.

(c)     **Assessment.**  Purchaser shall grant to the Providers reasonable access to its computer facilities in order to assess the on-going adequacy of Purchaser's security measures and procedures, and Purchaser shall assist and co-operate with the Providers in carrying out any such assessment.

(d)     **Denial of Access.**  In the event the Providers determine that Purchaser's security measures and procedures are inadequate to prevent unauthorized access to or use of the Providers Information Systems, the Providers may immediately deny further access until Purchaser takes such measures as the Providers may require.

7.      **Notice of Security Breach:**  Purchaser shall immediately notify the Providers in writing in the event there is a breach, or attempted breach, (i) of security on or at any Purchaser's computer systems or facilities that are used to access Providers Information Systems, or (ii) of the physical or electronic procedures for segregating and protecting Providers' information, data and communications from those of Purchaser and third parties. In the event of a breach or attempted breach, Purchaser shall, at its expense, do whatever is reasonably necessary to preserve the integrity of Providers Information Systems and Confidential Information, and to prevent such breach or attempted breach from recurring. The Providers reserve the right to request the removal of any Authorized Worker from the Providers' site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of the Providers' network, or a breach of Providers' policies or procedures.

8.      **Third-Party Technology:**  Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a third party.

C-2

Purchaser acknowledges that third-party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by Purchaser. Nothing herein shall require the Providers to acquire any rights to sublicense such rights from any third party. Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such third-party software. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain third-party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.

**9.     Confidential Information:** All passwords, identification numbers and all information and data obtained before Closing by Provider and modified during Purchaser's use of Providers Information Systems shall be treated as Confidential Information of Provider.

**10.     Personal Data:** The Parties shall comply with their respective obligations under all applicable data protection and privacy laws. If Purchaser has access to any element of the Providers Information Systems containing data relating to individuals (including but not limited to employee identification numbers, compensation records, health records, credit card information) ("Personal Data"), Purchaser shall use commercially reasonable efforts to not, and must not authorize any third party to (i) process the Personal Data for any purpose other than the Purpose or (ii) transfer any Personal Data to any third country. Purchaser shall use commercially reasonable efforts to, and will use commercially reasonable efforts to ensure that its employees, agents and contractors, take adequate technical and organizational security measures to safeguard Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use. Purchaser will provide the Providers with all reasonable assistance (x) in complying, within statutory time limits, with requests by individuals for access to their Personal Data; (y) in investigating any breach or alleged breach of applicable privacy or data protection Laws; and (z) in responding to and complying with any request or demand made by any national privacy or data protection authority.

**11.     Failure of Access:** Purchaser acknowledges that access to the Permitted Systems may be interrupted due to circumstances outside the reasonable control of the Providers. Nothing in this Agreement shall be considered a promise or covenant to deliver uninterrupted access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to Purchaser by virtue of access to the Permitted Systems.

**12.     Waiver of Liability:** The Parties shall have no liability whatsoever for any unintentional damages, losses or expenses incurred by accessing of a computer virus or other harmful computer file or program, whether arising in contract, tort or otherwise; provided, that any Party will be liable for damages, losses or expenses incurred by accessing of a computer virus or other harmful computer file or program if (i) such Party was aware of such virus or other program spreading inside its systems or in its applications, and (ii) such Party nevertheless did not alert other relevant Parties as to such virus or other program.

## **EXHIBIT F**

Excerpt of Transition Services Agreement, dated March 31, 2009, with Radware Ltd.

## Transition Services Agreement

This Transition Services Agreement ("Agreement") is made and entered into as of the Effective Date, as defined below, by and between Radware Ltd., 22 Raoul Wallenberg st., Tel Aviv, ISRAEL ("Purchaser") and Nortel Networks Limited, a Canadian corporation organized under the laws of Canada with offices at 195 The West Mall, Toronto ON M9C 5K1 ("NNL").

WHEREAS, Purchaser and NNL's subsidiary, Nortel Networks Inc. have entered into the Asset Purchase Agreement, dated, February 19, 2009, (the "APA"), pursuant to which Purchaser has agreed to purchase and Nortel Networks Inc. has agreed to sell the Business, as defined in the Asset Purchase Agreement (the "Transaction"); and

WHEREAS, Purchaser desires to receive and NNL has agreed to provide certain transition services related to the Business as set out in the schedules hereto (the "Services") after the closing date of the Transaction (the "Transaction Closing Date"); and

WHEREAS, Purchaser and NNL agree that the Services will be in substance, in scope and in price the same as those services that NNL provided to the Business prior to the Transaction Closing Date, except where Purchaser will have taken over the performance of such services or in cases where NNL is providing services it was not providing to the Business prior to the Closing Date or where the scope and supported population of such services is materially different; and

WHEREAS, it is a condition to the consummation of the Transaction that NNL and the Purchaser enter into this Agreement; and

NOW, THEREFORE, in consideration of the foregoing and the respective covenants, agreements, undertakings and obligations set forth herein and other consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Definitions**.  Capitalized terms not defined in the body of this Agreement shall have the following meanings:

"Additional Employees" means those employees of Purchaser who require the use of Services in connection with the Business but were not using the Services prior to the Closing Date and who are individually identified to Nortel by Purchaser.

"Affiliate" means, as to any Party, any other entity that, directly or indirectly, controls, is controlled by, or is under common control with, such entity, whether through ownership of voting securities or otherwise.  For this purpose, and without limiting the foregoing, any

Person that owns more than fifty percent (50%) of the outstanding voting securities of any other Person shall be deemed to control such other Person.

"Contract Service Providers" means people not located at a Nortel site that perform work for Nortel and are employed by another firm, a list of which is found in Schedule 1, Section 1: IT Infrastructure Services, Section 10.

"Effective Date" means the Transaction Closing Date or any other specific date agreed to in a Schedule, with respect to that Schedule.

"Nortel" means NNL and any Nortel Affiliate, which .perform Services for the Business.

"NPW" means an employee of a third party contractor to Nortel who is either currently performing or will perform services for the Business and is on a Nortel site.

"Party" means Nortel or Purchaser and "Parties" means Nortel and Purchaser.

"Project(s)" means those services over and above the Services, and which will be subject to the procedure set forth in Schedule 1 Section 5.

"Transferred Employees" means those former Nortel employees who are transferred to Purchaser pursuant to the Transaction as well as the NPWs.

"TSA Period" means the period of time set out in each Schedule during which Nortel will provide the applicable Services, or sub-category of those Services, to Purchaser pursuant to this Agreement.

2.      **Services to be Provided**.

(a)      <u>Services</u>. Nortel hereby agrees to provide to Purchaser the Services as further detailed in Schedules 1 to 2 for the period of time and upon the terms and conditions set forth in such Schedules and according to the conditions defined in the said Schedules.

(b)      Nortel further agrees to provide to the Contract Service Providers the Services as further detailed in Schedule 1, Section 1: IT Infrastructure Services, Section 10.

(c)      <u>Warranty</u>. Nortel warrants to Purchaser i) that each of the Services will be performed by individuals qualified for the tasks to which they are assigned and in a manner providing quality at a reasonable workmanlike standard, ii) that it will perform the Services hereunder with the same degree of care and skill with which it performs similar services for itself, including, with respect to the type and quality of

event will be less than those precautions that such Receiving Party employs to protect its own proprietary information. Confidential Information belonging to either Party that is not related to the Transaction or the provision of Services herein but is unintentionally disclosed to an employee or contractor of the other Party during the Term of this Agreement as an unintended result of the provision of the Services shall not be further disclosed by such employee or contractor to any other employee, contractor, director, officer or agent of the Receiving Party.

7.     **Relationships Between the Parties**. Nothing in this Agreement shall cause the relationship between Nortel and Purchaser to be deemed to constitute a partnership or joint venture between them. Neither Purchaser nor Nortel shall have any authority, express or implied, to bind, commit or act as agent for the other in any way except as provided herein. Each of Purchaser and Nortel shall be responsible for the salaries, payroll taxes, severance costs and benefits of its own employees. Each of the parties agrees that the provisions of this Agreement as a whole are not intended to, and do not, constitute control of the other party or provide it with the ability to control such other party, and each party hereto expressly disclaims any right or power under this Agreement to exercise any power whatsoever over the management or policies of the other. Nothing in this Agreement shall oblige either party hereto to act in breach of the requirements of any law, rule or regulation applicable to it.

8.     **Third Party Provider Access**. Each Party agrees that it shall, without charge, provide the other Party or its Affiliates, third party provider of the Services with whom it or its Affiliate has contracted for such Service (a **"Third Party Provider"**) and contractors with such access to its premises and/or personnel, and such assistance as may be required for each Party to perform its obligations under this Agreement. If either Party has access (either on-site or remotely) to any of the other Party's computer systems and/or information stores in relation to the Services, such Party shall limit such access solely to the use of such systems for purposes of the Services and shall not access or attempt to access any of the other Party's computer systems, files, software or services other than those agreed to by the Parties as being required for the Services, or those that are publicly available (e.g. public websites). Each Party shall limit such access to those of its employees, agents or contractors with a bona fide need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Party's security rules and procedures for restricting access to its computer systems. All user identification numbers and passwords disclosed by either Party to the other and any information obtained by either Party as a result of such Party's access to and use of the other Party's computer systems shall be deemed to be, and treated as, Confidential Information of the disclosing Party hereunder in accordance with the provisions set forth in Section 6, with the same degree of care as such Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care. Nortel and Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of either Party. These provisions concerning computer access shall apply equally to any access and use by one

Party of the other Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of the other Party, and any third party software that may be accessible by either Party in connection with this Agreement.

9.    **Firewall Protection**.  Notwithstanding anything to the contrary in Section 8 (Access) hereof, prior to Nortel's performance of certain Services, and/or in connection with the termination of Services hereunder, action may need to be taken to insulate one Party's and/or its Affiliates' operations, assets, proprietary information, software, equipment or data from that of the other Party and/or its Affiliates (such insulation being referred to hereinafter as a "Firewall").  Each Party shall give notice to the other Party indicating what aspects of the notifying Party's business, if any, need to be isolated, the nature of the activities necessary to accomplish such isolation and the expected time involved.  Unless otherwise set out in a Project, each Party will bear its own costs of Firewall installation and maintenance.

10.    **Security Measures**.  Each Party shall afford the other reasonable access to those of its computer facilities that it plans to use in association with the Services for the purposes of assessing the adequacy of the other Party's security measures and procedures in effect on such computer facilities, and shall assist and co-operate with the requesting Party in carrying out any such assessment.  In the event where one Party determines that the security measures and procedures are inadequate to prevent unauthorized access to or use of Services, the Parties shall agree upon such measures as may reasonably be needed to improve such security measures and procedures and, provided such Party determines that the implementation of such measures would not impair or further impair the adequacy of the other Party's security measures to prevent unauthorized access to or use of Services, the Parties shall take such measures. Periodically, at reasonable intervals thereafter, each Party shall afford the other an opportunity to confirm the continued adequacy of the security measures and procedures in effect on such computer facilities. In the event one Party intends to permit access to the Services by third parties, it shall so advise the other, in writing, not less than thirty (30) days prior to such access being allowed to such third party.  In the event of a breach of security on or at the one of the Party's facilities relating to, or that could potentially relate to, Services, or if the Party becomes aware of a breach by its employees of the other Party's security procedures relating to Services, such Party shall advise the other thereof by the most expeditious means available and shall, promptly thereafter, notify the other in writing of such breach and take such measures as are available to it to preserve the other's proprietary interest in Services and the information accessible thereby.

11.    **Regulatory Matters**.  Nortel will cooperate with Purchaser and any regulatory authorities that supervise Purchaser to satisfy any regulatory requirements applicable to entities that provide services to Purchaser.

12.    **Assignment**.  Neither this Agreement nor the rights or obligations hereunder shall be assignable by either party hereto, by operation of law or otherwise,

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized officers..

Radware, Ltd.                               Nortel Networks Limited

By: _R_____ _____          By:_____
Name: Roy Zisapel                           Name:
Title: CEO and President                    Title:

Date: March 31, 2009                        Date:

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized officers..

Radware, Ltd.

By:_____
Name:
Title:

Date:

Nortel Networks Limited

By: _____
Name:    Gordon A. Davies
Title:    Chief Legal Officer
         and Corporate Secretary

Date:    MAR. 31/09

By: _____
Name:    PAUL W KARR
Title:    CONTROLLER

Date:    MARCH 31, 2009

# EXHIBIT A

## ACCESS TO NORTEL INFORMATION SYSTEMS

Purchaser In order to receive certain Services provided by Nortel pursuant to this Transition Agreement (the "Purpose"), Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by Nortel ("**Nortel Information Systems**");

1.     **Access**: Subject to the terms and conditions of this Exhibit, Nortel hereby grants access to Purchaser solely to those elements of Nortel Information Systems (the "**Permitted Systems**") necessary for Purchaser to continue to run the Business, and to no other elements.

2.   **Purpose**: Purchaser agrees to use the Permitted Systems solely to carry out the the Business and Purchaser agrees to use the Permitted Systems for no other purpose.

3.   **Conditions of Use**: Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit and such further conditions and policies of use that Nortel may hereafter establish and make known to Purchaser , including, but not limited to the "Appropriate Use of Nortel's Network" policy and to which Purchaser agrees and accepts in writing case-by-case, based on Section 4 below and the format set forth in Attachment 1, attached to and incorporated in this Agreement. Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. Purchaser hereby undertakes full responsibility for all persons ) gaining access to Nortel Information Systems through its computer systems. Purchaser shall cooperate in the investigation of any apparent unauthorized access to Nortel Information Systems.

4.   **Employee Access**: Purchaser shall limit access to the Permitted Systems to the Transferred Employees and Additional Employees, , ("Authorized Workers").  Purchaser shall ensure that each Authorized Worker signs an undertaking in accordance with which confirms that the Authorized Worker has read, understands, and agrees to comply with this Agreement. Nortel must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as Nortel personnel. Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees who do not have an active role in supporting the Purpose) shall have no access to Nortel Information Systems.  Nortel may terminate applicable access as of the date of notice to Purchaser that the an Authorized Worker(s) identified in the notice has breached this Agreement, which would include a breach of the Appropriate Use of Nortel's Network acknowledgment signed by the Authorized Worker.

5.   **Prohibitions**: Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of Nortel Information Systems; (ii) make modifications, enhancements, adaptations or translations, in whole or in part, to or of any element of Nortel Information Systems; (iii) make copies of any element of Nortel Information Systems; (iv) probe host computers or networks; (v) breach the security controls of a host computer, network component or authentication system; (vi) monitor data on any network or system; (vii) interfere with the service of any user, host or network, or overload a server, network connected device, or network component; (viii) originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device; or (ix) forge data or misrepresent the origination of a user or source.

6.   **Purchaser 's Systems:**

(a)   **Access Security**. Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable firewall. Purchaser shall follow all of Nortel's security rules and procedures for restricting access to its computer systems.

(b)   **Assessment**. Purchaser shall grant to Nortel reasonable access to its computer facilities in order to assess the on-going adequacy of Purchaser 's security measures and procedures, and Purchaser shall assist and co-operate with Nortel in carrying out any such assessment. .

(c) **Denial of Access.** In the event Nortel determines that Purchaser 's security measures and procedures are inadequate to prevent unauthorised access to or use of Nortel Information Systems, Nortel may immediately deny further access until Purchaser takes such measures as Nortel may require.

**7.    Notice of Security Breach.** Purchaser shall immediately notify Nortel in writing in the event there is a breach, or attempted breach, (i) of security on or at Purchaser 's computer systems or facilities that are used to access Nortel Information Systems, or (ii) of the physical or electronic procedures for segregating and protecting Nortel information, data and communications from those of Purchaser and third parties. In the event of a breach or attempted breach, Purchaser shall, at its expense, do whatever is necessary to preserve the integrity of Nortel Information Systems and Confidential Information, and to prevent such breach or attempted breach from recurring. Nortel reserves the right to request the removal of any Authorized Worker from a Nortel site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of Nortel's network, or a breach of Nortel's policies or procedures.

**8.    Third Party Technology:** Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by Nortel from a third party. Accordingly, Nortel, to the extent of its legal right to do so, if any, hereby grants to Purchaser a sublicense under the rights Nortel may have, if any, in such third party software, but only to the extent necessary for the Purpose. Purchaser acknowledges that third party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained. Nothing herein shall require Nortel to acquire additional rights to sublicense such rights from any third party. Purchaser shall indemnify and hold harmless Nortel from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser 's use of such third party software. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain third party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.

**9.    Confidential Information:** All passwords, identification numbers and all information and data obtained before and modified during Purchaser 's use of Nortel Information Systems shall be treated as Confidential Information of Purchaser . *Confidential Information* has the meaning set out in Section 6 of this Transition Agreement and Section 6 applies to this Exhibit.

**10. Personal Data:** The parties shall comply with their respective obligations under all applicable data protection and privacy laws. If Purchaser has access to any element of Nortel Information Systems containing data relating to individuals (e.g., employee identification numbers, compensation records, health records, credit card information) ("**Personal Data**"), Purchaser must not, and must not authorize any third party to (i) process the Personal Data for any purpose other than the Purpose; or (ii) transfer any Personal Data to any third country. Purchaser must, and must ensure that its employees, agents and contractors, take adequate technical and organizational security measures to safeguard Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use. Purchaser will provide Nortel with all reasonable assistance (x) in complying, within statutory time limits, with requests by individuals for access to their Personal Data; (y) in investigating any breach or alleged breach of applicable privacy or data protection laws; and (z) in responding to and complying with any request or demand made by any national privacy or data protection authority. Individuals whose Personal Data are the subject of disclosure by Nortel to Purchaser may enforce the terms of this section 10 directly against Purchaser , however the consent of such individuals shall not be required for any variation or termination of this Agreement.

**11. Failure of Access:** Purchaser acknowledges that access to the Permitted Systems may be interrupted due to circumstances within or outside the reasonable control of Nortel. Nothing in this Agreement shall be considered a promise or covenant to deliver access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to Purchaser by virtue of access to the Permitted Systems.

**12. Waiver of Liability:** Nortel hereby excludes all representations, warranties and conditions, whether express or implied, including any representations, warranties or conditions of accuracy, sufficiency, suitability or non-infringement. Nortel shall have no liability whatsoever for any damages, losses or expenses incurred by Purchaser as a result of access of the Permitted Systems (including, without limitation, the inadvertent accessing of a computer virus or other harmful computer file or program), or of failure to access the Permitted Systems pursuant to this Agreement, whether arising in contract, tort or otherwise. Purchaser acknowledges that the limitations described in this Section and the allocation of risks and benefits under this Exhibit are a fundamental part of this Exhibit.

**13. Indemnity:** Purchaser shall be liable for and shall indemnify Nortel (together with its directors, officers, employees and agents) against any and all liability, loss, damages, costs, legal costs, fines, professional and other expenses incurred by Nortel arising out of any claims or proceedings brought against Nortel, its directors, officers, employees or agents by any

third party by reason of the failure of Purchaser , and those for whom Purchaser  is responsible in law (including, without limitation, all persons gaining access to Nortel Information Systems as a result of any act or omission of Purchaser ) to comply with the provisions of this Exhibit.

## **EXHIBIT G**

Excerpt of Transition Services Agreement, dated December 18, 2009, with Avaya, Inc.

**EXECUTION VERSION**

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement ("Agreement") is made and entered into as of December 18, 2009 and effective as of the Closing Date, by and between:

(1)    Nortel Networks Corporation, a Canadian corporation ("NNC"),

(2)    Nortel Networks Limited, a Canadian corporation ("NNL"),

(3)    Nortel Networks Inc., a Delaware corporation ("NNI"),

(4)    Nortel Networks UK Limited (in administration), a company incorporated in England (Company number 03937799) ("NNUK"), acting by its joint administrators A. R. Bloom, S. J. Harris, A. M. Hudson and C. J. W. Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF, United Kingdom (collectively, the "UK Joint Administrators"),

(5)    Nortel Networks (Ireland) Limited (in administration), a company incorporated in the Republic of Ireland (Company number 40287) ("NN Ireland"), acting by its joint administrators A. R. Bloom and D. Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland (together with the UK Joint Administrators, the "Joint Administrators"),

(6)    each of the entities identified as Other Sellers in Exhibit A (the "Other Sellers"),

(7)    each of the Joint Administrators in their respective capacities as joint administrators of respectively NNUK and NN Ireland only, acting as agent of respectively NNUK and NN Ireland and without any personal liability whatsoever, and

(8)    Avaya Inc., a Delaware corporation (the "Purchaser"),

each a "Party" and collectively, the "Parties"; provided that each of the Parties identified in (1) to (3) is acting on its own behalf and as agent for the Providers (as defined herein) other than any Provider incorporated and/or located in an EMEA Jurisdiction.

WHEREAS, Purchaser and the Main Sellers (together with certain other persons) have entered into the Asset and Share Sale Agreement, dated September 14, 2009 (the "ASSA"), pursuant to which Purchaser and the Designated Purchasers designated by Purchaser have agreed to purchase and the Main Sellers (and certain other persons) have agreed to sell that part of the Business (as defined in the ASSA) carried on by the Main Sellers (and those other persons);

WHEREAS, Purchaser and the EMEA Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated September 14, 2009 (the "EMEA ASA"), pursuant to which Purchaser and the EMEA Designated Purchasers designated by Purchaser have agreed to purchase and the EMEA Sellers (and certain other persons) have agreed to sell (subject to the irrevocable offer wording in Schedule 6 to the EMEA ASA) that part of the Business (as defined in the ASSA) carried on by the EMEA Sellers (and those other persons) (the sale of the Business under the ASSA and the EMEA ASA are hereinafter collectively referred to as the "Transactions");

"Transferred Employees" means those (i) employees of the Companies and (ii) former employees of the Main Sellers, EMEA Sellers and Other Sellers (if any) who are transferred to Purchaser, a Designated Purchaser or an EMEA Designated Purchaser pursuant to the Transactions including the Transferring Employees (as defined in the EMEA ASA).

"TS Employees" means those employees of Providers engaged in delivering Business Services to Purchaser or a Recipient.

"TUPE Employees" has the meaning set forth in Section 5(a).

"UK Joint Administrators" has the meaning set forth in the preamble.

"Unpaid Excess VAT" has the meaning set forth in Section 5(k)(ii).

"VAT" has the meaning set forth in the EMEA ASA.

"Work Order" means the document setting out the terms and conditions of a Project (other than those Projects already described in Schedule 5 and Schedule 6), a change to a Service or an additional service, as mutually agreed by the applicable Seller and Purchaser, the form of which is attached hereto as Exhibit C.

2.    **Services to be Provided**.

(a)    Services.  Subject to Section 5(a), each of the Sellers hereby agrees to provide, or to cause one or more of the Providers to provide, each of the services contemplated to be provided by that Seller in Schedule 1 Included Services, Extra Services, Network Managed Services and Certain Other Business Services, Segregation and Migration Services and Projects (collectively, the "Services").  The Services shall be provided during the Term for the applicable Initial Period and, if any, the applicable Maximum Extension Period, upon the terms and conditions of this Agreement, its Exhibits, Schedules and Work Orders; provided, however, that any Services provided by an EMEA Seller shall expire or terminate no later than twelve (12) months following the Closing Date at which time the EMEA Sellers and the Joint Administrators shall cease to be Parties to this Agreement and shall be relieved of any further obligations under this Agreement other than those set forth in Section 4(o).

(b)    Standard of Performance.

(i)    Each of the Sellers shall provide, or cause to be provided, the Services hereunder contemplated to be provided by it with the same degree of care, skill and quality which it would exercise in performing similar services for itself.  The relevant measure of performance of each Service shall include the measurement metric, if any, consistent with the applicable Seller's past practice with respect to such Service (subject to departures beyond such Seller's reasonable control attributable to (i) changes in the delivery of Services arising from interaction with Purchaser, and (ii) changes in the nature or quality of relationships with third parties arising from the sale of the Business to Purchaser).  In performing such Services, Providers will use and make available to Recipients such upgrades and improvements as the Providers deploy in their internal organizations in the ordinary course.  Each Seller will use its reasonable best efforts to secure compliance by third-party providers with their contractual

if (i) such Party was aware of such virus or other program spreading inside its systems or in its applications, and (ii) such Party nevertheless did not alert other relevant Parties as to such virus or other program.

(c)    Non-Disclosure. Subject to Section 7(a), Purchaser (if the Receiving Party is Purchaser or its Affiliate) and the Providers (if the Receiving Party is a Provider or its Affiliate) agree that such Receiving Party will (i) allow access to the Disclosing Party's Confidential Information only to the directors, officers, employees, agents and contractors ("Representatives") of the Receiving Party with a need to know such Confidential Information and (ii) take reasonable precautions to maintain the confidentiality of the Disclosing Party's Confidential Information, which in no event will be less than those precautions that such Receiving Party employs to protect its own proprietary information. Confidential Information belonging to any Party that is not related to the Transactions or the provision of Services hereunder but is unintentionally disclosed to a Representative of the other Parties during the Term of this Agreement as an unintended result of the provision of the Services shall not be further disclosed by such Representative to any other Representative of such Receiving Party. The Parties shall be liable to each other for any breaches of their respective confidentiality obligations.

(d)    Data Privacy. The Parties shall comply with their respective obligations under all applicable data protection and privacy laws.

8.    **Relationships Between the Parties**. Nothing in this Agreement shall cause the relationship between any Provider and any Recipient to be deemed to constitute a partnership or joint venture between them. No Recipient and no Provider shall have any authority, express or implied, to bind, commit or act as agent for the other in any way except as provided herein (including the Exhibits and Schedules hereto). Each Recipient and each Provider shall be responsible for the salaries, payroll taxes, severance costs and benefits of its own employees. Each of the Parties agrees that the provisions of this Agreement as a whole are not intended to, and do not, constitute control of other Parties or provide it with the ability to control such other Parties, and each Party hereto expressly disclaims any right or power under this Agreement to exercise any power whatsoever over the management or policies of any other Party. Nothing in this Agreement shall oblige any Party hereto to act in breach of the requirements of any Law, rule or regulation applicable to it.

9.    **Access and Cooperation**.

(a)    Access. Purchaser agrees that it shall, without charge, provide access to its premises and/or personnel, and such assistance as may be required for the Providers to perform their obligations under this Agreement, to (i) the Providers, (ii) any Affiliate of the Providers and/or (iii) a third-party provider of the Services with whom a Provider has contracted for such Service, it being understood that such Persons shall be informed by Sellers and be bound by the confidentiality obligations set forth in Section 7 herein. If any Party has access (either on-site or remotely) to any other Party's computer systems and/or information stores in relation to the Services, such Party shall limit such access solely to the use of such systems for purposes of the Services and shall not access or attempt to access any other Party's computer systems, files, software or services other than those agreed to by the Parties as being required for the Services, or those that are publicly available (e.g., public websites). Each Party shall limit such access to

27

those of its Representatives with a bona fide need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Parties' security rules and procedures for restricting access to their computer systems. All user identification numbers and passwords disclosed by any Party to another Party and any information obtained by any Party as a result of such Party's access to and use of another Party's computer systems shall be deemed to be, and treated as, Confidential Information of the disclosing Party hereunder in accordance with the provisions set forth in Section 7, with the same degree of care as such receiving Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care. The Providers and Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of any Party. These provisions concerning computer access shall apply equally to any access and use by a Party of another Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of another Party, and any third-party software that may be accessible by any Party in connection with this Agreement.

(b)     Cooperation. Each Party shall use reasonable best efforts, and shall use reasonable best efforts to cause its respective Affiliates and third-party service providers, to cooperate with the other Party in all matters relating to the provision and receipt of the Services, and shall perform all obligations hereunder in good faith and in accordance with principles of fair dealing. Each Recipient, at its own cost, shall (i) comply with its duties to cooperate as set forth in this Agreement or any subsequent Work Orders, (ii) use its reasonable endeavors to become self-sufficient in respect of the Services in accordance with the Schedules hereto (other than in respect of products being shut down or phased out during the Term) and (iii) comply with all reasonable operating standards and policies prescribed by any Provider (acting reasonably) of such Service. The Parties acknowledge that they need to work together to ensure that Services are delivered by the relevant Provider in a prompt and timely manner.

10.     **Firewall Protection**. Notwithstanding anything to the contrary in Section 9 hereof, prior to performance of certain Services, and/or in connection with the termination of Services hereunder, action may need to be taken to insulate the Provider's or the Recipient's, as applicable, and/or their respective Affiliates' operations, assets, proprietary information, software, equipment or data from that of the other Parties (such insulation being referred to hereinafter as a "Firewall"). Each Party shall give notice to the other Parties indicating what aspects of the notifying Party's business information, if any, need to be isolated, the nature of the activities necessary to accomplish such isolation and the expected time involved.

11.     **Security Measures**. Each Party shall provide the other Parties with reasonable access to the computer facilities that it plans to use in association with the Services for the purposes of assessing the adequacy of the requested Party's security measures and procedures in effect on such computer facilities, and shall assist and cooperate with the requesting Party in carrying out any such assessment. In the event where one Party determines that the security measures and procedures are inadequate to prevent unauthorized access to or use of Services or where data protection or privacy laws are in danger of being violated, the Parties shall agree upon such measures as may reasonably be needed to improve such security measures and procedures. Periodically, at reasonable intervals thereafter, each Party shall afford the other

28

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS CORPORATION

By:_____
    Name:  Anna Ventresca
    Title:   General Counsel-Corporate and
    Corporate Secretary

By:_____
    Name:  John Doolittle
    Title:   SVP, Finance and Corporate
    Services

NORTEL NETWORKS LIMITED

By:_____
    Name:  Anna Ventresca
    Title:   General Counsel-Corporate and
    Corporate Secretary

By:_____
    Name:  John Doolittle
    Title:   SVP, Finance and Corporate
    Services

NORTEL NETWORKS INC.

By:_____
    Name:  Anna Ventresca
    Title:   Chief Legal Officer

SIGNED for and on behalf of Nortel Networks )
UK Limited (in administration) by Christopher )
Hill as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

............................................................
Christopher Hill

Witness signature

............................................................ )
Name: Olivia Schofield )
Address: Herbert Smith LLP, Exchange House, )
Primrose Street, London EC2A 2HS

*Signature Page*
*Transition Services Agreement*

SIGNED for and on behalf of Nortel Networks )
(Ireland) Limited (in administration) by David )
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of:

David Hughes

Witness signature

Claire Madden )
Name: CLAIRE MADDEN )
Address: Harcourt Centre )
        Harcourt Street
        Dublin 2.

*Signature Page*
*Transition Services Agreement*

**SIGNED** by Alan Bloom in his own capacity
and on behalf of the Joint Administrators
without personal liability and solely for the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators in the presence of:

)
)
)

Alan Bloom

Witness signature

Name:     **HERBERT SMITH LLP**
Address:  **EXCHANGE HOUSE**
          **PRIMROSE STREET**
          **LONDON EC2A 2HS**

          **SOLICITORS**

)
)
)

*Signature Page*
*Transition Services Agreement*

NORTEL DE MEXICO S. DE R.L. DE
C.V.

By:

Name: Dora Giraldo J.
Title: Attorney-at-law

NORTEL NETWORKS (ASIA)
LIMITED

By: _____

Name: Alain O. Foster
Title:   Director

NORTEL NETWORKS (CHINA)
   LIMITED

By:_____

   Name: John Doolittle
   Title: Chairman of the Board and
   Legal Representative

NORTEL NETWORKS (CALA) INC.

By: _____
    Name:  Peter Look
    Title:   President

By: _____
    Name:  John Doolittle
    Title:  Treasurer

NORTEL NETWORKS
SINGAPORE PTE. LTD.

By:_____

Name: Christopher N. V. John
Title: Director, Law & Contracts
Asia

Andrew J. Grant
General Counsel
Asia Pacific

NORTEL NETWORKS JAPAN

By: _____

Name:

Title:

*Signature Page*
*Transition Services Agreement*

NORTEL NETWORKS AUSTRALIA PTY
LIMITED

By: _____

Name: Alain O. Foster
Title:  Director

NORTEL NETWORKS (INDIA) PRIVATE
LIMITED

By: _____

Name: Alain O. Foster
Title:  Director

AVAYA INC.

By: _Pamela F. Craven_

    Name:  Pamela F. Craven

    Title:   Chief Administrative Officer

## Exhibit D

### Access to Providers Information Systems

In order to receive certain Services provided by the Providers pursuant to this Agreement (the "Purpose"), Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by the Providers (the "Providers Information Systems").

**1.**    **Access**: Subject to the terms and conditions of this Exhibit D, the Providers hereby grant access to Purchaser solely to those elements of Providers Information Systems (the "Permitted Systems") necessary for Purchaser to perform the Purpose, and to no other elements.

**2.**    **Purpose**: Purchaser agrees to use the Permitted Systems solely to carry out the Purpose and Purchaser agrees to use the Permitted Systems for no other purpose.

**3.**    **Conditions of Use**: Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit D and such further conditions and policies of use that the Providers may hereafter establish and make known to Purchaser, including, but not limited to the "Appropriate Use of Nortel's Network" policy and to which Purchaser agrees and accepts in writing case-by-case, based on Section 4 of this Exhibit D, attached to and incorporated in this Agreement. Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. Purchaser hereby undertakes full responsibility for all persons (including past employees of Purchaser) gaining access to the Providers Information Systems through Purchaser's computer systems. Purchaser shall cooperate in the investigation of any apparent unauthorized access to the Providers Information Systems.

**4.**    **Employee Access**: Purchaser shall limit access to the Permitted Systems to the Active Employees, it being understood that such Active Employees shall be informed by Purchaser of the obligations set forth in this Exhibit D and the confidentiality obligations set forth in Section 7 of the Agreement, provided that, upon the Providers' reasonable request in relation to certain Services, access to Permitted Systems will be restricted to only Restricted Access Active Employees (such employees who have access to the Permitted Systems pursuant to the foregoing, "Authorized Workers"). The Providers must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as the Providers' personnel. Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees of Purchaser, any Designated Purchaser or any EMEA Designated Purchaser who do not have an active role in supporting the Purpose) shall have no access to the Providers Information Systems. The Providers may terminate applicable access as of the date of notice to Purchaser that the Authorized Worker(s) identified in the notice has breached this Agreement. Each Authorized Worker will be provided with an active Global ID which allows them to access the Providers Information Systems.

**5.     Prohibitions**: Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems; (ii) make modifications, enhancements, adaptations or translations, in whole or in part, to or of any element of the Providers Information Systems; (iii) make copies of any element of the Providers Information Systems; (iv) probe host computers or networks; (v) breach the security controls of a host computer, network component or authentication system; (vi) monitor data on any network or system; (vii) intentionally interfere with the service of any user, host or network, or overload a server, network connected device, or network component; (viii) intentionally originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device; or (ix) forge data or misrepresent the origination of a user or source.

**6.     Purchaser's Systems**:

(a)     **Access Security**.  Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable firewall.  Purchaser shall follow all of the Providers' security rules and procedures (which are commercially reasonable given the context that the Provider is providing access to unaffiliated Recipients hereunder) for restricting access to its computer systems.

(b)     **Assessment**.  Purchaser shall grant to the Providers reasonable access to its computer facilities in order to assess the on-going adequacy of Purchaser's security measures and procedures, and Purchaser shall assist and co-operate with the Providers in carrying out any such assessment.

(c)     **Denial of Access**.  In the event the Providers determine that Purchaser's security measures and procedures are inadequate to prevent unauthorized access to or use of the Providers Information Systems, the Providers may immediately deny further access until Purchaser takes such measures as the Providers may reasonably require.

**7.     Notice of Security Breach**: Purchaser shall immediately notify the Providers in writing in the event there is a breach, or attempted breach, (i) of security on or at Purchaser's computer systems or facilities that impacts Providers Information Systems, or (ii) of the physical or electronic procedures for segregating and protecting Providers' information, data and communications from those of Purchaser and third parties who are not permitted to access such information, data and communications.  In the event of such a breach or attempted breach, Purchaser shall, at its expense, take commercially reasonable measures to preserve the integrity of Providers Information Systems and Confidential Information, and to prevent such breach or attempted breach from recurring.  The Providers reserve the right to request the removal of any Authorized Worker from the Providers' site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of the Providers' network, or a breach of Providers' policies or procedures.

**8.     Third-Party Technology:**  Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a third party. Accordingly, Providers, to the extent of its legal right so to do, if any, hereby grant to Purchaser

a sublicense under the rights Providers may have, if any, in such third-party software, but only to the extent necessary for the Purpose. The Parties will reasonably cooperate in obtaining any third-party consents that may be required in connection with the use or access to certain elements of the Permitted Systems and will use reasonable best efforts to implement alternatives should such consents not be obtained. Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including reasonable legal fees and expenses) arising out of Purchaser's use of such third-party software, except to the extent arising from Provider's gross negligence or willful misconduct. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain third-party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.

**9.      Confidential Information:** All user identification numbers and passwords disclosed by any Party to another Party shall be treated as Confidential Information.

**10.     Personal Data:** The Parties shall comply with their respective obligations under all applicable data protection and privacy laws. If Purchaser has access to any element of the Providers Information Systems containing data relating to individuals (including but not limited to employee identification numbers, compensation records, health records, credit card information) ("Personal Data"), Purchaser must not, and must not authorize any third party to (i) process the Personal Data for any purpose other than the Purpose or (ii) transfer any Personal Data to any third country, unless in compliance with applicable laws. Purchaser must, and must ensure that its employees, agents and contractors, take commercially reasonable technical and organizational security measures to safeguard Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use. Purchaser will provide the Providers with all reasonable assistance (at Provider's cost and expense, unless arising in connection with the provision of the Services, in which case such assistance shall be at Purchaser's cost and expense) (x) in complying, within statutory time limits, with requests by individuals for access to their Personal Data; (y) in investigating any breach or alleged breach of applicable privacy or data protection Laws; and (z) in responding to and complying with any request or demand made by any national privacy or data protection authority. Individuals whose Personal Data are the subject of disclosure by the Providers to Purchaser may enforce the terms of this Section 10 directly against Purchaser however the consent of such individuals shall not be required for any variation or termination of this Agreement.

**11.     Failure of Access:** Purchaser acknowledges that access to the Permitted Systems may be interrupted due to circumstances within or outside the reasonable control of the Providers. Nothing in this Agreement shall be considered a promise or covenant to deliver continuous and uninterrupted 24/7/365 access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to Purchaser by virtue of access to the Permitted Systems.

**12.     Waiver of Liability:** The Providers shall have no liability whatsoever for any unintentional damages, losses or expenses incurred by any Purchaser or Recipient accessing of a computer virus or other harmful computer file or program, whether arising in contract, tort or otherwise; provided, that such Provider will be liable for damages, losses or expenses incurred by accessing of a computer virus or other harmful computer file or program if (i) such Provider

## **EXHIBIT H**

Excerpt of Transition Services Agreement, dated December 8, 2009, with Hitachi Communication Technologies America, Inc.

**EXECUTION VERSION**

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (this "<u>Agreement</u>") is made and entered into as of December 8, 2009, by and between Nortel Networks Limited, a Canadian corporation ("<u>NNL</u>"), Nortel Networks Inc., a Delaware corporation ("<u>NNI</u>" and, together with NNL, the "<u>Sellers</u>"), each acting on its own behalf and as agent for the Providers, and Hitachi Communication Technologies America, Inc., a Delaware corporation (for purposes of this Agreement, the "<u>Purchaser</u>"), each a "<u>Party</u>" and collectively, the "<u>Parties</u>".

WHEREAS, the Sellers, Nortel Networks Technology Corporation, a Canadian corporation, and Hitachi, Ltd., a corporation organized under the laws of Japan ("<u>Hitachi</u>") have entered into the Transaction Agreement, dated October 25, 2009, as amended on November 27, 2009 and as may be further amended from time to time in accordance with its terms (the "<u>Transaction Agreement</u>"), whereby the Sellers and Nortel Networks Technology Corporation have agreed to transfer to Hitachi and/or the Designated Purchaser, and Hitachi has agreed to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities from the Sellers, upon the terms and conditions set forth in the Transaction Agreement;

WHEREAS, in connection with the Transaction Agreement, NNL and Hitachi entered into the Intellectual Property License Agreement (the "<u>IPLA</u>") whereby NNL and Hitachi each granted one another a license under certain intellectual property as described in the IPLA (the sale of the Business under the Transaction Agreement and the licensing of the intellectual property under IPLA are hereinafter collectively referred to as the "<u>Transactions</u>");

WHEREAS, the Purchaser desires to receive and the Sellers, acting on their own behalf and as agents for the Providers, have agreed to provide after the Closing Date certain transition services related to the Transactions on the terms and subject to the conditions of this Agreement and as set forth in the Schedules hereto and any subsequent Work Orders;

NOW, THEREFORE, in consideration of the foregoing and the respective covenants, agreements, undertakings and obligations set forth herein and other consideration, the sufficiency and adequacy of which are hereby acknowledged, the Parties hereto agree as follows:

1.    **Definitions**. Unless otherwise defined herein, any capitalized term used herein shall have the meaning assigned to such term in the Transaction Agreement. The following capitalized terms used in this Agreement shall have the meanings set forth below:

"<u>Active Employees</u>" means those Transferring Employees and Additional Employees using the Services.

"<u>Additional Employees</u>" means those employees of the Purchaser, other than Transferring Employees, who require the use of Services in connection with the Business and are individually approved by Sellers, such approval not to be unreasonably withheld. Additional Employees shall be listed on <u>Schedule 3</u>.

"Services IP" has the meaning set forth in Section 2(d).

"Shortfall Notice" has the meaning set forth in Section 2(b)(ii).

"Significant Services Shortfall" has the meaning set forth in Section 2(b)(ii).

"Special Third-Party Costs" for any Service means (in each case to the extent reasonably allocable to providing such Service to a Recipient):

        1.     Costs paid to third parties for required consents or additional licensing so that the Provider(s) of such Service may use leased property, software and other intellectual property to perform such Service (if such Service is used internally or provided to more than one external recipient, then such costs shall be reasonably allocated among such internal and external recipients);

        2.     Costs for leased circuits in labs required to perform the Service including early termination charges; and/or

        3.     Software maintenance costs previously paid for by the Business prior to Closing for using RES Supported Tools and Applications identified in Part B, Section 2.0 of Schedule 1 hereto.

"Tax" or "Taxes" has the meaning set forth in the Transaction Agreement.

"Term" has the meaning set forth in Section 4(a).

"Transaction Agreement" has the meaning set forth in the recitals.

"Transactions" has the meaning set forth in the recitals.

"TSA Period" means, with respect to any Service or sub-category of Service, the period of time set forth in the applicable Schedule or Work Order hereto (if any) during which a Provider will perform such Service or sub-category of Service, provided, that in no event shall such period exceed two (2) months beyond the Closing Date.

"Voice Services" has the meaning set forth in Part A, Section 2.1 of Schedule 1.

"Work Order" means the document setting out the terms and conditions of a Project, a change to a Service or an additional service, as mutually agreed by the applicable Seller and the Purchaser, the form of which is attached hereto as Exhibit A.

        2.     **Services to be Provided**.

        (a)     Services. Each Seller hereby agrees to provide, or to cause one or more of the Providers to provide, to the applicable Recipient(s), each of the applicable services specified to be provided by such Seller in Schedule 1 (Certain Services) and in any Work Orders (collectively, the "Services") during the Term for the applicable TSA Period, upon the terms and conditions of this Agreement, its Exhibits, Schedules and Work Orders (if any). For avoidance

of doubt, to the extent applicable for purposes of each Recipient's receipt of the Services, the rights granted and benefits provided to Purchaser in this Agreement are also granted and provided to the other Recipients.

     (b)     Standard of Performance.

     (i)     Each of the Sellers shall provide, or cause to be provided to the Purchaser, the Services hereunder with the same degree of care and skill with which such Seller performs similar services for itself and the Purchaser at the Closing Date, including, with respect to the type and quality of such services; provided, however, that performance of the Services is subject to (A) variation in the provision of such Services that may be inherent in the plan of Services requested by the Purchaser hereunder (including, where a service related to any Service to be provided hereunder is provided by the Purchaser for itself or by a third party) or (B) differences in quality and timeliness, if any, beyond such Seller's reasonable control that may be caused by (x) changes in the delivery of Services arising from the requests of the Purchaser or (y) changes in the nature or quality of relationships with third parties arising directly from the sale of the Business to the Purchaser. In performing Services, Providers shall accord to the Recipients (and use commercially reasonable efforts to cause any permitted third-party providers to accord to the Recipients) the same priority under comparable circumstances as they have provided the Business in the ordinary course consistent with past practice.

     (ii)     If the quality or performance of the Services provided hereunder falls materially below the relevant standard required by Section 2(b)(i) (a "Significant Services Shortfall"), the Purchaser shall provide the Sellers' Service Coordinators (as defined below) with written notice (a "Shortfall Notice") thereof and the relevant Seller shall use commercially reasonable efforts or shall cause the Provider to use commercially reasonable efforts, to correct promptly in all material respects such Significant Services Shortfall or re-perform promptly in all material respects such Service at the request of the Purchaser and at the expense of the relevant Provider. To be effective, any Shortfall Notice by the Purchaser must (i) specify in reasonable detail the particular error or defect in relation to the performance of the Services and (ii) be made no more than thirty (30) days from the date such error or defect was discovered by the Purchaser or should have been discovered by the Purchaser after reasonable inquiry. If such Shortfall Notice is not made thirty (30) days from the date such error or defect was discovered by the Purchaser or should have been discovered by the Purchaser after reasonable inquiry, then such error or defect shall be deemed irrevocably waived. If a Provider fails to remedy such Significant Services Shortfall as required by this Section 2(b)(ii), the Purchaser may escalate the matter for resolution through the escalation procedures set forth in Section 3(f) and the applicable Provider and Recipient shall promptly implement any remedy determined in accordance with such Section 3(f).

     (c)     Changes.

     (i)     The Sellers will notify the Purchaser in advance of planned material changes to the Services or the manner in which those Services are delivered. The relevant Provider and Recipient will discuss in good faith each such change, and if they mutually agree with respect thereto, they shall complete and execute a corresponding Work Order. The Recipients shall not unreasonably withhold agreement to changes to the Services requested by

8.    **Relationships Between the Parties**.  Nothing in this Agreement shall cause the relationship between any Provider and any Recipient to be deemed to constitute a partnership or joint venture between them.  No Provider and no Recipient shall have any authority, express or implied, to bind, commit or act as agent for the other in any way except as provided herein (including the Exhibits and Schedules hereto).  Each Recipient and each Provider shall be responsible for the salaries, payroll taxes, severance costs and benefits of its own employees.  Each of the Parties agrees that the provisions of this Agreement as a whole are not intended to, and do not, constitute control of other Parties or provide it with the ability to control such other Parties, and each Party hereto expressly disclaims any right or power under this Agreement to exercise any power whatsoever over the management or policies of any other Party.  Nothing in this Agreement shall oblige any Party hereto to act in breach of the requirements of any Law applicable to it.

9.    **Access and Cooperation**.

(a)    Access.  Each Party agrees that it shall provide the other Party assistance as may be required to perform its obligations and exercise its rights under this Agreement.  If either Party has access (either on-site or remotely) to the other Party's computer systems and/or information stores in relation to the Services, such Party shall limit such access solely to the use of such systems for purposes of the Services and shall not intentionally access or attempt to access any other Party's computer systems, files, software or services other than those provided or licensed hereunder, those agreed to by the Parties as being required for the Services, or those that are publicly available (e.g., public websites).  Each Party shall limit such access to those of its Representatives with a bona fide need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Party's security rules and procedures for restricting access to their computer systems.  All user identification numbers and passwords disclosed by any Party to another Party and any information obtained by any Party as a result of such Party's access to and use of another Party's computer systems shall be deemed to be, and treated as, Confidential Information of the disclosing Party hereunder in accordance with the provisions set forth in Section 7, and handled with the same degree of care as such receiving Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care.  The Providers and the Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of any Party.  These provisions concerning computer access shall apply equally to any access and use by a Party of another Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of another Party, and any third-party software that may be accessible by any Party in connection with this Agreement.

(b)    Cooperation.  Each Party shall use commercially reasonable efforts, and shall use commercially reasonable efforts to cause its respective Affiliates and third-party service providers, to cooperate with the other Party in all matters relating to the provision and receipt of the Services, and shall perform all obligations hereunder in good faith and in accordance with principles of fair dealing. Each Recipient, at its own cost, shall (i) comply with its duties to cooperate as set forth in this Agreement, (ii) notwithstanding any Provider's obligation to provide any Services under this Agreement, use its reasonable endeavors to become self

16

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS LIMITED

By:_____
   Name: Anna Ventresca
   Title:  General Counsel-Corporate and
   Corporate Secretary

By:_____
   Name: John Doolittle
   Title:  SVP, Finance and Corporate
   Services

NORTEL NETWORKS INC.

By:_____

Name: Anna Ventresca
Title:    Chief Legal Officer

HITACHI COMMUNICATION
TECHNOLOGIES AMERICA, INC.

By: _Toru Takesu_____
    Name: Toru Takesu
    Title: President & CEO

## Exhibit B

### Access to Providers Information Systems

In order to receive certain Services provided by the Providers pursuant to this Agreement (the "Purpose"), the Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by the Providers and not specific to the Business (the "Providers Information Systems"). For avoidance of doubt, the Providers Information Systems do not include, and the provisions of this Exhibit B shall not apply to, any Assets (as defined in the Transaction Agreement) or Licensed Intellectual Property (as defined in the IPLA), or other equipment, systems or services owned by, or licensed by a Seller to, the Purchaser.

**1.    Access**: Subject to the terms and conditions of this Exhibit B, the Providers hereby grant access to the Purchaser solely to those elements of Providers Information Systems (the "Permitted Systems") necessary for the Purchaser to perform the Purpose, and to no other elements.

**2.    Purpose**: The Purchaser agrees to use the Permitted Systems solely to carry out the Purpose and the Purchaser agrees to use the Permitted Systems for no other purpose.

**3.    Conditions of Use**: The Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit B and such further conditions and policies of use that the Providers may hereafter establish and make known to the Purchaser, including, but not limited to, the "Appropriate Use of Nortel's Network" policy, and to which the Purchaser agrees and accepts in writing case-by-case, based on Section 4 of this Exhibit B, attached to and incorporated in this Agreement. Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. The Purchaser hereby undertakes full responsibility for all persons (including past employees of the Purchaser) gaining access to the Providers Information Systems through the Purchaser's computer systems. The Purchaser shall cooperate in the investigation of any apparent unauthorized access to the Providers Information Systems.

**4.    Employee Access**: The Purchaser shall limit access to the Permitted Systems to the Active Employees and Contract Service Providers, it being understood that such Active Employees and Contract Service Providers shall be informed by the Purchaser of the obligations set forth in this Exhibit B and the confidentiality obligations set forth in Section 7 of the Agreement, provided that, upon the Parties' mutual written agreement in relation to certain Services, access to Permitted Systems will be restricted to only designated Active Employees or Contract Service Providers (such individuals who have access to the Permitted Systems pursuant to the foregoing, "Authorized Workers"). The Providers must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as the Providers' personnel. The Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees of the Purchaser who do

not have an active role in supporting the Purpose) shall have no access to the Providers Information Systems. The Providers may terminate applicable access of Authorized Workers that have breached this Agreement as of the date of notice to the Purchaser that the Authorized Worker(s) identified in the notice has breached this Agreement.

5.    **Prohibitions**: The Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems; (ii) make modifications, enhancements, adaptations or translations, in whole or in part, to or of any element of the Providers Information Systems (except as permitted with respect to Licensed Applications as described in Schedule 1); (iii) make copies of any element of the Providers Information Systems; (iv) probe host computers or networks; (v) breach the security controls of a host computer, network component or authentication system; (vi) monitor data on any network or system; (vii) interfere with the service of any user, host or network, or overload a server, network connected device, or network component; (viii) originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device; or (ix) forge data or misrepresent the origination of a user or source.

6.    **Purchaser's Systems**:

(a)    **Access Security**. The Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable Firewall. The Purchaser shall follow all of the Providers' security rules and procedures for restricting access to its computer systems provided in writing to Purchaser.

(b)    **Segregation Wall**. The Purchaser will implement procedures to segregate Seller Confidential Information from Purchaser personnel who are not Authorized Workers.

7.    **Notice of Security Breach**: Each Party shall advise the other Party by the most expeditious means available, and shall, promptly thereafter, notify the other Party in writing if the first Party becomes aware of a breach, or attempted breach, by its employees of the other Party's security procedures relating to Services or in the event there is a breach, or attempted breach, (i) of security on or at any such first Party's computer systems or facilities that are used to access Providers Information Systems (in the case of access by the Recipients) or relating to, or that could potentially relate to, Services, or (ii) of the physical or electronic procedures for segregating and protecting the other Party's information, data and communications from those of the first Party and third parties. In the event of such a breach or attempted breach, the Party whose security procedures are affected shall, at its expense, preserve the integrity of Providers Information Systems (in the case of the Purchaser) and Confidential Information of the other Party, and to prevent such breach or attempted breach from recurring. The Providers reserve the right to request the removal of any Authorized Worker from the Providers' site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of the Providers' network, or a breach of Providers' policies or procedures.

8.    **Third-Party Technology:** The Purchaser acknowledges that access to the Permitted Systems may require that the Purchaser have access to software licensed by the Providers from a

third party. The Purchaser acknowledges that third-party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by the Purchaser. Nothing herein shall require the Providers to acquire any rights to sublicense such rights from any third party. Subject to the limitations set forth in Section 6 of the Agreement, the Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including legal fees and expenses) arising out of the Purchaser's use of such third-party software. Additionally, the Purchaser acknowledges that it may be required to acquire a license for certain third-party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case the Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.

**9.      Confidential Information:** All passwords, identification numbers and similar information and data obtained before Closing by the Provider and modified by Purchaser's use of Providers Information Systems shall be treated as Confidential Information of the Provider.

**10.      Personal Data:** The Parties shall comply with their respective obligations under all applicable data protection and privacy laws. If the Purchaser has access to any element of the Providers Information Systems containing data relating to identified or identifiable individuals (including but not limited to employee identification numbers, compensation records, health records, credit card information) ("Personal Data"), the Purchaser (a) must not, and must not authorize any third party to, process such Personal Data for any purpose other than the Purpose; (b) must, and must ensure that its employees, agents and contractors, take adequate technical and organizational security measures to safeguard such Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use; (c) reasonably cooperate with the Providers' efforts to (x) comply, within statutory time limits, with requests by individuals for access to such Personal Data; (y) investigate any breach or alleged breach of applicable privacy or data protection Laws with respect to such Personal Data; and (z) respond to and comply with any request or demand made by any national privacy or data protection authority with respect to such Personal Data.

**11.      Failure of Access:** The Purchaser acknowledges that access to the Permitted Systems may be interrupted due to circumstances within or outside the reasonable control of the Providers. Nothing in this Agreement shall be considered a promise or covenant to deliver uninterrupted access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to the Purchaser by virtue of access to the Permitted Systems.

**12.      Waiver of Liability:** The Providers shall have no liability whatsoever for any unintentional damages, losses or expenses incurred by any Purchaser or Recipient accessing of a computer virus or other harmful computer file or program through the Permitted Systems, whether arising in contract, tort or otherwise; provided, that such Provider shall be liable for damages, losses or expenses incurred by accessing of a computer virus or other harmful computer file or program if (i) such Provider was aware of such virus or other program spreading inside its systems or in its applications, and (ii) such Provider nevertheless did not alert the applicable Recipient as to such virus or other program. The Providers shall have no liability whatsoever for any unintentional damages, losses or expenses incurred by any Purchaser or

**<u>EXHIBIT I</u>**

Excerpt of Transition Services Agreement, dated March 19, 2010, with Ciena Corporation

Confidential                                                              Execution Copy

# TRANSITION SERVICES AGREEMENT
## TERMS AND CONDITIONS

This Transition Services Agreement (this "Agreement") is made and entered into as of 19 March 2010 and effective as of the Closing Date, by and between:

(1)    Nortel Networks Corporation, a Canadian corporation ("NNC"),

(2)    Nortel Networks Limited, a Canadian corporation ("NNL"),

(3)    Nortel Networks Inc., a Delaware corporation ("NNI"),

(4)    Nortel Networks UK Limited (in administration), a company incorporated in England (Company number 03937799) ("NNUK"), acting by its joint administrators A. R. Bloom, S. J. Harris, A. M. Hudson and C. J. W. Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF, United Kingdom, who act as agent only of NNUK and without any personal liability whatsoever (collectively, the "UK Joint Administrators"),

(5)    Nortel Networks (Ireland) Limited (in administration), a company incorporated in the Republic of Ireland (Company number 40287) ("NN Ireland"), acting by its joint administrators A. R. Bloom and D. Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland, who act as agent only of NN Ireland and without any personal liability whatsoever (together with the UK Joint Administrators, the "Joint Administrators"),

(6)    each of the Other Sellers (as defined in the ASA),

(7)    each of the Joint Administrators in their respective capacities as joint administrators of respectively NNUK and NN Ireland only, acting as agent of respectively NNUK and NN Ireland and without any personal liability whatsoever, and

(8)    Ciena Corporation, a Delaware corporation ("Purchaser"),

each a "Party" and collectively, the "Parties".

WHEREAS, Purchaser and the Main Sellers (together with the Other Sellers) have entered into the Amended and Restated Asset Sale Agreement, dated November 24, 2009 (the "ASA"), pursuant to which Purchaser has agreed to purchase and the Main Sellers (and those other persons) have agreed to sell that part of the Business carried on by the Main Sellers (and those other persons);

WHEREAS, Purchaser and the EMEA Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated October 7, 2009, as amended (the "EMEA ASA"), pursuant to which Purchaser and the EMEA Designated Purchasers designated by the Purchaser have agreed to purchase and the EMEA Sellers (and those other persons) have agreed to sell (subject to the irrevocable offer wording in Schedule 6 to the EMEA ASA) that part of the Business (as defined in the ASA) carried on by the EMEA Sellers (and those other persons) (the

1

2.    Services to be Provided

(a)    Services

Subject to the other provisions of this Agreement, each Seller hereby agrees to provide, or to cause one or more of the Providers to provide:

(i)    the tasks, functions, services and responsibilities set forth in the Services Schedules and in any Work Orders agreed to in writing by the Parties; and

(ii)    such other tasks, functions, services and responsibilities, which are not specified in this Agreement, but that:

(A)    are ancillary and necessary to any of services to be provided in respect of one or more of the categories of services that Sellers are to perform pursuant to Schedule B (Services), and which were performed in connection with the Business during the period from and including the Reference Date through the Closing Date; or

(B)    are reasonably required to extract or segregate Purchaser Data in Providers' Information Systems or permit the secure use of Purchaser Data on a co-mingled basis in Providers' Information Systems in order to support, and to continue to support throughout the Term, the Sellers' delivery of the Services to the Business as a business that is external to the Sellers, together with such changes, if any, to the mode of delivery of those tasks, functions, services and responsibilities made necessary by the change of the Business from one that is internal to Sellers to one that is external to Sellers.

during the Term for the applicable TSA Period, upon the terms and conditions of this Agreement, its Exhibits, Schedules and Work Orders (if any) (collectively, the "Services"), provided that (x) in respect of each TSA EMEA Seller, the Services Schedules set out explicitly each Service which is to be provided by such TSA EMEA Seller and a TSA EMEA Seller shall only be obliged to provide those Services which are so allocated to it and any Migration Services required of it to deliver a Project agreed by the Parties in accordance with Section 2(h), (y) within six (6) months after Closing and with a view to assisting the Purchaser to develop its migration strategy to ensure the stability of the supply of Services to the Purchaser after the first anniversary of the date of this Agreement, the TSA Sellers (other than the TSA EMEA Sellers) will initiate meetings with the Purchaser with a view to assisting them to establish a viable migration strategy for relevant Services, pursuant to which appropriate Migration Services will be identified in accordance with Section 2(h) and Schedule F (Migration), and (z) on the first anniversary of the Closing Date (the "Drop Dead Date"), the TSA EMEA Sellers and the Joint Administrators shall cease to be parties to this Agreement and shall be relieved of any further obligations under this Agreement and any Services to be provided by a TSA EMEA Seller (without prejudice to any claims that have arisen prior to that date). For the purposes of clarity, after the Drop Dead Date, the Sellers (other than the TSA EMEA Sellers) shall likewise have no obligations respecting any Services formerly provided by TSA EMEA Sellers (other than with respect to any Migration Services agreed as aforesaid, respecting any claims that have arisen prior to that date, and as otherwise agreed by the Parties).

8.      Relationships Between the Parties

Nothing in this Agreement shall cause the relationship between any Provider and any Recipient to be deemed to constitute a partnership or joint venture between them. No Provider and no Recipient shall have any authority, express or implied, to bind, commit or act as agent for the other in any way except as provided herein (including the Exhibits and Schedules hereto). Each Recipient and each Provider shall be responsible for the salaries, payroll taxes, severance costs and benefits of its own employees. Each of the Parties agrees that the provisions of this Agreement as a whole are not intended to, and do not, constitute control of other Parties or provide it with the ability to control such other Parties, and each Party hereto expressly disclaims any right or power under this Agreement to exercise any power whatsoever over the management or policies of any other Party. Nothing in this Agreement shall oblige any Party hereto to act in breach of the requirements of any Law applicable to it.

9       Access and Cooperation

(a)     Access

Purchaser shall, without charge, provide such reasonable access to its premises and/or personnel, and such reasonable assistance as may be required for the Providers to perform their obligations under this Agreement, to (i) the Providers, (ii) any Affiliate of the Providers and/or (iii) a third-party provider of the Services with whom the Providers have contracted for such Service, provided in all cases that such parties have agreed to confidentiality restrictions at least as rigorous as those required under Section 7. The Purchaser acknowledges that, especially at the outset of the Term, it will be important to afford the Sellers as much access as reasonably practicable to relevant Transferred Employees and Business NPWs. If any Party has access (either on-site or remotely) to any other Party's computer systems and/or information stores in relation to the Services, such access shall be in accordance with Section 7(b). Each Party shall limit such access to those of its Representatives with a good faith need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Parties' security rules and procedures for restricting access to their computer systems. All user identification numbers and passwords disclosed by any Party to another Party and any information obtained by any Party as a result of such Party's access to and use of another Party's computer systems shall be deemed to be, and treated as, Confidential Information of the Disclosing Party hereunder in accordance with the provisions set forth in Section 7, with the same degree of care as such Receiving Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care. The Providers and Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of any Party. These provisions concerning computer access shall apply equally to any access and use by a Party of another Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of another Party, and any third-party software that may be accessible by any Party in connection with this Agreement.

33

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION,**
on its own behalf and on behalf of the Other Sellers
listed in Section 11.15(a)(i) of the Sellers
Disclosure Schedule

By: _____

    Name: Anna Ventresca
    Title:  General Counsel-Corporate and
    Corporate Secretary

By: _____

    Name: John Doolittle
    Title:  Senior Vice-President, Finance and
    Corporate Services


**NORTEL NETWORKS LIMITED,**
on its own behalf and on behalf of the Other Sellers
listed in Section 11.15(a)(ii) of the Sellers
Disclosure Schedule

By: _____

    Name: Anna Ventresca
    Title:  General Counsel-Corporate and
    Corporate Secretary

By: _____

    Name: John Doolittle
    Title:  Senior Vice-President, Finance and
    Corporate Services


**NORTEL NETWORKS INC.,**
on its own behalf and on behalf of the Other Sellers
listed in Section 11.15(a)(iii) of the Sellers
Disclosure Schedule

By: _____

    Name: Anna Ventresca
    Title:  Chief Legal Officer


*[Signature page to Transition Services Agreement]*

NORTEL NETWORKS UK LIMITED (in administration) by Alan Bloom, as Joint Administrator (acting as agent only and without any personal liability whatsoever)

By:_____

Name: ALAN BLOOM

Title: JOINT ADMINISTRATOR

NORTEL NETWORKS (IRELAND) LIMITED (in administration) by Alan Bloom, as Joint Administrator (acting as agent only and without any personal liability whatsoever)

By:_____

Name: ALAN BLOOM

Title: JOINT AOMINISTRATOR

Signed in his own capacity and for and on behalf of the Joint Administrators without personal liability and solely for the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators:

By:_____

Name: ALAN BLOOM

Title: JOINT ADMINISTRATOR

**CIENA CORPORATION**

By: _____

Name:  Gary B. Smith
Title:    President and Chief Executive Officer

By: _____

Name:  David M. Rothenstein
Title:    Senior Vice President, General Counsel and
             Secretary

*[Signature Page to Transition Services Agreement]*

## Exhibit D

### Access to Providers' Information Systems

In order to receive certain Services provided by the Providers pursuant to this Agreement (the "Purpose"), Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by the Providers (the "Providers' Information Systems").

1.      **Access**: Subject to the terms and conditions of this Exhibit D, the Providers hereby grant access to Purchaser solely to those elements of Providers' Information Systems (the "Permitted Systems") necessary for Purchaser to perform the Purpose, and to no other elements.

2.      **Purpose**: Purchaser agrees to use the Permitted Systems solely to carry out the Purpose and Purchaser agrees to use the Permitted Systems for no other purpose.

3.      **Conditions of Use**: Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit D, the "Appropriate Use of Nortel's Network" policy attached as Annex 1 to this Exhibit D, and those policies to which Purchaser agrees and accepts in writing case-by-case, based on Section 4 of this Exhibit D, attached to and incorporated in this Agreement. Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. Purchaser hereby undertakes full responsibility for all persons (including past employees of Purchaser) gaining access to the Providers' Information Systems through Purchaser's computer systems. Purchaser shall cooperate in the investigation of any apparent unauthorized access to the Providers' Information Systems.

4.      **Employee Access**: Purchaser shall limit access to the Permitted Systems to the Active Employees, it being understood that such Active Employees shall be informed by Purchaser of the obligations set forth in this Exhibit D and the confidentiality obligations set forth in Section 7 of the Agreement, provided that, upon the Providers' reasonable request in relation to certain Services, access to Permitted Systems will be restricted to only Restricted Access Active Employees (such employees who have access to the Permitted Systems pursuant to the foregoing, "Authorized Workers"). The Providers must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as the Providers' personnel. Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees of Purchaser, any Designated Purchaser or any EMEA Designated Purchaser who do not have an active role in supporting the Purpose) shall have no access to the Providers' Information Systems. The Providers may terminate applicable access as of the date of notice to Purchaser that the Authorized Worker(s) identified in the notice has breached this Agreement.

5.      **Prohibitions**: Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers' Information Systems, (ii) make modifications, enhancements, adaptations or translations, in whole or in part,

to or of any element of the Providers' Information Systems, (iii) make copies of any element of the Providers' Information Systems, (iv) probe host computers or networks, (v) breach the security controls of a host computer, network component or authentication system, (vi) monitor data on any network or system, (vii) interfere with the service of any user, host or network, or overload a server, network connected device, or network component, (viii) originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device, or (ix) forge data or misrepresent the origination of a user or source.

6. **Purchaser's Systems:**

(a) **Access Security.** Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable Firewall. Purchaser shall follow each of the Provider's reasonable security rules and procedures for restricting access to its computer systems.

(b) **Segregation Wall.** Purchaser will ensure that Authorized Workers are effectively isolated from its personnel who are not Authorized Workers. As of the Closing Date, Purchaser will have in place and implemented procedures to segregate all the Seller information, data and communications (including, but not limited to Confidential Information) from other Purchaser's personnel who are not Authorized Workers.

(c) **Assessment.** Purchaser shall grant to the Providers' reasonable access to its computer facilities in order to assess the on-going adequacy of Purchaser's security measures and procedures as they relative to the security of Providers' Information Systems, and Purchaser shall assist and co-operate with the Providers in carrying out any such assessment.

(d) **Denial of Access.** In the event the Providers reasonably determine that Purchaser's security measures and procedures are inadequate to prevent unauthorized access to or use of the Providers' Information Systems, the Providers may immediately deny further access until Purchaser takes such measures as the Providers may reasonably require.

7. **Notice of Security Breach:** Purchaser shall immediately notify the Providers in writing in the event there is a breach, or attempted breach, (i) of security on or at Purchaser's computer systems or facilities that impacts Providers' Information Systems, or (ii) of the physical or electronic procedures for segregating and protecting Providers' information, data and communications from those of Purchaser and third parties. In the event of such a breach or attempted breach, Purchaser shall, at its expense, do whatever is necessary to preserve the integrity of Providers' Information Systems and Confidential Information, and to prevent such breach or attempted breach from recurring. The Providers reserve the right to request the removal of any Authorized Worker from the Providers' site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of the Providers' network, or a breach of Providers' policies or procedures.

Confidential                                                     Execution Copy

8.      **Confidential Information**: All passwords, identification numbers and all information and data obtained before Closing by the Provider and modified during Purchaser's use of Providers' Information Systems shall be treated as Confidential Information of the Provider.

9.      **Personal Data**: The Parties shall comply with their respective obligations under all applicable data protection and privacy laws. If Purchaser has access to any element of the Providers' Information Systems containing data relating to individuals (including but not limited to employee identification numbers, compensation records, health records, credit card information) ("Personal Data"), Purchaser must not, and must not authorize any third party to (i) process the Personal Data for any purpose other than the Purpose or (ii) transfer any Personal Data to any third country. Purchaser must, and must ensure that its employees, agents and contractors, take adequate technical and organizational security measures to safeguard Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use. Purchaser will provide the Providers with all reasonable assistance (x) in complying, within statutory time limits, with requests by individuals for access to their Personal Data, (y) in investigating any breach or alleged breach of applicable privacy or data protection Laws, and (z) in responding to and complying with any request or demand made by any national privacy or data protection authority. Individuals whose Personal Data are the subject of disclosure by the Providers to Purchaser may enforce the terms of this Section 10 directly against Purchaser however the consent of such individuals shall not be required for any variation or termination of this Agreement.

10.     **No License Created by Right of Access**: Nothing in this Agreement shall be considered a promise or covenant to deliver uninterrupted access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to Purchaser by virtue of access to the Permitted Systems.

## **EXHIBIT J**

Excerpt of Transition Services Agreement, dated March 31, 2010, with Telefonaktiebolaget L M
Ericsson (publ)

**EXECUTION VERSION**

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (this "<u>Agreement</u>") is made and entered into as of March 31, 2010 and effective as of the Closing Date, by and between:

(1)     Nortel Networks Corporation, a Canadian corporation ("<u>NNC</u>"),

(2)     Nortel Networks Limited, a Canadian corporation ("<u>NNL</u>"),

(3)     Nortel Networks Inc., a Delaware corporation ("<u>NNI</u>"),

(4)     Nortel Networks UK Limited (in administration), a company incorporated in England (Company number 03937799) ("<u>NNUK</u>"), acting by its joint administrators A. R. Bloom, S. J. Harris, A. M. Hudson and C. J. W. Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF, United Kingdom, who act as agent only of NNUK and without any personal liability whatsoever (collectively, the "<u>UK Joint Administrators</u>"),

(5)     Nortel Networks (Ireland) Limited (in administration), a company incorporated in the Republic of Ireland (Company number 40287) ("<u>NN Ireland</u>"), acting by its joint administrators A. R. Bloom and D. Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland, who act as agent only of NN Ireland and without any personal liability whatsoever (together with the UK Joint Administrators, the "<u>Joint Administrators</u>"),

(6)     each of the entities identified as Other Sellers in <u>Exhibit A</u> (the "<u>Other Sellers</u>"),

(7)     each of the Joint Administrators in their respective capacities as joint administrators of respectively NNUK and NN Ireland only, acting as agent of respectively NNUK and NN Ireland and without any personal liability whatsoever, and

(8)     Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden ("<u>Purchaser</u>"),

each a "<u>Party</u>" and collectively, the "<u>Parties</u>"; provided that each of the Parties identified in (1) to (3) is acting on its own behalf and as agent for the Providers (as defined herein) other than any Provider incorporated and/or located in an EMEA Jurisdiction.

WHEREAS, Purchaser and the Main Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated November 24, 2009 (the "<u>ASA</u>"), pursuant to which Purchaser and the Designated Purchasers have agreed to purchase and the Main Sellers (and those other persons) have agreed to sell the assets used or held for use predominantly in the Business carried on by the Main Sellers (and those other persons) (the sale of such assets under the ASA is hereinafter referred to as the "<u>Transaction</u>");

WHEREAS, the TSA EMEA Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated November 24, 2009 (the "<u>EMEA ASA</u>"), pursuant to which the purchaser thereunder (the "<u>EMEA Purchaser</u>") and the EMEA Designated Purchasers (as defined therein) have agreed to purchase and the TSA EMEA Sellers (and those other

1

"TS Employees" means those employees of Providers engaged in delivering Business Services to Purchaser.

"TSA EMEA Sellers" means NNUK and NN Ireland.

"TSA Period" means, with respect to any Service or sub-category of Service, the period of time set forth in the applicable Schedule or Work Order hereto (if any) during which Provider(s) will perform such Service or sub-category of Service, which in the case of Services provided by the TSA EMEA Sellers will not be beyond twelve (12) months from the Closing Date; provided, that in the event that no period of time is specified, an eighteen (18) month time period shall apply for Services provided by a Provider that is not a TSA EMEA Seller and a twelve (12) month time period shall apply for Services provided by a Provider that is a TSA EMEA Seller.

"UK Joint Administrators" has the meaning set forth in the preamble.

"VAT" means value added tax imposed in any member state of the European Union pursuant to EC Council Directive 2006/112 on the common system of value added tax (Directive 2006/112) and national legislation implementing that Directive or any predecessor to it or supplemental to that Directive and any other sales or turnover tax of a similar nature imposed in any country that is not a member of the European Union together with all penalties or interest thereon or any tax of a similar nature which may be substituted for or levied in addition to it.

"Work Order" means the document setting out the terms and conditions of a Project, a change to a Service or an additional service, as mutually agreed by the applicable Seller and Purchaser, the form of which is attached hereto as Exhibit B.

2.    **Services to be Provided**.

(a)    Services.  Each Seller hereby agrees to provide, or to cause one or more of the Providers to provide, each of the applicable services specified to be provided by such Seller in Schedule 1 (Certain Services) and in any Work Orders (collectively, the "Services") during the Term for the applicable TSA Period, upon the terms and conditions of this Agreement, its Exhibits, Schedules and Work Orders (if any).

(b)    Standard of Performance.

(i)    Each of the Sellers shall provide, or cause to be provided, the Services hereunder with the same degree of care and skill and to the same standard with which such Seller has on average performed or caused to be performed the same or similar services to the Business during the nine (9) month period prior to the date hereof (the "Measuring Period") and over the course of the Term, generally the same priority as provided to other Third Parties receiving comparable services under comparable transition services agreements entered into by the Sellers or their Affiliates; provided, however, that performance of the Services is subject to (A) variation in the provision of such Services that may be made at the request of Purchaser pursuant to the terms of this Agreement or inherent in the plan of Services requested by Purchaser hereunder (including, where a service related to any Service to be provided hereunder is provided by Purchaser for itself or by a Third Party) or (B) differences in quality and timeliness, if any,

9

which in no event will be less than those precautions that such Receiving Party employs to protect its own proprietary information. Confidential Information belonging to any Party that is not related to the Transaction or the provision of Services hereunder but is unintentionally disclosed to a Representative of the other Parties during the Term of this Agreement as an unintended result of the provision of the Services shall not be further disclosed by such Representative to any other Representative of such Receiving Party.

8.      **Relationships Between the Parties**.  Nothing in this Agreement shall cause the relationship between any Provider and any Recipient to be deemed to constitute a partnership or joint venture between them.  No Provider and no Recipient shall have any authority, express or implied, to bind, commit or act as agent for the other in any way except as provided herein (including the Exhibits and Schedules hereto).  Each Recipient and each Provider shall be responsible for the salaries, payroll Taxes, severance costs and benefits of its own employees. Each of the Parties agrees that the provisions of this Agreement as a whole are not intended to, and do not, constitute control of other Parties or provide it with the ability to control such other Parties, and each Party hereto expressly disclaims any right or power under this Agreement to exercise any power whatsoever over the management or policies of any other Party.  Nothing in this Agreement shall oblige any Party hereto to act in breach of the requirements of any Law, rule or regulation applicable to it.  The Parties agree that no Recipient shall, for any purposes whatsoever, by reason of this Agreement or the performance hereof be considered or deemed to be an "employer" for purposes of any Seller or Provider pension plan (other than the Transferred Employee Plans) and applicable pension benefits standards legislation.

9.      **Access and Cooperation**.

(a)      Access.  Purchaser agrees that it shall, without charge, provide such reasonable access to its premises and/or personnel, and such reasonable assistance as may be required for the Providers to perform their obligations under this Agreement, to (i) the Providers, (ii) any Affiliate of the Providers and/or (iii) a Third Party provider of the Services with whom the Providers have contracted for such Service.  If any Party has access (either on-site or remotely) to any other Party's computer systems and/or information stores in relation to the Services, such Party shall limit such access solely to the use of such systems for purposes of the Services and shall not access or attempt to access any other Party's computer systems, files, software or services other than those agreed to by the Parties as being required for the Services, or those that are publicly available (e.g., public websites). Each Party shall limit such access to those of its Representatives with a bona fide need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Parties' security rules and procedures for restricting access to their computer systems.  All user identification numbers and passwords disclosed by any Party to another Party and any information obtained by any Party as a result of such Party's access to and use of another Party's computer systems shall be deemed to be, and treated as, Confidential Information of the Disclosing Party hereunder in accordance with the provisions set forth in Section 7, with the same degree of care as such Receiving Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care.  The Providers and Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of any Party. These provisions concerning computer access shall apply equally to any access and use by a

28

Party of another Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of another Party, and any Third Party software that may be accessible by any Party in connection with this Agreement.

(b)     Cooperation. Each Party shall use commercially reasonable efforts, and shall use commercially reasonable efforts to cause its respective Affiliates and Third Party service providers, to cooperate with the other Party in all matters relating to the provision and receipt of the Services, and shall perform all obligations hereunder in good faith and in accordance with principles of fair dealing. Each Recipient, at its own cost, shall (i) comply with its duties to cooperate as set forth in this Agreement and (ii) comply with all reasonable operating standards and policies prescribed by any Provider (acting reasonably) of such Service. Each Party agrees that the provision of Services by the relevant Provider is dependent on prompt and timely cooperation between the Parties.

10.     **Firewall Protection**. Notwithstanding anything to the contrary in Section 9 hereof, prior to performance of certain Services, and/or in connection with the termination of Services hereunder, action may need to be taken to insulate the Provider's or the Recipient's, as applicable, and/or their respective Affiliates' operations, assets, proprietary information, software, equipment or data from that of the other Parties (such insulation being referred to hereinafter as a "Firewall"). Each Party shall give notice to the other Parties indicating what aspects of the notifying Party's business information, if any, need to be isolated, the nature of the activities necessary to accomplish such isolation and the expected time involved.

11.     **Security Measures**. Each Party shall provide the other Parties with reasonable access to the computer facilities that it plans to use in association with the Services for the purposes of assessing the adequacy of the requested Party's security measures and procedures in effect on such computer facilities, and shall assist and cooperate with the requesting Party in carrying out any such assessment. In the event where one Party determines that the security measures and procedures are inadequate to prevent unauthorized access to or use of Services or where data protection or privacy laws are in danger of being violated, the Parties shall agree upon such measures as may reasonably be needed to improve such security measures and procedures. Periodically, at reasonable intervals thereafter, each Party shall afford the other Parties an opportunity to confirm the continued adequacy of the security measures and procedures in effect on such computer facilities. In the event of a breach of security on or at a Party's facilities relating to, or that could potentially relate to, Services, or if the Party becomes aware of a breach by its employees of another Party's security procedures relating to Services, such Party shall advise the other thereof by the most expeditious means available and shall, promptly thereafter, notify the other in writing of such breach and take such measures as are available to it to preserve the other's proprietary interest in Services and the information accessible thereby.

12.     **Regulatory Matters; Trade Compliance**. The Sellers will reasonably cooperate with Purchaser, at Purchaser's expense, and any regulatory authorities that supervise Purchaser in order to assist Purchaser in satisfying any regulatory requirements applicable to entities that provide services to Purchaser. Purchaser will comply with applicable import and export control laws and regulations of those countries having jurisdiction with respect to the export of products

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS CORPORATION

By:_____

Name: John Doolittle
Title: SVP, Corporate Services and
Chief Financial Officer

By:_____

Name: Anna Ventresca
Title: General Counsel-Corporate and
Corporate Secretary

NORTEL NETWORKS LIMITED

By:_____
    Name:  John Doolittle
    Title:   SVP, Corporate Services and
    Chief Financial Officer

By:_____
    Name: Anna Ventresca
    Title:   General Counsel-Corporate and
    Corporate Secretary

NORTEL NETWORKS, INC.

By:_____
    Name: Anna Ventresca
    Title:  Chief Legal Officer

SIGNED for and on behalf of **Nortel Networks**          )     ...........................................................
**UK Limited** (in administration) by Stephen          )     Stephen Harris
Harris as Joint Administrator (acting as agent          )
and without personal liability) in the presence          )
of:

Witness signature

...........................................................          )
Name: EMILIA LAU          )
Address: Herbert Smith LLP, Exchange House,          )
Primrose Street, London EC2A 2HS

Signature Page to TSA -- Ericsson

**SIGNED** by Alan Bloom in his own capacity )
and on behalf of the Joint Administrators )  ..............................................
without personal liability and solely for the ) Alan Bloom
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators in the presence of:

Witness signature

.......................................................... )
Name:  TRACEY REAP )
Address: )
        **ERNST & YOUNG LLP**
        **1 More London Place**
        **London**
        **SE1 2AF**

Signature Page to TSA – Ericsson

SIGNED for and on behalf of **Nortel Networks**      )      ................................................................
**(Ireland) Limited** (in administration) by David      )      David Hughes
Hughes as Joint Administrator (acting as agent      )
and without personal liability) in the presence      )
of:


Witness signature

.Claire..Madden............................      )
Name: CLAIRE MADDEN      )
Address: HARCOURT CENTRE      )
         HARCOURT STREET
         DUBLIN 2

Signature Page to TSA – Ericsson

NORTEL DE MEXICO, S. DE R.L. DE C.V.

By:_____

Name: LIBARDO ANDRES RAMIREZ GRACIA
Title: ATTORNEY-IN-FACT

[Signature Page to TSA – Ericsson]

NORTEL NETWORKS (CHINA)
LIMITED

By:_____
    Name:  John Doolittle
    Title:  Chairman and Legal
    Representative

TELEFONAKTIEBOLAGET L M
ERICSSON (PUBL)

By: _____
    Name: Richard Gullbo
    Title: Authorized Signatory

By: _____
    Name: Martin Backman
    Title: Authorized Signatory

## Exhibit C

### Access to Providers Information Systems

In order to receive certain Services provided by the Providers pursuant to this Agreement (the "Purpose"), Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by the Providers (the "Providers Information Systems").

**1.     Access**: Subject to the terms and conditions of this Exhibit C, the Providers hereby grant access to Purchaser solely to those elements of Providers Information Systems (the "Permitted Systems") necessary for Purchaser to perform the Purpose, and to no other elements.

**2.     Purpose**: Purchaser agrees to use the Permitted Systems solely to carry out the Purpose and Purchaser agrees to use the Permitted Systems for no other purpose.

**3.     Conditions of Use**: Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit C and such reasonable further conditions and policies of use that the Providers may hereafter establish and make known to Purchaser, including, but not limited to the "Appropriate Use of Nortel's Network" policy attached as Annex 1 to this Exhibit C and those policies to which Purchaser agrees and accepts in writing case-by-case, based on Section 4 of this Exhibit C, attached to and incorporated in this Agreement. Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. Purchaser hereby undertakes full responsibility for all persons (including past employees of Purchaser) gaining access to the Providers Information Systems through Purchaser's computer systems. Purchaser shall cooperate in the investigation of any apparent unauthorized access to the Providers Information Systems.

**4.     Employee Access**: Purchaser shall limit access to the Permitted Systems to the Active Employees, it being understood that such Active Employees shall be informed by Purchaser of the obligations set forth in this Exhibit C and the confidentiality obligations set forth in Section 7 of the Agreement, provided that, upon the Providers' reasonable request in relation to certain Services, access to Permitted Systems will be restricted to only Restricted Access Active Employees (such employees who have access to the Permitted Systems pursuant to the foregoing, "Authorized Workers"). The Providers must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as the Providers' personnel. Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees of Purchaser or any Designated Purchaser who do not have an active role in supporting the Purpose) shall have no access to the Providers Information Systems. The Providers may terminate applicable access as of the date of notice to Purchaser that the Authorized Worker(s) identified in the notice has breached this Agreement.

**5.**     **Prohibitions**: Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems; (ii) make modifications, enhancements, adaptations or translations, in whole or in part, to or of any element of the Providers Information Systems; (iii) make copies of any element of the Providers Information Systems; (iv) probe host computers or networks; (v) breach the security controls of a host computer, network component or authentication system; (vi) monitor data on any network or system; (vii) interfere with the service of any user, host or network, or overload a server, network connected device, or network component; (viii) originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device; or (ix) forge data or misrepresent the origination of a user or source.

**6.**     **Purchaser's Systems**:

(a)     **Access Security**. Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable Firewall. Purchaser shall follow each of the Provider's security rules and procedures for restricting access to its computer system.

(b)     **Segregation Wall**. Purchaser will ensure that Authorized Workers are effectively isolated from its personnel who are not Authorized Workers. Purchaser will implement procedures to segregate all the Seller information, data and communications (including, but not limited to Confidential Information) from other Purchaser's personnel who are not Authorized Workers.

(c)     **Assessment**. Purchaser shall grant to the Providers reasonable access to its computer facilities in order to assess the on-going adequacy of Purchaser's security measures and procedures, and Purchaser shall assist and co-operate with the Providers in carrying out any such assessment.

(d)     **Denial of Access**. In the event the Providers determine that Purchaser's security measures and procedures are inadequate to prevent unauthorized access to or use of the Providers Information Systems, the Providers may immediately deny further access until Purchaser takes such measures as the Providers may require.

**7.**     **Notice of Security Breach**: Purchaser shall immediately notify the Providers in writing in the event there is a breach, or attempted breach, (i) of security on or at the Purchaser's computer systems or facilities that impacts Providers Information Systems, or (ii) of the physical or electronic procedures for segregating and protecting Providers' information, data and communications from those of Purchaser and third parties. In the event of such a breach or attempted breach, Purchaser shall, at its expense, do whatever is reasonably necessary to preserve the integrity of Providers Information Systems and Confidential Information, and to prevent such breach or attempted breach from recurring. The Providers reserve the right to request the removal of any Authorized Worker from the Providers' site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of the Providers' network, or a breach of Providers' policies or procedures.

**8.** **Third Party Technology:** Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a Third Party. Purchaser acknowledges that Third Party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by Purchaser. Nothing herein shall require the Providers to acquire any rights to sublicense such rights from any Third Party. Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such Third Party software. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain Third Party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.

**9.** **Confidential Information:** All passwords, identification numbers and all information and data obtained before Closing by a Provider and modified during Purchaser's use of Providers Information Systems shall be treated as Confidential Information of the Provider.

**10.** **Personal Data:** The Parties shall comply with their respective obligations under all applicable data protection and privacy laws. If Purchaser has access to any element of the Providers Information Systems containing data relating to individuals (including but not limited to employee identification numbers, compensation records, health records, credit card information) ("Personal Data"), Purchaser shall use commercially reasonable efforts to not, and must not authorize any Third Party to (i) process the Personal Data for any purpose other than the Purpose or (ii) transfer any Personal Data to any third country. Purchaser shall use commercially reasonable efforts to take, and to ensure that its employees, agents and contractors take, adequate technical and organizational security measures to safeguard Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use. Purchaser will provide the Providers with all reasonable assistance (x) in complying, within statutory time limits, with requests by individuals for access to their Personal Data; (y) in investigating any breach or alleged breach of applicable privacy or data protection Laws; and (z) in responding to and complying with any request or demand made by any national privacy or data protection authority.

**11.** **Failure of Access:** Purchaser acknowledges that access to the Permitted Systems may be interrupted due to circumstances within or outside the reasonable control of the Providers. Nothing in this Agreement shall be considered a promise or covenant to deliver uninterrupted access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to Purchaser by virtue of access to the Permitted Systems.

**12.** **Waiver of Liability:** The Parties shall have no liability whatsoever for any damages, losses or expenses incurred as a result of access of a computer virus or other harmful computer file or program, whether arising in contract, tort or otherwise except in the case of gross negligence or willful misconduct on the part of any other Party.

C-3

# **EXHIBIT K**

Excerpt of Transition Services Agreement, dated March 31, 2010, with Kapsch CarrierCom AG

**EXECUTION VERSION**

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (this "Agreement") is made and entered into as of 31 March 2010 and effective as of the Closing Date, by and between:

(1)    Nortel Networks Corporation, a Canadian corporation ("NNC"),

(2)    Nortel Networks Limited, a Canadian corporation ("NNL"),

(3)    Nortel Networks Inc., a Delaware corporation ("NNI"),

(4)    Nortel Networks UK Limited (in administration), a company incorporated in England (Company number 03937799) ("NNUK"), acting by its joint administrators A. R. Bloom, S. J. Harris, A. M. Hudson and C. J. W. Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF, United Kingdom, who act as agent only of NNUK and without any personal liability whatsoever (collectively, the "UK Joint Administrators"),

(5)    Nortel Networks (Ireland) Limited (in administration), a company incorporated in the Republic of Ireland (Company number 40287) ("NN Ireland"), acting by its joint administrators A. R. Bloom and D. Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland, who act as agent only of NN Ireland and without any personal liability whatsoever (together with the UK Joint Administrators, the "Joint Administrators"),

(6)    each of the entities identified as Other Sellers in Exhibit A (the "Other Sellers"),

(7)    each of the Joint Administrators in their respective capacities as joint administrators of respectively NNUK and NN Ireland only, acting as agent of respectively NNUK and NN Ireland and without any personal liability whatsoever, and

(8)    Kapsch CarrierCom AG, an incorporated company organized under the laws of Austria ("Purchaser"),

each a "Party" and collectively, the "Parties"; provided that each of the Parties identified in (1) to (3) is acting on its own behalf and as agent for the Providers (as defined herein) other than any Provider incorporated and/or located in an EMEA Jurisdiction (as defined in the EMEA ASA).

WHEREAS, the Main Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated 24 November 2009 (the "ASA"), pursuant to which Telefonaktiebolaget L M Ericsson (publ) and the Designated Purchasers have agreed to purchase and the Main Sellers (and those other persons) have agreed to sell that part of the business carried on by the Main Sellers (and those other persons);

WHEREAS, Purchaser and the EMEA Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated 24 November, 2009 (the "EMEA ASA"), pursuant to which Purchaser and the EMEA Designated Purchasers designated by such Purchaser have agreed to purchase and the EMEA Sellers (and those other persons) have agreed to sell (subject to the irrevocable offer wording in Schedule 6 to the EMEA ASA) the EMEA Assets (as defined

1

Services provided by the TSA EMEA Sellers will not be beyond twelve (12) months from the Closing Date;

"UK Joint Administrators" has the meaning set forth in the preamble;

"Un-creditable Amount" has the meaning set forth in Section 5(h)(iv);

"VAT" means value added tax imposed in any member state of the European Union pursuant to EC Council Directive 2006/112 on the common system of value added tax (Directive 2006/112) and national legislation implementing that Directive or any predecessor to it or supplemental to that Directive and any other sales or turnover tax of a similar nature imposed in any country that is not a member of the European Union together with all penalties or interest thereon or any tax of a similar nature which may be substituted for or levied in addition to it;

"Withholding Tax Information Certificate" has the meaning set forth in Section 5(h)(iv);

"Work Order" means the document setting out the terms and conditions of a Project, a change to a Service or an additional service, as mutually agreed by the applicable Seller and Purchaser, the form of which is attached hereto as Exhibit B; and

"Work Order IP" has the meaning set forth in Section 2(h).

2.    **Services to be Provided**.

(a)    Services.  Each Seller hereby agrees to provide, or to cause one or more of the Providers to provide, each of the applicable services specified to be provided by such Seller in Schedule 1 (Certain Services) and in any Work Orders agreed in writing by the Parties during the Term for the applicable TSA Period and in relation to each of the specified services shall provide all tasks, functions and responsibilities reasonably required for the performance of such services (collectively, the "Services"), upon the terms and conditions of this Agreement, its Exhibits, Schedules and Work Orders (if any).

(b)    Standard of Performance.

(i)    Each of the Sellers shall provide, or cause to be provided, the Services hereunder with the same degree of care and skill and to not less than the same standard to which such Seller has on average performed or caused to be performed the same or similar services to the Business during the nine (9) month period prior to the date hereof (the "Measuring Period") and to not less than the same standard and giving the Services over the course of the Term generally the same priority as provided to other Third Parties receiving comparable services under comparable transition services agreements entered into by the Sellers or their Affiliates; provided, however, that performance of the Services is subject to (A) variation in the provision of such Services that may be made at the request of Purchaser pursuant to the terms of this Agreement or inherent in the plan of

and such access will be governed by the terms and conditions set forth in this Agreement, including Section 7, and in Exhibit C attached hereto.  It is possible that the provision of a Service would require the Providers' employees to access Purchaser's information systems.  If such access were necessary, such access would be granted and governed by reciprocal terms and conditions (i.e., reversing the identity of the parties in Exhibit C).

(c)     Non-Disclosure.  Subject to Section 7(a), Purchaser (if the Receiving Party is Purchaser or its Affiliate) and the Sellers (if the Receiving Party is a Seller or its Affiliate) agree that such Receiving Party will (i) allow access to the Disclosing Party's Confidential Information only to the directors, officers, employees, agents and contractors ("Representatives") of the Receiving Party with a need to know such Confidential Information and (ii) take reasonable precautions to maintain the confidentiality of the Disclosing Party's Confidential Information, which in no event will be less than those precautions that such Receiving Party employs to protect its own proprietary information.  Confidential Information belonging to any Party that is not related to the Transaction or the provision of Services hereunder but is unintentionally disclosed to a Representative of the other Parties during the Term of this Agreement as an unintended result of the provision of the Services shall not be further disclosed by such Representative to any other Representative of such Receiving Party.

8.     **Relationships Between the Parties**.  Nothing in this Agreement shall cause the relationship between any Provider and any Recipient to be deemed to constitute a partnership or joint venture between them.  No Provider and no Recipient shall have any authority, express or implied, to bind, commit or act as agent for the other in any way except as provided herein (including the Exhibits and Schedules hereto).  Each Recipient and each Provider shall be responsible for the salaries, payroll Taxes, severance costs and benefits of its own employees.  Each of the Parties agrees that the provisions of this Agreement as a whole are not intended to, and do not, constitute control of other Parties or provide it with the ability to control such other Parties, and each Party hereto expressly disclaims any right or power under this Agreement to exercise any power whatsoever over the management or policies of any other Party. Nothing in this Agreement shall oblige any Party hereto to act in breach of the requirements of any Law, rule or regulation applicable to it.  The Parties agree that no Recipient shall, for any purposes whatsoever, by reason of this Agreement or the performance hereof be considered or deemed to be an "employer" for purposes of any Seller or Provider pension plan and applicable pension benefits standards legislation.

9.     **Access and Cooperation**.

(a)     Access.  Purchaser agrees that it shall, without charge, provide such reasonable access to its premises and/or personnel, and such reasonable assistance as may be required for the Providers to perform their obligations under this Agreement, to (i) the Providers, (ii) any Affiliate of the Providers and/or (iii) a Third Party provider of the Services with whom the Providers have contracted for such Service.  If any Party has access (either on-site or remotely) to any other Party's computer systems and/or information stores in relation to the Services, such Party shall limit such access solely

to the use of such systems for purposes of the Services and shall not access or attempt to access any other Party's computer systems, files, software or services other than those agreed to by the Parties as being required for the Services, or those that are publicly available (e.g., public websites). Each Party shall limit such access to those of its Representatives with a bona fide need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Parties' security rules and procedures for restricting access to their computer systems. All user identification numbers and passwords disclosed by any Party to another Party and any information obtained by any Party as a result of such Party's access to and use of another Party's computer systems shall be deemed to be, and treated as, Confidential Information of the Disclosing Party hereunder in accordance with the provisions set forth in Section 7, with the same degree of care as such Receiving Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care. The Providers and Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of any Party. These provisions concerning computer access shall apply equally to any access and use by a Party of another Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of another Party, and any Third Party software that may be accessible by any Party in connection with this Agreement.

(b)     Cooperation. Each Party shall use commercially reasonable efforts, and shall use commercially reasonable efforts to cause its respective Affiliates and Third Party service providers, to cooperate with the other Party in all matters relating to the provision and receipt of the Services, and shall perform all obligations hereunder in good faith and in accordance with principles of fair dealing. Each Recipient, at its own cost, shall (i) comply with its duties to cooperate as set forth in this Agreement, and (ii) comply with all reasonable operating standards and policies prescribed by any Provider (acting reasonably) of such Service. Each Party agrees that the provision of Services by the relevant Provider is dependent on prompt and timely cooperation between the Parties.

10.   **Firewall Protection**.   Notwithstanding anything to the contrary in Section 9 hereof, prior to performance of certain Services, and/or in connection with the termination of Services hereunder, action may need to be taken to insulate the Provider's or the Recipient's, as applicable, and/or their respective Affiliates' operations, assets, proprietary information, software, equipment or data from that of the other Parties (such insulation being referred to hereinafter as a "Firewall"). Each Party shall give notice to the other Parties indicating what aspects of the notifying Party's business information, if any, need to be isolated, the nature of the activities necessary to accomplish such isolation and the expected time involved.

11.   **Security Measures**. Each Party shall provide the other Parties with reasonable access to the computer facilities that it plans to use in association with the Services for the purposes of assessing the adequacy of the requested Party's security measures and

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS CORPORATION

By:_____
    Name:  John Doolittle
    Title:    SVP, Corporate Services and
    Chief Financial Officer

By:_____
    Name:  Anna Ventresca
    Title:    General Counsel-Corporate and
    Corporate Secretary

NORTEL NETWORKS LIMITED

By:_____

    Name: John Doolittle
    Title:   SVP, Corporate Services and
    Chief Financial Officer

By:_____

    Name: Anna Ventresca
    Title:  General Counsel-Corporate and
    Corporate Secretary

NORTEL NETWORKS, INC.

By:_____

    Name: Anna Ventresca
    Title:   Chief Legal Officer

[Signature Page to the TSA – Kapsch]

**SIGNED** for and on behalf of **Nortel Networks**    )
**UK Limited** (in administration) by Stephen    )     Stephen Harris
Harris as Joint Administrator (acting as agent    )
and without personal liability) in the presence    )
of:

Witness signature _____

.................................................................    )
Name: EMILIA LAU    )
Address: Herbert Smith LLP, Exchange House,    )
Primrose Street, London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks** )
**(Ireland) Limited** (in administration) by David )   David Hughes
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of:

Witness signature

.....Claire Madden..................... )
Name: CLAIRE MADDEN )
Address: HARCOURT CENTRE )
         HARCOURT STREET
         DUBLIN 2

**SIGNED** by Alan Bloom in his own capacity ) 
and on behalf of the Joint Administrators )    Alan Bloom
without personal liability and solely for the ) 
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators in the presence of:


Witness signature     *TReed*

.......................................................... )
Name:     TRACEY REPP    **ERNST&YOUNG LLP** )
Address:     **1 More London Place** )
    **London**
    **SE1 2AF**

NORTEL NETWORKS (CHINA)
LIMITED

By:_____
Name: John Doolittle
Title: Chairman and Legal
Representative

**KAPSCH CARRIERCOM AG**

By: _____

Name:

Title:

Mag. Ingolf Planer, MBA
Mitglied des Vorstandes

Mag. Petra Pracher-Ratnik, LL.M.
Prokurist

[Transition Services Agreement –
Nortel & Kapsch]

## Exhibit C

### Access to Providers Information Systems

In order to receive certain Services provided by the Providers pursuant to this Agreement (the "Purpose"), Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by the Providers (the "Providers Information Systems").

**1.** **Access**: Subject to the terms and conditions of this Exhibit C, the Providers hereby grant access to Purchaser solely to those elements of Providers Information Systems (the "Permitted Systems") necessary for Purchaser to perform the Purpose, and to no other elements.

**2.** **Purpose**: Purchaser agrees to use the Permitted Systems solely to carry out the Purpose and Purchaser agrees to use the Permitted Systems for no other purpose.

**3.** **Conditions of Use**: Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit C and such reasonable further conditions and policies of use that the Providers may hereafter establish and make known to Purchaser, including, but not limited to the "Appropriate Use of Nortel's Network" policy attached as Annex 1 to this Exhibit C and those policies to which Purchaser agrees and accepts in writing case-by-case, based on Section 4 of this Exhibit C, attached to and incorporated in this Agreement. Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. Purchaser hereby undertakes full responsibility for all persons (including past employees of Purchaser) gaining access to the Providers Information Systems through Purchaser's computer systems. Purchaser shall cooperate in the investigation of any apparent unauthorized access to the Providers Information Systems.

**4.** **Employee Access**: Purchaser shall limit access to the Permitted Systems to the Active Employees, it being understood that such Active Employees shall be informed by Purchaser of the obligations set forth in this Exhibit C and the confidentiality obligations set forth in Section 7 of the Agreement, provided that, upon the Providers' reasonable request in relation to certain Services, access to Permitted Systems will be restricted to only Restricted Access Active Employees (such employees who have access to the Permitted Systems pursuant to the foregoing, "Authorized Workers"). The Providers must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as the Providers' personnel. Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees of Purchaser or any EMEA Designated Purchaser who do not have an active role in supporting the Purpose) shall have no access to the Providers Information Systems. The Providers may terminate applicable access as of the date of notice to Purchaser that the Authorized Worker(s) identified in the notice has breached this Agreement.

C-1

**5.**     **Prohibitions**: Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems; (ii) make modifications, enhancements, adaptations or translations, in whole or in part, to or of any element of the Providers Information Systems; (iii) make copies of any element of the Providers Information Systems; (iv) probe host computers or networks; (v) breach the security controls of a host computer, network component or authentication system; (vi) monitor data on any network or system; (vii) interfere with the service of any user, host or network, or overload a server, network connected device, or network component; (viii) originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device; or (ix) forge data or misrepresent the origination of a user or source.

**6.**     **Purchaser's Systems**:

(a)     **Access Security**.  Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable Firewall.  Purchaser shall follow each of the Provider's security rules and procedures for restricting access to its computer system.

(b)     **Segregation Wall**.  Purchaser will ensure that Authorized Workers are effectively isolated from its personnel who are not Authorized Workers.  Purchaser will implement procedures to segregate all the Seller information, data and communications (including, but not limited to Confidential Information) from other Purchaser's personnel who are not Authorized Workers.

(c)     **Assessment**.  Purchaser shall grant to the Providers reasonable access to its computer facilities in order to assess the on-going adequacy of Purchaser's security measures and procedures, and Purchaser shall assist and co-operate with the Providers in carrying out any such assessment.

(d)     **Denial of Access**.  In the event the Providers determine that Purchaser's security measures and procedures are inadequate to prevent unauthorized access to or use of the Providers Information Systems, the Providers may immediately deny further access until Purchaser takes such measures as the Providers may require.

**7.**     **Notice of Security Breach**: Purchaser shall immediately notify the Providers in writing in the event there is a breach, or attempted breach, (i) of security on or at the Purchaser's computer systems or facilities that impacts Providers Information Systems, or (ii) of the physical or electronic procedures for segregating and protecting Providers' information, data and communications from those of Purchaser and third parties.  In the event of such a breach or attempted breach, Purchaser shall, at its expense, do whatever is reasonably necessary to preserve the integrity of Providers Information Systems and Confidential Information, and to prevent such breach or attempted breach from recurring.  The Providers reserve the right to request the removal of any Authorized Worker from the Providers' site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of the Providers' network, or a breach of Providers' policies or procedures.

**8.**     **Third Party Technology:** Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a Third Party. Purchaser acknowledges that Third Party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by Purchaser. Nothing herein shall require the Providers to acquire any rights to sublicense such rights from any Third Party. Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such Third Party software. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain Third Party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.

**9.**     **Confidential Information:** All passwords, identification numbers and all information and data obtained before Closing by a Provider and modified during Purchaser's use of Providers Information Systems shall be treated as Confidential Information of the Provider.

**10.**     **Personal Data:** The Parties shall comply with their respective obligations under all applicable data protection and privacy laws. If Purchaser has access to any element of the Providers Information Systems containing data relating to individuals (including but not limited to employee identification numbers, compensation records, health records, credit card information) ("Personal Data"), Purchaser shall use commercially reasonable efforts to not, and must not authorize any Third Party to (i) process the Personal Data for any purpose other than the Purpose or (ii) transfer any Personal Data to any third country. Purchaser must, and shall use commercially reasonable efforts to ensure that its employees, agents and contractors, take adequate technical and organizational security measures to safeguard Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use. Purchaser will provide the Providers with all reasonable assistance (x) in complying, within statutory time limits, with requests by individuals for access to their Personal Data; (y) in investigating any breach or alleged breach of applicable privacy or data protection Laws; and (z) in responding to and complying with any request or demand made by any national privacy or data protection authority.

**11.**     **Failure of Access:** Purchaser acknowledges that access to the Permitted Systems may be interrupted due to circumstances within or outside the reasonable control of the Providers. Nothing in this Agreement shall be considered a promise or covenant to deliver uninterrupted access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to Purchaser by virtue of access to the Permitted Systems.

**12.**     **Waiver of Liability:** The Parties shall have no liability whatsoever for any damages, losses or expenses incurred as a result of access of a computer virus or other harmful computer file or program, whether arising in contract, tort or otherwise except in the case of gross negligence or willful misconduct on the part of any other Party.

## **EXHIBIT L**

Excerpt of Transition Services Agreement, dated May 28, 2010, with Genband US LLC.

*Execution Version*

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (together with the Exhibits, Schedules and Work Orders (if any) hereto, this "<u>Agreement</u>") is made and entered into as of May 28, 2010 and effective as of the Closing Date, by and between:

(1)    Nortel Networks Corporation, a Canadian corporation ("<u>NNC</u>"),

(2)    Nortel Networks Limited, a Canadian corporation ("<u>NNL</u>"),

(3)    Nortel Networks Inc., a Delaware corporation ("<u>NNI</u>"),

(4)    Nortel Networks UK Limited (in administration), a company incorporated in England (Company number 03937799) ("<u>NNUK</u>"), acting by its joint administrators A. R. Bloom, S. J. Harris, A. M. Hudson and C. J. W. Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF, United Kingdom, who act as agent only of NNUK and without any personal liability whatsoever (collectively, the "<u>UK Joint Administrators</u>"),

(5)    Nortel Networks (Ireland) Limited (in administration), a company incorporated in the Republic of Ireland (Company number 40287) ("<u>NN Ireland</u>"), acting by its joint administrators A. R. Bloom and D. Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland, who act as agent only of NN Ireland and without any personal liability whatsoever (together with the UK Joint Administrators, the "<u>Joint Administrators</u>"),

(6)    each of the entities identified as Other Sellers in <u>Exhibit A</u> (the "<u>Other Sellers</u>"),

(7)    each of the Joint Administrators in their respective capacities as joint administrators of respectively NNUK and NN Ireland only, acting as agent of respectively NNUK and NN Ireland and without any personal liability whatsoever, and

(8)    Genband US LLC, a Delaware limited liability company (f/k/a Genband Inc.) ("<u>Purchaser</u>"),

each a "<u>Party</u>" and collectively, the "<u>Parties</u>"; provided that each of the Parties identified in (1) to (3) is acting on its own behalf and as agent for the Providers (as defined herein) other than any Provider incorporated and/or located in an EMEA Jurisdiction (as defined in the EMEA ASA).

WHEREAS, Purchaser and the Main Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated December 22, 2009 (as amended, the "<u>ASA</u>"), pursuant to which Purchaser and the Designated Purchasers have agreed to purchase and the Main Sellers (and those other persons) have agreed to sell that part of the Business carried on by the Main Sellers (and those other persons);

WHEREAS, Purchaser and the TSA EMEA Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated December 23, 2009 (as amended, the "<u>EMEA ASA</u>"), pursuant to which Purchaser and the EMEA Designated Purchasers designated by such Purchaser have agreed to purchase and the TSA EMEA Sellers (and those other persons) have

1

"Work Order" means the document setting out the terms and conditions of a Project, a change to a Service or an additional service, as mutually agreed by the applicable Seller and Purchaser, the form of which is attached hereto as Exhibit B.

2.    **Services to be Provided**.

(a)    Services. Each Seller hereby agrees to provide, or to cause one or more of the Providers to provide, each of the applicable services specified to be provided by such Seller in Schedule 1 (Certain Services) and in any Work Orders agreed to in writing by the Parties (collectively, the "Services") during the Term for the applicable TSA Period, upon the terms and conditions of this Agreement, its Exhibits, Schedules and Work Orders (if any). For the avoidance of doubt, the Temporary Employees Services shall not constitute or qualify as Services.

(b)    Standard of Performance.

(i)    Each of the Sellers shall provide, or cause to be provided, the Services hereunder to the Recipients with the same degree of care, skill and quality with which such Seller has on average performed or caused to be performed similar services to the Business during the six-month period prior to the date hereof (the "Measuring Period") (to the extent that there is an appropriate measurement of performance and subject to departures beyond such Seller's reasonable control attributable to (i) changes in the quality or standard of delivery of Services arising from the sale of the Business to Purchaser, (ii) any actions taken by or on behalf of the Sellers at the direction of Purchaser, despite the Sellers first having notified Purchaser, to the extent reasonably possible, that such actions would, or could reasonably be expected to have, an adverse effect on the quality or standard of the Services, and (iii) in the case of the TSA EMEA Sellers, any limitation imposed as a result of the Insolvency Proceedings). Each Seller will use its reasonable best efforts to secure compliance by Third Party providers with their contractual obligations to such Seller. The performance of the Services is subject to variation in the provision of such Services that may be inherent in any plan of Services requested by Purchaser hereunder (including, where a service related to any Service to be provided hereunder is provided by Purchaser for itself or by a Third Party), or incidental differences in quality and timeliness, if any, that may be caused by any change in process by Purchaser. In performing Services, Providers shall accord to the Recipients (and use reasonable best efforts to cause any Third Party providers to accord to the Recipients) the same priority under comparable circumstances as they have provided the Business during the Measuring Period.

(ii)    If the quality or performance of the Services provided hereunder falls materially below the relevant standard required by Section 2(b)(i) (a "Significant Services Shortfall"), Purchaser shall provide the Sellers' Service Coordinators (as defined below) with written notice (a "Shortfall Notice") thereof and the relevant Seller shall use commercially reasonable efforts, or shall cause the Provider to use commercially reasonable efforts, to correct promptly in all material respects such Significant Services Shortfall or re-perform promptly in all material respects such Service at the request of Purchaser and at the expense of the relevant Provider. To be effective, any Shortfall Notice by Purchaser must (i) specify in reasonable detail the particular error or defect in relation to the performance of the Services and (ii) be made no more than thirty (30) days from the date such error or defect was discovered by Purchaser. If a

11

employs to protect its own proprietary information. Confidential Information belonging to any Party that is not related to the Transactions or the provision of Services hereunder but is unintentionally disclosed to a Representative of the other Parties during the Term of this Agreement as an unintended result of the provision of the Services shall not be further disclosed by such Representative to any other Representative of such Receiving Party.

8.    **Relationships Between the Parties**. Nothing in this Agreement shall cause the relationship between any Provider and any Recipient to be deemed to constitute a partnership or joint venture between them. No Provider and no Recipient shall have any authority, express or implied, to bind, commit or act as agent for the other in any way except as provided herein (including the Exhibits and Schedules hereto). Each Recipient and each Provider shall be responsible for the salaries, payroll Taxes, severance costs and benefits of its own employees. Each of the Parties agrees that the provisions of this Agreement as a whole are not intended to, and do not, constitute control of other Parties or provide it with the ability to control such other Parties, and each Party hereto expressly disclaims any right or power under this Agreement to exercise any power whatsoever over the management or policies of any other Party. Nothing in this Agreement shall oblige any Party hereto to act in breach of the requirements of any Law, rule or regulation applicable to it.

9.    **Access and Cooperation**.

(a)    _Access_. Purchaser agrees that it shall, without charge, provide such reasonable access to its premises and/or personnel, and such reasonable assistance as may be required for the Providers to perform their obligations under this Agreement, to (i) the Providers, (ii) any Affiliate of the Providers and/or (iii) a Third Party provider of the Services with whom the Providers have contracted for such Service pursuant to the terms of this Agreement. Purchaser acknowledges that, particularly at the beginning of the Term, it is important to provide the Sellers as much access as reasonably practicable to the relevant Transferred Employees and Business NPWs. Unless otherwise agreed to in writing by the Parties, Provider will: (i) use the premises of any Recipient solely for the purpose of providing the Services or Temporary Employees Services and not to provide goods or services to or for the benefit of any Third Party or for any unlawful purpose; (ii) materially comply with all reasonable policies and procedures governing access to and use of such premises made known to Provider in advance, including, without limitation, all reasonable security requirements applicable to accessing the premises and any systems, technologies, or assets of Purchaser; (iii) instruct its employees, personnel, and Third Party providers when visiting the premises, not to photograph or record, duplicate, remove, disclose, or transmit to a Third Party any of Purchaser's Confidential Information, except as necessary to perform the Services or Temporary Employees Services; and (iv) return such space to Purchaser in the same condition it was in prior to Sellers' use of such space, ordinary wear and tear excepted.

(b)    If any Party has access (either on-site or remotely) to any other Party's computer systems and/or information stores in relation to the Services, such Party shall limit such access solely to the use of such systems for purposes of the provision or receipt of the Services and shall not access or attempt to access any other Party's computer systems, files, software or services other than those agreed to by the Parties as being required for the Services, or those that are publicly available (e.g., public websites). Each Party shall limit such access to those of its

34

Representatives with a bona fide need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Parties' security rules and procedures for restricting access to their computer systems. All user identification numbers and passwords disclosed by any Party to another Party and any information obtained by any Party as a result of such Party's access to and use of another Party's computer systems shall be deemed to be, and treated as, Confidential Information of the Disclosing Party hereunder in accordance with the provisions set forth in Section 7, with the same degree of care as such Receiving Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care. The Providers and Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of any Party. These provisions concerning computer access shall apply equally to any access and use by a Party of another Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of another Party, and any Third Party software that may be accessible by any Party in connection with this Agreement.

(c)    Cooperation. Each Party shall use commercially reasonable efforts, and shall use commercially reasonable efforts to cause its respective Affiliates and Third Party service providers, to cooperate with the other Party in all matters relating to the provision and receipt of the Services, and shall perform all obligations hereunder in good faith and in accordance with principles of fair dealing. Each Recipient, at its own cost, shall (i) comply with its duties to cooperate as set forth in this Agreement or any subsequent Work Orders, (ii) use its reasonable endeavors to become self-sufficient in respect of the Services in accordance with the Schedules hereto (other than in respect of products being shut down or phased out during the Term) and (iii) comply with all reasonable operating standards and policies prescribed in writing by the other Party (acting reasonably) with respect to any Service. Each Party agrees that the provision of Services by the relevant Provider is dependent on prompt and timely cooperation between the Parties. The Parties acknowledge that they need to work together to ensure that Services are delivered by the relevant Provider in a prompt and timely manner.

(d)    Access to IT Equipment and IT Spaces. Recipients shall provide Providers with space and access to the specified rooms and closets depicted in Schedule 5 (the "IT Spaces") at the locations shown on Schedule 5 (the "IT Premises") for Providers to continue to house equipment (including but not limited to voice and data networking, and midrange computing) that is currently located in the IT Spaces and which is not being transferred to Purchaser at Closing (the "Providers' Equipment") or are continuing to be supported by the Providers as Services under this Agreement after Closing (together with the Providers' Equipment, the "IT Equipment"). With respect to the IT Premises owned by Purchaser or its Affiliates, such space and access shall be provided for the Term and with respect to IT Premises that Purchaser or its Affiliates lease, sublease or license from a Third Party, such space and access shall be provided until thirty (30) days prior to the end of the applicable lease, sublease or license term pursuant to the applicable occupancy agreement between the Purchaser or its Affiliates, as applicable, and the Third Party landlord (assuming such occupancy agreement is not renewed), but in no event shall such space or access be provided beyond the Term. Notwithstanding anything to the contrary herein, Providers shall have (x) for IT Premises owned by Purchaser or its Affiliates, ten

35

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS CORPORATION

By:_____
Name:
Title:

By:_____
Name: George A. Riedel
Title: CSO

NORTEL NETWORKS LIMITED

By:_____
Name:
Title:

By:_____
Name: George A. Riedel
Title: CSO

NORTEL NETWORKS, INC.

By:_____
Name: George A. Riedel
Title: CSO

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS CORPORATION

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

NORTEL NETWORKS, INC.

By:_____
    Name:
    Title:

**Transition Services Agreement**

SIGNED for and on behalf of NORTEL ) ................................................
NETWORKS UK LIMITED (in administration) ) Christopher Hill
by CHRISTOPHER HILL as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of: )

Witness signature

................................................ )
Name: Ardil Salem )
Address: Herbert Smith LLP, Exchange House, )
Primrose Street, London EC2A 2HS, England

(copy)

**Transition Services Agreement**

**SIGNED by ALAN BLOOM** in his own                )    ...........................................................
capacity and on behalf of the Joint                )    Alan Bloom
Administrators without personal liability and      )
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

Witness signature    ḾN Cadell
                     JAN CORDELL
...............................................................    )
Name:           ⅢERNST&YOUNG LLP              )
Address:        1 More London Place             )
                London
                SE1 2AF

Transition Services Agreement

SIGNED for and on behalf of NORTEL )
NETWORKS (IRELAND) LIMITED (in )
administration) by DAVID HUGHES as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of: )

..........................................................
David Hughes

Witness signature

.......................................... ... . ...  )
Name: Maureen Daly                              )
Address: William Fry, Fitzwilton House,
Wilton Place, Dublin 2, Ireland

Nortel Networks de Mexico, S.A. de C.V.

By:_____
    Name: Karla Lizet Dorantes Aguilar
    Title: Attorney-In-Fact

Signature Page to TSA

Nortel de México, S. de R.L. de C.V.

By:_____
    Name: Karla Lizet Dorantes Aguilar
    Title: Attorney-In -Fact

Signature Page to TSA

Nortel Networks (China) Limited

By:
Name:
Title:

Signature Page to TSA

Nortel Networks Australia Pty Limited

By: _____
Name:
Title:

Nortel Networks (India) Private Limited

By:_____

Name:

Title:

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

**GENBAND US LLC**

By: _____
Name: Shaune Martin
Title:   Executive Vice-President and General Counsel

## Exhibit C

### Access to Providers Information Systems

In order to receive certain Services provided by the Providers pursuant to this Agreement (the "Purpose"), Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by the Providers (the "Providers Information Systems").

1.      **Access:** Subject to the terms and conditions of this Exhibit C, the Providers hereby grant access to Purchaser solely to those elements of Providers Information Systems (the "Permitted Systems") necessary for Purchaser to perform the Purpose, and to no other elements.

2.      **Purpose:** Purchaser agrees to use the Permitted Systems solely to carry out the Purpose and Purchaser agrees to use the Permitted Systems for no other purpose.

3.      **Conditions of Use:** Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit C and such further conditions and policies of use that the Providers may hereafter establish and make known to Purchaser, including, but not limited to the "Appropriate Use of Nortel's Network" policy attached as Annex 1 to this Exhibit C and those policies to which Purchaser agrees and accepts in writing case-by-case, based on Section 4 of this Exhibit C, attached to and incorporated in this Agreement. Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. Purchaser hereby undertakes full responsibility for all persons (including past employees of Purchaser) gaining access to the Providers Information Systems through Purchaser's computer systems. Purchaser shall cooperate in the investigation of any apparent unauthorized access to the Providers Information Systems.

4.      **Employee Access:** Purchaser shall limit access to the Permitted Systems to the Active Employees, it being understood that such Active Employees shall be informed by Purchaser of the obligations set forth in this Exhibit C and the confidentiality obligations set forth in Section 7 of the Agreement, provided that, upon the Providers' reasonable request in relation to certain Services, access to Permitted Systems will be restricted to only Restricted Access Active Employees (such employees who have access to the Permitted Systems pursuant to the foregoing, "Authorized Workers"). The Providers must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as the Providers' personnel. Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees of Purchaser, any Designated Purchaser or any EMEA Designated Purchaser who do not have an active role in supporting the Purpose) shall have no access to the Providers Information Systems. The Providers may terminate applicable access as of the date of notice to Purchaser that the Authorized Worker(s) identified in the notice has breached this Agreement.

C-1

5.    **Prohibitions:** Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems; (ii) make modifications, enhancements, adaptations or translations, in whole or in part, to or of any element of the Providers Information Systems; (iii) make copies of any element of the Providers Information Systems; (iv) probe host computers or networks; (v) breach the security controls of a host computer, network component or authentication system; (vi) monitor data on any network or system; (vii) interfere with the service of any user, host or network, or overload a server, network connected device, or network component; (viii) originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device; or (ix) forge data or misrepresent the origination of a user or source.

6.    **Purchaser's Systems:**

(a)    **Access Security.** Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable Firewall. Purchaser shall follow each of the Provider's security rules and procedures for restricting access to its computer system.

(b)    **Segregation Wall.** Purchaser will ensure that Authorized Workers are effectively isolated from its personnel who are not Authorized Workers. Purchaser will implement procedures to segregate all the Seller information, data and communications (including, but not limited to Confidential Information) from other Purchaser's personnel who are not Authorized Workers.

(c)    **Assessment.** Purchaser shall grant to the Providers reasonable access to its computer facilities in order to assess the on-going adequacy of Purchaser's security measures and procedures, and Purchaser shall assist and co-operate with the Providers in carrying out any such assessment.

(d)    **Denial of Access.** In the event the Providers determine that Purchaser's security measures and procedures are inadequate to prevent unauthorized access to or use of the Providers Information Systems, the Providers may immediately deny further access until Purchaser takes such measures as the Providers may reasonably require.

7.    **Notice of Security Breach:** Purchaser shall immediately notify the Providers in writing in the event there is a breach, or attempted breach, (i) of security on or at the Purchaser's computer systems or facilities that impacts Providers Information Systems, or (ii) of the physical or electronic procedures for segregating and protecting Providers' information, data and communications from those of Purchaser and third parties. In the event of such a breach or attempted breach, Purchaser shall, at its expense, do whatever is necessary to preserve the integrity of Providers Information Systems and Confidential Information, and to prevent such breach or attempted breach from recurring. The Providers reserve the right to request the removal of any Authorized Worker from the Providers' site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of the Providers' network, or a breach of Providers' policies or procedures.

C-2

[New York #2130279 v18]

8.    **Third Party Technology:** Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a Third Party. Purchaser acknowledges that Third Party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by Purchaser. Nothing herein shall require the Providers to acquire any rights to sublicense such rights from any Third Party. Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such Third Party software. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain Third Party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.

9.    **Confidential Information:** All passwords, identification numbers and all information and data obtained before Closing by a Provider and modified during Purchaser's use of Providers Information Systems shall be treated as Confidential Information of the Provider.

10.   **Personal Data:** The Parties shall comply with their respective obligations under all applicable data protection and privacy laws. If Purchaser has access to any element of the Providers Information Systems containing data relating to individuals (including but not limited to employee identification numbers, compensation records, health records, credit card information) ("Personal Data"), Purchaser must not, and must not authorize any Third Party to (i) process the Personal Data for any purpose other than the Purpose or (ii) transfer any Personal Data to any third country, except in both cases, where required to do so by applicable data protection and privacy Laws. Purchaser must, and must ensure that its employees, agents and contractors, take adequate technical and organizational security measures to safeguard Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use. Purchaser will provide the Providers with all reasonable assistance (x) in complying, within statutory time limits, with requests by individuals for access to their Personal Data; (y) in investigating any breach or alleged breach of applicable privacy or data protection Laws; and (z) in responding to and complying with any request or demand made by any national privacy or data protection authority.

11.   **Failure of Access:** Purchaser acknowledges that access to the Permitted Systems may be interrupted due to circumstances within or outside the reasonable control of the Providers. Nothing in this Agreement shall be considered a promise or covenant to deliver uninterrupted access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to Purchaser by virtue of access to the Permitted Systems.

12.   **Waiver of Liability:** The Providers shall have no liability whatsoever for any damages, losses or expenses incurred by Purchaser as a result of access of the Permitted Systems (including, without limitation, the inadvertent accessing of a computer virus or other harmful computer file or program), or of failure to access the Permitted Systems pursuant to this Agreement, whether arising in contract, tort or otherwise, except in the case of gross negligence or willful misconduct on the part of any Provider.

C-3

## EXHIBIT M

Excerpt of Transition Services Agreement, dated March 11, 2011, with Telefonaktiebolaget L M Ericsson (publ)

*Execution Version*

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (together with the Exhibits, Schedules and Work Orders (if any) hereto, this "Agreement") is made and entered into as of March 11, 2011 and effective as of the Closing Date, by and between:

(1)     Nortel Networks Corporation, a Canadian corporation ("NNC"),

(2)     Nortel Networks Limited, a Canadian corporation ("NNL"),

(3)     Nortel Networks Inc., a Delaware corporation ("NNI"),

(4)     Nortel Networks UK Limited (in administration), a company incorporated in England (Company number 03937799) ("NNUK"), acting by its joint administrators A. R. Bloom, S. J. Harris, A. M. Hudson and C. J. W. Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF, United Kingdom, who act as agent only of NNUK and without any personal liability whatsoever (collectively, the "UK Joint Administrators"),

(5)     Nortel Networks (Ireland) Limited (in administration), a company incorporated in the Republic of Ireland (Company number 40287) ("NN Ireland"), acting by its joint administrators A. R. Bloom and D. Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland, who act as agent only of NN Ireland and without any personal liability whatsoever (together with the UK Joint Administrators, the "Joint Administrators"),

(6)     each of the entities identified as Other Sellers in Exhibit A (the "Other Sellers"),

(7)     each of the Joint Administrators in their respective capacities as joint administrators of respectively NNUK and NN Ireland only, acting as agent of respectively NNUK and NN Ireland and without any personal liability whatsoever, and

(8)     Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden ("Purchaser"),

each a "Party" and collectively, the "Parties"; provided that each of the Parties identified in (1) to (3) is acting on its own behalf and as agent for the Providers (as defined herein) other than any Provider incorporated and/or located in an EMEA Jurisdiction (as defined in the EMEA ASA).

WHEREAS, Purchaser and the Main Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated September 24, 2010 (as amended, the "ASA"), pursuant to which Purchaser and the Designated Purchasers have agreed to purchase and the Main Sellers (and those other persons) have agreed to sell that part of the Business carried on by the Main Sellers (and those other persons);

WHEREAS, Purchaser and the TSA EMEA Sellers (together with certain other persons) have entered into the Asset Sale Agreement, dated September 24, 2010 (as amended, the "EMEA ASA"), pursuant to which Purchaser and the EMEA Designated Purchasers designated by such Purchaser have agreed to purchase and the TSA EMEA Sellers (and those other persons) have

"TSA EMEA Employment Escrow Amount" has the meaning set forth in Section 4(p)(i) of this Agreement.

"TSA EMEA Sellers" means NNUK and NN Ireland.

"TSA Escrow Agent" has the meaning set forth in the TSA Escrow Agreement.

"TSA Escrow Agreement" has the meaning set forth in Section 27 of this Agreement.

"TSA Escrow Amount" has the meaning set forth in Section 27 of this Agreement.

"TSA Period" means, with respect to any Service or sub-category of Service, the period of time set forth in the applicable Schedule or Work Order hereto (if any) during which Provider(s) will perform such Service or sub-category of Service.

"TSA Transferees" has the meaning set forth in Section 4(p)(ii) of this Agreement.

"UK Joint Administrators" has the meaning set forth in the preamble.

"VAT" has the meaning set forth in the EMEA ASA.

"Work Order" means the document setting out the terms and conditions of a Project, a change to a Service or an additional service, as mutually agreed by the applicable Seller and Purchaser, the form of which is attached hereto as Exhibit B.

2.    **Services to be Provided**.

(a)    Services.  Each Seller hereby agrees to provide, or to cause one or more of the Providers to provide, each of the applicable services specified to be provided by such Seller in Schedule 1 (Certain Services) and in any Work Orders agreed to in writing by the Parties (collectively, the "Services") during the Term for the applicable TSA Period, upon the terms and conditions of this Agreement, its Exhibits, Schedules and Work Orders (if any).

(b)    Standard of Performance.

(i)    Each of the Sellers shall provide, or cause to be provided, the Services hereunder to the Recipients with the same degree of care, skill and quality with which such Seller has on average performed or caused to be performed similar services to the Business during the nine-month period prior to the date hereof (the "Measuring Period") and over the course of the Term, generally the same priority as provided to other Third Parties receiving comparable services under comparable transition services agreements entered into by the Sellers or their Affiliates (to the extent that there is an appropriate measurement of performance and subject to departures beyond such Seller's reasonable control attributable to (i) changes in the quality or standard of delivery of Services arising from the sale of the Business to Purchaser, (ii) any actions taken by or on behalf of the Sellers at the direction of Purchaser, despite the Sellers first having notified Purchaser, to the extent reasonably possible, that such actions would, or could reasonably be expected to have, an adverse effect on the quality or standard of the Services, and (iii) in the case of the TSA EMEA Sellers, any limitation imposed as a result of the

11

provision of a Service would require the Providers' employees to access Purchaser's information systems, such access would be granted (where and to the extent necessary) and governed by reciprocal terms and conditions (i.e., reversing the identity of the parties in Exhibit C).

(c)     Non-Disclosure.  Subject to Section 7(a), Purchaser (if the Receiving Party is Purchaser or its Affiliate) and the Providers (if the Receiving Party is a Provider or its Affiliate) agree that such Receiving Party will (i) allow access to the Disclosing Party's Confidential Information only to the directors, officers, employees, agents and contractors ("Representatives") of the Receiving Party with a need to know such Confidential Information and (ii) take reasonable precautions to maintain the confidentiality of the Disclosing Party's Confidential Information, which in no event will be less than those precautions that such Receiving Party employs to protect its own proprietary information.  Confidential Information belonging to any Party that is not related to the Transaction or the provision of Services hereunder but is unintentionally disclosed to a Representative of the other Parties during the Term of this Agreement as an unintended result of the provision of the Services shall not be further disclosed by such Representative to any other Representative of such Receiving Party.

8.     **Relationships Between the Parties**.  Nothing in this Agreement shall cause the relationship between any Provider and any Recipient to be deemed to constitute a partnership or joint venture between them.  No Provider and no Recipient shall have any authority, express or implied, to bind, commit or act as agent for the other in any way except as provided herein (including the Exhibits and Schedules hereto).  Each Recipient and each Provider shall be responsible for the salaries, payroll Taxes, severance costs and benefits of its own employees. Each of the Parties agrees that the provisions of this Agreement as a whole are not intended to, and do not, constitute control of other Parties or provide it with the ability to control such other Parties, and each Party hereto expressly disclaims any right or power under this Agreement to exercise any power whatsoever over the management or policies of any other Party.  Nothing in this Agreement shall oblige any Party hereto to act in breach of the requirements of any Law, rule or regulation applicable to it.

9.     **Access and Cooperation**.

(a)     Access.  Purchaser agrees that it shall, without charge, provide such reasonable access to its premises and/or personnel, and such reasonable assistance as may be required for the Providers to perform their obligations under this Agreement, to (i) the Providers, (ii) any Affiliate of the Providers and/or (iii) a Third Party provider of the Services with whom the Providers have contracted for such Service.  If any Party has access (either on-site or remotely) to any other Party's computer systems and/or information stores in relation to the Services, such Party shall limit such access solely to the use of such systems for purposes of the Services and shall not access or attempt to access any other Party's computer systems, files, software or services other than those agreed to by the Parties as being required for the Services, or those that are publicly available (e.g., public websites).  Each Party shall limit such access to those of its Representatives with a bona fide need to have such access in connection with the Services and who, if required by the provisions of this Agreement, have been duly authorized or approved to have such access, and shall follow all of the other Parties' security rules and procedures for restricting access to their computer systems.  All user identification numbers and passwords disclosed by any Party to another Party and any information obtained by any Party as a result of

38

such Party's access to and use of another Party's computer systems shall be deemed to be, and treated as, Confidential Information of the Disclosing Party hereunder in accordance with the provisions set forth in Section 7, with the same degree of care as such Receiving Party uses for its own information of a similar nature, but in no event a lower standard than a reasonable standard of care. The Providers and Purchaser shall cooperate in the investigation of any apparent unauthorized access to any computer system and/or information stores of any Party. These provisions concerning computer access shall apply equally to any access and use by a Party of another Party's electronic mail system, electronic switched network, either directly or via a direct inward service access or calling card feature, data network or any other property, equipment or service of another Party, and any Third Party software that may be accessible by any Party in connection with this Agreement.

(b)     Cooperation. Each Party shall use commercially reasonable efforts, and shall use commercially reasonable efforts to cause its respective Affiliates and Third Party service providers, to cooperate with the other Party in all matters relating to the provision and receipt of the Services, and shall perform all obligations hereunder in good faith and in accordance with principles of fair dealing. Each Recipient, at its own cost, shall (i) comply with its duties to cooperate as set forth in this Agreement or any subsequent Work Orders and (ii) comply with all reasonable operating standards and policies prescribed in writing by the other Party (acting reasonably) with respect to any Service. Each Party agrees that the provision of Services by the relevant Provider is dependent on prompt and timely cooperation between the Parties. The Parties acknowledge that they need to work together to ensure that Services are delivered by the relevant Provider in a prompt and timely manner. Without limiting the foregoing, each Provider will respond to each Recipient's requests for information related to the functionality or operation of the Services that do not impose material time and effort burdens on the Sellers.

10.     **Firewall Protection**. Notwithstanding anything to the contrary in Section 9 hereof, prior to performance of certain Services, and/or in connection with the termination of Services hereunder, action may need to be taken to insulate the Provider's or the Recipient's, as applicable, and/or their respective Affiliates' operations, assets, proprietary information, software, equipment or data from that of the other Parties (such insulation being referred to hereinafter as a "Firewall"). Each Party shall give notice to the other Parties indicating what aspects of the notifying Party's business information, if any, need to be isolated, the nature of the activities necessary to accomplish such isolation and the expected time involved.

11.     **Security Measures**. Each Party shall provide the other Parties with reasonable access to the computer facilities that it plans to use in association with the Services for the purposes of assessing the adequacy of the requested Party's security measures and procedures in effect on such computer facilities, and shall assist and cooperate with the requesting Party in carrying out any such assessment. In the event where one Party determines that the security measures and procedures are inadequate to prevent unauthorized access to or use of Services or where data protection or privacy Laws are in danger of being violated, the Parties shall agree upon such measures as may reasonably be needed to improve such security measures and procedures. Periodically, at reasonable intervals thereafter, each Party shall afford the other Parties an opportunity to confirm the continued adequacy of the security measures and procedures in effect on such computer facilities. In the event of a breach of security on or at a Party's facilities relating to, or that could potentially relate to, Services, or if the Party becomes

39

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS CORPORATION

By:_____
    Name: John M. Doolittle
    Title:  Senior Vice-President, Corporate
    Services and Chief Financial Officer

By:_____
    Name: Anna Ventresca
    Title:  General Counsel-Corporate and
    Corporate Secretary

NORTEL NETWORKS LIMITED

By:_____
    Name: John M. Doolittle
    Title:  Senior Vice-President, Corporate
    Services and Chief Financial Officer

By:_____
    Name: Anna Ventresca
    Title:  General Counsel-Corporate and
    Corporate Secretary

NORTEL NETWORKS, INC.

By:_____
    Name: Christopher Ricaurte
    Title:  President

[TSA Signature Pages]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

NORTEL NETWORKS CORPORATION

By:_____
    Name: John M. Doolittle
    Title:  Senior Vice-President, Corporate
    Services and Chief Financial Officer

By:_____
    Name: Anna Ventresca
    Title:  General Counsel-Corporate and
    Corporate Secretary

NORTEL NETWORKS LIMITED

By:_____
    Name: John M. Doolittle
    Title:  Senior Vice-President, Corporate
    Services and Chief Financial Officer

By:_____
    Name: Anna Ventresca
    Title:  General Counsel-Corporate and
    Corporate Secretary

NORTEL NETWORKS, INC.

By:_____
    Name: Christopher Ricaurte
    Title:  President

[TSA Signature Pages]

SIGNED for and on behalf of Nortel )
Network UK Limited (in administration) )    ...............................................................
by Christopher Hill as Joint Administrator )    Christopher Hill
(acting as agent and without personal )
liability) in the presence of:

Witness signature    *JN Cordell*
..........................................................    )
Name:   JAN CORDELL    )
Address: ~~Herbert Smith LLP, Exchange House~~  )
~~Primrose Street, London EC2A 2HS, England~~
ERNST & YOUNG LLP, I MORE LONDON
PLACE, LONDON, SE1 2AF

SIGNED for and on behalf of Nortel )    ...............................................................
Network (Ireland) Limited (in )    David Hughes
administration) by David Hughes as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of: )

Witness signature

..........................................................    )
Name:    )
Address:    )

[TSA Signature Pages]

SIGNED for and on behalf of Nortel )    ......................................................................
Networks UK Limited (in administration) )    Christopher Hill
by Christopher Hill as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of:

Witness signature

.......................................................................... )
Name: )
Address: Herbert Smith LLP, Exchange House, )
Primrose Street, London EC2A 2HS, England

SIGNED for and on behalf of Nortel )    ......................................................................
Networks (Ireland) Limited (in )    David Hughes
administration) by David Hughes as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of:

Witness signature

.......................................................................... )
Name:   Niahh Flavonny )
Address: )
   **ERNST & YOUNG**
   ERNST & YOUNG BUILDING
   HARCOURT CENTRE,
   HARCOURT ST.,
   DUBLIN 2.

[TSA Signature Pages]

SIGNED by Alan Bloom in his own          )
capacity and on behalf of the Joint       )      ........................................................
Administrators without personal liability and  )      Alan Bloom
solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators in the presence of:


Witness signature

........................................................          )
Name: Kathryn Baillie                      )
Address: Herbert Smith LLP, Exchange House,   )
Primrose Street, London EC2A 2HS, England

49

NORTEL NETWORKS (CHINA)
LIMITED

By:_____

Name: John Marshall Doolittle
Title:   Chairman of the Board and Legal
Representative

[TSA Signature Pages]

TELEFONAKTIEBOLAGET L M
ERICSSON (PUBL)

By: _____
Name: PER OLUF STOL
Title: HEAD OF MERGERS & ACQUISITIONS

[TSA Signature Pages]

## Exhibit C

### Access to Providers Information Systems

In order to receive certain Services provided by the Providers pursuant to this Agreement (the "Purpose"), Purchaser requires access to computer, communication or network equipment, systems or services, including but not limited to, the CORWAN (CORporate Wide Area Network), the electronic switched network, Inter/Intranet gateways, electronic mail, telephony, computer systems, system hardware, drives, electronic media, storage areas, software programs, files, databases and information services (e.g., remote access, web/file servers and services) belonging to or controlled by the Providers (the "Providers Information Systems").

1.    **Access**: Subject to the terms and conditions of this Exhibit C, the Providers hereby grant access to Purchaser solely to those elements of Providers Information Systems (the "Permitted Systems") necessary for Purchaser to perform the Purpose, and to no other elements.

2.    **Purpose**: Purchaser agrees to use the Permitted Systems solely to carry out the Purpose and Purchaser agrees to use the Permitted Systems for no other purpose.

3.    **Conditions of Use**: Purchaser shall use the Permitted Systems in accordance with the terms of this Exhibit C and such further conditions and policies of use that the Providers may hereafter establish and make known to Purchaser, including, but not limited to the "Appropriate Use of Nortel's Network" policy attached as Annex 1 to this Exhibit C and those policies to which Purchaser agrees and accepts in writing case-by-case, based on Section 4 of this Exhibit C, attached to and incorporated in this Agreement.  Such conditions and policies of use may include (and be described as) policies, procedures, technical requirements, and protocols. Purchaser hereby undertakes full responsibility for all persons (including past employees of Purchaser) gaining access to the Providers Information Systems through Purchaser's computer systems.  Purchaser shall cooperate in the investigation of any apparent unauthorized access to the Providers Information Systems.

4.    **Employee Access**: Purchaser shall limit access to the Permitted Systems to the Active Employees, it being understood that such Active Employees shall be informed by Purchaser of the obligations set forth in this Exhibit C and the confidentiality obligations set forth in Section 7 of the Agreement, provided that, upon the Providers' reasonable request in relation to certain Services, access to Permitted Systems will be restricted to only Restricted Access Active Employees (such employees who have access to the Permitted Systems pursuant to the foregoing, "Authorized Workers").  The Providers must establish and maintain a unique identifier for any users of Permitted Systems for access and follow the same security rules as the Providers' personnel.  Purchaser shall ensure that individuals other than Authorized Workers (including, without limitation, past employees and current employees of Purchaser, any Designated Purchaser or any EMEA Designated Purchaser who do not have an active role in supporting the Purpose) shall have no access to the Providers Information Systems.  The Providers may terminate applicable access as of the date of notice to Purchaser that the Authorized Worker(s) identified in the notice has breached this Agreement.

C-1

5.      **Prohibitions**: Purchaser shall not (i) attempt to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems; (ii) make modifications, enhancements, adaptations or translations, in whole or in part, to or of any element of the Providers Information Systems; (iii) make copies of any element of the Providers Information Systems; (iv) probe host computers or networks; (v) breach the security controls of a host computer, network component or authentication system; (vi) monitor data on any network or system; (vii) interfere with the service of any user, host or network, or overload a server, network connected device, or network component; (viii) originate malformed data or network traffic that results in damage to, or disruption of, a service or network connected device; or (ix) forge data or misrepresent the origination of a user or source.

6.      **Purchaser's Systems**:

(a)     **Access Security**.  Purchaser shall ensure that Authorized Workers obtain access to the Permitted Systems through a computer system that maintains authentication controls and includes a suitable Firewall.  Purchaser shall follow each of the Provider's security rules and procedures for restricting access to its computer system.

(b)     **Segregation Wall**.  Purchaser will ensure that Authorized Workers are effectively isolated from its personnel who are not Authorized Workers.  Purchaser will implement procedures to segregate all the Seller information, data and communications (including, but not limited to Confidential Information) from other Purchaser's personnel who are not Authorized Workers.

(c)     **Assessment**.  Purchaser shall grant to the Providers reasonable access to its computer facilities in order to assess the on-going adequacy of Purchaser's security measures and procedures, and Purchaser shall assist and co-operate with the Providers in carrying out any such assessment.

(d)     **Denial of Access**.  In the event the Providers determine that Purchaser's security measures and procedures are inadequate to prevent unauthorized access to or use of the Providers Information Systems, the Providers may immediately deny further access until Purchaser takes such measures as the Providers may reasonably require.

7.      **Notice of Security Breach**: Purchaser shall promptly notify the Providers in writing in the event there is a breach, or attempted breach, (i) of security on or at the Purchaser's computer systems or facilities that impacts Providers Information Systems, or (ii) of the physical or electronic procedures for segregating and protecting Providers' information, data and communications from those of Purchaser and third parties.  In the event of such a breach or attempted breach, Purchaser shall, at its expense, do whatever is necessary to preserve the integrity of Providers Information Systems and Confidential Information, and to prevent such breach or attempted breach from recurring.  The Providers reserve the right to request the removal of any Authorized Worker from the Providers' site, and the right to request the discontinuance of the services of any Authorized Worker responsible for a breach of this Agreement, a breach of security of the Providers' network, or a breach of Providers' policies or procedures.

**8.    Third Party Technology:** Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a Third Party. Purchaser acknowledges that Third Party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by Purchaser. Other than with respect to Third Party Consents, nothing herein shall require the Providers or Purchaser, as the case may be, to acquire any rights to sublicense such rights from any Third Party.

**9.    Confidential Information:** All passwords, identification numbers and all information and data obtained before Closing by a Provider and modified during Purchaser's use of Providers Information Systems shall be treated as Confidential Information of the Provider.

**10.    Personal Data:** The Parties shall comply with their respective obligations under all applicable data protection and privacy laws. If Purchaser has access to any element of the Providers Information Systems containing data relating to individuals (including but not limited to employee identification numbers, compensation records, health records, credit card information) ("Personal Data"), Purchaser must use commercially reasonable efforts to not, and must not authorize any Third Party to (i) process the Personal Data for any purpose other than the Purpose or (ii) transfer any Personal Data to any third country, except in both cases, where required to do so by applicable data protection and privacy Laws. Purchaser shall use commercially reasonable efforts to take, and to ensure that its employees, agents and contractors take adequate technical and organizational security measures to safeguard Personal Data against unauthorized access, destruction, disclosure, transfer, or other improper use. Purchaser will provide the Providers with all reasonable assistance (x) in complying, within statutory time limits, with requests by individuals for access to their Personal Data; (y) in investigating any breach or alleged breach of applicable privacy or data protection Laws; and (z) in responding to and complying with any request or demand made by any national privacy or data protection authority.

**11.    Failure of Access:** Purchaser acknowledges that access to the Permitted Systems may be interrupted due to circumstances within or outside the reasonable control of the Providers. Nothing in this Agreement shall be considered a promise or covenant to deliver uninterrupted access to the Permitted Systems. Aside from the access as provided herein, no license of any patent, copyright, or any other right in respect of the Permitted Systems is granted to Purchaser by virtue of access to the Permitted Systems.

**12.    Waiver of Liability:** The Parties shall have no liability whatsoever for any damages, losses or expenses incurred as a result of access of a computer virus or other harmful computer file or program, whether arising in contract, tort or otherwise except in the case of gross negligence or willful misconduct on the part of any other Party.