## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

:     Chapter 11

*In re*     :

Nortel Networks Inc., *et al.,* [1]     :     Case No. 09-10138 (KG)

    :     Jointly Administered

Debtors.     :

    :     **Hearing date: May 2, 2011 at 10:00 a.m. (ET)**
    :     **Objections due: April 18, 2011 at 4 :00 p.m. (ET)**

-------------------------------------------------------X

## DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE ASSET SALE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES AND BID PROTECTIONS, (C) APPROVING THE NOTICE PROCEDURES AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) APPROVING THE LICENSE REJECTION PROCEDURES, (E) APPROVING A SIDE AGREEMENT, (F) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (G) SETTING A DATE FOR THE SALE HEARING AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN PATENTS AND RELATED ASSETS FREE AND CLEAR OF ALL CLAIMS AND INTERESTS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, (C) THE REJECTION OF CERTAIN PATENT LICENSES AND (D) THE LICENSE NON-ASSIGNMENT AND NON-RENEWAL PROTECTIONS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of orders pursuant to sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620, Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226)Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

District of Delaware (the "Local Rules") (i)(a) authorizing the selling Debtors' entry into that certain asset sale agreement dated as of April 4, 2011, among NNI, Nortel Networks Limited ("NNL"), Nortel Networks Corporation ("NNC"), Nortel Networks UK Limited, Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciaire) and certain other entities identified therein as sellers[2] (together, the "Sellers"), Ranger Inc., as purchaser ("Stalking Horse Purchaser") and Google Inc. as guarantor for the sale of substantially all of the Debtors' right, title and interest in the residual patents and certain related assets as described therein (the "Purchased Assets") as a "stalking-horse" sale agreement (as appended hereto as Exhibit A, the "Stalking Horse Agreement"),[3] (b) authorizing and approving the bidding procedures (as appended as Exhibit 1 to the Bidding Procedures Order (as defined below), the "Bidding Procedures") and the Bid Protections (as defined below), including granting administrative expense status to the Bid Protections payable to the Stalking Horse Purchaser, (c) approving the form and manner of notice of the sale (the "Notice Procedures") and the procedures (the Assumption and Assignment Procedures) as set forth below for the assumption and assignment of the Assumed and Assigned Contracts, (d) approving the procedures (the License Rejection Procedures) as set forth below for the rejection of certain patent licenses, (e) approving that certain side agreement attached hereto as Exhibit I (the "Side Agreement") by and among the Sellers, the Joint Administrators and the French Liquidator (as defined in the Stalking Horse Agreement), (f) authorizing the Debtors to file certain documents under seal and (g) setting the time, date and place for a hearing (the "Sale Hearing") to consider the sale of the Purchased Assets and assets of other Sellers being conveyed in the transactions (the "Assets") and the rejection of the Unknown Licenses (as defined below) (the "Sale"); (ii) authorizing and approving (a) the sale of the Purchased Assets, free and clear of all claims and

---

[2]     The Debtors who are Sellers include: NNI, NN Applications Management Solutions Inc., Nortel Altsystems, Inc. (previoiusly "Alteon Networks, Inc."), CoreTek, Inc., Qtera Corporation and Xros, Inc.

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Stalking Horse Agreement.

interests, pursuant to section 363 of the Bankruptcy Code, except as set forth in the Stalking Horse Agreement, (b) the assumption and assignment of the Assumed and Assigned Contracts pursuant to section 365 of the Bankruptcy Code, (c) the rejection of the Unknown Licenses pursuant to section 365 of the Bankruptcy Code and (d) the License Non-Assignment and Non-Renewal Protections (as defined in the Sale Order); and (iii) granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors rely on the declaration of George Riedel (the "Riedel Declaration"), attached hereto as Exhibit B.  In further support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9014 and 9018 of the Bankruptcy Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

### Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[4] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[4]     Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation, NNI's direct corporate parent Nortel Networks Limited (collectively with their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[5] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[6] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.      On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales.  Since then, Nortel has sold many of its business units and assets to various purchasers.  Efforts continue to be made

---

[5]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[6]     The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria)

with respect to the realization of value from Nortel's remaining assets.  For further information

regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed

by the Debtors and http://dm.epiq11.com/nortel.

## Relief Requested

7.      By this Motion, the Debtors seek orders:  (i)(a) authorizing the Debtors to enter

into the Stalking Horse Agreement and take other such steps as are necessary to consummate the

Sale, (b) authorizing and approving the Bidding Procedures and Bid Protections, (c) approving

the Notice Procedures and the Assumption and Assignment Procedures, (d) approving the

License Rejection Procedures, (e) approving the terms of a Side Agreement, (f) authorizing the

Debtors to file certain documents under seal, and (g) setting the time, date, and place of the Sale

Hearing (such order, substantially in the form attached hereto as Exhibit C, the "Bidding

Procedures Order"); (ii) authorizing and approving (a) the sale of the Purchased Assets, free and

clear of all claims and interests, as provided in the Stalking Horse Agreement, (b) the assumption

and assignment of certain executory contracts and (c) the rejection of certain patent licenses and

(c) the License Non-Assignment and Non-Renewal Protections (such order, substantially in the

form attached hereto as Exhibit D, the "Sale Order"); and (iii) granting them such other and

further relief as the Court deems just and proper.

## Facts Relevant to this Motion

### A.      The Assets and Nortel's Divestiture Efforts

8.      As mentioned above, on June 19, 2009, Nortel announced that it had determined

that the sale of its businesses is the best path for Nortel to maximize value.  Since that time,

Nortel has engaged in a process for the orderly disposition of its businesses.  To date, these

---

GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A.,
Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

efforts have led to Nortel closing: (i) the sale of certain portions of its Layer 4-7 data portfolio to

Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access

assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the

assets of its Wireless Networks business associated with the development of Next Generation

Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of

the assets of the Enterprise Solutions business globally, including the shares of Nortel

Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the

sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses

associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; (vi)

the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG

[D.I. 2065]; (vii) the sale of certain assets of its Carrier Voice Over IP and Application Solutions

business to GENBAND US LLC [D.I. 2632]; and (viii) the sale of substantially all the assets of

Nortel's Multi-Service Switch business to Ericsson [D.I. 4054].

9.    At this time, Nortel's residual patent assets are one of Nortel's largest remaining

assets.  The Stalking Horse Agreement contemplates the sale of approximately 6,000 U.S. and

foreign patents and patent applications spanning wireless, wireless 4G, data networking, optical,

voice, internet, service provider, semiconductors and other patent portfolios.  The extensive

patent portfolio touches nearly every aspect of telecommunications and additional markets as

well, including Internet search and social networking.

**B.    Efforts to Market and Sell the Transferred Patents**

10.    Nortel first began to solicit interest in a divestiture of the patent assets in May

2010.  In connection with this initial effort, Nortel, in consultation with its financial advisors,

engaged in discussions with approximately one hundred and five (105) parties likely to be

interested and able to acquire the patent assets, including a mix of financial investors and

strategic buyers.  A teaser intended to pique interest in the Assets (as defined in the Stalking

Horse Agreement) was sent to approximately ninety-five (95) entities.  Forty (40) companies

who executed confidentiality agreements were given access to an electronic data room

containing confidential diligence materials regarding the Assets.  During the solicitation process,

Nortel management also gave several presentations to interested parties.

### Summary of Transaction Documents

**A.    The Stalking Horse Agreement[7]**

11.    After extensive arm's-length, good faith negotiations among the Sellers and the

Stalking Horse Purchaser and their respective advisors, the Sellers have agreed, among other

things, to convey the Assets in accordance with the terms and conditions of the Stalking Horse

Agreement, subject to the approval of the Sale in the relevant jurisdictions in which the Sellers

are subject to creditor protection proceedings.  The Debtors have determined that the Stalking

Horse Agreement represents the best opportunity for the Debtors to maximize the value of the

Assets by serving as a basis for conducting an auction to seek higher and/or better offers.  The

Stalking Horse Agreement contemplates the sale of the Assets, subject to higher and/or better

bids, on the following material terms:

- <u>Purchase Price</u>.  The Stalking Horse Purchaser will pay to the Sellers, through their Distribution Agent, a purchase price of $900 million in cash, which includes $45 million to be held in escrow to secure indemnity obligations of the Sellers as further discussed below. (Stalking Horse Agreement §§ 2.2.1 and 2.3.2)

- <u>Certain Fees</u>.  As further described in section C below, in certain circumstances the Sellers may be required to pay to the Stalking Horse Purchaser a Break-Up Fee and/or an Expense Reimbursement, which payment obligations shall constitute an administrative expense under section 503(b) of the Bankruptcy Code.  (Stalking Horse Agreement § 8.2)

---

[7]    To the extent that there are inconsistencies between any summary description of the Stalking Horse Agreement contained herein and the terms and conditions of the Stalking Horse Agreement, the terms and conditions of the Stalking Horse Agreement shall control.

- <u>Good Faith Deposit</u>.  No later than three (3) Business Days following the later of the entry of the Bidding Procedures Order and the entry of the Canadian Sales Process Order, Purchaser will deliver to the Escrow Agent a good faith deposit in the amount of $27,000,000 in cash. The good faith deposit will be applied to the Purchase Price to be paid by the Stalking Horse Purchaser at Closing.  (Stalking Horse Agreement § 2.2.2)

- <u>Assets Sale Free and Clear</u>.  The Assets to be acquired by the Stalking Horse Purchaser include, among other things, the Sellers' right, title and interest in (i) the Transferred Patents and Purchased Specified UK Patents, subject to certain licenses granted thereunder, (ii) certain Patent Related Documentation and (iii) the Sellers' rights under certain patent-related data applications. The Assets to be transferred by the Sellers will be transferred free and clear of all claims and interests other than those expressly assumed by the Stalking Horse Purchaser or otherwise expressly permitted under the Stalking Horse Agreement.  (Stalking Horse Agreement § 2.1.1)

- <u>Assumed Liabilities</u>.  The liabilities to be assumed by the Stalking Horse Purchaser include, among others, (i) all Liabilities with respect to the ownership or exploitation of the Assets by or through the Purchaser arising after the Closing Date, (ii) all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof), if any, after the Closing Date and (iii) all Liabilities for any Tax that the Purchaser bears under Article VI of the Stalking Horse Purchase Agreement other than pursuant to Section 6.9(a) thereof.  (Stalking Horse Agreement § 2.1.3)

- <u>License to the Transferred Patents</u>.  Concurrently with the Closing, the Stalking Horse Purchaser shall grant to the Sellers a license under the Transferred Patents, the Purchased Specified UK Patents and certain other patents acquired under the Agreement.  (Stalking Horse Agreement § 5.13)

- <u>Undisclosed Patents</u>. Concurrently with the Closing, the Sellers shall grant the Stalking Horse Purchaser and its Affiliates a license under the Licensed Residual Patents pursuant to the terms of the Closing Date License Agreement. Upon the Sellers' discovery of any Undisclosed Patent Interest, the Purchaser shall have an option to purchase the Undisclosed Patent Interest at a price of $50,000. Prior to the Sellers' anticipated dissolution or winding up, the Purchaser will have an option to purchase any remaining Undisclosed Patent Interests on a quitclaim basis for a price of $1.00.  (Stalking Horse Agreement §§ 5.13 and 5.19; Sale Order ¶ 30)

- <u>License Rejections and Terminations</u>.  As further discussed below in Section E below, the Stalking Horse Purchaser has agreed to take the Assets subject to all Commercial Licenses, certain Intercompany Licenses and all licenses under known Outbound License Agreements and Cross-License Agreements, and the Debtors have agreed to reject Unknown Licenses (as defined below) pursuant to section 365(n) of the Bankruptcy Code and the procedures described in Section E below.  The Sellers also have agreed to terminate certain intercompany patent license rights.  (Stalking Horse Agreement § 5.13(b))

8

- Ongoing Covenants and Restrictions: In addition to certain other obligations, the Sellers have agreed to reasonably cooperate with the Stalking Horse Purchaser to provide the Purchaser the benefit of Assets that cannot be transferred at Closing, including by granting a royalty free, perpetual, exclusive (subject to pre-existing licenses), transferrable license under such patents. (Stalking Horse Agreement § 2.1.8)

- License Non-Assignment and Non-Renewal Protections. In furtherance of the sale, the Debtors agree under paragraph 28 of Sale Order to (i) limit or refrain from exercising any rights that they may have to renew, extend, assign, amend, waive or modify any rights under various agreements containing licenses absent the Stalking Horse Purchaser's consent in its sole and absolute discretion, and (ii) grant the Stalking Horse Purchaser a power of attorney. The Stalking Horse Purchaser has provided an indemnity related to its exercise of the power of attorney. (Stalking Horse Agreement §§ 10.1, 25; Sale Order ¶ 28)

- Maintenance of Books and Records. After the Closing, the Sellers generally shall preserve until the third (3rd) anniversary of the Closing Date (or such longer period as may be required by applicable law) all pre-Closing Date records relating to the Assets, subject to certain limitations. (Stalking Horse Agreement § 5.24)

- Restrictions on Solicitation of Competing Bids and other Transactions. The Sellers agree that they will not, until the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order, initiate, solicit, encourage or induce the submission or announcement of any offer for an Alternative Transaction or enter into any negotiations or execute any agreements for an Alternative Transaction. During this period, the Sellers continue to be able to negotiate and execute non-disclosure agreements, and from and after April 18, 2011, may provide access to the Data Room to Persons who have entered into non-disclosure agreements with the Primary Seller Parties. From and after the entry of the Bidding Procedures Order, the Sellers agree not to affirmatively take any material steps in furtherance of an Asset Retention Transaction, provided that the Sellers may consider an Alternative Transaction as part of an auction process under the Bidding Procedures. (Stalking Horse Agreement §§ 5.5(d), 5.26)

- Closing Conditions: In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals, the obligation of the Stalking Horse Purchaser to close the sale is subject to the satisfaction of the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing. (Stalking Horse Agreement § 7.3)

- Indemnity. On the Closing Date, $45 million of the Purchase Price will be placed in an escrow account to secure an indemnity provided by the Sellers for certain breaches of the Stalking Horse Agreement. (Stalking Horse Agreement Article IX, § 2.3.2)

**B.**     **The Bidding Procedures**[8]

12.     In order to ensure that the Sellers receive the maximum value for the Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.  The Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

13.     The proposed Bidding Procedures, which are attached as Exhibit 1 to the Bidding Procedures order attached hereto, set forth the procedures to govern the bidding process, and include the following provisions:

a.     <u>Provisions Governing Qualifications of Bidders</u>.  The proposed Bidding Procedures set forth various documents and information that a person[9] must deliver to become a Qualified Bidder, including:

(i)     an executed confidentiality agreement in conformance with the requirements set forth in the Bidding Procedures;

(ii)     current audited financial statements and latest unaudited financial statements of the Potential Bidder or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transactions; and

(iii)     a statement demonstrating to the Sellers' satisfaction, a bona fide interest in purchasing the Assets from the Sellers including: (A) the purchase price (including liabilities to be assumed by the Potential Bidder); (B) any Assets expected to be excluded; (C) the structure and financing of the Transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (D) any anticipated corporate, stockholder, internal or regulatory approvals required to

---

[8]     Capitalized terms used in this Section but not defined herein have the meanings ascribed to them in the Bidding Procedures. To the extent there are inconsistencies between any summary description of the Bidding Procedures contained herein and the Bidding Procedures attached as Exhibit 1 to the proposed Bidding Procedures Order, the terms of the Bidding Procedures shall control.

[9]     In the event that such person is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each actual or proposed holder of the equity (whether in the form of stock, partnership interests, LLC interests, debt issued in connection with such person's bid for the Assets or otherwise) or proposed beneficiary of such person through license or similar arrangement granted in connection with such person's bid (each an "<u>Equity Holder</u>") must comply with such requirements.

close the Transactions, the anticipated time frame and any anticipated impediments for obtaining such approvals; (E) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (F) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreement.

A Potential Bidder (i) that has delivered the documents described above, (ii) whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, the financial capability of the Potential Bidder to consummate the Transactions, (iii) that has submitted a reasonably competitive and realistic non-binding proposal, as described above, (iv) that has delivered executed confidentiality agreement(s), as described above, and (v) that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transactions, will be deemed a "Qualified Bidder".  The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group, the Administrators and the Monitor, whether to entertain bidders for the Assets that have not met one or more of the requirements specified above and deem such bidders to be Qualified Bidders.

b.      Provisions Governing Qualified Bids.  A bid, other than the Purchase Agreement, submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

        (i)      it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreement, including without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors and/or a plan of arrangement approved by one or more of the Canadian Debtors and the Monitor, in each case, either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Committee, the Bondholder Group and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreement;

        (ii)      it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder, provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (A) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (B) (1) with respect to the Successful Bidder only, 180 days from the Sale Hearing, subject to further extensions as may be agreed to under the applicable purchase agreements and (2) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date; provided further that,

notwithstanding anything to the contrary provided herein, in no event shall the Purchaser be required to serve as an Alternate Bidder without its consent, in its sole discretion;

(iii)    it includes a duly authorized and executed Purchase Agreement, including the purchase price for the Assets expressed in U.S. Dollars together with all exhibits and schedules thereto, the ancillary agreements as described in the Purchase Agreement and such additional ancillary agreements as may be required by the Qualified Bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") (in each case to the extent applicable) and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the Qualified Bidder;

(iv)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(v)    it is not conditioned on (A) the outcome of unperformed due diligence by the Qualified Bidder and/or (B) obtaining financing;

(vi)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), participating in or benefiting from (including through license or similar arrangement with respect to the assets to be acquired in connection with such bid) such bid, and the complete terms of any such sponsorship, participation, financing or benefit, such disclosure to include, without limitation, (A) in the case of a Qualified Bidder formed for the purpose of acquiring the Assets (or any portion thereof), the identity of each of the actual or proposed Equity Holders of such Qualified Bidder and the terms and participation percentage of such Equity Holder's interest in such bid and (B) the identity of each entity that has or will receive a benefit from such bid from or through the Qualified Bidder or any of its Equity Holders and the terms of such benefit;

(vii)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreement, plus the Break-Up Fee plus U.S. $4 million; provided that, in determining such value, the Sellers will not be limited to evaluating the dollar amount of a competing bid, but may also consider factors including those described under the "Evaluation of Competing Bids" section hereof;

(viii)    it includes an acknowledgment and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs, and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(ix)    it includes an acknowledgement and representation that the Qualified Bidder:  (A) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (D) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(x)    it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(xi)    it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in U.S. Currency in an amount equal to US $27,000,000;

(xii)    it (A) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with their continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (B) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(xiii)    it includes evidence of the Qualified Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(xiv)   it contains other information reasonably requested by the Sellers; and

(xv)   it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (iv), (v), (vi), (ix)(D), (x), (xi) or (xv) without the consent of the Purchaser, Committee, the Bondholder Group and the Monitor; provided further that such consent shall not be unreasonably withheld in connection with any bid that would (1) otherwise fully satisfy the requirements of a Qualified Bid but for a de minimis failure to comply with those criteria and (2) such non-compliance is cured within twenty-four (24) hours of the Bid Deadline; and provided further that the Sellers shall give the Purchaser written notice no later than the later of (x) three (3) Business Days prior to the commencement of the Auction or (y) 5:00 p.m. (ET) five calendar days prior to the commencement of the Auction of any determination by the Sellers (subject to the two preceding provisos in this sentence) to entertain a bid for the Assets that does not conform to one or more of the requirements specified herein and to deem such bid to be a Qualified Bid (it being understood that such notice shall include a description of the manner in which the applicable bid deviated from the requirements set forth herein) or to entertain a bidder for the Assets that has not met one or more of the requirements set forth under the heading "Participation Requirements" and deem such bidder to be a Qualified Bidder (it being understood that such notice shall include a description of the manner in which the applicable bidder deviated from the requirements set forth herein).  Notwithstanding the foregoing, the Purchaser is deemed a Qualified Bidder, and the Stalking Horse Agreement is deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) on the next Business Day after the day that the determination is made; provided that such notification shall be given no later than two (2) Business Days following the expiration of the Bid Deadline.  The Sellers shall provide the Purchaser and any Qualified Bidder that has previously submitted a Qualified Bid with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid, but in no event later than the later of (x)12:00 p.m. (noon) (ET) three (3) Business Days prior to the commencement of the Auction or (y) 5:00 p.m. (ET) five calendar days prior to the commencement of the Auction.

c.   Evaluation of Competing Bids.  The Bidding Procedures set forth various factors that would be considered by the Sellers in evaluating each Qualified Bid.

d.   Auction Process.  If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreement, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **9:00 a.m. (ET) on June 20, 2011**, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or

such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned, subject to the terms of the Purchase Agreement.  The Auction shall run in accordance with the following procedures:

(i)     Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor, the Administrators, the French Liquidator (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid (and the advisors to such Qualified Bidder), shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(ii)    Each Qualified Bidder shall be required to confirm that it has not engaged, and will not engage, in any collusion with respect to the bidding or the Transactions, and if such Qualified Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each of the Equity Holders of such Qualified Bidder shall be required to confirm that it has not engaged, and will not engage, in any collusion with respect to the bidding or the Transactions, such confirmation, in each case, in form and substance satisfactory to the Sellers in their joint and sole discretion.

(iii)   At least one (1) calendar day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (A) the date of the selection of the Successful Bidder at the conclusion of the Auction and (B) if such Qualified Bidder (other than the Purchaser) is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date.  By 12:00 p.m. (noon) at least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(iv)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that (A) the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction, (B) if such Qualified Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), the true identity of each of the Equity Holders of such Qualified Bidder will be fully disclosed to all Qualified Bidders at the Auction and (C) all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction in person.

15

(v)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (A) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (B) disclosed to each Qualified Bidder at the Auction.

(vi)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (A) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (B) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (1) for the first round, a higher or otherwise better offer than the Starting Bid, and (2) for subsequent rounds, a higher or otherwise better offer than the Leading Bid.  Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $ 5,000,000 over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise best offer (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

e.      Selection Of Successful Bid.  Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor and the Administrators will (i) review each Qualified Bid and evaluate each Qualified Bid, (ii) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such Qualified Bids, collectively the "Successful Bid" and the Qualified Bidder(s) making such Qualified Bid, collectively, the "Successful Bidder") and (iii) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder, if any, and the details of the Successful Bid and Alternate Bid, if any.  The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group the Monitor and the Administrators, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

For the avoidance of doubt, the Sellers shall not consider or support any bid (whether or

not such bid is a Qualified Bid) for any of the Assets received after the close of the Auction.

f.   <u>Other Limitations</u>.  The Sellers may not, without the prior written consent of the Committee, the Bondholder Group, the Administrators and the Monitor, which consent may not be unreasonably withheld, (i) extend the Bid Deadline for more than five (5) Business Days beyond June 13, 2011, (ii) adjourn the Auction for more than three (3) Business Days, or (iii) subject to the availability of the Bankruptcy Court and the Canadian Court adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded; <u>provided</u> that the Sellers shall give the Stalking Horse Purchaser written notice within one (1) Business Day after any such action (it being understood that such notice shall include a description of the action taken).

## C.   The Bid Protections

14.    The Stalking Horse Purchaser and its advisors have expended, and likely will continue to expend, considerable time, energy and resources pursuing the purchase of the Assets and have engaged in extended, good faith negotiations with the Sellers to facilitate such transaction.  The Stalking Horse Agreement is the culmination of these efforts.

15.    In recognition of this expenditure of time, energy, and resources, the Sellers, in accordance with section 8.2 of the Stalking Horse Agreement, have agreed to pay the Stalking Horse Purchaser an aggregate fee of twenty-five million dollars and 00/100 ($25,000,000), which break-up fee is equal to approximately two and eight-tenths percent (2.8%) of the estimated aggregate Purchase Price (the "<u>Break-Up Fee</u>").  In accordance with section 8.2 of the Stalking Horse Agreement and upon the termination events described therein, the Sellers also have agreed to pay the Stalking Horse Purchaser's reasonable and documented out-of-pocket costs and expenses in connection with the preparation, execution and performance of the Stalking Horse Agreement, which shall not exceed four million dollars and 00/100 ($4,000,000), which is equal to approximately four-tenths of one percent (0.4%) of the estimated aggregate Purchase Price (the "<u>Expense Reimbursement</u>," and together with the Break-Up Fee, the "<u>Bid Protections</u>").

16.     Specifically, section 8.2 of the Stalking Horse Agreement provides for payment of the Break-Up Fee if the Stalking Horse Agreement is terminated under the following circumstances: (i)(a) upon a breach by the Sellers of the Sellers' representations, warranties, Annex I statements, agreements or covenants under the Stalking Horse Agreement, which breach would result in a failure to satisfy certain closing conditions, and which breach, if capable of being cured, is not cured within twenty-five (25) days from receipt of a written notice thereof, (b) upon a breach by the Sellers of their obligation to close the transactions contemplated hereby at the Closing, which breach, if capable of being cured, has not been cured within five (5) days from receipt of written notice thereof,  (c) upon or following the determination by the Sellers to proceed with an Alternative Transaction, (d) upon or following the determination by the Sellers to proceed with an Asset Retention Transaction or (e) in the event that, the Stalking Horse Purchaser refuses to consent to take the Assets subject to an Unknown License, which refusal of consent, in the Primary Seller Parties' reasonable good faith judgment would likely result in the actual damages claims in excess of an aggregate specified amount; (ii) when the Stalking Horse Agreement is terminated, the Stalking Horse Purchaser is not in breach of the Stalking Horse Agreement, which breach would result in a failure to satisfy certain closing conditions; and (iii) an Alternative Transaction is consummated within twelve (12) months following such termination of the Stalking Horse Agreement.  The Break-Up Fee is payable in immediately available funds, from the proceeds of the Alternative Transaction, not more than five (5) Business Days after the consummation of an Alternative Transaction.

17.     Section 8.2 of the Stalking Horse Agreement provides for payment of the Expense Reimbursement if the Stalking Horse Agreement is terminated under the following circumstances: (i)(a) upon a breach by the Sellers of the Sellers' representations, warranties,

Annex I statements, agreements or covenants under the Stalking Horse Agreement, which breach would result in a failure to satisfy certain closing conditions, and which breach, if capable of being cured, is not cured within twenty-five (25) days from receipt of a written notice thereof, (b) upon a breach by the Sellers of their obligation to close the transactions contemplated hereby at the Closing, which breach, if capable of being cured, has not been cured within five (5) days from receipt of written notice thereof, (c) upon or following the determination by the Sellers to proceed with an Alternative Transaction, (d) upon or following the determination by the Sellers to proceed with an Asset Retention Transaction (e) in the event that, the Stalking Horse Purchaser refuses consent to take the Assets subject to an Unknown License, which refusal of content, in the Primary Seller Parties' reasonable good faith judgment would likely result in the assertion of actual damages claims in excess of an aggregate specified amount, or (f) upon failure of the closing condition listed in § 7.1(d) of the Stalking Horse Agreement and (ii) when the Stalking Horse Agreement is terminated, the Stalking Horse Purchaser is not in breach of the Stalking Horse Agreement, which breach would result in a failure to satisfy certain closing conditions. The Expense Reimbursement is payable in immediately available funds not more than five (5) Business Days following such termination and after the receipt by the NA Sellers of written notice from the Purchaser describing the fees and expenses that constitute the Expense Reimbursement in reasonable detail. The Sellers have further agreed that their obligation to pay the Break-Up Fee and the Expense Reimbursement shall survive termination of the Stalking Horse Agreement.

18.     Except in the event of actual fraud by the Sellers, the Stalking Horse Purchaser's monetary remedies against the Sellers for pre-Closing breaches of the Stalking Horse Agreement are capped at twenty-nine million dollars and 00/100 ($29,000,000), which is equal to the

amount of the Expense Reimbursement and the Break-Up Fee payable by the Sellers under the Stalking Horse Agreement.  The Break-Up Fee and the Expense Reimbursement are not remedies for any post-Closing breach by the Sellers.

**D.    The Notice Procedures**

19.    The Debtors propose to give notice as soon as reasonably practicable after the entry of the Bidding Procedures Order and the Canadian Sales Process Order (as defined below) of the Bidding Procedures, the License Rejection Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "Sale Notice"), substantially in the form attached hereto as Exhibit E by first-class mail, postage prepaid, facsimile, electronic transmission, hand delivery or overnight mail upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, (ii) all entities reasonably known to have asserted any claim, lien, encumbrance or interest in the Purchased Assets, (iii) the counterparties to the Cross-License Agreements and Outbound License Agreements, (iv) the attorneys general for all states in which Purchased Assets owned by the Debtors are located, all federal and state taxing authorities, the Securities and Exchange Commission, the Internal Revenue Service, and the Department of Labor and similar state labor or employment agencies, (v) all parties entitled to notice pursuant to Local Rule 2002-1(b), (vi) all counterparties to the Assumed and Assigned Contracts, (vii) all known creditors of the Debtors, (viii) counsel to the Committee, (ix) counsel to the Bondholder Group and (x) the additional persons agreed between the Debtors and the Stalking Horse Purchaser to be served in accordance with the terms of the Stalking Horse Agreement.

20.    In addition, within five (5) Business Days of entry of the Bidding Procedures Order and the Canadian Sales Process Order or as soon as reasonably practicable thereafter, the

Sellers shall publish notice of the Bidding Procedures, the License Rejection Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing in <u>The Wall Street Journal</u> (National Edition), <u>The Globe and Mail</u> (National Edition), <u>The New York Times</u> (<u>National Edition</u>) and <u>The Financial Times</u> (International Edition), substantially in the form attached hereto as <u>Exhibit F</u> (the "<u>Publication Notice</u>").

21.     The Debtors propose to give notice of the License Rejection Procedures to the Known Licensees (as defined below) in accordance with section E below.  The Debtors propose to give notice of the Sale to any counterparties under the Assumed and Assigned Contracts (as defined below), if any, in accordance with section F below.

**E.     License Rejection Procedures and License Non-Assignment and Non-Renewal Protections**

22.     The Debtors submit that the License Rejection Procedures and the License Non-Assignment and Non-Renewal Protections are beneficial to the Debtors' ability to realize the full value of the Purchased Assets through this sale process, as the procedures provide comfort to the Stalking Horse Purchaser or other Successful Bidder as to the scope and duration of licenses and other agreements that presently encumber and will continue to encumber the Assets they are purchasing.

23.     As described in the Stalking Horse Agreement, the Debtors have informed the Stalking Horse Purchaser that they do not believe that there are any Contracts pursuant to which the Debtors grant licenses under the Transferred Patents, the Jointly Owned Patents or the Specified UK Patents, which licenses are in force, and to which the Debtors are a party other than (i) the Outbound License Agreements listed in Schedule A.I(e) of the Sellers Disclosure Schedule and the Cross-License Agreements listed in Schedule A.I(d) of the Sellers Disclosure

Schedule (collectively, the "Scheduled Licenses"), (ii) the Commercial Licenses and (iii) license rights with respect to the Transferred Patents, Specified UK Patents or Jointly Owned Patents granted under certain intercompany contracts, arrangements or understandings to which the Debtors are a party.  Nevertheless, in view of the potential impact of continuing licenses on the value of the Sellers' patent assets, the Debtors have agreed in furtherance of the Sale to reject, pursuant to section 365 of the Bankruptcy Code, effective as of and conditioned on the occurrence of the Closing, any pre-petition Contract pursuant to which any Debtor is a party and pursuant to which such Debtor grants a license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, other than (i) the Scheduled Licenses, (ii) the Commercial Licenses, (iii) the Disclosed Intercompany Licenses (as defined in the Stalking Horse Agreement) and (iv) any intercompany contract, arrangement or understanding that is not a Disclosed Intercompany License but that is in effect and that is similar in kind to the Disclosed Intercompany Licenses (it being understood that any such intercompany contract, arrangement or understanding that grants license rights to the Transferred Patents, Specified UK Patents or Jointly Owned Patents that is broader in scope or longer in duration than the broadest license or longest license to such patents granted under any of the Disclosed Intercompany Licenses is not similar in kind to the Disclosed Intercompany Licenses).  The Debtors propose the following procedures with respect to the rejection of such Unknown Licenses (the "License Rejection Procedures", and any Contract described in the preceding sentence to be rejected pursuant to such procedures, the "Unknown Licenses").  The proposed License Rejection Procedures will be coordinated with a substantially similar process proposed by the Canadian Debtors in connection with the Canadian Sales Process Order Motion.

24.    The Sale Notice substantially in the form of Exhibit E hereto informs creditors and parties in interest of the Debtors' intention to reject all Unknown Licenses to which any Debtor is a party pursuant to section 365 of the Bankruptcy Code effective as of, and conditioned on, the occurrence of the Closing.  As described above, among other persons, the Sale Notice will be served on (i) all of the Debtors' known creditors, including all of the Debtors' scheduled creditors and all persons who have filed proofs of claims in these chapter 11 cases, (ii) all persons who have requested notice in these chapter 11 cases and (iii) any additional persons that the Stalking Horse Purchaser and the Sellers have agreed to serve in accordance with section 5.1 of the Stalking Horse Agreement.

25.    In addition, the Debtors shall serve on each counterparty to an Outbound License Agreement with the Debtors listed Schedule A.I.(e) of the Sellers Disclosure Schedules and on each counterparty to a Cross-License Agreement with the Debtors listed on Schedule A.I.(e) of the Sellers Disclosure Schedules (such Contracts, collectively, the "Known Licenses", and such counterparties, collectively, the "Known Licensees") a notice substantially in the form of Exhibit of Exhibit H hereto (the "Known License Notice"), identifying the Known Licenses that such counterparty has with the Debtors, informing such Known Licensees that the sale of the Assets to the Stalking Horse Purchaser is being made subject to the Known Licenses and informing the Known Licensees that the Debtors intend to reject any Unknown Licenses to which any Debtor is a party as of, and conditioned on, the occurrence of the Closing, including any Unknown Licenses with such Known Licensee that are not identified on such Known License Notice.  The Known License Notices shall be served by the Debtors by no later than five (5) Business Days following the entry of the Bidding Procedures Order or as soon thereafter as is reasonably practicable.

26.    The Publication Notice, published as described above, discloses the Debtors'
intent to reject the Unknown Licenses to which any Debtor is a party effective as of, and
conditioned on, the Closing.

27.    Absent receipt of a timely objection to rejection that is sustained by the Court,
each Unknown License to which the Debtors are a party will be rejected pursuant to section 365
of the Bankruptcy Code on the Closing Date, and absent receipt of a timely Notice of Election
(as defined below) the counterparties to such Unknown License will be irrevocably deemed to
have elected to treat each such Unknown License as terminated under section 365(n)(1)(a) of the
Bankruptcy Code.

28.    The Debtors propose that the deadline for any counterparty to an Unknown
License or party in interest to file and serve an objection to the rejection of any of the Unknown
Licenses (the "License Rejection Objection Deadline") will be **May 31, 2011 at 4:00 p.m. (ET)**.
Such objection shall be served on the Objection Notice Parties (as defined below); counsel to the
Canadian Debtors, Ogilvy Renault LLP, Attn: Jennifer Stam, Royal Bank Plaza, South Tower,
Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; and counsel to
the Monitor, Goodmans LLP, Attn: Jay Carfagnini and Joseph Pasquariello, Bay Adelaide
Centre, 333 Bay Street, Suite 3400, Toronto, ON  M5H 2S7, Facsimile: (416) 979-1234.

29.    The Debtors propose that the deadline for a counterparty to an Unknown License
with any of the Debtors to elect to retain its rights under such Unknown License in accordance
with section 365(n)(1)(b) of the Bankruptcy Code will be **June 6, 2011 at 4:00 p.m. (ET)** (the
"Notice of Election Deadline").  Any counterparty to an Unknown License that wishes to retain
such rights must file a notice of election to retain such rights (a "Notice of Election") on or prior
to such deadline, and serve such notice on the Objection Notice Parties, counsel to the Canadian

24

Debtors counsel to the Canadian Debtors, Ogilvy Renault LLP, Attn: Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; and counsel to the Monitor, Goodmans LLP, Attn: Jay Carfagnini and Joseph Pasquariello, Bay Adelaide Centre, 333 Bay Street, Suite 3400, Toronto, ON  M5H 2S7, Facsimile: (416) 979-1234.  With the Notice of Election served on the Debtors and the Canadian Debtors, the counterparty to such Unknown License shall serve a written copy of the Unknown License.

30.     If a counterparty to an Unknown License with the Debtors timely elects to retain its rights under such Unknown License in accordance with section 365(n)(1)(b) of the Bankruptcy Code by filing a Notice of Election prior to the Notice of Election Deadline, such rights as provided in section 365(n)(1)(b) of the Bankruptcy Code will be preserved as of the Closing without need for further action by the Debtors, the Bankruptcy Court or the counterparty to such Unknown License (without prejudice, as between the Sellers and the Stalking Horse Purchaser, to the rights of the Stalking Horse Purchaser under the Stalking Horse Agreement). The Debtors and the Stalking Horse Purchaser (or other Successful Bidder) reserve their right to object to any Notices of Election on any and all available grounds, which objections will be heard at the Sale Hearing.

31.     For any Unknown License that is rejected pursuant to section 365 of the Bankruptcy Code, the Debtors propose that the deadline for any counterparty to such Unknown License to file a rejection damages claim against the Debtors (each such claim, a "License Rejection Damages Claim") with respect to such rejection will be thirty (30) days following the date of the Closing.  All License Rejection Damages Claims must comply with the procedures established by the Order Establishing Deadlines For Filing Proofs Of Claim And Approving

Form And Manner Of Notice Thereof [D.I.1280].  With the License Rejection Damages Claim

served on the Debtors and the Canadian Debtors, the counterparty must include a written copy of

the relevant Unknown License.  The Debtors reserve their rights to object to any License

Rejection Damages Claim on any and all available grounds.

32.    Subject to the consent of the Stalking Horse Purchaser (in its sole and absolute

discretion) or other Successful Bidder, as applicable, the Debtors reserve their right to withdraw

any Unknown License from the contracts to be rejected, at any time prior to the occurrence of the

Closing.

License Non-Assignment and Non-Renewal Protections

33.    In view of the potential impact of continuing licenses on the value of the Sellers'

patent assets, the Debtors also have agreed in furtherance of the Sale to various limitations and

prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts

containing licenses to the patents offered for sale.  These prohibitions, which are set forth in full

in paragraph 28 of the Sale Order, apply to Outbound License Agreements, Cross License

Agreements, Commercial Licenses, intercompany contracts among the Sellers and their affiliates

and certain agreements entered into in connection with the post-petition divestiture of Nortel's

business units, and include (i) the deemed non-consent by the Debtors to requests to amend or

modify these agreements in manners that would have the practical effect of expanding the scope

or term of the licenses to the patents to be transferred to the Stalking Horse Purchaser pursuant to

the Stalking Horse Agreement, (ii) the deemed non-consent by the Debtors to the assignment of

certain of these agreements by the counterparties thereto to third parties, (iii) restrictions on the

Debtors' ability to assign such contracts and (iv) a power of attorney for the Stalking Horse

Purchaser to enforce these protections and terminate the Outbound License Agreements and

Cross License Agreements upon the occurrence of events, dates or circumstances entitling the Debtors to terminate such licenses pursuant to the terms of such license.  It is the Debtors' view that it is reasonable for them to agree at this time to these restrictions on the above described agreements as part of the consideration for the proceeds to be realized from the Sale.

34.    The Debtors believe that agreeing to the License Non-Assignment and Non-Renewal Protections is an exercise of their sound business judgment.  Such protections limit the impact of these license agreements on the Assets, which benefit the Debtors, their creditors, estates and all parties in interest through their expected ability to realize a higher price for the Purchased Assets, and these protections are tailored to respect the Debtors' current obligations under their existing contracts (while limiting their discretion to extend or modify those obligations after the Closing).  Such counterparties will retain any rights under their contracts that can be exercised without the Debtors' consent.

F.    **The Assumption and Assignment Procedures**

35.    The Stalking Horse Purchaser does not seek to have the Debtors assume and assign any executory contracts to it in connection with the Stalking Horse Agreement. Nevertheless, in furtherance of the sale process, the Debtors seek approval of the following procedures (the "Assumption and Assignment Procedures") to assume prepetition executory contracts of the Debtors that are related to the Purchased Assets and to assign such executory contracts to a Successful Bidder at the Auction, if so desired (the "Assumed and Assigned Contracts").

36.    If at any time after the Auction whether before or after Closing, the Debtors identify prepetition executory contracts to be assumed and assigned to the Successful Bidder as Assumed and Assigned Contracts, the Debtors will serve an individual notice substantially in the form attached hereto as Exhibit G (each an "Assumption and Assignment Notice") by facsimile,

electronic transmission, hand delivery or overnight mail on the Contract Counterparty to each supplemental Assumed and Assigned Contract (and its attorney, if known) at the last known address available to the Debtors by no later than ten (10) calendar days before the proposed effective date of the assignment.  Each Assumption and Assignment Notice shall set forth the following information:  (i) the name and address of the Contract Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the Debtors to withdraw such request for assumption and assignment of the Assumed and Assigned Contract prior to the Closing), (iii) identification of the Assumed and Assigned Contract, (iv) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount") and (v) a description of the Successful Bidder, and a statement as to the ability of the Successful Bidder to perform the Debtors' obligations under the Assumed and Assigned Contract.  The Cure Amount shall be paid as agreed by the Successful Bidder and Sellers pursuant to the procedures set forth in the section below.  The Debtors will also file with the Court a master notice of assignment of contracts (a "Master Assumption Notice") that sets forth:  (i) the name and address of each Counterparty, (ii) notice of the proposed effective date of each assignment (subject to the right of the Debtors and the Successful Bidder to withdraw such request for assumption and assignment of the Assumed and Assigned Contract prior to the Closing), (iii) a description of each Assumed and Assigned Contract, and (iv) the Cure Amount, if any, for such contracts (which shall be filed under seal as described above and may be supplemented from time to time) and serve copies of the Master Assumption Notice on (a) counsel to the Successful Bidder as applicable, (b) the U.S. Trustee, (c) counsel to the Monitor, (d) counsel to the Committee, and (e) counsel to the Bondholder Group.

37.     Unless the Contract Counterparty or any other entity properly files an objection to the Assumption and Assignment Notice in accordance with the General Objection Procedures (as defined below) within ten (10) calendar days of the date of the Assumption and Assignment Notice, the Debtors may assume and assign the Assumed and Assigned Contract, subject to the occurrence of the Closing, without further order or notice of hearing.  If an objection is filed and served in accordance with the General Objection Procedures within ten (10) calendar days of the date of the supplemental Assumption and Assignment Notice, and the objection cannot be resolved consensually, then the Debtors will schedule a hearing to consider the objection on the next scheduled omnibus hearing date.

38.     The identity of the counterparties to the Assumed and Assigned Contracts, if any, would include counterparties to various commercial agreements with the Sellers (the "Counterparties") where identities of the Counterparties and/or the relevant agreements may be commercially sensitive.  Access to lists of Counterparties absent appropriate confidentiality restrictions would entail releasing valuable confidential information of critical value to any prospective purchaser of the Assets and to the Counterparties themselves.

*Cure Amounts*

39.     To the extent necessary to consummate the Sale, the Cure Amounts shall be paid promptly by the Successful Bidder and the Debtors in accordance with the sale agreement entered into between the Sellers and any Successful Bidder, but in no event later than the later of (a) twenty (20) calendar days following the resolution of the Cure Amounts in accordance with these procedures and (b) ten (10) calendar days following the Closing.

*Service of Objections*

40.     All Contract Counterparty objections must be served in accordance with the General Objection Procedures (as defined below) and must specify the grounds for such

objection, including stating the Contract Counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount) if the Contract Counterparty disagrees with the Debtors' proposed Cure Amount and any other defaults or termination events the Counterparty alleges must be cured to effect assumption and assignment of the Assumed and Assigned Contract.

41.     To the extent that any Contract Counterparty does not timely serve an objection as set forth above, such Contract Counterparty will be: (i) deemed to have consented to such Cure Amounts, if any, and to the assumption and assignment of the applicable Assumed and Assigned Contract; (ii) bound to such corresponding Cure Amount, if any; (iii) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iv) deemed to have agreed that all defaults under the Assumed and Assigned Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the Assumed and Assigned Contract shall remain in full force and effect for the benefit of the Successful Bidder and the Contract Counterparty in accordance with its terms; (v) deemed to have waived any right to terminate the Assumed and Assigned Contract or designate an early termination date under the applicable Assumed and Assigned Contract as a result of any default that occurred and/or was continuing prior to the assignment date; and (vi) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assumed and Assigned Contract.

### *Reservation of Rights and Further Relief*

42.     The Debtors' assumption and assignment of the Assumed and Assigned Contracts is subject to Court approval and consummation of the sale of the Assets to a Successful Bidder (other than the Stalking Horse Purchaser under the Stalking Horse Agreement).  The Debtors shall be deemed to have assumed each of the Assumed and Assigned Contracts effective as of and conditioned on the occurrence of the Closing Date of the sale agreement entered into between the Sellers and any Successful Bidder (or such later date as noticed by the Debtors). Absent such closing, the Assumed and Assigned Contracts shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

43.     The Successful Bidder shall have no rights in and to a particular Assumed and Assigned Contract until such time as the particular Assumed and Assigned Contract is assumed and assigned in accordance with the procedures set forth herein.  The Debtors further reserve the right to modify the Assumption and Assignment Procedures, subject to approval of the Court.

44.     The same Assumption and Assignment Procedures will be used for each of the Assumed and Assigned Contracts.  Rule 6006(e) of the Bankruptcy Rules allows for the sale of multiple contracts in one motion upon authorization of the Court.  The Debtors therefore request that the Court grant authorization to seek approval of the assumption and assignment of the Assumed and Assigned Contracts through this Motion and the notice and procedures set forth in the Assumption and Assignment Procedures including, if necessary, to seek approval of the assumption and assignment of more than one hundred (100) contracts pursuant to this Motion and Rule 6006(f)(6) of the Bankruptcy Rules.

45.     To facilitate the assumption and assignment of the Assumed and Assigned Contracts, the Debtors further request that the Court find the anti-assignment provisions of the

Assumed and Assigned Contracts, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.[10]

46.    In the event an objection to the proposed assumption and assignment of a contract is not resolved prior to Closing, including objections related to Cure Amounts, the Debtors, in consultation with the Successful Bidder, may elect to (i) not assume such Assumed and Assigned Contracts, or (ii) postpone the assumption of such Assumed and Assigned Contracts until the resolution of such objection.  Any Cure Costs outstanding on the Closing Date shall be paid to the appropriate Counterparty as a condition subsequent to such assumption and/or assumption and assignment of the relevant Assumed and Assigned Contracts.

47.    The Debtors reserve and do not waive the right to amend, supplement, withdraw or otherwise modify the information contained in Schedule A of any individualized Assumption and Assignment Notice sent to a Counterparty.

**G.    Request to Set a Date for the Sale Hearing**

48.    The Debtors intend to present the Successful Bid and the Alternate Bid, if any, for approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court and currently proposed as **June 30, 2011 at 10:00 a.m. (ET)**.  The Debtors shall be deemed to have accepted a bid only when the Court has approved the bid at the Sale Hearing.  The Debtors propose that upon the failure to consummate a sale of the Assets after the Sale Hearing to the Successful Bidder, the next highest or otherwise best Alternate Bid, if any, as disclosed at the Sale Hearing, shall be deemed the

---

[10]    Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such

Successful Bid without need for further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Alternate Bid.

**H.      Objections**

49.      All objections to the sale of the Assets or any relief requested in the Motion other than the relief granted by this Court in the Bidding Procedures Order or as otherwise provided in the License Rejection Procedures (which procedures require objections to the rejection of Unknown Licenses to be filed and served by May 31, 2011 at 4:00 p.m. (ET) and Notices of Election to be filed and served by June 6, 2011 at 4:00 p.m. (ET)) must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than **4:00 p.m. (ET) on June 13, 2011** (the "General Objection Deadline"), or other applicable deadline as indicated in this Motion; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following (collectively, the "Objection Notice Parties"): (i) counsel to the Debtors: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax: (302) 658-3989 (Attention:  Derek C. Abbott); (ii) counsel to the Stalking Horse Purchaser: Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY  10019, Fax: (212) 403-2000 (Attention: Philip Mindlin, Adam O. Emmerich, Benjamin M. Roth) and Torys LLP 79 Wellington Street West, Suite 3000, Box 270, TD Centre, Toronto, Ontario, M5K 1N2, Fax: (416) 865-7380 (Attention: Michael Rotsztain and Adam Slavens), (iii) counsel to the

---

provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

Committee:  Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax:  (212) 872-1002 (Attention:  Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention:  Christopher M. Samis), (iv) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax:  (212) 822-5735 (Attention:  Roland Hlawaty) and (v) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Fax:  (302) 573-6497 (Attention: Patrick Tinker) (these notice parties collectively, the "Objection Notice Parties" and the procedures in this Paragraph, "General Objection Procedures").

50.    Each objection shall state the legal and factual basis of such objection and may be orally supplemented at the relevant hearing.

51.    If the Stalking Horse Purchaser is not the Successful Bidder at the Auction, objections to issues arising from and in connection with the Auction and/or the Debtors' selection of a Successful Bid made by a Successful Bidder other than the Stalking Horse Purchaser must be filed by the Supplemental Objection Deadline in accordance with the General Objection Procedures.

52.    Only those objections made in compliance with the General Objection Procedures will be considered by the Court at the relevant hearing.  The failure of any objecting person or entity to file its objection by the relevant objection deadline and in accordance with the General Objection Procedures will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection (including to the sale of the Assets and assumption and assignment of the Assumed and Assigned Contracts free and clear of all claims and interests), and shall be deemed to be "consent" for purposes of section 363(f) of the Bankruptcy Code.

**I.      Sale Free and Clear of All Interests**

53.      As discussed above, the Stalking Horse Purchaser has agreed to purchase the

Assets subject to certain known and identified or otherwise defined patent licenses under such

Assets.  Except for such licenses, the Assumed Liabilities, the Permitted Encumbrances and as

provided in Section 5.21 of the Stalking Horse Agreement, the Debtors have agreed to sell,

transfer and assign pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors' right,

title and interest in the Purchased Assets to the Stalking Horse Purchaser free and clear of Claims

(as defined in the Sale Order) and all liens, including any lien (statutory or otherwise), Lien (as

defined in the Sale Agreement), mortgage, pledge, security interest, charge, right of first refusal,

hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant, rights

of offset or recoupment, lease or conditional sale arrangement (collectively, the "Liens") and

debts, liabilities, obligations, contractual rights and claims and labor, employment and pension

claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled

or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed

or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured,

material or non-material, disputed or undisputed, whether arising prior to or subsequent to the

commencement of these chapter 11 cases, and whether imposed by agreement, understanding,

law, equity or otherwise (collectively, the "Liabilities" and together with the Liens, the

"Interests"), with such Interests to attach to the sale proceeds in the same validity, extent and

priority as existed with respect to the Purchased Assets immediately prior to the Transactions,

subject to any rights, claims and defenses of the Debtors and other parties in interest.

54.      The Debtors seek a finding by the Court that upon the Closing, the Stalking Horse

Purchaser or other Successful Bidder, shall not be liable for any Claims against, and Interests and

obligations of, the Debtors or any of the Debtors' predecessors or affiliates as a result of the

purchase of the Purchased Assets, other than the Assumed Liabilities, the Permitted

Encumbrances or as provided in Sections 2.1.1(a) and 5.21 of the Stalking Horse Agreement.[11]

**J.      Assumption and Assignment of the Assumed and Assigned Contracts**

55.      Pursuant to section 365(f) of the Bankruptcy Code, the Debtors seek authorization

and approval to assume and assign the Assumed and Assigned Contracts to a Successful Bidder

at the Auction pursuant to the Assumption and Assignment Procedures notwithstanding any

provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-

bankruptcy law, that prohibits, restricts, or conditions the assignment.

56.      Upon assumption of the Assumed and Assigned Contracts by the Debtors and

assignment to the Successful Bidder, the Assumed and Assigned Contracts shall be deemed valid

and binding, in full force and effect in accordance with their terms, subject to the provisions of

the Sale Order.

**K.      The Side Agreement**

57.      In connection with the entry into the Stalking Horse Agreement, the Debtors and

certain of the other Sellers have negotiated and executed a Side Agreement attached hereto as

Exhibit I, to address certain issues among the Sellers relating to the transaction contemplated by

the Stalking Horse Agreement, including the allocation of certain costs incurred or that may

potentially be incurred as part of the proposed transaction with the Stalking Horse Purchaser or

other Successful Bidder.  The Side Agreement also makes clear the Sellers' understanding that

---

[11]      The Debtors further seek a finding by the Court that as of the Closing, subject to the provisions of the Sale Order approving this Motion, the Successful Bidder, if such Successful Bidder takes an assignment of Assumed and Assigned Contracts, shall succeed to the entirety of the Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing (or such later assumption date) and shall have all rights thereunder, that (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing (or such later assumption date) shall be deemed cured, (ii) no other amounts will be owed by the Debtors, their estates, the Successful Bidder with respect to amounts first arising or accruing during, or attributable or related to, the period prior to Closing (or such later assumption date), (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, the Successful Bidder that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period prior to the Closing (or such later assumption date).

complying with their obligations under Section 5.13(b) of the Stalking Horse Agreement will not have any impact, positive or negative, on the rights of the Sellers with respect to the allocation of the proceeds of the Sale or the proceeds of any other transaction.

**L.      Canadian Proceedings**

58.      The Sellers subject to the Canadian Proceedings are seeking approval from the Canadian Court of certain of the relief sought in this Motion (the "Canadian Sales Process Order"), which request shall be considered at a joint hearing with this Court.  The final sale of the Assets also will be submitted for approval by the Canadian Court at a joint hearing with this Court.  The Debtors may seek recognition of the Orders of this Court approving the sale from the Canadian Court.

<u>Basis for Relief</u>

**A.      Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

59.      Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

60.      Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale:

"the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

61.    The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[12]

62.    Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or

interest holders.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722 F.2d at 1063 (passim).

63.    The proposed procedures for the sale of the Debtors' Assets meet the "sound business reason" test.  First, sound business purposes justify the sale.  The Debtors believe that a prompt sale of the Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the Assets for distribution to the Debtors' estates and their creditors.

64.    The proposed procedures for the sale of the Assets also meet the other factors of the "sound business reason" test.  As part of this Motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders.  Under the circumstances of this case, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

65.    Finally, the proposed procedures for the sale of the Assets, which require the Debtors to consult with the Committee, Bondholder Group, the Monitor and the Joint Administrators throughout the process, satisfy the good faith requirement of Abbotts Dairies.  The Debtors submit that the results of the Auction will be the product of good faith, arm's-length negotiations with respect to the price and other terms of the sale of the Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

66.    As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets, entry into the Stalking Horse Agreement as a

---

[12]    Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e.

"stalking horse" sale agreement and the payment of the Bid Protections under the circumstances, timing and procedures set forth herein and in the Bidding Procedures.  The sale of the Assets pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed procedures for sale of the Assets to the highest or otherwise best bidder at the Auction and approve the sale presented to the Court at the Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate the Sale.

## B.    The Bidding Procedures Are Appropriate Under the Circumstances

67.    A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

68.    The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the opportunity for competitive bidding embodied

---

when the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.

in the Bidding Procedures will generate the highest or otherwise best offer for the Assets and therefore is designed to maximize the value of the Assets.

69.    The Debtors believe that a prompt sale process is the best way to maximize the value of the Debtors' Assets for the benefit of their estates, creditors and other stakeholders. Accordingly, the Debtors have concluded that:  (a) a prompt sale of the Assets is the best way to maximize value for these estates, and (b) the proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Assets.

## C.    Provision for the Bid Protections in the Form of a Break-Up Fee and Expense Reimbursement Has Become a Recognized and Necessary Practice

70.    The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid, and which the Debtors believe is fair and reasonable and will provide a benefit to the Debtors' estates and creditors.  The Debtors have concluded that the provision of the Break-Up Fee and Expense Reimbursement is warranted under the circumstances at hand.

71.    The use of bid protections such as the Break-Up Fee and the Expense Reimbursement enables a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.

72.    Historically, bankruptcy courts have approved bidding incentives (including bid protections) solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a

'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking" and upholding the fee where the creditors committee closely scrutinized the fee, the fee was not unreasonable in relation to the size of the sale, and the work and expense involved in negotiating the transaction were significant) (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers");  see also In re Integrated Res., at 657-58.

73.     The Third Circuit Court of Appeals, through its decision in In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F. 3d 527 (3d Cir. 1999), clarified that in the bankruptcy context, while a debtor's business judgment is relevant, a debtor also must show that bidding incentives, as administrative expenses under section 503(b) of the Bankruptcy Code, also provide a benefit to the debtor's estate.  Id. at 533; see also Kelson Channelview LLC v. Reliant Energy Channelview LP (In re Reliant Energy Channel LP), No. 09-2074 (3d Cir. Jan. 15, 2010) (applying the O'Brien standard).

74.     The O'Brien opinion identified at least two instances in which bidding incentives may provide benefit to the estate.  First, a benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.  Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

75.     The Bid Protections proposed by the Debtors are consistent with the "business

judgment rule" and satisfy the Third Circuit's "administrative expense" standard.  The Stalking

Horse Purchaser has expressly stated that it will not pursue the Stalking Horse Agreement absent

approval of the Bid Protections.  The Debtors, the Canadian Debtors, the Monitor and the Joint

Administrators all agree that the Bid Protections are warranted to induce the Stalking Horse

Purchaser to continue to participate in the auction process, and that without such protections,

bidding on the Purchased Assets may be reduced.

76.     The Break-Up Fee payable under section 8.2 of the Stalking Horse Agreement is

twenty-five million dollars and 00/100 ($25,000,000), which is equal to approximately two and

eight-tenths percent (2.8%) of the estimated aggregate Purchase Price.  The Expense

Reimbursement shall not exceed four million dollars and 00/100 ($4,000,000), which is equal to

approximately four-tenths of one percent (0.4%) of the estimated aggregate Purchase Price.

77.     The Debtors believe that the size of the Bid Protections is reasonable under the

circumstances.  The proposed bid protections are reasonable and generally consistent with the

range of bidding protections typically approved by bankruptcy courts in this district.  See, e.g., In

re Rouge Indus., Inc., Case No. 03-13272 (Bankr. D. Del. Dec. 3, 2003); In re Ameriserve Food

Distrib., Inc., Case No. 00-00358 (Bankr. D. Del. Jan 31, 2000) (court approved break up fee of

3.6% or $4 million in connection with a $110 million sale of assets); In re Fruit of the Loom,

Inc., Case No. 99-04497 (Bankr. D. Del. Dec. 29, 1999) (court approved break-up fee of 3.0%,

or $25 million in connection with a $835 million sale of business); In re Worldwide Direct, Inc.,

Case No. 99-108 (Bankr. D. Del. Feb. 26, 1999) (approving break-up fee of 3.1% of the

proposed purchase price); In re Montgomery Ward Holding Corp., et al., Case No. 97-1409

(Bankr. D. Del. June 15, 1998) (court approved break-up fee of 2.7% or $3 million in connection

with $100 million sale of real estate); In re Medlab, Inc., Case No. 97-1893 (Bankr. D. Del. Apr.

28, 1999) (court approved break-up fee of 3.12% or $250,000 in connection with $8 million sale

transaction).  The Bid Protections also are consistent with bid protections previously approved by

the Court in the Debtors' cases.[13]

78.    The Debtors have concluded that the maximum $4,000,000 Expense

Reimbursement is similarly warranted based on the specific facts at hand, including without

limitation the length of negotiations leading up to the Stalking Horse Agreement and the

complexity of the transaction.

79.    For the foregoing reasons, the Debtors believe that payment of the portion of the

Bid Protections under the conditions set forth in the Stalking Horse Agreement is (a) an actual

and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the

Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and creditors and all parties in

interest herein, (c) reasonable and appropriate and (d) necessary to ensure that the Stalking Horse

Purchaser will continue to pursue the proposed Stalking Horse Agreement to undertake the sale

of the Assets, and therefore constitute administrative expenses with priority pursuant to

Bankruptcy Code sections 503(b) and 507(a)(2) of the Bankruptcy Code.

---

[13]    See, e.g.,Order Pursuant to Bankruptcy Code Sections 105, 363 and 365 (A) Authorizing Debtors' Entry into
the Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and
Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E)
Authorizing the Filing of Certain Documents Under Seal, and (G) Setting a Date for the Sale Hearing [D.I.
1012] (approving a break-up fee of 3% and expense reimbursement up to $3,000,000 in connection with the
sale of the CDMA and LTE Assets); Order Pursuant to Bankruptcy Code Sections 105, 363 and 365 (A)
Authorizing Debtors' Entry into the Asset Sale and Share Agreement, (B) Authorizing and Approving the
Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D)
Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing
the Filing of Certain Documents Under Seal, and (G) Setting a Date for the Sale Hearing [D.I. 1278]
(approving a break-up fee of approximately 3% and expense reimbursement up to $9,500,000 in connection
with the sale of the Enterprise Business); and Order Pursuant To Bankruptcy Code Sections 105, 363and 365
(A) Authorizing Debtors' Entry Into The Stalking Horse Asset Sale Agreement, (B) Authorizing And
Approving The Bidding Procedures And Bid Protections, (C) Approving The Notice Procedures And The
Assumption And Assignment Procedures, (D) Authorizing The Filing Of Certain Documents Under Seal And
(E) Setting A Date For The Sale Hearing [D.I. 1685] (approving a break-up fee of approximately 3% and an
expense reimbursement up to $5,348,000).

**D.**    **The Stalking Horse Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)**

80.    As will be set forth in further detail at the Sale Hearing, the Debtors also maintain

that the Stalking Horse Purchaser is entitled to the protections afforded by Bankruptcy Code

section 363(m).

81.    Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

82.    While the Bankruptcy Code does not define "good faith," the Third Circuit in In

re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated

Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding

that a party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take

grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610

(S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re

Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case,

concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

83.     As the Debtors will demonstrate at the Sale Hearing, over the last weeks and months, the Debtors have spent a considerable amount of time and resources negotiating the Stalking Horse Agreement at arm's length, with give and take on both sides.  Under the circumstances, this Court should find that the Stalking Horse Purchaser is entitled to all of the protections of Bankruptcy Code section 363(m).

**E.      The Stalking Horse Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)**

84.     As set forth above, the Debtors have been negotiating with the Stalking Horse Purchaser at arm's length and in good faith regarding the sale of the Assets.  Moreover, the Debtors do not believe that any sale of the Assets under the Stalking Horse Agreement will be the result of collusion or other bad faith between bidders or that the sale price under the Stalking Horse Agreement has been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).

85.     As will be set forth in further detail at the Sale Hearing, the Stalking Horse Agreement with the Stalking Horse Purchaser has been negotiated, proposed, and entered into by the Debtors and the Stalking Horse Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor the Stalking Horse Purchaser have engaged in any conduct that would cause or permit the Stalking Horse Agreement to be avoided under Bankruptcy Code section 363(n).

86.     If the Stalking Horse Purchaser is not the Successful Bidder at the Auction, the Sellers will demonstrate at the Sale Hearing that a Sale to the Successful Bidder will not be the result of collusion and should not be avoided under Bankruptcy Code section 363(n).

**F.      Privacy Ombudsman**

87.      Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer

customer list containing personal information relating to individual persons is inconsistent with

the Debtors' consumer privacy policy, section 332 governs the appointment of a consumer

privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtors' customers that are

subject to the sale of the Assets are individuals, and the Debtors do not have a consumer privacy

policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**G.      Sale of the Assets Should Be Free and Clear of Claims and Interests**

88.      As described above, except as set forth in the Stalking Horse Agreement or in a

purchase agreement with a Successful Bidder, the Debtors seek authority to sell and transfer the

Debtors' right, title and interest in the Assets to the Stalking Horse Purchaser or Successful

Bidder free and clear of all Claims and Interests, pursuant to section 363(f) of the Bankruptcy

Code, with such Claims and Interests to attach to the proceeds of the sale of the Assets, subject to

any rights and defenses of the Debtors and other parties in interest with respect thereto.  Section

363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such
> property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f);  see also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

89.     With respect to each creditor asserting a Claim or an Interest in the Purchased Assets, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2).  Those holders of Claims and Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

90.     A sale free and clear of Claims and Interests is necessary to maximize the value of the Assets.  The Stalking Horse Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the Sale if the sale of the Assets to the Stalking Horse Purchaser were not free and clear of all Claims and Interests, or if the Stalking Horse Purchaser or its assets (including the Purchased Assets) would, or in the future could, be liable for any such Claim or Interest.  A sale of the Assets other than one free and clear of all Claims and Interests would yield substantially less value for the Debtors' estates, with less certainty than the proposed Sale.  Therefore, the Sale contemplated by the Stalking Horse Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  A sale free and clear of Claims and Interests is particularly appropriate under the circumstances because any lien or claim in, to or against the Purchased Assets that exists immediately prior to the closing of any sale will attach to the sale proceeds allocated to the Debtors with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of Claims and Interests, if any, will be

adequately protected by the availability of the proceeds of the sale to satisfy their Claims and Interests.

**H.      Notice of the Proposed Sale Is Reasonable Under the Circumstances**

91.      The Debtors submit that the Sale Notice as set forth above, the Known License Notice as set forth above, along with the Publication Notice in <u>The Wall Street Journal</u> (National Edition) and <u>The Globe and Mail</u> (National Edition), the New York Times (National Edition) and <u>The Financial Times</u> (International Edition) is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the License Rejection Procedures, the Auction (if necessary) and the Sale Hearing.

**I.      Rejection of the Unknown Licenses Should Be Authorized**

92.      The Debtors submit that it is an exercise of their sound business judgment to reject the Unknown Licenses, and that the rejection of the Unknown Licenses is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The risk of the existence of the Unknown Licenses has a detrimental impact on the value of the Assets, and the rejection of the Unknown Licenses will give comfort to the Stalking Horse Purchaser and any other Successful Bidder that there are not material unidentified encumbrances on the Purchased Assets. This comfort will allow the Debtors to maximize the value of the Assets.

93.      Section 365(a) of the Bankruptcy Code preserves a debtor's right, "subject to the court's approval [to] reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(n) affords licensees under rejected intellectual property licenses the ability to elect to treat the rejected contract as terminated or to retain its rights to such intellectual property under such contract. 11 U.S.C. § 365(n). The License Rejection Procedures preserve the ability to make this election and preserve any applicable counterparty's rights under section 365(n), if such election is made. The Court should authorize the Debtors to

reject the Unknown Licenses.  Moreover, counterparties to such licenses are being provided

adequate notice of the rejection of these licenses, through the broad service of the Sale Notice

and through the Publication Notice.

**J.      The Assumption and Assignment of the Assumed and Assigned Contracts Should Be Authorized**

94.      Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.

§ 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an

executory contract of a debtor.  This subsection provides:

> (b) (1)      If there has been a default in an executory
> contract or unexpired lease of the debtor, the trustee may not
> assume such contract or lease unless, at the time of assumption of
> such contract or lease, the trustee -
>
> > (A)      cures, or provides adequate assurance that
> > the trustee will promptly cure, such default . . . ;
> >
> > (B)      compensates, or provides adequate
> > assurance that the trustee will promptly compensate, a party
> > other than the debtor to such contract or lease, for any
> > actual pecuniary loss to such party resulting from such
> > default; and
> >
> > (C)      provides adequate assurance of future
> > performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

that:

> The trustee may assign an executory contract or unexpired lease of
> the debtor only if --
>
> > (A)      the trustee assumes such contract or lease in
> > accordance with the provisions of this section; and
> >
> > (B)      adequate assurance of future performance by
> > the assignee of such contract or lease is provided, whether
> > or not there has been a default in such contract or lease.

50

11 U.S.C. § 365(f)(2).

95.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." <u>EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)</u>, 139 B.R. 585, 593 (S.D.N.Y. 1992).

96.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  <u>See, e.g.</u>, <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

97.     To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment as set forth in this Motion.  The Debtors will provide information in an Assumption and Assignment Notice (and at an omnibus hearing, if required in response to an objection to a proposed assumption and assignment) regarding the financial credibility of a Successful Bidder and their willingness and ability to perform under the Assumed and Assigned Contracts.  Other interested parties therefore will have the opportunity to evaluate and, if necessary, challenge the ability of a Successful Bidder to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

98.     In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to a Successful Bidder in

connection with the consummation of the Sale, and the assumption, assignment, and sale of Assumed and Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.  Any Assumed and Assigned Contracts to be assigned to a Successful Bidder will be an integral part of the Purchased Assets being purchased by the Successful Bidder, and accordingly, such assumption, assignment, and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors to assume and assign the Assumed and Assigned Contracts pursuant to the procedures set forth herein if so requested by a Successful Bidder.

**K.    The Side Agreement is Supported by a Sound Business Purpose**

99.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C.  § 363.  Section 363 applies when an agreement involves the disposition of the estate's assets in a way that ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

100.    The use or transfer of estate property under section 363 of the Bankruptcy Code must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re

Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071).  In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided, and that it is receiving fair and reasonable value in exchange.  See In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Decora Indus., Inc., 2002 WL 32332749, at *2.

101.    The Debtors respectfully submit that the Side Agreement meets each of the requirements under section 363 of the Bankruptcy Code.  The Side Agreement is supported by a sound business purpose because cooperation amongst the Sellers is essential to maximize the value of the transaction contemplated by the Stalking Horse Agreement to the Sellers.  By mitigating certain risks by providing for the allocation of certain cost exposures among the Sellers, the Side Agreement furthers the Debtors' ability to execute the Stalking Horse Agreement and engage in the transaction contemplated thereby.

**L.      Information Regarding The Counterparties Is Confidential Commercial Information and Should Be Filed Under Seal**

102.    The Debtors propose to file the lists of Counterparties, lists of counterparties to license agreements ("License Counterparties"), including any service lists identifying such parties, the Master Assumption Notice (including any supplements) under seal.

103.    The relief requested by the Debtors is squarely authorized under the Bankruptcy Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information. . . .

11 U.S.C. § 107(b).

104.     Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

105.     This Court has defined "commercial information" in the context of section 107(b)

as follows:

> Commercial information is information which would result in 'an
> unfair advantage to competitors by providing them information as
> to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion

Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section

107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid

'affording an unfair advantage to competitors by providing them information as to the

commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr.

D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

106.     Since information related to the Counterparties and the License Counterparties,

including the identity of the Counterparties and the License Counterparties and their agreements

with the Debtors, is "commercial information" within the ambit of section 107, the Court should

enter an order permitting the Debtors to file under seal all confidential information related to the

Counterparties and the License Counterparties.    Access to the list of Counterparties or License

Counterparties absent appropriate confidentiality restrictions would entail releasing confidential

information of critical value to any prospective purchaser of the Assets.  Therefore, it is critical

to the preservation of the value of the Debtors' estate that the Court allow for this confidential information to be filed under seal.

107.     As such, the Debtors respectfully submit that the Court permit the Debtors to file documents listing the names and addresses of such parties under seal, including the Master Assumption Notice, any Supplemental Master Assumption Notices and certificates of service.

**M.     Filing of Schedules, Exhibits and Side Agreement Under Seal**

108.     The Debtors respectfully submit that it is appropriate to allow the Sellers Disclosure Schedules and all exhibits and schedules to the Stalking Horse Agreement as well as any subsequent sale agreement with the Stalking Horse Purchaser or any Successful Bidder or Alternate Bidder (the "Schedules") be filed under seal.  The Schedules contain substantial sensitive commercial information concerning the Debtors' business, including lists of the Transferred Patents and licensees to such patents.  Disclosure of this confidential commercial information would be damaging to the Debtors and any Successful Bidder or Alternate Bidder if it is disclosed to their competitors.  The filing of the Schedules to the Stalking Horse Agreement and any subsequent sale agreement under seal is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein.

109.     The Debtors also respectfully submit that it is appropriate to allow the Side Agreement to be filed under seal.  The terms of the Side Agreement are confidential commercial information, the disclosure of which would be damaging to the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

**N.     Waiver of Bankruptcy Rule 6006(f)(6) with Respect to the Assumed and Assigned Contracts**

110.     Bankruptcy Rule 6006(f)(6) requires that an omnibus motion to reject, assume or assign multiple executory contracts or unexpired leases "be limited to no more than 100

executory contracts or unexpired leases."  With regards to the Assumed and Assigned Contracts, the Debtors request that the Court waive the provision in Bankruptcy Rule 6006(f)(6) limiting the number of executory contracts and unexpired leases that may be incorporated into one omnibus motion.  Rule 6006(f)(6) seeks "to help the other parties to the contracts locate their information in the midst of the omnibus motion."  10 Collier on Bankruptcy ¶ 6006.05 (15th ed. 1999).  Because the Debtors propose to send an individual notice to each Counterparty, the purpose of the rule will be satisfied without needlessly filing multiple motions with the Court.

**O.  Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

111.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

112.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

113.    Pursuant to the Stalking Horse Agreement, the Debtors must close this sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this instance.

## Notice

114.    Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to (i) counsel to the Stalking Horse Purchaser; (ii) the Office of the U.S. Trustee; (iii) the Monitor; (iv) counsel to the Committee; (v) counsel to the Bondholder Group;  (vi) counterparties to Outbound License Agreements; (vii) counterparties to Cross-License Agreements; and (viii) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

115.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  April 4, 2011
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann. C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*