# EXHIBIT D

# BLACKLINE AMENDED PURCHASE AGREEMENT

**AMENDED AND RESTATED ASSET SALE AGREEMENT**

BY AND AMONG

**NORTEL NETWORKS INC.**

AND

**MICROSOFT CORPORATION**

**DATED AS OF March 16,April 13, 2011**

EXECUTION COPY

ARTICLE I        INTERPRETATION ....................................................................1

SECTION 1.1 1.1 Definitions ............................................................1
SECTION 1.2 1.2 Interpretation .........................................................7

ARTICLE II        PURCHASE AND SALE OF LEGACY NUMBER BLOCKS ....................8

SECTION 2.1 2.1 Purchase and Sale ...................................................8
SECTION 2.2 2.2 Purchase Price .......................................................9
SECTION 2.3 2.3 Closing ...............................................................10

ARTICLE III        REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .......11

SECTION 3.1 3.1 Organization and Corporate Power ...................................11 12
SECTION 3.2 3.2 Authorization; Binding Effect; No Breach ..........................12
SECTION 3.3 3.3 Purchaser's Acknowledgments; Exclusivity of Representations
                and Warranties ......................................................12
SECTION 3.4 3.4 Brokers ................................................................13
SECTION 3.5        LRSA ................................................................14

ARTICLE IV        REPRESENTATIONS AND WARRANTIES OF THE SELLER ............14

SECTION 4.1 4.1 Organization and Corporate Power ...................................14
SECTION 4.2 4.2 Authorization; Binding Effect; No Breach ..........................14
SECTION 4.3 4.3 Internet Protocol Addresses.  To the Knowledge of the Seller: .........15
SECTION 4.4 4.4 Litigation ............................................................15
SECTION 4.5 4.5 Taxes ..................................................................16
SECTION 4.6 4.6 Exclusivity ...........................................................16

ARTICLE V        COVENANTS AND OTHER AGREEMENTS ...........................16

SECTION 5.1 5.1 Bankruptcy Actions ..................................................16
SECTION 5.2 5.2 Consultation; Notification ..........................................16
SECTION 5.3 5.3 Pre-Closing Cooperation ............................................17
SECTION 5.4 5.4 Public Announcements ...............................................17
SECTION 5.5 5.5 Further Actions .......................................................18 17
SECTION 5.6 5.6 Transaction Expenses ...............................................18
SECTION 5.7 5.7 Confidentiality .......................................................18
SECTION 5.8 5.8 No Solicitation of Transactions ....................................18

ARTICLE VI        TAX MATTERS ..........................................................19

SECTION 6.1 6.1 Transfer Taxes ........................................................19
SECTION 6.2 6.2 Reserved ..............................................................20
SECTION 6.3 6.3 Tax Characterization of Payments Under This Agreement ...............20
SECTION 6.4 6.4 Apportionment of Taxes ..............................................20
SECTION 6.5 6.5 Records ...............................................................21
SECTION 6.6 6.6 Tax Disclosure ........................................................21
SECTION 6.7 6.7 Tax Returns ...........................................................21

ARTICLE VII        CONDITIONS TO THE CLOSING ..................................23

EXECUTION COPY

SECTION 7.1 7.1 Conditions to Each Party's Obligation ............................................. 23
SECTION 7.2 7.2 Conditions to Seller's Obligation ................................................... 23
SECTION 7.3 7.3 Conditions to Purchaser's Obligation ............................................ 24

ARTICLE VIII    TERMINATION ........................................................................ 25

SECTION 8.1 8.1 Termination ..................................................................................... 25
SECTION 8.2 8.2 Effects of Termination ................................................................... 26
SECTION 8.3 8.3 Failed Subsequent Transfers .......................................................... 26

ARTICLE IX    MISCELLANEOUS ..................................................................... 27

SECTION 9.1 9.1 No Survival of Representations and Warranties or Covenants .......... 27
SECTION 9.2 9.2 Remedies .......................................................................................... 27
SECTION 9.3 9.3 No Third-Party Beneficiaries ........................................................... 27
SECTION 9.4 9.4 Consent to Amendments; Waivers ................................................... 27
SECTION 9.5 9.5 Successors and Assigns .............................................................. 28 27
SECTION 9.6 9.6 Governing Law; Submission to Jurisdiction; Waiver of Jury
             Trial ............................................................................................... 28
SECTION 9.7 9.7 Notices ............................................................................................. 29
SECTION 9.8 9.8 Exhibits; Seller Disclosure Schedule ............................................... 30
SECTION 9.9 9.9 Counterparts .............................................................................. 31 30
SECTION 9.10 9.10 ........................................................................... No Presumption 31 30
SECTION 9.11 9.11 ............................................................................................ Severability 31
SECTION 9.12 9.12 .................................................................................................. Headings 31
SECTION 9.13 9.13 ............................................................................. Entire Agreement 31
SECTION 9.14 9.14 ............... Availability of Equitable Relief; Limitation on Damages 32 31

Error! Unknown document property name.DWT 16275336v12 0025936-001328

## AMENDED AND RESTATED ASSET SALE AGREEMENT

This Amended and Restated Asset Sale Agreement is dated as of ~~March 16,~~ April 13, 2011, between Nortel Networks Inc., a corporation organized under the laws of Delaware (the "**Seller**" ~~or "NNI"~~) and Microsoft Corporation, a corporation organized under the laws of the State of Washington (the "**Purchaser**").

W I T N E S S E T H :

WHEREAS, the Seller is a debtor-in-possession under the Bankruptcy Code (as defined below), and commenced its case under Chapter 11 of the Bankruptcy Code on the Petition Date (as defined below) by filing a voluntary petition for relief in the Bankruptcy Court for the District of Delaware (the "**Chapter 11 Case**");

WHEREAS, the Seller has agreed to transfer to the Purchaser, and the Purchaser has agreed to purchase and assume, including, to the extent applicable, pursuant to section 363 of the Bankruptcy Code, the Seller's Rights in and to the Legacy Number Blocks and the Assumed Liabilities (each as defined below) from the Seller, upon the terms and conditions set forth hereinafter;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser of the Seller's Rights in and to the Legacy Number Blocks and the assumption by the Purchaser of the Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller and its affiliates~~.~~;

WHEREAS, Seller and Purchaser entered into an Asset Purchase Agreement dated March 16, 2011 (the "**March 16th Agreement**");

WHEREAS, this Agreement restates, supersedes and replaces the March 16th Agreement;

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

ARTICLE I ~~Article I~~
INTERPRETATION

SECTION 1.1    ~~Section 1.1.~~ Definitions.    Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" means the auditing firm of international reputation that is (i) jointly selected by the Parties, or (ii) in case they cannot agree on any such firm, such other auditing firm of international reputation (or, if the Parties agree on other criteria, such Person as satisfies such other criteria) that is selected by the American Arbitration Association at the request of the first of the Parties to move.

"**Acquisition Proposal**" has the meaning set forth in Section 5.8.

1

"**Action**" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreement**" means this Amended and Restated Asset Sale Agreement, the Seller Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 9.4.

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, of all or substantially all of the Seller's Rights in and to the Legacy Number Blocks, in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates.

"**ARIN**" means that American Registry for Internet Numbers, Ltd.

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3. "Bankruptcy Code" means Title 11 of the United States Code. "Bankruptcy Consent" has the meaning set forth in Section 3.3(b)(iv)4.1(a).

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Proceedings**" means the Chapter 11 Case and any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning the Seller or its Affiliates that are held from time to time.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in New York, New York, United States.

"**Chapter 11 Case**" has the meaning set forth in the recitals to this Agreement. "Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code. "Closing" has the meaning set forth in Section 2.3.1.

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

2

"**Contract**" means any written binding contract, agreement, instrument, lease, ground lease or commitment.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Designated Courts**" has the meaning set forth in Section 9.6(b).

"**Escrow Account**" means the escrow account holding the Good Faith Deposit and Subsequent Purchase Price to be set up by the Escrow Agent pursuant to the Escrow Agreement.

"**Escrow Agent**" means Wells Fargo Bank, National Association.

"**Escrow Agreement**" means the escrow agreement among the Seller, the Purchaser and the Escrow Agent to be entered into substantially in the form of Exhibit D hereto in accordance with Section 2.2.4(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2. "Excluded Liabilities" has the meaning set forth in Section 2.1.4. "Good Faith Deposit" has the meaning set forth in Section 2.2.2(a).

"**Government Entity**" means any U.S., supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, instrumentality, court, government or commission or tribunal or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"**Gross Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Initial Legacy Numbers**" means that subset of the Legacy Number Blocks listed on Exhibit B.

"**Initial Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Intentional Breach**" means, with respect to an agreement, an action or omission (including a failure to cure circumstances) that the breaching party knows or reasonably should have known is or would result in a breach of the agreement.

"**Interest**" means, in respect to the Legacy Number Blocks, any right in or to, right to use, interest in, or claim to the Legacy Number Blocks, including any "interest" as that term is used in 11 U.S.C. Section 363(f).

"**IPv4 Number Block**" means a contiguous block of Internet Protocol Version 4 Numbers, commonly expressed as a Classless Inter-Domain Routing notation, e.g., A.B.C.D/X, where A, B, C and D are numbers between 0 and 255 and X is a number between 0 and 32.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge" or "aware of**" or "**notice of**" or a similar phrase shall mean, with reference to the Seller, the actual knowledge after due inquiry and investigation of those Persons listed on Section 1.1(a) of the Seller Disclosure Schedule.

"**Law**" means any U.S., supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree, policy or guideline having the force of law.

"**Legacy Number Blocks**" means the IPv4 Number Blocks listed on Exhibit A.

"**Liabilities**" means debts, liabilities, commitments and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undeterminable, including those arising under any Law or Action and those arising under any contract, agreement, arrangement, commitment or undertaking or otherwise, including any Tax liability or tort liability.

"**Lien**" means any lien, mortgage, pledge or security interest, hypothecation, encumbrance, license, lease, lien or similar charge of any kind (including any conditional sale arrangement or other title retention agreement or use right).

"**Losses**" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"**LRSA**" means that certain Legacy Registration Services Agreement between ARIN and Purchaser dated as of April___, 2011, and any amendment thereto.

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "Effect") that, individually or in the aggregate with all other Effects, (a) has, or would reasonably be expected to have, a material adverse effect on the Legacy Number Blocks, taken as a whole, or (b) prevents or materially impedes or delays or would reasonably be expected to prevent or materially impede or delay the ability of the Seller to perform its obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, provided, however that any Effect to the extent arising out of or resulting from the following, either alone or in combination, shall not be considered in determining whether there has been a "Material Adverse Effect": (i) Effects resulting from changes in general economic conditions in any jurisdiction worldwide; (ii) Effects arising from the execution or delivery of this Agreement or the public announcement thereof; (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser; (iv) Effects relating to the industries and markets to which the Legacy Number Blocks relate; (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing; and (vi) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Court or any other court overseeing the Bankruptcy Proceedings.

"**New York Courts**" has the meaning set forth in Section 9.6(b).

"**NNI**" has the meaning set forth in the preamble to this Agreement.

4

"**Non-Disclosure Agreement**" means the non-disclosure agreement by and among the Purchaser and ~~NNI~~Seller, dated December 20, 2010, as well as any exhibits and amendments thereto.

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Seller and the Purchaser.

"**Permitted Encumbrances**" means statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or for Taxes the validity of which are being contested in good faith by appropriate proceedings.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Post-Closing Taxable Period**" means any taxable period or portion thereof beginning after the Closing Date (or Subsequent Transfer Date, as applicable).

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date (or Subsequent Transfer Date, as applicable).

~~"**Gross Purchase Price**" has the meaning set forth in Section 2.2.1.~~

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Sale Order**" means an order (or orders) of the Bankruptcy Court, which has been entered on the Bankruptcy Court docket, in form and substance reasonably acceptable to the Purchaser, approving this Agreement, the transactions contemplated under the Transaction Documents and all of the terms and conditions thereof, and approving and authorizing ~~NNI~~Seller to consummate the transactions contemplated thereby.  Without limiting the generality of the foregoing, such order shall find and provide, unless otherwise agreed between the parties and among other things, that (i) notice of the proposed sale was duly provided in accordance with the Bankruptcy Code to all creditors and parties-in-interest, to all existing buyers of ~~NNI~~Seller's business units pursuant to sales conducted since the Petition Date, and to ~~the American Registry for Internet Numbers ("ARIN")~~ARIN; (ii) Seller's Rights in the Legacy Number Blocks are property of ~~NNI~~Seller's bankruptcy estate; (iii) the Legacy Number Blocks shall be sold, assumed, assigned and transferred to the Purchaser free and clear of all Liens, claims and ~~interests~~Interests to the fullest extent permitted by section 363 of the Bankruptcy Code, provided that following such sale, assumption, assignment and transfer the Legacy Number Blocks shall be subject to the terms of the LRSA; (iv) the sale will vest the Purchaser with all of ~~NNI's right, title and interest~~Seller's Rights in and to the Legacy Number Blocks; (v) the Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (vi) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (vii) ~~no~~ARIN and Purchaser have entered into the LRSA and no other Consents are required; and (viii) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach thereof.

~~5~~

"**SEC**" means the Securities and Exchange Commission.

"**Securities Disclosure Documents**" has the meaning set forth in the first sentence of Article IV.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Seller's Rights**" means Seller's exclusive right to use the Legacy Numbers Blocks, Seller's exclusive right to transfer the Legacy Number Blocks, and any other legal and equitable rights that Seller may have in and to, the Legacy Number Blocks.

"**Seller Disclosure Schedule**" means the disclosure schedule delivered by the Seller to Purchaser on the date hereof.

"**Software**" means any computer programs, applications and interfaces, whether in source code or object code, and all related documentation, user and operational guides and/or manuals.

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subsequent Legacy Numbers**" means that subset of the Legacy Number Blocks listed on Exhibit C hereto.

"**Subsequent Purchase Price**" has the meaning set forth in Section 2.2.3(a).

"**Subsequent Transfer**" has the meaning set forth in Section 2.3.3(a).

"**Subsequent Transfer Date**" has the meaning set forth in Section 2.3.3(a).

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, harmonized sales, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto whether or not disputed, and (b) any obligation to pay any amounts set forth in clause (a) with respect to another Person, whether by contract, by reason of law, as a result of transferee or successor liability, as a result of being or ceasing to be a member of an affiliated, consolidated, combined or unitary group or otherwise for any period.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S. or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

6

"**Tax Returns**" means all returns, reports (including any amendments, elections, declarations, disclosures, claims for refunds, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes.

"**Third Party**" means any Person other than the Parties and their representatives, and the Escrow Agent.

"**Transaction Documents**" means this Agreement and all other ancillary agreements to be entered into, or documentation delivered by, any Party pursuant to this Agreement.

"**Transfer Taxes**" means all sales and use, and all other similar Taxes, together with interest, penalties and additional amounts imposed with respect thereto whether or not disputed.

"**Transfer Tax Return**" has the meaning set forth in Section 6.7.

"**Transition Services Agreements**" has the meaning set forth in Section 4.3(d).

SECTION 1.2        ~~Section 1.2~~ Interpretation.

1.2.1    Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2    Certain Phrases and Calculation of Time.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from but excluding" and the words "to" and "until" each mean "to and including", and (iv) the words "date hereof" or "date of this Agreement" shall mean ~~March 16,~~ April 13, 2011.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.  When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3    Headings, etc.  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4    Currency and Calculations.  All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.  All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency.  All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated.  Where another currency is to be converted into United States currency it shall be converted on the

7

basis of the exchange rate published in the Wall Street Journal, Eastern Edition for the day in question.

1.2.5   Statutory References.  Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

ARTICLE II~~Article II~~
PURCHASE AND SALE OF LEGACY NUMBER BLOCKS

SECTION 2.1        ~~Section 2.1.~~ Purchase and Sale.

2.1.1   Legacy Number Blocks.  Subject to the terms and conditions of this Agreement, at the Closing (with regard to the Initial Legacy Numbers) and the Subsequent Transfer Dates (with regard to the Subsequent Legacy Numbers), the Purchaser shall purchase from the Seller, and the Seller shall sell, transfer and assign to the Purchaser, on an "as is" and "where is" basis and to the fullest extent permitted under Section 363(f) of the Bankruptcy Code, ~~all of the~~ Seller's ~~right, title and interest~~Rights in and to the Legacy Number Blocks free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser or any of its Affiliates). Upon such sale, transfer and assignment, the Legacy Number Blocks shall be subject to terms of the LRSA.

2.1.2   Excluded Assets.  Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement to the contrary, the Seller shall retain its right, title and interest in and to, and the Purchaser shall have no rights with respect to the right, title and interest of the Seller in and to, any assets of the Seller other than the Legacy Number Blocks (collectively, the "Excluded Assets").

2.1.3   Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing (with respect to the Initial Legacy Numbers) or the applicable Subsequent Transfer Date (with respect to the Subsequent Legacy Numbers), the Purchaser shall assume and become responsible for, and perform, discharge and pay when due, the following Liabilities of the Seller (the "Assumed Liabilities"):

        (a)        all Liabilities with respect to the ~~ownership~~use or exploitation of the Legacy Number Blocks, or any other legal and equitable rights in or to, or any Interests in, the Legacy Number Blocks, arising and relating to periods after the Closing Date (with respect to the Initial Legacy Numbers) or the applicable Subsequent Transfer Date (with respect to the Subsequent Legacy Numbers), including all such Liabilities related to Actions or claims brought against or in relation to the Legacy Number Blocks, and all maintenance fees, service charges and registration costs, as applicable, related to the Legacy Number Blocks; and

        (b)        all Liabilities for, or related to any obligation for, any Tax that the Purchaser bears under Article VI (including, for the avoidance of doubt, Transfer Taxes imposed in connection with this Agreement and the transactions contemplated hereunder or in connection with the execution of any other Transaction Document).

2.1.4   Excluded Liabilities.  Except as provided in Section 2.1.3 and Article VI, the Purchaser shall not assume at the Closing or any Subsequent Transfer Date, as applicable, any of

-8-

8

the Liabilities of Seller (collectively, the "Excluded Liabilities").  Without limiting the foregoing, Excluded Liabilities include all Liabilities for, or related to any obligation for, any Tax that the Seller is required to bear under Article VI (including, for the avoidance of doubt, any liability of the Seller for unpaid Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise) and any maintenance fees, service charges and registration costs relating to the Legacy Number Blocks for periods prior to the Closing Date or applicable Subsequent Transfer Date, as applicable.

SECTION 2.2    ~~Section 2.2.~~ Purchase Price.

2.2.1    <u>Purchase Price</u>.  Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale of the Seller's Rights in and to the Legacy Number Blocks pursuant to the terms hereof, the Purchaser shall assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and shall pay an aggregate amount of cash (the "**Gross Purchase Price**") equal to Seven Million Five Hundred Thousand Dollars ($7,500,000) which shall include (i) the Good Faith Deposit paid to the Escrow Agent pursuant to Section 2.2.2(a), (ii) the Subsequent Purchase Price paid to the Escrow Agent pursuant to Section 2.2.3(a), and (iii) the balance of the Gross Purchase Price paid to the Seller at the Closing (the "**Initial Purchase Price**," i.e., the Gross Purchase Price less the sum of amount of the Good Faith Deposit and the amount of the Subsequent Purchase Price).

2.2.2    <u>Good Faith Deposit</u>.

(a)    No later than ten (10) business days after Seller's execution and delivery of this Agreement to Purchaser, the Purchaser will deliver to the Escrow Agent cash in the amount of Two Hundred Twenty-Five Thousand Dollars ($225,000) (the "**Good Faith Deposit**") to serve as earnest money under this Agreement.

(b)    The Good Faith Deposit shall be applied to the Gross Purchase Price to be paid by the Purchaser pursuant to Section 2.2.1 at the Closing, pursuant to Section 2.3.2.

(c)    On the Closing Date, the Purchaser and the Seller shall cause the Escrow Agent to release to the Seller the amount of cash equivalent to the Good Faith Deposit (exclusive of the actual earnings thereon).

2.2.3    <u>Subsequent Legacy Numbers and Subsequent Purchase Price</u>.

(a)    On the Closing Date, the Purchaser will deliver to the Escrow Agent cash in the amount equal to the product of (i) the Gross Purchase Price divided by the total number of IPv4 addresses included in the Legacy Number Blocks (the "**Unit Cost**") and (ii) the total number of IPv4 addresses included in the Subsequent Legacy Numbers (such product, the "**Subsequent Purchase Price**").

(b)    On each Subsequent Transfer Date, the Purchaser and Seller shall cause the Escrow Agent to release to the Seller the amount of cash equivalent to the Unit Cost multiplied by the total number of IPv4 addresses then transferred pursuant to the applicable Subsequent Transfer (the "**Release Amount**").

9

(c)     For any Subsequent Legacy Numbers that are not transferred as a result of the operation of Section 8.3 on or before January 31, 2012, the Parties shall instruct the Escrow Agent to release to the Purchaser (i) the amount of cash equivalent to the Unit Cost multiplied by the total number of IPv4 addresses included in such remaining Subsequent Legacy Numbers, and such remaining Subsequent Legacy Numbers shall be deemed Excluded Legacy Number Blocks at such time, and (ii) all amounts remaining in the Escrow Account.

2.2.4     Escrow.

(a)     As of the date hereof, each of the Seller and the Purchaser shall have entered into the Escrow Agreement with the Escrow Agent in order to secure payment of the Good Faith Deposit and the Subsequent Purchase Price as provided in this Agreement.

(b)     Each of the Seller and the Purchaser hereby undertakes to promptly execute and deliver to the Escrow Agent, in accordance with the formalities set forth in the Escrow Agreement, joint instructions to pay to the Seller or the Purchaser, as applicable, funds from the Escrow Account any time that any Person becomes entitled to such payment from the Escrow Account pursuant to this Agreement.

SECTION 2.3     Section 2.3.  Closing.

2.3.1     Closing Date.

(a)     The completion of the purchase and sale of the Seller's Rights in and to the Initial Legacy Numbers and the assumption of the Assumed Liabilities (the "**Closing**") shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 10:00 am New York time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under Article VII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Seller and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and Seller (the day on which the Closing takes place being the "Closing Date").  The Closing will be deemed completed at the time the Seller receives the deliverables set forth in Section 2.3.2.

(b)     Upon occurrence of the Closing, legal title, equitable title Seller's Rights in and to, and risk of loss with respect to, the Initial Legacy Numbers will transfer to the Purchaser, and the Assumed Liabilities will be assumed by the Purchaser, at 12:01 a.m. local time on the Closing Date in the jurisdiction in which the Initial Legacy Numbers are located in accordance with the terms hereof.

2.3.2     Closing Actions and Deliveries.  At the Closing:

(a)     The Purchaser shall deliver to the Seller, an amount equal to the Initial Purchase Price by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Closing Date by the Seller in a written notice to the Purchaser; and

(b)     The Seller shall deliver a bill of sale or similar instrument reasonably acceptable to Purchaser that assigns all of Seller's ~~right, title and interest~~Rights in and to the Initial Legacy Numbers to Purchaser.

(c)     Each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein~~, it being acknowledged and agreed that Seller's satisfaction of the condition set forth in Section 7.3.1(e) shall be deemed to have satisfied Seller's obligations under this Section 2.3.2(c)~~.

2.3.3    Subsequent Transfer Dates.

(a)     The completions of the purchase and sale of the Seller's Rights in and to the Subsequent Legacy Numbers (each, a "**Subsequent Transfer**") shall take place on the date which is five (5) Business Days after the applicable date set out in Exhibit C with respect to each Subsequent Legacy Number or group of Subsequent Legacy Numbers, or on such other date and time as shall be mutually agreed upon in writing by the Purchaser and Seller (each such date, a "**Subsequent Transfer Date**").  Each Subsequent Transfer will be deemed completed at the time the Seller receives the deliverables set forth in Section 2.3.4.

(b)     Upon occurrence of each Subsequent Transfer, ~~legal title, equitable title~~Seller's Rights and risk of loss with respect to the applicable Subsequent Legacy Numbers will transfer to the Purchaser at 12:01 a.m. local time on the Subsequent Transfer Date in the jurisdiction in which such Subsequent Legacy Numbers are located in accordance with the terms hereof.

2.3.4    Subsequent Transfer Actions and Deliveries.  At each Subsequent Transfer:

(a)     The Seller and the Purchaser shall cause the Escrow Agent to deliver to the Seller, and the Escrow Agent shall deliver to the Seller, the Subsequent Transfer Price (together with actual earnings thereon) applicable to such Subsequent Legacy Numbers (in accordance with Section 2.2.3) by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Subsequent Transfer Date by the Seller in a written notice to the Purchaser; and

(b)     The Seller shall deliver a bill of sale or similar instrument reasonably acceptable to Purchaser that assigns all of Seller's ~~right, title and interest~~Rights in and to the Subsequent Legacy Numbers to Purchaser.

(c)     Each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein~~, it being acknowledged and agreed that Seller's satisfaction of the condition set forth in Section 7.3.2(d) shall be deemed to have satisfied Seller's obligations under this Section 2.3.4(c)~~.

ARTICLE III~~Article III~~
REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as of the date of this Agreement as follows:

SECTION 3.1    ~~Section 3.1.~~ Organization and Corporate Power.

       (a)    The Purchaser is a corporation duly organized and validly existing under the Laws of the jurisdiction in which it was incorporated.  The Purchaser has all requisite power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party.

       (b)    The Purchaser is qualified to do business as contemplated by this Agreement and the other Transaction Documents and to own or lease and operate its properties and assets, except to the extent that the failure to be so qualified would not, individually or in the aggregate, materially hinder, delay or impair the Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement.

SECTION 3.2    ~~Section 3.2.~~ Authorization; Binding Effect; No Breach.

       (a)    The execution, delivery and performance of each Transaction Document to which the Purchaser is, or at the Closing Date will be, a party have been duly authorized by the Purchaser.  Assuming due authorization, execution and delivery by the Seller, each Transaction Document to which the Purchaser is, or at the Closing Date will be, a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its respective terms.

       (b)    The execution, delivery and performance by the Purchaser of the Transaction Documents to which the Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, or require any Consent of any Person or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws (or similar governing document) of the Purchaser; (ii) any Contract or other document to which the Purchaser is a party or to which any of the Purchaser's assets is subject; or (iii) any Laws to which the Purchaser or any of the Purchaser's assets is subject; except, in the case of clauses (ii) and (iii) of this sentence, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, materially hinder, delay or impair the Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement.

SECTION 3.3    ~~Section 3.3.~~ Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

       (a)    The Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement and the other Transaction Documents.  In consultation with experienced counsel and advisors of its choice, the Purchaser has conducted its own independent review and analysis of the Legacy Number Blocks, the Assumed Liabilities, and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents.  The Purchaser acknowledges that it and its representatives have been permitted such access to the books and records, contracts and other properties related to the Legacy Number Blocks as it required to complete its review.

(b)     The Purchaser acknowledges and agrees that:

(i)     except for the representations and warranties expressly set forth in Article IV, the Purchaser has not relied on any representation or warranty from the Seller or any Affiliate of any such Person or any employee, officer, director, broker, accountant, financial, legal or other representative of the Seller in determining whether to enter into this Agreement;

(ii)     except for the representations and warranties expressly set forth in Article IV, none of the Seller, or any employee, officer, director, broker, accountant, financial, legal or other representative of the Seller, or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Legacy Number Blocks (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Legacy Number Blocks including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, or any Affiliate of any such Person or as to the accuracy or completeness of any information regarding any of the foregoing that the Seller, or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)     Neither the Seller nor any other Person shall have or be subject to any liability to the Purchaser or any other Person resulting from the distribution to the Purchaser, or the Purchaser's use, of the information referred to in Section 3.3(b)(ii);

(iv)     subject to the terms of the Sale Order in the Chapter 11 Case in connection with the transactions contemplated hereby and the other Transaction Documents (the "**Bankruptcy Consent**"), the Purchaser takes the Seller's Rights in and to the Legacy Number Blocks on an "as is" and "where is" basis; and

(v)     the enforceability of this Agreement against the Seller is subject to receipt of the Bankruptcy Consent.

(c)     Without limiting the generality of the foregoing, PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION, SUITABILITY OR TITLE OF THE LEGACY NUMBER BLOCKS OR SELLER'S RIGHTS THEREIN OR THERETO, OR REGARDING THE SCOPE OR VALIDITY OF ANY OF THE SELLER'S RIGHTS IN AND TO THE LEGACY NUMBER BLOCKS.

SECTION 3.4     Section 3.4. Brokers.

Except for fees and commissions that will be paid by the Seller to Addrex, Inc. and by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with (i) the transactions contemplated by this Agreement and (ii) the other Transaction Documents, each based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

SECTION 3.5       LRSA.

The Purchaser has, or prior to the date of the hearing to consider and approve the Sale Order will have, entered into the LRSA.  Other than entry into the LRSA, no Consent from ARIN or any other regional internet registry is required for the purchase of Seller's Rights hereunder.

ARTICLE IV~~Article IV~~
REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except (a) subject to the provisions of Section 9.8(b), as set forth in the applicable sections of the Seller Disclosure Schedule; (b) as set forth in the registration statements, prospectuses, reports, schedules, forms and other filings (excluding any exhibits thereto but including any documents incorporated by reference and any amendments thereto) filed by Nortel Networks Corporation with the SEC (collectively, the "**Securities Disclosure Documents**") (but excluding any forward-looking disclosures in Securities Disclosure Documents as to risk factors, forward-looking statements and other similarly cautionary or generic disclosure contained or incorporated by reference therein) and/or in any filings made in the Bankruptcy Proceedings; or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, the Seller represents and warrants to the Purchaser as set forth in Section 4.1 through Section 4.6 as of the date of this Agreement.

SECTION 4.1       ~~Section 4.1.~~ Organization and Corporate Power.

(a)       Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to the receipt of the Bankruptcy Consent, Seller has the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party.

(b)       Seller is qualified to do business and to own, lease or otherwise hold its properties and assets, including the Seller's Rights in and to the Legacy Number Blocks, and to conduct its business as presently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Legacy Number Blocks requires it to so qualify, except to the extent that the failure to be so qualified does not have, or would not reasonably be expected to have, a Material Adverse Effect.

SECTION 4.2       ~~Section 4.2.~~ Authorization; Binding Effect; No Breach.

(a)       Subject to the receipt of the Bankruptcy Consent, the execution, delivery and performance by Seller of the Transaction Documents to which Seller is, or at the Closing will be, a party has been duly authorized by Seller.  Subject to receipt of the Bankruptcy Consent, and assuming due authorization, execution and delivery by the Purchaser, the Transaction Documents to which Seller is or will be a party, will constitute a legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms.

(b)       Assuming the accuracy of Purchaser's representations and warranties set forth in Article III and satisfaction of the Closing Conditions set forth in Section 7.1 and Section 7.2, and subject to receipt of the Bankruptcy Consent, the execution, delivery and performance by Seller of the Transaction Documents to which Seller is or will be a party do not and will not conflict with or

result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Seller's Rights in and to the Legacy Number Blocks, or require any Consent (other than the Bankruptcy Consent) or other action by or declaration or notice to any Government Entity or other Third Party pursuant to (i) the articles, charter or by-laws (or similar governing document) of the Seller; (ii) any order of any Government Entity applicable to Seller or by which any of its properties or Legacy Number Blocks are bound; (iii) any Laws to which the Seller or any of the Legacy Number Blocks are subject; or (iv) any Contract to which Seller is a party or by which the Legacy Number Blocks are bound; except, in the case of clauses (ii), (iii) and (iv) of this sentence, for such defaults, violations, actions and notifications that have not had, and would not reasonably be expected to have, a Material Adverse Effect.

SECTION 4.3    ~~Section 4.3.~~ Internet Protocol Addresses.    To the Knowledge of the Seller:

(a)    The Legacy Number Blocks are not subject to any Liens other than Permitted Encumbrances.  Seller has the right to assign and transfer all of ~~its right, title and interest~~ Seller's Rights in and to the Legacy Number Blocks pursuant to Section 2.1.1 in the manner contemplated by this Agreement.

(b)    The Legacy Number Blocks are not under an allocation or assignment agreement with any regional or other Internet registry.

(c)    Seller (i) is the holder or assignee of the right to use all of the Legacy Number Blocks, subject to Permitted Encumbrances~~,~~ and (ii) holds to the full extent allowed by Law, all ~~rights, title and interest in and to the Legacy Number Blocks and (iii) subject to Permitted Encumbrances, no other Person has title to or the right to use~~ of Seller's Rights  in and to the Legacy Number Blocks.

(d)    Section 4.3(d) of the Seller Disclosure Schedule sets forth all Contracts between Seller on the one hand and a Third Party on the other hand pursuant to which Seller provides services in which any Legacy Number Blocks are used (the "**Transition Services Agreements**").  None of the Transition Services Agreements has a term that extends beyond (or may be renewed or extended for a period beyond) December 31, 2011.  No Transition Service Agreement grants to any Third Party any ownership rights, or any preferential rights, rights of first refusal, rights of first offer or other similar rights in or to any Legacy Number Block.

(e)    Except as set forth in Section 4.3(e) of the Seller Disclosure Schedule, there has been no assertion or claim made in writing to the Seller during the past five (5) years preceding the date of this Agreement asserting invalidity or misuse of the Legacy Number Blocks or challenging the Seller's rights to the Legacy Number Blocks.

(f)    The Initial Legacy Numbers include no fewer than 470,016 IPv4 numbers.  The Subsequent Legacy Numbers include no fewer than 196,608 IPv4 numbers.

SECTION 4.4    ~~Section 4.4.~~ Litigation.

As of the date hereof, except for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of Seller, threatened in writing before any Government Entity against Seller

involving the Legacy Number Blocks that would be reasonably expected to result in a Material Adverse Effect.

SECTION 4.5    ~~Section 4.5.~~ Taxes.

Except for matters that would not have a Material Adverse Effect, (i) Seller has timely filed all Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Seller), and all such Tax Returns were correct and complete in all respects; and (ii) all Taxes owed by Seller (whether or not shown or required to be shown on any Tax Return) have been paid on a timely basis.  There are no liens on any of the Legacy Number Blocks that arose in connection with any failure (or alleged failure) to pay any Tax.

SECTION 4.6    ~~Section 4.6.~~ Exclusivity.

Other than the transactions contemplated by this Agreement and except as set forth in Section 4.6 of the Seller Disclosure Schedule, Seller is not a party to or bound by any agreement providing for a sale, exchange or other disposition of all or any of the Legacy Number Blocks.

ARTICLE V ~~Article V~~
COVENANTS AND OTHER AGREEMENTS

SECTION 5.1    ~~Section 5.1.~~ Bankruptcy Actions.

~~On the timetables and subject to the terms set forth below, the Seller shall (i) file with the Bankruptcy Court one or more motions and proposed orders as set forth below each in form and substance reasonably satisfactory to the Purchaser; (ii) notify, as required by the Bankruptcy Code and the Bankruptcy Rules, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court, and such additional parties as the Purchaser may reasonably request; and (iii) subject~~Subject to the provisions of this Agreement, including the provisions of Section 8.1, the ~~Seller shall~~ use its reasonable best efforts to obtain Bankruptcy Court approval of ~~such orders.~~ the Sale Order and any other order of the Bankruptcy Court relating to this Agreement. As promptly as possible, but in no event later than ten (10) days after the date of this Agreement, the Seller shall file with the Bankruptcy Court ~~a motion (the "Sale Motion")~~ notice of this Agreement and a revised proposed Sale Order seeking approval of the sale of the Legacy Number Blocks.

SECTION 5.2    ~~Section 5.2.~~ Consultation; Notification.

(a)    The Purchaser and the Seller shall cooperate with ~~filing and~~ prosecuting ~~the Sale Motion, a draft of which shall be delivered by the Seller to the Purchaser no later than three (3) days after the date hereof~~ any motion filed by the Seller with the Bankruptcy Court relating to this Agreement (each, a "**Sale Motion**"), and the Seller shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other material papers to be filed by the Seller in connection with such motion and the relief requested therein.

(b)      If the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Seller agrees to use its reasonable best efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts.  Each of the Parties hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser shall be able to assert the benefits of section 363(m) of the Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

SECTION 5.3.   ~~Section 5.3.~~ Pre-Closing Cooperation.

(a)      Prior to the Closing and each Subsequent Transfer, as applicable, and subject to the terms and conditions of this Agreement, each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Party's obligations to consummate the transactions contemplated by this Agreement, including: (i) upon mutual consent, the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and each Subsequent Transfer, as applicable; (ii) using commercially reasonable efforts to defend all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the Closing and each Subsequent Transfer, as applicable; and (iii) using commercially reasonable efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Closing and each Subsequent Transfer, as applicable.  The Parties acknowledge and agree that no Consents other than the Bankruptcy Consents are required in order to consummate the Closing and any Subsequent Transfer.

(b)      Each Party shall promptly notify the other Party of the occurrence, to such party's Knowledge, of any event or condition, or the existence, to such party's Knowledge, of any fact, that would reasonably be expected to result in any of the conditions to the other Party's obligation to effect the Closing and each Subsequent Transfer, as applicable, set forth in Article VII not being satisfied.

SECTION 5.4.   ~~Section 5.4.~~ Public Announcements.

Subject to the Parties' disclosure obligations imposed by Law (including any obligations under applicable bankruptcy Law), the Parties shall (a) cooperate with each other in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (b) not issue any such announcement or statement prior to consultation with, and the written approval of, the other Party; provided that approval shall not be

required where a Party determines, based on advice of counsel and after consultation with the other Party, that such disclosure is required by Law.

SECTION 5.5    ~~Section 5.5.~~ Further Actions.

Without limiting the foregoing, on and after the Closing Date and Subsequent Transfer Dates, each Party shall cooperate with the other Party, without any further consideration, to cause to be executed and delivered, all instruments, including instruments of conveyance, novations, assignment and transfer, and to make all filings with, and to obtain all consents, that may be required under any permit, license, agreement, indenture or other instrument or regulation, and to take all such other actions as each Party may reasonably request to take by the other Party from time to time, consistent with the terms of this Agreement, in order to effectuate the provisions and purposes of this Agreement and the other Transaction Documents; provided that, subject to Section 5.3 and Section 5.4, neither the Purchaser nor the Seller shall be obligated to make any payment or deliver anything of value to any Third Party.

SECTION 5.6    ~~Section 5.6.~~ Transaction Expenses.

Except as otherwise provided in this Agreement or the other Transaction Documents, each of the Purchaser and the Seller shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 5.7    ~~Section 5.7.~~ Confidentiality.

The Parties acknowledge that the Non-Disclosure Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Seller shall be at liberty to disclose the terms of this Agreement to any court or in connection with seeking approval of the Sale Agreement by the Bankruptcy Court pursuant to Section 5.1 or an offer for sale of assets of Seller or Seller's Affiliates, and show appropriate figures in their administration records, accounts and returns.

SECTION 5.8    ~~Section 5.8.~~ No Solicitation of Transactions.

Prior to the Closing, and provided that Purchaser is proceeding in good faith to consummate the transactions contemplated hereby in a timely manner, Seller shall not, directly or indirectly, (i) solicit a proposal by any third person to acquire the Seller's Rights in and to the Legacy Number Blocks, or any material part of them (an "**Acquisition Proposal**"), (ii) execute an agreement with respect to an Acquisition Proposal, or (iii) except as provided in this Agreement, seek or support Bankruptcy Court approval of a motion or Order inconsistent in any way with the transactions contemplated in this Agreement.  For the avoidance of doubt, this Agreement is not intended by the Parties to be a "stalking horse agreement" and the Sale Motion shall not seek an auction or overbid procedures, because the Gross Purchase Price was selected as the winning bid in a competitive bidding process that did not contemplate further bidding.

ARTICLE VIArticle VI
TAX MATTERS

SECTION 6.1    Section 6.1.  Transfer Taxes.

(a)    The Parties agree that the Gross Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction

(a)    The Parties agree that the Gross Purchase Price is exclusive of any Transfer Taxes.  The Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by the Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the Seller.  The Seller, Subsidiary, Affiliate or agent, as applicable, shall provide original receipt to the Purchaser evidencing the payment of such Transfer Taxes to the Seller.  Upon request from the Seller, the Purchaser shall provide to the Seller an original receipt (or such other evidence as shall be reasonably satisfactory to the Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1.  For the avoidance of doubt, the Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Legacy Number Blocks are removed from the premises of the Seller or any Seller's supplier, except to the extent the Seller or any Seller's agent has been provided an original receipt evidencing the Purchaser's payment of Transfer Taxes to the Seller.  All other closing expenses will be paid by the Party incurring such expenses.

(b)    If the Purchaser wishes to claim any exemption relating to,; or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Seller prior to Closing with its permit number or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser, as the case may be.  All parties shall make commercially reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.  Notwithstanding the foregoing, any such cooperation to be provided in this Section 6.1(b) shall not include or extend to (i) a liquidation or restructuring of Seller or any business of Seller, including the transfer of any assets or Legacy Number Blocks or liabilities or Assumed Liabilities between Seller or its Affiliates, except in the Seller's discretion, but in no case if there is a material cost to Seller or its Affiliates resulting from such liquidation or restructuring unless the Seller or the relevant Affiliate is indemnified (prior to such liquidation or restructuring) against any cost or expense of such liquidation or restructuring to its satisfaction (acting at all times reasonably and in good faith); (ii) any action or omission that would result in the imposition

on Seller or any Affiliate of Seller of any additional Transfer Tax liability or making any additional payment to any Tax Authority or Government Entity in respect of Transfer Tax which is an Excluded Liability, unless Seller or Affiliate is (prior to the relevant action or omission) indemnified against such additional Transfer Tax liability or payment; (iii) any action or omission that would result in any material out of pocket cost or expense for Seller or any Affiliate of Seller, unless Seller or Affiliate is (prior to the relevant action or omission), indemnified against such cost or expense to their satisfaction (acting at all times reasonably and in good faith) by the Purchaser; (iv) any action or omission which would cause the Seller or any Affiliates of the Seller to be in contravention of any applicable Law (including Bankruptcy Law) or published practice of a Tax Authority; (v) changing the identity or Tax residence of Seller, the location of any Legacy Number Blocks or Assumed Liabilities, the nature or extent of any Legacy Number Blocks or Assumed Liabilities, the Legacy Number Blocks or Assumed Liabilities to be transferred by Seller or the structure of the transaction as an asset sale rather than the sale of any form of entity, except in the Seller's commercially reasonable discretion, but in no case if there is a material cost to Seller or its Affiliates resulting from such action, unless the Seller or the relevant Affiliate is indemnified (prior to such action) against any cost or expense of such action to its satisfaction (acting at all times reasonably and in good faith); or (vi) any reduction in the obligations of the Purchaser or rights of the Seller.

SECTION 6.2    ~~Section 6.2.~~ Reserved.

SECTION 6.3    ~~Section 6.3.~~ Tax Characterization of Payments Under This Agreement.

The Seller and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than any interest payments) as adjustments to the Gross Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4    ~~Section 6.4.~~ Apportionment of Taxes.

(a)    Except as otherwise provided in this Article VI, (i) the Seller shall bear all Taxes of any kind relating to the Legacy Number Blocks for all Tax periods or portions thereof ending on or before the Closing Date (and where such Legacy Number Blocks are Subsequent Legacy Numbers, for all Tax periods or portions thereof ending on or before the corresponding Subsequent Transfer Dates) and (ii) the Purchaser shall bear all Taxes relating to the Legacy Number Blocks for all Tax periods or portions thereof beginning after the Closing Date (and where the Legacy Number Blocks are Subsequent Legacy Numbers, for all Tax periods or portions thereof beginning after the corresponding Subsequent Transfer Dates).

(b)    For purposes of this Agreement, any Taxes of any kind relating to the Legacy Number Blocks for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date, or Subsequent Transfer Date, as relevant) shall be apportioned between the Seller, on the one hand, and the Purchaser, on the other hand, based on the portion of the period ending on and including the Closing Date (or Subsequent Transfer Date, as relevant) and the portion of the period beginning after the Closing Date (or Subsequent Transfer Date, as relevant), respectively. The amount of any Taxes based on or measured by income or receipts related to the Legacy Number Blocks shall be allocated between the Pre-Closing Taxable Period and the Post-Closing

Taxable Period on a closing-of-the-books basis.  The amount of other Taxes shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

SECTION 6.5    ~~Section 6.5.~~ Records.

(a)    Except as provided elsewhere in this Section 6.5, (i) after the Closing Date, the Purchaser, on the one hand, and the Seller, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Legacy Number Blocks or the Assumed Liabilities for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Legacy Number Blocks or the Assumed Liabilities for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient.  The obligation to cooperate pursuant to this Section 6.5 shall terminate, for each taxable period, at the later of the time the relevant applicable statute of limitations expires (giving effect to any extension thereof) and the time when any appeal of an assessment of additional Tax with respect to such period is finally terminated.

SECTION 6.6    ~~Section 6.6.~~ Tax Disclosure.

Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities Laws and regulations, any party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to the taxpayer relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any non-public commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

SECTION 6.7    Section 6.7. Tax Returns.

(a)    The Seller shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Legacy Number Blocks, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.7(b)).  Such Tax Returns shall be prepared in compliance with all applicable laws and shall be true, correct and complete in all material respects.  Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Seller as and when required by Law.

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws.  The Seller shall make available to the Purchaser that portion of such Transfer Tax Returns prepared by the Seller that is applicable to the sale and purchase transaction contemplated by this Agreement, and, to the extent not already disclosed, such information as will enable the Purchaser to review and object to such portion of such Transfer Tax Returns, at least fifteen (15) Business Days before such Tax Returns are due to be filed.  In the event the Purchaser reasonably objects to the Transfer Tax Returns, the Seller may not include the applicable sale and purchase transaction and associated Transfer Tax.  The Purchaser shall pay to the Seller any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Seller pursuant to this Section 6.7(b) at least one (1) Business Day before such Transfer Tax becomes due and payable in each case to the extent such Transfer Taxes are the responsibility of the Purchaser pursuant to Section 6.1(a).

(c)    The Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Legacy Number Blocks for all Post-Closing Taxable Periods and Straddle Periods, except for Tax Returns for Taxes based on or measured by income or receipts that are allocated pursuant to Section 6.4 on a closing-of-the-books basis, which Tax Returns shall be filed by the Purchaser and Seller, each reporting its allocated income or receipts.  All Taxes indicated as due and payable on Tax Returns for a Straddle Period shall be paid by (or shall be caused to be paid by) the Purchaser as and when required by Law.

(d)    If the Seller is required to pay a portion of the Tax shown on any Tax Return for a Straddle Period, the Purchaser shall make available to the Seller that portion of such Tax Return prepared by the Purchaser at least fifteen (15) Business Days before such Tax Return is due to be filed.  The Seller shall pay to the Purchaser Seller's portion of any Tax shown on any Tax Return in respect of the Legacy Number Blocks for the Straddle Period as determined under Section 6.3(b) at least one (1) Business Day before any such Tax becomes due and payable, provided that the Seller need not pay such Tax to the extent it reasonably objects to the computation of such Tax on the Tax Return for the Straddle Period until the Seller and the Purchaser can come to agreement on the amount of such Tax due.

ARTICLE VII~~Article VII~~
CONDITIONS TO THE CLOSING

SECTION 7.1    ~~Section 7.1.~~ Conditions to Each Party's Obligation.

The Parties' obligation to effect the Closing and each Subsequent Transfer, as applicable, is subject to the satisfaction or the express written waiver of the Parties, at or prior to the Closing and each Subsequent Transfer, as applicable, of the following conditions:

(a)    *No Injunctions or Restraints*.  There shall be in effect no Law, or any binding material order, injunction, decree or judgment of any court or other Government Entity prohibiting the consummation of any of the transactions contemplated hereby.

(b)    *Sale Order*.  The Sale Order shall have been entered and shall not be stayed or have been modified, revised or amended in a manner adverse to the Parties.

SECTION 7.2    ~~Section 7.2.~~ Conditions to Seller's Obligation.

7.2.1    The Seller's obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Seller), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties*.  Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)    *No Breach of Covenants*.  The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(c)    *Officer Certificate*.  The Seller shall have been furnished with a certificate signed by a senior officer of the Purchaser certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

(d)    *Closing Deliveries*.  Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.3.2(a) and (c).

(e)    *LRSA*.  Purchaser shall have entered into the LRSA with ARIN.

7.2.2    The Seller's obligation to effect each Subsequent Transfer shall be subject to the fulfillment (or express written waiver by the Seller), at or prior to each Subsequent Transfer Date of each of the following conditions with regard to the Subsequent Legacy Numbers to be transferred in such Subsequent Transfer:

(a)    *No Breach of Representations and Warranties*.  Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as if restated on and as of the Subsequent Transfer Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)    *No Breach of Covenants*.  The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before each Subsequent Transfer.

(c)    *Transferability of Subsequent Legacy Numbers*.  The Subsequent Legacy Numbers to be transferred in such Subsequent Transfer shall not be in use by the Seller, any affiliate of the Seller or any Third Party and shall otherwise be available for transfer to the Purchaser.

(d)    *Transfer Deliveries*.  Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.3.4(a) and (c).

(e)    *LRSA*.  Purchaser shall have entered into the LRSA with ARIN.

SECTION 7.3    ~~Section 7.3.~~ Conditions to Purchaser's Obligation.

7.3.1    The Purchaser's obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties*.  Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date, or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that has not had a Material Adverse Effect.

(b)    *No Breach of Covenants*.  The Seller shall have complied in all material respects with all material covenants, obligations and agreements contained in this Agreement required to be performed by the Seller on or before the Closing.

(c)    *Officer Certificate*.  The Purchaser shall have been furnished with a certificate signed by a senior officer of one of the Seller that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

(d)    *Closing Deliveries*.  Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.3.2(b) and (c).

(e)    *Change to Point of Contact*.  Seller will have caused the applicable regional Internet registry (that manages the "Whois" record for each of the Initial Legacy Numbers) to change the "Point of Contact" for each of the Initial Legacy Numbers to a new contact designated

~~at least three (3) Business Days prior Closing, in writing, by Purchaser in Purchaser's reasonable discretion.~~

7.3.2    The Purchaser's obligation to effect each Subsequent Transfer shall be subject to the fulfillment (or express written waiver by the Purchaser) at or prior to the Subsequent Transfer Date, of each of the following conditions with regard to the Subsequent Legacy Numbers to be transferred in such Subsequent Transfer:

(a)    *No Breach of Representations and Warranties*.  Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Subsequent Transfer Date, or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that has not had a Material Adverse Effect.

(b)    *No Breach of Covenants*.  The Seller shall have complied in all material respects with all material covenants, obligations and agreements contained in this Agreement required to be performed by the Seller on or before each Subsequent Transfer.

(c)    *Transfer Deliveries*.  Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.3.4(a)-(c).

~~(d)    *Change to Point of Contact*.  Seller will have caused the applicable regional Internet registry (that manages the "Whois" record for each of the Subsequent Legacy Numbers) to change the "Point of Contact" for each of the Subsequent Legacy Numbers being transferred to Purchaser on the applicable Subsequent Transfer Date to a new contact designated at least three (3) Business Days prior to such Subsequent Transfer Date, in writing, by Purchaser in Purchaser's reasonable discretion.~~

ARTICLE VIII~~Article VIII~~
TERMINATION

SECTION 8.1    ~~Section 8.1.~~Termination.

This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Parties;

(b)    by any Party, upon written notice to the other Party:

(i)    if the Closing does not take place on or prior to January 31, 2012; or

(ii)    upon or following the entry of an order by the Bankruptcy Court approving an Alternative Transaction;

(c)    ~~(i)~~(i)    by the Purchaser, upon written notice to the Seller, in the event of a material breach by the Seller of the Seller's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 7.1(a), 7.3.1(a) or 7.3.1(b), as applicable, or (ii) by the Seller, upon written notice

to the Purchaser, in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 7.1(a), 7.2.1(a) or 7.2.1(b), as applicable, and, in each case under clauses (i) and (ii) of this paragraph, which, if capable of being cured, has not been cured within twenty-five (25) days from receipt of a written notice thereof from the non-breaching Party (but not later than the date set forth in Section 8.1(b)(i)); or

(d)      by the Seller, upon written notice to the Purchaser upon Purchaser's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within twenty-five (25) days from the receipt of a written notice thereof from the Seller (but not later than the date set forth in Section 8.1(b)(i));

(d)      by the Seller, upon written notice to the Purchaser upon Purchaser's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within twenty-five (25) days from the receipt of a written notice thereof from the Seller (but not later than the date set forth in Section 8.1(b)(i)); provided, however, that the right to terminate this Agreement pursuant to Section 8.1(b)(i), Section 8.1(b)(ii), Section 8.1(c) or Section 8.1(d) shall not be available to the Party seeking to terminate if such Party is then in breach of this Agreement and such breach was the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement.

SECTION 8.2    ~~Section 8.2.~~ Effects of Termination.

If this Agreement is terminated pursuant to Section 8.1:

(a)      all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other Parties except for the provisions of, or as provided in (i) Section 2.2.3 (Escrow), (ii) Section 5.4 (Public Announcements), (iii) Section 5.6 (Transaction Expenses), (iv) Section 5.7 (Confidentiality), (v) this Section 8.2 (Effects of Termination), and (vi) Article IX; provided, that, except as set forth in Section 9.14, nothing herein shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof;

(b)      the Purchaser shall return to the Seller all documents, work papers and other material of any of the Seller relating to the transactions contemplated hereby, whether obtained before or after the execution hereof;

(c)      the Parties shall cause the Escrow Agent to return the Good Faith Deposit to the Purchaser if (i) the Parties terminate this Agreement pursuant to Section 8.1(a) or (ii) subject to the proviso at the end of Section 8.1, either Party terminates this Agreement pursuant to Section(s) 8.1(b) or 8.1(c)(i); and

(d)      the provisions of the Non-Disclosure Agreement will continue in full force and effect.

SECTION 8.3    ~~Section 8.3.~~ Failed Subsequent Transfers.

Following the Closing, upon written notice from the Seller to the Purchaser, if any of the conditions precedent set forth in Section 7.2.2 relating to any Subsequent Legacy Numbers shall have become incapable of fulfillment (and shall not have been waived by the Seller), or if the transfer of any Subsequent Legacy Numbers to the Purchaser has otherwise not occurred hereunder by January 31, 2012, no Party shall have any further obligation with respect to the transfer of such Subsequent Legacy Numbers and any obligation with respect to such Subsequent Legacy Numbers hereunder that would have expired upon any such transfer shall become null and void and of no further force or effect, except that if the conditions precedent set forth in Section 7.2.2 shall have become incapable of fulfillment as a result of the Purchaser's failure to comply with its obligations under this Agreement, the Seller's right to pursue all legal remedies shall survive unimpaired.  With respect to such Subsequent Legacy Numbers that shall not be transferred hereunder as a result of the operation of this Section 8.3, the amount of cash (together with the actual earnings thereon) equivalent to the Unit Cost multiplied by the total number of IPv4 addresses that have not been transferred shall be refunded to the Purchaser in accordance with Section 2.2.3(c), which refund will be the sole and exclusive remedy of the Purchaser, whether at law or in equity, with respect to such Subsequent Legacy Numbers unless the conditions precedent to the transfers of the Subsequent Legacy Numbers shall have become incapable of fulfillment as a result of Seller's failure to comply with its obligations under this Agreement, in which case Purchaser's rights to pursue equitable relief pursuant to Section 9.14(a) shall survive unimpaired.

ARTICLE IX ~~Article IX~~
MISCELLANEOUS

SECTION 9.1    ~~Section 9.1.~~ No Survival of Representations and Warranties or Covenants.

Except for the representations set forth in Section 3.3, no representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date (with regard to the Initial Legacy Numbers) or the applicable Subsequent Transfer Date (with regard to the applicable Subsequent Legacy Numbers), except for covenants set forth in Article VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

SECTION 9.2    ~~Section 9.2.~~ Remedies.

No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 9.3    ~~Section 9.3.~~ No Third-Party Beneficiaries.

This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 9.4    ~~Section 9.4.~~ Consent to Amendments; Waivers.

No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

SECTION 9.5    ~~Section 9.5.~~ Successors and Assigns.

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Seller in case of an assignment by the Purchaser or the Purchaser in case of an assignment by the Seller, which consent may be withheld in such Party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party) and (ii) assignment by the Seller to a succeeding entity following Seller's emergence from the Chapter 11 Case.

SECTION 9.6    ~~Section 9.6.~~ Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of Laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, each Party:

(i)    agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in the (A) Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Case; or (B) Federal Courts in the Southern District of New York, Borough of Manhattan or the State Courts of the State of New York, County of New York, Borough of Manhattan (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Case (the courts specified in clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America or any court in any other country;

(ii)    agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby;

(iii)    waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum;

(iv)      agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 9.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and

(v)      agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)      Reserved.

(d)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 9.6.

SECTION 9.7      ~~Section 9.7.~~ Notices.

All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 9.7.

If to the Purchaser to:

Microsoft Corporation
One Microsoft Way
Redmond Washington, USA 98052-6339
Attention: CVP, Global Foundation Services
Facsimile:      425 936-7329

With copies (that shall not constitute notice) to:

**Microsoft Corporation**
One Microsoft Way
Redmond Washington, USA 98052-6339
Attention: Legal and Corporate Affairs, Associate General Counsel,
Global Foundation Services
Facsimile:      425 936-7329

If to the Seller, to:

> **Nortel Networks Inc**.
> 4001 E. Chapel Hill – Nelson Hwy. Research Triangle Park, NC  27709
> United States
> Attention:     Timothy Ross
>
> Vice President – U.S. Finance Operations
> Facsimile:     +1-919-905-3714

With copies (that shall not constitute notice) to:

> Cleary Gottlieb Steen & Hamilton LLP One Liberty Plaza
> New York, NY 10006
> United States
> Attention:       Lisa Schweitzer
>                     James Bromley
> Facsimile:       +1-212-225-3999

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 9.8    Section 9.8. Exhibits; Seller Disclosure Schedule.

(a)     The Seller Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)     Disclosure in any section of the Seller Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances in any other section of the Seller Disclosure Schedule as though fully set forth in such other section, if it is reasonably apparent from the Seller Disclosure Schedule that such disclosure is applicable.  The inclusion of any information in any section of the Seller Disclosure Schedule shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation or warranty to be true and correct in all material respects. The Seller Disclosure Schedule is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations or warranties by any Party except to the extent expressly set forth therein.  The inclusion of any information in any section of the Seller Disclosure Schedule or other document delivered by the Seller pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 9.9    Section 9.9. Counterparts.

The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature

page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement.

SECTION 9.10   ~~Section 9.10.~~ No Presumption.

The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 9.11   ~~Section 9.11.~~ Severability.

If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 9.12   ~~Section 9.12.~~ Headings.

The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 9.13   ~~Section 9.13.~~ Entire Agreement.

This Agreement and the Non-Disclosure Agreement together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Non-Disclosure Agreement and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and the Non-Disclosure Agreement the provisions of this Agreement shall prevail.

SECTION 9.14   ~~Section 9.14.~~ Availability of Equitable Relief; Limitation on Damages.

(a)   The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or

31

were otherwise breached.  Accordingly, subject to the limitations set forth in Section 8.3 and in this Section 9.14, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement prior to the Closing or applicable Subsequent Transfer Date, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.  Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.  Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement or that equitable relief is not available pursuant to section 8.3 or this Section 9.14.  Without limiting the preceding provisions of this Section 9.14(a), it is acknowledged and agreed that under no circumstances shall any Person be responsible or liable for any Losses that are consequential, in the nature of lost profits, diminution in the value of property, special or  punitive or otherwise not actual damages arising out of, or in connection with, this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof or any other Transaction Document.  Nothing set forth in this Agreement shall confer or give or shall be construed to confer or give to any Person (including any Person acting in a representative capacity) any rights or remedies against any Person other than the Parties.

(b)    Notwithstanding anything to the contrary set forth in Section 9.14(a), if this Agreement is terminated by either Party pursuant to Section 8.1, then equitable relief shall not be available as a remedy for any breach hereof to the terminating Party or its Affiliates against the non-terminating Party or its Affiliates.

(c)    Notwithstanding anything to the contrary contained in any Transaction Document, in no event shall the Seller be subject to any Liability to the Purchaser for the failure of the purchase and sale of the Seller's Rights in and to the Legacy Number Blocks contemplated by this Agreement to be consummated, or in respect of any Liabilities arising under, or relating to, this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, including as a result of an Intentional Breach of this Agreement or any other Transaction Document by the Seller prior to Closing (or if any contemplated Subsequent Transfer Date will not occur as a result of the operation of Section 8.3, the later of the Closing Date or the last Subsequent Transfer Date occurring hereunder), other than equitable relief granted pursuant to and in accordance with this Section 9.14.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

32

IN WITNESS WHEREOF, the Seller and the Purchaser have duly executed this Asset Sale Agreement as of the date first written above.

**NORTEL NETWORKS INC.**

By:

_____
Name:
_____
Title: _____

**MICROSOFT CORPORATION**

By: _____
Name:—
_____
Title: _____

33Amended and Restated ASA Signature Page