IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
                                   :

In re:                              :     Chapter 11
                                     :

NORTEL NETWORKS INC., *et al.*,[1]     :     Case No. 09-10138 (KG)
                                     :

                  Debtors.     :     (Jointly Administered)
                                     :
                                     :     **Hearing date: May 10, 2011 at 9:30 a.m. (ET)**
                                     :     **Objections due: April 15, 2011 at 4:00 p.m. (ET)**
                                     :     **Ref. No. 5200**
                                     :

---------------------------------------------------------- X

## THE JOINT ADMINISTRATORS' RESPONSE TO THE DEBTORS' MOTION FOR AN ORDER REQUIRING A MORE DEFINITE STATEMENT OF CLAIM AND SETTING A DEADLINE FOR THE FILING OF ANY PROOFS OF CLAIM BY THE EMEA CLAIMANTS

The court-appointed administrators and authorized foreign representatives

(collectively, the "Joint Administrators")[2] for Nortel Networks UK Limited ("NNUK") and

certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors")[3] located in the

region known as EMEA (Europe, Middle East, and Africa) in proceedings under the *Insolvency*

---

1.    The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

2.    The Administrators in the UK Proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The Administrators in the UK Proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

3.    The EMEA Debtors are:  Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Services Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding BV; Nortel Networks N.V.; Nortel Networks Oy; Nortel Networks Polska Sp. z. o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania Srl; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

*Act 1986* (the "English Insolvency Act"), pending before the High Court of Justice of England and Wales (the "English Court"), hereby respond (this "Response") to the motion of Nortel Networks, Inc. ("NNI") and its affiliated debtors and debtors-in-possession (collectively, the "U.S. Debtors") for entry of an order directing the EMEA Debtors to file a more definite statement of their claims and setting a deadline to file any and all prepetition claims (including any amended claims) against the U.S. Debtors by June 1, 2011.  In support of this Response, the Joint Administrators respectfully submit as follows:

## PRELIMINARY STATEMENT

1.      By their motion (the "Motion"), the U.S. Debtors seek to compel the EMEA Debtors to file a more definite statement of their claims previously filed against the U.S. Debtors in September 2009 (the "Proofs of Claim"), and request that the EMEA Debtors file particularized claims and documentation to support their claims by June 1, 2011 (the "Proposed Bar Date") or see their claims expunged with prejudice.  The U.S. Debtors' filing of the Motion was wholly unnecessary and premature in light of the ongoing efforts of all Nortel entities to resolve all outstanding disputes in out-of-court negotiation and mediation.  The EMEA Debtors filed the Proofs of Claim – which satisfied the requirements of notice pleading and Official Form B 10 – under compulsion of the bar date established in these Chapter 11 cases in order to protect against forfeiture of their claims.[4]  Since then, the EMEA Debtors have provided extensive details of their claims against the U.S. Debtors in confidential mediation submissions and in

---

4.   In fact, the EMEA Debtors were never under compulsion to file proofs of claim on account of their intercompany claims.  Paragraph 4(f) of the Notice of Deadline Requiring Filing of Proofs of Claim On or Before September 30, 2009 (the "Bar Date") provides that "[a]ny Debtor, nondebtor affiliate of the Debtors or Canadian Debtor, or any of their direct or indirect subsidiaries holding a claim" need not file a proof of claim prior to the Bar Date.   Nonetheless, the EMEA Debtors filed proofs of claim prior to the Bar Date out of an abundance of caution to preserve all of their rights, and in doing so, put the U.S. Debtors on notice of their claims.

public filings in the insolvency proceedings of NNI's ultimate corporate parent, Nortel Networks

Corporation ("NNC" and together with its affiliates and subsidiaries, "Nortel" or the "Nortel

Group"), Nortel Networks Limited ("NNL") and their affiliates (collectively, the "Canadian

Debtors") under the Companies' Creditors Arrangement Act in Canada (the "Canadian

Proceedings"). It is therefore astounding that the U.S. Debtors could now claim a complete lack

of knowledge of "any legal or factual basis for the EMEA [Debtors'] claims." (Motion ¶ 4).

       2.      The U.S. Debtors have suggested that expedited determination of the

EMEA Debtors' claims is necessary in order to advance ongoing efforts to allocate the asset sale

proceeds among the various Nortel entities. The Joint Administrators agree that there is much

overlap between the factual and legal issues relevant to asset allocation and to their claims

against the U.S. Debtors and the Canadian Debtors (collectively, the "North American Debtors").

They submit, however, that in light of the lack of success to date of the consensual resolution and

mediation processes (which have been ongoing for almost 12 months), all parties should now

move forward with the asset allocation dispute resolution process provided for in the Interim

Funding and Settlement Agreement approved by this Court and the Canadian Court almost two

years ago (the "IFSA"). To the extent that facts and legal issues underlying intercompany claims

must also be addressed in order to determine the proper allocation of asset sale proceeds, it has

already been agreed by the parties, and confirmed by the Courts, that such matters must be

determined in the first instance in the transnational dispute resolution procedure contemplated

under the IFSA. Addressing such issues piecemeal, in claims procedures in the separate

bankruptcy/insolvency proceedings across multiple jurisdictions, will be duplicative and will

create the risk of inconsistent determinations on key issues. The Joint Administrators therefore

request the Court's intervention to assist the parties to finalize the dispute resolution protocol they committed to when they entered the IFSA.

       3.     Thus, while the Joint Administrators maintain that the filing of the Motion was premature and unnecessary, they will nonetheless comply with the U.S. Debtors' request by filing amended proofs of claim on behalf of the EMEA Debtors by the Proposed Bar Date or at such other time as mutually-agreed by the parties or ordered by the Court.   In addition, the Joint Administrators join in the U.S. Debtor's request that the Court set a status conference for June 7, 2011 at 9:30 a.m., or at such other time as is convenient for the Court, and request that such conference be a joint video status conference with the Canadian Court, to review the progress of the matter and move forward with steps necessary in order to immediately finalize the dispute resolution protocol provided for under the IFSA.

## JURISDICTION AND VENUE

       4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 of the Bankruptcy Code.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this proper pursuant to 28 U.S.C. § 1408 and 1409.

## BACKGROUND

       5.     As the Court knows, Nortel has sold substantially all of its operating businesses in the course of the U.S., Canadian and UK insolvency proceedings and, pursuant to the escrow agreements for each of the business dispositions and the IFSA, the proceeds of these sales have been placed into escrow until their allocation among Nortel companies is determined. Pursuant to the IFSA and the relevant escrow agreements, the money held in the escrow account cannot be distributed until:  (i) the parties reach agreement on how the funds should be allocated or (ii) if the parties fail to reach an agreement, a determination of the proper allocation is made

pursuant to the dispute resolution procedure provided for under the IFSA.  See IFSA Section

12(b).  Under the IFSA, the Nortel parties agreed to negotiate in good faith to enter a protocol

that would establish binding procedures for the allocation of the sale proceeds in the event they

are unable to reach agreement regarding such allocation.  See IFSA Section 12(c).  Although the

parties made considerable progress in negotiating such a protocol, efforts to finalize the protocol

were put aside in favor of negotiation between the parties, followed in turn by the recent non-

binding mediation process conducted by the Honorable Layn R. Phillips.

      6.     Although the various Nortel parties have attempted to resolve asset

allocation and all other inter-estate issues in a consensual manner, to date these efforts have not

been successful.  The mediation process commenced in October 2010, with the first live sessions

held in November.  Further intensive sessions on April 11, 12 and 13 have not produced a

resolution, and no further sessions are scheduled at this time.

      7.     At the forefront of mediation discussions surrounding the allocation of

sale proceeds has been the interrelated issue of how to resolve various intercompany claims.  It is

beyond dispute that the allocation of proceeds and the intercompany claims are "intertwined," as

recognized by the Canadian Monitor.  See Fifty-Eighth Report of the Monitor Dated December

22, 2010 at ¶ 4 ("The inter-company claims are intertwined with allocation issues and include

proprietary and trust type claims.")  [D.I. 4642].  Indeed, the EMEA Debtors' intercompany

claims arise out of substantially the same facts, issues, and legal principles as the sale proceeds

allocation arguments, as further described below.  Transfer pricing in particular is an issue which

not only gives rise to claims, but which is also relevant to the allocation arguments of all of the

Nortel estates, not just those of the EMEA Debtors.   If the mediation process fails (as it appears

to have), then pursuant to the IFSA the next step is for the Nortel entities to reach an agreement

on a protocol for binding procedures for the allocation of the sale proceeds.

## ARGUMENT

**I.      The U.S. Debtors' Motion for a More Definite Statement of Claims was Unnecessary and Premature.**

8.      As noted above, the EMEA Claimants filed general protective Proofs of

Claim against the U.S. Debtors on September 30, 2009.  Since then, the EMEA Debtors have

detailed their claims, both in face-to-face negotiation sessions during the consensual resolution

process, as well as in extensive filings in connection with the mediation.  They have done so

despite having limited access to documents from Nortel's North American headquarters that

would help substantiate and particularize their claims. Though the U.S Debtors have provided

voluminous quantities of documents to the EMEA Debtors as part of the informal mediation

disclosure process, such disclosure needs to be seen in context.  Not only does this disclosure

consist of a vast number of documents which are irrelevant to the key issues, such disclosure is,

more importantly, incomplete in key areas.  Further, the documents which have been provided to

the EMEA Debtors are subject to confidentiality restrictions which prevent the EMEA Debtors

from being able to freely deploy them.  The EMEA Debtors will need to address this with the

U.S. Debtors, and assume that the U.S. Debtors will cooperate in providing such additional

disclosure of documents and information as may be needed in order to for the EMEA Debtors to

particularize their claims.

9.      Over the course of the two mediation sessions, first in November 2010 and

again in April 2011, the EMEA Debtors have submitted position papers and reply papers (with

exhibits), running to hundreds of pages in length, setting forth their allocation arguments,

intercompany claims and the interrelation between the two.  The Canadian and U.S. Nortel

entities have countered with extensive filings of their own, including portions devoted to the intercompany claims asserted by the EMEA Debtors.  These positions have been further elaborated at several face-to-face negotiating sessions and in the proofs of claim filed by the EMEA Debtors against the Canadian Debtors on March 18, 2011 in the Canadian Proceedings. Thus, it seems clear that each party to the mediation has a full understanding of the other parties' arguments to date.  It is therefore surprising for the U.S. Debtors to now state that they are unaware of <u>any</u> legal or factual basis for the EMEA Debtors' claims.  (Motion at ¶ 4).

10.    The principal issues being addressed in the mediation have been (a) the allocation of the sale proceeds of all of the Nortel assets and businesses currently held in escrow and (b) intercompany claims.   In broad terms, the EMEA Debtors seek recompense in respect of claims against NNL, NNI and their past and current officers and directors arising from a general pattern in which NNL, NNI or its officers and directors improperly transferred value away from the EMEA Debtors to the benefit of the North American Debtors and other entities within the Nortel Group.

11.    Based on the foregoing, the Joint Administrators respectfully submit that the U.S. Debtors' motion to compel the EMEA Debtors to file a more definite statement of claim was unnecessary and premature.  Notwithstanding this position, the EMEA Debtors will acquiesce to the U.S. Debtors' request and will file amended proofs of claim by the Proposed Bar Date, or at such other time as mutually agreed amongst the parties or ordered by the Court.

II.    **To The Extent Disputed Issues Relevant to Resolving Intercompany Claims Are Also Relevant to Determining Sale Proceeds Allocation, Such Issues Must Be Addressed In the First Instance in the Transnational Dispute Resolution Procedure Contemplated Under the IFSA.**

12.    The failure of the worldwide Nortel Group produced an extraordinarily complex scenario involving inconsistent laws and insolvency regimes, and competing national and creditor interests, in several dozen jurisdictions around the world.  It appears unlikely that any relevant court, be it Canadian, U.S., UK or otherwise, would have had jurisdiction to issue orders addressing the issues that would have needed to be resolved in order to facilitate the integrated sales of the international Nortel businesses that have taken place.  It was therefore necessary for the relevant Nortel entities to enter, and for the U.S. and Canadian courts to approve, the IFSA, and for the parties to negotiate and execute appropriate escrow agreements. The IFSA and escrow agreements allowed the asset sales to proceed in a manner designed to maximize recovery for Nortel creditors around the world.

13.    Because of the jurisdictional and other complexities here, one of the key elements of the IFSA is that it provides that any disputes between the various Nortel entities about asset allocation will be decided pursuant to a transnational dispute resolution procedure to be agreed by the parties.  Thus, Section 12(c) of the IFSA requires the Nortel parties to agree on a protocol that will establish a binding procedure determining allocation in case the parties are unable to agree.

14.    Prior to the commencement of the mediation process, the parties had engaged in substantial negotiations towards the entry of the protocol provided for under Section 12(c) of the IFSA.  Significantly, the parties appeared to have reached agreement in principle on procedures for appointing a three member panel (including designees of Canada, the U.S. and EMEA) to serve as the dispute resolver and (at least in general terms) the main procedures to be

followed.  The main unresolved matter related to attempts by some parties to limit the scope of

the issues the panel could find relevant in determining allocation issues.  The Joint

Administrators submit that any unresolved issues pertaining to such matters could and should

properly be resolved by the IFSA dispute resolution panel itself.

15.     It is not particularly surprising that facts pertinent to the proper allocation

of sale proceeds among the various Nortel entities will also be relevant to the determination of

claims asserted back and forth between those same entities.  Indeed, the quantum of the claims of

the EMEA Debtors, and the very existence of the claims themselves, may depend on the results

of the sales proceeds allocation process.  Sales proceeds allocation issues involve a consideration

of the situation of the Nortel Group prior to the Petition Date, particularly in relation to transfer

pricing and the applicability of those transfer pricing arrangements to allocation of proceeds

from the sale of the Nortel businesses.  These factors are relevant not only to the consideration of

EMEA's allocation position, but also to the allocation position as between the U.S. and Canadian

Debtors.  It is without question that in any allocation dispute between the U.S. and Canadian

estates, the facts and legal issues relevant to the appropriateness of the transfer pricing

arrangements, and in particular the Master Research and Development Agreement, dated

December 22, 2004, would need to be considered by a dispute resolver.

16.     The validity of the transfer pricing arrangements, for example, is therefore

crucial to a determination of both allocation and intercompany claims.  A finding that these

arrangements were flawed and resulted in an improper transfer of assets away from the EMEA

Debtors will also establish claims against those entities which benefited from those flawed

arrangements or knowingly procured those agreements.  Within the framework of this complex

international matter, it is essential that such matters be addressed in the first instance through the

transnational dispute resolution process contemplated under the IFSA. To implement a unilateral, internationally uncoordinated approach to resolve these issues in multiple courts would ignore the realities of these complex multijurisdictional issues facing the parties.

17.    The Joint Administrators believe that a joint video status conference, scheduled with the Canadian Court, to address these issues and determine the best way forward would be beneficial to all parties.

18.    This Response is without prejudice to any claims submissions that the Joint Administrators may wish to make in any other forum or in relation to the ultimate forum selected for determining the intercompany claims and allocation issues.

## CONCLUSION

19.    While the Joint Administrators maintain that the filing of the Motion was unnecessary, they will nonetheless comply with the U.S. Debtors' request by filing amended proofs of claim on behalf of the EMEA Debtors by the Proposed Bar Date or at such other time as mutually agreed by the parties or ordered by the Court.   In addition, the Joint Administrators join in the U.S. Debtor's request that the Court set a status conference for June 7, 2011 at 9:30 a.m., or at such other time that is convenient for the Court, and further request that such conference be a joint video status conference with the Canadian Court, to review the progress of the matter and move forward with steps necessary in order to immediately finalize the dispute resolution protocol provided for under the IFSA.

Dated:    Wilmington, Delaware
      April 15, 2011

**YOUNG CONAWAY STARGATE & TAYLOR, LLP**

/s/ Edwin J. Harron
James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
Jaime N. Luton (No. 4936)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6600
Facsimile: (302) 571–1253

- and -

**HUGHES HUBBARD & REED LLP**
Michael Luskin
Derek J.T. Adler
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837–6000
Facsimile: (212) 422–4726

- and -

**HERBERT SMITH LLP**
Kevin Lloyd
John Whiteoak
Richard Lawton
Exchange House
Primrose Street
London
EC2A 2HS

*Counsel for the Joint Administrators*