# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X

| | : | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | **Hearing date: May 10, 2011 at 9:30 a.m. (ET)** |
| | : | **Objections due: May 3, 2011 at 4:00 p.m. (ET)** |

-------------------------------------------------------- X

### DEBTORS' MOTION FOR AN ORDER (I) APPROVING NNI'S ENTRY INTO PURCHASE AND SALE AGREEMENT; (II) AUTHORIZING THE SALE OF NNI'S RICHARDSON CAMPUS FREE AND CLEAR OF ALL ENCUMBRANCES; (III) APPROVING NNI'S ENTRY INTO THE NORTEL LICENSE; (IV) APPROVING THE NOTICE PROCEDURES; AND (V) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit D,[2] pursuant to sections 105, 107(b)(1) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) approving

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]    The proposed form of order attached hereto as Exhibit D is in form and substance reasonably acceptable to both the Seller and the Purchaser.

NNI's entry into that certain purchase and sale agreement dated as of April 15, 2011 between NNI (the "Seller") and Pillar Commercial, LLC (together with any designated purchasers, "Pillar" or the "Purchaser") (attached hereto as Exhibit A, the "Purchase and Sale Agreement"[3]) for the sale of the premises at 2201 and 2221 Lakeside Boulevard, Richardson, Texas and certain related assets (the "Property"), (ii) authorizing the sale of the Property (the "Sale", together with the transactions contemplated by the Purchase and Sale Agreement, the "Transactions") free and clear of all encumbrances pursuant to section 363 of the Bankruptcy Code; (iii) approving NNI's entry into the license agreement between NNI and the Purchaser for the license by the Purchaser to NNI of certain areas of the Property (substantially in the form attached hereto as Exhibit G, the "Nortel License"); (iv) approving the Notice Procedures (as defined below); (v) authorizing the Debtors to file certain documents under seal; and (vi) granting them such other and further relief as the Court deems just and proper.   In support of this Motion, the Debtors rely on the Declaration of John J. Ray (attached hereto as Exhibit B, the "Ray Declaration") and the Declaration of Eric Mackey of CB Richard Ellis Inc. ("CBRE") (attached hereto as Exhibit C, the "Mackey Declaration").   In further support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Purchase and Sale Agreement.

2.      The statutory bases for the relief requested herein are sections 105, 107(b)(1) and 363 of the Bankruptcy Code, Rules 2002, 6004, 9014 and 9018 of the Bankruptcy Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

## Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[4] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only. The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[5] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by

---

[4]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[5]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[6] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.      On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales.  Since then, Nortel has sold many of its business units and assets to various purchasers.  Efforts continue to be made with respect to the realization of value from Nortel's remaining assets.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

## Relief Requested

7.      By this Motion, the Debtors seek an order:  (i) approving NNI's entry into the Purchase and Sale Agreement, (ii) authorizing the sale of the Property free and clear of all encumbrances, (iii) approving NNI's entry into the Nortel License, (iv) approving the Notice Procedures, (v) authorizing the Debtors to file certain documents under seal, and (vi) granting them such other relief as the Court deems just and proper.

---

[6]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

**Facts Relevant to this Motion**

**A.    The Richardson Campus**

8.    The Property is located at 2201 and 2221 Lakeside Boulevard in Richardson, Texas (the "Land").  It includes one sixteen-story high rise building containing approximately 413,319 net rentable square feet (the "Tower") and a research and laboratory building containing approximately 394,098 net rentable square feet (the "Lab") situated on approximately 18.37 acres of land (the improvements on the Land, including the Tower and the Lab, together with the Land, collectively, the "Premises").

9.    The Premises has historically functioned as the Debtors' and Nortel's United States headquarters.  NNI and certain of the purchasers of Nortel's various business units continue to occupy portions of the Premises, including under leases entered into with such purchasers in connection with the various asset sales approved by this Court.  NNI and such purchasers will continue to use and/or occupy portions of the Premises after the Closing pursuant to the terms of the purchasers' existing leases, the Assignment and Assumption Agreement (as defined below) and the Nortel License.

10.    The Debtors believe that the Transactions represent the highest or best offer for the Property and that the consummation of the Transactions is in the best interest of the Debtors, their estates, creditors and other parties in interest.  In addition to enabling NNI to monetize its ownership of the Property, the Transactions will enable NNI and the other Debtors to avoid the cost of maintaining the Premises and allow NNI to satisfy its lease obligations to the purchasers of Nortel's business units.

**B.    Efforts to Market the Property**

11.    NNI aggressively marketed the Property for approximately eighteen months, pursued two separate marketing campaigns and has heavily negotiated a purchase agreement

5

with respect to the Property on two separate occasions.  The Purchase and Sale Agreement with Pillar is the culmination of these efforts, and the Seller believes that the offer to purchase the Property embodied in the Purchase and Sale Agreement is the highest or otherwise best offer available for the Property.

12.     NNI began exploring a divestiture of the Property in 2009.  An interested party immediately surfaced and NNI began negotiating the sale of the Premises to such potential purchaser.  In November and December 2009, NNI also contacted sixty-five end users determined to have a potential need for the amount of space available at the Premises and the financial ability to close a transaction with respect to the Premises.  These additional marketing efforts did not lead to any firm offers.  Moreover, after several unsuccessful attempts to reach an agreement, negotiations with the potential purchaser broke down in December 2010.

13.     NNI began marketing the Property again in earnest in January 2011, retaining CBRE to lead those efforts.[7]  To market the Property, CBRE sent 2,052 investment summary brochures and offering announcements to potentially interested investors.  As a result, sixty-nine prospective purchasers executed confidentiality agreements with respect to the Property and were sent an offering memorandum containing additional information about the Property.  In January and February 2011, twenty potential purchasers took tours of the Property.  In late February 2011, CBRE received nine bids for the Property.  Following a second round of bidding, which concluded in March, 2011, the Seller determined that the Purchaser's bid represented the highest or otherwise best offer available for the Property.  Since that time, NNI has engaged in good faith negotiations with the Purchaser on the terms of the sale, which negotiations resulted in the Purchase and Sale Agreement and License.

---

[7]     CBRE was retained by order dated March 9, 2011 [D.I. 5086] *nunc pro tunc* to January 6, 2011.

14.    NNI believes that the consideration to be provided for the Property under the Purchase and Sale Agreement represents the highest or otherwise best offer available for the Property and that further marketing of the Property will not yield a better offer.  Accordingly, at the request of the Purchaser, NNI intends to proceed by private sale and not public auction.   The Seller has consulted with the Committee and the Bondholder Group throughout the marketing process and both do not object to the private sale approach.

## C.    Purchase and Sale Agreement[8]

15.    After arm's-length, good faith negotiations between the Seller and the Purchaser and their respective advisors, the Seller has agreed, among other things, to convey the Property in accordance with the terms and conditions of the Purchase and Sale Agreement, subject to this Court's approval of the Transactions.  The Purchase and Sale Agreement contemplates the sale of the Property on the following material terms:

- <u>Purchase Price</u>.  At the Closing, the Purchaser will pay to the Seller the balance of the Purchase Price of $43,100,000, less the Deposit and subject to adjustments provided for in the Purchase and Sale Agreement.  (Purchase and Sale Agreement §§ 4 and 7).

- <u>Good Faith Deposit</u>.  The Purchaser (i) has placed a good faith deposit of $ 2.5 million into an escrow account and (ii) within one (1) Business Day after the execution of the Purchase and Sale Agreement will place a further deposit of $2.5 million into such account, for a total good faith deposit of $5 million.  (Purchase and Sale Agreement § 4).

- <u>Assets</u>.  The Assets to be acquired by the Purchaser include, among other things, all right, title and interest in (i) the Premises; (ii) all fixtures, furnishings, fittings, apparatus, furniture, equipment, machinery, inventory, appliances and other personal property located in the Tower and Lab other than the Excluded Personalty; and (iii) all rights, privileges and appurtenances relating to such assets.  (Purchase and Sale Agreement §§ 2(a) and 8).

- <u>Excluded Assets</u>.  The assets to be acquired by the Purchaser exclude, among other things, (i) certain Personalty that is owned or leased by any Tenant, managing agent,

---

[8]    To the extent that there are inconsistencies between any summary description of the Purchase and Sale Agreement contained herein and the terms and conditions of the Purchase and Sale Agreement, the terms and conditions of the Purchase and Sale Agreement shall control.

leasing agent, contractor or employee at the Property; (ii) all items of art located in or on the premises; (iii) the Third Party Acquired Assets; and (iv) any service mark, trademark, copyright, license or other interest in or right to use the name "Nortel" or any variation thereof.  (Purchase and Sale Agreement §§ 2(a) and 8).

- <u>Sale Free and Clear</u>.  Pursuant to the Sale Order (as defined below), the Assets to be transferred by the Seller will be transferred free and clear of all encumbrances, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Purchase and Sale Agreement.  (Purchase and Sale Agreement § 2(a)).

- <u>Closing Conditions</u>.  In addition to certain other customary closing conditions, including conditions relating to Bankruptcy Court approval and prohibition of any injunctions or legal restraints, contemplated or in effect, that would prohibit the Transactions, the obligations of the Seller and the Purchaser to close the sale are subject to the performance in all material respects of all obligations, covenants and agreements required to be performed on or before the Closing.  Specifically, the obligation of the Purchaser to close the sale is, among other conditions, subject to its ability to obtain a title insurance policy on the Property.  (Purchase and Sale Agreement § 11).

- <u>Ancillary Agreements</u>.  At the Closing, the Purchaser and the Seller will enter into certain ancillary agreements, including (i) the Nortel License pursuant to which the Seller will license certain portions of the Property from the Purchaser to fulfill the Seller's ongoing need for space at the Property and (ii) an assignment and assumption agreement (the "<u>Assignment and Assumption Agreement</u>"), substantially in the form attached here to as <u>Exhibit H</u>, pursuant to which Purchaser will agree to take an assignment of the Seller's rights and obligations under certain existing leases with respect to the Property. (Purchase and Sale Agreement § 20).

- <u>Certain Fees</u>.  As further described in Section D below, in certain circumstances, the Seller may be required to pay a Limited Expense Reimbursement or an Expense Reimbursement, which payment obligations shall constitute administrative expenses under section 503(b) of the Bankruptcy Code.  (Purchase and Sale Agreement § 21(d)).

## D.    The Expense Reimbursements

16.    The Purchaser and its advisors have expended, and likely will continue to expend, considerable time, energy and resources pursuing the purchase of the Property and have engaged in extended, good faith negotiations with the Seller to facilitate the Transactions.  In recognition of the considerable time, energy and resources expended by the Purchaser and its advisors, and in accordance with the terms of the Purchase and Sale Agreement, the Seller has agreed to pay to

8

the Purchaser (i) $250,000 upon termination of the Purchase and Sale Agreement due to the Seller's failure to prosecute entry of the Sale Order, provided that the Purchaser is not in breach of the Purchase and Sale Agreement such that certain conditions to the Closing are not satisfied at the time of such termination (the "Limited Expense Reimbursement"), or (ii) reasonable and documented out-of pocket costs and expenses in connection with the preparation, execution and performance of the Purchase and Sale Agreement, in an amount not less than $1,250,000 upon consummation of an Alternative Transaction, provided (i) that such consummation occurs within six months of the termination of the Purchase and Sale Agreement and (ii) that the Purchaser is not in breach of the Purchase and Sale Agreement such that certain conditions to the Closing are not satisfied at the time of such termination (the "Expense Reimbursement," and together with the Limited Expense Reimbursement, the "Expense Reimbursements").  The maximum total potential Expense Reimbursements payable to the Purchaser, $1.25 million, is equal to approximately two and nine tenths percent (2.90%) of the Purchase Price.

**E.    Nortel License**

17.    At the Closing, the Seller will license certain space at the Property back from the Purchaser to fulfill the Seller's ongoing need for space at the Property.  Under the Nortel License and subject to the terms of such agreement, the Seller will license approximately 41,000 square feet of the Premises from the Closing until December 31, 2011.  Under the Nortel License, the Seller will pay to the Purchaser a set fee representing the parties' estimate of the Seller's portion of operating expenses for the duration of the license term; the Seller will not pay any "base rent" under the Nortel License.  Under the Nortel License, the Seller has the ability to surrender licensed space to the Purchaser and to decrease the fee paid to the Purchaser under such agreement accordingly.

**F.      The Notice Procedures**

18.      As soon as reasonably practicable after the date hereof, the Seller will give notice of the time and place of the hearing to consider the Motion (the "Sale Hearing") and the objection deadline for the Sale Hearing by sending a notice (the "Sale Notice"), substantially in the form attached hereto as Exhibit E, by first-class mail, postage prepaid and/or via overnight mail, facsimile, electronic transmission or hand delivery upon (i) counsel to the Purchaser; (ii) the Office of the U.S. Trustee; (iii) counsel to the Committee; (iv) counsel to the Bondholder Group; (v) all taxing authorities or recording offices which have a reasonably known interest in the relief requested; (vi) all United States federal, state and local regulatory authorities with jurisdiction over the Debtors; (vii) each of the entities that had received an invitation from the Seller to acquire the Property within the past eighteen months; (viii) the counterparties to the Leases (as defined in the Assignment and Assumption Agreement), (ix) all entities reasonably known by the Debtors to have asserted a lien against the Property; and (x) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1.

19.      In addition, as soon as practicable after the date hereof, the Seller shall publish notice of the proposed Transactions, the Sale Hearing, and the objection deadline for the Sale Hearing, substantially in the form attached hereto as Exhibit F (the "Publication Notice"), in The Wall Street Journal (Wednesday National Edition) and The Dallas Morning News.

20.      The Seller will seek this Court's approval of the form and manner of notice of the Sale (the "Notice Procedures") at the Sale Hearing.

**G.      Sale Free and Clear of All Encumbrances**

21.      Pursuant to this Court's order approving the Transactions (the "Sale Order"), except as otherwise set forth in the Purchase and Sale Agreement, NNI has agreed to sell, transfer and assign pursuant to sections 363 of the Bankruptcy Code, its right, title and interest in

10

the Property, free and clear of all Encumbrances, including any security interest, pledge, mortgage, lien (as defined in section 101(37) of the Bankruptcy Code), including liens imposed by Law, such as but not limited to, mechanics' liens, charge, hypothecation, option to purchase or lease or otherwise acquire any interest, conditional sales agreement, adverse claim of ownership or use, title defect, easement, right of first refusal, encumbrance of any other kind, right of way or claim (as defined in section 101(5) of the Bankruptcy Code), with such Encumbrance to attach to the sale proceeds in the same validity, extent and priority as existed with respect to the Property immediately prior to the consummation of the Transactions, subject to any rights, claims and defenses of the Debtors and other parties in interest.

22.    The Debtors seek a finding by the Court that, upon the Closing, and except as otherwise provided in the Purchase and Sale Agreement or the ancillary documents thereto, including the Assignment and Assumption Agreement, the Purchaser shall not be liable for any claims against, and interests and obligations of, the Debtors or any of the Debtors' predecessors or affiliates, and the Property will not be encumbered by any Encumbrances.[9]

### Basis for Relief

**A.    Sale of the Property Is a Product of the Seller's Reasonable Business Judgment**

23.    Section 363(b)(1) of the Bankruptcy Code provides:  "The Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in relevant

---

[9]    The Debtors also seek a finding that, upon the assignment and sale to the Purchaser, the Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Purchaser and that, upon the Closing, (i) the counterparties to the Leases shall attorn to the Purchaser, (ii) the Debtors shall be relieved of all obligations and liabilities under the Leases accruing from and after the Closing, and (iii) the Purchaser shall be deemed to have assumed all of and succeeded to the entirety of the Debtors' obligations and liabilities under the Leases accruing from and after the Closing.

part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

24.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code, outside the ordinary course of business and prior to the confirmation of a plan of reorganization, is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale:  "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa. 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

25.    The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) good faith.    In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[10]

26.    Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.    See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722 F.2d at 1063 (passim).

27.    The sale of the Property meets the "sound business reason" test.    First, sound business purposes justify the sale.    The Seller believes that a prompt sale of the Property presents the best opportunity to realize the maximum value of the Property for the Seller's estate and its creditors.    The Seller further believes that the benefit to their creditors will be adversely affected absent an immediate sale.    See In re Lionel Corp., 722 F.2d at 1071 (finding that of factors for courts to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").    In addition to the potential for a decrease in value of the Property if the sale is delayed, the Seller has been and will continue to be obligated to expend significant resources to maintain the Property, which resources would otherwise be available for

---

[10]    Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable.    In re Lionel, 722 F.2d at 1071.

distribution to its creditors.  In light of the potential decrease in the value of the Property and the continuing need to devote resources to maintain the Property, the Seller believes that a prompt sale is both necessary and justified to maximize the value of the Property for its benefit and the benefit of its creditors and estates.

28.     Second, notice of the Motion will be provided to interested parties in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and applicable Court orders as appropriate under the circumstances.

29.     Third, the Seller believes it has obtained a fair and reasonable price for the Property.  The purchase price agreed to in the Purchase and Sale Agreement is the result of significant marketing efforts and the culmination of rigorous negotiations with the Purchaser.

30.     Finally, the marketing and sale process, in which the Committee and the Bondholder Group were involved, satisfies the good faith requirement of Abbotts Dairies.  788 F.2d at 149-50.  As mentioned above and in the Ray and Mackey Declarations, NNI marketed the Property for approximately eighteen months, pursued two separate marketing campaigns and heavily negotiated a purchase agreement with respect to the Property on two separate occasions. The Debtors submit that the Transactions are the product of good faith solicitation efforts and arm's-length negotiations between the Seller and the Purchaser with respect to the price and other terms of the Transactions.

31.     As set forth above, the Seller has demonstrated compelling and sound business justifications for authorizing the entry into the Purchase and Sale Agreement and the ultimate sale of the Property.  The sale of the Property will afford the Seller's estate an opportunity to maximize the recovery for creditors.  Accordingly, the Debtors request that the Court approve

NNI's entry into the Purchase and Sale Agreement and authorize the Debtors to take such steps as are necessary to consummate the Transactions.

**B.      Provision of the Expense Reimbursements Are Necessary**

32.      The Seller believes that the provision of the Expense Reimbursements was necessary to induce the Purchaser to expend the time, energy and resources necessary to negotiate and enter into the Purchase and Sale Agreement, and believes that the Purchaser will have provided substantial benefit to NNI by entering into the Purchase Agreement even if the Sale Order approving the Sale to the Purchaser is ultimately not entered.  Therefore, the Seller submits that the Expense Reimbursements, if payable, constitute administrative expenses of the Seller's estate with priority pursuant to Bankruptcy Code sections 503(b) and 507(a)(2) of the Bankruptcy Code.

**C.      The Nortel License Is a Product of the Seller's Reasonable Business Judgment**

33.      Sound business purposes justify entry into the Nortel License.  As mentioned above, the Seller will continue to need space at the Property.  The Nortel License and the rent abatement therein will enable the Seller to meet its ongoing space needs at the Property without the costs associated with maintaining the whole Property.

34.      Accordingly, the Debtors request that the Court approve the Seller's entry into the Nortel License and authorize the Seller to perform thereunder.

**D.      The Sale of the Property By a Private Sale without Auction is Justified**

35.      Under Bankruptcy Rule 6004, a Debtor may sell assets outside of the ordinary course of business by private sale or public auction.  See Fed. R. Bankr. P. 6004 ("All sales not in the ordinary course of business may be by private sale or by public auction.").

36.      The Seller believes that the sale of the Property by means of a private sale to the Purchaser is the best way to maximize value for its estate.  As described above, the Seller has

15

exhaustively marketed the Property for sale since mid-2009 and has contacted hundreds of

potential purchasers.  The Seller believes that further marketing the Property will not bring any

additional offers and will waste the Seller's time and money to the detriment of its creditors and

estates.

**E.    The Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)**

37.    As described above, the Seller and the Purchaser negotiated the Transactions in

good faith and at arm's-length.  Accordingly, the Seller maintains that the Purchaser is entitled to

the protections afforded by Bankruptcy Code section 363(m).

38.    Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

39.    While the Bankruptcy Code does not define "good faith," the Third Circuit in In

re Abbotts Dairies of Pa., Inc., has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to
> the integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated

Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding

that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take

grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610

(S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re

Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case,

concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

40.     The Seller and the Purchaser have spent a considerable amount of time and

resources negotiating the Transactions at arm's-length, with give and take on both sides.  Under

the circumstances, this Court should find that the Purchaser is entitled to all of the protections of

Bankruptcy Code section 363(m).

**F.     The Purchase and Sale Agreement is Not the Subject of Collusive Bidding Under
Bankruptcy Code Section 363(n)**

41.     As set forth above, the Seller has negotiated with the Purchaser at arm's length

and in good faith regarding the sale of the Property.  Moreover, the Seller does not believe that

any such sale will be the result of collusion or other bad faith between bidders or that the sale

price under the Purchase and Sale Agreement has been controlled by an agreement between

potential or actual bidders within the meaning of Bankruptcy Code section 363(n).

42.     As set forth above, the Transactions with the Purchaser have been negotiated, and

proposed, and will be entered into by NNI and the Purchaser without collusion, in good faith,

and from arm's-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged

in any conduct that would cause or permit the Purchase and Sale Agreement to be avoided under

Bankruptcy Code section 363(n).

**G.     Privacy Ombudsman**

43.     Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer

customer list containing personal information relating to individual persons is inconsistent with

the Debtors' consumer privacy policy, section 332 governs the appointment of a consumer

17

privacy ombudsman.   11 U.S.C. § 363(b)(1).   The Debtors do not have a consumer privacy policy and no customer relationships are being transferred as part of the Transactions, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**H.    Sale of the Property Should Be Free and Clear of Encumbrances**

44.    Pursuant to section 363(f) of the Bankruptcy Code, NNI seeks authority to sell and transfer its right, interest and title in the Property to the Purchaser free and clear of all Encumbrances, except as set forth in the Purchase and Sale Agreement, with such Encumbrances to attach to the proceeds of the sale of the Property as applicable, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.   Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).   See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written in the disjunctive and thus, court may approve sale "free and clear" provided at least one of the requirements is met).

45.    With respect to each creditor that asserts an Encumbrance, NNI submits that one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) will be satisfied.   Those

holders of Encumbrances who do not object or who withdraw their objections to the Motion or the Transactions will be deemed to have consented to the Motion and Transactions pursuant to Bankruptcy Code § 363(f)(2).  NNI also submits that holders of Encumbrances who do object will fall within one or more of the other subsections of Bankruptcy Code section 363(f).  NNI notes that it is not aware of any liens on the Property that are material in relation to the value of the Property.

46.    A sale free and clear of Encumbrances is necessary to maximize the value of the Property.  The Purchaser would not have entered into the Purchase and Sale Agreement and will not consummate the Transactions if the sale of the Property to the Purchaser is not free and clear of all Encumbrances (except as permitted by the Purchase and Sale Agreement).  A sale of the Property other than one free and clear of all Encumbrances would yield substantially less value for the Seller's estate, with less certainty than the proposed Transactions.   Therefore, the Transactions contemplated by the Purchase and Sale Agreement are in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  A sale free and clear of Encumbrances is particularly appropriate under the circumstances because any lien or claim in, to or against the Seller's right, interest and title in the Property that exists immediately prior to the closing of the Transactions will attach to the sale proceeds with the same validity, priority, force and effect as existed with respect to the Property at such time, subject to the rights and defenses of the Debtors or any party in interest.   The Seller submits that holders of Encumbrances, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their claims and interests.

I.     **Notice of the Proposed Sale Is Reasonable Under the Circumstances**

47.     The Seller submits that the Sale Notice as set forth above, along with the Publication Notice in The Wall Street Journal (Wednesday National Edition) and The Dallas Morning News is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the proposed Transactions, the Sale Hearing and the deadline to object to the Sale.

J.     **Filing of Schedules and Certain Service Lists Under Seal**

48.     The Seller respectfully submits that it is appropriate to allow certain exhibits and schedules to the Purchase and Sale Agreement (the "Schedules") and certain affidavits of service listing entities invited by the Seller to acquire the Property to be filed under seal.  The Schedules contain substantial sensitive commercial information concerning the Debtors and related records and documentation, and the above mentioned affidavits of service will contain proprietary lists of contacts maintained by CBRE.

49.     The relief requested by the Seller is squarely authorized under the Bankruptcy Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information. . . .

11 U.S.C. § 107(b).

50.     Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

51.    This Court has defined "commercial information" in the context of section 107(b) as follows:

> Commercial information is information which would result in 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section 107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid 'affording an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr. D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

52.    Since information in the Schedules and the above-mentioned affidavits of service is "commercial information" within the ambit of section 107, and the Court should enter an order permitting the Debtors to file the Schedules and affidavits of service under seal.

53.    Disclosure of this confidential commercial information would be damaging to the Seller, the Purchaser and CBRE if it is disclosed.  The filing of the Schedules and affidavits of service under seal is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein.

## K.    Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)

54.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal

before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

55.    Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transactions to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

56.    Pursuant to the Purchase and Sale Agreement, and because of the potentially diminishing value of the Property, the Seller must close this sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

## Notice

57.    Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to (i) counsel to the Purchaser; (ii) the Office of the U.S. Trustee; (iii) counsel to the Committee; (iv) counsel to the Bondholder Group; (v) the Monitor; (vi) all taxing authorities or recording offices which have a reasonably known interest in the relief requested; (vii) all United States federal, state and local regulatory authorities with jurisdiction over the Debtors; (viii) each of the entities that had received an invitation from the Seller to acquire the Property within the past eighteen months; (ix) the counterparties to the Leases (as defined in the Assignment and Assumption Agreement), (x) all entities reasonably known by the Debtors to have asserted a lien against the Property; and (xi) the general service list established in these

chapter 11 cases pursuant to Bankruptcy Rule 2002.    The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

58.    No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  April 15, 2011
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Alissa T. Gazze*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Alissa T. Gazze (No. 5338)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

24