## EXHIBIT A

**Purchase and Sale Agreement**

PURCHASE AND SALE AGREEMENT

between

NORTEL NETWORKS INC.,
a Delaware corporation,

as SELLER,

and

PILLAR COMMERCIAL, LLC,
a Texas limited liability company,

as PURCHASER.

Premises:  2201 and 2221 Lakeside Boulevard,
City of Richardson, Dallas County, Texas

April 15th, 2011

NEWYORK:2370468.17

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | DEFINITIONS. | 2 |
| 2. | PURCHASE AND SALE. | 12 |
| 3. | ACCESS. | 12 |
| 4. | PURCHASE PRICE AND DEPOSIT. | 13 |
| 5. | PERMITTED ENCUMBRANCES. | 17 |
| 6. | TITLE INSURANCE; LIENS; DUE DILIGENCE. | 18 |
| 7. | APPORTIONMENTS. | 20 |
| 8. | PROPERTY NOT INCLUDED IN SALE. | 22 |
| 9. | COVENANTS AND OTHER AGREEMENTS | 22 |
| 10. | ASSIGNMENTS BY SELLER AND ASSUMPTIONS BY PURCHASER. | 24 |
| 11. | CONDITIONS TO EFFECTIVENESS AND CLOSING. | 24 |
| 12. | CONDITION OF THE PROPERTY. | 26 |
| 13. | SELLER REPRESENTATIONS. | 27 |
| 14. | PURCHASER REPRESENTATIONS. | 29 |
| 15. | CASUALTY. | 31 |
| 16. | CONDEMNATION. | 33 |
| 17. | BROKERS AND ADVISORS. | 34 |
| 18. | TAX REDUCTION PROCEEDINGS. | 34 |
| 19. | TRANSFER TAXES AND TRANSACTION COSTS. | 35 |
| 20. | DELIVERIES TO BE MADE ON THE CLOSING DATE. | 35 |
| 21. | CLOSING DATE; TERMINATION. | 37 |
| 22. | NOTICES. | 39 |
| 23. | DEFAULT BY PURCHASER OR SELLER. | 41 |
| 24. | MISCELLANEOUS | 42 |

i

Schedules

| | |
|---|---|
| A | Description of the Land |
| B-1 | Included Personalty |
| B-2 | Excluded Personalty |
| C-1 | Third Party Leases |
| C-2 | INTENTIONALLY OMITTED |
| D | Assumed Contracts |
| E | Specified Encumbrances |
| F | Title Report |
| G | Escrow Agent's Wire Instructions |
| H | Closing Documents |

Exhibits

| | |
|---|---|
| 1 | Form of Deed |
| 2 | Form of Bill of Sale |
| 3 | Form of FIRPTA Affidavit |
| 4 | Form of Omnibus Assignment and Assumption Agreement |
| 5 | INTENTIONALLY OMITTED |
| 6 | Form of Title Affidavit |
| 7 | Form of Assignment and Assumption of Third Party Leases Agreement |
| 8 | Form of Nortel License |

NEWYORK 2370468.17

THIS PURCHASE AND SALE AGREEMENT (together with the Schedules and Exhibits hereto, this "Agreement") is made as of April 15th, 2011 between NORTEL NETWORKS INC., a Delaware corporation ("Seller"), having an office at 2221 Lakeside Boulevard, Richardson, Texas 75082, as seller, and PILLAR COMMERCIAL, LLC, a Texas limited liability company having an address at 10440 N. Central Expressway, Suite 500, Dallas, Texas 75231, as purchaser ("Purchaser"). Purchaser and Seller are each a "Party" and, collectively, the "Parties."

WITNESSETH:

WHEREAS, Seller is the owner and holder of the fee simple estate in and to that certain plot, piece and parcel of land (the "Land") known as 2201 and 2221 Lakeside Boulevard, Richardson, Texas and more particularly described in Schedule A, together with the buildings and all other improvements thereon, including: (i) a sixteen (16) story office building (the "Tower") and (ii) a research and laboratory building (the "Lab"; the Lab, together with the Tower, the "Buildings") located on the Land (the improvements on the Land, including the Buildings, together with the Land, collectively, the "Premises");

WHEREAS, Seller and certain Affiliates of Seller (the "U.S. Debtors") are debtors-in-possession under Title 11 of the United States Code (the "Bankruptcy Code") having generally commenced cases under Chapter 11 of the Bankruptcy Code on January 14, 2009 (the "Petition Date") by filing voluntary petitions for relief (the "Chapter 11 Cases") in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the unsecured creditors of the estates of the U.S. Debtors (the "Committee") and the Bondholder Group (as defined below) has been organized;

WHEREAS, Seller desires to sell the Property (as defined below) to Purchaser and to enter into the Nortel License (as defined below), including, to the extent applicable, pursuant to Sections 363 and 365 of the Bankruptcy Code, and Purchaser desires to purchase the Property from Seller and to enter into the Nortel License, in each case upon and, subject to the terms and conditions of this Agreement;

WHEREAS, Seller and Purchaser acknowledge and agree that the consummation of the transactions set forth herein, including the purchase by Purchaser of the Property and the execution and delivery of the Nortel License, is being made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of Seller or its Affiliates;

WHEREAS, prior to the date hereof, Seller and its Affiliates have entered agreements for the disposition of various businesses (and related assets), operations of which occur at the Premises (any such agreement, together with all exhibits and schedules and ancillary agreements related thereto, as the same may be amended, restated or otherwise modified from time to time, a "Nortel Sale Agreement");

WHEREAS, in connection' with the Nortel Sale Agreements, Seller and its Affiliates have, among other things, sold various Personalty (as defined below) which comprises certain of the Excluded Personalty (as defined below) located at the Premises and have provided, pursuant to the Third Party Leases (as defined below), various occupancy rights and leasehold interests with respect to portions of the Premises to the purchasers, their Affiliates or designees under such Nortel Sale Agreements (collectively, "Third Party Purchasers"; any such Personalty, rights or interests acquired by Third Party Purchasers pursuant to a Nortel Sale Agreement, "Third Party Acquired Assets"); and

WHEREAS, Purchaser agrees to assume Seller's obligations under the Third Party Leases so that Seller is irrevocably released from any continuing liability thereunder;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

1.    DEFINITIONS.

The following terms have the meanings set forth below:

| | |
|---|---|
| "Action" | means any civil, criminal or administrative claim, demand, action, suit, proceeding (public or private), investigation, hearing, litigation, prosecution, arbitration, mediation or audit by or before any Government Entity. |
| "Additional Deposit" | has the meaning set forth in Section 4(a). |
| "Adjourned Closing Date" | has the meaning set forth in Section 6(a)(iv). |
| "Affiliate" | means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made.  For purposes of this definition, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Persons means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise. |
| "Agreement" | has the meaning set forth in the Preamble. |
| "Alternative Transaction" | means the sale, transfer or other disposition, directly or indirectly, of all or substantially all of the Property, in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates; provided, however, that an "Alternative Transaction" shall not include: (i) the retention of the Property by the Seller (or its successor entit(ies) emerging from its Chapter 11 Case) under a stand |

2

| | |
|---|---|
| | alone plan of reorganization or plan of arrangement approved by the Bankruptcy Court, (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Property in connection with the closure, liquidation or winding up of the Seller, or (iii) the conversion of the Seller's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code. |
| "Anti-Money Laundering Laws" | means all Laws, regulations and sanctions, state and federal, criminal and civil, that: (i) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (ii) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (iii) require identification and documentation of the parties with whom a Financial Institution conducts business; or (iv) are designed to disrupt the flow of funds to terrorist organizations.  Such Laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. Seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. Seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. Seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as Laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957. |
| "Apportionment Date" | has the meaning set forth in Section 7(a). |
| "Asbestos" | has the meaning set forth in the definition of Hazardous Materials. |
| "Assumed Contracts" | has the meaning set forth in Section 13(a)(iii). |
| "Bankruptcy Code" | has the meaning set forth in the Recitals. |
| "Bankruptcy Consents" | has the meaning set forth in Section 13(a)(i). |
| "Bankruptcy Court" | has the meaning set forth in the Recitals. |
| "Bankruptcy Rules" | has the meaning set forth in Section 9(a). |
| "Bill of Sale" | means the Bill of Sale in the form attached hereto as Exhibit 2. |
| "Bondholder Group" | means the ad hoc group of bondholders organized in the Chapter 11 Cases. |
| "Broker" | has the meaning set forth in Section 17(a). |
| "Buildings" | has the meaning set forth in the Recitals. |
| "Business Day" | means every day other than Saturdays, Sundays, all days observed by the federal or Texas or New York State government as legal holidays and all days on which |

3

|  | commercial banks in Texas or New York State are required by Law to be closed. |
|---|---|
| "Casualty Election Date" | means the tenth (10th) day following Seller's delivery of its written reasonable estimate of the cost of repair or restoration for the applicable casualty. |
| "Chapter 11 Cases" | has the meaning set forth in the Recitals. |
| "Charges" | shall include (i) all documentary, recording, filing and related Taxes and charges and other expenses incurred in connection with the Closing Documents, (ii) amounts required to be paid to third parties (including any Government Entity) to cause the state of title to be as described in the Title Insurance Policy, as applicable, and (iii) the premiums payable to the Escrow Agent for the issuance of the Title Insurance Policy, in addition to all other amounts listed on the Preliminary Closing Statement. |
| "Claim" | has the meaning set forth in section 101(5) of the Bankruptcy Code. |
| "Closing" | has the meaning set forth in Section 21(a). |
| "Closing Date" | has the meaning set forth in Section 21(a). |
| "Closing Documents" | shall mean those documents set forth on Schedule H. |
| "Code" | means the Internal Revenue Code 1986, as amended, and any regulations promulgated thereunder. |
| "Commitment Objections" | has the meaning set forth in Section 6(a)(ii). |
| "Committee" | has the meaning set forth in the Recitals. |
| "Condemnation Election Date" | means the tenth (10th) day following Seller's delivery of its written reasonable estimate of the percentage of the Building(s) subject to the applicable Taking. |
| "Consent" | means any approval, authorization, consent, Order, license, permission, Permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Person that is neither a Party nor an Affiliate of a Party. |
| "Contract" | means any agreement, contract, commitment, instrument, undertaking, lease, note, mortgage, indenture, sales or purchase order, license or arrangement, whether written or oral. |
| "Covered Loss" | means any and all losses, costs, liens, liabilities, expenses, claims, fines, deficiencies, damages, obligations, payments (including those arising out of any settlement, judgment or compromise relating to any Action), Taxes and reasonable out-of-pocket costs and expenses (including reasonable out-of-pocket attorneys' and accountants' fees and any other |

4

|  | reasonable out-of-pocket expenses incurred in investigating, preparing, defending or settling any Action and interest and penalties with respect to Taxes) that are due and payable, including any of the foregoing arising under, out of or in connection with any Violation, Action, Order or award of any arbitrator of any kind, or any Law or Contract; <u>provided</u> that in no event shall Covered Loss include any special, consequential or punitive damages or any lost profits. |
|---|---|
| "<u>day</u>" | has the meaning set forth in <u>Section 24(n)(viii)</u>. |
| "<u>Deed</u>" | means the Special Warranty Deed in the form attached hereto as <u>Exhibit 1</u>. |
| "<u>Default Rate</u>" | means the Prime Rate (as such rate may vary from time to time) as reported in *The Wall Street Journal* plus five (5) percent. |
| "<u>Deposit</u>" | has the meaning set forth in <u>Section 4(a)</u>. |
| "<u>Diligence Party</u>" | means any of Purchaser and any direct or indirect officers, directors, employees, agents, consultants, Affiliates, attorneys and representatives of Purchaser who were involved in the negotiation of this Agreement, the review of any Leases, Contracts or other information relating to the Property, the preparation of the Diligence Reports or the performance of the Due Diligence conducted in order to prepare the same, or who otherwise approved the transactions contemplated hereunder. |
| "<u>Diligence Report</u>" | means the results of any examinations, inspections, investigations, tests, studies, analyses, appraisals, evaluations and/or investigations prepared by, for or otherwise obtained by or on behalf of Purchaser in connection with the transactions contemplated hereunder. |
| "<u>Disclosed Survey Items</u>" | has the meaning set forth in <u>Section 5(a)</u>. |
| "<u>Due Diligence</u>" | means the examination, evaluation, analysis, appraisals, inspections and reviews of Diligence Reports by Purchaser. |
| "<u>Encumbrance</u>" | means any security interest, pledge, mortgage, lien (as defined in section 101(37) of the Bankruptcy Code, including liens imposed by Law, such as but not limited to, mechanics' liens), charge, hypothecation, option to purchase or lease or otherwise acquire any interest, conditional sales agreement, adverse claim of ownership or use, title defect, easement, right of first refusal, encumbrance of any other kind, right of way or claim (as defined in section 101(5) of the Bankruptcy Code). |
| "<u>Environmental Laws</u>" | means all federal, state and local Laws, statutes, ordinances and regulations, as in effect as of the Closing Date, in each case as amended or supplemented from time to time, including, |

5

without limitation, all applicable judicial or administrative Orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos (including, without limitation, 40 C.F.R. Part 61, Subpart M, the United States Environmental Protection Agency Guidelines on Mold Remediation in Schools and Commercial Buildings, the United States Occupational Safety and Health Administration regulations pertaining to Asbestos including, without limitation, 29 C.F.R. Sections 1910.1001 and 1926.58), applicable Texas State and Richardson City statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous Materials, and any state or local counterpart or equivalent of any of the foregoing, and any related federal, state or local environmental or property transfer of ownership notification or approval statutes.

| | |
|---|---|
| "ERISA" | has the meaning set forth in Section 14(a)(v). |
| "Escrow Account" | has the meaning set forth in Section 4(a). |
| "Escrow Agent" | means the Title Company. |
| "Excluded Personalty" | has the meaning set forth in Article 8. |
| "Expense Reimbursement" | has the meaning set forth in Section 21(d)(ii). |
| "FCPA" | has the meaning set forth in Section 14(a)(vii). |
| "Final Closing Statement" | has the meaning set forth in Section 7(c). |
| "Final Order" | means an order of the Bankruptcy Court or other court of competent jurisdiction (a) as to which no appeal, notice of appeal, motion for leave to amend, motion to amend or make |

6

additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility of further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that, with respect to an order issued by the Bankruptcy Court, the filing or pendency of a motion under the Federal Rule of Bankruptcy Procedure 9024 ("Rule 9024") or Federal Rule of Civil Procedure 60 ("Rule 60") shall not cause an order not to be deemed a "Final Order".

"Financial Institution"     means a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended.

"Government Entity"     means any U.S., Canadian and any other applicable supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"Hazardous Materials"     means (i) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under Environmental Law, or any of them, (ii) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (iii) natural gas, synthetic gas and any mixtures thereof, (iv) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non friable (collectively, "Asbestos"), (v) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (vi) radon, (vii) mold, (viii) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (ix) any other substance with respect to which any Environmental Law or Government Entity requires environmental investigation, monitoring or remediation.

"Included Personalty"     has the meaning set forth in Section 2.

"Independent Consideration"     has the meaning set forth in Section 24(p).

7

NEWYORK:2370468.17

"Initial Deposit"                    has the meaning set forth in Section 4(a).

"JCI Person"                         means Matt Briske, (972) 684-1756.

"Lab"                                has the meaning set forth in the Recitals.

"Law"                                means any applicable national, foreign, supranational,
                                     domestic, federal, territorial, state, provincial, local or
                                     municipal statute, law, common law, ordinance, rule,
                                     regulation, judicial, administrative or other Order, writ,
                                     injunction, directive, judgment, decree or policy or guideline
                                     having the force of law.

"Land"                               has the meaning set forth in the Recitals.

"Lease"                              means a lease, license or other occupancy agreement demising
                                     or granting the right to occupy space at the Premises, together
                                     with all amendments and modifications thereof.

"Limited Expense                     has the meaning set forth in Section 21(d)(i).
Reimbursement"

"New Closing Notice"                 has the meaning set forth in Section 6(d).

"Non-Objectionable                   means any Encumbrances (i) over which the Title Company is
Encumbrances"                        willing to insure (without additional cost to Purchaser or where
                                     Seller pays such cost for Purchaser), (ii) against which the Title
                                     Company is willing to provide affirmative insurance (without
                                     additional cost to Purchaser or where Seller pays such cost for
                                     Purchaser), (iii) which may be extinguished upon the transfer
                                     of the Property (including, without limitation, pursuant to the
                                     Sale Order), (iv) which are the responsibility of any Tenant to
                                     cure, correct or remove pursuant to an express provision in the
                                     relevant Third Party Lease or (v) which do not adversely affect
                                     the current or future use of any portion of the Premises
                                     consistent with the uses permitted at the Premises as of the date
                                     hereof.

"Nortel License "                    means the  license to be executed by and between Seller, as
                                     licensee, and Purchaser, as licensor, in the form attached hereto
                                     as Exhibit 8.

"Nortel Sale Agreement"              has the meaning set forth in the Recitals.

"Notices"                            has the meaning set forth in Article 22.

"OFAC"                               has the meaning set forth in Section 14(a)(vi).

"Order"                              means an order or decree or similar instrument of any
                                     Government Entity.

"Party"                              has the meaning set forth in the Preamble.

8

| | |
|---|---|
| "Patriot Act" | has the meaning set forth in the definition of Anti-Money Laundering Laws. |
| "PCBs" | has the meaning set forth in the definition of Hazardous Materials. |
| "Permit" | means permits, licenses, franchises, variances, exemptions, exceptions, and other governmental authorizations, consents, clearances and approvals from any Government Entity. |
| "Permitted Encumbrances" | has the meaning set forth in Article 5. |
| "Person" | means an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity. |
| "Personalty" | means fixtures, furnishings, fittings, apparatus, furniture, equipment, machinery, inventory, appliances and other personal property. |
| "Petition Date" | has the meaning set forth in the Recitals. |
| "Preliminary Closing Statement" | has the meaning set forth in Section 7(b). |
| "Premises" | has the meaning set forth in the Recitals. |
| "Property" | has the meaning set forth in Section 2. |
| "Property Contract" | means the service, maintenance, utility, equipment, supply, commission and other Contracts relating to the operation, ownership, use and maintenance of the Premises, together with all amendments and modifications thereof. |
| "Property Taxes" | means real estate Taxes, sewer rents and Taxes, water rates and charges, trash and other similar charges, vault charges and Taxes, business improvement district Taxes and assessments and any other governmental Taxes, charges or assessments levied or assessed against the Premises by a Taxing Authority. |
| "Purchase Price" | has the meaning set forth in Article 4. |
| "Purchaser" | has the meaning set forth in the Preamble. |
| "Purchaser Party" | has the meaning set forth in Section 14(a)(vi). |
| "Purchaser's Representatives" | has the meaning set forth in Section 3(a). |
| "Purchaser's Broker" | has the meaning set forth in Section 17(a). |
| "Release" | means, when used in conjunction with Hazardous Materials, any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, |

9

| | |
|---|---|
| | migrating, dumping, or disposing into the environment. |
| "Remediation" | means any investigation, removal, cleanup, or other remediation of Hazardous Materials. |
| "Rule 60" | has the meaning set forth in the definition of Final Order. |
| "Rule 9024" | has the meaning set forth in the definition of Final Order. |
| "Sale Hearing" | means the hearing to be held by the Bankruptcy Court in which Seller will seek entry of the Sale Order. |
| "Sale Motion" | has the meaning set forth in Section 9(a). |
| "Sale Order" | has the meaning set forth in Section 9(a). |
| "Seller" | has the meaning set forth in the Preamble. |
| "Seller Parties" | has the meaning set forth in Section 3(c). |
| "Seller's Actual Knowledge" | has the meaning set forth in Article 13. |
| "Seller's Broker" | has the meaning set forth in Section 17(b). |
| "Seller Knowledge Individual" | means Allan Lane. |
| "Survey" | means that certain ALTA/ACSM Land Title Survey prepared by CSSI Commercial Surveying Specialists, Inc., under the supervision of Earl N. Strom (RPLS No. 4123), dated December 9, 2009, and last revised January 12, 2010, as the same may be updated, amended or modified prior to the date hereof. |
| "Taking" | has the meaning set forth in Section 16(a). |
| "Tax" | means all taxes, fees, levies or other assessments imposed by a Taxing Authority, including income, prohibited transaction, gross receipts, excise, real and personal property, municipal, withholding, capital, sales, use, transfer, license, payroll and franchise taxes, and such term will include any interest, penalties, or additions to tax attributable to such taxes, fees, levies or other assessments or to the failure to properly comply with withholding and information reporting requirements relating to taxes. |
| "Tax Certiorari Proceeding" | has the meaning set forth in Article 18. |
| "Tax Period" | has the meaning set forth in Section 7(a)(i). |
| "Taxing Authority" | means any Government Entity responsible for the administration or imposition of any Tax. |
| "Tenant" | means any tenant, licensee or other occupant or user under a Lease, including, without limitation, the Third Party Purchasers, and any Persons claiming by, through or under such Person or Lease. |

10

| | |
|---|---|
| "Termination Date" | has the meaning set forth in Section 21(b)(ii). |
| "Third Party Acquired Assets" | has the meaning set forth in the Recitals. |
| "Third Party Lease" | means the Leases set forth on Schedule C-1. |
| "Third Party Purchasers" | has the meaning set forth in the Recitals. |
| "Title Affidavit" | means the Title Affidavit attached hereto as Exhibit 6. |
| "Title Company" | means Chicago Title Insurance Company, 711 Third Avenue, New York, New York 10017 (attention Elliot L. Hurwitz). |
| "Title Cure Period" | has the meaning set forth in Section 6(a)(iv). |
| "Title Insurance Policy" | has the meaning set forth in Section 11(b)(iii). |
| "Title Objections" | has the meaning set forth in Section 6(a)(iii). |
| "Title Report" | means that certain Title Commitment with respect to the Title Insurance Policy issued by the Title Company on March 31, 2011 and effective March 16, 2011, designated Commitment Number 44-901-80-TNB3703-A and attached hereto as Schedule F. |
| "Tower" | has the meaning set forth in the Recitals. |
| "Transfer Taxes" | means the transfer Taxes, if any, payable pursuant to Transfer Tax Laws. |
| "Transfer Tax Laws" | means any Law of any applicable Taxing Authority that imposes a Tax in connection with the transfer of title to the Premises and/or the recordation of the Deed and the regulations applicable thereto, as the same may be amended from time to time. |
| "Underlying Documents" | has the meaning set forth in Section 6(a)(i). |
| "Update Exception" | has the meaning set forth in Section 6(a)(iii). |
| "Update Objection Deadline" | has the meaning set forth in Section 6(a)(iii). |
| "Update Objections" | has the meaning set forth in Section 6(a)(iii). |
| "U.S. Debtors" | has the meaning set forth in the Recitals. |
| "Utilities" | means all electricity, water, steam, gas, telephone, and sewer or other similar services with respect to the Premises. |
| "Utility Encumbrance" | has the meaning set forth in Section 5(g). |
| "Violations" | means notes or notices of violations of Law, or municipal ordinances, Orders, designations, or requirements whatsoever noted in or issued by any federal, state, municipal or other governmental department, board, committee, manager, agency, bureau or any other Government Entity having jurisdiction over the Premises by Law. |

11

2.    PURCHASE AND SALE.

(a)    Subject to the terms and conditions hereof, Seller shall sell, assign and convey to Purchaser, and Purchaser shall purchase and assume from Seller, free and clear of all Encumbrances other than Permitted Encumbrances, to the fullest extent permitted by applicable Law, including, without limitation, Section 363 of the Bankruptcy Code, all of Seller's right, title and interest in and to: (i) the Premises; (ii) the Personalty listed on Schedule B-1, subject to depletions, replacements, or additions thereto in the ordinary course of business occurring at the Premises (the "Included Personalty"); and (iii) all rights, privileges and appurtenances relating to the foregoing items in clauses (i) and (ii) (the items described in the foregoing clauses (i), (ii) and (iii) are, collectively, the "Property").  Notwithstanding anything contained herein to the contrary, the Property shall not include any Excluded Personalty.

(b)    Purchaser agrees that Purchaser shall pay any and all State of Texas and City of Richardson sales and/or compensating use Taxes imposed upon or due in connection with the transactions contemplated hereunder under applicable Law.  Purchaser shall file all necessary Tax returns with respect to all such Taxes and, to the extent required by applicable Law, Seller will join in the execution of any such Tax returns.  The provisions of this Section 2(b) shall survive the Closing.

3.    ACCESS.

(a)    Subject to the provisions of Section 3(b), Purchaser and its agents, employees, consultants, inspectors, appraisers, engineers and contractors (collectively, "Purchaser's Representatives") shall have the right, through the earlier of (i) the termination of this Agreement in accordance with the terms hereof and (ii) the Closing Date, from time to time, upon the advance notice required pursuant to Section 3(b), to enter upon and pass through the Premises during normal business hours to examine and inspect the same.  Without limiting the generality of the foregoing, Purchaser shall have no right to terminate this Agreement or obtain a return of the Deposit except as expressly provided in Sections 6(b), 11(d)(ii), 15(a)(ii), 16(a)(ii), 21(c) and 23(b).

(b)    In conducting any inspection of the Premises or otherwise accessing the Premises, Purchaser shall at all times comply with all Laws of all applicable Government Entities, and neither Purchaser nor any of Purchaser's Representatives shall (i) contact or have any discussions with any of Seller's employees, agents or representatives, or with any Tenants at, or contractors providing services to, the Premises, unless in each case Purchaser obtains the prior written consent of Seller, it being agreed that all such contacts or discussions shall, pending any such approval, be directed to Allan Lane or, if someone at or near the Premises must be contacted, the JCI Person, (ii) interfere with the business of Seller or any of its Tenants conducted at the Premises or disturb the use or occupancy of Seller or any of its Tenants or (iii) damage the Premises.  In conducting the foregoing inspection or otherwise accessing the Premises, Purchaser and Purchaser's Representatives shall at all times comply with, and shall be subject to, the rights of the Tenants.  Seller may from time to time establish reasonable rules of conduct for Purchaser and Purchaser's Representatives in furtherance of the foregoing. Purchaser shall schedule and coordinate all inspections or other access with Seller and shall give

12

Seller at least two (2) Business Days' prior written notice, which written notice shall contain a description of the nature and scope of any such inspection. Seller shall be entitled to have a representative present at all times during each such inspection or other access. Purchaser agrees to pay to Seller on demand the cost of repairing and restoring any damage which Purchaser or Purchaser's Representatives shall cause to the Property. All inspection fees, appraisal fees, engineering fees and other costs and expenses of any kind incurred by Purchaser or Purchaser's Representatives relating to such inspection and its other access shall be at the sole expense of Purchaser. In the event that the Closing hereunder shall not occur for any reason whatsoever, Purchaser shall: (A) if Seller requests, promptly deliver to Seller, at no cost to Seller, and without representation or warranty, the originals of all tests, reports and inspections of the Premises, made and conducted by or on behalf of Purchaser which are in the possession or control of Purchaser or Purchaser's Representatives, and (B) promptly return to Seller copies of all Due Diligence materials delivered by Seller to Purchaser and shall destroy all copies and abstracts thereof. Purchaser and Purchaser's Representatives shall not be permitted to conduct borings of the Premises or drilling in or on the Premises, or any other invasive testing, in connection with the preparation of an environmental assessment, or in connection with any other inspection of the Premises. The provisions of <u>Section 3(b)</u> shall survive the Closing or any termination of this Agreement.

(c)    Purchaser agrees to (i) defend, indemnify and hold harmless Seller and its disclosed or undisclosed, direct and indirect shareholders, officers, directors, trustees, partners, principals, members, employees, agents, Affiliates, representatives, consultants, accountants, contractors and attorneys or other advisors, and any successors or assigns of the foregoing (collectively with Seller, "<u>Seller Parties</u>") from and against any and all Covered Losses incurred by any of Seller Parties arising from or by reason of Purchaser's and/or Purchaser's Representatives' access to, or inspection of, the Premises and (ii) maintain at all times prior to Closing general liability insurance coverage not less than that reflected on the Acord Certificate of Liability Insurance dated March 30, 2011 delivered to Seller and identifying Seller as an additional insured thereunder. The provisions of <u>Section 3(c)</u> shall survive the Closing or any termination of this Agreement.

4.    PURCHASE PRICE AND DEPOSIT.

The purchase price to be paid by Purchaser to Seller for the Property (the "<u>Purchase Price</u>") is $43,100,000.00, subject to apportionment as provided in <u>Article 7</u> and payable in cash as follows:

(a)    Purchaser has previously deposited $2,500,000.00 (the "<u>Initial Deposit</u>") to an escrow account (the "<u>Escrow Account</u>") of Escrow Agent in accordance with the wire instructions set forth on <u>Schedule G</u>. If Purchaser intends on proceeding with the transactions contemplated herein, then within one (1) Business Day of the later of (i) mutual execution of this Agreement and (ii) April 12, 2011, Purchaser shall deliver a wire transfer in immediately available funds in the amount of $2,500,000.00 to the Escrow Account (the "<u>Additional Deposit</u>" together with the Initial Deposit, the "<u>Deposit</u>"). Upon the delivery of the Additional Deposit by Seller, the Deposit shall be non-refundable except as expressly provided in <u>Sections 6(b)</u>, <u>11(d)(ii)</u>, <u>15(a)(ii)</u>, <u>16(a)(ii)</u>, <u>21(c)</u> and <u>23(b)</u>.

13

(b)    At the Closing, Seller shall be entitled to retain the Deposit (together with all of the interest accrued thereon) and Purchaser shall deliver the balance of the Purchase Price (i.e., the Purchase Price less the Deposit (but without deduction for any interest accrued thereon)), as adjusted pursuant to Article 7.

(c)    (i)    Escrow Agent shall cause the Deposit to remain deposited in the Escrow Account or another interest bearing account at Citibank, N.A., or another commercial bank in New York, New York, that is reasonably acceptable to Seller and Purchaser, it being agreed that Escrow Agent shall not be liable for (y) any loss of such investment (unless due to Escrow Agent's gross negligence, willful misconduct or breach of this Agreement) or (z) any failure to attain a favorable rate of return on such investment. Escrow Agent shall deliver such portion of the Deposit, and the interest accrued thereon, to Seller or to Purchaser, as the case may be, under the following conditions:

(1)    the Deposit (together with all interest accrued thereon) shall be delivered to Seller at the Closing as set forth pursuant to Section 4(d);

(2)    the Deposit, and the interest accrued thereon, shall be delivered to Seller following receipt by Escrow Agent of written demand therefor from Seller stating that Purchaser has defaulted in the performance of its obligations under this Agreement, or that this Agreement was terminated under circumstances entitling Seller to retain the Deposit, and specifying the Section of this Agreement which entitles Seller to retain the Deposit, in each case provided Purchaser shall not have given written notice of objection in accordance with the provisions set forth below;

(3)    the Deposit, and the interest accrued thereon, shall be delivered to Purchaser following receipt by Escrow Agent of written demand therefor from Purchaser stating that Seller has defaulted in the performance of its obligations under this Agreement or that this Agreement was terminated under circumstances entitling Purchaser to the return of the Deposit (including, without limitation, Sections 6(b), 11(d)(ii), 15(a)(ii), 16(a)(ii), 21(c) and Section 23(b)), and specifying the Section of this Agreement which entitles Purchaser to the return of the Deposit, in each case provided Seller shall not have given written notice of objection in accordance with the provisions set forth below; or

(4)    the Deposit, and the interest accrued thereon, shall be delivered to Purchaser or Seller as directed by joint written instructions of Seller and Purchaser.

(ii)    Upon the filing of a written demand for the Deposit by Seller or Purchaser, pursuant to subsection (2) or (3) above, Escrow Agent shall promptly give notice thereof (including a copy of such demand) to the other Party. The other Party shall have the right to object to the delivery of the Deposit, by giving written notice of such objection to Escrow Agent at any time within five (5) days after such Party's receipt of notice from Escrow Agent, but not thereafter. Such notice shall set forth the basis (in reasonable detail) for objecting to the delivery of the Deposit. Upon receipt of such

14

notice of objection, Escrow Agent shall promptly give a copy of such notice to the Party who filed the written demand. If Escrow Agent shall have timely received such notice of objection, Escrow Agent shall continue to hold the Deposit, and the interest accrued thereon, until (x) Escrow Agent receives joint written notice from Seller and Purchaser directing the disbursement of the Deposit, in which case Escrow Agent shall then disburse the Deposit, and the interest accrued thereon, in accordance with said direction, (y) Escrow Agent is presented with an Order from the Bankruptcy Court or other court of competent jurisdiction as described in Section 24(k) directing it to distribute the Deposit, in which case Escrow Agent shall then distribute the Deposit (and any interest accrued thereon) in accordance with such Order, or (z) Escrow Agent takes such affirmative steps as Escrow Agent may elect, at Escrow Agent's option, in order to terminate Escrow Agent's duties hereunder, including but not limited to depositing the Deposit, and the interest accrued thereon, with the Bankruptcy Court or other court of competent jurisdiction as described in Section 24(k) and commencing an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party in such interpleader action, as determined by a final non-appealable Order of such court.

(iii)    Escrow Agent may rely and act upon any instrument or other writing reasonably believed by Escrow Agent to be genuine and purporting to be signed and presented by any Person or Persons purporting to have authority to act on behalf of Seller or Purchaser, as the case may be, and shall not be liable in connection with the performance of any duties imposed upon Escrow Agent by the provisions of this Agreement, except for Escrow Agent's own gross negligence, willful misconduct or breach of its obligations hereunder. Escrow Agent shall have no duties or responsibilities except those set forth herein. Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless the same is in writing and signed by Purchaser and Seller, and, if Escrow Agent's duties hereunder are affected, unless Escrow Agent shall have given prior written consent thereto. Seller and Purchaser shall each severally (but not jointly) reimburse Escrow Agent for fifty (50) percent of its out-of-pocket expenses (including reasonable fees and disbursements of outside counsel), including Escrow Agent's fees and expenses with respect to any interpleader action incurred in connection with this Agreement; provided, however, that, as between Purchaser and Seller, the prevailing party in any dispute over the Deposit shall be entitled to reimbursement by the losing party of any such expenses paid to Escrow Agent. In the event that Escrow Agent shall be uncertain as to Escrow Agent's duties or rights hereunder, or shall receive instructions from Purchaser or Seller that, in Escrow Agent's opinion, are in conflict with any of the provisions hereof, Escrow Agent shall be entitled to hold the Deposit, and the interest accrued thereon, and may decline to take any other action until such conflict is resolved in accordance with the terms hereof. After delivery of the Deposit, and the interest accrued thereon, in accordance herewith, Escrow Agent shall have no further liability or obligation of any kind whatsoever.

(iv)    Escrow Agent shall have the right at any time to resign upon ten (10) Business Days prior notice to Seller and Purchaser. Seller and Purchaser shall jointly select a successor Escrow Agent and shall notify Escrow Agent of the name and address of such successor Escrow Agent within ten (10) Business Days after receipt of notice of Escrow Agent of its intent to resign. If Escrow Agent has not received notice of

15

the name and address of such successor Escrow Agent within such period, Escrow Agent shall have the right to select on behalf of Seller and Purchaser a bank or trust company licensed to do business in the State of New York (and the State of Texas, if required by applicable Law) and having a branch located in New York County to act as successor Escrow Agent hereunder. At any time after the ten (10) Business Day period, Escrow Agent shall have the right to deliver the Deposit, and the interest accrued thereon, to any successor Escrow Agent selected hereunder, provided such successor Escrow Agent shall execute and deliver to Seller and Purchaser an assumption agreement whereby it assumes all of Escrow Agent's obligations hereunder. Upon the delivery of all such amounts and such assumption agreement, the successor Escrow Agent shall become the Escrow Agent for all purposes hereunder and shall have all of the rights and obligations of the Escrow Agent hereunder, and the resigning Escrow Agent shall have no further responsibilities or obligations hereunder.

(v) The interest earned on the Deposit shall be paid to the Party entitled to receive such interest as provided in this Agreement. The Party receiving such interest shall pay any income Taxes thereon.

(d) Upon written (including by means of e-mail) confirmation by Seller and Purchaser that the transaction has closed, Escrow Agent is authorized and agrees to, as soon as possible: (i) apply all amounts wired to it, including the balance of the Purchase Price, to pay all such Charges and other costs set forth in the Preliminary Closing Statement, (ii) disburse the remaining amounts after payment of all Charges and other costs to the appropriate party as set forth in the Preliminary Closing Statement, (iii) issue the Title Insurance Policy to Purchaser as described in Article 11 and (iv) submit for filing and/or recording the Closing Documents in the exact order set forth, and at the recording office indicated, on Schedule H. Additionally, the Escrow Agent shall:

(i) Confirm that the Closing Documents are fully and properly signed, dated, acknowledged, attested and witnessed, as required by Law, and that those among them that are to be filed and/or recorded in the public records are in proper form for filing and/or recording, as applicable, and include a complete and accurate property description and all other exhibits that are necessary for filing and/or recording; and

(ii) Direct the recording office to deliver the original filed and/or recorded Closing Documents by return mail to the party indicated thereon, or, if such Closing Documents are received by the Escrow Agent, Escrow Agent shall deliver the original filed and/or recorded Closing Documents to the party indicated thereon, in either case with copies to counsel for all other parties, original recording receipts, as available.

(e) Escrow Agent agrees to keep all information it receives in connection with this transaction strictly confidential, unless disclosure is required by Law.

(f) If the requirements set forth herein for the consummation of the transaction have not been satisfied by 3:00 p.m. on the Closing Date, unless otherwise jointly directed by Purchaser and Seller, Escrow Agent is instructed not to record any of the Closing

16

Documents and Escrow Agent shall instead return such documents to the signatories thereof seven (7) days following the Closing Date.

(g)     The payments to be made by Purchaser pursuant to Sections 4(a) and 4(b) shall be made by wire transfers in immediately available funds to the Escrow Account.  All other payments owed to Seller shall be paid to Seller in the manner specified by Seller in written notice to Purchaser.

(h)     The Parties each hereby agree to severally (but not jointly) indemnify, defend and hold harmless Escrow Agent from and against fifty percent (50%) of any and all loss, cost, damage, expense and reasonable attorneys' fees actually incurred by Escrow Agent arising out of it acting as the Escrow Agent hereunder, other than to the extent arising from Escrow Agent's gross negligence, willful misconduct or breach of its obligations hereunder.

(i)     The provisions of Sections 4(c) and 4(e) shall survive the Closing or termination of this Agreement.

5.     PERMITTED ENCUMBRANCES.

Subject to the terms and provisions of this Agreement, Seller's interest in the Premises shall be sold, assigned and conveyed by Seller to Purchaser, and Purchaser shall accept and assume same, free and clear of all Encumbrances other than the following (collectively, the "Permitted Encumbrances"):

(a)     the state of facts disclosed on the Survey (the "Disclosed Survey Items");

(b)     the standard printed exclusions from coverage contained in the form of owners title policy promulgated by the Texas Department of Insurance, and the Encumbrances set forth on Schedule E;

(c)     Non-Objectionable Encumbrances;

(d)     any Encumbrances approved or waived by Purchaser as provided in this Agreement;

(e)     Property Taxes not yet due and payable or that are being apportioned in accordance with Article 7, and all Encumbrances securing such Taxes;

(f)     any Laws affecting the Premises, including, without limitation, all zoning, land use, building and Environmental Laws, rules, regulations, statutes, ordinances, Orders or other legal requirements, including landmark designations and all zoning variance and special exceptions, if any;

(g)     all Encumbrances relating to Utilities or a Utility's right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Premises (a "Utility Encumbrance"); provided, that if an update to the Title Report identifies any Utility Encumbrance not identified on the Title Report that has an adverse effect on any improvements included in the Premises, the same shall not constitute a Permitted

17

Encumbrance but shall instead be treated as an Update Exception (as defined herein) and resolved in accordance with the terms of this Agreement relating to Update Exceptions;

(h)    all Violations now or hereafter issued or noted;

(i)    the rights and interests held by Tenants under the Leases in effect at Closing (and any non-disturbance agreements and memorandum of lease relating thereto);

(j)    the rights and interests of Third Party Purchasers under any Nortel Sale Agreement (including any claim by a Third Party Purchaser to the Third Party Acquired Assets), and the rights and interests of others claiming by, through or under any Nortel Sale Agreement;

(k)    any Encumbrances caused by Purchaser, by any of its Affiliates, by any of their respective agents, employees or other representatives or by Seller at Purchaser's or their request;

(l)    any Encumbrances expressly assumed by Purchaser under this Agreement;

(m)    any Encumbrances not released by applicable Law (including, without limitation, the Bankruptcy Code) or the Sale Order at the Closing; and

(n)    all other matters which, pursuant to the terms of this Agreement, are deemed Permitted Encumbrances.

6.    TITLE INSURANCE; LIENS; DUE DILIGENCE.

(a)    (i)    The parties acknowledge that Purchaser has received the Title Report and copies of the instruments (the "Underlying Documents") shown on the Title Report. The parties acknowledge that Purchaser has received the Survey.

(ii)    Purchaser acknowledges that (i) it has had the opportunity to review the Title Report, Survey and Underlying Documents, (ii) any objections to exceptions or other matters disclosed therein other than Permitted Encumbrances (the "Commitment Objections") have been communicated in writing to Seller on or prior to the date hereof and (iii) Purchaser shall not be entitled after the date hereof to identify any further objections to exceptions or other matters disclosed in the Title Report, Survey or Underlying Documents (except as provided in Section 6(a)(iii) with respect to any updates to the same) and Purchaser shall be deemed to have waived its right to object to any such exceptions or other matters (and the same shall not constitute Commitment Objections, but shall instead be deemed Permitted Encumbrances).

(iii)    Purchaser shall deliver a copy of any update to the Title Report to Seller promptly upon Purchaser's receipt of such update. If, prior to the Closing Date, the Title Company shall deliver any update to the Title Report which discloses additional Encumbrances or other title exceptions which were not disclosed by the Title Report and are not Disclosed Survey Items and which do not otherwise constitute Permitted Encumbrances hereunder (each, an "Update Exception"), then Purchaser shall have until three (3) Business Days after delivery of such update to Purchaser and its counsel, TIME

18

BEING OF THE ESSENCE, (the "Update Objection Deadline") to deliver written notice to Seller objecting to any of the Update Exceptions (the "Update Objections"; the Update Objections and Commitment Objections are, collectively, the "Title Objections"). If Purchaser fails to deliver such objection notice by the Update Objection Deadline, Purchaser shall be deemed to have waived its right to object to any Update Exceptions (and the same shall not constitute Title Objections, but shall instead be deemed Permitted Encumbrances). If Purchaser shall deliver such objection notice by the Update Objection Deadline, any Update Exceptions which are not objected to in such notice shall not constitute Title Objections, but shall be Permitted Encumbrances.

(iv)     Notwithstanding anything to the contrary contained herein, if Seller is unable to eliminate the Title Objections by the Closing Date, unless the same are waived by Purchaser without any abatement in the Purchase Price, Seller may, upon at least two (2) Business Days' prior notice to Purchaser (except with respect to matters first disclosed during such two (2) Business Day period, as to which matters notice may be given at any time through and including the Closing Date) adjourn the Closing Date (such date to which Seller adjourns the Closing Date is the "Adjourned Closing Date"), for a period not to go beyond the thirtieth (30th) day following the Closing Date (the "Title Cure Period"), in order to attempt to eliminate such exceptions.

(b)     If Seller is unable to eliminate any Title Objection within the Title Cure Period, then, unless the same is waived by Purchaser, Purchaser may, in its sole discretion, (i) accept the Property subject to such Title Objection without abatement of the Purchase Price, in which event (x) such Title Objection shall be deemed to be, for all purposes, a Permitted Encumbrance, (y) Purchaser shall close hereunder notwithstanding the existence of same, and (z) Seller shall have no obligations whatsoever after the Closing Date with respect to Seller's failure to cause such Title Objection to be eliminated, or (ii) terminate this Agreement by notice given to Seller within ten (10) Business Days following expiration of the Title Cure Period, TIME BEING OF THE ESSENCE, in which event Escrow Agent shall return the Deposit to Purchaser (together with any interest accrued thereon). If Purchaser shall fail to deliver the termination notice described in clause (ii) within the ten (10) Business Day period described therein, TIME BEING OF THE ESSENCE, Purchaser shall be deemed to have made the election under clause (i). Upon the timely giving of any termination notice under clause (ii), this Agreement shall terminate and neither Party shall have any further rights or obligations hereunder other than those which are expressly provided to survive the termination hereof.

(c)     It is expressly understood that in no event shall Seller be required to bring any action or institute any proceeding, or to otherwise incur any costs or expenses in order to attempt to eliminate any Title Objections, or take any other actions to cure or remove any Title Objections, or to otherwise cause title in the Premises to be in accordance with the terms of this Agreement on the Closing Date. Notwithstanding anything in this Article 6 to the contrary, Seller shall be required to remove, by payment, bonding or otherwise any Title Objections which have been voluntarily recorded by Seller or otherwise placed by Seller against the Property on or following the date hereof (other than with the approval or deemed approval of Purchaser, which approval shall not be unreasonably withheld, conditioned or delayed) and which are not given for the benefit of any Utility or Government Entity, or placed by the Bankruptcy Court.

19

(d)     If Seller shall have adjourned the Closing Date in order to cure Title Objections in accordance with the provisions of this Article 6, Seller shall, upon the satisfactory cure thereof, promptly reschedule the Closing Date, upon at least five (5) Business Days' prior notice to Purchaser (the "New Closing Notice"); it being agreed, however, that if any Title Objections arise between the date the New Closing Notice is given and the rescheduled Closing Date, Seller may again adjourn the Closing for a reasonable period or periods, in order to attempt to cause such exceptions to be eliminated; provided, however, that Seller shall not be entitled to adjourn the new Closing Date pursuant to this Article 6 for a period or periods in excess of forty-five (45) days in the aggregate.

(e)     Purchaser agrees to purchase the Premises subject to any and all Violations, or any condition or state of repair or disrepair or other matter or thing, whether or not noted, which, if noted, would result in a Violation being placed on the Premises.  Seller shall have no duty to remove or comply with or repair any condition, matter or thing whether or not noted, which, if noted, would result in a Violation being placed on the Premises, Seller shall have no duty to remove or comply with or repair any of the aforementioned Violations, or other conditions, and Purchaser shall accept the Premises subject to all such Violations, the existence of any conditions at the Premises which would give rise to such Violations, if any, and any governmental claims arising from the existence of such Violations, in each case without any abatement of or credit against the Purchase Price.

(f)     Purchaser acknowledges (i) that it has had the opportunity to conduct its Due Diligence (including, but not limited to, review of the Building Condition Report dated February 11, 2011) and has determined to proceed with the transactions contemplated by this Agreement as a result thereof and (ii) that Purchaser shall have no right whatsoever to terminate this Agreement, not proceed to Closing or obtain a return of the Deposit except as expressly provided in Sections 6(b), 11(d)(ii), 15(a)(ii), 16(a)(ii), 21(c) and 23(b).

7.     APPORTIONMENTS.

(a)     The following shall be apportioned between Seller and Purchaser as of 11:59 p.m. Eastern Time (prevailing as of the Closing Date) on the day immediately preceding the Closing Date (the "Apportionment Date") on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in the month and a 365 day year:

(i)     Property Taxes, on the basis of the respective periods for which such Property Taxes are assessed or imposed (such period, a "Tax Period").  If the Closing Date shall occur before an assessment is made or a Tax rate is fixed for the Tax Period in which the Closing Date occurs, the apportionment of such Property Taxes based thereon shall be made at the Closing Date by applying the Tax rate for the preceding Tax Period to the latest assessed valuation, but, promptly after the assessment and/or Tax rate for the current Tax Period are fixed, the apportionment thereof shall be recalculated and Seller or Purchaser, as the case may be, shall make an appropriate payment to the other within five (5) Business Days based on such recalculation.  If as of the Closing Date the Premises or any portion thereof shall be affected by any special or general assessments which are or may become payable in installments of which the first installment is then a

20

lien and has become payable, Seller shall pay the unpaid installments of such assessments which are due prior to the Closing Date and Purchaser shall pay the installments which are due on or after the Closing Date;

       (ii)    prepaid fees for licenses and other Permits, if any, assigned to Purchaser at the Closing;

       (iii)    prepaid rents and additional rents under the Third Party Leases;

       (iv)    all other operating expenses with respect to the Property, including but not limited to, expenses incurred in connection with the Property Contracts;

       (v)    Charges for Utilities, and any Taxes due thereunder, shall be billed to Seller's account up to the Apportionment Date and, from and after the Apportionment Date, all Utilities shall be billed to Purchaser's account.  If for any reason such changeover in billing is not practicable as of the Closing Date as to any Utility, such Utility shall be apportioned on the basis of actual current readings or, if such readings have not been made, on the basis of the most recent bills that are available.  If any apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) Business Days following notice of the determination of such actual reading, readjust such apportionment and Seller shall promptly deliver to Purchaser, or Purchaser shall promptly deliver to Seller, as the case may be, the amount determined to be due upon such adjustment; and

       (vi)    such other items as are customarily apportioned in real estate closings of commercial properties in Dallas County, Texas.

    (b)    No later than five (5) Business Days prior to the Closing Date, Escrow Agent, with input from Seller and Purchaser and/or their respective agents or designees, will prepare a preliminary closing statement (the "Preliminary Closing Statement") which will show the net amount due either to Seller or to Purchaser as the result of the adjustments and prorations provided for in this Agreement, and such net due amount will be added to or subtracted from the cash balance of the Purchase Price to be paid to Seller at the Closing pursuant to Article 4, as applicable.

    (c)    Not later than forty-five (45) days following the Closing Date, Escrow Agent, with input from Seller and Purchaser and/or their respective agents or designees, will prepare a final closing statement reasonably satisfactory to Seller and Purchaser in form and substance (the "Final Closing Statement") setting forth the final determination of the adjustments and prorations provided for herein and setting forth any items which are not capable of being determined at such time (and the manner in which such items shall be determined and paid).  The net amount due Seller or Purchaser, if any, by reason of adjustments to the Preliminary Closing Statement as shown in the Final Closing Statement, shall be paid in cash by the Party obligated therefor within five (5) Business Days following that Party's receipt of the approved Final Closing Statement.  The adjustments, prorations and determinations agreed to by Seller and Purchaser in the Final Closing Statement shall be conclusive and binding on the parties hereto except for any items which are not capable of being determined at the time the Final Closing

<div align="center">21</div>

Statement is agreed to by Seller and Purchaser, which items shall be determined and paid in the manner set forth in the Final Closing Statement and except for other amounts payable hereunder pursuant to provisions which survive the Closing.

(d)    Prior to and following the Closing Date, each Party shall provide the other with such information as the other shall reasonably request (including, without limitation, access to the books, records, files, ledgers, information and data with respect to the Property during normal business hours upon reasonable advance notice) in order to make the preliminary and final adjustments and prorations provided for herein.

(e)    If any payment to be made after Closing under this Article 7 shall not be paid when due hereunder, the same shall bear interest (which shall be paid together with the applicable payment hereunder) from the date due until so paid at a rate per annum equal to the Default Rate.  To the extent a payment provision in this Article 7 does not specify a period for payment, then for purposes hereof such payment shall be due within five (5) Business Days of the date such payment obligation is triggered.

(f)    Any and all disputes under this Article 7 that cannot be resolved consensually between Purchaser and Seller, including disputes related to the Preliminary Closing Statement and Final Closing Statement shall be resolved by the Bankruptcy Court or other court of competent jurisdiction pursuant to Section 24(k).

(g)    The provisions of this Article 7 shall survive the Closing.

8.    PROPERTY NOT INCLUDED IN SALE.

Notwithstanding anything to the contrary contained herein, it is expressly agreed by the Parties that (i) any Personalty owned or leased by any Tenant, managing agent, leasing agent, contractor, or employee at the Buildings, (ii) all pictures, drawings, prints, sculptures, tapestries or other items of art now or hereafter located in or on the Premises, (iii) the Third Party Acquired Assets, (iv) any service mark, trademark, copyright, license or other interest in or right to use of the name "Nortel" or any variation thereof and (v) any other Personalty identified on Schedule B-2 (collectively, "Excluded Personalty"), shall not be included in the Property to be sold to Purchaser hereunder.

9.    COVENANTS AND OTHER AGREEMENTS

(a)    U.S. Bankruptcy Actions.

(i)    Seller shall file a motion (the "Sale Motion") in form and substance reasonably acceptable to Purchaser, the Committee and the Bondholder Group with the Bankruptcy Court as promptly as practicable after the delivery of the Additional Deposit pursuant to Section 4(a) (but no later than two (2) Business Days after such delivery of the Additional Deposit pursuant to Section 4(a)) seeking an order under Sections 105 and 363 of the Bankruptcy Code (the "Sale Order") approving the transactions contemplated by this Agreement.

22

(ii)     Seller shall provide notice to (i) all parties entitled to notice of the Sale Motion as required by the Bankruptcy Code, the U.S. Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and any applicable Order of the Bankruptcy Court, as such orders may be modified from time to time and (ii) such additional parties as Purchaser may reasonably request.

(b)     Consultation; Notification; Cooperation.

(i)     Purchaser and Seller shall cooperate with each other in seeking entry of the Sale Order, and Seller shall deliver to Purchaser prior to filing, copies of all proposed pleadings, motions, objections, responses to objections, notices, statements, schedules, applications, reports and other material papers to be filed by Seller in connection with such motion, relief requested therein and challenges thereto.

(ii)     If the Sale Order or any other Order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition or motion for certiorari, rehearing, re-argument or stay shall be filed with respect thereto), Seller shall, in consultation with the Committee and Bondholder Group, take all reasonable steps, and use its reasonable efforts, including incurring reasonable expenses, to defend against such appeal, petition or motion and Purchaser shall cooperate and use its reasonable efforts, including incurring reasonable expenses, in such efforts.

(c)     Subject to receipt of the Bankruptcy Consents and any other applicable Orders of the Bankruptcy Court, during the period from the date hereof until the Closing Date, Seller shall:

(i)     be permitted to enter into any Contracts (other than Leases) with respect to all or any portion of the Property provided that such agreements (w) expire by their terms on or prior to the Closing Date, (x) would not be effective following the Closing Date, (y) may be terminated by the owner of the Property without penalty upon not more than thirty (30) days' prior notice or (z) would be considered Assumed Contracts;

(ii)     maintain in full force and effect the insurance policies currently in effect with respect to the Property (or replacements continuing similar coverage);

(iii)     operate and manage the Premises in a manner consistent in all material respects with past practice during the pendency of the Chapter 11 Cases, subject to reasonable wear and tear, casualty and taking by eminent domain, except that Seller shall not be required to make any capital improvement or replacement to the Property; and

(iv)     be permitted to consummate the transactions set forth in and in accordance with the Nortel Sale Agreements (including, without limitation, the obligations under the Third Party Leases).

(d)     During the period from the date hereof until the Closing Date, Seller shall not, to the extent the same would be binding on or affect the Premises or any owner thereof after

23

the Closing, except as permitted under Section 9(c), without Purchaser's prior approval which approval shall not be unreasonably withheld, conditioned or delayed:

(i)      enter into any new Lease; or

(ii)     affirmatively subject the Property to any additional Encumbrances that would not constitute Permitted Encumbrances.

(e)      Whenever in Section 9(d) Seller is required to obtain Purchaser's approval with respect to any transaction described therein, Purchaser shall, within five (5) Business Days after receipt of Seller's request therefor, notify Seller of its approval or disapproval of same and, if Purchaser fails to notify Seller of its disapproval within said five (5) Business Day period, Purchaser shall be deemed to have approved same.

(f)      Seller and Purchaser agree and acknowledge that certain IT and Building network systems at the Premises may be separated by Seller from assets designated as Excluded Personalty in Schedule B-2 and each agree to cooperate in good faith to determine the identity of such systems and the manner in which such a separation may occur.

10.     ASSIGNMENTS BY SELLER AND ASSUMPTIONS BY PURCHASER.

On the Closing Date, Seller agrees to assume (to the extent applicable) and assign to Purchaser, pursuant to the instrument referenced in Section 20(c)(ii), without recourse, representation or warranty (except as expressly set forth in this Agreement), all of Seller's right, title and interest in, and Purchaser agrees to assume Seller's obligations accruing on and after the Closing Date under, the transferable Permits, if any, relating to the Property and the other intangible Included Personalty.

11.     CONDITIONS TO EFFECTIVENESS AND CLOSING.

(a)      Conditions to Obligations of Seller.  The obligation of Seller to effect the Closing shall be subject to the fulfillment (or written waiver by Seller) at or prior to the Closing Date of the following conditions:

(i)      Representations and Warranties.  Each of the representations and warranties of Purchaser set forth in Article 14 shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(ii)     Performance of Obligations.

(1)      Purchaser shall have paid the full balance of the Purchase Price (as adjusted pursuant to the terms hereof), executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Purchaser hereunder on the Closing Date in accordance with Section 20(b) and Section 20(c); and

24

(2)    Purchaser shall in all material respects have performed all other obligations required to be performed by Purchaser under this Agreement on or prior to the Closing Date.

(b)    <u>Conditions to Obligations of Purchaser</u>.  The obligation of Purchaser to effect the Closing shall be subject to the fulfillment (or written waiver by Purchaser) at or prior to the Closing Date of the following conditions:

(i)    <u>Representations and Warranties</u>.  Each of the representations and warranties of Seller set forth in <u>Article 13</u> shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(ii)    <u>Performance of Obligations</u>.

(1)    Seller shall have executed, acknowledged (if applicable) and/or delivered all documents required to be executed, acknowledged (if applicable) and/or delivered by Seller hereunder on the Closing Date in accordance with <u>Section 20(a)</u> and <u>Section 20(c)</u>; and

(2)    Seller shall in all material respects have performed all other obligations required to be performed by Seller under this Agreement on or prior to the Closing Date.

(iii)    <u>Title Insurance Policy</u>.  The Title Company shall be prepared, upon payment of the applicable premiums therefore, to insure title to the Property pursuant to an Owner's Policy of Title Insurance (Form T-1), subject to Permitted Encumbrances in the amount of the Purchase Price and at regular rates (which shall not include the cost of any endorsements to the policy, such as "extended coverage" requested by Purchaser, it being agreed that any and all endorsements shall be obtained at Purchaser's sole cost and expense (the "<u>Title Insurance Policy</u>").

(c)    <u>Conditions to Seller's and Purchaser's Obligations</u>.  The obligations of Seller and Purchaser hereunder are subject to the following conditions:

(i)    <u>No Injunctions or Restraints</u>.  There shall be in effect no Law, Order, injunction, decree or judgment of any Government Entity prohibiting the consummation of the transactions contemplated hereby, and there shall not be any proceedings pending by any Government Entity seeking such prohibition.

(ii)    <u>Sale Order</u>.  The Sale Order in form and substance reasonably acceptable to Seller, the Committee, the Bondholder Group and Purchaser shall have been entered, shall be in full force and effect and shall be a Final Order.

(d)    <u>Failure of Certain Conditions</u>.

(i)    If Purchaser is unable to timely satisfy (and Seller has not waived in writing) the conditions precedent to Seller's obligation to effect the Closing set forth in

25

Section 11(a)(i)-(a)(ii), then such failure shall constitute a default by Purchaser hereunder, in which case Section 23(a) shall govern.

(ii) If Seller is unable to timely satisfy (and Purchaser has not waived in writing) the conditions precedent to Purchaser's obligation to effect the Closing set forth in Section 11(b)(i) - (b)(iii), then, (1) Seller may, if it so elects and without any abatement in the Purchase Price, adjourn the Closing Date for a period or periods not to exceed ninety (90) days in the aggregate and (2) if, after any such extension, the conditions precedent to Purchaser's obligation to effect the Closing set forth in Section 11(b)(i) - (b)(iii) continue not to be satisfied (and Purchaser has not waived the same) or Seller does not elect such extension and, in either case, such failure of condition precedent is not the result of Seller's breach of the covenants set forth in this Agreement, then Purchaser or Seller shall be entitled to terminate this Agreement by notice thereof to the other Party and, if this Agreement is so terminated, then Purchaser shall be entitled to receive the Deposit (and all accrued interest therein) and neither Party shall have any further obligations hereunder, except those expressly stated to survive the termination hereof. If the provisions of clause (2) above of this Section 11(a)(ii) would be applicable, except such failure of condition precedent is the result of Seller's breach of a covenant hereunder, then Section 23(b) shall govern.

12. CONDITION OF THE PROPERTY.

(a) PURCHASER HEREBY ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ANY CLOSING DOCUMENT OR IN ANY CERTIFICATE DELIVERED PURSUANT TO SECTION 20(a)(x), NEITHER SELLER NOR ANY SELLER PARTIES, NOR ANY PERSON OR ENTITY WHICH PREPARED OR PROVIDED ANY OF THE MATERIALS REVIEWED BY PURCHASER IN CONDUCTING ITS DUE DILIGENCE, NOR ANY SUCCESSOR OR ASSIGN OF ANY OF THE FOREGOING PARTIES, HAS MADE OR SHALL BE DEEMED TO HAVE MADE ANY ORAL OR WRITTEN REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESSED OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE (INCLUDING WITHOUT LIMITATION WARRANTIES OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), WITH RESPECT TO THE PROPERTY, THE PERMITTED USE OF THE PROPERTY OR THE ZONING AND OTHER LAWS, REGULATIONS AND RULES APPLICABLE THERETO OR THE COMPLIANCE BY THE PROPERTY THEREWITH, THE REVENUES AND EXPENSES OR OTHER FINANCIAL MATTERS GENERATED BY OR ASSOCIATED WITH THE PROPERTY, OR OTHERWISE RELATING TO THE PROPERTY OR THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING WITHOUT LIMITATION: (I) THE DIMENSIONS OR LOT SIZE OF THE LAND OR THE SQUARE FOOTAGE OF ANY OF THE BUILDINGS THEREON, (II) THE ABILITY OF PURCHASER TO OBTAIN ANY NECESSARY CONSENTS FOR PURCHASER'S INTENDED USE OR DEVELOPMENT OF ANY OF THE PREMISES, (III) THE QUALITY OF ANY LABOR AND MATERIALS USED IN, OR WITH RESPECT TO, ANY OF THE PROPERTY, OR (IV) EXCEPT AS SET FORTH PURSUANT TO THE DEED, SELLER'S OWNERSHIP OF THE PREMISES OR ANY PORTION THEREOF, INCLUDING WITHOUT LIMITATION, THE CONDITION OF TITLE TO THE LAND. PURCHASER FURTHER ACKNOWLEDGES THAT ALL MATERIALS WHICH HAVE BEEN

26

PROVIDED BY ANY SELLER PARTIES HAVE BEEN PROVIDED WITHOUT ANY
WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED AS TO THEIR
CONTENT, SUITABILITY FOR ANY PURPOSE, ACCURACY, TRUTHFULNESS OR
COMPLETENESS, AND PURCHASER SHALL NOT HAVE ANY RECOURSE AGAINST
ANY SELLER PARTIES IN THE EVENT OF ANY ERRORS THEREIN OR OMISSIONS
THEREFROM. PURCHASER EXPRESSLY DISCLAIMS ANY INTENT TO RELY ON
ANY SUCH MATERIALS PROVIDED TO IT BY ANY SELLER PARTIES IN
CONNECTION WITH ITS DUE DILIGENCE AND AGREES THAT IT IS ACQUIRING THE
PROPERTY BASED SOLELY ON ITS OWN INDEPENDENT INVESTIGATION AND
INSPECTION OF THE PROPERTY AND NOT IN RELIANCE ON ANY INFORMATION
PROVIDED BY ANY SELLER PARTIES, EXCEPT FOR THE REPRESENTATIONS
EXPRESSLY SET FORTH HEREIN. PURCHASER AGREES FURTHER THAT, SUBJECT
TO THE TERMS AND CONDITIONS CONTAINED HEREIN, NO SELLER PARTY HAS
ANY OBLIGATION TO MAKE ANY CHANGES, ALTERATIONS OR REPAIRS TO THE
PROPERTY OR ANY PORTION THEREOF OR TO CURE ANY VIOLATIONS OR TO
COMPLY WITH THE REQUIREMENTS OF ANY INSURER. EXCEPT AS EXPRESSLY
PROVIDED IN THIS AGREEMENT, AND FOLLOWING AND SUBJECT TO THE
OCCURRENCE OF CLOSING, PURCHASER IS SOLELY RESPONSIBLE FOR
OBTAINING ANY APPROVAL OR PERMIT NECESSARY FOR CONTINUED
OCCUPANCY OF THE PREMISES AND FOR ANY REPAIRS OR ALTERATIONS
NECESSARY TO OBTAIN THE SAME, ALL AT PURCHASER'S SOLE COST AND
EXPENSE.

      (b)    PURCHASER ACKNOWLEDGES AND AGREES THAT IT IS
PURCHASING THE PROPERTY "AS IS", "WHERE IS" AND "WITH ALL FAULTS,"
BASED UPON THE CONDITION (PHYSICAL OR OTHERWISE) OF THE PROPERTY AS
OF THE DATE OF THIS AGREEMENT, REASONABLE WEAR AND TEAR AND,
SUBJECT TO THE PROVISIONS OF ARTICLES 15 AND 16 OF THIS AGREEMENT, LOSS
BY CONDEMNATION OR FIRE OR OTHER CASUALTY EXCEPTED. PURCHASER
ACKNOWLEDGES AND AGREES THAT ITS OBLIGATIONS UNDER THIS
AGREEMENT SHALL NOT BE SUBJECT TO ANY FINANCING CONTINGENCY OR
OTHER CONTINGENCIES OR SATISFACTION OF CONDITIONS AND PURCHASER
SHALL HAVE NO RIGHT TO TERMINATE THIS AGREEMENT OR RECEIVE A
RETURN OF THE DEPOSIT (OR THE ACCRUED INTEREST THEREON) EXCEPT AS
EXPRESSLY PROVIDED FOR IN SECTIONS 6(b), 11(d)(ii), 15(a)(ii), 16(a)(ii), 21(c) and
23(b). THIS ARTICLE SHALL SURVIVE THE CLOSING, OR, IF THE CLOSING DOES
NOT OCCUR, THE TERMINATION OF THIS AGREEMENT.

     13.    SELLER REPRESENTATIONS.

      (a)    Seller hereby represents and warrants to Purchaser as of the date hereof
and as of Closing that:

      (i)    Subject to the receipt of any applicable Consents and the entry of
the Sale Order in connection with the transactions contemplated hereby (collectively, the
"Bankruptcy Consents"), (i) Seller has full power and authority to enter into and perform
this Agreement in accordance with its terms and (ii) this Agreement and all documents

<div align="center">27</div>

executed by Seller which are to be delivered to Purchaser at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Seller, and at the time of Closing will be the legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, and do not and, at the time of Closing will not, violate any provision of any agreement or judicial Order to which Seller or the Property is subject.

(ii)     Schedule C-1 is a true, correct and complete list of the Leases in effect as of the date hereof and Seller has delivered to Purchaser, or made available to Purchaser for review, true and complete copies of all written Leases set forth on Schedule C-1. Seller makes no representations or warranties with respect to any subtenants or sublicensees under the Leases except that, Seller has not entered into any written agreement with any Party for occupancy of the Premises other than pursuant to the Leases.

(iii)     To Seller's Actual Knowledge, (x) Schedule D is a true, correct and complete list of the Property Contracts in effect as of the date hereof which shall be assumed by Purchaser as of the Closing (the "Assumed Contracts") and (y) Seller has delivered to Purchaser, or made available to Purchaser for review, true and complete copies of all Assumed Contracts.

(iv)     Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

(v)     Seller has not received written notice of any pending or threatened condemnation or eminent domain proceedings that would affect the Premises.

(vi)     To Seller's Actual Knowledge, Seller owns the Included Personalty free and clear of any Encumbrances other than Permitted Encumbrances, subject to depletions, replacements or additions thereto in the ordinary course of business occurring at the Premises.

(vii)     There are no Actions pending or, to Seller's Actual Knowledge, threatened relating to the Premises that, if determined adversely, would reasonably be expected to materially and adversely affect the value of the Premises taken as a whole or to prevent or materially interfere with Seller's ability to consummate the transaction contemplated hereby.

(viii)     To Seller's Actual Knowledge, there is no Asbestos in the Buildings and there has been no Release of Hazardous Materials in, on, or under the Land, which in either case requires Remediation pursuant to applicable Environmental Laws.

Any and all uses of the phrase, "to Seller's Actual Knowledge" or other references to Seller's knowledge in this Agreement, shall mean the actual, present, conscious knowledge of the applicable Seller Knowledge Individual(s) as to a fact at the time given without any investigation or inquiry. Without limiting the foregoing, Purchaser acknowledges that no Seller

28

Knowledge Individual has performed or is obligated to perform any investigation or review of any files or other information in the possession of Seller, or to make any inquiry of any Persons or to take any other actions in connection with the representations and warranties of Seller set forth in this Agreement. Neither the actual, present, conscious knowledge of any other individual or entity, nor the constructive knowledge of any Seller Knowledge Individual or of any other individual or entity, shall be imputed to any Seller Knowledge Individual.

(b)    The representations and warranties of Seller set forth in Article 13 are subject to the following limitations:  (i) Seller does not represent or warrant that any particular Lease or Property Contract will be in force or effect as of the Closing or that the Tenants or contractors thereunder, as applicable, will not be in default thereunder, (ii) to the extent that Seller has delivered or made available to Purchaser (or to any Diligence Party) any Leases, Property Contracts or other information with respect to the Property at any time prior to the date hereof, and such Leases, Property Contracts or other information contain provisions inconsistent with any of such representations and warranties, then such representations and warranties shall be deemed modified to conform to such provisions and Purchaser shall be deemed to have knowledge thereof and (iii) in the event that, prior to the Closing, Purchaser or any Diligence Party shall obtain knowledge of any information that is contradictory to, and would constitute the basis of a breach of, any representation or warranty or failure to satisfy any condition on the part of Seller, then, promptly thereafter (and, in all events, prior to Closing), Purchaser shall deliver to Seller notice of such information specifying the representation, warranty or condition to which such information relates and Article 11 will apply, and Purchaser further acknowledges that such representation or warranty will not be deemed breached in the event Purchaser or any Diligence Party shall have, prior to Closing, obtained knowledge of any information that is contradictory to such representation or warranty and shall have failed to disclose to Seller as required hereby and Purchaser shall not be entitled to bring any action after the Closing Date based on such representation or warranty. Without limiting the generality of the foregoing, Purchaser shall be deemed to know that any representation or warranty contained herein is untrue, inaccurate or breached to the extent that (1) Purchaser or any Diligence Party has knowledge of any fact or information which is inconsistent with such representation or warranty or (2) this Agreement or any Leases, Property Contracts or other information with respect to the Property delivered or made available to Purchaser or any Diligence Party contain provisions inconsistent with any of such representations and warranties.

(c)    The provisions of Sections 12(a), 12(b) and 14(b) shall be deemed incorporated by reference and made a part of all documents or instruments delivered by Seller to Purchaser in connection with the sale of the Property.

14.    PURCHASER REPRESENTATIONS.

(a)    Purchaser hereby represents and warrants to Seller as of the date hereof and as of Closing that:

(i)    Purchaser is duly formed and in good standing under the Laws of the State of Texas, is qualified to do business in the State of Texas and is not subject to any Law, Order, or Contract which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.

29

(ii)     Subject to the receipt of the Bankruptcy Consents, Purchaser has full power and authority to enter into and perform this Agreement in accordance with its terms and this Agreement and all documents executed by Purchaser which are to be delivered to Seller at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Purchaser and are, and at the time of Closing will be, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, and do not and, at the time of Closing will not, violate any provision of any agreement or judicial Order to which Purchaser is subject.

(iii)     Subject to the receipt of the Bankruptcy Consents, neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited, or requires Purchaser to obtain any consent, authorization, approval or registration under, any Law, statute, rule, regulation, judgment, Order, writ, injunction or decree which is binding upon Purchaser. Purchaser, in entering into this Agreement and consummating the transactions contemplated hereby, is doing so in good faith, on a arm's length basis, with the intention of purchasing the Property from Seller, and without engaging in any collusive or improper activities with Seller or any other Person, including, without limitation, any of the activities contemplated by section 363(n) of the Bankruptcy Code.

(iv)     There are no judgments or Orders of any kind against Purchaser unpaid and unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to Purchaser's actual knowledge, threatened against Purchaser, which would have a material adverse effect on Purchaser, its financial condition or its ability to consummate the transactions contemplated by this Agreement.

(v)     Purchaser is not acquiring the Property with the assets of an employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), or, if plan assets will be used to acquire the Property, Purchaser will deliver to Seller at Closing a certificate containing such factual representations as shall permit Seller and its counsel to conclude that no prohibited transaction would result from the consummation of the transactions contemplated by this Agreement. Purchaser is not a "party in interest" within the meaning of Section 3(3) of ERISA with respect to any beneficial owner of Seller.

(vi)     Purchaser and any Person who owns, controls or is under common control with Purchaser (collectively, a "Purchaser Party") are not now nor shall they be at any time prior to or at the Closing a Person with whom a United States citizen, Person organized under the Laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories is prohibited from transacting business of the type contemplated by this Agreement under United States Law including, but not limited to, executive Orders, regulations and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") or otherwise.

(vii)     To Purchaser's knowledge, no Purchaser Party or any Person providing funds to Purchaser: (i) is under investigation by any Government Entity for, or

30

has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws or the Foreign Corrupt Practices Act ("FCPA"); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws or the FCPA; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(viii)    Purchaser is in compliance with any and all applicable provisions of the Patriot Act.

(ix)    Purchaser's obligation to perform under this Agreement is not contingent upon Purchaser's ability to obtain any (i) approval of changes or modifications in use or zoning by any Government Entity, (ii) modification of any existing land use restriction, (iii) consents to assignments of any service contracts, management agreements or other agreements which Purchaser requests, (iv) a title insurance policy other than the Title Insurance Policy, or (v) any financing of any type or nature whatsoever (i.e., whether by way of debt financing or equity investment, or otherwise).

(b)    Apart from matters subject to Section 13(a)(viii):

(i)    Seller makes no warranty with respect to Environmental Laws or the presence of Hazardous Materials (as hereinafter defined) in, on, above or under the Premises (or any parcel in proximity thereto) or in any soil, sediment, or water (including surface water and groundwater) on or under the Premises;

(ii)    Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws; and

(iii)    Upon Closing, Purchaser, for itself and its agents, Affiliates, successors and assigns, releases and forever discharges Seller, and the other Seller Parties from any and all rights, claims and demands at Law or in equity, whether known or unknown at the time of this Agreement, which Purchaser has or may have in the future arising out of the physical, environmental, economic or legal condition of the Property including, without limitation, any claim for indemnification or contribution arising under any Environmental Law.

15.    CASUALTY.

(a)    If all or any part of either Building is damaged by fire or other casualty occurring on or after the date hereof and prior to the Closing Date, whether or not such damage affects a material part of such Building, then:

(i)    If the estimated cost of repair or restoration (after taking into account insurance proceeds and any additional amounts that Seller is willing to fund or credit against the Purchase Price (it being understood that Seller shall not be under any obligation to do so)) is less than or equal to $2,500,000 as reasonably estimated by Seller, neither Party shall have the right to terminate this Agreement and the parties shall

31

nonetheless consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage.  In such event, Seller shall assign to Purchaser and Purchaser shall have the right to make a claim for and to retain any casualty insurance proceeds received under the casualty insurance policies in effect with respect to the Premises on account of such physical damage or destruction as shall be necessary to perform repairs to the Building(s) and/or to rebuild the Building(s) to substantially the same condition as it existed prior to the occurrence of such fire or other casualty and Purchaser shall receive a credit against the cash due at Closing for the amount of the deductible plus any applicable co-insurance on such casualty insurance policy less any amounts reasonably and actually expended by Seller to collect any such insurance proceeds or to remedy any unsafe conditions at the Property or to repair or restore any damages, in no event to exceed the amount of the loss.  In the event such amount spent by Seller shall exceed the amount of the deductible and any applicable co-insurance on such casualty insurance policy, then Purchaser shall deliver such excess amount to Seller, within five (5) Business Days of its receipt of any casualty insurance proceeds received on account of such casualty.

(ii)     If the estimated cost of repair or restoration (after taking into account insurance proceeds and any additional amounts that Seller is willing to fund or credit against the Purchase Price (it being understood that Seller shall not be under any obligation to do so)) exceeds $2,500,000 as reasonably estimated by Seller, Purchaser shall have the option, exercisable on or prior to the Casualty Election Date, TIME BEING OF THE ESSENCE, to terminate this Agreement by delivering notice of such termination to Seller, whereupon the Deposit (together with any interest accrued thereon) shall be returned to Purchaser and this Agreement shall be deemed canceled and of no further force or effect, and neither Party shall have any further rights or liabilities against or to the other except for such provisions which are expressly provided in this Agreement to survive the termination hereof.  If a fire or other casualty described in this clause (ii) shall occur and Purchaser shall not timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage and, in such event, Seller shall, on the Closing Date assign to Purchaser and Purchaser shall have the right to make a claim for and to retain any casualty insurance proceeds received under the casualty insurance policies in effect with respect to the Premises on account of such physical damage or destruction as shall be necessary to perform repairs to the Building(s) and/or to rebuild the Building(s) to substantially the same condition as existed prior to the occurrence of such fire or other casualty and Purchaser shall receive a credit against the cash due at Closing for the amount of the deductible on such casualty insurance policy less any amounts reasonably and actually expended by Seller to collect any such insurance proceeds or to remedy any unsafe conditions at the Property or to repair or restore any damages, in no event to exceed the amount of the loss.  In the event such amount spent by Seller shall exceed the amount of the deductible on such casualty insurance policy, then Purchaser shall deliver such excess amount to Seller within five (5)

32

Business Days of its receipt of any casualty insurance proceeds received on account of such casualty.

(b)    The provisions of this Article 15 supersede any Law applicable to the Premises governing the effect of fire or other casualty in contracts for real property.

(c)    In the event of any fire or other casualty, the Closing Date shall be extended to the tenth (10th) day following the Casualty Election Date.

16.    CONDEMNATION.

(a)    If, prior to the Closing Date, any part of either Building or the Land is taken (other than a temporary taking), or if Seller shall receive an official notice from any Government Entity having eminent domain power over either Building or the Land of its intention to take, by eminent domain proceeding, any part of either Building or the Land (a "Taking"), then:

(i)    if such Taking involves fifteen percent (15%) or less (as reasonably determined by Seller) of the (y) aggregate rentable area of the Buildings or (z) total area of the Land, neither Party shall have any right to terminate this Agreement, and the parties shall nonetheless consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such Taking; provided, however, that Seller shall, on the Closing Date, (i) assign and remit to Purchaser the net proceeds of any award or other proceeds of such Taking which may have been collected by Seller as a result of such Taking less any amounts expended by Seller in connection with such Taking, or (ii) if no award or other proceeds shall have been collected, deliver to Purchaser an assignment of Seller's right to any such award or other proceeds which may be payable to Seller as a result of such Taking and Purchaser shall reimburse Seller for any amounts expended by Seller in connection with such Taking.

(ii)    if such Taking involves more than fifteen percent (15%) (as reasonably determined by Seller) of the (y) aggregate rentable area of the Buildings or (z) total area of the Land, Purchaser shall have the option, exercisable on or prior to the Condemnation Election Date, TIME BEING OF THE ESSENCE, to terminate this Agreement by delivering notice of such termination to Seller, whereupon the Deposit (together with any interest earned thereon) shall be returned to Purchaser and this Agreement shall be deemed canceled and of no further force or effect, and neither Party shall have any further rights or liabilities against or to the other except pursuant to the provisions of this Agreement which are expressly provided to survive the termination hereof. If a Taking described in this clause (ii) shall occur and Purchaser shall not timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such Taking; provided, however, that Seller shall, on the Closing Date, (i) assign and remit to Purchaser the net proceeds of any award or other proceeds of such Taking which may have been collected by Seller as a result of such Taking less any amounts expended by

33

Seller in connection with such Taking, or (ii) if no award or other proceeds shall have been collected, deliver to Purchaser an assignment of Seller's right to any such award or other proceeds which may be payable to Seller as a result of such Taking and Purchaser shall reimburse Seller for any amounts expended by Seller in connection with such Taking.

(b)     In the event of any Taking the Closing Date shall be extended to the tenth (10th) day following the Condemnation Election Date.

17.     BROKERS AND ADVISORS.

(a)     Purchaser represents and warrants to Seller that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any broker, finder, consultant, advisor, or professional in the capacity of a broker or finder (each a "Broker") in connection with this Agreement or the transactions contemplated hereby. Purchaser hereby agrees to indemnify, defend and hold Seller and the other Seller Related Parties harmless from and against any and all Covered Losses arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker (other than Seller's Broker) engaged by or claiming to have dealt with Purchaser in connection with this Agreement or the transactions contemplated hereby.

(b)     Seller represents and warrants to Purchaser that it has not dealt or negotiated with, or engaged on its own behalf or for its benefit, any Broker in connection with this Agreement or the transactions contemplated hereby other than CB Richard Ellis ("Seller's Broker"). Seller hereby agrees to indemnify, defend and hold Purchaser and its direct and indirect shareholders, officers, directors, partners, principals, members, employees, agents, contractors and any successors or assigns of the foregoing, harmless from and against any and all Covered Losses arising from any claim for commission, fees or other compensation or reimbursement for expenses made by any Broker engaged by or claiming to have dealt with Seller in connection with this Agreement or the transactions contemplated hereby.

(c)     The provisions of this Article 17 shall survive the termination of this Agreement or the Closing.

18.     TAX REDUCTION PROCEEDINGS.

Seller may file and/or prosecute an application for the reduction of the assessed valuation of the Premises or any portion thereof for Property Taxes or a refund of Property Taxes previously paid (a "Tax Certiorari Proceeding") with respect to the Premises for the Tax Period in which the Closing shall occur; provided, that Seller shall not withdraw, settle or otherwise compromise Tax Certiorari Proceedings affecting Property Taxes with respect to the Premises for the Tax Period in which the Closing shall occur unless Purchaser shall have consented with respect thereto, which consent shall not be unreasonably withheld or delayed. The amount of any Property Tax refunds (net of attorneys' fees and other costs of obtaining such Property Taxes refunds) with respect to any portion of the Premises for the Tax Period in which the Apportionment Date occurs shall be apportioned between Seller and Purchaser as of the Apportionment Date. If, in lieu of a Property Tax refund, a Property Tax credit is received with

34

respect to any portion of the Premises for the Tax Period in which the Apportionment Date occurs, then (y) within thirty (30) days after receipt by Seller or Purchaser, as the case may be, of evidence of the actual amount of such Tax credit (net of attorneys' fees and other costs of obtaining such Tax credit), the Tax credit apportionment shall be readjusted between Seller and Purchaser and (z) upon realization by Purchaser of a Tax savings on account of such credit, Purchaser shall pay to Seller an amount equal to the savings realized (as apportioned). All refunds, credits or other benefits, regardless of when granted, applicable to any period prior to the Tax Period in which the Closing shall occur shall belong solely to Seller (and Purchaser shall have no interest therein) and, if the same shall be paid to Purchaser or anyone acting on behalf of Purchaser, same shall be paid to Seller within five (5) days following receipt thereof and, if not timely paid, with interest thereon from the fifth day following such receipt until paid to Seller at a rate equal to the Default Rate. The provisions of this <u>Article 18</u> shall survive the Closing.

19.    TRANSFER TAXES AND TRANSACTION COSTS.

(a)    At the Closing, Seller and Purchaser shall execute, acknowledge, deliver and file all such returns (or, if required by customary local procedures, an electronic version thereof) as may be necessary to comply with any Transfer Tax Law. To the extent required by applicable Law, Purchaser shall pay (or cause to be paid) to the appropriate Government Entity the Transfer Taxes payable, if any, in connection with the consummation of the transactions contemplated by this Agreement.

(b)    Seller shall be responsible for (i) the costs of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Property, (ii) the premium for the Title Insurance Policy, (iii) the costs of the Survey through January 12, 2010, the date of its most recent revision, and (iv) any recording fees for the Deed.

(c)    Except as otherwise provided in <u>Section 21(d)</u>, Purchaser shall be responsible for (i) the costs and expenses associated with its Due Diligence, (ii) the costs and expenses of its legal counsel, advisors and other professionals employed by it in connection with the sale of the Property, (iii) the costs of any updates to the Survey performed after the date of this Agreement and (iv) any recording fees for documentation to be recorded in connection with the transactions contemplated by this Agreement, other than the Deed.

(d)    Seller and Purchaser shall share equally all escrow and/or closing fees of the Title Company.

(e)    The provisions of this <u>Article 19</u> shall survive the Closing.

20.    DELIVERIES TO BE MADE ON THE CLOSING DATE.

(a)    <u>Seller's Documents and Deliveries</u>: On the Closing Date, Seller shall deliver or cause to be delivered to Purchaser the following:

(i)    a duly executed and acknowledged Deed;

(ii)    a duly executed Bill of Sale;

35

(iii)    a duly executed certification as to Seller's non-foreign status in the form of Exhibit 3;

(iv)    a duly executed Title Affidavit;

(v)    copies of the Leases and Property Contracts then in effect to the extent in Seller's possession;

(vi)    copies of plans and specifications, technical manuals and similar materials for the Buildings to the extent in Seller's possession;

(vii)    copies of all books and records relating to the operation of the Premises and maintained by Seller during Seller's ownership thereof, to the extent in Seller's possession;

(viii)    copies of all Permits relating to the ownership, use or operation of the Premises, to the extent in Seller's possession;

(ix)    keys and combinations in Seller's possession relating to the operation of the Premises;

(x)    a certificate of an officer of Seller, reasonably satisfactory to Purchaser, certifying that the representations and warranties of Seller set forth in Article 13 are true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date; and

(xi)    an estoppel certificate in a commercially reasonable form from each Tenant under a Third Party Lease; provided, that Seller shall only be required to use commercially reasonable efforts to obtain such estoppel certificates; and

(xii)    all other documents reasonably necessary or appropriate to consummate the transactions contemplated hereby.

Seller shall be deemed to have delivered the items set forth in Sections 20(a)(v) - 20(a)(ix) if the same are left in the Building management office on the Closing Date.

(b)    Purchaser's Documents and Deliveries:  On the Closing Date, Purchaser shall deliver or cause to be delivered to Seller the following:

(i)    payment in cash, by wire transfer of immediately available funds, of the balance of the Purchase Price payable at the Closing by 1:00 P.M., Eastern Time on the Closing Date, as adjusted for apportionments under Article 7, in the manner required under this Agreement;

(ii)    documentation to establish to Seller's reasonable satisfaction the due authorization of Purchaser's acquisition of the Property and Purchaser's execution and delivery of the documents required to be executed and delivered by Purchaser pursuant to this Agreement (including the organizational documents of Purchaser and its

36

managing members or managers (as applicable), as they may have been amended from time to time), resolutions of Purchaser and its managing members or managers as applicable and incumbency certificates of Purchaser and its managing members or managers as applicable;

     (iii)    a certificate of an officer of Purchaser, reasonably satisfactory to Seller, certifying that the representations and warranties of Purchaser set forth in Article 14 are true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date; and

     (iv)    all other documents reasonably necessary or appropriate to consummate the transactions contemplated hereby.

     (c)    Jointly Executed Documents: Seller and Purchaser shall, on the Closing Date, each execute, acknowledge (as appropriate) and exchange the following documents:

     (i)    the returns required under the Transfer Tax Laws, if any, and any other Tax Law applicable to the transactions contemplated herein;

     (ii)    the Omnibus Assignment and Assumption Agreement;

     (iii)    documents relating to assumption by Purchaser of responsibility for building services, including assumption of the Assumed Contracts;

     (iv)    an assignment and assumption by Purchaser of all of Seller's right, title and interest as landlord under the Third Party Leases in the form attached hereto as Exhibit 7 and made a part hereof;

     (v)    the Nortel License in the form attached hereto as Exhibit 8 and made a part hereof;

     (vi)    in the event Purchaser elects to finance its acquisition of the Property with mortgage financing, a Non-Disturbance Agreement from Purchaser's mortgage lender in favor of the Tenants; and

     (vii)    any other affidavit, document or instrument required to be delivered by Seller or Purchaser or reasonably requested by the Title Company (so long as such request does not add additional warranties or covenants to Seller), pursuant to the terms of this Agreement or applicable Law in order to effectuate the transfer of title to the Premises.

21.    CLOSING DATE; TERMINATION.

     (a)    Closing. The closing of the transactions contemplated hereunder (the "Closing") shall occur, and the documents referred to in Article 20 shall be delivered upon tender of the Purchase Price provided for in this Agreement, at 1:00 P.M. Eastern Time on a date mutually agreed to by Purchaser and Seller (but not earlier than fifteen (15) days following entry of the Sale Order) (the "Closing Date"), or the date Seller sets for the Closing if Seller shall elect

<div align="center">37</div>

to extend this date pursuant to the terms of this Agreement, at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York (the Parties agree and acknowledge that the physical presence of the Parties or their representatives shall not be a required condition of the Closing). TIME IS OF THE ESSENCE as to Purchaser's obligation to close the transactions contemplated hereunder on the Closing Date (or, if Seller shall have extended the Closing Date pursuant to the terms of this Agreement, on such scheduled Closing Date so designated by Seller).

        (b)    <u>Termination</u>. This Agreement may be terminated at any time prior to Closing:

        (i)    by mutual written consent of Seller and Purchaser;

        (ii)    by either Seller or Purchaser, upon written notice to the other, if the Closing does not take place within 180 days from the date hereof (the "<u>Termination Date</u>"); <u>provided</u>, that the right to terminate this Agreement pursuant to this <u>Section 21(b)(ii)</u> shall not be available to the Party seeking to terminate if such Party or one of its Affiliates is then in breach of this Agreement and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to this <u>Section 21(b)(ii)</u>;

        (iii)    by Purchaser, as set forth in <u>Section 6(b)</u>, <u>Section 11(d)(ii)</u>, <u>Section 15(a)(ii)</u>, or <u>Section 16(a)(ii)</u>;

        (iv)    automatically, upon the earlier of (x) consummation of an Alternative Transaction, which consummation Seller shall promptly give written notice of to Purchaser, or (y) 60 days following the Sale Hearing, if the Bankruptcy Court approves an Alternative Transaction; in each case, <u>provided</u>, <u>however</u>, that, subject to the provisions of this Agreement and prior to termination of this Agreement pursuant to this <u>Section 21(b)(iv)</u>, Seller may schedule the Closing Date and require Purchaser to consummate the transactions contemplated by this Agreement on 15 calendar days prior written notice to Purchaser, <u>provided further</u>, <u>however</u>, that, if Seller schedules a closing of the transactions contemplated by this Agreement pursuant to this <u>Section 21(b)(iv)</u>, this Agreement will not terminate automatically pursuant to this <u>Section 21(b)(iv)</u>;

        (v)    as set forth in Article <u>23</u>;

        (vi)    by Seller as set forth in <u>Section 11(d)(i)</u> or <u>Section 11(d)(ii)</u>.

        (c)    If this Agreement is terminated pursuant to the terms contained in <u>Section 21(b)</u> (i) all further obligations of the parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other, except for the obligations that expressly survive the termination of this Agreement, and (ii) unless this Agreement is terminated under circumstances entitling Seller to retain the Deposit, Escrow Agent shall return the Deposit (and all interest accrued thereon) to Purchaser, within two (2) Business Days following such termination.

        (d)    <u>Expense Reimbursement and Limited Expense Reimbursement</u>.

38

(i)     If this Agreement is terminated by Purchaser pursuant to <u>Section</u> <u>21(b)(iii)</u> (because of the failure of the condition contained in <u>Section 11(c)(ii)</u>, which failure is caused by Seller's failure to prosecute entry of the Sale Order in compliance with its obligations under <u>Sections 9(a)</u> and <u>9(b)</u> hereof), and Purchaser is not in breach of this Agreement, which breach would result in a failure to satisfy any of the conditions to the Closing set forth in <u>Section 11(a)</u> (other than <u>Section 11(a)(ii)(1)</u>), then Seller shall pay to Purchaser cash in an amount equal to TWO-HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) (the "<u>Limited Expense Reimbursement</u>").  The Limited Expense Reimbursement shall be paid by wire transfer of immediately available funds to an account designated by Purchaser and shall be paid after termination of this Agreement under circumstances entitling Purchaser to the Limited Expense Reimbursement pursuant to this <u>Section 21(d)(i)</u>, within five (5) Business Days following the termination of this Agreement.

(ii)     If (a) this Agreement is terminated pursuant to <u>Section 21(b)(iv)</u>, (b) at the time of such termination Purchaser is not in breach of this Agreement, which breach would result in a failure to satisfy any of the conditions to the Closing set forth in <u>Section 11(a)</u> (other than <u>Section 11(a)(ii)(1)</u>), and (c) an Alternative Transaction is consummated within six (6) months of such termination, then Seller shall pay to Purchaser cash in an amount equal to the total amount of all actual, out-of-pocket fees, costs and expenses reasonably incurred by Purchaser in connection with the negotiation, preparation, execution and performance of this Agreement and the transactions contemplated thereby, including the prosecution of the Sale Motion, in an amount not less than ONE MILLION TWO-HUNDRED AND FIFTY THOUSAND DOLLARS AND 00/100 ($1,250,000) (the "<u>Expense Reimbursement</u>").  The Expense Reimbursement shall be paid upon consummation of an Alternative Transaction by wire transfer of immediately available funds to an account designated by Purchaser.

(iii)     Notwithstanding anything to the contrary in this Agreement, the payment of the Limited Expense Reimbursement or the Expense Reimbursement (it being understood that either the Limited Expense Reimbursement or the Expense Reimbursement may become payable under this Agreement, but not both) and the return of the Deposit shall be the sole and exclusive remedies of Purchaser, whether at Law or in equity, under this Agreement in the event this Agreement is terminated in accordance with this <u>Section 21(d)</u>.

(iv)     Seller's obligation to pay the Limited Expense Reimbursement or the Expense Reimbursement pursuant to this <u>Section 21(d)</u> shall survive termination of this Agreement and shall constitute an administrative expense of the Debtors under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

22.     <u>NOTICES.</u>

All notices, demands, requests or other communications (collectively, "<u>Notices</u>") required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, or (b) national overnight delivery service, or (c) facsimile transmission (<u>provided</u> that the original shall be simultaneously

39

delivered by national overnight delivery service or personal delivery), or (d) personal delivery, addressed as follows:

(i)    If to Seller:

Nortel Networks Inc.
GMS 991-02-A30
2221 Lakeside Boulevard
Richardson, Texas 75082
Attention:  Real Estate Group
Facsimile:  (972) 684-3923

With copies (that shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention:  Kimberly Brown Blacklow, James L. Bromley and Lisa M. Schweitzer
Facsimile:  (212) 225-3999

and:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention:  David Botter and Stephen Kuhn
Facsimile:  (212) 872-1002

and:

Milbank Tweed Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005-1413
Attention:  Roland Hlawaty
Facsimile:  (212) 822-5735

(ii)    If to Purchaser:

Pillar Commercial, LLC
10440 N. Central Expressway, Suite 500
Dallas, Texas 75231

with a copy to:

Cherry Petersen Landry Albert LLP
8350 North Central Expressway, Suite 800

40

Dallas, Texas 75206
Attention: Terry Landry
Facsimile: (214) 265-7008

(iii)   If to Escrow Agent:

Chicago Title Insurance Company
711 Third Avenue
New York, NY 10017
Attention:  Elliot L. Hurwitz, Chief Commercial Counsel
Facsimile:  (212) 880-1402

Any Notice so sent by certified or registered mail, national overnight delivery service or personal delivery shall be deemed given on the date of receipt or refusal as indicated on the return receipt, or the receipt of the national overnight delivery service or personal delivery service. Any Notice sent by facsimile transmission shall be deemed given when received as confirmed by the telecopier electronic confirmation receipt. A Notice may be given either by a Party or by such Party's attorney. Seller or Purchaser may designate, by not less than five (5) Business Days' notice given to the others in accordance with the terms of this Article 22, additional or substituted parties to whom Notices should be sent hereunder.

23.   DEFAULT BY PURCHASER OR SELLER.

(a)   If (i) Purchaser shall default in the payment of the Purchase Price or in the performance of any of its other obligations to be performed on the Closing Date, or (ii) Purchaser shall default in the performance of any of its material obligations to be performed prior to the Closing Date and, with respect to any default under this clause (ii) only, such default shall continue for five (5) Business Days after notice to Purchaser, Seller as its SOLE AND EXCLUSIVE REMEDY BY REASON THEREOF (IN LIEU OF PROSECUTING AN ACTION FOR DAMAGES OR PROCEEDING WITH ANY OTHER LEGAL OR EQUITABLE COURSE OF CONDUCT, THE RIGHT TO BRING SUCH ACTIONS OR PROCEEDINGS BEING EXPRESSLY AND VOLUNTARILY WAIVED BY SELLER, TO THE EXTENT LEGALLY PERMISSIBLE, FOLLOWING AND UPON ADVICE OF ITS COUNSEL) shall be entitled to terminate this Agreement and, upon such termination, Seller shall be entitled to retain the Deposit (and any interest earned thereon) as liquidated damages for Purchaser's default hereunder, it being agreed that the damages by reason of Purchaser's default are difficult, if not impossible, to ascertain, and thereafter Purchaser and Seller shall have no further rights or obligations under this Agreement except for those that are expressly provided in this Agreement to survive the termination hereof. Notwithstanding anything contained herein to the contrary, if Seller terminates this Agreement pursuant to a right given to it hereunder and Purchaser takes any action which interferes with Seller's ability to sell, exchange, transfer, lease, dispose of or finance the Property or take any other actions with respect thereto (including, without limitation, the filing of any lis pendens or other form of attachment against or Encumbrance on the Property), then the named Purchaser (and any permitted assignee of Purchaser's interest hereunder) shall be jointly and severally liable for all loss, cost, damage, liability or expense (including, without limitation, reasonable attorneys' fees, court costs and

41

disbursements and consequential damages) incurred by Seller by reason of such action to contest by Purchaser.

(b)    If after the entry of the Sale Order (i) Seller shall default in any of its obligations to be performed on the Closing Date or (ii) Seller shall default in the performance of any of its material obligations to be performed prior to the Closing Date and, with respect to any default under this clause (ii) only, such default shall continue for five (5) Business Days after notice to Seller, Purchaser as its SOLE AND EXCLUSIVE REMEDY BY REASON THEREOF (IN LIEU OF PROSECUTING AN ACTION FOR DAMAGES OR PROCEEDING WITH ANY OTHER LEGAL OR EQUITABLE COURSE OF CONDUCT, THE RIGHT TO BRING SUCH ACTIONS OR PROCEEDINGS BEING EXPRESSLY AND VOLUNTARILY WAIVED BY PURCHASER, TO THE EXTENT LEGALLY PERMISSIBLE, FOLLOWING AND UPON ADVICE OF ITS COUNSEL) shall have the right subject to the other provisions of this Section 23(b) (i) to seek to obtain specific performance of Seller's obligations hereunder, provided that any action for specific performance shall be commenced in the Bankruptcy Court or other court of competent jurisdiction pursuant to Section 24(k) within sixty (60) days after such default, or (ii) to terminate this Agreement by notice to Seller and to receive a return of the Deposit (together with any interest earned thereon), it being understood that if Purchaser fails to commence an action for specific performance within sixty (60) days after such default, Purchaser's sole remedy shall be to receive a return of the Deposit (together with any interest earned thereon). If Purchaser elects to seek specific performance of this Agreement, then as a condition precedent to any suit for specific performance, Purchaser shall on or before the Closing Date, TIME BEING OF THE ESSENCE, fully perform all of its obligations hereunder which are capable of being performed (other than the payment of the Purchase Price, which shall be paid as and when required by the Bankruptcy Court or other court of competent jurisdiction pursuant to Section 24(k) in the suit for specific performance). Upon such termination and return of Deposit, neither Party hereto shall have any further obligations hereunder except for those that are expressly provided in this Agreement to survive the termination hereof. Notwithstanding the foregoing, Purchaser shall have no right to seek specific performance, if Seller shall be prohibited from performing its obligations hereunder by reason of any Law applicable to Seller.

(c)    The provisions of this Article 23 shall survive the termination hereof.

24.    MISCELLANEOUS

(a)    Entire Agreement. This Agreement contains all of the terms agreed upon between Seller and Purchaser with respect to the subject matter hereof, and all prior agreements, understandings, representations and statements, oral or written, between Seller and Purchaser are merged into this Agreement. The provisions of this Section 24(a) shall survive the Closing or the termination hereof.

(b)    Amendments. This Agreement may not be changed, modified or terminated, except by an instrument executed by Seller and Purchaser. The provisions of this Section 24(b) shall survive the Closing or the termination hereof.

(c)    Waiver. No waiver by either Party of any failure or refusal by the other Party to comply with its obligations shall be deemed a waiver of any other or subsequent failure

42

or refusal to so comply. The provisions of this <u>Section 24(c)</u> shall survive the Closing or the termination hereof.

        (d)    <u>Partial Invalidity</u>. If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and shall be enforced to the fullest extent permitted by Law. The provisions of this <u>Section 24(d)</u> shall survive the Closing or the termination hereof.

        (e)    <u>Section Headings</u>. The headings of the various sections of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. The provisions of this <u>Section 24(e)</u> shall survive the Closing or the termination hereof.

        (f)    <u>Governing Law</u>. This Agreement shall be governed by the Laws of the State of Texas without giving effect to conflict of Laws principles thereof, and Purchaser hereby waives any defense to any action or proceeding granted by the Laws of any other country or jurisdiction unless such defense is also allowed by the Laws of the State of Texas. The provisions of this <u>Section 24(f)</u> shall survive the Closing or the termination hereof.

        (g)    <u>Parties; Assignment And Recording</u>.

        (i)    This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon Seller and Purchaser and their respective successors and permitted assigns; <u>provided</u>, <u>however</u>, that none of the representations or warranties made by Seller hereunder shall inure to the benefit of any Person that may, after the Closing Date, succeed to Purchaser's interest in the Property.

        (ii)    Purchaser may not assign or otherwise transfer this Agreement or any of its rights or obligations hereunder or any of the direct or indirect ownership interests in Purchaser, without first obtaining Seller's consent thereto (such consent to be granted or withheld by Seller in its sole discretion) and, in addition, without complying with the following requirements: (A) Purchaser shall provide Seller with the name, signature block, address and federal taxpayer identification number of such assignee or transferee, (B) the assignee or transferee shall assume all of the obligations of Purchaser under this Agreement and each other agreement or instrument to be delivered hereunder pursuant to an assignment and assumption agreement in form and substance reasonably acceptable to Seller; (C) Purchaser confirms to Seller in writing that the assignment or transfer does not relieve Purchaser of its obligations hereunder except to the extent that such obligations actually are satisfied by the assignee or transferee; (D) the assignment or transfer does not have the effect of delaying the Closing in any respect; and (E) Purchaser pays for any and all Taxes that may be payable in connection with such assignment or transfer; <u>provided</u>, <u>however</u>, that in the event that the assignee or transferee is an Affiliate

<div align="center">43</div>

of Purchaser, the consent of Seller shall not be required but all of the other conditions specified above must be satisfied.

(iii)    Seller may, without Purchaser's consent, sell, assign or otherwise transfer the Property together with this Agreement to a reorganized Seller or other successor to Seller's interest in the Property and this Agreement pursuant to a confirmed plan or plans of reorganization or liquidation or other order of the Bankruptcy Court.

(iv)    Neither this Agreement nor any memorandum hereof may be recorded without first obtaining Seller's consent thereto. Any breach of the provisions of this Section 24(g)(iv) shall constitute a default by Purchaser under this Agreement. Purchaser agrees not to file any lis pendens or other instrument or Encumbrance against all or a portion of the Premises in connection herewith. In furtherance of the foregoing, and notwithstanding anything contained herein to the contrary, Purchaser (i) acknowledges that the filing of a lis pendens, Encumbrance or other evidence of Purchaser's rights or the existence of this Agreement against all or a portion of the Premises could cause significant monetary and other damages to Seller and (ii) hereby agree to indemnify Seller from and against any and all Covered Losses arising out of the breach by Purchaser of any of its obligations under this Section 24(g)(iv).

(v)    The provisions of Section 24(g)(i) and Section 24(g)(iv) shall survive the Closing or the termination hereof. The provisions of Section 24(g)(ii) shall survive the termination hereof.

(h)    Public Announcements.

(i)    Until the Closing, Purchaser and its partners, members, attorneys, agents, employees and consultants will treat the information disclosed to it by Seller, or otherwise gained through Purchaser's access to the Property and Seller's books and records, as confidential, giving it the same care as Purchaser's own confidential information, and make no use of any such disclosed information not independently known to Purchaser except in connection with the transactions contemplated hereby. In the event of a termination of this Agreement, Purchaser shall promptly return all such confidential information to Seller.

(ii)    Subject to Seller and Purchaser's disclosure obligations imposed by Law or stock exchange regulation (including any obligations under any Bankruptcy Laws), during the period from the date hereof until the Closing Date, Purchaser and Seller shall, and shall cause their respective Affiliates to, (i) cooperate with each other in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and (ii) not issue any such announcement or statement prior to consultation with, and the approval of, the other Party (such approval not to be unreasonably withheld or delayed); provided, that approval shall not be required where the disclosing Party determines, based on advice of counsel and after consultation with the other Party, that such disclosure is required by Law or stock exchange regulation; and

44

provided, further, that nothing herein shall prevent Purchaser and its Affiliates from making disclosures and announcements that contain no more information regarding this Agreement than is contained in such public announcements or is otherwise disclosed or publicly filed by Seller or its Affiliates. In furtherance of the foregoing, the parties shall make a public announcement, on the date hereof, of the signing of this Agreement, and of the granting of the Sale Order, promptly after the granting thereof, in each case in the form agreed by the parties.

(iii)    The provisions of Section 24(h) shall survive the termination of this Agreement and the provisions of Section 24(h)(i) shall survive the termination hereof or the Closing.

(i)    Further Assurances. Seller and Purchaser will do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices, transfers and assurances as may be reasonably required by the other Party, for the better assuring, conveying, assigning, transferring and confirming unto Purchaser the Property and for carrying out the intentions or facilitating the consummation of this Agreement. The provisions of this Section 24(i) shall survive the Closing.

(j)    Third Party Beneficiary. This Agreement is an agreement solely for the benefit of Seller and Purchaser (and their permitted successors and/or assigns). No other Person shall have any rights hereunder nor shall any other Person be entitled to rely upon the terms, covenants and provisions contained herein. The provisions of this Section 24(j) shall survive the Closing or the termination hereof.

(k)    Jurisdiction And Service Of Process. To the fullest extent permitted by applicable Law, each Party: (i) agrees that any Action by such Party seeking any relief whatsoever arising out of, related to or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) the Bankruptcy Court, if brought prior to the entry of final decree(s) closing the Chapter 11 Cases, and (b) if brought after entry of final decree(s) closing the Chapter 11 Cases, in the United States District Court for the Northern District of Texas or, if that court lacks subject matter jurisdiction, a Texas State court with appropriate jurisdiction located in Dallas County, Texas, and shall not be brought in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Bankruptcy Court, the United States District Court for the Northern District of Texas and such appropriate Texas State court located in Dallas County, Texas, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, related to or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Article 22 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

45

(l)  <u>WAIVER OF TRIAL BY JURY</u>.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER RELATED TO OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 24(l)</u>.  THE PROVISIONS OF THIS <u>SECTION 24(l)</u> SHALL SURVIVE THE CLOSING OR THE TERMINATION HEREOF.

(m)  <u>Survival</u>.  Except as expressly set forth herein, no representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be performed or satisfied after the Closing Date, which covenants and agreements shall survive until performed or satisfied in accordance with their terms.

(n)  <u>Other</u>.

(i)  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

(ii)  Any consent or approval to be given hereunder by Seller or Purchaser shall not be effective unless the same shall be given in advance of the taking of the action for which consent or approval is requested and shall be in writing.  Except as otherwise expressly provided herein, any consent or approval requested of Seller or Purchaser shall not be unreasonably withheld, conditioned or delayed by Seller or Purchaser, as applicable.

(iii)  Escrow Agent is hereby designated the "real estate reporting person" for purposes of Section 6045 of the Code and Treasury Regulation 1.6045-4 and any instructions or settlement statement prepared by Escrow Agent shall so provide. Upon the consummation of the transaction contemplated by this Agreement, Escrow Agent shall file Form 1099 information return and send the statement to Seller as required under the aforementioned statute and regulation. Seller and Purchaser shall promptly furnish their federal tax identification numbers to Escrow Agent and shall otherwise reasonably cooperate with Escrow Agent in connection with Escrow Agent's duties as real estate reporting person.

(iv)  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

46

(v)      In this Agreement (x) the words "including" and "includes" mean "including (or includes) without limitation," (y) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (z) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a Business Day, such period will end on the next Business Day.

(vi)      When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

(vii)      All monetary amounts in this Agreement are stated in United States currency. All calculations and estimates to be performed or undertaken are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency.

(viii)      Any reference in this Agreement to a "day" or a number of "days" (other than references to a "Business Day" or "Business Days") shall mean a calendar day or calendar days.

(ix)      Notwithstanding anything contained herein to the contrary, Seller shall have the right to retain, following Closing, copies of any book, record, literature, list and any other written or recorded information with respect to the Property that Seller in good faith determines Seller is reasonably likely to require for bona fide business or legal purposes.

(x)      The provisions of this Section 24(n) shall survive the Closing or the termination hereof.

(o)      Exculpation; Damages.

(i)      Without limiting Section 23(b), subject to the satisfaction of the conditions set forth in Section 11(c) hereof, Purchaser agrees to look solely to Seller and Seller's interest in the Building or, if the Closing has occurred, the net proceeds of the sale (subject to the limitations contained herein) for the satisfaction of any liability or obligation arising under this Agreement or the transactions contemplated hereby, or for the performance of any of the covenants, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's other assets or properties with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby. Notwithstanding anything to the contrary set forth in this Agreement and without limiting

47

the other restrictions on damages set forth in this Agreement, in no event shall Seller be liable for any incidental, consequential, indirect, punitive, special or exemplary damages, or for lost profits, unrealized expectations or other similar claims, and in every case Purchaser's recovery for any claims hereunder shall be net of any insurance proceeds and any indemnity, contribution or other similar payment recovered or recoverable by Purchaser from any insurance company, Tenant, or other third party.

(ii)    The provisions of this <u>Section 24(o)</u> shall survive the termination of this Agreement and the Closing.

(p)    <u>Independent Consideration</u>.  Contemporaneously with the execution and delivery of this Agreement, Purchaser has delivered to Seller, and Seller hereby acknowledges the receipt of, $100 ("<u>Independent Consideration</u>"), which amount the parties hereto bargained for and agreed to as consideration for Purchaser's right to inspect and purchase the Property pursuant to this Agreement and for Seller's execution, delivery and performance of this Agreement.  The Independent Consideration is in addition to, and independent of, any other consideration or payment provided in this Agreement, is nonrefundable and is fully earned and will be retained by Seller notwithstanding any other provision of this Agreement to the contrary.

<p align="center">[END OF PAGE – SIGNATURE PAGES FOLLOW]</p>

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed the day and year first above written.

<div align="center">

SELLER:

NORTEL NETWORKS INC., a Delaware corporation

</div>

By: _____
Name:    John J. Ray III
Title:    Principal Officer

<div align="center">

PURCHASER:

PILLAR COMMERCIAL, LLC, a Texas limited liability company

</div>

By: _____
Name:    Manny Ybarra
Title:    Manager

<div align="center">

49

</div>

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed the day and year first above written.

SELLER:

NORTEL NETWORKS INC., a Delaware corporation

By: _____
Name:    John J. Ray III
Title:    Principal Officer

PURCHASER:

PILLAR COMMERCIAL, LLC, a Texas limited liability company

By: _____
Name:    Manny Ybarra
Title:    Manager

The undersigned hereby
acknowledges and consents
to the provisions of <u>Article 4</u> and <u>Sections 21(c)</u> and ███████;

CHICAGO TITLE INSURANCE COMPANY, as Escrow
Agent

By: _____

Name:

Title:

ELLIOT L. HURWITZ
Chief Commercial Counsel

SCHEDULE A

Description of the Land

Lot 3, Block 1 of Replat, Greenway-Block 1, Lot 3, an addition to the City of Richardson, Dallas County, Texas, according to the plat thereof recorded in Volume 91207, Page 1625, Map Records, Dallas County, Texas.

A-1

SCHEDULE B-1

<u>Included Personalty</u>

All Personalty located in the Tower and Lab Building as of the date hereof other than Excluded Personalty as set forth on <u>Schedule B-2</u>.

B-1-1

SCHEDULE B-2

<u>Excluded Personalty</u>

[FILED UNDER SEAL]

SCHEDULE C-1

<u>Third Party Leases</u>

1.  Lease Agreement, dated December 18, 2009, between Nortel Networks Inc., as landlord, and Avaya Inc., as tenant (with respect to space at the Lab), expiring on December 17, 2012 (as the same may be amended, supplemented or modified in accordance with its terms).

2.  Lease, dated August 1, 2010, between Nortel Networks Inc., as landlord, and Ericsson Inc., as tenant (with respect to space at the Lab), expiring on November 12, 2012 (as the same may be amended, supplemented or modified in accordance with its terms).

3.  Lease, dated August 1, 2010, between Nortel Networks Inc., as landlord, and Ericsson Inc., as tenant (with respect to space at the Lab) (as the same may be amended, supplemented or modified in accordance with its terms).

C-1-1

SCHEDULE C-2

[INTENTIONALLY OMITTED]

C-2-1

SCHEDULE D

<u>Assumed Contracts</u>

None.

D-1

## SCHEDULE E

### Specified Encumbrances

None.

SCHEDULE F

Title Report

Attached hereto.

F-1

# SCHEDULE A

GF# TNB3703-A –

| Commitment No. 44-901-80- | TNB3703-A | Issued | 03/31/11 | 8:00 AM |
|---|---|---|---|---|

Commitment Effective Date:    March 16, 2011

1. The policy or policies to be issued are:

(a) Form T-1: OWNER POLICY OF TITLE INSURANCE  (Not applicable for improved one-to-four family
residential real estate)

Policy Amount: $43,100,000.00
Proposed Insured:
NORTEL NETWORKS INC., a Delaware corporation

(b) Form T-1R: TEXAS RESIDENTIAL OWNER POLICY OF TITLE INSURANCE ONE-TO-FOUR FAMILY
RESIDENCES

Policy Amount:
Proposed Insured:

(c) Form T-2: MORTGAGEE POLICY OF TITLE INSURANCE

Policy Amount: $0.00
Proposed Insured:

Proposed Borrower:

(d) Form T-2R TEXAS SHORT FORM RESIDENTIAL MORTGAGEE POLICY OF TITLE INSURANCE

Policy Amount:
Proposed Insured:

Proposed Borrower:

(e) Form T-13 MORTGAGEE TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN

Binder Amount:
Proposed Insured:

Proposed Borrower:

(f) OTHER
Policy Amount:
Proposed Insured:

2002COMA

# SCHEDULE A, CONTINUED

GF# TNB3703-A -
Commitment No. 44-901-80- TNB3703-A

2. The interest in the land covered by this Commitment is:

Fee Simple

3. Record title to the land on the Effective Date appears to be vested in:

NORTEL NETWORKS INC., a Delaware corporation

4. Legal description of the land:

Lot 3, Block 1 of Replat, Greenway-Block 1, Lot 3, an addition to the City of
Richardson, Dallas County, Texas, according to the plat thereof recorded in
Volume 91207, Page 1625, Map Records, Dallas County, Texas.

GF# TNB3703-A-
Commitment No. 44-901-80-TNB3703-A

# SCHEDULE  B

### EXCEPTIONS FROM COVERAGE

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

B      1. The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception.):

Volume 83013, Page 1589; Volume 88235, Page 2829 and Volume 90051, Page 862, Deed Records, Dallas County, Texas,, but omitting any covenant or restriction based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that said covenant (a) is exempt under Chapter 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons.

E      2. Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments, or protrusions, or any overlapping of improvements.

G      3. Homestead or community property or survivorship rights, if any, of any spouse of any insured.  (Applies to the Owner Policy only.)

H      4. Any titles or rights asserted by anyone, including but not limited to, persons, the public, corporations, governments or other entities,
          a. to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or
          b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or
          c. to filled-in lands, or artificial islands, or
          d. to statutory water rights, including riparian rights, or
          e. to the area extending from the line of mean low tide to the line of vegetation, or the right of access to that area or easement along and across that area.
          (Applies to Owner Policy only).

L      5. Standby fees, taxes and assessments by any taxing authority for the year 2011 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax year. (If Texas Short Form Residential Mortgagee Policy (T-2R) is issued, that policy will substitute "which become due and payable subsequent to Date of Policy" in lieu of "for the year 2011 and subsequent years.")

N      6. The terms and conditions of the documents creating your interest in the land.

O      7. Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before binder is

## SCHEDULE B (continued)

issued.)

Q     8. Liens and leases that affect the title to the land, but that are
         subordinate to the lien of the insured mortgage.
         (Applies to Mortgagee Policy (T-2) only.)

R     9. The Exceptions from Coverage and Express Insurance in Schedule B of the
         Texas Short Form Residential Mortgagee Policy (T-2R). (Applies to Texas
         Short Form Residential Mortgagee Policy (T-2R) only. Separate exceptions
         1 through 8 of this Schedule B do not apply to the Texas Short Form
         Residential Mortgagee Policy (T-2R).)

U    10. The following matters and all terms of the documents creating or offering
         evidence of the matters (We must insert matters or delete this
         exception.):

AI   11. Rights of parties in possession.

AS   12. a. Rights of tenants in possession, as tenants only, under unrecorded
            lease agreements.

         b. Intentionally Deleted

         c. The following items as set out on plat recorded in Volume 91207, Page
         1625, Map Records, Dallas County, Texas, as shown on survey prepared by
         CSSI Commercial  Surveying Specialists, Inc. under the supervision of
         Earl N. Strom  R.P.L.S. No. 4123 dated December 9, 2009, and last revised
         _____.

         1) Fifteen foot pedestrian easements;
         2) Fifteen foot TUEC easements;
         3) Twenty foot TUEC easement;
         4) Forty foot building set back lines;
         5) Fifteen foot building set back line;
         6) Variable width fire lane easements;
         7) Variable width TUEC easement;
         8) Twenty five foot drainage easement;
         9) Variable width drainage easement;
         10) Ten foot pedestrian easement;
         11) Variable width private access easement for irrigation control, and
         pump vaults;
         12) Fifteen foot landscape area;
         13) Twelve foot utility easement; and
         14) Twenty foot utility and drainage easement.

         d. Intentionally Deleted

         e. Easement(s) for the purpose(s) shown below and rights incidental
         thereto, as granted in a document: Granted to: Texas Power & Light
         Company Purpose: right of way Recording Date: October 26, 1982 Recording
         No: in Volume 82210, Page 825, Deed Records, Dallas County, Texas, as

## SCHEDULE B (continued)

shown on survey prepared by CSSI Commercial  Surveying Specialists, Inc. under the supervision of Earl N. Strom  R.P.L.S. No. 4123 dated December 9, 2009, and last revised _____.

GF# TNB3703-A -
Commitment No. 44-901-80-TNB3703-A

# SCHEDULE C

Your Policy will not cover loss, costs, attorney's fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

Z 1. Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

AA 2. Satisfactory evidence must be provided that:
- no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,
- all standby fees, taxes, assessments and charges against the property have been paid,
- all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, subcontractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,
- there is legal right of access to and from the land,
- (on a Mortgagee policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

AB 3. You must pay the seller or borrower the agreed amount for your property or interest.

AC 4. Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

AR 5. NOTE - IMPORTANT NOTICE

YOU HAVE THE RIGHT TO HAVE YOUR FUNDS DEPOSITED IN AN INTEREST-BEARING ACCOUNT.

IF YOU CHOOSE TO ESTABLISH AN INTEREST-BEARING ACCOUNT FOR YOUR DEPOSIT, notify your escrow officer immediately.  Thereafter you will be provided with a Notice of Election form which you should complete in writing by completing and returning the form, along with your taxpayer identification information, not later than five (5) days before the scheduled closing.  If you choose to establish an interest-bearing account for your deposit, an additional charge of $50.00 will be required.  This charge may exceed the amount of interest to be earned on the deposit, depending on the amount, applicable interest rate, and the duration of the deposit.

As an example, the amount of interest you can earn on a deposit of $1,000.00 for a thirty-day period at an interest rate of 4% is $3.33. Interest earned is dependent on the amount of deposit, time of deposit and the applicable interest rate.

GF# TNB3703-A
Commitment No. TNB3703-A                                                    Page 2

## SCHEDULE C (continued)

IF YOU DO NOT CHOOSE TO ESTABLISH AN INTEREST-BEARING ACCOUNT FOR YOUR
DEPOSIT your funds will be deposited with other escrow funds in your
escrow agent's general escrow account with an authorized financial
institution and may be transferred to another general escrow account
or accounts.  By reason of the banking relationship between our
Company and the financial institution, the Company may receive an
array of bank services, accommodations or other benefits.  The escrow
funds will not be affected by such services, accommodations or other
benefits.

Failure to notify your escrow officer and complete the additional
required investment authorization form shall constitute waiver of any
intention of establishing an interest bearing account for your
deposit(s).

AT   6. 4. Any defect, lien or other matter that may affect title to the land
or interest insured, that arises or is filed after the effective date
of this Commitment.

5. Evidence of authority for those acting for or in behalf of any
party to the transaction to which the commitment is addressed, along
with evidence of good standing for any fictitious entity(ies).

6. The mechanic's lien provisions will be deleted from this commitment
and/or Policy/Policies to be issued upon proof satisfactory to the
company that the Policy/Policies to be issued do not include the cost
of contemplated improvements, construction or repairs.

OWNER'S POLICY:

Any and all liens arising by reason of unpaid bills or claims for work
performed or materials furnished in connection with improvements
placed, or to be placed, upon the subject land. However, the Company
does insure against loss, if any, sustained by the Insured
under this policy if such liens have been filed with the County Clerk
of _____ County, Texas, prior to the date hereof. Liability
hereunder at the date hereof is limited to $ _____.
Liability shall increase as contemplated improvements are made, so
that any loss payable hereunder shall be limited to said sum plus the
amount actually expended by the Insured as improvements at the time
the loss occurs. Any expenditures made for improvements, subsequent to
the date of this policy, will be deemed made as of the date of this
policy. In no event shall the liability of the Company hereunder
exceed the face amount of this policy. Nothing contained in this
paragraph shall be construed as limiting any exception or any printed
provision of this policy. LOAN POLICY:

Any and all liens arising by reason of unpaid bills or claims for work
performed or materials furnished in connection with improvements
placed, or to be placed, upon the subject land. However, the Company
does insure the Insured against loss, if any, sustained by the Insured

## SCHEDULE C (continued)

under this Policy if such liens have been filed with the County Clerk
of _____ County, Texas, prior to the date hereof.

Pending disbursement of the full proceeds of the loan secured by the
lien instrument set forth under Schedule A hereof, this policy insures
only to the extent of the amount actually disbursed, but increases as
each disbursement is made in good faith and without knowledge of any
defects in, or objections to, the title up to the face amount of the
policy. Nothing contained in this paragraph shall be construed as
limiting any exception under Schedule B, or any printed provision of
this policy.

7. A claim of mechanics lien or materialmans lien Claimant: Graybar
Electric Company, Inc. Amount: $11,008.66 Recording Date: January 29,
2009 Recording No: under Clerk's File No. 200900026586, Mechanic's
Lien Records, Dallas County, Texas

8. The following note is for informational purposes only: The
following deed(s) affecting said Land were recorded within twenty-four
(24) months of the date of this report:

None found of record.

The last Deed found of record affecting the Land was recorded
05/04/2004 at in Volume 2004086, Page 15885, Deed Records, Dallas
County, Texas, wherein the grantee acquired subject property.

AU   7. The title company has reviewed and approved a survey of the subject
property, subject to the matters shown in Schedule "B" and "C" of this
commitment.

Survey prepared by CSSI Commercial Surveying Specialists, Inc. under
the supervision of Earl N. Strom R.P.L.S. No. 4123 dated December 9,
2009, and last revised _____.

Survey is not signed and CTIC requires a final signed and dated survey
for review and approval.

Survey shows physical access along Lakeside BLVD and available under
the T-23 Access endorsement.

The BASIC MANUAL OF TITLE INSURANCE IN THE STATE OF TEXAS does not
allow for the amendment of Schedule "B", Item No. 2 (the survey
exception) in the commitment form.

Schedule "B", Item No. 2 will be amended in the Owner's Policy to read
"shortages in area", upon payment of a premium of 15% of the basic
premium.

Schedule "B", Item No. 2 will be amended in the Mortgagee's Policy to
read "shortages in area", at no additional charge.

## SCHEDULE D

GF Number: TNB3703-A    COM         Commitment Number: 44-901-80-         TNB3703-A

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1. Disclosure of:

CHICAGO TITLE INSURANCE COMPANY, a Nebraska Corporation

(a) The Shareholders owning or controlling, directly or indirectly, ten (10%), or more of the shares of Chicago Title Insurance Company:

CHICAGO TITLE AND TRUST COMPANY, an Illinois Corporation

(b) The Names of the Directors of Chicago Title Insurance Company: Christopher Abbinante, John A. Wunderlich, Erika Meinhardt, Raymond R. Quirk, Alan L. Stinson, Roger S. Jewkes, Anthony J. Park, Thomas E. Evans, Jr.

(c) The president, the executive or senior vice-president, the secretary and the treasurer of Chicago Title Insurance Company:

| | |
|---|---|
| Chairman of the Board, President and Chief Executive Officer: | Raymond R. Quirk |
| Executive Vice President and Regional Manager: | John A. Wunderlich |
| Vice President and Corporate Secretary: | Fernando Velez, Jr. |
| Vice President and Treasurer: | Patrick G. Farenga |

AJ      2.   "You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates. Upon your request, such disclosure will be made to you. Additionally, the name of any person, firm or corporation receiving any sum from the settlement of this transaction will be disclosed on the closing or settlement statement." "You are further advised that the estimated title premium* is:

Owner Policy
Mortgagee Policy
Endorsement Charges
Other
Total

Of this total amount: will be paid to the policy issuing Title Insurance Company; will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

AMOUNT                    TO WHOM                    FOR SERVICES

*The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance. Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance."

**DELETION OF ARBITRATION PROVISION**
(Not applicable to the Texas Residential Owner Policy)

Arbitration is a common form of alternative dispute resolution. It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company. However, if you agree to arbitrate, you give up your right to take the Title Company to court and your rights to discovery of evidence may be limited in the arbitration process. In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below). It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less. If you want to retain your right to sue the Company incase of a dispute over a claim, you must request deletion the arbitration provision before the policy issued. You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The arbitration provision in the Policy is as follows:
"Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity). All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgement upon the reward rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

I request deletion of the Arbitration provision.


_____          _____
SIGNATURE                                        DATE


_____          _____
SIGNATURE                                        DATE


T7DELAP 04/08 GRG

Effective Date: May 1, 2008

Fidelity National Financial, Inc.
**Privacy Statement**

Fidelity National Financial, Inc. and its subsidiaries ("FNF") respect the privacy and security of your non-public personal information ("Personal Information") and protecting your Personal Information is one of our top priorities. This Privacy Statement explains FNF's privacy practices, including how we use the Personal Information we receive from you and from other specified sources, and to whom it may be disclosed. FNF follows the privacy practices described in this Privacy Statement and, depending on the business performed, FNF companies may share information as described herein.

**Personal Information Collected**
We may collect Personal Information about you from the following sources:
Information we receive from you on applications or other forms, such as your name, address, social security number, tax identification number, asset information and income information;
Information we receive from you through our Internet websites, such as your name, address, email address, Internet Protocol address, the website links you used to get to our websites, and your activity while using or reviewing our websites.
Information about your transactions with or services performed by us, our affiliates, or others, such as information concerning your policy, premiums, payment history, information about your home or other real property, information from lenders and other third parties involved in such transactions, account balances, and credit card information; and
Information we receive from consumer or other reporting agencies and publicly recorded documents.

**Disclosure of Personal Information**
We may provide your Personal Information (excluding information we receive from consumer or other credit reporting agencies) to various individuals and companies, as permitted by law, without obtaining your prior authorization. Such laws do not allow consumers to restrict these disclosures. Disclosures may include, without limitation, the following:
To insurance agents, brokers, representatives, support organizations, or others to provide you with services you have requested, and to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure in connections with an insurance transaction;
To third-party contractors or service providers for the purpose of determining your eligibility for an insurance benefit or payment and/or providing you with services you have requested;
To an insurance regulatory authority, or a law enforcement or other governmental authority, in a civil action, in connection with a subpoena or a governmental investigation;
To companies that perform marketing services on our behalf or to other financial institutions with which we have joint marketing agreements and/or
To lenders, lien holders, judgment creditors, or other parties claiming an encumbrance or an interest in title whose claim or interest must be determined, settled, paid or released prior to a title or escrow closing.
We may also disclose your Personal Information to others when we believe, in good faith, that such disclosure is reasonably necessary to comply with the law or to protect the safety of our customers, employees, or property and/or to comply with a judicial proceeding, court order or legal process.

Disclosure to Affiliated Companies - We are permitted by law to share your name, address and facts about your transaction with other FNF companies, such as insurance companies, agents, and other real estate service providers to provide you with services you have requested, for marketing or product development research, or to market products or services to you. We do not, however, disclose information we collect from consumer or credit reporting agencies with our affiliates or others without your consent, in conformity with applicable law, unless such disclosure is otherwise permitted by law.

Disclosure to Nonaffiliated Third Parties - We do not disclose Personal Information about our customers or former customers to nonaffiliated third parties, except as outlined herein or as otherwise permitted by law.

**Confidentiality and Security of Personal Information**
We restrict access to Personal Information about you to those employees who need to know that information to provide products or services to you. We maintain physical , electronic, and procedural safeguards that comply with federal regulations to guard Personal Information.

**Access to Personal Information/**
**Requests for Correction, Amendment, or Deletion of Personal Information**
As required by applicable law, we will afford you the right to access your Personal Information, under certain circumstances to find out to whom your Personal Information has been disclosed, and request correction or deletion of your Personal Information. However, FNF's current policy is to maintain customers' Personal Information for no less than your state's required record retention requirements for the purpose of handling future coverage claims.

For your protection, all requests made under this section must be in writing and must include your notarized signature to establish your identity.
Where permitted by law we may charge a reasonable fee to cover the costs incurred in responding to such requests. Please send requests to:

Chief Privacy Officer
Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, FL 32204

**Changes to this Privacy Statement**
This Privacy Statement may be amended from time to time consistent with applicable privacy laws. When we amend this Privacy Statement, we will post a notice of such changes on our website. The effective date of this Privacy Statement, as stated above, indicates the last time this Privacy Statement was revised or materially changed.

PRIVACY 5/08 grg

SCHEDULE G

<u>Escrow Agent's Wire Instructions</u>

Citibank, N.A.
734 Third Avenue
New York, N.Y.  10017

ABA #021-000-089
Chicago Title Insurance Company
711 3rd Avenue-5th Floor
New York, N.Y.  10017

National Special Deposit Account
ACCOUNT # 9936777790

Telephone-Advise upon receipt Lisa Zicchinella
(212) 880-1257

Reference # 120904313
Nortel Campus, Richardson, TX

G-1

SCHEDULE H

<u>Closing Documents</u>

Deed.

NEWYORK·2370468 17

EXHIBIT 1

Form of Deed

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

SPECIAL WARRANTY DEED

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

KNOW ALL MEN BY THESE PRESENTS:

THAT THE UNDERSIGNED, NORTEL NETWORKS INC., a Delaware corporation, hereinafter referred to as "Grantor", whether one or more, for and in consideration of the sum of TEN DOLLARS ($10.00) cash, and other good and valuable consideration in hand paid by the Grantee, herein named, the receipt and sufficiency of which is hereby fully acknowledged and confessed, has GRANTED, SOLD and CONVEYED, and by these presents does hereby GRANT, SELL and CONVEY unto PILLAR COMMERCIAL, LLC, a Texas limited liability company, having an address at 10440 N. Central Expressway, Suite 500, Dallas, Texas 75231, herein referred to as "Grantee", whether one or more, the real property in Dallas County, Texas, as described on Exhibit A attached hereto and made a part hereof, together with all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in anywise appertaining thereto, and together with all buildings and improvements located thereon and any right, title, and interest of Grantor in and to adjacent streets, alleys, strips, gores, and rights-of-way (the "Property").

In addition, Grantor hereby grants, bargains, sells and conveys to Grantee, WITHOUT WARRANTY, all of Grantor's right, title, and interest, if any, in and to: (i) any and all rights of ingress and egress to and from the Property, or any portion thereof, and any of Grantor's rights to use same; (ii) any and all present and reversionary mineral rights and interests of Grantor relating to the Property, or any portion thereof; (iii) any and all rights to the present or future use of wastewater, wastewater capacity, drainage, water or other utility facilities to the extent the same pertain to or benefit the Property, or any portion thereof, or the improvements located thereon, including, without limitation, all reservations of or commitments or letters covering any such use in the future, whether now owned or hereafter acquired; (iv) any and all roads, streets, alleys, and ways (open or proposed) affecting, crossing, fronting, or bounding the Property, or any portion thereof, including any awards made or to be made relating thereto including, without limitation,

Exh. 1-1

any unpaid awards or damages payable by reason of damages the Property, or any portion thereof, or by reason of a widening of or changing of the grade; (v) any and all strips, gores or pieces of property abutting, bounding or which are adjacent or contiguous to the Property, or any portion thereof (whether owned or claimed by deed, limitations or otherwise); and (vi) any and all reversionary interests in and to the Property, or any portion thereof.

This conveyance is made and accepted subject to any and all validly existing encumbrances, conditions and restrictions, relating to the Property that are listed on <u>Exhibit B</u> attached hereto and made a part hereof (collectively, the "<u>Encumbrances</u>").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee, Grantee's heirs, executors, administrators, successors and/or assigns forever, subject to the Encumbrances; and Grantor does hereby bind Grantor, Grantor's heirs, executors, administrators, successors and/or assigns to WARRANT AND FOREVER DEFEND all and singular the Property, subject to the Encumbrances, unto the said Grantee, Grantee's heirs, executors, administrators, successors and/or assigns, against every person whomsoever claiming or to claim the same or any part thereof, by through and under Grantor, but not otherwise.

Current ad valorem taxes on said property having been prorated, the payment thereof is assumed by Grantee.

NORTEL NETWORKS INC., a Delaware corporation

By: _____
Name:
Title:

Grantee' Address:

10440 N. Central Expressway, Suite 500
Dallas, Texas 75231

THE STATE OF TEXAS          §
                            §
COUNTY OF _____    §

The foregoing instrument was acknowledged before me on _____, 2011 by _____.

_____
NOTARY PUBLIC, STATE OF TEXAS

Exh. 1-2

## Exhibit A

Lot 3, Block 1 of Replat, Greenway-Block 1, Lot 3, an addition to the City of Richardson, Dallas County, Texas, according to the plat thereof recorded in Volume 91207, Page 1625, Map Records, Dallas County, Texas.

NEWYORK 2370468.17

Exhibit B[1]

Encumbrances

1.    The following restrictive covenant of record itemized below:

Volume 83013, Page 1589; Volume 88235, Page 2829 and Volume 90051, Page 862, Deed Records, Dallas County, Texas, but omitting any covenant or restriction based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that said covenant (a) is exempt under Chapter 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons.

2.    Standby fees, taxes and assessments by any taxing authority for the year 2011 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership.

3.    Rights of Avaya Inc. and Ericsson Inc. as tenants under their lease agreements.

4.    The following items as set out on plat recorded in Volume 91207, Page 1625, Map Records, Dallas County, Texas, as shown on survey prepared by CSSI Commercial Surveying Specialists, Inc. under the supervision of Earl N. Strom R.P.L.S. No. 4123 dated December 9, 2009.

(a) Fifteen foot pedestrian easements;

(b) Fifteen foot TUEC easements;

(c) Twenty foot TUEC easement;

(d) Forty foot building set back lines;

(e) Fifteen foot building set back line;

(f) Variable width fire lane easements;

(g) Variable width TUEC easement;

(h) Twenty five foot drainage easement;

(i) Variable width drainage easement;

(j) Ten foot pedestrian easement;

(k) Variable width private access easement for irrigation control, and pump vaults;

(l)  Fifteen foot landscape area;

(m) Twelve foot utility easement; and

(n) Twenty foot utility and drainage easement.

---

[1] Note: this exhibit shall be revised as necessary prior to Closing.

Exh. 1-4

5.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document: Granted to: Texas Power & Light Company Purpose: right of way Recording Date: October 26, 1982 Recording No: in Volume 82210, Page 825, Deed Records, Dallas County, Texas.

Exh. 1-5

EXHIBIT 2

Form of Bill of Sale

NORTEL NETWORKS INC., a Delaware corporation having an office at 2221 Lakeside Boulevard, Richardson, Texas 75082 ("Seller"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid to Seller by PILLAR COMMERCIAL, LLC, a Texas limited liability company, having an address at 10440 N. Central Expressway, Suite 500, Dallas, Texas 75231 ("Purchaser"), the receipt and sufficiency of which are hereby acknowledged, hereby sells, conveys, assigns, transfers, delivers and sets over to Purchaser all Included Personalty, but not the Excluded Personalty (as each term is defined in that certain Purchase and Sale Agreement dated April ____, 2011 between Seller and Purchaser) listed on Schedule A attached hereto owned by Seller and which are located at and used or usable in connection with the real property located at 2201 and 2221 Lakeside Boulevard, Richardson, Texas.

TO HAVE AND TO HOLD unto Purchaser and its successors and assigns to its and their own use and benefit forever.

This Bill of Sale is made by Seller without recourse and without any expressed or implied representation or warranty whatsoever.

Dated: April ____, 2011.

[END OF PAGE – SIGNATURE PAGE FOLLOWS]

Exh. 2-1

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed as of the date first written above.

NORTEL NETWORKS INC., a Delaware corporation


By:    _____
Name:
Title:

Exh. 2-2

## Schedule A

All Personalty located in the Tower and Lab Building as of the date hereof other than Excluded Personalty.

Exh. 2-3

EXHIBIT 3

FIRPTA Affidavit

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by NORTEL NETWORKS INC., a Delaware corporation, the undersigned hereby certifies the following on behalf of NORTEL NETWORKS INC., a Delaware corporation ("Seller").

1. Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as such terms are defined in the Internal Revenue Code and Income Tax Regulations).

2. Seller's U.S. employer identification number is 04-2486332.

3. Seller's office is: 2221 Lakeside Boulevard, Richardson, Texas 75082.

The undersigned officer of Seller declares that she/he has examined this certification and to the best of his/her knowledge and belief it is true, correct and complete, and he/she further declares that he/she has authority to sign this document on behalf of Seller.

[END OF PAGE – SIGNATURE PAGE FOLLOWS]

Exh. 3-1

IN WITNESS WHEREOF, Seller has caused this Affidavit to be executed as of the date first written above.

NORTEL NETWORKS INC., a Delaware corporation

By: _____

Name:

Title:

Exh. 3-2

EXHIBIT 4

Form of Omnibus Assignment and Assumption Agreement

THIS GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT, made and entered into this ____ day of April, 2011, between NORTEL NETWORKS INC., a Delaware corporation, having an office at 2221 Lakeside Boulevard, Richardson, Texas 75082 ("Assignor") and PILLAR COMMERCIAL, LLC, a Texas limited liability company, having an address at 10440 N. Central Expressway, Suite 500, Dallas, Texas 75231 ("Assignee").

W I T N E S S E T H:

Assignor for Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns to Assignee all of Assignor's right, title and interest in, to and under (i) all books, records, and files owned by Assignor and relating to the occupancy, use or operation of the real property located at 2201 and 2221 Lakeside Boulevard, Richardson, Texas (the "Premises"), (ii) all transferable licenses, approvals, certificates and permits held by Assignor and exclusively relating to the occupancy, use or operation of the Premises, and (iii) all other items of intangible personal property owned by Assignor and exclusively relating to the occupancy, use or operation of the Premises (other than items expressly excluded from the sale of the Premises pursuant to that certain Purchase and Sale Agreement, dated April ____, 2011, between Assignor and Assignee; the items set forth in clauses (i) through (iii) above are hereinafter referred to collectively as the "Property Matters");

TO HAVE AND TO HOLD unto Assignee and its successors and assigns to its and their own use and benefit forever.

Assignee hereby expressly assumes the obligations of Assignor in respect of the Property Matters accruing from and after the date hereof.

This Agreement is made by Assignor without recourse or any expressed or implied representation or warranty whatsoever.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

[END OF PAGE – SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Omnibus Assignment and Assumption Agreement as of the date first above written.

ASSIGNOR:

NORTEL NETWORKS INC., a Delaware corporation

By: _____
Name:
Title:

ASSIGNEE:

PILLAR COMMERCIAL, LLC, a Texas limited liability company

By: _____
Name:
Title:

Exh. 4-2

EXHIBIT 5

[INTENTIONALLY OMITTED]

Exh. 5-1

EXHIBIT 6

Form of Title Affidavit
**Title Affidavit**
dated as of _____/_____/11

---

Re:   **Seller**
Nortel Networks Inc., a Delaware corporation
**Purchaser**
Pillar Commercial, LLC, a Texas limited liability company
**Title Insurer:**
Chicago Title Insurance Company, a NE corporation ("CTIC")
**CTIC Master #:**
120904313
**Commitment #:**
TNB3703 issued by CTIC (the "Commitment")
**Premises:**
2201 and 2221 Lakeside Boulevard, Richardson, TX, as more fully described in Schedule A to the Commitment (the "Premises")

---

**Certifications:**

The undersigned, solely in his capacity as an authorized signatory of Nortel Networks Inc. (the "Affiant"), the fee simple owner (the "Owner") of the Premises hereby certifies the following to Title Insurer (as to its respective estate and/or interest in the Premises):

**Mechanics Liens:**
To Affiant's knowledge (without inquiry), all labor, services or materials rendered or furnished within the last 180 days in connection with the Premises or with the construction or repair of any building or improvements on the Premises have been completed and paid for in full, except for routine maintenance and repair provision for the payment of which has already been made in the ordinary course of business since the filing of the Case (as defined below).

**Possession:**
To Affiant's knowledge, (a) the Owner's possession of the Premises has been peaceable and undisturbed and (b) the Owner's title to the Premises has never been disputed or questioned in writing.

**Unrecorded Easements:**
To Affiant's knowledge (without inquiry), there are no easements or claims of easements not shown on the Commitment.

Exh. 6-1

**Tenants/Parties in Possession:**
To Affiant's knowledge, there are no tenants or other parties who are in possession or have the right to be in possession of said Premises, except for those interests more fully described in Schedule A hereto (the "Leases").

**Taxes/Assessments:**
All taxes, assessments, water rents and/or charges, sewer rents and/or charges, sewer hook-up charges, fire service, gas charges, common charges (i.e. condominium or association charges or dues) and other municipal charges with respect to the Premises that would constitute a lien affecting the Premises and which are currently due and payable have been duly paid.

**Options to purchase or rights of first refusal:**
To Affiant's knowledge, the Owner has not granted (and has no knowledge of) any unrecorded outstanding options to purchase the Premises or rights of first refusal affecting the Premises.

**Pending Contracts/Agreements:**
But for the instant transaction, the Leases and any matters shown on the Commitment, the Owner has not entered into any contracts or agreement for the sale, disposition or encumbrance of all or part of the Premises.

**Covenants & Restrictions:**
To Affiant's knowledge, (a) the Owner has received no written notice of past or present material violations of any effective covenants, conditions or restrictions set forth in the Commitment (the "CC&Rs") and (b) any charge or assessment provided for in any of the CC&Rs has been duly paid.

**Bankruptcy:**
Owner filed a voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code on January 14, 2009 in the U.S. Bankruptcy Court for the District of Delaware, case number 09-br-10138 (the "Case"). Owner's chapter 11 Case is still pending.

**Gap Indemnification:**
Between the date hereof and the date of recording of the documents creating the interest being insured (the "Insured Instruments") but in no event later than ten (10) business days from the date hereof (hereinafter, the "Gap Period"), the Owner has not taken or allowed and will not take or allow any action to encumber or otherwise affect title to the Premises. In the event of any lien, encumbrance or other matter affecting title to the Premises in the Gap Period arising as a result of an act of the Owner, the Owner hereby indemnifies and holds Title Insurer harmless against any and all loss or actual damage sustained as a result thereof and further undertakes to take all necessary steps to discharge any such lien, encumbrance or other matter in a manner reasonably satisfactory to Title Insurer; provided, however, that the Title Insurer shall use reasonable best efforts to record all Insured Instruments as soon as is reasonably practical (but in no event later than ten (10) business days from the date hereof). The Owner makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy of title insurance. Notwithstanding anything contained herein to the contrary, the foregoing shall not be effective with respect to any encumbrance, lien or other objectionable title matter which is of record at the time the Insured Instruments are delivered to the clerk's office for recordation or of which Title Insurer becomes aware prior to recordation.

Exh. 6-2

**Further Assurances:**
The Owner hereby undertakes and agrees to fully cooperate with Title Insurer in correcting any errors in the execution and acknowledgment of the Insured Instrument(s).

**Inducement and Indemnification:**
The Owner provides this document to induce Title Insurer to insure title to said Premises well knowing that it will do so only in complete reliance upon the matters asserted hereinabove and further, will indemnify and hold Title Insurer harmless against any loss or actual damage sustained as a result of any inaccuracy in the matters asserted hereinabove.

**Total Liability:**
The total liability Owner assumes hereunder shall not exceed the insured amount under the Commitment, plus reasonable costs and expenses, including reasonable attorneys' fees, that the Title Insurer incurs pursuant to the terms of such Commitment.

- see annexed signature page -

**Signatory to Title Affidavit:**
NORTEL NETWORKS INC., a Delaware corporation

By:    _____

Name: _____

Title:  _____

Subscribed and sworn to on _____/_____/11

_____

Notary Public

Exh. 6-3

## Schedule A

### Interests Affecting the Premises

**Lease** – between Nortel Networks Inc. (landlord) and Avaya Inc. (tenant) dated December 18, 2009, as the same may be amended, supplemented or modified in accordance with its terms.

**Lease** – between Nortel Networks Inc. (landlord) and Ericsson Inc. (tenant) dated August 1, 2010, as the same may be amended, supplemented or modified in accordance with its terms.

**Lease** – between Nortel Networks Inc. (landlord) and Ericsson Inc. (tenant) dated August 1, 2010, as the same may be amended, supplemented or modified in accordance with its terms.

NEWYORK:2370468.17

EXHIBIT 7

## Form of Assignment and Assumption of Third Party Leases Agreement

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, NORTEL NETWORKS INC., a Delaware corporation, having an office at 2221 Lakeside Boulevard, Richardson, Texas 75082 (the "Assignor"), hereby assigns and delegates to PILLAR COMMERCIAL, LLC, a Texas limited liability company, having an office at 10440 N. Central Expressway, Suite 500, Dallas, Texas 75231 (the "Assignee"), all of Assignor's right, title and interest in and to and obligations under the (i) leases described on Schedule A attached hereto (collectively, the "Leases") and (ii) all guarantees with respect to any of the Leases, in each case relating to the property (collectively, the "Property") known as 2201 and 2221 Lakeside Boulevard, Richardson, Texas and more particularly described in the Agreement (as hereinafter defined) (the "Assignment").

Subject to the terms of the Agreement, Assignee hereby assumes all of the Assignor's obligations under the Leases arising with respect to the period on and after the date hereof, pursuant to the provisions of the Leases, in accordance with the terms of the Leases.

Subject to the terms of the Agreement, Assignee hereby agrees that it shall indemnify and hold the Assignor harmless from and against any and all judgments, suits, claims, demands, liabilities and obligations and related costs and expenses (including reasonable attorneys' fees) incurred or suffered by Assignor by reason of, or arising out of, the Leases with respect to the period on and after the date hereof.

The Assignor hereby agrees to indemnify and hold the Assignee harmless from and against any and all judgments, suits, claims, demands, liabilities and obligations and related costs and expenses (including reasonable attorneys' fees) incurred or suffered by Assignee by reason of, or arising out of, the Leases with respect to the period prior to the date hereof.

This Assignment is made pursuant to that certain Purchase and Sale Agreement, dated as of April ____, 2011, between Assignor and Assignee (the "Agreement"), and is made without any representation or warranty whatsoever by the Assignor except as expressly set forth in the Agreement and upon the express condition, understanding and agreement that this Assignment is made without recourse to the Assignor, except as expressly set forth in the Agreement, for any cause whatsoever (except with respect to Assignor's indemnification in the preceding paragraph), or by any successor to the interest of the Assignee. All capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

This Assignment shall be governed by the laws of the State of Texas.

Exh. 7-1

IN WITNESS WHEREOF, the Assignor and Assignee have executed this Assignment effective as of this _____ day of [•], 2011.

ASSIGNOR:

NORTEL NETWORKS INC., a Delaware corporation

By:_____
   Name:
   Title:


ASSIGNEE:

PILLAR COMMERCIAL, LLC, a Texas limited liability company

By:_____
   Name:
   Title:

Exh. 7-2

## Schedule A

### Leases

Dated August 1, 2010, between Nortel Networks Inc., as landlord, and Ericsson Inc., as tenant, with respect to space at the Lab.

Dated August 1, 2010, between Nortel Networks Inc., as landlord, and Ericsson, Inc., as tenant, with respect to space at the Lab.

Dated December 18, 2009, between Nortel Networks Inc., as landlord, and Avaya Inc., as tenant, with respect to space at the Lab.

Exh. 7-3

EXHIBIT 8

Form of Nortel License

Attached hereto.

NEWYORK:2370468.17

## FORM OF LICENSE AGREEMENT

This license agreement (the "License") made as of the ___ day of [•], 2011, between Pillar Commercial, LLC, a Texas limited liability company, as licensor (the "Licensor"), and Nortel Newtorks Inc., a Delaware corporation, as licensee (the "Licensee").

### W I T N E S S E T H :

**WHEREAS:**

1.    Pursuant to that certain Purchase and Sale Agreement, dated as of the date hereof, between Licensee, as seller, and Licensor, as purchaser (the "PSA"), Licensor acquired from Licensee the fee simple estate in and to that certain plot, piece and parcel of land known as 2201 and 2221 Lakeside Boulevard, Richardson, Texas, together with the buildings and all other improvements located on the land (the improvements on the land, including the buildings, together with the land, collectively, the "Premises");

2.    Licensee and certain of its Affiliates (as defined below) are debtors-in-possession under Title 11 of the United States Code (the "Bankruptcy Code"), having generally commenced cases under Chapter 11 of the Bankruptcy Code on January 14, 2009 by filing voluntary petitions for relief (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

3.    Licensor desires to license the Licensed Space (as defined below) to Licensee, and Licensee desires to license the Licensed Space from Licensor, upon and subject to the terms and conditions of this License;

4.    Licensor and Licensee acknowledge and agree that the execution and delivery of this License is being made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of Licensee or its Affiliates (as defined below); and

5.    Approval of the Bankruptcy Court was required as a condition to effectiveness of this License and on [•], the Bankruptcy Court in the Bankruptcy Case issued an order authorizing and approving, among other things, the execution and delivery of this License;

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein the parties agree as follows:

### ARTICLE I

### Grant of License and Term.

Section 1.1    Licensor does hereby grant to Licensee upon the terms and conditions of this License (i) an exclusive license to use a portion of the Premises more particularly set forth in Exhibit A attached hereto, consisting of segregated and demised IT rooms (the "Exclusive Space"), (ii) a non-exclusive license in common with Licensor to use a portion of the Premises more particularly set forth in Exhibit A attached hereto (the "Non-Exclusive Space", together with the Exclusive Space, the "Licensed Space") and (iii) a non-exclusive right in common with

1

the Licensor and other occupants of the Premises to use the common areas, all hallways, ingress and egress points and other common employee service and office areas, including without limitation, a cafeteria (the "Common Areas"). The license granted hereunder shall be for a term (the "Term") commencing on the License Commencement Date (as defined in Section 2.2 below) and ending on December 31, 2011, unless such Term shall sooner terminate, cease or expire, including but not limited to pursuant to Licensee's exercise of its rights under Article XI of this License (the "License Termination Date"). This License shall apply only to the Licensed Space, and during the Term Licensee shall have no rights to or in any part of the Premises except the Licensed Space and the Common Areas.

Section 1.2    Licensor and Licensee shall cooperate to ensure that neither party's respective use and operations at the Premises interferes with the use and operations at the Premises by the other party, all in conformance with the terms of this License.

ARTICLE II

Fees and Rent.

Section 2.1    Commencing on the License Commencement Date (as defined below), Licensee shall pay to Licensor rent ("Rent") in the amount of $[12.00] per rentable square foot per annum, multiplied by the rentable square feet of the Licensed Space (which, as of the date hereof, the parties agree is [41,000] rentable square feet). The parties hereby acknowledge that (i) such Rent is a good-faith estimate of the parties, taking into account Licensor's anticipated costs of operating the Premises, including, but not limited to, taxes, Licensee's anticipated usage of electricity and other utilities and services to be provided by Licensor hereunder, (ii) no separate charges for any such items shall be imposed by Licensor or payable by Licensee hereunder and (iii) Rent shall not include any charge for "base rent" and that Licensee shall not be responsible for paying any "base rent" hereunder. No adjustments to Rent will be required or permitted hereunder, either pursuant to annual true-ups or otherwise, except that Rent due hereunder shall be decreased in accordance with any Surrender (as defined below) by reducing the total rentable square feet of the Licensed Space by the total rentable square feet of the Surrendered Space (as defined below) and recalculating Rent accordingly.

Section 2.2    On the Closing Date (as defined in the PSA) (the "License Commencement Date"), Licensee shall take possession, or be deemed to have taken possession, of the Licensed Space and shall pay to Licensor a mutually agreed-to sum for the first month's Rent, pro-rated based upon the number of days before and after the License Commencement Date in the month during which the License Commencement Date occurs. In the event that the License Termination Date shall occur on a date other than the last day of any calendar month, Rent for such month shall be pro-rated on a per diem basis. Any Rent recalculation performed as a result of a Surrender in accordance with Section 2.1 will become effective immediately upon such Surrender, with Licensor remitting to Licensee any excess Rent prepaid for the month in which such Surrender occurs based upon the number of days remaining in the month of such Surrender (the "Excess Rent"), or such Excess Rent shall be used to offset the subsequent month's Rent payment, as the case may be.

2

Section 2.3    Except as otherwise set forth herein, Rent shall be paid on the first of each month of the Term, without notice, demand, deduction or offset by Licensee, in lawful money of the United States of America by wire transfer of immediately available funds to the account set forth on Schedule 2.

ARTICLE III

Licensed Space Use.

Section 3.1    Licensee shall use the Licensed Space in a manner generally consistent with its use of the same immediately prior to the date hereof.  Licensee shall use the Common Areas in a manner generally consistent with (i) the purposes for which the Common Areas were intended and in a manner consistent with the use prior to the date hereof or (ii) transitioning Licensee's business out of the Premises; provided, that no fixtures, furniture or other personal property of Licensee shall be permitted to be stored in the Common Areas.

Section 3.2    Each of Licensee and Licensor shall at all times act, conduct its business and control its agents, employees, invitees and visitors in such manner as not to create any nuisance, or unreasonably interfere with, annoy or disturb the other party, the other party's business operations or the other party's employees, invitees, tenants, licensees and visitors (as applicable).

Section 3.3    Licensee shall have access to the Licensed Space twenty-four (24) hours per day and seven (7) days per week.

ARTICLE IV

Alterations and Personal Property.

Section 4.1    Licensee shall not make any changes, additions, improvements, alterations or other physical changes to the Licensed Space or any portions thereof, or any of the systems therein or thereon (collectively, "Alterations", and individually, an "Alteration"), without the prior written consent of Licensor.

Section 4.2    All personal property, including, without limitation, furniture and equipment installed in or located in the Licensed Space prior to Licensee's possession of the Licensed Space is the property of Licensee, except to the extent that such property was transferred to the Licensor as set forth more fully in the PSA.  Notwithstanding anything herein to the contrary, Licensee shall have the right at any time and from time to time during the Term, without obtaining the consent of Licensor, to remove and relocate from the Licensed Space all property that is owned by the Licensee, at Licensee's sole cost and expense.

ARTICLE V

Repairs and Maintenance.

Section 5.1    Except in the event of damage caused by Licensee or its agents, employees, invitees or visitors (in which event the costs of maintenance, repair and replacement

3

shall be borne by Licensee), Licensor shall pay any and all charges, fees, costs, sums or expenses which Licensor incurs on or after the License Commencement Date in connection with the maintenance and repair of the Licensed Space and all equipment, fixtures, installations and appurtenances contained therein. Notwithstanding the foregoing, in no event shall Licensor have any obligation to Licensee to maintain, repair, replace or insure Licensee's property. Licensor shall also be responsible for all charges, fees, costs, sums or expenses incurred in connection with the maintenance, repair or replacement of the following: (i) the structural portions of the Premises, the roof and roof membranes of the buildings, foundations, exterior walls and windows of the Premises, (ii) all major systems of the buildings, such as HVAC, mechanical, electrical, plumbing and sprinkler systems at the Premises, (iii) repaving, striping and all other maintenance, repair and replacement of driveways and parking areas at the Premises, (iv) maintaining and repairing the sidewalks abutting and on the Premises, and (v) keeping those sidewalks, driveways and parking areas free of rubbish, snow, ice and other obstructions, and otherwise in a safe and clean condition; provided, that the parties agree that Licensor shall have no obligation to maintain, repair or replace any of the items set forth in (i) through (v) above to a condition or quality better than such condition or quality existed as of the License Commencement Date. In the performance of any maintenance, repairs or replacements, Licensor shall take reasonable measures to minimize interference with the conduct of Licensee's business in the Licensed Space. Licensor shall be required to promptly repair any damage to the Licensed Space or Licensee's personal property caused by Licensor's maintenance, repair or replacement activities. Notwithstanding anything herein to the contrary, Licensor shall not be responsible for any repairs or replacements which are caused by the misuse or negligence of Licensee, its agents, employees or representatives.

ARTICLE VI

Services.

Section 6.1    Licensor shall provide to Licensee all services set forth in Schedule 1. Licensee's share of the cost of the License Services shall be deemed included in Rent and no separate charge for services shall be imposed hereunder.

Section 6.2    In addition to the services described in Schedule 1,

(a)    Parking. Licensor shall provide to Licensee for the nonexclusive use of Licensee's employees and invitees parking spaces in a ratio of 3.7 parking spaces per 1,000 rentable square feet of Licensed Space. As of the date hereof, the parties agree that Licensee is entitled to [152] parking spaces, which shall change in accordance with any Surrender as set forth herein. Parking will be provided in an equitable manner and Licensee's employees and invitees shall have nonexclusive access to the parking areas twenty-four (24) hours a day, seven (7) days a week on a first-come, first-served basis with all other occupants of the Premises (but subject to reasonable security and other requirements of Licensor that are applicable to all users of such parking areas).

(b)    Directory Listing. Licensor shall list Licensee's name in the buildings' main tenant directories.

4

## ARTICLE VII

### Condition of the Licensed Space.

Section 7.1    Licensee shall take and hereby accepts the Licensed Space and all equipment, fixtures, installations and appurtenances contained therein in an "AS IS, WHERE IS" condition, WITH ALL FAULTS, as of the License Commencement Date.

## ARTICLE VIII

### End of Term.

Section 8.1    Licensee shall vacate the Licensed Space in broom clean and in good order and the same general condition that the Licensed Space existed on the License Commencement Date, ordinary wear and tear and damage due to casualty excepted and, subject to any approved Licensee's Alterations, and Licensee shall, on or prior to the License Termination Date (1) remove all of Licensee's personal property and all other property and effects of Licensee and all persons claiming through or under Licensee from the Licensed Space and (2) repair all damage to the Licensed Space, if any, occasioned by such removal, ordinary wear and tear excepted. If the date upon which the Term shall expire, terminate or end shall fall on a Sunday or holiday, then Licensee's obligations under the first sentence of this Article VIII shall be performed on or prior to the Saturday or business day immediately preceding such Sunday or holiday. Licensee's obligations under this Article VIII shall survive the License Termination Date.

## ARTICLE IX

### Assignment and Sublicensing.

Section 9.1    Licensee shall not assign its rights or delegate its duties under the License (whether by operation of law, transfer of interest or otherwise) or permit the Licensed Space or any part thereof to be occupied or used by any other person or entity without the prior written consent of Licensor (which Licensor may withhold, condition or delay in its sole discretion); provided, that Licensee shall be permitted to assign its rights and delegate its duties under this License to any successor entity created as a result of a plan of reorganization or liquidation under the Bankruptcy Code or other order of the Bankruptcy Court.

## ARTICLE X

### Segregation and Demising.

Section 10.1    If Licensor shall require segregation and demising of the Licensed Space from the remainder of the Premises ("Segregation Work"), Licensor shall undertake such Segregation Work at its sole cost and expense, in accordance with plans and specifications prepared by Licensor, at its sole cost and expense, and approved by Licensee, which approval shall not be unreasonably withheld, conditioned or delayed. Licensor shall obtain all necessary governmental permits and certificates necessary for the commencement and prosecution of such

5

Segregation Work including, without limitation, a temporary or permanent certificate of occupancy, if required. Licensor hereby agrees that all such Segregation Work shall be performed in accordance with the terms of this License, and, should Licensor require such Segregation Work, that it shall be diligently completed in a good and workmanlike manner, using materials consistent with the quality of the buildings and Premises. In support of any Segregation Work required by Licensor, the parties shall cooperate to provide relevant information not of a proprietary or confidential nature regarding the buildings and Premises to each other and consult with each other and use commercially reasonable efforts to develop and agree upon a work scope, plan and schedule for such Segregation Work, taking into account all relevant factors in order to minimize disruption to the business of the Licensee.

Section 10.2    Licensor's obligation to perform any Segregation Work which it requires under this Article X shall further include the obligation to provide that the building systems and utilities (including, without limitation, telecommunication, cable, IT, HVAC, fire alarm and security systems) serving the Premises and the business assets and equipment of Licensee are connected and operating in such a manner as to provide Licensee with substantially the same access to such building systems and utilities as on the License Commencement Date.

ARTICLE XI

Licensee Surrender Option.

Section 11.1    Licensee shall have the right to surrender to Licensor without payment of any fee or penalty (such surrender, a "Surrender") all or any portion of the Licensed Space (such surrendered space, the "Surrendered Space") from time to time upon not less than thirty (30) days prior written notice (the "Licensee Surrender Notice") to Licensor. The Licensee Surrender Notice shall contain a description of the Surrendered Space. From and after the date on which a Surrender is effective, this License (other than any provisions hereof that expressly survive termination) shall no longer apply to the Surrendered Space and Rent shall be decreased accordingly in accordance with Section 2.1 and Section 2.2.

ARTICLE XII

Licensor Access.

Section 12.1    Licensor and its employees, contractors and agents shall have the right, on no less than forty-eight (48) hours prior notice to Licensee (except in the case of an emergency), from time to time throughout the Term, to enter any portion of the Licensed Space during business hours to examine the same, to show the same to prospective purchasers, mortgagees, lessees, or licensees and to make such repairs, alterations, improvements or additions as Licensor may deem necessary or desirable to the Licensed Space or any other portion of the Premises; provided that such access shall be subject to (a) reasonable accommodations for proprietary and confidential information of the Licensee and (b) Licensee's right to designate a representative to accompany Licensor's representative for such period of access. Notwithstanding the foregoing, in the event of an emergency, Licensor shall have the right to enter upon and inspect the Licensed Space at any time provided that Licensor shall use commercially reasonable efforts to provide reasonable prior telephonic notice to a designated representative of Licensee and shall

6

use reasonable efforts not to materially interfere with the business and operations of the Licensee or Licensee's property (but taking into account the nature of the emergency). None of the foregoing shall give rise to any decrease or abatement of Rent, provided that any work performed or inspections or installations made shall be made in a manner to minimize disruption to the business and operations of Licensee.

Section 12.2 The exercise by Licensor or its agents or by the holder of any mortgage of any right reserved to Licensor in this Article XII shall not constitute an actual or constructive eviction, in whole or in part, or impose any liability upon Licensor, or its agents, or upon the holder of any such mortgage, by reason of inconvenience or annoyance to Licensee, or injury to or interruption of Licensee's business, or otherwise; provided that Licensor shall take reasonable measures to minimize interference with the conduct of Licensee's business and operations in the Licensed Space and damage to the Licensed Space.

## ARTICLE XIII

### Legal Compliance.

Section 13.1 Licensee agrees that its use of the Licensed Space and the installation, operation and maintenance of Licensee's personal property and equipment shall at all times, at Licensee's expense, comply with all applicable laws, regulations and ordinances ("Legal Requirements") and the orders and requirements of all government authorities, but Licensee shall have no duty to cure any violations (i) not brought about by Licensee or anyone claiming through or under Licensee or (ii) which arose prior to the License Commencement Date. Licensor agrees that its use of the Premises and the installation, operation and maintenance of Licensor's personal property and equipment shall at all times comply with any and all Legal Requirements, but Licensor shall have no duty to Licensee to cure any violations (i) which arose prior to the License Commencement Date and (ii) which Licensee had knowledge of and chose not to cure.

Section 13.2 In addition to the aforesaid, Licensee shall (i) not generate, store, install, dispose of or otherwise handle any Hazardous Materials (as defined in the PSA) in the Licensed Space in any negligent or unsafe manner or in any manner contrary to any applicable Legal Requirement; (ii) not install or place in the Licensed Space any asbestos or asbestos-containing materials; (iii) at Licensee's cost and expense, remove, clean-up and remedy any Hazardous Materials in the Licensed Space to the extent and in the manner required by any applicable Legal Requirement, if the presence of such Hazardous Materials resulted from the direct action of Licensee during the Term. Licensee shall not remove, clean-up, abate, or disturb any asbestos or asbestos-containing materials, or Hazardous Materials, in or about the Licensed Space under any other circumstances.

## ARTICLE XIV

### Casualty and Condemnation.

Section 14.1 If (i) the Licensed Space is materially damaged by fire or other casualty or (ii) any building in which the Licensed Space is located is totally or substantially damaged or destroyed as a result of fire or other casualty and (in either such case) an independent architect

7

retained by Licensor determines in good faith that the Licensed Space and/or building(s) cannot be rebuilt and/or repaired or restored within the lesser of (a) two (2) months and (b) the remaining term of this License, then in any of the above cases, Licensor or Licensee may, at its option (to be exercised by written notice to the other within ten (10) days following delivery of the report of the independent architect) elect to terminate this License retroactively as of the date of fire or other casualty; and neither party shall have any further obligations with respect to this License, including, without limitation, any obligation of Licensee to pay any Rent accruing after the date of such casualty. Notwithstanding the foregoing, in such circumstances Licensor shall reimburse Licensee for any portion of Rent paid by Licensee in advance with respect to any portion of the term of this license occurring after the date of such casualty. If neither Licensee nor Licensor elects to terminate this License, it will continue in full force and effect, Rent will be abated as of the date of the fire or other casualty and the Licensor will proceed without delay to repair, replace or rebuild the Licensed Space, in accordance with all governmental requirements in a good and workmanlike manner so that the Licensed Space (not including Licensee's personal property) is restored to the condition that it was in immediately prior to the damage and/or destruction (subject to any modifications imposed by governmental requirements). Licensee has no obligation to repair or rebuild any part of the Licensed Space if damaged. Once the Licensed Space has been rebuilt and/or repaired or restored in accordance with the foregoing requirements and the Licensee re-occupies the Licensed Space, the Licensee's obligation to pay Rent will re-commence.

Section 14.2   In the event that all or a substantial portion of the Licensed Space or the Premises shall be acquired or expropriated by any legal authority or for public use or purpose, this License shall automatically terminate upon such taking together with any and all of Licensor's and Licensee's obligations hereunder as of the date of such taking without prejudice to the right of the parties to claim compensation from the expropriating authority.

ARTICLE XV

Insurance.

Section 15.1   Licensee shall, at Licensee's expense, maintain at all times during the Term and at all times when Licensee is in possession of the Licensed Space:

(a)      Commercial comprehensive general liability insurance in respect of the Licensed Space, against claims of personal injury, bodily injury, wrongful death and property damage caused by Licensee and occurring upon, in or about the Licensed Space or Premises and endorsed to cover all contractual and other liabilities of Licensee pursuant to this License on an occurrence basis, with a combined single limit (annually and per occurrence and location) of not less than US$2,000,000 (which may consist of primary coverage of not less than US$1,000,000 and umbrella coverage), naming as additional insureds Licensor and any other person reasonably designated by Licensor;

(b)      Property insurance in an amount equal to 100% of replacement value covering Licensee's property against fire and other risks included in the standard form of property insurance for the State of Texas;

8

(c)    Workers' compensation insurance in statutory limits and employer's liability coverage in an amount of not less than US$1,000,000;

(d)    Comprehensive automobile liability insurance covering the use of all non-owned and hired vehicles with a bodily injury and property damage liability limit of not less than US$1,000,000; and

(e)    Such other insurance as is customarily required of Licensees in similar buildings in the vicinity of the Premises.

Section 15.2    Licensee shall be permitted to choose its insurer in its sole discretion; provided, that Licensee shall use commercially reasonable efforts to obtain insurance that shall not be subject to cancellation except after at least thirty (30) days prior written notice to Licensor.    Licensee may carry any required insurance under a blanket policy if that policy complies with the requirements of this License.    Licensor and Licensee may satisfy liability limits with the combination of primary and umbrella/excess coverage.

Section 15.3    Licensor shall maintain property insurance, in an amount not less than the amount which avoids any coinsurance provisions of the related policy, covering the buildings (including the Licensed Space, but not including the personal property required to be insured by Licensee pursuant to this Article XV) against fire and the other risks included in the standard Texas form of property insurance.    Licensor shall maintain customary comprehensive general liability and property insurance with respect to the building machinery, boilers and equipment located therein and owned by Licensor and identify Licensee as an additional insured thereunder.

Section 15.4    Licensor and Licensee agree that (insofar as and to the extent that such agreement may be effective without invalidating or making it impossible to secure insurance coverage from responsible insurance companies doing business in the State of Texas) with respect to any property loss that is covered by insurance then being carried by Licensor or Licensee, respectively, the party carrying such insurance and suffering said loss releases the other of and from any and all claims (including claims of negligence) with respect to such loss where such insurance is valid and collectible (or would have been valid and collectible if properly maintained) respecting any such loss only to the extent of proceeds actually received. Licensor and Licensee shall obtain, in each of their casualty and other insurance policies covering property in the Premises, so-called "waiver of subrogation" provisions to the effect that such policies shall not be invalidated should the insured waive, in writing, prior to a loss, any or all right of recovery against any party for loss occasioned by fire or other casualty.    If either party is unable to obtain such provisions in its property and other insurance policies, then it shall name the other party as an additional insured but not as a loss payee under such policies, it being understood and agreed that neither Licensor nor Licensee shall have any right whatsoever to any of the proceeds of insurance carried by the other.

NEWYORK:2374208.6

ARTICLE XVI

Indemnity.

Section 16.1    Licensee and Licensor (each as applicable, an "Indemnifying Party") each covenant and agree to defend, protect, indemnify and hold harmless the other (and its respective agents, servants and employees) (individually, the "Indemnitee", and collectively, the "Indemnitees") from and against each and every claim, demand, cause of action, liability, cost, damage, loss, penalty, fine, judgment or expense (including, but not limited to, reasonable attorneys' fees and expenses incurred in defense of the Indemnitees) which may be made, asserted, brought or recovered by any person, firm or corporation arising out of (a) any death or bodily or personal injury or any damage to tangible property of a third party, licensee, user or occupant of the Premises to the extent caused by or, resulting from the use of the Premises or operation of the equipment therein by the Indemnifying Party, its agents, employees, invitees or visitors or (b) any breach of this agreement by the Indemnifying Party, except to the extent arising out of, in the case of each of clause (a) and clause (b), any Indemnitee's gross negligence or willful misconduct.  The term "expense" shall include, but not be limited to, any reasonable legal fees or expenses incurred by any Indemnitee in connection with the aforesaid and reasonable legal fees or expenses incurred in connection with any action to recover such legal fees or expenses.  The obligations of each Indemnifying Party hereunder shall survive the expiration, cancellation or termination of this License and the Term.

ARTICLE XVII

Subordination.

Section 17.1    This License and Licensee's rights hereunder are subject and subordinate to all present and future mortgages and building loan agreements (and any renewals, modifications, replacements, substitutions, and extensions thereof) which may now or hereafter affect all or any portion of the Premises. The provisions of this Article XVII shall be self-operative and no further instrument of subordination shall be required.

ARTICLE XVIII

Intentionally Omitted.

ARTICLE XIX

Default/Remedies.

Section 19.1    Each of the following is a "Default" by Licensee under this License:

(a)    Licensee shall default in the payment when due of any installment of Rent and the failure continues for ten (10) business days following Licensor's written notice (which notice shall also be considered any demand required by any law);

10

(b)    Licensee fails to comply with any material term, covenant or condition (other than the covenants to make payment of Rent) of this License on Licensee's part to be observed or performed and such default continues for thirty (30) days following Licensor's written notice to Licensee, or if such default is of such a nature that it cannot be cured within thirty (30) days, if Licensee shall not, promptly upon the receipt of such notice, advise Licensor of Licensee's intention to institute all steps necessary to cure such default or shall not institute and thereafter diligently prosecute to completion all steps necessary to cure such default and, in any event, cure such default within forty-five (45) days of receipt of Licensor's notice of such default by Licensee.

Section 19.2   If a Default occurs and the applicable cure period has expired without Licensee having cured such Default, Licensor may give written notice to Licensee that this License shall terminate on the date specified in such notice, which date shall not be less than ten (10) business days after Licensor's notice to Licensee.   If Licensor gives such notice, the Term shall expire on the date set forth in that notice (but Licensee shall remain liable for that month's Rent).

Section 19.3   If this License is terminated as a result of Licensee's Default, Licensee shall also pay to Licensor, as damages, any deficiency between (i) the aggregate Rent for the period which otherwise would have constituted the unexpired portion of the Term and (ii) the rents, fees or charges, if any, applicable to such period collected under any reletting of any portion of the Licensed Space.   Licensee shall pay any deficiency in monthly installments on the days specified in this License for payment of Rent and Licensor shall be entitled to recover from Licensee each monthly deficiency as the same arises.

## ARTICLE XX

### Notices.

Section 20.1   Any bills, statements, notices, demands, requests or other communications given or required to be given pursuant to this License shall be effective only if rendered or given in writing, sent by (1) registered or certified mail, return receipt requested, (2) a nationally recognized courier service such as Federal Express or UPS, or (3) facsimile (with a duplicate copy sent via either method described in (1) or (2) immediately above) addressed

(a)    to Licensor,

Pillar Commercial, LLC
10440 N. Central Expressway, Suite 500
Dallas, TX 75231

With copies (that shall not constitute notice) to:

Cherry Petersen Landry Albert LLP
8350 North Central Expressway, Suite 800
Dallas, TX 75206
Attention: Terry Landry

11

Facsimile: (214) 265-7008

(b)    to Licensee,

Nortel Networks Inc.
2221 Lakeside Boulevard
[MS991 02-A30]
Richardson, TX 75082
Attention: Real Estate Dept.
Facsimile: (972) 684-3868

With copies (that shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Kimberly B. Blacklow
Facsimile: (212) 225-3999

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: James L. Bromley
Facsimile: (212) 225-3999

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Lisa M. Schweitzer
Facsimile: (212) 225-3999

Section 20.2   Any such demand, notice, communication or report shall be deemed to have been given pursuant to this License, if sent by facsimile transmission, upon answer-back confirmation, and otherwise, upon delivery, refusal of delivery or when delivery is first attempted on a business day.

## ARTICLE XXI

### Miscellaneous.

Section 21.1   Except as expressly otherwise provided herein, this License embodies and constitutes the entire understanding between the parties with respect to the licensing transaction contemplated herein.  This License may not be modified, amended or terminated except as expressly provided herein or by written instrument executed by the parties hereto.  This License

12

shall be governed by and construed in accordance with the laws of the State of Texas. This License shall not be binding or effective until this License is executed and delivered by Licensor and Licensee. This License may be executed in several counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument. The execution of this License may be effected by electronically transmitted (email) or facsimile signatures, all of which shall be treated as originals.

Section 21.2   The term "business days" as used in this License shall exclude Saturdays, Sundays and holidays, the term "Saturdays" as used in this License shall exclude holidays and the term "holidays" as used in this License shall mean all days observed as legal holidays by the United States of America or the State of Texas. The terms "Person" and "persons" as used in this License shall be deemed to include natural persons, firms, corporations, associations and any other private or public entities, whether any of the foregoing are acting on their own behalf or in a representative capacity. If any term, covenant or condition of this License or any application thereof shall be invalid or unenforceable, the remainder of this License and any other application of such term, covenant or condition shall not be affected thereby. This License shall be construed without regard to any presumption or other rule requiring construction against the party causing this License to be drafted. In the event of any action, suit, dispute or proceeding affecting the terms of this License, no weight shall be given to any deletions or striking out of any of the terms of this License contained in any draft of this License and no such deletion or strike out shall be entered into evidence in any such action, suit or dispute or proceeding given any weight therein.

Section 21.3   All legal actions relating to this License shall be adjudicated during the pendency of the Bankruptcy Case in the Bankruptcy Court and thereafter in the state courts of the State of Texas, or the federal courts, in either case having jurisdiction in the county in which the Premises is located. Each of the parties irrevocably consents to the personal and subject matter jurisdiction of those courts in any legal action relating to this License. This consent to jurisdiction is self-operative and no further instrument or legal action, other than service of process in any manner permitted by law is necessary in order to confer jurisdiction upon the person of Licensor or Licensee and the subject matter in question in any such court. Each of Licensor and Licensee irrevocably waives and shall not assert, by way of motion, as a defense or otherwise (i) any objection to any such court being the venue of any legal action relating to this License, (ii) any claim that any legal action relating to this License brought in any such court has been brought in an inconvenient forum or (iii) any claim that either party is not personally subject to the jurisdiction of that court.

Section 21.4   Neither Licensor nor Licensee shall be liable to the other under this License for incidental, indirect, special or consequential damages incurred in connection with a breach or default under this License, notwithstanding anything to the contrary contained herein. Each of Licensor and Licensee hereby waive the right to cover such damages from the other party.

Section 21.5   This License shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

13

**IN WITNESS WHEREOF,** the parties hereto have duly executed this License as of the day and year first above written.

<div style="margin-left: 50%;">

**LICENSOR:**

PILLAR COMMERCIAL, LLC,

_____

Name:
Title:


**LICENSEE:**

NORTEL NETWORKS INC.,

_____

Name:
Title:

</div>

14

.

## EXHIBIT A

Licensed Space

.

15

## SCHEDULE 1

License Services

16

NEWYORK:2374208.6

## SCHEDULE 2

Wiring Information

17