## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**SIXTY-SECOND REPORT OF THE MONITOR**
**DATED April 4, 2011**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   PURPOSE................................................................................................................3

III.  TERMS OF REFERENCE ......................................................................................4

IV.   BACKGROUND .....................................................................................................5

V.    THE HWT................................................................................................................7

      Overview...................................................................................................................7

      Mercer 2010 Preliminary HWT Valuation ............................................................8

VI.   JANUARY INTERIM DISTRIBUTION AND TERMINATION FUND PAYMENT .....9

VII.  PROPOSED APRIL PAYMENT TO SIB BENEFICIARIES AND STB
BENEFICIARIES...................................................................................................11

VIII. MONITOR'S RECOMMENDATION.....................................................................12

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**SIXTY-SECOND REPORT OF THE MONITOR**
**DATED April 4, 2011**

## I.    INTRODUCTION

1.    On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Applicants**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA proceedings. The stay of proceedings was extended to June 30, 2011, by this Honourable Court in its Order dated February 25, 2011.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S.**

- 2 -

Court") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

3.    An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**").

6.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

- 3 -

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II.    PURPOSE

9.    This Sixty-Second Report is to report on the Applicants' request for an order that:

    (a)    the employee hardship application criteria be amended such that sufficient funds (the "**Required Funds**") be made available for the payment from the Hardship Fund to beneficiaries entitled to survivor income benefits ("**SIBs**") and beneficiaries entitled to survivor transition benefits in pay ("**STBs In Pay**") of an amount that, when taken with the January Interim Distribution, will be 10% of their SIBs or STBs In Pay, calculated in accordance with the methodology used for the January Interim Distribution (the "**Maximum 10% Interim Distribution**"), provided that the payment shall not exceed one month's benefits, and to be credited against future distributions by the Applicants;

    (b)    the amount available for hardship applications be reduced by the Required Funds; and

    (c)    the Eligibility Requirements and Procedure with respect to Employee Hardship Payment Applications be amended consistent with (a) and (b) above.

10.    On the making of the payment for which this Order is being sought and of the Termination Fund Payments, all SIB Beneficiaries, approximately 158 of the 335 STB Beneficiaries currently receiving STBs in Pay (the others having received the Maximum 10% Interim Distribution as part of the January Interim Distribution) and approximately 351 of the total of 356 LTD Beneficiaries will receive a payment from the Applicants in April.

- 4 -

11.     Although not before the Court at this time, the Monitor considers it appropriate to advise the Court that, in response to concerns raised by the Representative for the LTD Beneficiaries, the Representatives for the Former Employees and the CAW, the Monitor has continued its discussions with them, Independent Counsel, counsel to the CAW and Representative Counsel for the Continuing Employees. All have now confirmed that they will consent to an order for a further interim distribution from the HWT to the Income Beneficiaries of the Maximum 10% Interim Distribution, to a maximum of an additional two months of benefits, bringing the maximum number of months to 5 months. The effect will be to allow for payments in respect of May and June, 2011. Monitor's counsel so advised counsel to certain dissenting LTD Beneficiaries by letter dated April 1, 2011, a copy of which is attached as Appendix "A".

## III.     TERMS OF REFERENCE

12.     In preparing this Sixty-Second Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, expresses no opinion or other form of assurance on the information contained in this Sixty-Second Report.

13.     Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Monitor's Fifty-First Report dated August 27, 2010 (the "**Fifty-First Report**"), filed in support of the application for approval of the Approved HWT Allocation Methodology or in the Monitor's Fifty-Seventh Report dated December 3, 2010 (the "**Fifty-Seventh Report**"), filed in support of the application for approval of the January Interim Distribution from the HWT.

- 5 -

14.    Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## IV.    BACKGROUND

15.    The Fifty-Seventh Report (which attaches the Fifty-First Report and the Supplemental Fifty-First Report as appendices thereto) and the Monitor's Fifty-Ninth Report dated February 18, 2011 (the "**Fifty-Ninth Report**") are attached hereto as Appendices "B" and "C", with only relevant appendices attached thereto.

16.    The Fifty-First Report provides background concerning:

(a)    the appointment of the representatives;

(b)    the Settlement Agreement, including the cessation of benefits payable by Nortel on December 31, 2010;

(c)    the HWT and the benefits provided thereunder;

(d)    the process leading to the motion for approval of the allocation methodology proposed thereunder;

(e)    the Mercer 2010 HWT Preliminary Valuation;

(f)    the retainer of Sack Mitchell Goldblatt LLP by the LTD Beneficiaries' Representative and Lerners LLP by the Former Employees' Representatives (collectively, the "**Independent Counsel**"); and

(g)    various allocation scenarios.

17.    The Supplemental Fifty-First Report provides the following update to the Fifty-First Report:

(a)    an addendum to the Mercer 2010 HWT Preliminary Valuation reflecting information received with respect to the LTD Optional Life Benefit (the "**Mercer 2010 Addendum**"); and

- 6 -

(b)     revised illustrative allocation scenarios reflecting the valuation of the LTD Optional Life Benefit.

18.    The Fifty-Seventh Report provides background on the January Interim Distribution. The Fifty-Ninth Report provides background on Termination Fund payments to individuals terminated between July 1, 2010 and December 31, 2010 (including LTD Beneficiaries) using the balance of funds in the Termination Fund and such funds as necessary from the Hardship Fund.

19.    In summary:

(a)     In accordance with the Settlement Agreement and the Order of this Court, income benefit payments by the Applicants ended on December 31, 2010.

(b)     The Monitor sought this Court's approval of the Approved HWT Allocation Methodology for the funds held in the HWT, to enable a distribution of the HWT corpus, which this Court approved by Order dated November 9, 2010 (the "**HWT Allocation Order**").

(c)     On November 29, 2010, counsel for a small group of dissenting LTD Beneficiaries filed an application for leave to appeal the HWT Allocation Order.

(d)     At the request of the LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW, the Monitor brought a motion to provide an interim payment to the Income Beneficiaries. On December 15, 2010, this court granted an Order for an interim distribution from the HWT to the Income Beneficiaries (the "**January Interim Distribution Order**", attached hereto as Appendix "D") given, among other things:

(i)      certain steps needed to be completed prior to a final distribution from the HWT, including reconciliation of data as at December 31, 2010 and a determination of certain variables that may affect assets available for distribution;

(ii)     it was unlikely that the leave to appeal and, if leave were granted, any appeal, would be finally resolved and that all steps required for final distribution would be completed in sufficient time to allow for a final distribution before December 31, 2010; and

- 7 -

(iii)   the interim payment would assist the Income Beneficiaries in the period between the termination of Income Benefits and the final distribution of the HWT corpus.

(e)   The Ontario Court of Appeal denied leave to appeal the HWT Allocation Order on January 7, 2011. On March 8, 2011, counsel filed an application for leave to appeal the denial of leave with the Supreme Court of Canada.

(f)   By order dated February 25, 2011, this court approved the making of Termination Fund payments to, among others, LTD Beneficiaries, using such funds as necessary from the Hardship Fund.

20.   The January Interim Distribution Order approved an interim distribution of the HWT corpus to each Income Beneficiary in an amount equal to 10% of the Income Benefits calculated in accordance with the Approved HWT Allocation Methodology, using data available as of December 31, 2010 according to the Applicants' books and records, as updated from time to time; provided that the interim distribution would not exceed 3 months of Income Benefits payable to the Income Beneficiary, based on the monthly amount payable to the Income Beneficiary for December, 2010 (the "**January Interim Distribution**").

## V.   THE HWT

### Overview

21.   As further described in the Fifty-First Report, Nortel provided the following benefits through the HWT (using the HWT as a payment mechanism with respect to non-pension employee benefits and to fund (in part) certain other benefit plans using trust assets): (a) medical, dental and life insurance benefits to pensioners; (b) income payments to disabled employees; (c) medical, dental and life insurance benefits to disabled employees; (d) income benefits for beneficiaries of deceased employees; and (e) medical, dental and life insurance benefits to active employees.

- 8 -

22.    Under the Approved HWT Allocation Methodology, distributions would be made on account of the following benefits:

(a)    Pensioner Life;

(b)    LTD Life;

(c)    LTD Income;

(d)    LTD Optional Life Benefit;

(e)    SIBs; and

(f)    STBs In Pay.

**Mercer 2010 Preliminary HWT Valuation**

23.    Attached as Appendix "C" to the Fifty-First Report is a report of Mercer dated August 27, 2010 (the "**Mercer 2010 HWT Preliminary Valuation**"), providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when payments under such plans ceased. As indicated in the Fifty-First Report, no amount was included in the valuation for the LTD Optional Life Benefit as there was insufficient data at the date of the Fifty-First Report to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life.

24.    Attached as Appendix "A" to the Supplemental Fifty-First Report is the Mercer 2010 Addendum, which provides a preliminary valuation of the LTD Optional Life Benefit based on the assumptions set out in the Mercer 2010 HWT Preliminary Valuation and data Nortel provided to Mercer and the Monitor following the date of the Fifty-First Report.

- 9 -

## VI.    JANUARY INTERIM DISTRIBUTION AND TERMINATION FUND PAYMENT

25.    The Fifty-Seventh Report sets out the Monitor's considerations in recommending the level of payment for the January Interim Distribution, including:

(a)    In all illustrative scenarios, each of LTD Income and SIBs would participate in a distribution of the HWT corpus.

(b)    In certain illustrative scenarios, STBs In Pay are excluded as participating benefits. However, the LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (whose constituents would be impacted if leave to appeal is granted and scenarios other than the Approved HWT Allocation Methodology are considered) consented to the January Interim Distribution to STB Beneficiaries entitled to STBs In Pay, of approximately $355,000 (currently approximately $405,000 based on the current number of STB Beneficiaries receiving STBs in Pay).

(c)    The percentage distribution on account of Income Benefits differs (including from the percentage distribution resulting from the Approved HWT Allocation Methodology) depending on which illustrative scenario is applied.

(d)    The Monitor considered a range of possible interim distributions and the consent described in (b) above and believed that payment to Income Beneficiaries at 10% of their Income Benefit to a maximum of 3 months would not prejudice other beneficiaries of the HWT.

(e)    The Monitor's Fifty-First Report indicated that for the purposes of the illustrative scenarios, the cash balance available for distribution on the termination of the HWT would be $80 million (including Pensioner Life premiums for 2010 of $7.8 million, which will be treated as a charge against any distribution in respect of Pensioner Life) but that the actual amount of cash available would be subject to adjustment for factors which include:

(i)    investment returns;

(ii)    treatment of stale-dated cheques;

(iii)    the actual amount of Pensioner Life premiums paid during 2010;

(iv)    the treatment of costs related to expenses incurred prior to the termination of the HWT but not submitted by February 28, 2010 and therefore not paid by Nortel pursuant to the Settlement Agreement;

- 10 -

<div style="padding-left:2em">

(v)    taxes and administrative costs; and

(vi)    any fees paid from HWT assets pursuant to the Settlement Agreement with respect to any dispute or litigation regarding the HWT.

</div>

(f)    The Fifty-First Report also indicated that the ultimate distribution from the HWT would be dependent upon the outcome of other matters, including:

<div style="padding-left:2em">

(i)    changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

(ii)    changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

<div style="padding-left:2em">

A.    a different allocation of the HWT corpus;

B.    the resolution of contingencies;

C.    updating of data to December 31, 2010; and

D.    the award of fees against any particular benefit type.

</div>
</div>

26.    The January Interim Distribution was made and resulted in a lump sum amount representing 3 months of payments for approximately 512 Income Beneficiaries, and less than 3 months of payments for approximately 230 Income Beneficiaries. The majority of the Income Beneficiaries who received less than 3 months of Income Benefits under the interim distribution were the STB Beneficiaries because STBs are limited to a 5 year time period and many are approaching the end of that period.

27.    As discussed in the Fifty-Ninth Report, at the request of the LTD Beneficiaries' Representative, the Applicants sought and the Monitor recommended that the Termination Fund payments under the Settlement Agreement of $3,000 to each eligible employee whose employment was terminated by June 30, 2010 be extended to those employees terminated by December 31, 2010. By Order dated February 25, 2011, this

- 11 -

Court approved payment of $3,000 to each eligible employee terminated from July 1, 2010 to December 31, 2010 (the **"Termination Fund Payments"**) from the balance remaining in the Termination Fund and using funds from the Hardship Fund (since the assets in the Termination Fund were not sufficient). At the time of the February 25, 2011 Order, approximately $626,000 remained in the Hardship Fund, of which approximately $360,000 will be required for Termination Fund Payments, leaving approximately $266,000. Approximately 351 out of approximately 356 LTD Beneficiaries are eligible for Termination Fund Payments, which will be made in April to all those who provided information to the Applicants by April 1, 2011. Those who provide information thereafter will receive their payments later.

## VII.    PROPOSED APRIL PAYMENT TO SIB BENEFICIARIES AND STB BENEFICIARIES

28.    Although there is increased certainty regarding the outcome of some of the matters in paragraph 25(e) and (f) above, some uncertainty remains, including as a result of the application for leave to appeal to the Supreme Court of Canada. Accordingly, the Monitor is not yet able to recommend that the final distribution be made from the HWT. The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW have therefore renewed requests for further interim Income Benefit payments.

29.    The Applicants are proposing a payment from the Hardship Fund in the month of April to SIB Beneficiaries and STB Beneficiaries in receipt of STBs In Pay, since they will not be receiving Termination Fund payments in April. The total payment will be approximately $179,000, leaving approximately $87,000 in the Hardship Fund. Given that, to date, only about 20% of the original amount of the Hardship Fund has been used to make payments to eligible applicants, the Monitor does not consider that this payment to SIB

- 12 -

Beneficiaries and STB Beneficiaries would cause prejudice. The payment to SIB Beneficiaries and STB Beneficiaries from the Hardship Fund would be treated like other hardship payments as an advance against future distributions by the Applicants and would be limited to the Maximum 10% Interim Distribution, provided that the payment shall not exceed one month's benefits. Payments from the Hardship Fund will be subject to applicable statutory withholdings. All 80 SIB Beneficiaries will receive a full month's benefits, none of them being at 10%. 158 STB Beneficiaries receiving STBs in Pay, including 17 whose entitlement was reported in 2011, will receive payments, of which 87 will receive a full month's benefits. The form of amended Hardship Eligibility Requirements and Procedure with respect to Hardship Payment Applications is attached here to as Appendix "E".

## VIII.  MONITOR'S RECOMMENDATION

30.     The Monitor recommends that this Honourable Court amend the hardship application criteria and grant the Order in the form submitted by the Applicants.

All of which is respectfully submitted this 4th day of April, 2011.

**ERNST & YOUNG INC.**

**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President
\5953952

# APPENDIX "A"

# Goodmans LLP

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416.597.4148
grubenstein@goodmans.ca

April 1, 2011

**Via E-mail**

Rochon Genova LLP
121 Richmond Street West
Suite 900
Toronto, Ontario   M5H 2S7

**Attention: Joel P. Rochon**

Dear Mr. Rochon:

Re:    **Nortel Networks Corporation, Court File No. 09-CI-7950**

The Monitor has continued its discussions with the Representative for the LTD Beneficiaries, the Representatives for the Former Employees, the Representatives for the Continuing Employees, the CAW, its counsel and the Independent Counsel. We have now confirmed that they all will consent to an order for a further interim distribution to the Income Beneficiaries of 10% of their benefits (inclusive of the interim distribution previously made), to a maximum of an additional two months of benefits, bringing the maximum number of months to 5 months. The effect will be to allow for payments in respect of May and June, 2011.

In summary, there are currently 344 LTD Income Beneficiaries. With the first interim distribution, 52 of the beneficiaries reached 10% of their claim value, primarily because they are close to age 65. Therefore of the 344 LTD Income Beneficiaries, 292 would receive some payment from the proposed distribution. Of those 292, 258 would receive the full 2 additional months. Of the total distribution of about $1.7 million, $1.4 would be paid to LTD Income Beneficiaries. There is no withholding tax on account of these payments to LTD Income Beneficiaries.

We will advise his Honour of this intention at the 9:30 already scheduled for April 8, 2011. We will schedule a motion for approval of these payments for April or early May, so that any interim payments can occur in May as anticipated.

# Goodmans LLP

To reduce costs for all parties, and the burden on your clients, we suggest the schedule for your pending motion, and its hearing, be deferred by approximately six weeks. By the end of that time frame, the SCC may have released its reasons on your application, which will inform any need to continue with your motion. If you are so agreeable, we shall advise the court and have the schedule adjusted accordingly.

Yours very truly,

**Goodmans LLP**

Gale Rubenstein
GOR/dm

cc:      HWT Distribution Service List
\5954554

**APPENDIX "B"**

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

FIFTY-SEVENTH REPORT OF THE MONITOR
DATED DECEMBER 3, 2010

# TABLE OF CONTENTS

                                                                                                                            Page

I.      INTRODUCTION ...................................................................................................1

II.     PURPOSE.............................................................................................................3

III.    TERMS OF REFERENCE ...................................................................................5

IV.     BACKGROUND ..................................................................................................5

V.      THE HWT.............................................................................................................6

        Overview...............................................................................................................6

        Mercer 2010 Preliminary HWT Valuation ...........................................................7

VI.     INTERIM DISTRIBUTION.................................................................................8

        Tax Ruling Request.............................................................................................10

        Specific Process Matters .....................................................................................10

VII.    MONITOR'S RECOMMENDATION.................................................................11

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FIFTY-SEVENTH REPORT OF THE MONITOR**
**DATED DECEMBER 3, 2010**

## I.    INTRODUCTION

1.    On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Applicants**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA proceedings. The stay of proceedings was extended to February 28, 2011, by this Honourable Court in its Order dated October 27, 2010.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S.**

- 2 -

Court") on January 14, 2009 (the "**Chapter 11 Proceedings**").  As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

3.      An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**").  In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.      Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.      Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**").

6.      Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

- 3 -

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.      The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.      Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II.     PURPOSE

9.      The purpose of this Fifty-Seventh Report of the Monitor (the "**Fifty-Seventh Report**") is to seek this Honourable Court's approval of an interim distribution to the Income Beneficiaries (defined below) from funds held in the Applicants' Health and Welfare Trust (the "**HWT**") on account of their Income Benefits (defined below) and such ancillary relief as is just and convenient.

10.     The Settlement Agreement provides and this Court has ordered that benefit payments by the Applicants will end on December 31, 2010.   The Monitor sought this Court's approval of a proposed allocation methodology (the "**Approved HWT Allocation Methodology**") for the funds held in the HWT, to enable a distribution of the HWT corpus, which this Court approved by Order dated November 9, 2010 (the "**HWT Allocation Order**").   On November 29, 2010, counsel for a small group of dissenting LTD Beneficiaries filed leave to appeal the HWT Allocation Order.

11.     The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW have asked that the Monitor bring this motion to provide an interim payment to the Income Beneficiaries receiving Income Benefits given, among other things:

- 4 -

(a)    as discussed in paragraph 26(e) below, certain steps must be completed prior to a final distribution from the HWT, including reconciliation of data as at December 31, 2010 and a determination of certain variables that may affect assets available for distribution;

(b)    it is unlikely that the leave to appeal and, if leave is granted, any appeal, would be finally resolved and that all steps required for final distribution will be completed in sufficient time to allow for a final distribution before December 31, 2010; and

(c)    the interim payment will assist the Income Beneficiaries in the period between the termination of Income Benefits and the final distribution of the HWT corpus.

12.    In response to the requests received from the LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW, the Monitor has agreed to bring this motion. The Monitor is recommending that the amount of the interim distribution of the HWT corpus to each Income Beneficiary be 10% of the Income Benefits calculated in accordance with the Approved HWT Allocation Methodology, using data available as of December 31, 2010 according to the Applicants' books and records, as updated from time to time; provided that the interim distribution cannot exceed three months of the Income Benefits payable to the Income Beneficiary[1]. Based on the illustrative scenarios appended to the Supplement to the Monitor's Fifty-First Report dated September 17, 2010 (the "**Supplemental Fifty-First Report**") and attached as Appendix "A" hereto, the Approved HWT Allocation Methodology (Scenario #2) results in an allocation on account of Income Benefits of 33.8% of the actuarial value of the Income Benefits. The Monitor believes that the proposed interim distribution is prudent and conservative and will not prejudice other beneficiaries. The LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (defined below) each consent to the within motion

---

[1] Based on the monthly amount payable to the Income Beneficiary for December, 2010

- 5 -

and the proposed interim distribution, without prejudice and with a reservation of all rights and arguments.

## III.    TERMS OF REFERENCE

13.    In preparing this Fifty-Seventh Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management.    The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, expresses no opinion or other form of assurance on the information contained in this Fifty-Seventh Report.

14.    Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Monitor's Fifty-First Report dated August 27, 2010 (the "**Fifty-First Report**"), filed in support of the application for approval of the Approved HWT Allocation Methodology.

15.    Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## IV.    BACKGROUND

16.    The Fifty-First Report is attached hereto as Appendix "B", without appendices except for the Mercer 2010 HWT Preliminary Valuation (Appendix "C" to the Fifty-First Report).

17.    In addition, the Supplemental Fifty-First Report is attached hereto as Appendix "C", with appendices (being the Mercer 2010 Addendum, the illustrative scenarios (initially attached as Appendix "D" to the Fifty-First Report) as revised to reflect the present value

- 6 -

of LTD Optional Life Benefit, and the form of newspaper notice regarding the motion for the HWT Allocation Order).

18.     The Fifty-First Report provides background concerning:

(a)     the appointment of the representatives;

(b)     the Settlement Agreement, including the cessation of benefits payable by Nortel on December 31, 2010;

(c)     the HWT and the benefits provided thereunder;

(d)     the process leading to the motion for approval of the allocation methodology proposed thereunder;

(e)     the Mercer 2010 HWT Preliminary Valuation;

(f)     the retainer of Sack Mitchell Goldblatt LLP by the LTD Beneficiaries' Representative and Lerners LLP by the Former Employees' Representatives (collectively, the **"Independent Counsel"**); and

(g)     various allocation scenarios.

19.     The Supplemental Fifty-First Report provides the following update to the Fifty-First Report:

(a)     an addendum to the Mercer 2010 HWT Preliminary Valuation reflecting information received with respect to the LTD Optional Life Benefit (the **"Mercer 2010 Addendum"**); and

(b)     revised illustrative allocation scenarios reflecting the valuation of the LTD Optional Life Benefit.

## V.     THE HWT

### Overview

20.     As further described in the Fifty-First Report, Nortel provided the following benefits through the HWT (using the HWT as a payment mechanism with respect to non-pension

- 7 -

employee benefits and to fund (in part) certain other benefit plans using trust assets): (a) medical, dental and life insurance benefits to pensioners; (b) income payments to disabled employees; (c) medical, dental and life insurance benefits to disabled employees; (d) income benefits for beneficiaries of deceased employees; and (e) medical, dental and life insurance benefits to active employees.

21.    Under the Approved HWT Allocation Methodology, distributions would be made on account of the following benefits:

    (a)      Pensioner Life;

    (b)      LTD Life;

    (c)      LTD Income;

    (d)      LTD Optional Life Benefit;

    (e)      SIBs; and

    (f)      STBs in pay (**"STBs In Pay"**)

22.    The LTD Income, SIBs and STBs In Pay are referred to collectively as the **"Income Benefits"**, and the LTD beneficiaries entitled to LTD Income, the SIB Beneficiaries and the STB Beneficiaries entitled to STBs In Pay are referred to collectively as the **"Income Beneficiaries"**.

**Mercer 2010 Preliminary HWT Valuation**

23.    Attached as Appendix "C" to the Fifty-First Report is a report of Mercer dated August 27, 2010 (the **"Mercer 2010 HWT Preliminary Valuation"**), providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when payments under such plans will

- 8 -

cease. As indicated in the Fifty-First Report, no amount was included in the valuation for the LTD Optional Life Benefit as there was insufficient data at the date of the Fifty-First Report to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life.

24.     Attached as Appendix "A" to the Supplemental Fifty-First Report is the Mercer 2010 Addendum, which provides a preliminary valuation of the LTD Optional Life Benefit based on the assumptions set out in the Mercer 2010 HWT Preliminary Valuation and data Nortel provided to Mercer and the Monitor following the date of the Fifty-First Report.

## VI.    INTERIM DISTRIBUTION

25.     The LTD Beneficiaries' Representative, the Former Employees' Representatives and the CAW asked the Monitor to seek Court approval for an interim distribution to Income Beneficiaries on account of Income Benefits because of the difficulties that could arise for them if their income payments cease before there is any distribution on account thereof.

26.     In evaluating an interim distribution to Income Beneficiaries, the Monitor considered a number of factors, including:

(a)     In all illustrative scenarios, each of LTD Income and SIBs would participate in a distribution of the HWT corpus.

(b)     In certain illustrative scenarios, STBs In Pay are excluded as participating benefits; however:

(i)     under the proposed interim distribution, STB Beneficiaries entitled to STBs In Pay would receive in aggregate approximately $355,000; and

- 9 -

    (ii)    the LTD Beneficiaries' Representative, the Former Employees' Representatives, the Continuing Employees' Representatives, CAW Counsel and the Independent Counsel (whose constituents would be impacted if leave to appeal is granted and scenarios other than the Approved HWT Allocation Methodology are considered) consent to the proposed interim distribution as described in paragraph 12, including an interim distribution to STB Beneficiaries entitled to STBs In Pay (such consenting parties are referred to herein as the **"Consenting Parties"**).

    (c)    The percentage distribution on account of Income Benefits differs (including from the percentage distribution resulting from the Approved HWT Allocation Methodology) depending on which illustrative scenario is applied.

    (d)    The Monitor has considered a range of possible interim distributions and the consent described in (b)(ii) above and believes that payment to Income Beneficiaries at 10% of their Income Benefit to a maximum of 3 months will not prejudice other beneficiaries of the HWT.

    (e)    The Monitor's Fifty-First Report indicated that the ultimate distribution from the HWT would be dependent upon the outcome of the following matters:

        (i)    changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

        (ii)    changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

            A.    a different allocation of the HWT corpus;

            B.    the distributable assets being more or less than estimated;

            C.    the resolution of contingencies;

            D.    updating of data to December 31, 2010; and

            E.    the award of fees against any particular benefit type.

    (f)    Although there is increased certainty regarding the outcome of some of the above matters, there is still some uncertainty such that a conservative interim distribution is warranted.

27.    The proposed interim distribution will result in a lump sum amount representing 3 months of payments for approximately 503 Income Beneficiaries, and less than 3 months

- 10 -

of payments for approximately 240 Income Beneficiaries. The majority of the Income Beneficiaries who will receive less than 3 months of Income Benefits under the proposed interim distribution are those in receipt of STBs In Pay, which STBs In Pay are limited to a 5 year time period. Attached as Appendix "D" hereto is a chart illustrating the proposed interim distribution using data as of June 30, 2010 according to the Applicants' books and records.

**Tax Ruling Request**

28.   LTD Beneficiaries' Representative Counsel and Former Employees' Representative Counsel, in conjunction with CAW Counsel and with the assistance and cooperation of the Applicants and the Monitor, have sought a ruling from the Canada Revenue Agency that payments from the corpus of the HWT on account of certain benefits, including payments for those benefits contemplated by this interim distribution, would be made on a tax-exempt basis. The Canada Revenue Agency has not issued a ruling on this matter. Until such time as the ruling is issued, payments from the HWT would be subject to the applicable statutory withholdings. If the ruling from the Canada Revenue Agency is received prior to December 31, 2010 then the interim distribution will be made in accordance with that ruling.

**Specific Process Matters**

29.   As discussed in the Fifty-First Report, the Mercer 2010 HWT Preliminary Valuation was prepared on an aggregate basis to assist in an analysis of the effect of various scenarios (including the allocation methodology proposed in the Fifty-First Report) on the various benefits covered by the HWT and thereby on the aggregate group of individuals participating in those benefits. At the request of the LTD Beneficiaries' Representative,

the Monitor provided a statement to the Income Beneficiaries setting out an estimate of the amount they would receive if the proposed allocation methodology were approved, subject to certain caveats (a "**Beneficiary Estimated Allocation Statement**").

30.    The Beneficiary Estimated Allocation Statement was substantially in the form attached to the Fifty-First Report as Appendix "NNN", which is also attached hereto as Appendix "E".

31.    In response to inquiries received following delivery of the Beneficiary Estimated Allocation Statements, on November 16, 2010, the Monitor caused to be sent to each Income Beneficiary a form indicating the data from Nortel's books and records on which the particular Beneficiary Estimated Allocation Statement was based and asking that any corrections to the data be forwarded to the Monitor by December 17, 2010.    The Applicants will amend their books and records according to any corrections received and validated.

## VII.    MONITOR'S RECOMMENDATION

32.    The Monitor believes that an interim distribution to Income Beneficiaries is appropriate in the circumstances and that an interim distribution of 10% of the Income Benefits to a maximum of 3 months is prudent and reasonable.    The Monitor believes that the proposed interim distribution does not prejudice other beneficiaries of the HWT (particularly given its conservative nature, that the proposed interim distribution results in a relatively small distribution on account of STBs In Pay and the Consenting Parties have consented to the proposed interim distribution, including on account of STBs In Pay) and is responsive to the Income Beneficiaries' request for an interim payment pending final distribution of the HWT corpus.

- 12 -

33.     Accordingly, the Monitor requests that this Honourable Court grant the Order in the form submitted.

All of which is respectfully submitted this 3rd day of December, 2010.

**ERNST & YOUNG INC.**

**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

\5910968

# Nortel Health and Welfare Trust
## REVISED Illustrative Allocation Scenarios
Scenario: Optional Life does not participate
Cdn Millions

REVISED Appendix D-1
Scenarios 1 to 4

| Type of Benefit | Benefit Liabilities [6] | 1 All Benefits Share Pro Rata | 2 Proposed Participating Benefits Share Pro Rata | 3 Benefits in Pay Share Pro Rata | 4 Reserved Asset Method 3,5 |
|---|---|---|---|---|---|
| | | (Distribution %: 14.6%) | (Distribution %: 33.8%) | (Distribution %: 72.1%) | (Distribution %: N/A) |
| Pensioner Life (including ADB) [1] | $ 126.9 | $ 10.72 | $ 35.05 | $ - | $ - |
| Pensioner M&D | 251.3 | 36.67 | | - | 33.53 |
| Pensioner Benefit Total | 378.2 | 47.39 | 35.05 | - | 33.53 |
| LTD Income (including IBNR) | 79.9 | 11.66 | 26.98 | 57.57 | 21.47 |
| LTD M&D [2] | 29.7 | 4.33 | - | - | - |
| LTD - STB accrued | 0.3 | 0.04 | - | - | - |
| LTD Life [2] | 4.5 | 0.66 | 1.52 | - | 0.65 |
| LTD Optional Life Benefit (including IBNR) | 5.3 | 0.78 | 1.80 | - | - |
| LTD Benefit Total | 119.7 | 17.47 | 30.30 | 57.57 | 22.12 |
| SIB [4] | | | | | |
| STB - in pay | 16.2 | 2.36 | 5.47 | 11.67 | 16.55 |
| STB - accrued | 4.1 | 0.60 | 1.38 | 2.95 | - |
| Optional Life | 30.0 | 4.38 | - | - | - |
| Total Benefits | $ 548.2 | $ 72.2 | $ 72.2 | $ 72.2 | $ 72.2 |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 | 7.80 |
| Total | $ 548.2 | $ 80.0 | $ 80.0 | $ 80.0 | $ 80.0 |

NOTES
1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Optional life reserved asset of $18.7 million has been allocated pro rata amongst the other reserved assets based on asset value
4. The pro-rata allocation of the optional life reserved asset amongst the other remaining reserved asset categories results in the SIB reserved asset allocation exceeding the total benefit claim attributable to this category. No adjustments have been made to limit the SIB distribution under the reserved asset method
5. The Reserved Asset Method allocates HWT Assets using the reserved asset mix as at December 31, 2009 (as disclosed in the 2009 Health Welfare Trust Financial Statements)
6. Source: Mercer 2010 HWT Preliminary Valuation

REVISED Illustrative Allocation Scenarios

# Nortel Health and Welfare Trust
## REVISED Illustrative Allocation Scenarios
Scenario: Optional Life is a participating benefit.
Cdn Millions

REVISED Appendix D-2

Scenarios 5 to 8

| Type of Benefit | Benefit Liabilities [4] | 5 — All Benefits Share Pro Rata | 6 — Proposed Participating Benefits Share Pro Rata | 7 — Benefits in Pay Share Pro Rata | 8 — Reserved Asset Method [3] |
|---|---|---|---|---|---|
| | | [Distribution %: 11.2%] | [Distribution %: 25.9%] | [Distribution %: 53.3%] | [Distribution %: N/A] |
| Pensioner Life (including ADB) [1] | $ 126.9 | $ 6.38 | $ 25.01 | $ - | $ 23.85 |
| Pensioner M&D | 251.3 | 28.08 | - | - | - |
| Pensioner Benefit Total | 378.2 | 34.46 | 25.01 | - | 23.85 |
| LTD Income (including IBNR) | 79.9 | 8.93 | 20.66 | 42.63 | 16.44 |
| LTD M&D [2] | 29.7 | 3.32 | - | - | - |
| LTD - STB accrued | 0.3 | 0.03 | - | - | - |
| LTD Life [2] | 4.5 | 0.50 | 1.16 | - | 0.50 |
| LTD Optional Life Benefit (including IBNR) | 5.3 | 0.60 | 1.38 | - | - |
| LTD Benefit Total | 119.7 | 13.38 | 23.20 | 42.63 | 16.94 |
| SIB | | | | | |
| STB- in pay | 16.2 | 1.81 | 4.19 | 8.64 | 12.67 |
| STB - accrued | 4.1 | 0.46 | 1.06 | 2.19 | - |
| Optional Life | 30.0 | 3.35 | - | - | - |
| | - | 18.74 | 18.74 | 18.74 | 18.74 |
| Total Benefits | $ 548.2 | $ 72.2 | $ 72.2 | $ 72.2 | $ 72.2 |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 | 7.80 |
| Total | $ 548.2 | $ 80.0 | $ 80.0 | $ 80.0 | $ 80.0 |

NOTES
1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit. (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. The Reserved Asset Method allocates HWT Assets using the reserved asset mix as at December 31, 2009 (as disclosed in the 2009 Health Welfare Trust Financial Statements)
4. Source: Mercer 2010 HWT Preliminary Valuation

REVISED Illustrative Allocation Scenarios

# Nortel Health and Welfare Trust

REVISED Illustrative Allocation Scenarios

Scenario: STB Liability is excluded and Optional Life does not participate

Cdn Millions

REVISED Appendix D-3

Scenarios 9 to 11

| Type of Benefit | Benefit Liabilities [3] | 9 All Benefits Share Pro Rata (Distribution %: 15.6%) | 10 Proposed Participating Benefits (Distribution %: 34.4%) | 11 Benefits in Pay Share Pro Rata (Distribution %: 75.1%) |
|---|---|---|---|---|
| Pensioner Life (including ADB) [1] | $ 126.9 | $ 11.96 | $ 35.80 | $ - |
| Pensioner M&D | 251.3 | 39.13 | - | - |
| Pensioner Benefit Total | 378.2 | 51.08 | 35.80 | - |
| | | | | |
| LTD Income (including IBNR) | 79.9 | 12.44 | 27.45 | 60.03 |
| LTD M&D [2] | 29.7 | 4.62 | - | - |
| LTD - STB accrued | EXCLUDED | - | - | - |
| LTD Life [2] | 4.5 | 0.70 | 1.55 | - |
| LTD Optional Life Benefit (including IBNR) | 5.3 | 0.83 | 1.83 | - |
| LTD Benefit Total | 119.4 | 18.60 | 30.83 | 60.03 |
| | | | | |
| SIB | | | | |
| STB - in pay | 16.2 | 2.52 | 5.57 | 12.17 |
| STB - accrued | EXCLUDED | - | - | - |
| Optional Life | EXCLUDED | - | - | - |
| Total Benefits | $ 513.8 | $ 72.2 | $ 72.2 | $ 72.2 |
| | | | | |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 |
| | | | | |
| Total | $ 513.8 | $ 80.0 | $ 80.0 | $ 80.0 |

NOTES

1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Source: Mercer 2010 HWT Preliminary Valuation (excludes STB Liability)

REVISED Illustrative Allocation Scenarios

# Nortel Health and Welfare Trust

## REVISED Illustrative Allocation Scenarios

Scenario: STB Liability is excluded and Optional Life is a participating benefit

Cdn Millions

REVISED Appendix D-4

Scenarios 12 to 14

| Type of Benefit | Benefit Liabilities [3] | 12 All Benefits Share Pro Rata (Distribution %: 11.9%) | 13 Proposed Participating Benefits (Distribution %: 26.3%) | 14 Benefits in Pay Share Pro Rata (Distribution %: 55.6%) |
|---|---|---|---|---|
| Pensioner Life (including ADB) [1] | $ 126.9 | $ 7.33 | $ 25.59 | $ |
| Pensioner M&D | 251.3 | 29.96 | - | - |
| Pensioner Benefit Total | 378.2 | 37.29 | 25.59 | |
| | | | | |
| LTD Income (including IBNR) | 79.9 | 9.53 | 21.02 | 44.45 |
| LTD M&D [2] | 29.7 | 3.54 | - | - |
| LTD - STB accrued | EXCLUDED | | | |
| LTD Life [2] | 4.5 | 0.54 | 1.18 | - |
| LTD Optional Life Benefit (including IBNR) | 5.3 | 0.64 | 1.40 | - |
| LTD Benefit Total | 119.4 | 14.24 | 23.61 | 44.45 |
| | | | | |
| SIB | 16.2 | 1.93 | 4.26 | 9.01 |
| STB - in pay | EXCLUDED | | | |
| STB - accrued | EXCLUDED | - | - | - |
| Optional Life | - | | | |
| | | 18.74 | 18.74 | 18.74 |
| Total Benefits | $ 513.8 | $ 72.2 | $ 72.2 | $ 72.2 |
| | | | | |
| Pensioner Life 2010 Premiums [1] | NA | 7.80 | 7.80 | 7.80 |
| | | | | |
| Total | $ 508.5 | $ 80.0 | $ 80.0 | $ 80.0 |

NOTES

1. Pensioner Life Premiums for 2010 have been treated as charge against the distribution in respect of the Pensioner Life Benefit (if any)
2. LTD Life and LTD M&D includes $2.0 million and $5.2 million, respectively, related to LTD individuals who are assumed to proceed to retirement and become eligible as pensioners.
3. Source: Mercer 2010 HWT Preliminary Valuation (excludes STB Liability)

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

FIFTY-FIRST REPORT OF THE MONITOR
DATED AUGUST 27, 2010

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................1

II.  PURPOSE ........................................................................................................3

III. TERMS OF REFERENCE .................................................................................5

IV.  BACKGROUND ...............................................................................................6

Appointment of Representatives.........................................................................6

The Settlement Agreement ................................................................................7

V.   PROCESS LEADING TO THIS MOTION ........................................................9

VI.  FACTS CONCERNING THE HWT..................................................................10

Overview of the HWT .......................................................................................10

Revenue Canada Ruling.....................................................................................12

The Trust Agreement ........................................................................................13

Current Plans.....................................................................................................14

Sun Life..............................................................................................................15

Pensioner Benefits ...........................................................................................15

    (a)    Pensioner Life ...................................................................... 16

    (b)    Medical and Dental Benefits................................................ 17

LTD Benefits .....................................................................................................18

    (a)    LTD Life Insurance Benefits ................................................ 18

    (b)    Medical and Dental Benefits................................................ 19

    (c)    Income Benefits ................................................................... 19

Survivor Income Benefits ..................................................................................19

Survivor Transition Benefits..............................................................................20

Optional Life Benefit .........................................................................................21

Basic and Optional Life Cross-Experience Rating ...........................................22

Financial Reports on the HWT ..........................................................................23

    (a)    Tax Returns.......................................................................... 23

    (b)    HWT Financial Statements .................................................. 23

HWT Valuations .................................................................................................24

Funding and Administration...............................................................................25

Available Cash ...................................................................................................26

Page

VII.    MERCER 2010 PRELIMINARY HWT VALUATION ................................................27

VIII.   PROPOSED ALLOCATION METHODOLOGY ..................................................29

      Illustrative Scenarios.........................................................................................29

      Proposed Allocation Methodology ...................................................................34

      Independent Legal Counsel................................................................................36

      Specific Process Matters ....................................................................................39

      Operational Steps...............................................................................................42

IX.     RECOMMENDATION .......................................................................................44

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

FIFTY-FIRST REPORT OF THE MONITOR
DATED AUGUST 27, 2010

## I.    INTRODUCTION

1.    On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Applicants**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA proceedings. The stay of proceedings was extended to October 29, 2010, by this Honourable Court in its Order dated July 16, 2010.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S.**

- 2 -

Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.     An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.     Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.     Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted Administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.     Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

- 3 -

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II.    PURPOSE

9.    The purpose of this Fifty-First Report of the Monitor (the "Fifty-First Report") is:

(a)    to seek this Honourable Court's approval of a proposed allocation methodology[1] (the "Proposed Allocation Methodology") for the allocation of funds held in the Applicants' Health and Welfare Trust (the "HWT") and such ancillary relief as is just and convenient to terminate the HWT and implement the Proposed Allocation Methodology to distribute the funds held in the HWT to the beneficiaries who are entitled thereto; and

(b)    to provide this Honourable Court with information about the HWT relevant to its termination and more specifically to the allocation and distribution of its corpus and the process that has been followed by the Applicants and the Monitor to resolve these issues in a reasonable and practical manner.

10.    The Settlement Agreement (defined below) provides and this Court has ordered that benefit payments by the Applicants will end on December 31, 2010. It is therefore timely to seek approval of the Proposed Allocation Methodology, which will enable a distribution of the HWT corpus.

---

[1] Described in Section VIII below. An illustrative example of the application of the Proposed Allocation Methodology to the participating benefits on an aggregate basis (not an individual basis) is attached as Appendix D-1, Column 2.

- 4 -

11.    It is appropriate for the Monitor to bring this motion in these proceedings and seek approval of the Proposed Allocation Methodology in order to assist this Honourable Court and the parties, given, among other things:

(a)    the Applicants administer the HWT and, as they are under the supervision of this Honourable Court in these proceedings, require approval of this Honourable Court prior to taking those proposed steps that are not in the ordinary course of the Applicants' business;

(b)    a resolution of HWT allocation and distribution matters is required in order to determine certain claims (in that distributions from the HWT will reduce them) against the Applicants, assist in the development of a CCAA Plan and advance the administration of the Applicants' estates;

(c)    the provisions of the Settlement Agreement;

(d)    The Northern Trust Company, Canada, the current trustee of the HWT (the "Trustee"), has an extremely limited mandate, pursuant to which virtually all decisions concerning the HWT are the Applicants' responsibility and the Trustee merely acts in accordance with instructions from the Applicants;

(e)    the Applicants' have no financial interest in the HWT corpus; and

(f)    the Monitor's role as an independent Court-appointed officer to balance the interests of the various parties, particularly in light of the uncertainties with respect to the interpretation of the Trust Agreement and the number of potential outcomes.

12.    Counsel has advised the Monitor that the Trust Agreement (defined below) does not provide clear guidance on which individuals are entitled to participate in a distribution on termination of the HWT and there are a number of interpretations and possible outcomes. To assist this Honourable Court and the parties, counsel to the Monitor has prepared a memorandum of law considering the potential interpretations of the Trust Agreement and issues related thereto, a copy of which is attached as Appendix "B".

13.    The Monitor recommends the Proposed Allocation Methodology based on the advice of counsel with respect to the interpretation of the Trust Agreement and, in the Monitor's

- 5 -

view, it represents a fair and reasonable balancing of various interests in a trust fund inadequate to fully meet all claims. It is also a practical methodology which can be implemented without undue cost and delay. Further, the Proposed Allocation Methodology is, in general, consistent with the way in which the HWT has been administered, in that, with the exception of the LTD Optional Life Benefit and the STBs, these benefits are not paid on a pay-as-you-go basis by Nortel and assets of the HWT are shown as reserved for payment of these benefits on the HWT financial statements.

14.    The Proposed Allocation Methodology is set out in paragraph 101 below. In brief, it provides that those beneficiaries whose claims are in pay (that is, those with income claims presently being paid) and those whose claims are certain to be payable at some future date will share in the distribution. Therefore, the following benefits would share *pro rata*: (a) LTD Income; (b) LTD Life; (c) LTD Optional Life Benefit; (d) SIBs and STBs in pay; and (e) Pensioner Life.

15.    The Proposed Allocation Methodology and subsequent distributions are based on the Mercer 2010 HWT Preliminary Valuation, a copy of which is attached as Appendix "C". An illustrative example of the application of the Proposed Allocation Methodology to the participating benefits on an aggregate basis (not on an individual basis) is attached as Appendix D-1, Column 2. Schedules providing illustrative examples under various allocation scenarios are attached as Appendix "D".

III.    TERMS OF REFERENCE

16.    In preparing this Fifty-First Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management. The Monitor has not audited,

- 6 -

reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, expresses no opinion or other form of assurance on the information contained in this Fifty-First Report.

17.     Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Monitor's Thirty-Ninth Report dated February 18, 2010 (the "**Thirty-Ninth Report**"), which terms from the Thirty-Ninth Report are reproduced on Appendix "A" attached hereto for ease of reference.

18.     Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## IV.     BACKGROUND

### Appointment of Representatives

19.     As set out in detail in the Monitor's Thirty-Sixth Report dated February 8, 2010 and the Affidavit of Elena King sworn February 18, 2010, all but a very few individuals are represented in these proceedings by Court appointed representative counsel; namely, Former Employees' Representative Counsel, LTD Beneficiaries' Representative Counsel, Continuing Employees' Representative Counsel or CAW Counsel, and also Court appointed representatives; namely, the Former Employees' Representatives, the LTD Beneficiaries' Representative (collectively, the "**Employee Representatives**") or the Continuing Employees' Representatives.

20.     The only individuals (collectively referred to as the "**Individual Parties**") not represented by the above appointments are:

- 7 -

(a) 3 former employees and one working employee who opted out of such representation; and

(b) any former chief executive officer or chairman of the board of directors, any non-employee member of the board of directors, or such former employees or officers that are subject to investigation and charges by the Ontario Securities Commission or the United States Securities and Exchange Commission.

21. The Court Orders appointing the Employee Representatives expressly state that they may represent their constituents for the purpose of settling or compromising their claims in insolvency proceedings "or in any other proceeding which has been or may be brought before this Honourable Court". The administration of the HWT, the benefits which it provides and its termination are all being overseen within the CCAA proceedings. Payments by Nortel of certain benefits funded through the HWT are included in the Applicants' cash flows approved in the CCAA proceedings. Employee and pensioner benefit claims against the Applicants will be dealt with in a compensation claims process to be subsequently brought before this Court for approval. These claims will be reduced by the amount of any distributions made to the claimant from the HWT. Therefore, an allocation and distribution of the corpus of the HWT impacts on, and relates to, employee and pensioner claims against the Applicants in the CCAA proceedings. As a result, the Court approved Settlement Agreement (discussed below) contemplated the involvement of the Employee Representatives in the allocation and distribution process for the HWT.

22. The Employee Representatives engaged RSM Richter Inc. as their financial advisor and The Segal Company Ltd. ("Segal") as their actuarial advisor.

## The Settlement Agreement

23. Although Nortel is insolvent, it continued for more than a year to fund its pre-filing obligations for medical, dental and certain other benefits to its pensioners, their survivors

- 8 -

and disabled employees; however, it could not continue to do so indefinitely. In the absence of special arrangements, Nortel's benefits payments would have ceased on March 31, 2010. At the conclusion of the payment of benefits in accordance with the Settlement Agreement, these benefits will have been funded for two years.

24.    The Applicants, the Monitor, the Former Employee Representatives (on their own behalf and on behalf of the parties they represent), the LTD Employee Representative (on her own behalf and on behalf of the parties she represents), the Former Employees' Representative Counsel, the LTD Beneficiaries' Representative Counsel and the CAW (the "Settlement Parties") reached an agreement regarding certain issues related to, among other things, the Applicants' registered Pension Plans, certain employee benefits for, among others, Pensioners and LTD Beneficiaries and certain employment related issues. The agreement was amended and restated on March 30, 2010 (as amended and restated, the "Settlement Agreement") following issuance of this Honourable Court's reasons on March 26, 2010. Additional information on the Settlement Agreement and the process leading up to the Settlement Agreement can be found in the Thirty-Ninth Report, the supplements to the Thirty-Ninth Report and the Forty-Second Report of the Monitor dated March 30, 2010.

25.    The Settlement Agreement was approved by this Honourable Court by Order dated March 31, 2010 (the "Settlement Approval Order"). Leave to appeal the Settlement Approval Order was denied by Endorsement of the Ontario Court of Appeal dated June 3, 2010. Copies of the Settlement Approval Order (which attaches a copy of the Settlement Agreement) and of the Endorsement of the Court of Appeal are attached hereto as Appendices "E" and "F", respectively.

- 9 -

26.     In summary, the Settlement Agreement addresses the payment of benefits during 2010 to, among others, Pensioners and LTD Beneficiaries, confirms that claims in respect of benefits and relating to the HWT rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of the Applicants and releases directors, officers, the Trustee and others from all direct and indirect claims related to the HWT (other than against a director of Nortel for a matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud.)

27.     The Settlement Agreement also provides:

> Resolution: *The Parties will work towards a Court approved distribution of the Health and Welfare Trust ("HWT") corpus in 2010 to its beneficiaries entitled thereto and the resolution of any issues necessarily incident thereto.* For greater certainty, nothing in this Settlement Agreement affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT. Any fees or expenses incurred in connection with any dispute or litigation among the beneficiaries of the HWT concerning entitlement (including without limitation all legal, actuarial and other fees and expenses of the trustee of the HWT and other service providers of the HWT) shall not be paid by Nortel, but shall be paid by the HWT corpus. For greater certainty, such fees or expenses shall not include those of the Monitor and incurred by Nortel in connection with any motion for termination of the HWT or for directions with respect to the HWT, which shall be paid by Nortel. (Section C.1) (Emphasis added.)

28.     This provision was in recognition of the importance and significance of achieving an allocation of the HWT corpus before the end of 2010 (when payment of benefits will cease) in order for distributions to be made to individuals based on such an allocation.

## V.     PROCESS LEADING TO THIS MOTION

29.     The Monitor has worked closely with the Applicants, the Trustee, Sun Life Assurance Company of Canada ("Sun Life") (party to an administrative services only arrangement with Nortel in respect of certain benefit plans and a provider of certain life insurance

- 10 -

policies) and Mercer (the Applicants' actuarial advisor) on all major aspects of the Applicants' current employee and former employee benefit plans and has sought their assistance in assembling facts and documents relevant to this motion. Section VI below summarizes the material facts relating to the HWT and refers to documents relevant to the HWT that are attached as Appendices to this Fifty-First Report.

30.    In order to analyze the options available for distribution of the funds held in the HWT, the Monitor and its advisors reviewed documentation relevant to the HWT that was available. Not all supporting records are available as the HWT was established 30 years ago. The Monitor also shared this information with Representative Counsel and Independent Counsel (discussed in Section VIII below) so as to ensure that all constituencies had the same available information.

31.    The information provided included:

   (a)    the documents basic to the establishment of the HWT, being the Revenue Canada ruling and the trust documents;

   (b)    benefits information, including policies with Sun Life and experience reports; and

   (c)    financial reports and valuations.

## VI.   FACTS CONCERNING THE HWT

### Overview of the HWT

32.    Nortel established the HWT on January 1, 1980 as a tax-efficient vehicle through which Nortel would continue to provide employee benefits by agreement between Northern Telecom Limited (a predecessor company to NNL) and Montreal Trust Company (as trustee), amended by agreements made as of September 24, 1984, June 1, 1994 and

- 11 -

December 1, 2005 and further amended by letter agreement dated December 1, 2005 (collectively, the "Trust Agreement"). The Trust Agreement (with an appendix respecting administrative services) is attached as Appendix "G". Northern Telecom Canada, Limitée, Montreal Trust Company (a predecessor trustee) and Association D'Hospitalisation du Québec entered into an administrative services only agreement dated January 1, 1981 in respect of benefits provided under medical and dental plans, a copy of which agreement is attached as Appendix "H".

33.    As the successor to Northern Telecom Limited, Nortel is bound by the Trust Agreement pursuant to Article IX.

34.    Most of Nortel's non-pension employee benefits, including life insurance, long term disability, medical, dental and survivor income benefits, are funded by Nortel on a pay-as-you-go basis but as an administrative matter are paid using the HWT as a payment mechanism. In respect of certain other benefit plans, the benefits have been funded (in part) by the HWT using trust assets (referred to as "Reserved Plans"). Assets were notionally allocated in the HWT financial statements with respect to the Reserved Plans; however, assets were not segregated in the HWT by benefit plan and no separate bank accounts were established. As a result, all the HWT assets are commingled.

35.    Employees and former employees of Nortel were not informed of the existence of the HWT until at least 2007 nor were they promised that their benefits would be provided through a health and welfare trust. None of Nortel's collective bargaining agreements referenced the HWT or promised to provide benefits through a health and welfare trust.

- 12 -

## Revenue Canada Ruling

36.    In 1979, prior to the establishment of the HWT, Nortel sought and obtained an advance income tax ruling from Revenue Canada (as it then was) regarding the tax treatment of the HWT. Nortel's letter to Revenue Canada dated December 16, 1979 (the "Ruling Request Letter"), attached as Appendix "I", and the ruling obtained on December 28, 1979 (the "Ruling"), attached as Appendix "J", described the facts relevant to the proposed health and welfare trust and benefit plans, including how the trust was to be operated.

37.    The Ruling Request Letter and the Ruling referred to:

(a)    the establishment of a single health and welfare trust fund by Nortel through which certain benefit plans would be provided;

(b)    the following benefit plans as comprising the plans within the HWT: health care (medical and dental); sickness and accident; long term disability; survivor income benefit and group life insurance;

(c)    the Trustee being responsible for receiving Nortel's contributions and employee contributions and arranging for payment of benefits to eligible employees and dependents and payment of premiums to the insurance company;

(d)    the transfer to the HWT of the Pensioners' Insurance Fund (in respect of the group life insurance plan -- part I) of $11 million held by Mutual Life Assurance of Canada representing a surplus in a prior retirement life insurance arrangement;

(e)    employee contributions in respect of optional life insurance (group life insurance - part II), stating they would form part of the Trust Fund (as defined below) but be kept in a separate sub-account; and

(f)    the following proposed funding arrangements:

(i)    Health Care Plan - Nortel to make contributions to the HWT to satisfy the claims liability and may fund expected future claims, as actuarially determined by the insurance carrier;

- 13 -

(ii)    Long Term Disability Plan - Nortel's contributions to be sufficient to satisfy all claims and may make additional/increased contributions based on an actuarial valuation or some other reasonable basis;

(iii)   Survivor Income Benefit Plan - funding to be identical to that of long term disability, but employees required to make contributions;

(iv)    Group Life Insurance Plan (Part I – Basic & Part II – Optional)

    A.    Nortel to make contributions to the HWT sufficient to pay premiums.  Contributions (both active employees' and Nortel's) not immediately applied against claims and expenses of the insurer to be deposited/transferred to a sub-account of the HWT called the 'Pensioners Insurance Fund'.[2]

    B.    At the time of the Ruling, the Pensioners' Insurance Fund of approximately $11 million, with Mutual Life Assurance of Canada, to be transferred into the HWT.

    C.    Group Life Insurance (Part II) to be paid totally by the employees, to form part of the Trust Fund but be kept in a separate account.

## The Trust Agreement

38.    In summary, the Trust Agreement provides that:

(a)    the Trust Fund is created for the purpose of providing the Health and Welfare Plan benefits for the benefit of the Applicants' active and retired employees;

(b)    Nortel may designate as the "Health and Welfare Plan" certain of the following health and welfare plans (and such other similar plan or plans as Nortel may from time to time place in effect): health care; management long term disability; union long term disability; a management survivor income benefit; management short term disability; and group life insurance;

(c)    all contributions (from both Nortel and employees) will be held in a single fund (the "**Trust Fund**"), including all profits, increments, and earnings thereon (Article I, Section 6);

---

[2] This funding arrangement is applicable to Part I – Basic life insurance.

- 14 -

(d)   with respect to record-keeping, the Trustee shall keep accurate and detailed accounts of all investments and transactions and separate records for each of the separate Plans (Article III, Section 2(p)); and

(e)   on termination of the HWT, the following shall apply:

> Upon sixty (60) days prior written notice to the Trustee, the Corporation may terminate its obligation to make Employer's contributions in respect of benefits after the date of written notice to the Trustee (hereinafter called the "Notice of Termination"). Upon receipt of the Notice of Termination the Trustee shall within one hundred twenty (120) days determine and satisfy all expenses, claims and obligations arising under the terms of the Trust Agreement and Health and Welfare Plan up to the date of the Notice of Termination. The Trustee shall also determine upon a sound actuarial basis, the amount of money necessary to pay and satisfy all future benefits and claims to be made under the Plan up to the date of the Notice of Termination. The Corporation and the designated affiliated or subsidiary corporations shall be responsible to pay to the Trustee sufficient funds to satisfy all such expenses, claims and obligations, and such future benefits and claims. The final accounts of the Trustee shall be examined and the correctness thereof ascertained and certified by the auditors appointed by the Trustee. Any funds remaining in the Trust Fund after the satisfaction of all expenses, claims and obligations and future benefits and claims, arising under the terms of the Trust Agreement and the Health and Welfare Plan shall revert to the Corporation. (Article VI, section 2.)

## Current Plans

39.   According to the 2005 Valuation (as defined below) (the most recent actuarial valuation of the obligations of the HWT located by the Monitor), the following plans (collectively, the "**Plans**") formed the Health and Welfare Plan as at that date:

- medical, dental and life insurance benefits provided to pensioners,

- income payments to disabled employees (long term disability and short term disability),

- medical, dental and life insurance benefits provided to disabled employees,

- 15 -

- income benefits for beneficiaries of deceased employees (survivor income benefit and survivor transition benefit[3]),

- medical and dental benefits provided to active employees,

- employer-paid basic life insurance provided to active employees, and

- employee-paid optional life insurance provided to active employees.

Handbooks concerning certain of Nortel's benefit plans are attached as Appendix "K". We will discuss each of the pensioner benefits, LTD benefits, survivor income benefits, survivor transition benefits and optional life in turn.

## Sun Life

40.     Nortel has an administrative services only arrangement with Sun Life in respect of benefits provided under health, dental, survivor transition, survivor income and long-term disability plans, all of which are self-insured by Nortel. Sun Life insures pensioner life and active employee life benefits (Life Part I – Basic and Part II – Optional). Copies of certain Sun Life policies and history summaries and amendments with respect thereto are attached as Appendix "L".

## Pensioner Benefits

41.     The Pensioner benefits are paid to pensioners of Nortel or eligible dependents. Approximately 11,000 pensioners are entitled to pensioner benefits, comprised of (a) pensioner life (10,461 pensioners), and (b) medical and dental benefits (11,180 pensioners and 6,251 spouses).

---

[3]     STBs are listed in the 2005 Valuation. However, as set out below, since closure of the STB plan in 2003, the STB plan has not been referenced in the HWT financial statements since the 2004 HWT financial statement.

- 16 -

(a)      *Pensioner Life*

42.    Pensioners are entitled to a group life insurance benefit ("**Pensioner Life**"). The benefit amount varies and generally decreases with age but it is permanent and not term insurance. Pensioner Life premiums were historically paid from HWT assets and this has continued throughout the CCAA proceedings.

43.    Sun Life insures Pensioner Life by a policy issued to Nortel, as policyholder. The policy is experience rated. Each year, the accounts between Nortel and Sun Life are adjusted based on claims experience. Essentially, if the claims experience in a year was less than the premiums paid, Sun Life paid a refund to Nortel and, if the claims experience was more than the premiums paid, the deficiency was paid to Sun Life from the HWT, subject to the cross-experience rating described in paragraph 74.

44.    The basic life insurance policy and the optional life insurance policy (discussed below) contain conversion privileges entitling a participant, without evidence of insurability, to convert to an individual life policy with Sun Life, to a maximum of $200,000 for basic and optional life insurance combined.

45.    The Settlement Agreement does not require Nortel to pay the premiums in respect of Pensioner Life for 2010. These premiums continue to be paid from the corpus of the HWT.

46.    The HWT financial statements indicate reserve assets in respect of Pensioner Life of $30.7 as at December 31, 2009[4] and $49.6 million as at December 31, 2008.

---

[4] The reserved asset amounts as at December 31, 2009 are lower than the comparable December 31, 2008 amounts primarily due to the payment of benefits during 2009 and a reduction in the net assets reflected in the 2009

- 17 -

Accordingly, this is a Reserved Plan.

47.    Pensioner Life premiums for 2009 were approximately $5.7 million.  The estimated cost of Pensioner Life premiums for 2010 is approximately $7.8 million.  For the period January 1 to June 30, 2010, Pensioner Life premiums amount to approximately $3.9 million, including taxes and administrative costs relating thereto.

48.    In addition, there are 77 Pensioners (most of whom retired prior to 1983) entitled to receive an additional death benefit of 1 x preretirement earnings, with no reductions ("ADB").  From January 1, 2010 to June 30, 2010, Nortel has paid approximately $0.2 million in ADB.  For the purposes of the Proposed Allocation Methodology and the illustrative scenarios, ADB forms part of Pensioner Life.

(b)    *Medical and Dental Benefits*

49.    Medical and dental benefits for Pensioners ("**Pensioner M&D**") were historically funded by Nortel on a pay-as-you-go basis but, as an administrative matter, were paid using the HWT as a payment mechanism.  This has continued throughout the CCAA proceedings.  Under the Settlement Agreement, the cost of Pensioner M&D will continue to be paid by Nortel on a pay-as-you-go basis until December 31, 2010.

50.    Pensioner M&D costs for 2009 were approximately $16.7 million.  The estimated cost of the Pensioner M&D for 2010 is between $17.1 million and $20.9 million.  For the period January 1 to June 30, 2010, Pensioner M&D costs amount to approximately $7.4 million, including taxes and administrative costs relating thereto.

---

HWT financial statements as a result of a reserve established on the amount Due from Sponsoring Company. This reserve has been allocated to the reserved assets *pro rata* based on their asset balances.

## LTD Benefits

51.     Long-term disability ("LTD") benefits are provided when short-term disability benefits end and continue for the duration of the employee's disability or until age 65 when the employee qualifies for pensioner benefits.  Approximately 360 people are entitled to receive LTD benefits, comprised of: (a) LTD life (358 individuals); (b) medical and dental benefits (360 individuals and 318 dependents); and (c) income benefits (351 individuals).

52.     LTD Beneficiaries are active employees.  Under the Settlement Agreement, LTD benefits are to be paid by Nortel on a pay-as-you-go basis until December 31, 2010.  The Settlement Agreement further provides that the employment of LTD beneficiaries terminates as of December 31, 2010 and that such termination does not affect in any manner their rights against Nortel arising out of their employment.

### (a)    LTD Life Insurance Benefits

53.     Life insurance benefits for LTD employees ("LTD Life") end when a disabled employee attains age 65. At that time, the disabled employee is eligible for Pensioner Life.

54.     LTD Life premiums were historically paid on a pay-as-you-go basis by Nortel through the HWT.  This has continued throughout the CCAA proceedings.  However, the premium for Optional Life (defined below) is waived while an individual is on LTD benefits (the "**LTD Optional Life** .").  These premiums were generally treated as part of the experience under the Optional Life policy, which was then cross-rated with the basic life policy as described in paragraph 74.

- 19 -

(b)    *Medical and Dental Benefits*

55.    Medical and dental benefits for LTD employees ("LTD M&D") were funded by Nortel on a pay-as-you-go basis, but as an administrative matter, were paid using the HWT as a payment mechanism. This has continued throughout the CCAA proceedings.

56.    LTD M&D and LTD Life costs for 2009 were approximately $2.5 million. The estimated cost of LTD M&D and LTD Life for 2010 is between $2.1 million and $2.6 million. The LTD M&D costs and life insurance premiums are included with the payment of medical, dental and life benefits for all active employees.

(c)    *Income Benefits*

57.    Income replacement benefits ("LTD Income") for Nortel employees on long-term disability were historically paid from HWT assets. This has continued throughout the CCAA proceedings.

58.    The HWT financial statements indicate reserve amounts in respect of LTD Income of $15.7 million as at December 31, 2009 and $30.7 million as at December 31, 2008. Accordingly, this is a Reserved Plan.

59.    LTD Income costs for 2009 were approximately $12.0 million. The estimated cost of LTD Income for 2010 is between $12.0 million and $12.2 million. For the period January 1 to June 30, 2010, LTD Income costs amount to approximately $5.3 million, including taxes and administrative costs relating thereto.

**Survivor Income Benefits**

60.    Survivor income benefits ("SIBs") are life-time income benefits for survivors of certain non-unionized Nortel employees. SIBs are no longer offered and have not been since

before the commencement of the CCAA proceedings but continue to be paid to a group of surviving spouses. SIBs were historically paid by the HWT from HWT assets. This has continued throughout the CCAA proceedings.

61.     Approximately 80 survivors of former employees of Nortel are currently in receipt of SIB ("SIB Beneficiaries").

62.     The HWT financial statements indicate reserve amounts in respect of SIBs of $12.1 million as at December 31, 2009 and $17.1 million as at December 31, 2008. Accordingly, this is a Reserved Plan.

63.     The cost of the SIBs for 2009 was approximately $1.4 million. The estimated cost of the SIBs for 2010 is approximately $1.4 million. For the period January 1 to June 30, 2010, the cost of SIBs amounts to approximately $0.7 million, including taxes and administrative costs relating thereto.

## Survivor Transition Benefits

64.     Survivor transition benefits ("STBs") are income benefits for survivors of certain unionized former Nortel employees, payable for a five year period. STBs are paid on a pay-as-you-go basis by Nortel but, as an administrative matter, were paid using the HWT as a payment mechanism. This has continued throughout the CCAA proceedings.

65.     STBs were closed during 2003. Those people who were entitled to STBs at that time (namely, survivors then in pay, survivors of individuals that retired prior to April 1, 2003 and who remained LTD Beneficiaries with no interruptions of more than 60 days) were grandfathered. As of 2005, certain disabled employees continued to have STB coverage (the "STB Beneficiaries").

66.     It does not appear that there have been any reserve amounts in respect of STBs. The 2004 HWT financial statements were the last to show the present value of future payments related to STBs.

67.     The actuarial liabilities associated with the STBs consist of three components: (i) liability for approximately 305 survivors currently receiving STBs (approximately $4.1 million as at December 31, 2010); (ii) an accrual for the approximately 2,900 pensioners on whose death their survivors would be eligible for STBs (approximately $30 million as at December 31, 2010); and (iii) an accrual for the approximately 101 LTD Beneficiaries on whose death their survivors would be eligible for STBs (approximately $0.3 million as at December 31, 2010).

68.     The cost of the STBs for 2009 was approximately $2.8 million. The estimated cost of the STBs for 2010 is approximately $2.8 million. For the period January 1 to June 30, 2010, the cost of STBs amounts to approximately $1.2 million, including taxes and administrative costs relating thereto.

**Optional Life Benefit**

69.     Nortel provides basic, core group life insurance (group life – part I), for all active employees. In addition, there is an optional life insurance program (also known as group life – part II) ("**Optional Life**"), available to active employees at their own cost. Participants in the Optional Life program ("**Optional Life Participants**") may change from year to year as they decide to opt in or out or their employment is terminated.

70.     As set out above, the basic life and Optional Life insurance policies contain conversion privileges.

71.   In summary, under Optional Life coverage:

(a)   Benefits are insured by Sun Life in a policy naming Nortel as the policyholder. Premiums are paid entirely by Optional Life Participants (other than those on long term disability, whose premiums are waived by Nortel).

(b)   The insurance is term life, with benefits terminating no later than January 1st following an Optional Life Participant's 65th birthday. Each Optional Life Participant chooses the amount of benefit by applying the benefit formula. When an Optional Life Participant dies, Sun Life pays the beneficiary the benefit in effect on the date of death.

(c)   The policy is experience-rated. Each year, the accounts between Nortel and Sun Life are adjusted, depending on the claims experience. Essentially, if the claims experience in a year was less than premiums paid, Sun Life paid a refund to Nortel and if the claims experience was more than the premiums paid, the deficiency was paid to Sun Life from the HWT, subject to the cross-experience rating described in paragraph 74. Premiums for Optional Life were reduced for the Optional Life Participants from about 2007 to reflect favourable experience.

(d)   Within 30 days of leaving Nortel, an Optional Life Participant is entitled, without evidence of insurability, to convert to an individual life policy with Sun Life, to a maximum of $200,000 for basic and Optional Life insurance coverage combined.

(e)   Neither the policies nor employee communications provided to the Monitor indicate any employee entitlement to a refund of premium.

72.   The HWT financial statements indicate reserve amounts in respect of Optional Life of $17.9 million as at December 31, 2009 and $26.0 million as at December 31, 2008. Accordingly, Optional Life is a Reserved Plan.

73.   The number of working employees and LTD Beneficiaries that elected Optional Life coverage is being determined.

## Basic and Optional Life Cross-Experience Rating

74.   Typically, each year Sun Life and Nortel agreed to cross-rate Optional Life (group life - part II) with basic life insurance (group life - part I). Accordingly, at the end of each year, any surplus or deficit under the two group policies was netted together. Sun Life

returned any net surplus to Nortel and Nortel deposited it in the HWT. If there was a net

deficit, this was paid as a lump sum to Sun Life from the HWT or carried over to the next

year to be included in the next year's claims experience. Generally, the surplus or deficit

was allocated to the reserve accounts for Optional Life or Pensioner Life, depending on

their respective experience. Copies of Sun Life letters available in respect of the Sun Life

policies for 2004, 2005, 2008, 2009 and 2010 and Sun Life financial reports available in

respect of the Sun Life policies for 2005 to 2009 are attached as Appendix "M". Certain

portions of these documents are redacted for privacy purposes.

## Financial Reports on the HWT

### (a)    Tax Returns

75.    For taxation purposes, the HWT files only one return in respect of the HWT. Attached as
       Appendix "N" are the HWT tax returns for the years 2005 to 2010.

### (b)    HWT Financial Statements

76.    Nortel has prepared financial statements in respect of the HWT, certain of which were
       audited, since 1982. The financial statements for 1982 through 2009 are attached as
       Appendices "O" to "PP".

77.    To assist in a review of the financial statements:

       (a)    A summary including certain notes that have evolved over the years from the
              years in which the notes first appeared is attached as Appendix "QQ"; and

       (b)    A chart summarizing amounts from the financial statements called accounts
              receivable or "due from sponsoring corporations or company" is attached as
              Appendix "RR". As indicated therein, almost from the inception of the HWT,
              there have been amounts receivable from the sponsoring companies. As set out
              in the Thirty-Ninth Report, the Monitor has been advised by the Applicants that
              these amounts are primarily related to benefit payments made to beneficiaries of

- 24 -

the HWT prior to the filing date. The Monitor has found nothing to indicate that these amounts represent anything other than accumulated contributions owing.

78.    The 2009 financial statements disclose cash on hand and investments of $80.0 million, net assets available for payment of benefits of $76.4 million, total claims paid and accrued of $23.9 million, employer contributions of $0.1 million and employee contributions of $1.6 million. For purposes of the 2009 financial statements, certain amounts are included in cash and investments that were excluded from the $78.0 million reported in the Thirty-Ninth Report. These amounts predominately related to stale-dated cheques.

## HWT Valuations

79.    Various valuations were performed in respect of the HWT from time to time. The Monitor has located:

(a)    analyses of the funding status of the Pensioners' Insurance Fund in the years 1993, 1998 and 2002 (the "PIF Valuations");

(b)    certain valuations of post-employment benefit liabilities for accounting purposes in the years 2003, 2004, 2006, 2007, 2008 and 2009 (the "Accounting Valuations"), the purpose of which valuations is to determine the unfunded liability related to post-employment benefits;

(c)    certain reports on non-pension post-retirement benefit net periodic benefit cost and disclosure for accounting purposes in the years 2005, 2006, 2007, 2008 and 2009 (the "Accounting Cost Reports"), which provide information related to the Applicants' non-pension post-retirement benefit plans intended for use in accounting for the costs of the plans and preparing financial statements;

(d)    a valuation of liabilities for the year 2005 (the "2005 Valuation"), which sets out the actuarial present value of the obligations of the HWT as at September 30, 2005 and the assumptions and data used therein; and

(e)    Mercer letters dated January 15, 2008 and April 30, 2008 (the "Mercer Letters"), which provide an estimate of the fiscal 2008 incremental expense for post-employment benefits, intended for use in the 2008 interim financial reporting, and the results of Mercer's analysis and calculations to determine the

- 25 -

estimated historical adjustments to certain post-retirement benefit expenses for certain years, respectively.

The PIF Valuations, Accounting Valuations, Accounting Cost Reports, 2005 Valuation and Mercer Letters are attached as Appendices "SS" to "III".

80.   To assist in a review of the above valuations, a summary including certain notes to the valuations is attached as Appendix "JJJ".

## Funding and Administration

81.   Nortel's general funding practices are described in the HWT financial statements and the 2005 Mercer Valuation. Though certain benefit plans were funded on a pay-as-you-go-basis, an exception to this funding practise occurred from May 2005 until April 2006 when Nortel was contemplating the termination of the HWT. The pay-as-you-go amounts were paid from the HWT and no corresponding contributions were made by Nortel. Once Nortel decided to keep the HWT in place, it made catch up payments through extra contributions in subsequent years in the amount of one month each year.

82.   The Monitor also located a policy manual in respect of the HWT, which appears to be the first policy manual. A copy of this manual is attached as "KKK". The funding policy in respect of the HWT is set out at page 32 of this manual; however, Nortel's funding policies changed over time. The Company has advised the Monitor there is not a current policy manual.

83.   In general:

(a)   contributions to the HWT (including employee contributions in respect of Optional Life) have been made to the Trustee and the Trustee has held all contributions in a single fund, as required by Article I, section 6 of the Trust Agreement;

- 26 -

(b)    the Trustee has made payments out of the HWT upon receipt of directions from Nortel in accordance with Article II, section 3 of the Trust Agreement;

(c)    there was only one trust account established for the HWT; and

(d)    one investment account and one bank account in respect of the HWT have been maintained with all contributions to the HWT co-mingled in such accounts.

## Available Cash

84.    The cash and investments of the HWT were reported to be approximately $80.0 million as at December 31, 2009 in the 2009 HWT financial statements. At that time, the majority of investments held by the HWT were of a long term nature, which potentially subjected their value at any point to significant volatility.

85.    As a result of this volatility and in anticipation of the distribution of the corpus of the HWT, Nortel determined a more appropriate asset mix would include holding of investments with a shorter average duration. Accordingly, during May 2010 Nortel directed the disposal of the long term bonds and their replacement with a portfolio of short term interest-bearing government issued instruments.

86.    The value of investments held at June 30, 2010 is approximately $77.2 million, comprised of $4.1 million of cash and $73.2 million of short term investments.

87.    According to Nortel's financial statements for the quarter ended June 30, 2010, Nortel's restricted cash includes, in part, US$72.0 million as of June 30, 2010 related to assets held in the HWT and restricted as to their use in operations by Nortel. The difference between the value of cash and investments as at June 30, 2010 reported in paragraph 86 and the amount disclosed in the Nortel June 30, 2010 financial statements primarily relates to foreign exchange.

- 27 -

88.    For purposes of the illustrative scenarios discussed in Section VIII below, the cash balance available for distribution at December 31, 2010 is $80 million, including Pensioner Life premiums for 2010 of $7.8 million, which will be treated as a charge against any distribution in respect of Pensioner Life. The actual amount of cash available as at the date of termination of the HWT is subject to adjustment for factors which include:

(a)    investment returns;

(b)    treatment of stale-dated cheques;

(c)    the actual amount of Pensioner Life premiums paid during 2010;

(d)    the treatment of costs related to expenses incurred prior to the termination of the HWT but not submitted by February 28, 2010 and therefore not paid by Nortel pursuant to the Settlement Agreement;

(e)    taxes and administrative costs; and

(f)    any fees paid from HWT assets pursuant to the Settlement Agreement with respect to any dispute or litigation regarding the HWT.

## VII.    MERCER 2010 PRELIMINARY HWT VALUATION

89.    Attached as Appendix "C" is a report of Mercer dated August 27, 2010 (the "Mercer 2010 HWT Preliminary Valuation"), providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when it is expected that the HWT will be terminated and such plans will be discontinued.

90.    The Mercer 2010 HWT Preliminary Valuation was prepared solely for the purpose of providing a preliminary valuation of the non-pension post retirement benefit plans and post employment benefit plans to assist with the analysis of the Proposed Allocation

- 28 -

Methodology and is the basis for distribution of the HWT corpus. As mentioned previously, the Applicants have not yet initiated a compensation claims process relating to, among other things, employee benefit claims. The Monitor anticipates that Mercer will prepare a separate valuation report for the purposes of the compensation claims process. The Mercer 2010 HWT Preliminary Valuation has not been prepared for and is not to be used for the purpose of determining the value, if any, of non-pension post retirement and post employment benefits for submission in a compensation claims process. Accordingly the assumptions used, the valuation date, the beneficiary data and the resulting values in the Mercer 2010 HWT Preliminary Valuation may differ materially from those relevant to a compensation claims process.

91.   In addition, the Mercer 2010 HWT Preliminary Valuation does not address those beneficiaries that have a right to the HWT corpus but only the valuation associated with each benefit.

92.   No amount has been included in the valuation for individuals who were employees of Nortel prior to being transferred as part of a pre-filing divestiture transaction. It has not been determined at this time whether these individuals have a claim against Nortel or the HWT in respect of certain benefits. If they have a claim against the HWT, under the Proposed Allocation Methodology this would result in an aggregate distribution from the HWT of approximately $2.0 million to these individuals.

93.   In addition, no amount has been included in the valuation for LTD Optional Life Benefit as there is insufficient data at this time to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life. In the 2005 Valuation, Mercer estimated that the present value of the LTD Optional Life as at September 30, 2005 was

$3.0 million relative to a present value of LTD Life and LTD M&D of approximately $28.8 million in the aggregate. As set out in the Mercer 2010 HWT Preliminary Valuation, the present value of LTD Life and LTD M&D as at December 31, 2010 aggregates approximately $27.0 million. For reference purposes, if the present value of the LTD Optional Life Benefit as at December 31, 2010 were $3.0 million, under the Proposed Allocation Methodology this would result in an aggregate distribution from the HWT of approximately $1.0 million to individuals participating in the LTD Optional Life Benefit. The Applicants and the Monitor will continue to work with Mercer to provide sufficient data to determine the present value of the LTD Optional Life Benefit as at December 31, 2010.

94.    Mercer has used the most recent data available. The actuarial assumptions do not attempt to reflect individuals' specific historical health experience or current health circumstances, as that may not be predictive of their future health experience. Faced with the uncertainty of future events and the conflict inherent in each beneficiary seeking to maximize his or her recovery by obtaining the highest possible valuation, the Monitor believes the use of actuarial assumptions is a reasonable and equitable approach to the required valuation.

95.    The data and assumptions on which the Mercer 2010 HWT Preliminary Valuation is based are set out in Sections 3 and 4 of the Valuation.

## VIII.    PROPOSED ALLOCATION METHODOLOGY

### Illustrative Scenarios

96.    It was apparent that a number of outcomes relating to an allocation of the HWT corpus is possible given, among other things: (a) ambiguities within the Trust Agreement; and (b)