## EXHIBIT A

Court File No. 09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### SIXTY-THIRD REPORT OF THE MONITOR
### DATED APRIL 14, 2011

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to June 30, 2011 by this Honourable Court in its Order dated February 25, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

- 2 -

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited ("NN Ireland"), to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.  Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "French Liquidator") and an administrator have been appointed by the Versailles Commercial Court.

7.  The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.  Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

- 3 -

**PURPOSE**

9.    The purpose of this Sixty-Third Report of the Monitor (the "Sixty-Third Report") is to provide this Honourable Court with information regarding the Applicants' motion returnable May 2, 2011, seeking:

- approval of an asset sale agreement dated April 4, 2011 (the "Ranger Agreement"), amongst NNC, NNL, NNUK, NN Ireland, Nortel Networks S.A. and certain of their affiliates (collectively, the "Sellers"), the Joint Administrators, the French Liquidator, Google Inc. ("Google"), and Ranger Inc., a wholly owned subsidiary of Google ("Ranger" or the "Purchaser") in respect of the sale of substantially all of Nortel's patent portfolio and certain other related assets (the "Residual IP") as a "stalking horse" agreement;

- approval of the terms and conditions of the Break-up Fee and Expense Reimbursement (each as defined below);

- approval of the Bidding Procedures (as defined below);

- approval of the Licence Rejection Procedures (as defined below);

- approval of the IP Transaction Side Agreement (as defined below);

- a sealing order in respect of the confidential appendices hereto for the reasons set out below;

and to provide the Monitor's support in respect thereof.

This Sixty-Third Report also provides information regarding the Applicants' motion returnable June 30, 2011, as it relates to the License Non-Assignment and Non-Renewal Protections (as defined in the proposed Canadian Approval and Vesting Order).

- 4 -

**TERMS OF REFERENCE**

10. In preparing this Sixty-Third Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel. The Monitor has not audited, reviewed nor otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Sixty-Third Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12. Capitalized terms not defined in this Sixty-Third Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the Ranger Agreement or the Bidding Procedures.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**THE RESIDUAL IP**

*Background*

14. In connection with its previous post-filing business unit divestitures, Nortel sold certain patents and intellectual property assets related to such businesses; however, Nortel retained significant Residual IP, including approximately 6,000 Canadian, U.S. and foreign patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios. Legal title to substantially all such patents is held by and registered in the name of NNL.

- 5 -

15. Over the course of 2010, Nortel, in consultation with its financial and legal advisors and various stakeholders, considered different methods of monetizing the Residual IP, including licensing the Residual IP to third parties to generate revenues and conducting a sale process for all of the Residual IP. Nortel ultimately concluded that a sale of the Residual IP was the best method of monetizing the Residual IP for the benefit of its stakeholders.

*Sale Process*

16. In May 2010, Nortel commenced efforts to market the Residual IP. With the assistance of Lazard Frères & Co., the Company approached or was contacted by 105 buyers or buyer groups. As a result of those efforts, 95 parties that indicated an initial interest in purchasing the Residual IP were sent teaser information along with a form of confidentiality agreement. Approximately forty parties executed confidentiality agreements and were given access to a confidential electronic data room containing due diligence materials for the Residual IP.

17. Nortel invited expressions of interest in the Residual IP in the fall of 2010 and 14 such expressions were submitted. Following a review of these expressions of interest, six parties were invited to submit formal bids for the Residual IP by December 20, 2010. Bids (based on a form of asset sale agreement made available by Nortel in the data room) were received from three buyers or buyer groups, including one from Google and the Company proceeded to engage in negotiations with two buyers / buyer groups in parallel before ultimately focussing on the bid received from Google. These negotiations culminated with Nortel entering into the Ranger Agreement as described below.

18. The Monitor, in conjunction with representatives of the Applicants, the U.S. Debtors and the Joint Administrators, has had extensive involvement in the sale process, including attending and participating in management presentations and negotiations with prospective buyers, performing its own review of materials submitted by prospective purchasers (including the Ranger Agreement) and providing input to the Company with respect to these matters.

- 6 -

**THE RANGER AGREEMENT**

19. On April 4, 2011, the Sellers entered into the Ranger Agreement with the Purchaser and Google. The Ranger Agreement sets forth the terms of the Sellers' sale of the Residual IP assets to Ranger, and the assumption of certain related liabilities by Ranger. The Ranger Agreement (excluding exhibits and the Sellers Disclosure Schedule) is attached as Appendix "A" hereto. A copy of the exhibits and the Sellers Disclosure Schedule to the Ranger Agreement is attached as confidential Appendix "B" hereto. As these exhibits and schedules contain sensitive competitive information, the Monitor requests that confidential Appendix "B" to this Sixty-Third Report be sealed by this Honourable Court.

20. Ranger is a wholly owned subsidiary of Google. Google is a publicly traded multinational corporation that is listed on NASDAQ and headquartered in Mountain View, California. Google is an internet search engine provider and hosts and develops a number of Internet-based services and products including various forms of advertising and web applications. Google unconditionally guarantees the full and timely payment and performance of all of the Purchaser's obligations under or in connection with the Ranger Agreement and the other Transaction Documents.

21. A summary of the key provisions of the Ranger Agreement is provided in the paragraphs that follow. Reference should be made directly to the Ranger Agreement for a complete understanding of the terms governing the proposed transaction.

*Assets Purchased and Options to Purchase*

22. The assets being sold are as follows (collectively, the "Assets"):

- the Transferred Patents, Specified UK Patents, and any inventions and improvements claimed or disclosed therein as of the Closing Date, together with, amongst other things, various rights in relation to such Assets, including the right to sue and recover damages for past, present or future infringements thereof, subject only to licences granted thereunder:

    o prior to the date of the Ranger Agreement, that are:

- 7 -

- granted pursuant to Commercial Licences entered into prior to the date of the Ranger Agreement;

- listed in Section 2.1.1(a) of the Sellers Disclosure Schedule; or

- Continuing Unlisted Licences;

o subsequent to date of the Ranger Agreement, but solely to the extent that such licenses would be permitted under the conduct of business covenants of the Ranger Agreement and either:

- constitute licences granted pursuant to Commercial Licences; or

- are identified to the Purchaser in writing prior to the Closing Date,

but in each case only to the extent such licenses remain in force after Closing.

- the Assigned Contracts and any claims arising under such Assigned Contracts on or after the Closing Date (although at present there are no such Assigned Contracts);

- the tangible embodiments (including electronic copies) of all Patent Related Documentation in the possession or under the control of the Sellers as of the date of the Ranger Agreement or the Closing Date;

- all rights to Intellectual Property (other than Trademarks) of any Seller, to the extent embodied in the Patent Related Documentation and that relate to the Transferred Patents or Purchased Specified UK Patents;

- all rights to the Sellers' patent-related data applications, provided that the Sellers shall not transfer any rights with respect to such patent-related data applications unless the Purchaser holds appropriate licenses to such applications;

- all rights of the Sellers under any non-disclosure agreement to the extent that such non disclosure agreements relate to the Assets; and

- 8 -

- the Sellers' right, title and interest in and to any and all tangible embodiments of Patent Related Documentation as of the Closing Date whether or not the tangible embodiments of such Patent Related Documentation are in the Sellers' possession or control.

23. The Assets do not include, among other things, cash and cash equivalents, accounts receivable other than those related to Assigned Contracts, all rights to Tax refunds, credits or similar benefits relating to the pre-Closing period, any right of the Sellers under any Contract that does not form part of the Assigned Contracts, any Excluded Licences and any Excluded Patents.

24. In the event the any Seller discovers that it owns an Undisclosed Patent Interest, the Purchaser shall have an option to purchase such Undisclosed Patent Interest for a cash purchase price of $50,000. The Purchaser shall have a thirty day period within which to exercise this option, following which the Sellers shall be free to dispose of such Undisclosed Patent Interest in their sole discretion. To the extent an Undisclosed Patent Interest is found to be owned by an Affiliate of the Sellers that is not a Seller, the Sellers shall use their best efforts to cause such Affiliate to transfer the Undisclosed Patent Interest to a Seller. Upon the winding up or dissolution of any of the Sellers, the Purchaser shall have a similar option to purchase on a "quitclaim" basis for $1.00 all of such Seller's right, title and interest in and to all remaining Undisclosed Patent Interests, whether or not previously identified.

25. From and after the Closing and upon written demand from the Purchaser, the Sellers shall transfer all of their interest in one or more specified Jointly Owned Patents to a Person of the Purchaser's choosing to the extent permitted by and subject to applicable Law, any Contracts governing a Seller's joint ownership of such Jointly Owned Patent and any licenses granted thereunder prior to the date of such transfer. In addition, subject to certain exceptions, the Sellers may not transfer any portion of a Seller's interest in any Jointly Owned Patent and no Seller shall reject, repudiate or terminate any Contract governing Seller's joint ownership of a Jointly Owned Patent prior to the last commercially reasonable date on which it can do so.

- 9 -

*Assumed Liabilities*

26.  The Purchaser will assume the following liabilities:

- all liabilities with respect to the ownership or exploitation of the Assets by or through the Purchaser arising after the Closing Date, including (i) all such liabilities related to Actions or claims brought against the Assets that relate to post Closing ownership or exploitation of the Assets, and (ii) all maintenance fees and prosecution costs related to the Transferred Patents associated with the ownership and exploitation of the Assets arising after the Closing Date;

- all liabilities arising from or in connection with the performance (or breach) of the Assigned Contracts after the Closing Date and liabilities with respect to Cure Costs payable pursuant to the Ranger Agreement; and

- all liabilities for, or related to any obligation for, any Tax that the Purchaser bears pursuant to the Ranger Agreement, which includes Transfer Taxes.

*Purchase Price*

27.  The Purchase Price is $900 million.

28.  A Good Faith Deposit, being an amount equal to $27 million, shall be delivered by the Purchaser to the Escrow Agent no later than three Business Days after the later of (i) the date the U.S. Bidding Procedures Order is entered and (ii) the date that the Canadian Sales Process Order is entered.

29.  At Closing, the Purchaser shall deliver to the Distribution Agent, as distribution agent for the Sellers, an amount equal to:

- the Purchase Price; minus

- the Good Faith Deposit (together with any actual earnings thereon); minus

- the Indemnification Escrow Amount (as defined and discussed below).

- 10 -

*Indemnification Escrow Amount*

30. Representations, warranties, statements, covenants, and agreements of the Sellers contained in the Ranger Agreement shall survive the Closing until a date that is twelve months after the Closing Date (the "Survival Date"), except for covenants that by their terms are to be satisfied after the Closing Date, which covenants will survive in accordance with their terms, and except as may be expressly provided in any Transaction Document other than the Ranger Agreement.

31. At Closing, the Purchaser shall deliver $45 million (increased by any actual earnings thereon, the "Indemnification Escrow Amount") to the Escrow Agent to serve as the Indemnification Escrow Amount.

32. The Purchaser (and certain related parties) shall be indemnified out of the Indemnification Escrow Account from Damages suffered resulting from: (i) inaccuracies or misrepresentations in respect of Seller representations, warranties and statements under the Ranger Agreement; (ii) the breach of certain covenants of the Sellers under the Ranger Agreement; (iii) Excluded Liabilities; or (iv) the existence of certain Permitted Encumbrances on the Assets, provided that the Purchaser shall not be entitled to any indemnification until the total amount of such Damages exceeds $1,000,000, in which case the Purchaser shall be entitled only to Damages in excess of such amount. The Indemnification Escrow Account is the sole source of funding for any Indemnification Claims and under no circumstances shall any Purchaser be entitled to indemnification or other monetary remedy from the Nortel Parties in respect of Damages other than from the Indemnification Escrow Amount, except to the extent Damages are incurred as a result of actual fraud of the Sellers under the Ranger Agreement. No Indemnification Claim may be asserted unless the applicable Notice of Claim is received by the Primary Seller Parties on or prior to the Survival Date.

33. The process for the resolution of Indemnification Claims is provided for in the Ranger Agreement. Contested Claims that cannot be resolved by written settlement shall be resolved by a joint hearing of the U.S. Court and this Honourable Court.

- 11 -

*Representations, Warranties and Annex I Statements*

34.  The Ranger Agreement contains a number of representations and warranties of the Sellers (or certain of them) with respect to various matters, including Canadian tax matters and export controls.  In addition, Annex I of the Ranger Agreement contains various statements in connection with the Assets and other matters contemplated by the Ranger Agreement, including statements regarding the Patents owned by the Sellers, contracts that grant licenses in respect of any Transferred Patent, Jointly Owned Patent or Specified UK Patent, and various other matters relating to the status of the Transferred Patents, Jointly Owned Patents and Specified UK Patents.

*Other Covenants*

35.  The Ranger Agreement includes a number of covenants with respect to various matters including, among others, pre-Closing cooperation, preparation and filings regarding Antitrust and other Regulatory Approvals as necessary, conduct of business, public announcements, confidentiality, preservation and maintenance of patents, licenses to be granted at Closing (as discussed in greater detail below), the use of trademarks, and the maintenance of books and records and taxes.

*Sale Free and Clear*

36.  The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Ranger Agreement.

*Exclusivity*

37.  Prior to the later of the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order, the Sellers shall not initiate, solicit or knowingly encourage the submission or announcement of any proposal or offer for an Alternative Transaction, enter into a letter of intent or other agreement relating to any Alternative Transaction or enter into, continue or otherwise participate in any discussions or negotiations, furnish any Third Party any information or data with respect to, or commence or continue affording access to any Third

- 12 -

Party to any information, data or its employees with respect to any Alternative Transaction, provided that nothing in the Ranger Agreement shall prohibit any Seller from providing any person with the Bidding Procedures and related documents, discussing, negotiating and entering into non-disclosure agreements relating to the sale of the Assets or, from and after April 18, 2011, providing access to the Data Room.

### Inter-Company Arrangements

38.   The Sellers have agreed to terminate all license rights granted under the Master R&D Agreement and other Intercompany Contracts which are exclusively among the Sellers or under which a Seller is a licensee to the extent such license rights are under any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests. In addition, each Seller shall request that any non-Seller Affiliate of such Seller that is a licensee under any other Intercompany Contract terminate its license rights pursuant to such Contract under any of the Transferred Patents, Specified UK Patents and Undisclosed Patent Interests in exchange for a sublicense of the license rights granted to the Sellers and their Affiliates pursuant to the Closing Date License Agreement.

39.   From and after Closing there shall be no future manufacture, development, sale, supply or other distribution, or servicing of any products under the Transferred Patents or Specified UK Patents by, for or on behalf of Sellers other than to the extent such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement. Further, neither the Sellers nor any Person acting on behalf of any Seller shall distribute any products, directly or, for the purpose of circumventing this provision of the Ranger Agreement, indirectly, to any Affiliates of any Seller that have not complied with the request described in paragraph 38, above, and agreed to receive a sublicense under the license rights granted to the Sellers and their Affiliates under the Closing Date License Agreement, except to the extent it is a Nortel Product required pursuant to the terms of any Intercompany Contract then in effect, but, in such case, subject to a cap on the quantum of Nortel Products to be distributed and an absolute prohibition on the distribution of any products upon the Change of Control of an Affiliate.

- 13 -

*Termination Rights*

40.  The Ranger Agreement may be terminated prior to Closing:

- by mutual written consent of the Primary Parties;

- by either Primary Party:

  o if the Closing does not take place on or prior to the date that is 180 days from the date of the Ranger Agreement (the "Outside Date"), provided that the Outside Date shall be extended by successive periods of 45 days (to a maximum of 360 days from the date of the Ranger Agreement) if on the date of such extension all of the conditions to Closing other than receipt of Mandatory Regulatory Approvals and/or the absence of injunctions or restraints have been or are capable of being satisfied;

  o upon or following the determination by any of the Primary Seller Parties to proceed with an Alternative Transaction, such determination to be made:

    o  if the Auction occurs, not later than the date that is three  Business Days after the conclusion of the Auction; or

    o if the Auction does not occur, not later than 63 days from the later of the date that the U.S. Bidding Procedures Order is first entered and the date the Canadian Sales Process Order is first granted.

- by the Purchaser:

  o in the event of a breach by the Sellers of the Sellers' representations, warranties, Annex 1 statements, agreements or covenants set forth in the Ranger Agreement, which breach would result in a failure of certain conditions to Closing, subject to certain cure rights;

- 14 -

o    in the event of the Sellers' breach of their obligation to close the transaction as contemplated in the Ranger Agreement, subject to certain cure rights;

o    upon or following the determination by any of the Primary Seller Parties to proceed with any Asset Retention Transaction;

o    if the Canadian Debtors have failed to serve and file the Canadian Sales Process Order Motion or if the U.S. Debtors have failed to file the U.S. Bidding Procedures and Sale Motion within 10 Business Days of the date the Ranger Agreement was entered into;

o    if the U.S. Court or this Honourable Court have not entered the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively, within 35 days of the date the Ranger Agreement was entered into;

o    at any time following the entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order but prior to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, upon or following the date that an order of any court of competent jurisdiction shall be entered vacating or reversing the U.S. Bidding Procedures Order or the Canadian Sales Process Order or amending, supplementing or otherwise modifying the U.S. Bidding Procedures Order or the Canadian Sales Process Order in a manner that is inconsistent with the standards set forth in the Ranger Agreement;

o    if the Auction shall not have been completed by the date that is 60 days from the later of the date that the U.S. Bidding Procedures Order is first entered by the U.S. Court and the date that the Canadian Sales Process Order is first granted by this Honourable Court;

o    if the hearing(s) to consider approval of the U.S. Sale Order and the Canadian Approval and Vesting Order shall not have commenced by the

- 15 -

date that is 75 days from the later of the date that the U.S. Bidding Procedures Order is first entered by the U.S. Court and the date that the Canadian Sales Process Order is first granted by this Honourable Court; or

o    upon or following the date on which the U.S. Court or this Honourable Court shall have stated unconditionally that it will not enter the U.S. Sale Order or the Canadian Approval and Vesting Order, respectively.

- by the Primary Seller Parties:

  o    in the event of a breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in the Ranger Agreement, which breach would result in a failure of certain conditions to Closing, subject to certain cure rights;

  o    in the event of the Purchaser's breach of its obligation to close the transaction as contemplated in the Ranger Agreement, subject to certain cure rights; or

  o    in the event that one or more Persons asserts the existence of an Unknown License (as defined below) that has been or would be rejected, repudiated or terminated pursuant to the Licence Rejection Procedures described below and that the Primary Seller Parties determine, in the exercise of their reasonable good faith judgment, constitute a substantial risk of resulting in an aggregate allowed damage claim at least equal to the dollar amount specified in the Seller Disclosure Schedule if rejected, repudiated or terminated, and, after the procedures outlined in Section 8.1(d)(iii) of the Ranger Agreement have been followed, the Purchaser has not consented to the Primary Seller Parties' request to withdraw the rejection or repudiation of, or to elect not to terminate, such Unknown License and to deem such Unknown License a Continuing Unlisted License.

- 16 -

### Break-Up Fee and Expense Reimbursement

41.  The Ranger Agreement provides for an aggregate expense reimbursement payable by the Sellers to the Purchaser in certain circumstances in respect of its actual fees, costs and expenses reasonably incurred by the Purchaser in connection with the preparation, execution and performance of the Ranger Agreement, to a maximum of $4,000,000 (the "Expense Reimbursement"). The Ranger Agreement also provides for an aggregate break-up fee of $25,000,000 to be paid by the Sellers to the Purchaser (the "Break-Up Fee") in certain circumstances.  The combined Expense Reimbursement and Break-up Fee equals approximately 3.2% of the Purchase Price and is comparable in percentage terms to expense reimbursements and break-up fees approved in Nortel's other post-filing business unit divestitures.

42.  The Sellers shall pay the Expense Reimbursement if the Ranger Agreement is terminated by the Purchaser or Primary Seller Parties pursuant to certain specified termination provisions and when the Ranger Agreement is terminated the Purchaser is not in breach thereof which breach would result in a failure to satisfy any of the Seller conditions or mutual conditions to Closing.

43.  The Sellers shall pay the Break-Up Fee to the Purchaser if the Ranger Agreement is terminated by the Purchaser or Primary Seller Parties pursuant to certain specified termination provisions, when the Ranger Agreement is terminated the Purchaser is not in breach thereof which breach would result in a failure to satisfy any of the Seller conditions or mutual conditions to Closing, and an Alternative Transaction is consummated within twelve (12) months following such termination.

### Closing Date Licence Agreement

44.  At Closing, the Purchaser and the Sellers shall enter into the Closing Date License Agreement pursuant to which:

- The Sellers grant the Purchaser and its Affiliates an irrevocable, perpetual, non-exclusive, non-assignable and non sub-licensable (except in certain specified circumstances), worldwide, royalty free, fully paid up license in respect of the

- 17 -

Licensed Residual Patents in connection with the Purchaser's or its Affiliates' products, systems, technologies or services;

- The Sellers grant the Purchaser and its Affiliates an irrevocable, perpetual, non-exclusive, non-assignable and non sub-licensable (except in certain specified circumstances), worldwide, royalty free, fully paid up license in respect of the Jointly Owned Patents, Specified UK Patents (other than Purchased Specified UK Patents) and any other non-assignable Assets;

- The Purchaser grants an irrevocable, non-exclusive, non-assignable, worldwide (but only to the extent necessary for the Sellers' and the Seller Permitted Sublicensees' performance under Retained Contracts), royalty free, fully paid up license in respect of the Licensed Back Patents (as defined in the Closing Date License Agreement) solely as necessary (and only to the extent necessary) for the Sellers' and the Seller Permitted Sublicensees' performance of their obligations under the Retained Contracts; and

- The Purchaser grants to the Sellers an irrevocable, non-exclusive, non-assignable, non-sublicensable (except as expressly provided), worldwide, royalty free, fully paid up license in respect of the Licensed Back Patents, for a period of three years following the Closing, to sell, offer for sale, import, lease or otherwise provide (and sublicense to users and customers in the ordinary course of business the right to use, even beyond such 3-year period), directly or indirectly, Inventory that would otherwise constitute infringement of any of the Licensed Back Patents.

*Closing*

45. Closing shall occur five Business Days after the date upon which all Closing conditions have been satisfied or waived.

- 18 -

*Closing Conditions*

46.   The Parties' obligation to effect the Closing is subject to the satisfaction of the following conditions:

- all Mandatory Regulatory Approvals shall have been obtained from appropriate Government Entities;

- there shall be in effect no Law, or any order, injunction, decree or judgment of any court or other Government Entity prohibiting, preventing or making illegal the consummation of any of the transactions contemplated in the Ranger Agreement. In the event that this condition is not satisfied only as to one or more jurisdictions other than Canada, France, Germany, the United Kingdom and the United States (each such other jurisdiction, a "Deferred Jurisdiction"), then if the Sellers or Purchaser so request, the Parties shall negotiate in good faith an amendment to the Ranger Agreement to provide for (i) the immediate consummation of the transactions contemplated in the Ranger Agreement in all applicable jurisdictions other than any Deferred Jurisdiction, and (ii) a delay in the consummation of the transactions contemplated in the Ranger Agreement in each Deferred Jurisdiction until this condition is satisfied as to such Deferred Jurisdiction. However, if the Purchaser reasonably determines in good faith that it would be impossible for the Purchaser to comply with delaying the consummation of the transactions in the Deferred Jurisdiction without meaningful adverse consequences to the Purchaser or the Purchaser's Affiliates, the Purchaser shall not be under the obligation to effect the Closing, and provided further, that if the Purchaser requests the negotiation of an amendment pursuant to the Ranger Agreement, the Sellers shall not be required to agree to any reduction in, or any delay in payment of, the Purchase Price;

- the U.S. Sale Order, the Canadian Approval and Vesting Order and the French Court Order shall have been entered and shall be Final Orders; and

- 19 -

- the requirements of paragraph 7 of this Honourable Court's Approval and Vesting Order dated July 28, 2009 (the "CDMA Vesting Order"), regarding a buyer of the Applicants' intellectual property assuming all of NNL's obligations under the IP Licenses (as defined in the CDMA Vesting Order) and executing an assumption agreement shall have been satisfied.

47. The obligation of the Sellers to effect the Closing is subject to satisfaction of the following conditions:

- each of the Purchaser's representations and warranties being true and correct as of the Closing Date or such other date as specified, except for any failure to be true and correct that has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of the Purchaser to consummate the transaction contemplated by the Ranger Agreement;

- the Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in the Ranger Agreement required to be performed by the Purchaser on or before the Closing;

- the Sellers shall be furnished with a certificate by a senior executive officer of the Purchaser certifying that the above two conditions have been satisfied; and

- ten Business Days shall have elapsed since the provision of the most recent notice, if any, that the Sellers have provided to the Purchaser in respect of the emergence of an Unknown Licence which could give rise to the Seller termination right discussed in paragraph 40, above.

48. The obligation of the Purchaser to effect the Closing is subject to satisfaction of the following conditions:

- each of the Sellers' representations and warranties and each Annex I statement being true and correct as of the Closing Date or such other date as specified, except for any failure to be true and correct that has not had, and would not

- 20 -

reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

- the Sellers shall have complied in all materials respects with all material covenants, obligations and agreements contained in the Ranger Agreement required to be performed by the Sellers on or before Closing; and

- the Purchaser shall be furnished with a certificate of a senior officer of each of the NA Sellers certifying that the above two conditions have been satisfied.

## LICENSE REJECTION PROCEDURES

49.  The Transferred Patents and Specified UK Patents are subject to licenses granted prior to the date of the Ranger Agreement pursuant to various patent license agreements as well as to various Commercial Licenses (as defined in the Ranger Agreement, but which generally encompasses limited licenses granted under Contracts entered into in the ordinary course of business of Nortel).  The Monitor is aware that Nortel has conducted significant diligence regarding the patent licenses (other than Commercial Licenses) to which the Transferred Patents, Specified UK Patents and Jointly Owned Patents are subject to and has compiled a list of all such known licenses (defined more fully below as the Known Licenses).

50.  As noted above, the Transferred Patents and Specified UK Patents are to be transferred to the Purchaser subject to the Known Licenses, all Commercial Licenses and certain intercompany licenses.

51.  In view of the negative impact any "unknown" licenses (i.e. licenses other than the Known Licenses, Commercial Licenses and certain intercompany licenses) may have on the value of the Assets to the Purchaser, the Applicants have agreed to conduct a process (the "Canadian License Rejection Procedures") for the rejection or termination of Unknown Licenses (as defined below). The U.S. Debtors have agreed to conduct a substantially similar process under the auspices of the Chapter 11 Proceedings (with the Canadian License Rejection Procedures, the "License Rejection Procedures").

- 21 -

52.  The Canadian License Rejection Procedures are as follows:

- The Applicants shall serve on each counterparty to an Outbound License Agreement or a Cross-License Agreement with the Applicants (as listed in the Sellers Disclosure Schedules, such licenses, collectively, the "Known Licenses", and such counterparties, collectively, the "Known Licensees") a notice (the "Known License Notice"), identifying the Known Licenses that such counterparty has with the Applicants. The Known Licence Notices shall be served by the Applicants (or another person on behalf of the Applicants) by no later than five business days following the entry of the Canadian Sales Process Order or as soon thereafter as is reasonably practicable. A copy of the Known License Notice is attached as Appendix "C" hereto;

- Notice of the Licence Deemed Termination Procedures (the "Publication Notice") will be published in The Globe & Mail (National Edition), The Wall Street Journal (National Edition), The Financial Times (International Edition) and The New York Times (National Edition) within five business days following the entry of the Canadian Sales Process Order or as soon thereafter as is reasonably practicable. A copy of the Publication Notice is attached as Appendix "D" hereto;

- Any counterparty to any pre-filing Contract pursuant to which any Applicant is a party and pursuant to which such Applicant has granted a license under any Transferred Patents, Specified UK Patents or Jointly Owned Patents other than (i) the Known Licenses, (ii) the Commercial Licenses, (iii) the Disclosed Intercompany Licences, and (iv) any intercompany contract, arrangement or understanding that is not a Disclosed Intercompany License but that is in effect and that is similar in kind to the Disclosed Intercompany Licenses (it being understood that any such intercompany contract, arrangement or understanding that grants license rights under the Transferred Patents, Specified UK Patents or Jointly Owned Patents that is broader in scope or longer in duration than the broadest license or longest license to such patents granted under any of the Disclosed Intercompany Licenses is not similar in kind to the Disclosed Intercompany Licenses) (any such licenses, collectively, the "Unknown Licenses"), who wishes to assert an Unknown License must serve an

- 22 -

objection notice (an "Objection Notice") on the parties listed on Schedule "B" of the Canadian Sales Process Order prior to 4:00 p.m. (ET) on June 6, 2011 (the "Canadian License Bar Date"). A copy of the Objection Notice is attached as Appendix "E" hereto. The Monitor intends to post the form of Objection Notice on its website within two Business Days of the entry of the proposed Canadian Sales Process Order;

- Without prejudice, as between the Sellers and the Purchaser, to the rights of the Purchaser under the Ranger Agreement, to the extent that a party asserts an Unknown License prior to the 4:00 p.m. (ET) on the Canadian License Bar Date (and if so asserted, an "Additional License"), the Assets shall only be sold subject to such Additional License, provided however that the validity of the Additional License has been established by Court Order prior to Closing;

- Except as provided in the immediately preceding bullet point, any Unknown Licenses to which the Applicants are a party are deemed to be terminated as of the Closing and shall forever be barred, released and extinguished, and any claim arising from such deemed termination shall be a claim against the Applicants, which claim shall be deemed to be a Restructuring Claim as such term is defined in the Claims Procedure Order granted by this Honourable Court on July 30, 2009, as amended from time to time (the "Claims Procedure Order") and must be filed within thirty (30) days of the date of Closing and otherwise in compliance with the Claims Procedure Order; and

- Subject to the consent of the Purchaser, in its sole and absolute discretion, or any other Successful Bidder, as applicable, the Applicants reserve their right to not terminate an Unknown License at any time prior to the occurrence of the Closing.

53. As noted above, the U.S. Debtors are seeking approval of a substantially similar procedure in the U.S. Bidding Procedures Order. A counterparty seeking to retain rights under an Unknown License with both the U.S. Debtors and the Applicants that is subject to rejection and termination under both the Canadian License Rejection Procedures and the corresponding procedures to be approved by the U.S. Court must (i) file and serve an Objection Notice; and (ii) elect to retain its license rights in accordance with the procedures

- 23 -

contained in the U.S. Bidding Procedures Order. Such a counterparty may not attempt to retain license rights in one jurisdiction and terminate such license rights in the other.

54. In addition to serving the service list in these CCAA proceedings, sending the Known License Notices to the Known Licensees and publishing the Publication Notice in the various newspapers identified, the Applicants, with the assistance of the Monitor, have or will undertake the additional service and notification procedures outlined in paragraphs 31 to 34 of the Affidavit of George Riedel sworn April 7, 2011 (the "First Riedel Affidavit"), including the service of the Notice of Sale (as defined in the First Riedel Affidavit) on various parties as provided for in the proposed Canadian Sales Process Order, with a view to ensuring that notice of the Canadian License Rejection Procedures (and the other relief sought in the Canadian Sales Process Order) is disseminated as widely as possible. The form of Notice of Sale is attached as Appendix "F" hereto.

55. In addition to the parties identified in paragraph 31 of the First Riedel Affidavit, the Applicants, with the assistance of the Monitor, have also served copies of (i) the Notice of Motion returnable May 2, 2011, the First Riedel Affidavit, and the proposed Canadian Sales Process Order, and (ii) the Notice of Motion, the Affidavit of George Riedel sworn April 7, 2011, and the draft Order in respect of the Applicants' motion returnable June 30, 2011, on counterparties to the Known Licenses. Attached hereto as confidential Appendix "G" is a copy of the affidavit of service attesting to such service. The Applicants and the Monitor are requesting that confidential Appendix "G" be sealed by this Honourable Court as it contains the identity of the Known License counterparties, which information is competitively sensitive.

56. The Applicants, the Monitor and the U.S. Debtors are working to implement a system that will allow them to respond in a timely fashion to any inquiries regarding the License Rejection Procedures as well as to review any Unknown Licenses that are asserted.

- 24 -

**LICENSE NON-ASSIGNMENT AND NON-RENEWAL PROTECTIONS**

57.  In light of the impact existing and continuing licenses of the Transferred Patents, Specified UK Patents or Jointly Owned Patents have on the value of the Assets to the Purchaser, and, in particular, the negative impact the expansion or assignment of such licenses by the Sellers or counterparties would have on the value of the Assets, the Sellers have also agreed to implement the License Non-Assignment and Non-Renewal Protections as outlined in the form of the Canadian Approval and Vesting Order and U.S. Sale Order negotiated between the Sellers and the Purchaser. Broadly conceived, and subject to various exceptions as outlined below to preserve flexibility for Nortel in relation to its global wind-down, the License Non-Assignment and Non-Renewal Protections are intended to prevent the Applicants and the U.S. Debtors from assigning, or consenting to the assignment of, the various types of specified licenses or expanding the scope or terms of such licenses as they relate to the Transferred Patents, Specified UK Patents or Jointly Owned Patents, as well as to provide for the termination of such licenses at the earliest time permissible.

58.  Pursuant to the License Non-Assignment and Non-Renewal Protections as they relate to the Applicants:

  •  the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any renewal, extension, assignment, amendment, waiver or modification of any license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, pursuant to any Cross-License Agreement or Outbound License Agreement (excluding (i) the Commercial Licenses, (ii) the transition services agreements (the "TSAs") and intellectual property license agreements (the "IPLAs") that the Applicants entered into with the purchasers of their various business units after the Filing Date in connection with their divestitures, (iii) any intercompany Contracts with the Sellers (the "Intercompany Licenses") and (iv) the Technology License Contract between Northern Telecom Limited and Guangdong-Nortel Telecommunications Switching Equipment Ltd. ("GDNT"), dated November 8, 1994, as amended (the "GDNT License")) (collectively, the "License

- 25 -

Agreements", and any one, a "License Agreement") that requires the consent of any Applicant pursuant to the terms of such License Agreement and that would have the practical effect of expanding the scope or term of the licenses to the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder (regardless of whether such renewal, extension, assignment, amendment, waiver or modification is sought prior to or after the Applicants dissolve or otherwise cease to exist), in each case unless the Purchaser shall otherwise agree in writing, in its sole discretion;

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment, modification or waiver to the GDNT License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of the GDNT License or any rights or obligations thereunder other than to Ericsson (as defined in the Sale Agreement) or another purchaser of all or substantially all of the assets or all of the outstanding shares of GDNT, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion. As the GDNT License is to be assigned by GDNT to Ericsson in connection with the sale of substantially all of the assets of GDNT to Ericsson, the Monitor is of the view that sufficient flexibility has been preserved with respect to the GDNT License;

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or  modification to the IPLAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of any IPLA by the license counterparty or any rights or obligations of the license counterparty under any IPLA, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion;

- 26 -

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any amendment, modification, renewal or extension to the TSAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder beyond June 30, 2012 unless the Purchaser shall otherwise agree in writing, in its sole discretion. As all TSAs are presently scheduled to be concluded by such date, the Monitor is of the view that sufficient flexibility has been preserved with respect to the TSAs;

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any amendment or modification of any Commercial License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except (i) to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement or (ii) to the extent the Purchaser shall otherwise agree in writing, in its sole discretion;

- the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification of any Intercompany License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement, and (ii) to any assignment of any Intercompany License by the license counterparty or any rights or obligations of the license counterparty under any Intercompany License, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion;

- 27 -

- no Applicant shall have the right or power to transfer any of its obligations, right, title or interest in the licenses under the Transferred Patents, Specified UK Patents and Jointly Owned Patents under:

  i. any License Agreement,

  ii. the GDNT License,

  iii. any Intercompany License,

  iv. (other than in connection with the consolidation, wind-down, reorganization or restructuring of the Applicants and their affiliates, including to the Applicants under confirmed plan(s) of arrangement) any IPLA, or

  v. (other than the transfer by the Applicants of Retained Contracts or contracts relating to the disposal of Inventory, in each case to the extent a sublicense to the assignee of such contract is permitted by the Closing Date License Agreement) any Commercial License,

  in each case, to any other person from and after the Closing, and any purported renewal, extension, assignment, amendment, waiver, transfer or modification of a License Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License that would contravene the provisions outlined in this paragraph 58 shall be null and *void ab initio* and unenforceable and of no force or effect, and

59. In furtherance of the License Non-Assignment and Non-Renewal Protections the Purchaser is also granted a limited power of attorney over the Applicants to take any and all action and to execute and deliver any and all instruments that the Purchaser may deem necessary or advisable to accomplish the matters outlined in paragraph 58, above, and regardless of whether or not any Applicant party to the applicable License Agreement is then in existence, to terminate the license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents in any License Agreement (including by delivering a notice of termination on behalf of an Applicant party thereto, regardless of whether such Applicant is

- 28 -

then in existence) upon the occurrence of any specific date or event or the existence of any specific circumstance to the extent that the occurrence of such date or event or the existence of such circumstance gives any Applicant (regardless of whether such Applicant is then in existence) a right to terminate such License Agreement pursuant to the terms thereof. A corresponding power of attorney over the U.S. Debtors is granted to the Purchaser in furtherance of the License Non-Assignment and Non-Renewal Protections as they relate to the U.S. Debtors. The exercise of the powers of attorney is subject to the provisions of the Ranger Agreement and the Purchaser has agreed to indemnify the Sellers (and certain related parties) from and against any and all Damages suffered resulting from the Purchaser's use and exercise (and not merely the grant) of such powers of attorney.

**IP TRANSACTION SIDE AGREEMENT**

60. In connection with the Ranger Agreement, the Sellers, the Joint Administrator and the French Liquidator have negotiated and executed a IP Transaction Side Agreement dated as of April 4, 2011 (the "IP Transaction Side Agreement"), to address the sharing of certain costs incurred, or that may be incurred, in connection with the transaction and various other agreements in relation to the transaction. A copy of the IP Transaction Side Agreement is attached as confidential Appendix "H" hereto. As the IP Transaction Side Agreement contains sensitive information regarding certain inter-estate matters, the disclosure of which would be potentially harmful to the Applicants and their stakeholders, the Applicants and the Monitor are requesting that confidential Appendix "H" be sealed by this Honourable Court.

**BIDDING PROCEDURES AND AUCTION PROCESS**

61. Given that certain of the U.S. Debtors are parties to the Ranger Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Ranger Agreement, Nortel has determined and has agreed with the Purchaser that the Ranger Agreement is subject to higher or better offers being obtained

- 29 -

pursuant to a sale process under section 363 of the Code and that the Ranger Agreement shall serve as a "stalking horse" bid pursuant to that process.

62.  A copy of the proposed bidding procedures is attached as Appendix "I" hereto (the "Bidding Procedures"). The Monitor notes that the Bidding Procedures are substantially similar to the bidding procedures used in the sale of Nortel's significant business units.

63.  The Ranger Agreement provides that the Sellers that are U.S. Debtors shall file the U.S. Bidding Procedures and Sale Motion with the U.S. Court no later than three Business Days from the date of the Ranger Agreement. This motion was filed with the U.S. Court on April 4, 2011. The Ranger Agreement also provides that the Applicants shall serve the Canadian Sales Process Order Motion no later than the date that is five Business Days from the date of the Ranger Agreement. This motion was served on April 7, 2011.

64.  The Monitor understands that the Applicants and the U.S. Debtors will seek approval of the Bidding Procedures at a videoconference joint hearing between this Honourable Court and the U.S. Court scheduled for May 2, 2011, conducted pursuant to the Cross-Border Insolvency Protocol previously approved by both Courts.

65.  The Bidding Procedures provide that all bids must be received by the Sellers not later than 4:00 p.m. (ET) on June 13, 2011, and that the Sellers will conduct an auction of the Assets beginning on June 20, 2011, at 9:00 a.m. (ET) (the "Auction").

66.  A joint sale hearing has been scheduled before both this Honourable Court and the U.S. Court for June 30, 2011.

67.  The key provisions of the Bidding Procedures are outlined in the paragraphs that follow. Reference should be made directly to the Bidding Procedures for a complete understanding of the terms thereof.

*Provisions Governing Qualifications of Bidders*

68.  Unless otherwise ordered by both the U.S. Court and this Honourable Court and accepted by the Joint Administrators, for cause shown, or as otherwise determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, in order to

- 30 -

participate in the Bidding Process, prior to the Bid Deadline each person other than the Purchaser who wishes to participate in the Bidding Process, and in the event that such person is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each actual or proposed holder of the equity (whether in the form of stock, partnership interests, LLC interests, debt issued in connection with such person's bid for the Assets or otherwise) or proposed beneficiary of such person through license or similar arrangement granted in connection with such person's bid (each an "Equity Holder") (each such person other than the Purchaser who wishes to participate in the Bidding Process, and each Equity Holder thereof, a "Potential Bidder") must deliver to the Notice Parties:

(a)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to such Potential Bidder) in substance substantially the same as the confidentiality agreement executed by the Purchaser in form and substance satisfactory to the Sellers and which shall inure to the benefit of any purchaser of the Assets. In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, prior to the distribution of any additional confidential information by the Sellers to such Potential Bidder, such Potential Bidder must provide a statement (i) agreeing that, if the confidentiality agreement executed by the Purchaser contains provisions that are more restrictive than the confidentiality agreement executed by such Potential Bidder, then the confidentiality agreement executed by such Potential Bidder shall be deemed to be amended to contain such more restrictive provisions; (ii) agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets; and (iii) waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transactions it may enter into, to the Notice Parties and other Qualified Bidders who submit a Qualified Bid;

(b)     current audited financial statements and latest unaudited financial statements of the Potential Bidder or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial

- 31 -

advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transactions; and

(c)     a statement demonstrating to the Sellers' satisfaction, a bona fide interest in purchasing the Assets from the Sellers including: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded; (iii) the structure and financing of the Transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Ranger Agreement.

69.  A Potential Bidder that has delivered the documents described above, whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, the financial capability of the Potential Bidder to consummate the Transactions, that has submitted a reasonably competitive and realistic non-binding proposal, as described above, that has delivered executed confidentiality agreement(s), as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transactions, will be deemed a "Qualified Bidder". The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group, the Joint Administrators and the Monitor, whether to entertain bidders for the Assets that have not