SIGNED for and on behalf of **Nortel GmbH** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

.........................................................

Christopher Hill

Witness signature

..............................W. Graham...............................

)
)
)

Name: Wilma Graham
Address: Ernst & Young LLP, 1 More London Place, SE1 2AF

*Asset Sale Agreement Signature Page*

**SIGNED** by Alan Bloom )
)
in his own capacity and on behalf of the Joint )
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint Ad-
ministrators in the presence of:

................................................................

Alan Bloom

Witness signature

................................................................ )
Name: KATHRYN BAILLIE )
Address: )

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

*Asset Sale Agreement Signature Page*

Signed by **MAÎTRE COSME ROGEAU**,
acting in the capacity of *Mandataire*
*Liquidateur* of **NORTEL NETWORKS S.A.**
**(IN ADMINISTRATION AND**
**LIQUIDATION JUDICIARE)**, without
personal liability and solely for the purpose of
obtaining the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the French Liquidator:

By _____

Name: Maître Cosme Rogeau
Title: *Mandataire Liquidateur*

In the presence of:
Witness signature

Name:    Thibault LEBRAY
Address: 26 rue Hoche,
         78000 Versailles

SIGNED for and on behalf of **NORTEL**              )
**NETWORKS S.A. (IN**                               )    ......................................
**ADMINISTRATION AND**                              )    **MAÎTRE COSME ROGEAU**
**LIQUIDATION JUDICIARE)**                           )
by **MAÎTRE COSME ROGEAU** as                        )
*Mandataire Liquidateur* (acting as agent            )
and without personal liability) in the               )
presence of:                                         )
Witness signature

Name:    Thibault LEBRAY
Address: 26 rue Hoche
         78000 Versailles

*Asset Sale Agreement Signature Page*

**RANGER INC.**

By: _____

    Name: Donald Harrison
    Title: Chief Executive Officer,
        President and Secretary

Solely for the purpose of Section 10.24
and the other Sections referenced in
Section 10.24(c):

**GOOGLE INC.**

By: _____

    Name: Kent Walker
    Title: Senior Vice President,
        General Counsel and
        Assistant Secretary

*Asset Sale Agreement Signature Page*

# ANNEX I – STATEMENTS

Except (i) as set forth in the applicable sections of the Sellers Disclosure Schedule or (ii) to the extent solely relating to the Excluded Assets or the Excluded Liabilities:

(a)    To the Knowledge of the Sellers, an accurate, true and complete list of all Patents owned in whole or in part by the Sellers (including Jointly Owned Patents and Specified UK Patents) is set forth in Section A.I(a) of the Sellers Disclosure Schedule.  Such list includes, for each patent and patent application, the patent number or application serial number and the jurisdiction, and for each U.S. patent and patent application that is not a Specified UK Patent, the name of the Person holding such patent or patent application and the filing date and issue date, if applicable.  With respect to Jointly Owned Patents, the list identifies the co-owner(s) of each U.S. patent and, to the extent the Sellers have or are able to obtain copies of the applicable agreements, the agreements under which any Seller and the co-owner(s) share ownership of the patent.

(b)    None of the Listed Patents, the Listed Jointly Owned Patents, the Specified Listed UK Patents or the Listed Inventions, and, to the Knowledge of the Sellers, none of the other Transferred Patents, Jointly Owned Patents or Specified UK Patents, is subject to any Liens other than Permitted Encumbrances, and no Seller has granted any exclusive license to any Third Party with respect to any Listed Patent, Listed Jointly Owned Patent, Specified Listed UK Patent or Listed Invention or, to the Knowledge of the Sellers, any other Transferred Patent, Jointly Owned Patent or Specified UK Patent, which exclusive license is in force as of the date hereof.

(c)    With respect to the Specified Listed UK Patents, the Listed Jointly Owned Patents and the Listed Patents, and, to the Knowledge of the Sellers, with respect to the other Specified UK Patents, Jointly Owned Patents and Transferred Patents, the Sellers own all right, title, and interest in and to each such Patent (other than the rights of co-owners of Jointly Owned Patents in and to the Jointly Owned Patents); and subject to the Cross-License Agreements, the Outbound License Agreements and the Commercial Licenses, such right, title, and interest are sufficient for the Sellers to independently bring suit against a Third Party to enforce the Listed Patents, the Specified Listed UK Patents, and, to the Knowledge of the Sellers, the other Specified UK Patents and Transferred Patents.

(d)    To the Knowledge of the Sellers, Section A.I(d) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts between the Sellers or their Affiliates, on the one hand, and any other Person, on the other hand, under which the Sellers or their Affiliates both (i) grant a license under any Transferred Patent, Jointly Owned Patent or Specified UK Patent and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property) (collectively, the "**Cross-License Agreements**"), and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof, except to the extent disclosure of the terms or existence of a Cross License Agreement is prohibited, in which case it has been omitted from Section A.I(d) of

the Sellers Disclosure Schedule, but the number of such Cross License Agreements that have been omitted is set forth in Section A.I(d) of the Sellers Disclosure Schedule.

(e)     To the Knowledge of the Sellers, Section A.I(e) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts (other than Cross-License Agreements and Commercial Licenses) under which the Sellers or their Affiliates grant a license (including a grant back or any other express license made by any of the Sellers (as licensors) to improvements or any other license rights) to a Transferred Patent, Jointly Owned Patent or Specified UK Patent (whether alone or with any Software or Trade Secrets) (collectively, the "**Outbound License Agreements**"), indicating for each such Outbound License Agreement the title and the parties thereto, and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof.

(f)     To the Knowledge of the Sellers, (i) Section A.I(f) of the Sellers Disclosure Schedule sets forth (A) an accurate, true and complete list of each transition services agreement, master purchase agreements and development and support agreements that the Sellers entered into with the purchasers of its various business units after the Petition Date in connection with their divestitures and (B) with respect to the transition services agreements, the original scheduled termination date thereof (which, as of the date hereof, has not been extended by more than 90 days), and (ii) the scope of the licenses granted under the Transferred Patents, Jointly Owned Patents and Specified UK Patents pursuant to such transition services agreements, master purchase agreements and development and support agreements is not broader than the scope of such licenses contained in the form licenses provided to the Purchaser prior to the date hereof in the Data Room as document numbers 2.5.3.187 2.5.3.193, 2.5.3.194 and 2.5.3.195; it being understood that work orders under certain of such agreements have been issued pursuant to such agreements, but are not listed.  To the Knowledge of the Sellers, the license rights, if any, granted by the Sellers under the Transferred Patents, Jointly Owned Patents and Specified UK Patents pursuant to each such transition services agreement during the term of such transition services agreement shall expire upon the termination of such transition services agreement (except for (A) rights to use and make certain Software applications and tools relating to the businesses being divested, to the extent that such Software applications and tools were delivered by the Sellers or their Affiliates and (B) internal use of Intellectual Property created by Sellers or their Affiliates prior to the expiration of such transition services agreement in support of or during the course of performing the services, to the extent such Intellectual Property has been delivered, including by integration into the divested business.

(g)     To the Knowledge of the Sellers, there is no Action pending asserting invalidity, misuse or unenforceability of any of the Jointly Owned Patents, Transferred Patents or Specified UK Patents or challenging the Sellers' right to use, right to transfer, or ownership of any of the Jointly Owned Patents, Transferred Patents or Specified UK Patents.

(h)     To the Knowledge of the Sellers, each of the registrations and applications for the Jointly Owned Patents, Transferred Patents or Specified UK Patents included in the Assets is currently in good standing and subsisting.  The foregoing will not be construed as a warranty that any patent will issue based on a patent application.

(i)     To the Knowledge of the Sellers, Section A.I(i) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Actions (including opposition, interferences and cancellation petitions and like proceedings) against any Seller, except for the Bankruptcy Proceedings, pending before any Government Entity or threatened in writing that involves the Jointly Owned Patents, Transferred Patents or Specified UK Patents.

(j)     To the Knowledge of the Sellers, there are no prior or preferential rights, rights of first refusal, rights of first offer or other similar rights of any party (other than the Purchaser) to purchase or otherwise acquire any of the Assets.

(k)     To the Knowledge of the Sellers: every Patent solely owned by the Sellers or their Affiliates, except for the Excluded Patents, is included among the Listed Patents or the Specified Listed UK Patents; every Patent jointly owned by one or more of the Sellers and their Affiliates, on the one hand, and one or more Third Parties, on the other hand, except for the Excluded Patents, is included among the Listed Jointly Owned Patents; and every invention disclosure owned by the Sellers or their Affiliates and under consideration for the filing of a patent application is included among the Listed Inventions.

(l)     No Person listed in Section A.I(l) of the Sellers Disclosure Schedule has been granted any license (other than a Commercial License) under the Jointly Owned Patents, Transferred Patents or Specified UK Patents by the Sellers, which license is in force as of the date hereof, it being understood that such Persons may have rights or licenses solely with respect to products or services sold or provided by the Sellers or Sellers' Affiliates.

(m)     To the Knowledge of the Sellers, Section A.I(m) of the Sellers Disclosure Schedule sets forth an accurate, true and complete list of all Contracts (other than Cross-License Agreements and Outbound License Agreements listed in Sections A.I(d) or A.I(e) of the Sellers Disclosure Schedule, respectively) under which the Sellers or their Affiliates have joint ownership in the Jointly Owned Patents (collectively, the "**Joint Ownership Agreements**"), indicating each Jointly Owned Patent and the title and the parties to each such agreement, and the Sellers have furnished a correct and complete copy of each such Contract in its final and effective form to the Purchaser prior to the date hereof.

(n)     To the Knowledge of the Sellers, no Affiliate of the Sellers that is not itself a Seller owns any Patents, invention disclosures or Patent Related Documentation.

(o)     To the Knowledge of the Sellers, (i)(x) all promises, declarations and commitments granted, made or committed in writing by the Sellers to standard-setting bodies or industry groups (other than those contained in membership agreements, by-laws or policies of standard-setting bodies or industry groups and described in clause (y) below or, without limiting clause (y) below, in Section A.I(b) of the Sellers Disclosure Schedule) and that may concern the Transferred Patents or Specified UK Patents, together with the title and number of the standard and the Patents to which such promises, declarations or commitments refer (in each case, to the extent identified in the respective promise, declaration or commitment), are listed in Section A.I(o)(i)(x) of the Sellers Disclosure Schedule, and (y) all membership agreements, by-laws or policies of standard-setting bodies or industry groups in which Sellers were participants and which contained commitments that may concern the Transferred Patents or Specified UK Patents

granted in writing by the Sellers and which bind Sellers to bind the Purchaser thereto, are listed in Section A.I(o)(i)(y) of the Sellers Disclosure Schedule; and (ii) except as set forth on Schedule A.I(o)(ii) of the Sellers Disclosure Schedule, none of the declarations, promises and commitments referred to in clause (i) above require royalty-free licensing of any of the Transferred Patents.

(p)     The patents, patent applications and provisional patent application listed in Section 1.1(c) of the Sellers Disclosure Schedule are solely those sold after the Petition Date to purchasers in connection with sales of divisions of Sellers and are not included in the Sellers' Patents.

(q)     There exist no Permitted Encumbrances of the type described in clause (i) of the definition of "Permitted Encumbrances" on any of the Assets.

(r)     To the Knowledge of the Sellers, there exist no Licensed Residual Patents (other than invention disclosures that (x) relate to a patent application filed anywhere in the world or (y) are dated thirty (30) months or more before the date hereof) or Undisclosed Patent Interests.

(s)     To the Knowledge of the Sellers, the aggregate amount of all unpaid past, present and future income and royalties payable to the Sellers under (i) the Transferred Licenses and (ii) any licenses granted under the Transferred Patents, Jointly Owned Patents or Specified UK Patents does not exceed $10 million.

(t)     The portions of the Ericsson Licenses and any other agreement between any Seller, on one hand, and Ericsson on the other hand, which were redacted in the copy of such agreements provided in the Data Room, do not provide for: (i) the assignment to any Person of any ownership or exclusive rights (including any option to acquire ownership or exclusive rights) to any Transferred Patents, Specified UK Patents or Jointly Owned Patents, (ii) the grant of any sublicense or other license rights under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, (iii) the Sellers to have any rights to receive an ownership or exclusive interest in any Patents transferred by any Sellers to Ericsson or (iv) any rights for any Person in any improvements to any Transferred Patents, Specified UK Patents or Jointly Owned Patents made by any Seller or any purchaser of Transferred Patents, Specified UK Patents or Jointly Owned Patents.

(u)     The Sellers have disclosed to Purchaser all agreements, contracts, notices and correspondence to, from or with Ericsson that relate in any way to the Transferred Patents, Jointly Owned Patents or Specified UK Patents, other than agreements, contracts, notices and correspondence relating to a potential stalking horse transaction for the Transferred Patents, Jointly Owned Patents and Specified UK Patents, as a whole.

(v)     To the Knowledge of the Sellers, there exist no disputes between any Seller, on the one hand, and Ericsson, on the other hand, concerning the Transferred Patents, Jointly Owned Patents or Specified UK Patents or the scope of any licenses granted to the Transferred Patents, Jointly Owned Patents or Specified UK Patents.

(w)     There are no Collective Labor Agreements in effect or labor organizing efforts outstanding or threatened with respect to any Employee of any of the Sellers.

(x)     No Employee of any of the Sellers works in Quebec, Canada.

(y)     [Reserved]

(z)     To the Knowledge of the Sellers, there is no ongoing and will be no future manufacture, development, sale, supply or other distribution, or servicing of Nortel Products or other products under the Transferred Patents or Specified UK Patents by, for or on behalf of Sellers or an Affiliate of any Seller, other than to the extent such activities would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement or Section 5.13(b) of this Agreement.

**APPENDIX "B"**

**EXHIBITS AND SELLERS DISCLOSURE SCHEDULE**

**[CONFIDENTIAL]**

**APPENDIX "C"**

**KNOWN LICENSE NOTICE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
                                                           :
*In re*                                                    :      Chapter 11
                                                           :
Nortel Networks Inc., *et al.*,[1]                         :      Case No. 09-10138 (KG)
                                                           :
                        Debtors.                           :      Jointly Administered
                                                           :
                                                           :
                                                           :
---------------------------------------------------------- X

---

**Court File No. 09-CL-7950[2]**

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### JOINT NOTICE OF (I) SALE OF PATENTS SUBJECT TO CERTAIN PATENT LICENSES AND (II) REJECTION OF CERTAIN PATENT LICENSES

---

[1]     The debtors in these chapter 11 cases (the "U.S. Debtors"), along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]     The debtors in these CCAA proceedings (the "Canadian Debtors"), include Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

On April [●], 2011, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and certain of their affiliates (collectively the "Sellers") entered into an agreement (the "Agreement") to convey substantially all of the Sellers' residual patents and certain related assets as described therein (the "Assets") to Ranger Inc., an affiliate of Google Inc., as more fully set forth in the U.S. Debtors' motion for approval of the Sale and other related relief filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April [●], 2011 (D.I. [●]) (the "U.S. Sale Motion")[3] and the Canadian Debtors' motion record containing materials supporting the request for approval of the Agreement as a stalking horse agreement and the bidding procedures filed with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") on [●], 2011 (the "Canadian Sale Motion").  The U.S. Sale Motion and Canadian Sale Motion contemplate the rejection or termination of certain outbound and cross patent license agreements in connection with the proposed Sale (as defined in the U.S. Sale Motion).

The sale of the Assets, and the transfer of the Assets to Ranger Inc. (or other Successful Bidder at the Auction), is being made subject to certain patent licenses to which the Sellers are a party, including one or more such licenses to which the Sellers believe you or your predecessor in interest are a party identified in Schedule A hereto (singularly or collectively, the "Scheduled Licenses").  The U.S. Debtors intend to reject any Unknown Licenses[4] related to patents being offered for sale to which the U.S. Debtors are a party pursuant to section 365 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in connection with the proposed Sale.  The Canadian Debtors similarly intend to terminate or repudiate any Unknown Licenses related to patents being offered for sale to which the Canadian Debtors are a party in connection with the proposed Sale.

The Auction and sale of the Assets and the rejection of the Unknown Licenses by the U.S. Debtors and the Canadian Debtors will occur in accordance with procedures established by an order of the Bankruptcy Court (the "Bidding Procedures Order"), entered on [●], 2011 [D.I. [●]] and an order of the Canadian Court entered on [●], 2011 (the "Canadian Sales Process Order"), respectively.

License Rejection Procedures.  Ranger Inc. has agreed that the Sellers will transfer the Assets, which include various patents in which the Sellers have an interest, subject to certain patent licenses to such Assets identified to Ranger Inc. by the Sellers, including the Scheduled

---

[3]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the U.S. Sale Motion.

[4]    "Unknown License" means any Contract entered into prior to January 14, 2009 (or prior to July 14, 2009 with respect to Nortel Networks (CALA)) pursuant to which any U.S. Debtor or Canadian Debtor is a party and pursuant to which such Debtor grants a license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, other than (i) the Outbound License Agreements and Cross-License Agreements (each as defined in the Agreement), (ii) the Commercial Licenses (as defined in footnote 5 hereof), (iii) the Disclosed Intercompany Licenses (as defined in the Agreement) and (iv) any intercompany contract, arrangement or understanding that is not a Disclosed Intercompany License but that is in effect and that is similar in kind to the Disclosed Intercompany Licenses (it being understood that any such intercompany contract, arrangement or understanding that grants license rights to the Transferred Patents, Specified UK Patents or Jointly Owned Patents that is broader in scope or longer in duration than the broadest license or longest license to such patents granted under any of the Disclosed Intercompany Licenses is not similar in kind to the Disclosed Intercompany Licenses).

Licenses listed on Exhibit A hereto, as well as other defined categories of patent licenses identified in the patent license rejection procedures approved by the Bankruptcy Court and the Canadian Court described below.  In furtherance of the Sale, (i) the U.S. Debtors intend to reject any Unknown Licenses to which the U.S. Debtors are a party pursuant to section 365 of the Bankruptcy Code and (ii) the Canadian Debtors intend to terminate any Unknown Licenses to which the Canadian Debtors are a party.  ***If you have a license to the Assets with the U.S. Debtors that is not listed on Exhibit A hereto and does not fall within one of the below categories of Covered Licenses (as defined below), such license will be rejected as of and conditioned upon the occurrence of the Closing, unless you follow the procedures described under "Unknown Licenses with U.S. Debtors" below.  If you have a license to the Assets with the Canadian Debtors that is not listed on Exhibit A hereto and does not fall within one of the below categories of Covered Licenses, such license will be terminated as of and conditioned upon the occurrence of the Closing, unless you follow the procedures described under "Unknown Licenses with Canadian Debtors" described below.  You should carefully read the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order to understand how your rights may be affected by the U.S. Sale Motion, the Canadian Sale Motion and the Sale.***  If all of the licenses that you have to the Assets with the U.S. Debtors or the Canadian Debtors are listed on Exhibit A hereto, you do not need to take any further action.

By use of these procedures, the Sellers do not intend to reject or terminate the following license agreements related to the patents being offered for sale (collectively, the "Covered Licenses"): (i) Commercial Licenses (as defined in the Stalking Horse Agreement)[5]; and (ii) certain intercompany agreements among the Sellers and their affiliates.  License agreements described in this paragraph will not be identified on Schedule A hereto.

Unknown Licenses with U.S. Debtors

For counterparties to Unknown Licenses to which the U.S. Debtors are a party, the deadline to file and serve an objection to the rejection of any Unknown License (a "U.S. Objection Notice") is [●], 2011 at [●] p.m. (ET) (the "License Rejection Objection Deadline").  Such objection shall be served in accordance with the Objection Procedures (as defined below) on the License Objection Notice Parties (as defined below).

For counterparties to Unknown Licenses to which the U.S. Debtors are a party, the deadline to elect to retain license rights under such Unknown License in accordance with section 365(n)(1)(b) of the Bankruptcy Code is [●], 2011 at [●] p.m. (ET) (the "Notice of Election Deadline").  To retain such rights, you must file a notice of election to retain such rights (a "Notice of Election") in accordance with the Objection Procedures (as defined below), serve such notice on: the License Objection Notice Parties (as defined below).  The Notice of Election served on the Canadian Debtors, Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors (the "Monitor") and the U.S. Debtors shall attach a written copy of the Unknown License with the Notice of Election.  ***If you are a counterparty to an Unknown License with the U.S. Debtors and do not file and serve a Notice of Election by the Notice of Election Deadline,***

---

[5]    "**Commercial Licenses**" means the Pre-Divestiture Commercial Licenses, the Post-Divestiture Commercial Licenses and the End-User Licenses, each of which is defined on Exhibit A hereto.

***you will be deemed to have elected to treat each such Unknown License as terminated under section 365(n)(1)(a) of the Bankruptcy Code.***  The U.S. Debtors and the Stalking Horse Purchaser (or other Successful Bidder) reserve their right to object to any Notices of Election on any and all available grounds, which objections will be heard at the Sale Hearing.

For any Unknown License with the U.S. Debtors that is rejected, the deadline to file a rejection damages claim against the Debtors (each such claim, a "License Rejection Damages Claim") with respect to such rejection will be thirty (30) days following the date of the Closing of the Sale.  All License Rejection Damages Claims must attach a written copy of the Unknown License and otherwise comply with the procedures established by the Order Establishing Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof [D.I.1280].

Unknown Licenses with Canadian Debtors

If you have an Unknown License with one or more of the Canadian Debtors and wish to object to its termination, you must serve a notice containing your objection using the form posted on the Monitor's website at www.ey.com/ca/nortel (a "Canadian Objection Notice") on or prior to [●] at [●] p.m. ET (the "Canadian License Bar Date") on the License Objection Notice Parties (as defined below).  The Canadian Objection Notice served on the Canadian Debtors, the Monitor and the U.S. Debtors shall attach a written copy of the Unknown License with the Notice of Election served on the Canadian Debtors, the Monitor, the U.S. Debtors and Ranger Inc.

To the extent that a counterparty to an Unknown License comes forward and serves a Canadian Objection Notice prior to the Canadian License Bar Date, which Unknown License is established by court order to be a valid Unknown License prior to the Closing (as defined in the Agreement), the Assets will be sold subject to such license.

Except as described in the immediately preceding paragraph, all Unknown Licenses to which the Canadian Debtors are a party are deemed to be terminated and forever barred as of the Closing and any claim arising from such deemed termination shall be an unsecured claim against the Canadian Debtors, which claim shall be deemed a Restructuring Claim as defined in the Claims Procedure Order granted by the Court on July 30, 2009, must be filed within thirty (30) days of the date of Closing and must otherwise be in compliance with that order.

Copies of the Proof of Claim form and Claims Package can be obtained on the Monitor's website at www.ey.com/ca/nortel or by contacting the Monitor by telephone (416-943-4439 or 866-942-7177) or by fax (416-943-2808).

Unknown Licenses with both U.S. Debtors and Canadian Debtors

If you are a counterparty to a patent license with both the U.S. Debtors and the Canadian Debtors, that is subject to rejection and termination under these procedures, to retain your license rights, you must (i) file and serve a Canadian Objection Notice; and (ii) elect to retain your license rights under Section 365(n) of the Bankruptcy Code in accordance with the procedures summarized above and contained in the Canadian Sales Process Order and the Bidding

Procedures Order, respectively.  You may not attempt to retain license rights in one jurisdiction and terminate such license rights in the other.

<u>License Non-Assignment and Non-Renewal Protections</u>

           In addition to the foregoing license rejection procedures, the U.S. Debtors and the Canadian Debtors have agreed as part of the transaction to various limitations and prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts containing licenses to the patents offered for sale, including outbound and cross patent licenses and certain licenses incorporated in Commercial Licenses, Intercompany Licenses (as defined in the Sale Order and the Vesting Order, each as defined below) and certain agreements entered into in connection with the divestiture of Nortel's business units, as set forth in paragraph 28 of the proposed Sale Order annexed to the U.S. Sale Motion (the "<u>Sale Order</u>") and paragraph 14 of the proposed Approval and Vesting Order annexed to the affidavit of [●] contained in the Canadian Sale Motion (the "<u>Vesting Order</u>").  ***<u>All counterparties to contracts with the Sellers should carefully read the U.S. Sale Motion and the proposed Sale Order annexed thereto and the Canadian Sale Motion and the proposed Approval and Vesting Order attached to the affidavit of [●] contained in the Canadian Sale Motion.</u>***

     <u>Objections, Election Notices</u>.  Pursuant to the Bidding Procedures Order and the Canadian Sales Process Order, all U.S. Objection Notices, Canadian Objection Notices and all Notices of Election must be:  (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in the case of an Unknown License to which the U.S. Debtors are a party, filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than the License Rejection Objection Deadline or the Notice of Election Deadline, as applicable, in conformity with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (d) in the case of an Unknown License to which the Canadian Debtors are a party in the form of Objection Notice available on the Monitor's website at www.ey.com/ca/nortel; and (e) served so as to be received on or before the License Rejection Objection Deadline or the Notice of Election Deadline, as applicable, by the following:  (i) counsel to the U.S. Debtors:  Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212) 225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989 (Attention: Derek C. Abbott), (ii) counsel to Ranger Inc.: Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY  10019, Fax: (212) 403-2000 (Attention: Philip Mindlin, Adam O. Emmerich and Benjamin M. Roth) and Torys LLP 79 Wellington Street West, Suite 3000, Box 270, TD Centre, Toronto, Ontario, M5K 1N2, Fax: (416) 865-7380 (Attention: Michael Rotsztain and Adam Slavens), (iii) counsel to the Committee:  Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax:  (212) 872-1002 (Attention:  Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention:  Christopher M. Samis), (iv) counsel to the Bondholder Group:  Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax:  (212) 822-5735 (Attention:  Roland Hlawaty), (v) counsel to the Canadian Debtors, Ogilvy Renault LLP, Attn: Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930, (vi) the Monitor: Ernst & Young Tower, 222 Bay Street, P. O. Box 251,

Toronto, ON M5K 1J7 Canada (Attention: Sharon Hamilton) Fax: (416) 943-3300 (vii) counsel to the Monitor, Goodmans LLP, Attn: Jay Carfagnini and Joseph Pasquariello, Bay Adelaide Centre, 333 Bay Street, Suite 3400, Toronto, ON  M5H 2S7, Facsimile: (416) 979-1234, and (viii) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Fax:  (302) 573-6497 (Attention: Patrick Tinker) (collectively, the "License Objection Notice Parties").  Any objection to the rejection or termination of an Unknown License must specify the grounds for such objection.  Only those objections made in compliance with the foregoing requirements will be considered by the Bankruptcy Court or the Canadian Court.

Reservation of Rights.  The procedures summarized in this notice are subject in all respects to the procedures set forth in the U.S. Sale Motion and the Canadian Sale Motion and approved in the Bidding Procedures Order and the Canadian Sales Process Order.  Nothing contained in this notice is to be construed as an admission by the Sellers or Ranger Inc. as to the character of any document denominated as an agreement, as an executory contract, or to the rights of any parties thereto.  Subject to the consent of Ranger Inc., in its sole and absolute discretion, or the consent of another successful bidder after an auction, as applicable, the Sellers reserve the right to withdraw any Unknown License from the contracts to be rejected or terminated, in accordance with the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order, at any time prior to the occurrence of the Closing.

Documents.  This notice is a summary only and is subject to the full terms and conditions of the Agreement, the Bidding Procedures Order and the Canadian Sales Process Order which shall control in the event of any conflict, and the U.S. Debtors and the Canadian Debtors encourage parties in interest to review such documents in their entirety.

Copies of the Sale Motion, the Stalking Horse Agreement and the Bidding Procedures Order (including the Bidding Procedures approved by the Bankruptcy Court) may be examined by interested parties between the hours of 8:00 a.m. and 4:00 p.m. (ET) at the office of the Clerk of the Court, 824 Market Street, Wilmington, Delaware 19801, or by appointment during regular business hours at the offices of the U.S. Debtors' attorneys: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley and Lisa M. Schweitzer.  Additionally, copies of the foregoing may be downloaded from the Court's docket at www.deb.uscourts.gov and from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://dm.epiq11.com/nortel.  Copies of the Agreement, Canadian Sale Motion and Canadian Sales Process Order (including the Bidding Procedures approved by the Canadian Court) can be viewed at the Monitor's website at http://www.ey.com/ca/nortel/ or by contacting the Monitor by telephone (1-416-943-4439 or 1-866-942-7177) or by fax (1-416-943-2808).

Dates set forth in this notice are subject to change, and further notice of such changes may be provided through announcements in open court and/or the filing of notices and/or amended agendas.  Parties in interest are encouraged to monitor the electronic court docket, the noticing agent website and/or the Monitor's website for further updates.

Dated:  May [●], 2011
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the U.S. Debtors
and U.S. Debtors in Possession*

-and-

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario M5J2Z4 CANADA

Derrick Tay LSUC# 21152A
Telephone: (416) 216-2327
Email: dtay@ogilvyrenault.com

Jennifer Stam LSUC# 46735J
Telephone: (416) 216-4832
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for Canadian Debtors

## Exhibit A

## Definition of Commercial Licenses

**"Pre-Divestiture Commercial License"** means any Contract entered into prior to the Petition Date in the ordinary course of business and, with respect to each Divested Business, any Contract entered into after the Petition Date but prior to the Divestiture Date in the ordinary course of business of such Divested Business, that: (1) provides for: (i) the manufacture of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller, (ii) the sale, offer for sale, importation, distribution and/or lease (or in the case of software, licensing) of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller, (iii) the servicing, including support, maintenance and installation, of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller and use of Nortel Products in connection therewith, (iv) the provision by, for or on behalf of, or under authority of any Seller or any Affiliate of any Seller of Nortel Services and use of Nortel Products in connection therewith, (v) the right to interoperate or interface (excluding air interfaces) with any Nortel Product and to use, make, sell, offer for sale, import, distribute and/or lease (or in the case of software, license), and support and maintain, the interface or the interoperability information (or software that provides the interface or interoperability), including as part of a Third Party product (but solely to the extent of the interface or the interoperability information); or (vi) research and/or development, and the right to make, use, sell, offer for sale, import, lease and support products, inventions or technologies resulting from such research and/or development, provided that (A) such Contract is with at least one of the Sellers or one of their Affiliates, (B) there is no ongoing performance of research and/or development  by Sellers or their Affiliates under such Contract as of the date hereof, (C) such contract includes a defined scope for the research and development, (D) the scope of any Patent license granted under such Contract is limited to the products, inventions or technologies developed as a result of the research and development within the defined scope for such Contract, and (E) such Contract (w) is with a university or research institution, (x) is a joint research and/or development agreement, (y) provided for research and/or development by at least one of the Sellers or one of their Affiliates or (z) provided for research and/or development that was directed at Nortel Products or was otherwise for or on behalf of Sellers or their Affiliates; and (2) included a non-exclusive grant of rights under any of the Transferred Patents, the Jointly Owned Patents or the Specified UK Patents limited to any of the activities referred to in clauses (i) - (vi) above.

"**Post-Divestiture Commercial License**" means with respect to each Divested Business, any Contract entered into with Sellers or Affiliates of the Sellers, on or after the Divestiture Date for such Divested Business, in connection with (i) performance required by Retained Contracts (including, for the avoidance of doubt, the Retained Contracts themselves) or (ii) sale, offer for sale, importation, distribution and/or lease of Inventory; in each case, where such Contract includes a non-exclusive grant of rights under any of the Transferred Patents, the Jointly Owned Patents, or the Specified UK Patents limited in time and scope to activities that would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement.

"**End-User License**" means any Contract entered into by, on behalf of or under authority of Sellers or their Affiliates prior to the date hereof and, to the extent that would be permitted after the Closing pursuant to the Closing Date License Agreement, after the date hereof, including any click-through or shrink wrap license, that (i) accompanies the sale, servicing (including support, maintenance and installation) or licensing of any Nortel Product to an end user or customer in the ordinary course of business, and (ii) includes a non-exclusive grant of a license to the customer or end user under any of the Transferred Patents, the Jointly Owned Patents, or the Specified UK patents, where such license is limited to the right to use such Nortel Product.

9

**APPENDIX "D"**

**PUBLICATION NOTICE**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- X
                                                        :
In re                                                   :     Chapter 11
                                                        :
Nortel Networks Inc., et al.,                           :     Case No. 09-10138 (KG)
                                                        :
                         Debtors.                       :     Jointly Administered
                                                        :
                                                        :
                                                        :
------------------------------------------------------- X
```

**Court File No.: 09-CL-7950**

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**JOINT NOTICE OF PUBLIC AUCTION,
SALE HEARING AND REJECTION OF IP LICENSES**

**PLEASE TAKE NOTICE** that on April [●], 2011, Nortel Networks Corporation, Nortel
Networks Limited (together, the "Canadian Debtors"), Nortel Networks Inc. (collectively with
certain of its U.S. debtor affiliates, the "U.S. Debtors", and together with the Canadian Debtors,
the "Sellers") entered into an agreement (the "Agreement") to convey substantially all of the
Sellers' residual patents and certain related assets as described therein (the "Assets") to Ranger
Inc., an affiliate of Google Inc.,  as more fully set forth in the motions for approval of the
Agreement and other related relief, including the procedures for the rejection of certain outbound
and cross patent licenses, filed with the United States Bankruptcy Court for the District of
Delaware (the "Bankruptcy Court") on [●], 2011 (D.I. [●]) (the "U.S. Sale Motion") and filed
with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") on [●],
2011( the "Canadian Sale Motion").  Except as set forth in the Agreement, the Sellers seek to sell

to Ranger Inc. or such other successful bidder(s) at an auction (the "<u>Successful Bidder</u>") the Assets covered by the Agreement free and clear of all claims and interests, in the case of the U.S. Debtors, pursuant to section 363 of the Bankruptcy Code, and in the case of the Canadian Debtors, pursuant to the Canadian Approval and Vesting Order.

  **PLEASE TAKE FURTHER NOTICE** that the terms and conditions of the proposed sale to Ranger Inc. are set forth in the Agreement attached to the U.S. Sale Motion and the Canadian Sale Motion. The Agreement represents the results of extensive marketing efforts conducted by the Sellers to obtain the highest and best offer for the Assets.

  **PLEASE TAKE FURTHER NOTICE** that on [●], 2011, the Bankruptcy Court entered an order (D.I. [●]) (the "<u>Bidding Procedures Order</u>") and that on [●], 2011 the Canadian Court entered an order (the "<u>Canadian Sales Process Order</u>") approving, among other things, (i) the bidding procedures (the "<u>Bidding Procedures</u>"), which set the key dates and times related to the sale of the Assets under the Agreement and (ii) the patent license rejection procedures, which establish procedures for the rejection of Unknown Licenses (as defined in the U.S. Sale Motion and Canadian Sale Motion). ***All interested bidders should carefully read the Bidding Procedures, and all counterparties to patent licenses with the Sellers should carefully read the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order.***

  **PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order and Canadian Sales Process Order, an auction (the "<u>Auction</u>") to sell the Assets will be conducted at [●] on **[●], 2011 at [●] a.m. (ET)** (the "<u>Auction Date</u>"). Only the Sellers, Ranger Inc., the Committee, the Bondholder Group, Ernst & Young Inc. in its capacity as the monitor of Nortel Networks Corporation *et al.* (the "<u>Monitor</u>") and the Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall be entitled to attend the Auction in person, and only Ranger Inc. and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

  **PLEASE TAKE FURTHER NOTICE** that Ranger Inc. has agreed to take the Assets subject to substantially all known outbound and cross patent licenses to such Assets granted prior to the signing of the Agreement, as identified by the Sellers, upon the terms and subject to the limitations contained in the Agreement. In an abundance of caution and in furtherance of the Sale, (i) the U.S. Debtors intend to reject any Unknown Licenses (as defined in the U.S. Sale Motion) to such Assets pursuant to section 365 of the Bankruptcy Code, effective as of and conditioned on the occurrence of the Closing, and (ii) the Canadian Debtors intend to terminate all Unknown Licenses (as defined in the Canadian Sale Motion) to such Assets, effective as of and conditioned on the occurrence of the Closing. The U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order further describe the types of patent licenses that will be rejected or terminated by the U.S. Debtors and Canadian Debtors in connection with the Sale.

  **PLEASE TAKE FURTHER NOTICE** that the U.S. Debtors and Canadian Debtors do not intend to reject or terminate certain "Covered Licenses" which consist of Commercial Licenses and certain intercompany agreements among the Sellers and their affiliates.

PLEASE TAKE FURTHER NOTICE that the deadline for any counterparty to an Unknown License with the U.S. Debtors or a party in interest in the U.S. Debtors' chapter 11 cases to file and serve an objection to the rejection of any Unknown License is [●], 2011 at [●] p.m. (ET).  Such objection shall be served in accordance with the Objection Procedures (as defined below) on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors; and counsel to the Monitor.

PLEASE TAKE FURTHER NOTICE that the deadline for a counterparty to an Unknown License with the U.S. Debtors to elect to retain its rights under such license in accordance with section 365(n)(1)(b) of the Bankruptcy Code is [●], 2011 at [●] p.m. (ET) (the "Notice of Election Deadline").  Any counterparty to an Unknown License with the U.S. Debtors that wishes to retain such rights must file a notice of election to retain such rights (a "Notice of Election") in accordance with the Objection Procedures and serve such notice on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors; and counsel to the Monitor, including a copy of such Unknown License with the Notice of Election served on counsel to each of the U.S. Debtors, the Canadian Debtors and the Monitor.  The U.S. Debtors and the Stalking Horse Purchaser (or other Successful Bidder) reserve their right to object to any Notices of Election on any and all available grounds, which objections will be heard at the Sale Hearing.  ***Any counterparty to an Unknown License with the U.S. Debtors that does not file and serve a Notice of Election by the Notice of Election Deadline will be deemed to have elected to treat each such Unknown License as terminated under section 365(n)(1)(a) of the Bankruptcy Code.***  For any Unknown License with the U.S. Debtors that is rejected, the deadline for any counterparty to such Unknown License to file a rejection damages claim against the U.S. Debtors with respect to such rejection will be thirty (30) days following the date of the Closing of the Sale.

PLEASE TAKE FURTHER NOTICE that the deadline for any counterparty to an Unknown License with the Canadian Debtors to come forward and object to the termination of such Unknown License by serving a notice of objection substantially in the form posted on the Monitor's website at www.ey.com/ca/nortel on counsel to the Canadian Debtors, counsel to the Monitor, counsel to the U.S. Debtors and counsel to Ranger Inc. is [●], 2011 at [●] p.m. (ET) (the "Canadian License Bar Date").  To the extent that a counterparty comes forward and asserts an Unknown License with the Canadian Debtors prior to the Canadian License Bar Date, which Unknown License is established by court order to be a valid Unknown License prior to the Closing (as defined in the Agreement), the Assets will be sold subject to such license.  ***Any Unknown License with the Canadian Debtors for which the counterparty to such Unknown License does not come forward and file and serve an objection notice, or whose objection is not established by court order, will be terminated and forever barred.***  Any claim arising from such deemed termination shall be an unsecured claim against the Canadian Debtors, shall be deemed a Restructuring Claim as such term is defined in the Claims Procedure Order granted by the Canadian Court on July 30, 2009, must be filed within thirty (30) days of the date of Closing and must otherwise be in compliance with that order.

PLEASE TAKE FURTHER NOTICE that, in addition to the foregoing license rejection procedures, the U.S. Debtors and the Canadian Debtors have agreed as part of the transaction to various limitations and prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts containing licenses to the patents offered for sale, including

outbound and cross patent licenses and certain licenses incorporated in Commercial Licenses, Intercompany Licenses (as defined in the Sale Order and the Vesting Order, each as defined below) and certain agreements entered into in connection with the divestiture of Nortel's business units, as set forth in paragraph 28 of the proposed Sale Order annexed to the U.S. Sale Motion (the "Sale Order") and paragraph 14 of the proposed Approval and Vesting Order annexed to the affidavit of [●] contained in the Canadian Sale Motion (the "Vesting Order"). *__All counterparties to contracts with the Sellers should carefully read the U.S. Sale Motion and the proposed Sale Order annexed thereto and the Canadian Sale Motion and the proposed Approval and Vesting Order attached to the affidavit of [●] contained in the Canadian Sale Motion.__*

**PLEASE TAKE FURTHER NOTICE** that a joint hearing (the "Sale Hearing") will be held before the Honorable Kevin Gross, United States Bankruptcy Judge and the Honourable Justice Morawetz of the Ontario Superior Court of Justice (Commercial List), which hearing is currently scheduled to be held on **[●], 2011 at [●] a.m. (ET)**, or at such other time as the Courts permit, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801 and the Ontario Superior Court (Commercial List) at 393 University Ave., Toronto, Ontario to confirm the results of the Auction, approve the sale of the U.S. Debtors' and Canadian Debtors' respective interests in the Assets to Ranger Inc. or the Successful Bidder and approve the rejection of the Unknown Licenses with the U.S. Debtors and the Canadian Debtors.  The U.S. Debtors and the Canadian Debtors may each adjourn their respective Sale Hearings one or more times without further notice by making an announcement in open Court or, in the case of the U.S. Debtors, by the filing of a hearing agenda pursuant to Local Rule 9029-3 announcing the adjournment or, in the case of the Canadian Debtors, by providing notice to the service list in the Canadian Debtors' *Companies' Creditors Arrangement Act* proceedings (the "Canadian Service List").

**PLEASE TAKE FURTHER NOTICE** that, except as described above, pursuant to the Bidding Procedures Order, the Bankruptcy Court has currently set:  (a) **[●], 2011 at [●] p.m. (ET)** as the deadline for all general objections to the U.S. Sale Motion, including objections to the sale of the Assets; (b) **[●], 2011 at [●] p.m. (ET)** as the Bid Deadline (as defined in the Bidding Procedures); and (c) **[●], 2011 at [●] p.m. (ET)** as the deadline for supplemental objections regarding objections to issues arising from and in connection with the Auction and/or the Sellers' selection of a Successful Bid made by a Successful Bidder other than Ranger Inc. Except as described above, pursuant to the Canadian Sales Process Order, the Canadian Court has currently set [●], 2011 at [●] p.m. (ET) as the Bid Deadline.

**PLEASE TAKE FURTHER NOTICE** that all objections to the U.S. Sale Motion must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than the General Objection Deadline, or other applicable deadline as indicated above; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following at the addresses provided in the Bidding Procedures and U.S. Sale Motion:  (i) counsel to the U.S. Debtors, (ii) counsel to Ranger Inc., (iii) counsel to the Committee, (iv) counsel to the Bondholder Group, and (v) the Office of the United States Trustee (collectively, the "Objection Notice Parties", such procedures the "Objection Procedures").

**PLEASE TAKE FURTHER NOTICE** that this notice is a summary only and is subject to the full terms and conditions of the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order, the Canadian Sales Process Order and the Bidding Procedures, and you should review such documents in their entirety. Copies of the Agreement, the U.S. Sale Motion, and the Bidding Procedures Order (including the Bidding Procedures approved by the Bankruptcy Court) may be examined by interested parties between the hours of 8:00 a.m. and 4:00 p.m. (ET) at the office of the Clerk of the Court, 824 Market Street, Wilmington, Delaware 19801, or by appointment during regular business hours at the offices of the U.S. Debtors' attorneys:  Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention:  James L. Bromley and Lisa M. Schweitzer.  Additionally, copies of these documents may be downloaded from the Bankruptcy Court's docket at www.deb.uscourts.gov and from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://dm.epiq11.com/nortel. Copies of the Agreement, Canadian Sale Motion and Canadian Sales Process Order (including the Bidding Procedures approved by the Canadian Court) and the Canadian Service List can be viewed at the Monitor's website at http://www.ey.com/ca/nortel/ or by contacting the Monitor by telephone (●) or by fax (●).

**PLEASE TAKE FURTHER NOTICE** that dates set forth in this notice are subject to change, and further notice of such changes may not be provided except through announcements in open court and/or the filing of notices and/or amended agendas.  Parties in interest are encouraged to monitor the electronic court docket, the noticing agent website and/or the Monitor's website for further updates.

Dated:  May [●], 2011
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the U.S. Debtors
and U.S. Debtors in Possession*

-and-

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario M5J2Z4 CANADA

Derrick Tay LSUC# 21152A
Telephone: (416) 216-2327
Email: dtay@ogilvyrenault.com

Jennifer Stam LSUC# 46735J
Telephone: (416) 216-4832
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for Canadian Debtors

6

**APPENDIX "E"**

**OBJECTION NOTICE**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**UNKNOWN LICENSE OBJECTION NOTICE**

**TO:   THE PARTIES LISTED ON SCHEDULE "A" HERETO**

Pursuant to an Order (Certain Patents and other Assets Bidding Procedures Order) of the Ontario Superior Court of Justice (Commercial List) dated ●, 2011 (the "**Order**"), the Court approved the Canadian License Rejection Procedure.[1]

Pursuant to the Canadian License Rejection Procedure, any counter-party to any pre-filing Contract (a "**Claimant**") containing a license to the Transferred Patents, Jointly Owned Patents or Specified UK Patents to which the Applicants are a party (subject to certain exceptions contained in the Order) who wishes to assert an Unknown License must serve an objection notice on the Objection Notice Parties, counsel to the Applicants, counsel to the Monitor and counsel to the Stalking Horse Purchaser, **prior to 4 p.m (ET) on ●, 2011** (the "**Canadian License Bar Date**").

1.      The undersigned hereby objects and asserts an Unknown License as follows:

      (a)      Full legal name of Claimant: _____

        (i)      Claimant Address: _____

                                   _____

        (ii)     Claimant Contact: _____

        (iii)    Phone #: _____

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Order.

- 2 -

<div style="margin-left:2em">

    (iv)    Fax #: _____

    (v)    E-mail: _____

</div>

(b)    Agreement pursuant to which Unknown License arises (please include title of agreement, date and parties):

_____

_____

(c)    For the copy of this objection that is sent to counsel to the U.S. Debtors, the Canadian Debtors and the Monitor, please append a complete copy of such agreement and any other relevant documents related to the agreement to this objection.

(d)    Please attach any additional relevant information regarding the objection as a schedule to this objection.

2.    The undersigned hereby certifies as to the accuracy and completeness of the information regarding the Unknown License asserted in this objection.

DATED this _____ day of _____, 2011

**[NAME OF CLAIMANT]**

Per: _____

Name:

Title:

**THIS UNKNOWN LICENSE OBJECTION NOTICE MUST BE SERVED IN ACCORDANCE WITH PARAGRAPH 8(C) OF THE ORDER ON THE OBJECTION NOTICE PARTIES PRIOR TO 4:00 P.M. (ET) ON THE CANADIAN LICENSE BAR DATE. TO THE EXTENT AN UNKNOWN LICENSE IS ESTABLISHED BY COURT ORDER TO BE A VALID UNKNOWN LICENSE PRIOR TO THE CLOSING, THE ASSETS WILL BE SOLD SUBJECT TO SUCH UNKNOWN LICENSE. ANY UNKNOWN LICENSE WITH THE APPLICANTS FOR WHICH THE COUNTERPARTY TO SUCH UNKNOWN LICENSE DOES NOT COME FORWARD AND FILE AND SERVE AN OBJECTION NOTICE, OR WHOSE OBJECTION IS NOT ESTABLISHED BY COURT ORDER AS DESCRIBED ABOVE WILL BE TERMINATED AND FOREVER BARRED AS OF THE CLOSING AND ANY CLAIM ARISING FROM SUCH DEEMED TERMINATION SHALL BE AN UNSECURED CLAIM AGAINST THE APPLICANTS, WHICH CLAIM SHALL BE DEEMED A RESTRUCTURING CLAIM AS DEFINED IN THE CLAIMS PROCEDURE ORDER GRANTED BY THE COURT ON JULY 30, 2009, MUST BE FILED WITHIN 30 DAYS**

- 3 -

**OF CLOSING OF THE TRANSACTION AND OTHERWISE IN COMPLIANCE WITH THAT ORDER.**

## SCHEDULE "A"

(a)     counsel to the U.S. Debtors:  Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212) 225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989 (Attention:  Derek C. Abbott),

(b)     counsel to Ranger Inc.:

    (i)     Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019, Fax: (212) 403-2000 (Attention: Philip Mindlin, Adam O. Emmerich and Benjamin M. Roth), and

    (ii)     Torys LLP 79 Wellington Street West, Suite 3000, Box 270, TD Centre, Toronto, Ontario, M5K 1N2, Fax: (416) 865-7380 (Attention: Michael Rotsztain and Adam Slavens)

(c)     counsel to the Committee:  Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax:  (212) 872-1002 (Attention:  Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention:  Christopher M. Samis),

(d)     counsel to the Bondholder Group:  Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax:  (212) 822-5735 (Attention:  Roland Hlawaty),

(e)     counsel to the Canadian Debtors, Ogilvy Renault LLP, Attn: Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930,

(f)     the Monitor: Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada (Attention: Sharon Hamilton) Fax: (416) 943-3300

(g)     counsel to the Monitor, Goodmans LLP, Attn: J.A. Carfagnini and Joseph Pasquariello, Bay Adelaide Centre, 333 Bay Street, Suite 3400, Toronto, ON M5H 2S7, Facsimile: (416) 979-1234, and

(h)     the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Fax:  (302) 573-6497 (Attention: Patrick Tinker)

**APPENDIX "F"**

**NOTICE OF SALE**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- X
                                                         :
In re                                                    :      Chapter 11
                                                         :
Nortel Networks Inc., et al.,¹                           :      Case No. 09-10138 (KG)
                                                         :
                              Debtors.                   :      Jointly Administered
                                                         :
                                                         :
                                                         :
------------------------------------------------------- X
```

**Court File No. 09-CL-7950**[2]

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### JOINT NOTICE OF (I) SOLICITATION OF INITIAL BIDS; (II) PUBLIC AUCTION AND SALE HEARING; (III) REJECTION OF CERTAIN PATENT LICENSES; AND (IV) RELATED RELIEF AND DATES

---

[1]     The debtors in these chapter 11 cases (the "U.S. Debtors"), along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]     The debtors in these CCAA proceedings (the "Canadian Debtors"), include Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

On April [•], 2011, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and certain of their affiliates (collectively the "Sellers") entered into an agreement (the "Agreement") to convey substantially all of the Sellers' residual patents and certain related assets as described therein (the "Assets") to Ranger Inc., an affiliate of Google Inc., as more fully set forth in the U.S. Debtors' motion for approval of the Sale and other related relief filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April [•], 2011 (D.I. [•]) (the "U.S. Sale Motion") and the Canadian Debtors' motion record containing materials supporting the request for approval of the Agreement as a stalking horse agreement and the bidding procedures filed with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") on [●], 2011 (the "Canadian Sale Motion").  The U.S. Sale Motion and Canadian Sale Motion contemplate the rejection or termination of certain outbound and cross patent license agreements in connection with the proposed Sale.[3]

The Auction and sale of the Assets and the rejection of the Unknown Licenses by the U.S. Debtors and the Canadian Debtors will occur in accordance with procedures established by an order of the Bankruptcy Court (the "Bidding Procedures Order"), entered on [●], 2011 [D.I. [●]] and an order of the Canadian Court entered on [●], 2011 (the "Canadian Sales Process Order"), respectively.

License Rejection Procedures.  Ranger Inc. has agreed to take the Assets subject to substantially all known outbound and cross patent licenses to such Assets granted prior to the signing of the Agreement, as identified by the Sellers, upon the terms and subject to the limitations contained in the Agreement.  In an abundance of caution and in furtherance of the Sale, (i) the U.S. Debtors intend to reject any Unknown Licenses (as defined in the U.S. Sale Motion) to such Assets pursuant to section 365(n) of the Bankruptcy Code, effective as of and conditioned on the occurrence of the Closing, and (ii) the Canadian Debtors intend to terminate all Unknown Licenses (as defined in the Canadian Sale Motion) to such Assets, effective as of and conditioned on the occurrence of the Closing.  ***If you have a license to the Assets granted by the U.S. Debtors that has not been identified in the Agreement and does not fall within one of the below categories of Covered Licenses (as defined below), such license will be rejected as of and conditioned upon the occurrence of the Closing, subject to your right to object to such rejection, as described under "Unknown Licenses with U.S. Debtors" below.  If you have a license to the Assets granted by the Canadian Debtors that has not been identified in the Agreement and does not fall within one of the below categories of Covered Licenses, such license will be terminated as of and conditioned upon the occurrence of the Closing, unless you follow the procedures described under "Unknown Licenses with Canadian Debtors" described below.  You should carefully read the Agreement, the U.S. Sale Motion, the Canadian Sale Motion, the Bidding Procedures Order and the Canadian Sales Process Order to understand how your rights may be affected by the U.S. Sale Motion, the Canadian Sale Motion and the Sale.***

Except as described below, within five (5) Business Days of the entry of the Bidding Procedures Order and the Canadian Sales Process Order, as applicable, or as soon as is practicable thereafter, (i) the U.S. Debtors will serve all of the U.S. Debtors' Known Licensees

---

[3]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the U.S. Sale Motion.

with a notice identifying the Known Licenses to the Transferred Patents, Specified UK Patents and Jointly Owned Patents (each as defined in the Agreement), and (ii) the Canadian Debtors will serve all Known Licensees (as defined in the Canadian Sales Process Order) of the Canadian Debtors with a notice identifying the Known Licenses (as defined in the Canadian Sales Process Order) to the Transferred Patents, Specified UK Patents and Jointly Owned Patents with the Canadian Debtors.  If you receive such a notice and it accurately lists all licenses to the Assets that you have with the U.S. Debtors and the Canadian Debtors, you do not need to take any further action.  If you do not receive such a notice and you are a counterparty to a license with the U.S. Debtors or the Canadian Debtors, or if you receive such a notice but you are a counterparty to a license with the Debtors that is not listed on such notice, your rights may be affected by the Sale Motion and the Sale.

The Sellers do not intend to reject or terminate the following license agreements related to the patents being offered for sale (collectively, the "Covered Licenses"): (i) Commercial Licenses (as defined in the Agreement)[4]; and (ii) certain intercompany agreements among the Sellers and their affiliates.  The counterparties to such licenses will not receive a notice identifying such licenses from the U.S. Debtors or the Canadian Debtors.

Unknown Licenses with the U.S. Debtors

Unknown Licenses with the U.S. Debtors will be rejected pursuant to section 365(n) of the Bankruptcy Code effective as of and conditioned on the occurrence of the Closing.

The deadline for any counterparty to an Unknown License with the U.S. Debtors or party in interest to file and serve an objection to the rejection of any Unknown License is **[●], 2011 at [●] p.m. (ET)**.  Such objection shall be served in accordance with the Objection Procedures (as defined below) on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors, Ogilvy Renault LLP, Attn: Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; and counsel to Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors (the "Monitor"), Goodmans LLP, Attn:  Jay Carfagnini and Joseph Pasquariello, Bay Adelaide Centre, 333 Bay Street, Suite 3400, Toronto, ON  M5H 2S7, Facsimile: (416) 979-1234.

The deadline for a counterparty to an Unknown License to elect to retain its rights under such license in accordance with section 365(n)(1)(b) of the Bankruptcy Code is **[●], 2011 at [●] p.m. (ET)** (the "Notice of Election Deadline").  Any counterparty to an Unknown License that wishes to retain such rights must file a notice of election to retain such rights (a "Notice of Election") in accordance with the Objection Procedures (as defined below), serve such notice on: the Objection Notice Parties (as defined below); counsel to the Canadian Debtors, Ogilvy Renault LLP, Attn: Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; and counsel to the Monitor, Goodmans LLP, Attn: Jay Carfagnini and Joseph Pasquariello, Bay Adelaide Centre, 333 Bay Street, Suite 3400, Toronto, ON  M5H 2S7, Facsimile: (416) 979-1234.  The Notice of Election served on counsel to each of the Canadian Debtors, the Monitor and the U.S. Debtors shall include a

---

[4]    "**Commercial Licenses**" means the Pre-Divestiture Commercial Licenses, the Post-Divestiture Commercial Licenses and the End-User Licenses, each of which is defined on Exhibit B hereto.

written copy of the Unknown License.  ***Any counterparty to an Unknown License that does not file and serve a Notice of Election by the Notice of Election Deadline will be deemed to have elected to treat each such Unknown License as terminated under section 365(n)(1)(a) of the Bankruptcy Code.***  The U.S. Debtors and the Stalking Horse Purchaser (or other Successful Bidder) reserve their right to object to any Notices of Election on any and all available grounds, which objections will be heard at the Sale Hearing.

For any Unknown License with the U.S. Debtors that is rejected, the deadline for any counterparty to such Unknown License to file a rejection damages claim against the U.S. Debtors (each such claim, a "License Rejection Damages Claim") with respect to such rejection will be thirty (30) days following the date of the Closing of the Sale.  All License Rejection Damages Claims must attach a written copy of the Unknown License and otherwise comply with the procedures established by the Order Establishing Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof [D.I.1280].

Subject to the consent of Ranger Inc., in its sole and absolute discretion, or the consent of another Successful Bidder (as defined in the Bidding Procedures), as applicable, the U.S. Debtors reserve the right to withdraw any Unknown License from the contracts to be rejected, in accordance with the Sale Motion and the Bidding Procedures Order, at any time prior to the occurrence of the Closing.

Unknown Licenses with Canadian Debtors

If you have an Unknown License granted by one or more of the Canadian Debtors and wish to object to its termination, you must serve a notice containing your objection  (a, "Canadian Objection Notice") substantially in the form available on the Monitor's website at www.ey.com/ca/nortel on or prior to [●] at [●] p.m. ET (the "Canadian License Bar Date") on the License Objection Notice Parties (as defined below); counsel to the Canadian Debtors, Ogilvy Renault LLP, Attn: Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; and counsel to the Monitor, Goodmans LLP, Attn: Jay Carfagnini and Joseph Pasquariello, Bay Adelaide Centre, 333 Bay Street, Suite 3400, Toronto, ON  M5H 2S7, Facsimile: (416) 979-1234.  The Canadian Objection Notice served on the Canadian Debtors, the Monitor and the U.S. Debtors shall include a written copy of the Unknown License.

To the extent that a counterparty to an Unknown License comes forward and serves a Canadian Objection Notice prior to the Canadian License Bar Date, which Unknown License is established by court order to be a valid Unknown License prior to the Closing, the Assets will be sold subject to such license.

Except as provided in the immediately preceding paragraph, all Unknown Licenses to which the Canadian Debtors are a party are deemed to be terminated and forever barred as of the Closing and any claim arising from such deemed termination shall be an unsecured claim against the Canadian Debtors, which claim shall be deemed a Restructuring Claim as defined in the Claims Procedure Order granted by the Court on July 30, 2009, must be filed within thirty (30) days of the date of Closing and must otherwise be in compliance with that order.

Copies of the Canadian Objection Notice, the Proof of Claim form and Claims Package can be obtained on the Monitor's website at www.ey.com/ca/nortel or by contacting the Monitor by telephone (416-943-4439 or 866-942-7177) or by fax (416-943-2808).

Subject to the consent of Ranger Inc., in its sole and absolute discretion, or the consent of another Successful Bidder, as applicable, the Canadian Debtors reserve the right to withdraw any Unknown License from the contracts to be terminated, in accordance with the Sale Motion and the Bidding Procedures Order, at any time prior to the occurrence of the Closing.

<u>Unknown Licenses with both U.S. Debtors and Canadian Debtors</u>

If you are a counterparty to a patent license granted by both the U.S. Debtors and the Canadian Debtors, that is subject to rejection and termination under these procedures, to retain your license rights, you must (i) file and serve a Canadian Objection Notice; and (ii) elect to retain your license rights under Section 365(n) of the Bankruptcy Code in accordance with the procedures summarized above and contained in the Canadian Sales Process Order and the Bidding Procedures Order, respectively.  You may not attempt to retain license rights in one jurisdiction and terminate such license rights in the other.

<u>License Non-Assignment and Non-Renewal Protections</u>.  In addition to the foregoing license rejection procedures, the U.S. Debtors and the Canadian Debtors have agreed as part of the transaction to various limitations and prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts containing licenses to the patents offered for sale, including outbound and cross patent licenses and certain licenses incorporated in Commercial Licenses, Intercompany Licenses (as defined in the Sale Order) and certain agreements entered into in connection with the divestiture of Nortel's business units, as set forth in paragraph 28 of the proposed Sale Order annexed to the U.S. Sale Motion and paragraph 14 of the proposed Approval and Vesting Order annexed to the affidavit of [●] annexed to the Canadian Sale Motion.  ***All counterparties to contracts with the Sellers should carefully read the U.S. Sale Motion and the proposed Sale Order annexed thereto and the Canadian Sale Motion and the proposed Approval and Vesting Order attached to the affidavit of [●] contained in the Canadian Sale Motion.***

<u>The Sale Hearing</u>.  A joint hearing (the "<u>Sale Hearing</u>") will be held before the Honorable Kevin Gross, United States Bankruptcy Judge and the Honourable Justice Morawetz of the Ontario Superior Court of Justice (Commercial List), which hearing is currently scheduled to be held on [●], 2011 at [●] a.m. (ET), or at such other time as the Courts permit, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801 and the Ontario Superior Court (Commercial List) at 393 University Ave., Toronto, Ontario to confirm the results of the Auction, approve the sale of the U.S. Debtors' and Canadian Debtors' respective interests in the Assets to Ranger Inc. or the Successful Bidder and approve the rejection of the Unknown Licenses with the U.S. Debtors and the Canadian Debtors.  The U.S. Debtors and the Canadian Debtors may each adjourn their respective Sale Hearings one or more times without further notice by making an announcement in open Court or, in the case of the U.S. Debtors, by the filing of a hearing agenda pursuant to Local Rule 9029-3 announcing the adjournment or, in the case of the Canadian Debtors, by providing notice to the service list in

the Canadian Debtors' Companies' Creditors Arrangement Act proceedings (the "Canadian Service List").

Key Deadlines. Except as described above, pursuant to the Bidding Procedures Order, the Bankruptcy Court has currently set: (a) [●], 2011 at [●] p.m. (ET) as the deadline for all general objections to the U.S. Sale Motion; (b) [●], 2011 at [●] p.m. (ET) as the Bid Deadline (as defined in the Bidding Procedures); and (c) [●], 2011 at [●] p.m. (ET) as the deadline for supplemental objections regarding objections to issues arising from and in connection with the Auction and/or the Sellers' selection of a Successful Bid made by a Successful Bidder other than Ranger Inc. Except as described above, pursuant to the Canadian Sales Process Order, the Canadian Court has currently set [●], 2011 at [●] p.m. (ET) as the Bid Deadline.

Objections to the U.S. Sale Motion. All objections to the relief requested in the U.S. Sale Motion must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than the General Objection Deadline, or other applicable deadline as indicated above; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following: (i) counsel to the Debtors: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax: (212) 225-3999 (Attention: James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax: (302) 658-3989 (Attention: Derek C. Abbott), (ii) counsel to Ranger Inc.: Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019, Fax: (212) 403-2000 (Attention: Philip Mindlin, Adam O. Emmerich and Benjamin M. Roth) and Torys LLP 79 Wellington Street West, Suite 3000, Box 270, TD Centre, Toronto, Ontario, M5K 1N2, Fax: (416) 865-7380 (Attention: Michael Rotsztain and Adam Slavens), (iii) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax: (212) 872-1002 (Attention: Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention: Christopher M. Samis), (iv) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax: (212) 822-5735 (Attention: Roland Hlawaty), and (v) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Fax: (302) 573-6497 (Attention: Patrick Tinker) (collectively, the "Objection Notice Parties", the procedures laid out in this paragraph, the "Objection Procedures").

Documents. This notice is a summary only and is subject to the full terms and conditions of the Agreement, the Bidding Procedures Order and the Canadian Sales Process Order which shall control in the event of any conflict, and the U.S. Debtors and the Canadian Debtors encourage parties in interest to review such documents in their entirety.

Copies of the Sale Motion, the Agreement and the Bidding Procedures Order (including the Bidding Procedures approved by the Bankruptcy Court) may be examined by interested parties between the hours of 8:00 a.m. and 4:00 p.m. (ET) at the office of the Clerk of the Court, 824 Market Street, Wilmington, Delaware 19801, or by appointment during regular business hours at the offices of the U.S. Debtors' attorneys: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention: James L. Bromley and Lisa M. Schweitzer.

Additionally, copies of the foregoing may be downloaded from the Court's docket at www.deb.uscourts.gov and from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://dm.epiq11.com/nortel.  Copies of the Agreement, the form of Objection Notice, the Canadian Sale Motion, Canadian Sales Process Order (including the Bidding Procedures approved by the Canadian Court) and the Canadian Service List can be viewed at the Monitor's website at http://www.ey.com/ca/nortel/ or by contacting the Monitor by telephone (1-416-943-4439 or 1-866-942-7177) or by fax (1-416-943-2808).

Dates set forth in this notice are subject to change, and further notice of such changes may be provided through announcements in open court and/or the filing of notices and/or amended agendas.  Parties in interest are encouraged to monitor the electronic court docket, the noticing agent website and/or the Monitor's website for further updates.

Dated:  May [●], 2011
         Wilmington, Delaware

<div style="text-align:right">

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP

_____

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the U.S. Debtors
and U.S. Debtors in Possession*

-and-

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario M5J2Z4 CANADA

Derrick Tay LSUC# 21152A
Telephone: (416) 216-2327
Email: dtay@ogilvyrenault.com

Jennifer Stam LSUC# 46735J
Telephone: (416) 216-4832
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for Canadian Debtors

</div>

## Exhibit A

**Bidding Procedures**

## Exhibit B

## Definition of Commercial Licenses

**"Pre-Divestiture Commercial License"** means any Contract entered into prior to the Petition Date in the ordinary course of business and, with respect to each Divested Business, any Contract entered into after the Petition Date but prior to the Divestiture Date in the ordinary course of business of such Divested Business, that: (1) provides for: (i) the manufacture of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller, (ii) the sale, offer for sale, importation, distribution and/or lease (or in the case of software, licensing) of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller, (iii) the servicing, including support, maintenance and installation, of any Nortel Product by, for or on behalf of, or under authority of, any Seller or any Affiliate of any Seller and use of Nortel Products in connection therewith, (iv) the provision by, for or on behalf of, or under authority of any Seller or any Affiliate of any Seller of Nortel Services and use of Nortel Products in connection therewith, (v) the right to interoperate or interface (excluding air interfaces) with any Nortel Product and to use, make, sell, offer for sale, import, distribute and/or lease (or in the case of software, license), and support and maintain, the interface or the interoperability information (or software that provides the interface or interoperability), including as part of a Third Party product (but solely to the extent of the interface or the interoperability information); or (vi) research and/or development, and the right to make, use, sell, offer for sale, import, lease and support products, inventions or technologies resulting from such research and/or development, provided that (A) such Contract is with at least one of the Sellers or one of their Affiliates, (B) there is no ongoing performance of research and/or development  by Sellers or their Affiliates under such Contract as of the date hereof, (C) such contract includes a defined scope for the research and development, (D) the scope of any Patent license granted under such Contract is limited to the products, inventions or technologies developed as a result of the research and development within the defined scope for such Contract, and (E) such Contract (w) is with a university or research institution, (x) is a joint research and/or development agreement, (y) provided for research and/or development by at least one of the Sellers or one of their Affiliates or (z) provided for research and/or development that was directed at Nortel Products or was otherwise for or on behalf of Sellers or their Affiliates; and (2) included a non-exclusive grant of rights under any of the Transferred Patents, the Jointly Owned Patents or the Specified UK Patents limited to any of the activities referred to in clauses (i) - (vi) above.

**"Post-Divestiture Commercial License"** means with respect to each Divested Business, any Contract entered into with Sellers or Affiliates of the Sellers, on or after the Divestiture Date for such Divested Business, in connection with (i) performance required by Retained Contracts (including, for the avoidance of doubt, the Retained Contracts themselves) or (ii) sale, offer for sale, importation, distribution and/or lease of Inventory; in each case, where such Contract includes a non-exclusive grant of rights under any of the Transferred Patents, the Jointly Owned Patents, or the Specified UK Patents limited in time and scope to activities that would be permitted after the Closing Date pursuant to the terms of the Closing Date License Agreement.

**"End-User License"** means any Contract entered into by, on behalf of or under authority of Sellers or their Affiliates prior to the date hereof and, to the extent that would be permitted after the Closing pursuant to the Closing Date License Agreement, after the date hereof, including any click-through or shrink wrap license, that (i) accompanies the sale, servicing (including support, maintenance and installation) or licensing of any Nortel Product to an end user or customer in the ordinary course of business, and (ii) includes a non-exclusive grant of a license to the customer or end user under any of the Transferred Patents, the Jointly Owned Patents, or the Specified UK patents, where such license is limited to the right to use such Nortel Product.

**APPENDIX "G"**

**AFFIDAVIT OF SERVICE REGARDING SERVICE ON COUNTERPARTIES TO KNOWN LICENSES**

**[CONFIDENTIAL]**

**APPENDIX "H"**

**IP TRANSACTION SIDE AGREEMENT**

**[CONFIDENTIAL]**

**APPENDIX "I"**

**BIDDING PROCEDURES**

BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Purchase Agreement (as defined below) with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) with respect to a Successful Bidder or an Alternate Bidder (each as defined below) (in each event, the "Sale"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

On [date], Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors"), Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors", together with the U.S. Debtors and the Canadian Debtors, the "North American Sellers"), certain other affiliates of the North American Sellers, including Nortel Networks UK Limited (in administration) ("NNUK"), Nortel Networks (Ireland) Limited (in administration) ("NN Ireland"), Nortel Networks S.A. (in administration and liquidation judiciaire) ("NNSA"), Nortel Networks France S.A.S (in administration) and Nortel GmbH (in administration) (the "EMEA Sellers" and together with the North American Sellers, the "Sellers"), certain of which are under the control of Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of those EMEA Sellers appointed by the English High Court of Justice in connection with the proceedings (the "UK Proceedings") under the Insolvency Act 1986 and NN Ireland which is acting by Alan Bloom also and David Hughes of Ernst & Young Chartered Accountants (such individuals collectively, the "Administrators"), the Administrators and Maître Cosme Rogeau appointed as *mandataire liquidateur* by the Commercial Court of Versailles (the "French Liquidator") executed that certain Asset Sale Agreement relating to the sale and purchase of the Assets with Ranger Inc. (the "Purchaser") and Google Inc. (the "Purchase Agreement").

The Sellers have determined that: (A) the transactions contemplated by the Purchase Agreement and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale or purchase agreement(s) and ancillary agreements with respect to a Successful Bidder (collectively, the "Transactions") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); (D) the transfer of the rights, title and interests of NNSA in and to the Assets should be subject to approval by the Supervisory Judge (*juge commissaire*) of the secondary insolvency proceedings of NNSA commenced in the Republic of France on May 28, 2009, within the meaning of Article 27 of the EC Regulation 1346/2000 (the "Supervisory Judge") and (E) the Transactions shall be (i) submitted for approval by such other applicable court(s) as the Sellers, in consultation with the Creditors' Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and (ii) subject to such

other closing conditions as are set forth in the Purchase Agreement with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) with respect to a Successful Bidder.

On [date], the U.S. Debtors filed a Motion for Orders For Orders (I)(A) Authorizing Debtors' Entry Into The Stalking Horse Asset Sale Agreement, (B) Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving The Notice Procedures And The Assumption And Assignment Procedures, (D) Approving The License Rejection Procedures, (E) Authorizing The Filing Of Certain Documents Under Seal And (F) Setting A Date For The Sale Hearing And (II) Authorizing And Approving (A) The Sale Of Certain Patents And Related Assets Free And Clear Of All Claims And Interests, (B) The Assumption And Assignment Of Certain Executory Contracts, (C) The Rejection Of Certain Patent Licenses And (D) The License Non-Assignment And Non-Renewal Protections (the "Sale Motion").

On [●], 2011, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2011, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Purchase Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Purchase Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2011, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

<p align="center">Bidding Process</p>

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets (as defined below), the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's, the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al.* (jointly administered under Case No. 09-10138) involving the U.S. Debtors (the "Creditors' Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, the French Liquidator and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party

<p align="center">2</p>

disagree as to the interpretation or application of these Bidding Procedures, the Canadian Court and the Bankruptcy Court, jointly, will have jurisdiction to hear and resolve such dispute.[1]

## Assets To Be Sold

The Sellers are offering for sale, in one or more Transactions, substantially all of the Sellers' patent assets and certain related assets, as described in the Purchase Agreement (to the extent that such assets are not subsequently excluded from the sale in accordance with the terms of the Purchase Agreement) with respect to the Purchaser, or, as set forth in the relevant sale or purchase agreement(s) with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, and to be made available to other potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets").

## "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Purchase Agreement or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale or purchase agreement(s) of such Successful Bidder.

## Free Of Any And All Claims And Interests

All of the rights, title and interests of the Sellers in and to the Assets, or any portion thereof, to be acquired will be sold (i) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims pursuant to sections 363 and 365 of the U.S. Bankruptcy Code, (ii) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens and Claims pursuant to the Canadian Approval and Vesting Order, when granted, and (iii) in the case of Assets that are transferred or assigned by the EMEA Sellers free and clear of all Liens, such Liens and Claims to attach to the net proceeds of the sale of such Assets, except with respect to the Purchaser to the extent otherwise set forth in the Purchase Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale or purchase agreement(s) of such Successful Bidder with the Sellers.

## Publication Notice

Within 5 (five) days of entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures or as soon as practicable thereafter, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Financial Times (International Edition), The Wall Street Journal (National Edition), The New York Times (National Edition) and The Globe & Mail (National Edition).

---

[1] For the avoidance of doubt, the Bidding Process shall not govern any disagreements among the Sellers.

Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown, or as otherwise determined by the Sellers (in consultation with the Creditors' Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the Purchaser who wishes to participate in the Bidding Process, and in the event that such person is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each actual or proposed holder of the equity (whether in the form of stock, partnership interests, LLC interests, debt issued in connection with such person's bid for the Assets or otherwise) or proposed beneficiary of such person through license or similar arrangement granted in connection with such person's bid (each an "Equity Holder"), (each such person other than the Purchaser who wishes to participate in the Bidding Process, and each Equity Holder thereof, a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to such Potential Bidder) in substance substantially the same as the confidentiality agreement (together with all supplements and addenda thereto) executed by the Purchaser, *mutatis mutandis*, and taking account of such Potential Bidder's corporate or other organizational structure, and otherwise in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets.  In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, prior to the distribution of any additional confidential information by the Sellers to such Potential Bidder, such Potential Bidder must provide a statement (i) agreeing that, if the confidentiality agreement (together with all supplements and addenda thereto) executed by the Purchaser contains provisions that are more restrictive than the confidentiality agreement (together with all supplements and addenda thereto) executed by such Potential Bidder, then the confidentiality agreement (together with all supplements and addenda thereto) executed by such Potential Bidder shall be deemed to be amended to contain such more restrictive provisions, *mutatis mutandis*; (ii) agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets; and (iii) waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that otherwise prohibit disclosures regarding the Potential Bidder, or any Transactions it may enter into, to the Notice Parties and other Qualified Bidders who submit a Qualified Bid (each as defined below);

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transactions; and

(c)    a statement demonstrating to the Sellers' satisfaction, a bona fide interest in purchasing the Assets from the Sellers including: (i) the purchase price (including

4

liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded; (iii) the structure and financing of the Transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transactions, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreement.

A Potential Bidder (i) that has delivered the documents described above, (ii) whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, the financial capability of the Potential Bidder to consummate the Transactions, (iii) that has submitted a reasonably competitive and realistic non-binding proposal, as described above, (iv) that has delivered executed confidentiality agreement(s), as described above, and (v) that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transactions, will be deemed a "<u>Qualified Bidder</u>".  The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group, the Administrators and the Monitor, whether to entertain bidders for the Assets that have not met one or more of the requirements specified above and deem such bidders to be Qualified Bidders.

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets as provided in the following paragraph.

<div align="center">Due Diligence</div>

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed confidentiality agreement(s) of the type described in clause (a) under the heading "Participation Requirements" with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Creditors' Committee, the Bondholder Group and the Monitor.  Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on-site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree.  The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.

<div align="center">5</div>

No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below).  The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  In any event, the Purchaser shall be provided access to all due diligence materials, management presentations, on-site inspections and other information provided to any Qualified Bidders that were not previously made available to the Purchaser as soon as commercially practicable and in no event later than two (2) Business Days after the date that the Sellers made such information available to any such Qualified Bidder.  Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders.  The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Purchase Agreement or in any other definitive agreement(s) with any Successful Bidder executed and delivered by Sellers.

<u>Bid Deadline</u>

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, Esq., 5945 Airport Road, Suite 360, Mississauga, Ontario L4V 1R9, Facsimile: (905) 863-1984; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) U.S. Debtors' counsel: Morris, Nichols, Arsht & Tunnell LLP, Attn: Derek C. Abbott, 1201 North Market Street, Wilmington, Delaware 19801, Facsimile:  (302) 658-3989; (iv) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (v) Sellers' financial advisors: Lazard Frères & Co., Attn: David Descoteaux, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 830-3395; (vi) Sellers'advisors: Global IP Law Group, LLC, 233 South Wacker Drive, Suite 8400, Chicago, IL 60606, Fascimile: (312) 283-8026 Attn: David Berten, (vii) counsel to the Creditors' Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (viii) financial advisor to the Creditors' Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (ix) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (x) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; (xi) the Administrators: Ernst & Young LLP, Attn: Christopher Hill and Robin Jowitt, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; (xii) counsel to the Administrators: Herbert Smith LLP, Attn: Alex Kay and Robert Moore, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4447 and + 44 20 7098 4918; (xiii) the French Liquidator:  26 avenue Hoche, 78000 Versailles, France, Facsimile: + 33 1 39 49 44 63, Attn: Cosme Rogeau; and (xiv) Counsel to the French Liquidator: Foucaud, Tchekhoff, Pochet & Associés, 1bis, avenue Foch, 75116 Paris, France Facsimile: + 33 1 45 00 08 19, Attn:

6

Rajeev Sharma-Fokeer & Edouard Fabre, so as to be received not later than **June 13, 2011 at 4:00 p.m. (ET)** by the Sellers (as may be extended as set out below, the "Bid Deadline").  The Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided that for any such extension beyond five (5) Business Days, the Sellers shall have obtained the written consent of the Creditors' Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably withheld.  If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

<div align="center">Qualified Bid</div>

A bid, other than the Purchase Agreement, submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)     it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreement, including without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors and/or a plan of arrangement approved by one or more of the Canadian Debtors and the Monitor, in each case, either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreement.

(b)     it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the Sale Hearing, subject to further extensions as may be agreed to under the applicable purchase agreements and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below); provided further that, notwithstanding anything to the contrary provided herein, in no event shall the Purchaser be required to serve as an Alternate Bidder without its consent, in its sole discretion;

(c)     it includes a duly authorized and executed Purchase Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price") together with all exhibits and schedules thereto, the ancillary agreements as described in the Purchase Agreement and such additional ancillary agreements as may be required by the Qualified Bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary

Agreements") (in each case to the extent applicable) and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the Qualified Bidder;

(d)      it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)      it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder and/or (ii) obtaining financing;

(f)      it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), participating in or benefiting from (including through license or similar arrangement with respect to the assets to be acquired in connection with such bid) such bid, and the complete terms of any such sponsorship, participation, financing or benefit, such disclosure to include, without limitation, (i) in the case of a Qualified Bidder formed for the purpose of acquiring the Assets (or any portion thereof), the identity of each of the actual or proposed Equity Holders of such Qualified Bidder and the terms and participation percentage of such Equity Holder's interest in such bid and (ii) the identity of each entity that has or will receive a benefit from such bid from or through the Qualified Bidder or any of its Equity Holders and the terms of such benefit;

(g)      it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreement, plus the Break-Up Fee plus U.S. $4 million (representing the Expense Reimbursement); provided that, in determining such value, the Sellers will not be limited to evaluating the dollar amount of a competing bid, but may also consider factors including those described under the "Evaluation of Competing Bids" section hereof;

(h)      it includes an acknowledgment and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs, and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)      it includes an acknowledgement and representation that the Qualified Bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)      it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)      it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in U.S. Currency in an amount equal to US$27,000,000 to be dealt with as provided for under "Good Faith Deposit" herein;

(l)      it (i) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with their continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (ii) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)      it includes evidence of the Qualified Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)      it contains other information reasonably requested by the Sellers; and

(o)      it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; underlined provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(iv), (j), (k) or (o) without the

consent of the Purchaser, Creditors' Committee, the Bondholder Group and the Monitor; provided further that such consent shall not be unreasonably withheld in connection with any bid that would (1) otherwise fully satisfy the requirements of a Qualified Bid but for a de minimis failure to comply with those criteria and (2) such non-compliance is cured within twenty-four (24) hours of the Bid Deadline; and provided further that the Sellers shall give the Purchaser written notice no later than the later of (x) three (3) Business Days prior to the commencement of the Auction or (y) 5:00 p.m. (ET) five calendar days prior to the commencement of the Auction of any determination by the Sellers (subject to the two preceding provisos in this sentence) to entertain a bid for the Assets that does not conform to one or more of the requirements specified herein and to deem such bid to be a Qualified Bid (it being understood that such notice shall include a description of the manner in which the applicable bid deviated from the requirements set forth herein) or to entertain a bidder for the Assets that has not met one or more of the requirements set forth under the heading "Participation Requirements" and deem such bidder to be a Qualified Bidder (it being understood that such notice shall include a description of the manner in which the applicable bidder deviated from the requirements set forth herein). Notwithstanding the foregoing, the Purchaser is deemed a Qualified Bidder, and the Purchase Agreement is deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) on the next Business Day after the day that the determination is made; provided that such notification shall be given no later than two (2) Business Days following the expiration of the Bid Deadline.  The Sellers shall provide the Purchaser and any Qualified Bidder that has previously submitted a Qualified Bid with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid, but in no event later than the later of (x) 12:00 p.m. (noon) (ET) three (3) Business Days prior to the commencement of the Auction or (y) 5:00 p.m. (ET) five calendar days prior to the commencement of the Auction.

<u>Aggregate Bids</u>

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from one or more "Qualified Bidders"; provided that all bidders, including all Equity Holders of such bidder shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

<u>Evaluation of Competing Bids</u>

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the Qualified Bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transactions, the proposed revisions to the relevant Transaction documents, other factors affecting the speed, certainty and value of the Transactions (including any regulatory approvals required to close the Transactions), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by

10

jurisdiction), if any, to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing, if any, and any related restructuring costs, and the likelihood and timing of consummating such transactions, each as determined by the Sellers, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor.

<u>Break-Up Fee</u>

Recognizing the value and benefits that the Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Purchase Agreement, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that they will, under the circumstances set forth in the Purchase Agreement and as set forth in the Bidding Procedures Order and the Canadian Sales Process Order pay to the Purchaser a break-up fee equal to $25 million (the "<u>Break-Up Fee</u>") and an Expense Reimbursement (as defined in the Purchase Agreement and to the extent provided in the Purchase Agreement).

<u>Auction</u>

If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreement, the Sellers will conduct an auction (the "<u>Auction</u>") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **9:00 a.m. (ET) on June 20, 2011**, at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned, subject to the terms of the Purchase Agreement.  The Auction shall run in accordance with the following procedures:

(a)    Only the Sellers, the Purchaser, the Creditors' Committee, the Bondholder Group, the Monitor, the Administrators, the French Liquidator (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid (and the advisors to such Qualified Bidder), shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any bids at the Auction.

(b)    Each Qualified Bidder shall be required to confirm that it has not engaged, and will not engage, in any collusion with respect to the bidding or the Transactions, and if such Qualified Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each of the Equity Holders of such Qualified Bidder shall be required to confirm that it has not engaged, and will not engage, in any collusion with respect to the bidding or the Transactions, such confirmation, in each case, in form and substance satisfactory to the Sellers in their joint and sole discretion.

(c) At least one (1) calendar day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such Qualified Bidder

11

(other than the Purchaser) is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date.  By 12:00 p.m. (noon) (ET) at least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that (i) the true identity of each Qualified Bidder at the Auction (as described in (f) of the Qualified Bid section above) will be fully disclosed to all other Qualified Bidders at the Auction, (ii) if such Qualified Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), the true identity of each of the Equity Holders of such Qualified Bidder will be fully disclosed to all Qualified Bidders at the Auction and (iii) all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction in person.

(e)    The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below).  Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $5,000,000 over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction.  After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise best offer (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Except as specifically set forth herein, for the

12

purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

<div align="center">Selection Of Successful Bid</div>

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Creditors' Committee, the Bondholder Group, the Monitor and the Administrators will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such Qualified Bids, collectively the "Successful Bid" and the Qualified Bidder(s) making such Qualified Bid, collectively, the "Successful Bidder") and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any.  The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Creditors' Committee, the Bondholder Group the Monitor and the Administrators, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, approval by the Canadian Court and receipt of any required approvals of any other applicable court(s).

For the avoidance of doubt, the Sellers shall not consider or support any bid (whether or not such bid is a Qualified Bid) for any of the Assets received after the close of the Auction.

<div align="center">Sale Hearing</div>

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as **June 30, 2011 at 10:00 a.m. (ET)**, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing or with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing.  The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing.  If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable

<div align="center">13</div>

court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such Qualified Bidder, the "Alternate Bidder", it being understood that in no event shall the Purchase Agreement be deemed an Alternate Bid or the Purchaser deemed an Alternate Bidder without its consent, in its sole discretion). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval the Sellers reasonably determine in good faith is legally required or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval the Sellers reasonably determine in good faith is legally required or appropriate. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until the earlier of (a) July 12, 2011, unless, prior to such date, the North American Sellers and NNUK have delivered written notice to the Alternate Bidder that the transaction contemplated by the Successful Bid will not occur and the North American Sellers intend to consummate the transaction contemplated by the Alternate Bid, in which case the terms of the Alternate Bid shall be enforceable and shall govern or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All the Qualified Bids other than the Successful Bid and the Alternate Bid shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

## Good Faith Deposits

Other than with respect to the Purchaser, whose Good Faith Deposit shall be treated in accordance with the terms and conditions of the Purchase Agreement, the Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such Qualified Bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be dealt with in accordance with the terms of the Successful Bid.

## Reservation Of Rights

The Sellers, after consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the

Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Creditors' Committee, the Bondholder Group and the Monitor or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, and (c) except as otherwise specifically set forth herein, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

Notwithstanding any of the foregoing, or anything else contained herein, the Sellers may not, without the prior written consent of the Creditors' Committee, the Bondholder Group, the Administrators and the Monitor, which consent may not be unreasonably withheld, (i) extend the Bid Deadline for more than five (5) Business Days beyond June 13, 2011, (ii) adjourn the Auction for more than three (3) Business Days, or (iii) subject to the availability of the Bankruptcy Court and the Canadian Court adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded; provided that the Sellers shall give the Purchaser written notice within one (1) Business Day after any such action (it being understood that such notice shall include a description of the action taken).

Each of the foregoing actions shall be made by the Sellers in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, and their respective advisors.  For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability and the French Liquidator is acting only as agent for and on behalf of NNSA without personal liability. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations hereunder or under the Purchase Agreement, including Purchaser's rights with respect to the timing of the Auction and the Sale Hearing, or the Purchaser's right to credit the Break-Up Fee and Expense Reimbursement as part of any subsequent bids.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**SIXTY-THIRD REPORT OF THE MONITOR**
**DATED APRIL 14, 2011**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.