044

## NOVA SCOTIA

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NOVA SCOTIA AS
REPRESENTED BY THE MINISTER OF
FINANCE**

P.O. Box 187
1723 Hollis St.
Halifax, Nova Scotia  B3J 2N3

Doug Moodie

Email:   moodiedj@gov.ns.ca
Tel:       902.424.5720
Fax:      902.424.6635

## ONTARIO

AND
TO:
**ONTARIO MINISTRY OF FINANCE**
Legal Services Branch
6th Floor
33 King Street West
Oshawa, Ontario
L1H 8H5

Kevin O'Hara

Email:   kevin.ohara@ontario.ca
Tel:       905.433.6934
Fax:      905.436.4510

## PRINCE EDWARD ISLAND

AND TO:
**HER MAJESTY THE QUEEN IN RIGHT OF THE PROVINCE OF PRINCE EDWARD ISLAND AS REPRESENTED BY THE PROVINCIAL TREASURY**

Shaw Building, 1st Floor
95 Rochford Street
PO Box 2000
Charlottetown, PE  C1A 7N8

Mary Hennessey

Email:  mihennessey@gov.pe.ca
Tel:    902.368.4070
Fax:    902.368.6164

## SASKATCHEWAN

AND TO:
**HER MAJESTY THE QUEEN IN RIGHT OF THE PROVINCE OF SASKATCHEWAN AS REPRESENTED BY THE MINISTER OF FINANCE**

2350 Albert Street
Regina, Saskatchewan  S4P 4A6

Margaret Johannsson, Assistant Deputy Minister

Email:  Margaret.johannsson@gov.sk.ca
Tel:    306.787.6685
Fax:    306.787.0241

046

**FEDERAL**

AND
TO:
**CANADA REVENUE AGENCY**
c/o Department of Justice
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email: diane.winters@justice.gc.ca
Tel:     416.973.3172
Fax:     416.973.0810

047

**BY FAX:**

**BRITISH COLUMBIA**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF BRITISH COLUMBIA,
AS REPRESENTED BY THE MINISTER OF
FINANCE, REVENUE DIVISION**

3rd Floor, 1802 Douglas Street
Victoria, British Columbia  V8T 4K6

Michael Ford

Fax:    250.356.0065

**QUEBEC**

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF QUEBEC AS
REPRESENTED BY THE MINISTER OF
FINANCE**

**Ministère des Finances**
12, rue Saint-Louis
Québec (Québec) G1R 5L3

Tel:    418.528.9323
Fax:    418.646.1631

048

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Applicants

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**Canadian Sales Process Order re Certain Patents**
**and other Assets**
**(returnable October 15, 2009)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# TAB 2

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF GEORGE RIEDEL**

**Canadian Sales Process Order re. Certain Patents and Other Assets**

**(sworn April 7, 2011)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH
AND SAY:

1.      I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel
Networks Limited ("NNL") and have held those positions since February, 2006. As
such, I have personal knowledge of the matters to which I hereinafter depose in this
Affidavit. Where I do not possess personal knowledge, I have stated the source of my
information and, in all such cases, believe it to be true.

2.      I swear this Affidavit in support of the motion for an order or orders to approve the relief
fully set out in the draft order included in the Motion Record herein, which includes,
among other things,

   (a)      the Bidding Procedures (as defined below);

   (b)      an asset sale agreement dated as of April 4, 2011 (the "Stalking Horse
Agreement") among:

(i)     Ranger Inc. as purchaser (the "Stalking Horse Purchaser");

(ii)    NNC, NNL, Nortel Networks Inc. ("NNI"), Nortel Networks UK Limited (in administration) ("NNUK"), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciare)("NNSA"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration), the other entities identified therein as sellers, Alan Bloom, Stephen Harris, Alan Hudson, David Hughes and Christopher Hill as Joint Administrators, and Maître Cosme Rogeau as French Liquidator (collectively, the "Sellers"), and

(iii)   Google Inc., as guarantor,

as a "stalking horse" sale agreement, including the Bid Protections (as defined below) provided for therein. A copy of the Stalking Horse Agreement (without exhibits or schedules) will be attached as an appendix to the sixty-third report (the "Sixty-Third Report") of the Monitor (as defined below) to be filed in connection with this motion;

(c)     certain License Rejection Procedures (as defined below);

(d)     a side agreement dated as of April 4, 2011 among the Sellers (the "Side Agreement"). A copy of the Side Agreement will be attached as a confidential appendix to the Sixty-Third Report; and

(e)     the sealing of certain confidential appendices to the Sixty-Third Report and confidential exhibits to one or more affidavits of service (the "Service Affidavits").

3.      This affidavit is also sworn in support of the motion for the Canadian Approval and Vesting Order referred to below.

4.      References to "Nortel" herein are references to the global enterprise of NNC, NNL, NNI and their respective affiliates as a whole.

5.      All dollar references are US$ unless otherwise indicated.

051

**BACKGROUND**

6.    On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology
       Corporation, Nortel Networks Global Corporation and Nortel Networks International
       Corporation (collectively, the "Applicants") were granted protection under the
       *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the
       "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial
       Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the
       "Monitor") in the CCAA proceedings.

7.    Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S.
       operating subsidiary NNI (together with the other U.S. filing entities, the "U.S.
       Debtors"), made voluntary filings in the United States Bankruptcy Court for the District
       of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code
       (the "Code")(such proceedings, the "U.S. Proceedings").    On the same date, this
       Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing
       the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to
       the automatic stay under the Code.

8.    Additionally, on January 15, 2009, NNUK and certain subsidiaries of the Nortel group
       incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an
       administration order for the appointment of administrators from the English High Court
       of Justice under the Insolvency Act 1986.

9.    On February 27, 2009, the U.S. Court granted petitions recognizing the CCAA
       proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

10.   On May 28, 2009, the Commercial Court of Versailles, France (the "French Court")
       ordered the commencement of secondary insolvency proceedings in respect of NNSA,
       which consist of liquidation proceedings during which NNSA was originally authorized
       to continue to operate as a going concern for an initial period of three months which
       period was subsequently extended. On October 1, 2009, the French Court approved an
       order to (i) suspend the liquidation operation relating to the sale of the assets and/or
       business of NNSA for a renewal period of two months; and (ii) authorize the continuation

of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA. In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

11.     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

12.     On July 14, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

13.     Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 previously filed in these proceedings and are therefore not repeated herein.

14.     The Applicants have previously obtained various relief related to the sale of certain other assets relating to their business units including Nortel's Layer 4-7 Application Delivery business, CDMA and LTE related assets, Enterprise Solutions business, Optical Networking and Carrier Ethernet businesses (associated with its Metro Ethernet Networks Business), Carrier Voice Over IP and Application Solutions business, GSM/GSM-R business and Multi-Service Switch business. NNL has also sold, among other assets, its "Westwinds Facility" in Alberta, its interest in its joint venture with LG Electronics Inc., and real property in Ottawa, Ontario known as the Carling Campus.

**THE TRANSACTION**

15.     Capitalized terms used in this section of my Affidavit and not otherwise defined herein shall have the meanings given to them in the Stalking Horse Agreement.

*The Assets*

16.    At this time, Nortel's residual patent assets are one of Nortel's largest remaining assets. The Stalking Horse Agreement contemplates the sale of approximately 6,000 Canadian, U.S. and foreign patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios.    The extensive patent portfolio touches nearly every aspect of telecommunications and additional markets as well, including Internet search and social networking.

*Previous Marketing Efforts*

17.    Nortel first began to solicit interest in a divestiture of its patent assets in May 2010.  In connection with this initial effort:

    (a)    Nortel, in consultation with its financial advisors, engaged in discussions with approximately one hundred and five (105) parties likely to be interested and able to acquire the patent assets, including a mix of financial investors and strategic buyers;

    (b)    a teaser intended to pique interest in the Assets was sent to approximately ninety-five (95) entities; and

    (c)    forty (40) companies who executed confidentiality agreements were given access to an electronic data room containing confidential diligence materials regarding the Assets.

18.    During the solicitation process, Nortel management also gave several presentations to interested parties.

19.    I am aware that the Sixty-Third Report will also include information regarding Nortel's sale efforts in this regard.

*The Stalking Horse Agreement[1]*

20.    After extensive arm's-length, good faith negotiations among the Sellers and the Stalking
Horse Purchaser and their respective advisors, the Sellers have agreed, among other
things, to convey the Assets in accordance with the terms and conditions of the Stalking
Horse Agreement, subject to certain Court approvals including this Honourable Court and
the U.S. Court. The Applicants have determined that the Stalking Horse Agreement
represents the best opportunity for the Applicants to maximize the value of the Purchased
Assets by serving as a basis for conducting an auction to seek higher and/or better offers.
The Stalking Horse Agreement contemplates the sale of the Assets, subject to higher
and/or better bids, on the following material terms:

(a)    *Purchase Price*. The Stalking Horse Purchaser will pay to the Sellers, through
their Distribution Agent, a purchase price of $900 million in cash, which includes
$45 million to be held in escrow to secure indemnity obligations of the Sellers as
further discussed below (Stalking Horse Agreement §§ 2.2.1 and 2.3.2);

(b)    *Certain Fees*. As further described below, in certain circumstances the Sellers
may be required to pay to the Stalking Horse Purchaser a Break-Up Fee and/or an
Expense Reimbursement (Stalking Horse Agreement § 8.2) ;

(c)    *Good Faith Deposit*. No later than three (3) Business Days following the later of
the entry of the Order sought in the within motion and the entry of the U.S.
Debtors' Bidding Procedures Order, the Stalking Horse Purchaser will deliver to
the Escrow Agent a good faith deposit in the amount of $27 million in cash. The
good faith deposit will be applied to the Purchase Price to be paid by the Stalking
Horse Purchaser at Closing (Stalking Horse Agreement § 2.2.2);

(d)    *Assets Sale Free and Clear*. The Assets to be acquired by the Stalking Horse
Purchaser include, among other things, the Sellers' right, title and interest in (i)
the Transferred Patents and Purchased Specified UK Patents, subject to certain
licenses granted thereunder, (ii) certain Patent Related Documentation and (iii) the

---

[1]  To the extent there are inconsistencies between any summary of the Stalking Horse Agreement contained herein
and the terms and conditions of the Stalking Horse Agreement, the terms and conditions of the Stalking Horse
Agreement shall control.

055

Sellers' rights under certain patent-related data applications. The Assets to be transferred by the Sellers will be transferred free and clear of all claims and interests other than those expressly assumed by the Stalking Horse Purchaser or otherwise expressly permitted under the Stalking Horse Agreement (Stalking Horse Agreement § 2.1.1);

(e) *Assumed Liabilities.* The liabilities to be assumed by the Stalking Horse Purchaser include, among others, (i) all Liabilities with respect to the ownership or exploitation of the Assets by or through the Stalking Horse Purchaser arising after the Closing Date, (ii) all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof), if any, after the Closing Date and (iii) all Liabilities for any Tax that the Stalking Horse Purchaser bears under Article VI of the Stalking Horse Agreement other than pursuant to Section 6.9(a) thereof (Stalking Horse Agreement § 2.1.3);

(f) *License to the Transferred Patents.* Concurrently with the Closing, the Stalking Horse Purchaser shall grant to the Sellers a license under the Transferred Patents, the Purchased Specified UK Patents and certain other patents acquired under the Stalking Horse Agreement (Stalking Horse Agreement § 5.13);

(g) *Undisclosed Patents.* Concurrently with the Closing, the Sellers shall grant the Stalking Horse Purchaser and its Affiliates a license under the Licensed Residual Patents pursuant to the terms of the Closing Date License Agreement. Upon the Sellers' discovery of any Undisclosed Patent Interest, the Stalking Horse Purchaser shall have an option to purchase the Undisclosed Patent Interest at a price of $50,000. Prior to the Sellers' anticipated dissolution or winding up, the Stalking Horse Purchaser will have an option to purchase any remaining Undisclosed Patent Interests on a quitclaim basis for a price of $1.00 (Stalking Horse Agreement §§ 5.13 and 5.19);

(h) *License Rejections and Terminations.* As further discussed below, the Stalking Horse Purchaser has agreed to take the Assets subject to all Commercial Licenses, certain Intercompany Licenses and all licenses under known Outbound License Agreements and Cross-License Agreements, and the Applicants have agreed to

056

terminate Unknown Licenses (as defined below) in accordance with the procedures described below. The Sellers also have agreed to terminate certain intercompany patent license rights (Stalking Horse Agreement § 5.13(b);

(i)    *Ongoing Covenants and Restrictions*: In addition to certain other obligations, the Sellers have agreed to reasonably cooperate with the Stalking Horse Purchaser to provide the Stalking Horse Purchaser the benefit of Assets that cannot be transferred at Closing, including by granting a royalty free, perpetual, exclusive (subject to pre-existing licenses), transferrable license under such patents (Stalking Horse Agreement § 2.1.8);

(j)    *License Non-Assignment and Non-Renewal Protections.* In furtherance of the sale, the Applicants agree under paragraph 14 of the agreed form of Approval and Vesting Order to (i) limit or refrain from exercising any rights that they may have to renew, extend, assign, amend, waive or modify any rights under various agreements containing licenses absent the Stalking Horse Purchaser's consent in its sole and absolute discretion, and (ii) grant the Stalking Horse Purchaser a power of attorney. The Stalking Horse Purchaser has provided an indemnity related to its exercise of the power of attorney. The Licenses Non-Assignment and Non-Renewal Protections are discussed in further detail below (Stalking Horse Agreement §§ 10.1);

(k)    *Maintenance of Books and Records.* After the Closing, the Sellers generally shall preserve until the third (3rd) anniversary of the Closing Date (or such longer period as may be required by applicable law) all pre-Closing Date records relating to the Assets, subject to certain limitations (Stalking Horse Agreement § 5.24);

(l)    *Restrictions on Solicitation of Competing Bids and other Transactions.* The Sellers agree that they will not, until the entry of the Canadian Sales Process Order and the U.S. Debtors Bidding Procedures Order, initiate, solicit, encourage or induce the submission or announcement of any offer for an Alternative Transaction or enter into any negotiations or execute any agreements for an Alternative Transaction. During this period, the Sellers continue to be able to negotiate and execute non-disclosure agreements, and from and after April 18,

2011, may provide access to the Data Room to Persons who have entered into non-disclosure agreements with the Primary Seller Parties. From and after the entry of the Canadian Sales Process Order, the Sellers agree not to affirmatively take any material steps in furtherance of an Asset Retention Transaction, provided that the Sellers may consider an Alternative Transaction as part of an auction process under the Bidding Procedures (Stalking Horse Agreement §§ 5.5(d), 5.26);

(m)    *Closing Conditions*.  In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals and regulatory approvals, the obligation of the Stalking Horse Purchaser to close the sale is subject to the satisfaction of the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing (Stalking Horse Agreement § 7.3);

(n)    *Indemnity*.  On the Closing Date, $45 million of the Purchase Price will be placed in an escrow account to secure an indemnity provided by the Sellers for certain breaches of the Stalking Horse Agreement (Stalking Horse Agreement Article IX, § 2.3.2).

*Break Up Fee and Expense Reimbursement*

21.    The Stalking Horse Purchaser and its advisors have expended, and likely will continue to expend, considerable time, energy and resources pursuing the purchase of the Assets and have engaged in extended, good faith negotiations with the Sellers to facilitate such transaction. The Stalking Horse Agreement is the culmination of these efforts.

22.    In recognition of this expenditure of time, energy, and resources, the Sellers, in accordance with section 8.2 of the Stalking Horse Agreement and upon the termination events described therein, have agreed to pay the Stalking Horse Purchaser an aggregate fee of twenty-five million dollars and 00/100 ($25,000,000), which break-up fee is equal to approximately two and eight-tenths percent (2.8%) of the estimated aggregate Purchase Price (the "Break-Up Fee"). In accordance with section 8.2 of the Stalking Horse Agreement and upon the termination events described therein, the Sellers also have

058

agreed to pay the Stalking Horse Purchaser's reasonable and documented out-of-pocket costs and expenses in connection with the preparation, execution and performance of the Stalking Horse Agreement, which shall not exceed four million dollars and 00/100 ($4,000,000), which is equal to approximately four-tenths of one percent (0.4%) of the estimated aggregate Purchase Price (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections").

23.     I am aware that the Sixty-Third Report will contain more detail with respect to the Bid Protections including outlining the circumstances in which they may become payable.

24.     Except in the event of actual fraud by the Sellers, the Stalking Horse Purchaser's monetary remedies against the Sellers for pre-Closing breaches of the Stalking Horse Agreement are capped at twenty-nine million dollars and 00/100 ($29,000,000), which is equal to the amount of the Expense Reimbursement and the Break-Up Fee payable by the Sellers under the Stalking Horse Agreement.     The Break-Up Fee and the Expense Reimbursement are not remedies for any post-Closing breach by the Sellers.

*License Rejection Procedures*

25.     As a condition to the proposed transaction, the Applicants in these proceedings and the U.S. Debtors in the U.S. Proceedings have both agreed to implement a process for the rejection or termination of Unknown Licenses.

26.     As described in the Stalking Horse Agreement, the Applicants have informed the Stalking Horse Purchaser that they do not believe that there are any Contracts pursuant to which the Applicants grant licenses under the Transferred Patents, the Jointly Owned Patents or the Specified UK Patents, which licenses are in force, and to which the Applicants are a party other than:

   (a)     the Outbound License Agreements listed in Schedule A.I(e) of the Sellers Disclosure Schedule and the Cross-License Agreements listed in Schedule A.I(d) of the Sellers Disclosure Schedule (collectively, the "Known Licenses"),

   (b)     the Commercial Licenses, and

(c)     license rights with respect to the Transferred Patents, Specified UK Patents or Jointly Owned Patents granted under certain intercompany contracts, arrangements or understandings to which the Applicants are a party.

27.     Nevertheless, in view of the potential impact of continuing licenses on the value of the Sellers' patent assets, the Applicants have agreed in furtherance of the sale of the Purchased Assets to reject, pursuant to certain agreed upon procedures as set out in the proposed Canadian Sales Process Order and described below, effective as of and conditioned on the occurrence of the Closing, any pre-filing Contract pursuant to which any Applicant is a party and pursuant to which such Applicant grants a license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, other than (i) the Known Licenses, (ii) the Commercial Licenses, (iii) the Disclosed Intercompany Licenses, and (iv) any intercompany contract, arrangement or understanding that is not a Disclosed Intercompany License but that is in effect and that is similar in kind to the Disclosed Intercompany Licenses (it being understood that any such intercompany contract, arrangement or understanding that grants license rights to the Transferred Patents, Specified UK Patents or Jointly Owned Patents that is broader in scope or longer in duration than the broadest license or longest license to such patents granted under any of the Disclosed Intercompany Licenses is not similar in kind to the Disclosed Intercompany Licenses).

28.     The Applicants propose the following procedures with respect to the rejection of Unknown Licenses (as defined below) (the "Canadian License Rejection Procedures"):

(a)     in conjunction and coordination with the equivalent US license rejection procedures, the Applicants (or another a person on behalf of the Applicants) shall serve on each counterparty to a Known License (such counterparties, collectively, the "Known Licensees") a notice substantially in the form that will be attached as an appendix to the Sixty-Third Report (the "Known License Notice"), identifying the Known Licenses that such counterparty has with the Applicants. The Known License Notices shall be served by the Applicants (or another person on behalf of the Applicants) by no later than five (5) Business Days following the entry of the Canadian Sales Process Order or as soon thereafter as is reasonably practicable.

(b)      the Applicants (or another person on behalf of the Applicants) shall publish a notice (the "Published License Notice") of the Canadian License Rejection Procedures described in this paragraph 27, substantially in the form that will be attached as an appendix to the Sixty-Third Report, in The Wall Street Journal (National Edition), The Globe and Mail (National Edition), The Financial Times (International Edition) and The New York Times (National Edition) within five (5) Business Days of entry of the Canadian Sales Process Order or as soon thereafter as is reasonably practicable.

(c)      any counterparty to any pre-filing Contract pursuant to which any Applicant is a party and pursuant to which such Applicant has granted a license under any Transferred Patents, Specified UK Patents or Jointly Owned Patents, other than (i) the Known Licenses, (ii) the Commercial Licenses, (iii) the Disclosed Intercompany Licenses (as defined in the Stalking Horse Agreement) and (iv) any intercompany contract, arrangement or understanding that is not a Disclosed Intercompany License but that is in effect and that is similar in kind to the Disclosed Intercompany Licenses (it being understood that any such intercompany contract, arrangement or understanding that grants license rights under the Transferred Patents, Specified UK Patents or Jointly Owned Patents that is broader in scope or longer in duration than the broadest license or longest license to such patents granted under any of the Disclosed Intercompany Licenses is not similar in kind to the Disclosed Intercompany Licenses) (any such licenses, collectively, the "Unknown Licenses") who wishes to assert an Unknown License must serve an objection notice substantially in the form that will be attached as an appendix to the Sixty-Third Report (an "Objection Notice") on the parties listed on Schedule "B" thereto (the "License Objection Notice Parties"), prior to 4 p.m (ET) on June 6, 2011 (the "Canadian License Bar Date").  The Monitor has advised that it intends to post the form of Objection Notice on its website within two (2) Business Days of the entry of the proposed Canadian Sales Process Order.

(d)      without prejudice, as between the Sellers and the Stalking Horse Purchaser, to the rights of the Stalking Horse Purchaser under the Stalking Horse Agreement, to the extent that a party asserts an Unknown License prior to the 4:00 p.m. (ET) on the

Canadian License Bar Date (and if so asserted, an "Additional License"), the Assets shall only be sold subject to such Additional License, provided however that the validity of the Additional License has been established by Court Order prior to Closing.

(e)     except as provided for in subparagraph (d) above, all Unknown Licenses to which the Applicants are a party are deemed to be terminated as of the Closing and shall forever be barred, released and extinguished, and any claim arising from such deemed termination shall be a claim against the Applicants, which claim shall be deemed to be a Restructuring Claim as such term is defined in the Claims Procedure Order granted by this Court on July 30, 2009, as amended from time to time, (the "Claims Procedure Order") and must be filed within thirty (30) days of the date of Closing and otherwise in compliance with the Claims Procedure Order.

(f)     subject to the consent of the Stalking Horse Purchaser, in its sole and absolute discretion, or any other Successful Bidder, as applicable, the Applicants reserve their right to not terminate an Unknown License at any time prior to the occurrence of the Closing.

(g)     a counterparty seeking to retain rights under an Unknown License with both the U.S. Debtors and the Applicants that is subject to rejection and termination under the Canadian License Rejection Procedures must (i) file and serve an Objection Notice; and (ii) elect to retain its license rights in accordance with the procedures contained in the motion of the U.S. Debtors for the granting of the U.S. Bidding Procedures Order, respectively.   Such a counterparty may not attempt to retain license rights in one jurisdiction and terminate such license rights in the other.

*License Non-Assignment and Non-Renewal Protections*

29.     In view of the potential impact of continuing licenses on the value of the Sellers' patent assets, the Applicants also have agreed in furtherance of the Sale to various limitations and prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts containing licenses to the patents offered for sale.

30.     These prohibitions, which are set forth in full in paragraph 14 of the proposed Approval and Vesting Order (which is attached as Exhibit "A" hereto), apply to Outbound License Agreements, Cross License Agreements, Commercial Licenses, intercompany contracts among the Sellers and their affiliates and certain agreements entered into in connection with the post-petition divestiture of Nortel's business units, and include:

(a)     the deemed non-consent by the Applicants to requests to amend or modify these agreements in manners that would have the practical effect of expanding the scope or term of the licenses to the patents to be transferred to the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement;

(b)     the deemed non-consent by the Applicants to the assignment of certain of these agreements by the counterparties thereto to third parties;

(c)     restrictions on the Applicants' ability to assign such contracts; and

(d)     a power of attorney for the Stalking Horse Purchaser to enforce these protections and terminate the Outbound License Agreements and Cross License Agreements upon the occurrence of events, dates or circumstances entitling the Applicants to terminate such licenses pursuant to the terms of such license.

**SERVICE PROCEDURES**

31.     In addition to the standard process for service of motions within these proceedings, I am advised by Jennifer Stam of Ogilvy Renault LLP that the Applicants intend to serve notice of this motion as well as the motion for the Approval and Vesting Order on a number of additional parties including: (a) all registrants of *Personal Property Security Act* ("PPSA") financing statements based on the Applicants' PPSA searches; (b) federal tax authorities and provincial tax authorities; (c) known Nortel affiliates; and (d) post-filing purchasers of Nortel business units (to the extent their counsel is not already on the Service List).

32.     In connection with such service efforts, I am further advised by Ms. Stam that the Applicants (or another person on behalf of the Applicants) will send a notice of sale substantially in the form that will be attached as an appendix to the Sixty-Third Report

(the "Notice of Sale") to additional parties as contemplated by the Canadian Sales Process Order within five (5) Business Days of the granting of the Order. Those parties will include: (a) all parties who receive notice of the Canadian Sales Process Order Motion and Canadian Approval and Vesting Order Motion; (b) known owners of Jointly Owned Patents; and (c) certain other parties as the Stalking Horse Purchaser and the Sellers may reasonably agree (collectively, the "Additional Service Parties").

33.  Lastly, as set out above, the Applicants (in coordination with the U.S. Debtors) intend to publish the Publication Notice substantially in the form that will be attached as an appendix to the Sixty-Third Report and serve the Known License Notice as contemplated by the Canadian License Rejection Procedures.

34.  These additional service efforts are being taken for the sake of ensuring adequate notice of the relief being requested. I believe that the service of the Additional Service Parties along with the publishing of the Publication Notice is fair, reasonable and adequate in the circumstances.

## THE SALE AND BID PROCESS

35.  In connection with having entered into the Stalking Horse Agreement and subject to approvals by the U.S. Court and this Honourable Court, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers and the Stalking Horse Purchaser have agreed that, in accordance with the provisions of the Bidding Procedures and the Canadian Sales Process Order, the Stalking Horse Agreement is subject to higher or better offers.

36.  It is anticipated that if the U.S. Debtors' Bidding Procedures Order and the Canadian Sales Process Orders are granted, Nortel will conduct an expedited sale process and follow the bidding procedures in the form attached to the proposed Canadian Sales Process Order (the "Bidding Procedures") with a view to ultimately conducting an auction.

37.  An agreed upon set of Bidding Procedures have been developed, which provide for a process through which an interested party may become a "Qualified Bidder". Bids from

Qualified Bidders must be submitted no later than June 13, 2011. The auction is scheduled to take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City at 9:00 a.m. (ET) on June 20, 2011 or such other location as the Sellers may designate prior to the auction.

38.     I am aware that the Sixty-Third Report will attach and outline the proposed sale process and the Bidding Procedures in more detail. I have reviewed the Bidding Procedures and believe them to be fair in the circumstances.

**SIDE AGREEMENT**

39.     In connection with the entry into the Stalking Horse Agreement, the Applicants and certain of the other Sellers have negotiated and executed the Side Agreement, to address certain issues among such parties relating to the transaction contemplated by the Stalking Horse Agreement, including the allocation of certain costs incurred or that may potentially be incurred as part of the proposed transaction with the Stalking Horse Purchaser or other Successful Bidder. The Side Agreement also makes clear the Sellers' understanding that complying with their obligations under Section 5.13(b) of the Stalking Horse Agreement will not have any impact, positive or negative, on the rights of the Sellers with respect to the allocation of the proceeds of the Sale or the proceeds of any other transaction. I am aware that a copy of the Side Agreement will be attached as a confidential appendix to the Sixty-Third Report.

**US PROCEEDINGS**

40.     The U.S. Debtors who are Sellers subject to the U.S. Proceedings are seeking approval from the U.S. Court of certain of the relief sought in this Motion. The Applicants and the U.S. Debtors are requesting their respective Court approval pursuant to a joint hearing between the U.S. Court and this Honourable Court. The Applicants and the U.S. Debtors also intend to seek approval of the final sale of the Assets as part of a joint hearing between this Honourable Court and the U.S. Court. The Applicants (or the Monitor as foreign representative of the Applicants in their Chapter 15 proceedings) may seek recognition of the orders of this Honourable Court approving the sale from the U.S. Court.

## SEALING

41.     I am aware that the Monitor has or will be filing confidential appendices to the Sixty-Third Report which contain the disclosure schedules and exhibits to the Stalking Horse Agreement as well as the Side Agreement.  The disclosure schedules and exhibits contain sensitive competitive, commercial and, in some instances, personal information, including lists of the Transferred Patents and licensees to such patents.  Disclosure of this confidential information would be damaging to the Applicants and the other Sellers and any Successful Bidder if it is disclosed to their competitors.  The filing of the disclosure schedules and exhibits to the Stalking Horse Agreement under seal is in the best interests of the Applicants and their estates, creditors and all other interested parties herein.  The Side Agreement contains sensitive information relating to certain inter-estate matters.

42.     Further, the confidential exhibits to the Service Affidavits will contain a list of the Known Licensees and information related to their service of the materials.  This information is commercially sensitive and confidential.

43.     I believe sealing these confidential appendices and confidential exhibits to the Service Affidavits is appropriate in the circumstances.

## CONCLUSION

44.     I believe that the Canadian License Rejection Procedures and the License Non-Assignment and Non-Renewal Protections are beneficial to the Applicants' ability to realize the full value of the Assets through this sale process, as the procedures provide comfort to the Stalking Horse Purchaser or other Successful Bidder as to the scope and duration of licenses and other agreements that presently encumber and will continue to encumber the Assets they are purchasing.  I believe that the proposed process for the termination of the Unknown Licenses will give comfort to the Stalking Horse Purchaser that there are not material unidentified encumbrances on the Assets and is therefore fair and reasonable in the circumstances.

45.     I believe that the Stalking Horse Agreement is the product of a vigorous, comprehensive and fair process.

46.   Based on the Applicants' previous consideration of potential transactions involving the Assets, I believe that the proposed transaction with the Stalking Horse Purchaser represents the highest and best proposal available for the Assets, subject to the receipt of higher or better offers through the auction process contemplated in this motion.

47.   The Stalking Horse Agreement requires an expeditious sale process and provides the Stalking Horse Purchaser the right to terminate the Stalking Horse Agreement if certain milestones in the sale process are not timely met. For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Applicants' assets and, in turn, to a recovery for the Applicants' estates

SWORN BEFORE ME at the City of
Boston, in the State of Massachusetts
on this 7th day of April, 2011.

_____
Commissioner for Taking Affidavits or
Notary Public

_____
George Riedel

**TAB A**

Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

This is Exhibit "A" referred to in the
affidavit of GEORGE RIEDEL
sworn before me, this 7th
day of APRIL, 2011

|  |  |  |
|---|---|---|
| THE HONOURABLE MR. | ) | ■ DAY, THE ■ |
|  | ) |  |
| JUSTICE MORAWETZ | ) | DAY OF ■, 2011 |

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER**
**(Certain Patents and Other Assets)**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Notice of Motion dated ■ ■, 2011, including the approval of a transaction (the "Transaction") pursuant to an asset sale agreement dated as of ■ ■, 2011 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc., Nortel Networks UK Limited (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciaire), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration), the other entities identified therein as sellers (collectively, the "Sellers"), Alan Bloom, Stephen Harris, Alan Hudson, David Hughes and Christopher Hill as

- 2 -

Joint Administrators, and Maître Cosme Rogeau as French Liquidator and Ranger Inc., as purchaser (the "Purchaser") and Google Inc., as guarantor for the sale (the "Sale") of the Assets to the Purchaser, was heard this day at 393 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of ■ sworn ■ ■, 2011 (the "☐ Affidavit") and the ■ report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated ■ ■, 2011 (the "■ Report") and on hearing the submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list although properly served as appears from the affidavit of ■ sworn ■ ■, 2011 (the "Service Affidavit"), filed:

**Service**

1.    **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the ■ Affidavit, the ■ Report and/or the Motion Record be and is hereby validated and abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

**Interpretation**

2.    **THIS COURT ORDERS AND DECLARES** that

    (a)    capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement; and

    (b)    "Initial Order" means the Order of the Honourable Justice Morawetz dated January 14, 2009, as amended and restated.

**The Transaction**

3.    **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved. Subject to approval of the Sale Agreement by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors, the execution, delivery and performance of the Sale Agreement and the other Transaction Documents by the Applicants is hereby authorized and approved, and the Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and

interest in and to the Assets to the Purchaser in accordance with the provisions of the Sale Agreement (including, the licenses under the Jointly Owned Patents, the Specified UK Patents, the Undisclosed Patent Interests and any other Patents granted by one or more of the Applicants to the Purchaser pursuant to the Sale Agreement and, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement, any Undisclosed Patent Interests, together with all the other Assets, collectively the "Purchased Assets").

4.      **THIS COURT ORDERS AND DECLARES** that without limiting the generality of the foregoing, the following documents are hereby approved and the Applicants party thereto are hereby authorized and directed to perform and comply with their respective obligations thereunder:

(a)     Closing Date License Agreement substantially in the form attached as Appendix ■ to the ■ Report; and

(b)     the Escrow Agreement substantially in the form attached as Appendix ■ to the ■ Report.

5.      **THIS COURT ORDERS AND DECLARES** that the Applicants are authorized and directed to perform their respective obligations under the Sale Agreement and each of the Transaction Documents.

6.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Purchased Assets (except any Undisclosed Patent Interests for which the Purchaser pays the Exercise Price after Closing, in which case the provisions of the balance of this paragraph shall be effective upon receipt by the Sellers or a successor or assign or any receiver, trustee or liquidator appointed in respect of such Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement for the applicable Undisclosed Patent Interest) shall vest absolutely in the Purchaser free and clear of and from:

- 4 -

(a)     any and all liens, claims and interests, including, without limitation, all security interests, hypothecs, mortgages, pledges, deeds of trust, trusts or deemed trusts, executions, levies, charges, or other financial or monetary claims, charges, rights of first refusal, encumbrances, restrictive covenants, rights of offset or recoupment, leases or conditional sale arrangements, debts, liabilities, obligations, contractual rights and claims and rights or causes of action, obligations, demands, restrictions, consent rights, options and indemnities; and

(b)     claims and interests of any nature or kind of employees, consultants or agents or former employees, consultants or agents, of any of the Applicants arising out of the alleged invalidity, unenforceability or irregularity on any grounds of any of their assignments, transfers or waivers to or in favour of any of the Applicants, whether express or implied or by operation of contract, law or otherwise, of any or all of their right, title and interest in any of the Purchased Assets,

in each case, whether or not they have attached or been perfected, registered or filed, whether secured, unsecured or otherwise, arising prior to or subsequent to the date of the Initial Order but prior to Closing, whether imposed by agreement, understanding, law, statute, equity or otherwise and whether allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether asserted prior to or after Closing, (collectively, the "Claims") including, for the avoidance of doubt: (i) any encumbrances or charges created by any of the Orders made in these proceedings including the Initial Order; and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which, together with Liens and Claims in the CCAA Cases, are collectively referred to as the "Encumbrances", provided however that "Encumbrances" shall not include Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order), Liens created by or through the Purchaser or any of its Affiliates, and Assumed Liabilities or as otherwise set forth Section 2.1.1(a) of the Sale Agreement and Section 5.21 of the Sale Agreement. For greater certainty, all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

071

7.    **THIS COURT ORDERS** that:

(a)    effective upon Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), all Government Entities maintaining records or data bases in which the Encumbrances are recorded, filed or registered are authorized and directed to strike such Encumbrances as they affect the Purchased Assets from their records and data bases; and

(b)    if any Person or entity which has filed statements or other documents or agreements evidencing Encumbrances affecting the Purchased Assets shall not have delivered to the Applicants before the Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) in proper form for filing and executed by the appropriate parties, discharge statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances which the Person or entity has or may assert with respect to the Purchased Assets, then the Applicants are each hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such Person or entity with respect to the Purchased Assets.

8.    **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims and Encumbrances, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, and that from and after the delivery of the Monitor's Certificate (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) all Claims and Encumbrances shall attach to the net proceeds from the sale of the

- 6 -

072

Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the Closing (or in the case of Undisclosed Patent Interests immediately prior to the date of the receipt of the Exercise Price), as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the Closing (or in the case of Undisclosed Patent Interest(s) immediately prior to the receipt of the Exercise Price).

9.      **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

10.     **THIS COURT ORDERS AND DECLARES** that the Transaction Documents shall be binding on the Applicants that are parties thereto, and shall not be repudiated, disclaimed or otherwise compromised in these proceedings or any subsequent receivership, bankruptcy or liquidation proceedings.

11.     **THIS COURT ORDERS AND DECLARES** that, in the event that any Applicant or any of their Affiliates owns any Undisclosed Patent Interest, no Applicant shall directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to a Third Party, other than the Purchaser, including by operation of law, in any transaction, series of related transactions or otherwise, except as expressly permitted by Section 5.19 of the Sale Agreement, and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by Section 5.19 of the Sale Agreement shall be null and void *ab initio* and of no force or legal effect.

12.     **THIS COURT ORDERS** that the Sale Agreement and the Transaction Documents and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment or supplement is not materially adverse to the interests of the Applicants (it being understood, for the sake of clarity and solely for the purposes of this paragraph, that no such modification, amendment or supplement shall be deemed to be materially adverse to the Applicants to the extent that the impact does not exceed two percent of the Purchase Price); and

provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Monitor.

13.    **THIS COURT ORDERS AND DECLARES** that the Applicants have complied with the License Rejection Procedure approved by this Court in the Canadian Sales Process Order dated ■, 2011 (the "Sales Process Order").

**License Non-Assignment and Non-Renewal Protections**

14.    **THIS COURT ORDERS** that effective from and after Closing,

      (a)    the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any renewal, extension, assignment, amendment, waiver or modification of any license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, pursuant to any Cross-License Agreement or Outbound License Agreement (excluding (i) the Commercial Licenses, (ii) the transition services agreements (the "TSAs") and intellectual property license agreements (the "IPLAs") that the Applicants entered into with the purchasers of their various business units after the Petition Date in connection with their divestitures, (iii) any intercompany Contracts with the Sellers (the "Intercompany Licenses") and (iv) the Technology License Contract between Northern Telecom Limited and Guangdong-Nortel Telecommunications Switching Equipment Ltd., dated November 8, 1994, as amended (the "GDNT License")) (collectively, the "License Agreements", and any one, a "License Agreement") that requires the consent of any Applicant pursuant to the terms of such License Agreement and that would have the practical effect of expanding the scope or term of the licenses to the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder (regardless of whether such renewal, extension, assignment, amendment, waiver or modification is sought prior to or after the Applicants dissolve or otherwise cease to exist), in each case unless the Purchaser shall otherwise agree in writing, in its sole discretion;

(b)     the Applicants shall be deemed to have affirmatively and reasonably refused to
        give consent (including any consent of any Applicant that may be deemed to be
        given as a result of inaction by such Applicant) (i) to any amendment,
        modification or waiver to the GDNT License that would have the practical effect
        of expanding the scope or the term of the licenses under the Transferred Patents,
        Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any
        assignment of the GDNT License or any rights or obligations thereunder other
        than to Ericsson (as defined in the Sale Agreement) or another purchaser of all or
        substantially all of the assets or all of the outstanding shares of Guangdong Nortel
        Telecommunication Equipment Company Ltd., in each case, unless the Purchaser
        shall otherwise agree in writing, in its sole discretion,

(c)     the Applicants shall be deemed to have affirmatively and reasonably refused to
        give consent (including any consent of any Applicant that may be deemed to be
        given as a result of inaction by such Applicant) (i) to any amendment or
        modification to the IPLAs that would have the practical effect of expanding the
        scope or the term of the licenses under the Transferred Patents, Specified UK
        Patents or Jointly Owned Patents thereunder and (ii) to any assignment of any
        IPLA by the license counterparty or any rights or obligations of the license
        counterparty under any IPLA, in each case, unless the Purchaser shall otherwise
        agree in writing, in its sole discretion,

(d)     the Applicants shall be deemed to have affirmatively and reasonably refused to
        give consent (including any consent of any Applicant that may be deemed to be
        given as a result of inaction by such Applicant) to any amendment, modification,
        renewal or extension to the TSAs  that would have the practical effect of
        expanding the scope or the term of the licenses under the Transferred Patents,
        Specified UK Patents or Jointly Owned Patents thereunder beyond June 30, 2012
        unless the Purchaser shall otherwise agree in writing, in its sole discretion,

(e)     the Applicants shall be deemed to have affirmatively and reasonably refused to
        give consent (including any consent of any Applicant that may be deemed to be