- 9 -

075

given as a result of inaction by such Applicant) to any amendment or modification of any Commercial License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except (i) to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement or (ii) to the extent the Purchaser shall otherwise agree in writing, in its sole discretion,

(f)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification of any Intercompany License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement, and (ii) to any assignment of any Intercompany License by the license counterparty or any rights or obligations of the license counterparty under any Intercompany License, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

(g)     no Applicant shall have the right or power to transfer any of its obligations, right, title or interest in the licenses under the Transferred Patents, Specified UK Patents and Jointly Owned Patents under:

(i)      any License Agreement,

(ii)     the GDNT License,

(iii)    any Intercompany License,

(iv)     (other than in connection with the consolidation, wind-down, reorganization or restructuring of the Applicants and their affiliates, including to the Applicants under confirmed plan(s) of arrangement) any IPLA, or

(v)      (other than the transfer by the Applicants of Retained Contracts or contracts relating to the disposal of Inventory, in each case to the extent a

> sublicense to the assignee of such contract is permitted by the Closing
> Date License Agreement) any Commercial License,

in each case, to any other person from and after the Closing, and any purported renewal,
extension, assignment, amendment, waiver, transfer or modification of a License
Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License
that would contravene the provisions of subparagraphs 14(a) through (g) hereof shall be
null and void *ab initio* and unenforceable and of no force or effect, and

(h)    the Purchaser is hereby irrevocably appointed (such appointment being coupled
       with an interest) as each Applicant's attorney-in-fact, with full authority in the
       place and stead of such Applicant and in the name of such Applicant, from time to
       time from and after the Closing in the Purchaser's sole discretion, subject to the
       provisions of paragraph 5.25 of the Sale Agreement, (x) to take any and all action
       and to execute and deliver any and all instruments that the Purchaser may deem
       necessary or advisable to accomplish the purposes of sub-paragraphs 14(a)
       through (g) of this Order and (y) regardless of whether or not any Applicant party
       to the applicable License Agreement is then in existence, to terminate the license
       under the Transferred Patents, Specified UK Patents or Jointly Owned Patents in
       any License Agreement (including by delivering a notice of termination on behalf
       of an Applicant party thereto, regardless of whether such Applicant is then in
       existence) upon the occurrence of any specific date or event or the existence of
       any specific circumstance to the extent that the occurrence of such date or event
       or the existence of such circumstance gives any Applicant (regardless of whether
       such Applicant is then in existence) a right to terminate such License Agreement
       pursuant to the terms thereof (the provisions set forth in subparagraphs 14(a)
       through (h) hereof collectively, the "License Non-Assignment and Non-Renewal
       Protections").

For the avoidance of doubt, the License Non-Assignment and Non-Renewal Protections shall not limit in any way the applicable Applicants' obligations to comply with the provisions of Section 5.13(b) of the Sale Agreement.

15.     THIS COURT ORDERS that the License Non-Assignment and Non-Renewal Protections shall not constitute the assignment of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses to, or assumption of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses by, the Purchaser, other than as the Purchaser may otherwise agree in an assumption agreement between the Purchaser and NNL in satisfaction of the requirements of paragraph 7 of the CDMA Vesting Order.

**Alternate Bid**

16.     **[THIS COURT ORDERS AND DECLARES that in the event that the Transaction contemplated by the Sale Agreement cannot be consummated in accordance with the Sale Agreement, the Alternate Bid (as defined in the ■ Affidavit) be and is hereby approved and the execution of the asset sale agreement pursuant to the Alternate Bid by the Applicants is approved and the Applicants and the Monitor shall be authorized to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the transaction contemplated by the Alternate Bid and for the conveyance of the Applicants' right, title and interest in and to the Purchased Assets to the Alternative Bidder.]**

**Proceeds**

17.     **THIS COURT ORDERS** that all the proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution

of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

**Miscellaneous**

18.    **THIS COURT ORDERS** that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of any of the Applicants,

the provisions of the Transaction Documents and the vesting of the Applicants' right, title and interest in and to the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

19.    **THIS COURT ORDERS AND DECLARES** that neither the *Bulk Sales Act* (Ontario), Sections 6(1) and (2) of the *Retail Sales Tax Act* (Ontario) nor any equivalent or similar legislation under any province or territory in Canada applies to the Transaction.

20.    **THIS COURT ORDERS** that confidential Appendix "■"to the ■ Report and Exhibits ■ through ■ of the Service Affidavit be and is hereby sealed and shall not form part of the public record pending further order of the Court.

DOCSTOR: 2138173\14

21.    **THIS COURT ORDERS AND DECLARES** that, to the extent permitted by law, neither the Purchaser nor any permitted assignee of the Purchaser pursuant to the Sale Agreement shall be a successor to any of the Applicants and neither the Purchaser nor any permitted assignee of the Purchaser pursuant to the Sale Agreement shall assume any liability of the Applicants or in respect of the Encumbrances, other than as expressly provided for in the Sale Agreement nor shall any labour, employment or pension claims continue with respect to the Purchased Assets or be liabilities of the Purchaser.

22.    **THIS COURT ORDERS AND DECLARES** that effective upon Closing, counterparties to the Unknown Licenses (as defined in the Sales Process Order) that are deemed to be terminated pursuant to the Sales Process Order shall have no right or claims against the Purchaser or the Purchased Assets.

23.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory, administrative or governmental body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory, administrative or governmental bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

24.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory, administrative or governmental body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

080

Schedule A – Form of Monitor's Certificate

Court File No.:  09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)
IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE**

**RECITALS**

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court
of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks
Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation,
Nortel Networks International Corporation and Nortel Networks Technology Corporation
(collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors
Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in
these proceedings.

B.      Pursuant to an Order of the Court dated ■ ■, 201■ (the "Approval and Vesting Order"),
the Court approved an asset sale transaction (the "Transaction") contemplated by an asset sale
agreement dated as of ■ ■, 2011 (the "Sale Agreement") among NNC, NNL, Nortel Networks
Inc., Nortel Networks UK Limited, Nortel Networks (Ireland) Limited, Nortel Networks S.A.,
the other entities identified therein as sellers (collectively, the "Sellers"), Alan Bloom, Stephen
Harris, Alan Hudson, David Hughes and Christopher Hill as Joint Administrators, and Maître
Cosme Rogeau as French Liquidator, and ■, as purchaser ("■" or the "Purchaser") and provided
for the vesting in the Purchaser of the Applicants' right, title and interest in and to the Purchased
Assets (as defined in the Approval and Vesting Order (but excluding any Undisclosed Patent
Interests for which the Purchaser pays the Exercise Price after Closing (the "Closing Date
Assets")) which vesting is to be effective with respect to the Closing Date Assets upon the
delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from
each of NNC, NNL and the Purchaser that: (i) the Purchaser has paid the Purchase Price for the

Closing Date Assets as set out in the Sale Agreement; (ii) the conditions to Closing as set out in Article ■ of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Applicants and the Purchaser.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.


THE MONITOR CERTIFIES the following:

1.    NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and [■] has received the Purchase Price payable for the Closing Date Assets on the Closing Date pursuant to the terms of the Sale Agreement;

2.    NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in Article ■ of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and

3.    NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

4.    The Purchaser has advised the Monitor that the Transaction has been completed to the satisfaction of the Purchaser.

This Certificate was delivered by the Monitor at □ {TIME} on □ 2011.

> **ERNST & YOUNG INC. in its capacity as monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**
>
> Per:_____
>
> Name:
>
> Title:

082

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
**(Certain Patents and Other Assets)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2138173\4

083

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
(sworn April 7, 2011)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 2149856\5

**TAB 3**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | ■ DAY, THE ■ |
| | ) | |
| JUSTICE MORAWETZ | ) | ■ DAY OF ■, 2011 |

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**ORDER**
(Certain Patents and other Assets Bidding Procedures Order)

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the notice of motion dated ■ ■, 2011 was heard this day at 393 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of ■ sworn ■ ■, 2011 (the "■ Affidavit"), the ■ report of Ernst & Young Inc. dated ■ ■, 2011 (the "■ Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although duly served as appears from the Affidavit of Service of ■ sworn ■ ■, 2011, filed.

DOCSTOR: 2141072\11

1.      **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the ■ Affidavit, the ■ Report and/or the Motion Record be and is hereby validated and abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the ■ Affidavit.

**Bidding Procedures and Stalking Horse ASA**

3.      **THIS COURT ORDERS** that the bidding procedures (the "Bidding Procedures") described in the ■ Affidavit, the ■ Report and attached as Schedule "A" hereto are hereby approved and, subject to approval of the Bidding Procedures in substantially the same form by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the U.S. Debtors, the Applicants shall be authorized to conduct the sale process and auction (the "Stalking Horse Process") contemplated therein.

4.      **THIS COURT ORDERS** that the asset sale agreement dated as of ■ ■, 2011 (the "Stalking Horse ASA") among Ranger Inc. as purchaser (the "Stalking Horse Purchaser"), and NNC, NNL, Nortel Networks Inc., Nortel Networks UK Limited (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciare), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration), the other entities identified therein as sellers, Alan Bloom, Stephen Harris, Alan Hudson, David Hughes and Christopher Hill as Joint Administrators, and Maître Cosme Rogeau as French Liquidator, and Google Inc., as guarantor in the form attached as Appendix "A" to the ■ Report be and is hereby approved and the execution, delivery and performance of the Stalking Horse ASA is hereby approved and accepted for the purposes of conducting the Stalking Horse Process, including, without limitation, the Applicants' obligation to pay the Break-Up Fee and the Expense Reimbursement (as both terms are defined in the Stalking Horse ASA) in accordance with the terms specified in the Stalking Horse ASA (the "Payment Obligation").

5.      **THIS COURT ORDERS** that the Notice of Sale substantially in the form set out in Appendix "■" to the ■ Report be and is hereby approved and the Applicants (or a person on behalf of the Applicants) shall serve such Notice of Sale on the Service List and such additional parties as the Applicants and the Stalking Horse Purchaser have reasonably agreed no later than

five (5) Business Days following the entry of the Bidding Procedures Order or as soon thereafter as is reasonably practicable.

6.    **THIS COURT ORDERS** that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the Bankruptcy and Insolvency Act (Canada) in respect of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of the Applicants;

the Applicants' Payment Obligation shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the Bankruptcy and Insolvency Act (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

7.    **THIS COURT ORDERS** that the Applicants' Payment Obligation shall not be repudiated, disclaimed or otherwise compromised in these proceedings or any subsequent receivership, bankruptcy or liquidation proceedings.

**License Rejection Procedures**

8.    **THIS COURT ORDERS** that the following procedures including the forms of notices referred to therein (the "Canadian License Rejection Procedures") are hereby approved:

    (a)    in conjunction and coordination with the US License Rejection Procedures, the Applicants (or another a person on behalf of the Applicants) shall serve on each counterparty to an Outbound License Agreement with the Applicants listed on Schedule A.I(e) of the Sellers Disclosure Schedules and each counterparty to a

Cross-License Agreement with the Applicants listed on Schedules A.I.(d) of the Sellers Disclosure Schedules (such licenses, collectively, the "Known Licenses", and such counterparties, collectively, the "Known Licensees") a notice substantially in the form attached as Appendix ■ to the ■ Report (the "Known License Notice"), identifying the Known Licenses that such counterparty has with the Applicants.    The Known License Notices shall be served by the Applicants (or another person on behalf of the Applicants) by no later than five (5) Business Days following the entry of the Bidding Procedures Order or as soon thereafter as is reasonably practicable.

(b)      the Applicants (or another person on behalf of the Applicants) shall publish a notice (the "Published License Notice") of the License Deemed Termination Procedures described in this paragraph 8, substantially in the form attached as Appendix ■ to the ■ Report, in The Wall Street Journal (National Edition), The Globe and Mail (National Edition), The Financial Times (International Edition) and The New York Times (National Edition) within five (5) Business Days of entry of this Order or as soon thereafter as is reasonably practicable.

(c)      any counterparty to any pre-filing Contract pursuant to which any Applicant is a party and pursuant to which such Applicant has granted a license under any Transferred Patents, Specified UK Patents or Jointly Owned Patents, other than (i) the Scheduled Licenses, (ii) the Commercial Licenses, (iii) the Disclosed Intercompany Licenses (as defined in the Stalking Horse Agreement) and (iv) any intercompany contract, arrangement or understanding that is not a Disclosed Intercompany License but that is in effect and that is similar in kind to the Disclosed Intercompany Licenses (it being understood that any such intercompany contract, arrangement or understanding that grants license rights under the Transferred Patents, Specified UK Patents or Jointly Owned Patents that is broader in scope or longer in duration than the broadest license or longest license to such patents granted under any of the Disclosed Intercompany Licenses is not similar in kind to the Disclosed Intercompany Licenses) (any such licenses,

collectively, the "Unknown Licenses") who wishes to assert an Unknown License must serve an objection notice substantially in the form attached as Appendix ■ to the ■ Report (an "Objection Notice") on the parties listed on Schedule "B" hereto (the "License Objection Notice Parties"), prior to 4 p.m (ET) on June 6, 2011 (the "Canadian License Bar Date"). The Monitor shall post the form of Objection Notice on its website within two (2) Business Days of the entry of this Order.

(d)     without prejudice, as between the Sellers and the Stalking Horse Purchaser, to the rights of the Stalking Horse Purchaser under the Stalking Horse ASA, to the extent that a party asserts an Unknown License prior to the 4:00 p.m. (ET) on the Canadian License Bar Date (and if so asserted, an "Additional License"), the Assets shall only be sold subject to such Additional License, provided however that the validity of the Additional License has been established by Court Order prior to Closing.

(e)     except as provided for in subparagraph (d) above, all Unknown Licenses to which the Applicants are a party are deemed to be terminated as of the Closing and shall forever be barred, released and extinguished, and any claim arising from such deemed termination shall be a claim against the Applicants, which claim shall be deemed to be a Restructuring Claim as such term is defined in the Claims Procedure Order granted by the Canadian Court on July 30, 2009, as amended from time to time, (the "Claims Procedure Order"), must be filed within thirty (30) days of the date of Closing and otherwise in compliance with the Claims Procedure Order.

(f)     subject to the consent of the Stalking Horse Purchaser, in its sole and absolute discretion, or any other Successful Bidder, as applicable, the Applicants reserve their right to not terminate an Unknown License at any time prior to the occurrence of the Closing.

**Miscellaneous**

9.      **THIS COURT ORDERS** that in connection with the Stalking Horse ASA and the Stalking Horse Process and pursuant to clause 7(3)(c) of the Canada Personal Information Protection and Electronic Documents Act, the Applicants shall disclose personal information of identifiable individuals to prospective purchasers or bidders for the Assets and to their advisors, but only to the extent desirable or required to negotiate and attempt to complete one or more sales of the Assets (each, a "Sale").  Each prospective purchaser or bidder to whom such personal information is disclosed shall maintain and protect the privacy of such information and limit the use of such information to its evaluation of the Sale, and if it does not complete a Sale, shall (i) return all such information to the Applicants; (ii) destroy all such information; or (iii) in the case of such information that is electronically stored, destroy all such information to the extent it is reasonably practical to do so.  The purchaser of the Assets shall be entitled to continue to use the personal information provided to it, and related to the Assets, in a manner which is in all material respects identical to the prior use of such information by the Applicants, and shall (i) return all other personal information to the Applicants; (ii) ensure that all other personal information is destroyed; or (iii) in the case of all other personal information that is electronically stored, destroy all such other personal information to the extent it is reasonably practical to do so.

10.      **THIS COURT ORDERS** that confidential appendix "■"to the ■ Report be and is hereby sealed and shall not form part of the public record pending further order of the Court.

11.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory, administrative and governmental bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

12.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory, administrative or governmental body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

091

**SCHEDULE "A"**
(Bidding Procedures)

092

BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Purchase Agreement (as defined below) with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) with respect to a Successful Bidder or an Alternate Bidder (each as defined below) (in each event, the "Sale"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

On [date], Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors"), Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors", together with the U.S. Debtors and the Canadian Debtors, the "North American Sellers"), certain other affiliates of the North American Sellers, including Nortel Networks UK Limited (in administration) ("NNUK"), Nortel Networks (Ireland) Limited (in administration) ("NN Ireland"), Nortel Networks S.A. (in administration and liquidation judiciaire) ("NNSA"), Nortel Networks France S.A.S (in administration) and Nortel GmbH (in administration) (the "EMEA Sellers" and together with the North American Sellers, the "Sellers"), certain of which are under the control of Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of those EMEA Sellers appointed by the English High Court of Justice in connection with the proceedings (the "UK Proceedings") under the Insolvency Act 1986  and NN Ireland which is acting by Alan Bloom also and David Hughes of Ernst & Young Chartered Accountants (such individuals collectively, the "Administrators"), the Administrators and Maître Cosme Rogeau appointed as *mandataire liquidateur* by the Commercial Court of Versailles (the "French Liquidator") executed that certain Asset Sale Agreement relating to the sale and purchase of the Assets with Ranger Inc. (the "Purchaser") and Google Inc. (the "Purchase Agreement").

The Sellers have determined that: (A) the transactions contemplated by the Purchase Agreement and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale or purchase agreement(s) and ancillary agreements with respect to a Successful Bidder (collectively, the "Transactions") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); (D) the transfer of the rights, title and interests of NNSA in and to the Assets should be subject to approval by the Supervisory Judge (*juge commissaire*) of the secondary insolvency proceedings of NNSA commenced in the Republic of France on May 28, 2009, within the meaning of Article 27 of the EC Regulation 1346/2000 (the "Supervisory Judge")  and (E) the Transactions shall be (i) submitted for approval by such other applicable court(s) as the Sellers, in consultation with the Creditors' Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and (ii) subject to such

other closing conditions as are set forth in the Purchase Agreement with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) with respect to a Successful Bidder.

On [date], the U.S. Debtors filed a Motion for Orders For Orders (I)(A) Authorizing Debtors' Entry Into The Stalking Horse Asset Sale Agreement, (B) Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving The Notice Procedures And The Assumption And Assignment Procedures, (D) Approving The License Rejection Procedures, (E) Authorizing The Filing Of Certain Documents Under Seal And (F) Setting A Date For The Sale Hearing And (II) Authorizing And Approving (A) The Sale Of Certain Patents And Related Assets Free And Clear Of All Claims And Interests, (B) The Assumption And Assignment Of Certain Executory Contracts, (C) The Rejection Of Certain Patent Licenses And (D) The License Non-Assignment And Non-Renewal Protections (the "Sale Motion").

On [●], 2011, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2011, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the Purchase Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Purchase Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2011, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

### Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets (as defined below), the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's, the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (jointly administered under Case No. 09-10138) involving the U.S. Debtors (the "Creditors' Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, the French Liquidator and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party

disagree as to the interpretation or application of these Bidding Procedures, the Canadian Court and the Bankruptcy Court, jointly, will have jurisdiction to hear and resolve such dispute.[1]

## Assets To Be Sold

The Sellers are offering for sale, in one or more Transactions, substantially all of the Sellers' patent assets and certain related assets, as described in the Purchase Agreement (to the extent that such assets are not subsequently excluded from the sale in accordance with the terms of the Purchase Agreement) with respect to the Purchaser, or, as set forth in the relevant sale or purchase agreement(s) with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, and to be made available to other potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets").

## "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Purchase Agreement or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale or purchase agreement(s) of such Successful Bidder.

## Free Of Any And All Claims And Interests

All of the rights, title and interests of the Sellers in and to the Assets, or any portion thereof, to be acquired will be sold (i) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims pursuant to sections 363 and 365 of the U.S. Bankruptcy Code, (ii) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens and Claims pursuant to the Canadian Approval and Vesting Order, when granted, and (iii) in the case of Assets that are transferred or assigned by the EMEA Sellers free and clear of all Liens, such Liens and Claims to attach to the net proceeds of the sale of such Assets, except with respect to the Purchaser to the extent otherwise set forth in the Purchase Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale or purchase agreement(s) of such Successful Bidder with the Sellers.

## Publication Notice

Within 5 (five) days of entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures or as soon as practicable thereafter, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Financial Times (International Edition), The Wall Street Journal (National Edition), The New York Times (National Edition) and The Globe & Mail (National Edition).

---

[1] For the avoidance of doubt, the Bidding Process shall not govern any disagreements among the Sellers.

## Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown, or as otherwise determined by the Sellers (in consultation with the Creditors' Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the Purchaser who wishes to participate in the Bidding Process, and in the event that such person is an entity formed for the purpose of acquiring the Assets (or any portion thereof), each actual or proposed holder of the equity (whether in the form of stock, partnership interests, LLC interests, debt issued in connection with such person's bid for the Assets or otherwise) or proposed beneficiary of such person through license or similar arrangement granted in connection with such person's bid (each an "Equity Holder"), (each such person other than the Purchaser who wishes to participate in the Bidding Process, and each Equity Holder thereof, a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)   an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to such Potential Bidder) in substance substantially the same as the confidentiality agreement (together with all supplements and addenda thereto) executed by the Purchaser, *mutatis mutandis,*a nd taking account of such Potential Bidder's corporate or other organizational structure, and otherwise in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets.  In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, prior to the distribution of any additional confidential information by the Sellers to such Potential Bidder, such Potential Bidder must provide a statement (i) agreeing that,if  the confidentiality agreement (together with all supplements and addenda thereto) executed by the Purchaser contains provisions that are more restrictive than the confidentiality agreement (together with all supplements and addenda thereto) executed by such Potential Bidder, then the confidentiality agreement (together with all supplements and addenda thereto) executed by such Potential Bidder shall be deemed to be amended to contain such more restrictive provisions, *mutatis mutandis*; (ii) agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets; and (iii) waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transactions it may enter into, to the Notice Parties and other Qualified Bidders who submit a Qualified Bid (each as defined below);

(b)   current audited financial statements and latest unaudited financial statements of the Potential Bidder or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transactions; and

(c)   a statement demonstrating to the Sellers' satisfaction, a bona fide interest in purchasing the Assets from the Sellers including: (i) the purchase price (including

4

096

liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded; (iii) the structure and financing of the Transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transactions, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreement.

A Potential Bidder (i) that has delivered the documents described above, (ii) whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, the financial capability of the Potential Bidder to consummate the Transactions, (iii) that has submitted a reasonably competitive and realistic non-binding proposal, as described above, (iv) that has delivered executed confidentiality agreement(s), as described above, and (v) that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transactions, will be deemed a "Qualified Bidder". The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group, the Administrators and the Monitor, whether to entertain bidders for the Assets that have not met one or more of the requirements specified above and deem such bidders to be Qualified Bidders.

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets as provided in the following paragraph.

#### Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed confidentiality agreement(s) of the type described in clause (a) under the heading "Participation Requirements" with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Creditors' Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on-site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.

No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided access to all due diligence materials, management presentations, on-site inspections and other information provided to any Qualified Bidders that were not previously made available to the Purchaser as soon as commercially practicable and in no event later than two (2) Business Days after the date that the Sellers made such information available to any such Qualified Bidder. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Purchase Agreement or in any other definitive agreement(s) with any Successful Bidder executed and delivered by Sellers.

Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, Esq., 5945 Airport Road, Suite 360, Mississauga, Ontario L4V 1R9, Facsimile: (905) 863-1984; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) U.S. Debtors' counsel: Morris, Nichols, Arsht & Tunnell LLP, Attn: Derek C. Abbott, 1201 North Market Street, Wilmington, Delaware 19801, Facsimile: (302) 658-3989; (iv) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (v) Sellers' financial advisors: Lazard Frères & Co., Attn: David Descoteaux, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 830-3395; (vi) Sellers'advisors: Global IP Law Group, LLC, 233 South Wacker Drive, Suite 8400, Chicago, IL 60606, Fascimile: (312) 283-8026 Attn: David Berten, (vii) counsel to the Creditors' Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (viii) financial advisor to the Creditors' Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (ix) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (x) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; (xi) the Administrators: Ernst & Young LLP, Attn: Christopher Hill and Robin Jowitt, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; (xii) counsel to the Administrators: Herbert Smith LLP, Attn: Alex Kay and Robert Moore, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4447 and + 44 20 7098 4918; (xiii) the French Liquidator:  26 avenue Hoche, 78000 Versailles, France, Facsimile: + 33 1 39 49 44 63, Attn: Cosme Rogeau; and (xiv) Counsel to the French Liquidator: Foucaud, Tchekhoff, Pochet & Associés, 1bis, avenue Foch, 75116 Paris, France Facsimile: + 33 1 45 00 08 19, Attn:

098

Rajeev Sharma-Fokeer & Edouard Fabre, so as to be received not later than **June 13, 2011 at 4:00 p.m. (ET)** by the Sellers (as may be extended as set out below, the "Bid Deadline"). The Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided that for any such extension beyond five (5) Business Days, the Sellers shall have obtained the written consent of the Creditors' Committee, the Bondholder Group and the Monitor, which consent will not be unreasonably withheld. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

## Qualified Bid

A bid, other than the Purchase Agreement, submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)     it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreement, including without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors and/or a plan of arrangement approved by one or more of the Canadian Debtors and the Monitor, in each case, either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreement.

(b)     it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the Sale Hearing, subject to further extensions as may be agreed to under the applicable purchase agreements and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below); provided further that, notwithstanding anything to the contrary provided herein, in no event shall the Purchaser be required to serve as an Alternate Bidder without its consent, in its sole discretion;

(c)     it includes a duly authorized and executed Purchase Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price") together with all exhibits and schedules thereto, the ancillary agreements as described in the Purchase Agreement and such additional ancillary agreements as may be required by the Qualified Bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary

7

Agreements") (in each case to the extent applicable) and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the Qualified Bidder;

      (d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

      (e)     it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder and/or (ii) obtaining financing;

      (f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), participating in or benefiting from (including through license or similar arrangement with respect to the assets to be acquired in connection with such bid) such bid, and the complete terms of any such sponsorship, participation, financing or benefit, such disclosure to include, without limitation, (i) in the case of a Qualified Bidder formed for the purpose of acquiring the Assets (or any portion thereof), the identity of each of the actual or proposed Equity Holders of such Qualified Bidder and the terms and participation percentage of such Equity Holder's interest in such bid and (ii) the identity of each entity that has or will receive a benefit from such bid from or through the Qualified Bidder or any of its Equity Holders and the terms of such benefit;

      (g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreement, plus the Break-Up Fee plus U.S. \$4 million (representing the Expense Reimbursement); provided that, in determining such value, the Sellers will not be limited to evaluating the dollar amount of a competing bid, but may also consider factors including those described under the "Evaluation of Competing Bids" section hereof;

      (h)     it includes an acknowledgment and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs, and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;