## BY FAX:

AND **ABN AMRO BANK N.V.**
TO: Canada Branch
79 Wellington Street West
Suite 1500
Toronto, ON M5K 1G8

    Tel:    416-367-0850
    Fax:   416-367-1485

AND **ABN AMRO BANK N.V.**
TO: 600 De Maissonneuve Blvd. W.
Suite 1500
Montreal, QC H3A 3J2

    Tel:    514.284.1133
    Fax:   514.284.2357

AND **DELL FINANCIAL SERVICES**
TO: **CANADA LIMITED**
155 Gordon Baker Road
Suite 501
North York, ON M2H 3N5

    Tel:    1.877.814.4142
    Fax:   1.888.438..1117

AND **GENERAL ELECTRIC CAPITAL**
TO: **CANADA INC.**
2300 Meadowvale Boulevard
Suite 200
Mississauga, ON L5N 5P9

    Bethany St. Pierre

    Tel:    1.866.329.4323
    Fax:   1.866.993.1902

AND **ST MICROELECTRONICS**
TO: **(CANADA), INC.**
1310 Electronics Drive
Carrollton, Texas 75006

    Tel:    613.768.9011
    Fax:   613.768.9001

AND **HEWLETT-PACKARD FINANCIAL**
TO: **SERVICES CANADA COMPANY**
5150 Spectrum Way
Mississauga, ON L4W 5G1

    Attn:   Anna Gagliardi

    Tel:    905.206.4725
    Fax:   905.614.5391

AND **PRODAIR CANADA LTEE**
TO: 291 Rue Quinlan
Ville Lasalle, QC H8R 3W4

    Alain Cote

    Tel:    1.800.363.3572
    Fax:   418.878.3235

038

**BY COURIER:**

AND
TO:

**CIT TECHNOLOGIES INC.**

181 Bay Street
Suite 3500
Toronto, ON M5J 2T3

AND
TO:

**HOLMAN CANADA LIMITED
PARTNERSHIP**

9000 Midlantice Drive
Mt. Laurel, New Jersey
USA  08054


AND
TO:

**THE ROYAL BANK OF
SCOTLAND N.V., (CANADA)
BRANCH**

79 Wellington Street West
Suite 1610
Toronto,  ON M5K 1G8

AND
TO:

**THE ROYAL BANK OF SCOTLAND
N.V., (CANADA) BRANCH**

600 De Maissonneuve Blvd. W.
Suite 2810
Montreal, QC H3A 3J2

039

040

Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**SUPPLEMENTARY SERVICE LIST OF**
**PROVINCIAL TAX AUTHORITIES**

TO:        **OGILVY RENAULT LLP**
           Royal Bank Plaza, South Tower
           200 Bay Street, Suite 3800
           Toronto, Ontario M5J 2Z4

           Derrick Tay
           Mario Forte
           Jennifer Stam

           Email:    dtay@ogilvyrenault.com
                     mforte@ogilvyrenault.com
                     jstam@ogilvyrenault.com

           Tel:      416.216.4000
           Fax:      416.216.3930

           Lawyers for the Applicants

DOCSTOR: 17315953

**BY EMAIL:**

**ALBERTA**

AND
TO:

**ALBERTA MINISTRY OF FINANCE**
The Tax and Revenue Administration
9811-109 Street
Edmonton, Alberta  T5K 2L5

Sue Jamieson, Assistant Deputy Minister

Email: sue.jamieson@gov.ab.ca
Tel:    780.427.9403
Fax:    780.427.0348

**MANITOBA**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF MANITOBA AS
REPRESENTED BY THE MINISTER OF
FINANCE**

450 Broadway
Winnipeg, Manitoba  R3C 0V8

Barry Draward

E-mail: barry.draward@gov.mb.ca
Tel:    204.945.3758
Fax:    204.948.2360

042

**NEW BRUNSWICK**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NEW BRUNSWICK AS
REPRESENTED BY THE MINISTER OF
FINANCE**

Centennial Building
Room: 371, Floor: 3
P. O. Box 6000
Fredericton, New Brunswick
E3B 5H1

Lynn Noel

Email:  lynn.noel@gnb.ca
Tel:      506.457.3550
Fax:     506.444.4920

**NEWFOUNDLAND**

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NEWFOUNDLAND AS
REPRESENTED BY THE MINISTER OF
FINANCE**

Department of Finance
3rd Floor, East Block, Confederation Complex
P.O. Box 8700, St. John's, Newfoundland
A1B 4J6

Keith Rees

Email:  krees@gov.nl.ca
Tel:      709.729.6297
Fax:     709.729.2856

043

## NOVA SCOTIA

AND
TO:
**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF NOVA SCOTIA AS
REPRESENTED BY THE MINISTER OF
FINANCE**

P.O. Box 187
1723 Hollis St.
Halifax, Nova Scotia  B3J 2N3

Doug Moodie

Email:   moodiedj@gov.ns.ca
Tel:      902.424.5720
Fax:     902.424.6635

## ONTARIO

AND
TO:
**ONTARIO MINISTRY OF FINANCE**
Legal Services Branch
6th Floor
33 King Street West
Oshawa, Ontario
L1H 8H5

Kevin O'Hara

Email:   kevin.ohara@ontario.ca
Tel:      905.433.6934
Fax:     905.436.4510

DOCSTOR: 17315595\3

044

## PRINCE EDWARD ISLAND

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF PRINCE EDWARD
ISLAND AS REPRESENTED BY THE
PROVINCIAL TREASURY**

Shaw Building, 1st Floor
95 Rochford Street
PO Box 2000
Charlottetown, PE  C1A 7N8

Mary Hennessey

Email:  mihennessey@gov.pe.ca
Tel:      902.368.4070
Fax:     902.368.6164

## SASKATCHEWAN

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF SASKATCHEWAN AS
REPRESENTED BY THE MINISTER OF
FINANCE**

2350 Albert Street
Regina, Saskatchewan  S4P 4A6

Margaret Johannsson, Assistant Deputy Minister

Email:  Margaret.johannsson@gov.sk.ca
Tel:      306.787.6685
Fax:     306.787.0241

045

**FEDERAL**

**CANADA REVENUE AGENCY**

AND  c/o Department of Justice
TO:   Ontario Regional Office
      The Exchange Tower, Box 36
      130 King Street W., Suite 3400
      Toronto, Ontario  M5X 1K6

      Diane Winters

      Email: diane.winters@justice.gc.ca
      Tel:    416.973.3172
      Fax:    416.973.0810

046

## BY FAX:

## BRITISH COLUMBIA

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF BRITISH COLUMBIA,
AS REPRESENTED BY THE MINISTER OF
FINANCE, REVENUE DIVISION**

3rd Floor, 1802 Douglas Street
Victoria, British Columbia  V8T 4K6

Michael Ford

Fax:    250.356.0065

## QUEBEC

AND
TO:

**HER MAJESTY THE QUEEN IN RIGHT OF
THE PROVINCE OF QUEBEC AS
REPRESENTED BY THE MINISTER OF
FINANCE**

**Ministère des Finances**
12, rue Saint-Louis
Québec (Québec) G1R 5L3

Tel:    418.528.9323
Fax:    418.646.1631

047

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**Canadian Approval and Vesting Order re:**
**Certain Patents and Other Assets**
**(returnable June 30, 2011)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2149792\3A

**TAB 2**

048

Court File No.  09-CL-7950

***ONTARIO***
***SUPERIOR COURT OF JUSTICE***
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF GEORGE RIEDEL**
**Canadian Approval and Vesting Order re Certain Patents and Other Assets**
**(sworn April 7, 2011)**

I, George Riedel, of the City of Boston in the State of Massachusetts, MAKE OATH
AND SAY:

1.      I am the Chief Strategy Officer and President, Business Units, of Nortel Networks
Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held the position of
Chief Strategy Officer since February, 2006.  As such, I have personal knowledge of the
matters to which I hereinafter depose in this Affidavit.  Where I do not possess personal
knowledge, I have stated the source of my information and, in all such cases, believe it to be
true.

2.      This Affidavit is sworn in addition to another affidavit that I have sworn in support of
the Applicants' motion for the Canadian Sales Process Order (the "First Affidavit").
Capitalized terms used in this affidavit and not otherwise defined herein shall have the
meanings given to them in the Proposed Sale Agreement (as defined below) or in the First
Affidavit.

3.    I swear this Affidavit in support of the motion to grant an approval and vesting order in the form attached as Exhibit "A" hereto (the "Canadian Approval and Vesting Order") for, among other things, the following relief:

a)  approving a transaction contemplated by an asset sale agreement dated as of April 4, 2011 (the "Proposed Sale Agreement") among:

   i.    NNC, NNL, Nortel Networks Inc. ("NNI"), Nortel Networks UK Limited (in administration) ("NNUK"), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciaire) ("NNSA"), Nortel Networks France S.A.S. (in administration), Nortel GmbH (in administration), the other entities identified therein as sellers, Alan Bloom, Stephen Harris, Alan Hudson, David Hughes and Christopher Hill as Joint Administrators, and Maître Cosme Rogeau as French Liquidator (collectively, the "Sellers"),

   ii.   Ranger Inc. (the "Proposed Purchaser"),

   iii.  and Google Inc., as guarantor,

   for the sale of the Assets of the Sellers as defined in the Proposed Sale Agreement (together with, the licenses under the  Jointly Owned Patents, the Specified UK Patents, the Undisclosed Patent Interests and any other Patents granted by one or more of the Applicants to the Proposed Purchaser pursuant to the Proposed Sale Agreement and, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Proposed Sale Agreement, any Undisclosed Patent Interests, together with all the other Assets, collectively the "Purchased Assets"); and

b)  vesting all of the Applicants' right, title and interest in and to the Purchased Assets absolutely in the Proposed Purchaser free and clear of and from all Encumbrances (as defined in the Canadian Approval and Vesting Order);

    c) the approval of certain License Non-Assignment and Non-Renewal Protections (as defined below); and

    d) the sealing of certain confidential information

4.    A copy of the Proposed Sale Agreement (without exhibits or schedules) will be attached as an appendix to the sixty-third report (the "Sixty-Third Report") of the Monitor (as defined below) to be filed in connection with this motion.

5.    References to "Nortel" herein are references to the global enterprise as a whole.

6.    All dollar references are US$ unless otherwise indicated.

## BACKGROUND

7.    On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (in such capacity, the "Monitor") in the CCAA proceedings.

8.    Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "U.S. Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code") (such proceedings, the "U.S. Proceedings"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

9.    Additionally, on January 15, 2009, NNUK and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an

administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986.

10.     On February 27, 2009, the U.S. Court granted petitions recognizing the CCAA proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

11.     On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of NNSA, which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended. On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months; and (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA.   In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

12.     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code.   On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

13.     On July 14, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

14.     Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 previously filed in these proceedings and are therefore not repeated herein.

15.     The Applicants have previously obtained various relief related to the sale of certain other assets relating to their business units including Nortel's Layer 4-7 Application Delivery business, CDMA and LTE related assets, Enterprise Solutions business, Optical Networking

052

and Carrier Ethernet businesses (associated with its Metro Ethernet Networks Business), Carrier Voice Over IP and Application Solutions business, GSM/GSM-R business and Multi-Service Switch business.  NNL has also sold, among other assets, its "Westwinds Facility" in Alberta, its interest in its joint venture with LG Electronics Inc., and real property in Ottawa, Ontario known as the Carling Campus.

## THE ASSETS

16.    At this time, Nortel's residual patent assets are one of Nortel's largest remaining assets.    The Proposed Sale Agreement contemplates the sale of approximately 6,000 Canadian, U.S. and foreign patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios.  The extensive patent portfolio touches nearly every aspect of telecommunications and additional markets as well, including Internet search and social networking.

## PROPOSED SALE AGREEMENT[1]

17.    After extensive arm's-length, good faith negotiations among the Sellers and the Proposed Purchaser and their respective advisors, the Sellers have agreed, among other things, to convey the Purchased Assets in accordance with the terms and conditions of the Proposed Sale Agreement, subject to certain Court approvals including this Honourable Court and the U.S. Court.

18.    The Proposed Sale Agreement contemplates the sale of the Assets for a price of $900 million on the terms and conditions set out in my First Affidavit.

19.    The proposed transaction will be subject to higher or better offers in the event that an auction occurs in accordance with the relief requested in the Canadian Sales Process Order Motion and the U.S. Bidding Procedures Order Motion which is scheduled to be heard on May 2, 2011.

---

[1] To the extent there are inconsistencies between any summary of the Proposed Sale Agreement contained herein and the terms and conditions of the Proposed Sale Agreement, the terms and conditions of the Proposed Sale Agreement shall control.

20.    The material terms of the Proposed Sale Agreement are summarized in the First Affidavit.

## THE LICENSE NON-ASSIGNMENT AND NON-RENEWAL PROTECTIONS

21.    In view of the potential impact of continuing licenses on the value of the Sellers' patent assets, the Applicants also have agreed in furtherance of the sale of the Purchased Assets, to the License Non-Assignment and Non-Renewal Protections (as defined in the Canadian Approval and Vesting Order) which contain various limitations and prohibitions on their rights to renew, extend, assign, amend, waive or modify contracts containing licenses to the patents offered for sale.

22.    These limitations and prohibitions, which are set forth in full in paragraph 14 of the proposed Canadian Approval and Vesting Order, apply to Outbound License Agreements, Cross License Agreements, Commercial Licenses, intercompany contracts among the Sellers and their affiliates and certain agreements entered into in connection with the post-petition divestiture of Nortel's business units, and include:

    a)  the deemed non-consent by the Applicants to requests to amend or modify these agreements in manners that would have the practical effect of expanding the scope or term of the licenses to the patents to be transferred to the Proposed Purchaser pursuant to the Proposed Sale Agreement;

    b)  the deemed non-consent by the Applicants to the assignment of certain of these agreements by the counterparties thereto to third parties;

    c)  restrictions on the Applicants' ability to assign such contracts; and

    d)  a power of attorney for the Proposed Purchaser to enforce these protections and terminate the Outbound License Agreements and Cross License Agreements upon the occurrence of events, dates or circumstances entitling the Applicants to terminate such licenses pursuant to the terms of such licenses.

23.    I believe that it is reasonable for the Applicants to agree at this time to these restrictions on the above described agreements as part of the consideration for the proceeds to

be realized from the sale of the Purchased Assets. The License Non-Assignment and Non-Renewal Protections limit the impact of the applicable license agreements on the Purchased Assets, which benefit the Applicants, their creditors, estates and all interested parties through their expected ability to realize a higher price for the Purchased Assets, and these protections are tailored to respect the Applicants' current obligations under their existing contracts (while limiting their discretion to extend or modify those obligations after the Closing). Such counterparties will retain any rights under their contracts that can be exercised without the Applicants' consent.

24.     The terms and conditions negotiated with respect to the License Non-Assignment and Non-Renewal Protections are material to the proposed transaction and significant to the Proposed Purchaser.

**SERVICE PROCEDURES**

25.     In addition to the standard process for service of motions within these proceedings, I am advised by Jennifer Stam of Ogilvy Renault LLP that the Applicants intend to serve notice of this motion on a number of additional parties including: (a) all registrants of *Personal Property Security Act* ("PPSA") financing statements based on the Applicants' PPSA searches; (b) federal tax authorities and provincial tax authorities; (c) known Nortel affiliates; and (d) post-filing purchasers of Nortel business units (to the extent their counsel is not already on the Service List).

26.     In connection with such service efforts, I am further advised by Ms. Stam that the Applicants (or another person on behalf of the Applicants) will send a Notice of Sale to the Additional Service Parties if the Canadian Sales Process Order and the U.S. Bidding Procedures Order are each granted. I anticipate that supplemental materials will be prepared providing an update with respect to the service of the Notice of Sale.

27.     Lastly, as set out above, the Applicants (in coordination with the U.S. Debtors) intend to publish the Publication Notice. I anticipate that supplemental materials will be prepared providing an update with respect to the publication of the Publication Notice.

28.     These additional service efforts are being taken for the sake of ensuring adequate notice of the relief being requested.     I believe that the service of the Additional Service

Parties along with the publishing of the Publication Notice is fair, reasonable and adequate in the circumstances.

**US PROCEEDINGS**

29.    The U.S. Debtors who are Sellers subject to the U.S. Proceedings are seeking approval from the U.S. Court of certain of the relief sought in this Motion. The Applicants and the U.S. Debtors are requesting their respective Court approval pursuant to a joint hearing between the U.S. Court and this Honourable Court. The Applicants (or the Monitor as foreign representative of the Applicants in their Chapter 15 proceedings) may seek recognition of the orders of this Honourable Court approving the sale from the U.S. Court.

**SEALING**

30.    -I am aware that the Monitor has or will be filing confidential appendices to the Sixty-Third Report, as well as confidential appendices to other reports to be filed in connection with this motion, which contain or will contain, among other things, the disclosure schedules and exhibits to the Proposed Sale Agreement. The disclosure schedules and exhibits contain sensitive competitive, commercial and, in some instances, personal information, including lists of the Transferred Patents and licensees to such patents. Disclosure of this confidential information would be damaging to the Applicants and the other Sellers and any Successful Bidder if it is disclosed to their competitors. The filing of the disclosure schedules and exhibits to the Proposed Sale Agreement under seal is in the best interests of the Applicants and their estates, creditors and all other interested parties herein.

31.    Further, exhibits to one or more affidavits of service (the "Service Affidavits") will contain a list of the Known Licensees and information related to their service of the materials. This information is commercially sensitive and confidential.

32.    I believe sealing these confidential appendices and the confidential exhibits to the Service Affidavits is appropriate in the circumstances.

056

## CONCLUSIONS

33.      I anticipate that further supplemental materials will be filed in support of the motion for the Canadian Approval and Vesting Order prior to the hearing of this motion which materials will include further information regarding: (a) the results of the implementation of the Bidding Procedures; (b) the service of the Notice of Sale on the Additional Service Parties; (c) the steps taken to comply with, and any results of, the Canadian License Rejection Procedures (including service of the Known License Notice); and (d) the outcome of any auction, if convened.

34.      The Proposed Sale Agreement was sufficiently negotiated at arm's length and in good faith and numerous potential purchasers were contacted, as more fully described in the First Affidavit and the Sixty-Third Report.  The terms and conditions of the Proposed Sale Agreement, including the License Non-Renewal and Non-Assignment Protections, are fair and reasonable.  I believe that the proposed transaction as set out in the Proposed Sale Agreement is the best offer available for the Purchased Assets and is critical to the maximization of the value of the Applicants assets, subject to any higher and/or better offers received through the bidding procedures further described in the First Affidavit.

- 10 -

**SWORN BEFORE ME** at the City of
Boston, in the State of Massachusetts
on this 7th day of April, 2011.

_____
Commissioner for Taking Affidavits
or Notary Public

_____
George Riedel

TAB A

058

Court File No.: 09-CL-7950

This is Exhibit ___ "A" ___
affidavit of ___ GEORGE RIEDEL
___ referred to in the
sworn before me, this ___ 7 + h
day of ___ APRIL , 2011

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

THE HONOURABLE MR.                    )        ■ DAY, THE ■ ___

                                      )

JUSTICE MORAWETZ                      )        DAY OF ■, 2011

## IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

## AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

## APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

### APPROVAL AND VESTING ORDER
**(Certain Patents and Other Assets)**

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Notice of Motion dated ■ ■, 2011, including the approval of a transaction (the "Transaction") pursuant to an asset sale agreement dated as of ■ ■, 2011 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc., Nortel Networks UK Limited (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciaire), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration), the other entities identified therein as sellers (collectively, the "Sellers"), Alan Bloom, Stephen Harris, Alan Hudson, David Hughes and Christopher Hill as

- 2 -

Joint Administrators, and Maître Cosme Rogeau as French Liquidator and Ranger Inc., as purchaser (the "Purchaser") and Google Inc., as guarantor for the sale (the "Sale") of the Assets to the Purchaser, was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of ■ sworn ■ ■, 2011 (the "□ Affidavit") and the ■ report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated ■ ■, 2011 (the "■ Report") and on hearing the submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list although properly served as appears from the affidavit of ■ sworn ■ ■, 2011 (the "Service Affidavit"), filed:

### Service

1.     THIS COURT ORDERS that the time for the service of the Notice of Motion, the ■ Affidavit, the ■ Report and/or the Motion Record be and is hereby validated and abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

### Interpretation

2.     THIS COURT ORDERS AND DECLARES that

   (a)    capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement; and

   (b)    "Initial Order" means the Order of the Honourable Justice Morawetz dated January 14, 2009, as amended and restated.

### The Transaction

3.     THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. Subject to approval of the Sale Agreement by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Proceedings of the Chapter 11 Debtors, the execution, delivery and performance of the Sale Agreement and the other Transaction Documents by the Applicants is hereby authorized and approved, and the Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and

interest in and to the Assets to the Purchaser in accordance with the provisions of the Sale Agreement (including, the licenses under the Jointly Owned Patents, the Specified UK Patents, the Undisclosed Patent Interests and any other Patents granted by one or more of the Applicants to the Purchaser pursuant to the Sale Agreement and, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement, any Undisclosed Patent Interests, together with all the other Assets, collectively the "Purchased Assets").

4.      **THIS COURT ORDERS AND DECLARES** that without limiting the generality of the foregoing, the following documents are hereby approved and the Applicants party thereto are hereby authorized and directed to perform and comply with their respective obligations thereunder:

(a)     Closing Date License Agreement substantially in the form attached as Appendix ■ to the ■ Report; and

(b)     the Escrow Agreement substantially in the form attached as Appendix ■ to the ■ Report.

5.      **THIS COURT ORDERS AND DECLARES** that the Applicants are authorized and directed to perform their respective obligations under the Sale Agreement and each of the Transaction Documents.

6.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Purchased Assets (except any Undisclosed Patent Interests for which the Purchaser pays the Exercise Price after Closing, in which case the provisions of the balance of this paragraph shall be effective upon receipt by the Sellers or a successor or assign or any receiver, trustee or liquidator appointed in respect of such Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement for the applicable Undisclosed Patent Interest) shall vest absolutely in the Purchaser free and clear of and from:

- 4 -

(a)     any and all liens, claims and interests, including, without limitation, all security interests, hypothecs, mortgages, pledges, deeds of trust, trusts or deemed trusts, executions, levies, charges, or other financial or monetary claims, charges, rights of first refusal, encumbrances, restrictive covenants, rights of offset or recoupment, leases or conditional sale arrangements, debts, liabilities, obligations, contractual rights and claims and rights or causes of action, obligations, demands, restrictions, consent rights, options and indemnities; and

(b)     claims and interests of any nature or kind of employees, consultants or agents or former employees, consultants or agents, of any of the Applicants arising out of the alleged invalidity, unenforceability or irregularity on any grounds of any of their assignments, transfers or waivers to or in favour of any of the Applicants, whether express or implied or by operation of contract, law or otherwise, of any or all of their right, title and interest in any of the Purchased Assets,

in each case, whether or not they have attached or been perfected, registered or filed, whether secured, unsecured or otherwise, arising prior to or subsequent to the date of the Initial Order but prior to Closing, whether imposed by agreement, understanding, law, statute, equity or otherwise and whether allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether asserted prior to or after Closing, (collectively, the "Claims") including, for the avoidance of doubt: (i) any encumbrances or charges created by any of the Orders made in these proceedings including the Initial Order; and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which, together with Liens and Claims in the CCAA Cases, are collectively referred to as the "Encumbrances", provided however that "Encumbrances" shall not include Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order), Liens created by or through the Purchaser or any of its Affiliates, and Assumed Liabilities or as otherwise set forth Section 2.1.1(a) of the Sale Agreement and Section 5.21 of the Sale Agreement. For greater certainty, all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

062

- 5 -

7.    **THIS COURT ORDERS** that:

(a)    effective upon Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), all Government Entities maintaining records or data bases in which the Encumbrances are recorded, filed or registered are authorized and directed to strike such Encumbrances as they affect the Purchased Assets from their records and data bases; and

(b)    if any Person or entity which has filed statements or other documents or agreements evidencing Encumbrances affecting the Purchased Assets shall not have delivered to the Applicants before the Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) in proper form for filing and executed by the appropriate parties, discharge statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances which the Person or entity has or may assert with respect to the Purchased Assets, then the Applicants are each hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such Person or entity with respect to the Purchased Assets.

8.    **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims and Encumbrances, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, and that from and after the delivery of the Monitor's Certificate (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) all Claims and Encumbrances shall attach to the net proceeds from the sale of the

Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the Closing (or in the case of Undisclosed Patent Interests immediately prior to the date of the receipt of the Exercise Price), as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the Closing (or in the case of Undisclosed Patent Interest(s) immediately prior to the receipt of the Exercise Price).

9.      **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

10.     **THIS COURT ORDERS AND DECLARES** that the Transaction Documents shall be binding on the Applicants that are parties thereto, and shall not be repudiated, disclaimed or otherwise compromised in these proceedings or any subsequent receivership, bankruptcy or liquidation proceedings.

11.     **THIS COURT ORDERS AND DECLARES** that, in the event that any Applicant or any of their Affiliates owns any Undisclosed Patent Interest, no Applicant shall directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to a Third Party, other than the Purchaser, including by operation of law, in any transaction, series of related transactions or otherwise, except as expressly permitted by Section 5.19 of the Sale Agreement, and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by Section 5.19 of the Sale Agreement shall be null and void *ab initio* and of no force or legal effect.

12.     **THIS COURT ORDERS** that the Sale Agreement and the Transaction Documents and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment or supplement is not materially adverse to the interests of the Applicants (it being understood, for the sake of clarity and solely for the purposes of this paragraph, that no such modification, amendment or supplement shall be deemed to be materially adverse to the Applicants to the extent that the impact does not exceed two percent of the Purchase Price); and

064

provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Monitor.

13.    **THIS COURT ORDERS AND DECLARES** that the Applicants have complied with the License Rejection Procedure approved by this Court in the Canadian Sales Process Order dated ∎, 2011 (the "Sales Process Order").

**License Non-Assignment and Non-Renewal Protections**

14.    **THIS COURT ORDERS** that effective from and after Closing,

(a)    the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) to any renewal, extension, assignment, amendment, waiver or modification of any license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents, pursuant to any Cross-License Agreement or Outbound License Agreement (excluding (i) the Commercial Licenses, (ii) the transition services agreements (the "TSAs") and intellectual property license agreements (the "IPLAs") that the Applicants entered into with the purchasers of their various business units after the Petition Date in connection with their divestitures, (iii) any intercompany Contracts with the Sellers (the "Intercompany Licenses") and (iv) the Technology License Contract between Northern Telecom Limited and Guangdong-Nortel Telecommunications Switching Equipment Ltd., dated November 8, 1994, as amended (the "GDNT License")) (collectively, the "License Agreements", and any one, a "License Agreement") that requires the consent of any Applicant pursuant to the terms of such License Agreement and that would have the practical effect of expanding the scope or term of the licenses to the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder (regardless of whether such renewal, extension, assignment, amendment, waiver or modification is sought prior to or after the Applicants dissolve or otherwise cease to exist), in each case unless the Purchaser shall otherwise agree in writing, in its sole discretion;

- 8 -                                                                065

(b)     the Applicants shall be deemed to have affirmatively and reasonably refused to
        give consent (including any consent of any Applicant that may be deemed to be
        given as a result of inaction by such Applicant) (i) to any amendment,
        modification or waiver to the GDNT License that would have the practical effect
        of expanding the scope or the term of the licenses under the Transferred Patents,
        Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any
        assignment of the GDNT License or any rights or obligations thereunder other
        than to Ericsson (as defined in the Sale Agreement) or another purchaser of all or
        substantially all of the assets or all of the outstanding shares of Guangdong Nortel
        Telecommunication Equipment Company Ltd., in each case, unless the Purchaser
        shall otherwise agree in writing, in its sole discretion,

(c)     the Applicants shall be deemed to have affirmatively and reasonably refused to
        give consent (including any consent of any Applicant that may be deemed to be
        given as a result of inaction by such Applicant) (i) to any amendment or
        modification to the IPLAs that would have the practical effect of expanding the
        scope or the term of the licenses under the Transferred Patents, Specified UK
        Patents or Jointly Owned Patents thereunder and (ii) to any assignment of any
        IPLA by the license counterparty or any rights or obligations of the license
        counterparty under any IPLA, in each case, unless the Purchaser shall otherwise
        agree in writing, in its sole discretion,

(d)     the Applicants shall be deemed to have affirmatively and reasonably refused to
        give consent (including any consent of any Applicant that may be deemed to be
        given as a result of inaction by such Applicant) to any amendment, modification,
        renewal or extension to the TSAs  that would have the practical effect of
        expanding the scope or the term of the licenses under the Transferred Patents,
        Specified UK Patents or Jointly Owned Patents thereunder beyond June 30, 2012
        unless the Purchaser shall otherwise agree in writing, in its sole discretion,

(e)     the Applicants shall be deemed to have affirmatively and reasonably refused to
        give consent (including any consent of any Applicant that may be deemed to be

DOCSTOR: 2138173\14

given as a result of inaction by such Applicant) to any amendment or modification of any Commercial License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except (i) to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement or (ii) to the extent the Purchaser shall otherwise agree in writing, in its sole discretion,

(f)     the Applicants shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Applicant that may be deemed to be given as a result of inaction by such Applicant) (i) to any amendment or modification of any Intercompany License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement, and (ii) to any assignment of any Intercompany License by the license counterparty or any rights or obligations of the license counterparty under any Intercompany License, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

(g)     no Applicant shall have the right or power to transfer any of its obligations, right, title or interest in the licenses under the Transferred Patents, Specified UK Patents and Jointly Owned Patents under:

(i)      any License Agreement,

(ii)     the GDNT License,

(iii)    any Intercompany License,

(iv)    (other than in connection with the consolidation, wind-down, reorganization or restructuring of the Applicants and their affiliates, including to the Applicants under confirmed plan(s) of arrangement) any IPLA, or

(v)     (other than the transfer by the Applicants of Retained Contracts or contracts relating to the disposal of Inventory, in each case to the extent a

sublicense to the assignee of such contract is permitted by the Closing
Date License Agreement) any Commercial License,

in each case, to any other person from and after the Closing, and any purported renewal,
extension, assignment, amendment, waiver, transfer or modification of a License
Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License
that would contravene the provisions of subparagraphs 14(a) through (g) hereof shall be
null and void *ab initio* and unenforceable and of no force or effect, and

(h)     the Purchaser is hereby irrevocably appointed (such appointment being coupled
with an interest) as each Applicant's attorney-in-fact, with full authority in the
place and stead of such Applicant and in the name of such Applicant, from time to
time from and after the Closing in the Purchaser's sole discretion, subject to the
provisions of paragraph 5.25 of the Sale Agreement, (x) to take any and all action
and to execute and deliver any and all instruments that the Purchaser may deem
necessary or advisable to accomplish the purposes of sub-paragraphs 14(a)
through (g) of this Order and (y) regardless of whether or not any Applicant party
to the applicable License Agreement is then in existence, to terminate the license
under the Transferred Patents, Specified UK Patents or Jointly Owned Patents in
any License Agreement (including by delivering a notice of termination on behalf
of an Applicant party thereto, regardless of whether such Applicant is then in
existence) upon the occurrence of any specific date or event or the existence of
any specific circumstance to the extent that the occurrence of such date or event
or the existence of such circumstance gives any Applicant (regardless of whether
such Applicant is then in existence) a right to terminate such License Agreement
pursuant to the terms thereof (the provisions set forth in subparagraphs 14(a)
through (h) hereof collectively, the "License Non-Assignment and Non-Renewal
Protections").

- 11 -

For the avoidance of doubt, the License Non-Assignment and Non-Renewal Protections shall not limit in any way the applicable Applicants' obligations to comply with the provisions of Section 5.13(b) of the Sale Agreement.

15.    THIS COURT ORDERS that the License Non-Assignment and Non-Renewal Protections shall not constitute the assignment of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses to, or assumption of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses by, the Purchaser, other than as the Purchaser may otherwise agree in an assumption agreement between the Purchaser and NNL in satisfaction of the requirements of paragraph 7 of the CDMA Vesting Order.

**Alternate Bid**

16.    **[THIS COURT ORDERS AND DECLARES that in the event that the Transaction contemplated by the Sale Agreement cannot be consummated in accordance with the Sale Agreement, the Alternate Bid (as defined in the ■ Affidavit) be and is hereby approved and the execution of the asset sale agreement pursuant to the Alternate Bid by the Applicants is approved and the Applicants and the Monitor shall be authorized to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the transaction contemplated by the Alternate Bid and for the conveyance of the Applicants' right, title and interest in and to the Purchased Assets to the Alternative Bidder.]**

**Proceeds**

17.    **THIS COURT ORDERS** that all the proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution

of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

**Miscellaneous**

18.     **THIS COURT ORDERS** that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of any of the Applicants,

the provisions of the Transaction Documents and the vesting of the Applicants' right, title and interest in and to the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

19.     **THIS COURT ORDERS AND DECLARES** that neither the *Bulk Sales Act* (Ontario), Sections 6(1) and (2) of the *Retail Sales Tax Act* (Ontario) nor any equivalent or similar legislation under any province or territory in Canada applies to the Transaction.

20.     **THIS COURT ORDERS** that confidential Appendix "■"to the ■ Report and Exhibits ■ through ■ of the Service Affidavit be and is hereby sealed and shall not form part of the public record pending further order of the Court.