## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------- X

In re

Nortel Networks Inc., *et al.*,[1]

                   Debtors.

----------------------------------------------------- X

:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing date: June 7, 2011 at 9:30 a.m. (ET)**
**Objections due: May 19, 2011 at 4:00 p.m. (ET)**

## JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND FOR RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "U.S. Debtors"), and the Official Committee of Unsecured Creditors

(the "Committee" and together with the U.S. Debtors, the "Movants"), hereby move the Court

(the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A,

approving an Allocation Protocol substantially in the form attached as Exhibit B hereto (the

"Allocation Protocol"), establishing procedures and an expedited schedule for the cross-border

resolution by the U.S. and Canadian Courts (as defined below) of the allocation of the proceeds

from the Sale Transactions (as defined below) (the "Sale Proceeds") pursuant to the Interim

Funding and Settlement Agreement, dated as of June 9, 2009 by and between the parties listed on

---

[1]       The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

Schedules 1, 2, and 3 thereto (the "IFSA"),[2] which was approved by the U.S. Court by order dated June 29, 2009 [D.I. 993] (the "U.S. IFSA Order"), and by the Canadian Court by order dated June 29, 2009 (the "Canadian IFSA Order"), and granting them such other and further relief as the U.S. Court deems just and proper.  In support of this Motion, the Movants respectfully represent as follows:

**Preliminary Statement**

1.      On April 4, 2011, the U.S. Debtors, together with NNL and NNC (as defined below) announced an agreement with an affiliate of Google Inc. to sell Nortel's remaining patent portfolio and related assets (the "IP Assets") for $900 million (the "Google Bid"), subject to higher or better offers.  With the announcement of the Google Bid and the contemplated auction, the last remaining substantial assets of the Nortel companies are now in the process of being sold.  The allocation of the Sale Proceeds[3] — an amount that should be at least approximately $3.7 billion after consummation of the sale of the IP Assets — now remains the primary outstanding impediment to the solicitation and approval of a chapter 11 plan in these cases and the distribution of funds to creditors.

2.      To this end, the Movants are filing this Motion and a companion application before the Canadian Court requesting that both the U.S. and Canadian Courts establish a timeline and protocol for joint hearings to determine the allocation of the Sale Proceeds.  As required by the IFSA, the various Selling Debtors[4] and certain of their key creditor constituencies have

---

[2]      The IFSA is attached as Exhibit 1 to the Declaration of Inna Rozenberg, dated April 25, 2011 (the "Rozenberg Decl."), submitted contemporaneously herewith.

[3]      Capitalized terms used but not defined herein have the meanings ascribed to them in the IFSA.

[4]      In this Motion, the term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements (as defined below), and the term "Non-Filed Entities" refers to any non-debtor Nortel company that signed one or more of the Escrow Agreements.

attempted to agree to an Interim Sales Protocol to govern the allocation of the Sale Proceeds. These Selling Debtors, along with the Committee and certain other interested parties, have also engaged in a lengthy non-binding mediation process that recently came to an unsuccessful conclusion. The mediation involved wide-ranging voluntary discovery resulting in the exchange of thousands of pages in submissions with respect to the allocation of the Sale Proceeds. Although the parties have now reached an impasse on allocation, it is the Movants' position that the issues have been narrowed and now revolve around a discrete set of alternative valuation methodologies.[5] The U.S. and Canadian Courts have both the power and the duty, both under the IFSA and applicable law, to establish an Allocation Protocol and hold joint hearings to determine how the Sale Proceeds should be allocated among the Selling Debtors and the Non-Filed Entities. Having failed to achieve consensual resolution, the time has come to move forward before the U.S. and Canadian Courts with a fully transparent and expeditious process to reach a resolution.

## Jurisdiction

3.       The U.S. Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the terms of the IFSA and the U.S. IFSA Order. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code").

---

[5]       As discussed below, certain claims raised by the Joint Administrators on behalf of the EMEA Debtors (as defined below), are not part of the allocation process and are subject to separate procedures and proceedings before the U.S. and Canadian Courts (as defined below).

## Background

5.     On January 14, 2009 (the "Petition Date"), the U.S. Debtors, other than Nortel Networks (CALA) Inc.,[6] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), which cases are consolidated for procedural purposes only. The U.S. Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On the Petition Date, the U.S. Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[7] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court," and together with the U.S. Court, the "U.S. and Canadian Courts") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court. Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[8] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint

---

[6]     Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[7]     The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[8]     The EMEA Debtors include the following entities: Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Administrators"). Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

7. On the Petition Date, the U.S. Debtors filed the *Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol* [D.I. 18], which established procedures for the coordination of cross-border hearings between the U.S. and Canadian Courts. This Court approved the Court-to-Court Protocol on January 15, 2009 [D.I. 54][9] and the Canadian Court approved the Court-to-Court Protocol on the Petition Date, which was later amended by order of this Court on June 29, 2009 [D.I. 990][10] and by an order of the Canadian Court on that same date (as amended, the "Cross Border Protocol").

8. On January 22, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee [D.I.s 141, 142]. The Bondholder Group has also been organized.

9. On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales. Since then, Nortel, working with all major creditor constituencies, has sold all of its business units and most of its assets to various purchasers, and after completion of the sale of the IP Assets will have sold substantially all of its assets. For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the U.S. Debtors and http://dm.epiq11.com/nortel.

---

[9]     *Order Approving Cross-Border Court-to-Court Protocol*, Jan. 15, 2009 [D.I. 54].

[10]     *Order Approving Stipulation of the Debtors and the Official Comm. of Unsecured Creditors of Nortel Networks Inc., et. al., Amending the Cross-Border Court-to-Court Protocol*, June 29, 2009 [D.I. 990].

## Relief Requested

10.     By this Motion, the Movants seek an order establishing an Allocation Protocol pursuant to the IFSA, scheduling joint hearings to determine allocation, and granting such other relief as the U.S. Court may deem just and proper.  The Movants are seeking the same relief from the Canadian Court in accordance with the Cross-Border Protocol and the IFSA.

## Facts Relevant to this Motion

**A.     The Selling Debtors Agreed to Escrow the Sale Proceeds Pursuant to the IFSA.**

11.     On or about June 9, 2009, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors, excluding Nortel Networks S.A. and Nortel Networks AG, entered into the IFSA.[11] The IFSA addressed several important issues, including the reimbursement of NNL for costs alleged to have been incurred on behalf of NNI during the post-petition period, the prevention of a potential funding crisis at NNL and the resolution of certain payments owed by NNL to NNUK.[12]

12.     More importantly, in order to ensure that the planned sale of Nortel's businesses and assets could progress unimpeded by disputes over proceeds among various Nortel sellers, the IFSA also addressed the allocation of the Sale Proceeds.  In particular, the parties to the IFSA agreed not to condition the execution of any sale agreement upon reaching agreement with the other parties proposed to be a party to such Sale Transaction regarding the allocation (or a binding procedure for allocation) of the ultimate Sale Proceeds.  IFSA, ¶ 12(a). The IFSA instead provides that all Sale Proceeds shall be held in escrow accounts corresponding to each

---

[11]     Nortel Networks S.A. and Nortel Networks AG acceded to the IFSA as EMEA Debtors – each agreeing "to perform and comply with its obligations under the IFSA as if it had been a party from the date of execution thereof" – on or about September 11, 2009.  *Accession and Amendment Agreement relating to the Interim Funding Settlement Agreement,* dated September 11, 2009, attached as Exhibit 2 to the Rozenberg Decl.

[12]     Any description of the IFSA set forth herein is for informational purposes only.  In the event of any discrepancy between such description and the terms of the IFSA, the terms of the IFSA shall govern.

Sale Transaction (each, an "Escrow Account"), and shall not be distributed "in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the [Interim Sales] Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors." Id., ¶ 12(b). The parties also agreed to "negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which [Interim Sales] Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation." Id., ¶ 12(c). The parties further agreed in the IFSA that any disputes relating to the IFSA and the matters addressed therein that affected the U.S. Debtors, Canadian Debtors and EMEA Debtors must be resolved in a joint hearing of the U.S. and Canadian Courts conducted in accordance with the Cross-Border Protocol. Id., ¶ 16(b).

13.     After holding a joint hearing on June 29, 2009, the U.S. and Canadian Courts both entered the IFSA Orders authorizing the U.S. Debtors and the Canadian Debtors respectively to enter into the IFSA. Furthermore, on June 23, 2009, the English High Court provided directions to the Joint Administrators on behalf of the EMEA Debtors, stating the Joint Administrators were at liberty to enter into the IFSA on behalf of the EMEA Debtors.

**B.     Sale of Operating Business Lines and Marketing of Remaining Assets.**

14.     As part of the extensive sale processes referenced above, Nortel has sold and continues to undertake efforts to sell its businesses and assets, including: (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539] (the "Layer 4-7 Sale"); (ii) the

sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM
Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of substantially all of the assets of the
Enterprise Solutions business globally, including the shares of Nortel Government Solutions
Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (iv) the sale of the assets of its
Wireless Networks business associated with the development of Next Generation Packet Core
network components to Hitachi Ltd. [D.I. 1760]; (v) the sale of substantially all the assets of its
Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks
business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM-
R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; (vii) the sale of certain assets of
its Carrier Voice Over IP and Application Solutions business to GENBAND US LLC [D.I.
2632]; (viii) the sale of certain assets of the Debtors' Multi-Service Switch (formerly known as
"Passport") business to Ericsson [D.I. 4054]; (ix) the proposed Google Bid to purchase the IP
Assets [D.I. 5202]; and (x) certain other sale transactions (collectively, the "Sale
Transactions").[13]

---

[13]    *Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims
and Encumbrances and (B) Assumption and Assignment of Certain Contracts*, Mar. 26, 2009 [D.I. 539] ("Layer 4-7
Sale Order"); *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' CDMA and LTE Bus.
Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C)
the Assumption and Sublease of Certain Leases*, July 28, 2009 [D.I. 1205] ("CDMA Sale Order"); *Order
Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests In, Debtors' Enterprise Solutions
Bus., (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of
Certain Leases*, Sept. 16, 2009 [D.I. 1514] ("Enterprise Sale Order"); *Order Authorizing and Approving Sale of
Debtors Next Generation Packet Core Network Components Free and Clear of All Liens, Claims, and Interests*, Oct.
28, 200) [D.I. 1760] ("Next Gen. Sale Order"); *Order Authorizing and Approving (A) Sale of Certain Assets of the
Debtors' Metro Ethernet Networks Bus. Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption
and Assignment of Certain Executory Contracts*, Dec. 3, 2009 [D.I. 2070] ("MEN Sale Order"); *Order Authorizing
and Approving Sale of Debtors' GSM/GSM-R Free and Clear of All Liens, Claims and Encumbrances,* Dec. 3, 2009
[D.I. 2065] ("GSM/GSM-R Sale Order"); *Order Authorizing and Approving (A) the Sale of Certain Assets of the
Debtors' Carrier Voice Over IP and Commc'ns Solutions Bus. Free and Clear of All Liens, Claims and
Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts*, Mar. 4, 2010 [D.I. 2632]
("CVAS Sale Order"); *Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service
Switch (Formerly Known as 'Passport') Bus. Free and Clear of All Liens, Claims and Encumbrances and (B) the
Assumption and Assignment of Certain Executory Contracts*, Sept. 30, 2010 [D.I. 4054] ("MSS Sale Order"); *Mot.
to Authorize Debtors Mot. for Orders (I)(A) Authorizing Debtors' Entry Into the Stalking Horse Asset Sale
Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Prots., (C) Approving the Notice*

15.     The U.S. and Canadian Courts have authorized the U.S. Debtors and Canadian Debtors to enter into the Sale Transactions other than the Google Bid to purchase the IP Assets (which is in process) in their respective jurisdictions in most cases following joint cross-border hearings. In fact, to date, the U.S. and Canadian Courts have held over a dozen joint cross-border hearings in these proceedings. The sale orders entered by the U.S. Court and the approval and vesting orders entered by the Canadian Court require that the Sale Proceeds be held in Escrow Accounts pursuant to the IFSA.[14]

16.     Pursuant to the IFSA and the U.S. and Canadian Courts' orders, the Selling Debtors entered into escrow agreements on or before the time each Sale Transaction closed (the "Escrow Agreements"). To date, approximately $2.7 billion has been deposited in accounts managed by JPMorgan Chase Bank, N.A., as third party escrow agent, pursuant to the Escrow Agreements. All such escrow accounts are maintained in the United States. The Sale Proceeds generated by the sale of the IP Assets will be treated in a substantially similar fashion.

**C.     No Agreement Has Been Reached on a Consensual Allocation of the Sale Proceeds or an Interim Sales Protocol.**

17.     Representatives of the Selling Debtors, together with the Monitor, the Joint Administrators, the Committee and the Bondholder Group, have unsuccessfully attempted since

---

*Procedures and the Assumption and Assignment Procedures, (D) Approving the License Rejection Procedures, (E) Approving a Side Agreement, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing and (II) Authorizing and Approving (A) the Sale of Certain Patents and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses and (D) the License Non-Assignment and Non-Renewal Protections*, Apr. 4, 2011 [D.I. 5202].

[14]     The U.S. Court order approving the Layer 4-7 Sale, which was entered prior to the signing of the IFSA, contains different language relating to the proceeds and retains the U.S. Court's jurisdiction "with respect to all matters arising from or related to the implementation of this Order." *Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts*, Mar. 26, 2009, ¶ 25 [D.I. 539]. The relevant Escrow Agreement is consistent with the IFSA in that it provides that the $17.65 million in proceeds from the Layer 4-7 Sale shall be held in escrow pending the Escrow Agent's receipt of consistent orders from both the U.S. and Canadian Courts (or a letter of direction or final decision of a court of competent jurisdiction if the bankruptcy cases have been closed). Escrow Agreement, Mar. 19, 2009, ¶ 5.

June 2009 to negotiate an Interim Sales Protocol to govern the allocation of the Sale Proceeds in the event a consensual agreement on allocation could not be reached. From June 2009 to May 2010, these parties had numerous conference calls and other communications to discuss the framework of an Interim Sales Protocol, including exchanging draft protocols. They also met on October 21, 2009 and May 4, 2010 for face-to-face negotiations. Rather than resulting in a consensus, these discussions instead exposed widely differing views as to the proper scope of any allocation exercise and related procedures. At least one draft Interim Sales Protocol ultimately swelled to 26 single-spaced pages, but still no consensus was reached. As a result, the Parties decided to shift their focus to comprehensive settlement discussions with respect to the allocation of the Sale Proceeds.

18.     From May 2010 to April 2011, the same parties, along with certain other key creditor constituencies and eventually the Non-Filed Entities (collectively, the "Mediation Attendees"), engaged in extensive efforts in an attempt to reach a consensual resolution on the allocation of the Sale Proceeds. The Mediation Attendees exchanged their respective positions on how to allocate the Sale Proceeds over email, conference calls and during in-person meetings, including all hands meetings held in New York on August 17-18, 2010 and on September 21, 2010. To further these negotiations, the Parties voluntarily exchanged documents and information, which included the posting of over 42,000 documents to a confidential electronic data room.

19.     Furthermore, the Mediation Attendees engaged a third party, retired U.S. federal judge Layn Phillips, to conduct formal non-binding mediation sessions on allocation of the Sale Proceeds. The Mediation Attendees submitted briefs to Judge Phillips and conducted five in-person, full day mediation sessions between November 11, 2010 and November 16, 2010 in New

York. At those sessions, approximately 125 representatives of the Mediation Attendees participated in an attempt to resolve allocation. Thereafter, the Mediation Attendees had further negotiations and, in addition, the Mediation Attendees engaged in further in-person full-day mediation sessions in New York with Judge Phillips over three days from April 11, 2011 through April 13, 2011, with approximately 115 individuals attending. Despite these extensive efforts, the mediation concluded unsuccessfully with no settlement reached. In addition, as set out in Joint Administrators' April 15, 2011 filing in this Court, during the course of the mediation process, the Joint Administrators, on behalf of the EMEA Debtors, raised certain intercompany claims against the U.S. and Canadian Debtors. It is the Movants' firm view that claims against the U.S. Debtors are not part of the allocation process and instead are the subject of separate proceedings and processes pending before the U.S. Court.[15]

20. The allocation discussions, mediation sessions and associated preparation have resulted in extensive professional fees and related costs over the past two years. While allocation efforts were delayed at times by the substantial efforts needed to negotiate and close the Sale Transactions, those obstacles no longer exist. With the failure of the most recent mediation sessions, it is time to move forward before the U.S. and Canadian Courts as contemplated by the IFSA. As discussed further below, the lack of a final resolution of the allocation of the Sale Proceeds is the primary hurdle preventing the U.S. Debtors from moving forward with the

---

[15] See *Debtors' Objection to the Proofs of Claim Filed by the EMEA Claimants and Mot. for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants*, Apr. 1, 2011 [D.I. 5200], and *The Joint Administrators' Response to the Debtors' Mot. for an Order Requiring a More Definitive Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants*, Apr. 15, 2011 [D.I. 5255] (the "Joint Administrators' April 15 Response"), noticed to be heard by the U.S. Court on May 10, 2011. The Canadian Debtors are in the process of challenging the claims made against the Canadian Debtors, which are likewise not part of the allocation process. The Canadian Court set a bar date and established a mechanism for the filing, proving and resolution of claims by the EMEA Debtors against the Canadian Debtors, see *EMEA Claims Procedure Order*, In re Companies Creditors Arrangement Act, No. 09-CL-7950 (Super Ct. of J. Commercial List Jan. 20, 2011), and such claims were filed against the Canadian Debtors on March 18, 2011.

solicitation and confirmation of a chapter 11 plan that will allow them to distribute assets to their creditors.

## Basis for Relief

**A.    The U.S. and Canadian Courts Have Jurisdiction to Implement the IFSA, Enforce the Related Orders and Approve an Allocation Protocol.**

21.    The jurisdiction of the U.S. and Canadian Courts to hear the Motion is embedded in multiple documents agreed to by the Selling Debtors and approved by orders of the U.S. and Canadian Courts.  First, in the U.S. IFSA Order, the U.S. Court "retains jurisdiction with respect to all matters arising from or related to the implementation of this Order."  U.S. IFSA Order, ¶ 11.  Further, for any Sale Transaction for which any of the U.S. Debtors was a Selling Debtor, the U.S. IFSA Order provides that "no Protocol for the allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court[,]" and that no proceeds from a Sale Transaction may be allocated among the Selling Debtors "unless such allocation is in accordance with a Protocol approved by this Court."  Id., ¶ 8.

22.    In addition, section 16(b) of the IFSA, in relevant part, provides that:

> To the fullest extent permitted by applicable law, each Party
>
> (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally),
>
> (ii) **agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in . . . . a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors . . . .**

(iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, . . . .

(v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.[16]

IFSA, ¶ 16(b) (emphasis added).

23.    The approval of an Allocation Protocol and the resulting allocation of the Sale Proceeds are undoubtedly "relat[ed] to the matters agreed in this Agreement." Id. It is therefore clear that the U.S. and Canadian Courts must jointly hear the relief requested herein and are empowered to and should grant it.

24.    Furthermore, the Escrow Agreements entered into by the Selling Debtors in order to close each Sale Transaction have clear provisions designating jurisdiction for legal proceedings arising from or in connection with the Escrow Agreements.  In particular, the Selling Debtors unconditionally submitted to the exclusive jurisdiction of the U.S. and Canadian Courts for actions brought prior to the entry of a final decree closing the bankruptcy cases.[17]  The allocation of the funds in the Escrow Accounts clearly arises in connection with the Escrow Agreements, and the jurisdiction vested in the U.S. and Canadian Courts is manifest.

---

[16]    Section 17 of the IFSA, which is not implicated by allocation, provides that any claim, action, or proceeding against the Joint Administrators in their personal capacities under the IFSA shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts.  IFSA, ¶ 17.

[17]    Escrow Agreement, dated as of December 1, 2009, ¶ 21; Escrow Agreement, dated as of May 27, 2010, ¶ 20; Escrow Agreement, dated as of June 3, 2010, ¶ 20; Escrow Agreement, dated as of March 11, 2011, ¶ 20. Escrow Agreement, dated as of  March 31, 2010, ¶ 21; Escrow Agreement, dated as of March 19, 2010, ¶ 21; Escrow Agreement, dated as of December 18, 2009, ¶ 21; Escrow Agreement, dated as of November 11, 2009, ¶ 21. In the case of the Layer 4-7 Sale, jurisdiction was vested in the U.S. Court alone.  Escrow Agreement, dated as of March 19, 2009, ¶ 20.  The Selling Debtors did not submit to the exclusive jurisdiction of the U.S. and Canadian Courts with respect to claims solely against the Joint Administrators in their personal capacities.

25.     The U.S. and Canadian Courts also approved the Cross-Border Protocol to govern proceedings affecting both the U.S. Debtors and the Canadian Debtors.  The Cross-Border Protocol, *which predates and is expressly referenced in the IFSA*, specifically provides that "any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor" is properly heard at a Joint Hearing (as defined in the Cross-Border Protocol) if, as is the case here, "the filing party agrees to seek a Joint Hearing."  Cross-Border Protocol, ¶ 15.  Given that the Movants seek allocation of Sale Proceeds in excess of U.S. $30 million and ask for joint hearings, the Cross-Border Protocol requires that the relief sought herein must be heard at a joint hearing of the U.S. and Canadian Courts.

26.     Section 105(a) of the Bankruptcy Code provides that the U.S. Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions [of the Bankruptcy Code,]" such as implementing the clear language of the IFSA, the Escrow Agreements and the Cross-Border Protocol.  11 U.S.C. § 105(a).  Bankruptcy courts, based on the reference of the inherent power of the district court contained in Section 157(c) of Title 28 of the United States Code and on the broad statutory grant of equitable powers in Section 105 of the Bankruptcy Code, have the inherent authority to enforce the terms of their lawful orders.  See, e.g., In re WorldCorp., Inc., 252 B.R. 890, 897 (Bankr. D. Del. 2000) (compelling party to make payment in accordance with agreement that was previously approved by court order); U.S. Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus., Inc.), 68 B.R. 690, 695-97 (Bankr. S.D.N.Y. 1986); Baer v. Bowser (In re Jones), Case No. 97-41205-7, Adv. No. 01-7131, 2003 Bankr. LEXIS 2056, at *15 (Bankr. D. Kan. Nov. 10, 2003) ("[T]he Court can think of no better

use of its equity powers under § 105 than to issue an order that compels compliance with a previous order."); JMF Acquisitions Co. v. Boccella (In re Edgehill Nursing Home, Inc.), 68 B.R. 413, 415-16 (Bankr. E.D. Pa. 1986); *Opinion on Motions Seeking Modification of the Sale Order Pursuant to Rule 60(b), the Trustee's Motion for Relief under the SIPA Sale Order, Barclays' Cross-motion to Enforce the Sale Orders and Adjudication of Related Adversary Proceedings*, In re Lehman Bros. Holdings Inc., No. 08-13555 (Bankr. S.D.N.Y. Feb. 22, 2011) [D.I. 14612] (granting in part motion under 105(a) to enforce previous sale order and compel delivery of approximately $1.9 billion in undelivered assets).  Here, relying on section 363 of the Bankruptcy Code, the U.S. Court approved the IFSA (and its jurisdiction provisions) by issuing the U.S. IFSA Order, which order also preserves the U.S. Court's jurisdiction to hear "matters arising from or related to the implementation of this Order."  U.S. IFSA Order, ¶ 11.  By exercising its jurisdiction over the allocation process, the U.S. Court will be enforcing the terms of the U.S. IFSA Order as authorized by the Bankruptcy Code.  The U.S. Court similarly relied on section 363 in approving each of the Sale Transactions and certain Escrow Agreements and retained jurisdiction to implement and enforce each of those Orders.[18]

27.     In sum, there can be no question that the Selling Debtors have submitted to the jurisdiction of the U.S. and Canadian Courts for the adjudication of issues relating to the

---

[18]     See Layer 4-7 Sale Order [D.I. 539]; CDMA Sale Order [D.I. 1205]; *Order Pursuant to 11 U.S.C. § 105(A) and § 363(B) Approving Debtors' Entry Into the CDMA Escrow Agreement and (B) Granting Related Relief,* Nov. 12, 2009 [D.I. 1889]; Enterprise Sale Order [D.I. 1514]; *Order Pursuant to 11 U.S.C. §105(A) and § 363(B) (A) Approving Debtors' Entry Into the Enterprise Solutions Bus. Escrow Agreement and (B) Granting Related Relief*, Dec. 17, 2009 [D.I. 2167]; Next Gen. Sale Order [D.I. 1760]; *Order Pursuant to 11 U.S.C. § 105(A) and § 363(B) (A) Approving Debtors' Entry Into the Next Generation Packet Core Network Components Escrow Agreement And (B) Granting Related Relief,*  Dec. 3, 2009 [D.I. 2062]; MEN Sale Order [D.I. 2070]; *Order Approving the Metro Ethernet Networks Side Agreement and Granting Related Relief*, Mar. 3, 2010 [D.I. 2627]; GSM/GSM-R Sale Order [D.I. 2065]; CVAS Sales Order [D.I. 2632]; *Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Bus. Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (II) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal*, May 24, 2010 [D.I. 3048]; MSS Sale Order [D.I. 4054].

allocation of the Sale Proceeds on multiple occasions. Accordingly, the U.S. and Canadian Courts have the authority, and indeed have specifically reserved their jurisdiction, to enforce the IFSA and the IFSA Orders, to approve an Allocation Protocol and to allocate the Sale Proceeds in accordance therewith.

**B.** **The Selling Debtors Have Reached an Impasse.**

28. Despite extensive good-faith efforts, the Selling Debtors have been unable to reach agreement regarding an Interim Sales Protocol or on allocation of the Sale Proceeds. Notwithstanding numerous in-person meetings, lengthy, good faith negotiations, and eight days of non-binding mediation before a former U.S. federal judge, the result of such sessions has resulted in a disagreement among the Selling Debtors that could not be bridged. Given the Mediation Attendees' failure to reach an agreement at the latest mediation session, an impasse has been reached and the U.S. and Canadian Courts must step in to facilitate a resolution that will allow timely distributions to creditors generally.[19]

29. Allocation of the Sale Proceeds is an essential next step in the progression of the U.S. Debtors' cases. In that regard, the U.S. Debtors cannot move forward with the solicitation and approval of their plan or to make distributions to creditors without knowing the portion of the Sale Proceeds to be allocated to them. Moreover, NNI will also receive a distribution as a material creditor of the Canadian Debtors (with an allowed claim of over $2 billion in the Canadian Proceedings), which they are unable to estimate until allocation is complete. There must be a mechanism to move the allocation process forward expeditiously.

---

[19] In response to the U.S. Debtors' separate motion regarding the EMEA Debtors' claims, the Joint Administrators concede that the mediation process failed. Joint Administrators' April 15 Response, ¶ 7. Moreover, while the Joint Administrators grossly and improperly mischaracterize the Selling Debtors' confidential, off-the-record settlement discussions surrounding the draft allocation protocol, id. at 14, they cannot and do not dispute the bottom line – that the Selling Debtors were unable to agree on the scope and terms of such a protocol after over one year of negotiations.

**C.    The U.S. and Canadian Courts Should Approve an Allocation Protocol.**

30.    The approval of the proposed Order is appropriate under section 105(a) of the Bankruptcy Code.  The law is clear that section 105 gives the U.S. Court broad discretion to issue orders necessary to "carry out the provisions of this title."  11 U.S.C. § 105(a).  See In re Combustion Eng'g, Inc., 391 F.3d 190, 236 (3d Cir. 2004) (noting that section 105(a) of the Bankruptcy Code "has been construed . . . to assure the orderly conduct of reorganization proceedings"); In re VII Holdings Co., 362 B.R. 663, 668 (Bankr. D. Del., 2007) (noting that "[s]ection 105(a) bestows broad equitable powers on the Court") (citing In re Combustion Eng'g, Inc.).

31.    General principles of contract interpretation also support the intervention of the U.S. and Canadian Courts.  As noted, the IFSA expressly provides that the U.S. and Canadian Courts should resolve any disputes relating to the matters addressed in the IFSA in a joint hearing.  In interpreting a contract, courts choose "an interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention."  Am. Law Institute, *Restatement (First) of Contracts* § 236 (1932); see Galli v. Metz, 973 F.2d 145,149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has "'the effect of rendering at least once clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'") (quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988)); see also Conzo v. City of New York, 438 F. Supp. 2d 432, 435-36 (S.D.N.Y. 2006) (denying motion to dismiss court action based on underlying agreement's dispute resolution clause, on grounds that movants' interpretation of the contract would render certain parts of agreement unenforceable and meaningless).  Although the IFSA is governed in relevant part by New York law, Canadian courts similarly have found that "[w]here words may bear two constructions, the more

reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intentions of the parties." Consol.-Bathurst Export Ltd. v. Mut. Boiler and Mach. Ins. Co., (1979) [1980] 1 S.C.R. 888, para. 26 (Can.); see Ventas, Inc. v. Sunrise Senior Living Real Estate Inv. Trust, (2007) 85 O.R. 3d 254, para. 24(d) (Can. Ont. C.A.) (upholding a lower court decision based in part on its affirmation that the decision "accords with sound commercial principles and good business sense, and . . . avoid[s] commercial absurdity").

32.     It manifestly was <u>not</u> the intention of the parties to the IFSA that, absent consensual agreement, there would be a never-ending stalemate, and that the Sale Proceeds would remain in escrow in perpetuity. Such a result would prevent any creditor recoveries from the Sale Proceeds and cause the U.S. Debtors to be unable to solicit and confirm chapter 11 plans, rendering the provisions in the IFSA and Escrow Agreements regarding the release of escrowed funds frustrated and superfluous. The only reasonable interpretation of the IFSA – consistent with its clear terms – is that the U.S. and Canadian Courts may – and indeed must – resolve any disputes under the IFSA, including the current impasse regarding an Interim Sales Protocol and allocation of the Sale Proceeds.

33.     Other courts have recognized their inherent powers with respect to allocation of sale proceeds in cross-border chapter 11 cases. The court in In re Calpine Corp., for example, approved a settlement among debtors pursuant to sections 105(a) and 363 and Rule 9019 that settled major cross-border issues, including a division of post-petition sale proceeds held in escrow between U.S. and Canadian debtors. *Order Granting Debtors' Mot. for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Bankr. Rule 9019(a) to Approve a Settlement with the Calpine Canadian Debtors*, In re Calpine Corp., No 05-60200 (Bankr. S.D.N.Y. July 26, 2007) [D.I. 5422].

34.     In addition, courts have approved similar allocations of proceeds and obligations among cross-border debtors through the confirmation of plans of reorganization. *Order Confirming Debtors' Fourth Am. Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the Bankr. Code*, In re Semcrude, L.P., No 08-11525 (Bankr. D. Del. Oct. 28, 2009) [D.I. 6347] (confirming plan of reorganization which included contribution of Canadian debtors' cash assets and proceeds from certain settlements to U.S. debtors for payments of certain claims); see also *Order Approving the Findings of Fact, Conclusions of Law and Order Confirming the Joint Plan of Reorganization for Smurfit-Stone Container Corporation and Its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors*, In re Smurfit-Stone Container Corp., No. 09-10235 (Bankr. D. Del. June 21, 2010) [D.I. 8107] (confirming joint plan of reorganization of U.S. and Canadian debtors); *Opinion on Confirmation*, In re AbitibiBowater Inc., No. 09-11296 (Bankr. D. Del. Nov. 22, 2010) [D.I. 3931] (confirming debtors' plan of reorganization and overruling objections to the debtors' proposed plan, including an objection that there was inadequate disclosure of value allocation among U.S. debtors, Canadian debtors, and cross-border debtors, and affirming the use of a distribution model to calculate allocation of asset value to creditors at each of those debtors).

35.     Approving an Allocation Protocol is indisputably in the best interest of the U.S. Debtors' creditors – as well as all Nortel creditors wherever situated. All such creditors have an interest in the speedy allocation of the Sale Proceeds, which will ultimately determine the distribution they receive on their claims.

36.     As time has passed and negotiations have failed, it has become clear to the Movants that a dispute resolution process established by the U.S. and Canadian Courts and

binding upon the Selling Debtors is the sole means to resolve allocation issues. The Selling Debtors and the other Mediation Attendees have worked hard over the almost two years since signing the IFSA to find common ground and substantially limit the open issues. As a result, the Movants believe that a limited universe of narrow issues can be presented to the U.S. and Canadian Courts to allow determination on a streamlined basis.

37.     The Movants, accordingly, respectfully request that the U.S. and Canadian Courts jointly approve the Allocation Protocol set forth in Exhibit B. The proposed procedures, which provide the Courts with great latitude to craft specific procedures to resolve the allocation of proceeds, are both fair and appropriate under the circumstances, will provide a final and full resolution of the allocation process on an expedited basis, and are neutral and designed to equally protect the interests of all interested parties.

### Request for a Joint Hearing

38.     As interested parties and as claimants or representatives of direct or indirect beneficiaries of over $2 billion in claims against the Canadian Debtors, the Movants hereby request that the relief in this Motion, the companion relief to be sought before the Canadian Court and any objections thereto be considered at a joint hearing between the U.S. and Canadian Courts pursuant to section 15 of the Cross-Border Protocol. A joint hearing is appropriate here given that the same relief is being sought from both the U.S. and Canadian Courts, and that the approval of an Allocation Protocol will impact the allocation of Sale Proceeds in excess of U.S. $30 million. Cross-Border Protocol, ¶ 15.

### Notice

39.     Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Monitor; (iii) counsel to the Canadian Debtors; (iv) counsel to the Joint Administrators; (v) the Selling Debtors; (vi) the Non-Filed Entities; and (vii) the general service

list established in these chapter 11 cases.  The Movants submit that under the circumstances no other or further notice is necessary.

**No Prior Request**

40.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Movants respectfully request that the U.S. Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  April 25, 2011
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
Howard S. Zelbo
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

   - and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Mark Collins*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*