## EXHIBIT A

Court File ___09-CL-7950___

Ontario
Superior Court of Justice
(Commercial List)

In the matter of the companies' creditors arrangement act (CCAA)
R.S.C. 1985, c. C-36, as amended

and in the matter of a plan of compromise or arrangement of
Nortel Networks Corporation, Nortel Networks Limited,
Nortel Networks Global Corporation, Nortel Networks International Corporation and
Nortel Networks Technology Corporation

application under the companies' creditors arrangement act
R.S.C. 1985, c. C-36, as amended.

MOTION RECORD
Canadian Sales Process Order regarding
Certain Patents and other Assets
(returnable May 2nd, 2011

David Steer,
Inventor,
10 Cypress Crt, Nepean,
Ontario, K2H 8Z8.
davidsteer127@sympatico.ca

April 26th 2011

The filing is provided in response to the proposal to sell intellectual property, certain patents and other assets as outlined in the 63rd report of the monitor and its associated documentation (dated April 7th 2011).

This affidavit is made to depose items of which I have personal knowledge and which have bearing on the matters of today's session.

I joined the research and development division of Nortel (then known as Bell-Northern Research) in the summer of 1974 as an Engineer and have since worked for the firm in many aspects of telecommunications technology development. If you make a phone call, use your mobile phone or WiFi, you are using products and inventions which are my work. I retired from Nortel Technology Corporation in December of 2008. A partial listing of the patents and patent applications (about 80 in total) of which I am an inventor is provided in Annex 1 of this filing.

1   It is my duty, as an inventor of a significant number of the patents that are part of today's
2   discussions, to make known to potential purchasers, the patent offices and interested parties
3   that there are some important irregularities that affect the merchantability of these patents.

4   Quite properly as I am their inventor, these patents have my name on them.  None of the other
5   parties to today's discussion have that important distinction.  As a true inventor of the patents,
6   the patents would be invalid without my name being included.  Inventors do have continuing
7   responsibilities towards their inventions.  One of these is to give consent for any litigation that
8   may arise concerning the invention, for example, a suit for infringement.  All of the inventors of a
9   patent must agree to such litigation before it can proceed[1].  Interested parties will recognise that
10  litigation may be blocked if even a single inventor indicates that they do not consent.

11  The purchaser and other interested parties will note in this regard that the proposed "motion
12  approval and vesting order (certain patents and other assets)", that is part of today's discussion,
13  includes clauses that unilaterally terminate the inventor's consideration[2].  Clause 6 (b), for
14  example, clearly indicates that the rights of former employees, including the inventors, are not
15  respected.  Furthermore, additional clauses[3] instruct government officials to strike all of these
16  encumbrances from their records and databases.  While victors often presume they will rewrite
17  history to their advantage, such Stalinesque misdirection seems inappropriate in this case.

18  Quite apart from any tidying of databases, the purchaser, other potential bidders and other
19  interested parties will recognise that the record of this court and its motions will remain with its
20  direction that the inventor's assignment contracts were unilaterally terminated.

21  The inventors, by being unilaterally ordered out of their contracts, have no obligation to Nortel or
22  to any successful purchaser.  The inventors may, if they are made aware of any potential suit for
23  infringement with respect to their inventions, and if they chose, indicate to any court that they do
24  not consent to such action.  In most cases such an indication of lack of consent would block any
25  legal proceedings for an alleged infringement.  Even if a suit for infringement were to proceed,
26  the inventors may, if they choose, assist the defence of those who are alleged to be infringing.
27  Those familiar with such proceedings will recognise that the inventor's technical knowledge and
28  their knowledge of the patent's prosecution development will render such an infringement suit
29  very unlikely to be successful.  The current wording of the motion which excludes the possibility
30  of agreement from the inventors will influence interested purchasers as to the practical utility of
31  the assets being offered for sale.

32  Also, the purchaser, other potential bidders and other interested parties will recognise that the
33  unilateral termination of the inventor's assignment contracts also terminates the
34  powers-of-attorney under which the inventor's many patent applications are proceeding.  With

---

[1] See, for example, 35 U.S.C. 262.

[2] The relevant clauses (e.g. clause 6 (b)) are attached here in Annex 4 for your convenience.

[3] See for example clause 7 (a), attached here in annex 4 for your convenience.

1   these powers-of-attorney no longer valid, the many pending applications become unsupported
2   and unable to continue.  The voiding of these many applications may also influence interested
3   parties as to the practical utility of the sale as outlined in the proposed court motion.

4   The prominent appearance as part of the proposed court order of a clause stating the unilateral
5   termination of the inventor's assignment contracts is a definitive indication that the order is
6   without the agreement or consent of the inventors.  The court order thus stands as a clear
7   marker that the inventors have not consented to the proceedings.  Such a court declaration of
8   non-consent by the inventors would itself be sufficient to stay any infringement suit from
9   proceeding.

10  In order to protect the interests of the applicants and to protect the interests of the purchaser
11  and other potential bidders, it is recommended that the proposed "motion approval and vesting
12  order (certain patents and other assets)" that is part of today's discussion be amended to
13  achieve the following objectives :

14      1.   that clause 6(b) be reworded to indicate that the purchasing process has included real
15           actions, including reaching agreement of the inventors, to assure that the inventor's
16           contracts are honoured and thereby preserving their consent for litigation involving their
17           patents and allowing the powers-of-attorney to remain in effect thereby enabling pending
18           applications to proceed.

19      2.   that clause 7(a) be reworded to indicate that, with the agreement of the inventors, the
20           records and databases may be amended to include the new purchaser, and that the
21           recorded history of the patent development and actions be maintained.

22      3.   that a clause be added to the motion to direct that the purchaser(s) work with the
23           inventors to achieve a satisfactory agreement to assure their support of the transaction
24           and that such consideration may affect the net purchase price.

25      4.   that the relevant sections of the sale agreement and the stalking horse agreement be
26           amended to reflect the processes in the amended clause 6(b), 7(a) and the new inventor
27           support clause of the motion approval and vesting order.

28  Failure to amend the order along the lines suggested to assure consent of the inventors will
29  leave the potential purchasers uncertain of the utility of the patents and patent applications and
30  thus reduce the potential sale proceeds.  Such uncertainty will be to the significant detriment of
31  the applicants, the inventors, and their creditors.

32  Although this filing refers specifically to the patents and applications for which I am an inventor
33  (Annex 1), it will be understood by interested parties that the same irregularities that affect my
34  assignment contracts also affect the other Nortel inventors.  These include, for example, all the
35  inventors who were participants in the Nortel long term disability insurance, life insurance,
36  savings, health and pension programs.  Severed inventors who have not received mandated
37  severance or other contracted payments are also among those with consequent irregularities in

1  the assignment of their patents and pending patent applications.  Annex 2 of this filing provides
2  some further notes on the irregularities involving the patents and some methods of resolution.

3  Interested parties will understand that the irregularities reported here do not affect the technical
4  aspects of the inventions, their inventiveness or their claims.  The fundamental value of the
5  patents and patent applications is unchanged by these irregularities.

6  This deposition is made on my own behalf and I am not acting at the request or on behalf of any
7  firm or association or any other interested party at this session.  Although I am here with the
8  knowledge and counsel of my co-inventors, I do not speak formally on their behalf, and the
9  specifics of these depositions apply to the patents and applications for which I am the sole or a
10 co-inventor.  Interested parties will, however, recognise the generality of the arguments
11 presented and their applicability to others.

12 This filing is made without the experience and benefit of legal counsel.  This is partly because of
13 financial constraints as the applicants have stolen my life savings.  Also, it is impractical to find a
14 suitable legal firm with experience in the aspects of inventor's intellectual property rights that
15 has not also been associated with patent actions on behalf of Nortel.  It is expected that the
16 court will consider this filing based on its matters of substance and will not be sidetracked with
17 items of procedure, form or format.

18 A previous filing discussing these irregularities was provided to the courts in August of 2010.
19 This previous filing was served on all of the firms on the service distribution list as it was at that
20 time and was also deposited with the US and the UK courts.  A copy of the previous filing may
21 be found in the docket of the US court at :

22    http://chapter11.epiqsystems.com/Nortel
23    (by searching for Docket 3774 in the Dockets heading).

24 If there are further questions about this filing, or if additional documentation is required, please
25 contact me at any time.  (The email is the most convenient)

26 Yours


27  ORIGINAL SIGNED BY:

28 David G. Steer,  PhD.

29 April 26th, 2011

30

5

1                                      **Annex 1**

2    The following is a partial listing of the intellectual property (patents and patent applications) for
3    which David Steer is a named inventor.  Note that some of these may have time expired or
4    otherwise been abandoned.  Interested parties are also advised to perform due diligence as to
5    those patents that are the subjects of licensing and those that are embedded in communications
6    standards.

7    Note this is a partial listing as it does not include filings for which I have not been informed,
8    continuations, divisionals etc. of existing applications or those applications for which it was
9    requested that publication be delayed until the patent was issued.

10   The following US patents plus such other United Sates patents that may be issued or
11   discovered in continued publication [35]:

| | | |
|---|---|---|
| 7,742,738 | 6,996,418 | 6,230,018 |
| 7,647,061 | 6,985,545 | 6,070,083 |
| 7,453,832 | 6,873,612 | 6,032,033 |
| 7,440,785 | | 5,982,324 |
| 7,421,276 | | 5,345,597 |
| 7,414,964 | | 5,239,682 |
| 7,400,888 | | 5,239,676 |
| 7,304,939 | 6,845,246 | 5,229,995 |
| 7,289,427 | 6,721,569 | 4,920,565 |
| 7,177,644 | 6,701,129 | |
| 7,177,371 | 6,643,517 | |
| 7,174,170 | 6,633,564 | |
| 7,151,944 | 6,343,213 | |
| 7,110,351 | 6,249,245 | |
| 7,031,753 | 6,236,359 | |

The following US patent applications and continuations and those that may be filed or
discovered in continued publication (this list does not include applications that have yet to be
published) [44]:

| | | |
|---|---|---|
| 20110033051 | 20090225743 | 20070123263 |
| 20110018766 | 20090161608 | 20070002818 |
| 20110013678 | 20090141668 | 20060258296 |
| 20100248619 | 20090053994 | 20060126493 |
| 20100246475 | 20090016259 | 20060052139 |
| 20100166180 | 20090016258 | 20040204026 |
| 20100141430 | 20080316990 | 20040176050 |
| 20100102964 | 20080171520 | 20040157645 |
| 20090307484 | 20080159430 | 20040157637 |
| 20090303895 | 20080159419 | 20040157613 |
| 20090252065 | 20080159186 | 20040157611 |

6

```
20040156345
20040125743
20040081113
20040076170
20030103445
20030067961
20030058833
20020118784
20020086708
20020075841
20010002822
```

The following European patents and applications and such other patents and applications that may be issued or discovered in continued searching. Note that while there is some overlap of these with the US/Canadian filings and patents, some are exclusive to the EU or other nations:

1. EP0957370
2. EP2172072
3. EP2140555
4. EP2123079
5. EP2122876
6. EP2122857
7. EP2084834
8. EP2050306
9. EP2050227
10. EP2041910
11. EP1916782
12. EP1606907
13. EP1602203
14. EP1602196
15. EP1597927
16. EP1520390
17. EP1348310
18. DE60318911
19. FR2842055

1. WO2010063095
2. WO2010048699
3. WO2009087443
4. WO2009077863
5. WO2008106797
6. WO2008084394
7. WO2008011718
8. WO2008004102
9. WO2008000554
10. WO2008000450
11. WO2008000067
12. WO2008000065
13. WO2007131347
14. WO2007001892
15. WO2007001328
16. WO2007001329
17. WO2007061357
18. WO2008116300
19. WO2008086599
20. WO2008049843
21. WO2008011717
22. WO2008003825
23. WO2008001827
24. WO2008003562
25. WO2004082070
26. WO2004073268
27. WO2004006532
28. WO2003049355

1                                    **Annex 2**

2    This annex provides further facts and analysis about the patent assignment process and
3    irregularities as practiced by Nortel and experienced by the Nortel inventors.

4    <u>Patent Assignment Obligations</u>

5    Generally, as part of the invention of innovations and the preparation and filing of patent
6    applications, the inventor is requested to sign an "Assignment contract".  The purpose of this
7    contract is to formalise and to acknowledge a transfer of the intellectual property of the inventor
8    that is associated with the invention.  A copy of the contract used by Nortel with its inventors is
9    attached as Annex 3 to this filing.

10   For this discussion, the significant words are in the first sentence "For valuable consideration,
11   the receipt of which is hereby acknowledged, ....".

12   In my experience, there was never an exchange of any specific "valuable consideration", not
13   even a minor token, at the time of the signing of the assignment form (or at any other time).

14   It was stated by Nortel to the inventors that the "valuable consideration" stipulated in the
15   assignment contract was the employee's "compensation plan".  This plan included a number of
16   items:  a salary, performance bonuses, holidays, long term disability insurance, savings plan,
17   life insurance, health, vision and drug plan, dental plan, termination benefits and a pension plan.
18   At the time I joined the company in 1974 there were no options within the plan.  It was fixed to
19   include all of these items and all employees were required to be a part of all programs.  In later
20   years, newer employees were allowed some flexibility in their choice of benefits.  Many times,
21   especially in the last decade, professional employees were informed that salaries could not be
22   compared or matched to others in the industry due to the many aspects of the very valuable
23   total compensation plan.

24   At the time of signing the "Assignment contract", my understanding, and the understanding of
25   other inventors, was that the "valuable consideration" included all aspects of their compensation
26   plan.

27   We were also led to believe that payments on our behalf relating to items such as long term
28   disability, life, health, vision and dental insurance, and pension contributions were being made
29   by Nortel as these were reported as taxable benefits in our yearly tax receipts. Employees were
30   also sent yearly summaries detailing the compensation plan and its benefits and were required
31   to pay sales tax on payments for these plans.   We were charged and we paid taxes on the
32   alleged Nortel contributions to the benefits programs.

1    However, the evidence before the court indicates that Nortel was in fact not making its
2    contributions to the compensation plan as it was informing the employees and was
3    acknowledging in the assignment contract with the inventors[4].

4    I.    In the case of the long term disability insurance (LTD), employees expected to receive a
5             pension until age 65 in the event of their disability.  As the LTD insurance accounting for
6             the 2008 year provided to the court indicates, not only was Nortel not making provision
7             for the payments for long term disability, it was also stealing money from the previous
8             accumulations of the plan to be used for Nortel`s current operations[5].  Employees were
9             required to pay Ontario sales tax on the "LTD Premiums".  Thus, in spite of
10            acknowledging valuable consideration for the LTD insurance in the inventor's
11            assignment contract, Nortel was in fact not making the necessary provision for the LTD
12            plan.  Any inventor who participated in the LTD insurance plan (including myself) was
13            misled by Nortel into believing a LTD plan was in place when it was not.  The signature
14            on the patent "Assignment contract" was thus obtained under false pretences and is
15            invalid.  The signatures on the "Assignment contracts" or other termination documents
16            are thus void as a consequence of long term fraudulent activity by Nortel involving the
17            LTD plan.

18    II.    In the case of the life insurance plan employees and pensioners expected their heirs
19             would receive a payment in the event of the employee's death.  This life insurance was
20            treated as a taxable benefit on the employee's tax record and employees were required
21            to pay both income tax and sales tax on the premiums.  As the court has agreed, this
22            "insurance" has been terminated.  Thus, in spite of acknowledging provision for life
23            insurance and death benefits as valuable consideration in the inventor's assignment
24            contract, Nortel was in fact not making the necessary provision for these plans.  Any
25            inventor who participated in these life insurance programs (including myself) was misled
26            by Nortel into believing an insurance plan was in place when it was not.  The signature
27            on the patent "Assignment contract" was thus obtained under false pretences and is
28            invalid.  The signatures on the "Assignment contract" or other termination documents are
29            thus void as a consequence of long term fraudulent activity by Nortel involving the life
30            insurance plan.

31    III.    In the case of the health, vision and dental plan, employees and pensioners expected to
32            receive health, vision and dental benefits.  As the court has agreed, these payments
33            have already been terminated.  Nortel has failed to pay my health benefits as a retiree
34            since January of 2009.  Thus, in spite of acknowledging provision for the health, vision

---

[4] The post retirement plans are summarised in Appendix G of the 39th Report of the Monitor, February 2009
Mercer Report Appendix D .  The decreasing financial status of the programs is summarised in Appendix F of the
39th Report of the Monitor, January 2009 Mercer Report.

[5] The deteriorating financial status of the HWT fund is summarised in Appendix H of the 39th Report of the
Monitor.

1     and dental plan as valuable consideration in the inventor's assignment contract, Nortel
2     was in fact not making the necessary provision for the health, vision and dental plan.
3     Any inventor who participated in the health, vision and dental program (including myself)
4     was misled by Nortel into believing a health, vision and dental plan was in place when it
5     was not.  The signature on the patent "Assignment contract" was thus obtained under
6     false pretences and is invalid.  The signatures on the "Assignment contract" or other
7     termination documents are thus void as a consequence of the long term fraudulent
8     activity by Nortel for the health, vision and dental plan.

9  IV.    In the case of the pension plan, employees participating in the plan expected to receive
10     a pension with indexing at the time of their retirement.  As the documents before the
11     court indicate, the pension plan is significantly under-funded (69%)[6].  The increase in the
12     under-funding over the years is clear evidence of the failure of Nortel to make due
13     provision for the pension plan.  As the court has agreed, the pension plan terminated in
14     September of 2010.  Thus, in spite of acknowledging the pension plan provision as
15     valuable consideration for in the inventor's assignment contract, Nortel was in fact not
16     making the necessary provision for the pension plan.  In spite of Nortel's failure to make
17     necessary provision for the pension plan, the employees were taxed by governments as
18     if the pension provision had been made.  Any inventor who participated in the pension
19     program (including myself) was misled by Nortel into believing a pension plan was in
20     place when it was not.  The signature on the patent "Assignment contract" was thus
21     obtained under false pretences and is invalid.  The signatures on the "Assignment
22     contract" or other termination documents are thus void as a consequence of long term
23     fraudulent activity by Nortel in its operation of the pension plan.

24  V.    In the case of the termination benefit plan, employees who were a part of the plan
25     expected to receive a payment at the time of their retirement ("TRA")[7].  Nortel has
26     refused to pay my TRA in January 2009 as it stated that it would do in December of
27     2008.  Thus, in spite of acknowledging termination benefits as valuable consideration in
28     the inventor's assignment contract, Nortel was in fact not making the necessary
29     provision for the TRA plan.  Any inventor who participated in the TRA program (including
30     myself) was misled by Nortel into believing a TRA plan was in place when it was not.
31     The signature on the patent "Assignment contract" was thus obtained under false
32     pretences and is invalid.  The signatures on the "Assignment contracts" or other
33     termination documents are thus void as a consequence of long term fraudulent activity
34     by Nortel in relation to the TRA plan.

35  VI.    In the case of the severance plan, professional employees expected to receive a
36     compensation package commensurate with customary legal employment requirements

---

[6] Doolittle Affidavit, Exhibit "D", Letter from Mercer Human Resource Consulting dated May 15, 2009

[7] TRA – Transition Retirement  Allowance - computed as a combination of years of service and final salary.

1  in the event of their severance.  As the court is aware, it has agreed to provide a shelter
2  such that Nortel is not required to pay the legally required severance.  Thus, in spite of
3  acknowledging required severance as valuable consideration in the inventor's
4  assignment contract, Nortel was in fact not making the necessary provision for the
5  severance of inventors.  The employee inventors were misled by Nortel into believing the
6  legally required severance plan was in place when it was not.  The signature on the
7  patent "Assignment contract" was thus obtained under false pretences and is invalid.
8  The signatures on the "Assignment contracts" or other termination documents are thus
9  void as a consequence of fraudulent activity by Nortel in the payment of severance.

10  Taken together, or individually, these six examples provide evidence that Nortel systematically
11  misled the inventors as to the "valuable consideration" being acknowledged in the assignment
12  contract.  Although Nortel led the inventors to believe that there were compensation plans in
13  place, Nortel was in fact not making the necessary provisions for these plans.  The accounting
14  records before the court also indicate Nortel was improperly removing funds previously made to
15  the plans and diverting them to other general operations.  As the signatures were obtained on
16  the assignment contracts, or other termination documents, through this deliberate misdirection,
17  they are invalid and the assignment of the patents to Nortel is void.  Without a valid assignment
18  contract, the intellectual property remains the property of the inventors.

19  Resolution

20  The most complete resolution would be to make whole, to the satisfaction of each of the
21  inventors, the employee compensation plans that were in place at the time the assignment
22  contracts were signed or the inventor terminated.

23  This fulfilment must ensure, for example:

24      1.  the uninterrupted continuation of the full LTD insurance plan for all those eligible to
25          receive LTD benefits.
26      2.  the uninterrupted continuation of the full pension plan for all inventors including the
27          associated inflation, health, vision and dental benefits etc.  The inventors may chose
28          to pool their pension fulfilment to the benefit of all the pensioners.
29      3.  that all severed employees receive the full customary legal severance.

30  This approach has the advantage to purchasers in that it ensures the continued consent of the
31  inventors in support of legal actions concerning their inventions and support for the continuation
32  of patent applications that are still in the process of being pursued.  A suitable vehicle for this
33  could be a trust fund established for the benefit of the whole community of long term disability
34  and pensioners.

35  Failure to satisfy each of the inventors would leave the inventors cause to withhold their consent
36  for any legal proceedings, including suits for infringements, in relation to their inventions.

37

1

**Annex 3**

*FILE NUMBER*

PATENT APPLICATION
ASSIGNMENT

**FOR VALUABLE CONSIDERATION**, the receipt of which is hereby acknowledged, I (we) the undersigned, whose full post office address(es) is(are) listed below by (our) name(s), do hereby sell, assign and transfer to:

**NORTEL NETWORKS LIMITED**

(hereinafter "Nortel"), its successors, assigns and legal representatives, whose full post office address is:

2351 Boulevard Alfred-Nobel
St. Laurent, Quebec
Canada, H4S 2A9

all their right, title, and interest worldwide in and to the invention relating to

*TITLE OF PATENT*

as described in the application for letters patent filed concurrently herewith, as well as all rights and privileges including priority rights arising from the aforesaid application and corresponding applications in other countries, all continuations, continuations-in-part, divisionals, renewals, substitutes, or reissues thereof, and all the rights and privileges under any and all letters patent that may be granted for said invention.

I (We) undertake without charges to Nortel, but at its request and expense to execute all documents, take all oaths and do all reasonable acts to enable Nortel, its successors assigns and legal representatives to procure and maintain patent or any other intellectual property protection for said invention in any and all countries and to vest title thereto to Nortel, its successors assigns and legal representatives.

THE UNDERSIGNED hereby authorizes the firm of *NAME OF FIRM* whose full post office address is *ADDRESS OF FIRM*, to correct clerical errors in this Assignment or to insert any further identification or other information necessary or desirable to make this Assignment suitable for recordial in a domestic or foreign Patent Office.

1            **Annex 4**

2    Extract from proposed motion approval and vesting order certain patents and others assets (from
3    the Motion Record returnable May 2, 2011 (Canadian Sales Process Order regarding Certain
4    Patents and other Assets  pp69).

069

- 3 -

interest in and to the Assets to the Purchaser in accordance with the provisions of the Sale Agreement (including, the licenses under the Jointly Owned Patents, the Specified UK Patents, the Undisclosed Patent Interests and any other Patents granted by one or more of the Applicants to the Purchaser pursuant to the Sale Agreement and, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement, any Undisclosed Patent Interests, together with all the other Assets, collectively the "Purchased Assets").

4.      **THIS COURT ORDERS AND DECLARES** that without limiting the generality of the foregoing, the following documents are hereby approved and the Applicants party thereto are hereby authorized and directed to perform and comply with their respective obligations thereunder:

      (a)      Closing Date License Agreement substantially in the form attached as Appendix ■ to the ■ Report; and

      (b)      the Escrow Agreement substantially in the form attached as Appendix ■ to the ■ Report.

5.      **THIS COURT ORDERS AND DECLARES** that the Applicants are authorized and directed to perform their respective obligations under the Sale Agreement and each of the Transaction Documents.

6.      **THIS COURT ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Purchased Assets (except any Undisclosed Patent Interests for which the Purchaser pays the Exercise Price after Closing, in which case the provisions of the balance of this paragraph shall be effective upon receipt by the Sellers or a successor or assign or any receiver, trustee or liquidator appointed in respect of such Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement for the applicable Undisclosed Patent Interest) shall vest absolutely in the Purchaser free and clear of and from:

070

- 4 -

(a)     any and all liens, claims and interests, including, without limitation, all security interests, hypothecs, mortgages, pledges, deeds of trust, trusts or deemed trusts, executions, levies, charges, or other financial or monetary claims, charges, rights of first refusal, encumbrances, restrictive covenants, rights of offset or recoupment, leases or conditional sale arrangements, debts, liabilities, obligations, contractual rights and claims and rights or causes of action, obligations, demands, restrictions, consent rights, options and indemnities; and

(b)     claims and interests of any nature or kind of employees, consultants or agents or former employees, consultants or agents, of any of the Applicants arising out of the alleged invalidity, unenforceability or irregularity on any grounds of any of their assignments, transfers or waivers to or in favour of any of the Applicants, whether express or implied or by operation of contract, law or otherwise, of any or all of their right, title and interest in any of the Purchased Assets,

in each case, whether or not they have attached or been perfected, registered or filed, whether secured, unsecured or otherwise, arising prior to or subsequent to the date of the Initial Order but prior to Closing, whether imposed by agreement, understanding, law, statute, equity or otherwise and whether allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether asserted prior to or after Closing, (collectively, the "Claims") including, for the avoidance of doubt:  (i) any encumbrances or charges created by any of the Orders made in these proceedings including the Initial Order; and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which, together with Liens and Claims in the CCAA Cases, are collectively referred to as the "Encumbrances", provided however that "Encumbrances" shall not include Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order), Liens created by or through the Purchaser or any of its Affiliates, and Assumed Liabilities or as otherwise set forth Section 2.1.1(a) of the Sale Agreement and Section 5.21 of the Sale Agreement.  For greater certainty, all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

DOCSTOR: 2133173\14

- 5 -

071

7.    **THIS COURT ORDERS** that:

(a)    effective upon Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property as defined in the Initial Order) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), all Government Entities maintaining records or data bases in which the Encumbrances are recorded, filed or registered are authorized and directed to strike such Encumbrances as they affect the Purchased Assets from their records and data bases; and

(b)    if any Person or entity which has filed statements or other documents or agreements evidencing Encumbrances affecting the Purchased Assets shall not have delivered to the Applicants before the Closing (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) in proper form for filing and executed by the appropriate parties, discharge statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances which the Person or entity has or may assert with respect to the Purchased Assets, then the Applicants are each hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such Person or entity with respect to the Purchased Assets.

8.    **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims and Encumbrances, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, and that from and after the delivery of the Monitor's Certificate (or, in the case of any Undisclosed Patent Interests, effective upon receipt by the Sellers or any successor or assign or any receiver, trustee or liquidator appointed in respect of a Seller (or its Property) of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement) all Claims and Encumbrances shall attach to the net proceeds from the sale of the