(ii)    Long Term Disability Plan - Nortel's contributions to be sufficient to satisfy all claims and may make additional/increased contributions based on an actuarial valuation or some other reasonable basis;

    (iii)    Survivor Income Benefit Plan - funding to be identical to that of long term disability, but employees required to make contributions;

    (iv)    Group Life Insurance Plan (Part I – Basic & Part II – Optional)

        A.    Nortel to make contributions to the HWT sufficient to pay premiums. Contributions (both active employees' and Nortel's) not immediately applied against claims and expenses of the insurer to be deposited/transferred to a sub-account of the HWT called the 'Pensioners Insurance Fund'.[2]

        B.    At the time of the Ruling, the Pensioners' Insurance Fund of approximately $11 million, with Mutual Life Assurance of Canada, to be transferred into the HWT.

        C.    Group Life Insurance (Part II) to be paid totally by the employees, to form part of the Trust Fund but be kept in a separate account.

## The Trust Agreement

38.    In summary, the Trust Agreement provides that:

    (a)    the Trust Fund is created for the purpose of providing the Health and Welfare Plan benefits for the benefit of the Applicants' active and retired employees;

    (b)    Nortel may designate as the "Health and Welfare Plan" certain of the following health and welfare plans (and such other similar plan or plans as Nortel may from time to time place in effect): health care; management long term disability; union long term disability; a management survivor income benefit; management short term disability; and group life insurance;

    (c)    all contributions (from both Nortel and employees) will be held in a single fund (the **"Trust Fund"**), including all profits, increments, and earnings thereon (Article I, Section 6);

---

[2] This funding arrangement is applicable to Part I – Basic life insurance.

(d)     with respect to record-keeping, the Trustee shall keep accurate and detailed accounts of all investments and transactions and separate records for each of the separate Plans (Article III, Section 2(p)); and

(e)     on termination of the HWT, the following shall apply:

Upon sixty (60) days prior written notice to the Trustee, the Corporation may terminate its obligation to make Employer's contributions in respect of benefits after the date of written notice to the Trustee (hereinafter called the "Notice of Termination"). Upon receipt of the Notice of Termination the Trustee shall within one hundred twenty (120) days determine and satisfy all expenses, claims and obligations arising under the terms of the Trust Agreement and Health and Welfare Plan up to the date of the Notice of Termination. The Trustee shall also determine upon a sound actuarial basis, the amount of money necessary to pay and satisfy all future benefits and claims to be made under the Plan up to the date of the Notice of Termination. The Corporation and the designated affiliated or subsidiary corporations shall be responsible to pay to the Trustee sufficient funds to satisfy all such expenses, claims and obligations, and such future benefits and claims. The final accounts of the Trustee shall be examined and the correctness thereof ascertained and certified by the auditors appointed by the Trustee. Any funds remaining in the Trust Fund after the satisfaction of all expenses, claims and obligations and future benefits and claims, arising under the terms of the Trust Agreement and the Health and Welfare Plan shall revert to the Corporation. (Article VI, section 2.)

## Current Plans

39.     According to the 2005 Valuation (as defined below) (the most recent actuarial valuation of the obligations of the HWT located by the Monitor), the following plans (collectively, the "**Plans**") formed the Health and Welfare Plan as at that date:

- medical, dental and life insurance benefits provided to pensioners,

- income payments to disabled employees (long term disability and short term disability),

- medical, dental and life insurance benefits provided to disabled employees,

- income benefits for beneficiaries of deceased employees (survivor income benefit and survivor transition benefit[3]),

- medical and dental benefits provided to active employees,

- employer-paid basic life insurance provided to active employees, and

- employee-paid optional life insurance provided to active employees.

Handbooks concerning certain of Nortel's benefit plans are attached as Appendix "K". We will discuss each of the pensioner benefits, LTD benefits, survivor income benefits, survivor transition benefits and optional life in turn.

## Sun Life

40.   Nortel has an administrative services only arrangement with Sun Life in respect of benefits provided under health, dental, survivor transition, survivor income and long-term disability plans, all of which are self-insured by Nortel.  Sun Life insures pensioner life and active employee life benefits (Life Part I – Basic and Part II – Optional).  Copies of certain Sun Life policies and history summaries and amendments with respect thereto are attached as Appendix "L".

## Pensioner Benefits

41.   The Pensioner benefits are paid to pensioners of Nortel or eligible dependents. Approximately 11,000 pensioners are entitled to pensioner benefits, comprised of (a) pensioner life (10,461 pensioners), and (b) medical and dental benefits (11,180 pensioners and 6,251 spouses).

---

[3]   STBs are listed in the 2005 Valuation.  However, as set out below, since closure of the STB plan in 2003, the STB plan has not been referenced in the HWT financial statements since the 2004 HWT financial statement.

(a)    *Pensioner Life*

42.    Pensioners are entitled to a group life insurance benefit ("**Pensioner Life**"). The benefit amount varies and generally decreases with age but it is permanent and not term insurance. Pensioner Life premiums were historically paid from HWT assets and this has continued throughout the CCAA proceedings.

43.    Sun Life insures Pensioner Life by a policy issued to Nortel, as policyholder. The policy is experience rated. Each year, the accounts between Nortel and Sun Life are adjusted based on claims experience. Essentially, if the claims experience in a year was less than the premiums paid, Sun Life paid a refund to Nortel and, if the claims experience was more than the premiums paid, the deficiency was paid to Sun Life from the HWT, subject to the cross-experience rating described in paragraph 74.

44.    The basic life insurance policy and the optional life insurance policy (discussed below) contain conversion privileges entitling a participant, without evidence of insurability, to convert to an individual life policy with Sun Life, to a maximum of $200,000 for basic and optional life insurance combined.

45.    The Settlement Agreement does not require Nortel to pay the premiums in respect of Pensioner Life for 2010. These premiums continue to be paid from the corpus of the HWT.

46.    The HWT financial statements indicate reserve assets in respect of Pensioner Life of $30.7 as at December 31, 2009[4] and $49.6 million as at December 31, 2008.

---

[4] The reserved asset amounts as at December 31, 2009 are lower than the comparable December 31, 2008 amounts primarily due to the payment of benefits during 2009 and a reduction in the net assets reflected in the 2009

Accordingly, this is a Reserved Plan.

47.     Pensioner Life premiums for 2009 were approximately $5.7 million.  The estimated cost of Pensioner Life premiums for 2010 is approximately $7.8 million.  For the period January 1 to June 30, 2010, Pensioner Life premiums amount to approximately $3.9 million, including taxes and administrative costs relating thereto.

48.     In addition, there are 77 Pensioners (most of whom retired prior to 1983) entitled to receive an additional death benefit of 1 x preretirement earnings, with no reductions ("ADB").  From January 1, 2010 to June 30, 2010, Nortel has paid approximately $0.2 million in ADB.  For the purposes of the Proposed Allocation Methodology and the illustrative scenarios, ADB forms part of Pensioner Life.

*(b)*     *Medical and Dental Benefits*

49.     Medical and dental benefits for Pensioners ("**Pensioner M&D**") were historically funded by Nortel on a pay-as-you-go basis but, as an administrative matter, were paid using the HWT as a payment mechanism.  This has continued throughout the CCAA proceedings.  Under the Settlement Agreement, the cost of Pensioner M&D will continue to be paid by Nortel on a pay-as-you-go basis until December 31, 2010.

50.     Pensioner M&D costs for 2009 were approximately $16.7 million.  The estimated cost of the Pensioner M&D for 2010 is between $17.1 million and $20.9 million.  For the period January 1 to June 30, 2010, Pensioner M&D costs amount to approximately $7.4 million, including taxes and administrative costs relating thereto.

---

HWT financial statements as a result of a reserve established on the amount Due from Sponsoring Company. This reserve has been allocated to the reserved assets *pro rata* based on their asset balances.

C  099

**LTD Benefits**

51.    Long-term disability ("LTD") benefits are provided when short-term disability benefits end and continue for the duration of the employee's disability or until age 65 when the employee qualifies for pensioner benefits.  Approximately 360 people are entitled to receive LTD benefits, comprised of: (a) LTD life (358 individuals); (b) medical and dental benefits (360 individuals and 318 dependents); and (c) income benefits (351 individuals).

52.    LTD Beneficiaries are active employees.  Under the Settlement Agreement, LTD benefits are to be paid by Nortel on a pay-as-you-go basis until December 31, 2010.  The Settlement Agreement further provides that the employment of LTD beneficiaries terminates as of December 31, 2010 and that such termination does not affect in any manner their rights against Nortel arising out of their employment.

*(a)    LTD Life Insurance Benefits*

53.    Life insurance benefits for LTD employees ("**LTD Life**") end when a disabled employee attains age 65.  At that time, the disabled employee is eligible for Pensioner Life.

54.    LTD Life premiums were historically paid on a pay-as-you-go basis by Nortel through the HWT.  This has continued throughout the CCAA proceedings.  However, the premium for Optional Life (defined below) is waived while an individual is on LTD benefits (the "**LTD Optional Life .**").  These premiums were generally treated as part of the experience under the Optional Life policy, which was then cross-rated with the basic life policy as described in paragraph 74.

*(b)*     *Medical and Dental Benefits*

55.     Medical and dental benefits for LTD employees ("**LTD M&D**") were funded by Nortel on a pay-as-you-go basis, but as an administrative matter, were paid using the HWT as a payment mechanism. This has continued throughout the CCAA proceedings.

56.     LTD M&D and LTD Life costs for 2009 were approximately $2.5 million. The estimated cost of LTD M&D and LTD Life for 2010 is between $2.1 million and $2.6 million. The LTD M&D costs and life insurance premiums are included with the payment of medical, dental and life benefits for all active employees.

*(c)*     *Income Benefits*

57.     Income replacement benefits ("**LTD Income**") for Nortel employees on long-term disability were historically paid from HWT assets. This has continued throughout the CCAA proceedings.

58.     The HWT financial statements indicate reserve amounts in respect of LTD Income of $15.7 million as at December 31, 2009 and $30.7 million as at December 31, 2008. Accordingly, this is a Reserved Plan.

59.     LTD Income costs for 2009 were approximately $12.0 million. The estimated cost of LTD Income for 2010 is between $12.0 million and $12.2 million. For the period January 1 to June 30, 2010, LTD Income costs amount to approximately $5.3 million, including taxes and administrative costs relating thereto.

**Survivor Income Benefits**

60.     Survivor income benefits ("**SIBs**") are life-time income benefits for survivors of certain non-unionized Nortel employees. SIBs are no longer offered and have not been since

- 20 -

before the commencement of the CCAA proceedings but continue to be paid to a group of surviving spouses. SIBs were historically paid by the HWT from HWT assets. This has continued throughout the CCAA proceedings.

61.    Approximately 80 survivors of former employees of Nortel are currently in receipt of SIB ("**SIB Beneficiaries**").

62.    The HWT financial statements indicate reserve amounts in respect of SIBs of $12.1 million as at December 31, 2009 and $17.1 million as at December 31, 2008. Accordingly, this is a Reserved Plan.

63.    The cost of the SIBs for 2009 was approximately $1.4 million. The estimated cost of the SIBs for 2010 is approximately $1.4 million. For the period January 1 to June 30, 2010, the cost of SIBs amounts to approximately $0.7 million, including taxes and administrative costs relating thereto.

**Survivor Transition Benefits**

64.    Survivor transition benefits ("STBs") are income benefits for survivors of certain unionized former Nortel employees, payable for a five year period. STBs are paid on a pay-as-you-go basis by Nortel but, as an administrative matter, were paid using the HWT as a payment mechanism. This has continued throughout the CCAA proceedings.

65.    STBs were closed during 2003. Those people who were entitled to STBs at that time (namely, survivors then in pay, survivors of individuals that retired prior to April 1, 2003 and who remained LTD Beneficiaries with no interruptions of more than 60 days) were grandfathered. As of 2005, certain disabled employees continued to have STB coverage (the "**STB Beneficiaries**").

66.  It does not appear that there have been any reserve amounts in respect of STBs. The 2004 HWT financial statements were the last to show the present value of future payments related to STBs.

67.  The actuarial liabilities associated with the STBs consist of three components: (i) liability for approximately 305 survivors currently receiving STBs (approximately $4.1 million as at December 31, 2010); (ii) an accrual for the approximately 2,900 pensioners on whose death their survivors would be eligible for STBs (approximately $30 million as at December 31, 2010); and (iii) an accrual for the approximately 101 LTD Beneficiaries on whose death their survivors would be eligible for STBs (approximately $0.3 million as at December 31, 2010).

68.  The cost of the STBs for 2009 was approximately $2.8 million. The estimated cost of the STBs for 2010 is approximately $2.8 million. For the period January 1 to June 30, 2010, the cost of STBs amounts to approximately $1.2 million, including taxes and administrative costs relating thereto.

**Optional Life Benefit**

69.  Nortel provides basic, core group life insurance (group life – part I), for all active employees. In addition, there is an optional life insurance program (also known as group life – part II) ("**Optional Life**"), available to active employees at their own cost. Participants in the Optional Life program ("**Optional Life Participants**") may change from year to year as they decide to opt in or out or their employment is terminated.

70.  As set out above, the basic life and Optional Life insurance policies contain conversion privileges.

- 22 -

71.    In summary, under Optional Life coverage:

    (a)    Benefits are insured by Sun Life in a policy naming Nortel as the policyholder. Premiums are paid entirely by Optional Life Participants (other than those on long term disability, whose premiums are waived by Nortel).

    (b)    The insurance is term life, with benefits terminating no later than January 1st following an Optional Life Participant's 65th birthday. Each Optional Life Participant chooses the amount of benefit by applying the benefit formula. When an Optional Life Participant dies, Sun Life pays the beneficiary the benefit in effect on the date of death.

    (c)    The policy is experience-rated. Each year, the accounts between Nortel and Sun Life are adjusted, depending on the claims experience. Essentially, if the claims experience in a year was less than premiums paid, Sun Life paid a refund to Nortel and if the claims experience was more than the premiums paid, the deficiency was paid to Sun Life from the HWT, subject to the cross-experience rating described in paragraph 74. Premiums for Optional Life were reduced for the Optional Life Participants from about 2007 to reflect favourable experience.

    (d)    Within 30 days of leaving Nortel, an Optional Life Participant is entitled, without evidence of insurability, to convert to an individual life policy with Sun Life, to a maximum of $200,000 for basic and Optional Life insurance coverage combined.

    (e)    Neither the policies nor employee communications provided to the Monitor indicate any employee entitlement to a refund of premium.

72.    The HWT financial statements indicate reserve amounts in respect of Optional Life of $17.9 million as at December 31, 2009 and $26.0 million as at December 31, 2008 . Accordingly, Optional Life is a Reserved Plan.

73.    The number of working employees and LTD Beneficiaries that elected Optional Life coverage is being determined.

**Basic and Optional Life Cross-Experience Rating**

74.    Typically, each year Sun Life and Nortel agreed to cross-rate Optional Life (group life - part II) with basic life insurance (group life - part I). Accordingly, at the end of each year, any surplus or deficit under the two group policies was netted together. Sun Life

returned any net surplus to Nortel and Nortel deposited it in the HWT.  If there was a net deficit, this was paid as a lump sum to Sun Life from the HWT or carried over to the next year to be included in the next year's claims experience.  Generally, the surplus or deficit was allocated to the reserve accounts for Optional Life or Pensioner Life, depending on their respective experience.  Copies of Sun Life letters available in respect of the Sun Life policies for 2004, 2005, 2008, 2009 and 2010 and Sun Life financial reports available in respect of the Sun Life policies for 2005 to 2009 are attached as Appendix "M".  Certain portions of these documents are redacted for privacy purposes.

## Financial Reports on the HWT

### (a)    Tax Returns

75.    For taxation purposes, the HWT files only one return in respect of the HWT.  Attached as Appendix "N" are the HWT tax returns for the years 2005 to 2010.

### (b)    HWT Financial Statements

76.    Nortel has prepared financial statements in respect of the HWT, certain of which were audited, since 1982.  The financial statements for 1982 through 2009 are attached as Appendices "O" to "PP".

77.    To assist in a review of the financial statements:

(a)    A summary including certain notes that have evolved over the years from the years in which the notes first appeared is attached as Appendix "QQ"; and

(b)    A chart summarizing amounts from the financial statements called accounts receivable or "due from sponsoring corporations or company" is attached as Appendix "RR".  As indicated therein, almost from the inception of the HWT, there have been amounts receivable from the sponsoring companies.  As set out in the Thirty-Ninth Report, the Monitor has been advised by the Applicants that these amounts are primarily related to benefit payments made to beneficiaries of

- 24 -

the HWT prior to the filing date. The Monitor has found nothing to indicate that these amounts represent anything other than accumulated contributions owing.

78.    The 2009 financial statements disclose cash on hand and investments of $80.0 million, net assets available for payment of benefits of $76.4 million, total claims paid and accrued of $23.9 million, employer contributions of $0.1 million and employee contributions of $1.6 million. For purposes of the 2009 financial statements, certain amounts are included in cash and investments that were excluded from the $78.0 million reported in the Thirty-Ninth Report. These amounts predominately related to stale-dated cheques.

## HWT Valuations

79.    Various valuations were performed in respect of the HWT from time to time. The Monitor has located:

    (a)    analyses of the funding status of the Pensioners' Insurance Fund in the years 1993, 1998 and 2002 (the "**PIF Valuations**");

    (b)    certain valuations of post-employment benefit liabilities for accounting purposes in the years 2003, 2004, 2006, 2007, 2008 and 2009 (the "**Accounting Valuations**"), the purpose of which valuations is to determine the unfunded liability related to post-employment benefits;

    (c)´    certain reports on non-pension post-retirement benefit net periodic benefit cost and disclosure for accounting purposes in the years 2005, 2006, 2007, 2008 and 2009 (the "**Accounting Cost Reports**"), which provide information related to the Applicants' non-pension post-retirement benefit plans intended for use in accounting for the costs of the plans and preparing financial statements;

    (d)    a valuation of liabilities for the year 2005 (the "**2005 Valuation**"), which sets out the actuarial present value of the obligations of the HWT as at September 30, 2005 and the assumptions and data used therein; and

    (e)    Mercer letters dated January 15, 2008 and April 30, 2008 (the "**Mercer Letters**"), which provide an estimate of the fiscal 2008 incremental expense for post-employment benefits, intended for use in the 2008 interim financial reporting, and the results of Mercer's analysis and calculations to determine the

estimated historical adjustments to certain post-retirement benefit expenses for certain years, respectively.

The PIF Valuations, Accounting Valuations, Accounting Cost Reports, 2005 Valuation and Mercer Letters are attached as Appendices "SS" to "III".

80.    To assist in a review of the above valuations, a summary including certain notes to the valuations is attached as Appendix "JJJ".

**Funding and Administration**

81.    Nortel's general funding practices are described in the HWT financial statements and the 2005 Mercer Valuation. Though certain benefit plans were funded on a pay-as-you-go-basis, an exception to this funding practise occurred from May 2005 until April 2006 when Nortel was contemplating the termination of the HWT. The pay-as-you-go amounts were paid from the HWT and no corresponding contributions were made by Nortel. Once Nortel decided to keep the HWT in place, it made catch up payments through extra contributions in subsequent years in the amount of one month each year.

82.    The Monitor also located a policy manual in respect of the HWT, which appears to be the first policy manual. A copy of this manual is attached as "KKK". The funding policy in respect of the HWT is set out at page 32 of this manual; however, Nortel's funding policies changed over time. The Company has advised the Monitor there is not a current policy manual.

83.    In general:

(a)    contributions to the HWT (including employee contributions in respect of Optional Life) have been made to the Trustee and the Trustee has held all contributions in a single fund, as required by Article I, section 6 of the Trust Agreement;

    (b)    the Trustee has made payments out of the HWT upon receipt of directions from Nortel in accordance with Article II, section 3 of the Trust Agreement;

    (c)    there was only one trust account established for the HWT; and

    (d)    one investment account and one bank account in respect of the HWT have been maintained with all contributions to the HWT co-mingled in such accounts.

## Available Cash

84.    The cash and investments of the HWT were reported to be approximately $80.0 million as at December 31, 2009 in the 2009 HWT financial statements. At that time, the majority of investments held by the HWT were of a long term nature, which potentially subjected their value at any point to significant volatility.

85.    As a result of this volatility and in anticipation of the distribution of the corpus of the HWT, Nortel determined a more appropriate asset mix would include holding of investments with a shorter average duration. Accordingly, during May 2010 Nortel directed the disposal of the long term bonds and their replacement with a portfolio of short term interest-bearing government issued instruments.

86.    The value of investments held at June 30, 2010 is approximately $77.2 million, comprised of $4.1 million of cash and $73.2 million of short term investments.

87.    According to Nortel's financial statements for the quarter ended June 30, 2010, Nortel's restricted cash includes, in part, US$72.0 million as of June 30, 2010 related to assets held in the HWT and restricted as to their use in operations by Nortel. The difference between the value of cash and investments as at June 30, 2010 reported in paragraph 86 and the amount disclosed in the Nortel June 30, 2010 financial statements primarily relates to foreign exchange.

88.    For purposes of the illustrative scenarios discussed in Section VIII below, the cash balance available for distribution at December 31, 2010 is $80 million, including Pensioner Life premiums for 2010 of $7.8 million, which will be treated as a charge against any distribution in respect of Pensioner Life. The actual amount of cash available as at the date of termination of the HWT is subject to adjustment for factors which include:

(a)    investment returns;

(b)    treatment of stale-dated cheques;

(c)    the actual amount of Pensioner Life premiums paid during 2010;

(d)    the treatment of costs related to expenses incurred prior to the termination of the HWT but not submitted by February 28, 2010 and therefore not paid by Nortel pursuant to the Settlement Agreement;

(e)    taxes and administrative costs; and

(f)    any fees paid from HWT assets pursuant to the Settlement Agreement with respect to any dispute or litigation regarding the HWT.

## VII.    MERCER 2010 PRELIMINARY HWT VALUATION

89.    Attached as Appendix "C" is a report of Mercer dated August 27, 2010 (the "**Mercer 2010 HWT Preliminary Valuation**"), providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when it is expected that the HWT will be terminated and such plans will be discontinued.

90.    The Mercer 2010 HWT Preliminary Valuation was prepared solely for the purpose of providing a preliminary valuation of the non-pension post retirement benefit plans and post employment benefit plans to assist with the analysis of the Proposed Allocation

- 28 -

Methodology and is the basis for distribution of the HWT corpus. As mentioned previously, the Applicants have not yet initiated a compensation claims process relating to, among other things, employee benefit claims. The Monitor anticipates that Mercer will prepare a separate valuation report for the purposes of the compensation claims process. The Mercer 2010 HWT Preliminary Valuation has not been prepared for and is not to be used for the purpose of determining the value, if any, of non-pension post retirement and post employment benefits for submission in a compensation claims process. Accordingly the assumptions used, the valuation date, the beneficiary data and the resulting values in the Mercer 2010 HWT Preliminary Valuation may differ materially from those relevant to a compensation claims process.

91.     In addition, the Mercer 2010 HWT Preliminary Valuation does not address those beneficiaries that have a right to the HWT corpus but only the valuation associated with each benefit.

92.     No amount has been included in the valuation for individuals who were employees of Nortel prior to being transferred as part of a pre-filing divestiture transaction. It has not been determined at this time whether these individuals have a claim against Nortel or the HWT in respect of certain benefits. If they have a claim against the HWT, under the Proposed Allocation Methodology this would result in an aggregate distribution from the HWT of approximately $2.0 million to these individuals.

93.     In addition, no amount has been included in the valuation for LTD Optional Life Benefit as there is insufficient data at this time to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life. In the 2005 Valuation, Mercer estimated that the present value of the LTD Optional Life as at September 30, 2005 was

$3.0 million relative to a present value of LTD Life and LTD M&D of approximately $28.8 million in the aggregate. As set out in the Mercer 2010 HWT Preliminary Valuation, the present value of LTD Life and LTD M&D as at December 31, 2010 aggregates approximately $27.0 million. For reference purposes, if the present value of the LTD Optional Life Benefit as at December 31, 2010 were $3.0 million, under the Proposed Allocation Methodology this would result in an aggregate distribution from the HWT of approximately $1.0 million to individuals participating in the LTD Optional Life Benefit. The Applicants and the Monitor will continue to work with Mercer to provide sufficient data to determine the present value of the LTD Optional Life Benefit as at December 31, 2010.

94.    Mercer has used the most recent data available. The actuarial assumptions do not attempt to reflect individuals' specific historical health experience or current health circumstances, as that may not be predictive of their future health experience. Faced with the uncertainty of future events and the conflict inherent in each beneficiary seeking to maximize his or her recovery by obtaining the highest possible valuation, the Monitor believes the use of actuarial assumptions is a reasonable and equitable approach to the required valuation.

95.    The data and assumptions on which the Mercer 2010 HWT Preliminary Valuation is based are set out in Sections 3 and 4 of the Valuation.

VIII.    PROPOSED ALLOCATION METHODOLOGY

Illustrative Scenarios

96.    It was apparent that a number of outcomes relating to an allocation of the HWT corpus is possible given, among other things: (a) ambiguities within the Trust Agreement; and (b)

- 30 -

the evolution of Nortel's practices, business, benefits and record keeping over the 30 years of the HWT's existence. In working with counsel, the Monitor has considered a number of potential interpretations of the Trust Agreement, and specifically the provisions dealing with the termination of the HWT, and has also taken into account other relevant documents and the manner in which the HWT was historically administered. The interpretations and issues related thereto included the following:

    (a)    whether the HWT constitutes one trust or several trusts;

    (b)    who is entitled to the assets in the reserve account on the HWT financial statements referred to as Group Life – Part II (optional life insurance);

    (c)    which benefits should participate on a termination of the HWT; and

    (d)    how the corpus of the HWT should be shared among participating beneficiaries.

97.    As mentioned above, to assist this Honourable Court and the parties, counsel to the Monitor has prepared a memorandum of law considering the potential interpretations of the Trust Agreement and issues related thereto, a draft of which was provided to Representative Counsel and Independent Counsel. A copy of the memorandum of law is attached as Appendix "B".

98.    The Monitor has prepared charts indicating the financial results of various allocation scenarios resulting from interpretations counsel has identified. In order to provide a basis for comparison, the resulting allocations are described using both a distribution percentage, where applicable (namely, the percentage of the present value of a particular benefit that is represented by the aggregate distribution amount for that benefit), and the aggregate distribution amount in dollars. The resulting allocations are expressed as an aggregate amount for each benefit type under the HWT and therefore relate to an

0    **112**

aggregate group of individuals participating in those benefits, not to individual beneficiaries. The illustrative scenarios use the following categories of benefits in accordance with the Mercer 2010 HWT Preliminary Valuation, except that they include an Optional Life category and an LTD Optional Life Benefit category and subdivide STBs into those in pay and those accrued but not in pay:

(a)    Pensioner Life (including ADB);

(b)    Pensioner M&D;

(c)    LTD Income (including IBNR[5]);

(d)    LTD M&D;

(e)    LTD – STB accrued;

(f)    LTD Life;

(g)    LTD Optional Life Benefit;

(h)    SIB;

(i)    STB – in pay;

(j)    STB – accrued; and

(k)    Optional Life,

(collectively, the "**Potential Participating Benefits**").

---

[5] "Incurred but not reported". As set out in the Mercer 2010 HWT Preliminary Valuation, there are 6 individuals whose status as LTD Beneficiaries as at December 31, 2010 cannot be known for certain at this time.

99.    Schedules prepared under the various scenarios are attached as Appendix "D" and described in more detail below[6]:

    (a)    **Appendix D-1** – Optional Life is not a participating benefit, the surplus associated with Optional Life forms part of the assets available for allocation to other assets and:

        (i)    **Column 1** – The HWT is to be treated as one trust. On termination, all Potential Participating Benefits except Optional Life share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits).

        (ii)    **Column 2** – This scenario reflects the Proposed Allocation Methodology. The HWT is to be treated as one trust. On termination, certain of the Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits. A determination of which Potential Participating Benefits share *pro rata* in this scenario was based on an analysis of the beneficiaries with claims that have been or would certainly be made with no contingency except timing.

    Claims that have been or would certainly be made are claims of:

        A.    Pensioners (including those active employees who will vest by the valuation date and LTD Beneficiaries) for Pensioner Life;

---

[6] Under all applicable scenarios, it is assumed the Pensioner Life premiums paid from the HWT during 2010 are to be treated as a reduction only to the allocation otherwise made to Pensioner Life. The reason for this treatment is that the only beneficiaries of this allocation are those with a claim for Pensioner Life. In the scenarios set out in Columns 3, 7, 11 and 14, there is no allocation to Pensioner Life and, accordingly, the participating benefits in these scenarios bear the approximately $7.8 million in Pensioner Life premiums *pro rata*. The estimated assets upon which the allocation under all scenarios is based are the cash and investments set out in the HWT financial statements as at December 31, 2009 since, except for the reduction in assets due to the payment of Pensioner Life premiums from the HWT, the December 31, 2009 cash and investments will be similar to the December 31, 2010 cash and investments. To the extent the actual December 31, 2010 asset base differs from the December 31, 2009 asset base (other than for Pensioner Life premiums paid in 2010), that difference would apply equally to each benefit.

In addition, these illustrative scenarios include a line item for LTD Optional Life Benefit; however, amounts are not inserted as insufficient data is available at this time. As set out in paragraph 93 above, for reference purposes, if the present value of the LTD Optional Life Benefit as at December 31, 2010 were $3 million (as estimated in the 2005 Valuation as at September 30, 2005), it would result in an aggregate distribution from the HWT of approximately $1.0 million to the participants in the LTD Optional Life Benefit. Further, these illustrative scenarios do not include an amount relating to individuals who were employees of Nortel prior to being transferred as part of a pre-filing divestiture transaction. As set out in paragraph 92, if these individuals are determined to have a claim against the HWT, under the Proposed Allocation Methodology, this would result in an aggregate distribution from the HWT of approximately $2.0 million to these individuals.

      B.     LTD Beneficiaries for LTD Income and LTD Life;

      C.     LTD Beneficiaries participating under Optional Life for LTD Optional Life Benefit;

      D.     STB Beneficiaries currently in pay for STBs; and

      E.     SIB Beneficiaries currently in pay for SIBs.

(iii)    **Column 3** – The HWT is to be treated as one trust. On termination, certain of the Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits). A determination of which Potential Participating Benefits share *pro rata* in this scenario was based on an analysis of the beneficiaries currently in pay who have claims for benefits in pay.

Claims for benefits in pay are claims of:

      A.     LTD Beneficiaries for LTD Income;

      B.     STB Beneficiaries currently in pay for STBs; and

      C.     SIB Beneficiaries currently in pay for SIBs;

(iv)    **Column 4** – The HWT is to be treated as separate trusts. Plans with reserved assets (the "**Reserved Asset Plans**") are each treated as a separate trust. On termination, the beneficiaries of each Reserved Asset Plan share pro rata in the assets reserved in respect of that plan. The estimated assets available at December 31, 2010 are allocated to the reserves proportionate to the values included in the HWT financial statements as at December 31, 2009.

(b)    **Appendix D-2** – Optional Life is a participating benefit with resulting allocations shown in Columns 5 to 8 on the same basis as indicated with respect to Columns 1 to 4 (except that a claim for Optional Life is included as a claim that has been or would certainly be made or a claim for benefits in pay).

(c)    **Appendix D-3** – STB is not a participating benefit and Optional Life is a participating benefit, with allocations shown in Columns 9 to 11 on the same basis as indicated with respect to Columns 1 to 3 (except that a claim for STBs is not included as a claim that has been or would certainly be made or a claim for benefits in pay and a claim for Optional Life is included as a claim that has been or would certainly be made or a claim for benefits in pay); however, as there are

no reserved assets for STBs, the allocation using the reserved asset method set out in Appendix D-1 is applicable and is not reproduced in Appendix D-3.

(d) **Appendix D-4** – STB is a participating benefit and Optional Life is not a participating benefit, with allocations shown in Columns 12 to 14 on the same basis as indicated with respect to Columns 1 to 3; however, as there are no reserved assets for STBs, the allocation using the reserved asset method set out in Appendix D-2 is applicable and is not reproduced in Appendix D-4.

100. The scenarios are illustrative examples only to assist this Honourable Court and the interested parties in considering the Proposed Allocation Methodology. The actual dollar amount available may differ from the illustrative scenarios. There is also the potential for an adjustment to an allocation relating only to a particular benefit, thereby reducing the *pro rata* share relating to that particular benefit, for example, were this Honourable Court to award costs against a distribution otherwise available for a particular benefit.

## Proposed Allocation Methodology

101. The Proposed Allocation Methodology (illustrated in Appendix D-1, Column 2) is as follows:

(a) the HWT is to be treated as one trust;

(b) on termination, the following Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits):

(i) Pensioner Life;

(ii) LTD Income;

(iii) LTD Life;

(iv) LTD Optional Life Benefit;

(v) STBs – in pay; and

- 35 -

    (vi)    SIBs – in pay;

    (collectively, the "**Proposed Participating Benefits**");

    (c)    the following beneficiaries will receive distributions from the Proposed Participating Benefits' *pro rata* share of the HWT corpus:

        (i)    Pensioners (including those active employees who will vest by the valuation date and LTD Beneficiaries) for Pensioner Life;

        (ii)    LTD Beneficiaries for LTD Income and LTD Life;

        (iii)    LTD Beneficiaries participating under Optional Life for LTD Optional Life Benefit;

        (iv)    STB Beneficiaries currently in pay for STBs; and

        (v)    SIB Beneficiaries currently in pay for SIBs;

    (collectively, the "**Proposed Participating Beneficiaries**");

    (d)    the amount of the distribution to each Proposed Participating Beneficiary from the Proposed Participating Benefits' *pro rata* share of the HWT corpus will be calculated pursuant to the assumptions in the Mercer 2010 HWT Preliminary Valuation, with data as of December 31, 2010, and the Pensioner Life premiums paid from the HWT during 2010 will be treated as a reduction only to the allocation otherwise made to Pensioner Life;

    (e)    the present value of the Proposed Participating Benefits will be calculated pursuant to the assumptions in the Mercer 2010 HWT Preliminary Valuation, with data as of December 31, 2010; and

    (f)    there will be no payment from the HWT on account of any conversion privilege, if any, relating to the Pensioner Life or Optional Life that is exercised by any holder of such right.

102.    The Monitor recognizes the hardship felt by the beneficiaries of the HWT as a result of Nortel's insolvency and the deficit in the HWT. The Monitor believes the Proposed Allocation Methodology reasonably and equitably addresses this hardship as far as available funds of the HWT allow and in the most economical and practical manner available, by balancing the interests of the beneficiaries of the HWT in the circumstances,

and, as discussed with counsel, is consistent with the most reasonable interpretation of the Trust Agreement.

### Independent Legal Counsel

103.   Analysis of the HWT reveals there could be a multitude of potential differing interests among the beneficiaries. Each individual seeks to maximize his/her recovery from the HWT assets. Since the assets are insufficient to pay all claims, each has an interest in minimizing the claims of others. Through their Court-appointed representative counsel, Employee Representatives informed the Monitor that, as a result of the potential for conflicts arising from the different interpretations of the Trust Agreement, they would retain independent counsel to provide advice concerning the HWT and sought funding from the Applicants for this purpose. The Applicants and the Monitor agreed to: (a) the retention of independent legal counsel to consider the Proposed Allocation Methodology and provide the Employee Representatives with legal advice thereon; and (b) the Applicants providing funding for the retention of independent legal advice, subject to a fee cap.

104.   In June 2010, the LTD Beneficiaries' Representative retained Sack Goldblatt Mitchell LLP ("**Sack**") to represent the interests of her constituents in the HWT. In July 2010, the Former Employees' Representatives retained Lerners LLP ("**Lerners**") to represent the interests of their constituents in the HWT (Lerners and Sack together are referred to as "**Independent Counsel**"). CAW Counsel also ensured that the Pensioners and STB Beneficiaries they represent were advised by the same independent counsel as the Former Employees' Representatives. As it became evident that Independent Counsel would be required to attend this motion, the Applicants and Monitor agreed to increase the fee cap

0. **118**

to $85,000 for each firm, with an additional $7,500 available for Sack to retain an actuarial advisor. As part of the relief requested on the within motion, the Monitor is seeking that, for certainty, this Honourable Court approve the retention of Independent Counsel.

105.    Independent Counsel signed confidentiality agreements in June 2010 and were then provided with access to documents, financial and actuarial information and other analysis related to the HWT. Attached hereto as Appendix "LLL" is a list of the documents provided to each Independent Counsel. The Monitor has confirmed that the same information has been provided to each Independent Counsel. The Monitor provided Continuing Employees' Representative Counsel with the same information and engaged in discussions with such counsel. All of the documents provided to Independent Counsel are attached as Appendices to this Fifty-First Report except for certain documents subject to confidentiality restrictions with third parties or portions of certain documents that have been redacted for privacy purposes.

106.    Since June 2010, there have been many in person meetings and telephone discussions concerning the HWT among various combinations of the Monitor, the Applicants, Mercer, Former Employees' Representatives, Former Employees' Representative Counsel, certain members of the NRPC, CAW Counsel, Lerners, LTD Beneficiaries' Representative, LTD Beneficiaries' Representative Counsel, Segal, certain members of the CNELTD and Sack.

107.    At the meetings and calls in which the Monitor participated, the Monitor discussed the Proposed Allocation Methodology, and the Monitor's process in developing and

0. **119**

- 38 -

presenting the scenarios provided above. The Monitor and its advisors have remained available for discussion and continue to respond to information requests.

108.   Independent Counsel are considering the Proposed Allocation Methodology and will advise the Court of their position prior to the return of the within motion.

109.   As mentioned above, there could be a multitude of potential differing interests among the beneficiaries. The Monitor is of the view that with the retention of Independent Counsel, the interests of the beneficiaries are appropriately represented and that retaining yet further counsel is not required and would not assist with the fair, practical and timely resolution of the issues at hand. There are already four sets of counsel appearing on this motion: two Independent Counsel, Continuing Employees' Representative Counsel and CAW counsel. The Monitor has been advised by Koskie Minsky LLP that it will not appear on this motion. A copy of a letter from Koskie Minsky LLP dated August 26, 2010 to the Monitor and the Service List is attached as Appendix "MMM".

110.   Each individual beneficiary may be a participant in multiple benefit plans or may only participate in a single benefit plan. For example, some LTD Beneficiaries do not or will not receive LTD Income because they receive or will receive income or income benefits from another source. Furthermore, the specific interests of individual participants in any one benefit may differ from those of another participant because of individual employment history or particular circumstances. Therefore, interests may differ between members in the same general group and interests may differ between participants in the same benefit plan. The Monitor has also considered the impracticality of hearing representations from thousands of individuals, including the timing and the costs of any attempt to do so.

111.  The Monitor is aware that a motion record has been served by Arlene Borenstein (Plante) on behalf of a group of dissident LTD Beneficiaries (the "**Dissident Beneficiaries**"). The motion seeks, among other things, the appointment of Rochon Genova LLP as counsel for the LTD Beneficiaries at Nortel's expense and the replacement of the LTD Beneficiaries' Representative. Sack has already been retained as independent counsel for the LTD Beneficiaries as noted above. The Monitor has corresponded with Rochon Genova LLP and advised it that the motion is unnecessary and the Dissident Beneficiaries may wish instead to make their submissions on the merits in response to the within motion. The Monitor reserves the right to deliver material in reply should the Dissident Beneficiaries choose to deliver material in response to this motion. The Monitor notes the Dissident Beneficiaries have not opted out of the various representation orders and are already represented by LTD Beneficiaries' Representative Counsel in these proceedings. Pursuant to the Settlement Agreement, the fees and disbursements of counsel are a cost to the HWT to the extent they are incurred in respect of disputes concerning entitlement to a distribution of the HWT corpus.

## Specific Process Matters

112.  The Monitor will serve the within Motion Record and this Fifty-First Report on the Service List, including Independent Legal Counsel, and the Individual Parties not otherwise represented by counsel on the Service List.

113.  In addition, as discussed above, the Mercer 2010 HWT Preliminary Valuation was prepared on an aggregate basis to assist in an analysis of the effect of various scenarios, including the proposed allocation methodology, on the various benefits covered by the HWT and thereby on the aggregate group of individuals participating in those benefits.

The LTD Beneficiaries' Employee Representative advised the Monitor that it is very important for those she represents to have an estimate of the amount they would receive individually as a result of an allocation and requested that such estimates be provided to LTD Beneficiaries. The Monitor considered the request and agreed to provide such a statement to those individuals in receipt of income benefits, namely, all LTD Beneficiaries in receipt of LTD Income, STB Beneficiaries in receipt of STBs and SIB Beneficiaries in receipt of SIBs (a "**Beneficiary Estimated Allocation Statement**"). Accordingly, the Monitor instructed Mercer to prepare such statements for delivery to such individuals subsequent to service of this Fifty-First Report and the within Motion Record, with the proviso that the statements must clearly indicate, among other things, that they are estimates only and subject to change, including as a result of an allocation of the HWT corpus different from the Proposed Allocation Methodology.

114.   In preparing the Beneficiary Estimated Allocation Statements, Mercer will apply the same actuarial assumptions and data dates used to value the benefits on an aggregate basis to each LTD Beneficiary, STB Beneficiary and SIB Beneficiary and will also apply unique employee information to determine the individual amounts for LTD Income, SIBs and STBs as indicated in Section 5 of the Mercer 2010 HWT Preliminary Valuation. The LTD Beneficiaries' Employee Representative and its independent counsel, Sack, reviewed and approved the form of Beneficiary Estimated Allocation Statement. The Beneficiary Estimated Allocation Statement substantially in the form attached hereto as Appendix "NNN" will be available in both English and French.

115.   The Monitor was provided with the spreadsheet used to produce the individual statements. The Monitor compared that spreadsheet to information available from the

- 41 -

Company, including addresses and recipient information, and was satisfied that the spreadsheet was suitable for producing Beneficiary Estimated Allocation Statements.

116.    Each Beneficiary Estimated Allocation Statement will include the actuarial value (expressed as a dollar amount) of: (a) the LTD Income[7], SIB or STB the respective LTD Beneficiary, SIB Beneficiary or STB Beneficiary would be entitled to on a distribution based on the Proposed Allocation Methodology; and (b) if the recipient of such income benefits is also a recipient of LTD Life, the actuarial value (expressed as a dollar amount) of the LTD Life such individual would be entitled to on a distribution based on the Proposed Allocation Methodology.  The Beneficiary Estimated Allocation Statement will also indicate that the dollar amounts set out therein reflect such individual's share of a distribution representing an estimated 34.5% of the present value of the Proposed Participating Benefits.

117.    The Beneficiary Estimated Allocation Statements clearly indicate they are illustrative only and subject to change for such things as:

   (a)    changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

   (b)    changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

      (i)    a different allocation of the HWT corpus;

      (ii)    the distributable assets being more or less than estimated;

      (iii)    the resolution of contingencies;

---

[7] LTD Beneficiaries entitled to an income benefit will receive a Beneficiary Estimated Allocation Statement; however, certain LTD Beneficiaries with health and/or life insurance coverage may not receive an income benefit from Nortel because they receive income benefits from certain other sources.

CC **123**

(iv)     updating of data to December 31, 2010; and

(v)      the award of fees against any particular benefit type.

118.   It is not proposed that individual statements be provided to participants under Pensioner Life as the number of participants is very large (approximately 10,400) and the average claim value and distribution to such participants is much smaller on an individual basis than the average claim and distribution of a participant under LTD Income.

119.   The distribution amount for each participant under Pensioner Life will be calculated using the assumptions in the Mercer 2010 HWT Preliminary Valuation (including Section 5 thereof) based on data as of December 31, 2010.

**Operational Steps**

120.   Court approval of a proposed allocation methodology is one of a number of steps that must take place in order to implement a distribution of the HWT corpus. Many steps facilitating such allocation and distribution have already occurred, and many must still be implemented, particularly since the HWT continues to operate. Accordingly, many variables may still affect the assets available for distribution and the benefits in respect of which those assets will be distributed.

121.   To date, the Applicants and the Monitor have taken a number of steps to facilitate the allocation and distribution of the HWT corpus, including:

(a)     reducing the term of the investments held by the HWT;

(b)     establishing a new banking arrangement for payment of current employee health benefits;

(c)     requesting a tax ruling with respect to the taxability to recipients of funds to be distributed from the HWT;

- 43 -

   (d)     instructing Mercer to prepare the Mercer 2010 HWT Preliminary Valuation and working with Mercer on such valuation;

   (e)     analyzing the impact of various allocation scenarios;

   (f)     amassing and organizing documents;

   (g)     terminating the current LTD program for working employees;

   (h)     investigating options with respect to life insurance; and

   (i)     ongoing data review and reconciliation.

Settlement Representative Counsel and CAW Counsel were involved and consulted with respect to the tax ruling referred to in (c) above.

122.    A further step required to facilitate the allocation and ultimate distribution of the corpus of the HWT is Court approval of the provisions in the requested Order deeming December 31, 2010 as the date of notice of termination of the HWT for the purposes of the Trust Agreement and dispensing with Nortel sending a notice of termination to the Trustee. This will create synergy between the date of termination of benefits and the LTD Beneficiary termination date of December 31, 2010 pursuant to the Settlement Agreement, the valuation date in the Mercer 2010 HWT Preliminary Valuation and the expected date of termination of the HWT. Otherwise, a date at least sixty days prior to termination of the HWT would have to be used (depending on the date of written notice to the Trustee). A deemed notice of termination date of December 31, 2010 creates certainty and consistency and avoids confusion.

123.    With Court approval of an allocation methodology, including a deemed notice of termination date of December 31, 2010, the Monitor, the Applicants and the Trustee can look to distributing the HWT corpus.

- 44 -

## IX.   RECOMMENDATION

124.   The Monitor believes the Proposed Allocation Methodology represents the most equitable, reasonable and practical approach to the distribution of the HWT funds, balancing the interests of the beneficiaries in the circumstances, particularly given the following:

    (a)    the Trust Agreement does not provide clear guidance on the issue of who is entitled to participate in a distribution on termination of the HWT and there are a number of interpretations and possible outcomes;

    (b)    based on its counsel's legal analysis, the Proposed Allocation Methodology is consistent with the most reasonable interpretation of the Trust Agreement;

    (c)    in general, the Proposed Allocation Methodology is consistent with the manner in which the HWT has been administered; and

    (d)    the resolution of HWT allocation and distribution matters is a necessary step to completion of the Applicants' claims process, development of a CCAA plan and administration of the Applicants' estates.

125.   The Monitor believes the retention of Independent Counsel by the respective Employee Representatives will facilitate the fair, timely and practical resolution of the within motion and recommends the approval of their retention.

126.   Accordingly, the Monitor requests that this Honourable Court grant the Order in the form submitted.

- 45 -

126

All of which is respectfully submitted this 27th day of August, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:
Murray A. McDonald
President

\5879303

127

# APPENDIX "C" TO
# FIFTY-FIRST REPORT

128

27 August 2010

# Valuation of the Obligations of the Non-Pension Benefits as at December 31, 2010

Nortel Networks Limited

# MERCER



MARSH  MERCER  KROLL
GUY CARPENTER  OLIVER WYMAN

Consulting. Outsourcing. Investments.

C  129

Valuation of the Obligations of the Non-Pension
Benefits as at December 31, 2010                                    Nortel Networks Limited

# Contents

1. Introduction .................................................................................................... 1

2. Valuation Results ........................................................................................... 5

3. Membership Data ........................................................................................... 7
   - Included Members ..................................................................................... 9
   - Member Headcount .................................................................................. 10
   - Summary of Data ..................................................................................... 11

4. Methods and Assumptions ........................................................................... 14
   - Post Retirement Medical, Dental and Life Insurance Benefits (PRB – M&D, PRB
     – Life and PRB – ADB) ........................................................................... 15
   - Benefits Provided to Disabled Members – LTD Income, Medical, Dental, Life
     Insurance, Optional Life Insurance and STB Benefits (LTD – Income, LTD –
     IBNR, LTD – M&D, LTD – Life, LTD – Optional Life, LTD – STB – Accruals) ..... 20
   - Survivor Benefits (SIB, STB) ................................................................... 25

5. Calculations for Individual Member Allocation of Trust ............................... 26

6. Non-Pension Benefit Plan Provisions .......................................................... 28
   - Post Retirement Benefits ......................................................................... 28
   - Benefits Provided to Disabled Members .................................................. 33
   - Survivor Benefits ..................................................................................... 34

7. Employer Certification .................................................................................. 35

l:\nortel\opeb\year2010\report\non-pension benefit valn\nortel - dec 31 10 non-pension ben valn - aug 27 (final).doc

0  **130**



**1**

# Introduction

To Nortel Networks Limited ("Nortel" or the "Company") and Ernst & Young Inc. (the "Monitor").

In accordance with your request, we have performed a valuation of the non-pension benefits provided by Nortel for purposes of termination of their Health and Welfare Trust ("Trust"). This report contains preliminary estimated liabilities for the identified non-pension plans and plan members based on assumptions and methodologies as reviewed with Nortel and the Monitor.  We understand that the liability figures provided in this report (along with the corresponding per member Excel file) are expected to be used for the following purposes:

1.  To determine a pro-rata allocation of the accumulated Trust funds to different benefit types.

2.  To determine an initial estimate of the corresponding per claimant liabilities for a certain subset of the specific benefits provided in this report. These liabilities, after potential adjustments for updates, will be used to determine the pro-rata allocation of the Trust funds for the specified benefit, to the individual claimants on a pro-rata basis.

This is all subject to the approval of the court in Nortel's insolvency proceedings.

We understand that Nortel will stop making benefit payments under both the non-pension post retirement, long-term post employment and survivor benefit plans as at December 31, 2010.  The liabilities in this report have been determined using the membership status as at the dates outlined below projected to December 31, 2010. The liabilities represent the present value as at December 31, 2010, of expected benefits to be received/claimed after December 31, 2010. The membership data used for the valuations is outlined in Section 3.

Mercer (Canada) Limited                                                                            1