## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**SIXTY-FIFTH REPORT OF THE MONITOR**
**DATED APRIL 28, 2011**
(Update on UK Pension and EMEA Claims)

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
    Networks International Corporation and Nortel Networks Global Corporation
    ("NNGC") (collectively the "Applicants") filed for and obtained protection under the
    *Companies' Creditors Arrangement Act* ("CCAA").  Pursuant to the Order of this
    Honourable Court dated January 14, 2009, as amended and restated (the "Initial
    Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the
    Applicants (the "Monitor") in the CCAA proceedings.  The stay of proceedings was
    extended to June 30, 2011 by this Honourable Court in its Order dated February 25,
    2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in
    the United States Bankruptcy Court for the District of Delaware (the "U.S. Court")

- 2 -

on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

3. An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel were appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries. Each of these groups is participating in the CCAA proceedings.

4. Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5. Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries and affiliates located in EMEA (collectively the "EMEA Debtors") were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (the "English Proceedings"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited ("NNIreland"), to which David Hughes (of Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6. Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

- 3 -

7.    Both the CCAA proceedings, in respect of the Applicants, and the English Proceedings, in respect of the EMEA Debtors, have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdictions in which they are located.

**BACKGROUND AND PURPOSE**

9.    In response to a call for EMEA claims as authorized by this Court, 84 Proofs of Claim have recently been filed by the EMEA Debtors containing hundreds of broad ranging claims, including a number of large priority claims, set out with limited specificity. The total of just the quantified EMEA claims is approximately CAD$9.8 billion. As described more fully below, unliquidated claims filed by EMEA include claims based on various alternative theories of mismanagement and breach of fiduciary duties.

10.   In addition to the Pension Guarantee Claims (described below), which total approximately CAD$1.05 billion, the UK Pension claimants have filed Amended UK Pension Claims (described below) which include not only an estimated claim of CAD$3.7 billion in respect of an alleged deficit in the UK Pension Plan based on a UK regulatory process, but also broad alternative claims based in oppression and breach of fiduciary duty.

11.   As has been reported, the Monitor and the Applicants have participated in confidential mediation sessions with the US Debtors, the EMEA Debtors and representatives of the major creditor groups of each estate with a view to settling the allocation of certain sale proceeds and claims among the various participants.

12.   Unfortunately, on April 13, 2011 the mediation ended without resolution of any of these matters.

13.   For reasons outlined in this Report, the Monitor is of the view that, absent a consensual resolution of these EMEA and UK Pension claims, it is now necessary

- 4 -

for this Court to resolve these claims before any further steps are taken in relation to the allocation of proceeds among the estates.

14.    The purpose of this Sixty-Fifth Report of the Monitor (the "Sixty-Fifth Report") is to provide information to this Honourable Court with respect to the following:

    (a)    Claims filed in the CCAA proceedings by the UK Pension Trustee and PPF (as defined below);

    (b)    Claims filed in the CCAA proceedings by the EMEA Debtors;

    (c)    Claims filed by the EMEA Debtors and the Joint Administrators in the Chapter 11 Proceedings and objections filed by the US Debtors;

and to provide the Monitor's observations in respect thereof.

**TERMS OF REFERENCE**

15.    In preparing this Sixty-Fifth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.  EYI has not audited, reviewed nor otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Sixty-Fifth Report.

16.    Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.  Where amounts claimed arose in a currency other than Canadian dollars, such claims have been converted into Canadian dollars using the Reuters closing rate on January 13, 2009 pursuant to the provisions of the Amended and Restated Claims Procedure Order dated July 30, 2009 and the EMEA Claims Procedure Order dated January 14, 2011.

17.    Capitalized terms not defined in this Sixty-Fifth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report and previous Reports of the Monitor.

18.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.  The Monitor's website also contains a

- 5 -

dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## THE UK PENSION TRUSTEE/PPF CLAIMS

### Background

19. NNUK participated in a pension plan in the United Kingdom for its employees and employees of its predecessors known as the Nortel Networks UK Pension Plan (the "UK Pension Plan").

20. The Amended and Restated Claims Procedure Order dated July 30, 2009 and the Claims Resolution Order dated September 16, 2010 established a general claims process for the calling for and determination of claims against the Applicants (the "General Claims Process").

21. On September 30, 2009, the bar date of the General Claims Process, joint claims (the "Original UK Pension Claims") were filed by Nortel Networks UK Pension Trust Limited (being the trustee of the UK Pension Plan) (the "UK Pension Trustee") and the Board of the Pension Protection Fund (a regulatory body in the UK) (the "PPF", and together with the UK Pension Trustee, the "UK Pension Claimants") against each of the Applicants.

22. Four of the Original UK Pension Claims consisted entirely of placeholder claims referring to potential liabilities under so-called financial support direction proceedings ("FSD Proceedings") that were being contemplated by The Pensions Regulator ("The UK Pensions Regulator") under the (UK) Pensions Act 2004.

23. The other Original UK Pension Claim, which was filed against NNL, included the placeholder claims relating to the FSD Proceedings and also contained claims in respect of two guarantees entered into by NNL in favour of the UK Pension Trustee (the "Pension Guarantee Claims").

24. The UK Pensions Regulator did not proceed with FSD Proceedings against NNTC, NNIC or NNGC. In breach of the CCAA stay of proceedings, The UK Pensions

- 6 -

Regulator sent a Warning Notice to NNC and NNL and commenced FSD Proceedings against those two Applicants. In an order dated February 26, 2010, this Honourable Court ordered that:

> [3. ]... for the purposes of these proceedings all acts taken by The UK Pensions Regulator in the purported exercise of rights and in commencing any proceedings against any of the Applicants, without the consent of those Applicants and the Monitor or without leave of this Court having been first obtained, are null and void and shall be given no force or effect in these proceedings, nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertakings in Canada.

25.    The UK Pensions Regulator appealed this decision and on June 16, 2010, the Ontario Court of Appeal upheld the Order of this Honourable Court, including paragraph 3 set out above, subject to a clarification that:

> Paragraph 3 should not operate so as to preclude the U.K. Trustee and/or the Pension Protection Fund from seeking to assert, by way of amendment of the Proof of Claim, if necessary, a claim in the Companies' Creditors Arrangement Act process for pension contribution shortfalls, including for the relief they assert they would have been able to establish in the U.K. Financial Support Direction process.

26.    The UK Pensions Regulator's application for leave to appeal to the Supreme Court of Canada was denied on January 27, 2011.

*Amended UK Pension Claims*

27.    Following the release of the Court of Appeal's decision, the UK Pension Claimants were given the opportunity to amend their Original UK Pension Claims.

28.    On November 30, 2010, the UK Pension Claimants filed amended proofs of claim against each of NNC and NNL (the "Amended UK Pension Claims").

29.    The Amended UK Pension Claims: (i) elaborated upon purported claims based on the FSD Proceedings as if the UK Pension Claimants had the right and ability to enforce the outcome of those FSD Proceedings (the "FSD Claim"); (ii) alleged in the

- 7 -

alternative, that remedies were available to them under section 241 of the *Canada Business Corporations Act* (the "Oppression Remedy"); and, also in the alternative, (iii) alleged that NNUK had breached an alleged duty to the UK Pension Plan of good faith or fair dealing under English law and that NNL and NNC had assumed that same duty.

30.    The alternative claims in the Amended UK Pension Claims all seek the same result – holding NNC and NNL jointly and severally liable for the full extent of an alleged deficit in the UK Pension Plan.  These claims have not been expressed as a liquidated amount but the UK Pension Claimants allege the deficit is estimated at GBP£2.1 billion (approximately CAD$3.7 billion).

31.    The Amended UK Pension Claims did not include the Pension Guarantee Claims, which remain as asserted in the Original UK Pension Claims.  The Amended UK Pension Claims and the Pension Guarantee Claims are collectively referred to herein as the "UK Pension Claims".

32.    The Pension Guarantee Claims consist of claims based on two guarantees entered into by NNL in favour of the UK Pension Trustee:

    (a)    a guarantee in respect of a Funding Agreement between NNUK and the UK Pension Trustee entered into in 2006 (the "Funding Guarantee"); and

    (b)    a guarantee entered into in 2007 in connection with an internal Nortel corporate reorganization called Project Swift (described below) (the "Swift Guarantee").

33.    The claim based on the Funding Guarantee alleges that a triggering event has occurred and NNL is thereby liable for amounts owing by NNUK under the Funding Agreement of at least GBP£490 million (CAD$870.9 million).

34.    The claim based on the Swift Guarantee alleges that, although the triggering events for liability under that guarantee have not occurred, they were inevitable under the interpretation of the UK Pension Claimants and therefore, NNL is liable to the UK Pension Trustee in the amount of US$150 million (CAD$183 million).

- 8 -

## THE EMEA INTER-COMPANY CLAIMS PROCESS

### *Background and Summary*

35.    The General Claims Process excluded inter-company claims.  The EMEA Debtors and Joint Administrators nevertheless filed numerous unparticularized claims in September 2009 which are not further addressed in this Report.  By Order dated January 14, 2011, this Court established a procedure (the "EMEA Claims Process") for the filing and resolution of claims by or on behalf of the EMEA Debtors against the Applicants and related claims against present or former directors or officers of the Applicants (the "EMEA Claims"), with a bar date of March 18, 2011.

36.    On March 18, 2011, the Joint Administrators on behalf of 19 EMEA Debtors filed a total of 84 proofs of claim (the "EMEA Proofs of Claim") against the Applicants and unspecified directors and officers of NNL and NNC who are also directors of the EMEA Debtors ("D&Os").  In addition, counsel for 131 former employees of Nortel Networks S.A. ("NNSA") submitted a letter indicating they would file proofs in connection with an action that is currently before the courts in France.

37.    Even absent the significant qualifications and reservations of rights included in the EMEA Proofs of Claim, it would be impossible to quantify the total potential amounts claimed under the EMEA Claims, as many of the claims were submitted as unquantified claims.  For the purpose of relaying the scope and potential impact of the EMEA Claims, the Monitor has set out in the following chart those amounts that have been claimed on a quantified basis, while ignoring duplicate and alternative claims by the same claimant.  Furthermore, it is assumed that any claims filed against a D&O or Applicant other than NNL is considered a duplicative claim if such claim is also filed against NNL.  Since claims were expressed in various currencies, the Monitor has converted amounts into Canadian dollars at the rates as they existed on the Filing Date, in accordance with the EMEA Claims Process.  The total amount claimed by the EMEA Debtors and Joint Administrators against NNL by way of only quantified claims exceeds CAD$9.8 billion.

- 9 -

**Claims against NNL (Converted to CAD)**

| Claimant | Trading Debt | Transfer Pricing | Loan | Other |
|---|---|---|---|---|
| NNUK | $56,505,287 | $1,648,557,750 | $1,083,797,804 | $775,067,260 |
| NNSA | $41,414,592 | $634,285,950 | | $4,394,677,233[1] |
| Ireland | $17,358,719 | $136,668,000 | $315,028,329 | $33,436,918[2] |
| Germany | $203,999 | $5,613,150 | | |
| Austria | | $2,640,621 | | |
| Sweden | | $1,477,060 | | |
| Netherlands | $353,550 | $32,702,700 | | |
| Hungary | | $1,586,325 | | |
| France SAS | $204,071 | | | |
| Spain | $52,650 | $48,810,000 | | |
| Belgium | $18,180 | $17,205,525 | | |
| Finland | | $111,043 | | |
| Poland | $325,000 | $13,909,630 | | |
| Portugal | $33,131 | $6,451,813 | | |
| Romania | | $207,443 | | |
| Czech Republic | | $2,543,001 | | |
| Slovakia | | $2,469,786 | | |
| Italy | $3,079,897 | $63,454,964 | | |
| NNIF | $246,563 | | | $504,854,830 |
| Total | $119,795,637 | $2,618,694,760 | $1,398,826,133 | $5,708,036,241 |
| | | | Total Quantified Claims | $9,845,352,771 |

**Claims against NNTC (Converted to CAD)**

| Claimant | Trading Debt | Transfer Pricing | Loan | Other |
|---|---|---|---|---|
| NNUK | $83,988 | | | |
| NNSA | $581 | | | |
| Ireland | $394,001 | | | |
| Germany | $211,056 | | | |
| France SAS | $4,937 | | | |
| Belgium | $23,853 | | | |
| Total | $718,416 | | | |
| | | | Total Quantified Claims | $718,416 |

---

[1] Includes a claim by the Liquidator for approximately $4.352 billion for alleged mismanagement of NNSA under French law and a claim for approximately $42 million relating to a payment to NNL on a subordinated loan.

[2] Represents a claim for alleged breach of fiduciary duty regarding certain dividend payments to NNL.

- 10 -

**Claims against NNGC (Converted to CAD)**

| Claimant | Trading Debt | Transfer Pricing | Loan | Other |
|---|---|---|---|---|
| NNUK | $488,265 | | | |
| | | | Total Quantified Claims | $488,265 |

*Description of EMEA Claims as Filed*

38.   As the EMEA Claims are very similar to each other in many respects, it is possible to summarize them under broad headings. The following is not intended as an all-inclusive description but rather an overview that demonstrates the broad and far-reaching scope of the EMEA Claims.

   **(A)   Proprietary Claims**

39.   As has been reported in previous Monitor Reports, proceeds from the post-filing sales of Nortel's business units in which more than one Nortel estate has claimed an economic interest are held in escrow (the "Lockbox") pending resolution of disputes over the allocation of those proceeds among the respective estates.

40.   The EMEA Debtors claim and reserve rights to claim that a substantial number of the allegations in the EMEA Claims give rise to property rights in and to NNL's interest in and allocation from the proceeds in the Lockbox, as well as priority over any other claims against NNL's other assets.

   **(B)   Transfer Pricing**

41.   Claims arising out of the Nortel group's transfer pricing arrangements over the last decade were filed in respect of 17 of the EMEA Debtors.

42.   There are two ways in which Nortel entities were involved in transfer pricing – as an RPS Entity or as an LRE. Both are explained below.

43.   A small number of Nortel companies carried out the research and development upon which the entire organization depended as a technology-based enterprise. These companies, referred to as "RPS Entities", entered into a Master Research &

- 11 -

Development Agreement (the "MRDA") effective January 1, 2001 whereby they agreed to share economic profits and losses in a manner referred to as a residual profit sharing method, or "RPSM".    The vast majority of the research and development at Nortel was conducted in North America by NNL in Canada and NNI in the United States -- both are RPS Entities.    In Europe, research was conducted under three RPS Entities -- NNUK, NNSA and NNIreland.    Each has filed substantial claims related to the transfer pricing system utilized by Nortel.

44.    The transfer pricing related claims of these RPS Entities include allegations that:

(a)    Nortel's RPSM was a flawed transfer pricing mechanism and did not sufficiently compensate NNUK, NNSA or NNIreland for various functions or costs including routine returns and restructuring costs;

(b)    NNL breached the MRDA by failing to allocate appropriate returns to NNUK, NNSA and NNIreland in its position as administrator of the MRDA; and

(c)    NNL breached fiduciary duties and/or conducted itself oppressively towards NNUK, NNSA and NNIreland in connection with Nortel's transfer pricing.

45.    Nortel companies that did not carry out research and development functions were referred to as limited risk entities ("LREs") because they performed only routine functions such as distribution activities relating to the sale of Nortel products and provision of related services under separate distribution agreements or marketing, promotional and consulting services under separate service agreements (collectively, "Distribution Agreements").

46.    Fourteen EMEA Debtors filed transfer pricing claims as LREs.    These claims include allegations that:

(a)    the RPSM and the specific Distribution Agreement entered into with NNL did not provide an appropriate rate of return for the routine distribution functions of that LRE and the LRE was not sufficiently reimbursed for restructuring costs;

(b)    NNL was in breach of contract in respect of the Distribution Agreement for failing to provide a greater return; and

- 12 -

    (c)    in applying the transfer pricing arrangements NNL acted contrary to the interests of the LRE and its creditors and in favour of its own interests.

47.    Quantified transfer pricing claims by the EMEA RPS Entities total approximately CAD$2.42 billion. The quantified transfer pricing claims of the EMEA LREs total approximately CAD$200 million.

    **(C)    Intercompany Loans**

48.    Claims were advanced in respect of intercompany loans made to NNL by NNUK and NNIreland. For clarity, the NNUK claim consists of primarily the conversion of ordinary course trading debt rather than the advance of new funds. The two proofs of claim set out various theories why the claimants suffered damage for which NNL should be held liable including: the claimant was harmed because the loans were made on an interest-free basis; NNL caused the claimant to enter into the loan agreements to its detriment; and certain repayments of the loans were not valid.

49.    The quantified claims based on intercompany loans total approximately CAD$1.4 billion.

    **(D)    Project Swift**

50.    In late December 2007, an internal corporate reorganization was implemented which was referred to within Nortel as Project Swift. In broad terms, this involved transferring ownership of many of the EMEA entities to NNUK from NNL in exchange for cash, a reduction of outstanding loans, the liquidation of a Luxembourg subsidiary, selling certain shareholdings of NNIF to NNL and reducing the capital of NNIF.

51.    NNUK has filed claims totalling approximately CAD$622 million in connection with NNUK's direct involvement in Project Swift and an additional CAD$153 million in relation to alleged harm to NNUK as a result of the NNIF reorganization as part of Project Swift.

52.    NNIF has filed claims totalling approximately CAD$505 million in connection with the NNIF restructuring within Project Swift.

- 13 -

### (E)    Liquidator's Mismanagement Claim

53.    The Liquidator of NNSA has filed a claim against NNL in the amount of
€2.691 billion (approximately CAD$4.352 billion), for mismanagement of NNSA
under French law.  NNSA's separate Proof of Claim also included mismanagement
as a claim but did not quantify the claim.

### (F)    NNSA Claim to Recover a Payment made on a Loan

54.    NNSA claims to recover a payment it made on a subordinated loan from NNL.  The
amount claimed is approximately CAD$42.4 million.

### (G)    NNUK Claim for its Pension Deficit

55.    Various theories are advanced by NNUK in its Proof of Claim which allege NNL is
liable to NNUK for NNUK's alleged failure to properly fund the UK Pension Plan.
The claim is not quantified.  However, in its Proof of Claim the deficit relating to the
UK Pension Plan is alleged to be approximately GBP£2.1 billion, or
CAD$3.7 billion.

### (H)    Trading Debt

56.    Twelve of the EMEA Debtors have specified amounts owing (by NNL for the most
part but there are also claims against NNTC and NNGC) as a result of ordinary
course intercompany trading.  No contracts are referred to nor any other evidence
provided in the EMEA Proofs of Claim.

57.    The amounts claimed as Trading Debt total approximately CAD$121 million.

### (I)    Claims for other Pension Deficits

58.    Apart from NNUK, each of the other EMEA Debtors included claims for any
liability they may have in respect of unparticularized deficits in unspecified pension
plans.

- 14 -

**(J)      Claims for FSD Liabilities**

59.    Apart from NNUK, which is not a "Target" entity under the FSD Proceedings, the other EMEA Debtors included claims alleging the ability to claim over against NNL for any amounts the EMEA claimant is found to be liable for as a result of the FSD Proceedings in respect of the UK Pension Plan.

**(K)      Claims for Customer Revenues**

60.    NNUK, NNSA, NNIreland and all but one of the EMEA Debtors that filed transfer pricing claims as LREs also filed claims for being wrongly deprived of unspecified customer revenues.

**(L)      Claims for Past Disposition of Businesses**

61.    All EMEA Debtors included claims based on unspecified past dispositions of businesses having resulted in NNL receiving greater proceeds than it was entitled to.

**(M)      EMEA's Reservations of Rights**

62.    The EMEA Proofs of Claim contain extensive qualifications and reservations of rights, including:

   (a)    the filing of the claim is not acceptance that this Court is the appropriate forum or that it has jurisdiction to determine the merits of the claims;

   (b)    rights to add to and/or modify the claims, the nature of the claims, the facts relied on in support of those claims and their quantum, including as a result of documentary and other information obtained from NNL (or elsewhere) and/or in the light of expert evidence produced in connection with the claims;

   (c)    rights to advance any prospective, contingent or future claims which may arise or become crystallized at any time after the date of the proof of claim;

   (d)    rights to claim contribution and indemnity if a claim is made against the EMEA Debtor (without conceding that such claims are subject to the bar date under this Court's EMEA Claims Process);

   (e)    the filing of the claim is not acceptance that claims by NNL are valid or eligible for set-off;

- 15 -

(f)    the filing of the claim is not acceptance that proprietary claims and claims for breaches of fiduciary duty are subject to the EMEA Claims Process or are required to be filed by the bar date; and

(g)    the claims are without prejudice to claims against other parties.

63.    In the EMEA Proofs of Claim against the D&Os, the EMEA Debtors indicated they cannot specify the names of the relevant D&Os because the claims are still under investigation.

64.    Despite certifying that complete documentation in support of each claim is attached to their Proofs of Claim, the EMEA Debtors did not provide any supporting documentation, instead indicating it would be provided as part of a yet to be determined further process.

**THE CHAPTER 11 PROCESS FOR EMEA CLAIMS**

65.    In September 2009, the EMEA Debtors filed 350 Proofs of Claim in the Chapter 11 Proceedings as placeholder or "protective" claims (the "EMEA US Placeholder Claims").

66.    On April 1, 2011, the US Debtors filed their objection to the EMEA US Placeholder Claims and filed a "Motion for an Order Requiring a More Definitive Statement of Claim and Setting a Deadline for the Filing of any Proofs of Claim by the EMEA Claimants." The Motion seeks a bar date of June 1, 2011 by which the EMEA Debtors are to file more definitive statements of claim (the "US EMEA Bar Date").

67.    Until more definitive claims are filed, the Monitor is unable to determine whether and to what extent there is duplication in EMEA's claims against the U.S. Debtors and the Canadian Applicants.

68.    The EMEA Claimants have filed responding material indicating they object to the filing of the Motion but will abide by the proposed US EMEA Bar Date.

- 16 -

## MONITOR'S OBSERVATIONS

69.   As described in the preceding paragraphs of this Sixty-Fifth Report, the claims filed by the UK Pension Claimants and the EMEA Debtors and Joint Administrators are numerous and of a material amount.

70.   The quantum of certain of the EMEA Claims and UK Pension Claims has been disclosed in the proofs of claim.  However, there remain many heads of claim that have not been quantified by the claimants, despite the requirements of the relevant claims processes.  The aggregate amount of claims that have been quantified at present is approximately CAD$13.5 billion.

71.   Should the EMEA Claims and the UK Pension Claims ultimately be allowed in the CCAA proceedings on the basis as filed, even as non-priority ordinary unsecured claims, they could have the effect of doubling (or more) the estimated CCAA claims pool and accordingly significantly reduce potential distributions to other unsecured creditors of the Applicants.

72.   In addition to the extraordinary quantum of the EMEA Claims and UK Pension Claims as filed, the various remedies requested with respect to these claims include, among other things, a ruling that amounts found owing to certain of the EMEA Debtors are held in trust on their behalf.  Furthermore, the amounts held in trust would include any assets of the Canadian estates as well as any right to proceeds allocated to the Canadian estates from the Lockbox.  On such a theory, the resulting priority claim could very likely be greater than all net realizations on assets ultimately allocated to the Applicants, thereby leaving no assets for distribution to the other unsecured creditors in the CCAA proceedings.

73.   As previously disclosed, these significant EMEA Claims are interwoven into allocation theories of the EMEA Debtors.  However, when this Honourable Court ordered the EMEA Claims Process it ruled that the EMEA Claims can be determined by this Court separate from any consideration or determination of the allocation.  As such and especially given the significant amounts claimed by the EMEA Debtors coupled with the unsuccessful conclusion of the recent mediation process, the

- 17 -

Monitor is of the view, as previously stated in the Supplemental Fifty-Eighth Report, that it is necessary for this Honourable Court to resolve the EMEA Claims and the UK Pension Claims in an efficient and expedited process before any further steps are taken in relation to the allocation of proceeds among the Canadian, U.S. and EMEA estates.  In that regard, the Monitor will continue to work with the Applicants and will discuss with Canadian counsel for the EMEA Debtors and the UK Pension Claimants such a process, with a view to expediting the process in the near term.

All of which is respectfully submitted this 28th day of April, 2011.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald

President

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION et al.

*ONTARIO*
SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)

Proceeding commenced at Toronto

SIXTY-FIFTH REPORT
OF THE MONITOR
DATED APRIL 28, 2011

GOODMANS LLP
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Jay A. Carfagnini  (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.