**EXHIBIT A**

**Sent by Email**

David Steer,
10 Cypress Crt.,
Nepean, Ontario, Canada, K2H 8Z8.
April 30, 2011
davidsteer127@sympatico.ca

To:

Jennifer Stam    jstam@ogilvyrenault.com

Ogilvy Renault, Suite 3600, Royal Bank Plaza, South Tower,
200 Bay Street,  P.O.  Box 84, Toronto, Ontario, M5J 2Z4

**RE:  Nortel Networks Corporation, et al.: Court File no: 09-CL-7950**

Dear Jennifer Stam

We have received your email of April 28th in response to our filings to the Ontario Court of April 27th and 28th.  We have chosen to distribute these comments together with your email to the service list to ensure that all interested parties are aware of the facts in discussion.

Yes we are aware that there will be two or more hearings for the sale of the Nortel patent portfolio.  We made the filings in preparation for the May 2 session to help streamline the bidding process so that the sale may proceed quickly and yield the maximum revenue for the applicants and the creditors as well as to assure the maximum benefit for the purchasers.

As indicated in our filing, the proposed bidding process and the final order contain several elements that will be of concern to the potential purchasers.  The serious bidders will recognise that they will achieve the most value from their purchase if the inventors are known to be "on-side" with the transaction.  As we indicated, the bidding process and its representation in the proposed final order confirm a unilateral termination of the inventors' assignment contracts.   Such unilateral termination creates concern for potential purchasers as they recognise the unlikelihood of successful infringement suits without the assistance of the inventors.  Successful completion of the many pending applications is also stayed without the necessary continuing powers-of-attorney for the filing agents and the assistance and technical knowledge of the inventors.

We therefore suggest that the bidding process and its consequent final order be amended to enable the potential purchasers to assure the value of their purchase by making suitable arrangements for the continuing assistance of the inventors.  Your suggestion that such changes in the final order be made at a later hearing is unlikely to happen, indeed impossible, once the sale process has been completed in the context and understanding of the existing draft order.

Ultimately, it is the purchasers who will decide if they are confident in the value of the portfolio and its future utility and this confidence will be reflected in their bidding prices.  They will be most confident, and bid the best prices, if they are able to assure themselves that the inventors are "on-side" so that

maximum value can be extracted from the portfolio both in prosecution and in development of pending applications.

Your statement that "Nortel has not repudiated or terminated any assignment agreements regarding the inventions of its employees or contractors and as such, all such assignments remain valid" is not supported by the facts. Nortel has already terminated the assignment contracts with its inventors through its failure to deliver the valuable consideration that is required by the contracts. The suite of termination events were outlined in more detail in our filings and are noted again briefly here:

> Nortel has failed to provide for the long term disability benefits that are a part of the inventors' assignment contracts. The money that was taken from salaries as "LTD Premiums" was not used to develop provision for long term benefits to disabled employees. The failure of Nortel to provide for the contracted long term disability benefit plan is a repudiation and termination of the inventors' assignment contracts.

> Nortel has failed to make the necessary ongoing payments to the defined benefit pension plan as required by law[1] and as required as part of the inventors' assignment contracts. The delinquency in funding has resulted in a pension fund deficit of the order of $2 billion that has been accumulated over decades of Nortel policy. The accumulated failure of Nortel to fund the contracted pension plan is a repudiation and termination of the inventors' assignment contracts.

> The Nortel "final payment" to the pension fund in 2010 of approximately $300 000 is an amount of about $15 per pensioner[2]. However, as a result of that $15 contribution, employees were required to pay some $18 000 in additional individual income tax. The final payment of Nortel to the contracted pension plan has diminished employees' salary income and is a repudiation and termination of the inventors' assignment contracts.

> Nortel has failed to provide for the health benefits to retirees that were part of the inventors' assignment contracts. This causes the pensioners to divert their meagre remaining savings into extra insurance premiums. The failure of Nortel to provide the contracted medical benefits is a repudiation and termination of the inventors' assignment contracts.

> Nortel has failed to provide the transition retirement allowances ("TRA") that were part of the inventors' assignment contracts. The failure of Nortel to pay the contracted TRA is a repudiation and termination of the inventors' assignment contracts.

The above facts are but four examples of Nortel's failure to provide the valuable consideration that was the basis of the inventors' assignment contracts and thus nullifies the contracts. Nortel has, from the view of an inventor, already unilaterally terminated the assignment contacts and thus is not, and never was, an "owner" of the patents.

We are aware that paragraph 8 of the approval and vesting order transfers claims from the patent assets to the proceeds of sales. The order is also clear that the inventors will be treated as unsecured creditors at the bottom of the queue even though their claims are secured by the intellectual property.

---

1 see for example Ontario Pension Benefits Act Pension Benefits Act RSO 1990 Chapter P.8 55.(1) and (2) http://www.e-laws.gov.on.ca/html/statutes/english/elaws_statutes_90p08_e.htm
[2] The approximate payment of $300 000 divided by the 20 000 approximate number of pension plan members.

We are furthermore aware that the total proceeds of all the asset sales are insufficient to pay all claimants, and so insufficient to fulfil the assignment contracts. Paragraph 8 thus provides no practical valuable consideration and is but a further instance of Nortel repudiating and terminating its assignment contracts with its inventors.

Your remark in relation to duties of inventors in relation to patent litigation is confusing. The 35 USC 262 is quite clear that any of the co-owners may grant a license[3], thus enabling a suit for infringement to be deflected by a license from any inventor and, indeed, it is reported to have been used to such effect. The Canadian act (55(3) and 55(1)) establishes a similar effect by automatically enjoining all the patentees to an infringement action and making the infringer liable to the patentees[4].

In the context of patent litigation or otherwise, Nortel is reminded that, as it has chosen to terminate the valuable consideration stipulated in contracts made with employees, there is no longer any continuing obligation to Nortel or its successors.    Such contracts are two-way, and require the delivery of a benefit to both sides. One side cannot unilaterally release itself of its obligations without the other consequently becoming released of its obligations. However, it should be noted that in the discussions here, no trade secrets or confidential information is involved.

Finally, yes we are aware that Koskie-Minsky LLP is the court-appointed counsel for Nortel former employees. They are, justifiably, one of the most respected firms in this practice. They have worked dutifully in the interests of their clients and we are very grateful for their efforts. While we would be pleased to have their assistance in these matters, we noted from their website that they do not advertise expertise in patent law, particularly as it relates to protection of inventors. It thus seemed most practical to provide comments directly and thereby avoid unnecessarily causing dilution of Nortel's funds by further attorney's fees.

In short, we believe that the applicants will receive improved response to the patent portfolio sale if the bidding process and the associated approval and vesting order are amended to enable the bidders to take positive actions to assure that the inventors continue to be on-side with the transaction and to provide continuing support of the portfolio. It is only through such a process that creditors will receive the best benefit from the portfolio sale.

Yours


 (Original Signed by)

David G. Steer,   PhD.

---

[3] as Nortel has chosen not to provide the valuable consideration required by the assignment contracts with the inventors, the inventors are the co-owners.

[4] in this case a joint action by the patentees not to proceed would block an infringement suit