## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTEL NETWORKS, INC., *et al*., | : | Case No. 09-10138 (KG) |
| | : | |
| Debtors. | : | **Hearing Date:  June 7, 2011 at 9:30 A.M.** |
| | : | |
| | : | **Re:  Docket No. 5196** |
| | : | |

## CREDITOR'S OPPOSITION TO DEBTORS' MOTION FOR A PROTECTIVE ORDER

Creditor SNMP Research International, Inc. ("SNMPRI"), by and through counsel, hereby moves this Court ("Response") to deny Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc. ("Motion") in its entirety. To support its motion, SNMPRI relies on the Declaration of Dr. Jeffrey Case dated May 5, 2011 filed in connection with this Response ("Case Declaration," attached as Exhibit 1) and the Exhibits attached to the Certification of John L. Wood dated May 5, 2011 ("Wood Cert.," attached as Exhibit 2).

## I.      PRELIMINARY STATEMENT

SNMPRI's initial proof of claim, filed on September 29, 2009, asserted a claim for $22,092 for unpaid royalties reported by Debtors (collectively "Nortel").[1]  After filing the initial claim, SNMPRI learned that Nortel has used and distributed SNMPRI software for more than ten years without a license to do so and without paying any fees to SNMPRI for such use and distribution.   When SNMPRI learned of this unlicensed and unpaid use and distribution, SNMPRI amended its proof of claim, to add $1,494,946[2] for unpaid royalties, licensing and

---

[1] SNMPRI's initial claim is referenced in the claims register as Claim No. 4624.

[2] SNMPRI relied on its standard price list in effect in 1999 to compute the $1,494,946 owed by Debtors for the SNMPRI software. *See* Case Declaration ¶ 7.  Nortel alleges that SNMPRI's additional claim is worth $10,425.  *See*

maintenance fees for certain known unauthorized uses and distributions of SNMPRI software plus "any and all additional amounts associated with licensing fees, royalties, and maintenance fees that have not been reported by the Debtors to date and are owed to SNMP." *See* Amended Proof of Claim of SNMP Research International, Inc., filed on October 19, 2010 [Claim No. 7471]. Together, the initial and the amended proof of claim are referred to as the "Claim."

Since filing the Claim, SNMPRI further discovered that Nortel used and distributed additional SNMPRI software in at least 14 Nortel product families corresponding to an undetermined number of products without paying licensing fees, royalties, or maintenance fees for these uses. Accordingly, SNMPRI is in the process of amending the Claim to include additional unpaid royalties, licensing and maintenance fees identified thus far in the amount of $3,853,713. *See* Case Declaration ¶ 9.

To determine the full extent of Nortel's unauthorized use and distribution of SNMPRI software and calculate the scope of SNMPRI's claim for unpaid licensing fees, royalties, and maintenance fees, SNMPRI has asked Nortel to:

1. Tell SNMPRI what Nortel knows about Nortel's use and distribution of SNMPRI software; and

2. Allow SNMPRI to examine the Nortel software for the presence of SNMPRI software.

SNMPRI is not asking Nortel to perform an audit as Nortel alleges in its Motion. *See* Motion ¶ 26. SNMPRI has agreed to bear the burden of examining the Nortel software and is willing to enter into a confidentiality agreement to protect Nortel's trade secrets, if requested.

---

Motion ¶ 17. Nortel has relied on its own calculation of royalties and ignored the fact that licenses for SNMPRI software incur license fees, royalty payments and, in some cases, maintenance fees.

## II.   BACKGROUND INFORMATION

1.      On December 23, 1999, SNMPRI entered into a license agreement with Nortel ("License Agreement").  The License Agreement allowed Nortel to license individual SNMPRI software products for use in an identified Nortel product. *See* License Agreement attached to Wood Cert. as Exhibit A at 3, ¶ 2.1(a).  The License Agreement also allowed Nortel to distribute the licensed SNMPRI software products by embedding them within the identified Nortel products. *Id.* at ¶ 2.1(a), (c); 3-4.  Nortel could license an SNMPRI software product for use by or distribution within a Nortel product by adding a Schedule A to the License Agreement.  *Id.* at 3-4. Since 1999 and pursuant to the License Agreement, Nortel licensed multiple software products from SNMPRI for use in many Nortel products.  *See* Case Declaration ¶ 2.   In some years, Nortel paid over $350,000 to SNMPRI for licenses and royalties.  *Id.* at  ¶ 3.

2.      On March 3, 2010, this Court approved the sale of Nortel's CVAS assets to GENBAND, Inc ("GENBAND").  *See* Order Authorizing & Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP & Communications Solutions Business Free & Clear of All Liens, Claims, and Encumbrances [Dkt No, 2632].   While preparing for the GENBAND sale, Nortel learned that it had been using and distributing SNMPRI software for 10 years without a license to do so and without paying royalties, license fees or maintenance fees ("Unauthorized Use").  *See* Claim.

3.      After learning about the Unauthorized Use, both Nortel and GENBAND refused to enter into an accession agreement with SNMPRI.  *See* Pierre Tremblay Email attached as Exhibit A to Case Declaration.  The GENBAND sale was completed on May 28, 2010, and Nortel transferred SNMPRI's software to GENBAND without the authority to do so. *See* Genband Press Release, Nortel, Nortel Completes Sale of Carrier VOIP & Application Solutions

Business to Genband (May 28, 2010), *available at* http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100267654&locale=en-US.

4.      On September 30, 2010, this court entered an Order approving the sale of Nortel's passport division to Ericsson ("Passport").  *See* Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch (Formerly Known as 'Passport') Business Free and Clear of All Liens, Claims, and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts [Dkt No. 4054].  Prior to entry of that  order, SNMPRI had moved for this Court to prevent the unauthorized transfer of SNMPRI software in the Passport sale by ordering Nortel to "perform an audit, as a condition of the sale, to determine if SNMPRI intellectual property will be transferred to the purchaser as a part of the sale."  *See* Passport Sale Objection [Dkt No. 3993], attached to the Kim Cert. as Exhibit C submitted with the Motion.  At the sale hearing, SNMPRI stated that Nortel was cooperating with SNMPRI and had agreed to perform an audit of the software to be transferred in the Passport sale.  *See* Excerpt from Hearing attached to Wood Cert. as Exhibit B at 51:13-52:2; 52:18-25; 53:8-25.   Thus, SNMPRI did not renew its request that this Court order Nortel to audit its software because Nortel had been cooperative. *See id.* at 59:17-23. However, this Court recognized that SNMPRI had the right to ask this Court to compel an audit if Nortel did not conduct the audit voluntarily. *See id.* at 59:17-24. Nortel completed the audit of the Passport assets prior to the sale.  *See* Bianca Email attached to Wood Cert. as Exhibit C.

5.      Because SNMPRI had learned of the Unauthorized Use in the course of the GENBAND sale, SNMPRI asked Nortel to conduct a similar audit or give SNMPRI access to the software transferred to other buyers so that SNMPRI could determine if other SNMPRI software was used or distributed by Nortel without a license.  *See* Bianca Email.  However, Nortel refused

to discuss a reasonable method for SNMPRI to obtain this information. Therefore, SNMPRI and Nortel agreed to a Scheduling Order so that SNMPRI could use the discovery process to determine the extent of Nortel's unauthorized use and distribution of SNMPRI software. *See In re* Nortel Networks, Inc., *et al.*, Scheduling Order Regarding Claims Filed by SNMP Research International, No. 09-10138 (Jan. 31, 2011).

6.    Pursuant to the Scheduling Order, on March 1, 2011, SNMPRI served its discovery requests on Nortel.  The discovery requests consisted of five interrogatories (each an "Interrogatory") and four requests for documents (each a "Request") that would allow SNMPRI to determine the amount of royalties, license fees and maintenance fees that Nortel owes SNMPRI for past usage and distribution of SNMPRI software.  On March 30, 2011, Nortel informed SNMPRI via conference call that Nortel objected to Interrogatories 3 and 5 and Requests 3 and 4.  *See* Kim Cert. ¶ 3.  On the same conference call, SNMPRI offered to discuss Nortel's specific concerns and indicated that SNMPRI was willing to modify the Interrogatories or Requests to reduce the perceived burden on Nortel. *See* Kim Email attached to Wood Cert. as Exhibit D.  Nortel stated that it was not prepared to discuss modifying the Interrogatories or Requests at that time.  *Id.*    Nortel filed the Motion the next day. *See* Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc. [Dkt No. 5196].

7.    Even after Nortel filed the Motion, SNMPRI has remained willing to modify the Interrogatories or Requests to reduce the perceived burden on Nortel, *see*  Kim Email, and at one time, Nortel's attorneys agreed to discuss modifying Request 4, which requested a search of Nortel software, with SNMPRI.  *Id.* However, Nortel has without exception asserted that any

search of Nortel software would be overly burdensome and has flatly refused to consider any modification to Request 4.  *Id.*

8.    On March 29, 2011, GENBAND Inc. notified SNMPRI that it needed a license for the SNMPRI software embedded in the Universal Signaling Point and SP2000 products.  *See* Paul Moran Spreadsheet attached to Wood Cert. as Exhibit E.  When SNMPRI checked its records, SNMPRI determined that Nortel had no rights to use SNMPRI software in the SP2000, and SNMPRI learned that Nortel also failed to pay royalties for the SNMPRI software in the Universal Signaling Point after 2006 ("Second Unauthorized Use").  *See* Case Declaration ¶ 4.

9.    While SNMPRI was attempting to obtain the requested discovery, it also learned that Nortel had transferred SNMPRI software to Avaya Inc. without a license or authorization to do so.  On April 14, 2011, Avaya Inc. notified SNMPRI that it needed a license for the SNMPRI software embedded in certain products within Nortel's Bay division ("Bay Software") it had acquired from Nortel.  *See* Weldon Email and attached spreadsheet attached to Case Declaration as Exhibit B.  Under the terms of a Letter of Accession Agreement between Nortel, Avaya Inc., and SNMPRI, Nortel did not have the right or authority to transfer the Bay Software to Avaya Inc.  *See* Accession Agreement between Nortel, SNMPRI and Avaya Inc dated March 3, 2010, attached to Wood Cert. as Exhibit F.  Furthermore, Nortel did not have the right to possess, use, or distribute the Bay Software after June 20, 2003, because all rights to the Bay Software expired on that date pursuant to Schedule 1A of the Nortel Agreement ("Third Unauthorized Use").  *See* Schedule 1A, attached to Wood Cert. as Exhibit G.

10.    SNMPRI is currently in the process of amending its Claim to account for unpaid license fees, royalties and maintenance fees in the amount of $3,853,713 for the Second Unauthorized Use and Third Unauthorized Use.  *See* Case Declaration ¶ 9.  SNMPRI requires

Nortel to comply with the Requests and Interrogatories to understand the full extent of Nortel's unauthorized use and distribution of SNMPRI software related to the Bay Software, Universal Signaling Point, SP2000 and other Nortel software.  SNMPRI's Requests and Interrogatories were designed to obtain information to allow SNMPRI to determine the full extent of licensing fees, royalties, and maintenance fees owed by Nortel.  The Requests and Interrogatories include *inter alia*: (a) information about which portions of SNMPRI software were subject to unauthorized use and distribution; (b) what SNMPRI software was incorporated into products shipped by Nortel to end users; (c) the quantities of end user products which were produced by Nortel that contained SNMPRI software; and (d) what versions of the SNMPRI software were used.

11.    The $3,853,713 additional claim is based on the unauthorized use and distribution of SNMPRI software that SNMPRI has learned without the discovery process.  *See* Case Declaration ¶ 9.  SNMPRI requires the information from the Interrogatories and the Requests to accurately determine the full amounts associated with the Unauthorized Use, the Second Unauthorized Use, the Third Unauthorized Use, and whether or not there were any additional unauthorized uses or distributions.

## III.    RELIEF REQUESTED

12.    SNMPRI requests that this Court (i) deny the Order proposed by the Debtors and (ii) compel the Debtors to comply with the Interrogatories and Requests so that SNMPRI can accurately determine the full amount of license fees, royalties and maintenance fees owed by Nortel for the Unauthorized Use, the Second Unauthorized Use, the Third Unauthorized Use, and any additional unauthorized use or distribution of SNMPRI software.

## IV.   <u>LAW</u>

13.     Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense-including the existence, description, nature, custody, condition and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." FED. R. CIV. PRO. 26(b)(1). A matter is relevant if it "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

14.     When one party claims that another party used the claimant's intellectual property without a license, the scope of discovery is broad. *See e.g., BigBand Networks, Inc. v. Imagine Commc'ns, Inc.*, Civ. Act. No. 07-351-JJF, 2010 WL 2898288 (D. Del. Jul. 20, 2010) (allowing discovery of software source code for products sold and products in development); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 269-70 (6th Cir. 2010) (upholding court's decision to require discovery of software by requiring defendant to produce the software for an plaintiff's expert to review);  *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465,  1471-72 (9th Cir. 1992) (upholding court's decision to require defendant to produce software for an independent consultant's review).  For example, in *BigBand Networks, Inc.*, the court ordered the producing party to produce the software source code for certain products, identified by the requesting party, which it had transferred or sold to third parties.  *Id.* at *2.  The court also ordered the producing party to produce the software source code for all products in development even though it was likely that such products would change before they were transferred to a third party or might never be transferred at all because such information was "reasonably likely to lead to evidence relevant to [the patent holder's] claim." *Id.* at *1. Furthermore, the court allowed broad interrogatories requesting the identification of classes of technology, *see id.* at * 2

(allowing an interrogatory that requested "identification of all video compression and video networking technology that [the producing party] has 'made, tested, licensed, sold, offered for license, or offered for sale'"), and requesting the identification of source code files for particular products. *Id.* (requiring the producing party to specifically identify which of its source code was used in the technology at issue rather than simply refer the requesting party to all of the "source code held in escrow").

15.    Both Rule 26(c) and Third Circuit jurisprudence allow discovery of trade secrets when the need for disclosure outweighs the need to keep the information private, *see* FED. R. CIV. P. 26(c); *Leucadia, Inc. v. Applied Extrusion Tech., Inc.*, 998 F.2d 157, 166 (3d. 1993). Moreover, a requesting party may discover its own confidential information, even if such discovery "involves examining things that the other party considers its own trade secrets" so long as the requesting party identifies "with reasonable particularity" the matter or information that it is seeking to discover so that the producing party can properly exclude anything that is unrelated to the information sought. *See, e.g. Hill v. Best Med. Intern., Inc.*, C.A. No. 09-1194, 2010 WL 2546023 (W.D. PA Jun. 24, 2010).

16.    The Federal Rules of Civil Procedure provide that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . ." Fed. R. Civ. P. 26(c)(1).  "A party seeking a protective order over discovery materials must demonstrate that 'good cause' exists for the protection of that material." *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) (citing FED.R.CIV.P. 26(c); *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786 (3d Cir.1994)). To show "good cause," the moving party must "specifically demonstrate[ ] that disclosure will cause a clearly defined and

serious injury." *Id.* at 483. The Third Circuit has articulated the following factors for courts to weigh when determining if a moving party has carried its burden of establishing "good cause:"

> 1.    whether disclosure will violate any privacy interests;
>
> 2.    whether the information is being sought for a legitimate purpose or for an improper purpose;
>
> 3.    whether disclosure of the information will cause a party embarrassment;
>
> 4.    whether confidentiality is being sought over information important to the public health and safety;
>
> 5.    whether the sharing of information among litigants will promote fairness and efficiency;
>
> 6.    whether a party benefitting from the order of confidentiality is a public entity or official; and
>
> 7.    whether the case involves issues important to the public.

*Id.* The moving party bears the burden of persuasion and "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning do not satisfy the Rule 26(c) test." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986).

17.    Furthermore, the party seeking the protective order is required to confer in good faith "with other affected parties in an effort to resolve the dispute without court action." Fed. R. Civ. P. 26(c)(1); *see also* Del. Bankr. L.R. 7026-1 (requiring "an averment of counsel for the moving party that a reasonable effort has been made to reach agreement with the opposing party on the matters set forth in the motion or the basis for the moving party not making such an effort").

18.    "If a motion for a protective order is wholly or partly denied, the court may, on just terms, order that any party or person provide or permit discovery." Fed. R. Civ. P. 26(c)(2).

## V.    ARGUMENT

**a.    The Motion does not show that "good cause" exists for the Protective Order.**

19.    Nortel has not met and cannot meet its burden to show "good cause" exists for the protective order it seeks.  To grant Nortel's motion, this Court must find that Nortel has shown that it will incur "a clearly defined and serious injury" by complying with the challenged discovery requests.  *Glenmede Trust Co.*, 56 F.3d at 483.  Nortel describes the burden and expense associated with auditing its software or even providing access to its software.  *See* Motion, ¶ 26 – 35.  But, neither the Interrogatories nor the Requests mention an audit or request that Nortel conduct an audit. Rather, the Interrogatories and Requests simply ask Nortel to share with SNMPRI any knowledge or documents that Nortel has regarding SNMPRI software and allow SNMPRI to perform a search of Nortel's software so that Nortel will not have to bear the burden of conducting such a search.  SNMPRI offered to modify its Interrogatories and Requests to further reduce the burden on Nortel but Nortel rebuffed this offer.  *See* Kim Email.

20.    Although Nortel characterizes the challenged requests as "grossly burdensome and unreasonable," *see* Motion at ¶ 26, Nortel neglects to address "the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." FED. R. CIV. P. 26(c)(1)(A).  SNMPRI's claim is for monetary damages for unpaid royalties, licensing and maintenance fees for certain known unauthorized uses and distributions of SNMPRI software plus "any and all additional amounts associated with licensing fees, royalties, and maintenance fees that have not been reported by the Debtors to date and are owed to SNMP."  Claim at Attachment to Amended Proof of Claim.  SNMPRI has had to amend its original claim because it has learned, after a sale of Nortel's assets, that Nortel had been using and distributing its software products without a license and without paying the licensing fees, royalties or

maintenance fees that it was owed. *See id.*  SNMPRI has no way to determine the extent of Nortel's unauthorized use or the scope of its claim without obtaining the requested information. Therefore, even if the requested discovery would burden Nortel, Nortel has not shown that this burden would cause such a "clearly defined and serious injury" that it outweighs the injury to SNMPRI by being unable to determine the true scope of its Claim.

**b.  Interrogatories 3 and 5 are relevant to the Claim.**

21.  Interrogatories 3 and 5 request information that is directly relevant to the Claim. The Claim asks for specific amounts for the known unpaid royalties and fees due to the Unauthorized Use and for "any and all additional amounts associated with licensing fees, royalties, and maintenance fees that have not been reported by the Debtors to date and are owed to SNMP." *See* Claim. Nortel argues that SNMPRI is only entitled to discover information related to the Unauthorized Use and that any other information is irrelevant.  *See* Motion ¶¶ 18, 19.  Nortel ignores the fact that the Claim encompasses any amounts owed by Nortel for use or distribution of SNMPRI software, regardless of whether SNMPRI has already learned of such use or distribution or not.  Thus, Nortel presents this Court with a circular argument: SNMPRI should be allowed to discover only information associated with what SNMPRI has already discovered through other sources.  This circular reasoning would limit Rule 26(b) which allows SNMPRI to discover information relevant to the Claim even if SNMPRI has not already discovered it.

22.  Nortel also argues that SNMPRI is in the best position to know if Nortel used or distributed SNMPRI software and failed to pay royalties or license fees.  *See* Motion at ¶ 28. Nortel fails, however, to substantiate that argument. Although SNMPRI knows what software it provided to Nortel, only Nortel knows what use it made of the software and to what extent.  If

Nortel failed to inform SNMPRI of its use or distribution or represented to SNMPRI that it was not using or distributing a particular SNMPRI software product, SNMPRI did not have access to information that would permit it to make its own assessment of those issues.  That is why, under the terms of the License Agreement, once SNMPRI shipped software to Nortel, Nortel was obligated to inform SNMPRI when it used or distributed SNMPRI's software products. Therefore, Interrogatories 3 and 5 are relevant for purposes of understanding each instance of use or distribution of SNMPRI software by Nortel.

23.     Nortel further argues that information about "the software of global Nortel transferred or made available to buyers in the Bankruptcy Sales" is not relevant. Motion ¶ 18. However, it ignores the fact that SNMPRI learned of the Unauthorized Use in the course of the GENBAND sale.  *See* Claim.  It also ignores the fact that SNMPRI learned of Nortel's unlicensed use of the Bay Software *after* Nortel transferred the software, embedded in Nortel's products, to Avaya Inc.  *Id.* Nortel could not have made these transfers if it had not already been using SNMPRI's software when it was not licensed to do so. Therefore, Nortel's knowledge of the SNMPRI software transferred to buyers is relevant to the Claim because it enables SNMPRI to determine if it is owed any fees or royalties from Nortel's use or distribution of SNMPRI's products.

24.     In an attempt to discredit and impute false motives to SNMPRI, Nortel mischaracterizes this Court's ruling in the September 30, 2010 Passport Sale Hearing.  Motion ¶ 20.  In the Passport sale, SNMPRI asked the Court to order Nortel to perform an audit of the software to be transferred to Ericsson to determine if any SNMPRI software was present.  *See* Passport Sale Objection, attached to Kim Cert. as Exhibit C.   Before the Hearing, Nortel cooperated with SNMPRI regarding an audit of the software to be transferred in the Passport

sale, and SNMPRI reported this fact to the Court.  *See* Excerpt of Hearing, at 51:13-52:2; 52:18-25; 53:8-25.  Nortel completed the audit of the software to be transferred in the Passport sale prior to the sale.  *See* Bianca Email.  Yet, in its Motion, Nortel asserts that this Court rejected SNMPRI's audit request in the Passport sale and that now, SNMPRI is using the Claim as a pretext to "re-tread the same arguments" and get the same discovery that this Court "squarely rejected."  *See* Motion ¶ 20.  This assertion mischaracterizes that Hearing.  The Passport sale audit was completed, and SNMPRI is not requesting that the Passport sale audit be repeated or even that Nortel perform an audit at all.

        **c.**      **Request No. 4 is Relevant to the Claim**

25.     Allowing SNMPRI to search Nortel software to determine what SNMPRI software was used and distributed by Nortel is relevant to the Claim.  Nortel uses the same circular argument that it applied to Interrogatories 3 and 5 when it states that SNMPRI should only be able to discover items related to the Unauthorized Use. Yet, SNMPRI's Claim requires that SNMPRI know the full scope of all SNMPRI software that Nortel has used or distributed— even if Nortel was doing so without a license.  In addition to the Unauthorized Use, Second Unauthorized Use and Third Unauthorized Use, SNMPRI needs to discover any other uses or distribution of SNMPRI software so that it can determine the scope of its Claim.

        **d.**      **Interrogatories 3 and 5 and Requests 3 and 4 are not Burdensome.**

26.     Interrogatory No. 3 asks Nortel to "Identify the Persons known to Nortel who have knowledge of the Nortel Software source code transferred or made available to each buyer in the Bankruptcy Sales, at the time the Bankruptcy Sale closed, categorized by each buyer." Nortel attempts to combine Interrogatory Nos. 3 and 5 to argue that responding to Interrogatory No. 3 will be unduly burdensome because it will require an "audit of all of the software source

code …" *See* Motion ¶ 27.   Provision of a list of Persons that have knowledge of the Nortel Software does not require an audit.  Therefore, Interrogatory No. 3 is not unduly burdensome.

27.    Nortel goes to great lengths to classify Interrogatory No. 5 as a request for an audit of all the Nortel software, but this is not the intent of Interrogatory No. 5.  SNMPRI needs the information that Nortel has in its possession regarding the SNMPRI software transferred to buyers as part of the bankruptcy sales.  To clarify that SNMPRI is not seeking an audit, SNMPRI has communicated the fact to Nortel that Interrogatory No. 5 should not and cannot be construed to request an audit.  Therefore, Nortel's extensive arguments regarding the burden of conducting a software audit are moot.

**e.    Request No. 4 is not Unduly Burdensome.**

28.    SNMPRI's willingness to search the Nortel software reduces the burden on Nortel rather than creating the burden that Nortel suggests.  Even if it would be a tremendous burden for Nortel to search its own software, *see* Motion ¶ 26, SNMPRI has requested access to the Nortel software so that SNMPRI can perform its own search. Request No. 4.  Yet, Nortel claims that even granting SNMPRI access to Nortel software is a great burden to Nortel.  *See* Motion ¶ 32.

29.    Nortel first claims that identifying the Nortel software that it shipped to its customers would be burdensome. *See* Motion ¶ 33.  But, Nortel has already identified the Nortel software shipped to customers when it prepared the Nortel software for the buyers in the various bankruptcy sales.  Nortel also claims that Nortel no longer has personnel available to determine which Nortel software shipped to customers. Motion ¶ 34.  However, if SNMPRI conducts the search, Nortel's lack of personnel is irrelevant.

30.    Nortel further claims that allowing SNMPRI access to Nortel software would cause great harm.  *See* Motion ¶ 36.  Nortel argues that, because the Nortel software is a trade

secret, SNMPRI should not have access to it.  *See* Motion  ¶¶ 36, 37.  Nortel's conclusory argument does not prove the harm that Nortel is asserting. SNMPRI is not a competitor of Nortel or any of the buyers in the bankruptcy sales.  SNMPRI has repeatedly agreed to enter into a confidentiality agreement with Nortel to protect the Nortel software, but Nortel has refused to even discuss SNMPRI's proposal.  *See* Kim Email. Furthermore, both Rule 26(b) and the Third Circuit allow discovery of trade secrets when the need for disclosure outweighs the need to keep the information private, *see* FED. R. CIV. P. 26(c); *Leucadia, Inc.*, 998 F.2d at 166, and SNMPRI can discover its own confidential information even if such discovery "involves examining things that the other party considers its own trade secrets" because SNMPRI has identified "with reasonable particularity" the matter or information that it seeks to discover. *See, Hill*, 2010 WL 2546023 at *3-4.  Therefore, even if SNMPRI must have access to Nortel's trade secrets to determine the extent of the use or distribution of its own software, which SNMPRI considers a highly confidential trade secret, such discovery is permissible because SNMPRI has identified, with reasonable particularity, the information that it seeks to discover.

31.    Finally, as discussed in Section II of this Response, the District Court of Delaware and courts in other Circuits allow broad discovery of software and source code when it is necessary to determine the scope of the producing party's unauthorized use of the requesting party's intellectual property. *See e.g. BigBand Networks, Inc.*, 2010 WL 2898288 at *1-2.  For all of the foregoing reasons, Request 4 is not unduly burdensome, but is within the parameters of permissible discovery for this issue.

For all of the foregoing reasons, SNMPRI respectfully requests that this Court deny Nortel's Motion for Protective Order and compel Nortel to comply with SNMPRI's Interrogatories and Requests.

Dated: May 5, 2011
      Wilmington, Delaware

CIARDI CIARDI & ASTIN

<u>/s/ Joseph J. McMahon, Jr.</u>
Daniel K. Astin (No. 4068)
Joseph J. McMahon, Jr. (No. 4819)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
(302) 658-1100 telephone
(302) 658-1300 facsimile
dastin@ciardilaw.com
jmcmahon@ciardilaw.com

-and-

Mark H. Ralston, Esquire
2603 Oak Lawn Avenue
Suite 200
Dallas, TX 75219
(214) 295-6416
(214) 602-1250
mralston@ciardilaw.com

*Attorneys for SNMP Research*
*International, Inc.*

535444v5