# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
: 
*In re*  :  Chapter 11
:
Nortel Networks Inc., *et al.*,[1]  :  Case No. 09-10138 (KG)
:
            Debtors.  :  Jointly Administered
:
:  **Hearing date: June 7, 2011, 9:30 AM (ET)**
:  **Objections due: May 31, 2011 4:00 PM (ET)**
---------------------------------------------------------X

### DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P. 9019 APPROVING AGREEMENT WITH NORTEL UK AND NORTEL ISRAEL AND APPROVING AMENDMENT OF CERTAIN ESCROW AGREEMENTS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) approving that certain Agreement dated April 13, 2011 (the "Israel Agreement"), by and among NNI, Nortel Networks (UK) Limited (in administration) ("Nortel UK" or "NNUK"), Nortel Networks Israel (Sales and Marketing) Ltd. ("Nortel Sales and Marketing") and Nortel Communications Holdings (1997) Ltd. ("Nortel Communications" and, together with Nortel Sales and Marketing, "Nortel Israel"), attached hereto as Exhibit B, (b) approving amendments to those certain escrow agreements to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

which Nortel Israel is a party, substantially in the forms attached hereto as Exhibit C (the "Escrow Amendments"); and (c) granting such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

## Background

### A.  Procedural History

3. On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only. The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders holding claims against certain of the Debtors and certain of the debtors in the related Canadian proceedings has been organized (the "Bondholder Group").

---

[2]  Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

2

5. On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court. Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators"). Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

**B.   Case Milestones**

6. On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales. Since then, Nortel has sold many of its business units and assets to various purchasers.

7. To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. ("Radware")[D.I. 539]; (ii) the sale of substantially all of its CDMA

---

[3] The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4] The EMEA Debtors include the following entities: NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions ("Enterprise") business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks ("MEN") business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; (vii) the sale of certain assets of its Carrier Voice Over IP and Application Solutions ("CVAS") business to GENBAND US LLC [D.I. 2632]; (viii) the sale of certain assets of the Debtors' Multi-Service Switch ("MSS", formerly known as "Passport") business to Ericsson [D.I. 4054]; (ix) the proposed Google Bid to purchase the IP Assets [D.I. 5202]; and (x) certain other sale transactions in relation to which Nortel entities, including the U.S. Debtors, have signed or will sign a License Termination Agreement selling their interest in certain intellectual property licenses (collectively, the "Sale Transactions"). Efforts continue to be made with respect to the realization of value from Nortel's remaining assets. For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

**Relief Requested**

8.   By this Motion, the Debtors seek an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the Israel Agreement, (b)

approving the Escrow Amendments, and (c) granting such other and further relief as the Court deems just and proper.

**Facts Relevant to this Motion**

9.       Nortel Israel, which consists of two wholly-owned subsidiaries of NNUK, has been in administration in Israel since January 19, 2009. On November 24, 2009, the Tel-Aviv District Court approved the scheme of arrangement of Nortel Israel's creditors (the "Scheme of Arrangement"). The Scheme of Arrangement provides for all of Nortel Israel's existing cash to be used to pay in full claims asserted by employees, taxes, suppliers, and certain litigation counterparties. A portion of the available cash was also allocated toward partial payment of the amounts due to certain pension claimants (the "Pension-10 Group"). The remaining claims of the Pension-10 Group, along with all claims asserted by Nortel Israel's affiliates, were to be paid from Nortel Israel's share of the proceeds of various Nortel global asset sales (the "Sale Proceeds"). Affiliate claims to be paid from Sale Proceeds included NNI's claim for NIS 14,500,000 ($4,080,300)[5] and NNUK's claim for NIS 21,400,000 ($6,021,960), as well as NIS 620,000 ($174,468) due to NNL and NIS 80,000 ($22,512) due to Nortel de Mexico, S. de R.L. de C.V.

10.       Because Nortel Israel ultimately had more cash than it anticipated when the Scheme of Arrangement was approved, the joint administrators for Nortel Israel (the "Israeli Administrators") made two partial distributions on the remaining creditor claims in 2010, including partial distributions to NNI. As a result, as of the date hereof NNI's remaining outstanding claim against Nortel Israel totals NIS 13,132,429 ($3,695,465), and NNUK is owed

---

[5]       All obligations of Nortel Israel are calculated in Israeli New Shekels ("NIS"). The approximate value in U.S. dollars is based on a Bank of Israel exchange rate of NIS .2814 to the U.S. dollar as of March 14, 2011.

a balance of NIS 19,141,168 ($5,386,325).  The remaining amounts due to the Pension-10 Group under the Scheme of Arrangement total approximately NIS 14,700,000 ($4,136,580).

11. The Israeli Administrators have informed the Debtors that as of September 30, 2010, the Nortel Israel's only remaining commercial activity included minor administrative functions, and very limited commitments to the Israel Ministry of Defense.  The only tasks that the Israeli Administrators must accomplish before they may place Nortel Israel into liquidation are to facilitate the sale of the remaining Nortel Israel assets, participate in the allocation discussions regarding the Sale Proceeds and argue for the maximum possible distribution to Nortel Israel, and then distribute any Sale Proceeds received by Nortel Israel to its remaining creditors.  The Debtors understand that Nortel Israel currently has sufficient cash to finalize its administration, pay the joint administrators' fees, and to satisfy all obligations incurred after approval of the Scheme of Arrangement, but until the allocation process is complete, there will be no sums available to make payment to the Nortel affiliate creditors or the Pension-10 Group.

12. Nortel Israel has participated in the Enterprise, CVAS, MEN, Radware and MSS transactions, and pursuant to those sale agreements, and as contemplated by the Interim Funding and Settlement Agreement, dated as of June 9, 2009, it may be entitled to a portion of the proceeds from each of those sales.  Those proceeds are currently held in escrow accounts governed by distribution escrow agreements that may not be amended without consent of the requisite parties thereto and approval of both this Court and the Canadian Court.

13. The Israeli Administrators attended the allocation mediation meetings in November 2010 and in April 2011, and have stated that unless a global compromise can be reached with Nortel Israel's affiliates, the Israeli Administrators will continue to participate in the global allocation exercise, in whatever format it may take, which would require retaining

counsel and experts to advocate for Nortel Israel's position in these discussions, and significant expenditure of its remaining cash.

14.     In an effort to resolve the Nortel Israel administration and avoid the need for continued participation in the allocation negotiations, Nortel Israel approached NNI and NNUK about the possibility of agreeing to a transaction whereby NNI and NNUK would purchase all of Nortel Israel's present and future rights, title and interest, if any, to a share of the Sale Proceeds (the "Nortel Israel Rights"), which would remove Nortel Israel from the allocation discussions and provide NNI and NNUK with any recovery out of the Sale Proceeds to which Nortel Israel is entitled.  After extensive negotiations, NNI and NNUK have agreed with the Israeli Administrators to purchase the Nortel Israel Rights for cash consideration of $2 million (the "Payment"), $813,819 of which will be contributed by NNI and the remaining $1,186,181 of which will be paid by NNUK.  In addition, NNI and NNUK will waive any right to further distributions on their claims against Nortel Israel under the Scheme of Arrangement (the "Waiver").[6]

15.     The Payment amount was agreed upon in discussions between Nortel Israel, NNI and NNUK, and constitutes a reasonable estimate, in NNI's view, of the total Sale Proceeds that could be allocated to Nortel Israel, based on the assets transferred by Nortel Israel to the various purchasers.[7]  Nortel Israel will use the Payment, along with the remainder of its available cash, to complete its administration, pay certain outstanding debts, and to fulfill its obligations under a

---

[6]     The Canadian Debtors, who also have claims against Nortel Israel, have executed a side letter to the Israel Agreement stating that upon effectiveness of the Israel Agreement, they will have no rights in or entitlements to the Nortel Israel Rights or against NNI or NNUK with respect to their rights to the Nortel Israel Rights.

[7]     It is important to note that if Nortel Israel continued to participate in the allocation discussions, the Israeli Administrators would argue for a much larger allocation.  By way of example, the Israeli Administrators have informed NNI and NNUK that Nortel Israel is entitled to substantially more than $2 million based on their view of the "Fair Value" of the Israeli assets transferred in connection with the global sales.

7

settlement agreement with the Pension-10 Group, pursuant to which the Pension-10 Group agrees to reduce its outstanding claim to NIS 9,500,000 ($2,673,300).

16. In exchange for the Payment and Waiver, Nortel Israel will assign to NNI and NNUK the Nortel Israel Rights (the "Assignment"), which shall be jointly held by NNI and NNUK. In furtherance of the Assignment, Nortel Israel will, among other things, execute the Escrow Amendments, which will remove Nortel Israel as a depositor under the MSS, Radware, CVAS, Ericson, and MEN distribution escrow agreements, and provide that the consent of Nortel Israel will no longer be required for any purposes thereunder. Nortel Israel will also provide NNI and NNUK with a limited power of attorney authorizing them to act on behalf of Nortel Israel in certain circumstances as necessary to facilitate the relevant sale transactions and distribute the Sale Proceeds (the "Power of Attorney").

17. Pursuant to the Israel Agreement, NNI and NNUK will each be entitled to a ratable share of the Sale Proceeds allocated to Nortel Israel proportional to its contribution to the Payment, until NNI has been paid an amount equal to the sum of its share of the Payment and its outstanding claim against Nortel Israel. In the event that both NNI and NNUK are paid from the Israeli share of the Sale Proceeds, amounts that would pay in full, their shares of the Payment and satisfy their claims against Nortel Israel, any excess will be paid to NNUK as sole shareholder of Nortel Israel. At this time, however, NNI does not expect there to be any excess.

18. The effect of the Israel Agreement and the Escrow Amendments is to simplify the allocation discussions among the Nortel estates by removing one of the parties at the negotiating table, and to preserve the possibility that NNI and NNUK will recover some amount on their claims against Nortel Israel because Sale Proceeds allocated to Nortel Israel that exceed the amount of the Payment will be applied directly to those claims, rather than being shared with

other creditors or depleted by the costs of Nortel Israel's prolonged administration.[8]  In addition, the Israel Agreement eliminates any chance that NNI and NNUK will need to further litigate their claims before the Tel-Aviv District Court in the event the Israeli Administrators refuse to make distributions on those claims after the ultimate release of the Sale Proceeds to Nortel Israel.

**Basis for Relief**

19. The Debtors seek authorization to enter into the Israel Agreement under sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

20. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease the property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363.  Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

21. The use or transfer of estate property under this provision must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider

---

[8]  The Israel Agreement is being entered into for convenience of the parties.  It shall have no precedential effect on the negotiations among the parties to the MEN, Radware, CVAS, MSS or Enterprise escrow agreements, and shall not support any party's argument for an entitlement to allocation from the escrowed funds.

9

all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071). In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange. See In re Decora Industries, Inc., 2002 WL 32332749, at *2; In re Delaware & Hudson Ry. Co., 124 B.R. at 176.

22.     Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Citing this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). Additionally, the Third Circuit has recognized that "'[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.'" In re Penn Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)). And courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

23.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re

Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)). Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." TMT Trailer Ferry, 390 U.S. at 424-25. The court need not be convinced that the settlement is the best possible compromise in order to approve it. In re Coram Healthcare Corp., 315 B.R. at 330. Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at 330.

24. The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

25. The Debtors respectfully submit that the Israel Agreement and the Escrow Amendments meet each of the requirements under section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. As required by section 363, the Israel Agreement is proposed as a good faith means to resolve actual and potential disputes regarding payment of NNI's claim against Nortel Israel and the Nortel Israel Rights, and to facilitate the timely wind-down of Nortel Israel's administration. NNI cannot expect to receive any recovery on its claims against Nortel

Israel until Nortel Israel receives its share of the Sale Proceeds, and Nortel Israel's continued participation in the allocation discussions will only serve to further complicate an already complex exercise among the various Nortel estates. Furthermore, prolonging the administration of Nortel Israel until allocation is complete and all Sale Proceeds have been distributed before pursuing collection of the amounts due from Nortel Israel to NNI would make it much more likely that recovery on that claim would be lower, as prolonged administration would erode the funds available for distribution to creditors, and would increase the risk of litigation of those claims and Nortel Israel's appropriate share of the Sale Proceeds. For these reasons, the Debtors submit that the benefits of the Israel Agreement and the Escrow Amendments are manifest and NNI's entry into the Israel Agreement and the Debtors' execution of the Escrow Amendments are within the sound business judgment of the Debtors. The Debtors have also consulted with the Committee and the Bondholder Group on the negotiation and entry into the Israel Agreement and the Escrow Amendments and both support approval of the Motion. Accordingly, the Debtors submit that the Israel Agreement and the Escrow Amendments are in the best interest of the Debtors, their estates and their creditors and should, therefore, be approved by the Court.

### Notice

26.     Notice of the Motion has been given via first class mail, facsimile, electronic transmission, hand delivery or overnight mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the Israeli Administrators; (v) counsel to NNUK; (vi) the Monitor; (vii) JPMorgan Chase Bank, N.A., as distribution agent on the escrow accounts relevant to the Escrow Amendments; and (viii) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

**No Prior Request**

27.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  May 17, 2011  
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)  
Lisa M. Schweitzer (admitted *pro hac vice*)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile:  (302) 658-3989

*Counsel for the Debtors  
and Debtors in Possession*