IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X
:
In re                                                          : Chapter 11
                                                               :
Nortel Networks Inc., *et al.*,                                : Case No. 09-10138 (KG)
                                                               :
                                       Debtors.                : Jointly Administered
                                                               :
                                                               : **Related Docket No. 5307**
                                                               :
---------------------------------------------------------------X
                                                                 **Hearing date: June 7, 2011 at 9:30 a.m.**
                                                                 **Objections due: May 19, 2011**

### INFORMAL BONDHOLDER GROUP'S RESPONSE TO JOINT MOTION TO ESTABLISH AN ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING AND SETTLEMENT AGREEMENT

On April 25, 2011, Nortel Networks Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "U.S. Debtors"), and the Official Committee of Unsecured Creditors (the "Committee" and together with the U.S. Debtors, the "Movants") filed their motion (the "Motion"; D.I. 5307) requesting that the Court utilize its jurisdiction and exercise its authority under the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "IFSA") to enter an order approving an Allocation Protocol.[1] The purpose of the proposed Allocation Protocol would be to establish procedures and a schedule for the resolution by the U.S. and Canadian Courts (collectively, the "Courts") of the allocation of the Sale Proceeds realized from the various Sale Transactions that have occurred (or are expected to occur) during the course of these chapter 11 cases -- an amount that will be at least **$3.7 billion** after consummation of the sale of Nortel's IP Assets.

The largest members of the ad hoc group of bondholders (the "Bondholder Group") hold in the aggregate nearly $1.9 billion in principal amount of bond claims against certain of the U.S.

---

[1]  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

68700-001\DOCS_DE:170136.1

and Canadian debtors. In total, bondholder claims represent $3.975 billion in aggregate principal amount of bond claims in the U.S. cases and $4.175 billion[2] of aggregate principal amount of bond claims in the Canadian proceedings, thus rendering the bondholders by far the largest creditor constituency in both jurisdictions. As major creditors in both the U.S. and Canada, the Bondholder Group is uniquely positioned as the only stakeholder able to bring a global perspective to situations where one estate might appear to be motivated to exert undue leverage at the expense of the other. That perspective has been instrumental in facilitating the resolution of many important issues in these cases, including finalizing and implementing the IFSA, developing and actively participating in value-maximizing auction processes for the various Sale Transactions and otherwise constructively participating in all significant events during these cases. The Bondholder Group believes that its perspective also will be unique and important to any resolution of the allocation issues that are the subject of the Motion.

The Bondholder Group supports the Motion and urges the Court to establish the Allocation Protocol, utilizing the December hearing timetable that the U.S. and Canadian Courts have already articulated, as a fair, appropriate and much-needed measure to ensure that there is at least a definitive litigation path to get the idle Sale Proceeds out of escrow and into the hands of the creditors, including the bondholders that collectively are the largest creditors of both the U.S. and Canadian estates, who by now have been patiently participating in these cases for 2 ½ years while they await distributions.

The Bondholder Group's support for the Motion is based upon the Bondholder Group's strong belief, articulated on many occasions to this Court, that time is of the essence with respect to allocating the Sales Proceeds among the Nortel estates so that (a) creditor distributions can

---

[2] Such claims to be converted and asserted against the Canadian Debtors in Canadian currency in accordance with the Amended and Restated Claims Procedure Order dated October 9, 2009 in the Canadian proceedings.

2

occur, and (b) the amount of Sales Proceeds available for creditors is not unnecessarily diminished further by what are already enormous costs of administration for the Nortel estates. The Movants thus rightfully conclude that "there must be a mechanism to move the allocation process forward expeditiously." The Bondholder Group is pleased that its fiduciaries now have taken on the sense of urgency that the Bondholder Group has been advocating.

The U.S. and Canadian Courts also have recognized the importance to creditors of an expeditious resolution of the allocation issues, taking the coordinated step of clearing the weeks of December 5 and 12, 2011 on their respective calendars for hearings to resolve the allocation issues. The Bondholder Group supports the Courts' efforts to dedicate that time for the resolution of these critical issues. The estates' various fiduciaries should now follow the Courts' lead and take whatever steps are necessary to adhere to the Courts' timetable.

The Motion clearly articulates *how* the IFSA, the Escrow Agreements and the Cross-Border Protocol interact to empower the U.S. and Canadian Courts to establish a straightforward litigation protocol to resolve disputes about allocation of the Sales Proceeds among the estates. The reason *why* the Courts should exercise that power now is equally clear – the parties undeniably have reached an impasse, and the Courts' proactive intervention is necessary to break the gridlock that holds the Sales Proceeds hostage.

The parties' own court filings illustrate how diametrically opposed they are on the most basic issues. The most stark example of the kinds of irreconcilable conflicts that exist among the parties is between the Joint Administrators and the Canadian Monitor. While the Joint Administrators argue that claims asserted by the EMEA Debtors against the Canadian and U.S.

3

estates can only be determined *after* allocation of Sales Proceeds is resolved,[3] the Canadian Monitor asserts exactly the opposite – that "it is necessary for [the Canadian Court] to resolve the EMEA Claims and the UK Pension Claims in an efficient and expedited process before any further steps are taken in relation to the allocation of proceeds among the Canadian, U.S. and EMEA estates."[4]

What is remarkable about this difference of opinion between the Joint Administrators and the Canadian Monitor is that they are diametrically opposed to one another and yet both are still equally misplaced. Put simply, there is no reason that *either* process must *precede* the other; rather, the allocation process and the claims processes can and should (and indeed routinely do in chapter 11 cases) occur separately, even if on a roughly concurrent basis. Indeed, the Honourable Mr. Justice Morawetz observed as much when he approved the EMEA Claims Procedure Order in the Canadian proceedings in February, noting:

- "I am in agreement with the comments of the Monitor that the proposed EMEA Claims Procedure Order does not concern the 'allocation of sale proceeds from the sale transactions', but rather a process for the calling and resolution of claims that may be advanced by the EMEA Companies against the [Canadian Debtors]."[5]

- "With respect to the submission that claims of the EMEA Companies cannot be dealt with separate from or prior to a consideration of the allocation of proceeds, it appears that the linkage between inter-company claims and allocation of proceeds, that is referenced by counsel to the Joint Administrators, may have more to do with achieving maximum leverage in the global distribution negotiations than with the determination of the EMEA Claims."[6]

---

[3] EMEA Claims Response at ¶15 ("[T]he quantum of the claims of the EMEA Debtors, and the very existence of the claims themselves, may depend on the results of the sales proceeds allocation process.")

[4] Sixty-Fifth Report of the Monitor Dated April 28, 2011 (Update on UK Pension and EMEA Claims), ¶ 73 (filed in the U.S. chapter 11 cases as D.I. 5351.

[5] Endorsement of the Honourable Mr. Justice Morawetz dated February 17, 2011, re EMEA Claims Procedure Order, at paragraph 19.

[6] Endorsement of the Honourable Mr. Justice Morawetz dated February 17, 2011, re EMEA Claims Procedure Order, at paragraph 20.

68700-001\DOCS_DE:170136.1

In sum, as of the date of the June 7th hearing on the Motion, the IFSA will have been in place for just two days shy of two years. During that time, the parties have utilized the IFSA to conduct very successful asset divestitures on a cooperative basis. Also during that time, the parties have exchanged expansive amounts of information and negotiated (and mediated) allocation and related issues extensively, but without any similar success. To the contrary, it now appears that all those negotiations have yielded is a series of entrenched, irreconcilable positions among the parties. It is the very existence of precisely those types of stalemates that necessitates the proactive and aggressive intervention of the U.S. and Canadian Courts through the imposition of the Allocation Protocol. The Bondholder Group and its members also reserve the right to seek additional relief in parallel with the Allocation Protocol as necessary or appropriate to speed resolution of these cases and distributions to creditors.

Dated: May 19, 2011

MILBANK, TWEED, HADLEY & McCLOY LLP
Thomas R. Kreller
601 South Figueroa St., Suite 3000
Los Angeles, CA 90017
Telephone: (213) 892-4463
Facsimile: (213) 892-4763
Email: tkreller@milbank.com

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       kmakowski@pszjlaw.com

Counsel for the Bondholder Group