**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| _____ ) | Chapter 11 |
| In re:                                    ) | |
|                                             ) | Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.*    ) | |
|                                             ) | Jointly Administered |
|         Debtors.                      ) | |
|                                             ) | **Related to D.I. 4345, 4347, 4786** |
|                                             ) | |
|                                             ) | **Requested Hearing Date**: |
|                                             ) | June 7, 2011 at 9:30 |
|                                             ) | **Requested Objection Deadline**: |
| _____ ) | June 1, 2011 |

**MOTION OF GENBAND US LLC FOR AN ORDER COMPELLING COMPLIANCE WITH SETTLEMENT AGREEMENT AND APPROVING THE SETTLEMENT AGREEMENT PURSUANT TO BANKRUPTCY RULE 9019**

GENBAND US LLC (formerly GENBAND Inc., "GENBAND"), files this Motion for an Order Compelling Compliance with Settlement Agreement and Approving the Settlement Agreement Pursuant to Bankruptcy Rule 9019 (the "Motion") and in support thereof respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     This is a motion to approve a fully-negotiated and documented settlement resolving certain disputes between GENBAND and the Debtors that were previously the subject of litigation before this Court. After a mediation conducted pursuant to a standing order of the District Court, GENBAND agreed to settle those disputes pursuant to a written Memorandum of Understanding ("MOU") containing all the essential terms. Critically, the MOU required the parties to use their "best efforts" to give effect to the settlement "as soon as reasonably practicable." This obligated Nortel to do whatever it could to obtain any necessary approvals

and submit the settlement to this Court *promptly*.  At the time of the MOU, it was contemplated that this would be done by the end of May.

2.       Unfortunately, that did not happen.  It took no less than <u>six weeks</u> for the parties to hammer out the terms of a Settlement Agreement implementing the MOU.  All of the relevant constituents were aware of and/or involved in those discussions.  At all times, GENBAND emphasized the need to ensure that the Settlement Agreement would be submitted to this Court pursuant to Bankruptcy Rule 9019 by May 17, 2011, so that it could be considered at the June 7, 2011 joint omnibus hearing.

3.       However, on the day the papers were to be filed, counsel for the UK Administrator announced that it would not consent to the Settlement Agreement because of an unrelated tax issue that had not been the subject of the disputes before this Court, had not been the subject of the mediation, and was not mentioned in the MOU.

4.       Within two hours of the UK Administrator's email, GENBAND confirmed in writing that <u>all</u> of the taxes in question either had been paid already or were in the process of being paid.  Counsel for the UK Administrator did not respond, and as a result of that (and some last-minute requests from the Debtors for additional language that could otherwise have been resolved by the deadline), the papers were not filed by the normal deadline for motions under Bankruptcy Rule 9019.  For the same reasons, the Debtors did not agree to GENBAND's request that they file the papers along with a request to shorten notice.

5.       As of today, there are no outstanding substantive disputes regarding the Settlement.  Counsel for the UK Administrator has not raised any substantive objection to the terms of the Settlement Agreement.  Indeed, as of 2:25 p.m. today, counsel for the UK Administrator stated that the UK Administrator is in agreement with the commercial terms of the

Settlement Agreement, but that because it has not received comment on the commercial terms of the documents from entities in France, Israel, and Russia, full sign-off by its constituencies will not occur this week.

6.    This has gone on long enough.  GENBAND bargained for a fast process. That was a critical element of the deal.  The parties have been discussing this for six weeks.  The documents have been finalized.  No substantive objections are outstanding.  GENBAND should not have to wait any longer at this point.  If any party wishes to raise a substantive objection to the Settlement Agreement, it can be raised in response to this Motion and addressed at the hearing.

7.    By this Motion, and in conjunction with GENBAND's motion to shorten filed contemporaneously herewith, GENBAND respectfully requests that this Court (1) order Debtors to comply with the Settlement Agreement, which is in final form as negotiated by the parties as of the morning of May 17th, attached hereto as **Exhibit A**, at the omnibus hearing scheduled for June 7, 2011; and (2) approve the Settlement Agreement.

## FACTUAL BACKGROUND

### A.    Nortel Enters Bankruptcy

8.    On January 14, 2009 (the "Petition Date") Nortel Networks Inc. ("NNI") and certain of its affiliates (collectively, the "U.S. Debtors"),[1] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

District of Delaware (this "Court" or the "U.S. Court") (hereinafter, the "Chapter 11 Cases").

On the Petition Date, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") (together with their affiliates, including the EMEA Debtors (as defined below) and the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court" and together with the U.S. Court, the "Courts") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.

9.      On the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLP and Ernst & Young Chartered Accountants (the "UK Administrator").

**B.      GENBAND Purchases Nortel's CVAS Business**

10.      On December 22, 2009, GENBAND agreed to purchase substantially all of the assets relating to Nortel's Carrier Voice over IP and Communications Solutions Business (the "CVAS Business").  This was done pursuant to an Asset Sale Agreement by and among Nortel, GENBAND, and the other Designated Purchasers that became parties thereto, dated December 22, 2009, as amended from time to time (the "Sale Agreement").

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]      The EMEA Debtors include the following entities:  NNUK (in administration), Nortel Networks S.A., Nortel Networks (Ireland) Limited (in administration), Nortel GmbH (in administration), Nortel Networks France S.A.S. (in administration), Nortel Networks Oy (in administration), Nortel Networks Romania SRL (in administration), Nortel Networks AB (in administration), Nortel Networks N.V. (in administration), Nortel Networks S.p.A. (in administration), Nortel Networks B.V. (in administration), Nortel Networks Polska Sp. z.o.o. (in administration), Nortel Networks Hispania, S.A. (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks, s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal S.A. (in administration), Nortel Networks Slovensko (in administration), s.r.o. (in administration) and Nortel Networks International Finance & Holding B.V. (in administration).

11.    This Court approved the sale of the CVAS Business to GENBAND by order dated March 4, 2010 [D.I. 2632].  The Canadian Court likewise approved the sale of the CVAS Business to GENBAND by order dated March 4, 2010.

12.    On May 28, 2010, the Sale Agreement closed.

**C.    Disputes Arise Over Various Matters Under the Sale Agreement**

13.    Subsequent to the closing, GENBAND and Nortel had a disagreement over the "Deferred Profit Amount," as provided in the Sale Agreement.

14.    On November 18, 2010, GENBAND filed the *Motion for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration* [D.I. 4347] (the "U.S. Motion to Compel Arbitration"), seeking, *inter alia*, an order requiring the disagreement regarding Deferred Profit Amount under the Sale Agreement to be submitted to arbitration.

15.    On November 17, 2010, the U.S. Debtors filed the *Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds* [D.I. 4345] which motion sought, *inter alia*, a determination that the U.S. Court maintained jurisdiction over the dispute regarding the definition of Deferred Profit Amount (the "Debtors' U.S. Motion").

16.    On or about November 30, 2010 the Canadian Debtors filed a motion with the Canadian Court seeking, *inter alia*, a declaration that the Canadian Court and the U.S. Court have the exclusive authority and jurisdiction to determine the dispute relating to the Deferred Profit Amount (the "Debtors' Canadian Motion").

17.    On or about December 9, 2010, GENBAND filed a motion with the Canadian Court seeking, *inter alia*, an order requiring Nortel to submit the Deferred Profit

Amount dispute to arbitration (the "Canadian Motion to Compel Arbitration" and with the U.S.

Motion to Compel Arbitration, the Debtors' U.S. Motion, and the Debtors' Canadian Motion, the

"Mediated Motions").

18.     On December 15, 2010, the U.S. Court and the Canadian Court held a

joint hearing regarding the U.S. Motion to Compel Arbitration and the Canadian Motion to

Compel Arbitration.

19.     On January 21, 2011, the U.S. Court denied the U.S. Motion to Compel

Arbitration (the "U.S. Order") [D.I. 4737].  On that same date, the Canadian Court denied the

Canadian Motion to Compel Arbitration.

20.     GENBAND appealed the U.S. Order pursuant to a Notice of Appeal filed

on February 1, 2011 [D.I. 4786] (the "U.S. Appeal").

21.     On March 8, 2011, the U.S. Appeal was docketed in the United States

District Court for the District of Delaware.

22.     On February 11, 2011, GENBAND served a notice of motion seeking

leave to appeal the Canadian Order (the "Canadian Appeal" and, with the U.S. Appeal, the

"Appeals").

**D.     The Parties Engage in a Court-Ordered Mediation and Agree to Settle**

23.     On April 4, 2011, GENBAND, the U.S. Debtors, the Canadian Debtors,

the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases, and Ernst &

Young Inc., in its capacity as Monitor of the Canadian Debtors (collectively, the "Mediation

Parties") engaged in mandatory mediation (the "Mediation") pursuant to a Standing Order of the

U.S. District Court dated July 23, 2004.

24.     After participating in the Mediation and engaging in arms' length

negotiations, the Mediation Parties agreed (the "Settlement"), *inter alia*, that: (a) Nortel would

pay GENBAND $26,920,863, subject to verification of certain amounts;[4] (b) the parties would

exchange full releases with respect to the disagreements that were raised in the motions; (c)

Nortel's entry into the Settlement would be subject to the receipt of approvals from all Nortel

Sellers (as defined in the Sale Agreement) and approval by the Courts; and (d) the parties would

use their "best efforts to document and give effect to" the terms of the MOU "as soon as

reasonably practicable."  The parties agreed that the terms of the MOU would be memorialized

in a settlement agreement (the "Settlement Agreement").

25.      The requirement that the parties use their best efforts to effect the

Settlement "as soon as reasonably practicable" was a critical element of the Settlement, as part of

the reason GENBAND agreed to accept a discount on its claim was the time value of money that

would be lost if GENBAND had been forced to litigate.

26.      On April 4, 2011, at the conclusion of the Mediation, the Mediation

Parties memorialized the Settlement in the MOU.  At that time, the Mediation Parties discussed

the proposed timeline, including the goal that Nortel would provide payment to GENBAND

pursuant to the Settlement by the end of May 2011.

**E.      The Parties Negotiate and Memorialize the Settlement Agreement**

27.      On April 6, 2011, in furtherance of the requirement in the MOU that the

parties use their best efforts to memorialize the terms of the MOU as soon as reasonably

practicable, GENBAND requested that Nortel provide a first draft of the Settlement Agreement.

28.      On April 19, 2011, Nortel provided the first draft of the Settlement

Agreement.

---

[4]      This amount represents a settlement of all open disputes regarding the Deferred Profit Amount, and other issues.  After verification of certain amounts, and pursuant to the Post-Close Credit Memo Issue (as defined below), this number was reduced to $24,905,244.

29.     On April 26, 2011, GENBAND's counsel provided its comments to Nortel's first draft of the Settlement Agreement.

30.     On April 27, 2011, counsel for GENBAND and Nortel had a conference call to discuss the draft Settlement Agreement.  During this conference call, GENBAND stressed that time was of the essence, and requested a detailed timeline that indicated when the Courts must be notified such that the Settlement could be approved by the Courts as soon as possible.

31.     On April 29, 2011 and May 2, 2011, counsel for GENBAND and Nortel exchanged correspondence regarding the wording of specific sections of the Settlement Agreement.  By this time the parties had limited their differences to only three open items.  The first was that Nortel sought a release from a party that was not a party to the Sale Agreement or the disputes raised in the Mediated Motions (the "Non-Party Release Issue").  The second disagreement pertained to the amount of the Settlement, particularly with regard to post-close credit memorandums (the "Post-Close Credit Memo Issue"), which, if Nortel's position were correct, would decrease the amount of the payment by Nortel to GENBAND by over $2 million. The third open issue pertained to the wording of certain releases with regards to Canadian taxes.

32.     On May 6, 2011, Nortel sent a new draft of the Settlement Agreement which confirmed that, despite slight wording differences regarding the aforementioned Canadian taxes, the only remaining substantive issues left to be resolved were the Non-Party Release Issue and the Post-Close Credit Memo Issue.

33.     On May 6, 2011, counsel for GENBAND spoke with counsel for Nortel regarding the deadline for filing a motion pursuant to Bankruptcy Rule seeking approval of the Settlement Agreement (the "9019 Motion") so that the 9019 Motion may be heard by the Courts at the next joint omnibus hearing scheduled for June 7, 2011.  Counsel for Nortel stated that the

9019 Motion had to be filed by May 17, 2011, twenty-one (21) days prior to the June 7, 2011

joint omnibus hearing.  Counsel for GENBAND specifically requested that Nortel cooperate in

filing the 9019 Motion by May 17, 2011.  That deadline was eleven days away at that time, and

the Settlement Agreement was fully negotiated save for the two open issues.

34.     On May 10, 2011, counsel for GENBAND and counsel for Nortel

participated in a conference call during which the parties attempted to resolve the Non-Party

Release Issue and the Post-Close Credit Memo Issue.  Afterwards, counsel for GENBAND sent a

new version of the Settlement Agreement to counsel for Nortel that confirmed that only those

issues remained to be resolved.  All other issues, as well as the form and wording of the

document, were resolved.  At this time, counsel for GENBAND again asked that the parties

prepare such that the 9019 Motion would be filed on or before May 17, 2011, so that the Courts

could consider the Settlement Agreement during the June 7, 2011 joint omnibus hearing.

35.     On May 11, 2011, counsel for the UK Administrator sent an email to

GENBAND regarding a tax issue that was unrelated to the Settlement Agreement, the MOU, and

all the negotiations over the five weeks since the mediation (the "Unrelated Tax Issue").  The

email did not state that the UK Administrator would withhold approval of the Settlement

Agreement or of filing the 9019 Motion due to the Unrelated Tax Issue.

36.     On May 12, 2011, counsel for Nortel circulated a new version of the

Settlement Agreement which demonstrated again that the only two issues left for resolution were

the Non-Party Release Issue and the Post-Close Credit Memo Issue.  During a conference call on

that day, Nortel proposed that the parties resolve the Non-Party Release Issue by instead

providing a side letter from the non-party affirming that it was not a party to the dispute and did

not have any of the claims covered by the Settlement Agreement.  The UK Administrator

participated on that call, on which counsel for GENBAND again reiterated its insistence that the

9019 Motion would be filed on or before May 17, 2011.

37.    On May 13, 2011, counsel for GENBAND sent counsel for Nortel minor

and insubstantial changes to the Settlement Agreement, noted that only the Non-Party Release

Issue and the Post-Close Credit Memo Issue remained outstanding, and requested that Nortel

provide a draft of the 9019 Motion for GENBAND's review.

**F.    The Parties Reach Agreement on the Only Two Remaining Issues**

38.    On May 16, 2011, GENBAND accepted Nortel's proposal regarding both

the Post-Close Credit Memo Issue and the Non-Party Release Issue, agreeing that Nortel would

instead receive a letter from the non-party affirming that it did not have the right to assert any of

the claims covered by the Settlement Agreement.  (The parties have since agreed on the wording

of the letter to be provided from the non-party.)

39.    On May 17, 2011, counsel for GENBAND circulated a revised draft of the

Settlement Agreement that indicated its agreement with Nortel; stated that all open issues,

including the Non-Party Release Issue and the Post-Close Credit Memo Issue, were resolved;

and requested that Nortel file the 9019 Motion promptly.

**G.    Hours Before the Filing Deadline, Nortel Requests Additional Changes to the
Settlement Agreement**

40.    On the morning of May 17, 2011, counsel for Nortel requested that

additional language be added to the Settlement Agreement regarding a point that had not

previously been discussed.  Despite the timing of the request, GENBAND nonetheless in good

faith agreed to consider it and proposed language to counsel for Nortel.

41.    That afternoon, mere hours before the filing deadline, counsel for Nortel

requested further changes to the proposed language.  Even though the new terms were not

required under the MOU, GENBAND nonetheless agreed to consider the request and proposed some additional language to address it.[5]

**H.      On the Day the Papers Are to Be Filed, the UK Administrator Voices an Objection Unrelated to the Settlement Which Prevents the Filing of the 9019 Motion**

42.      At 4:07 p.m. on May 17, 2011, counsel for the UK Administrator sent an email to counsel for GENBAND and counsel for Debtors stating that because of the Unrelated Tax Issue the UK Administrator would not approve the Settlement Agreement or the filing of the 9019 Motion.

43.      Less than two hours later, and with ample time left to file the 9019 Motion before the filing deadline, GENBAND directly responded to the UK Administrator and represented that the Unrelated Tax Issue was resolved because the payments requested had either already been paid, or had been approved for payment by GENBAND.

44.      GENBAND received no response from counsel for the UK Administrator on the date of the filing deadline, and the filing deadline was missed.

**I.      GENBAND Requests that Debtors File the 9019 Motion and Seek an Order to Shorten Time, but Debtors Refuse Pending Approval by the UK Administrator**

45.      On May 17, 2011, GENBAND sought confirmation from the UK Administrator that there were no longer any open issues and that it had no objection to filing the 9019 Motion.

46.      On the afternoon of May 18, 2011, counsel for the UK Administrator stated that the UK Administrator had not been made aware of the urgency of the need to file the

---

[5]      Nortel's request on May 17, 2011 was that the Settlement Agreement include a representation that no party to the Settlement Agreement had assigned any Claims (as defined in the Settlement Agreement).  This issue had not been raised during the preceding six weeks and was raised after the substantive terms of the Settlement Agreement were already agreed to by the parties.  Notwithstanding the fact that there is an operative and agreed to form of Settlement Agreement, GENBAND remains willing to discuss this addition, although such discussion need not delay this process any further.

9019 Motion until May 17, 2011, and as such was not yet in a position to approve the filing.[6]

Counsel for the UK Administrator stated that the UK Administrator was considering the

Settlement Agreement and would revert "in due course."

47.    Despite the parties' agreement in the MOU to "use their best efforts to

document and give effect to [the terms of the MOU] as soon as reasonably practicable," Nortel

did not file the 9019 Motion because the UK Administrator had not yet indicated its approval

(although it had not given any reason for objecting) and because the precise language of the side

letter to be received from the non-party had not yet been finalized.

48.    On May 19, 2011, the parties agreed upon the precise language of the side

letter to be received from the non-party.  At that point, the only thing preventing the filing of the

9019 Motion (along with a motion to shorten time) was the fact that the UK Administrator had

not provided its affirmative approval (although it also had not stated any reason for objecting).

**J.**    **The UK Administrator Agrees to the Terms of the Settlement Agreement, But States that Full Approval Will Not Come This Week**

49.    At 2:25 p.m. on Friday, May 20, 2011, counsel for the UK Administrator

stated that the UK Administrator was in agreement with the commercial terms of the Settlement

and the side letter.  However, counsel for the UK Administrator stated that it had not at that time

received comment on the commercial terms of the documents from entities not under the control

of the UK Administrator, in France, Israel, and Russia, and that accordingly full EMEA sign-off

on the documents would not come this week.

---

[6]    As noted above, GENBAND throughout the process had made clear its desire to have the necessary papers filed by May 17, 2011 so that the matter could be heard at the June 7, 2011 omnibus hearing.  The various constituencies have presumably been in the loop on all the drafts of the Settlement Agreement that had been submitted to GENBAND on behalf of the Debtors over the preceding six weeks, given Nortel's obligation to use its best efforts to effectuate the settlement and obtain the necessary approvals "as soon as reasonably practicable."

## ARGUMENT

### A.    The Court Should Enforce the Binding Settlement Agreement

50.    The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored." In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006); see also In re Coram Healthcare Corp., 315 B.R. 321, 329–30 (Bankr. D. Del. 2004).  Whether parties have agreed to a settlement depends on whether there has been offer, acceptance, and mutual consideration, and the terms of any such settlement are reasonably certain, definite, and complete.  See In re Frye, 216 B.R. 166, 171–72 (Bankr. E.D. Va. 1997).  Such an agreement is enforceable even if the parties contemplate a formal written agreement is yet to be negotiated and executed.  Id. at 172 ("the mere fact that a later formal writing is contemplated will not vitiate the agreement") (quotation and citation omitted); see also Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970) ("An agreement to settle a law suit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing.") (citations omitted).  Thus, absent fraud, settlement agreements are binding as between the negotiating parties pending required bankruptcy court approval.  See, e.g., In re Turner, 274 B.R. 675, 680–81 (Bankr. W.D. Pa. 2002); In re Lyons Transportation Lines, Inc., 163 B.R. 474, 476 (Bankr. W.D. Pa. 1994); In re Cotton, 136 B.R. 888, 890 (M.D. Ga. 1992); In re Tidewater Group, Inc., 8 B.R. 930, 933 (Bankr. N.D. Ga. 1981).

51.    Bankruptcy courts have held that an agreement by a debtor-in-possession to compromise litigation should also be binding upon all parties to the agreement pending a court determination as to whether or not to approve the agreement.  In re Tidewater Group, 8 B.R at 933 (those who reach a settlement are bound by its terms and may not challenge it pending

13

notice to others and subsequent court approval); In re Cotton, 136 B.R. at 890; see also 10

COLLIER ON BANKRUPTCY, ¶ 9019.02 (15th Ed. 1996) ("a debtor can be compelled to file a

motion to approve the settlement even if the debtor has changed its mind").

      52.    Here, after the U.S. District Court-ordered mediation, the parties agreed to

the MOU.  The MOU has clear terms that are reasonably certain and complete.  The MOU states

that the terms will be formalized in a more complete writing, but there is an agreement to settle

which is fully enforceable.  See, e.g., In re Frye, 216 B.R. at 172; Green, 436 F.2d at 390.  This

agreement to settle is binding upon the parties to the MOU pending Court approval.  In re

Tidewater Group, 8 B.R at 933.  There has been no fraud in the process, so the agreement to

settle has not been disturbed.  See, e.g., In re Turner, 274 B.R. at 680–81.

      53.    Nortel's decision to enter into the MOU, and its subsequent agreement on

the terms of the Settlement Agreement, binds all parties to the MOU pending the Courts'

determination as to whether or not to approve the Settlement Agreement.  See id.; In re Cotton,

136 B.R. at 890.  Here, all the material terms of the Settlement were agreed to by the parties.

Nortel offered the Settlement Agreement, with the caveats that (1) there would be a side letter

with regard to the Non-Party Release Issue and (2) GENBAND agree to Nortel's terms on the

Post-Close Credit Memo Issue.  GENBAND agreed to those terms as of the morning of May 17,

2011, and the language of the side letter was finalized on May 19, 2011.  All open issues have

therefore been resolved.  Indeed, Nortel could be compelled to file the 9019 Motion even if it

now did not support the Settlement.  See 10 COLLIER ON BANKRUPTCY, ¶ 9019.02.

      54.    At this point, the only thing stopping Nortel from filing the 9019 Motion

and a motion to shorten notice so that the 9019 Motion may be heard at the June 7, 2011 joint

omnibus hearing is the fact that the UK Administrator has not heard comments from entities not

under its control in France, Israel, and Russia.  The Unrelated Tax Issue has been resolved and

the UK Administrator has agreed to the terms of the Settlement Agreement.  The Debtors

presumably have involved all of the various constituencies in their discussions of the MOU and

the Settlement from day one, given their obligation to use their "best efforts" to effectuate the

Settlement "as soon as reasonably practicable."  The relevant parties have thus long been on

notice of both the fact and content of the discussion surrounding the Settlement Agreement, and

no substantive issues have been raised that remain unresolved.  Despite this, the entities in

France, Israel, and Russia still have not provided comment.

      55.    Negotiations of the Settlement Agreement lasted for approximately six

weeks.  Throughout the Mediation, the negotiation of the MOU, and the subsequent negotiations,

GENBAND made clear that time was of the essence.  Indeed, the MOU itself reflects that

urgency.  Moreover, GENBAND repeatedly stated its desire to have the Settlement Agreement

in final or nearly final form by May 17, 2011, so that the parties could meet the deadline for

having the 9019 Motion heard at the June 7, 2011 joint omnibus hearing.

      56.    As of this moment, there is not a single substantive issue outstanding.

Even the Unrelated Tax Issue has been resolved, as GENBAND has confirmed in writing that all

the amounts at issue either have been paid or are in the process of being paid.  The UK

Administrator has given its approval.  Only the failure to receive comments from the entities in

France, Israel, and Russia remains as a reason—and apparently the only reason—Nortel has not

filed the necessary papers.

      57.    There is no reason why GENBAND should have to wait any longer.  The

Settlement Agreement is done.  GENBAND bargained for the right to a fast process.  Further

delay is unwarranted, and the Court should consider the Settlement Agreement based on this

Motion. If for some yet-undisclosed reason any party still has an issue with the Settlement

Agreement then that party may object to it in response to this Motion. Permitting further delay

after six weeks when there is a fully negotiated Settlement Agreement would render

GENBAND's bargained-for rights meaningless. Simply put, the parties have a deal and the

Court should enforce it. See In re Frye, 216 B.R. at 171–72.

**B.**     **The Settlement Agreement Should Be Approved Pursuant to Bankruptcy Rule 9019**

58.     The Court should authorize the Debtors to enter into the Settlement

Agreement and approve it under sections 105 and 363 of the Bankruptcy Code and Bankruptcy

Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any

order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §

105(a).

59.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or

lease the property of the estate outside of the ordinary course of business after notice and a

hearing. 11 U.S.C. § 363. Section 363 applies when an agreement involves the disposition of

the estate's assets in such a way that it ventures beyond an ordinary course transaction. Myers v.

Martin (In re Martin), 91 F.3d 389, 394–95 (3d Cir. 1996).

60.     The use or transfer of estate property under this provision must be

supported by a sound business purpose. Comm. of Equity Sec. Holders v. Lionel Corp. (In re

Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459,

2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery

Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del.

1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas.

& Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J.

Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction

"should consider all salient factors pertaining to the proceeding and, accordingly, act to further

the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward

Holding Corp., 242 B.R. at 153–54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071).  In

addition, a debtor must show that the transaction has been proposed in good faith, that adequate

and reasonable notice has been provided and that it is receiving fair and reasonable value in

exchange.  See In re Decora Industries, Inc., 2002 WL 32332749, at *2; In re Delaware &

Hudson Ry. Co., 124 B.R. at 176.

61.     Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the

trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed.

R. Bankr. P. 9019.  Citing this authority, the Third Circuit has emphasized that "[c]ompromises

are favored in bankruptcy."  In re Martin, 91 F.3d at 393 (quoting COLLIER ON BANKRUPTCY ¶

9019.03[1] (15th ed. 1993)); see also In re World Health Alternatives, Inc., 344 B.R. 291, 296

(Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy").  Additionally, the

Third Circuit has recognized that "[i]n administering reorganization proceedings in an

economical and practical manner it will often be wise to arrange the settlement of claims as to

which there are substantial and reasonable doubts."  In re Penn Cent. Transp. Co., 596 F.2d

1102, 1113 (3d Cir. 1979) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer

Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).  And courts in this District have recognized

that the approval of a proposed compromise and settlement is committed to the sound discretion

of the bankruptcy court.  See, e.g., In re Coram Healthcare Corp., 315 B.R. at 329.

62.     Before approving a settlement under Bankruptcy Rule 9019, a court must

determine whether "the compromise is fair, reasonable, and in the interest of the estate."  In re

Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211

B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the

need to compare the terms of the compromise with the likely rewards of litigation."  TMT Trailer

Ferry, 390 U.S. at 424–25.  The court need not be convinced that the settlement is the best

possible compromise in order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.

Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below

the lowest point in a range of reasonableness."  Travelers Cas. & Sur. Co. v. Future Claimants

Representative, No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing Matter of

Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at

330.

    63.    The Third Circuit has set out four criteria for a bankruptcy court to

consider when evaluating a settlement proposal:  "(1) the probability of success in litigation; (2)

the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense,

inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."

In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803

(E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159,

165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

    64.    The Settlement Agreement meets the requirements under section 363 of

the Bankruptcy Code and Bankruptcy Rule 9019.  As required by section 363, the Settlement

Agreement is proposed as a good faith means to resolve the disputed matters.  Even if the

Debtors were prepared to litigate the Appeal and believed that they would prevail in such

litigation, litigation carries with it inherent uncertainties and there is no assurance that such

litigation would achieve a better result than the one set forth in the Settlement Agreement.  The

Settlement Agreement fairly balances the Debtors' likelihood of success on the merits of the

Mediated Motions and Appeals against their interest in avoiding the uncertainty of litigation.

65.    In addition, the disputes underlying the Mediated Motions and Appeals are

extremely complex and further litigation would result in the estate's expenditure of considerable

additional legal fees.  Thus, in the absence of a settlement between the Parties, the estate would

be burdened with the time and costs of continuing litigation, which would be disruptive of the

estate's efforts to resolve the many matters that are essential to the ultimate resolution of these

Chapter 11 cases.

66.    Finally, the interests of the Debtors' creditors in favor of approval of the

Settlement Agreement.  The interests of the Debtors' creditors are served by the prompt and

efficient resolution of the Mediated Motions and Appeals and the avoidance of legal expenses

that would be incurred if the Mediated Motions and Appeals were to be further litigated.  The

fact that the Settlement was reached with the aid of a court-appointed mediator provides

additional assurance that the Settlement is fair and reasonable.  In light of the foregoing, it is

respectfully requested that the court authorize the Debtors to enter into the Settlement Agreement

pursuant to Bankruptcy Rule 9019 and approve it.

## WAIVER OF BANKRUPTCY RULE 6004(h)

67.    It is also requested that the Court grant a waiver of any stay of the

effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n

order authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 10 days after entry of the order, unless the court orders otherwise."

Fed. R. Bankr. P. 6004(h).  Ample cause exists to justify a waiver of the ten (10) day stay

imposed by Bankruptcy Rule 6004(h).  It is requested that any order entered pursuant to the

Motion be effective immediately so that the parties can consummate the Settlement Agreement as expeditiously as possible.

## NOTICE

68.     Notice of this Motion is being provided to (i) the Office of the U.S. Trustee for the District of Delaware; (ii) counsel to the Unsecured Creditors' Committee; (iii) counsel to the Bondholder Group; (iv) counsel to Debtors; (v) counsel to the Canadian Nortel Debtors; (vi) counsel to the UK Administrator; and (vii) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

69.     No prior request for the relief sought herein has been made to this or any other court.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

WHEREFORE, GENBAND respectfully request that the Court enter an order in substantially the form attached hereto as **Exhibit B** (1) ordering the Debtors to comply with the terms of the Settlement Agreement and (2) approving the Settlement Agreement attached hereto as <u>Exhibit A</u>.  In the alternative, GENBAND respectfully requests that the Court enter an order in substantially the form attached hereto as **Exhibit C** (1) ordering the Debtors to file the 9019 Motion within three (3) business days from the entry of the Order and (2) scheduling a hearing on the 9019 Motion on an expedited basis.

Dated:  May 20, 2010                Respectfully submitted,
       Wilmington, Delaware

                                  /s/ *Michael R . Lastowski*
                                  Michael R. Lastowski (No. 3892)
                                  Sommer L. Ross (No. 4598)
                                  DUANE MORRIS, LLP
                                  222 Delaware Avenue, Suite 1600
                                  Wilmington, Delaware 19801
                                  Telephone: (302) 657-4900
                                  Facsimile: (302) 657-4901
                                  E-mail:       mlastowski@duanemorris.com
                                                  slross@duanemorris.com

                                  *Counsel for GENBAND US LLC*