# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
                                 :

*In re*                                :      Chapter 11
                                 :

Nortel Networks Inc., *et al.*,[1]      :      Case No. 09-10138 (KG)
                                 :

                   Debtors.       :      Jointly Administered
                                 :

                                 :      **Hearing date: June 7, 2011 at 9:30 a.m. (ET)**
                                 :      **Objections due: May 31, 2011 at 4:00 p.m. (ET)**
---------------------------------------------------------- X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING ACTION UNDER THE MEN SALE ESCROW AGREEMENT WITHOUT THE CONSENT OR PARTICIPATION OF NORTEL COLOMBIA AND GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "U.S. Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, (i) authorizing all actions under to the MEN Distribution Escrow Agreement entered into as of March 19, 2010 and approved by this Court's order of March 3, 2010 [D.I. 2627] (the "MEN Sale Escrow Agreement" or the "Escrow Agreement") requiring the authorization of the Depositors (as defined below) to be taken without the consent or participation of Nortel Networks de Colombia S.A. ("Nortel Colombia"), and (ii) granting related relief.  In support of this Motion, the U.S. Debtors respectfully represent as follows:

---

[1]      The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

**Preliminary Statement**

1.      As more fully detailed below and in prior motions filed by the U.S. Debtors with this Court, all of the substantial assets of the Nortel companies have been sold or are in the process of being sold, and the proceeds of those sales have been or will be placed in various escrow accounts pending determination of how proceeds will be allocated among the Nortel affiliates party to the transactions.

2.      In particular, with respect to the sale of Nortel's Metro Ethernet Networks ("MEN") business to Ciena Corporation ("Ciena") (the "MEN Sale"), the Escrow Agreement provides that the proceeds of the MEN Sale (the "MEN Sale Proceeds") cannot be released without either a final determination on allocation or the execution of a letter of direction to JPMorgan Chase Bank, N.A. as Distribution Agent (the "Distribution Agent"), by all of the Nortel entities party to the Escrow Agreement (the "Depositors"), and that any amendment to the Escrow Agreement requires the consent of all of the Depositors.

3.      Although the Escrow Agreement contemplates the removal of a Depositor in the event of a final dissolution or liquidation pursuant to applicable local law, it does not address how funds can be released or the agreement otherwise amended where, for reasons other than final dissolution, there is no authorized signatory for one of the Depositors.

4.      Nortel Colombia, a Depositor under the Escrow Agreement and a minor participant in the MEN sale, commenced liquidation in April 2010, shortly after the MEN Sale closing.  However, the liquidator of Nortel Colombia has since resigned and no replacement liquidator has been appointed.  As a result, although Nortel Colombia is not fully liquidated, no individual or entity has authority to execute documents on its behalf.  The Movants are filing this Motion and a companion application will be made by the Canadian Debtors (defined below)

2

before the Canadian Court (defined below) requesting that both the U.S. and Canadian Courts authorize the Distribution Agent to take all acts requiring the authorization of the Depositors under the Escrow Agreement without the consent or participation of Nortel Colombia.

5.    Granting the relief requested herein will enable the Depositors to access and distribute the funds subject to the Escrow Agreement, as contemplated by the MEN Sale and consistent with the purposes of these chapter 11 cases.  Furthermore, the relief will not prejudice any right Nortel Colombia may have to a distribution from the MEN Sale Proceeds.  As more fully described below, the relief requested here in will simply allow distribution of the funds subject to the Escrow Agreement by the Distribution Agent, not determine Nortel Colombia's rights, if any, to an allocation of those funds.

## Jurisdiction

6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The statutory bases for the relief requested herein include sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

### A.    Procedural History

8.    On January 14, 2009 (the "Petition Date"), the U.S. Debtors, other than Nortel Networks (CALA) Inc. ("NN CALA"),[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The U.S.

---

[2]    NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the U.S. Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

10.     On the Petition Date, the U.S. Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

---

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]      The EMEA Debtors are the following entities:  NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

B.      **Case Milestones**

11.      On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and that it would assess other restructuring alternatives for its businesses in the event that it was unable to maximize value through sales.  Since then, Nortel has sold many of its business units and assets to various purchasers.

12.      To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. ("Radware") [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions ("Enterprise") business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the MEN Sale [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; (vii) the sale of certain assets of its Carrier Voice Over IP and Application Solutions ("CVAS") business to GENBAND US LLC [D.I. 2632]; (viii) the sale of certain assets of Nortel's Multi-Service Switch ("MSS", formerly known as "Passport") business to Ericsson [D.I. 4054]; (ix) the proposed Google Bid to purchase the IP Assets [D.I. 5202]; and (x) certain other sale transactions in relation to which Nortel entities, including the U.S. Debtors, have signed or will sign a License Termination Agreement selling their interest in certain intellectual property licenses (collectively, the "Sale Transactions").

13.      Efforts continue to be made with respect to the realization of value from Nortel's remaining assets.  For further information regarding these chapter 11 cases, reference may be

made to the Monthly Operating Reports filed by the U.S. Debtors and

http://dm.epiq11.com/nortel.

**Relief Requested**

14.      By this Motion, the U.S. Debtors seek an order, pursuant to section 105(a) of the

Bankruptcy Code, (i) authorizing all actions under the Escrow Agreement requiring the

authorization of the Depositors to be taken without the consent or participation of Nortel

Colombia, and (ii) granting such other relief as the Court may deem just and proper.

**Facts Relevant to this Motion**

**A.      The MEN Sale Proceeds**

15.      On October 7, 2009, the U.S. Debtors and certain of their present and former

affiliates, including Nortel Colombia (the "MEN Sellers"), entered into an asset sale agreement

(as amended from time to time, the "Sale Agreement") for the MEN Sale, which was approved

by this Court's order of December 3, 2009 [D.I. 2070] (the "MEN Sale Order").[5]   Paragraph 45

of the Sale Order provides that, subject to certain adjustments, the MEN Sale Proceeds were to

be deposited in an escrow account and cannot be released without either a final determination on

allocation or the execution of a letter of direction to the Distribution Agent by all of the Nortel

entities party to the Escrow Agreement.

16.      On or about March 19, 2010, the MEN Sellers executed a fifth amendment to the

Sale Agreement (the "Fifth Amendment") which provided, among other things, that in order to

comply with applicable local laws, a portion of the MEN Sale Proceeds due under both the Sale

Agreement and the EMEA ASA was to be paid directly to Nortel Colombia, rather than

---

[5]      Separately, on or about October 7, 2009, the EMEA Debtors and certain of their present and former affiliates, entered into an asset sale agreement with Ciena for the acquisition by Ciena of certain assets and liabilities of the MEN business from the EMEA Debtors (the "EMEA ASA").  Section 3.1 of the EMEA ASA provides that payment shall be made to the Distribution Agent in accordance with the Sale Agreement.  The Nortel entities party to the EMEA ASA are Depositors under the Escrow Agreement.

6

deposited in the Escrow Account.  In particular, the Fifth Amendment provides that on or before

March 26, 2010, Ciena Colombia was to pay to Nortel Colombia an aggregate amount of cash

equal to COP221,506,740 (approximately $117,000) representing the tangible value of the assets

transferred by Nortel Colombia pursuant to the sale (the "Colombia Allocation").  Fifth

Amendment ¶ 14 (amending Paragraph 2.3.2(b) of the Sale Agreement).  See also, Declaration of

David Glass dated as of May 20, 2011 (the "Glass Declaration"), attached hereto as Exhibit B.

17.     The Sale Agreement was further amended to add a new section providing that if

additional tangible assets of Nortel Colombia were identified and transferred to Ciena Colombia

after closing of the Sale Agreement, Ciena Colombia would pay Nortel Colombia the net book

value of those assets, and the MEN Sellers (other than Nortel Colombia) would reimburse Ciena

for any such payment, and for certain associated transaction fees or expenses.  Fifth Amendment

¶ 19.

18.     On March 19, 2010, the MEN Sale was effectuated and the MEN Sale Proceeds

were deposited by Ciena in the Escrow Account, and on May 4, 2010, the Colombia Allocation

was paid to Nortel Colombia.  Glass Declaration at ¶ 5.

**B.      Dissolution of Nortel Colombia**

19.     Nortel Colombia is owned jointly by NN CALA (19.94%), Nortel Networks

International Corporation ("NNIC") (4.69%) and Nortel Networks Limited ("NNL") (75.37%)

(collectively, the "Shareholders").  Because of the Shareholders' pending insolvency proceedings

and the liquidation of Nortel's worldwide operations, in the months prior to the closing of the

MEN Sale, Nortel Colombia prepared to commence liquidation in accordance with the

requirements of Colombian law.  Shortly after the MEN Sale closing, on April 14, 2010, the

Shareholders voted to adopt resolutions for voluntary liquidation proceedings and approved

appointment of a liquidator.  On April 15, 2010, Nortel Colombia commenced liquidation

proceedings and a liquidator was appointed (the "Colombian Liquidator").

20.     At the time that Nortel Colombia commenced liquidation, the anticipated

obligations of the Colombian Liquidator included liquidation of assets, termination of remaining

employees, resolution of certain stranded contracts and payment of outstanding creditor claims.

Known assets of the entity included approximately $2.5 million in cash and certain office

equipment.  Creditor claims were expected to be relatively small, with the exception of potential

tax liabilities.  In particular, Nortel Colombia had appealed the assessment of significant local tax

liabilities for 2003, and that appeal was pending when Nortel Colombia was placed in

liquidation.  Shortly after the MEN Sale closed, Nortel was informed that the outcome of the tax

appeal would not be favorable to Nortel Colombia, and that the Colombian taxing authorities

would be asserting a tax claim of over $21 million against Nortel Colombia.

21.     The U.S. Debtors understand that under Colombian law, tax liabilities have

priority over all other debts of a company, including the fees of its liquidator.  Shortly after the

tax assessment, the Colombian Liquidator asked the Shareholders to assume responsibility for all

of his fees going forward, and to indemnify him against any liability to Nortel Colombia's

creditors, including any attempt by the Colombian tax authorities to hold him personally liable

on the tax judgment.  The Shareholders discussed this request both internally and with local

counsel, and ultimately decided that they could not accommodate the Colombian Liquidator's

request.  The Shareholders have no legal obligation to provide such an indemnification and,

given the size of the tax liability and the risk, however remote, that an indemnity could be argued

to create liability for the Colombian tax obligations, a consensus was reached that providing an

indemnity would not result in any benefit to the Shareholders' estates or their creditors.

Furthermore, the Shareholders were informed by local counsel that arguments might be made to hold a liquidator personally liable for the liquidating entity's debts.  As such, granting the indemnity could have exposed the Shareholders to over $21 million in possible liability to creditors of Nortel Colombia, without any commensurate benefit to the Shareholders' estates and creditors.

22.    Upon learning of the Shareholders' decision, the Colombian Liquidator tendered his resignation to the Colombian commercial authorities.  Although his name still appears in the relevant commercial registry as the point of contact for Nortel Colombia, the U.S. Debtors understand that the Colombian Liquidator no longer acts in that capacity.

23.    The Shareholders have been informed by Colombia counsel that, because of the risk of personal liability for Nortel Colombia's debts, it would be difficult if not impossible to locate a replacement liquidator willing to accept the appointment.  Any such liquidator would require an agreement by the Shareholders to pay the liquidator's fees and expenses and, more significantly, the same sort of indemnity from the Shareholders that could expose the Shareholders to liability on Nortel Colombia's tax obligations.  The Shareholders also have been informed by Colombia counsel that, pursuant to Colombia law, once a liquidation is commenced, no entity other than a duly appointed liquidator has authority to act or sign documents on behalf of the liquidating company.  Therefore, with the resignation of the Colombian Liquidator, there is no signatory able to act on behalf of Nortel Colombia.

C.    **The MEN Escrow Agreement**

24.    On or about March 19, 2010, the Depositors entered into the Escrow Agreement, and upon closing of the MEN Sale, the MEN Sale Proceeds were deposited in an account managed by the Distribution Agent and maintained in the United States (the "Escrow Account"),

where they remain.  Paragraph 5(a) of the Escrow Agreement provides that the Distribution Agent may not make a distribution from the Escrow Account unless one of two conditions is met.  The Distribution Agent must receive either a letter of direction jointly executed by <u>all</u> of the Depositors and certain estate fiduciaries or a final binding decision regarding the allocation of the MEN Sale Proceeds.

25.    The Escrow Agreement is silent on how funds can be distributed if, as is the case for Nortel Colombia, there is no one authorized to act on behalf of the entity and the entity is not fully liquidated or dissolved pursuant to local law.  Paragraph 12 of the Escrow Agreement references the complete liquidation or dissolution of a Depositor, not a situation such as this where operations have ceased but there is no path available for final liquidation or dissolution and no person or entity able to act.  Instead, Paragraph 12 provides that upon presentation of a court order or other officially certified document evidencing the Depositor's liquidation to the Distribution Agent, such dissolved or liquidated Depositor shall "cease to be [a Depositor] for all purposes under the [Escrow] Agreement, as amended, and the consent of such dissolved or liquidated depositor shall no longer be required for any purposes [t]hereunder."   On its face, this provision does not apply to Nortel Colombia, which has not formally completed its liquidation process and has not been struck from the Colombian corporate registry.

26.    In addition, except as provided in Paragraph 12, the Escrow Agreement cannot be amended in any way without the consent of all of the Depositors, including Nortel Colombia. Specifically, Paragraph 15(a) states that:

> [A]ny provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Distribution Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court . . . .

10

As a result, without an authorized signature from Nortel Colombia – again, an impossibility –

modification of the Escrow Agreement is not available.

## Basis for Relief

**A.   The U.S. and Canadian Courts Retain Jurisdiction to Interpret the Terms of the Escrow Agreement, and Authority to Order the Requested Relief.**

27.    The approval of the relief sought is appropriate under sections 105(a) and 363 of

the Bankruptcy Code.  The MEN Sale and the Escrow Agreement were approved pursuant to

section 363 of the Bankruptcy Code, and the law is clear that section 105 gives this Court broad

discretion to issue orders necessary to "carry out the provisions of this title."  11 U.S.C. § 105(a).

See In re Combustion Eng'g, Inc., 391 F.3d 190, 236 (3d Cir. 2004) (noting that section 105(a)

of the Bankruptcy Code "has been construed . . . . to assure the orderly conduct of reorganization

proceedings."); In re VII Holdings Co., 362 B.R. 663, 668 (Bankr. D. Del., 2007) (noting that

"[s]ection 105(a) bestows broad equitable powers on the Court.") (citing In re Combustion

Eng'g, Inc.).

28.    Furthermore, the jurisdiction of the U.S. and Canadian Courts to hear this Motion

and their authority to grant the relief requested herein is clear from the terms of the Escrow

Agreement, Paragraph 21 of which specifies that:

> For any claim, action or proceeding arising under or out of, in respect of,
> or in connection with this Agreement, each Party hereto irrevocably
> submits to and accepts for itself and its properties, generally and
> unconditionally to the exclusive jurisdiction of and service of process
> pursuant to the rules of both  . . . the U.S. Bankruptcy Court and the
> Canadian Court, if such claim, action or proceeding is brought prior to the
> entry of a final decree closing the Bankruptcy Cases involving the relevant
> Depositors pending before such courts . . . .

29.    The Escrow Agreement also provides that the Distribution Agent is authorized, in

its sole discretion, to comply with "any order, judgment or decree [that is] made or entered by

11

any court order affecting the property deposited under this Agreement." Escrow Agreement ¶
23.  In other words, although the Escrow Agreement does not expressly contemplate a
circumstance in which its terms cannot be fulfilled, it provides this Court and the Canadian Court
with authority to issue orders resolving issues regarding the deposited property, as the U.S.
Debtors request in this Motion.

        30.      The escrow of the MEN Sale Proceeds, and the ability of the Depositors to access
those proceeds, undoubtedly are matters arising out of the Escrow Agreement, and the relief
requested herein, if granted, would be an order affecting the property in the Escrow Account, as
contemplated by Paragraph 23 of the Escrow Agreement.  Furthermore, the relief requested falls
squarely within the scope of the Court's authority under section 105(a) of the Bankruptcy Code.
Where, as here, the purpose of the MEN Sale would be defeated if the MEN Sellers, and their
creditors, were unable to access the MEN Sale Proceeds given the terms of the Escrow Agreement, it
is both necessary and appropriate that the U.S. and Canadian Courts address this issue at a joint
hearing and grant the relief requested herein.

**B.**      **Where an Agreement is Silent Regarding an Important Issue, Contract Law
         Authorizes the Court Interpreting the Agreement to Read in the Necessary Terms.**

        31.      Under New York law, the general rule is that property in escrow may be released
only after the specified conditions precedent are satisfied.  See, e.g., In re Pan Trading Corp., S.A.,
125 B.R. 869, 878 (Bankr. S.D.N.Y. 1991) (an escrow cannot be fully transferred until the
conditions are satisfied); Netherby Ltd. v. G.V. Licensing, Inc., No. 92-4239, 1995 WL 491489, at *3
(S.D.N.Y. Aug. 17, 1995) (denying a motion to compel release of funds from escrow where there are
no reasons to override the clear terms of an escrow agreement, and the conditions for release have
not been met).  Here, as described above, the Escrow Agreement fails to address the situation where
one Depositor is unable to provide instructions to the Distribution Agent. .

32.     Courts in this Circuit and elsewhere have found that, to the extent a contract is silent with respect to a term essential to a determination of the parties' rights and duties, a term that is reasonable under the circumstances should be supplied by the court.  Restatement (Second) of Contracts § 204 cmt.b (1981) (noting that omission may occur when "the parties to an agreement fail to foresee the situation which later arises and gives rise to a dispute"); Big V Supermarkets, Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.), 267 B.R. 71, 108 (Bankr. D. Del. 2001) (requiring payment of withdrawal penalty as an implied term of contract under New Jersey law).  This principle consistently has been applied to contracts governed by New York law, which controls the Escrow Agreement.  City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 46 (2d Cir. 1988) (refusing to supply an implied term that would have required a facility to remain in operation without business justification); Haines v. City of New York, 41 N.Y.2d 769, 772-73 (N.Y. 1977) (supplying omitted term and finding implied intention that performance under contract will be for a reasonable time); Reiss v. Fin. Performance Corp., 715 N.Y.S.2d 29, 34 (N.Y. App. Div. 2000) (omission of essential term regarding effect of stock splits required court to supply reasonable term regarding proportional adjustment of number of shares that may be purchased and their price).  When supplying essential terms, courts look chiefly to the intent of the parties to the contract to ascertain the appropriate term.  City of Yonkers, 844 F.2d at 46 (stating that courts may imply terms that the parties intended or "would have intended had they thought about it" and "terms that are fair").

33.     Although the Escrow Agreement is governed in relevant part by New York law, the law in Canada is consistent on this point.  The Canadian Supreme Court has held that courts can fill in the essential terms of a contract that is otherwise silent, guided by their assessment of the parties' intentions or expectations.  MJB Enter. Ltd. v. Def. Constr., [1998] 1 S.C.R. 619

13

(Can.) (finding that, "in the circumstances of the present case, it is appropriate to find an implied

term according to the presumed intention of the parties") (citing G.H.L. Fridman, The Law of

Contract in Canada 476 (3d ed. 1994) ("[i]n determining the intention of the parties, attention

must be paid to the express terms of the contract"); Canadian Pac. Hotels Ltd. v. Bank of

Montreal, [1987] 1 S.C.R. 711 (Can.) (declining to imply a term in a contract because it could

not be presumed to have been intended, but noting that "the implication of terms in a contract on

the basis of customer or usage is a well recognized category of implication" and that

"implication of the basis of custom or usage is implication on the basis of presumed intention.").

34.     It manifestly was not the intention of the Depositors that one party's inability to

provide instructions under the Escrow Agreement would forever prevent the Depositors from

accessing the escrowed funds, leaving the MEN Sale Proceeds in escrow.  To the contrary, as

noted, the Escrow Agreement provides that the U.S. and Canadian Courts should resolve any

issues relating to the matters addressed in the Escrow Agreement, and authorizes the Distribution

Agent to comply with the orders of those courts.

35.     At the time they entered into the Escrow Agreement, the Depositors did not

anticipate a circumstance where there is no signatory authorized to act on behalf of one of the

Depositors, but where that Depositor continued to exist under the laws of its jurisdiction.  While

the Escrow Agreement requires the consent of all of the Depositors to take certain actions, it is

clear that the Depositors intended that consent not be required from those parties that are

incapable of providing consent.  Determining that the Distribution Agent may act on a direction

from all those Depositors that are capable of providing such direction is consistent with both the

intent of the Depositors in entering the Escrow Agreement and the overall purpose of the MEN

Sale.

**C.      Granting the Relief Requested Will Not Prejudice the Rights of Nortel Colombia**

36.      Granting the relief requested herein will not harm or otherwise prejudice the rights of Nortel Colombia to receive an allocation of a portion of the MEN Sale Proceeds.  As discussed above, Nortel Colombia has already been paid in full for the value of the tangible assets it transferred pursuant to the MEN Sale.  Other than the tangible assets, the only items transferred by Nortel Colombia to Ciena were whatever rights existed under two executory contracts.  No employees or other ongoing business operations were transferred.

37.      Although neither the Escrow Agreement nor the Fifth Amendment suggest that Nortel Colombia is guaranteed any recovery from the MEN Sale Proceeds beyond the Colombia Allocation, the relief requested herein will simply allow distribution of the funds in the Escrow Account by the Distribution Agent, not determine Nortel Colombia's rights to a further allocation.  If at the conclusion of the allocation process it is determined that Nortel Colombia is entitled to a further distribution, those sums will be reserved for payment in respect of Nortel Colombia's tax liabilities.

**<u>Request for a Joint Hearing</u>**

38.      The U.S. Debtors hereby request that the relief in this Motion, the companion relief to be sought before the Canadian Court and any objections thereto be considered at a joint hearing between the U.S. and Canadian Courts pursuant to Paragraph 21 of the Escrow Agreement, which provides for the exclusive jurisdiction of the U.S. and Canadian Courts over any claim, action or proceeding arising under or out of, in respect of, or in connection with the Escrow Agreement, where such claim, action or proceeding is brought prior to the entry of a final decree closing the bankruptcy cases involving the relevant Depositors pending before such courts.  Escrow Agreement ¶ 21.  The Canadian Debtors and the Monitor are seeking the same relief requested herein by separate application to the Canadian Court.

15

## Notice

39.     Notice of the Motion has been given via overnight mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the Distribution Agent; (v) Nortel Colombia, as provided in Paragraph 21 of the Escrow Agreement, (vi) the Colombian tax authority (the Dirección Impuestos y Aduanas Nacionales); (vii) the other Depositors, as provided in Paragraph 21 of the Escrow Agreement; and (viii) the general service list established in these chapter 11 cases.  The U.S. Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

40.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the U.S. Debtors respectfully request that the U.S. Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  May 23, 2011
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


/s/ Ann C. Cordo
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*