# EXHIBIT 1

**(Amended Exhibit)**

## STIPULATION AND SETTLEMENT AGREEMENT BY AND AMONG THE SELLERS AND GENBAND US LLC

This stipulation and settlement agreement (this "Stipulation") is entered into among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), the EMEA Sellers[1] and the Other Sellers, each as identified in the Sale Agreement (together with NNC, NNL, NNI and the EMEA Sellers, the "Sellers") and GENBAND US LLC (f/k/a GENBAND Inc.) ("GENBAND" or the "Purchaser," and with the Sellers, the "Parties").

WHEREAS, on January 14, 2009 (the "Petition Date"), NNI and certain of its affiliates (collectively, the "U.S. Debtors")[2], filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the Bankruptcy Court for the District of Delaware (the "U.S. Court");

WHEREAS, also on the Petition Date, NNC, NNL (together with their affiliates, including the EMEA Debtors (as defined below) and the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of Justice (the "Canadian Court" and together with the U.S. Court, the

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in that certain Asset Sale Agreement by and among NNC, NNL, NNI, the other entities identified therein as Sellers and GENBAND Inc. dated December 22, 2009, as amended (the "Sale Agreement"), or the Escrow Agreement (as defined below).

[2]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[3]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

1                              **Error! Unknown document property name.**

"Courts") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors (collectively, the "Canadian Proceedings");

WHEREAS, on January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration under the control of individuals from Ernst & Young LLP and Ernst & Young Chartered Accountants;

WHEREAS, on December 23, 2009, the U.S Debtors filed the *Debtors' Motion For An Order (I) (A) Authorizing Debtors' Entry Into The Stalking Horse Agreement, (B) Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving Payment Of An Incentive Fee, (D) Approving The Notice Procedures And The Assumption And Assignment Procedures, (E) Authorizing The Filing Of Certain Documents Under Seal And (F) Setting A Date For The Sale Hearing, And (II) Authorizing And Approving (A) The Sale Of Certain Assets Of Debtors' Carrier Voice Over IP And Application Solutions Business Free and Clear Of All Liens, Claims And Encumbrances And (B) The Assumption And Assignment Of Certain Executory Contracts* [D.I. 2193] seeking approval of the sale of substantially all of the assets relating to Nortel's Carrier Voice over IP and Communications Solutions Business (the "CVAS Business") to GENBAND pursuant to a stalking-horse purchase agreement (the "Stalking Horse Agreement"), subject to the receipt of a higher and better offer at auction;

---

[4]       The EMEA Debtors include the following entities:  NNUK (in administration), Nortel Networks S.A., Nortel Networks (Ireland) Limited (in administration), Nortel GmbH (in administration), Nortel Networks France S.A.S. (in administration), Nortel Networks Oy (in administration), Nortel Networks Romania SRL (in administration), Nortel Networks AB (in administration), Nortel Networks N.V. (in administration), Nortel Networks S.p.A. (in administration), Nortel Networks B.V. (in administration), Nortel Networks Polska Sp. z.o.o. (in administration), Nortel Networks Hispania, S.A. (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks, s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal S.A. (in administration), Nortel Networks Slovensko (in administration), s.r.o. (in administration) and Nortel Networks International Finance & Holding B.V. (in administration).

2

**Error! Unknown document property name.**

WHEREAS, on or about December 29, 2009, the Canadian Debtors filed a motion with the Canadian Court seeking approval of the Stalking Horse Agreement and bidding procedures in relation to the sale of the CVAS Business;

WHEREAS, following the Canadian Court's and U.S. Court's approval of the bidding procedures by orders dated January 6, 2010, and January 8, 2010 [D.I. 2259], respectively, Nortel marketed the CVAS Business to other potentially interested parties, based on the terms of the Stalking Horse Agreement, but ultimately announced that it would not proceed to auction and would work toward closing the sale of the CVAS Business with GENBAND.

WHEREAS, following a joint hearing between the Canadian Court and the U.S. Court on March 3, 2010, the Canadian Court approved the sale of the CVAS Business to GENBAND pursuant to the Sale Agreement by order dated March 3, 2010, and the U.S. Court approved the sale of the CVAS Business to GENBAND pursuant to the Sale Agreement by order dated March 4, 2010 [D.I. 2632];

WHEREAS, the sale of the CVAS Business by the Sellers to the Purchaser closed on May 28, 2010 (the "Closing");

WHEREAS, in connection with the sale of the CVAS Business, Wells Fargo Bank, National Association ("Wells Fargo"), NNI, NNL, NNUK and GENBAND entered into an Escrow Agreement dated as of January 6, 2010 and amended on May 28, 2010 (the "Escrow Agreement"), and established the Escrow Account, with Wells Fargo as escrow agent, to hold the Escrow Amount, which consists of, among other things, the Purchase Price Adjustment Escrow Amount in the principal sum of $8,000,000 that relates to certain potential post-closing purchase price adjustments that could be made pursuant to Section 2.2.3 of the Sale Agreement;

3          **Error! Unknown document property name.**

WHEREAS, under Section 4 of the Escrow Agreement, funds may be released from the Escrow Account either pursuant to the delivery of a joint written instruction by NNI, NNL, NNUK and GENBAND to Wells Fargo directing the release of funds, or by a final, non-appealable court order directing the release of funds;

WHEREAS, on September 15, 2010, the Purchaser delivered to the Sellers a Closing Statement that contained its calculation of certain post-closing purchase price adjustments provided for under the Sale Agreement and provided for a net purchase price adjustment in favor of the Purchaser in the amount of $139,096,000;

WHEREAS, on October 13, 2010,[5] the Sellers delivered a Disagreement Notice to the Purchaser that disputed, among other things, the Purchaser's calculation of the Deferred Profit Amount and provided for a net purchase price adjustment in favor of the Purchaser in the amount of $102,271,863;

WHEREAS, on November 17, 2010, the U.S. Debtors filed the *Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds* [D.I. 4345] (the "U.S. Motion to Enforce the Sale Agreement") which motion sought a determination (i) that the U.S. Court maintained jurisdiction over the dispute regarding the definition of Deferred Profit Amount, (ii) of the Final Purchase Price, (iii) that GENBAND was liable for payment of a settlement payment received from Verizon (the "Verizon Settlement Amount") and (iv) that GENBAND was liable for payment of the Canadian Transfer Tax Amount (defined below);

---

[5]     To account for certain corrections, on November 16, 2010, the Sellers delivered to the Purchaser a revised Disagreement Notice that provided for a net purchase price adjustment in favor of the Purchaser in the amount of $102,491,255; on January 18, 2011, the Sellers delivered to the Purchaser a further revised Disagreement Notice that provided for a net purchase price adjustment in favor of the Purchaser in the amount of $99,947,239.

4                    **Error! Unknown document property name.**

WHEREAS, on November 18, 2010, GENBAND filed the *Motion for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the Automatic Stay to Compel Arbitration* [D.I. 4347] (the "U.S. Motion to Compel Arbitration");

WHEREAS, on or about November 30, 2010 the Canadian Debtors filed a motion with the Canadian Court seeking, *inter alia*, a declaration that the Canadian Court and the U.S. Court have the exclusive authority and jurisdiction to determine the dispute relating to the Deferred Profit Amount, an order directing GENBAND to execute instructions to Wells Fargo for the release of amounts held pursuant to the Escrow Agreement consistent with the Sellers' calculation of the Deferred Profit Amount and relief in respect of the Canadian Transfer Tax Amount (as defined below) (the "Canadian Motion to Enforce the Sale Agreement", and together with the U.S. Motion to Enforce the Sale Agreement, the "Motions to Enforce the Sale Agreement");

WHEREAS, on or about December 9, 2010, GENBAND filed a motion with the Canadian Court seeking, *inter alia*, an order requiring Nortel to submit the Deferred Profit Amount dispute to the Accounting Arbitrator (the "Canadian Motion to Compel Arbitration," and collectively with the U.S. Motion to Compel Arbitration and the Motions to Enforce the Sale Agreement, the "Motions");

WHEREAS, at a telephonic conference held on November 29, 2010, the U.S. Court determined that the dispute over whether the disagreement regarding Deferred Profit Amount should be submitted to arbitration should be decided first, and thus that the U.S. Motion to Compel Arbitration would be determined prior to the U.S. Motion to Enforce the Sale Agreement;

**Error! Unknown document property name.**

WHEREAS, on December 15, 2010, the U.S. Court and the Canadian Court held a joint hearing regarding the U.S. Motion to Compel Arbitration and the Canadian Motion to Compel Arbitration;

WHEREAS, on January 21, 2011, the U.S. Court denied the U.S. Motion to Compel Arbitration (the "U.S. Order") [D.I. 4737];

WHEREAS, on January 21, 2011, the Canadian Court denied the Canadian Motion to Compel Arbitration;

WHEREAS, pursuant to a Notice of Appeal filed on February 1, 2011 [D.I. 4786], GENBAND appealed the U.S. Order (the "U.S. Appeal");

WHEREAS, on March 8, 2011, the U.S. Appeal was docketed in the United States District Court for the District of Delaware;

WHEREAS, on February 11, 2011, GENBAND served a notice of motion seeking leave to appeal the Canadian Order (the "Canadian Appeal" and together with the U.S. Appeal the "Appeals");

WHEREAS pursuant to Section 6.1 of the Sale Agreement GENBAND is obligated to promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes imposed upon or payable or collectible or incurred, in each case, as a direct result of the transfer of Assets to GENBAND or a Designated Purchaser pursuant to the Sale Agreement, provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by GENBAND to such Seller, Subsidiary, Affiliate, representative or agent, as applicable;

WHEREAS NNL and Nortel Networks Technology Corporation paid an aggregate of CDN $1,049,960.30 (the "Canadian Transfer Tax Amount"), which for the purposes of this

6                    **Error! Unknown document
                       property name.**

Stipulation has been calculated to be USD $1,000,390, to the Canadian Tax Authority on account of Transfer Taxes payable as a direct result of the transfer of the Assets to GENBAND pursuant to the Sale Agreement and are entitled to reimbursement for the payment of such Transfer Taxes in accordance with the terms of the Sale Agreement;

WHEREAS Nortel has demanded payment from GENBAND of the Canadian Transfer Tax Amount and GENBAND has yet to pay such amount;

WHEREAS, on April 4, 2011, GENBAND, the U.S. Debtors, the Canadian Debtors, the Official Committee of Unsecured Creditors, and Ernst & Young Inc. in its capacity as Monitor of the Canadian Debtors engaged in mediation pursuant to the Standing Order of the District Court of Delaware dated July 23, 2004; and

WHEREAS, after engaging in arms' length negotiations and based on the terms and representations set forth below, the Parties have agreed to resolve the Motions and the Appeals and the disputes underlying them as follows:

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED THAT:**

1.      Court Approvals. All provisions of this Stipulation are subject to: (i) the entry of an order by each of the U.S. Court and the Canadian Court approving this Stipulation and authorizing the U.S. Debtors and Canadian Debtors, respectively, to enter into and perform their obligations under this Stipulation (the "Approval Orders"); and (ii) such Approval Orders becoming final and not subject to further appeal. The Parties agree to use all deliberate and reasonable efforts to secure such Approval Orders as soon as is practicable.  In the event the Approval Orders are not entered by the Courts or such Approval Orders do not become final and not subject to further appeal, this Stipulation shall have no effect and the Parties reserve all of

7                    **Error! Unknown document property name.**

their rights and defenses with respect to the Motions, the Appeals, the purchase price adjustment under the Sale Agreement and the other matters in dispute as outlined herein.

      2.      <u>Calculation of the Purchase Price Adjustment.</u>

      a.      The Deferred Profit Amount shall be $56,049,381, which shall resolve all disputes among the parties with respect to the Deferred Profit Amount, including without limitation, adjustments to the Deferred Profit Amount related to the following: (i) disputes related to KPN product credits, (ii) post-closing credit memos relating to Qwest, Avaya and miscellaneous other parties, (iii) the negative deferred cost-of-sales balance related to Nortel Networks (Luxembourg) S.A. and (iv) deferred revenue associated with that certain Telus agreement with Root NTID F58BC800.

      b.      After giving effect to the Deferred Profit Amount, the Final Purchase Price under the Sale Agreement shall be **$157,743,756.**  To satisfy their obligations under section 2.2.3.2(a) of the Sale Agreement with respect to the reconciliation of the Final Purchase Price, the Sellers agree to remit to GENBAND **$24,905,244** (the "<u>Adjustment Amount</u>") pursuant to the terms of this Stipulation, which shall be effected by (i) a release of the full amount of the Purchase Price Adjustment Escrow Funds to GENBAND and (ii) payment by the Sellers to GENBAND of an amount (the "<u>Balance</u>") that is equal to (x) the Adjustment Amount, <u>minus</u> (y) the Purchase Price Adjustment Escrow Funds released to GENBAND in accordance with the preceding clause (i) all in accordance with Section 4 hereof.[6]

      3.      <u>Transfer Tax Obligations.</u>  In furtherance of Section 6.1(a) of the Sale Agreement, the Canadian Transfer Tax Amount shall be satisfied by the Sellers deducting an amount equal to the Canadian Transfer Tax Amount from the Balance payable to GENBAND and the Sellers

---

[6]    [NTD: The accrued interest amount changes daily.  Revise amounts in paragraph when we know the date the Stipulation will be signed.]

8          **Error! Unknown document property name.**

paying such amount to NNL, all in accordance with Section 4 hereof. GENBAND hereby consents to the deduction of the Canadian Transfer Tax Amount from the Balance and the payment of such amount to NNL in satisfaction of GENBAND's obligation to pay the Canadian Transfer Tax Amount. Upon the Settlement Date (as defined below), GENBAND shall be released from its obligations pursuant to the Sale Agreement with respect to Transfer Taxes imposed by or payable to all Tax Authorities of or in Canada up to the amount of the Canadian Transfer Tax Amount. For greater certainty: (i) such release or the release in favour of the Purchaser contained in section 7(b) hereof shall not release GENBAND from any of its obligations under the Sale Agreement (x) with respect to Transfer Taxes in any jurisdiction other than Canada or (y) with respect to Transfer Taxes imposed by or payable to any relevant Tax Authorities of or in Canada in excess of the Canadian Transfer Tax Amount; and (ii) the terms of the Sale Agreement as regards Transfer Taxes shall continue in full force and effect as provided for in the Sale Agreement (including, without limitation, all obligations of the Sellers to reimburse Purchaser for any deduction, credit, or refund related to Transfer Taxes, as set forth in the Sale Agreement).

    4.    <u>Release of Funds From Escrow, Payment of the Balance by Sellers and Payment of Transfer Tax Amounts by GENBAND.</u>

    a.    Within five (5) business days of the Approval Orders becoming final and not subject to further appeal, the Purchaser, NNL, NNI and NNUK shall deliver joint instructions authorizing Wells Fargo to immediately release the entire amount of the Purchase Price Adjustment Escrow Funds (being an amount of $8,000,000 plus interest accrued thereon from the Closing Date until the date of such release[7]) to GENBAND.

---

[7]    [NTD: As of 3/31/11 there was $8,006,094.48 in the escrow.]

**Error! Unknown document property name.**

b.      Concurrently with the release of the Purchase Price Adjustment Escrow Funds to GENBAND, the Sellers shall pay the Balance, less an amount equal to the Canadian Transfer Tax Amount, by delivering written instructions to JPMorgan Chase Bank, N.A. pursuant to that certain CVAS Distribution Escrow Agreement dated May 27, 2010 (the "Distribution Escrow Agreement"), to pay such amount to GENBAND by wire transfer of immediately available funds to an account designated in writing by GENBAND at least three (3) business days prior to such payment.

c.      Concurrently with the release of the Purchase Price Adjustment Escrow Funds to GENBAND, the Sellers, for and on behalf of GENBAND, shall pay the Canadian Transfer Tax Amount to NNL by delivering written instructions to JPMorgan Chase Bank, N.A. pursuant to the Distribution Escrow Agreement, to pay such amount to NNL by wire transfer of immediately available funds to an account designated in writing by NNL at least three (3) business days prior to such payment.

5.      Withdrawal of the Motions and the Appeal.  Forthwith upon the payments contemplated in Section 4 hereof having been made (the date of such payments, the "Settlement Date") (i) the U.S. Debtors shall file a notice of withdrawal of the U.S. Motion to Enforce the Sale Agreement with the U.S. Court, (ii) the Canadian Debtors shall withdraw the Canadian Motion to Enforce the Sale Agreement with the Canadian Court, and (iii) GENBAND shall file notices of withdrawal of the Appeals.

6.      Resolution of the Verizon Dispute.  Withdrawal of the Motions pursuant to paragraph 5 above shall resolve the dispute between the Parties concerning the Verizon Settlement Amount and GENBAND shall retain all amounts received from Verizon that were the subject of the Motions.

**Error! Unknown document property name.**

7.      Releases.  The Parties agree to the following releases:

  a.  Release of Sellers.  Effective upon the Settlement Date, the Purchaser hereby releases and forever discharges the Sellers, their past and present parents, subsidiaries, affiliates, general partners, limited partners, shareholders, directors, officers, employees, agents, attorneys and advisors, and each of their predecessors, successors and assigns (collectively, the "Seller Releasees"), from any and all claims, rights, defenses, demands, liabilities, obligations, damages, actions, suits, causes of action, and setoffs, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, whether sounding in contract, tort or otherwise (collectively "Claims"), that the Purchaser now has, had, may have had, or hereafter may have against any of the Seller Releasees concerning or relating to the Final Purchase Price owed under the Sale Agreement, the Deferred Profit Amount, the Canadian Transfer Tax Amount, or the Verizon Settlement Amount (collectively, the "Settled Matters"), and the Purchaser hereby covenants forever not to sue or bring any Claims against the Seller Releasees concerning or relating to the Settled Matters.

  b.  Release of Purchaser.  Effective upon the Settlement Date, the Sellers hereby release and forever discharge the Purchaser, its past and present parents, subsidiaries, affiliates, general partners, limited partners, shareholders, directors, officers, employees, agents, attorneys and advisors, and each of their predecessors, successors and assigns (collectively, the "Purchaser

11                    **Error! Unknown document property name.**

Releasees"), from any and all Claims that the Sellers now have, had, may have had, or hereafter may have against any of the Purchaser Releasees concerning or relating to the Settled Matters, and the Sellers hereby covenant forever not to sue or bring any Claims against the Purchaser Releasees concerning or relating to the Settled Matters.

c. The Parties acknowledge and understand that hereafter they may discover or appreciate claims, facts, issues, or concerns in addition to or different from those that they now know or believe to exist with respect to the Settled Matters, which if known or suspected at the time of execution of this Settlement Agreement, might have materially affected the settlement embodied herein. The Parties nevertheless agree that the releases contained herein apply to any such additional or different claims, facts, issues, or concerns. The Parties acknowledge that they are familiar with the provisions of California Civil Code Section 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.") and specifically waive all rights and release such claims as referenced therein and in any similar statute or law.

d. The Sellers and Purchaser hereby represent that they are the sole and exclusive owners of the claims and potential claims addressed in this Settlement Agreement and that each Party to this Settlement Agreement respectively has the sole right and exclusive authority to execute this Settlement Agreement and has not sold, assigned, transferred, conveyed, or

**Error! Unknown document property name.**

otherwise disposed of any of the Claims referred to in this Settlement

Agreement.

8.      No Admissions.  This Stipulation and any draft thereof shall not constitute an

admission of liability or lack thereof by any Party or the U.S. Debtors, the Canadian Debtors, the

EMEA Debtors or their affiliates, and shall not be admissible as evidence in any court of law or

other legal proceeding for any purpose, other than for the purpose of enforcing the Stipulation.

Each Party acknowledges and agrees that nothing in this Stipulation constitutes a concession of

any legal issue raised in or relating to the Motions or the Appeal.

9.      Final Settlement and No Further Adjustments.  From and after the Settlement

Date the Parties shall be forever estopped and barred from seeking further purchase price

adjustments under the Sale Agreement, and the payments made pursuant to this Stipulation shall

constitute a full and final satisfaction of all claims for purchase price adjustments under sections

2.2.3.1 and 2.2.3.2 of the Sale Agreement.

10.     Costs and Expenses.  Each Party agrees to bear its own costs, expenses and

attorneys' fees incurred in connection with the negotiations related to and preparation of the

Motions, the Appeal and this Stipulation and to not seek from the other Parties reimbursement of

any such costs, expenses or attorneys' fees.

11.     Governing Law.  This Stipulation shall be governed by, and construed in

accordance with, the laws of the State of New York without regard to the rules of conflict of

laws of any other jurisdiction that would cause any laws other than the laws of the State of New

York to be applied.

12.     Jurisdiction.  The Parties agree that the Courts shall have exclusive jurisdiction

over all matters involving or relating to the interpretation, implementation, and enforcement of

13

**Error! Unknown document property name.**

this Stipulation and any disputes arising in connection therewith, and each Party hereby expressly submits to the jurisdiction of the Courts.

13.    <u>Jury Waiver</u>. Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Stipulation or any transaction contemplated hereby or thereby. Each party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties hereto have been induced to enter into this Stipulation, by, among other things, the mutual waivers and certifications in this paragraph.

14.    <u>Binding Effect</u>. This Stipulation shall be binding on the Parties from the date the Approval Orders becomes final and not subject to further appeal and shall continue to be binding after the conclusion of the chapter 11 cases and the Canadian Proceedings.

15.    <u>Signing Authority</u>. The Parties represent and warrant to each other that the signatories to this Stipulation on their respective behalf have full power and authority to enter into it.

16.    <u>Reservation of Rights</u>. Except as expressly set out herein, nothing herein shall constitute an amendment, modification or waiver of any provision of the Sale Agreement or any other Transaction Document or of any rights of the Sellers or the Purchaser thereunder.

17.    <u>Entire Agreement</u>. This Stipulation and the Approval Orders contain the entire understanding of the Parties with respect to the matters addressed herein, and all prior discussions among the Parties concerning such matters are merged herein. There are no

**Error! Unknown document property name.**

representations, warranties, covenants, promises, or undertakings except those expressly set forth herein.

18.    <u>Manner of Execution</u>.  The Parties may execute this Stipulation in counterparts, and all executed counterparts shall collectively be deemed to be one and the same instrument.

**Error! Unknown document property name.**

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Parties have executed this Stipulation.

Dated:  [●], 2011

GENBAND US LLC

By  _____
     Name:
     Title:

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED                    NORTEL NETWORKS CORPORATION


By:_____              By:_____
Name:                                     Name:
Title:                                    Title:


By:_____              By:_____
Name:                                     Name:
Title:                                    Title:


NORTEL NETWORKS INC.


By:_____
Name:  John Ray
Title:   Principal Officer

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

By:_____
Name:
Title:


By:_____
Name:
Title:


**NORTEL NETWORKS DE MEXICO, S.A. DE C.V.**

By:_____
Name:
Title:


By:_____
Name:
Title:


**NORTEL DE MEXICO, S. DE R.L. DE C.V.**

By:_____
Name:
Title:


By:_____
Name:
Title:


**NORTEL NETWORKS PERU S.A.C.**

By:_____
Name:
Title:


By:_____
Name:
Title:


4

**Error! Unknown document property name.**

**NORTEL NETWORKS AUSTRALIA PTY LIMITED**

By:_____
Name:
Title:


By:_____
Name:
Title:


**NORTEL NETWORKS (INDIA) PRIVATE LIMITED**

By:_____
Name:
Title:


By:_____
Name:
Title:


**PT NORTEL NETWORKS INDONESIA**

By:_____
Name:
Title:


By:_____
Name:
Title:


**NORTEL NETWORKS MALAYSIA SDN. BHD.**

By:_____
Name:
Title:


By:_____

Name:
Title:

**NORTEL NETWORKS NEW ZEALAND LIMITED**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL NETWORKS SINGAPORE PTE. LIMITED**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL NETWORKS (ASIA) LIMITED**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL NETWORKS (CHINA) LIMITED**

By:_____
Name:
Title:

By:_____

Name:
Title:

**NORTEL NETWORKS (THAILAND) LTD.**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL VIETNAM LIMITED**

By:_____
Name:
Title:

By:_____
Name:
Title:

**NORTEL NETWORKS DE ARGENTINA, S.A.**

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS INTERNATIONAL INC.** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  John Ray
Title:   Principal Officer


**SIGNED** in the name and on behalf of **NORTEL NETWORKS (CALA) INC.** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  John Ray
Title:   Principal Officer


**SIGNED** in the name and on behalf of **NORTEL NETWORKS KABUSHIKI KAISHA** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  John Ray
Title:   Principal Officer


**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE GUATEMALA, LTDA.** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:  John Ray
Title:   Principal Officer

**SIGNED** for and on behalf of **NORTEL NETWORKS UK LIMITED** (in administration) by        as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

……………………………………………..

Witness signature

………………………………………..
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **NORTEL NETWORKS NV** (in administration) by      as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

……………………………………………..

Witness signature

………………………………………..
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **NORTEL NETWORKS SPA** (in administration) by      as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

………………………………………………

Witness signature

………………………………………..
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **NORTEL**                    )
**NETWORKS (IRELAND) LIMITED** (in                          )    ..................................................
administration) by _____ as Joint                )    _____
Administrator (acting as agent and without                  )
personal liability) in the presence of:                     )


Witness signature

..............................................              )
Name:                                                       )
Address:                                                    )

NEWYORK:2377703.18

SIGNED for and on behalf of NORTEL          )        ..................................................
NETWORKS FRANCE S.A.S. (in                   )
administration) by _____ acting as  )
authorised representative for _____ as )
Joint Administrator (acting as agent and without )
personal liability) in the presence of:      )

Witness signature

.................................................     )
Name:                                         )
Address:                                      )

**SIGNED** by _____    )    ...................................................
Duly authorized for and on behalf of **O.O.O.**    )
**NORTEL NETWORKS** in the presence of:    )


Witness signature

...............................................    )
Name:    )
Address:    )

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS ISRAEL (SALES AND**
**MARKETING) LIMITED** (in administration)
by            and            as Joint
Israeli Administrators (acting jointly and
without personal liability) in connection with
the Israeli Assets and Liabilities:

)
)
)
)
)
)
)
)
)

........................................................

_____

........................................................

_____

Witness signature

........................................................
Name:
Address:

)
)
)

**SIGNED** by                          )          .................................................

Duly authorized for and on behalf of **NORTEL**    )

**NETWORKS AG** in the presence of:      )



Witness signature

.................................................    )

Name:                               )

Address:                            )

**SIGNED** for and on behalf of **NORTEL**    )    ...............................................
**NETWORKS S.A.** (in administration and    )
secondary proceedings) by &#95;&#95;&#95;&#95;&#95;&#95; as    )
&#95;&#95;&#95;&#95;&#95;&#95; (acting as agent and without    )
personal liability) in the presence of:    )


Witness signature


...............................................    )
Name:    )
Address:    )

SIGNED for and on behalf of **NORTEL**　　）
**NETWORKS BV** (in administration) by　　）　　.................................................
_____as Joint Administrator　　）
(acting as agent and without personal liability)　　）
in the presence of:　　）

.................................................
Witness signature

　　　　　　　　　　　　　　　　　　　　　）
Name:　　　　　　　　　　　　　　　　　）
Address:　　　　　　　　　　　　　　　　）

SIGNED for and on behalf of **NORTEL**　　）
**NETWORKS POLSKA SP Z.O.O.** (in　　）　　.................................................
administration) by _____ as　　）
Joint Administrator (acting as agent and without　　）
personal liability) in the presence of:　　）

Witness signature

.................................................　　）
Name:　　　　　　　　　　　　　　　　　）
Address:　　　　　　　　　　　　　　　　）

SIGNED for and on behalf of **NORTEL**　　）
**NETWORKS HISPANIA S.A.** (in　　）　　.................................................
administration) by _____ as　　）
Joint Administrator (acting as agent and without　　）
personal liability) in the presence of:　　）

Witness signature

.................................................　　）
Name:　　　　　　　　　　　　　　　　　）
Address:　　　　　　　　　　　　　　　　）

**SIGNED** for and on behalf of **NORTEL**   )    ........................................................
**NETWORKS (AUSTRIA) GMBH** (in   )
administration) by _____ as   )
Joint Administrator (acting as agent and without   )
personal liability) in the presence of:   )


Witness signature

...................................................   )
Name:   )
Address:   )


**SIGNED** for and on behalf of **NORTEL**   )    ........................................................
**NETWORKS PORTUGAL SA** (in   )
administration) by _____ as   )
Joint Administrator (acting as agent and without   )
personal liability) in the presence of:   )


Witness signature

...................................................   )
Name:   )
Address:   )


**SIGNED** for and on behalf of **NORTEL**   )    ........................................................
**GMBH** (in administration) by   )
_____ as Joint Administrator   )
(acting as agent and without personal liability)   )
in the presence of:


Witness signature

...................................................   )
Name:   )
Address:   )

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS SLOVENSKO S.R.O.** (in )
administration) by )
                                           )
                                           )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

……………………………………………

Witness signature

…………………………………… )
Name:                                      )
Address:                                   )

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS S.R.O.** (in administration) by )
                                           )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

……………………………………………

Witness signature

…………………………………… )
Name:                                      )
Address:                                   )

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS ROMANIA S.R.L.** (in )
administration) by )
                                           )
                                           )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

……………………………………………

Witness signature

…………………………………… )
Name:                                      )
Address:                                   )

**SIGNED** for and on behalf of **NORTEL**                    )        ..................................................
**NETWORKS AB** (in administration) by              )
_____ as Joint Administrator           )
(acting as agent and without personal liability)       )
in the presence of:                                                )


Witness signature

....................................................            )
Name:                                                              )
Address:                                                           )