**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ X
                                            :

| | |
|---|---|
| In re: | :    Chapter 11 |
| | : |
| NORTEL NETWORKS INC., *et al.*,[1] | :    Case No. 09-10138 (KG) |
| | : |
|            Debtors. | :    (Jointly Administered) |
| | : |
| | :    **Hearing Date: June 7, 2011 at 9:30 a.m. (ET)** |
| | : |
| | :    **Objections due to Cross-Motion: May 31, 2011 at 4:00 p.m. (ET)** |
| | : |
| | :    **RE:  Docket No. 5307** |
| | : |

------------------------------------------------------------ X

**THE JOINT ADMINISTRATORS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR (I) OBJECTION TO JOINT MOTION FOR ENTRY OF AN**
**ORDER ESTABLISHING AN ALLOCATION PROTOCOL PURSUANT TO**
**THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND**
**(II) CROSS-MOTION TO COMPEL ARBITRATION**

The court-appointed administrators and authorized foreign representatives

(collectively, the "<u>Joint Administrators</u>")[2] for Nortel Networks UK Limited ("<u>NNUK</u>") and

---

1.  The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

2.  The Administrators in the UK Proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The Administrators in the UK Proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors")[3] located in the

region known as EMEA (Europe, Middle East, and Africa) in proceedings under the *Insolvency*

*Act 1986*, pending before the High Court of Justice of England and Wales (the "English Court"),

hereby submit this Memorandum of Law in support of their (i) Objection to the Joint Motion of

Nortel Networks, Inc. ("NNI") and its affiliated debtors and debtors-in-possession (collectively,

the "U.S. Debtors"), and the Official Committee of Unsecured Creditors (the "Committee" and,

together with the U.S. Debtors, the "Movants"), for Entry of an Order Establishing an Allocation

Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief (the

"Motion"), and (ii) Cross-Motion to Compel Arbitration.

## INTRODUCTION

The Joint Administrators agree that allocating the proceeds of the sales of the

Nortel businesses should be the highest priority for all concerned.  They disagree with Movants

only about who should decide allocation.  From the earliest negotiations of the Interim Funding

and Settlement Agreement (the "IFSA")[4] until the day Movants filed the Motion, it had been

recognized and agreed by all parties that allocation of the Nortel Sale Proceeds would be decided

in a private, transnational arbitration proceeding and not by any national court.  This is the only

fair and practical approach to allocation, and was the basis on which the U.S., Canadian, English

---

3.  The EMEA Debtors are:  Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH;
Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering
Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International
Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z. o.o.;
Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks
S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

4.  The IFSA, dated as of June 9, 2009, is attached as Exhibit 1 to the Declaration of Inna Rozenberg, dated April
25, 2011, submitted with the Motion, and is by and between the parties listed on Schedules 1, 2 and 3 thereto.
Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
IFSA.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms
in the IFSA.

and French courts approved the IFSA.  Movants' about-face on this point is contrary to the underlying agreements, basic principles of fairness, and the understandings and expectations of Nortel stakeholders around the world.

Thus, the Joint Administrators respectfully submit that the Motion should be denied for at least the following reasons:

First, the Motion is procedurally improper.  Pursuant to Bankruptcy Rule 7001, the relief sought in the Motion can be obtained only by way of an adversary proceeding.  This defect in itself mandates dismissal of the Motion.

Second, although the parties have never finalized the terms of an Interim Sales Protocol under the IFSA, the parties' intent to submit allocation disputes to arbitration rather than litigation is clear from the terms of the IFSA.  Any ambiguity or lack of clarity about what type of "dispute resolvers" the parties intended to appoint is resolved by looking at the negotiating history, the surrounding circumstances, the parties' public statements, and the positions taken in the negotiations towards a protocol for resolving allocation disputes (the "Interim Sales Protocol" or the "Protocol").  All evidence confirms that the parties bound themselves to submit allocation disputes to arbitration, regardless of whether they were successful in negotiating a procedural protocol to be followed in such arbitration.  Accordingly, under the Federal Arbitration Act ("FAA"), the Court's jurisdiction over allocation disputes is limited to compelling the parties to submit those disputes to arbitration.

Third, the parties to the IFSA made an enforceable promise to negotiate in good faith towards the entry of the Interim Sales Protocol.  Contrary to Movants' suggestion, there has been no bona fide failure of those negotiations.  The parties halted their discussions over one year ago, in order to pursue negotiations and a mediation directed to determining how to actually

allocate the asset Sale Proceeds.  Had those efforts been successful, this would have obviated the need to enter into an Interim Sales Protocol.  Prior to halting their discussions, the parties had substantially agreed on the bulk of the terms contained in a 27-page document that set forth detailed procedures for an arbitration before a three-member panel composed of arbitrators from the U.S., Canada and EMEA.  The only major dispute concerned a late effort by the Canadian Debtors to preclude the EMEA Debtors from presenting all relevant issues to the arbitrators.  Other than this, only minor drafting points remained to be addressed.  The Canadian Debtors' effort to change the agreed scope of the arbitration was contrary to the plain terms of the IFSA.  Meanwhile, the U.S. Debtors have rebuffed the EMEA Debtors' offer to revive the dormant negotiations in order to see if the few remaining open points can be resolved.

Fourth, before halting their protocol negotiations in favor of allocation negotiations and mediation, the parties had reached agreement on all material terms for a protocol to govern the procedures in an allocation arbitration.  Most significantly, they had agreed that allocation disputes should be decided by a three-member panel whose members would represent each of the three geographical estates.  They had also agreed on detailed procedures for the conduct of the arbitration.  Under New York law, which governs the IFSA, the Court has the power to enforce the material terms to which the parties agreed, and also the power to fill in any necessary gaps in the agreed terms, in order to effectuate the parties' intent and prevent the injustice that will occur if the parties' understandings are not enforced.

Fifth, if the Court rejects the foregoing arguments and finds that it does indeed have authority to impose a Protocol not agreed by the parties, then the Joint Administrators respectfully submit that the terms of such protocol should provide for the appointment of a three-member panel of arbitrators, with one member appointed by each of the U.S., Canada and

EMEA estates.  Attached hereto as **Exhibit A** is a proposed protocol that substantially adopts Movants' proposed "Allocation Protocol," but provides that the proceeding should be conducted by such a panel, rather than the courts.

Finally, regardless of any other arguments, the U.S. and Canadian Courts simply do not have jurisdiction to determine how the proceeds of the sales of the global Nortel businesses should be divided among the estates of the 28 Nortel debtors around the world.  The courts have no inherent power over assets belonging to other estates.  Nothing in any of the parties' agreements can be construed as a consent to such jurisdiction.  Nor is there any contractual, statutory or other basis that would authorize the courts to hold joint hearings leading to a single decision about allocation, as requested by Movants.  The procedure proposed by Movants would be fraught with practical difficulties, vulnerable to a deadlock between the courts, and subject to parallel challenges through two separate appeal processes.

The EMEA Debtors are prepared to engage in prompt negotiations to finalize the Interim Sales Protocol and proceed to arbitration, provided that the Canadian' Debtors' effort to limit the allocation arguments the EMEA Debtors can make to the arbitrators is rejected.  In the alternative, the Joint Administrators ask the Court to compel the parties to arbitrate in accordance with the attached form of Protocol.

## BACKGROUND

The facts relevant to the present motion are set forth in the accompanying Declaration of Kevin Francis Lloyd, executed on May 19, 2011 (the "Lloyd Decl."), which are incorporated herein by reference.  The salient facts may be summarized as follows:

A.    **The IFSA**

In the Spring of 2009, the U.S., Canadian and EMEA Debtors[5] were working to address two situations:  First, they were negotiating with respect to the settlement of certain inter-company debts and related transfers of cash needed by the Canadian Debtors.  Second, they were preparing for the first sale of a global Nortel business (the "Enterprise Sale").  (*See* Lloyd Decl. ¶ 12.)  Because of the geographic spread of this business, the Enterprise Sale could only be consummated if all of the relevant Nortel debtors were prepared to convey their intellectual property and other ownership rights to a purchaser in one transaction, for one purchase price.  Accordingly, it would be necessary to determine how that purchase price would be divided among the various estates.

Initially the U.S., Canadian and EMEA Debtors engaged in negotiations with respect to the actual percentages that each of them should receive from the Enterprise Sale proceeds, expecting that they could reach agreement on this before the sale went forward.  (Lloyd Decl. ¶ 13.)  As of late April 2009, they had made substantial progress in these negotiations.  However, there was a concern that the negotiations would not be completed in time for the sale.  In addition, the parties recognized that it would be sensible to have a format for addressing the allocation issue in relation to all of the other pending asset sales, so that there would be no delay in consummating those transactions and in order to maximize the proceeds available for distribution to creditors.

Thus the parties turned their attention to agreeing on procedures for determining proceeds allocation for all of the future sales.  (Lloyd Decl. ¶ 18.)  When they did so, they

---

5.    The Canadian Debtors include Nortel Networks Corporation, Nortel Networks Limited and certain of their Canadian affiliates.  The EMEA Debtors, the U.S. Debtors and the Canadian Debtors shall be collectively referred to herein as "Nortel" or the "Nortel Group."

reached agreement on the basic template:   First, the debtors who had an interest in a given asset sale would attempt to negotiate and reach agreement on how the Sale Proceeds should be divided.  (Lloyd Decl. ¶ 19.)  Second, if these negotiations failed, the parties would submit the question of allocation for determination by an independent dispute resolver in a private dispute resolution process – i.e. an arbitration.

As events played out, the parties' agreement with respect to how allocation would be handled was ultimately incorporated in the IFSA (*See* Lloyd Decl. ¶ 21), whose primary purpose was to provide cash to the Canadian Debtors and settle certain other inter-company issues.  The provisions relevant to asset sales are contained in Sections 11 and 12 of the IFSA.  Pursuant to Sections 11 and 12, the debtors agreed that they would terminate their intellectual property license, and execute all other documents necessary to consummate the asset sales, without reaching a final agreement as to how the proceeds of a particular sale would be allocated.  (IFSA §§ 11, 12(a); *see also* Lloyd Decl. ¶ 24.)  In Section 12(b) of the IFSA, they agreed that the proceeds from the asset sales would be placed in escrow and would only be disbursed based on either (i) an agreement of the parties regarding how the proceeds should be divided, or (ii) failing agreement, a binding determination by "dispute resolver(s)," to be appointed pursuant to a protocol that would be entered by the parties.  (IFSA § 12(b).)  The parties agreed to negotiate in good faith to agree on this "protocol for resolving disputes concerning the allocation of asset Sale Proceeds" (i.e. the "Interim Sales Protocol").  (IFSA § 12(c).)

Without the IFSA, the representatives of each selling debtor would not have been in a position to allow asset sales to proceed without a binding agreement regarding what percentage of the proceeds the selling debtor would receive from each sale.  (Lloyd Decl. ¶ 25.)

Without the IFSA, there would have been <u>no forum</u> that would have had jurisdiction to make a binding determination as to the relative interests of each debtor, nor to order any recalcitrant debtors to surrender their rights in order to facilitate a global sale.  It was <u>only by agreement of the parties</u>, in the exercise of their duties to their creditors, and under the supervision of their respective courts, that a unified dispute resolution procedure could be implemented.  In light of the competing national interests, it was a necessary ingredient of that dispute resolution procedure that it would be conducted in an independent, transnational forum rather than in the courts of any of the individual nations concerned.

> **B.**     **<u>Negotiations Towards The Interim Sales Protocol</u>**

After the execution of the IFSA, the U.S., Canadian and EMEA Debtors promptly commenced negotiations towards the entry of an Interim Sales Protocol.  The progress of these negotiations is detailed in Mr. Lloyd's Declaration.  Several points should be noted:

<u>First</u>, consistent with the terms of the IFSA, throughout the protocol negotiations it was clear that all parties intended and agreed that allocation would be decided in a private proceeding presided over by one or more individuals appointed for this purpose, and not by any national court.  It was never contemplated that the allocation could or should be addressed by any court. (*See* Lloyd Decl. ¶¶ 47-57.)

<u>Second</u>, the protocol negotiations were in fact quite successful.  The parties had reached agreement on the bulk of the provisions in a 27-page document that set out detailed procedures for all phases of the arbitration proceeding.  Although there had initially been some debate about the manner for appointing the members of the arbitration panel, the parties had ultimately agreed that each of the U.S., Canada and EMEA estates would appoint one member each of the three-member arbitration panel, whose appointment would be made with the advice and consent of the other Nortel debtors.  (*See* Lloyd Decl. ¶¶ 47, 49-51.)  However, a dispute

arose when the Canadian Debtors attempted to gain an unfair advantage in the dispute resolution process by requiring terms that were designed to prevent the EMEA Debtors from arguing that allocation should be based in part on the value of the actual contributions the EMEA entities made to developing the intellectual property and other rights conveyed in a particular asset sale. (*See* Lloyd Decl. ¶¶ 57-59.)  This was an improper attempt to change the scope of the matters that the parties had already agreed should be submitted to the arbitrators.

Third, the protocol negotiations did not in fact reach the point of failure.  Rather, in a context where most of the asset sales had been or soon would be consummated, the parties agreed that it would be more productive to see if they could reach agreement on the underlying substantive issue, i.e. how to divide the Sale Proceeds.  They therefore halted the protocol negotiations in order to pursue attempts to agree on how the proceeds should be allocated, eventually through the use of a mediator.  (*See* Lloyd Decl. ¶ 59.)  It has been over one year since the protocol negotiations were halted.

After the recent suspension of the mediation, the Joint Administrators promptly indicated their view that parties should proceed expeditiously with finalizing the Interim Sales Protocol and commencing arbitration.  This was stated in their response to the U.S. Debtors' objection to the claims filed by the EMEA Debtors.  In this response, the Joint Administrators requested the Court's assistance in causing the parties to finalize the Interim Sales Protocol.  (*See* Lloyd Decl. ¶ 60.)   Before filing the present Motion, Movants made no effort to ascertain whether the open points on the year-old draft protocol could be quickly resolved.  Moreover, they have subsequently refused an express invitation from the EMEA Debtors to restart and conclude the halted protocol negotiations. (*See* Lloyd Decl. ¶ 61.)

**ARGUMENT**

I.    **THE PRESENT MOTION IS PROCEDURALLY IMPROPER AND SHOULD HAVE BEEN BROUGHT BY WAY OF AN ADVERSARY PROCEEDING.**

Movants request entry of an order approving a proposed protocol (the "Movants' Proposed Protocol") that provides for the U.S. and Canadian Courts to allocate the proceeds of the sales of the Nortel businesses pursuant to the IFSA.  (Mot. ¶ 10.)  Such relief, however, may only be obtained through an adversary proceeding.

Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides, in relevant part, that actions to "recover money or property,"  "determine the validity, priority, or extent of a lien or other interest in property," "obtain an injunction or other equitable relief," or "obtain a declaratory judgment relating to any of the foregoing" must be commenced as adversary proceedings.  *See* Fed.R.Bankr.P. 7001(1), (2), (7), and (9).

Under the IFSA, the parties committed themselves to negotiate in good faith towards entering the Interim Sales Protocol.  (*See* IFSA § 12(c); *see also* Mot. ¶ 12.)  Despite the fact that the parties had made substantial progress towards such a consensual protocol, with agreement on all important issues, Movants seek to have this Court impose their non-consensual protocol.  Movants' only stated statutory bases for the requested relief are Sections 105(a) and 363 of the Bankruptcy Code.  (Mot. ¶ 4.)

While Section 363 of the Bankruptcy Code provided the statutory basis for the underlying sales, nothing contained therein provides a basis for this Court to impose a non-consensual protocol.  *See In re Realty Southwest Assoc.*, 140 B.R. 360, 364-65 (Bankr. S.D.N.Y. 1992) (denying creditor's requested relief for return of cash collateral where creditor sought the relief by filing a motion pursuant to Section 363 of the Bankruptcy Code because the requested relief was outside the scope of Section 363, which does not require a debtor to return cash

collateral, but only segregate and account for it, and therefore the relief could only be sought by commencing an adversary action). The only other statutory basis offered by Movants for the requested relief is Section 105(a) of the Bankruptcy Code.

The Section 105 cases on which the Movants rely stand for the non-controversial proposition that a court has the power to enforce its own orders. Those cases are in opposite here. Movants are seeking much more than the enforcement of an existing court order. The Motion seeks relief well beyond the scope of what this Court provided in its June 29, 2009, Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 993]. The relief granted in that order was limited to the approval of the IFSA and the authorization of the Debtors to enter into the IFSA. Movants now ask this Court to impose Movants' Proposed Protocol, which will give this Court, and the Canadian Court, "great latitude to craft specific procedures to resolve the allocation of Proceeds" and the authority to "provide a final and full resolution of the allocation process on an expedited basis." (*See* Mot. ¶ 37.) The substantive relief requested in the Motion, therefore, is considerably more extensive than "merely seeking to enforce an order already in place," and must be sought in an adversary proceeding. *See In re Whitehall Jewelers Holdings, Inc.*, No. 08-11261 (KG), 2008 WL 2951974, at *6 (Bankr. D. Del. July 28, 2008) (denying debtor's supplemental sale motion to sell consigned goods, despite prior court order approving sale of debtors' assets, because the relief requested required the court to make an underlying determination of whether the consigned goods were property of the estate and such determination required commencement of an adversary proceeding).

In addition to being an action to "obtain injunctive or other equitable relief," the Motion also is an effort to obtain a declaratory judgment related to actions to "recover money or

property" or "determine the validity, priority, or extent of a lien or other interest in property."  As

set forth herein, the Joint Administrators contend that the U.S. and Canadian Debtors did not

comply with their duty to negotiate in good faith a consensual allocation protocol and that the

IFSA does not provide this Court with jurisdiction to decide allocation.  To grant the relief

requested in the Motion would thus require the Court to enter a declaratory judgment that (i) the

Nortel debtors negotiated in good faith to reach an allocation protocol, (ii) the negotiations

reached an impasse and (iii) the parties agreed, pursuant to the IFSA, that in the event of an

impasse in such negotiations, this Court, along with the Canadian Court, could preside over

allocation of the Sale Proceeds.  (*See* Mot. ¶¶ 27-28.)

Granting such relief, therefore, would impermissibly circumvent Bankruptcy Rule

7001 in that the Court would be relying on Section 105 of the Bankruptcy Code to enter a

declaratory judgment in a contested matter instead of in a requisite adversary proceeding.

Section 105 of the Bankruptcy Code is not an appropriate basis upon which a court can rely to

eviscerate the substantive and procedural safeguards of Bankruptcy Rule 7001.  *See MFS*

*Telecom, Inc. v. Motorola, Inc. (In re Conxus Commc'ns, Inc.)*, 262 B.R. 893, 899-900 (D. Del.

2001) (holding that the bankruptcy court erred in issuing an injunction under Section 105 of the

Bankruptcy Code in a contested matter rather than in an adversary proceeding pursuant to

Bankruptcy Rule 7001); *In re DBSI, Inc.*, 432 B.R. 126, 134-35 (Bankr. D. Del. 2010) (stating

that requested declaratory judgment relating to a bank's entitlement to funds in certain

repayment accounts fell "clearly within types of proceedings specified by Fed. R. Bankr. P. Rule

7001 to be adversary proceedings").

The distinction under the Bankruptcy Rules between "adversary proceedings" and

"contested matters" is significant.  In determining what types of disputes require the full

procedural protections afforded by the adversary process, the drafters of the Bankruptcy Rules

operated from the premise that "to the extent possible practice before the bankruptcy courts and

the district courts should be the same." *See* Fed. R. Bankr. P. 7001 advisory committee's note.

> Adversary proceedings in bankruptcy court are the analogue to lawsuits in district court—both are initiated by the filing of a complaint, and both are governed by the same rules of discovery. *See* Fed. R. Bankr. P. 7004, 7026–7037. Contested matters, on the other hand, are initiated by motion, and the applicability of the discovery rules is at the discretion of the court. *See* Fed. R. Bankr. P. 9014. Thus, adversary proceedings offer the litigants more formality and more discovery rights than contested matters. *See Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 204 n.11 (3d Cir. 1995). Consequently, a bankruptcy court's erroneous conclusion that a dispute need not be resolved in an adversary proceeding may be a ground for reversal.

*Baltimore County v. IHS Liquidating LLC (In re Integrated Health Servs.)*, No. 00-389-MFW,

03-1057-GMS, 2006 WL 543876, at *3 (D. Del. Mar. 6, 2006).

The substantive and procedural safeguards contained in Bankruptcy Rule 7001 are the

result of a careful balancing of the competing interests of debtors, creditors, and other parties in

interest, with concerns of due process, expediency, and judicial economy.

> In general, an adversary proceeding involves more complex issues affecting substantial rights of the debtor, its creditors and third parties. The filing of a complaint triggers application of the Federal Rules of Civil Procedure, which have proved effective in facilitating adjudication of a wide range of controversies. . . . More complete relief, trial by jury, the possibility of pleading affirmative defenses and counterclaims, interpleading, joinder of parties, class actions, intervention, summary judgment, appeal as of right, and an opportunity for more thorough discovery and trial preparation are familiar features of the Federal Rules of Civil Procedure which are available in adversary proceedings.

*In re Riding*, 44 B.R. 846, 858–59 (Bankr. D. Utah 1984) (internal citation omitted).

Permitting Movants to pursue the requested relief by motion in a contested matter rather than by adversary complaint would allow Movants to short-circuit Bankruptcy Rule 7001 and obtain final relief within an abbreviated time frame without having to comply with all of the requirements of the Federal Rules of Civil Procedure.[6] Thus, pursuant to Bankruptcy Rule 7001, the Motion is procedurally improper and should be dismissed.

## II. THE COURTS SHOULD ENTER AN ORDER COMPELLING ARBITRATION OF THE DISPUTE OVER ALLOCATION OF THE ASSET SALE PROCEEDS.

The parties to the IFSA manifested a binding intention to arbitrate any dispute over allocation of the proceeds of asset sales. Although further negotiations were required in order to agree on procedural matters such as arbitrator selection and the format of the proceedings, the parties manifested a clear intention that any disputes about proceeds allocation would be decided by way of a private dispute resolution process, not by proceedings in any national court or courts. Accordingly, under the Federal Arbitration Act, the Court's jurisdiction is limited to compelling the parties to arbitrate the allocation issue.

### A. The Federal Arbitration Act Requires Enforcement of A Written Agreement To Arbitrate.

Section 2 of the Federal Arbitration Act (the "FAA") makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA was implemented in order to give effect to the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). A motion to compel arbitration must be

---

6. For example, in an adversary proceeding, Movants would have to file a complaint that provides a "short and plain statement of the claim showing that [they are] entitled to relief," Fed. R. Civ. P. 8(a)(2) and which consists of "simple, concise, and direct" averments in individually numbered paragraphs, see Fed. R. Civ. P. 10(b). The Joint Administrators then could answer in a responsive pleading or challenge for legal sufficiency by motion. See Fed. R. Civ. P. 12.

granted where the court finds a valid agreement to arbitrate the dispute in question.  *Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 28-29 (2d Cir. 2002) (remanding with instructions to compel arbitration).  For arbitration clauses pertaining to international relationships and transactions, the New York Convention imposes an additional overlay in favor of arbitration.  9 U.S.C. § 201 *et seq.*  Pursuant to the New York Convention, courts must compel arbitration where the parties have agreed to arbitrate a dispute, *see* 9 U.S.C. § 206, unless the agreement to arbitrate itself is "null and void, inoperative or incapable of being performed."  *See Ledee v. Ceramiche Ragno*, 684 F.2d 184, 187 (1st Cir 1982) (citation omitted).

Whether the parties have agreed to arbitrate a dispute is determined in accordance with the normal principles of contract interpretation, including the applicable state contract law selected by the parties to govern the contract at issue.  *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1996).  The parties to the IFSA have selected New York law.  (IFSA § 16(a).) The usual elements for contract formation must be met, such as an offer, acceptance, and the exchange of consideration.

Here, Movants agree that the IFSA is a binding, enforceable contract between the parties and approved by the Court.  (Mot. ¶¶ 11-13.)  Thus, the parties to the IFSA, including Movants, are obligated to comply with each of its terms – including any arbitration agreement contained therein.  *See Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845-46 (2d Cir. 1987) (party barred from arguing that it did not agree to arbitration clause in valid contract because court focuses "not on whether there was subjective agreement as to each clause in the contract, but on whether there was an objective agreement with respect to the entire contract"). Accordingly, the only question is whether the IFSA contains an enforceable agreement to arbitrate a dispute over allocation of the asset Sale Proceeds.

**B.**    **Section 12 Of The IFSA Is An Enforceable Arbitration Clause.**

There are three requirements for an arbitration agreement to be enforceable: (i) the arbitration agreement must be in writing, (ii) it must be clear what type of disputes the parties intend to submit to arbitration; and (iii) it must be clear that the parties intend to submit these disputes to be determined in a private dispute resolution process rather than by a court. *See* 9 U.S.C. § 2; 1 MARTIN DOMKE, GABRIEL WILNER & LARRY E. EDMONSON, DOMKE ON COMMERCIAL ARBITRATION § 8:15 (3d ed. 2010) (hereinafter "DOMKE"); *Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 28-29 (2d Cir. 2002); *Scone Invs., L.P. v. American Third Market Corp.*,  992 F. Supp. 378, 380 (S.D.N.Y. 1998).

Pursuant to Section 12(a) of the IFSA, the debtors agreed that sales of the Nortel assets would go forward even though they had not yet agreed on how the resulting proceeds would be divided among the selling debtors.  Section 12(a) provides that execution by a selling debtor of the documents required in order to consummate a sale:

> Shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the Sale Proceeds (the "Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

 (IFSA § 12(a).)

Section 12(b) provides that proceeds of the Nortel asset sales are to be deposited in escrow pending determination of how the proceeds are to be allocated.  It further states that:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol applicable to the Sale Proceeds.

(IFSA § 12(b).)

Finally, Section 12(c) of the IFSA provides that:

> [T]he Debtors shall, as soon as reasonably practicable, following
> the execution of this Agreement, negotiate in good faith and
> attempt to reach agreement on a timely basis on a protocol for
> resolving disputes concerning the allocation of Sale Proceeds from
> Sale Transactions (the "Interim Sales Protocol"), which Protocol
> shall provide binding procedures for the allocation of Sales
> Proceeds where the Selling Debtors in such transactions have been
> unable to reach agreement such allocations.

(IFSA § 12(c).)

The terms of Section 12 of the IFSA constitute an enforceable agreement to

arbitrate.  First, the agreement is in writing.  Second, the scope of matters to be arbitrated is

explicitly set forth – disputes regarding the allocation of proceeds of the Nortel asset sales.

Third, Section 12(b) provides that such disputes are to be submitted for a binding determination

to be issued by one or more "dispute resolver(s)" (IFSA § 12(b)), not the courts.

With respect to the third requirement, it should be noted, first of all, that it is not

necessary for an agreement to use the word "arbitration" or "arbitrate" in order to be enforceable

as an arbitration clause.  "Language clearly manifesting an interest by the parties to submit

certain disputes for binding resolution to a third party constitutes a binding arbitration clause. . . .

It is irrelevant that the contract language does not use the word "arbitration" if the contract

otherwise manifests this intent."  DOMKE, § 8:7 (emphasis supplied); *see also McDonnell*

*Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988) ("We believe

that the language clearly manifests an intention by the parties to submit certain disputes to a

specified third party for binding resolution.  It is, in our estimation, irrelevant that the contract

language in question does not employ the word 'arbitration' as such."); *CAE Indus., Ltd. v.*

*Aerospace Holdings Co.*, 741 F. Supp. 388, 391-93 (S.D.N.Y. 1989) (provision qualifies as

agreement to arbitrate despite not specifically denominating an arbitrator); *Int'l Longshoremen's*

*Ass'n v. Hellenic Lines, Ltd.*, 549 F. Supp. 435, 437 (S.D.N.Y. 1982) (reference to binding

review by a third party qualifies as arbitration even if not referred to as such); *Mencher v. B. & S. Abeles & Kahn*, 274 A.D. 585, 588, 84 N.Y.S.2d 718 (1st Dep't 1948) (use of terms such as "arbitrate" or "arbitration" unnecessary if parties clearly intend for binding review by a third party).

While the term "dispute resolver" may be subject to different interpretations, the commonly understood meaning would not include reference to a national court.  Rather, this terminology is clearly associated with the varieties of proceedings known as alternative dispute resolution.  In fact, the definition of "dispute resolution" in Black's Law Dictionary redirects the inquirer to the definition of "alternative dispute resolution," which is defined as "a procedure for settling a dispute by means <u>other than litigation</u>, such as arbitration or mediation."  BLACK'S LAW DICTIONARY (9th ed. 2009) (emphasis added).  Indeed, there are other cases where the term "dispute resolver" has expressly been used to refer to an arbitration.  *See, e.g. Palumbo v. Select Mgmt Holdings, Inc.,* No. 82900, 2003 WL 22674397, at *1-2 (Ohio Ct. App. Nov. 13, 2003) (parties used the term "Dispute Resolver" and not "arbitrator" to refer to the arbitrator in an enforceable arbitration clause).

Thus it is clear from the terms of Section 12 that the parties bound themselves to pursue some form of binding arbitration procedure rather than litigation.  And certainly they could not have intended "dispute resolvers" to encompass a joint hearing before the U.S. and Canadian Courts since, as explained below, there is no statutory authority or other basis for the Courts to perform a joint adjudication of such dispute.

**C.**      **The Court Is Entitled To Consider Extrinsic Evidence In Order To Resolve Any Ambiguity About What Type Of "Dispute Resolvers" The Parties Intended.**

The EMEA Debtors respectfully submit that the language in Section 12 of the IFSA makes it clear that the parties intended to submit allocation disputes for binding resolution

by one or more private "dispute resolvers."  But, in the event the Court finds this term to be

ambiguous, it should consider extrinsic evidence to divine the parties' intent.[7]

It is a widely accepted principle of contract interpretation that extrinsic evidence

is admissible to explain the terms of a written agreement when there is an ambiguity or the

language is doubtful.  58 N.Y. Jur. 2d Evidence § 586 (2000); *see Pikul v. Clough, Harbour &*

*Assocs,* 593 N.Y.S.2d 585 (3d Dep't 1993) (lower court did not err in considering extrinsic

evidence to determine intent of the parties when contract language was ambiguous); *Giles v. City*

*of New York*, 41 F. Supp. 2d 308, 316 (S.D.N.Y. 1999) (same).  The Supreme Court long ago

approved this principle:

> There can be no doubt whatever of the general proposition that, in
> the interpretation of any particular clause of a contract, the court is
> not only at liberty, but required to examine the entire contract, and
> may also consider the relations of the parties, their connection with
> the subject-matter of the contract, and the circumstances under
> which it was signed.

*Chicago, R.I. & P. Ry. Co. v. Denver & R.G.R. Co.*, 143 U.S. 596, 609 (1892).

Whether a writing is ambiguous is a question of law to be resolved by the Court.

*W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).  A contract is

ambiguous if "reasonably susceptible of more than one interpretation."  *Foot Locker, Inc. v.*

*Omni Funding Corp. of America*, 78 A.D.3d 513, 515, 911 N.Y.S.2d 344 (1st Dep't 2010) (citing

*Chimart Assoc.,* 489 N.E.2d 231, 233 (N.Y. 1986)).  The existence of an ambiguity calling for

explanation by extrinsic evidence may appear from words plain in themselves, but uncertain

---

7.    The IFSA does not include an integration (complete agreement) clause.  In a context where all parties were
      represented by sophisticated commercial counsel, this gives rise to a presumption that they did not intend to
      preclude reference to extrinsic evidence in interpreting the terms of the IFSA.  *See Adler & Shaykin v. Wachner*,
      721 F. Supp. 472, 477 (S.D.N.Y. 1988) (in the absence of an integration clause courts consider whether the
      parties had retained experienced counsel as one factor in determining whether agreement is integrated).

when applied to the subject matter of the contract (i.e. latent ambiguities), or from words which are uncertain in their literal sense (i.e. patent ambiguities). 58 N.Y. Jur. 2d Evidence § 586 (2000); *see also Lazar v. Nico Industries, Inc.*, 559 N.Y.S. 2d 326, 327 (1st Dep't 1990) (finding that parol evidence was necessary to interpret provision of contract that was not ambiguous on its face, but where events arising after the parties entered into agreement created a latent ambiguity).

To the extent that there may be any latent ambiguity as to the meaning of the term "dispute resolver," this ambiguity can be resolved by examining the history of the negotiations and other facts and circumstances.[8]

> **D.      All Extrinsic Evidence Confirms That The Parties Intended Allocation To Be Decided In A Private Dispute Resolution Process Not By Any National Court.**

Here, all of the extrinsic evidence confirms that it was always understood that the "dispute resolvers" to be appointed under Section 12 of the IFSA would be private individuals, not the courts of any nation.

As detailed in Mr. Lloyd's Declaration, the parties' intention to arbitrate allocation disputes is clear from the negotiations that led to the signing of the IFSA.  (*See* Lloyd Decl. ¶¶ 12-22.)  All references were to resolution by a private dispute resolution process, not by any national court.

---

8.   Relevant extrinsic evidence may pertain to anything that will aid in determining the intent of the parties, including "conversations, negotiations and agreements made prior to or contemporaneous with the execution" of the written instrument.  *67 Wall St. Co. v. Franklin Nat. Bank*, 333 N.E.2d 184, 186 (N.Y. 1975).  It is also appropriate to consider the circumstances existing when the contract was formed, the situation of the parties, the subject matter of the instrument, parole evidence, and the parties' statements and conduct <u>after</u> signing the agreement.  *See Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913); *Coliseum Towers Assoc. v. County of Nassau*, 769 N.Y.S.2d 293, 296 (2d Dep't 2003); *Winston v. Mezzanine Investments, L.P.*, 648 N.Y.S.2d 493, 499  (N.Y. Sup. Ct. 1996).

This understanding is confirmed by statements made by the parties and the courts in connection with the hearings that led to approval of the IFSA by the U.S., Canadian, English and French courts.  In seeking the Court's approval of the IFSA, counsel for the U.S. Debtors stated that the dispute resolution process under the IFSA:

> [I]s envisioned to be something that would require <u>very little participation or intervention or bother by these two courts</u>.  The view being that once we have a <u>fair and reasonable and independent body deciding the allocation</u>, that we would simply come to both of these courts for confirmation that those amounts are appropriate, and that due process would be available to all parties who are interested in the allocation of those resources.

(Transcript of June 29, 2009 Hearing at 33: 16-25.)

Counsel for the U.S. Debtors clarified the scope of the U.S. and Canadian Court's jurisdiction by stating:

> <u>this order, in and of itself, does not approve either [the US Court] or in Ontario for the allocation of any particular proceeds</u>.  But rather sets the stage for the parties to come back to these courts with a protocol for approval.

(Transcript of June 29, 2009 Hearing at 34: 16-20.)

In further describing the IFSA, counsel for the U.S. Debtors stated that the IFSA "allows for a process to be put in place to hopefully avoid the need to come back to these two courts, as well as the High Court in London, to decide how to split up the proceeds of any asset sales. (Transcript of June 29, 2009 Hearing at 34: 16-20.)

Moreover, the Joint Administrators made similar representations to the English and French Courts in seeking direction and approval to enter into the IFSA.  Specifically, the English Court considered submissions by the Joint Administrators that the allocation protocol contemplated by the IFSA is to be "agreed between the parties" and that part of the reason for entering the IFSA was to avoid "future litigation and the associated cost." (*See* Lloyd Decl.

¶ 40.)  The French Court authorized NNSA to enter into the IFSA based on the understanding that the sale proceeds allocated to NNSA would be either determined by the parties or by a "third party neutral arbitrator."  (*See* Lloyd Decl. ¶ 44.)

Subsequent public statements made by the parties and the courts also reflect the understanding that resolution of disputes under Section 12 would be by way of a private dispute resolution process.  In his declaration in support of the U.S. Debtors' motion to enforce the automatic stay with respect to the UK pension proceedings, John Ray stated that the purpose of the protocol is to "ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum."  Declaration of John Ray in Support of Debtors' Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants with respect to the U.K. Pension Proceedings at ¶ 16 (emphasis added).  Mr. Ray's representation was adopted by the Court in its decision to grant the motion and enforce the automatic stay against the UK pension proceedings.  *See In re Nortel Networks, Inc.*, 426 B.R. 84, 95 (Bankr. D. Del. 2010) ("The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these [allocation] issues must be resolved, on a global basis, in a single cross-jurisdictional forum. They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.") (emphasis added).

Similar, if not identical, statements were made by Ms. Anna Ventresca in support of the Canadian Monitor's application to stay the UK pension proceedings.  (*See* Lloyd Decl. ¶¶ 80, 85.)

The intention to arbitrate is also clear from the negotiations the parties conducted, after entry of the IFSA, towards agreeing on the Interim Sales Protocol.  Over the course of almost a year of periodic discussions, it was accepted at all times, by all parties that the "dispute

resolvers" would be one or more private arbitrators appointed for this purpose.  This was reflected in <u>every draft</u> of the Interim Sales Protocol that was circulated.  Before the negotiations were halted, the parties had already broadly agreed that there would be a tripartite panel of dispute resolvers and that each of the three main estates would have the right to appoint an arbitrator to the panel. (*See* Lloyd Decl. ¶¶ 49-52.)  Although there was not, initially, agreement about the means by which the arbitrator(s) would be selected, <u>no</u> party <u>ever</u> objected to arbitration or suggested that allocation could or should be determined in a proceeding before a national court.

    **E.**       **The Parties' Agreement To Engage In Good Faith Negotiations Towards An "Interim Sales Protocol" Is Not Inconsistent With A Firm Agreement To Arbitrate.**

        Pursuant to Section 12(c) of the IFSA, the parties committed themselves to "negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the '<u>Interim Sales Protocol</u>')."  (IFSA § 12(c).)  As shown above, it was understood and agreed at all times that allocation disputes would be submitted for resolution in a binding, private dispute resolution process.  The matters left to be addressed in the Interim Sales Protocol were therefore purely procedural, including:  (i) the method by which arbitrators would be selected, (ii) the rights of various parties to participate in the dispute resolution process, (iii) pre-hearing disclosures, (iv) timing and manner of submissions by the parties, and (v) hearing procedures.  An examination of the course of the IFSA negotiations, and the drafts that were exchanged, confirms this interpretation.  These matters did not affect the parties' underlying agreement to submit allocation disputes for resolution in a private process rather than by any national court.  (*See* Lloyd Decl. ¶¶ 47-57.)

It is well-settled that the failure to specify procedures to be followed does not render an arbitration clause invalid.  *See CAE Industs.*, 741 F. Supp. at 391-93 (compelling arbitration and designating arbitrator although "agreement lack[ed] the specific method by which to proceed").

**F.      Section 16(b) of the IFSA Only Empowers The Courts To Enforce The Agreement To Arbitrate and Provide Ancillary Relief, Not To Decide Allocation.**

Section 16(b) of the IFSA confers joint jurisdiction upon the U.S. and Canadian Courts over a "claim, action or proceeding" seeking relief "<u>to the extent relating to matters agreed in this Agreement</u>."  (IFSA § 16(b)(ii) (emphasis supplied).)  Movants contend that this provision indicates that these courts have jurisdiction over allocation itself.  (Mot. ¶ 23.)  But the fact that each selling debtor is entitled to an allocation of Sale Proceeds is not among the "matters agreed" in the IFSA.  The selling debtors had a preexisting right to a portion of the Sale Proceeds.  What was agreed in the IFSA in relation to allocation was merely the procedure by which the parties would decide allocation (i.e. by negotiation and, if necessary, arbitration).  It follows that the Court's jurisdiction under Section 16(b) is limited to assisting and enforcing those procedures, not supplanting them.

Contract clauses relating to matters of jurisdiction, forum selection, and service-of-suit – such as Section 16(b) of the IFSA – commonly appear in contractual agreements that also contain a clause providing that certain disputes will be decided by arbitration.  The fact that a contract contains a jurisdictional clause does not abrogate or otherwise affect a related arbitration clause.  *See, e.g.*, *Bank Julius Bear & Co. v. Waxfield Ltd.*, 424 F.3d 278, 284 (2d Cir. 2005) (citation omitted) (court jurisdiction clause "cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration"); *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2011 WL 1795297, at *5 (S.D.N.Y. Apr. 28, 2011) ("[T]he existence of a

judicial forum selection provision does not render the arbitration clause ambiguous or susceptible

to any alternative interpretation.").  Instead, the jurisdiction of the courts under such a contract is

understood to be limited to providing relief ancillary to the arbitration, such as compelling

arbitration, staying an action pending arbitration, or enforcing an arbitral award.  As the Second

Circuit has stated, a clause that designates a particular court to handle disputed matters:

> [M]ay be read, consistent with the Arbitration Agreement, in such
> a way that [plaintiff] and [defendant] are required to arbitrate their
> disputes, but that to the extent [plaintiff] files a suit in court in New
> York – for example, to enforce an arbitral award, or to challenge
> the validity or application of the arbitration agreement –
> [defendant] will not challenge either jurisdiction or venue.

*Bank Julius*, 424 F.3d at 285.

Thus, the jurisdictional clause here, Section 16(b) of the IFSA, complements

rather than supersedes the parties' agreement to arbitrate, by empowering the U.S. and Canadian

Courts to enforce the parties' agreement to arbitrate.

**G.    The Court Should Enter An Order Directing Each Of The U.S., Canadian
And EMEA Debtors To Appoint One Arbitrator, And Leave All Other
Issues For Arbitrators To Decide.**

Based on the foregoing, the Court should enforce the parties' agreement to submit

allocation disputes to relevant dispute resolvers by compelling the parties to arbitrate.  Although

the parties have not designated an arbitrator or arbitrators in Section 12 of the IFSA, the Court

has the authority.  Where the parties to an international agreement have manifested their intent to

arbitrate, but the procedures are ambiguous or uncertain, the courts exercise broad discretion

with respect to what form of arbitration to order.  *See Bauhinia Corp. v. China Nat'l Mach. &*

*Equip. Import & Export Corp.*, 819 F.2d 247, 249-50 (9th Cir. 1987) (where arbitration

agreement "lack[ed] any indication what forum the parties intended to select" district court

properly exercised discretion to compel parties to resolve international dispute before American

Arbitration Association).  Here, the Protocol proposed by the Joint Administrators on behalf of

the EMEA Debtors offers the best approach to effectuate the intention of the parties, honor the

legitimate expectations of Nortel stakeholders, and serve the interest of justice.

> **H.    The Court Should Confirm That The Arbitration Panel May Address Whatever Factual Or Legal Matters They Find Relevant In Determining How To Allocate The Asset Sale Proceeds**

Finally, in compelling the parties to arbitrate their dispute, the Court should honor

the parties' agreement regarding the scope of the issues that must be arbitrated as reflected in the

IFSA.  *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir.

1995) (court lacks discretion as to arbitrability of particular dispute in face of parties' written

agreement to arbitrate); *Lowry & Co. v. S.S. Le Moyne D'Iberville*, 253 F. Supp. 396, 399

(S.D.N.Y. 1966) ("The court having found the existence of a valid arbitration provision, all other

issues, including but not limited to interpretation and limitations, are for the arbitrators and not

the court.").  The parties to an arbitration are at liberty to determine the issues that they will

arbitrate, and courts "will not introduce a limitation on the arbitrator that the parties themselves

did not impose."  Domke § 15:3; *see also Chase v. Cohen*, 519 F. Supp. 2d 267, 274 (D. Conn.

2007) ("If either party had intended to limit the arbitrator's powers in any way they could have

done so in the Arbitration Agreement. But they did not, and the Court will not now introduce a

limitation on the arbitrator that the parties themselves did not impose.").

Here, the scope of arbitrable issues is clear.  The scope of arbitration before the

relevant dispute resolvers is to determine the allocation of Sale Proceeds.  (See IFSA §§ 12(a-d).)

There is no limitation on what the arbitrators may consider in order to reach their determination.

During the course of the protocol negotiations, the parties began to articulate their

views on how the Sale Proceeds should be allocated.  The EMEA Debtors expressed the view

that one of the factors that should be taken into account in allocating the value of a particular

business would be the relative contribution each debtor made in creating the intellectual property related to that business. (*See* Lloyd Decl. ¶ 57.)  Three EMEA Debtors, NNUK, NN Ireland and NNSA, performed research and development that produced a large proportion of the valuable intellectual property of the Nortel Group. (*See id*.)  The resulting intellectual property comprised a substantial proportion of the value of the Nortel businesses that was conveyed to their ultimate purchasers.  The EMEA Debtors believe that the value of their contributions should be recognized in the allocation determination.  The EMEA Debtors should be free to advance whatever arguments they see fit as to the basis on which they are entitled to sale proceeds and the extent of their entitlement.  Equally, it should be up to the dispute resolvers to determine whether to accept these arguments, or any counter arguments made by other debtors.

Once aware of the EMEA Debtors views on this point, the Canadian Debtors began trying to preclude the EMEA Debtors from being allowed to make this argument to the dispute resolvers.  The Canadian Debtors would take the position that the value of any contributions to intellectual property should be assessed by reference to the formula set out in Schedule A of the Master Research and Development Agreement (the "MRDA").  The EMEA Debtors' position is that the formulas in this schedule cannot be applied strictly because the agreement was not entered at arm's length.  (The fact that the MRDA was not at arm's length would appear to have been established in connection with the U.S. Debtors' settlement with the Internal Revenue Service.)  The MRDA must be applied so as to achieve an arm's length result.

The Canadian Debtors requested the insertion of language into the Interim Sales Protocol defining exactly what the panel could and could not consider in determining allocation.  They requested language stating that the panel must determine allocation "without regard to, or adjustment for, any other claims, entitlements, set-offs or adjustments of any nature whatsoever,"

and that "the [arbitration] Panel shall have no duty or authority to inquire into or determine . . . a

claim that a [participating party] is or was the rightful owner of or has or had an interest in the

particular asset, right, property or liability that was not recorded in the instrument of title, deed,

grant, lease, license or agreement governing the ownership, creation, invention, development or

establishment of the asset, right, property or liability." (*See* April 7, 2010 Draft Interim Sales

Protocol Section 8.1., attached to the Lloyd Decl. as Exh. A.)

The issues the Canadian Debtors raised constituted an improper attempt to

circumscribe the nature of the arguments another party may advance and to limit the panel's

freedom to take into account such arguments when rendering its decision.

The EMEA Debtors rejected these proposed insertions on the ground that they

were an attempt to pre-judge the very issues the parties had agreed to submit for resolution by

the dispute resolvers. The Canadian Debtors' position was an attempt to renegotiate a key aspect

of the IFSA, and was not taken in good faith.

## III.    MOVANTS HAVE NOT CARRIED THEIR BURDEN OF PROVING THAT THE PROTOCOL NEGOTIATIONS FAILED AFTER BEING CONDUCTED IN GOOD FAITH.

The U.S. Debtors argue in effect that the parties agreed to submit the issue of

allocation to the courts regardless of whether the parties were successful in negotiating an

Interim Sales Protocol. This is incorrect. The parties clearly undertook a primary duty to

negotiate in good faith the terms of an Interim Sales Protocol. Section 12 of the IFSA requires

the parties to negotiate in good faith to arrive at a protocol for resolving disputes concerning the

allocation of Sale Proceeds. The failure of such negotiations must necessarily be a condition

precedent to the putative jurisdiction of any national court to dictate terms not agreed by the

parties. Since the U.S. Debtors have not shown that agreement on the protocol failed despite

good faith negotiations, the Court should not allow the U.S. Debtors to circumvent this condition

precedent by imposing a protocol whose terms were not agreed to by the parties.

> **A.     Section 12(c) Is A Binding Agreement To Negotiate In Good Faith Toward An Agreement On The Interim Sales Protocol.**

Movants concede that Section 12(c) of the IFSA is an enforceable agreement to

negotiate in good faith.  (Mot. ¶ 12.)  This is consistent with New York law principles that

recognize that "an interpretation that renders a contract illusory and therefore unenforceable is

disfavored and enforcement of a bargain is preferred."  *Credit Suisse First Boston v. Ultrecht-*

*America Fin. Co.*, 915 N.Y.S.2d 531, 535 (1st Dep't 2011) (agreement to negotiate in good faith

not illusory "particularly where, as here, the parties have expressed their intent to be

contractually bound in a writing") (citing *Wood v. Duff-Gordon,* 118 N.E. 214 (1917)).

It is true that Section 12(c) does not obligate the parties to actually reach

agreement on the Protocol, but failure is only excused where good faith differences in the

negotiation of the open issues prevent the parties from reaching a final contract.  *See P.A.*

*Bergner & Co. v. Martinez*, 823 F. Supp. 151, 156 (S.D.N.Y. 1993).  Here, there were no

material good faith differences as to the terms of the Protocol.  Substantial agreement was

reached on the form of dispute resolution, which included the appointment of a three-arbitrator

panel with one representative from each of the U.S., Canadian and EMEA estates.  (*See* Lloyd

Dec. ¶¶ 49-52).  Yet Movants now seek to impose terms that they find more advantageous, but

which are contrary to the obligations of the parties under the IFSA.

> **B.     Any Deadlock In Formal Completion Of The IFSA Protocol Was Caused By The Canadian Debtors' Bad Faith Effort To Predetermine What Arguments and Evidence The Arbitrators May Consider In Deciding Allocation.**

It is well-settled that the obligation to negotiate in good faith, at the very least,

"bar[s] a party from . . . insisting on conditions that do not conform to the preliminary

agreement." *Teachers Ins.*, 670 F. Supp. at 498; *see CanWest Global*, 804 N.Y.S.2d at 570 (finding injunctive relief appropriate where defendant breached its duty to negotiate partnership agreement in good faith by "drastically altering the terms" previously agreed to by the parties).

Here, as set forth in Section II.H above, the representatives of the Canadian Debtors stalled negotiations of the Interim Sales Protocol by seeking to unreasonably and artificially limit the evidence and arguments that could be presented to the arbitrators.  (*See* Lloyd Decl. ¶ 57.)  In so doing the Canadian Debtors failed to comply with their obligation to negotiate in good faith.

**C.    The Parties' Refusal To Continue Protocol Negotiations Is Not In Good Faith.**

Over one year ago, the parties halted negotiations towards the Interim Sales Protocol in order to try to resolve allocation directly, through negotiation and mediation.  Since the suspension of the mediation, the U.S. and Canadian Debtors have refused to continue protocol discussions.  (*See* Lloyd Decl. ¶ 59-61.)  Instead Movants seek an allocation procedure that deprives the EMEA Debtors of their agreed-upon method of dispute resolution and bargained-for voice in the Interim Sales Protocol.  Measured against any reasonable conception of "good faith," the U.S. Debtors' and Canadian Debtors' failure to take any action toward the preliminary agreement's ultimate objective clearly falls short.

**IV.    THE COURT SHOULD ENFORCE THE AGREEMENT OF THE PARTIES THAT EMERGED FROM THEIR SUBSTANTIALLY COMPLETE PROTOCOL NEGOTIATIONS BY ORDERING THE APPOINTMENT OF A PANEL OF THREE ARBITRATORS, WITH ONE ARBITRATOR APPOINTED  BY EACH OF THE U.S., CANADIAN, AND EMEA ESTATES.**

Although it is a general rule that an agreement to agree, in which material terms are left for future negotiation, is unenforceable, it is also true that such an agreement may be enforceable where a "methodology for determining the material terms can be found within the

four corners of the agreement or where the agreement refers to an objective extrinsic event, condition, or standard by which the material terms may be determined." *Carmon v. Soleh Boneh Ltd.*, 614 N.Y.S.2d 555, 556 (2d Dep't 1994) (citations omitted); *Bed Bath & Beyond Inc. v. Ibex Const., LLC*, 860 N.Y.S.2d 107, 109 (1st Dep't 2008) (agreement between parties to execute subsequent construction contract, containing all material terms found enforceable despite its title "letter of intent" and its remaining "subject to" a more formal agreement in the future).  Despite the absence in Section 12(c) of the word "arbitration," the common sense interpretation is that it is an arbitration clause. This is clear both within the four corners of the agreement and by reference to the further negotiations of the parties, which established an arbitration framework. The Court should enforce the parties' agreement by directing the parties to appoint a neutral tripartite arbitration panel, consisting of one arbitrator selected by the debtors of each of the three geographic estates.[9]

To the extent that Section 12(c) left any material terms to be settled by the parties, the evidence of an extensive course of negotiations and exchange of documents clearly demonstrate agreement on material terms of the Protocol.  Section 34 of the Restatement (Second) of Contracts, entitled "Certainty and Choice of Terms; Effect of Performance and Reliance," notes, in pertinent part, that:

> (1)    The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance.

---

9.   Where, as here, "it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain."  N.Y. Jur. 2d § 18 (citing *Marshall Granger & Co., CPA's, P.C. v. Sanossian & Sardis, LLP*, 792 N.Y.S.2d 498 (2d Dep't 2005)).

(2)    Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.

(3)    Action in reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed.

*    *    *

Comment C: *Subsequent conduct removing uncertainty.* Indefiniteness may prevent enforcement of a contract in two different ways: it may mean that a manifestation of intention is not intended to be understood as an offer; or, even though the parties intended to enter into a contract, there may be no sufficient basis for giving an appropriate remedy. *Subsequent conduct of one or both parties may remove either obstacle or both.*

Restatement (Second) of Contracts § 34 (1981) (emphasis added).

At the time of its formation, the IFSA indeed contemplated that the parties would make "a selection of terms in the course of performance." Here, there was not merely "part performance"; the parties substantially completed the mutual obligation to negotiate in good faith. Their negotiations provide the Court with the basis to fashion a remedy for the breach by the U.S. and Canadian Debtors of that obligation. Moreover, the EMEA Debtors took "action in reliance" upon the shared interpretation of Section 12(c) by assenting to the sale of valuable assets. The EMEA Debtors have also incurred substantial expense, including professional fees expended during Protocol negotiations, and have suffered significant delay in their respective insolvency proceedings.

The Court should not deprive the EMEA Debtors of the benefit of their bargain in executing the IFSA by refusing to construe Section 12(c) in light of the commonsense meaning of its terms and in accordance with the conduct of the parties, each of which shows an intent to arbitrate the allocation dispute. By examining the subsequent conduct of the parties, the Court may infer that the parties intended Section 12(c) as a means to negotiate the details of an

arbitration protocol.  The Court should therefore construe Section 12(c) in accordance with the intent of the parties as manifested by their subsequent conduct.  *See Four Seasons Hotels Ltd. v. Vinnik*, 515 N.Y.S.2d 1, 6 (1st Dep't 1987); *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 98 (2d Cir. 2007); *Camrex Contractors (Marine) Ltd. v. Reliance Marine Applicators, Inc.*, 579 F. Supp. 1420, 1428-29 (E.D.N.Y. 1984).

**V.      IF THE COURT FINDS IT HAS JURISDICTION TO IMPOSE AN IFSA PROTOCOL NOT AGREED BY THE PARTIES, THAT PROTOCOL SHOULD REQUIRE RESOLUTION OF ALLOCATION THROUGH AN INTERNATIONAL ARBITRATION.**

As set forth above, the Joint Administrators respectfully submit that the Court has not been given jurisdiction to decide the terms of the Interim Sales Protocol.  But in the event that the Court rejects these arguments and finds that it does have such jurisdiction, the Joint Administrators submit that the only fair and practical approach to be required would be the one already agreed by the parties, i.e. that allocation should be decided by a three-member panel, of which one member shall be appointed by each of the U.S., Canadian and EMEA Debtors, subject to consultation and reasonable consent of the others.  The Joint Administrators submit herewith a draft protocol that incorporates this procedure and substantially adopts all of the other provisions of the protocol submitted by Movants.

**VI.     THE COURTS DO NOT HAVE JURISDICTION TO DETERMINE ALLOCATION IN A JOINT HEARING.**

**A.      Allocation Is Not Within Either Court's Inherent Jurisdiction.**

Movants implicitly concede that neither the U.S. nor Canadian Court would have any inherent jurisdiction to decide how the proceeds of the sale of the global Nortel businesses should be allocated.  The sums held in escrow now constitute property of the various Selling Debtors around the world, under the jurisdiction and control of the courts that are administering

their various insolvency proceedings.  Any jurisdiction of the U.S. and Canadian Courts could

only be derived from the agreements of the various debtors themselves.  Contrary to Movants'

position, there has been no such agreement.

**B.      The EMEA Debtors Did Not Submit To The Courts' Jurisdiction For Allocation.**

Movants assert that the U.S. and Canadian Courts have the jurisdiction to

determine allocation and/or approve an allocation protocol based on multiple documents agreed

to by the parties and approved by order of the U.S. and Canadian Courts.  (Mot. ¶ 21.)  An

examination of these documents shows that they do not reflect any such intention.

With respect to the IFSA itself, it is clear, as explained above, that Section 12 of

the IFSA grants exclusive jurisdiction to the protocol dispute resolvers to determine allocation.

Indeed, the U.S. Debtors' counsel has informed the Court that the allocation procedure would

require "very little participation or intervention or bother by [the Canadian and U.S.] Courts."

(*See* June 29 Hearing Tr: 33:18-19.)  Nor does Section 16 of the IFSA indicate any contrary

intention.  As explained in Section II above, this provision can be read only to give the courts the

jurisdiction necessary to enforce the parties' agreement to arbitrate and provide other relief

ancillary to this private dispute resolution process.

**C.      The U.S. And Canadian Courts Do Not Have Jurisdiction To Enter A Joint Decision On Allocation Under The Cross Border Protocol.**

The Allocation Protocol proposed by Movants is also flawed in that it requires the

U.S. and Canadian Courts to render a joint decision.  Section 5 of the Allocation Protocol

proposed by Movants provides that "[a]fter completion of Allocation Protocol Discovery and the

Allocation Protocol Hearings, the U.S. and Canadian Courts shall issue <u>a decision</u> on the merits"

(Mot. Exhibit B) without concern for whether it is proper or feasible for courts of two

independent nations to reach a joint decision.  It plainly is neither.

The issuance of a joint <u>decision</u> is not permitted under the Cross-Border Protocol, goes beyond the purpose and scope contemplated therein and would constitute an improper ceding of a portion of each Court's sovereignty and jurisdiction.  The Nortel entities adopted the Court-to-Court Protocol (the "Cross Border Protocol")[10] to ensure that the Canadian and U.S. proceedings were coordinated.  In their Motion to Approve the Cross-Border Protocol ("Cross-Border Protocol Motion"), the U.S. Debtors stated:

> [T]he Protocol is designed to promote the orderly and efficient administration of the Insolvency Proceedings, honor the independence and integrity of [the U.S.] Court and the Canadian Court, promote international cooperation and respect for comity among [the U.S.] Court and the Canadian Court, facilitate fair and open administration of the Insolvency Proceedings and implement a framework to address issues that will arise in these cases.

(Cross-Border Protocol Motion ¶ 18.)  In essence, the Cross-Border Protocol was designed and implemented for procedural purposes – to coordinate the administration of the proceedings by means of joint hearings and open communication between the two courts.

The courts' authority to enter into a cross-border insolvency protocol derives from Chapter 15 of the Bankruptcy Code, which substantially adopts the UNCITRAL Model Law on Cross-Border Insolvency, G.A. Res. 52/158, U.N. Doc. A/RES/52/158 (Jan. 30, 1997) (the "Model Law"), and empowers the bankruptcy courts to communicate with foreign courts as a means to coordinate and harmonize foreign and domestic insolvency proceedings.  Express authority to implement a cross-border protocol can be found in Section 1527(4) of the Bankruptcy Code, which provides that cooperation among courts may be implemented by "agreements concerning the coordination of proceedings."  11 U.S.C. § 1527(4).  Furthermore,

---

10.  The Cross Border Protocol was approved by this Court on January 15, 2009, which was later amended by order of this Court on June 29, 2009.

the American Law Institute (ALI) Guidelines Applicable to Court-to-Court Communications in

Cross-Border Cases (the "Guidelines"), which are incorporated by reference in the Cross-Border

Protocol, lay out basic procedures for court-to-court communications, including provisions for

holding joint hearings between the courts, but in no way suggests that joint decision-making is

proper or practical.  Joint decision-making is simply not contemplated under the Cross-Border

Protocol, the Model Rules, U.S. legislation, or related commentary.  All of these sources make

clear that the purpose of court-to-court communications include coordination, efficiency, and

other procedural advantages, but that actual decision-making remains separate.

          The Joint Administrators are not aware of any statutory or other legal basis for

either court to cede part of its decision-making authority to another sovereign, nor do Movants

offer any support for such a suggestion.  On the contrary, all relevant authorities confirm that

each court's independent sovereignty and decision-making authority is to be preserved.  (*See*

Cross-Border Protocol ¶ 7 ("By approving and implementing this Protocol, neither the U.S.

Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to

have approved or engaged in any infringement on the sovereignty of the United States of

America or Canada.").)  Equally, the Cross-Border Protocol recognizes that neither court has

"approved or engaged in any infringement" on its national sovereignty.  *Id*.; *see also id.* ¶ 8

("The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the

U.S. Proceedings and determination of matters arising in the U.S. Proceedings."); ¶ 9(b) ("In

accordance with the principles of comity and independence recognized herein, nothing contained

herein shall be construed to require the U.S. Court to take any action that is inconsistent with its

obligations under the laws of the United States."); ¶ 12 ("each [Court] may coordinate activities

and consider whether it is appropriate to defer to the judgment of the other Court"); ¶ 13

("[A]lthough the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to (a) the conduct of parties appearing in matters presented before such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.").

Though the Cross-Border Protocol authorizes the U.S. and Canadian Courts to hold joint hearings when they find it necessary or advisable, Section 12(d)(vi) only enables the courts to communicate with each other during or after any joint hearing for the limited purposes of "(1) determining whether <u>consistent rulings</u> can be made by both Courts; (2) coordinating the terms upon [sic] of the Courts' <u>respective</u> rulings and (3) addressing any other procedural or administrative matters." (Cross-Border Protocol § 12(vi) (emphasis added).)  It is evident that the Cross-Border Protocol contemplates independent decisions and that while the Courts are encouraged to communicate in an attempt to issue consistent rulings, each remains responsible for making its own independent decision.  Indeed, the issuance of a joint decision by two independent national courts would not only exceed the authority granted to the courts in the Cross-Border Protocol, but would be contrary to fundamental jurisprudential principles.

Even if the courts found that they have the authority to proceed in the manner suggested by Movants, the practical and prudential difficulties should counsel strongly against doing so:

First, the procedure contemplated by Movants would require the courts to coordinate full-scale discovery and trial of the allocation issues.  But there are major difference between the procedural and evidentiary rules that apply in the two jurisdictions, not to mention different interpretations of constitutional principles such as due process and the privilege against

self-incrimination.  Determining how to harmonize all of these procedural and substantive gaps is likely to take an undue amount of the parties' and courts' time and energy, and may not be achievable at all.

Assuming the procedural hurdles are overcome, the courts will then be required to reach a unified decision on the precise dollar amounts to be allocated to numerous debtors from the proceeds of the multiple separate sale transactions.  If the procedure is to be effective, the courts must reach the same decision on each of a multitude of individual fact determinations about the relative interests of each of the various debtors in each of these cases.  A deadlock or inconsistency will be fatal to the entire process.

Assuming the courts are indeed able to reach agreement on all the necessary determinations, chaos will ensue if any party exercises its right to appeal the courts' decision. There is no provision for a joint, cross-border appeal.  Separate appeals would therefore make their way up through the U.S. and Canadian court systems, with a strong likelihood of inconsistent results.

In short, resolution of the allocation dispute through an international arbitration – as the parties have always intended – offers the quickest and surest way to allocate the Sale Proceeds and make funds available to pay creditors.  Indeed, it may be the only feasible way to proceed.[11]

---

11. The Joint Administrators further submit that Nortel Switzerland, Nortel Norway and Nortel South Africa support the resolution of the purchase price allocation issue by means of international arbitration rather than by decisions of the U.S. and/or the Canadian courts.  These entities are not in the control of the Joint Administrators nor subject to the insolvency proceedings in the English Court but were party to several sales and have an entitlement to the sales proceeds.

## CONCLUSION

For the foregoing reasons, the Courts should deny the Motion and compel the

parties to arbitrate in accordance with the attached form of Protocol.


Dated:    Wilmington, Delaware          **YOUNG CONAWAY STARGATE & TAYLOR, LLP**
          May 19, 2011


                                        /s/ Edwin J. Harron
                                        James L. Patton (No. 2202)
                                        Edwin J. Harron (No. 3396)
                                        Jaime N. Luton (No. 4936)
                                        The Brandywine Building
                                        1000 West Street, 17th Floor
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 571–6600
                                        Facsimile: (302) 571–1253

                                        - and -

                                        **HUGHES HUBBARD & REED LLP**
                                        Michael Luskin
                                        Derek J.T. Adler
                                        One Battery Park Plaza
                                        New York, New York 10004
                                        Telephone: (212) 837–6000
                                        Facsimile: (212) 422–4726

                                        - and -

                                        **HERBERT SMITH LLP**
                                        Kevin Lloyd
                                        John Whiteoak
                                        Richard Lawton
                                        Exchange House
                                        Primrose Street
                                        London
                                        EC2A 2HS

                                        *Counsel for the Joint Administrators*

*EXHIBIT A*

## ALLOCATION PROTOCOL

1. Purpose. The purpose of this Allocation Protocol is to set forth binding procedures for resolving disputes concerning the allocation of Sale Proceeds among the Selling Debtors and the Non-Filed Entities (any hearing regarding same, an "Allocation Protocol Hearing," and discovery regarding same, "Allocation Protocol Discovery") as provided for under Section 12 of the Interim Funding and Settlement Agreement ("IFSA").[1]

2. Tribunal. Disputes concerning the allocation of Sale Proceeds shall be submitted for determination in a binding arbitration before a three-member panel of arbitrators (the "Tribunal") who shall be appointed as follows: One member shall be appointed by each of the US Debtors, the Canadian Debtors, and the Joint Administrators, after consultation with and consent of the other two, which consent shall not be unreasonably withheld. Each of the three members of the panel shall serve as a neutral arbitrator.

3. Participants. Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the Non-Filed Entities (collectively, the "Parties" and each individually, a "Party") and any other party that the Tribunal may rule should be included, and their authorized representatives, will have standing to fully participate in and submit written statements, present oral arguments and otherwise directly participate in any and all hearings before the Tribunal arising under or relating to this Allocation Protocol, as well as any and all discovery, depositions and examinations contemplated herein.

4. Procedures. The place of the arbitration shall be New York, New York, except that discovery and status conferences may be held by telephone or videoconference. The proceedings shall be conducted in the English language. The Tribunal will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery. The Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

    a. Fact Discovery. The Tribunal will facilitate the Parties' exchange of fact discovery by determining the following:

        i. the deadline for identification of fact witnesses and number of fact witnesses allowed;

        ii. the deadline for service of reasonable requests for the production of non-privileged documents on any other Party;

        iii. the deadline for objections to any Party's document requests; and

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the IFSA.

       iv.  the deadline for completion of depositions, the number of depositions permitted, and the time allowed for such depositions for each party.

  b.  <u>Experts</u>.  The Tribunal  shall facilitate expert discovery by determining the following:

       i.  the deadline for and format of expert reports (including exhibits), which shall constitute the direct testimony of each expert;

       ii.  the deadline for and format of rebuttal expert reports (including exhibits); and

       iii.  the deadline for completion of expert depositions and the time allowed for such expert depositions.

  c.  <u>Conferences</u>.  The Tribunal shall be available for conferences to resolve any discovery disputes among the Parties and to receive updates as to the status of the proceedings.  The Tribunal will determine when conferences may be set.

  d.  <u>Hearings</u>.  The Tribunal shall hold hearings on the merits.  The Tribunal shall determine:

       i.  the date(s) for an opening hearing on the Parties' allocation positions (prior to factual discovery) and the rules governing such hearing;

       ii.  the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination and limited redirect examination of fact and expert witnesses shall take place; and

       iii.  the procedure for requesting  or setting conferences as necessary to resolve any discovery disputes among the Parties or to receive updates to the status of the proceedings.

  e.  <u>Written Submissions</u>.  The Tribunal will determine:

       i.  the deadline for and format of opening submissions (including exhibits);

       ii.  the deadline for and format of fact affidavits to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

       iii.  the deadline for and format of reply submissions (including exhibits); and

       iv.  the deadline for and format of fact affidavits to accompany the reply submissions.

5.  <u>Decision</u>.  After the completion of Allocation Protocol Discovery and the Allocation Protocol Hearings, the Tribunal  shall issue a decision on the merits.