# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------- X
                                                          :
In re:                                                    :  Chapter 11
                                                          :
NORTEL NETWORKS INC., *et al.*,[1]                        :  Case No. 09-10138 (KG)
                                                          :
                                      Debtors.            :  (Jointly Administered)
                                                          :
----------------------------------------------------------------- X

## DECLARATION OF KEVIN FRANCIS LLOYD IN OPPOSITION TO JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND IN SUPPORT OF CROSS-MOTION TO COMPEL ARBITRATION

I, KEVIN FRANCIS LLOYD, hereby declare as follows:

1.      I am a Partner of Herbert Smith LLP, solicitors for the Joint

Administrators to the EMEA Debtors.[2]  I submit this declaration in opposition to the Joint

Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim

Funding and Settlement Agreement (the **"Motion"**), and in support of the EMEA Debtor's

Cross-Motion to Compel Arbitration.  Except as otherwise indicated, I state the following facts

on the basis of personal knowledge.  To the extent that I do not have personal knowledge, I

verily believe the information to which I depose.  I have generally been involved in relation to

---

1.      The Debtors in these Chapter 11 cases are: Nortel Networks Inc. (**"NNI"**), Nortel Networks Capital Corporation (**"NNCC"**), Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc. (collectively, the "**US Debtors**").

[2]      Alan Robert Bloom, Stephen John Harris, Christopher John Wilkinson Hill and Alan Michael Hudson are the court appointed administrators and authorised foreign representatives of Nortel Networks UK Limited (**"NNUK"**) and certain of its subsidiaries located in the region known as EMEA (Europe, Middle East and Africa) and as listed in Schedule "A" hereto (collectively, the **EMEA Debtors**"), save in respect of Nortel Networks (Ireland) Limited ("**NN Ireland**") where David Martin Hughes, of Ernst & Young Chartered Accountants, and Alan Robert Bloom were appointed administrators and authorised foreign representatives (collectively, the "**Joint Administrators**").  Where "Joint Administrators" is used herein in relation to NN Ireland, I am referring to Alan Robert Bloom and David Hughes.

the allocation protocol discussions and related work since early in 2009. I was not, however, involved in, or present at, all discussions between the parties, although I was generally aware of these. Throughout this Declaration, I refer to various documents. These can be found in Exhibit A to this Declaration.

**Insolvency of the Nortel Group**

2.      On 14 January 2009 the global Nortel Group went through a coordinated insolvency filing. Nortel Networks Corporation (**"NNC"**) and Nortel Networks Limited (**"NNL"**) (together with certain of its Canadian subsidiaries) (**"Canadian Debtors"**) sought protection under Canadian insolvency law, the *Companies' Creditors Arrangement Act* (**"CCAA"**), to facilitate the reorganisation of the Nortel Group for the benefit of its creditors. The Canadian entities continue to manage their properties and operate their business under the supervision of the Ontario Superior Court of Justice – Commercial List (the **"Canadian Court"**).

3.      On the same day, NNI and NNCC (together with certain of their direct and indirect US subsidiaries) filed voluntary petitions in the Bankruptcy Court for the District of Delaware pursuant to Chapter 11 of the United States Bankruptcy Code (the **"US Court"**).

4.      Later the same day, the EMEA Debtors were placed into administration under the Insolvency Act 1986 by orders of Mr. Justice Blackburne of the High Court of England and Wales (the **"English Court"**) and the Joint Administrators were appointed. Under English law the Joint Administrators were appointed by the Court to manage each of the EMEA companies' affairs, business and property. In contrast to the way in which I understand the US and Canadian insolvency regimes operate, the English Court does not have a specific supervisory role. However, the Joint Administrators are officers of the English Court and owe duties to the English Court, as well as to the creditors of the company in respect of which they are appointed.

5.      Subsequently, the Joint Administrators, in respect of Nortel Networks SA (**"NNSA"**), considered it in the best interests of the creditors of that company to commence secondary proceedings in France. On 28 May 2009, the Commercial Court of Versailles (the **"French Court"**) ordered the commencement of secondary proceedings. Under the European Union Insolvency Regulations, while NNSA remains in administration in the UK, its assets situated in France are subject to the French insolvency regime which consists of liquidation proceedings. The Joint Administrators entered into an agreement with the office holders in the French liquidation to ensure the coordination of proceedings in relation to NNSA.

**The EMEA Debtors Position**

6.      The EMEA Debtors' position in relation to the Motion is set out in a letter dated 9 May 2011 sent by me to counsel for the U.S. Debtors, Cleary Gottlieb Steen & Hamilton LLP (**"Cleary Gottlieb"**).[3]

7.      The EMEA Debtors' position is:

(a)      the parties, by Clause 12(b) of the Interim Funding and Settlement Agreement (the "**IFSA**")[4], have agreed that there will be an arbitration in relation to "*the allocation of Sale Proceeds*" from the relevant Sale Transaction, to be determined by private "*dispute resolvers*"[5];

(b)      if one party wishes to assert that a matter raised by another is not relevant to the "*allocation of Sale Proceeds*" that is a matter for the "*dispute resolvers*" to determine.   The Canadian Court and the US Court do not have jurisdiction to act as an arbitration panel to deal with allocation;

---

[3] Ex. page 1-10
[4] Ex. pages 11-48; Capitalised terms used but not otherwise defined herein shall have meaning given to them in the IFSA.
[5] Ex. page 21

33267259_6

(c)     if, as is the case here, the parties have had difficulties agreeing on the binding procedures for this arbitration, then in their role as supervisory courts in relation to the US Debtors and the Canadian Debtors, we respectfully request that the US and Canadian Courts assist in helping the parties to agree to such terms; and

(d)     the process for allocation should proceed immediately.  The issues relevant to allocation should be first decided in the allocation process and not by any other single court process, including the claims processes various courts have commenced.  Insofar as there are overlapping issues or facts, then these should be determined first in the allocation process.

8.     Further and in any event, the most sensible and desirable method of allocation of the sales proceeds has been, and remains, a cross-jurisdictional international arbitration by three panel members chosen from the various jurisdictions.  This is because:

(a)     it will enable the dispute resolvers to be appointed by each of the three main estates, resulting in a breadth of international expertise to deal with the allocation of truly international sales, including the various and complex inter-linking cross-border legal and conflict of laws questions that arise from the sale of assets in so many different jurisdictions;

(b)     as the arbitration process cannot be appealed or challenged, it will avoid lengthy, time consuming and costly appeals and jurisdictional disputes which are a consequence of court litigation in a matter like this, thereby avoiding any delay in money being released from the escrow accounts;

(c)     it enables the dispute resolvers to structure a procedure and allow representations by various interests for the unique situation that the allocation process

will require.  This is likely to lead to efficiency and therefore the release of money from the escrow accounts sooner.  The sooner money is able to be released from the escrow accounts in to the various estates, the sooner the separate Nortel entities can distribute the money to their individual creditors under their local insolvency regimes; and

       (d)     the resolution of the allocation issues is likely to significantly curtail the outstanding issues between the parties (including in relation to claims) and possibly even obviate the need for, or reduce the scope of, any further litigation, further expediting the resolution of the insolvency processes in the Nortel Group.

       9.     The Joint Administrators, as officers of the English Court, remain willing and eager to enter into an allocation protocol as per Clause 12 of the IFSA.  As noted in my letter of 9 May 2011[6], we are willing to have any necessary attendant discussions to finalise agreement before 7 June 2011.  Also, the Joint Administrators currently propose to send legal representatives to both Delaware and Toronto on 7 June 2011, to be available for further discussions and to be available to answer any questions the US and Canadian Courts may have.  Assuming a good faith commitment to negotiate a protocol between now and 7 June 2011, it is hoped that an allocation protocol under Clause 12 of the IFSA could be agreed and ready to be presented to the Court on or shortly after 7 June 2011.

       10.     Clause 12 of the IFSA should be respected and given its full effect.  In summary, and as elaborated upon below, this is because:

       (a)     as the history of the negotiation of the IFSA shows, the parties agreed to the IFSA, *inter alia*, to enable sales of their businesses to be completed without disputes relating to allocation delaying such sales.  Clause 12 of the IFSA was inserted to

---

[6] Ex. page 8

33267259_6

provide protection to each of the very many Nortel entities around the world in relation to the uncertainty as to their entitlements from each sale. The EMEA Debtors agreed to allow the sales to proceed as they had the protection of the IFSA provisions that would give them input into the appointment of the dispute resolver(s) and the allocation process. I understand the Joint Administrators would not and did not agree to allow the sales of businesses to proceed on the basis that the allocation of proceeds to which the EMEA Debtors are entitled would be determined by either or both the US and Canadian Courts.

(b)      the parties envisaged that all matters pertaining to allocation, regardless (and indeed because of) their overlap with potential claims and other disputes, should be first resolved under an allocation protocol in a cross-jurisdictional forum. As was stated by the US Court in a Memorandum Opinion in relation to an application to stay proceedings brought by the UK Pension Authorities:

"*The purpose of the protocol… is to ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum…  The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum.*"[7]

(c)      the substantial sales of Nortel businesses have been taking place on the basis of Clause 12;

(d)      the Courts of the US, Canada, the UK and France have all approved the terms of the IFSA on the basis that allocation disputes will be determined by a panel of dispute resolver(s) as envisaged by the parties to the IFSA (and not by any national court or courts); and

---

[7] Ex. page 66-67

33267259_6

(e)    the parties have previously reached substantial agreement in relation to the allocation protocol that is to be agreed pursuant to Clause 12 of the IFSA. Although there were several outstanding points of detail the only issue of real controversy was the Canadian Estates' insistence that the dispute resolvers should be limited in what they are allowed to consider in determining what entities are entitled to which portion of the sale proceeds.

11.    In this declaration I explain:

(a) the negotiations that led to agreement of the IFSA, which demonstrate that it was agreed amongst the parties that if the parties were not able to agree the allocation of the sales proceeds, they would arbitrate this issue (**Section A**);

(b) the terms of the IFSA (**Section B**);

(c) the basis of the Court approvals in the US, Canada, UK and France (**Section C**);

(d) the extent to which the parties in fact agreed the Allocation Protocol following execution of the IFSA (**Section D**);

(e) the basis upon which the CDMA business was sold, which was the first sale following agreement of the IFSA (**Section E**), and details of other sale processes which have taken place on the basis of the IFSA and in respect of which sale proceeds have been placed into escrow (pursuant to escrow agreements) compliant with Clause 12 of the IFSA (**Section F**);

(f) the application of the US Debtors' to this Court and the application by the Monitor in the CCAA proceedings in the Ontario Superior Court of Justice – Commercial List in February 2010 seeking to enforce the stay against the UK

pension interests. In that hearing, the US Debtors and Monitor tendered

evidence that confirmed to the relevant courts the pre-eminence of the

allocation process and the need for that to be conducted in a global cross-

jurisdictional forum (**Section G**);

(g)  the interaction between the allocation process and claims (**Section H**);

(h)  the potential prejudice faced by creditors in Europe (**Section I**); and

(i)  the limited progress that has in fact been made with respect to discovery in

these proceedings (**Section J**).

## A. THE NEGOTIATION OF THE IFSA

12.    Although I was not directly involved, I was generally aware (and updated

at that time by my colleagues, Stephen Gale and Gavin Davies, Partners of Herbert Smith LLP)

that in early April 2009, the US Debtors, the Canadian Debtors and the EMEA Debtors were

involved in discussions relating to the sale of the Nortel Group, and certain assets relating to the

businesses of the Nortel Group, to third party buyers.  This included the possible sale of the

Enterprise business which was in the process of being negotiated (the **"Enterprise Sale"**).  A

significant portion of the Enterprise business was based in Europe.

13.    I understand representatives of the US, Canadian and EMEA Debtors met

in April 2009 to discuss the most pressing issues at the time:

(a)    the allocation of the proceeds of the sale of the businesses; and

(b)    how to deal with the Canadian Debtors' cash flow shortages.

14.    In preparing this Declaration, I have reviewed a strategy paper entitled

"Outline of Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds" that was

prepared in April 2009 by Lazard, the investment bank which was engaged by the parties to

33267259_6

8

provide strategic advice (**"Lazard Paper"**).[8]  Under the heading "Referring a Dispute to the Dispute Resolver", Article I, sub-paragraph 1 of the Lazard Paper stated: "*Scope: any dispute, controversy or claim arising out of, relating to, or in connection with the issue of allocation of the sale proceeds among the parties, to the extent such a dispute is not resolved before closing*". Sub-paragraph 2 stated, under the heading "Dispute Resolver":

> "*a. Identify an individual*
>
> *b. Identify an [accounting firm] whose assistance Dispute Resolver may seek*".

This note seeks to remove the involvement of any court from any jurisdiction in the allocation process.

15.      In preparing this Declaration I reviewed an email circulated by Cleary Gottlieb, on 29 April 2009[9]. I understand that email attached the first draft of:

(a)      a Funding Framework Agreement; and

(b)      a Minimum Allocation Agreement.

16.      The first draft of the Minimum Allocation Agreement exhibited a Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds (**"First Draft Protocol"**)[10]. The First Draft Protocol closely followed the format of the Lazard Paper, and established a non-court dispute resolution process in respect of disputes over the allocation of sale proceeds. The First Draft Protocol relevantly provided:

(a)      Article II, Section 2.1: *If for any reason any dispute, controversy or claim arising out of, relating to, or in connection with the issue of allocation of the*

---

[8] Ex. pages 69-72
[9] Ex. pages 73-101
[10] Ex. pages 78-95

*Sale Proceeds among the Participating Debtors and their respective Participating*

*Affiliates (the "Dispute") is not resolved on or before the Closing, then at any time after*

*the Closing any of the US Debtors, the Canadian Debtors and the EMEA Debtors may*

*refer the Dispute to the Dispute Resolver for a decision in accordance with this*

*Protocol.*[11]

(b)    Article II, Section 2.2: *The Dispute Resolver shall be [name of*

*individual].  The Dispute Resolver may engage the services of [accounting firm] to assist*

*the Dispute Resolver in resolving the Dispute*.[12]

17.    No agreement was ultimately reached on the Funding Framework

Agreement and the Minimum Allocation Agreement referred to at paragraph 15 above. Instead,

on 30 May 2009, Cleary Gottlieb circulated two new draft agreements that I understand were

intended to replace the previous agreements[13].  The new agreements were the Enterprise

Proceeds Allocation Agreement and the Interim Funding and Settlement Agreement (the **"Draft**

**IFSA"**).[14]  The Enterprise Proceeds Allocation Agreement did not contain the First Draft

Protocol that had been appended to the Minimum Allocation Agreement, and instead set out a

process to agree a protocol.  The Enterprise Proceeds Allocation Agreement relevantly provided:

(a)    Clause 1(b): "*the remainder of the Sales proceeds (the "Balance")*

*shall remain in the Escrow Account and shall be allocated pursuant to a protocol for*

*resolving disputes concerning allocation of sale proceeds (the "Protocol"), and the*

---

[11] Ex. page 82

[12] Ex. page 82

[13] Email from Sanjeet Malik of Cleary Gottlieb, 30 May 2009, 00:51; (Ex. pages 102-131)

[14] Ex. pages 103-117

*parties hereto agree to negotiate in good faith and to reach agreement as to the Protocol as soon as possible following execution of this Agreement*"[15];

18.    I understand that the parties continued to negotiate the Enterprise Proceeds Allocation Agreement throughout May and early June 2009, as well as the substantive issues relating to the level of allocation of sales proceeds to which at least the EMEA estate was entitled, and the funding arrangements in respect of the Canadian estate. The pressing need for a funding agreement in Canada and a delay in the negotiations of the Enterprise Sale led to the parties focusing their efforts on the Draft IFSA which would include both funding for the Canadian estate and the mechanism to enable global sales to proceed.

19.    On 8 June 2009, Herbert Smith LLP wrote to the parties[16] with a draft provision relating to the dispute resolution process in relation to allocation.  An amended version of this draft clause eventually became Clause 12 of IFSA.  With regard to allocation, Clause 12 (c) stated:

"*The Selling Debtors shall, immediately following any M&A Transaction, negotiate in good faith and on a timely basis to reach agreement regarding allocation of the relevant Sale Proceeds within a reasonable period of time, failing which the Protocol shall apply to the relevant M&A Proceeds.  The Debtors shall, immediately following the date hereof, negotiate in good faith and on a timely basis the terms of a protocol to constitute, in the case of each M&A Transaction, the Protocol.*"

---

[15] Ex page 120
[16] Email from Gavin Davies to the parties, 8 June 2009, 19:57 (Ex. pages 132-133).

20.    On 8 June 2009, I understand Akin Gump Strauss Hauer & Feld LLP

(**"Akin Gump"**) wrote[17] to the parties suggesting some amendments to the clause. There were

no amendments to the dispute resolution process described above. On 9 June 2009 a further

amended version of the Draft IFSA was sent by Cleary Gottlieb.[18] Clause 12 was included for

the first time in the Draft IFSA.  It relevantly provided:

*b. Pending the distribution of the Sale Proceeds as described in the second*

*sentence of this Section 12.d., the entire amount of the Sale Proceeds (less applicable transfer*

*taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an*

*escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and*

*agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account").  In no*

*case shall there be any distribution from the Escrow Account in advance of either (i) agreement*

*of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement,*

*determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined*

*below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or*

*determined amount of allocation of Sale Proceeds to all Selling Debtors.*

*c. Without derogating from the obligations provided in Section 12.a., the*

*Debtors shall, as soon as reasonably practicable following the execution of this Agreement,*

*negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for*

*resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the*

*"Protocol"), which Protocol shall provide binding procedures for the allocation of Sales*

*Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach*

*agreement regarding such allocation.*

---

[17] Email from Ryan Jacobs on 8 June 2009 at 18:24 (Ex. pages 134-137)
[18] Email from Sanjeet Malik to the parties dated 9 June 2009 at 10:44 (Ex. pages 138-155)

*d. The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Protocol, failing which the Protocol shall apply to determine the allocation of the relevant Sale Proceeds.*

21.    I understand that the IFSA was finally agreed by teleconference on 9 June 2009 (into 10 June 2009 in the United Kingdom).[19]  The executed version of the IFSA was then circulated by Cleary Gottlieb on 10 June 2009[20]. The essence of the dispute resolution provision was unchanged (i.e. that the parties should negotiate a protocol to apply in the event that allocation of Sale Proceeds could not be agreed) in that it was for dispute resolver(s) to determine allocation.

22.    At this juncture, NNSA was not a signatory to the IFSA. However, as explained at paragraphs 42 to 45 below, the Joint Administrators entered into the IFSA on behalf of NNSA by an Accession and Amendment Agreement dated 11 September 2009.

## B. THE TERMS OF IFSA

23.    The executed version of the IFSA provides at clause 12(a) that "[each Debtor's] *execution of definitive documentation with a purchaser...of, or closing of any sale of, material assets...shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the*

---

[19] Email from Sanjeet Malik dated 10 June 2009 at 04:10. (Ex. pages 156-174)
[20] Email from Sanjeet Malik dated 10 June 2009 at 18:03 (Ex. pages 175-176)

*relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction*"[21].

24.    This is linked to Clause 11 of the IFSA, which further requires that the parties agree to enter into appropriate license termination agreements in relation to certain transactions whether or not they were actually a selling debtor participating party. In exchange for entering into these agreements, these parties would be entitled to claim any interest or right in the intellectual property that was being sold through the allocation process in Clause 12 of the IFSA (and the ownership rights the parties' had in respect of intellectual property were specifically reserved for this purpose in Clause 11(b) of the IFSA).  Indeed, in consideration for signing these licence termination agreements, the relevant entity was deemed, under Clause 11(d) of the IFSA, a Selling Debtor under Clause 12 of the IFSA.

25.    Clauses 11 and 12(a) of the IFSA capture the parties' intention that one of the primary purposes of the IFSA was to ensure that the various global sales were able to continue without being hindered by discussions in respect of the allocation of sale proceeds.  It was recognised that an inability to reach prior agreement on the allocation of sale proceeds could well hamper, or diminish the income generated from, the various global sales. The placing of sale proceeds into an escrow account allowed the various global sales to continue and for the allocation of sale proceeds to be discussed at a later, and more sensible, point.

26.    Clause 12(b) provides "*the entire amount of the Sale Proceeds...shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "*Escrow Account*").  In no case shall there be any distribution from the Escrow Account in advance of*

---

[21] Ex. page 21

*either (i) agreement of all the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol...applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.*"[22]

27.    It is clear on the face of Clause 12(b) that the monies which have been placed into escrow may only be released on the occurrence of one of two events: (i) an agreement on allocation is reached by the parties; or (ii) if the parties fail to reach agreement, a determination is made by the relevant dispute resolver(s) under the terms of the protocol to be agreed between the parties.  Release of monies under the Movants' proposed Allocation Protocol does not fall within these two events and goes beyond the agreed and executed IFSA.  The parties agreed that dispute resolvers would determine allocation and did not intend for the courts to become involved in allocation.  The IFSA was intended to facilitate the global sale of a global business by ensuring the sales proceeds would be distributed by a global process so that no single court or insolvency regime could determine the rights of many individual debtors in a multinational insolvency.

28.    Clause 12(c), of the IFSA requires the parties "*as soon as reasonably practicable following the execution of this* [IFSA], [to] *negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions*" and Clause 12(d) requires the parties to "*immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction...failing which the Interim Sales Protocol shall apply to determine the allocation of*

---

[22] Ex. page 21

*the relevant Sale Proceeds*"[23].  Upon finalising a sales transaction, an escrow agreement pursuant to Clause 12 of the IFSA was to be entered into.

29.    The entering into the IFSA was not intended to delay or suspend discussions in respect of the allocation of sales proceeds but to act as a catalyst for the parties to agree an appropriate allocation following each specific sale or, failing that, for allocation to occur under the terms of the Protocol.

## C. COURT APPROVAL OF IFSA

30.    Following execution of the IFSA the parties sought the approval of their respective national courts for entry into the IFSA[24].  Clause 13 of the IFSA provides that no provision of the IFSA shall be effective until each of the US Court and Canadian Court (as defined) approve the entirety of the IFSA and the English Court gives a direction that the Joint Administrators be at liberty to enter into the IFSA (however, the requirement for an English Court direction was capable of being waived by the Joint Administrators at their discretion).

31.    As a result of Clause 13, I understand that the US, Canadian and English Courts each considered the entirety of the IFSA. Subsequently, the French Court considered the IFSA when deciding whether the French office holders should consent to the Joint Administrators (as office holders in the main proceedings) acceding to the IFSA on behalf of NNSA.

---

[23] Ex. page 21
[24] At this point, NNSA was not yet a party to the IFSA but later acceded.

**US Court Approval of the IFSA**

     32.    By Motion dated 9 June 2009[25], the US Debtors invited the United States

Bankruptcy Court for the District of Delaware (the "**US Court**") to approve the entry into the

IFSA.

     33.    The US Court heard the Motion on 29 June 2009.  In preparing this

Affidavit, I have been shown a transcript of this hearing[26].

     34.    That transcript records that Mr. Bromley, counsel for the Movants,

explained to the Court that the parties had entered into the IFSA, and that it "*envisions a process*

*by which proceeds relating to asset sales will be divvied up*".[27]  Mr. Bromley continued:

> *That protocol, where we have distributed drafts of that and are in the process of*
> *discussing, is envisioned to be something that would require very little participation or*
> *intervention or bother by these two courts.  The view being that once we have a <u>fair and*
> *reasonable and independent body</u> deciding the allocation, that we would simply come to*
> *both of these courts for confirmation that those amounts are appropriate, and that due*
> *process would be available to all parties who are interested in the allocation of those*
> *resources.* [emphasis added]

The only role of the Court was to approve the allocation once determined.

     35.    Following these submissions, this Court[28] observed that it would be "*very*

*difficult for* [the US Court] *to have arrived at an allocation process as fair as* [the] *parties have*

*here in* [the IFSA]".

     36.    On 29 June 2009, on the basis of, *inter alia*, the above oral submissions,

the US Court approved the terms of the IFSA and authorised the US Debtors to enter into the

IFSA.  The Order requires the US Debtors "*take any and all actions that may be reasonably*

---

[25] Ex. pages 179-243
[26] Ex. pages 244-497
[27] Ex. page 277 (lines 9-10)
[28] Ex. page 301 (lines 21-22)

*necessary or appropriate to perform all obligations contemplated* [under the IFSA]"[29]. This includes the US Debtors performing their obligation under Clause 12(c) of the IFSA in which there is an obligation to "*negotiate in good faith and attempt to reach agreement on a timely basis on a protocol*".

**Canadian Court Approval of the IFSA**

37.    By Motion dated 22 June 2009[30], the Canadian Debtors applied to the Canadian Court to approve the IFSA.  In the Affidavit of John Doolittle, filed with the Notice of Motion, Mr. Doolittle noted that monies from any sale were to be deposited in an escrow account and could only be released from the escrow account by agreement of the parties or by "*determination by the relevant dispute resolver(s) under the terms of the* [Protocol]".  Mr. Doolittle continued: "*the parties have agreed to continue to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation*" and notes that such protocol shall provide a "*binding procedure*".[31]

38.    By Order dated 29 June 2009[32], the Canadian Court ordered the entry into the IFSA and that the Applicants[33] be directed to comply with their obligations under the IFSA (including, as set out under Clause 12(c) to "*negotiate in good faith and attempt to reach agreement on a timely basis on a protocol*").

---

[29] Ex. page 499

[30] Ex. pages 506-530

[31] Ex. page 548 (paragraphs 25(n)-(o))

[32] Ex. pages 727-734

[33] Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

**English Court Approval of the IFSA**

39.     By Order dated 23 June 2009 the English Court ordered that the Joint Administrators "*be at liberty*" to enter into the IFSA.[34]

40.     In making the Order, the English Court considered the oral submissions by counsel for the Joint Administrators along with the witness statement of Alan Robert Bloom, one of the Joint Administrators.  In his witness statement, Alan Robert Bloom notes that the dispute resolution protocol contained in the IFSA is to be "*agreed between the Parties*"[35].  Mr. Bloom stated that part of the reason for entering the IFSA was to achieve certainty as regards to "*avoiding future litigation and the associated cost*".[36]

41.     I understand that the Joint Administrators would not and did not agree to allow the sale of businesses to proceed without the protections in Clause 12. That is, that the allocation dispute would be determined by agreed upon dispute resolvers and not the courts of any one or more jurisdiction.  Had they done so, I do not consider they would have been able to properly represent to the English Court that the IFSA was in the best interests of the creditors of the EMEA Debtors. Absent such representations, I do not consider that the English Court would have declared that the Joint Administrators were at liberty to enter into the IFSA.

**French Court Approval of the IFSA**

42.     As a result of the secondary insolvency proceedings in France in respect of NNSA, the Joint Administrators considered that they were required to obtain prior approval for entering into the IFSA from both the NNSA Liquidator and the NNSA Administrator.

---

[34] Ex. page 736
[35] Ex. page 761 (paragraph 87(e))
[36] Ex. page 762 (paragraph 91(c))

43.    The NNSA Liquidator and NNSA Administrator sought authorisation from the French Court before providing their consent for the Joint Administrators to enter into the IFSA on behalf of NNSA.

44.    By Order dated 7 July 2009[37], the French Court authorised the NNSA Liquidator and NNSA Administrator, *inter alia,* to agree to:

(a)    "*continue with the transfer of assets simultaneously with the implementation of the process to reach an agreement on the split among companies of the NORTEL group, it being recalled however that with regard to NNSA's assets the offer presented to the Court must indicate a price to be paid to NNSA, which is either determined or which may at least be determinable by a third party neutral arbitrator*";

(b)    NNSA's "*participation in forthcoming negotiations concerning the sharing of the sale price, and, more particularly if the parties fail to reach an agreement, negotiating the agreement on the procedure for having such price determined by an expert*"[38].

45.    On the above basis, the French Court approved entry into the IFSA by NNSA by authorising the NNSA Liquidator and NNSA Administrator to sign all instruments connected with the matters set out at paragraphs 44(a) and (b) above.  The Joint Administrators acceded to the IFSA, on behalf of NNSA, by agreement dated 11 September 2009.[39]

46.    Subsequently, I understand that the French Court approved NNSA entering into the EMEA sales agreement for the GSM business, being a very substantial part of

---

[37] Ex. pages 779-785
[38] Ex. page 784
[39] Ex. 786-801

the business of NNSA on the basis that the proceeds would be determined in accordance with the above Order and the IFSA.

## D. NEGOTIATION OF THE ALLOCATION PROTOCOL

47.    Negotiations of the Protocol commenced shortly after the IFSA was agreed.  The negotiations took place on and off for just under a year, after which they were suspended in favour of direct negotiations regarding allocation, and the mediation process.  I was heavily involved in that process on behalf of the EMEA Debtors.  I do not traverse all the negotiations and communications between the parties in this Declaration, but simply address the main points relevant to this Motion.  As is set out further below, by the end of 2009 the parties at least agreed:

(a)    that there would be 3 dispute resolvers appointed, one from each region;

(b)    detailed procedures that were to govern the arbitration (i.e. that the parties would give full discovery and there would be a full and robust hearing with evidence and detailed submissions); and

(c)    that the decision of the dispute resolvers would be conclusive, final and binding and to the extent permitted by applicable law and, would not be appealed, challenged, or sought to be varied or set aside by any party in any jurisdiction.  The parties had agreed, however, that such a decision could be an Award under the UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

48.    The parties commenced negotiations with the benefit of having already negotiated the earlier First Draft Protocol that had been exhibited to the draft Minimum

Allocation Agreement in respect of the Enterprise Sale.[40]  Accordingly, Cleary Gottlieb

circulated a first draft of an allocation protocol on 14 June 2009[41] (**"Draft Allocation**

**Protocol"**), which substantially replicated the First Draft Protocol.  In accordance with the

parties' intent in entering the IFSA, the Draft Allocation Protocol provided for an international

arbitration rather than recourse to any national court.

> 49.    Herbert Smith LLP, on behalf of the EMEA Debtors, made it clear at the

outset of negotiations that: "*The Protocol needs to be clear on its face that the Protocol*

*constitutes the binding dispute resolution methodology for the allocation of proceeds for each*

*M&A deal and that no further recourse is available to any Court…*".[42]  On 23 September 2009,

Goodmans LLP (counsel for the Canadian Monitor) circulated a draft proposal for the Protocol.[43]

This suggested a panel of three dispute resolvers, with each estate entitled to appoint a member.

It was suggested that the dispute resolvers be "*retired commercial/bankruptcy judges and noted*

*international arbitrators*"[44].

> 50.    Following much discussion in the interim, the parties met on 30

September 2009 and broadly agreed that the panel should consist of one Dispute Resolver from

each of the US, Canada and EMEA, and should be constituted by Dispute Resolvers with a

strong arbitration and/or judicial background.  The parties agreed that they would circulate a

potential list of arbitrators by 12 October 2009.

---

[40] As referred to above in paragraph 16.
[41] Email from Cleary Gottlieb, 14 June 2009 (Ex. pages 802-839)
[42] Email from Ryan Ellis dated  27 July 2009 to the US and Canadian Estates (Ex. pages 840-842)
[43] Ex. pages 843-849
[44] Ex. page 845

51.     On 9 October 2009, Cleary Gottlieb circulated a revised Allocation Protocol (and blackline comparison with the 13 June 2009 first draft).[45] In this draft, the term "Dispute Resolver" was removed and replaced with "Panel". Clause 7.8, as in earlier drafts, continued to state that the decision of the Panel would be "*conclusive, final and binding*" and may not be "*challenged, appealed or sought to be vacated*."

52.     The parties met again on 13 October 2009, following which Cleary Gottlieb circulated a further drafts on 20 October 2009 and 9 November 2009.[46] As is evidenced by these drafts, by this point substantive agreement had been reached on the process for arbitration. There were, however, outstanding points of detail and in relation to whether the parties were free to raise any matter that they considered relevant in the arbitration.

53.     In or around October 2009, we contacted the UK advisers to the Creditors' Committee (Ashurst LLP) and the Canadian Debtors (Freshfields Bruckhaus Deringer LLP) to discuss potential names for an arbitrator from the EMEA region, being highly respected former appellate judges and Queens' Counsel.  In these discussions, we agreed the identity of a few suitable Dispute Resolvers on behalf of EMEA.

54.     Following further discussions in mid-November 2009, the parties elected to place negotiations on hold in order to give the US and Canadian estates some "breathing space" to deal with other matters (particularly in relation to completing various sales and finalising additional funding to the Canadian Debtors) and to allow further access to information. Under the Draft Protocol, there is provision for a 100 day period for the parties to negotiate to resolve the underlying allocation issues.  It was considered by the parties that early document disclosure would make that negotiation process more efficient.

---

[45] Ex. pages 850-888
[46] Ex. pages 889-932

55.     On 12 January 2010, Cleary Gottlieb circulated an email requesting that parties circulate their recommendations for the members of the dispute resolution panel by 22 January 2010.[47] On 22 January 2010, Cleary Gottlieb emailed again extending the deadline to 29 January 2009 and requesting a mark-up of and comment on of the 8 November 2009 Protocol.[48]

56.     By email dated 26 February 2010, Cleary Gottlieb circulated a further draft of the Protocol for the parties to consider.[49]

57.     By email dated 7 April 2010, incorporating comments that the parties had provided since February 2010, Cleary Gottlieb circulated a further draft of the Protocol for consideration.[50] This proved to be the last draft of the Protocol that had been circulated by the parties. This draft shows that, so far as the procedural terms of the Protocol went, it was largely agreed. However, the main unresolved issue (as previously stated) was as to the arguments that could be raised before the dispute resolvers, and whether the parties were limited in this respect or not. In relation to the latter issue, this new version contained comments from the Canadian Debtor that sought to greatly limit the matters the dispute resolver could deal with. In Article VIII of the draft, the Canadian Debtors sought to prevent a dispute resolver considering the ownership of the assets that were sold, save by reference to particular documents. This course would limit the ability of the EMEA Debtors to fully argue their allocation argument in relation to their rights to the intellectual property assets that were sold in the sales, and strengthen their own allocation argument. A large issue between the parties has always been the manner and proportion in which the five Residual Profit Entities (NNI, NNL, NNUK, NN Ireland and NNSA) each own the intellectual property that was sold. The determination of this issue

---

[47] Ex. page 933
[48] Ex. pages 934-936
[49] Ex. pages 937-962
[50] Ex. pages 963-1010

involves consideration beyond the documentation the Canadian Debtors sought to limit the

dispute resolvers to.  Indeed, the view of the EMEA Debtors was and is that that documentation

does not properly record the beneficial interests which each of the Residual Profit Entities have

in the intellectual property assets.  These were matters which obviously squarely fall within the

arbitration dispute.  The fact that these matters were always to be part of any allocation process,

is not only borne out in Clauses 11 and 12 of the IFSA but in sworn statements of Ms. Anna

Ventresca made on behalf of the Canadian Debtors and Mr. John Ray on behalf of the US

Debtors in February 2009 (discussed further below).

58.     In light of the proposed amendments from the Canadian Debtor, Herbert

Smith LLP wrote to the parties indicating that we could not recommend to the Joint

Administrators that they concede to limit the matters that could be raised at the arbitration.[51]

During discussions with Mr. Howard Zelbo of Cleary Gottlieb around this time, it was clear that

the US Debtors agreed with the EMEA Debtors' position and agreed to join with us in opposing

the Canadian Debtors' attempts to restrict the allocation process in this way.  Mr. Zelbo also sent

an email confirming the position.[52]

59.     The parties then had an unsuccessful meeting on 4 May 2010 in New

York, primarily because the Canadian Debtors would not concede on their demand for the

allocation process to be prejudicially constrained.  During that meeting, the parties decided to

suspend, or not pursue, for the time being discussions regarding the Allocation Protocol and try

instead to reach agreement about how the proceeds should actually be allocated.  For that

purpose, the parties entered into arrangements for sharing limited documents, setting out heads

of claims, providing further disclosure and having negotiations and mediation.  The mediations

---

[51] Email from Kevin Lloyd to the parties dated 14 April 2010. (Ex. pages 1011-1012)
[52] Email from Howard Zelbo to Herbert Smith LLP dated 16 April 2010. (Ex. pages 1013-1014)

took place in November 2010 and April 2011. During this time, the parties did not progress

negotiations in relation to the Allocation Protocol. The final mediation took place on 11, 12 and

13 April 2011. As noted below, sales have continued to be completed (and in the case of the

residual intellectual property assets, still are being completed) in reliance on the IFSA, and

money placed into escrow on the basis of Clause 12 of the IFSA.

60.    Following the mediation in April 2011, the Joint Administrators filed a

response to the Notice of Debtors' Objection to the Proofs of Claim filed by the EMEA

Claimants and Motion of an Order requesting a More Definite Statement of Claim and Setting a

Deadline for the Filing of Proofs of Claim by the EMEA Claimants[53]. This response expressed

the Joint Administrators' eagerness to proceed with finalising the protocol, and requested that the

US Court assist the parties in agreeing an Allocation Protocol.

61.    Following that response, the US Debtors have filed the present motion

seeking to have the US and Canadian Courts determine the substantive allocation issues. I wrote

on 9 May 2011[54] as mentioned above, suggesting, *inter alia*, that there should be a conference

call scheduled so that the parties could discuss the Allocation Protocol. On 12 May 2011[55],

Cleary Gottlieb responded indicating that they would not, contrary to the requirements of Clause

12(c) of the IFSA, negotiate in relation to the Protocol, and asserted that "*the parties have long

since passed the point of an intractable impasse on this issue*". They also say: "*There is no

agreement to arbitrate and, accordingly, there can be no and will be no arbitration on

allocation*". As referred to above, the EMEA Debtors' position is that Clause 12 of the IFSA

does constitute an agreement to arbitrate and accordingly there should be an arbitration on

---

[53] Ex. pages 1015-1025
[54] Ex. page 8
[55] Ex. pages 1026-1027

allocation.  Insofar as there is any dispute as to the arguments and matters that the parties can raise in the arbitration, that is a matter to be determined by the disputes resolvers.

## E. CDMA ESCROW AGREEMENT

62.     In addition to the various national courts approving the IFSA on the basis that any allocation dispute would be resolved through arbitration, I understand that the asset sale transactions were also conducted in reliance on that basis.  Indeed, and as noted earlier, I understand that this was a very important reason for the inclusion of Clause 12 into the IFSA.  In reliance on this, the EMEA Debtors sold their businesses and assets in Europe.  In addition, and in reliance on the IFSA, the EMEA Debtors signed Appropriate Licence Termination Agreements in relation to intellectual property (under Clause 11 of the IFSA) in consideration for the right to assert their ownership interest in the intellectual property through the allocation process.  The first such assets sold were certain assets relating to the CDMA and LTE Access businesses.  The CDMA and LTE Access Assets Business was sold pursuant to the Stalking Horse Process to Telefonaktiebolaget LM Ericsson (PUBL) (**"Ericsson"**) by way of an asset and share sale agreement dated 24 July 2009, and amended 30 October 2009, for $1.13 billion (the **"CDMA Sale"**).

63.     The transaction was only in respect of the North American part of the CDMA business and LTE Access assets and the EMEA part of the CDMA business was excluded from the scope of the sale. Therefore, the EMEA Debtors were not party to the asset and share sale agreement but did sign Appropriate License Terminations (pursuant to Clause 11 of the IFSA). As such, they were a Selling Debtor for the purposes of Clause 12 of the IFSA.

64.     Further to Clause 12(b) of the IFSA, the sale proceeds from the CDMA Sale were to be placed into an escrow account until distribution.  The parties started negotiating the escrow agreement around October 2009 (the **"CDMA Escrow Agreement"**).

65.     The first draft of the CDMA Escrow Agreement, circulated by Cleary Gottlieb, on 22 October 2009[56], provided for the release of funds from the escrow account in two circumstances: "*(i) a letter of direction executed by the Depositors...and Creditor Representatives or (ii) a final decision of a court of competent jurisdiction*" (Clause 5)[57].

66.     Shortly afterwards, I emailed the parties[58] pointing out that Clause 5 "*does not reflect the agreed terms for distribution of the proceeds from the escrow monies in IFSA – no reference is made to the decision of a dispute resolver and instead distribution is allowed by an order of the US/Canadian courts...the* [Escrow Agreement] *must obviously reflect the IFSA terms*".  An amended draft of the CDMA Escrow Agreement was attached that was consistent with Clause 12 of the IFSA.

67.     It was important that the CDMA Escrow Agreement accurately reflected the IFSA.  Future escrow agreements were to be based on the CDMA Escrow Agreement.

68.     Following circulation of the first draft of the CDMA Escrow Agreement, the parties had further discussions in respect of the allocation of sale proceeds from the CDMA Sale.  On 3 November 2009, Cleary Gottlieb proposed that 50% of the sale proceeds of the CDMA Sale be made available for the US estate and the Canadian estate by court order with the remaining 50% to be released by (a) joint instruction by the parties, or (b) by agreed mechanism of the protocol outlined by Herbert Smith LLP on the 30 October 2009.  In response, Herbert

---

[56] Ex. pages 1028-1048
[57] Ex. page 1033
[58] Ex. page 1049

Smith emailed Cleary Gottlieb[59] explaining that, whilst the Joint Administrators may be prepared to accommodate the proposal under certain conditions, "*it is for the dispute resolver(s) appointed under the* [IFSA] *to determine final allocation of all sale proceeds*".

69.     In the end, the parties executed the Escrow Agreement on 11 November 2009. Clause 5, which provides for the release of funds from the escrow account, states that funds may be disbursed "*pursuant to (i) a letter of direction jointly executed by the Depositors...or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding allocation of sales proceeds (a "Decision")*"[60].

## F. OTHER SALE PROCESSES

70.     Following the CDMA Sale, a number of sales were completed that were accompanied by escrow agreements incorporating materially the same terms as the CDMA Escrow Agreement.  The purchase prices referred to below are the gross sums prior to any deductions.

### Enterprise Solutions

71.     The Enterprise Solutions and Global Solutions business were sold to Avaya Inc. and its affiliates by way of a separate amended and restated EMEA asset sale agreement for the EMEA portion of the business and an amended and restated asset and share

---

[59] Ex. pages 1070-1072
[60] Ex. page 1079

sale agreement for the North American and rest of the world portions of the businesses, both dated 14 September 2009, for $900 million.  The sale completed on 18 December 2009.

### MEN and Optical Networks

72.     The optical networking solutions and carrier Ethernet switching segments of the Metro Ethernet Networks business were sold to Ciena Corporation and its affiliates by a separate EMEA asset sale agreement for the EMEA portion of the business and an amended and restated asset sale agreement for the North American and the rest of the world portion of the business, both dated 24 November 2009, for a total consideration of $774 million.  The sale completed on 19 March 2010.

### Global System for Mobile communications ("GSM") / GSM for Railways ("GSM-R")

73.     The GSM / GSM-R business was sold to a joint bid from Ericsson and Kapsch CarrierCom AG by a separate EMEA asset sale agreement with Kapsch for the EMEA portion of the business and an asset sale agreement with Ericsson for the North American portion of the business, both dated 24 November 2009, for $103 million.  This sale completed on 31 March 2010.

### CVAS

74.     The CVAS business (composed of the carrier VoIP and application solutions segment of the Carrier Networks business) was sold to GENBAND Inc. (now known as GENBAND US LLC) pursuant to separate asset sale agreements for EMEA and North American portions of the business, dated 23 December 2009 and 22 December 2009 respectively, for $282 million. This sale completed on 28 May 2010.

**MSS**

75.    The Multi Service Switch businesses was sold to Ericsson for $65 million pursuant to separate asset sale agreements for the EMEA and North American portions of the business, dated 24 September 2010.  This sale completed on 11 March 2011.

**Residual Intellectual Property**

76.    Pursuant to a stalking horse agreement signed with Google Inc., certain Nortel entities (including NNUK, NN Ireland, NNF SAS, Nortel GmbH and NNSA) have entered into a stalking horse asset sale agreement with Google Inc. for the sale of all of Nortel's remaining patents and patent applications for $900 million.  The stalking horse auction is due to take place on 20 June 2011.

## G.  ALLOCATION AND CLAIMS

77.    The Canadian Debtors filed a motion with the Canadian Court establishing a Bar Date for EMEA Claims against the Canadian Debtors in January 2011.  In those proceedings, John Whiteoak, a Partner of Herbert Smith LLP, swore an affidavit[61] explaining, *inter alia*, the interconnection between the allocation process and the various claims the EMEA Debtors have, or will make against the US and Canadian Debtors and the claims it is envisaged the Canadian Debtors will make against certain EMEA Debtors in the English insolvency proceedings or by way of set-off in the Canadian claims process.

78.    For reasons set out in that affidavit, there is a factual overlap between some of the claims that have been or will be made and the various allocation arguments that will be asserted in any allocation process.  Similarly, as set out below, there appears to be a factual overlap between the claims the UK Pension Authorities have asserted against many Nortel entities (including 16 of the 19 EMEA Debtors) and allocation arguments.

[61] Ex. pages 1115-1144

79.     As noted in Mr. Whiteoak's affidavit, it would be preferable if at least these overlapping inter-estate claims in the US, Canadian and UK insolvency proceedings could be consolidated into a cross-jurisdictional arbitral process with the allocation dispute.  However, if that cannot be achieved then in any event the allocation arbitration should proceed first.  The allocation dispute is the only forum in which all relevant estates will participate, and in which overlapping issues between allocation and claims should be decided. Such process should avoid, or at least reduce the number of, decisions with the same or similar subject matter in different jurisdictions. It will also reduce the possibility of any conflicting findings of fact.

80.     I note, as described below, similar submissions were made in February 2010 by Mr. John Ray, on behalf of the US Debtors, and Ms. Anna Ventresca, on behalf of the Canadian Monitor, in support of the motions of the US and Canadian Debtors to stay the UK pension proceedings.

## H.  PENSION APPLICATION IN THE US AND CANADA

81.     On or around 26 February 2010, this Court heard and granted a Motion from the US Debtor for Entry of an Order Enforcing the Automatic Stay against Certain Claimants with Respect to the UK Pension Proceedings (D.I.2441)[62].  On or around 25 February 2010, the Canadian Court heard and granted a similar application by the Monitor in the CCAA proceedings of the Canadian Debtors to stay the proceedings by the UK Pension authorities[63].

82.     The UK pension proceedings referred to in those motions relate to claims the Pension Regulator (a UK statutorily appointed regulator) commenced not only against the US and Canadian Debtors, but also, *inter alia*, against 16 of the 19 EMEA Debtors.  Currently those

---

[62] Ex. pages 1145-1196 and 49-68
[63] Ex. pages 1197-1214

claims against the EMEA Debtors, and other non-filed Nortel entities in the Europe and African region, have been referred to the Upper Tribunal, a division of the High Court of England and Wales where those claims shall be judicially adjudicated by a High Court Judge, and, if necessary, the appeal courts of England and Wales.

83.    In relation to the Motion heard by this Court on 26 February 2010, Mr. John Ray, the US Debtors' Principal Officer, made the main declaration and swore to the process for allocating proceeds.  In his declaration, Mr. John Ray stated[64]:

"*14. The issue to be determined in the U.K. Administrative Proceeding – whether and to what extent NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates – overlaps with one of the overriding issues in these cases, as well as in the related insolvency proceedings in Canada and the U.K.:  the allocation of the billions of dollars in proceeds of the post-petition sales of the Nortel assets.  This allocation will be a key part of the determination of the amounts available for distribution to the creditors located in the various jurisdictions, and will be based in part on the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold.*

*15. In recognition of the integrality of the allocation issue to the ultimate resolution of the global Nortel bankruptcy and insolvency cases, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors* [footnote omitted], *including NNUK, agreed, an Interim Funding and Settlement Agreement ("IFSA"), inter alia, (a) that all proceeds of sales of material assets of any Nortel debtor worldwide will be held in escrow until the parties either agree on a consensual allocation or, in the absence of such an agreement, obtain a binding determination on the allocation*

---

[64] Ex. pages 1219-1222

*pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. IFSA §§12(b)-(c) attached to Declaration of Lisa M. Schweitzer dated February 17, 2010 as Exhibit B.*

*16. The parties have engaged in extensive negotiations regarding the terms of the allocation protocol. The purpose of the protocol, (called the Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds), is to ensure a fair process for determining the allocation, to be determined (absent a consensual agreement), in a single cross-jurisdictional forum.*

*17. Resolution of the allocation issue may entail, among other things, reference by the contending parties to Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, individual corporate assets, and individual corporate revenues. These issues overlap with the inter-affiliate benefit analysis raised in the U.K. Administration Proceedings.*

*18. In the absence of the Court enforcing the automatic stay, a U.K. administrative body, whose sole focus is the financial protection of U.K. pension plans and their insurance vehicle, will be permitted to determine factual issues – including the benefits received and conferred among affiliates – that are not only central to the allocation process, but ones that NNUK has agreed must be resolved on a global basis in a single cross-jurisdictional forum. The U.S. Debtors should not be faced with the risk of collateral estoppel arising from litigation of the U.K. pension issues in advance of the allocation process.*

*19. In addition, I understand that one of the key elements in determining the "reasonableness" of imposing a FSD and CN against a Target is the Target's financial condition. (Hitchcock Dec. at*

*¶¶ 37.4.4,44.6.)  Until the allocation procedure is completed, however, the financial condition of the Debtors, as well as NNUK, whose alleged inability to fund its pension plan is the very reason for the U.K. Administrative Proceeding, cannot be determined.*

***The Burden Imposed on the Debtors***

*20. The breadth of the issues that TPR and U.K. Pension Claim have raised, and the very short timeframe it has provided for responses, would impose a substantial burden on the Debtors… Many of the fact issues – such as transfer pricing, ownership of intellectual property, internal research and development allocation and individual asset values – may also relate to the allocation process."* [emphasis added]

        84.     In reliance on this evidence and oral argument, this Court granted the motion sought.  In written reasons dated 9 March 2010, the court stated, *inter alia*[65]:

*"On June 9, 2009, to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales of their businesses, the Canadian Debtors, the US Debtors, and the EMEA Debtors, including NNUK (by the Joint Administrators), entered into an Interim Funding and Settlement Agreement (the "IFSA").  The Court approved the IFSA on June 29, 2009.  Pursuant to section 12 of the IFSA, the parties agreed that the proceeds of any sale of their material assets (less taxes and costs) would be held in escrow until the parties either reached consensual allocation of the proceeds, or:*

*   "in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol...applicable to the Sale Proceeds...which Protocol shall provide binding procedures for the allocation of Sales Proceeds..."*

---

[65] Ex. pages 51-68

33267259_6

*PREJUDICE*

*An overriding issue in these cases - as well as in the related insolvency proceedings in Canada and the UK - is the allocation of the billions of dollars in the proceeds of the post-petition asset sales.  This allocation will determine the amounts available for distribution to the creditors located in the various jurisdictions, in part based on the factual issue of the respective contributions of the various Nortel entities to the value of assets sold. (Ray Dec. para 14).*

*In recognition of this fundamental question, the US Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK) entered into the IFSA, pursuant to which they agreed, inter alia, (a) that all such sale proceeds will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process (IFSA paras 12(b)-(c), Exhibit B to the Schweitzer Dec.).*

*In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of the allocation protocol.  The purpose of the protocol (called the "Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds") is to ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum (Ray Dec. para 16).* [emphasis added]

*The Court is satisfied that the Claimants seek to litigate, in the context of an administrative proceeding before a UK administrative body whose sole focus is the financial protection of UK*

*pension plan members and an insurance vehicle, the question of whether NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that it is "reasonable" to impose financial responsibility on its affiliates.  The issue overlaps heavily with issues in the allocation dispute.  The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process (Ray Dec. para 14).*

*Indeed, the resolution of the issues Claimants seek to litigate in the UK Proceedings may involve consideration of the same factors - including Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to intellectual property, and individual corporate assets and revenues - as those that may be significant to the allocation process.  (Ray Dec. para 17).*

*<u>The Nortel debtors in Canada, the US, and the UK have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum</u>.  They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.*
[emphasis added]

*Moreover, the very premise for the UK Proceedings is that NNUK does not have the resources to fund the NNUK Pension Plan, and one of the key elements against a  determining the "reasonableness" of imposing a FSD and CN against a Non-Employer under the UK Pensions Act is the financial condition of the Non-Employer...Until the allocation procedure is completed,*

*however, the financial condition of the Employer, NNUK, and the Non-Employers, including the*

*Debtors, cannot be determined (Ray Dec. para 19).*

**Conclusion**

*The Court finds that the automatic stay applies to the efforts of the Trustees and the PPF to*

*"grab" at Debtors' assets when there is already a procedure in place for the allocation of the*

*multi-national Debtors' assets.  The UK Proceedings are premature and prejudice the ultimate*

*literally global resolution of these bankruptcy cases."*

        85.    In relation to the Canadian application, the Monitor relied, *inter alia*, on

the affidavit of Anna Ventresca sworn 17 February 2010. That states[66]:

**Allocation Process and Dispute**

*23.    Perhaps the most significant outstanding matters remaining to be determined*

*relate to allocation.  In June 2009, the Applicants, the U.S. Debtors and the EMEA*

*Debtors entered into the [IFSA] which provided for a settlement of certain funding*

*matters as between the Applicants and the U.S. Debtors through to the end of September*

*2009 and as between the Applicants and the EMEA Debtors, through to the end of*

*December 2009.*

*24.    Under the terms of the IFSA the Applicants, the U.S. Debtors and the EMEA*

*Debtors, including NNUK, also agreed, inter alia:*

    *a.   that all proceeds of sales of material assets of any Nortel debtor worldwide will*

       *be held in escrow until the parties either agree on a consensual allocation, or, in*

       *the absence of such an agreement, obtain a binding determination on the*

       *allocation pursuant to an agreed upon allocation protocol; and*

---

[66] Ex. pages 1258-1260

33267259_6

    b.   *that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process.*

25.    *As has been set out in previous affidavits of John Doolittle (including those sworn 14 December 2009 and 18 January 2010) as well as the Thirty-Fifth Report of the Monitor, all of the sales proceeds as a result of the CDMA Sale, ES Sale and Next Generation Sale have been placed into escrow pending a resolution on allocation.  The Monitor's Thirty-Third Report relating to the MEN Sale also makes it clear that proceeds from the sale will be placed into escrow.  This is consistent with the provisions of IFSA as set out above.*

26.    *Further, the parties have engaged in extensive negotiations and are continuing to negotiate the terms of the protocol for adjudicating the allocation of proceeds.  <u>The purpose of the protocol…is to ensure a fair allocation, to be determined (absent a consensual agreement), in a single cross-jurisdictional forum</u>.*

27.    *In general terms, the dispute over allocation (the "Allocation Dispute") arises from:*

    a.   *Nortel's historical conduct of its operations through numerous corporations, each with separate geographical residences in the countries in which Nortel did business;*

    b.   *The conduct of Nortel's operations along business, rather than geographical divisions; and*

    c.   *The existence of different creditors (and insolvency proceedings) to the different Nortel corporations.*

28.      *As reflected by the negotiations referred to above, the IFSA contemplates the process for the division of the proceeds from Nortel's global asset sales to be:*

    a.  *Either on a consensual basis; or*

    b.  <u>*As determined by the process to be established under the Allocation Protocol.*</u>

<u>*Clearly, the division of proceeds is a complex matter, and may involve arguments with reference to a number of inter-estate financial matters.  In the circumstances, one could expect reference by the contending parties, to, among other things*</u>:

    a.  <u>*Nortel's transfer pricing system;*</u>

    b.  <u>*Ownership of Nortel's intellectual property*</u>

    c.  <u>*Nortel's internal research and development allocation;*</u>

    d.  <u>*Individual corporate revenues; or*</u>

    e.  <u>*Individual corporate assets*</u>.

*To be clear, the parameters of the debate and the positions of the parities have not as yet been fully determined.  The prior description is intended simply to assist the Court, in the absence of pleadings, with the emerging outlines of the Allocation Dispute.* [emphasis added]

29.      *However these questions are ultimately resolved, the Allocation Dispute contains the ultimate question at the heart of the Nortel insolvency proceedings and estates: how to divide the proceeds created by the global sales process among the various creditors of the different Nortel entities.*

      86.      As noted by both Mr. Ray and Ms. Ventresca, the parties have proceeded to sell the assets of this global business on the basis that the allocation resolution is pre-eminent and should not be prejudged by any single jurisdiction court, tribunal or process.  Instead those

issues - which do impact on, *inter alia*, Nortel's transfer pricing arrangements, Nortel's Master

Research and Development Agreement, the value of certain research and development,

ownership rights to intellectual property, and individual corporate assets and revenues - should

be decided in a cross-jurisdictional tribunal established under the IFSA.

## I. PREJUDICE TO CREDITORS THROUGHOUT EUROPE

87.    The insolvency of the Nortel Group is a global process and requires a

global solution to ensure a satisfactory result for creditors worldwide.  The EMEA Debtors

comprise 19 separate companies located in 18 separate countries across Europe.  Although the

English insolvency regime is the relevant regime in respect of the various insolvencies, each

EMEA Debtor has a significant number of local creditors, on whose behalf the Joint

Administrators, as officers of the English Court, act.

88.    As part of this role the Joint Administrators consult and report to the

creditors of the EMEA Debtors and have done since shortly after their appointment on 14

January 2009.  This includes ensuring that all creditors are abreast of the Joint Administrators'

plans.

89.    As part of the Joint Administrators' consultation, they have worked to

ensure local creditors are both aware of, and, so far as possible, agree with, the operation of the

administration.

90.    As described above, the Joint Administrators have agreed to enter into

various business sales, which comprise the businesses (being the major assets) of the various

individual EMEA Debtors – on behalf of the creditors of each of those EMEA Debtors.  Such

businesses were sold as part of the sale of the global businesses and indeed creditors were to be

afforded suitable protection in that the full value of the businesses sold would be determined by

agreement or by a global allocation process.  I understand that the Joint Administrators entered into this arrangement as they believed that it was in the best interests of each of the EMEA Debtors' creditors.  They sought approval from the English Court on this basis.

91.    I understand that the Joint Administrators did not agree, and that nor would they have agreed, to a process whereby the rights to the assets sold would be determined by the courts of other jurisdictions outside the EMEA region and in the location of two other selling debtors (i.e. the US and Canada).

92.    The EMEA creditors, including all the local creditors, are keen for a distribution process to begin, particularly as all the businesses have now been sold.

93.    Creditors in each of the EMEA Debtors outside the UK are statutorily entitled to commence secondary proceedings and appoint local office-holders in respect of the assets in each of the European countries.  To date, the Joint Administrators have worked to ensure secondary proceedings are not commenced (save for NNSA) to enable the global allocation process under the IFSA to be effected.  It is possible that these creditors, having worked with the Joint Administrators to facilitate their assets being sold as part of a global realisation of Nortel's businesses, will now seek to instigate secondary proceedings if the Joint Administrators are deprived of an opportunity to argue their entitlement to allocation as part of a global allocation process and if jurisdiction is instead determined by the US and Canadian Courts.

94.    This will, of course, cause even further complication to what is already a complicated, but to date successful, global insolvency.

## J. DOCUMENT DISCOVERY

95.    In paragraph 2 of the Joint Motion dated 25 April 2011, the Movants state

that "[*t]he mediation involved wide-ranging discovery resulting in the exchange of thousands of*

*pages in submissions with respect to the allocation of the Sale Proceeds*".  Further, in paragraph

4 of Exhibit B to the Joint Motion, the Movants suggest that the "*The US and Canadian Courts*

*will determine the procedures that will govern the Allocation Protocol Hearings and related*

*Allocation Protocol Discovery. In recognition of the extensive discovery already conducted by*

*the parties to date in connection with the non-binding mediation sessions, the Allocation*

*Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner*".

96.    Discovery might have been wide-ranging and it might have been extensive

but it was not as focussed as was necessary and it was not adequate. This point can be made by

the disclosure of all the parties, including EMEA.  Indeed, during negotiations, various parties

voiced criticism of the discovery process and stated that it was inadequate. The discovery

process to which the Movants refer was conducted in the circumstances described above and has

been without prejudice, informal, ad hoc and limited to requests for documents, which at the time

were considered to be significant, required for the purposes of settlement negotiations.

97.    Furthermore, discovery was given on a voluntary basis with no

supervisory body to regulate the process or impose sanctions in the event of failure to disclose

documents.  The parties did not agree any discovery protocol governing the scope of the searches

to be performed.  Due to the tight deadlines involved in the mediation and claims process, the

parties agreed to keep limiting their requests for key documents.  The documents that have been

disclosed were only responsive to those narrow requests. This has resulted in significant gaps in

the discovery.

98.    I do not criticise the incomplete disclosure to date. It was provided to assist in an informal consensual process.  It is, however, entirely inadequate for a proper contested hearing on the underlying substantive matters.

\*                          · \*                          \*

99.    I declare under penalty of perjury of the laws of the United States of America   that the foregoing is true and correct.  I make this unsworn declaration pursuant to 28 U.S.C. § 1746.

Executed on the ___ day of May 2011.

_____
                         Kevin Francis Lloyd

SCHEDULE A – EMEA DEBTORS

1. Nortel Networks UK Limited

2. Nortel Networks S.A.

3. Nortel Networks (Ireland) Ltd

4. Nortel Networks International Finance & Holdings BV

5. Nortel Networks France SAS

6. Nortel Networks SpA (Italy)

7. Nortel GmbH

8. Nortel Networks NV (Belgium)

9. Nortel Networks BV (Netherlands)

10. Nortel Networks Hispania SA

11. Nortel Networks Polska Sp.z.o.o.

12. Nortel Networks (Austria) GmbH

13. Nortel Networks Slovenska s.r.o.

14. Nortel Networks Engineering Service Kft (Hungary)

15. Nortel Networks AB (Sweden)

16. Nortel Networks s.r.o. (Czech Republic)

17. Nortel Networks Portugal S.A.

18. Nortel Networks Romania Srl

19. Nortel Networks Oy (Finland)