# Exhibit A

# Herbert Smith

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York
NY 100006-1470
USA

For the attention of James L Bromley

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
T +44 (0)20 7374 8000
F +44 (0)20 7374 0888
D +44 (0)20 7466 2271
DX 28
E kevin.lloyd@herbertsmith.com
www.herbertsmith.com

Our ref
1403/30907295
Your ref

Date
09 May 2011

Dear Sirs

## Court Hearing Returnable on 7 June 2011

We will be filing our response to the Allocation Protocol Motion on or before 19 May 2011 as required and we will also be filing Proofs of Claim against the US Estate on or before 1 June 2011.

We are aware of various representations which have been made to the US Bankruptcy Court in respect of the Hearing scheduled for 7 June. We take issue with a number of points which have been made. In view of the fact that there is a Status Conference tomorrow, we thought that it would be helpful to the parties and to the Courts if we were to make known, at this stage, our views with regard to the matters in question.

We are also conscious that Jim Bromley has informed the Court that he is available until 7 June to see if the Allocation Protocol can be finalised through negotiation. We have always been prepared to try and finalise an Allocation Protocol and we see no reason why the parties should not be able

Herbert Smith LLP is a limited liability partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation Authority of England and Wales. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications.

10/33166705_1

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

to agree this before 7 June without the Courts' help or, alternatively, shortly after 7 June with the assistance of the Courts.

Our general position is as follows:

1.  In broad terms we have no difficulty with the proposed Allocation Protocol save for one principal point. Namely, it is clear that the parties have expressly agreed that allocation will be dealt with by the "dispute resolver(s)" as defined in clause 12 of the Interim Funding and Settlement Agreement ("IFSA"). In other words, that there will be, in effect, an arbitration to deal with allocation. We have commented on this issue further below. EMEA's position in respect of such arbitration is that each party would be free to advance whatever facts and issues it sees fit to the dispute resolvers as to how allocation is to be determined.

2.  The Courts should participate as necessary in ensuring that the parties enter into an Allocation Protocol as envisaged and in accordance with clause 12 of the IFSA.

3.  Clause 12 of IFSA relevantly states as follows:

    "*12.b ...pending the distribution of the Sale Proceeds (as defined) the entire amount of the Sale Proceeds... shall be deposited in an escrow account pursuant to an escrow agreement (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors (as defined) or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol applicable to the Sale Proceeds.*

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

*12.c ...the Debtors shall, as soon as reasonably practicable, following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such transactions have been unable to reach agreement regarding such allocations.*

*12.d The Selling Debtors shall, immediately following entry into any Sale Transactions, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds."*

4.  It is clear from the terms of clause 12 of IFSA that the parties have agreed that "dispute resolvers" will determine substantive matters relating to allocation, rather than the Courts. However, we agree that if the parties are unable to agree the terms of the Allocation Protocol then the Courts should assist in helping the parties to agree such terms. Thereafter, the underlying substantive issues should be determined by the "dispute resolvers" as referred to in clause 12 of IFSA.

5.  As described in the Motion, there have been discussions between the relevant parties to agree the terms of the Allocation Protocol and it is true that those discussions have not yet resulted in agreement of a final Allocation Protocol. However, they did result in the parties agreeing that three dispute resolvers should be chosen, one by the Canadian estate, one by the US estate and one by EMEA. The point was even reached where the parties were due to exchange names of

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

suggested dispute resolvers. At this point the negotiations were suspended because one party (not EMEA) sought to improperly limit the issues which could be considered by the dispute resolvers. This, of course, had nothing to do with the identity of the individual dispute resolvers or for that matter, the fact that dispute resolvers should be appointed, or that the parties acknowledged that they should be so appointed. Instead of continuing negotiations regarding the Allocation Protocol, the parties focussed their energies upon negotiating the substantive issues in dispute. In light of the failure to agree on the substantive issues in dispute, the Allocation Protocol should now be finalised.

6. It is for the dispute resolvers themselves to decide the matters which they are able to determine in order to resolve allocation. However, even if the Courts should decide this, that does not derogate from the fact that the substantive issue of allocation is nevertheless a matter that, on any basis, must be decided by the dispute resolvers.

7. For the avoidance of doubt, EMEA will readily agree the terms of an Allocation Protocol whereby (in the manner explained in paragraph 5 above) three dispute resolvers are appointed in accordance with clause 12b of IFSA. What EMEA cannot agree is that the US and Canadian Courts should dispose of the substantive allocation issues. That would not be in accordance with clause 12 of IFSA which is clear on this point, nor would it be in accordance with the terms of the Escrow Agreements which were subsequently entered into. Further, it is not the basis upon which EMEA has entered into the various sale transactions which have occurred since IFSA was agreed on 9 June 2009, nor is it the basis upon which the Joint Administrators obtained the approval of the English Court that they enter into IFSA, nor is it the basis the French administrator and liquidator obtained the approval of the French Court (indeed the

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

French Court specifically noted in its approving order that any allocation dispute must be resolved by a neutral third party arbitrator – an "*un tiers arbitre*").

8. At the Status Conference on 26 April 2011, we gather that Judge Gross questioned whether claims to be made by EMEA against the US estate should not be resolved at the same time and in the same hearing as allocation. He added that if there was an overlap then addressing claims at the same time might not add greatly to the length of an allocation hearing.

9. Our view is that there is clearly an overlap between the subject matter to be considered in dealing with allocation and the subject matter to be considered in dealing with claims that EMEA is bringing against both the US estate and the Canadian estate.

10. In brief, with regard to allocation, EMEA's position is that it is entitled to an interest in the proceeds of sale, commensurate with its contribution, direct and indirect, to the value in the businesses sold. That contribution is reflected in the terms of the MRDA, which agreement needs to be read on "an arm's length basis". However, contribution is also reflected in the fact that, on EMEA's case, value was improperly removed from EMEA in favour of the US and Canadian estates, that that money was used by the US and Canadian estates to enhance the value of the businesses sold and that such value should now be attributed or allocated to EMEA. In this regard we have referred to the existence of a proprietary entitlement on allocation. In so far as EMEA were not to receive its full entitlement on allocation, then that would affect the quantification and substance of the unsecured claims which EMEA would pursue through the inter-company claims processes against the Canadian and the US estates.

Herbert Smith in association with
Gleiss Lutz and Stibbe

**6**

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

In so far as we understand it, Canada's claim is that it also relies on the terms of the MRDA and says that this governs allocation. Crucially, Canada's position differs from EMEA in that Canada asserts that the MRDA was at arm's length. EMEA has lodged proofs of claims in Canada seeking recovery for the loss suffered by it on the basis, *inter alia*, that transfer pricing payments made on its behalf pursuant to the MRDA were not at arm's length.

In so far as we understand its position, the US estate asserts that it is entitled because of the quantum of revenues generated by the US estate when compared with revenues arising elsewhere in the Nortel Group.

11. It is clear from the above that on any basis there is an overlap in respect of the subject matter which needs to be considered in respect of allocation and inter-company claims and there will also be an overlap in respect of witnesses and documents. Jim Bromley has stated that he thought there would be no overlap at all between the witnesses who would speak on claims issues and the witnesses who would speak on allocation issues. This is incorrect.

12. We note that Jim Bromley has also said that the main dispute in respect of allocation concerns differences in valuation methodologies. He has said that allocation will be "a fight of valuation methodologies". This is incorrect. Allocation is not simply about "valuation methodologies". He further stated that it will be "mainly decided based on expert reports on valuation". Once more, this is incorrect.

13. Paragraph 32 of the Joint Motion states that:

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

*"It manifestly was not the intention of the parties to the IFSA that, absent consensual agreement, there would be a never-ending stalemate, and that the Sale Proceeds would remain in Escrow in perpetuity".*

We agree with this observation.

14. However, Paragraph 32 of the Joint Motion then states that:

*"The only reasonable interpretation of the IFSA – consistent with its clear terms – is that the US and Canadian Courts may – and indeed must – resolve any disputes under the IFSA, including the current impasse regarding an Interim Sale Protocol and allocation of the Sale Proceeds."*

This is a non sequitur. We agree that the US and Canadian Courts should resolve the current impasse regarding the Allocation Protocol and that it should require the parties to agree the terms of such Allocation Protocol appointing dispute resolvers within a specified period of time, failing which the US and Canadian Courts should direct the terms of the Allocation Protocol, which should be entered into pursuant to clause 12b of IFSA appointing the three dispute resolvers. However, what we do not accept is that the US and Canadian Courts could, should, and indeed, "must" determine the substantive issue of allocation of the Sale Proceeds. This is instead a matter for the dispute resolvers.

15. The issues to be considered as part of the allocation process are also a matter for the dispute resolvers, once appointed. If, as we anticipate, the dispute resolvers decide that the subject matter pertaining to allocation overlaps with some of the subject matter relating to inter-

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

company claims then there will need to be rulings as to whether the parties, in respect of inter-company claims, are to be bound by evidence and findings in the allocation process. Clearly the parties need to proceed in a way which is as efficient and cost-effective as possible. In our view, it follows, on this basis, that the parties should agree that relevant findings and evidence in the allocation process be accepted for all purposes but, no doubt, this is a matter which can be discussed.

16. Jim Bromley has said that he is available to negotiate and finalise the terms of the Allocation Protocol. We are similarly available and do not consider that it need take very long to agree this. We would be prepared to work with an Allocation Protocol along the lines of that appended to the Allocation Protocol Motion, subject to the appointment of the three dispute resolvers as explained above. Alternatively, we can simply agree the identity of the dispute resolvers and submit all other issues to them. A further possibility would be to agree to finalise the draft Allocation Protocol which was in a very advanced form and the subject of very detailed discussions between the parties. We are also prepared to agree a deadline by which the above needs to be done and to further agree that if no agreement has been reached by that date then the Courts should direct what needs to be done to implement the Allocation Protocol referred to in clause 12 of the IFSA. Would you please let us know how you wish to proceed and in particular if you wish to agree to a conference call which would be held on an open basis and involving the relevant parties with a view to agreeing the way forward. We would suggest that this occur as soon as possible and in any event before 7 June 2011. We therefore suggest that such a conference call be held at the beginning of the week commencing 16 May 2011.

17. One point we should make clear is that EMEA is fully prepared to progress this matter as quickly as possible. There should be no delay in resolving the allocation dispute. Indeed it

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

would be sensible for allocation to immediately be determined and to be done so in advance of claims. In this regard, we note that it is important that the assets in the lockbox are, for most entities, the only unrealised assets in their respective estates. Those proceeds should be properly distributed to each entity so that they may be distributed (either by interim or final distribution) by each of them in accordance with local insolvency laws. In EMEA we cannot even commence our claims process until the administrators have a firm understanding of timing of allocation and therefore the likely timescale for payment of a dividend. The delay in receiving the lockbox assets is therefore adversely effecting creditors of EMEA, as it is the creditors of the US and Canadian estates. Indeed, some entities which are a party to the IFSA (for example, Nortel Switzerland) have not been involved in the Canadian and US claims processes and the delay in distributing the lockbox proceeds is the primary matter delaying the winding up of such entities. One of the attractions of the international arbitration envisaged in the IFSA is that it would not only be expeditious, but also free from appeal. If allocation is determined first by the IFSA dispute resolvers this will also be the only proceeding in which all relevant parties will be participants, allowing any decisions to be final and binding and also assisting in quantifying any claims that are being made. The IFSA envisaged an early and expeditious determination of proceeds. This is what we seek.

We look forward to hearing from you.

Yours faithfully

*Herbert Smith LLP*

**HERBERT SMITH LLP**

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

Date
09 May 2011
To
Cleary Gottlieb Steen & Hamilton
LLP

## CC:

David H. Botter, Esq.
Fred S. Hodara, Esq.
Akin Gump Strauss Hauer & Field LLP
One Bryant Park
New York, New York 10036

Thomas R. Kreller, Esq.
Albert A. Pisa, Esq.
Milbank, Tweet, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413

Derrik C. Tay, Esq.
Jennifer Stam, Esq.
Ogilvy Renault LLP
Suite 3800, Royal Bank Plaza, South Tower
200 Bay Street – P.O. Box 84
Toronto ON M5J 2Z4, Canada

Jay Carfagnini, Esq
Joseph Pasquariello, Esq.
Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto On M5H 257, Canada

Michael Luskin, Esq.
Derek J.T. Adler, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

Edwin J. Harron, Esq.
Young Conaway Stargate & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

Robin Schwill, Esq.
Matthew Gottlieb, Esq.
Davies Ward Phillips & Vineberg LLP
44th Floor
1 First Canadian Place
Toronto, ON M5X 1B1

Herbert Smith in association with
Gleiss Lutz and Stibbe

**EXECUTION VERSION**

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

related understandings contained in, the documents listed in <u>Annex A</u> hereto, the "<u>Master R&D Agreement</u>") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in <u>Annex B</u> hereto and any other agreements similar to the agreements listed in <u>Annex B</u> hereto (as amended, supplemented or otherwise modified, the "<u>Distribution Agreements</u>"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "<u>January Payment</u>"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "<u>Canada/US Interim Period</u>" and the "<u>NNI Interim Obligations</u>") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "<u>EMEA Interim Period</u>"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "<u>Inter-Company Trading Payments</u>") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "<u>GSPAs</u>") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("<u>Trading Orders</u>"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "<u>Creditors' Committee</u>") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "<u>Bondholders' Committee</u>") have each agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

    a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

2. <u>Use of Funds; Reporting</u>.

    a.    NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "<u>Permitted Uses</u>").  To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b.    NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "<u>13 Week CF Forecast</u>"), and (ii) reports on actual weekly cash flow results.  NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3. <u>Maximum Payment; Full and Final Settlement</u>.  The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations.  Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4. <u>Settlement of Motions</u>.  It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

5.  <u>True-up Obligations</u>.  NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>").  Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above,  pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>").  The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full.  For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries,</u>" as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6.  <u>Administration; Funding</u>.

   a.  NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below.  Each of the EMEA Debtors hereby appoints NNUK as its agent

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on <u>Annex D</u> hereto.  Each of the EMEA Debtors agrees that the payments set out in <u>Annex D</u> shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK.  To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>First Shortfall Payment</u>"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "<u>Material Asset Sale</u>"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>Second Shortfall Payment</u>" and together with the First Shortfall Payment, the "<u>Shortfall Payments</u>"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.  The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full.  The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group.  Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL.  For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.   NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge).  Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f.   The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g.   In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances.  In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.   The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7. <u>Covenants</u>.

    a.  [left intentionally blank].

    b.  In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor.  The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8. <u>Maximum Payment; Full and Final Settlement</u>.  Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto.  Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9. <u>Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors</u>.  It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

## PART C – <u>PROVISIONS OF GENERAL APPLICATION</u>

10. <u>Scope of this Agreement</u>.  The Parties hereto agree that:

    a.  this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b.  this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either:  (i) prior to the Filing Date, or (ii)

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however*, the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.   this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.   each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.   this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.   this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. <u>Relinquishment of Intellectual Property Licenses</u>.

a.   Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "<u>IP Licenses</u>") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "<u>Asset Sale</u>"); *provided, however*, that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

b. For the purposes of this Agreement, the term "<u>Appropriate License Termination</u>" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "<u>Transaction IP</u>"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "<u>Existing Customer Contract</u>"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property.  For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c. The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination."  In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

    d.   Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. <u>Entry into Sale Transactions.</u>

    a.   Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "<u>Selling Debtor</u>") is proposed to be a party (each, a "<u>Sale Transaction</u>") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("<u>Sale Proceeds</u>") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

    b.   Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "<u>Escrow Account</u>").  In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

    c.   Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "<u>Interim Sales Protocol</u>"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

    d.   The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

e.  Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f.  Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g.  For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

  i.  the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

  ii.  the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. <u>Effectiveness</u>.

a.  No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "<u>North American Court Condition</u>"), (B) the UK Court giving a direction (the "<u>UK Court's Directions</u>") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "<u>UK Court Condition</u>" and, together with the North American Court Condition, the "<u>Court Approval Condition</u>"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition.  Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective).  Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective.  For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

   i.    use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

   ii.   keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

   iii.  use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e.  If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f.  Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. Term.  This Agreement shall expire on December 31, 2009 (the "Expiration Date"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. Amendments.  This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. Governing Law and Jurisdiction.

a.  This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

    b.   To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. <u>No Personal Liability of the Joint Administrators</u>.

    a.   The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

    b.   The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

    c.   Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

18. Creditors' Committee and Bondholders' Committee Support.

    a. Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b. Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

    a. Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i. it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii. the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii. this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b. Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights.  Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the

Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment.  The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. <u>Counterparts.</u>  This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. <u>Severability</u>.  In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision.  The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. <u>Several Obligations</u>.  Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. <u>Defunct Distributors' Covenant</u>.  Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:   Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:  Assistant Secretary

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Director

By: _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
   Name: Paviter S. Binning
   Title:  Director

By _____
   Tracy S. J. Connelly McGilley
   Assistant Secretary


NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
   Name: Paviter S. Binning
   Title:  Director

By: _____
   Name: Tracy S. J. Connelly McGilley
   Title:  Assistant Secretary

NORTEL NETWORKS INC.

By _____
    Name: John Doolittle
    Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President


CORETEK, INC.

By _____
    Name:  John Doolittle
    Title:  Vice President


NORTEL ALTSYSTEMS, INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President

NORTEL NETWORKS HPOCS INC.

By _____
    Name: John Doolittle
    Title: Vice President

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Name: John Doolittle
    Title: Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name: John Doolittle
    Title: Vice President

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President

QTERA CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President

SONOMA SYSTEMS

By _____
    Name: John Doolittle
    Title:  Vice President

XROS, INC.

By _____
    Name: John Doolittle
    Title:  Vice President

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

   Name:

   Title:

in the presence of:

Witness Signature

   Name:
   Address:

SIGNED for and on behalf of NORTEL
NETWORKS UK LIMITED (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)          ALAN BLOOM
)
)

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS (IRELAND) LIMITED                 )     **ALAN BLOOM**
(IN ADMINISTRATION)                        )
by ALAN BLOOM as Joint Administrator       )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:

Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS NV (IN                            )     **ALAN BLOOM**
ADMINISTRATION)                            )
by ALAN BLOOM as Joint Administrator       )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:

Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS SPA (IN                           )     **ALAN BLOOM**
ADMINISTRATION)                            )
by ALAN BLOOM as Joint Administrator       )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:

Address:

**SIGNED** for and on behalf of **NORTEL NETWORKS BV (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL NETWORKS POLSKA SP Z.O.O. (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL NETWORKS HISPANIA SA (IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:

10-06-2009    01:03    FRAN-RADISSON SAS STRAND HOTEL            +46            T-141   P.005/009   F-787

Address: _[handwritten]_

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS (AUSTRIA) GMBH (IN**   ) **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature _[handwritten signature]_

Name: _[handwritten]_
Address: _[handwritten]_


**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS SRO (IN**   ) **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature _[handwritten signature]_

Name: _[handwritten]_
Address: _[handwritten]_

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS ENGINEERING** )          **ALAN BLOOM**
**SERVICES KFT (IN** )
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS PORTUGAL SA (IN** )          **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS SLOVENSKO SRO (IN** )          **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: _Helen Machaughton_
Address: _1 More London Place_
         _London SE1._

**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS ROMANIA SRL (IN**              )    **ALAN BLOOM**
**ADMINISTRATION)**                        )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: _Helen Machaughton_
Address: _1 More London Place_
         _London SE._

**SIGNED** for and on behalf of **NORTEL**  )
**GMBH (IN ADMINISTRATION)**               )    **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: _Helen Machaughton_
Address: _1 More London Place_
         _London SE1._

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS OY (IN**                )        **ALAN BLOOM**
**ADMINISTRATION)**                )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS AB (IN**                )        **ALAN BLOOM**
**ADMINISTRATION)**                )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS INTERNATIONAL**            )        **ALAN BLOOM**
**FINANCE AND HOLDING BV (IN**        )
**ADMINISTRATION)**                )
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS FRANCE S.A.S. (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name: _Helen Macaughta_
Address: _1 More London Place_
_London SE . ._

**Schedule 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**Schedule 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**Schedule 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.  Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.  Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.  Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.  Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.  Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.  Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.  Release in Connection with Master R&D Agreement dated 1 January 2009.

8.  Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

**Annex B**

**Distribution Agreements**

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

**Annex C**

**<u>Funding Schedule</u>**

Payments pursuant to Section 1.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| **TOTAL** | **US$157,000,000.00** |

**Annex D**

**Intra-EMEA Transfer Pricing Settlement Amounts**

| EMEA Debtor | Amount payable US$m |
|---|---|
| [Nortel Networks S.A.][1] | [(4.80)] |
| Nortel Networks (Ireland) Limited | (20.84) |
| [Nortel Networks AG][1] | [(4.08)] |
| Nortel Networks Hispania SA | (1.72) |
| Nortel Networks Slovensko s.r.o | (0.52) |
| Nortel Networks Romania SRL | (0.19) |
| Nortel Networks Portugal S.A. | (1.50) |
| Nortel Networks Polska S.p.z.o.o | (8.22) |
| Nortel Networks B.V. | (17.99) |
| Nortel Networks S.p.A. | (2.73) |
| Nortel Networks Engineering Services Kft | (1.92) |
| Nortel Networks s.r.o | (2.79) |
| Nortel Networks N.V. | (6.43) |
| Nortel Networks Austria GmbH | (2.35) |

---

[1] To the extent it becomes a Party hereto.

| **EMEA Debtor** | **Amount receivable US$m** |
|---|---|
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)] [1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)] [1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Nortel Networks Corporation, *et al.*, | ) | Case No. 09-10138(KG) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| —————————————————— | ) | **Re: Dkt Nos. 2441, 2576** |

### MEMORANDUM OPINION[1]

The Court conducted an evidentiary hearing on February 26, 2010, on Debtors'[2]

Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants With

Respect to the U.K. Pension Proceedings (D.I. 2441) (the "Motion"). The Court was faced

with an impending deadline of March 1, 2010 (the next business day), by which Debtors

would have to take substantial action in the absence of the relief Debtors were seeking in the

Motion. The Court granted the Motion based upon an oral ruling and entered an Order (D.I.

2576) with the understanding that it would issue a written opinion given the significance of

the issues. Time does not permit the detailed opinion which the matter warrants but the

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

[2] The Debtors in these Chapter 11 cases, which are jointly administered, are: Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc..

Court will address the issues sufficiently to provide a reviewing court, if any, with the substance of the Court's findings and its rationale for granting the Motion and thereby enforcing the automatic stay.

## A. The Motion

The Debtors seek an order pursuant to sections 362(a)(1) and (a)(6) of the Bankruptcy Code, enforcing the automatic stay against two parties, Nortel Networks UK Pension Trust Limited (the "Trustee") and The Board of the Pension Protection Fund (the "PPF") (collectively, the "Claimants"), with respect to certain U.K. Administrative Proceedings (the "U.K. Proceedings") initiated by the U.K. Pensions Regulator ("TPR"). The U.K. Proceedings relate to Nortel Networks Corporation ("NNI") and Nortel Networks (CALA) Inc. ("NN CALA"). The U.K. Proceedings will determine whether to issue a financial support direction ("FSD") against NNI, NN CALA, and the non-U.S. Nortel Entities that are identified by TPR as targets of the U.K. Proceedings. The result may be to impose financial responsibility of as much as $3.1 billion on the targets for the statutory liability of Nortel Networks UK Limited ("NNUK") to the Trustee under section 75 of the U.K. Pensions Act 1995. The Motion seeks to enforce the stay against the Claimants, who previously filed proofs of claim and thereby submitted the U.K. Pension Claim to the Court.

## B. Relevant Background

On January 14, 2009 (the "Petition Date"), the Debtors (except for NN CALA, which filed on July 14, 2009) filed voluntary petitions for relief under chapter 11 of the Bankruptcy

Code. Also on the Petition Date, the Debtors' ultimate corporate parent, Nortel Networks Corporation ("NNC"), NNI's direct corporate parent, Nortel Networks Limited ("NNL") (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

On January 14, 2009, the Canadian Court entered an order recognizing these Chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

In addition, on January 14, 2009, after the filing by the U.S. Nortel Entities, the High Court of Justice in England placed nineteen of Nortel's European affiliates, including NNUK (collectively, the "EMEA Debtors") into administration. On June 8, 2009, NNUK filed petitions in this Court for recognition of the English insolvency proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code. The need for coordination in the proceedings caused the Court to enter an order on June 26, 2009, recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.

On June 9, 2009, to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales

of their businesses, the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors,

including NNUK (by the Joint Administrators), entered into an Interim Funding and

Settlement Agreement (the "IFSA"). The Court approved the IFSA on June 29, 2009.

Pursuant to section 12 of the IFSA, the parties agreed that the proceeds of any sale of their

material assets (less taxes and costs) would be held in escrow until the parties either reached

a consensual allocation of the proceeds, or:

> "in the case where the Selling Debtors fail to reach agreement,
> determination by the relevant dispute resolver(s) under the terms
> of the Protocol ... applicable to the Sale Proceeds . . .which
> Protocol shall provide binding procedures for the allocation of
> Sales Proceeds...."

On September 30, 2009, NNUK, on behalf of itself, the Joint Administrators, and the

other EMEA Debtors, filed proofs of claim against NNI and the other U.S. Debtors "in

respect of any heretofore unknown, unliquidated, or unmatured claim or claims ... against

Nortel Networks Inc. or its affiliated debtors in these cases".

### The U.K. Pension Claim

NNUK is the employer under the Nortel Networks U.K. Pension Plan (the "NNUK

Pension Plan"), a defined benefit occupational final salary pension scheme. (Declaration of

Richard Hitchcock, dated February 18, 2010 (the "Hitchcock Dec.") ¶ 5.4.) On both

November 21, 2006 and December 21, 2007, NNL executed guarantees regarding the NNUK

Pension Plan. No U.S. Nortel Entity provided any guarantee with respect to the NNUK

Pension Plan.

4

The PPF is a U.K. statutory body established under the U.K. Pensions Act 2004 (the "U.K. Pensions Act"). NNUK's commencement of proceedings in the U.K. led to the NNUK Pension Plan entering a PPF "assessment period" pursuant to the U.K. Pensions Act. (*See* Hitchcock Dec. ¶ 5.5; Exhibit A to the Declaration of John Ray, dated February 18, 2010. ("Ray Dec.") An "assessment period" means that the PPF is working with the Trustee to determine the NNUK Pension Plan's funding position. To the best of the Debtors' understanding, the NNUK Pension Plan remains in an "assessment period."

On or about September 30, 2009, and January 25, 2010, the Trustee and the PPF jointly filed proofs of claim against the U.S. Nortel Entities. The U.K. Pension Claim is based on allegations that (i) the NNUK Pension Plan is under-funded by an estimated amount alternatively stated to be £2.1 billion or $3.1 billion; and (ii) TPR may seek to require certain of the Debtors, as well as certain non-U.S. Nortel entities, to provide financial support for the NNUK Pension Plan.

According to the U.K. Pension Claim, by the time it was filed, TPR had concluded that grounds existed to issue certain warning notices ("Warning Notices") and to seek a FSD against certain members of the Nortel Group worldwide, including NNI and NN CALA, as companies allegedly "connected with or associates of" NNUK, with respect to the allegation that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR. (*See* Exhibit A to Ray Dec.) The U.K. Pension Claim also states that the indebtedness or liability of the relevant U.S. Nortel Entities arose no later than June 30, 2008, a date well prior to the

Petition Date. In addition, the U.K. Pension Claim asserts that if a FSD is issued against any of the U.S. Nortel Entities, such entity could then be instructed under the U.K. Pensions Act to procure financial support for the NNUK Pension Plan, either alone or with other members of the Nortel Group. The U.K. Pension Claim further asserts that if a U.S. Nortel Entity receives a FSD, but fails to put or keep in place financial support for the NNUK Pension Plan approved by TPR, then TPR could also exercise its power to impose on that U.S. Nortel Entity a liability to pay a specific amount, which could be all or some portion of the deficit in the NNUK Pension Plan. (*See* Exhibit A to Ray Dec.)

## The U.K. Pensions Act

Under the U.K. Pensions Act, TPR has, in relation to a pension plan, a stated pecuniary purpose: to protect the plan benefits of members and to reduce the risk that compensation would be required from the PPF. (Hitchcock Dec. ¶ 41.) Under the U.K. Pensions Act, the PPF imposes a levy like a private insurance premium on eligible pension plans as one of the ways of funding such compensation.

In furtherance of that pecuniary purpose, TPR may conduct an administrative process whereby it may issue, through TPR's Determinations Panel (the "Determinations Panel"), a FSD under section 43 of the U.K. Pensions Act, if it believes that the employer funding the pension plan (the "Employer") is either (a) a service company, or (b) "insufficiently resourced." (*See* Hitchcock Dec. ¶¶ 37-38, 50 & Schedule 2.)

are publicly available information. It further provides, *inter alia*, that (i) the "relevant time" on which to measure the NNUK Pension Plan's funding position for the purpose of deciding whether to issue a FSD is June 30, 2008; and (ii) TPR believes it is reasonable to issue a FSD against the Targets, including NNI and NN CALA, for various reasons including TPR's analysis of certain benefits conveyed among affiliates. The Warning Notice also reviews TPR's conclusion that benefits provided by certain affiliates to certain other affiliates provides a basis for issuing a FSD. (Ray Dec. ¶ 10.)

TPR indicated that the Targets, as well as the U.K. Trustee and PPF, should respond in writing to the Warning Notice by midday on March 1, 2010, and that the Determinations Panel will consider all responses. (Ray Dec. ¶ 12.)[3]

### Canadian Debtors' Motion to Stay U.K. Proceedings

On February 17, 2010, the Monitor filed an application with the Canadian Court seeking to stay the U.K. Proceedings on the ground that they violate the stay imposed by the Initial Order issued by the Canadian Court. That application was heard on February 25, 2010. The Canadian Court issued the stay on February 26, 2010.

### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue over

---

[3] The Claimants indicated the Determinations Panel may have been amenable to an extension of the March 1 response date. However, the Determinations Panel was statutorily required to rule by June 28, 2010, thus maintaining the time pressure on Debtors.

the Debtors' Chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and

1409.

The statutory bases for the relief requested herein are sections 362(a)(1) and (a)(6) of

the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

### DISCUSSION

11 U.S.C. § 362(a)(1), provides , in part, that a "judicial, administrative, or other

proceeding against the debtor that was or could have been commenced before the

commencement of the case under this title, or to recover a claim against the debtor that arose

before the commencement of the case under this title," is stayed. *Constitution Bank v. Tubbs*,

68 F.3d 685, 691 (3d Cir. 1995) ("[t]he automatic stay is of broad scope, directing that 'all

judicial actions against a debtor seeking recovery on a claim that were or could have been

brought before commencement of a bankruptcy case, are automatically stayed'") (citation

omitted); *In re Spansion, Inc.*, 418 B.R. 84, 92 (Bankr. D. Del. 2009) ("the automatic stay

applies . . . because the claims asserted . . . 'could have been brought' and were, in fact,

brought, prepetition"). Any acts to "assess" a claim that arose before the case commenced

are similarly barred by the automatic stay. *See, e.g., Glenshaw Glass Co. v. Ontario Grape

Growers' Mktg. Bd.*, 67 F.3d 470, 477 (3d Cir. 1995).

Here, TPR has issued a Warning Notice to NNI and NN CALA, as well as to a

number of non-U.S. Nortel entities, triggering the U.K. Proceedings, on the basis of what is

described in the NNUK Pension Claim as the "financial insufficiency" of NNUK to fully

fund the NNUK Pension Plan as of June 30, 2008, six months before NNI filed its Chapter 11 petition, and over a year before the filing of NN CALA's Chapter 11 petition. Accordingly, the FSD proceeding, and any future proceedings by TPR or the Determinations Panel, could have been commenced prior to the filing of these Chapter 11 cases, and are subject to the automatic stay. *See* 11 U.S.C. §§ 362(a)(1), (a)(6); *see also ACandS, Inc. v. Travelers Cas. and Surety Co.*, 435 F.3d 252, 260 (3d Cir. 2006); *Constitution Bank v. Tubbs*, 68 F.3d 685, 693 (3d Cir. 1995).

Moreover, the Claimants have submitted to this Court's jurisdiction by filing proofs of claim against the Debtors, including NNI and NN CALA, and the subject of the U.K. Pension Claim is the very subject of the U.K. Proceedings. *See Lagenkamp v. Culp*, 498 U.S. 42, 44 (1990) (filing a claim against a bankruptcy estate subjects the claimant to the bankruptcy court's equitable jurisdiction). Post-petition attempts to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay. *See, e.g., Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1207 (3d Cir. 1991).

## The Police Power Exception to the Automatic Stay Does Not Apply

An exercise of a governmental unit's police or regulator power exempts them from the automatic stay pursuant to Section 362(b)(4) of the Bankruptcy Code.[4] Here, neither of

---

[4] Section 362(b)(4) provides, in pertinent part: "The filing of a petition under section 301, 302, or 303 of this title, ... does not operate as a stay: (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's ... police or regulatory power."

the Claimants is a "governmental unit," as defined in Section 101(27) of the Bankruptcy Code. The Trustee is a private party, and the PPF, while defined as "a statutory body" in paragraph 1.4 of the U.K. Pension Claim, during an assessment period exercises the rights and powers of the Trustee. PPF thus stands in the shoes of the Trustee, a private party. (See Exhibit A to the Ray Dec.; Hitchcock Dec. ¶ 22, 46.)

The police power exception is to be "narrowly construed," as reflected in the standards courts apply in determining whether or not a governmental unit's action or proposed action constitutes an exercise of its police power. There are two objective tests upon which courts rely in considering if the Section 362(b)(4) exception is applicable.

First, under the "pecuniary purpose" test, the issue is whether the governmental action or proceeding relates primarily to the protection of the government's pecuniary or financial interest in the debtor's property, as opposed to a matter of public safety or welfare. See, e.g., Missouri v. U.S. Bankr. Court, 647 F.2d 768, 776 (8th Cir. 1981) (denying Section 362(b)(4) defense where plaintiff sought to enforce state grain laws that "primarily relate to the protection of the pecuniary interest in the debtors' property and not to matters of public safety and health"); In re Fairchild Corp., 2009 Bankr. LEXIS 3815, at *15 (Bankr.D.Del. Dec. 1, 2009) (concluding that agency's action sought solely to promote its pecuniary interest in being reimbursed for expenditures, and thus did not qualify as an exercise of police or regulatory power).

The U.K. Proceedings do not pass the "pecuniary purpose" test. The stated purpose of the U.K. Proceedings is to address an alleged financial shortfall in a private pension plan, first by determining whether the Targets should provide financial support to the Trustee, and, then potentially by imposing and fixing a claim against NNI and NN CALA through a CN. This is purely an issue of determining which, if any, entities, on an after-the-fact basis, should be financially responsible for funding a pension shortfall. It is clearly a pecuniary matter, and, notwithstanding the importance of the financial matter to the private Trustee, under the case law does not qualify as a matter of public safety or welfare. *See, e.g., Brock v. Morysville Body Works*, 829 F.2d 383 (3rd Cir. 1987) (holding that an order to abate violations of health and safety standards was enforceable by the Secretary of Labor under section 362(b)(4)'s exception to the automatic stay); *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267 (3rd Cir. 1983) (police power exception applicable to allow a state court to issue an injunction ordering debtor to clean up environmental hazards); *see also In re James (James v. Draper)*, 940 F.2d 46 (3rd Cir. 1991) (civil forfeiture proceeding for alleged proceeds of drug sales falls within the police power exception to the automatic stay).

Further illustrative of the appropriate application of the police - regulatory exception and, by contrast, its inapplicability here, are several cases. First, in *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, (4th Cir. 2001), the appeals court affirmed the ruling that the automatic stay did not bar action by South Carolina's Department of Health and Environmental Control to close a commercial hazardous waste site. The court based its

ruling on the finding that the primary purpose of South Carolina's statute was to deter pollution, a health and safety concern.

Next, the Claimants rely heavily on Equal Employment Opportunity Commission ("EEOC") cases to argue that a pecuniary purpose does not extinguish the automatic stay exception. *EEOC v. McLean Trucking Company*, 834 F.3d 398 (4th Cir. 1987) is an example of a case in which the court found that the governmental exception applied even though the suit at issue included a pecuniary benefit, back pay. The court of appeals rejected the bankruptcy court's finding that because the debtor was in liquidation, the subject litigation was merely an action to recover back wages, an adjudication of private rights. *Id.* at 400. *McLean* and similar equal employment cases emphasize the significance of eliminating discrimination through injunctive relief and the imposition of penalties – deterrents – and, coincidentally, private causes of action. Here, the Claimants can obtain complete monetary relief in this Court at the appropriate time.

Finally, a recent decision of the Bankruptcy Court from the Eastern District of Virginia discusses the issue posed here clearly and concisely. In *In re Qimonda AG*, Slip Op., 2010 WL595654 (Bankr. E.D. Va., Feb. 16, 2010), the debtor was seeking a Section 362 stay of an International Trade Commission ("ITC") proceeding in which debtor was accused of patent infringement. The matter was ready for trial. The bankruptcy court precisely stated the issues as follows:

14

> Is the action pending before the ITC the continuation of an
> action by the ITC? Is the action an enforcement of the ITC's
> police and regulatory power?

*Id.* at *2. The court answered "no" to both questions because the action was being

prosecuted before, not by, the ITC. Id. at *3. As the *Qimonda* court explained,

> The reality is that the ITC and its administrative law judges are the
> forum before whom the action was brought by [the claimants]. . .and who are
> seeking the protection of their property rights. The proceeding is adversarial
> and subject to the adjudicative provisions of the Administrative Procedure Act,
> 5 U.S.C. §§ 551, et seq. The administrative law judge makes an initial
> determination which contains findings of fact and conclusions of law with
> respect to the issues in controversy.

*    *    *

> Rather than being the governmental unit that is enforcing the patents, the ITC
> is the forum before which private litigants are enforcing their patents.

Similarly, the TPR is the forum for the dispute in the UK Proceedings, in which private

parties are seeking to protect their property rights.

The bankruptcy court also analyzed the legislative history of Section 362(b)(4) and

concluded that the exception was explicitly limited to true governmental entities, "not to

organizations acting in a governmental capacity." *Id.* at *2. The Claimants are such

organizations acting in a governmental capacity.

What we have here are creditors who have filed claims in this Court and who are

seeking to litigate those claims clear of the Court's jurisdiction and the automatic stay. Their

effort to do so is inimical to the Debtors' effort and those of non-U.S. debtors in a highly

complex liquidation to assemble the assets, reduce them to money, allocate those assets

15

among numerous entities in many countries and then distribute the assets. The Claimants' pecuniary interest does not warrant the extraordinary standing above all others they seek. The Claimants who implore this Court to give comity to the U.K. Proceedings are themselves ignoring comity. They as much as say, "give the proceedings of our choice the respect we are unwilling to show to other proceedings in which many debtors and creditors are working tirelessly to formulate a coherent, equitable plan."

The U.K. Proceedings also fail the "public policy test." The issue under this test is whether the governmental action is taken in furtherance of a matter of public policy, or instead is intended primarily to adjudicate private rights. *See, e.g., Fairchild Corp.*, 2009 Bankr. LEXIS 3815, at *15 (action akin to private action to collect money damages does not qualify as an exercise of police power under section 362(b)(4)); *Spansion*, 418 B.R. at 95 (administrative patent proceeding against debtors, prosecuted on behalf of the public by staff attorney of the U.S. International Trade Commission, was primarily an adjudication of private rights, only incidentally serving a public interest, and thus was not an exercise of police or regulatory power exempt from automatic stay).

Here, TPR seeks not to protect the "safety or welfare" of the public in the U.K., but rather to obtain financial support for the benefit of private parties -- the members of the NNUK Pension Plan, represented by the Trustee -- and if that fails, to assert and liquidate a claim to the property of the Debtors, on the Trustee's behalf. Any sum paid as a result of the U.K. Proceedings would not go to benefit the public, but would be used to reduce the debt

16

owed by NNUK to the Trustee. The Trustee as intended beneficiary, and PPF, filed the proofs of claim to recover from the Debtors the same financial support that is the subject of the U.K. Proceedings.

The provisions of the U.K. Pensions Act establish that the purpose of the FSD and CN proceedings is to vindicate the rights of private parties, that a FSD is a demand that financial support be provided for the benefit of a private pension plan (s. 43(3)); that in the event of non-compliance with the FSD, TPR can issue a CN requiring the payment of a specified sum that is "to be treated as a debt due from the person to the trustees or managers of the scheme" (s. 49(2), (3)); and that this debt can be enforced either directly by the trustees or by TPR on behalf of the trustees of the scheme (s. 49(4)) (emphasis supplied). (*See* Hitchcock Dec. ¶¶ 41, 46.)

The U.K. Pension Claim also shows that the focus of the U.K. Proceedings is to procure a pecuniary benefit, for a private party -- the Trustee. The Claim recites the process under the U.K. Pensions Act, and that, if necessary, the TPR will attempt to impose and liquidate an enforceable debt, to be enforced by or on behalf of the Trustee, for an amount to be paid to the Trustee. (*See* Exhibit A to Ray Dec.)

### "Sea Containers" Decision

The Claimants argue that the decision in *In re Sea Containers Ltd.*, 2008 Bankr. LEXIS 2363 (Bankr.D. Del. Sept. 19 2008) supports their defense to the Motion. In *Sea Containers*, the Determinations Panel issued a FSD against a single debtor, on the grounds

that: (i) the U.S. debtor against which the FSD was sought was a U.K. chartered company which, together with its subsidiary, the plan sponsor, operated primarily out of the U.K; (ii) the debtor had a clear control relationship with the employer-affiliate; (iii) the debtor had substantial assets in the U.K; and (iv) the Determinations Panel held a hearing on the FSD request, without a motion by the U.S. debtor to invoke or to lift the protections of the automatic stay, and at which one of the two U.S. creditors' committees encouraged the Panel to issue a FSD so that the plan trustee could rely on it to pursue their claims in the Chapter 11 proceedings.

Following the issuance of the FSD, a settlement was entered into among the debtors, affiliates, one of the creditors' committees and the pension trustee, and was approved by TPR, granting the trustee an allowed claim in the bankruptcy case. The matter never reached the CN stage. The case came before the court on a motion under Bankruptcy Rule 9019 for approval of the settlement.

The court approved the settlement. In so doing, it overruled a number of objections by the second creditors' committee, one of which was that the FSD proceeding had violated the automatic stay. In this regard, the court did not treat the FSD as determinative but only ruled that the FSD "should not be ignored as invalid," because it "provide[d] guidance as to the . . . pertinent considerations in valuing the Schemes' claims." *Id.* at **26-27. The court also relied on the fact that the Determinations Panel, as one would expect, did not view itself as being constrained by the automatic stay, not surprising given that the U.S. debtor had not

18

sought an order of the bankruptcy court enforcing the stay in connection with the proceeding.

In short, the court's ruling that the FSD proceeding did not violate the automatic stay was issued in an entirely different procedural context -- a Rule 9019 motion by the debtor to approve a settlement with TPR, where the debtor had not sought to invalidate the FSD -- and on entirely different facts. Furthermore, the facts reveal that the objecting creditors' committee never sought to enforce the automatic stay or formally objected to the proceedings in the U.K. Unlike in *Sea Containers*, the Debtors and the creditors' representatives here object to the U.K. Proceedings, and dispute TPR's right to proceed against the Debtors in the absence of relief from the automatic stay. Further, in contrast to *Sea Containers*, which involved only a FSD proceeding, here TPR is attempting to secure financial support for the benefit of the Plan Trustee through a FSD proceeding and, if necessary, a CN proceeding, which creates an enforceable debt. Also, the Trustee has already submitted to the jurisdiction of the Court for determination and liquidation of contingent and unliquidated claims for the very same financial support TPR seeks to obtain for them in the U.K. Proceedings. And here, unlike in *Sea Containers*, the Warning Notice makes plain that TPR is asserting a contingent claim, whereas in *Sea Containers*, integral to the court's ruling that there was no stay violation was its determination that there was no assertion of a claim. *Id.* at *26. Accordingly, *Sea Containers* is confined to its facts and is not controlling.

19

### Prejudice

An overriding issue in these cases -- as well as in the related insolvency proceedings in Canada and the U.K. -- is the allocation of the billions of dollars in proceeds of the post-petition asset sales. This allocation will determine the amounts available for distribution to the creditors located in the various jurisdictions, in part based on the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold. (Ray Dec. ¶14.)

In recognition of this fundamental question, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK) entered into the IFSA, pursuant to which they agreed, *inter alia*, (a) that all such sales proceeds will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. (IFSA §§ 12(b)-(c), Exhibit B to the Schweitzer Dec.)

In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of the allocation protocol. The purpose of the protocol (called the "Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds") is to ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum. (Ray Dec. ¶ 16.)

20

The Court is satisfied that the Claimants seek to litigate, in the context of an administrative proceeding before a U.K. administrative body whose sole focus is the financial protection of U.K. pension plan members and an insurance vehicle, the question of whether NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates. That issue overlaps heavily with the issues in the allocation dispute. The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process. (Ray Dec. ¶ 14.)

Indeed, the resolution of the issues Claimants seek to litigate in the U.K. Proceedings may involve consideration of the same factors -- including Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, and individual corporate assets and revenues -- as those that may be significant to the allocation process. (Ray Dec. ¶ 17.)

The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum. They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.

21

Moreover, the very premise for the U.K. Proceedings is that NNUK does not have the resources to fund the NNUK Pension Plan, and one of the key elements in determining the "reasonableness" of imposing a FSD and a CN against a Non-Employer under the U.K. Pensions Act is the financial condition of the Non-Employer. (U.K. Pensions Act s. 42(5); s. 47(3); *see* Hitchcock Dec. ¶¶ 37, 44.)  Until the allocation procedure is completed, however, the financial condition of the Employer, NNUK, and the Non-Employers, including the Debtors, cannot be determined. (Ray Dec. ¶ 19.)

### CONCLUSION

The Court finds that the automatic stay applies to the efforts of the Trustees and the PPF to "grab" at Debtors' assets when there is already a procedure in place for the allocation of the multi-national Debtors' assets. The U.K. Proceedings are premature and prejudice the ultimate literally global resolution of these bankruptcy cases.  An order has already issued.


Dated: March 9, 2010

KEVIN GROSS, U.S.B.J.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

Outline of Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds

**Recitals**

1. Parties

     a.     Nortel Networks, Inc. and affiliates (the US debtors)

     b.     Official Committee of Unsecured Creditors of US debtors

     c.     Nortel Networks Corporation and subsidiaries (the Canadian debtors) Ernst & Young Inc., Monitor in the Canadian proceedings

     d.     Nortel Networks UK Limited and affiliates (the EMEA debtors) Ernst & Young LLC individuals serving as administrators in the UK Proceedings

     e.     Ad Hoc Bondholder Group (creditors of certain of the US and Canadian debtors)

     f.     Nortel Networks Corporation and affiliates (as the Company, it is a party to the Protocol only for purposes of the provision concerning access to information and not as a party to the proceeding)

     g. [Governm     ental Pension Entities in the UK, US and Canada]

2. Pending     Proceedings

     a.     In re Nortel Networks, Inc. *et al*, Case No. 09-10138 (KG) (Jointly Administered) in the United States Bankruptcy Court for the District of Delaware (the US Proceedings)

     b.     the proceedings of the Canadian debtors before the Ontario Superior Court of Justice under the Companies' Creditors Arrangement Act (the Canadian Proceedings)

     c.     the administration of the EMEA debtors in the United Kingdom before the High Court of Justice in England (the UK Proceedings)

3. Description     of Parties' Intentions

     a.     Sell assets of their estates in several transactions, each relating to a particular line of business (each, a Business)

     b.     With respect to each Business, enter into an acquisition agreement with a buyer

     c.     Apply for orders authorizing the establishment of notice, bid and sale procedures with respect to the sale of each Business

     d. Conduct     an auction

     e.     Apply for orders approving the sale of each Business and establishing an escrow account for proceeds

     f.     Closing of each sale

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Article I – Initial Negotiations**

1. During the period commencing upon execution of any acquisition agreement relating to the sale of a Business through the date of closing of such sale, the parties shall negotiate in good faith a fair and equitable allocation of the proceeds of such sale among the parties.

2. If the parties fail to reach agreement regarding the allocation of proceeds resulting form a sale of a Business prior to the fifth business day immediately preceding the closing of such sale, the parties shall use reasonable best efforts to agree prior to such closing on the minimum amount that would be distributed to each party in any reasonable allocation scenario.

3. If the parties agree on minimum distribution amount(s) with respect to the sale of any Business, upon the closing of such sale, such amount(s) shall be distributed to the appropriate parties and any remaining amount shall be placed into escrow.  If the parties fail to agree on any minimum distribution amount(s) following such good faith negotiations, all proceeds shall be placed in escrow.

**Referring a Dispute to the Dispute Resolver**

1. Scope:  any dispute, controversy or claim arising out of, relating to, or in connection with the issue of allocation of the sale proceeds among the parties, to the extent such dispute is not resolved before closing.

2. Dispute          Resolver

    a.   Identify an individual

    b.   Identify an [accounting firm] whose assistance Dispute Resolver may seek

3. Parties shall also create a list of potential replacements in the event that the chosen Dispute Resolver is unable or unwilling to serve.

4. Costs and expenses of Dispute Resolver to be borne by the parties equally, but each party to bear costs and expenses associated with preparation and presentation of its case.

**Article II – Administrative Meetings**

1. Administrative meeting by telephone or videoconference to be held within 7 days of the start of the process.

2. Dispute Resolver may call other administrative meetings.

**Article III – Written Materials**

2

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

1. Written materials to be submitted to the Dispute Resolver are limited to a 50-page brief and exhibits in support of the brief.

2. Each party's brief shall address which of the three valuation methodologies should be applied (asset-based, revenue-based, transfer-pricing-based) or if an alternative methodology should be applied.

3. Each party's brief shall provide an allocation analysis under each of the three valuation methodologies as well as any alternative methodology advocated by such party.

4. Written materials may not contain any witness statements.

5. First round submissions are due 30 days after the start of the process.

6. Second round submissions are due 30 days thereafter.

## Article IV – Access to Information

1. Each party shall have equal access to the data room set up by the Company.

2. Each party shall provide every other party equal access to the back up information on which such party's valuations are based.

3. Each party may request additional information from the Company within 30 days of signature of the acquisition agreement; Company shall respond within 30 days of request.

4. Each party may request additional information from the Company within 5 days of first round submissions; Company shall respond within 15 days of request.

5. Dispute Resolver may request additional information from the Company within 10 days of second round submission deadline; Company shall respond within 10 days of request.

## Article V – Oral Argument

1. Oral argument shall be held in person or by videoconference between 30 and 60 days after second round submissions.

2. Each party shall be allocated an aggregate of 2 hours to present its position.

## Article VI – Decision of the Dispute Resolver

1. Decision to be rendered within 60 days of oral argument.

2. Decision shall contain:

   a. the percentage of the sale proceeds to be allocated to each party

   b. instructions to the escrow agent to distribute the proceeds accordingly

[New York #2037139 v3]

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

3.  Dispute Resolver shall make the decision based on his or her reasoned expert judgment, although decision shall not contain such reasoning, and is not bound to choose one of the positions advocated by the parties.

4.  If the parties agree on a method for allocating a portion of the sale proceeds, then the Dispute Resolver shall render a decision only with respect to the remainder.

5.  Decision may not be challenged or appealed, and shall not be deemed an arbitral award enforceable under the New York Convention.

6.  The Dispute Resolver's decision as to the percentage of sale proceeds to be allocated to each party with respect to the sale of a Business shall not be determinative of the percentage of the sale proceeds to be allocated to each party with respect to the sale of another Business.

## Article VII – Confidentiality

1.  Parties and Dispute Resolver to maintain confidentiality as to all aspects of proceeding.

2.  If a party is required by legal process to disclose confidential information, the party shall inform the provider of such information so that the provider may seek a protective order.

3.  Notwithstanding the foregoing, the parties may use information obtained in one protocol proceeding under this protocol to present its case in another proceeding under this protocol.

## Article VIII – Miscellaneous

1.  Protocol is subject to and contingent upon approval and entry by each of the relevant courts.

2.  No ex parte communications with Dispute Resolver.

3.  Exclusive jurisdiction in one of the bankruptcy courts to resolve any disputes concerning implementation of the Protocol.

4.  Other standard provisions, e.g., severability, addition of parties, execution in counterparts, integration clause.

[New York #2037139 v3]

## Mendoza, Richard

| | |
|---|---|
| **From:** | Luisa N Peredo [lperedo@cgsh.com] |
| **Sent:** | 29 April 2009 21:44 |
| **To:** | dtay@ogilvyrenault.com; plook@nortel.com; gadavies@nortel.com; mlang@ogilvyrenault.com; GALE, STEPHEN; jcarfagnini@goodmans.ca; Murray.A.McDonald@ca.ey.com; apatel2@uk.ey.com; rjowitt@UK.EY.COM; opecon@uk.ey.com; aplatt@uk.ey.com; rphillip1@uk.ey.com |
| **Cc:** | Craig B BROD; James L BROMLEY |
| **Subject:** | First drafts of funding and allocation agreements |
| **Attachments:** | 2044799_8(Letter Agreement- Minimum Allocation (as sent to Monitor and Administrators on 4.29)).DOC; 2044765_10(Framework Agreement (as sent to Monitor and Administrator)).DOC |

Dear all,

On behalf of Craig Brod and Jim Bromley attached are drafts of the following documents:

1. The Funding Framework Agreement; and
2. The Minimum Allocation Agreement, with the Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds attached thereto as Exhibit A.

Please note that we have distributed these drafts today in the interest of time, but that they remain subject to further comments by all parties.

Please let us know if you have any questions or comments.

Best regards,
Luisa

Luisa N. Peredo - Not yet admitted to the Bar
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2279 | f: +1 212 225 3999
www.clearygottlieb.com  |  lperedo@cgsh.com

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

17/05/2011

*CGSH Draft of April 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

April ●, 2009

Ladies and Gentlemen:

    This agreement is entered into by and among Nortel Networks Inc. ("NNI") and certain of its United States affiliates that are debtors and debtors-in-possession in the US Proceedings (as hereinafter defined) (collectively, the "US Debtors"); Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain Canadian affiliates that filed applications for protection in the Canadian Proceedings (as hereinafter defined) (collectively, the "Canadian Debtors", and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as the "Company" and, together with the US Debtors and the EMEA Debtors, as defined below, the "Nortel Group"); Nortel Networks UK Limited and certain of its European affiliates that are in administration in the UK Proceedings (as hereinafter defined) (collectively, the "EMEA Debtors" and, together with the US Debtors and the Canadian Debtors, the "Debtors" and each individually a "Debtor"), represented by the individuals from Ernst & Young LLC, serving as administrators in the UK Proceedings (the "Joint Administrators").

    WHEREAS, on January 14, 2009 (the "Filing Date"), the Canadian Debtors commenced creditor protection proceedings before the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

    WHEREAS, the Canadian Debtors have obtained the Monitor's consent and approval to enter into this agreement; and

    WHEREAS, on the Filing Date, the US Debtors filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (the "US Proceedings"); and

    WHEREAS, on the Filing Date, the EMEA Debtors commenced administration proceedings (the "UK Proceedings" and, together with the US Proceedings and the Canadian Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"); and

    WHEREAS, the Debtors and certain of their respective affiliates intend to sell certain assets relating to the enterprise businesses of the Nortel Group (collectively, the "Enterprise Businesses") to a third party buyer (the "Buyer"); and

    WHEREAS, with respect to the Enterprise Businesses, the Debtors intend to enter into one or more asset sale and related agreements (collectively, the "Acquisition Agreement") with the Buyer to govern the sale of certain assets of the Enterprise Businesses (the "Sale"); and

WHEREAS, after entering into the Acquisition Agreement, certain of the Debtors intend to apply to certain of the Courts for orders authorizing the such Debtors to establish notice, bid and sale procedures for the Sale of the Enterprise Businesses (the "Bid Procedures Orders"); and

WHEREAS, after entry of the Bid Procedures Orders, the US Debtors, the Canadian Debtors and the EMEA Debtors intend to conduct an auction for the Sale of the Enterprise Businesses in accordance with the Bid Procedures Orders; and

WHEREAS, after conclusion of the auction, certain of the Debtors intend to apply to certain of the Courts for orders approving the Sale of the Enterprise Businesses to the Buyer (the "Sale Orders"); and

WHEREAS, the Debtors intend to request that the Sale Orders contain procedures for the establishment of one or more escrow accounts (collectively, the "Escrow Account") overseen by an independent agent (the "Escrow Agent") for deposit of the proceeds of the Sale (the "Sale Proceeds"); and

WHEREAS, after entry of the Sale Orders, the Debtors intend to consummate the Sale of the Businesses in accordance with the Sale Orders (the "Closing").

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

1. Allocation of Sales Proceeds of the Enterprise Businesses.  In consideration of the agreement of the Debtors to enter into the Acquisition Agreement, the parties hereby agree as follows:

   a. Immediately following the Closing, [45]% of the Sale Proceeds shall be released from the Escrow Account payable as follows:

      i. as to [15]% of the Sale Proceeds, to NNL on behalf of those of the Canadian Debtors which participated as sellers in the Sale to the extent of their respective interests therein;

      ii. as to [15]% of the Sale Proceeds, to NNI on behalf of those of the US Debtors which participated as sellers in the Sale to the extent of their respective interests therein; and

      iii. as to [15]% of the Sale Proceeds, to NNUK on behalf of those of the EMEA Debtors which participated as sellers in the Sale to the extent of their respective interests therein,

      (in each such case, the "Minimum Allocation"); and

   b. the remaining [55]% of the Sales Proceeds (the "Balance") shall remain in the Escrow Account and shall be allocated pursuant to the Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds dated April [●], 2009, attached hereto as Exhibit A.

2

2.  <u>Governing Law and Jurisdiction.</u>  a.  The parties further agree that any questions, claims, disputes, remedies or actions arising from or related to this agreement, and any relief or remedies sought by any of the parties hereunder, shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

b.  To the fullest extent permitted by applicable law, each party (i) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this agreement shall be brought only in the US Court and the Canadian Court in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time, and shall not be brought, in each case, in any other state, provincial or federal court in the United States of America, Canada, England or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of the US and Canadian Courts for purposes of all legal proceedings arising out of, or in connection with, this agreement or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

[New York #2044799 v8]

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed and delivered as of the day and year first above written.

NORTEL NETWORKS CORPORATION, on behalf of itself and the other Canadian Debtors

By _____
   Name:
   Title:

NORTEL NETWORKS INC., on behalf of itself and the other US Debtors

By _____
   Name:
   Title:

Signed by ALAN BLOOM as joint administrator on behalf of the Joint Administrators without personal liability and solely for the purpose of obtaining the benefit of the provisions of this agreement expressed to be conferred on or given to the Joint Administrators

By _____
   Name:
   Title:

[New York #2044799 v8]

**EXHIBIT A**

## PROTOCOL FOR RESOLVING DISPUTES
## CONCERNING ALLOCATION OF SALE PROCEEDS

This Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds, dated as of April [●], 2009 (the "Protocol"), is entered into by and among Nortel Networks Inc. ("NNI") and certain of its United States affiliates that are debtors and debtors-in-possession in the US Proceedings (as hereinafter defined) (collectively, the "US Debtors"); Nortel Networks Corporation ("NNC" and, together with its affiliates, the "Company"), Nortel Networks Limited ("NNL") and certain of its Canadian affiliates that filed applications for protection in the Canadian Proceedings (as hereinafter defined) (collectively, the "Canadian Debtors"); and Nortel Networks UK Limited and certain of its European affiliates that are in administration in the UK Proceedings (as hereinafter defined) (collectively, the "EMEA Debtors" and, together with the US Debtors and the Canadian Debtors, the "Debtors" and each individually a "Debtor"), represented by the individuals from Ernst & Young LLC, serving as administrators in the UK Proceedings (the "Joint Administrators").

WHEREAS, the Proceedings are on-going with respect to: (a) as to the US Debtors, the cases commenced on January 14, 2009 (the "Filing Date") and brought under chapter 11 of title 11 of the United States Code and jointly administered in the United States Bankruptcy Court for the District of Delaware under the caption In re Nortel Networks Inc., et al, Case No. 09-10138 (KG) (Jointly Administered) (respectively, the "US Court" and the "US Proceedings"); (b) as to the Canadian Debtors, the proceedings, commenced on the Filing Date, before the Ontario Superior Court of Justice under the Companies' Creditors Arrangement Act (Canada) (respectively, the "Canadian Court" and the "Canadian Proceedings"), in connection

1

with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and (c) as to the EMEA

Debtors, the administration, also commenced on the Filing Date, of the EMEA Debtors in the

United Kingdom before the High Court of Justice in England (respectively, the "UK Court" and

the "UK Proceedings) (clauses (a) through (c) together, respectively, the "Courts" and the

"Proceedings"); and

      WHEREAS, the Canadian Debtors have obtained the Monitor's consent and

approval to enter into this Protocol; and

      WHEREAS, the US Debtors, the Canadian Debtors, the EMEA Debtors and their

respective affiliates intend to sell certain assets of their estates in several transactions, each

relating to a particular line of business (each, a "Business") to a third party buyer (the "Buyer");

and

      WHEREAS, the Debtors intend to instruct the Company to provide the Buyer

with access to a room (which may be an electronic data room) containing the books and records

of the Company and other financial information relating to the Company (the "Data Room"); and

      WHEREAS, with respect to each Business, the US Debtors, the Canadian Debtors

and the EMEA Debtors intend to enter into one or more acquisition agreements (such

agreements, with respect to the sale of each Business, collectively the "Acquisition Agreement")

with the Buyer to govern the sale of such Business (the "Sale");

      WHEREAS, after entering into the Acquisition Agreement, certain of the Debtors

intend to apply to certain of the Courts for orders authorizing such Debtors to establish notice,

bid and sale procedures for the Sale of each Business (the "Bid Procedures Orders"); and

[New York #2044799 v8]

WHEREAS, after entry of the Bid Procedures Orders, such Debtors intend to conduct an auction for the Sale of each Business in accordance with the Bid Procedures Orders; and

WHEREAS, after conclusion of the auction, certain of the Debtors intend to apply to certain of the Courts for orders approving the Sale of each Business to the Buyer (the "Sale Orders"); and

WHEREAS, the Debtors intend to request that the Sale Orders contain procedures for the establishment of a one or more escrow accounts (the "Escrow Account") overseen by an independent agent (the "Escrow Agent") for deposit of the proceeds of the Sale (the "Sale Proceeds") pending the allocation thereof in accordance with the provisions of this Protocol; and

WHEREAS, after entry of the Sale Orders, the Debtors intend to consummate the Sale of each Business in accordance with the Sale Orders (the "Closing"); and

WHEREAS, the Debtors wish to provide for a mechanism to negotiate the allocation of Sale Proceeds between and among themselves and to resolve disputes that might arise between and among themselves with respect to the allocation of the Sale Proceeds.

NOW THEREFORE, IT IS HEREBY CONSENTED TO, STIPULATED, AGREED AND ORDERED THAT:

## ARTICLE I

## INITIAL NEGOTIATIONS

*Section 1.1*    During the period beginning as early as the start of negotiations of any Acquisition Agreement but commencing no later than the execution of any Acquisition Agreement and continuing, as necessary, through to the date of Closing, the Debtors shall negotiate in good faith a fair and equitable allocation of the Sale Proceeds among those of the US

3

Debtors, the Canadian Debtors the EMEA Debtors and their respective affiliates, in each case, that are participating as sellers in the Sale of each relevant Business (the "Participating Debtors" and the "Participating Affiliates," respectively).

Section 1.2    If the Debtors fail to reach an agreement regarding the allocation of Sale Proceeds prior to the fifth day (excluding Saturdays, Sundays and holidays) ("Business Day") immediately preceding the Closing, the Debtors shall use reasonable best efforts to agree prior to such Closing on the minimum amount that would be distributed to each of the Participating Debtors and their respective Participating Affiliates in any reasonable allocation scenario (the "Minimum Allocation Amount"); *it being understood* that, with regards to the sale of the enterprise businesses of the Nortel Group (the "Enterprise Businesses Sale"), the Debtors have agreed to the Minimum Allocation Amount set forth in the agreement dated April [●], 2009 and attached hereto as Schedule 1 (the "Enterprise Allocation Agreement").

Section 1.3    At the Closing of any Sale, the Sale Proceeds shall be placed in the Escrow Account.  If the US Debtors, the Canadian Debtors and the EMEA Debtors agree on a Minimum Allocation Amount with respect to the allocation of the Sale Proceeds, upon the Closing of such Sale, such Minimum Allocation Amount shall be released from the Escrow Account immediately following the Closing of the Sale and distributed to the Participating Debtors and their respective Participating Affiliates; and any remaining amounts shall remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.  With respect to the Enterprise Businesses Sale, [45]% of the Sale Proceeds shall be released from the Escrow Account as the Minimum Allocation Amount, payable in accordance with the terms of the Enterprise Allocation Agreement, with the remaining [55]% to remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.  If the

4

Debtors fail to agree on a Minimum Allocation Amount following good faith negotiations, all Sale Proceeds shall remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.

## ARTICLE II

## REFERRING A DISPUTE TO THE DISPUTE RESOLVER

*Section 2.1*    If for any reason any dispute, controversy or claim arising out of, relating to, or in connection with the issue of allocation of the Sale Proceeds among the Participating Debtors and their respective Participating Affiliates (the "Dispute") is not resolved on or before the Closing, then at any time after the Closing any of the US Debtors, the Canadian Debtors and the EMEA Debtors may refer the Dispute to the Dispute Resolver for a decision in accordance with this Protocol.  Reference of a Dispute to the Dispute Resolver must be in writing with a copy to all other Debtors.

*Section 2.2*    The Dispute Resolver shall be [name of individual].  The Dispute Resolver may engage the services of [accounting firm] to assist the Dispute Resolver in resolving the Dispute.

*Section 2.3*    If the Dispute Resolver is unable or unwilling to serve after receiving notice to refer the matter to the Dispute Resolver, the Debtors shall endeavor to agree upon a replacement Dispute Resolver.  If the Debtors are unable to agree upon a replacement Dispute Resolver within ten (10) days (including Saturday, Sundays and holidays) ("Days") of receiving notice that the Dispute Resolver is unable or unwilling to serve, then a replacement Dispute Resolver shall be selected from the list of agreed-upon replacement Dispute Resolvers set forth on Schedule 2 attached hereto and made a part hereof, as follows:  The replacement Dispute Resolver listed first on Schedule 2 shall serve as the Dispute Resolver unless such individual is

5

not available to serve as and when requested, in which case the replacement Dispute Resolver listed next on Schedule 2 shall serve as the Dispute Resolver unless such individual is not available to serve as and when requested, and so on in like fashion through the list of replacement Dispute Resolvers set forth on Schedule 2 in the order listed.

Section 2.4    In connection with a particular Sale, all costs and expenses of the Dispute Resolver shall be borne by each of the US Debtors, the Canadian Debtors and the EMEA Debtors equally; each of the US Debtors, the Canadian Debtors and the EMEA Debtors shall bear its respective costs and expenses, including attorneys' fees, associated with the preparation and presentation of its case to the Dispute Resolver; and *it being understood* that such expenses shall be borne only by such of the US Debtors, the Canadian Debtors and the EMEA Debtors as are Participating Debtors and their respective Participating Affiliates.

## ARTICLE III

## ADMINISTRATIVE MEETINGS

Section 3.1    Within seven (7) Days of a matter being referred to the Dispute Resolver, the US Debtors, the Canadian Debtors, the EMEA Debtors and the Dispute Resolver shall hold a meeting to discuss administrative matters (the "Administrative Meeting").  Each of the US Debtors, the Canadian Debtors and the EMEA Debtors must be given the opportunity to be present at the Administrative Meeting.  The Administrative Meeting shall be held by telephone, videoconference or in person, as decided by the Dispute Resolver.  At the Administrative Meeting, the Dispute Resolver may, subject to the schedule for dispute resolution provided for in this Protocol, confirm the due date for written submissions, establish the time and place of oral argument and address other administrative matters.

[New York #2044799 v8]

*Section 3.2*    Nothing in the preceding section shall affect the right of the Dispute Resolver to call other meetings to discuss administrative matters after the seven (7) Days following a matter being referred to the Dispute Resolver.

## ARTICLE IV

## WRITTEN MATERIALS

*Section 4.1*    The materials that may be submitted to the Dispute Resolver by each of the US Debtors, the Canadian Debtors and the EMEA Debtors include the following (collectively, the "Written Materials"):  a brief consisting of no more than fifty (50) single-sided, double-spaced pages in Times New Roman twelve-point font, with one inch margins (the "Brief"); and any exhibits in support of the Brief (the "Exhibits").

*Section 4.2*    Each of the US Debtors, the Canadian Debtors and the EMEA Debtors in its respective Brief shall present its position (the "Presented Position") on which, if any, of the following valuation methodologies should be applied, and how it should be applied, in allocating the Sale Proceeds among the Debtors and their respective Participating Affiliates:  (i) asset-based valuation; (ii) revenue-based valuation; or (iii) transfer pricing methodology.  The Presented Position in the Brief may also advocate for the application of a valuation methodology not listed herein (and the fact that any such valuation is not listed herein shall not be construed as a presumption that such methodology is any less valid than those valuation methodologies listed herein).  The Exhibits shall not contain any Presented Position or any additional argument.

*Section 4.3*    The Written Materials shall not contain any fact or expert witness affidavits or declarations.

*Section 4.4*    Each of the US Debtors, the Canadian Debtors and the EMEA Debtors shall submit a first round of Written Materials to the Dispute Resolver, with a copy to all other

7

Debtors, no more than thirty (30) Days after a matter is referred to the Dispute Resolver ("First Round Submission Deadline").

Section 4.5    Each of the US Debtors, the Canadian Debtors and the EMEA Debtors shall submit a second round of Written Materials to the Dispute Resolver, with a copy to all other Debtors, no more than thirty (30) Days after the First Round Submission Deadline (the "Second Round Submission Deadline").

**ARTICLE V**

**ACCESS TO INFORMATION**

Section 5.1    Commencing as early as the start of the negotiations for the Sale of a Business but in any event no later than the date of entering into the Acquisition Agreement, each of the US Debtors, the Canadian Debtors and the EMEA Debtors shall have equal access to the Data Room, in the same manner as was provided to the Buyer.

Section 5.2    Each of the US Debtors, the Canadian Debtors and the EMEA Debtors may, within thirty (30) Days of the signature of the Acquisition Agreement, send a written request to the Company, with a copy to all other Debtors, for access to information concerning the Company not contained in the Data Room.  The Company shall make such information available to each of the US Debtors, the Canadian Debtors and the EMEA Debtors within thirty (30) Days of receiving such request.

Section 5.3    Each of the US Debtors, the Canadian Debtors and the EMEA Debtors may, within five (5) Days of the First Round Submission Deadline, send a written request to the Company, with a copy to all other Debtors, for access to information concerning the Company not contained in the Data Room and not otherwise previously made available to the Debtors by

8

the Company.  The Company shall make such information available to each of the US Debtors, the Canadian Debtors and the EMEA Debtors within fifteen (15) Days of receiving such request.

*Section 5.4*    The Dispute Resolver may, within ten (10) Days of the Second Round Submission Deadline, send a written request to the Company, with a copy to each of the US Debtors, the Canadian Debtors and the EMEA Debtors, for access to information concerning the Company not contained in the Written Materials.  The Company shall make such information available to the Dispute Resolver and each of the US Debtors, the Canadian Debtors and the EMEA Debtors within ten (10) Days of receiving such request.

## ARTICLE VI

## ORAL ARGUMENT

*Section 6.1*    The Dispute Resolver shall hold a proceeding where the US Debtors, the Canadian Debtors and the EMEA Debtors may orally present argument in favor of their Presented Position (the "Oral Argument").

*Section 6.2*     Oral Argument shall be held at a time and place specified by the Dispute Resolver, but in no event before thirty (30) Days or after sixty (60) Days of the Second Round Submission Deadline.  Oral Argument shall be held in person or by videoconference, as decided by the Dispute Resolver.

*Section 6.3*    Each of the US Debtors, the Canadian Debtors and the EMEA Debtors shall be allocated an aggregate of two hours in which to present Oral Argument.

*Section 6.4*     No Debtor shall be permitted to present fact or expert witness testimony during the Oral Argument.

# ARTICLE VII

## THE DECISION OF THE DISPUTE RESOLVER

*Section 7.1*    The Dispute Resolver shall render a written decision (the "Decision") within sixty (60) Days of the Oral Argument.

*Section 7.2*    The Decision shall contain:  (a) the percentage of the Sale Proceeds to be allocated to each of the Participating Debtors and their respective Participating Affiliates (the "Allocation"); and (b) instructions to the Escrow Agent to distribute the Sale Proceeds to the Participating Debtors and their respective Participating Affiliates in accordance with the Allocation.  The Decision shall not contain the reasoning behind the Allocation.

*Section 7.3*    For the avoidance of doubt, in rendering the Decision and the Allocation contained therein, the Dispute Resolver is not bound to select one of the Presented Positions.

*Section 7.4*    The Dispute Resolver shall render the Decision and the Allocation contained therein on the basis of his or her reasoned expert judgment and not on the basis of any national, federal, state or provincial law.

*Section 7.5*    If the US Debtors, the Canadian Debtors and the EMEA Debtors agree at any point in time prior to the relevant Decision as to the Allocation of any Portion of the relevant Sale Proceeds, then the Dispute Resolver shall render a Decision only with respect to the allocation of the remaining portion of the Sale Proceeds.

*Section 7.6*    The Decision of the Dispute Resolver shall be conclusive, final and binding upon the each of the US Debtors, the Canadian Debtors and the EMEA Debtors, and may not be challenged or appealed.

10

*Section 7.7*    The Decision of the Dispute Resolver shall not be deemed an arbitral award enforceable under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

*Section 7.8*    For the avoidance of doubt, the Sale Proceeds shall be allocated in accordance with the Allocation by the Escrow Agent after the Decision is rendered without the need for an order from any of the Courts.

*Section 7.9*    The Dispute Resolver's decision as to the percentage of the Sale Proceeds to be allocated to each of the Participating Debtors and their respective Participating Affiliates with respect to the sale of any one Business shall not be determinative of the percentage of the Sale Proceeds to be allocated to each of the Participating Debtors and their Participating Affiliates with respect to the sale of any other Business.

## ARTICLE VIII

## CONFIDENTIALITY

*Section 8.1*    Except as may be required by applicable law or court order or by an authority having appropriate jurisdiction, each of the US Debtors, the Canadian Debtors and the EMEA Debtors agrees (i) to maintain confidentiality as to all aspects of these procedures, including, without limitation, the presentation of any issue to the Dispute Resolver, any discussions, deliberations, proceedings or results of the dispute resolution procedure set forth in this Protocol, any Written Materials or Oral Arguments, or any Decisions produced by these proceedings (the "Confidential Material") and (ii) not to use any Confidential Material for its own benefit or the benefit of any of its affiliates, *it being understood* that the Company may disclose the existence and nature of this Protocol and the dispute resolution procedure conducted

11

hereunder as may be necessary to comply with U.S. federal or state or Canadian federal or provincial securities laws.

*Section 8.2*    In the event that a Debtor is served with or otherwise subject to legal process (including subpoena or discovery notice) requiring it to testify about, to produce, or otherwise to divulge Confidential Material, to the extent permitted by law such Debtor subject to such process will as soon as practicable inform the provider(s) of such Confidential Material so that the provider may seek a protective order or other remedy.  In the event that such protective order or other remedy has not been obtained and such Debtor is advised, in the opinion of counsel, that it is legally compelled to disclose any of the Confidential Material, such Debtor may disclose only such Confidential Material so advised to be disclosed.

*Section 8.3*    The US Debtors, the Canadian Debtors and the EMEA Debtors further agree to obtain the Dispute Resolver's agreement to preserve the confidentiality of the dispute resolution procedure conducted under this Protocol.

*Section 8.4*    Nothing herein shall prevent any party from disclosing information regarding the dispute resolution procedure conducted under this Protocol for purposes of proceedings to resolve any disputes arising from or relating to the enforcement or implementation of this Protocol.

## ARTICLE IX

### MISCELLANEOUS

*Section 9.1*    While a matter is before the Dispute Resolver, there shall be no communications between the Dispute Resolver and a Debtor unless all other Debtors are given the opportunity to be present during such communication.  For the avoidance of doubt, written

[New York #2044799 v8]

communication (whether transmitted by email, facsimile, or post) between the Dispute Resolver and a Debtor must also be transmitted contemporaneously to all other Debtors.

*Section 9.2*    All notices, requests, instructions, directions and other communications provided for herein shall be given made in writing (including by facsimile or electronic comminication) delivered to the intended recipient as follows:

If to the US Debtors:
Nortel Networks Inc.
Attn: [●]
Address: [●]
Facsimile No.: [●]
Telephone No.: [●]
Email: [●]

If to the Canadian Debtors:
Nortel Networks Limited
Attn: [●]
Address: [●]
Facsimile No.: [●]
Telephone No.: [●]
Email: [●]

If to the EMEA Debtors:
Nortel Networks UK Limited
Attn: [●]
Address: [●]
Facsimile No.: [●]
Telephone No.: [●]
Email: [●]

*Section 9.3*    Each of the US Debtors, the Canadian Debtors, the EMEA Debtors and the Company agree that any questions, claims, disputes, remedies or actions arising from or related

13

to this Protocol, and any relief or remedies sought by any of the parties hereunder, shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

To the fullest extent permitted by applicable law, each party (i) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Protocol shall be brought only in the US Court and the Canadian Court in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time, and shall not be brought, in each case, in any other state, provincial or federal court in the United States of America, Canada, England or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of the US and Canadian Courts for purposes of all legal proceedings arising out of, or in connection with, this Protocol or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.In the event any provision of this Protocol is held to be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions shall not be affected or impaired thereby.

*Section 9.4*    This Protocol is not intended to, and shall not, create rights in any person or entity not a party hereto.

14

[New York #2044799 v8]

*Section 9.5*   Other parties may be added to this Protocol only with the prior unanimous written consent of all parties hereto, which consent shall not unreasonably be withheld.

*Section 9.6*   This Protocol may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the party who signed the counterpart and all of which together shall constitute a single agreement.

*Section 9.7*   This Protocol constitutes the complete agreement among the US Debtors, the Canadian Debtors and the EMEA Debtors with respect to the subject matter herein, and supersedes all other agreements among the US Debtors, the Canadian Debtors and the EMEA Debtors with respect to the subject matter herein. This Protocol may not be amended, supplemented or modified except by a written instrument executed by the all remaining parties to this Protocol.

*Section 9.8*   This Protocol does not affect the confidentiality of any information exchanged between or among any of the US Debtors, the Canadian Debtors and the EMEA Debtors pursuant to any prior agreements or understandings.

*Section 9.9*   This Protocol shall inure to the benefit of, and shall be binding upon, each party and its respective agents, successors and assigns from the date of its execution, but is expressly subject to and contingent upon its approval and entry by the US and Canadian Courts.

*Section 9.10*  If this Protocol is not entered by the US and Canadian Courts, it shall be of no further force and effect.

[New York #2044799 v8]

SO STIPULATED AND AGREED:

Date:  April [●], 2009

NORTEL NETWORKS CORPORATION,
on behalf of itself and the other Canadian
Debtors

By    _____
Name:
Title:

NORTEL NETWORKS INC., on behalf of
itself and the other US Debtors

By    _____
Name:
Title:

Signed by ALAN BLOOM as joint
administrator on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the
benefit of the provisions of this agreement
expressed to be conferred on or given to the
Joint Administrators

By    _____
Name:
Title:

16

SCHEDULE 1

[*Note to draft*: Agreement dated April [●], 2009 as to the Minimum Allocation of Sale Proceeds from the Enterprise Businesses Sale to be attached.]

17

SCHEDULE 2

[*Note to draft*:  Insert list of agreed-upon replacement Dispute Resolvers.]

*CGSH Draft of April 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

April [●], 2009

Ladies and Gentlemen:

This agreement (the "Framework Agreement") is entered into by and among Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), Nortel Networks UK Limited ("NNUK"), Nortel Networks Ireland ("NNIR"), and Nortel Networks S.A. ("NNSA").

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as the "Company" and, together with NNI, as defined below, and the EMEA Debtors, as defined below, the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "Canadian Proceedings"), in connection with which Ernst & Young, Inc. (the "Monitor") was appointed by the Canadian Court to serve as Monitor; and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates (collectively, the "US Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (the "US Proceedings"); and

WHEREAS, on the Filing Date, NNUK, NNIR, NNSA and certain of NNUK's European affiliates (collectively, the "EMEA Debtors," and, together with the US Debtors and the Canadian Debtors, the "Debtors" and each individually, a "Debtor") commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLC, serving as administrators in the UK Proceedings (collectively, the "Joint Administrators"); and

WHEREAS, the Nortel Group has historically used the residual profit split method as the transfer pricing methodology (the "Transfer Pricing Methodology") for determining the arm's length compensation due to each of NNI, NNL, NNUK, NNIR and NNSA, among others, for all primary intercompany transactions consisting of tangible and intangible property transfers and global headquarters services, performed by any such party pursuant to the Master Research and Development Agreement dated December 22, 2004 by and between NNL, NNI, NNUK, NNIR, NNSA and Nortel Networks Australia, as amended (the "Master R&D Agreement"); and

WHEREAS, payments under the Master R&D Agreement have, with certain exceptions, been suspended since the Filing Date in light of the commencement of the

1

*CGSH Draft of April 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

Proceedings and discussions with various interested parties, including the Joint Administrators, the Monitor, the Official Committee of Unsecured Creditors appointed in the US Proceedings and an ad hoc group of bondholders, as holders of debt securities issued or guaranteed by certain entities in the Nortel Group, which has created liquidity pressure on certain members of the Nortel Group in that costs continue to be incurred in accordance with historic practice, but the funding of such costs through the Transfer Pricing Methodology has been suspended; and

WHEREAS, the Debtors have concluded it is appropriate and in the best interest of all Debtors to utilize the Transfer Pricing Methodology as an interim funding mechanism allowing the relevant estates to fund costs and facilitate operations of the Nortel Group during the period after the Filing Date through and including September 30, 2009; and

WHEREAS, NNI, NNIR and NNSA have been historic net payors under the Transfer Pricing Methodology and are projected to be net payors during the period from January 14, 2009 through September 30, 2009 (the "Interim Period") based on projections dated as March [●], 2009 previously provided to the parties (the "March Projections"); and

WHEREAS, NNL and NNUK have been historic net recipients under the Transfer Pricing Methodology and are projected to be net recipients during the Interim Period based on the March Projections.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

1.  Funding during Interim Period.  The parties hereby agree to the following funding arrangements utilizing the Transfer Pricing Methodology in respect of the period from January 14, 2009 through September 30, 2009 (the "Interim Period"):

    a.  NNI shall pay to NNL, on a monthly basis, a monthly amount of US$[●] in respect of the projected net amount owing by NNI under the Transfer Pricing Methodology based on the March Projections (for each party, such net amount the "Projected Interim TPM Amount"), with the first payment on May 31, 2009 to be in respect of the period from January 14, 2009 through May 31, 2009, pro rated for the month of January (the "First Interim Payment"), and in the case of NNI and NNL, such First Interim Payment shall take give full credit for payments made by NNI in January 2009 in accordance with the Transfer Pricing Methodology;

*CGSH Draft of April 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

b. NNIR shall pay to NNL, on a monthly basis during the Interim Period with the First Interim Payment to be paid on May 31, 2009, a monthly amount of [US$•] in respect of NNIR's Projected Interim TPM Amount[1];

c. NNL shall forebear from receiving from NNSA under the Transfer Pricing Methodology the aggregate amount of [US$•] in respect of NNSA's Interim Projected TPM Amount;

d. NNUK shall forebear from receiving from NNL under the Transfer Pricing Methodology the aggregate amount of [US$77 million] in respect of NNUK's Projected Interim TPA Amount; and

e. It is expressly understood that to the extent any party forbears from receipt from any payment or any party is unable to pay the relevant Projected Interim TPM Amount or relevant Final Interim TPA Amount, as defined below, any amount so unpaid will bear simple interest beginning June 1, 2009 at a rate of [•]% per annum until paid.

2. <u>True-Up Obligations</u>.  The parties recognize and agree that, to the extent actual amounts owed pursuant to the Transfer Pricing Methodology as determined based on the Nortel Group's unaudited financial statements for the nine months ended September 30, 2009 as filed with the US Securities and Exchange Commission (the "<u>SEC</u>") on Form 10-Q in respect of such period (the "<u>September 30 Form 10-Q</u>") (the "<u>Final Interim TPA Amount</u>") are less than or greater than the Projected Interim TPM Amount for such period, by the end of the 21-day period following the filing with the SEC of the September 30 Form 10-Q, the parties shall take such actions to pay or repay, as the case may be, to the appropriate party such amount so as to effect a "true-up" of the actual amounts owed (the "<u>True-Up Obligations</u>").  The parties shall use their reasonable best efforts to accelerate where possible the determination of any such True-Up Obligations so as to facilitate the payments thereof from the release from escrow of any proceeds from the sale of any assets of the Nortel Group to which a party with True-Up Obligation may be entitled.

3. <u>Amendments</u>.  The parties hereto agree to act in good faith and to cooperate to the extent any amendments or modifications may be necessary in the best interests of the parties in order to give effect to the purpose and intent of this Framework Agreement.

4. <u>Scope of this Framework Agreement</u>.  The parties hereto agree that this Framework Agreement shall not be deemed an acknowledgement of the assumption or adoption of Transfer Pricing Methodology for any other purpose nor shall it have any impact on the allocation of proceeds to any Debtor from any

---

[1] *Note to draft*: Confirm monthly approach for NNIR.

*CGSH Draft of April 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

sale of assets of the Nortel Group.  In addition, this Framework Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to any party prior to the Filing Date (the "Pre-Filing Claims"), all of which Pre-Filing Claims the parties agree and acknowledge are stayed as of the Filing Date.

5.  Scope of Parties' Participation.  The parties hereto recognize that under this Framework Agreement each of NNL, NNI, NNUK, NNIR and NNSA is acting on behalf of itself and not on behalf of any other entity and is not assuming the obligations of any other entity.  Nothing herein creates any rights or obligations with respect to any other members of the Nortel Group known as Limited Risk Distributors ("LRDs").

6.  Effectiveness.  This Framework Agreement is subject to, and shall not be effective until receipt of, the necessary approvals of the US Court and the Canadian Court.

7.  Term.  This Framework Agreement shall expire on September 30, 2009, except in respect of the obligations under Sections 2 and 8 hereunder.

8.  Governing Law and Jurisdiction.  a. The parties further agree that any questions, claims, disputes, remedies or actions arising from or related to this Framework Agreement, and any relief or remedies sought by any of the parties hereunder, shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

b. To the fullest extent permitted by applicable law, each party (i) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Framework Agreement shall be brought only in the US Court and the Canadian Court in a joint hearing conducted under the Cross-Border Protocol adopted by each Court, as it may be in effect from time to time, and shall not be brought, in each case, in any other state, provincial or federal court in the United States of America, Canada, England or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of the US and Canadian Courts for purposes of all legal proceedings arising out of, or in connection with, this Framework Agreement or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

[New York #2044765 v10]

*CGSH Draft of April 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

5

*CGSH Draft of April 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed and delivered as of the day and year first above written.

NORTEL NETWORKS LIMITED


By _____
    Name:
    Title:


NORTEL NETWORKS INC.

By _____
    Name:
    Title:


Signed by ALAN BLOOM as joint administrator on behalf of each of NNUK, NNIR and NNSA and the Joint Administrators without personal liability and solely for the purpose of obtaining the benefit of the provisions of this Framework Agreement expressed to be conferred on or given to the Joint Administrators

By _____
    Name:
    Title:

6

## Mendoza, Richard

| | |
|---|---|
| **From:** | Sanjeet Malik [smalik@cgsh.com] |
| **Sent:** | 30 May 2009 00:51 |
| **To:** | gadavies@nortel.com; rjacobs@AkinGump.com; dbotter@AkinGump.com; fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; shayne.kukulowicz@fmc-law.com; michael.wunder@fmc-law.com; APisa@milbank.com; tkreller@milbank.com; GALE, STEPHEN; ELLIOTT, LAURENCE; Gravell, Devreaux; mlang@ogilvyrenault.com; dtay@ogilvyrenault.com; kerbelj@bennettjones.com; orzyr@bennettjones.com; zychk@bennettjones.com; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca |
| **Cc:** | Craig B BROD; James L BROMLEY; Lisa M SCHWEITZER |
| **Subject:** | NT: Funding Agmt / Enterprise Allocation Agmt |
| **Attachments:** | 2061056_4(Interim Funding and Settlement Agreement - Revised 5_29_09).DOC; 2044799_19(Enterprise Proceeds Allocation Agmt -Revised May 29, 2009).DOC |

Dear All:

Attached are the initial drafts of the funding agmt and the allocation agmt for the Enterprise sale proceeds.  In the interest of time, we are circulating these drafts to all parties simultaneously and, therefore, these drafts have not been reviewed by any parties and remain subject to their comments.

As was discussed at the conclusion of Fri's meeting, the following two calls have been scheduled to discuss these agreements:

Sunday, May 31, 9:30pm (EST) - this call is for US and Canadian counsels of the parties.

Monday, June 1, 7:30am (EST) - this call is primarily to discuss the comments of Herbert Smith to the agmts; all parties, however, are welcome to join this call.

Dial-in for the calls is as follows:
US: 1 877 492 4010
Int'l: 1 719 955 0541
Passcode: 212 225 2136

Regards,
Sanjeet

---

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2136 | f: +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information.  If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

THIS DRAFT AGREEMENT HAS BEEN PRODUCED
FOR DISCUSSION AND SETTLEMENT PURPOSES
ONLY AND IS SUBJECT TO THE PROVISIONS OF
RULE 408 OF THE RULES OF EVIDENCE FOR
UNITED STATES COURTS AND MAGISTRATES AND
ANY OTHER SIMILAR APPLICABLE RULES IN ALL
PERTINENT JURISDICTIONS.

*Draft of May 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion purposes only*

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and Nortel Networks Inc. ("NNI") and the other Debtor signatories hereto, as of the date set forth below.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein, together with NNI and NNC's other affiliates, the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates (collectively, the "US Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region (collectively, the "EMEA Debtors," and, together with the US Debtors and the Canadian Debtors, the "Debtors" and each individually, a "Debtor") commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator has been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; however, the UK Administrator has retained the legal authority to bind NNSA to its respective obligations under this Agreement; and

WHEREAS, payments pursuant to a transfer pricing methodology ("Transfer Pricing") pursuant to the Master Research and Development Agreement dated as of December 22, 2004

(the "Master R&D Agreement"), which historically determined the allocation of profits and losses among various members of the Nortel Group, have largely been suspended since the Filing Date, apart from a US$30 million payment made by NNI to NNL (the "January Payment"); and

WHEREAS, since the Filing Date certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, each of NNL and NNI has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which NNI shall pay NNL for goods and services, including without limitation, for corporate overhead and research and development costs, provided by NNL to NNI during the period after the Filing Date through and including September 30, 2009 (the "Canada/US Interim Period"), as to which NNI has received and will receive post-filing benefits, the payment for which constitute administrative expense priority obligations pursuant to Sections 503 and 507 of the Bankruptcy Code (the "Administrative Obligations"); and

WHEREAS, each of NNL, NNI, NNUK, NNIR and NNSA has concluded that it is appropriate and in the best interests of each to enter into this Agreement pursuant to which NNUK shall be appointed to administer the Master R&D Agreement with respect to its interests and the interests of the other EMEA Debtors as provided for herein for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"); and

WHEREAS, the parties hereto intend this Agreement to constitute a full and final settlement of all the matters set forth in this Agreement whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee") and the ad hoc group of bondholders as holders of securities issued or guaranteed by certain entities in the Nortel Group (the "Bondholders' Committee") have agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

    a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex A hereto, subject to the following limitations:

        i. The first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

        ii. If it is determined, pursuant to a process to be agreed upon by the parties, the Creditors' Committee and the Bondholders' Committee, that the value of the Administrative Obligations is less than US$187 million (being the

sum of the Total Payment and the January Payment), then any such portion thereof in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

> A. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors, which charge shall be granted by order of the Canadian Court and which shall rank *pari passu* with the existing court ordered charge in favor of Export Development Canada.

> B. In the event any portion of the Contingent Payment must be repaid (the "Repayment Amount"), simple interest at [10%] per annum shall accrue in respect of the Repayment Amount from the date of NNL's receipt of the Contingent Payment through the date of repayment.

2. Use of Funds; Reporting.

> a. NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and other purposes as reflected in the 13 Week CF Forecast (as defined below). To the extent NNL seeks to use funds from the Total Payment for purposes other than the aforementioned purposes, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

> b. NNL and NNI shall continue to provide the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing accrual payments for the preceding monthly period, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3. Maximum Payment. The sum of the Total Payment and the January Payment (being US$187 million) represents the maximum payment that the US Debtors owe in respect of any amount that the US Debtors may or could owe under the Master R&D Agreement for the Canada/US Interim Period. For the avoidance of doubt, and without limiting the foregoing, the maximum administrative claim that any of the Debtors (including, without limitation, the Canadian Debtors and the EMEA Debtors) may have or could assert against the US Debtors in the US Proceedings or any other Proceedings with respect to the Canada/US Interim Period, whether pursuant to Sections 503 and 507 of the Bankruptcy Code, or otherwise, is capped at US$187 million.

4. <u>Settlement of Motions.</u> It is expressly understood that this Agreement is intended to constitute a full and final settlement of all of the matters set forth herein whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding or allocation motions of the Nortel Group scheduled to be heard by the US and Canadian Courts on June 29 and 30, 2009 or such later date as might be agreed or ordered.

## PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

5. <u>Administration; Funding</u>

a. NNUK is hereby appointed to administer the Master R&D Agreement with respect to its interests and the interests of the other EMEA Debtors for the EMEA Interim Period. NNL shall continue to be responsible for the determinations made under the Master R&D Agreement with respect to Transfer Pricing, including to compute the amounts of payments due to, and payments due from, each of the EMEA Debtors in accordance with Transfer Pricing, subject to such adjustments for the items set forth in Annex B hereto. *[**Note to Draft:** Herbert Smith to include such other provisions as necessary to address NNUK's administration of intercompany accounts and settlement of payables and receivables among EMEA Debtors.]*

b. NNL shall pay NNUK the sum total of US$● million (the "Shortfall"), representing the projected shortfall of payments owing to NNUK as detailed on Annex B hereto, such amount to be payable out of the sale proceeds allocated to, and actually received by, NNL from the first sale of assets representing all or a substantial portion of a reportable segment of the Nortel Group (a "Material Asset Sale"); *provided, however,* that such payment shall not be made to the extent that such payment would, in the reasonable judgment of the Monitor, materially and adversely impact the liquidity position of NNL based on a pro forma 13 Week CF Forecast (giving effect to such payment) prepared by the Monitor and provided to the Creditors' Committee and the Bondholders' Committee. Any unpaid balance of the Shortfall shall be carried forward and shall be payable out of the sale proceeds allocated to, and actually received by, NNL of one or more subsequent Material Asset Sales, subject to the proviso to the immediately preceding sentence, until paid in full. The obligation relating to the payment of the Shortfall contained in this Section 5.b. shall be an obligation of NNL only and of no other entity within the Nortel Group; *further, provided,* that NNL shall be subrogated to the rights of NNUK in respect of amounts which have not been paid by any EMEA Debtor during the EMEA Interim Period which contributed to the Shortfall.

c. NNL's obligation to pay the Shortfall shall be secured by a charge against all of the assets of the Canadian Debtors, which charge shall be granted by order of the Canadian Court and which shall rank junior to all existing charges that have been approved by the Canadian Court.

6. <u>Maximum Payment</u>. To the extent that any EMEA Debtor makes payment in full of the amounts owed by it, or receives payment in full of the amounts owed to it, as the case may be, pursuant to the arrangements set forth in Section 5, such payments shall constitute a full and final settlement of the Transfer Pricing payments owed by, or to it from, any entity in the Nortel Group for the EMEA Interim Period pursuant to the Master R&D Agreement. Except to the extent provided in the immediately preceding sentence and except with respect to the obligation of NNL to pay the Shortfall as herein provided, this Agreement shall constitute a full and final settlement of the Transfer Pricing Payments owed by or to such entities for the EMEA Interim Period pursuant to the Master R&D Agreement and, to the extent that NNL makes payment in full of the Shortfall, such payment shall constitute a full and final settlement of the Transfer Pricing payments owed by NNL to the EMEA Debtors for the EMEA Interim Period pursuant to the Master R&D Agreement.

## PART C – <u>PROVISIONS OF GENERAL APPLICATION</u>

7. <u>Scope of this Agreement</u>. The parties hereto agree that:

   a. this Agreement is not, and shall not be deemed to be, an acknowledgement by any party of the assumption, ratification, adoption or rejection of the Master R&D Agreement or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative or have any impact whatsoever on the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

   b. this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any party, either: (i) prior to the Filing Date, or (ii) after the Canada/US Interim Period or the EMEA Interim Period, as applicable, *provided, however*, the parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

   c. this Agreement shall not serve as the basis for any claim by any party against any other party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period after the Canada/US Interim Period or the EMEA Interim Period, as applicable.

8. <u>Relinquishment of Intellectual Property Licenses</u>. Each of the US Debtors and the EMEA Debtors (including NNSA) agrees, upon request from NNL, to enter into appropriate termination agreements with respect to licenses granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement for the purpose of facilitating, and in consideration of the right to the potential receipt of an allocation to such Debtors of the sale proceeds from, asset sales by the entities in the Nortel Group. In respect of NNSA, the UK Administrator will use its best efforts to obtain any termination agreement from the French liquidator for NNSA.

9. <u>Effectiveness</u>.  This Agreement is subject to, and shall not be effective until receipt of, the necessary approvals of each of the Canadian and the US Courts approving the entirety of this Agreement and all of the provisions hereof (the "<u>Condition</u>").  Each of the parties hereby agree to use commercially reasonable efforts to satisfy the Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement.

10. <u>Term</u>.  This Agreement shall expire on December 31, 2009.  Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1.a.ii, 2, 3, 4, 5.b, 5.c, 6, 7, 8, 12, 13, and 15 hereunder, shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

11. <u>Amendments</u>.  This Agreement only may be amended, on no less than 10 business days' notice, by means of a writing signed by all parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the parties, must be approved by the Canadian and the US Courts.

12. <u>Governing Law and Jurisdiction</u>.

   a.  This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

   b.  To the fullest extent permitted by applicable law, each party (i) agrees to submit to the jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement may be brought in the US Court and the Canadian Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

13. <u>No Personal Liability of the Joint Administrators</u>.

   a.  The parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the companies to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group

company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b. The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of the other parties to this Agreement.

c. [In exercising their rights under, or giving effect to the arrangements contemplated in, this Agreement, it is acknowledged that the Joint Administrators are required to act in the best interests of the creditors of the entity to which they have been appointed. Therefore, nothing in this Agreement shall operate so as to derogate from, restrict or prevent the Joint Administrators from complying with their statutory duties or legal obligations in relation to the exercise of their powers, duties or functions as administrators of the entities under the United Kingdom Insolvency Act 1986 or any other applicable legislation or statutory instrument.] **[NTD:** *To be discussed]*

14. Creditors' Committee and Bondholders' Committee Support. Attached hereto as Annex C and D, respectively, is written confirmation from the Creditors' Committee and Bondholders' Committee of their respective support of this Agreement and of their respective confirmation that they will file appropriate Court motion papers containing a statement of such support for Court approval of this Agreement.

15. Reservation With Respect to Potential Tax Contingencies. Nothing in this Agreement shall constitute a waiver of rights of any party with respect to any potential tax contingencies or assessments arising from transfer pricing payments pursuant to the Master R&D Agreement or otherwise or any offset arising therefrom.

16. Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the party who signed the counterpart and all of which together shall constitute a single agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of this [•]th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By _____
    Name:
    Title:

NORTEL NETWORKS GLOBAL CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS INTERNATIONAL CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS TECHNOLOGY CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS INC.

By _____
    Name:
    Title:


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name:
    Title:


CORETEK, INC.

By _____
    Name:
    Title:


NORTEL ALTSYSTEMS, INC.

By _____
    Name:
    Title:


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name:
    Title:


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name:
    Title:

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name:
    Title:


NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name:
    Title:


NORTEL NETWORKS HPOCS INC.

By _____
    Name:
    Title:


NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Name:
    Title:

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name:
    Title:


NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name:
    Title:

QTERA CORPORATION

By _____
   Name:
   Title:


SONOMA SYSTEMS

By _____
   Name:
   Title:


XROS, INC.

By _____
   Name:
   Title:


Signed by ALAN BLOOM as joint
Administrator on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the
benefit of the provisions of this agreement
expressed to be conferred on or given to the
Joint Administrators

By _____
   Name:
   Title:


{NOTE: Herbert Smith to add signature
blocks for each EMEA Filed Debtor and
EMEA Non-Filed Entity, including the Joint
Israeli Administrators, and to confirm any
procedural requirements as to
authorization/execution.]

## Annex A

## <u>Funding Schedule</u>

Payments pursuant to Section 1(a) of the Agreement shall be paid in the following amounts and on the following dates (if the Condition is not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of the Condition):

| | |
|---|---|
| June 1, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| **TOTAL** | **US$157,000,000.00** |

**Annex B**

**<u>Adjustments to EMEA Transfer Pricing</u>**

[To be inserted]

**Annex C**

**[Creditors' Committee Confirmation of Support]**

**Annex D**

**[Bondholders' Committee Confirmation of Support]**

THIS DRAFT AGREEMENT HAS BEEN PRODUCED
FOR DISCUSSION AND SETTLEMENT PURPOSES
ONLY AND IS SUBJECT TO THE PROVISIONS OF
RULE 408 OF THE RULES OF EVIDENCE FOR
UNITED STATES COURTS AND MAGISTRATES AND
ANY OTHER SIMILAR APPLICABLE RULES IN ALL
PERTINENT JURISDICTIONS.

*Draft of May 29, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion purposes only*

June ●, 2009

Ladies and Gentlemen:

This agreement (the "Agreement") is entered into by and among Nortel Networks Inc. ("NNI") and certain of its United States affiliates identified in Schedule 1 that are debtors and debtors-in-possession in the US Proceedings (as hereinafter defined) (collectively, the "US Debtors"); Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain Canadian affiliates identified in Schedule 2 that filed applications for protection in the Canadian Proceedings (as hereinafter defined) (collectively, the "Canadian Debtors", and NNC and its debtor and non-debtor affiliates together with the US Debtors and the EMEA Debtors, as defined below, the "Nortel Group"); Nortel Networks UK Limited ("NNUK") and certain of its affiliates in the Europe, Middle East and Africa ("EMEA") region that are in administration in the UK Proceedings (as hereinafter defined) represented by the individuals from Ernst & Young LLP (the "UK Administrator") and, in the case of Nortel Networks (Ireland) Limited ("NNIR") only, Ernst & Young Chartered Accountants (the "NNIR Administrator" and together with the UK Administrator, the "Joint Administrators"), serving as administrators in the UK Proceedings (collectively, the "EMEA Filed Debtors"); certain of NNUK's other European affiliates (collectively, the "EMEA Non-Filed Entities", and together with the EMEA Filed Debtors, the "EMEA Debtors"); and the EMEA Debtors together with the US Debtors and the Canadian Debtors, the "Debtors" and each individually a "Debtor".

WHEREAS, on January 14, 2009 (the "Filing Date"), the Canadian Debtors commenced creditor protection proceedings before the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, the Canadian Debtors have obtained the Monitor's consent and approval to enter into this Agreement; and

WHEREAS, on the Filing Date, the US Debtors filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (the "US Proceedings"); and

WHEREAS, on the Filing Date, the EMEA Filed Debtors commenced administration proceedings (the "UK Proceedings" and, together with the US Proceedings and the Canadian Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"); and

WHEREAS, subsequent to the Filing Date, Nortel Networks S.A. ("NNSA" and together with Nortel Networks France S.A.S., the "French Debtors") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council

Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator has been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; however, the UK Administrator has retained the legal authority to bind NNSA to its respective obligations under this Agreement; and

WHEREAS, the Debtors and certain of their respective affiliates intend to sell certain assets relating to the enterprise solutions businesses of the Nortel Group (collectively, the "Enterprise Businesses") to a third party buyer (the "Buyer"); and

WHEREAS, with respect to the Enterprise Businesses, the Debtors intend to enter into one or more asset sale and related agreements (collectively, the "Acquisition Agreements") with the Buyer to govern the sale of certain assets of the Enterprise Businesses (the "Sale"); and

WHEREAS, after entering into the Acquisition Agreements, certain of the Debtors intend to apply to certain of the Courts for orders authorizing such Debtors to establish notice, bid and sale procedures for the Sale of the Enterprise Businesses (the "Bid Procedures Orders"); and

WHEREAS, after entry of the Bid Procedures Orders, the US Debtors, the Canadian Debtors and the EMEA Debtors intend to conduct an auction for the Sale of the Enterprise Businesses in accordance with the Bid Procedures Orders; and

WHEREAS, after conclusion of the auction, certain of the Debtors intend to apply to certain of the Courts for orders approving the Sale of the Enterprise Businesses to the Buyer (the "Sale Orders"); and

WHEREAS, the Debtors intend to request that the Sale Orders contain procedures for the establishment of one or more escrow accounts (collectively, the "Escrow Account") overseen by an independent agent (the "Escrow Agent") for deposit of the proceeds of the Sale (the "Sale Proceeds"); and

WHEREAS, after entry of the Sale Orders, the Debtors intend to consummate the Sale of the Businesses in accordance with the Sale Orders and the Acquisition Agreements (the "Closing"); and

WHEREAS, the parties hereto have agreed to allocate to the EMEA Debtors which are participating as sellers in the Sale a percentage of the Sale Proceeds as adjusted as provided in this Agreement; and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee") and the ad hoc group of bondholders as holders of securities issued or guaranteed by certain entities in the Nortel Group (the "Bondholders' Committee") have agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

[New York #2044799 v19]

1. <u>Allocation to EMEA of Sales Proceeds of the Enterprise Businesses.</u> In consideration of the agreement of the Debtors to enter into the Acquisition Agreements, the parties hereby agree as follows:

   a. Immediately following the Closing, ●% of the Adjusted Sale Proceeds shall be released from the Escrow Account and shall be payable to NNUK on behalf of those of the EMEA Debtors which participated as sellers in the Sale to the extent of their respective interests therein in full and final satisfaction of the EMEA Debtors' share of the Sale Proceeds (the "EMEA Allocation"). For avoidance of doubt, the payment of the aforementioned amount to NNUK shall, as between the Debtors participating in the Sale, be in full and final satisfaction of any and all amounts determined to be payable to the French Debtors in respect of the Sale; and

   b. the remainder of the Sales Proceeds (the "<u>Balance</u>") shall remain in the Escrow Account and shall be allocated pursuant to a protocol for resolving disputes concerning allocation of sale proceeds (the "<u>Protocol</u>"), and the parties hereto agree to negotiate in good faith and to reach agreement as to the Protocol as soon as possible following execution of this Agreement.

   c. "<u>Adjusted Sale Proceeds</u>" means the amount as calculated in Schedule 3 to this Agreement.

2. <u>Effectiveness.</u>

   a. This Agreement is subject to, and shall not be effective until receipt of, the necessary approvals of the US Court and the Canadian Court (the "<u>Condition</u>").

   b. Each of the US Debtors and the Canadian Debtors shall:

      i. use commercially reasonable efforts to satisfy the Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

      ii. keep the EMEA Debtors reasonably apprised of the progress of the satisfaction of the Condition and provide such other information regarding the satisfaction of the Condition as reasonably requested by the EMEA Debtors; and

      iii. use commercially reasonable efforts to allow any EMEA Debtor which so requests in writing to participate in connection with any proceedings in the US Court and/or the Canadian Court related to the satisfaction of the Condition.

3. <u>Governing Law and Jurisdiction.</u>

   a. The parties further agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

[New York #2044799 v19]

b.  To the fullest extent permitted by applicable law, each party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement may be brought in the US Court and the Canadian Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

4.  No Personal Liability of the Joint Administrators.

a.  The parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the companies to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b.  The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Filed Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of the other parties to this Agreement.

c.  [In exercising their rights under, or giving effect to the arrangements contemplated in, this Agreement, it is acknowledged that the Joint Administrators are required to act in the best interests of the creditors of the EMEA Filed Entity to which they have been appointed.  Therefore nothing in this Agreement shall operate so as to derogate from, restrict or prevent the Joint Administrators from complying with their statutory duties or legal obligations in relation to the exercise of their powers, duties or functions as administrators of the EMEA Filed Entities under the United Kingdom Insolvency Act 1986 or any other applicable legislation or statutory instrument.] **[NTD: 4(c) to be discussed.]**

5.  Creditors' Committee and Bondholders' Committee Support.  Attached hereto as Annex A and B, respectively, is written confirmation from the Creditors' Committee and Bondholders' Committee of their respective support of this Agreement and of their respective confirmation that they will file appropriate Court motion papers containing a statement of such support for Court approval of this Agreement.

[New York #2044799 v19]

6. <u>Counterparts</u>.  This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the party who signed the counterpart and all of which together shall constitute a single agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

NORTEL NETWORKS CORPORATION

By _____
     Name:
     Title:

NORTEL NETWORKS LIMITED

By _____
     Name:
     Title:

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
     Name:
     Title:

NORTEL NETWORKS
INTERNATIONAL CORPORATION

By _____
     Name:
     Title:

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
     Name:
     Title:

[New York #2044799 v19]

NORTEL NETWORKS INC.

By _____ _____
    Name:
    Title:


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____ _____
    Name:
    Title:


CORETEK, INC.

By _____ _____
    Name:
    Title:


NORTEL ALTSYSTEMS, INC.

By _____
    Name:
    Title:


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name:
    Title:


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name:
    Title:

[New York #2044799 v19]

NORTEL NETWORKS CABLE
SOLUTIONS INC.


By _____
    Name:
    Title:


NORTEL NETWORKS CAPITAL
CORPORATION


By _____
    Name:
    Title:


NORTEL NETWORKS HPOCS INC.


By _____
    Name:
    Title:


NORTEL NETWORKS
INTERNATIONAL INC.


By _____
    Name:
    Title:


NORTEL NETWORKS OPTICAL
COMPONENTS INC.


By _____
    Name:
    Title:

[New York #2044799 v19]

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name:
    Title:

QTERA CORPORATION

By _____
    Name:
    Title:

SONOMA SYSTEMS

By _____
    Name:
    Title:

XROS, INC.

By _____
    Name:
    Title:

Signed by ALAN BLOOM as joint
administrator on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators

By _____
    Name:
    Title:

8

[NOTE: Herbert Smith to add signature blocks for each EMEA Filed Debtor and EMEA Non-Filed Entity, including the Joint Israeli Administrators, and to confirm any procedural requirements as to authorization/execution.]

[New York #2044799 v19]

## SCHEDULE 1

### US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

[New York #2044799 v19]

## SCHEDULE 2
### Canadian Debtors

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

[New York #2044799 v19]

**SCHEDULE 3**

**Adjusted Sale Proceeds**

The following table sets forth the calculation of Adjusted Sale Proceeds:

[New York #2044799 v19]

THIS DRAFT AGREEMENT HAS BEEN PRODUCED
FOR DISCUSSION AND SETTLEMENT PURPOSES
ONLY AND IS SUBJECT TO THE PROVISIONS OF
RULE 408 OF THE RULES OF EVIDENCE FOR
UNITED STATES COURTS AND MAGISTRATES AND
ANY OTHER SIMILAR APPLICABLE RULES IN ALL
PERTINENT JURISDICTIONS.

*Draft of May 28, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

## ANNEX A

## [Creditors' Committee Confirmation of Support]

[New York #2044799 v19]

## ANNEX B

### [Bondholders' Committee Confirmation of Support]

[New York #2044799 v19]

**Mendoza, Richard**

| | |
|---|---|
| **From:** | DAVIES, GAVIN |
| **Sent:** | 08 June 2009 19:57 |
| **To:** | Sanjeet Malik; fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE; Kois, Maria; Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; GALE, STEPHEN; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; lcarel@afarber.com; anackan@farberfinancial.com; JHarris@milbank.com; Max.Starnino@paliareroland.com; Ken.Rosenberg@paliareroland.com; Lily.Harmer@paliareroland.com; Tina.Lie@paliareroland.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; jstam@ogilvyrenault.com; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com |
| **Cc:** | Lisa M SCHWEITZER; Fabrice BAUMGARTNER; Megan Fleming-Delacruz; Sharmin Takin; Daniel Ilan; Craig B BROD; James L BROMLEY; abloom@UK.EY.COM; sharris@UK.EY.COM; Robin jowitt; Evan.Flaschen@bgllp.com; Schwill, Robin |

**Subject:** RE: IFA / Call at 11AM (EST) Today

All

Following our earlier call, we have now spoken to Alan Bloom and colleagues. Alan is prepared to accept the newly formulated request regarding behaviour of all of the Debtors on all future M&A deals, provided that it is clear that no Debtor is required to enter into any M&A transaction, where it is uneconomic to do so, or otherwise. To avoid any misunderstandings on what we are agreeing to, we have drafted a new section set out at the end of this email.

We also thought that it would be helpful to set out our response to all the open commercial points that I had iterated before the call came to end, so that all can see those points quickly and efficiently. They represent movement forward from our position over the weekend, and as such we hope that they will regarded as helpful in closing this agreement. But if there is any misunderstanding as to their meaning, please do call me as soon as possible as we want to continue to move forward, and think that any misunderstandings at this stage would be unhelpful. The points are as follows, in the order in which I iterated them on the call:

1.     Section 12b - EMEA Debtor covenant: we propose making it clear that a Subject Transaction is one to which EMEA is a party (as explained on the call). Also effect of a new bidder as per 363 process, for clarity . We have dropped our request for US$20m as the sole remedy.

2.     Section 12c - conditionality: we have no further comments on this draft, other than the technical point that we need to make it a waivable condition by the Administrators.

3.     Section 5 - dollar for two dollar payment where US Recoveries: we will drop this request (on the basis of satisfaction on our security point, as per point 6, below)

4.     Section 2a - clarification on use of funds provision not being used to avoid Shortfall Payment: we no longer require this.

5.     Section 6b - definition of a Material Asset Sale: we agree with the approach in the drafting, as per last night's call. But as per last night's call, and as per our ask since mid-week, we requested that the minimum recoveries of NNL to trigger payment obligations to NNUK is US$20m, not the US$50m. To move forward, we suggest US$30m.

6.     Section 11 - IP Licences: we await the latest turn, but believe that the Cleary and HS IP lawyers were settling this. We would reiterate our requirement, stated when we agreed to this and repeated in subsequent mark-ups, that 100% of the sale proceeds in these situations go into escrow/protocol process as well. We are also mindful that we need to reach settlement on which deals this applies to (i.e. RIM and Narnia, and (a) any others involving those assets, but not (b) any involving any other assets.)

7.     Section 6.e - ranking of security: we believe that we agreed that the Shortfall Payment would rank

pari passu at all times with the Inter-Company Charge. The only qualification would be that we would waive our rights to object to re-ranking of the Intercompany as security holder of the US$20m. Others in the Inter-Company Charge may object, but we would follow them wherever they ended up (i.e. maintaining pari passu). If this is still the agreed position, we believe the drafting needs tidying up to clarify.

Plus one further point not mentioned

8.    GSPA: we would like to understand what is proposed re GSPA extension, as old section 18 was deleted overnight. We still believe it appropriate for the GSPA to continue to the end of the EMEA Interim Period.

There remain some other lower level points from the mark-up, which we would discuss on a drafting call, but we believe that these are the key commercial points identified. We would be grateful for confirmation from others as to no significant new points on the Cleary draft of last night, otherwise, could we ask as to what they are.  If there are no new points, and the parties are satisfied with the package proposed in this email, perhaps we could proceed to a smaller drafting group? If not, presumably we reconvene the 1130 am call. Alan Bloom and colleagues from EY have agreed to make themselves available for any such call, now it is clear that these calls are intended to be as principals as well.

Please do call me if any questions on this. Otherwise, presumably Sanjeet/Craig will let us know the plan.

Thanks

Gavin
+44 207 466 2170

**Proposed new section**

a.    Each Debtor hereby agrees that its entry into and consummation of any sale of material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (an "M&A Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds from the relevant M&A Transaction or (B) the binding procedure for the allocation of sale proceeds ("Sale Proceeds") from the relevant M&A Transaction.

b.    Pending agreement of all of the Selling Debtors to an allocation of the Sale proceeds, the entire amount of the Sale Proceeds shall be deposited in an escrow account governed by an escrow agreement, the terms of which are to be agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) determination by the relevant dispute resolver(s) under the terms of the protocol applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c.    The Selling Debtors shall, immediately following any M&A Transaction, negotiate in good faith and on a timely basis to reach agreement regarding allocation of the relevant Sale Proceeds within a reasonable period of time, failing which the Protocol shall apply to the relevant M&A Proceeds. The Debtors shall, immediately following the date hereof, negotiate in good faith and on a timely basis the terms of a protocol to constitute, in the case of each M&A Transaction, the Protocol.

d.    Notwithstanding any other provision of this Section •, (i) no Debtor shall be required to enter into an M&A Transaction, whether because it is uneconomic to such Debtor to do so, or for any other reason, and (ii) it is expressly acknowledged by all Debtors that, in relation to any M&A Transaction, (A) neither any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such M&A Transaction (which shall include the cost of severance and other restructuring costs of each Selling Debtor) and sharing of deal costs relating to such M&A Transaction (which shall include break fees and escrow accounts) between the Selling Debtors shall constitute items regarding allocation of Sale Proceeds from such M&A Transaction.

e.    Nothing in this Section • shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to entitlement to the Sale Proceeds from any M&A Transaction.

NOTE: (i) to discuss NNSA and requirement of headline purchase  price in APA and (ii) US$20m provision still applies, and still applies only to first transaction.

17/05/2011

---- Forwarded by Sanjeet Malik/NY/Cgsh on 06/08/2009 06:39 PM ----

"Jacobs, Ryan" <rjacobs@AkinGump.com>

08 June 2009  06:24 PM

To Gavin.Davies@herbertsmith.com, "Sanjeet Malik"
<smalik@cgsh.com>, "Craig B BROD" <cbrod@cgsh.com>,
"Pisa, Albert A." <APisa@milbank.com>,
tkreller@milbank.com

cc "Hodara, Fred" <fhodara@AkinGump.com>, "Botter, David"
<dbotter@AkinGump.com>, "Michael Wunder" <michael.wunder@fmc-
law.com>

Subject FW: IFA / Call at 11AM (EST) Today

Our comments to your email are outlined in black below. We will discuss on the 6:30pm call.

---

**From:** DAVIES, GAVIN [mailto:Gavin.Davies@herbertsmith.com]
**Sent:** Monday, June 08, 2009 2:57 PM
**To:** Sanjeet Malik; Hodara, Fred; Alex MacFarlane; APisa@milbank.com;
Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com;
jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE; Kois, Maria;
Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com; Jacobs, Ryan; Shayne
Kukulowicz; GALE, STEPHEN; tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael Wunder;
Alex MacFarlane; Shayne Kukulowicz; lcarel@afarber.com; anackan@farberfinancial.com;
JHarris@milbank.com; Max.Starnino@paliareroland.com; Ken.Rosenberg@paliareroland.com;

Lily.Harmer@paliareroland.com; Tina.Lie@paliareroland.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; jstarn@ogilvyrenault.com; tracyc@nortel.com; Botter, David; plook@nortel.com
**Cc:** Schweitzer, Lisa; Fabrice BAUMGARTNER; Megan Fleming-Delacruz; Sharmin Takin; Daniel Ilan; Craig B BROD; James L BROMLEY; abloom@UK.EY.COM; sharris@UK.EY.COM; Robin jowitt;
Evan.Flaschen@bgllp.com; Schwill, Robin
**Subject:** RE: IFA / Call at 11AM (EST) Today

All

Following our earlier call, we have now spoken to Alan Bloom and colleagues. Alan is prepared to accept the newly formulated request regarding behaviour of all of the Debtors on all future M&A deals, provided that it is clear that no Debtor is required to enter into any M&A transaction, where it is uneconomic to do so, or otherwise. To avoid any misunderstandings on what we are agreeing to, we have drafted a new section set out at the end of this email.

We also thought that it would be helpful to set out our response to all the open commercial points that I had iterated before the call came to end, so that all can see those points quickly and efficiently. They represent movement forward from our position over the weekend, and as such we hope that they will regarded as helpful in closing this agreement. But if there is any misunderstanding as to their meaning, please do call me as soon as possible as we want to continue to move forward, and think that any misunderstandings at this stage would be unhelpful. The points are as follows, in the order in which I iterated them on the call:

1.    Section 12b - EMEA Debtor covenant: we propose making it clear that a Subject Transaction is one to which EMEA is a party (as explained on the call). Also effect of a new bidder as per 363 process, for clarity [WHAT DOES THIS MEAN?] . We have dropped our request for US$20m as the sole remedy.

2.    Section 12c - conditionality: we have no further comments on this draft, other than the technical point that we need to make it a waivable condition by the Administrators [Please Clarify Waiver]

3.    Section 5 - dollar for two dollar payment where US Recoveries: we will drop this request (on the basis of satisfaction on our security point, as per point 6, below)

4.    Section 2a - clarification on use of funds provision not being used to avoid Shortfall Payment: we no longer require this.

5.    Section 6b - definition of a Material Asset Sale: we agree with the approach in the drafting, as per last night's call. But as per last night's call, and as per our ask since mid-week, we requested that the minimum recoveries of NNL to trigger payment obligations to NNUK is US$20m, not the US$50m. To move forward, we suggest US$30m. [To be discussed]

6.    Section 11 - IP Licences: we await the latest turn, but believe that the Cleary and HS IP lawyers were settling this. We would reiterate our requirement, stated when we agreed to this and repeated in subsequent mark-ups, that 100% of the sale proceeds in these situations go into escrow/protocol process as well. We are also mindful that we need to reach settlement on which deals this applies to (i.e. RIM and Narnia, and (a) any others involving those assets, but not (b) any involving any other assets.)

7.    Section 6.e - ranking of security: we believe that we agreed that the Shortfall Payment would rank pari passu at all times with the Inter-Company Charge. The only qualification would be that we would waive our rights to object to re-ranking of the Intercompany as security holder of the US$20m. Others in the Inter-Company Charge may object, but we would follow them wherever they ended up (i.e. maintaining pari passu). If this is still the agreed position, we believe the drafting needs tidying up to clarify.

Plus one further point not mentioned

8.    GSPA: we would like to understand what is proposed re GSPA extension, as old section 18 was deleted overnight. We still believe it appropriate for the GSPA to continue to the end of the EMEA Interim Period.
EXTENSION MUST BE MONTH TO MONTH

There remain some other lower level points from the mark-up, which we would discuss on a drafting call, but

we believe that these are the key commercial points identified. We would be grateful for confirmation from others as to no significant new points on the Cleary draft of last night, otherwise, could we ask as to what they are. If there are no new points, and the parties are satisfied with the package proposed in this email, perhaps we could proceed to a smaller drafting group? If not, presumably we reconvene the 1130 am call. Alan Bloom and colleagues from EY have agreed to make themselves available for any such call, now it is clear that these calls are intended to be principals as well.

Please do call me if any questions on this. Otherwise, presumably Sanjeet/Craig will let us know the plan.

Thanks

Gavin
+44 207 466 2170

**Proposed new section**

a.       Each Debtor hereby agrees that its entry into and consummation of any sale of material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (an "M&A Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds from the relevant M&A Transaction ("Sale Proceeds") or (B) the binding procedure for the allocation of sale proceeds from the relevant M&A Transaction.

b.       Pending agreement of all of the Selling Debtors to an allocation of the Sale proceeds, the entire amount of the Sale Proceeds shall be deposited in an escrow account governed by an escrow agreement, the terms of which (as well as the selection of the escrow agent) are to be agreed by all Selling Debtors  and the Creditors' Committee and Bondholders' Committee, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors, the Creditors' Committee and the Bondholders' Committee or (ii) determination under the terms of the protocol (acceptable to the Selling Debtors, Creditors' Committee and Bondholders' Committee) applicable to the Sale Proceeds (the "Protocol"), and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c.       The Selling Debtors shall, immediately following any M&A Transaction, negotiate with the Creditors' Committee and Bondholders' Committee in good faith and on a timely basis to reach agreement regarding allocation of the relevant Sale Proceeds within a reasonable period of time, failing which the Protocol shall apply to the relevant M&A Proceeds. The Debtors shall, immediately following the date hereof, negotiate in good faith with the Creditors' Committee and the Bondholders' Committee  and on a timely basis the terms of a protocol to constitute, in the case of each M&A Transaction, the Protocol.

d.       Notwithstanding any other provision of this Section •, (i) no Debtor shall be required to enter into an M&A Transaction, whether because it is uneconomic [THE TERM "UNECONOMIC" IS TOO AMORPHOUS -- WE WOULD CONSIDER A FIDUCIARY DUTY STANDARD]  to such Debtor to do so, or for any other reason, and (ii) it is expressly acknowledged by all Debtors that, in relation to any M&A Transaction, (A) neither any matter in the course of negotiation with any prospective purchaser [What does this mean?] , nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such M&A Transaction (which shall include the cost of severance and other restructuring costs of each Selling Debtor) and sharing of deal costs relating to such M&A Transaction (which shall include break fees and escrow accounts) between the Selling Debtors shall constitute items regarding allocation of Sale Proceeds from such M&A Transaction.

e.       Nothing in this Section • shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to entitlement to the Sale Proceeds from any M&A Transaction.

NOTE: (i) to discuss NNSA and requirement of headline purchase  price in APA and (ii) US$20m provision still applies, and still applies only to first transaction.

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 issued by the United States Secretary of the

Treasury. Thus, we are required to inform you that you cannot rely upon any tax advice contained in this communication for the purpose of avoiding United States federal tax penalties. In addition, any tax advice contained in this communication may not be used to promote, market or recommend a transaction to another party.

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

11/05/2011

## Mendoza, Richard

| | |
|---|---|
| **From:** | Sanjeet Malik [smalik@cgsh.com] |
| **Sent:** | 09 June 2009 10:44 |
| **To:** | fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com; DAVIES, GAVIN; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE; Kois, Maria; Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; GALE, STEPHEN; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; lcarel@afarber.com; anackan@farberfinancial.com; JHarris@milbank.com; Max.Starnino@paliareroland.com; Ken.Rosenberg@paliareroland.com; Lily.Harmer@paliareroland.com; Tina.Lie@paliareroland.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; jstam@ogilvyrenault.com; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com; ken.baird@freshfields.com; DEACON, LAURA; bgray@ogilvyrenault.com |
| **Cc:** | Lisa M SCHWEITZER; Fabrice BAUMGARTNER; Megan Fleming-Delacruz; Sharmin Takin; Daniel Ilan; Craig B BROD; James L BROMLEY |
| **Subject:** | NT: Revised IFA |
| **Attachments:** | 2061056_17(Interim Funding and Settlement Agreement - Revised 6_9_09).DOC; 2066235_1 (DVComparison_NEWYORK_2061056_13-NEWYORK_2061056_17).DOC |

Dear All:

Attached is the revised draft of the Revised IFA, and a blackline comparison with the version that was circulated on Monday.

For the folks who had participated in the drafting session, I want to draw your attention to the following:
a. We have not incorporated Gavin's suggestion that Transfer Pricing Agreements be limited to the parties to this Agreement. Please refer to Section 19.b.
b. We have added 10.f. to address the Monitor's point that this Agmt should not interfere with the ordinary course inter-company trading arrangements and related claims.

This draft remains subject to further internal review and comments by our clients.

Regards,
Sanjeet

---

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2136 | f: +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

THIS DRAFT AGREEMENT HAS BEEN PRODUCED
FOR DISCUSSION AND SETTLEMENT PURPOSES
ONLY AND IS SUBJECT TO THE PROVISIONS OF
RULE 408 OF THE RULES OF EVIDENCE FOR
UNITED STATES COURTS AND MAGISTRATES AND
ANY OTHER SIMILAR APPLICABLE RULES IN ALL
PERTINENT JURISDICTIONS.

*Draft of June ~~7~~ 9, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion purposes only*
*CIRCULATED AT 5:40AM*

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3[1] attached hereto. [The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section ~~16~~[2]17 and references to the Parties shall be construed accordingly.][3]

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors (as defined below)), as the "Nortel Group") commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), [Nortel Networks S.A.] ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region included in Schedule 3 attached hereto (collectively, the "EMEA Debtors" and, together with the Canadian Debtors and the US Debtors, the "Debtors") commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC)

[1] ~~List in Schedule 3 to be confirmed~~
[2] ~~TBC – sections 7, 12.d. and 12.e~~
[3] ~~TBD~~

No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments **(the "Transfer Pricing Payments")** for distribution to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements (as defined below)~~, which methodology has been used for determining the compensation due to certain members of the Nortel Group for corporate overhead, research and development costs and licensing of intellectual property (the "Transfer Pricing Payments")~~, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL since the Filing Date (the "January Payment"), since the Filing Date, certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead~~,~~ **and** research and development costs ~~and licensing of intellectual property~~**, whether pursuant to Transfer Pricing Agreements or otherwise,** incurred by NNL for the benefit of the US Debtors which NNL has asserted **or could assert** (without admission by the US Debtors) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "Canada/US Interim Period" and the "NNI Interim Obligations") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the payments in respect of the inter-company trading of goods and services by Nortel Group entities **(the "Inter-Company Trading Payments")** pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (~~respectively, the "GSPAs" and the "GSPA Payments"). For avoidance of doubt, the GSPA Payments, for the purpose of this Agreement, are not~~**the "GSPAs") or pursuant to and in**

2

accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("Trading Orders"). Without prejudice to any Party's rights with respect to any period prior to the date hereof, it is expressly understood and agreed by the Parties that following satisfaction of the Conditions, the GSPAs shall not require any Party to make Transfer Pricing Payments ~~and the continuation of the GSPAs does not imply that any Party on a post-filing basis has assumed or acknowledged the validity~~ under or in respect of the Transfer Pricing Agreements ~~or~~ for the ~~payments thereunder~~ EMEA Interim Period; and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee") and the steering committee of the ad hoc group of bondholders as holders of securities issued or guaranteed by certain entities in the Nortel Group that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee") have each agreed to support this Agreement.[4]

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

   a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

      i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

      ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

   b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms

---

[4] ~~Note that this Agreement has not been approved by the Committees.~~

"Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

c.   Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

d.   Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

2.   Use of Funds; Reporting.

a.   NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

b.   NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide**, to the extent not already provided in accordance with the foregoing sentence,** each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3.   Maximum Payment; Full and Final Settlement. The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. ~~NNL~~**Each of NNL and the Canadian Debtors** hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement **(provided NNL has agreed in writing to any such settlement)**, and expenses (including without limitation reasonable attorneys' fees

4

and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4. <u>Settlement of Motions.</u> It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

5. <u>True-up Obligations.</u> NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>"). Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished ~~pursuant to Section 2 hereof~~**to the Parties**, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in <u>**Section**</u> 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall**, in addition to any payments made in accordance with Section 1.a.ii. above,** pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an **aggregate** amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the **date of** determination ~~of the Maximum Overage Repayment~~**thereof**; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by **NNL, with assistance from** the Monitor**,** and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable **or paid** to the Canadian Debtors by Nortel

5

Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

## PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6. Administration; Funding.

a. NNUK is hereby authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent (without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received**, solely with respect to the EMEA Interim Period**, as detailed on Annex D hereto. Each of the EMEA Debtors agrees that the payments set out in Annex D shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates **(other than such EMEA Debtor)** for such payment.

b. Subject to the terms of this Agreement (including without limitation Sections 7.a. and ~~12.~~**13.**b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be ~~payable~~**paid** out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds ~~US$50 million~~**the amount previously agreed to by the Parties in writing** (such sale, a "Material Asset Sale");[5] *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall **give pro forma**

---

[5] ~~From the comments of one of the parties it seems that this Material Asset Sale must involve the sale of assets of EMEA Debtors. (Parties to clarify the commercial deal).~~
[6] ~~Parties to consider whether the definition of Material Asset Sale should be filed under seal.~~

6

**effect to such payment and** take into account any payments actually received by NNL in connection with such Material Asset Sale).

c.  Subject to the terms of this Agreement (including without limitation Sections 7.a. and ~~12.~~**13.**b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be ~~payable~~**paid** out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.  The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be ~~payable~~**paid in full or in part to NNUK** on the earlier of (i) the date **or dates** that, in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales ~~(which for this purpose need not include the EMEA Debtors)~~, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full. The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group. Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the ~~Joint Administrators~~**UK Administrator**, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL. For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part. ~~For the avoidance of doubt,~~ **and** the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall **at all times** rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge); ~~provided, however, that under no circumstances shall the Shortfall Charge be senior to (A) all other existing charges that have been approved by the Canadian Court as of the date of this Agreement, (B) the Charge and (C),~~ **NNUK hereby acknowledges that** any

7

future charges that may be granted to the US Debtors in connection with any future funding provided by the US Debtors to the Canadian Debtors **could be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge**.

f.  The Canadian Debtors, the Monitor and the EMEA Debtors hereby confirm that the the Shortfall Payments resulted from arm's length negotiations among such Parties.

**g.  In the event of any breach of Section 12.a. by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances.  In addition, the Shortfall Charge shall be automatically extinguished.**

**h.** g. The Canadian Debtors, the Monitor and the EMEA Debtors hereby confirm that the calculation of the payments set forth in <u>Annex D</u> resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7.  <u>Covenants</u>.

a.  Each ~~EMEA Debtor hereby agrees that such party's entry into and consummation of the Subject Transaction (as defined in Section 12(b) below) shall not be conditioned upon such party reaching an agreement regarding (A) allocation of the sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction.  In the event of any direct or indirect breach of this Section 7.a. by any EMEA Debtor, NNL's obligation to make any Shortfall Payment shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Section 6.b. under any circumstances.~~ **of the EMEA Debtors agrees that it shall not at any time, directly or indirectly, make any distributions of any products, services or intellectual property to or from Nortel Networks OY, Nortel Networks AB, and Nortel Networks Shannon Limited, or enter into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by such entities.**

b.  In respect of NNSA, the UK Administrator shall use its commercially reasonable efforts to obtain (i) within 10 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a. ~~and~~, 11.b. **and 12** of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a. and 11.b. as applicable to an EMEA Debtor, ~~which shall effectuate an accession to this Agreement by NNSA~~.  The UK Administrator agrees to provide copies of

8

such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8. <u>Maximum Payment; Full and Final Settlement</u>.  Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments ~~for the calculation period in the applicable~~**under the** Transfer Pricing Agreements ~~in respect of~~**for all calculation periods or parts thereof within** the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto.  Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9. <u>Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors</u>.  It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

## PART C – PROVISIONS OF GENERAL APPLICATION

10. <u>Scope of this Agreement</u>.  The Parties hereto agree that:

    a. this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, {or have any impact whatsoever on,} the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b. this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either:  (i) prior to the Filing Date, or (ii) after the Canada/US Interim Period or the EMEA Interim Period, as applicable:; *provided, however*, the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

    c. this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

9

d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.  [this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments ~~thereof for the relevant period, as set out herein.~~]**with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and**

f.  **this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders.**

11. Relinquishment of Intellectual Property Licenses.

a.  **Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of the right to the potential receipt of an allocation to such Debtors of portions of the sale proceeds from, sale of any material assets of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however*, that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the name and the description of the scope of assets, businesses and technologies covered by such Asset Sales has been disclosed in writing to the Joint Administrators prior to the date hereof.**

b.  **For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by**

10

such Debtor as of the date of closing of such Asset Sale and only in connection with the products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; _provided, however_, that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; (iv) that the Appropriate License Termination shall not affect the ownership rights that Debtors and NNL may have to any intellectual property; and (v) for such other appropriate provisions as NNL and such Debtors, acting reasonably, shall agree.  For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement for the purposes of Article 9 thereof.

12. **Entry into Sale Transactions.**

    a.  [Rider to follow separately.]Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or consummation of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

    **b.**  Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.d., the entire amount of the Sale Proceeds (less applicable transfer taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all

Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c.   Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

d.   The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Protocol, failing which the Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

e.   Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, (A) neither any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute items regarding allocation of Sale Proceeds from such Sale Transaction.

f.   Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to entitlement to Sale Proceeds from any Sale Transaction.

**13.** ~~12.~~ Effectiveness.

a.   No provision of this Agreement (other than as set forth in Sections 13.d. and 13.e. of this Agreement, which shall be effective as of the date hereof) shall be

12

effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof ~~and~~**(the "North American Court Condition"), (B)** the UK Court providing directions~~, if so sought~~ (the "UK Court's Directions"), **if so sought,** that the Joint Administrators ~~are at liberty~~**have the necessary power and jurisdiction** to enter into this Agreement (the "**UK Court Condition" and, together with the North American Court Condition, the "Court Approval** Condition") ~~and (B~~**; *provided, however,* that if the UK Court has not entered any order or provided any directions prohibiting the Joint Administrators from entering into this Agreement, the Joint Administrators may at their election waive the UK Court Condition, and (C)** the Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition. Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective). Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective. For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of **any one or more of each of (i)** the ~~[Canadian Debtors] that shall result in the transfer of, *inter alia,* materials assets of,~~ **(ii) the US Debtors and (iii)** the EMEA Debtors~~upon consummation of such sale~~ (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to ~~termination of the IP Licenses~~**Appropriate License Terminations**).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court ~~refuses to provide the UK Court's Direction for any reason whatsoever~~**Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a.** and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

13

      i.    use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

      ii.   keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

      iii.  use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

   e.  If the Joint Administrators elect to seek the UK Court's ~~Direction~~**Directions**, then the EMEA Debtors ~~and the Joint Administrators~~ shall (A) use commercially reasonable efforts to obtain the UK Court's ~~Direction~~**Directions** as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's ~~Direction~~**Directions** and provide such other information regarding the efforts to obtain UK Court's ~~Direction~~**Directions** as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's ~~Direction~~**Directions**.

**14.** ~~13.~~ Term. This Agreement shall expire on December 31, 2009 (the "Expiration Date"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections ~~1.a.ii,~~ 2, 3, 4, 5, 6, ~~7,~~ 8, 9, **10,** 11, 12, ~~13,~~ 14, 15, ~~16~~**16, 17, 20** and ~~20}~~ ~~hereunder~~**21 of this Agreement** (but only to the extent that these provisions were effective)~~,~~ in accordance with Section ~~12~~**13** of this Agreement~~,~~ prior to the Expiration Date~~,~~**)** shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

**15.** ~~14.~~ Amendments. This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court).

For the purpose of this Section ~~14.~~**15,** "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

**16.** ~~15.~~ Governing Law and Jurisdiction.

    a.   This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section ~~16~~**17** shall be governed by English law.

    b.   To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding ~~to the extent that it relates solely to~~**set forth in** Section ~~16~~**17.c.** of this Agreement shall be brought exclusively in the English courts ~~[as set out in Section 16.c]~~.

**17.** ~~16.~~ No Personal Liability of the Joint Administrators.

    a.   The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the companies to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

15

b.  The Joint Administrators are a Party to this Agreement: (i) as agents of certain of
    the respective EMEA Debtors of which they are administrators; and (ii) in their
    own capacities solely for taking the benefit of the statutory charges under
    Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and
    enforcing the obligations of certain other Parties to this Agreement.

c.  [Notwithstanding anything in Section ~~15.~~**16,** any claim, action or proceeding
    ~~relating to the conduct of~~**against** the Joint Administrators **in their personal
    capacities (and not as agents for any EMEA Debtors)** under this Agreement ~~or
    otherwise is~~**shall be** within the exclusive jurisdiction of the English Courts.]

**18.** ~~17.~~ Creditors' Committee and Bondholders' Committee Support.

a.  Attached hereto as <u>Annex E</u> is written confirmation from the Creditors'
    Committee confirming that the members of the Creditors' Committee, after
    thorough review and due deliberation of this Agreement, have voted, in
    compliance with the by-laws of the Creditors' Committee, in favor of supporting
    this Agreement and have granted permission to their advisors to file appropriate
    materials with the applicable Courts in support of the motions by the Debtors for
    Court approval of this Agreement.

b.  Attached hereto as <u>Annex F</u> is written confirmation from the counsel to the
    Bondholders' Committee confirming that the ~~members of the steering committee
    of the~~ Bondholders' Committee ~~that signed relevant confidentiality or non-
    disclosure agreements are in support of this Agreement and have~~**has** granted
    permission to ~~their~~**its** advisors to file appropriate materials with the applicable
    Courts in support of the motions by the Debtors for Court approval of this
    Agreement.

**19.** ~~18.~~ Representations and Warranties.

a.  Subject to satisfaction of the Court Approval Condition, each Party [(but, for the
    avoidance of doubt, not the Joint Administrators **in their personal capacities**)]
    hereby severally represents and warrants to each other that, as of the date hereof:

    i.   it has the power and authority to enter into this Agreement and to carry
         out its obligations hereunder;

    ii.  the execution of this Agreement, and the consummation of the
         transactions contemplated herein, have been authorized by all necessary
         approvals, and no other act or proceeding on its part is necessary to
         authorize the execution of this Agreement; and

    iii. this Agreement has been duly executed by it and constitutes its legal,
         valid and binding obligations.

b.  Each Party hereby severally represents and warrants to each other Party that~~, to
    the best of such Party's knowledge based upon due and reasonable inquiry, there~~

16

~~are no Nortel Group entities, other than the Parties to this Agreement and the entities set forth in Schedule 5, which may have any claim (as such term is defined in Section 101(5) of the Bankruptcy Code) with respect to Transfer Pricing Payments~~ **it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement**.

**20.** ~~19.~~ Reservation of Rights. Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment.__The use of the term Transfer Pricing Payment (or any similar term) or reference to the Master R&D Agreement (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any entity of the transfer pricing regime or the Master R&D Agreement.__

**21.** ~~20.~~ Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

**22.** ~~21.~~ Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, ~~such provision~~ shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision.[7]__The Parties shall negotiate in good faith with respect to any provision found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.__

**23.** ~~22.~~ Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

---

[7] ~~TBD~~

## Mendoza, Richard

| | |
|---|---|
| **From:** | Sanjeet Malik [smalik@cgsh.com] |
| **Sent:** | 10 June 2009 04:10 |
| **To:** | fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com; DAVIES, GAVIN; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE; Kois, Maria; Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; GALE, STEPHEN; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; lcarel@afarber.com; anackan@farberfinancial.com; JHarris@milbank.com; Max.Starnino@paliareroland.com; Ken.Rosenberg@paliareroland.com; Lily.Harmer@paliareroland.com; Tina.Lie@paliareroland.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; jstam@ogilvyrenault.com; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com; ken.baird@freshfields.com; DEACON, LAURA; bgray@ogilvyrenault.com |
| **Cc:** | Lisa M SCHWEITZER; Fabrice BAUMGARTNER; Megan Fleming-Delacruz; Sharmin Takin; Daniel Ilan; Craig B BROD; James L BROMLEY |
| **Subject:** | Revised IFA |
| **Attachments:** | 2061056_22(Interim Funding and Settlement Agreement - EXECUTION VERSION).DOC; 2066948_1(IFA blackline v21-22).DOC |

Dear All:

Attached is the final version (hopefully).  When you are done reviewing the changes, please re-dial.

Regards,
Sanjeet

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2136 | f: +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

~~[EXECUTION VERSION]~~

**EXECUTION VERSION**

~~10:15 pm~~

### INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to

a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "January Payment"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission to the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "Canada/US Interim Period" and the "NNI Interim Obligations") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "Inter-Company Trading Payments") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "GSPAs") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("Trading Orders"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee") have each agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – <u>NNI FUNDING TO NNL; SETTLEMENT MATTERS</u>

1. <u>Funding</u>.

    a. NNI shall pay to NNL a sum total of US$157 million (the "<u>Total Payment</u>"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as <u>Annex C</u> hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "<u>Permanent Payment</u>"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "<u>Contingent Payment</u>") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "<u>Excess Funding Charge</u>"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "<u>EDC Charge</u>"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "<u>Canadian Initial Order</u>").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

3

2.  Use of Funds; Reporting.

    a.  NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b.  NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3.  Maximum Payment; Full and Final Settlement. The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4.  Settlement of Motions. It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

5.  True-up Obligations.  NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "Other Nortel Group Companies"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "ONGC Costs").  Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "Excess Recoveries"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "Overage Amount"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "Maximum Overage Repayment") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "NNL Liquidity Review Procedures").  The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full.  For the purposes of this Section, "U.S. Pro Rata Excess Recoveries," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million minus the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

## PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6.  Administration; Funding.

    a.  NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on <u>Annex D</u> hereto. Each of the EMEA Debtors agrees that the payments set out in <u>Annex D</u> shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b. Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>First Shortfall Payment</u>"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "<u>Material Asset Sale</u>"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

~~Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12b and 12d, and Sections 12b and 12d shall apply accordingly.~~

c. Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>Second Shortfall Payment</u>" and together with the First Shortfall Payment, the "<u>Shortfall Payments</u>"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL;

6

*provided, however,* that some or all of such payment shall be subject to NNL
Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.   The unpaid balance of the Shortfall Payments, if any, shall be carried forward
and shall be paid in full or in part to NNUK on the earlier of the date or dates
that, (i) in the reasonable and sole judgment of the Monitor, upon consultation
with the Creditors' Committee and the Bondholders' Committee, after the
application of the NNL Liquidity Review Procedures (giving pro forma effect to
such payment) such payment would not materially and adversely impact the
liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually
received by, NNL from one or more subsequent Material Asset Sales, subject to
the NNL Liquidity Review Procedures (giving pro forma effect to such payment
and taking into account the payments actually received by NNL in connection
with such Material Asset Sales), until paid in full. The obligation relating to the
Shortfall Payments shall be an obligation of NNL only and of no other entity
within the Nortel Group. Until the Shortfall Payments have been fully paid, NNL
shall (i) promptly notify NNUK of the signing and closing of any Material Asset
Sale, (ii) provide material information regarding such Material Asset Sale as may
be reasonably requested by the UK Administrator, and (iii) upon actual receipt of
sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK
of the calculation and allocation of the sale proceeds from such Material Asset
Sale to NNL. For the avoidance of doubt, any Shortfall Payments relating to any
Material Asset Sale shall not be used as any basis for claiming that the purchase
price allocation to NNUK in respect of such Material Asset Sale has been
satisfied in whole or in part, and the Shortfall Payments shall not be excluded
from the total amount of sale proceeds available for allocation to the relevant
parties to such Material Asset Sale.

e.   NNL's obligation to make the Shortfall Payments shall be secured by a charge
against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which
charge shall be granted by order of the Canadian Court and shall at all times rank
*pari passu* with the Inter-company Charge (as defined in the Canadian Initial
Order and as modified from time to time, including without limitation any
modifications relating to the priority of such charge). Without prejudice to the
previous sentence, NNUK hereby acknowledges that any current or future
charges that have been, or may be, granted to the US Debtors in connection with
any funding provided by the US Debtors to the Canadian Debtors may, or could,
be senior to the Shortfall Charge, and consents to such charges being senior to the
Shortfall Charge.

f.   The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall
Payments resulted from arm's length negotiations among such Parties.

g.   In the event of any breach of Section 12.a. in connection with the Subject
Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall
Payments shall be automatically forfeited, and the Shortfall Payments shall not
be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any

circumstances. In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.  The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in <u>Annex D</u> resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7.  <u>Covenants</u>.

a.  [left intentionally blank].

b.  In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor. The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8.  <u>Maximum Payment; Full and Final Settlement</u>. Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto. Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9.  <u>Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors</u>. It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

PART C – PROVISIONS OF GENERAL APPLICATION

10. Scope of this Agreement. The Parties hereto agree that:

    a.  this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b.  this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii) after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however,* the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

    c.  this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

    d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

    e.  this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

    f.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

    a.  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors

9

and/or the US Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

b.  For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that

10

the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property.  For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c.   The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination."  In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

**d.   Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.**

12.   Entry into Sale Transactions.

a.   Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

b.   Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account").  In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c.   Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely

11

basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

d.   The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

e.   Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f.   Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g.   For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

   i.   the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

   ii.   the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or

determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

a.  No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition. Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective). Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective. For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

    d.  Each Party hereto shall:

        i.    use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

        ii.    keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

        iii.    use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

    e.  If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

    f.  Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., **12.g.,** 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. <u>Term</u>.  This Agreement shall expire on December 31, 2009 (the "<u>Expiration Date</u>"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. <u>Amendments</u>. This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "<u>Business Day</u>" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. <u>Governing Law and Jurisdiction</u>.

   a. This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

   b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. <u>No Personal Liability of the Joint Administrators</u>.

   a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees,

advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b.   The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c.   Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

18. Creditors' Committee and Bondholders' Committee Support.

a.   Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

b.   Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

a.   Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

i.   it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

ii.  the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

iii. this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

b.  Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights. Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. Defunct Distributors' Covenant. Each of the Debtors hereby covenants that such Debtor is not currently a party to, has not entered, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.