## Mendoza, Richard

| | |
|---|---|
| **From:** | Sharmin Takin [stakin@cgsh.com] |
| **Sent:** | 10 June 2009 18:03 |
| **To:** | fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com; DAVIES, GAVIN; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE; Kois, Maria; Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; GALE, STEPHEN; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; lcarel@afarber.com; anackan@farberfinancial.com; JHarris@milbank.com; Max.Starnino@paliareroland.com; Ken.Rosenberg@paliareroland.com; Lily.Harmer@paliareroland.com; Tina.Lie@paliareroland.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; jstam@ogilvyrenault.com; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com; ken.baird@freshfields.com; DEACON, LAURA; bgray@ogilvyrenault.com |
| **Cc:** | Lisa M SCHWEITZER; Fabrice BAUMGARTNER; Megan Fleming-Delacruz; Sharmin Takin; Daniel Ilan; Craig B BROD; James L BROMLEY |
| **Subject:** | Executed Interim Funding and Settlement Agreement |

**Attachments:** Interim Funding and Settlement Agreement.pdf

Dear all,

Please find attached a copy of the executed Interim Funding and Settlement Agreement, for your records. This is comprised of the version that Sanjeet circulated in his email below, and the updated signature pages as signed by the parties. The side letter will be circulated separately.

Best regards,

Sharmin Takin
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2443 | f: +1 212 225 3999
www.clearygottlieb.com | stakin@cgsh.com

----- Forwarded by Sharmin Takin/NY/Cgsh on 06/10/2009 12:45 PM -----

**Sanjeet Malik/NY/Cgsh**

09 June 2009  11:10 PM

To fhodara@AkinGump.com, alex.macfarlane@fmc-law.com, APisa@milbank.com, Brent.R.Beekenkamp@ca.ey.com, Devreaux.Gravell@herbertsmith.com, dtay@ogilvyrenault.com, gadavies@nortel.com, Gavin.Davies@herbertsmith.com, jcarfagnini@goodmans.ca, jpasquariello@goodmans.ca, Kate.Wright@herbertsmith.com, Laurence.Elliott@herbertsmith.com, Maria.Kois@herbertsmith.com, Matthew.Hart@lazard.com, mlang@ogilvyrenault.com, orzyr@bennettjones.com, rjacobs@AkinGump.com, shayne.kukulowicz@fmc-law.com, Stephen.Gale@herbertsmith.com, Tkreller@milbank.com, Murray.A.McDonald@ca.ey.com, Michael.Wunder@FMC-Law.com, Alex.MacFarlane@FMC-Law.com, Shayne.Kukulowicz@FMC-Law.com, lcarel@afarber.com, anackan@farberfinancial.com, JHarris@milbank.com, Max.Starnino@paliareroland.com, Ken.Rosenberg@paliareroland.com,

Lily.Harmer@paliareroland.com,
Tina.Lie@paliareroland.com,
Orzyr@bennettjones.com, ZychK@bennettjones.com,
jstam@ogilvyrenault.com, tracyc@nortel.com,
dbotter@AkinGump.com, plook@nortel.com,
ken.baird@freshfields.com,
Laura.Deacon@herbertsmith.com,
bgray@ogilvyrenault.com

cc Lisa M SCHWEITZER/NY/Cgsh@Cgsh, Fabrice BAUMGARTNER/PAR/Cgsh@CGSH, Megan Fleming-Delacruz/NY/Cgsh@cgsh, Sharmin Takin/NY/Cgsh@CGSH, Daniel Ilan/NY/Cgsh@CGSH, Craig B BROD/NY/Cgsh@cgsh, James L BROMLEY/NY/Cgsh@cgsh

Subject Revised IFA

Dear All:

Attached is the final version (hopefully).  When you are done reviewing the changes, please re-dial.

Regards,
Sanjeet

---

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2136 | f: +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information.  If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

**Hearing date: June 29, 2009 at a time to be determined.**
**Objections due: June 22, 2009 at 4:00 PM (ET)**

-------------------------------------------------------X

### NOTICE OF MOTION PURSUANT TO 11 U.S.C. § 105(a), § 363, § 503 AND FED. R. BANKR. P. 9019 FOR AN ORDER (A) APPROVING THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

PLEASE TAKE NOTICE that the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, have today filed and served the attached **Motion Pursuant To 11 U.S.C. § 105(a), § 363, § 503 And Fed. R. Bankr. P. 9019 For An Order (A) Approving The Interim Funding And Settlement Agreement, And (B) Granting Related Relief** (the "Motion").

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **June 22, 2009 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

At the same time, you must serve such Objection on counsel for the Debtors so as to be received by the Objection Deadline:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **JUNE 29, 2009 AT A TIME TO BE DETERMINED,** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801. ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated:  June 9, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Phone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

2936370.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------X
                                        :
In re                                   :   Chapter 11
                                        :
Nortel Networks Inc., et al.,¹          :   Case No. 09-10138 (KG)
                                        :
                    Debtors.            :   Jointly Administered
                                        :
                                        :   Hearing date: June 29, 2009 at a time to be determined.
                                        :   Objections due: June 22, 2009 at 4 :00 P.M. (ET)
                                        :
-----------------------------------------------------X
```

## MOTION PURSUANT TO 11 U.S.C. § 105(A), § 363, § 503 AND FED. R. BANKR. P. 9019 FOR AN ORDER (A) APPROVING THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "US Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, approving the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "Agreement"),² attached hereto as Exhibit B, by and among the US Debtors, the Canadian Debtors (as defined below) including Nortel Networks Limited ("NNL"), the EMEA Debtors (as defined below) excluding Nortel Networks S.A. (all together, the "Parties"), and for purposes of Section 17 of the Agreement only, Ernst & Young LLP as administrator of the EMEA Debtors other than Nortel Networks

---

[1]     The US Debtors in these chapter 11 cases, along with the last four digits of each US Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the US Debtors can be found in the US Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     The description of the Agreement set forth herein is for informational purposes only.  In the event of any discrepancy between the description and the terms of the Agreement, the terms of the Agreement shall govern.

(Ireland) Limited (the "UK Administrator") and Ernst & Young Chartered Accountants on behalf of Nortel Networks (Ireland) Limited ("NNIR") only (the "NNIR Administrator," and together with the UK Administrator, the "Joint Administrators"); and granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the US Debtors respectfully represent as follows:

**Jurisdiction**

1.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.   The statutory bases for the relief requested herein are sections 105(a) and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

**A.     Introduction**

3.   On January 14, 2009 (the "Petition Date"), the US Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.   The US Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.   Also on the Petition Date, the US Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (together with NNC and their affiliates, including the US Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of

---

[3]       The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation ("NNTC"), Nortel Networks Global Corporation and Nortel Networks International Corporation.

Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. In addition, Ernst & Young, Inc. (the "Monitor") has been appointed by the Canadian Court to monitor the Canadian Debtors while the Canadian Proceedings are pending. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. Also, on January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. In addition, at 8 p.m. on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates into administration under the control of individuals from Ernst & Young LLC (collectively, the "EMEA Debtors")[4] into administration under the control of individuals from Ernst & Young LLC (collectively, the "EMEA Proceedings," and together with these proceedings and the Canadian Proceedings, the "Insolvency Proceedings"). On May 28, 2009, the Commercial Court of Versailles, France (Docket No. 2009P00492), ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months. In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA. On June 8, 2009, the UK Administrator filed a

---

[4]    The EMEA Debtors include the following entities: Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

petition with this Court under chapter 15 of the Bankruptcy Code seeking orders recognizing the EMEA Proceedings as they relate to NNUK as foreign main proceedings.

6. On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only. [D.I. 36].

7. On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc committee of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Committee"). No trustee or examiner has been appointed in the US Debtors' cases.

**B.     Corporate Structure and Business**

8. A description of the corporate structure and business of Nortel and the US Debtors and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[5]

**Relief Requested**

9. By this Motion, the US Debtors seek an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms and conditions of the Agreement, and (b) granting related relief.

---

[5]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

## Facts

### A.  History

10.     As described in the First Day Declaration, the Nortel entities operate on an integrated basis across multiple jurisdictions.  Nortel's business is based on the development, licensing and maintenance of intellectual property and the marketing of products and services based on that intellectual property.  Certain Nortel affiliates, including NNL, NNI, NNUK, NNIR and NNSA (collectively, the "Main Nortel Companies"), are or have been the primary source of the research and development that has created Nortel's global technology footprint, the benefits of which are shared worldwide across multiple corporate entities.  These five Nortel entities also provide service and support on an ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead and institutional support to Nortel entities and customers outside of their jurisdictions.  Certain other Nortel Group companies function primarily as sales operations, acting as intermediaries between the Main Nortel Companies and customers in jurisdictions not served by the Main Nortel Companies, and, in certain circumstances, providing ongoing service and support in their local jurisdictions.

11.     In light of the foregoing, certain Nortel entities, including the Main Nortel Companies, have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs, across the corporate entities within the Nortel Group.  These agreements include certain distribution agreements between one or more Nortel Group entities (the "Distribution Agreements"), and the Master R&D Agreement, dated as of December 22, 2004 among NNL, NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master R&D Agreement," and together with the Distribution Agreements, the "Transfer Pricing Agreements").  In addition, two group supplier protocol agreements, one

5

between NNL and the Joint Administrators on behalf of the EMEA Debtors, and the other between NNI and the Joint Administrators on behalf of the EMEA Debtors, have been entered in respect of the inter-company trading of goods and services after the Petition Date (together, and as amended from time to time, the "GSPAs").

12.    The Nortel Group has used "transfer pricing" to allocate profits and losses, and certain costs, among the various Nortel Group companies.  Transfer pricing is an accepted method for such allocation, used widely by multinational enterprises similar in structure and geographic scope to Nortel.  Transfer pricing principles similar to those used by Nortel have been accepted by most of the world's largest economies and are monitored by the Organization for Economic Co-operation and Development ("OECD"), an international non-profit organization headquartered in Paris, France, with 30 member states (including the United States, Canada, the United Kingdom and France).

13.    In the case of Nortel, the Master R&D Agreement is the governing document pursuant to which the Nortel Group implemented its transfer pricing regime using the residual profit split methodology (the "Nortel Transfer Pricing Regime").  Among other things, the Nortel Transfer Pricing Regime was designed to determine the arm's length allocation due to each of the parties for their share of the profits and losses arising from "Research and Development Activity," as that term is defined in the Master R&D Agreement.  In general terms, the Nortel Transfer Pricing Regime historically sought to allocate residual profits and losses among the Main Nortel Companies based on the proportionate share of Research and Development Activity conducted by or on behalf of, such affiliates.  Among other things, the Nortel Transfer Pricing Regime typically requires that profits and losses, and certain costs, be allocated among such affiliates during a calendar year under the Transfer Pricing Agreements (the "Transfer Pricing

<u>Payments</u>") and that a true-up allocation is determined after the actual results for the year are known.

14.      Within the Nortel Group, NNL is the owner of the vast majority of Nortel's intellectual property assets and, in accordance with the Master R&D Agreement, NNL licenses its intellectual property to the Main Nortel Companies on a royalty-free basis.  The Nortel Transfer Pricing Regime, in normal times, is the means by which NNL is compensated for the development and use of its intellectual property by affiliates.  NNI has historically been a net payor under the Nortel Transfer Pricing Regime largely due to the substantial sales revenue generated in the United States when contrasted with its level of Research and Development Activity.  NNL, on the other hand, has historically been a net recipient under the Nortel Transfer Pricing Regime given that NNL generates lower levels of revenue when compared to the high level of corporate overhead and Research and Development Activity incurred in Canada.

15.      As was set forth in the Cash Management Motion filed on the Petition Date, the US Debtors originally intended to reconcile amounts owed under the Master R&D Agreement on a monthly basis in the postpetition period.  However, following commencement of these proceedings, discussions began with various interested parties, including Nortel, the Monitor, the Joint Administrators, the Committee and the Bondholder Committee (the Bondholder Committee, together with the Committee, the "<u>Creditor Groups</u>") concerning continued payments under the Nortel Transfer Pricing Regime within the context of Nortel's worldwide insolvency proceedings.  In particular, issues were raised in light of substantial changes that have occurred and may continue to occur in respect of Nortel's business model given the uncertainties facing Nortel's business.  As a result, only one payment has been made in respect of amounts that could arguably be owed in respect of the Master R&D Agreement – a January 2009 payment

of $30 million by NNI to NNL (the "January Payment"). In addition, the EMEA Debtors have

neither made, nor received, any payments under the Nortel Transfer Pricing Regime since the

Petition Date. Without the receipt of these payments, NNL is currently facing significant

liquidity pressure – pressure that puts NNL, and thus the entire Nortel Group, at risk.

16.      The importance of NNL to the Nortel Group is self-evident. First, NNL is both

the historic and actual operational parent of the global Nortel enterprise. From the Nortel Group

headquarters in Toronto, Canada, NNL provides corporate overhead support to its affiliates

throughout the world. In particular, a substantial portion of Nortel's legal, finance, strategic,

insurance, procurement, human resources and real estate functions are directed on a group-wide

basis from NNL's Toronto offices. Second, NNL conducts a disproportionate share of Nortel's

Research and Development Activities (when compared to revenue generation) and operates the

Carling Facility, the largest Nortel R&D facility in the world (NNL's Research and Development

Activities and corporate overhead support, collectively, the "Postpetition Services," and the costs

related thereto, the "Expenses"). Third, as noted above, NNL is the legal owner of nearly all of

the group's intellectual property, which it licenses to its affiliates.

17.      The various interested parties have been discussing possible solutions to NNL's

liquidity issues for over two months. Among other possible solutions, NNL requested that

payments be made by both NNI and certain of the EMEA Debtors to NNL in respect of the

Postpetition Services and Expenses. The Joint Administrators informed NNL and the Monitor

that the EMEA Debtors are not willing to make such payments to NNL at the present time, but

the Parties, the Monitor and the Joint Administrators, working with the Creditor Groups, have

reached an agreement whereby NNI will make certain payments to NNL in respect of the

Postpetition Services and Expenses provided to NNI (on the basis described below) that should

provide NNL with sufficient liquidity at least through September 30, 2009 (the "Interim Funding Agreement" or the "Agreement").

18.    Prior to reaching the Interim Funding Agreement, NNI and NNL provided the Creditor Groups with access to an electronic database of relevant documents to allow the Creditor Groups' experts to conduct due diligence concerning the appropriate amount owed by NNI to NNL, whether for the provision of Postpetition Services and the reimbursement of the related Expenses, or in respect of the Nortel Transfer Pricing Regime.[6]  Furthermore, representatives of the Canadian Debtors, the Monitor, the US Debtors, the Joint Administrators and the Creditor Groups have met multiple times in person and by phone, in Toronto and in New York, to discuss this issue and reach a mutually acceptable compromise.

19.    A precise allocation of the Expenses that NNL incurs and the value of the Postpetition Services it provides on behalf of the other Nortel Group entities would be a time-consuming and difficult endeavor in light of the integrated nature of the Nortel entities.  In addition, any definitive and binding determination regarding the interpretation and applicability of the Nortel Transfer Pricing Regime similarly would be extremely time consuming and potentially contentious.  Rather than pursue such a precise allocation or definitive and binding determination at this time – and in recognition of NNL's near term liquidity needs - the Creditor Groups and the Joint Administrators have agreed with NNI and NNL that, for the purposes of and subject to the terms of the Agreement, an appropriate estimate of the value of the Postpetition Services provided and Expenses incurred by NNL postpetition on behalf of NNI for the period from the Petition Date through September 30, 2009 (the "Canada/US Interim Period"),

---

[6]     It should be noted that given the role of certain taxing authorities in reviewing the Nortel Transfer Pricing Regime, there is limited information with respect to the views of these government authorities regarding the Nortel Transfer Pricing Regime.

is $187 million (which includes the $30 million paid by NNI through the January Payment).

Such amount is equal to the amount forecasted by NNL to be owed by NNI under the Master

R&D Agreement, and is substantially less than an estimate generated by Nortel of the allocation

of costs to NNI on the basis of each entity's revenue generated, which indicated that NNI could

be considered responsible for a higher amount in costs incurred by NNL.

## B. Terms of the Interim Funding Agreement

      20. Following lengthy, difficult, and good faith negotiations, on or about June 9, 2009,

the Parties entered into the Interim Funding Agreement.  The main terms of the Interim Funding

Agreement[7] are as follows:

- PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

  - Total Payment:  NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C to the Agreement.

    - Permanent Payment:  The first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment").

    - Contingent Payment:  If it is determined, pursuant to a process to be agreed upon by NNL, NNI and the Creditor Groups, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    - True-up Obligations:  NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "Other Nortel Group Companies"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "ONGC Costs").  Solely to the extent that the Canadian

---

[7]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement, certain of which definitions appear in sections of the Agreement not set forth herein, but in the entire Agreement attached hereto as Exhibit B.

Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "Excess Recoveries"), and it is also determined, pursuant to the process referred to in Section 1.a.ii of the Agreement, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "Overage Amount"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii., pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "Maximum Overage Repayment") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditor Groups, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditor Groups (the "NNL Liquidity Review Procedures"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "U.S. Pro Rata Excess Recoveries," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million minus the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

- Excess Funding Charge: NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-

ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings (the "Canadian Initial Order"). Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

- Use of Funds: NNL has informed the other Parties that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI and the Creditor Groups.

- Settlement: The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations (as defined in the Agreement), (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, claims, costs, and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

- PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

  - Shortfall Payment: Subject to the terms of the Agreement, NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account certain adjustments) exceeds the amount previously communicated to the

Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor and the Creditor Groups) and such communication having been counter-signed by the Joint Administrators (such sale, a "Material Asset Sale"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (as set forth in the Agreement)  Subject to the terms of the Agreement, NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures.

- Shortfall Charge:  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order.  Without prejudice to the foregoing sentence, NNUK consents to any current or future charges that have been, or may be granted to the US Debtors in connection with any future funding provided by the US Debtors to the Canadian Debtors may, or could be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

- Settlement:  Except with respect to the obligation of NNL to make the Shortfall Payments, the Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se,* and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto.  Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.  It is expressly understood that Part B of the Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of the Agreement whether arising during, or related to, the EMEA Interim Period.

- PART C – PROVISIONS OF GENERAL APPLICATION

  - Intellectual Property Licenses:  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration

13

of a right to an allocation to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however*, that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditor Groups (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor and the Creditor Groups) and such communication having been by the Joint Administrators.

- Sale Transactions: Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or consummation of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction. Pending the distribution of the Sale Proceeds, the entire amount of the Sale Proceeds (less certain costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors. As soon as reasonably practicable following the execution of this Agreement, the Parties shall negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation. The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Protocol, failing which the Protocol shall apply to determine the allocation of the relevant Sale Proceeds. No Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and it is expressly acknowledged by all Debtors that, in relation to any Sale

Transaction, (A) neither any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction and sharing of transaction costs relating to such Sale Transaction between the Selling Debtors shall constitute items regarding allocation of Sale Proceeds from such Sale Transaction.  For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive) of the Agreement, the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditor Groups in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditor Groups acting in good faith; and

- Effectiveness:  No provision of the Agreement (other than as set forth in Section 13.f. of the Agreement) shall be effective until the satisfaction of the following conditions:  (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditor Groups (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

- Creditor Group Support:  Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of the Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.  Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of the Agreement.

- Reservation of Rights:  Nothing in the Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of the Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety

of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights under the Agreement against NNL, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL under certain provisions of the Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Master R&D Agreement (or similar agreement) in the Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any entity of the transfer pricing regime or the Master R&D Agreement.

### Basis for Relief

21. The relief requested herein is authorized by sections 105(a) and 363(b) of the

Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides

that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105.

22. Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate

outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363. Section

363 applies when an agreement involves the disposition of the estate's assets in such a way that

it ventures beyond an ordinary course transaction. Myers v. Martin (In re Martin), 91 F.3d 389,

395 (3d Cir. 1996).

23. The use or transfer of estate property under this provision must be supported by a

sound business purpose. The Committee of Equity Security Holders v. Lionel Corporation (In re

Lionel Corporation), 722 F.2d 1063, 1070-71 (2d Cir. 1983); Travelers Casualty and Surety

Company v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J.

Mar. 25, 2008); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del.

16

May 20, 2002); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re

Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson

Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).  A court determining whether a sound business

purpose justifies the transaction "should consider all salient factors pertaining to the proceeding

and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders,

alike." In re Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071).  In

addition, a Debtor must show that the transaction has been proposed in good faith, that adequate

and reasonable notice has been provided, and that it is receiving fair and reasonable value in

exchange.  See In re Decora Industries, Inc., 2002 WL 32332749, at *2; In re Delaware &

Hudson Ry. Co., 124 B.R. at 176.

     24.  Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr.

P. 9019.  Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored

in bankruptcy." Martin, 91 F.3d at 393 (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed.

1993)).  In addition, the District of Delaware has recognized that the approval of a proposed

compromise and settlement is committed to the sound discretion of the bankruptcy court.  See In

re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

     25.  Before approving a settlement under Bankruptcy Rule 9019, a court must determine

whether "the compromise is fair, reasonable, and in the interest of the estate." In re Marvel

Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211

B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the

need to compare the terms of the compromise with the likely rewards of litigation." Protective

Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414,

424-25 (1968).  The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." Travelers, 2008 WL 821088, at *5 (citing Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000); Coram, 315 B.R. at 330; Pennsylvania Truck Lines, 150 B.R. at 598.  The court need not be convinced that the settlement is the best possible compromise in order to approve it.  Coram, 315 B.R. at 330.

26. The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Martin, 91 F.3d at 393.

27. The US Debtors respectfully submit that the Agreement meets each of the requirements under section 363 and Bankruptcy Rule 9019.  The Agreement is proposed as a good faith means to reimburse NNL for actual costs incurred on behalf of NNI during the postpetition period while, at the same time, recognizing that assertions have been made that the Nortel Transfer Pricing Regime should no longer apply in light of the current uncertainties relating to Nortel's business.  With these positions in mind, good faith negotiations took place with the intention of avoiding the potential cost and delay of litigation relating to the funding of NNL.  It was determined by NNI, NNL and the Creditor Groups that a consensual resolution is in the best interest of the creditors (including those, such as the bondholders, with claims both in the United States and Canada) and the US Debtors' estates.  The reimbursement of NNL for the Postpetition Services and Expenses provides NNL with the necessary funding in order for NNL to operate during the Canada/US Interim Period, which will allow the US Debtors the continued uninterrupted use of NNL's intellectual property, and maximize the likelihood of a successful

resolution of these cases and that NNL will provide the Postpetition Services and pay the Expenses on the US Debtors' behalf in the future.

28. In addition, section 503(b) of the Bankruptcy Code provides administrative expense status for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).  Courts generally require that an administrative expense arise from a postpetition transaction with the debtor that provided a benefit to the debtor in the operation of its business.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999); In re Women First Healthcare, Inc., 332 B.R. 115, 121 (Bankr. D. Del. 2005).  These administrative expenses, in turn, are entitled to a second priority status pursuant to section 507(a)(2) of the Bankruptcy Code.  11 U.S.C. § 507(a)(2).

29. The Agreement is supported by a sound business purpose because it permits NNI to reimburse NNL for its share of the Postpetition Services and Expenses satisfying the standard set forth in Section 503(b), while including terms protecting the US Debtors in the event of an overpayment and capping the maximum liability to the US Debtors.  NNL has provided postpetition benefits to the US Debtors by allowing them to continue to sell products incorporating its intellectual property, and by providing Postpetition Services and paying the Expenses on their behalf pursuant to past practices.

30. The Agreement is further necessary to preserve the US Debtors' estate, because if NNI does not pay NNL the amounts provided for in the Interim Funding Agreement, NNL faces a potential funding crisis that would seriously harm the entities' interconnected global business operations and substantially decrease the value of the US Debtors' estates.  Such a crisis could also complicate the US Debtors' continued use of NNL's intellectual property.  If NNL were to stop sharing costs with NNI, it is also likely estate resources would be wasted duplicating efforts

and trying to separate out overhead between the intertwined affiliates. Moreover, if at any point NNL is unable to demonstrate to the Canadian Court that it has sufficient funds, it would be at risk of losing the protection of the CCAA stay imposed by the Initial Order, as extended from time to time. Termination or expiration of the CCAA stay protecting the Canadian Debtors would likely result in a rapid deterioration of Nortel's Canadian assets and could have a significant negative impact on the US Debtors. Further advances from NNI to NNL under the $200 million inter-company revolving loan facility that was put in place by the US Debtors at the time of bankruptcy filings are not acceptable to the Monitor overseeing the Canadian Proceedings as they would ignore those Postpetition Services and Expenses incurred by NNL on behalf of NNI and, in any event, are insufficient to address the expected operational cash outflow of NNL during the Canada/US Interim Period.

31. Furthermore, the US Debtors have received, and will continue to receive, fair value in exchange for their performance under the Interim Funding Agreement, including use of intellectual property owned by NNL that is crucial to the US Debtors' business, the benefit of Research and Development Activity performed by NNL, and the payment of certain overhead costs, which are necessary to its operations. As such, the Interim Funding Agreement is fair and its terms are reasonable. As mentioned above, NNL undertook a cost study to ascertain the extent of costs incurred by NNL for the benefit of the Nortel Group. Using revenue as a basis for cost allocation, the study concluded that NNL would be owed a higher amount from NNI for the Postpetition Services and Expenses, though this figure would be disputed by the Creditor Groups.

32. If the Interim Funding Agreement were not approved, NNL may have no choice but to pursue legal action to recover amounts claimed to be owing, whether in respect of the

Postpetition Services, the Expenses or under the Transfer Pricing Agreements, and NNL may have no choice but to also seek recovery of the value of the Postpetition Services it provided and the Expenses it paid on the US Debtors' behalf as an administrative expense. Any such lawsuit is likely to be complicated and drawn out given the factual nature of the dispute and the interconnected workings of the businesses, and will drain resources from the US Debtors' estates and detract attention from other important matters facing the US Debtors' estates.

33. Accordingly, the US Debtors submit that approval of the Interim Funding Agreement has a valid business purpose, including the payment of an administrative expense obligation owing to NNL for the provision of those actual and necessary Postpetition Services and the payment of related Expenses for the benefit of the US Debtors' estates, and the terms are fair and reasonable. The Agreement has been proposed in good faith upon reasonable and adequate notice, and is in the best interest of the US Debtors' estates, creditors and other stakeholders and should, therefore, be approved by the Court.

### Notice

34. Notice of the Motion has been given via first class mail to the (i) U.S. Trustee; (ii) the Committee; (iii) the Bondholder Committee; (iv) the Joint Administrators, and (v) the general service list established in these chapter 11 cases. The US Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

35. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the US Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  June 9, 2009            CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

James L. Bromley (No. 5125)
Lisa M. Schweitzer (No. 1033)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------X
                                                        :
                                                        :   Chapter 11
                                                        :
In re                                                   :   Case No. 09-10138 (KG)
                                                        :
Nortel Networks Inc., et al.,¹                          :   Jointly Administered
                                                        :
                        Debtors.                        :
                                                        :   RE: D.I. _____
                                                        :
--------------------------------------------------------X
```

## ORDER (A) APPROVING THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

Upon the motion dated, June 9, 2009 (the "Motion"),[2] of Nortel Networks Inc. and its

affiliated debtors, as debtors and debtors in possession in the above-captioned cases (the "US

Debtors"), for entry of an order, as more fully described in the Motion, pursuant to sections

105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms

and conditions of the Interim Funding and Settlement Agreement (the "Agreement"), and (b)

granting related relief; and adequate notice of the Motion having been given as set forth in the

Motion; and it appearing that no other or further notice is necessary; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

and 1334; and the Court having determined that consideration of the Motion is a core proceeding

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and factual

bases set forth in the Motion establish just cause for the relief requested in the Motion, and that

such relief is in the best interests of the US Debtors, their estates, their creditors and the parties in

interest; and upon the record in these proceedings; and after due deliberation;

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED.

2. The US Debtors are authorized, but not directed, to enter into the Interim Funding

Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and to

take any and all actions that may be reasonably necessary or appropriate to perform all

obligations contemplated thereunder.

3. NNI is authorized to pay NNL $157 million as set forth in the Interim Funding

Agreement as an administrative expense pursuant to sections 503(b) and 363 of the Bankruptcy

Code for the Postpetition Services NNL has provided and the Expenses NNL has paid for the

benefit of NNI subsequent to the Petition Date.

4. The Total Payment reflects the maximum administrative claim that the Canadian

Debtors may assert against the US Debtors for the Postpetition Services and Expenses, as well as

the maximum amount that NNI could owe under the Master R&D Agreement.

5. Pursuant to Bankruptcy Rule 9019, the Interim Funding Agreement constitutes a full

and final settlement of any and all NNI Interim Obligations, all of the matters set forth in Part A

of the Interim Funding Agreement whether arising during, or related to the Canada/US Interim

Period, including, without limitation, any relief the Canadian Debtors and the US Debtors

intended to seek from this Court and the Canadian Court on June 29 and 30, 2009 or such later

date or dates as might be agreed or ordered.

6.  Each of NNL and the Canadian Debtors shall indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

7.  With respect to any of the matters referred to in Sections 11.c. and 12.a. through 12.f. (inclusive) of the Agreement, as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditor Groups in any negotiations on such issues with the Canadian Debtors and/or the EMEA Debtors, or any related proceedings, and any agreement or determination by the US Debtors shall require the prior consent of the Creditor Groups acting in good faith.

8.  The failure to specifically describe or include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be approved in its entirety.

9.  Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the US Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the US Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

10. The Court retains jurisdiction with respect to all matters arising from or related to the

implementation of this Order.

Dated: _____, 2009
      Wilmington, Delaware

                                             _____
                                             THE HONORABLE KEVIN GROSS
                                             UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

related understandings contained in, the documents listed in <u>Annex A</u> hereto, the "<u>Master R&D</u> <u>Agreement</u>") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in <u>Annex B</u> hereto and any other agreements similar to the agreements listed in <u>Annex B</u> hereto (as amended, supplemented or otherwise modified, the "<u>Distribution Agreements</u>"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "<u>January Payment</u>"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "<u>Canada/US Interim Period</u>" and the "<u>NNI</u> <u>Interim Obligations</u>") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "<u>EMEA Interim Period</u>"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "<u>Inter-Company Trading Payments</u>") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "<u>GSPAs</u>") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("<u>Trading Orders</u>"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "<u>Creditors' Committee</u>") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "<u>Bondholders' Committee</u>") have each agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

    a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

3

2.  Use of Funds; Reporting.

   a.  NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

   b.  NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3.  Maximum Payment; Full and Final Settlement. The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4.  Settlement of Motions. It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

5. <u>True-up Obligations</u>. NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>"). Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6. <u>Administration; Funding</u>.

   a. NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on <u>Annex D</u> hereto.  Each of the EMEA Debtors agrees that the payments set out in <u>Annex D</u> shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK.  To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>First Shortfall Payment</u>"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "<u>Material Asset Sale</u>"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>Second Shortfall Payment</u>" and together with the First Shortfall Payment, the "<u>Shortfall Payments</u>"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.  The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full.  The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group.  Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL.  For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge).  Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f.  The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g.  In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances.  In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.  The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7. <u>Covenants</u>.

    a. [left intentionally blank].

    b. In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor. The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8. <u>Maximum Payment; Full and Final Settlement</u>. Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto. Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9. <u>Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors</u>. It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

PART C – <u>PROVISIONS OF GENERAL APPLICATION</u>

10. <u>Scope of this Agreement</u>. The Parties hereto agree that:

    a. this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b. this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii)

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however*, the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.  this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.  this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

a.  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however*, that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

b.  For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property.  For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c.  The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination."  In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

   d.  Where any Debtor enters into any Appropriate License Termination in
       accordance with the provisions of this Section 11, such Debtor shall be deemed
       to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be
       Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b.
       and 12.d. shall apply accordingly.

12. <u>Entry into Sale Transactions.</u>

   a.  Each Debtor hereby agrees that its execution of definitive documentation with a
       purchaser (or, in the case of any auction, the successful bidder in any such
       auction) of, or closing of any sale of, material assets of any of the Debtors to
       which such Debtor (a "<u>Selling Debtor</u>") is proposed to be a party (each, a "<u>Sale
       Transaction</u>") shall not be conditioned upon such Selling Debtor reaching
       agreement with the other Selling Debtors regarding (A) allocation of the sale
       proceeds ("<u>Sale Proceeds</u>") from the relevant Sale Transaction or (B) the binding
       procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

   b.  Pending the distribution of the Sale Proceeds as described in the second sentence
       of this Section 12.b., the entire amount of the Sale Proceeds (less applicable
       transfer or value-added taxes and, to the extent agreed by the Selling Debtors,
       transaction costs) shall be deposited in an escrow account pursuant to an escrow
       agreement, the terms of which shall be negotiated and agreed by all Selling
       Debtors, in each case acting reasonably (the "<u>Escrow Account</u>").  In no case shall
       there be any distribution from the Escrow Account in advance of either (i)
       agreement of all of the Selling Debtors or (ii) in the case where the Selling
       Debtors fail to reach agreement, determination by the relevant dispute resolver(s)
       under the terms of the Protocol (as defined below) applicable to the Sale
       Proceeds, and subject in each case to payment of the agreed or determined
       amount of allocation of Sale Proceeds to all Selling Debtors.

   c.  Without derogating from the obligations provided in Section 12.a., the Debtors
       shall, as soon as reasonably practicable following the execution of this
       Agreement, negotiate in good faith and attempt to reach agreement on a timely
       basis on a protocol for resolving disputes concerning the allocation of Sale
       Proceeds from Sale Transactions (the "<u>Interim Sales Protocol</u>"), which Protocol
       shall provide binding procedures for the allocation of Sales Proceeds where the
       Selling Debtors in such Sale Transaction have been unable to reach agreement
       regarding such allocation.

   d.  The Selling Debtors shall, immediately following entry into any Sale
       Transaction, negotiate in good faith and on a timely basis to attempt to reach
       agreement regarding the allocation of the Sale Proceeds from such Sale
       Transaction within a reasonable period of time or as may be otherwise provided
       in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply
       to determine the allocation of the relevant Sale Proceeds.

e.  Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f.  Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g.  For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

  i.  the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

  ii.  the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

a.  No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition.  Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective).  Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective.  For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

   i.   use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

   ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

   iii. use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e. If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f. Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. Term.  This Agreement shall expire on December 31, 2009 (the "Expiration Date"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. Amendments.  This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. Governing Law and Jurisdiction.

a. This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

14

b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. No Personal Liability of the Joint Administrators.

a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b. The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c. Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

18. Creditors' Committee and Bondholders' Committee Support.

    a.  Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b.  Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

    a.  Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i.  it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii.  the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii.  this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b.  Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights. Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the

Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. Defunct Distributors' Covenant. Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:   Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:  Assistant Secretary

NORTEL NETWORKS GLOBAL CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Director

By: _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
     Name: Paviter S. Binning
     Title:  Director

By _____
     Tracy S. J. Connelly McGilley
     Assistant Secretary


NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
     Name: Paviter S. Binning
     Title: Director

By: _____
     Name: Tracy S. J. Connelly McGilley
     Title:  Assistant Secretary


Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INC.

By _____
Name: John Doolittle
Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
Name: John Doolittle
Title: Vice President


CORETEK, INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL ALTSYSTEMS, INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
Name: John Doolittle
Title: Vice President

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS HPOCS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

QTERA CORPORATION

By _____
Name: John Doolittle
Title: Vice President

SONOMA SYSTEMS

By _____
Name: John Doolittle
Title:  Vice President

XROS, INC.

By _____
Name: John Doolittle
Title:  Vice President

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

Name: _____
Title: _____

in the presence of: _____

Witness Signature _____

Name:
Address:

SIGNED for and on behalf of NORTEL        )
NETWORKS UK LIMITED (IN                    )    ALAN BLOOM
ADMINISTRATION)                            )
by ALAN BLOOM as Joint Administrator       )
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name:
Address:

**SIGNED** for and on behalf of **NORTEL NETWORKS (IRELAND) LIMITED (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)    **ALAN BLOOM**

Witness signature

Name: HELEN MACNAGSTHAN
Address: 1 MORE LONDON PLACE LONDON SE6 ,

**SIGNED** for and on behalf of **NORTEL NETWORKS NV (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)    **ALAN BLOOM**

Witness signature

Name: HELEN MACNAUGHTAN
Address: 1 MORE LONDON PLACE LONDON SE6 )

**SIGNED** for and on behalf of **NORTEL NETWORKS SPA (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)    **ALAN BLOOM**

Witness signature

Name: HELEN MACNAUGHTAN
Address: 1 MORE LONDON PLACE LONDON SE6 .

**SIGNED** for and on behalf of **NORTEL
NETWORKS BV (IN
ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:

Address:

**SIGNED** for and on behalf of **NORTEL
NETWORKS POLSKA SP Z.O.O. (IN
ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)

**ALAN BLOOM**

Witness signature

Name:

Address:

**SIGNED** for and on behalf of **NORTEL
NETWORKS HISPANIA SA (IN
ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

**ALAN BLOOM**

Witness signature

Name:

Address: _(handwritten)_

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS (AUSTRIA) GMBH (IN**       )     **ALAN BLOOM**
**ADMINISTRATION)**                     )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal   )
liability) in the presence of:

Witness signature _(handwritten signature)_

Name: _(handwritten)_
Address: _(handwritten)_


**SIGNED** for and on behalf of **NORTEL**
**NETWORKS SRO (IN**                    )     **ALAN BLOOM**
**ADMINISTRATION)**                     )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal   )
liability) in the presence of:

Witness signature _(handwritten signature)_

Name: _(handwritten)_
Address: _(handwritten)_

10-06-2009   01:03   FRAN-RADISSON SAS STRAND HOTEL            +46            T-141  P.006/009  F-787

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS ENGINEERING**          )
**SERVICES KFT (IN**              )        **ALAN BLOOM**
**ADMINISTRATION)**               )
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS PORTUGAL SA (IN**      )
**ADMINISTRATION)**               )        **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS SLOVENSKO SRO (IN**    )
**ADMINISTRATION)**               )        **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

PAGE 6/9 * RCVD AT 10/06/2009 01:00:27 [GMT Daylight Time] * SVR:LN3FX01/5 * DNIS:888 * CSID:+46 * DURATION (mm-ss):01-13

Name: *Helen Macnaughton*
Address: *1 More London Place*
*London SE1.*

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS ROMANIA SRL (IN**                )   **ALAN BLOOM**
**ADMINISTRATION)**                          )
by **ALAN BLOOM** as Joint Administrator     )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: *Helen Macnaughton*
Address: *1 More London Place*
*London SE1.*

**SIGNED** for and on behalf of **NORTEL**   )
**GMBH (IN ADMINISTRATION)**                 )   **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator     )
(acting as agent and without personal        )
liability) in the presence of:

Witness signature

Name: *Helen Macnaughton*
Address: *1 More London Place*
*London SE1.*

SIGNED for and on behalf of NORTEL          )
NETWORKS OY (IN                              )     ALAN BLOOM
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator         )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS AB (IN                              )     ALAN BLOOM
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator         )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS INTERNATIONAL                       )     ALAN BLOOM
FINANCE AND HOLDING BV (IN                   )
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of **NORTEL**     )
**NETWORKS FRANCE S.A.S. (IN**     )   **ALAN BLOOM**
**ADMINISTRATION)**     )
by **ALAN BLOOM** as Joint Administrator     )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**Schedule 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**Schedule 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**Schedule 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.    Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.    Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.    Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.    Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.    Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.    Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.    Release in Connection with Master R&D Agreement dated 1 January 2009.

8.    Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

**Annex B**

**Distribution Agreements**

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

**Annex C**

**<u>Funding Schedule</u>**

Payments pursuant to Section 1.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| **TOTAL** | **US$157,000,000.00** |

C-1

| EMEA Debtor | Amount receivable US$m |
|---|---|
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)] [1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)] [1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              ) Case No. 09-10138(KG)
                                    ) (JOINTLY ADMINISTERED)
                                    ) Chapter 11
NORTEL NETWORKS, INC.,              )
_et al.,_                           ) Courtroom 3
                                    ) 824 Market Street
                    Debtors.   )    Wilmington, Delaware 19801
                                    )
                                    ) June 29, 2009
                                    ) 9:15 A.M.


TRANSCRIPT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING
DEBTOR TO MAKE CERTAIN TRANSFERS AND PROVIDE FINANCIAL SUPPORT
 TO THEIR NONDEBTOR SUBSIDIARIES. MOTION FOR AN INTERIM ORDER
(A) APPROVING INTERIM FUNDING AND SETTLEMENT AGREEMENT AND (B)
   GRANTING RELATED RELIEF. DEBTORS' MOTION FOR ORDER (A)
 AUTHORIZING DEBTORS' ENTRY INTO THE ASSET SALE AGREEMENT (B)
AUTHORIZING AND APPROVING BIDDING PROCEDURES (C) AUTHORIZING
  AND APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT (D)
   APPROVING NOTICE PROCEDURES (E) APPROVING ASSUMPTION AND
   ASSIGNMENT PROCEDURES (F) AUTHORIZING FILING OF CERTAIN
DOCUMENTS UNDER SEAL (G) SETTING DATE FOR SALE HEARING. MOTION
FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO ENTER
INTO ONE OR MORE LETTER OF CREDIT AND BONDING FACILITIES (II)
  GRANTING RELATED RELIEF PURSUANT TO SECTIONS 105, 361, 362,
            363, AND 364 OF THE BANKRUPTCY CODE.
            BEFORE HONORABLE KEVIN GROSS
            UNITED STATES BANKRUPTCY JUDGE


ECRO:                    LESLIE MURIN

TRANSCRIPTION SERVICE:   TRANSCRIPTS PLUS, INC.
                         435 Riverview Circle
                         New Hope, Pennsylvania 18938
                         Telephone:  215-862-1115
                         Facsimile: 215-862-6639
                         e-mail CourtTranscripts@aol.com


 Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

                                                                        2

APPEARANCES:

For the Debtors:          Morris Nichols Arsht & Tunnell, LLP
                          By:  ANNIE CORDO, ESQ.
                          1201 North Market Street
                          P.O. Box 1347
                          Wilmington, Delaware 19899-1347

                          Cleary Gottlieb Steen & Hamilton LLP
                          By:  LISA M. SCHWEITZER, ESQ.
                               JANE KIM, ESQ.
                               JIM BROMLEY, ESQ.
                          One Liberty Plaza
                          New York, NY 10006

                          Curtis Mallett-Prevost Colt & Mosle
                          By:  JAMES DREW, ESQ.
                               STEVEN REISMAN, ESQ.
                          101 Park Avenue
                          New York, New York 10178-0061

For FlexTronics:          Ashby & Geddes
                          By:  BEN KEENAN, ESQ.
                          222 Delaware Avenue, 17th Floor
                          Wilmington, Delaware 19801

For the Committee:        Richards Layton & Finger, PA
                          By:  CHRIS SAMIS, ESQ.
                          One Rodney Square, P.O. Box 551
                          Wilmington, Delaware 19899

                          Akin, Gump, Strauss, Hauer & Feld, LLP
                          By:  FRED HODARA, ESQ.
                               JOSH STURM, ESQ.
                          590 Madison Avenue
                          New York, NY 10022-2524

For NKS:                  Skadden Arps Slate Meagher & Flom
                          By:  ANTHONY CLARK, ESQ.
                          One Rodney Square, P.O. Box 636
                          Wilmington, Delaware 19899-0636

3

```
Appearances:
(Continued)

The U.S. Trustee:           United States Department of Justice
                           Office of the U.S. Trustee
                           By:  PATRICK TINKER, ESQ.
                           844 King Street
                           Wilmington, Delaware 19899

For Ernst & Young as        Buchanan Ingersoll & Rooney PC
Monitor:                    By:  MARY CALOWAY, ESQ.
                           The Brandywine Building
                           1000 West Street, Suite 1410
                           Wilmington, Delaware 19801

                           Allen & Overy LLP
                           By:  KEN COLEMAN, ESQ.
                                ANDREW DOVE, ESQ.
                           1221 Avenue of the Americas
                           New York, New York 10020

For MatlinPatterson         Cozen O'Connor
Global Advisers LLC:        By:  MARK FELGER, ESQ.
                           Chase Manhattan Centre
                           1201 North Market Street, Suite 1400
                           Wilmington, Delaware 19801

                           Bracewell & Giuliani, LLP
                           By:  JENNIFER FELDSHER, ESQ.
                           1177 Avenue of Americas
                           New York, New York

For Bondholder Group:       Pachulski Stang Ziehl & Jones
                           By:  CURTIS HEHN, ESQ.
                           919 North Market Street, 16th Floor
                           Post Office Box 8705
                           Wilmington, Delaware 19899-8705

                           Milbank, Tweed, Hadley & McCloy LLP
                           By:  THOMAS KRELLER, ESQ.
                           1 Chase Manhattan Plaza
                           New York, New York 10005-1413

For UBS:                    Ballard Spahr Andrews & Ingersoll
                           By:  DAVID POLLACK, EQ.
                           919 North Market Street, 12th Floor
                           Wilmington, Delaware 19801
```

4

Appearances:
(Continued)

For Pension Benefit          Pension Benefit Guaranty Corporation
Guaranty Corporation:        By:  VICENTE MURRELL, ESQ.
                             Office of the Chief Counsel
                             1200 K Street, N.W.
                             Washington, D.C. 20005-4026

For Automotive Rentals,      Archer & Greiner
Inc.:                        By:  JENNIFER STORY, ESQ.
                             300 Delaware Avenue
                             Suite 1370
                             Wilmington, Delaware 19801

For Joint Administrators     Young Conaway Stargatt & Taylor, LLP
for Nortel, et al:           By:  ED HARRON, ESQ.
                             The Brandywine Building
                             1000 West Street, 17th Floor
                             Wilmington, Delaware 19899-0391


**CANADIAN TELEPHONE PARTICIPANTS:   SEE FOLLOWING PAGE**

SUPERIOR COURT OF JUSTICE        COURT FILE NO:  09-7950-00CL

DATE:  Jun 29, 2009

SHORT TITLE  NORTEL NETWORKS CORPORATION

J. Carfagnini + J. Pasquariello
for EY as Monitor
(T) 416-597-7216
(F) 416-979-1234

COUNSEL SLIP

| COUNSEL FOR PLAINTIFF (S) | COUNSEL FOR DEFENDANT (S) |
|---|---|

Derrick Tay
Jennifer Stam
for Nortel Networks Corporation, et al
416.216.2327 (ph.)
416.216.3930 (f)

LYNDON BARNES
ADAM HIRSH
BOARD OF DIRECTORS OF NNI/NNC
PHONE: 416-862-6679
FAX: 416-862-6635

M. Starnino for Superintendent of Financial Services
as administrator of PBGF
T 416 640-8431
F 416 646-4301

S. Philpott for Former Employees.
T 416.595.2104
F 416.204.2882

K. Zych for Informal Noteholder Group
T - 416 777 5738

PHONE:  Pamela Huff / Craig Thorburn
FAX:  for Matlin Patterson
Tel: 416-863-2958 / Fax 416-863-2653

Ward, David for UK Pension Protection Fund    416-860-6566 (F)
869-8960 (Ph)

Leanne Williams for Flextronics    (416) 304-1616
(416) 304-1313 (F)

Alex MacFarlane for the Official Committee    (416)-863-4388
Unsecured Creditors    416-863-4592 (F)

ARTHUR O. JACQUES & TOM MCRAE
for FELSKE & SYLVAIN (defacto
continuing Employees Comm    416 214-5213
416 214 5413 (Fax)

Robin B. Schwill    P: 416.863.5502
Matthew P. Gottlieb    P: 416 863 5516
Counsel to    F: 416.863.0871
Nortel Networks UK Limited.

A. Kaufman for Export Development Canada
(416) 367-3538 (416) 364-7813

D. Ullmann for Verizon Communications Inc.
416-369-4148    416 364-9223

G. Benchetrit for IBM
Tel - 416-218-1141    Fax 416-218-1841

5

INDEX

|                          | Direct | Cross | Redirect | Recross | Further Redirect |
|--------------------------|--------|-------|----------|---------|------------------|
| WITNESSES FOR THE DEBTORS: |        |       |          |         |                  |
| GEORGE RIEDEL            |        |       |          |         |                  |
| By Ms. Schweitzer        | 74     |       | 119      |         |                  |
| By Mr. Hodara            |        | 110   |          |         |                  |
| By Ms. Feldsher          |        | 112   |          | 122     |                  |
| By Mr. Clark             |        | 118   |          |         |                  |
| MICHAEL MURRAY           |        |       |          |         |                  |
| By Ms. Schweitzer        | 125    |       |          |         |                  |
| By Ms. Feldsher          |        | 138   |          |         |                  |

**PLEASE NOTE: WITNESSES' MICROPHONE HAD AN
ECHO/REVERBERATION THROUGHOUT ENTIRE EXAMINATION**

6

1          MR. BROMLEY:  Thank you for having us this morning.

2  While we're trying to work out some of the problems here --

3          THE COURT:  I apologize.

4          MR. BROMLEY:  And, again, the last time I was here, I

5  offered a Nortel Enterprise Solutions person could come by.

6          THE COURT:  We should have.

7                    (Laughter)

8          MR. BROMLEY:  And it seems you still need them.  Your

9  Honor, we could do a couple of the U.S. only uncontested

10 matters.

11          THE COURT:  Sure, let's do that.

12          MR. BROMLEY:  To try to be as efficient as possible.

13          THE COURT:  Absolutely.  I got the certification

14 regarding the protocol stipulation.  I did sign that order this

15 morning.

16          MR. BROMLEY:  Okay.  Very good, Your Honor.

17          THE COURT:  So, that is not something you have to

18 address.

19          MR. BROMLEY:  Okay.  Terrific.  We will mention it

20 briefly as we talk about the interim funding --

21          THE COURT:  Good.

22          MR. BROMLEY:  -- and settlement agreement, but that's

23 very good.  Thank you very much, Your Honor.

24          THE COURT:  You bet.

25          MR. BROMLEY:  So, if we could just take a look at the

7

1  agenda letter --

2          THE COURT:  Yes.

3          MR. BROMLEY:  -- and try to knock a few of these off.

4  And I would -- we have -- the main addition to the agenda

5  letter, Your Honor, is a matter that is a U.S. only matter,

6  which we've added, which is the motion to approve a compromise

7  under Rule 9019 by and among the debtors and Crossroads

8  Wireless, Inc. and Crosswords Holding.

9          THE COURT:  Yes.

10         MR. BROMLEY:  And we moved that from Friday to today.

11         THE COURT:  Right.

12         MR. BROMLEY:  So, I think it would be worthwhile if

13  we could maybe start with Crossroads.

14         THE COURT:  That would be fine.

15         MR. BROMLEY:  Okay.

16         THE COURT:  Good morning.

17         MS. KIM:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MS. KIM:  The motion for an order approving the

20  compromise of a controversy under Rule 9019 between the debtors

21  and Crossroads Wireless, Inc. relates to a sale by Nortel to

22  Crossroads of certain equipment for which Crossroads has never

23  paid.  Crossroads is a Chapter 11 debtor in the Western

24  District of Oklahoma that's in the process of liquidation.

25         At the same time, Nortel holds an unperfected

1 | security interest in certain of Crossroads' Spectrum licenses.

2 | And so this motion and the stipulation that the debtors are

3 | asking Your Honor to approve seeks to resolve issues relating

4 | to the unperfected security interest and the equipment.

5 | The agreement that Nortel and Crossroads have reached

6 | is that Crossroads would transfer to Nortel all rights, title,

7 | and interest to the equipment free and clear of all liens and

8 | encumbrances, and relinquish any claims that Crossroads may

9 | have against Nortel.

10 | And in exchange, Nortel would release its security

11 | interest in the Spectrum licenses, and any other claims that

12 | Nortel may have against Crossroads.  And this is in the

13 | debtors' -- the debtors would submit that this is in their

14 | interest because Crossroads is in Chapter 11 and is in the

15 | process of liquidating.  And the debtors believe that this

16 | settlement maximizes the value that they would receive with

17 | respect to their claims against Crossroads.

18 | In addition, Nortel has a potential buyer for the

19 | equipment.  So, this would allow the equipment to be

20 | transferred over to Nortel free and clear so that Nortel would

21 | be able to maximize its value of the assets by selling those.

22 | We have Dan Carrigan, who is counsel to NNI, who was

23 | involved in negotiating the settlement, he's a partner at

24 | McKenna Long, if Your Honor has any questions for Mr. Carrigan.

25 | Otherwise, there are a couple of small revisions to

9

1  the stipulation that we made in order to resolve the --

2              (Interruption by Video Conference Recording)

3              MS. KIM:  That's only a little bit ironic.

4                          (Laughter)

5              THE COURT:  How about that.

6              MS. KIM:  The revisions to the stipulation resolve

7  the objection that was filed --

8              THE COURT:  Yes.

9              MS. KIM:  -- by Brookings Municipal Utilities.  The

10 revised stipulation clarifies that Nortel is responsible for

11 removing and transporting the equipment at Nortel's expense,

12 and explicitly resolves the Brookings Municipal Utilities'

13 objection, which was withdrawn in this Court.

14             THE COURT:  Right.

15             MS. KIM:  So, unless Your Honor has questions for Mr.

16 Carrigan, we would request that Your Honor approve the

17 stipulation.

18             And we will -- we can either hand up the revised

19 stipulation and the order now, or we can wait until --

20             THE COURT:  Why don't we do it now?

21             MS. KIM:  Sure.

22             THE COURT:  Because certainly I was prepared to grant

23 the settlement under Rule 9019.  If -- you can approach, Ms.

24 Kim.

25             MS. KIM:  May we approach?

1          THE COURT:  Certainly.  And this clearly makes it

2    better in resolving the objection, and it certainly meets the

3    standards that we apply under Rule 9019.  It's fair,

4    reasonable, in the best interest of the debtors' estate, and I

5    am satisfied that it is the result of vigorous arm's length

6    negotiations between the parties.  And for those reasons, I

7    would grant the motion.

8          MS. KIM:  Thank you, Your Honor.

9          Could I ask if Mr. Carrigan can be excused?

10          THE COURT:  He may.

11          MS. KIM:  Thank you.

12          THE COURT:  Yes.  Mr. Carrigan, you may be excused.

13   Thank you.

14          MS. MURIN:  Your Honor, I'd like to test the sound.

15          THE COURT:  Okay.

16                    (System test)

17          MS. MURIN:  Thank you, Your Honor.

18          THE COURT:  They can hear us?

19          MS. MURIN:  We'll have to -- we're still working on

20   it.

21          THE COURT:  Okay.  All right.  So, we may as well

22   continue with what we're doing, Ms. Kim.

23          MS. KIM:  Thank you, Your Honor.  The first item on

24   the agenda is the debtors' motion for entry of an order

25   authorizing the debtors to make certain transfers and provide

11

1  financial support to their nondebtor subsidiaries.  The debtors

2  request in this motion for authorization to make certain

3  transfers and provide financial support to their nondebtor

4  subsidiaries in accordance with procedures that are laid out in

5  the motion.  Specifically the debtors request authorization to

6  make loans on a secured or secured basis, and equity infusions

7  to their nondebtor subsidiaries in the debtors' business

8  judgment, which loan and capital infusions would not exceed $2

9  million.

10          And prior to making any loan or capital contribution,

11  that would result --

12          (Interruption by Video Conference Recording)

13          MS. KIM:  Prior to making any loan or capital

14  contribution that would result in outstanding post petition

15  financial support in excess of $100,000, the debtors would give

16  the Committee's counsel, as well as -- and this is part of a

17  revision that we've agreed to make -- the U.S. Trustee and the

18  bondholders five business days' notice with respect to those

19  contributions or loans.

20          THE COURT:  Justice Morowitz would like to speak with

21  me.

22          MS. KIM:  Oh.

23          THE COURT:  So, if you'll excuse me for a moment.

24          MS. KIM:  Certainly, Your Honor.

25              (Recess 9:24 A.M./Reconvene 9:29 A.M.)

12

1          THE COURT:  Thank you, everyone.  Please be seated.

2  Ms. Kim, let's see if we can finish.  Thank you for your

3  indulgence, everyone.  I do apologize.  And it looks like we've

4  got them up.  Whether they can hear us or not is another

5  matter.

6          MS. MURIN:  We're still working on that, Your Honor.

7          THE COURT:  Okay.

8          MS. KIM:  Thank you, Your Honor.  And actually it

9  occurred to me that I had neglected to introduce myself to the

10 Court and for the Court Reporter.  So, Jane Kim on behalf of

11 the debtors from Cleary Gottlieb Steen & Hamilton.  I

12 apologize.

13         As I was saying, we -- in connection with the

14 debtors' nondebtor subsidiary funding motion, John Doolittle,

15 who's the Vice President of NNI, and the Treasurer of NNL, is

16 available to testify today.  I would proffer his testimony,

17 unless Your Honor or anyone else would like to cross examine

18 him.

19         THE COURT:  Does anyone wish to cross examine?  Does

20 the Committee have any position?  Good morning, Mr. Hodara.

21         MR. HODARA:  Good morning, Your Honor.  The Committee

22 is supportive of the relief requested.

23         THE COURT:  Okay.  All right.  Well, I certainly find

24 that it is acceptable under the Code.  And obviously necessary

25 for the continued operation of the debtors' business.  I will

13

1 be pleased to grant the -- to sign the order.

2          MS. KIM:  Thank you, Your Honor.  And as I mentioned

3 earlier, there are a few revisions to the order --

4          THE COURT:  Yes.

5          MS. KIM:  -- which I would hand up, and I'll just

6 quickly summarize them.  We received informal comments from the

7 U.S. Trustee.  And as a result of those conversations with the

8 U.S. Trustee, we have agreed to add additional language to the

9 order that would say that the debtors will file with the Court

10 a notice that discloses the amount, nature, and recipient of

11 the proposed financial support.  That the debtors will provide

12 the Committee, and as I mentioned, the U.S. Trustee and the

13 bondholders five business days prior written notice of the

14 proposed disbursement.  And that in addition to notifying the

15 Committee, we would also notify the U.S. Trustee and the

16 bondholders with -- excuse me.  If we -- if they file a written

17 objection, if the bondholders and the U.S. Trustee, in addition

18 to the Committee, file an objection, then the Court -- then we

19 would seek relief from the Court with respect to that

20 objection.

21          THE COURT:  That's fine.  Thank you.

22          MS. KIM:  May I approach?

23          THE COURT:  You may.

24      (Video conference participants join in proceeding)

25          THE COURT:  We've got them.  Ms. Kim, I think we

14

1  should move on to the joint business at this point.

2          FEMALE SPEAKER:  Your Honor, we'll move on.  Just for

3  your introduction, this is Derrick Tay from Ogilvy Renault for

4  the debtor who's talking.

5          THE COURT:  Oh, thank you.  Thank you.

6                  (Pause)

7          MR. TAY:  And the reason I wanted to do this is

8  because, as you know, there is a real question these days about

9  what is the proper test that one should be applying in terms of

10  dealing with this question of whether you can use the CCAA to

11  sell all or substantially all your business or to sell your

12  business before there's a plan outside of the context of a

13  plan.  And I assume you have a copy of my --

14          MR. JUSTICE MOROWITZ:  Yes, the one -- this is the

15  (indiscernible - siren sounding).

16          MR. TAY:  Yes.

17          MR. JUSTICE MOROWITZ:  I do.

18          MR. TAY:  Okay.  So, in summary, what I would submit

19  to you, Your Honor, is that there is no question that there is

20  authority for the courts under the CCAA to authorize sales of

21  businesses without there having to be first a plan or in the

22  context of a plan.  And the case that has raised this question

23  is, as you know, the B.C. case of <u>Cliffs Over Maple Bay</u>, and I

24  will take you to it.  But I will suggest to you that even

25  there, the question is not a question of can a court do it, but

15

1  should a court do it.

2           And in essence, my submission to you is the question

3  that was considered by <u>Cliffs Over Maple Bay</u> is not the right

4  question.  And, in fact, detracts from the real issue.

5           So, it's not helpful to ask can the CCAA be used to

6  sell all the assets outside the context of a plan.

7           The real question is what are the principles that the

8  Court should apply in deciding whether it should allow the sale

9  of assets outside of the context of a plan.  And I would submit

10 to you that if you use that approach, and the principles that

11 I'm about to suggest, then that encompasses all of the case

12 that have been dealt with in this area and allows the Court the

13 requisite flexibility that it needs to come to the right

14 decision in the right circumstances without some kind of

15 arbitrary rule that it's -- you know, as to whether or not you

16 can do it outside of the context of a plan.

17          And the principles that I would suggest that the

18 Court be guided by is set out in Paragraph 20 of my factum.

19          And these are general questions that I believe, if a

20 court looks at and asks these questions, the answer will be

21 self evidence in most cases.  So, is the sale transaction

22 warranted at this time?  Will a sale benefit the whole economic

23 community?  Do any of the debtors' creditors have a bona fide

24 reason to object to the sale of the business?  And lastly, is

25 there a viable alternative?

16

1          And those are the questions that I submit are the

2 ones that the Court should address.  And I would suggest to

3 Your Honor, as well, that, you know, reasons along these lines

4 would be very helpful for the restructuring community at large

5 because I think it will bring some measure of consistency

6 across the country, and also accommodates the types of concerns

7 that were raised in the Cliffs Over Maple Bay case.

8          Clearly -- and I won't take you through this because

9 you are very familiar with the law.  There is judicial

10 discretion under the CCAA to do this.  The courts have always

11 taken a broad and remedial approach to the interpretation of

12 the act.  The courts have also been very clear about the

13 purpose of the CCAA, I'm referring now to Paragraph 28 of my

14 factum.

15          It is beyond controversy that the CCAA is flexible

16 remedial legislation that should be liberally construed in a

17 manner consistent with its purpose and the intention of

18 Parliament.  And in Paragraph 29, the courts have also

19 discussed what those intentions are.  And it's to address the

20 social evils that would follow the forced liquidation of

21 insolvent companies.

22          In Paragraph 30, I take you to the cases that -- to

23 the authorities that identify the fact that the preservation of

24 the debtors' business as a going concern has been specifically

25 identified as a key objective of the CCAA.

17

1          And in Paragraph 31, the fact that the courts have
2    repeatedly noted that the purpose of the CCAA is to preserve
3    the benefit of a going concern business for all stakeholders on
4    the whole economic community.

5          This approach has also been recognized in the Alberta
6    Courts in Paragraph 32, there is an overarching policy concern
7    favoring the possibility of a going concern solution and the
8    potential of a long-term upside value for broad constituency of
9    stakeholders.  So, I think that it's clear law across the
10   country that the CCAA should be read in a broad and purpose of
11   manner.  That there is clear authority that what the Parliament
12   and what the courts have been concerned about is preserving the
13   ongoing value of a business to maximize recoveries for all
14   stakeholders.

15         Then in -- starting with Paragraph 35, I've taken you
16   through -- I'm taking you through the various jurisdictions --
17   the issue of the Court's jurisdiction to approve a sale in the
18   various provinces.  Very clear in Ontario, repeatedly
19   recognized by this Court that it has jurisdiction under the
20   CCAA to approve asset sales in the absence of a plan
21   arrangement where such sale is in the best interest of
22   stakeholders generally.  This principle has been upheld by the
23   Court of Appeal in the <u>Consumers Packaging</u> case referred to in
24   Paragraph 37 where the Court of Appeals basically said the sale
25   is a going, allows the preservation of the business, albeit

18

1  under new ownership, and is, therefore, consistent for the

2  purposes of the CCAA.

3       And goes further on today we cannot refrain from

4  commenting that Farley J.'s decision to approve the bid is

5  consistent with previous decisions in Ontario and elsewhere

6  that have emphasized the broad remedial purpose and flexibility

7  of the CCAA and have approved the sale and disposition of

8  assets during CCAA proceedings prior to the formal plan being

9  tendered.

10      Similarly in <u>Canadian Red Cross</u>, Justice Blair said I

11  cannot accept the submission that the Court has no jurisdiction

12  to make the order so.  The source of the authority is twofold.

13  And first he refers to the words in Section 11, and secondly,

14  to the inherent jurisdiction of the Court.

15      Paragraph 39, I referred to the <u>Eaton</u> case where,

16  again, Justice Farley explained all this and said, "I have no

17  doubt that Blair J.'s conclusion in Canadian Red Cross, that in

18  the CCAA proceedings, a judge has the authority to approve the

19  sale of assets, in essence, outside direct involvement of a

20  plan context.

21      And there's ample authority, and I won't go through

22  each of them, they're pretty clear.  In Ontario, this issue has

23  been dealt head on numerous times, and the Courts have been

24  exceedingly consistent in this purpose of approach to arrive at

25  the right conclusion.

1        In other jurisdictions, you will see that courts in

2   Quebec, Manitoba, and Alberta have similarly recognized the

3   Court's jurisdiction to approve a sale of assets during the

4   course of a CCAA proceeding.

5        Recent case, <u>Winnipeg Motor Express, Inc.</u>, where the

6   court said no plan of arrangement has been prepared, or was

7   even contemplated.  The court relied on the fact that the sale

8   was in keeping with the objectives of CCAA and found that there

9   was no jurisdictional impediment in granting the order sought.

10       It goes on to say I consider those objectives to be

11  both more fundamental and broader than the title of the

12  statute, and this is a direct reference to the <u>Cliffs Over</u>

13  <u>Maple Bay</u> case where the B.C. court simply referred to the

14  title of the act.  And says, and goes beyond the circumstances

15  of a formal plan of arrangement.

16       So, now we come to the case of <u>Cliffs Over Maple Bay</u>

17  and the question was raised there as to whether the court

18  should, and I use the word very advisedly, "should" rather than

19  "can,: should authorize the sale of substantially all of a

20  debtor's assets where the debtor's plan will simply propose

21  that the net proceeds from the sale be distributed to the

22  creditors.

23       But the facts there are that the court was faced with

24  a debtor that no active business, but who was trying to use the

25  CCAA basically to stave off its secured creditor indefinitely.

20

1          The case didn't involve any kind of sale transaction.

2 But in _Obida_ (phonetic), the Court of Appeal questioned whether

3 a court should authorize a sale under the CCAA without

4 requiring the matter to be voted upon by the creditors.

5          And in posing the question, they adopted this very

6 narrow view of the purpose of the CCAA, relying solely on the

7 name of the act for guidance and ignoring the well developed

8 jurisprudence that the object of the CCAA is to allow companies

9 to reorganize and to preserve the business as a going concern.

10          And in Paragraph 41 of my factum, and this is also

11 important, the Court of Appeal never raised the issue of can

12 the court do this.  It's not a question of jurisdiction, rather

13 it focused on whether the Court should grant the requested

14 relief.

15          And so I would suggest that, you know, the question

16 that they pose is not the question that we want as being the

17 question to be answered.  But if you go back to the four

18 principles that I annunciated, you will find that the court --

19 this court, that court, any court would have been able to deal

20 with that fact situation quite easily by saying that, you know,

21 this process is being used to unfairly prejudice the secured

22 creditor where there's no real business purpose, no benefit to

23 be had by doing it.

24          And so I would suggest and submit that we do not need

25 to ask ourselves the question that the Court of Appeal in the

1  B.C. court asked.  But rather we should ask the question of

2  what other principles that any court, any court should apply in

3  determining whether or not to allow a sale of assets in a CCAA

4  outside of a plan context, or for any -- you know, for that

5  matter, any sale under the CCAA.

6          And to conclude, I would, again, suggest that the

7  right questions to ask are is the sale transaction warranted at

8  this time?  Will it benefit the whole economic community?  Do

9  any of the creditors have a bona fide reason to object to a

10 sale of the business?  And lastly, is there a better viable

11 alternative?

12         And I suggest that a broad purpose of approach

13 suggested by these questions would serve as a much better guide

14 for all courts in deciding this particular issue.

15         Those are my submissions.

16         MR. JUSTICE MOROWITZ:  Thank you.  Is there any other

17 counsel wishing to address on this point?  Mr. Barnes?

18         MR. BURNS:  I'd like to object on the comments of Mr.

19 Tay very, very briefly.  And I think that, once again, going

20 back to basic principles.  One of the overarching objectives of

21 the CCAA is to preserve the debtor's business as a going

22 concern for the benefit of all the stakeholders.

23         And this objective could be achieved regardless of

24 whether the business is continued as a going concern under the

25 debtors' control or under new ownership.

22

1          And as Mr. Tay took you through the case, except for

2   that one exception in B.C. Canadian courts have exercised their

3   jurisdiction to approve the sale of assets even in the absence

4   of a plan of arrangement or a compromise in creditors' vote.

5          And really it comes down, as Mr. Tay says, he gleaned

6   from the cases what the appropriate factors are.  And there's a

7   four-prong test which he took you through and concluded with.

8   And I suggest to you that this case, one, the evidence

9   satisfies all of those criteria, and that is the appropriate

10  test.

11         Those are the submissions.

12         MR. JUSTICE MOROWITZ:  Thank you.  So, at least Mr.

13  Tay covered that preliminary issue.

14         Does the equipment work?  Madam Register, is there

15  any update from the technical side of life?  I see my

16  counterpart, Judge Gross, on the screen.  He actually moved.

17                       (Laughter)

18         THE COURT:  Oh, Mr. Justice Morowitz, good morning.

19         MR. JUSTICE MOROWITZ:  Are we ready to go?

20         THE COURT:  I'm having difficulty hearing.

21         MR. JUSTICE MOROWITZ:  You've confirmed with Delaware

22  that they're ready to go.  Because I keep seeing there's

23  somebody behind Judge Gross.

24         Judge Gross, can you hear me?

25         THE COURT:  Now I can, yes.

23

1      MR. JUSTICE MOROWITZ:  All right.  We're just doing a

2 volume adjustment here.

3                    (Pause)

4      MR. JUSTICE MOROWITZ:  Good morning, Judge Gross.

5      THE COURT:  Good morning, Mr. Justice Morowitz.

6      MR. JUSTICE MOROWITZ:  Counsel in both Delaware and

7 Toronto, you can assume that under the provisions of the

8 protocol, Judge Gross and I have had a preliminary discussion

9 to deal with procedural matters.  We're going to divide the

10 proceedings today into two parts.  The first part is going to

11 deal with the interim funding agreement, and that is the Ovalby

12 (phonetic) motion that I have here and supplementary motion

13 record, and I assume that similar materials are before Judge

14 Gross.

15      THE COURT:  Yes.

16      MR. JUSTICE MOROWITZ:  That is going to proceed first

17 with dealing with the matters in the CCAA Court, and then in

18 dealing with the matters in the U.S. Bankruptcy Court.  At the

19 conclusion of argument, my expectation is that Judge Gross and

20 I will take a short recess to review that matter.  And there

21 will also be prior to the recess any update with respect to the

22 second part, which would be the Nokia transaction and the

23 status of the objection.

24      Now, regarding the procedures for that part of the

25 proceedings today, the objections were filed in the Chapter 11

24

1 court in Delaware.  Judge Gross will be considering those

2 objections.  And then we'll deal with the motion and its

3 substance in the CCAA Court.

4          THE COURT:  Yes.

5          MR. JUSTICE MOROWITZ:  I would also like just to

6 review a timing issue that some of you in the Toronto Court are

7 aware that I am scheduled to hear another matter involving

8 another judge in Delaware at 11:30.  We are investigating three

9 possibilities, because we know that this hearing is not going

10 to be concluded by 11:30, and we'll keep you updated.  But one

11 of those possibilities is there will be another judge in the

12 CCAA Court dealing with that matter.  The other two

13 possibilities will be either some flexibility with the 11:30

14 judge, or perhaps some flexibility in this matter.

15          But the priority is to start the Nortel matters, to

16 hear them until they are complete.

17          Judge Gross, do you have anything to add by way of

18 preliminary?

19          THE COURT:  Mr. Justice Morowitz, I think you've

20 stated the procedure perfectly well.  And I am prepared to

21 proceed as you have suggested.

22          MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.  Mr.

23 Tay, you may commence your first presentation.  I do have

24 before me the motion record, which is, today we'll call Interim

25 Funding Agreement, and the supplementary motion record.  And I

25

1  also have the 14th and 15th reports of the money.

2          MR. TAY:  Thank you, Your Honor.  Good morning, Judge

3  Gross.

4          THE COURT:  Good morning.

5          MR. TAY:  As you have stated, Your Honor, we plan to

6  deal with the interim funding agreement and the cross border

7  protocol that is a condition precedent to the interim funding

8  agreement.

9          Before I deal with that, though, my counterpart in

10 the U.S., Mr. Bromley, would simply like to make some opening

11 statements in terms of what's being done in the U.S.  And in

12 the spirit of cross border cooperation, I will yield the floor

13 to him before I continue.

14         THE COURT:  Thank you.  Mr. Bromley?

15         MR. BROMLEY:  Thank you, Your Honor.  And thank you,

16 Mr. Justice Morowitz.  It's a pleasure to be before both of

17 you.

18         As both of you know, we filed a number of cases in a

19 number of jurisdictions on January 14th.  We filed five debtors

20 in Canada, we filed 15 debtors in the United States, and 19

21 debtors in the United Kingdom.

22         And since those filings took place on January 14th,

23 there have been two secondary proceedings commenced:  One in

24 Israel, and more recently, one in France.

25         I think it's fair to say from the very start these

26

1  proceedings have been characterized by complexity,

2  international challenges, and cooperation amongst all of the

3  various interested parties.  And, indeed, the two matters that

4  we have before you today are of substantial interest and

5  importance.  Not just, I think, to the Nortel enterprises, but

6  also to the cross border functioning of them and the insolvency

7  regimes.  What we're trying to do today is to address some of

8  the inconsistencies that exist amongst our sister

9  jurisdictions.

10        First, with respect to the funding of different

11  entities within a corporate group, and next with respect to the

12  sale of assets on a worldwide basis in a manner that allows the

13  maximization of value notwithstanding certain inconsistencies

14  between the different jurisdictions but also taking into

15  account the common heritage that they all share.  The focus

16  that we've had very the very beginning of these cases has been

17  on cooperation and transparency with our creditor

18  consistencies, with the monitor in Canada, and with the

19  administrator in the United Kingdom.

20        There has been an excessive amount of cooperation, if

21  you will, an enormous amount of meetings, information provided

22  across borders, attempts to forestall having to clog the courts

23  of any jurisdiction with any disputes.  And, indeed, the

24  interim funding and settlement agreement is probably the

25  hallmark of that exercise.

1          And I think it's important to recognize what we're

2   dealing with with Nortel.  As we discussed in the very

3   beginning of these cases, Nortel is an integrated global

4   enterprise.  And if anything, the exercise that we have gone

5   through both with respect to funding and proposed asset sales,

6   and the asset sale that we have before you today, has driven

7   that point home.  The businesses themselves are integrated

8   across jurisdictions, the finances, the technology, the

9   research and development, the personnel.  They are integrated

10  across North America, South America, Africa, Asia, the Middle

11  East, and Europe.  And it's not surprising that that's the case

12  in light of an enterprise that has 110 year history of

13  technology and innovation.

14          What we're dealing with is a company that has three

15  main business units:  the carrier business, which is largely

16  the subject of the Narnia transaction, as we call it, the sale

17  to Nokia Siemens, and I apologize ahead of time if we segue at

18  times into our code names.  But we've gotten to the point where

19  it's hard to separate them.  There's the Metro Ethernet Group,

20  the optical division.  And the enterprise division.

21          These businesses are operated in various countries

22  around the world in single companies.  It's not as if there's a

23  carrier company, and an M-E-N company, and an enterprise

24  company in the United States.  There's one.  It's Nortel

25  Networks, Incorporated.  And similarly the case in Canada with

28

1  Nortel Networks Limited.  And that repeats itself throughout

2  the organization around the world.

3        That operational integration has created challenges

4  that we've worked hard to try to resolve.  Challenges with

5  respect to finances, supply chain, and the like.

6        And that bring us to the two matters that we have

7  before you today.  The first, the interim funding and

8  settlement agreement relates to intercompany funding.  It takes

9  into account the fact that as a global enterprise focused on

10  profit generation, for many years, the Nortel group has used a

11  particular type of program to allocate profits and losses and

12  costs amongst the various entities within the Nortel structure.

13  It was an exercise that was focused on profit maximization, tax

14  minimization, and the movement of people and resources around

15  the world to help advance those goals.  I think it's easy to

16  say that that type of system works very well in an integrated

17  global enterprise when that enterprise is doing well.

18        But when it is facing difficulties, as we are facing

19  here with Nortel, it creates a problem and a set of issues, and

20  a set of issues that has been difficult, I think, for all of us

21  on the professional side to get our heads around.  I think it's

22  fair to say that things work well on the up escalator, and not

23  as well on the down escalator, but we've been working very hard

24  to try to solve those problems.

25        And it's by no means to say that the system, known as

1  Transfer Pricing, was perfect.  I think there have been issues

2  and audits and concerns about transfer pricing, but it is an

3  accepted international standard.  It is something that the

4  Nortel group has been using for over 10 years.

5        So, while it was imperfect, it was the best thing

6  that was available.  And it was functioning.

7        It was also a system that was based on forecasts.

8  Forecast to future performance and then truing up after the

9  fact.  In a sense, that fundamental element of the system

10  created a problem once the companies entered into insolvency

11  proceedings.  And so once we found ourselves in the post filing

12  or post petition period, the smooth flow of funds throughout

13  the Nortel enterprise began to slow down.  And in particular,

14  there were concerns and legitimate concerns raised by various

15  creditor constituencies, particularly in the U.S., as well as

16  with respect to the administrator in the Amia countries.

17        And so while the transfer pricing system, which was

18  really the life blood of, in particular N&L, the Canadian

19  operating company, remained an open issue.

20        The funding essentially ground to a halt as parties

21  began to analyze their rights and remedies whether or not, in

22  light of the progress of the case and the potential for asset

23  sales, the continued use of the transfer pricing regime, and

24  particularly its reliance on forecasts continued to make sense.

25        We also had to look very carefully about the impact

1 of transfer pricing with respect to past years, and tax audits,

2 and plans that had been made and implemented over a long period

3 of time.

4          And so about the March time frame, we began a series

5 of conversations.  Conversations with the official Committee in

6 the United States, the bondholder committee, the monitor and

7 the administrator, as well as the U.S. and Canadian debtors.

8 And we began a series of in depth meetings.  Some of those

9 meetings were cordial, some of them were a little frustrating,

10 others were almost confrontational at times.  But I think it's

11 a testament to the efforts of all of the professionals involved

12 that we were able to move past that and get to an agreement, an

13 agreement that allows essentially for the funding of the

14 Canadian estate through and including the end of the third

15 quarter of 2009, it allows for a process to be put in place to

16 hopefully avoid the need to come back to these two courts, as

17 well as to the High Court in London, to decide how to split up

18 the proceeds of any asset sales.

19          It resolves concerns that had been expressed about

20 potential litigation, threats of discovery, and it is not a

21 perfect document, much like the system we had going forward.

22 But I think it's fair to say that it is the result of heavy and

23 intense good faith negotiations.  An exercise that was

24 undertaken in an area where we had no rules to operate in.  An

25 international context that provides challenges and that too

1  many times would have provided the easy way out of folks going

2  back to their corners and arguing about things.

3          But everyone kept an eye on the idea of value

4  maximization which, notwithstanding the fact that our systems

5  may differ in some ways, I think each one of our insolvency

6  regimes focus on providing an opportunity to maximize value for

7  our stakeholders, for our creditors, for our employees.  And it

8  is in that spirit that the interim funding agreement was

9  negotiated.

10          In simple terms, what we have been able to accomplish

11  is providing a mechanic for providing $157 million of cash that

12  will be provided by the U.S. estate, NNI, Nortel Networks,

13  Incorporated, to Nortel Networks Limited.  It will be paid on a

14  monthly basis, and monthly installments, and it will be paid

15  through and including September 30th.

16          From the U.S. creditors' perspective and the U.S.

17  estate's perspective, built into the system and the agreement

18  is protection against the risk of overpayment.  So, that if

19  there is overpayment between the amounts of 26 and $30 million,

20  there would be a charge created under the Canadian order.  And

21  there's a system that will be agreed to amongst the parties to

22  figure out whether or not there has, indeed, been any

23  overpayment.  And the rights of all parties with respect to

24  that is reserved.

25          What we have here, as well, is a recognition by the

32

1  U.S. estates and by the U.S. creditors that there has been a

2  post petition benefit, an administrative benefit received by

3  the U.S. estates under Sections 503 and 507 of the Bankruptcy

4  Code.

5          It's also important to note that this is a tri party

6  agreement.  It brings into the system the administrator from

7  the United Kingdom, Mr. Bloom and his colleagues.  And that was

8  a very important element of this agreement because there was a

9  legitimate concern expressed by the U.S. creditors and felt by

10  the U.S. estates of the risk that amounts could be paid, absent

11  an agreement, by the UK administrator that might be seen as

12  insufficient or somehow having to be repeated.  We were

13  concerned, in sum, about the risk of double payment.

14          And so what we have is an agreement with the UK

15  administrator that the amount of $96 million or so, a little

16  bit more, is the full and final amount that the UK

17  administrator and those estates would be entitled to under the

18  transfer pricing regime or any other method of administrative

19  expense recapture for the nine-month period, from January 1 to

20  September 30th.

21          Of that, $76 million approximately will be recaptured

22  through, in a sense, a netting amongst the EMEA entities

23  themselves.  So, it doesn't include any issues relating to

24  North America.

25          There will be an additional $20 million that would be

33

1  paid by NNL, the Canadian estate, to the UK after certain

2  thresholds are met in connection with asset sales.

3          The agreement also deals with some of the issues that

4  we have to address looking forward.  Recognizing, as we were

5  negotiating this, that the likelihood of substantial asset

6  sales for the debtors' businesses would be occurring in the

7  very near term.  And it is just a coincidence that we happen to

8  be here today with that first major asset sale.

9          The agreement also envisions a process by which

10 proceeds relating to asset sales will be divvied up, a term

11 that we've been using in our negotiations as the black box.

12 Proceeds will go into a black box, the parties and all

13 interested parties that have interest in those funds will have

14 the right to make submissions according to a protocol that we

15 were in the process of drafting.

16         That protocol, where we have distributed drafts of

17 that and are in the process of discussing, is envisioned to be

18 something that would require very little participation or

19 intervention or bother by these two courts.  The view being

20 that once we have a fair and reasonable and independent body

21 deciding the allocation, that we would simply come to both of

22 these courts for confirmation that those amounts are

23 appropriate, and that due process would be available to all

24 parties who are interested in the allocation of those

25 resources.

34

1          And that would involve, as well, not just the sale of

2 assets, but the extinguishment of licenses and, again, that is

3 an important issue here.  The intellectual property of the

4 Nortel enterprises held largely in Canada, I would say the vast

5 majority held in Canada at NNL, and flows through the rest of

6 the Nortel enterprise through royalty free licenses.  And the

7 termination of those licenses under the agreements will provide

8 the opportunity for value to be provided to the various

9 entities throughout the Nortel world.  And our allocation

10 protocol, which we are in the middle of negotiating, would help

11 us accomplish both the allocation of proceeds relating to asset

12 sales, as well as the allocation of proceeds relating to

13 license relinquishment.

14          I should note while we're at the point of allocation,

15 the U.S. Trustee has made a request for a clarification, which

16 we've added to the order.  The clarification that this order,

17 in and of itself, does not approve either here or in Ontario

18 for the allocation of any particular proceeds.  But rather sets

19 the stage for the parties to come back to these courts with a

20 protocol for approval.  And it is the intention of all of the

21 interested parties, the core parties, as we refer to them in

22 the agreement, to come back to both of these courts for

23 approval of that allocation protocol.

24          And so we have added a paragraph in the U.S. order,

25 and I want to make it clear to Mr. Justice Morowitz, as well,

35

1  that it is certainly the intention of all of the core parties

2  that there would also be a companion order issued out of the

3  Ontario Court, as well, before any allocation protocol would be

4  agreed.

5       There are a couple of conditions, Your Honors, to the

6  approval:

7       First, we need both of these courts to enter an

8  order.  And we hope that that will be accomplished today.

9       Second, we needed to agree to certain amendments to

10  the cross border protocol between the United States and Canada.

11  And we engaged in good faith negotiations through the course of

12  last week to do so.  And as one might expect, we reached an

13  agreement at about 9:30 on Friday night, and were able to sign

14  the agreement on that part.

15       One thing I would note is at the time, there were

16  certain representations made in connection with the official

17  Committee and providing information to the official Committee.

18  I was asked prior to the hearing from the bondholder group to

19  clarify that we would be providing equivalent notice to them

20  under those agreements, and we agree to do that.

21       In many respects, the amendments to the cross border

22  protocol are clarifications as to what types of matters would

23  require joint hearings of this sort.  And we have been able to

24  do that, and I think listed 17 or 18 separate matters which we

25  agree are matters of such import that we would come back to

1  both courts and seek relief, if necessary.

2         There was also an agreement that we reached with the

3  Creditors' Committee expressing some concerns about certain

4  material transactions that might be taken by the Canadian

5  debtors.  And in coordination with the monitor, we reached an

6  agreement with the Committee on that front.  It's not embodied

7  in the letter -- I mean in the actual interim funding and

8  settlement agreement, but we do have a letter to that effect.

9  And that, as I said, was agreeable to the debtors, as well as

10 to the monitor.

11        The final condition was an order of direction by the

12 UK court authorizing the UK administrator to take certain

13 actions in connection -- maybe not -- "authorizing" is the

14 wrong term.  Maybe allowing is the right term.  And that order

15 was entered by the high court last week.  And so we have

16 satisfied that condition.

17        And so with the approval of this order by the

18 Bankruptcy Court here in Delaware, and the Ontario court, as

19 well as the approval of the cross border protocol, we will have

20 satisfied all of the conditions to the interim funding and

21 settlement agreement.  And we would anticipate that the funding

22 mechanic would start immediately.

23        As I said,  Your Honor, we did accommodate a comment

24 that had been made by the Office of the U.S. Trustee.  And we

25 believe with that addition to the order relating to the fact

1 that we will come back for approval of any allocation

2 procedures, that we have addressed all of the objections, if

3 you will, that had been raised.

4       In addition, Your Honor, we have two witnesses in

5 court who we have available for testimony, as well as proffer,

6 who would be able to provide the background, if the courts so

7 desire, with respect to the facts and circumstances.  Both

8 justifying the funding needs in Canada, the means by which the

9 numbers were calculated that are embodied within the interim

10 funding agreement, and the prospects for the continued

11 operation of the business and -- in light of these funding

12 arrangements, and that would be Mr. Paul Karr, who is an

13 officer of both NNI and NNL, as well as a director of NNI.  And

14 Mr. Doolittle, who you've seen before, the treasurer of Nortel,

15 both in the U.S. and in Canada.  And I am happy to provide a

16 proffer for both of those gentlemen, if necessary.  I'm also

17 happy to put them on the stand, if anyone has any comments.

18       So, I think on that -- at that point, Your Honor, I

19 have finished the presentation with respect to the interim

20 funding agreement.

21       We will make a couple of other comments with respect

22 to the Nokia Siemens transaction, but I think it might be

23 worthwhile at this point for others, if they have anything to

24 say both here, in Delaware, and in Toronto with respect to the

25 interim funding agreement to do so.  And if there are any

38

1 concerns, we can address them.  And if there's a need to put

2 the witnesses on, we're willing to do so.

3         THE COURT:  All right.  Thank you, Mr. Bromley.

4         Shall we hear from Mr. Hodara for the Committee?  Mr.

5 Hodara, good morning.

6         MR. HODARA:  Good morning.  Thank you, Your Honor.

7 And good morning, Mr. Justice Morowitz.

8         MR. JUSTICE MOROWITZ:  Good morning, Mr. Hodara.

9         MR. HODARA:  Good morning.  The official Creditors'

10 Committee is fully supportive of the interim funding agreement.

11 And I think that Mr. Bromley has done a very fine job in

12 explaining not only the terms of the agreement, but the issues

13 and the considerations of the parties in the various

14 jurisdictions that went into this complex agreement.

15         In supporting the agreement, Your Honor, a couple of

16 items are worthy of note.  Because I think that they could be

17 referred to in future proceedings before these two courts, and

18 because they were of such substance in the discussions amongst

19 the parties.  In particular, Mr. Bromley referred to the

20 history of the transfer pricing agreement amongst the various

21 Nortel entities.  A system that, as Mr. Bromley indicated, has

22 been the subject of various permutations, questions, and

23 involvement of tax authorities in a number of jurisdictions.

24         Two of the provisions in the interim funding

25 agreement that are of utmost importance to the Creditors'

1 | Committee are Section 10, which is titled Scope of this

2 | Agreement.  And in that provision, it says, among other things,

3 | that, "This agreement is not and shall not be deemed to be an

4 | acknowledgment by any party of the assumption, ratification,

5 | adoption, or rejection of the transfer pricing agreement."  The

6 | same with respect to allocation of proceeds.

7 | And then Section 20 of the agreement, which is title

8 | Reservation -- I'm sorry.  The last bullet of Section 20 is

9 | titled Reservation of Rights.  And that provision, among other

10 | things, says, "Nothing in the agreement shall constitute an

11 | amendment, modification or waiver of rights of any party under

12 | any other agreement," and now I'm skipping through the

13 | paragraph so I don't have to quote the whole thing, "including

14 | the transfer pricing agreements, including the right to object

15 | to the propriety of any payments made under or in connection

16 | with the transfer pricing agreements, or any offset arising

17 | therefrom, or otherwise."  And the provision goes on to state

18 | other very important aspects of the reservation.

19 | But I do want to stop at that point in the paragraph

20 | on the phrase "or any offset arising therefrom, or otherwise"

21 | because that's an important provision as it relates to a

22 | comment that Mr. Bromley correctly made.  That the Creditors'

23 | Committee has acknowledged that there have been benefits to the

24 | United States entities on an administrative basis.  And that is

25 | the fundamental purpose of the agreement to permit funding or

1    payments to occur at this time from the United States.

2          But it's also recognized here by the parties that

3    there could be offset rights that could implicate the

4    entitlement of the U.S. estates to offset amounts that could

5    have been owing. And so it was fundamental to the EMEA estates

6    and to the Canadian debtors that it be recognized that

7    notwithstanding those potential offset rights that the

8    agreement to pay an additional $157 million at this time,

9    that's in addition to the 30 million that was paid at the

10   outset of these cases, is without right of setoff, other than

11   with respect to the mechanism that Mr. Bromley described.  And

12   yet there could be rights of setoff, and those will be relevant

13   or could be relevant in the future as the rest of the issues

14   between these estates are worked through.

15          And so, Your Honor, with those specific reservations

16   of rights, the Committee does fully support this intercompany,

17   interim funding agreement.

18          THE COURT:  Thank you, Mr. Hodara.  Anyone else?

19          MR. JUSTICE MOROWITZ:  We have Mr. Tay in Toronto,

20   and then I believe the monitor, either Mr. Carfagnini or Mr.

21   Pasquariello will be addressing.

22          THE COURT:  Why don't we give the Toronto attorney --

23          MR. TAY:  Thank you.  Thank you.  When I handed it to

24   Mr. Bromley for opening statements, I hadn't realized that he

25   was going to do his presentation.  So, he saved me a lot of

41

1  trouble in terms of my own presentation on the interim funding

2  agreement.

3         The -- from the Canadian's perspective, the Canadian

4  estate's perspective, Your Honors, we're in some ways the ham

5  in the sandwich.  In good times, what happened was Canada would

6  be funding a lot of the expenses up front, doing a lot of the

7  R&D, paying a lot of the overheads.  And then as part of this

8  transfer pricing arrangement that you've heard so much about,

9  would be compensated largely by the U.S. for having incurred

10 all those expenses, and that's how things happened.

11        And so on the date of the filing, we found ourselves

12 at a point in time where we were at the stage where we had

13 expended these monies.  But because of the filings, there was

14 an interruption in the collection of the monies from the other

15 estates in terms of the cost that Canada was bearing for the

16 rest of the Nortel empire.

17        From the Canadian estate's perspective, it was clear

18 to the companies, the Canadian companies, and to the monitors,

19 the court officer, recognizing that there are discrete Canadian

20 creditors while there are overlap creditors for the

21 bondholders, there are also discrete Canadian creditors whose

22 rights had to be protected in the same way that the U.C.C. is

23 trying to protect the rights of the discrete U.S. creditors and

24 the administrator in the EMEA regions are trying to protect the

25 rights of the people in their jurisdictions.

1          And so what became clear from the Canadian

2     perspective is that it was not appropriate that, as I used the

3     phrase before, Your Honor, here before that Canada should not

4     be burning its furniture to keep the rest of the empire warm.

5     And so the complex negotiations that Mr. Bromley referred to

6     was entered into because Canada was fast running out of money.

7     And at the time of the filing, we were short of money because

8     of the stage in the cycle.  But because we know that I would be

9     filing in these different jurisdictions, we did not feel that

10    it was appropriate to try and repatriate any of that money

11    prior to the filing.

12         And as a result, Canada was left, in essence,

13    underfunded while the bulk of the cash in the Nortel empire was

14    in the U.S., in the EMEA regions, and in the rest of the world.

15    And so it became extremely clear that we needed to solve this

16    problem.  And as Mr. Bromley has outlined to you after a huge

17    amount of effort on everybody's part, on the one hand, trying

18    to -- everyone recognizing that if you don't keep Canada alive,

19    there is no Nortel to speak about because it's one integrated

20    business.

21         And on the other hand, each of the fiduciaries in the

22    different estates make sure that they were not overpaying or

23    prejudicing their own discrete set of creditors for the benefit

24    of the other estates.

25         And so it's this difficult dynamic tension that give

43

1  rise to many of the issues that issues that we had incoming to

2  this agreement.  By having come to this agreement, we have

3  solved the funding problem for a short time.

4          As you've heard, this interim funding provides

5  funding just til the end of Q-3 in Canada.  And we'll have to

6  figure out what we do for periods after that.

7          But having said that, I think it's a great

8  achievement on the part of all the people involved in the

9  various estates to come to this agreement.  And there are -- I

10  won't belabor the points that have already been covered.  But

11  there are a couple of Canadian implications to this, Mr.

12  Justice Morowitz, that I need to bring your attention to.

13          And that is that you've heard out of the 157 million

14  that's being paid --

15          (Audio interrupted - Technical Difficulties)

16          MR. HARRON:  Excuse me, Your Honor.  While we're down

17  with technical difficulties.

18          THE COURT:  Yes, Mr. Harron.  Good morning.

19          MR. HARRON:  Good morning, Your Honor.  I received an

20  e-mail from several of the parties that were on the phone.

21  They cannot hear when those in Canada speak.  I don't know if

22  we can --

23          MS. MURIN:  I'm sorry?

24          MR. HARRON:  I've been informed by a party on the

25  phone that they can't hear when the Canadians speak.

1          MR. TAY:  ... (recording commences with the

2    following) ... that it will, in fact, be a repayment by the

3    Canadian estate of such amount.  And that -- so, this

4    contingent payment, I'm sorry, is secured by a charge, a new

5    charge to be created in the Canadian order which charge will

6    rank with where the EDC charge is right now.  And so that's

7    just -- I just wanted to draw that to your attention.

8    Similarly, part of this deal requires that in -- if certain

9    circumstances are achieved, that there will be a payment from

10   the Canadian estate to the EMEA estates of two $10 million

11   tranches.  And this is a recognition of the fact that

12   traditionally under the transfer pricing arrangements, that

13   Canada would be the one collecting these payments, and then

14   allocating them to the various so-called main companies or

15   profit centers as they were intended to be, including the UK.

16          And so there's a recognition here that as a final

17   settlement, there would be a payment of two $10 million

18   tranches to the EMEA regions.  And, again, it's going to come

19   from asset sales, and it's going to be subject to ensuring that

20   the Canadian estate has sufficient liquidity to pay those

21   payments.  They're very complex provisions, I won't get into

22   them.  But suffice it to say that if those events are

23   triggered, and Canada will be paying a total of $20 million to

24   the EMEA estates in total settlement under this agreement, and

25   to secure that, there will be a shortfall charge in favor of

45

1  NNUK, which will rank with the intercompany -- existing

2  intercompany charge, which is the last charge there is in the

3  various court charges that you've created, Justice Morowitz.

4          And then I simply want to emphasize again, because

5  that point has been raised a number of the Canadian creditors,

6  that nothing in this agreement is intended to deal with the

7  allocation of funds.  That we will be working on some kind of

8  protocol that will absolutely have to be brought back to this

9  Court for approval when we arrive at an agreement as to a

10 protocol to deal with the allocation of funds.

11         And so all the Canadian creditors will have an

12 opportunity to examine that, and to make submissions as

13 necessary.

14         Those are my submissions in terms of the interim

15 funding agreement.

16         The cross border protocol, you mentioned that you had

17 a number of materials.  I just wanted to make sure that you

18 have the supplementary report.

19         MR. JUSTICE MOROWITZ:  Yeah, I have the Supplementary

20 15th and --

21         MR. TAY:  So, as long as you have that --

22         MR. JUSTICE MOROWITZ:  -- the three that have been

23 through the blackline Schedule A.

24         MR. TAY:  Yeah.  Right.  And so, you know, we have no

25 objections to those changes, obviously.  And the monitor -- we

1 | will hear from the monitor.  I think we're all in accord with

2 | the changes to the cross border protocol, and we would ask that

3 | Your Honor approve those changes in part, because it's a

4 | condition precedent to the effectiveness of the interim funding

5 | agreement.

6 | So, those are my submissions on that issue, unless

7 | either judges have any questions.

8 | MR. JUSTICE MOROWITZ:  Thank you, Mr. Tay.  Judge

9 | Gross, do you have any further questions of Mr. Tay?

10 | THE COURT:  I do not.  Thank you.  I know that we

11 | have --

12 | MR. JUSTICE MOROWITZ:  Okay.  The next would be --

13 | THE COURT:  We may have others who wish to be heard

14 | here, I don't know about in Canada.

15 | MR. JUSTICE MOROWITZ:  We have counsel to the monitor

16 | who wishes to address.

17 | And I also -- I think it's Mr. Gottlieb on behalf of

18 | the joint administrators from the UK.

19 | THE COURT:  All right.

20 | MR. JUSTICE MOROWITZ:  So, we'll take them in that

21 | order.  Mr. Pasquariello first, and then followed by Mr.

22 | Gottlieb.

23 | MR. PASQUARIELLO:  Good morning, Judge Gross.

24 | THE COURT:  Good morning.

25 | MR. PASQUARIELLO:  Good morning, Mr. Justice

47

1  Morowitz.

2         On behalf of Ernst & Young as the monitor.  The

3  monitor supports the interim funding settlement agreement and

4  would echo the observations already made by the various counsel

5  that the agreement is the result of great cooperation among the

6  debtors and the stakeholders, and the culmination of lengthy

7  and complicated set of negotiations.

8         In respect of the CCAA applicants, the funding

9  settlement agreement is quite important.  As outlined in the

10  monitor's 15th report, and in particular the cash flow forecast

11  attaches Appendix B thereto, the cash flow forecast for the

12  subject period indicates that the applicants will experience a

13  negative cash flow of 23 million during the period to September

14  30, 2009.  And that includes the 86 million of proceeds from

15  the Westwind sale, which Justice Morowitz will recall, was the

16  Calvary property sale for which approval was obtained some time

17  ago, and also the $157 million of anticipated payments from NNI

18  under the settlement agreement.

19         Exclusive of those items, the negative forecast would

20  result in a cash flow of approximately 266 million to September

21  30th.  And, therefore, obviously the settlement agreement

22  provides the necessary funding in order for the CCAA applicants

23  to have adequate resources to fund their operations through to

24  September 30th, 2009.

25         As Mr. Tay has alluded to, further negotiations will

1  be required for funding passed September 30th.  But the interim

2  funding settlement agreement, I would submit, is a great step

3  to moving the case forward.  And we fully anticipate that the

4  parties will be responsible and flexible in providing a further

5  mechanic, if required, to achieve ongoing funding for the

6  benefit of all stakeholders, both north and south of the

7  border, in the future.

8          For these reasons, the monitor recommends approval of

9  the settlement agreement.  And also recommends the approval of

10 the amendments to the initial order, which Mr. Tay has taken

11 the Court through in Canada for the creation of the -- both the

12 interim funding charge and the shortfall charge, which flow

13 from the settlement agreement as being reasonable in the

14 circumstances.

15         With respect to the amendments to the cross border

16 protocol, the monitor concurs that those amendments will

17 enhance the communication and cooperation between the

18 respective courts, while confirming their independence.  And,

19 therefore, in that respect, the monitor also recommends that

20 those proposed amendments to the protocol be approved by both

21 this Court and the U.S. Bankruptcy Court.

22         Those are my submissions on behalf of the monitor,

23 unless either Judge Gross or Your Honor has any questions.

24         MR. JUSTICE MOROWITZ:  Thank you, Mr. Pasquariello.

25 I have no questions.

49

1          Judge Gross, do you have any?

2          THE COURT:  Nor do I.  Thank you.

3          MR. PASQUARIELLO:  And I'll just note to the extent

4  Your Honor may have any questions specifically of the monitor,

5  Ernst & Young, both Mr. Murray McDonald and Mr. Brad

6  Beconcamper (phonetic) are present in the Ontario Court.

7          THE COURT:  Excellent.  Thank you.

8          MR. PASQUARIELLO:  Thank you.

9          THE COURT:  Thank you.

10          MR. JUSTICE MOROWITZ:  Mr. Gottlieb?

11          MR. GOTTLIEB:  Thank you, Your Honor, and Judge

12  Gross.  We're counsel to the joint administrators in the UK.

13          Just two brief points:

14          One, the joint administrator supports the motion by

15  the applicants today.  And respectfully requests that the order

16  be granted.

17          And second point, although it's not relevant to the

18  approval of the agreement today, the joint administrator takes

19  certain issue with a statement made in Mr. Doolittle's

20  affidavit at Paragraph 17.  I would just like to state for the

21  record that it reserves its rights with respect to that, and

22  that deals with the IP, the ownership of the IP and IP rights.

23          And, Your Honor, we filed in this Court an

24  affirmation of Stephen John Harris.  And the reservation of

25  that right is set out in Paragraph 14 of the affirmation of Mr.

50

1  Harris.

2         And subject to any questions, Your Honor or Judge

3  Gross, those are our submissions.

4         MR. JUSTICE MOROWITZ:  Thank you, Mr. Gottlieb.  I

5  have no questions.

6         Judge Gross?

7         THE COURT:  No questions from here either.  Thank

8  you.

9         MR. GOTTLIEB:  Thank you.

10        MR. JUSTICE MOROWITZ:  Thank you.  Is there anybody

11 else in the Toronto Court that wishes to address this motion?

12                  (No audible response heard)

13        THE COURT:  All right.  I do have someone here who

14 would like to be heard.

15        MR. JUSTICE MOROWITZ:  Judge Gross, I think the only

16 other open point, I think, that Mr. Bromley had referenced was

17 whether we wanted to hear any live evidence.  I will leave

18 that, Judge Gross, to your discretion.  It will not be required

19 in the Toronto Court.

20        THE COURT:  All right.  Thank you very much, Mr.

21 Justice Morowitz.

22        Yes?

23        MR. KRELLER:  Good morning, Your Honor.  Good

24 morning, Mr. Justice Morowitz.

25        Tom Kreller of Milbank, Tweed, Hadley & McCloy

51

1  appearing on behalf of the ad hoc bondholder group.

2          MR. JUSTICE MOROWITZ:  Good morning.

3          MR. KRELLER:  Your Honor, I'll be brief.  We filed a

4  statement in support of the motion for approval of the interim

5  funding agreement.

6          THE COURT:  Yes.

7          MR. KRELLER:  Mr. Bromley, and Mr. Hodara, Mr. Tay,

8  and others have, I think, accurately summarized the relevant

9  terms of agreement.  I certainly would echo the statement that

10  it's fraught with complexities that I think the parties worked

11  very hard to resolve.  I think hearing everyone talk about how

12  complex it is, it's probably the first time we've all agreed on

13  anything, at least the first go around, in this process.

14          Your Honor, the agreement, I think, reflects a

15  careful balancing act that the parties have all engaged in in

16  trying to find a resolution to a difficult funding situation

17  while, at the same time, reserving rights in the future, and

18  trying to put processes in place to deal with a number of

19  difficult and important issues in the case surrounding the

20  transfer pricing regime, intercompany claims and relationships,

21  interjurisdictional relationships, allocation of proceeds, all

22  the things you've heard about.

23          The bondholders, as creditors, both here in the U.S.

24  and also in the Canadian cases, may be uniquely sensitive to

25  some of those complexities.  We view the interim funding

1  agreement as a carefully crafted and ultimately pragmatic

2  resolution to a near term problem, and hopefully the first step

3  in a process where we can resolve these other difficult issues

4  with the same kind of consensus we were ultimately able to

5  gather.

6          For those reasons, the bondholder group fully

7  supports approval of the interim funding agreement.

8          THE COURT:  All right.  Thank you, Mr. Kreller.

9          MR. KRELLER:  Thank you, Your Honor.

10         THE COURT:  Anyone else?  Mr. Harron, good morning.

11         MR. HARRON:  Good morning, Your Honor.  And good

12  morning, Justice Morowitz.

13         For the record, Ed Harron on behalf of the joint

14  administrators for the Nortel Network, UK Limited entity.

15         Your Honor, I rise only to make one point of

16  clarification.  Similar to the point raised by my colleague in

17  the Canadian court, the administrators take issue with some of

18  the statements made in Paragraph 14 of the approval motion that

19  was filed in this Court.

20         Your Honor, just for the record, the administrators

21  state that the interim funding settlement agreement does not

22  affect -- and the administrators reserve all rights in respect

23  of both the allocation and sale proceeds, consistent with what

24  Mr. Bromley already represented to the Court, but also with

25  respect to the ownership interest of intellectual property

53

1   rights.

2           THE COURT:  Okay.

3           MR. HARRON:  Thank you, Your Honor.

4           THE COURT:  Thank you, Mr. Harron.  Anyone else here

5   in the United States?

6                   (No audible response heard)

7           THE COURT:  No one else.  All right.  Mr. Bromley,

8   did you wish to make any final comments?  I take it that the

9   reservation of rights relating to Mr. Harron's concerns about

10  the allocation and ownership of the intellectual property do

11  not impact the settlement?

12          MR. BROMLEY:  No, Your Honor.  The agreement itself

13  actually has a very specific provision that deals with the

14  treatment of intellectual property and licenses relating

15  thereto.  The -- I think it's fair to say that the statements

16  that have been made, both in the motion papers here and in Mr.

17  Doolittle's affidavit or declaration are statements of the

18  company's position with respect to those.

19          THE COURT:  Yes.

20          MR. BROMLEY:  We believe they are the correct

21  position.  But we recognize that all parties have reserved

22  their rights on that, and certainly there's nothing intended by

23  this application or the orders to compromise any rights in that

24  regard.

25          THE COURT:  Very well.  Thank you.

54

1         As far as evidence is concerned, I agree with Mr.

2  Justice Morowitz that I think our record is sufficient at this

3  point based upon the declarations, as well as what has

4  transpired in this case to date.  I don't think I need the

5  proffers.  I'm prepared really at this point, subject to any

6  final comments or additional comments you may have to adjourn,

7  and speak with Mr. Justice Morowitz, and come back, and we

8  would state your ruling on the record.

9         MR. BROMLEY:  That would be fine, Your Honor.  I

10  certainly have nothing further other than I can give you the

11  marked copy of the order so that you can have that in front of

12  you when you speak to Mr. Justice Morowitz.

13        THE COURT:  That would be helpful.  Thank you, Mr.

14  Bromley.

15        MR. BROMLEY:  May I approach?

16        THE COURT:  Yes, of course.

17        MR. BROMLEY:  Thank you.

18        MR. JUSTICE MOROWITZ:  And at this end, Judge Gross,

19  thank you.  And, Ms. Stam, do you have any copies of the draft

20  order?  And, Mr. Tay, is there anything further that you wish

21  to --

22        MR. TAY:  I have nothing to add, Your Honor.

23        MR. JUSTICE MOROWITZ:  Thank you.

24        THE COURT:  All right.

25        MS. STAM:  Your Honor, there are two --

55

1          THE COURT:  Excuse me.

2          MS. STAM:  There's --

3          MR. JUSTICE MOROWITZ:  Ms. Stam just has a few

4   comments, Judge Gross, before we break.

5          MS. STAM:  Your Honor, just so that you're aware, we

6   only added two draft orders.  One is the third amended

7   (indiscernible - feedback) although there are still additional

8   changes that Mr. Tay will make further (indiscernible -

9   feedback) on, but it involves the --

10          MS. MURIN:  If counsel would please step to the

11   microphone.

12          MS. STAM:  And the second is the draft order

13   approving the interim funding agreement itself.  Both with one

14   exception that Mr. Tay will go over when he discusses the

15   initial order later, are in the form that were filed with the

16   motion materials.

17          MR. JUSTICE MOROWITZ:  Okay.  The Court in Delaware,

18   would you like Ms. Stam to repeat the first part of her

19   presentation?

20          THE COURT:  Yes, please.  We missed the very first

21   part.

22          MS. STAM:  I apologize, Judge Gross.  I was --

23   indicated that we were handing up two draft orders:  One was

24   the third amended and receipted initial order in Canada dealing

25   with the creation of the two charges contemplated under the

1 interim funding agreement, but which also had additional

2 changes that Mr. Tay will provide submissions on later.  As

3 well as a second order of the interim funding approval order,

4 both substantially in the same form that were filed with

5 materials.

6          THE COURT:  Thank you.

7          MR. JUSTICE MOROWITZ:  Mr. Tay, do you intend to make

8 those submissions now or part of the second motion.

9          MR. TAY:  No, after.  As a part of the Canadian

10 process.

11          MR. JUSTICE MOROWITZ:  Okay.  Thank you.  Judge

12 Gross, do you think it's an appropriate time now to take an

13 adjournment.  This time --

14          THE COURT:  Yes.

15          MR. JUSTICE MOROWITZ:  -- will be somewhat uncertain,

16 but we'll relay that back to the court as soon as we have a

17 better idea.

18          THE COURT:  Thank you, Mr. Justice Morowitz.

19          MR. JUSTICE MOROWITZ:  Thank you.

20          THE COURT:  We'll take a recess now.

21          (Recess 10:38 A.M./Reconvene 10:54 A.M.)

22          THE COURT:  Please be seated, everyone.  Thank you so

23 much.  I will defer to my esteemed colleague in Canada, Justice

24 Morowitz.

25          MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.  I

57

1  think just by way of housekeeping, an update on the other

2  matter, the Eddie Bauer matter at 11:30, that matter will be

3  deferred pending the completion of this hearing, and

4  arrangements have been made with Judge Walrath accordingly.

5         On the first motion this morning, this, I think, is

6  where you'll see some divergence of practice between the

7  Ontario courts and the Delaware court.  The record in Ontario

8  has been endorsed as follows:

9  ]        The motion is granted.  The order has been signed in

10  the form requested, brief reasons will follow.

11        And now over to Judge Gross for the disposition in

12  Delaware.

13        THE COURT:  Well, I am also prepared to grant the

14  motion, of course.  Because it is clear that the operations of

15  these companies are extremely integrated.  And the last thing

16  that the debtors can afford is to have any piece of that

17  integrated operation, that consolidated operation fail.  And

18  there is a benefit to all.  The -- just hearing and reading the

19  proposed settlement makes it clear that even after a two-day

20  trial, which had originally been scheduled, it would have been

21  very difficult for this Court to have arrived at an allocation

22  process as fair as these parties have here in this settlement.

23        And it certainly meets the requirements of Section

24  105(a) and 363(b), as well as Rule 9019.  It is in the best

25  interest of the debtors' estate.  And I am certainly most

58

1  satisfied with the fairness of the settlement and will approve

2  it.

3          MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.  Well,

4  that concludes the first motion.

5          THE COURT:  And I do have the order here.  And I will

6  sign it.

7          And now we're moving to a more contested matter, I

8  take it.

9          MR. JUSTICE MOROWITZ:  Judge Gross, this is the Nokia

10  Siemens Network B.V. bidding procedures motion.

11          THE COURT:  That is correct.

12          MR. JUSTICE MOROWITZ:  And as I outlined at the

13  outset of the hearing today, objections, I understand, have

14  been filed in the -- in your Court.  And I think the

15  appropriate place to hear those objections first is from the

16  Delaware court.  And then we will deal with the presentations

17  in the CCAA.

18          THE COURT:  Yes, sir.  Thank you, Justice Morowitz.

19  Mr. Bromley?

20          MR. BROMLEY:  Thank you, Your Honor.  Thank you, Mr.

21  Justice Morowitz.  And thank you for the entry of the order on

22  the interim funding agreement.

23          We're now turning our attention to the transaction

24  that the debtors have entered into with Nokia Siemens Networks

25  for the sale of a substantial portion of the debtors' carrier

1  business.  If I can just do a little housekeeping at this

2  point.  The way we would proceed is I'd make some introductory

3  remarks with respect to the transaction and what it is intended

4  to accomplish and the relief we will be seeking.

5          Then my partner, Lisa Schweitzer, will take us

6  through the witnesses.  We will then deal with the objections,

7  to the extent they continue to exist.

8          We do have, I think, a reason to put witnesses on in

9  connection with our affirmative case.  And so we would ask for

10  the Court's indulgence in doing so.

11          THE COURT:  Of course.

12          MR. BROMLEY:  Thank you very much, Your Honor.

13          So, the transaction that we're here today to consider

14  is a transaction to sell material assets of the debtors, both

15  in the United States and in Canada, and elsewhere, but

16  primarily in the United States and Canada, related to the

17  carrier business.  The carrier business, as we described

18  earlier, is one of the three main lines of business that Nortel

19  is engaged in.  And, indeed, the carrier business is named that

20  because the largest customers of this business are carriers.

21  They are the telephone companies of the world for those who

22  still remember that terminology, the Verizons, the Sprints, and

23  the like.  And Nortel has been one of the largest providers of

24  the infrastructure relating to these wireless networks.

25          And in particular, there are two technologies that

60

1  we're talking about the CDMA, which stands for code division

2  multiple access, a 3G technology, and LTE, which is long-term

3  evolution technology.

4         This motion and this hearing is a seminal decision in

5  these cases.  When the entry of the agreement was announced a

6  week ago this past Friday, it was accompanied by a press

7  release that indicated a couple of things:

8         Not only was this transaction being announced, but

9  also that Nortel had taken a decision to engage in discussions

10 with respect to the sale of other material assets, as well as

11 to begin the process of delisting its stock on the Toronto

12 stock exchange.

13        These are very gut wrenching decisions that have been

14 made by a very proud company.  But nevertheless, they are the

15 right decisions in the view of the company and its stakeholders

16 to be taken at this time.

17        Nortel operates in a very competitive environment. A

18 competitive environment where scale and financial resources are

19 paramount.  And, unfortunately, the development of technology

20 and competition, combined with the financial crisis that

21 emerged and exploded over the past nine months, has conspired

22 against Nortel and leads us to this situation where we are

23 doing our best in a very difficult environment.

24        In particular, the process by which we've reached the

25 decision to sell the CDMA and LTE businesses to Nokia Siemens

1  pursuant to an auction process has been highlighted by the

2  themes that were established in the first motion, which is the

3  complexity of the business and the international

4  interconnectedness of it all.

5          These are complicated assets.  They are being offered

6  for sale in the context of an evolving process.  It's not as if

7  every other competitor in this space has exactly the same

8  needs.  And, therefore, what we're talking about in terms of

9  trying to market these specialized assets, not just these, but

10 any others that the company has, is trying to find the right

11 mix.  The right mix of assets and buyer.  And we are, I think,

12 faced with a process that most would agree is complex.

13          In particular, the intellectual property footprint of

14 Nortel is overlapping.  And so there are certain aspects of the

15 business that have to be sold, certain other aspects of the

16 business that are retained and licensed, and certain elements

17 of transactions that have to be matched, if you will, almost

18 like a Lego set, with other transactions that are being

19 considered.

20          As a result of these challenges, we have engaged in a

21 highly consultative process.  We have had over the past several

22 weeks in our offices in New York probably at any given time 20

23 or 30 representatives of various constituencies, whether it be

24 purchasers, the Official Creditors' Committee, the monitor, the

25 administrator from the UK, their financial and legal advisors,

62

1  the bondholders, it has been a revolving door of participants

2  in these processes.

3         So, it is an exercise that I think has yielded the

4  best result at this point with respect to the CDMA business.

5  It is a transaction that we would be seeking under the U.S.

6  Bankruptcy Code approval under Section 363, in particular,

7  363(f) of the Bankruptcy Code, for the sale of certain hard

8  assets, for the sale of intellectual property rights.  Under

9  Section 365, as well, for the assumption and assignment of

10 certain leases, subleasing of certain elements.  We are looking

11 at a transaction that we believe will maintain the jobs of well

12 over 2,000 individuals.  We're looking at an intellectual

13 property license which will allow this business and these

14 assets to be sold, but also to maximize the possibility that as

15 we engage in further transactions, that we will be able to

16 maximize the value of those remaining assets.

17        It also involved something that does tie back into

18 our earlier discussion, which is something that is known as

19 transition services.  These businesses are so integrated that

20 there's going to be a fairly long lived residual responsibility

21 for the debtors, both the U.S. debtors and the Canadian

22 debtors, to provide transition services to the buyers, to allow

23 the buyers to be able to take the assets, integrate them into

24 their own systems, and transition over.

25        So, what we are looking at in the context of this

63

1 transaction, and any competing bids, is a transaction that has

2 several steps.  It has a transaction where we are looking on an

3 admittedly somewhat expedited time frame, but we think one

4 which is eminently justified under the circumstances, to try to

5 get to a closing -- an auction, and then a closing if the

6 current bidder prevails as the successful bidder by the end of

7 July, or the very beginning of August.  And there are reasons

8 for that, which we will go into.

9        We would then at that point also have, as I said, a

10 transition services arrangement for up to two years where the

11 U.S. and Canadian debtors will be establishing a team of people

12 in both jurisdiction and, indeed, around the world to provide

13 the support to be able to move the business out of the

14 integrated Nortel enterprise and into either the Nokia Siemens

15 or the successful bidder's enterprise.

16        The bidding procedures that we've proposed and

17 negotiated with Nokia Siemens are both typical and atypical.

18 They are attempting to balance certainty, the certainty of this

19 transaction, a bird in the hand, if you will, with the

20 flexibility to consider other transactions.  And the time line

21 to allow those transactions to come to fruition and be

22 proposed.

23        The bidding procedures create a certain number of

24 frameworks, frameworks which we believe are important.

25 Important so that as this process goes forward, we are able to

64

1 look at things as much as possible on an apples to apples

2 basis.

3          There are requirements built into the bidding

4 procedures that must be met in order for one to become a

5 proposed bidder.  Now, what does that mean?  Well, these

6 conditions are signing a confidentiality agreement,

7 demonstrating the financial wherewithal to undertake the

8 transaction, and to give an indication of interest of the type

9 of assets, nonbinding, but the type of assets and the scope

10 that the potential bidder would be looking for.

11          Now, why do we have restrictions on becoming a

12 proposed bidder?  Well, the process that we've gone through to

13 this point has been a very elaborate process.  And the

14 witnesses will describe that to you, particularly Mr. George

15 Riedel who is the chief strategy officer at Nortel, and Mr.

16 Michael Murray, our investment banker from Lazard.

17          They will tell you that in the context of this

18 exercise, 28 separate potential buyers were contacted, seven

19 have signed nondisclosure agreements.  And when we came down to

20 it, there were two active bidders involved in this process.

21          They will tell you that there are a limited number of

22 potential acquirers of these assets, given the technology, the

23 requirements, the fact that the scale and global reach that is

24 required in order to take these assets and pay the full value

25 for them is really possessed by a very limited number of

1  potential purchasers.

2         And that shouldn't been seen as disqualifying this

3  process by any stretch.  We have seen, unfortunately, in the

4  financial crisis a number of transactions that have been driven

5  by very few potential acquirers, whether that be the Lehman

6  Brothers or the Chrysler situation, or the General Motors

7  situation, which will be held -- where there's a sale hearing

8  scheduled to begin tomorrow.  The unfortunate result of such

9  large entities suffering in insolvency proceedings is that the

10 potential acquirers in the universe is necessarily narrow.  And

11 I think here we are lucky that we have had a full process with

12 respect to the CDMA and LTE assets, as you will hear from our

13 witnesses.

14        We also have requirements in the bidding procedures

15 that must be met in order for a party to become a qualified

16 bidder, and for the proposal that they put on the table to

17 become a qualified bid.

18        Again, we believe that there's an appropriate balance

19 struck here between certainty and flexibility.  We need,

20 indeed, require that there be deadlines for bids being

21 submitted, that diligence be conducted and completed.  That the

22 details of the transactions that are being proposed be

23 identified so that we can collectively, with our stakeholders,

24 analyze the pros and cons of those transactions.

25        We need to know that if someone is coming to us with

1 a proposal, that it's a proposal that can be financed.  And,

2 indeed, is financed.

3        It is a, I think in the scheme of things, a set of

4 requirements which are reasonable and appropriate.  But yet are

5 balanced with the flexibility to allow us to take multiple

6 bids, and aggregate them together so that we could have

7 multiple bidders show up, each bidding on the package of

8 assets.  And we could look at the bids as a collective

9 exercise.

10        Also because these assets are unique in the way that

11 they interact with each other, and will interact with the

12 bidders, it is possible that other bids could come up that may

13 not be exactly the same in terms of the asset package.  And we

14 have reserved the rights to look at those bids, as well.

15        It's hard to prejudge that process because until we

16 have a particular transaction on the table, we really don't

17 know what we are going to be able to compare.  But I can assure

18 you that what we have set forth in the process is a

19 consultative process that will make sure that we are talking on

20 a real time basis with the monitor, with the Creditors'

21 Committee, with the bondholders, and with the administrator.

22        As has been the practice in this jurisdiction and

23 others, the transaction also involves a break-up fee and an

24 expense reimbursement.  The break-up fee of $19.5 million, and

25 an expense reimbursement of a maximum of $3 million, for a

67

1  total of $22.5 million.

2          We believe that this set of buyer protections is

3  appropriate, and consistent with the market practice, both in

4  the District of Delaware, the Third Circuit, and the Second

5  Circuit in the Southern District of New York.

6          We believe that the evidence will show that the

7  process that has been brought to the Court today is a process

8  that has been benefitted by the presence of this bidder.  And,

9  indeed, there is another bidder that we have been talking to,

10  as well, and we believe the presence of both of them in the

11  process has helped make the value that will be obtained here as

12  high as possible.  And, indeed, while we are here today to

13  approve the bidding protections for Nokia Siemens, I think that

14  it's fair to say the debtors have no greater desire than to see

15  an active and vigorous bidding process for these assets so that

16  the dollars that we can obtain for our stakeholders will be

17  maximized.

18          We wish all of the bidders good luck and deep

19  pockets.

20          THE COURT:  Yes.

21          MR. BROMLEY:  The schedule that we're proposing here,

22  Your Honor, is a somewhat aggressive one.  And there have been

23  some concerns raised about that, and I think it's worthwhile to

24  pause a moment to talk about it.

25          We're here today, it is the 29th of June.  We're

68

1  looking for an objection deadline of July 17th, a bid deadline

2  of July 21st, a requirement that the debtors give adequate

3  assurances of future performance for assumed contracts and

4  leases by July 23rd, and an auction by July 24th.

5        We would then have a supplemental objection deadline,

6  to the extent that there are any changes as a result of the

7  auction, and a sale hearing on July 28th.

8        So, if we look at the 29th to the 28th, it's not

9  quite a month.  And I know that there have been some concerns

10 raised about that.

11       I think that you'll hear from Mr. Murray and Mr.

12 Riedel that the exercise that the debtors have engaged in over

13 the past several months has given comfort, both to the debtors

14 and to their constituents who have been involved in this

15 process.  The comfort that we are looking at a process that is

16 appropriate under the circumstances.  These assets are not the

17 prototypical melting ice cube that you hear in so many cases.

18 But they are assets that are deteriorating over time.

19       The CDMA assets that we're talking about are assets

20 that relate to the 3G network that the -- and the largest

21 customer we have is Verizon in that business.  And so while

22 Verizon is certainly out there saying "Do you hear me now," and

23 the world's largest 3G network, you can be rest assured that

24 they are actively working on the next generation network.

25       And so when you're looking at the 3G technology that

69

1  we are putting up for sale now, there is a limited life span

2  for that technology.

3         In addition, the long-term evolution technology that

4  is also a part of this transaction is the next generation

5  technology.  And it is very difficult for Nortel to be putting

6  those assets up for sale because they believe it is good, very

7  good, indeed, probably the best technology.

8         But what we have here is an inability to finance

9  that, a lack of scale, and a lack of financial resources.

10        That particular package of assets, however, is going

11 into testing for certain of the major carriers at the end of

12 this year.  And so our purchaser has made it clear that they

13 want a very expedited auction schedule so that if they are the

14 winning bidder, they will be able to take those particular

15 assets and plug them into their testing schedule so that they

16 will be best positioned to make proposals with respect to the

17 next generation.

18        And we believe that if we miss that cycle in selling

19 these assets, that we could find ourselves having a much less

20 valuable asset.

21        And so for that reason, Your Honor, and for others

22 that Mr. Riedel and Mr. Murray will give when they testify, we

23 do believe that the sale process, while expedited, is

24 appropriate in these circumstances.

25        The exercise that the debtors have been going through

70

1  over the past several months is one that has created an awful

2  lot of interest in the technology marketplace.  The assets that

3  we have are valuable assets, and the -- a testament to the

4  inventiveness of everyone who's worked at Nortel for so long.

5  We believe that the sale of these assets at this time is

6  appropriate.  It's not a particularly happy day for those who

7  have worked so hard to accomplish what Nortel has.  But

8  nevertheless, we believe at this point in time, it is the best

9  and highest uses for these assets to put them up for sale.

10          You will hear some questions raised, I think, perhaps

11  about why isn't it possible that these assets would form the

12  basis for a plan of reorganization.  And they are appropriate

13  questions to be asked.

14          You will hear from Mr. Riedel and Mr. Murray that

15  extensive efforts have been made to talk with our customers to

16  find out whether or not there would be an appropriate and long

17  lived business plan on a standalone basis that would allow

18  Nortel to use these technology assets to reorganize.  And I

19  think that what you will hear -- as a matter of fact, I know

20  what you will hear is that unfortunately, the customers are

21  looking for providers of this type of technology who are able

22  to provide a long-term commitment, who are going to be there

23  for a decade or more in order to develop and maintain, and

24  support all of these assets.

25          And so when the customers are of a concern that the

1  business on a standalone basis does not have the resources to

2  support it, they will go elsewhere.  They will go and buy,

3  arguably in theory or product, as long as they know they can

4  get it fixed over the long-term.  And I think that is sort of

5  the crux of the difficult choices that we're making here.  The

6  global footprint that our potential purchaser here presents is

7  one that fits with the requirements of those customers,

8  generally speaking.  And we believe there are several others

9  out there that have a similar footprint, and we hope that they

10  all come with loads of money to the auction.  But we have come

11  to the conclusion that it is not, at this point, possible with

12  respect to these particular assets to form a plan of

13  reorganization.  And I think the witnesses will make that clear

14  in their testimony.

15          So, as a result, Your Honor, what we're doing here

16  today is, as I said, a bitter sweet situation.  The debtors are

17  very proud of the assets that they've developed, the technology

18  that they've worked so hard on.  And the exercise that we're

19  going through is one of trying to marry a couple of different

20  things.  The right package of assets, the right purchasers, the

21  right point in time in order to maximize value.  There's lots

22  of other value that the debtors continue to have, and active

23  exercises are in place to make sure that value maximization is

24  going to take place with respect to all of those assets, as

25  well.

1         And, as I said, Your Honor, there is the requirement

2   that the Nortel entities remain supporting these businesses for

3   a fairly long period of time under the transition services

4   agreement.

5         So, in sum, that is the overall view of the

6   transaction that we're talking about here.  It is, again,

7   complex and complicated, lots of acronyms, and ultimately a

8   little bit tricky to negotiate and pull off.  But I have to say

9   that I think that the exercise that has gone on here has been

10  vigorous, and we certainly hope that the auction process that

11  we've put in place will yield proposals that will substantially

12  increase the bid that's on the table.  And we think that the

13  process is flexible enough to accommodate that.

14        So, with that as the overview, we would like to move

15  to put on our witnesses.

16        THE COURT:  Yes, please.  Thank you, Mr. Bromley.

17  Ms. Schweitzer?  Good morning.

18        MR. JUSTICE MOROWITZ:  Judge Gross, I'll just let you

19  know we are at somewhat of a disadvantage in the Toronto court

20  because we are not getting video of anybody with the exception

21  of you.

22        THE COURT:  Oh, that's terrible to look here.

23        MR. JUSTICE MOROWITZ:  I know they're trying to work

24  on it.  You're looking much better than you did a half an hour

25  ago.

1                    (Laughter)

2            THE COURT:  Oh, good.  I think I'm rallying here.

3            MR. JUSTICE MOROWITZ:  Good.  But hopefully we'll get

4  some improvement so that we can see both counsel and the

5  witness.

6            THE COURT:  Particularly with the witness.  I don't

7  know.  Is there a way to move the camera to the witness?  Okay.

8            MS. SCHWEITZER:  Your Honor, Lisa Schweitzer from

9  Cleary Gottlieb for the debtors.

10            THE COURT:  Yes, Ms. Schweitzer.

11            MS. SCHWEITZER:  Good morning.

12            THE COURT:  Good morning.

13            MS. SCHWEITZER:  I'm pleased to say we're still in

14  the morning.

15            THE COURT:  Yes.

16            MS. SCHWEITZER:  We have two witnesses that we'd like

17  to call today:

18            The first witness is Mr. George Riedel, who's the

19  chief strategy officer at Nortel.

20            And the second witness is Michael Murray, who's a

21  managing director at Lazard, an outside advisor to the debtors.

22            THE COURT:  Okay.

23            MS. SCHWEITZER:  So, if it would please the Court,

24  I'd call Mr. Riedel to the stand first.

25            THE COURT:  Yes, thank you.  Mr. Riedel?  If you will

Riedel - Direct                                    74

1  just remain standing, and will stand while you're sworn.

2          CLERK:  Please raise your right hand, place your left

3  hand on the Bible.

4              GEORGE RIEDEL, DEBTORS' WITNESS, SWORN

5          CLERK:  Please state and spell your name for the

6  record.

7          THE WITNESS:  George Riedel, R-I-E-D-E-L.

8          THE COURT:  Justice Morowitz, are you seeing the

9  witness in Canada?

10          MR. JUSTICE MOROWITZ:  No, we're not.  Apparently my

11  register has indicated that that function would have to be

12  controlled from your courtroom.  It's a question of the cameras

13  being available and pointed --

14          MS. MURIN:  I do have the camera on the witness, I

15  can see on my monitor.  I don't know why he's not seeing it.

16          THE COURT:  All right.

17          MR. JUSTICE MOROWITZ:  Well, we'll listen very

18  carefully.

19          THE COURT:  All right.  Thank you, Justice Morowitz.

20          MS. SCHWEITZER:  George, speak loudly because they

21  can't read lips today, so --

22                          DIRECT EXAMINATION

23  BY MS. SCHWEITZER:

24  Q   Mr. Riedel, could you state your position at Nortel?

25  A   Yes.  I'm George Riedel, I'm the chief strategy officer at

1 Nortel.

2 Q    And how long have you worked at Nortel?

3 A    About three and a half years, joined in February of '06.

4 Q    When you say you're the chief strategy officer at Nortel,

5 which Nortel entities are you employed by?

6 A    NNL and NNI.

7 Q    NNI or NNC?

8 A    NNC.

9 Q    Okay.  And what are your job responsibilities as chief

10 strategy officer?

11 A    I have five:  I look after corporate strategy, M&A,

12 business development, and strategic partnerships.  In addition,

13 we have a small incubation fund that we invest in new

14 businesses.

15 Q    Prior to February, 2006, where were you employed?

16 A    I was at Juniper Networks in a similar role.

17 Q    How --

18 A    VP of M&A and strategy.

19 Q    How long did you work at Juniper?

20 A    Three years.

21 Q    And what were your responsibilities there?

22 A    Again, corporate strategy, business development, and M&A.

23 Q    Okay.  Can you describe generally at Nortel, Juniper, and

24 more generally, what your experience has been with M&A

25 transactions?

Riedel - Direct                                                   76

1  A    Let me take it in two stages, Nortel first.  We've been

2  involved in both small acquisitions and divestitures.  The

3  largest divestiture would have been the 3G UMTS business to

4  Alcatel-Lucent in December of '06.

5         Prior to that at Juniper Networks, we had about nine

6  different acquisitions over a period of three years that I led.

7  The total value of those acquisitions would have been in the

8  billions of dollars.

9  Q    Can you give -- explain for us your general educational

10  background?

11 A    I have a B.S. in mechanical engineering from the

12 University of Virginia, and an MBA from Harvard University.

13         I then spent 15 years with Mackenzie and Company,

14 various strategy roles in both North America and in Asia.

15 Q    Thank you.  You're generally familiar with the sale of

16 assets to NSN that's being proposed today.

17 A    Yes, I am.

18 Q    What was your involvement in the process of negotiating

19 that sale agreement?

20 A    I led the business negotiations for that sale agreement.

21 Q    Before we go into the specifics of the sale agreement, I'd

22 like to talk generally about the CDMA and LTE business, and how

23 that fits into the Nortel enterprise.  Can you first just

24 describe the Nortel enterprise and the different divisions

25 within Nortel?

1  A      Think of it as a journey.  Nortel, as Mr. Bromley

2  mentioned, was an integrated entity that had both an enterprise

3  services and a carrier services.  Within the carrier business,

4  we have several different lines of business.  We have a

5  wireless business, CDMA and GSM are the two global standards

6  that that revolves around.  There's a carrier VoIP business

7  which sells voice technologies to large carrier customers.

8  Those are the two carrier businesses.

9            In addition, there's the optical business, which

10 sells Ethernet and optical transport technologies.  Those are

11 the bulk of the carrier assets in the company.  They represent

12 probably about 80 percent of the total revenue of the company.

13           In addition, there's the enterprise business, which

14 sells voice, data, and other applications to enterprise

15 customers.

16           And lastly, we have a joint venture interest in

17 Korea.  LG-Nortel, where we have a 50 plus one percent interest

18 in an operating with LG in Korea.

19 Q    When you talk about a carrier business and an enterprise

20 business, how does that overlay with the corporate structure of

21 Nortel and the different corporate entities?

22 A      Right.  The corporate entities have a responsibility for a

23 range of things.  There is a set of corporate functions,

24 finance, HR, strategy, operations and the like that are

25 matrixed to these some of these lines of business.  And so what

1 we've gone through is a process over time to disaggregate

2 these.  These businesses were once shared or shared functions,

3 whether it's in the global operations, whether it's in platform

4 development, whether it was in finance.  And as we launched the

5 plan late last year to create standalone businesses starting in

6 November, we've effectively tried to, if you will, carve up

7 these businesses so that they could be standalone entities

8 available for sale.

9         So, what that means is taking a sales function or an

10 operation function, mapping the people and the resources into

11 that line of business so that you could, in fact, present a

12 standalone entity to a prospective buyer.

13 Q    When you say "standalone entity," are you referring just

14 to a business that you can identify assets, and employees, and

15 contracts?  Or are you referring to that you actually took one

16 corporate entity and made it into two corporate entities?

17 A    No, it's the former.  I want to be very clear.  These are

18 global businesses, they cut across the entities that we operate

19 in.  The difference is now what used to be a matrixed,

20 interdependent set of organizational elements are now organized

21 differently.

22 Q    Okay.  So, for example, that you've referred to the

23 carrier business, and you've said within the carrier business,

24 there are these different sublines of the carrier business,

25 where it's the voice over Internet, protocol business, the LTE,

Riedel - Direct                                79

1  and the CDMA, and GSM, are those -- you've now disaggregated

2  those such that they could be sold separately?

3  A    That is correct.

4  Q    And when you say "disaggregated," are they completely

5  separate?  Or are there relationships that still exist between

6  the businesses?

7  A    There are still interdependencies on three fronts:

8         There are platform interdependencies where common

9  hardware elements are still shared across multiple businesses.

10        There are still operational supply chain

11  interdependencies.

12        And there are still some finance system

13  interdependencies to cut our costs.  We've tired to apportion

14  the costs and the activities as best we can, but there is still

15  some sharing of those different elements of costs.

16  Q    And can you just describe for us who don't live and

17  breathe the technology -- the telephone companies every day,

18  what is the CDMA business and the LTE business?

19  A    Let's start with the market.  CDMA stands for code

20  division multiple access, it's a way for multiplexing different

21  channel (indiscernible - feedback interference).  Effectively

22  it's wireless technology.  So, it's infrastructure we sell to

23  the major carriers, Sprint, Verizon as classic examples.  That

24  they run mobile services on, whether they're voice services or

25  data services.  So, we'll put in switching, we'll put in access

1  gear, we'll put in services to implement that that they run

2  their networks on.  It's not a consumer related service, it's

3  an enterprise, it's a corporate service sold to large mobile

4  carriers.  That's a business that is in decline.  The market

5  itself is (indiscernible - feedback interference) forecast

6  dropping somewhere between eight and 10 percent.  Our business

7  is declining more rapidly, in part because of the economy, in

8  part because of the filing.  But it's a business in decline.

9  It's a business that represents probably 18 to 20 percent of

10 the total wireless world.  GSM being the larger stand -- or GSM

11 and UMTS being the largest standing.  CDMA is a relatively

12 small piece of the total wireless spend, it's a market about $9

13 billion and change out of the total global spend of about 50.

14         It's in decline.  It's profitable.  It has a long

15 tail on the voice side.  The customers will continue to use

16 this technology for their voice services for quite some time,

17 particularly North America.

18         However, outside of North America, many of the

19 customers have moved to these other technologies.  GSM or wide

20 band CDMA as an example, which has been part of the reason why

21 this is a business that's been in decline for quite some time

22 for us.

23         Think of it as a legacy set of technologies that has

24 a long life in terms of the use in today's world being

25 transitioned to LTE.  LTE stands for long-term evolution.  It's

Riedel - Direct                                    81

1 a more efficient higher bandwidth technology that Verizon,

2 Vodafone, China Mobile and others have helped shape the global

3 standards on.  It's a substantial investment to develop LTE

4 technology.  We have been spending upwards of $200 million a

5 year in R&D on our own to develop that technology.  And it is,

6 I think, now finally seen as the consistent view where the most

7 of the wireless carriers want to take their next generation

8 networks.

9 Q    You had said that you have corporate clients, not

10 individual customers.  Someone like you or I wouldn't be a

11 customer of CDMA or LTE.

12 A    That's correct.  We'd be a user of a phone service, but we

13 wouldn't buy the equipment.

14 Q    So, it's the large telephone companies are your customers.

15 And when you say that this CDMA business is the declining

16 business, LTE is next generation, that's what people have

17 previously referred to as this 3G, third generation is the CDMA

18 and 4G is the LTE generation?

19 A    Just one clarification.  CDMA actually has a 2G element

20 and 3G element.  Not to go into techno babble, but there are

21 both 2G and 3G elements in the CDMA product line.  But LTE is,

22 in fact, the fourth generation.

23 Q    Okay.  And can you explain how Nortel or another

24 competitor would get a new customer contract and develop

25 customer relationships?

Riedel - Direct                                        82

1  A     Most of these large carriers go through lengthy trial

2  periods.  They go through different phases or stages.  They'll

3  start with lab trials, they'll go through technical trials,

4  field deployment trials.  They'll pick a short list of vendors

5  they want to bid with, and then over the next five, 10 years,

6  they'll deploy the networks associated by that.

7          In the instance of LTE, these trials have been

8  underway, certainly in North America.  Again, they're

9  coordinated with Vodafone and Verizon, trying to decide which

10 vendor they want to work with for the next decade for deploying

11 this technology.  Think of it as a -- roughly a two-year cycle

12 to go through the trials.  Two years, maybe two and a half

13 years.  And then an eight- to 10-year deployment.

14 Q     And where are we in the cycle of the 4G technology?

15 A     In North America, we're way into the commercial trials

16 now.  Perhaps the most seminal event occurred in February this

17 year when Verizon announced its decisions around the vendors it

18 wanted to deploy this LTE technology.  If I could go back a

19 bit, there were six vendors originally that were in the various

20 trials.  Three working with Vodafone in the European landscape,

21 three working with Verizon here in North America.  Of those

22 six, Verizon announced in February they were going to pick two

23 to go forward with.

24         The go forward means to start to deploy commercial

25 services in 2010.  And so they're on a very aggressive schedule

1  to finish, what they call, Phase 4 trials in order to get

2  commercial deployments in 2010 for a large part of their North

3  America footprint using the spectrum that they've invested in.

4          In addition, they're working with vice vendors and

5  ecosystem vendors to bring in the new services and handset

6  devices to the table so that when the infrastructure's

7  deployed, they actually have devices that can take advantage of

8  that.

9          So, it's a very aggressive schedule.  They're

10  probably leading the world in terms of the commercial

11  deployment in these technologies.

12          Followed right behind is other North American

13  vendors.  There's -- AT&T is also aggressively trying to roll

14  out LTE technology in a slightly shifted time frame, maybe it

15  will be 2010, perhaps 2011.  But it's a very significant

16  investment, and time, and energy and a commitment of capital

17  which would roll into the billions of dollars for these

18  companies over the next several years.

19  Q    And you've mentioned U.S. customers.  Can you describe the

20  global footprint or use of this technology, and also where

21  Nortel is present in the market?

22  A    It is used globally.  The majority of the business for us

23  in North America.  We have large customers in Canada, in the

24  U.S. certainly.  We also have some customers in Mexico, China,

25  parts of Eastern Europe, and the like.  But probably 80 to 85

1 percent of our business is in North America.

2 Q    You also spoke to the need to invest substantial amounts

3 of capital in the LTE technology to be able to compete in this

4 race to get to the next generation.  Can you speak to Nortel's

5 ability to commit that type of capital to the next generation?

6 A    One of our challenges, we're either Number 6 or Number 7,

7 depending on the league table you use, telecom equipment

8 provider.  So, sale in the R&D capacity is an important

9 challenge for us.

10       We have been spending near abouts $200 million a year

11 on LTE development.  We think we've built some fascinating

12 technology, the customers have given us very strong remarks on

13 that.

14       However, the combination of a limited balance sheet

15 and concerns about the ability to continue to sustain that

16 investment over the next, let's say, decade has basically given

17 significant pause on the parts of our trial customers who

18 effectively would say, love your technology, but we're

19 concerned about your economic viability to continue to sustain

20 that.  Therefore, we're going to choose other people.  And,

21 unfortunately for us, we will win the technology prize, but not

22 the commercial businesses.

23 Q    I'd like to go a little more into the decision to divest

24 the CDMA and LTE business before -- I'd like to just venture

25 off to a footnote for one second.  Which is that you've openly

1  discussed some of Nortel's customers in this space.  Is it --

2  would you describe the customer relationship as very open or

3  public?  Or is there a lot of confidentiality around the

4  contracts being entered into, and your customer relationships?

5  A    It's a bit of both.  We have a very good dialogue with our

6  customers, they're very transparent to us in terms of feedback.

7  But the contracts are, in fact, confidential in terms of --

8  under the terms that we've entered into them.

9  Q    And Nortel considers those to be sensitive commercial

10 information to the company?

11 A    That's correct.

12 Q    So, let's turn to the divestiture and the decision to

13 divest.  Can you describe generally Nortel's view and strategic

14 thinking around this business, starting with about two years

15 prior to the bankruptcy, and into the bankruptcy?

16 A    If you go back 18, 24 months, one of our challenges as we

17 looked down the road was substantial investment with uncertain

18 return, and it was driven by three factors.  We knew the dollar

19 value that we were going to have to spend in these 4G

20 technologies.  We knew what the competitors were spending.  The

21 ballpark number was in the neighborhood of 150 to $250 million.

22         The challenge was getting the return on that

23 investment, and it came from three reasons:

24         One is the global footprint required.  Again, we're

25 largely a North American player.  We haven't the strong

Riedel - Direct                                86

1  position that other large vendors have in Europe and Asia.  So,

2  our ability to recoup that investment without that footnote was

3  a difficult one.

4        Secondly was timing.  There was uncertainty about

5  these technologies would actually deploy, and how much of that

6  burn you have to continue to bear with some uncertain knowledge

7  of when the revenue would flow.

8        And then third was the customer feedback we gotten

9  which was, again, strong technology, concerned about your

10 balance sheet, concerned about your viability.  You, Nortel,

11 should be working with others to partner to help bridge that

12 gap.  Because you have strong install base assets, you have

13 strong support in terms of what you do for our networks.  But

14 we need you to work with others who have that kind of global

15 scale, who have that kind of ability to leverage the

16 technologies you develop more effectively.  And that began the

17 journey of discussions.  A journey of discussions which started

18 in earnest in the middle of '08 where we had a series of

19 discussions with -- again, go back to the six or so vendors

20 that Verizon and Vodafone focused on.  Each one of them we had

21 discussions with on their interest in partnering.  Partnering

22 is a euphuism, I'll granting you.  But the idea is there's some

23 form of consolidating transaction that would make sense.  The

24 specific nature of that was always unique to the conversation.

25        But was there an opportunity for us to combine our

1 footprint, our technology, and the other parties' interest to

2 build a stronger global scale player that would serve the

3 interest of customer respect.

4 Q    You made reference to your customers' encouraging you to

5 work with others or having their own vendors.  Are you

6 referring to strategic competitors of Nortel?

7 A    That's correct.

8 Q    And who are the major strategic competitors in this space?

9 A    Normally you think of six folks.  You think of Ericsson,

10 Nokia Siemens, Alcatel-Lucent, Motorola, Huawei, and ZT, and

11 us.

12 Q    And when you think of -- that -- looking into a potential

13 transaction, did your customers give you feedback on -- that it

14 had to be or they preferred any interest in strategic versus

15 financial investors to partner with?

16 A    The customers that we spoke with -- and, again, these are

17 largest North America customers, were quite direct.  That they

18 were very concerned about the ability of a partner who did not

19 have global scale, who could not help provide the long-term

20 support, both retain talent and deliver on the R&D end, which

21 was important to them, that a strategic vendor could only do.

22 Said differently, a financial buyer or a financial sponsor

23 would have challenges in their eyes to meet that same test.

24 How do I get global scale, how do I retain the talent, how do I

25 continue to support these networks long-term.  And it was their

1 confidence or comfort level that drove that decision to work

2 more closely with strategics.

3 Q    Just for the record, when you're referring to R&D, you're

4 talking about research and development?

5 A    That's correct.

6 Q    Have you, from time-to-time, gotten interest from other

7 parties in either merging, acquiring, or forming other

8 relationships on the CDMA and LTE business?

9 A    We have.  We've had a number of conversations, some

10 developed into meaningful dialogue, some were short and quick

11 where the combination of lack of desire or fit on the other

12 party's interest didn't develop into a more meaningful

13 conversation.  But for those that did, they understand the

14 business.  They've looked hard at it, in terms of the economics

15 and the technology transition, and customer base.  And I think

16 they're well equipped to assess the value of the asset.

17 Q    Can you give some of the reasons why strategic bidders

18 might not be interested in the business?  Or why it might be

19 more interesting to other strategic bidders?

20 A    Generally it would fit into two -- one or two categories.

21 Either they have their own financial constraint and concerns

22 that are impacting their ability to make big investments, big

23 decisions.  Or they've already gotten, if you will, the green

24 light from some of them, the major customers from a trial win.

25 So, if you've gotten from Verizon or Vodafone a indication that

1  you're already going to be a winner in some of these LTE

2  deployments, your appetite, your desire to spend more money to

3  acquire an asset is limited.

4         The third perhaps item is to gain trust.  If we know

5  we have a significant share in the North America CDMA market,

6  there are other players who have even a greater share.  I think

7  they would be concerned about whether that combination would,

8  in fact, pass muster on any trust issues.

9  Q    You've given us some color as to your strategic -- the

10 Nortel strategic thinking around the CDMA and LTE space prior

11 to the creditor protection filings in the U.S., Canada and

12 Europe.  Obviously none of those discussions or explorations

13 led to transaction because you still own the assets.  Can you

14 now turn to what the strategic thinking around the assets has

15 been since the bankruptcy and restructuring filings?

16 A    We ended up looking at two paths.  One was to continue to

17 go deeper into a couple of these strategic partners or

18 strategic competitor conversations.  Again, mindful of the

19 feedback we were getting for our large customers to see if that

20 made sense.

21        In addition, we did some analysis to decide could we,

22 on a standalone basis, develop a plan that made sense to our

23 customers.

24        Let me take the second one first.  The CDMA does have

25 a long tail, it's a profitable business.  We can see cash flows

1 that will be extending out to the many, many years in the mid

2 teens.   The challenge was the rate of decline that we were

3 seeing in that business.  Historically that business has been

4 dropping eight to 10 percent.  It's down 35, 37 percent this

5 year.  We are seeing attrition in that business, in our key

6 customer roles.  We basically had a financial model that looked

7 possibly interesting, but needed the affirmative support of our

8 customers.

9          And so we went to several of our largest customers

10 and said if we were to build this standalone plan, would you

11 support it.  And, again, they have grave concerns.  Grave

12 concerns about retaining talent, grave concerns about

13 continuing to stay in the high level investment they require.

14 And, therefore, were basically saying to us we will derisk our

15 plan if that's what you do.  We have other alternatives, other

16 options, and you, at your own peril, go down that path.  We'd

17 much rather you go back to the two or three vendors that we're

18 trying to work with you on to find a global answer to this

19 industry scale challenge and go back and, with vigor, revisit

20 the conversations you've had with these strategic vendors.

21 Which is principally where we focused on, which, hence, led to

22 the transaction we announced on the 19th.

23 Q    Okay.  Can you discuss how the transaction with Nokia

24 Siemens Networks evolved?  Where did you start?  What was the

25 timing?

Riedel - Direct                                    91

1  A     If you go back in time, we actually had our first

2  conversation with Nokia in April of '06 about this, before it

3  became know Nokia Siemens.  Then they obviously did that

4  merger, it took them a lot of time and energy.  Continues to be

5  an important activity to finish that integration.  In earnest,

6  we regained or rejoined these conversations in October of '08

7  where we sat down with senior management of Nokia Siemens about

8  putting the two businesses together.  That had a set of ups and

9  downs in discussions.  Then after the filing, it took on a

10 focused effort around when could we sit down and do something

11 that met the schedule of a major customer.

12         Part of the challenge here was -- I go back to

13 February 14th when Verizon announced their decisions for LTE

14 vendors.  We knew we were not going to be selected.  I think

15 Nokia Siemens had a hope that they would be selected on their

16 own.  It turns out they were not.

17         And as a result, the urgency for Nokia Siemens and

18 for us to address this solution to find a way to put a

19 partnership together that would meet the time line that

20 certainly Verizon and others were driving to get the deployment

21 of LTE networks.

22         So, since then, the focus has been on negotiating a

23 term sheet and exploring other options with other potential

24 bidders.  Nokia Siemens was clearly the most interested and

25 most engaged in that process.

1 Q    When you say February 14th was the monumental date, is it

2 -- everyone's now missed that window of opportunity?  Or it's

3 just important to keep staying on track?

4 A    No, there were two that were given an opportunity to start

5 the trials.  I think what Verizon said is that we would perhaps

6 consider a third, either because we wanted to have a chance to

7 see other options, or because derisking our two selections.

8 But there's a real premium on capturing the right footprint,

9 whether you call them the NFL cities or whether you call them -

10 - whatever you want.  But the volume associated with the

11 certain deployment is important.  So, getting, in a timely

12 fashion, a solution that Verizon could deploy into North

13 America is of paramount importance to Nokia Siemens.

14          As you may know, Nokia Siemens has had a strategic

15 challenge for building its business in North America.  Over the

16 next decade, while they've made some progress, I think they

17 would really admit that that remains one of their strategic

18 gaps, how do I become more relevant in North America.

19          If LTE is the next decade of relevance in North

20 America, without Verizon, without AT&T as part of that, that's

21 hard to see how that would work.

22 Q    And would other strategic bidders share that same interest

23 in getting in now versus waiting on the longer horizon?

24 A    You'd have to put it in two buckets.  If you were already

25 in one of those two who were selected as LTE trial vendors,

1 your interest is probably somewhat diminished.  If you are not,

2 then your interest will be how do I become part of that

3 solution.

4 Q    That would be an industry reason why it would be important

5 to pursue a sale at this time.  Are there other reasons unique

6 to Nortel, or as a result of this bankruptcy filing, that

7 caused this to be the right time --

8 A    Yes.

9 Q    -- to sell the assets?

10 A    Two reasons.  One was attrition.  The talent that we have

11 developed to serve and develop these products is quite special,

12 quite unique.  Historically our attrition rate is run in the

13 mid single digits, six, seven percent.  Post filing, now it's

14 in the mid double digits, 20, 25 percent.  And so you've got a

15 very talented workforce seen by the customers, which is

16 particularly important to any future, and attrition rates of

17 double digits, that's a significant concern in terms of the

18 value of that asset.

19         And secondly is customer support.  Our customer

20 support metrics has never been better.  The post filing

21 performance of this team is terrific.  But, again, another

22 attrition risk that as time goes on, the ability to retain

23 those people can continue to have them focus, but the uncertain

24 future is quite high.  So, attrition in either the R&D side or

25 on the customer support side are huge risks for both us and for

1  our customers.

2  Q    We've, throughout this discussion, been talking about

3  selling CDMA and LTE assets and how you broke apart Nortel's

4  business into these different business segments.  Is that a

5  clean boundaries to that such that every potential bidder is

6  going to look and say here's my pile of CDMA and LTE assets,

7  and we all agree what is in that pile, and what should be in

8  that pile, and what would be useful to us as bidders on these

9  assets?

10 A    Oh, if it were true.

11                          (Laughter)

12 A    The harsh reality is that for every one of these

13 conversations each of these perspective buyers has a set of

14 facts and circumstances that influence what they actually want

15 in the scope.  And so part of the journey is which customers,

16 which contracts, which platforms, which geography do you

17 actually fit in the scope.  And hence the need to have

18 flexibility to respond to the buyer side of the equation to

19 tailor a solution.

20          We set out a construct that we thought made sense

21 based on the logical buyer communities.  But, frankly, have

22 seen in every one of our dialogues, whether it's in this

23 particular asset or others, the need to tailor that solution

24 for the facts and circumstances of the buyer.

25 Q    Can you give a little color around that in terms of the

1  CDMA and LTE assets of how they interface with your other

2  business divisions and things that on the periphery might be

3  interesting to someone or necessary as part of a bid?

4  A    Sure.  Let me take a couple of examples to illustrate

5  that.  As I mentioned earlier, we have platform into entities

6  to cut across some of our businesses.  We have a hardware

7  platform that effectively runs the elements of the CDMA

8  business and the elements of GSM business, it's called the GE

9  core for our large North American customers.  A buyer could

10  quite well say I have a common platform, that I have a scale

11  advantages across all of these technologies and a common custom

12  base in North America, I might be interested in adding an

13  element of the GSM business to the bid, if you will, into what

14  I'd be looking for.  Similarly, we have a technology called

15  passport to just switching businesses that effectively cuts

16  across a number of our businesses, which is not in scope as an

17  asset sale here, but others have suggested an interest in

18  deciding whether that should be a scope.  So, those are two

19  platform examples of where folks would say I'd like the

20  flexibility because of what I'm interested in to add or modify

21  the scope of what I see here.

22  Q    Okay.  Has anyone expressed interest to date in buying

23  only the U.S. debtors' assets alone?

24  A    No, they haven't.  These are global businesses.  And the

25  combination of the IP, the platform, the customer support, the

1  sale that exists outside of North America.  Nobody has said I'm

2  only interested in North America.

3  Q    I'd like to turn a little bit to the bidding procedures

4  and the actual sale transaction that we're seeking to start a

5  process on today.  Are you generally familiar with the bidding

6  procedures that have been submitted to the Court for approval

7  today?

8  A    Yes, I am.

9  Q    And those bidding procedures provide for effectively a 22-

10 day window for bidders to put in qualified bids.  Do you have a

11 view as to whether that's a sufficient time to maximize the

12 value of the assets?  The value that can be obtained off of

13 these assets?

14 A    I do.  I think if you go back to the journey we've been on

15 in terms of having a dialogue with the leading industry

16 competitors who would be certainly representative of the

17 limited subset who have the most strategic rationale for doing

18 this, the value maximizing rationale.  They're familiar with

19 the assets, they understand the business, they know their

20 customers, they would be readily in the position, have either

21 already looked at it or quickly could look at it and decide in

22 that time frame to act.  I think if you broaden that circle and

23 say what about the rest of the buyer community being

24 interested, the business is 80 percent North America, the

25 contracts are few, there's a handful of customers that you need

Riedel - Direct                                        97

1  to sort of understand the revenue around.  That, too, is a

2  manageable task.  Is it aggressive?  Yes, but it's a manageable

3  task.

4  Q    Has an electronic data room been set up already?

5  A    It has.  An electronic data room has all the core

6  documents, all the history of the financials, all the ancillary

7  documents, and the like.  So, yes, all of that material is

8  readily available.

9  Q    And have other parties, other than Nokia Siemens Networks

10  already signed confidentiality agreements?

11  A    There have been, yes.  As a total of before -- seven total

12  have signed.

13  Q    And have other people, other than Nokia Siemens Networks,

14  been given access to the electronic data room already?

15  A    They have.

16  Q    How did you select the 22-day or 25-day or 27-day,

17  whatever we're going to call it, auction period, depending what

18  we're measuring off of?

19  A    Two things drove this.  I go back to the customer first.

20  They're on a very rapid deployment schedule.  And for Nokia

21  Siemens, that meant particularly a road map for integrating our

22  technologies into their platforms.  That was a key concern to

23  them.  That unless they could see a path forward to leveraging

24  LTE technologies into that road map quickly, the value

25  associated would just diminish.

1          Secondly, they were quite clear to us about the

2   financial implications of slipping months in the schedule.  The

3   CDMA business is profitable.  It kind of cash flow generated,

4   it was tens of millions of dollars a month, and they were quite

5   strong and clear that a delay in closing this transaction would

6   result in a reduction in purchase price.  And so a combination

7   of customer argument and a value diminution argument, their

8   interest and ours, was to find a solution that was manageable

9   to meet those constraints, but also fair to others who were

10  interested.

11  Q    When you say Nokia Siemens Networks expressed a view that

12  this business was throwing off cash, so another month closed,

13  another month that they missed cash coming in, did you get the

14  feeling that that -- or did they express any view as to whether

15  that would be a dollar for dollar reduction?  That you wait one

16  more month, that's 20 million less in their pockets, or 20

17  million less in your pocket?

18  A    There were two discussions.  There was an absolute

19  discussion and a formulaic discussion.  Both of them led to the

20  same conclusion.  Yes, you would see a dollar for dollar

21  reduction in the purchase price.

22  Q    And no more than that?

23  A    No more.

24  Q    That there'd be no secondary damages?  And do you think

25  that their interest would have declined, or that you would have

1  lost other value to the transaction?  Or were they perfectly

2  willing to hold out their bid for a longer -- a longer period?

3  A    I think -- again, I go back to their indication of the

4  customer and the financial, and from the attrition side, their

5  interest and the value of that asset to them would decline over

6  time quickly.

7  Q    And you had said that you were one of the primary

8  negotiators of the asset sale agreement, or the senior M&A

9  person on the transaction.

10 A    That's correct.

11 Q    And can you describe or give us all a flavor for how the

12 negotiations played out once you decided to engage with Nokia

13 Siemens to pursue an asset sale agreement?

14 A    Sure.  Think about this as having two tracks.  It was a

15 fairly vigorous set of discussions that took place in Cleary's

16 office for two and a half weeks in New York through a

17 combination of topics, whether it was on the main agreement,

18 whether it was on the ancillary agreements, whether it was on

19 schedules, the business aspects.  So, a fairly robust

20 discussion on all of those fronts.

21          The second track was briefing our constituents in the

22 process, real times or discussions with the Creditors'

23 Committee, the ad hoc bondholders, the UKA and the like about

24 where we were in the journey and what the issues were so that

25 they could understand this and other choices they had in front

1   of them.

2   Q    When you say the Creditors' Committee, you're referring to

3   the official Creditors' Committee appointed --

4   A    Yes, I am.

5   Q    -- in this case?

6   A    Correct.

7   Q    And the Bondholder Committee is the ad hoc committee of

8   bondholders that's been involved in these proceedings and in

9   Canada?

10  A    That's correct.  And UKA refers to the United Kingdom

11  Administrator or the Administrator appointed in the EMEA

12  jurisdictions?

13  A    Correct.  And I'd be remiss if I didn't mention the

14  monitor in Canada, too.  Sorry about that, Murray.

15  Q    Especially when he's on the camera, he would be horribly

16  offended if we forgot about Murray.

17       And without going into painful levels of detail, can

18  you give a flavor for the level of assets in the CDMA space and

19  LTE space that are involved in the Nokia Siemens bid?  Are they

20  taking everything?  Are they leaving some stuff behind?

21  A    Right.  So, they are not taking everything.  Let me do it

22  in two buckets.  Let me do CDMA and LTE.

23       CDMA, they are taking largely the North American

24  businesses, a set of assets in China, Mexico, and parts of

25  Latin America.  And that probably represents, in the aggregate,

1 | 85 to 87 percent of the CDMA business.

2 |         On the LTE side, they are taking several hundred

3 | people in Canada in our development organization.  But not any

4 | intellectual property associated with the patents, if you will,

5 | around the LTE business.

6 | Q    There's reference in the asset sale agreement to bundled

7 | contracts and other non-assignable contracts.  Can you explain

8 | what a bundled contract is?

9 | A    Sure.  Go back to the fact that Nortel is or has operated

10 | as an integrated entity.  Many of our suppliers are in multiple

11 | lines of businesses, whether they're on the IT side, whether

12 | they're on the operational side or the like.  So, a bundled

13 | contract for us is a supplier who we work with (indiscernible -

14 | feedback interference) or enterprise, or wireless, and the

15 | like.  And, therefore, our ability to assign that contract is,

16 | frankly, nonexistent.  We need to have that contract to

17 | continue perform business.

18 | Q    And the headline price for the sale and asset sale

19 | agreement is 650 million.

20 | A    Um-hum.

21 | Q    But it's subject to certain adjustments.

22 | A    Correct.

23 | Q    Can you walk through in general what that adjustment is?

24 | A    There's some small adjustments.  There's a small asset in

25 | China, it's a fixed value of two and a half million dollars.

1   Perhaps the more relevant adjustment is around working capital.

2   There were elements of the working capital that we were

3   transferring across as part of this transaction, not all

4   elements, but some elements.

5           And so the adjustments would flow from what you

6   estimated the balance sheet to look like at different stages in

7   time.   We had a view on the year end number.   We had a view on

8   the Q-1 number.   We have a view on what Q-2 will look like.

9   But in aggregate, there will be a true up of those adjustments

10  at the end of -- at a close.

11          I don't expect that adjustment to be material.   The

12  variances that we've seen in our working capital over each of

13  those different snapshots, year end, Q-1, Q-2 range in the tens

14  of millions of dollars.   It's quite possible there could be a

15  positive adjustment.   There could be a small negative

16  adjustment.   It wouldn't be material.

17  Q    In connection with the asset sale agreement, there's also

18  a contemplation that Nortel and NSN would enter into a series

19  of ancillary agreements.   Can you, just to the highest level,

20  explain the nature of those ancillary agreements and why

21  they're important to the transaction?

22  A    Probably two stand out the most:   transition services

23  agreement, or a TSA.   A set of services, again, supply chain,

24  IT, financial services, that any buyer is going to need to be

25  able to move from our system to their system, up to a period of

1  two years.  And so we've mapped out a schedule and a set of

2  services with them they would require and a cost to deliver

3  that.

4          The second ancillary agreement would be the IPLA, the

5  intellectual property licensing agreement.  In this, you

6  basically convey three things.  There are a set of patents that

7  will be assigned to the buyer, CDMA related patents.  There are

8  some licenses that are also going with that business for a

9  field of use.  And so part of what the IPLA does is describe

10 which patents to what licenses to what field it is.

11 Q    Are there any agreements around employees?

12 A    There is.  There's another agreement to basically help

13 facilitate the transition of some employees, I believe referred

14 to as the loaned employee agreement or transfer employee

15 agreement where for a period of time, not less than six months,

16 we would provide a set of services to help facilitate the

17 transition of those employees on to the Nokia Siemens' payroll

18 systems.

19 Q    And those ancillary agreements to date haven't been

20 publicly filed.  Would they be made available to any other

21 potential bidders?

22 A    Correct.  If you sign the NDA, they're -- would be

23 available through the electronic data room.

24 Q    Nortel obviously has decided to pursue or to select Nokia

25 Siemens Networks as the stalking horse bidder and to provide

1  them certain bidding protections, rather than to just hold

2  assets up for auction without a stalking horse bidder.  Can you

3  describe, based on your experience and M&A deals generally and

4  particularly in your experience in working with Nortel and

5  Nortel in this market why you decided to pursue an auction with

6  a stalking horse bidder?

7  A     Sure.  It gets a value risk.  A value risk is the person

8  who wants to be that stalking horse, and value in creating some

9  tension in the dynamics of the bid.  These buyers are spending

10 resources, they're extending reputation, they're spending a lot

11 of time and energy, there's a high opportunity cost.  They,

12 rightfully so, expect some level of protection as they put, if

13 you will, their foot forward to be a stalking horse.  It's

14 customary to have a model of the world where both expenses and

15 some break fee are part of that protection package.

16        In this particular situation, particularly around

17 post filing, the risks, I think, are even greater where the

18 concern about what am I getting, how do I get comfort on it,

19 are there issues that are unique to the post filing requirement

20 that I need to be mindful of.  And so it was our experience

21 through arm's length discussions with Nokia Siemens that the

22 model that we ended up negotiating, the break fee and the

23 expense reimbursements, was good practice for them and for us

24 to protect their interest and our interest.

25        I'd add to that the notion that it also helped bring

1 others to the table.  And that others to the table helped

2 create value for the creditors, the bondholders, the monitor,

3 and the like.

4         What we were able to observe in the process was a

5 significant change in the dynamics of the negotiations, i.e.,

6 tension gets induced into that negotiation as a result of this.

7 Q   I'd like to just respond to two of those points or ask you

8 follow-up questions.  First, you had referenced that there were

9 negotiations around the break fee and the bidding -- the

10 expense reimbursement.  Can you describe a little bit of what

11 the bid ask was or how you wound up on the protections that you

12 agreed to?

13 A   The bid ask sort of dealt with two topics.  The

14 circumstance under which the break fee was going to be paid was

15 primarily the bigger debate.  When, and how, and under what

16 circumstances.  It's not the amount itself.  I think we arrived

17 fairly easily to a number that made sense to both of the

18 parties.

19         On the expense reimbursement, there was a bit more

20 bid ask spread between what they wanted and we thought was

21 reasonable.   There was more arm wrestling around what would

22 make sense.  So, less so on break fee, more so on the expense

23 reimbursement.

24 Q   And expense reimbursement wound up, we agree -- you agreed

25 to three million -- or a cap up to $3 million --