1  A    Correct.

2  Q    -- in expense reimbursement.  But Nokia Siemens Network,

3  in fact, had asked for more than that?

4  A    That's correct.

5  Q    And how much had they asked for?

6  A    We talked about percentages.  The bid ask spread was -- it

7  started at one to five percent of expenses, we narrowed it down

8  $3 million to a cap.

9  Q    And then in terms of the break-up fee, you said that Nokia

10 Siemens Networks had asked for payment of a break-up fee in

11 more circumstances that you ultimately agreed to?

12 A    Correct.

13 Q    What was their initial ask with respect to the break-up

14 fee?

15 A    It was largely around timing as to when they would get

16 paid if there was a break-up fee, whether it was emergence of

17 an alternate bidder or other circumstances that create an

18 obligation on our part.

19 Q    Now, the size of the break-up fee is tied to -- it's a

20 flat number --

21 A    Correct.

22 Q    -- and you agreed to $19.5 million, and you've referred to

23 it as a three percent break-up fee.  Do you think it would be a

24 material different percentage of the final adjusted purchase

25 price for these assets?

1  A    No, I don't.  In the course of the discussions we went

2  through, there were gives and takes, back and forth around

3  adjustments.  But at the end of the day, where we ended up,

4  this would not be a material change.

5  Q    You testified to the fact of why Nokia Siemens Networks

6  would want a break-up fee or might even demand or require a

7  break-up and other bidding protections as part of their

8  willingness to play.  Where there -- what are the reasons that

9  it's important, in addition to the fact that you get them

10 willing to play, are there other reasons to Nortel that it's

11 important to have a stalking horse bidder or to engage someone

12 and be willing to pay these protections to them?

13 A    It's my experience that it enforces a discipline in the

14 auction process.  You have a benchmark, you have a forcing

15 function to shoot for.  And it creates better bid dynamics on

16 the other parties' part.  We saw this in the last week of our

17 negotiations with Nokia Siemens, we were having that desire to,

18 if you will, own that stalking horse position, it became a

19 particularly important variable in the calculus of these other

20 parties.  And so value then shifted hands in terms of those

21 discussions, and became better for our various stakeholders as

22 a result.

23 Q    When you -- you were making reference to other parties

24 that are -- their behavior was changed as a result of this

25 Nokia Siemens Networks pushing forward with a bid, are there

1  other potential bidders whose behavior changed as a result of

2  Nokia Siemens Networks pushing forward?

3  A    I'm sorry, could you repeat that again?

4  Q    Were there other potential bidders or strategic

5  competitors that changed their behavior once they heard that

6  Nokia Siemens Networks was prepared to --

7  A    Yes.

8  Q    And then what -- without going into confidential

9  discussions, can you give us some general flavor for what those

10 changes were?

11 A    It was a set of changes around both price and terms that

12 effectively put an interesting alternative on the table that

13 effectively became useful, as comparing that versus Nokia

14 Siemens' bid.

15 Q    And those price and terms weren't offered until you had

16 revealed to that bidder that Nokia Siemens Networks was out

17 there and --

18 A    We didn't reveal who it was.  We just said there was

19 another party that was well down the track, both in terms of

20 certainty and value.  That they had to up their bid.

21 Q    And do you think that there would have been different and

22 customer reaction if Nortel had announced the sale without a

23 stalking horse bidder?

24 A    I do.  Part of the experience here is dealing with

25 uncertainty, uncertainty for an employee, uncertainty for a

Riedel - Direct                                          109

1  customer, in a very difficult economic environment.  So, having

2  some sense of closure, even though there's a process still to

3  run, I want to acknowledge obviously the auction's still in

4  front of us, but having at least a stake in the ground, which

5  then sets in motion a time frame, has been hugely positive in

6  terms of the feedback from customers and employees.

7  Q   So, stepping back and realizing this is a negotiated

8  process then, do you have an overall view as to the

9  reasonableness of the bidding protections being afforded to

10 Nokia Siemens Networks?

11 A   I think they are very reasonable.  They're customary.

12 They're arrived at through arm's length negotiations.  I'm

13 quite comfortable where we're at on them.

14           MS. SCHWEITZER:  I have no further questions for the

15 witness.

16           THE COURT:  All right, Ms. Schweitzer.  Thank you.

17 Does anyone wish to cross examine?  Mr. Hodara?

18           MR. HODARA:  Thank you, Your Honor.  And before I do,

19 because, again, of the peculiarity of the procedural

20 arrangements, is it appropriate to inquire if Mr. Justice

21 Morowitz has questions for the witness?  Or shall I commence my

22 cross examination?

23           MR. JUSTICE MOROWITZ:  Mr. Hodara, you may commence

24 your cross examination.  I can also advise that we do now have

25 video of the witness.

1           THE COURT:  Oh, good.  All right.

2           MR. HODARA:  Good.  I'm glad to hear it's only of the

3  witness.

4           MR. JUSTICE MOROWITZ:  We've lost you, Judge Gross,

5  we do have the witness.

6           MR. HODARA:  Good.

7           THE COURT:  It's a relief.

8           MR. HODARA:  And, Your Honor and Mr. Justice

9  Morowitz, this will be very brief.

10                      CROSS EXAMINATION

11  BY MR. HODARA:

12  Q    Mr. Riedel, you are the chief strategy officer of Nortel,

13  is that correct?

14  A    Correct.

15  Q    During Mr. Bromley's opening comments, he made a comment

16  regarding strategy which I understood to say that part of the

17  sale process in considerations of the company of whether to

18  ultimately sell these assets and other assets is to conclude

19  the right mix of assets to include in any of the sales, did I

20  understand that strategy correctly?

21  A    Yes, you did.

22  Q    Is it fair to say that it would be appropriate or

23  beneficial in connection with the sale of Nortel's CDMA and LTE

24  assets that such sale might or might not include the specific

25  group of assets that have been included in the stalking horse

1  asset purchase agreement or asset sale agreement, and that in

2  so concluding, the estate might benefit from including these

3  specific assets, or some other mix of related assets?

4  A    Yes, I would conclude that the estate would benefit from

5  having the flexibility to deal with additional scope changes to

6  maximize value.

7  Q    Thank you, Mr. Riedel.  Is it your understanding that the

8  intent and the importance of Footnote 2 to the bidding

9  procedures goes to this issue?

10          MR. HODARA:  And that Footnote 2 for the parties who

11  are listening to this question says, "The debtors may entertain

12  bids through the bidding procedures for other assets besides

13  the assets, whether related to or unrelated to the CDMA and LTE

14  businesses."

15  A    That is correct.  That's the intent.

16  Q    One last question, Mr. Riedel.  Is there any preference or

17  prejudice of any kind that you're aware of on the part of any

18  of the Nortel entities or persons involved in the sale process

19  in favor of Nokia Siemens that would in any way favor them over

20  any other ultimate qualified bidder for these assets?

21  A    I'm not aware of any.

22          MR. HODARA:  Thank you.

23          THE COURT:  Good afternoon.

24          MS. FELDSHER:  Good afternoon, Your Honor.  I was

25  just checking my cell.

1        THE COURT:  Yes.

2        MS. FELDSHER:  Jennifer Feldsher from Bracewell &

3   Giuliani on behalf of MatlinPatterson Global Advisors, LLC, a

4   significant bondholder in these cases, Your Honor, just to

5   preface my later remarks.

6        THE COURT:  Thank you.

7                    CROSS EXAMINATION

8   BY MS. FELDSHER:

9   Q    Good morning -- good afternoon, Mr. Riedel.  I apologize.

10  Mr. Riedel, I, too, shall try to be brief.  I'll just ask a

11  couple of questions on what you testified to a few minutes ago.

12       Mr. Riedel, you testified that customers wanted to

13  see Nortel with more money and a stronger balance sheet, is

14  that correct?

15  A    What I said was that a greater balance sheet and a greater

16  ability to give them confidence that they could fund the next

17  generation investment, yes.

18  Q    Correct.  So, were Nortel to have more money and a

19  stronger balance sheet, that would be viewed favorably by your

20  customers, correct?

21  A    Necessary, but not sufficient.  Part of our challenge is

22  footprint and the ability to have global scale to recoup that

23  investment.  And so what effectively they said to us in a

24  number of different ways is, yes, if you had a better balance

25  sheet, that would be nice.  But, frankly, unless I see a global

Riedel - Cross/Feldsher                              113

1  footprint, you're still going to be subscale.

2  Q    Fair enough.  What if you had a financial backer that

3  provided you with a stronger balance sheet and more money who

4  partnered with a strategic, was that ever discussed with any of

5  your customers?

6  A    It was.  The key was to strategic.  We had a number of

7  conversations about if the financial sponsor, or some other

8  entity stepped up to bring the balance sheet, would that be

9  helpful.  And the answer was only in the context of having a

10 strategic integration.

11 Q    But there's nothing that prevents the financial --

12 A    Correct.

13 Q    -- backer from partnering with the strategic --

14 A    That's correct.

15 Q    -- correct?

16 A    That's correct.

17 Q    Also, just a related note, but it might be obviously

18 obvious.  There's nothing that prevents a financial player

19 partnering with a strategic through a Chapter 11 process as

20 opposed to a straight sale, correct?

21 A    That's correct.

22 Q    Thank you, Mr. Riedel.  You also testified that customers

23 were concerned that with a financial party coming in here, you

24 know, just a pure financial.  Just to clarify, the concern that

25 you expressed, that related to a financial player coming in as

1 | a buyer for these particular assets as opposed to Nokia

2 | Siemens, which is a strategic player, correct?

3 | A    That's correct.

4 | Q    Did any of your customers object to a financial party

5 | coming in as a sponsor for a Chapter 11 plan specifically?

6 | A    I'm sorry.  Could you say that again, please?

7 | Q    I apologize.  Did any of your customers object to a

8 | financial sponsor coming in to sponsor a Chapter 11 plan

9 | specifically?

10 | A    No.

11 | Q    Was that option discussed with any of your customers?

12 | A    It was discussed in the context of a standalone CDMA plan.

13 | If we were to have a standalone CDMA plan that had some

14 | independent status in terms of -- not aligning strategic, how

15 | would you -- forget whether it was sponsored by a private firm,

16 | or a bond firm, or somebody else, it was only in that context.

17 | Q    Correct.  But just to clarify, when you were speaking of a

18 | standalone, it was Nortel as it existed at that time that you

19 | were discussing it, correct?

20 | A    Not necessarily.  We were amenable to a range of different

21 | options if that business were to be spun off separately, that

22 | was also an option we explored with a couple of our customers.

23 | Q    Did you have any financial backer at the time, or

24 | financial party, waiting in the winds that your customers would

25 | have considered at that point?

1  A    No specific names.

2  Q    Now, you also testified that the business is down -- I

3  believe you said 37 percent since the commencement of these

4  cases.  Isn't it correct, Mr. Riedel, that a big portion of

5  that is because of delayed purchases and not lost customers?

6  A    Actually, no.  The Q-1 and Q-2 are ahead of the plan

7  relative to where we thought we had budgeted this business.  I

8  think part of the big challenge is customers in the aggregate

9  are spending less than they had planned for this year, in part,

10 due to the economy and in part due to our circumstances.

11 Q    But have you lost any material customers through the --

12 since the --

13 A    No, we have not.

14 Q    -- filing of the Chapter 11 cases?  You have not.  And do

15 you have any sense if the process were delayed a short two

16 weeks if you would lose any significant customers?

17 A    I don't think a two-week delay would cause a loss of a

18 significant customer, no.

19 Q    Thank you, Mr. Riedel.  Now, just a few more questions.  I

20 thank you for your indulgence.

21       You testified that Nokia Siemens has spent about a

22 decade trying to make in roads into the U.S. market, is that

23 correct?

24 A    That's correct.

25 Q    Again, is it your sense that if this process were delayed

Riedel - Cross/Feldsher                    116

1  a mere two weeks, that they would forego a decade's worth of

2  efforts here?

3  A    Hardly.

4  Q    I -- clearly that was a little bit of a loaded question.

5                        (Laughter)

6  Q    You also testified, Mr. Riedel, that most strategics could

7  look at these assets quickly.  But that's not the case with

8  financial players like MatlinPatterson, correct?

9  A    They would need more time, yes.

10 Q    Correct.  And not only would they need more time, but if

11 they were looking at not just the CDMA/LTE businesses, but

12 rather at the enterprise as it wholly exists, that would take

13 even more time, correct?

14 A    I'm sorry.  A clarifying question:  You say "the

15 enterprise," meaning --

16 Q    All of Nortel.

17 A    All of them.

18 Q    Your carrier --

19 A    Sure.

20 Q    -- your enterprise business, and any --

21 A    Yes.

22 Q    -- of your other assets --

23 A    Correct.

24 Q    -- that haven't been sold.  That would require more time,

25 correct?

Riedel - Cross/Feldsher                    117

1  A     Correct.

2  Q     In addition, and just to go back to your prior testimony,

3  did you speak to any of the strategic parties that were

4  involved in your initial shop process about possibly partnering

5  with a financial player?

6  A     Yes, we did.

7  Q     Any specific financial player?

8  A     We had a number of names that we had socialized with

9  various folks.  There was limited interest from the strategics

10 that we had talked to about bringing in financial sponsors.

11 Q     So, were MatlinPatterson Global Advisors to propose a

12 particular Chapter -- you know, to speak to the debtors about

13 proposing a particular Chapter 11 plan, they would need

14 significant time to negotiate with the strategics, correct?

15 A     I think you'd need time to negotiate with the strategics,

16 and I think you'd need time to get comfortable with talking

17 with the customers, too.

18         MS. FELDSHER:  Thank you, Mr. Riedel.  I agree with

19 both of those statements, and I'm fairly certain 22 days

20 probably wouldn't be enough time.

21         Thank you, Your Honor.

22         THE COURT:  Thank you, Ms. Feldsher.  Anyone else?

23         MS. MURIN:  We most likely lost the connection again,

24 but it should be -- it keeps coming up and down, but if you

25 want to wait just one moment.

Riedel - Cross/Clark                    118

1              THE COURT:  We'll wait a moment.  Let's wait one

2      moment.  Mr. Clark?

3              MR. CLARK:  Thank you.

4              THE COURT:  Good afternoon.  Why don't we wait just

5      one moment?

6              MS. MURIN:  It's coming back up.

7              THE COURT:  There you are.

8              MR. JUSTICE MOROWITZ:  Judge Gross, I think we're

9      back on.  But if there was any explosive testimony in the next

10     90 seconds, we missed it.

11                          (Laughter)

12             THE COURT:  I didn't notice when you dropped off,

13     Justice Morowitz.  But I think the explosive examination is

14     about to come from Mr. Clark.

15             MR. CLARK:  I was going to tell you the same thing,

16     Mr. Justice Morowitz.

17             I don't have very many questions.  Tony Clark of

18     Skadden Arps.  I'm here on behalf of Nokia Siemens, the

19     purchaser.  I just want to follow-up on some of the questions

20     from the bondholders' counsel.

21             MS. FELDSHER:  MatlinPatterson.

22             MR. CLARK:  Oh, MatlinPatterson.  Your questions

23     didn't bother me a bit, Mr. Hodara.

24                          (Laughter)

25                          CROSS EXAMINATION

1 BY MR. CLARK:

2 Q    The last lawyer up here made the point -- or asked you,

3 and you agreed, that a two-week delay, in your opinion,

4 probably wouldn't result in the loss of any significant

5 customers, is that correct?

6 A    Correct.

7 Q    But the longer it takes to close on the transaction, the

8 less of the CDMA's business revenues a buyer will ultimately

9 acquire, isn't that also correct?

10 A    Correct.

11 Q    And you said, did you not, that those revenues run to the

12 tens of millions of dollars a month?

13 A    The cash flow, not the revenues.  The cash flow one would

14 avoid on a month's slip is in the neighborhood of $30 million.

15          MR. CLARK:  Thank you very much.  No further

16 questions.  Thank you, Your Honor.

17          THE COURT:  Thank you, Mr. Clark.  Ms. Schweitzer,

18 anything in follow-up?

19          MS. SCHWEITZER:  Yes, I have a few redirects, please.

20                     REDIRECT EXAMINATION

21 BY MS. SCHWEITZER:

22 Q    Has Nortel come to the point where they've ruled out the

23 possibility that a financial bidder could bid such that they're

24 no longer willing to entertain such bids?

25 A    Not at all.

Riedel - Redirect                                    120

1  Q    And, in fact, has Nortel contacted any financial bidders

2  throughout this process to see if there was interest?

3  A    Quite a number, both before filing and after filing.

4  Q    You were asked questions regarding customer interest in

5  seeing Nortel reorganize around a plan, whether a standalone

6  plan or partnered with different financial strategic buyers.

7  Do you have an understanding as to whether a plan of

8  reorganization for Nortel's U.S. debtors could be confirmed by

9  year end?

10 A    I think it would be difficult at the extreme.  I go back

11 to the fundamental challenges that we've stared at to try and

12 do that, and it comes back to support from the customers,

13 attrition of talent, and loss of opportunity in terms of next

14 generation business.  And I think at least to this scope of

15 businesses, I don't see those fundamentally changing, i.e., it

16 doesn't get better, it gets worst.

17 Q    Has Nortel made an announcement with respect to strategic

18 plans for other divisions?

19 A    We have.  Two kinds of announcements.  We did announce our

20 intention to sell our interest in our LG Nortel joint venture

21 about a month ago.  And obviously on the 19th, we did indicate

22 that our intention was to -- given we were in accelerated

23 stages of discussions with other buyers for other assets, that

24 that, in fact, be our base plan is to sell the assets to the

25 highest bidders.

1 Q    And have you received, both before and after that time,

2 expressions of interest from potential acquirers for other

3 parts of the business?

4 A    We have.

5 Q    And Nortel's considering all options available to it at

6 this point?

7 A    Correct.

8 Q    Is it Nortel's intention to run all the sale processes

9 through these particular bidding procedures or not?

10 A    I'm sorry.  Say that again?

11 Q    Is it Nortel's -- in this Footnote 2 referenced to the

12 fact that you'd be willing to entertain the bids for non -- or

13 enter into bids that have non-LTE and CDMA assets involved with

14 them, is it your intention in putting forward these bidding

15 procedures that you would be effectively running their entire

16 auction process for your intention -- every Nortel business

17 through this auction today?

18 A    Yes.

19 Q    So, that if some -- are you looking right now for bids

20 for, let's say, Enterprise, and LG, and all these other things

21 through this particular bidding procedures?

22 A    Not through this particular bidding procedure.

23 Q    Okay.  And so what are these bidding procedures designed

24 to do?

25 A    Give flexibility to the buyer to allow them to adjust the

Riedel - Redirect/Recross                         122

1  scope of maximize value of the estate.

2  Q    And when you say "scope," you're talking around the CDMA

3  and LTE business specifically?

4  A    Correct.

5            MS. SCHWEITZER:  No further questions.

6            MS. FELDSHER:  Your Honor?

7            THE COURT:  Yes, Ms. Feldsher.

8            MS. FELDSHER:  Brief recross, unless somebody else --

9            THE COURT:  All right.

10            MS. FELDSHER:  Thank you, Your Honor.

11                         RECROSS EXAMINATION

12  BY MS. FELDSHER:

13  Q    Mr. Riedel, I just have one question.  You testified just

14  a moment ago that you -- through the bidding process, you and

15  the company are willing to entertain bids for a Chapter 11

16  plan, in addition to just a straight 363 sale, correct?

17  A    Correct.

18  Q    Is it your understanding that the current -- the bid

19  procedures, as proposed and filed with the Court, would permit

20  somebody to make a Chapter 11 plan proposal?

21  A    Yes.

22  Q    And for that proposal to be considered a qualified one?

23  A    I'd yield to our legal interpretation of the definition of

24  qualifying.

25            MS. FELDSHER:  Your Honor, actually if I may ask --

Riedel - Recross/Feldsher                    123

1  Q    I'm asking you your business decision.  You're considering

2  the proposals.

3  A    Yes.

4  Q    Is it your --

5  A    From a business perspective, yes.

6        MS. FELDSHER:  Okay.  Thank you very much.

7        THE COURT:  Thank you, Ms. Feldsher.  Well, I think

8  we have a considerable amount of time left here, and we still

9  have Justice Morowitz and Judge Walrath's Eddie Bauer matter.

10 Would it be appropriate for us to break in order to take that

11 now?  Those folks have been waiting quite a while already.

12       MR. JUSTICE MOROWITZ:  If it fits Judge Walrath's

13 schedule, that's fine with me.

14       MS. SCHWEITZER:  We're happy to entertain whatever

15 works for both of Your Honors.

16       THE COURT:  All right.  I think we should adjourn

17 this.  I don't know how long the Eddie Bauer matter is going to

18 take, but I had the impression probably not long, maybe an

19 hour.

20       MR. JUSTICE MOROWITZ:  I have some common counsel in

21 the room here.  Is there anybody here on Eddie Bauer that could

22 give a time estimate?

23       UNIDENTIFIED ATTORNEY:  I think probably an hour and

24 a half, Your Honor.

25       MR. JUSTICE MOROWITZ:  Boy, that's longer than what

1 was originally forecast.  They're now saying one and a half

2 hours.

3          THE COURT:  One and a half.

4          MR. JUSTICE MOROWITZ:  I think what I'm going to try

5 and do is find a colleague who might be prepared to volunteer.

6          THE COURT:  Okay.  And then we'll proceed with this

7 matter, in other words?

8          MR. JUSTICE MOROWITZ:  Well, perhaps we should take a

9 short break now, Judge Gross?

10          THE COURT:  Yes, let's take -- I'm thinking perhaps a

11 15-minute break.

12          MR. JUSTICE MOROWITZ:  All right.  We'll take a 15-

13 minute break, and I'll try to find a colleague.  Thank you.

14               (Recess 12:26 P.M./Reconvene 1:11 P.M.)

15          THE COURT:  Justice Morowitz, I think you've found a

16 replacement in the other case, is that correct?

17          MR. JUSTICE MOROWITZ:  I have found a replacement.  I

18 have an IOU list that's very long at the moment.

19          THE COURT:  All right.

20          MR. JUSTICE MOROWITZ:  But it's going forth, and

21 we're back, ready to go on this one.

22          THE COURT:  Ms. Schweitzer, are you prepared with

23 your second witness?

24          MS. SCHWEITZER:  Yes, I am, Your Honor.  Just to let

25 you know where we're going is that we have this witness, which

1  I expect to be a relatively short witness.

2              THE COURT:  Okay.

3              MS. SCHWEITZER:  And then after that, there is a

4  limited number of objections that have been filed.  Some of

5  them I think we can clear out as reservation of rights.  And

6  then there's two or three substantive objections that we can

7  take in turn, and then the end is near.

8              THE COURT:  Okay.

9              MS. SCHWEITZER:  Before that, we'll call Mike Murray,

10  who's the managing director from Lazard.

11             THE COURT:  All right.  Mr. Murray.  Thank you.  If

12  you'll stand while you're being sworn, sir.

13             CLERK:  Place your left hand on the Bible.

14              MICHAEL MURRAY, DEBTORS' WITNESS, SWORN

15             CLERK:  Please state and spell your name for the

16  record.

17             THE WITNESS:  Michael Murray, M-U-R-R-A-Y.

18             CLERK:  Thank you.

19                      DIRECT EXAMINATION

20  BY MS. SCHWEITZER:

21  Q    Mr. Murray, can you please tell us where you work and what

22  your job title is?

23  A    I'm a partner with Lazard, a managing director.

24  Q    And what are your job responsibilities at Lazard?

25  A    I am one of two senior partners in the firm that covers

1 the technology industry.

2 Q    How long have you worked at Lazard?

3 A    I joined in the fall of 2007

4 Q    What did you do before you were working at Lazard?

5 A    I was co-head of technology investment banking for

6 Deutsche Bank.

7 Q    How long did you work in that position at Deutsche Bank?

8 A    I was five years as group head, I had been at the firm for

9 13 years.

10 Q    Can you briefly describe your educational background?

11 A    I have a Harvard MBA and a Brown BA.

12 Q    When was Lazard initially retained by the debtors?

13 A    We -- we became restructuring advisor at the time of the

14 filing in January.  We had been working with the company for

15 some time prior to that.

16 Q    And what has Lazard's role been in the bankruptcy filings

17 and the related insolvency cases?

18 A    Restructuring advisor on all matters, and my particular

19 role is advising on the M&A side of the issues across the

20 businesses.

21 Q    And do you -- you mentioned Lazard versus you.  Do you

22 work with a team of personnel at Lazard?

23 A    We have a very large team on the Nortel case,

24 approximately 25 professionals.  In particular, I work very

25 closely with the vice chairman and co-head of our restructuring

1 practice, Terry Savage.

2 Q    And who at Lazard was involved in the development of the

3 asset purchase agreement in the CDMA and LTE space?

4 A    That was me.

5 Q    And did you consult with others in your group during that?

6 A    Yes.  Yes.

7 Q    Can you let us know your experience with distressed asset

8 sales, and particularly in telecom space?

9 A    Again, I've covered technology since the early '90's.

10 I've worked on, I'd say, at least 50 transactions in the space

11 over those years.  So, of course, I've been involved in some

12 distressed asset sales, but my space has been typified by

13 distress until fairly recently.  But I had sold -- and have

14 worked across from a number of the largest players in the

15 industry, including Cisco, Motorola, Alcatel-Lucent, and

16 others.

17 Q    Mr. Riedel, when he testified earlier, described that

18 Nortel went through a process of -- after the bankruptcy filing

19 of determining whether it was viable to pursue a standalone

20 plan, or whether it was a better decision to sell the assets.

21 Did you have any role in that decision?

22 A    We were quite involved in that, in that decision making

23 end analysis, I should say, including multiple presentations

24 before the Board and discussions with all of the business unit

25 managers with regard to their plans.

1  Q    And without giving away confidential discussions with the

2  company, did you have a view or conclusions based on your own

3  experience in consulting with other experienced folks at Lazard

4  as to whether a standalone plan or an asset sale was

5  preferable?

6  A    I did.  And I am in agreement with George's conclusions

7  and the company's conclusions that the standalone plan, in our

8  opinion and analysis, resulted in lower potential values versus

9  the ability to sell the assets today.

10 Q    Do you have a view on the affect of the bankruptcy on

11 operation of the company, in particular in the CDMA/LTE space?

12 A    I think it's affecting Nortel across its business units.

13 I think the decline in CDMA/LTE that we're witnessing this year

14 has been more radical than perhaps it otherwise might have

15 been, it's declining more rapidly than the overall market.  And

16 I think that's somewhat related to the company's financial

17 situation.

18 Q    Mr. Riedel also testified regarding his and the company's

19 views on whether now is the right time to sell the assets once

20 the decision to sell had been made.  Do you have a view, based

21 on your experience, as to whether his conclusions have merit?

22 A    Yeah.  I do find it compelling that decisions are being

23 made by major customers today with regard to their LTE strategy

24 and vendor choice, which leads me to believe that time is of

25 the essence.

Murray - Direct                                    129

1  Q    And once the company made the decision to pursue asset

2  sales, what did Lazard do to further that process?

3  A    We immediately staffed teams on the various business units

4  and began the process of outreach to the potential buyers of

5  each of them.

6         In this case in particular, we -- as Jim alluded to,

7  we contacted nearly 30 potential counterparties, including both

8  financials and strategics on all -- in all major markets.

9  Q    And then of those nearly 30 that you contacted, how many

10  of them proceeded to what we called the next steps in the

11  process?

12  A    Seven signed NDAs, four started, I would say, real

13  diligence or analysis of information, two in particular emerged

14  as motivated parties.

15  Q    Beyond the 28 parties that you contacted, do you think

16  that there are other obvious choices for partnering or for

17  acquiring the business that you would feel needed to be

18  contacted in addition?

19  A    No, I feel that we've been comprehensive.

20  Q    And what do you base that conclusion on?

21  A    My experience in the industry.  And I also would point

22  out, as George said, I regard the current processes really as

23  the culmination of 18 months to two years of work that's been

24  undertaken by the company in terms of exploring potential

25  options for the business.

1  Q    Mr. Riedel also had given testimony regarding the

2  likelihood that a strategic buyer or financial buyer would be

3  either well suited, better suited or better acceptable to

4  customers as an acquirer.  Do you have a view with respect to

5  the difference between strategic and financial bidders in this

6  process?

7  A    We have certainly heard that the large customers would

8  prefer a strategic buyer.  In fact, they've been quite specific

9  as to what kind of company, and which company in particular

10 they would -- which companies in particular they would prefer

11 as a buyer.

12 Q    Now, have you ruled out the possibility that a financial

13 buyer could be a successful bidder in this process?

14 A    No, we have not.

15 Q    What do you think their main obstacles would be?

16 A    I think that customer reaction would probably be at the

17 top of my list.  I think that that would be negative relative

18 to the perception of a strategic buyer.  And, again, this

19 business has a highly concentrated revenue base, customer base,

20 over 30 percent of its revenue, one major player.  So, that's

21 one.

22      Two, it's a difficult business to leverage because it

23 is in decline.  That being said, it is losing cash flow.

24      So, from a financial buyer's perspective, you could

25 put some limited leverage on it, but I don't think it would be

1  significant.

2         And George alluded to global scale.  I do -- I share

3  the view that that is a significant issue for this business.

4  Q    When you --

5  A    It's significantly smaller than the major competitors in

6  this market.  It's, I think, difficult for it to compete on a

7  global basis.

8  Q    When you say global scale being a significant issue, what

9  are you talking about?

10 A    Just breadth of resources around them, low revenue base,

11 customer base, and different geographies.

12 Q    You're saying the global scale of Nortel's business today?

13 A    Specifically CDMA/LTE, yes.  It's largely a North American

14 footprint today.

15 Q    And are you aware generally of the timing process set

16 forth in the bidding procedures that are proposed today?

17 A    Yes.

18 Q    And the bidding procedures proposed approximately or

19 exactly a 22-day period for potential bidders to submit bids,

20 are you aware of that?

21 A    I am.

22 Q    Do you have a view as to whether that's sufficient time to

23 bring in the highest and best bids for this asset?

24 A    I think it is.  Again, I view this as the culmination of

25 almost two years of work that's been undertaken to identify

1 potential counterparties in of the assets.  I think that those

2 that are prepared and able to bid are very knowledgeable of the

3 business.  That the data room is very well populated, I think

4 the information is there for those qualified bidders to see and

5 reach conclusions quickly.

6 Q    And are you generally familiar with the terms of the asset

7 sale agreement between Nokia Siemens Networks and Nortel?

8 A    Yes.

9 Q    What was your role in that negotiation process of that

10 agreement?

11 A    I worked very closely with George and the team on

12 negotiating that.

13 Q    Can you generally describe for us how those negotiations

14 went?

15 A    I would describe them as a four-month period of time with

16 several starts and stops.  I would describe them as, at times,

17 contentious, almost always vigorous.  And, you know, with the

18 culmination of approximately a two-week sprint that happened in

19 the past month with regard to finalizing the definitive

20 agreement.  We were also able, I would point out to, in my

21 opinion, significantly increase the value of the original offer

22 which came over in March.

23 Q    What parties were involved in the negotiations, to your

24 knowledge?

25 A    Well, certainly on our side it was George and his team at

1  Lazard, our representatives, Cleary on their side, it was

2  Citibank as advisor.  They also had M&A professionals from the

3  parent company of Nokia involved, as well as legal

4  representation from the parent company.

5  Q    Do you have a view as to whether the discussion -- the

6  negotiations were conducted at arm's length?

7  A    I certainly believe that to be the case.

8  Q    Do you have an opinion as to whether Nortel had special

9  preference for Nokia Siemens Networks over any other potential

10 bidders?

11 A    I don't believe that, no.

12 Q    Are you familiar with the purchase price adjustments

13 involved in the calculation of the final purchase price under

14 the ASA?

15 A    Yes.

16 Q    Can you describe that purchase price adjustment for us

17 very briefly?

18 A    The primary purchase price adjustment relates to the

19 delivery of working capital.  This was a negotiated point.  We

20 were quite successful, in my opinion, of lowering the peg or

21 target level to a level that we're extremely comfortable in

22 achieving.  I do not perceive there to be downside risk in

23 price as a result of that purchase price adjustment.

24 Q    When you say you don't perceive there to be downside risk,

25 you're saying that you expect the price to wind up flat or

1  maybe higher --

2  A    Yes.

3  Q    -- in the end?

4  A    I do.

5  Q    Do you have an opinion as to the reasonableness of the

6  value being offered by Nokia Siemens in their stalking horse

7  bid?

8  A    I consider it to be reasonable and fair.  Both in

9  comparison to standalone companies business capabilities,

10 producing cash flow, as well as in comparison to other bids

11 that we may or may not receive.

12 Q    Mr. Riedel had testified that he viewed that the

13 opportunity to realize value off of these assets would decline

14 over time.  Do you share his view that this is a wasting asset,

15 the CDMA and LTE business?

16 A    I do.  The revenues are clearly declining, that's seen in

17 the projections.  The cash flow, as well, is declining.  I

18 think most importantly, though, the company has an inability to

19 sustain the R&D required over the very long period of time to

20 effectively complete in the next generation technologies.

21 Q    Do you have any view as to whether you would characterize

22 this as a fire sale of assets?

23 A    I don't believe it to be.

24 Q    Why not?

25 A    Again, I think that we've had a very vigorous set of

1  negotiations with a very qualified buyer over extended

2  periods of time.  I think we've successfully moved the price up

3  and have reached a very reasonable and fair price for this

4  asset.

5  Q    Are you familiar with the bidding protections being

6  afforded to NSN in this transaction, and specifically with the

7  break-up fee and expense reimbursement provisions?

8  A    Yes, I am.

9  Q    And specifically there's a 19 and a half million dollar

10 break-up fee being offered and a cap of a $3 million expense

11 reimbursement, was there negotiation around these numbers and

12 the conditions in which they would be paid?

13 A    Yes, all of those were negotiated.  With regard to the

14 break-up fee, the 19 plus million is approximately three

15 percent of the in-line purchase price, which is in line with

16 precedent.  Very much in line with precedent.

17       We also negotiated the circumstances under which it

18 would be triggered.  Their original position was simply -- we

19 basically negotiated an alternative bidder had to be

20 identified.  That was not in the original position on their

21 side.

22       With regard to the expenses, there was a bid ask

23 spread of approximately one to five percent, in that range.  We

24 ended up at 3 million which, in my opinion, was a reasonable

25 outcome for our side.

1 Q    When you say that you determined that the three percent is

2 within market, what do you base your opinion on?

3 A    We track break-up fee levels very closely, as you might

4 imagine.  I recent reviewed a database that, I think, recent

5 transactions.  The average across those deals is 2.9 percent.

6 Q    Is there a financing out in this deal?

7 A    No.

8 Q    Do you have an expectation as to whether NSN has

9 sufficient capital lined up that they're able to close this

10 deal?

11 A    I believe that they do.  They recently completed a

12 refinancing of their bank facility, and they have very well

13 financed parent companies.

14 Q    In your mind, what kind of value is contributed to this

15 process and the debtors' ability to realize value off of their

16 assets through designating NSN as a stalking horse?

17 A    I'm sorry.  Could you repeat that?

18 Q    What's your view as to the value added to Nortel and the

19 value that it can receive off of this transaction by

20 designating NSN as the stalking horse?

21 A    I think it has brought value to the process, both through

22 NSN's involvement in the negotiations to date, but also the

23 announcement of the stalking horse bidder.  It gives other

24 potential creditors something to shoot at, it sets a baseline

25 value.  I think it's really healthy with regard to competitive

1  tension for our auction process.

2  Q    Has -- are you aware of customer reactions to the

3  announcement of the deal?

4  A    To a degree.  I believe they've been positive.

5  Q    Do you think there would have been additional risk to

6  auctioning this process if a stalking horse had not been

7  selected?

8  A    I think that -- yes.  I think that there would have been

9  potentially negative impact on a number of areas, including

10  employees where we have, as George mentioned, in suffering

11  elevated levels of attrition.  I think that having a stated

12  buyer, which is a very well known player in the industry, sets,

13  in my opinion, a level of stability for the business that

14  otherwise would have been at potential risk.

15  Q    So, taking the bidding process and the transaction as a

16  whole, are you reasonably comfortable this is in the best

17  interest of the company to pursue this course of action at this

18  time?

19  A    I am.

20          MS. SCHWEITZER:  No further questions.

21          THE COURT:  All right, Ms. Schweitzer.  Thank you.

22  Mr. Hodara?

23          MR. HODARA:  No questions, Your Honor.

24          THE COURT:  All right.  Ms. Feldsher?

25          MS. FELDSHER:  Thank you, Your Honor.

1                          CROSS EXAMINATION

2   BY MS. FELDSHER:

3   Q    Good afternoon, Mr. Murray.  Jennifer Feldsher again from

4   Bracewell & Giuliani.

5           Mr. Murray, you testified that you feel that you have

6   been comprehensive in identifying bidders for these assets, is

7   that correct?

8   A    That's correct.

9   Q    How many of the bidders did you identify were current

10  bondholders of Nortel?

11  A    I would say the ones that we contacted on the financial

12  buyer's side, none of them, to my knowledge.

13  Q    I'm sorry.  Could you say that?  None?

14  A    None.

15  Q    How many were pure financial bidders?

16  A    Of the 28 or so, eight are pure financial players.

17  Q    Okay.  And of the eight -- or of the 28, let's say, how

18  many were financial bidders and strategic partnerships?

19  A    There were a number of potential partnerships that had

20  been discussed along the way.  There was no specific financial

21  MPE firm partnership that was expressly set out with a bid in

22  mind.

23  Q    So, none.

24  A    Yes.

25  Q    Also, you testified that of the main obstacles you see to

Murray - Cross                                                    139

1  a financial player coming in and bidding for this asset is

2  customer reaction, which I think you said was --

3  A    Yes.

4  Q    -- one of the major ones.  And I'm just going to ask you

5  the same question that I asked Mr. Riedel.  Would a combination

6  of a financial player to bolster Nortel's balance sheet, along

7  with a strategic, help to assuage that customer reaction, in

8  your opinion?

9  A    I would say we're not averse to -- we don't rule anything

10 out in terms of a potential counterparty here.  So, yes.

11 Q    Thank you.  Also, with respect to the 22 days, you

12 testified, you know, that there is between today and the day

13 that bids are due, assuming that they -- you know, there's some

14 ruling today on the issue.

15 A    Right.

16 Q    You testified that anybody who is able and prepared to

17 bid, I believe were your exact words, would be able to under

18 that time frame.

19 A    I believe that to be true, yes.

20 Q    Do you believe -- are you familiar with MatlinPatterson

21 Global Advisors and their funds generally?

22 A    I am not, only with regard to this matter.

23 Q    Okay.  If I told you that MatlinPatterson was a large

24 private equity firm in New York, would you believe that a firm

25 like that could be prepared and able to bid for these assets?

1  A    I would say to the extent they understand the space, and

2  have gotten to know the company during the course of what has

3  been a very highly publicized process and procedure, yes, I

4  think they could be prepared to move that quickly.

5  Q    But isn't the diligence process supposed to be about

6  potential bidders and other outside parties getting familiar

7  with the space?  Isn't that the exact purpose of a due

8  diligence process?

9  A    Which is why we have an electronic data room that is

10 incredibly well populated with the information required to get

11 somebody intelligent about the business.

12 Q    In 22 days?

13 A    I think it's possible.

14 Q    Okay.  Would it be -- would you still think it was

15 possible if I told you -- and I'm going to represent to you --

16 that MatlinPatterson signed a confidentiality agreement last

17 Friday, but still doesn't have access to significant parts of

18 the data room?

19 A    I still think it's possible.

20 Q    Would you change your opinion if I represented to you that

21 -- actually -- excuse me.  Let me back up a second.  If you

22 were to sign an agreement for any of the other -- not you

23 personally.  But if Nortel was able to sign an agreement for

24 its other businesses, for example, the enterprise business, in

25 your opinion, would it be more likely than not that that

1  agreement would also contain a no shop provision in it until

2  the Court could rule on approval of bid procedures?

3  A    I do believe it more likely than not, yes.

4  Q    So, there is no assurance that even in the 22-day process

5  that you've laid out that there wouldn't be a period by which

6  MatlinPatterson or any other bidders wouldn't have access to

7  significant portions of your well populated data room?

8  A    You mean outside of CDMA and LTE?

9  Q    Correct.

10  A    That's true.

11  Q    Thank you.  You also testified that this is not a fire

12  sale, you don't believe that this is a fire sale.  And your

13  basis for that was that you negotiated extensively with the

14  buyer and successfully moved the price up.

15  A    Yes.

16  Q    And I obviously have no way to know otherwise, but I will

17  take you at your word.

18  A    Thank you.

19  Q    And I know the reputation certainly precedes you.  That

20  being said, would you not agree that in a real robust,

21  competitive process, that that price could go up?

22  A    I think that we've had a real competitive, robust process.

23  Q    So, then the auction is the fait accompli, you're not even

24  holding out hope for any better bids --

25  A    I very much am holding out hope.  I think we may see a

1  higher price result, and I think the auction process as

2  designed is sufficient to achieve that.

3  Q    Sufficient in that only those that have been involved thus

4  far would be able to come in and bid?

5  A    Now, again, as I said, I believe that we have structured

6  the information and the process such that even someone starting

7  from a standing start can get there in time.

8  Q    Unless they didn't have access to the data room?

9  A    Which is true --

10 Q    Which could be the case.  Right, which could be the case.

11 One final question, it's just something I asked Mr. Riedel, as

12 well.  Is it your -- you're familiar with the bid procedures

13 that the debtors are proposing be approved here?

14 A    Yes.

15 Q    Do you believe under those bid procedures that

16 MatlinPatterson, or any other bidder, could come in and propose

17 a Chapter 11 plan under those procedures?

18 A    I do believe from a business perspective, yes, I believe

19 they could do that.

20          MS. FELDSHER:  Thank you.

21          THE COURT:  Any redirect?

22          MS. SCHWEITZER:  No further questions, Your Honor.

23          THE COURT:  All right.  Anyone else?

24              (No audible response heard)

25          THE COURT:  Thank you, Mr. Murray.  You may step

143

1 down, sir.

2         MS. SCHWEITZER:  Your Honor, for the record, Lisa

3 Schweitzer.

4         I think that we've closed our evidentiary portion,

5 unless there's anyone else that wants to put on contrary

6 evidence.   I would turn to the objections that have been

7 filed.

8         THE COURT:  All right.

9         MS. SCHWEITZER:  So, there's been a handful of

10 objections and requests for clarifications and reservation of

11 rights in different forms.  What I would propose to do is take

12 some of the low hanging fruit and address that.  And then we

13 can give the more substantive some time.  And then we can --

14 NSN also wants to be heard on the different objections that

15 have been filed.  So, we'll -- the debtors and NSN will address

16 them after the objectors have had a chance to speak.

17         THE COURT:  Okay.

18         MS. SCHWEITZER:  So, to start with what I hope are

19 the more low hanging fruit, I may be able to be criticized for

20 my characterization, is the first that there was an informal

21 comment received from the Ontario government, which is a

22 representative for the pension in Ontario, the equivalent of

23 our PBGC type of representative.  And they just wanted

24 clarifying language added into the bidding procedures.  It

25 appears that in all of our efforts to conform everything, we

1  left out a reference to the fact that the Canadian court, as

2  well as the U.S. court, would have to approve the final sale

3  transaction which, of course, everyone's intended.  And we'll

4  modify the bidding procedures to account for that one

5  inadvertent slip.

6        THE COURT:  Very well.

7        MS. SCHWEITZER:  The second thing is there's a

8  property in Alpharetta, Georgia, and their landlord had

9  approached us informally regarding questions whether their

10 lease would be assumed and assigned, or assumed and sublet, or

11 subject to the sale transaction.

12       And in connection with that, the landlord had asked

13 for an extension of their time to object to the sale.  As you

14 may know, there's a two-step process that you object to the

15 contracts to the stalking horse bid, then you get a

16 supplemental objection deadline.  They've asked that they just

17 be allowed to file one objection, that they don't have to split

18 it, except for with respect to cure.  They'll respect the

19 original objection deadline with respect to cure, but all other

20 objections would be at the supplemental objection period.  And

21 we're fine with that.

22       THE COURT:  Okay.

23       MS. SCHWEITZER:  The next objection that was filed,

24 it was a limited objection, reservation of rights was filed by

25 FlexTronics.  FlexTronics, as you are probably well aware based

1  on prior motion practice before this Court, is a substantial

2  supplier to the debtors across their lines of business,

3  including with respect to CDMA, LTE, and they're one of the

4  holders of these referenced bundled contracts.

5           THE COURT:  Yes.

6           MS. SCHWEITZER:  So, FlexTronics had raised two

7  different points with -- first of all, it was more in the

8  nature of a reservation of rights with respect to the

9  substantive treatment of their contracts through the sale

10 process.  And I'd be happy for them to talk, if they feel the

11 need.  But we viewed that as more of substantive sale

12 objections, rather than procedural issues for today.

13          The second issue they had raised is that to the

14 extent that we intended to assume and assign the Flex contract

15 as part of this sale, that they wanted notice of that

16 assumption and assignment by July 1st, rather than by July 7th

17 wherein all other notices would be sent out.

18          Quite frankly, of course, we're going to work to get

19 notices out as soon as possible.  But as the objection reveals,

20 we have told Flex that there isn't currently any intention to

21 assume and assign the contract.  But I'm happy to say that for

22 everyone to be able to sleep at night if we were to change our

23 mind, then we'll change our mind before July 1st.  So, that

24 should hopefully address their objections and concerns.  But

25 I'll allow them speak if they'd like.

 1          I'm getting the high sign that I've actually

 2   characterized it properly.

 3          THE COURT:  Okay.

 4          MS. SCHWEITZER:  So -- and then I think there are

 5   three more substantive objections:  The Pension Benefit

 6   Guaranty Corporation, which I might characterize as a

 7   reservation of rights.  But I feel that it's worthy of letting

 8   them -- to have opportunity to speak on the record.

 9          And then there's an objection by MatlinPatterson, and

10   by the Creditors' Committee, and I know that the U.S. Trustee

11   has expressed some willingness to join or support some of the

12   issues raised in the Creditors' Committee objection.  So, I

13   propose to turn over the podium to the objectors at this time

14   and allow them to proceed forward.

15          THE COURT:  Okay.  Very well.  Who would like to be

16   heard first?  Mr. Hodara?

17          MR. HODARA:  Thank you, Your Honor and Mr. Justice

18   Morowitz.  Fred Hodara of Akin, Gump, Strauss, Hauer & Feld for

19   the Official Committee of Unsecured Creditors.

20          Your Honor, this is a limited objection of the

21   Creditors' Committee.  The Committee is strongly supportive of

22   what we understand through the testimony today and the

23   statements of counsel to be the chosen strategy of the Nortel

24   entities.  That is a strategy to engage in managed sales of

25   each of the asset groups of the company, and to engage in those

147

1  asset sales on a flexible basis.

2          The first of those sales, of course, is the one that

3  is before the Court today with respect to its bid procedures,

4  and that's the sale of the CDMA and LTE assets.  And so, again,

5  the Creditors' Committee is supportive of that approach, and it

6  comes to that support after more than four solid months of in-

7  depth analysis and review of the various options that are

8  before the company and their creditors.  Those options, of

9  course, included a potential standalone plan of reorganization

10  for these entities.  Those options included the potential of a

11  combination of a standalone plan of reorganization for certain

12  of the business groups or assets, and then sales of other -- of

13  the assets.  But it appears to the Committee, based on this

14  period of analysis, that the sale of all of the asset groups is

15  the right approach.

16          And so when we come today to the proposed bidding

17  procedures, we think that it is all the more important, and

18  perhaps more important than usual in looking at these kinds of

19  sale and bid procedures to make sure that we all, all of us

20  here in court today, our colleagues in Canada, are getting the

21  sale and bid procedures right.  Because these will be, if not

22  the template, certainly the model that the parties who are

23  looking at other assets of the company will review, and will

24  use as a starting point as the sale and bid procedures in the

25  forthcoming asset sales.

1        And so that's why we've identified six specific areas

2   of the bid procedures that we believe are problematic and

3   deserve the serious consideration of both this Court and the

4   Court in Canada.

5        We've laid out those six specific items in summary on

6   Pages 2 and 3 of our objection.  And they're not necessarily in

7   the order of importance.  I'm not sure exactly why we did it

8   that way.  But I will identify, as I go through, the nature of

9   each of the six and which of them we think are, in fact, the

10  most important.

11       The first one, the so-called matching right, is one

12  of the six that we think is of a critical nature.  It's not

13  unusual in bid procedures that there is a requirement that a

14  competing bidder, that is a bidder who's seeking to overbid the

15  stalking horse, reach a certain prescribed additional amount in

16  its bid in order for the bid to be recognized as a qualifying

17  bid.  But what -- and that is what the debtor has done in the

18  first portion of the procedures here.

19       But then what the bid procedures provide is that all

20  the stalking horse need do is match that bid, or substantially

21  match it.  Which we take to mean bid a dollar more, Canadian or

22  U.S. is unclear.

23       And so we think that it's essential that the same

24  obligations pertain to both the stalking horse bidder and any

25  other bidders that make a qualifying bid in the process.  We

1  think otherwise, there will be a slanting of the playing field

2  of an inappropriate nature toward the stalking horse.

3       The second area that we find objectionable is the

4  early notice of qualifying alternative bids to the stalking

5  horse.  As we read the procedures, as soon as an additional

6  qualifying bid is received, or I think the way to say it is as

7  soon as a bid is received that the debtor qualifies, that bid

8  must be turned over to the stalking horse.

9       In our experience, what's more common, and we think

10  more common because in keeping with the procedures here in

11  Delaware, and I can't speak to the procedures in Ontario, but I

12  suspect they would be similar, it's important that in dealing

13  with the competitive bids, they be handled in a careful manner

14  by the debtor to be vetted with Mr. Murray from Lazard, in this

15  case with the monitor, in this case with the Creditors'

16  Committee and the Ad Hoc Bondholders' Committee, and that the

17  bid not be prematurely shown to the stalking horse before it

18  can be vetted.

19       So, we have no problem with the bid ultimately being

20  shown to the stalking horse.  And in converse, as the stalking

21  horse, if it comes to pass, makes an additional bid, for that

22  bid to be shown to the other qualifying bidders.  But that

23  should all be done in a methodical process after the creditors,

24  the monitor, the debtors, of course, have had an opportunity to

25  properly vet the bid.

1          The next objection that we have to the bid procedures

2   is that the stalking horse is not required to have made a

3   deposit with its bid while the competing bidders will have to

4   make a deposit.

5          Now, we don't question the financial wherewithal of

6   Nokia Siemens.  But we do think, again, in order to keep the

7   playing field level, that if a deposit is going to be required

8   of alternative bidders, and we think one should be, that it

9   should also be required in a similar amount from the stalking

10  horse.

11         The fourth area of objection, due diligence access,

12  was actually the topic of some of the discussion on cross

13  examination from one of the other parties.  And we have been

14  assured, subsequent to filing our objection, that, in fact, the

15  data room is open and will be open to competing bidders.  So,

16  we believe based on the statements of Mr. Riedel today, and of

17  the debtors in speaking with us about this item, that this is

18  no longer an area of concern for the Creditors' Committee.

19         Obviously if there are diligence problems, bidders

20  have not been shy to come to the Creditors' Committee in the

21  past.  But typically, especially with this debtor, it has not

22  seemed to be a problem, and we don't expect it to be now.

23         The next item, I would emphasize, again, is one of

24  the more important of our objections.  And that is the terms on

25  which the debtors will be caused to pay a break-up fee in the

1  absence of an alternative transaction.  And there are several

2  instances under these procedures in which even absent a

3  successful alternative transaction, the break-up fee of a

4  considerable amount of cash would have to be paid.

5       So, for instance, the fee would have to be paid upon

6  enter into an alternative transaction even if that transaction

7  does not close.  And as we understand, for instance, the

8  O'Brien Energy ruling of the Third Circuit, and other cases

9  that have followed it, there needs to be a commensurate benefit

10 to the estate before the cash can be paid out in the form of

11 the break-up fee.

12      And we think that there needs to be the closing of

13 that alternative transaction before Nokia Siemens, as stalking

14 horse, would be entitled to receive the payment.

15      That's not to say that Nokia Siemens wouldn't be

16 entitled to be compensated in some manner for what it has done,

17 and that, in our view, is what the expense reimbursement of a

18 considerable -- several millions of dollars is in the bid

19 procedures to accomplish.  Of course, the hope would be the

20 alternative transaction would close.  Once that happens, we

21 have no objection to the amount and the payment of the break-up

22 fee that's proposed in these bid procedures.

23      Similarly, if NSN terminates the sale agreement to a

24 purported material breach by the debtors, which results in the

25 failure to satisfy any closing conditions, the break-up fee

1  would be required to be paid.  Again, we think expense

2  reimbursement satisfies that instance.

3         There are two others like this.  If the debtors

4  announce that they're going to liquidate the CDMA/LTE

5  businesses rather than sell them, and there are certain

6  scenarios where that could come to pass if, for any reason, the

7  process dragged out or otherwise, if that happens, again,

8  expense reimbursement should satisfy the stalking horse rather

9  than the payment of the $19 million in the way of a break-up

10 fee.

11        And then finally, if the debtors terminate because of

12 any of these very tight deadlines that we've heard about,

13 tight, but we think doable.  But if they're forced to terminate

14 because of missing those deadlines, that should not result in

15 payment of the break-up fee.

16        The final specific area of objection that the

17 Committee has is the potential for waiver of certain key

18 requirements of a qualified bid by the debtor -- by the debtors

19 without consultation or consent of the Creditors' Committee and

20 the bondholder group.  And just to make sure there's no

21 confusion, as I had myself when Mr. Clark made his comments

22 before.  The bondholder group, as we've generally referred to

23 in this case as the Ad Hoc Bondholder Group represented by the

24 Milbank firm, and not MatlinPatterson.  And so we think that it

25 is appropriate in keeping with the flexibility concepts that

153

1  we've talked about today that the ability to modify the --

2  certain of the key requirements.  But that needs to be done in

3  consultation with the consent of the other critical parties

4  that have taken part throughout this process.  So, those are

5  the specific areas of the bid procedures with which we have

6  concern and make objection.

7      The final comment that I'll make is with respect to

8  the scope of assets that is being sold here.  And just to

9  reiterate the point that was discussed between myself and Mr.

10 Riedel during his examination, Footnote 2 of the bid

11 procedures, we think, says it all, and says it appropriately.

12 And to be clear, it says, "The debtors' may entertain bids

13 through the bidding procedures for other assets besides the"

14 Capital A "Assets, whether related or unrelated to the CDMA and

15 LTE businesses."

16      So, if the debtors determine that it makes sense over

17 the course of this process to drop certain assets out of the,

18 capital A, Assets or to put certain other assets in, whatever

19 those assets might be, if they believe that makes sense, then

20 it's our understanding that that's within the scope of the

21 intention of these procedures.  And we think that's not only

22 appropriate but critical.

23      THE COURT:  All right.

24      MR. HODARA:  Thank you, Your Honor.

25      THE COURT:  Thank you, Mr. Hodara.  Mr. Tinker, good

1 afternoon.

2          MR. TINKER:  Good afternoon, Your Honors.  Patrick

3 Tinker for the United States Trustee.

4          Your Honor, my comments will be brief.  The United

5 States Trustee does support the arguments raised by the

6 Official Committee.

7          I don't have anything to add to that -- to those

8 arguments.  I would note that we did have other concerns that

9 debtors' counsel has addressed through the direct examination.

10          I do have the concerns raised by Creditors'

11 Committee.  Your Honor, last week I understand that Your Honor

12 indicated that you would allow us to raise these objections

13 informally --

14          THE COURT:  Yes.

15          MR. TINKER:  -- and I appreciate that.

16          THE COURT:  Yes.

17          MR. TINKER:  I think, Your Honor, to put it very

18 simply:  Our view is that a break-up fee and an expense

19 reimbursement is often times allowed because it can help you to

20 get to a good competitive auction.  And our concerns here today

21 are that some of the provisions in the bid procedures motion,

22 to the extent that they don't allow for an even playing field,

23 they are contrary to those goals.

24          And so, Your Honor, we are not objecting to a break-

25 up fee or expense reimbursement, per se.  We're simply

1 objecting to certain items as identified by the Committee.

2          THE COURT:  All right.

3          MR. TINKER:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. TINKER:  Your Honor, if I may be excused, I

6 actually have another sale hearing in five minutes.

7          THE COURT:  You certainly may, Mr. Tinker.

8          MR. TINKER:  Thank you, Judge.

9          THE COURT:  You bet.  Ms. Feldsher?

10          MS. FELDSHER:  Good afternoon again, Your Honor.

11 This is -- and Mr. Justice Morowitz.  This is Jennifer Feldsher

12 from Bracewell & Giuliani on behalf of MatlinPatterson Global

13 Advisors.

14          Your Honor, as you've heard earlier, MatlinPatterson

15 is a significant creditor in these cases.  It holds

16 approximately, if not more, than 10 percent of the total

17 outstanding bond debt of all of Nortel.

18          Your Honor, we stand before you unfortunately outside

19 of the process at this time, but we're not trying to upend the

20 process.  And I think that is critical to note.  We are not

21 trying to derail the debtors' sale process.  We are not opposed

22 to the debtors' sale process.

23          What we have asked here is for an opportunity to have

24 an open and full sales process.  My client, MatlinPatterson,

25 believes on the current information that it has that it can,

1  and will, propose a plan that will deliver more value to the

2  debtors' creditors.

3       That being said, again, it wants the process to go

4  forward.  We may very well be before this Court at the sale

5  hearing singing Kumbaya instead of Don't Stop Believing by

6  Foreigner.  But, you know, we're not there yet.  And all we're

7  asking for this Court and the Court in Toronto to do is allow

8  that process to be as fair and as open as possible.

9       To that end, we were heartened today to hear from Mr.

10  Riedel and Mr. Murray that they believe the current bid

11  procedures contemplate that a Chapter 11 plan could be filed.

12  And that that plan could serve as a qualified bid, albeit both

13  qualified their statements by saying they believe that to be

14  true on the business end.

15       We would obviously ask, and we have proposed language

16  which was appended to our response, that the debtors confirm

17  that that is, indeed, the legal case.  And that that language

18  be added just in order to preserve MatlinPatterson's, but also

19  any other creditors' ability here to propose a Chapter 11 plan.

20  And that plan -- Your Honor, just to be clear, we would propose

21  be subject to the same rigorous standards as all other bids in

22  this case.  And we're not changing any standards for it, just

23  rather that a Chapter 11 plan, rather than a 363 sale, could

24  serve as a qualified bid.

25       And just to highlight the point, Your Honor, the

1  reason there's some ambiguity is that in the bid procedures,

2  they require, as part of being a qualified bid, that a bidder

3  submit a sale -- the word "sale" is in there -- a sale

4  proposal.  And also that that proposal be on terms similar to

5  the current Nokia Siemens transaction.  Obviously that language

6  would not work.  So, we have proposed -- and, Your Honor, it's

7  very limited -- the addition of language that says very clearly

8  that it can also be by a Chapter 11 plan.  We believe that is

9  the right of all creditors here.  We believe there's been no

10 showing by the debtors that a potential transaction that would

11 involve a Chapter 11 plan should not -- should, at this point,

12 be foreclosed.

13        In addition, Your Honor, we stand before you asking

14 for a very, very short extension of the process.  This Court

15 has heard from Mr. Riedel, and we appreciate his candor, saying

16 anybody who has, up to this date, been outside of this process

17 would have a hard time in 22 days coming up with a fully vetted

18 bid for these assets.

19        And just to highlight the point, Mr. Bromley and

20 several of the other attorneys here, but I'm just going to cite

21 Mr. Bromley and, you know, imitation is the sincerest form of

22 flattery here.  Mr. Bromley started his remarks today by

23 saying, "This case has been about complexity and international

24 challenges."  Those were his words.

25        As an outsider, I hear those words, as do my clients.

1  And that says time, just need time to get the right transaction

2  here that maximizes value for all of the creditors.  That may

3  very well be the current transaction, maybe in a slightly

4  modified form.  But you need time to get the right one because

5  there is still value, we believe, to be achieved here, Your

6  Honor.

7          And so as late as yesterday, very late in the

8  evening, Your Honor, we were -- myself, MatlinPatterson

9  principals, as well as MatlinPatterson's financial advisors,

10  had very late conference calls yesterday, as well as throughout

11  this process since we heard about the sale.  We had originally

12  wanted to ask for an additional 60-day process because we do

13  think in a case of this complexity and size that that would be

14  fair and reasonable in these circumstances.

15          But in consultation with the debtors, and mindful to,

16  again, not upend this process, and in consultation with our own

17  advisors, we came forward with the bare minimum, 15 days.  Your

18  Honor, there is a impending holiday in the U.S. that will be

19  coming up, 22 days is not really 22 days.  You will lose people

20  for the July 4th holiday.  So, we asked for a bare two-week

21  extension, and really just to give people back what they're

22  going to lose because of the holiday.

23          For MatlinPatterson to propose a transaction here,

24  they will need to complete their due diligence, but they will

25  also need to speak to other creditors, to speak to strategic

1  parties, as Your Honor has heard from the testimony here.  We

2  are not challenging the debtors' reasoning in these cases or

3  the good faith judgment of the debtors that their customers

4  prefer a strategic.  All we're saying is give us a chance to

5  get there.  We might come in here and -- we might come to the

6  auction hand-in-hand with a strategic and provide the financial

7  backbone and strengthen the balance sheet or have a proposal to

8  do that.  All we ask is for the ability to try.

9          Now, Your Honor, Mr. Bromley mentioned, and I think

10  it's apt to highlight, that the 22 days is not so shocking in

11  light of transactions like Lehman, or Chrysler, I believe he

12  referred to G.M., although that -- the jury's still out on that

13  one.

14          Your Honor, one, I think it's a tough situation to be

15  in to argue that most 363 sales should proceed in accordance

16  with very extenuating cases of Lehman or Chrysler.  The entire

17  financial market does not hang in the balance of this

18  transaction, although I appreciate that it is significant to

19  the players that are here.  And I just want to make mention of

20  the fact that this is precisely not Lehman or Chrysler.

21          This company has not lost money since it has been in

22  Chapter 11.  In fact, by the most recent monitor's report, this

23  company has actually accumulated money.  It has consolidated

24  cash of $2.7 billion.  Asking for a short two-week extension,

25  an extension that Mr. Riedel testified likely will not cause

1  any harm to the business here, is, I don't think too much to

2  ask in order to ensure that bidders have enough time to

3  complete due diligence.

4        And while we've heard testimony from Mr. Riedel and

5  Mr. Murray that there is a runoff of this business because it's

6  a technology business.  New technologies come along all the

7  time, and we understand that.

8        The fact that it's running off business at this point

9  that is in a runoff period, at least as to the CDMA assets, may

10 be important to a strategic, but it might not be important to a

11 financial player.  The financial player can still achieve value

12 with those constraints.  And I think that's important to note.

13 That this is not -- the fact that the business is running off,

14 you know, its valuable technology will not prejudice a later

15 bid by a financial player here.

16        Your Honor, another point that I just wanted to

17 address is why now?  You know, why we waited until now to make

18 ourselves clear.  And I think that's worth a mention here.

19 Until a week ago, or slightly over a week ago when the debtors

20 filed the instant sale motion, we were under the information

21 that the debtors were considering all of their options.  In

22 fact, the debtors have publicly stated to this Court on

23 numerous occasions from the transcripts that I've been able to

24 review that they didn't know at the beginning of this case

25 which way this case would go.  And that they were going to

1 consider all of their options.

2          It was only when a little over a week ago, I believe

3 it was a week from Friday, the debtors filed their sale motion

4 that it became evident to MatlinPatterson, and I'm sure to

5 other players, that the debtors' current intention is not to

6 reorganize, but rather to sell off its assets in one off asset

7 sales.  And the reason I can say that, Your Honor, is because

8 what they're seeking to sell in this particular motion is the

9 historical heart of the Nortel business.  And I say that so

10 that that point is not overlooked.

11          There is no restructuring, Your Honor, once these

12 assets are sold.  There is no way to unscramble that egg.

13          And as a result, we believe that that dictates

14 caution, not haste, again, within the confines of the debtors'

15 business.  We are not asking for an extended additional period,

16 but rather a short one.  And we think that that is justified

17 given the severity and the significance of the transactions

18 that are being requested here today.

19          So, in short, Your Honor, just to sum up, we're

20 asking for two things:

21          The first is that the bid procedures be amended to

22 reflect what we have heard today.  Namely that a Chapter 11

23 plan can be proposed and would constitute a qualified bid, so

24 long as it met the other requirements in the bid procedures.

25 We're asking for a short 15-day extension of the process to

1  permit those bidders, like MatlinPatterson, who were outside of

2  this process up until now to be able to do their diligence and

3  propose an auction.

4          I find it wholly disheartening to hear from the

5  debtors or their professionals that they believe they've done

6  all that can be done here by their negotiations prior to coming

7  to this Court.  That is not a jab at the, you know, monumental

8  efforts they have undertaken.  To the contrary, we have no

9  qualms with what the debtors have done to date, and take them

10 at their word, and believe they've done a superior job.  But we

11 do believe that the whole process of 363 is you get to have

12 your stalking horse bid, then you get an auction process and

13 you come back at the end of that auction process when the

14 parties can tell the Court -- these Courts actually that we had

15 a fulsome, fair process, everybody could participate, and we

16 now know we have the best bid.  The current process would not

17 capture that because it would foreclose, and we've heard

18 testimony today, anybody who is outside of this process from

19 meaningfully participating in it.

20         We don't believe that is justified.  We don't believe

21 that is reasonable.  We don't believe that's the best way to

22 get to the most value here.  And, therefore, again, I close

23 with the Foreigner song, we have not stopped believing, my

24 client has not stopped believing.  We ask this Court to just

25 give us an opportunity to see if there is more value here to be

1 | achieved.

2 |          Thank you, Your Honor.

3 |          THE COURT:  Would MatlinPatterson be prepared to
4 | guarantee a minimum of $650 million?

5 |          MS. FELDSHER:  Excuse me, Your Honor.  Could you
6 | repeat that?

7 |          THE COURT:  Would your client be willing to guarantee
8 | a minimum of $650 million?

9 |          MS. FELDSHER:  I am -- I have been authorized to say
10 | in open court that on the basis and the information that
11 | MatlinPatterson has today, it believes that it is highly likely
12 | it will submit a bid of more value to creditors than the
13 | current $650 million bid on the table.  No qualifications in
14 | that.

15 |          THE COURT:  So, it would be willing to guarantee the
16 | $650 million for the extension of 22 days?

17 |          MS. FELDSHER:  I don't know if -- I don't know what
18 | you mean by a guarantee.

19 |          THE COURT:  If --

20 |          MS. FELDSHER:  It's not proposing to put in a cash
21 | bid.  It's proposing to reorganize this business, and the
22 | business is made up of more than just this -- the carrier
23 | business.  As you've heard, Your Honor, it's also made up of an
24 | enterprise business and other assets --

25 |          THE COURT:  Right.

1          MS. FELDSHER:  -- that are worth something, as well.

2   I can tell you that they are contemplating, and certainly would

3   like a bid on their own investment that will achieve value for

4   all creditors here well in excess of this bid.

5          THE COURT:  All right.  Thank you.

6          MS. FELDSHER:  Thank you, Your Honor.

7          THE COURT:  Thank you, Ms. Feldsher.  Good afternoon.

8          MR. MURRELL:  Good afternoon, Your Honor.  Vicente

9   Matias Murrell on behalf of Pension Benefit Guaranty

10  Corporation.

11         THE COURT:  Yes, sir.

12         MR. MURRELL:  And, good afternoon --

13         THE COURT:  Welcome.

14         MR. MURRELL:  -- Mr. Justice Morowitz.

15         Your Honor, PBGC is not philosophically opposed to

16  the sale of assets.  And it also appreciates that, you know,

17  the debtors are going to have to come back in front of Your

18  Honor for an allocation of the proceeds from the sale.

19         However, Your Honor, there's a fundamental problem

20  with the proposed bidding procedures and proposed sale order,

21  and that is that, Your Honor, the debtors are asking Your Honor

22  to approve the sale of assets that are not the property of the

23  debtors.  And, Your Honor, there's a long line of cases which,

24  you know, we cited in our brief in which many courts, including

25  this one, and most of the cases I cite, Your Honor, are

1  primarily from here.  And, Your Honor, I also would add to that

2  the Winstar case which, through oversight, was left out of the

3  brief.  That in which courts have held that in 363 sales,

4  nondebtor assets cannot be sold.  And the way these bidding

5  procedures are currently structured, Your Honor, you know,

6  nondebtor assets clearly are being sold.

7       A sale of nondebtor assets could end up with a

8  situation where state laws regarding, you know, fraudulent

9  transfers are, you know, are brought into play, as well as

10  possibly ERISA, you know, evasion of liability, you know,

11  facets.  And also the Code itself because if these entities go

12  bankrupt later on, these nondebtor entities go bankrupt which,

13  given the circumstances, Your Honor, and the fact that, you

14  know, where the business is going, could very well happen.  You

15  could have a situation with these current nonbankrupt debtors

16  than having to pursue the debtors or bringing actions for the

17  sale of assets that to them and essentially it would leave them

18  -- you know, and certainly that's what would happen because

19  what's being proposed would certainly leave them insolvent or,

20  at the very least, you know, marginally capitalized.

21       We think, Your Honor, that a solution for this would

22  be for the assets to be sold, you know, in a separate

23  agreement, Your Honor.  Not the way it's currently structured.

24       We don't think this is too burdensome, Your Honor, to

25  the debtors.  Right now, Your Honor, you will note that, I

1 believe, two Chinese subsidiaries or affiliates of the debtors,

2 Your Honor, are being sold in a separate agreement.  And, you

3 know, it doesn't take that much to carve out these non -- you

4 know, to carve out these non -- you know, these nondebtor

5 entities.  And certainly, as well, along with that the Court

6 should -- and we would ask that the Courts, since this -- since

7 nondebtors cannot be in front of the Court, that the nondebtors

8 be carved -- that the Court not issue any order, you know, free

9 -- you know, selling the nondebtor assets free and clear.

10 Because, Your Honor, that would just be an end run around

11 ERISA's joint and several liability that Congress has seen fit

12 to give PBGC and the Nortel Pension Plan, which has sponsored

13 or -- which is either sponsored by the debtors or which are --

14 to which the debtors are responsible for as members of its

15 control group.

16        PBGC would also ask, along with that, Your Honor,

17 that the bidding procedures be altered such that whoever is

18 taking the -- whoever is taking the assets be given the

19 opportunity to take plan assets, as well -- plan assets and

20 plan liabilities.  And that the debtor should then give a --

21 you know, should give a dollar-for-dollar credit for how much

22 is being -- for how much in plan liabilities and assets are

23 being assumed.

24        Your Honor, I would note that unlike any other

25 creditor in this -- in these cases, that PBGC -- reducing

1 PBGC's claim has a material affect on the amount of the -- on

2 the amount of recovery for the creditors in this case.  Because

3 unlike any other creditor, you know, assuming that, you know,

4 their claims are valued at whatever -- at the face value that

5 -- which they've been put in, even if it's sold, Your Honor, it

6 would take -- you know, they don't -- they still have that --

7 they still have that claim against the estate.  If somebody

8 assumes pension plan liabilities and assets, it would -- you

9 know, our claims are reduced by that amount.

10         And certainly, Your Honor, considering PBGC's joint

11 and several liability here, it would have a material affect on

12 the estates.

13         If there are no questions, thank you, Your Honor.

14         THE COURT:  Thank you.  Thank you.  Ms. Schweitzer,

15 are you going to respond to the objections?

16         MS. SCHWEITZER:  Yes, Your Honor.

17         If it is okay with you, I'd like to take them in

18 reverse order.

19         THE COURT:  Okay.

20         MS. SCHWEITZER:  To touch first on the PBGC concerns.

21 We understand the PBGC concerns.  We understand the PBGC

22 concerns.  We view these as issues that definitely need to be

23 dealt with at the time of the sale hearing and in selecting the

24 highest and best offer at the auction process.

25         I'd like to address a couple of the points in that we

168

1   agree that absolutely every buyer should have the opportunity

2   to take pension liabilities.  We'd love nothing more than for a

3   buyer to take all of the pension liabilities, and we certainly

4   would never stand in the way of an offer that considered any of

5   that.  And certainly we'd absolutely give buyers credit for the

6   assumption of PBGC liabilities, as with any liabilities.  And

7   the bidding procedures now make clear that assumed liabilities

8   are one of the factors that go into taking the highest and best

9   offer at the end of the process.

10          On the second point that he raised that with respect

11  to the proposed sale order, somehow asserting that we're trying

12  to get a free and clear 363(f) finding for nondebtor assets.

13          THE COURT:  Yes.

14          MS. SCHWEITZER:  This order could have been written

15  by a rabbi, or certainly interpreted by a rabbi, maybe.  It's

16  very complex, we've got a lot of defined terms.  But we were

17  trying, at least, to be very careful.  And I think we succeeded

18  in being very careful in making a distinction between assets,

19  the global collective assets being sold versus the purchased

20  assets which, you know, the term we picked, meaning the portion

21  of the assets relating to the U.S. debtors.  That the U.S.

22  debtors, as opposed to the global Nortel enterprise they've

23  conveying, we define as purchased assets.  And when you look at

24  Paragraph 21 of the sale order, it makes reference to the free

25  and clear findings, and elsewhere in the order, to be rapped up

1  in the purchased assets.  But certainly we've got almost a

2  month to go through and fine tooth comb this, and we're happy

3  to accept all comments on the sale order in the due course.

4          THE COURT:  Okay.

5          MS. SCHWEITZER:  On the proposal that we asked buyers

6  to offer separate agreements for the sale of nondebtor assets

7  and to change the bidding procedure requirements, I think, once

8  again, the enemy of the good might be the perfect here in that

9  we would love to have perfect process where we can do every

10  allocation, and not just for nondebtor assets but between U.S.

11  and Canada and any other jurisdiction.  We would absolutely

12  love to do that today and to be able to sell these as

13  disaggregated assets, and we'd love all this.

14          The fact is, as Mr. Riedel testified, that 80, 90

15  plus percent of the assets come from the North American

16  entities, come from the U.S. debtors and the Canadian debts.

17  And certainly in the NSN bid, it's relatively -- I don't want

18  to say de minimis, because I don't want to prejudice

19  allocation.  But in the grand scheme of things, it's not a

20  substantial portion.  And in some instances, it might be the

21  conveyance of employees or the conveyance of customer contracts

22  and the like such that the time and effort for a buyer might

23  just reject the offer that they're going to sign a separate

24  sale agreement.

25          As in NSN, there was a decision for various reasons

170

1  to make a separate sale agreement for China, but not for other

2  regions where there are smaller buckets of assets being

3  conveyed, sometimes maybe on the level of 10,000 or $100,000.

4  Again, not to put anything on the record that's prejudicial to

5  anyone on allocation, but just to give you an idea of the

6  flavor, could range from one or two contracts, all the way up

7  to a huge chunk of business.  And we recognize that these are

8  showings we're going to have to make later, issues we're going

9  to need to address at the time of the sale and getting anything

10 approved.  But for right now, we think that the bidding

11 procedures provide the flexibility that we need, and we're

12 aware that we have to approach bidders about addressing those

13 concerns.

14          With respect to MatlinPatterson's objection, I guess

15 maybe, again, we're in the world of the enemy of the good is

16 the perfect in that MatlinPatterson seems very sincerely

17 interested, and very active, and very willing to commit

18 themselves to this process, and to try and figure out the best

19 way for us to reorganized.  And we're enthusiastic to hear that

20 they're not trying to derail our sales process, and they really

21 hope and they expect that they'll be able to achieve a plan or

22 propose a plan that has more value to the debtors than the

23 current sale process.  And all we can say is I really hope

24 they're right.  I mean everyone in this room hopes they're

25 right.  So, maybe NSN, no, but everyone else in the room hopes

1  they're right.

2          And so the fact is is that up to this point, the

3  debtors, as the testimony came in, has spent a lot of time and

4  a lot of energy, and have had -- and unvariably large amounts

5  of advisors lined up across jurisdictions all over the world,

6  including counsel to the debtor, they have financial advisors,

7  and they have a monitor in Canada, they have administrators in

8  the UK, they have local insolvency proceedings filed in Europe,

9  they have nondebtors that need their own advice, and the

10  businesses are integrated in such a way that every decision,

11  particularly with respect to a plan of reorganization, has to

12  be vetted up and down that chain to make sure that you don't

13  just pick the best assets, or convey the best assets, or solve

14  for the high class problems.   That there are serious concerns

15  and, you know, when you work through a plan of reorganization

16  and that you can propose a plan that works for the whole

17  business.

18          Right now, the debtors, after a lot of talk and a lot

19  of consultation, and work with the Creditors' Committee in the

20  U.S., and an ad hoc bondholder committee that was formed at the

21  start of the case, that several bondholder participants who

22  have been actively involved in discussions, and actively able

23  to access diligence of the company, that with all those

24  professionals and people thinking very hard, and having a

25  common interest, we have reached the point where we said that

1  now is the time to sell.  And if we can get another plan

2  process in the next month, that's great.  But we can't wait for

3  that plan process.  And I'll let NSN address two weeks versus

4  three weeks versus whatever weeks, but from the debtors'

5  perspective, it's not just a matter about extending bidding

6  deadlines, it's about realizing the fact that we've made this

7  decision based on the information available to us, and our --

8  what we thought we had to do that we're committed to a sale

9  process.  And we're willing to entertain anything, but we can't

10  lose the sale process and the value that we're able to achieve

11  off of that in that hope.

12        That said, we have fiduciary duties.  We're

13  absolutely willing to entertain any bid that walks in the door

14  with or without the sale process.  I know folks have also

15  focused on this Footnote 2 of what assets are in or out, and I

16  think the answer on that, as Mr. Riedel said, is that the

17  process right now is focused on the CDMA/LTE business.

18  Different bidders might define that scope broadly, they might

19  define that scope narrowly, they might say they need more,

20  less, all of it, other assets.  We're here to start with the

21  CDMA/LTE business.  We're going to entertain the bids that come

22  in.  And with that footnote in general, we want to make sure

23  that we can maximize value and that we have the flexibility and

24  the optionality that enables us to maximize value on the time

25  lines proposed here and in other processes that are going on in

173

1  the parallel -- in the same time.

2        And I think that Your Honor did the cross examination

3  that I'm not allowed to do, and wouldn't do anyway maybe of the

4  asking of, you know, is this money for real.  And I think that,

5  you know, again, I hope it is.  I don't mean to doubt that it

6  is.  But I think that we do have to acknowledge then the

7  circumstance that even in that most unconditional statements,

8  it's the same that in the end, we realize that when we've

9  gotten under the tent, and we've gotten through the exercise,

10  they might, in fact, be singing Kumbaya and they might, in

11  fact, realize that we've all reached the same decision.

12        So, you know, I guess there's nothing more to address

13  on that.  The requests are rather small, and I'll leave NSN to

14  address -- you know, they're discreet in the bidding process.

15  I'll leave NSN's counsel to address, you know, this is their

16  bidding process.  I am proposing their process forward.  And

17  whether it's two weeks, that's one issue.  Whether it's a plan

18  that can come in, that's one issue.  But what we'll really have

19  to do is not lose sight from the debtors' perspective of doing

20  anything that will derail a willingness of an eager bidder to

21  show up and stay through the process.

22        Finally with respect to the objections of the

23  Committee that were seconded by the United States Trustee, I

24  think that we, once again, are in violent agreement that these

25  are precedential procedures.  And that, you know, of course, we

1 did our best.  Then we do recognize that any procedures

2 approved here would affect further auctions in the same way

3 that the Radware sale that took place early on in the case for

4 $16 million has now become, you know, the focus of attention

5 for a lot of people in saying that that somehow created

6 precedential effect, and we get that.

7 　　　　　But on the other hand, we're not in a hypothetical.

8 We're not in a bubble.  These were heavily negotiated

9 procedures, and they're complex, and they deal with different

10 jurisdictions, and with sensitivities all around the world to

11 answer to the needs of the monitor and the Canadian company to

12 show before their court, to keep enough flexibility in the

13 process for the debtor.  But also we feel that we have made a

14 very concerted effort to not only involve the Creditors'

15 Committee and the Bondholder Committee in this process, but to

16 actively and seriously consider their views, and to take them

17 into account in reaching the right conclusion because, after

18 all, we're doing this in order to maximize value for the

19 stakeholders of the company.  And we've tried in every way

20 possible to include them and consider them.  And with respect

21 to their key bidding requirements, even though they point those

22 out as things that they would like to be locked in time, what

23 the bidding procedures provide is for the different elements to

24 make someone a qualified bidder, including the ones that they

25 spotlight, which is that qualified bidders can't have financing

1  outs.  So, they have to have committed financing.  They don't

2  have diligence outs.  And conditions like that which, of

3  course, the debtors want.  And no one should be under the

4  impression that the debtors are going to ever waive that

5  lightly, and the Creditors' Committee want.

6         With all those key requirements, what the bidding

7  procedures provide is qualified bidders should plan to show up

8  with all of those requirements satisfied.  And the debtors, in

9  consultation with the Creditors' Committee, the bondholders,

10  and the monitor can make a decision in special circumstances to

11  waive those elements.

12         But there's -- no one in this courtroom should be

13  under the impression that the debtors would waive those lightly

14  or just that they're somehow vaporous.  We intend to hold

15  everyone to those standards and we intend, if we were to waive

16  them, to consult with the Committee.  So, we're not really

17  fighting about anything other than disagreement, whether the

18  Committee gets consultation rights or consent rights to that

19  process.  And where we come down on that is that we do have to

20  finalize -- we have to have a smaller universe of people that

21  make decisions in the end, that can make decisions in real

22  time, and we think our interests are aligned enough and that

23  the debtors should be allowed to have some control of the

24  process such that consent right -- that consultation rights are

25  satisfactory and the Committee, on that particular issue,

1 doesn't need consent rights for the waiver of those key bidding

2 requirements.

3       To go through the other bidding procedure elements

4 that Mr. Hodara raised.  I think, you know, again, I stand in

5 front of you as debtor counsel, and I'd love to say that the

6 purchaser has gotten no special provisions, that they don't

7 have any matching rights, and that they're going to pay all the

8 break-up -- the deposits, and they're never going to get paid a

9 break-up fee.  That's not the world we live in.  It's not the

10 practice in debtor cases.  And certainly that, you know, it's

11 always a give and take of negotiating of whether -- how many

12 rights a purchaser is going to get compared to other people.

13       We, the debtors, don't feel that these processes that

14 the Committee has spotlighted unduly shill bids, or that they

15 give the purchaser a strategic advantage in the process.  With

16 5 million -- to pick them down in the list, with respect to the

17 $5 million bid increment, other bidders would be required to

18 make the bidding in $5 million increments.  The purchaser would

19 be -- have the right to match.  But, again, the debtors, in

20 their discretion and consultation with all the right people,

21 have the right to alter the bidding increment such that if we

22 thought that there was an injustice being done, we could

23 address that, and we do keep that flexibility.

24       Also, with respect to the sticker price that we're

25 starting with, a $5 million bid increment is quite low, and

1  that was a negotiated number.  So, that the relative prejudice

2  is quite small compared to the size of the headline price that

3  we're talking about.

4          The second point on the early notification of

5  qualified bidders.  That all bidders would get copies of the

6  starting bid at auction.  Every bidder is going to know when we

7  get to the auction what the starting bid is that that have to

8  shoot against.  And the purchaser insisted in also getting

9  copies of all qualified bids, which would be people able to

10 participate in the auction, but they wouldn't be the starting

11 bid.  They wouldn't be the effective auction stalking horse.

12         And to Mr. Hodara's concern that he didn't want to

13 make it a situation where the purchaser was getting that bid

14 before it had been vetted by the Committee, there is -- I

15 acknowledge the bidding timing is tight, but there is a 24-hour

16 process.  And that the -- that we, the debtors, in

17 consultation, again, with the Committee and everyone else, have

18 to first make a determination that a bid does, in fact, qualify

19 as a qualified bid in order to get them in the door.

20         So, on balance, you know, it's just a factor that got

21 in there.  I'll let NSN explain to you the importance of these

22 different factors but we don't, as debtors, view it as so

23 highly prejudicial or shilling of the bidding process, or that

24 it would be detrimental to our process to let NSN see that.

25         On the lack of a good faith for the stalking horse

1 bidder.  I can tell you we asked.  I can tell you we asked over

2 and over and over again.  And I can tell you the entire

3 discussion around the good faith deposit by any bidder was a

4 contentious discussion on all sides of the table because there

5 are different issues, and different jurisdictions, and between

6 the seller and the buyer.

7        But, quite frankly, this is a point where it's just

8 not a level playing field.  It's just not.  The stalking horse

9 comes in and they take the position that they're going to hold

10 their bid open and that they're going to tell everyone their

11 homework through making public their asset purchase agreement.

12 And so that's where they're at risk.  And, in fact, maybe

13 they've put more at risk than a five percent good faith

14 deposit.

15        So, again, we negotiated.  But we don't view that as

16 really that it's something necessary to be required in order to

17 level the playing field because they've got enough skin in the

18 game to make sure that they're committed to this, and that

19 they're at risk, as well.

20        And finally on the payment of the break-up fee for --

21 in the absence of an alternative transaction.  I think that,

22 again, to start with, that this was, as you heard testimony

23 today, this was a highly negotiated provision.  And, of course,

24 the buyer wanted a break-up fee every single time that this

25 deal wouldn't go through.  We said, we never want to pay your

179

1 break-up fee, and we worked, and went back and forth.

2          But when you step back, the break-up fee here
3 basically gets paid when we decide we no longer want this
4 process.  If we're in this process, and we're seeking to get
5 this bid confirmed, we don't owe that break-up fee.

6          But if we decide that we don't want this process, or
7 we breach our sale agreement.  And when I say "we don't want
8 our process," it's because we've gotten an alternative
9 transaction actually approved by the courts, not just saw, but
10 we actually have gotten the alternative transaction approved in
11 U.S. and Canada, that's when the break-up fee would be paid by
12 the debtors.

13          If we fail to miss milestones in the case by getting
14 orders entered in time, and we, the debtors, decide to
15 terminate the asset purchase agreement as a result, then we
16 have to pay the break-up fee.  If we say, look, we're totally
17 willing to press on and you, purchaser, may not be, then they
18 might get expenses, but they're not going to get their break-up
19 fee.

20          So, basically the negotiation was that if we are the
21 ones that are walking away, either through a breach, through
22 pursuing another sale, or just walking away from the process
23 generally, that's when we owe the fee.

24          And as you heard, the number is, you know, in the
25 scheme of things from people who don't want to pay money, it

1 is, you know because who wants to pay money, that three percent

2 isn't the highest number that's -- you know, it's in the range

3 of reasonableness, and we really negotiated back to the point

4 of saying that we felt we could commit to the process and that

5 we were willing to put money at risk if we changed our mind and

6 we wanted to walk away.

7          So, I think that's where we're at as far as

8 addressing the Committee's concerns.  But I do want NSN to be

9 able to speak because I know they had an interest in addressing

10 some of these concerns, as well.

11          THE COURT:  All right.  Thank you.

12          MR. JUSTICE MOROWITZ:  Judge Gross, just before we

13 continue, the court's been sitting now for a considerable

14 length of time.  I would expect that some people in the

15 audience may like a five-minute comfort break, if nothing else.

16          THE COURT:  I think that's fine, Justice Morowitz.

17 Why don't we take a 10-minute break?  It will give Mr. Clark a

18 chance to get his thoughts together even more.  We'll be back

19 in 10 minutes.

20          MR. CLARK:  I might talk longer if I've got longer to

21 think about it, Your Honor.  Thank you.

22          (Recess 2:30 P.M./Reconvene 2:42 P.M.)

23          THE COURT:  Mr. Clark.

24          MR. CLARK:  Good afternoon, Your Honors.

25          THE COURT:  Good afternoon.

1    MR. CLARK:  Thank you for your time and your patience

2 here.  I'm going to say something that is almost never true

3 when it comes out of a lawyer's mouth, and I'm going to try to

4 make it true today.  I will be brief.

5    THE COURT:  Okay.

6    MR. CLARK:  Let's see if I succeed at that.

7    Your Honor, many of the objections that have been

8 made we simply don't take a position on one way or the other.

9 Either they're the debtors' issues or they become moot, or

10 they're really something for the sale hearing.  I'm just going

11 to focus on the few that we do really care about.

12    One objection we actually strongly agree with.  It

13 was an objection that the U.S. Trustee had communicated over

14 the weekend in their informal e-mail to the parties, but didn't

15 mention it here today, and that was an objection to Footnote 2

16 in the bid procedures.  The footnote that says that the debtors

17 can consider bids for assets other than those included in our

18 bid at the auction.

19    Now, Your Honor, that's plainly okay if what we're

20 talking about are nonmaterial assets.  If somebody else comes

21 in and wants to buy the same business as we're buying, but they

22 want to pick up a couple, three small dollar contracts that,

23 for some reason, we're not interested in, that's obviously

24 fine.  But if the debtors want to take bids on -- and sell

25 other material assets, hundreds of millions of dollars worth of

182

1  assets, then those should be done pursuant to separate

2  procedures with respect -- with appropriate due diligence and a

3  separate auction so that all bidders, including my client,

4  Nokia Siemens, can know what assets they're bidding for and at

5  what stalking horse price.  That's the only thing, I think,

6  that makes sense here.

7  　　　　　With respect to the few objections that we really do

8  strongly care about, Your Honor, these are objections that are

9  frankly flatly inconsistent with the deal we negotiated with

10  the debtors.

11  　　　　　First of all, there's the objection to the Committee

12  with respect to a deposit.  The fact that competing bidders

13  have to put up a five percent deposit, five percent of their

14  bid as a deposit.  But that Nokia Siemens doesn't have to do

15  that.

16  　　　　　The purpose of a deposit, Your Honor -- well, one

17  purpose is to make sure that you've got the financial

18  wherewithal to do a bid.  But Mr. Hodara has already conceded

19  that we have that.  So, that's not the purpose to be served

20  here.

21  　　　　　The other purpose is so that for such a substantial

22  deposit is to show that the bidder is a bona fide bidder.  And

23  Nokia Siemens has already done that by expending a substantial

24  amount of time, energy, and money doing diligence and

25  negotiating the stalking horse transaction that's here before

183

1  the Court now.  The bird in the hand.

2         And so, in effect, we've already put up our deposit.

3  And that's why the playing field is level if others who want to

4  come in and compete are required to put up a deposit on their

5  bid, to show that they have the same bona fides that we do, and

6  that they're really here, just as we are.

7         Secondly, Your Honor, there are -- the Committee's

8  objection to the triggers for payment of our break-up fee.

9  They say that should only be payable in the event that an

10 alternative transaction is selected and, indeed, goes to

11 closing.  And that's when the break-up fee should be paid, only

12 when and if that occurs.

13        Well, respectfully that's not our deal.  If the

14 debtors breach their contract with us, as they can do, we are

15 in bankruptcy, this is a 363 auction, but if they breach their

16 contract with us by opting for another path, whether it's

17 another transaction, a 363 sale, or a reorganization plan, or

18 something else, Nokia Siemens is not particularly interested in

19 taking the risk of one of those alternatives actually closing.

20 And that is why we negotiated for what we did in terms of when

21 our break-up fee would become payable.

22        Third, Your Honor, MatlinPatterson objects and says

23 that this auction should be delayed to give other potential

24 bidders more time to decide whether or not they ought to bid

25 here.  And one of the things they say -- or the factual

1  premises for that position is that it's really -- these are not

2  wasting assets.  So, there's no big deal to delay it just by a

3  couple of weeks, which Ms. Feldsher said -- and I wrote this

4  one down because I wasn't very good at math either, so I'm not

5  going to throw too many stones here.  But she said they want a

6  two-week extension simply to make up for the time that's going

7  to be lost because of the July 4th holiday.  The last I looked

8  at my calendar, we get one day.  And it's actually not even

9  July 4th, it's July 3rd.  So, two weeks is a little bit longer

10 than that.

11         And she also says that a delay may not be important

12 to a financial bidder.  Well, okay, fine.  But it is very

13 important to Nokia Siemens, which is the only bidder here.  It

14 is the only bird in the hand.

15         We very much disagree, Your Honor, with the asserted

16 factual basis for that objection.  That is these are not

17 wasting assets.

18         As Your Honor has heard from the testimony today, the

19 assets have been on the market for months.  In fact, even

20 before the Chapter 11 filing in January of this year, the

21 witness has testified that they had had discussions with us,

22 and presumably with others about potential transactions

23 involving these assets.

24         So, those folks out there in the world who are

25 interested in this kind of business have known for a long, long

1  time that these assets are available to purchase, or for some

2  kind of a strategic transaction if they're interested in doing

3  it.

4          Now, each of the two asset groups that we're talking

5  about here are, indeed, Your Honor, wasting assets.  The

6  proverbial melting ice cube, if you will, but for different

7  reasons.  What we're talking about are the two technologies

8  that we are purchasing:  The CDMA and the LTE.

9          With respect to the CDMA, Your Honor, this is the

10 current technology, the third generation, 3G technology.  But

11 it is, as the witnesses have indicated, it is dated.  It

12 becomes incrementally obsolete each and every day as newer, and

13 faster, and better technologies get closer and closer to the

14 marketplace.  So, it has a finite life span during which it can

15 earn money for the owner.

16         And each day that passes before Nokia Siemens owns

17 that business results in an irretrievable loss of earnings and

18 a diminution in the value of the assets to us.

19         Moreover, Your Honor, any delay in getting these

20 assets sold to a viable purchaser -- and they're -- I think

21 you've heard this from the witnesses, as well.  There are

22 really only two or three viable strategic purchasers for these

23 assets in the entire world, and we're one of them.  But every

24 day that these assets are delayed in getting sold to one of

25 those viable purchasers increases the risk of a loss of

1 customers which, of course, would result in a loss of value to

2 the purchaser.  And that simply -- we heard people say do you

3 think that if this thing is delayed for just two weeks that

4 you'll lose substantial customers?  And they said, well,

5 probably not.  Well, with all due respect, that's a risk that

6 Nokia Siemens doesn't want to take.  We want these assets.  We

7 want them at the price that we've agreed to pay.  And we're

8 willing to go to an auction and listen to others who want to

9 pay more, and maybe we'll pay more if there is an auction.  But

10 we want a closing, and we want a closing soon, and we want a

11 closing soon, quickly, so that we get the value, the benefit of

12 the bargain that we've tried to strike.   Now, with respect to

13 -- that's the CDMA assets.

14         With respect to the LTE assets, this is the new

15 fourth generation technology that's expected to replace CDMA at

16 some point.  So, it's the future of the business that we're

17 acquiring here.

18         The problem with this business, Your Honor, and as

19 the Court heard, what we're really acquiring is the right to

20 employ approximately 700 people who are working on that

21 technology today.  That's the asset, those employees.

22         And the problem with that asset, as Your Honor heard,

23 is employee attrition.  I think the testimony was that prior to

24 the Chapter 11 filing, the attrition rate for these debtors was

25 something in the range on an annual basis of six to seven

1  percent.  But that since the Chapter 11 filing, that number has

2  shot up to 25 to 30 percent now.

3        Now, these key -- and these are key employees, Your

4  Honor, who are nervous obviously about working for an employer

5  in bankruptcy, and some of them, 25 to 30 percent apparently,

6  are electing to leave to join other competing employers.  These

7  are very valuable workers to us, and the more of them that the

8  debtors lose while waiting to sell the business to us, the less

9  valuable that business will be to us.  And so delay is a

10  significant, significant issue for us, Your Honor.

11        So, we cannot agree to the modification suggested by

12  these objections to our break-up fee rights, the timing of the

13  auction process, the competing bidder requirements.  But in

14  order to try and forge some kind of a compromise for Your Honor

15  here to get the auction procedures approved today, we can and

16  will agree to the following modifications to the bid procedures

17  that we negotiated, Your Honor:

18        First of all, we certainly can live with a provision

19  that says, "All qualified bidders will get copies of all bids

20  in advance of the auction."  We think that -- and not just us.

21  We think that transparency in that respect will help the

22  process go more smoothly.  So, we're willing to have everybody

23  who is a true qualified bidder get the same information and be

24  able to use it.

25        Secondly, we have no problem with the bid procedures

1  being amended to expressly state that a plan transaction can be

2  included in the definition of an alternative transaction here.

3         Third, Your Honor, it's fine from our perspective if

4  the bid procedures are clarified to make it express and

5  explicitly clear that the pension treatment could be considered

6  by the debtors and the constituents in assessing the relative

7  value of bids, and to require bidders to say in their bid

8  whether or not they are assuming pension liabilities.  With

9  respect to Nokia Siemens, we are not assuming those

10 liabilities.

11        And fourth and finally, Your Honor, we are prepared,

12 if it gets the order for these procedures entered today, we are

13 prepared to give up our right to simply match a competing bid.

14 We'll step into the same position as all other bidders whatever

15 the incremental -- required incremental bid is.  If it's, you

16 know, $5 million, that's what we'll have to do.  If it's

17 modified by the debtors at the auction to something else, we'll

18 have to live by the same increment to make it a new bid, as

19 anybody else.

20        Your Honor, with those changes, I think we've got a

21 set of procedures.  And, frankly, given what I've heard the

22 Committee say and the debtors say, I'm thinking maybe we should

23 be applying for some kind of substantial contribution payment

24 here because we've created the template that's going to, you

25 know, guide these cases for the rest of the asset sales.  And

1 you're very welcome.  You're very welcome.

2                              (Laughter)

3          MR. CLARK:  Your Honor, if the Court has any

4 questions, I'd be happy to address them.

5          THE COURT:  I don't.

6          MR. CLARK:  Thank you very much.

7          THE COURT:  Thank you very much, Mr. Clark.  Anyone

8 else?

9          MR. MURRELL:  Your Honor, Vicente Matias Murrell

10 again --

11         THE COURT:  Yes.

12         MR. MURRELL:  -- on behalf of the Pension Benefit

13 Guaranty Corporation, as well as Mr. Justice Morowitz.

14         Your Honor, just a clarification of something that

15 Ms. Schweitzer said.  Just in case, so there is no

16 misunderstanding, PBGC's objections are only related to the

17 domestic nondebtors, nothing else.  Which is in accordance with

18 the case law, as well.

19         THE COURT:  Thank you.

20         MR. MURRELL:  Thank you, Your Honor.

21         THE COURT:  Thank you.  Oh, Ms. Caloway, why don't I

22 hear from you first?  I haven't heard from you today.

23         MS. CALOWAY:  Thank you, Your Honor.

24         And, Your Honor, Mary Caloway on behalf of Ernst &

25 Young as monitor.

1          THE COURT:  Yes.

2          MS. CALOWAY:  Your Honor, I just wanted to briefly

3   clarify for the record that notwithstanding the fact that in

4   both its objection and its counsel's comments earlier today by

5   MatlinPatterson of taking a couple of statements out of context

6   of the monitor's 14th report, a full reading of the 14th

7   report, and I just wanted to make it clear on the record, that

8   the monitor supports the sale process that is being proffered

9   to Your Honor here today by the debtors and as modified on the

10  record just now by buyer's counsel.  And we didn't want any

11  individual sentences removed from that report to give anyone

12  the misimpression.  And so that it's clear, the monitor does

13  support the process.

14          Thank you.

15          THE COURT:  Thank you very much, Ms. Caloway.  Thank

16  you.

17          Ms. Feldsher, yes?

18          MS. FELDSHER:  Your Honor, while I was glad to cede

19  the podium to Ms. Caloway, I hope that you haven't grown bored

20  of me yet.

21          THE COURT:  No.

22          MS. FELDSHER:  Your Honor, I, too, in the spirit of

23  Nokia's counsel will be brief.

24          The first is we've heard a lot today about the fact

25  that this technology has a finite life span.  It's -- you know,

1 it is technology, yes.  It has a finite life span.

2          That being said, Verizon came out recently -- and you

3 heard a lot about February -- but came out recently and

4 indicated its desire for this platform.  That is a game

5 changer.  It is a game changer for the debtors.  All of their

6 work that they've done in advance with strategic bidders while

7 valiant and fruitful to this point, and I'm not disparaging the

8 Nokia bid.  In fact, I suppose I need to send flowers, you

9 know, somewhat soon.

10          And, again, we're not disparaging the bid that's on

11 the table.  We're saying the game changed just recently.  And,

12 therefore, there are additional parties, including my own

13 clients, who have become interested here in these assets.  In

14 fact, in the entire business.

15          And so our short delay -- and look, Your Honor, it's

16 15 days, I mean, that we're asking for here.  It's designed

17 solely to get those parties, the ones that weren't picked up in

18 the previous efforts of the debtors, to come in and to bid here

19 so that we get the best value.  Obviously Nokia Siemens doesn't

20 want that.  There's nothing wrong with their position, it just

21 is not the best one for this estate.  And I understand the

22 debtors' position is that they need to go forward with the bird

23 in the hand, and to do their darndest to get it approved.  I

24 appreciate that, that's why we've fall on the mercy of the

25 Court.  Because at the end of the day, this Court will have to

1 be satisfied by the debtors and everybody else that it has

2 achieved the best value for these assets.  And all we're saying

3 is the current process would not get us there.

4          Now, again, we heard the loss of customers.  I just

5 highlight the testimony of Mr. Riedel.  This is a business that

6 has not lost a single customer since it filed for bankruptcy.

7 This is not the typical example where a debtor says, you know,

8 we've lost tons and tons of customers that have a lot of

9 options.

10          Nortel's customers do not have options.  They cannot

11 migrate off of this platform easily or quickly.  Nobody will go

12 anywhere in two weeks' time.  While I can't guarantee that, I

13 understand -- I think given the testimony that they've gone

14 nowhere for the last six months leads one to believe that an

15 additional two weeks will be okay, and Mr. Riedel's testimony

16 who is the business person here, corroborates that.  He does

17 not believe there will be a loss of any material customers.

18          And that is the same for the employee matters.  So,

19 Your Honor, just in closing, we're asking for two weeks.  I

20 understand that, you know, July 4th is only one day.  Although

21 those of us with children can stand before you and say, no, it

22 really is a week, and everybody goes away.  We're just trying

23 to get a fair shake, Your Honor.  And that's all we're asking

24 for.

25          Thank you.

1       THE COURT:  Thank you.  Anyone else?  Mr. Bromley?

2       MR. BROMLEY:  Your Honor, hopefully I'll be the last

3  one speaking today, other than the --

4       THE COURT:  It depends what you say.

5       MR. BROMLEY:  -- other than you.

6                    (Laughter)

7       MR. BROMLEY:  I'll try to keep that in mind.

8       THE COURT:  Yes.

9       MR. BROMLEY:  Your Honor, we started out earlier

10  today, much earlier today, talking about this being a seminal

11  event in the course of these cases.  And I believe that nothing

12  that we have seen today in the course of the hearing has

13  demonstrated that to be untrue.  Indeed, I think it's

14  emphasized how important a day it is.

15       We're here to approve the bidding procedures for our

16  first major asset sale.  We have had ample testimony explaining

17  why the process needs to proceed on the time line that we've

18  set forth.  Why this bidder has reasons, good reasons, business

19  justifications for insisting on the time line that it insists

20  on.

21       And while I understand that MatlinPatterson is a well

22  known investment vehicle, and they have certainly a lot of

23  experience in the distressed area, I would note that there's a

24  thin line between being a bona fide bidder and being an

25  irresponsible tease.  We're here with very heavy things that a

1  lot of people have thought about for many, many months.  And

2  not just months, but years.  So, we're not talking about adding

3  two weeks onto a 22-day process.  We're talking about adding

4  two weeks onto a two-year process.  A process that has been an

5  exhaustive process.  A process that's been a very public

6  process.  A process that would have allowed MatlinPatterson at

7  any point in time to have walked forward and said we own bonds

8  or we're buying bonds, and we'd like to be involved.  And

9  they've never done that.  But they're here today at the last

10 minute saying "please delay everything."

11        If they come back in a couple of weeks with a lot of

12 money and a signed agreement, then we might have something to

13 talk about.  But right now, we're talking about a hope and a

14 prayer as opposed to a signed agreement that these estates can

15 enforce against a credible worldwide entity.

16        And so we would say that while it's all well and good

17 to talk about just getting a little bit more time, and a little

18 bit more hope, we need a little bit more on the table in order

19 to try to justify that leap.

20        So, Your Honor, we've had a lot of argument and a lot

21 of objections.  And I think most of them have been resolved,

22 and we certainly appreciate Mr. Clark's efforts.

23        I would note, however, that there's one point that

24 Mr. Clark gave which I think is more -- easy for him rather

25 than for us, which is the idea that we would be providing

195

1  qualified bidders copies of all bids.  I would want to note

2  that it does -- the provision is in there, not particularly to

3  benefit the purchaser as much as it is to benefit the estates

4  and their constituencies in trying to have time to analyze the

5  bids.  Because what we're talking about is a relatively small

6  delay.

7          Now, if you look at the bidding procedures, what

8  we're talking about is providing to the Committee, the

9  bondholder group, the monitor, and the purchaser qualified bids

10 at such time that a bid is deemed to be a qualified bid, but no

11 later than two business days prior to the auction.  So, what

12 does that mean?  The bids don't come in until the very last

13 day.  And so two business days prior to the auction, we're

14 going to have to provide all qualified bids that we've -- all

15 bids that we've determined to be qualified to anyone who

16 submitted a qualified bid.  We were comfortable providing it to

17 the purchaser.

18          But if we have a robust and multifaceted auction, it

19 could be complicated if we have to provide those qualified bids

20 to multiple parties.  Because just a couple of paragraphs

21 later, what we're -- we are currently obligated to do is to

22 provide the starting bid to everyone.

23          So, the idea that -- say we get five bids, and that

24 is admittedly aspirational, five qualified bids, yes, right

25 now, the way this system is set up, the purchaser would have a

1 chance to take a look at them.

2          The purchaser, however, has now walked away from its

3 matching right.  We would, within a matter of hours, another

4 day or so, have to make a decision as to which of those

5 qualified bids is the starting bid.  And then we would provide

6 that starting bid to everyone who is a qualified bidder.  And

7 then everyone would know what they're shooting at.

8          So, I fear that if we had five bids, all of which are

9 a little bit apples and oranges, and we send them out to

10 everybody, what we will have is the debtors', and the

11 committees' and the various constituencies and their advisors

12 responding to five separate bidders all saying what can I do to

13 improve it, rather than that group getting together, as they

14 are intended to get together, and decide which is the best bid

15 and then take that best bid and show it to everyone else.

16          So, we actually think the system works well.  We

17 appreciate Mr. Clark's efforts to accommodate.  But we would

18 rather it remain as written.

19          Even given the fact that Mr. Clark would still

20 benefit from getting it early.  But, again, having removed the

21 matching right, we think that that's relatively insignificant

22 at this point.

23          So, in conclusion, Your Honor, we'd like to ask that

24 the applications be granted.  That the debtors' request for the

25 bidding procedures to be approved.  That the provisions in the

1  order relating to the notices that we are -- would be obligated

2  to provide be approved, including the publication, both in the

3  Globe and mail, and in the Wall Street Journal, in setting the

4  sale hearing for the 28th of July.

5          We believe that the record amply supports all of the

6  relief requested.  And we would ask for that order to be

7  entered as soon as possible.

8          THE COURT:  Thank you.

9          MR. BROMLEY:  Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Bromley.

11          Well, I am going to approve the bid procedures with

12  the modifications that Mr. Clark suggested, except for the

13  modification relating to providing the qualified bids in

14  advance.  I do think that would be problematic.  I know that we

15  have a Committee in this case, which has been extremely helpful

16  and cooperative.  But I think that in these circumstances, my

17  philosophy basically is if I have what I view to be a bona fide

18  purchaser, am I prepared to place at risk that offer for what

19  might be or could be or hopefully will be higher and better

20  bids?  But those higher and better bids are still available to

21  be made at the auction.  We don't lose that opportunity by

22  granting these procedures, and that's all they are is bidding

23  procedures.  And I'm sensitive to the fact that 22 days is not

24  a lot of time, but I think it is sufficient time under these

25  circumstances in a case that has been pending for quite some

198

1 time.  And it is a relatively narrow field of potential

2 purchasers.  And that, of course, also has some significance in

3 my decision to approve these bidding procedures.

4          I think that the PBGC's objections go to the sale.

5 We'll see what happens at the sale, and those will be of

6 concern to me at the sale hearing.

7          I also think that as far as MatlinPatterson is

8 concerned, I am concerned that they be afforded great

9 cooperation from the debtors in having access to all of the

10 information.  And I would want the debtors to really be very,

11 very forthcoming with information provided to them so that

12 there is no delay in their ability to put together a potential

13 plan.

14          But I do think that a $650 million bid -- I will say

15 this.  Some of it I think is perhaps -- forgive me, Mr. Clark

16 -- but a little bit cheeky on behalf of your client in not

17 making a deposit.  You know, I don't know that I would like to

18 sit down and play poker at a table where somebody says, well, I

19 don't have to put in an ante because, you know, I'm providing

20 the sandwiches tonight, or whatever.

21                    (Laughter)

22          THE COURT:  But I don't know, I think that in this

23 particular case, that is going to have such minimal negative

24 impact, if any negative impact upon a transaction of this

25 magnitude with such sophisticated players, if you will, that I

1  just don't think that it really does shill the bidding at all.

2  And I appreciate the other allowances from Nokia Siemens, and I

3  think those will be helpful in at least creating an atmosphere

4  were parties think that they'll be given a fair shot at this

5  auction.  And that, of course, is the most important thing.

6          So, having said that, I will approve the bidding

7  procedures.  There may be a little bit of tweaking that needs

8  to be done, I recognize, Mr. Bromley, in an order.  You could

9  either interlineate it or however you propose, but I do think

10 that the objections will be overruled under these facts --

11 under the facts presented.

12          MS. SCHWEITZER:  Your Honor --

13          THE COURT:  Ms. Schweitzer?

14          MS. SCHWEITZER:  -- Lisa Schweitzer.  There's just --

15 you're right, I think that there's very minor interlineation of

16 the order itself.  I think it's just to acknowledge that

17 objections have been filed, they're being overruled.  And that

18 the final form of the bidding procedure order will be attached

19 to that order.  The bidding procedures attached to that order,

20 as opposed to attached to the motion.

21          THE COURT:  Okay.  Okay.

22          MS. SCHWEITZER:  They're very minor clean-up changes,

23 but, of course, we'll give you a blackline and make it

24 available to the constituencies and objectors, so that they see

25 what's being submitted.

1          THE COURT:  Excellent.

2          MS. SCHWEITZER:  There is another housekeeping point

3  that got lost in the --

4          THE COURT:  Let me just interrupt.

5          MS. SCHWEITZER:  Go ahead.

6          THE COURT:  I want to say just one thing, too.  With

7  regard to Footnote 2, you know, I do have concern that this --

8  we basically know what assets are being purchased.  There could

9  be a little tweaking.  But if all of a sudden this sale

10  transaction changes in any material fashion, so I think that

11  the debtor ought to be careful that it not change much at all.

12  But if there's any material change, I would not approve that

13  because that would create a situation in which people are going

14  to be bidding on different -- not only perhaps making different

15  bids, but making different bids on different assets.  And that

16  could create a tremendous, I think, problem.

17          MS. SCHWEITZER:  Right.  No, everyone understands

18  that their concern is to show highest and best in the assets

19  presented.  And I think our view is that we cross that bridge

20  when we see it because we have to deal with what would

21  effectively be a private sale, and we'd have to make a separate

22  showing around that.  So, I think everyone understands your

23  concerns and appreciates it.

24          THE COURT:  Okay.

25          MS. SCHWEITZER:  And that's helpful guidance for

1  everyone to have.

2          There's one other ministerial point in that the asset

3  purchase --

4          THE COURT:  Mr. Hodara, yes?

5          MR. HODARA:  I'm sorry to interrupt.  But before we

6  get to another point, on the point of Footnote 2, if I may,

7  Your Honor.

8          THE COURT:  Yes.

9          MR. HODARA:  I think the reason that the parties have

10 harped on that point so much is because it's our belief, based

11 on, as Mr. Bromley indicated, not 22 days of shopping the

12 asset, but literally weeks and months of talking with

13 interested buyers that there may, in fact, be a bona fide bid

14 in the wings that includes assets other than the specific

15 assets within the four corners of the current agreement.  And

16 if our goal here is to make sure that we maximize value for the

17 estate, I think the testimony has been clear that this is a

18 flexible process by design.  So, I would ask Your Honor to

19 either reconsider that point, or perhaps do as you have done

20 many times in the past and permit us to come back to court over

21 the course of this short 22-day period if, in fact, there is an

22 alternative bid that is making sense to parties -- by parties,

23 I mean the debtor, the monitor, and the committees -- and seek

24 the Court's permission at that time, if appropriate, or

25 clarification at that time as to whether the competing bid is

1 one that can be entertained.

2        THE COURT:  I think Mr. Clark would like to address

3 that.

4        MR. CLARK:  Your Honor's prior comments were

5 brilliant, insightful, shouldn't be changed on syllable.  And

6 if something happens at the auction, Your Honor, that people

7 think that Your Honor ought to consider at that time, they can

8 come in and ask Your Honor to consider it at that time.

9        But right now, what we have, and what we ought to

10 have are clear bid procedures for a clear set of assets that

11 are being sold with a floor of $650 million that my client is

12 providing based on procedures we agreed to.  And we didn't

13 agree to procedures that said, oh, yeah, you can tack on 400,

14 $300 million of other assets that's got nothing to do with our

15 bid, and use that to compete against us.

16        Thank you, Your Honor.

17        THE COURT:  I am concerned with a moving target, and

18 the harm and the mischief that result from it.  And I would say

19 that, first of all, I'm readily accessible.  If that happens,

20 as Mr. Hodara indicated, I would like to hear about it in

21 advance.  And it may have -- we may find ourselves in a

22 situation -- well, I don't know.  I'm concerned.  I don't like

23 to approve bidding procedures where I don't know necessarily

24 what assets are involved in the sale.

25        MR. BROMLEY:  Well, I think, Your Honor, it's very

1 | clear that we're selling the CDMA and LTE assets.

2 |          THE COURT:  Right.

3 |          MR. BROMLEY:  The question is if someone comes to us

4 | with a proposal, like MatlinPatterson, that says I want to

5 | propose a plan of reorganization for all of Nortel --

6 |          THE COURT:  And that language has been conceded.

7 |          MR. BROMLEY:  That language has been added in.

8 |          THE COURT:  Yes.

9 |          MR. BROMLEY:  That can be an alternative transaction.

10 | That would be an alternative transaction that would generate a

11 | payment of the break-up fee and the expense reimbursement.

12 |          THE COURT:  Correct.

13 |          MR. BROMLEY:  That would be a different package of

14 | assets than the one that is the subject of the Nokia Siemens

15 | proposal.

16 |          I don't think that Footnote 2 -- I think we're

17 | getting a little mixed up about it, and I do agree it's a bit

18 | of a moving target.  I think fundamentally what we're talking

19 | about is that if there is another material transaction that is

20 | available to be proposed, and someone comes to the debtors with

21 | that, that the debtors will have to take a look at it.

22 |          Now, I think it's a fiduciary duty issue.  If someone

23 | came to us tomorrow and said we have $5 billion and we want to

24 | buy all of the business, we would say to Mr. Clark, here's your

25 | expense reimbursement and break-up fee, and thank you very

1 much.

2          If someone came in with a deal that was $1 more than

3 Mr. Clark's clients, we would say, in all likelihood, no, thank

4 you very much, and we'll go with Mr. Clark's client.

5          There's a lot of distance between that extra dollar

6 and the $5 billion deal.  And I think all we're looking for is

7 to have the flexibility that when somebody comes to us with a

8 proposal, that we can listen to it.  And I don't think that the

9 bidding procedures say that that's not possible.  It may mean

10 that the -- that we need to come back to both courts for

11 guidance, and I think that would be the appropriate thing to

12 do.

13          But it's definitely the debtors' view that the best

14 thing that we can have is an apples to apples comparison.

15          THE COURT:  Sure.

16          MR. BROMLEY:  And we'd certainly encourage anyone

17 who's out there looking at the LTE and CDMA assets to view it

18 in that fashion.  But it is also important to recognize that it

19 may be that others feel they can't do that.  And if we're to

20 have a true auction and a true fiduciary duty here, we need to

21 be able to look at whatever anyone delivers.  And the process

22 provides -- doesn't mean that it's a qualified bid, and it

23 doesn't mean that we are going to go forward on this bidding

24 procedure.   But it means that we have to be able to take a

25 look at it.  We can't simply close our eyes to it.

1          That said, you know, if someone's bidding on the CDMA

2   and LTE assets, we want to know exactly what they want, how

3   they want to pay for it, what they're going to do with it, and

4   when they intend to close on it so that we can compare it on

5   the best basis possible to the proposal that's been put on the

6   table.

7          I think you've heard that the business is

8   sufficiently malleable in some respects with respect to

9   different purchasers that we just want to have flexibility on

10  that.  And the protections that Mr. Clark's client has with the

11  break-up fee and the expense reimbursement, and that is

12  appropriate and fair, and we very much believe that it should

13  be approved and is justified in this circumstance.

14         And believe me, nothing that -- the debtors will do

15  nothing in a cavalier manner.  We'll do everything that we have

16  to do in a consultative basis, and the way that we've done it

17  to date.  And we take all of the obligations that we have under

18  the agreement, and to both courts, and to all of our

19  constituencies very seriously.

20         So, I hope that we're not trying to legislate for the

21  hypothetical.  We have a sale transaction.  We want to proceed

22  with it.  We want people to bid against it.  But we have

23  somebody here saying they want to put a plan together, that's a

24  different transaction.  That's an alternative transaction.

25         If somebody else shows up and says they want to buy

1  all of it, and then some, I think we have to be able to come

2  back to the courts and say this has landed in our lap, what

3  should we do.

4          THE COURT:  Yes, and I do appreciate that.  And

5  obviously, this Court is very concerned about maximizing value.

6          But just so you understand my primary concern, it is

7  -- you know, an auction is presumably the best test of value

8  for the estate.  And if somebody comes in at the last moment

9  with purchasing additional assets where other parties were not

10 also bidding on those other assets, it becomes very difficult

11 for a court to say yes, you know, that's been market tested and

12 I think that's a fair price.  That's part of my concern.

13         MR. BROMLEY:  And it's definitely part of the

14 debtors' concern, as well, Your Honor.  And if anyone is out

15 there considering doing just that, I think they need to take

16 that into very serious consideration.  Because unless there's a

17 fair market test for the assets that are being sold, then we do

18 believe that the courts are going to have to take into account

19 the lack of that market test.

20         THE COURT:  Right.

21         MR. BROMLEY:  And so by no means would we be looking

22 to do anything out of the ordinary in that respect.  So, that

23 is a -- if somebody wanted to come in with a proposal that was

24 in that fashion, the -- with respect to specific assets that

25 had not been tested, they better be sure about it, and they

1 better be sure that they're putting up money that is sufficient

2 to make that issue go away.  And I doubt that people are out

3 there ready to do that.  We'll see.

4         THE COURT:  I doubt it, too.

5         MR. BROMLEY:  We'll see.  But the point of view is we

6 are selling the CDMA and LTE assets.  The transaction is an

7 important transaction.  We believe that we should follow

8 through with it, and we will, subject to the ability of other

9 parties to come and make bids.

10         It's hard to sit here today and say, you know, well,

11 what if this or what if that.  We really don't have anything in

12 front of us to make a decision.

13         And I don't think that bidding procedures are ever

14 designed to prevent anyone from looking at what people throw at

15 you, so to speak.

16         THE COURT:  Understood.

17         MR. BROMLEY:  And so -- but by that same token, we

18 have 10 pages of requirements of showing up, and financial

19 wherewithal, and conditions, and what people have to put on a

20 piece of paper in order for it to be considered.

21         The fact is is that these processes are fairly fluid.

22 And many times, we have people taking somewhat cavalier

23 approaches to indications of interest.  And, you know, for

24 better, for worst, I think our M&A team and our investment

25 advisors have gotten pretty good at snipping those out.  So,

1 you know, we want hard and fast, clear cut, achievable

2 transactions.  And it is in that spirit that we've approached

3 this one.

4          THE COURT:  All right.  Thank you, Mr. Bromley.  Mr.

5 Clark?

6          MR. CLARK:  Your Honor, in view of the Court's

7 comments, I just want to make sure we all understand what the

8 record should be when these bid procedures go out there.

9          As I understood what Your Honor said, Footnote 2

10 comes out.  And that's what I'm asking.  Either it should come

11 out, Your Honor, or it should say "nonmaterial assets" to make

12 it clear that people are not being invited to come in here and,

13 as I say, bid on material assets that are not subject to the

14 stalking horse bid at this point.

15          THE COURT:  Well, let me say this, and I don't know

16 if this addresses it, but if there were material changes in

17 what was being auctioned, I think that the process would have

18 to start over.

19          MR. CLARK:  Thank you very much, Your Honor.

20          THE COURT:  That's what I think.  I do want to make

21 that clear.  I don't want to see a situation in which somebody

22 is suddenly throwing in the kitchen sink and there hasn't been

23 bidding on that kitchen sink.  I don't know what qualified bids

24 mean in that situation anymore, and we have a different

25 auction, and we start over.

1        MR. CLARK:  Understood, Your Honor.  Thank you.

2        THE COURT:  And if that's what parties want to do,

3 and if they think that there is that much better a transaction

4 out there than is on the table at the moment, then we'll start

5 over.

6        I mean one thing that concerns me, I don't know if

7 there is a party out there right now that is making or

8 expressing an interest.  And I'm not asking.  But I'll just

9 tell you what I think.  That is expressing a much different bid

10 for a lot more money.  And if that's the case, then we

11 shouldn't proceed down this path.  I think that's what I'm

12 saying.  I don't want to see us all of a sudden going in a

13 completely different direction here.  If that is what is being

14 contemplated by this debtor and the Committee, and I don't

15 blame you, but let's not go forward with these bidding

16 procedures then.

17        My whole principle in approving them today is a bird

18 in the hand.  And if you've got the bird in the hand, but

19 you've got another one under the table, then I'm not happy.

20        MR. BROMLEY:  Well, Your Honor, we certainly have a

21 bird in the hand.

22        THE COURT:  Okay.

23        MR. BROMLEY:  And we want a lot of other birds flying

24 in the door, and that's what we're trying to balance.  And we

25 do agree --

1          THE COURT:  I understand.

2          MR. BROMLEY:  -- this is very difficult.  Could I

3   just ask for two minutes with Mr. Hodara?

4          THE COURT:  Absolutely.  Would you like me to step

5   out and give you five minutes?

6          MR. BROMLEY:  I really think it would only be two

7   minutes.

8          THE COURT:  Okay.  Ms. Caloway?

9          MS. CALOWAY:  Your Honor, I'll use this two minutes

10  to address a housekeeping matter --

11         THE COURT:  Yes.

12         MS. CALOWAY:  -- on the Chapter 15 side.  And I would

13  just request Your Honor's approval, as I anticipate that

14  tonight or tomorrow, depending on when we get copies of the

15  signed orders from the Canadian court, we will be filing

16  motions in the Chapter 15 here to enforce those orders.

17         THE COURT:  Yes.

18         MS. CALOWAY:  And since we don't have omnibus hearing

19  dates, and if we get it filed tonight or very early tomorrow, I

20  think we could get -- satisfy the notice requirements without

21  the need for a motion to shorten notice for the next omnibus

22  hearing in these cases, which I think is the 17th.

23         THE COURT:  That would be fine.

24         MS. CALOWAY:  So, I would like to just be able to put

25  the motions to enforce the Canadian orders on for a hearing on

211

1  the 17th.

2          THE COURT:  Absolutely.  Something ministerial of

3  that nature, yes.

4          MS. CALOWAY:  Thank you, Your Honor.

5          THE COURT:  You're welcome.  Justice Morowitz, now I

6  can hear you, sir.

7          MR. JUSTICE MOROWITZ:  Good.  I was just going to

8  address yourself briefly, and then Ms. Caloway, that I don't

9  think the Canadian court has quite pronounced on it yet.  I

10 think a five-minute recess would be in order.

11         MS. CALOWAY:  I apologize for that, Your Honor, I was

12 being maybe overly optimistic and anticipating what I should

13 not have anticipated on the record.

14         THE COURT:  Well, let's just say that within a

15 reasonable time, yes, we will certainly allow that on a

16 shortened basis.

17         MS. CALOWAY:  Thank you.

18         THE COURT:  Yes.

19                      (Pause)

20         THE COURT:  Ms. Kim?

21         MS. KIM:  Your Honor, we have one other motion.

22         THE COURT:  We do.

23         MS. KIM:  And I don't know if now is an opportune

24 time.

25         THE COURT:  Yes.

212

1          MS. KIM:  I didn't want to have --

2          THE COURT:  As long as the Committee is not opposing

3 it.

4          MS. KIM:  The Committee is not opposing it.

5          THE COURT:  Okay.

6          MS. KIM:  Although maybe I might -- I might ask one

7 of my colleagues to just jump out and let them know that we are

8 presenting this motion.

9          THE COURT:  Okay.

10                    (Pause)

11          CANADIAN REGISTRAR:  Can you hear me, Judge Gross?

12          THE COURT:  Yes, now I can hear you.

13          CANADIAN REGISTRAR:  I'm sorry.  This is the

14 Registrar of the Courtroom 807.

15          THE COURT:  Yes.

16          CANADIAN REGISTRAR:  His Honor was addressing you,

17 and was saying that a five-minute recess, so he's not in court.

18          THE COURT:  Oh, I missed that.

19          CANADIAN REGISTRAR:  We're just in a five-minute

20 recess.

21          THE COURT:  Okay.  Thank you.

22          CANADIAN REGISTRAR:  All right?

23          THE COURT:  Thank you.  Thank you.

24          CANADIAN REGISTRAR:  You're welcome.

25          THE COURT:  So, we should take, I guess, a couple of

213

1  more minutes, all right, while Justice Morowitz is off the

2  bench.  Oh, no, this only pertains to our action, right?

3          MS. KIM:  Yes, exactly.

4          THE COURT:  Okay.

5          MS. KIM:  Exactly.  It's not a joint hearing issue.

6          THE COURT:  Good.

7          MS. KIM:  This is for -- this is the debtors' motion

8  for a final order authorizing the debtors to be able to enter

9  into one or more letter of credit, or bonding facilities.

10          THE COURT:  Yes.  Yes.

11          MS. KIM:  And if Your Honor may recall, Mr. Bromley

12 at the last hearing --

13          THE COURT:  I entered the interim order on that.

14 Exactly.

15          MS. KIM:  Exactly.  We received -- there was a couple

16 of developments since you entered that interim order.  First,

17 the debtors have been engaged in substantive negotiations with

18 two financial institutions, and hopefully are close to being

19 able to enter into letter of credit facilities with those two

20 financial institutions and have been in consultation with the

21 various constituents, the Committee, and the U.S. Trustee, and

22 we expect to, as those progress, to be able to give them notice

23 of the facilities once we've actually finalized them or are

24 close to finalizing them.

25          THE COURT:  Okay.

1          MS. KIM:  The other thing is that we did receive some

2   comments -- informal comments from the U.S. Trustee and have

3   incorporated them into the revised order that I would hand up

4   to Your Honor, if Your Honor is going to approve this -- the

5   order.

6          THE COURT:  Excuse me one moment.  Justice is

7   calling.

8                          (Pause)

9          THE COURT:  Thank you.  Please be seated.  And I

10  think that Justice Morowitz may have a few comments, as well.

11         Justice Morowitz?

12         MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.

13         Mr. Tay, is there anything you wish to add to what

14  has already transpired down in Delaware?

15         MR. TAY:  Thank you, Your Honors.  In the break that

16  we've had, I've had a chance to consult with counsel around the

17  room.  And clearly no one feels the need to add to anything

18  that has been said from a argumentation perspective, or from

19  the factual perspective.

20         The -- what we're interested in obviously is that we

21  need consistent bid procedures being approved in both

22  jurisdictions.  We were hoping that as -- in allowing the U.S.

23  proceedings to proceed first, that we get clarification, which

24  we have gotten, and we're very thankful to Judge Gross for

25  that.

1           And my job here right now is to submit to you, Mr.

2  Justice Morowitz, that you have the jurisdiction and the

3  ability to come to the same conclusion.  And I would refer you

4  to -- and you don't need to turn to it, but the <u>Sound Air</u>

5  decision, which I'm sure you're familiar with.  And although

6  that was done in the context of a receivership, I would submit

7  that the principles that were annunciated in that case should

8  equally apply to this fact situation.

9           And I'll simply take you through the four principles

10  very quickly.  And although this was, as I've said, in the

11  context of a receiver, says it should consider -- the court

12  should consider whether the receiver has made a sufficient

13  effort to get the best price, and has not acted improvidently.

14          The second test is it should consider the interest of

15  all parties.

16          Thirdly, it should consider the efficacy and

17  integrity of the process by which offers are obtained.

18          And lastly, it should consider whether there has been

19  unfairness in the working out of the process.

20          I think we've all seen in the proceedings today, and

21  in the evidence that was given today, that there clearly has

22  been due process.  There has been an ability for all of us who

23  have wanted to participate to participate.  And I believe, and

24  I submit to you, Your Honor, that under the Canadian law, that

25  we fall squarely within these principles.

1           And that I would submit to you that we should adopt

2  the same finding as has been found in the U.S. proceedings.

3           Those are my submissions.  Thank you.

4           MR. JUSTICE MOROWITZ:  Thank you.  Anybody else have

5  anything to add?  Mr. Pasquariello?

6           MR. PASQUARIELLO:  Good afternoon, Judge Gross.

7           THE COURT:  Good afternoon.

8           MR. PASQUARIELLO:  Your Honor.  The monitor has filed

9  its 14th report in relation to the Nokia Siemens sale agreement

10 and the related bid procedures.  And the monitor has reviewed

11 the efforts of the applicants to divest itself of the CDMA and

12 LTE businesses.  It is of the view that the applicants are

13 acting in good faith to maximize value for the benefit of the

14 stakeholders.

15          The monitor, therefore, recommends the approval of

16 the Nokia Siemens sale agreement as the stalking horse bid and

17 approval of the bidding procedures described therein.

18          If I may, Your Honor, clarify one point as it relates

19 to the bid procedures, and I'd ask you to turn to them.  And

20 they can be found in the 14th report as Tab C.  And in

21 particular, Your Honor, on Page 2 under the heading of Bidding

22 Process.

23          MR. JUSTICE MOROWITZ:  Yes?

24          MR. PASQUARIELLO:  To avoid any confusion, the last

25 sentence speaks to dealing with disagreements or

1 interpretations of the bidding procedures, and has the

2 jurisdiction of the Bankruptcy Court which is to be the U.S.

3 Court, to deal with and resolve those disputes, except with

4 respect to the application or the terms of any Canadian order.

5 We wanted it to be abundantly clear to the parties that --

6 especially given the joint hearing here today, that we view

7 that -- the monitor views that as being somewhat moot.  And

8 that to the extent that there are any issues with respect to

9 these bidding procedures, it is the expectation certainly of

10 the monitor, and I believe of the other parties, that like it

11 or not, we'll be back before both courts to deal with the

12 matter.

13         MR. JUSTICE MOROWITZ:  Thank you.  Mr. Pasquariello,

14 in light of the fact that Nortel is embarking on a series of

15 363, or asset, sales, and absent any type of plan of

16 arrangements coming forth, it very much looks like there's no

17 continuing business.  Does that require any enhanced oversight

18 by the monitor of these circumstances?

19         MR. PASQUARIELLO:  Your Honor, the monitor has been

20 extensively involved.  So, I don't want to suggest that it

21 hasn't by answering in the affirmative that additional -- an

22 additional oversight is required.  The monitor has been working

23 very closely with the company, both in respect of operational

24 matters, and in its efforts vis-a-vis sale divestiture.

25         So, I think the answer to the question is given the

1  extensive involvement in this particular case of the monitor,

2  we would expect that it would be status quo in terms of the

3  involvement of continuing at what is, in my respectful

4  submission, a very high level and degree of touch point as

5  between the monitor and the CCAA applicants.

6            MR. JUSTICE MOROWITZ:  Thank you.

7            MR. PASQUARIELLO:  Thank you.

8            MR. JUSTICE MOROWITZ:  Anything further?

9                 (No audible response heard)

10           MR. JUSTICE MOROWITZ:  Judge Gross, thank you very

11 much for your attention for this matter today.

12           As far as the Canadian decision, prior to the joint

13 hearing commencing this morning, Mr. Tay made submissions with

14 respect to the law that I will address, and some brief reasons

15 that will come forward hopefully later this week.  An order

16 will go approving the motion in the form requested.

17           I will add some observations.  I just gave some of

18 them.  That in view of the fact that in all likelihood, absent

19 a plan of arrangement forthcoming, the going forward business

20 of Nortel is somewhat questionable.

21           I do believe that this does require significant

22 creditor involvement and oversight.  With respect to the

23 request of the Committee, the UCC in 1, Sub F, waiver of key

24 requirements of qualified bid, it is my intention in the

25 endorsement to make mention that I do have an expectation that

1 there will be advance disclosure of any of the items listed in

2 Sub F to the monitor.

3          I will also add that our Court does not readily

4 embrace courthouse auctions.  That is not what is happening in

5 this situation.  It's an auction at the Cleary firm, then to be

6 brought before a Court.  But it is, I think, in the interest of

7 all parties to avoid chaotic situations.

8          Judge Gross has made mention of the fact that his

9 Court is open, as is this Court.

10          So, to the extent that there are matters that do

11 require attention on a timely basis, it is certainly my

12 expectation that they will be coming to the Court, and I

13 believe I don't have to put words in Judge Gross's mouth, but

14 he expects the same thing.  That the opportunity here is -- the

15 objective is clearly to the maximize value of the assets.  It

16 is being done on a very expedited time frame.

17          July 4th, will take people out of action, as will

18 July 1st in Canada.  So, there's an awful lot of work to be

19 done in a short period of time.  And to the extent it needs

20 adjustment, we expect that that will come back before us.

21          Judge Gross, I do not have anything further to add.

22 I'll turn it back to you.

23          THE COURT:  Thank you, Justice Morowitz.  Mr.

24 Bromley?

25          MR. BROMLEY:  Thank you, Your Honor.  I just wanted

1  to follow-up on Footnote 2.

2          We have consulted with the company and with our

3  creditor constituencies, both from the Official Committee and

4  the bondholder group.  And we have agreed that we should delete

5  Footnote 2.

6          THE COURT:  Okay.

7          MR. BROMLEY:  In light of Your Honor's statements

8  that if something substantial comes in, and we have to come

9  back to see you, we will do that.

10          THE COURT:  And you're welcome to do so.

11          MR. BROMLEY:  Thank you very much, Your Honor.

12          THE COURT:  Thank you.  Mr. Clark?

13          MR. CLARK:  Your Honor, my hearing -- everything's

14  falling apart on me.  I couldn't hear what Mr. Bromley just

15  said.  Footnote 2 has been deleted?

16          THE COURT:  Yes, Mr. Clark.

17          MR. CLARK:  Thank you, Your Honor.  That's what I

18  thought.

19          THE COURT:  I think you heard it, but you just wanted

20  to hear it another time.

21                          (Laughter)

22          THE COURT:  Ms. Schweitzer?

23          MS. SCHWEITZER:  I aspire to do housekeeping here,

24  Your Honor.

25          THE COURT:  All right.

1          MS. SCHWEITZER:  So, just in the nature of

2  housekeeping:

3          First of all, that we will have orders submitted to

4  you this afternoon, but we are -- in the interest of moving

5  this along, have marked it up and have blacklines here.  So,

6  I'd invite everyone in the courtroom to -- anyone who wants to

7  look at them, but just so we don't have to do e-mail

8  distributions and all that.

9          THE COURT:  Absolutely.  We want to get this on the

10 docket.

11         MS. SCHWEITZER:  Second thing is that in the last

12 week, people have had a chance to read through the asset

13 purchase agreement and found clean up changes to it.

14         THE COURT:  Yes.

15         MS. SCHWEITZER:  So, that -- they're not particularly

16 material changes, but we'd like everyone to be bidding off of a

17 cleaned up version, if all is the same.  So, I have a copy, if

18 you'd like me to hand it up to you.  We have 20 or so copies

19 for everyone else.  I'll file them.  If you want it now, I'm

20 happy to give it to you now just so you see the nature of the

21 changes.

22         THE COURT:  That will be fine.

23         MS. SCHWEITZER:  We'll formally file it, and then

24 we'll attach the revised version to the bidding procedure

25 order --

1          THE COURT:  Okay.

2          MS. SCHWEITZER:  -- just so we have a cleaner copy

3  for everyone to work off of.

4          MS. SCHWEITZER:  May I approach?

5          THE COURT:  Yes, please, Ms. Schweitzer.  Thank you.

6          MR. JUSTICE MOROWITZ:  Judge Gross, at this end, I

7  think it would be -- now is the time to terminate the joint

8  hearing.  There will be some clean up of the order up here, as

9  well.

10          THE COURT:  Yes, Justice Morowitz.  It's been an

11  honor to serve with you here today, sir.  And a good evening to

12  you.

13          MR. JUSTICE MOROWITZ:  Okay.  Mr. Tay will be framing

14  an order up for signature very shortly.

15          THE COURT:  Very well.

16          MR. JUSTICE MOROWITZ:  Thank you, Judge Gross.

17          THE COURT:  Thank you.  Good evening, Canada.

18          Ms. Kim, are we going to finish now?

19          MS. KIM:  I certainly hope so.  I have the unenviable

20  task of closing today's very long day.  And, thank you, Your

21  Honor, for indulging us.

22          THE COURT:  Certainly.

23          MS. KIM:  So, as I was mentioning -- for the record,

24  Jane Kim from Cleary Gottlieb Steen & Hamilton on behalf of the

25  debtors.

1            As I was mentioning, with respect to the debtors'

2  motion for a final order authorizing entry into some -- one or

3  more LC or bonding facilities --

4            THE COURT:  Correct.

5            MS. KIM:  -- we've received some informal comments

6  from the U.S. Trustee, and we also received some comments from

7  the financial institutions with which we are negotiating and

8  have made a few revisions to the proposed order as a -- in

9  response to those comments.

10            Mr. Tinker isn't here today, but he did -- this

11 afternoon, but he did represent to me earlier this morning that

12 he did not have any objections to the proposed revised order.

13 And I'll just quickly explain what those comments -- those

14 revisions are:

15            First, that the -- that the debtors will be expressly

16 and immediately authorized and empowered to negotiate and enter

17 LC and bonding facilities without obtaining Court approval.

18 But notice requirements will be in place -- five-day notice

19 requirements will be in place to the U.S. Trustee and the

20 Official Committee for fees over $50,000, and entry into a

21 facility or bond over $500,000, and two-day notice for bonds

22 over $200,000.

23            THE COURT:  Okay.

24            MS. KIM:  Second, there is a provision -- the

25 provision that requires funds to be kept in a segregated

224

1 account have been deleted because of the notice requirements to

2 the U.S. Trustee and the Committee.  I think we'll all have to

3 get satisfaction among ourselves that not keeping the funds in

4 a segregated account will still give us comfort that our

5 interests are -- and the cash collateral is being protected.

6          THE COURT:  Okay.

7          MS. KIM:  But that gives us some flexibility in terms

8 of negotiating with the financial institutions.

9          THE COURT:  Yes.

10         MS. KIM:  Third, there was an inadvertent admission

11 of the 364(e) protections that were in the interim order, but

12 were not in the final order giving the financial institutions

13 or sureties that entered into these facilities with us 364(e)

14 protection.  So, --

15         THE COURT:  So, you've put those back in?

16         MS. KIM:  And so we've put those back in.  And the

17 final -- I'm sorry, there are two more additions.

18         Any reimbursement obligation or any other obligation

19 made under the final order shall be governed by the final

20 order.

21         And the automatic stay -- the order provides that the

22 automatic stay will be amended as necessary to effectuate the

23 terms, rights, benefits, privileges, and provision of the final

24 order, and any facility.

25         THE COURT:  All right.

225

1          MS. KIM:  So, I think those are just self
2  explanatory, except for the segregation requirements.
3          THE COURT:  Absolutely.
4          MS. KIM:  And as I mentioned, we have a revised
5  order.  So, I am happy to hand it up --
6          THE COURT:  Very well.
7          MS. KIM:  -- if Your Honor --
8          THE COURT:  Please approach, and I will look at it
9  and enter it.
10          MS. KIM:  Thank you very much.  And I should have
11  mentioned.  Mr. John Doolittle is also here as a witness for
12  the LC facility motion, if Your Honor had any questions.  But I
13  take it from your comments that you do not.
14          THE COURT:  I don't.
15          MS. KIM:  Thank you, Your Honor.  May I approach?
16          THE COURT:  Please.  Thank you, Ms. Kim.  Thank you.
17          MS. KIM:  Your Honor, it's been a long day.  So, I
18  just wanted to remind you that in case things got lost in the
19  shuffle, at this point, we should have handed up to you three
20  revised orders.
21          THE COURT:  Yes.
22          MS. KIM:  And the -- actually four revised orders
23  because the interim funding agreement order was -- so, four
24  revised orders.
25          THE COURT:  Including the one you just gave me?

226

1          MS. KIM:  Including the one that I just handed up to

2   you.

3          THE COURT:  Yes.  The other three I think have

4   already made it down to the Clerk's Office.

5          MS. KIM:  Thank you very much, Your Honor.

6          THE COURT:  This one will, as well.  And now I'll

7   have the bidding procedures, of course.  And I'll be looking

8   for those right after the hearing, or shortly, or how do you

9   propose to do this?

10         MS. SCHWEITZER:  What we can do is have them sent to

11  your chambers.  We'll have them electronically sent over.

12  We'll caucus with anyone in the hall, they should be

13  nonobjectionable and --

14         THE COURT:  Good.

15         MS. SCHWEITZER:  -- then head back to counsel's

16  office and get them out.

17         THE COURT:  Excellent.

18         MS. SCHWEITZER:  Great.

19         THE COURT:  That will be fine.

20         MS. SCHWEITZER:  Thank you so much.

21         THE COURT:  Very well.  Thank you, Counsel.  Anything

22  further?

23         MS. SCHWEITZER:  No.

24         THE COURT:  All right.  It's been a good day.  A hard

25  day, but a good day.  And I wish you all a good holiday that's

227

1  upcoming and we'll stand in recess.

2           MS. SCHWEITZER:  Thank you, Your Honor.

3           THE COURT:  Thank you.

4       (Whereupon, at 3:50 P.M. the hearing was adjourned.)

5

6                          CERTIFICATE

7

8       I certify that the foregoing is a correct transcript from

9  the electronic sound recording of the proceedings in the

10 above-entitled matter.

11

12

13  _/s/ Karen Hartmann_    AAERT CET**D0475   Date:  July 7, 2009

14 TRANSCRIPTS PLUS, INC.

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1-** 204:2
**$10-** 44:10,17
**$100,000-** 11:15
170:3
**$157-** 31:11 40:8
47:17
**$16-** 174:4
**$19-** 152:9
**$19.5-** 66:24
106:22
**$2-** 11:8
**$2.7-** 159:24
**$20-** 32:25 44:23
**$200-** 81:4 84:10
**$200,000-** 223:22
**$22.5-** 67:1
**$250-** 85:21
**$3-** 66:25 105:25
106:8 135:10
**$30-** 31:19 119:14
**$300-** 202:14
**$5-** 176:17,18,25
188:16 203:23
204:6
**$50,000-** 223:20
**$500,000-** 223:21
**$650-**
163:4,8,13,16
198:14 202:11
**$76-** 32:21
**$9-** 80:12
**$96-** 32:15

**&**

**&-** 12:11 47:2
49:5 50:25 112:2
138:4 146:18
155:12 189:24
222:24

**'**

**'06-** 75:3 76:4
91:2
**'08-** 86:18 91:6
**'90'S-** 127:9

**/**

**/S/-** 227:13

**1**

**1-** 32:19 218:23
**10-** 29:4 39:1
80:6 82:5 90:4
155:16 180:19
207:18
**10,000-** 170:3
**105A-** 57:24
**10:38-** 56:21
**10:54-** 56:21
**10-MINUTE-** 180:17
**10YEAR-** 82:13
**11-** 7:23 8:14
18:13 23:25
113:19 114:5,8
115:14 117:13
122:15,20 142:17
156:11,19,23

157:8,11 159:22
161:22 184:20
186:24 187:1
**110-** 27:12
**11:30-** 24:8,10,13
57:2
**12:26-** 124:14
**13-** 126:9
**14-** 49:25 52:18
**14TH-** 25:1,19,22
91:13 92:1 190:6
216:9,20
**15-** 25:20 76:13
124:12 158:17
191:16 210:12,16
**150-** 85:21
**157-** 43:13
**15DAY-** 161:25
**15-MINUTE-** 124:11
**15TH-** 25:1 45:20
47:10
**17-** 35:24 49:20
**17TH-** 68:1 210:22
211:1
**18-** 35:24 80:9
85:16 129:23
**19-** 25:20
135:9,14
**19TH-** 90:22
120:21
**1:11-** 124:14
**1ST-** 145:16,23
219:18

**2**

**2-** 111:8,10
121:11 148:6
153:10 172:15
181:15 200:7
201:6 203:16
208:9 216:21
220:1,5,15
**2,000-** 62:12
**2.9-** 136:5
**20-** 15:18 39:7,8
61:22 80:9 93:14
98:16 221:18
**2006-** 75:15
**2007-** 126:3
**2009-** 30:15
47:14,24 227:13
**2010-** 82:25
83:2,15
**2011-** 83:15
**21-** 168:24
**21ST-** 68:2
**22-** 96:9 117:19
139:11 140:12
157:17 158:19
159:10 163:16
197:23 201:11
**22DAY-** 97:16
131:19 141:4
194:3 201:21
**23-** 47:13
**23RD-** 68:4
**24-** 85:16
**24HOUR-** 177:15
**24TH-** 68:4

**25-** 93:14 126:24
187:2,5
**25DAY-** 97:16
**26-** 31:19
**266-** 47:20
**27DAY-** 97:16
**28-** 16:13 64:18
129:15 138:16,17
**28TH-** 68:7,8
197:4
**29-** 16:18
**29TH-** 67:25 68:8
**2:30-** 180:22
**2:42-** 180:22
**2G-** 81:19,21

**3**

**3-** 135:24 148:6
**30-** 16:22 40:9
47:14 61:23
129:7,9 130:20
187:2,5
**30TH-** 31:15 32:20
47:21,24 48:1
**31-** 17:1
**32-** 17:6
**35-** 17:15 90:4
**363-** 62:6 122:16
156:23 159:15
162:11 165:3
183:15,17 217:15
**363B-** 57:24
**363F-** 62:7 168:12
**364E-** 224:11,13
**365-** 62:9
**37-** 17:24 90:4
115:3
**39-** 18:15
**3:50-** 227:4
**3G-** 60:2
68:20,23,25 76:3
81:17,20,21
185:10
**3RD-** 184:9

**4**

**4-** 83:1
**400-** 202:13
**41-** 20:10
**4G-** 81:18 82:14
85:19
**4TH-** 158:20
184:7,9 192:20
219:17

**5**

**5-** 176:16
**50-** 77:17 80:13
127:10
**503-** 32:3
**507-** 32:3

**6**

**6-** 84:6
**6DAY-** 158:12
**650-** 101:19

**7**

**7-** 84:6 227:13

**700-** 186:20
**7TH-** 145:16

**8**

**80-** 77:12 83:25
96:24 169:14
**807-** 212:14
**85-** 83:25 101:1
**86-** 47:14
**87-** 101:1

**9**

**90-** 118:10 169:14
**9019-** 7:7,20 9:23
10:3 57:24
**9:24-** 11:25
**9:29-** 11:25
**9:30-** 35:13

**A**

**ABILITY-** 84:5,15
86:2,15 87:18
88:22 93:22
101:15 112:16,22
128:9 136:15
153:1 156:19
159:8 198:12
207:8 215:3,22
**ABLE-** 8:21 20:19
30:12 31:10
35:13,23 37:6
52:4 62:15,23
63:13,25 66:17
69:14 70:21 84:3
102:25 105:4
132:2,20 136:9
139:16,17,25
140:23 142:4
143:19 145:22
160:23 162:2
169:12 170:21
171:22 172:10
177:9 18
**ABOUTS-** 84:10
**ABSENCE-** 17:20
22:3 151:1 178:21
**ABSENT-** 32:10
151:2 217:15
218:18
**ABSOLUTE-** 98:18
**ABSOLUTELY-** 6:13
45:8 168:1,5
169:11 172:13
210:4 211:2 221:9
225:3
**ABUNDANTLY-** 217:5
**ACCELERATED-**
120:22
**ACCEPT-** 18:11
169:3
**ACCEPTABLE-** 12:24
130:3
**ACCEPTED-** 29:3
**ACCESS-** 60:2
79:20,25 97:14
140:17 141:6
142:8 150:11
171:23 198:9
**ACCESSIBLE-**

202:19
**ACCOMMODATE-**
36:23 72:13
196:17
**ACCOMMODATES-**
16:6
**ACCOMPANIED-** 60:6
**ACCOMPLI-** 141:23
**ACCOMPLISH-** 31:10
34:11 59:4 70:7
151:19
**ACCOMPLISHED-**
35:8
**ACCORD-** 46:1
**ACCORDANCE-** 11:4
159:15 189:17
**ACCORDING-** 33:14
**ACCORDINGLY-** 57:4
**ACCOUNT-** 26:15
28:9 144:4 174:17
206:18 224:1,4
**ACCUMULATED-**
159:23
**ACCURATELY-** 51:8
**ACHIEVABLE-** 208:1
**ACHIEVE-** 48:5
142:2 160:11
164:3 170:21
172:10
**ACHIEVED-** 21:23
44:9 158:5 163:1
192:2
**ACHIEVEMENT-** 43:8
**ACHIEVING-** 133:22
**ACKNOWLEDGE-**
109:3 173:6
177:15 199:16
**ACKNOWLEDGED-**
39:23
**ACKNOWLEDGMENT-**
39:4
**ACQUIRE-** 89:3
119:9
**ACQUIRER-** 130:4
**ACQUIRERS-** 64:22
65:5,10 121:2
**ACQUIRING-** 88:7
129:17 186:17,19
**ACQUISITIONS-**
76:2,6,7
**ACRONYMS-** 72:7
**ACROSS-** 16:6 17:9
26:22 27:8,10
78:18 79:9
95:6,11,16 102:3
126:19 127:14
128:12 136:5
145:2 171:5
**ACT-** 16:12 19:14
20:7 51:15 96:22
**ACTED-** 215:13
**ACTING-** 216:13
**ACTION-** 137:17
213:2 219:17
**ACTIONS-** 36:13
165:16
**ACTIVE-** 19:24
64:20 67:15 71:22
170:17

ACTIVELY- 68:24
171:22 174:16
ACTIVITIES- 79:14
ACTIVITY- 91:5
ACTUAL- 36:7 96:4
AD- 51:1 99:23
100:7 149:16
152:23 171:20
ADD- 13:8 24:17
54:22 95:20
104:25 154:7
165:1 214:13,17
216:5 218:17
219:3,21
ADDED- 7:6
34:16,24 55:6
136:18 143:24
156:18 203:7
ADDING- 95:12
194:2,3
ADDITION- 7:4
8:18 13:14,17
36:25 37:4 40:9
69:3 75:12
77:9,13 83:4
89:21 107:9 117:2
122:16 129:18
157:7,13
ADDITIONAL- 13:8
32:25 40:8 54:6
55:7 56:1 111:5
137:5 148:15
149:5,21 158:12
161:15 191:12
192:15 206:9
217:21,22
ADDITIONS- 224:17
ADDRESS- 6:18
16:2,19 21:17
26:7 33:4 38:1
46:16 50:11 91:18
143:12,15 145:24
160:17 167:25
170:9 172:3
173:12,14,15
176:23 189:4
202:2 210:10
211:8 218:14
ADDRESSED- 37:2
154:9
ADDRESSES- 208:16
ADDRESSING- 40:21
170:12 180:8,9
212:16
ADEQUATE- 47:23
68:2
ADJOURN- 54:6
123:16
ADJOURNED- 227:4
ADJOURNMENT-
56:13
ADJUST- 121:25
ADJUSTED- 106:24
ADJUSTMENT- 23:2
101:23
102:1,11,15,16
133:16,18,23
219:20
ADJUSTMENTS-

101:21,24 102:5,9
107:3 133:12
ADMINISTRATIVE-
32:2,18 39:24
ADMINISTRATOR-
26:19 29:16 30:7
32:6,11,15,17
36:12 41:24
49:14,18 61:25
66:21 100:11
ADMINISTRATORS-
46:18 49:12
52:14,17,20,22
171:7
ADMISSION- 224:10
ADMIT- 92:17
ADMITTEDLY- 63:3
195:24
ADOPT- 216:1
ADOPTED- 20:5
ADOPTION- 39:5
ADVANCE- 28:15
187:20 191:6
197:14 202:21
219:1
ADVANTAGE- 83:7
176:15
ADVANTAGES- 95:11
ADVICE- 171:9
ADVISE- 109:24
ADVISEDLY- 19:18
ADVISING- 126:19
ADVISOR- 73:21
126:13,18 133:2
ADVISORS- 61:25
112:3 117:11
139:21 155:13
158:9,17 171:5,6
196:11 207:25
AFFECT- 52:22
128:10 167:1,11
174:2
AFFECTING- 128:12
AFFIDAVIT- 49:20
53:17
AFFILIATES- 166:1
AFFIRMATION-
49:24,25
AFFORD- 57:16
AFFORDED- 109:9
135:6 198:8
AFRICA- 27:10
AFTERNOON-
111:23,24 112:9
118:4 138:3
154:1,2 155:10
164:7,8,12
180:24,25 216:6,7
221:4 223:11
AGAINST-
8:9,12,17 31:18
60:22 167:7 177:8
194:15 202:15
205:22
AGENDA- 7:1,4
10:24
AGGREGATE- 66:6
100:25 102:9
115:8

AGGRESSIVE- 67:22
82:25 83:9 97:2
AGGRESSIVELY-
83:13
AGREE- 35:9,20,25
54:1 61:12 94:7
105:24 117:18
141:20 168:1
181:12 187:11,16
202:13 203:17
209:25
AGREEABLE- 36:9
AGREED- 11:17
13:8 31:21 35:4
51:12 105:12,24
106:11,22 119:3
186:7 202:12
220:4
AGREEMENT- 6:22
8:5 23:11 24:25
25:6,8 26:24 28:8
30:12,13 31:8,17
32:6,8,11,14
33:3,9 34:22
35:13,14
36:2,6,8,21
38:10,12,14,15,20
,25
39:2,3,5,7,10,12,
25
37:10,20,25
40:8,17 41:2
43:2,9 44:24
45:6,9,15 46:5
47:
AGREEMENTS- 34:7
35:20 39:14,16
64:19 97:10 99:18
102:19,20
103:11,19 169:6
AHEAD- 27:17
115:6 200:5
AIR- 215:4
AKIN- 146:18
ALBEIT- 17:25
156:12
ALBERTA- 17:5
19:2
ALCATEL-LUCENT-
76:4 87:10 127:15
ALIGNED- 175:22
ALIGNING- 114:14
ALIVE- 42:18
ALLOCATE- 28:11
ALLOCATING- 44:14
ALLOCATION-
34:9,11,12,14,18,
23
33:21,24 35:3
37:1 39:6 45:7,10
51:21 52:23 53:10
57:21 164:18
169:10,19 170:5
ALLOW- 8:19 15:8
20:8 21:3
62:13,22 63:21
66:5 70:17 121:25
145:25 146:14
154:12,22 156:7

211:15
ALLOWANCES- 199:2
ALLOWED- 144:17
154:19 173:3
175:23 194:6
ALLOWING- 36:14
214:22
ALLOWS- 15:12
17:25 26:12
30:13,15
ALLUDED- 47:25
129:6 131:2
ALONE- 95:23
ALPHARETTA- 144:8
ALTER- 176:21
ALTERED- 166:17
ALTERNATE- 106:17
ALTERNATIVE-
15:25 21:11
108:12 135:19
149:4 150:8
151:1,3,6,13,20
178:21 179:8,10
183:10 188:2
201:22 203:9,10
205:24
ALTERNATIVES-
90:15 183:19
AM/RECONVENE-
11:25 56:21
AMBIGUITY- 157:1
AMENABLE- 114:20
AMENDED- 55:6,24
161:21 188:1
224:22
AMENDMENT- 39:11
AMENDMENTS-
35:9,21
48:10,15,16,20
AMERICA- 27:10
32:24 76:14
80:17,18
82:8,15,21
83:3,23 84:1
87:17 89:5
92:13,15,18,20
95:12 96:1,2,24
100:25
AMERICAN- 83:12
85:25 95:9 100:23
131:13 169:15
AMIA- 29:16
AMONG- 7:7 39:2,9
47:5 224:3
AMONGST- 26:2,8
28:12 31:21 32:22
38:18,20
AMOUNT- 13:10
26:20,21 32:15,16
42:17 44:3 105:16
123:8 148:15
150:9 151:4,21
167:1,2,9 182:24
AMOUNTS- 31:19
32:10 33:22 40:4
84:2 171:4
AMPLE- 18:21
193:16
AMPLY- 197:5

ANALYSIS- 89:21
127:23 128:8
129:13 147:7,14
ANALYZE- 29:21
65:24 195:4
ANCILLARY- 97:6
99:18 102:19,20
103:4,19
ANNOUNCE- 120:19
152:4
ANNOUNCED- 60:5,8
82:17,22 90:22
91:13 108:22
ANNOUNCEMENT-
120:17 136:23
137:3
ANNOUNCEMENTS-
120:19
ANNUAL- 186:25
ANNUNCIATED-
20:18 215:7
ANSWER- 15:20
90:18 113:9
172:16 174:11
217:25
ANSWERED- 20:17
ANSWERING- 217:21
ANTE- 198:19
ANTICIPATE- 36:21
48:3 210:13
ANTICIPATED-
47:17 211:13
ANTICIPATING-
211:12
ANYMORE- 208:24
ANYWAY- 173:3
ANYWHERE- 192:12
APOLOGIZE- 6:3
12:3,12 27:17
55:22 112:9 114:7
211:11
APPARENTLY- 74:10
187:5
APPEAL- 17:23
20:2,11,25
APPEALS- 17:24
APPEARING- 51:1
APPEARS- 143:25
147:13
APPENDED- 156:16
APPENDIX- 47:11
APPETITE- 89:2
APPLES- 64:1
196:9 204:14
APPLICANTS-
47:8,12,22 49:15
216:11,12 218:5
APPLICATION-
53:23 217:4
APPLICATIONS-
77:14 196:24
APPLY- 10:3 15:8
21:2 215:8
APPLYING- 14:9
188:23
APPOINTED-
100:3,11
APPORTION- 79:13
APPRECIATE-

154:15 157:15
159:18 191:24
194:22 196:17
199:2 206:4
APPRECIATES-
164:16 200:23
APPROACH- 9:23,25
13:22 15:10 16:11
17:5 18:24 21:12
54:15 147:5,15
170:12 222:4
225:8,15
APPROACHED- 144:9
208:2
APPROACHES-
207:23
APPROPRIATE-
22:6,9 33:23
42:2,10 56:12
58:15 65:18 66:4
67:3 68:16 69:24
70:6,12,16 109:20
110:22 123:10
152:25 153:22
182:2 201:24
204:11 205:12
APPROPRIATELY-
153:11
APPROVAL-
34:20,23 35:6
36:17,19 37:1
45:9 47:16 48:8,9
49:18 51:4
52:7,18 56:3 62:6
96:6 141:2 210:13
216:15,17 223:17
APPROVE- 7:6 8:3
9:16 17:17,20
18:4,18 19:3 22:3
34:17 46:3 58:1
67:13 144:2
164:22 193:15
197:11 198:3
199:6 200:12
202:23 214:4
APPROVED- 18:7
48:20 142:13
170:10 174:2
179:9,10 187:15
191:23 196:25
197:2 205:13
214:21
APPROVING- 7:12
55:13 209:17
218:16
APPROXIMATELY-
32:21 47:20
126:24 131:18
132:18 135:14,23
155:16 186:20
APRIL- 91:2
APT- 159:10
ARBITRARY- 15:15
AREA- 15:12 30:24
149:3 150:11,18
152:16 193:23
AREAS- 137:9
148:1 153:5
ARGUABLY- 71:3

ARGUE- 159:15
ARGUING- 31:2
ARGUMENT- 23:19
98:7 194:20
ARGUMENTATION-
214:18
ARGUMENTS-
154:5,8
ARISING- 39:16,20
ARM- 105:21
ARM'S- 10:5
104:21 109:12
133:6
ARPS- 118:18
ARRANGEMENT-
17:21 19:6,15
22:4 41:8 63:10
218:19
ARRANGEMENTS-
37:12 44:12 57:4
109:20 217:16
ARRIVE- 18:24
45:9
ARRIVED- 57:21
105:16 109:12
ASA- 133:14
ASIA- 27:10 76:14
86:1
ASPECTS- 39:18
61:14,15 99:19
ASPIRATIONAL-
195:24
ASPIRE- 220:23
ASSERTED- 184:15
ASSERTING- 168:11
ASSESS- 88:16
ASSESSING- 188:6
ASSET- 17:20
27:5,6 29:22
30:18 33:2,5,8,10
34:11 44:19 66:13
69:20 88:16 89:3
93:18 94:23 95:17
99:5,8,13
101:6,18,24
102:17 111:1
127:3,7,12 128:4
129:1 131:23
132:6 134:14
135:4 139:1
146:25
147:1,14,25 1
ASSETS- 8:21
15:6,9 18:8,19
19:3,20 21:3 22:3
26:12 34:2 59:14
60:10 61:5,9,11
62:8,14,16,23
64:9,22,24 65:12
66:8,10 67:15
68:16,18,19
70:2,3,5,9,11,18,
24
69:6,10,15,19
71:12,17,20,24
76:16 77:11 78:14
86:12
ASSIGN- 101:15
145:14,21

ASSIGNED- 103:7
144:10
ASSIGNMENT- 62:9
145:16
ASSOCIATED- 82:6
92:10 97:25 101:4
ASSUAGE- 139:7
ASSUME- 14:13
23:7,13 145:14,21
ASSUMED- 68:3
144:10 166:23
168:7
ASSUMES- 167:8
ASSUMING- 139:13
167:3 188:8,9
ASSUMPTION- 39:4
62:9 145:16 168:6
ASSURANCE- 141:4
ASSURANCES- 68:3
ASSURE- 66:17
ASSURED- 68:23
150:14
AT&T- 83:13 92:20
ATMOSPHERE- 199:3
ATTACH- 221:24
ATTACHED-
199:18,19,20
ATTACHES- 47:11
ATTEMPTING- 63:18
ATTEMPTS- 26:22
ATTENTION- 43:12
44:7 58:23 174:4
218:11 219:11
ATTORNEY- 40:22
123:23
ATTORNEYS- 157:20
ATTRITION- 90:5
93:10,12,16,22,24
99:4 120:13
137:11 186:23,24
ATYPICAL- 63:17
AUCTION- 61:1
63:5 68:4,7 69:13
71:10 72:10 97:17
104:2,5 107:14
121:16,17 137:1
141:23 142:1
154:20 159:6
162:3,12,13
167:24
177:6,7,10,11
181:18 182:3
183:15,23 186:8,9
187:13,15,20
188:17
195:11,13,18
197:2
AUCTION'S- 109:3
AUCTIONED- 208:17
AUCTIONING- 137:6
AUCTIONS- 174:2
219:4
AUDIENCE- 180:15
AUDIO- 43:15
AUDITS- 29:2 30:1
AUGUST- 63:7
AUTHORITIES-
16:23 38:23
AUTHORITY- 14:20

17:11 18:12,18,21
AUTHORIZATION-
11:2,5
AUTHORIZE- 14:20
19:19 20:3
AUTHORIZED- 163:9
223:16
AUTHORIZING-
10:25 36:12,13
213:8 223:2
AUTOMATIC-
224:21,22
AVAILABLE- 12:16
29:6 33:23 37:5
74:13 78:8 97:8
103:20,23 121:5
172:7 185:1
197:20 199:24
203:20
AVERAGE- 136:5
AVERSE- 139:9
AVOID- 30:16
119:14 216:24
219:7
AWARE- 24:7 55:5
111:17,21
131:15,20 137:2
144:25 170:12
AWFUL- 70:1
219:18

_____
B
_____
BA- 126:11
BABBLE- 81:20
BACK- 20:17 21:20
30:16 31:2
34:19,22 35:25
37:1 45:8 54:7
56:16 62:17 82:18
85:16 86:19
90:17,19 91:1,12
96:14 97:19 99:3
101:9 107:2 109:7
117:2 118:6,9
120:10,12 124:21
140:21 158:21
162:13 164:17
179:1,
BACKBONE- 159:7
BACKER- 113:2,13
114:23
BACKGROUND- 37:6
76:10 126:10
BALANCE- 63:18
65:18 84:14 86:10
102:6
112:13,15,19,24
113:3,8 139:6
159:7,17 177:20
209:24
BALANCED- 66:5
BALANCING- 51:15
BALLPARK- 85:21
BAND- 80:20
BANDWIDTH- 81:1
BANK- 126:6,7
136:12
BANKER- 64:16
BANKING- 126:5

BANKRUPT- 165:12
BANKRUPTCY- 23:18
32:3 36:18 48:21
62:6,7 85:15
89:15 93:6 126:16
127:18 128:10
183:15 187:5
192:6 217:2
BARE- 158:17,20
BARGAIN- 186:12
BARNES- 21:17
BASE- 86:12 88:15
95:12 120:24
129:20 130:19
131:10,11 136:2
BASED- 29:7 54:3
94:21 104:3
128:2,20 144:25
147:13 150:16
172:7 201:10
202:12
BASELINE- 136:24
BASIC- 21:20
BASIS- 11:6 26:12
31:14 39:24 64:2
66:20 70:12,17
71:1 89:22 131:7
141:13 147:1
163:10 184:16
186:25 205:5,16
211:16 219:11
BAUER- 57:2
123:9,17,21
BAY- 14:23 15:3
16:7 19:13,16
BC- 14:23 19:13
21:1 22:2
BEAR- 86:6
BEARING- 41:15
BECAME- 42:1,15
91:3 107:18,21
108:13 126:13
161:4
BECOME- 64:4
65:15,17 92:18
93:2 174:4 181:9
183:21 191:13
BECOMES- 185:12
206:10
BECOMING- 64:11
BECONCAMPER- 49:6
BEGAN- 29:13,21
30:4,8 86:16
129:4
BEGINNING- 26:16
27:3 63:7 160:24
BEHAVIOR- 107:24
108:1,5
BEHIND- 22:23
83:12 100:20
BELABOR- 43:10
BELIEF- 201:10
BELIEVES- 155:25
163:11
BELIEVING- 156:5
162:23,24
BENCH- 213:2
BENCHMARK- 107:14
BENEFICIAL-

110:23
**BENEFIT-** 15:22
17:3 20:22
21:8,22 32:2
42:23 48:6 57:18
111:2,4 146:5
151:9 164:9
186:11 189:12
195:3 196:20
216:13
**BENEFITS-** 39:23
224:23
**BENEFITTED-** 67:8
**BET-** 6:24 155:9
**BETWEEN-** 7:20
10:6 26:14 31:19
35:10 40:14 48:17
57:6 65:19 79:5
80:6 105:20 130:5
132:7 139:12
153:9 168:18
169:10 178:5
193:24 204:5
218:5
**BIBLE-** 74:3
125:13
**BID-** 18:4 65:17
68:1 72:12 82:5
95:3,13 99:2
100:19 104:9
105:11,13,20
106:6 107:15,25
108:14,20 119:23
122:18 132:2
134:7 135:22
138:21 139:17,25
141:2 142:4,12,15
144:15
148:2,13,16,17,19
,
**BIDDER-** 63:6
64:5,10,12 65:16
67:8,9 69:14 94:5
103:25 104:2,6
106:17 107:11
108:16,23 111:20
119:23 130:13
135:19 136:23
142:16 148:14,24
157:2 173:20
174:24 177:6
178:1,3 182:22
184:12,13
187:13,23
193:18,2
**BIDDER'S-** 63:15
**BIDDERS-** 64:20
66:7,12 67:18
88:17,19 91:24
92:22 94:8 96:10
103:21 108:1,4
120:1,25 130:5
131:19 132:4
133:10
138:6,9,15,18
140:6 141:6
148:25 149:22
150:3,8,15,19
160:2 162:1

170:12 172:18
174:25 175:7
176:1
**BIDDING-** 58:10
63:16,23 64:3
65:14 66:7
67:13,15 96:3,5,9
104:1 105:9 107:7
109:9 111:8,12
121:9,14,21,22,23
122:14 131:16,18
135:5 137:15
139:1 143:24
144:4 147:16
153:13 164:20
165:4 166:17
168:7 169:7 170:1
**BIDS-** 63:1 65:20
66:6,8,12,14
96:10 111:12
119:24
121:12,13,19
122:15 131:19,23
134:10 139:13
141:24 149:4,13
153:12 156:21
172:21 176:14
177:9 181:17,24
195:1,5,9,12,14,1
5,19,23,24
187:19 188:7
196:5,8 197
**BIG-** 88:22
115:4,8 184:2
**BILLION-** 80:13
159:24 203:23
204:6
**BILLIONS-** 76:8
83:17
**BIRD-** 63:19 183:1
184:14 191:22
209:17,18,21
**BIRDS-** 209:23
**BIT-** 9:3 32:16
72:8 82:19 85:5
96:3 105:10,19
116:4 118:23
184:9 194:17,18
196:9 198:16
199:7 203:17
**BITTER-** 71:16
**BLACK-** 33:11,12
**BLACKLINE-** 45:23
199:23
**BLACKLINES-** 221:5
**BLAIR-** 18:10,17
**BLAME-** 209:15
**BLOOD-** 29:18
**BLOOM-** 32:7
**BOARD-** 127:24
**BODY-** 33:20
**BOLSTER-** 139:6
**BONA-** 15:23 21:9
182:22 183:5
193:24 197:17
201:13
**BOND-** 114:16
155:17 223:21
**BONDHOLDER-** 30:6

35:18 51:1 52:6
100:7 112:4
152:20,22,23
171:20,21 174:15
195:9 220:4
**BONDHOLDERS-**
11:18 13:13,16,17
41:21 51:23 62:1
66:21 99:23 100:8
105:2 138:10
175:9
**BONDHOLDERS'-**
118:20 149:16
**BONDING-** 213:9
223:3,17
**BONDS-** 194:7,8
223:21
**BORDER-** 25:6,12
26:6 35:10,21
36:19 45:16 46:2
48:7,15
**BORDERS-** 26:22
**BORED-** 190:19
**BOTH-** 19:11 23:6
25:16,18 27:5
33:21 34:11,22
35:7 36:1
37:7,13,15,16,24
48:6,11,20 49:5
51:23 52:23 53:16
55:13 56:4 59:14
62:21 63:12,17
67:3,10 68:13
73:4 76:2,14 77:2
81:21 85:5 87:20
93:25 98:19
104:14
**BOTHER-** 33:19
118:23
**BOUNDARIES-** 94:5
**BOX-** 33:11,12
**BOY-** 123:25
**BRACEWELL-** 112:2
138:4 155:12
**BRAD-** 49:5
**BREACH-** 151:24
179:7,21
183:14,15
**BREADTH-** 131:10
**BREAK-** 55:4
104:15,22
105:9,14,22
123:10
124:9,11,13
154:24 180:15,17
214:15
106:9,10,13,16,19
,23
**BREAKUP-** 66:23,24
107:6,7
135:7,10,14 136:3
150:25
151:3,11,21,25
152:9,15 154:18
179:1,2,5,11,16,1
8
176:8,9 178:20,24
183:8,11,21
187:12 203:11,25

205:11
**BREATHE-** 79:17
**BRIDGE-** 86:11
200:19
**BRIEF-** 49:13 51:3
57:10 110:9
112:10 122:8
154:4 164:24
165:3 181:4
190:23 218:14
**BRIEFING-** 99:21
**BRILLIANT-** 202:5
**BRINGS-** 32:6
**BROAD-** 16:11
17:8,10 18:6
21:12
**BROADEN-** 96:22
**BROADER-** 19:11
**BROADLY-** 172:18
**BROKE-** 94:3
6:1,4,8,12,16,19,
22,25
**BROMLEY-**
7:3,10,12,15
25:10,14,15
38:3,11,19,21
39:22 40:11,24
42:5,16 50:16
51:7 52:24
53:7,12,20
54:9,14,15,17
58:19,20 59:12
67:21 72:16 77:1
157:19,21,22
159:9
193:1,2,5,7,9
197:9,10
**BROMLEY'S-** 110:15
**BROOKINGS-** 9:9,12
**BROTHERS-** 65:6
**BROUGHT-** 45:8
67:7 136:21 165:9
219:6
**BROWN-** 126:11
**BS-** 76:11
**BUBBLE-** 174:8
**BUCKETS-** 92:24
100:22 170:2
**BUDGETED-** 115:7
**BUILD-** 87:2 90:10
**BUILDING-** 92:15
**BUILT-** 31:17 64:3
84:11
**BULK-** 42:13 77:11
**BULLET-** 39:8
**BUNDLED-**
101:6,8,12 145:4
**BURDENSOME-**
165:24
**BURN-** 86:6
**BURNING-** 42:4
**BURNS-** 21:18
**BUSINESS-** 11:7,18
12:25 13:13
14:1,11,12 15:24
16:24 17:3,13,25
19:24 20:9,22
21:10,21,24 27:15
37:11 42:20

59:1,17,18,19,20
61:3,15,16
62:4,13 63:13
68:21 70:17 71:1
75:12,22
77:3,4,5,6,9,13,1
9,20,2
**BUSINESSES-** 14:21
27:7,21 33:6
60:25 62:19 72:2
75:14 77:8
78:2,5,7,18
79:6,9 84:22 91:8
95:6,15,16,24
100:24 101:11
111:14 116:11
120:15 126:20
140:24 152:5
153:15 171:10
216:12
**BUY-** 71:2 81:13
181:21 203:24
205:25
**BUYER-** 8:18 61:11
67:2 78:12 87:22
94:18,21,24 95:9
96:23 102:24
103:7 114:1 119:8
121:25
130:2,8,11,13,18
135:1 137:12
141:14 168:1,3
169:22 178:6,24
**BUYER'S-** 130:24
138:12 190:10
**BUYERS-** 62:22,23
64:18 94:13 104:9
120:6,23 129:4
168:5 169:5
201:13
**BUYING-** 95:22
181:21 194:8
**BV-** 58:10

C

**CALCULATED-** 37:9
**CALCULATION-**
133:13
**CALCULUS-** 107:19
**CALENDAR-** 184:8
**CALL-** 24:24 27:16
73:17,24 83:1
92:9 97:17 125:9
**CALLED-** 95:8,14
129:10
**CALLING-** 214:7
**CALLS-** 158:10
**CALOWAY-**
189:21,23,24
190:2,15,19
210:8,9,12,18,24
211:4,8,11,17
**CALVARY-** 47:16
**CAMERA-** 73:7
74:14 100:15
**CAMERAS-** 74:12
**CAN-** 9:18,19,23
10:9,18 12:2,4
14:10,25 15:5,16

19:19 20:11 22:24,25 23:7 38:1 43:22 52:3 54:10,11 57:16 59:1 65:23 66:1,17 67:16 68:23 71:3 73:4 74:15 75:23 76:9,23 78:14 79:14,16 81:23 83:7,19 84:4 85:13
**CAN'T-** 43:25 74:21 149:11 172:2,9 174:25 192:12 204:19,25
**CANADA-** 25:20 26:18 27:25 34:4,5 35:10 37:8,15 41:5,15 42:3,6,12,18 43:5,21 44:13,23 46:14 48:11 55:24 56:23 59:15,16 74:9 83:23 89:11 100:9,14 101:3 147:20 148:4 169:11 171:7 179:11 219:18 222:17
**CANADIAN-** 18:10,17 22:2 29:18 30:7,14 31:20 33:1 36:4 40:6 41:3,17,18,19,21 42:1 43:11 44:3,5,10,20 45:5,11 51:24 52:17 56:9 62:21 63:11 144:1 148:21 169:16 174:11 210:15,25 212:11,13,16,19,2 2,24 211:9 215:24 2
**CANADIAN'S-** 41:3
**CANADIANS-** 43:25
**CANDOR-** 157:15
**CANNOT-** 18:3,11 43:21 165:4 166:7 187:11 192:10
**CAP-** 105:25 106:8 135:10
**CAPABILITIES-** 134:9
**CAPACITY-** 84:8
**CAPITAL-** 11:8,10,13 83:16 84:3,5 102:1,2,12 133:19 136:9 153:14,18
**CAPITALIZED-** 165:20
**CAPTURE-** 162:17
**CAPTURING-** 92:8
**CARE-** 181:11 182:8
**CAREFUL-** 51:15

149:13 168:17,18 200:11
**CAREFULLY-** 29:25 52:1 74:18
**CARFAGNINI-** 40:20
**CARRIER-** 27:15,23 58:25 59:17,19 77:3,6,7,8,11,19 78:23,24 116:18 163:22
**CARRIERS-** 59:20 69:11 79:23 80:4 81:7 82:1
**CARRIGAN-** 8:22,24 9:16 10:9,12
**CARVE-** 78:6 166:3,4
**CARVED-** 166:8
**CASE-** 14:22,23 15:11 16:7 17:23 18:15 19:5,13,16 20:1 22:1,8 27:11,25 29:22 48:3 51:19 54:4 59:9 100:5 116:7 124:16 126:23 129:6 133:7 142:10 149:15 152:23 156:17,22 157:23 158:13 160:24,25 165:2 167:2 171:
**CASES-** 15:21 16:22 22:6 25:18 26:16 27:3 40:10 51:24 60:5 68:17 112:4 115:4,14 126:17 151:8 155:15 159:2,16 164:23,25 166:25 176:10 188:25 193:11 210:22
**CASH-** 31:11 42:13 47:10,11,13,20 89:25 98:3,12,13 119:13 130:23 134:10,17 151:4,10 159:24 163:20 224:5
**CATEGORIES-** 88:20
**CAUCUS-** 226:12
**CAUSE-** 115:17 159:25
**CAUSED-** 93:7 150:25
**CAUTION-** 161:14
**CAVALIER-** 205:15 207:22
**CCAA-** 14:10,20 15:5 16:10,13,15,25 17:2,10,20 18:2,7,8,18 19:4,8,25 20:3,6,8 21:3,5,21 23:17 24:3,12 47:8,22 58:17 218:5
**CDMA-** 60:1,25

62:4 65:12 68:19 76:22 77:5 79:1,18,19 80:11,20 81:11,15,17,19,21 84:24 88:8 89:5,10,24 94:3,6 95:1,7 98:3 100:18,22,23 101:1 103:7 110:23 111:13 114:12,13 121:13 122:2 127:3 134:15 141:8 145:
**CDMA'S-** 119:8
**CDMA/LTE-** 116:11 128:11,13 131:13 152:4 172:17,21
**CEDE-** 190:18
**CELL-** 111:25
**CENTERS-** 44:15
**CERTAIN-** 7:22 8:1 10:25 11:2 26:13 33:1 35:9,16 36:3,12 44:8 49:19 61:14,15,16 62:7,10 63:23 69:11 92:11 101:21 104:1 117:19 147:11 148:15 152:5,17 153:2,17,18 155:1
**CERTAINLY-** 9:22 10:1,2 11:24 12:23 35:1 51:9 53:22 54:10 57:23,25 68:22 72:10 82:8 83:24 91:20 96:16 130:7 132:25 133:7 141:19 147:22 155:7 164:2 165:18,19 166:5 167:10 168:3,5,15 169:1,17 176:10 187:18 193:22 1
**CERTAINTY-** 63:18 65:19 110:20
**CERTIFICATE-** 227:6
**CERTIFICATION-** 6:13
**CERTIFY-** 227:8
**CET**D0475-** 227:13
**CHAIN-** 28:5 79:10 102:23 171:12
**CHAIRMAN-** 126:25
**CHALLENGE-** 84:9 85:22 90:2,19 91:12 92:15 112:21 115:8
**CHALLENGES-** 26:2 28:3,4 30:25 61:20 84:6 85:16 87:23 120:11 157:24
**CHALLENGING-** 159:2

**CHAMBERS-** 226:11
**CHANCE-** 92:6 143:16 159:4 180:18 196:1 214:16 221:12
**CHANGE-** 80:13 105:5 107:4 140:20 145:22,23 169:7 200:11,12
**CHANGED-** 107:24 108:1,5 180:5 191:11 202:5
**CHANGER-** 191:5
**CHANGES-** 45:25 46:2,3 55:8 56:2 68:6 108:10,11 111:5 188:20 199:22 200:10 208:16 221:13,16,21
**CHANGING-** 120:15 156:22
**CHANNEL-** 79:21
**CHAOTIC-** 219:7
**CHAPTER-** 7:23 8:14 23:25 113:19 114:5,8 115:14 117:12,13 122:15,20 142:17 156:11,19,23 157:8,11 159:22 161:22 184:20 186:24 187:1 210:12,16
**CHARACTERIZATION-** 143:20
**CHARACTERIZE-** 134:21 146:6
**CHARACTERIZED-** 26:1 146:2
**CHARGE-** 31:20 44:4,5,6,25 45:2 48:12
**CHARGES-** 45:3 55:25
**CHECKING-** 111:25
**CHEEKY-** 198:16
**CHIEF-** 64:15 73:19 74:25 75:4,9 110:12
**CHILDREN-** 192:21 100:24 101:25 170:1
**CHINESE-** 166:1
**CHOICE-** 128:24
**CHOICES-** 71:5 99:25 129:16
**CHOOSE-** 84:20
**CHOSEN-** 146:23
**CHRYSLER-** 65:6 159:11,16,20
**CHUNK-** 170:7
**CIRCLE-** 96:22
**CIRCUIT-** 67:4,5 151:8
**CIRCUMSTANCE-** 105:14 173:7 205:13

**CIRCUMSTANCES-** 15:14 19:14 37:7 44:9 48:14 63:4 68:16 69:24 94:14,24 105:16 106:11,17 115:10 135:17 158:14 165:13 175:10 197:16,25 217:18
**CISCO-** 127:15 164:25
**CITE-** 157:20 164:25
**CITED-** 164:24
**CITIBANK-** 133:2
**CITIES-** 92:9
**CLAIM-** 167:1,7
**CLAIMS-** 8:8,11,17 51:20 167:4,9
**CLARIFICATION-** 34:15,16 52:16 81:19 189:14 201:25 214:23
**CLARIFICATIONS-** 35:22 143:10
**CLARIFIED-** 188:4
**CLARIFIES-** 9:10
**CLARIFY-** 35:19 113:24 114:17 190:3 216:18
**CLARIFYING-** 116:14 143:24 118:2,3,14,15,17, 22
**CLARK-** 119:1,15,17 152:21 180:17,20,23,24 181:1,6 189:3,6,7 194:24 196:19 197:12 198:15 202:2,4 203:24 208:5,6,19 209:1 220:12,13,16,17
**CLARK'S-** 194:22 196:17 204:3,4 205:10
**CLASS-** 171:14
**CLASSIC-** 79:23
**CLEAN-** 94:5 221:13 222:8
**CLEANED-** 221:17
**CLEANER-** 222:2
**CLEANUP-** 199:22
**CLEAR-** 8:7,20 16:12 17:9,11,18 18:22 34:25 41:17 42:1,15 57:14,19 69:12 71:13 78:17 98:1,5 125:5 153:12 156:20 160:18 166:9 168:7,12,25 188:5 190:7,12,22 201:17 202:10 203:1 208:1,12,21 217:5
**CLEARLY-** 10:1 16:8 91:24 116:4 134:16 157:7 165:6 214:17

215:21 219:15
CLEARY- 12:11
73:9 133:1 219:5
222:24
CLEARY'S- 99:15
CLERK- 74:2,5
125:13,15,18
CLERK'S- 226:4
CLIENTS- 81:9
157:25 191:13
204:3
CLIFFS- 14:23
15:3 16:7
19:12,16
CLOG- 26:22
CLOSE- 102:10
119:7 136:9
151:7,20 162:22
204:25 205:4
213:18,24
CLOSED- 98:12
143:4
CLOSELY- 88:2
126:25 132:11
136:3 217:23
CLOSER- 185:13
CLOSING- 63:5
98:5 151:12,25
183:11,19
186:10,11 192:19
222:20
CLOSURE- 109:2
CODE- 12:24 27:18
32:4 60:1 62:6,7
79:19 165:11
CO-HEAD- 126:5,25
COINCIDENCE- 33:7
COLLATERAL- 224:5
COLLEAGUE- 52:16
56:23 124:5,13
COLLEAGUES- 32:7
147:20 212:7
COLLECTING- 44:13
COLLECTION- 41:14
COLLECTIVE- 66:8
168:19
COLLECTIVELY-
65:23
COLOR- 89:9 94:25
COMB- 169:2
COMBINATION-
84:14 88:11 89:7
95:25 98:6 99:17
139:5 147:11
COMBINE- 86:25
COMBINED- 60:20
COME- 6:5 15:13
19:16 30:16 33:21
34:19,22 35:25
37:1 43:2,9 44:18
54:7 63:21 66:12
71:10 118:14
119:22 142:4,16
147:16 150:20
152:6 159:5 160:6
162:13 164:17
169:15,16 172:21
173:18 175:19
183:4 191:18 194

COMES- 22:5
120:12 147:6
149:21 178:9
181:3,20 203:3,20
204:7 206:8
208:10 220:8
COMFORT- 68:13,15
88:1 104:18
180:15 224:4
COMFORTABLE-
109:13 117:16
133:21 137:16
195:16
COMING- 65:25
98:13 113:23,25
114:5,8 117:24
118:6 139:1
157:17 158:19
162:6 217:16
219:12
COMMENCE- 24:23
109:21,23
COMMENCED- 25:23
COMMENCEMENT-
115:3
COMMENCES- 44:1
COMMENCING-
218:13
COMMENSURATE-
151:9
COMMENT- 36:23
39:22 110:15
143:21 153:7
COMMENTING- 18:4
COMMENTS- 13:6
21:18 37:17,21
53:8 54:6 55:4
110:15 152:21
154:4 169:3 190:4
202:4 208:7
214:2,10
223:5,6,9,13
225:13
COMMERCIAL-
82:15,24 83:2,10
84:22 85:9
COMMIT- 84:5
170:17 180:4
COMMITMENT- 70:22
83:16
COMMITTED- 172:8
175:1 178:18
COMMITTEE-
12:20,21
13:12,15,18
30:5,6 35:17
36:3,6 38:4,10
39:1,23 40:16
61:24 66:21 99:23
100:2,3,7
146:10,12,19,21
147:5,13 149:16
150:18,20
152:17,19
154:6,11 155:1
171:19,20 173:23
174:15
175:5,9,16,18,25
1

COMMITTEE'S-
11:16 180:8 183:7
COMMITTEES-
201:23
COMMITTEES'-
196:11
COMMON- 26:15
79:8 95:10,11
123:20 149:9,10
171:25
COMMUNICATED-
181:13
COMMUNICATION-
48:17
COMMUNITIES-
94:21
COMMUNITY- 15:23
16:4 17:4 21:8
96:23
COMPANIES- 16:21
20:8 27:22 29:10
41:18 44:14 57:15
59:21 79:17 81:14
83:18 130:10
134:9 136:13
COMPANION- 35:2
COMPANY-
27:14,23,24 29:19
60:14,15 61:10
76:13 77:11,12
85:10 110:17
122:15 126:14
128:2,11 129:1,24
130:9 133:3,4
134:18 137:17
140:2 146:25
147:8,23
159:21,23 171:23
174:11,19 217:23
220:2
COMPANY'S- 53:18
128:7,16,18
COMPARE- 66:17
205:4
COMPARED- 176:12
177:2
COMPARING- 108:13
COMPARISON-
134:9,10 204:14
COMPELLING-
128:22
COMPENSATED- 41:9
151:16
COMPETE- 84:3
131:6 183:4
202:15
COMPETING- 63:1
148:14 150:3,15
182:12 187:6,13
188:13 201:25
COMPETITION-
60:20
COMPETITIVE-
60:17,18 136:25
141:21,22 149:13
154:20
COMPETITOR- 61:7
81:24 89:18
COMPETITORS-

85:20 87:6,8
96:16 108:5 131:5
132:5
COMPLETE- 24:16
134:20 158:24
160:3
COMPLETED- 65:21
136:11
COMPLETELY- 79:4
209:13
COMPLETION- 57:3
COMPLEX- 38:14
42:5 44:21 51:12
61:12 72:7 168:16
174:9
COMPLEXITIES-
51:10,25
COMPLEXITY- 26:1
61:3 157:23
158:13
COMPLICATED- 47:7
61:5 72:7 195:19
COMPREHENSIVE-
129:19 138:6
COMPROMISE-
7:6,20 22:4 53:23
187:14
CONCEDED- 182:18
203:6
CONCENTRATED-
130:19
CONCEPTS- 152:25
CONCERN- 16:24
17:3,6,7 20:9
21:22,24 32:9
70:25 93:17 97:22
104:18 113:24
150:18 153:6
177:12 198:6
200:7,18
206:6,12,14
CONCERNED- 17:12
32:13 54:1 84:19
86:9,10 87:18
89:7 113:23 198:8
202:17,22 206:5
CONCERNS- 16:6
29:2,14 30:19
36:3 38:1 53:9
67:23 68:9 84:15
88:21 90:11,12
145:24
154:8,10,20
167:20,21,22
170:13 171:14
180:8,10 200:23
209:6
CONCERTED- 174:14
CONCLUDE- 21:6
110:18 111:4
CONCLUDED- 22:7
24:10
CONCLUDES- 58:4
CONCLUDING- 111:2
CONCLUSION-
18:17,25 23:19
71:11 98:20
129:20 174:17
196:23 215:3
CONCLUSIONS-

128:2,6,7,21
132:5
CONCURS- 48:16
CONDITION- 25:7
36:11,16 46:4
CONDITIONS- 35:5
36:20 64:6 135:12
151:25 175:2
207:19
CONDUCTED- 65:21
133:6
CONFERENCE- 9:2
11:12 13:24
158:10
CONFIDENCE- 88:1
112:16
CONFIDENTIAL-
85:7 108:8 128:1
CONFIDENTIALITY-
64:6 85:3 97:10
140:16
CONFINES- 161:14
CONFIRM- 156:16
CONFIRMATION-
33:22
CONFIRMED- 22:21
120:8 179:5
CONFIRMING- 48:18
CONFORM- 143:25
CONFRONTATIONAL-
30:10
CONFUSION- 152:21
216:24
CONGRESS- 166:11
CONNECTION- 12:13
33:2 35:16 36:13
39:15 59:9 102:17
110:23 117:23
144:12
CONS- 65:24
CONSENSUS- 52:4
CONSENT- 152:19
153:3 175:18,24
176:1
CONSIDER- 19:10
59:13 63:20 92:6
134:8 161:1
174:16,20 181:17
215:11,12,14,16,1
8
CONSIDERABLE-
123:8 151:4,18
180:13
CONSIDERATION-
148:3 206:16
CONSIDERATIONS-
38:13 110:17
CONSIDERED- 15:3
61:19 114:25
122:22 168:4
188:5 207:20
CONSIDERING- 24:1
121:5 123:1
160:21 167:10
206:15
CONSIDERS- 85:9
CONSISTENCIES-
26:18
CONSISTENCY- 16:5

CONSISTENT- 16:17
18:1,5,24 52:23
67:3 81:6 214:21
CONSOLIDATED-
57:17 159:23
CONSOLIDATING-
86:23
CONSPIRED- 60:21
CONSTITUENCIES-
29:15 61:23 195:4
196:11 199:24
205:19 220:23
CONSTITUENCY-
17:8
CONSTITUENTS-
68:14 99:21 188:6
213:21
CONSTITUTE- 39:10
161:23
CONSTRAINT- 88:21
CONSTRAINTS- 98:9
160:12
CONSTRUCT- 94:20
CONSTRUED- 16:16
CONSULT- 127:5
175:16 214:16
CONSULTATION-
152:19 153:3
158:15,16 171:19
175:9,18,24
176:20 177:17
213:20
CONSULTATIVE-
61:21 66:19
205:16
CONSULTED- 220:2
CONSULTING- 128:3
CONSUMER- 80:2
CONSUMERS- 17:23
CONTACTED- 64:18
120:1
129:7,9,15,18
138:11
CONTAIN- 141:1
CONTEMPLATE-
156:11
CONTEMPLATED-
19:7 55:25 209:14
CONTEMPLATING-
164:2
CONTEMPLATION-
102:18
CONTENTIOUS-
132:17 178:4
CONTESTED- 58:7
CONTEXT- 14:12,22
15:6,9,16 18:20
21:4 30:25 61:6
62:25 64:17 113:9
114:12,16 190:5
215:6,11
CONTINGENT- 44:4
CONTINUE- 10:22
25:13 59:7 71:22
80:15 84:15,19
86:6 87:25 89:16
93:23 101:17
180:13
CONTINUED- 12:25

21:24 29:23,24
37:10
CONTINUES- 91:4
CONTINUING- 90:13
217:17 218:3
CONTRACT- 81:24
101:8,13,15,16
145:14,21
183:14,16
CONTRACTS- 68:3
78:15 85:4,7
94:16 96:25 101:7
144:15 145:4,9
169:21 170:6
181:22
CONTRARY- 143:5
154:23 162:8
CONTRIBUTED-
136:14
CONTRIBUTION-
11:10,14 188:23
CONTRIBUTIONS-
11:19
CONTROL- 21:25
166:15 175:23
CONTROLLED- 74:12
CONTROVERSY- 7:20
16:15
CONVERSATION-
86:24 88:13 91:2
CONVERSATIONS-
13:7 30:5 88:9
89:18 90:20 91:6
94:13 113:7
CONVERSE- 149:20
CONVEY- 103:6
171:13
CONVEYANCE-
169:21
CONVEYED- 170:3
CONVEYING- 168:23
COOPERATION-
25:12 26:2,17,20
47:5 48:17 198:9
COOPERATIVE-
197:16
COORDINATED- 82:9
COORDINATION-
36:5
COPIES- 54:19
177:5,9 187:19
195:1 210:14
221:18
COPY- 14:13 54:11
221:17 222:2
CORDIAL- 30:9
CORE- 34:21 35:1
95:9 97:5
CORNERS- 31:2
201:15
CORPORATE- 26:11
75:11,22
77:20,21,22,23
78:16 80:3 81:9
CORPORATION-
146:6 164:10
189:13
CORRECT- 53:20
58:11 79:3 81:12

85:11 87:7 88:5
99:10 100:6,10,13
101:22 103:22
106:1,4,12,21
110:13,14 111:15
113:12,14,15,16,2
0,21
112:14,18,20
114:2,3,17,19
115:4,23,24
116:8,10,13,23,25
117:1,14
119:5,6,9,
CORRECTLY- 39:22
110:20
CORROBORATES-
192:16
COST- 41:15 103:2
104:11
COSTS- 28:12
79:13,14,15
COULDN'T- 220:14
COUNSEL- 8:22
11:16 21:17 23:6
46:15 47:4 49:12
55:10 73:4 118:20
123:20 146:23
154:9 171:6
173:15 176:5
190:10,23 214:16
226:21
COUNSEL'S- 190:4
226:15
COUNTERPART-
22:16 25:9
COUNTERPARTIES-
129:7 132:1
COUNTERPARTY-
139:10
COUNTRIES- 27:21
29:16
COUNTRY- 16:6
17:10
COUPLE- 6:9 8:25
35:5 37:21 38:15
43:11 60:7 71:19
89:17 95:4 112:11
114:22 167:25
181:22 184:3
190:5 194:11
195:20 212:25
213:15
COURSE- 19:4
35:11 54:16 57:14
59:11 107:1
127:11 137:17
140:2 144:3
145:18 147:2,9
149:24 151:19
153:17 169:3
173:25 175:3
178:23 186:1
193:11,12 198:2
199:5,23 201:21
226:7
COURT'S- 17:17
19:3 59:10 180:13
201:24 208:6
COURTHOUSE- 219:4

COURTROOM- 74:12
175:12 212:14
221:6
COURTS- 14:20
16:10,12,18
17:1,6,12 18:23
19:1 21:14 22:2
26:22 30:16
33:19,22 34:19,22
35:7 36:1 37:6
38:17 48:18 57:7
162:14 164:24
165:3 166:6 179:9
204:10 205:18
206:2,18 217:11
COVERED- 22:13
43:10 127:9
COVERS- 125:25
CRAFTED- 52:1
CREATE- 63:23
78:5 105:2 106:17
200:13,16
CREATED- 28:3
29:10 31:20 44:5
45:3 70:1 174:5
188:24
CREATES- 28:19
107:15
CREATING- 104:8
199:3
CREATION- 48:11
55:25
CREDIBLE- 194:15
CREDIT- 166:21
168:5 213:9,19
CREDITOR- 19:25
20:22 26:17 29:15
89:11 155:15
166:25 167:3
218:22 220:3
CREDITORS- 15:23
19:22 20:4 21:9
31:7 32:1,9
41:20,21,23 42:23
45:5,11 51:23
105:2 136:24
146:19 147:8
149:23 156:2
157:9 158:2,25
163:12 164:4
167:2
CREDITORS'- 22:4
31:16 36:3
38:9,25 39:22
61:24 66:20 99:22
100:2,3
146:10,12,21
147:5 149:15
150:18,20 152:19
154:10 156:19
171:19 174:14
175:5,9
CRISIS- 60:20
65:4
CRITERIA- 22:9
CRITICAL- 148:12
153:3,22 155:20
CRITICIZED-
143:19

CROSS- 12:17,19
18:10,17 25:6,12
26:6 35:10,21
36:19 45:16 46:2
48:15
109:17,22,24
110:10 112:7
118:25 138:1
150:12 173:2
200:19
CROSSROADS-
7:7,13,21,22,23
8:5,6,8,12,14,17
CROSSROADS'- 8:1
CROSSWORDS- 7:8
CRUX- 71:5
CUBE- 68:17 185:6
CULMINATION- 47:6
129:23 131:24
132:18
CURE- 144:18,19
CURRENT- 63:6
122:18 129:22
138:9 155:25
156:10 157:5
158:3 161:5
162:16 163:13
165:15 170:23
185:10 192:3
201:15
CURRENTLY- 145:20
165:5,23 195:21
CUSTOM- 95:11
CUSTOMARY- 104:14
109:11
CUSTOMER- 68:21
81:11,24,25
85:2,4 86:8 87:3
88:15 90:6 91:11
93:19,25 95:25
97:19 98:7 99:4
108:22 109:1
115:18 120:4
130:16,19 131:11
137:2 139:2,7
192:21 192:6
CUSTOMERS- 59:20
70:15,20,25 71:7
77:7,15 80:15,19
81:10,14
83:19,23,24
84:12,17 85:1,6
87:13,16,17 88:24
89:19,23 90:8,9
93:15 94:1,15
95:9 96:20,25
109:6 112:12,20
113:5,22
114:4,7,11,22,24
115:5,8,11,16
117:1
CUSTOMERS'- 87:4
95:6 208:1
CUT- 78:18 79:13
95:6 208:11
CUTS- 95:15
CYCLE- 42:8 69:18
82:11,14

**D**

DAMAGES- 98:24
DAN- 8:22
DARNDEST- 191:23
DATA- 77:14 79:25
97:4,5,14 103:23
132:3 140:9,18
141:7 142:8
150:15
DATABASE- 136:4
DATE- 41:11 54:4
92:1 95:22 103:19
136:22 157:16
162:9 205:17
227:13
DATED- 185:11
DATES- 210:19
DAY- 70:6 79:17
96:10 107:3
139:12 184:8
185:12,16,24
191:25 192:20
193:14 195:13
196:4 222:20
225:17 226:24,25
DAYS- 13:13 14:8
117:19 139:11
140:12 157:17
158:17,19 159:10
163:16 191:16
195:11,13 197:23
201:11
DAYS'- 11:18
DE- 169:18
DEADLINE- 68:1,5
144:16,19
DEADLINES- 65:20
152:12,14 172:6
DEAL- 20:19
23:9,11 24:2
25:6,9 44:8
45:6,10 51:18
58:16 59:6 111:5
136:6,10 137:3
174:9 178:25
182:9 183:13
184:2 200:20
204:2,6 217:3,11
DEALING- 14:10
23:17,18 24:12
27:2,14 55:24
108:24 149:12
216:25
DEALS- 33:3 49:22
53:13 104:3 136:5
DEALT- 15:12
18:23 105:13
167:23
DEBATE- 105:15
DEBT- 155:17
DEBTOR- 7:23 14:4
19:24 148:17
149:7,14 150:21
152:18 166:20
171:6 174:13
176:5,10 192:7
200:11 201:23
209:14

DEBTOR'S- 19:20
21:21
DEBTORS- 7:7,20
8:2,13,15 10:25
11:1,5,15 12:11
13:9,11
25:19,20,21 30:7
36:5,9 40:6 47:6
57:16 58:24 59:14
62:21,22 63:11
67:14 68:2,12,13
69:25 71:16,22
73:9,21 111:11
117:12 120:8
126:12 142:13
143:15 145:2
DEBTORS'- 8:13
10:4,24 11:7
12:14,25 15:23
16:24 21:25 33:6
57:25 58:25 74:4
95:23 125:14
136:15 153:12
154:9 155:21,22
156:2 159:2
161:5,14 172:4
173:19 181:9
191:22 196:10,24
204:13 206:14
213:7 223:1
DEBTS- 169:16
DECADE- 70:23
82:10 84:16
92:16,19 115:22
DECADE'S- 116:1
DECEMBER- 76:4
82:9 89:21 96:21
179:3,6,14 183:24
196:14
DECIDED- 99:12
103:24 104:5
DECIDING- 15:8
21:14 33:21 95:18
DECISION- 15:14
18:4 60:4,9,25
84:23 85:12 88:1
123:1
127:20,21,22
128:20 129:1
169:25 171:10
172:7 173:11
175:10 196:4
198:3 207:12
215:5 218:12
DECISIONS- 18:5
60:13,15 82:17
88:23 91:13
128:22 175:21
DECLARATION-
53:17
DECLARATIONS-
54:3
DECLINE-
80:4,8,14,21 90:2
99:5 128:13
130:23 134:13
DECLINED- 98:25
DECLINING- 80:7

81:15 128:15
134:16,17
DEEMED- 39:3
195:10
DEEP- 67:18
DEEPER- 89:17
DEFER- 56:23
DEFERRED- 57:3
DEFINE- 168:23
172:18,19
DEFINED- 168:16
DEFINITELY-
167:22 204:13
206:13
DEFINITION-
122:23 188:2
DEFINITIVE-
132:19
DEGREE- 137:4
218:4
DELAWARE- 22:21
23:6 24:1,8 36:18
37:24 55:17
57:7,12 58:16
67:4 149:11
214:14
DELAY- 98:5
115:17 119:3
184:2,11 185:19
187:9 191:15
194:10 195:6
198:12
DELAYED-
115:5,15,25
183:23 185:24
186:3
DELETE- 220:4
DELETED- 220:15
224:1
DELISTING- 60:11
DELIVER- 87:20
103:2 156:1
DELIVERS- 204:21
DELIVERY- 133:19
DEMAND- 107:6
DEMONSTRATED-
193:13
DEMONSTRATING-
64:7
DEPENDING- 84:7
97:17 210:14
DEPENDS- 193:4
DEPLOY-
82:6,18,24 86:5
92:12
DEPLOYED- 83:7
DEPLOYING- 82:10
DEPLOYMENT-
82:4,13 83:11
91:20 92:11 97:20
DEPLOYMENTS- 83:2
89:2
DEPOSIT-
150:3,4,7
182:12,13,14,16,2
2
178:3,14 183:2,4
198:17
DEPOSITS- 176:8

DEPTH- 30:8 147:7
DERAIL- 155:21
170:20 173:20
DERISK- 90:14
DERISKING- 92:7
DERRICK- 14:3
DESCRIBE- 64:14
75:23 76:24 79:16
83:19 85:2,13
99:11 103:9 104:3
105:10 126:10
132:13,15,16
133:16
DESCRIBED- 40:11
59:17 127:17
216:17
DESERVE- 148:3
DESIGN- 201:18
DESIGNATING-
136:16,20
DESIGNED- 121:23
142:2 191:16
207:14
DESIRE- 37:7
67:14 88:11 89:2
107:17 191:4
DETAIL- 100:17
DETAILS- 65:22
DETERIORATING-
68:18
DETERMINATION-
177:18
DETERMINE- 153:16
DETERMINED- 136:1
195:15
DETERMINING- 21:3
127:19
DETRACTS- 15:4
DETRIMENTAL-
177:24
DEUTSCHE- 126:6,7
DEVELOP- 70:23
81:3,5,24 86:16
88:12 89:22 93:11
DEVELOPED- 20:7
71:17 88:10 93:11
DEVELOPMENT- 27:9
60:19 75:12,22
78:4 84:11 88:4
101:3 127:2
DEVELOPMENTS-
213:16
DEVICES- 83:6,7
DIALOGUE- 85:5
88:10 96:15
DIALOGUES- 94:22
DICTATES- 161:13
DIDN'T- 20:1
88:12 100:13
108:18 118:12,23
142:8 160:24
177:12 181:14
190:10 202:12
212:1
DIFFER- 31:5
DIFFERENCE- 78:19
130:5
DIFFERENT-
26:10,14 42:9,22

71:19 76:6,24
77:4,21 78:24
79:15,20 82:2
94:4 102:6,13
106:24 108:21
112:24 114:20
120:6 131:11
143:11,14 145:7
172:18 174:9,23
177:22 178:5
185:6 200:14,15
203:13 205:9,24
208:24 20
DIFFERENTLY-
78:21 87:22
DIFFICULT- 28:20
42:25 51:16,19
52:3 57:21 60:23
69:5 71:5 86:3
109:1 120:10
130:22 131:6
206:10 210:2
DIFFICULTIES-
28:18 43:15,17
DIFFICULTY- 22:20
DIGITS-
93:13,14,17
DILIGENCE- 65:21
129:13 140:5,8
150:11,19 158:24
160:3 162:2
171:23 175:2
182:2,24
DIMINISH- 97:25
DIMINISHED- 97:3
DIMINUTION- 98:7
185:18
DIRECTION- 36:11
209:13
DIRECTOR- 37:13
73:21 125:10,23
DISADVANTAGE-
72:19
DISAGGREGATE-
78:1
DISAGGREGATED-
79:1,4 169:13
DISAGREE- 184:15
DISAGREEMENT-
175:17
DISAGREEMENTS-
216:25
DISBURSEMENT-
13:14
DISCIPLINE-
107:13
DISCLOSES- 13:10
DISCLOSURE- 219:1
DISCOVERY- 30:20
DISCREET- 173:14
DISCRETE-
41:19,21,23 42:23
DISCRETION- 16:10
50:18 176:20
DISCUSS- 90:23
DISCUSSED- 16:19
27:2 85:1 113:4
114:11,12 138:20
153:9

DISCUSSES- 55:14
DISCUSSING- 33:17
114:19
DISCUSSION- 23:8
62:18 94:2 98:19
99:20 133:5
150:12 178:3,4
DISCUSSIONS-
38:18 60:9
86:17,19,21 89:12
91:9 98:18
99:15,22 104:21
107:1,21 108:9
120:23 127:24
128:1 171:22
184:21
DISHEARTENING-
162:4
DISPARAGING-
191:7,10
DISPOSITION- 18:7
57:11
DISPUTES- 26:23
217:3
DISQUALIFYING-
65:2
DISTANCE- 204:5
DISTINCTION-
168:18
DISTRESS- 127:13
DISTRESSED-
127:7,12 193:23
DISTRIBUTED-
19:21 33:16
DISTRIBUTIONS-
221:8
DISTRICT- 7:24
67:4,5
DIVERGENCE- 57:6
DIVEST- 84:23
85:13 216:11
DIVESTITURE- 76:3
85:12 217:24
DIVESTITURES-
76:2
DIVIDE- 23:9
DIVISION- 27:20
60:1 79:20
DIVISIONS- 76:24
95:2 120:18
DIVVIED- 33:10
DOABLE- 152:13
DOCKET- 221:10
DOCUMENT- 30:21
DOCUMENTS- 97:6,7
DOESN'T- 32:23
120:16 140:17
166:3 176:1
182:14 186:6
191:19 204:22,23
DOLLAR- 85:18
98:15,20 135:9
148:21 166:21
181:22 204:5
DOLLARS- 67:16
76:8 83:17 98:4
101:25 102:14

119:12 151:18
181:25
DOMESTIC- 189:17
DOOLITTLE- 12:14
37:14 225:11
DOOLITTLE'S-
49:19 53:17
DOOR- 62:1 172:13
177:19 209:24
DOUBLE- 32:13
93:14,17
DOUBT- 18:17
173:5 207:2,4
DOWNS- 91:9
DOWNSIDE-
133:22,24
DRAFT- 54:19
55:6,12,23
DRAFTING- 33:15
DRAFTS- 33:16
DRAGGED- 152:7
DRAW- 44:7
DRIVEN- 27:6 65:4
85:18
DRIVING- 91:20
DROP- 153:17
DROPPED- 118:12
DROPPING- 80:6
90:4
DROVE- 88:1 97:19
DUE- 33:23 115:10
139:13 140:7
150:11 158:24
160:3 169:3 182:2
186:5 215:22
DUTIES- 172:12
DUTY- 203:22
204:20
DYNAMIC- 42:25
DYNAMICS- 104:9
105:5 107:15

**E**

EACH- 18:22 31:5
42:21 66:7,11
86:20 94:13
102:12 129:5
146:25 148:9
185:4,12,16
EAGER- 173:20
EARLIER- 13:3
59:18 62:18 95:5
127:17 155:14
190:4 193:9,10
223:11
EARLY- 127:9
149:4 174:3 177:4
196:20 210:19
EARN- 185:15
EARNEST- 86:18
91:5
EARNINGS- 185:17
EASILY- 20:20
105:17 192:11
EAST- 27:11
EASTERN- 83:25
EASY- 28:15 31:1
194:24
EATON- 18:15

ECHO- 47:4 51:9
ECONOMIC- 15:22
17:4 21:8 84:19
109:1
ECONOMICS- 88:14
ECONOMY- 80:7
115:10
ECOSYSTEM- 83:5
ED- 52:13
EDC- 44:6
EDDIE- 57:2
123:9,17,21
EDUCATIONAL- 76:9
126:10
EFFECT- 36:8
174:6 183:2
EFFECTIVE- 177:11
EFFECTIVELY- 78:6
79:21 84:18 86:16
95:7,15 96:9
108:12,13 112:23
121:15 134:20
200:21
EFFECTIVENESS-
46:4
EFFECTUATE-
224:22
EFFICACY- 215:16
EFFICIENT- 6:12
81:1
EFFORT- 42:17
91:10 169:22
174:14 215:13
EFFORTS- 30:11
70:15 116:2
143:25 162:8
191:18 194:22
196:17 216:11
217:24
EGG- 161:12
EIGHT- 80:6 82:13
90:4 138:16,17
ELABORATE- 64:13
ELECTING- 187:6
ELECTRONIC-
97:4,5,14 103:23
140:9 227:9
ELECTRONICALLY-
226:11
ELEMENT- 29:9
32:8 81:19,20
95:13
ELEMENTS- 61:16
62:10 78:20
79:9,15 81:21
95:7,8 102:2,4
174:23 175:11
176:3
ELEVATED- 137:11
ELSEWHERE- 18:5
59:15 71:2 168:25
EMAIL- 43:20
181:14 221:7
EMBARKING- 217:14
EMBODIED- 36:6
37:9
EMBRACE- 219:4
EMEA- 32:22 40:5
41:24 42:14

44:10,18,24
100:11
EMERGED- 60:21
129:13
EMERGENCE- 106:16
EMINENTLY- 63:4
EMPHASIZE- 45:4
150:23
EMPHASIZED- 18:6
193:14
EMPIRE- 41:16
42:4,13
EMPLOY- 186:20
EMPLOYED- 75:5,15
EMPLOYEE- 103:14
108:25 186:23
192:18
EMPLOYEES- 31:7
78:14
103:11,13,17
109:6 137:10
169:21 186:21
187:3
EMPLOYER- 187:4
EMPLOYERS- 187:6
EMPOWERED- 223:16
ENABLES- 172:24
ENCOMPASSES-
15:11
ENCOURAGE- 204:16
ENCOURAGING- 87:4
ENCUMBRANCES- 8:8
ENDORSED- 57:8
ENDORSEMENT-
218:25
ENEMY- 169:8
170:15
ENERGY- 83:16
91:4 104:11 151:8
171:4 182:24
ENFORCE- 194:15
210:16,25
ENFORCES- 107:13
ENGAGE- 60:9
62:15 99:12
107:11 146:24,25
ENGAGED- 35:11
51:15 59:19 61:20
68:12 91:25
213:17
ENGINEERING-
76:11
ENHANCE- 48:17
ENHANCED- 217:17
ENORMOUS- 26:21
ENSURE- 160:2
ENSURING- 44:19
ENTER- 35:7
102:18 121:13
151:6 213:8,19
223:16 225:9
ENTERED- 29:10
36:15 42:6 58:24
85:4,8 179:14
188:12 197:7
213:13,16 224:13
ENTERPRISE- 6:5
27:4,12,20,23
28:9,17 29:13

34:6 63:14,15
76:23,24
77:2,13,14,19
80:3 101:14
116:12,15,20
121:20 140:24
163:24 168:22
ENTERPRISES- 26:5
34:4
ENTERTAIN- 111:11
119:24 121:12
122:15 123:14
153:12
172:9,13,21
ENTERTAINED-
202:1
ENTHUSIASTIC-
170:19
ENTIRE- 121:15
159:16 178:2
185:23 191:14
ENTITIES- 26:11
28:12 32:22 34:9
38:21 39:24 65:9
72:2 75:5
77:21,22
78:7,16,18 95:5
111:18 146:24
147:10 165:11,12
166:5 169:16
ENTITLED- 32:17
151:14,16
ENTITLEMENT- 40:4
ENTITY- 52:14
77:2 78:12,13,16
101:10 113:8
194:15
ENTRY- 10:24
58:21 60:5
223:2,20
ENVIRONMENT-
60:17,18,23 109:1
ENVISIONED- 33:17
ENVISIONS- 33:9
EQUALLY- 215:8
EQUATION- 94:18
EQUIPMENT- 7:22
8:4,7,19 9:11
22:14 81:13 84:7
EQUIPPED- 88:16
EQUITY- 11:6
139:24
EQUIVALENT- 35:19
143:22
ERICSSON- 87:9
ERISA- 165:10
ERISA'S- 166:11
ERNST- 47:2 49:5
189:24
ESCALATOR-
28:22,23
ESPECIALLY-
100:15 150:21
217:6
ESSENCE- 15:2
18:19 42:12
128:25
ESSENTIAL- 148:23
ESSENTIALLY-

29:20 30:13 165:17
**ESTABLISHED-** 61:2
**ESTABLISHING-** 63:11
**ESTATE-** 10:4 30:14 31:12 33:1 44:3,10,20 57:25 111:2,4 122:1 151:10 167:7 191:21 201:17 206:8
**ESTATE'S-** 31:17 41:4,17
**ESTATES-** 32:1,3,10,17 40:4,5,14 41:15 42:22,24 43:9 44:10,24 167:12 194:14 195:3
**ESTEEMED-** 56:23
**ESTIMATE-** 123:22
**ESTIMATED-** 102:6
**ETHERNET-** 27:19 77:10
**EUPHUISM-** 86:22
**EUROPE-** 27:11 83:25 86:1 89:12 171:8
**EUROPEAN-** 82:20
**EVASION-** 165:10
**EVENING-** 158:8 222:11,17
**EVENTS-** 44:22
**EVERYBODY-** 162:15 187:22 192:1,22 196:10
**EVERYBODY'S-** 42:17
**EVERYONE-** 12:1,3 31:3 42:18 51:11 56:22 70:4 145:22 170:24,25 175:15 177:17 178:10 195:22 196:6,7,15 200:17,22 201:1 221:6,16,19 222:3
**EVERYONE'S-** 92:2 144:3
**EVERYTHING-** 100:20,21 143:25 194:10 205:15
**EVERYTHING'S-** 220:13
**EVIDENCE-** 15:21 22:8 50:17 54:1 67:6 143:6 215:21
**EVIDENT-** 161:4
**EVIDENTIARY-** 143:4
**EVILS-** 16:20
**EVOLUTION-** 60:3 69:3 80:25
**EVOLVED-** 90:24
**EVOLVING-** 61:6
**EXACT-** 139:17 140:7
**EXACTLY-** 61:7 66:13 131:19

148:7 205:2 213:3,5,14,15
**EXAMINATION-** 74:22 109:22,24 110:10 112:7 118:13,25 119:20 122:11 125:19 138:1 150:13 153:10 154:9 173:2
**EXAMINE-** 12:17,19 45:12 109:17
**EXAMPLE-** 78:22 80:20 140:24 192:7
**EXAMPLES-** 79:23 95:4,19
**EXCEED-** 11:8
**EXCEEDINGLY-** 18:24
**EXCELLENT-** 49:7 200:1 226:17
**EXCEPT-** 22:1 144:18 197:12 217:3 225:2
**EXCEPTION-** 22:2 55:14 72:20
**EXCESS-** 11:15 164:4
**EXCESSIVE-** 26:20
**EXCHANGE-** 8:10 60:12
**EXCLUSIVE-** 47:19
**EXCUSE-** 11:23 13:16 43:16 55:1 140:21 163:5 214:6
**EXCUSED-** 10:9,12 155:5
**EXERCISE-** 26:25 27:4 28:13 30:23 62:3 64:18 66:9 68:12 69:25 71:18 72:9 173:9
**EXERCISED-** 22:2
**EXERCISES-** 71:23
**EXHAUSTIVE-** 194:5
**EXISTED-** 114:18
**EXISTING-** 45:1
**EXISTS-** 96:1 116:12
**EXPECT-** 35:12 102:11 104:12 125:1 133:25 150:22 170:21 180:14 213:22 218:2 219:20
**EXPECTATION-** 23:19 136:8 217:9 218:25 219:12
**EXPECTED-** 186:15
**EXPECTS-** 219:14
**EXPEDITED-** 63:3 69:13,23 219:16
**EXPENDED-** 41:13
**EXPENDING-** 182:23
**EXPENSE-** 9:11 32:19 66:24,25 104:23

105:10,19,22,24 106:2 135:7,10 151:17 152:1,8 154:18,25 203:11,25 205:11
**EXPENSES-** 41:6,10 104:14 106:7 135:22 179:18
**EXPERIENCE-** 47:12 75:24 104:3,4,20 107:13 108:24 127:7 128:3,21 129:21 149:9 193:23
**EXPERIENCED-** 128:3
**EXPLAIN-** 76:9 81:23 101:7 102:20 177:21 223:13
**EXPLAINED-** 18:16
**EXPLAINING-** 38:12 193:16
**EXPLANATORY-** 225:2
**EXPLICITLY-** 9:12 188:5
**EXPLODED-** 60:21
**EXPLORATIONS-** 89:12
**EXPLORED-** 114:22
**EXPLORING-** 91:23 129:24
**EXPLOSIVE-** 118:9,13
**EXPRESS-** 19:5 98:14 188:4
**EXPRESSED-** 30:19 32:9 95:22 98:11 113:25 146:11
**EXPRESSING-** 36:3 209:8,9
**EXPRESSIONS-** 121:2
**EXPRESSLY-** 138:21 188:1 223:15
**EXTENDED-** 135:1 161:15
**EXTENDING-** 90:1 104:10 172:5
**EXTENSION-** 144:13 157:14 158:21 159:24,25 161:25 163:16 184:6
**EXTENSIVE-** 70:15 218:1
**EXTENSIVELY-** 141:13 217:20
**EXTENT-** 49:3 59:7 68:6 140:1 145:14 154:22 217:8 219:10,19
**EXTENUATING-** 159:16
**EXTINGUISHMENT-** 34:2
**EXTRA-** 204:5
**EXTREME-** 120:10
**EYE-** 31:3

**EYES-** 87:23 204:25

F

**FACE-** 167:4
**FACED-** 19:23 61:12
**FACETS-** 165:11
**FACILITATE-** 103:13,16
**FACILITIES-** 213:9,19,23 223:3,17 224:13
**FACILITY-** 136:12 223:21 224:24 225:12
**FACING-** 28:18
**FACTORS-** 22:6 85:18 168:8 177:22
**FACTUAL-** 183:25 184:16 214:19
**FACTUM-** 15:18 16:14 20:10
**FAIL-** 57:17 179:13
**FAILURE-** 151:25
**FAIR-** 10:3 25:25 28:22 30:22 33:20 53:15 57:22 67:14 98:9 110:22 113:2 134:8 135:3 156:8 158:14 162:15 192:23 199:4 205:12 206:12,17
**FAIRLY-** 62:20 72:3 99:15,19 105:17 117:19 127:13 207:21
**FAIRNESS-** 58:1
**FAIT-** 141:23
**FAITH-** 30:23 35:11 159:3 177:25 178:3,13 216:13
**FALL-** 126:3 191:24 215:25
**FALLING-** 220:14
**FAR-** 54:1 142:4 180:7 198:7 218:12
**FARLEY-** 18:4,16
**FASCINATING-** 84:11
**FASHION-** 92:12 200:10 204:18 206:24
**FAST-** 42:6 208:1
**FASTER-** 185:13
**FAVOR-** 44:25 111:19
**FAVORABLY-** 112:19
**FAVORING-** 17:7
**FEAR-** 196:8
**FEBRUARY-** 75:3,15 82:16,22 91:13 92:1 191:3
**FEE-** 66:23,24 104:15,22

106:9,10,14,16,19 ,23
105:9,14,22 107:6 135:7,10,14 136:3 150:25
151:3,5,11,22,25 152:10,15 154:18,25 176:9 179:1,2,5,11,16,1 9,23
178:20,24 183:8,11,21 187:12 203:11,25 205:11
**FEEDBACK-** 55:7,9 79:21 80:5 85:6 86:8 87:13 89:19 101:14 109:6
**FEEL-** 42:9 129:17,19 138:5 145:10 146:7 174:13 176:13 204:19
**FEELING-** 98:14
**FEELS-** 214:17
**FEES-** 223:20
**FELD-** 146:18
**FELDSHER-** 111:24 112:2,8 117:18,22 122:6,7,8,10,12,2 5
118:21 123:6,7 137:24,25 138:2,3 142:20
155:9,10,11 163:5,9,17,20 164:1,6,7 184:3 190:17,18,22
**FELT-** 32:9 180:4
**FEMALE-** 14:2
**FIDE-** 15:23 21:9 182:22 193:24 197:17 201:13
**FIDES-** 183:5
**FIDUCIARIES-** 42:21
**FIDUCIARY-** 172:12 203:22 204:20
**FIELD-** 82:4 103:9,10 149:1 150:7 154:22 178:8,17 183:3 198:1
**FIGHTING-** 175:17
**FIGURE-** 31:22 43:6 170:18
**FILE-** 13:9,16,18 144:17 221:19,23 25:18,19,20 49:23 51:3 52:19 55:15 56:4 58:14 103:20 122:19 125:4 143:7,15 144:23,24 156:11 160:20 161:3 171:8 192:6 199:17 210:19 216:8

FILING- 29:11
41:11 42:7,9,11
80:8 91:9
93:6,13,20
104:17,19 115:14
120:3 126:14
127:18 150:14
184:20 186:24
187:1 210:15
FILINGS- 25:22
41:13 89:11,15
126:16
FINAL- 32:16
36:11 44:16 53:8
54:6 106:24
133:13 142:11
144:2 152:16
153:7 199:18
213:8 223:2
224:12,17,19,23
FINALIZE- 175:20
FINALIZED- 213:23
FINALIZING-
132:19 213:24
FINALLY- 81:6
152:11 173:22
178:20 188:11
FINANCE- 69:8
77:24 78:4 79:12
FINANCED- 66:1,2
136:13
FINANCES- 27:8
28:5
FINANCIAL-
11:1,3,15 13:11
60:18,20 61:25
64:7 65:4 69:9
87:15,22 88:21
90:6 98:2 99:4
113:2,7,11,18,23,
24,25
102:24
114:4,8,23,24
116:8 117:5,7,10
119:23 120:1,6
128:16
138:11,15,16,18,2
0
130:2,5,12,24
139:1,6
FINANCIALS- 97:6
129:8
FINANCING- 136:6
174:25 175:1
FIND- 12:23 20:18
51:16 61:10 69:19
70:16 90:18 91:18
98:8 124:5,13
128:22 149:3
162:4 202:21
FINDING- 168:12
216:2
FINDINGS- 168:25
FINE- 7:14 13:21
38:11 54:9 123:13
144:21 169:2
180:16 181:24
184:12 188:3
210:23 221:22

226:19
FINITE- 185:14
190:25 191:1
FIRE- 134:22
141:11,12
FIRM- 114:15,16
125:25 126:8
138:21 139:24
152:24 219:5
FIRST- 10:23
14:21 18:13
23:10,16 24:23
26:10 28:7 33:8
35:7 46:21
51:12,13 52:2
55:18,20 57:5
58:4,15 61:2
73:18,24 76:1,23
89:24 91:1 97:19
105:8 143:20
145:7 146:16
147:2 148:11,18
161:21 167:20
177:18 18
FIVE- 11:18 13:13
25:19 75:11 82:5
106:7 126:8
135:23 155:6
178:13 182:13
195:23,24
196:8,12 210:5
FIVE-DAY- 223:18
FIVE-MINUTE-
180:15 211:10
212:17,19
FIXED- 71:4
101:25
FLAT- 106:20
133:25
FLATLY- 182:9
FLATTERY- 157:22
FLAVOR- 99:11
100:18 108:9
170:6
FLEX- 145:14,20
FLEXIBILITY-
15:13 18:6
24:13,14 63:20
65:19 66:5 94:18
95:20 111:5
121:25 152:25
170:11 172:23
174:12 176:23
204:7 205:9 224:7
FLEXIBLE- 16:15
48:4 72:13 147:1
201:18
FLEXTRONICS-
144:25 145:6
FLOOR- 25:12
202:11
FLOW- 29:12
47:10,11,13,20
48:12 86:7 98:3
102:5 119:13
130:23 134:10,17
FLOWERS- 191:8
FLOWS- 34:5 89:25
FLUID- 207:21

FLYING- 209:23
FOCUS- 26:15 31:6
91:22 93:23 174:4
181:11
FOCUSED- 20:13
28:9,13 86:20
90:21 91:10
172:15,17
FOLKS- 31:1 87:9
95:19 117:9
123:11 128:3
172:14 184:24
FOLLOW- 16:20
57:10 207:7
FOLLOWED- 46:21
83:12 151:9
FOLLOWING- 44:2
187:16
FOLLOWS- 57:8
FOLLOW-UP- 105:8
118:19 119:18
220:1
FOOT- 104:13
FOOTNOTE- 84:25
86:2 111:8,10
121:11 153:10
172:15,22
181:15,16 200:7
201:6 203:16
208:9 220:1,5,15
FOOTPRINT- 61:13
71:6,9 83:3,20
85:24 87:1 92:8
112:22 113:1
131:14
FORCED- 16:20
152:13
FORCING- 107:14
FORECAST- 29:8
47:10,11,19 80:5
124:1
FORECASTS-
29:7,24
FORECLOSE- 162:17
FORECLOSED-
157:12
FOREGO- 116:1
FOREGOING- 227:8
FOREIGNER- 156:6
162:23
FORESTALL- 26:22
FORGE- 187:14
FORGET- 114:15
FORGIVE- 198:15
FORGOT- 100:16
FORM- 55:15 56:4
57:10 70:11 71:12
86:23 151:10
157:21 158:4
199:18 218:16
FORMAL- 18:8
19:15
FORMALLY- 221:23
FORMED- 171:20
FORMER- 78:17
FORMING- 88:7
FORMS- 143:11
FORMULAIC- 98:19
FORTH- 66:18

107:2 124:20
131:16 179:1
193:18 217:16
FORTHCOMING-
147:25 198:11
218:19
FORWARD- 30:21
33:4 48:3 63:25
82:23,24 97:23
104:13 107:25
108:2 121:14
146:14 156:4
158:17 173:16
191:22 194:7
204:23 209:15
218:15,19
FOUND- 19:8 29:11
41:11 124:15,17
216:2,20 221:13
FOUR- 20:17
129:12 147:6
201:15 215:9
225:22,23
FOUR-MONTH-132:15
FOUR-PRONG- 22:7
FOURTH- 81:22
150:11 186:15
188:11
FRAME- 30:4 63:3
83:14 96:22 109:5
139:18 219:16
FRAMEWORKS- 63:24
FRAMING- 222:13
FRANCE- 25:24
FRANKLY- 94:21
101:16 112:25
145:18 178:7
182:9 188:21
FRAUDULENT- 165:8
FRAUGHT- 51:10
FRED- 146:18
FREE- 8:7,20 34:6
166:8,9 168:12,24
FRIDAY- 7:10
35:13 60:6 140:17
161:3
FRONT- 36:6 41:6
54:11 99:25 109:4
164:17 166:7
176:5 207:12
FRONTS- 79:7
99:20
FRUIT- 143:12,19
FRUITFUL- 191:7
FRUITION- 63:21
FRUSTRATING- 30:9
FULL- 32:16 64:24
65:11 155:24
190:6
FULLY- 38:10
40:16 48:3 52:6
157:17
FULSOME- 162:15
FUNCTION- 74:11
78:9,10 107:15
FUNCTIONING- 26:6
29:6
FUNCTIONS- 77:23
78:2

FUND- 47:23 75:13
112:16
FUNDAMENTAL-
19:11 29:9 39:25
40:5 120:11
164:19
FUNDAMENTALLY-
120:15 203:18
FUNDING- 6:20
12:14 23:11 24:25
25:6,7 26:10,24
27:5 28:7,8 29:20
30:13 31:8
36:7,20,21
37:8,10,11,20,25
38:10,24 39:25
40:17 41:1,6
43:3,4,5 45:15
46:4 47:3,8,22
48:1,2,5,12
51:5,16,25
52:7,21 55:13
56:1,3 58
FUNDS- 29:12
33:13 45:7,10
139:21 223:25
224:3
FURNITURE- 42:4
FURTHER- 18:3
46:9 47:25 48:4
54:10,20 55:8
62:15 109:14
119:15 122:5
129:2 137:20
142:22 174:2
218:8 219:21
226:22
FUTURE- 29:8
38:17 40:13 48:7
51:17 68:3
93:16,24 186:16

                G

GAIN- 89:4
GAME- 178:18
191:4,5,11
GAP- 86:12
GAPS- 92:18
GAVE- 194:24
218:17 225:25
GE- 95:8
GEAR- 80:1
GENERAL- 15:19
65:6 76:9 101:23
108:9 172:22
GENERALLY- 17:22
71:8 75:23,24
76:15,22 85:13
88:20 96:5 104:3
131:15 132:6,13
139:21 152:22
179:23
GENERATE- 203:10
GENERATED- 98:3
GENERATION- 28:10
68:24 69:4,17
81:7,16,17,18,22
84:4,5 112:17
120:14 134:20

185:10 186:15
GENTLEMEN- 37:16
GEOGRAPHIES-
131:11
GEOGRAPHY- 94:16
GEORGE- 64:14
73:18
74:4,7,20,25
129:22 131:2
132:11,25 137:10
GEORGE'S- 128:6
GEORGIA- 144:8
GET- 28:21 30:12
44:21 63:5 71:4
73:3 81:24 83:1
84:4 87:24 91:20
98:13 104:18
106:15 107:9
117:16 120:16
140:10 142:7
144:15 145:18
154:20 158:1,4
159:5
162:11,12,22
168:12 172:1
174:6 176:8,12
177:5,7,19
GETS- 104:7 105:6
120:16 175:18
179:3 188:12
GIULIANI- 112:3
138:4 155:12
GIVE- 11:15 40:22
42:25 54:10 64:8
68:2 69:22 76:9
87:13 88:17 94:25
99:11 100:18
108:9 112:16
121:25 123:22
143:13 158:21
159:4 162:25
166:12,20,21
168:5 170:5
176:11,15 180:17
183:23 188:13
190:11 199:23
GIVEN- 61:22
64:22 68:13
84:12,16 89:9
92:4 97:14 120:22
130:1 161:17
165:13 166:18
188:21 192:13
196:19 199:4
215:21 217:6,25
GIVES- 107:2
136:23 224:7
GLAD- 110:2
190:18
GLEANED- 22:5
GLOBAL- 27:3
28:9,17 64:23
71:6 77:5 78:3,18
80:13 81:2 83:20
85:24 86:14
87:2,19,24 90:18
95:24 112:3,22,25
117:11
131:2,7,8,12

139:21 155:12
168:19,22
GLOBALLY- 83:22
GLOBE- 197:3
GM- 159:12
GO- 18:21 20:17
22:19,22 33:12
51:13 55:14 63:8
82:1,2,3,12,18,23
,24
71:2 76:21 81:20
84:23 85:16 86:19
89:17 90:16,17,19
91:1,12 96:14
97:19 99:3 101:9
117:2 120:10
124:21 141:21
148:8 156:3
160:25 165:1
GOAL- 201:16
GOALS- 28:15
154:23
GOING- 16:24
17:3,7,25 20:9
21:19,21,24
23:9,10,16 24:9
30:21 31:1 40:25
44:18,19 62:20
66:17 69:10,25
70:22 71:19,24
82:22 84:20 85:19
89:1 91:14 94:6
97:17 100:17
102:24 103:8
105:14 108:8
113:1 118:15 123
GONE- 27:4 64:12
72:9 78:1 192:13
GOOD- 6:16,21,23
7:16,17,18
12:20,21 22:18
23:4,5 25:2,4
30:23 35:11
38:5,6,7,8,9 41:5
43:18,19
46:23,24,25 50:23
51:2 52:10,11
67:18 69:6,7
72:17
73:2,3,11,12 85:5
104:23 110:1,2,6
111:23,24 112:9
118:4 13
GOT- 6:13 12:4
13:25 93:14
168:16 169:1
177:20 178:17
180:20 182:17
188:20 200:3
202:14 209:18,19
225:18
GOTTLIEB- 12:11
46:17,22 49:10,11
50:4,9 73:9
222:24
GOVERNED- 224:19
GOVERNMENT-
143:21
GRAND- 169:19

GRANT- 9:22 10:7
13:1 20:13 57:13
GRANTED- 49:16
57:9 196:24
GRANTING- 19:9
86:22 197:22
GRAVE- 90:11,12
GREATER- 67:14
89:6 104:17
112:15
GREEN- 88:23
GROSS-
22:16,23,24
23:4,8,14,19
24:1,17,22 25:3
46:9,23 48:23
49:1,12
50:3,6,15,18
54:18 55:4,22
56:12,25 57:11
58:3,9 72:18
110:4 118:8 124:9
180:12 212:11
214:12,24 216:6
218:10 219:8,21
222:6,16
GROSS'S- 219:13
GROUND- 29:20
109:4
GROUP- 26:11
27:19 28:10 29:4
35:18 51:1 52:6
110:25 126:8
127:5
152:20,22,23
166:15 195:9
196:13 220:4
GROUPS- 146:25
147:12,14 185:4
GROWN- 190:19
GSM- 77:5 79:1
80:10,19 95:8,13
GUARANTEE-
163:4,7,15,18
192:12
GUARANTY- 146:6
164:9 189:13
GUESS- 170:14
173:12 212:25
GUIDANCE- 20:7
200:25 204:11
GUIDE- 21:13
188:25
GUIDED- 15:18
GUMP- 146:18
GUT- 60:13

——— H ———
HADLEY- 50:25
HADN'T- 40:24
HALF- 72:24 75:3
82:12 99:16
101:25 123:24
124:1,3 135:9
HALL- 226:12
HALLMARK- 26:25
HALT- 29:20
HAM- 41:4
HAMILTON- 12:11

222:24
HAND- 9:18 13:5
42:17,21 63:19
74:2,3 125:13
174:7 183:1
184:14 191:23
209:18,21 214:3
221:18 225:5
HANDED- 40:23
225:19 226:1
HANDFUL- 96:25
143:9
HAND-IN-HAND-
159:6
HANDLED- 149:13
HANDS- 107:20
HANDSET- 83:5
HANG- 159:17
HANGING-
143:12,19
HAPPEN- 33:7
165:14,18
HAPPENED- 41:5,10
132:18
HAPPENING- 219:4
HAPPENS- 151:20
152:7 198:5
202:6,19
HAPPY- 37:15,17
70:6 123:14
145:10,21 169:2
189:4 209:19
221:20 225:5
HARD- 27:19
28:4,23 51:11
62:7 66:15 70:7
71:18 88:14 92:21
157:17 171:24
207:10 208:1
226:24
HARDWARE- 79:9
95:6
HARM- 160:1
202:18
HARPED- 201:10
HARRIS- 49:24
50:1
HARRON-
43:16,18,19,24
52:10,11,13
53:3,4
HARRON'S- 53:9
HARSH- 94:12
HARVARD- 76:12
126:11
HASN'T- 208:22
217:21
HASTE- 161:14
HAUER- 146:18
HAVEN'T- 85:25
95:24 103:19
116:24 189:22
190:19
HE'S- 8:23 74:15
100:15 212:17
HEAD- 18:23 126:8
226:15
HEADING- 216:21
HEADLINE- 101:18
177:2

HEALTHY- 136:25
HEAR- 10:18 12:4
22:24 24:7,16
38:4 43:21,25
46:1 50:17 58:15
65:12 68:11,17,22
70:10,14,19,20
110:2 156:9
157:25 162:4
170:19 189:22
202:20 211:6
212:11,12
220:14,20
HEARD- 41:8
43:4,13 46:13
50:12,14 51:22
53:6 108:5 130:7
142:24 143:14
146:16 152:12
155:14 157:15
158:11 159:1
160:4 161:22
162:17 163:23
178:22 179:24
184:18 185:21
186:2,19,22
188:21 189:22
190:24 191:3
HEARING- 22:20
24:9 35:18 51:11
57:3,18 58:13
60:4 65:7 68:7
155:6 156:5
167:23 181:10
193:12 197:4
198:6
210:18,22,25
213:5,12 217:6
218:13 220:13
222:8 226:8 227:4
HEARINGS- 35:23
HEART- 161:9
HEARTENED- 156:9
HEAVILY- 174:8
HEAVY- 30:22
193:25
HELD- 34:4,5 65:7
165:3
HELP- 28:15 34:10
86:11 87:19
103:12,16 139:7
154:19 187:21
HELPED- 67:11
81:2 104:25 105:1
HELPFUL- 15:5
16:4 54:13 113:9
197:15 199:3
200:25
HENCE- 90:21
94:17
HERE'S- 94:6
203:24
HERITAGE- 26:15
HIGH- 30:17 36:15
67:12 90:13 93:24
104:11 146:1
171:14 218:4
HIGHER- 81:1
134:1 142:1

HIGHEST- 70:9 102:19 120:25 131:23 167:24 168:8 180:2 200:18
HIGHLIGHT- 156:25 157:19 159:10 192:5
HIGHLIGHTED- 61:1
HIGHLY- 61:21 130:19 140:3 163:11 177:23 178:23
HISTORICAL- 161:9
HISTORICALLY- 90:3 93:12
HISTORY- 27:12 38:20 97:6
HOC- 51:1 99:23 100:7 149:16 152:23 171:20
HODARA- 12:20,21 38:4,5,6,8,9 40:18 51:7 109:17,18,23 110:2,6,8,11 111:10,22 118:23 137:22,23 146:16,17,18 153:24,25 176:4 182:18 201:4,5,9 202:20 210:3
HODARA'S- 177:12
HOLD- 99:2 104:1 175:14 178:9
HOLDERS- 145:4
HOLDING- 7:8 141:24,25
HOLDS- 7:25 155:15
HOLIDAY- 158:18,20,22 184:7 226:25
HOME- 27:7
HOMEWORK- 178:11
HONOR'S- 202:4 210:13 220:7
HONORS- 35:5 41:4 123:15 154:2 180:24 214:15
HOPE- 35:8 71:9 72:10 91:15 141:24,25 143:18 151:19 170:21,23 172:11 173:5 190:19 194:13,18 205:20 222:19
HOPEFULLY- 30:16 52:2 73:3 145:24 193:2 197:19 213:18 218:15
HOPES- 170:24,25
HOPING- 214:22
HORIZON- 92:23
HORRIBLY- 100:15
HORSE- 103:25 104:2,6,8,13 107:11,18 108:23

197:19,20

110:25 134:6 136:16,20,23 137:6 144:15 149:2,5,8,17,20,21 148:15,20,24 150:2,10 151:14 152:8 162:12 177:11,25 178:8 182:5,25 208:14 216:16
HOUR- 72:24 123:19,23
HOURS- 124:2 196:3
HOUSEKEEPING- 57:1 59:1 200:2 210:10 220:23 221:2
HR- 77:24
HUAWEI- 87:10
HUGE- 42:16 93:25 170:7
HUGELY- 109:5
HUNDRED- 101:2
HUNDREDS- 181:25
HYPOTHETICAL- 174:7 205:21

I

ICE- 68:17 185:6
IDEA- 31:3 56:17 86:22 170:5 194:25 195:23
IDENTIFIED- 16:25 65:23 135:20 148:1 155:1
IDENTIFY- 16:23 78:14 131:25 138:9 148:8
IDENTIFYING- 138:6
IE- 105:5 120:15
IGNORING- 20:7
ILLUSTRATE- 95:4
IMAGINE- 136:4
IMITATION- 157:21
IMMEDIATELY- 36:22 129:3 223:16
IMPACT- 29:25 53:11 137:9 198:24
IMPACTING- 88:22
IMPEDIMENT- 19:9
IMPENDING- 158:18
IMPERFECT- 29:5
IMPLEMENT- 80:1
IMPLEMENTED- 30:2
IMPLICATE- 40:3
IMPLICATIONS- 43:11 98:2
IMPORT- 35:25
IMPORTANCE- 26:5 38:25 92:13 111:8 148:7 177:21
IMPORTANT- 20:11 27:1 32:5,8 34:3 39:18,21 47:9

51:19 63:24,25 84:8 87:21 91:5 92:3,11 93:4,16 102:21 107:9,11,19 147:17,18 148:10 149:12 150:24 160:10,12 184:11,13 193:14 199:5 204:18 207:7
IMPORTANTLY- 134:18
IMPRESSION- 123:18 175:4,13
IMPROVE- 196:13
IMPROVEMENT- 73:4
IMPROVIDENTLY- 215:13
INABILITY- 69:8 134:18
INADVERTENT- 144:5 224:10
INAPPROPRIATE- 149:2
INC- 7:8,21 19:5 227:14
INCOMING- 43:1
INCONSISTENCIES- 26:8,13
INCONSISTENT- 182:9
INCORPORATED- 27:25 31:13 214:3
INCREASE- 72:12 132:21
INCREASES- 185:25
INCREDIBLY- 140:10
INCREMENT- 176:17,21,25 188:18
INCREMENTAL- 188:15
INCREMENTALLY- 185:12
INCREMENTS- 176:18
INCUBATION- 75:13
INCURRED- 41:9
INDEED- 26:3,23 31:22 59:19 63:12 65:20 66:2 67:9,12 69:7 156:17 183:10 185:5 193:13
INDEFINITELY- 19:25
INDEPENDENCE- 48:18
INDEPENDENT- 33:20 114:14
INDICATED- 38:21 55:23 60:7 74:11 154:12 185:11 191:4 201:11 202:20
INDICATES- 47:12
INDICATION- 64:8

88:25 99:3
INDICATIONS- 207:23
INDISCERNIBLE- 14:15 55:7,8 79:21 80:5 101:13
INDIVIDUAL- 81:10 190:11
INDIVIDUALS- 62:12
INDUCED- 105:6
INDULGENCE- 12:3 59:10 115:20
INDULGING- 222:21
INDUSTRY- 90:19 93:4 96:15 126:1 127:15 129:21 137:12
INFLUENCE- 94:14
INFORMAL- 13:6 143:20 181:14 214:2 223:5
INFORMALLY- 144:9 154:13
INFORMATION- 26:21 35:17 85:10 129:13 132:4 140:10 142:6 155:25 160:20 163:10 172:7 187:23 198:10,11
INFORMED- 43:24
INFRASTRUCTURE- 59:24 79:22
INFRASTRUCTURE'S- 83:6
INFUSIONS- 11:6,8
INHERENT- 18:14
INITIAL- 48:10 55:15,24 106:13 117:4
INITIALLY- 126:12
INJUSTICE- 176:22
INLINE- 135:15
INNOVATION- 27:13
INQUIRE- 109:20
INSIGHTFUL- 202:5
INSIGNIFICANT- 196:21
INSISTED- 177:8
INSISTING- 193:19
INSISTS- 193:19
INSOLVENCY- 26:6 29:10 31:5 65:9 126:17 171:8
INSOLVENT- 16:21 165:19
INSTALL- 86:12
INSTALLMENTS- 31:14
INSTANCE- 82:7 151:5,7 152:2
INSTANCES- 151:2 169:20
INSTANT- 160:20
INSTEAD- 156:5
INSTITUTIONS- 213:18,20 223:7 224:8,12

INSUFFICIENT- 32:12
INTEGRATE- 62:23
INTEGRATED- 27:3,7,9 28:16 42:19 57:15,17 62:19 63:14 77:2 101:10 171:10
INTEGRATING- 97:21
INTEGRATION- 28:3 91:5 113:10
INTEGRITY- 215:17
INTELLECTUAL- 34:3 52:25 53:10,14 61:13 62:8,12 101:4 103:5
INTELLIGENT- 140:11
INTEND- 56:7 175:14,15 205:4
INTENDED- 44:15 45:6 53:22 59:3 144:3 145:14 196:14
INTENSE- 30:23
INTENT- 111:8,15
INTENTION- 16:17 34:20 35:1 120:20,22 121:8,14,16 145:20 153:21 161:5 218:24
INTENTIONS- 16:19
INTERACT- 66:11
INTERCOMPANY- 28:8 40:16 45:1,2 51:20
INTERCONNECTED NESS- 61:4
INTERDEPENDENCIES - 79:7,8,11,13
INTERDEPENDENT- 78:20
INTEREST- 8:1,4,7,11,14 10:4 17:21 26:4 33:13 52:25 57:25 64:8 70:2 77:16,17 86:21 87:1,3,14 88:6,12 92:22 93:1,2 95:17,22 98:8,25 99:5 104:24 117:9 120:2,4,20 121:2 137:17 171:25 180:9 207:23 209:8 215:14 219: 233:13,24 34:21 88:18 91:24 95:12,20 96:2,24 98:10 170:17 181:23 183:18 184:25 185:2 191:13 201:13 214:20
INTERESTED- 26:3

INTERESTING-
88:19 90:7 95:3
108:12
INTERESTS- 175:22
224:5

INTERFACE- 95:1

INTERFERENCE-
79:21 80:5 101:14

INTERIM- 6:20
23:11 24:24
25:6,7 26:24 28:7
31:8 36:7,20
37:9,19,25
38:10,24 40:17
41:1 43:4 45:14
46:4 47:3 48:1,12
51:4,25 52:7,21
55:13 56:1,3
58:22 213:13,16
224:11 225:23
INTERJURISDIC-
TIONAL -51:21

INTERLINEATE-
199:9
INTERLINEATION-
199:15
INTERNATIONAL-
26:2 29:3 30:25
61:3 157:23
INTERNET- 78:25
INTERPRETATION-
16:11 122:23
INTERPRETATIONS-
217:1
INTERPRETED-
168:15
INTERRUPT- 200:4
201:5
INTERRUPTED-
43:15
INTERRUPTION- 9:2
11:12 41:14
INTERVENTION-
33:19
INTRODUCE- 12:9
INTRODUCTION-
14:3
INTRODUCTORY-
59:2
INVENTIVENESS-
70:4
INVEST- 75:13
84:2
INVESTED- 83:3
INVESTIGATING-
24:8
INVESTMENT- 64:16

81:3 83:16 84:16
85:17,23 86:2
90:13 112:17,23
126:5 164:3
193:22 207:24
INVESTMENTS-
88:22
INVESTORS- 87:15
INVITE- 221:6
INVITED- 208:12
INVOLVE- 20:1
34:1 157:11
174:14
INVOLVEMENT-
18:19 38:23 76:18
136:22 218:1,3,22
INVOLVES- 55:9
66:23
IOU- 124:18
IP- 49:22 95:25
IPLA- 103:4,9
IRONIC- 9:3
IRRESPONSIBLE-
193:25
IRRETRIEVABLE-
185:17
ISN'T- 70:11
115:4 119:9
140:5,7 145:20
180:2 223:10
ISRAEL- 25:24
ISSUE- 15:4 17:17
18:22 20:11 21:14
22:13 24:6 29:19
34:3 46:6 49:19
52:17 111:9
131:3,8 139:14
145:13 166:8
173:17,18 175:25
187:10 203:22
207:2 213:5
ISSUED- 35:2
ISSUES- 8:3
28:19,20 29:1
32:23 33:3 38:12
40:13 43:1 51:19
52:3 89:8 99:24
104:19 126:19
145:12 146:12
167:22 170:8
178:5 181:9 217:8
IT'S- 10:3
11:5,5,16 16:19
17:9 20:12
25:16,25
27:1,11,19,22,24
28:15,21,25
30:10,22 32:5
36:6 40:2
42:19,25 43:7
44:18,19 46:3,17
49:17 51:10,12
53:15 56:12 61:6
66:1,15 67:14,23
68:8 70:6 74:12
78:3,17,25 7
ITEM- 10:23 89:4
150:17,23
ITEMS- 38:16

47:19 148:5 155:1
219:1

――――― J ―――――

J'S- 18:4,17
JAB- 162:7
JANE- 12:10
222:24
JANUARY- 25:19,22
32:19 126:14
184:20
JENNIFER- 112:2
138:3 155:11
JIM- 129:6
JOB- 38:11 75:9
125:22,24 162:10
215:1
JOBS- 62:11
JOHN- 12:14 49:24
225:11
JOIN- 13:24
146:11 187:6
JOINED- 75:3
126:3
JOINT- 14:1 35:23
46:18 49:12,14,18
52:13 77:16
120:20 166:11
167:10 213:5
217:6 218:12
222:7
JOURNAL- 197:3
JOURNEY- 77:1
86:17 94:15 96:14
99:24
JUDGE- 18:18
22:16,23,24
24:1,8,11,14,17,2
2
23:4,8,13,19 25:2
46:8,23 48:23
49:1,11
50:2,6,15,18
54:18 55:4,22
56:11,25 57:4,11
58:3,9 72:18
110:4 118:8
123:9,12 124:9
155:8 180:12
212:11 214:12,24
216:6 218
JUDGES- 46:7
JUDGMENT- 11:8
159:3
JUDICIAL- 16:9
JULY- 63:7
68:1,2,4,7
145:16,23 158:20
184:7,9 192:20
197:4 219:17,18
227:13
JUMP- 212:7
JUNE- 67:25
JUNIPER-
75:16,19,23 76:5
JURISDICTION-
17:17,19 18:11,14
19:3 20:12 22:3
26:23 63:12 66:22

169:11 215:2
217:2
JURISDICTIONAL-
19:9
JURISDICTIONS-
17:16 19:1 25:19
26:9,14 27:8
38:14,23 41:25
42:9 100:12 171:5
174:10 178:5
214:22
JURISPRUDENCE-
20:8
JURY'S- 159:12
JUSTICE- 11:20
14:14,17 18:10,16
21:16
22:12,18,19,21
23:1,4,5,6,16
24:5,19,22 25:16
34:25 38:7,8
40:19 43:12
45:3,19,22
46:8,12,15,20,25
47:15 48:24 49:10
50:4,10,15,21,24
51:2 52:12
54:2,7,12,18,23
55:3,17 5
JUSTIFICATIONS-
193:19
JUSTIFIED- 63:4
161:16 162:20
205:13
JUSTIFY- 194:19
JUSTIFYING- 37:8

――――― K ―――――

KARR- 37:12
KEEPING- 19:8
149:10 152:25
224:3
KEEPS- 117:24
KEY- 16:25 90:5
97:22 113:6
152:17 153:2
174:21 175:6
176:1 187:3
218:23
9:3,6,9,15,21,24,
25
KIM- 7:17,19
10:8,11,22,23
11:13,22,24
12:2,8,10
13:2,5,22,25
211:20,21,23
212:1,4,6
213:3,5,7,11,15
214:1
222:18,19,23,24
223:5,24
225:1,4,7,10,15,1
6,17,22
224:7,10,16
226:1,5
KINDS- 120:19
147:18
KINGDOM- 25:21

26:19 32:7 100:10
KITCHEN-
208:22,23
KNOCK- 7:3
KNOWLEDGE- 86:6
132:24 138:12
KNOWLEDGEABLE-
132:2
KNOWN- 28:25
62:18 137:12
184:25 193:22
KOREA- 77:17,18
KRELLER- 50:23,25
51:3,7 52:8,9
KUMBAYA- 156:5
173:10

――――― L ―――――

LAB- 82:3
LACK- 69:9 88:11
177:25 206:19
LAID- 11:4 141:5
148:5
LANDED- 206:2
LANDLORD-
144:8,12
LANDSCAPE- 82:20
LANGUAGE- 13:8
143:24 156:15,17
157:5,7 203:6,7
LAP- 206:2
LARGE- 16:4 65:9
77:7 80:3 81:14
82:1 83:2,23 86:1
89:19 95:9 126:23
130:7 139:23
171:4
LARGELY- 27:15
34:4 41:9 85:25
100:23 106:15
131:13
LARGER- 80:10
LARGEST- 59:20,23
68:20,23 76:3
80:11 87:17 90:9
127:14
LASTLY- 15:24
21:10 77:16
215:18
LATE- 78:5
158:7,10
LATER- 55:15 56:2
112:5 160:14
165:12 170:8
195:11,21 218:15
LATIN- 100:25
LAUGHTER- 6:7 9:4
22:17 73:1 94:11
116:5 118:11,24
189:2 193:6
198:21 220:21
LAUNCHED- 78:4
LAWYER- 119:2
LAWYER'S- 181:3
LAZARD- 64:16
73:21
125:10,23,24
126:2,4,12,21,22
127:2 128:3 129:2

133:1 149:14
LAZARD'S- 126:16
LC- 223:3,17
225:12
LEADING- 83:10
96:15
LEADS- 60:22
128:24 192:14
LEAGUE- 84:7
LEAP- 194:19
LEASE- 144:10
LEASES- 62:10
68:4
LEAVE- 50:17
165:17,19
173:13,15 187:6
LEAVING- 100:20
LED- 76:6,20
89:13 90:21 98:19
LEFT- 42:12 74:2
123:8 125:13
144:1 165:2
LEGACY- 80:23
LEGAL- 61:25
122:23 133:3
156:17
LEGISLATE- 205:20
LEGISLATION-
16:16
LEGITIMATE- 29:14
32:9
LEGO- 61:18
LEHMAN- 65:5
159:11,16,20
LENGTH- 10:5
104:21 109:12
133:6 180:14
LENGTHY- 47:6
82:1
LET'S- 6:11 12:2
79:19 84:16 85:12
118:1 121:20
124:10 138:17
181:6 209:15
211:14
LETTER- 7:1,5
36:7,8 213:9,19
LETTING- 146:7
LEVEL- 88:1 90:13
100:18 102:19
104:12 133:21
137:13 150:7
170:3 178:8,17
183:3 218:4
LEVELS- 100:17
136:3 137:11
LEVERAGE- 86:15
130:22,25
LEVERAGING- 97:23
LG- 77:18 120:20
121:20
LGNORTEL- 77:17
LIABILITIES-
166:20,22 167:8
168:2,3,6,7
188:8,10
LIABILITY- 165:10
166:11 167:11
LIBERALLY- 16:16

LICENSE- 34:13
62:13
LICENSED- 61:16
LICENSES- 8:1,11
34:2,6,7 53:14
103:8,10
LICENSING- 103:5
LIENS- 8:7
LIGHT- 27:12
29:22 37:11 88:24
159:11 217:14
220:7
LIGHTLY- 175:5,13
LIKELIHOOD- 33:5
130:2 204:3
218:18
LIMITED- 28:1
31:13 52:14
64:21,25 69:1
84:14 89:3 96:17
117:9 125:4
130:25 144:24
146:20 157:7
LINE- 63:20 78:11
81:21 91:19
135:15,16 164:23
193:17,19,24
LINED- 136:9
171:5
LINES- 16:3 59:18
77:4,25 101:11
145:2 172:25
LIPS- 74:21
LIQUIDATE- 152:4
LIQUIDATING- 8:15
LIQUIDATION- 7:24
16:20
LIQUIDITY- 44:20
LISA- 59:5 73:8
143:2 199:14
LIST- 82:4 124:18
130:17 176:16
LISTED- 35:24
219:1
LISTENING- 111:11
LITERALLY- 201:12
LITIGATION- 30:20
LIVED- 62:20
70:17
LLC- 112:3
LOADED- 116:4
LOADS- 71:10
LOAN- 11:8,10,13
LOANED- 103:14
LOANS- 11:6,19
LOCAL- 171:8
LOCKED- 174:22
LOGICAL- 94:21
LONDON- 30:17
LONG- 8:24 30:2
45:21 62:20
70:4,16 71:3 72:3
75:2,19 80:14,24
89:25 123:17,18
124:18 126:2,7
134:19 161:24
164:23 184:25
212:2 222:20
225:17

LONGER- 92:23
99:2 119:7,24
123:25 150:18
179:3 180:20
184:9
LONG-TERM- 17:8
60:2 69:3 70:22
71:4 80:25
87:19,25
LOOK- 6:25 29:25
64:1 66:8,14 68:8
72:22 75:11 94:6
96:21 102:6,8
116:7 168:23
179:16 191:15
195:7 196:1
203:21 204:21,25
221:7 225:8
LOOKED- 85:17
88:14 90:6 96:21
184:7
LOOKING- 33:4
62:10,12,25 63:2
64:10 68:1,15,25
70:21 72:24 87:12
89:16 95:14
116:11 121:19
147:18,23
204:6,17 206:21
207:14 226:7
LOSE- 115:16
158:19,22 172:10
173:19 186:4
187:8 197:21
LOSING- 130:23
LOSS- 115:17
119:4 120:13
185:17,25 186:1
192:4,17
LOSSES- 28:11
LOST- 99:1 110:4
115:5,11 117:23
159:21 184:7
192:6,8 200:3
225:18
LOT- 40:25 41:6,7
70:2 85:3 91:4
104:10 168:16
171:3,4,18 174:5
190:24 191:3
192:8 193:22
194:1,11,20
197:24 204:5
209:10,23 219:18
LOTS- 71:21 72:7
LOUDLY- 74:20
LOVE- 84:18 168:2
169:9,12,13 176:5
LOW- 131:10
143:12,19 176:25
LOWER- 128:8
LOWERING- 133:20
LTE- 60:2,25
65:12 76:22 78:25
79:18 80:25
81:3,11,16,18,21
82:7,18 83:14
84:3,11,24 88:8
89:1,10 91:13,21

92:19,25 94:3,6
95:1 97:24
100:19,22 101:2,5
110:23 111:13
122:3 127:3
128:23 134:15
141:8 145:3 1
LUCK- 67:18
LUCKY- 65:11

---

### M

M&A-
75:11,18,22,24
99:8 104:3 126:19
133:2 207:24
MACKENZIE- 76:13
MADAM- 22:14
MAGNITUDE- 198:25
MAIL- 197:3
MAIN- 7:4 27:15
44:14 59:18 99:17
130:15 138:25
MAINTAIN- 62:11
70:23
MAJOR- 83:8 69:11
79:23 87:8 88:24
91:11 128:23
129:8 130:20
131:5 139:4
193:16
MAJORITY- 34:5
83:22
MAKING- 11:10,13
71:5 107:23
127:22 168:18
178:11 198:17
200:14,15 201:22
209:7
MALLEABLE- 205:8
MANAGEABLE- 97:2
98:8
MANAGED- 146:24
MANAGEMENT- 91:7
MANAGERS- 127:25
MANAGING- 73:21
125:10,23
MANITOBA- 19:2
MANNER- 16:17
17:11 26:12
149:13 151:16
205:25
MANY- 28:10 31:1
35:21 43:1 68:17
80:18 90:1 101:10
118:17 129:9
138:9,15,18
164:24 176:11
181:7 184:5 194:1
201:20 207:22
MAP- 97:21,24
MAPLE- 14:23 15:3
16:7 19:13,16
MAPPED- 103:1
MAPPING- 78:10
MARCH- 30:4
132:22
MARGINALLY-
165:20
MARKED- 54:11

221:5
MARKET- 61:9 67:3
79:19 80:4,12
83:21 89:5 104:5
115:22 128:15
131:6 136:2
159:17 184:19
206:11,17,19
MARKETPLACE- 70:2
185:14
MARKETS- 129:8
MARRY- 71:19
MARY- 189:24
MATCH- 148:20,21
176:19 188:13
MATCHED- 61:17
MATCHING- 148:11
176:7 196:3,21
MATERIAL- 36:4
59:14 60:10 97:7
102:11,16 106:24
107:4 115:11
151:24 167:1,11
181:25 192:17
200:10,12 203:19
208:13,16 221:16
MATERIALS- 23:13
45:17 55:16 56:5
MATH- 184:4
MATIAS- 164:9
189:9
MATLINPATTERSON-
112:3 116:8
117:11 118:21,22
139:20,23 140:16
141:6 142:16
146:9 152:24
155:12,14,24
158:8,23 161:4
162:1 163:3,11
170:16 183:22
190:5 193:21
194:6 198:7 203:4

MATLINPATTERSON'S
156:18 158:9
170:14

MATRIXED- 77:25
78:19

MATTER- 7:5 12:5
20:4 21:5 23:20
24:7,12,14 57:2
58:7 70:19
123:9,17 124:7
139:22 172:5
196:3 210:10
217:12 218:11
227:10
MATTERS- 6:10
23:9,17,18 24:15
26:3 28:6
35:22,24,25
126:18 192:18
217:24 219:10
MAXIMIZATION-
26:13 28:13 31:4
71:23

MAXIMIZE- 8:21 17:13 31:6 62:14,16 71:21 96:11 111:6 122:1 172:23,24 174:18 201:16 216:13 219:15
MAXIMIZED- 67:17
MAXIMIZES- 8:16 158:2
MAXIMIZING- 96:18 206:5
MAXIMUM- 66:25
MBA- 76:12 126:11
MCCLOY- 50:25
MCDONALD- 49:5
MCKENNA- 8:24
MEANINGFUL- 88:10,12
MEANINGFULLY- 162:19
MEANS- 28:25 37:8 78:9 82:24 204:24 206:21
MEANT- 97:21
MEASURE- 16:5
MEASURING- 97:18
MECHANIC- 31:11 36:22 48:5
MECHANICAL- 76:11
MECHANISM- 40:11
MEET- 87:23 91:19 98:9
MEETINGS- 26:21 30:8,9
MEETS- 10:2 57:23
MELTING- 68:17 185:6
MEMBERS- 166:14
MEN- 27:23
MENTIONING- 222:23 223:1
MERCY- 191:24
MERE- 116:1
MERGER- 91:4
MERGING- 88:7
MERIT- 128:21
MET- 33:2 64:4 65:15 91:11 161:24
METHOD- 32:18
METHODICAL- 149:23
METRICS- 93:20
METRO- 27:19
MEXICO- 83:24 100:24
MICHAEL- 64:16 73:20 125:14,17
MICROPHONE- 55:11
MIGRATE- 192:11
MIKE- 125:9
MILBANK- 50:25 152:24
MILESTONES- 179:13
MILLION- 11:9

31:11,19 32:15,21,25 40:8,9 43:13 44:10,17,23 47:13,14,17,20 66:24,25 67:1 81:4 84:10 85:21 98:16,17 101:19,25 105:25 106:8,22 119:14 135:9,10,14,24 152:9 163:4,8,13,16 174:4 176:16,17,18,25 188:
MILLIONS- 98:4 102:14 119:12 151:18 181:25
MINDFUL- 89:18 104:20 158:15
MINIMAL- 198:23
MINIMIS- 169:18
MINIMIZATION- 28:14
MINIMUM- 158:17 163:4,8
MINISTERIAL- 201:2 211:2
MINOR- 199:15,22
MISCHIEF- 202:18
MISIMPRESSION- 190:12
MISS- 69:18 179:13
MISSED- 55:20 92:2 98:13 118:10 212:18
MISSING- 152:14
MISUNDERSTANDING- 189:16
MIX- 61:11 110:19 111:3
MIXED- 203:17
MOBILE- 79:24 80:3 81:2
MODEL- 90:6 104:14,22 147:22
MODIFICATION- 39:11 187:11 197:13
MODIFICATIONS- 187:16 197:12
MODIFIED- 158:4 188:17 190:9
MODIFY- 95:20 144:4 153:1
MONEY- 25:1 42:6,7,10 71:10 89:2 112:13,18 113:3 159:21,23 173:4 179:25 180:1,5 182:24 185:15 194:12 207:1 209:10
MONIES- 41:13,14
MONITOR- 26:18 30:6 36:5,10 40:20 45:25

46:1,15 47:2,3 48:8,16,19,22 49:4 61:24 66:20 74:15 100:14 105:2 149:15,24 171:7 174:11 175:10 189:25 190:8,12 195:9 201:23 216:8,10,15 217:7,10,18,19,22 218:1,5 219:2
MONITOR'S- 47:10 159:22 190:6
MONITORS- 41:18
MONTH- 68:9 98:4,12,13,16 119:12 120:21 132:19 169:2 172:2
MONTH'S- 119:14
MONTHLY- 31:14
MONTHS- 60:21 68:13 70:1 85:16 98:2 103:15 129:23 147:6 184:19 192:14 194:1,2 201:12
MONUMENTAL- 92:1 162:7
MOOT- 181:9 217:7
MOREOVER- 185:19
MORNING- 6:1,15 7:16,17,18 12:20,21 22:18 23:4,5 25:2,4 38:5,6,7,8,9 43:18,19 46:23,24,25 50:23,24 51:2 52:10,11,12 57:5 72:17 73:11,12,14 112:9 218:13 223:11
MOROWITZ- 11:20 14:14,17 21:16 22:12,18,19,21 23:1,4,5,6,16 24:5,19,22 25:16 34:25 38:7,8 40:19 43:12 45:3,19,22 46:8,12,15,20 47:1,15 48:24 49:10 50:4,10,15,21,24 51:2 52:12 54:2,7,12,18,23 55:3,17 56:7,11,15, MOTION- 7:6,19 8:2 10:7,24 11:2,5 12:14 23:12 24:2,24,25 49:14 50:11 51:4 52:18 53:16 55:16 56:8 57:5,9,14 58:4,10 60:4 61:2 109:5 145:1

154:21 160:20 161:3,8 199:20 210:21 211:21 212:8 213:7 218:16 223:2 225
MOTIONS- 210:16,25
MOTIVATED- 129:14
MOTOR- 19:5
MOTOROLA- 87:10 127:15
MOTORS- 65:6
MOUTH- 181:3 219:13
MOVE- 14:1,2 30:12 63:13 72:14 73:7 102:25 140:4
MOVED- 7:10 22:16 80:19 135:2 141:14
MOVEMENT- 28:14
MOVING- 48:3 58:7 202:17 203:18 221:4
MPE- 138:21
MUCH- 6:23 21:13 30:21 41:8 50:20 56:23 59:12 64:1 69:19 72:24 86:5 90:17 106:5 119:15 123:6 135:16 141:25 160:1 166:3,21,22 184:15 189:6,7 190:15 193:10 195:3 200:11 201:10 204:1,4 205:12 208:19 209:3,9 21
MULTIFACETED- 195:18
MULTIPLE- 60:2 66:5,7 79:9,20 101:10 127:23 195:20
MULTIPLEXING- 79:20
MUNICIPAL- 9:9,12
MURIN- 10:14,17,19 12:6 43:23 55:10 74:14 117:23 118:6
MURRAY- 49:5 64:16 68:11 69:22 70:14 73:20 100:14,16 125:9,11,14,17,21 138:3,5 142:25 149:14 156:10 160:5
MURRELL- 164:8,9,12,14 189:9,12,20
MUSTER- 89:8

**N**

N&L- 29:18
NAMED- 59:19
NAMES- 27:18

115:1 117:8
NARNIA- 27:16
NARROW- 20:6 65:10 198:1
NARROWED- 106:7
NARROWLY- 172:19
NDA- 103:22
NDAS- 129:12
NEAR- 33:7 52:2 84:10 125:7
NECESSARILY- 65:10 114:20 148:6 202:23
NECESSARY- 12:24 36:1 37:16 45:13 47:22 95:3 112:21 178:16 224:22
NEEDED- 35:9 42:15 90:7 129:17
NEGATIVE- 47:13,19 102:15 130:17 137:9 198:23,24
NEGLECTED- 12:9
NEGOTIATE- 72:8 117:14,15 223:16
NEGOTIATED- 31:9 63:17 109:7 133:19 135:13,17,19 141:13 174:8 177:1 178:15,23 183:3 182:9 183:20 187:17
NEGOTIATING- 8:23 33:5 34:10 76:18 91:22 104:22 132:12 176:11 182:25 223:7 224:8
NEGOTIATION- 105:6 132:9 135:11 179:20
NEGOTIATIONS- 10:6 30:23 33:11 35:11 42:5 47:7,25 76:20 99:12 105:5,9 107:17 109:12 132:13,23 133:6 135:1 136:22 162:6 213:17
NEGOTIATORS- 99:8
NEIGHBORHOOD- 85:21 119:14
NERVOUS- 187:4
NET- 19:21
NETTING- 32:22
NETWORK- 52:14 58:10 68:20,23,24 106:2
NETWORKS- 27:25 28:1 31:12,13 58:24 59:24 75:16 76:5 80:2 81:8 82:6 86:13 87:25 90:24 91:21 97:9,13 98:11 103:25 106:10

107:5,25
108:2,6,16 109:10
132:7 133:9
**NEVER-** 7:22 20:11
93:20 168:4 176:8
178:25 181:2
194:9
**NEVERTHELESS-**
60:14 70:8
**NEW-** 18:1 21:25
44:4 61:22 67:5
75:13 81:24 83:5
99:16 139:24
160:6 186:14
188:18
**NEWER-** 185:12
**NFL-** 92:9
**NICE-** 112:25
**NIGHT-** 35:13
145:22
**NINE-** 60:21 76:5
**NINE-MONTH-** 32:19
**NNC-** 75:7,8
**NNI-** 8:22 12:15
31:12 37:13 47:17
75:6,7
**NNL-** 12:15 33:1
34:5 37:13 75:6
**NNUK-** 45:1
**NOBODY-** 96:1
192:11
**NOKIA-** 23:22
27:17 37:22
58:9,24 60:25
63:14,17 67:13
87:10 90:23
91:2,3,7,15,17,24
92:13,14
97:9,13,20 98:11
99:12 100:19
103:17,24 104:21
106:2,9
107:5,17,25
108:2,6,13,16
109:10 111:19
114:1 115:21
118:18
**NOKIA'S-** 190:23
**NON-** 121:12
166:3,4
**NON-ASSIGNABLE-**
101:7
**NONBANKRUPT-**
165:15
**NONBINDING-** 64:9
**NONDEBTOR-**
11:1,3,7 12:14
165:4,6,7,12
166:4,9 168:12
169:6,10
**NONDEBTORS-** 166:7
171:9 189:17
**NONDISCLOSURE-**
64:19
**NONEXISTENT-**
101:16
**NONLTE-** 121:13
**NONMATERIAL-**
181:20 208:11

**NONOBJECTIONABLE-**
226:13
**NOR-** 49:2
**NORMALLY-** 87:9
**NORTEL-** 6:5
8:5,6,9,10,12,18,
20
7:21,25 9:10
24:15 26:5
27:2,3,24
28:1,10,12,19
29:4,13 31:12,13
34:4,6,9 37:14
38:21 41:16
42:13,19 52:14
59:18,23
60:9,17,22 61:14
63:14 64:15 69:5
70:4,7,18 72:2
73:19 74:24
**NORTEL'S-** 9:11
84:4 85:1,13 94:3
110:23 120:8
121:5,8,11 131:12
139:6 192:10
**NORTH-** 27:10
32:24 48:6 76:14
80:17,18
82:8,15,21
83:2,12,23 84:1
85:25 87:17 89:5
92:12,15,18,19
95:9,12 96:1,2,24
100:23 131:13
169:15
**NOTE-** 32:5 34:14
35:15 38:16 49:3
113:17 154:8
155:20 160:12
165:25 166:24
193:23 194:23
195:1
**NOTED-** 17:2
**NOTICE-** 11:18
13:10,13 35:19
118:12 145:15
149:4 210:20,21
213:22 223:18,21
224:1
**NOTICES-**
145:17,19 197:1
**NOTIFICATION-**
177:4
**NOTIFY-** 13:15
**NOTIFYING-** 13:14
**NOTION-** 104:25
**NOTWITHSTANDING-**
26:13 31:4 40:7
190:3
**NOVEMBER-** 78:6
**NSN-** 76:16 102:18
135:6 136:8,16,20
143:14,15 151:23
169:17,25 170:25
172:3 173:13
177:21,24 180:8
**NSN'S-** 136:22
173:15
**NUMBERS-** 37:9

135:11
**NUMEROUS-** 18:23
160:23

○

**O'BRIEN-** 151:8
**OBIDA-** 20:2
**OBJECT-** 15:24
20:8 21:9,18
39:14 114:4,7
144:13,14
**OBJECTING-** 154:24
155:1
**OBJECTION-** 9:7,13
10:2 13:17,18,20
144:16,17,19,20,2
3,24
23:23 68:1,5
145:19
146:9,12,20 148:6
150:1,11,14
151:21 152:16
153:6 170:14
181:12,13,15
182:11 183:8
184:16 190:4
**OBJECTIONABLE-**
149:3
**OBJECTIONS-** 23:25
24:2 37:2 45:25
58:13,15 59:6
125:4,6
143:6,10,14
144:20 145:12,24
146:5 150:24
154:12 167:15
173:22 181:7
182:7,8 187:12
189:16 194:21
198:4 199:10,17
223:12
**OBJECTIVE-** 16:25
21:23 219:15
**OBJECTIVES-**
19:8,10 21:20
**OBJECTORS-** 143:16
146:13 199:24
**OBJECTS-** 183:22
**OBLIGATED-** 195:21
197:1
**OBLIGATION-**
106:18 224:18
**OBLIGATIONS-**
148:24 205:17
**OBSERVATIONS-**
47:4 218:17
**OBSERVE-** 105:4
**OBSOLETE-** 185:12
**OBSTACLES-** 130:15
138:25
**OBTAIN-** 67:16
**OBTAINED-** 47:16
67:11 96:12
215:17
**OBTAINING-** 223:17
**OBVIOUS-** 113:18
129:16
**OBVIOUSLY-** 12:24
45:25 47:21 89:12

91:3 103:24 109:3
113:17 120:21
141:16 150:19
156:15 157:5
181:23 187:4
191:19 206:5
214:20
**OCCASIONS-** 160:23
**OCCUR-** 40:1
**OCCURRED-** 12:9
82:16
**OCCURRING-** 33:6
**OCCURS-** 183:12
**OCTOBER-** 91:6
**OFFENDED-** 100:16
**OFFER-** 132:21
167:24 168:4,9
169:6,23 197:18
**OFFERED-** 6:5 61:5
108:15 134:6
135:10
**OFFERS-** 215:17
**OFFICE-** 36:24
99:16 226:4,16
**OFFICER-** 37:13
41:19 64:15 73:19
74:25 75:4,10
110:12
**OFFICES-** 61:22
**OFFICIAL-** 30:5
35:16,17 38:9
61:24 100:3
146:19 154:6
220:3 223:20
**OFFSET-** 39:16,20
40:3,4,7
**OFTEN-** 154:19
**OGILVY-** 14:3
**OKLAHOMA-** 7:24
**OMNIBUS-**
210:18,21
**ONE-** 14:9,14
21:20 22:2,8
24:10 25:23,24
27:24 31:5
35:12,15 42:17,19
44:13 49:14 52:15
53:7 55:6,13,23
59:18,23 63:3
64:4 67:22 70:1
71:7,19 77:17
78:15 81:19
84:6,25 85:16,24
86:3,20 88:20
89:16,24 92:17
**ONES-** 16:2 138:11
139:4 174:24
179:21 191:17
**ONGOING-** 17:13
48:5
**ONTARIO-** 17:18
18:5,22 34:17
35:3 36:18 49:6
57:7 143:21,22
149:11
**OPEN-** 29:19 50:16
85:2 150:15
155:24 156:8
163:10 178:10

219:9
**OPENING-** 25:10
40:24 110:15
**OPENLY-** 84:25
**OPERATE-** 30:24
78:18
**OPERATED-** 27:21
101:9
**OPERATES-** 60:17
**OPERATING-** 29:19
77:18
**OPERATION-** 12:25
37:11 57:17 78:10
128:11
**OPERATIONAL-** 28:3
79:10 101:12
217:23
**OPERATIONS-** 47:23
57:14 77:24 78:3
**OPINION-** 119:3
128:8 132:21
133:8,20 134:5
135:24 136:2
137:13 139:8
140:20,25
**OPPORTUNE-** 211:23
**OPPORTUNITY-** 31:6
34:8 45:12 86:25
92:2,4 104:11
120:13 134:13
146:8 149:24
155:23 162:25
166:19 168:1
197:21 219:14
**OPPOSED-** 113:20
114:1 155:21
164:15 168:22
194:14 199:20
**OPPOSING-** 212:2,4
**OPTICAL-** 27:20
77:9,10
**OPTIMISTIC-**
211:12
**OPTING-** 183:16
**OPTION-** 114:11,22
**OPTIONALITY-**
172:24
**OPTIONS-** 90:16
91:23 92:7 114:21
121:5 129:25
147:7,8,10 160:21
161:1 192:9,10
**ORANGES-** 196:9
**ORDER-** 6:14 7:19
9:1,19 10:24
13:1,3,9 18:12
19:9 31:20
34:16,24 35:2,8
36:11,14,17,25
44:5 46:21 47:22
48:10 49:15
54:11,20
55:12,15,24 56:3
57:9 58:5,21
64:4,24 65:15
70:23 71:21 83:1
123:10 148:7,16
150:6
**ORDERS-** 53:23

55:6,23 179:14
210:15,16,25
221:3
225:20,22,24
ORDINARY- 206:22
ORGANIZATION-
28:2 101:3
ORGANIZATIONAL-
78:20
ORGANIZED- 78:20
ORIGINAL- 132:21
135:18,20 144:19
ORIGINALLY- 57:20
82:19 124:1
158:11
OTHERWISE- 8:25
39:17,20 128:14
137:14 141:16
149:1 152:7
OURS- 98:8
OURSELVES- 20:25
29:11 41:11 69:19
160:18 202:21
224:3
OUTCOME- 135:25
OUTLINED- 42:16
47:9 58:12
OUTREACH- 129:4
OUTS- 175:1,2
OUTSET- 40:10
58:13
OUTSIDER- 157:25
OUTSTANDING-
11:14 155:17
OVALBY- 23:11
OVERALL- 72:5
109:8 128:15
OVERARCHING- 17:6
21:20
OVERBID- 148:14
OVERHEADS- 41:7
OVERLAP- 41:20
OVERLAPPING-
61:14
OVERLAY- 77:20
OVERLOOKED-
161:10
OVERLY- 211:12
OVERPAYING- 42:22
OVERPAYMENT-
31:18,19,23
OVERRULED-
199:10,17
OVERSIGHT- 165:2
217:17,22 218:22
OVERVIEW- 72:14
OWE- 179:5,23
OWING- 40:5
OWN- 41:1 42:23
62:24 81:5 87:5
88:21 89:13 90:16
91:16 107:18
128:2 158:16
164:3 171:9
191:12 194:7
OWNER- 185:15
OWNERSHIP- 18:1
21:25 49:22 52:25
53:10

OWNS- 185:16

**P**

PACKAGE- 66:7,13
69:10 71:20
104:15 203:13
PACKAGING- 17:23
PAID- 7:23
31:13,14 32:10
33:1 40:9 43:14
105:14 106:16
135:12 151:4,5,10
152:1 176:8
179:3,11 183:11
PAINFUL- 100:17
PAPERS- 53:16
PARALLEL- 173:1
PARAMOUNT- 60:19
92:13
PARENT- 133:3,4
136:13
PARLIAMENT- 16:18
17:11
PARTICIPANTS-
13:24 62:1 171:21
PARTICIPATE-
162:15 177:10
215:23
PARTICIPATING-
162:19
PARTICIPATION-
33:18
PARTICULAR- 21:14
28:11 29:13,18
34:18 38:19 47:10
59:25 60:24 61:13
62:6 66:16
69:10,14 71:12
94:23 104:16
114:1 117:12,13
121:9,21,22
126:18,24 128:11
129:6,13 130:9,10
161:8 175:25
198:23 216:21
218:1
PARTICULARLY-
29:15,24 64:14
70:6 73:6 80:17
93:16 97:21
104:4,16 107:19
127:8 171:11
183:18 195:2
221:15
PARTIES- 10:6
26:3 29:20
31:21,23
33:12,13,24
34:19,21 35:1
38:13,19 40:2
43:20 48:4
51:10,15 53:21
57:22 88:7 97:9
105:18 107:20,23
111:10 117:3
129:14,15 132:23
140:6 147:22
150:13 153:3
159:1 162:14

181:14
PARTIES'- 87:1
107:16
PARTNER- 8:23
59:5 86:11
87:15,18 125:23
PARTNERED- 113:4
120:6
PARTNERING- 86:21
113:13,19 117:4
129:16
PARTNERS- 89:17
125:25
PARTNERSHIP-
91:19 138:21
PARTNERSHIPS-
75:12 138:18,19
PARTS- 23:10
83:25 84:17
100:24 121:3
140:17
PARTY- 32:5
39:4,11 43:24
65:15 108:19
113:23 114:4,24
209:7
PARTY'S- 88:12
PASQUARIELLO-
40:21 46:21,23,25
48:24 49:3,8
216:5,6,8,24
217:13,19 218:7
PASS- 89:8 149:21
152:6
PASSED- 48:1
PASSES- 185:16
PASSPORT- 95:15
PAST- 30:1,12
60:6,21 61:21
68:13 70:1 132:19
150:21 201:20
PATENTS- 101:4
103:6,7,10
PATH- 90:16 97:23
183:16 209:11
PATHS- 89:16
PATIENCE- 181:1
PATRICK- 154:2
PAUL- 37:12
PAUSE- 14:6 23:3
67:24 84:17
211:19 212:10
214:8
PAY- 40:8 44:20
64:24 107:12
150:25 176:7
178:25 179:16,25
180:1 186:7,9
205:3
PAYABLE- 183:9,21
PAYING- 41:7
44:23
PAYMENT- 32:13
44:4,9,17 106:10
151:14,21
152:9,15 178:20
183:8 188:23
203:11
PAYMENTS- 39:15

40:1 44:13,21
47:17
PAYROLL- 103:17
PBGC- 143:23
164:15
166:12,16,25
167:20,21 168:6
PBGC'S- 167:1,10
189:16 198:4
PECULIARITY-
109:19
PEG- 133:20
PENDING- 57:3
197:25
PENSION- 143:22
146:5 164:9
166:12 167:8
168:2,3 188:5,8
189:12
PEOPLE- 28:14
41:25 43:8 63:11
78:10 81:16 84:20
93:23 97:13 101:3
158:19,21 171:24
174:5 175:20
176:12,20 177:9
179:25 180:14
186:2,20 194:1
200:13 202:6
205:22
207:2,14,19,22
208:12 219:17
221:12
PERCEIVE-
133:22,24
PERCENT- 77:12,17
80:6,9 84:1 90:4
93:13,14 96:24
101:1 106:7,23
115:3 130:20
135:15,23 136:1,5
155:16 169:15
178:13 180:1
182:13 187:1,2,5
PERCENTAGE-
106:24
PERCENTAGES-
106:6
PERCEPTION-
130:18
PERFECT- 29:1
30:21 169:8,9
170:16
PERFECTLY- 24:20
99:1
PERFORM- 101:17
PERFORMANCE- 29:8
68:3 93:21
PERHAPS- 24:14
70:10 82:16 83:15
89:4 92:5 102:1
124:8,10 128:14
147:18 198:15
200:14 201:19
PERIL- 90:16
PERIOD- 29:12
30:2 32:19
47:12,13 72:3
76:6 97:17 99:2

102:25 103:15
131:19 132:15
134:19 141:5
144:20 147:14
160:9 161:15
201:21 219:19
PERIODS- 43:6
82:2 135:2
PERIPHERY- 95:2
PERMISSION-
201:24
PERMIT- 39:25
122:19 162:1
201:20
PERMUTATIONS-
38:22
PERSON- 6:5 99:9
104:7 192:16
PERSONALLY-
140:23
PERSONNEL- 27:9
126:22
PERSONS- 111:18
PERSPECTIVE-
31:16,17
41:3,4,17 42:2
94:13 123:5
130:24 142:18
172:5 173:19
188:3 214:18,19
PETITION- 11:14
29:12 32:2
PHASE- 83:1
PHASES- 82:2
PHILOSOPHICALLY-
164:15
PHILOSOPHY-
197:17
PHONE- 43:20,25
81:12
PHRASE- 39:20
42:3
PICK- 82:4,22
171:13 176:16
181:22
PICKED- 168:20
191:17
PIECE- 57:16
80:12 207:20
PILE- 94:6,7,8
PLACE- 25:22
30:15 51:18 58:15
71:23,24 72:11
74:2 99:15 125:13
174:3 197:18
223:18,19
PLAINLY- 181:19
PLAN-
14:12,13,21,22
15:6,9,16 17:20
18:8,20
19:6,15,20 21:4
22:4 25:5
70:12,17 71:12
78:5 89:22
90:10,15
114:5,8,12,13
115:6 117:13
120:5,6,7,24

122:16,20 127:20
128:4,7 142:17
156:1,11,12,19,20
,2
**PLANNED-** 115:9
**PLANS-** 30:2
120:18 127:25
**PLATFORM-** 78:3
79:8
95:5,7,10,19,25
191:4 192:11
**PLATFORMS-** 94:16
97:22
**PLAY-** 107:8,10
165:9 198:18
**PLAYED-** 99:12
**PLAYER-** 85:25
87:2 113:18,25
142:2 117:5,7
130:20 137:12
139:1,6 160:11,15
**PLAYERS-** 89:6
116:8 127:14
138:16 159:19
161:5 198:25
**PLAYING-** 149:1
150:7 154:22
178:8,17 183:3
**PLEASED-** 13:1
73:13
**PLEASURE-** 25:16
**PLUG-** 69:15
**PM-** 124:14 180:22
227:4
**PM/RECONVENE-**
124:14 180:22
**POCKET-** 98:17
**POCKETS-** 67:19
98:16
**PODIUM-** 146:13
190:19
**POINTED-** 74:13
**POINTS-** 43:10
49:13 105:7 145:7
167:25
**POKER-** 198:18
**POLICY-** 17:6
**POPULATED-** 132:3
140:10 141:7
**PORTION-** 58:25
115:4 143:4
148:18 168:20
169:20
**PORTIONS-** 141:7
**POSE-** 20:16
**POSING-** 20:5
**POSITION-** 12:20
53:18,21 74:24
86:1 96:20 107:18
126:7 135:18,20
178:9 181:8 184:1
188:14 191:20,22
**POSITIONED-** 69:16
**POSITIVE-** 102:15
109:5 137:4
**POSSESSED-** 64:25
**POSSIBILITIES-**
24:9,11,13
**POSSIBILITY-** 17:7

62:14 119:23
130:12
**POST-** 11:14
29:11,12 32:2
93:13,20
104:17,19
**POTENTIAL-** 8:18
17:8 29:22 30:20
40:7 64:10,18,22
65:1,5,10 71:6
87:12 91:23 94:5
103:21 108:1,4
121:2 128:8
129:4,7,24 131:19
132:1 133:9
136:24 137:14
138:19 139:10
140:6 147:9,10
152:17 157:10
183:23 184:22 1
**POTENTIALLY-**
137:9
**PRACTICE-** 57:6
66:22 67:3 104:23
127:1 145:1
176:10
**PRAGMATIC-** 52:1
**PRAYER-** 194:14
**PRECEDENT-** 25:7
46:4 135:16
**PRECEDENTIAL-**
173:25 174:6
**PRECEDES-** 141:19
**PRECISELY-** 159:20
**PREFACE-** 112:5
**PREFER-** 130:8,10
159:4
**PREFERABLE-** 128:5
**PREFERENCE-**
111:16 133:9
**PREFERRED-** 87:14
**PREJUDGE-** 66:15
**PREJUDICE-** 20:21
111:17 160:14
169:18 177:1
**PREJUDICIAL-**
170:4 177:23
**PREJUDICING-**
42:23
**PRELIMINARY-**
22:13 23:8 24:18
**PREMATURELY-**
149:17
**PREMISES-** 184:1
**PREMIUM-** 92:8
**PREPARED-** 9:22
19:6 24:20 54:5
57:13 108:6
124:5,22 132:2
139:16,25 140:4
163:3 188:11,13
197:18
**PRESCRIBED-**
148:15
**PRESENCE-** 67:8,10
**PRESENT-** 49:6
78:11 83:21
**PRESENTATION-**
24:23 37:19 40:25

41:1 55:19
**PRESENTATIONS-**
58:16 127:23
**PRESENTED-** 199:11
200:19
**PRESENTING-** 212:8
**PRESENTS-** 71:6
**PRESERVATION-**
16:23 17:25
**PRESERVE-** 17:2
20:9 21:21 156:18
**PRESERVING-** 17:12
**PRESIDENT-** 12:15
**PRESS-** 60:6
179:17
**PRESUMABLY-**
184:22 206:7
**PREVAILS-** 63:6
**PREVENT-** 207:14
**PREVENTS-**
113:11,18
**PREVIOUS-** 18:5
191:18
**PREVIOUSLY-** 81:17
**PRICE-** 98:6,21
101:18 106:25
133:12,13,16,18,2
3,25
108:11,15
135:2,3,15
141:14,21 142:1
176:24 177:2
182:5 186:7
206:12 215:13
**PRICING-**
29:1,2,17,23 30:1
32:18 38:20
39:5,14,16 41:8
44:12 51:20
**PRIMARILY-** 59:16
105:15 165:1
**PRINCIPALLY-**
90:21
**PRINCIPALS-** 158:9
**PRINCIPLE-** 17:22
209:17
**PRINCIPLES-**
15:7,10,17 20:18
21:2,20
215:7,9,25
**PRIOR-** 11:10,13
13:13 18:8 23:21
35:18 42:11 75:15
76:5 85:15 89:10
117:2 126:15
145:1 162:6
186:23 195:11,13
202:4 218:12
**PRIORITY-** 24:15
**PRIVATE-** 114:15
139:24 200:21
**PRIVILEGES-**
224:23
**PRIZE-** 84:21
**PROBABLY-** 26:24
51:12 61:22 69:7
77:12 80:9
83:10,25 93:1
100:25 102:22

117:20 119:4
123:18,23 130:16
144:25 186:5
**PROBLEM-** 28:19
29:10 42:16 43:3
52:2 149:19
150:22 164:19
186:18,22 187:25
200:16
**PROBLEMATIC-**
148:2 197:14
**PROBLEMS-** 6:2
28:24 150:19
171:14
**PROCEDURAL-** 23:9
109:19 145:12
**PROCEDURE-** 24:20
121:22 140:3
169:7 176:3
199:18 204:24
221:24
**PROCEDURES-** 11:4
23:24 37:2 58:10
63:16,23 64:4
65:14 96:3,6,9
111:9,12
121:9,15,21,23
122:19 131:16,18
141:2
142:12,15,17
143:24 144:4
147:3,17,19,21,24
148:2,13,18,19
149:5,10,11 150:1
151:2,19,22
153:5,11,13,2
**PROCEED-** 23:16
24:21 59:2 124:6
146:14 159:15
193:17 205:21
209:11 214:23
**PROCEEDED-** 129:10
**PROCEEDINGS-**
18:8,18 23:10,25
25:23 26:1 29:11
38:17 65:9 100:8
171:8 214:23
215:20 216:2
227:9
**PROCEEDS-** 19:21
30:18 33:10,12
34:11,12,18 39:6
47:14 51:21 52:23
164:18
**PROCESS-** 7:24
8:15 20:21 30:15
33:9,15,17,23
51:13 52:3 56:10
57:22 60:11,24
61:1,6,12,21
63:25 64:12,13,20
65:3,11
66:15,18,19
67:7,11,15 68:15
69:23 72:10,13
76:18 78:1 91:25
96:5 99:22 105:4
107:14 109:2,8
**PROCESSES-** 51:18

62:2 121:8 129:22
172:25 176:13
207:21
**PRODUCING-** 134:10
**PRODUCT-** 71:3
81:21
**PRODUCTS-** 93:11
**PROFESSIONAL-**
28:21
**PROFESSIONALS-**
30:11 126:24
133:2 162:5
171:24
**PROFFER-** 12:16
37:5,16
**PROFFERED-** 190:8
**PROFFERS-** 54:5
**PROFIT-** 28:10,13
44:15
**PROFITABLE-** 80:14
89:25 98:3
**PROFITS-** 28:11
**PROGRAM-** 28:11
**PROGRESS-** 29:22
92:16 213:22
**PROJECTIONS-**
134:17
**PRONOUNCED-** 211:9
**PROPER-** 14:9
**PROPERLY-** 146:2
149:25
**PROPERTY-** 34:3
47:16 52:25
53:10,14 61:13
62:8,13 101:4
103:5 144:8
164:22
**PROPOSAL-** 65:16
66:1 122:20,22
157:4 159:7 169:5
203:4,15 204:8
205:5 206:23
**PROPOSALS-** 69:16
72:11 123:2
**PROPOSE-** 19:20
117:11 142:16
143:11 146:13
156:1,19,20
158:23 162:3
170:22 171:16
199:9 203:5 226:9
**PROPOSED-**
13:11,14 27:5
48:20 57:19
63:16,22 64:5,12
65:22 76:16
122:19 131:16,18
147:16 151:22
156:15 157:6
161:23 164:20
165:19 168:11
172:25 203:20
223:8,12
**PROPOSING-** 67:21
117:13 142:13
163:20,21 173:16
**PROPRIETY-** 39:15
**PROS-** 65:24
**PROSPECTIVE-**

78:12
**PROSPECTS-** 37:10
**PROTECT-** 41:23,24
104:24
**PROTECTED-** 41:22
224:5
**PROTECTION-** 31:18
89:11 104:12,15
224:14
**PROTECTIONS-**
67:2,13 104:1
105:11 107:7,12
109:9 135:5
205:10 224:11
**PROTOCOL-** 6:14
23:8 25:7
33:14,16
34:10,20,23
35:3,10,22 36:19
45:8,10,16 46:2
48:16,20 78:25
**PROTOTYPICAL-**
68:17
**PROUD-** 60:14
71:17
**PROVERBIAL-** 185:6
**PROVIDE-** 10:25
11:3 13:11 34:7
37:6,15 56:2
62:22 63:12 70:22
87:19 96:9
103:16,25 148:19
159:6 170:11
174:23 175:7
195:14,19,22
196:5 197:2
**PROVIDED-** 26:21
31:1,12 34:8
113:3 198:11
**PROVIDER-** 84:8
**PROVIDERS-** 59:23
70:21
**PROVIDES-** 30:25
43:4 47:22 204:22
224:21
**PROVIDING-**
31:6,11 35:17,19
48:4 194:25
195:8,16 197:13
198:19 202:12
**PROVINCES-** 17:18
**PROVISION-**
39:2,9,17,21
53:13 141:1
178:23 187:18
195:2 223:24,25
224:23
**PROVISIONS-** 23:7
38:24 44:21 135:7
154:21 176:6
196:25
**PUBLIC-** 85:3
178:11 194:5
**PUBLICATION-**
197:2
**PUBLICIZED-** 140:3
**PUBLICLY-** 103:20
160:22
**PULL-** 72:8

**PURCHASE-** 98:6,21
106:24 111:1
133:12,13,16,18,2
3
127:3 135:15
178:11 179:15
185:1 201:3
221:13
**PURCHASED-**
168:19,23 169:1
200:8
**PURCHASER-** 69:12
71:6 118:19
176:6,12,15,18
177:8,13 179:17
185:20 186:2
195:3,9,17,25
196:2 197:18
**PURCHASERS-** 61:24
65:1 71:20
185:22,25 198:2
205:9
**PURCHASES-** 115:5
**PURCHASING-** 185:8
206:9
**PURE-** 113:24
138:15,16
**PURPORTED-** 151:24
**PURPOSE-** 16:13,17
17:2,10 18:6,24
20:6,22 21:12
39:25 140:7
182:16,17,19,21
**PURPOSES-** 18:2
**PURSUANT-** 61:1
182:1
**PURSUE-** 93:5
99:13 103:24
104:5 127:19
129:1 137:17
165:16
**PURSUING-** 179:22
**PUSHING-** 107:25
108:2
**PUTTING-** 69:1,5
91:8 121:14 207:1

─────────

Q

─────────
**Q1-** 102:8,13
115:6
**Q2-** 102:8,13
115:6
**Q3-** 43:5
**QUALIFICATIONS-**
163:13
**QUALIFIED-**
65:15,17 96:10
111:20 122:22
132:4 135:1
152:18
156:12,13,24
157:2 161:23
174:24,25 175:7
177:5,9,19
195:1,9,10,14,15,
16,19,24
187:19,23 196:5,6
197:13 204:22
208:23 218:24

**QUALIFIES-** 149:7
**QUALIFY-** 177:18
**QUALIFYING-**
122:24 148:16,25
149:4,6,22
**QUALMS-** 162:9
**QUARTER-** 30:15
**QUEBEC-** 19:2
**QUESTIONABLE-**
218:20
**QUESTIONED-** 20:2
**QUESTIONS-** 8:24
9:15 15:19,20
16:1 21:7,13
38:22 46:7,9
48:23,25 49:4
50:2,5,7 70:10,13
105:8 109:14,21
112:11 115:19
118:17,19,22
119:16 120:14
122:5 137:20,23
142:22 144:9
167:13 189:4
225:12
**QUICK-** 88:10
**QUICKLY-** 13:6
96:21 97:24 99:6
116:7 132:5 140:4
186:11 192:11
215:10 223:13
**QUO-** 218:2
**QUOTE-** 39:13

─────────

R

─────────
**R&D-** 41:7 81:5
84:8 87:20 88:3
93:24 134:19
**RABBI-** 168:15
**RACE-** 84:4
**RADICAL-** 128:14
**RADWARE-** 174:3
**RAISE-** 74:2
154:12
**RAISED-** 14:22
16:7 19:17 20:11
29:14 37:3 45:5
52:16 67:23 68:10
70:10 145:6,13
146:12 154:5,10
168:10 176:4
**RALLYING-** 73:2
**RANGE-** 77:23
102:13 114:20
135:23 170:6
180:2 186:25
**RANK-** 44:6 45:1
**RAPID-** 97:20
**RAPIDLY-** 80:7
128:15
**RAPPED-** 168:25
**RATE-** 90:2 93:12
186:24
**RATES-** 93:16
**RATHER-** 19:18
20:12 21:1 34:18
90:17 104:1
116:12 145:12,16
152:5,8 156:23

161:6,16 173:13
194:24 196:13,18
**RATIFICATION-**
39:4
**RATIONALE-**
96:17,18
**REACH-** 64:23
132:5 148:15
**REACHED-** 8:5
35:12 36:2,5
60:24 135:3
171:25 173:11
**REACHING-** 174:17
**REACTION-** 108:22
130:16 139:2,7
**REACTIONS-** 137:2
**READILY-** 96:20
97:8 202:19 219:3
**READING-** 57:18
190:6
**READY-** 22:19,22
124:21 207:3
**REALITY-** 94:12
**REALIZE-** 134:13
136:15 173:8,11
**REALIZED-** 40:24
**REALIZING-** 109:7
172:6
**REASON-** 14:7
15:24 21:9 59:8
69:21 80:20 93:4
152:6 157:1 161:7
181:23 201:9
**REASONABLE-** 10:4
33:20 48:13 66:4
105:21 109:11
134:8 135:3,24
158:14 162:21
211:15
**REASONABLENESS-**
109:9 134:5 180:3
**REASONABLY-**
137:16
**REASONING-** 159:2
**REASONS-** 10:6
16:3 48:8 52:6
57:10 63:7 85:23
88:17 93:5,10
107:8,10 169:25
185:7 193:18
218:14
**RECAPTURE-** 32:19
**RECAPTURED-** 32:21
**RECEIPTED-** 55:24
**RECEIVE-** 8:16
134:11 136:19
151:14 214:1
**RECEIVED-** 13:6
32:2 43:19 121:1
143:21 149:6,7
213:15 223:5,6
**RECEIVER-**
215:11,12
**RECEIVERSHIP-**
215:6
**RECENT-** 19:5
136:4 159:22
**RECENTLY-** 25:24
127:13 136:11

191:2,3,11
**RECIPIENT-** 13:10
**RECOGNITION-**
31:25 44:11,16
**RECOGNIZE-** 27:1
53:21 170:7 174:1
199:8 204:18
**RECOGNIZED-**
17:5,19 19:2
40:2,6 148:16
**RECOGNIZING-** 33:4
41:19 42:18
**RECOMMENDS-**
48:8,9,19 216:15
**RECONSIDER-**
201:19
**RECORDING-** 9:2
11:12 44:1 227:9
**RECOUP-** 86:2
112:22
**RECOVERIES-** 17:13
**RECOVERY-** 167:2
**RECROSS-** 122:8,11
**RED-** 18:10,17
**REDIRECT-** 119:20
142:21
**REDIRECTS-** 119:19
**REDUCED-** 167:9
**REDUCING-** 166:25
**REDUCTION-**
98:6,15,21
**REFERENCED-** 50:16
105:8 121:11
145:4
**REFERRED-** 17:23
18:15 19:13
38:17,19 42:5
78:22 81:17
103:13 106:22
152:22 159:12
**REFERRING-** 16:13
78:13,15 87:6
88:3 100:2
**REFERS-** 18:13
100:10
**REFINANCING-**
136:12
**REFLECT-** 161:22
**REFLECTS-** 51:14
**REFRAIN-** 18:3
**REGAINED-** 91:6
**REGARDLESS-** 21:23
**REGIME-** 29:23
32:18 51:20
**REGIMES-** 26:7
31:6
**REGIONS-** 41:24
42:14 44:18 170:2
**REGISTER-** 22:14
74:11
212:11,13,14,16,1
9,22,24
**REIMBURSEMENT-**
66:24,25
105:10,19,23,24
106:2 135:7,11
151:17 152:2,8
154:19,25
203:11,25 205:11

224:18
**REIMBURSEMENTS-**
104:23
**REITERATE-** 153:9
**REJECT-** 169:23
**REJECTION-** 39:5
**REJOINED-** 91:6
**RELATE-** 68:20
**RELATION-** 216:9
**RELATIONSHIP-**
85:2
**RELATIONSHIPS-**
51:20,21 79:5
81:25 85:4 88:8
**RELATIVE-** 115:7
130:17 177:1
188:6
**RELATIVELY-** 80:11
125:1 169:17
195:5 196:21
198:1
**RELAY-** 56:16
**RELEASE-** 8:10
60:7
**RELEVANCE-** 92:19
**RELIANCE-** 29:24
**RELIED-** 19:7
**RELIEF-** 12:22
13:19 20:14 36:1
59:4 110:7 197:6
**RELINQUISH-** 8:8
**RELINQUISHMENT-**
34:13
**RELYING-** 20:6
**REMAIN-** 72:2 74:1
196:18
**REMAINED-** 29:19
**REMAINING-** 62:16
**REMAINS-** 92:17
**REMARKS-** 59:3
84:12 112:5
157:22
**REMEDIAL-**
16:11,16 18:6
**REMEDIES-** 29:21
**REMIND-** 225:18
**REMISS-** 100:13
**REMOVED-** 190:11
196:20
**REMOVING-** 9:11
**RENAULT-** 14:3
**REORGANIZATION-**
70:12 71:13 120:8
147:9,11
171:11,15 183:17
203:5
**REORGANIZE-** 20:9
70:18 120:5 161:6
163:21
**REORGANIZED-**
170:19
**REPATRIATE-** 42:10
**REPAYMENT-** 44:2
**REPEATED-** 32:12
**REPEATEDLY-**
17:2,18
**REPEATS-** 28:1
**REPLACE-** 186:15
**REPLACEMENT-**

124:16,17
**REPORT-** 45:18
47:10 159:22
190:6,7,11
216:9,20
**REPORTER-** 12:10
**REPORTS-** 25:1
**REPRESENTATION-**
133:4
**REPRESENTATIONS-**
35:16
**REPRESENTATIVE-**
96:16 143:22,23
**REPRESENTATIVES-**
61:23 133:1
**REPRESENTED-**
52:24 140:20
152:23
**REPUTATION-**
104:10 141:19
**REQUEST-** 9:16
11:2,5 34:15
196:24 210:13
218:23
**REQUESTED-** 12:22
20:13 57:10
161:18 197:6
218:16
**REQUESTS-** 49:15
143:10 173:13
**REQUIRE-** 33:18
35:23 65:20 90:13
103:2 107:6
116:24 157:2
188:7 217:17
218:21 219:11
**REQUIRED-** 48:1,5
50:18 64:24 85:24
134:19 140:10
150:2,7,9 152:1
176:17 178:16
183:4 188:15
217:22
**REQUIREMENT-** 68:2
72:1 104:19
148:13
**REQUIREMENTS-**
57:23 64:3,23
65:14 66:4 71:7
152:18 153:2
161:24 169:7
174:21 175:6,8
176:2 187:13
207:18 210:20
218:24 223:18,19
224:1 225:2
**REQUIRES-** 44:8
223:25
**REQUIRING-** 20:4
**REQUISITE-** 15:13
**RESEARCH-** 27:9
88:4
**RESERVATION-**
39:8,9,18 49:24
53:9 125:5 143:10
144:24 145:8
146:7
**RESERVATIONS-**
40:15

**RESERVE-** 52:22
**RESERVES-** 49:21
**RESERVING-** 51:17
**RESIDUAL-** 62:20
**RESOLUTION-** 51:16
52:2
**RESOLVE-** 8:3
9:1,6 28:4 51:11
52:3 217:3
**RESOLVED-** 194:21
**RESOLVES-** 9:12
30:19
**RESOLVING-** 10:2
**RESOURCES-** 28:14
33:25 47:23 60:18
69:9 71:1 78:10
104:10 131:10
**RESPECT-** 8:17
11:18 13:19 23:21
26:10,11 27:5
28:5 29:16 30:1
31:23
37:7,19,21,24
39:6 40:11 47:8
48:15,19 49:21
52:22,25 53:18
59:3 60:10 62:4
65:12 69:16
71:12,24 87:3
106:13 120:17
130:4 139:11
144:18,19 14
**RESPECTFUL-** 218:3
**RESPECTFULLY-**
49:15 183:13
**RESPECTIVE-** 48:18
**RESPECTS-** 35:21
205:8
**RESPOND-** 94:18
105:7 167:15
**RESPONDING-**
196:12
**RESPONSE-** 50:12
53:6 142:24
156:16 218:9
223:9
**RESPONSIBILITIES-**
75:9,21 125:24
**RESPONSIBILITY-**
62:20 77:22
**RESPONSIBLE-** 9:10
48:4 166:14
**RESTRICTIONS-**
64:11
**RESTRUCTURING-**
16:4 89:15
126:13,18,25
161:11
**RESULT-** 10:5
11:11,14 13:7
30:22 42:12
47:5,20 61:20
62:4 65:8 68:6
71:15 91:17 93:6
98:6 105:6
107:22,24 108:1
119:4 133:23
142:1 152:14
161:13 179:15

186:1 202:18
**RESULTED-** 128:8
**RESULTS-** 151:24
185:17
**RETAIN-** 87:20,21
93:22
**RETAINED-** 61:16
126:12
**RETAINING-** 90:12
**RETURN-** 85:18,22
**REVEAL-** 108:18
**REVEALED-** 108:16
**REVEALS-** 145:19
**REVENUE-** 77:12
86:7 97:1
130:19,20 131:10
**REVENUES-**
119:8,11,13
134:16
**REVERSE-** 167:18
**REVIEWED-** 136:4
216:10
**REVISED-** 9:10,18
214:3 221:24
223:12
225:4,20,22,24
**REVISION-** 11:17
**REVISIONS-** 85:25
9:6 13:3 223:8,14
**REVISIT-** 90:19
**REVOLVES-** 77:6
**REVOLVING-** 62:1
**RIEDEL-** 64:15
68:12 69:22 70:14
73:18,24,25
74:4,7,24,25
110:12 111:7,16
112:9,10,12
113:22 115:4,19
116:6 117:18
122:13 127:17
128:18 130:1
134:12 139:5
142:11 150:16
153:10 156:10
157:15 159:25
160:4 169:14
**RIEDEL'S-** 192:15
**RIGHTFULLY-**
104:12
**RIGHTS-** 8:6 29:21
31:23 39:9,11
40:3,7,12,16
41:22,23,25
49:21,22 51:17
52:22
53:1,9,22,23 62:8
66:14 125:5
143:11 144:24
145:8 146:7
175:18,24
176:1,7,12 187:12
224:23
**RIGOROUS-** 156:21
**RISE-** 43:1 52:15
**RISK-** 31:18
32:10,13 93:22
104:7 133:22,24
137:5,14

178:12,13,19
180:5 183:19
185:25 186:5
197:18
**RISKS-** 93:25
104:17
**ROAD-** 85:17
97:21,24
**ROADS-** 115:22
**ROBUST-** 99:19
141:20,22 195:18
**ROLE-** 75:16
126:16,19 127:21
132:9
**ROLES-** 76:14 90:6
**ROLL-** 83:13,17
**ROOM-** 97:4,5,14
103:23 123:21
132:3 140:9,18
141:7 142:8
150:15 170:24,25
214:17
**ROYALTY-** 34:6
**RULE-** 7:7,20 9:23
10:3 15:15 57:24
139:9 141:2
**RULED-** 119:22
130:12
**RULES-** 30:24
**RULING-** 54:8
139:14 151:8
**RUN-** 79:24 80:1
93:12 109:3
119:11 121:8
166:10
**RUNNING-** 42:6
121:15 160:8,13
**RUNOFF-** 160:5,9
**RUNS-** 95:7

───── S ─────

**SALE-** 7:21
15:8,21,22,24
17:17,21,24
18:7,19
19:3,7,19,21
20:1,3
21:3,5,7,10 22:3
26:12 27:6,16
33:8 34:1
47:15,16 52:23
58:25 60:10 61:6
62:7,8 65:7 68:7
69:1,6,23 70:5,9
76:15,19,20,21
78:8 84:8 93:5
95:1
**SALES-** 14:20
17:20 27:5 29:23
30:18 33:2,6,10
34:12 44:19 78:9
110:19 127:8,12
129:2 146:24
147:1,2,12,25
155:24 159:15
161:7 165:3
170:20 188:25
217:15
**SANDWICH-** 41:5

SANDWICHES- 198:20
SAT- 91:7
SATISFACTION- 224:3
SATISFACTORY- 175:25
SATISFIED- 10:5 36:16,20 58:1 175:8 192:1
SATISFIES- 22:9 152:2
SATISFY- 151:25 152:8 210:20
SAVAGE- 127:1
SAVED- 40:25
SAW- 107:16 179:9
SCALE- 60:18 64:23 69:9 86:15 87:2,19,24 90:19 95:10 112:22 131:2,8,12
SCENARIOS- 152:6
SCHEDULE- 45:23 67:21 69:13,15 82:25 83:9 91:11 97:20 98:2 103:1 123:13
SCHEDULED- 24:7 57:20 65:8
SCHEDULES- 99:19
SCHEME- 66:3 169:19 179:25
SCHWEITZER- 59:5 73:8,10,11,13,16,23 72:17 74:20,23 109:14,16 119:17,19,21 122:5 123:14 124:22,24 125:3,9,20 137:20,21 142:22 143:2,3,9,18 144:7,23 145:6 146:4 167:14,16,20 168:14 169:5 189:15 199:12,13,14,22 200
SCOPE- 39:1 64:9 94:15,17 95:16,18,21 111:5 120:14 122:1,2 153:8,20 172:18,19
SCREEN- 22:16
SEATED- 12:1 56:22 214:9
SECOND- 23:22 35:9 49:17 55:12 56:3,8 67:4 73:20 84:25 89:24 99:21 103:4 124:23 140:21 144:7 145:13 149:3 168:10 177:4 215:14 221:11

223:24
SECONDARY- 25:23 98:24
SECONDED- 173:23
SECONDLY- 18:13 86:4 93:19 98:1 183:7 187:25
SECONDS- 118:10
SECTIONS- 32:3
SECURE- 44:25
SECURED- 11:6 19:25 20:21 44:4
SECURITY- 8:1,4,10
SEE- 12:2 19:1 22:15 57:6 67:14 73:4 74:15 89:19,25 92:7,21 95:21 97:23 98:20 112:13,25 120:2,15 132:4 138:25 141:25 162:25 177:24 181:6 198:5 199:24 200:20 207:3,5 208:21 209:12 220:9 221:20
SEEING- 22:22 74:8,15 90:3,5 120:5
SEEK- 13:19 36:1 201:23
SEEKING- 59:4 62:5 96:4 148:14 161:8 179:4
SEEKS- 8:3
SEEN- 32:11 37:14 65:2,3 81:6 93:15 94:22 102:12 134:16 166:11 193:12 215:20
SEGMENTS- 94:4
SEGREGATED- 223:25 224:4
SEGREGATION- 225:2
SEGUE- 27:17
SELECT- 97:16 103:24
SELECTED- 91:14,15 92:25 137:7 183:10
SELECTING- 167:23
SELECTIONS- 92:7
SELF- 15:21 225:1
SELL- 14:11 15:6 59:14 60:25 79:22 93:9 110:18 120:20,24 127:20 128:9,19,20 152:5 161:6,8 169:12 172:1 181:24 187:8
SELLER- 178:6
SELLING- 8:21 69:18 94:3 166:9 203:1 207:6
SELLS- 77:7,10,14

SEMINAL- 60:4 82:16 193:10
SENIOR- 91:7 99:8 125:25
SENSITIVE- 51:24 85:9 197:23
SENSITIVITIES- 174:10
SENT- 145:17 226:10,11
SENTENCE- 216:25
SENTENCES- 190:11
SEPARATE- 27:19 35:24 64:18 79:5 165:22 166:2 169:6,23 170:1 182:1,3 196:12 200:21
SEPARATELY- 79:2 114:21
SEPTEMBER- 31:15 32:20 47:13,20,24 48:1
SERIES- 30:4,8 86:18 102:18 217:14
SERIOUS- 148:3 171:14 206:16
SERIOUSLY- 174:16 205:19
SERVE- 21:13 87:2 93:11 156:12,24 222:11
SERVED- 182:19
SERVICE- 80:2,3 81:12
SERVICES- 62:19,22 63:10 72:3 77:3 79:24,25 80:1,16 82:25 83:5 102:22,23,24 103:2,16
SET- 15:18 28:19,20 42:23 47:7 49:25 61:18 66:3,18 67:2 77:23 78:20 80:23 91:8 94:13,20 97:4 99:15 100:24 102:23 103:1,6,16 108:11 131:15 134:25 138:21 188:21 193:18 195:25 202:10
SETOFF- 40:10,12
SETS- 34:18 109:5 136:24 137:12
SETTING- 197:3
SETTLEMENT- 6:22 8:16,23 9:23 26:24 28:8 36:8,21 44:17,24 47:3,9,18,21 48:2,9,13 52:21 53:11 57:19,22 58:1
SEVEN- 64:18 93:13 97:11

129:12 186:25
SEVERAL- 43:20 61:21 63:2 68:13 70:1 71:8 77:4 83:18 90:9 101:2 132:16 151:1,18 157:20 166:11 167:11 171:21
SEVERITY- 161:17
SHAKE- 192:23
SHALL- 38:4 39:3,10 109:21 112:10 224:19
SHAPE- 81:2
SHARE- 26:15 89:5,6 92:22 131:2 134:14
SHARED- 78:2 79:9
SHARING- 79:15
SHEET- 84:14 86:10 91:23 102:6 112:13,15,19,25 113:3,8 139:6 159:7
SHIFTED- 83:14 107:20
SHILL- 176:14 199:1
SHILLING- 177:23
SHOCKING- 159:10
SHOOT- 107:15 136:24 177:8
SHOOTING- 196:7
SHOP- 117:4 141:1
SHOPPING- 201:11
SHORTEN- 210:21
SHORTENED- 211:16
SHORTFALL- 44:25 48:12
SHORTLY- 222:14 226:8
SHOT- 187:2 199:4
SHOULDN'T- 65:2 202:5 209:11
SHOW- 66:7 67:6 173:21 174:12 175:7 182:22 183:5 196:15 200:18
SHOWING- 157:10 200:22 207:18
SHOWINGS- 170:8
SHOWN- 149:17,20,22
SHOWS- 205:25
SHUFFLE- 225:19
SHY- 150:20
SIDE- 22:15 28:21 80:15 93:24,25 94:18 99:4 101:2,11,12 126:19 132:25 133:1 135:21,25 138:12 210:12
SIDES- 178:4
SIEMENS- 27:17 37:22 58:10,24 60:25 63:14,17 67:13 87:10 90:24

91:3,7,15,17,24 92:13,14 97:9,13,21 98:11 99:13 100:19 103:25 104:21 106:2,10 107:5,17,25 108:2,6,16 109:10 111:19 114:2 115:21 118:18 132:7 133:9
SIEMENS'- 103:17 108:14
SIGHT- 173:19
SIGN- 6:14 13:1 35:13 58:6 103:22 140:22,23 146:1 169:23
SIGNATURE- 222:14
SIGNED- 57:9 64:19 97:10,12 129:12 140:16 194:12,14 210:15
SIGNIFICANCE- 161:17 198:2
SIGNIFICANT- 83:15 84:17 89:5 93:17 105:5 112:4 115:16,18 117:14 119:4 131:1,3,8 140:17 141:7 155:15 159:18 187:10 218:21
SIGNIFICANTLY- 131:5 132:21
SIGNING- 64:6
SIMILAR- 23:13 52:16 71:9 75:16 149:12 150:9 157:4
SIMILARLY- 18:10 19:2 27:25 44:8 95:14 151:23
SIMPLE- 31:10
SIMPLY- 19:13,20 25:10 33:21 45:4 135:18 154:18,25 181:8 184:6 186:2 188:13 204:25 215:9
SINCERELY- 170:16
SINCEREST- 157:21
SINGING- 156:5 173:10
SINGLE- 27:22 93:13 178:24 192:6
SINK- 208:22,23
SIREN- 14:15
SISTER- 26:8
SIT- 91:10 198:18 207:10
SITTING- 180:13
SITUATION- 20:20 51:16 60:22 65:6,7 71:16 104:16 128:17 159:14 165:8,15 177:13 200:13

202:22 208:21,24
215:8 219:5
**SITUATIONS-** 219:7
**SIX-** 82:19,22
86:19 87:9 93:13
103:15
148:1,5,9,12
186:25 192:14
**SIZE-** 106:19
158:13 177:2
**SKADDEN-** 118:18
**SKIN-** 178:17
**SKIPPING-** 39:12
**SLANTING-** 149:1
**SLEEP-** 145:22
**SLIGHTLY-** 83:14
158:3 160:19
**SLIP-** 119:14
144:5
**SLIPPING-** 98:2
**SLOW-** 29:13
**SMALL-** 8:25 75:13
76:2 80:12 101:24
102:15 173:13
177:2 181:22
195:5
**SMALLER-** 131:5
170:2 175:20
**SMOOTH-** 29:12
**SMOOTHLY-** 187:22
**SNAPSHOTS-** 102:13
**SNIPPING-** 207:25
**CO-CALLED-** 44:14
148:11
**SOCIAL-** 16:20
**SOCIALIZED-** 117:8
**SOLD-** 61:15 62:14
79:2 80:3 116:24
127:13 153:8
161:12 165:4,6,22
166:2 167:5
168:19 185:20,24
202:11 206:17
**SOLELY-** 20:6
191:17
**SOLID-** 147:6
**SOLUTION-** 17:7
91:18 92:12 93:3
94:19,23 98:8
165:21
**SOLUTIONS-** 6:5
**SOLVE-** 28:24
42:15 171:13
**SOLVED-** 43:3
**SOMEONE'S-** 205:1
**SOMEWHAT-** 56:15
63:3 67:22 72:19
93:1 128:16 191:9
207:22 217:7
218:20
**SONG-** 162:23
**SOPHISTICATED-**
198:25
**SOUGHT-** 19:9
**SOUND-** 10:14
215:4 227:9
**SOUNDING-** 14:15
**SOURCE-** 18:12
**SOUTH-** 27:10 48:6

**SOUTHERN-** 67:5
**SPACE-** 61:7 85:1
87:8 89:10
100:18,19
127:3,8,10,12
128:11 140:1,7
**SPAN-** 69:1 185:14
190:25 191:1
**SPEAKER-** 14:2
**SPEAKS-** 216:25
**SPECIAL-** 93:11
133:8 175:10
176:6
**SPECIALIZED-** 61:9
**SPECIFIC-** 40:15
53:13 86:24
110:24 111:3
115:1 117:7 130:8
138:20 148:1,5
152:16 153:5
201:14 206:24
**SPECIFICALLY-**
11:5 16:24 49:4
114:5,9 122:3
131:13 135:6,9
**SPECIFICS-** 76:21
**SPECTRUM-** 8:1,11
83:3
**SPELL-** 74:5
125:15
**SPEND-** 80:12,13
85:19 89:2
**SPENDING-** 81:4
84:10 85:20
104:9,10 115:9
**SPENT-** 76:13
115:21 171:3
**SPIRIT-** 25:12
31:8 190:22 208:2
**SPLIT-** 30:17
144:17
**SPONSOR-** 87:22
113:7 114:5,8
**SPONSORED-** 114:15
166:12,13
**SPONSORS-** 117:10
**SPOTLIGHT-** 174:25
**SPOTLIGHTED-**
176:14
**SPREAD-** 105:20
106:6 135:23
**SPRINT-** 79:23
132:18
**SPRINTS-** 59:22
**SPUN-** 114:21
**SQUARELY-** 215:25
**STABILITY-** 137:13
**STAFFED-** 129:3
**STAGE-** 34:19
41:12 42:8
**STAGES-** 76:1 82:2
102:6 120:23
**STAKE-** 109:4
**STAKEHOLDERS-**
17:3,9,14,22
21:22 31:7 47:6
48:6 60:15 65:23
67:16 107:21
174:19 216:14

**STALKING-** 103:25
104:2,6,8,13
107:11,18 108:23
110:25 134:6
136:16,20,23
137:6 144:15
148:15,20,24
149:2,4,8,17,20
150:2,9 151:13
152:8 162:12
177:11,25 178:8
182:5,25 208:14
216:16
**STAM-** 54:19,25
55:2,3,5,12,18,22
**STAND-** 37:17
73:24 74:1 80:10
102:22 125:12
155:18 157:13
168:4 176:4
192:21 227:1
**STANDALONE-** 70:17
71:1 78:5,7,12,13
89:22 90:10
114:12,13,18
120:5 127:19
128:4,7 134:9
147:9,11
**STANDARD-** 29:3
**STANDARDS-** 10:3
77:5 81:3
156:21,22 175:15
**STANDING-** 74:1
80:11 142:7
**STANDS-** 60:1
79:19 80:25
**STARED-** 120:11
**START-** 7:13 24:15
25:25 36:22 79:19
82:3,24 90:24
92:4 96:4 142:7
143:18 171:21
172:20 178:22
208:18,25 209:4
**STARTED-** 86:17
106:7 129:12
157:22 193:9
**STARTING-** 17:15
78:5 85:14 142:6
147:24 176:25
177:6,7,10 195:22
196:5,6
**STARTS-** 132:16
**STATE-** 39:17
49:20 52:21 54:8
74:5,24 125:15
165:8 188:1
**STATEMENT-** 49:19
51:4,9
**STATEMENTS-** 25:11
40:24 52:18
53:15,17 117:19
146:23 150:16
156:13 173:7
190:5 220:7
**STATUS-** 23:23
114:14 218:2
**STATUTE-** 19:12
**STAVE-** 19:25

**STAY-** 90:13
173:21 224:21,22
**STAYING-** 92:3
**STEEN-** 12:11
222:24
**STEP-** 48:2 52:2
55:10 142:25
179:2 188:14
210:4
**STEPHEN-** 49:24
**STEPPED-** 113:8
**STEPPING-** 109:7
**STEPS-** 63:2
129:10
**STICKER-** 176:24
**STIPULATION-** 6:14
8:2
9:1,6,10,17,19
**STOCK-** 60:11,12
**STONES-** 184:5
**STOP-** 39:19 156:5
**STOPPED-**
162:23,24
**STOPS-** 132:16
**STRAIGHT-** 113:20
122:16
**STRATEGIC-** 75:12
85:13
87:6,8,14,21
88:17,19
89:9,10,14,17,18
90:20 92:14,17,22
96:17 108:4
113:4,6,10,13,19
114:2,14 117:3
120:6,17
130:2,5,8,18
138:18 139:7
158:25 159:4,6
160:10 176:15
185:2,22 191:6
**STRATEGICS-** 88:2
116:6 117:9,14,15
129:8
**STRATEGY-** 64:15
73:19 74:25
75:4,10,11,18,22
76:14 77:24
110:12,16,20
128:23 146:23,24
**STRAUSS-** 146:18
**STREET-** 197:3
**STRENGTHEN-** 159:7
**STRETCH-** 65:3
**STRIKE-** 186:12
**STRONG-** 84:12
85:25 86:9,12,13
98:5
**STRONGER-** 87:2
112:13,19 113:3
**STRONGLY-** 146:21
181:12 182:8
**STRUCK-** 65:19
**STRUCTURE-** 28:12
77:20
**STRUCTURED-** 142:5
165:5,23
**SUB-** 218:23 219:2
**SUBLEASING-** 62:10

**SUBLET-** 144:10
**SUBLINES-** 78:24
**SUBMISSION-** 15:2
18:11 218:4
**SUBMISSIONS-**
21:15 22:11 33:14
45:12,14 46:6
48:22 50:3 56:2,8
216:3 218:13
**SUBMITTED-** 65:21
96:6 195:16
199:25 221:3
**SUBSCALE-** 113:1
**SUBSEQUENT-**
150:14
**SUBSET-** 96:17
**SUBSIDIARIES-**
11:1,4,7 166:1
**SUBSIDIARY-** 12:14
**SUBSTANCE-** 24:3
38:18
**SUBSTANTIAL-** 26:4
33:5 58:25 81:3
84:2 85:17 145:1
169:20 182:21,23
186:4 188:23
220:8
**SUBSTANTIALLY-**
14:11 19:19 56:4
72:11 148:20
**SUBSTANTIVE-**
125:6 143:13
145:9,11 146:5
213:17
**SUCCEED-** 181:6
**SUCCEEDED-** 168:17
**SUCCESSFUL-**
63:6,15 130:13
133:20 151:3
**SUCCESSFULLY-**
135:2 141:14
**SUDDEN-** 200:9
209:12
**SUDDENLY-** 208:22
**SUFFERING-** 65:9
137:10
**SUFFICE-** 44:22
**SUFFICIENT-** 44:20
54:2 96:11 112:21
131:22 136:9
142:2,3 197:24
207:1 215:12
**SUFFICIENTLY-**
205:8
**SUGGESTED-** 21:13
24:21 95:17
187:11 197:12
**SUITED-** 130:3
**SUM-** 32:13 72:5
161:19
**SUMMARIZE-** 13:6
**SUMMARIZED-** 51:8
**SUMMARY-** 14:18
148:5
**SUPERIOR-** 162:10
**SUPPLEMENTAL-**
68:5 144:16,20
**SUPPLEMENTARY-**
23:12 24:25

45:18,19
SUPPLIER- 101:13
145:2
SUPPLIERS- 101:10
SUPPLY- 28:5
79:10 102:23
SUPPORT-
11:1,3,15 13:11
40:16 51:4 63:13
70:24 71:2 86:13
87:20,25 90:7,11
93:19,20,25 95:25
120:12 146:11
147:6 154:5
190:13
SUPPORTING- 38:15
72:2
SUPPORTIVE- 12:22
38:10 146:21
147:5
SUPPORTS- 47:3
49:14 52:7 190:8
197:5
SUPPOSE- 191:8
SUPPOSED- 140:5
SURETIES- 224:13
SURPRISING- 27:11
SURROUNDING-
51:19
SUSPECT- 149:12
SUSTAIN- 84:15,19
134:19
SWEET- 71:16
SWITCHING- 79:25
95:15
SWORN- 74:1,4
125:12,14
SYLLABLE- 202:5
SYSTEM- 10:16
28:16,25
29:7,9,17 30:21
31:17,21 32:6
38:21 79:12
102:25 195:25
196:16
SYSTEMS- 31:4
62:24 103:18

——————
T
——————
TAB- 216:20
TABLE- 65:16
66:16 72:12 83:6
84:7 105:1 108:12
163:13 178:4
191:11 194:18
198:18 205:6
209:4,19
TACK- 202:13
TAIL- 80:15 89:25
TAILOR- 94:19,23
TAKING- 17:16
26:14 78:9
100:20,21,23
101:2 137:15
166:18 168:8
183:19 190:5
207:22
TALENT- 87:20,24
90:12 93:10

120:13
TALENTED- 93:15
TARGET- 133:21
202:17 203:18
TASK- 97:2,3
222:20
TAX- 28:13 30:1
38:23
TAY- 14:3,7,16,18
21:19 22:1,5,13
24:23 25:2,5
40:19,23 44:1
45:21,24 46:8,9
47:25 48:10 51:7
54:20,22 55:8,14
56:2,7,9
214:13,15 218:13
222:13
TEAM- 63:11 93:21
126:22,23
132:11,25 207:24
TEAMS- 129:3
TEASE- 193:25
TECHNICAL- 22:15
43:15,17 82:3
TECHNO- 81:20
TECHNOLOGIES-
59:25 77:7,10
80:19,23 83:11
85:20 86:5,16
95:11 97:22,24
134:20 160:6
185:7,13
TECHNOLOGY-
27:8,13 60:2,3,19
64:22 68:25
69:2,3,5,7
70:2,18,21 71:17
79:17,22 80:16
81:1,4,5
82:11,14,18
83:14,20
84:3,12,18,21
86:9 87:1 88:15
95:14 126:1,5
127:9 160:6,14
185:10 186:15,21
190:25 191:1
TEENS- 90:2
TELECOM- 84:7
127:8
TELEPHONE- 59:21
79:17 81:14
TEMPLATE- 147:22
188:24
TENDERED- 18:9
TENS- 98:4 102:13
119:12
TENSION- 42:25
104:9 105:6 137:1
TENT- 173:9
TERM- 33:7,10
36:14 52:2 91:23
168:20
TERMINATE-
152:11,13 179:15
222:7
TERMINATES-
151:23

TERMINATION- 34:7
TERMINOLOGY-
59:22
TERMS- 14:9 25:11
31:10 38:12
41:1,15 45:14
51:9 61:8 66:13
80:24 83:10
85:6,7,8 86:13
88:14 93:17 94:25
96:15 106:9
107:20
108:11,15,19
109:6 114:14
120:13 129:24
132:6 139:10
150:24 157:4
168:16 183:20 217
TERRIBLE- 72:22
TERRIFIC- 6:19
93:21
TERRY- 127:1
TEST- 10:14,16
14:9 22:7,10
87:23 206:7,17,19
215:14
TESTAMENT- 30:11
70:3
TESTED- 206:11,25
TESTIMONY- 12:16
37:5 71:14 117:2
118:9 130:1
146:22 159:1
160:4 162:18
171:3 178:22
184:18 186:23
192:5,13,15
193:16 201:17
TESTING- 69:11,15
THANKFUL- 214:24
THEMES- 61:2
THEORY- 71:3
THERE'D- 98:24
THEREFORE- 18:1
47:21 48:19 61:8
84:20 90:14
101:15 162:22
191:12 216:15
THEREFROM-
39:17,20
THEREIN- 216:17
THERETO- 47:11
53:15
THEY'D- 145:25
THEY'LL-
82:2,3,4,6 144:18
170:21 199:4
THIN- 193:24
THIRD- 30:14
55:6,24 67:4
81:17 86:8 89:4
92:6 151:8 183:22
185:10 188:3
224:10
THIRDLY- 215:16
THREATS- 30:20
THREE- 24:8 27:14
45:22 59:18
75:3,20 76:6 79:7

82:20,21 85:18,23
90:17 103:6
105:25 106:23
125:6 135:14
136:1 146:5 172:4
180:1 181:22
185:22 225:19
226:3
THRESHOLDS- 33:2
THROW- 184:5
207:14
THROWING- 98:12
208:22
THUS- 142:3
TIE- 62:17
TIED- 106:19
TIGHT- 152:12,13
177:15
TIL- 43:5
TIME- 6:4 7:25
15:22 21:8 27:17
30:3,4 35:15
40:1,8 41:12 42:7
43:3 47:16
51:12,17 56:12,13
60:16 61:22
63:3,20 66:20
68:18 70:5,8
71:21 72:3 78:1
80:16,21 83:14,16
91:1,4,19
93:5,7,22
96:11,22 99:6
102:7 1
TIMELY- 92:11
219:11
TIMES- 18:23
27:18 30:10 31:1
41:5 99:22 132:16
154:19 201:20
207:22
TIME-TO-TIME-
88:6
TIMING- 24:6 86:4
90:25 106:15
131:15 177:15
187:12
TINKER- 153:25
154:2,3,15,17
155:3,5,7,8
223:10
TIRED- 79:13
TITLE- 8:6
19:11,14 39:7
125:22
TITLED- 39:1,9
TODAY- 7:10 12:16
18:3 23:10,25
24:24 26:4,7 27:6
28:7 33:8 35:8
49:15,18 58:13
59:13 67:7,12,25
71:16 73:17 74:21
76:16 96:5,7
121:17 128:9,23
131:12,14,16
139:12,14 145:12
146:22
147:3,16,20
150:16 153:1 1

TODAY'S- 80:24
222:20
TOGETHER- 66:6
91:8,19 180:18
196:13,14 198:12
205:23
TOKEN- 207:17
TOM- 50:25
TOMORROW- 65:8
203:23 210:14,19
210:14,19
TONIGHT- 198:20
210:14,19
TONS- 192:8
TONY- 118:17
TOOK- 22:1,7
25:22 78:15
91:4,9 99:15
174:3
TOOTH- 169:2
TOP- 130:17
TOPIC- 150:12
TOPICS- 99:17
105:13
TORONTO- 23:7
24:6 37:24
40:19,22 50:11,19
60:11 72:19 156:7
TOTAL- 44:23,24
67:1 76:7 77:12
80:10,12,13 97:11
155:16
TOUCH- 167:20
218:4
TOUGH- 159:14
TOWARD- 149:2
TRACK- 92:3 99:21
108:19 136:3
TRACKS- 99:14
TRADITIONALLY-
44:12
TRANCHES-
44:11,18
TRANSACTION-
15:21 20:1 21:7
23:22 27:16 37:22
58:23 59:3,13,14
60:8 62:5,11
63:1,2,19 64:8
66:16,23 69:4
72:6 86:23 87:13
89:13 90:22,23
96:4 98:5 99:1,9
102:3,21 119:7
135:6 136:19
137:15 144:3,11
151:1,3,6,13,2
TRANSACTIONS-
36:4 61:17,18
62:15 63:20,21
65:4,22,24 75:25
127:10 136:5
159:11 161:17
184:22 208:2
TRANSCRIPT- 227:8
TRANSCRIPTS-
160:23 227:14
TRANSFER- 8:6
29:1,2,17,23 30:1
32:18 38:20

39:5,14,16 41:8
44:12 51:20
103:14
**TRANSFERRED-** 8:20
**TRANSFERRING-**
102:3
**TRANSFERS-** 10:25
11:3 165:9
**TRANSITION-**
62:19,22,24 63:10
72:3 88:15 102:22
103:13,17
**TRANSITIONED-**
80:25
**TRANSPARENCY-**
26:17 187:21
**TRANSPARENT-** 85:6
**TRANSPIRED-** 54:4
214:14
**TRANSPORT-** 77:10
**TRANSPORTING-**
9:11
**TREASURER-** 12:15
37:14
**TREATMENT-** 53:14
145:9 188:5
**TREMENDOUS-**
200:16
**TRI-** 32:5
**TRIAL-** 57:20 82:1
84:17 88:24 92:25
**TRIALS-**
82:3,4,7,12,15,20
83:1 92:5
**TRICKY-** 72:8
**TRIED-** 78:6
174:19 186:12
**TRIGGERED-** 44:23
135:18
**TRIGGERS-** 183:6
**TROUBLE-** 41:1
**TRUING-** 29:8
**TRUST-** 89:4,8
**TRUSTEE-** 11:17
13:7,8,12,15,17
34:15 36:24
146:10 154:3,5
173:23 181:13
213:21 214:2
223:6,19 224:2
**TSA-** 102:23
**TURN-** 85:12 89:14
96:3 125:7 143:6
146:13 215:4
216:19 219:22
**TURNED-** 149:8
**TURNING-** 58:23
**TURNS-** 91:16
**TWEAKING-** 199:7
200:9
**TWEED-** 50:25
**TWO-** 23:10 24:12
25:23 26:3 28:6
30:16 33:19 37:4
38:17,24 44:10,17
49:13 54:25
55:6,23,25 59:25
63:10 64:20 73:16
76:1 77:5,8 78:16

82:12,22 85:14
88:20 89:16 90:17
91:8 92:4,7,24,25
93:10 95:18 97:19
98:
**TWO-DAY-** 57:19
223:21
**TWOFOLD-** 18:12
**TWO-STEP-** 144:14
**TWO-WEEK-** 115:17
119:3 132:18
158:20 159:24
184:6
**TWO-YEAR-** 82:11
194:4
**TYPES-** 16:6 35:22
**TYPICAL-** 63:17
192:7
**TYPICALLY-** 150:21
**TYPIFIED-** 127:12

U

**UCC-** 41:22 218:23
**UK-** 32:11,14,16
33:1 36:12 44:15
46:18 49:12 52:14
61:25 171:8
**UKA-** 99:23 100:10
**ULTIMATE-** 111:20
**ULTIMATELY-**
52:1,4 72:7
106:11 110:18
119:8 149:19
**UMTS-** 76:3 80:11
**UNCERTAIN-** 56:15
85:17 86:6 93:23
**UNCERTAINTY-** 86:4
108:25
**UNCLEAR-** 148:22
**UNCONDITIONAL-**
173:7
**UNCONTESTED-** 6:9
**UNDERFUNDED-**
42:13
**UNDERSTANDING-**
111:7 120:7
122:18 153:20
**UNDERSTANDS-**
200:17,22
**UNDERSTOOD-**
110:16 207:16
208:9 209:1
**UNDERTAKE-** 64:7
**UNDERTAKEN-** 30:24
129:24 131:25
162:8
**UNDERWAY-** 82:8
**UNDULY-** 176:14
**UNENVIABLE-**
222:19
**UNFAIRLY-** 20:21
**UNFAIRNESS-**
215:19
**UNFORTUNATE-** 65:8
**UNFORTUNATELY-**
60:19 65:3 70:20
84:21 155:18
**UNIDENTIFIED-**
123:23

**UNIQUE-** 66:10
86:24 93:5,12
104:19
**UNIQUELY-** 51:24
**UNIT-** 127:24
**UNITED-** 25:20,21
26:19 27:24 30:6
32:7 35:10 39:24
40:1 53:5
59:15,16 100:10
154:3,4 173:23
**UNITS-** 27:15
128:12 129:3
**UNIVERSE-** 65:10
175:20
**UNIVERSITY-** 76:12
**UNLESS-** 9:15
12:17 46:6 48:23
97:23 112:25
122:8 142:8 143:5
206:16
**UNLIKE-** 166:24
167:3
**UNPERFECTED-** 7:25
8:4
**UNRELATED-** 111:13
153:14
**UNSCRAMBLE-**
161:12
**UNSECURED-** 146:19
**UNTRUE-** 193:13
**UNUSUAL-** 148:13
**UNVARIABLY-** 171:4
**UPCOMING-** 227:1
**UPDATE-** 22:15
23:21 57:1
**UPDATED-** 24:10
**UPEND-** 155:19
158:16
**UPHELD-** 17:22
**UPS-** 91:8
**UPSIDE-** 17:8
**UPWARDS-** 81:4
**URGENCY-** 91:17
**USED-** 15:5 20:21
28:10 42:2 78:19
83:22
**USEFUL-** 94:8
108:13
**USER-** 81:12
**USES-** 70:9
**USING-** 9:4 33:11
83:3
**UTILITIES-** 9:9
**UTILITIES'-** 9:12
**UTMOST-** 38:25

V

**VALIANT-** 191:7
**VALUABLE-** 69:20
70:3 160:14
187:7,9
**VALUE-** 8:16,21
17:8,13 26:13
31:3,6 34:8 62:16
64:24 67:11
71:21,22,23 76:7
85:19 88:16 93:18
96:12,18 97:24

98:7 99:1,5
101:25 104:7,8
105:2 107:20
108:20 111:6
122:1 132:21
136:14,15,18,19,2
1,25
134:6,13 1
**VALUED-** 167:4
**VALUES-** 128:8
**VAPOROUS-** 175:14
**VARIABLE-** 107:19
**VARIANCES-** 102:12
**VARIOUS-** 17:16,18
26:3 27:21 28:12
29:14 34:8
38:13,20,22 43:9
44:14 45:3 47:4
61:23 76:14 82:19
107:21 117:9
129:3 147:7
169:25 196:11
213:21
**VAST-** 34:4
**VEHICLE-** 193:22
**VENDOR-** 82:10
87:21 128:24
**VENDORS-**
82:4,17,19
83:4,5,13 86:1,19
87:5 90:17,20
91:14 92:25
**VENTURE-** 77:16
84:24 120:20
**VERIZON-** 68:21,22
79:23 81:1
82:9,17,21,22
86:20 88:25
91:13,20
92:5,12,20 191:2
**VERIZONS-** 59:22
**VERSION-**
221:17,24
**VERSUS-** 87:14
92:23 108:13
126:21 128:8
168:19 172:3,4
**VET-** 149:25
**VETTED-** 149:14,18
157:17 171:12
177:14
**VIABILITY-** 84:19
86:10
**VIABLE-** 15:25
21:10 127:19
185:20,22,25
**VICE-** 12:15 83:4
126:25
**VICENTE-** 164:8
189:9
**VIDEO-** 9:2 11:12
13:24 72:20
109:25
**VIEW-** 20:6 33:19
51:25 60:15 72:5
81:6 85:13 96:11
98:11,14 102:7,8
109:8 128:2,10,20
130:4 131:3,22,24

133:5 134:14,21
136:18 151:17
154:18 167:22
177:22 178:15
197:17 200:19
204:13,17 207:5
208:6 216:12 2
**VIEWED-** 112:19
134:12 145:11
134:19 128:19
174:16 217:7
**VIGOR-** 90:19
**VIGOROUS-** 10:5
67:15 72:10 99:15
132:17 134:25
**VIOLENT-** 173:24
**VIRGINIA-** 76:12
**VIS-A-VIS-** 217:24
**VODAFONE-** 81:2
82:9,20 86:20
88:25
**VOICE-** 77:7,14
78:25 79:24
80:15,16
**VOIP-** 77:6
**VOLUME-** 23:2
92:10
**VOLUNTEER-** 124:5
**VOTE-** 22:4
**VOTED-** 20:4
**VP-** 75:18

W

**WAIT-** 9:19 98:15
117:25 118:1,4
172:2
**WAITED-** 160:17
**WAITING-** 92:23
114:24 123:11
187:8
**WAIVER-** 39:11
152:17 176:1
218:23
**WALK-** 101:23
180:6
**WALKED-** 194:7
196:2
**WALKING-**
179:21,22
**WALKS-** 172:13
**WALL-** 197:3
**WALRATH-** 57:4
**WALRATH'S-**
123:9,12
**WANTS-** 104:8
143:5,14 156:3
180:1 181:21
221:6
**WARM-** 42:4
**WARRANTED-** 15:22
21:7
**WASN'T-** 184:4
**WASTING-** 134:14
184:2,17 185:5
**WAYS-** 31:5 41:4
112:24
**WE'RE-** 6:2
10:19,22 12:6
23:1,9 26:7

27:1,14 34:14
38:2 41:4 43:16
46:1 49:12
58:7,23 59:13
60:1 61:8 62:12
67:21,25 68:19
71:5,15,18 72:6
73:13 74:10 82:15
84:6,18,20 85:24
90:17 96:4
97:17,18 109:13
118:8
**WEEK-** 35:12 36:15
60:6 107:16
154:11 160:19
161:2,3 192:22
218:15 221:12
**WEEKEND-** 181:14
**WEEKS-** 61:22
99:16 115:16
116:1 172:3,4
173:17 184:3,9
186:3 192:15,19
194:3,4,11 201:12
**WEEKS'-** 192:12
**WELCOME-** 164:13
189:1 211:5
212:24 220:10
**WEREN'T-** 108:15
191:17
**WESTERN-** 7:23
**WESTWIND-** 47:15
**WHEREIN-** 145:17
**WHEREUPON-** 227:4
**WHEREWITHAL-** 64:7
150:5 182:18
207:19
**WHO'S-** 12:15 14:4
70:4 73:18,20
125:10 148:14
204:17
**WHOLE-** 15:22 17:4
21:8 39:13 137:16
162:11 171:16
209:17
**WHOLLY-** 116:12
162:4
**WIDE-** 80:19
**WILL-** 6:19 9:18
12:25 13:9,11
14:24 15:20,22
16:5 19:1,20
20:18 21:8
23:20,21
24:1,11,13 25:12
26:21
31:12,13,14,21
32:21,25
33:10,12,13 34:7
35:8 36:19
37:1,3,21
40:12,21
44:2,5,9,23,25
45:1,7,8,11 46:1
47
**WILLING-** 38:2
99:2 107:10,12
119:24 121:12
122:15 163:7,15

170:17 172:9,13
179:17 180:5
186:8 187:22
**WILLINGNESS-**
107:8 146:11
173:20
**WIN-** 84:21 88:24
**WIND-** 133:25
**WINDOW-** 92:2
96:10
**WINDS-** 114:24
**WINGS-** 201:14
**WINNER-** 89:1
**WINNING-** 69:14
**WINNIPEG-** 19:5
**WINSTAR-** 165:2
**WIRELESS-** 7:8,21
59:24 77:5 79:22
80:10,12 81:7
101:14
**WISH-** 12:19 46:13
53:8 54:20 67:18
109:17 214:13
226:25
**WISHES-** 46:16
50:11
**WISHING-** 21:17
**WITHDRAWN-** 9:13
**WITNESS-**
73:5,6,7,18,20
74:4,7,9,14
109:15,21,25
110:3,5 124:23,25
125:1,14,17
184:21 225:11
**WITNESSES-** 37:4
38:2 59:6,8 64:14
65:13 71:13 72:15
73:16 185:11,21
**WITNESSING-**
128:13
**WON'T-** 16:8 18:21
43:10 44:21
**WORD-** 19:18
141:17 157:3
162:10
**WORDS-** 18:13
124:7 139:17
157:24,25 219:13
**WORK-** 6:2 22:14
28:22 72:23 75:19
82:10 86:14 87:5
88:1 90:18 92:21
101:13 125:21
126:7,22,24
129:23 131:25
145:18 157:6
171:15,19 191:6
219:18 222:3
**WORKED-** 28:4
40:14 51:10
70:4,7 71:18 75:2
126:2 127:10,14
132:11 179:1
**WORKERS-** 187:7
**WORKFORCE-** 93:15
**WORKING-** 10:19
12:6 28:23 45:7
68:24 82:20,21

83:4 86:11
102:1,2,12 104:4
126:4,14 133:19
186:20 187:4
215:19 217:22
**WORKS-** 28:16
123:15 171:16
196:16
**WORLD-** 27:22
28:2,15 34:9
42:14 59:21 63:12
80:10,24 83:10
104:14 170:15
171:5 174:10
176:9 184:24
185:23
**WORLD'S-** 68:23
**WORLDWIDE-** 26:12
194:15
**WORST-** 120:16
207:24
**WORTH-** 116:1
160:18 164:1
181:25
**WORTHWHILE-** 7:12
37:23 67:23
**WORTHY-** 38:16
146:7
**WOULDN'T-**
81:10,13 102:16
117:20 119:4
141:5,6 151:15
173:3 177:10,11
178:25
**WOUND-** 105:11,24
**WRENCHING-** 60:13
**WRESTLING-** 105:21
**WRITTEN-** 13:13,16
168:14 196:18
**WROTE-** 184:3

―――――――――
           Y
―――――――――
**YEAR-** 27:12 69:12
78:5 81:5 82:17
84:10 90:5
102:7,13 115:9
120:9 128:13
184:20
**YEARS-** 28:10 29:4
30:1 63:10
75:3,20 76:6,13
82:5,12,13 83:18
85:14 90:1 103:1
126:8,9 127:11
129:23 131:25
194:2
**YESTERDAY-**
158:7,10
**YIELD-** 25:12
72:11 122:23
**YIELDED-** 62:3
**YORK-** 61:22 67:5
99:16 139:24
**YOU'D-** 92:4
117:15,16 121:12
221:18
**YOU'LL-** 11:23
57:6 68:11 125:12
186:4

**YOU'RE-** 55:5
68:25 72:24 74:1
75:4 76:15 88:3
89:1 100:2 111:17
113:1 122:2 123:1
125:12 131:12
133:25 141:23
142:12 189:1
199:15 211:5
212:24 215:5
220:10
**YOU'VE-** 22:21
24:19 37:14 41:8
43:4,13 45:3
51:22 78:22,23
79:1 83:19 84:25
88:25 89:9 90:20
93:14 106:22
124:15 141:5
155:14 163:23
182:17 185:21
205:7 209:18,19
224:15
**YOUNG-** 47:2 49:5
189:25

―――――――――
           Z
―――――――――
**ZT-** 87:10

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X

|  |  |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*, [1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
|  | RE: D.I. 874 |

------------------------------------------------------------X

## ORDER (A) APPROVING THE INTERIM FUNDING AND
## SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

Upon the motion dated, June 9, 2009 (the "Motion"),[2] of Nortel Networks Inc. and its

affiliated debtors, as debtors and debtors in possession in the above-captioned cases (the "US

Debtors"), for entry of an order, as more fully described in the Motion, pursuant to sections

105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms

and conditions of the Interim Funding and Settlement Agreement (the "Agreement"), and (b)

granting related relief; and adequate notice of the Motion having been given as set forth in the

Motion; and it appearing that no other or further notice is necessary; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

and 1334; and the Court having determined that consideration of the Motion is a core proceeding

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and factual

bases set forth in the Motion establish just cause for the relief requested in the Motion, and that

such relief is in the best interests of the US Debtors, their estates, their creditors and the parties in

interest; and upon the record in these proceedings; and after due deliberation;

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED.

2. The US Debtors are authorized, but not directed, to enter into the Interim Funding

Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and to

take any and all actions that may be reasonably necessary or appropriate to perform all

obligations contemplated thereunder.

3. NNI is authorized to pay NNL $157 million as set forth in the Interim Funding

Agreement as an administrative expense pursuant to sections 503(b) and 363 of the Bankruptcy

Code for the Postpetition Services NNL has provided and the Expenses NNL has paid for the

benefit of NNI subsequent to the Petition Date.

4. The Total Payment reflects the maximum administrative claim that the Canadian

Debtors may assert against the US Debtors for the Postpetition Services and Expenses, as well as

the maximum amount that NNI could owe under the Master R&D Agreement.

5. Pursuant to Bankruptcy Rule 9019, the Interim Funding Agreement constitutes a full

and final settlement of any and all NNI Interim Obligations, all of the matters set forth in Part A

of the Interim Funding Agreement whether arising during, or related to the Canada/US Interim

Period, including, without limitation, any relief the Canadian Debtors and the US Debtors

intended to seek from this Court and the Canadian Court on June 29 and 30, 2009 or such later

date or dates as might be agreed or ordered.

6. Each of NNL and the Canadian Debtors shall indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

7. With respect to any of the matters referred to in Sections 11.c. and 12.a. through 12.f. (inclusive) of the Agreement, as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditor Groups in any negotiations on such issues with the Canadian Debtors and/or the EMEA Debtors, or any related proceedings, and any agreement or determination by the US Debtors shall require the prior consent of the Creditor Groups acting in good faith.

8. Nothing in this Order or in the Interim Funding Agreement shall determine the allocation of proceeds from a Sale Transaction among the Selling Debtors or shall constitute a Protocol for determining the allocation of proceeds from a Sale Transaction among the Selling Debtors. In any Sale Transaction for which a US Debtor is a Selling Debtor, no Protocol for the allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court after notice to parties in interest with an opportunity to object, and no proceeds from a Sale Transaction may be allocated among the US Debtors and the other Selling Debtors unless such allocation is in accordance with a Protocol approved by this Court after notice to

3

parties in interest with an opportunity to object or upon further order of this Court after notice to parties in interest with an opportunity to object.

9.  The failure to specifically describe or include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be approved in its entirety.

10. Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the US Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the US Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

11. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: June 29, 2009
Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD**
**Interim Funding Agreement**
**(returnable June 29, 2009)**

June 22, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte  LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

DOCSTOR: 1680120\1

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**INDEX**

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| 1. | Notice of Motion returnable June 29, 2009 | 1 |
| 2. | Affidavit of John Doolittle, sworn June 22, 2009 | 26 |
| 3. | Draft Order re Interim Funding Agreement | 207 |

**TAB 1**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**
**(returnable June 29, 2009)**

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") will make a motion to Justice Morawetz of the Commercial List court on Monday, June 29, 2009 at a time to be determined or as soon after that time as the motion can be heard, at **393 University Avenue, Toronto, Ontario**.

PLEASE BE ADVISED that certain of the relief sought herein will be subject to a joint hearing between this Honourable Court and the United States Bankruptcy Court for the District of Delaware.

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

THE MOTION IS FOR AN ORDER:

(a)     Abridging the time for service of the Notice of Motion, the fifteenth report (the "Fifteenth Report") of the Ernst & Young Inc., as monitor (the "Monitor") and Motion Record in respect of this motion and dispensing with further service thereof;

(b)     Approving the interim funding and settlement agreement dated as of June 9, 2009 (the "Interim Funding Agreement") among the Applicants (as defined below), the Chapter 11 Debtors (as defined below), the EMEA Debtors (as defined below)[1] and the Joint Administrators (as defined below);

(c)     Approving certain amendments to the Initial Order (as defined below) arising from the Interim Funding Agreement providing for, inter alia, the creation of the Excess Funding Charge and the Shortfall Charge (each as defined below);

(d)     Approving the fifth, sixth and seventh extensions of the Canadian GSPA (as defined below);

(e)     Approving certain amendments to the Initial Order arising from amendments to the EDC Short Term Support Agreement (as defined below);

(f)     Approving certain amendments to the Cross-Border Protocol (as defined below); and

(g)     Such further and other relief as counsel may request and this Honourable Court deem just.

THE GROUNDS FOR THE MOTION ARE:

**BACKGROUND**

(a)     References herein to "Nortel" are references to the global enterprise as a whole;

---

[1] All EMEA Debtors other than Nortel Networks S.A., a French entity, are parties to the Interim Funding Agreement.

(b)     On January 14, 2009, this Court granted an initial order (subsequently amended and restated) (the "Initial Order");

(c)     Pursuant to the Initial Order, Ernst & Young Inc. was appointed as Monitor;

(d)     Also on January 14, 2009, certain of NNC's U.S. subsidiaries (the "Chapter 11 Debtors") made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay under the Code in Canada;

(e)     Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries ( the "EMEA Debtors") of the Nortel group incorporated in the Europe, Middle East and Africa region each obtained an administration order for appointment of administrators (the "Joint Administrators") from the English High Court of Justice under the Insolvency Act 1986;

(f)     On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code;

(g)     On May 28, 2009, the Commercial Court of Versailles, France (the "French Court:") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"). In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA;

(h)     Lastly, on June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK under Chapter 15 of the Code;

**THE INTERIM FUNDING AGREEMENT**

(i)     Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the affidavit of John Doolittle sworn June 22, 2009 (the "Doolittle Affidavit");

(j)   Nortel is a highly integrated business with significant distribution and research and development operations around the world;

(k)   On filing, Nortel entered into two group supplier protocol agreements, one between the Applicants and the Joint Administrators on behalf of the EMEA Debtors, and the other between the Chapter 11 Debtors and the Joint Administrators on behalf of the EMEA Debtors (the "Canadian GSPA" and the "US GSPA", respectively, and together, as each has been and may be amended from time to time, the "GSPAs");

(l)   The GSPAs were entered into in respect of the inter-company trading of goods and services after the Filing Date;

(m)   Since filing, the parties have continued to extend and rely on the GSPAs in respect of basic trade payables. However, following the commencement of these proceedings, discussions began with various interested parties (the "Creditor Groups") concerning continued payments under the Nortel Transfer Pricing Regime within the context of Nortel's worldwide insolvency proceedings;

(n)   As a result, only one payment has been made in respect of amounts that could arguably be owed in respect of the Master R&D Agreement – a January 2009 payment of US$30 million by NNI to NNL;

(o)   In addition, the EMEA Debtors have neither made, nor received, any payments under the Nortel Transfer Pricing Regime since the Filing Date;

(p)   Without the receipt of these payments, NNL is currently facing significant liquidity pressure – pressure that puts NNL, and thus all of Nortel, at risk;

(q)   The various interested parties have been discussing possible solutions to NNL's liquidity issues for over two months. After extensive negotiation, NNL, NNI, the Monitor and the Joint Administrators, working with the Creditor Groups have reached a consensus;

(r)   The terms of the Interim Funding Agreement are set out in the Doolittle Affidavit and, among other things, result in settlement terms which will result in payments being made to NNL to satisfy its projected liquidity needs through to the end of September 2009;

## GROUP SUPPLIER PROTOCOL AGREEMENTS

(s)     Pursuant to previous orders of this Honourable Court, extensions of the Canadian GSPA have been previously approved up through the fourth extension of the GSPA;

(t)     The relevant parties subsequently entered into the fifth, sixth and seventh extensions (collectively, the "Extensions") of the GSPAs and they are currently set to expire on July 9, 2009;

(u)     The terms of the Interim Funding Agreement expressly provide for the parties' intentions that they continue to make monthly payments in respect of the inter-company trading of goods and services among the various Nortel entities;

## EDC

(v)     On filing, NNL and EDC entered into a Short Term Support Agreement dated as of January 14, 2009 (as the same has been subsequently amended and restated, the "Short Term Support Agreement") pursuant to which EDC agreed to provide further "Support" (as defined in the Short Term Support Agreement) to Nortel post-filing, which Support provided was to be secured by the EDC Charge;

(w)     NNL and EDC have now concluded arrangements which will result in the EDC Charge as currently constituted under the Initial Order being replaced in favour of a mechanism whereby EDC will be provided with cash collateral;

(x)     In connection with such arrangements, NNL and EDC have entered into an amendment to the Short Term Support Agreement as well as a cash collateral agreement (the "Cash Collateral Agreement") both dated as of June 18, 2009;

(y)     The previously committed support facility will become discretionary on EDC's part while at the same time, the Applicants will have the flexibility to post cash collateral in respect of any new Support provided to the Applicants up to a maximum of cash collateral permitted by applicable approvals;

(z)     In addition, any existing Support formerly secured by the EDC Charge (as defined in the Initial Order) will be collateralized by the posting of cash collateral pursuant to the Cash Collateral Agreement;

(aa)    In addition to securing outstanding financial assurances, cash collateral will also secure certain fees and expenses of EDC arising from the provision of Support and from the CCAA proceedings themselves. Such fees also formed part of the previously approved EDC arrangements, but will be modestly expanded to include the additional expense of the cash collateral mechanism;

(bb)    EDC will permit the EDC Charge to be vacated upon the approval of the new arrangements and the posting of cash collateral in the amount of approximately US$6.5 million including a deposit for fees and expenses in the amount of US$540,000;

(cc)    EDC has requested amendments to the Initial Order which reflect the fact that EDC will be relying upon the terms of the Cash Collateral Agreement, which amendments mirror those previously ordered in respect of those parties who currently have cash collateral facilities with the Applicant;

## CHANGES TO THE INITIAL ORDER

### Excess Funding Charge and the Shortfall Charge

(dd)    The Interim Funding Agreement contemplates the creation of an Excess Funding Charge and Shortfall Charge (collectively, the "Proposed Charges");

(ee)    The Proposed Charges are to secure the payment obligations of NNL under the Interim Funding Agreement and, from the standpoint of the beneficiaries of those charges, are fundamental terms of the Agreement;

**EDC Charge**

(ff)    As set out above, the EDC Charge will be extinguished and discharged and certain amendments with respect to the cash collateral to be posted with EDC are to be incorporated into the Initial Order;

**Cross Border Protocol**

(gg)    One of the conditions to the effectiveness of the Interim Funding Agreement are agreed upon changes to the Cross Border Protocol;

(hh)    As of the date of this notice of motion, negotiations with respect to such changes are on going;

(ii)    To the extent that a consensus is reached, supplemental evidence will be provided in respect of such amendments,

**MISCELLANEOUS**

(jj)    The provisions of the CCAA;

(kk)    Such further and other grounds as counsel may advise and this Honourable Court permit.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)    The Doolittle Affidavit;

(b)    The Fifteenth Report; and

(c)    Such further and other relief as counsel may request and this Honourable Court deem just.

June 22, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4  CANADA

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for the Applicants

TO:        Attached Service List

514

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**SERVICE LIST**

TO:    **OGILVY RENAULT LLP**
Royal Bank Plaza, South Tower
200 Bay Street, Suite 3800
Toronto, Ontario M5J 2Z4

Derrick Tay
Mario Forte
Jennifer Stam

Email:    dtay@ogilvyrenault.com
mforte@ogilvyrenault.com
jstam@ogilvyrenault.com

Tel:    416.216.4000
Fax:    416.216.3930

Lawyers for the Applicants

TO:   **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:   nortel.monitor@ca.ey.com

Tel:      416.943.3016
Fax:     416.943.3300

AND   **GOODMANS LLP**
TO:   250 Yonge Street
Suite 2400
Toronto, ON  M5B 2M6

Jay Carfagnini
Joseph Pasquariello
Chris Armstrong

Email:   jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
carmstrong@goodmans.ca

Tel:      416.597.4107
Fax:     416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND   **OSLER HOSKIN AND HARCOURT**
TO:   **LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:   lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
ahirsh@osler.com

Tel:      416.362.2111
Fax:     416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND   **FASKEN MARTINEAU DUMOULIN LLP**
TO:   66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:   dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:      416.868.3538
Fax:     416.364.7813

Lawyers for Export Development Canada

AND TO: **EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:   jsullivan@edc.ca

Tel:      613.597.8651
Fax:     613.598.3113


AND TO: **THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON  M5K 1K7

Robert I. Thornton
Michael Barrack
Rachelle Moncur
Leanne M. Williams

Email:    rthornton@tgf.ca
           mbarrack@tgf.ca
           rmoncur@tgf.ca
           lwilliams@tgf.ca

Tel:      416.304.1616
Fax:     416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.


AND TO: **McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:    john.stringer@mcinnescooper.com
           stephen.kingston@mcinnescooper.com

Tel:      902.425.6500
Fax:     902.425.6350

Lawyers for Convergys EMEA Limited


AND TO: **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:    jcarhart@millerthomson.com
           msims@millerthomson.com

Tel:      416.595.8615/8577
Fax:     416.595.8695

Lawyers for Toronto-Dominion Bank


AND TO: **CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:    barry.wadsworth@caw.ca
           lewis.gottheil@caw.ca

Tel.:     416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel employees represented by the CAW-Canada


AND TO: **BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:    hharrison@boughton.ca

Tel:      604.687.6789
Fax:     604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.

AND TO:
**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:     416. 367.6646
Fax:     416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:     416.367.6266
Fax:     416.361.7067

Email:  srappos@blgcanada.com
Tel:     416.367.6033
Fax:     416.361.7306

Lawyers for Bell Canada


AND TO:
**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:  ray.leach@siskinds.com
        dimitri.lascaris@siskinds.com
        monique.radlein@siskinds.com

Tel:     519.672.2121
Fax:     519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare


AND TO:
**LANG MICHNER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

Leslie A. Wittlin
John Contini
Aaron Rousseau

Email:  lwittlin@langmichener.ca
Tel:     416.307.4087
Fax:     416.304.3855

Email  jcontini@langmichener.ca
Tel:     416.307.4148
Fax:     416.304.3767

Email  arousseau@langmichener.ca
Tel:     416.307.4081
Fax:     416.365.1719

Lawyers for ABN AMRO Bank N.V.


AND TO:
**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Robert W. Staley
Gavin Finlayson

Email:  zychk@bennettjones.com
Tel:     416.777.5738
Fax:     416.863.1716

Email:  orzyr@bennettjones.com
Tel:     416.777.5737
Fax:     416.863.1716

Email:  staleyr@bennettjones.com
Tel:     416.777.4857
Fax:     416.863.1716

Email:  finlaysong@bennettjones.com
Tel:     416.777.5762
Fax:     416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

| | | | | |
|---|---|---|---|---|
| AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON M5H 3R3 | | AND TO: | **MILLER THOMSON LLP**<br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON M5H 3S1 |

<table>
<tr><td>
Mark Zigler<br>
Susan Philpott<br>
Demetrios Yiokaris<br>
Andrea McKinnon

Email:  mzigler@kmlaw.ca<br>
Tel:      416.595.2090<br>
Fax:     416.204.2877

Email:  sphilpott@kmlaw.ca<br>
Tel:      416.595.2104<br>
Fax:     416.204.2882

Email:  dyiokaris@kmlaw.ca<br>
Tel:      416.595.2130<br>
Fax:     416.204.2810

Email:  amckinnon@kmlaw.ca<br>
Tel:      416.595.2150<br>
Fax:     416.204.2874

Lawyers for the Former Employees of Nortel
</td><td>
Jeffrey Carhart<br>
Margaret Sims<br>
James Klotz

Email:  jcarhart@millerthomson.com<br>
Tel:      416.595.8615<br>
Fax:     416.595.8695

Email:  msims@millerthomson.com<br>
Tel:      416.595.8577<br>
Fax:     416.595.8695

Email:  jmklotz@millerthomson.com<br>
Tel:      416.595.4373<br>
Fax:     416.595.8695

Lawyers for LG Electronics Inc.
</td></tr>
</table>

| | | | | |
|---|---|---|---|---|
| AND TO: | **MILLER THOMSON LLP**<br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON M5H 3S1 | | AND TO: | **LG ELECTRONICS INC.**<br>11/F, LG Twin Towers (West)<br>20 Yeouido-dong, Yeongdeungpo-gu<br>Seoul 150-721, Korea |

<table>
<tr><td>
Jeffrey Carhart<br>
Margaret Sims

Email:  jcarhart@millerthomson.com<br>
Tel:      416.595.8615<br>
Fax:     416.595.8695

Email   msims@millerthomson.com<br>
Tel:      416.595.8577<br>
Fax:     416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.
</td><td>
Joseph Kim

Email:  joseph.kim@lge.com

Tel:     +82.2.3777.3171<br>
Fax:     +82.2.3777.5345
</td></tr>
</table>

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:  harvey@chaitons.com

Tel:    416.218.1129
Fax:    416.218.1849

Lawyers for IBM Canada Limited

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder

Email:  Shayne.kukulowicz@fmc-law.com
        Alex.macfarlane@fmc-law.com
        Michael.wunder@fmc-law.com

Tel:    416.863.4511
Fax:    416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:  ken.rosenberg@paliareroland.com
Tel:    416.646.4304
Fax:    416.646.4301

Email:  max.starnino@paliareroland.com
Tel:    416.646.7431
Fax:    416.646.4301

Email:  lily.harmer@paliareroland.com
Tel:    416.646.4326
Fax:    416.646.4301

Email:  tina.lie@paliareroland.com
Tel:    416.646.4332
Fax:    416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:  patrick.shea@gowlings.com

Tel:    416.369.7399
Fax:    416.862.7661

Lawyers for Westcon Group

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:   rslattery@mindengross.com
            dullmann@mindengross.com
Tel:      416.369.4149
Fax:     416.864.9223

Lawyers for Verizon Communications Inc.

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:   vdare@gardiner-roberts.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Andrew, LLC

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:

**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:   hfogul@airdberlis.com
Tel:      416.865.7773
Fax:     416.863.1515

Email:   pczegledy@airdberlis.com
Tel:      416.865.7749
Fax:     416.863.1515

Lawyers for Microsoft Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:   renglish@airdberlis.com
            smitra@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND
TO:

**ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:   surquhart@ahbl.ca
Tel:      604.484.1757
Fax:     604.484.1957

Lawyers for Algo Communication Products Ltd.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:  mfleming@millerthomson.com
Tel:     416.595.8686
Fax:    416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:     416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:     416.941.5397
Fax:    416.365.7886

Lawyers for Brookfield LePage Johnson Controls
Facility Management Services

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:  andrew.kent@mcmillan.ca
Tel:     416.865.7160
Fax:    416.865.7048

Email:  hilary.clarke@mcmillan.ca
Tel:     416.865.7286
Fax:    416.865.7048

Email:  tushara.weerasooriya@mcmillan.ca
Tel:     416.865.7262
Fax:    416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:     416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:     416.865.3082
Fax:    416.863.1515

Lawyers for Perot Systems Corporation

AND TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:   lawrence.crozier@mcmillan.ca
Tel:      416.865.7178
Fax:     416.865.7048

Email:   adam.maerov@mcmillan.ca
Tel:      416.865.7285
Fax:     416.865.7048

Lawyers for Citibank

AND TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:      416.593.2996
Fax:     416.593.5437

Lawyers for Expertech Network Installation Inc.

AND TO:

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Leslie Wittlin
Aaron Rousseau

Email:   lwittlin@langmichener.ca
Tel:      416.307.4087
Fax:     416.365.1719

Email:   arousseau@langmichener.ca
Tel:      416.307.4081
Fax:     416.365.1719

Lawyers for Right Management Inc.

AND TO:

**BLANEY McMURTRY LLP**
2 Queen Street East,
Suite 1500
Toronto, ON  M5C 3G5

Deborah S. Grieve

Email:   dgrieve@blaney.com
Tel:      416.593.2951
Fax:     416.593.5437

Lawyers for Alvarion Ltd.

AND TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:   vdare@gardiner-roberts.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Amphenol Corporation

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra
Sandra A. Vitorovich

Email:   smitra@airdberlis.com
            svitorovich@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND TO: **NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Ainslie Benedict
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
         ainslie.benedict@nelligan.ca
         steven.levitt@nelligan.ca
         christopher.rootham@nelligan.ca

Tel:     613.231.8245
Fax:     613.788.3655

Lawyers for the Steering Committee of Recently
Severed Canadian Nortel Employees

AND TO: **CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman

Email:   bleonard@casselsbrock.com
         hgarman@casselsbrock.com

Tel:     416.860.6455
Fax:     416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND TO: **CALEYWRAY**
Labour/Employment Lawyers
1600-65 Queen Street West
Toronto, Ontario  M5H 2M5

Gail E. Misra

Email:   misrag@caleywray.com

Tel:     416.775.4680
Fax:     416.366.3293

Lawyers for the Communication, Energy and
Paperworkers Union of Canada

AND TO: **MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:     613.233.2679
Fax:     613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management, Inc.

AND TO: **CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street, West
Toronto, Ontario  M5H 3C2

Lydia Salvi

Email:   lsalvi@casselsbrock.com

Tel:     416.869.5409
Fax:     416.640.3195

Lawyers for Jabil Circuit Inc.

AND TO: **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant

Email:   chris.besant@bakernet.com

Tel:     416.865.2318
Fax:     416.863.6275

Co-counsel for Jabil Circuit Inc.

AND
TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:    janice.payne@nelligan.ca
          steven.levitt@nelligan.ca
          christopher.rootham@nelligan.ca

Tel:      613.231.8245
Fax:      613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009

AND
TO:

**COLBY, MONET DEMERS, DELAGE &
CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:    ddropsy@colby-monet.com
Tel:      514.284.3663
Fax:      514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:    theintzm@mccarthy.ca
Tel:      416.601.7627
Fax:      416.868.0673

Email:    jsirivar@mccarthy.ca
Tel:      416.601.7750
Fax:      416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:

**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:    dgoldstein@schneidergaggino.com
          mgaggino@schneidergaggino.com

Tel:      514.631.8787
Fax:      514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:    ryanbellr@bennettjones.com
          laugesenm@bennettjones.com

Tel:      416.863.1200
Fax:      416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND
TO:

**EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:    nanci@eurodata.ca
Tel:      613.745.0921
Fax:      613.745.1172