**TAB G**

**701**

THIS AMENDMENT TO THE SECOND AMENDED AND RESTATED SHORT-TERM
SUPPORT AGREEMENT (the "**Amendment**") dated as of June 18, 2009 is made

BETWEEN

NORTEL NETWORKS LIMITED

(hereinafter called the "**Principal**")

> This is Exhibit........G..............referred to in the
> affidavit of.....J̶O̶H̶N̶  D̶O̶O̶L̶I̶T̶T̶L̶E̶.....
> sworn before me, this......2̶2̶ nd.....
> day of......J̶a̶l̶a̶l̶......................20.09
> ....J̶.̶J̶.̶ C̶o̶n̶n̶e̶l̶l̶y̶ m̶ #̶4̶....
> A COMMISSIONER FOR TAKING AFFIDAVITS

AND

EXPORT DEVELOPMENT CANADA

(hereinafter called "**EDC**")

WHEREAS, pursuant to a Second Amended and Restated Master Facility Agreement dated as of December 14, 2007 between the Principal and EDC (the "**Facility Agreement**"), EDC agreed to provide Support for the benefit of the Principal and its affiliates, subject to the terms and conditions of the Facility Agreement;

WHEREAS the Principal commenced a voluntary proceeding seeking relief including an initial order (as amended, the "**Initial Order**") under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA Proceeding**") and the Principal's subsidiaries have commenced administration proceedings in the United Kingdom and restructuring proceedings under Chapter 11 of the United States Bankruptcy Code;

WHEREAS the Principal and EDC entered into an Agreement dated as of January 14, 2009, as amended by the Amended and Restated Short-Term Support Agreement dated as of February 10, 2009, by and between the Principal and EDC, as further amended by the Second Amended and Restated Short-Term Support Agreement dated as of April 24, 2009 by and between the Principal and EDC (collectively, the "**Original Agreement**"), pursuant to which EDC agreed, among other things, that, until July 30, 2009, new Support would continue to be made available to the Principal under the Facilities, to an aggregate maximum amount of USD 30 million; and

WHEREAS the Principal and EDC wish to further amend the terms and conditions of the Original Agreement in accordance with the terms and conditions herein.

THEREFORE, for good and valuable consideration, the sufficiency of which is acknowledged, the parties agree as follows:

1.      Unless otherwise defined herein, words and phrases herein shall have the meanings ascribed to them in the Facility Agreement, the Original Agreement or the Initial Order.

2

2.    Section 4 of the Original Agreement be and is hereby amended by deleting Section 4(a) in its entirety and replacing it with the following:

"The Principal shall (i) execute and deliver a cash collateral pledge agreement substantially in the form of Schedule C hereto and (ii) deliver cash collateral to EDC as continuing collateral security for (A) all new Support provided on or after January 14, 2009, whether before or after the date of this Agreement, and any renewals or extensions of such new Support, (B) all renewals or extensions of Support that was outstanding on January 14, 2009 provided on or before April 14, 2009 and (C) all agreed upon fees and expenses, all such cash collateral to be provided in an amount equal to the underlying Support where the underlying Support is in United States Dollars or, in each case where the currency of the underlying Support is not United States dollars, in the currency of the underlying Support in an amount equal to the underlying Support, and the Principal shall otherwise satisfy all applicable conditions set forth herein and in the Facility Agreement."

3.    The Conditions contained in Schedule A to the Original Agreement is hereby amended by deleting paragraph (g) in its entirety and replacing it with the following:

"(g) Any Support requested under the Small Bonds Facility during the Interim Period shall be at the sole and unfettered discretion of EDC and the Principal acknowledges that EDC shall be under no obligation at any time to permit any use to be made of the Small Bonds Facility during the Interim Period notwithstanding that any conditions precedent to the provision of any such Support have been satisfied or that such Support is within the parameters contemplated by any EDC Agreements."

4.    The Conditions contained in Schedule A to the Original Agreement are hereby amended by the addition of the following:

"(j) The Initial Order shall be amended, on terms satisfactory to EDC, to give effect to Section 4(a) hereof, as amended, on substantially the same terms as provided to the LC Banks in respect of the LC Cash Collateral in paragraphs 7(c), 10A, 44 and 46 of the Initial Order.

(k) Upon the execution and delivery of the Cash Collateral Agreement and the provision of cash collateral as set forth in Section 4(a) hereof, the EDC Charge shall be of no further force and effect, and the Principal shall be at liberty to take such steps as it deems necessary to cancel such charge and to amend the Initial Order accordingly, and EDC agrees to do all things necessary or incidental to give effect to the cancellation of the EDC Charge, including without limitation the deletion of conditions (a) and (b) herein."

5.    Schedule B to the Original Agreement is hereby deleted in its entirety and replaced by Schedule B hereto.

6.    MISCELLANEOUS

(a)    Save only as expressly provided in this Amendment, the provisions of the Facility Agreement and the Original Agreement continue in full force and effect, and the

**703**

3

Facility Agreement, the Original Agreement and this Amendment shall be read and construed as one instrument.

(b) . This Amendment shall be governed and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

(c) This Amendment may be executed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(d) This Amendment shall be binding upon and enure to the benefit of the parties and their respective successors and assigns.

(e) Any provision of this Amendment may be amended or waived if such amendment or waiver is in writing and is signed by the Principal and EDC.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF the parties have signed and delivered this Agreement as of the date first written above.

**NORTEL NETWORKS LIMITED, as Principal**

Per:
Name:
Title:

Per:
Name:       Gordon A. Davies
Title:      Chief Legal Officer
Address:    195 The Overall Secretary
            Toronto, Ontario  M9C 5KI
            Facsimile:  905-863-8563


**EXPORT DEVELOPMENT CANADA**

Per:        _____
Name:
Title:

Per:        _____
Name:
Title:
Address:    151 O'Connor Street
            Ottawa, Ontario  K1A 1K3
            Facsimile:  613-597-8504

IN WITNESS WHEREOF the parties have signed and delivered this Agreement as of the date first written above.

**NORTEL NETWORKS LIMITED, as Principal**

Per: _____

Name:

Title:

Per: _____

Name:

Title:

Address:    195 The West Mall
            Toronto, Ontario M9C 5KI
            Facsimile: 905-863-8563

**EXPORT DEVELOPMENT CANADA**

Per: _____

Name:    DEREK AUSTIN

Title:    MANAGER

Per: _____

Name:    Anna Tzvinkis

Title:    Underwriter

Address:    151 O'Connor Street
            Ottawa, Ontario K1A 1K3
            Facsimile: 613-597-8504

## SCHEDULE B

### FEES AND EXPENSES

(a)    For Support made available by EDC during the Interim Period, the Principal shall pay to EDC prior to the issuance of any Secured Support by EDC, a fee of 1.525% per annum calculated on the aggregate amount of such Support for the stated term thereof.

(b)    The Principal shall pay all reasonable fees and expenses of external legal counsel and external financial advisors incurred by EDC in connection with (i) the negotiation, preparation and implementation of this Agreement and all arrangements contemplated hereby including, without limitation, in connection with the CCAA Proceedings, the negotiation and preparation of the EDC Agreements and the provision of Secured Support or the renewal of any existing Secured Support and (ii) the negotiation and provision of advice in respect of any one or more sales of assets by the Principal or its affiliates in respect in respect of which EDC has issued Support.

(c)    EDC shall release, net of fees and expenses owed, the Principal's previous deposits of USD450,000 and CAD350,000 (for certainty, the Principal shall not be compelled to provide any further cash deposits pursuant to the terms of the Fees and Expenses Letter, as such term is defined in the Cash Collateral Agreement) upon receipt by EDC from the Principal of a new deposit of USD540,000 (the "Deposit"). The Deposit shall be applied by EDC to (i) the fees and expenses referenced in paragraphs (a) and (b) of this Schedule B and (ii) the fees and expenses of EDC's external legal counsel incurred in connection with the CCAA Proceedings. When the Obligations (as defined in the Cash Collateral Agreement) have been satisfied, the balance of the Deposit, if any, shall be returned by EDC to the Principal. The Principal acknowledges and agrees that (i) any fees and expenses which are due and payable by the Principal to EDC and which are not recovered from Collateral (as defined in the Cash Collateral Agreement) and (ii) any amounts paid by EDC on behalf of, and at the request of, the Principal or its affiliates to a financial institution or a surety company in connection with the issuance, renewal or amendment of any letter of credit, letter of guarantee or surety bond shall constitute an unsecured claim against the Principal in the CCAA Proceeding and all such amounts shall be treated as if outstanding immediately prior to the commencement of the CCAA Proceeding.

707

## SCHEDULE C

## CASH COLLATERAL AGREEMENT

# TAB H

This is Exhibit............H............referred to in the
affidavit of.........JOHN DOOLITTLE..............
sworn before me, this.......22ⁿᵈ..........................
day of.........J........................................20.09.

..............................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

## CASH COLLATERAL AGREEMENT

**THIS AGREEMENT** is made as of the 18ᵗʰ day of June, 2009 among **NORTEL NETWORKS LIMITED** (the "**Principal**") and **EXPORT DEVELOPMENT CANADA** ("**EDC**").

**RECITALS:**

**WHEREAS**, pursuant to a Second Amended and Restated Master Facility Agreement dated as of December 14, 2007 between the Principal and EDC (the "**Facility Agreement**"), EDC agreed to provide Support for the benefit of the Principal and its affiliates, subject to the terms and conditions of the Facility Agreement;

**WHEREAS** the Principal commenced a voluntary proceeding seeking relief including an initial order (as amended, the "**Initial Order**") under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA Proceeding**") and the Principal's subsidiaries have commenced administration proceedings in the United Kingdom and restructuring proceedings under Chapter 11 of the United States Bankruptcy Code;

**WHEREAS** the Principal and EDC entered into an Agreement dated as of January 14, 2009, as amended by the Amended and Restated Short-Term Support Agreement dated as of February 10, 2009, by and between the Principal and EDC, as further amended by the Second Amended and Restated Short-Term Support Agreement dated as of April 24, 2009 by and between the Principal and EDC (collectively, the "**Original Agreement**"), pursuant to which EDC agreed, among other things, that, until July 30, 2009, new Support would continue to be made available to the Principal under the Facilities, to an aggregate maximum amount of USD 30 million; and

**WHEREAS** the Principal and EDC have further amended the terms and conditions of the Original Agreement as of the date hereof;

**NOW THEREFORE** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenants, acknowledges, represents and warrants to and in favour of each other as follows:

1.      **Recitals Correct**

The Principal confirms the validity and truth of the facts set forth in the Recitals to this Cash Collateral Agreement, which have the same force and effect as if repeated herein at length.

2.      **Definitions**

Capitalized terms used in this Agreement and not otherwise defined herein have the meanings given to them in the Initial Order, the Facility Agreement and the Original

196

- 2 -

Agreement. Unless the context otherwise requires, in this Agreement the following terms are used with their corresponding defined meanings:

"**Agreement**" means this agreement. The terms "**this Agreement**", "**hereof**", "**hereunder**" and similar expressions refer to this Agreement and not to any particular Article, Section, Subsection, paragraph, clause or other portion of this Agreement. Each reference to a "Schedule" in this Agreement is a reference to a Schedule attached to this Agreement which shall form an integral part hereof.

"**Business Day**" means a day which is not a Saturday or a Sunday on which banks and trust companies are generally open for business in Toronto, Canada.

"**Collateral**" means (i) the Support Collateral, (ii) the Deposit, and (iii) all proceeds of personal property described in this definition and subject to the security hereby constituted.

"**Collateral Delivery Account**" means a U.S. dollar account of EDC at Royal Bank of Canada's branch located at 90 Sparks Street, Ottawa, ON identified as 00006-4015906 (SWIFT ROYCCAT2).

"**Deposit**" has the meaning ascribed thereto in Schedule B of the Original Agreement.

"**Fees and Expenses Letter**" means the fees and expenses letter dated January 27, 2009 by EDC as agreed to and accepted by the Principal January 28, 2009.

"**Lien**" means (i) any right of set-off intended to secure the payment or performance of an obligation, (ii) any interest in property created by way of mortgage, pledge, charge, lien, assignment by way of security, hypothecation, security interest, hire purchase agreement, conditional sale agreement, sale/lease back transaction, deposit arrangement, title retention, capital lease or discount, factoring or securitization arrangement on recourse terms, (iii) any statutory deemed trust or lien, (iv) any preference, priority, adverse claim, levy, execution, seizure, attachment, garnishment or other encumbrance which binds property, and (v) any agreement to grant any of the rights or interests described in clauses (i) to (iv) inclusive of this definition.

"**Obligations**" means all of the Principal's present and future payment, reimbursement and indemnity obligations owing to EDC under the Original Agreement and the Fees and Expenses Letter. For greater clarity, Obligations shall not include Unsecured Renewal Support (as defined in the Original Agreement).

"**Security**" means any and all Liens granted by the Principal to EDC in this Agreement.

"**Support Collateral**" means the funds transferred by the Principal to EDC pursuant to Sections 5 and 6 hereof.

- 3 -

## *Extended Meanings*

To the extent the context so admits, in this Agreement the following words and expressions shall be given the extended meanings set out opposite them:

an **"agreement"** - any agreement, oral or written, simple contract or specialty, bond, bill of exchange, indenture, instrument or undertaking.

an **"asset"** - any undertaking, business, property (real, personal or mixed, tangible or intangible) goodwill or other asset.

an **"authorization"** – any authorization, approval, consent, exemption, licence, permit, franchise, quota, privilege or no-action letter from any governmental authority or from any person in connection with any easements or contractual rights.

**"change"** - change, modify, alter, amend, supplement, extend, renew, compromise, novate, replace, terminate, release, discharge, cancel, suspend or waive.

**"claim"** - claim, claim over, cross-claim, counter-claim, defence, demand, liability, suit, action or proceeding, judgment, order or award of any court, other governmental authority, arbitrator or other alternative dispute resolution authority.

a **"document"** - a written agreement, consent, waiver, certificate, notice or other written document or instrument.

a **"final judgment"** - a judgment, order, declaration or award of a court, other governmental authority, arbitrator or other alternative dispute resolution authority of competent jurisdiction from which no appeal may be made or from which all rights of appeal have expired or been exhausted.

a **"government"** - (i) the Crown in right of Canada or in the right of any Province of Canada, (ii) the government of a Territory in Canada, (iii) a municipality in Canada or (iv) the government of a foreign country or any political subdivision of it.

a **"governmental authority"** – any court, administrative tribunal, regulatory authority, government, union of nations or any agency or other authority of a government or union of nations.

**"include"** – to be interpreted as if followed by the term "without limitation", and such term shall not be construed to limit any word or statement which it follows to the specific items or matters immediately following it or similar terms or matters.

**"losses and expenses"** - losses, costs, expenses, damages, penalties and judgments and awards of any court or other governmental authority, arbitrator, mediator or other alternative dispute resolution authority, including any applicable awarded costs, and legal fees and disbursements on a full indemnity basis.

- 4 -

**"obligations"** - indebtedness, obligations, promises, covenants, responsibilities, duties and liabilities (actual or contingent, direct or indirect, matured or unmatured, now existing or arising hereafter), whether arising by agreement or statute, at law, in equity or otherwise.

**"paid in full"** in relation to any payment obligation owing to any person (the "obligee") - permanent, indefeasible and irrevocable payment in cash (or other freely available funds transfer as may be expressly provided for in the applicable document creating or evidencing such payment obligation) to the applicable obligee in full of such payment obligation in accordance with the express provisions of the applicable document creating or evidencing such payment obligation, without regard to any compromise, reduction or disallowance of all or any item or part thereof by virtue of the application of any bankruptcy, insolvency, fraudulent conveyance, assignment, preference or other similar such laws, any law affecting creditors' rights generally or general principles of equity, and, if applicable, the cancellation or expiry of any commitment of the obligee to lend or otherwise extend credit.

a **"person"** - an individual, including an individual in his or her capacity as trustee, executor, administrator or other representative, a sole proprietorship, a partnership, an unincorporated association, an unincorporated syndicate, an unincorporated organization, a trust, including a business trust, a body corporate organized under the laws of any jurisdiction, a government or agency of a government or any other legal or commercial entity.

a **"proceeding"** - any proceeding, legal action, lawsuit, arbitration, mediation, alternative dispute resolution proceeding or other proceeding.

a **"receiver"** - a privately appointed or court appointed receiver or receiver and manager, or, except in the definition of "Receiver", an interim receiver, liquidator, trustee in bankruptcy, administrator, administrative receiver and any other like or similar official.

a **"representative"** - any person empowered to act for another, including an agent, director, officer or employee of a body corporate or an association and a trustee, executor or administrator of an estate.

**"rights"** - rights, titles, benefits, interests, powers, authorities, discretions, privileges, immunities and remedies (actual or contingent, direct or indirect, matured or unmatured, now existing or arising hereafter), whether arising by agreement or statute, at law, in equity or otherwise.

**"set-off"** - any right or obligation of set-off, compensation, offset, combination of accounts, netting, retention, withholding, reduction, abatement, deduction, counter-claim, cross-claim or any similar right or obligation, or (as the context requires) any exercise of any such right or performance of such obligation.

a **"successor"** of a person (the "relevant party") - (i) any amalgamated or other body corporate of which the relevant party or any of its successors is one of the amalgamating or merging body corporates, (ii) any person resulting from any court approved

- 5 -

arrangement of which the relevant party or any of its successors is party, (iii) any person to whom all or substantially all the assets of the relevant party is transferred, (iv) any body corporate resulting from the continuance of the relevant party or any successor of it under the laws of another jurisdiction of incorporation and (v) any successor (determined as aforesaid or in any similar or comparable procedure under the laws of any other jurisdiction) of any person referred to in clause (i), (ii), (iii) or (iv) of this definition. Each reference in this Agreement to any party hereto or any other person shall (where the context so admits) include its successors.

"**written**" and "**in writing**" - an original writing, a pdf or facsimile copy of a writing or an e-mail.

3.      **Reference to Agreements**

Each reference in this Cash Collateral Agreement to any agreement or document (including this Cash Collateral Agreement and any term defined or incorporated by reference herein that is an agreement or document) at any time shall be construed so as to include such agreement or document (including any attached schedules, appendices and exhibits) and any amendment, modification or restatement thereof.

4.      **Grammatical Variations**

In this Cash Collateral Agreement, unless the context otherwise requires, (i) words and expressions (including words and expressions (capitalized or not) defined or given extended meanings) in the singular include the plural and *vice versa* (the necessary changes being made to fit the context), (ii) words in one gender include all genders and (iii) grammatical variations of words and expressions (capitalized or not) which are defined or incorporated by reference in this Cash Collateral Agreement shall be construed in like manner.

5.      **Collateral**

The Principal shall deposit USD $6,462,672.20 to the credit of the Collateral Delivery Account, being USD $5,992,672.10 for outstanding Secured Support and USD $540,000 as the Deposit. The Principal shall have no proprietary rights to the Collateral. Subject to Section 16, the Principal's sole rights in relation to the Collateral shall be to receive repayment from EDC of an amount equal to any unapplied balance of the Collateral remaining after the Obligations have been paid in full.

6.      **Additional Collateral**

In the event that the Principal requests EDC to provide new Support that would result in the contingent amount of the Obligations exceeding the outstanding balance from time to time of the Collateral , the Principal shall deposit the amount of such deficit to the credit of the Collateral Delivery Account prior to the provision of such new Support.

- 6 -

7.        **Dealings with Collateral**

        EDC is irrevocably authorized and directed by the Principal to apply Collateral to satisfy the Obligations as they become due and payable in accordance with their terms.

8.        **Grant of Security Interest**

        To secure the payment and performance of the Obligations, the Principal hereby grants a security interest and right of set-off to EDC in the Collateral, its rights under this Cash Collateral Agreement and any and all rights of the Principal therein and thereto.

9.        **Attachment**

        The Principal agrees that value has been given, that the parties hereto have not agreed to postpone the time for attachment of the Liens contemplated hereby and that such Liens are intended to attach, as to all of the Collateral and the rights of the Principal under this Cash Collateral Agreement in which the Principal now has rights, when the Principal executes this Cash Collateral Agreement and, as to all Collateral and the rights of the Principal under this Cash Collateral Agreement in which the Principal only has rights after the execution of this agreement, when the Principal first has such rights.

10.        **Indemnity Obligations**

        The Collateral shall be continuing collateral security for the due payment and performance of the Obligations.

11.        **Enforcement**

        The Security shall become enforceable against the Collateral each and every time an Obligation becomes due and payable.

12.        **Application of Payments**

        EDC may apply Collateral to the Obligations in such order and in such manner as EDC may in its sole discretion decide. EDC shall be entitled to reverse any such application and reapply any Collateral from time to time. EDC may grant extensions of time and other indulgences, take and give up guarantees and Liens, including the Security, modify or abstain from perfecting or taking advantage of Liens including the Security, accept compositions, grant releases and discharges and otherwise deal with the Principal, debtors of the Principal, any other person, sureties and others and with any guarantees and Liens, including the Security, all as EDC may see fit without prejudice to the Obligations or to the right of EDC to hold, deal with and realize the Security.

13.        **Condition Precedent to Effectiveness**

        This Agreement shall not become effective unless and until the arrangements provided for herein are approved by the Ontario Superior Court of Justice pursuant to the CCAA Proceeding.

- 7 -

**14.        No Merger**

This Cash Collateral Agreement shall not operate by way of merger of any Obligations or under any agreement by which the same may now or at any time hereafter be represented or evidenced and no judgment recovered by any of EDC shall merge or in any way affect the Security created by this Cash Collateral Agreement.

**15.        Security in Addition**

This Cash Collateral Agreement and the Security afforded hereby shall not be prejudiced by any collateral or other guarantees now or hereafter held by any of EDC in respect of the Obligations or any other obligations of the Principal to any of EDC or by any exchange, release or variation of any such collateral. The rights of EDC under this Cash Collateral Agreement are in addition to and not in substitution for any other Liens, collateral or guarantees now or hereafter held by EDC in respect of the Obligations.

**16.        Return of Support Collateral**

Upon receipt by EDC of a written release, in form and substance satisfactory to EDC, from a financial institution or surety company to whom EDC has issued a letter of credit, letter of guarantee or secured bond as Secured Support, the Support Collateral shall be reduced by an amount equal to such letter of credit, letter of guarantee or secured bond so released and the Principal shall be entitled to the repayment of an amount equal to such portion of the Support Collateral and EDC shall so repay, and shall release its security interest in, such amount.

**17.        Notices**

All notices, demands, requests or other communication of any kind (a "**notice**") that any party may be required or may desire to serve upon another party hereunder, shall be made in accordance with the Facility Agreement.

**18.        Changes**

No agreement purporting to change (other than waive) any provision of this Cash Collateral Agreement shall be binding upon the parties hereto unless that agreement is in writing and signed by the parties hereto. No waiver of strict performance or compliance with any provision hereof shall be binding upon any party hereto unless such waiver is in writing signed by the party sought to be bound thereby.

**19.        Time of the Essence**

Time is and shall remain of the essence of this Cash Collateral Agreement and each of its provisions.

**20.        Governing Law**

This Cash Collateral Agreement shall be governed by, and construed and interpreted in accordance with, the laws in force in the Province of Ontario, including the federal

- 8 -

laws of Canada applicable therein, but excluding choice of law rules. Such choice of law shall, however, be without prejudice to or limitation of any other rights available to EDC under the laws of any other jurisdiction where Collateral may be located. The Principal irrevocably attorns to and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario located at Toronto with respect to any matter arising hereunder or related hereto.

### 21.        Binding Effect

This Cash Collateral Agreement shall enure to the benefit of EDC and their respective successors and permitted assigns and shall be binding on the Principal, its legal representatives (including receivers) and its successors.

### 22.        No Third Party Rights

No person who is not a party hereto shall be entitled to any benefit under this Agreement including so as to claim any rights against the Collateral.

### 23.        Limitation Period

The parties hereto agree to extend the limitation period under the *Limitations Act, 2002* (Ontario), other than one established by Section 15 of that Act, applicable to this Cash Collateral Agreement, and each provision hereof and any claim thereunder, to ten (10) years.

### 24.        Headings

The division of this Cash Collateral Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Cash Collateral Agreement. The insertion in this Cash Collateral Agreement of headings are for the convenience of reference only and shall not affect the construction or interpretation of this Cash Collateral Agreement.

### 25.        Receipt of Copy

The Principal acknowledges receipt of an executed copy of this Cash Collateral Agreement.

### 26.        Counterparts

This Cash Collateral Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument, and it shall not be necessary in making proof of this Cash Collateral Agreement to produce or account for more than one such counterpart. Transmission of a copy of an executed signature page of this Cash Collateral Agreement (including any change to this Cash Collateral Agreement ) by any party hereto to the other parties to this Cash Collateral Agreement by facsimile transmission or e-mail in pdf format, shall be as effective as delivery to the other parties hereto of a manually executed counterpart hereof.

717

- 9 -

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DM_TOR/231274-00017/3115083.7

IN WITNESS WHEREOF this Cash Collateral Agreement has been executed and delivered by the parties hereto.

**EXPORT DEVELOPMENT CANADA**

Per:
Name: DEREK AUSTIN
Title: MANAGER

Per: A. Tzulakis
Name: Anna Tzulakis
Title: UNDERWRITER

**NORTEL NETWORKS LIMITED**

Per:
Name:
Title:

Per:
Name:
Title:

**IN WITNESS WHEREOF** this Cash Collateral Agreement has been executed and delivered by the parties hereto.

EXPORT DEVELOPMENT CANADA

Per:     _____
Name:
Title:

Per:     _____
Name:
Title:


NORTEL NETWORKS LIMITED

Per:     _____
Name:
Title:

Per:     _____
Name:
Title:     Gordon A. Davies
          Chief Legal Officer
          and Corporate Secretary

720

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE-
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

AFFIDAVIT OF JOHN DOOLITTLE
(sworn June 22, 2009)

---

**Ogilvy Renault LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay  LSUC#: 21152A**
Tel:      (416) 216-4832
Email:    dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel:      416-216-4870
Email:    mforte@ogilvyrenault.com

**Jennifer Stam LSUC #36735J**
Tel:      (416) 216-2327
Email:    jstam@ogilvyrenault.com

Lawyers for Applicants

# TAB 3

722

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 29th |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JUNE, 2009 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**ORDER**
**(Interim Funding Agreement)**

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited

("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and

Nortel Networks International Corporation (collectively, the "Applicants") for, *inter alia*, the

approval of an interim funding and settlement agreement dated as of June 9, 2009 (the "Interim

Funding Agreement") among the Applicants, the Chapter 11 Debtors (as defined in the Doolittle

Affidavit, as defined below), the EMEA Debtors (as defined in the Doolittle Affidavit) and the

Joint Administrators (as defined in the Doolittle Affidavit) (other than the Joint Administrator appointed in respect of Nortel Networks S.A.) and the other relief set out in the Applicants' notice of motion dated June 22, 2009 was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn June 22, 2009 (the "Doolittle Affidavit") and the fifteenth report of Ernst & Young Inc. dated June ●, 2009 (the "Fifteenth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Katie Legree sworn June ●, 2009, filed.

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Fifteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Doolittle Affidavit.

3.      THIS COURT ORDERS that the Interim Funding Agreement, including without limitation, all of the settlements and reservations of rights provided for therein, be and is hereby approved and that the Applicants are hereby authorized and directed to comply with their obligations thereunder.

4.      THIS COURT ORDERS that, without limiting anything contained in paragraph 3 hereof, with respect to any matters referred to in Section 11.c. and 12.a. through 12.f. (inclusive) of the Interim Funding Agreement, as to which agreement or determination of any of the

Applicants is required, the Applicants shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Applicants shall require prior consent of the Bondholders' Committee acting in good faith and the Monitor.

5.      **THIS COURT ORDERS** that, subject to the terms of the Interim Funding Agreement, the Extensions to the Canadian GSPA and the Accession be and are hereby approved.

6.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

7.      **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

725

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**ORDER**
**(Interim Funding Agreement)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

Court File No:  09-CL-7950

**726**

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**MOTION RECORD**
**Interim Funding Agreement**
**(returnable June 29, 2009)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 29th |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JUNE, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**ORDER**
**(Interim Funding Agreement)**

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited

("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and

Nortel Networks International Corporation (collectively, the "Applicants") for, *inter alia*, the

approval of an interim funding and settlement agreement dated as of June 9, 2009 (the "Interim

Funding Agreement") among the Applicants, the Chapter 11 Debtors (as defined in the Doolittle

Affidavit, as defined below), the EMEA Debtors (as defined in the Doolittle Affidavit) and the

- 2 -

Joint Administrators (as defined in the Doolittle Affidavit) (other than the Joint Administrator appointed in respect of Nortel Networks S.A.) and the other relief set out in the Applicants' notice of motion dated June 22, 2009 was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn June 22, 2009 (the "Doolittle Affidavit") and the fifteenth report of Ernst & Young Inc. dated June 25, 2009 (the "Fifteenth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Katie Legree sworn June 22, 2009, filed.

1.   THIS COURT ORDERS that the time for the service of the Notice of Motion, the Fifteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.   THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Doolittle Affidavit.

3.   THIS COURT ORDERS that the Interim Funding Agreement, including without limitation, all of the settlements and reservations of rights provided for therein, be and is hereby approved and that the Applicants are hereby authorized and directed to comply with their obligations thereunder.

4.   THIS COURT ORDERS that, without limiting anything contained in paragraph 3 hereof, with respect to any matters referred to in Section 11.c. and 12.a. through 12.f. (inclusive) of the Interim Funding Agreement, as to which agreement or determination of any of the

- 3 -

Applicants is required, the Applicants shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Applicants shall require prior consent of the Bondholders' Committee acting in good faith and the Monitor.

5.     **THIS COURT ORDERS** that, subject to the terms of the Interim Funding Agreement, the Extensions to the Canadian GSPA and the Accession be and are hereby approved.

6.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

7.     **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 30 2009

PER / PAR:

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**ORDER**
**(Interim Funding Agreement)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

731



IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

Court File No: 09-CL-7950

MOTION RECORD
Interim Funding Agreement
(returnable June 29, 2009)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

The motion was supported by the
UK Administrator, the Bondholders and
the Unsecured Creditors Committee on the
basis that these parties are reserving their
rights in respect of the allocation issue.

It is clear that this motion is to for
approval of the Interim Funding Agreement.
The reservation of rights has been noted
ed. The Jay, counsel to the Applicants,
acknowledged that the motion does not
deal with the allocation of funds.

The affidavit of Mr. Doolittle sworn
Jun 22/09 at the 15th Rpt
of the Monitor provides a
detailed background as to
benefits of the Interim Funding Agmt.
I am satisfied that, in the
circumstances, the Interim Funding Agmt
should be approved. As part
of the approval process, I
understand that certain amounts

to the hon - Binder Protonal were
also sought. These amendments were
not opposed. I am satisfied that
the proposed amendments are appropriate and
they are approved.

3 The mechanism in respect of the
EDC Charge were also referenced. And I
am satisfied that it is appropriate for
the order deleting the EDC Charge
to become effective upon the Monitor
filing a certificate on the advice of
EDC That EDC has received The
collateral funds. ( Such certificate
was delivered by the Monitor
at 5⁰⁰ p.m. on June 30/09)
The requested amendments to the
Initial Order are also approved
as are the extensions to the Canadian
GSPA and the EDC Short
Term Support Agreement.

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**ORDER**
(Interim Funding Agreement)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

Derrick Tay LSUC# 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

An order to give effect to the foregoing has been signed in the form presented.

DOCSTOR: 17129693

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

The Honourable Mr Justice Blackburne
23 June 2009

IN THE MATTERS OF:

| | |
|---|---|
| NORTEL NETWORKS UK LIMITED | No 536 of 2009 |
| NORTEL GMBH | No 542 of 2009 |
| NORTEL NETWORKS NV | No 550 of 2009 |
| NORTEL NETWORKS S.P.A | No 552 of 2009 |
| NORTEL NETWORKS BV | No 553 of 2009 |
| NORTEL NETWORKS POLSKA SP. Z.O.O | No 554 of 2009 |
| NORTEL NETWORKS HISPANIA SA | No 535 of 2009 |
| NORTEL NETWORKS INTERNATIONAL FINANCE & | No 549 of 2009 |
| HOLDINGS BV | No 537 of 2009 |
| NORTEL NETWORKS (AUSTRIA) GMBH | No 538 of 2009 |
| NORTEL NETWORKS SRO | No 540 of 2009 |
| NORTEL NETWORKS ENGINEERING SERVICE KFT | No 547 of 2009 |
| NORTEL NETWORKS PORTUGAL SA | No 551 of 2009 |
| NORTEL NETWORKS SLOVENSKO | No 544 of 2009 |
| NORTEL NETWORKS FRANCE SAS | No 545 of 2009 |
| NORTEL NETWORKS OY | No 546 of 2009 |
| NORTEL NETWORKS ROMANIA SRL | No 548 of 2009 |
| NORTEL NETWORKS AB | No 541 of 2009 |

NORTEL NETWORKS (IRELAND) LIMITED
(INDIVIDUALLY THE "COMPANY" AND TOGETHER
THE "COMPANIES")

AND IN THE MATTER OF THE INSOLVENCY ACT
1986



~~MINUTE OF~~ ORDER

UPON THE APPLICATION of:

(1)     Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris and Christopher John
Wilkinson Hill of Ernst & Young LLP, the joint administrators of Nortel Networks UK
Limited, Nortel GmbH, Nortel Networks NV, Nortel Networks S.p.A, Nortel Networks
BV, Nortel Networks Polska Sp. z.o.o, Nortel Networks Hispania SA, Nortel Networks

International Finance & Holdings BV, Nortel Networks (Austria) GmbH, Nortel Networks sro, Nortel Networks Engineering Service Kft, Nortel Networks Portugal SA, Nortel Networks Slovensko sro, Nortel Networks Finance SAS, Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB; and

(2)    Alan Robert Bloom and David Hughes, the joint administrators of Nortel Networks (Ireland) Limited

AND UPON HEARING Leading Counsel for the Applicants

AND UPON READING the third witness statement of Alan Robert Bloom dated 19 June 2009 and the exhibit thereto

IT IS ORDERED AND DIRECTED THAT:

(1)    The joint administrators of each of the Companies be at liberty to enter into the Interim Funding and Settlement Agreement in substantially the form exhibited to the third witness statement of Alan Robert Bloom dated 19 June 2009.

(2)    Pursuant to rule 7.31(5) of the Insolvency rules 1986, the third witness statement of Alan Robert Bloom dated 19 June 2009 and the exhibit thereto not be open to inspection without the leave of the Court.

(3)    The costs of and incidental to this application be paid as an expense of the administrations of the Companies.

DATED THIS 23RD DAY OF JUNE 2009

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
COMPANIES COURT
MR JUSTICE BLACKBURNE
23rd JUNE 2009
IN THE MATTERS OF:

| | |
|---|---|
| NORTEL NETWORKS UK LIMITED | No 536 of 2009 |
| NORTEL GMBH | No 542 of 2009 |
| NORTEL NETWORKS NV | No 550 of 2009 |
| NORTEL NETWORKS S.P.A | No 552 of 2009 |
| NORTEL NETWORKS BV | No 553 of 2009 |
| NORTEL NETWORKS POLSKA SP. Z.O.O | No 554 of 2009 |
| NORTEL NETWORKS HISPANIA SA | No 535 of 2009 |
| NORTEL NETWORKS INTERNATIONAL | |
| FINANCE & HOLDINGS BV | No 549 of 2009 |
| NORTEL NETWORKS (AUSTRIA) GMBH | No 537 of 2009 |
| NORTEL NETWORKS SRO | No 538 of 2009 |
| NORTEL NETWORKS ENGINEERING | |
| SERVICE KFT | No 540 of 2009 |
| NORTEL NETWORKS PORTUGAL SA | No 547 of 2009 |
| NORTEL NETWORKS SLOVENSKO | No 551 of 2009 |
| NORTEL NETWORKS FRANCE SAS | No 544 of 2009 |
| NORTEL NETWORKS OY | No 545 of 2009 |
| NORTEL NETWORKS ROMANIA SRL | No 546 of 2009 |
| NORTEL NETWORKS AB | No 548 of 2009 |
| NORTEL NETWORKS (IRELAND) LIMITED | No 541 of 2009 |

(INDIVIDUALLY THE "COMPANY" AND
TOGETHER THE "COMPANIES")

AND IN THE MATTER OF THE
INSOLVENCY ACT 1986

---

### ~~MINUTE OF~~ ORDER

---

Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS
Ref: 1403/7938/30899414
**Solicitors to the Applicants**

Applicant
Alan Robert Bloom
3rd Statement
Exhibit "ARB3"
19 June 2009

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTERS OF:**

| | |
|---|---|
| **NORTEL NETWORKS UK LIMITED** | No 536 of 2009 |
| **NORTEL GMBH** | No 542 of 2009 |
| **NORTEL NETWORKS NV** | No 550 of 2009 |
| **NORTEL NETWORKS S.P.A** | No 552 of 2009 |
| **NORTEL NETWORKS BV** | No 553 of 2009 |
| **NORTEL NETWORKS POLSKA SP. Z.O.O** | No 554 of 2009 |
| **NORTEL NETWORKS HISPANIA SA** | No 535 of 2009 |
| **NORTEL NETWORKS INTERNATIONAL FINANCE &** | |
| **HOLDINGS BV** | No 549 of 2009 |
| **NORTEL NETWORKS (AUSTRIA) GMBH** | No 537 of 2009 |
| **NORTEL NETWORKS SRO** | No 538 of 2009 |
| **NORTEL NETWORKS ENGINEERING SERVICE KFT** | No 540 of 2009 |
| **NORTEL NETWORKS PORTUGAL SA** | No 547 of 2009 |
| **NORTEL NETWORKS SLOVENSKO** | No 551 of 2009 |
| **NORTEL NETWORKS FRANCE SAS** | No 544 of 2009 |
| **NORTEL NETWORKS OY** | No 545 of 2009 |
| **NORTEL NETWORKS ROMANIA SRL** | No 546 of 2009 |
| **NORTEL NETWORKS AB** | No 548 of 2009 |
| **NORTEL NETWORKS (IRELAND) LIMITED** | No 541 of 2009 |

**(INDIVIDUALLY THE "COMPANY" AND TOGETHER THE "COMPANIES")**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

### THIRD WITNESS STATEMENT OF
### ALAN ROBERT BLOOM

---

I, **ALAN ROBERT BLOOM** of Ernst & Young LLP, 1 More London Place, London SE1 2AF, United Kingdom, **DO STATE** as follows:-

1.      I am a licensed insolvency practitioner and Partner in the firm of Ernst & Young LLP ("**E&Y**").

2.      I was appointed as a joint administrator of each of the Companies on 14 January 2009 together with Alan Michael Hudson, Christopher John Wilkinson Hill and Stephen John Harris, of E&Y, save in respect of Nortel Networks (Ireland) Limited ("**NN Ireland**") where David Hughes, of Ernst & Young Chartered Accountants, and I were appointed as the joint administrators, pursuant to the orders of Mr Justice Blackburne. I will refer to us collectively in this statement as the "**Joint Administrators**", where I use this term in relation to NN Ireland, I am referring to myself and David Hughes.

3.      I am duly authorised to make this witness statement on behalf of the Joint Administrators for each of the Companies in support of an application for directions by the Court that the Joint Administrators be at liberty to enter into the Interim Funding and Settlement Agreement (the "**Funding Agreement**") for each of the Companies[1] under which the Joint Administrators have sought to achieve, inter alia, a full and final settlement of the transfer pricing arrangements between the Nortel group entities since 14 January 2009 and until 31 December 2009 (the "**Period**").

4.      Save where I indicate to the contrary, the facts contained in this witness statement are within my own knowledge and are true. Where the facts stated are not within my own knowledge, I have identified my sources of information and/or belief.

5.      There is now produced and shown to me a bundle of documents marked "ARB3" to which I shall refer in this witness statement.

6.      This is my third witness statement in these proceedings. My first witness statement dated 1 February 2009 was filed in support of an application by the Joint Administrators that letters of request be sent to the relevant foreign courts requesting their assistance in giving the Joint Administrators adequate notice of the opening of any secondary insolvency proceedings. NNUK was not a party to this application. My second witness statement dated 20 February 2009 was filed in support of the Joint Administrators' application for the Court's leave to pay on account 80% of their fees out of the assets of the Companies and Nortel Networks SA (in Administration) ("**NN France**") until the Joint Administrators'

---

[1] Nortel Networks SA (in Administration) is excluded from this application for the reasons described at paragraphs 27 and 28 below.

remuneration was fixed in the usual way by either the creditors, creditors' committee or the Court.

7.     In addition, Stephen Harris (one of my fellow Joint Administrators) has signed a witness statement in these proceedings on behalf of the Joint Administrators of NN France in relation to a protocol arrangement with the French liquidators and French administrators appointed under secondary insolvency proceedings commenced in the Commercial Court of Versailles in France (Case No. 2009P00492). I describe this at paragraphs 27 and 28 below.

8.     This witness statement is divided into the following sections:

(a)     Background;

(b)     Canada and the US;

(c)     EMEA Administration Applications;

(d)     Conduct of the Joint Administrations;

(e)     Transfer Pricing Arrangements;

(f)     Transfer Pricing Regime Post-Administration;

(g)     Funding Agreement;

(h)     Funding Agreement in the Interests of each of the EMEA Debtors;

(i)     Urgency of the Application;

(j)     Relief Sought;

(k)     Inspection of the Court File; and

(l)     Conclusion.

**A.     BACKGROUND**

*Global Structure*

9.     Nortel Networks Corporation ("**NNC**") is a Canadian company and the ultimate holding company of the Nortel group. Nortel Networks Limited ("**NNL**") is the primary Canadian

operating company and holding company for most of the Nortel global subsidiaries.

10.     Nortel Networks Inc. ("**NNI**") is a private company incorporated in the United States of America ("**US**") and is the primary US Nortel operating company. It is a direct subsidiary of NNL.

11.     The Companies form part of the global Nortel group of companies (the "**Nortel Group**") and particularly form part of the Nortel Group operating in Europe, the Middle East and Africa ("**EMEA**" and the "**EMEA Group**").

12.     Historically, the EMEA Group's central management and control has, to a large extent, been directed from England, where all major decisions are made. The English Court found on 14 January 2009 that the Centre of Main Interest ("**COMI**") of each of the Companies and NN France is England. Nortel Networks UK Limited (in Administration) ("**NNUK**") is the largest operation in the EMEA Group. NNUK acts as a vital hub to liaise with, supervise and provide administrative functions for the other companies within the EMEA Group. The EMEA Group therefore depends, to a significant extent, on NNUK continuing to trade.

### *Nortel Business*

13.     The Nortel Group operates on a large scale; its year end 2007 worldwide revenue was approximately US$11 billion and it employed, prior to 14 January 2009 (the date of the administration orders), 24,000 employees worldwide.

14.     The Nortel Group is a global supplier of networking solutions (i.e. telecommunications, computer networks and software) serving customers in Canada, the US, EMEA, Caribbean, Latin America and Asia.

15.     The Nortel Group operates on a highly integrated basis across multiple jurisdictions. Nortel's business is based on the development, licensing and maintenance of intellectual property and the marketing of products and services based on that intellectual property.

16.     As such, research and development ("**R&D**") is an important part of Nortel's business. At paragraphs 23 and 24 of Sharon Rolston's witness statement ("**Ms Rolston's Statement**"), filed in support of the application for the making of an administration order in respect of NNUK, she describes Nortel's history of innovation in the design, development and deployment of products, systems and solutions in modern communications to deliver value to its customers globally. This includes internal R&D initiatives and external strategic

R&D partnerships. A copy of Ms Rolston's Statement is attached at pages 1 to 50 of ARB3.

**B.    CANADA AND THE UNITED STATES**

17.    In the previous five financial years, the Nortel Group has reported losses or break-even financial results. I understand that for the year ended 31 December 2008, the Nortel Group incurred a consolidated net loss after tax of US$5.8 billion against a net loss after tax of US$957 million in the year ended 31 December 2007. A copy of the consolidated 2007 and 2008 accounts is at page 51 of ARB3.

18.    On 14 January 2009, NNC and NNL (together with certain of its Canadian subsidiaries), sought protection under Canadian bankruptcy law, the Companies' Creditors Arrangement Act ("CCAA"), to facilitate the reorganisation of the Nortel Group for the benefit of its creditors. The Canadian Nortel companies continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

19.    On the same day, NNI and Nortel Networks Capital Construction (together with certain of their direct and indirect US subsidiaries), filed voluntary petitions in the Bankruptcy Court for the District of Delaware pursuant to Chapter 11 of the United States Bankruptcy Code. No trustee or examiner of these companies has been appointed. On 26 January 2009, the Office of the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors pursuant to Chapter 11. An ad hoc committee of bondholders holding claims against certain of the US companies and certain of the Canadian companies has also been organised. The US Nortel companies through their directors/managers continue to operate their businesses and manage their properties as debtors in possession under the US Bankruptcy Code.

**C.    EMEA ADMINSTRATION APPLICATIONS**

20.    As a result of the precarious financial position of the Nortel Group and the likely impact on the EMEA Group of the insolvency filings in Canada and the United States, it was concluded that there was a danger that the EMEA Group companies' affairs would disintegrate as the individual companies sought protection under the insolvency laws of their own individual jurisdictions of incorporation and/or were unable to trade intra-group without protection.

21.    Additionally, uncoordinated insolvency filings for the EMEA companies, with each

10/21155308_4

jurisdiction operating under different sets of insolvency legislation, would have hindered attempts to restructure the Nortel Group's businesses and assets as going concerns, thereby reducing returns to creditors. Accordingly, the directors of each of the Companies took the decision, on the basis of professional advice and in the belief that the Companies' COMI, as defined by the Council Regulation (EC) on Insolvency Proceedings 2000 (No 1346/2000) (the **"Regulation"**), was in England, to issue applications in this Court for the appointment of joint administrators to each of the Companies.

22.    On 14 January 2009, therefore, the following Nortel companies in the EMEA Group were placed into administration by orders of Mr Justice Blackburne and the Joint Administrators were appointed to each of the following, namely:

    (a)    NNUK (England);

    (b)    Nortel GmbH (Germany);

    (c)    NN Ireland (Ireland);

    (d)    Nortel Networks NV (Belgium);

    (e)    Nortel Networks S.P.A. (Italy);

    (f)    Nortel Networks BV (Netherlands);

    (g)    Nortel Networks Polska SP. Z O.O. (Poland);

    (h)    Nortel Networks Hispania SA (Spain);

    (i)    Nortel Networks International Finance & Holdings BV (Netherlands);

    (j)    Nortel Networks (Austria) GmbH (Austria);

    (k)    Nortel Networks, S.R.O. (Czech Republic);

    (l)    Nortel Networks Engineering Service KFT. (Hungary);

    (m)    Nortel Networks Portugal SA (Portugal);

    (n)    Nortel Networks Slovensko (Slovakia);

    (o)    Nortel Networks France SAS (France);

(p)    Nortel Networks Oy (Finland);

(q)   : Nortel Networks Romania SRL (Romania);

(r)    Nortel Networks AB (Sweden) (collectively the entities listed in (a) to (r) are referred to herein as either the **"Companies"** or the **"EMEA Debtors"**); and

(s)    NN France (collectively the entities listed in (a) to (s) are referred to herein as the **"EMEA Companies in Administration"**).

23.    As noted above, the English Court found that the COMI of each of the EMEA Companies in Administration was in England. Accordingly, each of the administrations is a main insolvency proceeding as defined in Article 3(1) of the Regulation (the **"Main Proceedings"**).

24.    Copies of the orders appointing the Joint Administrators to each of the EMEA Companies in Administration appear at pages 52 to 220 of ARB3 (the **"Orders"**). In addition to appointing joint administrators to each of the EMEA Companies in Administration, the Judge directed as follows:

(a)    pursuant to Paragraph 3 of Schedule 1 of the Insolvency Act 1986 (**"IA 1986"**), the Joint Administrators be at liberty to enter into and to procure each EMEA Company in Administration to enter into an administration expense facility agreement in the same or substantially the same terms as the draft shown to the Court (whether as a borrower or lender thereunder), such agreement to take effect as a contract entered into by the Joint Administrators within the meaning of Paragraph 99(4) of Schedule B1, IA 1986;

(b)    pursuant to Paragraph 66 of Schedule B1, IA 1986, provided that they consider the making of such payments is likely to assist achievement of the purpose of each of the administrations, the Joint Administrators may:

    i.    make such payments to the employees of each of the EMEA Companies in Administration as they would receive from the assets of such company if Secondary Proceedings were to be commenced under Article 27 of the Regulation (**"Secondary Proceedings"**);

    ii.    make such payments from the assets of each of the EMEA Companies in

Administration to those creditors of each company whose claims against the company would be preferential under the laws governing Secondary Proceedings, were Secondary Proceedings to be commenced there under Article 27 of the Regulation, as they would receive in such Secondary Proceedings; and

iii.    make payment in respect of pre-administration liabilities for each of the EMEA Companies in Administration.

(c)    the Joint Administrators, being officers of the Court, may apply to the relevant judicial authorities in any other country or territory for such assistance as they consider they may require in connection with the exercise of their functions.

25.    The applications for administration orders sought these directions as it was considered that if the Joint Administrators had those powers and directions they would be in a position to:

(a)    take steps to limit the prospects of Secondary Proceedings being opened in any of the jurisdictions in which the EMEA Companies in Administration are incorporated;

(b)    ensure that suppliers continued to make supplies to the EMEA Companies in Administration during the administrations to allow them to continue to trade; and

(c)    participate, if in the interests of an individual EMEA Company in Administration's creditors, in a coordinated global reorganisation of the Nortel Group,

thereby maximising returns for creditors in each of the EMEA Companies in Administration.

26.    On the further application of the Joint Administrators on 3 February 2009, this Court sent a letter of request (a **"Letter"**) to the local courts of each of the EU Member States in which the EMEA Companies in Administration have an establishment (**"Local Courts"**). The Letters requested that the Local Courts provide cooperation and assistance in ensuring that the Joint Administrators are given adequate notice of any request or application for the opening of Secondary Proceedings in respect of any of the EMEA Companies in Administration.

27.    As noted above, the Joint Administrators for NN France subsequently considered it in the

best interests of the creditors of that company for it to commence Secondary Proceedings in France. As such, on 28 May 2009 the Commercial Court of Versailles ordered the commencement of Secondary Proceedings in respect of NN France. Whilst NN France remains in administration, its assets situated in France are subject to the French insolvency regime which consists of liquidation proceedings during which NN France will continue to operate as a going concern for an initial period of three months.

28.     Prior to the opening of Secondary Proceedings, on the application of the Joint Administrators of NN France, on 20 May 2009 this Court ordered (inter alia) that the Joint Administrators be at liberty to enter into a protocol in substantially the same form as attached to the application (the **"Protocol"**) to ensure the coordination of the Main Proceedings and Secondary Proceedings in relation to NN France. A further hearing of the Commercial Court of Versailles is scheduled for 26 June 2009 in order to approve the terms of the Protocol which is to be entered into by the office holders in the French liquidation.

### D.     CONDUCT OF THE ADMINISTRATIONS

29.     The Joint Administrators' view, in the case of each of the EMEA Companies in Administration, is that the best option available to maximise value for the creditors of each is through a series of coordinated asset sales, and where necessary a reorganisation, of the various individual global business lines of the Nortel Group. These proposals were approved by the creditors of each of the EMEA Companies in Administration following consultation with the Joint Administrators.

30.     As the Nortel Group operated along global business lines and not generally by legal entity, the Nortel Group has complex inter-dependent trading relationships between the various global entities. The highly integrated nature of the Nortel business has necessitated liaising with NNI and NNL, together with other Nortel Group companies in the US and Canada, and those Nortel Group companies which are not insolvent or in administration in the EMEA. The Joint Administrators have therefore sought to stabilise the business and operations of the EMEA Companies in Administration and integrate, to the extent that it is in the creditors' interests, with the Canadian and US sale and restructuring plans. In particular, the Nortel Group's purchasing arrangements result in very large numbers of inter-company receivables and payables, which necessitates transfer pricing and inter-group settling methods.

31.     As described at paragraphs 15 and 16 above, Nortel's business requires the development, licensing and maintenance of intellectual property and the marketing of products and services based on that intellectual property. To date, NNL, NNI, NNUK, NN Ireland and NN France (the **"Main R&D Companies"**) are or have been the primary source of the R&D that has created the corpus of Nortel's global technology, the benefits of which are shared across multiple Nortel corporate entities. The Main R&D Companies also provide service and support on an ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead and institutional support to Nortel entities and customers outside of their jurisdictions.

32.     Certain other Nortel Group companies function primarily as "limited risk" sales and distribution operations. They act as intermediaries between the Main R&D Companies and customers in jurisdictions not served by the Main R&D Companies and they provide ongoing service and support in their local jurisdictions (**"LR Distributors"**).

33.     An overview of the different types of entities that make up the Nortel Group is at paragraphs 40 to 56 of Ms Rolston's Statement.

34.     To facilitate the integrated Nortel Group operations, certain Nortel companies (including the Main R&D Companies and the LR Distributors) have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs.

E.      **TRANSFER PRICING ARRANGEMENTS**

35.     The Nortel Group has and continues to allocate profits and losses amongst the various Nortel Group companies on an arms length basis. This is achieved by incorporating "transfer pricing" methodologies into all pricing arrangements between Nortel Group companies. Transfer pricing is a term used by tax professionals and tax authorities in the context of ensuring that payments of whatever nature (including payments for goods and services, for intellectual property rights and for finance) made between parties under common control reflect the arrangements which independent parties operating at arms length would achieve. All major multinationals operate on the basis that tax authorities in their relevant jurisdictions will wish to be satisfied that pricing arrangements between group companies are made on such a basis, and that no attempt is made to "transfer" profits from one jurisdiction to another, by setting pricing levels at non-arms length levels. Transfer

pricing methodologies largely reflect the work carried out in the field by the Organisation for Economic Co-operation and Development, an international non-profit organisation headquartered in Paris with 30 member states (including the US, Canada, UK and France).

36.     The Nortel Group has in place a transfer pricing regime governed by a suite of agreements (the "**Nortel Pricing Regime**"). The Nortel Pricing Regime was designed to ensure that intra-group sales of goods and services are performed at prices reflecting fair market value.

37.     The Nortel Pricing Regime is governed, and has been since at least 1 January 2001, by the "Master R&D Agreement" (as amended) ("**MRDA**") which works in tandem with separate but dependant bilateral sale and distribution "Limited Risk Agreements" ("**LRAs**") between the LR Distributors and NNL (together the "**Transfer Pricing Agreements**"). A copy of the MRDA is at pages 221 to 271 of ARB3.

38.     In broad terms, the Transfer Pricing Agreements, and related arrangements and agreements, provide for an initial price for intra-group supplies of good and services and acknowledge the contribution to R&D spend by various Nortel Group companies (the "**Base Price**"). In order to ensure that the ultimate intra-group payments reflect an arm's length position, it is necessary to review quantum of payments, profit margins and other financial information, and this can only be established in full at the end of relevant periods. For this reason the Transfer Pricing Agreements operate, at the end of relevant periods, to adjust the Base Price by means of introducing additional intra-group payments (such payments being the "**True-up Payments**").

39.     The aims of the Transfer Pricing Agreements are, therefore, to share out the costs and benefits of R&D activity on an arm's length basis:

(a)     The MRDA governs transfer pricing arrangements for those Nortel Group companies that undertake research and development activity and thereby have incurred or are likely to incur R&D expenditure and which are granted licences in respect of intellectual property; and

(b)     The LRAs (broadly in standard form) govern those LR Distributors that hold intellectual property licences from NNL and which benefit from, but do not incur costs for, developing R&D. An example of a standard form LRA is at pages 272 to 277 of ARB3. The only exception, for LR Distributors, is in respect of Nortel Networks Romania SRL ("**NN Romania**") which operates on a different limited

risk model. The LRA for Romania is at pages 278 to 284 of ARB3.

40. Each of the LRAs automatically renews for one year periods each year unless terminated. To date the MRDA and LRAs are still operative pursuant to the post-administration agreements described at paragraphs 61 to 70 below.

### Master R&D Agreement

41. The parties to the MRDA are the Main R&D Companies.

42. Nortel Networks Australia Pty Limited resigned as a party to the MRDA prior to 14 January 2009.

43. The MRDA provides that legal title to any and all NN Technology shall be vested in NNL. Under the MRDA, NNL grants licenses of NN Technology including the intellectual property relating thereto, to the other parties on a royalty-free basis.

44. The MRDA acknowledges that the Nortel business as a whole benefits from R&D activity carried out by individual companies and seeks to share out the costs incurred on an arm's length basis. The parties to the MRDA derive revenues from distribution and sales of Nortel products both to third party customers and other Nortel companies, and conduct and fund the Nortel Group R&D effort.

45. The MRDA sets out the transfer pricing methodology, known as the residual profit split methodology ("**RPSM**"), which determines the compensation due to each party for its respective R&D activity for the benefit of the Nortel Group (see in particular Schedule A).

46. The RPSM provides that, in addition to receiving a functional rate of return for their distribution and sales function, each party receives a share of the adjusted operating earnings of the consolidated Nortel Group (including the adjusted operating earnings of the LR Distributors as determined under their separate bilateral arrangements with NNL). The share is commensurate, inter alia, with the value of that party's contribution to R&D in the proportion that its expenditure on R&D activity in a preceding five year period bears to the total research and development expenditure of all participants during that period (the "**R&D Allocation**"). The MRDA also provides for an adjustment payment to be made after the actual results for the year end are known (see Article 3(d) of the MRDA).

47. As described above, the MRDA specifically refers to the arrangements under the LRAs for

the purposes of calculating R&D Allocations (see Schedule A). However, the LRAs separately govern payment obligations as between the LR Distributors and NNL and as such the LR Distributors are not parties to the MRDA.

48.  Notwithstanding the above, the drafting of the MRDA is open to interpretation as to the precise obligations owed under the RPSM and to whom payments under the MRDA are to be made.

49.  In addition to the RPSM, the MRDA provides that legal title to any and all NN Technology (as that term is defined in the MRDA) shall be vested in NNL. It is the position of each of the EMEA Companies in Administration that each of them is the beneficial owner of the NN Technology which it created as a result of its own R&D Activity, and that this beneficial interest is unaltered by the MRDA.

*Limited Risk Agreements*

50.  As described above, as part of the suite of transfer pricing documents, the LR Distributors which benefit from but do not incur costs for R&D, have each entered into separate bilateral LRAs with NNL.

51.  The following EMEA Companies in Administration are each party to a separate bilateral LRA with NNL:

(a)  Nortel Networks N.V. (Belgium);

(b)  Nortel Networks S.p.A. (Italy);

(c)  Nortel Networks Polska Sp. Z. o. o. (Poland);

(d)  Nortel Networks B.V. (Netherlands);

(e)  Nortel Networks Hispania S. A. (Spain);

(f)  Nortel Networks (Austria) GmbH (Austria);

(g)  Nortel Networks s.r.o. (Czech Republic);

(h)  Nortel Networks Engineering Service Kft (Hungary);

(i)  Nortel Networks Portugal S.A. (Portugal);

(j)     Nortel Networks Slovenska s.r.o. (Slovakia); and

(k)     NN Romania.  Copies of each of these LRAs are at pages 285 to 348 of ARB3.

52.     Other Nortel Group companies are also parties to the LRAs, but are not in administration. This includes entities that are within the EMEA region as well as entities from the Asia Pacific region.

53.     In summary, the LRAs (except for NN Romania) provide for a payment arrangement by which the LR Distributors are granted the non-exclusive right to use NN Technology and intellectual property for the purposes of using, installing, servicing, leasing and distributing products, software and services. The payment arrangement provides that if the LR Distributor's return is less than a reasonable arm's length rate of return (currently set as an operating margin of 1%), NNL shall make a payment to the LR Distributor.  Conversely, if it is more, the LR Distributor will make a payment to NNL in accordance with the terms of the LRA.

54.     The LRA between NNL and NN Romania (the **"Romanian LRA"**) is for marketing and services and NN Romania does not hold intellectual property rights.  The Romanian LRA provides for NN Romania to be compensated with a reasonable arm's length mark up (3%) on its total direct and indirect costs.  If NN Romania's return is less, then NNL shall make a payment to NN Romania.  Conversely, if it is more, NN Romania will make a payment to NNL in accordance with the terms of the Romanian LRA.

*Pre-administration Payments under the Nortel Pricing Regime*

55.     Under the Transfer Pricing Agreements, NNL is obliged to:

(a)  Compute the amount of the R&D Allocations due to and payment due from each party to the MRDA; and

(b)  To estimate the amount to be paid under the separate bilateral LRAs.

56.     NNI has historically been a net payor under the Nortel Pricing Regime largely due to the substantial sales revenue generated in the US when contrasted with its level of R&D activity.  NNL, on the other hand, has historically been a net recipient under the Nortel Pricing Regime given that NNL generates lower levels of revenue when compared to the high level of R&D activity in Canada.

57.  Of the EMEA Companies in Administration, previously NN Ireland and NN France have generally been net payors of R&D Allocations under the MRDA. NNUK, like NNL, has historically been a net recipient under the Nortel Pricing Regime.

58.  The MRDA provides for R&D Allocations to be made on a periodic basis (Article 3(d)). The LRAs provide for payments to be made quarterly.

59.  It has been a matter of past practice that payments and accounting under the Transfer Pricing Agreements have been quarterly. The True Up Payments for the first, second and third quarters are based on quarterly accounts prepared by the Canadian companies. The fourth and final quarter's calculation often included the adjustment for that year and was calculated on the actual yearly earnings (rather than projected earnings).

## F.    TRANSFER PRICING REGIME POST-ADMINISTRATION

### Group Supplier Protocol Agreement

60.  From the day that the EMEA Companies in Administration were placed into administration and the insolvency filings for NNL and NNI in Canada and the US were commenced, agreements became effective between certain Nortel Group companies to enable intra-group trading whilst the Nortel Group underwent a business and financial restructuring. Given the integrated nature of the Nortel Group, it was essential to its continuing business that intra-group transactions/trading could take place in the post-administration period.

61.  On 14 January 2009, therefore, two Group Supplier Protocol Agreements were entered into in respect of post-administration intra-group trading of goods and services (together the "**GSPAs**"). Both agreements had identical operative provisions. The GSPAs were entered into between:

(a)     NNL (and certain other Canadian entities) and each of the EMEA Companies in Administration; and

(b)     NNI (and certain other US entities) and each of the EMEA Companies in Administration. Copies of these agreements together with the most recent extension deeds are at pages 349 to 404 and pages 405 to 463 of ARB3 respectively.

62.  The GSPAs are governed by English law and came into effect on 14 January 2009. They

have been extended by agreement on a regular basis thereafter and are currently effective, with only minor changes being made to take into account of the fact that NN France is now subject to Secondary Proceedings (as noted in paragraph 27 above).

63.    The Joint Administrators determined that it was in the best interests of each of the EMEA Companies in Administration to enter into the GSPAs as it enabled each of those companies to continue to trade with NNI (and certain other US entities) and NNL (and certain other Canadian entities) in the ordinary course on the basis that goods and services provided post-administration would be paid for in full:

   *"All amounts and liabilities arising in respect of Goods and Services that are supplied or provided by one Party within one Filing Group to another party within the other Filing Group after the Filing Date [14 January 2009] shall be paid for in full in accordance with the Protocol..."* (clause 3.1)

64.    The Protocol (as defined in the GSPAs) states that *"All amounts payable by any party that is an EMEA Company in Administration in respect of the Post Filing Goods and Services Payments shall rank as an expense of the administration under the EMEA Filing under the UK Insolvency Act 1986 paragraph 99(4) of Schedule B1."*

65.    The GSPAs specifically envisage that payments under the MRDA will continue to be made as Administration Expenses. "Goods and Services" are defined as *"any goods, services or products of any kind provided by and to, and other intra-group trading by, a relevant Nortel Group Company on and from the Filing Date, including under the Master R&D Agreement."* Payments are to be made in accordance with past practice.

66.    Trading under the LRAs, which provide for the sale of NN Technology and products by NNL to the LR Distributors are also captured within the scope of clause 3.1 (where the LR Distributor is a party to the GSPAs).

67.    The Joint Administrators, therefore, entered into the GSPAs on the understanding that the parties to the GSPAs would continue to fulfil their obligations and continue to make payments in accordance with the terms of the Transfer Pricing Agreements. This was also the understanding of the Canadian entities. The Treasurer of NNL, John Doolittle, stated in his affidavit before the Ontario Superior Court of Justice dated 14 January 2009, that:

   *"The [Nortel] inter-company sales and receivables system is highly complex and essential*

*for the ongoing fulfilment of customer orders. The Applicants propose to continue their buying and selling arrangements consistent with the Transfer Pricing Model post-filing"*. A copy of the affidavit is at pages 464 to 517 of ARB3.

68. The position is the same in respect of NNI and the other US Nortel Group companies. On the application by NNI (and certain other US Nortel Group companies) by Motion to the US Bankruptcy Court on 14 January 2009, NNI and others specifically sought (inter alia) an order authorising them to continue to use the Cash Management System. The "Cash Management System" is defined to be a system to transfer funds within the group to allocate costs and profits *"as part of an arm's length transfer pricing policy to comply with tax laws"* (paragraph 44), i.e. the Nortel Pricing Regime. The reasons stated are that the maintenance of the Cash Management System is not only essential, but also is in the best interests of the debtors' respective estates and creditors (paragraph 70). A copy of the Motion is at pages 518 to 561 of ARB3.

69. Accordingly, on 15 January 2009 the Bankruptcy Court ordered that NNI be authorised to: *"(a) maintain the Cash Management System, in substantially the same form as the Cash Management System described in the Motion; (b) implement ordinary course changes to the Cash Management System..."*

70. It was therefore the intention and the understanding of the US Nortel Group companies that the Nortel Pricing Regime would continue post-administration, and that its continuation was essential to the future operation of the Nortel Group.

### Post-Administration payments

71. Despite the operation of the GSPAs since 14 January 2009, and therefore the continuation of the Transfer Pricing Agreements within the Nortel Group, the only payment that has been made that could arguably be said to have been owed in respect of a True Up Payment was a payment made in January 2009 of US$30 million by NNI to NNL. However, netting and/or payments have been continuing for intra-group supplies of goods and services on the basis of the Base Price since 14 January 2009.

72. Both according to past Nortel practice and the terms of the Transfer Pricing Agreements as protected by the GSPA, the first quarterly allocation payments since the Companies entered administration fell due on 31 March 2009 and are payable a month or two thereafter. Without prejudice to the entitlement of the parties to the Transfer Pricing Agreements as

protected by the GSPAs to receive payment under those agreements, the EMEA entities who are party to those agreements have neither made nor received any payments under the Transfer Pricing Agreements which are continuing post 14 January 2009 by virtue of the GSPA.

73.    The companies which have in the past contributed the most to R&D activity, namely NNUK and NNL, have continued to trade on the basis of the GSPA during the post administration period.    As such, NNUK have continued to incur trading losses (which includes R&D expenditure) in the expectation that they will recoup a significant proportion of such losses by operation of the Transfer Pricing Agreements as protected by the GSPAs.

74.    In continuing to incur trading losses (including R&D expenditure), NNUK has sought to preserve the value of the Nortel business assets so as to maximise value for its creditors. This has in turn benefited the Nortel Group as a whole.

75.    As noted above, NNUK is epicentral to the EMEA operation.    Given NNUK's administrative and strategic importance for the EMEA Group, the winding up of NNUK will undermine the value of the rest of the EMEA Group and put each of those company's administrations at risk.

76.    The companies who are obliged to make payments under the MRDA and LRAs pursuant to the GSPAs, have received the benefit of this activity without making any payments in return.

77.    NNL is currently facing significant liquidity issues without the receipt of payments under the Transfer Pricing Agreements as protected by the GSPA. Whilst NNUK is not currently facing a liquidity issue, NNUK will need to revisit the justification for continuing to incur trading losses without the certainty that such payment is going to be made under the Transfer Pricing Agreements.    This pressure is placing key members of the Nortel Group, NNL and NNUK, and thus the entire Nortel Group, at risk.

78.    To provide some context as to the scale of the trading losses being incurred by NNUK, since 14 January 2009, NNUK's trading losses have been approximately US$37.2 million for the quarter January to March 2009 ("Q1").    NNUK's projected trading losses for the remaining quarters of 2009 are estimated at between US$130 to US$150 million (which includes restructuring costs of approximately US$40 to US$50 million).    A copy of the

schedule prepared by the Joint Administrators which sets out these figures is at page 562 of ARB3.

79.     Unless the Joint Administrators of NNUK receive certainty as to:

   (a)     Whether the current and future amounts owing under the Transfer Pricing Agreements as protected by the GSPA will be paid; and

   (b)     The current and future amounts to be paid under those agreements,

   the Joint Administrators will need to revisit the justification for continuing to allow NNUK to continue trading while it is incurring such trading losses.

80.     Given the above, the Joint Administrators considered it necessary and in the best interests of each of the Companies to enter into discussions with NNL and NNI (and their respective Creditors) with a view to ensuring certainty of the True Up Payments since 14 January 2009 and those the True Up Payments forecasted for the remainder of the Period.

81.     During the initial discussions it was proposed that NNI was to enter into a bilateral deal with NNL so as to ensure funding for NNL (to the exclusion of the EMEA Companies in Administration). To the extent that any such payment was to be made under the Transfer Pricing Agreements, the Joint Administrators' considered that it was imperative that they be involved in any such discussions. To the extent that they were excluded, the Joint Administrators intended to look to the Court for relief.

82.     What became clear as a result of these discussions was that:

   (a)     the Official Committee of Unsecured Creditors in the US Chapter 11 proceedings would not endorse the Nortel Pricing Regime and consequently would not allow NNI to fulfill all of its obligations under the Transfer Pricing Agreements;

   (b)     there was an urgent need to ensure that funds were made available to NNL due to the liquidity concerns that it was facing; and

   (c)     NNUK required certainty (although it is not under as significant a liquidity constraint as NNL) as to the amounts payable to it and future payments due to it pursuant to the Transfer Pricing Agreements if it is to continue trading.

83.     So as to deal with the particular concerns listed in paragraph 82 above and to:

(a)     crystallise the amounts owing and future amounts payable under the Transfer Pricing Agreements in the Period;

(b)     achieve certainty of obligations and to avoid disputes regarding the quantum of payments owed and future amounts payable in the Period; and

(c)     avoid possible future fluctuations in payments as a result of the failure of any of the unfiled Nortel Group entities to meet their separate bilateral obligations under their respective LRAs with NNL,

it was considered appropriate by the Joint Administrators to look to achieve full and final settlement of all amounts owing and payable in the future under the Transfer Pricing Agreements for the Period.

To address the concerns of NNL and NNUK in isolation would not have been reflective of the operation of the Transfer Pricing Agreements or the integrated structure of the Nortel Group prior to 14 January 2009 as protected by the GSPAs. Furthermore, it would have rendered those entities who are obliged to pay under the Transfer Pricing Agreements uncertain as to their current and future exposure under those agreements.

## G.    FUNDING AGREEMENT

### The terms of the Funding Agreement

84.    As a result of the circumstances set out above, on or around 10 June 2009 the following entities entered into the Funding Agreement:

(a)     The **"Canadian Debtors"**, comprising:

   i.     NNC;

   ii.    NNL;

   iii.   Nortel Networks Global Corporation;

   iv.    Nortel Networks International Corporation; and

   v.     Nortel Networks Technology Corporation.

(b)     The **"US Debtors"**, comprising:

i.     NNI;

ii.    Architel Systems (U.S.) Corporation;

iii.   CoreTek, Inc.;

iv.   Nortel Alsystems, Inc. (previously Alteon WebSystems, Inc.);

v.     Nortel Alsystems International Inc. (previously Alteon WebSystems International, Inc.);

vi.   Nortel Networks Applications Management Solutions Inc.;

vii.  Nortel Networks Cable Solutions Inc.;

viii. Nortel Networks Capital Corporation;

ix.   Nortel Networks HPOCS Inc.;

x.     Nortel Networks International Inc.;

xi.   Nortel Networks Optical Components Inc.;

xii.  Northern Telecom International Inc.;

xiii. Qtera Corporation;

xiv.  Sonoma Systems; and

xv.   Xros, Inc.

(c)     The EMEA Debtors, ((a) to (c) collectively the **"Parties"**). A copy of the Funding Agreement is at pages 563 to 600 of ARB3.

*Summary of Funding Agreement*

85.     The Joint Administrators entered into the Funding Agreement on behalf of each of the EMEA Debtors.

86.     For the avoidance of doubt, the Funding Agreement only seeks to compromise matters relating to the period post administration (namely, after 14 January 2009).

87.     The following offers a summary of the key section of the Funding Agreement:

(a)     Section 1 provides for funding to be provided by NNI to NNL in settlement of NNI's obligations for the Interim Period (as defined) and secures the much needed funding for NNL from NNI, in the amount of US$157 million.

(b)     Section 6 is the key section for the Joint Administrators' purposes. As a result of negotiations between the Parties it was agreed that the amount payable to NNUK should be US$96.08 million as full and final settlement of their transfer pricing entitlements for the Period, albeit that this was less than the amount owing to NNUK under the Transfer Pricing Agreements. The question was then how that agreed amount was to be settled. It was agreed that this amount could be settled first by self-settlement amongst the EMEA Debtors and second by a payment from NNL to bridge some of the gap between the amount owed under the Transfer Pricing Agreements and the amount to be paid by the EMEA Debtors self-settlement. It is section 6(a) which makes provision for the EMEA Debtors self-settlement, this enables NNUK to recover directly from the EMEA Debtors. The exact payments to be made by the relevant EMEA Debtors and the total sums to be received by NNUK for the Period are set out in Annex D to the Funding Agreement. Such payments are to be made to NNUK in cleared funds and without set off, within 30 days of the effective date of the Funding Agreement except as otherwise agreed between the relevant EMEA Debtor and NNUK. The payment by NNL to bridge some of the gap between the amount owed under the Transfer Pricing Agreements and the amount to paid under the EMEA Debtors' self-settlement is provided for in sections 6(b) and (c). These sections provide for two so called shortfall payments to be made to NNUK by NNL. Each such payment is to the value of US$10 million, giving a total shortfall payment of US$20 million. Section 6(e) provides that the shortfall payments are secured by the so called "Shortfall Charge" which ranks pari passu with the Inter Company Charge in the Canadian CCAA proceedings but subordinate to any current or future charges granted to the US Debtors in connection with any funding of the Canadian Debtors.

(c)     Sections 8 and 9 provide that the payments to NNUK provided for in Part B of the Funding Agreement constitute full and final settlement of all matters between the US and Canadian Debtors on the one hand, and the EMEA Debtors on the other hand for the defined "Interim Period". It also provides for full and final settlement of all of the EMEA Debtors *inter se* as regards to Transfer Pricing payments for the

defined Interim Period.

(d)     Section 11 - Under the MRDA, inter alia, each of NNUK, NN France and NN
Ireland and NNI is granted a licence to use and exploit NN Technology and related
intellectual property rights which, in respect of its own identified territory, is
exclusive and in respect of the rest of the world, save for Canada and the exclusive
territories of the other parties to the MRDA, is non-exclusive. For example, NNUK
has an exclusive licence in respect of the UK and a non-exclusive licence in the rest
of the world excluding Canada, the US (including Puerto Rico), France, Australia
and the Republic of Ireland. The licences permit sub-licensing. Section 11(a) of the
Funding Agreement provides that, in the event that there is a sale of material assets
by the Canadian Debtors and/or the US Debtors in relation to a particular aspect of
the Nortel Group's core business which do not form part of the EMEA entities'
business, then the EMEA Debtors agree to terminate the licences and rights granted
under the MRDA referred to above ("**Appropriate Licence Terminations**") in
consideration of a right to an allocation of the proceeds from such sale.  This
arrangement relates to the sales of what is known as the "Code Division Multiple
Access" and "LTE" businesses (both of which are described at paragraphs 57 to 67
of Ms Rolston's Statement).  Section 11(b) of the Funding Agreement sets out the
terms to be included in an Appropriate Licence Termination agreement which
include  the grant to the EMEA Debtors of a non-exclusive licence of the relevant
intellectual property to enable the relevant EMEA Debtor to continue to use such
intellectual property to wind down its business in connection with the types of
products and services sold or provided by the EMEA Debtor at the time of the
relevant sale of assets and to enable each EMEA Debtor to perform its obligations
under its existing customer contracts or end-user contracts, for so long as such
contract subsists (including any automatic extension thereof) with the right to grant
sublicences to such customers to the extent required under the relevant contract.
Section 11(c) of the Funding Agreement provides that the parties will work to agree
a sample form agreement for an Appropriate Licence Termination which will
include further appropriate and customary terms and Section 11(d) provides that the
proceeds from a sale to which the Appropriate Licence Termination applies will be
treated in accordance with the procedures set out in Section 12 of the Funding
Agreement.

(e)     Section 12 – Section 12(a) provides a mechanism by which future material asset sales (other than those provided for in section 11) will occur without objections based on (a) allocation of the sale proceeds; or (b) the binding procedure for the allocation of proceeds. Section 12(e), however, specifies the basis upon which a party can object to the entry into material asset sale which includes that the agreement is not in the interests of its creditors and specifically excludes severance and other restructuring costs from the operation of section 12(a). Importantly, section 12(c) provides that the Parties will seek to reach an agreement as to a protocol by which an allocation of sale proceeds will take place. Such sale proceeds will remain in an escrow account until an agreement is reached as to the distribution of sale proceeds with all of the parties to the relevant material asset sale agreement. If no consensus is achieved then it will be resolved via the Protocol agreed between the Parties (see section 12(b) in this regard). The requirement in section 12(a) of the Funding Agreement is tied, by virtue of section 6(g) to the short fall payments referred to in paragraph 88(e) above. Such that, in the event that there is a breach of section 12(a) in respect of the first material asset sale to which an EMEA Debtor is a party, the shortfall payment shall be forfeited and no payment made under any circumstances. In addition the shortfall charge (referred to above) shall also automatically be extinguished.

(f)     Section 13 – This provides as a condition of the Funding Agreement that the Joint Administrators, if they consider it appropriate, may apply to the English Court for directions that they be at liberty to enter into the Funding Agreement. The Funding Agreement is also subject to the North American Court Condition (as defined in the Funding Agreement) and will not be effective until such approval is obtained.

(g)     Section 24 – The Debtors in this section provide a covenant that Nortel Networks OY ("NN Finland") and Nortel Networks AB ("NN Sweden") and Nortel Networks Shannon Limited are not part of transactions which give rise to Transfer Pricing Payments (as defined in the Funding Agreement).

### *Rationale for the Funding Agreement*

88.     As noted above at paragraph 29, the Joint Administrators consider that the best option available to maximise the value for the creditors of each of the EMEA Debtors is through a series of coordinated sales along global business lines of the assets of the business.

89.    The Joint Administrators considered that there were two possible sources of funds for the EMEA Companies in Administration:

   (a)    Purchase price allocation, as the result of a sale of a material asset of the business; and

   (b)    The obligations owed under the Transfer Pricing Agreements.

90.    It has not, as at the date of this statement, been possible to enter into an agreement for the sale of a material asset, nor to agree a mechanism for the allocation of the purchase price of such an asset sale. As such, the Joint Administrators have, of necessity, focussed their attention on securing a settlement of the payment obligations owed under the Transfer Pricing Agreements.

91.    It is the Joint Administrators' view that entering into the Funding Agreement on behalf of each of the Companies was a much needed arrangement which not only ensured the viability of certain Nortel Group entities (in particular NNL due to its significant liquidity constraints) but also achieved certainty as regards to:

   (a)    NNUK's ability to continue to trade which in the interests of each company in the EMEA Group;

   (b)    the extent to which each of the Companies who was party to the Transfer Pricing Agreements is obligated to provide payment or receive funds under these agreements for the Period and the date upon which such payments fall due;

   (c)    avoiding future litigation and the associated cost. In particular, should the settlement under the Funding Agreement not proceed, NNI and NNL have indicated that they will enter into a bilateral agreement to provide further funding to NNL. Such an agreement would exclude NNUK from recovering any of its entitlement under the MRDA with the effect that the continued trading of each of the EMEA Companies in Administration would be put at risk;

   (d)    avoiding future fluctuations in payments as a result of the possible failure of any of the unfiled Nortel Group entities in meeting their separate bilateral obligations under their respective LRAs. This enables the EMEA Debtors effectively to be ring-fenced from the Nortel Group companies in the rest of the world; and

(e)     future material asset sales as the Funding Agreement has facilitated a cooperative approach by the Parties to future sales, which is in the interests of the creditors of each of the EMEA Debtors.

92.    The Funding Agreement thereby has kept viable the option of a series of coordinated sales along global business lines of the assets of the Nortel Group which, in the Joint Administrators' view, is the best way to maximise value for the creditors of each of the EMEA Debtors.

93.    In the Joint Administrators' opinion the Funding Agreement provides the most pragmatic and commercially sensible and viable solution to resolving the concerns of all the Parties as to the operation of the Transfer Pricing Agreements since 14 January 2009 and the future operation of these agreements in the Period.

94.    For the avoidance of doubt, the Funding Agreement does not in any way form a basis for the future allocation of sale proceeds of any material asset sale, for which (as identified above) it is intended that there be a separate process.

95.    In addition to the above, I will discuss below why the Joint Administrators believe that entry into the Funding Agreement is in the best interests of each of the EMEA Debtors that are party to it.

96.    The Joint Administrators also consider that the payments provided for under the Funding Agreement are reflective of the amounts that are likely to be due and that the Joint Administrators have estimated would in the Period be likely to be due under the Transfer Pricing Agreements.

## H.    FUNDING AGREEMENT IN THE INTERESTS OF EACH OF THE EMEA DEBTORS

97.    For the purposes of identifying why it is in the interests of each of the EMEA Debtors to enter into the Funding Agreement, the EMEA Debtors naturally fall into four subcategories:

(a)     NNUK, as a Main R&D Company;

(b)     The other Main R&D Companies;

(c)     The LR Distributors; and

(d)     The remaining EMEA Debtors that are neither Main R&D Companies nor LR Distributors.

98.     In addition to the matters discussed above at paragraphs 89 to 97, the Funding Agreement is in the interests of each of the EMEA Debtors as follows.

*NNUK, as a Main R&D Company*

99.     NNUK, as noted above, is a party to both the MRDA and the GSPA.

100.    NNUK generates a lower level of revenue when compared to the high level of corporate overhead and R&D activity incurred in England.   As such, NNUK was traditionally compensated by other Nortel group companies for the trading losses it incurred (which included the development and use of the intellectual property it created as a result of its R&D activity).

101.    As noted above, NNUK since 14 January 2009 has been trading at a significant loss.  For Q1 it is calculated that NNUK has incurred US$37.2 million in losses.  It is projected that for the year NNUK will incur losses in the region of US$130 to US$150 million.  Attached at page 51 of ARB3 is a schedule that details these trading losses.

102.    As noted above, NNUK has not received any of the payments which are duly owed to it under the Transfer Pricing Agreements since 14 January 2009. The figures for Q1 have been published and show that NNUK is eligible to receive US$45 million.  A copy of the published scheduled is attached at page 601 of ARB3.  As such, it is imperative that the Joint Administrators of NNUK have certainty as to the amounts payable for the Period under the Transfer Pricing Agreements and the dates that such payments are due.

103.    The Funding Agreement, in the Joint Administrators' view, achieves this. The Funding Agreement provides that the EMEA Debtors provide certain amounts to NNUK as specified in Annex D.  In addition, a short fall payment (as referred to above) is to be made to NNUK by NNL totalling US$20 million. These amounts are summarised as follows:

| **EMEA Debtor** | **Company** | **Amount receivable US$m** |
|---|---|---|
| Nortel Networks UK Limited | Nortel Networks S.A. [2] | 4.80 |
| | Nortel Networks (Ireland) Limited | 20.84 |
| | Nortel Networks AG[3] | 4.08 |
| | Nortel Networks Hispania SA | 1.72 |
| | Nortel Networks Slovensko s.r.o | 0.52 |
| | Nortel Networks Romania SRL | 0.19 |
| | Nortel Networks Portugal S.A. | 1.50 |
| | Nortel Networks Polska S.p.z.o.o | 8.22 |
| | Nortel Networks B.V. | 17.99 |
| | Nortel Networks S.p.A. | 2.73 |
| | Nortel Networks Engineering Services Kft | 1.92 |
| | Nortel Networks s.r.o | 2.79 |
| | Nortel Networks N.V. | 6.43 |

[2] To the extent it becomes a Party to the Agreement
[3] To the extent it becomes a Party to the Agreement

| EMEA Debtor | Company | Amount receivable US$m |
|---|---|---|
|  | Nortel Networks Austria GmbH | 2.35 |
|  | NNL | 20 |
| Total |  | 96.08 |

104.  The Joint Administrators consider that the total amount receivable by NNUK (namely US$96.08 million), represents a good commercial settlement of the Transfer Pricing Agreements and is reflective of the amounts that the Joint Administrators consider, having performed their own reconciliation of the amounts likely to be owed and payable in the Period to NNUK under the RPSM, are reflective of the amounts that are likely to be due and that the Joint Administrators have estimated would in the Period be likely to be due under the Transfer Pricing Agreements.  As such, the Joint Administrators consider that it is in the best interests of NNUK's creditors to enter into the Funding Agreement on NNUK's behalf.

105.  Whilst the Funding Agreement alters the previous arrangements in place under the MRDA, namely NNL administering the payments, the net result is broadly the same for NNUK.  In so far as the MRDA obliges NNL to make payments, the Funding Agreement has the effect of reducing NNUK's credit risk to NNL (a company with liquidity concerns) and replacing it with the EMEA Debtors, which is in the direct interest of NNUK's estate as control of the payments under the Transfer Pricing Agreements in relation to the EMEA Group now rests within the EMEA Group.

106.  The Funding Agreement also provides certain concessions surrounding future material assets sales (see the summary of sections 11 and 12 at paragraph 87 above) that are to be made by NNUK.  Section 11 provides for the surrender of licences granted under the MRDA in respect of two identified material asset sales in which the EMEA Debtors are not sellers.  Section 12, is a general concession relating to all other material asset sales to which an EMEA Debtor is a party.  In the case of a "section 12" material asset sale, this concession is subject to the Joint Administrators' discretion as to whether to enter into any

agreement for a material asset sale and only to do so where they consider that it is in the best interests of the creditors of NNUK.

107.   The advantage to the EMEA Debtors of conceding that they would not object to the allocation of proceeds for a material asset sale prior to the sale taking place, is that it facilitates future sales by allowing for the orderly negotiation, on behalf of NNL, NNI and/or various EMEA Debtors, of the sale of various business assets of the Nortel Group to be undertaken on a global scale and without disruption. This is, in the Joint Administrators' view, in the interests of each of the EMEA Debtors.

108.   As noted in paragraph 29 above, it is the Joint Administrators' view that the best option available to maximise the value for the creditors of each of the companies is through a series of co-ordinated sales of the assets of the business of the entire Nortel Group along global business lines. It is the Joint Administrators' view that these concessions will enable the smooth facilitation of such a reorganisation and sale.

109.   On the basis of the above, the Joint Administrators of NNUK have entered into the Funding Agreement on NNUK's behalf and consider that it is in the best interests of its creditors to do so. The alternative to the entry into this Funding Agreement is likely to be the liquidation of NNUK with the consequential negative impact on the other EMEA Companies in Administration.

### The other Main R&D Companies

Ireland

110.   NN Ireland is a party to both the MRDA and the GSPA.

111.   NN Ireland has historically been a net payor under the MRDA.

112.   NN Ireland owes continuing obligations under the MRDA as protected by the GSPA.

113.   In accordance with Annex D, NN Ireland is required to pay NNUK US$20.84 million.

114.   The Joint Administrators consider that the total amount payable by NN Ireland, represents a good commercial settlement of the Transfer Pricing Agreements and is reflective of the amounts that the Joint Administrators consider, having performed their own reconciliation of the amounts that are likely to be due and that that the Joint Administrators have estimated would in the Period be likely to be due by NN Ireland under the Transfer Pricing

Agreements.

115.    The Funding Agreement crystallises the obligation of NN Ireland to make such payments and alters to whom such payment is to be made, namely NNUK. This arrangement is to NN Ireland's advantage as it provides:

    (a)    NNUK with funds to continue to trade thereby increasing the prospects of a series of coordinated sales along global business lines of the assets of the business. which are in the interests of the creditors of NN Ireland;

    (b)    certainty as to its obligations and avoids any dispute regarding the quantum of payments owed and future amounts payable by NN Ireland for the Period;

    (c)    certainty by avoiding any possible future fluctuations in payments as a result of the failure of any of the unfiled Nortel Group entities in meeting their separate bilateral obligations under their respective LRA. This enables the EMEA Debtors effectively to be ring-fenced from the Nortel Group companies in the rest of the world; and

    (d)    that future material asset sales are facilitated, as the Funding Agreement provides for a cooperative approach by the Parties to such future sales, which is in the interests of each of the EMEA Debtors.

116.    The Funding Agreement accelerates NN Ireland's payment obligations under the MRDA and requires payment within 30 days of the effective date of the Funding Agreement. However, section 6(a) of the Funding Agreement does provide for payment terms to be otherwise agreed between the Joint Administrators and any EMEA Debtors. As such, the Joint Administrators would consider entering into a payment concession where required by an EMEA Debtor based on the quarterly revenue achieved so as to ease any liquidity pressures for that EMEA Debtor.

117.    However, saying this, the Joint Administrators are satisfied that NN Ireland has sufficient cash available to meet such a payment. Attached is a copy of a schedule showing the cash balance of NN Ireland (amongst others) as at 16 June 2009 at page 602 of ARB3 which demonstrates this.

118.    The Funding Agreement also provides certain concessions surrounding future material assets sales (see the summary of sections 11 and 12 at paragraph 87 above) that are to be

made by NN Ireland. Section 11 provides for the surrender of licences granted under the MRDA in respect of two identified material asset sales in which the EMEA Debtors are not sellers. Section 12, is a general concession relating to all other material asset sales to which an EMEA Debtor is a party. In the case of a "section 12" material asset sale, this concession is subject to the Joint Administrators' discretion as to whether to enter into any agreement for a material asset sale and only to do so where they consider that it is in the best interests of the creditors of NN Ireland.

119.   The advantage to the EMEA Debtors of conceding that they would not object to the allocation of proceeds for a material asset sale prior to the sale taking place, is that it facilitates future sales by allowing for the orderly negotiation, on behalf of NNL, NNI and/or various EMEA Debtors, of the sale of various business assets of the Nortel Group to be undertaken on a global scale and without disruption. This is, in the Joint Administrators' view, in the interests of each of the EMEA Debtors

120.   The Funding Agreement seeks to facilitate such a sale in this way, by allowing the determination of the proceeds allocation to those entities interested in such sale to be deferred until after the sale takes place.

121.   As noted in paragraph 29 above, it is the Joint Administrators' view that the best option available to maximise the value for the creditors of each of the companies is through a co-ordinated sale of the assets of the business of the entire Nortel Group along global business lines. It is the Joint Administrators' view that these concessions will enable the smooth facilitation of such a reorganisation and sale.

122.   On the basis of the above, the Joint Administrators of NN Ireland have entered into the Funding Agreement on NN Ireland's behalf and consider it is in the best interests of its creditors to do so.

NN France

123.   As noted in paragraph 27 above, NN France has commenced Secondary Proceedings pursuant to which a liquidator (**"NN France Liquidator"**) and an administrator (**"NN France Administrator"**) have been appointed by the Versailles Commercial Court.

124.   NN France is, at the date of this statement, not a party to the Funding Agreement.

125.   It is, however, the intention of the Parties that NN France becomes a party to the Funding

Agreement and provision is made in Annex D for the amount of US$4.80 million to be paid by NN France to NNUK.

126. Provision is made in Section 7(b) of the Funding Agreement for a mechanism by which the EMEA Debtors shall use commercially reasonable efforts to obtain agreement from the NN France Liquidator and NN France Administrator for entering into the Funding Agreement.

127. Specifically, the Funding Agreement provides that there are two time frames in which to reach such an agreement. Pursuant to section 7(b), within 30 days of the date of the Funding Agreement the EMEA Debtors shall use commercially reasonable efforts to obtain agreement to the Funding Agreement (save for sections 11(a), 11(b) (which deals with the Appropriate Licence Terminations) and 12 (which deals with the entry into material asset sale transactions) of the Funding Agreement), and 45 days for sections 11(a), 11(b) and 12 of the Funding Agreement.

128. I will provide the Court with an update of these negotiations, if applicable, prior to the hearing of this application.

### *The Limited Risk Distributors*

129. The relevant EMEA Debtors that are parties to both the LRAs and to the Funding Agreement are as follows:

    (a)      Nortel Networks NV (in Administration);

    (b)      Nortel Networks SpA ( in Administration);

    (c)      Nortel Networks BV (in Administration);

    (d)      Nortel Networks Polska Sp z.o.o. (in Administration);

    (e)      Nortel Networks Hispania SA (in Administration);

    (f)      Nortel Networks (Austria) GmbH (in Administration);

    (g)      Nortel Networks sro (in Administration);

    (h)      Nortel Networks Engineering Services Kft (in Administration);

    (i)      Nortel Networks Portugal SA (in Administration);

(j)    Nortel Networks Slovensko, sro (in Administration); and

(k)    NN Romania (in Administration).

130.    The Funding Agreement alters the arrangements of the LR Distributors to a limited extent. Section 6(a) provides that it is now NNUK that is the agent for the collection of payments under their separate LRAs and not NNL.

131.    Annex D to the Funding Agreement sets out the amounts now payable by these entities to NNUK in accordance with Section 6(a) of the Funding Agreement:

| **EMEA Debtor** | **Amount payable US$m** |
| --- | --- |
| Nortel Networks Hispania SA | (1.72) |
| Nortel Networks Slovensko s.r.o | (0.52) |
| Nortel Networks Romania SRL | (0.19) |
| Nortel Networks Portugal S.A. | (1.50) |
| Nortel Networks Polska S.p.z.o.o | (8.22) |
| Nortel Networks B.V. | (17.99) |
| Nortel Networks S.p.A. | (2.73) |
| Nortel Networks Engineering Services Kft | (1.92) |
| Nortel Networks s.r.o | (2.79) |
| Nortel Networks N.V. | (6.43) |
| Nortel Networks Austria GmbH | (2.35) |

132.    The Joint Administrators consider that the total amount payable by each of the LR Distributors listed in paragraph 131 above, represents a good commercial settlement of the Transfer Pricing Agreements and is reflective of the amounts that the Joint Administrators consider, having performed their own reconciliations of the amounts that are likely to be due and that the Joint Administrators have estimated, would in the Period, be likely to be due by each of the LR Distributors under the Transfer Pricing Agreements.

133.    The Funding Agreement crystallises the obligation of each of the LR Distributors listed in paragraph 131 above, to make such payments and alters to whom such payment is to be made, namely NNUK.  This arrangement is to the advantage of each of those LR Distributors as it provides:

(a)    NNUK with funds to continue to trade, thereby increasing the prospects of achieving a series of coordinated sales along global business lines of the assets of the business which are in the interests of the creditors of each of the LR Distributors;

(b)    certainty as to its obligations and avoids any dispute regarding the quantum of payments owed and future amounts payable for the Period;

(c)    certainty by avoiding any possible future fluctuations in payments as a result of the failure of any of the unfiled Nortel Group entities in meeting their separate bilateral obligations under their respective LRA.  This enables the EMEA Debtors effectively to be ring-fenced from the Nortel Group companies in the rest of the world; and

(d)    that future material asset sales are facilitated, as the Funding Agreement provides for a cooperative approach by the Parties to such future sales, which is in the interests of each of the EMEA Debtors.

134.    The Funding Agreement accelerates the payment obligations of each of the LR Distributors under the LRAs and requires payment within 30 days of the effective date of the Funding Agreement.  However, section 6(a) of the Funding Agreement does provide for payment terms to be otherwise agreed between the Joint Administrators and any EMEA Debtors.  As such, the Joint Administrators would consider entering into a payment concession where required by an EMEA Debtor, based on the quarterly revenue achieved, so as to ease any liquidity pressures for the EMEA Debtors from requiring a full years payment within 30 days of the effective date of the Funding Agreement.

135.    However, saying this, the Joint Administrators are satisfied that each of the LR Distributors listed at paragraph 131 above have sufficient cash available to meet such a payment. Attached is a copy of a schedule showing the cash balances as at 16 June 2009 at page 602 of ARB3 which demonstrates this.

136.    The Funding Agreement also provides certain concessions surrounding future material assets sales (see the summary of section 12 at paragraph 87 above) that are to be made by each of the LR Distributors listed at paragraph 131 above.  Section 12, is a general concession relating to all other material asset sales to which an EMEA Debtor is a party.  In the case of a "section 12" material asset sale, this concession is subject to the Joint Administrators' discretion as to whether to enter into any agreement for a material asset sale and only to do so where they consider that it is in the best interests of the creditors of each of the LR Distributors listed in paragraph 131 above.

137.    The advantage to the EMEA Debtors of conceding that they would not object to the allocation of proceeds for a material asset sale prior to the sale taking place, is that it facilitates future sales by allowing for the orderly negotiation, on behalf of NNL, NNI and/or various EMEA Debtors, of the sale of various business assets of the Nortel Group to be undertaken on a global scale and without disruption. This is, in the Joint Administrators' view, in the interests of each of the EMEA Debtors.

138.    The Funding Agreement seeks to facilitate such a sale in this way, by allowing the determination of the proceeds allocation to those entities interested in such sale to be deferred until after the sale takes place.

139.    As noted in paragraph 29 above, it is the Joint Administrators' view that the best option available to maximise the value for the creditors of each of the Companies is through a co-ordinated sale of the assets of the business of the entire Nortel Group along global business lines.  It is the Joint Administrators' view that these concessions will enable the smooth facilitation of such a reorganisation and sale.

140.    On the basis of the above, the Joint Administrators of each of the LR Distributors listed at paragraph 131 above have entered into the Funding Agreement on behalf of each of them, and consider that to do so is in the best interests of the creditors of each of those LR Distributors.

*The remaining EMEA Debtors that are neither Main R&D Companies or LR Distributors*

141.    The Joint Administrators have entered into the Funding Agreement on behalf of the following EMEA Debtors in administration:

(a)    NN Finland;

(b)      NN Sweden;

(c)      Nortel GmbH;

(d)      Nortel Networks France S.A.S; and

(e)      Nortel Networks International Finance & Holding BV.

142.    Each of the above entities falls outside the Transfer Pricing Agreements and are therefore not required under the Funding Agreement to make any payments to NNUK.

143.    In relation to NN Sweden and NN Finland this is specifically reflected in section 24 of the Funding Agreement whereby the Parties covenant that they are not currently a party to, and shall not enter into, any arrangement pursuant to which any Transfer Pricing Payment (as defined in the Funding Agreement) may become payable to NN Finland and NN Sweden.

144.    Each of the entities listed in paragraph 141 above were required, however, by other Nortel Group companies, in particular NNL and NNI, to enter into the Funding Agreement so as to facilitate future material asset sales of the business.

145.    As such, the Funding Agreement provides certain concessions surrounding future material assets sales (see the summary of section 12 at paragraph 87 above) that are to be made by each of the entities listed at paragraph 141 above.  Section 12, is a general concession relating to all other material asset sales to which an EMEA Debtor is a party.  In the case of a "section 12" material asset sale, this concession is subject to the Joint Administrators' discretion as to whether to enter into any agreement for a material asset sale and only to do so where they consider that it is in the best interests of the creditors of each of the entities listed in paragraph 141 above.

146.    The advantage to the EMEA Debtors of conceding that they would not object to the allocation of proceeds for a material asset sale prior to the sale taking place, is that it facilitates future sales by allowing for the orderly negotiation, on behalf of NNL, NNI and/or various EMEA Debtors, of the sale of various business assets of the Nortel Group to be undertaken on a global scale and without disruption. This is, in the Joint Administrators' view, in the interests of each of the EMEA Debtors.

147.    The Funding Agreement seeks to facilitate such a sale in this way, by allowing the determination of the proceeds allocation to those entities interested in such sale to be

deferred until after the sale takes place.

148.    As noted in paragraph 29 above, it is the Joint Administrators' view that the best option available to maximise the value for the creditors of each of the Companies is through a co-ordinated sale of the assets of the business of the entire Nortel Group along global business lines. It is the Joint Administrators' view that these concessions will enable the smooth facilitation of such a reorganisation and sale.

149.    On the basis of the above, the Joint Administrators of each of the entities listed at paragraph 141 above have entered into the Funding Agreement on behalf of each of them, and consider that to do so is in the best interests of the creditors of each of those entities.

### Nortel Networks AG

150.    For completeness, Nortel Networks AG (**"NN Switzerland"**) is a LR Distributor and therefore party to the Transfer Pricing Agreements. NN Switzerland has not, however, entered into administration proceedings. NN Switzerland's directors are currently considering whether it is in the best interests of their company to accede to the Funding Agreement and, in the event it does become party, the terms on which it shall accede.

151.    I will provide the Court with an update on NN Switzerland's decision to accede to the Funding Agreement, if available, prior to the hearing of this application.

## J.    URGENCY OF THIS APPLICATION

152.    The Joint Administrators for each of the EMEA Companies in Administration are in the process of negotiating, together with NNI and NNL, for the global sale of a part of the Nortel Group's business known as the Enterprise Business. The Enterprise Business is described in further detail at paragraphs 62 to 63 of Ms Rolston's Statement. Pursuant to the proposed terms of the sale agreement for the Enterprise Business, NNUK (amongst other EMEA Companies in Administration) will need to continue to trade for a substantial period of time before the sale is fully effected. As such, before NNUK enters into this sale agreement, the Joint Administrators for NNUK need to ensure that it is in the interests of all of NNUK's creditors for NNUK to continue trading. As noted above, the Joint Administrators of NNUK require some certainty as to its funding either under the Transfer Pricing Agreements or under the allocation of the proceeds of any material asset sale to justify continued trading. As between NNI, NNL and each of the EMEA Companies in

Administration it has not been decided how the proceeds of the sale of the Enterprise Business will be allocated. Instead the Parties are negotiating a dispute resolution mechanism for the allocation of these proceeds. As no agreement has been reached as to how the proceeds are to be allocated, the Joint Administrators are therefore relying on the Funding Agreement for the certainty of funding it needs to enter into the sale agreement for the Enterprise Business and thereby continue to trade. The sale of the Enterprise Business is imminent.

153.    As noted above, by its terms the Funding Agreement is only binding on the EMEA Debtors to the extent that the UK Court provide directions (if requested) that the Joint Administrators are at liberty to enter into the Funding Agreement. If this condition is not satisfied it will not prevent NNI and NNL (subject to the consent of the US and Canadian courts) consummating a bilateral agreement on terms of the Funding Agreement applicable only to them. Therefore, before the Joint Administrators for NNUK sign the agreement for the sale of the Enterprise Business, they would like to ensure that the UK Court Condition (as provided for in section 13 of the Funding Agreement) is satisfied and that the EMEA Debtors remain party to the Funding Agreement when the Funding Agreement comes to be considered by the US and Canadian courts on 29 June 2009. As such the Joint Administrators respectfully request, on an urgent basis, directions from this Court as to whether they are at liberty to enter into the Funding Agreement.

## J.    RELIEF SOUGHT

154.    For the reasons set out in the foregoing paragraphs, it is the considered view of the Joint Administrators that the Funding Agreement is in the best interests of each of the Companies. The Joint Administrators have decided to seek the directions of this Court as a result of:

    (a)    Section 13(a) of the Funding Agreement which states that no provision of the Funding Agreement shall be effective until the satisfaction of the following conditions…"*the UK court giving a direction (the "UK Court's Direction") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement…provided however, the Joint Administrators may at their election waive the UK Court Condition*".

    (b)    In light of the complicated and inextricably linked arrangements of the EMEA

Companies in Administration.

155.   Accordingly, the Joint Administrators respectfully request that this Honourable Court direct that they be at liberty to enter into the Funding Agreement on behalf of each of the Companies.

## K.   INSPECTION OF THE COURT FILE

156.   I would also request that for reasons of commercial sensitivity surrounding the Companies, that this witness statement and its exhibit are ordered not to be open to inspection without the prior leave of the Court pursuant to rule 7.31(5) of the Insolvency Rules 1986.

## L.   CONCLUSION

157.   For the reasons mentioned above, I respectfully request that the Court grants the relief sought by the application.

## STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true.

**ALAN ROBERT BLOOM**

Date:  19 June 2009

<div align="right">

Applicant
Alan Robert Bloom
3rd Statement
Exhibit "ARB3"
19 June 2009

</div>

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**IN THE MATTERS OF:**

| | |
|---|---|
| **NORTEL NETWORKS UK LIMITED** | No 536 of 2009 |
| **NORTEL GMBH** | No 542 of 2009 |
| **NORTEL NETWORKS NV** | No 550 of 2009 |
| **NORTEL NETWORKS S.P.A** | No 552 of 2009 |
| **NORTEL NETWORKS BV** | No 553 of 2009 |
| **NORTEL NETWORKS POLSKA SP. Z.O.O** | No 554 of 2009 |
| **NORTEL NETWORKS HISPANIA SA** | No 535 of 2009 |
| **NORTEL NETWORKS INTERNATIONAL FINANCE &** | |
| **HOLDINGS BV** | No 549 of 2009 |
| **NORTEL NETWORKS (AUSTRIA) GMBH** | No 537 of 2009 |
| **NORTEL NETWORKS SRO** | No 538 of 2009 |
| **NORTEL NETWORKS ENGINEERING SERVICE KFT** | No 540 of 2009 |
| **NORTEL NETWORKS PORTUGAL SA** | No 547 of 2009 |
| **NORTEL NETWORKS SLOVENSKO** | No 551 of 2009 |
| **NORTEL NETWORKS FRANCE SAS** | No 544 of 2009 |
| **NORTEL NETWORKS OY** | No 545 of 2009 |
| **NORTEL NETWORKS ROMANIA SRL** | No 546 of 2009 |
| **NORTEL NETWORKS AB** | No 548 of 2009 |
| **NORTEL NETWORKS (IRELAND) LIMITED** | No 541 of 2009 |
| **(INDIVIDUALLY THE "COMPANY" AND TOGETHER THE** | |
| **"COMPANIES")** | |

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

<div align="center">

**THIRD WITNESS STATEMENT OF**
**ALAN ROBERT BLOOM**

</div>

---

LJ : NORTEL NETWORKS SA
Jugement du 28 mai 2009
JC : Monsieur SEUGÉ
AJ : Maître MICHEL
LJ : Maître ROGEAU



---

**REQUETE AUX FINS D'AUTORISATION DE PAIEMENT ET DE CONCLUSION D'UN ACCORD DE PARTICIPATION AUX PROCESSUS DE CESSION**

---

A Monsieur le Président Jean-Claude SEUGÉ – Juge Commissaire au Tribunal de Commerce de Versailles

**A la requête de :**

**Maître Franck MICHEL**, membre de la SELARL F. MICHEL- A. MIROITTE- C. GORINS, demeurant à VERSAILLES - 10 Allée Pierre de Coubertin, agissant poursuites et diligences en sa qualité d'Administrateur Judiciaire de la société :

NORTEL NETWORKS SA
SA au capital de 136 963 425 €
Ayant pour activité : Recherche & développement tous matériel de télécommunication
Dont le siège social est situé à CHATEAUFORT (78117)- Parc d'activité de Magny.

Nommé à ces fonctions par jugement du Tribunal de Commerce de Versailles en date du 28 mai 2009.

**Maître Cosme ROGEAU**, demeurant à VERSAILLES – 26 avenue Hoche, agissant poursuite et diligences en sa qualité de Liquidateur Judiciaire de la société :

NORTEL NETWORKS SA
SA au capital de 136 963 425 €
Ayant pour activité : Recherche & développement tous matériel de télécommunication
Dont le siège social est situé à CHATEAUFORT (78117)- Parc d'activité de Magny.

Nommé à ces fonctions par jugement du Tribunal de Commerce de Versailles en date du 28 mai 2009.

**ONT L'HONNEUR DE VOUS EXPOSER QUE :**

**1-La procédure de liquidation de la société Nortel Networks SA**

Par jugement en date du 14 janvier 2009, la *High Court of Justice, Chancery Division, Companies Court* a ouvert une procédure principale d'insolvabilité au sens du Règlement (CE) n° 1346/2000 relatif aux procédures d'insolvabilité à l'égard de Nortel Networks SA (ci-après "NNSA").

Par jugement du 28 mai 2009, à la demande des Administrateurs anglais et en application du Règlement CE précité, le Tribunal de Commerce de Versailles a ouvert une procédure secondaire de liquidation judiciaire, avec autorisation de poursuite d'activité à l'égard de NNSA.

Par le même jugement, Maître MICHEL a été désigné en qualité d'Administrateur Judiciaire de NNSA et Maître Cosme ROGEAU en qualité de Liquidateur Judiciaire de NNSA.

**2-L'apurement des sommes dues pour l'année 2009 au titre du « *MASTER R&D AGREEMENT* »**

Le 10 juin 2009, les sociétés du groupe Nortel, à l'exception de NNSA, ont conclu un accord complexe dit Interim Funding Agreement (Ci-après « **IFSA** ») visant, notamment, à fixer les sommes dues par certaines sociétés du groupe au profit d'autres sociétés du groupe au titre du « MASTER R&D AGREEMENT » pendant la période l'année en cours.

On rappellera que le « *MASTER R&D AGREEMENT* » permet, notamment, à la société NNSA de bénéficier d'une licence sur l'ensemble des droits de propriété intellectuelle nécessaire à son activité.
Cet accord, sans lequel NNSA ne peut pas exercer ses activités, s'est poursuivi pendant la procédure principale puis la procédure secondaire.

C'est dans ces conditions que la société Nortel Networks UK a demandé à NNSA de lui verser une somme de 4,8 millions de dollars au titre de sa contribution au mécanisme du « MASTER R&D AGREEMENT » et a accepté, par lettre en date du 1er juillet 2009, de différer le paiement de cette la somme à l'encaissement des prix de cession des actifs et après paiement de la somme de 8 millions d'euros superprivilégiée.

Les Joint Administrators estiment que la conclusion de cet accord avec Nortel Networks UK permet de limiter les « *Administration Expenses* » au titre de la poursuite, pendant la procédure principale du « MASTER R&D AGREEMENT » qu'ils avaient un temps estimées à près de 22 millions de dollars.
Ainsi, aux termes du protocole de Coordination conclu le 1er juillet 2009, l'accord sur le paiement à Nortel Networks UK de cette somme de 4,8 millions de dollars permettra, aussi, la mise à disposition par les Joint Administrators à la procédure secondaire d'une somme de 8,072 millions d'euros.

**3 – La participation de NNSA aux processus de cession des actifs du groupe et de répartition des prix de cession**

Afin de faciliter les cessions des actifs du groupe Nortel au niveau mondial et le processus à venir de répartition des prix de cession entre les différentes entités du groupe, il apparait effectivement nécessaire que :

- les licences liées aux activités cédés, dont bénéficie chacune des sociétés signataire du « MASTER R&D AGREEMENT » soient résiliées au profit du cessionnaire, pour les besoins et au fur et à mesure des cessions ;

- les cessions d'actifs puissent intervenir indépendamment du processus de négociation en cours sur les répartitions à intervenir entre les différentes sociétés du groupe afin d'éviter qu'un désaccord sur ces répartition puisse bloquer une cession ;

- le prix des cessions des actifs du groupe soit déposé entre les mains d'un séquestre à charge pour ce dernier de les répartir selon l'accord de répartition à intervenir ;

- les sociétés du groupe s'engagent à négocier de bonne foi un accord permettant la répartition des prix de cession, à défaut d'un accord, de prévoir une procédure contraignante permettant de procéder à une répartition à dire d'expert.

A cet égard, on relèvera que de leurs côtés, les sociétés américaines et canadiennes du groupe et celles sous le contrôle des Joint Administrators ont accepté, en signant l'IFSA, ces quatre points qui devront présider aux processus de cession et de négociation en cours.

**Il convient, aussi, de rappeler qu'aux termes du Protocole de coordination conclu le 1er juillet 2009, les Joint Administrators et les organes de la procédure secondaire ont, par ailleurs, organisé leurs relations dans le cadre de ces ventes et des négociations à intervenir sur la répartition de leurs produits.**

U

**C'est pourquoi,** les exposants qui se réservent de vous saisir ultérieurement en complément d'autorisation, requièrent, qu'il vous plaise, Monsieur le Juge Commissaire, de les autoriser à donner, d'ores et déjà, leur accord sur :

-   le paiement différé à Nortel Networks UK d'une somme de 4,8 millions de dollars avec intérêt au taux légal, au jour de l'encaissement par NNSA du prix de cession d'actifs ou de l'arrêt d'activité de NNSA et après remboursement à l'AGS de sa créance superprivilégiée d'un montant d'environ 8 millions d'euros, au titre de l'exécution du *« MASTER R&D AGREEMENT »* pour l'année en cours, étant entendu que ce paiement ne vaudra, en aucun cas, renonciation de la part de la Société et/ou des organes de la procédure secondaire à contester la validité, le bien fondé ou le quantum des accords et des paiements intervenus antérieurement au 14 janvier 2009 ;

-   la résiliation des licences attachées à des activités cédées, dont bénéficie NNSA, pour les besoins et au fur et à mesure des cessions ;

-   la poursuite du processus de cession d'actifs en parallèle à la mise en œuvre du processus d'accord sur les répartitions entre les sociétés du groupe NORTEL, étant rappelé, toutefois, que pour ce qui concerne les actifs de NNSA, l'offre présentée au Tribunal devra indiquer un prix devant revenir à NNSA déterminé ou du moins déterminable au besoin par un tiers arbitre ;

-   le dépôt entre les mains d'un séquestre du prix des actifs cédés, dans des conditions à déterminer;

-   leur participation aux négociations à intervenir sur la répartition du prix de cession et le protocole prévoyant, notamment, à défaut d'accord des parties sur cette répartition, le processus de détermination de celle-ci à dire d'expert.

Fait à Versailles
Le   6 juillet 2009
**Franck MICHEL**
**Administrateur Judiciaire**

**Cosme ROGEAU**
**Liquidateur Judiciaire**

**ORDONNANCE**

Nous, Jean Claude Seugé, Juge Commissaire,

A la liquidation judiciaire de la société :

NORTEL NETWORKS SA, SA au capital de 136 963 425 €
Dont le siège social est situé à CHATEAUFORT (78117)- Parc d'activité de Magny.

Assisté de Madame le Greffier.

Vu la requête qui précède, les motifs y exposés et les articles L.621-9, L 641-3 et L 641-11 du Code de Commerce,

**AUTORISONS** Maître Franck MICHEL, es-qualité d'Administrateur Judiciaire de la société NORTEL NETWORKS SA, et Maître Cosme ROGEAU, es-qualité de Liquidateur Judiciaire de la société NORTEL NETWORKS SA, à donner leur accord sur :

-    le paiement différé à Nortel Networks UK d'une somme de 4,8 millions de dollars avec intérêt au taux légal, au jour de l'encaissement par NNSA du prix de cession d'actifs ou de l'arrêt d'activité de NNSA et après remboursement à l'AGS de sa créance superprivilégiée d'un montant d'environ 8 millions d'euros, au titre de l'exécution du *« MASTER R&D AGREEMENT »* pour l'année en cours, étant entendu que ce paiement ne vaut, en aucun cas, renonciation de la part de la Société et/ou des organes de la Procédure Secondaire à contester la validité, le bien fondé ou le quantum des accords et des paiements intervenus antérieurement au 14 janvier 2009 ;

-    la résiliation des licences, attachées à des activités cédées, dont bénéficie NNSA, pour les besoins et au fur et à mesure des cessions ;

-    la poursuite du processus de cession d'actifs, en parallèle à la mise en œuvre du processus d'accord sur les répartitions entre les sociétés du groupe NORTEL, étant rappelé, toutefois, que pour ce qui concerne les actifs de NNSA, l'offre présentée au Tribunal devra indiquer un prix devant revenir à NNSA déterminé ou du moins déterminable au besoin par un tiers arbitre ;

-    leur participation aux négociations à intervenir sur la répartition du prix de cession et le protocole prévoyant, notamment, à défaut d'accord des parties sur cette répartition, le processus de détermination de celle-ci à dire d'expert ;

-    le dépôt, entre les mains d'un séquestre, du prix des actifs cédés, dans des conditions à déterminer;

**AUTORISONS** Maître Franck MICHEL, es-qualité d'Administrateur Judiciaire de la société NORTEL NETWORKS SA, et Maître Cosme ROGEAU, es-qualité de Liquidateur Judiciaire de la société NORTEL NETWORKS SA, à rédiger tous engagements et à signer tous actes en rapport avec les cinq point ci-dessus.

Disons que la présente sera notifiée a :

- La société Nortel Networks SA, Monsieur Michel CLEMENT
- Maître Franck MICHEL, Administrateur Judiciaire
- Maître Cosme ROGEAU, Liquidateur
- Messieurs Alan Robert BLOOM, Alan Michael HUDSOHN, Stephen John HARRIS, Christopher John WILKINSON HILL chez Maître BASUYAUX, Cabinet HERBERT SMITH, 66 avenue Marceau 75008 PARIS.
- Les représentants des salariés : Madame Claire DECHENAUX 69, rue Savestre 78370 PLAISIR et Monsieur Elie ENSACI 42 rue des Maraîchers 75020 PARIS

FAIT EN NOTRE CABINET
TRIBUNAL DE COMMERCE DE VERSAILLES, *le 7 Juillet 2009*

**Jean Claude SEUGE**

**L'ANDROMEDE**

**7 RUE DESFLACHES**

**42100 SAINT ETIENNE**

I hereby confirm that, to the best of my knowledge, my translation into English of the

« Ordonnance » (Order) of the Versailles Commercial Court of 7 July 2009,

relating to the liquidation of the company NORTEL NETWORKS SA, truthfully and

accurately reflects the content of this Order.

Signed in Saint Etienne

18 May 2011

Susan Rees

# ORDER

The undersigned, Jean Claude Seugé, Supervisory Judge,

Relating to the court-ordered liquidation of the company:

NORTEL NETWORKS SA, French *société anonyme* (public limited company) with share capital of € 136,963,425,

Whose registered office is Parc d'activité de Magny, CHATEAUFORT 78117,

Assisted by the Clerk to the Court,

Further to the above petition, the grounds set forth therein and articles L 621-9, L 641-3 and L 641-11 of the Commercial Code,

HEREBY AUTHORISES Maître Franck MICHEL, as Liquidator of the company NORTEL NETWORKS SA, and Maître Cosme ROGEAU, as Liquidator of the company NORTEL NETWORKS SA, to agree to:

- the deferred payment to Nortel Networks UK of a sum of $ 4.8 million, together with interest at the legal rate, on the day of collection by NNSA of the price for the sale of assets or the discontinuance of NNSA's business, and after repayment to AGS of its priority claim amounting to approximately € 8 million, with regard to the performance of the "*MASTER R&D AGREEMENT*" for the year in progress, it being understood that this payment will not under any circumstances be deemed a waiver on the part of the Company and/or the managers of the Secondary Procedure to challenge the validity, the merits or the quantum of the agreements and of payments made prior to 14 January ,
- the termination, for the purpose of and in line with the transfers, of the licenses from which NNSA benefits which are associated with the transferred activities,
- continue with the transfer of assets simultaneously with the implementation of the process to reach an agreement on the split among companies of the NORTEL group, it being recalled however that with regard to NNSA's assets the offer presented to the Court must indicate a price to be paid to NNSA, which is either determined or which may at least be determinable by a third party neutral arbitrator,
- their participation in forthcoming negotiations concerning the sharing of the sale price and, more particularly if the parties fail to reach an agreement, negotiating the agreement on the procedure for having such price determined by an expert,
- the deposit of the price for the assets with an escrow agent, under conditions to be determined.

AUTHORISES Maître Franck MICHEL, as Liquidator of the company NORTEL NETWORKS SA, and Maître Cosme ROGEAU, as Liquidator of the company NORTEL NETWORKS SA, to draft all undertakings and to sign all instruments connected with the five points set forth above.


This Order shall be notified to:

- The company Nortel Networks SA, Mr Michel CLEMENT
- Maître Franck MICHEL, Liquidator
- Maître Cosme ROGEAU, Liquidator
- Messrs Alan Robert BLOOM, Alan Michael HUDSOHN, Stephen John HARRIS, Christopher John WILKINSON HILL c/o Maître BASUYAUX, HERBERT SMITH, 66 Avenue Marceau, 75008 PARIS
- Employee representatives: Ms Claire DECHENAUX, 69 rue Savestre, 78370 PLAISIR, and Mr Elie ENSACI, 42 rue des Maraîchers, 75020 PARIS.


SIGNED IN CHAMBERS

VERSALLES COMMERCIAL COURT          7 JULY 2009

# ACCESSION AND AMENDMENT AGREEMENT

## relating to the

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

**THIS AGREEMENT** (the "Agreement") is entered into by and among:

1. **NORTEL NETWORKS LIMITED** ("NNL") and the other entities set forth in Part 1 of Schedule 1 attached hereto;

2. **NORTEL NETWORKS INC.** ("NNI") and the other entities set forth in Part 2 of Schedule 1 attached hereto;

3. the entities set forth in Part 3 of Schedule 1 attached hereto (the "EMEA Debtors");

4. the Joint Administrators (as defined in the IFSA),

   (the above being the "Existing Parties");

5. **NORTEL NETWORKS AG**, a company incorporated under the laws of Switzerland having its registered office at Wilstrasse 11, Building U95, Uster, Switzerland CH-8610 (the "NNAG"); and

6. **NORTEL NETWORKS S.A. (In Administration)**, a French *société anonyme* registered with the Registry of Commerce of Versailles under the number RCS Versailles no. 389 516 741 ("NNSA") represented by the Joint Administrators acting in their capacity as agents of NNSA without personal liability.

**WHEREAS:**

(A) This Agreement is supplemental to an interim funding and settlement agreement (as amended or supplemented from time to time) dated 9 June 2009 between the Existing Parties (the "IFSA").

(B) NNAG and NNSA wish to accede to the IFSA and each has agreed to perform and comply with its obligations under the IFSA as if it had been a party from the date of execution thereof.

(C) The parties hereto have further agreed to make certain amendments to the IFSA as set out in this Agreement.

10/22953572_1

1

**NOW THEREFORE, THE PARTIES HERETO HEREBY AGREE THAT:**

**1.     DEFINITIONS**

1.1     Words and expressions defined in (or by reference to) the IFSA have the same meaning when used in this Agreement (including the Recitals and Schedule hereto).

**2.     ACCESSION**

2.1     The Existing Parties hereby agree that NNAG and NNSA shall accede to the IFSA as EMEA Debtors. The IFSA shall henceforth be read and construed as if NNAG and NNSA had originally been party thereto and accordingly references therein to an EMEA Debtor shall be deemed to include references to NNAG and NNSA.

2.2     Each of NNAG and NNSA hereby undertakes to and covenants with each of the Existing Parties in the same terms as it would have undertaken and covenanted if it had originally been a party to the IFSA as an EMEA Debtor.

2.3     Each of the Existing Parties to this Agreement covenants with each of NNAG and NNSA that NNAG and NNSA shall each be entitled to the benefit of the terms of the IFSA as if each were a party to it and named therein as an EMEA Debtor.

**3.     AMENDMENT AND RESTATEMENT OF THE IFSA**

3.1     The parties hereto hereby agree that with effect from the date hereof the provisions of the IFSA shall be amended and restated by:

   3.1.1     inserting the words *"(excluding Nortel Networks AG and NNSA)"* after the words *"EMEA Debtor"* in the second line of Section 6.g.;

   3.1.2     inserting the words *"Nortel Networks AG"* and *"Nortel Networks S.A.(In Administration)"* (each on a separate line) below the words *"Nortel Networks France S.A.S. (In Administration)"* in Schedule 3 (EMEA Debtors); and

   3.1.3     inserting the following sentence at the end of Section 6.g.: *"In the event of a breach of Section 12.a. in connection with the Subject Transaction by Nortel Networks AG, NNSA or both, NNL's obligation to make any Shortfall Payments and the Shortfall Charge shall be automatically reduced by $4.08 million, $4.80 million or $8.88 million, respectively."*

**4.     WAIVER**

4.1     The Existing Parties hereby waive the requirement in Section 15 of the IFSA that the IFSA be amended on no less than 10 Business Days' notice as applicable to this Agreement.

**5.     MISCELLANEOUS**

5.1     Subject to the terms of this Agreement, the IFSA shall remain in full force and effect.

5.2     The following provisions of the IFSA shall apply to this Agreement as if set out in this Agreement: Sections 16, 17 and 20-23.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and .
delivered as of this **11th** day of September 2009

NORTEL NETWORKS CORPORATION

By _____
John Doolittle, SVP, Finance a Corp.
                          Services

NORTEL NETWORKS LIMITED

By: _____
John Doolittle, SVP, Finance a
                  corporate Services

By _____
John Doolittle, Director

By _____
John Doolittle, Director

NORTEL NETWORKS CORPORATION

By _____
Title: GENERAL COUNSEL - CORPORATE +
                    CORPORATE SECRETARY

NORTEL NETWORKS LIMITED

By _____
Title: GENERAL COUNSEL - CORPORATE +
                    CORPORATE
                          SECRETARY

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
Title: Anne Ventresca, Secretary

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
Title: Anne Ventresca, Secretary

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
Title: Anne Ventresca, Secretary

Signature page to Accession and Amendment Agreement

NORTEL NETWORKS INC.

By _____
Title: John Doolittle, Vice President

ARCHITEL SYSTEMS (U.S.) CORPORATION

By _____
Title: John Doolittle, Vice President

CORETEK, INC.

By _____
Title: John Doolittle, Vice President

NORTEL ALTSYSTEMS, INC.

By _____
Title: John Doolittle, Vice President

NORTEL ALTSYSTEMS INTERNATIONAL INC.

By _____
Title: John Doolittle, Vice President

NORTEL NETWORKS APPLICATIONS MANAGEMENT SOLUTIONS INC.

By _____
Title: John Doolittle, Vice President

NORTEL NETWORKS CABLE SOLUTIONS INC.

By _____
Title: John Doolittle, Vice President

Signature page to Accession and Amendment Agreement

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Title: John Doolittle, Vice President

NORTEL NETWORKS HPOCS INC.

By _____
    Title: John Doolittle, Vice President

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Title: John Doolittle, Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Title: John Doolittle, Vice President

NORTHERN TELECOM INTERNATIONAL
INC.

By _____
    Title: John Doolittle, Vice President

QTERA CORPORATION

By _____
    Title: John Doolittle, Vice President

SONOMA SYSTEMS

By _____
    Title: John Doolittle, Vice President

XROS, INC.

By _____
    Title: John Doolittle, Vice President

Signature page to Accession and Amendment Agreement

Signed by **ALAN BLOOM** as joint
Administrator on behalf of the Joint
Administrators without personal liability solely
for the purpose of obtaining the benefit of the
provisions of this Agreement expressed to be
conferred on or given to the Joint Administrators

By _____

     Title:


**SIGNED** for and on behalf of **NORTEL**             )
**NETWORKS UK LIMITED (IN**                            )      **ALAN BLOOM**
**ADMINISTRATION)**                                   )
by **ALAN BLOOM** as Joint Administrator              )
(acting as agent and without personal liability)
in the presence of:


Witness signature  *W Graham*


Name:    WILMA  GRAHAM
Address: 1 MORE  LONDON PLACE
         LONDON  SE1 2AF


**SIGNED** for and on behalf of **NORTEL**             )
**NETWORKS (IRELAND) LIMITED (IN**                    )      **ALAN BLOOM**
**ADMINISTRATION)**                                   )
by **ALAN BLOOM** as Joint Administrator              )
(acting as agent and without personal liability)
in the presence of:


Witness signature  *W. Graham*


Name:    WILMA  GRAHAM
Address: 1 MORE  LONDON PLACE
         LONDON  SE1 2AF


Signature page to Accession and Amendment Agreement

SIGNED for and on behalf of NORTEL )
NETWORKS NV (IN ADMINISTRATION) )    **ALAN BLOOM**
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal liability) )
in the presence of:

Witness signature    *W. Graham*

Name: _    WILMA GRAHAM
Address:    1 MORE  LONDON PLACE
            LONDON  SE1 2AF

SIGNED for and on behalf of NORTEL )
NETWORKS SPA (IN )    **ALAN BLOOM**
ADMINISTRATION) )
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal liability)
in the presence of:

Witness signature    *W. Graham*

Name:    WILMA GRAHAM
Address:    1 MORE  LONDON PLACE
            LONDON  SE1 2AF

SIGNED for and on behalf of NORTEL )
NETWORKS BV (IN ADMINISTRATION) )    **ALAN BLOOM**
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal liability) )
in the presence of:

Witness signature    *W. Graham*

Name:    WILMA GRAHAM
Address:    1 MORE  LONDON PLACE
            LONDON  SE1 2AF

Signature page to Accession and Amendment Agreement

SIGNED for and on behalf of NORTEL    )
NETWORKS POLSKA SP Z.O.O. (IN    )   **ALAN BLOOM**
ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal liability)
in the presence of:

Witness signature    *W. Graham*

Name:    WILMA GRAHAM
Address:    1 MORE LONDON PLACE
    LONDON SE1 2AF

SIGNED for and on behalf of NORTEL    )
NETWORKS HISPANIA SA (IN    )   **ALAN BLOOM**
ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal liability)
in the presence of:

Witness signature    *W. Graham*

Name:    WILMA GRAHAM
Address:    1 MORE LONDON PLACE
    LONDON SE1 2AF

SIGNED for and on behalf of NORTEL    )
NETWORKS (AUSTRIA) GMBH (IN    )   **ALAN BLOOM**
ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal liability)
in the presence of:

Witness signature    *W. Graham*

Name:    WILMA GRAHAM
Address:    1 MORE LONDON PLACE
    LONDON SE1 2AF

Signature page to Accession and Amendment Agreement

**SIGNED** for and on behalf of NORTEL
NETWORKS SRO (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

)
)   ALAN BLOOM
)
)

Witness signature

Name:  WILMA GRAHAM
Address: 1 MORE LONDON PLACE
London SE1 2AF

**SIGNED** for and on behalf of NORTEL
NETWORKS ENGINEERING SERVICES
KFT (IN ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

)
)   ALAN BLOOM
)
)

Witness signature

Name:  WILMA GRAHAM
Address: 1 MORE LONDON PLACE
London SE1 2AF

**SIGNED** for and on behalf of NORTEL
NETWORKS PORTUGAL SA (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

)
)   ALAN BLOOM
)
)

Witness signature

Name:  WILMA GRAHAM
Address: 1 MORE LONDON PLACE
London SE1 2AF

Signature page to Accession and Amendment Agreement

SIGNED for and on behalf of NORTEL
NETWORKS SLOVENSKO SRO (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

)
)   **ALAN BLOOM**
)
)



Witness signature   *W. Graham*

Name:   *WILMA  GRAHAM*
Address:   *1 MORE LONDON PLACE*
*LONDON SE1 2AF*

SIGNED for and on behalf of NORTEL
NETWORKS ROMANIA SRL (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

)
)   **ALAN BLOOM**
)
)

Witness signature   *W. Graham*

Name:   *WILMA  GRAHAM*
Address:   *1 MORE LONDON PLACE*
*LONDON SE1 2AF*

SIGNED for and on behalf of NORTEL
GMBH (IN ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

)
)   **ALAN BLOOM**
)
)

Witness signature   *W. Graham*

Name:   *WILMA  GRAHAM*
Address:   *1 MORE LONDON PLACE*
*LONDON SE1 2AF*

**SIGNED** for and on behalf of NORTEL  )
NETWORKS OY (IN ADMINISTRATION)   )    **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal liability)  )
in the presence of:



Witness signature   *W. Graham*

Name:   WILMA GRAHAM
Address:  1 MORE LONDON PLACE
          LONDON SE1 2AF

**SIGNED** for and on behalf of NORTEL  )
NETWORKS AB (IN ADMINISTRATION)   )    **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal liability)  )
in the presence of:

Witness signature   *W. Graham*

Name:   WILMA GRAHAM
Address: 1 MORE LONDON PLACE
         LONDON SE1 2AF

**SIGNED** for and on behalf of NORTEL  )
NETWORKS INTERNATIONAL   )
FINANCE & HOLDING BV (IN   )    **ALAN BLOOM**
ADMINISTRATION)   ).
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal liability)
in the presence of:

Witness signature   *W. Graham*

Name:   WILMA GRAHAM
Address: 1 MORE LONDON PLACE
         LONDON SE1 2AF

Signature page to Accession and Amendment Agreement

SIGNED for and on behalf of NORTEL                )
NETWORKS FRANCE S.A.S. (IN                        )    ALAN BLOOM
ADMINISTRATION)                                   )
by ALAN BLOOM as Joint Administrator              )
(acting as agent and without personal liability)
in the presence of:

Witness signature _W. Graham_

Name:      WILMA GRAHAM
Address:   1 MORE LONDON PLACE
           LONDON SE1 2AF

SIGNED for and on behalf of NORTEL                )
NETWORKS S.A. (IN ADMINISTRATION)                 )    ALAN BLOOM
by ALAN BLOOM as Joint Administrator              )
(acting as agent and without personal liability)  )
in the presence of:

Witness signature _W. Graham_

Name:      WILMA GRAHAM
Address:   1 MORE LONDON PLACE
           LONDON SE1 2AF

Signature page to Accession and Amendment Agreement

SIGNED by SIMON FREEMANTLE duly )
authorised for and on behalf of NORTEL )     SIMON FREEMANTLE
NETWORKS AG in the presence of:        )
                                       )

Witness signature

Name:      B. DANDRIDGE
Address:   ⅄₀ NORTEL NETWORKS
           MAIDENHEAD, UK

Signature page to Accession and Amendment Agreement

**SCHEDULE 1**

**PART 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**PART 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**PART 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

## Mendoza, Richard

| | |
|---|---|
| **From:** | Sanjeet Malik [smalik@cgsh.com] |
| **Sent:** | 14 June 2009 00:04 |
| **To:** | fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com; DAVIES, GAVIN; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE; Kois, Maria; Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; GALE, STEPHEN; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; JHarris@milbank.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; jstam@ogilvyrenault.com; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com |
| **Cc:** | Craig B BROD; James L BROMLEY; Lisa M SCHWEITZER; Brian T Sandstrom |
| **Subject:** | NT: Allocation Protocol |
| **Attachments:** | 2068820_1(Nortel_ Allocation Protocol).DOC |

Dear All:

Attached is the first draft of the Allocation Protocol for your review. Please note that this draft has not been reviewed by our client or any other stakeholders and therefore remains subject to further internal review and comments from other parties.

We would appreciate if you could please provide written comments to the attached draft. In addition, we propose to have a call to discuss this draft next week - we will circulating the details during the course of the week.

Please feel free to call me if you have any questions or concerns.

Regards,
Sanjeet

---

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2136 | f: +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

**THIS DRAFT AGREEMENT HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE RULES OF EVIDENCE FOR UNITED STATES COURTS AND MAGISTRATES AND ANY OTHER SIMILAR APPLICABLE RULES IN ALL PERTINENT JURISDICTIONS.**

*Draft of June 13, 2009*
*Privileged and Confidential*
*Attorney Work Product*
*Attorney-Client Communication*
*For discussion and contingency purposes only*

## ~~EXHIBIT A~~PROTOCOL FOR RESOLVING DISPUTES CONCERNING ALLOCATION OF SALE PROCEEDS

This Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds, dated as of ~~May~~June [•], 2009 (the "Protocol"), is entered into by and among Nortel Networks ~~Inc. ("NNI") and~~Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"), certain ~~of its United States affiliates that are debtors and debtors-in-possession~~affiliates of the Debtors (as defined below) set forth in Schedule 4 attached hereto (the "Non-Filed Affiliates"), the Monitor, the Official Committee of Unsecured Creditors appointed in the US Proceedings (as ~~hereinafter defined) (collectively, the "US Debtors"); Nortel Networks Corporation ("NNC" and, together with its affiliates, the "Company"), Nortel Networks Limited ("NNL") and certain of its Canadian affiliates that filed applications for protection in the Canadian Proceedings (as hereinafter defined) (collectively, the "Canadian Debtors"); and Nortel Networks UK Limited and certain of its European affiliates that are in administration in the UK Proceedings (as hereinafter defined), represented by the individuals from Ernst & Young LLP and, in the case of Nortel Networks (Ireland) Limited only, Ernst & Young Chartered Accountants, serving as administrators in the UK Proceedings (the "Joint Administrators") (collectively, the "EMEA Filed Debtors"); certain of NNUK's other European affiliates (collectively, the "EMEA Non-Filed Entities", and together with the EMEA Filed Debtors, the "EMEA Debtors"); and the EMEA Debtors together with the US Debtors and the Canadian Debtors, the "Debtors" and each individually a "Debtor".~~ defined below) (the "Creditors' Committee") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with the Canadian Debtors and the US Debtors (each, as defined below) (the "Bondholders' Committee," and along with the Creditors' Committee, the "Committees") (each, a "Party," and collectively, the "Parties"). **[NTD: Participation of other stakeholders to be discussed.]** The Joint Administrators, in their individual capacity, shall be Party to this Agreement solely for the purposes of Section 9.4 and references to the Parties shall be construed accordingly.

WHEREAS, ~~the Proceedings are on-going with respect to: (a) as to the US Debtors, the cases commenced~~ on January 14, 2009 (the "Filing Date") ~~and brought under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and jointly administered in the United States Bankruptcy Court for the District of Delaware under the caption In re Nortel Networks Inc., *et al*, Case No. 09-10138 (KG) (Jointly Administered) (respectively, the "US Court" and the "US Proceedings"); (b) as to the Canadian Debtors, the proceedings, commenced on the Filing Date.~~, Nortel Networks Corporation ("NNC", and together with its affiliates, the "Company," or the "Nortel Group"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, ~~the "Canadian Court~~"CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed

monitor (the "Monitor"); and ~~(e) as to the EMEA Debtors, the administration, also commenced on the Filing Date, of the EMEA Debtors in the United Kingdom~~

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England ~~(respectively, the "UK Court" and the "UK Proceedings) (clauses (a) through (c) together, respectively, the "Courts" and the "Proceedings~~the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

~~WHEREAS, in the US Proceedings, the Office of the United States Trustee~~

~~appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section~~

~~1102(a)(1) of the Bankruptcy Code; and~~

~~WHEREAS, an ad hoc group of bondholders holding claims against certain of the~~

~~US Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder~~

~~Group"); and~~

~~WHEREAS, the Canadian Debtors have obtained the Monitor's consent and~~

~~approval to enter into this Protocol; and~~

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, NNSA is not a Party to this agreement, but shall be invited by the Parties to accede to this agreement as an EMEA Debtor; and

[New York #2068820 v1]

WHEREAS, the ~~US Debtors, the Canadian Debtors, the EMEA~~ Debtors and their respective affiliates intend to sell certain assets of their estates in several transactions, each relating to a particular line of business (each, a "Business") to a third party buyer (the "Buyer"); and

WHEREAS, the ~~Debtors intend to instruct the~~ Company intends to provide ~~the Buyer~~potential Buyers with access to a room (which may be an electronic data room) containing the books and records of the Company and other financial information relating to the Company (the "Data Room"); and

WHEREAS, with respect to each Business, the ~~US Debtors, the Canadian~~ Debtors and ~~the EMEA Debtors~~their respective affiliates intend to enter into one or more acquisition agreements (such agreements, with respect to the sale of each Business, collectively the "Acquisition Agreement") with the Buyer to govern the sale of such Business (the "Sale"); and

WHEREAS, after entering into the Acquisition Agreement, certain of the Debtors intend to apply to certain of the Courts for orders authorizing such Debtors to establish notice, ~~bid~~bidding and sale procedures for the Sale of each Business (the "Bid Procedures Orders"); and

WHEREAS, after entry of the Bid Procedures Orders, such Debtors intend to conduct an auction for the Sale of each Business in accordance with the Bid Procedures Orders; and

WHEREAS, after conclusion of the auction, certain of the Debtors intend to apply to certain of the Courts for orders approving the Sale of each Business to the Buyer (the "Sale Orders"); and

WHEREAS, the relevant Debtors and their respective affiliates intend to request that the Sale Orders contain procedures for the establishment of ~~a~~ one or more escrow accounts (the "Escrow Account") overseen by an independent agent (the "Escrow Agent") for deposit of the proceeds of the Sale (the "Sale Proceeds") pending the allocation thereof in accordance with the provisions of this Protocol; and

WHEREAS, after entry of the Sale Orders, the Debtors and their respective affiliates intend to consummate the Sale of each Business in accordance with the Sale Orders (~~the~~in each case, a "Closing"); and

WHEREAS, the ~~Debtors~~Parties previously agreed, pursuant to the Interim Funding and Settlement Agreement, dated June 9, 2009 (as amended from time to time, the "Interim Funding Agreement"), to as soon as reasonably practicable following the execution of such agreement, to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sales Proceeds, which would provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors (as defined therein) have been unable to reach agreement regarding such allocation;

WHEREAS, the Parties wish to provide for a mechanism to negotiate the allocation of Sale Proceeds between and among ~~themselves~~the Selling Parties (as defined below) and to

3

resolve disputes that might arise between and among themselves with respect to the allocation of the Sale Proceeds; and

WHEREAS, ~~the Debtors wish to provide the Monitor, Committee and the Bondholder Group the~~each Party (including the Monitor, the Creditors' Committee and the Bondholders' Committee), wishes to participate in the procedures set forth in this Protocol, and has agreed to be bound by this Protocol and any outcome with respect to the Allocation of Sales Proceeds pursuant to a Decision by the Dispute Resolver (each, as defined below); and

WHEREAS, in order to ensure that the Non-Filed Affiliates are afforded an adequate opportunity to participate in ~~certain of the procedures provided for by this Protocol; and~~the procedures under this Protocol, the Parties have agreed to appoint an independent financial advisor to assist the Non-Filed Affiliates in connection with the negotiations and other procedures under this Protocol (the "Affiliates' FA").

~~WHEREAS, neither Nortel Networks S.A. ("NNSA") nor Nortel Networks France S.A.S. ("NNF", together with NNSA, the "French Debtors") is a party to this agreement, but each shall be invited by the Debtors to accede to this agreement as an EMEA Filed Debtor.~~

NOW THEREFORE, IT IS HEREBY CONSENTED TO, STIPULATED, AGREED AND ORDERED THAT:

## ARTICLE I
## INITIAL NEGOTIATIONS

*Section 1.1*        During the period beginning as early as the start of negotiations of any Acquisition Agreement but commencing no later than the execution of any Acquisition Agreement, the ~~Debtors~~Parties shall negotiate in good faith a fair and equitable allocation of the Sale Proceeds among those of the ~~US Debtors, the Canadian Debtors the EMEA Debtors and their respective affiliates, in each case,~~Parties that are participating as sellers in the Sale of each relevant Business (the "~~Participating Debtors" and the "Participating Affiliates," respectively). For greater certainty, an entity is an affiliate of the US Debtors, the Canadian Debtors or the EMEA Debtors (each, a "Debtor Group") if voting securities of the entity carrying more than 50% of the voting rights attached to all outstanding voting securities of the entity are beneficially owned, directly or indirectly, by a member or members of such Debtor Group other than where such ownership is held indirectly through a member or members of another Debtor Group.~~ Selling Parties," and together with the Committees, the Monitor, the Affiliates' FA, the "Negotiating Parties"). The Non-Filed Affiliates shall be assisted in such negotiations and all other procedures under this Protocol by the Affiliates' FA.

*Section 1.2*        If the ~~Debtors~~Negotiating Parties fail to reach an agreement regarding the allocation of Sale Proceeds prior to the thirtieth (30th) day (excluding Saturdays, Sundays and national public holidays in any of the United States, Canada or the United Kingdom) ("Business Day") immediately succeeding the execution of any Acquisition Agreement, the ~~Debtors~~Negotiating Parties shall use commercially reasonable ~~best~~ efforts to agree within an

4

additional ten (10) Business Days as to the minimum amount that would be distributed to each of the ~~Participating Debtors and their respective Participating Affiliates~~Selling Parties in any reasonable allocation scenario (the "Minimum Allocation Amount")~~; *it being understood* that, with regards to the sale of the enterprise businesses of the Nortel Group (the "Enterprise Businesses Sale"), the Debtors have agreed to the Minimum Allocation Amount set forth in the agreement dated May [•], 2009 and attached hereto as Schedule 1 (the "Enterprise Allocation Agreement")~~.  In the event that the ~~Debtors~~Negotiating Parties shall have failed to reach an agreement as to the allocation of Sales Proceeds, including as to a Minimum Allocation Amount, at the end of the forty-fifth (45th) Business Day succeeding the execution of such Acquisition Agreement (the "First DR Referral Date"), such failure to agree shall be deemed a dispute as to a fair and equitable allocation of the Sale Proceeds among the ~~Participating Debtors and Participating Affiliates~~Selling Parties (a "Basic Allocation Dispute"), which shall be automatically referred to the Dispute Resolver pursuant to this Protocol.  The Parties hereby agree that the deadlines imposed by this Section 1.2 may be extended by mutual written agreement among the relevant Negotiating Parties.  At any time prior to the First DR Referral Date, by agreement among the Negotiating Parties, any Selling Party may retain a mediator to reach an agreement as to the allocation of Sale Proceeds (the "Mediator").

    *Section 1.3*    In the event that a dispute as to the fair and equitable allocation of the Sale Proceeds shall be deemed a Basic Allocation Dispute as contemplated by Section 1.2, NNI shall be responsible for promptly sending a notice to the Dispute Resolver and the other Negotiating Parties, indicating in such notice (a) that the Negotiating Parties have failed to reach an agreement regarding the allocation of the Sale Proceeds and that such failure to reach agreement has been deemed a Basic Allocation Dispute, and (b) the First DR Referral Date.  If for any reason NNI shall fail to send such notification to the Dispute Resolver, any other Negotiating Party may undertake to send such notice to the Dispute Resolver and the other Negotiating Parties.

    *Section 1.4*    ~~Section 1.3~~ At the Closing of any Sale, the Sale Proceeds shall be placed in the Escrow Account.  If the ~~US Debtors, the Canadian Debtors and the EMEA Debtors agree on~~Negotiating Parties agree to a Minimum Allocation Amount with respect to the allocation of the Sale Proceeds, upon the Closing of such Sale, such Minimum Allocation Amount shall be released from the Escrow Account immediately following the Closing of the Sale and distributed to the ~~Participating Debtors and their respective Participating Affiliates~~Selling Parties; and any remaining amounts shall remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.  ~~With respect to the Enterprise Businesses Sale, 50% of the Sale Proceeds shall be released from the Escrow Account as the Minimum Allocation Amount, payable in accordance with the terms of the Enterprise Allocation Agreement, with the remaining 50% to remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.~~  If the ~~Debtors~~If the Negotiating Parties fail to agree on a Minimum Allocation Amount following good faith negotiations, all Sale Proceeds shall remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.

~~[NTD: Issues with respect to VAT and transfer taxes to be addressed by the Equinox acquisition documents.]~~

## ARTICLE II
## REFERRING A DISPUTE TO THE DISPUTE RESOLVER; ADDITIONAL PARTICIPATING PARTIES

*Section 2.1*        As contemplated by Section 1.2 ~~hereof~~of this Agreement, a Basic Allocation Dispute shall be automatically referred to the Dispute Resolver.  In addition, if any other dispute, controversy or claim arising out of, relating to, or in connection with the issue of allocation of the Sale Proceeds among the ~~Participating Debtors and their respective Participating Affiliates~~Selling Parties (an "Additional Dispute" and together with a Basic Allocation Dispute, a "Dispute") is not resolved on or before the Closing, then at any time after the Closing~~, such Additional Dispute shall be automatically referred to the Dispute Resolver for a decision in accordance with this Protocol.  In addition, any of the US Debtors, the Canadian Debtors and the EMEA Debtors~~ any of the Negotiating Parties may, on or at any time after the ~~first~~First DR Referral Date, refer an Additional Dispute to the Dispute Resolver for a decision in accordance with this Protocol, and such referral shall be binding ~~on all parties~~upon the Parties.  Reference of an Additional Dispute to the Dispute Resolver must be in writing with a copy to all other ~~Debtors~~Negotiating Parties.  Upon such reference, the Dispute Resolver shall notify the Negotiating Parties whether the Negotiating Parties shall be permitted to provide supplementary written materials with regards to such Additional Dispute to the Dispute Resolver.

~~Section 2.2    In light of the interests of the Monitor, the Committee and the Bondholder Group in the resolution of any Dispute, each of the Monitor, the Committee and the Bondholder Group (each an "Additional Participating Party" and collectively, the "Additional Participating Parties") shall have standing to present its position to the Dispute Resolver in the same fashion as, and subject to the same substantive and procedural obligations and limitations applicable to, any of the US Debtors, Canadian Debtors and the EMEA Debtors, as in the case of (x) the Monitor as a representative of the Canadian Debtors, (y) the Committee as a representative of the US Debtors and (z) the Bondholder Group as a representative of each of the Canadian Debtors and the US Debtors as more fully set forth herein.  The Dispute Resolver shall be instructed that, where any Additional Participating Party exercises its right to present its position, (x) in setting any restriction on length of Written Materials or Oral Arguments (in each case as herein defined) as set out in this Protocol or otherwise, and (y) any weight that he ascribes to the Presented Position of each of the US Debtors, the Canadian Debtors and the EMEA Debtors, the participation of the relevant Additional Participating Party shall be deemed to form a part of the Presented Position and~~

6

~~procedural process of the Debtor to which such Additional Participating Party is to be considered a~~

~~representative as set out in Section 2.2 above.~~

**Section 2.2**     ~~Section 2.3~~ The Dispute Resolver shall be [name of individual].  The Dispute Resolver may engage the services of [accounting firm] to assist the Dispute Resolver in resolving the Dispute.  **[NTD:  Alternatively, consider a three-member panel, with one dispute resolver appointed by each of the three estates  — to be discussed.]**

**Section 2.3**     ~~Section 2.4~~ If the Dispute Resolver is unable or unwilling to serve after receiving notice to refer the matter to the Dispute Resolver, the ~~Debtors~~Negotiating Parties shall endeavor to agree upon a replacement Dispute Resolver.  If the ~~Debtors~~Negotiating Parties are unable to agree upon a replacement Dispute Resolver within ten (10) days (including ~~Saturday~~Saturdays, Sundays and holidays) ("Days") of receiving notice that the Dispute Resolver is unable or unwilling to serve, then a replacement Dispute Resolver shall be selected from the list of agreed-upon replacement Dispute Resolvers set forth on ~~Schedule 2~~Exhibit A attached hereto and made a part hereof, as follows:  The replacement Dispute Resolver listed first on ~~Schedule 2~~Exhibit A shall serve as the Dispute Resolver unless such individual is not available to serve as and when requested, in which case the replacement Dispute Resolver listed next on ~~Schedule 2~~Exhibit A shall serve as the Dispute Resolver unless such individual is not available to serve as and when requested, and so on in like fashion through the list of replacement Dispute Resolvers set forth on ~~Schedule 2~~Exhibit A in the order listed.

**Section 2.4**     ~~Section 2.5~~ In connection with a particular Sale, all costs and expenses of the Mediator (if any), the Dispute Resolver and the Affiliates' FA shall be paid from the Escrow Account before allocation in accordance with Section 7.8; each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors shall bear its respective costs and expenses, including attorneys' fees, associated with the preparation and presentation of its case to the Dispute Resolver, it being understood that such expenses shall be borne only by such of the US Debtors, the Canadian Debtors and the EMEA Debtors as are Participating Debtors and their respective Participating Affiliates; and each Additional Participating Party~~Negotiating Parties (other than the Affiliates' FA) shall bear its respective costs and expenses, including attorneys' fees, associated with the preparation and presentation of its case to the Dispute Resolver.

**Section 2.5**     For avoidance of doubt, in rendering any Decision (as defined below) and Allocation (as defined below) in such Decision, the Dispute Resolver shall (i) treat as final and binding any Minimum Allocation Amount and any other partial allocation of Sale Proceeds that the Selling Parties have agreed to in respect of a particular Sale, and (ii) not be bound to adopt or follow (x) any allocation agreed with the Buyer in or pursuant to the relevant Acquisition Agreement, or (y) any previous Decision or Allocation of the Dispute Resolver relating to another Sale.

**Section 2.6**     ~~For the purposes of any Dispute, no prior agreement between any of the Debtors or resolution by a Dispute Resolver, in each case under (x) this Protocol, (y) the Enterprise Allocation Agreement or (z) any other sale allocation agreement between the Debtors since the Filing Date, as to percentage, as to methodology or as to allocation ("Debtors' Prior Allocation Agreement") shall be considered relevant, and accordingly (x) no Debtor or Additional~~

7

[New York #2068820 v1]

~~Participating Party may make reference to such Debtors' Prior Allocation Agreement in its written materials or its Oral Arguments or otherwise in connection with its Presented Position or the Dispute generally and (y) the Dispute Resolver shall be instructed that, to the extent that he is otherwise aware of a Debtors' Prior Allocation Agreement, he shall not have any regard to it in rendering his Decision under this Protocol.~~ It is further understood and agreed that it is not the intention of the Parties that submissions to the Dispute Resolver (including Written Materials and Oral Argument (each as defined below)) of any Party be used to reopen or seek reconsideration of or compensation or credit for any matter that previously was expressly agreed by the Parties in connection with their entering into any Acquisition Agreement or the Interim Funding Agreement.

~~Section 2.7    For the purposes of any Dispute, any sale proceeds allocation agreement between any of the Debtors and any Buyer set out in the relevant purchase or relating agreements ("Purchase Agreement Allocation") may be considered relevant, but shall not be considered determinative nor shall be taken to be evidence of the agreement of all of the Debtors to such Purchase Agreement Allocation, and accordingly (x) any Debtor or Additional Participating Party may make reference to such Purchase Agreement Allocation in its written materials and its Oral Argument and otherwise in connection with its Presented Position and the Dispute generally but (y) the Dispute Resolver shall be instructed not to consider such Purchase Agreement Allocation as so determinative or as such evidence.~~

### ARTICLE III
### ADMINISTRATIVE MEETINGS

*Section 3.1*        Within seven (7) Days of a matter being referred to the Dispute Resolver, the ~~US Debtors, the Canadian Debtors, the EMEA Debtors~~Negotiating Parties and the Dispute Resolver ~~(and any Additional Participating Party)~~ shall hold a meeting to discuss administrative matters (the "Administrative Meeting")~~. Each of the US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~, which shall be convened by the Dispute Resolver. Each of the Negotiating Parties must be given the opportunity to be present at the Administrative Meeting. The Administrative Meeting shall be held by telephone, videoconference or in person, as decided by the Dispute Resolver. At the Administrative Meeting, the Dispute Resolver may, subject to the schedule for dispute resolution provided for in this Protocol, confirm the procedure and manner in which the settlement of the Dispute shall be conducted, including, but not limited to, the due date for written submissions, establish the time and place of oral argument and address other administrative matters. At the Administrative Meeting and at any other proceeding before the Dispute Resolver, each of the Negotiating Parties shall be entitled to be represented by counsel.

[New York #2068820 v1]

*Section 3.2*          Nothing in the preceding section shall affect the right of the Dispute Resolver to call other meetings to discuss administrative matters after the seven (7) Days following a matter being referred to the Dispute Resolver.

<div align="center">

**ARTICLE IV**
**WRITTEN MATERIALS**

</div>

*Section 4.1*          The materials that may be submitted to the Dispute Resolver by ~~each of the US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party) include~~<u>NNL (on behalf of any Selling Parties that are Canadian Debtors), NNI (on behalf of any Selling Parties that are US Debtors), NNUK (on behalf of any Selling Parties that are EMEA Debtors), the Affiliates' FA (on behalf of any Selling Parties that are Non-Filed Affiliates), the Monitor, the Creditors' Committee and the Bondholders' Committee (collectively, the "Filing Parties") shall be limited to</u> the following (collectively, the "<u>Written Materials</u>"): a brief consisting of no more than [fifty (50)] single-sided, double-spaced pages in Times New Roman twelve-point font, with one inch margins (the "<u>Brief</u>")~~:~~<u>,</u> and any exhibits in support of the Brief.

*Section 4.2*          Each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~<u>Filing Parties</u> in its respective Brief shall present its position (the "<u>Presented Position</u>") on which, if any, of the following valuation methodologies should be applied, and how it should be applied, in allocating the Sale Proceeds among the ~~Debtors and their respective Participating Affiliates~~<u>Selling Parties</u>: (i) asset-based valuation; (ii) revenue-based valuation; or (iii) transfer pricing methodology.  The Presented Position may also address any allocation advanced by a Buyer in the Acquisition Agreement~~, subject to the provisions of Section 2.7.~~<u>.</u>  The Presented Position in the Brief may also advocate for the application of a valuation methodology not listed ~~herein~~<u>in this Section 4.2</u> (and the fact that any such valuation methodology is not listed ~~herein~~<u>in this Section 4.2</u> shall not be construed as a presumption that such methodology is any less valid than those valuation methodologies listed herein).

*Section 4.3*          The Written Materials shall not contain any expert witness affidavits or declarations.

*Section 4.4*          Each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~<u>Filing Parties</u> shall submit a first round of Written Materials to the Dispute Resolver, with a copy to all other ~~Debtors (and any Additional Participating Party)~~<u>Filing Parties</u>, no more than thirty (30) Days after a matter is referred to the Dispute Resolver (the "<u>First Round Submission Deadline</u>").

*Section 4.5*          Each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~<u>Filing Parties</u> shall submit a second round of Written Materials to the Dispute Resolver, with a copy to all other ~~Debtors (and any Additional Participating Party)~~<u>Filing Parties</u>, no more than thirty (30) Days after the First Round Submission Deadline (the "<u>Second Round Submission Deadline</u>").

## ARTICLE V
## ACCESS TO INFORMATION

*Section 5.1*      Commencing as early as the start of the negotiations for the Sale of a Business but in any event no later than the date of entering into the Acquisition Agreement, each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~Filing Parties shall have equal access to the Data Room, in the same manner as was provided to the Buyer.

*Section 5.2*      Each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~Filing Parties may following the ~~signature~~execution of the Acquisition Agreement, send a written request to the Company, with a copy to all other ~~Debtors (and any Additional Participating Party)~~Filing Parties, for access to information concerning the Company not contained in the Data Room.  Subject to Section 5.3, the Company shall undertake commercially reasonable efforts to make such information available (to the extent such information exists or is readily obtainable) to each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party) within~~Filing Parties as soon as reasonably practicable.

*Section 5.3*      Each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~Filing Parties may, within five (5) Days of the First Round Submission Deadline, send a written request to the Company, with a copy to all other ~~Debtors (and any Additional Participating Party)~~Filing Parties, for access to information concerning the Company not contained in the Data Room and not otherwise previously made available to the ~~Debtors (and any Additional Participating Party)~~Filing Parties by the Company.  The Company shall undertake commercially reasonable efforts to make such information available (to the extent such information exists or is readily obtainable) to each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party) as soon as reasonably practicable and in any event no later than within ten (10) Days of~~Filing Parties as soon as reasonable practicable after receiving such request.

*Section 5.4*      The Dispute Resolver may, within ten (10) Days of the Second Round Submission Deadline, send a written request to the Company, with a copy to each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~Filing Parties, for access to information concerning the Company not contained in the Written Materials.  The Company shall undertake commercially reasonable efforts to make such information available (to the extent such information exists or is readily obtainable) to the Dispute Resolver and each of the ~~US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~Filing Parties as soon as reasonably practicable ~~and in any event no later than within ten (10) Days of~~after receiving such request.

## ARTICLE VI
## ORAL ARGUMENT

*Section 6.1*      The Dispute Resolver shall hold a proceeding where ~~the US Debtors, the Canadian Debtors and the EMEA Debtors (and any Additional Participating Party)~~each of the

10

Filing Parties may orally present argument in favor of their Presented Position (the "Oral Argument").

      *Section 6.2*      Oral Argument shall be held at a time and place specified by the Dispute Resolver, but in no event before thirty (30) Days or after sixty (60) Days of the Second Round Submission Deadline. Oral Argument shall be held in person or by videoconference, as decided by the Dispute Resolver.

      *Section 6.3*      No ~~Debtor~~Filing Party shall be permitted to present expert witness testimony during the Oral Argument.

## ARTICLE VII
## THE DECISION OF THE DISPUTE RESOLVER

      *Section 7.1*      The Dispute Resolver shall render a written decision (the "Decision") within sixty (60) Days of the Oral Argument.

      *Section 7.2*      The Decision shall contain: (a) the percentage of the Sale Proceeds to be allocated to each of the ~~Participating Debtors and their respective Participating Affiliates~~Selling Parties (the "Allocation"); and (b) instructions to the Escrow Agent to distribute the Sale Proceeds to the ~~Participating Debtors and their respective Participating Affiliates~~Selling Parties in accordance with the Allocation. The Decision shall not contain the reasoning behind the Allocation.

      *Section 7.3*      ~~For the avoidance of doubt, in~~In rendering the Decision and the Allocation contained therein, the Dispute Resolver ~~is~~shall not be bound to select one of the Presented Positions.

      *Section 7.4*      The Dispute Resolver shall render the Decision and the Allocation contained ~~therein~~in such Decision on the basis of his or her reasoned expert judgment and not on the basis of any national, federal, state or provincial law.

      *Section 7.5*      If the ~~US Debtors, the Canadian Debtors and the EMEA Debtors~~Negotiating Parties agree at any point in time prior to the relevant Decision as to the Allocation of any ~~Portion~~portion of the relevant Sale Proceeds, then the Dispute Resolver shall render a Decision only with respect to the allocation of the remaining portion of the Sale Proceeds~~. For the avoidance of doubt, the Decision shall only have effect in relation to the Sale Proceeds in the Escrow Account, and in no event shall an Allocation or a Decision affect the prior distribution of any Minimum Allocation Amount, or give any of the Debtors or any Additional Participating Party any claim thereover~~.

      *Section 7.6*      The Decision of the Dispute Resolver shall be conclusive, final and binding upon ~~the each of the US Debtors, the Canadian Debtors and the EMEA Debtors, and upon each of the Monitor, the Committee and the Bondholder Group (whether or not any of the foregoing participated as an Additional Participating Party)~~each of the Negotiating Parties and may not be challenged or appealed ~~except in the case of willful misconduct~~.

*Section 7.7*     The Decision of the Dispute Resolver shall not be deemed an arbitral award enforceable under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ~~or any of the applicable laws, rules or regulations of the United States and/or the individual States, including but not limited to the laws, rules or regulations of the State of New York~~.

*Section 7.8*     ~~For the avoidance of doubt, the~~The Sale Proceeds shall be allocated in accordance with the Allocation by the Escrow Agent after the Decision is rendered without the need for an order from any of the Courts.

~~Section 7.9     Without prejudice to Sections 2.6 and 2.7, the Dispute Resolver's decision as~~

~~to the percentage of the Sale Proceeds to be allocated to each of the Participating Debtors and their~~

~~respective Participating Affiliates with respect to the sale of any one Business shall not be~~

~~determinative of, or binding as to, or in any other way be relevant to or admissible with respect to~~

~~the percentage of the Sale Proceeds to be allocated to each of the Participating Debtors and their~~

~~Participating Affiliates with respect to the sale of any other Business.~~

# ARTICLE VIII
## CONFIDENTIALITY

*Section 8.1*     Except as may be required by applicable law or court order or by an authority having appropriate jurisdiction, each ~~of the US Debtors, the Canadian Debtors and the EMEA Debtors, and each of the Monitor, the Committee and the Bondholder Group,~~Party agrees (i) to maintain confidentiality as to all aspects of these procedures, including, without limitation, the presentation of any issue to the Dispute Resolver, any discussions, deliberations, proceedings or results of the dispute resolution procedure set forth in this Protocol, any Written Materials or Oral Arguments, or any Decisions produced by these proceedings (the "Confidential Material") and (ii) not to use any Confidential Material for its own benefit or the benefit of any of its affiliates, *it being understood* that the Company may disclose the existence and nature of this Protocol and the dispute resolution procedure conducted hereunder as may be necessary to (x) satisfy the Condition or (y) comply with the applicable laws, including, without limitation, the U.S. federal or state or Canadian federal or provincial securities laws.

*Section 8.2*     In the event that a ~~Debtor or any of the Monitor, the Committee or the Bondholder Group~~Party is served with or otherwise subject to legal process (including subpoena or discovery notice) requiring it to testify about, to produce, or otherwise to divulge Confidential Material, to the extent permitted by law such entity subject to such process will as soon as practicable inform the provider(s) of such Confidential Material so that the provider may seek a protective order or other remedy. In the event that such protective order or other remedy has not been obtained and such entity is advised, in the opinion of counsel, that it is legally compelled to disclose any of the Confidential Material, such entity may disclose only such Confidential Material so advised to be disclosed.

*Section 8.3*   The ~~US Debtors, the Canadian Debtors and the EMEA Debtors, and each of the Monitor, the Committee and the Bondholder Group.~~Parties further agree to obtain the Dispute Resolver's agreement to preserve the confidentiality of the dispute resolution procedure conducted under this Protocol.

*Section 8.4*       Nothing herein shall prevent any ~~party~~Party from disclosing information regarding the dispute resolution procedure conducted under this Protocol for purposes of proceedings to resolve any disputes arising from ~~or~~, relating to or in connection with the enforcement or implementation of this Protocol.

~~Section 8.5~~ *Section 8.5* Nothing herein shall prevent any of the EMEA ~~Filed~~Debtors from ~~(x)~~ disclosing ~~Confidential Material~~ to any Nortel Group creditor or group thereof, where a legally binding confidentiality ~~provision~~agreement, satisfactory to all of the other Debtors, has been agreed with such party or parties, (x) Confidential Material or (y) ~~disclosing~~ the existence and substance of this Protocol ~~to any creditor or group thereof.~~ **[NTD:  To be discussed]**

## ARTICLE IX
## MISCELLANEOUS

*Section 9.1*       While a matter is before the Dispute Resolver, there shall be no communications between the Dispute Resolver and a ~~Debtor (or any Additional Participating~~ Party) unless all other ~~Debtors (and any Additional Participating Party)~~Parties are given the opportunity to be present during such communication.  For the avoidance of doubt, written communication (whether transmitted by email, facsimile, or post) between the Dispute Resolver and a ~~Debtor (or any Additional Participating~~ Party) must also be transmitted contemporaneously to all other ~~Debtors (and any Additional Participating Party)~~Parties.

*Section 9.2*       All notices, requests, instructions, directions and other communications provided for herein shall be given made in writing (including by facsimile) delivered to the intended recipient as follows:

**If to the US Debtors:**
c/o Nortel Networks Inc.
Attention: Gordon A. Davies, Esq.
        Chief Legal Officer
Address: [●]2221 Lakeside Boulevard
        Richardson, Texas 75082
        U.S.A.
Facsimile No.: [●]+1 905 863 8386
Telephone No.: [●]
+1 905 863 7000

**If to the Canadian Debtors:**
c/o Nortel Networks Limited
Attention: Gordon A. Davies, Esq.
        Chief Legal Officer
Address: [●]195 The West Mall

~~If~~With a copy ~~to the Monitor:~~
Cleary Gottlieb Steen & Hamilton LLP
Attention: [●]James L. Bromley, Esq.
Address: [●]One Liberty Plaza
        New York, New York 10006
        U.S.A.
Facsimile No.: [●]+1 212 225 3999
Telephone No.: [●]+1 212 225 2163

~~If to the Committee:~~
With a copy to:
Ogilvy Renault LLP
Attention: [●]Derrick Tay, Esq.
Address: [●]Suite 3800
        Royal Bank Plaza, South Tower

13

Toronto, Ontario M9C 5K1
Canada
Facsimile No.: [•]+1 905 863 8386
Telephone No.: [•]
+1 905 863 1144

**If to the EMEA Debtors:**
c/o Nortel Networks UK Limited

c/o Ernst & Young LLP
Attention: [•]Alan Bloom
Address: [•]One More London Place
London SE1 2AF
United Kingdom
Facsimile No.: [•]+44 (0) 20 7951 1345
Telephone No.: [•]+44 (0) 20 7951 9898

**If to the Monitor:**
c/o Ernst & Young, Inc.
Attention: Murray A. McDonald
Address: Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON M5K 1J7
Canada
Facsimile No.: +1 416 943 3300
Telephone No.: +1 416 943 3016

**If to the Creditors' Committee:**
c/o Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara, Esq.
Address: One Bryant Park
New York, New York 10036
U.S.A.
Facsimile No.: +1 212 872 1002
Telephone No.: +1 212 872 8040

200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4
Canada
Facsimile No.: [•]+1 416 216 3930
Telephone No.: [•]+1 416 216 3939

IfWith a copy to the Bondholder Group:
Herbert Smith LLP
Attention: [•]Stephen Gale, Esq.
Address: [•]Exchange House
Primrose Street
London EC2A 2HS
United Kingdom
Facsimile No.: [•]+44 (0) 20 7098 4878
Telephone No.: [•]+44 (0) 20 7466 2878

**With a copy to:**
Goodmans LLP
Attention: Jay Carfagnini, Esq.
Address: 250 Yonge Street, Suite 2400
Toronto, Ontario M5B 2M6
Canada
Facsimile No.: +1 416 979 1234
Telephone No.: +1 416 597 4107

**If to the Bondholders' Committee:**
c/o Milbank, Tweed, Hadley & McCloy LLP
Attention: Albert A. Pisa, Esq.
Address: One Chase Manhattan Plaza
New York, New York 10005-1413
U.S.A.
Facsimile No.: +1 212 530 5219
Telephone No.: +1 212 530 5319

All notices, requests, instructions, directions and other communications to be sent under this Protocol to the Non-Filed Affiliates shall be made in writing (including by facsimile) and delivered to the contact addresses or facsimile numbers set forth in Schedule 4 hereto.

*Section 9.3* Each of the US Debtors, the Canadian Debtors, the EMEA Debtors, each of the Monitor, the Committee and the Bondholder Group and the Company agree that thisThis Protocol shall be governed exclusively by the laws of the State of New York without regard to the

rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 9.4 shall be governed exclusively by English law.

[To the fullest extent permitted by applicable law, each ~~party~~Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the ~~Cross-Border~~cross-border Protocol adopted by such ~~Court~~Courts, as it may be in effect from time to time (the "Cross-Border Protocol")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Protocol, (ii) agrees that any claim, action or proceeding by such ~~party~~Party seeking any relief whatsoever to the extent relating to the matters agreed in this Protocol ~~may~~must be ~~brought in the US Court and the Canadian Court~~commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law~~. In the event any provision of this Protocol is held to be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions shall not be affected or impaired thereby~~; *provided, however,* that any claim, action or proceeding set forth in Section 9.4 of this Protocol shall be brought exclusively in the English courts.]

*Section 9.4*        The Parties agree that the Joint Administrators have negotiated and are entering into this Protocol as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Protocol or under or in relation to any associated arrangements or negotiations. The Joint Administrators are a Party to this Protocol: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Protocol. Notwithstanding anything in Section 9.3, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Protocol shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

*Section 9.5*        ~~Section 9.4~~ This Protocol is not intended to, and shall not, create rights in any person or entity not a party hereto.

*Section 9.6*        ~~Section 9.5~~ Without prejudice to the provisions of Section ~~9.6~~9.7 below, other parties may be added to this Protocol only with the prior unanimous written consent of all ~~parties~~Parties hereto, which consent shall not unreasonably be withheld.

*Section 9.7*        ~~Section 9.6~~ [The ~~parties~~Parties agree that, if within fourteen days of the date hereof, ~~the French Debtors~~NNSA so ~~request~~requests in writing, they shall each enter into an accession agreement with ~~the French Debtors~~NNSA whereby ~~the French Debtors~~NNSA shall accede to this Protocol as if a party to this Protocol from the date hereof (the "~~French~~NNSA Accession"); *provided further*, that if ~~French~~NNSA Accession does not take place, in the allocation of any Sale Proceeds to the EMEA Debtors pursuant to this Protocol, the amount allocated to ~~the French Debtors~~NNSA in the Acquisition Agreement as purchase price consideration shall be deemed to be ~~the French Debtors'~~NNSA's allocation and shall be deducted from any allocation otherwise to be made to the EMEA Debtors.] **[TBD]**

*Section 9.8*        ~~Section 9.7~~ This Protocol may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the party who signed the counterpart and all of which together shall constitute a single agreement.

*Section 9.9*        ~~Section 9.8~~ This Protocol constitutes the complete agreement among the ~~US Debtors, the Canadian Debtors, the EMEA Debtors, the Monitor, the Committee and the Bondholder Group~~Parties with respect to the subject matter herein, and supersedes all other agreements among the ~~US Debtors, the Canadian Debtors, the EMEA Debtors, the Monitor, the Committee and the Bondholder Group~~Parties with respect to the subject matter herein.  This Protocol may ~~not be amended, supplemented or modified except by a written instrument executed by the all remaining parties~~be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all the remaining Parties to this Protocol, which amendments, if material in the judgment of the Parties, must be approved by each of the Canadian Court and the US Court.

*Section 9.10*        ~~Section 9.9~~ This Protocol does not affect the confidentiality of any information exchanged between or among any of the ~~US Debtors, the Canadian Debtors, the EMEA Debtors, the Monitor, the Committee and the Bondholder Group~~Parties pursuant to any prior agreements or understandings.

*Section 9.11*        ~~Section 9.10~~ This Protocol shall inure to the benefit of, and shall be binding upon, each ~~party~~Party and its respective agents, successors and assigns from the date of its execution, but is expressly subject to and contingent upon its approval and entry by the US and Canadian Courts.

*Section 9.12*        ~~Section 9.11~~ ~~If~~No provision of this Protocol ~~is not~~shall be effective until each of the US Court and the Canadian Court has approved this Protocol and ~~adopted by the US and Canadian Courts, it shall be of no further force and effect~~all of the provisions hereof (the "Condition").  Each ~~of the US Debtors and the Canadian Debtors~~Party to this Protocol shall (a) use ~~all~~commercially reasonable ~~best~~ efforts to satisfy the Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Protocol~~.~~; (b) keep ~~the EMEA Debtors~~all other Parties reasonably apprised of the progress of the satisfaction of the Condition and provide such other information regarding the satisfaction of the Condition ~~on a~~

16

timely basis as reasonably requested by the EMEA Debtors.other Parties; and (c) use allcommercially reasonable best efforts to allow any EMEA Debtorother Party, which so requests in writing to participatereasonable participation in connection with any proceedings in the US Court and/or the Canadianany Court related to the satisfaction of the Condition.

Section 9.13       Subject to satisfaction of the Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof: (a) it has the power and authority to enter into this Protocol and to carry out its obligations hereunder; (b) the execution of this Protocol, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Protocol; and (c) this Protocol has been duly executed by it and constitutes its legal, valid and binding obligations.

Section 9.14       In the event that any provision of this Protocol shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Protocol found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

Section 9.15       Except as specifically set forth in this Protocol, the obligations of each Party hereunder are several, and not joint and several.

Section 9.16       If any of the Parties, the Mediator, the Affiliates' FA or the Dispute Resolver shall have an obligation or deadline imposed pursuant to this Protocol that shall fall on any of a Saturday, Sunday or a national public holiday in any of the United States, Canada or the United Kingdom, such Party shall have until the next Business Day immediately following such day to comply with such deadline or obligation.

IN WITNESS WHEREOF, the Parties hereto have caused this Protocol to be duly executed and delivered as of this [●]th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By _____
    Name:
    Title:

NORTEL NETWORKS GLOBAL CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS INTERNATIONAL CORPORATION

By _____
    Name:
    Title:

NORTEL NETWORKS TECHNOLOGY CORPORATION

By _____
    Name:
    Title:

**Signature page to Protocol**

NORTEL NETWORKS INC.

By _____
    Name:
    Title:


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name:
    Title:


CORETEK, INC.

By _____
    Name:
    Title:


NORTEL ALTSYSTEMS, INC.

By _____
    Name:
    Title:


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name:
    Title:


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name:
    Title:

**Signature page to Protocol**

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
        Name:
        Title:

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
        Name:
        Title:

NORTEL NETWORKS HPOCS INC.

By _____
        Name:
        Title:

NORTEL NETWORKS
INTERNATIONAL INC.

By _____
        Name:
        Title:

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
        Name:
        Title:

**Signature page to Protocol**

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name:
    Title:


QTERA CORPORATION


By _____
    Name:
    Title:


SONOMA SYSTEMS


By _____
    Name:
    Title:


XROS, INC.


By _____
    Name:
    Title:

**Signature page to Protocol**

Signed by ALAN BLOOM on behalf of each of
the Joint Administrators of each of the EMEA
Debtors over which they have been appointed,
without personal liability as provided in Section
9.4 of this Protocol and solely for the purpose of
obtaining the benefit of the provisions of this
Protocol expressed to be conferred on or given to
each of the Joint Administrators

By _____

     Name:
     Title:

in the presence of:

Witness Signature

_____
     Name:
     Address:


**SIGNED** for and on behalf of **NORTEL**   )
**NETWORK UK LIMITED (IN**     )    **ALAN BLOOM**
**ADMINISTRATION)**        )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal     )
liability) in the presence of:        )


Witness signature:


Name:
Address:

[New York #2068820 v1]

**SIGNED** for and on behalf of **NORTEL     )**
**NETWORKS (IRELAND) LIMITED        )        ALAN BLOOM**
**(IN ADMINISTRATION)                        )**
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal        )
liability) in the presence of:                     )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL     )**
**NETWORKS NV (IN                          )        ALAN BLOOM**
**ADMINISTRATION)                            )**
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal        )
liability) in the presence of:                     )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL     )**
**NETWORKS SPA (IN                          )        ALAN BLOOM**
**ADMINISTRATION)                            )**
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal        )
liability) in the presence of:                     )

Witness signature:

Name:

**Signature page to Protocol**

Address:

SIGNED for and on behalf of **NORTEL** )
**NETWORKS BV (IN** )       **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

SIGNED for and on behalf of **NORTEL** )
**NETWORKS POLSKA SP Z.O.O. (IN** )       **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

SIGNED for and on behalf of **NORTEL** )
**NETWORKS HISPANIA SA (IN** )       **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:

**Signature page to Protocol**

Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS (AUSTRIA) GMBH (IN** ) **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS SRO (IN** ) **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS ENGINEERING** )
**SERVICES KFT (IN** ) **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS PORTUGAL SA (IN** )        **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS SLOVENSKO SRO (IN** )        **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS ROMANIA SRL (IN** )        **ALAN BLOOM**
**ADMINISTRATION)** )
by **ALAN BLOOM** as Joint Administrator )
(acting as agent and without personal )
liability) in the presence of: )

Witness signature:

Name:

**Signature page to Protocol**

Address:

| | |
|---|---|
| **SIGNED** for and on behalf of **NORTEL** ) | |
| **GMBH (IN ADMINISTRATION)** ) | **ALAN BLOOM** |
| by **ALAN BLOOM** as Joint Administrator ) | |
| (acting as agent and without personal ) | |
| liability) in the presence of: ) | |

Witness signature:


Name:
Address:


| | |
|---|---|
| **SIGNED** for and on behalf of **NORTEL** ) | |
| **NETWORKS OY (IN** ) | **ALAN BLOOM** |
| **ADMINISTRATION)** ) | |
| by **ALAN BLOOM** as Joint Administrator ) | |
| (acting as agent and without personal ) | |
| liability) in the presence of: ) | |

Witness signature:


Name:
Address:


| | |
|---|---|
| **SIGNED** for and on behalf of **NORTEL** ) | |
| **NETWORKS AB (IN** ) | **ALAN BLOOM** |
| **ADMINISTRATION)** ) | |
| by **ALAN BLOOM** as Joint Administrator ) | |
| (acting as agent and without personal ) | |
| liability) in the presence of: ) | |

Witness signature:


Name:
Address:


**Signature page to Protocol**

[New York #2068820 v1]

**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS INTERNATIONAL**           )        **ALAN BLOOM**
**FINANCE AND HOLDING BV (IN**       )
**ADMINISTRATION)**                  )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal      )
liability) in the presence of:            )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS FRANCE S.A.S. (IN**       )        **ALAN BLOOM**
**ADMINISTRATION)**                  )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal      )
liability) in the presence of:            )

Witness signature:

**Signature page to Protocol**

SO STIPULATED, ACKNOWLEDGED AND AGREED:

Date: May [•], 2009

NORTEL NETWORKS CORPORATION,
on behalf of itself and the other Canadian
Debtors

By
Name:
Title:

NORTEL NETWORKS INC., on behalf of
itself and the other US Debtors

By
Name:
Title:

Signed by ALAN BLOOM as joint
administrator on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this agreement expressed
to be conferred on or given to the Joint
Administrators

By
Name:
Title:

Name:
Address:

[NOTE: ~~Herbert Smith to add signature blocks for each EMEA Filed Debtor and EMEA Non-Filed Entity, including the Joint Israeli Administrators, and to confirm any procedural requirements as to authorization/execution.~~ Additional signature blocks to be added for the Monitor, the <u>Creditors'</u> Committee<u>, the Bondholders' Committee,</u> and the ~~Bondholder Group.~~]

[New York #2068820 v1]

**Non-Filed Affiliates]**

**Signature page to Protocol**

## SCHEDULE 1

[~~*Note to draft*: Agreement dated May [●], 2009 as to the Minimum Allocation of Sale Proceeds from the Enterprise Businesses Sale to be attached.~~]

### <u>Canadian Debtors</u>

<u>Nortel Networks Corporation</u>

<u>Nortel Networks Limited</u>

<u>Nortel Networks Global Corporation</u>

<u>Nortel Networks International Corporation</u>

<u>Nortel Networks Technology Corporation</u>

[New York #2068820 v1]

## SCHEDULE 2

### US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

[New York #2068820 v1]

**SCHEDULE 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

[New York #2068820 v1]

## SCHEDULE 4
### Names of Non-Filed Affiliates
### and Notice Information

[New York #2068820 v1]

**<u>EXHIBIT A</u>**

[*Note to draft*:  Insert list of agreed-upon replacement Dispute Resolvers.]

[New York #2068820 v1]

Document comparison by Workshare Professional on 15 June 2009 09:57:46

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://LN-WORKSITE/London_10/21126873/1 |
| Description | #21126873v1<London_10> - Protocol - Exhibit A to PPA - May 4.DOC |
| Document 2 ID | interwovenSite://LN-WORKSITE/London_10/21126741/1 |
| Description | #21126741v1<London_10> - Allocation Protocol (Cleary draft rec'd 14 June 2009).DOC |
| Rendering set | HS_Colour |

| Legend: | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| *Moved from* | |
| *Moved to* | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

## Mendoza, Richard

| | |
|---|---|
| **From:** | Ellis, Ryan |
| **Sent:** | 27 July 2009 15:15 |
| **To:** | 'smalik@cgsh.com'; 'fhodara@AkinGump.com'; 'alex.macfarlane@fmc-law.com'; 'APisa@milbank.com'; 'Brent.R.Beekenkamp@ca.ey.com'; 'dtay@ogilvyrenault.com'; 'gadavies@nortel.com'; 'jcarfagnini@goodmans.ca'; 'jpasquariello@goodmans.ca'; 'Matthew.Hart@lazard.com'; 'mlang@ogilvyrenault.com'; 'orzyr@bennettjones.com'; 'rjacobs@AkinGump.com'; 'shayne.kukulowicz@fmc-law.com'; 'Tkreller@milbank.com'; 'Murray.A.McDonald@ca.ey.com'; 'Michael.Wunder@FMC-Law.com'; 'Alex.MacFarlane@FMC-Law.com'; 'Shayne.Kukulowicz@FMC-Law.com'; 'JHarris@milbank.com'; 'Orzyr@bennettjones.com'; 'ZychK@bennettjones.com'; 'jstam@ogilvyrenault.com'; 'tracyc@nortel.com'; 'dbotter@AkinGump.com'; 'plook@nortel.com'; 'jbromley@cgsh.com'; 'cbrod@cgsh.com'; 'lschweitzer@cgsh.com'; 'bsandstrom@cgsh.com'; 'Fabrice BAUMGARTNER' |
| **Cc:** | 'abloom@UK.EY.COM'; 'chill1@uk.ey.com'; 'rjowitt@uk.ey.com'; 'sharris@uk.ey.com'; 'sedel@UK.EY.COM'; GALE, STEPHEN; DAVIES, GAVIN; LLOYD, KEVIN; ELLIOTT, LAURENCE; WARD, BEN; MONTGOMERY, ALAN; Whiteoak, John; Segger, Joanne; BASUYAUX, BRUNO |

**Subject:** FW: Allocation Protocol

Dear Sanjeet,

Here are the JA's high level points on the draft Protocol (and subject to more detailed mark-up comments), for when the group discusses that document. What do you think the likely timing of engagement on this will be? We assume that timing is being driven by the earliest date that M&A proceeds are received, which presumably would be on closing of the Zenith /CDMA transaction?

### 1.   Agreement

1.1        The Protocol should be conditioned on the necessary court approvals being obtained from both the US and Canadian Courts, with the appropriate efforts standards (and creditor support) to such applications, consistent with the approach taken with the IFSA.

1.2        The Joint Administrators will likely seek a direction from the English Court that they be at liberty to enter into the Protocol.

1.3        The Protocol needs to be clear on its face that the Protocol constitutes the binding dispute resolution methodology for the allocation of proceeds for each M&A deal and that no further recourse is available to any Court (except as set out in paragraph 4.7 below).

1.4        Can you please circulate a pro-forma of the Escrow Agreement to be used on each M&A deal (including Zenith / CDMA, where the EMEA Estate participates through Section 11.d. of the IFSA). We expect that this document will be a fairly standard document, where no pay-out is allowed from the account without the unanimous approval of each of the Selling (or in the case of Section 11, deemed selling) Parties, to be held by an independent escrow agent, with any pay-out to be free of any set off or other claim between any of the parties.

### 2.        Parties and roles

2.1        There should not be a Fourth Estate comprising the Non Filed entities. Each of the Non-Filed entities should be represented by their parent in the relevant US, Canadian or EMEA estates (as has been the practice with the EMEA Non-Filed entities to date).

2.2        There should only be three parties to the negotiation and Dispute Resolver process: the US, Canadian and EMEA Estates. We acknowledge that behind the US and Canadian Estates stand the Monitor, the Bonds and the UCC. However, any representations that these entities wish to make should be coordinated through the relevant Estates (as is the case with the EMEA creditors). This is consistent with and reflected in Section 12.g. of the IFSA. This point goes to the definitions of "Negotiating" and "Filing Parties" vs. "Selling Parties".

2.3        We need to include as deemed Selling Parties, non-selling entities that are participating via Section 11.d. of the IFSA.

2.4        As noted in my email to certain of you last Friday, the French Court has signed and handed down an order authorising NNSA to accede to the IFSA and therefore to participate in the Protocol

arrangements. We propose that the draft Protocol should assume the accession of NNSA and we await any comments on the form of the draft accession agreement I circulated last Friday. We note that while the court order authorises the NNSA's participation in the Protocol arrangements, we will need to confirm whether any further French Court approval may be needed in respect of the final agreed form of the Protocol.

2.5        We note the introduction of a mediator (Section 2.2). In principle, the Joint Administrators support the idea of good faith negotiations with or without a mediator during this process so as to facilitate, if possible, a negotiated solution. The Joint Administrators would therefore require that such negotiations be built into the Protocol at the end of each milestone in the DR process.

### 3.        Appointment of Dispute Resolver (DR)

3.1        The Estates are to agree the genre / discipline of the DR in advance of the nomination of individual DR. We would welcome your initial views on the genre / disciple of the DR. Once agreed, the Estates can then submit relevant individuals for consideration.

3.2        There should be only one DR and not a panel of three.

3.3        The DR should have access to such specialist / expert advice as needed to assist in reaching his or her decision.

### 4.        DR process

4.1        As mentioned above, the Monitor, Bonds and UCC should not be Filing Parties with rights to present written materials and oral arguments, but should coordinate their representation through their relevant estates.

4.2        The draft Protocol sets out the matters that the DR cannot be bound by (2.5), we broadly agree with these. However, 2.6 should be deleted.

4.3        The Estates should not be entitled to provide oral submissions from expert witnesses. In terms of their written submissions, these submissions may only refer to one named valuation expert.

4.4        Filing should be on a fixed date, rather than within a period as proposed (4.5).

4.5        Where the Selling Parties have already agreed a partial allocation (2.5), we should clarify that the DR's allocation decision, while considering the sale proceeds as a whole, should be applied proportionately only to the proceeds that remain outstanding. So there are no refunds if there has been an overdistribution in the partial allocation, compared to the DR's allocation decision (7.5).

4.6    Whilst it is acknowledged that the DR should not reach his decision on the basis of any national, federal, state or provincial law (7.4), there may be there the need for legal determination on IP ownership issues, where the DR may not be best placed to reach a conclusion. As such, consideration needs to be given to a process by which such legal determinations can be made within the Protocol process.

4.7        As currently drafted the DR's decision is not open to challenge on any basis by any Estate or Selling Party. We should discuss potential restricted grounds upon which the DR's decision can be challenged. The obvious grounds would be fraud and "manifest error" (as that term is understood in English Law).

4.8        The DR should provide brief reasons for his / her decision.

### 5.        Other points

5.1        Section 9.3 of the draft Protocol provides that the Protocol shall be governed exclusively by the laws of the state of New York. It needs to be made clear that whilst the agreement reached in the Protocol may be governed by New York law the underlying issues that are the subject of the DR process are not governed by New York law.

5.2        There are a number of other points (e.g. usual protections for the Joint Administrators, access to information, more detailed points on timing and process) that we can deal with once we start looking at the actual drafting of the Protocol.

We look forward to discussing.

Gavin / Ryan

**Ryan Ellis**
**Associate (New Zealand), Corporate Division**

10/05/2011

Herbert Smith LLP
DD:  +44 20 7466 7565
Mob: +44 780 920 0571
e-mail: ryan.ellis@herbertsmith.com

---

**From:** Sanjeet Malik [mailto:smalik@cgsh.com]
**Sent:** 14 June 2009 00:04
**To:** fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com;
Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com;
DAVIES, GAVIN; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE;
Kois, Maria; Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com;
rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; GALE, STEPHEN; Tkreller@milbank.com;
Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com;
Shayne.Kukulowicz@FMC-Law.com; JHarris@milbank.com; Orzyr@bennettjones.com;
ZychK@bennettjones.com; jstam@ogilvyrenault.com; tracyc@nortel.com; dbotter@AkinGump.com;
plook@nortel.com
**Cc:** Craig B BROD; James L BROMLEY; Lisa M SCHWEITZER; Brian T Sandstrom
**Subject:** NT: Allocation Protocol

Dear All:

Attached is the first draft of the Allocation Protocol for your review.  Please note that this draft has not been
reviewed by our client or any other stakeholders and therefore remains subject to further internal review and
comments from other parties.

We would appreciate if you could please provide written comments to the attached draft.  In addition, we
propose to have a call to discuss this draft next week - we will circulating the details during the course of the
week.

Please feel free to call me if you have any questions or concerns.

Regards,
Sanjeet

---

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2136 | f: +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.