**If to the Canadian Debtors:**
c/o Nortel Networks Limited
Attention:  Anna Ventresca, Esq.
          Chief Legal Officer
Address: 5945 Airport Road, Suite 360
          Mississauga, Ontario L4V 1R9
          Canada
Facsimile No.:  +1 905 863 2075
Telephone No.:  +1 905 863 1204

**With a copy to:**
Ogilvy Renault LLP
Attention:  Derrick Tay, Esq. and Michael J.
Lang, Esq.
Address:  Suite 3800
          Royal Bank Plaza, South Tower
          200 Bay Street, P.O. Box 84
          Toronto, Ontario M5J 2Z4
          Canada
Facsimile No.:  +1 416 216 4832 / 216 3930
Telephone No.:  +1 416 216 4832 / 216 3939

**If to the EMEA Debtors:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
          London SE1 2AF
          United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**With a copy to:**
Herbert Smith LLP
Attention:  Stephen Gale, Esq. and Kevin Lloyd,
Esq.
Address:  Exchange House
          Primrose Street
          London EC2A 2HS
          United Kingdom
Facsimile No.: +44 (0) 20 7098 4878
Telephone No.: +44 (0) 20 7466 ~~2878~~**2271**

**If to the Monitor:**
c/o Ernst & Young, Inc.
Attention: Murray A. McDonald
Address:  Ernst & Young Tower
          222 Bay Street, P.O.  Box 251
          Toronto, ON M5K 1J7
          Canada
Facsimile No.: +1 416 943 3300
Telephone No.: +1 416 943 3016

**With a copy to:**
Goodmans LLP
Attention:  Jay Carfagnini, Esq.
Address:  250 Yonge Street, Suite 2400
          Toronto, Ontario M5B 2M6
          Canada
Facsimile No.: +1 416 979 1234
Telephone No.: +1 416 597 4107

**If to the Creditors' Committee:**
c/o Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara, Esq.
          David H. Botter, Esq.
Address:  One Bryant Park
          New York, New York 10036
          U.S.A.
Facsimile No.: +1 212 872 1002
Telephone No.: +1 212 872 8040

**If to the Bondholders' Committee:**
c/o Milbank, Tweed, Hadley & McCloy LLP
Attention: Albert A.  Pisa, Esq.
Address:  One Chase Manhattan Plaza
          New York, New York 10005-1413
          U.S.A.
Facsimile No.: +1 212 530 5219
Telephone No.: +1 212 530 5319

All notices, requests, instructions, directions and other communications to be sent under

this Protocol to the Non-Filed Affiliates shall be made in writing (including by facsimile) and delivered to the contact addresses or facsimile numbers set forth in Schedule 4 hereto.

*Section 10.3*    ~~Section 9.3 This~~**The terms of this** Protocol shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction, except to the extent that the United States Federal Arbitration Act applies, <u>provided</u> that Section ~~9.7~~**10.7** shall be governed exclusively by English law. **[HS: For the avoidance of doubt, the Parties do not agree that the underlying issues and the subject of the dispute are governed by New York law, and the Panel will determine the relevant laws pertaining to such issues.]**

*Section 10.4*    ~~Section 9.4~~ To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the exclusive jurisdiction of the [US Court and the Canadian Court (in a joint hearing conducted under the cross-border protocol adopted by such courts, as it may be in effect from time to time (the "Cross-Border Protocol"))][**HS: delete and add: federal and state courts sitting in New York County, State of New York**], for purposes of all legal proceedings arising from, relating to or in connection with the enforcement or implementation of this Protocol, including, without limitation, any matters relating to enforcement or otherwise of any Decision or Supplementary Decision, (ii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such courts or any claim that any such action brought in such courts has been brought in an inconvenient forum, (iii) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law, <u>provided</u> that any claim, action or proceeding set forth in Section ~~9.6 of this Protocol~~**10.8** shall be brought exclusively in the English courts.

*Section 10.5*    ~~Section 9.5~~ Each Party set forth on Schedule 6~~+230~~ (each such party, "Designating Party") has appointed ● as its authorized agent (the "Process Agent"), upon whom process may be served in any legal proceeding arising from, relating to or in connection with the enforcement or implementation of this Protocol. Each Designating Party consents to process being served in any legal proceeding arising from, relating to or in connection with the enforcement or implementation of this Protocol by mailing a copy thereof by registered or certified mail to the Process Agent. Each Designating Party hereby represents and warrants that the Process Agent has accepted such appointment and has agreed to act as said agent for service of process, and each Designating Party agrees to take any and all action, including the filing of any and all documents that may be necessary to continue such appointment in full force and effect as aforesaid. Service of process upon the Process Agent shall be deemed, in every respect, effective service of process upon the relevant Designating Party.

*Section 10.6*    ~~Section 9.6~~ No provision of this Protocol (other than as set forth in Sections [9.2, 9.3, 9.4, 9.6, 9.7, 9.10, 9.11, 9.15, 9.17 and 9.18] ~~of this Protocol~~) shall be

---

~~+230~~ Non-Filed Affiliates + EMEA Non-Filed entities. TBD – whether EMEA Debtors should be included in this list.

effective until the satisfaction of the following conditions: (A) each of the US Court, and the Canadian Court ~~and the UK Court~~ approve the entirety of this Protocol and all of the provisions hereof ~~(the "Conditions").~~and (B) the Joint Administrators apply to the UK Court and receive a direction from the UK Court that they are at liberty to enter into this Protocol [and it approves the entirety of this Protocol and all of the provisions hereof] (the "Conditions").[31]

> **Section 10.7** ~~Section 9.7~~ [Nothing contained in any Transaction Document, including without limitation any intellectual property license termination agreements, shall be with prejudice to (A) any right, entitlement or claim by or on behalf of NNL or any affiliate or subsidiary which licensed any intellectual property from NNL (each a "Nortel Licensee") to assert solely as (x) between NNL and any such Nortel Licensee or (y) between two or more Nortel Licensees any ownership or proprietary interest in and to the intellectual property subject to the intellectual property licenses, whether in respect of or pursuant to that certain Master Research and Development Agreement, dated as of December 22, 2004 (as amended and supplemented from time to time, the "Master R&D Agreement"), or otherwise, for the purpose of advocating such position in connection with an allocation of the Sale Proceeds resulting from the sale, license or other disposition of the intellectual property in an In-Scope Sale, or (B) the right, entitlement or claim by or on behalf of NNL or any Nortel Licensee to dispute and defend any such assertions in connection with an allocation of Sale Proceeds from an In-Scope Sale; ~~and]~~[12],][32]

> **Section 10.8** ~~Section 9.8~~ The Parties agree that the Joint Administrators have negotiated and are entering into this Protocol as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Protocol or under or in relation to any associated arrangements or negotiations.  The Joint Administrators are a Party to this Protocol:  (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Protocol.  Notwithstanding anything to the contrary in this Protocol, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Protocol shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts.[14][33]

> **Section 10.9** ~~Section 9.9~~ The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or

---

[31] Section revised by HS.

[12] ~~To be discussed~~[32] OR/G: Delete as it is beyond the scope of the Protocol and intrudes on the jurisdiction of the applicable claims resolution procedures.

[14][33] UK counsel to advice whether we need language delegating authority from NNSA to the Joint Administrators.

agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Protocol or under or in relation to any associated arrangements or negotiations. The Joint Israeli Administrators are a party to this Protocol: (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (a) obtaining the benefit of any provisions of this Protocol expressed to be conferred on them and (b) enforcing the obligations of the other Parties to this Protocol. Notwithstanding anything to the contrary in this Protocol, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents, (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the ~~Courts~~**courts** of Israel.

**Section 10.10**    ~~Section 9.10~~ Except as specifically set forth in this Protocol, this Protocol is not intended to, and shall not, create rights in any person or entity not a Party hereto.

**Section 10.11**    ~~Section 9.11~~ Other parties may be added to this Protocol only with the prior unanimous written consent of all Parties hereto, which consent shall not be unreasonably withheld.

**Section 10.12**    ~~Section 9.12~~ This Protocol may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original, shall be binding on the Party who signed the counterpart and together shall constitute a single agreement.

**Section 10.13**    ~~Section 9.13~~ This Protocol constitutes the complete agreement among the Parties with respect to the subject matter herein, and supersedes all other agreements among some or all of the Parties with respect to the subject matter herein. This Protocol may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all the remaining Parties to this Protocol, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts.

**Section 10.14**    ~~Section 9.14~~ This Protocol does not affect the confidentiality of any information exchanged between or among any of the Parties pursuant to any prior agreements or understandings.

**Section 10.15**    ~~Section 9.15~~ This Protocol shall inure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns from the date of its execution, but is expressly subject to and contingent upon its approval and entry by the Courts.

**Section 10.16**    ~~Section 9.16~~ Each Party to this Protocol shall (a) use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Protocol; (b) keep all other Parties reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and (c) use commercially reasonable efforts to allow any other Party, which so

26

requests in writing, reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

**Section 10.17**    Section 9.17 Subject to satisfaction of the Conditions, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof: (a) such Party has the power and authority to enter into this Protocol and to carry out its obligations hereunder; (b) the execution of this Protocol, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Protocol; and (c) this Protocol has been duly executed by such Party and constitutes the legal, valid and binding obligations of such Party.

**Section 10.18**    Section 9.18 In the event that any provision of this Protocol shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Protocol found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision. [Notwithstanding anything to the contrary in this Section, in the event that all or any part of Section(s) ● of this Protocol shall be found pursuant to a final order of a court or tribunal with competent jurisdiction to be illegal, invalid or unenforceable, or any part of Section(s) ● is any way struck down or modified without the consent of the Parties, this Protocol in its entirety shall automatically terminate and shall cease to have any force and effect.][34]

**Section 10.19**    Section 9.19 Except as specifically set forth in this Protocol, the obligations of each Party hereunder are several, and not joint and several.

**Section 10.20**    Section 9.20 If any of the Parties, the Experts, the Affiliates' Representative or the Panel shall have an obligation or deadline imposed pursuant to this Protocol that shall fall on any of a Saturday, Sunday or a national public holiday in any of the United States, Canada or the United Kingdom, such Party, Expert or the Panel shall have until the next Business Day immediately following such day to comply with such deadline or obligation.

**Section 10.21**    Section 9.21 The Parties agree that, if after the date hereof, any subsidiary of any US Debtor commences chapter 11 proceedings in the US Court, then the Parties and such entity shall enter into an accession agreement whereby such entity shall accede to this Protocol as a US Debtor.

**Section 10.22**    Section 9.22 The Non-Filed Affiliates hereby appoint [●] as the Affiliates' Representative and grant the Affiliates' Representative the authority to represent each

---

[34] OR/G: Is this provision intended to apply retroactively?  HS: Which provisions are intended to be non-severable?

Non-Filed Affiliate in all matters relating to this Protocol, including, without limitation, the power (a) to agree to any Partial Allocation Amount on behalf of the Non-Filed Affiliates, (b) to agree to a [fair and equitable] allocation of the Sale Proceeds pursuant to Section 1.1 or otherwise, (c) to amend or waive any provision of this Protocol, (d) to deliver and receive any notices permitted or required under this Protocol, and (e) to perform on behalf of the Non-Filed Affiliates any other act which the Affiliates' Representative deems necessary or desirable in the performance of the Affiliates' Representative's role under this Protocol. Any action taken by the Affiliates' Representative and any agreement or settlement entered into by the Affiliates' Representative on behalf of the Non-Filed Affiliates in connection with the performance of this Protocol shall be binding upon and enforceable against the Non-Filed Affiliates without any need for further ratification by the Non-Filed Affiliates. In addition, the Non-Filed Affiliates hereby grant the Affiliates' Representative the authority to select and retain one counsel and financial advisor to assist the Affiliates' Representative in connection with any proceedings or matters under this Protocol.

IN WITNESS WHEREOF, the Parties hereto have caused this Protocol to be duly executed and delivered as of this [●]th day of [●].

NORTEL NETWORKS CORPORATION

By
    Name:
    Title:

NORTEL NETWORKS LIMITED

By
    Name:
    Title:

NORTEL NETWORKS GLOBAL
CORPORATION

By
    Name:
    Title:

NORTEL NETWORKS
INTERNATIONAL CORPORATION

By
    Name:
    Title:

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By
    Name:
    Title:

**Signature page to Protocol**

NORTEL NETWORKS INC.


By
   Name:
   Title:


ARCHITEL SYSTEMS (U.S.)
CORPORATION


By
   Name:
   Title:


CORETEK, INC.


By
   Name:
   Title:


NORTEL ALTSYSTEMS, INC.


By
   Name:
   Title:


NORTEL ALTSYSTEMS
INTERNATIONAL INC.


By
   Name:
   Title:


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.


By
   Name:
   Title:

**Signature page to Protocol**

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By
    Name:
    Title:


NORTEL NETWORKS CAPITAL
CORPORATION

By
    Name:
    Title:


NORTEL NETWORKS HPOCS INC.

By
    Name:
    Title:


NORTEL NETWORKS
INTERNATIONAL INC.

By
    Name:
    Title:


NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By
    Name:
    Title:


**Signature page to Protocol**

NORTHERN TELECOM
INTERNATIONAL INC.

By
    Name:
    Title:


QTERA CORPORATION

By
    Name:
    Title:


SONOMA SYSTEMS

By
    Name:
    Title:


XROS, INC.

By
    Name:
    Title:


NORTEL NETWORKS (CALA) INC.

By
    Name:
    Title:


**Signature page to Protocol**

Signed by ALAN BLOOM on behalf of each of
the Joint Administrators of each of the EMEA
Debtors over which they have been appointed,
without personal liability as provided in Section
9.4 of this Protocol and solely for the purpose of
obtaining the benefit of the provisions of this
Protocol expressed to be conferred on or given to
each of the Joint Administrators

By                                    _____

    Name:
    Title:

in the presence of:

Witness Signature

_____

    Name:
    Address:

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **NORTEL NETWORK UK LIMITED (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of: | ) ) ) ) ) | **ALAN BLOOM** |

Witness signature:

Name:
Address:

**Signature page to Protocol**

**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS (IRELAND) LIMITED**  )    **ALAN BLOOM**
**(IN ADMINISTRATION)**  )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal  )
liability) in the presence of:  )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS NV (IN**  )    **ALAN BLOOM**
**ADMINISTRATION)**  )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal  )
liability) in the presence of:  )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**  )
**NETWORKS SPA (IN**  )    **ALAN BLOOM**
**ADMINISTRATION)**  )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal  )
liability) in the presence of:  )

Witness signature:

**Signature page to Protocol**

Name:
Address:


**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS BV (IN**   )    **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )


Witness signature:


Name:
Address:


**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS POLSKA SP Z.O.O. (IN**   )    **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )


Witness signature:


Name:
Address:


**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS HISPANIA SA (IN**   )    **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator   )
(acting as agent and without personal   )
liability) in the presence of:   )


Witness signature:

**Signature page to Protocol**

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS (AUSTRIA) GMBH (IN**   )    **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS SRO (IN**   )    **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**   )
**NETWORKS ENGINEERING**   )
**SERVICES KFT (IN**   )    **ALAN BLOOM**
**ADMINISTRATION)**   )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal   )
liability) in the presence of:   )

Witness signature:

Name:
Address:


**SIGNED** for and on behalf of **NORTEL**        )
**NETWORKS PORTUGAL SA (IN**        )        **ALAN BLOOM**
**ADMINISTRATION)**        )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal        )
liability) in the presence of:        )


Witness signature:


Name:
Address:


**SIGNED** for and on behalf of **NORTEL**        )
**NETWORKS SLOVENSKO SRO (IN**        )        **ALAN BLOOM**
**ADMINISTRATION)**        )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal        )
liability) in the presence of:        )


Witness signature:


Name:
Address:


**SIGNED** for and on behalf of **NORTEL**        )
**NETWORKS ROMANIA SRL (IN**        )        **ALAN BLOOM**
**ADMINISTRATION)**        )
by **ALAN BLOOM** as Joint Administrator  )
(acting as agent and without personal        )
liability) in the presence of:        )


**Signature page to Protocol**

Witness signature:

Name:
Address:

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **NORTEL** | ) | |
| **GMBH (IN ADMINISTRATION)** | ) | **ALAN BLOOM** |
| by **ALAN BLOOM** as Joint Administrator | ) | |
| (acting as agent and without personal | ) | |
| liability) in the presence of: | ) | |

Witness signature:

Name:
Address:

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **NORTEL** | ) | |
| **NETWORKS OY (IN** | ) | **ALAN BLOOM** |
| **ADMINISTRATION)** | ) | |
| by **ALAN BLOOM** as Joint Administrator | ) | |
| (acting as agent and without personal | ) | |
| liability) in the presence of: | ) | |

Witness signature:

Name:
Address:

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **NORTEL** | ) | |
| **NETWORKS AB (IN** | ) | **ALAN BLOOM** |
| **ADMINISTRATION)** | ) | |
| by **ALAN BLOOM** as Joint Administrator | ) | |
| (acting as agent and without personal | ) | |
| liability) in the presence of: | ) | |

**Signature page to Protocol**

Witness signature:

Name:
Address:

| **SIGNED** for and on behalf of **NORTEL** | ) | |
| **NETWORKS INTERNATIONAL** | ) | **ALAN BLOOM** |
| **FINANCE AND HOLDING BV (IN** | ) | |
| **ADMINISTRATION**) | ) | |
| by **ALAN BLOOM** as Joint Administrator | ) | |
| (acting as agent and without personal | ) | |
| liability) in the presence of: | ) | |

Witness signature:

Name:
Address:

| **SIGNED** for and on behalf of **NORTEL** | ) | | |
| **NETWORKS FRANCE S.A.S.  (IN** | | ) | **ALAN BLOOM** |
| **ADMINISTRATION**) | ) | | |
| by **ALAN BLOOM** as Joint Administrator | ) | | |
| (acting as agent and without personal | ) | | |
| liability) in the presence of: | ) | | |

Witness signature:

Name:
Address:

**Signature page to Protocol**

[NOTE: Additional signature blocks to be added for NNSA, the Monitor, the Creditors' Committee, the Bondholders' Committee, the Non-Filed Affiliates]

Signature page to Protocol

## SCHEDULE 1

### Canadian Debtors

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**SCHEDULE 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

Nortel Networks (Cala), Inc.

## SCHEDULE 3

### EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

Nortel Networks Israel (Sales and Marketing) Limited (In Administration)

**SCHEDULE 4**

**Names of Non-Filed Affiliates**

**and Notice Information**

**SCHEDULE 5**

**List of In-Scope Sales**

**SCHEDULE 6**

**Names of Respective Participating Parties**

**for each Party**

**SCHEDULE 7**

**List of Transaction Documents**

**Mendoza, Richard**

| | |
|---|---|
| **From:** | LLOYD, KEVIN |
| **Sent:** | 14 April 2010 18:53 |
| **To:** | 'irozenberg@cgsh.com' |
| **Cc:** | 'Pasquariello, Joe'; 'Lang, Michael'; 'Murray.A.McDonald@ca.ey.com'; 'cbrod@cgsh.com'; 'jbromley@cgsh.com'; 'fhodara@akingump.com'; 'dbotter@AkinGump.com'; 'Tay, Derrick C.'; 'cbrod@cgsh.com'; GALE, STEPHEN; Whiteoak, John; 'abloom@uk.ey.com'; rjowitt@uk.ey.com; 'apisa@milbank.com'; 'smalik@cgsh.com' |

**Subject:** Nortel - Allocation Protocol

Inna

Thanks for your email.

I have now had a chance to look at the comments from the Canadian Debtor and Monitor.

What I am not clear about is whether the Canadian Debtor and Monitor are still maintaining a point advanced last year namely, that EMEA (and the other estates) are unable to contend in the Allocation Hearing that they have a beneficial ownership in various assets, including most relevantly intellectual property. I thought that that point had been withdrawn because, as I had indicated, it is something that I simply could not recommend to my clients that they concede. But the way I read the recent amendments to recital 15, clause 8.1 and 10.7 is to suggest that this issue has resurfaced. It may be that all that is intended by the Canadian Debtor and the Monitor is that the allocation hearing shall not cover inter-estate claims. We are content to discuss that - Indeed I do not believe the Protocol was ever intended to extend to those type of claims, which will be dealt with in the ordinary way by the various claim processes. This of course, will still entitle the parties to argue beneficial ownership in any allocation hearing.

I hope that I have misunderstood the effect of the proposed amendments from the Canadian Debtor and the Monitor but before we finalise arrangements to travel over to New York I need to confirm this.

Hopefully, the position is as per Cleary's draft on 26 February, which we felt was a useful basis in which to progress discussions. Could either you or representatives for the Canadian Debtor and the Monitor please confirm this, ideally by return email. Subject to this, I am looking forward to seeing you next week when hopefully we will finalise the terms of the protocol.

Regards

Kevin

---

**From:** Inna Rozenberg
**To:** 'aleblanc@milbank.com' ; Alex MacFarlane ; amark@ogilvyrenault.com ; 'annav@nortel.com' ; 'apisa@milbank.com' ; Qureshi, Abid ; Kahn, Brad ; 'Brent.R.Beekenkamp@ca.ey.com' ; 'bzarnett@goodmans.ca' ; Craig B BROD ; David.Descoteaux@Lazard.com ; Botter, David ; 'dtay@ogilvyrenault.com' ; Hodara, Fred ; DAVIES, GAVIN; Giles Boothman ; Howard ZELBO ; James L BROMLEY ; 'jcarfagnini@goodmans.ca' ; jharris@milbank.com ; Segger, Joanne; Whiteoak, John; 'jpasquariello@goodmans.ca' ; 'jstam@ogilvyrenault.com' ; Sturm, Joshua ; LLOYD, KEVIN; Rowe, Kevin ; Lisa M SCHWEITZER ; 'Matthew.Hart@lazard.com' ; Michael Wunder ; 'mlang@ogilvyrenault.com' ; mnolan@milbank.com ; 'Murray.A.McDonald@ca.ey.com' ; 'Nortel' ; 'Orzyr@bennettjones.com' ; Bagon, Paul ; Jacobs, Ryan ; Pees, Robert ; 'SDrymer@ogilvyrenault.com' ; Shayne Kukulowicz ; stenai@ogilvyrenault.com ; GALE, STEPHEN; tkreller@milbank.com ; 'ZychK@bennettjones.com' ; Sanjeet Malik ; Theodore Geiger ; jravidity@earthlink.net ; Jacobs, Ryan
**Sent:** Wed Apr 07 22:01:56 2010
**Subject:** Nortel - Allocation Protocol

Dear all,

Please find attached the latest draft of the Allocation Protocol, along with a blackline against the last version circulated.

This draft incorporates comments received from Ogilvy and Goodmans (denoted as OR/G) and Herbert Smith (denoted as HS), as well as some smaller language changes that Cleary implemented.

Suggested additions to the text are bracketed and preceded by an indication of the firm making the proposal (using the initials described above). Suggested deletions to the text are bracketed, and the firm suggesting the deletion is indicated by the legend [OR/G: delete] or [HS:delete], which appears immediately following the language at issue. More substantive comments are included in the footnotes, preceded by an indication of which firm made the comment (again, using the initials).

Best regards,
Inna Rozenberg

Inna Rozenberg
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2972 | f: +1 212 225 3999
www.clearygottlieb.com | irozenberg@cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

19/05/2011

**Mendoza, Richard**

---

**From:** Howard ZELBO [mailto:hzelbo@cgsh.com]
**Sent:** 16 April 2010 12:41
**To:** LLOYD, KEVIN
**Cc:** James BROMLEY; Inna Rozenberg
**Subject:** Re: PPA

That is my understanding. Looking forward to seeing you next week. Hopefully, flights will be resumed before then.


Regards,

Howard.
--------------------------------------------------
Howard Zelbo
Cleary Gottlieb Steen & Hamilton LLP
Direct Dial: 212 -225-2452
Cell Phone: 646-642-4029
Fax: 212-225-3999
One Liberty Plaza
New York, N.Y. 10006

---

**From:** "LLOYD, KEVIN" [Kevin.Lloyd@herbertsmith.com]
**Sent:** 04/16/2010 12:23 PM CET
**To:** Howard ZELBO
**Subject:** PPA


Howard

Many thanks for your call yesterday. I have discussed the matter with my client overnight.

We assume the position of Clearys with respect to there being no limitation to argue beneficial ownership is shared by Millbank and Akin Gump? On the basis that it is, we would be prepared to attend next Wednesday. Like you, we are hoping that this will be a productive meeting and that we can actually finalise the protocol so we can move into a regime to allocate proceeds.

Regards

Kevin


This message is confidential and may be covered by legal professional privilege. If you have received this message in error please delete it and notify the sender immediately by contacting our main switchboard +44 (0)20 7374 8000; you should not retain the message or disclose its contents to anyone. Herbert Smith LLP may monitor e-mail communications in accordance with applicable law and regulations.

Herbert Smith LLP is a Limited Liability Partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation Authority of England and Wales whose rules can be accessed via www.sra.org.uk/code-of-conduct.page. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications. Herbert Smith LLP's registration number for Value Added Tax in the United Kingdom is GB 927 1996 83.

Herbert Smith LLP, Gleiss Lutz and Stibbe are three independent firms which have a formal alliance. Further information is available from www.herbertsmith.com.

This message is being sent from a law firm and may contain confidential or privileged information.  If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
:
In re:                                                    :    Chapter 11
:
NORTEL NETWORKS INC., *et al.*,[1]                        :    Case No. 09-10138 (KG)
:
Debtors.                        :    (Jointly Administered)
:
:    **Hearing date: May 10, 2011 at 9:30 a.m. (ET)**
:    **Objections due: April 15, 2011 at 4:00 p.m. (ET)**
:    **Ref. No. 5200**
:
---------------------------------------------------------- X

### THE JOINT ADMINISTRATORS' RESPONSE TO THE DEBTORS' MOTION FOR AN ORDER REQUIRING A MORE DEFINITE STATEMENT OF CLAIM AND SETTING A DEADLINE FOR THE FILING OF ANY PROOFS OF CLAIM BY THE EMEA CLAIMANTS

The court-appointed administrators and authorized foreign representatives

(collectively, the "Joint Administrators")[2] for Nortel Networks UK Limited ("NNUK") and

certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors")[3] located in the

region known as EMEA (Europe, Middle East, and Africa) in proceedings under the *Insolvency*

---

1.  The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

2.  The Administrators in the UK Proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The Administrators in the UK Proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

3.  The EMEA Debtors are:  Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Services Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding BV; Nortel Networks N.V.; Nortel Networks Oy; Nortel Networks Polska Sp. z. o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania Srl; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

*Act 1986* (the "Enɡlish Insolvency Act"), pending before the High Court of Justice of England

and Wales (the "English Court"), hereby respond (this "Response") to the motion of Nortel

Networks, Inc. ("NNI") and its affiliated debtors and debtors-in-possession (collectively, the

"U.S. Debtors") for entry of an order directing the EMEA Debtors to file a more definite

statement of their claims and setting a deadline to file any and all prepetition claims (including

any amended claims) against the U.S. Debtors by June 1, 2011. In support of this Response, the

Joint Administrators respectfully submit as follows:

## PRELIMINARY STATEMENT

      1.      By their motion (the "Motion"), the U.S. Debtors seek to compel the

EMEA Debtors to file a more definite statement of their claims previously filed against the U.S.

Debtors in September 2009 (the "Proofs of Claim"), and request that the EMEA Debtors file

particularized claims and documentation to support their claims by June 1, 2011 (the "Proposed

Bar Date") or see their claims expunged with prejudice. The U.S. Debtors' filing of the Motion

was wholly unnecessary and premature in light of the ongoing efforts of all Nortel entities to

resolve all outstanding disputes in out-of-court negotiation and mediation. The EMEA Debtors

filed the Proofs of Claim – which satisfied the requirements of notice pleading and Official Form

B 10 – under compulsion of the bar date established in these Chapter 11 cases in order to protect

against forfeiture of their claims.[4] Since then, the EMEA Debtors have provided extensive

details of their claims against the U.S. Debtors in confidential mediation submissions and in

---

4.   In fact, the EMEA Debtors were never under compulsion to file proofs of claim on account of their
     intercompany claims. Paragraph 4(f) of the Notice of Deadline Requiring Filing of Proofs of Claim On or
     Before September 30, 2009 (the "Bar Date") provides that "[a]ny Debtor, nondebtor affiliate of the Debtors or
     Canadian Debtor, or any of their direct or indirect subsidiaries holding a claim" need not file a proof of claim
     prior to the Bar Date. Nonetheless, the EMEA Debtors filed proofs of claim prior to the Bar Date out of an
     abundance of caution to preserve all of their rights, and in doing so, put the U.S. Debtors on notice of their
     claims.

public filings in the insolvency proceedings of NNI's ultimate corporate parent, Nortel Networks Corporation ("NNC" and together with its affiliates and subsidiaries, "Nortel" or the "Nortel Group"), Nortel Networks Limited ("NNL") and their affiliates (collectively, the "Canadian Debtors") under the Companies' Creditors Arrangement Act in Canada (the "Canadian Proceedings").  It is therefore astounding that the U.S. Debtors could now claim a complete lack of knowledge of "any legal or factual basis for the EMEA [Debtors'] claims."  (Motion ¶ 4).

   2. The U.S. Debtors have suggested that expedited determination of the EMEA Debtors' claims is necessary in order to advance ongoing efforts to allocate the asset sale proceeds among the various Nortel entities.  The Joint Administrators agree that there is much overlap between the factual and legal issues relevant to asset allocation and to their claims against the U.S. Debtors and the Canadian Debtors (collectively, the "North American Debtors").  They submit, however, that in light of the lack of success to date of the consensual resolution and mediation processes (which have been ongoing for almost 12 months), all parties should now move forward with the asset allocation dispute resolution process provided for in the Interim Funding and Settlement Agreement approved by this Court and the Canadian Court almost two years ago (the "IFSA").  To the extent that facts and legal issues underlying intercompany claims must also be addressed in order to determine the proper allocation of asset sale proceeds, it has already been agreed by the parties, and confirmed by the Courts, that such matters must be determined in the first instance in the transnational dispute resolution procedure contemplated under the IFSA.  Addressing such issues piecemeal, in claims procedures in the separate bankruptcy/insolvency proceedings across multiple jurisdictions, will be duplicative and will create the risk of inconsistent determinations on key issues.  The Joint Administrators therefore

request the Court's intervention to assist the parties to finalize the dispute resolution protocol they committed to when they entered the IFSA.

3.      Thus, while the Joint Administrators maintain that the filing of the Motion was premature and unnecessary, they will nonetheless comply with the U.S. Debtors' request by filing amended proofs of claim on behalf of the EMEA Debtors by the Proposed Bar Date or at such other time as mutually-agreed by the parties or ordered by the Court.   In addition, the Joint Administrators join in the U.S. Debtor's request that the Court set a status conference for June 7, 2011 at 9:30 a.m., or at such other time as is convenient for the Court, and request that such conference be a joint video status conference with the Canadian Court, to review the progress of the matter and move forward with steps necessary in order to immediately finalize the dispute resolution protocol provided for under the IFSA.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 of the Bankruptcy Code.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this proper pursuant to 28 U.S.C. § 1408 and 1409.

## BACKGROUND

5.      As the Court knows, Nortel has sold substantially all of its operating businesses in the course of the U.S., Canadian and UK insolvency proceedings and, pursuant to the escrow agreements for each of the business dispositions and the IFSA, the proceeds of these sales have been placed into escrow until their allocation among Nortel companies is determined. Pursuant to the IFSA and the relevant escrow agreements, the money held in the escrow account cannot be distributed until:  (i) the parties reach agreement on how the funds should be allocated or (ii) if the parties fail to reach an agreement, a determination of the proper allocation is made

pursuant to the dispute resolution procedure provided for under the IFSA.  See IFSA Section

12(b).  Under the IFSA, the Nortel parties agreed to negotiate in good faith to enter a protocol

that would establish binding procedures for the allocation of the sale proceeds in the event they

are unable to reach agreement regarding such allocation.  See IFSA Section 12(c).  Although the

parties made considerable progress in negotiating such a protocol, efforts to finalize the protocol

were put aside in favor of negotiation between the parties, followed in turn by the recent non-

binding mediation process conducted by the Honorable Layn R. Phillips.

6.      Although the various Nortel parties have attempted to resolve asset

allocation and all other inter-estate issues in a consensual manner, to date these efforts have not

been successful.  The mediation process commenced in October 2010, with the first live sessions

held in November.  Further intensive sessions on April 11, 12 and 13 have not produced a

resolution, and no further sessions are scheduled at this time.

7.      At the forefront of mediation discussions surrounding the allocation of

sale proceeds has been the interrelated issue of how to resolve various intercompany claims.  It is

beyond dispute that the allocation of proceeds and the intercompany claims are "intertwined," as

recognized by the Canadian Monitor.  See Fifty-Eighth Report of the Monitor Dated December

22, 2010 at ¶ 4 ("The inter-company claims are intertwined with allocation issues and include

proprietary and trust type claims.")  [D.I. 4642].  Indeed, the EMEA Debtors' intercompany

claims arise out of substantially the same facts, issues, and legal principles as the sale proceeds

allocation arguments, as further described below.  Transfer pricing in particular is an issue which

not only gives rise to claims, but which is also relevant to the allocation arguments of all of the

Nortel estates, not just those of the EMEA Debtors.   If the mediation process fails (as it appears

to have), then pursuant to the IFSA the next step is for the Nortel entities to reach an agreement

on a protocol for binding procedures for the allocation of the sale proceeds.

## ARGUMENT

I.    **The U.S. Debtors' Motion for a More Definite Statement of Claims was Unnecessary and Premature.**

8.    As noted above, the EMEA Claimants filed general protective Proofs of

Claim against the U.S. Debtors on September 30, 2009.  Since then, the EMEA Debtors have

detailed their claims, both in face-to-face negotiation sessions during the consensual resolution

process, as well as in extensive filings in connection with the mediation.  They have done so

despite having limited access to documents from Nortel's North American headquarters that

would help substantiate and particularize their claims. Though the U.S Debtors have provided

voluminous quantities of documents to the EMEA Debtors as part of the informal mediation

disclosure process, such disclosure needs to be seen in context.  Not only does this disclosure

consist of a vast number of documents which are irrelevant to the key issues, such disclosure is,

more importantly, incomplete in key areas.  Further, the documents which have been provided to

the EMEA Debtors are subject to confidentiality restrictions which prevent the EMEA Debtors

from being able to freely deploy them.  The EMEA Debtors will need to address this with the

U.S. Debtors, and assume that the U.S. Debtors will cooperate in providing such additional

disclosure of documents and information as may be needed in order to for the EMEA Debtors to

particularize their claims.

9.    Over the course of the two mediation sessions, first in November 2010 and

again in April 2011, the EMEA Debtors have submitted position papers and reply papers (with

exhibits), running to hundreds of pages in length, setting forth their allocation arguments,

intercompany claims and the interrelation between the two.  The Canadian and U.S. Nortel

entities have countered with extensive filings of their own, including portions devoted to the intercompany claims asserted by the EMEA Debtors. These positions have been further elaborated at several face-to-face negotiating sessions and in the proofs of claim filed by the EMEA Debtors against the Canadian Debtors on March 18, 2011 in the Canadian Proceedings. Thus, it seems clear that each party to the mediation has a full understanding of the other parties' arguments to date. It is therefore surprising for the U.S. Debtors to now state that they are unaware of <u>any</u> legal or factual basis for the EMEA Debtors' claims. (Motion at ¶ 4).

10.    The principal issues being addressed in the mediation have been (a) the allocation of the sale proceeds of all of the Nortel assets and businesses currently held in escrow and (b) intercompany claims. In broad terms, the EMEA Debtors seek recompense in respect of claims against NNL, NNI and their past and current officers and directors arising from a general pattern in which NNL, NNI or its officers and directors improperly transferred value away from the EMEA Debtors to the benefit of the North American Debtors and other entities within the Nortel Group.

11.    Based on the foregoing, the Joint Administrators respectfully submit that the U.S. Debtors' motion to compel the EMEA Debtors to file a more definite statement of claim was unnecessary and premature. Notwithstanding this position, the EMEA Debtors will acquiesce to the U.S. Debtors' request and will file amended proofs of claim by the Proposed Bar Date, or at such other time as mutually agreed amongst the parties or ordered by the Court.

II.     **To The Extent Disputed Issues Relevant to Resolving Intercompany Claims Are Also Relevant to Determining Sale Proceeds Allocation, Such Issues Must Be Addressed In the First Instance in the Transnational Dispute Resolution Procedure Contemplated Under the IFSA.**

12.     The failure of the worldwide Nortel Group produced an extraordinarily complex scenario involving inconsistent laws and insolvency regimes, and competing national and creditor interests, in several dozen jurisdictions around the world.  It appears unlikely that any relevant court, be it Canadian, U.S., UK or otherwise, would have had jurisdiction to issue orders addressing the issues that would have needed to be resolved in order to facilitate the integrated sales of the international Nortel businesses that have taken place.  It was therefore necessary for the relevant Nortel entities to enter, and for the U.S. and Canadian courts to approve, the IFSA, and for the parties to negotiate and execute appropriate escrow agreements.  The IFSA and escrow agreements allowed the asset sales to proceed in a manner designed to maximize recovery for Nortel creditors around the world.

13.     Because of the jurisdictional and other complexities here, one of the key elements of the IFSA is that it provides that any disputes between the various Nortel entities about asset allocation will be decided pursuant to a transnational dispute resolution procedure to be agreed by the parties.  Thus, Section 12(c) of the IFSA requires the Nortel parties to agree on a protocol that will establish a binding procedure determining allocation in case the parties are unable to agree.

14.     Prior to the commencement of the mediation process, the parties had engaged in substantial negotiations towards the entry of the protocol provided for under Section 12(c) of the IFSA.  Significantly, the parties appeared to have reached agreement in principle on procedures for appointing a three member panel (including designees of Canada, the U.S. and EMEA) to serve as the dispute resolver and (at least in general terms) the main procedures to be

followed. The main unresolved matter related to attempts by some parties to limit the scope of the issues the panel could find relevant in determining allocation issues. The Joint Administrators submit that any unresolved issues pertaining to such matters could and should properly be resolved by the IFSA dispute resolution panel itself.

15.     It is not particularly surprising that facts pertinent to the proper allocation of sale proceeds among the various Nortel entities will also be relevant to the determination of claims asserted back and forth between those same entities. Indeed, the quantum of the claims of the EMEA Debtors, and the very existence of the claims themselves, may depend on the results of the sales proceeds allocation process. Sales proceeds allocation issues involve a consideration of the situation of the Nortel Group prior to the Petition Date, particularly in relation to transfer pricing and the applicability of those transfer pricing arrangements to allocation of proceeds from the sale of the Nortel businesses. These factors are relevant not only to the consideration of EMEA's allocation position, but also to the allocation position as between the U.S. and Canadian Debtors. It is without question that in any allocation dispute between the U.S. and Canadian estates, the facts and legal issues relevant to the appropriateness of the transfer pricing arrangements, and in particular the Master Research and Development Agreement, dated December 22, 2004, would need to be considered by a dispute resolver.

16.     The validity of the transfer pricing arrangements, for example, is therefore crucial to a determination of both allocation and intercompany claims. A finding that these arrangements were flawed and resulted in an improper transfer of assets away from the EMEA Debtors will also establish claims against those entities which benefited from those flawed arrangements or knowingly procured those agreements. Within the framework of this complex international matter, it is essential that such matters be addressed in the first instance through the

transnational dispute resolution process contemplated under the IFSA. To implement a unilateral, internationally uncoordinated approach to resolve these issues in multiple courts would ignore the realities of these complex multijurisdictional issues facing the parties.

17.     The Joint Administrators believe that a joint video status conference, scheduled with the Canadian Court, to address these issues and determine the best way forward would be beneficial to all parties.

18.     This Response is without prejudice to any claims submissions that the Joint Administrators may wish to make in any other forum or in relation to the ultimate forum selected for determining the intercompany claims and allocation issues.

## CONCLUSION

19.     While the Joint Administrators maintain that the filing of the Motion was unnecessary, they will nonetheless comply with the U.S. Debtors' request by filing amended proofs of claim on behalf of the EMEA Debtors by the Proposed Bar Date or at such other time as mutually agreed by the parties or ordered by the Court.   In addition, the Joint Administrators join in the U.S. Debtor's request that the Court set a status conference for June 7, 2011 at 9:30 a.m., or at such other time that is convenient for the Court, and further request that such conference be a joint video status conference with the Canadian Court, to review the progress of the matter and move forward with steps necessary in order to immediately finalize the dispute resolution protocol provided for under the IFSA.

Dated:   Wilmington, Delaware
         April 15, 2011

**YOUNG CONAWAY STARGATE & TAYLOR, LLP**

/s/ Edwin J. Harron
James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
Jaime N. Luton (No. 4936)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6600
Facsimile: (302) 571–1253

- and -

**HUGHES HUBBARD & REED LLP**
Michael Luskin
Derek J.T. Adler
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837–6000
Facsimile: (212) 422–4726

- and -

**HERBERT SMITH LLP**
Kevin Lloyd
John Whiteoak
Richard Lawton
Exchange House
Primrose Street
London
EC2A 2HS

*Counsel for the Joint Administrators*

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS

LONDON · MOSCOW · FRANKFURT · COLOGNE

ROME · MILAN · HONG KONG · BEIJING

Writer's Direct Dial: +1 212 225 2452
E-Mail: hzelbo@cgsh.com

MARK A. WALKER
LESLIE B. SAMUELS
EDWARD F. GREENE
EVAN A. DAVIS
LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
A. RICHARD SUSKO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
WILLIAM F. GORIN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
JAIME A. EL KOURY
STEVEN G. HOROWITZ
ANDREA G. PODOLSKY
JAMES A. DUNCAN
STEVEN M. LOEB
DANIEL S. STERNBERG
DONALD A. STERN
CRAIG B. BROD
SHELDON H. ALSTER
WANDA J. OLSON
MITCHELL A. LOWENTHAL
DEBORAH M. BUELL
EDWARD J. ROSEN
JOHN PALENBERG
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
JANET L. FISHER
DAVID L. SUGERMAN
HOWARD S. ZELBO

DAVID E. BRODSKY
ARTHUR H. KOHN
RAYMOND B. CHECK
RICHARD J. COOPER
JEFFREY S. LEWIS
FILIP MOERMAN
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY
PAUL E. GLOTZER
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI JR
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
KRISTOFER W. HESS
JUAN G. GIRALDEZ
DUANE McLAUGHLIN

BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
CHRISTOPHER P. MOORE
JOON H. KIM
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
GABRIEL J. MESA
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
NANCY I. RUSKIN
WALLACE L. LARSON, JR
JAMES D. SMALL
AVRAM E. LUFT
ELIZABETH LENAS
DANIEL ILAN
CARLO DE VITO PISCICELLI
ANDREW WEAVER
RESIDENT COUNSEL

May 12, 2011

BY MAIL AND EMAIL

Kevin Lloyd, Esq.
Herbert Smith LLP
Exchange House, Primrose Street
London EC2A 2HS, United Kingdom

Dear Kevin:

I am responding to your May 9 letter to Jim Bromley.

First, I will not respond to the arguments contained in much of your letter. Clearly, we disagree with your view of the IFSA, what it provides and what it requires. We will review your response to our motion after it is filed and respond appropriately.

Second, we do agree that the parties, after extensive efforts, were unable to agree on an allocation protocol and, as you say in your letter, are at an "impasse". In fact, the parties have long since passed the point of an intractable impasse on this issue. There is no agreement to arbitrate and, accordingly, there can be no and will be no arbitration on allocation.

Third, if you wish to discuss scheduling issues relating to the proposed protocol submitted with our allocation motion — which provides for the allocation issue to be decided by the Canadian and US Courts — please let us know. These discussions should begin promptly.

Finally, we have also asked you to engage in negotiations regarding a schedule with respect to the claims that the EMEA Debtors have already filed in the US Court and have committed to amending on or before June 1. Ed Harron stated on May 10 that the EMEA Debtors will not discuss any such schedule until after both the EMEA Debtors file their amended

Kevin Lloyd, Esq., p. 2

claims on June 1 and the US Debtors thereafter file what we anticipate will be dispositive motions directed to all or virtually all those claims. We urge you to reconsider this position, particularly since during the May 10 hearing Judge Gross expressly encouraged the parties to coordinate on these types of scheduling issues.

Very truly yours,

Howard S. Zelbo

cc:  Via email

David H. Botter, Esq.
Fred S. Hodara, Esq.
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036

Michael Luskin, Esq.
Derek J. T. Adler, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

Thomas R. Kreller, Esq.
Albert A. Pisa, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005-1413

Edwin J. Harron, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801

Derrik C. Tay, Esq.
Jennifer Stam, Esq.
Ogilvy Renault LLP
Suite 3800, Royal Bank Plaza, South Tower
200 Bay Street - P.O. Box 84
Toronto ON M5J 2Z4, Canada

Robin Schwill, Esq.
Matthew Gottlieb, Esq.
Davies Ward Phillips & Vineberg LLP
44th Floor
1 First Canadian Place
Toronto ON M5X 1B1

Jay Carfagnini, Esq.
Joseph Pasquariello, Esq.
Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto ON M5H 257, Canada

**Mendoza, Richard**

| | |
|---|---|
| **From:** | John P McGill [jmcgill@cgsh.com] |
| **Sent:** | 22 October 2009 01:53 |
| **To:** | skuhn@AkinGump.com; tfeuerstein@akingump.com; ddurso@AKINGUMP.com; dbotter@AkinGump.com; fhodara@AkinGump.com; vzhu@milbank.com; apisa@milbank.com; gciraldo@milbank.com; NVenditto@milbank.com; Ellis, Ryan; DEACON, LAURA; jstam@ogilvyrenault.com; iness@ogilvyrenault.com; mconvery@ogilvyrenault.com; Sharon.S.Hamilton@ca.ey.com; jpasquariello@goodmans.ca; carmstrong@goodmans.ca; dtay@ogilvyrenault.com; saverio.lunetta@jpmorgan.com; John.Mazzuca@jpmorgan.com |
| **Cc:** | kirk.otis@nortel.com; douglapa@nortel.com; James L BROMLEY; Lisa M SCHWEITZER; Elisabeth M Polizzi; Sanjeet Malik; Corey M Goodman |
| **Subject:** | CDMA Proceeds Escrow |
| **Attachments:** | CDMA Escrow Agreement October 21.doc |

Attached please find a draft agreement providing for the escrow of the proceeds from Nortel's sale of its CDMA business to Ericsson.  The intent of the attached draft is for the parties to operate under a simple process whereby any releases of funds from the escrow account will require either a joint instruction executed by the Nortel parties and creditors' representatives or a court order from the U.S. and Canadian courts.

Please provide any comments you have to the attached draft at your earliest convenience.  The agreement needs to be in place by the closing of the CDMA transaction, which is expected to occur in the near term.

Regards,

John P. McGill, Jr.
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
t: +1 202 974 1625 | f: +1 202 974 1999
www.clearygottlieb.com | jmcgill@cgsh.com

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

04/05/2011

*CGSH LLP Draft 10/21/09*
*Subject to client comments*

### ESCROW AGREEMENT

among

## NORTEL NETWORKS CORPORATION

and

## NORTEL NETWORKS LIMITED

and

## NORTEL NETWORKS INC.

and

## NORTEL NETWORKS UK LIMITED

and

**JPMorgan Chase Bank, N.A., as Escrow Agent**

**dated as of October [     ], 2009**

ESCROW AGREEMENT (this "Agreement"), dated as of October [•], 2009, by and among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), Nortel Networks UK Limited ("NNUK" and collectively with NNC, NNL and NNI, the "Depositors"), and JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America ("JPMorgan") and acting through its TS/Escrow Services and solely in its capacity as escrow agent under the Agreement, and any successors appointed pursuant to the terms hereof (JPMorgan in such capacity, the "Escrow Agent").

WHEREAS, NNC, NNL and NNI, and certain of their affiliates (collectively, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ) (the "Buyer") have entered into that certain Asset Sale Agreement, dated as of July 24, 2009 (the "Asset Sale Agreement", and terms not otherwise defined herein shall have the meaning given to them in the Asset Sale Agreement), whereby the Sellers have agreed to sell certain of their assets to the Buyer;

WHEREAS, it is contemplated under Section 2.3.2 of the Asset Sale Agreement that at Closing the Buyer will deliver or cause to be delivered an amount in immediately available funds equal to, the Estimated Purchase Price less the Good Faith Deposit, the Working Capital Escrow Amount (as defined below) and other amounts deducted from the Estimated Purchase Price by mutual agreement of the Depositors and the Buyer (the "Deposited Purchase Price") to the Sellers, and will deliver or cause to be delivered an amount in immediately available funds equal to the Working Capital Escrow Amount to Citibank N.A., in its capacity as escrow agent ("Citi") under that certain Escrow Agreement dated as of the Closing Date (the "Working Capital Escrow Agreement") by and among the Sellers, Citi and the Purchaser;

WHEREAS, it is contemplated under the Transition Services Agreement that at Closing the Sellers will deliver or cause to be delivered an amount in immediately available funds equal to $50,000,000 (the "TSA Escrow Amount") to Citi under that certain escrow agreement to be entered into at Closing by and among the Sellers, Citi and Ericsson Inc., a corporation organized under the laws of Delaware ("E Inc.") pursuant to the Transition Services Agreement (the "TSA Escrow Agreement");

WHEREAS, it is contemplated that the Depositors and certain other parties will enter into an agreement (the "Side Agreement") relating to, among other things, the release of amounts hereunder prior to final allocation of the Escrow Funds (as defined below) and at the time of such final allocation;

WHEREAS, the Closing is expected to occur in late October, 2009 or early November, 2009 and the Depositors desire to establish an account prior to Closing for the escrow of the Deposited Purchase Price pursuant to this Agreement, it being understood by the Depositors that this Agreement is subject to amendment in accordance with Paragraph 15(a) to, among other things, reflect further agreement among the Depositors as to the terms of the escrow of the Deposited Purchase Price; and

WHEREAS, this Agreement has been approved, and the Side Agreement has been or will be approved, by the Canadian Court and the U.S. Bankruptcy Court and the Depositors have provided the Escrow Agent with evidence of such approvals; and

**WHEREAS,** the Depositors wish to appoint JPMorgan as Escrow Agent and JPMorgan is willing to accept such appointment and to act as Escrow Agent, in each case upon the terms and conditions of the Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.    <u>Appointment of Escrow Agent</u>.    The Depositors hereby jointly nominate, constitute and appoint Escrow Agent as escrow agent to hold the Escrow Funds (as defined below) in the Escrow Account (as defined below) upon the terms and conditions set forth herein. The Escrow Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Escrow Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. Escrow Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Escrow Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, shall be binding upon each of the Depositors and the Escrow Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, as provided in this Agreement.

2.    <u>Deposit of Escrow Deposit or Property</u>. Funds shall be deposited in the Escrow Account (as defined below) as follows:

(a)    At the Closing, NNC, NNL and NNI shall instruct the Buyer to deposit the Deposited Purchase Price, less the TSA Escrow Amount, with the Escrow Agent in immediately available funds to an interest bearing account established with the Escrow Agent (the "<u>Escrow Account</u>") account number [_____];

(b)    At the Closing, NNC, NNL and NNI shall deposit the Good Faith Deposit with the Escrow Agent in immediately available funds to the Escrow Account;

(c)    After the Closing, NNC, NNL and NNI shall instruct the Buyer to deposit any purchase price adjustments to be paid to the Sellers under the Asset Sale Agreement with the Escrow Agent in the Escrow Account;

(d)    After the Closing, NNC, NNL and NNI shall instruct Citi to deposit any of the Working Capital Escrow Amount to be released to Sellers pursuant to the Working Capital Escrow Agreement with the Escrow Agent in the Escrow Account;

(e)    After the Closing, NNC, NNL and NNI shall instruct Citi to deposit any of the TSA Escrow Amount to be released to the Sellers pursuant to the TSA Escrow Agreement with the Escrow Agent in the Escrow Account; and

(all funds deposited in accordance with (a)-(e) above collectively, the "<u>Escrow Property</u>"). The Escrow Property, plus all interest and other income thereon received by Escrow Agent, less any funds distributed or paid in accordance with this Agreement are collectively referred to herein as "<u>Escrow Funds</u>"). The Escrow Agent shall provide written confirmation to the Depositors upon its receipt of any Escrow Property from the Buyer, Citi or otherwise. The Escrow Property shall

2

at all times, until disbursement as provided herein, remain segregated and separately identified by the Escrow Agent and shall not be commingled with the other assets held by the Escrow Agent.

3.   <u>Investment of Escrow Funds</u>.

(a)   Until otherwise jointly directed by all of the Depositors, the Escrow Agent shall invest the Escrow Funds in Permitted Investments only. "Permitted Investments" means (1) United States Treasury obligations with maturities not in excess of one year, (2) money market funds invested solely in such United States Treasury obligations and (3) the JPMorgan money market deposit account. The Escrow Agent shall invest the Escrow Funds on the date of deposit provided that it is received on or before 11:00 a.m. New York City time. Any written notice to remit payment received by the Escrow Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement "<u>Business Day</u>" shall mean any day that the Escrow Agent is open for business. In the absence of joint written instruction from the Depositors, the Escrow Agent will invest the Escrow Funds in item (3) referenced above.

(b)   Any investment direction contained herein may be executed through an affiliated broker dealer of the Escrow Agent and will be entitled to such usual and customary fee. Neither the Escrow Agent nor any of its affiliates assume any duty or liability for monitoring the investment rating.

(c)   The Escrow Agent shall have the right to liquidate investments as necessary to distribute Escrow Funds pursuant to <u>paragraph 5</u>.

4.   <u>Ownership of Escrow Funds; Taxes</u>.

(a)   The Escrow Funds at all times are and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Funds shall, as of the end of each calendar year and to the extent required by law, be reported by Escrow Agent on Form 1099 or Form 1042-S as the income of Depositors or their Affiliates, based upon the disbursement of the Escrow Funds to Depositors or their Affiliates pursuant to <u>Paragraph 5</u> if such income was disbursed during such calendar year or, with respect to any Escrow Funds not disbursed during such calendar year, based upon each Depositor's pro rata share of such income, with each Depositor's pro rata share being deemed to be equal to such Depositor's interest allocation percentage as set forth on <u>Exhibit 1</u>. Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("<u>FIRPTA</u>"). The Depositors acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Funds or any income earned by the Escrow Funds. The Depositors further acknowledge and agree that any taxes payable from the income earned on the investment of any sums held in the Escrow Funds shall be paid by the Depositors. All proceeds of the Escrow Funds shall be retained in the Escrow Account and reinvested from time to time by the Escrow Agent as provided in this Agreement. The Escrow Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such

3

taxes to the appropriate authorities. The Escrow Agent has no ownership interest in the Escrow Funds but is serving solely as escrow holder having only possession thereof. This Paragraph 4 shall survive notwithstanding any termination of this Agreement or the resignation of Escrow Agent. Each Depositor will provide Escrow Agent with the appropriate form W-9 or W-8 either (x) if any of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, as a condition to such Depositor's receipt of such Escrow Funds from Escrow Agent, prior to Escrow Agent making such disbursement hereunder or (y) if none of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, on or before December 31, 2009. If W-8 or W-9 forms, validated by Escrow Agent, have not been provided by all of the Depositors prior to December 31, 2009 the Escrow Agent shall report taxes on a disbursement basis in the year they are disbursed.

(b)    To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Funds. The Depositors shall, jointly and severally, indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of the Escrow Agent. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with their Interest Allocation Percentages reflected in Exhibit 1 and any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to Escrow Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to Escrow Agent or by payment to another Depositor. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9 and shall survive the resignation or removal of Escrow Agent and the termination of this Agreement.

5.    Distribution of Escrow Funds. The Depositors and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:

(a)    The Escrow Agent shall disburse to any Person all or any portion of the Escrow Funds after such disbursement if and as so instructed pursuant to (i) a letter of direction executed by the Depositors and each of the parties listed under the heading "Creditor Representatives" in Schedule B (the "Creditor Representatives") or (ii) a final decision of a court of competent jurisdiction (as set forth in Paragraph 20 below), which is either non-appealable or with respect to which the time for appeal has expired without the filing of a timely appeal, directing the distribution of all or such portion of the Escrow Fund as specified in such letter of direction or court order. Any court order pursuant to the preceding sentence may be presented to

4

the Escrow Agent by an Authorized Representative (as set forth in <u>Paragraph 12</u>) of one or more of the Depositors and accompanied by the written instruction referenced in <u>Paragraph 5(d)</u>.

(b)    The Depositors understand and agree that no payments or reimbursements made pursuant to Section 6.1 of the Asset Sale Agreement in respect of Transfer Taxes shall constitute any part of the Escrow Amount or the Escrow Fund, or shall be required to be paid by the Buyer into the Escrow Account. In the event, however, that Buyer or its affiliates make any payments with respect Transfer Taxes that are payable to or intended for the benefit of one or more Depositors or any Subsidiary, Affiliate or agent thereof pursuant to Section 6.1 of the Asset Sale Agreement but which are deposited into the Escrow Account (any such payment, "<u>Misdirected Tax Payment</u>"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing the Escrow Agent with a letter of direction executed by an Authorized Representative of such Depositor directing the release of such Misdirected Tax Payment. The requesting Depositor(s) shall (A) send a copy of such letter of direction to each of the other Depositors and each of the Creditor Representatives at the same time as such letter is sent to Escrow Agent and (B) attach thereto (i) supporting documentation evidencing the amount of the Transfer Taxes payable (it being understood that the Escrow Agent shall have no responsibility for verifying the accuracy or sufficiency of such supporting documentation) and (ii) a certification of an Authorized Representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Buyer or its affiliates with respect to Transfer Taxes pursuant to the Asset Sale Agreement. The Escrow Agent shall, within ten (10) days of receipt of such letter of direction disburse to such Depositor the amounts requested therein; provided, however, that if Escrow Agent receives a notice of objection from one or more of the Depositors prior to making such disbursement (but in no event later than 3:00 p.m. EST on such release date), the Escrow Agent shall not make such disbursement until Escrow Agent either (x) receives an order of a court of competent jurisdiction (as provided in <u>Paragraph 20</u>) instructing it to make such distribution or (y) the objecting Depositor(s) provide written notice to the Escrow Agent withdrawing such objection. Subject to the proviso to the preceding sentence, the Escrow Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors.

(c)    The Escrow Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Escrow Account. The Escrow Agent shall have the right to withhold an amount equal to the amount due and owing to the Escrow Agent, plus any reasonable costs and expenses incurred by Escrow Agent in accordance with the terms of this Agreement in connection with the termination of the Escrow Account.

(d)    The Authorized Representative of the Depositor(s) presenting court order(s) to the Escrow Agent pursuant to <u>Paragraph 5(a)</u> shall provide, along with such court order(s), a written instruction from the Depositors informing the Escrow Agent of the action to be taken by the Escrow Agent on account of such court order(s), as the Escrow Agent shall not be required to interpret any court orders independently of such written instruction. None of the Depositors shall issue a written instruction which fails to comply with the terms of the applicable

5

court order(s) and the Depositors shall provide a copy of such written instruction to each of the other Depositors.

(e)    Any request for a distribution pursuant to this Paragraph 5 shall be accompanied by a completed Schedule A with respect to the Depositors participating in such distribution, unless a completed Schedule A with respect to such Depositor has previously been provided to the Escrow Agent (in which case the Schedule A to be provided to the Escrow Agent need only contain the requisite information with respect to the Depositors as to whom no previous Schedule A has been provided to the Escrow Agent. The Depositors shall comply with any request from another Depositor for information necessary for inclusion in Schedule A.

6.    Termination of Escrow Account. The Agreement shall terminate upon the distribution of all Escrow Funds from the Escrow Account established hereunder in accordance with paragraph 5 hereof, subject to the survival of provisions which expressly survive the termination of this Agreement; provided, however, that this Agreement shall not terminate until (i) all of the Working Capital Escrow Amount and the TSA Escrow Amount owing to the Sellers have been released from the Working Capital Escrow Account and the TSA Escrow Account, respectively, and deposited in the Escrow Account in accordance herewith and (ii) all other purchase price adjustment amounts owing to the Sellers under the terms of the Asset Sale Agreement have been deposited in the Escrow Account by the Buyer in accordance herewith.

7.    Method of Payment. Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on Schedule A annexed hereto (collectively, the "Standing Settlement Instructions"). Any Depositor shall have the right, from time to time, to provide written notice to the Escrow Agent and the other Depositors updating its Standing Settlement Instructions, and the Escrow Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Paragraph 5 until such Standing Settlement Instructions have been further updated pursuant to this Paragraph 7.

The Depositors acknowledge that the Escrow Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Escrow Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if the Escrow Agent has previously authenticated such Standing Settlement Instructions with respect to such Depositor. The parties acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8.    Monthly Reports. The Escrow Agent shall provide monthly account statements to the Depositors with respect to the Escrow Account, with copies to the Creditor Representatives.

9.    Liability of Escrow Agent. The Escrow Agent's sole liability hereunder shall be to hold and invest the Escrow Amount and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder. It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. The Escrow Agent may execute any of its

6

powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in Paragraph 20 below) determines that the Escrow Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Account, including, without limitation, the Escrow Property nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. The Escrow Agent shall have no duty or obligation to make any calculations of any kind hereunder. In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the parties pursuant to Paragraph 5 which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Paragraph 20 below).

Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage or any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Amount, or any part thereof, at any time, that cannot be settled under other provisions hereof, the Escrow Agent is authorized to retain in its possession, without liability to anyone, all or any part of the Escrow Amount, as applicable, or the proceeds from any sale thereof until such dispute shall have been settled either by mutual agreement between the parties concerned or until otherwise ordered by a court order of a court of competent jurisdiction (as set forth in Paragraph 20 below).

The Depositors shall, jointly and severally, indemnify and hold harmless Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively "Losses") arising out of or in connection with (a) Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by Escrow Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except

in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in Paragraph 20 below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with their Interest Allocation Percentages reflected in Exhibit 1 and any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Escrow Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to Escrow Agent or by payment to another Depositor. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9 and shall survive the resignation or removal of Escrow Agent and the termination of this Agreement.

The duties and responsibilities of the Escrow Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. The Escrow Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Asset Sale Agreement, other than as outlined in this Agreement, nor shall the Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. In the event of any conflict between the terms and provisions of this Agreement, those of the Asset Sale Agreement, any schedule or exhibit attached to the Agreement, or any other agreement among Depositors, or any of them, the terms and conditions of this Agreement shall control.

10.    Compensation of Escrow Agent. The Depositors agree to pay the Escrow Agent a fee in the amount of $2,500 in the aggregate on the date hereof and on the anniversary of the date hereof each year thereafter as full compensation for its services hereunder; provided, however, that the Depositors further agrees to reimburse the Escrow Agent all reasonable, documented out-of-pocket costs and out-of-pocket expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, including but not limited to any suit in interpleader brought by the Escrow Agent (which shall be brought only in a court of competent jurisdiction (as set forth in Paragraph 20). The Escrow Agent shall collect amounts due to it under this Paragraph 10 from the Escrow Account.

11.    Resignation or Removal of Escrow Agent. The Escrow Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon

8

selection of a successor escrow agent pursuant to the provisions of this Agreement. Similarly, the Escrow Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to the Escrow Agent by the Depositors. In either event the Escrow Agent shall then deliver the balance of the Escrow Amount then in its possession to a successor escrow agent as shall be appointed by the Depositors as evidenced by a written notice filed with the Escrow Agent and signed by the Depositors and the Creditor Representatives.

If the Depositors and the Creditor Representatives are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in Paragraph 20 below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

The successor escrow agent shall be a bank or trust company having its principal executive office in the United States and assets in excess of $5,000,000,000.[1]

Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Amount the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

Any corporation into which the Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Escrow Agent in its individual capacity may be transferred, shall be the Escrow Agent under this Agreement without further act.

12.    Notices. All communications hereunder shall be in writing and shall be deemed to be duly given and received: (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day (as hereinafter defined) if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule B or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (a), (b) and (c) of this Section 12, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth above is authorized or required by law or executive order to remain closed.

---

[1] U.S. Trustee requirements tbd.

9

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by telecopier or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on <u>Schedule C</u> hereto (each an "<u>Authorized Representative</u>" of the applicable Depositor), and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Escrow Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to the Escrow Agent and the Creditor Representatives or by providing a copy of a court order of a court of competent jurisdiction (as provided in <u>Paragraph 20</u>) to the Escrow Agent designating a successor Authorized Representative. The parties to this Agreement acknowledge that such security procedure is commercially reasonable.

If at any time prior to the termination of this Agreement any of the Creditor Representatives ceases to act as a representative of its client creditors, any Depositor shall be permitted to send a notice thereof to the Escrow Agent with copies to the other Depositors and the Authorized Representatives. If, by the tenth (10th) day following the Escrow Agent's receipt of such notice, the Escrow Agent has not received a notice of objection from the Creditor Representative that is the subject of the Depositor's notice, such Creditor Representative shall cease to be such for all purposes of this Agreement.

The parties represent, warrant and covenant that each document, notice, instruction or request provided by such party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

13.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Facsimile copies may be deemed originals for the purpose of this Agreement.

14.    <u>Paragraph Headings</u>. The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15.    <u>Amendments; No Waivers</u>.

(a)    Any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Creditor Representatives and the Escrow Agent and, if prior to the entry of a final decree closing the all of the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating all

10

Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

(b)    No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

16.    <u>Entire Agreement; No Third Party Beneficiaries</u>. This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors) the Side Agreement, the Interim Funding and Settlement Agreement dated June 9, 2009 among the U.S. Debtors, the Canadian Debtors and the Joint Administrators and the Allocation Protocol to be entered into pursuant thereto (a) constitute the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder; <u>provided</u>, that the Creditor Representatives shall be third party beneficiaries hereunder.

17.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the choice of law provisions thereof).

18.    <u>Account Opening Information</u>. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When an account is opened, Escrow Agent will ask for information that will allow it to identify relevant parties.

19.    <u>Severability</u>. If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in <u>Paragraph 20</u> below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

20.    <u>JURISDICTION</u>. EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPREME COURT OF JUSTICE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPREME COURT OF JUSTICE ON JUNE 29, 2009, AND (II) THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF MANHATTAN (COLLECTIVELY, THE "NEW YORK COURTS"), IF BROUGHT AFTER

ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED DOCUMENT OR OBLIGATION. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY LEGAL PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED IN OR PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION.

21.    Interpretation. As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

22.    Compliance with Court Orders. In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Paragraph 19), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without

jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

23.    <u>Force Majeure</u>.  In the event that any party or the Escrow Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Escrow Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Escrow Agent is able to perform substantially.

24.    <u>Patriot Act Disclosure</u>.  Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("<u>USA PATRIOT Act</u>") Requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, the parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm the parties identity including without limitation name, address and organizational documents ("identifying information").  The parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

25.    <u>Taxpayer Identification Numbers ("TIN")</u>.  The parties have provided the Escrow Agent with their respective fully executed Internal Revenue Service ("<u>IRS</u>") Form W-8, or W-9 and/or other required documentation.  The parties each represent that its correct TIN assigned by the IRS, or any other taxing authority, is set forth in the delivered forms, as well as in the Substitute IRF Form W-9 set forth on the signature page of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

13

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED,                    NORTEL NETWORKS CORPORATION,

By:_____                 By:_____
Name:                                       Name:
Title:                                      Title:


By:_____                 By:_____
Name:                                       Name:
Title:                                      Title:


NORTEL NETWORKS UK LIMITED,                 NORTEL NETWORKS INC.,

By:_____                 By:_____
Name:                                       Name:
Title:                                      Title:


By:_____                 By:_____
Name:                                       Name:
Title:                                      Title:


                                            **ESCROW AGENT**

                                            JPMorgan Chase Bank, N.A., as Escrow Agent


                                            By: _____
                                            Name:
                                            Title:

Escrow Agreement

S-1

SCHEDULE A

STANDING SETTLEMENT INSTRUCTIONS

[to be provided]

Escrow Agreement

SCHEDULE B

NOTICE ADDRESSES

Nortel Networks Corporation:

Nortel Networks Limited:

Nortel Networks Inc.:

Nortel Networks UK Limited:

Escrow Agent:                                      JPMorgan Chase Bank, N.A.
                                                   TS / Escrow Services
                                                   4 New York Plaza, 21st Floor
                                                   New York, N.Y. 10004
                                                   Attention: Andy Jacknick
                                                   Phone: 212.623. 0241
                                                   Fax No.: 212.623.6168

Creditor Representatives:

[UCC]

[Monitor]

SCHEDULE C

<u>Telephone Number(s) for Call-Backs and
Person(s) Designated to Give and Confirm Funds Transfer Instructions</u>

If to Nortel Networks Corporation:

<u>Name</u>                    <u>Telephone Number</u>              <u>Signature Specimen</u>

_____        _____        _____

<u>Name</u>                    <u>Telephone Number</u>              Signature Specimen

_____        _____        _____


If to Nortel Networks Limited:

<u>Name</u>                    <u>Telephone Number</u>              <u>Signature Specimen</u>

_____        _____        _____

<u>Name</u>                    <u>Telephone Number</u>              <u>Signature Specimen</u>

_____        _____        _____


If to Nortel Networks Inc.:

<u>Name</u>                    <u>Telephone Number</u>              <u>Signature Specimen</u>

_____        _____        _____

<u>Name</u>                    <u>Telephone Number</u>              <u>Signature Specimen</u>

_____        _____        _____

Escrow Agreement

Schedule C-1

If to Nortel Networks UK Limited:

<u>Name</u>                    <u>Telephone Number</u>              <u>Signature Specimen</u>

_____        _____        _____

<u>Name</u>                    <u>Telephone Number</u>              <u>Signature Specimen</u>

_____        _____        _____

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Escrow Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Escrow Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders. Moreover, such Party agrees to accept any risk associated with a deviation from the Escrow Agent's policy.

Escrow Agreement

Schedule C-2

EXHIBIT 1

<u>INTEREST ALLOCATION PERCENTAGES</u>

**Interest Allocation
Percentage**

Nortel Networks Inc

Nortel Networks Limited

Nortel Networks Corporation

Nortel Networks UK Limited

\* The inclusion of the Interest Allocation Percentages set forth above does not constitute an admission of any Depositor that such Interest Allocation Percentage reflects the percentage of the proceeds to be received by any Depositor or any of its Respective Affiliates under the Asset Sale Agreement. The Interest Allocation Percentages are the initial allocation percentages hereunder and are subject to amendment in accordance with Section 15. The Interest Allocation Percentages set forth above are in no way indicative of the final allocation of proceeds received by the Depositors under the Asset Sale Agreement.

Escrow Agreement

Exhibit 1

## Mendoza, Richard

| From: | LLOYD, KEVIN |
|---|---|
| Sent: | 30 October 2009 18:27 |
| To: | Whiteoak, John; 'jmcgill@cgsh.com' |
| Cc: | LLOYD, KEVIN; GALE, STEPHEN; MONTGOMERY, ALAN; Hollis, Richard; WARD, BEN; DAVIES, GAVIN; Segger, Joanne; Walsh, Thomas; BASUYAUX, BRUNO; Segger, Joanne; Barcock, Alison; Pearson, Simon; DEACON, LAURA |
| Subject: | RE: CDMA Proceeds Escrow |
| Attachments: | Proceeds Escrow Agreement HS Mark Up Oct 30.DOC; WS_BinaryComparison_#24149151v1_London_10_ - Proceeds Escrow Agreement Oct 29-#24145674v1_London_10_.DOC |

John

Further to your email, I attach some proposed amendments to the Escrow Agreement. These amendments reflect the initial views of the Joint Administrators on the agreement. They do not represent the position of the French Administrators. As France SA is a party to the IFSA and an intended signatory to an LTA, France SA will be a necessary signatory to the Escrow Agreement and the French Administrators will need to be consulted. I will ask my colleague Bruno Basuyaux to liaise with the French Administraors.

I am liaising with my colleagues in the Corporate department regarding some ASA aspects of the agreement as they have reviewed this in detail. I hope to have their comments by 9am on Monday EST as requested, and I shall feed them through then. Please therefore take these amendments as our initial comments. We are happy to have a call on Monday to discuss if this is considered necessary

One concern I have regarding the agreement as currently drafted is that it does not adequately reflect the terms of the IFSA, which was to form the basis of this agreement. In particular, clause 5 of the Escrow agreement does not reflect the agreed terms for distribution of the proceeeds of the Escrow monies in the IFSA - no reference is made to the decision of a dispute resolver and instead distribution is allowed by an order of the US/Canadian courts. Subject to the below, the Escow agreements must obviously reflect the IFSA terms.

Strictly under the IFSA, the Bondholders, the UCC and the Monitor are not required to provide their consent to the distribution of money if this is done by agreement. However, given the sensitivities previously expressed by these parties about their involvement in this process, the Joint Administrators are prepared to agree to them providing their consent to a distribution by agreement.

Hopefully our other amendments are self-explanatory and are designed to make this agreement more in line with the IFSA.

There were some amendments made yesterday which we did not fully understand. As originally drafted the agreement had a sensible allocation of interest benefit and indemnity liability in accordance to the eventual allocation of proceeds. Much of this pro rata sharing has been removed. Is there a reason?

Please do not hesitate to contact me or John Whiteoak, Joanne Segger or Ryan Ellis to discuss.

Regards.

Kevin F Lloyd

---

**From:** Whiteoak, John
**Sent:** 29 October 2009 20:03
**To:** 'jmcgill@cgsh.com'; GALE, STEPHEN; MONTGOMERY, ALAN; Sullivan, Jim; Hollis, Richard; WARD, BEN; DAVIES, GAVIN; LLOYD, KEVIN; Segger, Joanne; Walsh, Thomas
**Subject:** Re: CDMA Proceeds Escrow

John

We will revert to you on this tomorrow.

Regards

John


John Whiteoak
Herbert Smith LLP

---

**From:** John P McGill
**To:** GALE, STEPHEN; MONTGOMERY, ALAN; Sullivan, Jim; Hollis, Richard; WARD, BEN; DAVIES, GAVIN; Whiteoak, John
**Sent:** Thu Oct 29 19:53:44 2009
**Subject:** Fw: CDMA Proceeds Escrow


Gentlemen:

I received responses to the e-mail below indicating that both Laura Deacon and Ryan Ellis will be out of the office until sometime on November 2. As you will see from my cover note below, this matter requires attention before then.

Regards,

---

John P. McGill, Jr.
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
t: +1 202 974 1625 | f: +1 202 974 1999
www.clearygottlieb.com | jmcgill@cgsh.com

----- Forwarded by John P McGill/DC/Cgsh on 10/29/2009 03:50 PM -----

**John P McGill/DC/Cgsh**

29 October 2009  03:20 PM

To skuhn@AkinGump.com, tfeuerstein@akingump.com, ddurso@AKINGUMP.com, dbotter@AkinGump.com, fhodara@AkinGump.com, vzhu@milbank.com, apisa@milbank.com, gciraldo@milbank.com, NVenditto@milbank.com, Ryan.Ellis@herbertsmith.com, laura.deacon@herbertsmith.com, jstam@ogilvyrenault.com, iness@ogilvyrenault.com, mconvery@ogilvyrenault.com, Sharon.S.Hamilton@ca.ey.com, jpasquariello@goodmans.ca, carmstrong@goodmans.ca, dtay@ogilvyrenault.com, saverio.lunetta@jpmorgan.com, John.Mazzuca@jpmorgan.com

cc kirk.otis@nortel.com, douglapa@nortel.com, James L BROMLEY/NY/Cgsh@cgsh, Lisa M SCHWEITZER/NY/Cgsh@Cgsh, Elisabeth M Polizzi/NY/Cgsh@cgsh, Sanjeet Malik/NY/Cgsh@cgsh, Corey M Goodman/NY/Cgsh@cgsh, jwilliam@nortel.com

Subject CDMA Proceeds Escrow


Attached please find a revised draft of the escrow agreement for the proceeds from the CDMA sale, together with a version that has been marked to show changes from the previous draft distributed to you. The revised draft reflects comments we received, although we did not receive comments from all parties after distributing the October 21 draft.

In order for the escrow agreement to be in place by closing, the agreement must be approved by the

Canadian court on next Friday, November 6. The agreement will be approved around the same time by the U.S. bankruptcy court. I understand from Canadian counsel that, in order to file for approval on November 6, the agreement must be finalized and executed by the parties no later than the evening of November 3 or first thing in the morning on November 4.

Accordingly, please send any remaining comments you have to me no later than 9 a.m. (U.S. eastern time) on November 2. If necessary we will schedule a conference call among all parties later in the day on the 2nd to resolve any open points.

Thank you in advance for your cooperation.

Regards,

John P. McGill, Jr.
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
t: +1 202 974 1625 | f: +1 202 974 1999
www.clearygottlieb.com | jmcgill@cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

17/05/2011

*HS LLP Draft 10/30/09*
*Subject to client comments*

**ESCROW AGREEMENT**

**among**

**NORTEL NETWORKS CORPORATION**

**and**

**NORTEL NETWORKS LIMITED**

**and**

**NORTEL NETWORKS INC.**

**and**

~~**NORTEL NETWORKS UK LIMITED**~~

**THE EMEA FILED ENTITIES**

**and**

**THE JOINT ADMINISTRATORS**

**and**

**JPMorgan Chase Bank, N.A., as Escrow Agent**

**dated as of November [      ], 2009**

**ESCROW AGREEMENT** (this "Agreement"), dated as of November [●], 2009, by and among (i) Nortel Networks Corporation ("NNC"), (ii) Nortel Networks Limited ("NNL"), (iii) Nortel Networks Inc. ("NNI"), ~~Nortel Networks UK Limited ("NNUK" and~~(iv) the companies set out in Schedule A (the "EMEA Filed Entities"), which, except for Nortel Networks S.A. (In Administration and Secondary Proceedings) ("NNSA"), are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited (In Administration) for which David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom serve as joint administrators (collectively the "Joint Administrators")) who act as agents of the EMEA Filed Entities without any personal liability whatsoever (the EMEA Filed Entities collectively with NNC, NNL and NNI, the "Depositors"),~~; and~~; (v) the Joint Administrators in their individual capacity solely for the purposes of taking the benefit of Paragraph 20 below; and (vi) JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America ("JPMorgan") and acting through its TS/Escrow Services Division and solely in its capacity as escrow agent under the Agreement, and any successors appointed pursuant to the terms hereof (JPMorgan in such capacity, the "Escrow Agent").

**WHEREAS,** on January 14, 2009 (the "Petition Date"), NNC, NNL and certain of their affiliates (collectively, the "Canadian Debtors") filed with the Ontario Superior Court of Justice (the "Canadian Court") an application for protection under the Companies' Creditors Arrangement Act (Canada) (the "CCAA") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court;

**WHEREAS,** NNI and certain of its affiliates (collectively, the "U.S. Debtors") are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date (except for Nortel Networks (CALA) Inc., which commenced its case under Chapter 11 of the U.S. Bankruptcy Code on July 14, 2009) by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court");

**WHEREAS,** the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors as representative for the U.S. Debtors (the "Committee," and together with the Monitor, the "Estate Fiduciaries"), and in addition, and ad hoc group of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group");

**WHEREAS** on January 14, 2009, the High Court of Justice in London, England (the "English Court" ordered that the EMEA Filed Entities be placed into administration under the English Insolvency Act 1986 (the "Insolvency Act") and Insolvency Rules 1986 (the "Insolvency Rules") and European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the "EC Regulation") and appointed the Joint Administrators (as appropriate) to manage the affairs, business and property of the EMEA Filed Entities;

**WHEREAS** on May 28, 2009, insolvency proceedings, opened in accordance with Article 3(3) of the EC Regulation ("Secondary Proceedings"), were opened by the Commercial Court of Versailles (the "French Court") in relation to NNSA pursuant to Article 27 of the EC Regulation pursuant to which the French Court appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Liquidateur Judiciaire" and Maître Franck Michel, partner of Selarl F. Michel – A. Miroitte – C. Gorins, 10 Allée Pierre de Coubertin, 7800 Versailles as the "Administrateur Judiciaire" of NNSA under Articles 641-1 et seq. of the French Commercial Code;

**WHEREAS,** NNC, NNL and NNI, and certain of their affiliates (collectively, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ) (the "Buyer") have entered into that certain Asset Sale Agreement, dated as of July 24, 2009, as amended on [_____], 2009 and as may be further amended from time to time in accordance with its terms (the "Asset Sale Agreement", and terms not otherwise defined herein shall have the meaning given to them in the Asset Sale Agreement), whereby the Sellers have agreed to sell certain of their assets to the Buyer;

**WHEREAS,** it is contemplated under Section 2.3.2 of the Asset Sale Agreement that at Closing the Buyer will deliver or cause to be delivered an amount in immediately available funds equal to the Estimated Purchase Price less the Good Faith Deposit, the Working Capital Escrow Amount and other amounts deducted from the Estimated Purchase Price by mutual agreement of the Sellers and the Buyer (the "Deposited Purchase Price") to the Sellers, and will deliver or cause to be delivered an amount in immediately available funds equal to the Working Capital Escrow Amount to Citibank N.A., in its capacity as escrow agent ("Citi") under that certain Escrow Agreement dated as of the Closing Date (the "Working Capital Escrow Agreement") by and among the Sellers, Citi and the Purchaser;

**WHEREAS,** it is contemplated under the Transition Services Agreement that at Closing the Sellers will deliver or cause to be delivered an amount in immediately available funds equal to $50,000,000 (the "TSA Escrow Amount") to Citi under that certain escrow agreement to be entered into at Closing by and among the Sellers, Citi and Ericsson Inc., a corporation organized under the laws of Delaware ("E Inc.") pursuant to the Transition Services Agreement (the "TSA Escrow Agreement");

**WHEREAS,** it is contemplated that the Depositors and certain other parties will enter into an agreement (the "Side Agreement") relating to, among other things, the release of amounts hereunder prior to final allocation of the Escrow Funds (as defined below) and at the time of such final allocation; *[Can we please be provided with further details as to what is contemplated by the Side Agreement]*

**WHEREAS,** the Closing is expected to occur in early November, 2009 and the Depositors desire to establish an account prior to Closing for the escrow of the Deposited Purchase Price pursuant to this Agreement, it being understood by the Depositors that this Agreement is subject to amendment in accordance with Paragraph 15(a) to, among other things, reflect further agreement among the Depositors as to the terms of the escrow of the Deposited Purchase Price; and

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property    2

WHEREAS, this Agreement and the Side Agreement will be approved by the Canadian Court and the U.S. Bankruptcy Court and the Depositors will, promptly after receiving such approval, provide the Escrow Agent with evidence of such approvals; and

WHEREAS, the Depositors wish to appoint JPMorgan as Escrow Agent and JPMorgan is willing to accept such appointment and to act as Escrow Agent, in each case upon the terms and conditions of the Agreement.;

WHEREAS, the Depositors and certain other parties (together, the "IFSA Parties") have entered into an agreement to address interim funding and the settlement of certain matters dated June 9, 2009 (the "Interim Funding and Settlement Agreement"), pursuant to clause 12 (c) of which, the IFSA Parties have agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions (the "Interim Sales Protocol") which shall provide binding procedures for the allocation of sales proceeds where the IFSA Parties are otherwise unable to reach agreement;

WHEREAS the EMEA Filed Entities have agreed pursuant to clause 11 of the Interim Funding and Settlement Agreement to enter into an Appropriate License Termination with respect to the licenses and rights granted by NNL to the EMEA Filed Entities under or pursuant to the Master Research and Development Agreement for the purposes of facilitating the entering into of the Asset Sale Agreement, and in consideration of a right to an allocation to such Depositors of the Escrow Funds (as defined below). Such Appropriate License Termination is in agreed form and will be signed following the execution of this Agreement. Upon the execution of the Appropriate Licence Termination the EMEA Filed Entities, pursuant to clause 11 (d) of the Interim Funding and Settlement Agreement, shall be deemed to be a Selling Debtor (for the purposes of the Interim Funding and Settlement Agreement) and have an entitlement to share in the Escrow Funds; and

WHEREAS the Depositors agreed pursuant to clause 12 (b) of the Interim Funding and Settlement Agreement that the Escrow Funds (as defined below) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which are to make clear that in no case shall there be any distribution from the escrow account in advance of either (i) agreement of all of the Selling Debtors (which includes such deemed Selling Debtors) (as that term is defined in the Interim Funding and Settlement Agreement) or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolvers under the terms of the Interim Sales Protocol.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors and the Escrow Agent hereto agree as follows:

1.    Appointment of Escrow Agent. The Depositors hereby jointly nominate, constitute and appoint the Escrow Agent as escrow agent to hold the Escrow Funds (as defined below) in the Escrow Account (as defined below) upon the terms and conditions set forth herein. The Escrow Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Escrow Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. The Escrow Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its

obligations hereunder.  The Depositors and the Escrow Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, shall be binding upon each of the Depositors and the Escrow Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.    Deposit of Escrow Property.  Funds shall be deposited in the Escrow Account (as defined below) as follows:

(a)    At the Closing, NNC, NNL and NNI shall instruct the Buyer to deposit the Deposited Purchase Price, less the TSA Escrow Amount, with the Escrow Agent in immediately available funds in an account established with the Escrow Agent (the "Escrow Account") account number [_____];

(b)    At the Closing, NNI shall deposit the Good Faith Deposit less $22,500,000 (which represents the reimbursement to NNI and NNL of the termination fee and expense reimbursement previously paid by NNI and NNL to Nokia Siemens Networks, B.V.) with the Escrow Agent in immediately available funds in the Escrow Account;

(c)    After the Closing, NNC, NNL and NNI shall instruct the Buyer to deposit any purchase price adjustments to be paid to the Sellers under the Asset Sale Agreement with the Escrow Agent in the Escrow Account;

(d)    After the Closing, NNC, NNL and NNI shall instruct Citi to deposit any of the Working Capital Escrow Amount to be released to Sellers pursuant to the Working Capital Escrow Agreement with the Escrow Agent in the Escrow Account; and

(e)    After the Closing, ~~unless the Escrow Account has been terminated in accordance with Paragraph 6,~~ NNC, NNL and NNI shall instruct Citi to deposit any of the TSA Escrow Amount to be released to the Sellers pursuant to the TSA Escrow Agreement with the Escrow Agent in the Escrow Account;

(all funds deposited in accordance with (a)-(e) above collectively, the "Escrow Property").  The Escrow Property, plus all interest and other income thereon received by Escrow Agent, less any funds distributed or paid in accordance with this Agreement, is collectively referred to herein as "Escrow Funds").  The Escrow Agent shall provide written confirmation to the Depositors, and the Estate Fiduciaries and the Bondholder Group upon its receipt of any Escrow Property from the Buyer, Citi or otherwise.  The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Escrow Agent and shall not be commingled with the other assets held by the Escrow Agent. *[EMEA would like actual and irrevocable instructions to be made to the Buyer and/or Citi concurrently with this agreement and the relevant instructions held in escrow on behalf of the parties pending the closing of the sale].*

3.    Investment of Escrow Funds.

(a)    Until otherwise jointly directed by all of the Depositors, the Escrow Agent shall invest the Escrow Funds in Permitted Investments only.  "Permitted Investments" means (1) United States Treasury obligations with maturities not in excess of one year, (2) money market

funds invested solely in such United States Treasury obligations and (3) the JPMorgan money market deposit account. The Escrow Agent shall invest the Escrow Funds on the date of deposit provided that it is received on or before 11:00 a.m. New York City time. Any written notice to remit payment received by the Escrow Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement "Business Day" shall mean any day that the Escrow Agent is open for business in New York City. In the absence of joint written instruction from the Depositors and the Estate Fiduciaries, the Escrow Agent will invest the Escrow Funds in item (3) referenced above.[1]

(b)     Any investment direction contained herein may be executed through an affiliated broker dealer of the Escrow Agent and will be entitled to such usual and customary fee. Neither the Escrow Agent nor any of its affiliates assume any duty or liability for monitoring the investment rating.

(c)     The Escrow Agent shall have the right to liquidate investments as necessary to distribute Escrow Funds pursuant to Paragraph 5.

4.     Ownership of Escrow Funds; Taxes.[2]

(a)     The Escrow Funds at all times are and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Funds shall, as of the end of each calendar year and to the extent required by law, be reported by Escrow Agent on Form 1099 or Form 1042-S as the income of Depositors or their Affiliates, based upon the disbursement of the Escrow Funds to Depositors or their Affiliates pursuant to Paragraph 5 if such income was disbursed during such calendar year or, with respect to any Escrow Funds not disbursed during such calendar year, based upon each Depositor's pro rata share of such income, with each Depositor's pro rata share being deemed to be equal to such Depositor's interest allocation percentage as set forth on Exhibit 1. The Escrow Agent acknowledges and agrees that the interest percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Funds and, accordingly, the Escrow Agent agrees to amend Form 1099 and Form 1042-S upon a joint written request therefor from the Depositors, which request shall set forth the re-allocation of all interest and any other earnings on Escrow Funds previously reported on Form 1099 and Form 1042-S. Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("FIRPTA"). The Depositors acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Funds or any income earned by the Escrow Funds. Each Depositor further acknowledges and agrees that any taxes payable from the income earned by it on the investment of any sums held in the Escrow Funds shall be paid by such Depositors. All proceeds of the Escrow Funds shall be retained in the Escrow Account and reinvested from time to time by the Escrow Agent as provided in this Agreement. The Escrow Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities. The Escrow Agent has no ownership interest in the Escrow Funds but is serving solely as escrow holder having only possession thereof. This

---

[1] Investment options that comply with U.S. Trustee rules to be proposed by JP Morgan.

[2] Arrangements for taxes to be discussed. See Exhibit 1.

Paragraph 4 shall survive notwithstanding any termination of this Agreement or the resignation of the Escrow Agent. Each Depositor will provide the Escrow Agent with the appropriate form W-9 or W-8 either (x) if any of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, as a condition to such Depositor's receipt of such Escrow Funds from the Escrow Agent, prior to the Escrow Agent making such disbursement hereunder or (y) if none of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, on or before December 31, 2009. If W-8 or W-9 forms, validated by the Escrow Agent, have not been provided by all of the Depositors prior to December 31, 2009 the Escrow Agent shall report taxes on a disbursement basis in the year they are disbursed.

(b)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Funds. The Depositors shall, jointly and severally, indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of the Escrow Agent. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with their Interest Allocation Percentages reflected in Exhibit 1 and any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to Escrow Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to Escrow Agent or by payment to another Depositor. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9. 9 and shall survive the resignation or removal of Escrow Agent and the termination of this Agreement. The Depositors shall have no liability under this clause in the event that the Escrow Agent is in breach of the terms of this Agreement.

5.     Distribution of Escrow Funds. The Depositors and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:

(a)     The Escrow Agent shall disburse to any Person all or any portion of the Escrow Funds if and as so instructed pursuant to (i) a joint letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) a final decision or decisions of a court or courts of competent jurisdiction (as set forth in Paragraph 20 below), which is not stayed or subject to appeal, directing the distribution of all or such portion of the Escrow Funds as specified in such letter of direction or court order. where the Depositors have entered into the Interim Sales Protocol in accordance with clause 12 of the Interim Funding and Settlement Agreement, a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property    6

allocation of sales proceeds (a "Decision"). Any ~~court order~~Decision pursuant to the preceding sentence may be presented to the Escrow Agent by an Authorized Representative (as set forth in Paragraph 12) of one or more of the Depositors and accompanied by the written instruction referenced in Paragraph 5(d)~~, certifying as to the finality of the court order~~.

(b)    [The Depositors understand and agree that no payments or reimbursements made pursuant to Section 6.1 of the Asset Sale Agreement in respect of Transfer Taxes shall constitute any part of the Deposited Purchase Price or the Escrow Funds, or shall be required to be paid by the Buyer into the Escrow Account. In the event, however, that Buyer or its affiliates make any payments with respect to Transfer Taxes that are payable to or intended for the benefit of one or more Depositors or any Subsidiary, Affiliate or agent thereof pursuant to Section 6.1 of the Asset Sale Agreement but which are deposited into the Escrow Account (any such payment, "Misdirected Tax Payment"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing the Escrow Agent with a letter of direction executed by an Authorized Representative of such Depositor directing the release of such Misdirected Tax Payment.  The requesting Depositor(s) shall (A) send a copy of such letter of direction to each of the other Depositors, the Estate Fiduciaries and the Bondholder Group at the same time as such letter is sent to Escrow Agent and (B) attach thereto (i) supporting documentation evidencing the amount of the Transfer Taxes payable (it being understood that the Escrow Agent shall have no responsibility for verifying the accuracy or sufficiency of such supporting documentation) and (ii) a certification of an Authorized Representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Buyer or its affiliates with respect to Transfer Taxes pursuant to the Asset Sale Agreement.  The Escrow Agent shall, within ten (10) days of receipt of such letter of direction disburse to such Depositor the amounts requested therein; provided, however, that if Escrow Agent receives a notice of objection from one or more of the Depositors or an Estate Fiduciary prior to making such disbursement (but in no event later than 3:00 p.m. EST on such release date), the Escrow Agent shall not make such disbursement until Escrow Agent either (x) receives an order of a court of competent jurisdiction (as provided in Paragraph ~~20~~21 below) instructing it to make such distribution or (y) the objecting Depositor(s) and/or Estate Fiduciary(ies) provide written notice to the Escrow Agent withdrawing such objection.  Subject to the proviso to the preceding sentence, the Escrow Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors and/or Estate Fiduciary(ies).] *[This clause is subject to verification by our Corporate team and we will revert early next week.]*

(c)    The Escrow Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Escrow Account. The Escrow Agent shall have the right to withhold an amount equal to the amount due and owing to the Escrow Agent, plus any reasonable costs and expenses incurred by Escrow Agent in accordance with the terms of this Agreement in connection with the termination of the Escrow Account.

(d)    The Authorized Representative of the Depositor(s) presenting ~~court order~~Decision(s) to the Escrow Agent pursuant to Paragraph 5(a)(ii) shall provide, along with such ~~court order~~Decision(s), a written instruction from the Depositors informing the Escrow Agent of the action to be taken by the Escrow Agent on account of such ~~court order~~Decision(s), as the

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property        7

Escrow Agent shall not be required to interpret any ~~court orders~~Decision(s) independently of such written instruction. None of the Depositors shall issue a written instruction which fails to comply with the terms of the applicable ~~court order~~Decision(s) and the Depositors shall provide a copy of such written instruction to each Estate Fiduciary and the Bondholder Group.

(e)    Any request for a distribution pursuant to this <u>Paragraph 5</u> shall be accompanied by a completed <u>Schedule AB</u> with respect to the Depositors participating in such distribution, unless a completed <u>Schedule AB</u> with respect to such Depositor has previously been provided to the Escrow Agent (in which case the <u>Schedule AB</u> to be provided to the Escrow Agent need only contain the requisite information with respect to the Depositors as to whom no previous <u>Schedule AB</u> has been provided to the Escrow Agent). The Depositors shall comply with any request from another Depositor for information necessary for inclusion in <u>Schedule AB</u>.

6.    <u>Termination of Escrow Account</u>.  The Agreement shall terminate upon the distribution of all Escrow Funds from the Escrow Account established hereunder in accordance with <u>Paragraph 5</u> hereof, subject to the survival of provisions which expressly survive the termination of this Agreement; <u>provided, however,</u> that this Agreement shall not terminate until (i) all of the Working Capital Escrow Amount owing to the Sellers has been released from the Working Capital Escrow Account, deposited in the Escrow Account in accordance herewith and subsequently distributed hereunder, (ii) all of the TSA Escrow Amount owing to the Sellers has been released from the TSA Escrow Account, deposited in the Escrow Account in accordance herewith and subsequently distributed hereunder~~, unless such amount has been distributed upon release from the TSA Escrow Account, in which case the Sellers shall give the Escrow Agent notice thereof with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group~~ and (iii) all other purchase price adjustment amounts owing to the Sellers under the terms of the Asset Sale Agreement have been deposited in the Escrow Account by the Buyer in accordance herewith and subsequently distributed hereunder; <u>provided, further,</u> that if the balance of the Escrow Account is expected by the Depositors to decrease to zero prior to any such deposits, the Depositors shall give the Escrow Agent reasonable advance notice thereof. *[Note to drafter: this clause envisages that in addition to the Decision, there must be a written direction by all the Depositors. There should be some compulsion on the Depositors to issue this direction and some ability for the dispute resolver(s) to resolve any dispute.]*

7.    <u>Method of Payment</u>.  Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on <u>Schedule AB</u> annexed hereto (collectively, the "<u>Standing Settlement Instructions</u>"). Any Depositor shall have the right, from time to time, to provide written notice to the Escrow Agent and the other Depositors updating its Standing Settlement Instructions, and the Escrow Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to <u>Paragraph 5</u> until such Standing Settlement Instructions have been further updated pursuant to this <u>Paragraph 7</u>.

The Depositors acknowledge that the Escrow Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Escrow Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if the Escrow Agent has previously authenticated such Standing Settlement Instructions with respect

to such Depositor. The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8.    <u>Monthly Reports</u>. The Escrow Agent shall, promptly following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Escrow Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9.    <u>Liability of Escrow Agent</u>. The Escrow Agent's sole liability hereunder shall be to hold and invest the Escrow Funds and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder. It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in Paragraph <s>20</s>21 below) determines that the Escrow Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Account, including, without limitation, the Escrow Property, nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. The Escrow Agent shall have no duty or obligation to make any calculations of any kind hereunder. In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the parties pursuant to Paragraph 5 which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Paragraph <s>20</s>21 below).

Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage or any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Funds, or any part thereof, at any time, that cannot be settled under other provisions hereof, the Escrow Agent is authorized to retain in its possession, without liability to

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property                    9

anyone, all or any part of the Escrow Funds, as applicable, or the proceeds from any sale thereof until ~~such dispute shall have been settled either by mutual agreement between the parties concerned or until otherwise ordered by a court order of a court of competent jurisdiction (as set forth~~a distribution is ordered in ~~accordance with Paragraph 20 below). 5.~~

      The Depositors shall, jointly and severally, indemnify and hold harmless Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively "Losses") arising out of or in connection with (a) Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by Escrow Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in Paragraph ~~20~~21 below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement. The parties further acknowledge that the Depositors shall have no liability for the foregoing indemnities in the event that the Escrow Agent is in breach of the terms of this Agreement. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with their Interest Allocation Percentages reflected in Exhibit 1 and any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Escrow Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to Escrow Agent or by payment to another Depositor. The indemnification provided by this Paragraph 9 is in addition to the indemnification provided in Paragraph 4(b).

      The duties and responsibilities of the Escrow Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. The Escrow Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Asset Sale Agreement, other than as outlined in this Agreement, nor shall the Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. In the event of any conflict between the terms and provisions of this Agreement, those of the Asset Sale Agreement, any schedule or exhibit attached to the Agreement, or any other agreement among Depositors, or any of them, the terms and conditions of this Agreement shall control solely to the extent such conflict is with respect to the rights, duties, obligations and liabilities of the Escrow

Agent: ~~provided, however, for the avoidance of doubt, as between the Depositors, such other Agreements shall control.~~

10.    Compensation of Escrow Agent.  The Depositors agree to pay the Escrow Agent a fee in the amount of $2,500 in the aggregate on the date hereof and on the anniversary of the date hereof each year thereafter as full compensation for its services hereunder; provided, however, that the Depositors further agree to reimburse the Escrow Agent all reasonable, documented out-of-pocket costs and out-of-pocket expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, including but not limited to any suit in interpleader brought by the Escrow Agent (which shall be brought only in a court of competent jurisdiction (as set forth in Paragraph ~~20~~21 below).  The Escrow Agent shall collect amounts due to it under this Paragraph 10 from the Escrow Account.

11.    Resignation or Removal of Escrow Agent.  The Escrow Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon selection of a successor escrow agent pursuant to the provisions of this Agreement.  Similarly, the Escrow Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to the Escrow Agent by the Depositors and the Estate Fiduciaries.  In either event the Escrow Agent shall then deliver the balance of the Escrow Funds then in its possession to a successor escrow agent as shall be appointed by the Depositors as evidenced by a written notice filed with the Escrow Agent and signed by the Depositors and the Estate Fiduciaries.

If the Depositors and the Estate Fiduciaries are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in Paragraph ~~20~~21 below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. For the avoidance of doubt, the parties acknowledge that under no circumstances shall any party be entitled to obtain a distribution from the Escrow Account as a result of the resignation of the Escrow Agent.

The successor escrow agent shall be a bank or trust company having its principal executive office in the United States and assets in excess of $5,000,000,000.

Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Funds the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

Any corporation into which the Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Escrow Agent in its individual capacity may be transferred, shall be the Escrow Agent under this Agreement without further act.

12.    Notices.  All communications hereunder shall be in writing and shall be deemed to be duly given and received:  (i) upon delivery, if delivered personally, or upon confirmed

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property          11

transmittal, if by facsimile; (ii) on the next Business Day (as hereinafter defined) if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule BC or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (i), (ii) or (iii) of this Paragraph 12, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth on Schedule BC is authorized or required by law or executive order to remain closed.

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule CD hereto (each an "Authorized Representative" of the applicable Depositor), and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Escrow Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to the Escrow Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a court order of a court of competent jurisdiction (as provided in Paragraph 2021 below) to the Escrow Agent designating a successor Authorized Representative. The Depositors acknowledge that such security procedure is commercially reasonable.

If at any time prior to the termination of this Agreement any of the Estate Fiduciaries is discharged, removed or dissolved whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Bankruptcy Court, or otherwise any Depositor or Estate Fiduciary shall present to the Escrow Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document, and such Estate Fiduciary by operation of this Agreement shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposed hereunder. If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed or dissolved Estate Fiduciary, then such rights and responsibilities shall pass automatically to such successor entity.

The Depositors represent, warrant and covenant that each document, notice, instruction or request provided by such party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Depositors to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

13.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Facsimile copies may be deemed originals for the purpose of this Agreement.

14.    Paragraph Headings.    The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15.    Amendments; No Waivers.

(a)    Any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Escrow Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing all of the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating all Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

(b)    No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

16.    Entire Agreement; No Third Party Beneficiaries. This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors) the Asset Sale Agreement, the Side Agreement, the Interim Funding and Settlement Agreement dated June 9, 2009 among the U.S. Debtors, the Canadian Debtors and the Joint Administrators and the Allocation Protocol to be entered into pursuant thereto (a) constitute the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder.

17.    Governing Law.   ~~This~~Subject to Paragraph 20, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the choice of law provisions thereof).

18.    Account Opening Information. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When an account is opened, Escrow Agent will ask for information that will allow it to identify relevant parties.

19.    Severability. If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Paragraph 2021 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining

Error! Unknown document property
name.Error! Unknown document property
name Error! Unknown document property                    13

provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

20.      Exclusion of Liability for the Joint Administrators.

(a)      The parties hereto agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Filed Entities to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any EMEA Filed Entity to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Paragraph 99(4) of Schedule B1 to the Insolvency Act and/or Rule 2.67 of the Insolvency Rules or otherwise howsoever.

(b)      The Joint Administrators are a party to this Agreement: (i) as agents of certain of the respective EMEA Filed Entities of which they are administrators; and (ii) in their own capacities solely for taking the benefit of this Paragraph 20 and the exclusions and limitations in their favour in this Agreement and taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act and enforcing the obligations of certain other parties to this Agreement.

(c)      Notwithstanding anything in Paragraph 21, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Filed Entities) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

21.      ~~20.~~ JURISDICTION.  SUBJECT TO PARAGRAPH 20, FOR ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, EACH PARTY HEREBY  ~~IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE~~ AGREES TO SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ~~AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH~~ (I) THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPREME COURT OF JUSTICE, IF SUCH ACTION OR PROCEEDING IS BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, ~~INCLUDING~~IN A JOINT PROCEEDING AS PROVIDED FOR UNDER THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPREME COURT OF JUSTICE ON JUNE 29, 2009, AS SUCH MAY BE FURTHER AMENDED FROM TIME TO TIME, AND (II) ~~THE~~ANY STATE OR FEDERAL ~~COURTS IN THE SOUTHERN DISTRICT OF~~COURT SITTING IN NEW YORK ~~AND THE STATE COURTS OF THE STATE OF NEW YORK,~~ COUNTY, STATE OF ~~MANHATTAN (COLLECTIVELY, THE "NEW YORK COURTS"), IF~~ IF SUCH ACTION OR PROCEEDING IS BROUGHT AFTER ENTRY OF ~~SUCH~~A FINAL DECREE CLOSING SUCH BANKRUPTCY CASES, AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS ~~AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED DOCUMENT OR OBLIGATION. EXCEPT AS PROVIDED IN THE~~

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

14

~~FOREGOING NO PARTY HERETO SHALL INITIATE ANY LEGAL PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION BEFORE ANY BODY,~~ OR OTHER OBJECTION TO VENUE IN SUCH ACTION OR PROCEEDING. EACH PARTY FURTHER AGREES THAT SERVICE OF PROCESS UPON IT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT MAY BE MADE BY DELIVERING SUCH PROCESSS VIA FAX AND OVERNIGHT COURIER TO THE PERSON DESIGNATED TO RECEIVE NOTICES FOR SUCH PARTY PURSUANT TO PARAGRAPH 12. SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE ~~EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE~~VALID AND SUFFICIENT SERVICE. EACH PARTY FURTHER AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAW~~, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE. THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION.~~, PROVIDED, HOWEVER, THAT ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN PARAGRAPH 20 OF THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE ENGLISH COURTS.

     22. ~~21.~~Interpretation. As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23. ~~22.~~ Compliance with Court Orders. In the event that any escrow Funds shall be attached, garnished or levied upon by any court order, or the ~~delivery~~distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Paragraph ~~20~~21 above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24. ~~23.~~ Force Majeure. In the event that any party or the Escrow Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Escrow Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Escrow Agent is able to perform substantially.

25. ~~24.~~ Patriot Act Disclosure. Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, each Depositor acknowledges that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm such Depositor's identity including without limitation name, address and organizational documents ("identifying information"). Each Depositor agrees to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information with respect to it required as a condition of opening an account with or using any service provided by the Escrow Agent.

26. ~~25.~~ Taxpayer Identification Numbers ("TIN"). Each Depositor will provide the Escrow Agent with its fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other required documentation as set forth in Paragraph 4(a). Each Depositor providing such documentation represents that its correct TIN assigned by the IRS, or any other taxing authority, shall be set forth in the delivered forms[, as well as in the Substitute IRS Form W-9 set forth on the signature page of this Agreement.]³

27. Interim Sales Protocol. The Depositors, the Estate Fiduciaries and the Bondholder Group agree and acknowledge that nothing in this Agreement shall prejudice any pre-existing rights or obligations of any of the Depositors, the Estate Fiduciaries and the Bondholder Group to argue the appropriateness of any allocation of the Escrow Funds before a dispute resolver(s) appointed pursuant to the Interim Sales Protocol. Without limitation to the foregoing, the Depositors' Interest Allocation Percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Funds and shall not be used by any of the Depositors, the Estate Fiduciaries and the Bondholder Group in any of their submissions (whether in writing or orally) as

---

³ To be confirmed by JPMorgan.

to the appropriate allocation of the Escrow Funds before the dispute resolver(s) appointed pursuant to the Interim Sales Protocol.

*[Remainder of Page Intentionally Left Blank]*

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

17

# Mendoza, Richard

| | |
|---|---|
| **From:** | Segger, Joanne |
| **Sent:** | 04 November 2009 19:45 |
| **To:** | 'jbromley@cgsh.com'; 'jmcgill@cgsh.com'; 'epolizzi@cgsh.com' |
| **Cc:** | GALE, STEPHEN; DAVIES, GAVIN; LLOYD, KEVIN; Whiteoak, John; Ellis, Ryan; Barcock, Alison; adler@hugheshubbard.com; 'Schwill, Robin' |
| **Subject:** | CDMA Escrow Agreement |
| **Attachments:** | CDMA Escrow Proposal (2).DOC |

Dear All

Further to our telephone conversation last night, we were asked to consider whether the EMEA entities would consent to the release of certain funds from escrow (in advance of any final determination of proceeds) to the US and Canadian Estates.

Having discussed this with our clients, the Joint Administrators are prepared to accommodate your request for a release of funds subject to certain conditions. This accommodation is detailed in the attached.

As noted in the attached, we do not consider that our proposals should hold up the execution of the CDMA Escrow agreement, as there is no reason why paragraph 5 should not mirror the requirements of the IFSA as per our draft on 30 October 2009. Subject to the agreement of all of the Selling Debtors to the CDMA transaction, our proposal should be able to be documented by way of a Side Agreement. Any matters of details can be discussed.

In the meantime we suggest that the CDMA Escrow agreement be finalised to reflect the IFSA so that an agreed position can be put to the Canadian Court on Friday.

Regards

---

**Joanne Segger**
**Senior Associate (Australia)**
Litigation and Arbitration Division
Herbert Smith LLP
Phone (Direct Dial): + 44 (0)207 466 2605
Email: Joanne.Segger@Herbertsmith.com

## CDMA Escrow Proposal

By telephone conference on Tuesday 3 November 2009, Clearys made a request of the EMEA entities in relation to the draft CDMA Escrow agreement; namely, that up to 50% of the proceeds from the CDMA sale be capable of release to the US and Canadian estate by court order before an allocation of proceeds is determined. We understand the CDMA Escrow agreement needs approval in principle by the Canadian court by 6 November 2009 and to be finally in place by Friday 13 November 2009.

As noted by Herbert Smith on that conference call, clause 12 b of the IFSA states that all the proceeds from the sale of CDMA are to be placed into escrow and not released without agreement of all the Selling Debtors (including all the filed EMEA entities) or final determination by Dispute Resolvers appointed under an Interim Sales Protocol. This clause 12 b, and the IFSA as a whole, has been approved by the US, Canadian, English and French Courts. Clearys' request to make an interim payment a condition of the CDMA Escrow agreement is contrary to what was agreed under the court approved IFSA.

Despite the contractual rights afforded to the EMEA entities by the Court-approved IFSA, the Joint Administrators are committed to cooperating where appropriate with the North American estates. However, in doing so the EMEA entities need to ensure that their rights in relation to allocation of proceeds are protected; and not compromised.

Therefore the Joint Administrators, on behalf of all the EMEA filed entities, are prepared to agree as follows:

1.  Subject to (2) and (3), that the US and Canadian Estates have the ability to release up to 50% of the Escrow Funds to the US and Canadian Estates in proportions to be agreed by all the Selling Debtors. Such a release shall not constitute an allocation of sale proceeds for the CDMA sale or a final and binding payment to those estates. The release of money will be paid to the US and/ or Canadian Estates on account and subject to repayment by either estate should the ultimate final allocation of proceeds either as agreed between the parties or determined by the dispute resolver(s) under the Interim Sales Protocol (or otherwise) be less than the amounts that are released under this paragraph (such right to be secured or such other protection provided). For the avoidance of doubt, it is for the dispute resolver(s) appointed under an Interim Sales Protocol to determine the final allocation of all sale proceeds and the release under this paragraph (or any court order or judgment that may accompany it) is not to be used as evidence in any allocation hearing (before a dispute resolver(s) appointed under the Interim Sales Protocol or otherwise) that the US or Canadian estates are entitled to be allocated the amount released.

2.  That the First and Second Shortfall Payments (as those terms are defined in the IFSA, and being an amount of $20 million) be payable without set-off or deduction by NNL to NNUK immediately upon the release of any amounts under paragraph 1. As such, any amounts released under paragraph 1 must provide a minimum amount of $20 million to NNL. As to this $20 million, but only with respect to this $20 million and no other amounts, all the parties agree that this is a minimum allocation to NNL and is not subject to the repayment referred to in paragraph 1. As such, the payment of this $20 million by NNL to NNUK will be in full and final settlement of the First and Second Shortfall Payments. The parties are to give consideration to what, if any, Court approval is required in order that this $20 million payment can be so made to NNUK.

3. That the US and Canadian Debtors, the UCC, the Bondholders Committee and the Monitor agree to the points made in Kevin Lloyd's protocol proposal dated 3 November 2009, which directly relate to the allocation procedure for, inter alia, the CDMA transaction. Namely that the Interim Sales Protocol will need to ensure:

    a. The definition of Negotiating Parties includes all filed EMEA entities for all transactions;

    b. That the Dispute Resolvers are entitled to determine who is/are the legal and beneficial owner/s of the assets that are subject to the sale in question, for the purpose of allocating proceeds of that sale. This is without prejudice to the right of any Negotiating Party to argue that such a determination is not relevant to any proceeds allocation; and

    c. Any statements, representations or provisions in the sale agreements are not determinative and are without prejudice to the legal and beneficial ownership of assets that are the subject to the sale.

In terms of the drafting of the CDMA Escrow agreement, none of the above needs to hold up the execution of the CDMA Escrow agreement. There is no reason paragraph 5 should not mirror the requirements of the IFSA as per our draft on 30 October 2009. That clause specifically allows for release of the Escrow Funds by agreement (as does the IFSA). Subject to the agreement of the other Selling Debtors this can be documented by way of the proposed Side Agreement. In this regard it will be necessary for the French Administrator and Liquidator to agree to this proposal. We have been in contact with them during the course of today and will put them in contact with you as to their thoughts on the above proposal. We have not yet had a full opportunity to discuss the proposal with the Directors of the EMEA non filed entities; however, we will endeavour to do so prior to the finalisation of the CDMA Escrow agreement. Finally, we would expect that you will be making similar contact with the APAC entities to secure their agreement to this proposal.

We understand that separate discussions have taken place between our respective tax colleagues, and that Cleary's tax department are currently considering whether it may be desirable for the parties to make certain changes to the way in which interest (arising on any amounts held in escrow) is held. With regard to the balance of the draft agreement, can you please provide us with a revised draft of the agreement (in light of our comments provided on Friday 30 October 2009)?

**Herbert Smith LLP**
**4 November 2009**

ESCROW AGREEMENT

among

THE SELLERS

and

THE EMEA FILED ENTITIES

and

THE ESTATE FIDUCIARIES

and

JPMorgan Chase Bank, N.A., as Escrow Agent

dated as of November 11, 2009

**ESCROW AGREEMENT** (this "Agreement"), dated as of November 11, 2009, by and among (i) Nortel Networks Corporation ("NNC"); (ii) Nortel Networks Limited ("NNL"); (iii) Nortel Networks Inc. ("NNI"); (iv) the companies set out in Schedule A (the "EMEA Filed Entities"), which are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited (In Administration) for which David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom serve as joint administrators (collectively the "Joint Administrators")) who act as agents of the EMEA Filed Entities without any personal liability as set forth in Paragraph 20 below (the EMEA Filed Entities and collectively with NNC, NNL and NNI, the "Depositors"); (v) the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Paragraph 28; and (vi) JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America ("JPMorgan") and acting through its TS/Escrow Services Division and solely in its capacity as escrow agent under the Agreement, and any successors appointed pursuant to the terms hereof (JPMorgan in such capacity, the "Escrow Agent").

**WHEREAS,** on January 14, 2009 (the "Petition Date"), NNC, NNL and certain of their affiliates (collectively, the "Canadian Debtors") filed with the Ontario Superior Court of Justice (the "Canadian Court") an application for protection under the Companies' Creditors Arrangement Act (Canada) (the "CCAA") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of any Depositor that is a Canadian debtor, the "Canadian Cases");

**WHEREAS,** NNI and certain of its affiliates (collectively, the "U.S. Debtors") are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date (except for Nortel Networks (CALA) Inc., which commenced its case under Chapter 11 of the U.S. Bankruptcy Code on July 14, 2009) by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court") (the "U.S. Cases" and together with the Canadian Cases, the "Bankruptcy Cases");

**WHEREAS,** the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors as representative for the creditors of the U.S. Debtors (the "Committee," and together with the Monitor, the "Estate Fiduciaries"), and in addition, and ad hoc group of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group");

**WHEREAS,** on the Petition Date, the High Court of Justice in London, England (the "English Court") ordered that the EMEA Filed Entities be placed into administration under the English Insolvency Act 1986 (the "Insolvency Act") and Insolvency Rules 1986 (the "Insolvency Rules") and European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the "EC Regulation") and appointed the Joint Administrators (as appropriate) to manage the affairs, business and property of the EMEA Filed Entities;

1

**WHEREAS** on May 28, 2009, insolvency proceedings, in accordance with Article 3(3) of the EC Regulation ("Secondary Proceedings"), were opened by the Commercial Court of Versailles (the "French Court") in relation to NNSA in accordance with Article 27 of the EC Regulation pursuant to which the French Court appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Liquidateur Judiciaire" and Maître Franck Michel, partner of Selarl F. Michel – A. Miroitte – C. Gorins, 10 Allée Pierre de Coubertin, 7800 Versailles as the "Administrateur Judiciaire" of NNSA under Articles 641-1 et seq. of the French Commercial Code;

**WHEREAS,** NNC, NNL and NNI (collectively, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ) (the "Buyer") have entered into that certain Asset Sale Agreement, dated as of July 24, 2009, as amended on October 30, 2009 and as may be further amended from time to time in accordance with its terms (the "Asset Sale Agreement", and terms not otherwise defined herein shall have the meaning given to them in the Asset Sale Agreement), whereby the Sellers have agreed to sell certain of their assets relating to the CDMA and LTE Access businesses to the Buyer;

**WHEREAS,** it is contemplated under Section 2.3.2 of the Asset Sale Agreement that at Closing the Buyer will deliver or cause to be delivered an amount, in immediately available funds, equal to the Estimated Purchase Price less the Good Faith Deposit, the Working Capital Escrow Amount and other amounts deducted by mutual agreement of the Sellers and the Buyer (subject to the consent of the Estate Fiduciaries and the Bondholder Group in accordance with clause 12.g of the IFSA (as defined below)) from the Estimated Purchase Price to be paid by the Buyer at Closing (the "Deposited Purchase Price") to the Sellers, and will deliver or cause to be delivered an amount, in immediately available funds, equal to the Working Capital Escrow Amount to Citibank N.A., in its capacity as escrow agent ("Citi") under that certain Escrow Agreement to be entered into at Closing (the "Working Capital Escrow Agreement") by and among the Sellers, Citi and the Buyer;

**WHEREAS,** it is contemplated under the Transition Services Agreement that at Closing the Sellers will deliver or cause to be delivered an amount in immediately available funds equal to $50,000,000 (the "TSA Escrow Amount") to Citi under that certain escrow agreement to be entered into at Closing by and among the Sellers, Citi and Ericsson Inc., a corporation organized under the laws of Delaware, pursuant to the Transition Services Agreement (the "TSA Escrow Agreement");

**WHEREAS,** the Closing is expected to occur in early November, 2009 and the Depositors desire to establish an account prior to Closing for the escrow of the Deposited Purchase Price pursuant to this Agreement, it being understood by the Depositors that this Agreement is subject to amendment in accordance with Paragraph 15(a) to, among other things, reflect further agreement among the Depositors as to the terms of the escrow of the Deposited Purchase Price;

**WHEREAS,** the Depositors and certain other parties (together, the "IFSA Parties") have entered into that certain agreement to address interim funding and the settlement of certain matters dated June 9, 2009 (the "IFSA"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties have agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions (the "Allocation Protocol"),

2

which shall provide binding procedures for the allocation of sales proceeds where the IFSA Parties are otherwise unable to reach agreement; and

WHEREAS the EMEA Filed Entities have agreed pursuant to clause 11 of the IFSA to enter into an Appropriate License Termination with respect to the licenses and rights granted by NNL to the EMEA Filed Entities under or pursuant to the Master Research and Development Agreement or any other internal agreement among entities of the Nortel group for the purposes of facilitating the entry into the Asset Sale Agreement, and in consideration of a right to an allocation to such Depositors of a portion of the Escrow Funds (as defined below). Upon the execution of the Appropriate License Termination the EMEA Filed Entities, pursuant to clause 11.d of the IFSA, shall be deemed to be a Selling Debtor (for the purposes of the IFSA) and shall be entitled to a portion of the Escrow Funds. Such Appropriate License Termination is in agreed form and has been executed by the EMEA Filed Entities (the "<u>ALT</u>");

WHEREAS, this Agreement will be approved by the Canadian Court and the U.S. Bankruptcy Court prior to Closing and the Depositors will, promptly after receiving such approval, provide the Escrow Agent with evidence of such approvals; and

WHEREAS, the Depositors wish to appoint JPMorgan as escrow agent and JPMorgan is willing to accept such appointment and to act as escrow agent, in each case upon the terms and conditions of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors and the Escrow Agent hereto agree as follows:

1.      <u>Appointment of Escrow Agent</u>. The Depositors hereby jointly nominate, constitute and appoint the Escrow Agent as escrow agent to hold the Escrow Funds in the Escrow Account (as defined below) upon the terms and conditions set forth herein. The Escrow Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Escrow Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. The Escrow Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Escrow Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, shall be binding upon each of the Depositors and the Escrow Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.      <u>Deposit of Escrow Property</u>. Funds shall be deposited in the Escrow Account (as defined below) as follows:

(a)      At the Closing, the Sellers shall instruct the Buyer to deposit the Deposited Purchase Price, less the TSA Escrow Amount, with the Escrow Agent, in immediately available funds, in an account established with the Escrow Agent (the "<u>Escrow Account</u>") account number 507953312;

(b)    At the Closing, NNI shall deposit the Good Faith Deposit less $22,500,000 (which amount represents the aggregate reimbursement to NNI and NNL of the termination fee and expense reimbursement previously paid to Nokia Siemens Networks, B.V. by NNI and NNL, each of whom paid $11,250,000) with the Escrow Agent in immediately available funds in the Escrow Account and pay $11,250,000 to NNL;

(c)    After the Closing, the Sellers shall instruct the Buyer to deposit any purchase price adjustments to be paid to the Sellers under the Asset Sale Agreement with the Escrow Agent in the Escrow Account;

(d)    After the Closing, the Sellers shall instruct Citi to deposit any of the Working Capital Escrow Amount to be released to Sellers pursuant to the Working Capital Escrow Agreement with the Escrow Agent in the Escrow Account; and

(e)    After the Closing, the Sellers shall instruct Citi to deposit any of the TSA Escrow Amount to be released to the Sellers pursuant to the TSA Escrow Agreement with the Escrow Agent in the Escrow Account; provided, however, that if the Depositors (subject to the consent of the Estate Fiduciaries) have agreed to an allocation of the TSA Escrow Amount (or the amount thereof remaining at the time of release or such allocation has been determined pursuant to the Allocation Protocol), the Sellers shall instruct Citi to distribute the TSA Escrow Amount in accordance with such allocation;

(all funds deposited in accordance with sub-paragraphs (a)-(e) above collectively, the "Escrow Property"). The Escrow Property, plus all interest and other income thereon received by Escrow Agent, less any funds distributed or paid in accordance with this Agreement, is collectively referred to herein as "Escrow Funds"). The Escrow Agent shall provide written confirmation to the Depositors, and the Estate Fiduciaries and the Bondholder Group upon its receipt of any Escrow Property from the Buyer, Citi or otherwise. Prior to the deposits in accordance with sub-paragraphs (a)-(e) above, there shall be no other funds in the Escrow Account. The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Escrow Agent and shall not be commingled with the other assets held by the Escrow Agent.

3.    Investment of Escrow Funds.

(a)    Until otherwise jointly directed by all of the Depositors, the Escrow Agent shall invest the Escrow Funds in Permitted Investments only. "Permitted Investments" means (1) United States Treasury obligations with maturities not in excess of one year, (2) money market funds invested solely in such United States Treasury obligations and (3) the JPMorgan Chase Bank Collateralized Money Market Deposit Account; provided, however, that in no event shall Permitted Investments include investments that are not eligible for the portfolio interest exemption or other similar exception to U.S. withholding tax. The Escrow Agent shall invest the Escrow Funds on the date of deposit so long as the relevant funds are received on or before 11:00 a.m. New York City time. Any written notice to remit payment received by the Escrow Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth on Schedule C is authorized or required by law or executive order to remain closed. In the absence

4

of joint written instruction from the Depositors and the Estate Fiduciaries, the Escrow Agent will invest the Escrow Funds in item (3) referenced above. The parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of the Escrow Funds or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Depositors to give the Escrow Agent instructions to invest or reinvest the Escrow Funds.

(b)     Any investment direction contained herein may be executed through an affiliated broker-dealer of the Escrow Agent, which shall be entitled to such affiliated broker-dealer's usual and customary fee. Neither the Escrow Agent nor any of its affiliates assume any duty or liability for monitoring the investment rating of the investments.

(c)     The Escrow Agent shall have the right to liquidate investments as necessary to distribute Escrow Funds pursuant to Paragraph 5.

4.     Ownership of Escrow Funds; Taxes.

(a)     The Escrow Funds at all times are and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Funds shall, as of the end of each calendar year and to the extent required by law, be reported by Escrow Agent on Form 1099 or Form 1042-S as the income of Depositors or their Affiliates, based upon the disbursement of the Escrow Funds to Depositors or their Affiliates pursuant to Paragraph 5 if such income was disbursed during such calendar year or, with respect to any Escrow Funds not disbursed during such calendar year, based upon each Depositor's pro rata share of such income, with each Depositor's pro rata share being deemed to be equal to such Depositor's interest allocation percentage as set forth on Exhibit 1. The Escrow Agent acknowledges and agrees that the interest percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Funds and, accordingly, the Escrow Agent agrees to amend Form 1099 and Form 1042-S upon a joint written request from the Depositors and the Estate Fiduciaries, which request shall set forth the re-allocation of all interest and any other earnings on Escrow Funds previously reported on Form 1099 and Form 1042-S; provided, however, the Escrow Agent shall be permitted to rely at all times upon the interest percentages then set forth on Exhibit 1 delivered to the Escrow Agent and otherwise the Escrow Agent shall be entitled to act upon the allocations and interest percentages as then set forth in Exhibit 1 without liability to any Depositor, notwithstanding any subsequent amendment to Exhibit 1 setting forth any new allocation or interest percentage. Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to, any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("FIRPTA"). The Depositors acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Funds or any income earned by the Escrow Funds. Each Depositor further acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Funds shall be paid by such Depositor. All proceeds of the Escrow Funds shall be retained in the Escrow Account and reinvested from time to time by the Escrow Agent as provided in this Agreement. The Escrow Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax

5

documentation, and shall remit such taxes to the appropriate authorities. The parties hereby agree and acknowledge that the Escrow Agent has no ownership interest in the Escrow Funds but is serving solely as escrow holder having only possession thereof. This <u>Paragraph 4</u> shall survive notwithstanding any termination of this Agreement or the resignation of the Escrow Agent. Each Depositor will provide the Escrow Agent with the appropriate form W-9 or W-8 either (x) if any of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, as a condition to such Depositor's receipt of such Escrow Funds from the Escrow Agent, prior to the Escrow Agent making such disbursement hereunder or (y) if none of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, on or before December 31, 2009. If W-8 or W-9 forms, validated by the Escrow Agent, have not been provided by all of the Depositors prior to December 31, 2009 the Escrow Agent shall report taxes on a disbursement basis in the year they are disbursed.

(b)    To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Funds. The Depositors shall, jointly and severally, indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of the Escrow Agent. Any indemnification payments arising from the indemnification provided by this <u>Paragraph 4(b)</u> shall be initially satisfied out of the Escrow Funds to the extent available. The indemnification provided by this <u>Paragraph 4(b)</u> is in addition to the indemnification provided in <u>Paragraph 9</u> and shall survive the resignation or removal of Escrow Agent and the termination of this Agreement.

5.    <u>Distribution of Escrow Funds</u>. The Depositors, the Estate Fiduciaries and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:

(a)    The Escrow Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of sales proceeds (a "<u>Decision</u>") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.

(b)    The Depositors understand and agree that no payments or reimbursements made pursuant to Section 6.1 of the Asset Sale Agreement in respect of Transfer Taxes shall constitute any part of the Deposited Purchase Price or the Escrow Funds, or shall be required to be paid by the Buyer into the Escrow Account. In the event, however, that Buyer or its Affiliates

6

make any payments with respect to Transfer Taxes that are payable to or intended for the benefit of one or more Sellers or any Affiliate or agent thereof pursuant to Section 6.1 of the Asset Sale Agreement but which are deposited into the Escrow Account (any such payment, "Misdirected Tax Payment"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing the Escrow Agent with a letter of direction executed by an Authorized Representative of such Depositor identifying the amount that is represented to be a Misdirected Tax Payment(s) and further directing the release of such Misdirected Tax Payment to the appropriate beneficiary in accordance with Paragraph 12 below. The requesting Depositor(s) shall (A) send a copy of such letter of direction to each of the other Depositors, the Estate Fiduciaries and the Bondholder Group at the same time as such letter is sent to Escrow Agent and (B) attach thereto (i) supporting documentation evidencing the amount of the Transfer Taxes payable (it being understood that the Escrow Agent shall have no responsibility for verifying the accuracy, delivery or sufficiency of such supporting documentation) and (ii) a certification of an Authorized Representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Buyer or its affiliates with respect to Transfer Taxes pursuant to the Asset Sale Agreement. The Escrow Agent shall, on the tenth (10th) day following receipt of such letter of direction, disburse to such Depositor the amounts requested therein; provided, however, that if Escrow Agent receives a notice of objection from one or more of the Depositors or an Estate Fiduciary prior to making such disbursement (but in no event later than 3:00 p.m. EST on such release date), the Escrow Agent shall not make such disbursement until Escrow Agent either (x) receives an order of a court of competent jurisdiction (as provided in Paragraph 21 below), which is not stayed or subject to appeal, instructing it to make such distribution or (y) the objecting Depositor(s) and/or Estate Fiduciary(ies) provide written notice to the Escrow Agent withdrawing such objection. Subject to the proviso to the preceding sentence, the Escrow Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors and/or Estate Fiduciary(ies).

(c)     The Escrow Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Escrow Account. The Escrow Agent shall have the right to withhold an amount equal to the amount due and owing to the Escrow Agent, plus any reasonable costs and expenses incurred by Escrow Agent in accordance with the terms of this Agreement in connection with the termination of the Escrow Account.

(d)     No Depositor shall submit to the Escrow Agent a certificate that falsely certifies to the finality of a Decision.

(e)     Any request for a distribution pursuant to this Paragraph 5 shall be accompanied by a completed Schedule B with respect to the Depositors participating in such distribution, unless a completed Schedule B with respect to such Depositor has previously been provided to the Escrow Agent (in which case the Schedule B to be provided to the Escrow Agent need only contain the requisite information with respect to the Depositors as to whom no previous Schedule B has been provided to the Escrow Agent). The Depositors shall comply with any request from another Depositor for information necessary for inclusion in Schedule B.

6.     Termination of Escrow Account. The Agreement shall terminate upon the distribution of all Escrow Funds from the Escrow Account established hereunder in accordance

7

with Paragraph 5 hereof, subject to the survival of provisions which expressly survive the termination of this Agreement; provided, however, that this Agreement shall not terminate until (i) all of the Working Capital Escrow Amount owing to the Sellers has been released from the Working Capital Escrow Account, deposited in the Escrow Account in accordance herewith and subsequently distributed hereunder, (ii) all of the TSA Escrow Amount owing to the Sellers has been released from the TSA Escrow Account, deposited in the Escrow Account in accordance herewith and subsequently distributed hereunder, unless such amount has been distributed upon release from the TSA Escrow Account in accordance with Paragraph 2(e), in which case the Sellers shall give the Escrow Agent notice thereof with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group and (iii) all other purchase price adjustment amounts owing to the Sellers under the terms of the Asset Sale Agreement have been deposited in the Escrow Account by the Buyer in accordance herewith and subsequently distributed hereunder; provided, further, that if the balance of the Escrow Account is zero prior to any such deposits, the Depositors shall give the Escrow Agent reasonable advance notice of expected deposits and the Escrow Agent shall keep the Escrow Account open.

7.    Method of Payment. Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on Schedule B annexed hereto (collectively, the "Standing Settlement Instructions"). Any Depositor shall have the right, from time to time, to provide written notice to the Escrow Agent and the other Depositors updating its Standing Settlement Instructions, and the Escrow Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Paragraph 5 until such Standing Settlement Instructions have been further updated pursuant to this Paragraph 7.

The Depositors acknowledge that the Escrow Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Escrow Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if the Escrow Agent has previously authenticated such Standing Settlement Instructions with respect to such Depositor. The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8.    Monthly Reports. The Escrow Agent shall, promptly following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Escrow Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9.    Liability of Escrow Agent. The Escrow Agent's sole liability hereunder shall be to hold and invest the Escrow Funds and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder. It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted by it in accordance with the

8

advice or opinion of any such counsel, accountants or other skilled persons. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in Paragraph 21 below) determines that the Escrow Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Account, including, without limitation, the Escrow Property, nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. The Escrow Agent shall have no duty or obligation to make any calculations of any kind hereunder. In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the parties pursuant to Paragraph 5 which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Paragraph 21 below).

Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage or any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Funds, or any part thereof, at any time, that cannot be settled under other provisions hereof, the Escrow Agent is authorized to retain in its possession, without liability to anyone, all or any part of the Escrow Funds, as applicable, or the proceeds from any sale thereof until a distribution is requested in accordance with Paragraph 5(a).

The Depositors shall, jointly and severally, indemnify and hold harmless Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively "Losses") arising out of or in connection with (a) Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by Escrow Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in Paragraph 21 below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or

9

removal of the Escrow Agent or the termination of this Agreement. Any indemnity payments to the Escrow Agent arising from the indemnification provided by this Paragraph 9 shall be initially satisfied from the Escrow Funds to the extent available. The indemnification provided by this Paragraph 9 is in addition to the indemnification provided in Paragraph 4(b) and shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement.

The duties and responsibilities of the Escrow Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. The Escrow Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Asset Sale Agreement, the IFSA and the Allocation Protocol, other than as outlined in this Agreement, nor shall the Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. In the event of any conflict between the terms and provisions of this Agreement, those of the Asset Sale Agreement, any schedule or exhibit attached to the Asset Sale Agreement, the IFSA, the Allocation Protocol, or any other agreement among Depositors, or any of them, the terms and conditions of this Agreement shall control solely to the extent such conflict is with respect to the rights, duties, obligations and liabilities of the Escrow Agent.

10.    Compensation of Escrow Agent. The Depositors agree to pay the Escrow Agent a fee in the amount of $2,500 in the aggregate on the date hereof and on the anniversary of the date hereof each year thereafter as full compensation for its services hereunder; provided, however, that the Depositors further agree to reimburse the Escrow Agent all reasonable, documented out-of-pocket costs and out-of-pocket expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, including but not limited to any suit in interpleader brought by the Escrow Agent (which shall be brought only in a court of competent jurisdiction (as set forth in Paragraph 21 below). The Escrow Agent shall collect amounts due to it under this Paragraph 10 from the Escrow Account.

11.    Resignation or Removal of Escrow Agent. The Escrow Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon selection of a successor escrow agent pursuant to the provisions of this Agreement. Similarly, the Escrow Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to the Escrow Agent by the Depositors and the Estate Fiduciaries. In either event the Escrow Agent shall then deliver the balance of the Escrow Funds then in its possession to a successor escrow agent as shall be appointed by the Depositors and the Estate Fiduciaries as evidenced by a written notice filed with the Escrow Agent and signed by the Depositors and the Estate Fiduciaries.

If the Depositors and the Estate Fiduciaries are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in Paragraph 21 below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. For the avoidance of doubt, the parties acknowledge that under no

circumstances shall any party be entitled to obtain a distribution from the Escrow Account as a result of the resignation of the Escrow Agent.

The successor escrow agent shall be a bank or trust company having its principal executive office in the United States and assets in excess of $5,000,000,000.

Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Funds the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

Any corporation into which the Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Escrow Agent in its individual capacity may be transferred, shall be the Escrow Agent under this Agreement without further act.

12.    Notices. All communications hereunder shall be in writing and shall be deemed to be duly given and received:  (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule C or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (i), (ii) or (iii) of this Paragraph 12, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule D hereto (each an "Authorized Representative" of the applicable Depositor), and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Escrow Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to the Escrow Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a court order of a court of competent jurisdiction (as provided in Paragraph 21 below) to the Escrow Agent designating a successor Authorized Representative. The Depositors acknowledge that such security procedure is commercially reasonable.

If at any time prior to the termination of this Agreement any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of

11

reorganization or liquidation by order of the Canadian Court, the U.S. Bankruptcy Court or otherwise, any Depositor or Estate Fiduciary may present to the Escrow Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Escrow Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder. . If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If at any time prior to the termination of this Agreement any of the Depositors is liquidated or dissolved whether pursuant to an approved plan of reorganization of liquidation by order of the Canadian Court of U.S. Bankruptcy Court (or, in the case of the EMEA Filed Entities, such order court of competent jurisdiction or by operation of law), or otherwise any Depositor, or Estate Fiduciary (as the case may be) shall present to the Escrow Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Escrow Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposed hereunder. If such dissolution or liquidation provides for a successor to such dissolved or liquidation, then such rights and responsibilities shall pass automatically to such successor entity.

The Depositors represent, warrant and covenant that each document, notice, instruction or request provided by such party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Depositors to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

13. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Facsimile copies may be deemed originals for the purpose of this Agreement.

14. Paragraph Headings. The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15. Amendments; No Waivers.

(a) Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Paragraph 12 or the liquidation or dissolution of a Depositor as set forth in Paragraph 12, any provision of this Agreement may be waived or amended if, and only if, such

12

amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Escrow Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing all of the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating all Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

(b)     No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

16.    Entire Agreement; No Third Party Beneficiaries.  This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors that are parties thereto) the Asset Sale Agreement, the IFSA, the ALT and the Allocation Protocol to be entered into pursuant thereto (a) constitute the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder; provided, however, that the Joint Administrators shall be entitled to enforce and take the benefit of Paragraph 20 hereof.

17.    Governing Law.  Subject to Paragraph 20, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the choice of law provisions thereof).

18.    Account Opening Information.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  When an account is opened, Escrow Agent will ask for information that will allow it to identify relevant parties.

19.    Severability.  If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Paragraph 21 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

20.    Exclusion of Liability for the Joint Administrators.

(a)     The parties hereto agree that the Joint Administrators have negotiated this Agreement as agents for the EMEA Filed Entities to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any EMEA Filed Entity to observe, perform or comply with any of its obligations

under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Paragraph 99(4) of Schedule B1 to the Insolvency Act and/or Rule 2.67 of the Insolvency Rules or otherwise howsoever.

(b) Notwithstanding anything in Paragraph 21, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Filed Entities) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

21.   JURISDICTION.  SUBJECT TO PARAGRAPH 20, EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPERIOR COURT OF JUSTICE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPERIOR COURT OF JUSTICE ON JUNE 29, 2009, AND (II) THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF MANHATTAN (COLLECTIVELY, THE "NEW YORK COURTS"), IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY LEGAL PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS.  IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12.  EACH PARTY HEREBY

ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS <u>PARAGRAPH 21</u> TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN <u>PARAGRAPH 20</u> SHALL BE BROUGHT <u>EXCLUSIVELY</u> IN THE ENGLISH COURTS. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.    <u>Interpretation</u>. As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.    <u>Compliance with Court Orders</u>. In the event that any of the Escrow Funds shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.    <u>Force Majeure</u>. In the event that any party or the Escrow Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Escrow Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Escrow Agent is able to perform substantially.

25.    <u>Patriot Act Disclosure</u>. Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, each Depositor acknowledges that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm such Depositor's identity including without limitation name, address and organizational

15

documents ("identifying information"). Each Depositor agrees to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information with respect to it required as a condition of opening an account with or using any service provided by the Escrow Agent.

26.     Taxpayer Identification Numbers ("TIN"). Each Depositor will provide the Escrow Agent with its fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other required documentation as set forth in Paragraph 4(a). Each Depositor providing such documentation represents that its correct TIN assigned by the IRS, or any other taxing authority, shall be set forth in the delivered forms

27.     Allocation Protocol. The Depositors and the Estate Fiduciaries agree and acknowledge that nothing in this Agreement shall prejudice any pre-existing rights or obligations of any of the Depositors and the Estate Fiduciaries to argue the appropriateness of any allocation of the Escrow Funds before a dispute resolver(s) appointed pursuant to the Allocation Protocol. Without limitation to the foregoing, the Depositors' Interest Allocation Percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Funds and shall not be presented by any of the Depositors and the Estate Fiduciaries in any of their submissions (whether in writing or orally) as to the appropriate allocation of the Escrow Funds before the dispute resolver(s) appointed pursuant to the Allocation Protocol.

28.     Exclusion of Liability for Estate Fiduciaries. The Depositors and the Escrow Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Escrow Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement.

*[Remainder of Page Intentionally Left Blank]*

16

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  John Doolittle
Title: _ Senior Vice-President, Finance and
Corporate Services

By:_____
Name:  Anna Ventresca
Title:  General Counsel – Corporate and
Corporate Secretary

NORTEL NETWORKS INC.

By:_____
Name:  Anna Vestresca
Title:  Chief Legal Officer

NORTEL NETWORKS CORPORATION

By:_____
Name:  John Doolittle
Title:  Senior Vice-President, Finance and
Corporate Services

By:_____
Name:  Anna Ventresca
Title:  General Counsel – Corporate and
Corporate Secretary

ESCROW AGENT

JPMorgan Chase Bank, N.A., as Escrow Agent

By:_____
Name:
Title:

ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY

By:_____
Name:
Title:

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity,

By:_____
Name:  Timothy Burling
Title:  Vice President, Finance

Escrow Agreement

S-1

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  George Riedel
Title:   Chief Strategy Officer


By:_____
Name:  Anna Ventresca
Title:    General Counsel – Corporate and
Corporate Secretary

NORTEL NETWORKS INC.

By:_____
Name:  Anna Vestresca
Title:   Chief Legal Officer


NORTEL NETWORKS CORPORATION

By:_____
Name: George Riedel
Title:   Chief Strategy Officer


By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary

ESCROW AGENT

JPMorgan Chase Bank, N.A., as Escrow Agent

By:_____
Name:       SAVERIO A. LUNETTA
Title:          VICE PRESIDENT


ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY



By:_____
Name:
Title:


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By: Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity,

By:_____
Name:  Timothy Burling
Title:   Vice President, Finance


Escrow Agreement

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name: John Doolittle
Title:  Senior Vice-President, Finance and
Corporate Services

By:_____
Name:  Anna Ventresca
Title:    General Counsel – Corporate and
Corporate Secretary

NORTEL NETWORKS INC.

By:_____
Name:  Anna Vestresca
Title:    Chief Legal Officer

NORTEL NETWORKS CORPORATION

By:_____
Name: John Doolittle
Title:  Senior Vice-President, Finance and
Corporate Services

By:_____
Name:  Anna Ventresca
Title:    General Counsel – Corporate and
Corporate Secretary

ESCROW AGENT

JPMorgan Chase Bank, N.A., as Escrow Agent

By:_____
Name:
Title:

ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY

By: *Sharon Hamilton*
Name:  Sharon Hamilton
Title:  Senior Vice-President

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By: Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity,

By:_____
Name: Timothy Burling
Title:   Vice President, Finance

Escrow Agreement

S-1

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

By:_____
Name:   Anna Ventresca
Title:    General Counsel – Corporate and
Corporate Secretary

NORTEL NETWORKS INC.

By:_____
Name:  Anna Vestresca
Title:   Chief Legal Officer

NORTEL NETWORKS CORPORATION

By:_____
Name: John Doolittle
Title:  Senior Vice-President, Finance and
Corporate Services

By:_____
Name:   Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary

ESCROW AGENT

JPMorgan Chase Bank, N.A., as Escrow Agent

By:_____
Name:
Title:

ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY

By:_____
Name:
Title:

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By: Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity,

By: _____
Name:  Timothy Burling
Title:   Vice President, Finance

Exhibit 1

SIGNED for and on behalf of NORTEL    )
NETWORKS UK LIMITED (in    )    ............................................
administration) by ALAN BLOOM as Joint    )    Alan Bloom
Administrator (acting as agent and without    )
personal liability) in the presence of:

Witness signature

......... *W. Graham* ...............    )
Name:   WILMA   GRAHAM    )
Address: NO1 MORE LONDON PLACE, LONDON )
SE12AF
SIGNED for and on behalf of NORTEL    )    ............................................
NETWORKS NV (in administration) by    )    Alan Bloom
ALAN BLOOM as Joint Administrator (acting    )
as agent and without personal liability) in the    )
presence of:

Witness signature

......... *N. Graham* ...............    )
Name:   WILMA   GRAHAM    )
Address: NO.1 MORE   LONDON   PLACE,    )
LONDON   SE1   2AF

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property        S-2        Error! Unknown document property name.
name.Error! Unknown document property

SIGNED for and on behalf of NORTEL )
NETWORKS SPA (in administration) by )
ALAN BLOOM as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of: )

Alan Bloom    Stephen Harris

Witness signature

Name: STUART DEACON )
Address: No. 1 MORE LONDON PLACE )
LONDON SE1 2AF )

SIGNED for and on behalf of NORTEL )
NETWORKS BV (in administration) by )
ALAN BLOOM as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of: )

Alan Bloom    Stephen Harris

Witness signature

Name: STUART DEACON )
Address: No 1, MORE LONDON )
PLACE LONDON SE1 2AF )

SIGNED for and on behalf of NORTEL )
NETWORKS POLSKA SP Z.O.O. (in )
administration) by ALAN BLOOM as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of: )

Alan Bloom    Stephen Harris

Witness signature

Name: STUART DEACON )
Address: NO 1, MORE LONDON )
PLACE, LONDON )
SE1 2AF )

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name. Error! Unknown document property        S-3        Error! Unknown document property name.

**SIGNED** for and on behalf of **NORTEL NETWORKS HISPANIA SA** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

Alan Bloom

Witness signature

*W. Graham*

Name: WILMA GRAHAM
Address: NO 1 MORE LONDON PLACE
LONDON SE1 2AF

)
)
)

**SIGNED** for and on behalf of **NORTEL NETWORKS (AUSTRIA) GMBH** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

Alan Bloom

Witness signature

*W. Graham*

Name: WILMA GRAHAM
Address: NO. 1 MORE LONDON PLACE
LONDON SE1 2AF

)
)
)

**SIGNED** for and on behalf of **NORTEL NETWORKS S.R.O** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

Alan Bloom

Witness signature

*W. Graham*

Name: WILMA GRAHAM
Address: NO 1 MORE LONDON PLACE
LONDON SE1 2AF

)
)
)

Escrow Agreement

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

S-4

Error! Unknown document property name.

SIGNED for and on behalf of **NORTEL**
**NETWORKS ENGINEERING SERVICE**
**KFT** (in administration) by **ALAN BLOOM** as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)
)

Witness signature

Name: STUART DEATON
Address: No 1 MORE LONDON
PLACE LONDON SE1 2AF

)
)
)

SIGNED for and on behalf of **NORTEL**
**NETWORKS PORTUGAL SA** (in
administration) by **ALAN BLOOM** as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)
)

Witness signature

Name: STUART DEATON
Address: No 1 MORE LONDON PLACE
LONDON SE1 2AF

)
)
)

SIGNED for and on behalf of **NORTEL**
**NETWORKS SLOVENSKO S.R.O** (in
administration) by **ALAN BLOOM** as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)
)

Witness signature

Name: STUART DEATON
Address: No 1 MORE LONDON
PLACE, LONDON SE1 2AF

)
)
)

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

Error! Unknown document property name.

SIGNED for and on behalf of NORTEL )
NETWORKS ROMANIA SRL (in )
administration) by ALAN BLOOM as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of:

Alan Bloom

Witness signature

.......... *W. Graham* ..........

Name: WILMA GRAHAM )
Address: NO. 1 MORE LONDON PLACE )
          LONDON SE1 2AF

SIGNED for and on behalf of NORTEL )
GMBH (in administration) by ALAN BLOOM )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Alan Bloom

Witness signature

.......... *W. Graham* ..........

Name: WILMA GRAHAM )
Address: NO1 MORE LONDON PLACE )
          LONDON SE1 2AF

SIGNED for and on behalf of NORTEL )
NETWORKS OY (in administration) by )
ALAN BLOOM as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of:

Alan Bloom

Witness signature

.......... *W. Graham* ..........

Name: WILMA GRAHAM )
Address: NO1. MORE LONDON PLACE )
          LONDON SE1 2AF

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name Error! Unknown document property          S-6          Error! Unknown document property name.

SIGNED for and on behalf of NORTEL                )
NETWORKS AB (in administration) by               )    Alan Bloom    Stephen Harris
ALAN BLOOM as Joint Administrator (acting        )
as agent and without personal liability) in the  )
presence of:                                      )

Witness signature

Name: STUART DEACON
Address: No 1, MORE LONDON
PLACE, LONDON SE1 2AF

SIGNED for and on behalf of NORTEL                )
NETWORKS INTERNATIONAL                            )    Alan Bloom    Stephen Harris
FINANCE & HOLDING BV (in                          )
administration) by ALAN BLOOM as Joint            )
Administrator (acting as agent and without        )
personal liability) in the presence of:           )

Witness signature

Name: STUART DEACON
Address: No 1, MORE LONDON PLACE
LONDON SE1 2AF

SIGNED for and on behalf of NORTEL                )
NETWORKS FRANCE S.A.S (in                         )    Alan Bloom    Stephen Harris
administration) by ALAN BLOOM as Joint            )
Administrator (acting as agent and without        )
personal liability) in the presence of:           )

Witness signature

Name: STUART DEACON
Address: No 1, MORE LONDON
PLACE, LONDON SE1 2AF

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property          S-7          Error! Unknown document property name.

**SIGNED** for and on behalf of **NORTEL NETWORKS (IRELAND) LIMITED** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

Alan Bloom

Witness signature

..............................................................  )

Name:    NILMA    GRAHAM    )

Address:  NO. 1  MORE  LONDON  PLACE  )
LONDON  SE1  2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS SA** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)

Alan Bloom

)
)
)

Witness signature

..............................................................  )

Name:    WILMA    GRAHAM    )

Address:  NO 1  MORE  LONDON  SE1 2AF  )

Escrow Agreement

Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property name.Error! Unknown document property

S-8

Error! Unknown document property name.

SCHEDULE A

<u>EMEA FILED ENTITIES</u>

Nortel Networks UK Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp Z.o.o (In Administration)

Nortel Networks Hispania SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks S.r.o (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko S.r.o (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks SA (In Administration and Secondary Proceedings)

## SCHEDULE B

### STANDING SETTLEMENT INSTRUCTIONS

Nortel Networks Limited
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 38545364

Nortel Networks Inc.
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30463444

Nortel Networks Corporation
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30428374

Nortel Networks UK Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks NV (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SpA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks BV (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Polska Sp Z.o.o (In Administration)

Schedule B-1

Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Hispania SA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Austria) GmbH (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks S.r.o (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Engineering Services Kft (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Portugal SA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Slovensko S.r.o (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Romania Srl (In Administration)
Bank: tbc
ABA#:
SWIFT:

Escrow Agreement

A/C#:

Nortel GmbH (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Oy (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AB (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks International Finance & Holding BV (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks France S.A.S (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Ireland) Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SA (In Administration and Secondary Proceedings)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Escrow Agreement

S-3

SCHEDULE C

<u>NOTICE ADDRESSES</u>

<u>Depositors:</u>

Nortel Networks Corporation, Nortel
Networks Limited and Nortel Networks:

195 The West Mall
Mailstop: TO505006
Toronto, Ontario
M9C 5K1 Canada
Attn: Anna Ventresca
Phone: 905.863.1204
Facsimile: 905.863.2057

The EMEA Filed Entities:

c/o Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS
United Kingdom
Attn: Stephen Gale and Kevin F Lloyd
Phone: +44 20 7374 8000
Facsimile: +44 20 7374 0888

Escrow Agent:

JPMorgan Chase Bank, N.A.
TS / Escrow Services
4 New York Plaza, 21st Floor
New York, New York 10004
Attn: Andy Jacknick
Phone: 212.623.0241
Facsimile: 212.623.6168

Estate Fiduciaries:

The Official Committee of Unsecured
Creditors in connection with the Chapter
11 cases of Nortel Networks Inc., et al.
(Case No. 09-10138):

c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Fred S. Hodara, Stephen B. Kuhn,
David H. Botter and Kenneth A. Davis
Phone: 212.872.1000
Facsimile: 212.872.1002

Monitor:

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario, Canada
M5K 1J7
Facsimile: (416) 943-3300
Attn: Murray A. McDonald

Bondholder Group:

c/o Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Albert A. Pisa and Roland Hlawaty
Phone: 212.530.5000
Facsimile: 212.822.5735

SCHEDULE D

Telephone Number(s) for Call-Backs;
Person(s) Designated to Give and Confirm Funds Transfer Instructions; and Addresses

If to Nortel Networks Corporation:

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| John Marshall Doolittle | 905.863.6636 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule C | |

If to Nortel Networks Limited:

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| John Marshall Doolittle | 905.863.6636 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule C | |

If to Nortel Networks Inc.:

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| John Marshall Doolittle | 905.863.6636 | |
| Name | Telephone Number | Signature Specimen |

Schedule D-1

| Anna Ventresca | 905.863.1204 | _A V_ |
| Address | See <u>Schedule C</u> | |

**If to the EMEA Filed Entities (apart from Nortel Networks (Ireland) Limited):**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Alan Bloom | +44 (0) 207 951 9898 | |

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See <u>Schedule C</u> | |

**If to Nortel Networks (Ireland) Limited:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Alan Bloom | +44 (0) 207 951 9898 | |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Attn: Stephen Gale and<br>Kevin F Lloyd | |

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Escrow Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Escrow Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein

| | | |
|---|---|---|
| Anna Ventresca | 905.863.1204 | |
| Address | See <u>Schedule C</u> | |

**If to the EMEA Filed Entities (apart from Nortel Networks (Ireland) Limited):**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | |
| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See <u>Schedule C</u> | |

**If to Nortel Networks (Ireland) Limited:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Attn: Stephen Gale and<br>Kevin F Lloyd | |

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Escrow Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Escrow Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein

Anna Ventresca                905.863.1204

Address                      See Schedule C

**If to the EMEA Filed Entities (apart from Nortel Networks (Ireland) Limited):**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | |

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See Schedule C | |

**If to Nortel Networks (Ireland) Limited:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Attn: Stephen Gale and<br>Kevin F Lloyd | |

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Escrow Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Escrow Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein

Schedule D-2

constitutes a commercially reasonable method of verifying the authenticity of payment orders. Moreover, such Party agrees to accept any risk associated with a deviation from the Escrow Agent's policy.

EXHIBIT 1

INTEREST ALLOCATION PERCENTAGES

|  | **Interest Allocation Percentage** |
|---|---|
| Nortel Networks Inc | 0% |
| Nortel Networks Limited | 100% |
| Nortel Networks Corporation | 0% |
| The EMEA Filed Entities | 0% |

\* The inclusion of the Interest Allocation Percentages set forth above does not constitute an admission of any Depositor that such Interest Allocation Percentage reflects the percentage of the proceeds to be received by any Depositor or any of its Respective Affiliates under the Asset Sale Agreement. The Interest Allocation Percentages are the initial allocation percentages hereunder and are subject to amendment in accordance with Paragraph 15. The Interest Allocation Percentages set forth above shall not be presented by any party hereto as being indicative of the final allocation of proceeds received by the Depositors under the Asset Sale Agreement.

Exhibit 1



# N⊘RTEL

November 30, 2009

VIA REGISTERED MAIL, RETURN RECEIPT REQUESTED

JPMorgan Chase Bank, N.A.
TS / Escrow Services
4 New York Plaza, 21st Floor
New York, New York 10004
Attn: Andy Jacknick
Facsimile: 212-623-0241

Ladies and Gentlemen:

Reference is made to the Escrow Agreement, dated as of November 11, 2009 (the "Agreement"), by and among Nortel Networks Corporation, a Canadian corporation ("NNC"), Nortel Networks Limited, a Canadian corporation ("NNL"), Nortel Networks Inc., a Delaware corporation ("NNI"), the EMEA Filed Entities and JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America and acting through its TS/Escrow Services Division and solely in its capacity as escrow agent under the Agreement, and any successors appointed pursuant to the terms thereof. Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Agreement.

Effective as of November 20, 2009, all communications provided for in the Agreement to be sent by personal delivery, facsimile with confirmed transmittal, overnight courier, or mailed by prepaid registered mail, return receipt requested to NNC, NNL and NNI only shall be addressed to the number or address specified below, and at such address, to the attention of the Persons specified below, and with such other copy, as are specified below:

> **Nortel Networks Corporation, Nortel Networks Limited and Nortel Networks Inc.:**
> 5945 Airport Road
> Suite 360
> Mississauga, Ontario, Canada  L4V 1R9
> Attention:   Anna Ventresca
> Facsimile:   +1-905-863-2057

*[Remainder of page intentionally left blank.]*

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

**AFFIDAVIT OF JOHN HAYDN WHITEOAK**
**(SWORN JANUARY 12 , 2011)**

I, John Haydn Whiteoak, of London, England, **MAKE OATH AND SAY**:

1.　　　　I swear this Affidavit in opposition to a motion (returnable January 14, 2011) brought by Nortel Networks Corporation (**"NNC"**), Nortel Networks Limited (**"NNL"**), Nortel Networks Technology Corporation (**"NNTC"**), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the **"Nortel CCAA Debtors"**) with respect to the following:

- 2 -

a.      Establishing a process for calling of claims by the EMEA Creditors (as defined in the draft EMEA Claims Procedure Order (defined below)) against the Nortel CCAA Debtors as at January 14, 2009 (the "**Filing Date**") (collectively, the "**EMEA Claims**");

b.      Establishing a bar date of February 11, 2011 for the filing of the EMEA Claims ("**EMEA Claims Bar Date**"); and

c.      Establishing a process for determination and resolution of such EMEA Claims for purposes of voting and distribution in relation to a plan of compromise or arrangement to be presented by the Nortel CCAA Debtors at a later date (the "**Plan**").

2.      I will refer to the above motion as the "**EMEA Claims Procedure Motion**" and the order of this Court being sought in connection therewith the "**EMEA Claims Procedure Order**".

3.      The paragraphs that follow will demonstrate the Joint Administrators' view that the EMEA Claims Procedure Order is premature and flawed. Issuing the EMEA Claims Procedure Order will embroil this Court in the adjudication of numerous claims involving complex issues of conflicts of laws, transfer pricing and will require this court to interpret and apply a host of foreign laws that will not resolve the main disputes between the parties. Indeed, the stand-alone, one-way process will give rise to multiple proceedings dealing with the identical issues and the likelihood of inconsistent results.

- 3 -

4.         Alan Robert Bloom, Stephen John Harris, Christopher John Wilkinson Hill and Alan Michael Hudson are the court appointed administrators and authorized foreign representatives of Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in the region known as EMEA (Europe, Middle East and Africa) and as listed in Schedule "A" hereto (together the "**EMEA Debtors**"), save in respect of Nortel Networks (Ireland) Limited ("**Nortel Ireland**") where David Martin Hughes, of Ernst & Young Chartered Accountants and Alan Robert Bloom were appointed administrators and authorized foreign representatives.  I will refer to them collectively in this Affidavit as the "**Joint Administrators**".  Where I use this term in relation to Nortel Ireland, I am referring to Alan Robert Bloom and David Hughes.

5.         I am a partner with Herbert Smith LLP, solicitors for the Joint Administrators and as such I have knowledge of the matters to which I hereinafter depose in this Affidavit.  Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

6.         References to "**Nortel**" herein are references to the global enterprise as a whole.

7.         The EMEA Claims Procedure Motion Record includes an Affidavit of Anna Ventresca sworn on December 20, 2010, which I will refer to as the "**Ventresca Affidavit**".

- 4 -

**EMEA Claims Procedure Order is Premature**

8.        In summary, it is premature to approve the EMEA Claims Procedure

Order because:

(a)        It is  impossible to resolve the EMEA Claims either in advance of or

separate to the question of the proper allocation of the sale proceeds

of all of the Nortel assets and businesses sold to date or to be sold

because without a known allocation the full extent and quantum of

EMEA Claims cannot be known;

(b)        The link between allocation and inter-company claims is of such a

nature that the two must be resolved either:

(i)        at the same time, pursuant to the mechanism set out in

section 12(c) of the Interim Funding and Settlement

Agreement approved by this Honourable Court on June 23,

2009 (the "**IFSA**");

(ii)        a new mechanism to be agreed upon by the parties or

imposed by the Courts; or

(iii)        if, for whatever reason (including any objection by the Nortel

CCAA Debtors to the scope of application of section 12(c) of

IFSA), it were not possible to resolve the EMEA Claims at the

same time as allocation, allocation must be resolved before

the EMEA claims;

- 5 -

(c)     There is already in place an agreed and Court approved procedure for dealing with allocation which must be complied with;

(d)     It is disruptive to the ongoing mediation process, will make any consensual resolution (to which an enormous amount of time, energy and resources has already been devoted) more difficult and it is in violation of the agreed procedures for the mediation as it will require that certain confidential information be made public;

(e)     It will delay the consideration and determination of the allocation of the sale proceeds currently in escrow if the Joint Administrators are forced to now dedicate significant time and resources to the determination of claims solely against the Nortel CCAA Debtors;

(f)     The EMEA Debtors have not received full disclosure that would enable the Joint Administrators to particularise all of the claims that they have against the Nortel CCAA Debtors; and

(g)     The EMEA Claims Procedure Order appears to be an attempt by the Nortel CCAA Debtors to obtain a tactical advantage in the mediation discussions.

**The EMEA Claims Procedure is Flawed**

9.      In summary, the EMEA Claims Procedure Order is flawed for the following reasons in particular:

- 6 -

(a)     It adopts an overly simplistic approach to dealing with the EMEA Claims which involve complex issues of fact (in particular in respect of the Nortel Group's transfer pricing arrangements) and complex issues of law;

(b)     It does not deal with the process for resolving questions around the applicable law for the EMEA Claims and if foreign law is the applicable law, how it will be applied (e.g., expert evidence; court-to-court communication; and/or referral to another court);

(c)     It does not deal with the mechanics for discovery of information covered by confidentiality agreements (to which more than just the EMEA Debtors and Nortel CCAA Debtors are parties) and which is necessary to prove the EMEA Claims nor does it establish a manageable, proper, more complete discovery process which is required in order to deal with the large number of EMEA Claims;

(d)     It sets an unrealistic EMEA Claims Bar Date;

(e)     It purports to terminate the tolling of applicable limitation periods under *any* applicable law provided for in the Order Approving Tolling made by this Court on December 20, 2010 (the **"Tolling Order"**), which should continue to have effect in all respects;

(f)     It is not co-ordinated with:

(i)     The EMEA Debtors' own claim processes in their respective

- 7 -

jurisdictions which have not yet formally commenced (albeit claims have been invited to be filed on a non-binding basis but no bar date has been set nor has any determination been made of filed claims) and it is likely that a claims process will formally commence and conclude only following the resolution of the allocation of the sale proceeds currently in escrow. As noted later, the Nortel CCAA Debtors may well make claims against the EMEA Debtors. If either party asserts set-off against claims being made in their respective claims process, there is a real danger that there will be a consideration by at least the UK Court (as defined below) and this Court of the same claims, the same facts and the same arguments;

(ii)  An inter-company claims process in the United States Bankruptcy Court for the District of Delaware (the **"US Court"**) to deal with inter-company claims being asserted against the US Debtors (as defined below). Many of the same claims, facts and agreements will need to be considered in that process as well; and

(iii) Other claims in the CCAA Proceedings themselves as a similar bar date is not being applied to other Nortel entities, notwithstanding that several of those entities, particularly in the US, may have similar claims against the Nortel CCAA

- 8 -

Debtors based on the same facts or the same multi-party agreements (in particular in relation to the transfer pricing). Indeed, as part of the Canadian Funding and Settlement agreement (the **"CFA"**) (discussed below), a copy of which is attached as Exhibit "A" hereto, the Nortel CCAA Debtors have agreed to only instigate bar dates against the US Debtors following negotiations and agreement with them and other interested parties. The EMEA Debtors' claims will be isolated from their full context and this will lead to this Court potentially having to consider the same issues brought by several Nortel entities at different times;

(g)    As a consequence of the matters above, this could lead to parallel proceedings in the insolvency courts of the numerous jurisdictions involved in the Nortel insolvency (as well as the allocation tribunal that is contemplated by IFSA, using different procedures and with different timetables and with other Nortel entities). Claims arising out of the same facts and circumstances as the EMEA Claims would have to be determined in each of those different forums and there would be a significant risk of conflicting judgments in different jurisdictions.

- 9 -

## A.    Background

10.         The Joint Administrators were appointed in respect of the EMEA Debtors, pursuant to Administration Orders (the "**UK Administration Orders**") granted by the High Court of Justice of England and Wales (the "**UK Court**") on the Filing Date pursuant to the provisions of the *Insolvency Act 1986* (UK) (collectively, the "**UK Proceedings**").  The UK Administration Orders remain in full force and effect and are not subject to any appeal or motions to vary or set aside.

11.         Nortel has sold substantially all of its operating businesses in the course of the insolvency proceedings in Canada, England and also the United States.  The proceeds are being held in escrow pending determination of how they are to be allocated among the Nortel companies.

12.         Two material and significant issues in the administration of the EMEA Debtors involves determining and valuing:

(a)    The EMEA Debtors' entitlement to the sale proceeds which are currently held in escrow; and

(b)    the interrelated issue of the inter-company claims between and among the EMEA Debtors and the Nortel CCAA Debtors who filed for and obtained protection under the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36 (the "**CCAA**") pursuant to an order of this Court made on the Filing Date (the "**Nortel Canada CCAA Proceedings**").

- 10 -

13.        The Amended and Restated Claims Procedure Order (the "**Claims Procedure Order**") and the Claims Resolution Order made by this Court on July 30, 2009 and September 16, 2010, respectively, do not pertain to the inter-company claims as described in paragraph 3(t)(ii) of the Claims Procedure Order (defined in the EMEA Claims Procedure Order as the "EMEA Claims").

14.        The IFSA among the Nortel CCAA Debtors, Nortel Networks Inc. and the other companies listed at Schedule 2 of the IFSA (collectively the "**US Debtors**"), the Joint Administrators, and the EMEA Debtors (the "**Parties**") was approved by this Court and specifically contemplated the method for addressing this complex and inextricably intertwined inter-company claims issue. In particular, Section 12 (b) of the IFSA provides that funds cannot be distributed from the escrow accounts until either: (i) an agreement on allocation is reached by the Parties; or (ii) if the Parties fail to reach an agreement, a determination is made on the basis of an agreed upon protocol by the Parties for resolving disputes. A copy of the IFSA is attached hereto as Exhibit "B". All the proceeds of all the major sales which have been completed to date (including those not covered by the IFSA) have been placed into escrow and are not to be released until the occurrence of one of the two events listed above. An example copy of the escrow agreements relating to the sales proceeds is at Exhibit "C".

15.        To date, various efforts have been undertaken but have not yet resulted in the resolution of the allocation of these sale proceeds, or the various inter-company claims.

- 11 -

16.          As described in more detail below, to date the Parties are currently attempting to reach an agreement on allocation, and inter-company claims through a mediation process.

17.          If the mediation process fails, then pursuant to the IFSA the next step is for the Parties to reach an agreement on a protocol for binding procedures for the allocation of the sale proceeds.

**B.    The EMEA Claims Procedure Order is Premature and Unnecessary**


18.          As described at paragraph 28(h) of the Ventresca Affidavit, the EMEA Claims Procedure Order permits the Monitor, in consultation with the Nortel CCAA Debtors, and where applicable, any Affected Director or Officer (as defined in the EMEA Claims Procedure Order), to review proofs of claim, to request additional information, to request the filing of a revised proof of claim, to attempt to resolve and settle any issue arising in respect of an EMEA Claim, to accept EMEA Claims, and to disallow EMEA Claims (in whole or in part). This is a unilateral, one-way and internationally uncoordinated approach to dealing with multi-jurisdictional claims issues. It is one which ignores the provisions of the IFSA and which ignores the reality of the complex multi-jurisdictional issues which arise as a result of the multi-jurisdictional insolvency proceedings with which the parties are faced.

**i.    The EMEA claims cannot be dealt with prior to allocation due to the inextricable link between allocation and the EMEA Claims**

- 12 -

19.         As noted above, the issues to which the EMEA Claims give rise are inextricably linked to the allocation of the sales proceeds. The EMEA Claims arise out of the same facts, issues, and legal principles as the EMEA Debtors' sale proceeds allocation arguments.

20.         Further, the quantum of the EMEA Claims, and the very existence of certain of the EMEA Claims themselves, depend entirely on the results of the sales proceeds allocation process.

21.         This is illustrated by the following example (which is described in more detail in paragraphs 36 – 44 below):

    (a)    Sales proceeds allocation issues involve a consideration of the pre-filing situation of the Nortel group, particularly in relation to transfer pricing and the applicability of those transfer pricing arrangements to the sale of the business.  The probity of those arrangements is crucial therefore to a determination of allocation. Insofar as those arrangements were flawed (as at least the EMEA Debtors allege) and resulted in an improper transfer of  assets pre-filing (which will determine which entity legally/beneficially owned which assets at the time of the relevant sale), this will also found claims against those entities which benefited from those flawed arrangements or knowingly procured those agreements. Such claims would, if successful, result in a greater allocation of the sales proceeds to the injured party on the basis it has made a greater

- 13 -

contribution to the development of the sold asset than might otherwise appear;

(b)    The EMEA Debtors further allege that several of the claims they have against the Nortel CCAA Debtors are proprietary in nature and/or derived from the law of trusts which would constitute a priority right to a certain portion of the sale proceeds held in escrow. These issues involve complex questions of conflicts of laws and, again, the determination of these issues may well give rise to claims against other Nortel entities;

(c)    Depending upon the decision that is reached in any allocation dispute, additional claims may be founded. For example, the less a Nortel entity receives by way of allocation, the greater the likelihood is that that entity may have a claim in relation to its pre-filing contributions to the Nortel group that were not properly recompensed, for example through transfer pricing; and

(d)    If the Canadian claims process takes place in advance of the determination of sale proceeds allocation, then the claims cannot be properly or finally dealt with in this Court. Any decision would have to be revisited and adjusted in light of the outcome of findings made in the proceeds allocation dispute. This would be procedurally absurd, grossly inefficient and very costly to all of the Nortel estates.

- 14 -

22.        The fact that the determination and resolution of inter-company claims is intertwined with allocation issues is explicitly recognised by the monitor of the Nortel CCAA Debtors (the "**Monitor**") at paragraph 18 in its Fifty-Eighth Report filed in support of the EMEA Claims Procedure Motion.

23.        It is therefore impossible to deal with the EMEA Claims in advance of the allocation process. At the very least, therefore, the EMEA Claims should be decided after the allocation process. However, for the reasons outlined above, it makes the most commercial sense to have these issues determined at the same time as resolving the allocation of the sale proceeds.

24.        For the reasons above, the main justification relied on by the Nortel CCAA Debtors at paragraph 25 of the Ventresca Affidavit is not sustainable. The claims process, if granted, will lead to significant delay and additional, unnecessary costs.

ii.        **EMEA claims must in any case be dealt with in accordance with section 12(c) of the IFSA**

25.        The attempt to unilaterally impose a claims resolution process through the EMEA Claims Procedure Order runs counter to section 12(c) of the IFSA.

26.        Section 12(c) of the IFSA requires the Parties to agree on a protocol for resolving allocation disputes that provides binding procedures for allocation where the parties are unable to agree. As acknowledged by the Monitor in its