- 15 -

Fifty-Eighth Report, these allocation issues are inextricably intertwined with all Nortel company inter-company claims issues.

27.        In accordance with section 12(c) of the IFSA, the estates began a process of negotiating a protocol for resolving disputes concerning the allocation of the sales proceeds from sale transactions of the material assets of Nortel (the "Interim Sales Protocol"). This process took place for over almost a year from 2009 - 2010, whereby the Joint Administrators acted in good faith in an attempt to reach agreement in accordance with the IFSA. An agreement has not yet been reached. As these discussions proceeded on a without prejudice basis, I am not able to divulge the content of them. If the Court desires, and with the other parties' consent, counsel will be able to advise the Court as to the progress that was made in those discussions.

28.        As noted above, the EMEA debtors' position is that the EMEA Claims are so inextricably linked with allocation that EMEA's Claims must be dealt with under the section 12(c) IFSA process.

### iii.    Ongoing Mediation

29.        As part of an attempt to reach a consensual resolution, the Parties met on several occasions in an attempt to agree on a global settlement.   A disclosure exercise was carried out and documents were placed into a central database (albeit their use was limited only to the settlement discussions). Although helpful, this disclosure fell a long way short of the disclosure that would be required

- 16 -

if the matters were to be litigated.   Nevertheless, a considerable amount of time, resources and effort has been spent on this process to date.

30.        As a result of these meetings, the Parties agreed that the negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues.  The Parties selected Layn R. Phillips of the Alternate Dispute Resolution Center at Irell & Manella LLP to serve as a mediator.

31.        Specific procedures to be utilized for the mediation were agreed. The mediation is non-binding and Mr. Phillips is to keep all information received in connection with the mediation confidential.

32.        The first mediation took place in November 2010 with approximately 134 lawyers and insolvency representatives present.  The Parties were not able to reach any agreements at that time.

33.        A second mediation is currently scheduled for the end of January 2011, although it is possible that this may be postponed for a short time to enable some discussions to occur in order to ensure that the mediation is as productive as possible.

34.        If the EMEA Claims Procedure Order is approved in advance of the second round of mediation, it will subvert the mediation process.  Further, it will run counter to the Parties' agreement to suspend negotiations around a dispute resolution protocol required by the IFSA during the continued mediation and negotiation process.

- 17 -

35.        The Monitor itself acknowledges at paragraph 18 of its Fifty-Eighth Report that the EMEA Claims Procedure Order is only necessary if a settlement is not reached.

### iv.    Allocation and claims positions – danger of a duplication of process

36.        In order to properly understand the integrated nature of the inter-company claims and allocation of sale proceeds, one needs to understand the parties' positions taken to allocation and to inter-company claims. Very substantial position papers (running to hundreds of pages) have been provided as part of the mediation that set out the parties' allocation arguments and inter-company claims and the interrelation between the two. These positions were further elaborated orally on various occasions. Each party to the mediation has a full understanding of the other parties' arguments made to date. However, these positions have been put forward on a confidential and without prejudice basis, and that privilege must be respected.

37.        It goes without saying that a consideration of the pre-filing transfer pricing agreements between the relevant Nortel entities (which purport to regulate the creation of intellectual property – a key element of the businesses that were sold) will be central to any allocation arguments. In particular, a consideration of the Master Research and Development Agreement dated 22 December 2004, as amended from time to time (the **"MRDA"**) will need to be undertaken.  The MRDA is part of a suite of transfer pricing documents which sought to regulate the position

- 18 -

between certain so-called residual profit entities (which invested in the creation of intellectual property in the Nortel group) for the purposes of transfer pricing and the creation of intellectual property. A copy of the MRDA is at Exhibit "D". What is clear is that any allocation dispute resolver as contemplated under the IFSA (a "Dispute Resolver") will need to consider the applicability of the MRDA to the allocation of proceeds (particularly in relation to intellectual property) and, further, consider whether the MRDA was an arm's length document properly regulating the relationship between the parties. The resolution of the entire global Nortel insolvency, encompassing both inter-company claims and allocation of the sales proceeds, will necessitate a detailed interpretation, analysis and assessment of the Nortel group's complex transfer pricing system. This is a significant exercise and one that the parties cannot afford to duplicate in numerous processes.


38.       As part of the EMEA Claims Procedure Order, the Canadian Debtors will almost certainly use any claims they have against the EMEA Debtors by way of set-off (if they are permitted to) against claims made by the EMEA Debtors. Those Canadian claims will therefore need to be considered in any claims process. As I am currently unable to refer to these due to mediation privilege, I cannot go into detail about the interrelationship of those claims with the allocation arguments. I can, however, refer this Court to the CFA and the hearing to approve that agreement on 21 January 2010, including the material filed by the EMEA Debtors at that time. The CFA, to which the EMEA Debtors are not party,  saw the Nortel CCAA Debtors accept a $2 billion inter-company claim from

- 19 -

the US Debtors on the basis of a settlement with the U.S. Internal Revenue Service (the "**IRS**") and Canada Revenue Agency resulting from the historic misapplication of transfer pricing principles (the "**IRS Settlement**").

39.        In the material filed before this Court for the 21 January 2010 hearing, it was clear that the Nortel CCAA Debtors will seek compensation from the EMEA Debtors in relation to some of that amount of the IRS Settlement, presumably under the provisions of the MRDA. Conversely, the EMEA Debtors (and perhaps other Nortel entities) will argue that the enormity of this settlement and the methodologies used by the revenue authorities in determining the quantum of the IRS Settlement is evidence that the MRDA is fundamentally flawed and not at arm's length. Indeed, the EMEA Debtors will argue that they are entitled to substantial recompense because of the misapplication of the arm's length principle, similar to the US Debtors' claim under the IRS Settlement. Nevertheless, it can be assumed that the Nortel CCAA Debtors will attempt to raise by way of set-off (if they can) against any claims made in the EMEA Claims Procedure Order a claim under the MRDA for some of that IRS Settlement amount. This will involve this Court analysing the provisions of the MRDA and considering whether they are arm's length agreements; the very same arguments a Dispute Resolver will need to resolve when analysing the allocation arguments. Further, any claim of set-off as against any one of the EMEA Debtors should really be a claim properly dealt with in the relevant foreign insolvency proceeding relating to the particular EMEA Debtor in question.

- 20 -

40.        The relationship between the EMEA Claims and EMEA's allocation arguments is particularly intertwined.

41.        In summary, in any allocation hearing the EMEA Debtors intend to take a principled approach to allocation and claims.  In relation to allocation, the sale proceeds were a sale of the assets of the relevant businesses.  Allocation should therefore proceed on the basis of which entities owned which assets.  In order to determine which entities own what, one must first determine what was sold (i.e. which assets were sold and what the value of those assets is using robust valuation principles).  Then, in accordance with established legal and equitable principles, the EMEA Debtors intend to determine which Nortel entities own which assets and on what basis they own those assets.

42.        In relation to intellectual property, which makes up a very valuable component of the sold businesses, this involves a factual analysis of which entities created that intellectual property prior to the insolvency of the group.  This in turn involves a consideration of the circumstances in which the group was operated so as to facilitate the creation of this intellectual property.  Given that the MRDA purports to regulate the creation of intellectual property, this involves a consideration of that agreement and whether it was the arm's length document it purports to be.  This in turn calls into question the effect of the IRS Settlement and the $2 billion adjustment.  The Joint Administrators are presently of the view that these transfer pricing arrangements, and indeed much of the pre-filing conduct and inter-company transactions, were not done on an arm's length basis were carried out contrary to the interests of the EMEA Debtors.  This impermissible transfer of

- 21 -

value, particularly in relation to transfer pricing (but also in relation to inter-company loans, the operation of the treasury funding and in the corporate restructurings of the group) must be considered when (i) determining the contribution to the creation of intellectual property, and, (ii) to determine the ownership of the intellectual property that was sold as part of the business sales. Also those matters are relevant to whether any of the proceeds of sale are subject to a proprietary or trust claim in the EMEA Debtors' favour. This is a matter for a Dispute Resolver in an allocation dispute. However, this conduct will also found many of the EMEA Debtors' inter-company claims that are purported to be caught by the EMEA Claims Procedure Order insofar as these are not satisfied through the allocation process. Indeed, the less that the EMEA Debtors receive by way of allocation towards the intellectual property that was sold, as a logical consequence, the greater will be their claim in relation to the payments and assets it transferred pre-filing in non arm's length transfers. It is artificial to try and separate these claims from the allocation dispute. It is illogical to determine the claims before the allocation.

43.        Unless a process is implemented to ensure a co-ordinated resolution of inter-company issues there is a real risk that several courts or tribunals will consider and determine the same issues against some or all of the Nortel entities. For example, if the EMEA Claims Procedure Order is approved then in relation to transfer pricing alone:

- 22 -

(a)     A Dispute Resolver in an allocation dispute will need to consider the transfer pricing arrangements, their probity, the effect of the IRS Settlement and the consequences for allocation of proceeds and ownership of intellectual property;

(b)     This Court, as part of the EMEA Claims Process, would need to consider the same issues in determining whether the EMEA Debtors have a claim in relation to transfer pricing and whether any of the Nortel CCAA Debtors have any right of set-off on the basis of a claim in connection with the IRS Settlement;

(c)     The UK Court would have to consider the same issues in adjudicating any claim the Nortel CCAA Debtors may make against any one of the EMEA Debtors on the basis of the IRS Settlement and the right of set-off that the EMEA Debtors would assert on the basis of its transfer pricing claims;

(d)     The US Court would have to consider these issues if, as is likely, the EMEA Debtors make a claim against the US Debtors in relation to their facilitation of the transfer pricing regime; and

(e)     This Court would potentially need to consider any claim from the US Debtors in relation to the transfer pricing arrangements that were put in place from 2006, as the IRS Settlement does not cover the period after 2006 and the US Debtors reserved their right to make this claim

- 23 -

(see clause 13 of the CFA and the limited definition of "NNI TPA Claim").

44.        Essentially this will mean constant and repetitive litigation between the parties in several jurisdictions over the same facts, claims and arguments in a way which is both inefficient and inequitable.

### vi.    Use of Confidential Information

45.        As noted above, with a view to facilitating the negotiation and mediation process around allocation issues and the determination and resolution of the EMEA Claims, the Parties agreed that all mediation submissions were to be confidential.  The EMEA Claims cannot be advanced without reference to such submissions or the documentary and witness evidence on which they were based (much of which were only provided to the EMEA Debtors on a confidential and without prejudice basis). Waiving such confidentiality would require the agreement of several parties beyond just the Nortel CCAA Debtors and the EMEA Debtors.

46.        The process set out in the EMEA Claims Procedure Order would require that confidential information on which the EMEA Claims are based be made public, thereby negating the Parties' agreement on the mediation procedures. As things stand, therefore, the EMEA Claims cannot be advanced without breaching confidentiality.

- 24 -

### viii.    International guidelines

47.         Even without the IFSA, an orderly multinational procedure for the determination of all the inter-company issues would be sensible and in accordance with the *Practice Guide on Cross-Border Insolvency Cooperation* prepared by the United Nations Commission on International Trade Law (UNCITRAL) (1 July 2009) ("**UNCITRAL Practice Guide**"). If one dispute resolution process is not possible then, at a minimum, the processes that are implemented (including the Canadian inter-company claims process) should be as efficient and co-ordinated with the other insolvency regimes as possible.

48.         The agreed and court approved process for establishing a dispute resolution process under the IFSA is consistent with the UNCITRAL Practice Guide.

49.         The UNCITRAL Practice Guide discusses the treatment of inter-company claims at section III paragraph 128 which suggests that treatment of inter-company claims in an enterprise group context should be the "subject of an agreement and include, for example, the establishment of a mechanism, such as a committee to resolve differences with respect to those claims." It is also suggested that "procedural matters with respect to coordination of claims processing, such as place and time (including deadlines) of submission, responsibility and procedure for verification and admission, handling of objections, provision of notice of claims submitted and cross-recognition of admission can be...coordinated in an insolvency agreement".    The paragraph goes on to suggest that such a dispute

- 25 -

resolution mechanism could deal with timing, process, jurisdiction and the law applicable to the resolution of claims. A copy of the UNCITRAL Practice Guide is attached hereto as Exhibit "E".

50.         The Ventresca Affidavit suggests at paragraphs 24 and 25 that the EMEA Claims Procedure Order is necessary to establish an orderly and timely claims process. I strongly disagree. It will do the opposite.

51.         The Nortel Canada CCAA Proceedings is approaching its second anniversary. Accordingly, to suggest that today (rather than at some point over the past two years) it is necessary to have an orderly and timely claims process is simply untenable.  It is obvious in the context of this case that the only Plan to be put forward at this stage will be one that is required to implement a distribution of the final allocation of the collective sale proceeds.  Determining this alloction should therefore come first given the relatively unique fact in this case that allocation determinations will necessarily affect the existence and quantum of all inter-company claims.

**C.      The EMEA Claims Procedure Order is Flawed**

**i.       No Procedure for Dealing with Jurisdictional and Conflicts of Laws Issues**

52.         While the EMEA Claims Procedure Order references the Cross-Border Protocol, it does not address how, except in respect of EMEA Claims covered by the Cross-Border Claims Protocol approved by this Court on

- 26 -

September 16, 2010, issues of jurisdiction, applicable law and coordinating proceedings with the UK Court will be resolved.

53.        Further, the EMEA Claims Procedure Order does not anticipate or deal with situations where there are claims that may be set-off as between the EMEA Debtors and the Nortel CCAA Debtors, or that certain claims and defences may give rise to claims over against other Nortel entities.

## ii.    Mechanics for Establishing Claims are Objectionable

54.        The EMEA Claims Procedure Order does not address how in the face of confidentiality agreements the appropriate evidentiary foundation for proving the EMEA Claims can be developed. As noted above, a proper, more complete disclosure exercise would be required. So far, only limited discovery has been made. That discovery subject to mediation privilege and confidentiality agreements meaning that the documents disclosed cannot be used on an open basis.

55.        In addition, given the number of potential claims by each of the 19 EMEA Debtors, and the range of potentially applicable laws, the EMEA Claims Bar Date of less than one month following the EMEA Claims Procedure Motion is untenable.

56.        Furthermore, the time and resources that would be required to prepare and file the EMEA Claims under the EMEA Claims Procedure Order over the month of January would prove to be an immense distraction for the Parties

- 27 -

from the mediation process and other discussions planned for that month and/or the following months.

### iii.    Tolling under the Tolling Order for all Claims Should not be Terminated

57.        Paragraph 14 of the EMEA Claims Procedure Order states that the tolling of applicable limitation periods under any applicable law provided for in the Tolling Order shall terminate on the EMEA Claims Bar Date.

58.        The purpose of the Tolling Order was to protect limitation periods in respect of causes of action under various potential applicable laws and in respect of the potential pursuit of such causes of action in various jurisdictions. Given the inextricable link between inter-company claims and allocation it is necessary to preserve the tolling to prevent any potential prejudice to the EMEA Debtors' allocation arguments. Termination of the Tolling Order would unjustifiably deny the EMEA Debtors this protection.

### E. Conclusion

59.        The EMEA Claims Procedure Motion is not procedural in nature and implicates a central and inextricably connected issue in the Nortel allocation process. Contrary to the suggestion at paragraphs 30 and 31 of the Ventresca Affidavit, it would not be beneficial to the resolution of Nortel allocation issues to put into place the EMEA Claims Procedure Order. Rather, almost one year's worth of work towards reaching a settlement would be subverted along with the Court

- 28 -

approved IFSA that is already in place to deal with the process for the determination and resolution of the allocation issue. Therefore, because of their interrelationship, the EMEA Claims would be violated.

60.        If the Canadian claims process takes place in advance of the determination of sale proceeds allocation, then the claims cannot be properly or finally dealt with in this Court. Any decision would have to be revisited and adjusted in light of the sales proceeds allocation. This would be procedurally absurd, grossly inefficient and very costly to all of the Nortel estates.

61.        Further, the EMEA Claims Procedure Order is incomplete, includes mechanics that are objectionable and purports to unilaterally terminate the Tolling Order so far as it relates to claims that are not covered by the EMEA Claims Procedure Order.

62.        For the reasons outlined above, it is the Joint Administrators' position that this Court should not grant the EMEA Claims Procedure Order and doing so will not only be contrary to UNCITRAL Practice Guide but will also embroil this Court in the adjudication of numerous claims involving complex issues of conflicts of laws, transfer pricing and the necessity to interpret and apply a host of foreign laws without any present compelling reason. It would also mean that the resolution of claims and allocation in this multi-jurisdictional insolvency would become uncoordinated and duplicated.

- 29 -

SWORN BEFORE ME at
_____

on January 12, 2011

_____
Commissioner for taking affidavits


John Whiteoak


Ashurst LLP
Broadwalk House
5 Appold Street
London EC2A 2HA

## Schedule A

(a)    Nortel Networks UK Limited

(b)    Nortel Networks SA (France)

(c)    Nortel GmbH (Germany)

(d)    Nortel Networks (Ireland) Limited (Ireland)

(e)    Nortel Networks N.V. (Belgium)

(f)    Nortel Networks S.p.A. (Italy)

(g)    Nortel Networks B.V. (Netherlands)

(h)    Nortel Networks Polska S.p. z.o.o. (Poland)

(i)    Nortel Networks Hispania S.A. (Spain)

(j)    Nortel Networks International Finance & Holding B.V. (Netherlands)

(k)    Nortel Networks (Austria) GmbH (Austria)

(l)    Nortel Networks s.r.o. (Czech Republic)

(m)    Nortel Networks Engineering Service Kft. (Hungary)

(n)    Nortel Networks Portugal S.A. (Portugal)

(o)    Nortel Networks Slovensko s.r.o. (Slovakia)

(p)    Nortel Networks France S.A.S. (France)

(q)    Nortel Networks Oy (Finland)

(r)    Nortel Networks Romania SRL (Romania)

(s)    Nortel Networks AB (Sweden)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                                        :
*In re*                                                 :     Chapter 11
                                                        :
NORTEL NETWORKS INC., *et al.*,[1]                      :     Case No. 09-10138 (KG)
                                                        :
                                     Debtors.           :     Jointly Administered
                                                        :
                                                        :     **Hearing Date: February 26, 2010 at 10:00 a.m. (ET)**
                                                        :     **(PROPOSED)**
                                                        :     **Objections Due: February 24, 2010 at 12:00 p.m. (ET)**
                                                        :     **(PROPOSED)**
-------------------------------------------------------X

## NOTICE OF DEBTORS' MOTION FOR ENTRY OF
## AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST
## CERTAIN CLAIMANTS WITH RESPECT TO THE U.K. PENSION PROCEEDINGS

PLEASE TAKE NOTICE that the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases, have today filed the attached **Debtors' Motion For Entry Of An Order Enforcing The Automatic Stay Against Certain Claimants With Respect to The U.K. Pension Proceedings** (the "Motion").

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **February 24, 2010 at 12:00 p.m. (Eastern Time) (PROPOSED)** (the "Objection Deadline").

At the same time, you must serve such Objection on counsel for the Debtors so as to be received by the Objection Deadline.

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **FEBRUARY 26, 2010 AT 10:00 A.M. (EASTERN TIME) (PROPOSED)** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801.  ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: February 18, 2010
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
Neil P. Forrest
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

3400491

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
                                                         :
                                                         :     Chapter 11
                                                         :
*In re*                                                  :     Case No. 09-10138 (KG)
                                                         :
Nortel Networks Inc., *et al.*,[1]                       :     Jointly Administered
                                                         :
                            Debtors.                     :
                                                         :     **Hearing Date: February 26, 2010 at 10:00 a.m.**
                                                         :     **(ET) (PROPOSED)**
                                                         :     **Objections Due: February 24, 2010 at 12:00 p.m.**
                                                               **(ET) (PROPOSED)**
---------------------------------------------------------X

**DEBTORS' MOTION FOR ENTRY OF
AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST
<u>CERTAIN CLAIMANTS WITH RESPECT TO THE UK PENSION PROCEEDINGS</u>**

Debtors Nortel Networks Inc. ("<u>NNI</u>") and certain of its affiliated debtors, as

respective debtors and debtors in possession (the "<u>U.S. Nortel Entities</u>" or the "<u>Debtors</u>"), by and

through their undersigned counsel, submit this motion (the "<u>Motion</u>") pursuant to sections

362(a)(1) and (a)(6) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") to enforce the

automatic stay against claimants Nortel Networks UK Pension Trust Limited (as trustee of the

Nortel Networks UK Pension Plan) (the "<u>U.K. Pension Trustee</u>") and The Board of the Pension

Protection Fund (the "<u>PPF</u>") with respect to their participation in certain U.K. Administrative

---

[1]        The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc.
(9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable
Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Proceedings (as defined _infra_).  In support of this Motion, Debtors respectfully represent as follows:

### RELIEF REQUESTED

1. By this Motion, the Debtors seek the entry of an order pursuant to sections 362(a)(1) and (a)(6) of the Bankruptcy Code, enforcing the automatic stay against two claimants that have submitted to the jurisdiction of the Court by filing proofs of claim, the U.K. Pension Trustee and the PPF (collectively the ("Claimants")), with respect to certain U.K. Administrative Proceedings (as defined _infra_) initiated by the U.K. Pensions Regulator ("TPR"), as such Proceedings relate to NNI and Nortel Networks (CALA) Inc. ("NN CALA"). The stated purpose of those Proceedings is to determine whether to issue a financial support direction ("FSD") against NNI, NN CALA, and the non-U.S. Nortel Entities that are identified by TPR as targets of the Proceeding, to establish a predicate for imposing financial responsibility on the targets for the statutory liability of Nortel Networks UK Limited ("NNUK") to the U.K. Pension Trustee under section 75 of the U.K. Pensions Act 1995.  The automatic stay under section 362(a), however, protects the Debtors from just such an adjudication of potential financial responsibility outside of this Court.  Accordingly, this Motion seeks to enforce the stay against the Claimants, which have submitted the U.K. Pension Claim to this Court, and to confirm that they are subject to sanctions if they participate in a proceeding that is void under section 362, including the FSD proceeding, any contribution notice ("CN") process (each as described _infra_), or any other proceedings that TPR may initiate in the future with respect to the NNUK Pension Plan (as defined _infra_) outside of this Court.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue

over the Debtors' Chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and

1409.

3.      The statutory bases for the relief requested herein are sections 362(a)(1)

and (a)(6) of the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

## BACKGROUND

**A.      Introduction**

4.      On January 14, 2009 (the "Petition Date"), the Debtors (except for NN

CALA, which filed on July 14, 2009) filed voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.

5.      The Debtors continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

6.      Also on the Petition Date, the Debtors' ultimate corporate parent, Nortel

Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited

("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and

certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application

with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies'

---

[2]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

3

Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

7.    The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.    In addition, on January 14, 2009, after the filing by the U.S. Nortel Entities, the High Court of Justice in England placed nineteen of Nortel's European affiliates, including NNUK (collectively, the "EMEA Debtors")[3] into administration under the control of certain individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On June 8, 2009, NNUK filed petitions in this Court for recognition of the English insolvency proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. In light of the need for coordination in the proceedings, on June 26, 2009, the Court entered an order

---

[3]    The EMEA Debtors include the following entities: NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

9.    On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases (other than that of NN CALA) and for consolidation for procedural purposes only. In re Nortel Networks Inc., et al., No. 09-10138 (KG) (Bankr. D. Del. Jan. 15, 2009) (Ct. Dkt. No. 36).[4]

10.    On or about January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code (NNI Ct. Dkt. No. 141).[5] An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

11.    On July 14, 2009 (the "CALA Petition Date"), NN CALA, an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, the Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes (NNI Ct. Dkt. No.1098), and applying to NN CALA certain previously entered orders in the other Debtors' chapter 11 cases (NNI Ct. Dkt. No.1099).

---

[4] The Nortel Networks Inc. docket citations are referenced herein as "NNI Ct. Dkt. No. ___."

[5] The order appointing the Committee was amended on January 26, 2009 to reflect that Odyssey American Reinsurance Corporation had resigned from the Committee. (NNI Ct. Dkt. No. 142).

**B.    Bar Date**

12.    On August 4, 2009, the Court entered the Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof  (the "Bar Date Order") (NNI Ct. Dkt. No. 1280).

13.    Pursuant to the procedures set forth in the Bar Date Order, with certain exceptions, all entities (including governmental units) that desired to assert a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors (other than NN CALA) that arose prior to the Petition Date were required to file a proof of claim in writing so that it was received on or before September 30, 2009, at 4:00 p.m. (prevailing Eastern Time).

14.    On December 3, 2009, the Court entered the Order Establishing Deadlines for Filing Proofs of Claim Against Nortel Networks (CALA) Inc. and Approving Form and Manner of Notice Thereof (the "CALA Bar Date Order") (NNI Ct. Dkt. No. 2059).  Pursuant to the procedures set forth in the CALA Bar Date Order, with certain exceptions, all entities (including governmental units) that desired to assert a claim, as defined in section 101(5) of the Bankruptcy Code, against NN CALA that arose prior to the CALA Petition Date were required to file a proof of claim in writing so that it was received on or before January 25, 2010, at 4:00 p.m. (prevailing Eastern Time).

**C.    Asset Sales and Cross-Affiliate Allocation Issues**

15.    On June 9, 2009, to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales of their businesses, the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors, including NNUK (by the Joint Administrators), entered into an Interim Funding and Settlement Agreement (the "IFSA").  The Court approved the IFSA on June 29, 2009.  Pursuant

6

to section 12 of the IFSA, the parties agreed that the proceeds of any sale of their material assets

(less taxes and costs) would be held in escrow until the parties either reached a consensual

allocation of the proceeds, or:

> "in the case where the Selling Debtors fail to reach agreement, determination by
> the relevant dispute resolver(s) under the terms of the Protocol ... applicable to
> the Sale Proceeds . . .which Protocol shall provide binding procedures for the
> allocation of Sales Proceeds...."

(A copy of the IFSA is attached as <u>Exhibit B</u> to the Declaration of Lisa M. Schweitzer, dated

February 17, 2010 (the "<u>Schweitzer Dec.</u>").) As per the escrow agreements entered into by the

parties, the proceeds of the sales that have been consummated thus far are being held in escrow

accounts located in the United States. (By way of example, a copy of the escrow agreement with

respect to the sale of substantially all of Nortel's CDMA business and LTE Access assets is

attached to the Schweitzer Dec. as <u>Exhibit C</u>.)

16.    In addition, all parties agreed that New York law would govern the IFSA,

and consented to the jurisdiction of the U.S. and Canadian courts for all legal proceedings

concerning the Agreement, other than proceedings against the U.K. Joint Administrators in their

personal capacities, which were required to be brought in the U.K. with U.K. law governing.

(IFSA ¶¶ 16-17.)

17.    On June 19, 2009, Nortel announced that it was advancing in discussions

with external parties to sell its businesses and it would assess other restructuring alternatives for

its businesses in the event it is unable to maximize value through sales. To date, Nortel has

closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. (<u>NNI</u> Ct.

Dkt. No. 539); (ii) the sale of substantially all of its CDMA business and LTE Access assets to

Telefonaktiebolaget LM Ericsson (publ) (<u>NNI</u> Ct. Dkt. No. 1205); (iii) the sale of the assets of its

Wireless Networks business associated with the development of Next Generation Packet Core

network components to Hitachi Ltd. (NNI Ct. Dkt. No.1760); and (iv) the sale of substantially all

of the assets of the Enterprise Solutions business globally, including the shares of Nortel

Government Solutions Incorporated and DiamondWare Ltd., to Avaya Inc. (NNI Ct. Dkt. No.

1514). In addition, Nortel has completed auction processes and obtained Court approval for the

planned sale of substantially all the assets of its Optical Networking and Carrier Ethernet

businesses associated with its Metro Ethernet Networks business unit (NNI Ct. Dkt. No. 2070);

as well as for the planned sale of substantially all of its GSM/GSM-R business (NNI Ct. Dkt. No.

2065).

**D.    The NNUK Proof of Claim**

18.    On September 30, 2009, NNUK, on behalf of itself, the Joint

Administrators, and the other EMEA Debtors, filed proofs of claim against NNI and the other

U.S. Debtors "in respect of any heretofore unknown, unliquidated, or unmatured claim or claims

... against Nortel Networks Inc. or its affiliated debtors in these cases" (other than NN CALA).

The proofs of claim are listed on the Debtors' claim log as claim numbers 5122-5136. (A copy

of the NNUK proof of claim against NNI is attached to the Schweitzer Dec. as Exhibit A.)

**E.    The U.K. Pension Claim**

19.    NNUK is the employer under the Nortel Networks U.K. Pension Plan (the

"NNUK Pension Plan"), a defined benefit occupational final salary pension scheme.

(Declaration of Richard Hitchcock, dated February 18, 2010 (the "Hitchcock Dec.") ¶ 5.4.)

20.     On both November 21, 2006 and December 21, 2007, NNL executed guarantees regarding the NNUK Pension Plan.  No U.S. Nortel Entity provided any guarantee with respect to the NNUK Pension Plan.

21.     The PPF is a U.K. statutory body established under the U.K. Pensions Act 2004 (the "U.K. Pensions Act").  NNUK's commencement of Administration proceedings in the U.K. led to the NNUK Pension Plan entering a PPF "assessment period" pursuant to the U.K. Pensions Act. (See Hitchcock Dec. ¶ 5.5; Exhibit A to the Declaration of John Ray, dated February 18, 2010 ("Ray Dec.")(as described in ¶ 23 infra).)  An "assessment period" means that the PPF is working with the U.K. Pension Trustee to determine the NNUK Pension Plan's funding position.[6]  To the best of the Debtors' understanding, the NNUK Pension Plan remains in an "assessment period."

22.     On or about September 30, 2009, the U.K. Pension Trustee and the PPF jointly filed proofs of claim against the U.S. Nortel Entities (with the exception of NN CALA, discussed infra at ¶ 23), which are listed on Debtors' claim log as claim numbers 5573-5587 (collectively, with the proof of claim filed against NN CALA discussed at ¶ 23 infra, the "U.K. Pension Claim").  (A copy of the U.K. Pension Trustee and PPF's proof of claim against NNI, which is representative of all of their proofs of claim, is attached to the Ray Dec. as Exhibit A.)

23.     On January 25, 2010 the U.K. Pension Trustee and PPF jointly filed a proof of claim against NN CALA, which is listed on Debtors' claim log as claim number 6979. (A copy of the proof of claim filed against NN CALA is attached as Exhibit B to the Ray Dec.)

---

[6]     The PPF is a statutorily created compensation scheme designed to protect private sector defined benefit pension plan members whose employers become insolvent with unfunded liabilities in the pension plan.  The PPF "assessment period" commences on the day of appointment of the administrators of the plan employer, and ends when the plan shortfall has been valued, and, if eligible, the plan is either admitted to the PPF or wound-up outside the PPF.  (Hitchcock Dec. ¶¶ 5.5, 19-22.)

9

24.    The U.K. Pension Claim is based on allegations that (i) the NNUK Pension Plan is under-funded by an estimated amount alternatively stated to be £2.1 billion or $3.1 billion; and (ii) TPR may seek to require certain of the Debtors, as well as certain non-U.S. Nortel entities, to provide financial support for the NNUK Pension Plan.

25.    According to the U.K. Pension Claim, by the time it was filed, TPR had concluded that grounds existed to issue certain warning notices ("Warning Notices") and to seek a FSD against certain members of the Nortel Group worldwide, including NNI and NN CALA, as companies allegedly "connected with or associates of" NNUK, with respect to the allegation that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR. (See Exhibit A to Ray Dec.)

26.    The U.K. Pension Claim also states that the indebtedness or liability of the relevant U.S. Nortel Entities arose no later than the date on which NNUK was allegedly first "insufficiently resourced," and therefore the liability had been incurred no later than TPR's selected date, June 30, 2008. The U.K. Pension Claim further asserts that no Warning Notice had been issued pre-petition or indeed prior to the filing of the Claim. Instead, as discussed *infra*, TPR has only recently purported to issue a Warning Notices addressed, inter alia, to two U.S. Nortel Entities, NNI and NN CALA. [7]

27.    In addition, the U.K. Pension Claim asserts that if a FSD is issued against any of the U.S. Nortel Entities, such entity could then be instructed under the U.K. Pensions Act to procure financial support for the NNUK Pension Plan, either alone or with other members of the Nortel Group. The U.K. Pension Claim further asserts that if a U.S. Nortel Entity receives a

---

[7] The Warning Notice was issued prior to the filing of the U.K. Pension Claim against NN CALA.

10

FSD, but fails to put or keep in place financial support for the NNUK Pension Plan approved by TPR, then TPR could also exercise its power to issue a CN, imposing on that U.S. Nortel Entity a liability to pay a specific amount, which could be all or some portion of the deficit in the NNUK Pension Plan. (See Exhibit A to Ray Dec.)

F.    **The U.K. Pensions Act**

28.    Under the U.K. Pensions Act, TPR has, in relation to a pension plan, a stated pecuniary purpose: to protect the plan benefits of members and to reduce the risk that compensation would be required from the PPF. (Hitchcock Dec. ¶ 41.) Under the U.K. Pensions Act, the PPF imposes a levy like a private insurance premium on eligible pension plans as one of the ways of funding such compensation.

29.    In furtherance of that pecuniary purpose, TPR may conduct an administrative process whereby it may issue, through TPR's Determinations Panel (the "Determinations Panel"), a FSD under section 43 of the U.K. Pensions Act, if it believes that the employer funding the pension plan (the "Employer")[8] is either (a) a service company, or (b) "insufficiently resourced."[9]  (See Hitchcock Dec. ¶¶ 37-38, 50 & Schedule 2.)

30.    A FSD, which is preceded by a "Warning Notice," is a direction, issued to certain persons following a decision of the Determinations Panel to issue it, to secure financial

---

[8]    Here, NNUK.

[9]    In deciding whether the Employer is "insufficiently resourced," which is the claim with respect to NNUK here, the Panel must determine: (1) whether at the "relevant time" the value of the Employer was less than 50% of the estimated section 75 debt of the pension plan (this debt is defined in section 75 of the U.K. Pensions Act of 1995 and is calculated by reference to the cost of securing all plan benefits under annuities purchased from an insurance company); and (2) whether at the relevant time there existed one or more connected and/or associated companies to the Employer whose individual or combined value was greater than the difference between the Employer's value and 50% of the estimated section 75 debt.  (U.K. Pensions Act, s. 44(3).) (See Hitchcock Dec. ¶ 37.5 & Schedule 2.)

11

support for a pension plan. A FSD may only be issued against a person who is either the Employer, or is "connected and/or associated with" the employer (the "Non-Employers"). The FSD specifies a certain time period during which the financial support is to be put in place, and directs that this support is to continue for as long as the pension plan is in existence. A FSD may only be issued if the Determinations Panel believes that it is reasonable to do so. (See Hitchcock Dec. ¶¶ 37.3 – 37. 4, 50 & Schedule 2.)

        31.    In deciding whether it is reasonable to issue a FSD against a Non-Employer, the Determinations Panel must consider such matters as it considers relevant, including: (a) the relationship between the Non-Employer and the Employer, including whether the Non-Employer controlled the Employer; (b) the value of any benefits received directly or indirectly by the Non-Employer from the Employer; (c) any connection or involvement of the Non-Employer with the pension plan; and (d) the financial circumstances of the Non-Employer. (Hitchcock Dec. ¶¶ 37.4, 50.)

        32.    If the Determinations Panel decides to issue a FSD, pursuant to section 45(2) of the U.K. Pensions Act, the financial support must take a form that TPR is satisfied is reasonable under the circumstances, including any combination of the following arrangements: (a) all Non-Employers who are members of the same corporate group as the Employer assuming joint and several liability for the whole or part of the Employer's pension liabilities; and/or (b) where there is a holding company for the Employer's corporate group, the holding company assuming liabilities for the whole or part of the Employer's pension liabilities; and/or (c) any other arrangement that meets the statutory requirements and provides financial resources to the Employer's pension plan. (Hitchcock Dec. ¶ 37.6.)

33.     In addition to its ability to issue a FSD, where the target has not complied with the FSD, and TPR believes that it is reasonable to do so, it is authorized to issue a CN. (Hitchcock Dec. ¶ 43.)

34.     A CN states that the persons to whom it is issued are under a liability to pay to the trustee of the pension plan the sum specified therein. The CN may be for all or part of the amount by which the pension plan is under-funded (such amount is called the "section 75 debt," as discussed <u>supra</u>). This amount is treated as a debt due to the trustee of the pension plan. (U.K. Pensions Act, s. 49(3).) While TPR can exercise such powers as the trustee of the pension plan to recover the debt under the CN, during the assessment period (which the NNUK Pension Plan has been in since it entered administration proceedings), only the PPF may exercise the trustee's rights and powers. (Hitchcock Dec. ¶¶ 5.5, 46 & Schedule 2.)

35.     In determining whether it is reasonable to issue a CN, TPR must consider the reasonableness of imposing liability on the person to pay the sum specified in the notice. In determining whether it is reasonable to issue a CN to a Non-Employer to whom a FSD has been issued, where it deems relevant, TPR must consider such matters as: (a) whether the Non-Employer has taken reasonable steps to secure compliance with the FSD; (b) the relationship the Non-Employer has or had with the Employer, including whether the Non-Employer controlled the Employer; (c) the value of any benefits received directly or indirectly by the Non-Employer from the Employer; (d) the relationship that the Non-Employer has or had with the parties to any arrangements put in place in accordance with the FSD (including whether the Non-Employer has or had control of those parties); (e) any connection or involvement which the Non-Employer has

13

or had with the Employer's pension plan; and (f) the financial circumstances of the Non-Employer. (U.K. Pensions Act, s. 47(4); (Hitchcock Dec. ¶ 44 & Schedule 2).)

        36.     If a party to whom a FSD or CN is issued disputes that issuance, it may make a reference to the TPR Tribunal (the "Tribunal") within 28 days from the date of the issuance. The Tribunal will decide the appropriate action, if any, to take, including possibly revoking, confirming, or varying the FSD or CN. After receiving the Tribunal's decision, the party may, with permission of the Tribunal or the U.K. Court of Appeal, appeal to the Court of Appeal on a point of law arising from a decision of the Tribunal. (U.K. Pensions Act, s.103; Hitchcock Dec. ¶¶ 54-58.)

**G.**    **FSD Warning Notice Addressed to NNI and NN CALA**

        37.     By letters dated January 13, 2010 and addressed to NNI and NN CALA (along with certain non-U.S. Nortel entities), TPR purported to issue a Warning Notice initiating an administrative proceeding regarding the alleged shortfall in the funding of the NNUK Pension Plan (the "U.K. Administrative Proceedings"); the other U.S. Nortel Entities were not referred to in the Warning Notice.[10] The Warning Notice provides, in summary, that TPR believes it is reasonable to issue a FSD against the addressees (the "Targets") and references certain documents and witness statements as support for this determination, some of which, on information and belief, were provided by NNUK, and others of which are publicly available information. It further provides, inter alia, that (i) the "relevant time" on which to measure the NNUK Pension Plan's funding position for the purpose of deciding whether to issue a FSD is

---

[10]     Section 82 of the U.K. Pensions Act prohibits disclosure of "restricted information," which includes information obtained by TPR that is not publicly available from other sources, imposing criminal sanctions for a violation of the statute. (Hitchcock Dec. ¶ 35.) Debtors do not concede that the Warning Notice contains "restricted information"; out of an abundance of caution, however, they are not submitting the Warning Notice as an exhibit with the Motion.

June 30, 2008; and (ii) TPR believes it is reasonable to issue a FSD against the Targets,

including NNI and NN CALA, for various reasons including TPR's analysis of certain benefits

conveyed among affiliates. The Warning Notice also reviews TPR's conclusion that benefits

provided by certain affiliates to certain other affiliates provides a basis for issuing a FSD. (Ray

Dec. ¶ 10.)

        38.    TPR has indicated that the Targets, as well as the U.K. Pension Trustee

and PPF, may respond in writing to the Warning Notice by midday on March 1, 2010, and that

the Determinations Panel will consider all responses. (Ray Dec. ¶ 12.)

**H.    Canadian Debtors' Motion to Stay U.K. Administrative Proceedings**

        39.    On February 17, 2010, the Monitor filed an application with the Canadian

Court seeking to stay the U.K. Administrative Proceedings on the ground that they violate the

stay imposed by the Initial Order issued by the Canadian Court. That application is scheduled to

be heard on February 25, 2010. (A copy of that application and the supporting papers filed with

the Canadian Court, are attached to the Ray Dec. as Exhibit C.)

<div align="center">

**BASIS FOR RELIEF**

</div>

**A.    The Court Should Enforce the Automatic Stay As Against the Claimants With
      Respect to the U.K. Administrative Proceedings**

        40.    Pursuant to 11 U.S.C. § 362(a)(1), a "judicial, administrative, or other

proceeding against the debtor that was or *could have been* commenced before the

commencement of the case under this title, or to recover a claim against the debtor that arose

before the commencement of the case under this title," is stayed. (Emphasis supplied.) See, e.g.,

Constitution Bank v. Tubbs, 68 F.3d 685, 691 (3d Cir. 1995) ("[t]he automatic stay is of broad

scope, directing that 'all judicial actions against a debtor seeking recovery on a claim that were

<div align="center">

15

</div>

or could have been brought before commencement of a bankruptcy case, are automatically stayed'") (citation omitted); In re: M. Frenville Co., 744 F.2d 332, 335 (3d Cir. 1984) ("[o]nly proceedings that could have been commenced or claims that arose before the filing of the bankruptcy petitions are automatically stayed"); In re: Spansion, Inc., 418 B.R. 84, 92 (Bankr. D. Del. 2009) ("the automatic stay applies . . . because the claims asserted . . . 'could have been brought' and were, in fact, brought, prepetition"). Pursuant to 11 U.S.C. § 362(a)(6), any acts to "assess" a claim that arose before the case commenced are similarly barred by the automatic stay. See, e.g., Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd., 67 F.3d 470, 477 (3d Cir. 1995) ("a voluntary Chapter 11 bankruptcy filing operates as a stay of 'any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate…[and] any act to collect, assess, or recover a claim against the debtor that arose before the commencement of [the case]…'"); In re: Solutia Inc., 379 B.R. 473, 485 n.8 (Bankr. S.D.N.Y. 2007) ("as used in Code § 362(a)(6) assess … can mean to simply determine the size or value of something").

41.     Here, TPR has issued a Warning Notice to NNI and NN CALA, as well as a number of non-U.S. Nortel entities, triggering the U.K. Administrative Proceeding, on the basis of what is described in the NNUK Pension Claim as the "financial insufficiency" of NNUK to fully fund the NNUK Pension Plan as of *June 30, 2008*. This date is some six months prior to the filing of NNI's Chapter 11 petition, and over a year before the filing of NN CALA's Chapter 11 petition. Accordingly, the FSD proceeding, and any future proceedings by TPR or the Determinations Panel, *could have been commenced* prior to the filing of these Chapter 11 cases, and are subject to the automatic stay. See 11 U.S.C. §§ 362(a)(1), (a)(6); see also ACandS, Inc.

16

v. Travelers Cas. and Surety Co., 435 F.3d 252, 260 (3d Cir. 2006); Constitution Bank, 68 F.3d at 693.

42.    Moreover, the Claimants have submitted to this Court's jurisdiction by filing proofs of claim against the Debtors, including NNI and NN CALA, and the subject of the U.K. Pension Claim is the very subject of the U.K. Administrative Proceedings. See Lagenkamp v. Culp, 498 U.S. 42, 44 (1990) (stating that "by filing a claim against a bankruptcy estate the creditor triggers the process of allowance and disallowance of claims, thereby subjecting himself to the bankruptcy court's equitable power" (internal quotations deleted)); In re Nakash, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (actions against debtor by receiver in Israel, who submitted to the jurisdiction of the U.S. court by filing a proof of claim, violated automatic stay). Indeed, the determination or liquidation of the U.K. Pension Claim constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(B), which can only occur in this Court as part of the claims determination process.

43.    The courts have repeatedly recognized, in fact, that post-petition attempts to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay. See, e.g., Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1207 (3d Cir. 1991) (attempt to obtain a judgment against a debtor outside the bankruptcy court violates the stay); In re Berman, 352 B.R. 533, 540 (Bankr. D. Mass. 2006) (the "automatic stay prevents different proceedings in different courts," thus avoiding a "free-for-all" against the debtor). To allow such proceedings to occur elsewhere -- particularly where the Claimants have submitted themselves and the U.K. Pension Claim to the jurisdiction of this Court -- would violate

17

fundamental bankruptcy principles and interfere with the administration of the estate. See, e.g., In re Underwood, 98 F.3d 956, 961 (7th Cir. 1996) (holding that attempt by receiver appointed in Nevis to gain control over debtor's property constituted a violation of the automatic stay, as it "did imperil the orderly administration of the bankruptcy proceeding, and by doing so it posed an indirect threat to the estate"). Given Claimants' submission of the U.K. Pension Claim to this Court, the determination of their claims regarding the NNUK Pension Plan should occur in this Court, and this Court alone.

44.    Accordingly, by this Motion, the Debtors seek to enforce the automatic stay against the U.K. Pension Trustee and the PPF, so that in the absence of a violation of the stay, all matters concerning NNI and NN CALA that relate to the NNUK Pension Plan, which Claimants have placed before this Court by filing their proofs of claim, will be determined by this Court.[11]

**B.    The Police Power Exception to the Automatic Stay Does Not Apply**

45.    There is no applicable exception to the automatic stay that would allow the U.K. Pension Trustee and the PPF to participate in the U.K. Administrative Proceedings without violating the stay. In particular, the U.K. Administrative Proceedings do not constitute an exercise of a governmental unit's police power that would exempt them from the automatic stay by virtue of section 362(b)(4) of the Bankruptcy Code.[12]

---

[11]    To the extent claimants violate the automatic stay, their actions would be void and unenforceable against the Debtors. See, e.g., ACandS, Inc., 435 F.3d at 260; Constitution Bank, 68 F.3d at 693.

[12]    Section 362(b)(4) provides, in pertinent part: "The filing of a petition under section 301, 302, or 303 of this title, ... does not operate as a stay: (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's ... police or regulatory power."

46.     First, neither of the Claimants is a "governmental unit," within the meaning of that term under section 101(27) of the Bankruptcy Code.[13] The U.K. Pension Trustee is a private party,[14] and the PPF, while defined as "a statutory body" in paragraph 1.4 of the U.K. Pension Claim, during an assessment period exercises the rights and powers of the U.K. Pension Trustee with respect to any debt owed to the Trustee by the Employer, or pursuant to a CN or otherwise, including any contingent debt or section 75 debt. In this capacity, the PPF stands in the shoes of the Trustee, a private party. (See Exhibit A to the Ray Dec.; Hitchcock Dec. ¶ 22, 46.)

47.     Second, the U.K. Administrative Proceedings do not constitute an exercise of police power that would implicate the section 362(b)(4) exception.

48.     The courts in this Circuit and elsewhere have made it clear that this exception is to be "narrowly construed." For example, in a recent decision in this District in which the court denied a state administrative agency's attempt to invoke section 362(b)(4) to pursue an action against a debtor to repay the agency for costs incurred in investigating and remedying alleged environmental violations, Judge Sontchi stated, quoting the legislative history:

> "This section is intended to be given a *narrow* construction in order to permit governmental units to pursue actions to protect the public health and safety and *not to apply to actions by governmental units to protect a pecuniary interest* in property of the debtor or property of the estate."    (Emphasis in original.)

---

[13]     Section 101(27) defines "governmental unit" to mean: The "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government") 11 U.S.C. § 101 (27).

[14]     Under the U.K. pension scheme, trustees act for the benefit of plan members and are fiduciaries of their pension plans, not governmental entities. (See Hitchcock Dec. ¶¶ 16-17.)

19

In re Fairchild Corp., No. 09-10899 (CSS), 2009 Bankr. LEXIS 3815, at * 22 (Bankr. D. Del.

Dec. 1, 2009) (rejecting agency's contention that it was exercising police power where its action

was "akin to a private action by OCWD [the agency] to collect money damages"). See also

Missouri v. U.S. Bankr. Court, 647 F.2d 768, 776 (8th Cir. 1981) (denying state's contention that

section 362(b)(4) excepted from the stay its efforts to liquidate grain held in debtors'

warehouses; holding that "police or regulatory power" refers to the enforcement of state laws

affecting "health, welfare, morals, and safety, but not regulatory laws that directly conflict with

the control of the res or property by the bankruptcy court"); In re Nextwave Personal Comm.,

Inc., 244 B.R. 253, 274 (Bankr. S.D.N.Y. 2000) (FCC's retroactive cancellation of debtor's

broadband license as remedy for payment default did not impact public health or safety and was

thus not shielded by "narrow exception" to automatic stay under section 362(b)(4)).

49.     The courts' narrow interpretation of section 362(b)(4) is reflected in the

standards they apply in determining whether or not a governmental unit's action or proposed

action constitutes an exercise of its police power. These standards are embodied in two objective

tests upon which the courts rely in considering a contention that the section 362(b)(4) exception

is applicable. The first is referred to as the "pecuniary purpose" test; the second, the "public

policy test." See, e.g., Fairchild Corp., 2009 Bankr. LEXIS 3815, at *22. The U.K.

Administrative Proceeding fails each of these tests by a wide margin.

50.     First, under the "pecuniary purpose" test, the issue is whether the

governmental action or proceeding relates primarily to the protection of the government's

pecuniary or financial interest in the debtor's property, as opposed to a matter of public safety or

welfare. See, e.g., Missouri, 647 F.2d at 776 (denying section 362(b)(4) defense where plaintiff

sought to enforce state grain laws that "primarily relate to the protection of the pecuniary interest

in the debtors' property and not to matters of public safety and health"); Fairchild Corp., 2009 Bankr. LEXIS 3815, at *15 (concluding that agency's action sought solely to promote its pecuniary interest in being reimbursed for expenditures, and thus did not qualify as an exercise of police or regulatory power); Nextwave Personal Comm., 244 B.R. at 274 ("The FCC's action is nothing other than a direct attempt to enforce its pecuniary interests"); In re Chateaugay Corp., 115 B.R. 28, 33 (Bankr. S.D.N.Y. 1988) (claims under the False Claims Act served no public purpose, and were intended merely to fix government's damages, and thus did not qualify as an exercise of police or regulatory power).

   51. As in these cases, the U.K. Administrative Proceedings fall far short of passing the "pecuniary purpose" test. The stated purpose of the Proceedings is to address an alleged financial shortfall in a private pension plan, first by determining whether the Targets should provide financial support to the U.K. Pension Trustee, and, then potentially by imposing and fixing a claim against NNI and NN CALA through a CN. This is purely an issue of determining which, if any, entities, on an after-the-fact basis, should be financially responsible for funding a pension shortfall. It is clearly a pecuniary matter, and, notwithstanding the importance of the financial matter to the private U.K. Pension Trustee, under the case law does not qualify as a matter of public safety or welfare. See, e.g., Brock v. Morysville Body Works, 829 F.2d 383 (3rd Cir. 1987) (holding that an order to abate violations of health and safety standards was enforceable by the Secretary of Labor under section 362(b)(4)'s exception to the automatic stay); Penn Terra v. Dep't of Envtl. Res., 733 F.2d 267 (3rd Cir. 1983) (police power exception applicable to allow a state court to issue an injunction ordering debtor to clean up environmental hazards); see also In re: James (James v. Draper), 940 F.2d 46 (3rd Cir. 1991)

21

(civil forfeiture proceeding for alleged proceeds of drug sales falls within the police power exception to the automatic stay).

52.    Indeed, it is manifest in the provisions of the U.K. Pensions Act pursuant to which the U.K. Administrative Proceedings will be conducted, that the purpose of any such proceedings is to procure a pecuniary benefit to the trustee of an allegedly under-funded pension plan. For example, with respect to a FSD proceeding, the Act provides that TPR can issue a FSD where the Employer is "insufficiently resourced" (s. 43(2)); that the FSD is a demand to "put in place financial support" (s. 43(3)); and that such support shall be with respect to the amount of "the liability that is or may become due from the employer to the trustees." (s. 45(2),(4); s. 50(2)). Further, in the event the Targets do not comply with the FSD, TPR may issue a CN, which, unlike a FSD, is a collectible debt under U.K. law, "stating that the person is under a liability to pay to the trustees or managers of the scheme the sum specified in the notice" (s.47 (2), (3)), which sum "may be either the whole or a specified part of the shortfall sum [deficiency] in relation to the scheme." (s. 48 (1),(2)). (See Hitchcock Dec. ¶¶ 41, 46-47 & Schedule 2.)

53.    The U.K. Administrative Proceedings also fail the "public policy test." The issue under this test is whether the governmental action is taken in furtherance of a matter of public policy, or instead is intended primarily to adjudicate private rights. See, e.g., Fairchild Corp., 2009 Bankr. LEXIS 3815, at *15 (action akin to private action to collect money damages does not qualify as an exercise of police power under section 362(b)(4)); Spansion, 418 B.R. at 95 (administrative patent proceeding against debtors, prosecuted on behalf of the public by staff attorney of the U.S. International Trade Commission, was primarily an adjudication of private rights, only incidentally serving a public interest, and thus was not an exercise of police or regulatory power exempt from automatic stay); see also In re Qimonda AG, Case No. 09-14766

22

(Bankr. E.D. Va. Feb. 16, 2010) (patent proceeding before U.S. International Trade Commission

was primarily intended to determine private rights, and was thus not an exercise of police

power)[15]; In re: Corporacion de Servicios Medicos Hospitalarios de Fajardo, 60 B.R. 920, 932

(D. Puerto Rico 1986) (action on contract between Department of Health and debtor to operate

hospital was not an action to protect health, safety, or welfare of public, was no different than an

action by a private party, and thus violated automatic stay: "the mere fact that the Department of

Health is involved" does not mean that the agency was exercising a "police or regulatory power

*per se*"); In re Dan Hixson Chevrolet Co., 12 B.R. 917, 921 (Bankr. N.D. Tex. 1981) ("where the

administrative agency is acting in a quasi-judicial capacity seeking to adjudicate private rights

rather than effectuate public policy as defined by regulatory law the (b)(4) exception is

inapplicable").

        54.    Here, TPR seeks not to protect the "safety or welfare" of the public in the

U.K., but rather to obtain financial support for the benefit of private parties -- the members of the

NNUK Pension Plan, represented by the U.K. Pension Trustee -- and if that fails, to assert and

liquidate a claim to the property of the Debtors, on the Trustee's behalf. Any sum paid as a

result of the U.K. Administrative Proceedings would not go to benefit the public, but would be

used to reduce the section 75 debt owed by NNUK to the U.K. Pension Trustee.[16] Indeed, it is

that potential beneficiary who, together with the PPF, filed the proofs of claim in this Court to

recover from the Debtors the same financial support that is the subject of the U.K.

Administrative Proceedings.

---

[15]    A copy of the Qimonda decision is attached as Exhibit A hereto.

[16]    Under s. 50(6) of the U.K. Pensions Act, any sums paid to the trustees in respect of any debt due to them under a CN is treated as reducing the amount of the debt due from the employer under section 75. (See Hitchcock Dec. ¶ 47.)

55.    The provisions of the U.K. Pensions Act underscore that the purpose of

the FSD and CN proceedings is to vindicate the rights of private parties. The Act provides, <u>inter</u>

<u>alia,</u> that a FSD is a demand that financial support be provided for the benefit of a <u>private</u>

<u>pension plan</u> (s. 43(3))[17]; that in the event of non-compliance with the FSD, TPR can issue a CN

requiring the payment of a specified sum that is "to be treated as a debt due from the person to

the trustees or managers of the scheme" (s. 49(2), (3)); and that this debt can be enforced either

directly by the trustees or by TPR on behalf of the trustees of the scheme (s. 49(4)) (emphasis

supplied). (<u>See</u> Hitchcock Dec. ¶¶ 41, 46.)

56.    Moreover, the U.K. Pension Claim itself makes clear that the focus of the

U.K. Administrative Proceedings is to procure a pecuniary benefit, for a private party -- the U.K.

Pension Trustee -- not the "health, safety, or welfare" of the U.K. citizenry. The Claim recites

the process under the U.K. Pensions Act, from Warning Notice, to FSD, to CN, pursuant to

which TPR will attempt to obtain financial support for the U.K. Pension Trustee, and failing that,

attempt to impose and liquidate an enforceable debt, to be enforced by or on behalf of the

Trustee, for an amount to be paid to the Trustee. (<u>See</u> Exhibit A to Ray Dec.) Accordingly, the

FSD/CN proceedings do not constitute an exercise of a regulator's police powers within the

meaning of section 362(b)(4), and are subject to the automatic stay. <u>See, e.g.</u>, <u>Fairchild Corp.</u>,

2009 Bankr. LEXIS 3815, at *15; <u>Spansion</u>, 418 B.R. at 95; <u>Hixson Chevrolet Co.</u>, 12 B.R. at

921.

---

[17]    FSDs only apply in relation to "occupational pension schemes" (see s. 43(1)), which are defined by
reference to the definition in s. 1 of the Pensions Schemes Act 1993. (<u>See</u> Hitchcock Dec. ¶ 29.)

C.    **The _Sea Containers_ Decision Is Not to the Contrary**

57.    Nor does the one decision in this District that involved a TPR administrative proceeding, In re: Sea Containers Ltd., No. 06-11156 (KJC), 2008 Bankr. LEXIS 2363 (Bankr. D. Del. Sept. 19, 2008), call for a different result than the Debtors seek here. Sea Containers was presented to the bankruptcy court in a unique factual and procedural context and should not be followed on these facts insofar as the FSD proceedings are concerned.

58.    In Sea Containers, the Determinations Panel issued a FSD against a single debtor, on the basis of the following facts, which are sharply distinguishable from those presented here: (i) the U.S. debtor against which the FSD was sought was a U.K. chartered company which, together with its subsidiary, the plan sponsor, operated primarily out of the U.K; (ii) the debtor had a clear control relationship with the employer-affiliate; (iii) the debtor had substantial assets in the U.K; and (iv) the Determinations Panel held a hearing on the FSD request, without a motion by the U.S. debtor to invoke the protections of the automatic stay, and at which one of the two U.S. creditors' committees encouraged the Panel to issue a FSD so that the plan Trustee could rely on it to pursue their claims in the Chapter 11 proceedings.

59.    Following the issuance of the FSD, a settlement was entered into among the debtors, affiliates, one of the creditors' committees and the pension trustee, and was approved by TPR, granting the trustee an allowed claim in the bankruptcy case. The matter never reached the CN stage. The case came before the court on a motion under Bankruptcy Rule 9019 for approval of the settlement.

60.    The court approved the settlement. In so doing, it overruled a number of objections by the second creditors' committee, one of which was that the FSD proceeding had violated the automatic stay. In this regard, the court did not treat the FSD as determinative but

only ruled that the FSD "should not be ignored as invalid," because it "provide[d] guidance as to

the . . . pertinent considerations in valuing the Schemes' claims." Id. at **26-27.  The court also

relied on the fact that the Determinations Panel, as one would expect, did not view itself as being

constrained by the automatic stay, not surprising given that the U.S. debtor had not sought an

order of the bankruptcy court enforcing the stay in connection with the proceeding.

          61.    In short, the court's ruling that the FSD proceeding did not violate the

automatic stay was issued in an entirely different procedural context -- a Rule 9019 motion by

the debtor to approve a settlement with TPR, where the debtor had not sought to invalidate the

FSD -- and on entirely different facts.  To the extent the Sea Containers court found that a FSD

was not an assertion of a claim, it was wrong.  A FSD is an assertion of a contingent claim under

U.S. law, as is the proceeding that leads up to its issuance.  Moreover, unlike in Sea Containers,

the Debtors and the creditors' representatives here object to the U.K. Administrative Proceeding,

and dispute TPR's right to proceed against the Debtors in the absence of relief from the

automatic stay.  Further, in contrast to Sea Containers, which involved only a FSD proceeding,

here TPR is attempting to secure financial support for the benefit of the Plan Trustee through a

FSD proceeding and, if necessary, a CN proceeding, which creates an enforceable debt.  Here,

the U.K. Pension Trustee has already submitted to the jurisdiction of this Court for determination

and liquidation contingent and unliquidated claims for the very same financial support TPR

seeks to obtain for them in the U.K. Administrative Proceeding.  And here, unlike in Sea

Containers, the Warning Notice makes plain that TPR is asserting a contingent claim, whereas in

Sea Containers, integral to the court's ruling that there was no stay violation was its

determination that there was no assertion of a claim. Id. at *26.[18]

     62.    Accordingly, Sea Containers is confined to its facts and is not controlling.

On the authority of cases such as Fairchild Corp., 2009 Bankr. LEXIS 3815, at *15; Spansion,

Inc., 418 B.R. at 95; and Hixson Chevrolet Co., 12 B.R. at 921, the U.K. Administrative

Proceeding, which seeks pecuniary relief to benefit the private trustee of a private pension plan,

does not involve an exercise of the police power and is subject to the automatic stay.

**D.    The U.K. Pension Claim Should Await Resolution of the**
**     Allocation Proceeding Involving the U.S., Canadian, and U.K. Debtors**

     63.    The violation of the automatic stay posed by the U.K. Administrative

Proceeding is even more egregious because it goes to the heart of these cases.

     64.    As the Court is well aware, one of the overriding issues in these cases -- as

well as in the related insolvency proceedings in Canada and the U.K. -- is the allocation of the

billions of dollars in proceeds of the post-petition asset sales. This allocation will determine the

amounts available for distribution to the creditors located in the various jurisdictions, in part

based on the factual issue of the respective contributions of the various Nortel entities to the

value of the assets sold. (Ray Dec. ¶14.)

---

[18]    There can be little doubt that the issuance of a CN against the Debtors, which under section 49(3) of the U.K. Pensions Act imposes on the Target *a collectible debt* owed to the pension plan trustees, in a specified amount, would violate the automatic stay and would thus be void and unenforceable against the Debtors. See, e.g., ACandS, 435 F.3d at 260 (action in violation of stay is void ab initio); Constitution Bank, 68 F.3d at 693 (same); Maritime Elec. Co. v. United Jersey Bank, 959 F.2d at 1204 (same). Indeed, even the court in the Sea Containers case recognized that an attempt to "collect a debt or assert a claim" against a debtor, even by a regulator, involves different automatic stay considerations than proceedings not involving the determination or liquidation of a claim. 2008 Bankr. LEXIS 2363, at *26.

65.    In recognition of this fundamental question, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK) entered into the IFSA (defined in paragraph 15 supra), dated June 9, 2009, pursuant to which they agreed, inter alia, (a) that all such sales proceeds will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. (IFSA §§ 12(b)-(c), Exhibit B to the Schweitzer Dec.)[19]

66.    In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of the allocation protocol. The purpose of the protocol (called the Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds) is to ensure a fair allocation, to be determined (absent a consensual agreement), in a single cross-jurisdictional forum. (Ray Dec. ¶ 16.)

67.    Based on the assertions in the U.K. Pension Claim, it appears that the Claimants seek to litigate, in the context of an administrative proceeding before a U.K. administrative body, whose sole focus is the financial protection of U.K. pension plan members and an insurance vehicle, the question of whether NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates. That issue, of course, overlaps with the issues in

---

[19]    The proceeds of the sales that have been consummated thus far have been deposited into escrow accounts located in the United States. Moreover, as discussed in paragraph 16 supra, the IFSA and the escrow agreements provide that any disputes arising respectively thereunder shall be subject to the jurisdiction of the U.S. and Canadian courts (pursuant to the existing Cross-Border Protocol), and that the English courts shall have jurisdiction only over claims brought against the Joint Administrators in their personal capacities. (IFSA § 16(b); see Exhibits B and C to the Schweitzer Dec.)

the allocation dispute. The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process. (Ray Dec. ¶ 14.)

68.    Indeed, the resolution of the issues Claimants seek to litigate in the U.K. Administrative Proceedings may involve consideration of the same factors -- including Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, and individual corporate assets and revenues -- as those that may be significant to the allocation process. (Ray Dec. ¶ 17.)

69.    The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum.[20] They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.

70.    Moreover, the very premise for the U.K. Administrative Proceeding is that NNUK does not have the resources to fund the NNUK Pension Plan, and one of the key elements in determining the "reasonableness" of imposing a FSD and a CN against a Non-Employer under the U.K. Pensions Act is the financial condition of the Non-Employer. (U.K. Pensions Act s. 42(5); s. 47(3); see Hitchcock Dec. ¶¶ 37, 44.) Until the allocation procedure is completed, however, the financial condition of the Employer, NNUK, and the Non-Employers, including the Debtors, cannot be determined. (Ray Dec. ¶ 19.)

---

[20]    It would be an utter waste of estate resources, as the Debtors attempt to move forward to further maximize value to the creditor constituencies through asset sales and in developing a chapter 11 plan, for their essential personnel and professionals to be forced to litigate in the U.K. Administrative Proceeding the very issues that Claimants put before the Court by filing their proofs of claim, and to engage in a piecemeal determination of issues relevant to the allocation process that even NNUK has agreed should instead be resolved on a global basis in a single cross-jurisdictional forum. (See Ray Dec. ¶ 21.)

71.    Further, unless the allocation proceeding takes place first, the Debtors will be faced with the prospect of the offensive use of collateral estoppel against them in that proceeding or in this Court with respect to any of the overlapping factual issues that would have been determined in the U.K. Administrative Proceedings.

72.    Accordingly, an order should be entered enforcing the automatic stay, putting the Claimants on notice that any results of such Proceeding will be void in this Court and that they will be subject to possible sanctions should they proceed in violation of the stay.[21]

## NOTICE

73.    Notice of the Motion has been given via hand delivery or overnight mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the Joint Administrators; (v) counsel to the U.K. Pension Trustee/PPF; (vi) counsel to NNUK; and (v) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

---

[21]    The Order the Debtors seek on this Motion includes a provision that "the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order."  The purpose of this provision is to prevent the Claimants, upon entry of the Order, from filing an appeal, ignoring the automatic stay, and going forward with the U.K. Administrative Proceeding before the appeal is decided, thereby defeating the purpose of the Order enforcing the stay.  Under Bankruptcy Rule 8005, a party is only entitled to a stay pending appeal if it demonstrates, like a party seeking an injunction, inter alia, a probability of success on the merits, irreparable harm if the stay is denied, and the absence of harm to the appellee if the stay is granted.  See, e.g., In re Polaroid Corp., No. 02-1353 (JJF), 2004 U.S. Dist. LEXIS 1917, at *3 (D. Del. May 22, 2004); In re ANC Rental Corp., No. 02-154, et al. (GMS), 2002 U.S. Dist. LEXIS 9409, **6-7 (D. Del. Feb. 4, 2002).  Here, putting aside the Claimants' inability to demonstrate a likelihood of success on the merits, it is obvious that the balance of hardships tips entirely in the Debtors' favor.  A stay would allow the Claimants to proceed in the U.K. as though the automatic stay did not exist, forcing the Debtors either to waste the Estate's resources and participate even though it obtained a favorable ruling from this Court on the motion to enforce the stay, or take the risk that if it did not participate, and the District Court reversed, there would be a determination by the Determinations Panel that the Claimants would attempt to use in this Court to pursue the U.K. Pension Claim.  On the other hand, in the absence of a stay, the Claimants would suffer no harm because the only consequence would be a delay in the U.K. Administrative Proceeding, unless of course the Claimants were willing to risk violating the stay by going ahead in the U.K. in any event.

## NO PRIOR REQUEST

74.    No prior request for the relief sought herein has been made to this or any

other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems proper.

Dated: February 18, 2010
  Wilmington, Delaware

       CLEARY GOTTLIEB STEEN & HAMILTON LLP

       Deborah M. Buell (admitted *pro hac vice*)
       James L. Bromley (admitted *pro hac vice*)
       Lisa M. Schweitzer (admitted *pro hac vice*)
       Neil P. Forrest
       One Liberty Plaza
       New York, New York 10006
       Telephone:  (212) 225-2000
       Facsimile:  (212) 225-3999

         - and -

       MORRIS, NICHOLS, ARSHT & TUNNELL LLP

       */s/ Ann C. Cordo*
       Derek C. Abbott (No. 3376)
       Eric D. Schwartz (No. 3134)
       Ann C. Cordo (No. 4817)
       Andrew R. Remming (No. 5120)
       1201 North Market Street
       P.O. Box 1347
       Wilmington, Delaware 19801
       Telephone:  (302) 658-9200
       Facsimile: (302) 658-3989

       *Counsel for the Debtors*
       *and Debtors in Possession*

Exhibit A
In re Qimonda Memorandum Opinion

### UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:

QIMONDA AG,                                    Case No. 09-14766-RGM
                                               (Chapter 15)
      Debtor.

### MEMORANDUM OPINION

     The question presented is whether the automatic stay is applicable to an action pending before the International Trade Commission. The ITC argues that the action is an enforcement of its police or regulatory power and is excluded from the automatic stay.[1] 11 U.S.C. §362(b)(4).

### Prior Bankruptcy Proceedings

     Qimonda AG filed an application with the Amtsgericht-Insolvenzgericht München ("the Munich Local Court") to open insolvency proceedings under the German insolvency law. The Munich Local Court appointed Dr. Michael Jaffé as the preliminary insolvency administrator. After receiving his report, the court opened the insolvency proceeding and appointed him the insolvency administrator.

     Dr. Jaffé, as Qimonda's foreign administrator, filed a request for recognition of a foreign main proceeding under 11 U.S.C. §1515 and a motion for provisional injunctive relief pending recognition of the foreign main proceeding. He sought preliminary application of §362(a) to stay the ITC proceeding as to Qimonda. This court granted the provisional relief requested. *In re*

---

[1]Section 362(b)(4) excludes only acts under subsection 1, 2, 3 and 6 of §362(a). Acts by governmental units covered under subsections 4, 5, 7 and 8 are stayed.

1

*Qimonda AG*, 2009 WL 2210771 (Bankr.E.D.Va. 2009). The court later entered a recognition order recognizing the German insolvency proceeding as a foreign main proceeding 11 U.S.C. §1517. The automatic stay arises upon entry of a recognition order. 11 U.S.C. §1520. LSI and the ITC argued at the recognition hearing that the automatic stay did not apply to the ITC proceeding because the proceeding was an enforcement proceeding under the ITC's police and regulatory powers. This Memorandum Opinion addresses that question.

<u>**Proceedings Pending before the ITC**</u>

LSI Corporation and Agere Systems, Inc., initiated an action against twenty respondents, including Qimonda, before the ITC under §337 of the Tariff Act of 1930, 19 U.S.C. §1337, *et seq.* They alleged that the respondents were infringing their patents and sought an order prohibiting any infringing devices from being imported into the Untied States. *In the Matter of Certain Semiconductor Integrated Circuits Using Tungsten Metallization, Inv. No. 337-TA-648.* Several respondents settled with LSI and Agere and were dismissed as parties to the action. The ITC reviewed and approved the settlements. In addition to the parties, the Office of Unfair Import Investigations, which is separate from the Commission itself, also participated in the case. It filed pleadings and argued motions, but the laboring oar was, and continues to be, pulled by the parties themselves. The action was pending before an administrative law judge when the recognition order was entered and the automatic stay became effective. The matter had been fully briefed and was ready for trial before the administrative law judge.

2

<u>Discussion</u>

Section 362(b)(4) states:

> (b) The filing of a petition under section 301, 302, or 303 of this title . . . does not operate as a stay — . . .
>
> (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

11 U.S.C. §362(b)(4).

Section 362(b)(4) requires three elements: (1) a governmental unit (2) that is commencing or continuing an action or proceeding (3) to enforce that governmental unit's police or regulatory power. Two questions are presented: Is the action pending before the ITC the continuation of an action *by* the ITC? Is the action an enforcement of the ITC's police and regulatory power?

<u>Continuation of Action by Governmental Unit</u>

The governmental unit must be the moving party, the party enforcing its police and regulatory power. The statutory language is clear: There must be a commencement or continuation of an action *"by* a governmental unit" and the police and regulatory power sought to be enforced must be *"such* governmental unit's" police and regulatory power. 11 U.S.C. §362(b)(4) (emphasis added). The plain meaning of the provision is that a governmental unit must bring the action, not a private party. *See* Collier on Bankruptcy §362.05 (15th ed. Rev., 2010).

Actions brought by private entities are not within the exception of §362(b)(4). In *Hudson River Sloop Clearwater, Inc. v. Revere Copper and Brass, Inc., (In re Revere Copper and Brass,*

3

*Inc.),* 32 B.R. 725 (S.D.N.Y.1983), Hudson River Sloop Clearwater, Inc., and National Resources

Defense Council, Inc., two private, non-governmental entities, filed a suit against Revere Copper

and Brass, Inc., which had filed a chapter 11 petition in bankruptcy almost a month before the suit

was filed. *Id.* at 726. The debtor successfully sought to enjoin the suit and hold the plaintiffs in

contempt for violating the automatic stay. On appeal to the District Court, the plaintiffs argued that

"they should be given the status of a governmental unit" and that because they were "in the position

of private attorney generals seeking to enforce the environmental laws they should be given the same

status as governmental units with respect to" the debtor, that is, that the exception under §362(b)(4)

should apply to them as well. *Id.* at 727. The District Court disagreed and affirmed the Bankruptcy

Court. It stated:



> Not only is this provision explicitly limited to true governmental entities, but
> the legislative history of this definitional section provides:
>
>> Entities that operate through state action such as through the grant of
>> a charter or license, and have no further connection with the state or
>> federal government are not within the contemplation of the definition.
>
> H.R.Rep. No. 595, 95th Cong., 1st Sess. 311 (1977); S.Rep. No. 989, 95th Cong., 2d
> Sess. 24 (1978), U.S.Code Cong. & Admin.News, pp. 5787, 5810, 6268.
>
> Clearly, both the statutory language and the legislative history demonstrate
> that the term "governmental unit" in the bankruptcy code refers exclusively to actual
> governmental groups and not to organizations acting in a governmental capacity.
> The exception to the automatic stay for governmental units was intended to allow
> state, federal or foreign entities to continue to proceed or to commence actions
> against debtors.

*Id.* at 727. *See also United States v. Environmental Waste Control, Inc.,* 131 B.R. 410, 422

(N.D.Ind.1991) (§362(b)(4) is confined to governmental authorities seeking to enforce regulations).

The ITC argues that it is the moving party and that LSI and Agere are simply complaining

parties. This argument requires an examination of the roles of the ITC on the one hand and LSI and

4

Agere on the other. LSI and Agere initiated the proceeding. The proceeding is pending before an administrative law judge, not the Commission itself.

LSI and Agere have controlled the litigation from the beginning. The ITC does not control the litigation before the administrative law judge. LSI and Agere negotiated settlements with various respondents who have been dismissed from the case. The ITC did not participate in the negotiation of the settlements. The administrative law judge hearing the matter did not participate in the negotiations of the settlements. There is no indication that the staff attorneys from the Office of Unfair Import Investigations had any significant participation either. It is true that the ITC approved the settlements, but this is little different from a bankruptcy court approving settlements or any other court granting motions to dismiss a party from the case.

The participation of the Office of Unfair Import Investigations is not control over the proceedings. There are three parties or groups of parties: the complainant who is asserting the validity of a patent; the respondent who is alleged to have infringed the patent; and a staff investigative attorney from the Office of Unfair Import Investigations. The staff attorney participates in the proceeding by filing pleadings and arguing matters before the administrative law judge, but he does not control or direct either the complainant's actions or the respondent's actions.

The closest that the ITC comes to controlling the litigation is the standing rules of procedure it promulgated. They are similar to the Federal Rules of Civil Procedure. *See* Rules of Practice and Procedure, 19 C.F.R. parts 201 and 210. They are applicable to all such actions and are intended to be fair and evenhanded to all the participants. They assist in the orderly disposition of matters before the administrative law judges. They do not influence the substantive rights of the parties and are not control over the litigation.

5

The reality is that the ITC and its administrative law judges are the forum before whom the action was brought by LSI and Agere and who are seeking the protection of their property rights. The proceeding is adversarial and subject to the adjudicative provisions of the Administrative Procedure Act, 5 U.S.C. §§551, *et seq*. The administrative law judge makes an initial determination which contains findings of fact and conclusions of law with respect to the issues in controversy. In this action, those issues include the validity of the patents, the scope of the patents, the infringement of the patents, and the scope of any licenses previously granted. Any party may petition the ITC to review the initial determination and to modify or reverse it. The ITC may also review the initial determination on its own motion. Rather than being the governmental unit that is enforcing the patents, the ITC is the forum before which private litigants are enforcing their patents. The action is not being prosecuted *by* the ITC, but *before* the ITC. LSI and Agere are prosecuting it. The exception of 11 U.S.C. §362(b)(4) is not applicable.

## Police or Regulatory Power

The Court of Appeals for the Fourth Circuit set out the test for determining whether a particular action by a governmental unit is an exercise of its police or regulatory power. It stated:

> The difficulty in applying this exception comes in distinguishing between situations in which the state acts pursuant to its "police and regulatory power" and situations in which the state acts merely to protect its status as a creditor. To make this distinction, we look to the purpose of the law that the state is attempting to enforce. If the purpose of the law is to promote "public safety and welfare," *Universal Life Church, Inc. v. United States (In re Universal Life Church, Inc.)*, 128 F.3d 1294, 1297 (9th Cir.1997), or to "effectuate public policy," *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 942(6th Cir.1986) (internal quotation marks omitted), then the exception applies. On the other hand, if the purpose of the law relates "to the protection of the government's pecuniary interest in the debtor's property," *Universal Life Church*, 128 F.3d at 1297, or to "adjudicate private rights," *Edward Cooper Painting*, 804 F.2d at 942(internal quotation marks omitted), then the

6

exception is inapplicable. The inquiry is objective: we examine the purpose of the law that the state seeks to enforce rather than the state's intent in enforcing the law in a particular case. *See United States v. Commonwealth Cos. (In re Commonwealth Cos.), 913 F.2d 518, 523 n. 6 (8th Cir.1990); United States v. Grooms,* No. Crim. A. 96-00071-C, 1997 WL 578752, at *3 (W.D.Va. Aug.29, 1997).

*Safety-Kleen, Incorporated (Pinewood) vs. Wyche (In re Safety Kleen Corporation),* 274 F.3d 846, 865 (4th Cir. 2001).

*Safety-Kleen* sets out two tests to determine the applicability of §362(b)(4): the pecuniary interest test and the private rights test. *EEOC v. McLean Trucking Co.,* 834 F.2d 398, 401 (4th Cir. 1987 (applying private rights test); *In re Cutting Edge Enterprises, Inc.,* 372 B.R. 255, 262 (Bankr.M.D.N.C.2007) (applying pecuniary interest test). The pecuniary interest test addresses the question of whether the governmental unit is acting to further public health, safety or welfare as opposed to furthering the governmental unit's own pecuniary interest. There must be a recognizable public purpose and if there is, it may not be used as a ruse to further the governmental unit's pecuniary interest. The private rights test addresses the question of whether the governmental unit is acting to further public health, safety or welfare as opposed to furthering a private party's rights. Again, there must be a recognizable public purpose and if there is, it may not be used as a ruse to further the rights of a private party.

The Court of Appeals recognized that many actions contain both a public purpose and either a governmental unit's own pecuniary interest or a private party's rights. *Safety-Kleen,* 274 F.3d at 865-866. Many statutes have dual (or even multiple purposes) and, for a creative lawyer, it is easy to find a public purpose in every statute. *Chao v. Hospital Staffing Services, Inc.,* 270 F.3d 374, 389 (6th Cir. 2001) ("All acts of Congress by definition declare national policy, and lawsuits to enforce those acts necessarily effectuate the public policy of the United States."). If the test were simply to find a public purpose or a public policy, virtually all actions brought by governmental units would

7

be excluded from §362(a) by virtue of §362(b)(4). The exception would devour the rule. The Court

of Appeals for the Fourth Circuit discussed the problem. It stated:

> Of course, many laws have a dual purpose of promoting the public welfare as well as protecting the state's pecuniary interest. The fact that one purpose of the law is to protect the state's pecuniary interest does not necessarily mean that the exception is inapplicable. Rather, we must determine the primary purpose of the law that the state is attempting to enforce. *See Yellow Cab Coop. v. Metro Taxi, Inc. (In re Yellow Cab Coop.), 132 F.3d 591, 597 (10th Cir.1997); Javens v. City of Hazel Park (In re Javens), 107 F.3d 359, 367-68 (6th Cir.1997); EEOC v. Rath Packing Co., 787 F.2d 318, 324 (8th Cir.1986). But see Universal Life Church, 128 F.3d at 1299* ("Only if the action is pursued *solely* to advance a pecuniary interest of the governmental unit will the automatic stay bar it." (emphasis added) (internal quotation marks omitted)). Likewise, the fact that the state action requires the debtor to make an expenditure does not necessarily mean that the regulatory exception is inapplicable. *See, e.g., Commonwealth Oil Refining Co. v. EPA (In re Commonwealth Oil Refining Co.), 805 F.2d 1175, 1186 (5th Cir.1986)* (holding that the EPA could force debtor to comply with environmental regulations even though compliance would cause debtor to spend money).

*Safety-Kleen*, 274 F.3d at 865-866.

An action is not an action to enforce a police and regulatory power if the governmental unit

is seeking primarily to further its pecuniary interests. *In re Thomassen*, 15 B.R. 907, 909 (9th Cir.

BAP 1981). The governmental unit is acting in its capacity as a creditor, not in its capacity as

protector of the public's health or safety. *See e.g., F.T.C. v. AmeriDebt*, 343 F.Supp.2d 451

(D.Md.2004). Such actions fall outside the scope of the §362(b)(4) exception. The purpose of the

Bankruptcy Code is to resolve debtor-creditor issues. The automatic stay furthers this public policy.

In a liquidation case, it enables the trustee to assemble the debtor's assets, reduce them to money

and distribute them in accordance with the distribution scheme established by Congress. In a

reorganization case, it gives the debtor a brief respite to attempt to restructure its financial affairs

and repay its creditors. When a governmental unit seeks to exercise its creditor remedies under the

guise of its police or regulatory powers, it disrupts the bankruptcy proceeding to the detriment of

other creditors. *See Board of Supervisors for the County of Campbell v. Royal (In re Royal),* 137 Fed.Appx. 537 (4th Cir.2005) (unpublished opinion).

An action is not an action to enforce a police and regulatory power if the governmental unit is seeking primarily to further private rights. *EEOC v. McLean Trucking Co.,* 834 F.2d at 401. In *McLean Trucking,* the EEOC sued McLean Trucking which was in bankruptcy. The suit sought an injunction against further discrimination and back pay for several affected employees. The Court of Appeals easily found that a suit for injunctive relief was within the police and regulatory exception to the automatic stay. The real issue was the back pay issue. The back pay would be paid solely to the affected employees. This looked like the government suing to enforce the private rights of the affected employees by merely substituting itself for a private party. The exclusion under §362(b)(4) is for the benefit of the public, not private parties. Private parties should not be able to achieve indirectly what they may not achieve directly. *See also E.E.O.C. v. Rath Packing Co.,* 787 F.2d 318 (8th Cir.1986).

The Court of Appeals had to determine the primary purpose of the Equal Employment Opportunity Act because the public purpose of the Act and the private rights of interested parties were intertwined. *Safety-Kleen,* 274 F.3d at 865. In *McLean Trucking Co.,* the Court of Appeals found that the additional prayer for back pay effectuated the strong public policy of eliminating discrimination in the workplace which was the primary purpose of the statute. 834 F.2d at 402. *See also In re Cloverleaf Enterprises, Inc.,* 2009 WL 3066643 (Bankr.D.Md.2009.)

The ITC argues that the public policy underlying the Tariff Act of 1930 is the protection of domestic industries from patent infringement. The remedy is preventing infringing articles from being imported into the United States. This public policy is not sufficient. It is as stated in *Chao*

9

*v. Hospital Staffing Services, Inc.*, the type that can be found in every public law. It is unlike the public policy prohibiting racial, gender or age discrimination in the workplace. The public policy argument is belied in this case by the fact that several respondents were dismissed from the ITC action because they entered into a settlement with LSI and Agere. Settlements are within the province of the private litigants, although subject to approval by the ITC. The terms of the settlement agreements were not presented at the hearing. It is not known how they protected domestic industry, but it is not difficult to infer that such settlements generally require the respondent to pay a license fee to LSI and Agere. They do not change the essential dynamics of the domestic market and are the same results that can be achieved in a patent infringement suit. A patent infringement suit is not within the ambit of §362(b)(4). It is brought by a private litigant for its own benefit. The resolution affects the parties but not the essential dynamics of domestic industry. The result in a patent infringement case and an ITC action are essentially the same. The remedy in an ITC action is broader as to imported goods, but does not affect domestically produced goods. The primary purpose of the applicable provisions of the Tariff Act of 1930 is to protect patent holders. The action is primarily for the benefit of the private parties.

*Spansion, Inc.*, 418 B.R. 84 (Bankr.D.Del.2009) addressed the same issue. It found that "the ITC offered a public policy argument in broad strokes only, and presented no specific evidence that the public interest does and should outweigh the considerations involving adjudication of the private dispute between Spansion and Samsung." *Id.* at 95. That Bankruptcy Court concluded that the ITC was not exercising its police and regulatory power and that the action was not exempt from the automatic stay under Bankruptcy Code § 362(b)(4). *Id.* at 95. This case is no different from *Spansion.* While there is no pecuniary gain for the government in an ITC action, there is also no

10

significant public policy advanced by the ITC action presented in this case. LSI's and Agere's objectives were to enforce their patent rights against private parties for their own benefit. The ITC action furthers the goal of preventing unfair competition at best only incidentally. If the ITC action were brought *by* the ITC – which it is not – the ITC would be doing so for the private benefit of LSI and Agere.

### Conclusion

The pending ITC action does not satisfy the pecuniary interest test and the private rights test. The particular action now pending before the ITC is not within the ambit of §362(b)(4). It is stayed by the automatic stay.

Alexandria, Virginia
February 16, 2010

/s/Robert G. Mayer

Robert G. Mayer
United States Bankruptcy Judge

copies to:

Robert K. Coulter
Jeffrey Anderson Showalter
Robert H. Chappell, III

15756

Exhibit B
Proposed Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------X
                                       :
                                       :    Chapter 11
 In re                                 :
                                       :    Case No. 09-10138 (KG)
 Nortel Networks Inc., et al.,[1]      :
                                       :    Jointly Administered
                     Debtors.          :
                                       :    RE: D.I. _____
                                       :
                                       :
-------------------------------------------------------X
```

## ORDER ENFORCING THE AUTOMATIC STAY AGAINST CERTAIN CLAIMANTS WITH RESPECT TO THE U.K. PENSION PROCEEDINGS

Upon the motion dated February 18, 2010 of Nortel Networks Inc. and its

affiliated debtors, as debtors and debtors in possession in the above-captioned cases (the

"Debtors"), for Entry Of An Order Enforcing the Automatic Stay Against Certain Claimants

With Respect To The U.K. Pension Proceedings (the "Motion"), pursuant to sections 362(a)(1)

and (a)(6) of title 11 of the United States Code (the "Bankruptcy Code"), as more fully described

in the Motion and supporting papers; and adequate notice of the Motion having been given as set

forth in the Motion; and it appearing that no other or further notice is necessary; and the Court

having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C.

sections 157 and 1334; and the Court having determined that consideration of the Motion is a

core proceeding pursuant to 28 U.S.C. section 157(b)(2); and the Court having determined that

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

the legal and factual bases set forth in the Motion and supporting papers establish just cause for the relief requested in the Motion, and that such relief is in the best interests of the Debtors, their estates, their creditors and the parties in interest; and upon the record in these proceedings; and after due deliberation; and with respect to the following facts:

WHEREAS, on January 14, 2009 (the "Petition Date"), Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), with the exception of Nortel Networks CALA ("NN CALA"), which filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on July 14, 2009; and

WHEREAS, the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, on January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.1.S 141, 142], an ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"), and no trustee or examiner has been appointed in the Debtors' cases; and

WHEREAS, on August 4, 2009, the Court entered the Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (the "Bar Date Order") [D.I.1084], and on December 3, 2009 the Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059]; and

3

WHEREAS, on September 30, 2009 Nortel Networks U.K. Limited ("NNUK"), on behalf of itself, certain individuals from Ernst & Young LLC (the "Joint Administrators"), and nineteen of Nortel's European affiliates (the "EMEA Debtors") filed proofs of claim against the Debtors (except NN CALA), bearing claim identification numbers 5122 through 5136, submitting to the jurisdiction of this Court; and

WHEREAS, on September 30, 2009 the Nortel Networks U.K. Pension Trust Limited (as Trustee of the Nortel Networks U.K. Pension Plan) (the "U.K. Pension Trustee") and the Board of the Pension Protection Fund (the "PPF") jointly filed proofs of claim against each of the Debtors, bearing claim identification numbers 5573 through 5587(except for NN CALA, against whom the U.K. Pension Trustee and PPF filed a proof of claim on January 25, 2010, bearing claim identification number 6979) (collectively, the "U.K. Pension Claim"), submitting to the jurisdiction of this Court; and

WHEREAS, the U.K. Pension Claim is based on the allegation that the Nortel Networks U.K. Pension Plan (the "NNUK Pension Plan") is under-funded by an estimated amount alternatively stated to be £2.1 billion or $3.1 billion; and

WHEREAS, according to the U.K. Pension Claim, the U.S. Nortel Entities have a contingent liability and indebtedness arising from the alleged deficit in the NNUK Pension Plan, based on the anticipated exercise by the U.K. Pensions Regulator ("TPR") of powers under the U.K. pension laws to issue, through TPR's Determinations Panel (the "Determinations Panel"), a "financial support direction" ("FSD") against certain of the Debtors and certain non-U.S. Nortel Entities and, if they fail to put or keep in place financial support approved by TPR, to issue a contribution notice ("CN"); and

4

WHEREAS, the U.K. Pension Claim asserts that TPR concluded that, by the time the Claim was filed, grounds existed to issue certain warning notices ("Warning Notices") and to seek a FSD against certain members of Nortel Group affiliates worldwide, including the U.S. Nortel Entities, as companies allegedly "connected with or associates of" NNUK, based on the allegation that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR; and

WHEREAS, the U.K. Pension Claim also asserts that if a FSD is issued against any of the U.S. Nortel Entities, such entity could then be directed under the U.K. pension laws to procure financial support for the NNUK Pension Plan, either alone or with other members of the Nortel Group, and if such entity fails to put or keep in place financial support for the NNUK Pension Plan approved by TPR, then TPR could also exercise its power to issue a CN, imposing on that U.S. Nortel Entity a liability to pay a specific amount, which could be all or some portion of the deficit in the NNUK Pension Plan, which liability, it is alleged, would be enforceable as a debt under U.K. law; and

WHEREAS, by letters dated January 13, 2010 and addressed to NNI and NN CALA (along with certain non-U.S. Nortel entities), TPR purported to issue a Warning Notice initiating an administrative proceeding (the "U.K. Pension Proceedings") regarding the alleged deficit in the funding of the NNUK Pension Plan, which provides, in summary, that TPR believes it is reasonable to issue a FSD against the addressees (the "Targets") and references certain documents and witness statements as support for this determination, some of which, on information and belief, were provided by NNUK, and others of which are publicly available information, and indicating that the Targets may respond in writing to the Warning Notice by

midday on March 1, 2010, and may request a hearing on TPR's requested issuance of a FSD

against them; and

WHEREAS, on February 18, 2010, the Debtors filed the Motion;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    By virtue of their filing proofs of claim in this Court, the U.K. Pension

Trustee and the PPF have submitted to the jurisdiction of this Court.

3.    The automatic stay imposed by Section 362 of the Bankruptcy Code is

hereby enforced and fully applicable to the U.K. Pension Proceedings as referenced in the proofs

of claim filed by the U.K. Pension Trustee and the PPF, and with respect to the Debtors such

Proceedings are deemed void and of no force or effect; to the extent that either of the U.K.

Pension Trustee or the PPF participate in the U.K. Pension Proceedings, such participation will

be in violation of the automatic stay and subject the participating persons or entities to sanctions

under Section 362.

4.    Notwithstanding any provision in the Federal Rules of Bankruptcy

Procedure to the contrary, (i) the terms of this Order shall be immediately effective and

enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation,

enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their

discretion and without further delay, take any action and perform any act authorized under this

Order.

5.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2010
         Wilmington, Delaware

                                     _____
                                     THE HONORABLE KEVIN GROSS
                                     UNITED STATES BANKRUPTCY JUDGE

7

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS**
**ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION (the "Applicants")**

**NOTICE OF MOTION**
**(Returnable February 25, 2010)**

Ernst & Young Inc. in its capacity as monitor of the Applicants (the "Monitor")
pursuant to the Third Amended and Restated Initial Order dated January 14, 2009 (the "Initial
Order") will make a motion to The Honourable Mr. Justice Morawetz of the Ontario Superior
Court of Justice, on Thursday, February 25, 2010, at 10:00 a.m. or as soon after that time as
the motion can be heard at 330 University Avenue, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent ;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

THE MOTION IS FOR an Order:

(a)    abridging the time for service of this Notice of Motion and the Motion Record
herein and validating service thereof so that this motion is properly returnable
on February 25, 2010;

(b)    declaring that the purported exercise of rights and the commencement of
proceedings against the Applicants, Nortel Networks Corporation and Nortel

- 2 -

2

Networks Limited, by The Pensions Regulator under *The Pensions Act 2004* (U.K.) amount to breaches of paragraphs 14 and 15 of the Initial Order;

(c)    authorizing, directing and requiring the Applicants and the Monitor to refrain from participating in any proceedings commenced by The Pensions Regulator in breach of the Initial Order;

(d)    declaring that for the purposes of these proceedings all acts taken by the U.K. Pensions Regulator in the purported exercise of rights and in commencing any proceedings against any of the Applicants, without the consent of those Applicants and the Monitor or without leave of this Court having been first obtained, are null and void and shall be given no force or effect in these proceedings nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertakings in Canada; and

(e)    such further and other relief as to this Honourable Court seems just.

THE GROUNDS FOR THE MOTION ARE:

(a)    Under paragraph 14 of the Initial Order, no proceeding or enforcement process in any Court or tribunal may be commenced or continued against any of the Applicants, except with the consent of the affected Applicant and the Monitor or with leave of this Honourable Court first having been obtained;

(b)    Under paragraph 15 of the Initial Order, the exercise of all rights and remedies of all entities, including governmental bodies, against any of the Applicants or affecting their businesses or property are stayed and suspended except with the consent of the affected Applicant and the Monitor, or with leave of this Honourable Court first having been obtained;

(c)    The Pensions Regulator is the body charged with enforcement of certain provisions of *The Pension Act 2004* (UK) (the "UK Statute"). It has, to date,

- 3 -

*3*

refrained from participating in these proceedings or submitting to the jurisdiction of this Honourable Court;

(d)    On January 11, 2010, The Pensions Regulator delivered a "warning notice" in accordance with the procedure set out in section 96 of the UK Statute (the "Warning Notice") to Nortel Networks Limited and Nortel Networks Corporation in Canada. The Warning Notice is effectively a pleading required under the UK Statute to enable The Pensions Regulator to make "financial support" orders under the UK Statute so as to cause foreign affiliates of Nortel Networks UK Limited ("NNUK"), including Nortel Networks Limited and Nortel Networks Corporation in Canada, to become liable to provide financial support for the pension plan maintained by NNUK. In the Warning Notice, The Pensions Regulator purports to exercise rights under the UK Statute including, without limitation, the commencement of the proceedings to require Nortel Networks Limited and Nortel Networks Corporation to pay up to £2.1 billion (approximately $4 billion Canadian) to fund the deficit in NNUK's pension plan and the purported right to deem the value of certain resources under Regulation 12 of The Pensions Regulator (Financial Support Directions etc.) Regulations 2005 made under the UK Statute;

(e)    The Warning Notice, including appendices, is over 150 pages in length and is supported by additional, voluminous productions. The Pensions Regulator demanded that Nortel Networks Limited and Nortel Networks Corporation deliver a response by March 1, 2010 under the UK Statute, failing which default proceedings would be taken;

(f)    The Pensions Regulator has exercised rights and commenced proceedings against Nortel Networks Limited and Nortel Networks Corporation without the consent of those Applicants, the Monitor or leave of this Honourable Court and is therefore in breach of the Initial Order;

(g)    Moreover, the exercise of rights and the commencement of proceedings by The Pensions Regulator against Nortel Networks Limited and Nortel Networks

- 4 -

Corporation at this time and in the manner undertaken is contrary to the purpose of the stay of proceedings and contrary to the objectives of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended to January 14, 2009 (the "CCAA");

(h)     The substance of the allegations advanced by The Pensions Regulator against Nortel Networks Limited and Nortel Networks Corporation is that they ought to be held liable to provide funds to the pension plan of NNUK due to the historic manner of the allocation of funds among the various affiliates of the Applicants located in Canada and abroad;

(i)     This Honourable Court has already approved a procedure establishing a bar date of September 30, 2009, for the filing of claims against any of the Applicants in its Order dated July 30, 2009, as amended and restated (the "Claims Procedure Order"). In accordance with the Claims Procedure Order, Nortel Networks UK Pension Trust Limited (the trustee of the NNUK pension plan – the "Trustees") and the UK Pension Protection Fund ("PPF") have delivered claims in this proceeding with respect to "financial support" under the UK Statute;

(j)     Moreover, by Order of this Honourable Court dated June 29, 2009, the Court approved and directed the Applicants and the Monitor to enter into an agreement (the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "IFSA")) with the UK Administrators and representatives of the insolvent US affiliates of the Applicants and their creditors under which, among other things, the Canadian, UK and US representatives of the Applicants, their foreign affiliates and their creditors are actively engaged in negotiation of an "Allocation Protocol" to govern the process to determine the distribution of the proceeds of sale of the various businesses carried on by the Applicants and their affiliates around the world. The proceeds are currently being held in escrow. The proceeds may be released from escrow either by consensus among the parties or pursuant to the decision of an arbitral panel to

- 5 -

be established under the Allocation Protocol. Among the primary proposed purposes of the Allocation Protocol is for the representatives of the insolvent debtors to negotiate a manner in which to allocate the sale proceeds among the relevant parties. As part of this process, parties are likely to assert claims based on pre-filing contributions and other factors which claims are likely to be contested;

(k)    Management is fully engaged at the present time in the implementation of the various Court-approved sales transactions that involve the conveyance of assets all over the world, the transitioning of the many Nortel businesses in Canada and abroad, the negotiation of significant sales of other businesses and assets, such as LG-Nortel, considering alternatives for the realization of the significant residual intellectual property, and in engaging in the negotiation of the Allocation Protocol, among other things. The Applicants can ill afford to participate at this time in major litigation of a claim of up to $4 billion when many of the issues raised in the Warning Notice are key components that will be raised by parties in the negotiation of the Allocation Protocol or in the arbitration of allocation of the sale proceeds pursuant to the Allocation Protocol;

(l)    In these circumstances, proceeding with a major claim now on an urgent timetable is an inefficient and ineffective prioritization and use of the scarce human and economic resources of the Applicants;

(m)    Allowing the UK Pensions Regulator to ignore the stay, serve demands and process in Canada and proceed with its enforcement of rights and litigation at this time and in this manner would undermine the negotiation of the Allocation Protocol and might destabilize the entire restructuring processes for the Applicants and their affiliates both here and abroad by impairing managements' ability to engage in the pressing tasks currently facing the Applicants and their foreign affiliates and undermining, usurping or predetermining the outcome of the Allocation Protocol;

- 6 -

(n)     There are significant issues to be resolved in the UK proceedings commenced
by The Pensions Regulator including substantial defences to the issues
regarding allocation of funds among the various Nortel entities. This same
issue is the subject matter of voluminous documentary disclosure efforts being
undertaken in connection with the negotiation of the Allocation Protocol.
Moreover, there are significant issues as to whether any order against Nortel
Networks Limited or Nortel Networks Corporation that The Pensions
Regulator may decide to make to require the Canadian Applicants to provide
"financial support" will amount to a recognized claim under the CCAA in any
event. The CCAA defines and determines "claims" against the Canadian
Applicants, not a foreign statute. The claim being brought by the Pensions
Regulator is a device to attempt to give UK creditors an advantage over other
creditors by creating a "claim" which does not exist in Canada or in the UK at
the present time;

(o)     NNL executed two limited guarantees in relation to the liabilities of NNUK to
fund its pensions. Claims under these guarantees have been delivered to the
Monitor under the Claims Procedure Order by the Trustees, PPF and the UK
Administrators in addition to their claims for additional "financial support".
The aggregate amount claimed under NNL's guarantees is in excess of $1
billion. It is inappropriate to use a foreign long-arm statute to create additional
ex post facto "claims" or to deem that a post-filing event creates a pre-filing
claim when insolvency proceedings are already underway against the Canadian
Applicants in this Court and elsewhere. The Pensions Regulator has confirmed
to the UK Administrators that the very purpose of its actions is to take funds
from Canadian and other pensioners and creditors in an attempt to increase
recovery for UK pensioners. This is contrary to the doctrine of comity and
international cooperation in insolvency proceedings, contrary to the purposes
of the CCAA, contrary to the terms of the IFSA, to which the UK
Administrators are a party, and contrary to the purpose of the negotiation of the
Allocation Protocol as approved by this Honourable Court and by the U.S.
Bankruptcy Court;

- 7 -

(p)    It is not apparent that The Pensions Regulator is amenable to, or would abide by, any further Order of this Honourable Court requiring it to refrain from proceeding under the Warning Notice.   Therefore, the appropriate relief to respond to and redress the blatant disregard of the jurisdiction and Orders of this Honourable Court is to refuse to participate in, recognize or give any effect whatsoever to the purported exercise of rights and proceedings brought by The Pensions Regulator and those who would purport to rely upon the outcome thereof;

(q)    Nortel Networks UK Pension Trust Limited, UK Pension Protection Fund and the UK Administrators have attorned to the jurisdiction of this Honourable Court and ought not to be participating in or benefiting from proceedings that have been brought in breach of the Initial Order.

(r)    The Monitor relies on sections 11(4) and 12 of the CCAA; and

(s)    Such further and other grounds as counsel may advise and this Honourable Court permits.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)    The Thirty-Eighth Report of the Monitor dated February 17, 2010;

(b)    The Affidavit of Anna Ventresca sworn February 17, 2010;

(c)    The Affidavit of Robin Knowles C.B.E., Q.C. sworn February 17, 2010; and

(d)    Such further and other materials as counsel may advise and this Honourable Court permits.

- 8 -

February 17, 2010

**Goodmans LLP**
Barristers & Solicitors
333 Bay Street
 Suite 3400
Toronto, Canada  M5H 2S76

Jay Carfagnini  LSUC#: 222936
Fred Myers  LSUC#: 26301A
Joseph A. Pasquariello  LSUC#: 37389C

Tel:   416.597.5923
Fax:   416.979.1234

Lawyers for Ernst & Young Inc., in its capacity
as Court-Appointed Monitor



TO:

**ATTACHED SERVICE LIST**

AND TO:

The Pensions Regulator
Napier House
Trafalgar Place
Brighton, U.K.
BN1 4DW

9

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Applicants

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(Commercial List)

Proceeding commenced at Toronto

NOTICE OF MOTION
(RETURNABLE FEBRUARY 25, 2010)

Goodmans LLP
Barristers & Solicitors
333 Bay Street
Suite 3400
Toronto, Canada  M5H 2S7

Jay Carfagnini  LSUC#: 222936
Fred Myers  LSUC#: 26301A
Joseph A. Pasquariello  LSUC#: 37389C

Lawyers for Ernst & Young Inc., in its capacity
as Court-Appointed Monitor

# TAB 2



CITATION: Nortel Networks Corporation (Re), 2010 ONSC 1304
COURT FILE NO.: 09-CL-7950
DATE: 20100318

**SUPERIOR COURT OF JUSTICE – ONTARIO (COMMERCIAL LIST)**

**RE:** IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:** MORAWETZ J.

**COUNSEL:** Fred Myers, J. Carfagnini and C. Armstrong, for Ernst & Young, Inc., Monitor

Derrick Tay, Alan Merskey and Suzanne Wood, for the Applicants

Adam Hirsh, for the Board of Directors of Nortel Networks Limited and Nortel Networks Corporation

Arthur O. Jacques, for Nortel Canadian Continuing Employees

Kevin Zych, for Informal Noteholder Group

John Marshall and James Szunski, for The Pensions Regulator (U.K.)

Mark Zigler, for the Former and Disabled Canadian Employees

William Burden and David Ward, for the UK Pension Trustee and the Pension Protection Fund

M. Starnino, for the Pension Benefit Guarantee Fund

Alex MacFarlane, for the Unsecured Creditors' Committee

**HEARD:** FEBRUARY 25, 2010

**RELEASED:** FEBRUARY 26, 2010

**REASONS:** MARCH 18, 2010

**ENDORSEMENT**

**INTRODUCTION**

[1] Ernst & Young, Inc., in its capacity as Monitor of the Applicants (the "Monitor") brings this motion for an order:

(a) validating short service;

(b) declaring that the purported exercise of rights and the commencement of proceedings against the Applicants, Nortel Networks Corporation and Nortel Networks Limited, by The Pensions Regulator under the *Pensions Act 2004* (U.K.) amount to breaches of paragraphs 14 and 15 of the Initial Order;

(c) authorizing, directing and requiring the Applicants and the Monitor to refrain from participating in any proceedings commenced by The Pensions Regulator in breach of the Initial Order; and

(d) declaring that the for the purposes of these proceedings all acts taken by the U.K. Pensions Regulator in the purported exercise of rights and in commencing any proceedings against any of the Applicants, without the consent of those Applicants and the Monitor or without leave of this court having been first obtained, are null and void and should be given no force or effect in these proceedings nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertaking in Canada.

[2] The motion was heard on February 25, 2010.

[3] On February 26, 2010, the Record was endorsed: "The Stay applies. The relief requested in (a), (b) and (d) of the Notice of Motion is granted. No order in respect of (c). Reasons will follow".

[4] These are those reasons.

**FACTS**

[5] Paragraphs 14 and 15 of the Initial Order, granted January 14, 2009, provide as follows:

> 14. THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.
>
> 15. THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of

- Page 3 -

the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

[6]     The Pensions Regulator ("The Pensions Regulator") is the body charged with the enforcement of certain provisions of the *Pensions Act 2004* (U.K.) (the "U.K. Statute").

[7]     The U.K. Statute's objectives include protecting the benefits of employees in work-based pension schemes and promoting proper administration of those schemes. Under s. 96 of the U.K. Statute, the Regulator may determine whether or not to take regulatory action, which includes, *inter alia*, determining whether the applicable pension is underfunded, quantifying the deficit and holding the employer or a related party responsible for such deficit. The Determinations Panel, an internal group, determines whether the regulatory functions should be exercised.

[8]     On August 24, 2009, The Pensions Regulator advised the Administrators of the Nortel Networks UK Limited ("NNUK") (the "Administrators") Pension Plan that it was considering issuing a warning notice, a mandatory step towards issuing a financial support direction ("FSD"). A warning notice sets out the grounds for the potential issuance of an FSD, which is a direction requiring a party to put financial supports in place for an underfunded pension scheme. Any company that is an associate of or is otherwise connected with an employer may be issued an FSD.

[9]     On September 4, 2009, The Pensions Regulator wrote to Nortel Networks Corporation ("NNC") advising that it was considering issuing a warning notice seeking an FSD against NNC and other members in the Nortel Group.

[10]     On September 16, 2009, NNC wrote to The Pensions Regulator advising that because of the stay issued by this court under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA"), it could not consider individual potential claims.

[11]     On January 11, 2010, The Pensions Regulator issued a warning notice to NNC, NNI and 27 other companies in the Nortel Group (the "Notice"). The Notice was sent to Nortel Networks Limited ("NNL") and NNC in Canada.

[12]     The Pensions Regulator informed NNL and NNC that they had until March 1, 2010 to make submissions under the U.K. Statute, failing which default proceedings would be taken. The court was advised that the issuance of an FSD is subject to time limits and that the decision to issue an FSD must occur no more than two years after the "relevant time." The relevant time is designated by The Pensions Regulator in this case as June 30, 2008, such that any decision to issue an FSD in respect of this matter must be made by June 30, 2010.

- Page 4 -

**ISSUE**

[13]   By issuing the Notice, did The Pensions Regulator contravene the stay granted in the Initial Order?

**POSITIONS OF THE PARTIES**

[14]   Counsel to the Monitor submits that the issuance of the Notice constitutes the commencement of an enforcement process by a tribunal that is stayed by paragraph 14 of the Initial Order and an assertion of rights by a governmental body that is stayed by paragraph 15 of the Initial Order.

[15]   The Monitor takes the position that the Notice is effectively a pleading required under the U.K. Statute to enable The Pensions Regulator to make an FSD under the U.K. Statute. Such a determination would cause foreign affiliates of NNUK, including NNL and NNC, to become liable to provide financial support for the pension plan maintained by NNUK.

[16]   The Monitor contends that in the Notice, The Pensions Regulator purports to exercise rights under the U.K. Statute including, without limitation, the commencement of proceedings to require NNL and NNC to pay up to £2.1 billion (approximately CDN$4 billion) to fund the deficit in NNUK's pension plan.  The Pensions Regulator also exercises purported statutory rights, such as deeming certain facts for the purposes of the U.K. Statute and demanding a response by a time limit under threat of default proceedings.  Counsel submits that these exercises of rights without consent or leave are stayed by paragraphs 14 and 15 of the Initial Order.

[17]   Counsel to the Monitor further submits that if The Pensions Regulator is allowed to proceed under the Notice and the process described therein, the result would be extremely prejudicial to the Applicants' ongoing restructuring efforts and to their creditors generally because:

  i. Management is fully engaged in the restructuring process and the Applicants cannot afford to sacrifice the time and resources required to participate in the complex process envisaged in the Notice.

  ii. The restructuring would be disrupted and the progress already made therein, including the international efforts to negotiate the Allocation Protocol under the IFSA, would be threatened by The Pension Regulator's proceedings or its efforts to make determinations therein.

  iii. This Court is the proper forum for proceedings to determine the validity of and resolve all claims against the Applicants at an appropriate time and in an appropriate manner.

[18]   Regarding forum, the Monitor submits that the issues put forth by The Pensions Regulator can only be properly determined under the CCAA. The NNUK Pension Trust Limited (the "Trustee") and the U.K. Pension Protection Fund (the "PPF") filed proofs of claim in accordance with the October 7, 2009 Claims Process Order (the "Claims Process Order").  The

- Page 5 -

Trustee and the PPF claim "in the amount to be determined to be owing to [the Trustee and the PPF] pursuant to the Financial Support Direction Proceedings undertaken pursuant to the provisions of the [Pension Act]". Counsel to the Monitor submits that the filing under the Claims Procedure Order expressly raises the issues in the Notice.

[19]    The Monitor submits that there are extensive issues of fact and law for resolution in those proceedings. Moreover, there are issues as to whether any FSD determination can or ought to be recognized as a proper claim under the CCAA. Counsel submits that these are substantial issues upon which determination may or may not be required depending on the outcome of the Allocation Protocol negotiations, and regardless of when such issues may be resolved, there are issues that have been raised in these proceedings by the parties having the economic interest in the FSD claims and who have appeared before this Court and have filed proofs of claims under the Claims Process Order. Counsel argues that it is not efficient, reasonable or appropriate for the Applicants to proceed with massive litigation now in a severely compressed timeframe before a foreign tribunal with an expressed interest in benefiting one group of creditors.

[20]    At the very least, the Monitor submits that the Notice, having been issued in breach of the stay, should be declared null and void and of no force or effect due to the court's power to compel observance of its orders and to fulfill the purpose of the CCAA.

[21]    The Monitor also seeks a direction that it refrain from engaging in the proceedings commenced by The Pensions Regulator due to the prejudice caused by a diversion of resources.

[22]    The Applicants substantially adopt the Monitor's characterization of the Notice and the prejudice it would cause the parties.

[23]    The Applicants support the Monitor's request for an order declaring that any findings or claims emanating from the Notice and the associated process be null and void, and not recognizable or enforceable in this proceeding.

[24]    The position of the Monitor is also supported by counsel to the Noteholders, the Unsecured Creditors' Committee, the Former Disabled Canadian Employees and the Nortel Continuing Canadian Employees.

[25]    Counsel to the PPGF and the Board of Directors of NNL and NNC took no position.

[26]    The motion was opposed by counsel on behalf of The Pensions Regulator, which responds only to one of the heads of relief sought in the Monitor's Notice of Motion: whether the activities of The Pensions Regulator are a breach of paragraphs 14 and 15 of the Initial Order. The Pensions Regulator submits that the issue is whether this court has jurisdiction to make the order sought by the Monitor in relation to The Pensions Regulator.

[27]    The Pensions Regulator further submits that if this Court does have such jurisdiction, it should not be exercised in this case in any event.

[28]    Regarding the assertion by the Monitor and Applicants that the Notice is a pleading, Counsel for The Pensions Regulator took the position that that the Notice provides a standard

- Page 6 -

procedure for determining, internally, whether The Pensions Regulator should commence proceedings to exercise its statutory powers (the "Standard Procedure").

[29]    Counsel to The Pensions Regulator submits that pursuant to the Notice, the Determinations Panel will consider exercising its powers to issue an FSD and that these powers have not yet been exercised and may never be exercised. A determination in this regard will not be made until the responding parties to the Notice have had an opportunity to make representations and those representations have been considered by the Determinations Panel pursuant to the Standard Procedure set out at sections 96(2)(b) and (c) of the U.K. Statute.

[30]    Counsel further submitted that the FSD powers which The Pensions Regulator is considering exercising will not result in additional *ex post facto* claims in the proceedings under the CCAA as the Monitor has alleged, as the activities of the Determinations Panel will not result in making The Pensions Regulator a creditor of the Applicants.

[31]    Counsel to The Pensions Regulators submits this court does not have jurisdiction to make, and/or ought not to make, the order sought by the Monitor for the following reasons:

    (a)    The Initial Order is of no effect in the UK;

    (b)    The Monitor has not sought to enforce the Initial Order in the UK by way of an application for a recognition order;

    (c)    Although it is speculative to predict whether a UK court would make a recognition order enforcing the Initial Order in the UK, a number of factors suggest that any such recognition would not stay the regulatory proceedings;

    (d)    The blanket request for aid and recognition in the Initial Order does not eliminate the need for an application for a recognition order and the inquiry by the UK court that would be triggered thereby; and

[32]    Counsel further submits that this court lacks the jurisdiction to make an order under the CCAA that purports to have an inherent effect in a foreign state.

[33]    Counsel to the Trustee of the NNUK Pension Plan also opposed the making of any order. In particular, counsel submitted that an FSD could assist this court in CCAA proceedings, as the Panel making the determination has expertise and operates in a similar legal system as Canada.

**LAW AND ANALYSIS**

[34]    The CCAA stay of proceedings has been described as "the engine that drives a broad and flexible statutory scheme": see *Re Stelco Inc.*, 2005 CarswellOnt 1188 at para 36 (C.A.).

[35]    This court had the jurisdiction to make the Orders in paragraphs 14 and 15 of the Initial Order. Subsection 11(3) (with respect to initial applications) and subsection 11(4) (with respect to subsequent applications such as extensions of the initial stay) of the CCAA expressly empower the Court to make an order staying "any action, suit or proceeding" against the company on such terms as it may impose.

- Page 7 -

[36]   The court retains the ability to control its own process including litigation against CCAA debtors and claims procedures within a CCAA process. To ensure its effectiveness, s. 11, and in particular "proceedings" has been broadly interpreted to cover both judicial and extra-judicial proceedings which could prejudice an eventual arrangement.

[37]   In *Re Woodward's Ltd.*, (1993) 17 C.B.R. (3d) 236 (B.C.S.C.), the court found that "if a step must be taken vis-a-vis the insolvent company" for the creditor to enforce its rights, that step was a proceeding (at para. 27). The B.C. court looked to Black's Law Dictionary's definition of "proceeding" to base its finding:

> "proceeding" may refer not only to a complete remedy but also to a mere procedural step that is part of a larger action or special proceeding.

[38]   In *Meridian Development Inc. v. Toronto Dominion Bank*, (1984) 52 C.B.R. (N.S.) 109 (Alta Q.B.), Wachowich J. provided a helpful analysis of the breadth of the definition of "proceeding" at para 27:

> ... I am mindful of the wide scope of action which Parliament intended for this section of the Act. To narrow the interpretation of "proceeding" could lessen the ability of a court to restrain a creditor from acting to prejudice an eventual arrangement in the interim when other creditors are being consulted. As I indicated earlier, it is necessary to give this section a wide interpretation in order to ensure its effectiveness. I hesitate therefore to restrict the term "proceedings" to those necessarily involving a court or court official, because there are situations in which to do so would allow non-judicial proceedings to go against the creditor which would effectively prejudice other creditors and make effective arrangement impossible. The restriction could thus defeat the purpose of the Act ... (i)n the absence of a clear indication from Parliament of an intention to restrict proceedings" to "proceedings which involve either a court or court official", I cannot find that the term should be so restricted. Had Parliament intended to so restrict the term, it would have been easy to qualify it by saying for instance "proceedings before a court or tribunal".

[39]   It has also been established that the term "proceeding" may refer to any procedural step that is part of a larger proceeding. Delivery of a certificate to the debtor company as a prerequisite to drawing on a letter of credit has been stayed as a proceeding against a CCAA debtor: see *Re Woodward's Ltd., supra*, at paras 26-27.

[40]   It seems to me that, even though the Notice may be described as a warning shot across the bow, the effect of the Notice in this case is something far more significant. It clearly puts the Applicants and the Monitor on notice that there is a substantial claim that is being considered in the CCAA proceedings. At the present time, the claim as filed by the U.K. Pension Trustee makes reference to the FSD which may very well flow from the activities being undertaken by The Pensions Regulator. Having already set out the parameters of this claim in the proof of claim, the claim has to be considered a contingent claim in the CCAA proceedings. In my view, the issuance of the Notice is another step on the road to crystallizing the contingent claim.

- Page 8 -

[41]    The issuance of an FSD is a remedy created by a statute of the United Kingdom. Regardless of whether the U.K. Statute purports to extend its reach beyond the borders of the U.K., the Notice, naming the Applicants, NNC and NNL, as "target companies" affects these entities which are clearly within the jurisdiction of this Court.    Moreover, The Pensions Regulator purported to deliver the Notice to NNL and NNC by sending it to them in Canada in purported compliance with the U.K. Statute. In my view, The Pensions Regulator took steps in Canada in respect of a proceeding. In this context, The Pensions Regulator is, in my view, a person affected by the Initial Order, with which it must comply when it takes any proceedings in Canada.

[42]    The Pensions Regulator did not obtain the consent of NNC and NNL or the Monitor, and did not obtain the leave of this court, before taking steps in Canada which affected NNC and NNL. In my view, the delivery of the Notice in Canada was in breach of the Initial Order. It follows that any continuation of these proceedings in Canada and attempted enforcement of rights in Canada will also be in breach of the Initial Order.

[43]    As such, section (b) of the relief requested by the Monitor should be granted.

[44]    It also follows that for the purposes of the CCAA proceedings, the actions taken by The Pensions Regulator, are null and void in Canada and are to be given no force or effect in these CCAA proceedings. Accordingly, section (d) of the requested relief should also be granted.

[45]    Having made this determination, in my view, it is not necessary to consider the arguments outlined at [17]. The points raised in [17] may be relevant to any motion to lift the stay, but that issue is not before the court.

[46]    The Monitor also requested an order authorizing, directing or requiring the Applicants and the Monitor to refrain from participating in any proceedings commenced by The Pensions Regulator. In my view, it is not necessary to comment further and provide directions with respect to a proceeding which, on its face, is null and void. The UK proceedings operate under UK law, and I decline to make a declaration on their legitimacy or to provide direction to the Monitor and the Applicants on their obligations to attend.

[47]    An order shall issue to give effect to the foregoing.


MORAWETZ J.


**Date:** March 18, 2010

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------X
                                                            :
                                                            :    Chapter 11
                                                            :
In re                                                       :
                                                            :    Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,[1]                            :
                                                            :    Jointly Administered
                    Debtors.                                :
                                                            :
                                                            :
------------------------------------------------------------X
```

DECLARATION OF JOHN RAY IN
SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
ENFORCING THE AUTOMATIC STAY AGAINST CERTAIN
CLAIMANTS WITH RESPECT TO THE U.K. PENSION PROCEEDINGS

I, John Ray, do hereby declare as follows:

1.    On January 6, 2010, upon the motion of Debtors, I was appointed by this

Court as Debtors' Principal Officer, *nunc pro tunc* to December 7, 2009. I am also Senior

Managing Director and sole member of Avidity Partners, LLC. Except as otherwise noted, all

facts set forth in this Declaration are based upon my personal knowledge, and information that I

learned from reviewing relevant documents. If I were called upon to testify, I could and would

testify competently to the facts set forth herein.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel
Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073),
Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846),
Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel
Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226), (collectively the "U.S. Nortel
Entities" or the "Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://chapter11.epiqsystems.com/nortel.

2.      I submit this Declaration in support of the Debtors' Motion[2] for entry of an order, pursuant to sections 362(a)(1) and (a)(6) of title 11 of the United States Code (the "Bankruptcy Code") enforcing the automatic stay against claimants the Trustee of the NNUK Pension Plan (the "U.K. Pension Trustee"), and the U.K. Pension Protection Fund (the "PPF" and, collectively with the U.K. Pension Trustee, "Claimants") with respect to their participation in certain Pension Administrative Proceedings in the U.K.

**The U.K. Pension Claim**

3.      On or about September 30, 2009, the U.K. Pension Trustee and the Board of the PPF jointly filed proofs of claim against the U.S. Nortel Entities (with the exception of NN CALA), which are listed on Debtors' claim log as claim numbers 5573-5587 (collectively, the "U.K. Pension Claim"). A true and correct copy of the U.K. Pension Trustees and PPF's proof of claim against NNI, with exhibits, which I understand is representative of all of their proofs of claim, is attached hereto as Exhibit A.

4.      On January 25, 2010 the U.K. Pension Trustees and PPF jointly filed a proof of claim against NN CALA, which is listed on Debtors' claim log as claim number 6979. A true and correct copy of the proof of claim filed against NN CALA, with exhibits, is included in Exhibit B hereto as part of the U.K. Pension Claim.

5.      The U.K. Pension Claim is based on the allegation that the Nortel Networks U.K. Pension Plan (the "NNUK Pension Plan") is underfunded by an amount alternatively stated to be £2.1 billion or $3.1 billion.

---

[2]      Capitalized terms not defined herein have the same meanings as in the Motion.

2

6.     On both November 21, 2006 and December 21, 2007, Nortel Networks Limited ("NNL")[3] executed certain guarantees regarding the NNUK Pension Plan. No U.S. Nortel Entity provided any guarantee with respect to the U.K. Pension Plan.

7.     The U.K. Pension Claim asserts that the U.K. pension regulator ("TPR") has concluded that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR, and that as of the date on which the Claim was filed, grounds existed to issue warning notices ("Warning Notices") and to seek a Financial Support Direction ("FSD") against certain members of Nortel Group affiliates worldwide, including the U.S. Nortel Entities, as companies that are allegedly "connected with or associates" of Nortel Networks U.K. Limited ("NNUK"). The Claim further asserts that no Warning Notice had been issued pre-petition or indeed prior to the filing of the U.K. Pension Claim. Instead, as discussed below, TPR has only recently purported to issue a Warning Notice addressed, inter alia, to two U.S. Debtors, NNI and NN CALA.

8.     The U.K. Pension Claim also asserts that if a FSD is issued against any of the U.S. Nortel Entities, such entity could then be instructed under the U.K. Pension Act to procure financial support for the NNUK Pension Plan, either alone or with other members of the Nortel Group. The U.K. Pension Claim further asserts that if a U.S. Nortel Entity receives a FSD, but fails to put or keep in place financial support for the NNUK Pension Plan approved by TPR, then TPR could also exercise its power to issue a Contribution Notice ("CN"), imposing on that U.S. Nortel Entity a liability to pay a specific amount, which could be all or some portion of the NNUK Pension Plan under-funded obligations. I am informed that, as a matter of U.K. law

---

[3]     Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (and together with NNC and their affiliates, including the Debtors, "Nortel") and certain of their Canadian affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

under the Pensions Act, such amount could constitute an enforceable debt owed by the target of the CN to the U.K. Pension Trustee (without reference to issues of U.S. law). (See Declaration of Richard Hitchcock, dated February 18, 2010 (the "Hitchcock Dec." at ¶ 46.)

## THE U.K. ADMINISTRATIVE PROCEEDING

9.    By letters dated January 13, 2010 and addressed to NNI and NN CALA (along with certain other non-U.S. Nortel entities, including, without limitation NNC and NNL, collectively (the "Targets")), TPR purported to issue a Warning Notice, pursuant to the U.K. Pensions Act 2004 (the "Pensions Act"), initiating an administrative proceeding regarding the alleged shortfall in the funding of the U.K. Pension Plan (the "U.K. Administrative Proceedings"). Such Proceedings are to be conducted by the Pensions Regulator's Determinations Panel (the "Determinations Panel"). The other U.S. Nortel Entities were not referred to in the Warning Notice.

10.    The Warning Notice is more than 150 pages long, and is supported by voluminous documents and witness statements, certain of which on information and belief were provided by NNUK and others of which are publicly available information. It provides, inter alia, that (i) the "relevant time" on which to measure the U.K. Pension Plan's funding position for the purpose of deciding whether to issue an FSD is June 30, 2008; and (ii) TPR believes it is reasonable to issue a FSD against the Targets, including NNI and NN CALA, for various reasons including the TPR's analysis of certain benefits conveyed among affiliates. The Warning Notice also reviews TPR's conclusion that benefits provided by certain affiliates to certain other affiliates provides a basis for issuing a FSD.

11.    I am informed that under the Pensions Act, there are various factors that TPR and the Determinations Panel considers in making the "reasonableness" determination.

4

(Hitchcock Dec. at ¶ 37.4.) One is the extent to which the employer provided benefits to other affiliates. Another is the general financial circumstances of the Targets. (Hitchcock Dec. at ¶¶ 37.4.2, 37.4.4.) Accordingly, among the key issues in any U.K. Administrative Proceeding would be an assessment of the benefits flowing among the various Nortel debtors (and presumably the compensation received for them), and the financial positions of the various Targets.

12.     TPR has indicated that the Targets, as well as the U.K. Pension Trustees and PPF, may respond in writing to the Warning Notice by midday on March 1, 2010, and the Determinations Panel will consider all responses.

**Canadian Monitor's Motion to Stay the U.K. Administrative Proceedings**

13.     On February 17, 2010, the Monitor filed an application with the Canadian Court seeking, inter alia, a declaration that the U.K. Administrative Proceedings would violate the stay imposed by the Initial Order entered by the Court pursuant to the CCAA, and that the U.K. Administrative Proceedings would be void and of no force or effect as against NNC and NNL in the Canadian Proceedings. True and correct copies of that application and the supporting papers filed with the Canadian Court are attached hereto as Exhibit C.

**THE NEED FOR THE RELIEF SOUGHT ON THE MOTION**

**The Overlap With the Allocation Process**

14.     The issue to be determined in the U.K. Administrative Proceeding – whether and to what extent NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates – overlaps with one of the overriding issues in these cases, as well as in the related insolvency proceedings in Canada and the U.K.: the allocation of the billions of dollars in proceeds of the post-petition sales of Nortel assets. This allocation will be a key part

5

of the determination of the amounts available for distribution to the creditors located in the various jurisdictions, and will be based in part on the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold.

15.     In recognition of the integrality of the allocation issue to the ultimate resolution of the global Nortel bankruptcy and insolvency cases, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors[4], including NNUK, agreed, in the Interim Funding and Settlement Agreement (the "IFSA"), inter alia, (a) that all proceeds of sales of material assets of any Nortel debtor worldwide will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. IFSA §§ 12(b)-(c) attached to Declaration of Lisa M. Schweitzer dated February 17, 2010 as Exhibit B.

16.     The parties have engaged in extensive negotiations regarding the terms of the allocation protocol.  The purpose of the protocol, (called the Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds), is to ensure a fair process for determining the allocation, to be determined (absent a consensual agreement), in a single cross-jurisdictional forum.

17.     Resolution of the allocation issue may entail, among other things, reference by the contending parties to Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, individual corporate assets, and individual

---

[4]     Nineteen of Nortel's European affiliates, including NNUK (collectively the "EMEA Debtors") are under administration under the control of certain individuals from Ernst & Young LLC.

6

corporate revenues. These issues overlap with the inter-affiliate benefit analysis raised in the U.K. Administration Proceedings.

18.    In the absence of the Court enforcing the automatic stay, a U.K. administrative body, whose sole focus is the financial protection of U.K. pension plans and their insurance vehicle, will be permitted to determine factual issues – including the benefits received and conferred among affiliates -- that are not only central to the allocation process, but ones that NNUK has agreed must be resolved on a global basis in a single cross-jurisdictional forum. The U.S. Debtors should not be faced with the risk of collateral estoppel arising from litigation of the U.K. pension issues in advance of the allocation process.

19.    In addition, I understand that one of the key elements in determining the "reasonableness" of imposing a FSD and CN against a Target is the Target's financial condition. (Hitchcock Dec. at ¶¶ 37.4.4,44.6.)  Until the allocation procedure is completed, however, the financial condition of the Debtors, as well as NNUK, whose alleged inability to fund its pension plan is the very reason for the U.K. Administrative Proceeding, cannot be determined.

**The Burden Imposed on the Debtors**

20.    The breadth of the issues that TPR and U.K. Pension Claim have raised, and the very short timeframe it has provided for responses, would impose a substantial burden on the Debtors. In order to defend against TPR's broad allegations, the Debtors would have to engage in a substantial factual inquiry, going back many years and addressing complex issues such as the value of certain research and development, transfer pricing and affiliate relationships relating to pension oversight and legal and tax determinations. This inquiry will be detailed and complicated, requiring far longer than the limited period set forth in the Warning Notice as well as significant investment of time by Debtor personnel. Many of the fact issues -- such as transfer

7

pricing, ownership of intellectual property, internal research and development allocation and individual asset values -- may also relate to the allocation process. Moreover, the Debtors will require expert testimony on a variety of these issues, which will require additional time and focus.

21.    As the Debtors attempt to move forward to further maximize value to the creditor constituencies through asset sales and in developing a Chapter 11 plan, it would be a waste of the estate's resources for their essential personnel and professionals to be forced to litigate these complex issues on an expedited basis (particularly in a foreign jurisdiction) or before the allocation process resolved. The drain on scarce management resources to respond to this significant dispute in this time frame would be excessively costly both in terms of expense and time commitment, to the detriment of these cases and the estates.

22.    Accordingly, an order should be entered enforcing the automatic stay, putting the Claimants on notice that any results of such Proceeding will be void in this Court and that they will be subject to possible sanctions should they proceed in violation of the automatic stay.

8

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 18, 2010

John Ray

John Ray Declaration

- Exhibit A -

Due to the voluminous nature of the attachments to the Proof of Claim, the filing and service copies of this Declaration will include only the Proof of Claim and the relevant materials cited in the Declaration, not the full attachments to the Proof of Claim.

The Appendices to the Proof of Claim are available for download from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://chapter11.epiqsystems.com/nortel, or upon written request to counsel for the Debtors.

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT   FOR THE   DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|
| Name of Debtor: Nortel Networks Inc. . | Case Number: 09-10138 (KG) |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Nortel Networks UK Pension Trust Limited (as trustee of the Nortel Networks UK Pension Plan) and The Board of the Pension Protection Fund | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>Nortel Networks UK Pension Trust Limited<br>(as trustee of the Nortel Networks UK Pension Plan)<br>Westacott Way<br>Maidenhead, Berkshire<br>SL6 3QH<br>Attn: David Davies, Chairman<br>Telephone number: 44 78 0829 6794<br><br>and<br><br>The Board of the Pension Protection Fund<br>Knollys House<br>17 Addiscombe Road<br>Croydon<br>Surrey<br>CR0 6SR<br>Attn. Richard Favier, Senior Insolvency Advisor<br>Telephone number: 44 208 633 4940 | Court Claim Number_____<br>*(if known)*<br><br>Filed on:_____<br><br>With notice to:<br>Brian E. O'Connor, Esq<br>Willkie Farr & Gallagher LLP<br>787 7th Avenue<br>New York, NY 10019<br>Telephone number: (212) 728-8000<br><br>**FILED / RECEIVED**<br>**SEP 3 0 2009**<br>**EPIQ BANKRUPTCY SOLUTIONS, LLC** |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |
| 1. Amount of Claim as of Date Case Filed: <u>See attached Schedule A</u><br><br>If all or part of your claim is secured, complete item 4 below; I<br>item 4.<br><br>If all or part of your claim is entitled to priority, complete item<br><br>☒ Check this box if claim includes interest or other charges i itemized statement of interest or charges.<br>*Filed: USBC - District of Delaware*<br>*Nortel Networks Inc., Et AL*<br>*09-10138 (KG )   0000005573* | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim<br><br>☐ Domestic support obligations under 11 U.S.C §507(a)(1)(A) or (a)(1)(B). |
| 2. Basis for Claim: <u>See attached Schedule A</u><br>(See instruction #2 on reverse side.)<br>3. Last four digits of any number by which creditor identifies debtor: _____<br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. Secured Claim (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br>Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☒ Other<br>Describe: _____<br>Value of Property: $_____   Annual Interest Rate____%<br>Amount of arrearage and other charges as of time case filed included in secured claim,<br>if any: $_____   Basis for perfection: _____<br>Amount of Secured Claim: _____   Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).<br><br>(continued on next page) |

Page 1 of 2

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. **See attached Schedule A**

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain: **See attached Schedule A**

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**See attached Schedule A**

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with after respect to cases commenced on or a the date of adjustment.*

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

DAVID DAVIES

BRUCE McNESS
BESTRUSTEES
PLC

RICHARD FAVIER
SENIOR INSOLVENCY
ADVISER

Date: 9/29/09

FOR COURT USE ONLY

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## Schedule A

**"The Claimants"** : (i) Nortel Networks UK Pension Trust Limited (the "Trustee") and/or (ii) The Board of the Pension Protection Fund ("PPF"), in accordance with their respective interests.

**"The Debtor":**    Nortel Networks Inc.

The Debtor has a contingent liability and indebtedness to the Trustee and the PPF in accordance with their respective interests arising pursuant to the Pensions Act 2004 and the Pensions Act 1995 (Acts of the UK Parliament) and all applicable UK Regulations (collectively, "UK Legislation", as a result of the matters set out below. See Appendix B (Schedule of Applicable Laws).

**Item 1 and Item 2:** Amount of Claim as of Date Case Filed and Basis For Claim.

1. **THE CLAIMANTS AND THE NORTEL NETWORKS UK PENSION PLAN.**

1.1    Nortel Networks UK Limited ("NNUK") has carried on business in the United Kingdom by itself and through its predecessors for over 18 years as part of the Nortel group of companies (the "Nortel Group") and for many years before that outside the Nortel Group. NNUK's predecessors established, and NNUK participated in, the occupational pension scheme known as the Nortel Networks UK Pension Plan (the "Plan"), in order to provide pensions and other benefits for their employees. The Trustee is the trustee of the Plan.

1.2    The Plan is a defined benefit arrangement pursuant to which employees of participating employers become entitled to pension benefits based on final salary and the employers agree to meet the balance of the cost of providing such benefits after taking into account the employees' own contributions. A copy of the current governing documentation for the Plan is appended hereto in Appendix A as Exhibits 1 and 2. The Plan now has over 40,000 present and potential (deferred) pensioners.

1.3    Messrs A Bloom, A Hudson, S Harris and C Hill of Ernst & Young LLP (hereinafter referred to as the "Administrators") were appointed as joint administrators of NNUK under schedule B1 of the UK Insolvency Act 1986 on January 14, 2009 (hereinafter referred to as the "Administration").

1.4    Notice was given by the PPF (a statutory body established under the Pensions Act 2004) on March 30, 2009 to the Administrators confirming that the Plan was in an assessment period for the purposes of the Pensions Act 2004. See Appendix A at Exhibit 3. An assessment period is a period in which the PPF will work with the Trustee of the Plan so that a valuation of the Plan can be completed to determine the Plan's admittance into the PPF. This notice has been accepted by the Administrators in the Administration.

1.5      Under section 137 of the Pensions Act 2004, during an assessment period, the rights and powers of a trustee of a pension scheme in relation to any debt (including any contingent debt) due to them by the employer, whether by virtue of section 75 of the Pensions Act 1995 (an Act of the UK Parliament) or otherwise, are exercisable by the PPF. In addition, under section 49(5) of the Pensions Act 2004, the rights and powers of a trustee in relation to any debt due to it by virtue of a contribution notice issued pursuant to the process described below are exercisable by the PPF. A trustee retains the right to enforce claims and rights in respect of which the PPF does not have creditor rights. The whole of any amount paid in respect of such debts are ultimately payable to the Plan, whether it is the PPF or the Trustee who exercises the right or power to enforce the obligations.

2.      **LIABILITIES UNDER FINANCIAL SUPPORT DIRECTION PROCEEDINGS UNDER THE UK PENSIONS ACT 2004.**

2.1      The Pensions Regulator in the United Kingdom ("the **Regulator**") has power under the Pensions Act 2004 to issue a financial support direction ("**Financial Support Direction**") to any company connected with or an associate of a company which is an employer in relation to a UK occupational pension scheme. A Financial Support Direction requires the company or companies to whom it is issued to secure that financial support for the pension scheme is put in place within the period specified by the Regulator and as approved by the Regulator, and that such support remains in place whilst the pension scheme is in existence.

2.2      The procedure for issuing a Financial Support Direction is that the Regulator reviews the background and circumstances relating to the pension plan. The Regulator, if it concludes that there are grounds to do so, then sets out the case for the issuance of a Financial Support Direction in a warning notice (the "**Warning Notice**"), which is sent to the named company or companies. The company or companies to whom the Warning Notice is addressed have the opportunity to make written representations as to the matters set out in the Warning Notice to the Regulator, and then all parties have the opportunity to make submissions at a hearing in front of the Determinations Panel of the Regulator, which must then decide whether it is appropriate under the Pensions Act 2004 and related laws and regulations to issue a Financial Support Direction.

2.3      The Plan is a UK occupational pension scheme. NNUK is the current employer in relation to the Plan. The Debtor, being part of the Nortel Group, is an associate of or connected with NNUK for the purposes of the Pensions Act 2004 and the Insolvency Act 1986.

2.4      The Plan has a funding deficit (as described more fully below). As is confirmed by the letter from the Regulator to the Trustee and the PPF (see Appendix A at Exhibit 4), the Regulator has investigated and is continuing to investigate the circumstances of this case. The Regulator in the light of its investigation has concluded that grounds exist to

issue Warning Notices and to seek a Financial Support Direction against one or more of the members of the Nortel Group, whose members expressly include the Debtor. See Schedule A to Letter in Appendix A at Exhibit 4.

2.5    A Financial Support Direction may be issued by the Regulator when the employer in relation to the Plan is insufficiently resourced within the meaning of Part 1 of the Pensions Act 2004 (and associated Regulations) at a time determined by the Regulator, which in this case was June 30, 2008, and the other statutory and regulatory requirements are satisfied. See Sections 43-44 of the Pensions Act 2004.

2.6    The Regulator considers that NNUK was insufficiently resourced within the meaning of the UK Legislation, because:

   2.6.1    the Regulator has determined the value of NNUK's resources (as defined in the UK Legislation) to be less than 50% of the "estimated section 75 debt" (see Section 2.7 below) of NNUK as at the date specified by the Regulator, namely June 30, 2008 - such estimated section 75 debt being (UK) £1.777 billion (see Appendix A at Exhibits 5 & 6); and

   2.6.2    Nortel Networks Corporation ("NNC"), which is and was the ultimate parent company of both NNUK and the Debtor, is an associate of NNUK for the purposes of the UK Legislation. The Regulator has determined the value of the resources of NNC to be not less than (and, indeed, more than) the difference between the value of the resources of NNUK and 50% of NNUK's estimated section 75 debt (see Appendix A at Exhibits 7 & 8).

2.7    The section 75 debt under the Pensions Act 1995 is the amount which the Regulator estimates would become due from NNUK to the Trustee if the liability had been triggered on June 30, 2008. The liability under section 75 is broadly equal to the deficiency in the funding of a pension scheme on a "buy-out" basis together with certain costs. For the purpose of calculating the "buy-out" amount, the assets of the Plan are compared to the amount required or estimated by the actuary for the Plan (the "Plan Actuary") to be required to "buy out" its liabilities by purchasing equivalent annuities from an authorised insurance company.

2.8    The Plan Actuary has estimated the section 75 debt of NNUK as of January 13, 2009 to be (UK) £2.1 billion. See Appendix A at Exhibit 9. The Administrators of NNUK have stated that an informal estimate of the section 75 debt of NNUK is (US) $3.1 billion. See Appendix A at Exhibit 10.

2.9    The issuance of a Financial Support Direction against the Debtor will require the Debtor either alone or together with other members of the Nortel Group to procure financial support for the Plan satisfactory to the Regulator.

2.10    Under the Pensions Act 2004, if the Debtor fails to put or keep in place financial support approved by the Regulator, the Regulator has power to issue a contribution notice ("**Contribution Notice**") imposing on the Debtor a liability to pay the sum specified in the notice, which may be in an amount equal to the whole of the debt that is or would be due by NNUK in relation to the Plan under section 75 of the Pensions Act 1995.

2.11    By virtue of section 49 of the Pensions Act 2004, the sum specified in such a Contribution Notice is to be treated as a debt due from the Debtor to the Trustee of the Plan. As set out above, by virtue of section 49(5), during an assessment period the rights and powers of the Trustee in relation to the debt to the Trustee pursuant to said Contribution Notice are exercisable by the PPF.

2.12    The indebtedness or liability of the Debtor to the Claimants under the applicable laws and the Plan arose at the latest on the date on which NNUK was first insufficiently resourced within the meaning of Part 1 of the Pensions Act 2004. The liability had therefore been incurred no later than June 30, 2008.

2.13    As summarized above, the process under the Pensions Act 2004 relating to the determination of any potential Financial Support Direction obligations of the Debtor and other entities in the Nortel Group is underway, and certain entities within the Nortel Group have received and responded to inquiries from the Regulator. The responses to the Regulator's inquiries and any additional evidence that may be submitted and any submissions that may be made by the Debtor or other affected entities within the Nortel Group will be considered by the Regulator's Determination Panel in reaching a determination of the Debtor's and the other members of the Nortel Groups' Financial Support Direction and other obligations.

**Items 4 and 5.    <u>Secured or Priority Claim</u>.**

Claimants' claims are secured to the extent that Claimants have a right of setoff, recoupment, or are otherwise entitled to secured status.

To the extent that any portion of Claimants' claims are entitled to administrative priority status under 11 U.S.C. § 507, Claimants claim such priority status in the maximum amount allowed by law. The filing of this proof of claim shall in no way be deemed a waiver of either Claimant's right to assert that any or all of the their claims are entitled to administrative priority status.

**Item 6.    <u>Credits</u>.**

Undetermined at this time.

**Item 7.    <u>Documents</u>.**

Attached hereto as Appendix A is a list of the relevant documents and materials supporting this proof of claim and copies of such documents and materials. Any other documents and materials will be made available upon reasonable request.

## RESERVATION OF RIGHTS.

1.     Each Claimant reserves the right to:  (a) amend, clarify, modify, update or supplement this proof of claim at any time and in any respect, including without limitation to assert additional claims or additional grounds for its claim and/or to specify the amount of any contingent, unmatured or unliquidated claim as they become non-contingent, matured and/or liquidated; (b) file additional proofs of claim at any time and in any respect; and (c) file a request for payment of administrative priority expenses in accordance with 11 U.S.C. §§ 503(b) and 507(a).

2.     Each Claimant reserves the right to attach or bring forth additional documents supporting their claims and additional documents that may become available after further investigation and discovery.

3.     To the extent that either Claimant has or may have a right to subrogation under 11 U.S.C. § 509 or any other equitable claim under common law against the Debtor, such Claimant expressly preserves such rights.

4.     By filing this proof of claim, each Claimant does not waive, and specifically preserves, its respective procedural and substantive defenses to any claim that may be asserted against such Claimant by the Debtor, by any trustee of its estate, by the Debtor's Official Committee of Unsecured Creditors, by any other official committee appointed in these cases or by any other party or group.

5.     Claimants are continuing to investigate the elements of their claims and this proof of claim is filed under the compulsion of an order, dated August 4, 2009, authorizing the Debtor to set a final date for filing proofs of claim. Accordingly, this proof of claim is filed to protect Claimants from potential forfeiture of any and all rights against the Debtor. The filing of this proof of claim shall not constitute: (a) a waiver or release of the rights of either Claimant against the Debtor or any other person or property; (b) a waiver of either Claimant of its right to contest the jurisdiction of the United States Bankruptcy Court for the District of Delaware with respect to the subject matter of each Claimant's claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving Claimants; or (c) an election of remedies or choice of law.

6.     This proof of claim shall not be deemed to be a waiver of either Claimant's rights to: (a) have final orders in noncore matters entered only after *de novo* review by a District Court Judge; (b) trial by jury in any proceeding so triable in these cases or any case,

controversy or proceeding related to these cases; (c) have a District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; (d) arbitrate existing or future claims or disputes; or (e) any other rights, claims, actions, set-offs or recoupments to which either Claimant is or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments such Claimant expressly reserves.

**ITEM # 3**

**Pension
Protection
Fund**

Mr Alan Bloom
Ernst & Young LLP
1 More London Place
London
SE1 2AF

30 March 2009

Our Ref: AT-KM-Nortel-300309

Dear Mr Bloom

Nortel Networks UK Pension Plan
Nortel Networks UK Limited - in Administration

We acknowledge receipt of the section 120 notice notifying us that an insolvency event has occurred in relation to the above named employer and section 122 notice in respect of the above named scheme, received on 15 January 2009 and 5 February 2009 respectively.

The Board of the Pension Protection Fund is required by law formally to respond to each of these notices.

**Section 120 Notice**

Under the requirements of the Pensions Act 2004 and supporting Regulations, the Board of the Pension Protection Fund is required to validate that:

    a) a qualifying insolvency event as defined in section 121 and 127 of the Pensions Act 2004 and Regulation 5 of the Pension Protection Fund (Entry Rules) Regulations 2005 has occurred in relation to an employer; and

    b) the pension scheme is an eligible scheme as defined in section 126 of the Pensions Act 2004 and Regulation 2 of the Pension Protection Fund (Entry Rules) Regulations 2005.

We confirm that, on the basis of the information provided to us in your capacity as joint administrator of the employer and by the trustees/managers of the scheme and the Pensions Regulator, both factors noted above appear to have been satisfied.

Knollys House, 17 Addiscombe Road, Croydon, Surrey CR0 6SR
T 0845 600 2541  F 020 8633 4903
www.pensionprotectionfund.org.uk

The Pension Protection Fund is a statutory fund run by the Board of the Pension Protection Fund, a body corporate, under the Pensions Act 2004.

**Pension
Protection
Fund**

This means that an assessment period for the above scheme commenced on 14 January 2009 which is the date of the qualifying insolvency event.

Whether or not an assessment period has commenced is a matter of law and this letter does not affect this legal position. If an assessment period has not in fact commenced, the Board of the Pension Protection Fund accepts no responsibility for actions arising from this letter, in particular if the information previously supplied was incomplete or inaccurate.

You should be aware that section 137 of the Pensions Act 2004 also provides for a key change in the role of the trustees in relation to the pension scheme creditor. During an assessment period the Board of Pension Protection Fund assumes the rights and powers of the trustees or managers as creditor of the employer. Please, therefore, send to the Board of the Pension Protection Fund a copy of any document you would usually send to the trustees or managers as creditor in the insolvency. During this period, however, the trustees or managers will remain responsible for administering the pension scheme, subject to certain statutory requirements. Questions from employees or pensioners about the pension scheme or their pension rights should be directed to them rather than to the Board of the Pension Protection Fund.

Information on roles and responsibilities during the assessment period can be found in the 'Guidance for insolvency practitioners and official receivers' which is available, and can be downloaded, from our website www.pensionprotectionfund.org.uk.

**Section 123 Notice**

Notwithstanding that an assessment period has commenced for the scheme the Board of the Pension Protection Fund is required by law formally to issue notice under section 123 in response to the section 122 notice issued on 2 February 2009 and received on 5 February 2009 in respect of the Nortel Networks UK Pension Plan, based on the information supplied to it. Your section 122 notice confirmed that a scheme failure had occurred.

The Board of the Pension Protection Fund has determined for the purposes of section 123 of the Pensions Act 2004 to approve the section 122 notice. Information relating to the above named scheme and company which the Board is required by regulations to include in this determination is to be found in Appendix A.

**Pension
Protection
Fund**

The scheme failure notice will become binding on the expiry of 28 days beginning with the date of this letter, in accordance with the Pension Protection Fund (Review and Reconsideration of Reviewable Matters) Regulations 2005. The Board will issue a further notice when the scheme failure notice has become binding.

This notice does not contain any restricted information as defined in section 197 of the Pensions Act 2004.

If you require any additional explanation or guidance relating to the matters set out in this letter please contact Keith Mayne on 020 8633 5905.

Yours sincerely

*P.W.Mr*

**Peter Walker**
*Director of Delivery*

For and on behalf of the Board of the Pension Protection Fund

Copies:        Trustees of the Nortel Networks UK Pension Plan
               Manager of Trustee Services Team, The Pensions Regulator

**Pension
Protection
Fund**

**Appendix A**

| Scheme Name | Nortel Networks UK Pension Plan |
|---|---|
| Pension Scheme Registration Number | 10092331 |
| Address of pension scheme | Nortel Networks<br>Maidenhead Office Park<br>Westacott Way<br>Maidenhead<br>SL6 3QH |
| Employer | Nortel Networks UK Limited |
| Company Registration Number | 03937799 |
| Name of Insolvency Practitioner(s) | Alan Bloom<br>Alan Hudson<br>Chris Hill<br>Stephen Harris |
| Contact Address for Insolvency Practitioner(s) | Ernst & Young LLP<br>1 More London Place<br>London<br>SE1 2AF |

John Ray Declaration

- Exhibit B -

Due to the voluminous nature of the attachments to the Proof of Claim, the filing and service copies of this Declaration will include only the Proof of Claim and the relevant materials cited in the Declaration, not the full attachments to the Proof of Claim.

The Appendices to the Proof of Claim are available for download from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://chapter11.epiqsystems.com/nortel, or upon written request to counsel for the Debtors.

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT    FOR THE    DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|
| Name of Debtor: Nortel Networks (CALA) Inc. | Case Number: 09-12515 (KG) |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Nortel Networks UK Pension Trust Limited (as trustee of the Nortel Networks UK Pension Plan) and The Board of the Pension Protection Fund | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>Nortel Networks UK Pension Trust Limited<br>(as trustee of the Nortel Networks UK Pension Plan)<br>Westacott Way<br>Maidenhead, Berkshire<br>SL6 3QH<br>Attn: David Davies, Chairman<br>Telephone number: 44 78 0829 6794<br><br>and<br><br>The Board of the Pension Protection Fund<br>Knollys House<br>17 Addiscombe Road<br>Croydon<br>Surrey<br>CR0 6SR<br>Attn: Richard Favier, Senior Insolvency Advisor<br>Telephone number: 44 208 633 4940<br><br>With notice to:<br>Brian E. O'Connor, Esq.<br>Willkie Farr & Gallagher LLP<br>787 7th Avenue<br>New York, NY  10019<br>Telephone number:  (212) 728-8000 | Court Claim Number:_____<br>*(If known)*<br><br>Filed on:_____<br><br><br>Filed: USBC - District of Delaware<br>Nortel Networks Inc., Et Al.<br>09-10138 (KG)          0000006979 |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check this box if you are the debtor or trustee in this case. |
| **1. Amount of Claim as of Date Case Filed:** See attached Schedule A<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☒  Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br>Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:** See attached Schedule A<br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>3a. Debtor may have schedules account as: _____<br>(See instruction #3a on reverse side.) | |
| **4. Secured Claim (See instruction #4 on reverse side.)** See attached  Schedule A<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:  ☐ Real Estate    ☐ Motor Vehicle    ☒ Other<br>Describe: _____<br>Value of Property: $_____  Annual Interest Rate____%<br>Amount of arrearage and other charges as of time case filed included in secured claim,<br>if any: $_____    Basis for perfection: _____<br>Amount of Secured Claim: _____    Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).<br><br>(continued on next page) |

Page 1 of 2

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. **See attached Schedule A**

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See Instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain: **See attached Schedule A**

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (aX__).

**See attached Schedule A**

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with after respect to cases commenced on or a the date of adjustment.*

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any

DAVID DAVIES

BRUCE MCNESS
BESTRUSTEES PLC

RICHARD FARER
SENIOR INSOLVENCY
ADVISER

**FOR COURT USE ONLY**

FILED / RECEIVED
JAN 25 2010
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: JANUARY 25, 2010

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Page 2 of 2

## Schedule A

**"The Claimants"** :  (i) Nortel Networks UK Pension Trust Limited (the "Trustee") and/or (ii) The Board of the Pension Protection Fund ("PPF"), in accordance with their respective interests.

**"The Debtor":**        Nortel Networks (CALA) Inc.

The Debtor has a contingent liability and indebtedness to the Trustee and the PPF in accordance with their respective interests arising pursuant to the Pensions Act 2004 and the Pensions Act 1995 (Acts of the UK Parliament) and all applicable UK Regulations (collectively, "UK Legislation", as a result of the matters set out below. See Appendix B (Schedule of Applicable Laws).

**Item 1 and Item 2:  Amount of Claim as of Date Case Filed and Basis For Claim.**

1.      THE CLAIMANTS AND THE NORTEL NETWORKS UK PENSION PLAN.

1.1      Nortel Networks UK Limited ("NNUK") has carried on business in the United Kingdom by itself and through its predecessors for over 18 years as part of the Nortel group of companies (the "Nortel Group") and for many years before that outside the Nortel Group.  NNUK's predecessors established, and NNUK participated in, the occupational pension scheme known as the Nortel Networks UK Pension Plan (the "Plan"), in order to provide pensions and other benefits for their employees.  The Trustee is the trustee of the Plan.

1.2      The Plan is a defined benefit arrangement pursuant to which employees of participating employers become entitled to pension benefits based on final salary and the employers agree to meet the balance of the cost of providing such benefits after taking into account the employees' own contributions.  A copy of the current governing documentation for the Plan is appended hereto in Appendix A as Exhibits 1 and 2.  The Plan now has over 40,000 present and potential (deferred) pensioners.

1.3      Messrs A Bloom, A Hudson, S Harris and C Hill of Ernst & Young LLP (hereinafter referred to as the "Administrators") were appointed as joint administrators of NNUK under schedule B1 of the UK Insolvency Act 1986 on January 14, 2009 (hereinafter referred to as the "Administration").

1.4      Notice was given by the PPF (a statutory body established under the Pensions Act 2004) on March 30, 2009 to the Administrators  confirming that the Plan was in an assessment period for the purposes of the Pensions Act 2004.  See Appendix A at Exhibit 3.  An assessment period is a period in which the PPF will work with the Trustee of the Plan so that a valuation of the Plan can be completed to determine the Plan's admittance into the PPF. This notice has been accepted by the Administrators in the Administration.

5389024.3

1.5    Under section 137 of the Pensions Act 2004, during an assessment period, the rights and powers of a trustee of a pension scheme in relation to any debt (including any contingent debt) due to them by the employer, whether by virtue of section 75 of the Pensions Act 1995 (an Act of the UK Parliament) or otherwise, are exercisable by the PPF. In addition, under section 49(5) of the Pensions Act 2004, the rights and powers of a trustee in relation to any debt due to it by virtue of a contribution notice issued pursuant to the process described below are exercisable by the PPF. A trustee retains the right to enforce claims and rights in respect of which the PPF does not have creditor rights. The whole of any amount paid in respect of such debts are ultimately payable to the Plan, whether it is the PPF or the Trustee who exercises the right or power to enforce the obligations.

2.    LIABILITIES UNDER FINANCIAL SUPPORT DIRECTION PROCEEDINGS UNDER THE UK PENSIONS ACT 2004.

2.1    The Pensions Regulator in the United Kingdom ("the Regulator") has power under the Pensions Act 2004 to issue a financial support direction ("Financial Support Direction") to any company connected with or an associate of a company which is an employer in relation to a UK occupational pension scheme. A Financial Support Direction requires the company or companies to whom it is issued to secure that financial support for the pension scheme is put in place within the period specified by the Regulator and as approved by the Regulator, and that such support remains in place whilst the pension scheme is in existence.

2.2    The procedure for issuing a Financial Support Direction is that the Regulator investigates the background and circumstances relating to the pension plan. The Regulator, if it concludes that there are grounds to do so, then sets out the case for the issuance of a Financial Support Direction in a warning notice, which is sent to the named company or companies. The company or companies to whom the warning notice is addressed have the opportunity to make written representations as to the matters set out in the warning notice to the Regulator, and then all parties have the opportunity to make submissions at a hearing in front of the Determinations Panel of the Regulator, which must then decide whether it is appropriate under the Pensions Act 2004 and related laws and regulations to issue a Financial Support Direction.

2.3    The Plan is a UK occupational pension scheme. NNUK is the current employer in relation to the Plan. The Debtor, being part of the Nortel Group, is an associate of or connected with NNUK for the purposes of the Pensions Act 2004 and the Insolvency Act 1986.

2.4    The Plan has a funding deficit (as described more fully below). On the basis of its investigations into the circumstances relating to the Plan, the Regulator has issued a warning notice dated January 11, 2010 (the "Warning Notice") particularising the case for a Financial Support Direction against a number of the members of the Nortel

5389024.3

Group, including the Debtor. A copy of the Warning Notice along with all supporting documentation was sent to the Debtor (in addition to all other members of the Nortel Group to whom the Warning Notice is addressed and all other interested parties) on January 13, 2010. The letter from the Regulator to the Trustee and the PPF dated January 25, 2010 summarizes some of the key information contained in the Warning Notice. See Letter in Appendix A at Exhibit 4.

2.5    A Financial Support Direction may be issued by the Regulator when the employer in relation to the Plan is insufficiently resourced within the meaning of Part 1 of the Pensions Act 2004 (and associated Regulations) at a time determined by the Regulator, which in this case was June 30, 2008, and the other statutory and regulatory requirements are satisfied. See Sections 43-44 of the Pensions Act 2004.

2.6    The Regulator considers that NNUK was insufficiently resourced within the meaning of the UK Legislation, because:

2.6.1    the Regulator has determined the value of NNUK's resources (as defined in the UK Legislation) to be less than 50% of the "estimated section 75 debt" (see Section 2.7 below) of NNUK as at the date specified by the Regulator, namely June 30, 2008 - such estimated section 75 debt being (UK) £1.777 billion (see Appendix A at Exhibits 5 & 6); and

2.6.2    Nortel Networks Corporation ("NNC"), which is and was the ultimate parent company of both NNUK and the Debtor, is an associate of NNUK for the purposes of the UK Legislation. The Regulator has determined the value of the resources of NNC to be not less than (and, indeed, more than) the difference between the value of the resources of NNUK and 50% of NNUK's estimated section 75 debt (see Appendix A at Exhibits 7 & 8).

2.7    The section 75 debt under the Pensions Act 1995 is the amount which the Regulator estimates would become due from NNUK to the Trustee if the liability had been triggered on June 30, 2008. The liability under section 75 is broadly equal to the deficiency in the funding of a pension scheme on a "buy-out" basis together with certain costs. For the purpose of calculating the "buy-out" amount, the assets of the Plan are compared to the amount required or estimated by the actuary for the Plan (the "Plan Actuary") to be required to "buy out" its liabilities by purchasing equivalent annuities from an authorised insurance company.

2.8    The Plan Actuary has estimated the section 75 debt of NNUK as of January 13, 2009 to be (UK) £2.1 billion. See Appendix A at Exhibit 9. The Administrators of NNUK have stated that an informal estimate of the section 75 debt of NNUK is (US) $3.1 billion. See Appendix A at Exhibit 10.

- 3 -

5389024.3

2.9     The issuance of a Financial Support Direction against the Debtor will require the Debtor either alone or together with other members of the Nortel Group to procure financial support for the Plan satisfactory to the Regulator.

2.10    Under the Pensions Act 2004, if the Debtor fails to put or keep in place financial support approved by the Regulator, the Regulator has power to issue a contribution notice ("Contribution Notice") imposing on the Debtor a liability to pay the sum specified in the notice, which may be in an amount equal to the whole of the debt that is or would be due by NNUK in relation to the Plan under section 75 of the Pensions Act 1995.

2.11    By virtue of section 49 of the Pensions Act 2004, the sum specified in such a Contribution Notice is to be treated as a debt due from the Debtor to the Trustee of the Plan. As set out above, by virtue of section 49(5), during an assessment period the rights and powers of the Trustee in relation to the debt to the Trustee pursuant to said Contribution Notice are exercisable by the PPF.

2.12    The indebtedness or liability of the Debtor to the Claimants under the applicable laws and the Plan arose at the latest on the date on which NNUK was first insufficiently resourced within the meaning of Part 1 of the Pensions Act 2004. The liability had therefore been incurred no later than June 30, 2008.

2.13    As summarized above, the process under the Pensions Act 2004 relating to the determination of any potential Financial Support Direction obligations of the Debtor and other members of the Nortel Group is underway, and the Warning Notice has been sent by the Regulator to all members of the Nortel Group to whom it is addressed, including the Debtor. Any submissions that may be made by the Debtor or the other affected members of the Nortel Group in response to the Warning Notice will be considered by the Regulator's Determination Panel in reaching a determination of the Debtor's and the other members of the Nortel Groups' Financial Support Direction and other obligations.

Items 4 and 5.    Secured or Priority Claim.

Claimants' claims are secured to the extent that Claimants have a right of setoff, recoupment, or are otherwise entitled to secured status.

To the extent that any portion of Claimants' claims are entitled to administrative priority status under 11 U.S.C. § 507, Claimants claim such priority status in the maximum amount allowed by law. The filing of this proof of claim shall in no way be deemed a waiver of either Claimant's right to assert that any or all of the their claims are entitled to administrative priority status.

- 4 -

5389024.3

Item 6.        <u>Credits</u>.

               Undetermined at this time.

Item 7.        <u>Documents</u>.

        Attached hereto as Appendix A is a list of the relevant documents and materials supporting this proof of claim and copies of such documents and materials. Any other documents and materials will be made available upon reasonable request.

## <u>RESERVATION OF RIGHTS.</u>

        1.      Each Claimant reserves the right to: (a) amend, clarify, modify, update or supplement this proof of claim at any time and in any respect, including without limitation to assert additional claims or additional grounds for its claim and/or to specify the amount of any contingent, unmatured or unliquidated claim as they become non-contingent, matured and/or liquidated; (b) file additional proofs of claim at any time and in any respect; and (c) file a request for payment of administrative priority expenses in accordance with 11 U.S.C. §§ 503(b) and 507(a).

        2.      Each Claimant reserves the right to attach or bring forth additional documents supporting their claims and additional documents that may become available after further investigation and discovery.

        3.      To the extent that either Claimant has or may have a right to subrogation under 11 U.S.C. § 509 or any other equitable claim under common law against the Debtor, such Claimant expressly preserves such rights.

        4.      By filing this proof of claim, each Claimant does not waive, and specifically preserves, its respective procedural and substantive defenses to any claim that may be asserted against such Claimant by the Debtor, by any trustee of its estate, by the Debtor's Official Committee of Unsecured Creditors, by any other official committee appointed in these cases or by any other party or group.

        5.      Claimants are continuing to investigate the elements of their claims and this proof of claim is filed under the compulsion of an order, dated August 4, 2009, authorizing the Debtor to set a final date for filing proofs of claim. Accordingly, this proof of claim is filed to protect Claimants from potential forfeiture of any and all rights against the Debtor. The filing of this proof of claim shall not constitute: (a) a waiver or release of the rights of either Claimant against the Debtor or any other person or property; (b) a waiver of either Claimant of its right to contest the jurisdiction of the United States Bankruptcy Court for the District of Delaware with respect to the subject matter of each Claimant's claims, any objection or other

- 5 -

5389024.3

proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving Claimants; or (c) an election of remedies or choice of law.

6.     This proof of claim shall not be deemed to be a waiver of either Claimant's rights to:  (a) have final orders in noncore matters entered only after *de novo* review by a District Court Judge; (b) trial by jury in any proceeding so triable in these cases or any case, controversy or proceeding related to these cases; (c) have a District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; (d) arbitrate existing or future claims or disputes; or (e) any other rights, claims, actions, set-offs or recoupments to which either Claimant is or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments such Claimant expressly reserves.

John Ray Declaration

- Exhibit C -

Court File No.  09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

MOTION RECORD
(Returnable February 25, 2010)

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto, Canada   M5H 2S7

Jay A. Carfagnini (LSUC#222936)
Joseph Pasquariello (LSUC#37389e)
Chris Armstrong (LSUC#55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for Monitor, Ernst & Young Inc.

# NOT INCLUDED
# SEE SEPARATE TAB

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION (collectively the "Applicants")**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF ANNA VENTRESCA**
**(sworn February 17, 2010)**

I, Anna Ventresca, of the city of Hamilton, in the Province of Ontario, MAKE OATH
AND SAY:

1.      I am the General Counsel-Corporate and Corporate Secretary of Nortel Networks
Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held this position since
August 2009. From July, 2007 to July, 2009 I was the Assistant General Counsel – Corporate
and Assistant Secretary. I am also the chief legal officer of Nortel Networks Inc. ("NNI") and
have held that position since September 11, 2009. As such, I have personal knowledge of the
matters to which I hereinafter depose in this Affidavit. Where I do not possess personal
knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

2.      I swear this Affidavit in support of the motion brought by the Monitor[1] for advice and
directions regarding a warning notice issued by the United Kingdom's pensions regulator (a

_____

[1] As hereinafter defined.

DOCSTOR: 1864042\7

- 2 -

statutory body created by the *Pensions Act 2004* (U.K.), the "Pensions Regulator") during the Stay period.[2]

3.    In this affidavit I address:

    (a)    the background circumstances of the CCAA Proceedings[3];

    (b)    the recent successes and activities in implementing the Applicants' restructuring and value realization efforts;

    (c)    the next major anticipated tasks in the CCAA Proceedings;

    (d)    the fundamental issue facing the CCAA Proceedings – how to allocate value – and therefore assets – across the multi-jurisdictional insolvency estates;

    (e)    the recent attempt by the Pensions Regulator to circumvent the CCAA Proceedings and issues; and

    (f)    the harmful effects of the Pensions Regulator's proceedings on the CCAA Proceedings generally and the allocation process in particular.

4.    Ultimately, as a result of those facts, the Applicants agree with and support the relief sought by the Monitor. The Pensions Regulator's activities put at risk critical aspects of the restructuring for the sole benefit of one group of potential creditors.

**BACKGROUND**

5.    Reference to "Nortel" herein shall be to the global enterprise as a whole.

6.    On January 14, 2009, this Honourable Court made an Initial Order granting a stay in the *Companies' Creditors Arrangement Act* ("CCAA") proceedings of the Applicants (the "CCAA

---

[2] As hereinafter defined.

[3] As hereinafter defined.

- 3 -

Proceedings") and appointing Ernst & Young Inc. as the monitor ("Monitor") in the CCAA
Proceedings (the "Stay").

7.    Also on January 14, 2009, NNI and certain of its U.S. subsidiaries (the "U.S. Debtors")
made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code"). On
the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA
recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving
effect to the automatic stay under the Code in Canada.

8.    Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain
subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA" and
the "EMEA Debtors") each obtained an administration order for the appointment of
administrators (the "Joint Administrators") from the High Court of England and Wales under the
Insolvency Act 1986.

9.    On February 27, 2009, the United States Bankruptcy Court for the District of Delaware
(the "U.S. Court") granted petitions recognizing these proceedings as "foreign main proceedings"
pursuant to Chapter 15 of the Code.

10.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court")
ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks
S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA continued to
operate as a going concern for an initial period of three months, which period was extended by
the French Court. In accordance with the European Union's Insolvency Regulation, the English
law proceedings remain the main proceedings in respect of NNSA.

11.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition
with the U.S. Court for the recognition of the Administration Proceedings as they relate to
NNUK under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order
recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

12.    On July 14, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S.
Court under Chapter 11 of the Code.

DOCSTOR: 1864042\7

- 4 -

## STATUS OF NORTEL'S RESTRUCTURING

13.    The Stay has allowed the Applicants to focus all of their available resources and efforts on the restructuring and realization of asset value. As a result, the Applicants, and Nortel generally, have been able to work diligently to maximize value for its various businesses and preserve customer and other relationships. To that end, Nortel has generated over US$2 billion in sales proceeds as a result of the completion of:

    (a)    the sale of substantially all of Nortel's CDMA/LTE assets to Telefonaktiebolaget LM Ericsson (publ), which sale closed on November 13, 2009 (the "CDMA Sale");

    (b)    the sale of Nortel's Enterprise Solutions business to Avaya Inc. which sale closed on December 18, 2009 (the "ES Sale"); and

    (c)    the sale of the assets of Nortel's Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Inc. which sale closed on December 4, 2009 (the "Next Generation Sale").

14.    The CDMA Sale and the ES Sale were completed through the "stalking horse"/auction process and auctions were held. As a result of the auctions, significant value was obtained for the sale of the assets.

15.    In addition to the sales that have been completed, additional M&A achievements include:

    (a)    bidding procedures and a stalking horse agreement entered into with Ciena Corporation ("Ciena") for the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with Nortel's Metro Ethernet Networks business unit, which was subject to higher and better offers and subsequently led to the approval of an amended and restated sale agreement for the sale of that business to Ciena, now anticipated to close in Q1 2010 (the "MEN Sale");

- 5 -

(b)     bidding procedures and an ultimate purchase agreement entered into with Ericsson for the sale of substantially all of Nortel's GSM/GSM-R business, which sale is anticipated to close in Q1 2010 (the "GSM Sale"); and

(c)     bidding procedures and stalking horse agreement dated as of December 22, 2009 entered into with GENBAND Inc. for the sale of substantially all of Nortel's Carrier Voice Over IP and Application Solutions business (the "CVAS Sale").[4]

16.     With respect to the CVAS Sale, the scheduled bid deadline is February 23, 2010. To the extent that additional "qualified bids" are received, the auction is scheduled to take place on February 25, 2010.

17.     In total, assuming all of these sales close, Nortel will have received just under US$3 billion in gross proceeds.

18.     Nortel has realized great value for the assets it has sold. Significant other benefits have been realized in the course of transitioning Nortel's businesses to buyers, including:

(a)     providing ongoing employment for many Nortel employees;[5]

(b)     providing reassurance to customers that they will continue to have their contracts serviced; and

(c)     providing suppliers with ongoing customers in the buyers of the businesses.

---

[4] The CDMA Sale, the ES Sale, the Next Generation Sale, the MEN Sale, the GSM Sale and the CVAS Sale together with any other material sales of assets of Nortel shall be referred to collectively as the "Sales". The buyers pursuant to the various Sales shall be referred to collectively as the "Purchasers".

[5] As a result of the CDMA Sale, the ES Sale and the Next Generation Sale as well as the anticipated completion of the MEN Sale, the GSM Sale and the CVAS Sale, Nortel has been able to preserve approximately 13,000 jobs including approximately 3,500 Canadian employees, which jobs may otherwise have been in significant jeopardy.

- 6 -

## NORTEL'S CURRENT OPERATIONS

19.    There have been significant achievements in the past thirteen (13) months. Nevertheless, there is still much to accomplish. These tasks will require the Applicants' full attention. The Applicants must focus upon, among other things:

    (a)    completing and closing significant sales such as the MEN Sale, the GSM Sale and the CVAS Sale;

    (b)    advancement of other sales processes, such as the LGN Joint Venture and Nortel's Passport business;

    (c)    performing transitioning services set out under most or all of the sales arrangements;

    (d)    determining how to maximize value for Nortel's IP;

    (e)    resolving claims pursuant to the claims bar process approved by this Court on July 30, 2009;

    (f)    allocating proceeds among the estates, which is discussed in more detail below;

    (g)    establishing and resolving compensation related claims; and

    (h)    distributing proceeds to creditors.

20.    On August 10, 2009, Nortel announced the creation of the "Nortel Business Services" or "NBS" and the "Corporate Group". These units were created in order to address the important work that still needed to be completed to facilitate the transitioning of sold businesses and the continued operation of Nortel throughout the insolvency proceedings. The function of the NBS Group is to provide vital services during transition periods, including but not limited to:

    (a)    IT infrastructure services;

    (b)    IT applications services;

    (c)    research and development engineering services; and

- 7 -

(d)    various business services, including order management and billing services, supply chain services, knowledge management services, finance services and real estate services.

21.    The function of the Corporate Group is to provide corporate overhead services to the Nortel companies. This includes the facilitation of the measurement and evaluation of all claims in the claims processes. It also involves assisting in the sale and disposition of Nortel's remaining assets.

22.    To better conserve resources for creditors, these business functions are being performed with minimum or skeletal staffing levels. There have been significant lay-offs throughout the course of these CCAA Proceedings. In the circumstances, the Applicants' employees are already fully extended dealing with these important issues.

**ALLOCATION PROCESS AND DISPUTE**

23.    Perhaps the most significant outstanding matters remaining to be determined relate to allocation. In June 2009, the Applicants, the U.S. Debtors and the EMEA Debtors entered into the Interim Funding and Settlement Agreement ("IFSA") which provided for a settlement of certain funding matters as between the Applicants and the U.S. Debtors through to the end of September 2009 and as between the Applicants and the EMEA Debtors, through to the end of December 2009.

24.    Under the terms of the IFSA the Applicants, the U.S. Debtors and the EMEA Debtors, including NNUK, also agreed, *inter alia*:

(a)    that all proceeds of sales of material assets of any Nortel debtor worldwide will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and

(b)    that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process.

DOCSTOR: 1864042\7

- 8 -

25.   As has been set out in previous affidavits of John Doolittle (including those sworn December 14, 2009 and January 18, 2010) as well as the Thirty-Fifth report of the Monitor, all of the sales proceeds as a result of the CDMA Sale, ES Sale and Next Generation Sale have been placed into escrow pending a resolution on allocation. The Monitor's Thirty-Third Report relating to the MEN Sale also makes it clear that proceeds from that sale will be placed into escrow. This is consistent with the provisions of IFSA as set out above.

26.   Further, the parties have engaged in extensive negotiations and are continuing to negotiate the terms of the protocol for adjudicating the allocation of proceeds. The purpose of the protocol, (called the Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds) (the "Allocation Protocol"), is to ensure a fair allocation, to be determined (absent a consensual agreement), in a single cross-jurisdictional forum.

27.   In general terms, the dispute over allocation (the "Allocation Dispute") arises from:

(a)   Nortel's historical conduct of its operations through numerous corporations, each with separate geographical residences in the countries in which Nortel did business;

(b)   The conduct of Nortel's operations along business, rather than geographical divisions; and

(c)   The existence of different creditors (and insolvency proceedings) to the different Nortel corporations.

28.   As reflected by the negotiations referred to above, the IFSA contemplates the process for the division of the proceeds from Nortel's global asset sales to be:

(a)   either on a consensual basis; or

(b)   as determined by the process to be established under the Allocation Protocol.

Clearly, the division of proceeds is a complex matter, and may involve arguments with reference to a number of inter-estate financial matters. In the circumstances, one could expect reference by the contending parties, to, among other things:

DOCSTOR: 1864042\7

- 9 -

(a)     Nortel's transfer pricing system;

(b)     Ownership of Nortel's intellectual property

(c)     Nortel's internal research and development allocation;

(d)     Individual corporate revenues; or

(e)     Individual corporate assets.

To be clear, the parameters of the debate and the positions of the parties have not as yet been fully determined. The prior description is intended simply to assist the Court, in the absence of pleadings, with the emerging outlines of the Allocation Dispute.

29.     However these questions are ultimately resolved, the Allocation Dispute contains the ultimate question at the heart of the Nortel insolvency proceedings and estates: how to divide the proceeds created by the global sales process among the various creditors of the different Nortel entities.

**NNUK PENSION SCHEME**

30.     In 1991, Northern Telecom PLC, a wholly owned subsidiary of Northern Telecom Limited (which in 1999 became NNC), acquired the shares of STC plc ("STC"), a company located in the United Kingdom, which had sponsored a defined benefit pension scheme for the benefit of its U.K. employees since 1949. NNUK added portions of STC to its existing UK operations. At this time, NNUK became the sponsor and participating employer of this pension plan, which subsequently became the NNUK pension plan (the "NNUK Plan"). Nortel Networks UK Pension Trust Limited (the "U.K. Pension Trustee"), was subsequently appointed as the trustee of the NNUK Plan

31.     In 2006, the U.K. Pension Trustee and NNUK held negotiations regarding a funding deficiency in the NNUK Plan. These negotiations ultimately resulted in NNUK and the U.K. Pension Trustee entering into certain arrangements regarding the funding of the NNUK Plan, including the payment of past service deficit contributions.

- 10 -

32.     At the request of the U.K. Pension Trustee and the Pensions Regulator, NNL provided a guarantee of certain of NNUK's obligations in relation to the NNUK Plan (the "Funding Guarantee"). A copy of the Funding Guarantee is attached hereto as Exhibit "A".

33.     In 2007, Nortel undertook a corporate reorganization which resulted in NNUK acquiring ownership of a number of Nortel's EMEA entities. As a part of this reorganization, and at the request of the U.K. Pension Trustee and the Pensions Regulator, NNL provided a second guarantee regarding certain of NNUK's obligations in relation to the NNUK Plan (the "Insolvency Guarantee"). A copy of the Insolvency Guarantee is attached hereto as Exhibit "B".

**CANADIAN CLAIMS PROCESS**

34.     On July 30, 2009, the claims procedure order was granted by this Honourable Court which provided for, *inter alia*, a claims bar date for pre-filing claims of September 30, 2009. A copy of this Order is attached hereto as Exhibit "C".

35.     On or about September 30, 2009, the U.K. Pension Trustee and the U.K. Pension Protection Fund ("PPF") a UK statutory body established under the *Pensions Act, 2004* jointly filed a proof of claim in the CCAA Proceedings against NNC (the "U.K. Pension Claim"). A copy of the U.K. Pension Claim, without exhibits, is attached hereto as Exhibit "D".

36.     The U.K. Pension Claim is based on the allegation that the NNUK Plan is under-funded by an amount alternatively stated to be £2.1 billion or US$3.1 billion.

37.     According to the U.K. Pension Claim, NNUK's commencement of Administration proceedings in the U.K. created an "insolvency event". In consequence, it is alleged that a statutory debt under section 75 of the U.K. *Pensions Act, 1995* will be owed to the NNUK Plan by NNUK, the plan sponsor, in respect of the deficit amount.

38.     The U.K. Pension Claim alleges that NNL's obligations with respect to the Funding Guarantee and the Insolvency Guarantee include:

    (a)     Past service deficit contributions payable in the period from April 6, 2008 to January 14, 2009 of allegedly £45M;

- 11 -

(b)    Past service deficit contributions due or accruing due in the period from January 14, 2009 to April 5, 2012 consisting of allegedly £445.25M;

(c)    Current service contributions for the period following January 14, 2009 allegedly in the amount of £5M to September 30, 2009 and all current service contributions subsequently due or accruing due under the Funding Agreement; and

(d)    Amounts payable under the Insolvency Guarantee limited to the lesser of:

(i)    US$150M; and

(ii)    the net amount of the U.K. Pension Plan's buy-out deficit.

39.    The U.K. Pension Claim further asserts that the Pensions Regulator has concluded that NNUK was "insufficiently resourced" on June 30, 2008 - a date selected by Pensions Regulator - and that as of the date on which the U.K. Pension Claim was filed, grounds existed to issue certain warning notices ("Warning Notices") and to seek a financial support direction ("Financial Support Direction" or "FSD") against NNL and NNC. As at that date, no Warning Notice or FSD had been issued.

40.    Finally, the U.K. Pension Claim goes on to assert that if NNL and/or NNC receives a Financial Support Direction, but fails to put or keep in place financial support for the NNUK Plan approved by the Pensions Regulator, then the Pensions Regulator could also exercise its power to issue a Contribution Notice ("Contribution Notice"), imposing on NNL and/or NNC a liability to pay a specific amount, which could be all or some portion of the NNUK Plan under-funded obligations.

**WARNING NOTICE FROM THE REGULATOR**

41.    On or about September 4, 2009, NNC received a letter from the Pensions Regulator. This letter purported to alert Nortel to the fact that the Pensions Regulator was considering issuing a warning notice pursuant to sections 96(2) and 43(2) of the *Pensions Act 2004*. A copy of the letter is attached hereto as Exhibit "E".

42.    On September 16, 2009, NNC sent a letter to the Pensions Regulator indicating that:

DOCSTOR: 1864042\7

123

- 12 -

> ... there is a stay of proceedings under Canadian law in relation to NNC and
> certain of its subsidiaries, and by its order dated 30 July 2009 ( the "Claims
> Bar Order"), the Canadian Court has ordered that the bar date for submitting
> claims against NNC (and relevant subsidiaries) is 30 September 2009. All
> claims against NNC (and relevant subsidiaries) are being dealt with in
> accordance with the claims procedure for debtors pursuant to the Claims Bar
> Order and the *Companies Creditor's Arrangement Act.*

> As you can therefore appreciate, NNC is not in a position to enter into any
> correspondence with individual entities in respect of potential claims against
> .NNC.

A copy of this letter is attached hereto as Exhibit "F".

43.    On November 11, 2009, the Pensions Regulator wrote to the Joint Administrator and
indicates that:

> The Pensions Regulator will shortly be in a position to issue the appropriate
> warning notice under section 96 of the Pensions Act 2004.... As many if not
> all these Nortel entities are also in some form of insolvency process, we
> anticipate that the financial support sought will be simply the ability of the
> pension scheme to prove in the various insolvency estates as a creditor.

A copy of this letter is attached hereto as Exhibit "G".

44.    On January 13, 2010, NNL and NNC each received a letter, dated January 11, 2010,
addressed to John Doolittle from the Pensions Regulator purporting to serve NNL and NNC in
Canada with the Warning Notice pursuant to s. 303 of the *Pensions Act 2004.* Copies of these
letters are attached hereto as Exhibits "H" and "I".

45.    The Warning Notice is more than 150 pages in length and includes nine binders of
supporting documents. The supporting documents include financial statements, spreadsheets and
witness statements sworn by seventeen former Nortel employees, some of whom left Nortel's
employ more than 10 years ago.

46.    I have not attached a copy of the Warning Notice to my affidavit, nor has the Monitor
attached a copy to its report. I understand that, under the applicable laws of England and Wales,
public disclosure of the Warning Notice may constitute a criminal offence, subject to penal
consequences. I further understand that U.K. counsel to the Monitor has requested confirmation

*DOCSTOR: 1864042\7*

- 13 -

by the applicable entities that they do not object to disclosure of the Warning Notice. A copy of that letter is attached as Exhibit "J".

47.     At the present time, no response has been received. Accordingly, my evidence in reference to the Warning Notice paraphrases its contents, rather than extracting them directly.

48.     The Warning Notice indicates in relevant part that:

   (a)     the Pensions Regulator believes that it is reasonable, within the meaning of the applicable legislation, to require various Nortel affiliates, including NNC and NNL, to put in place financial support for the occupational pension scheme of the company known as Nortel Networks UK Limited ("NNUK"); and

   (b)     that NNUK has a deficit in its pension scheme of approximately £2.1 billion, for which such financial support will be required.

49.     The Warning Notice goes on to stipulate that NNC and NNL may make written representations, but that such submissions must be received by midday on Monday March 1, 2010. If no representations are received by this date, according to the Warning Notice, the Determinations Panel will make its decision based on the information contained in the Warning Notice.

50.     On or about February 3, 2010, U.K. Counsel to NNC and NNL advised the Pensions Regulator that NNC and NNL were engaging in required consultations with stakeholders and would advise of their instructions in due course. A copy of this letter is attached hereto as Exhibit "K".

51.     On or about February 8, 2010, the Monitor sent a letter to the Pensions Regulator indicating that it believed that the issuance of the Warning Notice was in direct contravention of the Stay. A copy of the Monitor's letter is attached hereto as Exhibit "L".

52.     On or about February 9, 2010, the Pensions Regulator also advised NNC and NNL that if "Representations" were not received by March 1, 2010, the matter would be passed over to the "Determinations Panel" for directions regarding the running of the case.    I understand "Representations" to mean complete and detailed written submissions responding in detail on the

- 14 -

merits to the allegations and arguments set out in the Warning Notice. A copy of the Pension Regulator's email of February 9, 2010 is attached as Exhibit "M".

53.    On or about February 10, 2010, NNC and NNL, through their U.K. counsel, advised the Pensions Regulator that, given the Monitor's communication, NNC and NNL could not deliver "Representations" by March 1, 2010. A copy of this letter is attached hereto as Exhibit "N".

**EFFORTS REQUIRED TO DEFEND**

54.    The Pensions Regulator has made a plethora of allegations in the Warning Notice which touch almost all areas of Nortel's business and span from Nortel's first foray into the European market with the establishment of Bell Northern Research Limited, NNUK's predecessor company, until the commencement of these CCAA Proceedings. The Pensions Regulator attacks, among other things:

    (a)    The operation of the transfer pricing system;

    (b)    The operation of the NNUK pension scheme and the extent to which NNL and NNC exercised control over the NNUK pension scheme;

    (c)    NNUK's ability to resource the pension scheme;

    (d)    The credit given to NNUK for its relative contribution to Nortel's R&D;

    (e)    The credit given to NNUK for its performance of corporate functions; and

    (f)    A 2007 corporate reorganization of the EMEA entities.

55.    The allegations made by the Pensions Regulator are extremely broad. They cover a lengthy time span going back to the early 1990s. In order for NNL and NNC to respond to the Warning Notice, the Applicants will need to engage in a substantial factual inquiry, going back many years and addressing complex issues such as the value of certain research and development, transfer pricing and affiliate relationships relating to pension oversight and legal and tax determinations.

- 15 -

56. In order to defend itself from these allegations, NNL and NNC will need to at a minimum draw on the following resources:

  (a)  <u>Finance and Treasury:</u> to demonstrate that NNUK was over compensated for its contributions to Nortel through transfer pricing and costs allocation arrangements.

  (b)  <u>Research and Development</u>: to demonstrate that the Pensions Regulator has mistakenly reported that NNUK was responsible for developing "more than its fair share" of Nortel's R&D and that the R&D developed by NNUK was no more valuable to Nortel than that developed by some other Nortel entities, including NNL.

  (c)  <u>Pensions</u>: to demonstrate that the NNUK's pension scheme was operated with the requisite diligence and care.

  (d)  <u>Corporate</u>: to demonstrate that NNUK was not responsible for any more of the corporate headquarters functions than it was compensated for.

  (e)  <u>Legal and Tax</u>: to demonstrate that the EMEA reorganization was not conducted at the sole discretion and instruction of NNL and NNC.

57. In addition, there are many difficult questions of valuations of, not only the UK Pension Plans, but also NNUK, NNL and NNC and Nortel's R&D which arise as a result of the test under the UK pensions legislation. NNL and NNC will have to, and indeed already have, retained an expert to assist in responding to the numerous financial calculations allegedly relied upon by the Pensions Regulator in issuing the Warning Notice.

## OVERLAP WITH ALLOCATION PROCESS AND DRAIN ON RESOURCES

58. The unilateral imposition of the Warning Notice claim and procedure has at least two severely prejudicial effects upon the Applicants:

  (a)  overlap with the Allocation Dispute; and

  (b)  drain on scarce management resources.

DOCSTOR: 1864042\7

- 16 -

59.    The Allocation Dispute and the Warning Notice share numerous controversial factual issues, including:

    (a)    Nortel's transfer pricing system;

    (b)    the ownership of Nortel's intellectual property;

    (c)    Nortel's internal research and development allocation;

    (d)    the value of individual corporate revenues; and

    (e)    the value of individual corporate assets.

60.    If the Warning Notice process is permitted to proceed, NNC and NNL will be compelled to litigate these issues piecemeal, with undue focus on NNUK-specific questions, in the U.K., at the expense of the total Nortel picture.

61.    By way of example, the Warning Notice alleges that NNUK received insufficient credit for products created or informed by "NNUK" technological contributions. The Applicants in fact believe the reverse to be true: that NNUK benefited significantly from or leveraged off of "NNL's" or "NNC's" technological contributions.

62.    Similarly, the Pensions Regulator claims that NNUK received insufficient credit for its contributions under the transfer pricing regime. Again, the Applicants believe the case to be the converse: that NNUK was "over-compensated" for research and development spending versus benefits generated.

63.    For both these arguments, and without even exploring the merits of the contending positions, it is apparent to the Applicants that these debates are simply microcosms of a larger issue in the Allocation Dispute: what was the historical treatment of affiliate contributions under the transfer pricing scheme and how should it be applied to the asset realizations Nortel has achieved?

64.    These issues are just two examples of the kinds of important determinations which should be dealt with in the Allocation Dispute and not within a limited process which will examine only

DOCSTOR: 1864042\7



- 17 -

one facet of the greater issues. Moreover, litigation under the Warning Notice gives unfair priority to the Pension Regulator's perspective and issues, at the expense of the participants in the Allocation Dispute. Likewise there may be more extensive discovery and other procedural protections available in the Allocation Protocol than before the U.K. tribunal.

65.    Of equal concern is the disproportionate effect of the Warning Notice on the Applicant's limited resources. Compared to the Allocation Dispute, the Warning Notice engages a more limited and less wholistic analysis. Nevertheless, given the quantum and breadth of the Warning Notice, it constitutes large scale litigation in and of itself.

66.    To deliver the forceful and comprehensive defence that the Applicants believe can be made to the Warning Notice is a significant undertaking. It will entail, among other things:

    (a)    frequent and detailed consultation with U.K. legal advisors;

    (b)    frequent and detailed consultation with U.K. financial advisors;

    (c)    coordination and consultation with Canadian and U.S. legal advisors and financial advisors with knowledge of the underlying issues;

    (d)    document searches and reviews;

    (e)    witness meetings and preparation; and

    (f)    comment and review upon lengthy legal submissions.

67.    These steps will require the attention of numerous employees across the functions noted above, such as finance, treasury, research and development, pensions, corporate, legal and tax. These employees will be needed both to develop the substantive response, and to provide management's instruction and supervision on the responding strategy. Given the issues involved, similar efforts may be required from the Monitor and its counsel. The substantial effort required will also be intensified by the Pension Regulator's narrow time frame for response.

68.    As the Applicants attempt to move forward to further maximize value to the creditor constituencies through asset sales and in developing a plan of arrangement, it would be a waste

- 18 -

of the Applicants' scarce resources for their essential personnel and professionals to be forced to litigate these complex issues on an expedited and truncated basis or before the Allocation Dispute is ultimately resolved.

69.    The breadth of the issues that the Pension Regulator has raised, the very short timeframe it has provided for responses, and the clear duplication with the Allocation Process would impose a substantial and inappropriate burden on the Applicants.

70.    Accordingly, an order should be entered for the relief sought by the Monitor to avoid these prejudicial effects.

SWORN BEFORE ME at the City of )
Mississauga, in the Province of Ontario )
on this 17th day of February, 2010. )
 )
 )
 )

_____ _____
Commissioner for Taking Affidavits or  ANNA VENTRESCA
Notary Public

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

DOCSTOR: 1864042\7

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

AFFIDAVIT OF ANNA VENTRESCA
(sworn February 17th, 2010)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 18640\217

# TAB 9

DOCSTOR: 1680120\1