## **EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**SIXTY-SIXTH REPORT OF THE MONITOR
DATED MAY 18, 2011**

**INTRODUCTION**

1.    On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
      collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
      Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
      Networks International Corporation and Nortel Networks Global Corporation
      ("NNGC") (collectively the "Applicants") filed for and obtained protection under the
      *Companies' Creditors Arrangement Act* ("CCAA").   Pursuant to the Order of this
      Honourable Court dated January 14, 2009, as amended and restated (the "Initial
      Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the
      Applicants (the "Monitor") in the CCAA proceedings.  The stay of proceedings was
      extended to June 30, 2011 by this Honourable Court in its Order dated February 25,
      2011.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates concurrently filed
      voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in
      the United States Bankruptcy Court for the District of Delaware (the "U.S. Court")
      on January 14, 2009 (the "Chapter 11 Proceedings").  As required by U.S. law, an

- 2 -

official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel were appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries. Each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries and affiliates located in EMEA (collectively the "EMEA Debtors") were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (the "English Proceedings"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited ("NNIreland"), to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.    Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

- 3 -

7.    Both the CCAA proceedings, in respect of the Applicants, and the English Proceedings, in respect of the EMEA Debtors, have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdictions in which they are located.

**PURPOSE**

9.    The purpose of this Sixty-Sixth Report of the Monitor ("Sixty-Sixth Report") is to report to this Honourable Court on:

    (a)    the status of Nortel's involvement with the Impacted Sites (as defined below);

    (b)    the nature of the contracts the Applicants seek to repudiate in relation to the Impacted Sites; and

    (c)    an update on the status of the various Director's Orders the Ontario Ministry of the Environment ("MOE") has issued or is in the process of issuing in respect of the Impacted Sites,

as well as to provide the Monitor's recommendation in respect of the relief sought by the Applicants in their Notice of Motion dated March 15, 2011 (the "Motion").

**TERMS OF REFERENCE**

10.    In preparing this Sixty-Sixth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.  EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Sixty-Sixth Report.

11.    The Monitor has not engaged its own environmental consultants with respect to the Impacted Sites.

- 4 -

12.   Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

13.   Capitalized terms not defined in this Sixty-Sixth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Affidavit of Thomas McKenna sworn on March 14, 2011, the Pre-Filing Report or previous Reports of the Monitor.

14.   The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**BACKGROUND**

**History and Overview of the Impacted Sites**

15.   Historically, Nortel's operations included the manufacture of a variety of systems, equipment and supplies for the telecommunications industry. Nortel's manufacturing operations were carried on from various leased and owned facilities located in Ontario, among other places. The Ontario properties included:

(a)    8200 Dixie Road, Brampton, Ontario (the "Brampton Site");

(b)    100 Strowger Boulevard, Brockville, Ontario (the "Brockville Site");

(c)    700 Gardiners Road, Kingston, Ontario (the "Kingston Site");

(d)    250 Sidney Street, Belleville, Ontario (the "Belleville Site"); and

(e)    20 Sise Road, London, Ontario (the "London Site")

(collectively, the "Impacted Sites"). The status of Nortel's involvement with each of the Impacted Sites is summarized below at paragraphs 31 to 66.

16.   During the 1990's, Nortel discontinued its manufacturing activities at the Impacted Sites and subsequently sold all of these properties between 1995 and 2005 with the exception of a 12 acre parcel of land situated on the central and north-western

- 5 -

portions of the London Site (the "Retained Lands"). The Retained Lands are vacant and have not been used for any business purpose since 1997.

17.    Nortel's historic manufacturing processes involved the use of certain hazardous substances, including chlorinated solvents ("VOCs") and, in particular, trichloroethylene, a specific type of VOC.  In conjunction with the sale of the Impacted Sites, it was discovered that the use of VOCs in the manufacturing process had caused environmental impacts to the soil and groundwater located at the Impacted Sites.

18.    Whether the properties were sold or retained, Nortel voluntarily undertook various investigations with respect to each of the Impacted Sites and developed a monitoring and/or remediation and risk assessment program for each site in conjunction with third party environmental consultants.

19.    Nortel's monitoring and remediation work has been carried out either voluntarily or on a contractual basis with the owners of the Impacted Sites.  The MOE was advised of the site conditions and Nortel's monitoring and remediation work at the Impacted Sites, with the exception of the Retained Lands. The Applicants, through the Motion, have now also disclosed certain material information in their possession regarding monitoring and remediation work at the Retained Lands.

20.    Since the commencement of the CCAA proceedings, the Monitor has consulted with Nortel regarding environmental matters and reviewed various reports on the status of the Impacted Sites, the extent of remediation work currently being carried out as well as estimates of future costs projected to be incurred by the Applicants if remediation programs are carried out.

21.    As summarized in Exhibit "F" to the Affidavit of Tom McKenna sworn on March 14, 2011, Nortel has spent approximately $30 million to date dealing with the environmental impacts of its manufacturing activities on the Impacted Sites.  Of this amount, approximately $1.7 million has been spent by the Applicants subsequent to the commencement of the CCAA proceedings.

- 6 -

**MOE Orders**

22. In October 2009, the MOE issued a Provincial Officer's Order and a Director's Order (the "2009 London Order") requiring NNL to undertake a monitoring / cleanup plan with respect to particular areas of the London Site including, at a minimum, investigation and reporting as to environmental contamination and ongoing treatment activities.

23. In November 2009, NNL requested particulars regarding the 2009 London Order and filed an appeal with the Environmental Review Tribunal (the "ERT"). The purpose of the appeal was to preserve and protect the Applicants' rights and remedies in the ERT proceedings. Through the appeal NNL and NNTC also requested a stay of the 2009 London Order in light of, among other reasons, the stay granted in the within proceedings. No further substantive steps have been taken in the ERT proceeding.

24. Further details regarding the 2009 London Order and the Applicants' response to same over the course of 2010 are provided at paragraph 62 hereof. During this period, the ERT proceeding was adjourned from time to time at the consent of the parties thereto while the Applicants and MOE canvassed the possibility of a settlement. In addition to the reasons outlined below at paragraph 68, the Applicants brought the Motion in light of the possibility that further adjournments of the ERT hearing may not have been possible in the absence of seeking relief from this Honourable Court.

25. At a pre-hearing held on April 4, 2011, the ERT, at the request of the Applicants and with the consent of the MOE, adjourned the ERT proceeding pending the outcome of the Motion.

26. Subsequent to the service of the Motion, the Applicants and the Monitor were advised by the MOE that it anticipated draft Director's Orders related to the Belleville Site, Brockville Site, Kingston Site and the London Site (collectively, the "Draft 2011 Orders") would be posted on the Environmental Bill of Rights Registry for public comment. The Draft 2011 Order for the London Site, which is intended to

- 7 -

subsume and replace the 2009 London Order, has been posted and the Monitor understands the Draft 2011 Orders for the other Impacted Sites are expected to be posted shortly. The Monitor further understands that the posting of the Draft 2011 Orders is the first step towards ultimately issuing Director's Orders against NNL and the other named parties in relation to those sites. Copies of the Draft 2011 Orders are appended as Exhibits "A", "B" and "C" to the Affidavit of Trevor Dagilis sworn April 28, 2011, and Exhibit "H" to the Affidavit of Kanina Blanchard sworn April 29, 2011, respectively.

27.    The Draft 2011 Orders, if issued, would require NNL to perform, among other things, the following actions in relation to each of the Belleville Site, Brockville Site, Kingston Site and London Site:

    (a)    submit written confirmation to the MOE of having retained a licensed and practicing geo-scientist or professional engineer with expertise in hydrogeology and groundwater issues (the "Consultant") to prepare and complete all work specified in the items below;

    (b)    submit a work plan prepared by the Consultant to the MOE with a proposed timetable that shall include: (i) identification of the nature and extent of the remaining remediation and/or monitoring work for the site; (ii) a proposed timeframe for the implementation and completion of the remaining remediation and/or monitoring for the site; and (iii) a proposed decommissioning plan for the existing monitoring and recovery wells on and related to the site;

    (c)    implement the work plan; and

    (d)    commencing April 12, 2012 and annually thereafter submit to the MOE a finalized annual report, prepared by the Consultant, detailing all of the actions taken in implementing the work plan as approved.

28.    Based on advice provided by Golder, the Applicants have estimated that a further $18 million of costs will be incurred over a period of up to 18 years to conduct the

- 8 -

remediation, monitoring and decommissioning activities identified as necessary to address contaminants at the Impacted Sites. Details of these costs are provided in Exhibit "F" to the Affidavit of Tom McKenna sworn on March 14, 2011. This estimate does not include any further costs that would be incurred in complying with the additional work required under the Draft 2011 Orders. The Monitor understands that a supplementary affidavit of Tom McKenna will provide an update with respect to additional costs that the Applicants expect would be incurred in complying with the Draft 2011 Orders.

## IMPACTED SITES

29. As noted above, with the exception of the Retained Lands, the Applicants no longer own any of the Impacted Sites.

30. To date, Nortel has dealt with the Impacted Sites either voluntarily or on a contractual basis with the existing owners who have provided Nortel with access for the purpose of monitoring and remediation activities that have been carried out.

31. The following paragraphs provide a brief description of the status of each of the Impacted Sites. A more detailed description is included in the Affidavit of Thomas McKenna sworn on March 14, 2011. Also outlined below is a brief summary of the contracts, if any, NNL is a party to concerning environmental matters at the Impacted Sites.[1]

### Brampton Site

32. Nortel ceased manufacturing operations at the Brampton Site in 1999 and sold it to the current owner, Rogers Communications Inc. ("Rogers"), in 2005.

33. In connection with the sale of the Brampton Site to Rogers, NNL agreed to perform certain remediation work in relation to existing soil and groundwater contamination pursuant to an Environmental and Remediation and Access Agreement between

---

[1] The summary of contractual obligations provided below is for informational purposes only and shall not constitute an admission by the Applicants or the Monitor as to the nature, scope or enforceability of any such obligations.

- 9 -

Rogers and NNL dated January 4, 2006, and also indemnified Rogers in respect of certain environmental liabilities pursuant to an Indemnity Agreement between Rogers and NNL dated January 4, 2006.

34.    Certain remediation activities were completed pursuant to the foregoing agreements and a risk assessment is currently being prepared by Golder which is expected to confirm there is no risk to human health or the environment.

35.    Approximate costs incurred to date for remediation work are $6.6 million and estimated future costs of the risk assessment, monitoring and decommissioning of monitoring wells are $944,000.

36.    Rogers has not filed a proof of claim in the CCAA proceedings.

37.    The MOE has not indicated that it intends to issue a Director's Order in respect of the Brampton Site.

**Brockville Site**

38.    Nortel ceased operations at and sold the Brockville Site in 1999.  Subsequently, the Monitor understands the Brockville Site was resold to Apex Logistics Inc. ("Apex").

39.    In connection with the sale of the Brockville Site, NNL agreed to operate and maintain a groundwater treatment facility and perform certain remediation work pursuant to an Environmental Access Agreement between NNL and the purchaser of the Brockville Site dated August 30, 1999. NNL consented to the assignment of this agreement by the original purchaser to Apex through a Consent & Acknowledgement Agreement dated September 15, 2006.

40.    Remediation activities to extract and treat impacted groundwater were undertaken by Nortel during its ownership of the site and continued pursuant to the foregoing agreement after the sale.

- 10 -

41.    Approximate costs incurred to date for the remediation work are $4.1 million and the estimated cost of future monitoring over an 18 year period and decommissioning of monitoring wells is $3.7 million.

42.    Apex has filed a proof of claim in the CCAA proceedings in the amount of $16.5 million "to be spent over 40 years".

43.    As described above, the MOE has advised it anticipates posting a Director's Order for public comment on the Environmental Bill of Rights Registry with respect to the Brockville Site.

**Kingston Site**

44.    Nortel ceased operations at and sold the Kingston Site in 1995. The Monitor understands the Kingston Site was subsequently resold to 2058756 Ontario Limited ("205").

45.    Pursuant to an Asset Purchase Agreement among the purchaser, an affiliate thereof and NNL dated December 16, 1995, and an Environmental Access Agreement between the purchaser and NNL dated February 2, 1996, NNL agreed to develop and pay for the cost of conducting an environmental investigation and monitoring program as well as to indemnify the purchaser in respect of various environmental liabilities. Certain of the foregoing rights and obligations appear to have been assigned by the original purchaser of the Kingston Site to 205 pursuant to an Assignment and Assumption Agreement dated November 21, 2005.

46.    Remediation activities to excavate and remove impacted soil and extract and dispose of impacted groundwater have been undertaken by Nortel.

47.    Approximate costs to date for the remediation work are $1 million and the estimated costs of future work to contain and treat impacts and decommissioning of monitoring wells are $635,000.

48.    205 has filed a proof of claim in the CCAA proceedings in the amount of $5.2 million.

- 11 -

49.     As described above, the MOE has advised it anticipates posting a Director's Order
        for public comment on the Environmental Bill of Rights Registry with respect to the
        Kingston Site.

**Belleville Site**

50.     Nortel ceased manufacturing operations at the Belleville Site in 1999.  In 2000, the
        site was sold to Rentx Realties Corp. ("Rentx") which assigned the sale agreement to
        an affiliate, Sidney Street Properties Corp. ("Sidney"). At the time of the sale, NNL
        entered into a Lease Agreement with Sidney dated July 27, 2000 (the "Lease") to
        lease back the property to conduct research and design activities and to perform
        environmental work on the site.  In 2009, the research and design operations were
        sold and NNL sublet the premises to the purchaser of such operations.  The Lease
        expired in December 2010.

51.     Pursuant to an Amending Agreement between NNL and Rentx dated July 20, 2000,
        NNL agreed to assume responsibility for dealing with certain known contamination
        at the Belleville Site for a period of time. NNL also provided a time limited
        indemnity in favour of Sidney for certain environmental liabilities.

52.     There are three separate impacted areas of the Belleville Site.  Remediation activities
        have included completion of a risk assessment, excavation and removal of impacted
        soil, in-situ treatment of contaminants, groundwater extraction and collection and
        ongoing monitoring of groundwater.   These remediation activities have been
        conducted pursuant to the foregoing agreements with Sidney.  NNL's remediation
        activities at the Belleville Site are ongoing.

53.     Approximate costs to date for the remediation work are $8 million and estimated
        costs of future work to contain, treat and monitor impacts and decommissioning of
        monitoring wells are $1.4 million.

54.     Sidney has filed a proof of claim in the CCAA proceedings in relation to
        environmental claims in the amount of "$1 million to $10 million".

- 12 -

55.    As described above, the MOE has advised it anticipates posting a Director's Order for public comment on the Environmental Bill of Rights Registry with respect to the Belleville Site.

**London Site**

56.    Nortel ceased operations at the London Site in 1994 and the manufacturing complex located thereon was demolished in 1997.

57.    Various parcels of the London Site were disposed of in 1997 and 1998 (the "Former Lands") leaving the Retained Lands as the only portion of the London Site owned by NNL.  The Retained Lands are vacant and have not been used for any business operations since 1994.

58.    Since 1997, Nortel has conducted remediation activities on both the Retained Lands and the Former Lands, including excavation, in situ treatment, pump and treat and monitoring activities.

59.    These remediation activities have been conducted either on a voluntary basis or pursuant to agreements with purchasers of the Former Lands.  All contractual obligations to the purchasers of the Former Lands with respect to environmental matters have been satisfied by Nortel.

60.    Expenditures to date with respect to remediation efforts regarding the London Site are approximately $10.5 million.  It is anticipated that future costs to deal with environmental conditions would be approximately $12 million.

61.    There have been no proofs of claim filed in the CCAA proceedings by any of the purchasers of the Former Lands.

62.    In response to the issuance of the 2009 London Order, NNL had discussions with the MOE over the course of 2010 and in to early 2011 in an attempt to settle the appeal. As a result of these discussions, NNL has disclosed all pertinent data in its possession with respect to the current site conditions on the lands subject to the 2009 London Order.  It has also retained Golder to conduct risk assessments with respect

- 13 -

to those lands. These risk assessments have been subject to a peer review and reviewed by the MOE. The risk assessments and peer reviews have been provided to the parties at interest in the ERT appeal.

63.     The risk assessments concluded that groundwater and soil impacts in the assessed areas were not anticipated to result in any human health or ecological risks.

64.     Nortel has also retained Golder to prepare a risk assessment of contaminated portions of the Retained Lands (which are not subject to the 2009 London Order). This risk assessment has confirmed:

    (a)     impacted groundwater is unlikely to migrate to neighbouring properties until at least 25 years in the future and contaminant levels may reduce over time; and

    (b)     the undissolved TCE on the Retained Lands does not appear to be migrating to neighbouring properties and should not pose unacceptable on-site human health or ecological risks if the property is left undeveloped.

65.     The estimated cost to remediate the Retained Lands is $9-10 million which, based on a valuation provided to the Monitor in informal discussions between the Monitor and a local commercial realtor, significantly exceeds the estimated value of the Retained Lands even assuming no environmental contaminants were present.

66.     As described above, the MOE has posted a Director's Order for public comment on the Environmental Bill of Rights Registry with respect to the London Site, which Director's Order would replace the 2009 London Order.

- 14 -

**MONITOR'S OBSERVATIONS AND RECOMMENDATIONS**

67.    As described above, all of the Impacted Sites have either been previously disposed of by the Applicants prior to the CCAA proceedings or are vacant and none of the Impacted Sites are currently being used for any commercial purpose by the Applicants. Notwithstanding this fact, the Applicants have spent approximately $1.7 million on their environmental obligations in respect of the Impacted Sites subsequent to the commencement of these CCAA proceedings. The Monitor is advised by the Applicants that based on the investigations, reviews and recommendations of Golder, remediation and monitoring activities related to the Impacted Sites will require a time frame significantly exceeding the estimated duration of the restructuring and the Applicants' operational existence, therefore requiring that such obligations be quantified at some point in time.

68.    As this Honourable Court well knows, the Applicants have sold most of their operating businesses and are in the course of divesting their remaining material assets and otherwise winding down their active business operations. Consistent with the wind down of the Applicants' operations and the elimination of costs that are not to the benefit of the Applicants' estate, the Applicants now seek to repudiate contracts relating to environmental monitoring and remediation at the Impacted Sites and to cease performing any environmental remediation and monitoring work at the Impacted Sites so that any claims resulting therefrom can be quantified and resolved in accordance with the claims process authorized by this Honourable Court.

69.    The Monitor supports the Applicants' request to repudiate these contracts and to cease performing any monitoring or remediation work at the Impacted Sites.

70.    The Applicants and the Monitor are committed to ensuring an orderly transition of environmental responsibilities at the Impacted Sites in the event the relief sought by the Applicants is granted. To that end, the Applicants and the Monitor have or will be contacting the owners of the Impacted Sites to discuss transition arrangements, including, *inter alia*, the transfer of relevant information, permits and telephone and

- 15 -

utilities accounts, as well as arrangements regarding on site pumping, treatment and monitoring equipment.

All of which is respectfully submitted this 18th day of May, 2011.

**ERNST & YOUNG INC.**
in its capacity as Monitor of the Applicants
and not in its personal capacity

Per:

Murray A. McDonald

President

\5967813

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION et al.

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**SIXTY-SIXTH REPORT OF THE MONITOR**
**DATED MAY 18, 2011**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5967813