## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                                                         :
*In re*                                                  :        Chapter 11
                                                         :
Nortel Networks Inc., *et al.*,[1]                       :        Case No. 09-10138 (KG)
                                                         :
                                        Debtors.         :        Jointly Administered
                                                         :
                                                         :        **Hearing Date:  June 7, 2011 at 9:30 a.m. (ET)**
                                                         :
-------------------------------------------------------- X        Re: D.I. 5196, 5384

## DEBTORS' REPLY IN FURTHER SUPPORT OF THEIR
## MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY
## REQUESTS PROPOUNDED BY SNMP RESEARCH INTERNATIONAL, INC.

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), respectfully submit this reply (the "Reply") in further

support of the Debtors' motion (the "Motion")[2] for protective order limiting the discovery

requests (the "Disputed Demands") propounded by SNMP Research International, Inc. ("SNMP

RI") and in response to the objection (the "Objection")[3] filed by SNMP RI.  In support of this

Reply, the Debtors rely on the Supplemental Declaration of Stephen Kenkel (the "Kenkel

Supplemental Declaration" or "Kenkel Supp. Decl.") and the Declaration of George Reichert

(the "Reichert Declaration" or "Reichert Decl."), each submitted in connection with this Reply.

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]        See Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc. [D.I. 5196].  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

[3]        See Objection to Debtors' Motion for a Protective Order [D.I. 5384].

## PRELIMINARY STATEMENT

SNMP RI does not deny that the Sale Audit Demands and Request No. 4 (together, the "Disputed Demands") are not relevant to the claim specifically alleged in SNMP RI's original claim or its Amended Claim, which is for unreported and unpaid royalties and other fees arising from the Debtors' use of a single piece of SNMP RI's software. Instead, to support its argument that it is entitled to a broadscale fishing expedition to determine what claims it may have, SNMP RI points to a catchall phrase included in its Amended Claim that seeks "any and all additional amounts associated with licensing fees, royalties, and maintenance fees that have not been reported by the Debtors to date and are owed to SNMP." By virtue of that phrase, SNMP RI asserts that it is entitled to review every single piece of software source code of the Debtors and their affiliates, including what is contained in the enormous ClearCase repository. But SNMP RI cannot so easily circumvent the relevance requirements of Rule 26. Case law – and common sense – dictate that conclusory, generic assertions cannot support a burdensome fishing expedition to determine if claims exist.

SNMP RI does not refute the Debtors' detailed factual evidence that it would be unduly burdensome for the Debtors to conduct a review of all of the software source code sold through the Bankruptcy Sales. Nor does SNMP RI dispute that it would be grossly burdensome for the Debtors to create a repository of all software source code shipped or otherwise distributed to customers or other third parties, as required under Request No. 4. SNMP RI also does not contest that the Disputed Demands are impossible for the Debtors to comply with because the Debtors do not have the personnel to perform the necessary review. Instead, SNMP RI asserts that the Debtors will not bear any burden, and that their lack of personnel to review the source code in the repository or supervise any review is "irrelevant," because SNMP RI itself will conduct the review.

In other words, SNMP RI seeks access to 8 terabytes of software source code contained in the ClearCase repository consisting of almost all of the source code used in the development of any product by Nortel over the past 15 years. Such unsupervised access to such a broad universe of the type of highly confidential and valuable trade secrets at issue is unprecedented, and certainly not contemplated by any of the cases cited by SNMP RI. Moreover, given that third party vendors' software licensed to the Debtors (including software competing with SNMP RI's own products) is inextricably intertwined in the repository, and the vast majority of the software source code contained in the ClearCase repository has been sold to the purchasers in the Bankruptcy Sales, third parties, and not just the Debtors, face serious injury from SNMP RI's overreaching demands. A confidentiality agreement is simply insufficient to protect against such harm, even assuming that the material were relevant to a pleaded claim, which it is not.

## ARGUMENT

### I.      The Disputed Demands Are Not Relevant to the Claim or Amended Claim.

1.      SNMP RI leaps into its argument that the Debtors have failed to meet their burden to establish "good cause" in support of a protective order without even addressing, as a threshold matter, whether the requested discovery is relevant to the pleaded claim. SNMP RI puts the cart before the horse. If the requested discovery is not relevant, the Court need not address whether there is also good cause for a protective order protecting otherwise relevant material – the discovery sought is impermissible regardless of good cause. See Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense…").

2.      As set forth in the Motion, SNMP RI's original claim, filed before the bar date, asserts a claim for $22,281 in unpaid royalties and software maintenance fees. SNMP RI's Amended Claim asserts a claim for $22,092 in reported royalties and maintenance fees

outstanding at the time of the filing, plus a claim for $1,494,946 in alleged unreported royalties and fees relating to one piece of software used by the Debtors in connection with one business line.  Motion ¶ 9.  SNMP RI does not dispute that the Disputed Demands are wholly irrelevant to this piece of software or its use – and wholly irrelevant to its pleaded claims.

3.      Rule 26 has not, and indeed cannot, be satisfied where the requested discovery is not relevant to the well-pleaded allegations.  Importantly, SNMP RI does not deny that the Disputed Demands constitute a fishing expedition.  Instead, SNMP RI defends its right to a fishing expedition by arguing that under Rule 26, discovery cannot be limited to what they already know.  See Objection ¶ 21.  But that is true only with respect to discovery relevant to a pleaded claim – Rule 26 does not permit SNMP RI to conduct a wide-ranging investigation for other possible wrongs beyond that which SNMP RI actually alleges.  See e.g., Bridgewater v. Taylor, 745 F. Supp. 2d 355, 358 (S.D.N.Y. 2010) (denying a motion to compel discovery where plaintiff sought "discovery in order to state his claims," because "[a]s a general proposition, a litigant has to state a [sic] claims before he or she is entitled to discovery."); Podany v. Robertson Stephens, Inc., 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004) (noting that "discovery is authorized solely for parties to develop the facts in a lawsuit in which a plaintiff has stated a legally cognizable claim, not in order to permit a plaintiff to find out whether he has such a claim") (emphasis added).

4.      SNMP RI cannot get around Rule 26 by shoehorning in a right to broad, fishing expedition-style discovery based on a conclusory, catchall phrase that violates its pleading obligations under Federal Rule of Civil Procedure 8.  See Ethypharm S.A. France v. Abbott Labs., 748 F. Supp. 2d 354, 361 (D. Del. Nov. 2, 2010) (prohibiting discovery regarding patent not at issue in complaint as "a fishing expedition beyond that which is nominally permitted by

the Federal Rules").  Although the Debtors have reserved their right to object to SNMP RI's

Amended Claim at a later time, Rule 26 clearly requires the inclusion of sufficient specific facts

to justify any discovery, much less the type of very broad discovery sought here.  See, e.g.,

Bridgewater, 745 F. Supp. 2d at 359, n.1 (noting that it is proper to prevent a fishing expedition

when "a party is attempting to take discovery in an effort to find the facts necessary to state a

claim"); see also Collens v. City of New York, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) ("[C]ourts

should not grant discovery requests based on pure speculation that amount to nothing more than

a 'fishing expedition' into actions . . . not related to the alleged claims or defenses.") (collecting

cases).  Even the case law cited by SNMP RI is clear that "general allegations and generic

references to [allegedly infringing] products are insufficient to satisfy [a plaintiff's] burden of

identifying its misappropriated trade secrets with 'reasonable particularity'" in order to allow it

to seek discovery of a defendant's trade secrets.  Hill v. Best Medical Int'l, Inc., No. 09-1194,

2010 WL 2546023 at *4 (W.D. Pa June 24, 2010) (holding that defendant "will not be compelled

to reveal any of its own trade secrets or confidential information in response to the very broad

discovery sought by" plaintiff); see also AutoMed Tech., Inc. v. Eller, 160 F. Supp. 2d 915, 926

(N.D. Ill. 2001) ("We will not permit plaintiff to go on a fishing expedition through Express

Scripts' files.  Plaintiff must articulate what specific information they believe defendants

misappropriated, so we can assess whether its requests are reasonably tailored to discover

relevant evidence.") (cited in Hill, at **3-4).  The catchall phrase in SNMP RI's Amended Claim

is nothing but a generic Hail Mary pass that fails to set forth any factual basis needed to justify

discovery.

        5.        The cases cited by SNMP RI purportedly for the proposition that the scope of

discovery is broad when a claimant alleges use of its intellectual property without a license fall

far short of SNMP RI's characterization.  In <u>BigBand Networks, Inc. v. Imagine Commc'ns,</u>

<u>Inc.</u>, No. 07-351-JJF, 2010 WL 2898288 (D. Del. July 20, 2010) (cited at Objection ¶¶ 14, 31),

plaintiff alleged that <u>all</u> of the products of the defendant – a company formed shortly before the

original filing of the litigation by former employees of the plaintiff[4] – infringed on BigBand's

patent.[5]  Moreover, at the time the discovery dispute at issue was litigated, the defendant was

such a small and new company that it had only ever produced three products.[6]  Under these

circumstances, it is not surprising that the court would find that the discovery requests for the

source code of products in development were directly relevant to the plaintiff's infringement

claim, given that the plaintiff had alleged that all such products infringed on its patent.  This case

is simply not comparable:  here, SNMP RI seeks access to the source code for thousands of

Nortel products developed over a period of longer than a decade, without any allegations as to

whether any – let alone all, as in <u>Big Band</u> – used SNMP RI software without a license.  There is

simply no basis for arguing that <u>Big Band</u> supports the broad, unfettered discovery that SNMP

RI seeks.

       6.       SNMP RI's reliance on <u>R.C. Olmstead, Inc. v. CU Interface, LLC</u>, 606 F.3d 262

(6th Cir. 2010) (cited at Objection ¶ 14) and <u>Brown Bag Software v. Symantec Corp.</u>, 960 F.2d

1465 (9th Cir. 1992) (cited at Objection ¶ 14), is likewise unavailing.  In <u>Olmstead</u>, the plaintiff

alleged that the defendant had developed credit union processing software that infringed on its

trade secrets and copyright.  The court in <u>Olmstead</u> upheld the district court's ruling that the

defendant had to give the plaintiff's expert access to the software at issue only after noting that

access was premised on a determination that the trade secrets were relevant to the alleged claim.

---

[4]     <u>See</u> Mem. of Def.-Countercl. Pl. dated May 6, 2008, at 2, <u>BigBand Networks, Inc. v. Imagine</u>
<u>Commc'ns, Inc.</u> [D.I. 49]; Br. of Def.-Countercl. Pl. dated May 29, 2008, at 3, <u>BigBand Networks</u> [D.I.
62].
[5]     First Am. Compl., dated May 6, 2009, at 5, <u>BigBand Networks</u> [D.I. 86].
[6]     Reply Br. of Pl.-Countercl. Def., dated May 30, 2008, at 1, <u>BigBand Networks</u> [D.I. 64].

Id. at 269 ("[Once] the trade secrets are deemed relevant and necessary," the court has discretion about their disclosure."). Similarly, in Brown Bag, the plaintiff and the defendant were software developers of software programs that served the same function. Id. at 1468-69. The plaintiff alleged that the defendant's software program infringed on its copyright and trademark rights. Id. at 1469. On that basis, the court upheld the plaintiff's consultant's right to see trade secrets directly related to the defendant's version of the software program. Id. at 1469, 1472. As in Big Band, the trade secret discovery permitted in Olmstead and Brown Bag were limited to only those products specifically alleged to have infringed on plaintiff's trade secrets.[7] SNMP RI fails utterly to meet this threshold relevance showing.

7.      The reason that plaintiffs must first identify with reasonable particularity the information they seek to discover is especially clear in this case. The Debtors voluntarily performed a costly and burdensome audit of the Passport business and are undertaking a reasonable search to respond to SNMP RI's relevant document demands.[8] And now, three months after serving its discovery demands, and seven months after filing its Amended Claim, only in its Objection here has SNMP RI raised new allegations never before mentioned in its pleadings or its discovery demands.

---

[7]      The courts in Brown Bag and Olmstead also recognized, notwithstanding the direct relevance of the discovery sought to the pleaded claims, that "responding parties are entitled to protection from 'undue burden' in discovery, including protection from misuse of trade secrets by competitors," Brown Bag at 1470, and therefore, both courts denied the requesting parties' employees access to the trade secrets and only permitted their viewing by an independent consultant retained by the requesting parties. See Olmstead at 269-70; Brown Bag at 1471. SNMP RI, by contrast, insists that it will review Nortel's source code itself. As discussed below and supported by the cases SNMP RI cites, the competitive injury to both the Debtors and third parties would be too serious to permit SNMP RI such access, even if the material was relevant.

[8]      SNMP RI attaches as Exhibit C to the Wood Certification an email from its counsel to Debtors' counsel dated December 22, 2010. The Debtors promptly made clear their disagreement with the factual characterizations in the email from SNMP RI counsel, as the responsive email from Debtors' counsel dated December 23, 2010 reflects. The December 23, 2010 email is attached as Exhibit A to the Certification of Salvatore Bianca, dated May 31, 2011.

8.      SNMP RI cites new examples of alleged breaches that are not pleaded in their claim, even as amended.[9]  In an attempt to relate Nortel's sale transactions to SNMP RI's claim and argue that Interrogatories Nos. 3 and 5 are relevant, SNMP RI references the discovery of alleged infringements by Nortel that SNMP RI now contends came to light through communications with asset buyers.  The assertion of allegations that were neither pleaded nor filed at the time of the service of the Disputed Demands to establish relevance simply proves that the Disputed Demands do not relate to the Original Claim as timely filed or even later amended well after the bar date.  SNMP RI cannot, on that basis, establish a need or a right to discovery related to every sale conducted by Nortel in the past eleven and a half years.

## II.      SNMP Does Not Refute That Complying with the Disputed Demands Would Unduly Burden the Debtors

9.      As demonstrated in the Motion, the Disputed Demands are also unduly burdensome.  SNMP RI does not attempt to dispute any of the factual evidence cited by the Debtors in support of that position.  Instead, SNMP RI simply dismisses the facts and arguments by saying that the Sale Audit Demands do not seek an audit, and, with respect to Request No. 4, SNMP RI will conduct the search itself.  Both of these arguments fail because they ignore the reality of what the Disputed Demands actually seek.

### A.      The Sale Audit Demands Require an Unduly Burdensome Audit of Code Related to the Sold Business Lines

10.      SNMP RI's Objection does not dispute that conducting an audit of the code related to the sold business lines would be unduly burdensome and, indeed, impossible for the Debtors to perform given their lack of employees qualified to conduct such an audit.  Nor does it

---

[9]      On May 31, 2011, the day before the filing of this Reply, SNMP RI sent the Debtors their Second Amended Proof of Claim, which they filed on May 25, 2011, almost twenty months after the bar date, which, among other things, purports to amend SNMP RI's claim to include such new alleged breaches.  As they have done with respect to SNMP RI's first Amended Claim, the Debtors reserve their rights to object to SNMP RI's Second Amended Proof of Claim.

dispute that the Passport Audit conducted by the Debtors was, indeed, burdensome.  Rather, SNMP RI argues that the Sale Audit Demands are not burdensome because "neither the Interrogatories nor the requests mention an audit or request that Nortel conduct an audit." Objection ¶¶ 19, 26-27.   SNMP RI's argument that the Sale Audit Demands do not explicitly request an audit ignores that, as demonstrated in the Motion and not refuted by SNMP RI, the information requested in each of the Sale Audit Demands can only be procured by conducting an unduly burdensome audit.

11.    ***Interrogatories No. 3 and 5.***  SNMP RI summarily asserts that (i) providing a list of persons with knowledge of Nortel Software transferred or made available to the purchasers in the Bankruptcy Sales (the "Purchasers") and (ii) "all [SNMP RI] Software used or distributed by Nortel that was transferred or made available to a buyer as part of the Bankruptcy Sales" is not burdensome because they do not require an audit.  See Objection ¶ 26.  However, to provide a list of persons with knowledge of software transferred or made available to the Purchasers, Nortel would first need to canvass an impossibly broad body of potential information.

12.    As detailed in the Kenkel Declaration, "[i]t would be virtually impossible to identify all persons which have knowledge of all Nortel software (and not just SNMP RI software) transferred or made available to buyers in the various sales, because (i) nearly every employee of the Debtors worked on the Bankruptcy Sales at different times, in different locations and in different capacities, and (ii) nearly all of the individuals involved in the sales are no longer at Nortel, thus making it difficult, if not impossible to determine whether such individuals have knowledge of the software transferred in the Bankruptcy Sales."  Kenkel Decl. ¶ 17.  SNMP RI does not contend otherwise.  Similarly, to identify any and all SNMP RI software transferred or made available to a Purchaser, as requested in Interrogatory 5, the Debtors would

need to perform a review all of the software code relating to each of the sold business lines to identify whether any such software is owned or licensed by SNMP RI.  See Kenkel Decl. ¶ 18. Such a review – as discussed in the Motion and uncontested by SNMP RI – would be unduly burdensome and impossible to perform.

13.      **Request No. 3.**  Although the heading of Section V(d) of the Objection is entitled "Interrogatories 3 and 5 and Requests 3 and 4 are not Burdensome," SNMP RI provides no argument or mention of the burdensomeness of Request No. 3.  Request No. 3 is the document request corollary to Interrogatory No. 5 and requests the same information as Interrogatory No. 5.  It is therefore unduly burdensome for the same reasons.

**B.      Creating the Special Software Database Demanded by SNMP RI in Request No. 4 Would be Unduly Burdensome**

14.      SNMP RI argues that Request No. 4 is not burdensome because if SNMP RI is granted the broad access to Nortel software code that it seeks, then SNMP RI would be able to perform a search of the software code on its own without Nortel's involvement.  See Objection ¶¶ 28-29.  SNMP RI's argument is futile, simply ignoring the issues in providing such access to SNMP RI in the first instance.  Request No. 4 demands that the Debtors provide SNMP RI access to "all Nortel Software . . . in source code format as extracted from the Nortel source code repository that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited as a direct result of the Bankruptcy Sales" from December 1999 to present.  As explained in the Motion, it would be impossible for the Debtors to create a new repository containing all such Nortel software source code because the Debtors lack the personnel to identify and isolate such source code.

15.      Unable to argue that creating such a repository would not be burdensome, SNMP RI instead changes the scope of the Request, asserting, without support, that the software

shipped to customers is easily identifiable because such software was transferred to the

Purchasers in the Bankruptcy Sales.  Objection ¶ 29.  Given that the vast majority of the software

contained in the ClearCase repository has been transferred to the Purchasers in the Bankruptcy

Sales, <u>see</u> Reichert Decl. at 4, SNMP RI seeks complete access to nearly all of the 8 terabytes of

software source code contained in the ClearCase repository.  Not only does this go well beyond

the relevance scope of Rule 26, but it also implicates serious confidentiality concerns as

described below.  Moreover, because the information that SNMP RI now seeks is all of the

software transferred to the Purchasers, the confidentiality concerns are not just those of the

Debtors, but also those of the Purchasers who now have an interest in the software source code

and in keeping it confidential.

16.     As a result, limiting SNMP RI's access to just software transferred to the

Purchasers would not remove the burden on Debtors, nor would it significantly narrow the vast

scope of what SNMP RI seeks or ensure that only software shipped to customers were in the

repository.  This runs exactly counter to the law cited by SNMP RI, that the requesting party

must "identif[y] 'with reasonable particularity' the matter or information that it is seeking to

discovery <u>so that the producing party can properly exclude anything that is unrelated to the</u>

<u>information sought</u>."  Objection ¶ 15 (citing <u>Hill</u>, 2010 WL 2546023) (emphasis added).  SNMP

RI does not deny that the Debtors cannot undertake such a review to exclude unrelated

information.  Its proposed solution – that it be entitled to undertake a limitless fishing expedition

through all of Nortel's source code – is impermissible under Rule 26, and particularly

inappropriate given the confidentiality interests discussed below.[10]

---

[10]     Moreover, contrary to SNMP RI's assertion that "Nortel's lack of personnel is irrelevant"
(Objection ¶ 29) because SNMP RI seeks to conduct its own search of the source code requested in
Request No. 4, the Debtors' lack of personnel is critical because, at a minimum, such a search by SNMP

**III.    The Debtors' Motion for a Protective Order is Also Supported by Good Cause**

17.        As set forth above, the Debtors' Motion should be granted because the Disputed

Demands are not relevant to SNMP RI's Original Claim or the Amended Claim, as required

under Rule 26(b)(1).  However, even if they were relevant, there is good cause to grant a

protective order in this instance under Rule 26(c).  Good cause for a protective order is

established when the moving party "demonstrate[s] a particular need for protection" by

articulating the significant harm it will face in the absence of such an order.  See Cipollone v.

Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).  Courts then typically analyze the need

for protection under Rule 26(c) through a balancing process.  Arnold v. Pa., Dep't of Transp.,

477 F.3d 105, 108 (3d Cir. 2007).

**A.        Providing Access to Nortel's Source Code Repository Would Cause Serious
Injury to the Debtors and Third Parties**

18.        Compliance with the Disputed Demands could seriously injure Nortel by

diminishing the value of the source code over which it retains ownership, as well as by

contravening the confidentiality obligations set forth in its agreements with the third party

vendors from which it licensed software (the "Third Party Vendors") and the sale agreements

with the Purchasers.  The Debtors would also be injured through the imposition of excessive cost

and burden, as set forth in more detail above.  Furthermore, as if that were not injury enough,

Nortel's Third Party Vendors and the Purchasers would also be harmed by SNMP RI being

allowed access to the confidential proprietary information in which they also have an interest.

19.        The value derived from the confidential nature of the source code is self-

evident.  Throughout its history, Nortel earned revenue through the sales of its products and

services relating to the development, licensing and maintenance of intellectual property,

---

RI cannot be unsupervised because of the confidentiality concerns described further below, and a
supervised search is simply not possible.

including software.  See Reichert Decl. 3.  The confidential source code in ClearCase "contributed to distinguishing Nortel's products from other competitive products on the market and drove sales."  See Reichert Decl. 3.  By keeping its proprietary source code confidential, Nortel was able to realize the value of the great majority of its source code through the Bankruptcy Sales, where it was among the transferred assets that have earned Nortel approximately $3.7 billion thus far.

20.     As the Court is aware, Nortel continues its efforts to divest its remaining assets, including the software over which it retains ownership.  Sharing the source code underlying such software with SNMP RI could reduce the value that Nortel could obtain for the assets in such a sale, where the unique and confidential nature of a program would be key pricing factors.  As a result, giving SNMP RI free access to search Nortel's source code would cause serious injury to both Nortel and its creditors by reducing the value of the assets ultimately available for distribution.

21.     Moreover, complying with the Disputed Demands would expose Nortel to potential litigation by the Third Party Vendors and the Purchasers.  In developing its own software, Nortel frequently licensed and incorporated the source code of Third Party Vendors into its products.  See Kenkel Supp. Decl. 3.  That licensed source code remains interwoven throughout the source code in ClearCase.  Kenkel Supp. Decl. 3.  Furthermore, as set forth in the Reichert Declaration, "[n]ow that Nortel has sold its operating business lines, the ownership of the vast majority of the Nortel source code stored within the ClearCase repository has transferred to the purchasers in the bankruptcy sales."  See Reichert Decl. 4.  Under the relevant sale

agreements, the Debtors are not free to let SNMP or any other third party roam freely through the repository.[11]

22.     Even beyond the contractual issues faced by the Debtors, the Third Party Vendors and Purchasers would likewise face serious harm if SNMP RI were permitted to access the source code stored in ClearCase as requested in the Disputed Demands.  Courts have considered the serious injury that would be suffered by a third party when imposing a protective order.  See Province v. The Pep Boys-Manny, Moe and Jack, No. 99-2162, 2000 U.S. Dist. LEXIS 4929 (E.D. Pa. April 12, 2000) (restricting a plaintiff from sharing the employment files of company employees with other plaintiffs).  The Third Party Vendors and Purchasers have a significant interest in ensuring that their source code remain confidential, particularly given that the Third Party Vendors include vendors that licensed software to Nortel that provide comparable or the same functions as provided by SNMP RI's software.  See Kenkel Supp. Decl. 3.  It is axiomatic that these third parties would face serious competitive harm if their source code were given to their competitor.

23.     Requiring SNMP RI to enter into a confidentiality agreement would be insufficient to protect Nortel, the Third Party Vendors and Purchasers against these injuries. SNMP RI's suggestion to the contrary ignores the competitive reality.  The fact is that the SNMP RI employees reviewing the material cannot "unknow" what they would inevitably see and learn during the course of their review.[12]  This is particularly the case given that, as set forth in the

---

[11]     See, e.g., section 9.14 of the Asset Purchase Agreement, dated as of February 19, 2009 [D.I. 353]; section 5.11 of the Asset Sale Agreement, dated as of July 24, 2009 [D.I. 1205]; section 5.11 of the Amended and Restated Asset Share Sale Agreement, dated as of September 14, 2009 [D.I. 1514]; section 5.10 of the Transaction Agreement, dated as of October 25, 2009 [D.I. 1723]; section 5.11 of the Asset Sale Agreement, dated as of September 24, 2010 [D.I. 4054].

[12]     Indeed, in a case SNMP RI cites in its Objection, Brown Bag Software, 960 F.2d 1465 (cited at Objection ¶ 14), the Ninth Circuit makes the same point in affirming the district court's decision to prevent Brown Bag's in-house counsel from access to trade secrets, noting that the issue is "not only whether the documents could be locked

Motion, and not contested by SNMP RI, the ClearCase repository can only be reviewed by someone highly trained in the use of ClearCase and "with detailed knowledge of Nortel's software development process."  See Motion ¶ 34; Kenkel Decl. ¶¶ 8-9; see also Brown Bag, 960 F.2d at 1471 (affirming district court's denial of access by Brown Bag's in-house counsel to trade secrets based on magistrate's inquiry into in-house counsel's responsibilities and conclusion that in-house counsel's "employment would necessarily entail advising his employer in areas relating to Symantec's trade secrets").

24.    Other courts have recognized the unique importance of keeping source code protected from disclosure.  In Viacom International Inc. v. Youtube Inc., 253 F.R.D. 256 (S.D.N.Y. 2008), the court was presented with a motion to compel the production of YouTube and Google's source code.  The court found that "[t]here is no dispute that [the code's] secrecy is of enormous commercial value.  Someone with access to it could readily perceive its basic design principles, and cause catastrophic competitive harm to Google by sharing them with others who might create their own programs."  Id. at 259.  Noting that the source code is a "vital asset," the court held that "the protections set forth in the stipulated confidentiality order are careful and extensive, but nevertheless not as safe as nondisclosure.  There is no occasion to rely on them, without a preliminary proper showing justifying production of the search code."  Id. at 260 (emphasis added).

### B.    The Balance of Factors Demonstrates Good Cause For a Protective Order

25.    In applying the balancing test to consider a protective order, courts consider various factors, including whether disclosure will violate any privacy interests; whether the

up in cabinets, but also whether Brown Bag counsel could lock-up trade secrets in his mind, safe from inadvertent disclosure to his employer once he had read the documents." Id. at 1471.  Similarly, in Olmstead, 606 F.3d 262 – also cited by SNMP RI (cited at Objection ¶ 14) – the Sixth Circuit affirmed the district court's denial of access to defendant's software by plaintiff's employees over plaintiff's arguments "that its employees were in the best position to evaluate the software," on the grounds that such restriction properly reflected defendants' "interest in preventing a potential competitor from having access to its software." Id. at 269-70.

information is being sought for a legitimate or improper purpose, and whether the sharing of information will promote fairness and efficiency. Arnold, 477 F.3d at 108; see also Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995) (outlining "several factors, which are neither mandatory nor exhaustive, that may be considered in evaluating whether 'good cause' exists") (citation omitted). Given the seriousness of the injury faced by both Nortel and third parties, the balance of factors militates in favor of a protective order.

26.        The case law is clear that privacy is among those interests a court must consider when determining whether there is good cause to grant a protective order. Bonin v. World Umpires Ass'n, 204 F.R.D. 67, 69 (E.D. Pa., 2001). Furthermore, the Third Circuit has made clear that the privacy interest factor applies where a litigant seeks a protective order to prevent competitors from using proprietary information. Leap Systems, Inc. v. MoneyTrax, Inc., 638 F.3d 216, 219 (3d Cir. Mar. 15, 2011) (affirming the district court's holding that a litigant's "interest in preventing competitors from using the proprietary information in the transcript to 'unfairly compete,' coupled with its reliance on the Court's assurance of confidentiality, outweighed Langford's personal interest in litigating his claim in state court").

27.        SNMP RI does not dispute that the source code contained in ClearCase is valuable and confidential information that satisfies the standard for trade secrets under Rule 26(c)(1)(G). Under federal law, information of all forms and types is subject to protection as a trade secret when (a) reasonable measures have been taken to protect its confidential nature, and (b) that information derives independent economic value from not being publicly known. 18 U.S.C. § 1839.

28.        The source code contained in ClearCase is intangible information and satisfies both of these requirements. First, it has consistently been Nortel's practice to protect the source

code of its software from disclosure to third parties.  <u>See</u> Reichert Decl. 3.  Even throughout the

Bankruptcy Sales, Nortel maintained its policy of not providing prospective purchasers access to

the source code of the relevant products during the diligence process or at any time prior to the

closing of their respective Bankruptcy Sale.  <u>See</u> Reichert Decl. 4.  After each Bankruptcy Sale

closed, the Purchasers' access to the source code continued to be restricted through provisions in

each and every TSA[13].   The damage of permitting SNMP unfettered access to ClearCase now, as

requested by the Disputed Demands, would only be magnified by the fact that it is wholly

unprecedented.  <u>Second</u>, as described above, the ClearCase source code has contributed to the

billions of dollars in proceeds realized from the Bankruptcy Sales.

   29.  Nor would sharing the information requested in the Disputed Demands with

SNMP RI promote fairness and efficiency.  <u>Arnold</u>, 477 F.3d at 108.  To the contrary, given the

burden on the Debtors in the form of cost, time, and strain on limited resources, the cost of

breaching the Debtors' contractual confidentiality obligations, as well as the impact on third

parties who also share an interest in keeping the materials confidential, complying with the

demands would in fact be manifestly unfair and wasteful.

   30.  Finally, SNMP RI has no countervailing interests that would tip the outcome of

the balancing test in its favor.  Indeed, the Disputed Demands do not even relate to any specific

claims asserted by SNMP RI in its Original Claim or its Amended Claim.  A simple desire to

undertake a fishing expedition and search for further claims cannot be sufficient to overcome

Nortel's good cause and the interests of the Third Party Vendors and Purchasers in maintaining

the value and competitiveness of their confidential trade secrets.  As a result, there is good cause

to grant the protective order sought by Nortel.

---

[13]  <u>See, e.g.</u>, Excerpt of the CDMA TSA attached to the Kim Cert. as Ex. E, at § 9(a), as well as the similar provisions set forth in the other excerpts of the TSAs attached to the Kim Cert.

WHEREFORE, the Debtors respectfully request that this Court (i) grant the Motion and

the relief requested therein; and (ii) grant such other and further relief as it deems just and

proper.

Dated:  June 1, 2011  
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)  
James L. Bromley (admitted *pro hac vice*)  
Lisa M. Schweitzer (admitted *pro hac vice*)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors*  
*and Debtors in Possession*