**EXHIBIT A**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**MOTION RECORD OF THE CANADIAN DEBTORS**

**(Allocation Protocol)**
**(returnable June 7, 2011)**

June 1, 2011

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

## I N D E X

| TAB | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1. | Notice of Motion (Allocation Protocol), returnable June 7, 2011 | 1 |
| 2. | Affidavit of Michael Joseph Lang, sworn June 1, 2011 | 33 |
| A. | Exhibit "A" – E-mail from Ryan Ellis of Herbert Smith LLP re: Allocation dated July 27, 2009 | 41 |
| B. | Exhibit "B" – E-mail from Ryan Jacobs of Akin Gump Strauss Hauer & Field LLP re: Nortel – Allocation Protocol (UCC Issues List) dated October 13, 2009 | 45 |
| C. | Exhibit "C" – Herbert Smith Comments on Draft Protocol for resolving Disputes Concerning Allocation of Sale Proceeds dated October 9, 2009 | 48 |
| D. | Exhibit "D" – Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds (Draft of November 8, 2009) with Ogilvy Renault's comments February 1, 2010 | 52 |
| E. | Exhibit "E" – E-mail from Michael Lang to Sanjeet Malik of Cleary Gottlieb Steen & Hamilton LLP re: Nortel – Allocation Protocol dated March 19, 2010 | 91 |

- 2 -

| TAB | DESCRIPTION | PAGE NO. |
|---|---|---|
| F. | Exhibit "F" – E-mail from Inna Rozenberg of Cleary Gottlieb Steen & Hamilton LLP re: Nortel – Allocation Protocol dated April 7, 2010 with attached Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds (Draft of April 7, 2010) | 135 |
| G. | Exhibit "G" – E-mail from Michael Lang to Kevin Lloyd of Herbert Smith LLP re: Nortel – Allocation Protocol, dated April 16, 2010 | 182 |
| H. | Exhibit "H" – E-mail from Kevin Lloyd of Herbert Smith LLP re: Nortel – Allocation Protocol, dated April 14, 2010 | 185 |
| 3. | Draft Order (Allocation Protocol) | 188 |

# Tab 1

- 1

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**

**(Allocation Protocol)**
**(returnable June 7, 2011)**

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") will make a motion to Justice Morawetz of the Commercial List court on **Tuesday, June 7, 2011 at 10:00am.**, or as soon after that time as the motion can be heard, at **393 University Avenue**, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

**THE MOTION IS FOR AN ORDER:**

(a)    granting an Order approving an allocation protocol in substantially the form attached as Schedule "A" hereto (the "Allocation Protocol"); and

- 2 -

2

(b)      granting such further and other relief as counsel may request and this Honourable Court may grant.

**THE GROUNDS FOR THE MOTION ARE:**

(a)      Capitalized terms used herein and not otherwise defined have the meaning given to them in the sixty-seventh report of the Monitor (defined below), to be filed in connection with this motion (the "Sixty-Seventh Report");

*Background*

(b)      On January 14, 2009, the Canadian Debtors were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order of this Honourable Court, and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings;

(c)      Also on January 14, 2009, certain of NNC's United States subsidiaries (together with Nortel Networks (CALA) Inc., the "U.S. Debtors") made voluntary filings in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the U.S. Bankruptcy Code.  Nortel Networks (CALA) Inc. subsequently filed under Chapter 11 of the U.S. Bankruptcy Code;

(d)      As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January 2009;

(e)      The Chapter 11 cases have been recognized by the Ontario Superior Court of Justice, Commercial List as "foreign proceedings" in Canada, and the within proceedings have been recognized by the U.S. Court as "foreign main proceedings" pursuant to Chapter 15 of the U.S. Bankruptcy Code;

(f)      Additionally, on January 14, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa (the "EMEA Debtors") each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986;

- 3 -

3

(g)   Nortel Networks S.A. ("NNSA") is also subject to secondary insolvency proceedings in France, although the English law proceedings remain the main proceedings in respect of NNSA.  A French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France;

***The Allocation Protocol***

(h)   In June 2009, the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors entered into an Interim Funding and Settlement Agreement ("IFSA") which, among other things, provided for the parties' cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an interim sales protocol ("Protocol");

(i)   The parties subsequently entered into negotiations for approximately one year with respect to the terms of a Protocol;

(j)   After a year of negotiations, the parties were still unable to agree on certain fundamental terms of a Protocol including, for example, the scope of the issues to be determined under the Protocol;

(k)   As a result, the Protocol negotiations were suspended and the parties agreed to attempt to reach a consensual resolution through mediation;

(l)   After two mediation sessions, the mediation was declared unsuccessful;

(m)   On or about April 25, 2011, the U.S. Debtors and the Committee filed a motion seeking to approve a proposed form of allocation protocol pursuant to which this Court and the U.S. Court would make decisions on the allocation of sale proceeds;

(n)   The Canadian Debtors and the Monitor have since worked with the U.S. Debtors, the Committee and others to develop the proposed form of Allocation Protocol, for which it is now seeking approval;

(o)   The Allocation Protocol contemplates, among other things:

- 4 -

4

(i)    This Honourable Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the sale proceeds of the global sales amongst the various Nortel parties;

(ii)    Creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("Intercompany Claims"), are not governed by the Allocation Protocol. All Intercompany Claims, with the exception of Intercompany Claims between the U.S. Debtors and the Canadian Debtors, shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claims is made;

(iii)    Each of the relevant Nortel selling entities (including the Canadian Debtors, the U.S. Debtors and the EMEA Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the CCC would be established as "core parties" in the Allocation Protocol hearings, with full rights of participation in such hearings and any related discovery. Any other party in interest could seek to establish itself as a core party;

(iv)    All Allocation Protocol hearings will proceed by way of joint hearings between this Honourable Court and the U.S. Court pursuant to the cross-border protocol;

(v)    Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators against the (A) U.S. Debtors (the "EMEA U.S. Claims") and (B) the Canadian Debtors (the "EMEA Canadian Claims"). The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA U.S. Claims. The Canadian Debtors may file motions with this Honourable Court to dismiss the EMEA Canadian Claims;

(vi)    The U.S. and Canadian Courts will (A) hold simultaneously (1) the Allocation Protocol Hearings, (2) hearings before the U.S. Court on the

- 5 -                                                    5

      merits of any remaining EMEA U.S. Claims, and (3) hearings before the Canadian Court on the merits of any remaining EMEA Canadian Claim, provided, however, that the U.S. and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims or only EMEA Canadian Claims, and (B) issue their respective decisions on (1), (2) and (3);

(p)    Although not expressly in the Allocation Protocol, the Canadian Debtors and the Monitor are also of the view that claims advanced by the UK Pension Trustee and PPF against the Canadian Debtors must be resolved in a manner similar to EMEA Canadian Claims as outlined in subparagraphs o(v) and (vi) above;

(q)    The proposed Allocation Protocol is fair and reasonable for the following reasons:

      (i)    the parties have reached an impasse regarding the negotiations of a Protocol under IFSA;

      (ii)    there is significant factual overlap between the theories of allocation that have been put forth the by the EMEA Debtors and the causes of action contained in the EMEA Claims asserted against the Canadian Debtors in Canada (and the U.S. Debtors in the U.S.);

      (iii)    in the event that different authorities were to decide the allocation dispute and the EMEA claims, there would be significant potential for inconsistent results;

(r)    Other than the sale of Nortel's residual IP portfolio, the balance of the Nortel assets have now been monetized. Over US$3 billion sits in various escrow accounts and cannot be distributed to creditors until these issues have been resolved;

(s)    The Allocation Protocol presents the only realistic, timely  and fair proposal for resolution of allocation;

- 6 -

6

*Miscellaneous*

(t)     The provisions of the CCAA; and

(u)     Such further and other grounds as counsel may advise and this Honourable Court permit.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

(a)     the affidavit of Michael Lang to be sworn;

(b)     the Sixty-Seventh Report, to be filed separately; and

(c)     such further and other material as counsel may request and this Honourable Court may permit.

May 31, 2011                     **OGILVY RENAULT LLP**
                                 Suite 3800
                                 Royal Bank Plaza, South Tower
                                 200 Bay Street
                                 Toronto, Ontario  M5J 2Z4  CANADA

                                 **Derrick Tay LSUC#: 21152A**
                                 Tel: (416) 216-4832
                                 Email: dtay@ogilvyrenault.com

                                 **Jennifer Stam LSUC #46735J**
                                 Tel: (416) 216-2327
                                 Email: jstam@ogilvyrenault.com

                                 Fax: (416) 216-3930
                                 Lawyers for the Canadian Debtors

TO:     Attached Service List

*June 1, 2011*

Court File No. 09-CL-7950                    7

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**SERVICE LIST**

TO:      **NORTON ROSE OR LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Tony Reyes
         Jennifer Stam

         Email:    derrick.tay@nortonrose.com
                   tony.reyes@nortonrose.com
                   jennifer.stam@nortonrose.com

         Tel:      416.216.4000
         Fax:      416.216.3930

         Lawyers for the Applicants

- 2 -

8

TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, Ontario  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:  nortel.monitor@ca.ey.com

Tel:  416.943.3016
Fax:  416.943.3300

AND
TO: **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:  jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
fmyers@goodmans.ca
carmstrong@goodmans.ca

Tel:  416.597.4107
Fax:  416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO: **OSLER HOSKIN AND HARCOURT**
**LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, Ontario  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Betsy Putnam

Email:  lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
eputnam@osler.com

Tel:  416.362.2111
Fax:  416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO: **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, Ontario  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:  dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:  416.868.3538
Fax:  416.364.7813

Lawyers for Export Development Canada

- 3 -

**9**

AND
TO:

**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, Ontario  K1A 1K3

Jennifer Sullivan

Email:  jsullivan@edc.ca

Tel:     613.597.8651
Fax:     613.598.3113


AND
TO:

**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:  john.stringer@mcinnescooper.com
        stephen.kingston@mcinnescooper.com

Tel:     902.425.6500
Fax:     902.425.6350

Lawyers for Convergys EMEA Limited

AND
TO:

**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, Ontario M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:  barry.wadsworth@caw.ca
        lewis.gottheil@caw.ca

Tel.:    416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada


AND
TO:

**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific
Tower
Toronto, Ontario  M5K 1K7

Leanne M. Williams

Email:  lwilliams@tgf.ca

Tel:     416.304.1616
Fax:     416.304.1313

Lawyers for Flextronics Telecom Systems
Ltd.

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Jeffrey Carhart

Email:  jcarhart@millerthomson.com

Tel:     416.595.8615/8577
Fax:     416.595.8695

Lawyers for Toronto-Dominion Bank

AND
TO:

**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:  hharrison@boughton.ca

Tel:     604.687.6789
Fax:     604.683.5317

Lawyers for Tonko Realty Advisors (BC)
Ltd., in its capacity as duly authorized agent
for Holdings 1506 Enterprises Ltd.

- 4 -

10

AND TO:
**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, Ontario  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:    416. 367.6646
Fax:    416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:    416.367.6266
Fax:    416.361.7067

Email:  srappos@blgcanada.com
Tel:    416.367.6033
Fax:    416.361.7306

Lawyers for Bell Canada

AND TO:
**SISKINDS LLP**
680 Waterloo Street
London, Ontario  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein
Emilie E. M. Maxwell

Email:  ray.leach@siskinds.com
        dimitri.lascaris@siskinds.com
        emilie.maxwell@siskinds.com

Tel:    519.672.2121
Fax:    519.672.6065

Lawyers for Indiana Electrical Workers
Pension Trust Fund IBEW, Laborers Local
100 and 397 Pension Fund, and Bruce
William Lapare

AND TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario  M5J 2T3

John Contini
Aaron Rousseau

Email   john.contini@mcmillan.ca
Tel:    416.307.4148
Fax:    416.304.3767

Email   aaron.rousseau@mcmillan.ca
Tel:    416.307.4081
Fax:    416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:
**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson
Richard Swan

Email:  zychk@bennettjones.com
Tel:    416.777.5738
Fax:    416.863.1716

Email:  orzyr@bennettjones.com
Tel:    416.777.5737
Fax:    416.863.1716

Email:  finlaysong@bennettjones.com
Tel:    416.777.5762
Fax:    416.863.1716

Email:  swanr@bennettjones.com
Tel:    416.777.7479
Fax:    416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

11

| | | | |
|---|---|---|---|
| AND<br>TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, Ontario  M5H 3R3 | AND<br>TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, Ontario  M5H 3R3 |

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:     416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:     416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:     416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:     416.595.2150
Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca
Tel:     416.595.2701
Fax:     416.204.2909

Lawyers for the Former Employees of Nortel

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:   mzigler@kmlaw.ca
Tel:     416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:     416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:     416.595.2130
Fax:     416.204.2810

Email: . amckinnon@kmlaw.ca
Tel:     416.595.2150
Fax:     416.204.2874

Email:   cpoltak@kmlaw.ca
Tel: .    416.595.2701
Fax:     416.204.2909

Lawyers for the LTD Beneficiaries

- 6 -

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:  jcarhart@millerthomson.com
Tel:    416.595.8615
Fax:    416.595.8695

Email:  msims@millerthomson.com
Tel:    416.595.8577
Fax:    416.595.8695

Email:  jmklotz@millerthomson.com
Tel:    416.595.4373
Fax:    416.595.8695

Lawyers for LG Electronics Inc.

AND
TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:  joseph.kim@lge.com

Tel:    +82.2.3777.3171
Fax:    +82.2.3777.5345

AND
TO:

**MILLER THOMSON LLP**       –       12
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:  jcarhart@millerthomson.com
Tel:    416.595.8615
Fax:    416.595.8695

Email   msims@millerthomson.com
Tel:    416.595.8577
Fax:    416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision
Communication Services, Inc.

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, Ontario  M2N 1M9

Harvey G. Chaiton

Email:  harvey@chaitons.com

Tel:    416.218.1129
Fax:    416.218.1849

Lawyers for IBM Canada Limited

DOCSTOR: 1600901\15

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, Ontario  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:   ken.rosenberg@paliareroland.com
Tel:      416.646.4304
Fax:     416.646.4301

Email:   max.starnino@paliareroland.com
Tel:      416.646.7431
Fax:     416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:      416.646.4326
Fax:     416.646.4301

Email:   tina.lie@paliareroland.com
Tel:      416.646.4332
Fax:     416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, Ontario  M5X 1G5

E. Patrick Shea

Email:   patrick.shea@gowlings.com

Tel:      416.369.7399
Fax:     416.862.7661

Lawyers for Westcon Group

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, Ontario  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:   Shayne.kukulowicz@fmc-law.com
            Alex.macfarlane@fmc-law.com
            Michael.wunder@fmc-law.com
            ryan.jacobs@fmc-law.com

Tel:      416.863.4511
Fax:     416.863.4592

Canadian Lawyers for the Official Committee
of Unsecured Creditors

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:   rslattery@mindengross.com
            dullmann@mindengross.com
Tel:      416.369.4149
Fax:     416.864.9223

Lawyers for Verizon Communications Inc.

DOCSTOR: 1600901\15

- 8 -

AND
TO:
**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:  hfogul@airdberlis.com
Tel:    416.865.7773
Fax:    416.863.1515

Email:  pczegledy@airdberlis.com
Tel:    416.865.7749
Fax:    416.863.1515

Lawyers for Microsoft Corporation

AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:  renglish@airdberlis.com
        smitra@airdberlis.com

Tel:    416.863.1500
Fax:    416.863.1515

Lawyers for Tata Consultancy Services
Limited and Tata America International
Corporation

AND
TO:
**ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:  surquhart@ahbl.ca
Tel:    604.484.1757
Fax:    604.484.1957

Lawyers for Algo Communication Products
Ltd.

AND
TO:
**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:    416.865.6655
Fax:    416.865.6636

Email:  vdare@foglers.com
Tel:    416.865.6641
Fax:    416.865.6636

Lawyers for Andrew, LLC

AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Maurice Fleming

Email:  mfleming@millerthomson.com
Tel:    416.595.8686
Fax:    416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

- 9 -

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, Ontario  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:     416.365.3529
Fax:     416.369.5210

Email:  jdavissydor@davis.ca
Tel:     416.941.5397
Fax:     416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services


AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:     416.865.7726
Fax:     416.863.1515

Email:  iaversa@airdberlis.com
Tel:     416.865.3082
Fax:     416.863.1515

Lawyers for Perot Systems Corporation


AND
TO:

**McMILLAN LLP**                               **15**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:  andrew.kent@mcmillan.ca
Tel:     416.865.7160
Fax:     416.865.7048

Email:  hilary.clarke@mcmillan.ca
Tel:     416.865.7286
Fax:     416.865.7048

Email:  tushara.weerasooriya@mcmillan.ca
Tel:     416.865.7262
Fax:     416.865.7048

Lawyers for Royal Bank of Canada


AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:  lawrence.crozier@mcmillan.ca
Tel:     416.865.7178
Fax:     416.865.7048

Email:  adam.maerov@mcmillan.ca
Tel:     416.865.7285
Fax:     416.865.7048

Lawyers for Citibank

AND TO:  **CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

Email:  dgrieve@casselsbrock.com
Tel:     416.860.5219
Fax:    416.350.6923

Lawyers for Alvarion Ltd.

AND TO:  **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:     416.865.6655
Fax:    416.865.6636

Email:  vdare@foglers.com
Tel:     416.865.6641
Fax:    416.865.6636

Lawyers for Amphenol Corporation

AND TO:  **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra

Email:  smitra@airdberlis.com

Tel:     416.863.1500
Fax:    416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND TO:  **BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:  dmagisano@blaney.com
Tel:     416.593.2996
Fax:    416.593.5437

Lawyers for Expertech Network Installation Inc.

AND TO:  **McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario  M5J 2T3

Aaron Rousseau

Email:  aaron.rousseau@mcmillan.ca
Tel:     416.307.4081
Fax:    416.365.1719

Lawyer for Right Management Inc.

AND TO:  **CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
David S. Ward
Michael Casey

Email:  bleonard@casselsbrock.com
         dward@casselsbrock.com
         mcasey@casselsbrock.com

Tel:     416.860.6455
Fax:    416.640.3054

Lawyers for the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited

- 11 -

**17**

AND
TO:

**McFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:  pklepsoe@mcfarlanelaw.com

Tel:     613.233.2679
Fax:    613.233.3774

Lawyers for Iron Mountain Canada
Corporation and Iron Mountain Information
Management, Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:  theintzm@mccarthy.ca
Tel:     416.601.7627
Fax:    416.868.0673

Email:  jsirivar@mccarthy.ca
Tel:     416.601.7750
Fax:    416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:

**IRVING MITCHELL KALICHMAN LLP**
Place Alexis Nihon, Tour 2
3500 Boulevard De Maisonneuve Ouest
Bureau 1400
Montreal, Quebec  H3Z 3C1

Kurt A. Johnson

Email :  kjohnson@imk.ca
Tel:      514.935.5755
Fax :    514.935.2999

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND
TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
            steven.levitt@nelligan.ca
            christopher.rootham@nelligan.ca

Tel:     613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post
CCAA as at January 14, 2009

- 12 -

**18**

AND
TO:
**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:  chris.besant@bakernet.com

Tel:   416.865.2318
Fax:   416.863.6275

Email:  lydia.salvi@bakernet.com

Tel:   416.865.6944
Fax:   416.863.6275

Lawyers for Jabil Circuit Inc.

AND
TO:
**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:  dgoldstein@schneidergaggino.com
        mgaggino@schneidergaggino.com

Tel:   514.631.8787
Fax:   514.631.0220

Lawyers for the Teamsters Quebec Local
1999

AND
TO:
**EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:  nanci@eurodata.ca
Tel:   613.745.0921
Fax:   613.745.1172

AND
TO:
**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:  ryanbellr@bennettjones.com
        laugesenm@bennettjones.com

Tel:   416.863.1200
Fax:   416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND
TO:
**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:  tdunn@mindengross.com
Tel:   416.369.4335
Fax:   416.864.9223

Lawyers for 2748355 Canada Inc.

AND
TO:
**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:  ibrady@baldwinlaw.ca
Tel:   613.771.9991
Fax:   613.771.9998

Lawyers for Sydney Street Properties Corp.

- 13 -                                        **- 19**

AND    **AETL TESTING, INC.**
TO:     130 Chaparral Court, Suite 250
        Anaheim, California 92808

        Raffy Lorentzian

        Email:  raffy.lorentzian@ntscorp.com
        Tel:     714.998.4351
        Fax:    714.998.7142

        Lawyers for AETL Testing, Inc.

AND    **AIRD & BERLIS LLP**
TO:     Barristers & Solicitors
        Brookfield Place, P.O. Box 754
        181 Bay Street, Suite 1800
        Toronto, ON  M5J 2T9

        Steven L. Graff
        Ian E. Aversa

        Email:  sgraff@airdberlis.com
        Tel:     416.865.7726
        Fax:    416.863.1515

        Email:  iaversa@airdberlis.com
        Tel:     416.865.3082
        Fax:    416.863.1515

        Lawyers for Huawei Technologies Co. Ltd.

AND    **SHIBLEY RIGHTON LLP**
TO:     Barristers and Solicitors
        250 University Avenue, Suite 700
        Toronto, Ontario M5H 3E5

        Arthur O. Jacques
        Thomas McRae

        Email:  arthur.jacques@shibleyrighton.com
        Tel:     416.214.5213
        Fax:    416.214.5413

        Email : thomas.mcrae@shibleyrighton.com
        Tel :    416.214.5206
        Fax :   416.214.5400

        Lawyers for The Recently Severed
        Canadian Nortel Employees Committee

AND    **SHIBLEY RIGHTON LLP**
TO:     Barristers and Solicitors
        250 University Avenue, Suite 700
        Toronto, Ontario M5H 3E5

        Arthur O. Jacques
        Thomas McRae

        Email:  arthur.jacques@shibleyrighton.com
        Tel:     416.214.5213
        Fax:    416.214.5413

        Email : thomas.mcrae@shibleyrighton.com
        Tel :    416.214.5206
        Fax :   416.214.5400

        Co-Counsel for the Steering Committee of
        Nortel Canadian Continuing Employees –
        Post CCAA as at January 14, 2009

AND    **NATIONAL TECHNICAL SYSTEMS**
TO:     130 Chaparral Ct., Suite 250
        Anaheim, California, U.S.A.
        92808

        Raffy Lorentzian

        Email:  raffy.lorentzian@ntscorp.com
        Tel:     714.998.4351

AND    **GOWLING LAFLEUR HENDERSON LLP**
TO:     Suite 1600, First Canadian Place
        100 King Street West
        Toronto, ON  M5X 1G5

        David F.W. Cohen

        Email:  david.cohen@gowlings.com

        Tel:     416.369.6667
        Fax:    416.862.7661

        Lawyers for General Electric Canada
        Equipment Finance G.P. and GE Capital
        Canada Leasing Services Inc.

- 14 -

- 20

| | | | |
|---|---|---|---|
| AND<br>TO: | **DAVIS LLP**<br>1 First Canadian Place<br>Suite 5600<br>100 King Street West<br>Toronto, ON  M5X 1E2 | AND<br>TO: | **DAVIES WARD PHILLIPS & VINEBERG<br>LLP**<br>44th Floor<br>1 First Canadian Place<br>Toronto, ON  M5X 1B1 |

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:    416.365.7886

Lawyers for Computershare Trust Company
of Canada

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:  rschwill@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Email:  mgottlieb@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:     416.598.1744
Fax:     416.598.3730

Email:   slaubman@counsel-toronto.com
Tel:     416.598.1744
Fax:     416.598.3730

Lawyers for William A. Owens

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:  lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Wipro Limited

DOCSTOR: 1600901\15

- 15 -

AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for the Current and Former
Employees of Nortel Networks Inc. who are
or were Participants in the Long-Term
Investment Plan Sponsored by Nortel
Networks Inc.

AND
TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario, M5J 2T3

Sheryl E. Seigel

Email:   sheryl.seigel@mcmillan.ca
Tel:      416.307.4063
Fax:     416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:
**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:   susan.grundy@blakes.com
Tel:      416.863.2572
Fax:     416.863.2653

Email:   marc.flynn@blakes.com
Tel:      416.863.2685
Fax:     416.863.2653

Lawyers for Telefonaktiebolaget L M
Ericsson (publ)

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:      416.601.8342
Fax:     416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:
**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:      416.973.3172
Fax:     416.973.0810

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:   kmcelcheran@mccarthy.ca
Tel:      416.601.7730
Fax:     416.868.0673

Email:   rstabile@mccarthy.ca
Tel:      416.601.8335
Fax:     416.868.0673

Lawyers for Avaya Inc.

- 16 -

AND TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:     416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:     416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:     416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:     416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global
Advisers LLC, MatlinPatterson Global
Opportunities Partners III L.P. and
MatlinPatterson Opportunities Partners
(Cayman) III L.P.

AND TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:     416.979.6425
Fax:    416.591.7333

Email:  dbrown@sgmlaw.com
Tel:     416.979.4050
Fax:    416.591.7333

Lawyers for Edmund Fitzgerald

AND TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com
Tel:     416.864.9700
Fax:    416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO:

**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

E-mail:  thomas.wallis@vdg.ca
Tel:     613.241.2701
Fax:    613.241.2599

Lawyers for La Regie des Rentes du Quebec

23

| | | | |
|---|---|---|---|
| AND TO: | **STIKEMAN ELLIOTT LLP**<br>5300 Commerce Court West<br>199 Bay Street<br>Toronto, ON  M5L 1B9<br><br>Sean F. Dunphy<br><br>Email:  sdunphy@stikeman.com<br>Tel:    416.869.5662<br>Fax:   416.947.0866<br><br>Lawyers for GENBAND Inc. | AND TO: | **STIKEMAN ELLIOTT LLP**<br>445 Park Avenue, 7th Floor<br>New York, NY  10022<br><br>Gordon Cameron<br>Ron Ferguson<br><br>Email:  gncameron@stikeman.com<br>Tel:    212.845.7464<br>Fax:   212.371.7087<br><br>Email:  rferguson@stikeman.com<br>Tel:    212.845.7477<br>Fax:   212.371.7087<br><br>Lawyers for GENBAND Inc. |
| AND TO: | **BORDEN LADNER GERVAIS LLP**<br>Barristers and Solicitors<br>Scotia Plaza, Suite 4400<br>40 King Street West<br>Toronto, ON  M4H 3Y4<br><br>John D. Marshall<br>Craig J. Hill<br><br>Email:  jmarshall@blgcanada.com<br>Tel:    416.367.6024<br>Fax:   416.361.2763<br><br>Email:  chill@blgcanada.com<br>Tel:    416.367.6156<br>Fax:   416.631.7301<br><br>Lawyers for the U.K. Pensions Regulator | AND TO: | **BLAKE, CASSELS & GRAYDON**<br>Box 25, Commerce Court West<br>199 Bay Street, Suite 2800<br>Toronto, Ontario  M5L 1A9<br><br>Pamela J. Huff<br>J. Jeremy Forgie<br><br>Email:  pamela.huff@blakes.com<br>Tel:    416.863.2958<br>Fax:   416.863.2653<br><br>Email:  jeremy.forgie@blakes.com<br>Tel:    416.863.3888<br>Fax:   416.863.2653<br><br>Lawyers for The Northern Trust Company, Canada |
| AND TO: | **ROCHON GENOVA LLP**<br>121 Richmond Street West<br>Suite 900<br>Toronto, ON  M5H 2K1<br><br>Joel P. Rochon<br><br>Email:  jrochon@rochongenova.com<br>Tel:    416.363.1867<br>Fax:   416.363.0263<br><br>Lawyers for the Opposing LTD Employees | AND TO: | **LERNERS LLP**<br>130 Adelaide St. West<br>Suite 2400<br>Toronto, ON  M5H 3P5<br><br>William E. Pepall<br><br>Email:  wpepall@lerners.ca<br>Tel:    416.601.2352<br>Fax:   416.867.2415<br><br>Lawyers for the Former Employees in Respect of the Distribution of the Corpus of the Health and Welfare Trust |

- 18 -                                          **2 4**

AND
TO:
**MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email:   kyle.kashuba@macleoddixon.com
Tel:     403.267.8399
Fax:     403.264.5973

Constellation NewEnergy Canada Inc.

AND
TO:
**SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email:   pengelmann@sgmlaw.com
Tel:     613-482-2452
Fax:     613-235-3041

Email:   fcampbell@sgmlaw.com
Tel:     613-482-2451
Fax:     613-235-3041

Lawyers for the LTD Beneficiaries in Respect of
the Distribution of the Corpus of the Health and
Welfare Trust

AND
TO:
**CLEARY GOTTLIEB STEEN & HAMILTON
LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer
Martin N. Kostov

Email:   jbromley@cgsh.com
         lschweitzer@cgsh.com
         mkostov@cgsh.com
Tel:     212.225.2000
Fax:     212.225.3999

Lawyers for Nortel Networks Inc.

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage

E-mail:  bboake@mccarthy.ca
Tel:     416.601.7557
Fax:     416.868.0673

Email:   jgage@mccarthy.ca
Tel:     416.601.7539
Fax:     416.686.0673

Lawyers for Morneau Shepell Ltd.

AND
TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON  M5J 2T3

D. Brent McPherson

Email:   brent.mcpherson@mcmillan.ca
Tel:     416.307.4103
Fax:     416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to
Wachovia Bank, N.A., in its capacity as
Servicer for the Nortel Networks Pass-
Through Trust, Series 1-1

AND
TO:
**DAVID STEER**
10 Cypress Court
Nepean, ON  K2H 8Z8

E-mail:  davidsteer127@sympatico.ca

- 19 -

25

| | |
|---|---|
| AND TO: | **FOGLER, RUBINOFF LLP**<br>Barristers and Solicitors<br>Suite 1200<br>Toronto-Dominion Centre<br>95 Wellington Street West<br>Toronto, Ontario  M5J 2Z9 |

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com

Tel:     416.864.9700
Fax:    416.941.8852

Lawyers for Apex Logistics Inc.

AND
TO:      **TORYS LLP**
79 Wellington St. W., Suite 3000
Toronto-Dominion Centre
Toronto, Ontario  M5K 1N2

Michael Rotsztain
Adam M. Slavens

Email:  mrotsztain@torys.com
Tel:     416.865.7508
Fax:    416.865.7380

Email:  aslavens@torys.com
Tel:     416.865.7333
Fax:    416.865.7380

Lawyers for Ranger, Inc.

AND
TO:      **MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson

Email :
andrew.robertson@macleoddixon.com

Tel :     403.267.8222
Fax :    403.264.5973

Lawyers for Recently Severed Calgary
Employees

AND
TO:      **TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Tony DeMarinis
Scott Bomhof
Sheila Block
Andrew Gray

Email:  tdemarinis@torys.com
           sbomhof@torys.com
           sblock@torys.com
           agray@torys.com
Tel:     416.865.0040
Fax:    416.865.8730

Lawyers for Nortel Networks Inc.

AND
TO:      **TEMPLEMAN MENNINGA LLP**
401-366 King Street East
Kingston, Ontario  K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email:  hvw@tmlegal.ca
           rbm@tmlegal.ca

Tel:     613.542.1889
Fax:    613.542.8202

Lawyers for The Corporation of the City of
Belleville

AND
TO:      **McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario M5J 2T3

Brett Harrison

Email:  brett.harrison@mcmillan.ca
Tel :     416.865.7932
Fax :    416.865.7048

Lawyers for Rogers Communications Inc.

- 20 -                                        26

AND TO: **ATTORNEY GENERAL FOR ONTARIO**
Crown Law Office -- Civil
720 Bay Street, 8th Floor
Toronto, Ontario  M7A 2S9

Leonard Marsello
William MacLarkey

Email:  leonard.marsello@ontario.ca
Tel:      416.326.4939
Fax:     416.326.4181

Email:  William.MacLarkey@ontario.ca
Tel:      416.326.4082
Fax:     416.326.4181

Lawyers for Her Majesty the Queen in right
of Ontario, as represented by the Ministry of
the Environment

AND TO: **TEMPLEMAN MENNINGA LLP**
401-366 King Street East
Kingston, Ontario  K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email:  hvw@tmlegal.ca
            rbm@tmlegal.ca

Tel:      613.542.1889
Fax:     613.542.8202

Lawyers for Algonquin and Lakeshore
Catholic District School Board

AND TO: **BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Steven J. Weisz
Jackie Moher

Email:  steven.weisz@blakes.com
Tel:      416.863.2616
Fax:     416.863.2653

Email:  jackie.moher@blakes.com
Tel:      416.863.3174
Fax:     416.863.2653

Lawyers for the American Registry for Internet
Numbers

AND TO: **McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario M5J 2T3

Andrew J. F. Kent
Wael Rostom

Email:  andrew.kent@mcmillan.ca
Tel :     416.865.7160
Fax :    416.865.7048

Email:  wael.rostom@mcmillan.ca
Tel :     416.865.7790
Fax :    416.865.7048

Lawyers for the Norpax LLC and RPX
Corporation, in its capacity as Managing
Member of Norpax LLC

- 21 -                                              ~   **27**

<u>**COURTESY COPIES:**</u>

AND
TO:
**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA  85004-4429

Scott K. Brown

Email:  <u>sbrown@lrlaw.com</u>

Tel:    602.262.5321
Fax:    602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:
**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail: <u>sreisman@curtis.com</u>
        <u>jdrew@curtis.com</u>

Tel:    212.696.6000
Fax:    212-697-1559

Lawyers for Flextronics International

AND
TO:
**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara

Email:  <u>fhodara@akingump.com</u>

Tel:    212.872.1000
Fax:    212.872.1002

U.S. Lawyers for the Official Committee
of Unsecured Creditors

AND
TO:
**MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:  <u>DDunne@milbank.com</u>
Tel:    212.530.5770
Fax:    212.530.5219

Email:  <u>ALeblanc@milbank.com</u>
Tel:    212.835.7574
Fax:    212.530.5219

Email:  <u>APisa@milbank.com</u>
Tel:    212.530.5319
Fax:    212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

DOCSTOR: 1600901\15

- 22 -

28

| | | | |
|---|---|---|---|
| AND<br>TO: | **VEDDER PRICE P.C.**<br>1633 Broadway, 47th Floor<br>New York, New York  10019 | AND<br>TO: | **BRYAN CAVE LLP**<br>161 North Clark Street, Suite 4300<br>Chicago, Illinois  60601 |

AND
TO:  **VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York  10019

Michael L. Schein

Email:  mschein@vedderprice.com

Tel:    212.407.6920
Fax:    212.407.7799

U.S. Lawyers for Telmar Network
Technology, Inc. and Precision
Communication Services, Inc.

AND
TO:  **MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :
andrew.robertson@macleoddixon.com
caylee.rieger@macleoddixon.com

Tel :    403.267.8222
Fax :    403.264.5973

Agent for Nelligan O'Brien Payne LLP,
lawyers for the Steering Committee of
Recently Severed Canadian Nortel
Employees and lawyers for the Steering
Committee of Nortel Canadian Continuing
Employees – Post CCAA as at January 14,
2009

AND
TO:  **BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois  60601

Eric S. Prezant

Email:    eric.prezant@bryancave.com
Tel:      312.602.5033
Fax:      312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:  **LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel :    212.906.1373
Fax :    212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

Schedule "A"

## ALLOCATION PROTOCOL

1. <u>Purpose</u>. The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors[1] ("<u>Allocation</u>", and any hearing regarding same, an "<u>Allocation Protocol Hearing</u>," and any discovery regarding same, "<u>Allocation Protocol Discovery</u>"). Subject to paragraph 5 hereof, creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("<u>Intercompany Claims</u>") are not governed by this Allocation Protocol. All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be determined in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol. All other Intercompany Claims shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2. <u>Participants</u>. Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the CCC (collectively, the "<u>Core Parties</u>," and each individually, a "<u>Core Party</u>") and their authorized representatives shall have the right to participate fully in (a) any and all Allocation Protocol Hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, and (b) any and all Allocation Protocol Discovery conducted in connection therewith. The foregoing is without prejudice to (x) the right of any other party in interest to file written submissions in support of or in opposition to any theory of allocation advanced at any Allocation Protocol Hearing before the U.S. and Canadian Courts or request permission to become a Core Party and fully participate in the foregoing, which request shall be made by motion on notice to the Core Parties for cause shown to both the U.S. and Canadian Courts, or (y) the power of the U.S. and Canadian Courts to adopt procedures to manage the Allocation Protocol Hearings and related proceedings.

3. <u>Cross-Border Protocol</u>. Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4. <u>Procedures</u>. The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery. After hearing the procedural submissions of the Core Parties and taking into account the discovery already conducted to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

      a.  <u>Pleadings</u>. The Core Parties will exchange pleadings, which they shall be entitled to amend, from time to time, in accordance with the usual practice of

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in ●.

- 5 -

the U.S. and Canadian Courts. There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation.

b. Fact Discovery. The U.S. and Canadian Courts will facilitate the Core Parties' exchange of fact discovery by determining the following:

    i.   the deadline for, and acceptable manners of service of, reasonable requests for the production of non-privileged documents on any other Core Party;

    ii.  the deadline for objections to any Core Party's document requests;

    iii. the deadline for identification of fact witnesses and number of fact witnesses allowed;

    iv. the process for compelling attendance of fact witnesses at depositions; and

    v.  the deadline for completion of depositions, the number of depositions permitted, and the location of and time allowed for such depositions for each Core Party.

c. Experts. The U.S. and Canadian Courts shall facilitate expert discovery by determining the following:

    i.   the deadline for and format of expert reports (including exhibits);

    ii.  the deadline for and format of rebuttal expert reports (including exhibits); and

    iii. the deadline for completion of expert depositions and the time allowed for such expert deposition.

d. Joint Conferences. The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Core Parties and to receive updates as to the status of the proceedings. The U.S. and Canadian courts will determine when joint conferences may be set.

e. Joint Hearings. The U.S. and Canadian Courts shall have joint hearings on the merits. The U.S. and Canadian Courts shall determine:

    i.   the date(s) for an opening hearing on the Core Parties' allocation positions (prior to factual discovery) and on the rules governing the joint hearing on the merits;

    ii.  the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination

- 6 -

and redirect examination of fact and expert witnesses shall take place; and

    iii.    the procedure for requesting or setting joint conferences as necessary to resolve any discovery disputes among the Core Parties or to receive updates to the status of the proceedings.

    f.    <u>Written Submissions</u>. The U.S. and Canadian Courts will determine:

    i.    the deadline for and format of opening submissions (including exhibits);

    ii.    the deadline for and format of fact affidavits, if any, to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

    iii.    the deadline for and format of reply submissions (including exhibits); and

    iv.    the deadline for and format of fact affidavits, if any, to accompany the reply submissions.

5. <u>EMEA Claims</u>. Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators or any other administrator of an EMEA Debtor against (a) the U.S. Debtors (the "<u>EMEA U.S. Claims</u>") and (b) the Canadian Debtors (the "<u>EMEA Canadian Claims</u>" (and together with the EMEA U.S. Claims, the "<u>EMEA Claims</u>")). The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA U.S. Claims. The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Canadian Claims.

6. <u>Decisions</u>. The U.S. and Canadian Courts will (a) hold simultaneously (i) the Allocation Protocol Hearings, (ii) hearings before the U.S. Court on the merits of any remaining EMEA U.S. Claims, and (iii) hearings before the Canadian Court on the merits of any remaining EMEA Canadian Claim, provided, however, that the U.S. and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims or only EMEA Canadian Claims, and (b) issue their respective decisions on (i), (ii) and (iii).

6. <u>Appeals</u>. The Core Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. and Canadian Courts.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

NOTICE OF MOTION
(Allocation Protocol)
(returnable June 7, 2011)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Jennifer Stam LSUC#: 46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

3 2

DOCSTOR: 2186817\2

# Tab 2

- **33**

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**


IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED


**AFFIDAVIT OF MICHAEL JOSEPH LANG**
**(sworn June 1, 2011)**

I, Michael Joseph Lang, of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY**:

1.      I am a senior partner in the law firm of Norton Rose OR LLP, formerly Ogilvy Renault LLP, counsel for the Canadian Debtors.  I have been intimately involved in these proceedings and, in particular, the negotiation and settlement of the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "IFSA") and the negotiations that took place in an attempt to reach agreement on an "Interim Sales Protocol" pursuant to, and as that term is defined in, Section 12.c. of the IFSA (a "Protocol").

2.      Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the sixty-seventh report of Ernst & Young Inc., in its capacity as monitor (the "Monitor"), to be filed in connection with this motion.

3.     It is not my intention in this affidavit to review in detail the course of the without-prejudice negotiations which Kevin Lloyd has discussed in his declaration of May 19, 2011 (the "Lloyd Declaration"). Nor is it my intention to, and I do not, discuss any advice or communications between my firm and its clients, nor do I have any authorization to, and I do not, waive any solicitor-and-client, without-prejudice or other privilege. Rather, the purpose of this my affidavit is to provide evidence related directly to certain matters discussed in the Lloyd Declaration, including, in particular, to demonstrate that, contrary to the assertions of Mr. Lloyd:

(a)     there was never an agreement reached among the parties to the IFSA to arbitrate allocation disputes. While the parties attempted to negotiate a Protocol to resolve disputes regarding the allocation of the proceeds of sales of Nortel's business units, there was never any agreement reached on, *inter alia*:

(i)     who the dispute resolvers would be or how they would be selected;

(ii)     the question or scope of the dispute to be resolved pursuant to the Protocol; or

(iii)     the process for resolving the question or dispute to be resolved pursuant to the Protocol; and

(b)     it was always the position of the Canadian Debtors and the Monitor that intercompany claims asserted against any of the Canadian Debtors would be decided exclusively by this Honourable Court.

IFSA

4.     As indicated in other materials filed with this Court, the IFSA was intended to deal with two imminent issues then facing the parties and the Court:

(a)     ongoing funding for the Canadian estate, which would permit the Canadian Debtors to continue their operations for the benefit of the Nortel group globally; and

- 3 -

35

(b)    facilitating value maximizing sales of Nortel's business units.

5.    With regard to the second of these issues, the IFSA included provisions to the general effect that the parties would cooperate in the completion of the global business sales prior to any determination of the allocation of the sale proceeds or agreement as to a binding procedure for determining such allocations (Sections 11 and 12.a. of the IFSA). It was in connection with and, in part, as consideration for these cooperation covenants, that the parties also agreed to the inclusion of Section 12.c. of the IFSA which provided that the parties would "negotiate in good faith and *attempt to reach agreement* on a timely basis on a protocol for resolving disputes concerning the allocation of the Sale Proceeds from the Sale Transactions" (emphasis added).

6.    Although discussions with respect to possible allocation procedures had taken place prior to entering into the IFSA, there was no agreement with respect to a number of fundamental, substantive issues on how allocation would be determined.  Following the execution of the IFSA at the time negotiations commenced pursuant to Section 12.c., there was no agreement on such basic issues as:

(a)    the scope of the dispute or the question to be resolved through this mechanism;

(b)    whether the mechanism for dispute resolution would be in the form of an arbitration;

(c)    who the dispute resolver(s) would be or how they would be selected or replaced; and

(d)    the number of separate interests that could be represented and participate in the dispute resolution process.

7.    The foregoing were among the many substantive issues on which there had been no consensus.  The IFSA contained the parties' agreement to attempt to work these issues through.  However, there was never any assurance that agreement on a Protocol would be reached.

- 4 -

-          3 6

<u>Negotiation of a Protocol</u>

8.     Multiple drafts of a proposed Protocol were exchanged between June 2009 and July 2010. The parties to the IFSA and certain of their respective stakeholders also met in person on three occasions during this period to attempt to settle the scope and terms of a Protocol.

9.     Throughout the negotiations, it was apparent through the correspondence of the parties that a number of fundamental, substantive issues remained unresolved.  Attached hereto as exhibits are a number of emails and other documents which indicate a lack of agreement among the parties on various issues with respect to the Protocol:

   (a)     Exhibit A – An email dated July 27, 2009 from Ryan Ellis of Herbert Smith LLP setting out the Joint Administrators' comments on a draft of the Protocol.  The email indicates lack of agreement on, *inter alia*:

      (i)     who the participating parties should be (points 2 and 4.1); and

      (ii)     whether legal determination on intellectual property ("IP") ownership issues should be decided by the dispute resolver or the courts (point 4.6).

   (b)     Exhibit B – An email dated October 13, 2009 from Ryan Jacobs, who was at that time of Akin Gump Strauss Hauer & Field LLP, setting out the Committee's comments on a draft of the Protocol. The email indicates lack of agreement on, *inter alia*:

      (i)     who the participating parties should be (point 1);

      (ii)     the scope and application of the Protocol (point 3);

      (iii)     whether the dispute resolver should give reasons for its decision (point 5); and

      (iv)     matters regarding the selection of the dispute resolver, including the required conflict of interest standard (point 8).

- 5 -

37

(c)     Exhibit C -- A note dated October 9, 2009 of comments on a draft of the Protocol from Kevin Lloyd of Herbert Smith LLP. The email indicates lack of agreement on, *inter alia*:

    (i)     who the participating parties should be (point 3);

    (ii)    the parameters of the dispute (points 16 and 19); and

    (iii)   whether the decision would be an arbitral award (point 24).

(d)     Exhibit D – Comments of Ogilvy Renault LLP and Goodmans LLP on the November 8, 2009 draft of the Protocol indicating a lack of agreement on, *inter alia*:

    (i)     the nature of the dispute to be submitted for determination (section 1.2); and

    (ii)    who the participating parties should be (section 4.1; note 15).

(e)     Exhibit E -- My email dated March 19, 2010 to Sanjeet Malik of Cleary Gottlieb Steen & Hamilton LLP indicating areas of substantive disagreement among the parties that were not sufficiently highlighted in the February 26, 2010 draft of the Protocol.

(f)     Exhibit F – An email from Inna Rozenberg of Cleary Gottlieb Steen & Hamilton LLP attaching the April 7, 2010 draft of the Protocol (the "April 7 Draft"), indicating lack of agreement on, *inter alia*, the scope of the dispute to be submitted for determination (sections 1.1 and 8.1) and other issues referenced in my email attached as Exhibit E to this my affidavit.

(g)     Exhibit G – My email dated April 16, 2010 to Kevin Lloyd of Herbert Smith LLP pointing out that the February 26, 2010 draft of the Protocol did not sufficiently highlight all areas of substantive disagreement among the parties on the terms of that document, including with respect to the scope of the dispute to be determined pursuant to the Protocol.

- 6 -

38

10.   It is not accurate to state that, at any point in time, the parties were close to reaching consensus on the final terms of a Protocol. The drafts of the Protocol that were circulated during negotiations generally reflected one or another of the parties' views and were proposed for the purpose of advancing and facilitating discussion but did not represent consensus on all issues. For example, my emails of March 19, 2010 and April 16, 2010 (Exhibits E and G, respectively) recorded that the February 26, 2010 draft of the Protocol did not reflect the agreement of the Canadian Debtors and the Monitor and, in particular, as regards the scope of the Protocol, as well as numerous other important substantive provisions.

11.   While the parties over time reached a preliminary consensus on many aspects of a Protocol, it has always been the position of the Canadian Debtors and the Monitor that their agreement to any single provision of the Protocol was conditional upon agreement regarding all aspects of the Protocol, including, without limitation, agreement as to the scope of the dispute to be submitted to a dispute resolver under the Protocol.

Inter-company Claims

12.   In a meeting held in New York City on October 21, 2009, counsel for the Joint Administrators indicated that the EMEA Debtors may take the view that "economic rights" are involved in the sale of Nortel's CDMA business, rather than just the relinquishment of an IP license. Further, he indicated that the Joint Administrators may also want to advance "hardship arguments". Counsel stated that the Joint Administrators wanted allocation of sale proceeds to be based on ownership rights, including "beneficial ownership rights". From and after October 21, 2009, it has always been the position of the Canadian Debtors and the Monitor, as communicated to all other parties, that allocation disputes should be determined without regard to matters which are, in substance, inter-company claims or allegations of wrongful conduct. For example, my emails of March 19, 2010 and April 16, 2010 (Exhibits E and G to this my affidavit) clearly state that position. The April 7 Draft (Exhibit F to this my affidavit) incorporates the previous comments of the Canadian Debtors and the Monitor showing the significant difference of views on the appropriate scope of the Protocol. In particular, reference is made to Section 8.1 of the April 7 Draft for the Canadian Debtors' and the Monitor's views as to the proper scope of the Protocol:

- 7 -

Each Decision or Supplementary Decision, as the case may be:

(i)     shall reflect the Panel's determination of a fair and reasonable allocation of the Sale Proceeds of the particular In-Scope Sale between and among each of the relevant  Participating Parties based on an evaluation of the assets, rights, properties and liabilities of each such Participating Party sold, assigned, transferred or licensed to, or assumed by, the Buyer in such In-Scope Sale (including, without limitation, any intellectual property license rights of a Participating Party that were terminated pursuant to an Appropriate License Termination, as such term is defined in the Interim Funding Agreement, in connection with such In-Scope Sale), provided that the foregoing shall not require the Panel to allocate any amount of such Sale Proceeds to any or all of such assets, rights, properties or liabilities; and

(ii)    shall be determined without regard to, or adjustment for, any other claims, entitlements, set-offs or adjustments of any nature whatsoever.

For greater certainty, the Panel shall have no duty or authority to inquire into or determine (i) whether any Participating Party is responsible for any alleged breach or non-performance of, or any indemnification obligation under, the terms of any Acquisition Agreement, or (ii) any Adverse Claim (as defined below) that may be asserted by any Participating Party (an "Adverse Person"). For this purpose, "Adverse Claim" means a claim that a particular Adverse Person is or was the rightful owner of or has or had an interest in the particular asset, right, property or liability that was not recorded in the instrument of title, deed, grant, lease, license or agreement governing the ownership, creation, invention, development or establishment of the asset, right, property or liability.

13.    While there has not been agreement amongst the parties on the scope of a Protocol, there was at one time a clear understanding that the Protocol, contrary to the current position of the Joint Administrators, would not cover inter-company claims.  Attached hereto and marked as Exhibit H to this my affidavit is a copy of the email dated April 14, 2010 from Kevin Lloyd to myself and others wherein Mr. Lloyd states:

- 8 -

40

> "Indeed I do not believe the Protocol was ever intended to extend to [inter-estate claims], which will be dealt with in the ordinary way by the various claim processes."

14.     This stands in direct contrast to the position the Joint Administrators have asserted in negotiations following April 2010, namely that the allocation dispute is inextricably linked to the inter-company claims being advanced by the EMEA Debtors and the Joint Administrators and that the Protocol should permit the dispute resolver to adjudicate the inter-company claims.  The Joint Administrators now take the position, as stated by John Whiteoak in his affidavit sworn January 12, 2011 that "...EMEA Claims are so inextricably linked with allocation that EMEA's Claims must be dealt with under the section 12(c) IFSA process."

15.     As noted above, notwithstanding my email of April 16, 2010, it soon became apparent to the Canadian Debtors and the Monitor that the Joint Administrators' concept of a claim of "beneficial ownership" could include litigation of the same matters they were advancing as inter-company claims.  Notwithstanding the clear position of the Canadian Debtors and the Monitor on this issue, discussions continued for some time on the Protocol, but were ultimately suspended when the decision was made to attempt mediation with respect to allocation and other outstanding inter-estate issues.

SWORN BEFORE ME at the City of
Toronto, on June 1, 2011.

_____
Commissioner for Taking Affidavits

_____
Michael Joseph Lang

# Exhibit "A"

**Ma, Catherine**

This i~ ...........¨A¨.............referred to in the
affide.... MICHAEL JOSEPH LANG......
sworn before me, this...........1ˢᵗ.......
day of.................JUNE..................20..11...

.....................................................
COMMISSIONER FOR TAKING AFFIDAVITS

**41**

| | |
|---|---|
| **From:** | Ellis, Ryan [Ryan.Ellis@herbertsmith.com] |
| **Sent:** | July 27, 2009 10:15 AM |
| **To:** | smalik@cgsh.com; fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; AFisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Tay, Derrick C.; gadavies@nortel.com; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Matthew.Hart@lazard.com; Lang, Michael; orzyr@bennetjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; JHarris@milbank.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; Stam, Jennifer; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com; jbromley@cgsh.com; cbrod@cgsh.com; lschweitzer@cgsh.com; bsandstrom@cgsh.com; Fabrice BAUMGARTNER |
| **Cc:** | abloom@UK.EY.COM; chill1@uk.ey.com; rjowitt@uk.ey.com; sharris@uk.ey.com; sedel@UK.EY.COM; GALE, STEPHEN; DAVIES, GAVIN; LLOYD, KEVIN; ELLIOTT, LAURENCE; WARD, BEN; MONTGOMERY, ALAN; Whiteoak, John; Segger, Joanne; BASUYAUX, BRUNO |

**Subject:** FW: Allocation Protocol

Dear Sanjeet,

Here are the JA's high level points on the draft Protocol (and subject to more detailed mark-up comments), for when the group discusses that document. What do you think the likely timing of engagement on this will be? We assume that timing is being driven by the earliest date that M&A proceeds are received, which presumably would be on closing of the Zenith /CDMA transaction?

## 1.  Agreement

1.1       The Protocol should be conditioned on the necessary court approvals being obtained from both the US and Canadian Courts, with the appropriate efforts standards (and creditor support) to such applications, consistent with the approach taken with the IFSA.

1.2       The Joint Administrators will likely seek a direction from the English Court that they be at liberty to enter into the Protocol.

1.3       The Protocol needs to be clear on its face that the Protocol constitutes the binding dispute resolution methodology for the allocation of proceeds for each M&A deal and that no further recourse is available to any Court (except as set out in paragraph 4.7 below).

1.4       Can you please circulate a pro-forma of the Escrow Agreement to be used on each M&A deal (including Zenith / CDMA, where the EMEA Estate participates through Section 11.d. of the IFSA).  We expect that this document will be a fairly standard document, where no pay-out is allowed from the account without the unanimous approval of each of the Selling (or in the case of Section 11, deemed selling) Parties, to be held by an independent escrow agent, with any pay-out to be free of any set off or other claim between any of the parties.

## 2.       Parties and roles

2.1       There should not be a Fourth Estate comprising the Non Filed entities.  Each of the Non-Filed entities should be represented by their parent in the relevant US, Canadian or EMEA estates (as has been the practice with the EMEA Non-Filed entities to date).

2.2       There should only be three parties to the negotiation and Dispute Resolver process: the US, Canadian and EMEA Estates.  We acknowledge that behind the US and Canadian Estates stand the Monitor, the Bonds and the UCC. However, any representations that these entities wish to make should be coordinated through the relevant Estates (as is the case with the EMEA creditors).  This is consistent with and reflected in Section 12.g. of the IFSA. This point goes to the definitions of "Negotiating" and "Filing Parties" vs. "Selling Parties".

2.3       We need to include as deemed Selling Parties, non-selling entities that are participating via Section 11.d. of the IFSA.

2.4       As noted in my email to certain of you last Friday, the French Court has signed and handed down an order

**42**

authorising NNSA to accede to the IFSA and therefore to participate in the Protocol arrangements. We propose that the draft Protocol should assume the accession of NNSA and we await any comments on the form of the draft accession agreement I circulated last Friday. We note that while the court order authorises the NNSA's participation in the Protocol arrangements, we will need to confirm whether any further French Court approval may be needed in respect of the final agreed form of the Protocol.

2.5      We note the introduction of a mediator (Section 2.2). In principle, the Joint Administrators support the idea of good faith negotiations with or without a mediator during this process so as to facilitate, if possible, a negotiated solution. The Joint Administrators would therefore require that such negotiations be built into the Protocol at the end of each milestone in the DR process.

## 3.      Appointment of Dispute Resolver (DR)

3.1      The Estates are to agree the genre / discipline of the DR in advance of the nomination of individual DR. We would welcome your initial views on the genre / disciple of the DR. Once agreed, the Estates can then submit relevant individuals for consideration.

3.2      There should be only one DR and not a panel of three.

3.3      The DR should have access to such specialist / expert advice as needed to assist in reaching his or her decision.

## 4.      DR process

4.1      As mentioned above, the Monitor, Bonds and UCC should not be Filing Parties with rights to present written materials and oral arguments, but should coordinate their representation through their relevant estates.

4.2      The draft Protocol sets out the matters that the DR cannot be bound by (2.5), we broadly agree with these. However, 2.6 should be deleted.

4.3      The Estates should not be entitled to provide oral submissions from expert witnesses. In terms of their written submissions, these submissions may only refer to one named valuation expert.

4.4      Filing should be on a fixed date, rather than within a period as proposed (4.5).

4.5      Where the Selling Parties have already agreed a partial allocation (2.5), we should clarify that the DR's allocation decision, while considering the sale proceeds as a whole, should be applied proportionately only to the proceeds that remain outstanding. So there are no refunds if there has been an overdistribution in the partial allocation, compared to the DR's allocation decision (7.5).

4.6      Whilst it is acknowledged that the DR should not reach his decision on the basis of any national, federal, state or provincial law (7.4), there may be there the need for legal determination on IP ownership issues, where the DR may not be best placed to reach a conclusion. As such, consideration needs to be given to a process by which such legal determinations can be made within the Protocol process.

4.7      As currently drafted the DR's decision is not open to challenge on any basis by any Estate or Selling Party. We should discuss potential restricted grounds upon which the DR's decision can be challenged. The obvious grounds would be fraud and "manifest error" (as that term is understood in English Law).

4.8      The DR should provide brief reasons for his / her decision.

## 5.      Other points

5.1      Section 9.3 of the draft Protocol provides that the Protocol shall be governed exclusively by the laws of the state of New York. It needs to be made clear that whilst the agreement reached in the Protocol may be governed by New York law the underlying issues that are the subject of the DR process are not governed by New York law.

5.2      There are a number of other points (e.g. usual protections for the Joint Administrators, access to information, more detailed points on timing and process) that we can deal with once we start looking at the actual drafting of the Protocol.


We look forward to discussing.

Gavin / Ryan


**Ryan Ellis**

31/05/2011

Associate (New Zealand), Corporate Division
Herbert Smith LLP
DD: +44 20 7466 7565
Mob: +44 780 920 0571
e-mail: ryan.ellis@herbertsmith.com

**4 3**

---

**From:** Sanjeet Malik [mailto:smalik@cgsh.com]
**Sent:** 14 June 2009 00:04
**To:** fhodara@AkinGump.com; alex.macfarlane@fmc-law.com; APisa@milbank.com; Brent.R.Beekenkamp@ca.ey.com; Gravell, Devreaux; dtay@ogilvyrenault.com; gadavies@nortel.com; DAVIES, GAVIN; jcarfagnini@goodmans.ca; jpasquariello@goodmans.ca; Wright, Kate; ELLIOTT, LAURENCE; Kois, Maria; Matthew.Hart@lazard.com; mlang@ogilvyrenault.com; orzyr@bennettjones.com; rjacobs@AkinGump.com; shayne.kukulowicz@fmc-law.com; GALE, STEPHEN; Tkreller@milbank.com; Murray.A.McDonald@ca.ey.com; Michael.Wunder@FMC-Law.com; Alex.MacFarlane@FMC-Law.com; Shayne.Kukulowicz@FMC-Law.com; JHarris@milbank.com; Orzyr@bennettjones.com; ZychK@bennettjones.com; jstam@ogilvyrenault.com; tracyc@nortel.com; dbotter@AkinGump.com; plook@nortel.com
**Cc:** Craig B BROD; James L BROMLEY; Lisa M SCHWEITZER; Brian T Sandstrom
**Subject:** NT: Allocation Protocol


Dear All:

Attached is the first draft of the Allocation Protocol for your review. Please note that this draft has not been reviewed by our client or any other stakeholders and therefore remains subject to further internal review and comments from other parties.

We would appreciate if you could please provide written comments to the attached draft. In addition, we propose to have a call to discuss this draft next week - we will circulating the details during the course of the week.

Please feel free to call me if you have any questions or concerns.


Regards,
Sanjeet

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2136 | f: +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain
confidential or privileged information. If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

This message is confidential and may be covered by legal professional privilege. If you have received this message in error please delete it and notify the sender immediately by contacting our main switchboard +44 (0)20 7374 8000; you should not retain the message or disclose its contents to anyone. Herbert Smith LLP may monitor e-mail communications in accordance with applicable law and regulations.

Herbert Smith LLP is a Limited Liability Partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation Authority of England and Wales whose rules can be accessed via www.sra.org.uk/code-of-conduct.page. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications. Herbert Smith LLP's registration number for Value Added Tax in the

United Kingdom is GB 927 1996 83.                                                 -      **44**

Herbert Smith LLP, Gleiss Lutz and Stibbe are three independent firms which have a formal alliance. Further information is available from www.herbertsmith.com.

# Exhibit "B"

Ma, Catherine                                                                                                          ` ___ 4 5

| | |
|---|---|
| **From:** | Jacobs, Ryan [rjacobs@AkinGump.com] |
| **Sent:** | October 13, 2009 9:40 AM |
| **To:** | Sanjeet Malik; Kevin.Lloyd@herbertsmith.com; Gavin.Davies@herbertsmith.com; Joanne.Segger@herbertsmith.com; John.Whiteoak@herbertsmith.com; Stephen.Gale@herbertsmith.com; Botter, David; Hodara, Fred; tkrefter@milbank.com; apisa@milbank.com; aleblanc@milbank.com; jcarfagnini@goodmans.ca; bzarnett@goodmans.ca; plook@nortel.com; annav@nortel.com; Brent.R.Beekenkamp@ca.ey.com; Murray.A.McDonald@ca.ey.com; Tay, Derrick C.; Stam, Jennifer; Lang, Michael; jpasquariello@goodmans.ca; Matthew.Hart@lazard.com; Orzy@bennettjones.com; ZychK@bennettjones.com; Alex MacFarlane; Michael Wunder; Shayne Kukulowicz; Drymer, Stephen |
| **Cc:** | James L BROMLEY; Craig B BROD; Jose M Bazan; Howard ZELBO; Inna Rozenberg; Dina Zioczower; Nortel; 'nortel@jefferies.com'; Giles Boothman; Bagon, Paul; Kahn, Brad; Qureshi, Abid; Pees, Robert; Rowe, Kevin |
| **Subject:** | Nortel - Allocation Protocol (UCC Issues List) |

**Attachments:** Nortel UCC Allocation Protocol Issues List.pdf

Attached for discussion on today's call is a preliminary list of issues prepared by the Creditors' Committee with respect to the latest draft of the protocol.

Ryan C. Jacobs
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Direct: 212.872.7434

---

**From:** Sanjeet Malik [mailto:smalik@cgsh.com]
**Sent:** Monday, October 12, 2009 4:39 PM
**To:** Kevin.Lloyd@herbertsmith.com; Gavin.Davies@herbertsmith.com; Joanne.Segger@herbertsmith.com; John.Whiteoak@herbertsmith.com; Stephen.Gale@herbertsmith.com; Botter, David; Hodara, Fred; Jacobs, Ryan; tkrefter@milbank.com; apisa@milbank.com; aleblanc@milbank.com; jcarfagnini@goodmans.ca; bzarnett@goodmans.ca; Brent.R.Beekenkamp@ca.ey.com; Murray.A.McDonald@ca.ey.com; dtay@ogilvyrenault.com; jstam@ogilvyrenault.com; mlang@ogilvyrenault.com; jpasquariello@goodmans.ca; Matthew.Hart@lazard.com; Orzy@bennettjones.com; ZychK@bennettjones.com; Alex MacFarlane; Michael Wunder; Shayne Kukulowicz; SDrymer@ogilvyrenault.com
**Cc:** James L BROMLEY; Craig B BROD; Jose M Bazan; Howard ZELBO; Inna Rozenberg; Dina Zioczower
**Subject:** NT: Allocation Protocol Call (Oct 13; 1PM (EST))

Dear All:

Following are the details for our conference call to discuss the latest draft of the Allocation Protocol:

Time and Date:  1PM (EST), October 13, 2009
Domestic:       1 877 492 4010
International:   1 719 955 0541
Passcode:       212 225 2136

Regards,
Sanjeet

Sanjeet Malik
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
E +1 212 225 2136 | E +1 212 225 3999
www.clearygottlieb.com | smalik@cgsh.com

This message is being sent from a law firm and may contain
confidential or privileged information. If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 issued b

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you hav

This is Exhibit............$1B$............referred to in the

affidavit of.. MICHAEL JOSEPH LANG

sworn before me, this............1ST............

day of............JUNE............20.11.

...............................................................

A COMMISSIONER FOR TAKING AFFIDAVITS

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

—    **46**

**Confidential**
**For Discussion Purposes Only**
**Subject to FRE 408**

## PROCEEDS ALLOCATION PROTOCOL - PRELIMINARY ISSUES LIST
### Prepared by the Official Committee of Unsecured Creditors

1. Negotiating Parties
   - Definition of "Negotiating Parties" should be dynamic (i.e., participation only when interests at stake).

2. Minimum Allocation
   - There should be no requirement to try to reach a minimum allocation.
   - Protocol should instead provide flexibility for Parties to consider whether a minimum allocation is appropriate.

3. Scope of Disputes Addressed/Resolved under Protocol
   - Need to decide the scope and application of this Protocol (i.e., asset sales, IP, etc.)
   - Definition of "Additional Disputes" (section 2.1) is overly broad as it may permit the Panel to decide issues more appropriate for a court (i.e., APA settlement).

4. Supplementary Decisions
   - Protocol should govern only inter-estate disputes, not intra-estate disputes.
   - Panel should only decide intra-estate allocations/disputes if agreed to by all affected Parties and at their own cost.

5. Form of Panel's Decision
   - Decision by Panel should state a simple allocation to the estates without a statement of reasons.

6. Timing Issues
   - Discuss appropriate timeframes for commencing negotiations, referral to Panel, etc.

7. Side Agreements
   - Side Agreements cannot be the "tail wagging the dog" for allocation of proceeds. Need to define scope of Side Agreements.
   - UCC/Bonds must have formal consent rights over Side Agreements.

8. Selection of Panel/Chairperson
   - Chairperson is not necessary. The need for administrative assistance to be tabled pending appointment of the Panel.
   - Discuss necessity of appointing alternates at this time.
   - Panel member conflicts must be disclosed before appointment and on an ongoing basis thereafter. Panel members must meet "disinterestedness" standard under U.S. Bankruptcy Code with U.S.-style disclosure to the Parties.

AKIN GUMP
STRAUSS HAUER & FELD L.L.P.
Attorneys at Law

– **47**

Confidential
For Discussion Purposes Only
Subject to FRE 408

9. Reconsideration of Previous Agreements
   - Interim Funding Agreement and all other funding arrangements can be considered in connection with ultimate allocation methodologies applied and in rendering allocation decisions.

10. Oral Arguments/Evidentiary Hearings
    - There must be live hearings before the Panel.
    - Negotiating Parties must be able to cross-examine witnesses and refute other Parties' arguments before the Panel.

11. "Separate Representations" (section 3.3)
    - Where Parties represent distinct interests, they should not be permitted to retain multiple legal and financial professionals, but shall be permitted to advocate multiple positions.

12. Allocation Methodologies
    - The Protocol should not list or define what allocation methodologies can be advocated by each of the Negotiating Parties. Parties must be free to advocate whatever methodologies they choose.

13. Access to Information
    - In view of the information advantage of the NNL estate, all Parties should have informal and formal access to Company employees from the earliest possible time.
    - Witnesses who give affidavits/statements must be made available for depositions and cross-examination at an Evidentiary Hearing.
    - There should be no time restrictions on when information requests can be made.
    - Any information requests (and information provided) must be made available to all Negotiating Parties.

14. Transparency
    - Written submissions should be available to the public.

15. Escrow
    - Proceeds must be maintained in escrow until completion of applicable set-offs/ resolution of intercompany claims, or until settlement of those issues is reached by the appropriate Parties.

16. IBA Rules of Evidence
    - No need to lock Panel into applying specific rules of evidence.

# Exhibit "C"

This is Exhibit...........*C*..............referred to in the
affidavit of..MICHAEL...JOSEPH...LANG...
sworn before me, this...............1st.................
day of................JUNE........................20....11....

............................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

**Nortel**

**HERBERT SMITH Comments on the Draft Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds**

**9 October 2009**

48

1. Generally, presumably we have the same Panel for all disputes/transactions.

2. Footnote 2 (page 2). This remains to be discussed.

3. Recital (page 3). "Whereas, the Parties wish to provide for a mechanism ..." The definition of "Selling Parties" needs to be broad enough to cover parties who assert that they are beneficial owners of assets being sold or who have an economic interest therein even if those parties are not participating as a named seller in the sale. An obvious example is NNUK in the CDMA transaction.

4. Section 1.1 (page 4). "At any time prior to the First DR Referral Date (as defined below), the Parties may elect to use the services of a mediator .... and each Negotiating Party hereby agrees to fully cooperate, acting in good faith, with such mediator."

   Is it proposed that all parties need to consent to such election or can a Mediator be appointed on the election of any one Party? The latter may be the most sensible. We should discuss this.

5. Footnote 3 (page 4). The idea of the definition of Negotiating Parties in say the CDMA Sale excluding NNUK would not be acceptable.

6. Section 1.4 (page 5). This clause seems to suggest that the Escrow Account is subject to a Side Agreement but the Side Agreement is only to be reached between the "Principal Selling Parties". It is not clear how the phrase "Principal Selling Parties" is to be construed. But if it has the consequence of excluding for instance NNUK, I would have difficulties with it. We may be able to agree this if our consent is also required.

7. Footnote 4 (page 5). This was discussed in New York. As indicated, our clients would wish the Equinox dispute to be the first Basic Allocation Dispute to be handled by the Panel and would enter into the agreed Protocol on this express understanding.

8. <u>Section 2.1</u> (page 5).  The procedure set out for dealing with an "Additional Dispute" is extremely short and I question whether the 10 day period is sufficient.

9. <u>Section 2.2</u> (page 6).  We are not convinced that there is a need for a "Chairperson" of the Panel.  This was discussed on the telephone call earlier this week.

10. <u>Section 2.3</u> (page 6).  This clause should also include provision to the effect that no party may independently contact the Panel.

11. <u>Section 2.4</u> (page 6).  We consider that one Alternate only per category is required.  There is a cost to retaining a second alternate.  We doubt that this is justified and the overwhelming possibility is that that expense will be wasted.

    Consideration should be given to the parties jointly taking out insurance on the Panel.  Whether this is warranted will probably depend upon the length of the Hearing.

12. <u>Section 2.6</u> (page 6).  This provision should be extended so that it is explicit that none of the parties is able to refer or rely on the Buyer's allocation as evidence.  We should also consider whether we want to prevent any of the parties relying on statements made by any court on allocation.

    We agree that the Panel should not be "bound to adopt or follow" any previous Decision or Allocation of the Panel relating to another Sale but it should be clear that they can nevertheless be aware of it and have regard to it.  Indeed if the members of the Panel are the same this will no doubt be the case in any event.

13. <u>Section 2.8</u> (page 7).  We would not agree to the inclusion of the indemnity which is contained in square brackets.  If the Panel and/or any experts should subsequently raise this then that matter can be considered at that time.

14. <u>Section 2.9</u> (page 8).  This refers to all "Proceedings" being heard in New York.  This needs to be read with Section 3.1 which provides for Administrative Hearings being held at various venues.  Section 2.9 should probably be subject to Section 3.1.

15. <u>Section 3.2</u> (page 7).  The first line should be amended to read "except as specifically provided in this Protocol, the Panel <u>shall</u>, after taking into account ...."

16. <u>Section 4.2</u> (page 8).  As discussed we suggest that the various valuation methodologies referred to should be omitted.

Further, we suggest that the sentence "The Presented Positions may also address any allocation advanced by a Buyer in the Acquisition Agreement" be deleted.

17. Generally, we have no difficulty with the incorporation of the IBA Rules of Evidence but equally this is a matter which presumably can be discussed and thereafter agreed with the Panel.

18. Section 4.6 (page 9). This should be amended to ensure there is capability for the different interests in a given estate (eg say three in EMEA) to be represented at the second stage.

19. Article V (page 9). As a general comment we would wish to ensure that greater flexibility is built in so that there is the necessary access by all parties to information and also to witnesses. Further, in the event that there is a delay in providing such information/access there should be a right for the disadvantaged party to extend the date that their submission is due.

We consider that the relevant documents of all Parties should be available and that there should be access to witnesses of all parties. The current wording uses the definition of "Data Room" and limits the information to be contained in the Data Room to that information which is provided to potential Buyers (see Recital re the "Data Room" on page 2).

It may be that at an early stage the Parties should agree the nature of the issues in dispute because this will determine or govern the issue of relevance for the purpose of disclosure. I know that this is a slightly contentious issue but it is something we need to consider further.

20. Section 5.2 (page 10). Reference to "the Company" should instead be reference to each of the relevant Estates.

We suggest that the words "always readily obtainable" be deleted. If the information is not obtainable then the Company (or relevant Estate) will not be able to make it available by use of commercially reasonable efforts.

21. Footnote 12 (page 10). Prima facie we have no difficulty with incorporating or copying provisions from Articles 8 and 9 of IBA Rules of Evidence. Consideration needs to be given as to who is the Claimant for the purposes of the Hearing. But as a general proposition we think it is probably preferable for the Panel to set the rules.

22. Footnote 13 (page 11).  If Prior Evidence cannot be further tested in circumstances where it may be necessary to do so, presumably there will be an issue of weight to be given to earlier evidence.  This will depend upon the reason why the Witness in question is not available.  Generally, we are content with the proposed wording of section 6.2.

23. Section 7.3 (page 11).  This was discussed on the telephone call.  We consider that the clause should be drafted so that a Decision should be capable of being signed on behalf of the Panel.  We agree that no dissenting decision should be issued.

24. Section 7.9 (page 12).  Our initial reaction to this paragraph was that we were unclear as to why the parties would not want there to be an arbitral award.  We can see that an arbitral award would provide advantages with regard to enforceability.  We understand that there are reasons for the paragraph and would wish to hear these.

25. Section 9.3 (page 14).  Would you please add my name (Kevin Lloyd) to the notice provision under Herbert Smith LLP.

26. Section 9.6 (page 15).  The words "if so sought" should be deleted from the phrase "the UK Court giving a direction (the UK Court's Directions )" that if so sought the Joint Administrators ...

27. Section 9.10 (page 16).  We do not see the need for the inclusion of this clause.

28. Section 9.12 (page 16).  Insert in the last line "and the UK Court".

29. Section 9.14 (page 16).  In the last line insert "and the UK Court".

**Kevin F. Lloyd**

**Herbert Smith**

**15 October 2009**

# Exhibit "D"

THIS DRAFT AGREEMENT HAS BEEN PRODUCED
FOR DISCUSSION AND SETTLEMENT PURPOSES
ONLY AND IS SUBJECT TO THE PROVISIONS OF
RULE 408 OF THE RULES OF EVIDENCE FOR
UNITED STATES COURTS AND MAGISTRATES AND
ANY OTHER SIMILAR APPLICABLE RULES IN ALL
PERTINENT JURISDICTIONS.

*Draft of November 8, 2009*
*Privileged and Confidential*     **52**
*Ogilvy Renault's comments 01-02-10*

## PROTOCOL FOR RESOLVING DISPUTES
## CONCERNING ALLOCATION OF SALE PROCEEDS

This Protocol for Resolving Disputes Concerning Allocation of Sale Proceeds,
dated as of • (the "Protocol"), is entered into by and among Nortel Networks Limited ("NNL")
and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc.  ("NNI") and
the other entities set forth in Schedule 2 attached hereto, [the Joint Administrators (as defined
below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors")][1], certain
affiliates of the Debtors (as defined below) set forth in Schedule 4 attached hereto (the "Non-
Filed Affiliates"), the Monitor (as defined below), the Official Committee of Unsecured
Creditors appointed in the US Proceedings (as defined below) (the "Creditors' Committee") [and
the steering committee members of the ad hoc group of bondholders that have executed
confidentiality or non-disclosure agreements with the Canadian Debtors and the US Debtors
(each, as defined below) (the "Bondholders' Committee," and along with the Creditors'
Committee, the "Committees")][2] (each, a "Party," and collectively, the "Parties").  [The Joint
Administrators, in their personal capacity, shall be Party to this Protocol as provided in Section
9.7 and solely for the purposes of obtaining the benefit of the provisions of this Protocol
expressed to be conferred on or given to the Joint Administrators (as defined below) and
references to the Parties shall be construed accordingly.][3]

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks
Corporation ("NNC", and together with its affiliates, the "Company" or the "Nortel Group"),
NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the
"Canadian Debtors"), commenced creditor protection proceedings before the Ontario Superior
Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors
Arrangement Act (Canada) (respectively, the "Canadian Proceedings" and the "CCAA"), in
connection with which Ernst & Young Inc.  was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date and on July 14, 2009 (with respect to Nortel
Networks (CALA) Inc.), NNI and certain of NNI's United States affiliates included in Schedule
2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA
Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of
Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively,
the "US Proceedings" and the "Bankruptcy Code"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel
Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A.  ("NNSA") and certain of NNUK's

---

[1] Whether unfiled subsidiaries of EMEA filed entities will be parties to the Protocol as EMEA Debtors or Non-Filed
Affiliates.

[2] TBD: Whether the Bondholders' Committee will be a party to the Protocol or third party beneficiaries.  Also
discuss whether the Bondholders' Committee has the ability to execute submissions to the Panel.

[3] To be reviewed by English counsel in light of JAs' increased obligations in this draft.

This is Exhibit...........D.............referred to in the
affidavit of.........INSERT.. LANG.
.................................................ST
sworn before me, this...................................
day of..........JUNE.......................20...11..

...............................................
A COMMISSIONER FOR TAKING AFFIDAVITS

affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), and the UK Court appointed individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, and including their respective successors, replacements and any subsequent office holders appointed to the relevant EMEA Debtors, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, the Debtors and their respective affiliates ~~intend, or have agreed, to sell~~have sold or are in the process of selling certain assets of their estates in several transactions, each relating to a particular line of business or portfolio of technologies (each, a "Business"), to ~~a~~ third party buyers (each such buyer, a "Buyer"); and

WHEREAS, the Company has provided, or intends to provide, potential Buyers with access to a data room (which may be an electronic data room) containing the books and records of the relevant Business and other financial information relating to such Business (each such electronic data room, an "Asset Sale EDR"); and

WHEREAS, with respect to each Business, the Debtors and their respective affiliates intend to enter, or have entered, into one or more acquisition agreements and other ancillary agreements (such agreements, with respect to the sale of each Business, collectively the "Acquisition Agreement") with the Buyer to govern the sale of such Business (the "Sale"); and

WHEREAS, after entering into an Acquisition Agreement in the case where a so called "stalking horse" bidder has been selected, or prior to entering into an Acquisition Agreement in the case where no "stalking horse" bidder has been selected, certain of the Debtors intend to apply, or have applied, to certain of the Courts for orders authorizing such Debtors to establish notice, bidding and sale procedures for the Sale of each Business (the "Bidding Procedures Orders"); and

WHEREAS, after entry of the Bidding Procedures Orders, such Debtors intend to conduct, or have conducted, an auction for the Sale of each Business in accordance with the Bidding Procedures Orders; and

2

WHEREAS, after conclusion of the auction, certain of the Debtors intend to apply, or have applied, to certain of the Courts for orders approving the Sale of each Business to the relevant Buyer (the "Sale Orders"); and

[WHEREAS, in connection with certain Sales, the relevant Debtors intend to request, or have requested, that the Sale Orders contain procedures for the establishment of one or more escrow accounts (the "Escrow Account") overseen by an independent agent (the "Escrow Agent") for deposit of the proceeds of the Sale (the "Sale Proceeds") pending the allocation thereof in accordance with the provisions of this Protocol (each such Sale, an "In-Scope Sale")];[4] and

WHEREAS, after entry of the Sale Orders and satisfaction or waiver of the conditions to closing set forth in the relevant Acquisition Agreement, the Debtors and their respective affiliates intend to consummate, or have consummated, the Sale of each Business in accordance with the Sale Orders (in each case, a "Closing"); and

WHEREAS, the Debtors and certain Non-Filed Affiliates previously agreed, pursuant to the Interim Funding and Settlement Agreement, dated as of June 9, 2009 (as amended from time to time, the "Interim Funding Agreement"), as soon as reasonably practicable following the execution of such agreement, to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sales Proceeds, which would provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors (as defined therein) have been unable to reach agreement regarding such allocation; and

WHEREAS, the Parties wish to provide for a mechanism to negotiate the allocation of Sale Proceeds of each In-Scope Sale between and among the Canadian Debtors that are Selling Parties with respect to such In-Scope Sale, if any, (the "Canadian Filed Sellers"), the EMEA Debtors that are Selling Parties with respect to such In-Scope Sale, if any, (the "EMEA Filed Sellers"), the US Debtors that are Selling Parties with respect to such In-Scope Sale, if any, (the "US Filed Sellers") and to the Non-Filed Affiliates that are Selling Parties with respect to such In-Scope Sale, if any, (the "Non-Filed Selling PartiesSellers") and to resolve disputes with respect to the allocation of the Sale Proceeds of each In-Scope Sale, where ["Selling Parties," with respect to the US Debtors, the Canadian Debtors and the EMEA Debtors, means the Selling Debtors in connection with such In-Scope Sale (as such term is defined under the Interim Funding Agreement) in connection with such In-Scope Sale and, with respect to the Non-Filed Affiliates, refers to those Nortel Group entities that are participating as sellers in the In-Scope Sale or otherwise releasing their intellectual property rights in connection with such In-Scope Sale]; and

WHEREAS, each Party (including the Monitor, the Creditors' Committee and [the Bondholders' Committee]) wishes to participate in the procedures set forth in this Protocol, and has agreed to be bound by this Protocol and any outcome with respect to the Allocation of

---

[4] TBD: Definition of In-Scope Sale.

[New York #2068820 v5]

DOCSTOR: 1856744\2

Sales Proceeds of each In-Scope Sale pursuant to a Decision or a Supplementary Decision of the Panel (each, as defined below); and

[WHEREAS, the Non-Filed Affiliates have appointed ● as their representative, which shall represent the Non-Filed ~~Affiliates~~Sellers in connection with the negotiations and other procedures with respect to the Allocation of Sale Proceeds of each In-Scope Sale under this Protocol ("Affiliates'' Representative"), and the Non-Filed Affiliates have also appointed an independent financial advisor and an independent counsel to assist the Affiliates' Representative.][5]

NOW THEREFORE, IT IS HEREBY CONSENTED TO, STIPULATED, AGREED AND ORDERED THAT:

## ARTICLE I
## INITIAL NEGOTIATIONS

*Section 1.1*   During the period beginning as early as the execution of each Acquisition Agreement (such date, the "Relevant Signing Date") but commencing no later than the consummation of the In-Scope Sale that is the subject of such Acquisition Agreement (such date, the "Relevant Closing Date"), the Negotiating Parties (as defined below) shall use commercially reasonable efforts to negotiate in good faith a fair and ~~equitable~~reasonable allocation of the Sale Proceeds of such In-Scope Sale among the Canadian Filed Sellers, the US Filed Sellers, the EMEA Filed Sellers and the Non-Filed ~~Selling Parties~~Sellers, where the "Negotiating Parties" means [NNL (on behalf of Canadian Filed Sellers), NNI (on behalf of US Filed Sellers), the [Joint Administrators][6] (on behalf of EMEA Filed Sellers), the Affiliates' Representative (on behalf of Non- Filed ~~Selling Parties~~Sellers), the Monitor, the Creditors' Committee and the Bondholders' Committee.][7]  The Non-Filed ~~Selling Parties~~Sellers shall be represented in such negotiations and all other procedures under this Protocol by the Affiliates' Representative.

*Section 1.2*   If the Negotiating Parties fail to reach an agreement regarding the allocation of the Sale Proceeds of an In-Scope Sale prior to the [one-hundredth (100th)][8] calendar day immediately following the later of (x) the Relevant Closing Date or (y) the date when all Conditions (as defined below) have been satisfied (the "First DR Referral Date"), the dispute as to the allocation of the relevant Sale Proceeds among the Canadian Filed Sellers, the US Filed Sellers, the EMEA Filed Sellers and the Non-Filed ~~Selling Parties~~Sellers shall be automatically referred to the Panel (as defined below) pursuant to this Protocol and the Panel shall determine a fair and ~~equitable~~reasonable allocation of the Sale Proceeds of such In-Scope Sale among the

---

[5] Consensual settlement with Non-Filed Affiliates to be discussed.

[6] TBD: Please confirm that the proposal to replace NNUK with Joint Administrators does not contemplate the Joint Administrators acting separately.  In other words, please confirm that the UK Administrator and the NN Ireland Administrator will not have a right to act separately.

[7] Consider whether the definition of Negotiating Parties should be dynamic and change with each sale.  For instance, for the purposes of CDMA sale, should the definition of Negotiating Parties exclude the Joint Administrators?

[8] Consider extending this period for sales that have already closed (CDMA and ES).

4

Canadian Filed Sellers, the US Filed Sellers, the EMEA Filed Sellers and the Non-Filed ~~Selling Parties~~Sellers on the basis of such Selling Parties' relative contribution, if any, of the assets (tangible and intangible) and rights transferred or relinquished and liabilities assumed in the particular In-Scope Sale (a "Basic Allocation Dispute").[82] [Each Basic Allocation Dispute shall be determined without regard to, or adjustment for, any other rights, entitlements, set offs, or adjustments of any nature asserted by or on behalf of any Selling Party against another Selling Party, including, without limiting the generality of the foregoing, claims of beneficial ownership or equitable interests in and to the assets included in the Business that is the subject of an In-Scope Sale (collectively, "Inter-Party Claims").][910] The Parties hereby agree that the deadlines imposed by this Section 1.2 may be modified by mutual written agreement among the Negotiating Parties.

*Section 1.3*      Upon the automatic referral of the Basic Allocation Dispute to the Panel as contemplated by Section 1.2, NNI shall be responsible for promptly sending a notice to the Panel and the other Negotiating Parties, indicating in such notice (a) that pursuant to the terms of Section 1.2 of this Protocol, the Basic Allocation Dispute has been automatically referred to the Panel, and (b) the First DR Referral Date. If for any reason NNI shall fail to send such notification to the Panel within [two] days (excluding Saturdays, Sundays and national public holidays in any of the United States, Canada or the United Kingdom) (each a "Business Day") of the automatic referral of the Basic Allocation Dispute to the Panel, any other Negotiating Party may undertake to send such notice to the Panel and the other Negotiating Parties.

*Section 1.4*      [The Negotiating Parties, in their sole discretion, may agree to a partial allocation of the Sale Proceeds of an In-Scope Sale (each such partial allocation, a "Partial Allocation Amount").][101] If the Negotiating Parties agree to a Partial Allocation Amount, such Partial Allocation Amount shall be released from the Escrow Account and distributed to one or more Selling Parties immediately following the later of (x) the Closing of the In-Scope Sale and (y) the date when the Negotiating Parties agree to such Partial Allocation Amount; and any remaining amounts shall remain in the Escrow Account until released from the Escrow Account in accordance with the provisions of this Protocol.

## ARTICLE II
## REFERRAL OF ALLOCATION DISPUTES TO THE PANEL

*Section 2.1*      As contemplated by Section 1.2 of this Protocol, a Basic Allocation Dispute shall be automatically referred to a dispute resolution panel constituted in accordance with Sections 2.2, 2.3 and 2.4 (the "Panel"). [In addition, the Parties hereby agree that the Panel may decide any other dispute, controversy or claims of a Selling Party that the Panel considers must be addressed in order to finally determine the Allocation of the Sale Proceeds of a given In-

---

[82] Prior to signing of this Protocol (by which time the timing of the CDMA and Equinox closing should be known to the Parties), this Protocol will be revised to add language to accommodate EMEA's request that the Equinox dispute be the first Basic Allocation Dispute to be handled by the Panel so long as it does not unreasonably delay the allocation for CDMA, which is expected to close earlier than Equinox.

[910] TBD

[101] Compare this language with Section 12.d. of the IFSA.

Scope Sale in accordance with this Protocol (each such dispute, controversy or claim, an "Other Dispute" and together with a Basic Allocation Dispute, a "Dispute"), provided that the resolution of any Other Dispute shall be binding on the Parties solely for the purposes of the determination of the relevant Allocation.][142]

   *Section 2.2*      The members of the Panel shall be as follows:  ● (the "Category A Member"),  ● (the "Category B Member") and ● (the "Category C Member").  For the purposes of administrative convenience, the Panel may designate one of its members as the chairperson or administrative secretary of the Panel with regards to a given Dispute ("Relevant Chairperson").  The Relevant Chairperson shall have no special powers or authority to act unless otherwise agreed by ~~other~~all members of the Panel.

   *Section 2.3*      [Each member of the Panel shall be and remain at all times impartial and independent of the Parties and Selling Parties.][123]  No member of the Panel shall act as an advocate of any Party.  No member, whether before or after appointment to the Panel, shall advise any Party or Selling Party on the merits or outcome of a Dispute.  Each Party hereby agrees, and each Selling Party by its participation in a Dispute shall be deemed to agree, that such Party or Selling Party, as the case may be, shall communicate with the Panel only as expressly permitted by this Protocol, provided that any written communication must be served on the Panel and the Negotiating Parties simultaneously.

   *Section 2.4*      If any member of the Panel is unable or unwilling to serve after receiving notice of the referral of any matter to the Panel or at any time thereafter, such member shall be replaced by another individual from the names set forth on Exhibit A attached hereto at the sole discretion of the Panel, provided that such replacement must belong to the same category as the member that is being replaced.

   *Section 2.5*      ~~In connection with a *particular In-Scope Sale*, all costs and expenses of the Mediator (if any) shall be paid from the relevant Escrow Account before transfer of Sale Proceeds in accordance with the terms of this Protocol and the relevant escrow agreement.~~ Each of the Negotiating Parties (other than the Affiliates' Representative) shall bear its respective costs and expenses, including attorneys' fees, associated with the preparation and presentation of its case to the Panel and any other costs and expenses incurred by such Negotiating Party in connection with the proceedings pursuant to this Protocol.  The Panel shall specify in each Decision the total amount of the costs and other expenses of the Panel in connection with such Decision (the "Panel Costs"), and the proportions in which the US Filed Sellers, the Canadian Filed Sellers, the EMEA Filed Sellers and the Non-Filed ~~Selling Parties~~Sellers shall bear such Panel Costs.  The costs and expenses of the Affiliates' Representative and the pro rata portion of the Panel Costs to be paid by Non-Filed ~~Selling Parties~~Sellers shall be paid from the Sale Proceeds of the *particular In-Scope Sale* allocated to the Non-Filed ~~Selling Parties~~Sellers.  The incremental costs and other expenses of the Panel in connection with a Supplementary Decision

---

[142] Concept of Other Dispute to be reviewed after resolution of the issue relating to assertion of beneficial claims to IP being transferred by Canadian Debtors.

[123] Parties to discuss whether each Panel member must make disclosures as required to satisfy the "disinterestedness" standard under the Bankruptcy Code.  Will there be a requirement to update such disclosures on a periodic basis?

6

(as defined below) shall be paid from the Sale Proceeds of the particular In-Scope Sale allocated to the Selling Parties covered by such Supplementary Decision.

Section 2.6    In rendering any Decision and the Allocation in such Decision, the Panel shall (i) treat as final and binding any Partial Allocation Amount, and (ii) not be bound to adopt or follow [(x) any allocation agreed with the Buyer in or pursuant to the relevant Acquisition Agreement,][134] or (y) any previous Decision or Allocation of the Panel relating to another In-Scope Sale. In addition, after the Panel has entered a Decision or a Supplementary Decision, the Panel shall be barred from modifying such Decision or Supplementary Decision, as the case may be, other than to correct a clerical, computational or typographical error contained in the Decision or Supplementary Decision. If the Panel makes such a correction on its own initiative, it shall do so within 30 days of the date of the Decision or Supplementary Decision, as the case may be. Any application by a Party for such a correction must be made within 30 days of the date of the Decision or Supplementary Decision, as the case may be.

Section 2.7    To the maximum extent permitted by applicable law, none of the members of the Panel or any expert appointed by the Panel shall be liable to any Party, Selling Party or any third party howsoever for any act or omission in connection with any proceedings under this Protocol.

Section 2.8    The place of arbitration shall be New York, New York. Other than as expressly specified otherwise in this Protocol or as agreed by the Parties, all proceedings pursuant to this Protocol, including, but not limited to, Administrative Meetings, an Evidentiary Hearings and the Oral ArgumentArguments (as defined herein), shall be held in New York, New York and shall be conducted in the English language.

### ARTICLE III
### ADMINISTRATIVE MEETINGS

Section 3.1    Within ● (●) calendar days of a Basic Allocation Dispute being referred to the Panel, the Negotiating Parties and the Panel shall hold a meeting to discuss any administrative, procedural or other relevant matters (the "Administrative Meeting"), which shall be convened by the Panel. Each of the Negotiating Parties must be given (i) at least seven (7) calendar days' notice prior to the Administrative Meeting and (ii) the opportunity to present atattend and participate in the Administrative Meeting. The Administrative Meeting shall be held at a time and in a location, as determined by the Panel, such that each Negotiating Party and/or its counsel shall be able to participate by telephone, videoconference or in person. At the Administrative Meeting and at any other proceeding before the Panel, each of the Negotiating Parties shall be entitled to be represented by counsel.

Section 3.2    Except as specifically provided in this Protocol, the Panel shall, after taking into account the facts and circumstances of the relevant In-Scope Sale, the multiple jurisdictions involved in such In-Scope Sale or the applicable Dispute, the different types of Nortel Group entities under the Nortel Group's transfer pricing regime which(as it was in effect

---

[134] Tax counsel to provide rider to carve-out an exception to this rule b/c Nortel has agreed to allocate at least the book value to each tangible asset and the Panel has to respect this allocation principle.

[New York #2068820 v5]

DOCSTOR: 1856744\2

-    **59**

prior to the Filing Date) that are Selling Parties in such In-Scope Sale and such other factors as the Panel considers relevant, establish the procedure and manner in which the resolution of the Basic Allocation Dispute or Other Dispute, as the case may be, shall be conducted, including, without limitation, (i) the due dates for Written Submissions, (ii) the timing of the identification of Experts (as defined below), the submission of Expert Reports (as defined below), the identification of witnesses and the submission of Witness Statements (as defined below), (iii) the time, place, length and number of oral arguments for each Negotiating Party (the number of oral arguments for a given Negotiating Party multiplied by the length of each such oral argument, the "Oral Argument Duration") and (iv) other administrative, procedural, or other relevant matters such as the scheduling of the Evidentiary Hearings (as defined below) and subsequent Administrative Meetings (if necessary), [provided that the right of the Non-Filed ~~Selling Parties~~Sellers to participate and present their Interests (as defined below and as determined by the Panel) to the Panel shall reflect, to the extent reasonably practicable and determinable under the circumstances, the Panel's assessment of the relative contribution of the assets (tangible and intangible) and the rights transferred or relinquished by and liabilities assumed from the Non-Filed ~~Selling Parties~~Sellers in comparison to other Selling Parties with regards to a given Sale.][145]

    *Section 3.3*     If any Negotiating Party determines that there is an actual or potential conflict with respect to the Dispute among any of the Respective Selling Parties (as such term is defined in Exhibit B attached hereto) of such Negotiating Party or that such Negotiating Party represents a diversity of interests with regard to such Negotiating Party's Respective Selling Parties (each such interest, an "Interest"), such Negotiating Party may petition in writing the Panel to further modify the procedures, including, without limitation, by increasing the Oral Argument Duration allocated to such Negotiating Party, or providing separate representation, to address such potential conflict of interest or diversity of interests, provided that ~~any other Negotiating Party shall be free to make submissions as to the extent and scope of any additional representation rights; and provided, further that~~ in the case of the Joint Administrators or the Monitor, their respective petitions to the Panel to represent up to three separate Interests shall not be opposed by any other Negotiating Party, and provided, further that any other Negotiating Party shall be free to make submissions as to the extent and scope of any additional representation rights.

    *Section 3.4*     Nothing in the preceding section shall affect the right of the Panel to call other administrative meetings to discuss administrative, procedural or other relevant matters after the initial Administrative Meeting. Each such meeting shall constitute a separate Administrative Meeting for the purposes of this Protocol and must comply with the requirements set forth in Section 3.1 of this Protocol.

**ARTICLE IV**
**WRITTEN SUBMISSION BY THE NEGOTIATING PARTIES**

    *Section 4.1*     Each of the following [P]arties may submit a written statement to the Panel, including, without limitation, Party-Appointed Expert Reports (as defined below) and written Witness Statements (as defined below), of such [P]arty's one or more Interests (as

---

[145] Due Process concerns to be discussed.

[New York #2068820 v5]

DOCSTOR: 1856744\2

permitted by the Panel pursuant to Section 3.3) with regards to the Allocation of the relevant Sale Proceeds to the Panel (such submission, the "First Round Submission"): NNL (on behalf of Canadian Filed Sellers), NNI (on behalf of US Filed Sellers), the Joint Administrators (on behalf of EMEA Filed Sellers), the Affiliates' Representative (on behalf of Non-Filed ~~Selling Parties~~Sellers), the Monitor, the Creditors' Committee and the Bondholders' Committee. **[NTD: the description of who may submit a written statement should correspond with the balance of section 4]**

Section 4.2    Each of the [Negotiating Parties][156] in its First Round Submission shall present its methodology for the allocation of the relevant Sale Proceeds (the "Presented Position"). In the case of a Negotiating Party that represents more than one Interest (as determined by the Panel), such Negotiating Party may offer more than one Presented Position to the Panel. The Presented Positions may also address any allocation or allocation methodology adopted or employed by any Buyer.

Section 4.3    A Negotiating Party may rely, in its sole discretion, on one or more experts as a means of evidence on specific issues (each such expert, a "Party-Appointed Expert"). A report by any Party-Appointed Expert (each such report, a "Party-Appointed Expert Report") shall include: (i) a description of the qualifications of such expert, (ii) a description of the scope of work or mandate of such expert together with a copy of the engagement letter of such expert, (iii) a description of the compensation paid or to be paid to such expert, (iv) a description of any relationship on the part of such expert within the two years immediately preceding the date that such expert was first contacted with respect to the engagement that could reasonably be considered relevant to an assessment of the expert's independence or objectivity, (v) a description of the scope of review conducted by such expert (including a list of the materials and other information reviewed and relied upon by such expert, the identity of all current or former employees, officers or directors of Nortel Group entities who such expert interviewed in connection with the preparation of such report, and any limitation on the scope of such review and the implications of such limitation on the expert's opinions or conclusions), (vi) a statement of the facts on which such expert is basing its opinions and conclusions, (vii) the allocation approach and methodologies selected by such expert and the reasons for selecting the particular allocation approach and methodology or methodologies, (viii) the key assumptions made by such expert, (ix) such expert's findings, opinions and conclusions, and (x) any qualifications or limitations to which such expert's findings, opinions or conclusions are subject.

Section 4.4    A Negotiating Party may rely on a written statement by any person, including, without limitation, any Party's officer, employee or other representative (the Parties hereby acknowledge that certain individuals occupy multiple positions in the Company). Such witness statement must contain a full and detailed description of the facts, and the source of the witness's information as to those facts, sufficient to serve as that witness's evidence in the matter in dispute (each such statement, a "Witness Statement").

Section 4.5    Each of the Negotiating Parties shall provide a First Round Submission to the Panel, with a copy to all other Negotiating Parties, no later than the deadline established by

---

[156] If the definition of Negotiating Party is dynamic, then consider adding a different term to ensure that each Selling Party has the right to at least make an initial written submission.

[New York #2068820 v5]

DOCSTOR: 1856744\2