17

## STATUS OF APPLICANTS' CLAIMS PROCESS AND CROSS BORDER CLAIMS

39. On July 30, 2009, this Honourable Court issued an Order (as amended and restated, the "Claims Procedure Order") setting out the procedures for the filing of certain claims against the Applicants.

40. Pursuant to the provisions of the Claims Procedure Order, a claims bar date of September 30, 2009 was established (the "Claims Bar Date") whereby all claims were to be filed with the Monitor with the exception of the Excluded Claims, as defined in the Claims Procedure Order, including:

    a) Inter-company Claims;

    b) Compensation Claims of the current and former employees and directors of the Applicants;

    c) claims secured by any of the Charges in the Initial Order;

    d) claims for grievances under any collective agreements to which any of the Applicants are a party; and

    e) claims of any director or officer of the Applicants for indemnification and/or contribution, arising from such director's and officer's service to any Applicant.

41. By order dated August 4, 2009, the U.S. Court also established September 30, 2009 as its bar date for filing of claims in the Chapter 11 Proceedings with the exception of claims against NN CALA, for which the bar date was January 25, 2010.

42. On September 16, 2010, this Honourable Court issued an Order approving the methodology applicable for the review and determination of claims filed against the Applicants (the "Claims Resolution Order"). In a joint hearing on the same date, a Cross-Border Claims Protocol was approved which addresses matters relating to the resolution of overlapping claims and same-creditor claims, including, the level of

cooperation and consultation between the Applicants and U.S. Debtors with respect the resolution of such claims.

43. In its Fifty-Fifth Report, the Monitor provided an update as to the status of claims filed against the Applicants as of October 19, 2010.

44. The table below (the "Claims Report") provides an update as to the status of claims filed against the Applicants as of February 2, 2011. All claim amounts are in Canadian dollars using January 14, 2009 exchange rates.

**Nortel Networks - CCAA Applicants Overall Claims Status**

February 2, 2011
All amounts in CAD $ millions

| CCAA Applicant | Claim Category | Filed Proof of Claim | | Current claim value - most recent stage [1] [2] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Under Review | | Accepted or Reviewed and unadjusted | | Value per Notice of Disallowance | | Value per Notice of Dispute | | Valued by Claims Officer | | Valued by Court | |
| | | # | $ | # | $ | # | $ | # | $ | # | $ | # | $ | # | $ |
| Nortel Networks Corporation | | | | | | | | | | | | | | | |
| | Trade | 64 | 1,655.1 | 30 | 149.2 | 28 | 0.1 | - | - | 6 | 20.8 | - | - | - | - |
| | Bonds | 2 | 4,808.7 | 2 | 4,808.7 | - | - | - | - | - | - | - | - | - | - |
| | Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 7 | 2,514.0 | 7 | 2,514.0 | - | - | - | - | - | - | - | - | - | - |
| | Other | 161 | 727.6 | 71 | 723.5 | 67 | 0.6 | - | - | 23 | 2.4 | - | - | - | - |
| | Total | 234 | 9,705.5 | 110 | 8,195.5 | 95 | 0.6 | - | - | 29 | 23.2 | - | - | - | - |
| Nortel Networks Global Corporation | | | | | | | | | | | | | | | |
| | Trade | 12 | 1,479.6 | 4 | 1.3 | 5 | 0.1 | - | - | 3 | 1.2 | - | - | - | - |
| | Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| | Other | 35 | 213.6 | 35 | 213.6 | - | - | - | - | - | - | - | - | - | - |
| | Total | 53 | 4,203.5 | 45 | 2,725.2 | 5 | 0.1 | - | - | 3 | 1.2 | - | - | - | - |
| Nortel Networks International Corporation | | | | | | | | | | | | | | | |
| | Trade | 7 | 1,483.2 | 4 | 0.1 | 1 | - | - | - | - | - | - | - | - | - |
| | Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| | Other | 35 | 213.6 | 35 | 213.6 | - | - | - | - | - | - | - | - | - | - |
| | Total | 48 | 4,207.2 | 45 | 2,724.0 | 1 | - | - | - | - | - | - | - | - | - |
| Nortel Networks Limited | | | | | | | | | | | | | | | |
| | Trade | 295 | 1,314.7 | 67 | 391.5 | 193 | 25.9 | 4 | 0.3 | 31 | 66.2 | - | - | - | - |
| | Bonds | 4 | 5,243.1 | 4 | 5,243.1 | - | - | - | - | - | - | - | - | - | - |
| | Inter-company (NNI claim) | 1 | 2,517.0 | - | - | 1 | 2,517.0 | - | - | - | - | - | - | - | - |
| | Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 7 | 2,510.7 | 7 | 2,510.7 | - | - | - | - | - | - | - | - | - | - |
| | Other | 189 | 1,541.1 | 148 | 1,533.7 | 23 | 0.1 | - | - | 18 | 7.2 | - | - | - | - |
| | Total | 496 | 13,126.6 | 226 | 9,679.1 | 217 | 2,543.0 | 4 | 0.3 | 49 | 73.4 | - | - | - | - |
| Nortel Networks Technology Corporation | | | | | | | | | | | | | | | |
| | Trade | 337 | 1,535.0 | 16 | 2.7 | 110 | 18.5 | - | - | 11 | 22.8 | - | - | - | - |
| | Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| | Other | 36 | 213.7 | 35 | 213.7 | - | - | - | - | - | - | - | - | - | - |
| | Total | 379 | 4,258.9 | 57 | 2,726.6 | 110 | 18.5 | - | - | 11 | 22.8 | - | - | - | - |

Notes:
Note 1: All amounts (other than Accepted) are subject to potential material change (i.e. through negotiation, appeal, etc.) as the process for the determination of claims proceeds.
Note 2: Amount and number of claims both in aggregate and for each Applicant may be materially different than previously presented for the following reasons:
- Claims filed have been split or transferred among Applicants
- Additional late filed claims and amendments to claims filed previously are included for presentation purposes only and without prejudice to the rights of the Applicants in connection with such Claims



45. Pursuant to the provisions of the Canadian Funding and Settlement Agreement, the Claims Report includes a claim by NNI against NNL for $2.0627 billion. This claim consists of two portions:

    a) $2.0 billion representing a pre-filing unsecured claim against NNL ranking pari passu with all other unsecured pre-filing claims; and

    b) $62.7 million representing a pre-filing secured claim pursuant to the provisions of the Initial Order relating to the Revolving Loan Agreement.

46. To date, 1,010 claims including cross-border Claims with a cumulative value of CAD $35.5 billion have been filed against the Applicants. This includes potential duplicative claims filed against multiple Applicants and claims filed subsequent to the Claims Bar Date. The Monitor, in conjunction with the Applicants, has reviewed 526 claims with a claim value of $9.5 billion. Of the claims reviewed, the Monitor has provisionally accepted 430 claims with a claim value of $2.6 billion.

47. Pursuant to the provisions of the Claims Resolution Order, the Monitor has provided the U.S. Debtors with supporting detail for the Claims Report as of February 2, 2011. A copy of the Claims Report has been posted on the Monitor's website.

48. The claims resolution process has progressed since the issuance of the Claims Resolution Order. The Monitor continues to review, revise and disallow claims, as applicable, and continues to work with the U.S. Debtors with respect to cross-border claims and will report to this Honourable Court further on these processes in subsequent reports.

## STATUS OF EMEA INTER-COMPANY CLAIMS PROCESS

49. The Claims Procedure Order specifically identified certain claims, including inter-company claims, not subject to the provisions contained within the order.

50. On January 14, 2011, this Honourable Court issued an Order (the "EMEA Claims Procedure Order") stipulating a bar date and a mechanism for the filing, proving and resolution of claims by an EMEA Company (as defined in the EMEA Claims Procedure Order) against the Applicants, their property or their Directors and Officers (the "EMEA Claims").

51. Pursuant to the provisions of the EMEA Claims Procedure Order, a bar date of 4:00 p.m. (prevailing time in Toronto, Ontario, Canada), March 18, 2011 (the "EMEA Claims Bar Date") was established whereby EMEA Claims are to be filed with the Monitor, failing which they are forever barred and extinguished.

52. Pursuant to the provisions of the EMEA Claims Procedure Order, the Monitor:

   a) has posted a copy of the Proof of Claim Document Package on its website at *www.ey.com/ca/nortel*;

   b) has sent, on behalf of the Applicants, a copy of a Proof of Claim Document Package to the Administrators and the Administrators' counsel; and

   c) will continue to provide a copy of the Proof of Claim Document Package to any person claiming to be an EMEA Creditor as soon as reasonably possible after receipt of such a request provided such request is received prior to the EMEA Claims Bar Date.

**CURRENT STATUS OF GSPA**

53. Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the CCAA proceedings (e.g. the Initial Order) and the Chapter 11 Proceedings and/or in accordance with the Code

(together, the "Trading Orders"). Trade between the EMEA Debtors and the Applicants is pursuant to the GSPA.

54. The purpose of the Trading Orders and GSPA is to ensure goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed as between the Nortel parties prior to the Filing Date. In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amounts for post-filing purchases owing to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

55. The GSPA had continued to be extended by the parties substantially in the same form as the initial GSPA through the end of May 2010. Subsequent to the expiry of the sixteenth extension of the GSPA on May 31, 2010, ongoing day to day trade of goods and services and settlement of post filing inter-company accounts continues in normal course.

**STATUS OF HEALTH AND WELFARE TRUST**

56. By Court Order dated November 9, 2010, this Honourable Court approved an allocation methodology for the corpus of the HWT. An application for leave to appeal therefrom to the Ontario Court of Appeal was dismissed on January 7, 2011.

57. By Court Order dated December 15, 2010, this Honourable Court approved an interim distribution from the HWT to Income Beneficiaries (as defined in such Order). The interim distribution, in the amount of approximately CAD $3.1 million, was made on January 31, 2011 to 742 Income Beneficiaries (including 344 LTD Beneficiaries, 80 SIB Beneficiaries and 318 STB Beneficiaries). A notice was sent to all Income Beneficiaries in January 2011 solely to advise them of this payment.

58. Prior to sending the notice of the interim payment, a Nortel HWT Personal Data Confirmation ("HWT - PDC") had been sent to those Income Beneficiaries who

were known to the Company at June 30, 2010. Following the November 2010 mailing of the HWT-PDC's, beneficiaries returned their HWT-PDC to the Monitor with changes to their information, including status changes. The changes were not significant to the amount of the interim distribution; however, the Monitor is working with the Company to validate the changes so that the effect of the changes on the actuarially determined value of the beneficiary's entitlement may be taken into account for further HWT distributions. The validated personal data will also be used to calculate claims against the estate. To the extent applicable, changes are being validated by reference to Company or external documents. Certain changes require information from the individual and the Monitor is seeking such information.

59. The receipt of the interim distribution has also resulted in communications from beneficiaries regarding the amounts of their payments. The Monitor believes certain of the inquiries have arisen as a result of the HWT - PDC being based on June 2010 payments while the interim distribution was based on December 2010 payments. The Monitor continues to work closely with the Company on finalizing HWT distribution matters, including gathering, updating and validating data to December 31, 2010.

**STATUS OF TERMINATION FUND**

60. In accordance with the settlement agreement, approved by this Honourable Court on March 31, 2010, the Applicants established a CAD $4.3 million fund for former employees of the Applicants (the "Termination Fund"). Under the settlement agreement, a former employee is eligible for payment from the Termination Fund to a maximum of CAD $3,000, if: (a) employment was terminated on or prior to June 30, 2010; (b) amounts are owing to the former employee for termination or severance payments; (c) the former employee has not been offered employment with a purchaser of Nortel's assets; and (d) the former employee did not receive certain other payments. Pursuant to the settlement agreement, any payments under the Termination Fund to former employees will be credited against allowed claims of

such individuals and such claims will be correspondingly reduced. To the extent that funds remain unused in respect of terminations prior to or on June 30, 2010, the Termination Fund may be used to make payments on account of terminations after June 30, 2010 to former employees who meet the eligibility requirements.

61. The Termination Fund in the amount of CAD $4.3 million consisted of a maximum CAD $100,000 for payment of fees and costs of Representative Counsel (as defined in the settlement agreement) and for payments to eligible former employees (based on an estimate of 1,400 eligible former employees). On September 17, 2010, 1,157 former employees were notified by mail they were eligible for a maximum payment of CAD $3,000 each from the Termination Fund and advised of the steps they were to take to receive their Termination Fund payment.

62. As of January 31, 2011, 1,105 of these 1,157 former employees have taken the necessary steps and received their payment. In aggregate, the payments to these former employees amounted to CAD $3,315,000. The Monitor understands the Company continues to work to contact the 52 former employees who have not yet taken the necessary steps to receive their payments. These 52 former employees have an entitlement of CAD $156,000.

63. Taking into account payments made to eligible former employees in the aggregate amount of CAD $3,315,000 and a reserve of CAD $156,000 for eligible former employees who have not yet completed the required documentation, there is an estimated CAD $729,000 remaining in the Termination Fund as of January 31, 2011. Accordingly, it is proposed the remaining funds in the Termination Fund be used to make payments to former employees who were terminated during the period from July 1, 2010 to and including December 31, 2010 and who otherwise meet the eligibility requirements.

64. Subsequent to June 30, 2010 and on or prior to December 31, 2010, an additional 363 employees were terminated (including 354 employees on Long Term Disability)

who would be eligible for Termination Fund payments (the "Additional Eligible Former Employees"). It is anticipated that employees who are terminated after December 31, 2010 will receive certain payments that otherwise prohibit their being eligible for the Termination Fund. The unused funds available in the Termination Fund are only sufficient to provide each Additional Eligible Former Employee terminated during this period with approximately CAD $2,000.

65. To date each eligible terminated employee has received CAD $3,000. The amount required to pay CAD $3,000 to each of the Additional Eligible Former Employees is CAD $1,086,000, or approximately CAD $360,000 (i.e. the Required Funds) in excess of the remaining funds available in the Termination Fund. In order to provide equitable treatment to the Additional Eligible Former Employees an amendment to the Employee Hardship Application Process is proposed, as discussed below, to permit the use of a portion of the amounts allocated to the Employee Hardship Application Process, in combination with the remaining funds in the Termination Fund, to pay CAD $3,000 to each of the Additional Eligible Former Employees, which payment would be credited against allowed claims of such individuals.

**STATUS OF EMPLOYEE HARDSHIP APPLICATION PROCESS AND FUND**

66. On July 30, 2009, an order was issued by this Honourable Court approving an employee hardship application process (the "Employee Hardship Order") as more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

67. On October 27, 2010, this Honourable Court approved the Applicants' request to extend the Application Period until February 28, 2011 and to amend the eligibility requirements in respect of the Employee Application Hardship Process to reflect the extended date.

68. The Monitor is continuing to administer the hardship payment application process and report thereon to the relevant representative counsel. There currently remains

available approximately CAD $626,000 of the original CAD $750,000 provided pursuant to the Employee Hardship Order. Applications continue to be received from former employees of the Applicants asserting financial hardship resulting from illness, healthcare costs or ineligibility for pension or employment insurance benefits.

69. As noted above approximately 354 of the 363 Additional Eligible Former Employees are LTD Beneficiaries. The LTD representative has advised the Monitor that many of those terminated on December 31, 2010 are experiencing financial difficulties and has requested that they receive the same payment of CAD $3,000 as those former employees terminated prior to June 30, 2010.

70. As noted in the Status of the Termination Fund update in this Fifty-Ninth Report, the Required Funds of approximately CAD $360,000 would allow payments of CAD $3,000 to be made to the Additional Eligible Former Employees, consistent with the amount awarded from the Termination Fund to the initial 1,157 former employees. Given that to date only about 20% of the hardship monies have been used, the Monitor considers that it would not cause undue prejudice to other former employees to use approximately half the amount remaining for the termination payments to this group.

71. Accordingly, the Monitor supports the Applicants' request that:

a) the Employee Hardship Application Process criteria be amended such that the Required Funds be made available for payment of CAD $3,000 to each of the Additional Eligible Former Employees who meet the other criteria for Termination Fund payments;

b) hardship funds so made available shall be treated in the same manner as payments from the Termination Fund and credited against allowed claims of such individuals;

c) the amount available for hardship applications be reduced by the Required Funds;

d) the Application Period be extended until and including June 30, 2011; and

e) Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended consistent with clauses (a) to (c) above.

72. A copy of the proposed amended Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications is attached as Appendix "C" to this Fifty-Ninth Report.

## ASSET DIVESTITURES AND ALLOCATION MATTERS

73. While Nortel has now completed the sale of most of its operating units, Nortel continues to assess the sale of its remaining assets, in consultation with its legal and financial advisors, while at the same time exploring other options in the event it cannot maximize value through sale transactions.

### Divestiture Activities

***MSS Business Sale***

74. As discussed in the Fifty-Fourth Report, NNC, NNL and certain of NNL's subsidiaries, including NNI, entered into an asset sale agreement dated September 24, 2010 with Ericsson for the sale of substantially all of the MSS Business for $65 million plus certain assumed liabilities.

75. The sale transaction was approved by this Honourable Court and the U.S. Court on September 30, 2010.

76. The sale transaction is currently targeted to close before the end of March 2011; however, due to the timing of the application process for EU anti-trust approval the closing may be further delayed.

*Carling Campus*

77. As discussed in the Fifty-Sixth Report, NNTC and NNL (the "Vendor") entered into an asset sale agreement for the sale of 3500 Carling Avenue, Ottawa, Ontario (the "Carling Campus") to Public Works and Government Services Canada (the "Purchaser") for an amount of CAD $208 million.  On November 8, 2010, this Honourable Court issued an order approving the sale.

78. The sale of the Carling Campus closed on December 17, 2010.

79. Net proceeds realized by the Vendor on closing amounted to approximately CAD $126.3 million after normal closing adjustments, payment of approximately CAD $3.1 million of real estate commissions and repayment in full of all principal and interest obligations owing to NNI pursuant to the NNI Loan Agreement (as described in the Fifty-Sixth Report) of approximately CAD $77.5 million.

80. Pursuant to the provisions of the asset sale agreement, the Vendor was directed by the Purchaser to exercise its early termination rights regarding two leases of portions of the Carling Campus with Ciena Canada, Inc., an affiliate of the purchaser of Nortel's Metro Ethernet Networks business.  The early termination right was exercised and an amount of $33.5 million (plus interest) was paid from the Carling Property Escrow Amount (as described in the Twenty-Fourth Report) to Ciena.

81. At closing, NNL entered into a three year lease for certain portions of the Carling Campus at reasonable market rates to facilitate completion of obligations it has pursuant to provisions of transition service agreements entered into with various purchasers of Nortel businesses, facilitate the sale of the MSS business and monetize its remaining intellectual property assets.  The lease is subject to early termination rights in favour of NNL.  In addition, NNL continues to have access to certain free space within the Carling Campus for varying periods up to one year to allow it to vacate lab equipment and other assets and to consolidate its remaining operations.

*Realization of Remaining Assets*

82. Nortel continues to make progress towards maximizing proceeds of realization on its residual assets. The Corporate Group remains focused on facilitating the sale of Nortel's residual businesses and assets, including the sale of GDNT, one of NNL's remaining joint ventures. In addition, the Corporate Group continues to explore the strategic alternatives available to best optimize the value of Nortel's remaining intellectual property assets.

*Allocation Matters and Mediation*

83. As previously reported by the Monitor, a voluntary non-binding mediation process is underway through which the Applicants, the U.S. Debtors, the Joint Administrators, various other Nortel entities and their respective stakeholders are attempting to negotiate a comprehensive settlement of all outstanding inter-estate matters, including sale proceeds allocation and inter-company claims. Mediation sessions were held with mediator Layn R. Phillips, a former U.S. federal district court judge, over four days in November 2010. The mediation was initially scheduled to continue in January 2011; however, by agreement of the estates, the continuation of the mediation was postponed until mid-April 2011.

**OTHER RESTRUCTURING ACTIVITIES**

*CVAS Purchase Price Dispute*

84. As detailed in the Thirty-Fourth Report of the Monitor, on December 22, 2009, NNC, NNL, NNI and various other Nortel entities entered into an asset sale agreement (the "Sale Agreement") for the sale of certain assets pertaining to Nortel's CVAS business to GENBAND Inc. (now Genband US LLC, "GENBAND"), which sale subsequently closed on May 28, 2010. Subsequent to the closing, certain disputes have arisen between Nortel and GENBAND as regards the final purchase price payable to Nortel, which disputes have centered around the interpretation of the

term "Deferred Profit Amount" in the Sale Agreement. Under Nortel's interpretation of the term, the final purchase price payable under the Sale Agreement, subject to the resolution of certain other outstanding disputes, would be approximately $182 million, whereas under GENBAND's interpretation, the final purchase price payable would be approximately $143 million.

85. This dispute resulted in each of Nortel and GENBAND bringing motions before the U.S. Court and this Honourable Court which, in the case of Nortel's motions, sought, amount others things, a declaration that the dispute was within the exclusive jurisdiction of the U.S. Court and this Honourable Court and an order enforcing Nortel's interpretation of the meaning of Deferred Profit Amount, and, in the case of GENBAND's motions, sought an Order that the dispute be referred to an accounting arbitrator.

86. The parties agreed to defer a hearing on the substantive dispute in order to permit the U.S. Court and this Honourable Court to consider the jurisdictional issue at a joint hearing held on December 16, 2010.

87. On January 21, 2011, both this Honourable Court and the U.S. Court issued reasons which confirmed the Deferred Profit Amount dispute was not subject to arbitration under the provisions of the Sale Agreement and that this Honourable Court and the U.S. Court retained exclusive jurisdiction to determine the dispute.

88. On February 1, 2011, GENBAND filed a Notice of Appeal with respect to the U.S. Court's order and on February 11, 2011, GENBAND sought leave to appeal this Honourable Court's decision to the Ontario Court of Appeal. The Applicants and the Monitor, in conjunction with NNI, are presently considering their options with respect to these matters.

*CTDI Litigation*

89. As further detailed in the Fifty-Fifth Report, on September 21, 2010, NNL commenced an adversary proceeding in the Chapter 15 proceedings against Communications Test Design, Inc. ("CTDI"). NNL alleges in its complaint that CTDI obtained or used its proprietary materials, components and information for unauthorized purposes, including but not limited to the manufacture of new products. NNL is asserting claims against CTDI for misappropriation of trade secrets, trademark infringement, dilution of a famous mark, false designation of origin, breach of contract, breach of covenant of good faith and fair dealing, fraud and unjust enrichment. NNI has commenced a related adversary proceeding against CTDI in the Chapter 11 Proceedings, which has been joined with NNL's proceeding. The parties are currently engaged in the discovery process. In addition, CTDI brought a motion before the U.S. Court to dismiss both complaints, which motion is pending before the U.S. Court. On January 3, 2011 CTDI answered NNI and NNL's complaints and asserted counterclaims of breach of contract against both NNI and NNL and has moved to join NNC as a counterclaim defendant. NNI has moved to dismiss CTDI's counterclaims and NNL has joined in that motion. Further, NNL has objected to the joinder of NNC.

***BreconRidge Dispute***

90. On November 15, 2010, the Applicants served a Notice of Motion seeking an Order compelling SCI Brockville Corp. ("SCI Brockville"), as successor to BreconRidge Corporation, to pay certain payables due and owing to NNL (the "BreconRidge Payable"). SCI Brockville is a subsidiary of Sanmina SCI Corporation ("Sanmina"). On December 1, 2010, SCI Brockville and Sanmina filed a responding motion record in which they allege SCI Brockville is entitled to set-off amounts claimed to be owing by various Nortel entities to Sanmina or its affiliates against the BreconRidge Payable. The Applicants and the Monitor take the position that SCI Brockville is not entitled to such a set-off and that the BreconRidge Payable is due in

full. The motion, originally scheduled to be heard on February 11, 2011, was adjourned to March 25, 2011, to allow the parties further time to discuss a potential settlement of these issues.

*Estate Separation Activities*

91. As discussed in previous reports, many of Nortel's corporate functions span multiple legal entities. As the divestiture of the various operating lines of business has largely been completed and with the expectation that transitional services provided to the various buyers will be completed during 2011, the interdependency of the Nortel entities is expected to diminish. The various Nortel estates are developing plans for the separation of various functions to allow each estate to operate going forward on a "standalone" basis.

92. Further analysis by the Applicants and the Monitor is required to finalize these plans and identify the resources required by the Applicants to ensure all necessary functions continue to operate allowing the administration of the Canadian estates to continue on an effective, efficient and independent basis.

93. The Monitor believes that it is in the best interest of the Applicants to position themselves, in the near term, to operate on an independent basis.

*French Employee Claims*

94. Approximately 128 former employees of NNSA of have commenced actions against; *inter alia*, NNC, NNL and the Monitor, before the Versailles employment tribunal in France. Although the specific relief claimed varies on a case by case basis, the central claim is that NNC and NNL are liable for various employment related claims on the grounds that they were "co-employers" with NNSA. The aggregate amount claimed is approximately €18 million. A consultation hearing before a French tribunal was held in France on November 24, 2010 and a full hearing has been scheduled before the French tribunal on October 31, 2011. The Applicants, in

consultation with the Monitor and their respective counsel, are reviewing the claims and considering their options.

*Appeal of the U.K. Pension Regulator*

95. On February 25, 2010, this Honourable Court heard a motion brought by the Monitor requesting certain relief with respect to "financial support direction" proceedings commenced by the U.K. Pensions Regulator (the "UKPR") against NNC and NNL. Additional information relating to this matter can be found in the Thirty-Eighth Report.

96. On February 26, 2010, this Honourable Court granted an Order providing, among other things, that all acts taken by the UKPR in the purported exercise of rights and in commencing any proceedings against any of the Applicants are null and void and shall be given no force or effect in these proceedings, nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertakings in Canada.

97. Notices of Motion for Leave to Appeal this Order were filed with the Ontario Court of Appeal by the UKPR, the Nortel Networks UK Pension Trust Limited and The Board of the UK Pension Protection Fund and leave to appeal was granted on May 10, 2010.

98. Following a hearing on June 16, 2010, the Ontario Court of Appeal dismissed the appeal. The UKPR subsequently sought leave to appeal to the Supreme Court of Canada. On January 27, 2011, the Supreme Court dismissed the UKPR's leave application.

## STATUS OF FOREIGN PROCEEDINGS

*Chapter 11*

99. The following is a summary of the court orders that have been issued and the financial information that has been filed in the Chapter 11 Proceedings since the last update provided in the Monitor's Fifty-Fifth Report:

a) on October 27, 2010, the U.S. Debtors obtained an order appointing Layn R. Phillips as the mediator for resolving disputes concerning the allocation of sale proceeds;

b) on November 8, 2010, the U.S. Debtors obtained an order approving a stipulation between the U.S. Debtors, the Committee, and the UKPR regarding the UKPR's participation in the mediation;

c) on November 23, 2010, the U.S. Debtors obtained an order approving the sale of limited partnership and limited liability company interests free and clear of all liens, claims and encumbrances to CS Strategic Partners IV VC Holdings, L.P. and Amberbrook V, LLC;

d) on December 17, 2010, the U.S. Debtors obtained an order approving a stipulation between the U.S. Debtors and the Joint Administrators on behalf of NNUK and Nortel Networks (Ireland) Limited regarding the tolling of certain claims;

e) on January 21, 2011, the U.S. Debtors obtained an order denying the motion of GENBAND US LLC to compel arbitration. On February 2, 2011, GENBAND US LLC filed a notice appealing this order; and

f) the U.S. Debtors filed Debtor-in-Possession Monthly Operating Reports for the months of September, October and November on November 11, 2010, December 6, 2010 and December 22, 2010, respectively.

100. In addition, the U.S. Debtors obtained orders authorizing the expenditure of funds related to the wind-down of non-debtor subsidiaries and branch offices, extending the deadline for the Internal Revenue Service to complete its examination, granting omnibus objections to claims, authorizing the retention and payment of professionals, resolving certain claims and motions, and approving omnibus procedures to settle advance claims.

*Chapter 15*

101. The following is a summary of the filings in the Chapter 15 proceedings of the Applicants since the last update provided in the Monitor's Fifty-Fifth Report:

a) the Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Honourable Court. The Monitor also filed notice of the Stay Extension Order and Endorsement of the Ontario Court dated October 27, 2010;

b) on November 5, 2010, the Monitor obtained an order from the U.S. Court recognizing and enforcing the order of this Court approving a cross-border claims protocol establishing procedures to resolve overlapping and same-creditor claims in the CCAA proceedings and the Chapter 11 Proceedings. The US Court's order also recognized and enforced this Court's claims resolution order establishing mechanisms to determine the proven claims of creditors, including protocol claims; and

c) on November 5, 2010, the Monitor obtained an order enforcing this Court's order approving the sale of certain MSS business assets by NNC, NNL, NNI, and certain of their affiliates, to Telefonaktiebolaget L M Ericsson.

## REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS

102. The Stay Period presently expires on February 28, 2011. The Applicants are seeking a 122 day extension of the Stay Period up to and including June 30, 2011.

As stated above, based on the cash flow analysis, including the assumptions contained therein, the Applicants have sufficient cash resources to fund operations through the requested stay extension.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

103. The Monitor has assisted and continues to assist the Applicants in their efforts to efficiently complete the realization and maximization of value from their assets, conduct the claims process and prepare a plan of arrangement. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a Plan.

104. For the reasons outlined in this Fifty-Ninth Report, the Monitor supports the Applicants' request for the following:

    a) the employee hardship application criteria be amended such that the Required Funds be made available for payment of CAD $3,000 to the Additional Eligible Employees who meet the other criteria for Termination Fund payments, when combined with unused funds in the Termination Funds;

    b) the amount available for hardship applications be reduced by the Required Funds;

    c) an extension of the Employee Hardship Application Process to June 30, 2011;

    d) the Eligibility Requirements and the Procedure with Respect to Hardship Payments Applications be amended consistent with (a) through (c) above; and

    e) an extension of the stay up to and including June 30, 2011.

105. The Monitor also supports the administrative amendments to the Initial Order proposed by the Applicants to remove references to the NNI Loan, the NNI Loan

Charge, the Goldman Charge and the Carling Facility Charge as the obligations to which those provisions and charges relate have been satisfied by the Applicants.

All of which is respectfully submitted this 18 day of February, 2011.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

37

APPENDIX A

## Nortel Networks - October 3, 2010 to February 5, 2011
## CCAA Applicants
### Forecast Cash Flow - Variances

USD (Millions)
(Unaudited)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 03-Oct-10 | 03-Oct-10 | 03-Oct-10 |
| End of period | 05-Feb-11 | 05-Feb-11 | 05-Feb-11 |
| **1. Receipts & Disbursements** | | | |
| **Receipts** | | | |
| Collection of Accounts Receivable | 2.7 | 5.1 | 2.4 |
| Other Receipts | 203.9 | 210.6 | 6.7 |
| TSA Recoveries from Buyer | 43.8 | 53.0 | 9.2 |
| Payroll & AP reimbursement from Buyers | 10.8 | 8.6 | (2.2) |
| Intercompany Receipts | 17.5 | 14.3 | (3.2) |
| **Total Receipts** | 278.6 | 291.6 | 13.0 |
| **Disbursements** | | | |
| Payroll (Gross) | 23.0 | 20.8 | 2.2 |
| Benefits | 12.4 | 11.3 | 1.1 |
| Pension | - | - | - |
| Inventory Purchases | - | 3.7 | (3.7) |
| Non-Inventory Purchases | 36.2 | 48.2 | (12.0) |
| Payroll & AP payments on behalf of Buyers | 10.8 | 8.6 | 2.2 |
| Intercompany Disbursements | 83.9 | 80.4 | 3.5 |
| Restructuring Costs | 29.6 | 32.8 | (3.2) |
| **Total Disbursements** | 195.9 | 205.9 | (10.0) |
| **Net Cash Flow** | 82.7 | 85.6 | 3.0 |
| FX Impact | - | 5.4 | 5.4 |
| **Opening Available Cash Balance** | 189.6 | 189.6 | - |
| **Closing Available Cash Balance** | 272.3 | 280.7 | 8.4 |
| Unavailable Cash | 237.7 | 237.7 | - |
| **Total Cash** | 510.0 | 518.4 | 8.4 |
| Restricted Cash | 44.4 | 40.9 | (3.5) |
| **Total Cash + Restricted Cash** | 554.4 | 559.3 | 4.9 |

38

APPENDIX B

# Nortel Networks - February 6, 2011
## CCAA Applicants
Forecast Cash Flow
USD (Millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Feb 2011 | | | | Mar 2011 | | | | | Apr 2011 | | | | | May 2011 | | | | | Jun 2011 | | | | | Total |
| Start of period | 06-Feb-11 | 13-Feb-11 | 20-Feb-11 | 27-Feb-11 | 01-Mar-11 | 06-Mar-11 | 13-Mar-11 | 20-Mar-11 | 27-Mar-11 | 01-Apr-11 | 03-Apr-11 | 10-Apr-11 | 17-Apr-11 | 24-Apr-11 | 01-May-11 | 08-May-11 | 15-May-11 | 22-May-11 | 29-May-11 | 01-Jun-11 | 05-Jun-11 | 12-Jun-11 | 19-Jun-11 | 26-Jun-11 | 06-Feb-11 |
| End of period | 12-Feb-11 | 19-Feb-11 | 26-Feb-11 | 28-Feb-11 | 05-Mar-11 | 12-Mar-11 | 19-Mar-11 | 26-Mar-11 | 31-Mar-11 | 02-Apr-11 | 09-Apr-11 | 16-Apr-11 | 23-Apr-11 | 30-Apr-11 | 07-May-11 | 14-May-11 | 21-May-11 | 28-May-11 | 31-May-11 | 04-Jun-11 | 11-Jun-11 | 18-Jun-11 | 25-Jun-11 | 30-Jun-11 | 30-Jun-11 |
| **1. Receipts & Disbursements** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | - | 0.2 | - | - | - | 0.1 | 0.1 | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.4 |
| Other Receipts | - | - | - | - | - | - | - | - | 30.0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 30.0 |
| TSA Recoveries from Buyers | 4.3 | - | 0.2 | - | - | - | - | 11.0 | - | - | - | - | - | 9.3 | - | - | - | 8.2 | - | - | - | - | - | 4.2 | 37.0 |
| Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 4.3 | 0.2 | 0.2 | - | - | 0.1 | 0.1 | 11.1 | 30.0 | - | - | - | - | 9.3 | - | - | - | 8.2 | - | - | - | - | - | 4.2 | 67.4 |
| **Disbursements** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll (Gross) | 1.6 | - | 1.6 | - | - | 1.6 | - | 21.2 | - | - | 0.7 | - | 1.7 | - | 0.7 | - | 0.7 | - | - | 0.7 | - | 0.7 | - | 0.5 | 31.6 |
| Benefits | 0.2 | - | 1.3 | - | - | 0.2 | - | 1.2 | 0.5 | - | - | 0.1 | 0.1 | 0.5 | - | 0.1 | - | 0.3 | - | 0.3 | - | 0.1 | - | 0.3 | 5.1 |
| Pension | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | - | - | 0.5 | - | - | - | - | 0.5 | - | - | - | - | - | 0.5 | - | - | - | 0.5 | - | - | - | - | 0.5 | - | 2.5 |
| Non-Inventory Purchases | 0.6 | 3.2 | 0.6 | - | 0.6 | 0.6 | 3.0 | 0.6 | 0.6 | - | 0.5 | 2.3 | 0.5 | 0.5 | 0.5 | 0.5 | 2.5 | 0.5 | - | 0.5 | 0.5 | 2.3 | 0.5 | 0.5 | 21.6 |
| Intercompany Disbursements | 0.2 | - | - | - | 0.6 | - | - | 8.0 | - | - | 0.2 | - | - | - | 0.1 | - | - | - | - | - | 0.1 | - | 4.7 | - | 13.6 |
| Restructuring Costs | 1.9 | 1.9 | 1.9 | - | 1.9 | 1.9 | 1.9 | 1.9 | 1.6 | - | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | - | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 31.5 |
| **Total Disbursements** | 4.4 | 5.1 | 5.9 | - | 3.1 | 4.3 | 4.9 | 33.4 | 2.7 | - | 2.6 | 3.7 | 3.6 | 2.7 | 2.6 | 1.9 | 4.5 | 2.6 | - | 2.7 | 1.9 | 4.4 | 7.0 | 2.6 | 106.4 |
| **Net Cash Flow** | [illegible] | [illegible] | [illegible] | - | [illegible] | (4.2) | (4.9) | (22.3) | 27.3 | - | [illegible] | [illegible] | [illegible] | 0.6 | [illegible] | [illegible] | [illegible] | 5.6 | - | (2.7) | (1.9) | (4.4) | [illegible] | 1.6 | [illegible] |
| **Opening Available Cash Balance** | 280.7 | 280.5 | 275.6 | 269.9 | 269.9 | 268.8 | 262.6 | 257.7 | 235.4 | 262.7 | 262.7 | 260.1 | 256.4 | 252.9 | 259.4 | 256.8 | 255.0 | 250.5 | 256.1 | 256.1 | 253.4 | 251.5 | 247.1 | 240.1 | 280.7 |
| **Closing Available Cash Balance** | 280.5 | 275.6 | 269.9 | 269.9 | 268.8 | 262.6 | 257.7 | 235.4 | 262.7 | 262.7 | 260.1 | 256.4 | 252.9 | 259.4 | 256.8 | 255.0 | 250.5 | 256.1 | 256.1 | 253.4 | 251.5 | 247.1 | 240.1 | 241.7 | 241.7 |
| Unavailable Cash | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 | 237.7 |
| **Total Cash** | 518.2 | 513.3 | 507.6 | 507.6 | 504.5 | 500.2 | 495.4 | 473.1 | 500.4 | 500.4 | 497.8 | 494.1 | 490.6 | 497.1 | 494.5 | 492.7 | 488.2 | 493.8 | 493.8 | 491.1 | 489.2 | 484.8 | 477.8 | 479.4 | 479.4 |
| Restricted Cash | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 |
| **Total Cash + Restricted Cash** | 559.1 | 554.2 | 548.5 | 548.5 | 545.4 | 541.1 | 538.3 | 514.0 | 541.3 | 541.3 | 538.7 | 535.0 | 531.5 | 538.0 | 535.4 | 533.6 | 529.1 | 534.7 | 534.7 | 532.0 | 530.1 | 525.7 | 518.7 | 520.3 | 520.3 |

# APPENDIX C

## Eligibility Requirements and Procedure with Respect to Hardship Payment Applications

1. **Eligibility** – A former employee would be eligible for hardship payments if he or she is resident in Canada and has no available source of income, being all monies receivable by the former employee including, without limitation, employment income such as wages, salary or bonuses, consulting income, or pension or disability payments or income replacement payments ("Income"), or Income of a spouse, as of the date of the application and has no reasonable expectation of being in receipt of Income during the Application Period (referred to below) and:
   a. The former employee is unable to work due to illness or is incurring costs in excess of 25% of his or her EI payments as a result of treatment for illness or healthcare costs, or as a result of the illness of a family member who is dependent on the former employee for support; or
   b. During the Application Period the former employee is not receiving a Nortel pension or employment insurance (EI) as a result of ineligibility for EI or exhaustion of EI benefits, and demonstrates some other significant hardship in dealing with financial obligations.

2. **Application Process** – Notice of the application process will be posted on the Monitor's website and the website of the Nortel Retiree Protection Committee (NRPC) in a form approved by the Court. An applicant would be required to complete an application form (to be approved by the Court) to be submitted to a person designated by the Monitor. The person so designated would be expected to deal with completed applications within 14 to 21 days and to make an initial determination to approve or reject the application. The first payment will proceed within seven business days subject to the payment parameters set out below. If not approved, the application is to be reviewed by an informal committee and the applicant will be given the right to be heard by the committee. The committee will be composed of one company appointee, one appointee of the Monitor and one appointee chosen by the NRPC, who will be compensated for his time on an hourly basis. A further appeal may be brought to the Court or an officer of the Court designated by the presiding judge, costs to be determined by the Court on the application.

3. **Payment Parameters** – Any successful applicant may be approved for a maximum payment of up to 8 weeks salary based on a maximum weekly salary of up to $1,200 per week payable in monthly instalments. The hardship committee will also have discretion to approve additional amounts in cases of medical and other emergencies in an amount up to $2,500.

4. **Application Period** – From the date of court approval to June 30, 2011.

5. **Miscellaneous**
   a. Hardship Payments are advances against distributions on claims, and will be deducted from any payments on claims that may be allowed in the ultimate claims process in these proceedings.
   b. The Monitor shall report to the Court on or before November 30, 2009 with respect to the processing and administration of hardship payment applications.
   c. The aggregate maximum amount available for hardship payments on applications approved during the Application Period is $750,000 less the Required Funds (as defined by paragraph 4 of the February X, 2011 Court order).

40

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FIFTY-NINTH REPORT OF THE MONITOR**
**DATED FEBRUARY 18, 2011**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# TAB 2

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT* R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT* R.S.C. 1985, c. C-36 AS AMENDED**

**AFFIDAVIT OF DONALD SPROULE**
**(sworn February 23, 2010)**

I, Donald Sproule, of the City of Ottawa, in the Province of Ontario, MAKE OATH AND SAY:

1. I am a former employee and pensioner of Nortel Networks Limited ("NNL"). I retired on April 27, 2005 after approximately 28 years of service with NNL and/or one of its predecessor companies, subsidiaries or affiliates.

2. I am one of three court-appointed Representatives who were appointed on behalf of all former employees, including pensioners, of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International and/or Nortel Networks Technology Corporation (collectively, "Nortel"), or any person claiming an interest under or on behalf of such former employees or pensioners and surviving spouses in receipt of a Nortel pension, or group or class of them (collectively, the "Former Employees"). Attached as **Exhibit "A"** is the Representation Order dated May 27, 2009 (the "Representation Order"). As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal

knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

3. Capitalized terms used in this Affidavit and not otherwise defined shall have the meanings given to them in the Settlement Agreement dated February 8, 2010, the Monitor's thirty-sixth report (the "Thirty-Sixth Report") and the Monitor's thirty-ninth report (the "Thirty-Ninth Report") that have already been filed with this Court. Attached at Schedule "A" to this Affidavit is a list of those defined terms and their meanings.

4. I swear this Affidavit in support of a motion for the approval of a Settlement Agreement which provides all former employees, including pensioners and surviving spouses, as well as all LTD Beneficiaries, with continued health, dental, life and income benefits through until the end of 2010.

5. The specific relief being sought in this motion by the Applicants is outlined in detail at paragraph 4 of the Affidavit of Elena King sworn February 18, 2010 in support of this motion (the "King Affidavit"). I have reviewed the King Affidavit and I am in agreement with the relief being sought as outlined in its paragraph 4. After much discussion with the Representatives, Representative Counsel, our legal, financial and actuarial advisors and a broad-cross section of our constituency, I swear this Affidavit in support of this motion on my behalf and on behalf of the parties I represent, in its form put forward before this Court including in particular, the following relief:

a) Approval of the Settlement Agreement, dated as of February 8, 2010, among the Applicants, the Monitor, the Former Employees' Representatives,[1] the LTD Representative,[2] Representative Settlement Counsel and the CAW (the "Settlement Parties");

b) An Order that the Applicants shall make all current service payments and special payments to the Pension Plans in the same manner as they have been doing over the course of the proceedings under the CCAA, through to March 31, 2010, in the aggregate amount of $2,216,254 per month and that thereafter and through to

[1] On their own behalf and on behalf of the parties they represent.
[2] On her own behalf and on behalf of the parties she represents.

September 30, 2010, the Applicants shall make only current service payments to the Pension Plans, in the aggregate amount of $379,837 per month; and

c) An Order that notwithstanding anything else in the Order, in the event of a bankruptcy of Nortel, if there is an amendment to any provision of the *Bankruptcy and Insolvency Act* that changes the current, relative priorities of the claims against the Applicants, no party will be precluded by the Order from arguing the applicability or non-applicability of any such amendment in relation to any such claim.

6. I, as a court-appointed Representative of the Former Employees, have been closely involved with Representative Counsel throughout discussions concerning and negotiations surrounding the Settlement Agreement. In my opinion, this Settlement Agreement represents the best outcome for the provision of benefits to a large group of individuals who, for the most part, do not have any other source of income or ability to replace benefits, and in particular, the health, dental, life and income benefits they receive from Nortel. It also provides sufficient time to deal with these issues after Nortel, as we know it, ceases to exist.

**BACKGROUND**

7. On January 14, 2009, the Applicants ("Nortel") were granted protection under the *Companies' Creditors Arrangement Act,* R.S.C. c. C-36, as amended ("CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court. Ernst & Young Inc. was appointed as Monitor (the "Monitor") in the CCAA proceedings. Details regarding the background to the company's proceedings, and the insolvency proceedings of Nortel's related foreign entities, are set out in the affidavit of John Doolittle, sworn January 14, 2009 (the "Initial Order Affidavit") previously filed by the Applicants in these proceedings and are therefore not repeated herein.

8. The Nortel Retiree Protection Committee, later renamed Nortel Retiree and former employee Protection Canada ("NRPC") began its official formation shortly after January 14, 2009, the date that the Initial Order was granted.

9. Prior to the date of the Initial Order, it was widely reported in the media that Nortel was experiencing financial difficulties. Knowing that this was the case, I started to contact former colleagues in early November, to discuss what impact, if any, our former employer's financial difficulties would have on the various pensions, benefits and retirement arrangements we were receiving from Nortel.

10. On January 14, 2009, after it was announced that Nortel had filed for CCCA protection, a group of my former colleagues held a teleconference with legal counsel at Koskie Minsky LLP to determine the legal consequences of the company's CCAA filing and what effects it would have on our pensions and benefits.

11. Several days later, the NRPC formally retained Koskie Minsky LLP as its legal counsel, and we began to reach out to Former Employees across the country. It was our mandate to protect the pensions and benefits of our friends, our previous colleagues and other individuals who were being impacted by the company's CCAA filing. We were particularly concerned about reaching out to the most vulnerable pensioners, or pensioners' survivors, and to those who did not use the internet and/or were unaware that their pensions and benefits were in danger.

12. On May 27, 2009, this Honourable Court granted a Representation Order which appointed David Archibald, Michael Campbell and myself as the three court-appointed Representatives of all Former Employees ("Representatives"), subject to certain exceptions. The Representation Order also appointed Koskie Minsky LLP as Representative Counsel to all Former Employees, subject to certain exceptions. Individuals who are not bound by the Representation Order are:

a) Any individual Former Employee who did not wish to be bound by the Order;

b) Any individual Former Employee already represented by Lewis Gottheil, counsel to the National Automobile, Aerospace, Transportation and General Workers Union of Canada ("CAW-Canada"); and

c) Any former chief executive officer or chairman of the board of directors, any non-employee member of the board of directors, or such former employees or officers

that are subject to investigation and charge by the Ontario Securities Commission or the United States Securities and Exchange Commission.

13.    Individuals who wished to opt-out of the Representation Order were required to do so within thirty days of the publication of the notice of the Representation Order, in accordance with the terms of that Order. As indicated at paragraph 30 of the Monitor's Thirty-Ninth Report already filed with this Court in support of this motion, which I have reviewed, only one former employee opted out of representation by the Representatives and Representative Counsel. I am aware of no other Former Employee who has done so, or who has attempted to do so.

14.    The Representatives were thus responsible to represent the interests of an estimated 12,271 pensioners, survivor pensioners and other survivors, an estimated 6,000 deferred pensioners and an estimated 1,187 former employees owed termination and severance pay amounts. See Mercer Canadian Post Employment Benefits Accounting Report and the Report on Non-Pension Post Retirement Benefit Cost and Disclosure for the Fiscal Year Ending December 31, 2009, attached as Schedules A and B to the Supplement to the Monitor's 39th Report, dated February 23, 2010.

15.    As indicated in paragraph two of the Representation Order, our responsibility as Representatives included the responsibility to provide instructions to Representative Counsel for the purpose of settling or compromising claims by the Former Employees in Nortel's proceedings under the CCAA, the *Bankruptcy and Insolvency Act* (Canada) ("BIA") or any other proceedings brought before this Honourable Court. Given the significance of this responsibility, David, Michael and I took our roles as Representatives very seriously.

## ORGANIZATION OF THE REPRESENTATIVES AND THE NRPC

16.    At the date of our appointment as Representatives, David, Michael and I were already heavily involved with the NRPC. Given the magnitude of our new responsibilities and the broad cross-section of individuals whose interests we were in charge of advancing, and whose pension and benefits we were responsible to protect, we worked hard to

establish an organization which would ensure that all varying interests were being heard and addressed.

17. The NRPC established an organization to facilitate the task at hand. We formed regional subcommittees in Ottawa, Toronto, London, Montreal, Belleville, Halifax, Kingston and Calgary to facilitate contact throughout different cities and to reach out to individuals in different circumstances. We also established a contact point to look after and understand the needs of those living outside of Canada, but who have a claim against the Canadian estate. We estimate that as of March 3, 2010 members of the NRPC will have spent over 75,000 person hours in support of the constituency.

18. We continued to expand the website and database that had already been established at that time. Since January 14, 2009, our membership has grown from the original 14 individuals to approximately 4,400 individuals. We registered members through the NRPC website and by telephone, and kept our membership informed of all developments and concerns via telephone, by sending out email bulletins, by holding information sessions and by posting updates on our website,.

19. We established a Legal Steering Committee that involved a broad cross-section of individuals, including both pensioners and terminated employees, each of whom were able to reach out to individuals within their group.

20. The Legal Steering Committee participates in weekly teleconference calls with Representative Counsel, our financial advisors, RSM Richter, and our actuarial advisors, Segal Company. All members of the Legal Steering Committee signed a non-disclosure agreement with Nortel. The committee reported the non-confidential details of the legal meetings to the National Committee, and also took feedback from the National Committee back to our counsel. The Legal Steering Committee also is responsible to relay the concerns of our constituency to our legal, financial and actuarial advisors, and we have been heavily involved in the various discussions and negotiations throughout Nortel's CCAA proceedings and in particular, with respect to the Settlement Agreement.

21. To the extent we can now reach some 4,400 members of our constituency via email, we believe we have been successful in keeping the group up to date and apprised of

important developments.  While it has been a difficult task, the NRPC has worked diligently to reach the individuals in its constituents who do not have ready access to email or the internet.

22.    In order to ensure we were addressing the concerns of as many individuals as possible, we set up NRPC email addresses to receive Former Employees' inquiries.  These email addresses were posted on the public portion of our NRPC website, and were available for the use of all NRPC members and also to non-members.  The NRPC made it their mandate to read and try to respond to email inquiries, and to act as a liaison between these individuals and their Representative Counsel.

23.    We also established a number of subcommittees, including the Political Action Committee, the Health Plan Continuation Committee and the Pension Orphanage Committee.

24.    We have been in contact with Sue Kennedy, the court-appointed Representative for Nortel's disabled employees (the "LTD Representative") since her appointment as the LTD Representative.

25.    As indicated in my Affidavit sworn March 30, 2009 (the "Original Affidavit") in support of the motion for a Representation Order, the objectives of the NRPC included the protection of the interests of the pensioners, former employees, and their survivors, with respect to Nortel's various funded and unfunded pension and benefit arrangements, and also the protection of other post-employment interests including severance and termination payment obligations, TRAs (as subsequently defined) and excess pension payments, among others.

26.    In my Original Affidavit, I indicated that the NRPC was confident that the structure of its National Committee, as outlined in my Original Affidavit, would enable the NRPC to advance and protect the interests of all former Nortel employees.  I still believe this to be true.

48

**PENSIONERS' AND FORMER EMPLOYEES' BENEFITS**

27. Since the date of the Initial Order, the NRPC and its members have worked hard to understand the different interests of our constituents, what concerns them most and how they have, or fear they will be, affected by Nortel's CCAA proceedings.

28. We first determined the different categories of individuals within our constituency, which generally can be broken down as follows:

a) pensioners;

b) deferred pensioners;

c) surviving spouses of pensioners, who receive or are entitled to receive a survivor pension from the Pension Plans and/or other retirement arrangements; and

d) former employees, including employees whose employment has been terminated since the date of the CCAA filing, and any other former employee of the company who is owed funds by Nortel.

29. The major concerns of our constituency, both before and after Nortel's CCAA filing, have been for pensioners, the future of our pensions and the continuation of our health, dental and life insurance benefits, and for terminated employees, payment of termination and severance pay owed upon termination of employment.

30. As I mentioned above, I have reviewed the King Affidavit. In her Affidavit, Ms. King outlines some of the funded and unfunded pension and benefit plans which Nortel has historically operated as follows:

a) pension benefits through two registered pension plans, the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and the Nortel Networks Negotiated Pension Plan (the "Pension Plans"); and

b) medical, dental, life insurance, long term disability and survivor income and transition benefits paid, except for survivor transition benefits, through Nortel's Health and Welfare Trust (the "HWT").

49

31. Many members of our constituency are entitled to pensions and benefits from these plans. Additionally, Nortel operated many other benefit plans from which Former Employees are entitled to benefits, which among others, include:

a) pensions paid from sources other than through the registered Pension Plans, including from the Nortel Networks Excess Plan ("Excess Plan") and the Nortel Networks Supplementary Executive Retirement Plan ("SERP"), which are non-registered retirement plans used to provide benefits to plan members in excess of those permitted under the registered Pension Plan in accordance with the Canada *Income Tax Act.*;

b) Transition Retirement Allowance ("TRA") and Retirement Allowance Plan ("RAP"), which are retirement benefits to which certain Former Employees become entitled to upon retirement; and

c) Other various employee incentive and benefit programs operated by Nortel in the past, from which some Former Employees are owed outstanding amounts.

32. In addition to these benefit plans, members of our constituency are also entitled to other employment related amounts from Nortel, including:

a) statutorily mandated standards termination and severance pay;

b) contractual termination and severance pay amounts; and

c) many other various outstanding amounts relating to their employment with the company.

**OUR BENEFITS SINCE THE CCAA FILING**

33. On the date of the Initial Order, and in the weeks that followed, David, Michael and I, along with the NRPC Legal Steering Committee, had many discussions with our legal counsel at Koskie Minsky LLP about the types of payments the Former Employees would continue, or would cease to receive during and after Nortel's CCAA proceedings. Our legal counsel outlined that in accordance with the Initial Order, Nortel was "entitled but not required" to make payment of all future and employee benefits, which specifically

included medical benefit plans, and both current service and special payments into the Pension Plans.

34.    After the date of the Initial Order, Nortel announced that it had decided to stop making the following payments:

a)    all pensions which were paid from sources other than the registered Pension Plans, including payments in respect of the Excess Plan and the SERP;

b)    all TRA and RAP payments;

c)    all severance and termination agreements where amounts were still owing to the affected former employees as at January 14, 2009;

d)    all retention payment amounts were still owing to the affected former employees as at January 14, 2009; and

e)    other various retirement or employment arrangements that were paid to individuals through Nortel's general revenues, including future termination and severance payments that would become owing.

35.    Nortel chose to continue paying and providing Former Employees with our health and medical benefits, and also to continue making both current service and special payments contributions into the Pension Plans, despite the fact that it was not "required" to do so under the Initial Order.

36.    While we were satisfied with Nortel's decision to continue making payment of our health and medical benefits, a letter that many retirees received from Nortel, dated February 25, 2009, sparked many concerns among retirees. Attached as **Exhibit "B"** is a copy of the letter I received from Nortel, on or around February 25, 2009.

37.    This letter confirmed that the SERP, Excess Plan, TRA and RAP payments were being stopped as at the date of the Initial Order. The letter also stated that our medical benefit payments could be suspended or discontinued at any time. This concerned us, and other retirees greatly, as pensioners are dependent on these plans to pay for prescription drugs, dental and other health related benefits not covered by government programs during their retirement years. We became concerned the elderly population of retirees would be

unable to obtain alternative medical coverage if Nortel abruptly and without notice discontinued our medical benefit plans.

38.    Additionally, the Initial Order Affidavit, at paragraph 121, indicated that the Pension Plans are, or would be, seriously underfunded, in part as a result of the recent deterioration of the global financial markets in 2009. Our legal counsel advised us that in the event the Pension Plans were wound up in an underfunded state, this would mean a reduction to many retirees' monthly pension payment amounts. For some retirees, this would be a further blow to an income that had already been reduced from a loss of their Excess Plan or SERP payments.

39.    Finally, terminated employees have fared very poorly throughout Nortel's CCAA proceedings, as there have been no termination or severance payments made since the date of the Initial Order, not even the statutory minimum standards payments that are mandated by provincial employment laws.

40.    There have, of course, been wide-ranging and various issues arising throughout Nortel's CCAA proceedings, particularly due to the large and complex nature of the company. However, it was these three main concerns, our pensions, health and medical benefits and termination and severance pay, that have driven the Representatives' and the NRPC's legal and political mandate over the past year.

**NRPC EFFORTS**

41.    With these three driving forces in mind, the NRPC sought to protect the various interests of our constituency.

42.    We have fought hard to keep medical, dental and life insurance benefit payments intact. We have, and continue, to seek alternative solutions that would allow some form of basic replacement benefit coverage to continue once Nortel no longer exists as a company. We have not yet determined whether this is feasible, and require more time to do so.

43.    Our Political Action Committee has approached various levels of government, in order to request governmental reforms and legislative amendments that would offer protection for the vulnerable members of our group, to push the federal government for various amendments to the BIA and the CCAA to protect Former Employees, to push for various

provincial governments to honour obligations and offer support to the Nortel Pension Plans, including through the Ontario Pension Benefit Guarantee Fund and Québec's Régie des Rentes du Québec. We are examining options and alternative solutions for the Pension Plans going forward. While we have been successful in gaining ground on this issue, we also require more time to gain ground on issues related to the Pension Plans.

44. We instructed our Representative Counsel to appeal the CCAA judge's decision to allow Nortel to continue terminating its employees without making payment of statutorily mandated termination and severance pay in accordance with provincial legislation, which was leaving these individuals high and dry during a vulnerable period of unemployment. When the Court of Appeal for Ontario upheld the CCAA judge's decision that the company did not have to honour its statutory termination and severance pay obligations, we instructed our legal counsel to seek leave to appeal to the Supreme Court of Canada. I am advised by my legal counsel that this leave application remains pending with the Court, that this litigation is costly and that we are uncertain of its chances of success.

45. After all of these efforts, I believe that the NRPC has gained substantial ground for our constituency. However, we require more time to assess these alternatives.

## THE SETTLEMENT AGREEMENT

### *General*

46. The NRPC efforts ultimately led us to the Settlement Agreement that is the subject of this motion. We agreed to the terms of the Settlement Agreement, which was executed on February 8, 2010, after our Representative Counsel was involved in months of extensive discussions with the Monitor, Nortel, the CAW and other interested parties, to resolve some of the outstanding issues pertaining to the Former Employees' and disabled employees' pensions and benefits. During these discussions, the NRPC was kept apprised of developments by way of our weekly calls.

47. The terms of the ultimate Settlement Agreement we reached have been described by the Monitor in its Thirty-Ninth Report, and in paragraph 19 of the King Affidavit. I have reviewed both of these documents and substantially agree with their description of the terms of the Settlement Agreement.

Canada. Again, by giving up this right, we are avoiding uncertain and costly litigation in favour of a payout of funds that is certain, and is payable within a reasonable time frame.

**CONCLUSION**

95. To put it simply, the Settlement Agreement provides the Former Employees and Nortel's disabled employees with an interim benefit funding solution that provides short-term security and certainty for the next year. While we are releasing certain litigation claims, we are exchanging this risk and uncertainty with real benefits, more time to find alternative solutions and real cash, in the range of $44.2 million.

96. In assessing the merits of the Settlement Agreement, the court-appointed Representatives and the NRPC canvassed and took into consideration the interests of a wide cross-section of our constituency. We engaged in many lengthy discussions to assess the advantages and disadvantages of the Settlement Agreement. After careful consideration and strong stances taken during extensive negotiations, the Representatives and the NRPC fully support the Settlement Agreement. The Settlement Agreement provides Former Employees with a reasonable outcome, and the best outcome we were able to achieve, given the circumstances. We have negotiated a good deal without giving up any of the NRPC's and Former Employees' strategic aims.

97. I make this Affidavit in good faith and in support of this motion to approve the Settlement Agreement dated February 8, 2010 and for no improper purpose.

| | |
|---|---|
| SWORN BEFORE ME at the City of Toronto, in the province of Ontario, on February 23, 2010 | |
| Commissioner for Taking Affidavits | **DONALD SPROULE** |

# TAB 3

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT R.S.C. 1985, c. C-36 AS AMENDED**

**AFFIDAVIT OF SUSAN KENNEDY**
**(sworn February 23, 2010)**

I, Susan Kennedy, of the City of Ottawa, in the Province of Ontario, MAKE OATH AND SAY:

1. I am an employee of Nortel Networks Limited ("Nortel") and am currently not working due to a medical condition in respect of which I receive long term disability ("LTD") income benefits. I have been receiving LTD income benefits from Nortel since June 23, 1995.

2. I am the Court-appointed Representative for all employees of Nortel who are not working due to an injury, illness or medical condition in respect of which they are receiving or are entitled to receive disability income benefits by or through Nortel ("the LTD Beneficiaries") pursuant to the Representation Order for Disabled Employees dated July 30, 2009 (the "Representation Order"). Attached hereto as **Exhibit "A"** is the Representation Order dated July 30, 2009 (the "Representation Order").

3.  As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

4.  Capitalized terms used in this Affidavit and not otherwise defined shall have the meanings given to them in the Settlement Agreement dated February 8, 2010, the Monitor's Thirty-Sixth report dated February 8, 2010 (the "Thirty-Sixth Report") and the Monitor's Thirty-Ninth report dated February 18, 2010 (the "Thirty-Ninth Report") that have already been filed with this Court. Attached at Schedule "A" to this Affidavit is a list of those defined terms and their meanings.

5.  I swear this Affidavit in support of a motion for the approval of a Settlement Agreement which provides all former employees of Nortel, including pensioners and surviving spouses (the "Former Employees"), and all LTD Beneficiaries, with continued health, dental, life and income benefits until the end of 2010.

6.  The specific relief being sought in this motion by the Applicants is outlined in detail at paragraph 4 of the Affidavit of Elena King sworn February 18, 2010 in support of this motion (the "King Affidavit"). I have reviewed the King Affidavit and I am in agreement with the relief being sought as outlined in its paragraph 4. Based on information I have received from a broad cross-section of the LTD Beneficiaries, and after much discussion with Representative Counsel, our financial and actuarial advisors and the Representatives of the Former Employees, I swear this Affidavit in support of this motion on my behalf and on behalf of the individuals I represent, in its form put forward before this Court including in particular, the following relief:

    (a)  Approval of the Settlement Agreement, dated as of February 8, 2010, among the Applicants, the Monitor, the Former Employees' Representatives[1], the LTD Representative[2], Representative Settlement Counsel and the CAW (the "Settlement Parties") which requires, among other things, that the Applicants pay to the LTD Beneficiaries their disability income benefits on a "pay as you

---

[1] On their own behalf and on behalf of the parties they represent.
[2] On her own behalf and on behalf of the parties she represents.

go basis" and shall continue to pay medical and dental benefits and life insurance benefits to Pensioners and LTD Beneficiaries until December 31, 2010;

(b) An Order that the Applicants shall make all current service payments and special payments to the Pension Plans in the same manner as they have been doing over the course of these insolvency proceedings, through to March 31, 2010, in the aggregate amount of $2,216,254 per month and that thereafter and through to September 30, 2010, the Applicants shall make only current service payments to the Pension Plans, in the aggregate amount of $379,837 per month; and

(c) An Order that notwithstanding anything else in the Settlement Agreement, in the event of a bankruptcy of Nortel, if there is an amendment to any provision of the *Bankruptcy and Insolvency Act* that changes the current, relative priorities of the claims against the Applicants, no party will be precluded by the Order from arguing the applicability or non-applicability of any such amendment in relation to any such claim.

7. As the Court-appointed Representative of the LTD Beneficiaries, I have been closely involved with Representative Counsel throughout the discussions concerning and negotiations leading up to the Settlement Agreement. In my opinion, this Settlement Agreement represents a fair and reasonable solution for the provision of benefits through 2010 to a small, but vulnerable group of disabled individuals who, for the most part, do not have any other source of income or ability to replace their benefits, and in particular, the health, dental, life and income benefits they receive from Nortel. It also provides more time for the LTD Beneficiaries to prepare to live and support themselves and their families, and to deal with their health concerns and disabilities after Nortel, as we know it, ceases to exist.

**BACKGROUND**

8. On January 14, 2009, the Applicants ("Nortel") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. c. C-36, as amended ("CCAA")

57

pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court. Ernst & Young Inc. was appointed as Monitor (the "Monitor") in the CCAA proceedings. Details regarding the background to the company's proceedings, and the insolvency proceedings of Nortel's related foreign entities, are set out in the affidavit of John Doolittle, sworn January 14, 2009, and previously filed by the Applicants in these proceedings and are therefore not repeated herein.

9. The committee now known as the Canadian Nortel Employees on Long Term Disability ("CNELTD") was formed at the end of January 2009, shortly after Nortel filed for protection under the CCAA. It was originally called the Nortel Networks Long Term Disability Survivors ("NNLTDS"). A number of LTD Beneficiaries, including Charles Black, Connie Walsh and myself, formed the committee for support, information sharing, legal guidance and in order to ensure we had a voice in Nortel's insolvency proceedings. Upon the resignation of Connie Walsh as committee leader and Yahoo! Group facilitator on April 23, 2009, I volunteered to take over this role. In addition to communicating with the committee via the internet, I set up two face-to-face meetings among committee members in Ottawa on April 30, 2009 and June 1, 2009.

10. Anyone who is an LTD Beneficiary is permitted to join the CNELTD. Membership in the CNELTD grew from about 20 members in June 2009 to approximately 84 members by the end of 2009.

11. At my request, our legal counsel sent a letter to all Nortel LTD Beneficiaries on January 15, 2010. Since then an additional 46 LTD Beneficiaries have contacted and joined the CNELTD, which now has 130 members (a number that continues to increase).

12. Since its establishment, members of the CNELTD have engaged in numerous projects and undertakings to assist in the plight of LTD Beneficiaries. We have done extensive research into Nortel's decision to self-insure our income benefits, including benefit industry practices, tax implications, the historical documents and legal aspects of the matter. Our members have also met with politicians to lobby for legislative and policy

change, have broadcast information about our situation through the media, and we have created a database of information and documents relevant to our research.

13.    From the outset, it has been the mandate of the CNELTD to protect the income and health benefits of the LTD Beneficiaries, as we learned very soon after the Initial Order was issued that both our income benefits and health benefits were in jeopardy by virtue of the insolvency proceedings. Many disabled employees were unaware that our disability income benefits were not insured. We discovered through our research and our discussions with Koskie Minsky LLP that Nortel provided our income benefits on a self-funded basis through a vehicle known as the Health and Welfare Trust ("HWT").

14.    I contacted Koskie Minsky LLP in May of 2009 to determine whether they would provide legal representation to the LTD Beneficiaries. I was in regular communication with Koskie Minsky LLP through that period, as the LTD Beneficiaries were very concerned about the effect of Nortel's insolvency on them. It was ultimately agreed that Koskie Minsky LLP would represent us and would seek a representation order from the Court to that effect.

15.    By the July 30, 2009 Representation Order, I was appointed as Representative of all LTD Beneficiaries, and Koskie Minsky LLP was appointed as Representative Counsel, subject to certain exceptions. Individuals who are not bound by the Representation Order are:

(a)    Those LTD Beneficiaries who are employed and whose benefit or other payments arise directly or inferentially out of a Collective Agreement between the Applicants, or any of them, and the CAW; and

(b)    Any individual LTD Beneficiary who did not wish to be bound by the Order and filed an opt-out notice with the Monitor by September 25, 2009.

16.    Individuals who wished to opt-out of the Representation Order were required to do so within thirty days of the publication of the Notice of the Order. As indicated in paragraph 30 of the Monitor's Thirty-Ninth Report already filed with this Court in support of this motion, which I have reviewed, none of the LTD Beneficiaries opted-out

of representation by me and by Representative Counsel. Accordingly, I have the mandate and authority to represent the interests of an estimated 250 individuals.

17. The individuals who belonged to the CNELTD organization at the time of the Representation Order were very pleased to have Koskie Minsky LLP appointed as our Representative Counsel, as we knew from our research that they had experience in this area of law. Additionally, we were glad to be represented as a separate group, rather than as a subgroup of the company's active employee group. Attached hereto as **Exhibit "B"** is a copy of the Representation Order dated July 22, 2009 appointing Representative Counsel on behalf of certain of Nortel's active employees.

18. As indicated in paragraph 3 of our Representation Order, the scope of my mandate is to represent all LTD Beneficiaries in the insolvency proceedings or any other proceeding which has been or may be brought before this Honourable Court, including, without limitation, for the purpose of settling or compromising claims by the LTD Beneficiaries in the insolvency proceedings. I take this significant responsibility very seriously.

**ORGANIZATION AND COMMUNICATIONS**

19. By the date of my appointment as Representative, I had already been very involved with the CNELTD. I was responsible for communications, maintaining a database of LTD Beneficiaries joining the CNELTD, sending information to members, and interfacing with Koskie Minsky LLP. I also participated with other CNELTD members in meetings with politicians and media events, such as demonstrations. Following my appointment as Representative, I gathered together the key people who had been involved in the CNELTD up to that point, to establish a working group to assist me in these activities and to ensure that the varying interests among the LTD Beneficiaries were being heard and addressed.

20. After July 30, 2009, on an informal basis, we started to regularly seek input from Koskie Minsky LLP as our counsel, to gather information about our situation and to seek guidance from our lawyers as to what steps we could take to improve our position.

21. I arranged for Susan Philpott and Andrea McKinnon of Koskie Minsky LLP to participate in a conference call with the CNELTD members on August 18, 2009. The