CNELTD members then had an opportunity to listen to a Webinar presented by Koskie Minsky LLP on August 25, 2009. We held a meeting on August 28, 2009 with a number of members of our group and discussed different roles that individuals could take on.

22.   We established a Legal Steering Committee which participated in periodic calls with Koskie Minsky LLP. We sent out a call for volunteers and from these volunteers, I selected the people I felt would work well together with each other, and with our Representative Counsel. Attached hereto as **Exhibit "C"** is a copy of the Call for Volunteers which was posted on our Yahoo! Group.

23.   The CNELTD has had a communications structure in place since September 2009 through the CNELTD Yahoo! Group, and for several months before this date, certain LTD Beneficiaries communicated through the NNLTDS Yahoo! Group. Individuals on long term disability can join CNELTD group by sending an e-mail to CNELTD-Owner@yahoogroups.com. Membership in the group enabled individuals to partake in the e-mail communications that occurred within that group including the circulation of reports and answers to questions pertaining to the circumstances of the LTD Beneficiaries in Nortel's insolvency proceedings. As some LTD Beneficiaries did not wish to join the Yahoo! Group, we established a separate email mechanism to send them information of importance. We also communicate with other LTD Beneficiaries by telephone.

24.   We also instructed our counsel to include information for the LTD Beneficiaries on their website. A special page was established on the Koskie Minsky LLP website tabbed "Information for Disabled Employees". We use that page as a means of communication with the members of the CNELTD and all other LTD Beneficiaries who have not joined the group. Anyone with internet access can access that page.

25.   At the end of September, 2009 the CNELTD established a formal Legal Steering Committee to liaise regularly with counsel, seek their guidance, provide instructions and provide information to the LTD Beneficiaries group as a whole. The Legal Steering Committee was originally comprised of myself, Johanne Bérubé, Anne Clark-Stewart, Kevin Leblanc, Manon Gaudreau and Sylvain de Margerie, four of whom are bilingual.

Both Manon Gaudreau and Sylvain de Margerie have resigned from the Legal Steering Committee.

26.   In addition, Anne Clark-Stewart, who is a Nortel pensioner and a member of the Political Action Committee of the Nortel Retiree and former employee Protection Canada ("NRPC") and who was a disabled employee of Nortel until shortly after the Initial Order was issued, also sits on the Legal Steering Committee. Ms. Clark Stewart fills a valuable role in providing us with information about the political and lobbying efforts of the NRPC and assisting with our own lobbying, and in providing a liaison with the NRPC.

27.   The CNELTD. and NRPC work together in many circumstances where our collaboration and coordination is advantageous to our constituencies.

28.   The Legal Steering Committee participates in weekly teleconference calls with Representative Counsel and our actuarial advisors, the Segal Company. With the assistance of counsel, we prepare reports of those meetings and deliver periodic updates by e-mail to the CNELTD Yahoo! Group. The agendas of our conference calls with counsel and our actuaries are typically informed by the questions and inquiries that we receive from the LTD Beneficiaries.

29.   The Legal Steering Committee receives a vast number of e-mail questions and inquiries about the status of the proceedings, the projects in which we are engaged, seeking status reports on the work of counsel, and raising possible legal actions that should be investigated. Despite our disabilities, Johanne, Anne and I spend many hours per day responding to e-mails, speaking with LTD Beneficiaries on the telephone, speaking with our counsel, coordinating with the members of the Legal Steering Committee, preparing presentations and reports and meeting with politicians.  Johanne and Kevin are both bilingual.

30.   In addition, information is also available to any LTD Beneficiary who wishes to access it through the Koskie Minsky LLP website or by leaving a message on the toll free number that is administered by Koskie Minsky LLP. Individuals can also contact me directly by e-mail (and regularly do) for any information they require.

31.    There are approximately 391 LTD Beneficiaries, which include an estimated 100 members of the CAW.  CAW members are represented by counsel for the CAW in these proceedings. I have been provided with a list of the individuals in our constituency by Nortel.  We communicate with members of our constituency who have contacted us by telephone, email and through the Yahoo! Group and in doing so, keep them advised of all developments in the proceedings.

## NATURE OF ISSUES AND CONCERNS OF THE LTD BENEFICIARIES

32.    I have personally spoken with numerous LTD Beneficiaries and have had e-mail communications with many more. The range of illnesses, disabilities and medical conditions that exist among the LTD Beneficiaries are quite diverse.

33.    In addition, the characteristics of the group in terms of their financial needs and their medical needs vary as well. Included in the group are single parents, individuals with spouses who work and have benefits coverage, individuals who are close to retirement or already qualify for retirement pension, those who are still very young and have no reasonable prospect of ever working again, and those who are highly dependent on costly prescription drugs and medical benefits. The common characteristic of the individuals in the group, however, is that they are all extremely anxious about their futures.  They have no financial security or certainty and this is causing great anxiety among members of our group.

34.    Many of the LTD Beneficiaries with whom I have spoken or from whom I have received e-mail communication were unaware and shocked about the uninsured nature of their disability income benefits and to learn that those benefits could disappear through Nortel's insolvency.  It takes considerable time for people to accept that the benefits were not insured, and I have noticed that some individuals are unwilling to accept that they will receive a future reduction, in any amount, to their monthly income benefit payments.  This has been and continues to be a constant source of discontent and disagreement within the CNELTD group.

35.    The key concerns of the LTD Beneficiaries that have been articulated to me, and which I share, are as follows:

a)   **Income** – The LTD Beneficiaries want to know whether and for how long their disability income will continue, and from what source it will be paid. They want to know when it will stop and how much notice they will be provided of the cessation of payments because they require time to make other arrangements and plan for their financial futures.

b)   **Medical Benefits** – The LTD Beneficiaries want to know if their health plan will continue, whether they will be able to replace their medical benefits in some way at an affordable cost and whether they will be able to replace their life insurance once coverage by Nortel is terminated.

## OUR BENEFITS SINCE THE CCAA FILING

36.   I understand from counsel that in accordance with the Initial Order, Nortel was "entitled but not required" to make payment of outstanding and future wages, salaries and employee benefits, which specifically included medical benefit plans, and both current service and special payment contributions into the registered Pension Plans. In other words, Nortel could have terminated our income benefit payments at any time after January 14, 2009.

37.   However, Nortel chose to continue paying and providing the LTD Beneficiaries with our health and medical benefits, to continue making our long term disability income payments out of the HWT, a trust vehicle Nortel uses as a mechanism to fund some of our benefits, and also to continue to make both current service contributions and special payment contributions into the registered Pension Plans.

38.   The current structure of the HWT, the benefits relevant to the motion that are paid from it and its history, are described by the Monitor in paragraphs 45 through 52 of its Thirty-Ninth Report dated February 18, 2010 (the "Thirty-Ninth Report"), which I have reviewed. I have also reviewed the trust agreement, and amendments thereto[3],

---

[3]   The Trust Agreement is more fully described at paragraph 46 of the Thirty-Ninth Report, and attached as Appendix "E" thereto.

establishing the HWT and understand from my counsel that based upon the documents and information that they have received, this description is accurate.

39.    The HWT is the vehicle through which Nortel provided a Health and Welfare Plan to its employees and retirees. The Health and Welfare Plan included a health care plan, a management long term disability plan, a union long term disability plan, a management survivor income benefit plan, a management short term disability plan and a group life insurance plan. Certain employee benefits, including the income benefits for LTD Beneficiaries, in recent years, have been paid by the HWT with trust assets, whereas other employee benefits, including medical and dental benefits, have been funded by the Applicants on a pay-as-you-go basis, but paid through the HWT as an administrative matter.

40.    There was fear among our group that our medical benefits and our monthly income benefits would be discontinued, or worse, that they would be discontinued without notice.  This concerned me, and other LTD Beneficiaries who contact me regularly, as we are dependent on these plans to pay for prescription drugs, dental and other health related benefits.  The LTD Beneficiaries have significant medical needs in this regard.

## CNELTD EFFORTS SINCE REPRESENTATION ORDER

*Maximize Replacement of LTD Income*

41.    One of the main concerns of the LTD Beneficiaries has been their financial security in the future. With this in mind, I and other members of the Legal Steering Committee and members of the CNELTD at large, have explored as many avenues as we can think of to find ways to replace as much of our disability income as possible, knowing that at some point in the not-to-distant future, our disability income payments from Nortel will cease.  Accordingly, with the guidance and advice of our counsel at Koskie Minsky LLP, we have explored the following:

(a)    **HWT – Payment of Assets to the LTD Beneficiaries**

We learned from the Thirty-Second Report of the Monitor dated November 30, 2009, that the assets in the HWT had a market value of approximately $84 million (see

paragraph 19). We have made it a priority to ensure that the LTD Beneficiaries would receive the largest portion of those assets to which we could reasonably claim entitlement. Our counsel, with our input, has been engaged in discussions about the allocation and distribution of the assets in the HWT since early October of 2009. As described in the Thirty-Ninth Report, the Settlement Agreement provides that the Settlement Parties will work towards a court-approved distribution of the HWT in 2010 to its beneficiaries entitled thereto, and to resolve any issues related to this distribution.

With the relief provided by the Settlement Agreement, I understand from our counsel that the objective is to be in a position to have a lump sum distribution from the HWT to the LTD members before our income payments from Nortel cease on December 31, 2010. I have asked our actuaries to calculate roughly what percentage of the future value of our disability income would be paid to us from the HWT assuming that the trust assets are divided pro-rata to the liabilities. I have been advised that although we are still awaiting 2009 numbers, we can expect that there will be a lump sum payment which will be equivalent to a sizeable percentage of the value of our future payments. Attached hereto as **Exhibit "D"** is a copy of an unofficial memorandum prepared by our actuary, Segal Company, delivered to our legal counsel on February 23, 2010.

We are also exploring the most tax effective way of distributing those assets to LTD Beneficiaries and will seek a tax ruling to ensure as tax-effective a distribution as possible.

(b)    **HWT – Preservation of Assets**

Recognizing that the continued payment of our disability income from the HWT was depleting assets that belonged to us in any event, we raised this concern with counsel, and sought ways to have our disability income payments made by Nortel directly rather than from the HWT. The Settlement Agreement achieves that goal for a significant period of twelve (12) months. I am advised by my counsel that this change in payment, if Court approved, will apply retroactively, starting at January 1, 2010.

(c)    **Making a Claim against Nortel for Negligent Misrepresentation**

One of the causes of action that we asked our counsel to explore was the possibility of a negligent misrepresentation claim. Many of our constituents wanted to see such a claim launched, however, our counsel were quite clear that no advantage would be gained by such a claim because Nortel is currently under Court protection and no lawsuits can be made against Nortel while it is under the protection of a stay of proceedings. Nortel will not emerge from Court protection as a viable entity, against which the LTD Beneficiaries could make a claim for the loss in our benefits. In any event, our claim against Nortel for 100% of the loss of our disability income benefits will be made in the claims process.

(d)    **Making a Claim against Nortel for Failing to Fund the HWT**

We also asked our counsel to explore the possibility of suing Nortel for failing to fully fund the HWT and, in particular, failing to remit monies to the HWT sufficient to pay 100% of our disability income.

Again, many of our members urged us to make such a claim, however, our counsel advised us that (i) there was no statutory obligation under the terms of the Trust Agreement which required Nortel to fund in full the HWT benefits, and (ii) no advantage would be gained in any event by such a claim because Nortel is currently under Court protection, no lawsuits can be made against Nortel while it is under the protection of a stay of proceedings, Nortel will not emerge from Court protection as a viable entity, and our claim against Nortel for 100% of the loss of our disability income benefits will be made in the claims process in any event.

(e)    **Making a Claim against Nortel's Directors**

The Legal Steering Committee asked our counsel to evaluate the viability of a claim against Nortel's directors for Nortel's decision to self-insure the LTD program, a claim for negligent misrepresentation by Nortel's directors, a claim against Nortel's directors for failing to ensure that the LTD program was fully funded, and any other possible claim we could make against the directors. We were advised that there are very strict limitations on the kinds of claims that can be made against directors of a corporation.

Our counsel reviewed the documentation pertaining to the HWT and the LTD program including the summary benefits booklets and other communications that were provided to Nortel employees. They also reviewed the applicable case law and statutory provisions. Based on the evidence that was available, our counsel advised us that any claim that could be made against the directors of Nortel would be risky, costly, lengthy and without any guarantee of success.

(f)    **Making a Claim against the Trustee of the HWT for Failing to Ensure that Nortel Fully Funded the LTD Program**

The Trustee of the HWT has responsibility for undertaking actuarial calculations for the benefits to be paid under the health benefit programs in the HWT, but no obligation to pay them. Only Nortel is obliged to pay them and there is no clear obligation on the Trustee to enforce payment. We have been advised by counsel that actuarial calculations for accounting purposes were prepared for accounting purposes by Mercer, the actuaries for the plans, not the Trustee. Further, the Trust Agreement precludes legal action by trust beneficiaries against the Trustee. Any claim against the Trustee is therefore risky and uncertain, both as to liability of the Trustee and any damages that might result.

In summary, like many of our members, the Steering Committee also wished that we could find a way to end up with a greater percentage of our actuarial values. However, we understood that to pursue the lawsuits outlined above in these circumstances would just prolong the process, use up additional funds from Nortel's estate for legal fees, and possibly would lead to the cessation of our medical and income benefits. If this course was taken, we may have had to wait years to receive a distribution in respect to our claims against Nortel, and most disabled employees could not afford to take this chance. We felt that the responsible decision was to rely on the advice of our legal counsel and our actuarial advisors, rather than to proceed with what possibly could be prolonged and risky litigation.

(g)    **Lobbying**

The CNELTD has also been very active politically and has approached various levels of government to request legislative reforms that would offer protection for the

vulnerable members of our group. One initiative is to elevate uninsured disability income benefits to preferred status in any insolvency proceedings. The other is to eliminate the ability of companies to "self-insure" their disability income programs or, if they do self-insure, to ensure that their programs are fully funded. Regardless, the latter request for legislative reforms would not benefit our group.

## Ensure Replacement of Health Benefits

42. The second major concern of the LTD Beneficiaries is that they have access to continued prescription drug and other medical and dental benefits coverage. As I have explained, the LTD Beneficiaries are particularly vulnerable and dependent on their medical and drug coverage. Many have prescription drugs costs of thousands of dollars per month and without benefits coverage, would become more ill, and potentially die, and would be required to rely on the mercy of government programs.

43. Over the past year the CNELTD, with the help of Representative Counsel, has fought hard to keep medical, dental and life insurance benefits intact.

44. The CNELTD and the NRPC have formed a joint committee, which includes members of both the CNELTD and the NRPC to explore alternative solutions that would allow some form of replacement benefit coverage to continue once Nortel no longer exists as a company and the HWT is wound up. We have joined with the NRPC in this project because we have been advised that the sheer size of that group will assist in making a plan attractive and viable, and without the pensioners, the LTD Beneficiaries alone might not be in a position to secure benefits coverage.

45. With the help of our actuaries at the Segal Company, our legal counsel, Nortel's benefits personnel, actuaries and consultants at Mercer and the existing benefits administrator, Sun Life, the committee is exploring funding options, and whether there are viable benefit plan options which suit the varied needs of the constituencies. These explorations are still at a preliminary stage but I expect that the work of the joint committee will accelerate in the coming months if the Settlement Agreement is approved, as we will not be distracted by the uncertainty of our benefits continuation in the short term.

## OPPOSITION TO CNELTD

46.     Shortly after the CNELTD Legal Steering Committee was struck, a dissident group of LTD Beneficiaries formed, who, among other things, were unhappy with the way that the members of the Legal Steering Committee were selected. At various times since then, these individuals have sought to replace me as the Court-appointed Representative (but have never taken formal steps to do so), have insisted they be permitted to access the confidential information disclosed to me and counsel under a non-disclosure agreement, have refused to follow the civility protocols put in place for communications on the CNELTD Yahoo! Group, and have written abusive and harassing emails to me, other members of the Legal Steering Committee and our counsel.

47.     Johanne Bérubé is the group owner and moderator of the CNELTD Yahoo! Group. The moderator controls the flow of messages among the members of the group. When emails from certain members became aggressive, threatening and hostile, the Legal Steering Committee instituted a moderating policy whereby all messages were first reviewed to ensure they met a standard of ordinary civility. Messages which did not meet such a standard were not allowed on the site by the moderator and one member was removed. That way the members of the CNELTD who were content with my representation and that of Representative Counsel were not unnecessarily exposed to the hateful communications. I must be clear, however, that I have not stopped responding to the communications and questions in those uncirculated emails. Johanne Bérubé and I conscientiously respond, to the best that we are able, to all of the inquiries that are sent to us. We also ensure that important messages are forwarded to members' email addresses whether or not they are members of the Yahoo group.

48.     Most recently, these individuals wrote to Koskie Minsky LLP and a copy of their letter and the reply from counsel is attached hereto as **Exhibit "E"**. Counsel's response is attached.

49.   There have been a number of individuals who have communicated to me their opposition to the Settlement Agreement, however, the majority of those who contacted me have been in support of the agreement.

## THE SETTLEMENT AGREEMENT

### General

50.   Efforts of the CNELTD in conjunction with the NRPC have ultimately resulted in the Settlement Agreement that is the subject of this motion. I agreed to the terms of the Settlement Agreement, which was executed on February 8, 2010, following weeks of intensive negotiations by Representative Counsel with the Monitor, the Company, the CAW, the bondholder group and the Unsecured Creditors Committee from the U.S. insolvency proceedings.  We were guided in those negotiations by our counsel.

51.   The terms of the Settlement Agreement which was ultimately reached have been described by the Monitor in its Thirty-Ninth Report and in paragraph 19 of the King Affidavit. I have reviewed both of these documents and substantially agree with the description of the Settlement Agreement contained therein.

### Negotiation of the Settlement Agreement

52.   In December 2009, our concern about the future of our disability income, and our health, medical and life insurance benefits increased. We became aware, through discussions with our legal and financial advisors, that there was limited cash flow within the Canadian estate and that a new funding agreement (the "Funding Agreement") was being negotiated to fund Canadian operations through 2010 and beyond. We were uncertain how long the company planned to continue paying for our income and benefits, and were worried that our group's benefits might cease without notice.

53.   We were eventually advised that the proposed Funding Agreement ensured the funding of our benefits and the Pension Plans only through to the end of Q1 of 2010. This was unacceptable to us.

consideration and many discussions with our advisors and constituency, I, as Court-appointed Representative, and CNELTD fully support the Settlement Agreement. The Settlement Agreement provides the LTD Beneficiaries with a reasonable outcome, and the best outcome we were able to achieve, given the circumstances.

95.   I make this Affidavit in good faith and in support of this motion to approve the Settlement Agreement dated February 8, 2010 and for no improper purpose.

SWORNBEFORE ME at the City of
Toronto, in the province of Ontario, on
February 23, 2010

_____
Commissioner for Taking Affidavits

_____
SUSAN KENNEDY

# TAB 4

(NNI) Client Home                                                                                            Page 1 of 4

72

Claim Question? Call: 646 282 2400    Technical Support Question? Call: 800 794 4430

Guest | Sign In



Nortel Networks Inc.

Change Client

Client Home    Claims    Docket    Key Documents

Home > Client Home

Bookmark this Page

**NORTEL**

## GENERAL INFORMATION

On January 14, 2009, Nortel Networks Inc. ("NNI") and fourteen (14) of its subsidiaries (collectively, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware seeking relief under chapter 11 of the United States Bankruptcy Code. The Debtors' cases have been assigned to Judge Kevin Gross. The Debtors' cases are being jointly administered for procedural purposes, meaning that all pleadings will be maintained on the case docket for Nortel Networks Inc., Case No. 09-10138 (the "Main Case Docket"). The Main Case Docket can be accessed through the website maintained by the United States Bankruptcy Court for the District of Delaware http://www.deb.uscourts.gov. An unofficial version of the docket is accessible by selecting the "Docket" link at the top of this page.

On January 14, 2009, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC") and NNI's direct corporate parent Nortel Networks Limited, together with certain of their affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (Commercial List) under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Court appointed Ernst & Young Inc. to serve as Monitor for the Canadian Proceedings. On January 14, 2009, Ernst & Young Inc., as foreign representative for the Canadian Debtors, filed petitions for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. For further information regarding the Canadian Proceedings, please contact Ernst & Young Inc. The Monitor's hotline is 1-866-942-7177 in the United States and Canada, and 1-416-943-4439 outside of the United States and Canada. The Monitor is also maintaining a website with information on the Canadian Proceedings, located at http://www.ey.com/ca/nortel. In addition, on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "U.K. Debtors") into administration under the control of individuals from Ernst & Young (collectively, the "U.K. Proceedings"). This website only provides information on the chapter 11 proceedings, and does not provide information on the Canadian Proceedings, the Canadian Debtors, the U.K. Proceedings, or the U.K. Debtors.

On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors") into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").

On May 28, 2009, at the request of the Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months. In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA.

On June 8, 2009, Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

On July 14, 2009, Nortel Networks (CALA) Inc. ("NN CALA") filed a petition with the Court seeking relief under chapter 11 of the Bankruptcy Code (Case No. 09-12515). On July 15, the Court entered an Order approving the joint administration and consolidation of NN CALA's case with the chapter 11 cases of Nortel Networks Inc. and its affiliated debtors (jointly administered under Case No. 09-10138), and the application to NN CALA of certain previously entered orders in the Debtors' chapter 11 cases.

On July 13, 2010, the Debtors filed the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated Debtors. A copy of the Plan is available here.

On September 3, 2010, the Debtors filed their Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated Debtors. A copy of the Disclosure Statement is available here. The Disclosure Statement has not yet been approved by the Court.

## ASSET SALES

**Layer 4-7 Assets**

On March 28, 2009, the Court entered an order approving the sale of the Layer 4-7 assets to Radware Ltd. as the successful bidder at auction.

- A copy of the Sale Motion is available here. The Asset Sale Agreement is attached as Exhibit A to the Sale Motion.
- A copy of the Bid Procedures Order is available here. The Asset Sale Agreement is attached as Exhibit A to the Sale Motion.
- A copy of the Sale Order is available here.

**CDMA & LTE Assets**

On July 28, 2009, the Court entered an order approving the sale of CDMA and LTE-related assets to Telefonaktiebolaget LM Ericsson (Publ) ("Ericsson") as the successful bidder at auction.

- A copy of the Sale Motion is available here.
- A copy of the Bidding Procedures Order is available here.
- A copy of the Motion seeking to join NN CALA to the sale is available here.
- A copy of the order joining NN CALA to the Sale Motion is available here.
- A copy of the Sale Order is available here. The Asset Sale Agreement is attached as Exhibit A to the Order.

**Enterprise Solutions Business Assets**

On September 16, 2009, the Court entered an order approving the sale of the Enterprise Solutions business to Avaya Inc. as the successful bidder at auction.

- A copy of the Sale Motion is available here.
- A copy of the Bidding Procedures Order is available here.
- A copy of the Sale Order is available here. The Asset and Share Sale Agreement is attached as Exhibit A to the Order.

**Next Generation Packet Core Assets**

On October 28, 2009, the Court entered an order approving the sale of assets associated with Nortel's Next Generation Packet Core network components to Hitachi, Ltd.

- A copy of the Sale Motion is available here.
- A copy of the Bidding Procedures Order is available here.
- A copy of the Sale Order is available here.

**GSM/GSM-R Assets**

On December 2, 2009, the Court entered an order approving the sale of assets associated with Nortel's GSM/GSM-R business to Telefonaktiebolaget LM Ericsson (Publ) and Kapsch

Carriercom AG as the successful bidder at auction.

- A copy of the Sale Motion is available here.
- A copy of the Bidding Procedures Order is available here.
- A copy of the Sale Order is available here.

### Metro Ethernet Networks Business Assets

On December 3, 2009, the Court entered an order approving the sale of the Debtors Metro Ethernet Networks business to Ciena Corporation as the successful bidder at auction.

- A copy of the Sale Motion is available here.
- A copy of the Bidding Procedures Order is available here.
- A copy of the Sale Order is available here.

### Carrier Voice Over IP and Application Solutions Business Assets

On March 4, 2010, the Court entered an order approving the sale of certain assets of Nortel's Carrier Voice Over IP and Application Solutions business to GENBAND Inc.

- A copy of the Sale Motion is available here.
- A copy of the Bidding Procedures Order is available here.
- A copy of the Sale Order is available here. The Asset Sale Agreement is attached as Exhibit A to the Order.

### Multi-Service Switch Business Assets

On September 30, 2010, the Court entered an order approving the sale of certain assets of Nortel's Multi-Service Switch business to Ericsson.

- A copy of the Bidding Procedures Motion is available here. The stalking horse asset sale agreement is attached to the Bidding Procedures Motion as Exhibit A.
- A copy of the Bidding Procedures Order is available here. The bidding procedures for the proposed sale is attached to the Bidding Procedures Order as Exhibit A
- A copy of the Sale Order is available here. The Asset Sale Agreement is attached to the Sale Order as Exhibits.

### Residual Patent Assets

On April 4, 2011, the Debtors filed a Sale Motion to approve their entry into a stalking horse agreement with Ranger Inc., a subsidiary of Google Inc.

- A copy of the Sale Motion is available here. The stalking horse asset sale agreement is attached to the Sale Motion as Exhibit A.

## PROOFS OF CLAIM

On August 4, 2009, the Court entered an order fixing the general bar date for the filing of proofs of claim or interest in the U.S. The deadline for filing of proofs of claim against the Debtors in these cases has been set by the Bankruptcy Court as follows:

General Bar Date: September 30, 2009 at 4:00 p.m. (prevailing Eastern Time)

Completed forms can be sent to the following addresses:

| If by first-class mail: |
|---|
| Nortel Networks Inc. Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5075 |
| If by Hand Delivery or Overnight mail: |
| Nortel Networks Inc. Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>757 Third Avenue, 3rd Floor<br>New York, NY 10017 |

A blank proof of claim form can be obtained here.

Instructions for filing a proof of claim can be found here.

The Debtors' Schedules of Assets and Liabilities can be found here.

### Nortel Networks (CALA) Inc.

On December 2, 2009, the Court entered an order fixing the general bar date for filing of proofs of claim or interest against Nortel Networks (CALA) Inc. The deadline for filing of proofs of claims against Nortel Networks (CALA) Inc., case number 09-12515, has been set by the Bankruptcy Court as follows:

General NN CALA Bar Date: January 25, 2010 at 4:00 pm (prevailing Eastern Time)

Completed forms can be sent to the following addresses:

| If by first-class mail: |
|---|
| Nortel Networks Inc. Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5075 |
| If by Hand Delivery or Overnight mail: |
| Nortel Networks Inc. Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>757 Third Avenue, 3rd Floor<br>New York, NY 10017 |

A blank proof of claim form for NN (CALA) Inc. can be obtained here.

Instructions for filing a proof of claim against NN (CALA) Inc. can be found here.

Nortel Networks (CALA) Inc. Schedules of Assets and Liabilities can be found here.

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Pursuant to Docket No. 142, the following creditors have been appointed to the Official Committee of Unsecured Creditors in these cases by the Office of the United States Trustee:

| The Bank of New York Mellon | Pension Benefit Guaranty Corporation | Law Debenture Trust Company of New York |
|---|---|---|
| 101 Barclay Street-8 West | 1200 K Street, N.W. | 400 Madison Ave., 4th Floor |
| New York, NY 10286 | Washington, DC 20005 | New York, NY 10017 |
| Phone: (212) 815-5583 | Phone: (202) 326-4000 ext. 3209 | Phone: (212) 750-6474 |
| Fax: (732) 667-4756 | Fax: (202) 842-2643 | Attn: Robert L. Bice, II |

(NNI) Client Home

Attn:   Martin Feig, V.P.              Attn:   Jennifer Messina

## DEBTORS

Lead Debtor:

| Nortel Networks Inc. | Case No.: | 09-10138 |

Related Debtors:

| Nortel Networks Capital Corporation | Case No.: | 09-10139 |
| Nortel Altsystems Inc. | Case No.: | 09-10140 |
| Nortel Altsystems International Inc. | Case No.: | 09-10141 |
| Xros, Inc. | Case No.: | 09-10142 |
| Sonoma Systems | Case No.: | 09-10143 |
| Qtera Corporation | Case No.: | 09-10144 |
| CoreTek, Inc. | Case No.: | 09-10145 |
| Nortel Networks Applications Management Solutions Inc. | Case No.: | 09-10146 |
| Nortel Networks Optical Components Inc. | Case No.: | 09-10147 |
| Nortel Networks HPOCS Inc. | Case No.: | 09-10148 |
| Architel Systems (U.S.) Corporation | Case No.: | 09-10149 |
| Nortel Networks International Inc. | Case No.: | 09-10150 |
| Northern Telecom International Inc. | Case No.: | 09-10151 |
| Nortel Networks Cable Solutions Inc. | Case No.: | 09-10152 |
| Nortel Networks (CALA), Inc. | Case No.: | 09-12515 |

### SECTION 341 MEETING OF CREDITORS

Pursuant to section 341 of the Bankruptcy Code, the United States Trustee for the District of Delaware has continued the meeting of creditors to 11:00 a.m. (ET), on August 24, 2009 at the J. Caleb Boggs Federal Building, 844 North King Street, Room 2112, Wilmington, Delaware 19801.

### KEY PROFESSIONALS

**Debtors' Counsel**
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
http://www.cgsh.com
Phone:   (212) 225-2000
Fax:   (212) 225-3999
Attn:   James L. Bromley, Esq.

**Debtor's Co-Counsel**
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
http://www.mnat.com
Phone:   (302) 658-9200
Fax:   (302) 425-4664
Attn:   Derek C. Abbott, Esq.

**Counsel for the Official Committee of Unsecured Creditors**
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Phone:   (212) 872-1212
Fax:   (212) 872-1002
Attn:   Fred S. Hodara, Esq.

Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
Phone:   (302) 651-7845
Fax:   (302) 651-7701
Attn:   Christopher M. Samis, Esq.

### U.S. TRUSTEE

Office of the United States Trustee
844 King Street, Room 2207
Wilmington, DE 19801
Phone:   (302) 573-6491
Fax:   (302) 573-6497

### USEFUL LINKS

| Debtor's Website: | http://www.nortel.com |
| Canadian Monitor's Website: | http://www.ey.com/ca/nortel/ |

### WEBSITE INFORMATION

(NNI) Client Home                                                                                Page 4 of 4

75

As stated above, an unofficial version of the Main Case Docket can be accessed through this website by selecting "Docket" link at the top of this page. In addition, from time to time, certain key documents filed in this case or otherwise made available by the Debtor will be available by selecting the "Key Documents" link above. Should you have any questions relating to this website, please feel free to contact us toll free at 1-866-897-6435 in the United States and Canada and 646-282-2400 outside the United States and Canada.

Epiq Bankruptcy Solutions, LLC ("Epiq") maintains this website for the public's convenience. While Epiq makes every attempt to assure the accuracy of the information contained herein, this website is not the website of the United States Bankruptcy Court and does not contain the complete, official record of the Bankruptcy Court. All documents filed with the Bankruptcy Court are available for inspection at the office of the Clerk of the Bankruptcy Court during its normal business hours or online on the Bankruptcy Court's website. Use of this website is also subject to our TERMS OF USE and END USER LICENSE AGREEMENT. Please review our PRIVACY STATEMENT for additional information regarding the data maintained on this website.

# TAB 5

76

Court File No.

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION (the "Applicants")**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**ERNST & YOUNG INC.**
**In its capacity as proposed Monitor of the Applicants**

---

**REPORT OF ERNST & YOUNG INC.**

**JANUARY 14, 2009**

**INTRODUCTION**

1. Ernst & Young Inc. ("EYI") understands that Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") have applied to this Honourable Court seeking commencement of proceedings under the *Companies' Creditors Arrangement Act* ("CCAA") in order to restructure the business and affairs of the Company.

2. This is the first report of EYI, the proposed Monitor in the Applicants CCAA proceedings. EYI has consented to act as Monitor in these CCAA proceedings.

3.  The purpose of this report ("Report") is to provide this Honourable Court with information on:

- General background;

- Overview of operations and interdependencies;

- Legal entity structure;

- Nortel's operational transformation;

- Research and development ("R&D") expenditures and transfer pricing adjustments;

- Financial overview

    o Debt structure;

    o Export Development Canada;

    o Pension and other post retirement plans;

- Cash position and liquidity;

- Efforts to refinance;

- Sale and divestiture efforts;

- Formal insolvency proceedings;

- Overview of the 13 week cash flow forecast;

- Flextronics Amending Agreement;

- Charges and financial thresholds in the draft Initial Order and employee and director matters;

2

- o  Administrative charge;

- o  Directors and Officers' trust and charge;

- o  EDC Charge;

- o  Inter-Company payments, Inter-Company charge and GSPA

- o  Carling Facility charge;

- o  Sales of assets;

- o  Creditor notification;

- ▪  AIP and KEIP;

- ▪  Directors' remuneration;

- ▪  Restructuring alternatives; and

- ▪  Conclusions and recommendations.

4.  In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, the financial information prepared by the Company, and discussions with management of Nortel.  EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Report.

5.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

6.  Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle (the "Doolittle Affidavit") filed in connection with these CCAA proceedings.

7.  EYI was retained by Nortel on September 26, 2008, to assist Nortel and its other professional advisors to analyze options available to refinance and restructure the Company's operations.

8.  EYI is not the auditor of Nortel.

## GENERAL BACKGROUND

9.  Nortel is fundamentally a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

10. In 2000, BCE Inc. spun-off substantially all of its shareholdings in NNC, and NNC became a widely-held public company listed on the Toronto Stock Exchange and New York Stock Exchange.   NNC is a Canadian corporation and is the direct or indirect parent of 143 subsidiaries operating worldwide. NNC is also the issuer of the convertible notes, described later in this report.

11. At its peak in 2000, NNC and its subsidiaries generated approximately $30 billion of consolidated revenues and employed approximately 93,000 people around the world. Since that time, it has faced increasing challenges due to the end of the technology boom and market saturation.

12. In addition, in 2003, NNC and certain of its then-current officers and directors became the subject of numerous court actions and regulatory investigations in connection with the restatements of NNC's financial statements. During 2006, Nortel entered into agreements to settle all of these class action lawsuits, concurrently (the "Global Class Action Settlement"), with the exception of one related Canadian action. In December 2006 and January 2007, the Global Class Action Settlement was approved by the relevant courts and became effective on March 20, 2007 (the

4

"Measurement Date"). Under the terms of the Global Class Action Settlement, Nortel paid $575 million in cash plus accrued interest and NNC issued common shares with a fair value of approximately $1,600 million (at the Measurement Date).

13. During 2007 Nortel also entered into separate settlement agreements with the Ontario Securities Commission and U.S. Securities and Exchange Commission.

14. Nortel has also indicated it continues to cooperate with authorities regarding on-going criminal investigations being conducted by the U.S. Attorney's Office and the RCMP, but is not the subject of such investigations.

15. These events distracted the Company and significantly hampered the growth of Nortel during a critical time of industry consolidation.

16. Since 2000, Nortel has contracted significantly. In each of the years 2001, 2004, 2006, 2007 and 2008 the Company announced restructuring plans that involved, among other things, a reduction of real estate costs and write down of plant and equipment. However, most of the restructuring plans focused on a reduction of employee headcount. As at September 30, 2008, Nortel, including its joint ventures, employed approximately 30,000 people, including over 6,000 people in Canada. Consolidated global revenues were approximately $10.9 billion for the year ended December 31, 2007.

## OVERVIEW OF OPERATIONS AND INTERDEPENDENCIES

17. As at December 31, 2008, Nortel conducted its business through four reportable business unit segments, Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and Global Services ("GS"). The respective business units provide the following products and services to telecommunications carriers and enterprise customers worldwide:

81

a) CN - provides wireless networking solutions that enable telecommunication service providers and cable operators to supply mobile voice, data and multimedia communications services to individuals and enterprises.

b) ES - provides communication solutions to large and small businesses in a variety of industries, which are used to build new networks and transform existing communications networks into more cost effective, packet-based networks supporting data, voice and multimedia communications.

c) MEN - provides optical networking and carrier grade Ethernet data networking solutions to make the CN and large ES customers' networks more scalable and reliable for the high speed delivery of diverse multimedia communications services.

d) GS – (a separate reporting segment up until December 31, 2008) provides a broad range of services and solutions supporting the entire lifecycle of multi-vendor, multi-technology networks for enterprises and carriers worldwide seeking to reduce costs, improve efficiency and performance, and capitalize on new revenue opportunities.

18. Effective January 1, 2009, Nortel implemented a new operating and customer service delivery model that involves the decentralization of several of its corporate functions and a transition to vertically integrated business units to give greater financial and operational control to the business units, and to reduce duplication inherent in a matrix organization. Specifically:

a) Enterprise customers will now be served by the ES business unit for the entire communications solutions portfolio, advanced software and the associated value-added services and solutions. Service provider customers will be served by two business units – CN and MEN - which will have full responsibility for all product, services, applications, portfolio, business and market

6

development, marketing and R&D functions. A dedicated global carrier sales organization will support both business units.

b) The GS and global operations organizations will be decentralized and transitioned to the relevant business units by April 1, 2009, although their financial results will be included in ES, CN and MEN from January 1, 2009 forward.

19. Nortel's largest business unit is CN which represents approximately 40% of Nortel's YTD Q3 2008 revenue. From a geographical perspective the largest region by revenue is the United States, primarily through Nortel Networks Inc. ("NNI"), a U.S. subsidiary of NNL, representing approximately 40% of YTD Q3 2008 revenue. A summary of 2007 and YTD Q3 2008 revenue by business unit and region is as follows:



EMEA - Europe, Middle East and Africa
APAC - Asia Pacific and China

7

83

20. In 2007, one customer, Verizon Communications Inc., represented approximately 11% of 2007 consolidated revenue with approximately $1,149 million of total revenue (approximately $730 million in CN).

## LEGAL ENTITY STRUCTURE

21. Generally, Nortel has established a separate legal entity in each of the countries in which it operates.

22. The revenue and assets of each of the business units is distributed among the multiple Nortel legal entities and joint ventures around the world. Each legal entity may have revenue and operations relating to some or all of Nortel's business units. Each region generally has a main operating entity or hub. The majority of Nortel's remaining legal entities operate as sales entities within their local countries.

23. The Canadian corporate structure is as follows:

   a) NNC is the ultimate parent company of the Nortel group of companies and its executive office is located in Toronto, Ontario. NNC has no active operations and its principal assets are its investments in direct and indirect subsidiaries.

   b) NNL is a direct subsidiary of NNC. It was incorporated in Canada and is Nortel's principal Canadian operating subsidiary. NNL's executive offices are located in Toronto, Ontario with its registered office in Montreal. It also has offices in Ottawa and Montreal with sales and support offices located throughout Western and Central Canada, Québec and the Maritimes. NNL's outstanding preferred shares are publicly traded on the TSX. NNL employs approximately 2,800 employees in Canada and is the direct or indirect parent of over 100 subsidiaries including NNTC, as well as, Nortel's other principal operating subsidiaries:

      i. NNI in the U.S.; and

8

ii. Nortel Networks UK Limited ("NNUK") in the U.K.

c) NNTC is a Nova Scotia unlimited liability company, whose purpose is to carry on R&D. NNTC employs approximately 3,000 employees at its executive office and R&D facility in Ottawa, Ontario (the "Carling Facility"). NNTC, does not produce any third party revenue and relies on NNL for all of its funding, including for payroll and R&D. This arrangement allows NNL to receive significant tax credits.

d) NNIC is a wholly owned subsidiary of NNL. It has no business or assets other than a minority equity interest in a number of foreign Nortel companies. NNIC was incorporated in 1977 under the CBCA.

e) NNGC is a wholly owned subsidiary of NNL. It has no business or assets, but has representative offices outside of Canada on behalf of the Company and employs approximately 22 employees in China. The payroll for these employees is funded by other Nortel entities. NNGC was incorporated in 1988 under the CBCA.

24. In addition to the Applicants, there are eight other Canadian Nortel companies, all of which either have limited or no business within Canada. None of these Nortel companies are a part of the proposed CCAA proceedings.

## OPERATIONAL TRANSFORMATION

25. Prior to 2000, Nortel manufactured the majority of its own products. In 2000, Nortel undertook an initiative to transition to an outsourced manufacturer model and focus on being a sales and service provider. In 2006, Nortel completed the transition, whereby it outsourced substantially all of its hardware manufacturing and related activities including certain product integration, testing, repair operations, supply chain management, third party logistics operations and design assets.

9

85

26. As part of this transition, NNL, entered into asset purchase agreements with several contract manufacturers, including Flextronics Telecom Systems Ltd. (together with its affiliates and subsidiaries, "Flextronics") who purchased the bulk of Nortel's inventory and manufacturing facilities. In connection with the Flextronics sale, NNL and Flextronics entered into complex multi-year supply arrangements for the supply of products and services on an on-going basis. As at September 30, 2008, Flextronics, having acquired other contract manufacturers that NNL had entered into similar arrangements with, supplied approximately 75% of Nortel's finished product around the world.

27. Flextronics and the other contract manufacturers have manufacturing plants located around the world.

28. In order to accommodate its global purchase and sales structure, Nortel employs a complex internal purchasing system for its hardware and software products and services.

29. Nortel's internal purchasing system is set up as follows:

    a) When a sales order is placed with one of the regional sales offices, an internal purchase order is generated by the Nortel entity in the country originating the sale. The purchase order is then automatically routed through one of four transaction control centres ("TCCs") depending on the business segment and the geographic region involved. The TCCs act as purchasing hubs for all of the Nortel's regional sales entities. The four TCCs are NNL, NNI, NNUK and Nortel Networks SA (France) ("NNFrance").

    b) When a purchase order is received internally by one of the TCCs, it contracts directly with equipment and design manufacturers to facilitate the ultimate product delivery to the customer.

c) Upon completion of the purchase order, the TCC pays the manufacturer and invoices the regional Nortel company, adding a mark-up to the price. This internal invoice is settled after delivery of the product. As a result of these steps, the manufacturer may be paid prior to the internal settlement of the resulting inter-company transaction.

30. Approximately two-thirds of all inventory purchases flow through the North American TCCs, NNL and NNI. The TCCs typically purchase specific products for Nortel's entities within specified regions. As a result of a TCC re-design that is targeted for implementation in April 2009 or as operational changes may require, the current TCC purchasing entity may change. The current TCC structure is outlined below:

| Product Family | TCC Purchasing Entity: Region Purchases for | Supplier Manufacturing Locations |
|---|---|---|
| MEN | Canada - Americas<br>UK - EMEA & APAC | Mexico<br>Poland<br>Canada |
| Enterprise | *Voice*<br>Canada - Americas & APAC<br>UK - EMEA<br>*Data*<br>USA - Americas & APAC<br>UK - EMEA | Malaysia<br>China<br>Mexico<br>Canada<br>USA<br>UK |
| CDMA | Canada - global | China<br>Mexico<br>Malaysia |
| CVAS | USA - global | USA<br>Mexico<br>Thailand |
| GSM | France - global | China<br>Mexico<br>Poland |

31. As a result of the purchasing system described above, there is a large volume of transactions flowing through the inter-company trade accounts on a daily basis.

87

32. Typically, the inter-company trade accounts, with the exception of disputed invoices, are settled on a monthly basis either via a cash payment (where the purchasing entity has sufficient funds to pay the account due), or a set off against previously outstanding inter-company debt owing to the same legal entity. Occasionally, the inter-company balance remains outstanding and is settled at a later date. The initial determination of how to settle inter-company accounts is typically assessed through Nortel's administrative offices in Mexico and Nortel's treasury team and then a recommendation is sent to the applicable legal entity for consideration. The payor entity is the ultimate decision maker regarding how the amount will be settled.

33. If an inter-company balance is not settled for an extended period of time or if a Nortel entity is building up a cash balance that could be used elsewhere within the group of companies, an inter-company loan agreement is set up.

34. The Applicants have significant inter-company receivables and payables both between the Applicants and from Nortel entities outside of Canada. Some of these inter-company amounts are from the U.S. and Europe, the Middle East and Africa ("EMEA") entities that are or will be under insolvency proceedings in other jurisdictions.

35. As a result of the numerous inter-company transactions related to inventory purchases, provision of services and transfer pricing (described in more detail below), it is evident that there is a significant interdependence among the Nortel entities. As such, it is imperative that the Nortel entities continue to settle their inter-company trade balances.

36. The Applicants have advised the proposed Monitor that they intend to maintain the current settlement practices for inter-company trade, including the settlement of pre-filing intercompany trade amounts, between the Applicants and the other Nortel entities, except for the EMEA filing entities and the other Nortel entities, in order to allow for the continued flow of product and funds among the various Nortel entities.

12

88

37. As is discussed in more detail below, NNI and certain of the other U.S. Nortel companies (the "Chapter 11 Entities") are filing for protection under Chapter 11 of the *United States Bankruptcy Code* (the "Code"). In order to preserve the *status quo* as it exists at the time of the filing of proceedings with respect to the various Nortel entities (particularly with respect to the Applicants and the Chapter 11 Entities), the Applicants will continue to keep track of all inter-company payments and advances. In addition, the Applicants will ask the Court to authorize a charge on their property and undertaking (the "Inter-company Charge") to secure advances made to the Applicants by the Chapter 11 entities. Further, to continue the settlement of pre-filing intercompany trade transactions between the Applicants and NNI, NNI is prepared to reserve its right of set-off for inter-company trade amounts as against the pre-filing loan from NNI to NNL (the "Existing NNI Revolver"), in return, the Applicants will ask the Court to secure any amounts owing by NNL to NNI pursuant to the Existing NNI Revolver (approximately $295 million as at January 13, 2009) by way of the Inter-company Charge to secure the intercompany loan from NNI to NNL.

38. NNUK and certain EMEA entities intend to seek administration orders from the U.K. Court. In order to continue to conduct business in the ordinary course with EMEA entities post-filing and post-administration, NNL has entered into a Group Supplier Protocol Agreement ("GSPA") with the proposed Administrator, which contemplates an arrangement for post-filing receivables pursuant to the Transfer Pricing Model and prevents the set-off of post filing liabilities against pre-filing obligations. The Applicants have advised the proposed Monitor that they are seeking approval of the GSPA, including that NNL's obligations pursuant to the GSPA be secured by the Inter-company Charge.

89

## R&D EXPENDITURES AND TRANSFER PRICING ADJUSTMENTS

39. As a Canadian technology company, R&D forms the backbone for Nortel's product development and provision of services to its customers.

40. Nortel conducts R&D through ten key R&D "Centers of Excellence" situated around the globe and also invests in technology innovation initiatives with more than twenty major universities. Its in-house R&D is complemented through strategic alliances, partnerships and joint ventures with other companies.

41. Nortel's R&D headquarters is located in Ottawa, Ontario with two R&D campuses located in China. As full-service R&D sites, the Ottawa and China locations maintain critical mass of R&D expertise spanning all of Nortel's identified business lines. Nortel also has nine other R&D laboratories, four are located in the U.S.; and there is one in each of Ireland; the U.K.; Turkey; India; and Korea. In addition, Nortel has four "specialty" R&D sites, three of which are located in Canada.

42. Nortel's intellectual property ("IP") is principally owned by NNL.

43. To provide for reimbursement of R&D costs incurred by the R&D centres on behalf of Nortel globally, including NNL funding of NNTC, and to allow for the sharing of the IP among NNL's subsidiaries, Nortel developed and implemented a Transfer Pricing Arrangement ("TPA"). The TPA provides for:

   a) the "distributor" or "limited risk" Nortel entities, to distribute product and provide services to customers in return for a small profit margin. These entities have a limited amount of risk and do not participate significantly in R&D activities; and

   b) allowing certain Nortel entities to participate in the redistribution of profits or losses to the "residual profit share" ("RPS") entities and provides these entities with exclusive rights within their geographic area and non-exclusive

90

rights elsewhere to exploit the IP.  The RPS entities are the four TCCs described above and NNIreland.  The RPS entities incur significant R&D cost, sales and administrative costs on behalf of Nortel globally that require reimbursement.

44. Under the TPA, inventory and services purchased by a TCC is invoiced to the purchasing entity with a mark-up on cost.  At the end of each quarter, after the operating profit for each legal entity is calculated, routine returns are calculated for both the limited risk entities and the RPS entities.  For a limited risk entity the normal return is generally calculated as a small percentage return on sales and for a RPS entity it is calculated as a return on sales and "cost plus" on sales and marketing, G&A and operation costs incurred.  Any profits in excess of these calculations are allocated to the four RPS entities based upon a calculation determined by their historical R&D spending.

45. Historically the TPA adjustments have been calculated on a quarterly basis within 45 days of Nortel's earnings announcements or approximately two and a half months after the quarter end.  Starting in the first quarter of 2009, these adjustments will be estimated, booked and settled within the quarter.  A true-up will generally occur as part of the following quarter's settlement.

91

# FINANCIAL OVERVIEW

46. Nortel's historical consolidated financial results are summarized below:

| USD millions | 2004 | 2005 | 2006 | 2007 | YTD Q3 2008 |
|---|---|---|---|---|---|
| Revenue | 9,478 | 10,509 | 11,418 | 10,948 | 7,699 |
| Operating earnings (losses) | (298) | (2,709) | 282 | 226 | (1,125) |
| EBITDA* | 276 | 304 | 499 | 812 | 195 |
| Net earnings (losses) | (247) | (2,610) | 28 | (957) | (3,664) |
| Net cash flow | (317) | (734) | 541 | 40 | (1,228) |
| Cash - on hand | 3,685 | 2,951 | 3,492 | 3,532 | 2,304 |

| INDEBTEDNESS | | | | | |
|---|---|---|---|---|---|
| Trade, taxes, deposits and other AP | 1,504 | 1,655 | 1,750 | 1,673 | 1,439 |
| Payroll and benefit related liabilities | 515 | 803 | 640 | 690 | 541 |
| Pension and other employment liabilities | 2,350 | 2,469 | 2,759 | 2,002 | 1,763 |
| Contractual liabilities | 571 | 348 | 243 | 272 | 214 |
| Restructuring liabilities | 463 | 297 | 274 | 280 | 279 |
| Deferred revenue and advance billings | 3,349 | 3,585 | 3,398 | 3,109 | 2,317 |
| Product and warranty provisions | 330 | 257 | 310 | 340 | 287 |
| Global Class Action Settlement provision | - | 2,703 | 2,494 | - | - |
| Long term indebtedness | 3,866 | 3,885 | 4,464 | 4,514 | 4,485 |
| Other | 561 | 587 | 741 | 600 | 468 |

*EBITDA = Net income/loss before interest, taxes, depreciation, amortization, goodwill impairment and shareholder litigation expense

47. Since 2006, Nortel has experienced declining sales volumes, particularly in North America, due to challenging economic conditions including a reduction in customer capital expenditures. The significant decline in net cash flow in comparison to revenue is due to significant deferred revenue being realized.

48. Contractual liabilities of approximately $214 million (approximately $62 million related to Canada) at September 30, 2008 relate to on-going customer and supplier obligations.

49. Restructuring liabilities of approximately $279 million (approximately $34 million related to Canada) at September 30, 2008 relate to workforce reduction and contractual and lease obligations.

16

50. The decline in sales, along with Nortel's increasing restructuring and pension costs, in part has lead to an increase in operating and net losses and an increase in the cash burn of the Company.

**Debt Structure**

51. Nortel's debt structure as at January 9, 2008 consisted of the following unsecured obligations:



52. Nortel's debt structure as at January 9, 2008 consisted of the following unsecured obligations:

*NNC*

a)  $575 million aggregate principal amount of 1.75% Convertible Senior Notes due 2012 (the "2012 Notes"). The 2012 Notes bear interest at an annual rate

of 1.75% payable semi-annually on April 15 and October 15 of each year, and mature on April 15, 2012; and

b) $575 million aggregate principal amount of 2.125% Convertible Senior Notes due 2014 (the "2014 Notes" and together with the 2012 Notes, the "Convertible Notes"). The 2014 Notes bear interest at an annual rate of 2.125% payable semi-annually on April 15 and October 15 of each year, and mature on April 15, 2014.

c) The Convertible Notes are senior unsecured obligations of NNC and rank equally and rateably with other senior unsecured obligations of NNC. Further, holders of the Convertible Notes may convert their notes into NNC common shares at any time prior to the close of business on the trading day on the NYSE prior to the stated maturity date of the notes at a conversion rate of 31.25 common shares per $1,000 principal amount of Convertible Notes so converted (equal to a conversion price of $32.00 per common share), subject to adjustment in certain circumstances.

d) The Convertible Notes are fully and unconditionally guaranteed by NNL and NNI. Each guarantee is a direct, unconditional, unsecured and unsubordinated obligation of the respective guarantor and ranks equally and rateably with other senior unsecured obligations of the respective guarantor.

*NNL*

e) $1,000 million aggregate principal amount of Floating Rate Senior Notes due 2011 (the "2011 Notes"). The 2011 Notes bear interest at an annual rate, reset quarterly, equal to three-month LIBOR plus 4.25%, payable quarterly on January 15, April 15, July 15 and October 15 of each year, and mature on July 15, 2011;

18

94

f)  $550 million aggregate principal amount of 10.125% Senior Notes due 2013 (the "2013 Notes"). The 2013 Notes bear interest at an annual rate of 10.125% payable semi-annually on January 15 and July 15 of each year, and mature on July 15, 2013;

g)  $1,125 million aggregate principal amount of 10.750% Senior Notes due 2016 (the "2016 Notes"). The 2016 Notes bear interest at an annual rate of 10.750% payable semi-annually on January 15 and July 15 of each year, and mature on July 15, 2016; and

h)  $200 million principal amount of 6.875% Notes due 2023 (the "2023 Notes"). The 2023 Notes bear interest at an annual rate of 6.875% payable semi-annually on March 1 and September 1 of each year, and mature on September 1, 2023.

i)  Each of the 2011 Notes, the 2013 Notes and the 2016 Notes (collectively the "High Yield Notes") is a senior unsecured obligation of NNL and ranks equally and rateably with other senior unsecured obligations of NNL. The amounts under the 2023 Notes are a direct senior, unconditional and unsecured obligation of NNL.

j)  The High Yield Notes are fully and unconditionally guaranteed by NNC and NNI. Each guarantee is a direct, unconditional, unsecured and unsubordinated obligation of the respective guarantor and ranks equally and rateably with other senior unsecured obligations of the respective guarantor.

*NNCC*

k)  $150 million aggregate principal amount of 7.875% Notes due 2026 of Nortel Networks Capital Corporation ("NNCC") (the "2026 Notes"). The 2026 Notes bear interest at an annual rate of 7.875% payable semi-annually on June 15th and December 15th of each year, and mature on June 15, 2026. NNL has

fully and unconditionally guaranteed the 2026 Notes. The guarantee is a direct, unconditional and unsecured obligation of NNL and ranks equally and rateably with other senior unsecured obligations of NNL. NNCC is a shell financing subsidiary.

**Export Development Canada ("EDC")**

53. A key element of NNL's ability to carry on its business is the ability to provide performance bonds and guarantees to its customers to support its sales contracts.

54. Through an agreement with EDC dated February 14, 2003, as amended and restated on December 14, 2007, NNL has been provided with a $750 million unsecured support facility ("EDC Support Facility"), comprised of $300 million of committed revolving support for guarantee bonds or similar instruments with individual amounts of up to $25 million and $450 million of uncommitted revolving support for accounts receivable or securitizations by EDC and for the issuance of guarantee bonds or other similar documents in support of contract performance. NNI has also guaranteed all of the existing and potential payments that NNL would or could have to make under the EDC Support Facility.

55. As at January 5, 2009, there were approximately $187 million of performance bonds outstanding of which $122 million were issued under the committed line and $65 million under the uncommitted revolving support line.

56. Pursuant to the terms of the EDC Support Facility, there are certain default clauses which if triggered permit EDC to suspend further guarantee support. On December 15, 2008, Moody's Investor Services ("Moody's") downgraded NNC's credit rating to Caa2, gave EDC the right to suspend or terminate the EDC Support Facility. Accordingly, NNL has executed a 30 day Standstill and Waiver Agreement with EDC, in relation to such termination rights, that expires on January 15, 2009.

57. On January 13, 2009, EDC provided Nortel with a waiver to provide a post filing facility that allows the Company the ability to issue new performance based bonds or other similar types of securities of up to $30 million (the "EDC Facility"), based on Nortel's estimated requirements for a period of 30 days. The facility is to be secured by a first charge on the Applicants assets.

**Pension and Other Post Retirement Plans**

58. Nortel has several funded and unfunded pension and post-employment retirement plans. In Canada, Nortel has two funded defined benefit pension plans. In 1999, Nortel closed these two plans to new members and allowed current plan members to elect to convert to defined contribution or similar retirement plans. In January 2008, all members, except for those receiving or eligible to receive a pension and certain unionized employees, were converted to the defined contribution plan.

59. The annual funding costs for the plans in Canada is summarized as follows:

| PLAN CDN$ millions | Service | | Total |
|---|---|---|---|
| | Current | Past | |
| Defined Benefit | 8.4 | 22.4 | 30.8 |
| SERP, TRA and Other | - | 28.8 | 28.8 |
| Defined Contribution | 70.3 | - | 70.3 |
| Total | 78.6 | 51.2 | 129.9 |

60. As at September 30, 2008, Nortel's aggregate current and long-term accounting liability for pension benefit liabilities and post employment and post-retirement benefit liabilities (as determined under U.S. GAAP) was approximately $1,800 million based on a valuation as of Nortel's most recent annual measurement date of September 30, 2007. The Company has indicated to the Monitor that due to the decline in market conditions and other factors, the estimated funding deficits, as at December 31, 2008, will have significantly increased.

21

97

61. NNUK is a wholly owned subsidiary of NNL. NNUK operates both a defined benefit pension plan ("UKDB") and a defined contribution pension plan. A valuation of the UKDB plan completed in 2005 disclosed a deficit of approximately £356 million.

62. In order to address the UKDB deficit issue, NNUK entered into an agreement with Nortel Networks UK Pension Trust Limited ("NPT"), the pension trustee, to amongst other things, make both current service and past service "catch up" payments and to pay the pension protection fund levy. This obligation amounts to approximately £85 million per year.

63. In support of NNUK's agreement with NPT, NNL provided a guarantee dated November 2006, of NNUK's obligation to make the required pension contributions under the agreement. In 2007, NNL further agreed to guarantee the obligations under the UKDB plan up to the lesser of £150 million and the plan's "Buy Out Deficit" (as defined in the UKDB plan) in the event of an insolvency event affecting NNUK.

64. While a further valuation of the UKDB plan has not yet been filed, based on a March 2008 actuarial valuation there is a significant increase in the deficit under the UKDB plan.



## CASH POSITION AND LIQUIDITY

65. At December 31, 2008, Nortel's consolidated cash balance was, approximately $2.4 billion. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at December 31, 2008:

| Region | Gross Cash | Restricted | Unavailable (see below) | Available Cash |
|---|---|---|---|---|
| NNL | 168 | (17) | | 151 |
| Other Canada | 36 | (11) | | 25 |
| | | | | |
| NNI | 661 | | | 661 |
| NNI - Reserve MMF (ST/LT) | 65 | | (65) | - |
| NGS | 27 | | (27) | - |
| Other US | 4 | | | 4 |
| North America | 961 | (28) | (92) | 841 |
| | | | | |
| NN UK Limited | 396 | | (396) | - |
| NNUK subs (excl JVs) | 158 | | (158) | - |
| JV - Netas | 71 | | (71) | - |
| Other EMEA | 119 | | (79) | 40 |
| UK/Europe | 744 | - | (704) | 40 |
| | | | | |
| Greater China | 195 | (3) | (192) | - |
| Other ASIA PAC (excl JVs) | 119 | (1) | | 118 |
| LG Nortel | 323 | | (162) | 162 |
| Other JVs | 59 | | (30) | 30 |
| ASIA | 696 | (4) | (383) | 309 |
| | | | | |
| Cala | 41 | - | | 41 |
| | | | | |
| Total Treasury Cash | 2,442 | (32) | (1,179) | 1,231 |

66. As at December 31, 2008, North America had cash available for operations of approximately $841 million. Of this amount, approximately $176 million is held by Canadian entities and approximately $665 million is held by U.S. entities. It is expected that a further $65 million from the Money Market Reserve Fund will become available in the U.S. at some time during 2009.

67. The U.K. and EMEA Nortel entities had cash available for EMEA operations of approximately $711 million. As a result of the significant unfunded pension liability in the U.K. and the anticipated filings of NNUK, most of its European subsidiaries

99

and NNIreland, no cash will be available to NNL from the majority of the EMEA region. The NETAS joint venture, a joint venture in which Nortel owns approximately a 53% interest, holds approximately $71 million of cash of which $38 million represents Nortel's approximately 53% share. Nortel believes these funds will be difficult to repatriate for other funding purposes as approval of the other joint venture would be required. The proposed Monitor understands there are no current plans for a dividend distribution from the NETAS joint venture.

68. Asia Pacific, Asia Central ("APAC") Nortel entities have approximately $309 million of cash available for operations. As a result of the regulatory regime in the People's Republic of China, Nortel believes it will be difficult to repatriate funds in the near term. Furthermore, Nortel's LG Nortel Co. Ltd. joint venture and other joint ventures Nortel participates in hold approximately $383 million of cash of which $192 million represents Nortel's 50% share. Repatriation of these funds requires approval of the respective joint venture partners. A distribution of $36 million was received from LG Nortel Co. Ltd. in December 2008 and a dividend distribution of $7 million is planned from Guangdong-Nortel Telecommunications Company Limited of China, another of Nortel's joint ventures, in the first quarter of 2009.

69. The Caribbean and Latin America ("CALA") region Nortel entities have approximately $41 million of cash generally available for operations.

70. The proposed Monitor is advised by management that several of Nortel's suppliers, have reduced Nortel's credit terms, demanded deposits or periodically placed Nortel on stop shipment for late payments.

71. Further, Nortel has net interest payments totalling $107 million due on January 15, 2009, in respect of the following notes:

    a) quarterly payment on the 2011 Notes issued by NNL;

    b) semi-annual payment on the 2013 Notes issued by NNL; and

100

    c)  semi-annual payment on the 2016 notes issued by NNL.

72. It is anticipated that Nortel will make the decision to not make the interest payment due January 15, 2009 in the net amount of $107 million.

73. The proposed Monitor is advised by Nortel that without protection from its creditors the remaining available cash resources within Canada could be fully exhausted as early as the second quarter of 2009 and the Canadian companies will not be able to operate.

74. Nortel has undertaken steps to address its operating and financial concerns and focus on cash preservation.  As previously indicated Nortel has implemented a new operating model to further consolidate and increase efficiencies in its business segments and has announced a further restructuring of its workforce and other cost reduction actions.

75. To further preserve cash, on November 10, 2008 Nortel also announced the suspension of dividends on the preferred shares of NNL.

76. Despite its efforts to restructure informally, Nortel believes a comprehensive operational and financial restructuring is required to adequately address its operating and financial challenges including significant employee expenses and high debt levels.  Nortel has advised that, given its current liquidity position, the nature and extent of restructuring required is cost prohibitive and formal insolvency proceedings in multiple jurisdictions is required to allow the Company to undertake this comprehensive operational and financial restructuring.

77. It is Nortel's view and the proposed Monitor concurs, that if Nortel's requests for creditor protection are approved, Nortel has sufficient cash on hand to adequately fund its projected liquidity needs for on-going operations, while Nortel determines the basis on which it intends to restructure in consultation with its stakeholders.

25

**EFFORTS TO REFINANCE**

78. Nortel has canvassed the capital markets to review its options with respect to obtaining new or replacement financing or otherwise address its indebtedness. As a result of the challenges within the telecommunications industry including customer consolidation, cut backs or deferrals in customers' capital spending programs, the worldwide economic downturn and the general freeze of the global capital markets, Nortel has been unsuccessful in obtaining either additional or replacement financing on acceptable terms.

79. On December 15, 2008, Moody's downgraded Nortel's corporate rating from B3 to Caa2 resulting in the senior unsecured ratings for all of Nortel's outstanding $4,175 million debt securities to drop to Caa2 from B3 as well. While NNC's speculative grade liquidity rating was affirmed at SGL-2, the uncertain business environment caused the rating to remain negative. These rating actions were prompted by the potential that on-going adverse business conditions may persist for a prolonged period, implying the Company is unlikely to return to positive free cash flow generation over the near term and the risk of default has increased.

80. On November 21, 2008, Standard & Poor's Ratings Services affirmed its B- rating for NNL, including its long term corporate credit rating, and at the same time removed the ratings from its CreditWatch with negative implications status.   Its overall outlook for Nortel, however, is negative. The affirmation primarily reflects its belief that Nortel should be able to sustain adequate levels of liquidity over the next 12 to 18 months; however, they remain concerned about NNL's ability to contain revenue erosion given difficult market conditions, high cash burn and execution risk as it relates to its revised strategy.

**SALE AND DIVESTITURE EFFORTS**

81. Over the past two years, Nortel has also pursued potential M&A opportunities with various parties to accomplish much needed consolidation necessary within the

industry. These pursuits have been unsuccessful thus far owing to a variety of reasons, including the condition of the capital markets, the inability to raise the funds required, and Nortel's debt and costs.

## FORMAL INSOLVENCY PROCEEDINGS

82. As a result of Nortel's current financial and liquidity position, the Applicants have commenced an application for protection under the CCAA. NNI is filing under Chapter 11 of the Code ("Chapter 11") for itself and the majority of the U.S. operating subsidiaries. In addition, NNUK and certain of the EMEA entities intend to seek Administration orders in the U.K. Court.

83. The Applicants are also seeking this Court's direction for the Monitor to apply for recognition of the CCAA proceedings as "Foreign Main Proceedings" under Chapter 15 of the United States Bankruptcy Code. In addition, NNI is seeking an Order pursuant to Section 18.6 of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" and giving effect to the automatic stay provided for in the U.S. Bankruptcy Code.

84. Given that proceedings will be taking place in Canada and the United States, it is proposed that the Courts in these jurisdictions adopt a cross border insolvency protocol. The proposed Monitor has reviewed the protocol to be presented to the Courts and is of the view the protocol is both beneficial to effectively manage the nature of these proceedings and consistent with protocols adopted by the Courts in previous large cross border insolvency proceedings.

85. The Nortel entities in APAC and CALA (the "APAC Group" and CALA Group", respectively) are not filing for protection from their creditors. In addition, certain EMEA region Nortel entities, (the "Other EMEA Entities" and collectively with the APAC Group and the CALA Group, the "Non-Filing Entities") are not encompassed by the anticipated U.K. Administration. The Non-Filing Entities will benefit from