arrangements made for financial support from NNL and NNI as discussed later in this Report.

86. After a careful review of the operations and financial position of the Non-Filing Entities, management concluded the Non-Filing Entities should continue to operate on a business as usual basis to the fullest extent possible.

87. In the proposed Monitor's view, this approach will maintain the enterprise value of the Non-Filing Entities. However, it is anticipated that the Non-Filing Entities may require support from the Applicants and the Chapter 11 Entities.

88. In making the determination to not seek insolvency protection for the Non-Filing Entities, Nortel and its advisors considered the following:

   a) certain customers are vital to the on-going value of Nortel's business units as these customers have needs, not only in the local EMEA country or APAC and CALA regions, but in other regions serviced by Nortel's global customer network; and

   b) certain suppliers and R&D activities are critical to the continued operations of Nortel, not only in the local EMEA country or APAC and CALA regions, but globally. While these suppliers and R&D activities are, to a large extent, strategically managed out of Canada and the United States, their continued support is essential to support on-going operations and to service Nortel customers throughout the world. Any potential operational disruption with these suppliers could potentially impact all operations going forward, whether through the global purchasing agent or directly.

89. The complexity and cost of implementing formal restructuring procedures in countries such as Brazil, Columbia, Chile, Argentina, India and Australia would be prohibitive in relation to the amount owed to trade suppliers in such countries, and

104

would further complicate the efforts and length of time necessary to restructure Nortel.

90. In the view of the proposed Monitor, the Non-Filing Entities should be able to maintain operations with adequate funding from the Applicants and other North American Nortel entities without the need for creditor protection.

## OVERVIEW OF THE 13-WEEK CASH FLOW FORECAST

91. Nortel, with the assistance of the proposed Monitor, has prepared a 13-week cash flow forecast that estimates the CCAA Applicants financing requirements. A copy of the cash flow forecast is attached as Appendix A.

92. The cash flow forecast estimates that the Applicants for the period of January 11, 2009 to March 31, 2009 will have total receipts of $439 million and total disbursements of $572 million for net cash flow outflow of $133 million. NNL is not forecast to draw upon the NNI Loan (as describe later) during the forecast period.

93. At March 31, 2009, the Applicants are forecast to have available liquidity, consisting of cash on hand and availability under the NNI Loan, of approximately $278 million.

94. The main assumptions of the cash flow forecast are as follows:

   a) accounts receivable collections have been estimated by the Applicants' collection group based on revenue forecasts and customer collection experience;

   b) all disbursements are made assuming suppliers pre-filing amounts are stayed and post-filing amounts are paid on significantly reduced credit terms in light of the commencement of these CCAA proceedings;

   c) inter-company loans are stayed. Inter-company trade accounts including pre-filing amounts, continue to settle on a cash basis in the normal course between

105

the North America filing entities and the other Nortel entities except for NNUK and the other EMEA filing entities;

d) severance payments are stayed and are unsecured claims;

e) pension funding payments are made for the current service portion for defined benefit plans. Funding for past service is not included;

f) subject to both Canadian and U.S. Court approval of the NNI Loan and Carling Facility Charge, the forecast reflects funding payments to NNL from NNI in the amount of $200 million; and

g) all interest payments relating to the Company's indebtedness are not included.

## FLEXTRONICS AMENDING AGREEMENT

95. In preparation for a filing and in recognition of the importance of Flextronics' continuing compliance during the proceedings, Nortel very recently entered into negotiations with Flextronics, which would ensure ongoing supply. On January 14, 2009, NNL and Flextronics entered into an amending agreement (the "Flextronics Amending Agreement") that amends the various Flextronics agreements and provides Nortel with post petition supply of products and services.

96. Key terms of the Flextronics Amending Agreement include:

a) Purchase of certain Flextronics inventory in the total amount of $120 million payable on the following schedule: (i) $25 million on January 14, 2009; (ii) $50 million on January 20, 2009, (iii) $25 million on April 1, 2009 and (iv) $20 million on July 1, 2009; and

b) Payment of post filing products and services on a weekly basis for goods and services supplied during the immediately preceding week.

97. Due to the essential and strategic nature of Flextronics's services for Nortel, it was critical for Nortel to establish a post petition supply agreement to minimize disruption to its continuing operations. Without the agreement, Nortel risked significant interruption to its customer deliveries. Further, given the specialized IP and manufacturing equipment as well as the significant volume of business, in terms of number and quantity of products, manufactured at Flextronics, transitioning to alternative contract manufacturers would have been prolonged and costly, resulting in significant disruption to Nortel's operations.

## CHARGES AND FINANCIAL THRESHOLDS IN THE DRAFT INITIAL ORDER AND EMPLOYEE AND DIRECTOR MATTERS

98. The draft Initial Order provides for a number of charges and financial thresholds that are described below:

### Administration Charge

99. The Administration Charge as described in the draft Initial Order provides for an amount of CDN$5 million for the Monitor, the Monitor's Canadian and U.S. legal counsel, and the Applicants' Canadian counsel, as security for the professional fees and disbursements incurred both before and after the making of the Initial Order in respect of these proceedings. The Administration Charge has been established based on the respective professionals' previous history and experience with large cross border restructurings of similar magnitude and complexity. The proposed Monitor believes that the Administrative Charge is required and reasonable under the circumstances.

### D&O Trust and Charge

100.    As described in the Doolittle Affidavit, Nortel has established a D&O Trust in the amount of CDN$10 million to indemnify NNC's directors and officers on terms consistent with the D&O Charge described below. The purposes of the D&O Trust is

to provide financial support for the defence and payment of claims against NNC's directors and officers to the extent that directors' and officers' insurance maintained by NNC is inadequate and also to pay for the maintenance of such insurance.

101.   The D&O Charge as described in the Doolittle Affidavit and the draft Initial Order provides for an amount of CDN$90 million to indemnify the Applicants' directors and officers from and against all costs, charges, expenses, claims, liabilities and obligations which may arise on or after the date of the Initial Order provided that the liability relates to his or her capacity as director and officer and all costs, charges, expenses, claims, liabilities and obligations relating to the failure of Nortel to make any payments or to pay amounts in respect of employee or former employee entitlements.

102.   The amount of the D&O Charge was estimated by Nortel with the assistance of the proposed Monitor taking into consideration the D&O trust already in place, hourly and salaried payroll, sales commissions, vacation pay and sales taxes.

103.   Given that Nortel will require the committed involvement of its directors and officers to successfully restructure, the proposed Monitor believes that the D&O Trust and the D&O Charge are required and reasonable under the circumstances.

**EDC Charge**

104.   With respect to the EDC Facility, as previously described, Nortel is seeking approval to secure the facility with a first charge on the Applicants assets. The EDC Facility will assist the Applicants in continuing to operate in the normal course.

105.   The EDC Charge shall rank after the Administration Charge and Carling Facility Charge with respect to the Carling Facility but ahead of the D&O Charge

**Inter-Company Payments, the Inter-Company Charge and GSPA**

106.    The Applicants are also seeking Court approval of the Inter-Company Charge as described above at paragraph 37.

107.    As discussed above, the Applicants intend to maintain the current settlement practices for inter-company trade, including the settlement of pre-filing intercompany trade amounts, with NNI and is seeking approval that the Inter-Company Charge secure NNI's payments and other advances, including goods and services, made post filing to the Applicants as well as pre-filing amounts outstanding under the Existing NNI Revolver. The Inter-company Charge will allow the Applicants to continue to ensure prompt payment post-filing for inter-company receivables between the Applicants and Chapter 11 filed entities.

**GSPA Charge**

108.    As discussed above, NNL has entered into the GSPA with the U.K. Administrator and is seeking approval that the Inter-Company Charge secure NNL's obligations thereunder. The GSPA will allow the Applicants to continue to ensure prompt payment post-filing and post-administration for inter-company receivables relating to the sale of goods and services between the Applicants and the Administrator.

109.    The proposed Monitor is of the view that the maintenance of Nortel's system for the settling of inter-company payables is necessary to ensure the continued smooth operation of the Applicants and the Nortel business after the commencement of these CCAA proceedings. As such, the proposed Monitor believes that the continuation of the Transfer Pricing Model system, the granting of the Inter-Company Charge, and NNL entering into the GSPA is reasonable in the current circumstances. The proposed Monitor will assist the Applicants in tracking inter-company payments and will report to the Court on any developments in this regard.

**Carling Facility Charge**

110.   To ensure that the Applicants have sufficient cash resources available to them, NNI has agreed to provide an additional inter-company loan of up to $200 million (the "NNI Loan") support to the Applicants under a proposed court sanctioned secured charge.   The NNI Loan bears interest at 10% and pursuant to terms for use of proceeds, the Applicants can not advance more than $10 million to its subsidiaries that are not Applicants or debtors in the Chapter 11 proceedings.

111.   NNI is seeking approval under the Chapter 11 proceedings of the NNI Loan to NNL on the basis that the NNI Loan will be secured by a court sanctioned secured charge.   Therefore, NNL seeks authorization to provide NNI with a secured charge consisting of a mortgage against the Carling Facility, NNTC's R&D facility in Ottawa and a guarantee (recourse limited to only the Carling property) from NNTC (the "NNTC Guarantee"). NNTC will receive a direct benefit by the NNL's on-going ability to receive advances from NNI as it is dependent on NNL for all funding requirements, including with respect to its approximately 3,000 employees.

112.   The Carling Facility Charge shall rank after the Administration Charge and ahead of the D&O Charge on the Carling Facility.

**Sales of Assets**

113.   The threshold established in the draft Initial Order for each Applicant, "with the prior approval of the Monitor, to sell property worth up to $10 million or $50 million in the aggregate", was established in relation to the size of Nortel's operations and the value of its assets, in order to facilitate the orderly restructuring of the Company without adding undue administrative burden that would not add value to the process. In the proposed Monitor's view, these thresholds are appropriate given the asset base of Nortel.

## Creditor Notification

114.    The draft Initial Order requires the proposed Monitor to send notice of the Order, within ten days, to every known creditor, including all inactive members of the Applicants' defined benefit pension plans, of each of the Applicants, having a claim of more than $5,000. Approval to use a $5,000 threshold is being sought to reduce the administrative burden and the cost of such process, considering the large number of creditors with low outstanding balances. An analysis of recent accounts payable sub-ledger indicates that almost 30% in number of the creditors have outstanding balances less than $5,000 represented less than 1% of the aggregate dollar value of the trade accounts payable. The proposed Monitor will attempt to ensure that creditors owed less than $5,000 receive notice of the Initial Order by posting the Initial Order on its website.

## AIP AND KEIP

115.    The Applicants have indicated to the proposed Monitor that as part of the restructuring Nortel believes that it is important for its Annual Incentive Program ("AIP") for its employees to continue. In addition, Nortel has indicated that it believes a Key Employee Incentive Plan ("KEIP") should be established to retain key employees necessary to preserve Nortel's global operations. Nortel intends to establish the criteria for the 2009 AIP in consultation with its advisor, Mercer, and in accordance with past practice. Nortel also intends to develop a KEIP and seek the approval of this Honourable Court of the proposed KEIP. The proposed Monitor believes continuing the AIP and establishing the KEIP at the earliest opportunity are essential to a successful restructuring of Nortel. The proposed Monitor will, to the extent required, assist Nortel in the development of the 2009 AIP and the KEIP and will keep this Honourable Court apprised of any developments in this regard.



## DIRECTOR REMUNERATION

116.   Directors may elect to receive their remuneration in the form of either cash or
share units under the Directors' Deferred Share Compensation Plans of NNC and
NNL.   In the past the majority of the Directors' had elected to receive their
remuneration by way of the allocation of share units.  As a change in a Director's
election constitutes an "investment decision", the non-employee Directors are
currently prohibited from updating their elections.  The proposed Monitor has been
advised by the Applicants that in the future all Directors' will be remunerated by way
of cash payments on a current basis (at current cash equivalent levels less an overall
reduction of $25,000), subject to court approval. The proposed Monitor believes that
the Applicants proposed change to Directors' remuneration is appropriate in the
circumstances given the Directors' may not otherwise receive any remuneration.

## RESTRUCTURING ALTERNATIVES

117.   At the outset of a complex multijurisdictional restructuring such as this, it is not
possible to unveil a comprehensive restructuring strategy.

118.   The shape and direction of the Nortel restructuring will take some time to
develop.  It will require a thorough strategic review of the Company's assets and
operations as well as input from Nortel's various stakeholder groups.

119.   Nortel has a significant employee, R&D and asset base.  It is clear to the proposed
Monitor that several different restructuring approaches are available to the Company
including asset sales or recapitalization, or a combination thereof.

120.   The CCAA, Chapter 11, and U.K. administration proceedings will provide an
environment to stabilize Nortel's business and provide for the continuation of going
concern operations.

112

121.   Once the Company's business has been stabilized, Nortel and the Monitor will be able to update this Honourable Court on Nortel's restructuring alternatives.

122.   The proposed Monitor understands that it is the clear intent of Nortel to restructure and to file a plan of arrangement.

## CONCLUSION AND RECOMMENDATIONS

123.   The proposed Monitor believes that the Applicants should be granted the benefit of protection under the CCAA.  This will enable Nortel to commence a financial and operational restructuring and allow the Applicants to file a plan of arrangement in the best interest of all stakeholders.

124.   The proposed Monitor believes that it should be authorized to apply for recognition of the CCAA proceedings as "Foreign Main Proceedings" under Chapter 15 of the Code and that the proposed Monitor be authorized to act, if necessary, as the "foreign representative" with respect to such proceedings.

125.   The proposed Monitor recommends approval of the Flextronics Amending Agreement as ongoing supply from Flextronics is essential to ensure continuing operations.

126.   It is the opinion of the proposed Monitor that the accommodation for the Inter-Company Charge and GSPA charge and the NNI Loan is in the best interest of stakeholders.  The Inter-Company Charge and GSPA charges allow for the continuation of the Company's cash management system and the proposed NNI Loan along with the Applicants available cash should provide the necessary liquidity to Nortel's Canadian businesses in order to fund their operations. .

127.   Further to EYI's review of the proposed draft Initial Order, EYI supports the charges and financial thresholds proposed in the draft Initial Order, including:

a)   the Administration Charge of CDN$5 million;

b)  the Carling Facility Charge and the NNTC Guarantee to the benefit of NNI;

c)  the EDC Charge;

d)  the D&O Charge of CDN$90 million;

e)  the Inter-Company Charge;

f)  asset sale thresholds for each of the Applicants of $10 million or $50 million in the aggregate; and

g)  notices to creditors with outstanding balances of $5,000 or more.

All of which is respectfully submitted this 14th day of January 2009.


**ERNST & YOUNG INC.**
**In its capacity as the proposed Monitor of**
**Nortel Networks Corporation** *et al*


Per:


Murray A. McDonald
President

38

APPENDIX A

114

## Nortel Networks (Jan 13 Edition)
### CCAA Applicants
### Forecast of Cash Flow
US$ Millions
**Receipts & Disbursements**

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | |
| Collection of Accounts Receivable | 5.8 | 18.9 | 65.6 | 3.3 | 4.7 | 4.0 | 19.9 | 4.1 | 4.1 | 8.1 | 18.9 | 169.4 |
| Other Receipts | 0.0 | 0.4 | 0.4 | - | 0.7 | - | 0.4 | - | 0.3 | - | 0.2 | 1.1 |
| Intercompany Receipts | 15.0 | 67.2 | - | - | - | 131.5 | - | - | - | 55.0 | - | 268.8 |
| NNL/NNI Restructuring Loan Advances | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 20.8 | 86.1 | 66.0 | 3.3 | 4.7 | 135.6 | 20.3 | 4.1 | 4.1 | 63.1 | 19.1 | 439.3 |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | 24.2 | 23.6 | 7.1 | 14.5 | 7.2 | 14.3 | 7.2 | 13.8 | 7.2 | 7.2 | 12.7 | 131.7 |
| Benefits | 2.7 | 2.7 | 1.8 | 0.7 | 1.8 | 0.6 | 1.8 | 0.3 | 1.8 | 1.8 | 0.0 | 14.2 |
| Pension | - | 1.9 | - | - | - | 1.9 | - | - | - | - | 1.9 | 5.8 |
| Inventory Purchases | 34.7 | 51.3 | 4.4 | 12.5 | 17.9 | 14.5 | 6.1 | 18.3 | 4.2 | 4.2 | 5.7 | 169.5 |
| Non-Inventory Purchases | 14.2 | 13.1 | 13.8 | 8.5 | 13.8 | 13.1 | 13.9 | 1.9 | 17.6 | 13.1 | 13.9 | 137.0 |
| Intercompany Disbursements | - | 62.3 | - | - | 20.3 | - | - | - | 16.8 | - | - | 99.4 |
| Professional Fees | 1.4 | 1.2 | 1.2 | 1.5 | 1.2 | 1.2 | 1.5 | 1.2 | 1.4 | 1.4 | 1.2 | 14.4 |
| NNL/NNI Restructuring Loan Repayments | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | 77.1 | 129.8 | 45.8 | 31.3 | 48.1 | 43.8 | 46.5 | 18.4 | 51.2 | 44.5 | 35.5 | 572.0 |
| **Net Cash Flow** | (56.4) | (43.7) | 20.2 | (28.0) | (43.4) | 91.7 | (26.1) | (14.3) | (47.1) | 18.6 | (16.4) | (132.7) |
| **Opening Cash Balance** | 210.3 | 154.0 | 110.3 | 130.5 | 102.5 | 59.1 | 150.8 | 124.7 | 110.4 | 63.3 | 81.9 | 210.3 |
| **Closing Cash Balance** | 154.0 | 110.3 | 130.5 | 102.5 | 59.1 | 150.8 | 124.7 | 110.4 | 63.3 | 81.9 | 65.6 | 77.6 |
| Facility Size | 75.0 | 75.0 | 75.0 | 75.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 |
| Less Utilized Facility | - | - | - | - | - | - | - | - | - | - | - | - |
| Available Facility | 75.0 | 75.0 | 75.0 | 75.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 |
| **Closing Cash + Available Facility** | 229.0 | 185.3 | 205.5 | 177.5 | 259.1 | 350.8 | 324.7 | 310.4 | 263.3 | 281.9 | 265.6 | 277.6 |

**Nortel Networks Corporation**
**13 Week cash flow forecast assumptions:**

Nortel has prepared a 13 week cash flow forecast for the period January 1 – March 31, 2009 ("Forecast Period") that estimates the CCAA Applicants ("Applicants") financing requirements. The following outlines the main assumptions underlying the Applicants cash flow forecast ("Cash Forecast"):

**Summary of Assumptions:**

1. Collections of Accounts Receivable ("AR") include direct collections from customers and collections from contract manufacturers. Collections of AR have been estimated by the Applicant's collection group based on revenue forecasts and customer collection experience.

2. Other Receipts include real estate sublease income, income from investments, realizations on asset sales and other unusual receipts that may occur from time to time.

3. Intercompany Receipts represent collections on intercompany trade and transfer pricing adjustments from subsidiaries and joint ventures. Intercompany trade accounts and transfer pricing adjustments including pre-filing amounts continue to settle on a cash basis in the normal course with all global intercompany counterparties (filed and non-filed) with the exception of EMEA filing entities.

4. NNL / NNI Advances and Repayment represent the advances and repayment of funds drawn under the Restructuring Loan from NNI pursuant to the proposed post filing loan arrangement.

5. Payroll disbursements consist of wages, vacation pay, source deductions, and sales commissions. Payroll costs have been adjusted to reflect the anticipated workforce reduction during the forecast period.

6. Benefits include Health & Welfare Trust ("HWT") payments, defined benefit plan contribution funding, other benefit premiums and employer's share of Canada Pension Plan, Employment Insurance, Employer Health Taxes and Workers Safety and Insurance Board. Funding payments to HWT account are suspended post-filing as it is forecast that the HWT trust has sufficient surplus assets to sustain itself during the Forecast Period.

7. Pension includes payments to funded defined benefit plans for both current and past service.

8. Inventory Purchases consist of disbursements to third party suppliers for post filing product shipments on reduced credit terms.

9. Non-Inventory Purchases consist of disbursements for employee expenses, rent, taxes, capital expenditures, and all other payments to suppliers unrelated to inventory.

10. Intercompany Disbursements represent payments on intercompany trade and transfer pricing adjustments.

11. Professional fees include Monitor fees, legal, financial advisory and other professional fees related to the restructuring.

# TAB 6

116

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)
IN BANKRUPTCY AND INSOLVENCY

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AFFIDAVIT OF DAVID WYNDHAM DAVIES

(Sworn February 24, 2010)

I, David Wyndham Davies, of London, England, MAKE OATH AND
SAY AS FOLLOWS:

1.      I am the Chairman of the Board of Nortel Networks U.K. Pension Trust
Limited, which is the trustee ("**Trustee**") of the Nortel Networks UK Pension Plan
("**Plan**") described below.   I have held this position since June 2007.   I am an
independent trustee director;

2.      Prior to taking on my role as a Director and Chairman of the Trustee, I was a
Trustee Director of the British Telecom Pension Scheme for 9 years (1997 – 2005),
the UK's largest private pension scheme.   Following that, I was a non-executive

23073945.DOC

- 3 -

from participating in a certain investigation and related pension regulatory process ("UK Regulatory Procedure") undertaken by the UK Pensions Regulator ("Pensions Regulator") in the UK in relation to the Plan.

8.    The Monitor's motion also seeks a declaration that all acts taken by the Pensions Regulator in furtherance of the UK Regulatory Procedure without the consent of the Debtors or the Monitor or without leave of the court are null and void and shall be given no force or effect in the CCAA proceedings.

Nortel Networks UK Pension Plan

9.    Prior to the filing date on 14 January 2009 ("the Filing Date"), Nortel Networks UK ("NNUK") and its predecessor companies carried on business in the United Kingdom for over a hundred years. The corporate headquarters of NNUK and its predecessor companies have been based in Maidenhead in the UK, but at all times after 1991 the company and its predecessors operated as wholly-owned subsidiaries of Nortel Networks Limited ("NNL"). During that time, NNUK and its predecessors provided its employees with pensions and other benefits under the terms of the Plan as the principal employer of the Plan.

10.    The Plan is a defined benefit plan, under which employees are entitled to pension benefits based on their final salary, with the employer agreeing to meet the balance of the cost of providing such pension benefits after taking into account the employees' own contributions.

- 4 -

11.    The Plan currently has over 40,000 members of whom over half are pensioners.   The vast majority of these members reside in the UK which is also where the Trustee is based.

12.    The Plan has a substantial funding deficit. Although not yet finally determined, the Plan actuary estimated NNUK's section 75 debt (as of 13 January 2009) as £2.1 billion. A copy of the Plan actuary's letter dated 29 September 2009 to the Trustee is attached as Exhibit "A" to this affidavit. Similarly, the Plan's deficit was estimated in a Report dated 13 August 2009 made by the Joint Administrators to be in the vicinity of U.S. $3.1 billion. The Joint Administrators have confirmed that no further payments will be made by NNUK to the Plan.  A copy of the report of the Joint Administrators dated 13 August  2009 is attached as Exhibit "B" to this affidavit and a copy of the letter dated 18 September 2009 from the Joint Administrators confirming that no further payments will be made by NNUK to the Plan is exhibited to the proof of claim (see paragraph 27 below).

13.    The Plan is the largest and most significant defined benefit pension scheme within the Nortel Group in terms of the number of members involved for whom Nortel has failed to provide the pension benefits to which they are entitled. The Plan has the most material pension deficit in all the pensions schemes across the Nortel Group, according to the Joint Administrators' statement of proposals for NNUK, attached as Exhibit "C".

118.1

- 9 -

any negotiations or discussions in respect of the Protocol with the NNUK Administrators or any other Nortel party. As far as I know, the Protocol has not been agreed and I can state that our views have not been sought.

**Canadian Claims Bar Proceedings - Trustee's and PPF's Claims**

26.    By order of the Honourable Mr. Justice Morawetz made 30 July 2009, this Court established 30 September 2009 as the deadline for the filing of proofs of claims against the Debtors (the "Bar Date Order"). The Trustee and the PPF filed proofs of claim against the Debtors in accordance with the Bar Date Order.   The Trustee and the PPF also filed proofs of claim in the U.S. Proceedings.

27.    The claims filed by the Trustee and the PPF related to the Debtors' Plan-related liabilities arising pursuant to the UK legislation described above and also to NNL's liabilities under guarantees provided to the Trustee in support of NNUK's Plan obligations (see below).   The proofs of claim (excluding exhibits) filed are attached as Exhibits "D" to this affidavit.

**The Determinations Panel is the best forum for resolving the UK Regulatory Procedure**

28.    I believe that the UK Regulatory Procedure is the best and most convenient way to resolve the issues identified in the Warning Notice.  As I understand from the opinion of Mr. Ham QC, it involves a single integrated assessment of Nortel Group company liabilities in relation to Plan funding issues before a specialised and expert panel, thereby avoiding the delay and expense of having a multiplicity of concurrent

43.    This affidavit is sworn in opposition to the relief requested in the Monitor's notice of motion and for no other or improper purpose.

Sworn at 3, Bushill Row in the
City of London,
England & Wales

this 24th

day of February 2010

Before me

Notary Public London, England
(J. B. BURGESS)

23073945.DOC

120

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE -
COMMERCIAL LIST

AFFIDAVIT OF DAVID WYNDHAM DAVIES
(SWORN        FEBRUARY, 2010)

Cassels Brock & Blackwell LLP
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard  LSUC#: 12015D
Tel: 416.860.5757
Fax: 416.640.3027

Lawyers for the Nortel Networks UK Pension
Trust Limited and the Board of the Pension
Protection Fund

# sm32488

\\server\name

PSCRIPT Page Separator

# TAB 7

121

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| THE HONOURABLE MR. | ) | MONDAY, THE 29th |
|---|---|---|
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JUNE, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER**
**(Interim Funding Agreement)**

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited

("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and

Nortel Networks International Corporation (collectively, the "Applicants") for, *inter alia*, the

approval of an interim funding and settlement agreement dated as of June 9, 2009 (the "Interim

Funding Agreement") among the Applicants, the Chapter 11 Debtors (as defined in the Doolittle

Affidavit, as defined below), the EMEA Debtors (as defined in the Doolittle Affidavit) and the

- 2 -

Joint Administrators (as defined in the Doolittle Affidavit) (other than the Joint Administrator appointed in respect of Nortel Networks S.A.) and the other relief set out in the Applicants' notice of motion dated June 22, 2009 was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn June 22, 2009 (the "Doolittle Affidavit") and the fifteenth report of Ernst & Young Inc. dated June 25, 2009 (the "Fifteenth Report") in its capacity as monitor (the "Monitor") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Katie Legree sworn June 22, 2009, filed.

1.    **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Fifteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.    **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Doolittle Affidavit.

3.    **THIS COURT ORDERS** that the Interim Funding Agreement, including without limitation, all of the settlements and reservations of rights provided for therein, be and is hereby approved and that the Applicants are hereby authorized and directed to comply with their obligations thereunder.

4.    **THIS COURT ORDERS** that, without limiting anything contained in paragraph 3 hereof, with respect to any matters referred to in Section 11.c. and 12.a. through 12.f. (inclusive) of the Interim Funding Agreement, as to which agreement or determination of any of the

123

- 3 -

Applicants is required, the Applicants shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Applicants shall require prior consent of the Bondholders' Committee acting in good faith and the Monitor.

5.    **THIS COURT ORDERS** that, subject to the terms of the Interim Funding Agreement, the Extensions to the Canadian GSPA and the Accession be and are hereby approved.

6.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

7.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 3 0 2009

PER / PAR:

DOCSTOR: 1712969\3

124

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

ORDER
(Interim Funding Agreement)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1712969\3

# TAB 8

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF JOHN DOOLITTLE**
**(sworn June 22, 2009)**

I, John Doolittle, of the city of Oakville in the Province of Ontario, MAKE OATH AND

SAY:

1.    I am the Treasurer of Nortel Networks Corporation ("NNC") and Nortel Networks

Limited ("NNL") and have held those positions since June 23, 2008. From October 14,

2002 to June 12, 2006 I was the Vice-President, Tax for NNC and NNL. As such, I have

personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where

I do not possess personal knowledge, I have stated the source of my information and, in

all such cases, believe it to be true.

2.    I swear this affidavit in support of the motion to approve:

(a)    an interim funding and settlement agreement dated as of June 9, 2009 (the

"Interim Funding Agreement") among the Applicants (as defined below), the

- 4 -

9.    Lastly, on June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK under Chapter 15 of the Code.

10.    Further details regarding the background to these proceedings are set out in my affidavit sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

## THE INTERIM FUNDING AGREEMENT

*Background*

11.    As was set out in the Initial Order Affidavit, Nortel is a highly integrated business with significant distribution and research and development operations around the world. The Initial Order Affidavit set out several of the ways in which business was integrated across international lines, including cost allocation and profit sharing.

12.    NNL, NNI, NNUK, Nortel Networks (Ireland) Limited ("NNIR") and NNSA (collectively, the "Main Companies"), among others, are or have been the primary source of the research and development that has created Nortel's global technology footprint, the benefits of which are shared across multiple corporate entities within the Nortel group. These five Nortel entities also provide service and support on an ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead and institutional support to Nortel entities and customers outside of their jurisdictions. Certain other Nortel companies function primarily as sales operations, acting as intermediaries between the Main Nortel Companies and customers in jurisdictions not served by the Main Nortel

Companies, and, in certain circumstances, providing ongoing service and support in their local jurisdictions.

13.    In light of the foregoing, certain Nortel entities, including the Main Nortel Companies, have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs, across the corporate entities within the Nortel Group. These agreements include:

(a)    the Master R&D Agreement, dated as of December 22, 2004 among NNL, NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master R&D Agreement"); and

(b)    certain distribution agreements between one or more Nortel entities (the "Distribution Agreements" and together with the Master R&D Agreement, the "Transfer Pricing Agreements").

14.    For a number of years, Nortel has used "transfer pricing" to allocate profits and losses, and certain costs, among the various Nortel companies. A more detailed description of Nortel's transfer pricing model was set out in the Initial Order Affidavit. Transfer pricing is an accepted method for such allocation, used widely by multinational enterprises similar in structure and geographic scope to Nortel.

15.    In the case of Nortel, the Master R&D Agreement is the governing document pursuant to which the Nortel Group implemented its transfer pricing regime using the residual profit split methodology (the "Nortel Transfer Pricing Regime"). Among other things, the Nortel Transfer Pricing Regime was designed to determine the arm's length allocation

due to each of the parties for their share of the profits and losses arising from "R&D Activity," as that term is defined in the Master R&D Agreement.

16.    In general terms, the Nortel Transfer Pricing Regime historically sought to allocate residual profits and losses among the Main Nortel Companies based on the proportionate share of R&D Activity conducted by or on behalf of, such affiliates. Among other things, the Nortel Transfer Pricing Regime typically requires that profits and losses, and certain costs, be allocated among such affiliates during a calendar year under the Transfer Pricing Agreements (the "Transfer Pricing Payments") and that a true-up allocation is determined after the actual results for the year are known.

17.    Within Nortel, NNL is the owner of the vast majority of Nortel's intellectual property assets and, in accordance with the Master R&D Agreement, NNL licenses its intellectual property to the Main Nortel Companies on a royalty-free basis. The Nortel Transfer Pricing Regime, in normal times, is the means by which NNL is compensated for the development and use of its intellectual property by affiliates. NNL has historically been a net recipient of payments under the Nortel Transfer Pricing Regime given that NNL generates lower levels of revenue when compared to the high level of corporate overhead and R&D Activity incurred in Canada.

*Events Since Filing*

18.    As was set out in the Initial Order Affidavit, on filing, Nortel entered into two group supplier protocol agreements, one between the Applicants and the Joint Administrators on behalf of the EMEA Debtors, and the other between the Chapter 11 Debtors and the Joint Administrators on behalf of the EMEA Debtors (the "Canadian GSPA" and the "US

GSPA", respectively, and together, as each has been and may be amended from time to time, the "GSPAs"). The GSPAs were entered into in respect of the inter-company trading of goods and services after the Filing Date.

19.    Since filing, the parties have continued to extend and rely on the GSPAs in respect of basic trade payables. However, following the commencement of these proceedings, discussions began with various interested parties, including Nortel, the Monitor, the Joint Administrators, the Official Committee of Unsecured Creditors of NNI (the "Creditors' Committee") and the ad hoc Bondholder Committee (the "Bondholders' Committee", together with the Creditors' Committee, the "Creditor Groups") concerning continued payments under the Nortel Transfer Pricing Regime within the context of Nortel's worldwide insolvency proceedings. In particular, issues were raised in light of substantial changes that have occurred and may continue to occur in respect of Nortel's business model given the uncertainties facing Nortel's business.

20.    As a result, only one payment has been made in respect of amounts that could arguably be owed in respect of the Master R&D Agreement – a January 2009 payment of US$30 million by NNI to NNL (the "January Payment"). In addition, the EMEA Debtors have neither made, nor received, any payments under the Nortel Transfer Pricing Regime since the Filing Date. Without the receipt of these payments, NNL is currently facing significant liquidity pressure – pressure that puts NNL, and thus all of Nortel, at risk.

21.    The various interested parties have been discussing possible solutions to NNL's liquidity issues for over two months. Among other possible solutions, NNL requested that payments be made by both NNI and certain of the EMEA Debtors to NNL in respect of research and development and other overhead services post-filing ("Post-filing

Services"). After extensive negotiation, NNL, NNI, the Monitor and the Joint Administrators, working with the Creditor Groups, reached the consensus outlined in the Interim Funding Agreement, which, if the conditions to its effectiveness are satisfied, should provide NNL with sufficient liquidity at least through September 30, 2009 based on the current weekly cash flow forecast attached to the Monitor's report.

*The Interim Funding Agreement*

22.   Following lengthy, difficult, and good faith negotiations, on or about June 9, 2009, the parties entered into the Interim Funding Agreement. The terms of the Interim Funding Agreement were premised on an agreement that the parties have reached that the value of the Post-filing Services and expenses incurred by NNL post-filing for the benefit of NNI for the period from the Filing Date through September 30, 2009 (respectively, the "NNI Interim Obligations" and the "Canada/US Interim Period"), would be estimated to be US$187 million (which includes the $30 million paid by NNI through the January Payment). Such amount is equal to the amount forecasted (in the March 2009 Financial Outlook) by NNL to be owed by NNI for such period under the Master R&D Agreement.

23.   These estimations were agreed upon by the parties in recognition of the fact that a precise allocation of the expenses that NNL incurs and the value of the Post-filing Services it provides on behalf of the other Nortel entities would be a time-consuming and difficult endeavour in light of the integrated nature of the Nortel entities. Additionally, any definitive and binding determination regarding the interpretation and applicability of the Nortel Transfer Pricing Regime similarly would be extremely time consuming and potentially contentious.

- 9 -

24.    Capitalized terms used in this section and not otherwise defined shall have the meaning given to them in the Interim Funding Agreement.

25.    The main terms of the Interim Funding Agreement are as follows:

US/Canada Settlement Terms

(a)    NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal instalments of US$31.4 million in accordance with the schedule attached as Annex C to the Interim Funding Agreement;

(b)    The Total Payment shall be comprised of two (2) components:

(i)    Permanent Payment:  The first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment").

(ii)    Contingent Payment:  If it is determined, pursuant to a process to be agreed upon by NNL, NNI and the Creditor Groups, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009 with interest thereon as provided for in the Interim Funding Agreement.

(c)    *True-up Obligations*:  NNL agrees to use commercially reasonable efforts to recover from Nortel entities, other than the Debtors (collectively, "Other Nortel Group Companies"), Transfer Pricing Payments that are determined to be owed to the Applicants by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "ONGC Costs").  Solely to the extent that the Applicants actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Applicants' forecast, based

on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the parties to the Interim Funding Agreement, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "Excess Recoveries"), and it is also determined, pursuant to the process referred to in subparagraph (b)(ii) above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "Overage Amount"), the Applicants shall, in addition to any payments made or required to be made in repayment of the Contingent Payment, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the Chapter 11 Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "Maximum Overage Repayment") within 30 days of the date of determination thereof; provided, however, that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditor Groups, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (as defined below) (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditor Groups (the "NNL Liquidity Review Procedures"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Applicants from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the above-mentioned purposes, "U.S. Pro Rata Excess Recoveries," as of any date of determination shall equal the product of (i) the

Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has already been paid U.S. Pro Rata Excess Recoveries) and (ii) a fraction (x) the numerator of which shall equal US$161 million minus the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Applicants by Nortel Group entities (excluding the Applicants) that are payors for the Canada/US Interim Period (rounded to four decimal points). The general effect of this provision is that up to an additional US$30 million of the Total Payment may be repayable by NNL to NNI, out of specific funds recovered by the Applicants from certain other Nortel entities, but only to the extent that the value of the NNI Interim Obligations is determined to be less than US$161 million.

(d)     *Excess Funding Charge*:   NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Applicants (the "Excess Funding Charge"), which charge shall be granted by order of this Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); provided, however, that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges) (as both such terms are defined

in the Initial Order), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in these proceedings.[2]

(e)   *Use of Funds:*   Under the terms of the Interim Funding Agreement, NNL is entitled to use the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI and the Creditor Groups.

(f)   *Settlement:*   The sum of the Total Payment and the January Payment (being US$187 million) is intended to be a full and final settlement of any and all NNI Interim Obligations. Under the terms of the Interim Funding Agreement, the Applicants have agreed to indemnify, defend and hold harmless each Chapter 11 Debtor from and against any and all actions, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order) and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

---

[2] Since the entering into of the Interim Funding Agreement, the Applicants have confirmed with the Committees that the Goldman Charge (as defined in the Order of this Court made on June 1, 2009) shall continue to be a first priority charge, ranking *pari passu* with the Administration Charge, with respect to the assets secured by that charge.

Settlement Terms with EMEA Debtors

(g)  *EMEA Self-Funding; Shortfall Payments:* Under the terms of the Interim Funding Agreement, NNUK is irrevocably authorized to seek payment from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"), which amounts have been fixed by the Interim Funding Agreement.

(h)  *First Shortfall Payment:* Subject to the terms of the Interim Funding Agreement, NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"):

(i)  The First Shortfall Payment is to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account certain adjustments) exceeds a threshold amount communicated to the Joint Administrators by NNL in a letter dated June 9, 2009 (with copies to the Monitor and the Creditor Groups) and counter-signed by the Joint Administrators (any such sale, a "Material Asset Sale");

(ii)  Some or all of such payment shall be subject to the performance of NNL Liquidity Review Procedures (as set forth in the Interim Funding Agreement).

(i)  *Second Shortfall Payment:* Subject to the terms of the Interim Funding Agreement, NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or

- 14 -

all of such payment shall again be subject to the performance of NNL Liquidity Review Procedures.

NNL, as the "clearing house" for transfer pricing, would normally be the recipient of payments from the payor Nortel entities and the distributor of such funds received to the recipient Nortel entities, under the transfer pricing regime. The provisions relating to the Shortfall Payments provide the Applicants with certainty of settling transfer pricing related claims by EMEA Debtors during the EMEA Interim Period.

(j)    *Shortfall Charge*:  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Applicants (the "Shortfall Charge"), which charge shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Initial Order).   Without prejudice to the foregoing sentence, NNUK acknowledges that any current or future charges that have been, or may be granted to the Chapter 11 Debtors in connection with any funding provided by the Chapter 11 Debtors to the Applicants may, or could be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

(k)    *Effectiveness of the Shortfall Payments and the Shortfall Charge*: The obligation of NNL to make the Shortfall Payments and the triggering of the Shortfall Charge

40

137

- 15 -

only occur upon the execution of transaction documents in respect of a "Subject Transaction".[3]

(l)    *Settlement:*  Except with respect to the obligation of NNL to make the Shortfall Payments,

     (i)    the Interim Funding Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any party to the Interim Funding Agreement;

     (ii)    Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished; and

     (iii)    It is expressly understood that Part B of the Interim Funding Agreement is intended to constitute a full and final settlement of all of the matters between the Applicants and the Chapter 11 Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of the Interim Funding Agreement whether arising during, or related to, the EMEA Interim Period.

General Settlement Terms

(m)    *Intellectual Property Licenses:*  Each of the Chapter 11 Debtors and the EMEA

Debtors has agreed that it will enter into an Appropriate License Termination (as

defined in Section 11.b. of the Interim Funding Agreement) with respect to the

licenses and rights granted by NNL to such parties under or pursuant to the

provisions of the Master R&D Agreement (such licenses and rights, the "IP

---

[3] "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Applicants; (ii) the Chapter 11 Debtors; and (iii) the EMEA Debtors (excluding, however, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

Licenses") for the purpose of facilitating, and in consideration of a right to an allocation to the parties of portions of the sale proceeds from, the sale of any material assets of any of the Applicants and/or the Chapter 11 Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the Chapter 11 Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditor Groups (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated June 9, 2009 (with copies to the Monitor and the Creditor Groups) and counter-signed by the Joint Administrators.

(n)     *Sale Transactions*:   Each of the Applicants, the Chapter 11 Debtors and the EMEA Debtors (collectively, the "Debtors" or individually, a "Debtor") has agreed that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or consummation of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.  Pending the distribution of the Sale Proceeds, the entire amount of the Sale Proceeds (less

certain taxes and transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Sale Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

(o)    The parties have agreed to continue to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Sale Protocol"), which Sale Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

(p)    The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Sale Protocol, failing which the Sale Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

(q)    No Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the

- 18 -

other parties to the Interim Funding Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally.

(r)　For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive) of the Interim Funding Agreement, the Chapter 11 Debtors have agreed that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Chapter 11 Debtors is required, the Chapter 11 Debtors shall include the Creditor Groups in any negotiations on such issues with the other Debtors or any related proceedings and any such agreement or determination by the Chapter 11 Debtors shall require the prior consent of the Creditor Groups acting in good faith. For purposes of the same such Sections, the Applicants have agreed that with respect to any of the matters referred to in such Sections as to which the agreement regarding determination of the Applicants is required, the Applicants shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Applicants shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

(s)　*Effectiveness:*　The Interim Funding Agreement is subject to the following conditions:

　　(i)　approval of the US Court and this Honourable Court;

　　(ii)　the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into the Interim Funding Agreement (the "UK Court Condition"); provided, however, the Joint Administrators may at their election waive the UK Court Condition; and

- 19 -

(iii)   this Honourable Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and this Honourable Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Applicants), NNI (on behalf of the Chapter 11 Debtors), the Monitor and the Creditor Groups

(collectively, the "Conditions").

(t)   *Reservation of Rights*:  Nothing in the Interim Funding Agreement shall constitute an amendment, modification or waiver of rights of any party thereto (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of the Interim Funding Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however*, that the parties to the Interim Funding Agreement waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to the Interim Funding Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights under the Interim Funding Agreement against NNL, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL under certain provisions of the Interim Funding Agreement, and (B) the January Payment.  The use of the term Transfer Pricing Payment (or any similar term) or reference to the Master R&D Agreement (or similar agreement) in the Interim Funding Agreement is for convenience only and

- 20 -

shall have no evidentiary effect or be used by any of the parties thereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any entity of the Nortel Transfer Pricing Regime or the Master R&D Agreement.

26.    On June 15, 2009, the Joint Administrators, NNL and NNI entered into a side letter (the "Side Letter") pursuant to which the Joint Administrators acknowledged that there may be a circumstance in which the UK Court refused to make an order that the Joint Administrators are at liberty to enter into the Interim Funding Agreement, solely because the UK Court does not consider it appropriate to make an order in relation to the exercise of the Joint Administrators' powers under the UK Insolvency Act. The Side Letter confirms that if the UK Court does this and also does not make any determination or express any views on the appropriateness of the Joint Administrators entering into the Interim Funding Agreement on behalf of the EMEA Debtors, the Joint Administrators would be willing to waive the UK Court Condition. A copy of the Side Letter is attached as Exhibit "B" hereto.

*GSPAs*

27.    Pursuant to previous orders of this Honourable Court, extensions of the Canadian GSPA have been previously approved up through the fourth extension of the GSPAs. The relevant parties subsequently entered into the fifth, sixth and seventh extensions (collectively, the "Extensions") of the GSPAs and they are currently set to expire on July 9, 2009. On June 17, 2009, the administrator appointed by the French Court in the secondary proceedings acceded (the "Accession") to the sixth and seventh extensions of