187

# CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

## A. Background

1. Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2. NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1] The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

188

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Creditors Committee") in the U.S. Proceeding.  An ad hoc committee

of bondholders (the "Bondholders Committee") has also been organized.

3.    On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC,

NNI's  direct corporate parent NNL (together with NNC and their affiliates, including the U.S.

Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian

Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors have obtained

an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under

which, inter alia:  (a) the Canadian Debtors have been determined to be entitled to relief under

the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the

Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the

CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors

has been granted.

4.    The Monitor filed petitions and obtained an order in the U.S. Court

granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Proceedings").  NNI also filed an application and obtained an order in the Canadian

Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign

proceedings" in Canada and giving effect to the automatic stay thereunder in Canada.  None of

the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian

Proceedings.

---

[2]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation,
Nortel Networks Global Corporation and Nortel Networks International Corporation.

5.    For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

**B.    Purpose and Goals**

6.    Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity. Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

f.    implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

**C.    Comity and Independence of the Courts**

7.    The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

8.    The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

5

191

9.    In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to:

    a.   increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

    b.   require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

    c.   require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

    d.   require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

    e.   authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

    f.   preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.    The Debtors, the Creditors Committee, the Estate Representatives and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the Canadian Order and other applicable laws.

**D.    Cooperation**

11.    To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

6

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

12.    To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court. In furtherance of the foregoing:

a.    The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

b.    Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

c.    The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

d.    The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

193

(i)     A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)     Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)     Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)     If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)     The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)     The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

194

13.    Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.    Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.    Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

195

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess

of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and

one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure

statement, information circular, plan of reorganization or plan of compromise and arrangements

in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee

or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7

proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to

convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy

and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates;

(ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating

losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of

the Debtors' registered pension plans the effect of which would increase the liability of any

Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign

executory contracts having a material impact on the assets, operations, obligations, rights,

property or business of both the U.S. and Canadian estates and accounting for annual gross

revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief

from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian

Proceedings (1) involving any Material Contract or (2) to pursue actions having a material

impact on the assets, operations, obligations, rights, property or business of at least one U.S.

Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any

motion seeking to create or extend any program, plan, proposal or scheme relating to or

authorizing payments to employees where the consideration relates to non-ordinary course

incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

196

motion regarding any program, plan proposal, scheme or similar course of action related to the wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

a. unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however*, that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

b. upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

c. if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

d. if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E. **Recognition of Stays of Proceedings**

16. The Canadian Court hereby recognizes the validity of the stay of proceedings and actions against the U.S. Debtors and their property under section 362 of the

197

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

      17.    The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

      18.    Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.    **Rights to Appear and Be Heard**

      19.    The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

198

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.     In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

**G.     Claims Protocol**

21.     The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

**H.    Retention and Compensation of Estate Representative and Professionals**

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

200

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.    The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order. In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.    Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including:  (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States. The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

201

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.     Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.     Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court.

27.     Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

202

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

**I.    Notice**

28.    Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following:  (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time.  Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur.  In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

17

203

**J.    Effectiveness; Modification**

30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing.  Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.    Procedure for Resolving Disputes Under this Protocol**

32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above.  In rendering a determination in any such dispute, the Court to which the issue is addressed:  (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either:  (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above.  Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

    a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

    b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

18

204

c.   copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

d.   the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

e.   for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

## L.   Preservation of Rights

34.   Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall:  (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

19

205

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**THIRD AMENDED AND RESTATED
INITIAL ORDER**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1717808\2

# TAB 10

206

Court File No.: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | THURSDAY, THE 12th |
| | ) | |
| JUSTICE WILTON-SIEGEL | ) | DAY OF NOVEMBER, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### ORDER
### (Approval of CDMA Escrow Agreement)

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notice of Motion dated November 11, 2009 was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn November 11, 2009 ("Doolittle Affidavit") and on hearing the submissions of counsel for the Applicant, the Monitor and those

- 2 -

other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn November 11, 2009, filed:

1.    THIS COURT ORDERS that the time for the service of the Notice of Motion and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof

2.    THIS COURT ORDERS AND DECLARES that the escrow agreement among, Nortel Networks Inc., NNC, NNL, Nortel Networks UK Limited, the EMEA Filed Entities and the Estate Fiduciaries (as each is defined in the Escrow Agreement), and JPMorgan Chase Bank, N.A., as escrow agent, substantially in the form attached as Exhibit "A" to the Doolittle Affidavit (the "Escrow Agreement"), is hereby approved and that the execution of the Escrow Agreement by NNC and NNL is hereby authorized and approved.

3.    THIS COURT ORDERS that the Monitor be and is hereby authorized and directed to execute the Escrow Agreement.

4.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

5.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

NOV 1 2 2009

PER / PAR: ___

DOCSTOR: 1805600\3

208

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

ORDER
(Approval of CDMA Escrow Agreement)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario - M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# TAB 11

30
209

**ESCROW AGREEMENT**

among

**THE SELLERS**

and

**THE EMEA FILED ENTITIES**

and

**THE ESTATE FIDUCIARIES**

and

**JPMorgan Chase Bank, N.A., as Escrow Agent**

dated as of November 11, 2009

This is Exhibit _____ referred to in the
affidavit of _____ JOHN DOOLITTLE _____
sworn before me this ____
day of _____ November _____ no. 09

_____
A COMMISSIONER FOR TAKING AFFIDAVITS

31
210

**ESCROW AGREEMENT** (this "Agreement"), dated as of November 11, 2009, by and among (i) Nortel Networks Corporation ("NNC"); (ii) Nortel Networks Limited ("NNL"); (iii) Nortel Networks Inc. ("NNI"); (iv) the companies set out in Schedule A (the "EMBA Filed Entities"), which are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited (In Administration) for which David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom serve as joint administrators (collectively the "Joint Administrators")) who act as agents of the EMBA Filed Entities without any personal liability as set forth in Paragraph 20 below (the EMBA Filed Entities and collectively with NNC, NNL and NNI, the "Depositors"); (v) the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Paragraph 28; and (vi) JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America ("JPMorgan") and acting through its TS/Escrow Services Division and solely in its capacity as escrow agent under the Agreement, and any successors appointed pursuant to the terms hereof (JPMorgan in such capacity, the "Escrow Agent").

**WHEREAS,** on January 14, 2009 (the "Petition Date"), NNC, NNL and certain of their affiliates (collectively, the "Canadian Debtors") filed with the Ontario Superior Court of Justice (the "Canadian Court") an application for protection under the Companies' Creditors Arrangement Act (Canada) (the "CCAA") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of any Depositor that is a Canadian debtor, the "Canadian Cases");

**WHEREAS,** NNI and certain of its affiliates (collectively, the "U.S. Debtors") are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date (except for Nortel Networks (CALA) Inc., which commenced its case under Chapter 11 of the U.S. Bankruptcy Code on July 14, 2009) by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court") (the "U.S. Cases" and together with the Canadian Cases, the "Bankruptcy Cases");

**WHEREAS,** the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors as representative for the creditors of the U.S. Debtors (the "Committee," and together with the Monitor, the "Estate Fiduciaries"), and in addition, and ad hoc group of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group");

**WHEREAS** on the Petition Date, the High Court of Justice in London, England (the "English Court") ordered that the EMBA Filed Entities be placed into administration under the English Insolvency Act 1986 (the "Insolvency Act") and Insolvency Rules 1986 (the "Insolvency Rules") and European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the "EC Regulation") and appointed the Joint Administrators (as appropriate) to manage the affairs, business and property of the EMBA Filed Entities;

1

WHEREAS on May 28, 2009, insolvency proceedings, in accordance with Article 3(3) of the EC Regulation ("Secondary Proceedings"), were opened by the Commercial Court of Versailles (the "French Court") in relation to NNSA in accordance with Article 27 of the EC Regulation pursuant to which the French Court appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Liquidateur Judiciaire" and Maître Franck Michel, partner of Selarl F. Michel – A. Miroitte – C. Gorins, 10 Allée Pierre de Coubertin, 7800 Versailles as the "Administrateur Judiciaire" of NNSA under Articles 641-1 et seq. of the French Commercial Code;

WHEREAS, NNC, NNL and NNI (collectively, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ) (the "Buyer") have entered into that certain Asset Sale Agreement, dated as of July 24, 2009, as amended on October 30, 2009 and as may be further amended from time to time in accordance with its terms (the "Asset Sale Agreement", and terms not otherwise defined herein shall have the meaning given to them in the Asset Sale Agreement), whereby the Sellers have agreed to sell certain of their assets relating to the CDMA and LTE Access businesses to the Buyer;

WHEREAS, it is contemplated under Section 2.3.2 of the Asset Sale Agreement that at Closing the Buyer will deliver or cause to be delivered an amount, in immediately available funds, equal to the Estimated Purchase Price less the Good Faith Deposit, the Working Capital Escrow Amount and other amounts deducted by mutual agreement of the Sellers and the Buyer (subject to the consent of the Estate Fiduciaries and the Bondholder Group in accordance with clause 12.g of the IFSA (as defined below) from the Estimated Purchase Price to be paid by the Buyer at Closing (the "Deposited Purchase Price") to the Sellers, and will deliver or cause to be delivered an amount, in immediately available funds, equal to the Working Capital Escrow Amount to Citibank N.A., in its capacity as escrow agent ("Citi") under that certain Escrow Agreement to be entered into at Closing (the "Working Capital Escrow Agreement") by and among the Sellers, Citi and the Buyer;

WHEREAS, it is contemplated under the Transition Services Agreement that at Closing the Sellers will deliver or cause to be delivered an amount in immediately available funds equal to $50,000,000 (the "TSA Escrow Amount") to Citi under that certain escrow agreement to be entered into at Closing by and among the Sellers, Citi and Ericsson Inc., a corporation organized under the laws of Delaware, pursuant to the Transition Services Agreement (the "TSA Escrow Agreement");

WHEREAS, the Closing is expected to occur in early November, 2009 and the Depositors desire to establish an account prior to Closing for the escrow of the Deposited Purchase Price pursuant to this Agreement, it being understood by the Depositors that this Agreement is subject to amendment in accordance with Paragraph 15(a) to, among other things, reflect further agreement among the Depositors as to the terms of the escrow of the Deposited Purchase Price;

WHEREAS, the Depositors and certain other parties (together, the "IFSA Parties") have entered into that certain agreement to address interim funding and the settlement of certain matters dated June 9, 2009 (the "IFSA"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties have agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions (the "Allocation Protocol"),

2

33
212

which shall provide binding procedures for the allocation of sales proceeds where the IFSA Parties are otherwise unable to reach agreement; and

WHEREAS the EMEA Filed Entities have agreed pursuant to clause 11 of the IFSA to enter into an Appropriate License Termination with respect to the licenses and rights granted by NNL to the EMEA Filed Entities under or pursuant to the Master Research and Development Agreement or any other internal agreement among entities of the Nortel group for the purposes of facilitating the entry into the Asset Sale Agreement, and in consideration of a right to an allocation to such Depositors of a portion of the Escrow Funds (as defined below). Upon the execution of the Appropriate License Termination the EMEA Filed Entities, pursuant to clause 11.d of the IFSA, shall be deemed to be a Selling Debtor (for the purposes of the IFSA) and shall be entitled to a portion of the Escrow Funds. Such Appropriate License Termination is in agreed form and has been executed by the EMEA Filed Entities (the "ALT");

WHEREAS, this Agreement will be approved by the Canadian Court and the U.S. Bankruptcy Court prior to Closing and the Depositors will, promptly after receiving such approval, provide the Escrow Agent with evidence of such approvals; and

WHEREAS, the Depositors wish to appoint JPMorgan as escrow agent and JPMorgan is willing to accept such appointment and to act as escrow agent, in each case upon the terms and conditions of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors and the Escrow Agent hereto agree as follows:

1.     Appointment of Escrow Agent. The Depositors hereby jointly nominate, constitute and appoint the Escrow Agent as escrow agent to hold the Escrow Funds in the Escrow Account (as defined below) upon the terms and conditions set forth herein. The Escrow Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Escrow Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. The Escrow Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Escrow Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, shall be binding upon each of the Depositors and the Escrow Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.     Deposit of Escrow Property. Funds shall be deposited in the Escrow Account (as defined below) as follows:

(a)     At the Closing, the Sellers shall instruct the Buyer to deposit the Deposited Purchase Price, less the TSA Escrow Amount, with the Escrow Agent, in immediately available funds, in an account established with the Escrow Agent (the "Escrow Account") account number 507953312;

34
213

(b)    At the Closing, NNI shall deposit the Good Faith Deposit less $22,500,000 (which amount represents the aggregate reimbursement to NNI and NNL of the termination fee and expense reimbursement previously paid to Nokia Siemens Networks, B.V. by NNI and NNL, each of whom paid $11,250,000) with the Escrow Agent in immediately available funds in the Escrow Account and pay $11,250,000 to NNL;

(c)    After the Closing, the Sellers shall instruct the Buyer to deposit any purchase price adjustments to be paid to the Sellers under the Asset Sale Agreement with the Escrow Agent in the Escrow Account;

(d)    After the Closing, the Sellers shall instruct Citi to deposit any of the Working Capital Escrow Amount to be released to Sellers pursuant to the Working Capital Escrow Agreement with the Escrow Agent in the Escrow Account; and

(e)    After the Closing, the Sellers shall instruct Citi to deposit any of the TSA Escrow Amount to be released to the Sellers pursuant to the TSA Escrow Agreement with the Escrow Agent in the Escrow Account; provided, however, that if the Depositors (subject to the consent of the Estate Fiduciaries) have agreed to an allocation of the TSA Escrow Amount (or the amount thereof remaining at the time of release or such allocation has been determined pursuant to the Allocation Protocol), the Sellers shall instruct Citi to distribute the TSA Escrow Amount in accordance with such allocation;

(all funds deposited in accordance with sub-paragraphs (a)-(e) above collectively, the "Escrow Property"). The Escrow Property, plus all interest and other income thereon received by Escrow Agent, less any funds distributed or paid in accordance with this Agreement, is collectively referred to herein as "Escrow Funds"). The Escrow Agent shall provide written confirmation to the Depositors, and the Estate Fiduciaries and the Bondholder Group upon its receipt of any Escrow Property from the Buyer, Citi or otherwise. Prior to the deposits in accordance with sub-paragraphs (a)-(e) above, there shall be no other funds in the Escrow Account. The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Escrow Agent and shall not be commingled with the other assets held by the Escrow Agent.

3.    Investment of Escrow Funds.

(a)    Until otherwise jointly directed by all of the Depositors, the Escrow Agent shall invest the Escrow Funds in Permitted Investments only. "Permitted Investments" means (1) United States Treasury obligations with maturities not in excess of one year, (2) money market funds invested solely in such United States Treasury obligations and (3) the JPMorgan Chase Bank Collateralized Money Market Deposit Account; provided, however, that in no event shall Permitted Investments include investments that are not eligible for the portfolio interest exemption or other similar exception to U.S. withholding tax. The Escrow Agent shall invest the Escrow Funds on the date of deposit so long as the relevant funds are received on or before 11:00 a.m. New York City time. Any written notice to remit payment received by the Escrow Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth on Schedule C is authorized or required by law or executive order to remain closed. In the absence

4

of joint written instruction from the Depositors and the Estate Fiduciaries, the Escrow Agent will invest the Escrow Funds in item (3) referenced above. The parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of the Escrow Funds or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Depositors to give the Escrow Agent instructions to invest or reinvest the Escrow Funds.

(b)    Any investment direction contained herein may be executed through an affiliated broker-dealer of the Escrow Agent, which shall be entitled to such affiliated broker-dealer's usual and customary fee. Neither the Escrow Agent nor any of its affiliates assume any duty or liability for monitoring the investment rating of the investments.

(c)    The Escrow Agent shall have the right to liquidate investments as necessary to distribute Escrow Funds pursuant to Paragraph 5.

4.    Ownership of Escrow Funds; Taxes.

(a)    The Escrow Funds at all times are and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Funds shall, as of the end of each calendar year and to the extent required by law, be reported by Escrow Agent on Form 1099 or Form 1042-S as the income of Depositors or their Affiliates, based upon the disbursement of the Escrow Funds to Depositors or their Affiliates pursuant to Paragraph 5 if such income was disbursed during such calendar year or, with respect to any Escrow Funds not disbursed during such calendar year, based upon each Depositor's pro rata share of such income, with each Depositor's pro rata share being deemed to be equal to such Depositor's interest allocation percentage as set forth on Exhibit 1. The Escrow Agent acknowledges and agrees that the interest percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Funds and, accordingly, the Escrow Agent agrees to amend Form 1099 and Form 1042-S upon a joint written request from the Depositors and the Estate Fiduciaries, which request shall set forth the re-allocation of all interest and any other earnings on Escrow Funds previously reported on Form 1099 and Form 1042-S; provided, however, the Escrow Agent shall be permitted to rely at all times upon the interest percentages then set forth on Exhibit 1 delivered to the Escrow Agent and otherwise the Escrow Agent shall be entitled to act upon the allocations and interest percentages as then set forth in Exhibit 1 without liability to any Depositor, notwithstanding any subsequent amendment to Exhibit 1 setting forth any new allocation or interest percentage. Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to, any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("FIRPTA"). The Depositors acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Funds or any income earned by the Escrow Funds. Each Depositor further acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Funds shall be paid by such Depositor. All proceeds of the Escrow Funds shall be retained in the Escrow Account and reinvested from time to time by the Escrow Agent as provided in this Agreement. The Escrow Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax

documentation, and shall remit such taxes to the appropriate authorities. The parties hereby agree and acknowledge that the Escrow Agent has no ownership interest in the Escrow Funds but is serving solely as escrow holder having only possession thereof. This Paragraph 4 shall survive notwithstanding any termination of this Agreement or the resignation of the Escrow Agent. Each Depositor will provide the Escrow Agent with the appropriate form W-8 or W-9 either (x) if any of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, as a condition to such Depositor's receipt of such Escrow Funds from the Escrow Agent, prior to the Escrow Agent making such disbursement hereunder or (y) if none of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, on or before December 31, 2009. If W-8 or W-9 forms, validated by the Escrow Agent, have not been provided by all of the Depositors prior to December 31, 2009 the Escrow Agent shall report taxes on a disbursement basis in the year they are disbursed.

(b)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Funds. The Depositors shall, jointly and severally, indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of the Escrow Agent. Any indemnification payments arising from the indemnification provided by this Paragraph 4(b) shall be initially satisfied out of the Escrow Funds to the extent available. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9 and shall survive the resignation or removal of Escrow Agent and the termination of this Agreement.

5.     Distribution of Escrow Funds. The Depositors, the Estate Fiduciaries and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:

(a)     The Escrow Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of sales proceeds (a "Decision") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.

(b)     The Depositors understand and agree that no payments or reimbursements made pursuant to Section 6.1 of the Asset Sale Agreement in respect of Transfer Taxes shall constitute any part of the Deposited Purchase Price or the Escrow Funds, or shall be required to be paid by the Buyer into the Escrow Account. In the event, however, that Buyer or its Affiliates

6

make any payments with respect to Transfer Taxes that are payable to or intended for the benefit of one or more Sellers or any Affiliate or agent thereof pursuant to Section 6.1 of the Asset Sale Agreement but which are deposited into the Escrow Account (any such payment, "Misdirected Tax Payment"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing the Escrow Agent with a letter of direction executed by an Authorized Representative of such Depositor identifying the amount that is represented to be a Misdirected Tax Payment(s) and further directing the release of such Misdirected Tax Payment to the appropriate beneficiary in accordance with Paragraph 12 below. The requesting Depositor(s) shall (A) send a copy of such letter of direction to each of the other Depositors, the Estate Fiduciaries and the Bondholder Group at the same time as such letter is sent to Escrow Agent and (B) attach thereto (i) supporting documentation evidencing the amount of the Transfer Taxes payable (it being understood that the Escrow Agent shall have no responsibility for verifying the accuracy, delivery or sufficiency of such supporting documentation) and (ii) a certification of an Authorized Representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Buyer or its affiliates with respect to Transfer Taxes pursuant to the Asset Sale Agreement. The Escrow Agent shall, within ten (10) days of receipt of such letter of direction disburse to such Depositor the amounts requested therein; provided, however, that if Escrow Agent receives a notice of objection from one or more of the Depositors or an Estate Fiduciary prior to making such disbursement (but in no event later than 3:00 p.m. EST on such release date), the Escrow Agent shall not make such disbursement until Escrow Agent either (x) receives an order of a court of competent jurisdiction (as provided in Paragraph 21 below), which is not stayed or subject to appeal, instructing it to make such distribution or (y) the objecting Depositor(s) and/or Estate Fiduciary(ies) provide written notice to the Escrow Agent withdrawing such objection. Subject to the proviso to the preceding sentence, the Escrow Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors and/or Estate Fiduciary(ies).

(c)    The Escrow Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Escrow Account. The Escrow Agent shall have the right to withhold an amount equal to the amount due and owing to the Escrow Agent, plus any reasonable costs and expenses incurred by Escrow Agent in accordance with the terms of this Agreement in connection with the termination of the Escrow Account.

(d)    No Depositor shall submit to the Escrow Agent a certificate that falsely certifies to the finality of a Decision.

(e)    Any request for a distribution pursuant to this Paragraph 5 shall be accompanied by a completed Schedule B with respect to the Depositors participating in such distribution, unless a completed Schedule B with respect to such Depositor has previously been provided to the Escrow Agent (in which case the Schedule B to be provided to the Escrow Agent need only contain the requisite information with respect to the Depositors as to whom no previous Schedule B has been provided to the Escrow Agent). The Depositors shall comply with any request from another Depositor for information necessary for inclusion in Schedule B.

6.    Termination of Escrow Account. The Agreement shall terminate upon the distribution of all Escrow Funds from the Escrow Account established hereunder in accordance

with Paragraph 5 hereof, subject to the survival of provisions which expressly survive the termination of this Agreement; provided, however, that this Agreement shall not terminate until (i) all of the Working Capital Escrow Amount owing to the Sellers has been released from the Working Capital Escrow Account, deposited in the Escrow Account in accordance herewith and subsequently distributed hereunder, (ii) all of the TSA Escrow Amount owing to the Sellers has been released from the TSA Escrow Account, deposited in the Escrow Account in accordance herewith and subsequently distributed hereunder, unless such amount has been distributed upon release from the TSA Escrow Account in accordance with Paragraph 2(e), in which case the Sellers shall give the Escrow Agent notice thereof with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group and (iii) all other purchase price adjustment amounts owing to the Sellers under the terms of the Asset Sale Agreement have been deposited in the Escrow Account by the Buyer in accordance herewith and subsequently distributed hereunder; provided, further, that if the balance of the Escrow Account is zero prior to any such deposits, the Depositors shall give the Escrow Agent reasonable advance notice of expected deposits and the Escrow Agent shall keep the Escrow Account open.

7.    Method of Payment.  Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on Schedule B annexed hereto (collectively, the "Standing Settlement Instructions").  Any Depositor shall have the right, from time to time, to provide written notice to the Escrow Agent and the other Depositors updating its Standing Settlement Instructions, and the Escrow Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Paragraph 5 until such Standing Settlement Instructions have been further updated pursuant to this Paragraph 7.

The Depositors acknowledge that the Escrow Agent may rely upon all identifying information set forth in the Standing Settlement Instructions.  The Escrow Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if the Escrow Agent has previously authenticated such Standing Settlement Instructions with respect to such Depositor.  The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8.    Monthly Reports.  The Escrow Agent shall, promptly following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Escrow Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9.    Liability of Escrow Agent.  The Escrow Agent's sole liability hereunder shall be to hold and invest the Escrow Funds and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder.  It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it.  The Escrow Agent shall not be liable for anything done, suffered or omitted by it in accordance with the

8

39
218

advice or opinion of any such counsel, accountants or other skilled persons. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in Paragraph 21 below) determines that the Escrow Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Account, including, without limitation, the Escrow Property, nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. The Escrow Agent shall have no duty or obligation to make any calculations of any kind hereunder. In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the parties pursuant to Paragraph 5 which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Paragraph 21 below).

Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage or any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Funds, or any part thereof, at any time, that cannot be settled under other provisions hereof, the Escrow Agent is authorized to retain in its possession, without liability to anyone, all or any part of the Escrow Funds, as applicable, or the proceeds from any sale thereof until a distribution is requested in accordance with Paragraph 5(a).

The Depositors shall, jointly and severally, indemnify and hold harmless Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively "Losses") arising out of or in connection with (a) Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by Escrow Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in Paragraph 21 below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or

40
219

removal of the Escrow Agent or the termination of this Agreement. Any indemnity payments to the Escrow Agent arising from the indemnification provided by this Paragraph 9 shall be initially satisfied from the Escrow Funds to the extent available. The indemnification provided by this Paragraph 9 is in addition to the indemnification provided in Paragraph 4(b) and shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement.

The duties and responsibilities of the Escrow Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. The Escrow Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Asset Sale Agreement, the IFSA and the Allocation Protocol, other than as outlined in this Agreement, nor shall the Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. In the event of any conflict between the terms and provisions of this Agreement, those of the Asset Sale Agreement, any schedule or exhibit attached to the Asset Sale Agreement, the IFSA, the Allocation Protocol, or any other agreement among Depositors, or any of them, the terms and conditions of this Agreement shall control solely to the extent such conflict is with respect to the rights, duties, obligations and liabilities of the Escrow Agent.

10.    Compensation of Escrow Agent. The Depositors agree to pay the Escrow Agent a fee in the amount of $2,500 in the aggregate on the date hereof and on the anniversary of the date hereof each year thereafter as full compensation for its services hereunder; provided, however, that the Depositors further agree to reimburse the Escrow Agent all reasonable, documented out-of-pocket costs and out-of-pocket expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, including but not limited to any suit in interpleader brought by the Escrow Agent (which shall be brought only in a court of competent jurisdiction (as set forth in Paragraph 21 below). The Escrow Agent shall collect amounts due to it under this Paragraph 10 from the Escrow Account.

11.    Resignation or Removal of Escrow Agent. The Escrow Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon selection of a successor escrow agent pursuant to the provisions of this Agreement. Similarly, the Escrow Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to the Escrow Agent by the Depositors and the Estate Fiduciaries. In either event the Escrow Agent shall then deliver the balance of the Escrow Funds then in its possession to a successor escrow agent as shall be appointed by the Depositors and the Estate Fiduciaries as evidenced by a written notice filed with the Escrow Agent and signed by the Depositors and the Estate Fiduciaries.

If the Depositors and the Estate Fiduciaries are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in Paragraph 21 below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. For the avoidance of doubt, the parties acknowledge that under no

41
220

circumstances shall any party be entitled to obtain a distribution from the Escrow Account as a result of the resignation of the Escrow Agent.

The successor escrow agent shall be a bank or trust company having its principal executive office in the United States and assets in excess of $5,000,000,000.

Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Funds the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

Any corporation into which the Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Escrow Agent in its individual capacity may be transferred, shall be the Escrow Agent under this Agreement without further act.

12.    Notices. All communications hereunder shall be in writing and shall be deemed to be duly given and received:  (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule C or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (i), (ii) or (iii) of this Paragraph 12, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule D hereto (each an "Authorized Representative" of the applicable Depositor), and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Escrow Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to the Escrow Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a court order of a court of competent jurisdiction (as provided in Paragraph 21 below) to the Escrow Agent designating a successor Authorized Representative. The Depositors acknowledge that such security procedure is commercially reasonable.

If at any time prior to the termination of this Agreement any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of

11

42
221

reorganization or liquidation by order of the Canadian Court or U.S. Bankruptcy Court or otherwise, any Depositor or Estate Fiduciary may present to the Escrow Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Escrow Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder. If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If at any time prior to the termination of this Agreement any of the Depositors is liquidated or dissolved whether pursuant to an approved plan of reorganization of liquidation by order of the Canadian Court or U.S. Bankruptcy Court (or, in the case of the EMEA Filed Entities, such order court of competent jurisdiction or by operation of law), or otherwise any Depositor, or Estate Fiduciary (as the case may be) shall present to the Escrow Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Escrow Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposed hereunder. If such dissolution or liquidation provides for a successor to such dissolved or liquidation, then such rights and responsibilities shall pass automatically to such successor entity.

The Depositors represent, warrant and covenant that each document, notice, instruction or request provided by such party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Depositors to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

13.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Facsimile copies may be deemed originals for the purpose of this Agreement.

14.    Paragraph Headings. The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15.    Amendments; No Waivers.

(a)    Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Paragraph 12 or the liquidation or dissolution of a Depositor as set forth in Paragraph 12, any provision of this Agreement may be waived or amended if, and only if, such

12

43
222

amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Escrow Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing all of the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating all Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

(b)    No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

16.    Entire Agreement; No Third Party Beneficiaries.    This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors that are parties thereto) the Asset Sale Agreement, the IFSA, the ALT and the Allocation Protocol to be entered into pursuant thereto (a) constitute the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder; provided, however, that the Joint Administrators shall be entitled to enforce and take the benefit of Paragraph 20 hereof.

17.    Governing Law.    Subject to Paragraph 20, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the choice of law provisions thereof).

18.    Account Opening Information.    To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When an account is opened, Escrow Agent will ask for information that will allow it to identify relevant parties.

19.    Severability.    If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Paragraph 21 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

20.    Exclusion of Liability for the Joint Administrators.

(a)    The parties hereto agree that the Joint Administrators have negotiated this Agreement as agents for the EMEA Filed Entities to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any EMEA Filed Entity to observe, perform or comply with any of its obligations

44
223

under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Paragraph 99(4) of Schedule B1 to the Insolvency Act and/or Rule 2.67 of the Insolvency Rules or otherwise howsoever.

(b)     Notwithstanding anything in Paragraph 21, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Filed Entities) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

21.   JURISDICTION. SUBJECT TO PARAGRAPH 20, EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPERIOR COURT OF JUSTICE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPERIOR COURT OF JUSTICE ON JUNE 29, 2009, AND (II) THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF MANHATTAN (COLLECTIVELY, THE "NEW YORK COURTS"), IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY LEGAL PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS.   IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12.   EACH PARTY HEREBY

ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS PARAGRAPH 21 TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN PARAGRAPH 20 SHALL BE BROUGHT EXCLUSIVELY IN THE ENGLISH COURTS. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OR RELATING TO THIS AGREEMENT.

22. <u>Interpretation</u>. As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23. <u>Compliance with Court Orders</u>. In the event that any of the Escrow Funds shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Paragraph 21 above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24. <u>Force Majeure</u>. In the event that any party or the Escrow Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Escrow Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Escrow Agent is able to perform substantially.

25. <u>Patriot Act Disclosure</u>. Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "<u>USA PATRIOT Act</u>") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, each Depositor acknowledges that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm such Depositor's identity including without limitation name, address and organizational

15

46
225

documents ("identifying information"). Each Depositor agrees to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information with respect to it required as a condition of opening an account with or using any service provided by the Escrow Agent.

26.    Taxpayer Identification Numbers ("TIN"). Each Depositor will provide the Escrow Agent with its fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other required documentation as set forth in Paragraph 4(a). Each Depositor providing such documentation represents that its correct TIN assigned by the IRS, or any other taxing authority, shall be set forth in the delivered forms

27.    Allocation Protocol. The Depositors and the Estate Fiduciaries agree and acknowledge that nothing in this Agreement shall prejudice any pre-existing rights or obligations of any of the Depositors and the Estate Fiduciaries to argue the appropriateness of any allocation of the Escrow Funds before a dispute resolver(s) appointed pursuant to the Allocation Protocol. Without limitation to the foregoing, the Depositors' Interest Allocation Percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Funds and shall not be presented by any of the Depositors and the Estate Fiduciaries in any of their submissions (whether in writing or orally) as to the appropriate allocation of the Escrow Funds before the dispute resolver(s) appointed pursuant to the Allocation Protocol.

28.    Exclusion of Liability for Estate Fiduciaries. The Depositors and the Escrow Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Escrow Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement.

*[Remainder of Page Intentionally Left Blank]*

47
226

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services


By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary


NORTEL NETWORKS INC.

By:_____
Name:  Anna Vestresca
Title:   Chief Legal Officer


NORTEL NETWORKS CORPORATION

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services


By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary


ESCROW AGENT

JPMorgan Chase Bank, N.A., as Escrow Agent


By:_____
Name:
Title:


ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY


By:_____
Name:
Title:


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity,


By:_____
Name:  Timothy Burling
Title:   Vice President, Finance


Escrow Agreement

S-1

48

227

**SIGNED** for and on behalf of **NORTEL NETWORKS UK LIMITED** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

.........................................................................
Alan Bloom

Witness signature

.........................................................................
Name:
Address:

)
)
)
)

**SIGNED** for and on behalf of **NORTEL NETWORKS NV** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

.........................................................................
Alan Bloom

Witness signature

.........................................................................
Name:
Address:

)
)
)

Escrow Agreement

S-2

*49*
*228*

SIGNED for and on behalf of **NORTEL** ) ...................................................................
**NETWORKS SPA** (in administration) by ) Alan Bloom
**ALAN BLOOM** as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of:

Witness signature

........................................................... )
Name: )
Address: )

SIGNED for and on behalf of **NORTEL** ) ...................................................................
**NETWORKS BV** (in administration) by ) Alan Bloom
**ALAN BLOOM** as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of:

Witness signature

........................................................... )
Name: )
Address: )

SIGNED for and on behalf of **NORTEL** ) ...................................................................
**NETWORKS POLSKA SP Z.O.O.** (in ) Alan Bloom
administration) by **ALAN BLOOM** as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of:

Witness signature

........................................................... )
Name: )
Address: )

Escrow Agreement

S-3

229

**SIGNED** for and on behalf of **NORTEL NETWORKS HISPANIA SA** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

............................................................
Alan Bloom

Witness signature

............................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **NORTEL NETWORKS (AUSTRIA) GMBH** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

............................................................
Alan Bloom

Witness signature

............................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **NORTEL NETWORKS S.R.O** (in administration) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

............................................................
Alan Bloom

Witness signature

............................................................
Name:
Address:

)
)
)

Escrow Agreement

S-4