## EXHIBIT A

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**SIXTY-SEVENTH REPORT OF THE MONITOR
DATED JUNE 2, 2011**

**INTRODUCTION**

1.    On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
      collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
      Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
      Networks International Corporation and Nortel Networks Global Corporation
      ("NNGC") (collectively the "Canadian Debtors") filed for and obtained protection
      under the *Companies' Creditors Arrangement Act* ("CCAA").  Pursuant to the Order
      of this Honourable Court dated January 14, 2009, as amended and restated (the
      "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the
      Canadian Debtors (the "Monitor") in the CCAA proceedings.   The stay of
      proceedings was extended to June 30, 2011 by this Honourable Court in its Order
      dated February 25, 2011.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates concurrently filed
      voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in
      the United States Bankruptcy Court for the District of Delaware (the "U.S. Court")
      on January 14, 2009 (the "Chapter 11 Proceedings").  As required by U.S. law, an

- 2 -

official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group").  In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel were appointed on behalf of the former employees of the Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD Beneficiaries.  Each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries and affiliates located in EMEA (collectively the "EMEA Debtors") were granted administration orders (the "U.K. Administration Orders") by the High Court of England and Wales on January 14, 2009 (the "U.K. Proceedings").  The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited ("NNIreland"), to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.  Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.  Both the CCAA proceedings, in respect of the Canadian Debtors, and the English Proceedings, in respect of the EMEA Debtors, have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.  Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdictions in which they are located.

**PURPOSE**

9.  The purpose of this Sixty-Seventh Report of the Monitor ("Sixty-Seventh Report") is to report to this Honourable Court on the proposed Allocation Protocol and to provide the Monitor's recommendation in respect thereof.

**TERMS OF REFERENCE**

10. In preparing this Sixty-Seventh Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.  EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Sixty-Seventh Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in United States dollars.

12. Capitalized terms not defined in this Sixty-Seventh Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous Reports of the Monitor.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.  The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

- 4 -

## BACKGROUND

### *Allocation and the IFSA*

14.     As this Honourable Court well knows, over the course of the past two years, the Canadian Debtors, along with the U.S. Debtors, the EMEA Debtors and certain other Nortel entities, have divested themselves of Nortel's various global operating businesses. The necessity of having various Nortel entities as "sellers" under those transactions resulted from the fact that the businesses divested were not operated through a dedicated legal entity, but rather on a worldwide basis across various Nortel legal entities. Amongst other things, the Canadian Debtors held (or hold) legal title to the intellectual property which underpinned Nortel's global businesses, which intellectual property was and is licensed to its affiliates, in some cases on an exclusive basis and in other cases on a non-exclusive basis.

15.     The first significant divestiture to be discussed among each of the three main estates was the sale of Nortel's Enterprise business. At the time of initially discussing and negotiating that sale in the late spring and early summer of 2009, it became evident to the representatives of the various estates and certain of their stakeholders that it would be difficult to agree on the allocation of sale proceeds amongst the various selling parties prior to entering into a sale transaction. Accordingly, to address this problem, and, in particular, the possibility that disagreements over allocation would hinder the various sales processes under way to the detriment of all Nortel entities and their respective stakeholders, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors agreed that the proceeds of any "global" sale would be deposited into escrow pending agreement as to allocation.

16.     This agreement was documented in the Interim Funding and Settlement Agreement among the Canadian Debtors, certain of the U.S. Debtors and the EMEA Debtors dated June 29, 2009 (the "IFSA"), which agreement also dealt with the funding of various costs incurred by the Canadian Debtors for the benefit of the worldwide Nortel group that is not relevant to the present motion. A copy of the IFSA is attached as Appendix "A" hereto. The IFSA was approved by this Honourable Court

in an Order dated June 29, 2009, a copy of which is attached as Appendix "B" hereto. The IFSA was approved by the U.S. Court on the same date.

17.    In addition to the parties' agreement that the net proceeds of any global sale were to be deposited into an escrow account, that the execution of sale documentation by a party would not be conditioned upon reaching agreement on, or establishing a binding procedure for, the allocation of sale proceeds, and that the U.S. Debtors and the EMEA Debtors would agreed to relinquish their license rights under the Master R&D Agreement in furtherance of a sale[1], the IFSA provides that:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.[2]

18.    With respect to the "Protocol" referenced above, the parties agreed as follows:

> ...the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, ***negotiate in good faith and attempt to reach agreement on a timely basis*** on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.[3] **[emphasis added]**

19.    Over the course of the past two years, the Canadian Debtors, the U.S. Debtors and EMEA Debtors have entered into and consummated seven significant global

---

[1] IFSA, s. 11 and s. 12.

[2] IFSA, s. 12. b.

[3] IFSA, s. 12. c.

- 6 -

transactions[4] with an aggregate value of approximately $3 billion under the framework established by the IFSA, and have entered into a stalking horse agreement to sell Nortel's patent portfolio and related assets to an affiliate of Google Inc. for $900 million. In connection with each of those transactions, and as will be the case with the patent portfolio transaction, the relevant selling parties, the Monitor, the Committee and JPMorgan Chase Bank, N.A., as distribution agent, have entered into a distribution escrow agreement  that governs the escrow and distribution of the relevant sale proceeds. A copy of the distribution escrow agreement related to the CDMA/LTE Access transaction dated November 11, 2009, is attached as Appendix "C" hereto (the "CDMA/LTE Distribution Escrow Agreement").[5] Each of the distribution escrow agreements has been approved by this Honourable Court. A copy of the Order approving the CDMA/LTE Distribution Escrow Agreement is attached as Appendix "D" hereto.

20.    The distribution escrow agreements reflect the terms of the IFSA in that sale proceeds may only be distributed as follows:

> 5.    Distribution of Escrow Funds. The Depositors, the Estate Fiduciaries and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:
>
> (a)    The Escrow Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or

---

[4] These transactions are: the CDMA/LTE Access transaction with Telefonaktiebolaget LM Ericsson (publ) ("Ericsson"), the Enterprise transaction with Avaya Inc., the Next Generation Packet Core transaction with Hitachi Ltd., the MEN transaction with Ciena Corporation, the GSM/GSM-R transaction with Ericsson and Kapsch CarrierCom AG, the CVAS transaction with GENBAND US LLC and the MSS (Passport) transaction with Ericsson. Certain of the Canadian Debtors and the U.S. Debtors, and in one case the EMEA Debtors, have completed a number of smaller transactions, the proceeds of which are subject to similar escrow arrangements.

[5] The distribution escrow agreements for each of the other significant global sale transactions are substantially the same and contain substantially similar provisions relating to the release of escrowed sale proceeds and jurisdiction as those found in the CDMA/LTE Distribution Escrow Agreement.

(ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of sales proceeds (a "Decision") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.[6]

21.     Further, each of the distribution escrow agreements contains a jurisdiction clause substantially similar to the following:

...EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF [...] THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPERIOR COURT OF JUSTICE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPERIOR COURT OF JUSTICE ON JUNE 29, 2009[...], WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER

---

[6] CDMA/LTE Distribution Escrow Agreement, s. 5. Each of the Approval and Vesting Orders granted by this Honorable Court in connection with the global sale transactions contain provisions which are consistent with the terms of the IFSA and the distribution escrow agreements in that it is ordered that the net sale proceeds will be paid into escrow and such sale proceeds shall not be distributed in advance of either agreement of the relevant parties or determination by a dispute resolver under a Protocol. See, for instance, Approval and Vesting Order (Enterprise Solutions Business) dated September 16, 2009, at para. 5, a copy of which is attached as Appendix "E" hereto.

OR OUT OF IN RESPECT OF OR IN CONNECTION
WITH THIS AGREEMENT.[7]

22.    The IFSA contains the following consent to jurisdiction clause:

> To the fullest extent permitted by applicable law, each Party
> (i) agrees to submit to the non-exclusive jurisdiction of the US
> and Canadian Courts (in a joint hearing conducted under the
> Cross-Border Protocol adopted by such Court, as it may be in
> effect from time to time), for purposes of all legal proceedings
> to the extent relating to the matters agreed in this Agreement
> (but not, for the avoidance of doubt, any Transfer Pricing
> Agreement matter generally), (ii) agrees that any claim action
> or proceeding by such Party seeking any relief whatsoever to
> the extent relating to the matters agreed in this Agreement
> must be commenced in the US Court if such claim, action or
> proceeding would solely affect the US Debtors, the Canadian
> Court if such claim, action or proceeding would solely affect
> the Canadian Debtors, a joint hearing of both the Canadian
> and US Courts conducted under the Cross-Border Protocol if
> such claim, action or proceeding would affect the Canadian
> Debtors and the US Debtors or the EMEA Debtors and the
> English courts if such claim, action or proceeding would
> solely affect the EMEA Debtors...[8]

23.    Contemporaneously with the presentation of the IFSA for Court approval, an
amended Cross-Border Protocol was presented for approval by the Canadian Debtors
and the U.S. Debtors (and approved by both Courts) which provided that:

> "...to the extent any motion is filed or relief is sought
> (collectively, "Requested Relief") in either [the U.S. or
> Canadian] Court relating to...any motion to allocate sale
> proceeds which are in the aggregate more than U.S. $30
> million and where at least one U.S. Debtor and one Canadian
> Debtor are parties to the related sale agreement or that
> involves assets owned by at least one U.S. Debtor and one
> Canadian Debtor...", [9]

---

[7] CDMA/LTE Distribution Escrow Agreement, s. 21.

[8] IFSA, s. 16 b.

[9] Cross-Border Protocol, s. 15. See the Supplemental Fifteenth Report of the Monitor dated June 26, 2009, a
copy of which is attached as Appendix "F" hereto.

then certain parties could, among other things, request a joint hearing.

*Protocol Negotiations*

24.     Subsequent to the execution of the IFSA, the Canadian Debtors, the Monitor, the U.S. Debtors, the EMEA Debtors and certain of their respective stakeholders commenced negotiations on a Protocol. These negotiations took place, off and on, over the course of a year, from the summer of 2009 to the early summer of 2010. During those twelve months, the parties, including the Monitor, exchanged multiple drafts, held numerous conference calls and met in person three (3) times in an attempt to resolve Protocol-related issues.

25.     After approximately a year of negotiations on a Protocol, it was evident there were a number of key issues that could not be agreed upon by the parties, the details of which are addressed in the Affidavit of Michael Joseph Lang sworn June 1, 2011 (the "Lang Affidavit"). Among these issues were the significantly differing views of the Canadian Debtors and the EMEA Debtors as to the proper scope of the dispute the parties would submit to one or more dispute resolvers for determination pursuant to a Protocol. As a result of these issues, no Protocol has been agreed to.

26.     The disagreement as regards the scope of a Protocol is based largely on the EMEA Debtors' contention that they should be able to assert claims of alleged wrongful conduct on the part of the Canadian Debtors in the allocation context. The EMEA Debtors have advanced the position that these claims would, among other things, give rise to proprietary claims to, or "beneficial ownership" of, the Canadian Debtors' share of the escrowed proceeds of sale. The claims are prefaced on substantially the same allegations that underlie the majority of the claims made against the Canadian Debtors in the proofs of claim (the "EMEA Claims") that have been delivered on behalf of the EMEA Debtors pursuant to the EMEA Claims Procedure Order made by this Honourable Court dated January 14, 2011.[10]

---

[10] For a description of the EMEA Claims, see the Sixty-Fifth Report of the Monitor dated April 28, 2011, a copy of which is attached as Appendix "G" hereto, in particular paragraphs 38 to 47 thereof.

27.   The Monitor is of the view that agreeing to permit the EMEA Debtors to advance these claims as part of the allocation process would be tantamount to permitting the exclusive jurisdiction of this Honourable Court to resolve claims against the Canadian Debtors to be usurped insofar as such claims, in essence, assert the same causes of action as are contained in the EMEA Claims. Moreover, agreeing to allow the EMEA Debtors to raise claims in the context of the allocation dispute would also unfairly give the EMEA Debtors "two kicks at the can" in that they would have the ability to, in effect, prove their claims twice: first, in the allocation process and then in the EMEA Claims process established by this Court. The views of the Monitor in this regard are consistent with the finding of this Honourable Court that the allocation of sale proceeds is distinct from the resolution of the claims filed by the EMEA Debtors against the Canadian Debtors.[11]

28.   As a result of this fundamental difference of opinion regarding the proper scope of a Protocol and the other issues identified in the Lang Affidavit, it is clear to the Monitor (and has been clear for some time) that the parties are at an impasse and that no agreement will ever be reached on a Protocol despite the good faith efforts of the Canadian Debtors and other parties to do so.

*Mediation and Documentary Discovery*

29.   The parties, nearly a year ago, agreed to focus on a consensual resolution of the global issues among them (i.e. both allocation and claims) and subsequently submitted to extensive non-binding mediation sessions over the course of eight days in November 2010 and April 2011 before retired U.S. Judge Layne Phillips. In connection with those mediation sessions, the parties disclosed an aggregate of approximately 43,000 documents in their possession through an electronic database accessible by each of the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and certain of their stakeholders. In the case of the Canadian Debtors, this process involved the review and posting of approximately 16,000 documents in their

---

[11] Endorsement of the Honourable Mr. Justice Morawetz dated February 17, 2011, at paragraph 19. A copy is attached as Appendix "H" hereto.

possession regarding Nortel's transfer pricing system and other matters relevant to the disputes among the parties. Notwithstanding the significant good faith efforts of all parties, these mediation sessions ended in failure.

30.    As a result of the parties' inability to reach a consensual global resolution and the impasse outlined above as regards a negotiated Protocol, the time has now come to implement a definitive procedure for the resolution of the allocation dispute. As discussed below, the proposed Allocation Protocol (as defined below) contemplates that the resolution of the allocation dispute will be conducted in parallel with, and in a manner complementary to, the resolution of the two other most significant issues in these CCAA proceedings: the EMEA Claims and the claims (the "U.K. Pension Claims") advanced by the Nortel Networks UK Pension Trust Limited (the trustee of the Nortel Networks UK Pension Plan) (the "U.K. Pension Trustee") and the Board of the UK Pension Protection Fund (the "PPF") against the Canadian Debtors.

## THE PROPOSED ALLOCATION PROTOCOL

31.    The Canadian Debtors seek approval of the allocation protocol attached as Schedule "A" to the draft Order included in the Canadian Debtors' Motion Record returnable June 7, 2011 (the "Allocation Protocol"). The U.S. Debtors and the Committee are also seeking approval of the Allocation Protocol by the U.S. Court. These motions will be heard by way of a joint hearing on June 7, 2011.

32.    The fundamental terms of the Allocation Protocol[12] are as follows:

(a)    This Honourable Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the sale proceeds of the global sales amongst the various Nortel parties;

(b)    Creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("Intercompany Claims"), are not governed by the Allocation Protocol. All Intercompany Claims, with the exception of Intercompany Claims between

_____

[12] The following is intended as a summary only. Reference should be made directly to the form of Allocation Protocol proposed for a complete understanding of the terms thereof.

the U.S. Debtors and the Canadian Debtors[13], shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claims is made;

(c)     Each of the relevant Nortel selling entities (including the Canadian Debtors, the U.S. Debtors and the EMEA Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors would be established as "core parties" in the Allocation Protocol hearings, with full rights of participation in such hearings and any related discovery. Any other party in interest could seek to establish itself as a core party;

(d)     Certain intercompany claims have been made by the EMEA Debtors and/or the Joint Administrators against (A) the U.S. Debtors (the "EMEA U.S. Claims") and (B) the Canadian Debtors.  The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA U.S. Claims. The Canadian Debtors may file motions with this Honourable Court to dismiss the EMEA Claims; and

(e)     This Honourable Court and the U.S. Court will (a) hold simultaneously (i) the Allocation Protocol hearings, (ii) hearings before the U.S. Court on the merits of any remaining claims of the EMEA Debtors advanced against the U.S. Debtors (the "EMEA US Claims"), and (iii) hearings before this Honourable Court on the merits of any remaining EMEA Claims against the Canadian Debtors, provided, however, that the U.S. Court and this Honourable Court, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims or EMEA Claims against the Canadian Debtors; and (b) issue their respective decisions on (i), (ii) and (iii).

33.     The Monitor is of the view that the Allocation Protocol is appropriate for the following reasons.

34.     First and foremost, as discussed above, despite the parties' efforts to negotiate in good faith and attempt to reach agreement on a timely basis on a Protocol, there is clearly an impasse regarding the negotiation of a Protocol. In the absence of being able to agree on a Protocol, pursuant to the terms of the IFSA and the various escrow agreements, the sale proceeds may only be released upon the written direction (i.e.

---

[13] No process has been established for Intercompany Claims between the U.S. Debtors and the Canadian Debtors. Such Intercompany Claims and any process for calling for same are also subject to the terms of the Final Canadian Funding and Settlement Agreement dated December 23, 2009, as well as the Cross-Border Protocol and Cross-Border Claims Protocol approved in these CCAA Proceedings.

- 13 -

35.     Second, as has been noted on numerous occasions, significant factual elements (e.g. Nortel's transfer pricing regime) are relevant to both the allocation dispute and the EMEA Debtors' claims against the Canadian Debtors. As such, from an efficiency standpoint, and having particular regard to the significant litigation costs that will be incurred in connection with these processes as well as further delays that would be occasioned by separate proceedings, it makes sense for the same authority to consider both the allocation dispute and the EMEA Claims rather than conducting two wholly distinct processes that, in large part, will cover much of the same factual territory on the same evidence. As noted above, as the EMEA Claims can only be resolved in the context of the claims process established by this Honourable Court, that authority must be this Honourable Court (together with the U.S. Court in the context of the allocation dispute).

36.     Third, in the event that different authorities were to resolve the allocation dispute and the EMEA Claims, there is significant risk of inconsistent decisions. Different authorities for the resolution of allocation and the EMEA Claims also creates the possibility that another authority, in the context of the allocation dispute, would determine the facts that underlie the allegations of wrongful conduct made by the EMEA Debtors against the Canadian Debtors, thereby potentially usurping the jurisdiction of this Honourable Court to hear and determine the EMEA Claims. Finally, in such a scenario, the EMEA Debtors could also seek to take "two kicks at the can", providing them with two opportunities to establish and receive value for the same alleged wrongdoings and thereby subjecting the Canadian Debtors to a

form of double jeopardy. Significant prejudice would flow to the Canadian Debtors and their stakeholders in these circumstances. Having this Honourable Court consider both the allocation dispute (in conjunction with the U.S. Court) and the EMEA Claims minimizes these possibilities and provides for one joint authority to finally resolve all of the outstanding issues among the parties.

37.    For the reasons outlined in paragraphs 35 and 36, the Monitor is of the view that the EMEA Claims should be resolved in conjunction with the resolution of the allocation dispute. Accordingly, as noted in paragraph 32, above, the Allocation Protocol anticipates that the claims of the EMEA Debtors against the Canadian Debtors and the U.S. Debtors will be heard simultaneously with the Allocation Protocol hearings.

38.    Although not expressly contemplated by the Allocation Protocol, the Monitor is also of the view that the claims advanced by the U.K. Pension Trustee and the PPF (whom the Monitor understands to be the majority creditors of NNUK and, potentially, certain of the other EMEA Debtors) against the Canadian Debtors must be resolved in a manner similar to the EMEA Claims. As outlined in the Sixty-Fifth Report, these claims are both significant and, importantly, cover much of the same factual territory as the EMEA Claims.[14] Similar to the situation with the EMEA Claims as outlined above, a failure to resolve these claims in conjunction with the allocation dispute, or a failure to consider them without regard to the allocation dispute and/or the EMEA Claims, would expose the Canadian Debtors to the possibility of the same alleged wrongdoings being asserted, and extracting value from the Canadian Debtors' estates, in three separate ways. In addition, the concerns outlined above with respect to the EMEA Claims regarding efficiency, preservation of scarce resources and risk of inconsistent decisions apply equally to the U.K. Pension Claims.

---

[14] See, in particular, paragraphs 19 to 34 of the Sixty-Fifth Report. The U.K. Pension Claims related to the Funding Guarantee and the Swift Guarantee (each as defined in the Sixty-Fifth Report) total approximately CAD$1.6 billion. The U.K. Pension Claims also seek to hold NNC and NNL jointly and severally liable for the estimated U.K. pension plan deficiency of approximately CAD$3.7 billion.

39.    The Allocation Protocol recognizes the need for this Honourable Court and the U.S. Court to establish procedures for the allocation hearings, including documentary and oral discovery. The Canadian Debtors and the Monitor do not seek to establish these procedures now, but do expect to return before this Honourable Court and the U.S. Court in the near future to make submissions in connection with discovery and process issues for the Allocation Protocol hearings, as well as for the EMEA Claims and the U.K. Pension Claims (as discussed below at paragraph 41).

40.    In light of the considerable discovery already undertaken by the parties in connection with the mediation as outlined above at paragraph 29 and the fact that these are insolvency proceedings, the Allocation Protocol does contemplate that discovery and the allocation hearings will proceed in an expeditious manner. The Monitor is of the view that an expeditious resolution of these matters is essential given that no significant progress towards a plan or distributions to creditors can be made in the absence of their resolution.

41.    In light of the interplay between the proposed Allocation Protocol, the EMEA Claims and the U.K. Pension Claims, and in furtherance of this Honourable Court's direction to the Canadian Debtors and the Monitor, the Monitor has commenced discussions with Canadian counsel to the Joint Administrators and the U.K. Pension Trustee and the PPF regarding, among other things, procedures for resolution of the EMEA Claims and the U.K. Pension Claims, including proposing a timeline for the resolution of same. Attached hereto at Appendix "I" are copies of the relevant correspondence, including a copy of the proposed timetable the Monitor has presented to the parties at interest. The Monitor expects to meet with these parties, along with counsel to the Canadian Debtors and counsel to the Canadian Debtors' directors and officers, in the coming days and is hopeful that the parties will have made considerable progress on agreeing to procedures and a timetable in advance of the June 7 hearing.

- 16 -

## MONITOR'S RECOMMENDATIONS

42.     With the exception of the IP transaction, the auction for which will commence on June 20, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets. The proceeds of these divestitures – some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related assets transaction – now sit in escrow awaiting the resolution of allocation.

43.     This issue, together with the resolution of the EMEA Claims and the U.K. Pension Claims, lays at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and the U.K. Proceedings. Simply put, they are matters that must be resolved before any creditor of an Applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

44.     It is evident that the parties are presently unable to resolve these issues on a consensual basis and it therefore falls within the ambit of this Honourable Court to resolve the issues in the insolvency proceeding before it.

45.     To this end, this Honourable Court has already approved of the Canadian Debtors' request to establish a claims process for EMEA Claims.[15] This process complemented the general claims process established by this Honourable Court in September 2009, and, in conjunction with the Canadian Debtors, the Monitor and certain of their stakeholders continued efforts towards establishing a compensation claims process, have provided the Canadian Debtors and the Monitor with a sense of the totality of claims against the Canadian Debtors and processes for resolving them.

---

[15] The U.S. Debtors have recently commenced a similar process.

46.    The time has come to establish a procedure for the resolution of the other key variable: the portion of the global sale proceeds that will be available to the Canadian Debtors to satisfy the claims of their creditors.

47.    As a result of the EMEA Debtors and their creditors comingling allocation theories with their claims against the Canadian Debtors, it is clear that resolving the allocation of proceeds must be and should be coordinated with the procedure for resolving the EMEA Claims and the U.K. Pension Claims. In particular, such claims must be resolved in conjunction with the allocation dispute so as to protect the integrity of the CCAA claims process form being ousted, and to protect from the abuses of multiple proceedings in multiple fora, including the risk of inconsistent verdicts, doubling (or tripling) up of claims, and the additional cost and delay inherent in multiple proceedings.

48.    For the reasons outlined herein, the Monitor respectfully recommends that this Honourable Court approve the Allocation Protocol.

All of which is respectfully submitted this 2nd day of June, 2011.

**ERNST & YOUNG INC.**
in its capacity as Monitor of the Canadian Debtors
and not in its personal capacity

Per:

Murray A. McDonald

President

\5970962

**APPENDIX "A"**

**[ATTACHED]**



**EXECUTION VERSION**

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the other entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator") and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

This is Exhibit......A.........referred to in the affidavit of...JOHN DOOLITTLE.......... sworn before me, this.....22nd.................. day of...June..........................20.09.

....J.J.Connelly...M.Aitp......
A COMMISSIONER FOR TAKING AFFIDAVITS

51

related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "January Payment"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "Canada/US Interim Period" and the "NNI Interim Obligations") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "Inter-Company Trading Payments") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "GSPAs") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("Trading Orders"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee") have each agreed to support this Agreement.

2



NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

<u>PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS</u>

1. <u>Funding.</u>

   a. NNI shall pay to NNL a sum total of US$157 million (the "<u>Total Payment</u>"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as <u>Annex C</u> hereto, subject to the following limitations:

      i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "<u>Permanent Payment</u>"); and

      ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "<u>Contingent Payment</u>") shall be repaid by NNL to NNI on October 30, 2009.

   b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "<u>Excess Funding Charge</u>"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "<u>EDC Charge</u>"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "<u>Canadian Initial Order</u>").

   c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

   d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

53

2. Use of Funds; Reporting.

    a. NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b. NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3. Maximum Payment; Full and Final Settlement. The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4. Settlement of Motions. It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

5. <u>True-up Obligations</u>. NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>"). Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

## PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6. <u>Administration; Funding</u>.

   a. NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent

5



(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on Annex D hereto. Each of the EMEA Debtors agrees that the payments set out in Annex D shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "Material Asset Sale"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.  The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full. The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group. Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL. For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e. NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge). Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f. The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g. In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances. In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h. The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7



7.  Covenants.

    a.  [left intentionally blank].

    b.  In respect of NNSA, the EMEA Debtors shall use commercially reasonable
efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA
Administrator and the NNSA Liquidator (to the extent legally required)
authorizing the UK Administrator to bind NNSA to all provisions of this
Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and
12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the
NNSA Administrator and the NNSA Liquidator (to the extent legally required)
authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12
as applicable to an EMEA Debtor.  The EMEA Debtors hereby agree to provide
copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors),
NNI (on behalf of the US Debtors), the Creditors' Committee and the
Bondholders' Committee.

8.  Maximum Payment; Full and Final Settlement.  Except with respect to the obligation of
NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute
a full and final settlement of any and all Transfer Pricing Payments owing and that may,
or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on
the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer
Pricing Payments under the Transfer Pricing Agreements for all calculation periods or
parts thereof within the EMEA Interim Period including, without limitation, any
subsequent determination by any revenue authority with respect to the EMEA Interim
Period giving rise to any subsequent liability to taxation of any Party hereto.  Upon
payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically
extinguished.

9.  Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors.  It is
expressly understood that Part B of this Agreement is intended to constitute a full and
final settlement of all of the matters between the US and Canadian Debtors, on the one
hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement
whether arising during, or related to, the EMEA Interim Period.

PART C – PROVISIONS OF GENERAL APPLICATION

10. Scope of this Agreement.  The Parties hereto agree that:

    a.  this Agreement is not, and shall not be deemed to be, an acknowledgement by
any Party of the assumption, ratification, adoption or rejection of the Transfer
Pricing Agreements or any other Transfer Pricing methodology employed by the
Nortel Group or its individual members for any purpose nor shall it be
determinative of, or have any impact whatsoever on, the allocation of proceeds to
any Debtor from any sale of assets of the Nortel Group; and

    b.  this Agreement shall not have any effect on any claims as to amounts owed or
purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii)



after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however*, the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.  this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.  this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

a.  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however*, that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

9

69

b.  For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property. For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c.  The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination." In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

10



    d.  Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. <u>Entry into Sale Transactions.</u>

    a.  Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "<u>Selling Debtor</u>") is proposed to be a party (each, a "<u>Sale Transaction</u>") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("<u>Sale Proceeds</u>") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

    b.  Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "<u>Escrow Account</u>"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

    c.  Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "<u>Interim Sales Protocol</u>"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

    d.  The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

e.  Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f.  Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g.  For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

   i.  the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

   ii.  the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

   a.  No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the

12

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition.  Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective).  Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective.  For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

   i.   use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

   ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

   iii. use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

13

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e.  If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f.  Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. Term.  This Agreement shall expire on December 31, 2009 (the "Expiration Date"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. Amendments.  This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. Governing Law and Jurisdiction.

a.  This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

14

b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. No Personal Liability of the Joint Administrators.

   a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

   b. The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

   c. Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.



18. Creditors' Committee and Bondholders' Committee Support.

    a. Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b. Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

    a. Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i. it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii. the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii. this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b. Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights. Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the

16



Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. Counterparts.  This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. Severability.  In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision.  The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. Several Obligations.  Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. Defunct Distributors' Covenant.  Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

17

.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
Name: Paviter S. Binning
Title:  Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title:   Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
Name: Paviter S. Binning
Title:  Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title:  Assistant Secretary

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
Name: Paviter S. Binning
Title:  Director

By: _____
Tracy S. J. Connelly McGilley
Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

68

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
      Name: Paviter S. Binning
      Title: Director

By _____
      Tracy S. J. Connelly McGilley
      Assistant Secretary


NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
      Name: Paviter S. Binning
      Title: Director

By: _____
      Name: Tracy S. J. Connelly McGilley
      Title: Assistant Secretary

69

NORTEL NETWORKS INC.

By _____
    Name: John Doolittle
    Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President


CORETEK, INC.

By _____
    Name:  John Doolittle
    Title:  Vice President


NORTEL ALTSYSTEMS, INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President


Signature page to Interim Funding
and Settlement Agreement



NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS CAPITAL
CORPORATION

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS HPOCS INC.

By _____
Name: John Doolittle
Title: Vice President


NORTEL NETWORKS INTERNATIONAL
INC.

By _____
Name: John Doolittle
Title: Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
Name: John Doolittle
Title: Vice President


NORTHERN TELECOM
INTERNATIONAL INC.

By _____
Name: John Doolittle
Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

71

QTERA CORPORATION

By _____
Name: John Doolittle
Title: Vice President

SONOMA SYSTEMS

By _____
Name: John Doolittle
Title: Vice President

XROS, INC.

By _____
Name: John Doolittle
Title: Vice President

Signature page to Interim Funding
and Settlement Agreement

72

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

Name: _____
Title: _____

in the presence of: _____

Witness Signature _____

Name:
Address: _____

SIGNED for and on behalf of NORTEL          )
NETWORKS UK LIMITED (IN                      )    ALAN BLOOM
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name: _____
Address: _____

SIGNED for and on behalf of NORTEL          )
NETWORKS (IRELAND) LIMITED                  )    ALAN BLOOM
(IN ADMINISTRATION)                         )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS NV (IN                             )    ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS SPA (IN                            )    ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

74

SIGNED for and on behalf of NORTEL       )
NETWORKS EV (IN                          )    ALAN BLOOM
ADMINISTRATION)                          )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: Helen Macnaughton
Address: 1 more London Place
                       London SE1.

SIGNED for and on behalf of NORTEL       )
NETWORKS POLSKA SP Z.O.O. (IN            )    ALAN BLOOM
ADMINISTRATION)                          )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: Helen Macnaughton
Address: 1 more London Place
                       London SE1

SIGNED for and on behalf of NORTEL       )
NETWORKS HISPANIA SA (IN                 )    ALAN BLOOM
ADMINISTRATION)                          )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: Helen Macnaughton

Address:     _[handwritten]_

SIGNED for and on behalf of NORTEL          )    ALAN BLOOM
NETWORKS (AUSTRIA) GMBH (IN                 )
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature    _[signature]_

Name:     _[handwritten]_
Address:     _[handwritten]_


SIGNED for and on behalf of NORTEL          )    ALAN BLOOM
NETWORKS SRO (IN                            )
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature    _[signature]_

Name:     _[handwritten]_
Address:     _[handwritten]_